UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                  Debtor.

Civil Action No. 08-13555-JMP

Chapter 11

—————————————————————

KA KIN WONG, SIU LUI CHING, CHUN IP, JIN LIU, YIN YING LEUNG, LAI MEI CHAN and SING HEUNG, On Behalf of Themselves and All Others Similarly Situated,

                  Plaintiffs,

    vs.

HSBC USA, INC., HSBC BANK PLC, PACIFIC INTERNATIONAL FINANCE LIMITED, HSBC BANK (CAYMAN) LIMITED (f/k/a HSBC FINANCIAL SERVICES (CAYMAN) LTD.), HSBC HOLDINGS PLC, SCOTT AITKEN, CEREITA LAWRENCE, SARAH COOMBS, JANET CRAWSHAW, SYLVIA LEWIS, THE BANK OF NEW YORK MELLON CORPORATION and LEHMAN BROTHERS SPECIAL FINANCING INC.,

                  Defendants.

Adversary Proceeding No. _____

——————————————————— x

## CLASS ACTION COMPLAINT
### FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

## SUMMARY OF THE RELIEF SOUGHT

1.      Plaintiffs ("Plaintiffs" or "Minibond Investors"), on behalf of themselves and all others similarly situated (the "Class"), bring this action to seek declaratory and equitable relief, and damages, on behalf of all purchasers of "Minibonds" issued by Pacific International Finance Limited ("Pacific Finance" or the "Issuer"), a bankruptcy-remote entity that is wholly owned and controlled ultimately by HSBC Holdings Plc ("HSBC Holdings") (collectively, "Pacific Finance/HSBC"). The Class consists of all persons or entities who acquired outstanding Minibonds between June 16, 2003 and September 15, 2008, and who have been damaged thereby.

2.      This action consists of two parts: (i) declaratory and injunctive relief to confirm Plaintiffs' title and ownership rights in collateral supporting their Minibonds; and (ii) damage claims against HSBC USA Inc., which was the trustee for the Minibond Investors ("HSBC USA" or the "Trustee"), the Issuer and the directors of the Issuer for their breaches of contract and fiduciary duties owed to Plaintiffs, the Minibond Investors.

3.      As described in greater detail, *infra*, custodian banks are holding segregated accounts specifically identified as containing "the assets underlying each Series/Tranche of the [Minibond] Notes" in the form of cash and/or securities with a face value of approximately $1.6 billion ("Minibond Collateral"). The custodian banks have not, to Plaintiffs' knowledge, ever disputed Plaintiffs' entitlement or ownership of the Minibond Collateral. The Minibond Collateral could be distributed to Plaintiffs but for defendant Lehman Brothers Special Financing Inc.'s ("LBSF") improper assertion of an ownership interest in the Minibond Collateral. The Minibond Collateral has never been in LBSF's control or possession and has always remained segregated, not commingled, and in accounts at the custodian banks that have been specifically identified as for the benefit of specific series and tranches of the Minibonds.

- 1 -

4.      Plaintiffs seek declaratory and injunctive relief that the Minibond Collateral is not property of the estate, an order to LBSF to cease asserting any claim to the Minibond Collateral, and an order to the custodian banks to release and convey the Minibond Collateral to Plaintiffs. Plaintiffs also assert damage claims that are described more fully below.

## SUMMARY STATEMENT OF THE CASE

5.      This case involves the sale of approximately $2 billion of complex derivatives misleadingly marketed as "Minibonds," and the failure of the Trustee to fulfill its responsibilities with respect to the Minibonds and protect investors from improper actions by LBSF and Lehman Brothers Holdings, Inc. ("LBHI" or "Lehman"). The Plaintiffs, who purchased these Minibonds, are primarily elderly retirees and retail investors, including United States citizens and residents, as well as tens of thousands of investors in Hong Kong. Although these Minibonds were marketed as low-risk, safe, and secure, in reality they were backed by numerous credit default swaps and synthetic collateralized debt obligations – the kinds of toxic financial instruments that are at the heart of the current financial crisis.

6.      As with most bonds, the investors in Minibonds were protected by the obligations of the Trustee and the Issuer. These obligations were extensive, and were specified in detail in the Minibonds' trust deeds and prospectuses. Because the Minibonds carried additional risks associated with underlying complex derivatives, the Trustee and Issuer undertook particular obligations associated with these derivatives. Most importantly, the Trustee and the Issuer undertook to safeguard the Minibond Collateral backing the derivatives (which in turn supported the payments on the Minibonds) to protect the investors from defaults on the derivatives and to take certain steps in the event of a default.

7.      As described in detail below, the defendants utterly failed to protect the Plaintiffs' interests. The Trustee failed to protect the collateral backing the Minibonds. The Issuer failed to

- 2 -

execute the terms of the deal so that the promised high-quality collateral would be purchased and safeguarded, and also failed to give notice of negative information about the derivatives underlying the Minibonds. For the same reasons, the directors of the Issuer failed to satisfy their fiduciary duties to the Minibond Investors. The custodian and the derivatives counterparty, LBSF, also failed to satisfy their obligations, and incredibly LBSF is now seeking to seize the remainder of Plaintiffs' collateral. The Trustee is failing to take steps to prevent LBSF from taking this improper action. As a result, Plaintiffs' supposedly low-risk, safe and secure investments in the Minibonds have been wiped out.

8.     Plaintiffs bring this class action complaint for declaratory and injunctive relief against HSBC USA, acting in its capacity as trustee, HSBC Bank Plc, acting in its capacity as custodian of credit derivatives underlying the bonds ("HSBC Bank" or "Custodian") (collectively with HSBC Holdings and HSBC Bank (Cayman) Ltd., "HSBC"), The Bank of New York Mellon Corporation ("BNY Mellon"), acting in its capacity as the custodian of the assets that in turn support the credit derivatives held by HSBC Bank, and LBSF, acting in its capacity as the interest rate and/or credit default swap counterparty with entities that issued notes that in turn constitute part of the Minibond Collateral securing Plaintiffs' Minibond notes. Plaintiffs seek injunctive and declaratory relief against defendants and an order that the $1,512,830,157.00 (face value) or more of Minibond Collateral being held by BNY Mellon and HSBC USA for the benefit of Minibond Investors does not constitute property of LBSF or its bankrupt estate, but is the rightful property of Plaintiffs and the Class. Under the explicit terms of the swap agreements with LBSF, a default under the collateral, or the guarantee to pay, constituted an immediate Event of Termination that terminated the swap agreements before LBSF's formal filing for bankruptcy protection. Under the procedures set forth for determining obligations subsequent to the Event of Termination, BNY Mellon is

- 3 -

obligated to liquidate the Minibond Collateral and redeem Plaintiffs' notes (pay them back) first and foremost in priority to any other obligations.

9.      In conjunction herewith, Plaintiffs also seek equitable relief, including an order from the Court that deems the Minibond Collateral to have been held in a constructive trust for Plaintiffs' benefit, in an amount equal to the value of the Minibond Collateral, plus interest and expenses, and requiring the return of the Minibond Collateral to Plaintiffs. Plaintiffs were led to believe that HSBC USA, as Trustee, and Pacific Finance/HSBC would represent the Minibond Investors' interests in "selecting collateral for purchase" that would match or fulfill the payment of obligations due under the terms of the Minibonds and that Pacific Finance/HSBC would negotiate and enter into credit default swaps to the further benefit of Minibond Investors. In truth, HSBC USA and Pacific Finance/HSBC fulfilled none of those roles or obligations and permitted LBSF to control all aspects of the Minibonds in explicit contradiction to contractual and fiduciary duties and obligations owed by HSBC USA and Pacific Finance/HSBC to Plaintiffs. Any property interest that was transferred to LBSF was done so improperly and through the deceit and misleading of Plaintiffs by defendants. Any property interests in the Minibond Collateral acquired by LBSF was done so wrongfully. Plaintiffs' Minibond Collateral is being held by HSBC USA and BNY Mellon in clearly identified, segregated and non-comingled accounts for the benefit of Plaintiffs.

10.     Plaintiffs also hereby bring this action for damages on behalf of themselves and the Class of Minibond Investors against the Trustee, HSBC USA, against Pacific Finance/HSBC and against the individual directors of Pacific Finance (who also happen to be HSBC Holdings employees) (the "Directors") for breaches of contract, breaches of fiduciary duties, negligence and unjust enrichment in completely failing to oversee the execution and management of the Mindbond transactions, and for abdicating their contractual and fiduciary responsibilities and obligations in

overseeing and executing the purchases of collateral supporting the Minibonds and in overseeing and negotiating and executing the interest rate or credit default swaps with LBSF for the benefit of Minibond Investors. Moreover, as LBSF and its related entities have self-destructed in scandal, disgrace and bankruptcy, HSBC USA and Pacific Finance/HSBC have persisted in negligently discharging their duties and in their failure to fulfill their contractual and fiduciary duties to Plaintiffs and the Class. Specifically they have failed to act in the Minibond Investors' best interests to protect, to secure and to distribute the Minibond Collateral to Minibond Investors and to protect their principal and collateral against any further impairment or destruction of its value. As a result of HSBC USA's, the Directors' and Pacific Finance/HSBC's inaction, Plaintiffs have been compelled to bring this action to protect their own property rights and interests.

11.    In fact, *none of the HSBC-related defendants*, including the Directors, who are ultimately HSBC Holdings employees that were supplied and placed as directors of the defendant issuer, Pacific Finance, *fulfilled their contractual or fiduciary duties owed to Minibond Investors.* Senior HSBC Holdings executive and legal officers stated repeatedly in sworn testimony on December 30, 2008 before the Hong Kong Legislative Council that despite the many roles that HSBC entities assumed in the Minibond deals, for which the HSBC defendants collected significant fees and compensation, and despite all of the contractual and fiduciary obligations that each of the HSBC defendants undertook, *the bank was in name only the "director," it was merely playing an administrative role and that "HSBC directors at the head of Pacific Finance only did filing and administrative work. . . . 'The directors are only administrators.'"* In short, HSBC USA and Pacific Finance/HSBC *did nothing* to fulfill their obligations to Minibond Investors, the effect of which was to abdicate all contractual and fiduciary responsibilities, and to permit the Lehman Entities (as defined below), and LBSF specifically, to negotiate and execute the transactions

- 5 -

underlying the Minibonds with knowledge of the other defendants' breaches of contractual and fiduciary obligations owed to Plaintiffs.

12.    The Issuer, Pacific Finance/HSBC, explicitly promised Plaintiffs it would "carefully select . . . AAA rated collateral" to match payment obligations under the notes; that it would negotiate terms and enter into interest rate or currency or credit default swaps with LBSF in order to meet its obligations under the notes; that it would inform the Trustee, HSBC USA, if Pacific Finance/HSBC itself breached any obligations, or if an event of default occurred under the notes; that it would redeem the notes, if necessary; and that it would enforce the Issuer's rights under the collateral. The Trustee, HSBC USA, for its part, contracted with Plaintiffs to be the "representative of the note holders" in the implementation, operation and wind-up of the Minibond transactions. One of the most important commitments HSBC USA made to the Minibond Investors was, "if necessary, to take action against [Pacific Finance/HSBC] to enforce [the Issuer's] undertakings, including enforcing the security that [Pacific Finance/HSBC] created over the assets which back the notes." This was a key obligation – to stand in the investors' shoes with the rights and obligations to oversee the set up of the transactions and, critically, to enforce the investors' and the Plaintiffs' rights when defaults and credit events occurred. Neither HSBC USA or Pacific Finance/HSBC has fulfilled their obligations and duties to Plaintiffs.

