Michael J. Kelly (MK-0915)
Nikhil Singhvi (NS-7607)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

Hearing Date and Time: April 7, 2009 @ 10:00 a.m.
Objection Deadline:  April 1, 2009 @ 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

_____
                                            )
**In re**                                   ) **Chapter 11**
                                            )
**LEHMAN BROTHERS HOLDINGS INC., et al.**   ) Case No. 08-13555 (JMP)
                                            )
         **Debtors.**                       ) **(Jointly Administered)**
_____   )


**MOTION OF WWK HAWAII-WAIKAPUNA, LLC, WWK HAWAII-MOAULA, LLC, WWK HAWAII-HONU'APO, LLC, WWK HAWAII-LITTLE HONU'APO, LLC, WWK HAWAII-HOUSE PARCEL, LLC, WWK HAWAII-HOUSE PARCEL 2, LLC, AND WWK HAWAII-NAALEHU PARCEL 1, LLC FOR ORDER (I) SETTING PROMPT DATE FOR ASSUMPTION OR REJECTION OF PROJECT LOAN; (II) UPON REJECTION, GRANTING RELIEF FROM THE <u>AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF</u>**


TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

**PRELIMINARY STATEMENT**

1.     Debtor Lehman Brothers Holdings Inc. ("Lehman," and together with its affiliated debtors and debtors in possession, the "Debtors") has failed to meet funding requirements as sole lender on a $105 million Project Loan (defined below) to the Hawaii Borrowers (defined below), severely disrupting efforts by the Hawaii Borrowers to develop 5,700 acres of land on the Big Island of Hawaii (the "Project").

2. In discussions with the Hawaii Borrowers, Lehman has stated that it will likely reject the Project Loan. But Lehman has not moved to do so. No purpose is served by Lehman's failure to reject the Project Loan, but Lehman's delay has caused, and continues to cause, significant harm to the Hawaii Borrowers.

3. Lehman's inaction adversely affects not only the Hawaii Borrowers (and their affiliates and equity investors), but also scores of local contractors and employees whose wages cannot be paid without contractually-required funding from Lehman. Those contractors' work is essential to obtaining permits for the acquired land necessary to realize its full value. Lehman's failure to fund the Project's operating costs has thus severely disrupted the Project's ability to obtain necessary permits and has been so devastating that the Hawaii Borrowers' damages may exceed the amount borrowed. Even assuming that Lehman will eventually reject the Project Loan, Lehman's delay in making that determination further harms the project because the Hawaii Borrowers cannot presently consummate any agreement to provide replacement financing.

4. Accordingly, as set forth below, the Hawaii Borrowers respectfully request that the Court compel Lehman to promptly decide whether it will assume or reject the Project Loan. If Lehman elects to reject the Project Loan, the Hawaii Borrowers further request that the Court grant relief from the automatic stay so that the Hawaii Borrowers can liquidate their claim for damages and pursue all of their rights and remedies against Lehman (except for enforcement of a money judgment) in a state court, including obtaining relief which will allow a third party lender to fund replacement financing for the Project. Without such relief, the Project may fail.

5.  Compelling Lehman to promptly decide whether to assume or reject the Project Loan will not prejudice Lehman, which has evidently already reached its decision and has relatively little at stake from its perspective. On the other hand, the Project Loan is the sole source of financing for the Hawaii Borrowers and prompt resolution of the Project Loan debacle is critical to keeping the Project afloat.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over this motion (the "Motion") pursuant to 28 U.S.C. §§ 1334 and 157 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as that term is defined in 28 U.S.C. § 157.

7.  The statutory predicates for the relief sought herein are sections 362, 365(d) and 105(d)(2)(A) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

8.  On September 15, 2008, Lehman filed a voluntary petition for relief in this Court under chapter 11 of the Bankruptcy Code. It is operating as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.  In 2006, WWK Hawaii-Waikapuna, LLC, WWK Hawaii-Moaula, LLC, WWK Hawaii-Honu'apo, LLC, WWK Hawaii-Little Honu'apo, LLC, WWK Hawaii-House Parcel, LLC, WWK Hawaii-House Parcel 2, LLC, and WWK Hawaii-Naalehu Parcel 1, LLC (collectively, the "Hawaii Borrowers") acquired approximately 5,700 acres

of undeveloped land on the Big Island of Hawaii. (Declaration of Alan Worden ("Worden Decl.") at ¶ 4.) The land is separated into three large parcels: Moa'ula (approximately 2,050) acres, Honu'apo (approximately 1,643 acres) and Waikapuna (approximately 2,015 acres). (*Id.*)

