## EXHIBIT A

# LOAN AGREEMENT

by and among

## LEHMAN BROTHERS HOLDINGS INC.
### Lender

and

## WWK HAWAII-WAIKAPUNA LLC,
## WWK HAWAII-MOAULA LLC,
## WWK HAWAII-HONU'APO LLC,
## WWK HAWAII-LITTLE HONU'APO LLC,
## AND
## WWK HAWAII-CHURCH LLC
### Borrower

Dated:  as of August 14, 2006

Property Location:

Big Island of Hawaii

Sidley Austin LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Attention: William D. Ellis, Esq.

## TABLE OF CONTENTS

Page

1. Defined Terms ................................................................................................................1
2. Loan Amount; Payment of Debt; Incorporation of Covenants, Conditions and Agreements ................................................................................................................11
3. Warranty of Title; Delivery of Survey ....................................................................17
4. Insurance ....................................................................................................................18
5. Payment of Taxes .......................................................................................................23
6. Tax and Insurance Escrow Fund ...............................................................................23
7. Annual Budgets; Tax and Insurance Escrow; Accounts; Property Cash Flow .......24
8. Condemnation ............................................................................................................25
9. Leases and Rents ........................................................................................................28
10. Representations Concerning Loan .............................................................................30
11. Single Purpose Entity; Authorization .......................................................................35
12. Predevelopment and Management of Mortgaged Property .......................................38
13. Transfer or Encumbrance of the Mortgaged Property ..............................................39
14. Estoppel Certificates; Affidavits ..............................................................................42
15. Changes in the Laws Regarding Taxation .................................................................42
16. No Credits on Account of the Debt ...........................................................................43
17. Documentary Stamps .................................................................................................43
18. Controlling Agreement ..............................................................................................43
19. Books and Records .....................................................................................................44
20. Performance of Other Agreements ............................................................................44
21. Further Assurances; Right to Split and Participate the Loan ....................................44
22. Recording of Mortgage ..............................................................................................45
23. Reporting Requirements .............................................................................................45
24. Events of Default .......................................................................................................46
25. Late Payment Charge; Servicing Fees ......................................................................49
26. Right to Cure Defaults ...............................................................................................50
27. Remedies ....................................................................................................................50
28. Right of Entry ............................................................................................................53
29. Secondary Market Transactions ................................................................................47
30. Actions and Proceedings ...........................................................................................54
31. Waiver of Setoff and Counterclaim ..........................................................................56
32. Contest of Certain Claims ..........................................................................................56
33. Recovery of Sums Required to Be Paid ....................................................................57
34. Marshalling and Other Matters ..................................................................................57
35. Hazardous Substances ................................................................................................57
36. O&M Plan ..................................................................................................................58
37. Environmental Monitoring .........................................................................................58
38. Management of the Mortgaged Property; Additional Covenants ..............................59
39. Persons with Disabilities; Accessibility ....................................................................63
40. ERISA ........................................................................................................................64
41. Indemnification ..........................................................................................................64
42. Notice .........................................................................................................................68
43. Authority ....................................................................................................................69
44. Waiver of Notice ........................................................................................................69
45. Remedies of Borrower ...............................................................................................70

i

46.     Sole Discretion of Lender .................................................................70
47.     Non-Waiver.......................................................................................70
48.     No Oral Change ................................................................................71
49.     Liability.............................................................................................71
50.     Inapplicable Provisions....................................................................71
51.     Section Headings ..............................................................................72
52.     Counterparts......................................................................................72
53.     Certain Definitions............................................................................72
54.     Homestead.........................................................................................72
55.     Assignments......................................................................................72
56.     Submission to Jurisdiction ...............................................................72
57.     Agent for Receipt of Process ...........................................................73
58.     Service of Process ............................................................................73
59.     Waiver of Jury Trial.........................................................................73
60.     Choice of Law...................................................................................73
61.     Limitation on Recourse ....................................................................74
62.     Intentionally omitted........................................................................74
63.     Intentionally omitted.........................................................................74
64.     Inconsistency with Other Loan Documents ....................................74
65.     Partial Release...................................................................................75
66.     Lockbox .............................................................................................77
67.     Interest Rate Protection....................................................................77
68.     Loan Expense and Advances ...........................................................80
69.     Lender's Right of First Offer to make Additional Financing ..........81

LA1 789909

## LOAN AGREEMENT

This LOAN AGREEMENT ("Agreement") dated as of August 14, 2006, by and between WWK Hawaii-Waikapuna, LLC ("Waikapuna Borrower"), WWK Hawaii-Moaula, LLC ("Moaula Borrower"), WWK Hawaii-Honu'apo, LLC ("Honu'apo Borrower"), WWK Hawaii-Little Honu'apo, LLC ("Little Honu'apo Borrower"), and WWK Hawaii-Church, LLC ("Church Borrower"), each a Delaware limited liability company having its principal place of business at Windwalker Real Estate, 12 Oak St., Nantucket, Massachusetts 02554 (Waikapuna Borrower, Moaula Borrower, Honu'apo Borrower, Little Honu'apo Borrower, and Church Borrower each a "Parcel Borrower" and, collectively, jointly and severally, "Borrower") (and, with respect to Section 75 only, the SPE Member Parties (as defined below)), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, having an address at 399 Park Avenue, New York, New York 10022 ("Lender").

WITNESSETH:

WHEREAS, Lender concurrently herewith agrees to make the Loan (as defined below) to Borrower, secured by a mortgage lien on, and security interest in, Borrower's interest in and to the Mortgaged Property (hereinafter defined);

WHEREAS, the Loan is evidenced by a certain Promissory Note dated the date hereof made by Borrower in favor of Lender (the "Note") and secured by, among other things, a certain Mortgage, Assignment of Rents, Security Agreement and Financing Statement dated as of the date hereof and encumbering the Mortgaged Property (the "Mortgage"; the Note, the Mortgage, this Agreement and all other documents executed or delivered in connection with the Loan, collectively, the "Loan Documents"); and

WHEREAS, Lender and Borrower agree to enter into this Agreement to memorialize their understanding regarding their respective rights and obligations in respect of the Loan.

NOW, THEREFORE, in consideration of the making of the Loan and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereby covenant, agree, represent and warrant as follows:

1.     Defined Terms

The following terms shall have the following meanings:

"Access Laws" has the meaning set forth in Section 39 hereof.

"Accounts" has the meaning set forth in Section 7 hereof.

"Additional Advance" means each requested disbursement of funds other than the Initial Advance, Predevelopment Advances, the Kenner Member Predevelopment Advance.

"Additional Funding" has the meaning set forth in Section 70 hereof.

1

"Advance" means the Initial Advance and any Predevelopment Advance made by Lender pursuant to Section 2, and any Additional Advance made by Lender pursuant to Section 2.

"Advance Date" means the date that any Advance (other than the Initial Advance) is funded.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director, officer or manager of such Person or of an Affiliate of such Person.

"Alternative Funding" has the meaning set forth in Section 70 hereof.

"Approval Notice Legend" has the meaning set forth in Subsection 38(i).

"Architect" means any architect selected by Borrower to work in connection with the construction of the Development Improvements or any Predevelopment Work, which architect shall be subject to Lender's reasonable approval.

"Assignment of Agreements" means the Assignment of Contracts, Licenses, Permits, Agreements, Warranties and Approvals dated as of the date hereof.

"Assignment of Leases" means the Assignment of Leases and Rents dated as of the date hereof, executed by Borrower for the benefit of Lender.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended from time to time.

"Bankruptcy Laws" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Budget" means, individually and collectively, the Construction Budget and the Predevelopment Budget.

"Certification Notice" means the notice referenced in Subsection 2.1(e) of the SPE Member Operating Agreement whereby Na'alehu Ventures certifies that it believes that any environmental conditions have been remedied adequately at the Sugar Mill Parcel, together with reasonable supporting third party evidence of such remediation in a form reasonably acceptable to Windwalker Hawaii (all as more particularly described in such Subsection 2.1(e)).

"Church Parcel" means the land owned by Church Borrower and described in Exhibit A as the "Church Parcel."

"Closing Date" means the date of the initial funding of the Loan.

2

"Condemnation" has the meaning set forth in Section 8 hereof.

"Construction Budget" means the budget for the construction of the Development Improvements, as approved by Lender in its reasonable discretion.

"Construction Consultant" means a construction consultant engaged by Lender at Borrower's expense to perform various services on behalf of Lender including: examination of the Plans and Construction Plans and changes thereto, periodic inspections on Lender's behalf and advising and rendering periodic reports to Lender concerning the same. Lender shall use its reasonable efforts, but shall not be required, to engage the same construction consultant as Construction Lender engages.

"Construction Documents" means any and all contracts, plans or documents concerning the construction, design, or engineering of the Development Improvements, including without limitation any architect's contract, construction agreement, or engineer's contract.

"Construction Lender" means a lending institution which provides a Construction Loan.

"Construction Loan" means one or more loans provided by the Construction Lender for the development and construction and improvement of the Development Improvements.

"Construction Loan Documents" means all agreements, documents, and instruments evidencing the Construction Loan and security interests granted the Construction Lender.

"Construction Management Agreement" means the Construction Agreement between Borrower and Construction Manager to be approved by Lender, which approval shall not be unreasonably withheld.

"Construction Manager" means the construction manager, reasonably approved by Lender, that is party to the Construction Management Agreement.

"Construction Plans" means the plans and specifications for the construction of the Development Improvements, prepared by the Borrower's architect and approved (to the extent approval is required hereunder) by Lender (such approval not to be unreasonably withheld, conditioned or delayed), with such amendments thereto as may from time to time be made by Borrower and approved by Lender and Construction Consultant (such approval not to be unreasonably withheld, conditioned or delayed).

"Construction Schedule" means the schedule setting forth the anticipated starting dates and completion dates of the various elements and categories of the work in the construction of the Development Improvements, as approved by Lender in its reasonable discretion.

"Controlling Interest" has the meaning set forth in Section 13 hereof.

"Counterparty" means each counterparty to, or issuer of, any Interest Rate Protection Agreement, other than Borrower or an Affiliate of Borrower.

"Counterparty Opinion" has the meaning set forth in Section 68 hereof.

3

"Debt" means the outstanding principal balance of the Note from time to time, with all accrued and unpaid interest thereon, and all other sums now or hereafter due (including any applicable Prepayment Fee) under the Loan Documents.

"Default" means an event which, with the passage of time or the giving of notice, or both, would constitute an Event of Default.

"Default Rate" means the rate of interest payable from and after the occurrence of an Event of Default, as more particularly described in the Note.

"Development Agreement" means that certain Development Agreement dated as of the date hereof by and between Borrower and Windwalker.

"Development Improvements" means structures, buildings and improvements of every kind and description at any time hereafter located or placed on the Real Property as provided in the Construction Plans.

"Development Manager" means Windwalker.

"Dollar" means the dollar currency of the United States of America.

"Environmental Audits" means the environmental assessments, letters and reports listed on Schedule 1 attached hereto.

"Environmental Agreement" means that certain Environmental and Hazardous Substance Indemnification Agreement, dated as of the date hereof, from Environmental Guarantor in favor of Lender.

"Environmental Guarantor" means, collectively, Borrower, Worden and Kenner.

"Environmental Laws" has the meaning set forth in Section 35 hereof.

"ERISA" has the meaning set forth in Section 40 hereof.

"Event of Default" has the meaning set forth in Section 24 hereof.

"Fiscal Year" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"General Contractor" means a suitably experienced, qualified and reputable contractor retained by Borrower for the construction of Development Improvements, subject to reasonable approval of Lender.

"Governmental Authorities" means any and all courts, boards, agencies, commissions, offices, officers, officials or authorities of any nature whatsoever (including health, zoning, land use and environmental) for any governmental unit (federal, state or local) having jurisdiction over Borrower or any portion of the Mortgaged Property.

"Guarantor" means any guarantor of all or any part of the Debt.

4

LA1 789909

"Hard Money Documents" means, collectively, that certain Management Agreement, dated October 19, 2005, by and between Ka'U Holding Company, LLC, a Delaware limited liability company ("KHC") and Urban Expansion, LLC, a Nevada limited liability company ("UE"); that certain Agreement dated October 19, 2005, by and among KHC, UE and Kenner; and that certain Promissory Note, dated October 14, 2005, from KHC to UE.

"Hazardous Substances" has the meaning set forth in Section 35 hereof.

"Honu'apo Parcel" means the land owned by Honu'apo Borrower and described in Exhibit A as the "Honu'apo Parcel."

"House Parcel Borrower" is defined in Section 76.

"House Parcel" means the property that is the subject of the House Purchase Option, as defined in the SPE Member Operating Agreement.

"Indemnified Parties" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"Independent" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest in Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor, or in any Affiliate of Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor or any Affiliate of any constituent partner, shareholder, member or beneficiary of Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor (direct or indirect), and (c) is not connected with Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor or any Affiliate of Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor or any Affiliate of any constituent partner, shareholder, member or beneficiary of Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor Party (direct or indirect) as an officer, employee, promoter, underwriter, trustee, partner, member, director or Person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning thereof.

"Independent Director" shall have the meaning set forth in Section 11(o).

"Initial Advance" has the meaning set forth in Section 2 hereof.

"Insurance Premiums" has the meaning set forth in Section 4 hereof.

5

"Insured Casualty" has the meaning set forth in Section 4 hereof.

"Intangibles" means, without limitation, all accounts, escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as such terms are defined in the Uniform Commercial Code, as well as the Accounts, and all contract rights, franchises, books, records, appraisals, architects and engineering plans, specifications, environmental and other reports relating to the Mortgaged Property, trademarks, trade names, symbols, permits, licenses (to the extent assignable), approvals, actions, refunds of real estate taxes and assessments and causes of action which now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon.

"Interest Rate Protection Agreement" shall mean one or more interest rate caps (together with the schedules relating thereto) in form and substance reasonably satisfactory to Lender, with a confirmation from the Counterparty thereto, between Borrower and, subject to Section 68 of this Agreement, a Counterparty reasonably acceptable to Lender with a Minimum Counterparty Rating, and all amendments, restatements, replacements, supplements and modifications thereto.

"Investor" is defined in Section 29.

"Kenner" means Philip A. Kenner, an individual.

"Leases" means all leases and other agreements affecting the use, enjoyment or occupancy of the Real Property (including without limitation the leases set forth in Schedule 2) heretofore or hereafter entered into (including, without limitation, subleases, licenses, concessions, tenancies and other occupancy agreements covering or encumbering all or any portion of the Real Property), together with any guarantees, supplements, amendments, modifications, extensions and renewals of any thereof, and all additional remainders, reversions, and other rights and estates appurtenant thereto.

"Legal Requirements" means all governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities (including, without limitation, any of the foregoing relating to zoning, parking or land use, any and all Environmental Laws and Access Laws) affecting Borrower or the Mortgaged Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof (whether now or hereafter enacted and in force), and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, at any time in force affecting the Mortgaged Property or any part thereof or any utility services or septic systems or other infrastructure serving any portion of the Mortgaged Property (including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Mortgaged Property or any part thereof or any utility services or septic systems or other infrastructure serving any portion of the Mortgaged Property, or (ii) in any way limit the use and enjoyment thereof).

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lien" means any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Mortgaged

LA1 789909

Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"Little Honu'apo Parcel" means the land owned by Little Honu'apo Borrower and described in Exhibit A as the "Little Honu'apo Parcel."

"Loan" means a revolving term loan from Lender to Borrower of up to the Maximum Loan Amount (as defined below).

"Loan Documents" has the meaning set forth in the recitals of this Agreement.

"Loan-to-Value Ratio" means the ratio of: (i) the Debt, plus all other debt (or other liquidated economic obligations) which are then outstanding and secured by the Mortgaged Property, to (ii) the appraised value of the Mortgaged Property as estimated by an appraiser acceptable to Lender. Any appraisal for purposes of calculating the Loan-to-Value Ratio shall be performed in accordance with the then-approved standards under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended (FIRREA).

"Lockbox Agreement" has the meaning set forth in Section 67 hereof.

"Na'alehu Ventures" means Na'alehu Ventures 2006, LLC, a Delaware limited liability company.

"Management Agreement" means each of the Construction Management Agreement (if any) and the Development Management Agreement (collectively the "Management Agreements").

"Manager" means each of Development Manager and Construction Manager (if any) (collectively, the "Managers").

"Maturity Date" has the meaning set forth in the Note.

"Maximum Loan Amount" means One Hundred Five Million and 00/100 Dollars ($105,000,000.00).

"Minimum Counterparty Rating" means an unqualified credit rating from S&P and Fitch of at least "AA-" and from Moody's of at least "Aa3".

"Moaula Parcel" means the land owned by Moaula Borrower and described in Exhibit A as the "Moaula Parcel."

"Mortgage" has the meaning set forth in the recitals of this Agreement.

"Mortgaged Property" shall mean the Real Property, Borrower's interest in all real and personal property located on or related to the Real Property, including without limitation, the Intangibles, Rents, Condemnation awards, insurance proceeds, tradenames, trademarks,

7

servicemarks, logos, copyrights, goodwill, books and records, all refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Real Property as a result of tax certiorari or any applications or proceedings for reduction, all agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all proceeds, substitutions and replacements thereof.

"Note" has the meaning set forth in the recitals of this Agreement.

"Obligations" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of Borrower, any Parcel Borrower, Guarantor, and Environmental Guarantor in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"Organizational Documents" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"Origination Fee" means a fee in an amount equal to one percent (1.0%) of the maximum Loan amount, payable by Borrower, as consideration for Lender providing the Loan.

"Other Charges" has the meaning set forth in Section 5 hereof.

"Parcel" means the Waikapuna Parcel owned by Waikapuna Borrower, Moaula Parcel owned by Moaula Borrower, Honu'apo Parcel owned by Honu'apo Borrower, Little Honu'apo Parcel owned by Little Honu'apo Borrower, and Church Parcel owned by Church Borrower, as set forth in Exhibit A (collectively, "Parcels").

"Parcel Borrower" has the meaning set forth in the preamble to this Agreement.

"Participations" is defined in Section 29.

"Permitted Equipment Leases" has the meaning set forth in Subsection 11(d) hereof.

"Permitted Exceptions" has the meaning set forth in Section 3 hereof.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

8

LA1 789909

"Plans" means, individually and collectively, the Construction Plans and the Predevelopment Plans.

"Policies" has the meaning set forth in Subsection 4(c) hereof.

"Predevelopment Documents" means any and all contracts, plans or documents concerning the construction, design, or engineering of the Predevelopment Work.

"Predevelopment Budget" means the budget attached hereto as Exhibit C-1 for the predevelopment costs and expenses associated with the Predevelopment Schedule.

"Predevelopment Plans" means the applications, materials, petitions, or any other instruments or documents in connection with subdividing and obtaining of entitlements on the Real Property, together with the plans and specifications for clearing, demolition, grading, and any other predevelopment work and approved (to the extent approval is required hereunder) by Lender (such approval not to be unreasonably withheld, conditioned or delayed), with such amendments thereto as may from time to time be made by Borrower and approved by Lender and Construction Consultant (such approval not to be unreasonably withheld, conditioned or delayed) in connection with the Predevelopment Schedule.

"Predevelopment Schedule" means the predevelopment/development schedule setting forth the anticipated starting dates and completion dates of the various elements and categories of the work in the predevelopment of the Property, including clearing, demolition, grading, and processing of entitlements, as approved by Lender in its reasonable discretion, and as attached hereto as Exhibit C-2.

"Predevelopment Work" means any work described in or items to be performed or obtained pursuant to the Predevelopment Budget or Predevelopment Schedule.

"Rating Agency" means each of Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies (S&P), Moody's Investors Service, Inc., Duff & Phelps Credit Rating Co. and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been approved by Lender.

"Real Property" means the real property described on Exhibit A annexed hereto.

"Release Parcel" means either (a) any of the Waikapuna Parcel, Moaula Parcel, Honu'apo Parcel, Little Honu'apo Parcel, and Church Parcel, as set forth in Exhibit A, in the event any such Parcel is to be released, in whole, from the lien of the Mortgage pursuant to the terms of Section 66 of this Agreement, or (b) a portion of one or more of any of the Waikapuna Parcel, Moaula Parcel, Honu'apo Parcel, Little Honu'apo Parcel, and Church Parcel, the size and location of which must be approved for release by Lender in its reasonable discretion pursuant to Section 66 of this Agreement.

"Release Price" means, in respect of each whole Release Parcel, an amount reasonably agreed upon by Lender and Borrower; provided however, if the applicable Release Parcel is less than the whole of any of the Waikapuna Parcel, Moaula Parcel, Honu'apo Parcel, Little

9

Honu'apo Parcel, and Church Parcel, the Release Price will be determined by Lender in its reasonable discretion.

"Remedial Work" has the meaning set forth in Section 37 hereof.

"Rent Roll" means the certified rent roll regarding the Property delivered by Borrower to Lender as of the Closing Date.

"Rents" means all rents, income, issues, profits, revenues (including oil and gas or other mineral royalties and bonuses), deposits and other benefits from the Mortgaged Property now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the possession, use or occupancy of all or any portion of the Mortgaged Property or personalty located thereon.

"Securities" has the meaning set forth in Section 29 hereof.

"Securitization" shall have the meaning set forth in Section 29.

"Servicer" means the servicer of the Loan designated by Lender, in its sole and absolute discretion, from time to time.

"Severed Loan Documents" is defined in Section 29.

"Schedule" means, individually and collectively, the Construction Schedule and the Predevelopment Schedule.

"SPE Member" means WWK Hawaii Holdings, LLC, a Delaware limited liability company.

"SPE Member Operating Agreement" means that certain Limited Liability Company Operating Agreement of SPE Member dated on or about the date hereof.

"SPE Member Parties" means, collectively, Borrower, SPE Member, Windwalker Hawaii and Na'alehu Ventures.

"Substantial Deviation" means any increase to the Predevelopment Budget or increase in the costs associated with the Predevelopment Work, or increase in the costs associated with the construction of the Development Improvements (in each case subject to Borrower's right to reallocate costs in accordance with Agreement).

"Sugar Mill Borrower" means WWK Hawaii-Sugar Mill, LLC, a Delaware limited liability company.

"Sugar Mill Parcel" means "Parcel 5" as defined in the SPE Member Operating Agreement.

"Tax and Insurance Escrow Account" has the meaning set forth in Section 7 hereof.

"Tax and Insurance Escrow Fund" has the meaning set forth in Section 6 hereof.

10

"Taxes" has the meaning set forth in Section 5 hereof.

"Tenant" means each Person granted a possessory interest or right to use or occupy any portion of the Mortgaged Property pursuant to a Lease.

"Title Company" means Title Guaranty Company of Hawaii, Inc., as agent of Ticor Title Insurance Company, the insurer under the Title Policy.

"Title Policy" means the mortgagee or loan title policy or policies showing indefeasible fee simple title to the Mortgaged Property is vested in Borrower and insuring Lender's first priority mortgage lien on the Mortgaged Property.

"Unavoidable Delay" means any delay in the completion of any Predevelopment Work or of the Construction Schedule on account of: (i) an act of God (including any hurricane, flood, tornado or other natural disaster), (ii) an act of war or other military act, (iii) any terrorist or other illegal act by a third party beyond the reasonable control of Borrower, (iv) a shortage of supplies or materials resulting from an embargo, rationing order, or similar action or order by a sovereign government, (v) any moratorium imposed by any governmental authority having jurisdiction over the Mortgaged Property, (vi) a strike, lockout, or other substantial labor dispute beyond the reasonable control of Borrower, (vii) a riot or other substantial civil disturbance, (viii) a fire, explosion or other casualty or disaster not caused by Borrower or any Borrower Affiliate, (viii) any Governmental Authority refusing to issue a discretionary approval or provide services, or take any other requisite actions, provided Borrower and Guarantor have used commercially reasonable and diligent efforts to obtain such approval, services and actions, as applicable, or (ix) any other cause beyond the reasonable control of Borrower.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code, as adopted and enacted by the State of New York.

