WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Diane Harvey
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                   :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

---------------------------------------------------------------------x

**DEBTORS' OBJECTION TO**
**MOTION TO LIFT AUTOMATIC STAY OF A PENDING ACTION IN**
<u>**THE SUPREME COURT OF THE STATE OF NEW YORK, KINGS COUNTY**</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        BNC Mortgage LLC ("<u>BNC</u>" or the "<u>Debtor</u>") and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors in possession (together, the "<u>Debtors</u>" and,

collectively with their non-debtor affiliates, "<u>Lehman</u>"), respectively submit this response in

opposition to the motion, dated February 27, 2009 (the "<u>Motion</u>"), of Howard W. Tomlinson

("<u>Tomlinson</u>") to lift the automatic stay (the "<u>Automatic Stay</u>") extant under section 362 of title

11 of the United States Code (the "<u>Bankruptcy Code</u>") to permit Tomlinson's state court action

to proceed against BNC:

**Preliminary Statement**[1]

1.    The Automatic Stay should not be lifted under the factual circumstances here.  Before it ceased operations, BNC was a subprime mortgage lender.  The Debtor has cash of $1,572 and is faced with an onslaught of over 59 prepetition litigations where it is a defendant.[2]  These cases are all presently stayed.  The lifting of the Automatic Stay for this plaintiff in this one prepetition litigation against the Debtor will inevitably lead to other prepetition plaintiffs seeking to lift the stay.

2.    The Debtor lacks sufficient resources to litigate any of these 59 actions unless it has insurance coverage.  The Debtor does not have such insurance coverage with respect to the Litigation which Tomlinson seeks to prosecute.  The Debtor has not had sufficient time to analyze the existence of insurance coverage with respect to the other 58 litigations.

3.    Since the Debtor lacks cash to prosecute this or any other prepetition litigation, the lifting of the Automatic Stay would cause the Debtor to have to default.  This would have the prejudicial effect of dramatically increasing the amount of creditor claims, without the Debtor having the right to fully adjudicate its defenses or negotiate settlements with respect to such claims.  Certainly the Automatic Stay is meant to protect the Debtor in this situation.

**Background**

4.    Commencing on September 15, 2008, and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliates commenced with this Court

---

[1] Capitalized terms used, but not otherwise defined in this Preliminary Statement, shall have the meanings as ascribed them below.

[2] See BNC's Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, and Schedules of Executory Contracts and Unexpired Leases [Docket No. 3054].  Neither Tomlinson nor the Litigation is listed on BNC's Schedules.

voluntary cases under chapter 11 of the Bankruptcy Code.  BNC, an indirect subsidiary of LBHI,

commenced its chapter 11 case on January 9, 2009.  The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to Rule

1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

5.    BNC's business was defunct well before the eruption of the credit crisis

in the summer of 2008.  The liquidation of BNC began at that time and, according to BNC's

Schedules of Assets and Liabilities, the vast majority of BNC's remaining assets consist of inter-

company claims.

## The Litigation

6.    On November 8, 2007, Tomlinson commenced an action against several

defendants, including BNC, by filing a summons and complaint in the Supreme Court of the

State of New York, County of Kings styled <u>Howard W. Tomlinson v. Cherry Anne Degannes, et.

al.</u>, Index No. 41418/07 (the "<u>Litigation</u>").  Tomlinson subsequently filed an amended complaint

and second amended complaint.  A copy of the second amended complaint (the "<u>Complaint</u>") is

annexed hereto as <u>Exhibit A</u>.  In the Complaint, Tomlinson alleges that certain defendants, which

are wholly separate and apart from Lehman, fraudulently induced Tomlinson into agreeing to a

transaction whereby he (i) sold his home to defendant Cherry Anne Degannes ("<u>Degannes</u>") and

(ii)  simultaneously entered into a lease with an option to buy back his home from Degannes one

year later.  Compl. at ¶¶ 17-28.

7.    According to the Complaint, defendants David Dodson and Jeffrey Lacy

and their respective companies, Encore Capital Services, Inc. and Avenue Mortgage, Inc.,

allegedly deceived Tomlinson into accepting a sale-leaseback transaction with Degannes as a result of which, Tomlinson alleges, he did not receive the full amount of proceeds as promised. Compl. at ¶¶ 11-20.

8.     Tomlinson made only the following three allegations with respect to BNC: (i) BNC financed Degannes's purchase of Tomlinson's property, in return for which, BNC received a security interest in the property, (ii) BNC has been accused of fraud in connection with the origination of *other* mortgages, and (iii) BNC and the other defendants intentionally listed the wrong sale price on the sale leaseback transaction.  Compl. at ¶¶ 23-24 and 28.  Based on the allegations in the Complaint, BNC was only tangentially involved in the disputed transaction.

## **Jurisdiction**

9.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § § 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## **The Automatic Stay**

10.     Section 362(a)(1) of the Bankruptcy Code provides, in relevant part, that a bankruptcy petition

> operates as a stay, applicable to all entities, of … the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code].

