**Expedited Hearing Requested**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, : **08-13555 (JMP)**
:
**Debtors.** : **(Jointly Administered)**
:
:
-------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a)**
**AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULES 9019 AND 6004, FOR AUTHORIZATION TO INVEST**
**CAPITAL AND TO PERFORM CERTAIN RELATED ACTIONS TO**
**SUPPORT THE CAPITAL LEVEL OF LEHMAN BROTHERS BANK**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper

Inc. ("LCPI") and their affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (together, the "Debtors" and, collectively with their

non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Preliminary Statement**

1.     As contemplated in its initial motion to restore the capital level of

Lehman Brothers Bank, FSB ("LBB" or the "Bank") – LBHI's indirect wholly owned

non-debtor subsidiary – LBHI now seeks authorization to take certain additional actions

to support the Bank's capital (primarily through non-cash capital contributions) in order

to continue to preserve the opportunity to realize the value of its equity interest in the

Bank and to maximize recoveries to LBHI's creditors.

2.          As this Court is aware, in response to the diminished capital level

reported in the Bank's December 31, 2008 Thrift Financial Report, on February 4, 2009,

the Office of Thrift Supervision (the "OTS") issued a Prompt Corrective Action directive

(the "PCA") requiring the Bank to (i) achieve the "adequate" capital levels required

under the applicable regulations by February 28, 2009 and (ii) to demonstrate how it

would thereafter maintain those levels, including by virtue of the support from its holding

company, LBHI, which would be available for this purpose.  As an initial step to permit

LBB to comply with the PCA and avoid adverse regulatory action, LBHI sought and

obtained authority from the Court to take certain actions to restore the Bank's diminished

capital level as of December 31, 2008 and undertook such actions on February 27, 2009.

3.          In connection with satisfying the PCA requirement to maintain the

ongoing adequacy of the Bank's capital, LBHI now seeks authority to make one or more

further capital contribution to the Banks, to the extent such are required for such purpose.

Under the PCA, LBHI, as the ultimate holding company of LBB, is required to commit to

make contributions to LBB's capital as may be needed in order for LBB to maintain its

capital at the adequacy level until LBB's capital has been sustained at such level for four

consecutive quarters after December 31, 2008, up to a total of approximately $127

million (given the contributions made on February 27, 2009).  To position LBHI to meet

this requirement and to otherwise bolster LBB's capital position, LBHI by this Motion is

seeking authority to make certain capital contributions to LBB and to take certain other

actions to support its capital level.

        4.     LBB is required to report to the OTS on its capital levels as part of

its quarterly financial report as of March 31, 2009.  It is expected that LBB's capital at

that date may be below the level that is considered to be adequate under the applicable

regulations and required by the PCA.  If the Bank's capital level does fall below the

adequacy requirements, and the Bank is not in compliance with the PCA, the Bank's

regulators may take actions to restrict or control the Bank's activities in a manner that

could jeopardize the value of LBHI's equity interest.  Additionally, unless LBHI is

authorized to make the requested capital investment and take the other measures

described herein, LBHI's prior efforts to preserve LBB and its affiliate Woodlands

Commercial Bank, formerly known as Lehman Brothers Commercial Bank

("Woodlands"), namely (i) LBHI's February 27, 2009 settlement agreement with the

Bank's wholly owned subsidiary Aurora Loan Services, LLC ("Aurora"), which provided

approximately $189 in economic benefit to Aurora and the Bank, (ii) the $200 million

cash contribution made to Woodlands on February 20, 2009,[1] (iii) the $9.838 million cash

capital contribution to LBB made on February 27, 2009, and (iv) LBHI's recent entry

---

[1] The Woodlands investment was made pursuant to the Court's order, dated February 17, 2009
[Docket No. 2846], authorizing LBHI's investment in exchange for a first right of recovery in
Woodlands' claim filed against Lehman Brothers Inc. with respect to certain municipal bonds as
explained in greater detail in *LBHI's Motion, Pursuant to Sections 105(a) and 363 of the
Bankruptcy Code, for Authorization to Fund a Capital Contribution Into Woodlands Commercial
Bank* [Docket No. 2742] (the "Woodlands Motion").  The Woodlands Motion is incorporated by
reference herein.

into a master repurchase agreement (the "<u>Repurchase Agreement</u>")[2] with the Bank, which made up to $325 million in cash available to the Bank on a short term basis to assure Aurora's ability to satisfy monthly advance obligations arising in connection with its servicing of mortgage loans, may all prove futile.

