WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | 08-13555(JMP) |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,: | | (Jointly Administered) |
| **DEBTORS.** | : | |

------------------------------------------------------------------x

**STIPULATION, AGREEMENT AND ORDER**
**RESOLVING MOTION OF TPG-AUSTIN PORTFOLIO HOLDINGS LLC**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

This stipulation, agreement, and order ("Stipulation") is entered into by and between Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Holdings Inc. ("LBHI" and, together with LCPI and their affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession, the "Debtors"), TPG-Austin Portfolio Holdings LLC ("TPG-Austin"), TPG-Austin Portfolio Lender, LLC ("TPG-Lender"), Revere Funding Limited ("Revere" and, together with TPG-Lender, the "Co-Lenders"); Austin Portfolio Partners GP, LLC ("Austin GP"), TPG-Austin Portfolio Investor LP ("Sponsor LP"),   Revere Austin Holdings, LLC ("Revere LP"), TPG-Austin Portfolio Syndication Partners JV LP ("TPG-Austin JV"), TPG-401 Congress REIT LLC ("REIT 1"), TPG-300 West 6th Street REIT LLC ("REIT 2"), TPG-One Congress Plaza  REIT LLC ("REIT 3"), TPG-One American Center REIT LLC ("REIT 4"), TPG-San Jacinto Center REIT LLC ("REIT 5"), TPG-Stonebridge Plaza II

REIT LLC ("REIT 6"), TPG-Research Park Plaza I & II REIT LLC ("REIT 7"), TPG-Westech 360 REIT LLC ("REIT 8"), TPG-Park 22 REIT LLC ("REIT 9"), and TPG-Great Hills Plaza REIT LLC ("REIT 10" and, together with TPG-Austin JV, REIT 1, REIT 2, REIT 3, REIT 4, REIT 5, REIT 6, REIT 7, REIT 8 and REIT 9, the "Guarantors").

## RECITALS

A.    On September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LCPI, commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").    The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").    The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    Austin Portfolio LB Syndication Partner LLC (an affiliate of LBHI), Austin GP (an affiliate of TPG-Lender), Sponsor LP (an affiliate of TPG-Lender), and Revere LP (an affiliate of Revere) are parties to that certain limited partnership agreement, dated June 1, 2007, of TPG-Austin JV (as amended from time to time, the "TPG-Austin JV Agreement" and together with the related Syndication Agreement, the "Equity Documents"), through which they acquired, indirectly, ten office properties in Austin, Texas.

C.    Prior to the Commencement Date, LCPI entered into (i) that certain Credit Agreement, dated as of June 1, 2007 (as amended, restated, modified or supplemented from time to time in accordance with its terms, the "Credit Agreement"), among TPG-Austin, as borrower, the Guarantors, the several lenders from time to time party thereto, Lehman Brothers Inc., as arranger, and LCPI, as administrative agent, for a term loan facility in the amount of $192,500,000 (the "Term Loan") and a revolving loan in the amount of up to $100,000,000 (the "Revolver") and (ii) certain other documents relating to, evidencing, securing, or otherwise

affecting (directly or indirectly) the loans, commitments and other rights, obligations and liabilities outstanding under the Credit Agreement (all such documents, together with the Credit Agreement, the "Loan Documents" and together with the Equity Documents, the "Documents").

D.     As of the Commencement Date, the Term Loan was fully funded.  As of the date hereof, no advances have been made under the Revolver.

E.     On November 13, 2008, TPG-Austin filed the Motion of TPG-Austin Portfolio Holdings LLC to Compel Immediate Assumption or Rejection of Credit Agreement; or in the Alternative, Grant Relief from the Automatic Stay to Permit Alternative Financing on a Senior Secured Basis (the "Motion") [Docket No. 1514].

F.     On December 11, 2008, the Debtors filed the Debtors' Objection to Motion of TPG-Austin Portfolio Holdings LLC to Compel Immediate Assumption or Rejection of Credit Agreement; or in the Alternative, Grant Relief from the Automatic Stay to Permit Alternative Financing on a Senior Secured Basis (the "Objection") [Docket No. 2162].

G.     On December 15, 2008, TPG-Austin filed the Reply to Debtors' Objection to Motion of TPG-Austin Portfolio Holdings LLC to Compel Immediate Assumption or Rejection of Credit Agreement; or in the Alternative, Grant Relief from the Automatic Stay to Permit Alternative Financing on a Senior Secured Basis (the "Reply") [Docket No. 2215].

H.     In an effort to consensually resolve the Motion, the Objection, and the Reply, the Debtors and TPG-Austin have agreed it is in their best interests to enter into this Stipulation upon the terms and conditions herein and the term sheet attached as Annex A hereto (the "Term Sheet"), which is incorporated as though fully set forth herein.

I.     Pursuant to this Stipulation, the parties hereto have agreed to amend the Loan Documents, substantially consistent with the terms set forth in the Term Sheet, including by providing for two (2) debt tranches (the "Tranches") as follows: (i) a commitment by LCPI and the Co-Lenders to fund the Revolver as a priority credit facility in the amount of $60,000,000 (the "Priority Credit Facility" or Tranche A") and (ii) a tranche consisting of a portion of the

Term Loan in the amount of $112,500,000 ("Tranche B"). The parties will be committed to lend to TPG-Austin pursuant to the Priority Credit Facility in the following amounts: (i) TPG-Lender in the amount of $15,000,000; (ii) LCPI in the amount of $30,000,000; and (iii) Revere in the amount of $15,000,000. The additional terms of the Documents, as modified, including the payment priority of the Tranches, are as set forth more specifically in the Term Sheet.

**NOW, THEREFORE, UPON THE FOREGOING RECITALS, WHICH ARE INCORPORATED AS THOUGH FULLY SET FORTH HEREIN, IT IS HEREBY AGREED, BY AND BETWEEN EACH OF THE PARTIES, THROUGH THEIR RESPECTIVE UNDERSIGNED COUNSEL, AND, UPON COURT APPROVAL HEREOF, IT SHALL BE ORDERED THAT:**

1.      This Stipulation shall not become effective unless and until it is entered by the Court (the "Effective Date").

2.      Upon the Effective Date, the Motion, the Objection, and the Reply shall be deemed resolved as set forth herein.

3.      LCPI shall be authorized to assume, and, upon the closing of the transactions contemplated by this Stipulation (the "Closing"), the Loan Documents shall be deemed assumed as modified by the documents executed at the Closing substantially consistent with the Term Sheet pursuant to section 365(a) of the Bankruptcy Code.

4.      LCPI and LBHI shall be authorized to consummate all transactions contemplated in this Stipulation, without necessity or requirement of further court proceedings or approval, including, without limitation, amendment or restatement, consistent with the Term Sheet, of each of the Documents. Each Document, when executed substantially consistent with the terms set forth in the Term Sheet, is hereby approved.

