1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.



              Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.



              Debtor.

- - - - - - - - - - - - - - - - - - - -x

              United States Bankruptcy Court

              One Bowling Green

              New York, New York


              March 25, 2009

              10:02 AM

B E F O R E :

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

VERITEXT REPORTING COMPANY

212-267-6868                                    516-608-2400

2

1

2    HEARING re Debtors' Motion for an Order Modifying the Automatic

3    Stay to Allow Advancement Under Directors and Officers and

4    Fiduciary Liability Insurance Policies

5

6    HEARING re TPG-Austin Portfolio Holdings LLC's Motion to Compel

7    Immediate Assumption or Rejection of Credit Agreement

8

9    HEARING re Debtors' Motion to Transfer Agents Funds in

10   Connection with Resignations from Agency Positions

11

12   HEARING re Debtors' Motion Authorizing Lehman Commercial Paper

13   Inc. to Settle Dispute with the Metropolitan Life Insurance

14   Company

15

16   HEARING re Motion of the Tobacco Settlement Authority for an

17   Order Compelling Lehman Brothers Special Financing Inc. to

18   Assume or Reject an Executory Contract

19

20   HEARING re Motion of Howard W. Tomlinson for Relief from the

21   Automatic Stay

22

23   HEARING re Debtor's Motion for Approval of the Sale of Debtor's

24   Aircraft Pursuant to an Aircraft Sale and Purchase Agreement

25   and Payment of Related Fees

3

1

2    HEARING re Trustee's Application for an Order Pursuant to

3    Section 365(d)(1) of the Bankruptcy Code Further Extending the

4    Time Within Which the Trustee may Assume or Reject Executory

5    Contracts and Certain Unexpired Leases

6

7

8    HEARING re Notice of Hearing Regarding Motion of Carret P.T.,

9    L.P. #2 and Evansville Insurance Ltd. for Leave to Conduct Rule

10    2004 of Lehman Brothers Inc., Barclays Capital Inc. and SIPA

11    Trustee

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

4

```
 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Debtors

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  RICHARD P. KRASNOW, ESQ.

 9         SHAI Y. WAISMAN, ESQ.

10         JACQUELINE MARCUS, ESQ.

11         JOHN W. LUCAS, ESQ.

12         DIANE HARVEY, ESQ.

13

14    HUGHES HUBBARD & REED LLP

15         Attorneys for James W. Giddens, SIPC Trustee

16         One Battery Park Plaza

17         New York, NY 10004

18

19    BY:  JEFFREY S. MARGOLIN, ESQ.

20         DAVID W. WILTENBURG, ESQ.

21         SARAH L. CAVE, ESQ.

22

23

24

25
```

5

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3        Attorneys for the Official Committee of Unsecured

4         Creditors

5        One Chase Manhattan Plaza

6        New York, NY 10005

7

8    BY:  DENNIS C. O'DONNELL, ESQ.

9        DENNIS F. DUNNE, ESQ.

10       EVAN R. FLECK, ESQ.

11

12   ALSTON & BIRD LLP

13       Attorneys for Prudential Insurance Company

14       One Atlantic Center

15       1201 West Peachtree Street

16       Atlanta, GA 30309

17

18   BY:  WILLIAM S. SUGDEN, ESQ.

19       (TELEPHONICALLY)

20

21

22

23

24

25

6

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for Metropolitan Life Insurance Company

4         399 Park Avenue

5         New York, NY 10022

6

7    BY:  CASSANDRA AQUART, ESQ.

8

9    BOIES, SCHILLER & FLEXNER, LLP

10        Attorneys for Barclays Capital Inc.

11        575 Lexington Avenue

12        7th Floor

13        New York, NY 10022

14

15   BY:  JACK G. STERN, ESQ.

16

17   CHAPMAN & CUTLER LLP

18        Attorneys for General Helicopters International

19        111 West Monroe Street

20        Chicago, IL 60603

21

22   BY:  JAMES HEISER, ESQ.

23        FRANKLIN H. TOP, III (TELEPHONICALLY)

24

25

7

1

2    CONE & KILBOURN

3          Attorneys for Howard W. Tomlinson

4          83 South Bedford Road

5          Mount Kisco, NY 10549

6

7    BY:  JOHN E. CONE, JR.

8

9    EZRA BRUTZKUS GUBNER LLP

10         Attorneys for City of Long Beach

11         21650 Oxnard Street

12         Suite 500

13         Woodland Hills, CA 91367

14

15   BY:  COREY R. WEBER

16         (TELEPHONICALLY)

17

18   FURMAN KORNFELD & BRENNAN LLP

19         Attorneys for Daniel Chan in Tomlinson State Court Action

20         545 Fifth Avenue

21         Suite 401

22         New York, NY 10017

23

24   BY:  ANDREW S. KOWLOWITZ, ESQ.

25

8

```
 1

 2    K&L GATES LLP

 3         Attorneys for the Washington State Tobacco Settlement

 4          Authority

 5         599 Lexington Avenue

 6         New York, NY 10022

 7

 8    BY:  KRISTIN S. ELLIOTT, ESQ.

 9

10    MARCUS, CLEGG & MISTRETTA P.A.

11         Attorneys for MAC Aircraft Sales

12         One Canal Plaza

13         Suite 600

14         Portland, ME 04101

15

16    BY:  GEORGE J. MARCUS, ESQ.

17         (TELEPHONICALLY)

18

19    ROPES & GRAY LLP

20         Attorneys for R3 Capital Management LLC

21         One International Place

22         Boston, MA 02110

23

24    BY:  PATRICIA I. CHEN, ESQ.

25         (TELEPHONICALLY)
```

9

1

2    STRUTMAN TRESISTER & GLATT P.C.

3        Attorneys for TPG-Austin Portfolio Holdings LLC

4        1901 Avenue of the Stars

5        Twelfth Floor

6        Los Angeles, CA 90067

7

8    BY:  MARGRETA M. MORGULAS, ESQ.

9

10   WUERSCH & GERING LLP

11       Attorneys for Carret P.T., L.P. #2 and Evansville

12        Insurance Ltd.

13       100 Wall Street

14       21st Floor

15       New York, NY 10005

16

17   BY:  STEPHEN MCNALLY, ESQ.

18       JASON M. RIMLAND, ESQ.

19

20

21

22

23

24

25

10

1

2    ZUCKERMAN SPAEDER LLP

3         Attorneys for State of New Jersey, Department of Treasury,

4          Division of Investments

5         919 Market Street

6         Suite 990

7         Wilmington, DE 19899

8

9    BY:   THOMAS G. MACAULEY, ESQ.

10        VIRGINIA W. GULDI, ESQ.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

11

P R O C E E D I N G S

1

2      THE COURT:  Good morning.  Be seated, please.  Please

3  proceed.

4      MR. KRASNOW:  Good morning, Your Honor.  Richard

5  Krasnow, Weil Gotshal & Manges LLP on behalf of the Chapter 11

6  debtors.

7      THE COURT:  Good morning.

8      MR. KRASNOW:  Good morning.  Your Honor, last night

9  the debtors filed an amended agenda letter.  It's at docket

10  number 3215.  And, with the Court's permission, I would propose

11  that we just go down the agenda, if we may.

12      THE COURT:  It sounds most efficient.

13      MR. KRASNOW:  Your Honor, the first matter on the

14  agenda is the debtors' motion for an order modifying the

15  automatic stay with respect to the debtors' primary D&O and

16  fiduciary policies.  That is at docket number 2949.

17      Your Honor, this is a motion that was filed at the

18  request of the respective insurers with respect to those

19  policies who wanted to ensure that if they made payments under

20  those policies and, in particular, the context was advancing

21  monies with respect to defense costs, that it wasn't

22  subsequently asserted that in making those payments, they

23  violated the automatic stay to the extent that the stay was

24  applicable.  And therefore, we are before the Court today

25  seeking that relief.

12

1          Your Honor, I think having described the rather

2     narrow relief that we are seeking here, in light of various

3     pleadings that were filed, correspondence that we received,

4     discussions we have had with certain parties, I'd like to

5     emphasize what we are not seeking and what we believe the Court

6     would not be determining should Your Honor grant the relief

7     requested.

8          We are not seeking and we don't believe the Court

9     would be determining what claims, obligations there may be by

10    parties including the insurers, the beneficiaries, those who

11    are covered by the policies, anybody who has an interest in

12    those policies.  There would be no determination as to what

13    those obligations and claims would be.  It is merely a lifting

14    of the stay.

15         Secondly, Your Honor, the Court, we do not believe,

16    and we have not requested that the Court do this, determine

17    whether or not in fact the proceeds of these policies would or

18    would not be property of the estate.  We are only seeking a

19    modification of the stay to the extent it is applicable.  We

20    are not asking this Court to determine whether or not it is

21    applicable.

22         As to that last point, Your Honor, there were two

23    pleadings that were filed with the Court, one of which is

24    styled as a limited objection by the "lead plaintiffs" who have

25    requested that the proposed order that was attached to our

13

1    motion being modified so as to explicitly provide that the

2    Court would not be making any determination as to whether or

3    not the proceeds are property of the estate and that the rights

4    and claims of all parties in interest in respect of that issue

5    would be reserved.  We have advised the lead plaintiffs that

6    there language with some very minor nonsubstantive tweaks which

7    we have shared with them is acceptable.  They have advised us

8    that our suggestive revisions are acceptable.  New Jersey had

9    filed a limited response in which they had indicated that they

10   had no objection to the motion or the proposed order but if the

11   proposed order were modified, they were reserving their rights.

12   We have provided them with the revised order in a blacklined

13   form.  They have informed us that they have no objection to the

14   entry of that order.

15          Your Honor, I have a copy of the blacklined order and

16   I'd be prepared to share it with the Court if the Court wants.

17          THE COURT:  Fine.  Please approach with that.

18          MR. KRASNOW:  Excuse me, Your Honor?

19          THE COURT:  Please approach.

20          MR. KRASNOW:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. KRASNOW:  On that note, Your Honor, we would

23   request, for the reasons set forth in our motion and the

24   reasons I've stated on the record that the Court grant us the

25   relief and enter the order as it has been revised.

14

1       THE COURT:  I'm prepared to do that.  I'm just going

2   to ask if there's anyone either from the state of New Jersey or

3   on behalf of the lead plaintiffs who has any comment.  If the

4   answer is no, I'll enter the order as modified.  I see the

5   committee is rising to perhaps say something.

6       MR. O'DONNELL:  Yeah.  Your Honor, Dennis O'Donnell,

7   Milbank Tweed Hadley & McCloy on behalf of the committee.  We

8   have had discussions with the debtors about the subject of

9   insurance and general insurance coverage in general and this

10  motion specifically.  The changes reflected in the order

11  address our concerns at this point.  We are reserving our

12  rights, specifically, with respect to this determination down

13  the road as it relates to excess coverage here.  There are

14  numerous excess policies and we expect this issue to arise

15  again and again in the case.  And as to the relief sought in

16  this motion, we are not objecting.  But as to any future relief

17  on this subject, we're reserving our rights.

18      THE COURT:  Fine.  Well, Mr. Krasnow has made a very

19  full record with respect to what I'm not deciding.  And I

20  confirm that I'm not deciding any of the things that he

21  believes I'm not deciding and that the order is narrowly

22  drafted and acceptable to the parties.  And I will enter it as

23  modified.

24      MR. KRASNOW:  Thank you, Your Honor.  And I believe

25  the next item on the agenda is being handled by Mr. Lucas.

15

1        MR. LUCAS:  Good morning, Your Honor.  John Lucas for

2   the Chapter 11 debtors.  Your Honor, the second item on the

3   agenda is the motion of TPG-Austin Portfolio Holdings to compel

4   assumption or rejection of a credit agreement that was entered

5   into by the debtors.  And I don't know if movant's counsel is

6   here today.

7        Your Honor, I don't know if you recall but previously

8   this motion was on in December -- was on before December --

9        THE COURT:  Mr. Kessler was here in connection with

10   that, I believe.

11        MR. LUCAS:  Correct.  And at the first hearing on

12   this, we had informed the Court that we would assume or reject

13   by date certain; I believe it was mid-December.  However, since

14   that time, the parties have gotten together and we've revised

15   the credit agreement.  And, Your Honor, in short, the

16   stipulation that we intend to hand up to the Court today

17   provides that the parties will enter into a transaction

18   amending the credit agreement and the supporting documents

19   pursuant to a term sheet that's attached to the stipulation.

20   And in short, there will be new funding provided in place of

21   the revolver that was alleged to have never been funded where

22   LCPI will provide thirty million dollars and Revere Holdings

23   will provide fifteen million and TPG-Austin, an affiliate of

24   TPG, will also fifteen million dollars under this revolver.

25   And it's all set forth clearly in the stipulation.

16

1          THE COURT:  Is there anything you wish to add or to

2     say.