13.    LBSF was literally permitted by HSBC USA and Pacific Finance/HBSC *to negotiate with itself* over the collateral to be purchased with Plaintiffs' funds and to establish the terms and conditions of the swap agreements upon which LBSF is basing its claims to *all* of Plaintiffs' remaining Minibond Collateral. The circumstances under which LBSF was able to dictate the terms of the swap agreements were one-sided and for the benefit of LBSF at the expense of Plaintiffs, in direct contradiction to how the transactions were supposed to be negotiated and entered into.

Moreover, LBSF is attempting to take further unfair advantage of Plaintiffs by asserting claims on the remaining Minibond Collateral after LBSF's and its related entities' central role in misleading the Minibond Investors in the first instance and facilitating and assisting HSBC USA's and Pacific Finance/HSBC's breaches of contractual and fiduciary duties.

14.    HSBC Holding Group Chairman Stephen Green, in his March 10, 2009 annual statement to his own shareholders, identified many of the very problems that plagued the Minibond deals complained of herein:

> The causes of the [financial] crisis are complex and interrelated. But we can clearly see that a number of different factors contributed, . . . [including] securitisation based on overly complex product structures. *The complexity and opacity of certain financial instruments reached a point where even senior and experienced bankers and professional investors had trouble understanding them. This meant that people were selling and buying assets whose risk they had not properly assessed.*
>
> \*       \*       \*
>
> [W]e must also recognise that there have been too many [bankers] who have profoundly damaged the industry's reputation.
>
> *Inappropriate products were sold inappropriately by many.* . . . There is genuine and widespread anger that the contributors to the crisis were in some cases amongst the biggest beneficiaries of the system. . . .
>
> Underlying all these events is a question about the culture and ethics of the industry. . . . *The industry needs to recover a sense of what is right and suitable as a key impulse for doing business.*

## JURISDICTION AND VENUE

15.    The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1334. The declaratory and injunctive relief sought herein is a core proceeding within the meaning of 28 U.S.C. §157(b). The damage claims against only the HSBC-related parties are related to these proceedings but are non-core.

16.    Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

17.    The statutory predicates for the relief requested herein are §§105(a), 362, 541 and 560 of Title 11 of the United States Code, as amended ( the "Bankruptcy Code"), Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001, 7065 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

18.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2), in that Plaintiffs and defendants are citizens of different states and foreign states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  Plaintiffs are citizens of the United States, Hong Kong, China, or residents of the State of California.

19.    Venue is proper in this District because the violations of law complained of herein occurred in this District.  The execution of the transactions that constituted the breaches of contract and fiduciary duties also occurred in this district.

## PARTIES

20.    Plaintiff Ka Kin Wong is an individual and legal resident of the State of California. Mr. Wong purchased Minibonds and has been damaged thereby.

21.    Plaintiff Siu Lui Ching is an individual and legal resident of the State of California. Ms. Ching purchased Minibonds and has been damaged thereby.

22.    Plaintiff Chun Ip is an individual who resides in Hong Kong, China.  Ms. Ip purchased Minibonds and has been damaged thereby.

23.    Plaintiff Jin Liu is an individual who resides in Hong Kong, China.  Ms. Liu purchased Minibonds and has been damaged thereby.

24.    Plaintiff Yin Ying Leung is an individual and a U.S. citizen who resides in Hong Kong, China.  Ms. Leung purchased Minibonds and has been damaged thereby.

25.    Plaintiff Lai Mei Chan is an individual who resides in Hong Kong, China.  Ms. Chan purchased Minibonds and has been damaged thereby.

26.     Plaintiff Sing Heung is an individual and a U.S. citizen who resides in Hong Kong, China. Ms. Heung purchased Minibonds and has been damaged thereby.

27.     Defendant HSBC USA is a national commercial bank and one of the largest U.S. bank holding companies. HSBC USA is identified as the Trustee in the offering documents for all the offerings. HSBC USA is a Delaware corporation with its headquarters located at 452 5th Avenue, New York, NY 10018. HSBC USA maintains a foreign branch of HSBC USA in the Cayman Islands at the same address as the Issuer, Pacific Finance/HSBC.

28.     Defendant HSBC Bank is one of the largest banks in the world and operates in over 85 countries and territories. HSBC Bank is the custodian of the Minibonds and holds assets or property intended to be security or collateral for Plaintiffs' Minibonds. HSBC Bank is incorporated in the United Kingdom and its headquarters are located at 8 Canada Square, London, E14 5HQ, England.

29.     Defendant Pacific Finance is the Issuer of the 28 outstanding Minibond series. Pacific Finance is incorporated in the Cayman Islands and has its offices and principal place of business located at the same address as HSBC Financial Services and the Cayman Islands branch of HSBC USA. Pacific Finance is entirely owned and controlled by defendant HSBC Bank (Cayman) Limited (f/k/a HSBC Financial Services (Cayman) Ltd.) ("HSBC Financial Services"), which is in turn a wholly owned subsidiary of HSBC Holdings. All of the Individual Director Defendants of Pacific Finance are employees of HSBC Financial Services and HSBC Holdings.

30.     Defendant HSBC Bank (Cayman) Limited (f/k/a HSBC Financial Services (Cayman) Ltd.) is incorporated in the Cayman Islands and is a wholly owned subsidiary of HSBC Holdings. Defendant HSBC Financial Services controlled the Issuer, Pacific Finance.

- 9 -

31.    Defendant HSBC Holdings is the world's largest banking and financial services corporation. The bank holding company is listed on the New York Stock Exchange (Ticker: HBC) and has hundreds of billions of dollars worth of assets and business in the United States. HSBC Holdings is incorporated in the United Kingdom and does business in over 83 countries around the world. It has substantial operations, assets and dealings within this District such that it is subject to general jurisdiction. HSBC Holdings controls HSBC Finance Services, HSBC Bank and HSBC USA.

32.    Defendant Scott Aitken is an individual, an employee of defendants HSBC Financial Services and HSBC Holdings, and is or was a director of defendant Pacific Finance.

33.    Defendant Cereita Lawrence is an individual, an employee of defendants HSBC Financial Services and HSBC Holdings, and is or was a director of defendant Pacific Finance.

34.    Defendant Sarah Coombs is an individual, an employee of defendants HSBC Financial Services and HSBC Holdings, and is or was a director of defendant Pacific Finance.

35.    Defendant Janet Crawshaw is an individual, an employee of defendants HSBC Financial Services and HSBC Holdings, and is or was a director of defendant Pacific Finance.

36.    Defendant Sylvia Lewis is an individual, an employee of defendants HSBC Financial Services and HSBC Holdings, and is or was a director of defendant Pacific Finance.

37.    Defendant BNY Mellon is a custodian of one of the largest financial institutions in the U.S. and the world. BNY Mellon is in possession of assets and instruments that constitute part of Plaintiffs' Minibond Collateral belonging to Plaintiffs that has a face value of approximately $1.6 billion. BNY Mellon is a Delaware corporation with its headquarters located at One Wall Street, New York, NY, 10286.

38.    Defendant LBSF is a bankrupt Delaware corporation with its former headquarters located at 745 Seventh Avenue, New York, NY 10019 and its current headquarters at 1271 Avenue of the Americas, 43rd Floor, New York, NY 10020.  LBSF is a swap counterparty in certain transactions underlying the Minibond notes.

## CLASS ACTION ALLEGATIONS

39.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired outstanding Minibond series notes between June 16, 2003 and September 15, 2008 (the "Class Period"), and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are numerous members in the proposed Class, possibly as many as 33,000, according to media and government reports.  Purchasers and holders of the Minibonds and other members of the Class may be identified from records maintained by HSBC USA, HSBC Bank and Pacific Finance or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in complex class actions.

41.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of law that is complained of herein.

42.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in complex financial and securities fraud class actions.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether the collateral held by defendants is the rightful property of Plaintiffs; whether the collateral held by defendants may be immediately distributed to Plaintiffs and the Class; whether defendants breached their fiduciary duties; whether defendants breached their contractual obligations; whether defendants were negligent in fulfilling their duties; and to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done them. There will be no difficulty in the management of this action as a class action.

## DETAILED FACTUAL ALLEGATIONS

45.     This action involves contracts for the purchase and sale of approximately 28 virtually identical series of structured finance notes totaling approximately $1.6 billion that were marketed and sold to retail investors, primarily elderly retirees, who are United States citizens and residents, as well as tens of thousands of investors in Hong Kong. Pacific Finance/HSBC was the issuer of a total of approximately $2 billion worth of Minibonds in about 34 series, 28 of which are outstanding and are the subject of this action. Pacific Finance/HSBC contracted with each Class member as the Issuer of the Minibonds. The Minibonds were in fact highly complex and extremely high-risk

derivatives that were marketed as "mini-bonds" in order to convey the perception that the Minibonds

were "credit-linked" to a diversified basket of high quality "blue chip" or even sovereign debt –

instead of being extremely high-risk, multi-layered, structured notes virtually unintelligible to even

sophisticated investors, much less unsophisticated risk-adverse retirees. The retail nature of the

target market for the Minibonds is shown by the sales process, which included offers of electronics

or grocery coupons as incentives. Defendant HSBC Financial Services owns and controls all of the

outstanding shares of Pacific Finance and all of the Directors of Pacific Finance were placed as

Directors of Pacific Finance because they were employees of HSBC Financial Services or other

HSBC entities. HSBC Holdings is the ultimate parent of Pacific Finance and HSBC Financial

Services, and HSBC Holdings is the ultimate employer that directs and oversees the Pacific Finance

Director defendants.

46.    Defendant HSBC USA contracted with each Class member to act as the Trustee and

Registrar for each of the 28 outstanding Minibond series. The arranger of each of the Minibond

series notes was Lehman Brothers Asia Limited ("LBAL"), which is not a party hereto. As

described further below, the credit default swap counterparty that was supposed to provide additional

support to the Minibonds was LBSF, with payment by LBSF guaranteed by LBHI (collectively, the

"Lehman Entities").

47.    Each of the 28 series of Minibonds was sold via advertisements and leaflets that were

created and issued entirely and solely by Pacific Finance/HSBC. Each Minibond series leaflet

contains the following disclaimer:

> This leaflet is issued by Pacific International Finance Limited and is not issued by or
> on behalf of Lehman Brothers Asia Limited or any of their directors or their
> affiliates. Pacific International Finance Limited takes responsibility for the issue and
> contents of this leaflet.

Thus, the marketing materials, as well as the prospectuses and pricing supplements, explicitly imply a separation between and independence of Pacific Finance from the Lehman Entities. The Minibond leaflets aggressively promoted a steady annual coupon "as high as 4.75%" that "lets you invest with peace of mind," with the Minibond notes "[c]redit-linked to a basket of well-known international financial institutions." The Pacific Finance/HSBC leaflets also highlighted "blue chip" corporate bonds and sovereign notes that created a further aura or impression of safety, stability and reliability. Safety, security and steady returns were sold to investors as the key characteristics and benefits of the Minibonds. Depending on the amount of Minibonds purchased, Pacific Finance/HSBC even offered investors "prizes," like free parking at the mall, digital cameras, video cameras and even flat-screen televisions. The security collateral underlying the Minibond notes was repeatedly and broadly promoted as "AAA," *i.e.*, the same safety as high quality corporate bonds, or U.S. Treasury obligations. Pacific Finance/HSBC had to promise safe, steady returns because they marketed their Minibonds primarily to elderly retirees who were looking for alternatives to certificates of deposit.