10. The purpose of the acquisition was to develop the Project, by converting the land into large agricultural estates for sale as second home residential properties to wealthy buyers. (*Id.* ¶ 5.) The conversion involves the design and installation of basic infrastructure and amenities such as roads, water lines, and electricity. (*Id.*) The conversion also involves obtaining development entitlements, regulatory permits, and development plan approvals and related permits which would allow an average density of one residence per 20 acres. (*Id.*)

11. The land acquisition and conversion for the Project was anticipated to take three to five years. (*Id.* ¶ 6.) To date, the Project has retained 16 contractors and professionals separate from its own workforce, who in turn have employed approximately 70 employees to work on the Project. (*Id.*) When the construction phase of the Project begins, it is anticipated that the Project will retain an additional 13 local contractors employing an additional 98 employees. (*Id.*)

12. All permit applications for the Moa'ula portion of the Project have been in process since September 2008. (*Id.* ¶ 7.) Thus, the Moa'ula portion of the Project already supports 35 families of coffee farmers (148 workers in total) who are highly dependent on the economic success of the Project to provide much needed resources in the form of coffee processing equipment and co-operative marketing and management services. (*Id.*) With Lehman's knowledge and agreement, the Hawaii Borrowers

extended commitments to the coffee farmers to provide various agricultural resources as a means of advancing the Project and, in particular, in order to secure critical entitlements, permits, variances and land plan approvals from the County of Hawaii. (*Id*.)

13. The Project already supports seven cattle ranches and it is estimated that the Project, once complete, will support approximately 60 new coffee farms. (*Id.* ¶ 8.)

14. Lehman is the sole mortgage lender in connection with the Project. (*Id.* ¶ 9.) Certain of the Hawaii Borrowers and Lehman are parties to a loan agreement dated as of August 14, 2006 (the "Loan Agreement" and, collectively with all amendments, agreements, documents, and instruments executed and delivered in connection therewith, the "Project Loan"). (*Id.*) Pursuant to the Project Loan, Lehman financed the land acquisition and committed to fund future development costs associated with the Project consistent with applicable budgets and plans. (*Id.*) A copy of the Loan Agreement is annexed to the Worden Decl. as Exhibit A.

15. Pursuant to the Project Loan, Lehman committed to lend up to $105 million for the Project. (*Id.* ¶ 10.) Of that amount, the Hawaii Borrowers to date have borrowed approximately $43 million. (*Id*.)

16. The Project Loan is the sole source of debt financing for the Project. (*Id.* ¶ 11.) The Project Loan provides 85% of the Project's operating expenses. (*Id*.) In particular, the Project has yearly operating expenses of $1,539,500, for its U.S. mainland and Hawaiian employees' salaries and benefits, office expenses, travel costs, and other operating expenses. $1,308,000 of those yearly operating expenses are to be funded by the Project Loan, on a $109,000 per month basis. (*Id.*)

17.     Notably, the Loan Agreement at Section 11 prohibits the Hawaii Borrowers from incurring additional indebtedness, subject to certain exceptions. (*Id.* ¶ 12.)

18.     Beginning in September 2008 and continuing through the present, Lehman failed to fund requisitions under the Project Loan. (*Id.* ¶¶ 13-17.) In total, between September 2008 and February 2009, Lehman advanced only $1,184,964 of the $2,567,081 requisitioned amounts. (*Id.*) The $1,184,964 actually "funded" during such period merely represented interest due on the Project Loan, rather than cash that could be used for the Project. (*Id.* ¶ 18.) The unfunded requisitions were intended to fund necessary tasks for the Project such as employees' salaries and overhead, contractors' fees for land use permits and applications, site surveys, and design activities. (*Id.*)

19.     The unfunded requisitions are consistent in character and amount with the Project Loan, and the Hawaii Borrowers have not breached the Project Loan in any manner, nor has Lehman contended otherwise. (*Id.* ¶ 19.)

20.     Within the past two weeks, a representative of the Hawaii Borrowers spoke with a representative of Lehman who informed the Hawaii Borrowers of Lehman's intention to reject the Project Loan. (*Id.* ¶ 20.) Subsequently, the Hawaii Borrowers' outside counsel contacted Lehman's bankruptcy counsel who reported that Lehman would likely reject the Project Loan. (*Id.*) A motion to reject, however, has not yet been filed.