"Waikapuna Parcel" means the land owned by Waikapuna Borrower and described in Exhibit A as the "Waikapuna Parcel."

"Windwalker" means Windwalker Hawaii Management, LLC, a Delaware limited liability company.

"Windwalker Hawaii" means Windwalker Hawaii, LLC, a Delaware limited liability company.

"Worden" means Alan J. Worden, an individual.

Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Note.

2.      Loan Amount; Payment of Debt; Incorporation of Covenants, Conditions and Agreements

(a)      Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make the Loan to Borrower. The Loan shall be used solely for (i) acquisition,

11

LA1 789909

financing, and refinancing of existing loans encumbering any of the Mortgaged Property, and (ii) predevelopment and development of the Mortgaged Property in accordance with the terms of this Agreement. On the Closing Date, the amount of Twenty-Five Million Six Hundred Six Thousand Six Hundred Thirteen and 12/100 Dollars ($25,606,613.12) shall be advanced by Lender to Borrower (the "Initial Advance") pursuant to the schedule of sources and uses attached hereto as Schedule 3, upon satisfaction or waiver of the following conditions, as determined by Lender, acting reasonably:

       (i)     Lender shall have received all Loan Documents, other documents, instruments, policies, including without limitation UCC financing statements, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents

       (ii)    and provided further Lender shall have received and approved in form and substance satisfactory to Lender all of the following: (i) environmental site assessments for each Parcel with respect to the presence, if any, of Hazardous Materials on the Mortgaged Property; (ii) copies of all agreements which are material to completion of the Predevelopment Work described herein, to the extent entered into on or before the date of this Agreement; (iii) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with any governmental agency in connection with the Mortgaged Property; (vii) a formal written appraisal of each Parcel reasonably satisfactory to Lender; (iv) insurance certificates evidencing all insurance required to be carried by Borrower hereunder; (v) financial statements of Borrower, Guarantor, and Environmental Guarantor; (vi) copies of the Management Agreements; (vii) bonding and other construction matters required to be confirmed by Lender's construction consultant; (viii) the opinions of Borrower's counsel as required by Lender; (ix) evidence satisfactory to Lender that Windwalker Hawaii has contributed and maintained no less than $250,000 of cash equity in SPE Member; (x) title insurance in accordance with Lender's requirements for each Parcel; (xi) organizational documents, evidence of authority, certificates of good standing and certificates of qualification of Borrower; (xii) a Personal Property Lien Report, a Court Report, and a Tax Clearance Certificate for Borrower, to the extent requested by Lender, (xiii) documents and other evidence satisfactory to Lender regarding the release of any existing obligations of Borrower and SPE Member, including without limitation the Hard Money Documents. Lender hereby acknowledges that delivery to Lender of a fully signed copy of the Settlement Agreement (as defined below) shall satisfy the condition set forth in this Subsection (xiii) with respect to the Hard Money Documents.

       (iii)   Borrower has paid the Origination Fee on the date hereof to Lender.

   (b)    Lender acknowledges that $2,000,000 of the Initial Advance may be distributed to the SPE Member and further distributed to the Kenner Member on the Closing Date.

12

(c)     Subject to the terms of this Agreement, a portion of the unadvanced principal amount of the Loan in the amount identified on Exhibit E (the "Predevelopment Holdback") shall be advanced from time to time by Lender for payment of costs and expenses associated with the Predevelopment Work (each such advance, a "Predevelopment Advance"), and in accordance with the Predevelopment Budget (and Borrower may use such funds solely for such purpose, subject to Borrower's right to reallocate cost savings among various line items within the Predevelopment Budget as specifically permitted in this Agreement). Any such disbursement on account of a Predevelopment Advance, if made, shall be added to the outstanding principal balance of the Note and shall, when disbursed, bear interest at the Applicable Interest Rate (as defined in the Note). The Predevelopment Advances shall be advanced by Lender to Borrower, provided no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, and upon satisfaction or waiver of the following conditions, as determined by Lender, acting reasonably:

(i)     Borrower has delivered a notice of title continuation and endorsements to the Title Policy theretofore delivered, which endorsements shall (A) indicate that since the last Advance there has been no change (other than changes that are otherwise permitted under the Loan Documents) in the state of title and no survey exceptions not theretofore approved by Lender, and (B) if, after giving effect to the requested Predevelopment Advance, the outstanding principal Balance of the Note will exceed the policy limit of the Title Policy, increase the policy limit of the Title Policy to an amount not less than the then-current outstanding principal balance plus the amount of the requested Additional Advance;

(ii)     Borrower shall have delivered a written request for funding of the Predevelopment Advance at least ten (10) days prior to the date Borrower desires funding to occur, and each such request will specify (a) the date on which Borrower desires the Advance to be made; (b) the amount of Predevelopment Advance Borrower desires to Lender to make on such date, provided however that all such requests must specify an amount of Predevelopment Advance not less than $100,000 (except for the final Predevelopment Advance) and in no event shall Lender be obligated to make any Advance in an amount less than $100,000 (except for the final Predevelopment Advance) or more than one Predevelopment Advance in any thirty (30) day period;

(iii)     Borrower delivers such documents, letters, affidavits, report and assurances, as Lender and/or the Title Company may reasonably require, including without limitation (A) invoices, receipts, lien waivers and/or releases and other evidence reasonably satisfactory to Lender showing that any and all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law Liens and have furnished material or labor to the Mortgaged Property have been paid (or will be paid pursuant to the disbursement of the requested Predevelopment Advance) all amounts due for labor and materials furnished to the Mortgaged Property for such job, (B) certification from Construction Consultant or an inspecting architect, engineer or other consultant acceptable to Lender describing the completed work and, if applicable, certifying that the Mortgaged Property is, as a result of such work, in compliance with all Legal Requirements, and (C) a certificate of occupancy for any improvements if required by law;

13

LA1 789909

(iv)     Borrower has delivered a detailed description of the intended use of such Predevelopment Advance; and

(v)     Borrower has delivered evidence satisfactory to Lender that all representations and warranties set forth in the Loan Documents are true and correct in all material respects at the time of such requests.

All Predevelopment Advances made pursuant to this Subsection 2(c), and all Additional Advances made pursuant to Subsection 2(g) below, must be made, and the funds advanced therefor be used, in accordance with Predevelopment Budget, subject to Borrower's right to reallocate funds among line items in the Predevelopment Budget that do not otherwise increase the amount of the Predevelopment Budget so as to cause a Substantial Deviation, as are reasonably necessary for the Predevelopment Work, in Borrower's judgment. Any such reallocation which causes a Substantial Deviation or other amendment to the Predevelopment Budget shall require Lender's prior consent, which shall not be unreasonably withheld. In addition, Borrower shall be entitled to increase the total amount of the Predevelopment Budget without Lender's prior consent, whether or not the same causes a Substantial Deviation, provided that (x) such increase is fully covered by additional equity contributions from SPE Member to Borrower, (y) Borrower has delivered to Lender such information as Lender may reasonably request regarding the proposed Predevelopment Budget increase and corresponding additional equity contributions; and (z) no Event of Default is continuing. Without limiting the foregoing, Lender shall make Predevelopment Advances into the Tax and Insurance Escrow Fund sufficient to cover Borrower's obligations under Section 6 provided (1) sufficient amounts of the Predevelopment Holdback are then available; (2) Borrower has delivered to Lender information sufficient in Lender's reasonable discretion for the calculation of amounts then due from Borrower into the Tax and Insurance Escrow Fund pursuant to Section 6; and (3) if reasonably requested in writing by Lender, all of the conditions set forth above in this subsection 2(c) (except the conditions described in clause (ii) and (iv) above) have been satisfied and no Event of Default is then continuing.

(d)     Subject to the terms of this Agreement, a portion of the unadvanced principal amount of the Loan in the amount of $4,000,000.00 (the "Kenner Member Predevelopment Advance") shall be advanced from time to time by Lender to Borrower for distribution to the Kenner Member as described in Schedule 4 of this Agreement provided (i) no Default or Event of Default has occurred and is continuing, and (ii) Borrower has met and achieved the applicable predevelopment milestone, as determined by Lender in its reasonable discretion, described in Schedule 4. For the purposes of this subsection, in order for any milestone to be satisfied where Schedule 4 requires that Windwalker Hawaii is "reasonably satisfied" (or words of similar effect) of any existing condition, Lender must be reasonably satisfied regarding such existing condition as well. Borrower shall endeavor to achieve by the first anniversary of the date hereof all of the predevelopment milestones set forth on Schedule 4. Lender hereby acknowledges that the Kenner Member Predevelopment Advance may be distributed by Borrower to the Kenner Member, notwithstanding anything to the contrary in this Agreement.

14

(e)     All advances or disbursements of the Loan set forth in clauses (a) through (d) shall be conditioned on there being no Event of Default at the time such Advance is requested by Borrower and at the time such Advance is to be made by Lender.

(f)     Borrower will pay the Debt at the time and in the manner provided in the Note, the Mortgage and in this Agreement. Payments made by Borrower to Lender shall be applied by Lender in the following order of priority: (i) first, to the extent of any unpaid costs and expenses incurred by Lender on Borrower's behalf and reimbursable to Lender under the provisions of the Loan Documents, including, without limitation, any enforcement costs incurred and protective advances made by Lender; (ii) next, to interest payable under the Note; and (iii) last, to the reduction of the principal balance of the Loan. Notwithstanding the foregoing, from and after the occurrence, and during the continuance, of an Event of Default, payments made by Borrower (or Guarantor) to Lender shall be applied by Lender in such order and priority as Lender shall determine in its sole discretion. Principal borrowed and repaid may be re-borrowed by Borrower subject to the terms of Subsection 2(g) below; provided however, in no event shall the outstanding balance of the Loan be greater than the Maximum Loan Amount, as determined by Lender as of the Advance Date.

(g)     <u>Additional Advances</u>.

(i)     Each request for an Additional Advance shall be made on written notice, given by Borrower to Lender not later than ten (10) days prior to the date on which Borrower requests that such Additional Advance be funded by Lender. Each such notice of borrowing (each, a "<u>Request for Additional Advance</u>") shall otherwise be in substantially the form of Schedule 2(g) attached hereto. Upon satisfaction of the conditions precedent set forth in this subsection 2(g), Lender shall advance the proceeds of such Additional Advance to Borrower. Any such disbursement on account of An Additional Advance, if made, shall be added to the outstanding principal balance of the Note and shall, when disbursed, bear interest at the Applicable Interest Rate (as defined in the Note).

(ii)     Lender's obligation to make any Additional Advance and to disburse the proceeds thereof shall be conditioned upon Borrower's performance or satisfaction of all of the following conditions precedent. Where in this Subsection 2(g), any documents, instruments or information are to be delivered to Lender, then the condition shall not be satisfied unless (i) the same shall have been delivered to Lender, allowing a reasonable time for Lender's review thereof, (ii) the same shall be in form and substance reasonably satisfactory to Lender, and (iii) if so required by Lender, Borrower shall deliver to Lender a certificate duly executed by Borrower stating that, to Borrower's knowledge, the applicable document, instrument or information is true and complete. Such conditions are as follows:

(1)     <u>Representations and Warranties</u>. Each representation and warranty contained herein shall be true, correct and complete as of the Advance Date (except for such changes in circumstances as are permitted under this Loan Agreement) and Lender shall have received such certifications, results of searches, or other confirmation of such representations and warranties as Lender shall request.

15

(2)    No Default. No Default or Event of Default has occurred and is continuing, and Borrower shall have timely complied with and performed all of Borrower's obligations under this Agreement which by their terms are required to have been complied with and performed by Borrower prior to or on the Advance Date.

(3)    Request for Additional Advance. Borrower shall have timely delivered to Lender a Request for Additional Advance.

(4)    Certification, Representations. Lender may require that each or any request for an Additional Advance be accompanied by a signed certification setting forth some or all of the representations specified in this paragraph or any other information that Lender reasonably requires. Whether or not any such certification is required or given, and if given, whether or not each of the following representations shall be expressly set forth therein, by submitting any request for an Additional Advance, Borrower shall be deemed to make to Lender the following representations: (i) the information set forth in the draw request is true and correct; and (ii) the documents submitted in support of the request for advance are true and complete copies of the applicable documents, and Borrower knows of no inaccurate statements therein.

(5)    Maximum Loan Amount. The outstanding principal balance of the Loan immediately following the funding of such requested Additional Advance shall not be greater than the Maximum Loan Amount as determined by Lender as of the Advance Date.

(6)    Title Endorsements. Lender shall have received, in connection with each and every Additional Advance, the following endorsements to its Title Policy: (i) a date-down or additional advance endorsement, (ii) if, after giving effect to the requested Additional Advance, the outstanding principal Balance of the Note will exceed the policy limit of the Title Policy, an endorsement increasing the policy limit of the Title Policy to an amount not less than the then-outstanding principal balance plus the amount of the requested Additional Advance, (iii) an endorsement insuring that since the last Advance, there has been no change (other than changes that are otherwise permitted under the Loan Documents) in the state of title and no survey exceptions not theretofore approved by Lender, and (iv), such additional endorsements as Lender may reasonably require.

(7)    Frequency of Requests. Borrowers shall not request an Additional Advance more frequently than once during any thirty (30) day period.

(8)    Minimum Amount. Lender shall not be required to disburse any Additional Advance in an amount less than $100,000.

(9)    Additional Information. Borrower shall have delivered all documents, letters, affidavits, report and assurances as Lender and/or the Title Company may reasonably require as set forth in subsection 2(c)(iii) above. Borrower shall have provided such additional documents, information and certifications as Lender may reasonably request, and Borrower shall provide to Lender such documentation and

16

certifications as Lender may reasonably request to substantiate that all conditions to the requested Additional Advance have been satisfied.

3.    Warranty of Title; Delivery of Survey

(a)    (i) Waikapuna Borrower represents and warrants that Waikapuna Borrower has good, marketable and insurable fee simple title to the Waikapuna Parcel and has the full power, authority and right to execute, deliver and perform its obligations under this Agreement and to encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign, hypothecate and grant a security interest in the Waikapuna Parcel and that Waikapuna Borrower possesses an unencumbered fee estate in the Waikapuna Parcel (except for those exceptions approved by Lender and identified in the Title Policy and the Leases identified on the Rent Roll, herein, the "Permitted Exceptions")), and that it owns the Waikapuna Parcel free and clear of all Liens, encumbrances and charges whatsoever (except for the Permitted Exceptions), and that the Mortgage is and will remain a valid, perfected, and enforceable Lien on and security interest in the Mortgaged Property, subject only to such Permitted Exceptions and other exceptions expressly permitted under this Loan Agreement; (ii) Moaula Borrower represents and warrants that Moaula Borrower has good, marketable and insurable fee simple title to the Moaula Parcel and has the full power, authority and right to execute, deliver and perform its obligations under this Agreement and to encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign, hypothecate and grant a security interest in the Moaula Parcel and that Moaula Borrower possesses an unencumbered fee estate in the Moaula Parcel (except for Permitted Exceptions), and that it owns the Moaula Parcel free and clear of all Liens, encumbrances and charges whatsoever (except for the Permitted Exceptions), and that the Mortgage is and will remain a valid, perfected, and enforceable Lien on and security interest in the Mortgaged Property, subject only to such Permitted Exceptions and other exceptions expressly permitted under this Loan Agreement; (iii) Honu'apo Borrower represents and warrants that Honu'apo Borrower has good, marketable and insurable fee simple title to the Honu'apo Parcel and has the full power, authority and right to execute, deliver and perform its obligations under this Agreement and to encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign, hypothecate and grant a security interest in the Honu'apo Parcel and that Honu'apo Borrower possesses an unencumbered fee estate in the Honu'apo Parcel (except for Permitted Exceptions), and that it owns the Honu'apo Parcel free and clear of all Liens, encumbrances and charges whatsoever (except for the Permitted Exceptions), and that the Mortgage is and will remain a valid, perfected, and enforceable Lien on and security interest in the Mortgaged Property, subject only to such Permitted Exceptions and other exceptions expressly permitted under this Loan Agreement; (iv) Little Honu'apo Borrower represents and warrants that Little Honu'apo Borrower has good, marketable and insurable fee simple title to the Little Honu'apo Parcel and has the full power, authority and right to execute, deliver and perform its obligations under this Agreement and to encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign, hypothecate and grant a security interest in the Little Honu'apo Parcel and that Little Honu'apo Borrower possesses an unencumbered fee estate in the Little Honu'apo Parcel (except for Permitted Exceptions), and that it owns the Little Honu'apo Parcel free and clear of all Liens, encumbrances and charges whatsoever (except for the Permitted Exceptions), and that the Mortgage is and will remain a valid, perfected, and enforceable Lien on and security interest in the Mortgaged Property, subject only to such Permitted Exceptions and other

17

exceptions expressly permitted under this Loan Agreement; (v) Church Borrower represents and warrants that Church Borrower has good, marketable and insurable fee simple title to the Church Parcel and has the full power, authority and right to execute, deliver and perform its obligations under this Agreement and to encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign, hypothecate and grant a security interest in the Church Parcel and that Church Borrower possesses an unencumbered fee estate in the Church Parcel (except for Permitted Exceptions), and that it owns the Church Parcel free and clear of all Liens, encumbrances and charges whatsoever (except for the Permitted Exceptions), and that the Mortgage is and will remain a valid, perfected, and enforceable Lien on and security interest in the Mortgaged Property, subject only to such Permitted Exceptions and other exceptions expressly permitted under this Loan Agreement. Borrower shall forever warrant, defend and preserve such title and the validity and priority of the lien of the Mortgage and shall forever warrant and defend such title, validity and priority to Lender against the claims of all persons whomsoever. The following items shall also be deemed to included in the definition of "Permitted Exceptions": (x) encumbrances and liens that do not materially and adversely affect the value, use, predevelopment, development, or operability of the Mortgaged Property; (y) Taxes, Other Charges and mechanics' and materialmen's liens which are not yet due and payable or which are being duly contested in accordance with the terms hereof; and (z) the liens of Permitted Equipment Leases.

(b)     The Permitted Encumbrances do not materially and adversely affect the value of the Property, the use of the Property for the use being made thereof as of the date of this Agreement, the operation of the Property or Borrower's ability to repay the Loan in full. There are no claims for payment for work, labor or materials affecting the Property, which will become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than Tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, Liens or encumbrances, except the liens and security interest created by the Loan Documents. There are no prior assignments of Leases or any portion of the Rents due and payable or to become due and payable, which are presently outstanding. There are no options, rights of first refusal, rights of first offer or similar rights, which affect the Property or any portion thereof.

(c)     Borrower covenants and agrees to diligently pursue and deliver to Lender as soon as possible after the date hereof a survey of each Parcel, prepared by a surveyor duly licensed in Hawaii and in form acceptable to Lender. Each such survey shall be certified to Lender, Lender's counsel, and Lender's successors and/or assigns, pursuant to a certification reasonably acceptable to Lender.

4.     Insurance

(a)     Borrower, at its sole cost and expense, will keep the Mortgaged Property insured during the entire term of this Agreement for the mutual benefit of Borrower and Lender in accordance with the terms of this Section 4. The insurance policy shall be in an amount equal to the original principal amount of the Loan without deduction for physical depreciation; provided, however, that such insurance shall be in an amount such that the insurer would not deem Borrower a co-insurer under such policies. The deductible in respect of such insurance

18

shall not exceed the lesser of: (1) $20,000.00; and (2) one (1%) percent of the face value of such policy, unless a higher deductible is required by law.

      (b)     Borrower shall obtain and maintain during the entire term of this Agreement, at its sole cost and expense, for the mutual benefit of Borrower and Lender, the following policies of insurance:

      (1)     (A) Commercial general liability insurance, including broad form property damage, blanket contractual and personal injuries (including death resulting therefrom) coverages, and containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00) and Two Million and No/100 Dollars ($2,000,000.00) general aggregate for the Mortgaged Property, or such greater amount as may be required under the Management Agreements; and (B) Umbrella liability insurance containing minimum limits of Ten Million and No/100 Dollars ($10,000,000.00) for the Mortgaged Property;

      (2)     Worker's compensation insurance, subject to the statutory limits of the jurisdiction in which the Mortgaged Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000.00) per accident and per disease per employee, and One Million and No/100 Dollars ($1,000,000.00) for disease aggregate in respect of any work or operations on or about the Mortgaged Property, or in connection with the Mortgaged Property or their operations (if applicable);

      (3)     Business automobile liability coverage for all owned and non-owned vehicles, including rented and leased vehicles, containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00), if applicable;

      (4)     A blanket fidelity bond or Crime Insurance insuring against losses resulting from dishonest or fraudulent acts committed by: (A) Borrower's, Construction Manager's, or Development Manager's personnel; (B) any employees of outside firms that provided appraisal, legal, data processing, or other services for Borrower or Development Manager; and (C) temporary contract employees or student interns;

      (5)     Errors and omissions insurance coverage, if applicable;

      (6)     Such other insurance as may from time to time be reasonably required by Lender in order to protect its interests in the Mortgaged Property or as may be required under the Management Agreements.

      (c)     All policies of insurance required pursuant to this Section (collectively, the "Policies") shall: (i) be issued by an insurer with an "A/A2" rating or better for claims paying ability by Moody's Investors Service, Inc. and Standard & Poor's Rating Group, or a general policy rating of "A" or better and a financial class of VIII or better assigned by A.M. Best Company, Inc.; (ii) contain a standard noncontributory mortgagee clause naming Lender as the person to which all payments made by such insurance company shall be paid; (iii) be maintained throughout the term of this Agreement without cost to Lender; (iv) be assigned and copies thereof delivered to Lender; (v) contain such provisions as Lender deems reasonably necessary

19

or appropriate to protect its interest including, without limitation, endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer thereunder, and that Lender shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation; and (vi) be satisfactory in form and substance to Lender (acting reasonably), and be approved by Lender as to amounts, form, risk coverage, deductible, loss payees and insureds (such consent not to be unreasonably withheld, conditioned or delayed). Borrower shall pay the premiums for the Policies (the "Insurance Premiums") as they become due and payable. Not later than thirty (30) days prior to the expiration date of each of the Policies, Borrower will deliver to Lender satisfactory evidence of the renewal of each Policy.

(d)     If the Mortgaged Property shall be damaged or destroyed, in whole or in part, by any casualty, Borrower shall give prompt notice thereof to Lender.

(1)     In the case of a loss covered by any insurance policy, Lender may: (A) settle and adjust any claim without the consent of Borrower, or (B) allow Borrower to agree with the insurance company or companies on the amount to be paid upon the loss; provided, however, that Borrower may adjust losses aggregating not in excess of $50,000.00 if such adjustment is carried out in a competent and timely manner, and provided in any case that Lender shall be, and is hereby, authorized to collect and receipt for any such insurance proceeds. Borrower shall fully cooperate with Lender in obtaining for Lender the benefits of any insurance proceeds lawfully or equitably payable in connection with losses covered by insurance. Lender will hold any insurance proceeds actually received in an interest bearing account and any interest earned on such proceeds shall be deemed additional proceeds of insurance. The expenses incurred by Lender in the adjustment and collection of insurance proceeds, including reasonable attorneys' fees shall become part of the Debt, shall be secured by the Mortgage and shall be reimbursed by Borrower to Lender within ten (10) days after written demand.