11 U.S.C. § 362(a)(1).

11.     The Automatic Stay is "one of the fundamental debtor protections provided by the bankruptcy laws."  Mid-Atlantic Natl'l Bank v. New Jersey Dep't of Envtl. Prot., 474 U.S. 494, 503 (1986).  It provides a debtor with a "'breathing spell' from the collection process."  See, e.g., Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc., 157

F.3d 169, 172 (2d Cir. 1998). "The principal purpose of the automatic stay of acts against property of the estate … is to preserve that property for distribution or use in reorganization of the debtor." <u>Official Creditors' Comm. of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.)</u>, 114 B.R. 27, 29 (Bankr. S.D.N.Y. 1989). The Automatic Stay "is necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization." <u>Fidelity Mortgage Inv. v. Camelia Builders, Inc.</u>, 550 F.2d 47, 53 (2d Cir. 1976).

<b>Tomlinson Did Not and Cannot Demonstrate that<br><u>Cause Exists for Relief from the Automatic Stay</u></b>

12.     Tomlinson's filing of the Motion is an acknowledgement that the Automatic Stay applies to the Litigation. Tomlinson attempts, however, to argue that the Automatic Stay is inapplicable to his claims for alleged intentional fraud. Mot. at 18-20. To support his proposition, Tomlinson relies on three cases which are completely inapposite. <u>See Hal Roach Sr. v. Reldman Trading Corp.</u>, 321 F.2d 42 (2d Cir. 1963); <u>Cumberland Oil Corporation, et al. v. Thropp</u>, 791 F.2d 1037 (2d Cir. 1986); <u>Kommanditselskab v. O.C.C. Shipping, Inc.</u>, 79 B.R. 534 (Bankr. S.D.N.Y. 1987). None of such cases stands for the proposition that the Automatic Stay is inapplicable where a plaintiff sues the debtor prepetition for intentional fraud. Rather, these cases deal with the situation where the court is determining whether a claim belongs to the debtor or to an individual creditor who may pursue its own claim irrespective of the Automatic Stay. Contrary to Tomlinson's contentions, it is patently clear that absent relief from the Court, the continued prosecution of a prepetition action against a debtor constitutes a direct violation of the Automatic Stay. 11 U.S.C. §362(a)(1).

13.     A party is only entitled to relief from the Automatic Stay under certain circumstances. 11 U.S.C. § 362(d); <u>In re Eclair Bakery Ltd.</u>, 255 B.R. 121, 132 (Bankr.

S.D.N.Y. 2000).  The Motion fails to state the statutory basis for the relief requested, but BNC

assumes Tomlinson seeks relief from the Automatic Stay pursuant to section 362(d)(1) of the

Bankruptcy Code, which provides that the Court shall grant relief "for cause."  11 U.S.C.

§ 362(d)(1).

14.    Because section 362(d) does not define "cause," courts determine what

constitutes such cause based on the totality of the circumstances.  In re Wilson, 116 F.3d 87, 90

(3d Cir. 1997); In re George, 315 B.R. 624 (Bankr. S.D. Ga. 2004).  Sonnax Indus., Inc. v. Tri-

Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1285 (2d Cir. 1990), is the

seminal case in the Second Circuit with respect to relief from the Automatic Stay for cause.  In

Sonnax, the Second Circuit catalogued twelve factors (the "Sonnax Factors") to be considered

and balanced when deciding whether the Automatic Stay should be lifted.  They are:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been
established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other
creditors;

(8) whether the judgment claim arising from the other action is subject to
equitable subordination;

(9) whether movant's success in the other proceeding would result in a judicial
lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical
resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

Sonnax, 907 F.2d at 1286.

15.    Not all of the factors are relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), and a court need not assign equal weight to each factor.  In re Keene Corporation, 171 B.R. 180, 183 (Bankr.S.D.N.Y.1994).

16.    Relief from the Automatic Stay was denied in an analogous case involving allegations of mortgage fraud in a multi-defendant action.  In In re Pioneer Commercial Funding Corp., the Court found that "an unliquidated, unsecured creditor … must establish extraordinary circumstances before the stay would be lifted in order to compel the debtor to continue to participate as a defendant in [a] multi-defendant action in [another court]."  114 B.R. 45, 47 (Bankr. S.D.N.Y. 1990) (citing In re Sonnax Industries, Inc., 99 B.R. 591, 595 (D. Vt. 1989)).

17.    Like Tomlinson, the movant in Pioneer did not assert that the debtor was a necessary party defendant in the non-bankruptcy litigation or that the automatic stay in the debtor's chapter 11 case would prevent the movant from proceeding with its litigation against the other non-debtor defendants.  Id.  The debtor in Pioneer, like BNC, argued that it had limited resources and personnel, that it had not engaged in any wrongful conduct, that it had been victimized by the fraudulent scheme charged in the action, that it was an insolvent company in the early stages of its chapter 11 case, and that it required the "breathing spell" afforded by the Automatic Stay.  Id. at 46.  The Court in Pioneer denied the movant's request for relief from the Automatic Stay, finding the creditor should not be permitted to pursue litigation against the debtor in another court, "especially if the only cause shown by the unsecured claimholder for lifting the stay, one month after the commencement of the Chapter 11 case, is judicial economy and administrative efficiency."  Id. at 48.