## <u>Background</u>

5.       Commencing on September 15, 2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.       On September 17, 2008, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

---

[2] The Repurchase Agreement was entered into pursuant to the Court's order, dated March 13, 2009 [Docket No. 3104], authorizing LBHI's purchase of certain performing mortgage loans from LBB subject to LBB's repurchase of the loans, as explained in greater detail in *LBHI's Motion Pursuant to Sections 105(A) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for Authorization to Enter Into a Master Repurchase Agreement With Lehman Brothers Bank* [Docket No. 3074].  On March 16, 2009, the OTS issued a letter of non-objection to the Repurchase Agreement and the consummation of transactions thereunder, subject to LBB's providing certain information and compliance with certain other conditions in connection with engaging in transactions thereunder.

7.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

8.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

9.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

10.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

12.    By this Motion, the Debtors seek authorization, but not direction, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, to execute the following actions to support the Bank's capital level:

- LBHI's entry into one or more assignment agreements (the "Assignment Agreements") with Aurora to transfer all or part of a portfolio of LBHI's unencumbered mortgage servicing rights to Aurora;

- LBHI's entry into a settlement agreement (the "Settlement Agreement") with the Bank and Aurora, pursuant to which LBHI will convey to and confirm Aurora's ownership of certain funds;

- LBHI's investment of cash up to $15 million in one or more capital contributions (the "Cash Contribution," and together with the Assignment Agreement and the Settlement Agreement, the "Capital Contribution"); and

- The consensual termination of unfunded loan commitments with General Electric Capital Corporation ("GECC"), among others, in which LCPI, the Bank and Woodlands are participants aggregating $1.375 billion (the "Loan Commitment Termination," and together with the Capital Contribution, the "Capital Maintenance Actions").[3]

The Capital Maintenance Actions are intended to enable the Bank to maintain its capital, starting as of March 31, 2009, at a level satisfying the capital adequacy requirements under the applicable regulations and the PCA, and otherwise to provide a level of capital sufficient to support the Bank's strategies.  Given the exigency of the circumstances and to avoid irreparable harm to their estates, the Debtors further request that the Court waive

---

[3] The Settlement Agreement, the Loan Commitment Termination and the Assignment Agreement are subject to approval of the OTS, which is currently being sought.

the requirements of Bankruptcy Rule 6004(h) and direct that the order granting the relief requested herein be effective immediately.

13.    It is currently anticipated that, in order for LBB to meet the capital adequacy requirements on March 31, 2009, the bulk of the Capital Maintenance Actions will be required to be taken by such date.[4]  To the extent not required by such date, LBHI seeks authorization, but not direction, to commit to contribute, or to contribute, subsequently the balance of the Capital Contribution as needed for the Bank to meet capital adequacy requirements in accordance with the PCA or, even if not so required (and subject to certain conditions), to support implementation of the Bank's business strategy.  As set forth more fully below, the Debtors' decision to perform the Capital Maintenance Actions represents a reasonable exercise of their business judgment and should be approved.