5.      Upon the Closing, any defaults under the Loan Documents occurring before the Closing shall be deemed cured for purposes of Bankruptcy Code section 365(b), and no cure amounts shall be due or owing by LCPI.

4

6.     Without limitation of the foregoing, upon the Closing, TPG-Austin, TPG-Austin JV, Revere, Revere LP, TPG-Lender, the Guarantors, Austin GP, and Sponsor LP, for themselves, their affiliates, successors and assigns, hereby expressly waive and release any defenses, rights of set-off, claims or counterclaims of whatever nature, in contract or in tort (with the exception of those arising from fraud, willful breach, gross negligence, or any breach of applicable transfer provisions), whether unsecured, secured, priority, administrative, or otherwise, they may have against the Debtors or affiliates of the Debtors, or any of them, arising from or relating to the Documents prior to the date of the Closing (with the exception of those arising from any such obligations that continue to apply after the date of the Closing pursuant to the Documents, as amended at the Closing).   Upon the Closing, LCPI, for itself, its affiliates, successors and assigns, hereby expressly waives and releases any defenses, rights of set-off, claims or counterclaims of whatever nature, in contract or in tort (with the exception of those arising from fraud, willful breach, gross negligence, or any breach of applicable transfer provisions), whether unsecured, secured, priority, administrative, or otherwise, that it may have against TPG-Austin, TPG-Austin JV, Revere, Revere LP, TPG-Lender, the Guarantors, Austin GP, and Sponsor LP or their affiliates, or any of them, arising from or relating to the Documents prior to the date of the Closing (with the exception of those arising from any such obligations that continue to apply after the date of the Closing pursuant to the Documents, as amended at the Closing).

7.     Without limitation of the foregoing, the Debtors and their applicable affiliates: (a) are duly authorized and empowered to execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers (including, without limitation, the execution and delivery of one or more restated Documents, agreements modifying one or more Documents, successor agency agreements, collateral releases, security agreements, pledge agreements, control agreements, mortgages, and financing statements), that may be necessary or appropriate to consummate the transactions contemplated under the Term Sheet; (b) are duly authorized and

empowered to take all other and further actions as may be necessary to implement the transactions substantially consistent with those contemplated by the Term Sheet; and (c) shall have the right both in connection with and following consummation of the transactions substantially consistent with those contemplated under the Term Sheet (i) to consent to any amendment, restatement, waiver, supplement or other modification of any of the Documents substantially consistent with the terms set forth in the Term Sheet and (ii) to otherwise vote and make all determinations and take all other actions under each Document; it being understood that nothing in this Stipulation shall prejudice the right of LCPI to assign, in accordance with the terms of the Documents as modified substantially consistent with the terms set forth in the Term Sheet, its loans and commitments to, or equity interests in, the TPG-Austin JV Agreement or TPG-Austin or any of its affiliates. Any actions described in clauses (a), (b) and (c) taken by the Debtors or their affiliates may be taken without the necessity (x) of further court proceedings or approval or (y) of any consent of any party other than the parties to this Stipulation, and their respective affiliates, as applicable, and shall be conclusive and binding in all respects on all parties in interest in these cases.

8.      Pursuant to section 362(d) of the Bankruptcy Code, the automatic stay in effect in LCPI's bankruptcy case is hereby modified for the limited purpose of allowing the parties to implement this Stipulation, enter into and make necessary modifications to the Documents substantially consistent with the terms set forth in the Term Sheet and allow the parties to negotiate, document, execute and file such statements, instruments, and other documents in furtherance of the Term Sheet, and to perform, execute, and carry out all of the terms of the definitive Documents entered into by and among the parties.

9.      This Stipulation shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental units, secretaries of state, federal, state and local officials, and all other persons

and entities who may be required by operation of law, contract, or the duties of their office to accept, acknowledge, assent or consent to, file, register, record or release any documents or instruments with respect to any Document and consummation of the transactions substantially consistent with those contemplated under the Term Sheet.

10.    The Debtors have demonstrated good, sufficient and sound business purposes and justifications and compelling circumstances for the approval of the transactions contemplated herein.

11.    Prompt consummation of the transactions described in the Term Sheet is in the best interests of the Debtors, their estates and their creditors.    The modification of the automatic stay granted by this Stipulation shall take effect immediately upon entry of this Stipulation and shall not be stayed by operation of Rule 4001(a)(3) of the Bankruptcy Rules.

12.    Nothing contained herein is intended or should be construed as an admission as to the validity of any claim of or against any party, or as a waiver of the rights of any party to dispute any claim except as expressly waived herein.

13.    Each person who executes this Stipulation on behalf of a party or parties hereto represents that he is duly authorized to execute this Stipulation on behalf of such party or parties.

14.    This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

15.    If the Closing does not occur by April 24, 2009 (unless extended by agreement of all parties hereto), this Stipulation shall be deemed null and void for all purposes and shall not be referred to or used for any purpose by any of the parties hereto or any of the other parties in the Debtors' chapter 11 cases and all parties shall have all rights, remedies, positions and defenses as if this Stipulation had never been entered into.    Any failure to close the transactions contemplated by this Stipulation shall not give rise to any action or claim.

16.    The Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation.

[*The remainder of this  page is intentionally blank.*]

Dated:  March __, 2009

**WEIL, GOTSHAL & MANGES LLP**

/s/ Shai Y. Waisman
Shai Y. Waisman
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**STUTMAN, TREISTER & GLATT PC**

/s/ Scott H. Yun
Theodore B. Stolman
Scott H. Yun
H. Alexander Fisch
Margreta M. Morgulas
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5000
Facsimile: (310) 228-5788

Attorneys for TPG-Austin Portfolio Holdings,
LLC, TPG-Austin Portfolio Lender, LLC,
Austin Portfolio Partners GP, LLC, TPG-Austin
Portfolio Investor LP,  TPG-Austin Portfolio
Syndication Partners JV LP, TPG-401 Congress
REIT LLC, TPG-300 West 6th Street REIT
LLC, TPG-One Congress Plaza REIT LLC,
TPG-One American Center REIT LLC, TPG-
San Jacinto Center REIT LLC, TPG-
Stonebridge Plaza II REIT LLC, TPG-Research
Park Plaza I & II REIT LLC, TPG-Westech 360
REIT LLC, TPG-Park 22 REIT LLC, and TPG-
Great Hills Plaza REIT LLC

**PATTON BOGGS, LLP**

/s/ Jeff LeForce
Deborah C. Ryan
Jeff LeForce
Robert W. Jones
2001 Ross Avenue, Suite 3000
Dallas, TX 75201
Telephone: (214) 758-1500
Facsimile: (214) 758-1550