3          MS. MORGULAS:  Again, Your Honor, Margreta Morgulas,

4     Stutman Treister & Glatt for TPG-Austin.  The debtors and our

5     client are happy with the way this came out.

6          THE COURT:  Good.  That's fine.

7          MR. LUCAS:  Thank you.  And we'll hand up the

8     stipulation at the end of the hearing, Your Honor.

9          THE COURT:  Fine.  I'll approve it.

10         MR. LUCAS:  Thank you.

11         MS. MARCUS:  Good morning, Your Honor.  Jacqueline

12    Marcus, Weil Gotshal & Manges for LBHI and the affiliated

13    debtors.  Number 3, Your Honor, is the debtors' motion pursuant

14    to Sections 105(a), 363(b) and 541(d) of the Bankruptcy Code

15    and Bankruptcy Rule 6004 for authority to transfer agents'

16    funds in connection with resignations from agency positions.

17    As you may recall, Your Honor, at the first day hearing with

18    respect to LCPI on October 6th, you entered an order

19    authorizing LCPI to resign agency positions and granted related

20    relief with respect to transfers of funds that were in a

21    designated agency account.  And we had an account number in

22    that motion and order.  As the case has developed, it's become

23    apparent that there's at least one other situation where LCPI

24    had been acting in an agency capacity but the funds were not in

25    that designated agency account.  So the purpose of this motion

17

1    was to expand the relief granted on October 6th to cover the

2    individual situation at issue today which is the Integral loan

3    as well as other situations that might arise in the future.

4         What we have proposed in the motion and in the

5    proposed order is a procedure with respect to other situations

6    that might arise where LCPI would provide five business days'

7    written notice to the creditors' committee and the U.S. trustee

8    before it actually effected those transfers of assets so that

9    the committee could take a look at what we were proposing and

10   make sure it falls within the bounds of the order.

11        The motion was filed and served on March 11th, 2009.

12   We inadvertently failed to file a notice of motion although the

13   motion itself was marked with the hearing date and the

14   objection deadline.  On March 20th, in response to comments

15   that we had received from Barclays Bank as well as from the

16   creditors' committee, we filed a supplement to the debtors'

17   motion which clarified some of the factual allegations in the

18   motion and as well, we filed a revised form of the order which

19   has been approved by the relevant parties as well as the

20   creditors' committee.

21        So, unless you want to hear what the clarifications

22   are, Your Honor, we'd request that you enter the revised order

23   granting the relief.

24        THE COURT:  I don't need to hear the clarifications

25   because I read your supplement.  And there are no objections to

18

1    this rather technical relief being requested.  And unless

2    there's someone who wished to be heard now, I'll enter the

3    relief you seek.  Hearing nothing, I'll enter the order that

4    you've proposed.

5          MS. MARCUS:  Thank you, Your Honor.  Number 4 is the

6    notice of debtors' motion for entry of an order pursuant to

7    Sections 105 and 363 of the Bankruptcy Code and Federal Rule of

8    Bankruptcy Procedure 9019 authorizing Lehman Commercial Paper

9    Inc. to settle dispute with the Metropolitan Life Insurance

10   Company.

11         In that motion, we seek authorization to settle

12   certain disputes between LCPI and MetLife with respect to

13   certain securitization trusts.  The motion was filed on March

14   2nd, 2009 and the objection deadline was fixed as March 12th

15   although we have agreed to give the creditors' committee

16   additional time.

17         Changes have been made to the proposed order at the

18   request of the committee and the committee made a comment that

19   we thought needed clarification but we have not filed the

20   revised motion with the Court yet.  No objections at all had

21   been filed to the motion except there's been a recent

22   development.  And the recent development is that there's an

23   issue with respect to three of the loans that are in one of the

24   securitization trusts.  PWC, in its role as administrator of a

25   UK entity called Lehman Commercial Mortgage Conduit Ltd., has

19

1    raised an issue as to whether the transfer of those loans to

2    LCPI might be a transaction under value under UK law.  We are

3    attempting to work that out with PWC.  And in the interim, LCPI

4    and MetLife have determined that it's probably more appropriate

5    not to seek the Court approval of the motion at this point but

6    to adjourn it to the next hearing on April 7th.  And we hope to

7    have resolved the issue with PWC or determine whether any other

8    changes are necessary by that time.

9         THE COURT:  Fine.  So that even though this -- that

10   was a report basically saying we want to adjourn this.

11        MS. MARCUS:  I thought the Court might wonder why we

12   were adjourning it if no objections were on file so I wanted to

13   clarify it for the record.

14        THE COURT:  I appreciate the clarification and this

15   will be adjourned to April 7th.

16        MS. MARCUS:  Thank you, Your Honor.  Mr. Lucas will

17   take over again.

18        MR. LUCAS:  Your Honor, the next uncontested item on

19   the calendar is the motion of Tobacco Settlement Authority for

20   an order compelling Lehman Brothers Special Financing Inc. to

21   assume or reject an executory contract.  And I believe the

22   movant's counsel is here.

23        Your Honor, we've been in discussion with the Tobacco

24   Settlement Authority and we've agreed to a form of order where

25   Lehman Brothers Special Finance will agree to the rejection of

20

1    this contract.

2         MS. ELLIOTT:  Good morning, Kristin Elliott, K&L

3    Gates on behalf of the Washington State Tobacco Settlement

4    Authority.  Debtors' counsel is correct that we have been in

5    discussions since the filing of the motion.  And the debtors

6    have advised that Lehman Brothers Special Financing has

7    determined to reject the agreement.  And I have a form of

8    revised proposed order that simply orders that the debtors are

9    authorized to reject the agreement -- or rather, Lehman

10   Brothers Special Financing is authorized to reject the

11   agreement and that the Authority will have until the later of

12   thirty days or the bar date established in these cases to file

13   any proof of claim with respect to the rejection.

14        THE COURT:  Okay.  Mr. Lucas, have you seen that form

15   of order?

16        MR. LUCAS:  We have.  And also the committee has

17   previewed the order also.

18        THE COURT:  And it's acceptable to everybody?

19        MR. LUCAS:  It is to the debtors, yes.

20        THE COURT:  Fine.  To the committee?

21        MR. O'DONNELL:  Here, too, Your Honor.

22        THE COURT:  Fine.  It will be entered.

23        MS. ELLIOTT:  Your Honor, I'll leave the order with

24   the debtors' counsel to hand up with the orders.

25        THE COURT:  We'll add it to the pile.

21

1          MS. ELLIOTT:  Thank you.

2          MR. LUCAS:  Your Honor, the next item on the calendar

3     is the Tomlinson lift stay motion which will be handled by my

4     colleague, Diane Harvey.

5          THE COURT:  Okay.

6          MR. CONE:  Good morning, Your Honor.  My name is John

7     Cone.  I'm counsel for Cone & Kilbourn, attorney for Howard

8     Tomlinson.  And I think that this matter has been fully briefed

9     to the Court.  And I don't want to take up too much time

10    because I know you have a lot of things on your agenda today.

11         But simply put, Tomlinson alleged over a year and a

12    half ago in state court that he had been fraudulently deprived

13    of his house and that the scheme resulted in a joint effort by

14    several parties, all of which are defendants.  One of the

15    parties is BNC Mortgage Inc. as they were called at that time.

16    Their name has subsequently been changed for the bankruptcy

17    proceeding.

18         BNC, in its brief to this Court, makes the unabashed

19    statement that they were not affiliated in any way or

20    associated with any of the other defendants.  However, I have

21    here today a cross-claim BNC asserted in the state court action

22    claiming that they had entered into a mortgage/brokerage

23    agreement with a co-defendant, Avenue Mortgage.  So there was a

24    linkage.

25         At any rate, BNC contended, without getting into all

22

1    of the facts, that Tomlinson had not pleaded, sufficiently

2    pleaded, or set forth facts sufficient for the state court to

3    come to the conclusion that it could be held liable for a fraud

4    to Tomlinson.  That motion was decided after argument, lengthy

5    argument, in the state court.  During that argument, it was

6    pointed out exactly what allegations were made.  The judge then

7    reserved decision and about two weeks later wrote an opinion in

8    which he decided that indeed a proper complaint had been

9    alleged against BNC.  One of the issues they raise here is that

10   there's no real fraud and that has already been decided.  The

11   issue of whether, in fact, the fraud extended to BNC has been

12   already decided by the state court as having been sufficiently

13   pled.

14        THE COURT:  Well, excuse me for just one second.  To

15   the extent this is actually relevant to the motion for stay

16   relief, I'd like more clarification on what the state court

17   did.  What was the procedural motion that was argued and

18   decided?  It would surprise me if a preliminary procedural

19   motion would result in a determination that there actually was

20   fraud.  Rather, it would seem to me that it would be a

21   determination that there was a sufficient pleading of fraud.  I

22   just don't know what the procedure --

23        MR. CONE:  That is correct, Your Honor.

24        THE COURT:  Okay.  Fine.

25        MR. CONE:  That there was a sufficient pleading of

23

1      fraud.

2            THE COURT:  So there was no determination on the

3      merits.

4            MR. CONE:  No.  Oh, absolutely not.  That would have

5      to await discovery and trial.  But at any rate, that same issue

6      is being proffered once again that the pleadings simply don't

7      add up to fraud.

8            THE COURT:  What does that have to do with your

9      motion for stay relief?

10           MR. CONE:  Well, it's one of the things that they

11     have raised in their motion.  So that's the only reason I bring

12     it up.

13           THE COURT:  Why are you -- why is your client

14     entitled to relief from the automatic stay at this point in

15     this bankruptcy case?

16           MR. CONE:  Well, Your Honor, I believe our client is

17     entitled to relief because the only court that has jurisdiction

18     over all of the defendants and which can obtain jurisdiction is

19     a state court.  The other defendants are not subject to the

20     jurisdiction of this court.  The sole issue in the case is one

21     of state law not federal law.  One of the prime cases cited to

22     this Court in opposition, which is claimed as being wholly

23     analogous, is, in fact, involving federal law not state law.

24     And there are a number of cases that say if the issue was one

25     of state law, the judicial economy and a resolution of the

24

1    facts can only be determined in state court, the stay should be

2    lifted.

3           Now, I'm not going to go into all the Sonnax factors

4    but I think we've detailed them fully in our brief.  And I

5    think that we comply with the vast majority of them.  Insofar

6    as the question of insurance is concerned, from the outset of

7    the state court action, BNC has been represented by two law

8    firms.  The second law firm is not stylized as representing an

9    underwriter but is, in fact, representing as counsel of record

10   BNC, that, in effect, that retention was by a Fidelity

11   underwriter of BNC.

12          Additionally, the only place a rescission of what

13   took place at the closing can be had is in the state court

14   where all the defendants are present.  So, basically, those are

15   our reasons, Your Honor.

16          THE COURT:  Just as a matter of curiosity, if you

17   were to file an amended complaint and leave BNC out, would you

18   be able to obtain effective relief as against the other

19   defendants?

20          MR. CONE:  Well, one of the problems is that BNC

21   cross-claimed against its own -- first they impleaded their own

22   attorney.  And they alleged their own attorney committed fraud

23   on them.  I don't believe we would have access to BNC's

24   documentation which was promised to be given me a long time ago

25   and never has been.

25

1          THE COURT:  Well, couldn't you take third party

2     discovery?  Why would they have to be a defendant to take

3     discovery of their documents?

4          MR. CONE:  Well, if that isn't precluded by the

5     state, we could do it.  But they contend that we can't take any

6     discovery.  We were on the verge --

7          THE COURT:  Well, is this --

8          MR. CONE:  -- of court-ordered discovery when --

9          THE COURT:  I just want to understand something.  Is

10    this motion that you've brought for stay relief designed to

11    facilitate discovery as against BNC or is it designed to obtain

12    coercive relief and damages against BNC?

13         MR. CONE:  It's designed for both purposes, Your

14    Honor.

15         THE COURT:  Okay.  And the question I was asking just

16    as a point of clarification is whether you could obtain

17    effective relief in this litigation that relates to a sale

18    lease back of real estate if BNC were not a party.

19         MR. CONE:  Well, I think -- I think we could obtain

20    effective relief if BNC would agree that if the state court

21    decides the mortgage should be rescinded then they'll go along

22    with that.  I don't know if the state court is empowered to

23    rescind the mortgage which is one of the causes of action

24    unless BNC is a party.