48.    As presented in each of the contracts for the sale and purchase of Minibonds, there are three primary parties to the Minibond deal structure with specific corresponding duties, who promise to fulfill their contractual and fiduciary duties to Minibond investors: (1) HSBC USA as Trustee; (2) Pacific Finance/HSBC as the Issuer; and (3) LBAL (arranger), LBSF (swap counterparty) and LBHI (swap guarantor).

49.    The Issuer Pacific Finance/HSBC explicitly and unequivocally promised the Minibond Investors that it would represent investors' interests in "carefully selecting collateral" to secure the Minibond notes and meet the Minibonds' interest payment obligations, and would negotiate and execute on investors' behalf interest rate and/or credit default swap agreements with LBSF. Pacific Finance/HSBC also confirmed that its Directors (HSBC employees), "accept full

- 14 -

responsibility for the accuracy of the information in [the] [P]rogramme [P]rospectus." Pacific Finance/HSBC also assured investors and confirmed that the Directors (HSBC employees) "made all reasonable enquiries" into the representations and descriptions of the Minibond deals in the Programme Prospectuses and confirmed that they "contain[] no untrue statement . . . [or] material omission." Pacific Finance/HSBC further promised the Minibond Investors to "give notice of any information relating to us [the Issuer] (or, if we are aware of it, about Lehman Brothers Holdings, Inc.)" "which might reasonably be expected significantly to affect our ability to meet our [the Issuer's] commitments under our Notes [Minibonds] or the ability of Lehman Brothers Holdings Inc. to meet its obligations under the swap guarantee." Thus, in addition to affirmative obligations to oversee and actively structure and execute the transactions to "carefully select collateral" and secure the Minibond Collateral, there was also an affirmative, ongoing monitoring and communication obligation from Pacific Finance/HSBC to Minibond Investors.

50.    Each of the contracts also promised that HSBC USA as Trustee would "*act as a representative of the noteholders*" to ensure each of the other parties (Pacific Finance/HSBC and the Lehman Entities) would fulfill their obligations to the Minibond Investors. In committing to fulfill its role and obligations to Minibond Investors, HSBC USA further and explicitly promised that it "shall not assume any duty or responsibility to any Counterparty, Credit Support Provider or Derivatives Counterparty . . . *and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Counterparty or Derivatives Counterparty.*" In plain language, HSBC USA owes Minibond Investors a duty of loyalty and an obligation not to abandon its oversight of the execution and ongoing management and control of the Minibond transactions to the Lehman Entities serving as counterparties – but to act solely for the interests of the Minibond Investors. *But this is precisely what happened, as HSBC's own executives*

- 15 -

*confirmed in sworn testimony.* HSBC USA and Pacific Finance/HSBC raised approximately $1.6

billion from investors and instead of fulfilling their obligations, they quite literally turned the funds

over to the Lehman Entities so that the Lehman Entities *alone* selected the collateral for the notes,

instead of Pacific Finance/HSBC "carefully selecting" the collateral to match its payment obligations

under the notes, as Pacific Finance/HSBC unequivocally and clearly promised to do in the contracts

with Plaintiffs. Moreover, by turning control over to the Lehman Entities, LBSF was permitted by

Pacific Finance/HSBC and HSBC USA to *negotiate with itself* over the essential terms of the swap

agreements, including the key terms in the event of a cancellation of the swap agreements, as has

now happened and is part of the instant dispute.

51.    The Issuer Pacific Finance/HSBC represented to investors that the Minibonds were

"credit-linked" to financially stable companies, such as HSBC Bank, and backed by stable

"collateral." In the prospectuses and sales materials, the collateral was promised to be "AAA" in

quality, which meant it was supposed to have similar default and recovery characteristics to

securities backed by the full faith and credit of the United States Government, such as treasury bills.

That is, the collateral for the Plaintiffs' notes was, in effect, supposed to be safe and stable.

52.    Those "AAA" assets were not remotely similar to safe and stable government

securities, or any other securities meriting a "AAA" rating, as LBSF knew given the fact that the

Lehman Entities created the assets and stood in a position to profit if those assets failed. As the

"protection buyer," LBSF would get substantial payments upon the failure of certain of the collateral

that was supposed to be AAA in quality. Pacific Finance/HSBC and HSBC USA should have

known these facts. If they did not, it was because, in breach of their contractual and fiduciary

obligations, they did not endeavor to discover the truth. Pacific Finance/HSBC and HSBC USA and

- 16 -

the defendant Directors have essentially admitted to breaching their responsibilities by asserting that HSBC and the Directors *"only did filing and administrative work."*

53.     The Minibonds and their underlying collateral were in fact extremely risky and never should have been marketed to retail investors. Unsophisticated investors were exposed to multiple levels of complex credit derivative transactions often used by major investment banks, insurance companies and hedge funds to hedge credit risk in their loan portfolios. A Lehman investment banker, either in a fit of black comedy or truthful confession, appropriately named one of those derivative transactions "Dante" (the "Dante Transaction"). As the Plaintiffs have quickly discovered, investing their life savings into complex derivative investments, rather than the "safe and steady" bonds they *thought* they were buying, has truly been a descent into financial hell.

54.     In the Dante Transaction, LBSF transferred risks associated with hundreds of credit default swap contracts (in addition to the Dante swap) to the Minibond Investors through notes issued by a financial structure called a synthetic collateralized debt obligation (a "Synthetic CDO").

55.     Typical CDOs are similar to mutual funds that pool series of securities together and issue securities that mimic the combined performance of the constituent securities. The "assets" of a CDO are typically a diverse group of high-quality bonds. The CDO issues notes (its "liabilities") that obligate the CDO to pay the noteholders principal and interest derived from its constituent assets. CDOs differ from mutual funds in that they are "tranched" into a capital structure that mimics the kind of structure seen in many corporations. Broadly, there is a "capital" level that is like equity and not rated by the rating agencies; then there is a "mezzanine" level that is often given an investment grade rating by the rating agencies; and finally there is a senior level, typically rated "AAA" by the rating agencies. As in a corporation's capital structure, there is an inverse relationship between placement in the capital structure and investment risk and yield. The "capital"

- 17 -

level is exposed to losses first and is consequently more expensive to issue; that is, it has the highest interest rate paid to investors.

56.    The lower an investment in a CDO's capital structure, the more critical it is that a detailed investigation be conducted of the "assets" included in the CDO and the structure of the CDO. The probability of successfully investing at a lower point in a CDO's capital structure is only as high as the probability that the *worst performing* assets succeed. A sophisticated investor, such as Pacific Finance/HSBC, can review a basket of assets, evaluate those probabilities, and command an appropriate price for investing. But they did not.

57.    Unlike a typical CDO, a Synthetic CDO does not purchase any bonds. Rather, it enters into numerous credit default swaps that *reference* certain debt issuers or certain obligations, or both. A credit default swap is often (but incompletely) analogized to insurance because of its origins. Historically, large commercial banks used credit default swaps to hedge risks on their balance sheets. For example, when LBSF was concerned that one of its borrowers or bond issuers might fail to make payment, it could ask Pacific Finance/HSBC to assume the risk of default in exchange for a regular payment or "premium." Much like an interest payment, the cost of the premium is derived from the credit risk associated with the underlying bond and the face value of the bond.

58.    As a sophisticated counterparty, Pacific Finance/HSBC is aware of the risks posed by particular borrowers and can negotiate appropriate terms with LBSF in order to obtain high enough premiums to cover the assumed risk. Further, because HSBC Holdings likely has exposure to a broad range of credits on its own balance sheet, it can enter into such contracts in order to better diversify its loan or bond portfolios.

- 18 -

59.    In this example above, LBSF is called the "protection buyer" while Pacific Finance/HSBC is called the "protection seller." LBHI acted as the guarantor of LBSF's obligations under all of the swaps ("Lehman Guarantee").

60.    Upon the occurrence of certain predetermined "credit events," the parties may settle the transaction in one of two predetermined ways. Assuming a credit event occurs triggering Pacific Finance/HSBC's obligation as a protection seller to LBSF, for example, Pacific Finance/HSBC may pay LBSF the difference between the agreed-upon value (often, but not always, face or par value, called the "notional value") of the bonds at issue and the then market value at the time of the credit event (a "cash settlement"); or LBSF may be required to deliver the bonds at issue and Pacific Finance/HSBC pays LBSF the face or par value of the bonds (a "physical settlement"). Where a transaction has a physical settlement feature, Pacific Finance/HSBC would at least have possession of a bond and could recover some if not all of its principal investment should the bond perform to maturity. The reason why is because a bond issuer may experience a negative credit event (such as a ratings downgrade) but it does not necessarily follow that the issuer will fail to honor its principal obligation or even interest payments.

61.    In the credit default swap ("CDS") context, because "credit events" are not always black-and-white determinations, such as a Chapter 11 bankruptcy filing or failure to pay, the CDS "protection seller" (who may wind up buying the asset at issue) must take care to investigate diligently the characteristics of the bonds underlying the CDS, the "credit event" and pricing terms. This investigation is doubly important in the "cash settlement" context because, as noted, the "protection buyer" never delivers a physical asset upon the occurrence of a "credit event." The protection buyer does not even need to own the reference obligation. This is an exponentially higher risk than a typical "bond" or "note" transaction where loans are secured with real assets.

- 19 -

62.    Where the protection buyer does not own the reference obligation, a CDS does not resemble insurance. It resembles a bet.

63.    A "single name" Synthetic CDO combines some CDO and some CDS features. In essence, a bankruptcy-remote vehicle is set up. A pool of CDS collateral is placed in trust for the benefit of the owners of that bankruptcy-remote vehicle, here the Dante Trust. Unlike a "typical" Synthetic CDO, however, not all of the "single name" Synthetic CDO's capital structure is sold. Rather, an investor – in this case Pacific Finance/HSBC as the Issuer – selected a particular slice or tranche of the capital structure that it wanted to buy. Pacific Finance/HSBC selected a very low point in the capital structure, and it ceded the entire collateral selection, pricing and "credit event" definitions and management to LBSF, who stood in an exactly opposite economic position to the Minibond Investors in a zero sum, winner-take-all game.

64.    Given the risky nature of these investments and the unsophisticated buyers, the Issuer and the Trustee each had heightened responsibility to communicate with investors and protect the collateral should defaults occur. Pacific Finance/HSBC and the Lehman Entities and their affiliates or agents did not market these exotic financial instruments to sophisticated investment banks, insurance companies, hedge funds or other commercial banks, but rather to retail savings bank customers using, *literally*, prizes of Sony televisions, digital cameras, camcorders and grocery store coupons as "attractive gifts." At bottom, they encouraged savings bank customers to spend their savings on the gamble that they could out-bet LBSF on the performance of the single name Synthetic CDO tranche that Pacific Finance/HSBC acquired and used to "match issue" the Minibonds via the Issuer. To compound the already huge risk, LBSF added yet another layer of risk underlying the Minibonds.