## **RELIEF REQUESTED**

21.     The Hawaii Borrowers request that this Court enter an order compelling Lehman to promptly decide whether it will assume or reject the Project Loan. If Lehman

elects to reject the Project Loan, the Hawaii Borrowers further request that this Court enter an order granting the Hawaii Borrowers relief from the automatic stay so that they may seek relief in a state court and liquidate (but not collect) their claim for damages.

**I.    IN LIGHT OF THE SUBSTANTIAL HARM TO THE PROJECT AND THE NON-EXISTENT BURDEN OR PREJUDICE TO LEHMAN, THE COURT SHOULD COMPEL LEHMAN TO PROMPTLY ASSUME OR REJECT THE PROJECT LOAN**

22.    Section 365(d)(2) of the Bankruptcy Code permits the debtor to determine whether to assume or reject its executory contracts at any point prior to confirmation of a plan of reorganization, but it also provides that "the court, on request of any party to [a] contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contact." *See* 11 U.S.C. § 365(d)(2). In addition, section 105(d)(2)(A) of the Bankruptcy Code specifies that courts have authority to enter an order compelling debtors to assume or reject executory contracts by a date certain. *See* 11 U.S.C. § 105(d)(2)(A) (providing that the court may enter an order setting a date by which the trustee must assume or reject an executory contract).

23.    The purpose of section 365(d)(2) is to "'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate.'" *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3d Cir. 1992) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978)); *see also In re Beker Indus. Corp.*, 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986).

24.    Consistent with that purpose, the Court has broad discretion under section 365(d)(2) to order a debtor to assume or reject an executory contract within a specified period of time. *See In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

25. The non-exhaustive list of factors considered by courts in exercising their discretion under section 365(d)(2) include: (a) the nature of the interests at stake, (b) the balance of harm to the litigants, (c) the good to be achieved, (d) the safeguards afforded to the litigants, (e) the debtor's failure or ability to satisfy post-petition obligations, (f) the damage that the non-debtor will suffer beyond the compensation under the Bankruptcy Code, and (g) the importance of the contract to the debtor's business and reorganization. *See In re Adelphia Communications Corp.*, 291 B.R. 283, 293 (Bankr. S.D.N.Y. 2003); *see also South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 761 (2d Cir. 1996); *Teligent Inc.*, 268 B.R. at 738; *In re Lionel Corp.*, 23 B.R. 224, 225-26 (Bankr. S.D.N.Y. 1982).

26. Among the other factors listed above, Lehman's numerous failures to fund requisitions post-petition (*see* Worden Decl. ¶¶ 13-17) are a strong factor favoring imposition of deadline compelling Lehman to elect whether to assume or reject the Project Loan before confirmation of a plan of reorganization or liquidation. *See In re Taber Farm Assocs.*, 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990); *see also In re Rebel Rents*, 291 B.R. 520, 531 (Bankr. C.D. Cal. 2003); *In re Shalom Hospitality Inc.*, 2002 WL 1001000, *3 (Bankr. N.D. Iowa May 9, 2002).

27. The other listed factors also mandate issuance of a prompt date by which Lehman should assume or reject the Project Loan. The record of these cases demonstrates that it will take months, if not years, for the Debtors to assess their assets and liabilities and develop a plan to commence an orderly reorganization or liquidation.[1] But waiting for Lehman to file and seek to confirm a plan of reorganization or liquidation

---

[1] On January 15, 2009, this Court entered an order extending until July 13, 2009 the Debtors' exclusive periods in which to file a chapter 11 plan.

is not a viable option for the Hawaii Borrowers, whose activities on the Project have slowed to a virtual standstill.

28. In particular, Lehman's failure to fund and delay in making a final determination regarding the Project Loan have caused, and are causing, several specific harms to the Project, including, but not limited to the following (*see* Worden Decl. ¶¶ 21-28):

- Without Project Loan funding for the Project's operating expenses, the Project risks losing its own employees, many of whom have been working on the Project since the outset and have invaluable experience.

- Furthermore, as set forth in an October 2008 letter to Lehman's counsel, the Project's local Hawaiian contractors working on predevelopment and design activities have gone unpaid due to a lack of funding. In particular, the Project owes at least $335,000 for past services rendered. This includes, among others, the Project's local attorneys and engineers, whose coordination with local regulators is essential for the permitting processes but may be compromised due to the Project's inability to pay them. Moreover, unpaid contractors may quit the Project and/or file mechanics' liens, damaging all parties' interests.