(2)     In the event of any insured damage to or destruction of the Mortgaged Property or any part thereof (an "Insured Casualty"), Lender, in its sole and absolute discretion, may (i) apply such proceeds in reduction of the Debt, (ii) make the net insurance proceeds available to Borrower for the purpose of restoring and repairing the Mortgaged Property or performing Predevelopment Work in accordance with the Predevelopment Schedule; provided that: at the time of each disbursement, (x) no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, and (y) no event of default exists under the Management Agreements, or (iii) reimburse Borrower for costs of repair or restoration of the Mortgaged Property from all or any portion of the net insurance proceeds, based on consideration of such factors as Lender deems relevant including, without limitation, the following: (A) the nature and extent of the loss, damage or destruction; (B) the estimated cost and expense of repairing and restoring the Mortgaged Property; (C) the extent to which the Mortgaged Property can be repaired and restored to its condition and utility prior to such loss, damage, or condemnation; (D) the likely value and general utility of the Mortgaged Property following repair and restoration; (E) the extent to which the projected Loan-To-Value Ratio and the debt service coverage ratio for the Mortgaged Property following the completion of repair and restoration are consistent with Lender's then current standards for making mortgage loans on similar properties; (F) the termination rights of any tenants

20

under Leases by reason of such damage or destruction or delays in repair and restoration; (G) the period of time remaining until the Maturity Date; and (H) termination rights of Construction Manager or Development Manager, as a consequence of such casualty.

Notwithstanding the immediately preceding paragraph to the contrary, in the case of a casualty affecting less than thirty percent (30%) of any unimproved portion of the Mortgaged Property, Lender shall make the net insurance proceeds available to Borrower for the purpose of restoring and repairing the Mortgaged Property (including repair and/or replacement of equipment and other personal property and any Development Improvements), subject to and in accordance with the terms, covenants and conditions set forth herein with respect to the disbursement of proceeds; provided that: (A) at the time of each disbursement, (x) no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, or (y) no event of default exists under the Management Agreements, (B) at the time of each disbursement, the amount of available insurance proceeds, together with any other immediately available funds deposited by Borrower with Lender (or another party acceptable to Lender, in its reasonable discretion), is sufficient in Lender's reasonable judgment, to enable restoration to be completed in accordance with the terms, covenants and conditions contained herein, (C) the estimated cost of restoration and repair of any improvements actually affected by the casualty will not exceed $1,000,000.00 (as determined by Lender, acting reasonably); (D) the estimated time to complete the restoration, as determined by Lender and any Construction Consultant, will not be greater than one hundred eighty days (180) after the date of the casualty, or result in forecasted completion of restoration to occur on or after the six month period prior to the Maturity Date; (E) an updated MAI appraisal of the Mortgaged Property (if required by Lender in its reasonable business judgment, given the scope of the casualty and other circumstances then existing), shall show that the completed value of the entire Mortgaged Property, after the repair and restoration of the remaining portion of the Mortgaged Property is completed will not be materially less than the value of the entire Mortgaged Property immediately prior to the casualty; and (F) the term of, and proceeds derived from, Borrower's business interruption insurance (or other similar insurance), shall be sufficient to fully cover the period that the Mortgaged Property is undergoing restoration.

(3)     In no case shall any such application reduce or postpone any payments otherwise required pursuant to the Note, other than the final payment on the Note.

(4)     In the event that proceeds of insurance, if any, shall be made available to Borrower pursuant to the terms of this Section 4, Borrower hereby covenants to restore, repair, or rebuild the Mortgaged Property to be of at least equal value and of substantially the same character as prior to such damage or destruction or develop and build the Mortgaged Property in accordance with the Predevelopment Schedule, all to be effected in accordance with Legal Requirements and plans and specifications approved in advance by Lender (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that Borrower shall pay all costs (and if required by Lender, shall deposit the total thereof with Lender in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

21

(5)     In the event Borrower is to receive reimbursement out of insurance proceeds pursuant to this Agreement, such proceeds shall be disbursed from time to time upon Lender being furnished with: (A) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement, rebuilding, or construction in accordance with the Predevelopment Schedule; (B) funds, or, at Lender's option, assurances satisfactory to Lender that such funds are available, sufficient in addition to the proceeds of insurance to complete the proposed restoration, repair, replacement, rebuilding, or construction in accordance with the Predevelopment Schedule; and (C) such architect's certificates, waivers of Lien for work previously performed or contemporaneously funded, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve. Lender may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Lender prior to commencement of work (which approval shall not be unreasonably withheld). No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety (90%) percent of the value of the work performed from time to time. Funds other than proceeds of insurance shall be disbursed prior to disbursement of such proceeds, and at all times the undisbursed balance of such proceeds remaining in Lender's possession, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the restoration, repair, replacement or rebuilding, free and clear of all Liens and claims of Lien. Any surplus which may remain out of insurance proceeds held by Lender after payment of such costs of restoration, repair, replacement or rebuilding shall be delivered to Borrower, provided such restoration was performed in accordance with the provisions of this Section 4 and no Event of Default is continuing.

(6)     In the event that proceeds of insurance, if any, shall be made available to Borrower for the restoring, repairing, replacing or rebuilding of the Mortgaged Property, Borrower hereby covenants to restore, repair, replace or rebuild the Mortgaged Property to be of at least equal value and of substantially the same character as prior to such damage or destruction or to a condition consistent with the Plans and Predevelopment Schedule, all to be effected in accordance with Legal Requirement and plans and specifications approved in advance by Lender (which approval shall not be unreasonably withheld, conditioned or delayed).

(e)     Unless the premiums for the insurance carried in accordance with this Section 4 are deposited in escrow pursuant to Section 6 of this Agreement, the premiums shall be paid annually in advance.

(f)     Borrower shall not carry separate insurance, concurrent in kind or form or contributing in the event of loss, with any insurance required under this Section 4. Notwithstanding the foregoing, Borrower may carry insurance not required under this Agreement, provided any such insurance affecting the Mortgaged Property shall be for the mutual benefit of Borrower and Lender, as their respective interests may appear, and shall be subject to all other provisions of this Section 4.

22

(g)    Borrower shall cause each of the Construction Manager and Development Manager to maintain worker's compensation insurance (or a substitute insurance approved by the laws of the State of Hawaii), builder's all hazard risk (to the extent applicable) and public liability insurance and other insurance required under applicable law, in each case acceptable to Lender.

(h)    Lender acknowledges that as of the date hereof, the insurance coverages maintained by Borrower, as evidenced by the certificates of insurance Borrower has provided to Lender, have been approved by Lender.

5.    <u>Payment of Taxes</u>

Borrower shall pay all taxes, assessments, and impact fees, now or hereafter levied, assessed or imposed against the Mortgaged Property or any part thereof (collectively, the "<u>Taxes</u>") and all ground rents, maintenance charges, other governmental impositions, and other charges now or hereafter levied, assessed or imposed against the Mortgaged Property or any part thereof (collectively, the "<u>Other Charges</u>") as they become due and payable. Borrower will deliver to Lender evidence satisfactory to Lender that the Taxes and Other Charges have been so paid, or are not then delinquent, no later than thirty (30) days following the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer, and shall promptly cause to be paid and discharged, any Lien or charge whatsoever which may be or become a Lien or charge against the Mortgaged Property, and shall promptly pay for all utility services provided to the Mortgaged Property. Borrower shall furnish to Lender or its designee receipts, if any, for the payment of the Taxes, Other Charges and charges for utility services prior to the date that such obligations shall become delinquent. Borrower shall be entitled to contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount of any Taxes or Other Charges. Notwithstanding the immediately preceding sentence, during the pendency of any such contest Borrower shall pay or cause to be paid all Taxes and Other Charges as and when due and payable, or otherwise in accordance with <u>Section 32</u> hereof.

6.    <u>Tax and Insurance Escrow Fund</u>.

Subject to the terms of <u>subsection 2(c)</u> of this Agreement, Borrower shall pay to Lender on the first day of each calendar month: (i) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months (the "<u>Tax Escrow Fund</u>"); and (ii) one-twelfth ($^1/_{12}$) of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the "<u>Insurance Escrow Fund</u>"; the amounts described in clauses (i) and (ii) above, collectively, the "<u>Tax and Insurance Escrow Fund</u>"). The Tax and Insurance Escrow Fund and the monthly installments of principal and interest payable under the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender, subject to <u>Section 1</u> of the Note. Borrower hereby pledges to Lender any and all monies now or hereafter deposited in the Tax and Insurance Escrow Fund as additional security for the payment of the Debt. Lender will apply the Tax Escrow Fund to the payments of Taxes and the Insurance Escrow Fund to payments of Insurance Premiums required to be made by Borrower pursuant to <u>Sections 4 and 5</u> hereof; except, that, in Lender's sole and absolute discretion either fund may be

23

utilized to pay Taxes and Insurance Premiums where payment of such sums is past due. If the amount of the Tax and Insurance Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 4 and 5 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Fund. If the Tax Escrow Fund is not sufficient to pay the Taxes, Borrower shall promptly pay to Lender, within twenty (20) days after written demand, an amount which Lender shall estimate as sufficient to make up the deficiency. If the Insurance Escrow Fund is not sufficient to pay the Premiums, Borrower shall promptly pay to Lender, within twenty (20) days after written demand, an amount that Lender shall estimate as sufficient to make up the deficiency. During the continuance of an Event of Default, Lender may apply any sums then comprising the Tax and Insurance Escrow Fund to the payment of the Debt in any order in its sole discretion. Until expended or applied as above provided, any amounts in the Tax and Insurance Escrow Fund shall constitute additional security for the Debt. To the extent permitted by applicable law, the Tax and Insurance Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender. All earnings or interest on the Tax and Insurance Escrow Fund shall accrue for the benefit of Borrower and shall become part of the Tax and Insurance Escrow Fund, and shall be disbursed as provided in this Section. Borrower shall furnish to Lender evidence reasonably satisfactory to Lender of the timely payment in full of the Taxes and Insurance Premiums, which evidence shall be furnished within twenty (20) days after each such payment.

      7.     Budget; Property Cash Flow

          (a)     The Predevelopment Budget is attached hereto as Exhibit C-1.

          (b)     Borrower shall this day, or as soon hereafter as is practicable, establish and shall thereafter maintain the following interest-bearing escrow accounts at one or more federally insured institutions to be approved by Lender, which approval shall not be unreasonably withheld or delayed (collectively, "Accounts"), which shall have Lender as a beneficial owner, pledged or charged to Lender pursuant to the Loan Documents as additional security for the Loan:

          (1)     Tax and Insurance Escrow Account, into which shall be deposited monthly, an amount sufficient to satisfy Borrower's obligations under Section 6 hereof (the "Tax and Insurance Escrow Account").

          (2)     Lockbox Account, into which shall be deposited, during the continuation of an Event of Default, in accordance with Subsection 7(d), all revenues generated by or appurtenant to the Mortgaged Property.

          (c)     Servicer, as Lender's agent, shall have sole signatory authority with respect to any and all withdrawals from the Tax and Insurance Escrow Account and Borrower does hereby irrevocably authorize and direct Servicer to make all such withdrawals on Borrower's behalf to satisfy Borrower's obligations hereunder.

          (d)     If an Event of Default has occurred, and so long as an Event of Default continues, absent any other instructions Lender may, in its sole discretion, have given or elect to

24

give Borrower, all revenues generated by or appurtenant to the Mortgaged Property shall be deposited into the Lockbox Account within one business day after receipt of such revenues, and disbursed in accordance with <u>Section 10</u> of the Lockbox Agreement as follows (except any costs of collection and enforcement incurred by Lender which shall, if due and owing, be paid prior to any of the foregoing items, in Lender's sole discretion):

        (i)     First, to pay any sums required to be paid into the Tax and Insurance Escrow Account;

        (ii)    Next, to pay and discharge any operating and capital expenses identified in the Predevelopment Budget, as approved by Lender;

        (iii)   Next, to any interest then due and payable under the Loan;

        (iv)   Next, to pay the outstanding principal amount of the Loan; and

        (v)    Next, to repay any other Debt then due and payable to Lender.

Any sums remaining after application of revenues in accordance with (i) through (v) above, shall be disbursed to Borrower and applied as Borrower may elect.

        (e)    Subject to the terms of this Agreement, until the occurrence of an Event of Default, Borrower shall have the right to receive and control the use of Loan proceeds and revenues and proceeds from the Property.

        8.     <u>Condemnation</u>

        (a)    Borrower shall, promptly upon becoming aware thereof, give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding or the compulsory purchase of the whole or any part of the Mortgaged Property (a "<u>Condemnation</u>") and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment for such Condemnation and to make any compromise or settlement in connection with such proceeding, subject to the provisions of this Agreement. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note, the Mortgage, this Agreement, and the other Loan Documents, and the Debt shall not be reduced until any award or payment therefor shall have been actually received after expenses of collection and applied by Lender to the discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided in the Note.

        (b)    In the case of a Condemnation, Lender may: (A) settle and adjust any claim without the consent of Borrower, or (B) allow Borrower to agree with the condemning authority on the amount to be paid upon the Condemnation; <u>provided</u>, <u>however</u>, that Borrower may adjust losses aggregating not in excess of $50,000.00 if such adjustment is carried out in a

competent and timely manner, and provided in any case that Lender shall be, and is hereby, authorized to collect and receipt for any such Condemnation award or proceeds. Lender will hold any Condemnation award or proceeds actually received in an interest bearing account and any interest earned on such proceeds shall be deemed additional proceeds of such Condemnation award. The expenses incurred by Lender in the adjustment and collection of a Condemnation award or proceeds (including, without limitation, attorneys' fees and costs incurred in connection with any condemnation proceedings) shall become part of the Debt, shall be secured by the Mortgage and shall be reimbursed by Borrower to Lender within ten (10) days after written demand.

(c)     In the event of any Condemnation affecting all or any portion of the Mortgaged Property, Lender, in its sole and absolute discretion, may (i) apply such proceeds in reduction of the Debt, (ii) make the net condemnation proceeds available to Borrower for the purpose of restoring and repairing the Mortgaged Property or performing Predevelopment Work in accordance with the Predevelopment Schedule; provided that: at the time of each disbursement, (x) no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, and (y) no event of default exists under the Management Agreements, or (iii) reimburse Borrower for costs of repair or restoration of the Mortgaged Property from all or any portion of the net condemnation proceeds, based on consideration of such factors as Lender deems relevant including, without limitation, the following:  (A) the nature and extent of the loss, damage or destruction; (B) the estimated cost and expense of repairing and restoring the Mortgaged Property; (C) the extent to which the Mortgaged Property can be repaired and restored to its condition and utility prior to such condemnation; (D) the likely value and general utility of the Mortgaged Property following repair and restoration; (E) the extent to which the projected Loan-To-Value Ratio and the debt service coverage ratio for the Mortgaged Property following the completion of repair and restoration are consistent with Lender's then current standards for making mortgage loans on similar properties; (F) the termination rights of any tenants under Leases by reason of such condemnation or delays in repair and restoration; (G) the period of time remaining until the Maturity Date; and (H) termination rights of Construction Manager or Development Manager, as a consequence of such casualty.

Notwithstanding the immediately preceding paragraph to the contrary, in the case of a condemnation affecting less than thirty percent (30%) of any unimproved portion of the Mortgaged Property, Lender shall make the net condemnation proceeds available to Borrower for the purpose of restoring and repairing the Mortgaged Property (including repair and/or replacement of equipment and other personal property and any Development Improvements), subject to and in accordance with the terms, covenants and conditions set forth herein with respect to the disbursement of proceeds; provided that: (A) at the time of each disbursement, (x) no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, or (y) no event of default exists under the Management Agreements, (B) at the time of each disbursement, the amount of available condemnation proceeds, together with any other immediately available funds deposited by Borrower with Lender (or another party acceptable to Lender, in its reasonable discretion), is sufficient in Lender's reasonable judgment, to enable restoration to be completed in accordance with the terms, covenants and conditions contained herein, (C) the estimated cost of restoration and repair of any improvements actually affected by the condemnation will not exceed $1,000,000.00 (as determined by Lender, acting reasonably);

26

(D) the estimated time to complete the restoration, as determined by Lender and any Construction Consultant, will not be greater than one hundred eighty days (180) after the date of the condemnation, or result in forecasted completion of restoration to occur on or after the six month period prior to the Maturity Date; (E) an updated MAI appraisal of the Mortgaged Property (if required by Lender in its reasonable business judgment, given the scope of the condemnation and other circumstances then existing), shall show that the completed value of the entire Mortgaged Property, after the repair and restoration of the remaining portion of the Mortgaged Property is completed will not be materially less than the value of the entire Mortgaged Property immediately prior to the condemnation; and (F) the term of, and proceeds derived from, Borrower's business interruption insurance (or other similar insurance), shall be sufficient to fully cover the period that the Mortgaged Property is undergoing restoration.

(d)      In the event Lender retains the proceeds and applies same toward the payments of the Debt, the payments due under the Note shall be adjusted accordingly.

(e)      In the event that a Condemnation award or proceeds, if any, shall be made available to Borrower for the restoring or repairing of the Mortgaged Property, Borrower hereby covenants to restore or repair the Mortgaged Property to be of at least equal value and of substantially the same character as prior to such Condemnation or to a condition consistent with the Plans and Predevelopment Schedule (and Construction Plans, if applicable), all to be effected in accordance with Legal Requirements and plans and specifications approved in advance by Lender (which approval shall not be unreasonably withheld, conditioned or delayed); provided, however, that Borrower shall pay all costs (and if required by Lender, shall deposit the total thereof with Lender in advance) of such restoring or repairing, in excess of the net award or proceeds made available pursuant to the terms hereof.

(f)      In the event Borrower is to receive reimbursement out of proceeds pursuant to this Agreement, such proceeds shall be disbursed from time to time upon Lender being furnished with: (i) evidence satisfactory to it of the estimated cost of completion of the restoration or repair; (ii) funds, or, at Lender's option, assurances satisfactory to Lender that such funds are available, sufficient in addition to the Condemnation award or proceeds to complete the proposed restoration or repair; and (iii) such architect's certificates, waivers of Lien for work previously performed or contemporaneously funded, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve. Lender may, in any event, require that all plans and specifications for such restoration or repair, be submitted to and approved by Lender prior to commencement of work (which approval shall not be unreasonably withheld). No payment made prior to the final completion of the restoration or repair, shall exceed ninety (90%) percent of the value of the work performed from time to time. Funds other than the Condemnation award or proceeds shall be disbursed prior to disbursement of such proceeds, and at all times the undisbursed balance of such proceeds remaining in Lender's possession, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the restoration or repair, free and clear of all Liens and claims of Lien. Any surplus which may remain out of a Condemnation award or proceeds held by Lender after payment of such costs of restoration or repair, shall be delivered to

27

Borrower, provided such restoration was performed in accordance with the provisions of this Section 8, and no Event of Default has occurred and is continuing.

9.      Leases and Rents

(a)      In connection with the Loan, Borrower has absolutely and unconditionally assigned to Lender, pursuant to the Mortgage, all of Borrower's right, title and interest in all current and future Leases and Rents, it being intended by Borrower that such assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise to impose any obligation upon Lender. Borrower shall execute and deliver to Lender such additional instruments, in form and substance reasonably satisfactory to Lender, as may hereafter be requested by Lender to further evidence and confirm such assignment. Nevertheless, subject to the terms of this Section 9, Lender has granted to Borrower a revocable license to operate and manage the Mortgaged Property and to collect the Rents. Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums. During the continuance of an Event of Default, the license granted to Borrower shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents, whether or not Lender enters upon or takes control of the Mortgaged Property. Lender is hereby granted and assigned by Borrower the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after revocation of the license may be applied toward payment of the Debt in such priority and proportions as Lender in its discretion shall deem appropriate.

(b)      Borrower shall furnish Lender with executed copies of all Leases. All renewals of Leases and all proposed Leases shall provide for rental rates comparable to existing local market rates and shall be arms-length transactions. All Leases entered into after the date hereof shall provide that they are subordinate to the Mortgage and that the lessee agrees to attorn to Lender. All proposed Leases shall be subject to the prior approval of Lender, which approval shall not be unreasonably withheld or delayed, provided that Lender's prior approval shall not be required for Leases that comply with the following requirements:

(A)      such Lease is terminable by lessor upon thirty (30) days notice to the tenant under such Lease;

(B)      the net income from such Lease is less than $15,000.00 per year;

(C)      the tenant under any such Lease is an independent third party unaffiliated with Borrower;

(D)      the Rents due and payable thereunder and the other terms and conditions of such Lease were agreed to as the result of good faith, bona fide arms-length negotiations;

28

LA1 789909

(E)     such Lease is expressly by its terms subject and subordinate to the
Mortgage and provides for the attornment of the tenant to Lender, its successors,
assignees or designees;

(F)     the tenant under such Lease intends to use and occupy the space
demised thereby in the conduct of its business and not for the purpose of releasing or
subleasing;

(G)     such space is to be used solely for legal purposes;

(H)     such Lease does not grant any option or right to acquire the
Mortgaged Property or any part thereof or interest therein; and

(I)     no Event of Default is continuing under this Agreement or the
other Loan Documents.

Upon Borrower's request with respect to a Lease approved by Lender (whether or not
such approval is required pursuant to the first paragraph of this Subsection 9(b)), Lender will
execute Lender's form of non-disturbance or similar recognition agreement in favor of tenant
under such Lease. Subject to the terms of this Section, Borrower shall: (i) subject to the exercise
of Borrower's good faith judgment, observe and perform all the material obligations imposed
upon the lessor under a Lease; (ii) not do or permit to be done anything to impair the value of the
Leases as security for the Debt; (ii) promptly send to Lender copies of all notices of default
which Borrower shall send or receive thereunder; (iii) subject to the exercise of Borrower's good
faith judgment, enforce all of the terms, covenants and conditions contained in the Lease on the
part of the lessee thereunder to be observed or performed; (iv) not collect any Rents more than
one month in advance; (v) not execute any other assignment of the lessor's interest in the Leases
or Rents; (vi) other than de minimis non-financial amendments, not alter, modify or change the
terms of the Leases without the prior written consent of Lender (which consent shall not be
unreasonably withheld), or, except if a lessee is in default, cancel or terminate the Leases or
accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of
the Mortgaged Property or of any interest therein so as to effect a merger of the estates and rights
of, or a termination or diminution of the obligations of, lessees thereunder; (vii) deliver to Lender
copies of any amendment or modification of any Lease within two (2) business days after the
same is executed and delivered by lessee to Borrower; (viii) subject to the exercise of Borrower's
good faith judgment, not consent to any assignment of or subletting under the Leases not in
accordance with their terms, without the prior written consent of Lender; and (ix) execute and
deliver at the request of Lender all such further assurances, confirmations and assignments in
connection with the Mortgaged Property as Lender shall from time to time request.
Notwithstanding the foregoing, Lender hereby consents to the termination by Borrower, in its
discretion, of any and all Leases and license agreements disclosed on the certified rent roll
delivered to Lender on the Closing Date.

(c)     Unless permitted by applicable law, all security deposits of lessees,
whether held in cash or any other form, shall not be commingled with any other funds of
Borrower. Borrower shall provide Lender with evidence reasonably satisfactory to Lender of
Borrower's compliance with the foregoing. Following the occurrence and during the

29

continuance of any Event of Default, Borrower shall, upon Lender's request, if permitted by any applicable legal requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Mortgaged Property, to be held by Lender subject to the terms of the Leases.