18. It is well established that the party seeking to lift or modify the Automatic Stay bears the initial burden to show cause why the stay should be lifted. Sonnax, 907 F.2d at 1285. "Conclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause. In re Texaco Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) (citing In re Penn Dixie, 6 B.R. 832 (Bankr. S.D.N.Y. 1980)). "If the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection". Sonnax, 907 F.2d at 1285. As the Pioneer court noted, "the debtor does not start out by proving the absences of cause if a creditor with an unsecured claim fails to show some evidence of good cause for relief." Pioneer, 114 B.R. at 48.

19. The Motion fails to discuss several of the Sonnax Factors and misapplies others. As described in more detail below, application of the relevant Sonnax Factors demonstrates that Tomlinson has failed to meet his burden that cause exists to justify modifying the Automatic Stay. Accordingly, the Motion should be denied.

## A.    The First Sonnax Factor - Relief Would Not Result In A Complete Resolution

20. Relief from the Automatic Stay would initiate the commencement of a multi-step, prolonged and expensive litigation process, which could include, but not be limited to, discovery, hearings, motion practice, and trial. As reflected in the Motion, the Litigation is in the early stages of discovery. See Mot. at 9. Full participation in and completion of this process would not necessarily lead to complete resolution of the issues, however, as rulings and decisions at the trial level may be subject to several levels of appeal by the multiple parties to the Litigation. BNC does not have sufficient funds to participate in even the first level of trial litigation, much less in the appellate process. Accordingly, application of the first Sonnax Factor weighs against granting the relief sought by Tomlinson.

**B.**      **The Second Sonnax Factor - Interference With The Bankruptcy Case**

21.      Lifting of the Automatic Stay could exhaust BNC's limited resources and have a direct and destructive impact upon the administration of BNC's and the other Debtors' estates.  Since BNC commenced the wind-down of its business in November 2007, it has liquidated the majority of its assets and terminated all of its employees.  As a result, the administration of its chapter 11 case is being carried out by the employees of certain of BNC's Debtor affiliates.  The Debtors' cases, the largest chapter 11 cases in history, are only six months old and involve issues that require the full attention of the employees and professionals rendering services on the Debtors' behalf.  Permitting the Litigation to proceed at this time would encourage BNC's other litigation claimants, who may argue they are similarly situated, to seek permission from this Court to proceed with their state or federal court litigations.  Responding to stay relief motions in this Court, and defending against cases in other courts, would further distract BNC and the Debtors from their efforts to administer their cases for the benefit of all creditors.  Courts have regularly denied requests to lift the automatic stay in such instances.  See, e.g., Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.), 40 B.R. 219, 223-25 (S.D.N.Y. 1984) (affirming bankruptcy court finding that lifting the Automatic Stay would divert Debtors' and Debtors' employees' attention away from the chapter 11 case and affirming bankruptcy court's denial of motion for relief from the Automatic Stay).  Thus, application of the second Sonnax Factor weighs against granting the relief sought by Tomlinson.

**C.**      **The Third Sonnax Factor –BNC Was Not Sued as a Fiduciary**

22.      Admittedly, "proceedings in which the debtor is a fiduciary need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors."  In re Bailey, 11 B.R. 199, 201 (Bankr. E.D.Va. 1981) (internal citations omitted).  However, BNC was not sued in the Litigation as a fiduciary (such as a

trustee) on behalf of others. Rather, Tomlinson, and other parties to the Litigation, seek to collect property of BNC's estate for alleged acts taken by BNC for BNC's benefit. Thus, application of the third Sonnax Factor weighs against granting the relief sought by Tomlinson.[3]

**D.    The Fourth Sonnax Factor – No Specialized Tribunal Has been Established**

23.    No specialized tribunal has been established to consider the Litigation. A state court such as the one in which the Litigation is pending is not a specialized tribunal. In re Cicale, 2007 WL 1893301, *3 n.3 (Bankr. S.D.N.Y. June 29, 2007). This Court is qualified to resolve prepetition claims for breach of contract or fraud through BNC's claims reconciliation process or otherwise. Accordingly, application of the fourth Sonnax Factor weighs against granting the relief sought by Tomlinson.

**E.    The Fifth Sonnax Factor – BNC Lacks Insurance Coverage for the Litigation**

24.    The fifth Sonnax Factor, the availability of insurance coverage, is particularly salient to the present analysis. BNC lacks insurance coverage to satisfy either the litigation costs that will be incurred if the Automatic Stay is lifted or the potential costs of any

---

[3] Tomlinson confuses the concept of fiduciary capacity with fiduciary duty, which is irrelevant to the application of the Sonnax Factors, and mistakenly asserts that BNC had a fiduciary duty to Tomlinson. See Motion at 16. Even so, BNC had *no* such duty to Tomlinson. The law is clear in New York that a lender does not owe a fiduciary duty to its borrower. Bank Leumi Trust Co. v. Block 3102 Corp., 180 A.D.2d. 588, 589, 580 N.Y.S.2d 299, 301 (1st Dept. 1992) (finding that, "[t]he legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors."). Thus, BNC owed no duty to Degannes and, by extension, no duty to Tomlinson, who had no relationship, contractual or otherwise, with BNC. This common sense conclusion has been upheld by courts in New York, which consistently have held that a mortgagee has no duty to the non-mortgagor seller of a property. Burgher v. Singh, 28 A.D.3d 695, 698-699, 816 N.Y.S.2d 478, 480 (2d Dept. 2006) (dismissing plaintiff's negligence claims against the mortgagee which provided financing for what plaintiff alleged was a fraudulent purchase of her property because "the bank did not owe the plaintiff a duty of  care."); Falle v. Metalios, 132 A.D.2d 518, 519-20, 517 N.Y.S.2d 534, 536 (finding that the defendant mortgage lender, which financed a third party's purchase of the property for which plaintiff had contracted, "owed no duty to the plaintiff.").