**The Capital Maintenance Actions**

The Capital Position of Lehman Brothers Bank

14.    On February 17, 2009, this Court granted *LBHI's Motion, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, for Authorization to Increase the Capital Level of Lehman Brothers Bank, FSB*

---

[4] The principal capital adequacy standard requires the Bank to have a total risk-based capital ratio of 8%.  LBHI seeks to invest the Capital Contribution before March 31, 2009 in an amount sufficient, based on the Bank's projected March 31, 2009 capital, to result in the Bank attaining the capital adequacy level at such date, so that such quarter-end will be the first of the four consecutive quarters of capital adequacy that LBHI is required to support in compliance with the PCA requirements.  The exact amount of the investment, if any, required for this purpose cannot be determined at this time as it will depend on the Bank's projected capital level as determined just before March 31, 2009 and a final determination of the effect on the Bank's capital that will result from the Assignment Agreement, the Settlement Agreement and the Loan Commitment Termination, as well as other developments in the Bank's business and in market conditions.

*Through (I) the Settlement of Pending Disputes and (II) a Direct Capital Contribution of up to $15 Million* [Docket No. 2800] (the "Capital Restoration Motion"). *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 17, 2009) [Docket No. 2847] (Order Approving Capital Restoration Motion).[5]

15.     As explained in the Capital Restoration Motion, the Bank is subject to the regulatory authority of the OTS and its deposits are insured by the Federal Deposit Insurance Corporation (the "FDIC" and together with the OTS, the "Regulators").  The OTS and FDIC regulations impose strict restrictions on the Bank's operations, including its capital levels.  Most importantly for present purposes, the Bank is required to maintain sufficient capital levels to satisfy the risk-based capital requirements of the OTS's regulations.  The Regulators monitor the Bank's capital and business through, among other things, quarterly Thrift Financial Reports ("TFRs") filed by the Bank.  If the Bank is not "adequately capitalized," the OTS and FDIC may take regulatory actions to restrict or control LBB's activities.

16.     In response to the PCA issued by the OTS on February 4, 2009, and due to the serious risk that the Regulators could seize the Bank based upon the Bank's capital levels reported in its December 31, 2008 TFR, LBHI sought and obtained authority through the Capital Restoration Motion to take certain actions that would result in an increase in the Bank's capital to a level sufficient to comply as of December 31, 2008 with the adequacy level of the applicable regulations.  LBHI's actions were primarily intended to preserve the value of its equity interest in the Bank (as well as the

---

[5] The Capital Restoration Motion and the record of the February 17, 2009 hearing on such motion, including the testimony and presentation made by LBHI's Chief Restructuring Officer, Mr. Bryan Marsal, are incorporated by reference herein.

value of Woodlands, which was also at risk of seizure pursuant to a statutory cross-liability provision).

17.    As explained in greater detail in the Capital Restoration Motion, the Bank is a valuable asset of LBHI's estate.  Less than six months ago, the value of LBHI's equity interest in the Bank was reported at approximately $1 billion with total assets of approximately $7.2 billion and total liabilities of approximately $6.2 billion.  *See* September 30, 2008 TFR, Schedule SC.  On that same date, the Bank was considered "well capitalized" with a total risk based capital ratio of 10.57% in full compliance with its capital regulations.  Indeed, notwithstanding the decline of the Bank's capital levels reflected on the Bank's December 31, 2008 TFR, the value of LBHI's equity interest was still reported at approximately $467 million.

18.    Pursuant to the order authorizing the relief requested in the Capital Restoration Motion, on February 27, 2009, LBHI consummated the first settlement agreement with Aurora and invested $9.838 million in cash into the Bank to comply with the PCA by adding to the Bank's capital a sufficient amount so that its December 31, 2008 capital level would reach the adequacy level.  Since that time, LBHI has been working with the Bank to develop in accordance with the PCA a plan acceptable to the OTS to maintain the adequacy of the Bank's capital on a going forward basis (the "Capital Restoration Plan").  Pursuant to 12 U.S.C. § 1831o(e)(2)(C)(ii), to be acceptable to the OTS, the Capital Restoration Plan must be accompanied by an undertaking from LBHI providing assurances that the Bank will maintain capital adequacy for four consecutive quarters, including a commitment by LBHI to make capital contributions of up to 5% of the value of the Bank's reported assets as of December 31, 2008 (the date

that the Bank fell below the minimum capital levels) as needed to comply with this condition.  The Capital Contribution will be a key element of the Capital Restoration Plan.  When taken together with the capital contribution made pursuant to the Capital Restoration Motion, the Capital Contribution is intended to satisfy the 5% commitment under the PCA requirements.  In addition, even if not needed to maintain the Bank's capital adequacy, the Capital Contribution may be utilized to facilitate the implementation of a longer-term strategic plan for the Bank, as discussed below.