Attorneys for Revere Austin Holdings, LLC and
Revere Funding Limited

SO ORDERED this 25th day of March, 2009

S/ James M. Peck
HONORABLE JAMES PECK
UNITED STATES BANKRUPTCY JUDGE

**<u>Annex A</u>**

**Term Sheet**

Non-Binding Summary of Terms

March 24, 2009

| | |
|---|---|
| "Closing Date" | All of the transactions described herein are simultaneous and concurrent transactions all of which shall occur on the same date (the "Closing Date"). |
| Purchase and Sale of Revolving Credit Facility | On the Closing Date, each of TPG-Austin Portfolio Lender, LLC ("TPG") and Revere Holdings Limited or its lender affiliate ("Revere")  will acquire 25% of the existing $100 Million Revolving Credit Facility from Lehman Commercial Paper Inc. ("LB"),  for $1.00 each pursuant to the assignment provisions contained in the Credit Agreement (defined below) (the  "Assignment"). TPG, Revere and LB are collectively referred to herein as the "Lenders."  After giving effect to the Assignment, the Lenders will each own the following percentage interests in the Revolving Credit Facility:  TPG - 25%; Revere - 25%; LB 50%; provided, however, the purchase of any interest in the Revolving Credit Facility shall not obligate TPG or Revere to fund any portion of the Revolving Credit Facility. On the Closing Date, after the consummation of the Assignment, (i) the Lenders will advance the sum of $14 million to the Agent under the Credit Agreement (the  "Revolving Credit Advance"), with each Lender advancing its share in proportion to its portion of the Revolving Credit Facility as follows:  TPG - $3.5 million; Revere - $3.5 million; and LB - $7 million; (ii) the Agent will advance the Revolving Credit Advance to the Borrower under the Revolving Credit Facility on behalf of the Lenders; and (iii) the Borrower will advance the Revolving Credit Advance to  TPG-Austin Portfolio Syndication Partners JV LP (the "Partnership") for the purpose of purchasing and retiring an $80 million portion of the existing Term Loan Facility (as defined in the Credit Agreement) from Barclays  Bank PLC, as successor in interest to Laodecia LLC, an affiliate of Dresdner Bank AG (the "Dresdner Portion Acquisition")     . LB will provide all consents required as a lender and as Agent to authorize the advances made in (ii) and (iii) above. |
| Amended and Restated Credit Facility | On the Closing Date and immediately following the Dresdner Portion Acquisition, the Lenders and the Borrower, as all of the parties to the Credit Agreement, will enter into an |

Amended and Restated Credit Agreement (the "Amended and Restated Credit Agreement") modifying the total amount of the debt from $292,500,000 to $172,500,000 and modifying the Revolving Credit Facility described therein to (i) reduce the maximum principal amount of the Revolving Credit Facility to $60 million, including the Revolving Credit Advance; and (ii) provide for a multiple advance term loan credit facility ("Tranche A"). The Amended and Restated Credit Facility shall provide that the Revolving Credit Advance will be made a part of Tranche A, with each Lender being credited for funding its respective share thereof. The Amended and Restated Credit Agreement will provide that each Lender shall have the commitment to fund the additional following amounts under Tranche A (each such commitment, respectively, a "Tranche A Commitment"):

| | | |
|---|---|---|
| TPG | - | $ 11.5 million (25%) |
| LB | - | $ 23 million (50%) |
| Revere | - | $ 11.5 million (25%) |

Each Lender will fund its respective share of each loan advance requested by the Borrower (and share in the payment of interest on each such advance) in the same proportion as such Lender's Tranche A Commitment bears to the total of all such Commitments. Giving effect to the Revolving Credit Advance and the Tranche A Commitments, each Lender's share of Tranche A will be as follows: TPG - $15; Revere - $15 million; and LB $30 million.

Tranche A shall have the same maturity date as the Revolving Credit Facility, June 1, 2012, with no right of extension, and shall bear interest on a 360 day calendar year basis at the rates of 10% per annum on the first $24 million of Tranche A advanced ("Tranche A-1"), 15% per annum on the next $12 million advanced ("Tranche A-2"), and 20% per annum on the remainder advanced ("Tranche A-3"). Interest on Tranche A shall accrue and be capitalized on each Interest Payment Date until maturity.

On the Closing Date, and concurrently with execution and delivery of the Amended and Restated Credit Agreement, the Lenders will collectively advance, in proportion to their respective Tranche A Commitments, the sum of $6 million under Tranche A to a Borrower-controlled operating expense account (the "First Advance"). The parties presently estimate

that $1 million of the First Advance is for the purpose of paying transaction costs incurred by the Lenders in connection with the transaction evidenced by the Amended and Restated Credit Agreement and the documents executed in connection therewith and other expenses approved by Lenders.  As a condition to the Closing, the Lenders will mutually approve the final closing statement setting forth the costs and expenses incurred by each Lender in connection with the transactions described in this Term Sheet. The remaining $5 million of the First Advance shall be used for the purpose of paying accrued but unpaid interest on Tranche B (as defined below under "Debt Tranches") due with respect to the months of December, 2008, January and February, 2009, and the partial month from March 1, 2009 until the Closing Date, and for working capital for the Austin properties.    The remaining balance of Tranche A in the amount of $40 million will be advanced in one or more advances (the "Subsequent Advances"), made from time to time upon the request by Borrower in accordance with the terms of the Amended and Restated Credit Agreement.  Subsequent Advances  will be used to: (i) fund a Lender-controlled reserve account in an amount of up to $15 million, as determined to be necessary by Borrower; (ii) pay amounts set forth in an Approved Annual Plan (as defined below) approved by Borrower in accordance with Borrower's Partnership Agreement, and as approved by the Lenders in accordance with the Amended and Restated Credit Agreement; and (iii) pay such other amounts as are otherwise approved by the Lenders from time to time.    The Amended and Restated Credit Agreement shall grant Borrower the right to request Subsequent Advances on Tranche A on a monthly basis in accordance with the Approved Annual Plan.

As used herein, the properties known as One American Center, One Congress and West Tech 360 shall be referred to as the "Three Properties" and the remaining properties shall be referred to as the "Seven Properties." As a condition to the Closing, in accordance with Section 4.3 of the Partnership Agreement of the Partnership, TPG, LB and Revere (or their affiliated entities that are Partners in the Partnership) will approve an Annual Plan for calendar year 2009, which Annual Plan will include a sub-part for the Seven Properties and a separate sub-part for the Three Properties (such plan as may be approved is referred to herein as the "Approved Annual Plan").  The approval of the Annual Plan by the Partners shall also constitute approval thereof by their Affiliate Lenders

under the Amended and Restated Credit Agreement. The Approved Annual Plan will be attached to the Amended and Restated Credit Agreement and shall remain in effect throughout 2009. The provisions of Section 4.3 of the existing Partnership Agreement shall continue to apply with respect to the process for the Partners to approve an Annual Plan for subsequent years, except that each of the Lenders shall have the right to approve the Approved Annual Plan in accordance with the standards set forth on Exhibit A (subject to the provision under "Other Considerations" below that any approval by an Affiliate of a Lender as a Partner in the Partnership shall also bind such Lender). The provisions of Section 4.3(c) of the existing Partnership Agreement shall remain in effect with respect to the carryover of the provisions of the Approved Annual Plans for subsequent calendar years (for both operating and capital items) if an Approved Annual Plan is not adopted by the Partners of the Partnership. Section 4.3(c) of the Partnership Agreement will be amended to clarify that (i) if any capital expenditures included in the Approved Annual Plan for any calendar year are commenced in such calendar year but not completed in such calendar year, the unspent portion of the amount budgeted for such capital expenditure in the Approved Annual Plan will carry forward to subsequent years and (ii) otherwise, such unspent budgeted amounts for capital expenditures shall not carry over from year to year.