25         THE COURT:  Okay.  Thank you.

26

1          MR. CONE:  Thank you, Your Honor.

2          THE COURT:  Ms. Harvey?

3          MS. HARVEY:  Good morning, Your Honor.  Diane Harvey

4     from Weil Gotshal representing debtor, BNC Mortgage LLC.  Your

5     Honor, the movant here bears the burden to establish cause and

6     that burden has not been met.  First, the plaintiff's

7     allegations of wrongdoing are not evidence.  No Court has

8     determined the truth of any of these allegations and BNC has

9     denied them in its answer.

10         One of the things that counsel has brought up is this

11    concept of who owns the mortgage.  I can state on the record,

12    Your Honor, that BNC no longer holds this mortgage.  And we

13    believe that (1)that makes a big difference; and (2)there isn't

14    any applicable insurance here to cover should BNC have to

15    litigate in the state court.  And we believe that that's

16    obviously very significant here in determining whether the

17    automatic stay should be lifted.

18         THE COURT:  Ms. Harvey, I read your papers and

19    something occurred to me as I was reading through the

20    statements of counsel concerning the financial condition of

21    BNC.  It appears that BNC is effectively out of money, is that

22    right?

23         MS. HARVEY:  Yes, Your Honor.  There are certain

24    intercompany claims that will need to be assessed and obviously

25    prosecuted.  And right now, it's too early in the bankruptcy

27

1    process to be able to assess in a realistic fashion what the

2    success of those claims will be and what dollar amounts.

3        THE COURT:  Well, frankly, one of the questions that

4    came to my mind as I was reading through this is why BNC is in

5    Chapter 11 at all as opposed to Chapter 7.  It appears that

6    there's no realistic reorganization potential for BNC.  And it

7    also occurs to me that if judgments were obtained in the full

8    amount by default which is one of the adverse consequences of

9    granting stay relief assuming that there's no potential for

10   those judgment to be borne by other affiliates and this is

11   truly a debtor that would not be subject to consolidation risk,

12   why are we spending any time on this case?

13       MS. HARVEY:  Fair point, Your Honor.  I guess there

14   are accounts receivables in the amount of approximately 465,00

15   dollars.  The intercompany claims are in the millions.  And

16   again, because the debtor was filed in January and there needs

17   to be an assessment of what those claim amounts potentially can

18   be, certain of the intercompany claims are not against -- or

19   are against nondebtors.  And so, there might be at least a

20   likelihood of potentially getting back millions into the

21   estate.  But at this point, it's too early to know.

22       THE COURT:  Okay.  I didn't mean to break into your

23   argument.  It was just something that was occurring to me as I

24   was reading through your papers.  I was wondering why we were

25   trying to protect this empty pocket.

28

1          MS. HARVEY:  I anticipated that you would be asking

2     that question, Your Honor, and my answer is my answer.

3          THE COURT:  I accept your answer.

4          MS. HARVEY:  Your Honor, because this is fully

5     briefed, let me just make a couple of points.  These are

6     unliquidated, unsecured claims.  The courts in this district

7     have held that relief from the automatic stay with respect to

8     such claims that the stay should only be lifted in

9     "extraordinary circumstances".  And here, there aren't such

10    extraordinary circumstances.  This is not an instance where's

11    there's already been a judgment made and there is a -- the

12    judgment has been secured by a superseding bond so that the

13    plaintiff could actually pursue monies.  As I said, there's no

14    applicable insurance here.  And, as I stated on the record, BNC

15    no longer owns this mortgage.

16         Weighing all of the Sonnax factors -- and I'm not

17    going to through all of them.  They're fully briefed, Your

18    Honor -- we believe that the automatic stay should not be

19    lifted with respect to this.

20         THE COURT:  Thank you.  Anything more?

21         MR. CONE:  Your Honor, if --

22         MR. KOWLOWITZ:  I'm sorry, yeah.  Yes, Your Honor.  I

23    represent a defendant in the state court action.

24         THE COURT:  Please identify yourself.

25         MR. KOWLOWITZ:  Pardon me?

29

1          THE COURT:  Please state your name.

2          MR. KOWLOWITZ:  Oh, I'm sorry.  Andrew Kowlowitz from

3     Furman Kornfeld & Brennan.  We represent a defendant named

4     Daniel Chan in the underlying state court proceedings.  Mr.

5     Chan was BNC's settlement agent at the closing.  And we also

6     filed an application in opposition to Tomlinson's motion to

7     lift the stay.

8          It's our argument and we believe that if the stay

9     were, in fact, lifted, Attorney Chan would be severely

10    prejudiced as a result of the lifted stay.  First of all, BNC

11    defaulted.

12         THE COURT:  What standing does Mr. Chan have to raise

13    questions about BNC's stay?  I understand you might be

14    benefited if the stay remains in effect but --

15         MR. KOWLOWITZ:  Well --

16         THE COURT:  -- I'm curious as to why you have a

17    litigable position with respect to the automatic stay since you

18    are not a direct beneficiary of the stay.

19         MR. KOWLOWITZ:  Well, the fact is, Your Honor, we

20    have viable cross-claims against BNC.  We were BNC's agent at

21    the closing.  We signed the closing documents as we were

22    instructed to do.

23         THE COURT:  Maybe I'm missing something.  Do you want

24    the stay lifted or do you want the stay to remain in effect?

25         MR. KOWLOWITZ:  We want the stay to remain in effect

30

1    because BNC is not a party to the state court litigation.  My

2    client will be essentially left blowing in the wind.  If they

3    were unable -- if they did not appear in the action, if we're

4    unable to get discovery from them, it will be very hard for me

5    to mount a defense.

6         Not only that but most of the defendants in the state

7    court action haven't appeared.  Essentially, my client would be

8    the only solvent defendant left at the end of the day with a

9    judgment if we went to trial against them.  So it would be

10   grossly prejudicial to Attorney Chan to lift the stay.

11        Now, when you weigh the equities on the other side of

12   the coin, if the stay remained in place, plaintiff won't even

13   be harmed at all.  The fact of the matter is Mr. Tomlinson and

14   his family are living in this house right now rent free,

15   mortgage free.  They're not paying anything.  So they're

16   getting a windfall.  If this stay remains in place, they

17   continue to get their windfall.  So where's the harm or the

18   prejudice to plaintiff?

19        And the last thing being, and I think it's one of the

20   factors the Court considers when determining whether or not to

21   lift the stay is we're really at the starting point of the

22   state court litigation.  True, we've briefed a 3211 pre-answer

23   motion to dismiss.  We haven't gotten to foreign discovery.

24   There's been one deposition.  I believe not everybody has

25   exchanged documents.  We have a very long road ahead of us, a

31

1    very long road ahead of us.  And the fact of the matter is BNC

2    is a critical player in this litigation and my guy is really an

3    ancillary player.  If BNC is out of the litigation or somehow

4    defaults, he's going to be left flapping in the wind, the only

5    solvent defendant here.

6            So I think when you weigh the equities, it falls out

7    on the side of keeping the stay in place.

8            THE COURT:  Okay.  Thank you for your argument.

9            MR. KOWLOWITZ:  Thank you.

10           MR. CONE:  Your Honor, if I could just state two

11   things.  We never received any paperwork regarding Chan.  So

12   this is the first notice I've had that they were opposing

13   lifting the stay.  I'm not quite sure I understand the

14   arguments about being left in the wind if, in fact, the stay is

15   lifted because BNC would be another defendant in the action

16   with potential assets.

17           But the other issue I would like to raise, if the

18   Court decides not to lift the stay, we would like some guidance

19   as to permissible discovery of BNC.  As Your Honor said before,

20   you'd be able to get discovery; there shouldn't be a problem

21   with that.  We've been told by BNC's counsel that you can have

22   discovery.  So these are -- I'm not a bankruptcy specialist.

23   I've tried many cases in the Southern District but not

24   bankruptcy cases, Your Honor.  So we'd like the Court's

25   guidance.

32

1          THE COURT:  Okay.

2          MR. CONE:  But we do believe the stay really needs to

3    be lifted.  The only other thing is the state court judge took

4    the unusual step of assigning himself to this case fast track

5    all the way through.  There's no jury.  It's going to be tried

6    within six months, Your Honor.  Thank you.

7          THE COURT:  Anything more, Ms. Harvey?

8          MS. HARVEY:  I'm sorry, Your Honor.  Diane Harvey for

9    Weil Gotshal.  Just to clarify for the record, plaintiff's

10   counsel has never asked me or anyone else at Weil Gotshal with

11   respect to discovery of BNC.  And just for the record also, BNC

12   does not have any employees at this point.  Thank you.

13         THE COURT:  Does BNC have separately retained counsel

14   in the state court litigation?

15         MS. HARVEY:  Yes, they do, Your Honor.

16         THE COURT:  And it's not Weil Gotshal?

17         MS. HARVEY:  No, Your Honor.

18         THE COURT:  All right.  I looked at the papers in

19   preparation for the hearing and noted the efforts of counsel

20   both for the movant and for BNC to identify and analyze

21   applicable Sonnax standards as it relates to this case.  I am

22   satisfied, based upon my review of the papers submitted, that

23   the Sonnax factors properly applied to this dispute weigh in

24   favor of not granting stay relief.  And I adopt the reasoning

25   of debtors' counsel in opposition to this motion.

33

1          I also note, as a result of colloquy with counsel,

2    that it appears that BNC may not be a critical and necessary

3    party to the granting of effective relief in this litigation.

4    I take no position on that because, frankly, it's simply an

5    informal statement that was made as a result of questioning

6    from the bench.  Whether or not BNC is truly in the middle of

7    this or not remains to be determined.

8          But to the extent that there is the ability to sever

9    BNC as a party defendant and proceed with the litigation and

10   provide parties in interest with whatever discovery is

11   presently available by agreement, it occurs that may be an

12   efficient way to deal with the state court litigation.

13         If the parties can't reach agreement on that, it's

14   always possible for counsel for the plaintiff, Mr. Tomlinson,

15   to bring a further motion for stay relief relating to the

16   discovery question.  That would seem to me to be unnecessary

17   and wasteful but that is an available option in the event the

18   parties are unable to reach an agreement.

19         I note Ms. Harvey's comment that BNC is effectively

20   defunct at this point having no employees.  And I suspect a

21   limited ability to access materials that may be relevant to

22   this particular transaction.  If, in fact, there are no

23   documents, discovery is, for all practical purposes, a simple

24   matter of saying we have no responsive documents.  If there are

25   documents that are accessible and can be produced with

34

1    relatively little cost and difficulty, that may be ultimately a

2    less expensive and more efficient way to deal with this as

3    opposed to having further motion practice.

4          The motion is denied and I'll entertain an order from

5    debtors' counsel and suggest that it be submitted on notice to

6    the moving party.  That's resolved.

7          MR. CONE:  Your Honor, if I could offer just one

8    comment --

9          THE COURT:  It's too late.

10         MR. CONE:  No.  I'm just -- counsel for BNC in the

11   state court, their client counsel, Sills Cummins, claims they

12   have the entire BNC file.

13         THE COURT:  Well, then you can talk to them about

14   that.  I'm not making any determination regarding discovery in

15   a state court matter that, at least as to BNC, remains subject

16   to the automatic stay.

17         MR. CONE:  Okay.

18         THE COURT:  If anybody involved in the Tomlinson

19   matter wishes to be excused, you may be excused.  If you want

20   to stay and observe the balance of the agenda, you're welcome

21   to do that.

22         MR. LUCAS:  Your Honor, John Lucas.

23         THE COURT:  Yes, Mr. Lucas?

24         MR. LUCAS:  Your Honor, the next item on the calendar

25   is the debtors' motion for approval of sale of an aircraft.

35

1    Your Honor, my colleague, Shai Waisman, is in the conference, I

2    believe, discussing things with one of the prospective

3    purchasers.  And perhaps we could move to the LBI calendar and

4    I can check to see where they are in that process and move this

5    piece to the end?

6           THE COURT:  All right.  So we're going to defer the

7    helicopter sale motion to some time at the end of the calendar?

8           MR. LUCAS:  Correct, if that's okay with Your Honor.

9           THE COURT:  That's fine with me.

10          MR. WILTENBURG:  Good morning, Your Honor.  David

11   Wiltenburg, Hughes Hubbard & Reed representing James Giddens,

12   the LBI trustee.  We have a short calendar this morning, one

13   uncontested matter and one contested matter.  The uncontested

14   matter is the trustee's application pursuant to Bankruptcy Code

15   Section 365(d)(1) for an order further extending the time

16   within which the trustee may assume or reject executory

17   contracts and certain unexpired leases.  And the grounds for

18   the present motion to extend continue to be as they were

19   before, namely, that given the history of the case in the first

20   sixty days, it was Barclays' option to designate executory

21   contracts for assumption and assignment and, thereafter, the

22   project of examining what remained and evaluating what remained

23   for potential value to the estate commenced and is continuing.