65.    LBSF and Pacific Finance/HSBC layered on top of the single-name Synthetic CDOs another separate CDS tied to "well known" Blue Chip companies, *e.g.*, through HSBC, American Express, Standard Chartered, JP Morgan Chase and Bank of America, and related additional CDSs. These additional CDSs had the effect of further "leveraging" the Minibonds (pushing them further down the synthetic capital structure to ever-higher levels of risk). For all of this risk, the Minibond Investors received, in most cases, 4.75%, which is no longer being paid, and which was further reduced by the fees heaped on top of the purchase price of the Minibonds.

66.    One of the very few ways the Minibond Investors could "win" a return of their principal – along with the prizes offered at the time of their investments – would be if Lehman, one of the largest investment banks in the world, went bankrupt. In that circumstance, the Minibond Investors could escape the one-sided bets that LBSF rigged in its favor using Minibond Investors' collateral. As a former LBAL analyst stated as part of counsel's investigation, "The Minibond Investors were *lucky* Lehman went bankrupt or they definitely would lose everything." Yet the Minibond Investors still have not been paid, and their investment capital has not been returned.

## THE CORRECT EARLY TERMINATION DATE UNDER THE DANTE TRANSACTION PRECEDED LEHMAN'S FORMAL BANKRUPTCY PETITIONS, AND THE MINIBOND INVESTORS ARE THUS ENTITLED TO ALL MINIBOND COLLATERAL

67.    On September 15, 2008, Lehman and certain of its subsidiaries voluntarily declared bankruptcy in the Southern District of New York. On October 3, 2008, LBSF voluntarily declared bankruptcy in the Southern District of New York.

68.    Preceding September 15, 2008, events analogous to bankruptcy, insolvency, and an inability to pay debts impacted LBSF. These insolvency events individually and combined constituted events of default under the Dante Transaction documents. Among others, the following insolvency events occurred, and are referred to herein as the "Lehman Insolvency Events":

- 21 -

- On June 2, 2008, Standard & Poor's lowered Lehman's long-term credit rating from A+ to A;

- On June 9, 2008, Fitch lowered Lehman long- and short-term credit ratings from A+ to A and from F1+ to F1, respectively;

- On July 17, 2008, Moody's lowered Lehman's long-term credit rating to A2;

- On September 10, 2008, Lehman announced a $3.9 billion loss for the third quarter of 2008;

- Throughout the third financial quarter of 2008, Lehman's debt and equity obligations declined in value on solvency concerns; and,

- On information and belief, additional events occurred in addition to and prior to the events set forth above.

69.    HSBC USA and Pacific Finance/HSBC failed to enforce the Minibond Investors' rights to the Minibond Collateral before and upon the occurrence of the Lehman Insolvency Events. Moreover, Pacific Finance/HSBC and HSBC USA completely failed to inform Minibond Investors of these extremely significant events related to the Lehman Entities' ability to perform their obligations under the terms of the Minibond deals.

70.    Notwithstanding that failure, the Minibond Investors are entitled to 100% of the Minibond Collateral because the Lehman Insolvency Events triggered an obligation on the part of Lehman and LBSF to provide notice and specify promptly each such insolvency event (whether in isolation or combined). This is because the Lehman Guarantee constituted "collateral" under the terms of the Dante Transaction. The Lehman Guarantee was in default as a consequence of the Lehman Insolvency Events. When this "collateral" defaulted, it triggered an immediate Early Termination Date per the terms of the Dante Transaction. The insolvency events happened in advance of Lehman's and LBSF's formal bankruptcy petitions and therefore terminated the swaps. As such, that termination date is the appropriate date on which to measure any diminution in market value of the assets supporting the parties' respective obligations.

71.    Neither Lehman or LBSF ever claimed any diminution in market value. The Minibond Investors are therefore entitled to 100% of the Minibond Collateral, being equal to the market value of the assets supporting the parties' respective obligations as of the date the Lehman Guarantee was in default.

### THE PAYMENT PRIORITY PROVISIONS REQUIRE DEFENDANTS TO DISTRIBUTE ALL MINIBOND COLLATERAL TO THE BONDHOLDERS BEFORE MAKING DISTRIBUTIONS TO LEHMAN OR LBSF

72.    Plaintiffs assert that LBSF and Lehman were the "defaulting parties" before Lehman's and LBSF's bankruptcy filings, but even so, when Lehman and LBSF voluntarily initiated bankruptcy proceedings on September 15, 2008, LBSF was unambiguously the "defaulting party" under the terms of the Dante Transaction documents.

73.    Because LBSF was the defaulting party, the "noteholder priority" of payments applies under the terms of the Dante Transaction documents.

74.    The "noteholder priority" provisions clearly state that customary trustee and custodial fees and expenses are paid first and second, and then BNY Mellon, as trustee, shall apply all monies received in connection with the sale of the Minibond Collateral, first, to satisfy all claims of the Minibond Investors, and second, if any monies are left over (and none will be left over since the Minibond Collateral is close in value to or significantly less than the par value of the notes), to LBSF as the swap counterparty.

75.    The plain language of the applicable documentation clearly demonstrates that even if any "termination payments" were owed by the Minibond Investors to LBSF, BNY Mellon must liquidate the Minibond Collateral and pay 100% of the Minibond Investors' claims under their notes *before* paying LBSF anything.

- 23 -

76.    The payment of the Minibond Collateral is not stayed during bankruptcy proceedings, as derivative transactions such as the Dante Transaction are excepted from the Bankruptcy Code's stay provisions. *See* 11 U.S.C. §553. Because the Minibond Investors are predominantly elderly retirees and individual retail investors who cannot afford to wait any longer for the return of their principal investment, Plaintiffs seek an order from the Court declaring that the Minibond Collateral is not the property of the bankruptcy estate, and that the Minibond Investors are the rightful owners of the Minibond Collateral.

77.    Upon raising the approximately $1.6 billion in investment funds, HSBC USA and Pacific Finance/HSBC abdicated their responsibilities and turned complete control of the Minibond proceeds over to LBSF to select the collateral (which, coincidentally, turned out to be Lehman collateral purchased through or from Lehman), and HSBC USA and Pacific Finance/HSBC failed to conduct any negotiations with Lehman or LBSF serving as counterparties over the terms and conditions of the interest rate and CDS. The swaps were extremely important and a significant part of the overall deal, and the negotiation and execution of the swaps was critical to ***protecting*** Plaintiffs' collateral and providing "steady returns," instead of imperiling the collateral.

78.    LBSF took advantage of Plaintiffs and exploited its position and control to enter into unjust and one-sided swap agreements in an effort to obtain some ownership interest in the Minibond Collateral. LBSF was able to negotiate with itself; thus it is no great surprise that virtually all risk was shifted to Plaintiffs and away from LBSF. HSBC USA and Pacific Finance/HSBC should not be able to shield themselves from liability for their abdication of their contractual and fiduciary duties. Thus, Lehman and LBSF should also not be able to benefit further by any terms of any swap agreements related to the Minibonds, which LBSF negotiated with itself, because of their complicity

- 24 -

in this scheme and their roles in assisting, aiding and facilitating the HSBC defendants' breaching of their contractual and fiduciary obligations owed to Plaintiffs.

79.    While HSBC USA and Pacific Finance/HSBC did little to fulfill their contractual and fiduciary obligations, LBSF and its agents jointly engineered a series of complex transactions that exposed retail bank depositors to sophisticated financial instruments, including compound CDS and Synthetic CDOs. These transactions transferred enormous undisclosed risks to Minibond Investors and resulted in hundreds of millions of dollars in losses to them.

80.    LBSF had knowledge of such risks but did not disclose them since it stood to profit substantially from the issuance of the Minibonds. LBSF was also aware of the contractual and fiduciary obligations owed to Plaintiffs by HSBC USA and Pacific Finance/HSBC, and that by their turning complete control of investors' funds over to LBSF, those defendants were breaching their contractual and fiduciary obligations to Plaintiffs.

81.    In breach of their contractual and fiduciary duties, HSBC USA and Pacific Finance/HSBC, in their own words and by their own admission, undertook no due diligence to ascertain those risks or negotiate even remotely balanced terms on behalf of the Minibond Investors, to whom HSBC USA and Pacific Finance/HSBC owed fiduciary duties as Trustee for the Minibond Investors and as Issuer, respectively.

82.    The transcript below contains detailed admissions of defendant HSBC USA's and Pacific Finance/HSBC's breaches of contract and fiduciary duties, as well as explicit evidence that the Lehman Entities knowingly participated in those breaches in addition to perpetuating a deceptive scheme on Minibond Investors. The transcript below is from an authorized recording of a hearing by the Hong Kong Legislative Counsel's Special Committee investigating the Minibonds debacle. Testifying under oath on behalf of HSBC Holdings are HSBC Holdings Senior Vice President

- 25 -

Leticia Chau ("HSBC SVP Chau") and HSBC Holdings Deputy Legal Head Susan Sayers ("HSBC

DLH Sayers"). Portions of the testimony and transcript of the proceedings follow:

[LegCo Member:[1]]    . . . I would like to ask . . . having read these articles it says
that the issuer, Pacific International Finance Limited, itself,
the shareholders thereof, that is the HSBC Financial Services
Limited, the directorship, the directors, they come from
HSBC Financial Services Limited. That is to say the issuer,
for it to sell this product to the investors, is, in fact, controlled
by the people behind at the HSBC.

\*        \*        \*

[HSBC SVP Chau:]    First of all . . . on behalf of HSBC, *we're not involved in
putting together this program*. . . . And as you, let's, if we
can look first of all at the corporate services role as you say,
*we are, indeed, the shareholder of the issuing company and
we provide directorship services.* This is at the behest of
Lehman Brothers after the program was structured. . . .
[Regarding the investors' collateral,] if HSBC is involved in
litigation in the US, this *would* be at the instigation of
Lehman Brothers and/or then liquidated. It will not be at the
instigation of HSBC.

\*        \*        \*

In the market Special Purpose Vehicles [like Pacific Finance]
are arranged like this. The HSBC provides the Trustee and
the directorship. . . . [W]e are just the administrator. . . . *This
is market practice.*

\*        \*        \*

[HSBC DLH Sayers:]. . . I don't think there is any conflict between the two roles
that HSBC has as Director of the Special Purpose vehicle or
as the Trustee. Simply because the Special Purpose Vehicle
[Pacific Finance] has such a limited role and that is simply to
issue the notes. . . . Certainly the liquidator is involved insofar
as it has now sought to challenge the flow of payments
following the enforcement of the collateral. That is somewhat
separate from the SPV [Pacific Finance]. This is Lehman's in
their role as counter-party to the swaps which comprise of the

---

[1]    Member of Hong Kong Legislative Council ("LegCo Member").

underlying collateral. It is in that capacity that Lehman and their liquidator has sought to challenge the structure of the program, so to speak. It is not in any way connected with the SPV or our role as Director of the SPV [Pacific Finance]. But we are certainly not you, the translation, the working through its instruction, we are not forming any instruction of Lehman or the liquidator. *We have certainly received a letter from their lawyers challenging certain parts of the terms of the Trust Deed which would provide for flow of funds to the investors and it is that challenge that we need to meet.*

\*        \*        \*

[LegCo Member:]      *[You're] ...going to wait until you're being sued and you're not going to do anything. I mean it sounds as if, you know, Lehman Brothers just made a claim which is, as you said, is contrary to the express document and the Minibond document and you're just going to wait. I mean, it's easy for them to make the statement, you're not going to do anything.*

\*        \*        \*

[HSBC DLH Sayers:]  *. . . Uh, at the outset we were approached by Lehman Brothers to take on the role [of Director and Trustee for Pacific Finance] and of course, followed their instructions or acted on their request to take on the role.*

\*        \*        \*

[LegCo Member:]      My simple question is, uh said that you would take instructions from Lehman Brothers at the outset near the time when the products were put together. And then, you know, then after the companies have started to issue notes on the instructions of the arranger then you just continue to do it automatically. And you would not look at the condition of the market, you would not examine the conditions of the collateral.