- In the tight-knit communities in Hawaii where the Project is attempting to develop its 5,700 acres, the failure to pay for past services, the interruption of local vendors' businesses, and the economic hardship placed on these important small businesses, including the coffee farms and cattle ranches, may create significant local-area ill-will which will damage the Project going forward. As local regulators become aware that local contractors are going unpaid, those regulators are likely to be less responsive to the Project's pending permits and applications. As discussed above, the Project is entirely dependent on numerous local permits and applications to realize the full value of the acquired land.

- The prospect of damage arising from the permitting process is particularly acute because of a forthcoming 2010 Community Development Plan ("CDP") in the county of Hawaii (where the Project is located). Before Lehman's failure to fund under the Project Loan, the Project was on track to submit its permit and plan approval applications to the county for the Moa'ula, Honu'apo and Waikapuna parcels by the end of 2008. With Lehman's failure to fund past payables and future work, however, all efforts to submit permit and plan approvals for Honu'apo and Waikapuna applications stopped completely, and the Project's ability to call on vendors to assist in responding to officials' questions regarding the

September 2008 Moa'ula submittal has been severely hampered. It is conceivable that the CDP review could impose severe land use restrictions, density limitations, and/or financial extractions that would render the Project's original development plans unfeasible. The potential new restrictions and extractions resulting from the CDP would likely have been avoided if the Project had submitted permits according to its original timetable.

29. While the harm to the Hawaii Borrowers as described above is imminent and grave, granting the Motion will result in no burden or prejudice to Lehman. Indeed, it appears that Lehman's deliberations have already occurred and that Lehman has decided to reject the loan. The balancing of harm to the litigants thus strongly favors granting the limited relief requested in this Motion, *i.e.*, setting a prompt date by which Lehman must assume or reject the Project Loan. From Lehman's perspective, the Project Loan is one of scores of investments and, especially given its value in the context of all of Lehman's interests, nothing suggests that it is especially important to Lehman's reorganization plans.

30. In short, the Project Loan is nowhere near as important to Lehman as it is to the Hawaii Borrowers. From the Hawaii Borrowers' perspective, the Project Loan is the sole source of financing for the development of 5,700 acres of real estate in Hawaii, and the absence of that funding is devastating to the Project, its employees, and its local contractors and their employees. Especially in light of the foregoing damages to the Project occasioned by Lehman's inaction, there is no credible reason why Lehman cannot promptly and finally decide whether to assume or reject the Project Loan.

31. Assuming Lehman's determination will be to reject the Project Loan,[2] a prompt and official decision in that respect will at least allow the Hawaii Borrowers to

---

[2] In the unlikely event that Lehman chooses to assume the Project Loan, Lehman must be treated as a defaulting party under section 365(b)(1) of the Bankruptcy Code for its failure to fully fund the Project

attempt to find and consummate replacement financing on sustainable terms. Although prospects in that respect are grim, rejection of the Project Loan will, among other things, relieve the Hawaii Borrowers of the prohibition on their assumption of additional indebtedness arising from Section 11 of the Loan Agreement.

## II. IF LEHMAN REJECTS THE PROJECT LOAN, THE COURT SHOULD GRANT THE HAWAII BORROWERS RELIEF FROM THE AUTOMATIC STAY TO PURSUE RELIEF IN STATE COURT

32.    If Lehman chooses to reject the Project Loan, the Court should grant the Hawaii Borrowers relief from the automatic stay to liquidate their claim for damages and pursue all of their rights and remedies against Lehman (except for enforcement of a money judgment), including seeking equitable relief, in a state court. With permission of this Court, the Hawaii Borrowers would among other things petition the state court for equitable relief to modify Lehman's liens associated with the Project, and otherwise reform the Project Loan documents, to partially recompense Lehman's damages to the Project and better enable the Hawaii Borrowers to attract and obtain replacement financing necessary to save the Project.

33.    Section 362(d)(1) of the Bankruptcy Code provides, in relevant part: "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay… such as by terminating, annulling, modifying, or conditioning such stay for cause …" 11 U.S.C. § 362(d)(1). The party seeking relief from the stay is required to make an initial showing of cause, and if cause is shown, the burden is shifted to the debtor to disprove the existence of cause under section 362(g)(2) of the Bankruptcy Code. *In re Deep*, 279 B.R. 653, 657 (Bankr. N.D.N.Y. 2002).