    10.    Representations Concerning Loan

    Borrower represents, warrants and covenants as follows:

        (a)    The Note, the Mortgage, this Agreement and the other Loan Documents are the legal, valid and binding obligations of Borrower and are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor would the operation of any of the terms of the Note, this Loan Agreement, the Mortgage, and the other Loan Documents, or the exercise of any right thereunder, render the Note, this Loan Agreement, the Mortgage or any other Loan Document unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except to the extent such unenforceability may be the result of bankruptcy, insolvency, reorganization or similar laws affecting rights of creditors generally or general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and Borrower has not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

        (b)    All certificates, permits, licenses and other authorizations of Governmental Authorities which are necessary for the subdividing, clearing, grading or otherwise preparing for development of the Mortgaged Property have been duly obtained by or on behalf of Borrower, or will be obtained prior to when needed, and shall at all times thereafter remain in full force and effect, and copies of the same shall be furnished to Lender within five (5) days after being obtained.

        (c)    To Borrower's knowledge, and except as disclosed on any Title Policy and/or any survey of the Mortgaged Property delivered to Lender in connection with the Loan, (i) no improvements on adjoining properties encroach upon the Real Property, and (ii) no easements or other encumbrances on adjoining properties encroach upon Mortgaged Property, so as to materially adversely affect the value or marketability of the Mortgaged Property.

        (d)    To Borrower's knowledge, all surveys of the Mortgaged Property delivered to Lender in connection with this Agreement have been performed by duly licensed surveyors or registered professional engineers in the jurisdiction in which the Mortgaged Property is situated, and do not fail to reflect any material matter affecting the Mortgaged Property or the title thereto.

        (e)    The Real Property is not subject to any Leases other than the Leases described in the certified rent roll delivered to Lender on the Closing Date and true, correct and complete copies of such Leases have been delivered to Lender. Such rent roll accurately states the amounts payable under the Leases and the other information set forth in such rent roll is true, correct and complete in all material respects. No Person has any possessory interest in the

30

Property or right to occupy the same except under and pursuant to the provisions of the Leases and licenses listed on the certified rent roll delivered to Lender on the Closing Date. All Leases are by their terms or by the terms of a separate subordination agreement (which Borrower has delivered a copy of to Lender), either freely terminable by Borrower or subordinate to the lien of the Mortgage. Borrower is the sole owner of the landlord's interest in the Leases and none of the Leases or Rents have been assigned, pledged or hypothecated except in connection with the Loan (or to a lender whose loans have been, or will with the Loan proceeds be, paid off and such assignment therefor released), and none of the Rents have been discounted, released, waived or compromised. Except as otherwise disclosed in writing to Lender (including, without limitation, as disclosed in the Title Policy), (i) none of the Rents have been collected for more than one (1) month in advance; (ii) to Borrower's knowledge, there exist no offsets or defenses to the payment of any portion of the Rents; (iii) no Lease contains any option to purchase, right of first offer, right of first refusal to purchase, or any other similar provision; (iv) there are no agreements with Tenants other than as set forth in the Leases, including any revisions, amendments or modifications of the Leases; (v) there are no brokerage commissions or finder's fees due or payable with respect to any Leases; (vi) the Leases are in full force and effect and there are no material defaults thereunder by Borrower or any Tenant, and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute material defaults thereunder; and (vii) no person has any possessory interest in the Mortgaged Property or right to occupy any portion thereof.

(f)    The financial statements heretofore furnished to Lender are, as of the date specified therein, complete and correct in all material respects and fairly present the financial condition of Borrower as of such date, and are prepared in accordance with generally accepted accounting principles of the United States of America applied on a consistent basis. Borrower does not have on the date hereof any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any commitments which in each case are known to Borrower and which, in Borrower's opinion, are reasonably likely to result in a material adverse effect on the Mortgaged Property except as referred to or reflected or provided for in the financial statements heretofore furnished to Lender or as otherwise disclosed to Lender in writing. Since the last date of such financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or any Guarantor or Environmental Guarantor from that set forth in such financial statements as of the dates thereof.

(g)    Each of Waikapuna Borrower, Moaula Borrower, Honu'apo Borrower, Little Honu'apo Borrower, and Church Borrower is duly organized and validly existing in good standing under the applicable laws of the jurisdiction of its creation as a limited liability company, and each of Waikapuna Borrower, Moaula Borrower, Honu'apo Borrower, Little Honu'apo Borrower, and Church Borrower is qualified to do business in and is in good standing in the State of Hawaii, with full power, right, authority and legal capacity to enter into the Loan and the Loan Documents and to operate the Mortgaged Property as contemplated hereunder. Each of Waikapuna Borrower, Moaula Borrower, Honu'apo Borrower, Little Honu'apo Borrower, and Church Borrower is currently solvent.

31

(h)    A true and correct organizational chart outlining the percentage of ownership and capital structure of Borrower and the direct and indirect owners of Borrower is attached hereto as Exhibit D.

(i)    The execution, delivery and performance of the Loan Documents executed or delivered by Borrower and the consummation of the transactions contemplated thereby by Borrower: (i) have been duly authorized by all requisite actions; (ii) have been approved or consented to by all of Borrower's constituent persons or entities whose approval or consent is required to be obtained; (iii) do not require the approval or consent of any Governmental Authority having jurisdiction over Borrower or the Mortgaged Property except where such approval or consent has been obtained; (iv) do not and will not constitute a violation of, or default under, the governing instruments of Borrower or any applicable requirement of a Governmental Authority; and (v) will not be in contravention of any court or administrative order or ruling applicable to Borrower or the Mortgaged Property, or any mortgage, indenture, agreement, commitment or instrument to which Borrower is a party or by which it or its assets are bound, nor create or cause to be created any mortgage, Lien, encumbrance, or charge against the assets of Borrower other than those permitted by the Loan Documents.

(j)    There are no actions, suits or proceedings pending, or, to the knowledge of Borrower, threatened, nor any pending or, to the knowledge of Borrower, threatened labor disputes, against or affecting Borrower or the Mortgaged Property, or any other collateral covered by the Loan Documents, or involving the validity or enforceability of the Loan Documents or the priority of the liens created or to be created thereby, at law or in equity, or before or by any Governmental Authority, which, if adversely determined, would, in the reasonable determination of Lender, either individually or in the aggregate, have a material adverse affect on (i) the operation of the Mortgaged Property as contemplated hereunder, (ii) the ability of Borrower to pay all of its liabilities or to perform all of its obligations in the manner and within the time periods required under the Loan Documents, (iii) the validity, enforceability or consummation of the Loan Documents or the transactions contemplated thereby, or (iv) the title to the Mortgaged Property, the permitted uses of the Mortgaged Property or the value of the security provided by the Loan Documents.  Borrower is not subject to any order or injunction restraining Borrower from borrowing or entering into and completing the transactions constituted by the Loan Documents.

(k)    There is no operating agreement, management agreement, construction agreement, development agreement, or license agreement in effect with respect to all or part of the Mortgaged Property other than the other agreements listed on Exhibit B attached hereto.

(l)    (A) (i) All Parcel Borrowers are solvent (within the meaning of all Bankruptcy Laws) and no bankruptcy, reorganization, insolvency or similar proceeding with respect to any Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor under any Bankruptcy Law has been initiated, and (ii) the entering into the Loan Documents to which any Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor is a party does not constitute a fraudulent conveyance by any Person; and (B) no petition in bankruptcy has been filed by or against Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor, or any Affiliate thereof in the last seven (7) years, and none of Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor, or any related entity, or any principal, any general

32

partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any applicable Bankruptcy Laws. Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor has entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and each of Parcel Borrower, SPE Member, Guarantor or Environmental Guarantor has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities and its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of the obligations of Borrower).

(m)     Since the date of the information and documentation relating to the Mortgaged Property furnished by Borrower to Lender, no material change in the Mortgaged Property has occurred.

(n)     Except as otherwise previously disclosed to Lender in writing, to the best of Borrower's knowledge (after diligent inquiry and investigation), no notice of violation of any municipal ordinances has been filed against the Mortgaged Property by any Governmental Authority.

(o)     The Mortgaged Property complies in all material respects with all Environmental Laws and other similar laws.

(p)     Except as disclosed in writing to Lender prior to the date hereof, each Parcel is contiguous to, and has access to, public roads.

(q)     No portion of the Mortgaged Property has been taken in condemnation or other similar proceedings. Borrower has received no notice of an actual or threatened condemnation or eminent domain proceeding, or compulsory purchase by any public or quasi-public authority affecting the Mortgaged Property.

(r)     The Mortgaged Property is assessed for real estate tax purposes as one or more wholly independent tax lots, separate from any adjoining land or improvement not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Mortgaged Property or any portion thereof.

(s)     Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that would cause any representation or warranty made herein to be materially misleading. No statement of fact made by Borrower, Guarantor or Environmental Guarantor in this Agreement or in any of the other Loan Documents, nor any written materials relating to the business, operations or condition (financial or otherwise) of Borrower, or any

33

Affiliate thereof or the Property that were supplied to Lender in connection with Lender's due diligence investigation (other than financial projections in respect of which no representation is made) contains (or, in the case of such written material, at the time supplied contained) any untrue statement of a material fact or omits (or omitted, as the case may be) to state any material fact necessary to make the statements contained therein or in any of the Loan Documents not misleading. To the best of Borrower's knowledge, the representations and the warranties made by Guarantor and Environmental Guarantor in the Loan Documents are true and correct in all material respects.

(t)     No portion of the Mortgaged Property has been or will be purchased, improved, fixtured, equipped or furnished with proceeds of any criminal or other illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Mortgaged Property.

(u)     The Plans shall comply with all Legal Requirements.

(v)     The copies of the Management Agreements delivered by Borrower to Lender (1) are true and correct copies of such agreements, (2) are in full force and effect, and (3) there are no defaults thereunder.

(w)     There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(x)     Borrower has obtained and has delivered to Lender a certificate of insurance satisfactory to Lender reflecting the insurance coverages, amounts and other requirements set forth in this Agreement and there have been no acts or omissions that would impair the coverage of any such Policies or the benefits of the mortgagee endorsements, and Borrower shall deliver to Lender certified copies of all such Policies within ten (10) Business Days following the date of this Agreement.

(y)     Borrower has not entered into any Construction Documents or Construction Loan Documents.

(z)     Upon the consummation of this Loan transaction, none of Borrower, Guarantor, or any Affiliate of any of them shall have any obligations existing or outstanding, whether fixed or contingent, under the Hard Money Documents. Other than the Hard Money Documents, there are no agreements regarding the transactions that are the subject of the Hard Money Documents.

Borrower agrees that all of the representations and warranties set forth in this Section 10 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower; provided, however, that particular representations and warranties shall survive the complete payment of the Debt as specifically provided herein and/or in the other Loan Documents. All representations, warranties, covenants and agreements made in this Agreement

34

or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. Borrower acknowledges that the representations and warranties contained in the Loan Documents are a material inducement to Lender to make the Loan.

      11.     Single Purpose Entity; Authorization

     Borrower represents and warrants, and covenants that since its incorporation, and for so long as any of the Debt remains outstanding, as follows:

      (a)     No Parcel Borrower has owned, owns, or will own any asset or property other than: (i) the applicable Parcel; and (ii) incidental personal property necessary for the ownership, predevelopment, development or operation of such Parcel.

      (b)     No Parcel Borrower has engaged, engages, or will engage in any business other than the ownership, management, development and operation of the applicable Parcel.

      (c)     No Parcel Borrower has entered or will enter into any contract or agreement with any Guarantor, Environmental Guarantor or Affiliate, except upon terms and conditions that would be available on an arms-length third-party basis.

      (d)     Borrower will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than: (i) the Debt, (ii) a Construction Loan approved in writing by Lender pursuant to Section 71 hereof and (ii) trade, operational debt and equipment leases incurred in the ordinary course of business with trade creditors and equipment lessors and in amounts as are customary and reasonable under the circumstances (the aggregate value of all equipment that is subject to equipment leases related to Mortgaged Property shall not exceed $100,000.00, in the aggregate among all Parcel Borrowers, and anything over such amount shall be deemed unreasonable unless otherwise approved by Lender in its sole and absolute discretion (such equipment leases meeting the above criteria or otherwise approved by Lender being "Permitted Equipment Leases")). Except with Lender's prior written approval in each instance, no indebtedness other than the Debt, the Construction Loan, and the amounts payable under (and with respect to Permitted Equipment Leases, only secured to the extent of the equipment so leased) is or shall be secured by the Mortgaged Property. Lender's approval shall not be unreasonably withheld, conditioned or delayed. In connection with any such financing approved by Lender (including, without limitation, any Construction Loan), Borrower shall be required to obtain and deliver to Lender, in the case of a subordinate secured loan that is acceptable to Lender, a subordination and standstill agreement from such lender which shall be in form and substance reasonably satisfactory to Lender. No indebtedness other than the Debt and any Lender-approved Construction Loan may be secured by the Mortgaged Property or any portion thereof.

      (e)     No Parcel Borrower has made or will make any loans or advances to any third party (including any constituent party, Environmental Guarantor, any Guarantor or any Affiliate of any Parcel Borrower or SPE Member, of any constituent party or any Guarantor), except in de minimus amounts in the ordinary course of business of the character of trade or

operational expenses, in each case fully disclosed to Lender in Borrower's financial statements, reports delivered to Lender under this Agreement, and in any Budget.

(f)     Each Parcel Borrower has done or caused to be done, and will do or cause to be done, all things necessary to preserve its existence, and no Parcel Borrower will, nor will any Parcel Borrower permit any constituent party or Guarantor or Environmental Guarantor, to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, trust or any Organizational Documents, as the case may be, of such Parcel Borrower, without in each case the prior written consent of Lender. The foregoing shall not limit Borrower's right to effect certain Transfers as specifically described in Section 13 hereof and to amend such Organizational Documents in such a manner as may be reasonably required to do so in connection therewith provided that Borrower delivers to Lender copies of any such amendments within five (5) business days after the same are executed and delivered.

(g)     Each Parcel Borrower will maintain books and records and bank accounts separate from those of its Affiliates and any constituent party, and each Parcel Borrower will file or cause to be filed separate tax returns. No Parcel Borrower shall change the principal place of its business without providing Lender with at least thirty (30) days prior written notice of such change to Lender and executing such additional UCC-3 financing statements as Lender may require in order to reflect such change of address.

(h)     Each Parcel Borrower has, is and will be, and at all times has and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Parcel Borrower, any constituent party of any Parcel Borrower, any Guarantor or Environmental Guarantor or any Affiliate of any constituent party or Guarantor).

(i)     No Parcel Borrower nor any constituent party has caused or sought, or will cause or seek, the dissolution or winding up, in whole or in part, of any Parcel Borrower.

(j)     No Parcel Borrower has commingled, and no Parcel Borrower will commingle, any funds and other assets with those of any constituent party, any Guarantor or Environmental Guarantor, any Affiliate of any Parcel Borrower, of any constituent party or of any Guarantor or Environmental Guarantor, or any other person.

(k)     No Parcel Borrower has filed or will file or consent to the filing of any petition to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors.

(l)     No Parcel Borrower has held, does hold, or will hold itself out to be responsible for the debts or obligations of any other person (except as specifically provided under the Loan Documents, including without limitation the joint and several liability of all Parcel Borrowers for the Debt).

(m)     No Parcel Borrower will take any action or permit any action or inaction which could result in any Parcel Borrower not being in compliance with this Section 11.

36

(n)     No Parcel Borrower shall cancel or otherwise forgive or release any claim or debt owed to any Parcel Borrower except for adequate consideration and in the ordinary course of business.

(o)     The sole member of each Parcel Borrower shall be the SPE Member. Each Parcel Borrower shall at all times be member-managed by the SPE Member. The SPE Member will at all times comply (subject to modifications as may be necessary (1) to reflect the fact that it owns the equity in all Parcel Borrowers, and (2) to state that the SPE Member will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation)), and will cause all Parcel Borrowers to comply, with each of the representations, warranties and covenants contained in this <u>Section 11</u> as if such representation, warranty or covenant was made directly by such SPE Member. Without limiting the restrictions on Transfers set forth in <u>Section 13</u> hereof, upon the withdrawal, removal or disassociation of the SPE Member from any Parcel Borrower, such Parcel Borrower shall immediately cause a new member to be appointed whose articles of incorporation or articles of organization are substantially similar to those of the SPE Member and deliver a new non-consolidation opinion to Lender and the Rating Agency or Rating Agencies, as applicable, with respect to the new SPE Member and its equity owners. Except as specifically permitted pursuant to the terms of this Agreement, in no event shall SPE Member shall be removed from any Parcel Borrower without also being removed from all other Parcel Borrowers.

(p)     Borrower shall at all times cause there to be at least one duly appointed independent manager (an "<u>Independent Director</u>") of SPE Member reasonably satisfactory to Lender who shall not have been at the time of such individual's initial appointment, and may not have been at any time during the preceding five years, and shall not be at any time while serving in the capacity of Independent Director, either (A) a shareholder of, or an officer, director (other than as the Independent Director), partner or employee of, Borrower, or any of Borrower's members, partners, members, subsidiaries or Affiliates, (B) a shareholder, director, officer, employee, partner, member or customer of, or supplier or service provider to (including professionals), or other Person who derives more than 10% of its purchases, revenues, compensation, or other financial remuneration from its activities with, Borrower, the entity for which he or she acts as the Independent Director (if other than Borrower) or any of the members, directors, officers, employees, partners, members, subsidiaries or Affiliates of Borrower, or such entity or who otherwise is financially dependent upon Borrower such entity or any of the shareholders, directors, officers, employees, partners, members, subsidiaries or Affiliates or Borrower or such entity, (C) a Person controlling or under common control with any such shareholder, officer, director, partner, member, employee, supplier or customer, or (D) a family member (by blood or marriage) of any such shareholder, officer, director, partner, member, employee, supplier or customer. As used herein, the term "control" has the meaning set forth in the definition of Affiliate.

(q)     Borrower shall not cause or permit SPE Member to take any action which, under the terms of the Organizational Documents of SPE Member, requires a vote of an Independent Director unless at the time of such action there shall be at least one Independent Director of SPE Member.

37

(r)    Each Parcel Borrower will continuously maintain the requirement in its Operating Agreement by which it is required to obtain the consent of the independent managers named therein for (i) the filing of a voluntary petition in bankruptcy or other similar relief, of (ii) the liquidation, dissolution (in whole or in part) merger or consolidation with or into any other Person.

(s)    All Parcel Borrowers shall conduct their affairs so that all assumptions made in any non-consolidation opinion delivered in connection with the Closing of the transaction contemplated hereby shall at all times be true and correct in all respects.

12.    Predevelopment and Management of Mortgaged Property

(a)    Borrower shall and shall cause the Managers to promptly repair or restore any material part of the Mortgaged Property which may be destroyed by any casualty to the condition the Mortgaged Property was in prior to such casualty or to a condition consistent with the Plans and Schedule. Except as expressly permitted in writing by Lender (which permission shall not be unreasonably withheld, conditioned or delayed) or as expressly contemplated in the Predevelopment Schedule, Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction limiting or defining the uses which may be made of the Mortgaged Property or any part thereof. Except as otherwise expressly permitted herein or in any other Loan Document, Borrower shall not enter into any license, easement, covenant or other agreement affecting the Mortgaged Property without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    Borrower shall not commit or suffer any waste on or to the Mortgaged Property or take any action that might invalidate or give cause for cancellation of any insurance policy, or do or permit to be done thereon anything that may in any way impair the value of the Mortgaged Property or, except to the extent expressly permitted herein, the security provided in connection with the Loan. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Real Property, regardless of the depth thereof or the method of mining or extraction thereof.

(c)    Subject to Section 32, Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Mortgaged Property and promptly discharge, bond over or otherwise protect against (in a manner that is reasonably satisfactory to Lender) the enforcement of any Lien or security interest related thereto, and in any event never permit to be created or exist in respect of the Mortgaged Property or any part thereof any voluntary Lien or security interest other than the Liens or security interests hereof, except as otherwise expressly permitted by Lender or permitted by this Agreement.

(d)    If reasonably requested by Lender in order to facilitate the Predevelopment Work, Borrower shall commence and diligently pursue to completion "quiet title" actions under applicable law, at Borrower's sole cost and expense, regarding any and all portions of the Mortgaged Property which the Title Policy excepts from full coverage due to the

38

failure of recorded documents to conclusively demonstrate that ownership of such portions of the Mortgaged Property are legally and solely vested in Borrower. Borrower shall keep Lender reasonably informed of any such actions, including without limitation, by delivering such documents and information as Lender may reasonably request regarding same.

13.    Transfer or Encumbrance of the Mortgaged Property

(a)    Borrower acknowledges that Lender has examined and relied on the creditworthiness and experience of Borrower and its members or principals in agreeing to make the Loan, and that Lender will continue to rely on Borrower's ownership, development, and operation of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should an Event of Default occur, Lender can recover the Debt by enforcing its security over the Mortgaged Property pursuant to the Mortgage or otherwise. Except as otherwise permitted herein, Borrower shall not, without the prior written consent of Lender, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred. The foregoing limitations contained in this Subsection 13(a) shall not apply to the grant of a mortgage or other assignment to Construction Lender in connection with a Construction Loan entered into by Borrower in accordance with this Agreement.

(b)    A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this Section shall be deemed to include: (i) an installment sales agreement wherein any Parcel Borrower agrees to sell the Mortgaged Property or any part thereof for a price to be paid in installments; (ii) an agreement by any Parcel Borrower leasing all or substantially all of a Parcel or the Mortgaged Property or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if any Parcel Borrower, any Guarantor, or any member of any Parcel Borrower or any Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than forty-nine (49%) percent of such corporation's stock shall be vested in a party or parties who are not now stockholders; and (iv) if Parcel Borrower, any Guarantor or any member of any Parcel Borrower or any Guarantor is a limited or general partnership, joint venture, or limited liability company the change, removal or resignation of a general partner, managing partner, joint venturer, or managing member, or the transfer of the partnership interest of any general or limited partner, managing partner or joint venturer, or membership interest of any member; provided, however, that, subject to the conditions, limitations and restrictions set forth in subsection (c), the direct and indirect holders of ownership interests in each Parcel Borrower are permitted to transfer, without Lender's consent, directly or indirectly, their respective direct or indirect interests in the Parcel Borrowers (the "Member Interests") to one or more of such holder's spouse, children or grandchildren, only for estate planning purposes, or to a trust for the benefit of such family members.