judgment arising from the Litigation.  Although one claim in the Litigation, for rescission of the

mortgage, is being defended by a title insurance company, the underlying title insurance is not

for the benefit of BNC and does not insulate BNC from money damages that Tomlinson is

seeking against BNC.  As a result, BNC's limited estate will be directly burdened by the

postpetition litigation costs and its resources will be consumed by the prepetition Litigation.[4]

Granting relief from the Automatic Stay would therefore limit the estate available for BNC's

other creditors.  Accordingly, application of the fifth Sonnax Factor strongly weighs against the

relief sought by Tomlinson.

F.    **The Sixth Sonnax Factor – The Litigation**
      **Involves BNC and Third Parties as Primary Defendants**

          25.    This Court has previously explained that it "may lift a stay for actions

which bear little relation to the bankruptcy case."  City Ins. Co. v. Mego Int'l Inc. (In re Mego

Int'l, Inc.), 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983).  In Mego, the Court found that "[s]uch

lack of connection with the title 11 case occurs where the action essentially involves third

parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and

resolution of the issue in no way frustrates the orderly distribution of assets of the estate. Id.

(citing See In re Columbia Ribbon & Carbon Manufacturing Co., Inc., 13 B.R. 276. (Bankr.

S.D.N.Y. 1981)).  The Court in Mego denied the movant's request for relief from the Automatic

Stay because the debtor was "more than a mere conduit for the flow of proceeds" and where the

property recovered would "constitute property of the estate."  Id.

---

[4] Notably, Debtors other than BNC have stipulated to stay relief to the extent that insurance was
available.  See [Docket No. 3064].

26.     Likewise, in the instant case, Tomlinson is seeking to assert a claim directly against BNC that, if successful, will reduce the value of its estate.  Thus, application of the sixth Sonnax Factor militates against granting the Motion.

**G.     The Seventh Sonnax Factor - Litigation in State
         Court Would Prejudice the Interests of Other Creditors**

27.     Tomlinson fails to discuss the seventh Sonnax Factor.  Nonetheless, as described above and below, Tomlinson seeks to lift the Automatic Stay to prosecute his claim at the expense of BNC's and the Debtors' other creditors.  Allowing Tomlinson to proceed with the Litigation will hurt BNC's other creditors in one of two ways.  Either (i) either BNC will have to default, resulting in a large claim against the estate, or (ii) BNC will exhaust its limited assets defending the Litigation, which will reduce distributions to other creditors.  Either scenario damages other creditors and, particularly at this early stage of BNC's chapter 11 case, should not be permitted.  Tomlinson's litigation claim should be liquidated in the same manner and forum as other similarly situated creditors of BNC's estate.  Application of the seventh Sonnax Factor, therefore,  weighs against granting the relief sought by Tomlinson.

**H.     The Eighth Sonnax Factor – Tomlinson's Claim, if
         Allowed, Would Be A General Unsecured Claim Against BNC**

28.     The eighth Sonnax Factor is whether the judgment claim arising from the Litigation is subject to equitable subordination.  Although it is too early to tell at this early stage of its chapter 11 case, it is unlikely that Tomlinson's claim resulting from the Litigation would be equitably subordinated.  Although this factor may be inapplicable as a reason for the Court to deny relief from the Automatic Stay, it does not provide support for Tomlinson's request and, indeed, is not cited by Tomlinson.

**I.    The Ninth Sonnax Factor – Tomlinson's Success
in the Litigation Would Not Result In a Judicial Lien**

29.    Assuming, *arguendo*, that Tomlinson were to prevail in the Litigation, Tomlinson would, at best, be an unsecured creditor of BNC's estate.  The ninth Sonnax Factor is inapplicable to the present dispute.

**J.    The Tenth Sonnax Factor - The Interests Of Judicial
Economy And The Expeditious And Economical Resolution Of Litigation**

30.    The Litigation involves a disputed, unliquidated, prepetition claim.  Such a claim will be more efficiently dealt with as part of the Court's claims resolution process. Tomlinson will have the opportunity to file a proof of claim in BNC's case and will be given similar treatment to all other similarly situated unsecured claimants.  The amount of time and resources necessary to litigate the Litigation from its present procedural stage to a final outcome would interfere with BNC's case, and would not bring Tomlinson significantly closer to collection of his alleged claim against BNC.  To divert management attention from the chapter 11 cases at this time would serve neither judicial economy nor the purposes of section 362 of the Bankruptcy Code.  Accordingly, application of the tenth Sonnax Factor weighs against granting the relief sought by Tomlinson.