The Bank's Projected March 31, 2009 Capital Level

19.     Although substantial progress has been made, the Capital Restoration Plan is not yet complete.  Nevertheless, in working on the Capital Restoration Plan, the Bank has determined, primarily to bolster its liquidity reserves, that it should sell certain of its assets that are not considered to be important for the long-term success of the Bank.  In connection with the marketing effort for these non-core assets, the Bank recently received an offer for some of these assets that it considers acceptable and currently is working to close the sale of the assets before the end of March 2009.

20.     As a result of, among other things, the anticipated sale of these non-core assets, the Bank's capital on March 31, 2009 is expected to fall below the 8% total risk based capital ratio that is considered to be adequate under the applicable regulations and required by the PCA.  To sustain the Bank's capital adequacy at March 31, 2009 and avoid regulatory action further restricting the Bank's activities, LBHI has determined that it should invest before such date the Capital Contribution into the Bank and take the Capital Maintenance Actions to the extent needed for such purpose based on the best estimate of the Bank's capital level as of such date.  To the extent the full amount

of the Capital Contribution is not contributed before March 31, 2009, LBHI anticipates

that the balance may be contributed in the future if needed to maintain the Bank's capital

adequacy and that, as LBHI had contemplated at the time of the Capital Restoration

Motion, LBHI would commit to the Bank in connection with finalizing the Capital

Restoration Plan to make such capital contributions.[6]  In addition, as a longer-term

strategic plan for the Bank is developed and implemented, LBHI may determine, with the

consent of the Creditors' Committee, to contribute to the Bank's capital the balance of

the Capital Contribution, even if not required to maintain the Bank's capital at the

adequacy level, as further discussed (and on the conditions provided) below, including in

connection with obtaining regulatory authorization for the Bank to incur certain new

deposit obligations to support its longer-term operations.

        21.      Accordingly, to support the Bank's capital level, the Debtors seek

authorization, but not direction, to take the Capital Maintenance Actions.  More

specifically, LBHI contemplates that (i) the Settlement Agreement and the Loan

Commitment Termination would be given effect before March 31, 2009 and (ii) the

mortgage servicing rights would be assigned to Aurora pursuant to the Assignment

Agreement and/or all or part of the Cash Contribution would be made before such date to

the extent needed for the Bank's anticipated capital level as of such date to meet the

adequacy requirement.  An additional portion of the mortgage servicing rights and/or the

Cash Contribution would subsequently be contributed as needed to maintain the Bank's

capital adequacy, including pursuant to the capital contribution to LBB that LBHI

---

[6] *See* Capital Restoration Motion, at 11-12 n. 6.

expects to make as part of the Capital Maintenance Plan, required by the PCA. In

addition, even if not required to sustain the Bank's capital at the adequacy level, LBHI

may, with the consent of the Creditors' Committee, make the balance of the Capital

Contribution in connection with implementation of a strategic plan for the Bank so as to

help restore the Bank to a "well capitalized" status under the applicable regulations.

LBHI anticipates that, at this capital level, the Bank may be able to once again raise

deposit funds to provide longer-term funding for its on-going operations than provided by

its current ongoing obligations, facilitating the positioning of the Bank so that LBHI can

realize over time on the value of its investment in the Bank. LBHI would only make any

portion of the Capital Contribution for such further purpose (i) after a review of the

contribution and the related strategic plan for the Bank with, and upon receiving the

support of, the Creditors' Committee and (ii) in connection with obtaining regulatory

authorization for the Bank to incur certain new deposit obligations to replace existing

deposit obligations upon their maturity so as to support the Bank's longer-term

operations.