In no event shall the Lenders have any obligation to make any advance under Tranche A for any amount not consistent with the then applicable Approved Annual Plan. Each request for an Advance must be accompanied by a copy of the Approved Annual Plan and a description of how the Advance complies with the Approved Annual Plan. The Agent will have no obligation to fund any portion of the Revolving Credit Facility or Tranche A in its capacity as Agent under the Amended and Restated Credit Agreement.

The Amended and Restated Credit Agreement will suspend the Borrower's obligation to comply with any financial covenants until January 1, 2012 and will provide that for the period thereafter the financial covenants in Section 7 will be revised to require a Consolidated Debt Service Coverage Ratio of 1:00 to 1:00 (calculated only on the current interest payable on the mortgage loans, mezzanine loans and the Tranche B Loan and not based on any interest accruing on either Tranche A or Tranche B), a Consolidated Leverage

Ratio of 89% and a Maintenance of Tangible Net Worth covenant of $115,000,000 and all other financial covenants will be eliminated.    In the event of  non-compliance with either the Leverage  or Tangible Net Worth covenant, Borrower will  have 30 days after notice by Agent to (i) deliver to Agent an outline of a sale strategy specifying assets proposed for sale, target proceeds, listing agent, and a draft Offering Memorandum or (ii) elect to make a Specified Equity Contribution (which must be made within 10 days after the date of such election) which satisfies the covenants. If Borrower elects to proceed under clause (i) above, subject to Agent's  reasonable approval of the sale strategy, Borrower will have 90 days after the approval by Agent to enter into a purchase agreement with one or more third party purchasers for the sale of the assets listed in the approved sale strategy (with closings of such sales to occur within 30 days thereafter) and thereby comply with the financial covenants.  If there is non-compliance with any of the financial covenants, then unless and until Borrower cures such   non-compliance as otherwise provided above, the interest rate on Tranche B shall be adjusted so that the outstanding balance of Tranche B will accrue additional interest at the following applicable rate (not to exceed the highest lawful rate):  250 bps for the  period from January 1, 2012 to June 30, 2012; 350 bps for  period from July 1, 2012 to December 31, 2012; 450 bps for the period from January 1, 2013 to May 31, 2013;  and 500 bps for the  one year extension term of Tranche B, as provided below.    The accrual of additional interest under the prior sentence will not affect the amount of current interest that is payable on Tranche B, at the rate provided in the existing Credit Agreement, for the period after January 1, 2012 until the maturity of Tranche B, as provided under the section titled "Priority Among Facilities" below.    The Appraisal Trigger Event, and the appraisal requirement under the Credit Agreement shall not become effective until January 1, 2012 but Borrower shall have the right to cause appraisals of the assets to be done earlier, at its election.  Subsequent to the violation of a financial covenant after January 1, 2012, the Administration Fee payable to the General Partner will accrue and not be payable until such financial covenant  violation has been cured.

Other than as specified in this Term Sheet the terms of Tranche A will be substantially similar to the terms of the existing term loan made under the Credit Agreement (the "Term Loan").    No further investment ratings shall be

required for the Term Loan debt. However, in the event that LB determines in its discretion to remarket the Term Loan, TPG, at LB's sole cost and expense, will use commercially reasonable efforts to aid LB in remarketing and syndicating the Term Loan, including, without limitation, obtaining investment ratings for the Term Loan to the extent LB deems necessary. Revere shall be fully advised of all such remarketing and syndicating efforts.

The Amended and Restated Credit Agreement shall grant the Borrower the option to extend the maturity of the Term Loan for a period of one year from June 1, 2013 the existing maturity date to May 31, 2014. An extension fee in the amount of 1% of the then outstanding balance of the Term Loan shall be payable by the Borrower upon the exercise of the extension option as a condition to the exercise of such extension option; such extension fee may be added to the balance of the Term Loan. The interest rate payable by the Borrower on the Term Loan shall be increased by 350 bps on the commencement of the one year extension, but in no event to exceed a total interest rate of 10% per annum on the Term Loan (on a current pay basis, not including any additional interest that may accrue by reason of non-compliance with the financial covenants). The extension of the Term Loan will require that Borrower be in compliance with the DSCR covenant (based on the current interest payable during the extension term); if Borrower is not in compliance with the Leverage or Tangible Net Worth covenants during the extension term, then the same provisions as are set forth above during the initial term will apply with respect to Borrower's rights to cure such violation, and regarding the accrual of additional interest on Tranche B for a failure to cure such violation (e.g. up to 15%, not to exceed the highest lawful rate).

Subject to Excluded Transfers (defined below), the Lenders will each have the following rights of first offer ("ROFO") to purchase the following interests (as applicable, the "Offered Interest"): (i) each Lender will grant to the other Lenders a right of first offer to purchase any portion of each Lender's interest in the Term Loan and Tranche A; and (ii) each of the ultimate parents of the Lenders will grant to the other Lenders the right of first offer to purchase the capital stock or other ownership interest of its Lender affiliate. Any party acting as a seller of an Offered Interest pursuant to the provisions of this paragraph is hereinafter referred to as a "Seller Party."

Each party acting as a purchaser of an Offered Interest pursuant to the following provisions is hereinafter referred to as a "Purchaser Party". If two Purchaser Parties exercise their right to acquire an Offered Interest, then they will each acquire such Offered Interest pro rata, based on the proportion which the Tranche A Commitments of each such Purchaser Party bears to the aggregate Tranche A Commitments of all such Purchaser Parties, or if only one of them exercises such right, then such Purchaser Party will acquire all of such Offered Interest. The Seller Party shall provide written notice of its intent to sell the Offered Interest to the other parties (the "ROFO Notice"). The ROFO Notice shall set forth all of the material terms of the proposed transfer, including, but not limited to, the identification and aggregate amount of the Offered Interest, the purchase price therefor and other economic terms relevant to such offer, such as discounts or fees. The other two parties will have the right to elect to acquire such Offered Interest on the terms set forth in the ROFO Notice by sending a written notice (the "Acceptance Notice") to the Selling Party and the other party within 20 days after the date of the ROFO Notice. The closing of such purchase shall occur within 90 days after such Acceptance Notice by the last of the two Purchaser Parties that elects to purchase. If two Purchaser Parties elect to acquire the Offered Interest by sending the Acceptance Notice in the manner and within the time provided and one of the Purchaser Parties fails to close, the remaining Purchaser Party will be obligated to purchase the entire Offered Interest at closing at the price and on the terms set forth in the ROFO Notice and the closing date will be extended for an additional 10 business days after Selling Party notifies the Purchasing Parties of such failure to close. If the other two parties do not elect to acquire an Offered Interest, then the Seller Party owning such Offered Interest may sell such Offered Interest to any third party pursuant to the same terms and for a price that is not lower than the price offered by the Seller Party to the other two parties for a period of 6 months after the ROFO Notice. If the Offered Interest is not sold within said 6 month period pursuant to the terms of the ROFO Notice, the foregoing process shall be repeated for any subsequent offer to sell an Offered Interest.