24   And indeed, there are ongoing negotiations with respect to

25   certain of these contracts that have proved valuable to attempt

36

1    to realize value on behalf of the estate.  And accordingly, the

2    motion requests a further ninety day extension.  It's not

3    opposed.

4            THE COURT:  It's unopposed and it's granted.

5            MR. WILTENBURG:  Thank you, Your Honor.  The next

6    matter, the contested matter, is a 2004 application.  And

7    probably we'll hear from the moving party and the trustee's

8    response will be handled by my partner, Sarah Cave.

9            THE COURT:  It seems very quiet.  Is somebody moving

10   this motion forward?

11           MR. MCNALLY:  Pardon me, Your Honor.  I was

12   gathering --

13           THE COURT:  There was a pregnant pause.

14           MR. MCNALLY:  Yes, Your Honor, yes.  Your Honor,

15   Stephen McNally, the firm Wuersch & Gering on behalf of the

16   movants which are an entity I'll call Carret and Evansville.

17   They are holders of what were foreign exchange trading accounts

18   with Lehman.  We have filed a motion seeking discovery from the

19   SIPA trustee and from Barclays --

20           THE COURT:  Before you proceed, I just want to break

21   in and ask you something about Carret --

22           MR. MCNALLY:  Yes.

23           THE COURT:  -- because before proceeding with this, I

24   want to assure myself that I don't have a discloseable --

25           MR. MCNALLY:  Conflict?

37

1         THE COURT:  -- relationship?  Do you know if Carret

2    was ever a portfolio company of Castle Harlan?

3         MR. MCNALLY:  I do not, Your Honor, but I suspect I

4    should inquire.

5         THE COURT:  Excuse me?

6         MR. MCNALLY:  I suspect that I should inquire.

7         THE COURT:  I would like you to inquire only in this

8    respect.  A number of years ago, and I don't believe that it's

9    a conflict but I believe it is discloseable, I was involved in

10   certain transactional work that involved the sale of a business

11   that had the same name.  And at the time that business was

12   owned by a private equity firm that was a client of my old law

13   firm.  I participated in the transactional work associated with

14   the sale of that business.  I don't think it's a matter that

15   affects my ability to fairly and impartially handle this rather

16   narrow discovery dispute.  But I'd like to know whether or not

17   it's an issue at all.  It may just be the same name.

18        MR. MCNALLY:  If Your Honor could repeat the name of

19   the affiliation that -- the owner that you suspected was a

20   related entity?

21        THE COURT:  Castle Harlan, C-A-S-T-L-E, Harlan,

22   H-A-R-L-A-N, two words.

23        MR. MCNALLY:  All right.  What I would request, Your

24   Honor, is that you simply handle the next matter on the agenda.

25   I will inquire of my client and perhaps signal to counsel if we

38

1    have an answer.

2        THE COURT:  Now, I believe that even if the answer is

3    yes, it's not an issue.  But I wanted, if, in fact, the answer

4    is yes, to make appropriate disclosure so that parties who

5    might be affected by this, including the SIPA trustee, could

6    make a determination as to whether or not this was anything

7    that might result in a reassignment of this one dispute to

8    another judge.  I doubt that it's going to get to that level.

9    It was at least five years ago.  But it caught my eye.

10        MR. MCNALLY:  Is that fair enough, Your Honor?  I'll

11    inquire and let the Court know?  Thank you very much.

12        THE COURT:  That's fine.

13        MR. LUCAS:  Your Honor, we're requesting if we can

14    take a fifteen minute recess to finish our discussions in the

15    conference regarding -- and then we would like to --

16        THE COURT:  That's fine.

17        MR. LUCAS:  -- come back and go forward with the

18    motion with the result of the conference.

19        THE COURT:  Fine.  Let's take a break until 11:05.

20    That's a twenty minute recess.

21        MR. LUCAS:  Thank you, Your Honor.

22        THE COURT:  Fine.

23        (Recess from 10:45 a.m. until 11:10 a.m.)

24        THE COURT:  Please be seated.  Is it helicopter time?

25    Is it helicopter time or Carret time?

39

1          MS. CAVE:  It's Carret time, Your Honor.  Sarah Cave

2    from Hughes Hubbard on behalf of the LBI trustee.  And I

3    believe Mr. McNally is prepared to address the Court.

4          THE COURT:  Fine.

5          MS. CAVE:  Thank you.

6          MR. MCNALLY:  Yes, please, Your Honor.  It appears

7    that in 2004, Your Honor may have had a hand in representing

8    Castle Harlan in connection with the transaction where Carret

9    was sold to a series of family trusts that are controlled

10   essentially by my client, Alan Quasha & Company.  So there is

11   the relationship that Your Honor recalls.  It is, Your Honor

12   was quite accurate, five years ago.  And in discussing it with

13   my client, my client has no reservation whatsoever about Your

14   Honor adjudicating the pending motion.

15         THE COURT:  Fine.  Let's proceed then.

16         MR. MCNALLY:  All right, Your Honor, again, my

17   clients are two, Carret and Evansville Insurance.  Both are

18   controlled by the same series of family trusts that are

19   essentially corporate parent of them both, the Alan Quasha &

20   Co. series of family trusts.

21         They were both holders of foreign exchange accounts

22   with Lehman Brothers in the pre-petition period.  In the case

23   of Evansville, on deposit in the account was approximately

24   980,000 dollars (sic) of euros -- or 980,000 euros, I'm sorry,

25   that had been the proceeds of a closed-out foreign exchange

40

1    trade.

2          In the case of Carret, there was approximately, I

3    believe, 6.8 million dollars, in a combination of U.S.

4    treasuries and cash.  The U.S. treasuries were collateral that

5    had been posted with Lehman in connection with the foreign

6    exchange trading that was done on behalf of Carret.  And the

7    two million or so in cash was the proceeds of a foreign

8    exchange trade that had been closed at some point pre-petition.

9          In both the cases of Evansville and Carret, my

10   clients had made demands pre-petition for the return of the

11   collateral in the accounts and the cash in the accounts and in

12   both cases had been assured that the funds would be returned or

13   the collateral returned pre-petition.  But somehow in the

14   morass of the last days of the last week of the pre-petition

15   period, those instructions for the transfer of those accounts

16   were not completed.

17         My client independently made many efforts over the

18   period of time from the date of the filing and in the months

19   afterwards to contact the Lehman people that were still there

20   to assist, some Barclays people, to try to get information

21   about what happened with this transfer, why didn't it get

22   completed, where's the money, what's the status of our

23   accounts.

24         THE COURT:  Tell me something --

25         MR. MCNALLY:  Yes.

41

1          THE COURT:  -- about the transaction that was

2    supposed to have taken place.  Assuming that the transaction

3    had been closed in accordance with the expectations of your

4    clients, what would have happened to the 980,000 euros and 6.8

5    million dollars of --

6          MR. MCNALLY:  Treasuries and cash, yeah.

7          THE COURT:  -- cash and treasuries.

8          MR. MCNALLY:  They would have been transferred to my

9    client.

10          THE COURT:  So the ultimate resting place was an

11   account someplace outside of Lehman controlled by your clients?

12          MR. MCNALLY:  Yes.

13          THE COURT:  Okay.

14          MR. MCNALLY:  That's where it was supposed to have

15   gone.  That was the instruction received by Lehman.  That was

16   the instruction that pre-petition e-mails indicate was being

17   executed by Lehman but none of that evidently happened to

18   completion.  We have, really, what are conflicting stories

19   about what happened to the money.  In fact, the stories are all

20   over the board as to what happened to the cash or the

21   securities.  But in a nutshell, some of the money might have

22   ended up in some intermediary account where funds went to

23   disappear in that last week on the way out but then got stopped

24   in this intermediate place.  And that can be -- that may be the

25   case, Your Honor, but we'd like to know exactly what those

42

1    intercompany transfers were so we can know what happened to our

2    customers' account.

3         But on top of that, and what is particularly

4    troubling is that it seems that all of Evansville's euros and a

5    significant portion of Carret's treasuries were transferred to

6    Barclays and remained there as far as we can tell from the

7    information that we've been supplied.  And I don't know where

8    all this leads, Your Honor.

9         The objection of Lehman indicates that Carret and

10   Evansville are simply the squeaky wheel, we are trying to jump

11   the gun and jump the list of parties to receive distributions

12   from the estate.  I submit, Your Honor, that at this point in

13   this case, it's seven months since the case was filed.  We

14   filed our motion two months ago.  We agreed to one adjournment

15   so that we could be supplied with information on a consensual

16   basis that we're not -- you know, we're far enough along that

17   we're entitled to get some concrete answers to very discreet

18   targeted questions about what happened with our specific

19   accounts, that we even know what the nature of our clients'

20   claims are.  We don't, at this point.  We don't know whether we

21   have securities.  We don't whether we have cash.  We don't

22   where it is.

23        So I understand that Your Honor is going to have some

24   predisposition to not let a squeaky wheel like my clients'

25   being right now interfere with the orderly liquidation of the

43

1    assets of Lehman and the orderly administration of the claims

2    process.  But we have very real and we think very discreet

3    questions about what happened to our clients' money.  We're

4    perfectly willing to be as helpful as possible in limiting

5    those inquiries into the very narrow areas that would answer

6    the questions that we have, the very discreet questions that we

7    have.

8             THE COURT:  Let me ask you this question --

9             MR. MCNALLY:  Yeah.

10            THE COURT:  -- only because you referenced a possible

11   predisposition.  I wasn't aware that I had any but let's just

12   assume that there's something about your question that may be

13   an accurate reflection of what a hypothetical jurist might have

14   in his or her mind.

15            MR. MCNALLY:  Okay.  Fair enough, Your Honor.

16            THE COURT:  There's a claim administration process

17   that the trustee follows as it relates to all of the proofs of

18   claim that are filed in this massive case which the trustee

19   notes is the largest broker/dealer liquidation in the history

20   of the world, the universe, and suggests that there is a parade

21   of horribles aspect to what you're asking for because if you,

22   on behalf of Evansville and Carret, have the opportunity to

23   pursue particularized discovery as it relates to a claim before

24   there's any objection to the claim, before there's any issue as

25   to the claim, before issue has been joined, in effect, there's

44

1    a floodgates argument that the courtroom will be filled with

2    similarly situated creditors who will be saying well, what

3    about me, what about me.  We want information, too, and that an

4    orderly statutory process for managing the case will be

5    adversely affected.

6         In effect, what's different about -- what, if

7    anything, is different about the Evansville and Carret claim

8    that distinguishes it from this parade of other claimants that

9    may come in to One Bowling Green and fill the hallways

10   attempting to gain court time so that they can have the same

11   kind of discovery you're seeking?

12        MR. MCNALLY:  I understand, Your Honor, and that's

13   fair.  What I think differentiates our claim is that, number

14   one, it's patently not a general unsecured claim.  We are not a

15   supplier of goods and services to Lehman.  And not only that,

16   but we are not the counterparty with Lehman to some Lehman-

17   sponsored contract that has a claim in which Lehman is failing

18   to meet its counterparty obligations.  And I think Your Honor

19   can surmise at this point that a good portion of the claims

20   that must be extant and outstanding against Lehman consist in

21   those two groups of parties, at least some of the larger

22   claims, certainly in the second class.

23        We are a customer specially protected under SIPA with

24   identifiable securities and identifiable cash in our accounts

25   except they can't tell us what happened to it.  So I think we

45

1    sit at the highest tier of the group of what might be

2    considered in the unsecured creditor class of Lehman.  And we

3    have very discreet questions related to instructions that were

4    not executed pre-petition or -- we didn't just simply sit there

5    and wait and file a claim post-petition and then start becoming

6    a squeaky wheel.  We had very specific instructions that we

7    were told by Lehman were being executed to transfer these

8    funds.  And in that process, our accounts got lost or misplaced

9    or sent all over.  And on top of that, Your Honor, we have a

10   very real question as to whether, in fact, we have the right to

11   get our money right now because it's sitting at Barclays not at

12   Lehman anymore.

13          So I think all of these questions are unique enough,

14   we have been patient enough in the presentation of them to the

15   Court that they deserve at this point some attention from

16   Lehman's side and from Barclays' side.

17          THE COURT:  Okay.

18          MR. MCNALLY:  Thank you.

19          MS. CAVE:  Good morning again, Your Honor, Sarah Cave

20   from Hughes Hubbard on behalf of James Giddens, the LBI

21   trustee.  And I think Your Honor has really struck right to the

22   heart of the trustee's objection to this motion and really, as

23   the Court explained in his January 14th hearing on a similar --

24   dissimilar, but another Rule 2004 request, that at this stage

25   of the litigation proceedings exceptional circumstances must be

46

1      shown in order for Rule 2004 discovery to proceed.  And it's

2      the trustee's position, and I haven't heard anything here today

3      that demonstrates that those extraordinary circumstances exist

4      in this situation.