[HSBC SVP Chau:]    *. . . [T]he key is that we are and were appointed by Lehman Brothers as the Trustee.*

\*        \*        \*

[HSBC DLH Sayers:] I think there are a number of parties who have responsibility for ensuring the contents of the prospectus are true and fair.

\*        \*        \*

*The prospectus for each series was compiled by those who designed the product, by Lehman Brothers.*

[LegCo Member:]    Yes, but in acting as automatically, in acting [as] ... [d]irectors for the issuer, were you at least holding out to the public, including the buyers of the Minibonds that the prospectus are accurate and fair? And could be relied upon?

[HSBC DLH Sayers:]    Uh, you know, *[as] Director of the Issuers, it would indeed be our responsibility to ensure that the uh, or to be satisfied that the contents of the prospectus as put together by Lehman was correct.*

[LegCo Member:]    So, you just gave an inconsistent answer. You said earlier you had no responsibility now you say you are responsible.

[HSBC DLH Sayers:]    No, no, no, I did not say we were not responsible, I said there were a number of parties that would have responsibility for ensuring that the content of the prospectus was correct.

[LegCo Member:]    But you accept that you have the responsibility with regard to the truthfulness of the contents of the prospectus.

[HSBC DLH Sayers:]    *As the Director of the Issuer we have a responsibility to ensure that the content was correct.* Perhaps if I make a point if I could just clarify, the SPV [Pacific Finance], the issuer as has been described earlier is a Special Purpose Vehicle. Uh, it has uh in fact one purpose and that is to issue the notes. *It is to all intents and purposes a creature of Lehman's design and is set-up simply to perform a role, a function within the larger structured product.* It is not an active company as such and HSBC's role as a Director is not an active role it's an administrative corporate services role.

*            *            *

[LegCo – Shek:[2]]    . . . I have two questions. Number one to follow-up on a previous question. Just now I heard HSBC answer Mr. James Tow and Mr. Albert Ho, I think the answers are still not clear. Let me ask a simple question. Let me ask it on behalf of the 40,000 investors. I still don't understand the overall concept and how the Minibonds are sold to investors. The HSBC said that they are neutral, that they are in a neutral position and

---

2        LegCo Member Abraham Shek ("LegCo – Shek").

that they are just the Trustee. And it has a responsibility to watch the investors as well to the issuer so that they are in a neutral position. But when they answered Mr. James Tow they said that they were not involved in the design of the product at all. *But, as the Trustee it should understand that the product was actually portrayed, as gold when it was indeed, mud. So, actually there was a fraud and you are feeding people with poison. From that perspective when they know that, when you take the product, you will be poisoned and they just say that if you should die we'll just watch over you. Now they have this responsibility to watch the Minibond buyers. So, do they have the duty-of-care to watch the investors as a Trustee? Just now when Mr. Albert Ho asked them they said that they are the Director of this Special Purpose Vehicle. If you were not involved in the design, how can you be the Director of this SPV? And how can you discharge your responsibility as a Trustee, this is the first question?*

[LegCo Member:]   Ms. Chau or Ms. Sayers.

[HSBC DLH Sayers:] You finished by asking how could we discharge [our duties] as Trustee. Our duty as Trustee under normal circumstances is to hold any collateral that supports the notes, to act as a conduit for information to the investors and more importantly as a conduit for the, the funds should there be interest that's generated during the life of the, the bonds and the repayment of principal at maturity. Ordinarily that would be the extent of our role. Of course, in this unfortunate circumstance where we have seen the demise of Lehman Brothers our role has come to . . . *our role is to, to take action to enforce the collateral for the benefit of the investors to ensure that they receive whatever value is raised from that collateral.* It is not our responsibility as Trustee to comment or have a view on the product that is being sold. That is, as I said designed by third-party, by Lehmans . . . .

                        *        *        *

[LegCo Member:]   . . . But you have also a fiduciary duty to ensure that what is being sold to the Minibond holders are good products. So you, as a bank, like HSBC, you have a moral obligation to ensure that those people who bought their products are not taking in poison, mud and [thinking] those are gold. So, basically, where is your obligation? You said you're not a designer of that scheme but knowing that, as a bank, an experienced bank, an international bank, you must be aware

- 29 -

that this, this product that has an entrapment of people, turning those mud into gold, you know. And how can you still act as a Trustee saying that you have no responsibility? My, uh answer, is that my question is that simple.

*        *        *

[LegCo Member:]    So, you knew that...okay, okay...it means that you, as a Trustee, you think that is a good product?

[HSBC DLH Sayers:] Sir, that is not our role to determine whether it is a good or other . . . .

[LegCo Member:]    If it is not a good product why should you be a Director to that SPV [Pacific Finance]? As uh, of the whole just asked and not being a design of that product, how can you not be a designer of that product and still can be a Director of that Special Vehicle? And then you still act as a Trustee to ensure that the Minibond holders are being protected? It's your fiduciary duty to who and to whom.

*        *        *

[LegCo Member:]    *. . . [T]he Minibond people trust you. You betray them.*

*        *        *

[LegCo – Ho:[3]]    According to documents, we could see that the CDOs [part of the collateral underlying the Minibonds] were to ensure that the issuer [Pacific Finance] can discharge his responsibility. In other words, if there is a collapse, if the issuer cannot discharge his responsibility, then it is very clear that the Minibonds holders should be the first beneficiaries. Our understanding so far and even for the Administration, that's the same or else it would not have proposed that option. So, I was asking the HSBC, as the Trustee, it has to ensure that the prospectus is fair and true. The same for banks. When the Minibonds were sold, the message of that nature would have been given to the public. That was one of the conditions of the sale. *In other words that the collateral was to protect the buyers of the Minibonds. But now, something has gone berserk and many people have been misled. That is very clear. . . .*

---

[3]    LegCo Member Albert Ho ("LegCo – Ho").

- 30 -

\*      \*      \*

[LegCo Member:]    . . . Now, now something, there's something more to it. Now, if we look at the documents now the HSBC is Trustee, that's on page 4. Now it says that the HSBC Trustee it has to, on behalf of the representatives . . . it has to provide, because they've got possible for the investors. Now if you look at point #4 it says . . . that means to say the HSBC as Trustee has the responsibility to sue the issuer. But the issuer is itself. So, I would like to ask HSBC how come it's possible that on one hand it is the issuer appointed by Lehman Brothers as Directors of the Pacific International Finance Limited and then it's also putting on another hat uh to uh represent the investors and to sue itself? Now uh, so uh and it says that there is no conflict of interest. How can the two caps be put on at that same time? Now, also, about the collaterals, a member said that it is for protecting for safeguard of the investors. Now, when something goes wrong, the collaterals should go to the investors. But now we hear that the uh, the collaterals can be swapped around. . . . *Now, HSBC, as Trustee, do you take orders from Lehman Brothers on swapping around of these collaterals? So, how can you tell us there is no conflict of interest? On one hand you are holding the collaterals at the same time you listen to Lehman Brothers and swap around the collaterals. So, how do you safeguard the investors and say that there's no conflict of interest? Now, this responsibility is not just for you to sit there and take action only when the money comes from the funding. Now you have a continuous responsibility from the design of documents up to now. So, if something goes wrong, the Lehman Brothers' side say that the collaterals belong to them and you would have another hat to safeguard the investors. How can you tell us, how can you satisfactorily discharge the obligations under your two hats?*

[LegCo Member:]    Now how, if they are not the Trustee, how can they safeguard the investors' interest? They have to do it on both sides, they have to safeguard uh, I mean on, in regard in many of the collaterals and then it says that it necessarily has to sue the issuer. The issuer is itself. If it doesn't safeguard the collaterals then what is its purpose as a Trustee?

[LegCo Member:]    You have to protect the collaterals. I mean they belong to the victims. But the according to this, you have to sue yourself, you have to sue the issuer. How can you discharge both

duties at the same time?  Surely there's a clear conflict of interest, isn't there?

[HSBC SVP Chau:]   *No, I have to disagree, I don't think there is any conflict of interest. There will be no suggestion that the issuer has to be sued by us*.

[LegCo Member:]   That's what it says here, according to, unless they are wrong. *That's what it says on page 4, if necessary, take action against the issuer to enforce the issuer's undertaking. Including enforcing the security*.

\*           \*           \*

[LegCo Member:]   I mean if you have on the one-hand as custodian, Trustee the duty to enforce the security and sue the issuer and you are the issuer, according to page 3.  According to this document you are the issuer.  You've been appointed by Lehman Brothers to be Directors of Pacific International Finance.  I mean that's the part that I can't understand.  How can you sue yourself?

[HSBC SVP Chau:]   Uh, perhaps if I may explain.  Uh, we are not the issuer.  We do provide corporate services to the issuer of the upper level. Uh, as part of the enforcement process there will be a request made of the issuer at the upper level for redemption of the notes.  Uh, the issuer will…

[LegCo Member:]   Just now, the reply of, respect of Albert Ho that they are issuer.  Now they were appointed as the issuer.  Now, my question is, how come there is no conflict of interest?  Uh may I ask Ms. Chau to explain.

[HSBC SVP Chau:]   No, we are not the issuer.  We are the corporate service directors.  This is uh as a one single, this company has one single purpose that is to issue the notes.

[LegCo Member:]   That is, you are the puppet, it doesn't have anything to do with you.

\*           \*           \*

[HSBC SVP Chau:]   We are directors but as directors we only do the corporate services, the filing, the returns because the company doesn't actively run this company, it's just a Special Purpose Vehicle to issue the note.  As a Trustee we merely fulfill the obligation of the Trustee.  As my colleague just mentioned there are several duties. *Firstly we are [conveyors of] information between the issuers and note holders.*

- 32 -

*Secondly, we are custodian of the underlying collaterals solely in the event of default, if action is required, they're subject to direction.* On instructions we have to fulfill this obligation and a distribution of assets is uh, uh we will assess according to the Trust Deed. Uh, so if the uh as Trustee, we will uh, certainly do the Administration when the time comes but as corporate service providers we merely implement the Trust Deed.

[LegCo Member:]    It is very hard for us to sort out but I'm shocked as HSBC as a corporate service provider you can tell us that I only sign documents, I know nothing, it's got nothing to do with me. In the market there are many such, yes, I know that but they have signed their names, they have to be responsible. You can't say I've been appointed and I sign my name as Director, it has nothing to do with me. When you have signed your name then you're responsible.

[HSBC SVP Chau:]    Our responsibility is that *when we receive the directions to realize the assets, we will fulfill that obligation as stated in the Trust Deed.*

[LegCo Member:]    You said that to fulfill the obligation, now *who gave you that, the relevant, who is going to give you the relevant instruction*? Now you are the issuer, Directors, at the same time you are going to sue yourself, I don't see how the two can be done at the same time.

[HSBC SVP Chau:]    Now *I think that HSBC, as Trustee will definitely fulfill its obligation* that is where we need, uh *when we know that we need to enforce the collaterals we will definitely do that.*

[LegCo Member:]    How will you know? We are waiting for . . . .