---

Loan requisitions from September 2008 through February 2009; accordingly Lehman must, upon assuming the Project Loan, (a) cure the previous defaults, (b) compensate the Hawaii Borrowers for their pecuniary losses resulting from the defaults, and (c) provide adequate assurance of future performance.

34. This Court has broad discretion to grant relief from the automatic stay. *In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992); *see also In re Newman*, 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996) *In re Pittsford Polo Club, Inc.*, 188 B.R. 339, 344 (Bankr. W.D.N.Y. 1995).

35. In the exercise of their discretion under section 362(d)(1) to permit litigation against debtors in a non-bankruptcy forum, Courts in this Circuit consider the following twelve factors: "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceedings; and (12) impact of the stay on the parties and the balance of harms." *In re Deep*, 279 B.R. at 657 (citing *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)). These factors need not apply to every case, and need not be weighed equally. *In re Anton*, 145 B.R. at 770.

36. The applicable factors weigh in favor of granting the Hawaii Borrowers relief from the automatic stay. Among other things, the Hawaii Borrowers will request

relief aimed at determining whether and to what extent additional funding can be placed at the Project. Such relief in a state court action would not interfere with the bankruptcy case. On the other hand, without a prompt determination of, *inter alia*, whether the Hawaii Borrowers' damages exceed their borrowings, the Project will continue to suffer the harms outlined above and will be gravely jeopardized.

37. It is well-settled that state courts are in a better position to interpret issues of state law than federal courts. *See Corcoran v. Ardra Insurance Co., Ltd.*, 657 F. Supp. 1223, 1235 (S.D.N.Y. 1987); *Allied Mechanical and Plumbing Corp. v. Dynamic Hostels Housing Development Fund, Co.*, 62 B.R. 873, 878 (Bankr. S.D.N.Y. 1986); *see also In re OptInRealBig.com*, LLC, 345 B.R. 277, 286 (Bankr. D. Colo. 2006). For example, Hawaii state courts are better positioned than this Court to apply Hawaiian law to, *inter alia*, the issues surrounding the parties' competing interests in the Project property.

38. Finally, given the complexity of this proceeding, a state court is in a position to act as expeditiously, if not more expeditiously, than this Court. Prompt resolution of the Project financing issue would benefit all interested parties and provide the best hope for maximizing the value of the Project. As noted above, the Project has already suffered considerably in the six months during which Lehman has halted funding, and the damages resulting from Lehman's breach of the Project Loan, which the Hawaii Borrowers believe may exceed Lehman's interest in the liens, are only increasing with the passage of time. In addition, obtaining equitable relief may permit the Hawaii Borrowers to attract replacement funding to rescue the Project and could possibly mitigate the borrowers' damages against Lehman.

## **PROCEDURE**

39. The Hawaii Borrowers have provided notice of this Motion in accordance with the procedures set forth in the Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures, dated February 13, 2009 [Docket No. 2837]. The Hawaii Borrowers respectfully submit that no other or further notice of this Motion need be provided.

40. Because the authority for the relief requested is cited herein, the Hawaii Borrowers respectfully request that the Court waive the requirement of Local Bankruptcy Rule 9013-1(b) that a separate memorandum of law be submitted herewith.

41. No previous motion for the relief sought herein has been made to this or any other court.

## **CONCLUSION**

42.  WHEREFORE, the Hawaii Borrowers request that the Court enter an order (a) compelling Lehman to assume or reject the Project Loan within 15 days from the date of entry of an order granting the Motion; (b) upon rejection, granting the Hawaii Borrowers relief from the automatic stay; and (c) granting such other and further relief as may be just or proper.

Dated: New York, New York
       March 20, 2009

WILLKIE FARR & GALLAGHER LLP

By: /s/ Michael J. Kelly
    Michael J. Kelly (MK-0915)
    Nikhi Singhvi (NS-7607)

    787 Seventh Avenue
    New York, New York 10019
    (212) 728-8000

*Attorneys for WWK Hawaii-Waikapuna, LLC, WWK Hawaii-Moaula, LLC, WWK Hawaii-Honu'apo, LLC, WWK Hawaii-Little Honu'apo, LLC, WWK Hawaii-House Parcel, LLC, WWK Hawaii-House Parcel 2, LLC, and WWK Hawaii-Naalehu Parcel 1, LLC*