39

(c)      Notwithstanding anything contained herein to the contrary, (x) Transfers
of interests by the members in the SPE Member pursuant to the operating agreement of SPE
Member in effect as of the date hereof and/or (y) any transfers or issuances of indirect interests
in Borrower shall be permitted (each of (x) and (y), a "Permitted Transfer"), provided that in all
cases as a condition to a Permitted Transfer, (1) following such transfer Worden must hold a
Controlling Interest in every Parcel Borrower and SPE Member, (2) Lender shall receive prior
written notice of all proposed transfers of Member Interests, and shall be provided with copies of
all documents executed or to be executed in connection with all such transfers, (3) no Permitted
Transfers shall release any Guarantor or Environmental Guarantor from his or her obligations
under his or her guaranty, (4) all documentation executed by transferors and/or transferees of
Member Interests shall be in form and substance acceptable to Lender in its reasonable
judgment, (5) no Permitted Transfers shall be permitted while any default or Event of Default
shall be continuing under this Loan Agreement, and (6) all reasonable costs and expenses
incurred by Lender in connection with its review and approval of the foregoing (including
attorneys' fees and disbursements), to the extent such review and approval are required
hereunder, shall be fully paid by Borrower. As used in this Agreement, "Controlling Interest"
means (x) the legal or beneficial ownership, use, enjoyment or benefit of, directly or indirectly
through one or more intermediate persons:  (i) in the case of a corporation, (A) twelve and one-
half percent (12.5%) or more of the issued and outstanding shares of any class of stock of such
corporation, (B) twelve and one-half percent (12.5%) or more of the aggregate of all issued and
outstanding shares of all classes of stock of such corporation or (C) the right to receive twelve
and one-half percent (12.5%) or more of any dividends or other distributions made by such
corporation at any time or from time to time; (ii) in the case of a limited liability company, (A)
any managing membership interest therein, (B) twelve and one-half percent (12.5%) or more of
any interest in a managing member therein, (C) twelve and one-half percent (12.5%) or more of
the member interests of all the members therein, or (D) the right to receive twelve and one-half
percent (12.5%) or more of any profits, gains, losses, cash flow or distributions of such company
at any time or from time to time; (iii) in the case of a general partnership or joint venture, (A)
twelve and one-half percent (12.5%) or more of any interests of all the partners or venturers
therein or (B) the right to receive twelve and one-half percent (12.5%) or more of any profits,
gains, losses, cash flow or distributions of such partnership or joint venture at any time or from
time to time; (iv) in the case of a trust or other entity, (A) twelve and one-half percent (12.5%) or
more of the interests of all persons owning, using, enjoying or benefiting from such entity or (B)
the right to receive twelve and one-half percent (12.5%) or more of the profits, gains, losses, cash
flow or distributions of such entity at any time or from time to time; or (v) in the case of a
limited partnership, (A) any general partner's interest therein, (B) twelve and one-half percent
(12.5%) or more of any interest in a general partner therein, (C) twelve and one-half percent
(12.5%) or more of the limited partnership interests of all the partners therein, or (D) the right to
receive twelve and one-half percent (12.5%) or more of any profits, gains, losses, cash flow or
distributions of such company at any time or from time to time; and (y) the power, direct or
indirect, to direct or cause the direction of the management and policies of the subject entity,
whether through the ownership of voting stock, by contract, as trustee or executor, or otherwise.

(d)      Nothing contained in this Section 13 shall restrict or require Lender's
consent to the admission of new members into SPE Member so long as following such admission
Worden would at all times hold a Controlling Interest in every Parcel Borrower and SPE
Member. Notwithstanding any provisions hereunder permitting transfers of direct or indirect

40

interests in Borrower, Worden shall at all times have the power, direct or indirect, to direct or cause the direction of the management and policies of every Parcel Borrower, SPE Member, and the Mortgaged Property, whether through the ownership of voting stock, by contract, as trustee or executor, or otherwise.

(e)    Unless otherwise expressly permitted hereunder or under any other Loan Document, no sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property or any part thereof (excluding Release Parcels sold in accordance with Section 66), shall be permitted during the term of the Loan without Lender's prior written approval. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any impermissible sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property without Lender's consent. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property (excluding Release Parcels sold in accordance with Section 66) regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property.

(f)    Notwithstanding anything to the contrary contained in this Section 13, Lender shall not unreasonably withhold its consent to a one-time transfer of, and the release of the Liens of the Loan Documents from, the "123 Parcel" as defined in that certain Settlement Agreement dated as of July 31, 2006 by and among KHC, UE, Kenner, and SPE Member (the "Settlement Agreement"), as and when such transfer and lien release is contemplated in the Settlement Agreement, upon Borrower's delivery to Lender of evidence reasonably satisfactory to Lender that all of the conditions set forth in Sections 7(i), 7(ii), 7(iii), and 7(iv) of the Settlement Agreement (collectively, the "123 Parcel Release Conditions") have been satisfied. Borrower acknowledges that Lender's withholding of its consent to the transfer of the 123 Parcel shall be deemed reasonable if all of the 123 Parcel Release Conditions have not been satisfied in accordance with this Section 13(f) on or before the date on which Borrower requests such consent by Lender. Lender agrees to release the 123 Parcel from the lien created by the Mortgage and the provisions of all other Loan Documents promptly after the satisfaction of the 123 Parcel Release Conditions in accordance with this subsection 13(f), provided Borrower shall have delivered to Lender (x) all other documents, certificates, instruments, opinions or assurances as Lender may reasonably require, including without limitation, any endorsements to the Title Policy satisfactory to Lender, all at Borrower's sole cost and expense, and (y) all out-of-pocket costs and expenses of Lender, including, without limitation, reasonable, out-of-pocket attorneys' fees, in connection with the release of the 123 Parcel.

(g)    Notwithstanding anything to the contrary contained in this Section 13, Lender shall not unreasonably withhold its consent to the granting of utility and/or access easements or recording of covenants, conditions and restrictions and other similar day-to-day activities so long as (i) the same would not have a material adverse effect on Borrower, the Loan, or the Mortgaged Property, (ii) the same are consistent with the Development Plans, and (iii) neither the granting of such easement or document nor the existence of such easement or document, nor the effect of such easement or document shall result in a Substantial Deviation; provided, however, that if Borrower delivers to Lender a notice and request for consent to such easement, covenants, conditions, and restrictions or other activities, which notice shall (x)

41

describe in reasonable detail such easement, covenants, conditions, and restrictions or other activities, (y) include copies of all such draft or proposed documents in connection therewith, and (z) include on the first page of such notice and request the Approval Notice Legend (as defined in Section 38 below), and Lender then fails to respond to such notice and request within five (5) Business Days thereafter, Lender shall be deemed to have consented to the easement, covenants, conditions, and restrictions or other activities set forth in such notice and request for consent.

(h)     Lender's consent to one sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property shall not be deemed to be a waiver of Lender's right to require such consent in the future. Any sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property made in contravention of this Section 13 shall be null and void and of no force or effect.

(i)      Borrower agrees to bear and shall pay or reimburse Lender within ten (10) days after written demand for all expenses (including, without limitation, Lender's out-of-pocket attorney's fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval or disapproval, and documentation of any such sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer.

14.    Estoppel Certificates; Affidavits

(a)     Within ten (10) days after request by Lender or Borrower, but with respect to Lender no more than twice in any given consecutive twelve (12) month period, the non-requesting party shall furnish the requesting party a statement, duly acknowledged and certified, setting forth: (i) the amount of the original principal amount of the Note; (ii) the then outstanding principal balance of the Note; (iii) the rate of interest of the Note; (iv) the date on which installments of interest and/or principal were last paid; (v) any offsets or defenses to the payment of the Debt; and (vi) that the Note, the Mortgage, this Agreement, the Environmental Agreement and the other Loan Documents are valid, legal and binding obligations, which have not been modified or if modified, giving particulars of such modification.

(b)     Within ten (10) days after request by Lender, but in no event more than twice in any given consecutive twelve (12) month period, Borrower shall furnish Lender with a certificate reaffirming all representations and warranties of Borrower set forth herein and in the other Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes. Borrower acknowledges that delivering any such certificate shall not limit Borrower's obligations to comply with every other covenant of Borrower contained in the Loan Documents.

(c)     Borrower shall use its good faith efforts to deliver to Lender upon written request, tenant estoppel certificates from each tenant under a Lease in form and substance reasonably satisfactory to Lender; provided, however, that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

15.    Changes in the Laws Regarding Taxation

42

If any law is enacted, adopted or amended after the date of this Agreement which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation, or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Mortgaged Property, Borrower will pay such tax, with interest and penalties thereon, if any. In the event that Lender or its counsel determines that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

16.    No Credits on Account of the Debt

Borrower will not claim, demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property, or any part thereof, for real estate tax purposes by reason of the Mortgage or the Debt. In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

17.    Documentary Stamps

If at any time the United States of America, or any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or the Mortgage, or shall impose any intangible tax or other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

18.    Controlling Agreement

It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Section 18 shall control every other covenant and agreement in this Agreement and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited on the principal balance of the Note and all other Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until

43

payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

19.   Books and Records

(a)   Borrower will maintain full and accurate books of accounts and other records reflecting the operations of the Mortgaged Property.

(b)   Borrower shall furnish, within ninety (90) days following the end of each calendar year, a statement of the financial affairs and condition of the Mortgaged Property, including a statement of profit and loss and a balance sheet for the Mortgaged Property (and the Borrower) for the immediately preceding fiscal year, prepared by an independent certified public accountant approved by Lender which approval shall not be unreasonably withheld.

(c)   Borrower will furnish, or cause to be furnished to Lender, within fifteen (15) days after the end of each calendar quarter, the following items, each certified by a member or officer of Borrower, to his best knowledge after due inquiry and investigation, as true, correct and complete as of the end of and for such period, and as having been prepared in accordance with generally accepted accounting principles of the United States of America, consistently applied: (a) a written occupancy statement or rent roll dated as of the last day of the most recently ended calendar month identifying each of the Leases by the term, space occupied, rental required to be paid, security deposit paid, any rental concessions, and identifying any defaults or payment delinquencies thereunder; and (b) monthly and year to date operating statements detailing the total revenues received and total expenses incurred in connection with the ownership and operation of the Mortgaged Property, including a comparison of the budgeted income and expenses and the actual income and expenses for such month and the year to date; (c) a written statement dated as of the last day of the most recently ended calendar quarter showing the total fees, dues, reimbursements and other receipts derived from the Mortgaged Property, and (d) at any time that the work contemplated in the Plans is being performed, a written summary of the status of such work and a comparison between budgeted costs associated with such work and actual costs of performing same. Borrower will provide to Lender promptly a detailed explanation of any variances of ten (10%) percent or more between budgeted and actual amounts for such periods.

20.   Performance of Agreements

Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all principal, interest, costs, fees and expenses to the extent required under, the Loan Documents. Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any other agreement or recorded instrument affecting or pertaining to Borrower or the Real Property.

21.   Further Assurances

44

LA1 789909

(a)   Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, Uniform Commercial Code financing statements or continuation statements, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording the Mortgage. Borrower, within ten (10) days after written demand, will execute and deliver and hereby authorizes Lender, upon Borrower's failure to so executed within such ten (10) day period, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Mortgaged Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation such rights and remedies available to Lender pursuant to this Section 21; provided, however, that so long as no Event of Default is continuing, Lender will first seek Borrower's assistance prior to acting as its attorney in fact, which assistance shall not be, in Lender's opinion, unreasonably withheld or delayed; and Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's exercise of Lender's rights under this Section 21 or the execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney, unless such claim or cause of action results from Lender's gross negligence or willful misconduct, or unless Lender has failed to seek Borrower's cooperation as required above.

22.   Recording of Mortgage

Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time, will cause the Mortgage, and any security instrument creating a lien or security interest or evidencing the lien thereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest thereof upon, and the interest of Lender in, the Mortgaged Property. Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Mortgaged Property and any instrument of further assurance, and all taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Mortgage.

23.   Reporting Requirements

45

Borrower agrees to give prompt notice to Lender of (a) the bankruptcy filing of Borrower, SPE Member, or any constituent thereof, (b) the death or bankruptcy filing of any Guarantor or Environmental Guarantor, (c) any litigation or governmental proceeding pending or threatened against Borrower or the Mortgaged Property, or (d) any material adverse change to the Mortgaged Property.

24.    Events of Default

The term "Event of Default" as used herein shall mean the occurrence or happening, at any time and from time to time, of any one or more of the following:

(a)    subject to Subsection 1(h) of the Note, if any portion of the Debt is not paid prior to the fifth (5th) day after such portion is first due and owing, or if the entire Debt is not paid on or before the Maturity Date;

(b)    subject to Borrower's right to contest as provided herein, if any of the Taxes or Other Charges are not paid within ten (10) days after the same are due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement and Lender fails to pay same;

(c)    if the Policies are not kept in full force and effect;

(d)    if Borrower transfers or encumbers any portion of the Mortgaged Property in a manner inconsistent with the terms of this Agreement;

(e)    any representation or warranty made by Borrower, any Parcel Borrower, Guarantor, or Environmental Guarantor herein or in any other Loan Document, or in any material report, certificate, financial statement or other instrument, agreement or document furnished to Lender in connection with the Loan, shall have been false or misleading in any material respect;

(f)    if Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor shall make an assignment for the benefit of creditors, or if Borrower shall generally not be paying its debts as they become due;

(g)    if (i) Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor shall commence any case, proceeding or other action (A) under any existing or future Bankruptcy Laws, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor or for all or any substantial part of the assets of Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor, or Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor shall make a general assignment for the benefit of creditors; or (ii) there shall be commenced against Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (1) results in the entry of an order for relief or any such adjudication or appointment or (2) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint

46

or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (iv) the Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due (provided, however, that solely for the purposes of this subsection 24(g), neither the term "Guarantor" nor the term "Environmental Guarantor" shall include Kenner).

(h)     if Borrower shall be in default beyond any applicable notice, and cure or grace period under any other mortgage or security agreement covering any part of the Mortgaged Property, whether it be superior or junior in lien to the Mortgage; provided, however, the foregoing shall not be deemed to permit Borrower to incur any other Indebtedness unless expressly permitted by the Loan Documents;

(i)     if Borrower fails to cure promptly, after receipt of written notice from Lender or any Governmental Authority, any violations of laws or ordinances affecting the Mortgaged Property; provided, however, that same shall not constitute an Event of Default so long as Borrower shall be contesting such violation in good faith, and such contest will not subject Borrower, or the Mortgaged Property to the possibility of additional sanction or penalty;

(j)     if Borrower or any Guarantor or Environmental Guarantor causes or institutes any proceeding for the dissolution or termination of Borrower or any Guarantor;

(k)     subject to Borrower's right to contest contained herein, if Borrower fails to pay or cause to be paid, within thirty (30) days after Borrower's receipt and notice that same are due and payable, all franchise taxes of Borrower, or assessments, water rates and charges, and other governmental charges, general and special, ordinary and extraordinary, foreseen as well as unforeseen, of any kind and nature whatsoever, including, but not limited to, assessments for public improvements or benefits which are assessed, levied, confirmed, imposed or become a Lien upon the Mortgaged Property or become payable while any portion of the Loan remains outstanding;

(l)     if a Borrower default shall occur under the Note, the Mortgage, the Environmental Agreement, any guaranty executed by a Guarantor, the Management Agreements or any document delivered by Borrower to Lender in connection with the Loan, beyond any applicable grace period expressly provided for therein;

(m)     if any of the materials, fixtures or articles of personal property used in furtherance of or in connection with the work to be performed in accordance with the Predevelopment Schedule are not in substantial accordance with the Plans as approved by Lender and not cured within thirty (30) days after written notice from Lender or Lender's Construction Consultant, or such longer period as may be reasonably required so long as Borrower is exercising diligent efforts to cure same, but in no event more than ninety (90) days;

47

(n)    except to the extent permitted by Lender in this Agreement, if Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any furniture, furnishings, fixtures and equipment intended to be incorporated in the Mortgaged Property, or covering articles of personal property placed in or on the Mortgaged Property, or files a financing statement publishing notice of such security instrument, or purchases any of such furniture, furnishings, fixtures and equipment so that ownership of the same will not vest unconditionally in Borrower, free from encumbrances, or if Borrower does not produce to the Lender, promptly upon written demand, the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower claims title to such materials, fixtures and articles; and in either case such breach is not remedied by Borrower to Lender's reasonable satisfaction within ten (10) Business Days after demand to do so;

(o)    If without Lender's prior written consent or as otherwise permitted in this Agreement, Borrower modifies in any material respect the Plans, or the Management Agreements;

(p)    If certified copies of the Policies are not delivered to Lender within ten (10) days after written request, or Borrower shall default under the provisions of Section 4, Section 11, Section 40, Section 43 or Section 70 of this Agreement, or any SPE Member Party defaults under Section 75 of this Agreement; provided, however, that except as provided in Subsection 24(c) above, any default under Section 4 shall not be an Event of Default unless Borrower fails to cure such default within ten (10) days after written notice from Lender.

(q)    Borrower's failure to implement, or taking any action to frustrate the implementation of, the Lockbox Agreement following the occurrence of an Event of Default;

(r)    Borrower's failure to comply with the terms of Section 68 or Section 69 hereof within the time period set forth in said Sections to do so;

(s)    the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Mortgaged Property for a continuous period of more than thirty (30) days;

(t)    the sequestration or attachment of, or any levy or execution upon any of the Mortgaged Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of ninety (90) days or the sale of the assets affected thereby;

(u)    the failure at any time of the Mortgage to be a valid first lien upon the Mortgaged Property or any portion thereof, other than as a result of any release or reconveyance of the Mortgage with respect to all or any portion of the Mortgaged Property pursuant to the terms and conditions of this Agreement;

(v)    the discovery of any significant Hazardous Substances in, on or about the Mortgaged Property subsequent to the Closing Date which have been brought onto any of the Mortgaged Property by or on behalf of Borrower, or any of its Affiliates, representatives, agents, contractors, or invitees. Any such Hazardous Substances shall be **"significant"** for this purpose

48

if the presence of said Hazardous Substances, in Lender's sole discretion, have a material adverse effect on the value of the Mortgaged Property;

(w)    any of the assumptions contained in the non-consolidation opinions delivered in connection with the Loan, or in any other non-consolidation opinions delivered subsequent to the closing of the Loan, are or shall become untrue in any material respect;

(x)    any statements made in any certificates, separateness agreements or similar documents delivered in connection with any non-consolidation opinions delivered in connection with the Loan (whether delivered in connection with closing the Loan or thereafter), and whether delivered to Lender or the attorneys rendering such non-consolidation opinions, are or shall become untrue in any material respect; and

(y)    If without Lender's prior written consent (or deemed consent under Subsection 38(i)) Borrower enters into, terminates, cancels, or materially modifies or amends in any material respect any Construction Documents or Predevelopment Documents.

(z)    any default (after any applicable notice and cure periods) under any Construction Loan Documents.

(aa)    if for more than thirty (30) days after receipt of notice from Lender, Borrower shall continue to be in default under any term, covenant or condition of this Agreement, the Environmental Agreement or any of the other Loan Documents other than (i) as specified in any of subsections (a) through (z) of this Section 24, and (ii) any default for which a time period is expressly provided in any of such agreements; provided, however, that if the cure of any such default cannot reasonably be effected within such thirty (30) day period, such default is reasonably capable of being cured, and Borrower shall have promptly and diligently commenced to cure such default within such thirty (30) day period, then the period to cure shall be deemed extended for up to an additional ninety (90) days after Lender's default notice so long as Borrower diligently and continuously proceeds to cure such default to Lender's reasonable satisfaction.

Without limiting Lender's right, in its sole and absolute discretion, to waive any Event of Default, any references in this Agreement or the other Loan Documents to the "continuance" of an Event of Default shall not imply that Borrower may cure any Event of Default.

25.    Late Payment Charge; Servicing Fees

(a)    If any portion of the Debt is not paid prior to the fifth (5th) day after the date such payment is due or if the entire Debt is not paid on or before the Maturity Date, Borrower shall pay to Lender upon demand an amount equal to five (5%) percent of such overdue portion of the Debt, to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such amount shall be secured by the Mortgage, the Environmental Agreement and the other Loan Documents.

(b)    Borrower shall pay, monthly, all fees to the Servicer in respect of servicing the Loan of ten (10) basis points per annum on the then outstanding Loan amount.

49

Such fees shall be added to the monthly payment due on the Loan (as described in the Note). In addition, Borrower shall pay all of Servicer's out-of-pocket costs and expenses incurred in connection with its review of any construction advances or draws, change orders, construction progress reports, leases, subordination and non-disturbance agreements, property inspections, casualty or condemnation matters or loan defaults.

26.    Right to Cure Defaults; Protection of Collateral

(a)    Lender shall have the right (but not the obligation) to cure any and all defaults under this Agreement or the other Loan Documents (where such default continues beyond applicable notice and grace periods, if any). Lender's costs incurred in effecting any such cure (including without limitation, attorney's and consultant's fees and expenses) shall be paid by Borrower within ten (10) days after written demand for same. Any sums advanced by Lender pursuant to this Subsection 26(a) shall bear interest from the date of Lender's advance until paid at the Default Rate, and, at Lender's election, added to the principal amount of the Loan.

(b)    Upon the occurrence of an Event of Default, Lender may, but without any obligation to do so and without further notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, take such action as Lender may deem necessary to protect its security for the Loan. Lender is authorized to enter upon the Mortgaged Property for such purposes or to appear in, defend, or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose the Mortgage or collect the Debt, and the cost and expense thereof (including Lender's attorneys' fees to the extent permitted by law), with interest at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Mortgage, the Environmental Agreement and the other Loan Documents and shall be due and payable to Lender within ten (10) days after written demand for same.

27.    Remedies

(a)    Upon the occurrence of an Event of Default, Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Mortgaged Property by Lender itself or otherwise including, without limitation, the following actions, to the maximum extent available under applicable law, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(1)    declare the entire Debt to be immediately due and payable;

(2)    exercise any rights set forth in Article X of the Mortgage.

(3)    institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete foreclosure of the Mortgage in which case the Mortgaged Property or any interest therein may be sold for cash or otherwise in one or more parcels or in several interests or portions and in any order or manner;

50

(4)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of the Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of the Mortgage for the balance of the Debt not then due;

(5)     sell for cash or otherwise the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to the power of sale contained herein or otherwise, at one or more sales, as an entity or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(6)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Environmental Agreement, the other Loan Documents or in the Note;

(7)     subject to Section 9 of the Note, recover judgment on the Note either before, during or after any proceedings for the enforcement of the Mortgage;

(8)     apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, as a matter of right and without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Environmental Guarantor, or of any person, firm or other entity liable for the payment of the Debt;

(9)     revoke the license granted to Borrower to collect the Rents and other sums due under the Leases and enforce Lender's interest in the Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, and thereupon Lender may to the maximum extent permitted, or not restricted, under applicable law or any other Loan Document: (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Lender deems advisable; (C) make alterations, additions, renewals, replacements to or on the Mortgaged Property; (D) exercise all rights and powers of Borrower with respect to the Mortgaged Property, whether in the name of Borrower or otherwise including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Mortgaged Property and every part thereof; and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all expenses (including Lender's attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

51

(10)    require Borrower to vacate and surrender possession of the Mortgaged Property to Lender or to such receiver and, in default thereof, evict Borrower by summary proceedings or otherwise;

(11)    obtain an order for sequestration of Rents and other income derived from the Mortgaged Property pursuant to applicable law; and

(12)    pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code, including the right to establish a lock box for all Rents and other receivables of Borrower relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, the Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b)    The proceeds of any sale made under or by virtue of this Section, together with any other sums which then may be held by Lender under this Agreement, whether under the provisions of this Section or otherwise, shall be applied by Lender to the payment of the Debt in such priority and proportion as Lender in its sole discretion shall deem proper.

(c)    Lender may adjourn from time to time any sale by it to be made under or by virtue of the Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Lender, without further notice or publication, may make such sale at the time and place to which such sale shall be so adjourned.

(d)    Upon the completion of any sale or sales pursuant hereto, Lender or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Lender is hereby irrevocably appointed the true and lawful attorney-in-fact of Borrower, to act in its name and stead (such power of attorney being coupled with an interest, and irrevocable), to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Lender may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Borrower hereby ratifying and confirming all that its attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any sale or sales made under or by virtue of this Section, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Borrower.

(e)    Upon any sale made under or by virtue of this Section, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Lender may bid for and acquire the Mortgaged

52

Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sale price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Lender is authorized to deduct under the Mortgage.

(f)     No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Borrower shall affect in any manner or to any extent the lien of the Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Lender hereunder, but such liens, rights, powers and remedies of Lender shall continue unimpaired as before.

(g)     Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(h)     Lender may effect any remedies and realize upon the security given by the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents in whole or in part, and in such portions and in such order as determined by Lender's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents. The failure of Lender to exercise any right, remedy or option provided in the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default with respect to Borrower, or Borrower's liability to pay such obligation. No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Mortgaged Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated.