**K.    The Eleventh Sonnax Factor - The Parties Are Not Ready For Trial**

31.    Tomlinson admits that the Litigation is in its early stages – only one deposition has occurred and several more are scheduled before this aspect of discovery is complete.  See Motion at 9.  The fact that fact that the parties are not ready for trial weighs in favor of BNC.  See In re WorldCom, Inc., Case No. 02-13533, 2007 WL 841948, *8 (Bankr. S.D.N.Y. Mar. 12, 2007).  After the conclusion of discovery, the parties will likely engage in various forms of motion practice, including the filing and arguing of dispositive motions.  Thus, the facts of this case are unlike the facts of Burger Boys, Inc. v. South Street Seaport Ltd. P'ship

(In re Burger Boys, Inc.), 183 B. R. 682, 683 (S.D.N.Y. 1994), upon which Tomlinson relies.

Unlike the debtor in that case, BNC did not commence its chapter 11 case on the eve of the trial.

BNC had been winding down its business since November of 2007 and the commencement of its

chapter case was a natural extension of the wind-down and liquidation of the other Debtors.  It is

clear from the Motion itself that the parties are not ready for trial.  Consequently, application of

the eleventh Sonnax Factor weighs against granting the relief sought by Tomlinson.

**L.      The Twelfth Sonnax Factor - Impact Of
          the Stay on the Parties and the Balance of Harms**

        32.      The twelfth Sonnax factor, the balance of harms, is not discussed in the

Motion.  Indeed, Tomlinson does not specifically allege any "harm" that will occur if it does not

obtain the requested relief from the Automatic Stay.  In Sonnax, the Second Circuit affirmed a

bankruptcy court's denial of relief from the Automatic Stay, where the movant would suffer little

harm if the stay was left in place and "lifting the stay might doom [debtors'] attempts to

reorganize."  Sonnax, 907 F.2d at 1287.  As described above, the harm to BNC and the Debtors

from lifting the Automatic Stay would be substantial.  The impact of the Automatic Stay on

Tomlinson, on the other hand, is minimal.  Because his claim is a prepetition claim, Tomlinson

will have to wait for BNC to confirm a chapter 11 plan before he can receive any distribution on

account of his alleged claim.  Accordingly, application of the twelfth Sonnax factor weighs

heavily against granting the relief sought by Tomlinson.

## **Conclusion**

33.     For all of the foregoing reasons, the Debtors respectfully request that the

Court deny the Motion.

Dated:  March 20, 2009
          New York, New York

                                    /s/ Jaqueline Marcus
                                    Diane Harvey
                                    Jacqueline Marcus

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

**<u>EXHIBIT A</u>**

**(Complaint)**

**SUPREME COURT OF THE STATE OF NEW YORK**
<u>**COUNTY OF KINGS**</u>                                    **X**

Howard W. Tomlinson

                                    Plaintiff,                    **SECOND AMENDED**
                                                                  **VERIFIED**
                        v.                                        **COMPLAINT**
                                                                  **Index No. 41418/07**

**Cherry Ann Degannes, David Dodson, Encore**
**Capital Services, Inc., Jeffery Lacy,**
**Avenue Mortgage, Inc., BNC Mortgage Inc. and**
**Daniel Chan, Esq.**


<u>                                    **Defendant(s)**           </u>**X**


**BNC Mortgage, Inc.**

                                    **Third-Party Plaintiff**

                        v.

**Daniel Chan, Esq.**

                                    **Third-Party Defendant**

<u>                                                              </u>**X**

        Plaintiff, Howard W. Tomlinson, by his Attorneys, Cone &
Kilbourn, for his Second Amended Verified Complaint, alleges:

   (1)   That at all material times Plaintiff, Howard W. Tomlinson, is a
         resident of Kings County, New York with an address at 694
         Crown Street, Brooklyn, New York 11213.
   (2)   That at all material times Defendant, Cherry Ann Degannes, is
         a resident of Nassau County, New York with an address at 9
         Lombardi Place, Amityville, New York 11701.

(3)    That upon information and belief at all material times Defendant, David Dodson, is the owner/manager/operator of Defendant Encore Capital Services, Inc. with an address located at 100 Garden City Plaza, Garden City, New York 11530.

(4)    That at all material times Defendant, Encore Capital Services Inc. is an entity duly organized and operating pursuant to law with a principal place of business located at 100 Garden City Plaza, Garden City, New York 11530.

(5)    That upon information and belief at all material times Defendant, Jeffery Lacy, is the owner/manager/operator of Defendant, Avenue Mortgage, with an address located at 57 Manorhaven Blvd., Port Washington, New York 11050.

(6)    That at all material times Defendant, Avenue Mortgage, is an entity duly organized under law with a principal place of business located at 57 Manorhaven Blvd., Port Washington, New York 11050.

(7)    That at all material times Defendant, BNC Mortgage Inc., is/was an entity organized under law with an office located at 510 Broad Hollow Rd. #101, Malville, New York 11747 and with agents, Lehman Brothers Bancorp located at Bldg. 1000 West St., Wilmington De. 19801 and Aurora Loan Services, a Lehman Bros. Company located at 10350 Park Meadows Dr. Littleton, Co. 80124.

(8)    That at all material times Defendant, Daniel Chan, Esq. is an attorney duly admitted to practice with an office located at 104 W. Main St. Patchogue, N.Y. and counsel, Furman Kornfeld & Brennan LLP located at 545 5th Ave., 4th Floor New York, N.Y.