The Assignment Agreement

22.    LBHI is the legal and beneficial holder of certain mortgage

servicing rights (the "MSRs") for a vast portfolio of residential mortgage loans (the

"Loans") sold by LBHI to third parties over the years. Most of the Loans are currently

being serviced by Aurora in accordance with various servicing agreements (including

sub-servicing agreements with LBHI) pursuant to appointment by LBHI in connection

with the sale of the loans or similar arrangements (the "Aurora Serviced Loans").

23.     To support the Bank's capital level, LBHI may transfer certain of its unencumbered MSRs to Aurora.  LBHI has identified a portfolio of MSRs encompassing approximately 115,000 Loans with a unpaid principal balance of approximately $26 billion as of February 28, 2009 that it can contribute to the Bank. This portfolio of MSRs has been valued by a third party as of February 28, 2009 at approximately $140 million.  Pursuant to one or more Assignment Agreements, LBHI would transfer ownership of these MSRs to the Bank as capital contributions to the extent LBHI determines that such transfers, together with other Capital Maintenance Actions, are needed to bring the Bank's capital to the adequacy level or, with the approval of the Creditors' Committee, to otherwise support implementation of the Bank's business strategy.  The transfers of such MSRs to the Bank may be accompanied by all or a portion of the Cash Contribution, as appropriate, to achieve the desired capital level.

The Settlement Agreement

24.     As explained in the Capital Restoration Motion, pursuant to terms of the servicing agreements related to the Aurora Serviced Loans, Aurora collects a servicing fee out of payments received on the loans for the functions that it performs. Prior to the Commencement Date, it was the long-standing practice between Aurora and LBHI for Aurora to pay a monthly fee (the "Excess Servicing Fees") to LBHI as compensation for the appointment of Aurora as servicer of the Aurora Serviced Loans.

25.     After the Commencement Date, payment of the Excess Servicing Fees became the subject of dispute between Aurora and LBHI and Aurora discontinued payment for the Excess Servicing Fees.  Aurora has contended that payment of the Excess Servicing Fees has not been a matter of contractual obligation and, further, that

Aurora may under certain circumstances be entitled to claim against LBHI for the return of Excess Servicing Fees previously paid to LBHI.  LBHI disputes Aurora's contentions and believes that it is entitled to the Excess Servicing Fees.  Pursuant to the authority granted under the Capital Restoration Motion, LBHI and Aurora consummated a settlement agreement resolving their dispute over the Excess Servicing Fees for the months of August 2008 through February 2009.  The Capital Restoration Motion expressly reserved, however, the parties' rights with respect to Excess Servicing Fees earned for any period prior to August 2008 and any period after February 2009.  *See* Capital Restoration Motion, at 14 n. 8.

26.     Consistent with its prior position, Aurora contends that it is the rightful owner of the Excess Servicing Fees for the month of March 2009.  LBHI disputes Aurora's contentions and believes that it is entitled to the Excess Servicing Fees for March 2009.  Due to the uncertainty surrounding the disputes between LBHI and Aurora, Aurora accrues the Excess Servicing Fees for March 2009 as a liability in its financial reports.  Consequently, the value of the Bank's capital (and LBHI's equity interest in Aurora) would not reflect the value of these assets.  The Bank's management and LBHI anticipate that if LBHI's claim to the Excess Servicing Fees for March 2009 are settled so that such fees can be treated as assets of Aurora, the Bank's capital could increase by as much as $6 - $7 million.

27.     In an effort to minimize the risks surrounding both the Bank's inadequate capital level and LBHI's disputes with Aurora, the parties have determined to enter into the Settlement Agreement (to be documented on terms substantially similar to the first settlement agreement that was approved under the Capital Restoration Motion).