"Excluded Transfers" include (i) transfers to Lender affiliates (who become subject to the ROFO), (ii) a one-time transfer by LB of its assets, real estate related assets, or equity interests, and (iii) sales of participating interests in the Loans or

| | |
|---|---|
| | Commitments under the Amended and Restated Credit Agreement. Enforcement of the ROFO is personal to LB, Lenders and their ultimate parents and affiliate transferees. All transferees permitted under Excluded Transfers, including under the LB one-time transfer of its assets, real estate assets or equity interests, will be subject to the ROFO.<br><br>Contemporaneously with the sending of the Acceptance Notice, each Purchaser Party shall deposit in escrow the amount of 10% of the Offered Interest sale price. The escrow deposit shall be deposited with a mutually agreeable escrow party. If there is more than one Purchaser Party for an Offered Interest, each Purchaser Party shall deposit in escrow an amount equal to 10% of the Offered Interest sale price. If a Purchaser Party fails to close, the Seller Party shall have the right to retain such Purchaser Party's deposit as liquidated damages, as the only remedy for such Purchaser Party's failure to close; provided, however, that if there is more than one Purchaser Party and one of them fails to close, but the other(s) close the entire Offered Interest, then the Seller shall credit the entire deposit provided by all Purchaser Parties to the performing Purchaser Party or Parties, provided that the closing Purchaser Party shall bear any risk of a claim to the deposit by the defaulting Purchaser Party.<br><br>The ROFO rights set forth herein are intended to be in addition to existing rights of first offer in favor of the partners of the Partnership under the existing Partnership Agreement, without modification or amendment of any such existing rights. The Notes representing the Tranche A or Tranche B loans issued to each Lender, and any certificate representing the equity in the Lender held by its ultimate parent will be legended to reference this ROFO (except that LB, as its own ultimate parent, will not place a legend). |
| Debt Tranches | The Amended and Restated Credit Agreement will provide for two (2) tranches of debt, as follows: (i) Tranche A in the amount of $60 Million (including the initial $14 million to be advanced under the Revolving Credit Facility), and (ii) the existing Term Loan in the amount of $112,500,000 ("Tranche B"), which is the amount remaining after the retirement of the $80 million portion of the Term Loan being acquired by the Partnership from Barclays Bank PLC. |
| Reserve Accounts | All funds on deposit in the existing Interest Reserve Account (as defined in the Credit Agreement) have been released to the |

| | |
|---|---|
| | Borrower and such reserve is not required to be replenished by Borrower. The Interest Reserve Account shall be used as Borrower's Operating Expense Account and shall be under the control of Borrower.<br><br>At Closing, Borrower shall enter into a Lockbox, Reserve and Security Agreement with Agent on behalf of Lenders pursuant to which Borrower will establish (i) a lockbox collection account controlled by Agent for the deposit of all Net Cash Flow (to be defined in the Amended and Restated Credit Agreement) and (ii) a Reserve Account controlled by Agent for the deposit of up to $15 million of Tranche A loan proceeds to be disbursed by the Agent in the same manner as loan draws pursuant to Approved Annual Plans. |
| Interest Payments | Tranche A: Subject to available cash under the Lockbox Agreement, interest on Tranche A will accrue and be capitalized on each Interest Payment Date until maturity.<br><br>Tranche B: Subject to available cash under the Lockbox Agreement, interest on Tranche B will accrue and be capitalized on each Interest Payment Date until January 1, 2012. Thereafter, the current rate of interest on Tranche B will again be due and payable in cash on each Interest Payment Date. |
| Capitalized Interest | All unpaid accrued interest on Tranche A and Tranche B shall be capitalized and treated as principal of the respective Tranche on which it accrued for all purposes, including, without limitation, with respect to Tranche A, for the determination of the interest rate applicable thereto. |
| Priority Among Facilities | The Collateral will secure both Tranche A and Tranche B with the priorities hereinafter set forth. The occurrence of an event of default, whether attributable to Tranche A or Tranche B, which is declared by the appropriate Lenders in accordance with the Amended and Restated Credit Agreement shall be an event of default under the Amended and Restated Credit Agreement. After the occurrence of an event of default on either Tranche A or Tranche B which is declared by the appropriate Lenders in accordance the Amended and Restated Credit Agreement, the Lenders of Tranche A shall be entitled to all cash flow and other proceeds from the Collateral until Tranche A is repaid in full before any such proceeds are paid to the holder of Tranche B. For purposes of clarification, if there is any default under the Amended and Restated Credit |

Agreement, including the maturity of Tranche A, and Tranche A is not repaid in full, then unless the Majority Tranche A Lenders elect to declare an event of default on Tranche A by notice thereof to the Borrower, such Tranche A Lenders shall be deemed to have elected to forebear from declaring such default or from exercising any remedies with respect thereto, in which case the Tranche B Lenders shall not have the right to declare an event of default or exercise any remedies as a result of such Tranche A default, unless and until the Majority Tranche A Lenders subsequently elect to give notice of such a default.

So long as Borrower is not in an event of default under the Amended and Restated Credit Agreement all cash flow, including proceeds from any capital events, after making the following payments in the following order or priority: (i) making any payments due under the first mortgage loans; (ii) funding the Reserve Account in an amount not to exceed $15 million (it being agreed that 50% of the net proceeds from any capital event will be deposited into such Reserve Account, up to $15 million); and (iii) funding a Borrower-controlled Operating Expense Account not to exceed $5 million (except that such account will initially be funded with $6 million at the closing of Amended and Restated Credit Facility) will be applied as follows on the first day of each month (subject to Agent fee and expense reimbursement and to certain priorities among the Lenders with respect to the repayment of protective advances made by some or all of the Lenders to be set forth in a Lockbox, Security and Reserve Agreement):

On and prior to December 31, 2011:

first, to pay current interest on Tranche A;
second, to pay current interest on Tranche B;
third, to pay principal on Tranche A; and
fourth, to pay principal on Tranche B;

and

From and after January 1, 2012:

first, to pay current interest on Tranche B;
second, to pay current interest on Tranche A;
third, to pay principal on Tranche A; and
fourth, to pay principal on Tranche B.