5               THE COURT:  Let me break in for a second now --

6               MS. CAVE:  Sure.

7               THE COURT:  -- because one of the things that occurs

8      to me in terms of case administration is that the Evansville

9      and Carret discovery request is, in effect, comparable to the

10     complaints that are beginning to crowd the adversary docket in

11     the Lehman case where parties who are looking for comfort with

12     respect to identified securities are bringing lawsuits saying I

13     want my securities back, I want my property back.  And I

14     haven't done a complete inventory of the number of these cases,

15     but there are quite a few of them.

16               From a case administration perspective, one of my

17     concerns becomes okay, let's just say that I find that there

18     isn't good cause for 2004 discovery because -- and you've used

19     my words -- an extraordinary showing hasn't been made.  But

20     what's to prevent Evansville and Carret From leaving court,

21     going back to their offices and preparing an adversary and

22     taking discovery in the context of that adversary.  That

23     wouldn't be 2004 discovery, but it would be, in its own way, a

24     less favorable outcome in terms of case administration and

25     inefficiencies.  I mean, there are ways to get at this

47

1   information one way or the other.  And if one door is closed,

2   another door may be opened.

3          MS. CAVE:  I think, Your Honor, that that's a valid

4   point, and that's I think a concern for the trustee in terms of

5   administering the estate as well.  But we're now being faced

6   with, as you said, people who feel that they have been waiting

7   long enough.  But the fact of the matter is that the initial

8   bar date for the claims process only recently passed on January

9   30th, the final bar date -- so claims continue to be filed

10  every day -- through June 1st of this year.  So at the moment

11  we know that there are 85,000 claims or more, but we don't know

12  the universe.

13         The trustee has begun -- has implemented a process

14  for determining those claims and has begun to determine claims

15  and we're into the several hundreds now at this point.  And

16  it's difficult to ask people to be patient and respect the

17  process, but I think that's what we're asking the Court to

18  endorse, the trustee's belief that the claims process that we

19  have in place is the way that people need to proceed.

20  Otherwise, we're spending all of our time here in front of you,

21  as pleasant as that is, we're spending time litigating or

22  responding to motions and not dedicating all of our resources

23  to the claims process.

24         THE COURT:  I understand, but I really don't have a

25  predisposition to finding one way or the other on this, even

48

1    though that suggestion was made in the comment made by movant's

2    counsel.  My predisposition, if there is such a thing, is for

3    the case to be managed as efficiently as it can be,

4    notwithstanding its massive size.

5              MS. CAVE:  Um-hmm.

6              THE COURT:  And so part of my concern, as I debate

7    this openly with both sides, is what's the most efficient way

8    to get to a resolution of a very discrete issue.  And it raises

9    in my mind the question, why is it that counsel for Evansville

10   and Carret has had to go to the lengths of filing a motion, and

11   it's not one that can be resolved, it's actually one that's

12   being litigated in open court, why can't we find out what

13   happened to the 908,000 euros and the 6.8 million dollars worth

14   of treasuries and cash.  It seems like it should be a

15   relatively simple question, but there must be some reason why

16   it's not.  Why is it not a simple question?

17             MS. CAVE:  It actually is a simple question, Your

18   Honor, and I was surprised to hear counsel say that he doesn't

19   know where his money is, because what we did in the period that

20   we had the adjournment was we undertook to locate or to find

21   out information about where their accounts were, where those

22   amounts were, and we provided that information to Mr. McNally.

23   And still he has insisted with proceeding with the motion.  We

24   suggested that an adjournment, pending the trustee's

25   determination of his client's claims, was an appropriate way to

49

1    resolve the motion, but that was not how he wished to proceed.

2    So we did in fact -- he knows -- we've told him where the

3    property that his clients are claiming, we've told him where it

4    is.

5         THE COURT:  And is it definite?  Is it declarative?

6    Is it indisputable as to where all this property is?  Who has

7    it?  Where is it?

8         MS. CAVE:  Well, with respect to -- give me just a

9    moment, Your Honor.  With respect to Carret, several of the

10   positions have been credited to accounts that are with the LBI

11   trustee, that are within the trustee's control.  And then two

12   of the amounts were credited to an account at Barclays Capital,

13   which is not a Carret account, but we know the name of the

14   account where it is at Barclays.  And with respect to the

15   amount that was in Evansville's account, the 908,000 euros,

16   that was a failed transaction and it's in another account that

17   the trustee has control of.

18        THE COURT:  Well, then I guess I'm missing something

19   in terms of what we're here debating.  This is a request for

20   2004 discovery.  You're telling me that informally the trustee,

21   through counsel, has provided, in substance, the information

22   that both Evansville and Carret have been seeking, presumably

23   in the form of a letter or an e-mail or some other transmission

24   of information which Evansville and Carret should be relying on

25   in your view, is that correct?

50

1        MS. CAVE:  Correct, yes.

2        THE COURT:  So why are we here?

3        MS. CAVE:  I think Mr. McNally can speak to that, but

4    my understanding is that they are seeking all documents that

5    relate to the history of their accounts and why they failed.

6    And then they're also seeking a deposition of the trustee or of

7    a person at Barclays with knowledge.

8        THE COURT:  And I take it that the trustee's position

9    would be that as to this additional document discovery and

10   requested deposition, that that would be burdensome and

11   unnecessary at this point and would interfere with orderly case

12   administration?

13       MS. CAVE:  Exactly, Your Honor.  There's a time and a

14   place for that sort of discovery.  And pursuant to this Court's

15   order setting up the claims process, as well as SIPA, that

16   takes place after a determination has been made, at which point

17   a claimant who is unsatisfied with that determination has all

18   the rights of discovery.

19       THE COURT:  Okay.  I understand.

20       MS. CAVE:  Thank you.

21       MR. STERN:  Your Honor, Jack Stern from Boies,

22   Schiller on behalf of Barclays.  When we received this motion,

23   the first thing we did was to call up Carret's counsel, express

24   our understanding of their customer's anxiety, and try to

25   provide as much information as we could.  With respect to

51

1    Evansville, we explained that that account is not a Barclays

2    account.  We explained that in error certain statements that

3    were sent to customers in September had the Barclays address.

4    But a subsequent letter which we provided to counsel, that went

5    out to customers in December, explained that those statements

6    had been sent in error.  And we've attached that letter

7    explaining the situation to customers to our papers.

8            As to Carret, we told Carret's counsel that this is

9    not a Barclays account, Barclays did not assume foreign

10   exchange accounts, but that we would work with the SIPA trustee

11   to find as much information we could about the customer's

12   account.  We did that.  The SIPA trustee did an exhaustive

13   investigation of the facts, and we found out that what

14   happened -- and we've explained this in our papers and to

15   counsel, that inadvertently, around September 19th at the time

16   the SIPA proceeding began, this account went into the Barclays

17   column by mistake instead of the LBI column.  And that was then

18   later corrected.  So the Carret account is an LBI account.

19           Now, we also explained that as a result of this

20   operational mistake, certain securities that belonged in the

21   Carret account at LBI were mistakenly transferred by JPMorgan

22   Chase to Barclays.  And the proceeds of those securities went

23   to a Barclays inter-company account.  However, none of that, as

24   we've explained to counsel, has any bearing on the Carret

25   account, because the Carret account was properly credited with

52

1    the proceeds.  While all of this operational minutia may be of

2    interest, it really has no bearing on their rights.  And at

3    this point, given the exhaustive efforts of the trustee and

4    Barclays, we really don't see that 2004 discovery is going to

5    add anything.

6         THE COURT:  So after hearing all this, why do we need

7    all this discovery now?

8         MR. MCNALLY:  Your Honor, if I may.  The -- if I were

9    to quote counsel -- exhaustive efforts of the SIPA trustee with

10   the munificent assistance of Barclays, amounted to a reply

11   during this month delay that, in the case of Carret, was a

12   single e-mail.  And in that e-mail what we were advised was

13   that yes, the treasuries, which were the collateral posted by

14   Carret, were in the possession of Lehman at the time the case

15   was filed and they had subsequently, in each instance, because

16   it was multiple treasuries, matured and there were some

17   crediting of interest related to those maturities.  And that's

18   it with respect to Carret.  With respect to Evansville, which

19   was a separate e-mail, we received a one sentence reply that

20   said that well, it looks like your money got lost in this

21   inter-company account.  I'm summarizing.

22        Now, that may all be accurate, Your Honor, but I

23   submit that it is not a good faith effort to supply information

24   that might be enlightening to Carret or Evansville.  Nor was it

25   what was readily accessible to the trustee.  In my response to

53

1    one of the e-mails, Your Honor, which we sent by letter, I

2    asked a very simple question:  Well, in this case, if you are

3    aware that these treasuries matured and that this interest was

4    credited, as you say, you must have been referring to some

5    document that was supplied to you by the SIPA trustee or by

6    Lehman or someone else.  Can you turn over what you were

7    looking at?  No.  Not a single document was turned over, Your

8    Honor, in response to these requests.  And even Ms. Cave

9    acknowledges that when it came to the maturity of the

10   treasuries, it looks like those funds were deposited in

11   Barclays.  But why?  Your Honor, these are my client's money.

12           And as far as the Evansville transaction goes, Your

13   Honor, I hope you were as confused as we were by the

14   explanation you received from counsel.  It looks to us like a

15   significant portion of Evansville, or all of Evansville's

16   money, is now on deposit in Barclays in a transfer that,

17   whether it happened inadvertently or intentionally, we have now

18   the right to reclaim our client's customer funds from Barclays.

19           And all we're asking, Your Honor, okay, because

20   counsel got into how far we need to go, we certainly, it

21   appears, do not need a deposition of the SIPA trustee or

22   probably anyone else, but certainly what was reasonably within

23   the control of counsel or the SIPA trustee were the documents

24   concerning these transfers, where the money went, so we can

25   reconstruct the path of these funds.  If at the end of that

54

1    inquiry, with a reasonable reply to our request, not a

2    perfunctory response, Your Honor, that brushes us off -- we

3    served 400 some odd people with this motion in order to get

4    here and speak to Your Honor.  It's a very burdensome thing for

5    my client to have done to even appear before the Court and

6    present these arguments.  So they've gone a long way to find

7    out this information.

8          Your Honor's right, it's seven months in.  We should

9    be getting from the SIPA trustee, at this point, and his

10   counsel, more than perfunctory brush-off responses.

11         THE COURT:  Okay.  Anything more from the trustee?

12         MS. CAVE:  Your Honor, just briefly, Sarah Cave again

13   from Hughes Hubbard for the trustee.  With respect to counsel's

14   comment that his client's property was in an account and got

15   lost somewhere, certainly those were not the words that I used,

16   and I identified specifically the account into which we believe

17   that those amounts had been transferred.  And with that we

18   would rest on our papers.  Thank you.

19         THE COURT:  Anything more from Barclays?

20         MR. STERN:  Just one more word for Barclays.  The

21   suggestion that Barclays has his client's property is just

22   without any basis.  We've explained that pretty clearly in our

23   brief submission, Your Honor.  And as to the inter-company

24   transfers, there is a payable from Barclays to LBI, but again,

25   all of that has no bearing on this customer and we don't think

55

1          they have the right to that.

2                    THE COURT:   Okay.   It's obvious to me from the papers

3          that I've read and from the argument that counsel for

4          Evansville and Carret is seeking, through informal means and

5          now through 2004 discovery, the very same sort of information

6          that plaintiffs have been seeking at various times since the

7          commencement of these cases, but bringing separate adversary

8          proceeding complaints focused on attempting to locate and

9          obtain the return of identified securities.

10                   As I sit here at this moment, I'm unable to give you

11         the total number of such litigations that have already been

12         commenced, but I believe it's some number between ten and

13         twenty separate cases.   As a matter of case administration, I

14         think that it is probably a bad idea for parties like these

15         movants to need to go to the trouble of having to bring a 2004

16         request to obtain answers to questions that they're really

17         entitled to.   I also think it's a bad idea for these parties to

18         have to bring separate lawsuits.

19                   So in a balancing of harms analysis, in an effort to

20         come up with some model that can be generally applied to this

21         case, I find myself in the difficult position of considering

22         whether 2004 discovery under these facts makes sense.   It

23         really doesn't from the point of view of case administration.

24         For reasons that I pointed out in an earlier question, while

25         2004 may be a generally available tool, it is a blunt

56

1    instrument and it creates enormous burdens for the trustee, and

2    candidly, it also creates unnecessary burdens for the moving

3    parties.  It's an available remedy, but the most effective

4    remedy is an e-mail that produces a response which could be we

5    can't get to this now, can you give us an extra sixty days so

6    that we can deal with this when we have more time.