83.    Neither HSBC USA nor Pacific Finance/HSBC satisfied any of their contractual or fiduciary obligations to the Minibond Investors. To the contrary, as quoted above, they claimed to be there "in name only," with duties limited to "filing." HSBC Holdings' authorized representatives repeatedly attempted to shift blame and focus onto Lehman by claiming it was all Lehman's design, Lehman had called all the shots, and Lehman had prepared the prospectuses, Trust Deed and marketing materials – everything was under Lehman's control with regard to HSBC USA's and Pacific Finance/HBSC's obligations and duties and, therefore, HSBC Holdings is not to blame. All

- 33 -

of this testimony and the shifting of responsibility and blame is in direct contradiction of each of the

prospectuses, which state:

> The directors [HSBC Holdings employees] are independent from Lehman Brothers Holdings Inc. and its subsidiaries and affiliates.

*     *     *

> Neither Lehman Brothers Holdings Inc. nor any of its subsidiaries or affiliates has any equity interest in, *or any control over, us* [Pacific Finance/HSBC].

## THE DOCUMENTS GOVERNING THE
## CONTRACT AND FIDUCIARY DUTY OBLIGATIONS
## OF THE HSBC-RELATED DEFENDANTS

84.    There are three documents which operate together to govern all 28 series of

Minibonds: the Principal Trust Deed, the Programme Prospectus and the Issue Prospectus. These

documents set forth the duties and obligations of HSBC USA as Trustee and of Pacific

Finance/HSBC as Issuer. Each of these documents is authored by Pacific Finance/HSBC as the

Issuer of the Minibonds.   Further, the directors of Pacific Finance/HSBC "collectively and

individually accept full responsibility for the accuracy of the information contained in" these same

documents.   As declared in each and every Programme Prospectus, "[t]he directors [of Pacific

Finance/HSBC] are independent from Lehman Brothers Holdings Inc. and its subsidiaries and

affiliates," and further, "[n]either Lehman Brothers Holdings Inc. nor any of its subsidiaries or

affiliates has any equity interest in, or any control over, us [Pacific Finance/HSBC]."

85.    The Principal Trust Deed dated March 30, 2000 (the "Trust Deed") is a contract

between Pacific Finance/HSBC[4] as the Issuer and HSBC USA as the Trustee.  It serves as the base

---

[4]    The Principal Trust Deed identifies Arapahoe International Limited as the Issuer, not Pacific Finance/HSBC.  This is due to a series of name changes by the Issuer during which Arapahoe became what is now known as Pacific Finance/HSBC. "The Issuer was registered and incorporated on 9 March 2000 under the Companies Law (1998 Revision) (now the Companies Law (2003

of the Minibonds, and as such it sets forth most of the specific duties and obligations which HSBC

USA promised to faithfully carry out as Trustee for the Minibond Investors. The Trust Deed is

complemented by a numbered Supplemental Trust Deed for each series of Minibond, or in the words

of Pacific Finance/HSBC, "Each series of our notes will be constituted by a new supplemental trust

deed that supplements and forms part of the principal trust deed."

86.    The Programme Prospectus is intended to provide "an overview of the main features

of [the Minibond] programme." There are approximately five Programme Prospectus documents,

one each dated March 5, 2004; February 1, 2005; March 20, 2006; March 12, 2007; and April 14,

2008.

87.    An Issue Prospectus is published by the Issuer for each Series of Notes issued, "to

explain the terms for each series of our notes." There are 28 outstanding Issue Prospectuses, one for

each series of Minibonds that have not yet matured and are thus at issue here. HSBC USA

authorized the inclusion of its name as Trustee in each Issue Prospectus.

## HSBC USA'S DUTIES AS TRUSTEE

88.    Foremost among the duties and obligations owed to the Minibond Investors is the

overarching, contractual requirement that the Trustee "shall have regard solely to the interests of the

Noteholders" and to act at all stages of the Minibond deals as the "representative of the noteholders."

Additionally, the Trustee is bound to "enforce the obligations of the Issuer," for it acts as the

---

Revision)) of the Cayman Islands, registered number CR–97856, and under the name Arapahoe
International Limited. The Issuer has been incorporated for an indefinite period. The name of the
Issuer was changed to Pacific International Limited [PI Ltd.] by a special resolution of our sole
shareholder of the Issuer on 2 April 2002. The name of the Issuer was further changed from Pacific
International Limited to Pacific International Finance Limited [Pacific Finance Ltd.] by a special
resolution of the sole shareholder of the Issuer on 23 April 2002." The issued shares of Pacific
Finance are in the legal ownership of HSBC Financial Services, which is a wholly-owned subsidiary
of HSBC Holdings.

representative of noteholders – the Minibond Investors. Thus, at their most basic level, the Trustee's obligations are to protect the interests of the Minibond Investors and, if necessary, take action to enforce the terms of the Minibonds, including the terms relating to the collateral that backs the Minibonds.

89.    In order to fulfill those general duties, the Trustee is granted a continuing security over the Mortgaged Property, enforceable to ensure performance of the Issuer's obligations (*e.g.*, to make payments) to the Minibond Investors. The Trustee may appoint a receiver for the Mortgaged Property and may direct the actions of the Issuer in order to protect and perfect this continuing security – indeed, the Issuer specifically covenants with the Trustee that it shall "do such further things as may be necessary or desirable in the opinion of the Trustee to give effect to this Principal Trust Deed and each Supplemental Trust Deed."

90.    Pursuant to the Trust Deed, "Upon the happening of an Event of Default or a Potential Event of Default . . . the Trustee may: . . . require the Custodian to act in accordance with the provisions of the Trust Deed and deliver or transfer the Securities." In other words, should there be a default – or even a potential default – under the Minibonds, the Trustee can compel the Custodian to deliver the collateral so that it can be distributed to the Minibond Investors.

91.    Finally, "If the Trustee fails to show the degree of care and diligence required of it as trustee [including the failure to force the Issuer into action], nothing in this Principal Trust Deed . . . shall relieve or indemnify it from or against any liability that would otherwise attach to it in respect of any negligence, default, breach or duty or breach of trust of which it may be guilty."

## PACIFIC FINANCE/HSBC'S DUTIES AS ISSUER

92.    Key among the duties and obligations owed by the Issuer to the Minibond Investors is the unconditional promise to pay interest at regular periods and to repay principal upon redemption. To accomplish these obligations, Pacific Finance/HSBC promised to "carefully select" the collateral

to purchase with Plaintiffs' investments in order to fulfill the payment obligations. Pacific Finance/HSBC also promised to negotiate and execute interest rate, currency or CDS agreements with LBSF in order to meet the payment obligations under the Minibonds.

93.     Pacific Finance/HSBC also undertook to notify the Trustee immediately on becoming aware of any potential event of default by either itself or LBSF, *without waiting* for the Trustee to take any action.

94.     Additionally, Pacific Finance/HSBC made clear promises to the Minibond Investors regarding the collateral to be purchased, including that it be: rated "AAA" or "Aaa" by Standard & Poor's, Fitch, and Moody's; not subject to any possible downgrades or negative watches; and acceptable as a funding source for Pacific Finance/HSBC's obligations under the swaps. The Issuer also had the power to terminate the swaps where, to give but two examples, a payment was missed or a swap partner suffered insolvency-related events.

95.     As Issuer, Pacific Finance/HSBC also promised to give notice of any information it is aware of "which might reasonably be expected significantly to affect our ability to meet our commitments under our Notes or the ability of Lehman Brothers Holdings Inc. to meet its obligations under the swap guarantee."

96.     While still collecting huge fees and commissions, HSBC USA and Pacific Finance/HSBC failed to fulfill these obligations and abandoned their duties and obligations, leaving Minibond Investors to be further exploited by LBSF and the other Lehman Entities.

## COUNT I

### (Declaratory Judgment – The Collateral Is Not Property of the Bankruptcy Estate: It Is the Property of the Minibond Investors)

97.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length. Plaintiffs seek a

declaratory judgment that the Minibond Collateral is property of the Minibond Investors and not property of the bankruptcy estate.

98.      The Lehman Insolvency Events, preceding September 15, 2008, terminated the swaps, as they constituted a default under the swap agreements. Specifically, Plaintiffs seek a declaratory judgment that the following events individually and combined, constituted events of default under the respective swap agreements:

- On June 2, 2008, Standard & Poor's lowered Lehman's long-term credit rating from A+ to A;

- On June 9, 2008, Fitch lowered Lehman long- and short-term credit ratings from A+ to A and from F1+ to F1, respectively;

- On July 17, 2008, Moody's lowered Lehman's long-term credit rating to A2;

- On September 10, 2008, Lehman announced a $3.9 billion loss for the third quarter of 2008;

- Throughout the third financial quarter of 2008, Lehman's debt and equity obligations declined in value on solvency concerns; and,

- On information and belief, additional events occurred in addition to and prior to the events set forth above.

99.      Under the terms of the Minibonds, termination of the swaps is an Event of Default, and upon an Event of Default, the notes shall be redeemed early. The terms provide that Pacific Finance/HSBC "will have to redeem our Notes early [i]f . . . the swap arrangements for our notes are terminated for any reason."

100.    Under an early redemption, Pacific Finance/HSBC was obligated to make the notes immediately due and payable at the redemption amount, together with accrued interest thereon. In direct contravention of the express terms of the notes, Pacific Finance/HSBC failed to redeem the notes early.

- 38 -

101.    Additionally, as Trustee, HSBC USA had both the obligation and the power to force the Issuer to make an early redemption of the notes, to protect the interests of the Minibond Investors.

102.    In direct contravention of the express terms of the notes, and in violation of its fiduciary duties as Trustee, HSBC USA failed to force an early redemption by the Issuer.

103.    Because of the failures of Pacific Finance/HSBC and HSBC USA to cause an early redemption of the notes, Minibond Investors are now left holding notes for collateral purchased with their investment capital, which was intended to be used to generate the promised interest payments to the Minibond Investors.

104.    The Issuer has ceased making those promised interest payments, and the Trustee has failed to protect the interests of the Minibond Investors, as it has failed to force the Issuer to make those payments.

105.    The collateral, which was purchased with the investment capital of the Minibond Investors, is currently in the possession of HSBC USA, HSBC Bank and BNY Mellon – none of which have any colorable claim of title to the collateral. By contract, they are the custodians of the collateral.

106.    There is an actual controversy between the parties on this issue because HSBC USA, HSBC Bank and BNY Mellon each refuse to acknowledge the Minibond Investors' property interest in the Minibond Collateral and to transfer the assets to Plaintiffs because of the Lehman and LBSF bankruptcy proceedings.

107.    There is nothing in the terms of the Minibonds that would vest either LBSF or Lehman with any property interest in the Minibond Collateral. They served as swap counterparty and swap guarantor, respectively, roles that were eliminated by the Lehman Insolvency Events.

- 39 -

108.    Accordingly, Plaintiffs and the Class are entitled to a declaratory judgment that the Minibond Collateral held by HSBC USA, HSBC Bank and BNY Mellon is not property of the bankruptcy estate; it is property of the Minibond Investors.