(i)     The interests and rights of Lender under the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents shall not be impaired by any indulgence, including: (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt; (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Mortgaged Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

28.     <u>Right of Entry</u>

During the term of the Loan, Lender and its agents shall have the right upon reasonable notice to Borrower to inspect the Mortgaged Property (except in an emergency or after an Event of Default, where no notice shall be required, and except as provided in <u>Section 35</u>). If Lender

reasonably suspects that Borrower is in default under any of the Loan Documents, the cost of such inspections or audits, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender, shall be borne by Borrower. The cost of such inspections, if not paid for by Borrower following demand, may, at Lender's option, be added to the principal balance of the sums due under the Note and shall bear interest thereafter until paid at the Default Rate.

29.    Secondary Market Transactions

(a)    Sale of Notes and Securitization.  Lender may, without the consent of Borrower or any other Person, at any time, sell, transfer or assign the Note, the Mortgage and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "Participations") or issue mortgage pass-through certificates or other securities ("Securities") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "Securitization"). Lender may forward to each potential purchaser, transferee, assignee, servicer or investor in any Participations, Securitizations or Secondary Market Transaction (collectively, an "Investor") or any Rating Agency rating such Securities, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor, and the Property, whether furnished by Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor or otherwise, as Lender determines necessary or desirable. Lender may also disclose to such parties any lending relationship in addition to the Debt which Lender may have with Borrower and/or any Parcel Borrower, Guarantor or Environmental Guarantor and/or any of their Affiliates. Borrower, on behalf of itself and each Parcel Borrower, Guarantor, and Environmental Guarantor, irrevocably waives any and all rights Borrower may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy. With respect to the disclosure to any potential Investor of any financial information of Borrower or Guarantor, Lender will act in a commercially reasonable manner in a way that conforms to industry confidentiality standards.

(b)    Cooperation.  Borrower agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each Investor, and Borrower further agrees to cooperate with Lender in connection with any sale, assignment, conveyance, alienation or pledge or other transfer made pursuant to this Section, including the delivery of an estoppel certificate required in accordance with Section 14 and such other documents as may be reasonably requested by Lender. In furtherance of the foregoing, Borrower shall (i) cooperate with Lender so that the Lender may perform or cause to be performed, at Lender's sole expense, such site inspections, appraisals, market studies, environmental reviews and reports (Phase I and, if appropriate, Phase II), engineering reports and other due diligence investigations of the Property, as required by Lender or as may be requested by the Rating Agencies in connection with a Securitization; (ii) cause counsel to render or update opinions (which may be relied upon by the Rating Agencies) in substantially the same form and substance as those delivered on the Closing Date, with such modifications as may be desired by the Rating Agencies; (iii) furnish and the Borrower, on behalf of itself and each Parcel Borrower, Guarantor, and Environmental Guarantor, consents to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the

54

Property, the Leases, the financial condition of Borrower and any Parcel Borrower, Guarantor or Environmental Guarantor as may be requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale or transfer of Participations or Securities; and (iv) execute such amendments to the Loan Documents and Organizational Documents of Borrower or Borrower's members or partners as may be reasonably requested by the Lender or desired by the Rating Agencies or otherwise to effect the Securitization; provided, however, that Borrower shall not be required to modify or amend any Loan Document or Organizational Document if such modification or amendment would (x) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (y) modify or amend any other economic terms or conditions of the Loan or (z) impose any additional liability or restrictions on, or diminish any material rights of, Borrower or Guarantor. Lender shall pay any reasonable and customary costs incurred by Borrower in connection with such cooperation. Lender may forward to each Investor or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor, or the Property.

(c)     Securitization Indemnification. It is understood that the information provided by Borrower or any Parcel Borrower, Guarantor or Environmental Guarantor to Lender in connection with the Loan or subsequent to the date hereof which is delivered in connection with any Loan Document may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various Investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower and Borrower indemnifies Lender as to any losses, claims, damages or liabilities that arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in such information (excepting any information contained in a document prepared by a third party engaged by Borrower, for which Borrower shall not be liable, so long as Borrower had no knowledge of the untrue statement or any allegation of an untrue statement) or arise out of or are based upon the omission or alleged omission to state therein a material fact known by Borrower and required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

(d)     Splitting the Loan. Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "Severed Loan Documents") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder, provided, however; that the terms, provisions and clauses of the Severed Loan Documents shall be no more adverse to Borrower and/or Guarantor than those contained in the Note, this Agreement, the Mortgage and the other Loan Documents. Without limiting the immediately preceding sentence, the weighted applicable non-default interest rate under the Severed Loan Documents shall be the same as the Applicable Interest Rate under the Note. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to

LA1 789909

effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, that Lender shall not exercise its power of attorney contained in this Section unless and until Borrower has failed to comply with its obligations under this Section for a period of 5 days, or an Event of Default is otherwise continuing. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

    30.    Actions and Proceedings

Lender has the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Mortgaged Property. Lender shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

    31.    Waiver of Setoff and Counterclaim

All amounts due under the Mortgage, the Note and the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Borrower hereby waives the right to assert a counterclaim (other than compulsory counterclaims) in any action or proceeding brought against it by Lender, or arising out of or in any way connected with this Agreement, the Mortgage, the Note, any of the other Loan Documents, or the Debt.

    32.    Contest of Certain Claims

Notwithstanding the provisions of Section 5 and Subsection 24(i) hereof, Borrower shall not be in default for failure to pay or discharge Taxes or Other Charges asserted against the Mortgaged Property, or because of claims or demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Mortgaged Property, so long as in each case: (i) Borrower shall have notified Lender of such nonpayment, claim or demand and the reasons therefor within ten (10) days after obtaining knowledge thereof; (ii) Borrower shall diligently and in good faith contest such Taxes, Other Charges, claim or demand, by appropriate legal proceedings which shall operate to prevent the enforcement or collection thereof and the sale of the Mortgaged Property or any part thereof, in satisfaction thereof; (iii) Borrower shall have furnished to Lender a cash deposit, or an indemnity bond satisfactory to Lender with a surety satisfactory to Lender, in the amount of the Taxes, Other Charges, claim or demand, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Mortgaged Property or any part thereof; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges, claim or demand so determined, together with all costs, interest and penalties which may be payable in connection

LA1 789909

therewith; and (v) the failure to pay the Taxes, Other Charges, claim or demand does not constitute a default under any other deed of trust, mortgage or security interest covering or affecting any part of the Mortgaged Property. Notwithstanding the foregoing, Borrower shall immediately upon request of Lender pay (and if Borrower shall fail so to do, Lender may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges, claim or demand notwithstanding such contest, if in the opinion of Lender (acting reasonably and with the advice of counsel), the Mortgaged Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, cancelled or lost. Lender may pay over any such cash deposit or part thereof to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

### 33.   Recovery of Sums Required to Be Paid

Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as they become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

### 34.   Marshalling and Other Matters

Borrower hereby waives, to the extent permitted by applicable law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force, and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Mortgage on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

### 35.   Hazardous Substances

(a)      Borrower hereby represents and warrants to Lender that, to the best of Borrower's knowledge, after due inquiry and investigation, and except as otherwise expressly disclosed in the Environmental Audits: (a) the Mortgaged Property is not in direct or indirect violation of any statute, ordinance, code, order, decree, law, rule or regulation pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up (collectively, "Environmental Laws"); (b) the Mortgaged Property is not subject to any private or governmental Lien or judicial or administrative notice or action relating to hazardous and/or toxic, dangerous and/or regulated, substances, solvents, wastes, materials, pollutants or contaminants, petroleum, tremolite, anthlophylie or actinolite or polychlorinated biphenyls (including, without limitation, any raw materials which include hazardous constituents) and any other substances, materials or solvents which are included under or regulated by Environmental Laws (collectively, "Hazardous Substances"); (c) no Hazardous Substances are or have been, prior to Borrower's acquisition of the Mortgaged Property, discharged, generated, treated, disposed of or stored on, incorporated in or removed or transported from the Mortgaged Property other than in compliance with all Environmental Laws;

57

and (d) no underground storage tanks exist on or under any of the Mortgaged Property. So long as Borrower owns or is in possession of the Mortgaged Property, Borrower shall keep or cause the Mortgaged Property to be kept free from Hazardous Substances (other than de minimis quantities of Hazardous Substances that are necessary and lawfully used during development of the Mortgaged Property, and which are stored and disposed of in compliance with all Environmental Laws) and in compliance with all Environmental Laws, shall promptly notify Lender if Borrower shall become aware of any Hazardous Substances on the Mortgaged Property and/or if Borrower shall become aware that the Mortgaged Property is in direct or indirect violation of any Environmental Laws and Borrower shall remove such Hazardous Substances and/or cure such violations, as applicable, as required by law, promptly after Borrower becomes aware of such Hazardous Substances or such violations, at Borrower's sole expense. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal or cure. Upon Lender's request, at any time and from time to time while this Agreement is in effect, Borrower shall provide at Borrower's sole expense, an inspection or audit of the Mortgaged Property prepared by a licensed hydrogeologist or licensed environmental engineer approved by Lender indicating the presence or absence of Hazardous Substances on the Mortgaged Property; provided, however, that Lender shall not request more than two (2) inspections or audits within any twelve (12) consecutive month period, unless Lender has cause to believe in its sole reasonable judgment that there has been a release or a threatened release of Hazardous Substances, and in the event that there has been a release of Hazardous Substances on the Mortgaged Property, such inspection or audit shall be at Borrower's sole expense. If Borrower fails to provide such inspection or audit within thirty (30) days after such request, Lender may order such inspection or audit, and Borrower hereby grants to Lender and its employees and agents access to the Mortgaged Property and a license to undertake such inspection or audit. The cost of such inspection or audit shall be paid by Borrower and added to the principal balance of the sums due under the Note and the Mortgage and shall bear interest thereafter until paid at the Default Rate. The obligations and liabilities of Borrower under this Section shall survive any termination, satisfaction, or assignment of the Mortgage and the exercise by Lender of any of its rights or remedies thereunder including, without limitation, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

36.   O&M Plan

(a)   Borrower shall, subject to Lender's reasonable approval, develop an operations and maintenance plan for the Mortgaged Property with respect to the presence of Hazardous Substances at, in or under the Mortgaged Property (the "O&M Plan"), if recommended by Lender's environmental consultant or if required under Section 37 hereof. Borrower shall comply in all respects with the terms and conditions of the O&M Plan. Unless required by Environmental Laws, Borrower shall not modify or amend the O&M Plan without Lender's prior written consent.

(b)   Borrower shall not remove, disturb, encapsulate or otherwise remediate any Hazardous Substances in the Mortgaged Property except in compliance with the O&M Plan and all Environmental Laws.

37.   Environmental Monitoring

58

Borrower shall give prompt written notices to Lender of: (a) any proceeding or inquiry by any party with respect to the presence of any Hazardous Substance on, under, from or about the Mortgaged Property; (b) all claims made or threatened by any third party against Borrower or the Mortgaged Property relating to any loss or injury resulting from any Hazardous Substance; and (c) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property that could cause the Mortgaged Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Borrower shall permit Lender to join and participate, as a party if it so elects, in any legal proceedings or actions initiated with respect to the Mortgaged Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees incurred by Lender in connection therewith. In the event that any environmental site assessment report prepared for the Mortgaged Property recommends that an operations and maintenance plan be implemented for any Hazardous Substance, Borrower shall cause such operations and maintenance plan to be prepared and implemented at Borrower's expense upon request of Lender and in accordance with the recommendation. In the event that any investigation, site monitoring, containment, cleanup, removal, restoration, or other work of any kind is reasonably necessary under an applicable Environmental Law ("Remedial Work"), Borrower shall, at its sole cost and expense, commence and thereafter diligently prosecute to completion all such Remedial Work within thirty (30) days after written demand by Lender for performance thereof (or such shorter period of time as may be required under applicable law); except that if the performance of any such Remedial Work cannot reasonably be effected within such thirty (30) day period and Borrower shall have promptly and diligently commenced to cure such default within such thirty (30) day period, then the period to cure shall be deemed extended for up to the lesser of the following, so long as Borrower diligently and continuously proceeds to perform such Remedial Work to Lender's reasonable satisfaction: (i) an additional ninety (90) days after Lender's written demand, or (ii) the period required for remediation under applicable law.

38.    Management of the Mortgaged Property; Additional Covenants Concerning Construction and Property.

Borrower hereby unconditionally covenants, warrants and represents to Lender as follows (which covenants, warranties and representations have been and will be relied upon by Lender in advancing Loan proceeds to Borrower, and shall be deemed to be continuing covenants, representations and warranties during the term of this Agreement):

(a)    Borrower shall:

(1)    subject to any applicable defenses or cure periods contained therein, pay all sums required to be paid by Borrower under the Management Agreements and promptly perform and/or observe all of the covenants and agreements required to be performed and observed by it under the Management Agreements and do all things necessary to preserve and to keep unimpaired its material rights thereunder;

(2)    promptly notify Lender of any default under the Management Agreements of which it is aware and provide Lender with copies of any notices delivered in connection therewith;

59

(3)     diligently proceed to cure any default and satisfy any demand, or contest the validity of such default or demand, made upon it pursuant to any of the Management Agreements;

(4)     promptly deliver to Lender a copy of each material (A) financial statement, (B) business plan, (C) capital expenditures plan, (D) notice, (E) report and (F) estimate received by it under any of the Management Agreements;

(5)     promptly enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the applicable Manager under any of the Management Agreements; provided that Borrower is not obligated to terminate any of the Management Agreements if Borrower reasonably determines that it is not in the best interest of the Mortgaged Property or the development thereof, to do so;

(6)     grant Lender the right, but Lender shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of any of the Management Agreements on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under any of the Management Agreements shall be kept unimpaired and free from default; provided that Lender shall not take any such action described in this subparagraph (6) unless Borrower has failed to do so within ten (10) days after its receipt of notice of Lender's intent to do so;

(7)     exercise each individual option, to the extent any exist or are granted, to extend or renew the term of any of the Management Agreements upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest; and

(8)     upon reasonable request by Lender, Borrower shall use good faith efforts to deliver to Lender estoppel certificates from each party to any of the Management Agreements, in form and substance reasonably satisfactory to Lender.

(b)     For so long as the Loan is outstanding, Borrower shall not, without Lender's prior written consent (not to be unreasonably withheld): (i) surrender, terminate or cancel any Management Agreement; (ii) reduce or consent to the reduction of the term of any Management Agreement; (iii) increase or consent to the increase of the amount of any charges under any Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Management Agreement in any material respect; except that same may be terminated with respect to portions of the Mortgaged Property that have been released from the lien of the Loan Documents in accordance with the terms hereof. Modifications or amendments to the Management Agreements shall not be deemed material unless same would result in (a) a Substantial Deviation, or (b) an increase in the amounts payable by Borrower as fees under any Management Agreement.

60

(c)     Borrower shall not, without Lender's prior written consent, enter into transactions with any Affiliate except any such transaction in the ordinary course of business of Borrower if the monetary or business consideration arising therefrom would be as advantageous to Borrower as the monetary or business consideration which would obtain in a comparable transaction with a person not an affiliate of Borrower. Lender hereby consents to the Development Agreement.

(d)     Borrower irrevocably authorizes and directs each of the Managers to deliver to Lender the following (and shall communicate same in writing to Managers): (i) all operating information concerning the Mortgaged Property submitted by Borrower to such Manager; (ii) written results of all quality assurance inspections of the Mortgaged Property performed by such Manager, (iii) all notices delivered by such Manager to Borrower concerning any work on the Mortgaged Property or the Predevelopment Schedule or the Plans; and (iv) such other information that Lender or Lender's agents may reasonably request, from time to time, including any information in the possession of such Manager relating to Borrower not included in the reports referred to above.

(e)     Borrower shall advise Lender in writing, within five (5) days after Borrower's receipt, of any notice, written or oral, from any laborer, contractor, subcontractor or material supplier to the effect that said laborer, contractor, subcontractor or material supplier has not been paid for any labor or materials furnished to or in the Mortgaged Property, and Borrower shall deliver to Lender, within five (5) days of written demand, any contracts, bills of sale, statements, receipted vouchers or agreements, under which Borrower claims title to any materials, fixtures or articles used in the construction of any improvements (including, without limitation Development Improvements) at the Mortgaged Property.

(f)     Subject to Lender's required written consent with respect to the General Contractor and Construction Manager (not to be unreasonably withheld), Borrower is solely responsible for the selection of the General Contractor, Construction Manager, all subcontractors, all materials, supplies and equipment to be used in construction of any improvements (including, without limitation Development Improvements) at the Mortgaged Property and Lender assumes no responsibility for adequacy or sufficiency of materials, or design or engineering, or for the completion of the Development Improvements according to the Plans and applicable laws.

(g)     Borrower shall promptly advise Lender of any proposed changes made to any Budget if the actual or projected costs of any line item within said Budget exceeds the amount specified thereon for such item. Borrower shall make no material changes in any Budget without the prior written approval of Lender, which approval shall not be unreasonably withheld, delayed or conditioned (a material change in any Budget shall be deemed to exist if the change increases the cost of construction in excess of the total Budget, but only if there are no corresponding savings in any other Budget line item that offset such cost overrun(s)). Borrower shall be permitted to reallocate costs savings from one line item in the Budget to another so long as same would not result in a Substantial Deviation.

(h)     Borrower shall not modify or amend any Schedule without Lender's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

61

Notwithstanding the foregoing, Lender agrees that any modification to a Schedule caused by an Unavoidable Delay shall not be a default under this subsection.

(i)      Except as provided below in this subsection, Borrower shall not enter into, terminate, cancel, or materially modify or amend any Plans, Construction Documents, or Predevelopment Documents, without the prior written approval of Lender, which approval shall not be unreasonably withheld, delayed or conditioned; provided, however, that if Borrower delivers a notice to Lender prior to any such action with the Approval Notice Legend at the top of such notice, and Lender fails to respond to such notice within five (5) Business Days thereafter, Lender shall be deemed to have approved such action. As used herein, "Approval Notice Legend" means the following language in 12-point or larger type: "THIS IS A NOTICE REGARDING APPROVAL OF A PREDEVELOPMENT OR CONSTRUCTION DOCUMENT UNDER THE BIG ISLAND LOAN DOCUMENTS. YOU MUST ACT WITHIN FIVE (5) BUSINESS DAYS TO PRESERVE IMPORTANT RIGHTS." Notwithstanding the foregoing in this subsection and notwithstanding anything to the contrary in this Section 38, Borrower may modify or amend the Plans, Construction Documents, and Predevelopment Documents without Lender's consent so long as such modifications or amendments (x) are not materially inconsistent with the Plans and (y) do not cause a Substantial Deviation. Borrower shall deliver copies of such modifications and amendments within five (5) days after request by Lender. Borrower shall notify Lender of any contractors, architects or engineers contracted with by Borrower as substitutes for Architect, or General Contractor or as additional general contractors, architects, engineers or project coordinators, and Lender shall have the right to approve or disapprove such substitution or addition (Lender agreeing not to unreasonably withhold, delay or condition the approval of any such proposed substitution), and to require the submission of any additional loan documentation regarding such substitutions or additions. Borrower represents and warrants that any copy of any Construction Documents, the Predevelopment Documents, and the Management Agreements furnished or to be furnished to Lender by Borrower is and shall be a true and complete copy thereof, that the copies of the Plans delivered to Lender by Borrower are and shall be true and complete copies of the Plans, that to date there have been no modifications of any of the Management Agreements which are not fully set forth in the copies delivered, and that Borrower's interest therein is not subject to any claim, setoff, or encumbrance.

(j)      Borrower shall construct any improvements at the Mortgaged Property (including without limitation any Development Improvements) such that the same (i) will not encroach upon or overhang any easement or right of way, nor upon the land of others, (ii) shall be wholly within the building restriction lines, however established, (iii) will not violate applicable use or other restrictions contained in applicable prior conveyances or applicable protective covenants or restrictions, (iv) shall comply with the Plans and all applicable laws in all material respects, and shall complete, or cause the completion of, all utility lines, sewer and septic systems and streets serving the Mortgaged Property in accordance with applicable laws in all material respects.

(k)      Upon reasonable prior notice (except in an emergency or after an Event of Default, where no notice shall be required, and except as provided in Section 35) Borrower shall permit Lender, Construction Consultant and their representatives and agents to enter upon the Real Property and to inspect any improvements at the Mortgaged Property (including without limitation any Development Improvements) and all materials to be used in the construction

62

thereof and to cooperate and cause the General Contractor, or any contractor or subcontractor of General Contractor, Borrower, or any Manager, to cooperate with Lender and its representatives and agents during such inspections.

(l)     Borrower agrees that it will correct any deficient work performed and replace any materials that do not comply with the Plans or applicable laws.

(m)     Borrower shall use commercially reasonable efforts to cause any Managers, Architect, Construction Consultant, General Contractor, contractors and engineers to execute and deliver all certificates, estoppels, agreements, statements and other documentation deemed reasonably necessary by Lender.

(n)     Borrower shall have entered into the Development Agreement on the date hereof. For so long as the Loan is outstanding, the Development Agreement may not be terminated or modified in any material respect, or assigned by the developer or manager thereunder, without the prior written consent of Lender, except that same may be terminated with respect to portions of the Mortgaged Property that have been released from the lien of the Loan Documents in accordance with the terms hereof.

(o)     Borrower shall not commit or allow any other Person in occupancy of or involved with the operation or use of the Mortgaged Property to commit any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. Borrower shall keep and maintain all licenses necessary for the operation of the Mortgaged Property for its intended use.

(p)     Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority, which may in any way affect the rights of Lender hereunder, or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

39.     Persons with Disabilities; Accessibility

(a)     Borrower agrees that the Mortgaged Property shall at all times strictly comply to the extent applicable with the requirements of laws and ordinances related to accessibility for persons with disabilities and all rules, regulations, and orders issued pursuant thereto, if any (collectively, "Access Laws").

(b)     Notwithstanding any provisions set forth herein or in any other document regarding Lender's approval of alterations of the Mortgaged Property, except in accordance with the Plans, Borrower shall not alter the Mortgaged Property in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws without the prior written approval of Lender, or as otherwise set forth in the Plans approved by Lender. The foregoing shall apply to tenant Development Improvements constructed by Borrower or by any of its tenants. Lender may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other person acceptable to Lender.

63

(c)    Borrower agrees to give prompt written notice to Lender of the receipt by Borrower of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

40.    ERISA

(a)    Borrower covenants and agrees that it shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, the Mortgage, this Agreement and the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), as amended ("ERISA").

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of this Agreement, as requested by Lender in its sole discretion, that: (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(A)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(B)    Less than 25 percent of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

41.    Indemnification

(a)    General Indemnification.  In addition to any other indemnifications provided herein or in the other Loan Documents, Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Legal Requirements; (e) any failure of the Property to comply with any Access Laws; (f) any representation or warranty made in any of the Loan Documents being false or misleading in any material respect as of the date such

representation or warranty was made or the use or intended use of the proceeds of the Loan; (g) any claim by brokers, finders or similar Persons claiming to be entitled to a commission in connection with the Loan (other than one claiming to have dealt exclusively with Lender) or any Lease or other transaction involving the Property; and (h) the claims of any Tenant and not applied in accordance with the Loan Documents (except any claims of Tenants first accruing after the date Lender or Lender's Affiliate takes title to the Property); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Losses arise from the gross negligence or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that Borrower is permitted to pay and satisfy under applicable law and this indemnification provision shall be enforced to the maximum extent allowed by law.  Any amounts payable to Lender by reason of the application of this paragraph shall be secured by the Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date of demand until paid.  The obligations and liabilities of Borrower under this <u>Section 41</u> shall survive termination, satisfaction, or assignment of this Agreement, the repayment of the Debt and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.  **WITHOUT LIMITATION TO THE FOREGOING, BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTY. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE MORTGAGE.**

       (b)    <u>ERISA Indemnification</u>.  Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under

65

ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Subsection 11(a) or Section 40.