### AS AND FOR A FIRST CAUSE OF ACTION
### AGAINST ALL OF THE DEFENDANTS

(9)    That, prior to November 7, 2006 Plaintiff, Howard W. Tomlinson ("Tomlinson"), was the sole owner of a two family house located at 694 Crown St. Brooklyn, New York 11213.

(10)   That in October and November, 2006, Tomlinson was desirous of refinancing the then existing mortgage on the Crown St. residence.

(11)   That, in October, 2006, Tomlinson met with Defendant, David Dodson ("Dodson"), of Defendant, Encore Capital Services Inc. ("Encore"), to seek refinancing. During this meeting Tomlinson stressed the urgency of refinancing since he was behind on his mortgage payments.

(12)   That at all material times Dodson represented to Tomlinson

that he and his company, Encore, were in the business of acting as *bona fide* mortgage brokers in New York.

(13) That the representations alleged in paragraph "(12)" herein led Tomlinson to believe that Dodson and Encore were licensed real estate brokers.

(14) Upon information and belief, at all material times, Dodson was not licensed to operate as a mortgage broker in New York.

(15) Upon information and belief, at all material times, Encore was not licensed to operate as a mortgage broker in New York.

(16) That, in reliance upon the false representations set forth in paragraph "(12)" herein, Tomlinson asked Dodson and his company, Encore, to obtain refinancing for the Crown St. residence.

(17) That, in late October or early November, 2006, Dodson told Tomlinson that his credit rating was so "poor" that neither he, Dodson nor Encore could obtain the sought refinancing.

(18) Dodson then introduced Tomlinson to Defendant, Jeffery Lacy ("Lacy"), who represented to Tomlinson that he, Lacy, was the owner/operator of Defendant, Avenue Mortgage ("Avenue"). Lacy represented that both he and Avenue were licensed to operate as mortgage brokers in New York.

(19) Lacy told Tomlinson that he was aware of the urgency of the need for refinancing and that Tomlinson's credit rating was allegedly "poor". Lacy then, in the presence of Dodson, proposed that the Crown St. residence be "sold" to a "temporary" buyer/ holder who could obtain refinancing and who would enter into a 1 year lease and buy back agreement with Tomlinson during which time Tomlinson could "improve" his credit rating and thus buy back the residence.

(20) Both Lacy and Dodson represented to Tomlinson that he had no alternative but to accept the scheme set forth in paragraph "(19)" herein to avoid foreclosure under the then existing mortgage.

(21) At this same meeting with Lacy and Dodson on November 6, 2006, Tomlinson was introduced, for the first time, to Defendant, Cherry Ann Degannes ("Degannes"), who was described as the person willing to buy, hold and lease, with a purchase option in favor of Tomlinson, the Crown St. residence as described in paragraph "(19)" herein.

(22) As the result of the various false and untrue representations made in paragraphs "(12)", "(17)", "(18)" and "(19)", Tomlinson decided to accept the scheme and, on November 7, 2006 entered into a "sale", "lease" and "buy back" agreement with Degannes.

(23)   That Dodson, Lacy and Degannes told Tomlinson that he had no need for legal counsel for the "sale", "lease" and "buy back" agreement and that they and/or Defendant, counsel, Daniel Chan ("Chan"), for the refinancing bank, BNC Mortgage Inc. ("BNC") would attend to all the necessary paperwork including the "sale/ lease/ purchase" agreement that should have had nothing to do with Defendant, BNC.

(24)   That, upon information and belief, BNC has been accused of fraud in connection with its work in arranging for and providing mortgage loans and, as a consequence, may now no longer be in business.

(25)   That, upon information and belief, Degannes was paid approximately $93,000 for her participation in the scheme although Tomlinson had been advised that Degannes would only receive $25,000. These funds were given to her at the "closing" by Chan which took place on November &, 2006 and were funds obtained from Tomlinson without his knowledge or consent that they were to be paid to Degannes for her participation in the purchase, lease and buy back scheme. It is not yet known whether Degannes shared any of these funds with any of the other Defendants.

(26)   That, on the same day, November 6, 2006, a "closing" was held on Long Island, New York where Tomlinson, Degannes, Dodson, Lacy and Chan were present.

(27)   That, at the aforementioned "closing", various documents which were previously drawn up by Chan were presented to Tomlinson, Degannes and Chan for signature. These documents included, among others, a hand written work sheet, a schedule of settlement charges, a HUD uniform settlement statement, a deed, mortgage documents and a lease with purchase option.

(28)   That the "sale" agreement listed a sales price of $660,000 despite the fact that the Crown St. premises, on November 6, had a greater market value. All of the Defendants, including, but not limited to BNC through its authorized agent, Chan, acted and expressed themselves in such a way that Tomlinson believed and relied on their actions and representations that the "closing" was being conducted in an entirely legal and *bona fide* manner.  That such actions and representations were deliberately and intentionally made knowing they were false at the time they were made by Degannes, Dodson and Lacy and Chan in the furtherance of the business of Encore, Avenue, Degannes and BNC in order to induce Tomlinson to part with the Crown St. residence and his money.