Generally, the Settlement Agreement will provide that LBHI shall relinquish and transfer and assign to Aurora any and all rights and claims that LBHI may have to the Excess Servicing Fees for the month of March 2009.[7]

The Loan Commitment Termination

28.     With the assistance of LBHI, the Bank has been making other efforts to improve its capital level, including the termination of the Bank's loan commitments. In that regard, the Bank, Woodlands and LCPI have agreed (subject to necessary approvals) to terminate by March 31, 2009 certain unfunded loan commitments aggregating $1.375 billion on which they are obligated, as more fully described below, the effect of which will be to considerably reduce the liabilities of all three entities and reduce the amount of capital the Bank (as well as Woodlands) must maintain to satisfy its capital adequacy requirement as of March 31, 2009 and going forward.

29.     The Bank is party to a certain Fourth Amended and Restated Five-Year Credit Agreement dated as of May 14, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Bank Credit Agreement"), by and among GECC, General Electric Capital Services, Inc., GE Capital (Hong Kong) Ltd. and GE Capital European Funding (each the "Borrower" and collectively, the "Borrowers"), the Bank and the several banks and other financial institutions or entities from time to time parties thereto, pursuant to which the Bank has an unfunded revolving commitment in the amount of $875,000,000 (the "Bank Loan Facility"). Pursuant to certain participation agreements, the Bank sold to LCPI and Woodlands participation interests in the Bank

---

[7] For the avoidance of doubt, the parties have reserved their rights with respect to Excess Servicing Fees for any period after March 2009 and continue to reserve their rights for any period before August 2008.

Credit Agreement and the Bank Loan Facility in the full amount of the Bank Loan

Facility (the "Participation Interests").

30.    Woodlands is party to a certain 364-day Revolving Credit

Agreement, dated as of May 14, 2008 (as amended, restated, supplemented or otherwise

modified from time to time, the "364-day Credit Agreement"), between Woodlands and

GECC, pursuant to which Woodlands has an unfunded commitment in the amount of

$333,000,000 (the "Woodlands Loan Facility").

31.    LCPI is party to a certain 5-year Revolving Credit Agreement

dated as of May 14, 2008 (as amended, restated, supplemented or otherwise modified

from time to time, the "5-year Credit Agreement," and together with the Bank Credit

Agreement and the 364-day Credit Agreement, the "Credit Agreements") between LCPI

and GECC, pursuant to which LCPI has an unfunded commitment in the amount of

$167,000,000 (the "LCPI Loan Facility").  Together, the Bank Loan Facility, the

Woodlands Loan Facility, and the LCPI Loan Facility aggregate $1.375 billion in

unfunded commitments (the "Unfunded Commitment").

32.    Pursuant to the terms of the Loan Commitment Termination, the

Bank, Woodlands and LCPI, on the one hand, and the Borrowers, on the other hand

(collectively, the "LCT Parties"), have agreed to terminate the Unfunded Commitment

and their respective rights and obligations under the Credit Agreements (including the

Participation Interests) in exchange for the payment to the Borrowers of a reasonable

release fee for the termination of the entire Unfunded Commitment (the "Release Fee") to

be borne pro rata by Woodlands and LCPI based upon the percentage of their

Participation Interests in the Bank Loan Facility.[8]  The terms of the Loan Commitment

Termination also include mutual releases and waivers between the LCT Parties of claims

arising out of the respective Credit Agreements to which they are parties.

### Sound Business Reasons Support the
### Debtors' Decision to Perform the Capital Maintenance Actions

33.     The Debtors seek authorization, pursuant to sections 105(a) and

363(b)(1) of the Bankruptcy Code, to perform the Capital Maintenance Actions to

preserve the value of the Bank for the benefit of their estates and creditors.

34.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant

part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When

considering a transaction outside the ordinary course of business, courts in the Second

Circuit, and others, require that such transaction be based upon the sound business

judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

*Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d

141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton*

*State Bank v. Schipper (In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional*

*Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.*), 780

F.2d 1223, 1226 (5th Cir. 1986).