10

| | |
|---|---|
| Prior Defaults Waived | On execution of the Amended and Restated Credit Facility, all prior failures by LB to fund or other prior defaults by Lehman Commercial Paper Inc. will be waived and all defaults by TPG-Austin Portfolio Holdings LLC ("<u>Borrower</u>") that occurred prior to the effective date of the Amended and Restated Credit Agreement will be waived but not any default which occurs or continues after such effective date; provided, however, Borrower will be required to pay the accrued but unpaid interest on Tranche B due with respect to the months of December, 2008,  January and February, 2009, and the period from March 1, 2009 through the Closing Date concurrently with the funding of the First Advance of Tranche A . |
| Lender Agreement | If any Lender defaults in any of its funding obligations under Tranche A (any such Lender, a "<u>Defaulting Lender</u>", and the amount of such Defaulting Lender's defaulted funding obligation, a "<u>Defaulted Funding Amount</u>"), and if such Defaulting Lender fails to cure its default within 10 business days after written notice, then (i) such Defaulting Lender will lose all lender voting and approval rights with respect to Tranche A described in Exhibit A, and (ii) the other non-defaulting Lenders will each have the right to fund the Defaulted Funding Amount on behalf of the Defaulting Lender(s), and if they both elect to do so, they shall fund on a pro rata basis based on their respective    Tranche A Commitment amounts.  The Lender(s) who so fund on behalf of the Defaulting Lender (the "<u>Funding Lenders</u>") would thereafter be entitled to receive from payments made by the Borrower on   Tranche A an aggregate amount equal to the sum of (A) the Defaulted Funding Amount <u>plus</u> (B) the aggregate amount of Tranche A funded by the Funding Lenders for their own accounts, respectively, on the date on which the Funding Lenders funded the Defaulted Funding Amount, prior to the Defaulting Lender being entitled to receive any payment from the Borrower in respect of the obligations under Tranche A owed to the Defaulting Lender. Payments of principal and interest to the Funding Lenders (if there is more than one of them) shall be allocated between them pro rata based on the relative amount each of them has advanced on behalf of the Defaulting Lender.<br><br>In addition and as a further consequence of the Defaulting Lender's failure to fund, a portion of the principal balance of |

Tranche A owed to the Defaulting Lender in an amount equal to one half (1/2) of the Defaulted Funding Amount shall be transferred from the subaccount of the Defaulting Lender to the subaccounts of the Funding Lenders (pro rata, based on the relative amount each of them has advanced on behalf of the Defaulting Lender) and the Administrative Agent shall update the Register accordingly.   Each such transfer of the principal balance of Tranche A from the subaccount of the Defaulting Lender to the subaccounts of the Funding Lenders shall be made from the sub-tranche in which the default occurred, provided, that if the outstanding principal balance of such sub-tranche owed to the Defaulting Lender is in an amount less than one-half of the Defaulted Funding Amount, then such transfer shall be made in the following order of priority: first, from the sub-tranche in which the default occurred and, then, from the sub-tranche that was advanced immediately prior to the sub-tranche in which the default occurred, and, then (if applicable) from the first sub-tranche (Tranche A-1) advanced.

In lieu of the rights described in the two preceding paragraphs, if the non-Defaulting Lenders unanimously agree, they may commence an action against such Defaulting Lender to recover liquidated damages in an amount equal to the Defaulted Funding Amount together with attorneys' fees and costs of collecting the same , with a recovery capped at an amount equal in the aggregate to the lesser of (a) the total remaining unfunded Tranche A Commitment of such Defaulting Lender or (b) $15 million.  If the  non-Defaulting Lenders proceed with an action  under the immediately preceding sentence, to the extent  the liquidated damages would be subject to the $15 million cap, then the   non-Defaulting Lenders may collect such liquidated damages up to the cap amount and also proceed under clause (ii) of the first sentence of this section only with respect to the portion of the Defaulted Funding Amount     that exceeds   the  cap.  Notwithstanding anything to the contrary contained above, to the extent any Lender shall be a Defaulting Lender with respect to its share of the First Advance of Tranche A then the $15 million cap set forth above shall not be applicable in connection with any liquidated damages that may be collected by the  non-Defaulting Lender(s).   To the extent a  non-Defaulting Lender(s) is  entitled to receive amounts pursuant to the procedure described above, then the affiliate of the Defaulting Lender which is an indirect Partner in the Borrower (through the Partnership) would guarantee the

payment of such amount to the extent it exceeds the amount that is recoverable from the amounts to which the Defaulting Lender is entitled under Tranche A, with recourse only to such guarantor's partnership interest in the Partnership and such guaranteed amount shall be paid to the Partner affiliate of the non-Defaulting Lender(s) prior to any distribution to the Partner affiliate of the Defaulting Partner under the Partnership Agreement.

The Tranche A Lenders will have the right to cure a default with respect to any payment due under Tranche B prior to the Tranche B holder exercising any remedies with respect to such default. Any funds advanced to cure a Tranche B default will be treated pari passu with the Tranche B Loan. In addition, the Tranche A Lenders will have the right to pay off Tranche B at any time, including following a default thereunder, and upon such payment to assume the rights of Tranche B holders. If more than one Tranche A Lender exercises this right, then each such Lender shall contribute to such cure or payment in the same proportion that its Tranche A Commitment bears to the total Tranche A Commitments of such electing Lenders.

If any Tranche A Lender votes to declare a default on Tranche A and one or more of the other Tranche A Lenders does not wish to declare a default on Tranche A Loan, any or both of such non-electing Tranche A Lenders may purchase the Tranche A Loan held by the Tranche A Lender(s) who is electing to declare a default at the par value of the Tranche A Loan held by such Lender together with all accrued interest thereon. Such election must be made, if at all, within ten (10) days after the vote of the Tranche A Term Loan Lenders to declare an Event of Default and the closing of such purchase shall occur within 30 days thereafter.