7           I don't presume to become involved in the back and

8    forth that attorneys engage in as they seek to gain traction

9    and attention in a case this large.  But I do think it is not

10   desirable for parties like Evansville and Carret to need to go

11   to a 2004 request to request a deposition, whether or not it's

12   going to be pursued or not is kind of beside the point, and to

13   seek documents through coercive means when I think well

14   represented parties can probably get to the truth a lot more

15   conveniently and efficiently by simply cooperating with each

16   other.  I encourage that.

17          For purposes of today's motion however, I am denying

18   the 2004 request without prejudice, in all respects, to further

19   efforts that may be made by Evansville and Carret to obtain the

20   information that it seeks.  That information is probably best

21   obtained by talking to counsel, picking up the phone, sending

22   an e-mail.  And if that effort proves to be unsuccessful, doing

23   what other parties have done, which is to bring an adversary

24   proceeding.  I recognize that that is an unfortunate Whack-a-

25   Mole response in which you whack the mole on one side of the

57

1    game board only to have a mole jump up in another place and

2    have to whack again.

3           But that's how the system works.  Step one is to try

4    to do it cooperatively.  Step two, I suppose, is the 2004

5    request, which is now being rebuffed, not necessarily because

6    it's the wrong approach, but because I believe it to be wrong

7    for this case.  I believe it is inappropri8ate for every

8    claimant in an LBI case to have what amounts to coercive

9    discovery rights before the claim resolution process has had a

10   full and fair opportunity to run its course.  But impatient

11   litigants have recourse, and that's to start an adversary

12   proceeding which is certainly an available option.  Expensive,

13   inefficient, to be sure, but available absolutely.  That's not

14   to say that such an adversary proceeding would be one that

15   would get past a motion to dismiss.  That's not to say that

16   such an adversary proceeding would have merit.  But it's an

17   available option.

18          The motion is denied with the comment that it would

19   be desirable for the parties to try to work this out if they

20   can.  And if they can't, I'll see you again some other day.

21          MR. MCNALLY:  Thank you, Your Honor.

22          MR. WAISMAN:  Good morning, Your Honor.  Shai

23   Waisman, Weil, Gotshal & Manges on behalf of the LBHI debtors.

24   Your Honor, the only remaining matter on the agenda is the

25   motion of CES Aviation V LLC to sell a Sikorsky S-76C+

58

1    helicopter.  I'd like to take Your Honor through where we are

2    on that motion.  And then subsequent to that, if I could maybe

3    present to the Court a bit of a status conference on where the

4    debtors are in the SunCal matter in California.

5         THE COURT:  I'm interested in both.

6         MR. WAISMAN:  Your Honor, the debtors filed the

7    motion to sell the Sikorsky helicopter and proposed a sort of

8    truncated auction process whereby bidders could submit their

9    bids, execute asset purchase agreements, and we would be

10   prepared to proceed with an appropriate sale today.  Bids were

11   due seventy-two hours before the commencement of this hearing

12   today, so effectively on Sunday morning.

13        Sometime ago, the debtors executed an asset purchase

14   agreement for the helicopter with MAC Aircraft Sales, LLC, and

15   they are represented today on the telephone by their attorneys.

16   That bid was for 2,795,000 dollars.  The debtors subsequently

17   received and executed a counter-bid from General Helicopters

18   International, LLC, GHI, for three million dollars.  And that

19   bid was received this past Friday evening.  On Sunday morning,

20   MAC, the original bidder, counter-bid.  And they counter-bid

21   with a bid of 3.1 million dollars.  They already had 500,000

22   dollars in an escrow account, and Monday morning wired the

23   balance of the purchase price to an escrow agent to be held

24   pending the closing and a transfer to the debtors.

25        Yesterday we received an objection filed by GHI,

59

1    effectively complaining about the process and the fact that

2    they were surprised that MAC could have topped up its deposit

3    on a Sunday.  In fact, MAC didn't have to top up the deposit.

4    While the deposit requirement was only for five percent of the

5    purchase price, MAC from day one had deposited with an escrow

6    agent the deposit of 500,000 dollars.

7          Nevertheless, when we arrived at the hearing today,

8    we spoke to GHI's attorneys and they presented to us -- and

9    they are also represented here in court today by their

10   attorney, James Heiser.  They represented to us that they would

11   like to present to Your Honor a counter-bid of 3.2 million

12   dollars without any deductions and a closing today, if that was

13   possible, so effectively 100,000 dollars more than the MAC bid.

14         During this morning's session I went offline and

15   spoke to MAC's attorneys.  Needless to say, they insist that

16   they are the highest and best bidder, they complied with the

17   procedures and have wired the entirety of the purchase price,

18   and to preserve the integrity of the process, they should be

19   awarded the helicopter.

20         Notwithstanding that though, and as a sign of good

21   faith, they have increased their bid to 3.225, so 3,225,000

22   dollars.  They have already purchased the purchase price so

23   they would close today, or if that's not possible because of

24   logistics, as soon as possible.  And just to clarify the

25   record, there would be no claims back against the estate for

60

1    the increased amount of the bid.  With MAC's new bid at

2    3,225,000 dollars, and given that they have complied with the

3    auction procedures, the debtors would proceed with the MAC

4    Aircraft Sales bid as modified by the record at this hearing

5    and would seek to close that as soon as possible with Your

6    Honor's approval.

7              THE COURT:  Okay.

8              MR. HEISER:  Good morning, Your Honor, Jim Heiser

9    from Chapman and Cutler on behalf of General Helicopters

10   International, LLC.  We're prepared to go to 3.3 million

11   dollars today for the helicopter.  And I think that because the

12   MAC bidders have increased the price that we're sort of back

13   into the auction process now.  And we're prepared to go for 3.3

14   today to close the transaction.

15             THE COURT:  Well, this is all very interesting, isn't

16   it?

17             MR. WAISMAN:  Your Honor, if I may?

18             THE COURT:  It must be quite a helicopter.

19             MR. WAISMAN:  Your Honor, I believe it's actually a

20   misstatement to say that we're back in the bidding process.

21   There were bid procedures that were published to the word.  The

22   debtor spoke to a number of parties about this extensively.

23   Everyone was very aware of the procedures.  And as Your Honor

24   is aware, the debtors have tried very hard to market an entire

25   portfolio of aircraft assets that some of these same parties

61

1    are involved with.  And if we don't preserve the integrity of

2    the process, I'm not sure we get to some happy counterparties,

3    who may be interested in other assets, feeling that somehow the

4    process we propose doesn't really matter and what you do is you

5    show up before the judge and just throw out your last minute

6    offer and we turn this into an auction before Your Honor.  The

7    increase, MAC's increase, was a show of good faith.  It should

8    not be held against them.  They, in fact, complied with the

9    procedures and the aircraft should be awarded to them.

10             THE COURT:  Okay.

11             MR. HEISER:  Your Honor, if I could just be heard on

12    that for a moment?

13             THE COURT:  Sure.

14             MR. HEISER:  We have real issues with the process

15    that was employed in this matter.  But I think at this point

16    now the debtors would be receiving the 3.225 million dollars,

17    assuming that Your Honor approved their bid today, so I think

18    that we have gone beyond what the terms were that were agreed

19    to at the process on Sunday.  So I think that the 3.3 million

20    dollars is probably in the best interest of the estate.  And

21    without going into the whole issue of the process that happened

22    over the weekend, which we do have issues with, we think that

23    the 3.3 million dollars, because everyone's here, they're on

24    the phone, if there's a desire to increase the bid we can do

25    that, the MAC people can do that, but at this point I think

62

1    that the 3.3 million is the highest offer and that that's what

2    should be approved.  The terms are the same; we're just

3    disputing the price here.  So as the high bidder, I believe

4    that GHI's bid should be

5           MR. MARCUS (TELEPHONICALLY):  Your Honor, may I have

6    the floor?

7           THE COURT:  Counsel for MAC, you're coming through

8    faintly.

9           MR. MARCUS:  Let me see if I can turn the volume up.

10   Is that better, Your Honor?

11          THE COURT:  That's better.

12          MR. MARCUS:  Okay.  Thank you.  My name is George

13   Marcus.  I'm an attorney in Portland, Maine at Marcus, Clegg, &

14   Mistretta.  They represent MAC Aircraft Sales.  Our position is

15   as stated by the debtor that before we complied with the

16   auctions terms, and in compliance with those terms we made the

17   high bid of 3.1 million dollars.  The objection voiced by the

18   other bidder, we think, is not plausible.  The objection being

19   that although we had 500,000 dollars on deposit -- it was

20   sufficient to cover the deposit requirement for our 3.1 million

21   dollar higher offer by a significant margin, by the way.

22   Although we had complied in that respect, there seemed to be a

23   contention that the auction terms required putting up yet

24   another deposit on top of the one that was already more than

25   sufficient to cover the increased bid.  We don't think that's a

63

1    plausible interpretation of the auction terms, and we think the

2    Court should quickly overrule that.

3        Now, as far as today is concerned, obviously our

4    position is that the helicopter should be awarded to MAC

5    Aviation who had the high bid price in the auction.  Now, as an

6    accommodation to the debtor, we have expressed an increased

7    bid, we obligated to close on it today.  But we would strongly

8    prefer that the Court award the sale at the original price to

9    preserve the integrity of the process.

10       Now, I will point out one more thing, which I think

11   the Court should take into account, that is that if the Court

12   declines either to award the sale at 3.1 million or 3.225

13   million, then we will be pursuing claims against the estate.

14   And so the possibility of accepting a 3.3 million dollar offer,

15   without having to deal with other claims against the estate is

16   not there, making that a much less attractive offer to the

17   estate, in my judgment.  I believe that the debtor said it

18   correctly that it's going to be in the process of auctioning

19   off assets and the integrity of the process ought to be

20   honored.  The Court should award the sale at 3.1 million

21   dollars, but as stated, we'd like to bring this process to a

22   conclusion and we are prepared, if the Court is not inclined to

23   award the original bid, to proceed with the 3.2 million dollar

24   offer, but that is our last bid.

25       THE COURT:  I thought your last bid was 3.225.

64

1          MR. MARCUS:  Yes, 3.225, I somewhat misstated it,

2     that's correct.

3          THE COURT:  Okay.  I understand your position, I

4     think.  Your position is you wanted a 3.1 but you're willing to

5     go to 3.225 if you get it?

6          MR. MARCUS:  Yes, and if we get it at either price,

7     we will waive any objections, appeals, administrative claims

8     against the estate, but we are not prepared to make those

9     waivers if we don't get it at either price.

10          THE COURT:  Okay.  I understand your position.

11     Anything more from GHI?  Anything more from the debtor?

12          MR. HEISER:  Yes, Your Honor.  We believe that the

13     Court has broad discretion in this process, and we believe that

14     the cases support the fact that the judicial procedure that the

15     Court employs in this case is -- I should say that the

16     procedures that were presented in the motion have never been

17     approved by this Court.  And so I think that the Court should

18     take an independent look at what happened and really focus on

19     whatever the higher bid is.  I think that MAC knew that we were

20     bidding and the debtor has reserved its right to accept or

21     reject bids for any reason.  So I don't know if it's fair for

22     the debtor to be able to exercise its discretion to reject the

23     MAC bid or anyone's bid, and then when we come in with the

24     higher price to say that there's a reason why that's not

25     appropriate.

65

1          Now, if the Court wishes, I can get into the real

2     issues that we have with the sale and with the MAC bid itself.

3     Just briefly, we never got notice of the increase in the MAC

4     bid, or we would have certainly been there on Sunday morning

5     with the increase in the bid.  Rather, what it appears had

6     happened is MAC was notified of our increase in the bid on

7     Friday night and then subsequently increased its bid, but we

8     didn't have any notice of that.  And I have my client here to

9     testify to that.  So I don't think that it's fair that MAC can

10    be preferred and have an opportunity to increase its bid.  But

11    all of those issues go away here today, because everyone's on

12    the phone, everyone has an opportunity to bid whatever they

13    think is appropriate.

14          And also we had tried to contact the debtor as soon

15    as we got notice so that the reply says that we had an

16    opportunity to increase our bid on Monday.  Now, that means two

17    things.  One, it means that we could have increased our bid on

18    Monday and the debtor might have accepted it.  That was after

19    the bidding deadline.  So to me that suggests that the process

20    was -- the debtor could have exercised its discretion, as it

21    was entitled to do in the motion, to later accept a higher bid.

22    And so I think that that validates what we are doing here

23    today.