## COUNT II

### (Request for Temporary Restraining Order and Preliminary and Permanent Injunction Against Defendants LBSF, HSBC USA, HSBC Bank and BNY Mellon)

109.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

110.    For the reasons set forth herein, Plaintiffs seek immediate and permanent injunctive relief enjoining LBSF and related parties from asserting or seeking any further claim or impairment of the collateral held by HSBC USA, HSBC Bank and BNY Mellon, and enjoining and requiring HSBC USA, HSBC Bank and BNY Mellon to immediately deliver the collateral to the Minibond Investors.

111.    If LBSF or any related parties are allowed to assert or seek any claims or impairments of the Minibond Collateral to Plaintiffs, Plaintiffs will suffer immediate and irreparable injury. Plaintiffs will be prevented from realizing value from the collateral, which was purchased with their investment capital for their benefit.

112.    If HSBC USA, HSBC Bank and BNY Mellon do not immediately deliver the Minibond Collateral to Plaintiffs, Plaintiffs will suffer immediate and irreparable injury. Plaintiffs will be prevented from realizing value from the collateral, which was purchased with their investment capital and for their benefit.

113.    As a result, Plaintiffs and the Class are entitled to an injunction enjoining LBSF and related parties from asserting or seeking any further claim or impairment of the Minibond Collateral

held by HSBC USA, HSBC Bank and BNY Mellon, and enjoining and requiring HSBC USA,

HSBC Bank and BNY Mellon to immediately deliver the collateral to the Minibond Investors.

## COUNT III

### (For Imposition of Resulting or Constructive Trust on the Minibond Collateral)

114.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs with the same force and effect as if hereinafter fully set forth at length. Plaintiffs seek

the imposition of a resulting or constructive trust on the Minibond Collateral for the benefit of

Minibond Investors.

115.    HSBC USA agreed to serve as the Trustee for the Minibond Investors. In making

that agreement, HSBC USA created a fiduciary and/or confidential relationship, by which it owed at

least a duty of loyalty to the Minibond Investors.

116.    In the governing documents, HSBC USA specifically promised the Minibond

Investors that it "shall have regard solely to the interests of the Noteholders," and further that it was

bound to "enforce the obligations of the Issuer." Likewise, in those same governing documents,

Pacific Finance/HSBC promised the Minibond Investors that it would pay interest at regular periods

and would repay principal upon redemption.

117.    In reliance on those promises, *i.e.*, that they would receive interest at regular periods,

would be repaid their principal upon redemption, and would be protected by HSBC USA as Trustee,

the Minibond Investors agreed to purchase the Minibonds. In order to invest in the Minibonds, they

necessarily transferred their investment capital to the Issuer. In turn, the Issuer used that capital to

purchase the collateral underlying the interest payments.

118.    The Minibond Investors' capital, in the form of Minibond Collateral, is currently in

the possession of HSBC USA, HSBC Bank and BNY Mellon, none of which has any colorable

claim of title to the Minibond Collateral. By contract, they are the custodians of the collateral, which

- 41 -

upon redemption is returned to the Minibond Investors. However, and apparently due to concerns

regarding the bankruptcy petitions of LBSF and other Lehman Entities, return of the collateral, *i.e.*,

the investment capital of the Minibond Investors, has not been forthcoming.

119.    As custodians, HSBC USA, HSBC Bank and BNY Mellon agreed to accept the

payment of certain fees in exchange for their service as custodians. Thus, these entities have no right

to retain the beneficial interest of the collateral. Allowing HSBC USA, HSBC Bank and BNY

Mellon to retain the beneficial interest of the collateral would be inequitable, for retaining such

beneficial interest would unjustly enrich them, at the expense of the Minibond Investors.

120.    There is an actual controversy between the parties on this issue because HSBC USA,

HSBC Bank and BNY Mellon refuse to acknowledge the Minibond Investors' right to the Minibond

Collateral.

121.    Accordingly, this Court should deem the Minibond Collateral held by HSBC USA,

HSBC Bank and BNY Mellon to be placed into either a resulting trust or a constructive trust, for the

benefit of the Minibond Investors and the Class.

### COUNT IV

### (Claim for Breaches of Contract Against HSBC USA)

122.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding

paragraphs with the same force and effect as if hereinafter fully set forth at length.

123.    This is a claim for contract breaches against HSBC USA, as Trustee.

124.    Each member of the plaintiff Class contracted with HSBC USA as the Trustee for the

Minibond Investors. The terms of the contract are included in substantially identical written

materials distributed to each Class member. These documents include substantially identical

presentations to prospective investors, and substantially identical prospectus documents, and their

related and referenced materials.

- 42 -

125.    HSBC USA's performance as Trustee for Minibond Investors did not conform to the terms of the contract. Material terms of the contract binding HSBC USA's performance as Trustee for Minibond Investors included, *inter alia*:

(a)    the Trustee "shall have regard solely to the interests of the [Minibond Investors]";

(b)    the Trustee shall enforce the obligations of the Issuer;

(c)    the Trustee is granted a continuing security over the collateral which backs the Minibonds and shall enforce that security to ensure performance of the Issuer; and

(d)    any early termination of the swaps requires early redemption of the Minibonds.

126.    The foregoing terms of the contract evidence the parties' intent that Minibond Investors would purchase Minibonds in exchange for HSBC USA's promises to enforce the terms and obligations of the Issuer, that HSBC USA shall have regard solely to the interests of the Minibond Investors, and that any early termination of the swaps would result in an early redemption of the Minibonds.

127.    HSBC USA materially breached its promises to the Minibond Investors because, *inter alia*:

(a)    the Trustee had no regard to the interests of the Minibond Investors, as evidenced by the Trustee's failure to effect an early redemption of the Minibonds, despite the occurrence of the Lehman Insolvency Events;

(b)    the Trustee failed to enforce the obligations of the Issuer when it neglected to force Pacific Finance to redeem the notes early, as was required by the early termination of the swaps and the occurrence of the Lehman Insolvency Events;

- 43 -

(c)    the Trustee failed to enforce its continuing security over the collateral which backs the Minibonds because it never sought to perfect that security interest by obtaining the collateral; had the Trustee perfected the security interest, it could have forced an early redemption of the Minibonds by selling the collateral and delivering the proceeds to the Minibond Investors; and

(d)    the Trustee failed to effect an early redemption of the Minibonds, despite the occurrence of the Lehman Insolvency Events.

128.    Minibond Investors and Plaintiffs have fully performed under the terms of the contracts by paying in full for the Minibonds they purchased.

129.    Plaintiffs and all Class members have been damaged by HSBC USA's breaches.

## COUNT V

### (Claim for Breaches of Contract Against Pacific Finance/HSBC)

130.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

131.    This is a claim for contract breaches against Pacific Finance/HSBC, as Issuer.

132.    Each member of the plaintiff Class contracted with Pacific Finance/HSBC as Issuer of the Minibonds. The terms of the contract are included in substantially identical written materials distributed to each Class member. These documents include substantially identical presentations to prospective investors, and substantially identical prospectus documents, and their related and referenced materials.

133.    Pacific Finance/HSBC's performance as Issuer of the Minibonds did not conform to the terms of the contract. Material terms of the contract governing Pacific Finance/HSBC's performance as Issuer of the Minibonds included, *inter alia*:

(a)    to "carefully select" AAA rated collateral to purchase with Minibond Investors' funds to meet Pacific Finance/HSBC's payment obligations under the notes;

- 44 -

(b)    to negotiate and execute interest rate, currency or CDS with LBSF to further support Pacific Finance/HSBC's payment obligations under the notes;

(c)    to pay interest at regular, pre-determined periods, and to repay principal upon redemption to the Minibond Investors;

(d)    to remain independent of any Lehman Entities, including subsidiaries or affiliates of LBHI;

(e)    to control what collateral was purchased, and the quality of the collateral purchased, with the funds of the Minibond Investors; and

(f)    to terminate the swaps when a swap partner suffered insolvency-related events, such as a bankruptcy filing.

134.    The foregoing terms of the contract evidence the parties' intent that Minibond Investors would purchase Minibonds in exchange for Pacific Finance/HSBC's promises to pay interest at regular periods, to repay principal upon redemption, to be outside the control of any Lehman Entities, and to terminate the swaps when a swap partner suffered insolvency-related events, such as a bankruptcy filing.

135.    Pacific Finance/HSBC materially breached its promises to the Minibond Investors because, *inter alia*:

(a)    the Issuer did not "carefully select" any collateral but rather turned control over the investment of Plaintiffs' funds to LBSF;

(b)    the Issuer failed to negotiate at all with LBSF over the terms of the swaps but let LBSF unilaterally set terms;

(c)    the Issuer ceased paying interest at regular, pre-determined periods and has thus far refused to repay principal to Minibond Investors;

- 45 -

(d)     rather than operating outside of the control of any of the Lehman Entities, the Issuer allowed Lehman Entities to select the collateral which was purchased with the funds of Minibond Investors;

(e)     rather than controlling what collateral was purchased, and the quality of that collateral, the Issuer allowed the Lehman Entities to select the collateral which was purchased with the funds of Minibond Investors; and

(f)     the Issuer failed to immediately terminate the swaps after the occurrence of the Lehman Insolvency Events.

136.    Minibond Investors and Plaintiffs have fully performed under the terms of the contracts by paying in full for the Minibonds they purchased.

137.    Pursuant to the terms of the Minibonds, Pacific Finance/HSBC had a contractual obligation to give notice of any information it became aware of that might reasonably be expected to significantly affect its ability to meet its commitments under the notes, or the ability of LBHI to meet its obligations under the swap guarantee.   Pacific Finance/HSBC never gave any such notice, including, but not limited to, the increasingly worsening financial condition of LBHI, which ultimately led to its September 15, 2008 bankruptcy filing.

138.    Plaintiffs and all Class members have been damaged by Pacific Finance/HSBC's breaches.

### COUNT VI

### (Claim for Breaches of Fiduciary Duties Against HSBC USA)

139.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

140.    This is a claim for breaches of fiduciary duties owed to the plaintiff Class by HSBC USA, as Trustee.

- 46 -

141.    HSBC USA owed fiduciary duties to the plaintiff Class because, *inter alia*:

(a)    HSBC USA contracted with each Class member to act as the Trustee and Registrar for each of the 28 outstanding Minibond series;

(b)    HSBC USA, its officers, agents and employees, held themselves out as having knowledge, expertise and skill in the area of serving as a Trustee;

(c)    HSBC USA controlled the flow of information concerning the Minibonds to the Minibond Investors; and

(d)    HSBC USA was in a unique position to prevent, or at least minimize, losses to the Minibond Investors as it contractually agreed to serve as their Trustee.

142.    Class members necessarily reposed their confidence in HSBC USA's knowledge, expertise and skill in serving as a Trustee because important information concerning the structure of the notes, the quality of the collateral purchased and the details of the swaps was not provided to Minibond Investors.

143.    HSBC USA breached its duties to the Class by, *inter alia*:

(a)    sitting idly by and taking no action to protect the interests of the Minibond Investors, despite the occurrence of the Lehman Insolvency Events, which required that the swaps be terminated early;

(b)    concealing and not disclosing the breaches of contract alleged herein;

(c)    concealing and not disclosing the known misconduct of other defendants alleged herein; and

(d)    failing to observe care in protecting the assets of the Minibond Investors (*i.e.*, the collateral purchased with the investment funds of the Minibond Investors), by failing to perfect

- 47 -

the security interest it was granted in those assets and by failing to force an early redemption of the Minibonds upon the occurrence of the Lehman Insolvency Events.

144.    HSBC USA knew of the aforementioned breaches at the time the Minibonds were issued and throughout the relevant time period.