    (c) Duty to Defend; Attorneys' Fees and Other Fees and Expenses; Settlement of Claims.

      (i) Subject to the terms of this subsection (c), if any of the Indemnified Parties is a named defendant in any claim or action where the payment of any Losses therefrom are the obligation of Borrower under this Section 41 (collectively, "Claims" and each individually, a "Claim"), then Borrower may engage attorneys, at its sole cost and expense, to defend or assist in the defense of such Claim and may control the resolution of such Claim (including, without limitation, any settlement thereof, subject to the terms of this clause (c)); provided however, that (x) the attorneys selected by Borrower must be partners or members of, or employed by, a nationally recognized law firm and must have recognized expertise in the subject matter of the Claim, and (y) all such attorneys shall be subject to Lender's (and any other applicable Indemnified Parties') prior written consent, not to be unreasonably withheld.

      (ii) Notwithstanding anything contained in clause (c)(i), above, Indemnified Parties may engage, in their sole and absolute discretion, at Borrower's sole cost and expense, attorneys to defend or assist in the defense of any such Claim (in addition to any attorneys otherwise engaged by Borrower) and may control the resolution of such Claim (including, without limitation, any settlement thereof, subject to the terms of this clause (c)) if any of the following conditions are satisfied:

      (x) the attorneys engaged by Borrower regarding such Claim do not meet the criteria set forth in clause (x) and (y) of clause (c)(i); or

      (y) any of the Indemnified Parties reasonably determines at any time that defenses are available to it in connection with such Claim that differ from the defenses available to Borrower, or

      (z) any of the Indemnified Parties determines at any time that a conflict of interest exists with respect to the representation of any Indemnified Parties by the attorneys engaged by Borrower.

      (iii) Notwithstanding that Borrower has control of the resolution of a Claim as described in clause (c)(i), above, the Indemnified Parties may reject any proposed settlement by Borrower of such Claim if any of the Indemnified Parties reasonably believes that Borrower will not have sufficient ability (in the form of cash, securities or other available credit which could be utilized in each case without violating the terms of the Loan Documents) to pay the full amount of such settlement and to satisfy all of its other obligations under the Loan Documents.

      (iv) Notwithstanding that Indemnified Parties have control of the resolution of a Claim as described in clause (c)(ii), above, Borrower may reject any proposed settlement by Indemnified Parties of any such Claim if Borrower delivers to Lender evidence reasonably satisfactory to Lender (and any other applicable Indemnified

LA1 789909

Parties) that Borrower will have sufficient ability (in the form of cash, securities, or other available credit which could be utilized in each case without violating the terms of the Loan Documents) to pay the full amount of the Claim and to satisfy all of its other obligations under the Loan Documents.

        (v)     Without limiting the foregoing, upon written demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of all fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection with any Claim.

        (d)     <u>Recording of Mortgage</u>. Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time upon five (5) days notice from Lender, will cause the Mortgage, and any other Loan Document creating a Lien or security interest or evidencing the Lien thereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by Lender or by any present or future law in order to publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of Lender in, the Mortgaged Property or to correct any error in the legal description of the Real Property. Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document and any instrument of further assurance, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Mortgage, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, Servicer, their respective successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Mortgage or any other Loan Document. If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any. Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this <u>Section 41</u> if Borrower fails to do so for five days after demand by Lender. Borrower hereby ratifies all that Borrower's said attorney shall do by virtue of such power or authority. Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

        (e)     <u>Brokers and Financial Advisors</u>. Each of Lender and Borrower ("<u>Representing Party</u>") hereby (i) represents to the other party that Representing Party has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement; and (ii) agrees to indemnify, defend and hold the other party harmless from and against any and all claims, liabilities, costs and expenses of any kind (including such other party's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of the

67

Representing Party in connection with the transactions contemplated herein. The provisions of this Subsection 41(e) shall survive the expiration and termination of this Agreement and the payment of the Debt.

    42.   Notice

    Any notice, demand, statement, request or consent made hereunder shall be in writing and shall be deemed given on the next business day if sent by Federal Express or other reputable overnight courier and designated for next business day delivery, or on the third day following the day such notice is deposited with the United States Postal Service, first class certified mail, return receipt requested, addressed to the following address of the party to whom such notice is to be given, or such other address or additional party as Borrower or Lender, as the case may be, shall in like manner designate in writing:

| | |
|---|---|
| If to Borrower: | c/o Windwalker Real Estate<br>12 Oak Street<br>Nantucket, Massachusetts 02554<br>Attention: Alan J. Worden |
| and | |
| | Willkie Farr & Gallagher, LLP<br>787 Seventh Avenue<br>New York, N.Y. 10019-6099<br>Attention:  Steven D. Klein, Esq. |
| If to Lender: | Lehman Brothers Holdings Inc.<br>399 Park Avenue<br>New York, New York 10022<br>Attention:  Masood Bhatti |
| and | |
| | Sidley Austin LLP<br>555 West Fifth Street, Suite 4000<br>Los Angeles, California 90013<br>Attention: William D. Ellis, Esq. |

    With respect to any notice to Borrower, courtesy copies shall also be sent to the address and to the attention of each of the persons listed immediately below:

        Baker & Hostetler
        666 Fifth Avenue
        New York, NY 10103
        Attention: Laurence S. Markowitz, Esq.

        Philip Kenner
        c/o Standard Advisors
        10705 East Cactus Road
        Scottsdale, Arizona 85258

LA1 789909

Failure to deliver the foregoing courtesy copies shall not invalidate any notice to Borrower.

43.    Authority

(a)    Borrower represents and warrants that it has full power, authority and right to execute, deliver and perform its obligations pursuant to this Agreement, and to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, hypothecate and assign the Mortgaged Property pursuant to the terms hereof and to keep and observe all of the terms of this Agreement on Borrower's part to be performed.

(b)    Borrower represents that as of the date of this Agreement, and Borrower covenants that throughout the term of this Agreement: (a) Borrower is not, and shall not be, an Embargoed Person, (b) none of the funds or other assets of Borrower are or shall constitute property of, or are or shall be beneficially owned, directly or indirectly, by any Embargoed Person; (c) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, with the result that the investment in Borrower (whether directly or indirectly) is or would be blocked or prohibited by law or that this Agreement and performance of the obligations hereunder are or would be blocked or in violation of law and (d) none of the funds of Borrower are, or shall be derived from, any activity with the result that the investment in Borrower (whether directly or indirectly) is or would be blocked or in violation of law or that this Agreement and performance of the obligations hereunder are or would be in violation of law. "Embargoed Person" means a person, entity or government (i) identified on the Specially Designated Nationals and Blocked Persons List maintained by the United States Treasury Department Office of Foreign Assets Control and/or any similar list maintained pursuant to any authorizing statute, executive order or regulation and/or (ii) subject to trade restrictions under United States law, including, without limitation, the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such laws, with the result that the investment in Borrower (whether directly or indirectly), is or would be prohibited by law or this Agreement is or would be in violation of law and/or (iii) subject to blocking, sanction or reporting under the USA Patriot Act, as amended; Executive Order 13224, as amended; Title 31, Parts 595, 596 and 597 of the U.S. Code of Federal Regulations, as they exist from time to time; and any other law or Executive Order or regulation through which the U.S. Department of the Treasury has or may come to have sanction authority. If any representation made by Borrower pursuant to this Section 43 shall become untrue Borrower shall within ten (10) days give written notice thereof to Lender, which notice shall set forth in reasonable detail the reason(s) why such representation has become untrue and shall be accompanied by any relevant notices from, or correspondence with, the applicable governmental agency or agencies. Such notice shall not cure any default hereunder.

44.    Waiver of Notice

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by Legal Requirements to give notice, and Borrower hereby expressly waives the

69

right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

45.   Remedies of Borrower

In the event that a claim or adjudication is made that Lender has acted unreasonably or has unreasonably delayed acting in any case where by law or under the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents, it has an obligation to act reasonably or promptly, Lender shall not be liable for any monetary damages, and Borrower's remedies shall be limited to injunctive relief or declaratory judgment.

46.   Sole Discretion of Lender

Whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval. The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made. Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that neither Lender, Servicer nor their agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principles, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

47.   Non-Waiver

The delay or failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Agreement. Borrower shall not be relieved of Borrower's obligations hereunder by reason of: (a) the failure of Lender to comply with any request of Borrower or any Guarantor to take any action to foreclose the Mortgage or otherwise to enforce any of the provisions hereof or of the Note, the Environmental Agreement or the other

LA1 789909

Loan Documents; (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any person liable for the Debt or any portion thereof; or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, the Mortgage, this Agreement, the Environmental Agreement or the other Loan Documents. Lender may look for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose the Mortgage. The rights and remedies of Lender under this Agreement shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

48.    No Oral Change

This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

49.    Liability; Release from Liability.    If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. Subject to the provisions hereof requiring Lender's consent to any transfer of the Mortgaged Property, this Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever. Lender hereby agrees that any Parcel Borrower shall be released of its obligations hereunder and under the other Loan Documents following the sale or other transfer of all of the Release Parcel owned by such Parcel Borrower as specifically provided in, and subject to, the terms of this Agreement, provided, however, that all obligations of such Parcel Borrower under the Environmental Agreement, and any other provisions of the Loan Documents regarding Hazardous Substances (including, without limitation, Section 35, Section 36, and Section 37 of this Agreement) shall continue in full force and effect until the fifth anniversary of such sale or other transfer. Without limiting the foregoing, the obligations under the Environmental Agreement and any other provisions of the Loan Documents regarding Hazardous Substances (including, without limitation, Section 35, Section 36, and Section 37 of this Agreement) of any Parcel Borrower that has not sold or transferred a Release Parcel owned by such Parcel Borrower shall continue in full force and effect until the fifth anniversary of the payment in full of the Debt (not including, without limitation, any satisfaction of the Debt pursuant to a foreclosure of the Property or deed in lieu thereof).

50.    Inapplicable Provisions

If any term, covenant or condition of the Note, the Mortgage or this Agreement is held to be invalid, illegal or unenforceable in any respect, the Note, the Mortgage and this Agreement shall be construed without such provision.

71

51.    Section Headings

The headings and captions of the various Sections and Subsections of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

52.    Counterparts

This Agreement may be executed in any number of counterparts and each such duplicate original shall be deemed to be an original.

53.    Certain Definitions

Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Agreement may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein", the word "Lender" shall mean "Lender and any subsequent holder of the Note", the word "Debt" shall mean "the Note and any other evidence of indebtedness secured by the Mortgage, and any renewals, replacements and substitutions thereof", the word "person" shall include an individual, corporation, partnership, trust, unincorporated association, government, Governmental Authority and any other entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property and any interest therein and the words "attorneys' fees" shall include any and all attorneys' fees, paralegal and law clerk fees including, without limitation, fees at the pretrial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Mortgaged Property and enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

54.    Homestead

Borrower hereby waives and renounces all homestead and exemption rights provided by the constitution and the laws of the United States and of any state, in and to the Real Property as against the collection of the Debt, or any part thereof.

55.    Assignments

Lender shall have the right to assign or transfer its rights under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Agreement.

56.    Submission to Jurisdiction

**BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN OR HAVING JURISDICTION OVER NEW YORK COUNTY OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY OTHER**

72

**STATE TO OBJECT TO SUCH JURISDICTION. BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO EITHER ANY COURT IN THE STATE OF NEW YORK AS BEING AN INAPPROPRIATE VENUE OR AN INCONVENIENT FORUM.**

57.    Agent for Receipt of Process

Borrower hereby irrevocably appoints Willkie Farr & Gallagher LLP, with an address at 787 Seventh Avenue, New York, New York 10019, Attention: Steven D. Klein, Esq. as its authorized agent to accept and acknowledge, on behalf of Borrower, service of any and all process which may be served in any suit, action or proceeding of the nature referred to in Section 56 hereof in any State or Federal court within the State of New York. If such agent shall cease so to act, Borrower shall irrevocably designate and appoint without delay another such agent satisfactory to Lender, and shall promptly deliver to Lender written evidence of such other agent's acceptance of such appointment.

58.    Service of Process

To the extent permitted by applicable law, process in any suit, action or proceeding of the nature referred to in Section 56 hereof may be served: (a) by registered or certified mail, postage prepaid, to Borrower at the address set forth above or to such other address of which Borrower shall have given Lender written notice; or (b) if Borrower shall not have made an appearance within twenty one (21) days after service in accordance with clause (a) of this Section, by hand delivery to the agent identified in Section 57 hereof, or such successor agent as shall have been identified in accordance with Section 57 hereof. Nothing in this Agreement shall affect the Lender's right to serve process in any manner permitted by law, or limit Lender's right to bring proceedings against Borrower in the courts of any other jurisdiction.

59.    Waiver of Jury Trial

**BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THE MORTGAGE, THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

60.    Choice of Law

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK**

73

**WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW. NOTWITHSTANDING THE FOREGOING, BORROWER AND LENDER AGREE THAT THE PROCEDURES GOVERNING THE ENFORCEMENT BY LENDER OF ITS SECURITY (WHETHER PURSUANT TO THE MORTGAGE OR OTHERWISE) AND PROVISIONAL REMEDIES AGAINST BORROWER UNDER THE MORTGAGE AND ANY OTHER COLLATERAL FOR THE LOAN, INCLUDING BY WAY OF ILLUSTRATION BUT NOT LIMITATION, ACTIONS FOR POSSESSION OF THE MORTGAGED PROPERTY, FOR CLAIM AND DELIVERY OF PROPERTY, FOR INJUNCTIVE RELIEF OR FOR THE APPOINTMENT OF A RECEIVER, SHALL BE GOVERNED BY THE LAWS OF THE STATE OF HAWAII (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW).**

61.     Limitation on Recourse

Anything to the contrary notwithstanding, Lender's recourse hereunder and under all other Loan Documents is subject to the provisions of Section 9 of the Note, which is incorporated herein by reference.

62.     Survival. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to any of the Loan Documents, shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

63.     Preferences. Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor to any portion of the Obligations. To the extent any of Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor makes a payment or payments to Lender, which payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law or equitable cause, then, to the extent of such payments, the Obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payments had not been received by Lender.

64.     Shortfall; Completion Deposit

If at any time (which may include the execution of this Agreement and the inception of the Loan), and from time to time, Lender shall determine that the Construction Loan (including any undisbursed balance thereof), is insufficient to cover the remaining costs to complete the Development Improvements to be funded thereby in accordance with the Construction Plans (a "Shortfall"), then, unless the Construction Lender has required Borrower to make a deposit in the amount of the Shortfall, the Borrower shall be required to furnish a deposit to Lender (the

74

"Completion Deposit"), which shall consist of the deposit of cash or other security satisfactory to the Lender, by the Borrower or the Guarantor, in an amount satisfactory to Lender, in its sole but reasonable discretion. Lender shall release portions of sums constituting any Completion Deposit furnished to Lender to Borrower only when and to the extent that Lender determines (acting reasonably) that the value or amount thereof is more than the excess, if any, of (x) the total remaining costs to complete the Development Improvements to be funded thereby in accordance with the Construction Plans and sums necessary to operate the Mortgaged Property in accordance with the Construction Budget, over (y) the sum of the then available Construction Loan, and provided that no Event of Default has occurred and is continuing.

    65.    <u>Inconsistency with Other Loan Documents</u>

       This Agreement and the other Loan Documents are to be read in pari materia, and shall be construed in such a manner as to afford the greatest possible protection and benefit for Lender. In the event of an express conflict between the terms of the Note and the terms of any other Loan Documents as to payment terms, the terms of the Note shall control. In the event of any other express conflict between the terms of the Loan Agreement, and the terms of any other Loan Documents, the terms of this Agreement shall govern and control. In the event of any express conflict between the terms of the Mortgage and the terms of any other Loan Documents (other than this Agreement), the terms of the Mortgage shall govern and control.

    66.    <u>Release of Parcels; Partial Release</u>

        (a)    <u>Release of Parcels</u>

           (i)    <u>Compliance with laws regarding Sale of Parcels</u>.  Borrower shall comply with all state and federal laws, rules and regulations of the United States of America (to the extent applicable) governing the sale of Release Parcels.

           (ii)    <u>Indemnification</u>.  Borrower shall and does hereby agree to indemnify and hold Lender harmless from and against any and all liability, loss or damage which Lender may or might incur under any contract or under or by reason of this assignment and from and against any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any contract. Should Lender incur any such liability, loss or damage under any contract or under or by reason of this assignment, or in the defense of any such claims or demand, the amount thereof, including costs, expenses and attorneys' fees, shall be secured hereby, and Borrower shall reimburse Lender therefor within ten (10) days after written demand. Under no circumstance shall Lender be liable for any obligation to pay any sale commission, finders fee or similar fee or charge in connection with any contract.

           (iii)    <u>No Liability for Inspections</u>.  Borrower hereby acknowledges that Lender is acting hereunder only as a lender and mortgagee, and not a guarantor or warrantor. Borrower acknowledges that any periodic inspections of the Mortgaged Property and any review or approval of any of Borrower's dealings with any prospective purchaser, made by, through or for Lender, are for Lender's loan administration purposes

75

only, that neither Lender nor any of its representatives, agents, or contractors, assumes any responsibility or liability to any purchaser of the Mortgaged Property or a portion thereof or any other person by reason of any such actions and that neither Borrower nor any such purchaser may rely upon any of such actions for any purpose whatsoever.

(A)     Borrower will cause any sale or transfer of any part of the Mortgaged Property to be in full compliance with all Legal Requirements, codes and regulations of Governmental Authorities, and the terms of any Construction Loan Documents;

(B)     Borrower will comply with all applicable provisions of law and all applicable rules and regulations of all Governmental Authorities, and will furnish such evidence of such compliance as Lender shall reasonably request.

(iv)     Contracts of Sale; Approved by Lender and Subordinate to Mortgage. Any and all contracts or agreements in which Borrower or any Parcel Borrower agrees to sell, convey, transfer, encumber, pledge, or assign any interest in any Parcel or any portion of the Mortgaged Property must be approved by Lender in its reasonable discretion and shall be subordinate to the lien of the Mortgage and all renewals, replacements, increases and modifications thereof, but Lender, in its sole discretion, may elect to subordinate its interest in the Mortgaged Property to any party it deems, in its sole discretion, desirable to do so.

(b)     Provided no Event of Default exists, Lender agrees to release individual Release Parcels from the lien created by the Mortgage and the provisions of all other Loan Documents in accordance with and subject to all of the following terms, provisions and conditions applicable to such Release Parcel:

(i)     Any applicable statutory or legal requirements have been complied with in full;

(ii)     Lender shall have received a copy of an executed contract of sale with reference to such Release Parcel;

(iii)     Lender shall have received not less than five (5) Business Days' prior written notice of the proposed release accompanied by release documents prepared by Borrower, at Borrower's expense, and a pro forma settlement statement signed by Borrower and reflecting the Release Price;

(iv)     The Release Parcel to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Mortgaged Property encumbered by the lien of the Mortgage;

(v)     Neither the release from the lien of the Mortgage, nor the conveyance to the transferee of such Release Parcel, will violate any applicable zoning or subdivision laws;

76

(vi)     Lender shall have received endorsements to the Title Policy satisfactory to Lender;

(vii)    Lender shall have received such other documents, certificates, instruments, opinions or assurances as Lender may reasonably request.

(viii)   Borrower shall have paid all out-of-pocket costs and expenses of Lender, including, without limitation, reasonable, out-of-pocket attorneys' fees, in connection with any release; and

(ix)     Releases of Release Parcels shall not affect or impair the lien of the Mortgage and Lender's lien and security interests created by the other Loan Documents as to any and all portions of the Mortgaged Property not theretofore released or the remaining portion of the Mortgaged Property, and said liens and security interests shall continue in full force and effect as to the unreleased portions of the Mortgaged Property. From and after any such release, the term "Mortgaged Property" shall be deemed to refer to all portions and parcels of the Mortgaged Property not previously released in accordance with this Section 66.

67.    Lockbox

Borrower, Lender and Servicer have entered in that certain Lockbox, Pledge and Security Agreement (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the "Lockbox Agreement") which provides, among other things, that following the occurrence of an Event of Default (unless waived in writing by Lender in its sole and absolute discretion), all Rents and other sums collected from, or arising with respect to, the Mortgaged Property be deposited in one or more accounts established in connection with such Lockbox Agreement.  Borrower shall take all steps necessary or appropriate to permit the implementation of the Lockbox Agreement, and pay all costs and expenses required under the Lockbox Agreement.  Upon the occurrence of an Event of Default, Lender may apply any sums then held pursuant to the Lockbox Agreement to the payment of the Debt in any order in Lender's sole discretion.  Until expended or applied, amounts held pursuant to the Lockbox Agreement shall constitute additional security for the Debt.

68.    Interest Rate Protection

(a)     At Lender's request, in connection with a Securitization or with the subordination of the lien of the Mortgage by Lender to another lienholder, Borrower shall enter into one or more Interest Rate Protection Agreements effective as of the date of such Securitization or subordination, which Interest Rate Protection Agreements shall effectively hedge the LIBOR Rate on the entire outstanding principal balance of the Loan until the Maturity Date with a strike price reasonably determined by Lender, calculated on an annual basis.  The obligations of Borrower under any Interest Rate Protection Agreements shall not be secured by or encumber any of the collateral securing Borrower's obligations under the Loan Documents. Promptly upon obtaining any Interest Rate Protection Agreement, Borrower shall deliver the same to Lender.

77

(b)      Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Protection Agreement. Borrower shall take all action reasonably requested by Lender to enforce Lender's rights under the Interest Rate Protection Agreements in the event of a default by Counterparty and shall not waive, amend or otherwise modify any of its rights thereunder. Borrower shall not (a) without the prior written consent of Lender, modify, amend or supplement the terms of the Interest Rate Protection Agreement, (b) without the prior written consent of Lender, cause the termination of the Interest Rate Protection Agreement prior to its stated maturity date, (c) without the prior written consent of Lender, waive or release any obligation of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) under the Interest Rate Protection Agreement, (d) without the prior written consent of Lender, consent or agree to any act or omission to act on the part of the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) which, without such consent or agreement, would constitute a default under the Interest Rate Protection Agreement, (e) fail to exercise promptly and diligently each and every material right which it may have under the Interest Rate Protection Agreement, (f) take or omit to take any action or suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Interest Rate Protection Agreement or any defense by the Counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) to payment or (g) fail to give prompt notice to Lender of any notice of default given by or to Borrower under or with respect to the Interest Rate Protection Agreement, together with a complete copy of such notice.

(c)      Borrower shall collaterally assign to Lender, pursuant to an Assignment of Interest Rate Protection Agreement in form satisfactory to Lender in its sole discretion, all of its right, title and interest to receive any and all payments under the Interest Rate Protection Agreement (and any related guarantee, if any) and shall deliver to Lender an executed counterpart of such Interest Rate Protection Agreements, notify the Counterparty of such collateral assignment and obtain the agreement (either in such Interest Rate Protection Agreement or by separate instrument) of such Counterparty to make any payments to become payable under or pursuant to the Interest Rate Protection Agreement directly to Lender until such time as the Assignment of Interest Rate Protection Agreement is terminated or otherwise canceled. At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Protection Agreement shall terminate and Lender shall execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of the Interest Rate Protection Agreements and to notify the Counterparty of such release. If Lender receives any payments under the Interest Rate Protection Agreement (other than a payment by reason of a termination event or any other payment during the existence of an Event of Default), Lender shall deliver the same to Borrower. If Lender receives any payments under the Interest Rate Protection Agreement during the existence of an Event of Default or by reason of a termination event under the Interest Rate Protection Agreement, Lender shall have the right to hold the same, to deposit the same in the Lockbox Account as additional security for the Loan or to apply same to any portion of the Debt in any order it desires or, if the Interest Rate Protection Agreement has been partially or wholly terminated, to apply same to the cost of acquiring another interest rate protection agreement in form and substance, and from a counterparty, satisfactory to Lender in all respects.