(29)  That Tomlinson relied upon the false statements, actions and representations, as previously alleged herein, so made by the Defendants and believed them to be true and as a result was induced to enter into the contract of sale and lease with purchase option as set forth herein and therefore lost both money and ownership of the Crown St. residence.

(30)  That on October 2, 2007 a "NOTICE OF DEFAULT AND RIGHT TO CURE" was allegedly sent to Degannes regarding her alleged failure to make payments on her existing mortgage on the Crown St. property. This notice, a copy of which was sent to Degannes at the Crown St. address, indicated that Degannes' monthly payments of $5,782.83 had not been made for the months of August and September, 2007 and that there existed a "TOTAL DEFAULT" of $17,568.95. The default letter was sent to Degannes by Chase Home Finance LLC ("Chase") acting as the receiving agent for BNC. Additionally, the letter threatened an acceleration of the entire mortgage balance. Tomlinson advised Lacy of this letter.

(31)  That, eight months of "rent" had been deducted in advance at the "closing" at an excessive monthly amount.

(32)  That Tomlinson was assessed, among other "charges", $13,990 as a "brokerage" fee by Avenue and/or Encore, "title" charges to "TERRA" or "TBRRA" of $33,144, "legal" fees to "Nglen & Associates" of $2,000 and other sundry charges including alleged work done by either Mel Harris, Esq. or Mel and Harris, Esqs. totaling $9,061.29 and a payment of $9,975 to one, Eliss Harrison for alleged services unknown. Degannes was paid, according to the "closing" work sheet $93,000 and an "attorney fee" of $1,250 to "DC", presumably Defendant, Chan. All of these assessments were set forth on a handwritten "closing sheet" prepared by Chan who issued all the checks at the "closing".

(33)  That despite the fact that Tomlinson was to be paid $192,000 at the closing, he was only paid $32,000.

(34)  That Tomlinson's father later complained to Dodson of the non payment of at least $200,000 to his son and was told that as the result of "mistakes" made at the closing, another check for $11,000 would be sent. The check was ultimately received and was issued from Chan's IOLA account.

(35)  That the "Lease with Purchase Option" entered into with Degannes included rental charges of $6,000 per month by Tomlinson, far in excess of what was reasonable, that eight month's rent was deducted, in advance, at the closing and the

"lease" contained no provision regarding any buy back price or any method to determine the buy back price.

(36) That all of the various actions and representations as set forth in paragraphs "(12)", "(17)", "(18)", "(19)", "(20)", "(28)" and ("32") were false and known by the Defendants to be false when made and were made with the intent to defraud Tomlinson of his Crown St. property.

(37) That the property delivered to Degannes had, at the time, a fair market value of at least $800,000 and, in addition Tomlinson paid and was defrauded of eight months "rent" totaling $48,000 and "closing" charges, including "child support" and GMAC Insurance and $9,000 to "Traders Discount Center LLC. despite the fact Tomlinson has no child and no GMAC insurance and does not know Traders Discount Center, as best as can currently be assessed, of at least $ 218,196.42 made up of the following:

| | |
|---|---|
| BNC (escrow interest) | $ 364.14 |
| "DC" (attorney fee) | $1,250.00 |
| Avenue (broker fee) | $13,990.00 |
| Michelle Paulette (deed preparation) | $ 200.00 |
| DC Appraisals | $ 550.00 |
| "TERRA" "B's title" | $17,324.00 |
| "TERRA" "S's title" | $17,820.00 |
| Karen Mainella (title closer pickup) | $500.00 |
| *Fremont Investment & Loan | $379,119.28 |
| *Wilshire Credit Corp | $29,106.61 |
| NYC Dept. of Tax & Finance | $795.37 |
| NYC Water Board | $4,921.62 |
| Roger Frances (survey) | $4,000.00 |
| Mary Ann Degannes (certified check) | $93,000.00 |
| "Nglen & Assoc." ("legal fees" certified check) | $2,000.00 |
| Mel & Harris, Esq. ( certified check) | $9,061.29 |
| Eliss Harrison | $9,025.00 |
| Eliss Harrison | $9,975.00 |
| GMAC Insurance | $2,800.00 |
| Child support | $1,600.00 |
| Christopher Hall (three checks) total | $20,000.00 |
| Traders Discount Center LLC | $9,000.00 |

- denotes payoffs of existing mortages.

**WHEREFORE**, Plaintiff, Tomlinson, demands judgment against all Defendants, joint and several, in the amount of $406,196.42, as best as said amount can now be determined, together with legal fees for this action, interest from November 7, 2006,

costs and disbursements and for such other and further relief that this Court may deem just and proper.

## ALTERNATIVELY, AS AND FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

(38) Plaintiff repeats and realleges each and every allegation contained in paragraphs "(1)" through "(37)" as if fully set forth herein.

(39) That the false and untrue actions and representations, which were unknown to Tomlinson to be false and untrue when they were made and were relied on by Tomlinson, were made by the Defendants and their agents in a careless and negligent manner.

(40) Because of the carelessness and negligence of the Defendants, their agents and/or employees as alleged in paragraph "(39)" herein, and without any contributory negligence on the part of Plaintiff, Tomlinson, Tomlinson was damaged, as best as can now be determined, in the amount of $406,196.42.