35.     It is generally understood that "[w]here the debtor articulates a

reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

---

[8] Due to the confidential nature of certain terms of the Loan Commitment Termination, the
amount of the Release Fee has not been disclosed herein.  The amount of the Release Fee has
been disclosed, however, to the professionals for the Creditors' Committee and will be disclosed
to the Court upon request.

capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

36. There are ample business justifications to support the Capital Maintenance Actions proposed by the Debtors. Most importantly, by taking the Capital Maintenance Actions, LBHI continues to preserve the opportunity to realize the value of its equity interest in the Bank and avoids the risks associated with a failure of the Bank (as detailed in the Capital Restoration Motion), including regulatory actions that could jeopardize the value of LBHI's equity interest in Woodlands. By making the investment prior to the quarter ending on March 31, 2009, LBHI will also obtain the added benefit of satisfying, starting with the quarter ended March 31, 2009, a portion of the commitment obligation required of it under the PCA to ensure that the Bank maintains adequate levels of capital for a period of four consecutive quarters.

37. If the Capital Maintenance Actions are not implemented, all of LBHI's prior efforts to preserve its equity interest in both LBB and Woodlands, such as (i) LBHI's first settlement agreement with Aurora, which provided approximately $189 in economic benefit to Aurora and the Bank, (ii) the $200 million cash contribution made

to Woodlands on February 20, 2009, (iii) the $9.838 million cash capital contribution to

LBB made on February 27, 2009, and (iv) LBHI's recent entry into a Repurchase

Agreement with the Bank, which made up to $325 million in cash available to the Bank

on a short term basis to assure Aurora's compliance with certain advance obligations,

may all prove futile.

38.     The Bank's management and LBHI continue to believe that the

reported value of LBB's assets in its December 31, 2008 TFR is not a true reflection of

the underlying value of such assets that can be achieved if the Bank's affairs can be

addressed in an orderly manner under normal market conditions.  LBHI has been

developing with the Bank a strategic plan not only to stabilize the Bank's capital position

in accordance with the PCA requirements so as to protect LBHI's investment, but also to

realize the full value that can be achieved over time for the Bank and related assets of

LBHI.

39.     LCPI's entry into the Loan Commitment Termination should also

be approved as a sound exercise of its business judgment.  Through the Loan

Commitment Termination, LCPI's estate is relieved of substantial funding obligations

and claims that could be asserted under the 5-Year Credit Agreement and the Bank Credit

Agreement and LCPI's Participation Interest by the Borrowers and the Bank,

respectively, for a reasonable release fee a cost of less than 1% of the Unfunded

Commitment (which LCPI and Woodlands will share pro rata to their liability on the

Participation Interests).  The release provided by the Borrowers will relieve LCPI of

potentially enormous rejection damage claims that might be asserted by the Borrowers if

the Credit Agreements were rejected.  Moreover, the Loan Commitment Termination will

reduce the amount of the Bank's risk-based capital as determined under the applicable regulations, thereby reducing the Bank's required capital level on March 31, 2009 and thereafter.  Consequently, the proposed termination fee is eminently reasonable.

40.    For these reasons, the Debtors' decision to invest the Capital Contribution and carry out the other Capital Maintenance Actions is in the best interests of their estates and creditors and represents a reasonable exercise of their business judgment.  As such, the relief requested in this Motion should be granted.

### The Settlement Agreement is
### Reasonable and in the Bests Interests of the Estate

41.  For the reasons explained, the Settlement Agreement is reasonable and should be approved.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id.; see also* 9 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at 505.