The Lenders shall enter into a stipulation that will be filed with the Bankruptcy Court in which the Lehman bankruptcy proceedings are pending seeking the court's approval of the transactions described in this Term Sheet and pursuant to which any Defaulted Funding Amount (or the liquidated damages resulting from a failure to fund the Defaulted Funding Amount) owed by LB shall be deemed to be an allowed administrative claim in such bankruptcy proceeding that is to be paid to the non-Defaulting Lenders or Funding Lenders, up to the aggregate amount owed to the non-Defaulting Lenders or Funding Lenders by LB as a Defaulting

| | |
|---|---|
| | Lender under the first three paragraphs of this section. |
| Restricted Payments | The Loan Parties will be prohibited from making any Restricted Payments under Sections 7.6(b) and (c) of the Credit Agreement. |
| Governance | The Amended and Restated Credit Agreement will specify the voting and governance rights as among the various Lenders, which will be consistent with Exhibit A attached hereto. |
| Lender Transfer Rights | Transfers of direct or indirect interests in Tranche A will be governed as follows: (i) certain permitted transfers such as mergers, consolidations, and transfers to affiliates, will be permitted at any time; and (ii) all other transfers will be allowed only after December 31, 2010 and will be subject to a ROFO in favor of the other Lenders as provided for above. |
| Forced Sale | The forced sale right currently provided for in the Syndication Agreement will be amended to make such right effective at any time after June 1, 2011, with respect to no more than one CBD property and one suburban property in the Austin portfolio.   TPG will make a recommendation to LB as to which 2 buildings TPG recommends be marketed for sale, subject to LB's right to approve.   In the event of a disagreement on the selection of the 2 buildings to be sold LB's decision will control. The effective date of the forced sale right will remain as currently set forth in the Syndication Agreement with respect to all other properties. LB's forced sale right as to the 2 buildings in 2011 is personal to LB.  The Amended and Restated Credit Agreement and related documents will provide that the liens securing the Tranche A and Tranche B loans will be released on any building (or the equity interests therein) as to which LB exercises the forced sale right, upon the closing of such sale; provided the proceeds of such sale are applied in accordance with the priorities set forth in the "Priority Among Facilities" section. |
| Failure to Repay the Priority Credit Facility at Maturity | If the Borrower fails to pay the Tranche A obligations in full on the Tranche A maturity date then a vote in favor of exercising rights and remedies by the Majority Tranche A Lenders (as defined in Exhibit A) shall control and the Tranche B Lenders will have no right to object to same, except that subsequent to such initial vote by the Majority Tranche A Lenders, the Majority Lenders (as defined in |

| | |
|---|---|
| | Exhibit A) shall have the right to decide which remedy or remedies for default (other than forbearance) shall be exercised, provided that such decisions by the Majority Lenders must be carried out in good faith and in a commercially reasonable manner. As provided above, if the Majority Tranche A Lenders do not vote to give notice of a default to Borrower under Tranche A, they are deemed to have elected to forebear from declaring a default or exercising any remedies for such default until the Majority Tranche A Lenders subsequently elect to declare such default and exercise their remedies arising from such default. If a remedy elected by the Majority Lenders is to sell one or more of the Austin Properties, it shall be deemed commercially unreasonable if the Tranche B Lenders voting in favor of such remedy refuse to sell such Austin Property at a price equal to or greater than the Appraised Value thereof set forth in the most recent Appraisal delivered to the Administrative Agent pursuant to the Credit Agreement or in any more recent Appraisal obtained by the Administrative Agent or the Tranche B Lenders; provided further, however, that in the event of such a Tranche A maturity date default which is declared by the Majority Tranche A Lenders (so they have not elected to forebear from exercising remedies for such default), the Tranche B Lenders shall have the right at any time after such a default to purchase all of the Tranche A Loans and Commitments of the Tranche A Lenders at a purchase price equal to the outstanding principal balance of Tranche A and all accrued interest thereon at the pre-default rate in accordance with the Credit Agreement. |
| Other Considerations: | At the funding of the First Advance under Tranche A, part of such funds shall be distributed by Borrower to the Partnership (to which LB will consent) to be used by the Partnership to pay TPG-Austin Portfolio Partners GP LLC the Administration Fee accrued on the Capital Contributions made to the Partnership by Revere (as provided for in the Partnership Agreement). From and after the closing of Tranche A, notwithstanding any other provisions of the existing agreements between the parties, the Partnership shall pay TPG-Austin Portfolio Partners GP LLC an Administration Fee equal to 50 bps per annum times the sum of (x) the total Capital Contributions made to the Partnership by all Partners and (y) the funded amount of Tranche A from time to time; provided, however, that if Tranche A is not repaid in full on or before maturity thereof, then TPG Austin Portfolio Partners GP LLC and TPG/CalSTRS, LLC, jointly |

| | |
|---|---|
| | and severally, will repay to LB the lesser of (i) the unpaid balance of Tranche A owed to LB or (ii) the amount of all Administration Fees paid to TPG Austin Portfolio Partners GP LLC with respect to the Capital Contribution made by LB to the Partnership and the portion of Tranche A advanced by LB.   TPG-Austin Portfolio Partners GP LLC shall also be entitled to the distributions payable under Section 8.3(b)(iii) of the Partnership Agreement notwithstanding any other provisions of the agreements between the parties.<br><br>Notwithstanding the foregoing, to the extent there is insufficient cash flow (taking into account any available borrowing capacity) after payment of all other costs and expenses of the Austin Properties to pay the Administration Fee due in any month, such unpaid portion of the Administration Fee shall accrue without interest and be payable when cash flow is sufficient to pay such deferred amount.<br><br>Notwithstanding Exhibit A, so long as a Lender has an Affiliate that is a Partner in the Borrower, any approval by such Affiliate as a Partner shall be binding on such Lender for purposes of its approvals under Exhibit A.  For example, if a Partner approves an Annual Plan under the Partnership Agreement of TPG-Austin Portfolio Syndication Partners JV LP, such Partner's affiliate Lender shall not have the right to disapprove such Annual Plan. |
| Protective Advances | If the Lenders vote to make Protective Advances as described on Exhibit A attached, such Protective Advances shall be made first by the Tranche B Lenders if they vote to make such advances, or if the Tranche B Lenders fail to vote to make such advances, or fail to fund such approved advances, then by the Tranche A Lenders.   No Tranche A Lender can be required to advance more than its Tranche A Commitment and the failure to approve making a Protective Advance shall not affect the voting or other rights of a Lender; provided that if a Tranche A Lender does vote to make a Protective Advance and then fails to fund its share of such Protective Advance, then such Lender shall be subject to the same rights of the other lenders as are applicable to a failure to fund part of Tranche A.   Any Protective Advance by the Tranche A Lenders shall be deemed to be an advance under sub-tranche A-3 regardless of whether all of sub-tranches A-1 and A-2 have already been funded at such time. |

| Title and Opinions | As a condition to Closing, the Lenders will obtain title insurance and legal opinions with respect to the transactions described in the Amended and Restated Credit Agreement in such forms as are reasonably acceptable to each of the Lenders. |
|---|---|
| Agreement Regarding Debtor/Creditor Relationship | The Agreement Regarding Debtor/Creditor Relationship will be amended and restated to reflect the Tranche A Lenders and the Revere Partner, among other changes. Borrower Parties will agree to the distinction and separateness between each of the Lenders and the Administrative Agent, on the one hand, and their respective affiliated Partners and the Borrower parties, on the other hand. The terms of the agreement will protect each Lender and Administrative Agent against claims from the Borrower parties based those affiliate relationships so long as an affiliate relationship exists between a Lender, on the one hand, and an affiliated Borrower party or Partner, on the other hand. The Borrower parties will agree to cooperate in the defense of third-party claims and bankruptcy claims asserted to the effect that the relationship between a Lender and a Borrower party is not solely and exclusively that of a debtor/borrower and creditor/lender. The provisions of the agreement will not extend to a non-affiliated party who purchases or otherwise takes an assignment of an interest held by a Lender that had one of such affiliation relationships. |

This Summary of Terms does not constitute a legally binding obligation or commitment to provide any financing to Borrower or any waiver of claims by Borrower against Lehman. Moreover, this Summary of Terms does not attempt to describe all of the terms and conditions that would pertain to a restructuring of the Credit Agreement or the Loans thereunder. Instead, this Summary of Terms is intended to outline certain basic points around which the Credit Agreement and the Loans could be restructured for discussion purposes only. Except as otherwise required by law or unless the Lenders shall otherwise consent, this Summary of Terms and its contents may not be disclosed by Borrower, Guarantors or any of their respective affiliates to any other person or entity. Capitalized terms used but not defined herein have the meanings set forth in the Credit Agreement dated as of June 1, 2007 (the "Credit Agreement") among TPG-Austin Portfolio Syndication Partners JV LP, TPG-401 Congress REIT LLC, TPG-300 West 6th Street REIT LLC, TPG-One Congress Plaza REIT LLC, TPG-One American Center REIT LLC, TPG-San Jacinto Center REIT LLC, TPG Stonebridge Plaza II REIT LLC, TPG-Research Park Plaza I & II REIT LLC, TPG-Westech 360 REIT LLC, TPG-Park 22 REIT LLC and TPG – Great Hills Plaza REIT LLC, as Parent Guarantors, TPG-Austin Portfolio Holdings LLC, as Borrower, the lenders from time to time parties thereto, Lehman Brothers Inc. as Arranger and Lehman Commercial Paper Inc., as Administrative Agent.

## EXHIBIT A

### Lender Approval Rights

#### Unanimous Tranche A (100% vote of holders of Tranche A)
?? Amendments, modifications and waivers that:
  ?? Reduce or forgive principal amount of the Priority Credit Facility;
  ?? Extend or shorten maturity date of the Priority Credit Facility;
  ?? Require amortization of the Priority Credit Facility;
  ?? Reduce interest rate or fees with respect to the Priority Credit Facility;
  ?? Increase the Priority Credit Facility commitments, other than as allowed for under the credit agreement;
  ?? Amend, modify, or waive the defined terms in the credit agreement requiring the vote of a certain percentage (or all of) the holders of Tranche A;
  ?? Amend, modify or waive pro-rata treatment and payments with respect to the Priority Credit Facility;
  ?? Impose restriction on assignments or participations of the Priority Credit Facility that are more restrictive;
?? Any transfer by a Lender of a direct or indirect interest in the Priority Credit Facility prior to January 1, 2011 (with certain carve-outs with respect to indirect interests as set forth in the draft credit agreement under negotiation);
?? Consent to assignment or transfer of rights or obligations of Borrower under the agreements;
?? Release of all or substantially all of the collateral or any of the guarantors;
?? Consent to require protective advances (other than First Level Protective Advances);
?? Any other matters specified in the Summary of Terms, if any, as requiring unanimous approval by the holders of the Priority Credit Facility.

#### Unanimous Tranche B (100% vote of holders of Tranche B)
?? Amendments, modifications and waivers that:
  ?? Reduce or forgive principal amount of Tranche B;
  ?? Extend or shorten maturity date of Tranche B;
  ?? Require amortization of Tranche B;
  ?? Reduce or increase interest rate or fees with respect to Tranche B;
  ?? Amend, modify, or waive the defined terms in the credit agreement requiring the vote of a certain percentage (or all of) the holders of Tranche B;
  ?? Amend, modify or waive pro-rata treatment and payments with respect to Tranche B;
  ?? Impose restriction on assignments or participations of Tranche B that are more restrictive;
?? Consent to assignment or transfer of rights or obligations of Borrower under the agreements;
?? Release of all or substantially all of the collateral or any of the guarantors;
?? Consent to require protective advances (other than First Level Protective Advances);

19

?? Any other matters specified in the Summary of Terms, if any, as requiring unanimous approval by the holders of Tranche B.

**Unanimous Tranche A (100% vote of holders of Tranche A) and Majority Tranche B Lenders (vote of more than 50% of holders of Tranche B)**

?? Increase interest rate or fees with respect to the Priority Credit Facility.

**Unanimous Vote of Tranche A Lenders holding more than 15% of the sum of the commitment to lend under the Priority Credit Facility plus the outstanding balance of the Priority Credit Facility**

?? Any other amendment, modification or waiver of any provision of the loan documents regarding the Priority Credit Facility.

**Unanimous Vote of Tranche A Lenders holding more than 15% of the sum of the commitment to lend under the Priority Credit Facility plus the outstanding balance of the Priority Credit Facility and Unanimous Vote of Tranche B Lenders holding more than 15% of the outstanding balance of Tranche B**

?? Amendments, modifications and waivers of the cash sweep provisions of the loan documents, including share of proceeds to go to repay principal, to fund a reserve account, or to fund any other escrow account(s) used to fund ongoing operations.

**Super-Majority Tranche A Lenders (vote of more than 75% of Tranche A Lenders needed, including each of TPG, LB and Revere (unless the sum of such Lender's commitment to lend under the Priority Facility plus the outstanding balance of the Priority Facility owed to such Lender is less than 15% of the aggregate commitments plus outstanding balance of the Priority Credit Facility)) plus Majority Tranche B Lenders**

?? Approval of a proposed Budget submitted by Borrower for each calendar year during the term of the Priority Credit Facility, such approval not to be unreasonably withheld;

?? Approval of a material modification (more than $2.5 million in the aggregate) of the approved Budget requested by Borrower, such approval not to be unreasonably withheld;

?? Any other matters specified in the Summary of Terms, if any, as requiring a Super-Majority of the Lenders;

?? Amend, modify or waive anything affecting the rights, duties or obligations of the agent.

**Majority Tranche A Lenders (vote of more than 50% of holders of Tranche A)**

?? Terminating the commitments to lend the Priority Facility following an event of default.

**Majority Tranche A Lenders (vote of more than 50% of holders of Tranche A) or Majority Tranche B Lenders (vote of more than 50% holders of Tranche B)**

Consent to require a protective advance for Emergency Expenses, to pay interest and principal on the CMBS Facilities, to pay taxes, assessments or insurance premiums, to satisfy non-permitted liens on the collateral or the real property and to prosecute and defend actions/proceedings in connection with the collateral or the real property that are not covered by insurance or, if successful, could not result in a lien on the collateral or the real property ("<u>First Level Protective Advances</u>").

**<u>Majority Lenders (vote of more than 50% of holders of Tranche A and Tranche B</u>)**

?? Non-material modifications (less than $2.5 million in the aggregate) to the approved Budget, such approval not to be unreasonably withheld;

?? Exercising any rights and remedies of the Lenders following an event of default except as otherwise provided herein;

?? Any other matter not specified above or in the Summary of Terms.