24          And finally, there's this issue of the deposit.  And

25    I think that this goes to the validity of the MAC bid that was

66

1    made on Sunday.   If we assume that the procedures that were set

2    forth, the proposed sale procedures, are appropriate, subpart

3    (d) provides two things.   It says that when you make a higher

4    bid you have to make, quote, "an increased deposit to reflect

5    an amount equal to five percent of the modified purchase price

6    and two, a deposit in the amount included in the offer."   So to

7    me that means that you have the original deposit which MAC

8    would have made on March the 5th of 500,000 or whatever it was,

9    and then they would have had to make an increased deposit with

10   that on Sunday prior to the deadline in order to make a valid

11   deal.

12           And what footnote 4 of the debtor's reply says is

13   that they even recognize this and they did a second amendment,

14   which was dated as of March 23rd, which was after the bidding

15   deadline.   So the increased deposit did not come in until after

16   the bidding deadline on Sunday.   And therefore, we don't think

17   that the 3.1 million dollar bid of MAC was ever valid in the

18   first place.   So if we're going to stick with the notion that

19   the bidding deadline was Sunday morning, then the real valid

20   bid is the GHI bid on Friday night.

21           Now, we're here to bid the price that we think is

22   appropriate, with everyone here in full disclosure, at 3.3

23   million dollars.   And so we would ask that the Court approve

24   that bid here today.   Thank you.

25           MR. DUNNE:   Your Honor, may I be heard?

67

1          MR. MARCUS:  If I could reply, Your Honor?

2          THE COURT:  Actually, you may reply.  It's just that

3    Mr. Dunne, who's here for the creditors' committee was standing

4    up and I was about to recognize him for his comments and then

5    you can say whatever you want on behalf of MAC.

6          MR. DUNNE:  For the record, Dennis Dunne from

7    Milbank, Tweed, Hadley & McCloy, LLP on behalf of the official

8    creditors' committee.  The short answer, Your Honor, is that

9    our first principals are to see the largest possible recovery

10   to the estate.  So while it's a close call, we're on the side

11   of accepting the 3.3 million dollar bid.  And let me go through

12   the reason --

13         THE COURT:  Tell me why it's a close call.

14         MR. DUNNE:  The --

15         THE COURT:  Because at some level you're also

16   principled, is that it?

17         MR. DUNNE:  Because at some level -- I have been

18   frustrated at a number of deals where the procedures spill

19   over -- notwithstanding what they say -- spill over into a

20   courtroom auction.  And I don't think it's ideal to have those

21   auctions spill over into the courtroom all the time.  In this

22   case those were not court approved --

23         THE COURT:  Well, I consider it to be not ideal all

24   of the time for matters of this sort to spill over into the

25   courtroom.

68

1          MR. DUNNE:  And I agree with that.  And that's why

2     it's a close call, Your Honor.  But I do think, at the end of

3     the day, we're here to maximize the value.  This was a

4     truncated process.  They were not court approved procedures.

5     To deal with Mr. Waisman's concern, maybe on future sales we

6     should have court approved procedures that would spell out

7     precisely that we're not going to have this happen.  But given

8     where we are today, and the fact that there were subsequent

9     modifications, on both sides, to the bids since the Sunday bid

10    deadline -- and as recently as this morning -- that I think

11    that we should continue it one more round.  It's unfortunate

12    it's in front of Your Honor, but that's the committee's

13    position.

14         THE COURT:  I said that I was going to hear from

15    counsel from MAC.  Then we will hear from counsel for the

16    debtor.

17         MR. MARCUS:  Thank you, Your Honor.  Just a couple of

18    comments.  Number one is MAC had no advantage or special terms

19    or anything else in this auction.  The reason that we found out

20    about the competing bid is that we picked up the phone and

21    asked.  And I can't think of any reason that the other bidder

22    could not have done the same and then submitted another bid.

23    So we complied with the process procedures, and they are not

24    intrinsically unfair.  One might devise a different scheme.

25    One might devise an auction in the court.  But the scheme

69

1    devised by the debtor is not, per se, unfair.  We just have

2    somebody who didn't put in the higher bid.

3          Now, the post-bidding increase and offer to increase

4    the deposit, and even this offer that I'm making today, I made

5    to accommodate the debtor, not because we feel we are required

6    to, nor because we feel the need to in order to comply, but

7    because we are trying to act in good faith.  We were trying to

8    close a deal where we won an auction in good faith.  And it

9    seems that improper that we should have to go to step one.

10   Having won the auction, now close it.  But we're big boys and

11   we're prepared to proceed.  But none of the post-auction things

12   that we are offering and doing, as I said before, are

13   requirements of the auction.  It's because we're trying to act

14   in good faith to the Court and to the debtor.

15         And so again, I come back in saying that I believe

16   the integrity of the process is important in this case.  I

17   listened in on the prior hearing, I understand how big this

18   case is, and if there's anything of value here it's honoring

19   these processes, and particularly we know, of course, insuring

20   there's been fair compliance by all sides and I think we've

21   done that.  Thank you.

22         THE COURT:  Thank you.  Mr. Waisman?

23         MR. WAISMAN:  Thank you, Your Honor.  Shai Waisman

24   again for the debtors.  Your Honor, where we are at the moment

25   is the debtor, in its business judgment, proposed procedures

70

1    that it thought would maximize the value of this asset, based

2    on its experience in prior transactions.  The debtor was right.

3    It garnered significant interest for an asset that has lost a

4    lot of value over time, and it proceeded in good faith.  The

5    procedures were followed.  MAC did pick up the phone and ask if

6    anybody submitted an alternate bid.  MAC did send in, by

7    e-mail, a topping offer on Sunday morning, and MAC prosecuted

8    its interest in this helicopter in accordance with the

9    procedures.

10            Where that leaves GHI, unfortunately, is in a

11   position of an aggrieved bidder.  It does not have standing in

12   the first place to object at the sale.  It has come in, it has

13   expressed an interest.  MAC has stepped up to the plate and

14   done the right thing, in the view of this estate.  And in our

15   business judgment we believe the integrity of the process

16   requires us to pursue the 3.225 bid from MAC.

17            THE COURT:  At some point we're going to stop hearing

18   from everybody.  But I guess you're going to have the last

19   licks.

20            MR. HEISER:  One last point, Your Honor.  We do think

21   that the issue of maximizing the value to the estate is what's

22   important, that because of the increase in the MAC bid to

23   3.225, that that puts us back into the process.  And I just

24   want to make my last point that the obligation of the people

25   conducting the sale is to conduct the bidders to see if they're

71

1    going to increase the price.

2        And my last point is that we believe the MAC bid did

3    not comply with the procedures because it did not remit the

4    required deposit, required by subpart (d) of the procedures

5    before 10 a.m. on Sunday.  So we think that the procedures that

6    are going on here today are what's appropriate and reflect the

7    will of all the parties and the highest and best value of this

8    asset.  Thank you.

9        THE COURT:  This has turned into something of a free-

10   for-all, hasn't it?  The history of the debtors' efforts to

11   sell excess aircraft, within the context of this bankruptcy

12   case, has been less than glorious.  It is my distinct

13   recollection that in prior transactions involving fixed wing

14   aircraft, that there were various deals that were made,

15   approved, and then renegotiated the wrong way because the

16   pricing was moving south at a time when parties who had already

17   agreed to the transaction were threatening to walk away from

18   the deal and forfeit their deposits.

19       Apparently, helicopters are a lot more attractive in

20   the market right now, because we have the opposite situation.

21   Instead of parties seeking to renegotiate deals for their

22   benefit, we have what amounts to an unstructured auction

23   process that's not presently covered by any court approved

24   procedures.  It's an interesting situation, to say the least.

25       I understand the committee to be saying -- and it's

72

1    not a surprising proposition -- more is better.  And I think

2    that they're right, more almost always is better in the context

3    of a bankruptcy sale.  But I'm also concerned that,

4    particularly in a case with this much visibility, and with

5    asset dispositions that may take place over the life of the

6    case that are in prospect, that it's also important for the

7    sale process to be principled.  Which gets to the question of

8    whether or not the sale procedures that were set forth by the

9    debtor, without prior approval of the sale procedures,

10   constitute procedures that are sufficiently fair, reasonable,

11   and worthy of judicial respect that they should be strictly

12   enforced.

13        Ordinarily, unless a set of sale procedures has been

14   approved by the bankruptcy court, they simply represent an

15   effort by the debtor to regularize a process that would take

16   place in the ordinary course in a nonbankruptcy setting in the

17   marketplace.  In that respect, proposed sale procedures are no

18   more entitled to a judicial imprimatur than what goes on at a

19   garage sale.  I am, however, going to treat the proposed sale

20   procedures as being the baseline test for determining whether

21   or not what has happened prior to today's hearing is fair,

22   relative to fundamental due process standards, even though it's

23   completely informal.

24        I read the reply papers that were submitted this

25   morning by the debtor before the pricing moved.  And the

73

1    fundamental argument made was that the deposit of 500,000

2    dollars, made at the time of the original bid, was sufficiently

3    robust, relative to the five percent requirement, that there

4    was no need to increase the amount of the deposit in order to

5    satisfy the bid procedures.

6            But I was also struck by the fact that the debtor

7    itself recognized that the five percent deposit was probably

8    insufficient, and by conduct, modified the deposit requirement

9    by having a gross-up, additional amounts were put in as a

10   deposit.  This, to me, suggests -- and I mean no disrespect in

11   saying this -- that to some extent these sale procedures were

12   being modified on an ad hoc basis as the process was going

13   along.  Perhaps, in part, because to the surprise of the

14   debtor -- I'm not suggesting a state of mind -- this turned out

15   to be a much more active two-way auction process than might

16   have been anticipated.

17           In that respect, the proposed sale procedures have

18   been ignored by the debtor itself.  Within the seventy-two hour

19   period prior to the sale hearing, an auction has been taking

20   place.  In fact, it's been taking place without authority in

21   the courtroom.  So for all practical purposes, the baseline

22   proposed sale procedures no longer seem to be governing the

23   conduct of the parties.  The fact that the price now being

24   offered by MAC, at 3.225 million dollars, is 125,000 dollars

25   more than the amount which was proposed over the weekend,

74

1    demonstrates that within the seventy-two hour period prior to

2    the sale hearing, we are engaged in an auction process without

3    authority to do so.

4            To me this suggests that there is no principled way,

5    at this point, to deal with the sale of this helicopter unless

6    the Court imposes what I'm going to impose right now.  It's now

7    almost 12:15.  I'm going to extend the auction period until

8    2 p.m.  MAC and GHI may each, in their sole discretion, stand

9    on their existing bids -- but their existing bids may not be

10   withdrawn -- or they may increase their existing bids, if they

11   choose to.  They will be sealed bids in the sense that this

12   will not be an auction process in the sense of 25,000 dollar

13   increments.

14           The debtor will be advised before 2:00 -- let's pick

15   a time, let's make it 1:45 this afternoon -- privately as to

16   your last best bid which can be no less than, in the case of

17   MAC, 3.225 million dollars, or in the case of GHI, 3.3 million

18   dollars.  But as far as I'm concerned, the sky is the limit.

19   The best bid will be determined in the discretion of the debtor

20   in consultation with the creditors' committee.  The bid, in

21   order to be the best bid, must be fully funded by the close of

22   business today.  There can be no closing conditions.  And I'll

23   see you at 2:00.

24           MR. HEISER:  Your Honor, just to clarify, so it's the

25   exact same purchase and sale agreement, just with the price

75

1   changed?

2            THE COURT:  Correct.

3            MR. HEISER:  Thank you.

4            MR. WAISMAN:  Your Honor, could I beseech you for one

5   additional requirement to your bidding requirements?

6            THE COURT:  What's that?

7            MR. WAISMAN:  That the parties waive any claims

8   against these estates?

9            THE COURT:  Oh, yes, absolutely.  There are no claims

10  against the estate.  I'll see you at 2.

11           MR. WAISMAN:  Thank you, Your Honor.

12           MR. HEISER:  Thank you, Your Honor.

13       (Recess from 12:14 p.m. until 2:01 p.m.)

14           THE COURT:  Be seated, please.

15           MR. WAISMAN:  Afternoon, Your Honor.

16           THE COURT:  So what happened, Mr. Waisman?

17           MR. WAISMAN:  Shai Waisman, Weil Gotshal Manges on

18  behalf of the Lehman debtors.  Your Honor, in accordance with

19  the Corut's bidding procedures, two sealed bids were received

20  prior to the 1:45 bid deadline.  MAC submitted a bid of 3.4

21  million dollars for the helicopter.  GHI, General Helicopters

22  International, submitted a bid for 3,426,000 dollars.  With

23  that, the debtors conferred with the official committee of

24  unsecured creditors and together support the GHI bid of

25  3,426,000 dollars subject to confirmation by GHI on the record

76

1    that all the other terms and conditions of the executed

2    purchase agreement stand and that the balance of the purchase

3    price will be funded today.

4         THE COURT:  Let's get that confirmation.

5         MR. HEISER:  Good afternoon, Your Honor.  Jim Heiser

6    from Chapman & Cutler on behalf of General Helicopters

7    International.  I can confirm on the record that we have

8    received -- that we have wired the funds to Insured Aircraft

9    Title Service in Oklahoma City per the contract, the previously

10   executed aircraft purchase contract.

11        THE COURT:  So the money is already there?

12        MR. HEISER:  Yes, Your Honor.

13        THE COURT:  Sounds like that condition has been

14   satisfied.  Is counsel for MAC still on the telephone?

15        MR. MARCUS:  Yes, Your Honor.  George Marcus on the

16   phone.

17        THE COURT:  I take it that what's been reported on

18   the record here is accurate in that you made a bid of 3.4 and

19   the high bid is 3.426, correct?

20        MR. MARCUS:  Your Honor, I can only speak to the bid

21   that we submitted.  We don't know what the other bid was apart

22   from what's been reported today.  But that is accurate in terms

23   of the bid we put in.

24        THE COURT:  All right.  And that you are waiving any

25   claims against the estate as a result of your participation in

77

1   this auction process?

2      (Pause)

3         THE OPERATOR:  Your Honor, this is Sigrid Walker

4   (ph.).  I just lost Mr. Marcus.  He evidently disconnected

5   himself, hopefully by accident.

6         THE COURT:  I hope it's by accident, too.  Please

7   bring him back on the line.

8         THE OPERATOR:  Yes, Your Honor.

9      (Pause)

10        THE OPERATOR:  Your Honor, Mr. Marcus has now

11  rejoined us.

12        THE COURT:  Welcome back.

13        MR. MARCUS:  Your Honor, thank you.  I'm sorry.  I

14  don't know what happened but we got disconnected.

15        THE COURT:  I was in the process of confirming that

16  MAC, by virtue of participating in the auction process and

17  having submitted a sealed bid, also waives any claims against

18  the estate with respect to the auction process at this point.

19        MR. MARCUS:  Your Honor, we do waive claims against

20  the estate but I would like the opportunity to argue that the

21  Court should award the bid to MAC in any event.  But we

22  understand that there's no claim against the estate arising by

23  reason of the auction process.

24        THE COURT:  That's fine.  The process has run its

25  course in terms of arguing higher and better bids.  It's tough

78

1    to do when both the debtor and the creditors' committee, after

2    confirming, have concluded that the GHI bid is the highest and

3    best bid.  But if you wish to say something, this is the

4    opportunity to do that.

5             MR. MARCUS:  Well, thank you.  I'd just add that the

6    higher bid is the one submitted by GHI is higher by 26,000

7    dollars.  I guess I go back to saying that I don't believe that

8    the waiver of claims precludes me from urging the Court, having

9    gone through this process, to simply go back and accept the bid

10   that was greatly submitted because MAC participated in that

11   process in good faith fairly and whatever concerns there may be

12   with the debtors' conduct at the auction, it seems unreasonable

13   that MAC should be penalized.  MAC has incurred a significant

14   amount of expense in participating in the bidding including

15   inspecting the aircraft and taking other steps and feels

16   terribly aggrieved by the process because it appeals did apply.

17   Now, while I don't have any entitlement to make a claim, I

18   would like to know if the Court would entertain an

19   administrative claim because MAC has incurred a substantial

20   amount of money and has benefited the estate by an expenditure

21   by driving the bid process up.  So while, as I said, I

22   acknowledge waiver of entitlement, I think that it nevertheless

23   is appropriate to recognize the contribution to the estate if

24   the Court is inclined to award the bid as originally made.

25             THE COURT:  Well, if I understand your argument,

79

1    you're acknowledging that you have no claim against the estate

2    and have confirmed on the record that any such claim has been

3    waived.  But notwithstanding that waiver, you're asking for me

4    to tell you now that I will permit you to bring some kind of as

5    yet unspecified administrative claim against the estate for

6    having participated in a process that produced increased value

7    to the estate.  Do I have that correct?

8            MR. MARCUS:  Yes.

9            THE COURT:  I'm not inclined to take away the benefit

10   of the waiver by giving you what amounts to a backdoor

11   opportunity to pursue claims against the estate.  And so, I

12   accept the waiver.  I enforce the waiver and confirm on the

13   record now that there is no entitlement to bring any claim

14   against the estate for administrative expense claims or for

15   substantial contribution claims or for any other kind of claim.

16   By virtue of participating voluntarily in an auction process

17   which you had, through your client, an opportunity to win by

18   simply putting in a bid that was a thousand dollars more or

19   even 500 dollars more than the bid that was put in by GHI, you

20   had every opportunity to successfully obtain the aircraft in

21   question and lost fair and square.  And good luck to you with

22   other aircraft acquisitions.

23           MR. MARCUS:  Thank you.

24           MR. HEISER  Thank you, Your Honor.

25           MR. WAISMAN:  Your Honor, one of my colleagues is

80

1    revising our proposed form of order and we will submit that to

2    chambers today so that we can, in fact, effect this

3    transaction --

4          THE COURT:  Fine.

5          MR. WAISMAN:  -- today.

6          THE COURT:  Now, I think I'm also supposed to hear

7    something about SunCal before I let you go.

8          MR. WAISMAN:  If Your Honor would like, I would

9    provide a brief status update on the SunCal matters.  As Your

10    Honor may recall --

11          MR. MARCUS:  Your Honor, may I disconnect?

12          THE COURT:  That's fine.

13          MR. MARCUS:  Thank you.

14          MR. WAISMAN:  As Your Honor may recall, on March

15    10th, there was a hearing scheduled before Judge Smith in

16    California with respect to the SunCal debtors to the motion to

17    implement certain auction procedures.  As a result of the

18    hearing that day as well as a conference had between Your Honor

19    and Judge Smith, that hearing and the consideration of the

20    auction procedures motion was adjourned to March 19th.  Both

21    parties were enjoined from filing further pleadings in either

22    court with respect to the auction procedures motion.  And on

23    the very next day, we had a status conference with Your Honor,

24    telephonic conference with Your Honor, where both parties --

25    all the parties participated and Your Honor reported to all

81

1    parties that you had conferred with Judge Smith on these

2    matters.

3          So the adjourned hearing took place on March 19th

4    with respect to the auction procedures.  And at that hearing,

5    the parties mutually agreed to further adjourn to March 24th.

6    As well, Lehman Ali, a nondebtor Lehman entity, agreed to the

7    primary terms of a DIP financing for certain of the SunCal

8    entities.  That DIP financing will be in the amount of

9    aggregating 1.5 million dollars.  And the main terms will

10   include a approved budget with specific line items as to which

11   the monies are to be expended and for no other purpose,

12   superpriority liens and claims for Lehman Ali, the DIP to

13   mature upon a confirmed plan or a sale of any of the DIP

14   collateral and an interest rate of ten percent.  To accommodate

15   a fast moving situation, this was read into the record and is

16   subject to the parties subsequently confirming the

17   documentation.  And, of course, that is taking longer than

18   expected.

19         THE COURT:  Usually does.

20         MR. WAISMAN:  So, on March 23rd, which was four days

21   subsequent to that hearing, Lehman Ali did, in fact, fund the

22   DIP.  And the documentation is still being worked on.

23         As for the equitable subordination litigation, that

24   continues.  SunCal filed a motion in the California court for

25   leave to file the second amended complaint.  That request was

82

1   granted by the California court.  Lehman has until April 23rd

2   to respond.  And the hearing, as well as the status conference,

3   on that litigation is scheduled for May1 21st.

4        Lehman also filed notices of appeal with respect to

5   certain rulings by the California court, in particular, the

6   ruling that the equitable subordination litigation as to LCPI,

7   which is a debtor here, could continue or could be filed and

8   continued despite the applicability of the automatic stay as

9   well as SunCal's request to transfer LCPI's liens on SunCal's

10  assets to the SunCal debtors.

11       That aside, Lehman and SunCal have met face to face

12  in California to try and reach a global settlement.  Those

13  meetings have taken place over the last couple of weeks.  They

14  continued as late as yesterday.  And yesterday would have been

15  the adjourned hearing on the auction procedures motion and the

16  parties agreed in light of the substantial progress made in

17  negotiations to adjourn further the auction procedures motion

18  to an April 9th date.  And that's where we are.

19       THE COURT:  Thank you for that report.  I do have one

20  question, however, as a result of what I've heard.  Is Lehman

21  taking the position that the district court or bankruptcy

22  appellate panel -- I'm not sure which entity will be dealing

23  with the appeal from Judge Smith's rulings in connection with

24  the ongoing prosecution of the equitable subordination

25  complaint.  I assume it's going to go to the BAP, correct?

83

1          MR. WAISMAN:  That is correct, Your Honor.

2          THE COURT:  Is Lehman taking the position that the

3     proper court to consider the applicability of the automatic

4     stay as to Lehman is the California bankruptcy court or the

5     BAP?  Is there, in effect, an election of jurisdiction there

6     for that determination?  Because it seems to me, at least in

7     theory, that there is continuing jurisdiction here to consider

8     that question.  I'm only asking that question rhetorically.

9     I'm not necessarily calling for a response on the record now.

10    You're welcome to make one but you're also free to duck it if

11    you wish.

12         MR. WAISMAN:  Your Honor, your comments are very much

13    appreciated.  I think Your Honor appreciates the sensitivities

14    of the situation which is one of the reasons that led us to

15    submit a pleading, draft pleading, by letter two weeks ago

16    rather than actually file it on the docket and proceed with the

17    hearing.  There are two courts, two bankruptcy judges, with

18    significant matters pending before both.  And Lehman has tried

19    from the beginning and continues to try to not step on anyone's

20    toes.  Your comments, Your Honor, are well taken.  That issue

21    is being considered but because of the time in which we had to

22    appeal, if -- or we had to file the notice of appeal to

23    preserve that right.  I wanted to advise the Court that the

24    notice had been filed.  A further determination as to how to

25    proceed on that appeal or other relief in this jurisdiction is

84

1    pending.

2              THE COURT:  Fine.  Well, I assume this is a fluid

3    situation.  I was just reacting to what I heard.

4              MR. WAISMAN:  Thank you, Your Honor.

5              THE COURT:  Is there anything more on SunCal?

6              MR. WAISMAN:  That is all.

7              THE COURT:  Good luck in getting that resolved if you

8    can.  Is there anything more for today's hearing?

9              MR. WAISMAN:  I believe that's the end of the agenda.

10             THE COURT:  GHI, good luck with your helicopter.

11             MR. WAISMAN:  Thank you, Your Honor.

12             THE COURT:  We're adjourned.

13        (Whereupon these proceedings were concluded at 2:17 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

85

```
 1

 2                        I N D E X

 3

 4                      R U L I N G S

 5     DESCRIPTION                              PAGE    LINE

 6     Debtors' motion for an order modifying     14      22

 7     automatic stay with respect to the debtors'

 8     primary D&O and fiduciary policies granted

 9     Motion of TPG-Austin Portfolio Holdings to  16      9

10     compel assumption or rejection of a credit

11     agreement that was entered into by the debtors

12     approved

13     Debtors' motion pursuant to Sections 105(a),  18      3

14     363(b) and 541(d) of the Bankruptcy Code and

15     Bankruptcy Rule 6004 for authority to transfer

16     agents' funds in connection with resignations

17     from agency positions granted

18     Motion of Tobacco Settlement Authority for order  20   22

19     compelling Lehman Brothers Special Financing Inc.

20     to assume or reject an executory contract

21     Motion of Howard W. Tomlinson for relief from the  34   4

22     automatic stay denied

23

24

25
```

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

86

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Trustee's application pursuant to Bankruptcy | 36 | 4 |
| Code Section 365(d)(1) for order further | | |
| extending time within which trustee may assume | | |
| or reject executory contracts and certain | | |
| unexpired leases granted | | |
| Motion of Carret Asset Management and Evansville | 56 | 17 |
| Insurance Ltd. for leave to conduct Rule 2004 | | |
| discovery from Lehman Brothers Inc., SIPA | | |
| trustee and Barclays Capital Inc. denied | | |
| without prejudice | | |
| Waiver of entitlement by MAC Aircraft Sales to | 79 | 12 |
| any claim against the estate for administrative | | |
| expense claims or any other kind of claim enforced | | |

87

1

2                        C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  March 27, 2009

16

17

18

19

20

21

22

23

24

25