145.    Plaintiffs and all Class Members have been damaged as a result of HSBC USA's breaches of its fiduciary duties in an amount to be determined at trial.

## COUNT VII

### (Claim for Breaches of Fiduciary Duties Against Pacific Finance/HSBC and the Directors)

146.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

147.    This is a claim for breaches of fiduciary duties owed to the plaintiff Class by Pacific Finance/HSBC, as Issuer, and the Directors of Pacific Finance/HSBC.

148.    Pacific Finance/HSBC and the Directors owed fiduciary duties to the plaintiff Class because, *inter alia*:

(a)    Pacific Finance/HSBC, its Directors, officers, agents and employees, held themselves out as having knowledge, expertise and skill in the area of creating and issuing investments such as the Minibonds;

(b)    Pacific Finance/HSBC and its Directors controlled the flow of information concerning the Minibonds to the Minibond Investors;

(c)    Pacific Finance/HSBC and its Directors were in a unique position to prevent, or at least minimize, losses to the Minibond Investors as it issued the Minibonds and had the power to call for their early redemption and to declare an early termination of the swaps;

- 48 -

(d)     Pacific Finance/HSBC and its Directors were in possession of highly material
non-public information concerning the performance and quality of assets purchased with the funds of
the Minibond Investors;

(e)     Pacific Finance/HSBC and its Directors were uniquely positioned (i) to
prevent the purchase of high-risk collateral with the funds of the Minibond Investors, and (ii) to
update the Minibond Investors with any information of which they became aware that might
reasonably be expected to significantly affect Pacific Finance/HSBC's ability to meet its
commitments under the Minibonds, or the ability of LBHI to meet its obligations under the swap
guarantee.  By failing to exercise these responsibilities, Pacific Finance/HSBC and its Directors
deprived the Minibond Investors of information needed to properly monitor their investments or take
other action, such as selling their Minibonds.

149.    Class members necessarily reposed their confidence in Pacific Finance/HSBC's and
its Directors' knowledge, expertise and skill in creating and issuing the Minibonds because
important information concerning the structure of the notes, the quality of the collateral purchased
and the details of the swaps was not provided to Minibond Investors.

150.    Pacific Finance/HSBC and its Directors breached their duties to the Class by, *inter
alia*:

(a)     sitting idly by and taking no action to protect the interests of the Minibond
Investors, despite the occurrence of the Lehman Insolvency Events;

(b)     concealing and not disclosing the breaches of contract alleged herein;

(c)     concealing and not disclosing the known misconduct of other defendants
alleged herein;

- 49 -

(d)    failing to observe care in protecting the assets of the Minibond Investors (*i.e.*, the collateral purchased with the investment funds of the Minibond Investors) by allowing the Lehman Entities to select the collateral purchased with the investment funds of the Minibond Investors; and

(e)    engaging in self-dealing by marketing and pricing the Minibonds in a manner that did not fully capture the risks associated with the swaps in order to maximize its profit interest in issuing the Minibonds.

151.    Pacific Finance/HSBC and its Directors knew of the aforementioned breaches at the time it issued the Minibonds and throughout the relevant time period.

152.    Plaintiffs and all Class members have been damaged as a result of Pacific Finance/HSBC's and its Directors' breaches of their fiduciary duties in an amount to be determined at trial.

## COUNT VIII

### (Claim for Negligence Against HSBC USA)

153.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

154.    This is a claim for negligence against HSBC USA, as Trustee.

155.    As alleged herein, HSBC USA owed numerous duties to the Minibond Investors in its role as Trustee.

156.    For example, after the bankruptcy filings of LBSF and its parent, only the Trustee was in a position to act swiftly and effectively to ensure that the rights of the Minibond Investors to recover what they were owed was vindicated.

- 50 -

157.    The bankruptcy filings of LBSF and its parent constituted an event of default under the swaps, requiring an early termination of the swaps, which in turn should have caused an early redemption of the Minibonds.

158.    However, rather than acting with prudence in exercising its obligations to the Minibond Investors, by *inter alia*, forcing an early redemption of the notes, or enforcing its security interest over the collateral by requiring the custodian to transfer or deliver that collateral to the Trustee, HSBC USA did nothing to protect the interests of the Minibond Investors.

159.    Because of HSBC USA's failure to take action to protect the interests of the Minibond Investors, the value of both the notes and the collateral has likely been diminished substantially and even now likely continues to diminish, while the Minibond Collateral remains in the possession of the custodians.  Additionally, Lehman and LBSF are now seeking to have the collateral become part of the bankruptcy estate, to the further damage of the Class.

160.    Plaintiffs and all Class members have suffered damages as a result of HSBC USA's negligence in an amount to be determined at trial.

## COUNT IX

### (Claim for Unjust Enrichment Against HSBC USA)

161.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

162.    This is a claim for unjust enrichment or quasi contract against HSBC USA, as Trustee.

163.    HSBC USA received millions of dollars in compensation for serving as Trustee to the Minibond Investors.

164.    HSBC USA directly contributed to the destruction of approximately $1.6 billion in investment value as a result of its failures as a Trustee.  HSBC USA stood in conflicted positions

- 51 -

relative to the Minibond Investors. HSBC USA failed to exercise reasonable care in acting as Trustee but was paid substantial profits and fees out of the Minibond Investors' investment capital and income on that capital.

165.    HSBC USA received a profit interest in the Minibonds, and other fees, which it was receiving only in exchange for fulfilling its duties as Trustee.

166.    It is against equity and good conscience to permit HSBC USA to retain any profits or remuneration received in connection with the Minibonds.

167.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is among the leading financial centers in the world. HSBC USA's ill-gotten gains should be disgorged in favor of the plaintiff Class in order to protect and promote this policy.

## COUNT X

### (Claim for Unjust Enrichment Against Pacific Finance/HSBC and the Directors)

168.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

169.    This is a claim for unjust enrichment or quasi contract against Pacific Finance/HSBC, as Issuer, and the Directors of the Issuer.

170.    Pacific Finance/HSBC and the Directors received millions of dollars in compensation for serving as the Issuer, directors, administrators and corporate service providers to the Minibond Investors.

171.    Pacific Finance/HSBC and the Directors directly contributed to the destruction of approximately $1.6 billion in investment value as a result of their failures as Issuer and as Directors of the Issuer. Pacific Finance/HSBC and the Directors stood in conflicted positions relative to the

Minibond Investors. Pacific Finance/HSBC and the Directors failed to exercise reasonable care in acting as Issuer and as Directors of the Issuer but were paid substantial profits and fees out of the Minibond Investors' investment capital and income on that capital.

172.    Pacific Finance/HSBC and the Directors received a profit interest in the Minibonds, and other fees, which they were receiving only in exchange for fulfilling their duties as Issuer and as Directors of the Issuer.

173.    It is against equity and good conscience to permit Pacific Finance/HSBC and the Directors to retain any profits or remuneration received in connection with the Minibonds.

174.    New York has a public policy interest in fostering the integrity and transparency of financial markets since it is among the leading financial centers in the world.    Pacific Finance/HSBC's and the Directors' ill-gotten gains should be disgorged in favor of the plaintiff Class in order to protect and promote this policy.

## COUNT XI

### (Claim for Aiding and Abetting Against HSBC USA)

175.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

176.    This is a claim against HSBC USA for aiding and abetting the other defendants' violations of law alleged herein.

177.    This claim is alleged in the alternative to each count against HSBC USA to the extent that such claims do not proceed.

178.    HSBC USA knew of each defendants' violation of laws and substantially assisted in such violations.

179.    Plaintiffs and all Class members have suffered damages as a result of HSBC USA's aiding and abetting in an amount to be determined at trial.

- 53 -

## COUNT XII

### (Claim for Aiding and Abetting Against Pacific Finance/HSBC)

180.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

181.    This is a claim against Pacific Finance/HSBC for aiding and abetting the other defendants' violations of law alleged herein.

182.    This claim is alleged in the alternative to each count against Pacific Finance/HSBC to the extent that such claims do not proceed.

183.    Pacific Finance/HSBC knew of each defendants' violation of laws and substantially assisted in such violations.

184.    Plaintiffs and all Class members have suffered damages as a result of Pacific Finance/HSBC's aiding and abetting in an amount to be determined at trial.

## COUNT XIII

### (Claim for Aiding and Abetting Against the Directors)

185.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

186.    This is a claim against the Directors for aiding and abetting the other defendants' violations of law alleged herein.

187.    This claim is alleged in the alternative to each count against the Directors to the extent that such claims do not proceed.

188.    The Directors knew of each defendants' violation of laws and substantially assisted in such violations.

189.    Plaintiffs and all Class members have suffered damages as a result of the Directors' aiding and abetting in an amount to be determined at trial.

- 54 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Entry of a declaratory judgment that:

(i)    termination of the Credit Default Swap Agreements occurred prior to September 15, 2008;

(ii)    the Minibond Collateral is not the property of the bankruptcy estate but belongs to the Minibond Investors;

(iii)    Neither LBSF or the Lehman Entities is entitled to Termination Payments under the Credit Default Swap Agreement; and

(iv)    the Minibond Collateral held by defendants HSBC USA, HSBC Bank and BNY Mellon is the rightful property of Plaintiffs and the Class.

B.    A temporary restraining order and preliminary and permanent injunctive relief, enjoining LBSF and the Lehman Entities from taking any action in furtherance of the wrongful attempt to impair or prohibit the distribution of the collateral to Plaintiffs and the Class, as well as an order to HSBC USA, HSBC Bank and BNY Mellon to immediately release and transfer the Minibond Collateral to Plaintiffs and the Class;

C.    Awarding compensatory damages in favor of Plaintiffs and the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.    Awarding a rescission or a rescissory measure of damages;

- 55 -

F.       Awarding such additional equitable/injunctive or other relief as deemed appropriate

by the Court, including an order for HSBC to repurchase the Minibonds from investors at face value

plus accumulated or owed interest; and

G.       And for such other relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  March 12, 2009                          COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
                                                SAMUEL H. RUDMAN
                                                DAVID A. ROSENFELD
                                                ROBERT M. ROTHMAN
                                                MARK T. MILLKEY


                                                        SAMUEL H. RUDMAN

                                                58 South Service Road, Suite 200
                                                Melville, NY  1177
                                                Telephone:  631/367-7100
                                                631/367-1173 (fax)

                                                COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
                                                PATRICK J. COUGHLIN
                                                DAVID C. WALTON
                                                PATRICK W. DANIELS
                                                NATHAN W. BEAR
                                                655 West Broadway, Suite 1900
                                                San Diego, CA  92101
                                                Telephone:  619/231-1058
                                                619/231-7423 (fax)

                                                COUGHLIN STOIA GELLER
                                                   RUDMAN & ROBBINS LLP
                                                JASON C. DAVIS
                                                100 Pine Street, Suite 2600
                                                San Francisco, CA 94111
                                                Telephone:  415/288-4545
                                                415/288-4534 (fax)

- 56 -

GENOVESE JOBLOVE & BATTISTA, P.A.
JOHN H. GENOVESE
PAUL J. BATTISTA
DAVID C. CIMO
Bank of America Tower, 44th Floor
100 Southeast Second Street
Miami, FL 33131
Telephone: 305/349-2300
305/349-2310 (fax)

Attorneys for Plaintiffs

I:\Lehman Minibonds\Pleadings\Cpt Lehman Minibonds2.doc