78

(d)     If for any reason the Counterparty's rating shall fall below the Minimum Counterparty Rating, Borrower shall within ten (10) Business Days following receipt of notice thereof from Lender or any other Person, procure a new interest rate protection product from a counterparty having a rating from Standard & Poor's Rating Group of at least "AA-" and from Moody's of at least "Aa3" in the form of the Interest Rate Protection Agreement and shall pledge same to Lender pursuant to an assignment of interest rate protection agreement in the form of the Assignment of Interest Rate Protection Agreement or such other assignment form as is then generally utilized by Lender and accompanied by an opinion letter from counsel to such new Counterparty in form and substance reasonably satisfactory to Lender.

(e)     In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Protection Agreement as and when required hereunder, Lender may purchase the Interest Rate Protection Agreements and the cost incurred by Lender in purchasing the Interest Rate Protection Agreements shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid to Lender.

(f)     In connection with an Interest Rate Protection Agreement, unless Lender is the Counterparty thereunder, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty thereunder (upon which Lender and Lenders and their respective successors and assigns may rely) (the "Counterparty Opinion"), under New York law and, if the Counterparty is a non-U.S. entity, the applicable foreign law, substantially in compliance with the requirements set forth below:

(1)     The Counterparty Opinion shall be addressed to Lender and its respective successors and assigns and shall state that it may be relied upon by (A) successor Lender, (B) any assignee of any Lender's interest in the Loan, (C) any participant of any Lender's interest in the Loan, and (D) any servicer of the Loan,

(2)     The Counterparty Opinion shall be in form and substance acceptable to Lender and shall contain the following opinions:

a.     the Counterparty under the Interest Rate Protection Agreement is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

b.     the execution and delivery of the Interest Rate Protection Agreement by the Counterparty thereunder, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

79

   c. all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Protection Agreement, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which such Counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any Governmental Authority or regulatory body is required for such execution, delivery or performance; and

   d. the Interest Rate Protection Agreement, and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto, has been duly executed and delivered by such Counterparty and constitutes the legal, valid and binding obligation of such Counterparty, enforceable against such Counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

   (3) Depending on the nature of the transaction, the Counterparty Opinion shall contain such additional opinions on such other matters relating to the Interest Rate Protection Agreement and/or and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto, as Lender shall reasonably require, including, without limitation, the following additional opinions if the Counterparty is a foreign entity:

   a. Jurisdiction where Counterparty is located will respect and give effect to the choice of law provisions of the Interest Rate Protection Agreement and any other agreement (including, without limitation, the Assignment of Interest Rate Protection Agreement) which the Counterparty thereunder has executed and delivered pursuant thereto.

   b. A judgment obtained in the courts of the State of New York is enforceable in the jurisdiction where Counterparty is located.

   (g) Lender may, in its sole and absolute discretion, require Borrower to purchase a Interest Rate Protection Agreement to the direct benefit of Lender (rather than for the benefit of Borrower to be assigned to Lender) but otherwise in form and substance as described in this Section 68.

   69. Loan Expense and Advances

   (a) Loan and Administration Expenses.  Borrower shall reimburse Lender, from time to time upon ten (10) days' demand therefor, for reasonable, out-of-pocket expenses incurred by Lender in connection with the Loan, including all amounts payable pursuant to

LA1 789909

Subsections 69(b) and (c) hereof and any and all other fees owing to Lender pursuant to the Loan Documents, and also including, without limitation, all recording, filing and registration fees and charges, mortgage or documentary taxes, insurance premiums, title insurance premiums and other charges of the Title Insurer, survey fees and charges, cost of certified copies of instruments, cost of premiums on surety company bonds and the Title Policy, charges of Title Insurer or other escrowee for administering disbursements, all fees and disbursements of Lender's Consultant, all fees and disbursements of Servicer, appraisal fees, syndication fees, insurance consultant's fees, environmental consultant's fees, travel related expenses and all costs and expenses incurred by Lender or Servicer in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Lender hereunder, but (without limiting anything contained in Section 29) not including any of Lender's out-of-pocket expenses incurred in connection with a Securitization. Further, if any default or Event of Default occurs or if the Loan is not paid in full when and as due, Borrower shall pay to Lender upon ten (10) days' demand therefor, all costs and expenses of Lender (including, without limitation, reasonable attorneys' fees and court costs) incurred in attempting to enforce payment of the Loan or to realize upon the security therefor. Borrower agrees to pay Lender's fees and disbursements incurred in connection with title updates and title endorsements ordered by the Lender (i) in connection with each disbursement of Loan proceeds, and (ii) to be ordered every six (6) months if Borrower commences or performs any physical clearing, demolition, grading, preconstruction or construction of any kind on any portion of the Mortgaged Property.

(b)     Brokerage Fees. Borrower shall pay all brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby and shall indemnify and hold Lender harmless against all claims, liabilities, costs and expenses (including attorneys' fees and expenses) incurred in relation to any claim by any broker, finder or similar person; provided however, as an inducement to Borrower to make the foregoing undertaking, Lender represents to Borrower that Lender has not dealt with any broker, finder or similar person in connection with this Loan.

(c)     Right of Lender to Make Advances to Cure Borrower's Defaults. If Borrower fails to perform any of Borrower's covenants, agreements or obligations contained in this Agreement or any of the other Loan Documents or Construction Documents (after the expiration of applicable grace periods, except in the event of an emergency or other exigent circumstances), Lender may (but shall not be required to) perform any of such covenants, agreements and obligations, and any amounts expended by Lender in so doing shall be added to the Debt and bear interest at the Default Rate.

(d)     The provisions of this Section 69 shall survive the termination of this Agreement.

70.     Lender's Right of First Offer to Make Additional Financing  Prior to seeking or obtaining any Additional Funding (as defined below), Borrower shall request in writing an offer for Additional Funding from Lender. Lender, or any affiliate or subsidiary of Lender (for purposes of this Section 70, collectively "Lender"), will have twenty (20) days after such request to provide Borrower a term sheet, application or commitment for such Additional Funding, if it wishes to make the Additional Funding, which may be subject to satisfaction of additional

81

conditions; provided however, in no event shall Lender be obligated to provide any Additional Funding. If Borrower continues to seek Additional Funding, Borrower shall enter into such funding arrangements with Lender unless Borrower is able to obtain other funding from a comparable third-party that provides for more favorable economic terms than the Additional Funding offered by Lender, or with fewer material conditions to closing (the "Alternative Funding"); such favorability shall be reasonably determined by both Borrower and Lender. Prior to entering into any Alternative Funding, Borrower will deliver to Lender a notice ("Alternative Notice") which shall state the name(s) of the proposed lender(s), the amount of the Alternative Funding, and the other proposed material terms upon which such lender(s) intend to effect such Alternative Funding, certifying that Borrower believes in good faith that a binding agreement for the Alternative Funding is obtainable on the terms set forth in the Alternative Funding offer and including a copy of the Alternative Funding offer and any other information that Lender may reasonably request regarding the Alternative Funding. If the Alternative Funding does not close within a one hundred eighty (180) day period after delivery of the Alternative Notice on materially the same terms described in the Alternative Notice, Borrower shall again be required to comply with the terms of this Section 70. As used herein (a) "Additional Funding" means (i) any additional financing (before or after the Maturity Date) or refinancing of any portion of the Loan, (ii) except for a Permitted Transfer or a Current Member Contribution (as defined below), additional equity investments, directly or indirectly in Borrower, or (iii) any sale or other transfer of the Mortgaged Property to an Affiliate of Borrower or to any other entity whose direct or indirect owners include any direct or indirect owners of Borrower, or any Affiliates thereof; and (b) "Current Member Contribution" means any equity contribution made by any direct or indirect members or shareholders in Borrower as of the date hereof. The rights in favor of Lender set forth in this Section 70 shall survive the Maturity Date, payment of the Debt, and any Current Member Contribution, and shall terminate only upon the closing of an Alternative Funding as and when provided herein. Borrower hereby agrees to execute at the request of Lender a Memorandum of Right of First Offer regarding this Section and hereby consents to the recordation of such Memorandum against the Property at Lender's discretion. Lender agrees to promptly release of record the Memorandum upon the termination of Lender's rights set forth in this Section 70, including without limitation after a bona fide third party sale of the Property or all equity interests in Borrower in compliance with this Section 70 where the Debt is fully repaid. Borrower shall provide to Lender promptly upon Lender's reasonable request any information or documentation Lender deems necessary or advisable to determine Borrower's compliance with the terms of this Section 70.

71.    Subordination to Construction Loan.

(a)    Lender acknowledges that Borrower will apply for a Construction Loan for the development of the Development Improvements, subject to the provisions of this Section 71. Notwithstanding the immediately preceding sentence, Lender shall have the right, in its sole and reasonable discretion, to approve or disapprove any proposed Construction Loan, Construction Loan Documents and Construction Documents with respect to the Development Improvements, as well as any and all documentation and other instruments relating thereto.

(b)    In connection with Borrower obtaining a Construction Loan, Lender agrees, at the election of Borrower, to either (i) subordinate the lien of the Mortgage and all other Loan Documents to the Construction Loan Documents regarding the applicable Parcel to which

82

such Construction Loan relates only or (ii) reconvey the applicable Parcel to Borrower and release the lien of the Mortgage and all other Loan Documents from the applicable Parcel upon payment of the applicable Release Price to Lender and, if requested by Borrower, provide concomitant mezzanine financing to Borrower's direct and/or indirect members or other interest holders in the amount of such Release Price, subject to such terms and conditions, including without limitation additional documentation, as Lender may determine in its sole discretion; provided, however, that if (x) the Mortgage is subordinated to the Construction Loan mortgage or (y) Lender provides mezzanine financing to Borrower's direct or indirect members or other interest holders, Construction Lender must enter into an intercreditor agreement with Lender reasonably satisfactory to Lender.

(c)    Such subordination or mezzanine financing shall only be made by Lender if no Event of Default has occurred and is continuing under this Agreement or the other Loan Documents, and upon satisfaction of the following conditions, as determined by Lender, acting reasonably:

(i)    Borrower has delivered a notice of title continuation and an endorsement to the Title Insurance Policy theretofore delivered, indicating that there has been no change (other than changes that are otherwise permitted under the Loan Documents) in the state of title (other than with respect to the release effected pursuant to this Section 71) and no survey exceptions not theretofore approved by Lender, which endorsement shall have the effect of increasing the coverage of the policy by an amount equal to the advance then being made by Lender, if any, if the policy does not by its terms provide for such an increase;

(ii)    The Mortgaged Property has been duly subdivided and the applicable Parcel is a separate and distinct lot (including tax lot) from the remaining Mortgaged Property;

(iii)    Borrower delivers such documents, letters, affidavits, report and assurances, as Lender and/or the Title Company may reasonably require;

(iv)    Borrower pays all out-of-pocket costs and expenses of Lender, including, without limitation, reasonable, out-of-pocket attorneys' fees, in connection with any such release; and

(v)    Releases of Parcels shall not affect or impair the security of the Mortgage and Lender's lien and security interests created by the other Loan Documents as to the Mortgaged Property not theretofore released, and said liens and security interests shall continue in full force and effect as to the unreleased Mortgaged Property.

72.    No Usury.

Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by

83

applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, the Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess.

73.    No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents shall not be deemed to constitute Lender a mortgagee in possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of Borrower, any Parcel Borrower or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Mortgaged Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Mortgaged Property), and review or approval of budgets, expenses or obligations or any analysis of the Mortgaged Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create or form

84

the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of its employees or agents, any guest or invitee upon the Mortgaged Property, or any other Person.

(c)     Except as otherwise provided in Section 29, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and any Servicer appointed by Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender, the Servicer appointed by Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Section 29, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

74.     Costs of Enforcement. In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Event of Default, (ii) foreclosure of any mortgage prior to or subsequent to the Mortgage in which proceeding Lender is made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor or an assignment by any of Borrower, any Parcel Borrower, Guarantor or Environmental Guarantor for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due under this Agreement, the other Loan Documents or with respect to the Mortgaged Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out", then Borrower, its successors or assigns, shall pay to Lender on demand any and all expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Mortgaged Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Mortgaged Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence or willful misconduct of Lender. Any cost and expenses due and payable to Lender may be paid from any amounts in the Lockbox Account. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the maximum extent allowed by law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of Lender's remedies against the Mortgaged Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

75.     Sugar Mill Parcel.

85

(a)     SPE Member and Sugar Mill Borrower hereby represent to Lender that
Sugar Mill Borrower has the right to purchase the Sugar Mill Parcel pursuant to the terms of the
Parcel 5 PSA (as defined in the SPE Member Operating Agreement). If Sugar Mill Borrower,
elects, in its sole and absolute discretion, to acquire the Sugar Mill Parcel pursuant to the Parcel
5 PSA, then Sugar Mill Borrower hereby agrees that it shall deliver to Lender written notice not
less than five (5) business days before closing of its election to purchase the Sugar Mill Parcel
and the date of such closing. Lender acknowledges that closing funds under the Parcel 5 PSA
will be funded by Predevelopment Advances made in accordance with Section 2(c) hereof. SPE
Member Parties hereby agree, upon written notice from Lender to the SPE Member Parties, to
promptly cause the execution and delivery by Borrower and the Sugar Mill Borrower of an
amendment to the Loan Documents, and any other documents reasonably required by Lender
(including, without limitation, a new mortgage instrument) whereby the Sugar Mill Parcel
becomes part of the Mortgaged Property hereunder, the Sugar Mill Borrower becomes a Parcel
Borrower hereunder, and other provisions of the Loan Documents are modified in the reasonable
discretion of Lender such that all representations, warranties and covenants made by each Parcel
Borrower are similarly made by Sugar Mill Borrower, and all the requirements regarding each
Parcel are similarly applied to the Sugar Mill Parcel. The SPE Member Parties hereby agree that
the Sugar Mill Borrower shall have a similar ownership structure and similar entity documents to
each Parcel Borrower (in Lender's reasonable determination). Windwalker Hawaii hereby
agrees that neither it nor any of its Affiliates will have any direct or indirect equity interest in the
Sugar Mill Parcel except to the extent the Sugar Mill Parcel is acquired by SPE Member or the
Sugar Mill Borrower, as the case may be, as set forth above.

(b)     All of the SPE Member Parties, at their sole cost and expense, shall
reasonably cooperate with Lender in connection with their obligations under this Section 75.
Without limiting the foregoing, Lender shall have the right to require any and all title updates,
public records' searches, third party reports, and other diligence documents, materials and
information regarding the Sugar Mill Parcel and/or the Sugar Mill Borrower that Lender may
deem reasonably necessary, all at the sole cost and expense of the SPE Member Parties. All SPE
Member Parties and Sugar Mill Borrower hereby agree that their collective address for the
purposes of written notice under this Section 75 and Section 76 below shall be the Borrower's
address as set forth in Section 42 of this Agreement. Notwithstanding any other provision of this
Agreement, SPE Member, Windwalker Hawaii are deemed a party to this Agreement only with
respect to this Section 75 and Section 76 below, and Na'alehu Ventures is deemed a party to this
Agreement only with respect to this Section 75, and any reference in this Agreement or the other
Loan Documents to any "party" or the "parties" to any of the Loan Documents shall not refer (x)
to any of SPE Member, Windwalker Hawaii, except specifically with respect to this Section 75
and Section 76 below, or (y) to Na'alehu Ventures, except specifically with respect to this
Section 75.

76.    House Parcel.

(a)     SPE Member on behalf of itself and any wholly owned subsidiary it may
form to take title to the House Parcel (the "House Parcel Borrower") hereby represents to Lender
that SPE Member has the right to purchase the House Parcel pursuant to the terms of the House
Purchase Option (as defined in the SPE Member Operating Agreement). If SPE Member elects,
in its sole and absolute discretion, to acquire the House Parcel pursuant to the House Purchase

86

Option, then SPE Member hereby agrees that it shall form House Parcel Borrower to take title thereto, and deliver to Lender written notice not less than five (5) business days before closing of its election to purchase the House Parcel and the date of such closing. Lender acknowledges that the acquisition price under the House Purchase Option will be funded by Predevelopment Advances or Additional Advances requested by Borrower and made by Lender in accordance with Section 2 hereof. SPE Member Parties hereby agree, upon written notice from Lender to the SPE Member Parties, to promptly cause the execution and delivery by Borrower and the House Parcel Borrower of an amendment to the Loan Documents, and any other documents reasonably required by Lender (including, without limitation, a new mortgage instrument) whereby the House Parcel becomes part of the Mortgaged Property hereunder, the House Parcel Borrower becomes a Parcel Borrower hereunder, and other provisions of the Loan Documents are modified in the reasonable discretion of Lender such that all representations, warranties and covenants made by each Parcel Borrower are similarly made by House Parcel Borrower, and all the requirements regarding each Parcel are similarly applied to the House Parcel. The SPE Member Parties hereby agree that the House Parcel Borrower shall have a similar ownership structure and similar entity documents to each Parcel Borrower (in Lender's reasonable determination). Windwalker Hawaii hereby agrees that neither it nor any of its Affiliates will have any direct or indirect equity interest in the House Parcel except to the extent the House Parcel is contributed to the House Parcel Borrower as set forth above.

(b)     All of the SPE Member Parties, at their sole cost and expense, shall reasonably cooperate with Lender in connection with their obligations under this Section 76. Without limiting the foregoing, Lender shall have the right to require any and all title updates, public records' searches, third party reports, and other diligence documents, materials and information regarding the House Parcel and/or the House Parcel Borrower that Lender may deem reasonably necessary, all at the sole cost and expense of the SPE Member Parties. House Parcel Borrower hereby agrees that its address for the purposes of written notice under this Section 75 shall be the Borrower's address as set forth in Section 42 of this Agreement.

[Signature page follows]

87

IN WITNESS WHEREOF, Borrower and Lender have executed this instrument as of the day and year first above written.

BORROWER:

Waikapuna Borrower:

**WWK HAWAII-WAIKAPUNA LLC,**
a Delaware limited liability company

By:    WWK Hawaii Holdings, LLC,
       a Delaware limited liability company,
       its sole and managing member

       By:    Windwalker Hawaii, LLC,
              a Delaware limited liability company,
              its managing member

              By:   _____
                   Alan J. Worden, its managing member

Moaula Borrower:

**WWK HAWAII-MOAULA LLC,**
a Delaware limited liability company

By:    WWK Hawaii Holdings, LLC,
       a Delaware limited liability company,
       its sole and managing member

       By:    Windwalker Hawaii, LLC,
               a Delaware limited liability company,
               its managing member

              By:   _____
                   Alan J. Worden, its managing member

[Signatures Continue Next Page]

Signature Page 1

Honu'apo Borrower:

**WWK HAWAII-HONU'APO LLC,**
a Delaware limited liability company

By:    WWK Hawaii Holdings, LLC,
        a Delaware limited liability company,
        its sole and managing member

        By:    Windwalker Hawaii, LLC,
                a Delaware limited liability company,
                its managing member

                By:     _____
                       Alan J. Worden, its managing member

Little Honu'apo Borrower:

**WWK HAWAII-LITTLE HONU'APO LLC,**
a Delaware limited liability company

By:    WWK Hawaii Holdings, LLC,
        a Delaware limited liability company,
        its sole and managing member

        By:    Windwalker Hawaii, LLC,
                a Delaware limited liability company,
                its managing member

                By:     _____
                       Alan J. Worden, its managing member

[Signatures Continue Next Page]

Signature Page 2

Loan Agreement
LA1 789909

Church Borrower:

**WWK HAWAII-CHURCH LLC,**
a Delaware limited liability company

By:    WWK Hawaii Holdings, LLC,
         a Delaware limited liability company,
         its sole and managing member

         By:    Windwalker Hawaii, LLC,
                  a Delaware limited liability company,
                  its managing member

                  By:    _____
                           Alan J. Worden, its managing member

[Signatures Continue Next Page]

Lender:

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name: _____
            Joelle Halperin

Its:     Authorized Signatory

**THE UNDERSIGNED EXECUTE THIS
AGREEMENT SOLELY FOR PURPOSES OF
ACKNOWLEDGING AND AGREEING TO BE
BOUND BY THE PROVISIONS OF SECTION 75
HEREOF:**

SPE Member:

**WWK HAWAII HOLDINGS, LLC,**
a Delaware limited liability company

By:     Windwalker Hawaii, LLC,
        a Delaware limited liability company


        By: _____
        Name: Alan J. Worden
        Title:   Managing Member

[Signatures Continue Next Page]

Signature Page 4

Lender:

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name: _____
Its:     Authorized Signatory

**THE UNDERSIGNED EXECUTE THIS
AGREEMENT SOLELY FOR PURPOSES OF
ACKNOWLEDGING AND AGREEING TO BE
BOUND BY THE PROVISIONS OF SECTION 75
HEREOF:**

SPE Member:

**WWK HAWAII HOLDINGS, LLC,**
a Delaware limited liability company

By:     Windwalker Hawaii, LLC,
          a Delaware limited liability company

By: _____
Name: Alan J. Worden
Title:   Managing Member

[Signatures Continue Next Page]

Signature Page 4

Windwalker Hawaii:

**WINDWALKER HAWAII, LLC,**
a Delaware limited liability company

By: _____

Name: Alan J. Worden
Title:  Managing Member


Na'alehu Ventures:

**NA'ALEHU VENTURES 2006, LLC,**
a Delaware limited liability company

By:      Na' alehu Management, LLC
         a Delaware limited liability company,
         its Managing Member

         By: _____
             Name: Phillip A. Kenner
             Title:  Managing Member


## EXHIBITS

Exhibit A:      Real Property
Exhibit B:      Agreements Affecting the Mortgaged Property
Exhibit C-1:    Predevelopment Budget
Exhibit C-2:    Predevelopment Schedule
Exhibit D:      Organizational Chart
Exhibit E:      Loan Proceeds Holdbacks

## SCHEDULES

Schedule 1:     Environmental Audits
Schedule 2:     Leases
Schedule 3:     Sources and Uses
Schedule 4:     Predevelopment Milestones

Signature Page 5

Windwalker Hawaii:

**WINDWALKER HAWAII, LLC,**
a Delaware limited liability company


By:_____
Name: Alan J. Worden
Title:  Managing Member


Na'alehu Ventures:

**NA'ALEHU VENTURES 2006, LLC,**
a Delaware limited liability company

By:      Na' alehu Management, LLC
         a Delaware limited liability company,
         its Managing Member,

         By:_____
            Name: Phillip A. Kenner
            Title:  Managing Member


## EXHIBITS

Exhibit A:       Real Property
Exhibit B:       Agreements Affecting the Mortgaged Property
Exhibit C-1:    Predevelopment Budget
Exhibit C-2:    Predevelopment Schedule
Exhibit D:       Organizational Chart
Exhibit E:       Loan Proceeds Holdbacks

## SCHEDULES

Schedule 1:     Environmental Audits
Schedule 2:     Leases
Schedule 3:     Sources and Uses
Schedule 4:     Predevelopment Milestones


Signature Page 5