*WHEREFORE*, Plaintiff, Tomlinson, demands judgment against all Defendants, joint and several, in the amount of $406,196.42, as best as that amount can now be determined, together with legal fees, interest from November 7, 2006, costs and disbursements and for such other and further relief that this Court deems just and proper.

## ALTERNATIVELY, AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

(41) Plaintiff repeats and realleges each and every allegation Contained in paragraphs "(1)" through "(37)" as if fully set forth herein.

(42) That the false and untrue actions and representations, which were unknown to Tomlinson to be false and untrue when they were made and relied upon by him, were made by the Defendants and their agents in a grossly negligent manner.

(43) Because of the gross negligence of the Defendants, their Agents and/or their employees as alleged herein, and without contributory negligence on the part of the Plaintiff, Tomlinson, Tomlinson was damaged, as best as can now be determined, in the amount of $406,196.42.

*WHEREFORE*, Plaintiff, Tomlinson, demands judgment against all Defendants, joint and several, in the amount of $406,196.42, as best as now can be determined, together with the legal fees of this action and interest from November 7, 2006, costs and disbursements, and for such other and further relief that this Court may deem just and proper.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS

(44) Plaintiff repeats and realleges each and every allegation contained in paragraphs "(1)" through "(37)" and paragraphs "(42)" and "(43)" as if fully set forth herein.

(45) That due to the fraudulent and/or grossly negligent acts and omissions and Defendants their obvious dealings with the public and Chan's position as counsel representing BNC cloaked with authority to act on BNC's behalf, Plaintiff is entitled to and asks for exemplary and/or punitive damages as determined by this Court.

*WHEREFORE*, Plaintiff, Tomlinson, demands exemplary and punitive be given Plaintiff against all the Defendants, jointly and severally, as this Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AGAINST DEFENDANT, DEGANNES

(46) Plaintiff repeates and realleges each and every allegation Contained in paragraphs "(1)" through "(37)" and paragraphs "(42)" and "(43)" as if fully set forth herein.

(47) That Degannes fully and knowingly participated in the fraud perpetrated on Tomlinson which caused said Tomlinson at least $406,196.42 in damages and the ownership of the Crown St. residence.

(48) That, as a consequence of the fraud as set forth herein and Degannes participation in the same, Tomlinson was wrongfully and fraudulently induced into entering into the "sale" and "purchase option" of November 6, 2006.

(49) That the sale and purchase option should be rescinded and cancelled in the interests of justice since it has no valid consideration and was entered into by reason of untrue and fraudulent misrepresentations made by and on Degannes' behalf to induce Tomlinson to enter into the sale and purchase

agreement of November 6, 2006 and which were relied on by
Tomlinson who believed them to be true.

*WHEREFORE*, Plaintiff, Tomlinson, asks that the sale and
purchase option agreement of November 6, 2006 be
rescinded and/or cancelled, for legal fees, costs and
disbursements and such other and further relief that this
Court deems just and proper.

Dated: October 1, 2008

                                        Cone & Kilbourn

                                        By: _____
                                            John E. Cone Jr.
                                            Attorneys for Plaintiff
                                            83 S. Bedford Rd.
                                            Mount Kisco, N.Y. 10549
                                            Tel.: 914 481 6249

To:
Sills Cummis & Gross              Hofheimer, Gartlir & Gross
Attorneys for BNC                 Attorneys for BNC
One Rockefeller Plaza             530 5th Ave.
New York, N.Y. 10112              New York, N.Y. 10036

Lipsky, Bresky & Lowe LLP         Furman, Kornfeld & Brennan
Attorneys for Avenue              Attorneys for Chan
585 Stewart Ave. Ste. 440         545 5th Ave. 4th Fl.
Garden City, N.Y. 11530           New York, N.Y. 10017

Anthony T. Ballato, Esq.
Attorney for Degannes
5476 Merrick Rd.
Massapequa, N.Y. 11758

\*-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**                **X**

**Howard W. Tomlinson**

                          **Plaintiff,**               **VERIFICATION**

       **v.**

                                       **Index No. 41418/07**

**Cherry Ann Degannes, David Dodson, Encore**
**Capital Services, Inc., Jeffery Lacy,**
**Avenue Mortgage, Inc., BNC Mortgage Inc. and**
**Chase Home Finance LLC**

                        **Defendant(s)**       **X**

**BNC MORTGAGE, INC.**

                    **Third-Party Plaintiff**

       **v.**

**DANIEL CHAN, ESQ.**

                   **Third-Party Defendant**

                                          **X**

Howard W. Tomlinson, being duly sworn, deposes and says:

1. I am the Plaintiff herein and as such, am fully familiar with the facts and circumstances of this matter.
2. I have read the attached Plaintiff's Verified Second Amended Complaint and know the contents thereof.
3. That the Second Amended Complaint is true to my own knowledge and belief except as to matters stated to be alleged on information and belief, and as to those matters I believe them to be true.

HOWARD W. TOMLINSON

Sworn to before me this 1st day
of October, 2008

Notary Public

**Maureen B. Guido**
**Notary Public, State of New York**
No. 01GU6006221
Qualified in Putnam County
Commission Expires 4/27/2010