42.    Bankruptcy courts have applied the following factors in determining whether a settlement should be approved:  (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity

and likely duration of the litigation and any attendant expense, inconvenience, and delay;

(iii) the proportion of creditors who do not object to, or who affirmatively support, the

proposed settlement; and (iv) the extent to which the settlement is truly the product of

arm's-length bargaining and not the product of fraud or collusion. *See Protective Comm.*

*for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968)

("There can be no informed and independent judgment as to whether a proposed

compromise is fair and equitable until the bankruptcy judge has apprised himself of all

facts necessary for an intelligent and objective opinion of the probabilities of ultimate

success should the claim be litigated.")*; In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804

(Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

43.   The Settlement Agreement permits LBHI to recover the full value of

its disputed claims to the unpaid Excess Servicing Fees for March 2009, as well as the

value of LBHI's accounts receivable from Aurora, through a reinvestment of that value

into the Bank.  That is, instead of making a direct cash contribution to the Bank, LBHI

can achieve its goal of supporting the Bank's capital level by applying the value of the

disputed claims with Aurora to such purpose.  The Settlement Agreement also allows

LBHI to preserve its opportunity to maximize the value of both LBB and Woodlands.

Lastly, under the Settlement Agreement, LBHI avoids the risk of costly time-consuming

litigation with Aurora.

## Notice

44.   No trustee has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Motion in accordance with the procedures set forth in

the amended order entered on February 13, 2009 governing case management and

administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii)

the attorneys for the Creditor's Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; and (vi) all parties who have requested notice in these

chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

45.    No previous request for the relief sought herein has been made by

LBHI to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 23, 2009
       New York, New York

/s/ Alfredo R. Perez
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                :

In re                              :         **Chapter 11 Case No.**
                                :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :        **08-13555 (JMP)**
                                :

                    **Debtors.**        :         **(Jointly Administered)**
                                :
                                :
-------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019 AND 6004, FOR AUTHORIZATION TO INVEST CAPITAL AND TO PERFORM CERTAIN RELATED ACTIONS <u>TO SUPPORT THE CAPITAL LEVEL OF LEHMAN BROTHERS BANK</u>

Upon the motion, dated March 23, 2009 (the "<u>Motion</u>"), of Lehman

Brothers Holdings Inc. ("<u>LBHI</u>") and Lehman Commercial Paper Inc. ("<u>LCPI</u>") and their

affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in

possession (together, the "<u>Debtors</u>"), pursuant to sections 105(a) and 363 of title 11 of the

United States Code (the "<u>Bankruptcy Code</u>") and Rules 9019 and 6004 of the Federal

Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for authorization to maintain

the capital level of LBHI's indirect wholly owned non-debtor subsidiary, Lehman

Brothers Bank, FSB (the "<u>Bank</u>" or "<u>LBB</u>"), through (i) LBHI's entry into an assignment

agreement (the "<u>Assignment Agreement</u>") with the Bank's wholly owned subsidiary,

Aurora Loan Services, LLC ("<u>Aurora</u>") to transfer certain of LBHI's unencumbered

master servicing rights to Aurora, (ii) LBHI's entry into a settlement agreement (the

"<u>Settlement Agreement</u>") with the Bank and Aurora, pursuant to which LBHI will

convey to and confirm Aurora's ownership of certain funds and the settlement of certain

intercompany accounts between LBHI and Aurora; (iii) a cash contribution of up to $15

million (the "Cash Contribution"); and (iv) LCPI's termination of certain unfunded loan

commitments with General Electric Corporation, among others (the "Loan Commitment

Termination"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated

July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set

forth in the order entered September 22, 2008 governing case management and

administrative procedures [Docket No. 285] to (i) the United States Trustee for the

Southern District of New York; (ii) the attorneys for the Official Committee of

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal

Revenue Service; (v) the United States Attorney for the Southern District of New York;

and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing

that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Motion; and the Court having found and determined

that the relief sought in the Motion is in the best interests of LBHI, its estate and

creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is approved; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI is authorized, but not required, to execute the Assignment Agreement and to invest the Cash Contribution; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1), LCPI is authorized, but not directed, to execute the Loan Commitment Termination under the terms and conditions set forth in the Motion and to take all other and further actions that may be required or necessary for the performance by LCPI of the Loan Commitment Termination; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and this Order shall be effective immediately upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: March __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE