HEARING DATE: APRIL 22, 2009 AT 10:00 A.M.
OBJECTION DEADLINE: APRIL 17, 2009 AT 4:00 P.M.

DAY PITNEY LLP
(MAIL TO) P.O. BOX 1945, MORRISTOWN, NJ 07962-1945
(DELIVER TO) 200 CAMPUS DRIVE, FLORHAM PARK, NJ 07932-0950
(973) 966-6300
RICHARD M. METH, ESQ. (RM7791)
HERBERT K. RYDER, ESQ. (HR5137)
- AND -
7 Times Square
New York, NY 10036-7311
(212) 297-5800

- AND -

FAIRFIELD AND WOODS, P.C.
1700 Lincoln Street, Suite 2400
Denver, CO 80203
(303) 830-2400
SCOTT T. RODGERS, ESQ. (19943)

ATTORNEYS FOR MIDCOUNTRY BANK

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (jointly administered) |

**MIDCOUNTRY BANK'S MOTION FOR ENTRY OF AN ORDER (i) GRANTING RELIEF FROM AUTOMATIC STAY, (ii) WAVING THE 10-DAY STAY UNDER FED. R. BANKR. P. 4000 (a)(3), AND (iii) GRANTING RELATED RELIEF, WITH INCORPORATED MEMORANDUM OF LAW**

MidCountry Bank ("MidCountry"), by and through its undersigned counsel, moves this

Court for an order granting MidCountry relief from the automatic stay, pursuant to Sections 362

and 541 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), and respectfully states as follows:

**INTRODUCTION**

1. MidCountry seeks relief from the automatic stay in order to proceed unfettered with an action previously initiated in Colorado[1] against Aurora Loan Services, LLC, a Colorado limited liability company ("Aurora") which is neither a debtor before this (or any other bankruptcy) Court, nor otherwise protected by the Court, or the Bankruptcy Code, in connection these cases. Additionally, MidCountry, to the extent necessary, seeks a determination that Lehman Brothers Holdings, Inc. ("LBHI" or the "Debtor") is deemed to have given its consent to MidCountry's preferred substitute servicer for Aurora; MidCountry seeks to terminate Aurora "for cause" under an existing three-party contract between Lehman Capital, a division of LBHI, MidCountry and Aurora.

2. The agreement at issue is a three-party contract dated July 30, 2007 (the "Contract"). MidCountry, as owner of approximately 52 mortgage loans, Aurora, as servicer of the loans, and Lehman Capital, as servicing rights owner, entered into the Contract whereby Aurora would service the mortgage loans on behalf of MidCountry. Under the Contract, Aurora was to, among other things, (i) hold the mortgage documents in trust for and on behalf of MidCountry, (ii) act in a fiduciary capacity for MidCountry, by, *inter alia,* servicing the loans on a day-to-day-basis, exercising judgment on behalf of, and in the best interest of MidCountry, and (iii) accept payments from the mortgagors and remit such payments to MidCountry, minus a servicing fee.

---

[1] The action was commenced on or about February 6, 2009, when MidCountry filed in the District Court, Douglas County, State of Colorado (the "Colorado Court"), a Verified Complaint for Replevin and Other Related Relief (the "Colorado Action").

2

3. After MidCountry terminated Aurora for cause on or about February 6, 2009, Aurora nonetheless refused to recognize its termination, refused to return MidCountry's loan files, and insisted on continuing to service the loans at issue. As a result of Aurora's refusal to return MidCountry's property and recognize its termination for cause, MidCountry was forced to seek injunctive relief in the Colorado Action, as well as to bring additional causes of action related to damages caused by Aurora's various breaches of contract.

4. Subsequently, on March 9, 2009, MidCountry filed a First Amended Verified Complaint for Replevin and Other Relief against Aurora for its actions arising out of the Contract (the "First Amended Complaint"). In connection with the First Amended Complaint, MidCountry has sought a Temporary Restraining Order and Preliminary/Permanent Injunction against Aurora. The Colorado Court has entered an Order granting a portion of the relief requested, namely, compelling Aurora to provide copies of all of the MidCountry loan files and prohibiting the destruction of any of the files.

5. While MidCountry does not seek to directly affect or terminate any remaining rights that LBHI may have in the underlying contract, *i.e.*, as servicing rights owner, MidCountry does seek relief from stay to proceed against Aurora in the Colorado Action, to terminate the Contract (to the extent not previously terminated) and to terminate Aurora as servicer. Further, and to the extent necessary, MidCountry seeks an Order determining that the Debtor is deemed to have given its consent to MidCountry's preferred successor servicer, which consent cannot be unreasonably withheld.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

**PROCEDURAL BACKGROUND**

7. MidCountry is in the business of, *inter alia*, originating and purchasing home mortgage loans.

8. Aurora is in the business of, *inter alia*, servicing home mortgage loans.

9. In a three-party contract dated July 30, 2007 (*i.e.*, the Contract), MidCountry, as owner of approximately 52 mortgage loans, Aurora, as servicer of the loans, and Lehman Capital, as servicing rights owner, entered into the Contract whereby Aurora would service the mortgage loans on behalf of MidCountry. (A true and exact copy of the Contract is attached hereto as **Exhibit A**.)

10. The Contract provides, in relevant part, as follows:

> Each Servicing File delivered to the Servicer shall be held by the Servicer in order to service the Mortgage Loans pursuant to this agreement and **shall be held in trust by the Servicer for the benefit of the Owner** as the owner thereof and the Servicing Rights Owner. **The Servicer's possession** of any portion of the Mortgage Loan documents **shall be at the will of the Owner** for the sole purpose of facilitating servicing of the related Mortgage Loan pursuant to this Agreement, **and such retention and possession by the Servicer shall be in a custodial capacity only**. **The ownership of each Mortgage Note, Mortgage, and the contents of the Servicing File shall be vested in the Owner**, and **the ownership of all records and documents** with respect to the related Mortgage Loan prepared by or which come into the possession of the Servicer **shall vest in the Owner and shall be retained and maintained, in trust, by the Servicer at the will of the owner in such custodial capacity only**. [*See* Contract at § 2.01, page 9 (emphasis added).]

4

11. Under the Contract, Aurora is to hold the mortgage documents in trust for and on behalf of MidCountry, and to act in a fiduciary capacity for MidCountry by, *inter alia*, servicing the loans on a day-to-day basis, exercising judgment on behalf of, and in the best interest of MidCountry, as well as by accepting payments from the mortgagors and remitting such payments to MidCountry, minus a service fee.

12. The Contract provides a standard of care to be exercised in the servicing of the loans, as well as certain representations and warranties made by Aurora to MidCountry.

13. The Contract contains a choice of law provision which provides that New York law is to govern the rights, remedies and obligations of the parties.

14. After entering into the Contract, Aurora breached the Contract.

15. Aurora has failed to properly take actions necessary to service, maintain and administer the loans subject to an insurance policy for primary mortgage guaranty insurance ("LPMI Loans") in accordance with the insurance policy ("LPMI Policy") and to perform and enforce the rights of the insured under such LPMI Policy.

16. Aurora has also failed to properly manage, conserve and protect defaulted loans and Real Estate Owned (REO) property.

17. By letter dated September 3, 2008, MidCountry notified Aurora of significant and material issues with respect to Aurora's servicing of delinquent loans. Aurora was notified that its monthly reports provided to MidCountry did not contain sufficient information for MidCountry to determine the status of the delinquent loans and to properly account for the delinquent loans. Aurora has thus failed to observe and perform the covenants and agreements contained within the Contract.

18. Section 9.01(ii) of the Contract provides that MidCountry may terminate Aurora "for cause" in the event of Aurora's failure to duly "observe or perform in any material respect any other of the covenants or agreements on the part of [Aurora] set forth in this [Contract] which continues unremedied for a period of thirty (30) days . . . ."

19. Aurora breached Section 9.01(ii) of the Contract, by, among other things, failing to observe the practices of prudent mortgage lending institutions which service mortgage loans of the same type in the respective jurisdictions at issue (as required by Section 2.01, referencing "Accepted Servicing Practices," as defined in Article I of the Contract), with respect to not less than the Adams Loan (Servicer Loan No. 45697588) and the Cisneros Loan (Servicer Loan No. 40402422). Aurora breached the above-referenced Contract provisions, as well as Section 3.08 (relating to LPMI Claims), by failing to timely object to the insurer's denial of mortgage insurance coverage for both the Adams and Cisneros Loans, where the grounds for such denial were baseless and/or in doubt, as well as by failing to timely inform MidCountry of such denial of coverage until after the expiration of the insurer's objection/appeal deadline.

20. Aurora additionally breached Section 9.01(ii), as well as Section 3.01(c), of the Contract with respect to the Lindo Loan (Servicer Loan No. 40552739), by, among other things, failing to notify MidCountry or to secure its pre-approval of the short sale at a significantly discounted price, which failure constitutes a violation of Section 3.10 (requiring notice/pre-approval), as well as a violation of the practices of prudent mortgage lending institutions which service mortgage loans of the same type in the respective jurisdictions at issue.

21. During the course of its servicing and administration of the loans at issue, Aurora failed to confer with, and to keep informed, MidCountry in numerous aspects of such servicing and administration, which constitutes an additional breach of its duties under the Contract.

6

Despite being advised of its repeated failure to communicate with MidCountry in a timely and meaningful manner regarding delinquent loans and to seek required pre-approvals, Aurora failed to take appropriate remedial action.

22. Under the Contract, if terminated without cause, LBHI might be entitled to a termination fee of approximately $25,000.00, at least according to Aurora. However, if terminated for cause, LBHI would <u>not</u> be entitled to a termination fee. Whether with or without cause, the Contract expires upon its termination.

23. By email dated January 12, 2009, MidCountry notified Aurora that it was terminating the Contract, effective as of February 1, 2009. On January 14, 2009, Aurora acknowledged receipt of the termination notice. After this written request from MidCountry, Aurora failed to prepare, execute and deliver to the successor entity designated by MidCountry the appropriate documents and instruments to effectuate the termination.

24. Aurora did not object to its termination, and agreed to "make every effort to cooperate fully."

25. On or about March 9, 2009, MidCountry filed a Motion for Temporary Restraining Order and Preliminary/Permanent Injunction in the Colorado Action. (A true and exact copy of that motion and related exhibits, together with MidCountry's First Amended Verified Complaint, is attached hereto as **Exhibit B**.) The grounds for the Motion for Temporary Restraining Order are as follows:

   a. MidCountry is the owner of approximately 52 home mortgage loans, currently valued at roughly $16,000,000.00 ("Loans"), for which Aurora has been acting as the servicer under the Contract.

7

b. In its First Amended Verified Complaint for Replevin and Other Relief against Aurora, dated March 9, 2009, MidCountry alleged four causes of action: breach of contract, breach of fiduciary duty, accounting and replevin ("Amended Complaint"). Contemporaneous with filing its original Verified Complaint on February 6, 2009, and under the express terms of the Contract, MidCountry terminated Aurora for cause by letter dated February 6, 2009.[2]

c. Without contractual or other authority, Aurora has refused to recognize its termination under the Contract, and has indicated that it intends to continue to service the Loans.

d. The Motion for Temporary Restraining Order and Preliminary/Permanent Injunction ("Motion") was brought to secure a Temporary Restraining Order ("TRO"), followed by a Preliminary and Permanent Injunction, which compels Aurora to: (1) cease and desist from taking any further action on the Loans, including on behalf of MidCountry; (2) requires the immediate transfer of all accounts, loan documents and servicing files to Dovenmuehle Mortgage Inc. ("Dovenmuehle"), as well as all payments received from borrowers, less servicing fees earned prior to February 6, 2009 (date of termination); (3) affirmatively forbids any destruction of mortgage documents or servicing files; (4) and orders Aurora to provide MidCountry with a detailed accounting for each of the Loans.

e. Notice of this Motion was provided to counsel for Aurora, Jamie G. Siler, Esq., Bloom Murr & Accomazzo, P.C., 410 17th Street, Suite 2400, Denver, Colorado, by hand delivery and electronic mail on March 9, 2009.

---

[2] As noted in paragraph 25, *supra*, MidCountry filed a First Amended Verified Complaint on or about March 9, 2009.

8

f. Under the Contract, in fulfilling its obligations as servicer of the Loans, Aurora was obligated to "service and administer the . . . Loans . . . consistent with the terms of [the] Agreement and with Accepted Servicing Practices." (**Exhibit A** at § 2.01.)

g. "Accepted Servicing Practices" is defined under the Contract as "those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans . . . ." *Id.* at Article I.

h. Under the Contract, Aurora was granted authority to allow a borrower "to pay off a non-performing [loan] at less than its unpaid principal balance, [*i.e.*, a "short sale" or] charge off all or a portion of a non-performing [loan] . . . if [the] discounted payoff . . . or chargeoff . . . is in the best interest of . . . [MidCountry]; provided that in the case of any proposed discounted payoff [or] proposed charge off . . . [, **Aurora] shall notify . . . [MidCountry] of the <u>proposed</u> discounted payoff . . . [or] chargeoff** . . . ." **Exhibit A** at § 3.10 (emphasis added).

i. Despite its contractual obligation to notify MidCountry of short sales, Aurora has on multiple occasions authorized and conducted short sales at unreasonably low sales prices without providing MidCountry with advance notice and, thereby, deprived MidCountry of the opportunity to deny Aurora authority to proceed. *See* Affidavit of Gregory A. Krenz at ¶ 16.

j. One such short sale occurred on November 26, 2008 and involved the Lindo loan, where Aurora authorized a short sale on a property appraised at $440,000, with an outstanding principal balance and interest of $532,000, for a short sale amount of $300,000, resulting in a loss to MidCountry of $297,840.30. *See* Affidavit of Mr.

9

Krenz at ¶ 6. Aurora failed to provide MidCountry with notice of this short sale, which constitutes a breach of Section 3.10 of the Contract. If provided with notice, MidCountry would have instructed Aurora to reject the proposed short sale price. *Id.* at ¶ 6.

k. Another short sale occurred on January 15, 2009 and involved the Tran loan, where Aurora authorized a short sale on a property with an outstanding principal balance and interest of $608,000, for a short sale amount of $462,000, resulting in a loss to MidCountry of $179,930.33. *Id.* at ¶ 7. Aurora failed to provide MidCountry with complete notice of this short sale, which constitutes a breach of Section 3.10 of the Contract. If provided with notice, MidCountry would have instructed Aurora to reject the proposed short sale price. *Id.* at ¶ 7.

l. In September, 2008, upon learning of the short sales after the fact, MidCountry, through its former counsel, made demand upon Aurora to provide MidCountry with, *inter alia*, notice of all short sales and detailed information on all the loans. Despite this demand, Aurora failed to provide the demanded information. Affidavit of Mr. Krenz at ¶ 16.

m. Despite its termination, upon information and belief, other non-performing loans are, or may imminently be, extinguished through short sales by Aurora without the contractually-required notice being provided to MidCountry, to its significant detriment. *Id.* at ¶ 17.

n. Once a short sale is completed, MidCountry is deprived of the opportunity to object to the sale and, thereby, avoid or reduce the loss on the loan. *Id.* at ¶ 17.

10

o. Despite repeated demands for information regarding short sales prior to its termination, Aurora has failed to so provide such information; and, upon information and belief, other loans are presently in immediate risk of being compromised in short sales without advance notice being provided to MidCountry and without contractual authority following its termination.

p. Some portion of the Loans are termed "LPMI Loans," which are defined under the Contract as loans covered by a "LPMI Policy," which, in turn, is defined as a policy of primary mortgage guaranty insurance. (**Exhibit A** at Article I.)

q. For an LPMI loan, when a borrower defaults on his or her monthly mortgage payment obligation, an LPMI Policy provides protection to the lender, MidCountry, to make it whole for the loss of payments. Affidavit of Mr. Krenz at ¶ 9.

r. On April 1, 2008, one borrower failed to make his or her mortgage payment, and, despite a valid LPMI Policy being in effect, the insurer denied the claim. *Id*. at ¶ 10. The basis of the denial was that the borrower did not intend to occupy the property at the time the cash refinancing was closed, which was patently erroneous as the borrower did in fact occupy the property at the time the loan was closed. *Id*. at ¶ 10,12. Aurora was aware of those facts. *Id.* at ¶ 12.

s. Under the terms of the LPMI Policy, an appeal of the denial had to be made within 60 days or rejection. *Id*. at ¶ 10. However, despite the baseless denial, Aurora failed to timely appeal the denial or to provide MidCountry with notice of the denial until after the appeal period had expired, resulting in losses of approximately $128,728.08. *Id*. at ¶ 12.

t. Under the Contract, Aurora was obligated to "take all such actions as are necessary to service, maintain and administer the LPMI Loans in accordance with the LPMI Policy and to perform and enforce the rights of [MidCountry] under such LPMI Policy." (**Exhibit A** at § 3.08.)

u. Further, Aurora was contractually obligated to "prepare and present, on behalf of itself and . . . [MidCountry], claims to the insurer under any LPMI Policy in a timely fashion in accordance with the terms of such LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any LPMI Policy respecting a defaulted . . . Loan." *Id*.

v. Despite the foregoing contractual obligations, Aurora has, on at least two occasions, failed to timely appeal a patently unfounded denial of an LPMI claim, and, further, failed to timely inform MidCountry so as to allow it to take appropriate action on its own behalf. Affidavit of Mr. Krenz at ¶ 10,12, and 13.

w. Upon information and belief, numerous other LPMI claims have or may in the immediate future be denied. Aurora has already been termination as servicer, and, therefore, it cannot "take such action as shall be necessary to permit recovery under any LPMI Policy . . . ." **Exhibit A** at § 3.08; Affidavit of Mr. Krenz at ¶ 15.

x. Due to Aurora's refusal to provide MidCountry with demanded loan-level information, MidCountry is presently unaware of additional short sales or LPMI claims; however, based upon the known instances of such, and upon information and belief, Aurora has, or in the immediate future will, act contrary to the Contract and against MidCountry's interests.

y. In addition to refusing to provide MidCountry with loan information, Aurora has also refused to recognize its termination by MidCountry and its current obligation to cooperate in the transfer of the escrow accounts, mortgage and servicing files, as well as servicing responsibilities to MidCountry's designee, Dovenmuehle.

z. Based upon media publications related to Aurora's financial condition and prospects for future success, there is a substantial present danger that Aurora will file for bankruptcy protection.

aa. If such were to occur, MidCountry's assets, *i.e.*, the Loans, accounts and all related documents in Aurora's possession, would be at significant risk of loss or destruction, with resultant irreparable damage to MidCountry and its borrowers. Affidavit of Mr. Krenz at ¶ 18.

bb. Additionally, MidCountry's borrowers are directly adversely affected by Aurora's inability to service the Loans through missed insurance and/or tax payments. *Id*. at ¶ 18.

cc. Under the Contract, MidCountry, as owner of the Loans, accounts and mortgage files, and on whose behalf Aurora holds the mortgage documents in trust, has the discretion and authority to unilaterally terminate Aurora for cause. (**Exhibit A** at § 9.01.) Based upon Aurora's breach of the Contract and its continuing refusal to provide basic information requested by MidCountry, on February 6, 2009, MidCountry served written notice to Aurora of its termination for cause, setting forth in detail the grounds for termination.

dd. Without contractual or other authority, Aurora has refused to recognize its termination and has refused to transfer escrow accounts, mortgage documents and

13

        servicing files to Dovenmuehle, as demanded by MidCountry. Aurora has, thereby, further breached its contractual obligation to cooperate in the transfer of serving responsibilities to the successor servicer. (**Exhibit A** at § 10.01.)

ee. This refusal to transfer accounts and loan files and related documents represents an improper interference with MidCountry's property rights as owner of the Loans, accounts and related documents, but also will result in irreparable harm without adequate legal remedy based upon Aurora's interference with MidCountry's ability to service the loans on a day-to-day basis itself through its designated successor servicer Dovenmuehle, and may additionally cause irreparable harm to the borrowers themselves through the lack of servicing of their loans, including missed insurance and tax payments. Affidavit of Mr. Krenz at ¶ 18.

    26. By order dated March 11, 2009, the Colorado Court entered an order granting, with amendments, the Temporary Restraining Order request. (A true and exact copy of that Temporary Restraining Order is attached hereto as **Exhibit C**.)

    27. A preliminary injunction and replevin hearing was held before the Colorado Court on March 18, 2009. That hearing was not concluded and has been continued until May 15, 2009. At the close of the proceeding, the Colorado Court ordered Aurora to return to MidCountry copies of all its loan files. The Court additionally ordered that, pending the completion of the hearing, Aurora was to continue serving the loans at issue. (A true and exact copy of the Order issued by the Colorado Court on March 20, 2009 is attached hereto as **Exhibit D**.)

## ARGUMENT

28. MidCountry does not seek to directly impact any property right of this Debtor. Specifically, MidCountry does not seek to directly terminate the Contract with respect to LBHI, nor does MidCountry seek to change any of the rights LBHI may have under the Contract as servicing rights owner or other rights that may exist under the Contract in favor of the LBHI, if any. However, and that said, it is clear that the termination of Aurora as servicer has the legal effect of the terminating the Contract as a whole. *See* **Exhibit A** at § 9.01 Termination for Cause ("This Agreement shall be terminable at the sole option of the Owner if any of following events of default exist on the part of [Aurora])." *Id at* § 9.02 Termination Without Cause ("This Agreement shall terminate . . . upon sixty days notice from the Owner."). Hence, the Contract can be terminated with or without cause. If "no cause" is found to exist for the termination of Aurora, then Aurora may still be terminated "without cause." Under those circumstances, LBHI may be entitled to a termination fee under the Contract, but the Contract is still terminated. MidCountry does not seek to change that potential termination fee obligation to LBHI.

29. As discussed in *Collier On Bankruptcy*, Volume 5, paragraph 541.27, 541-110 (15th Ed. 2005): "[I]t is expressly provided that the property interests included in the estate pursuant to subsection (d) [of 11 U.S.C. § 541] include the debtor's legal title to a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains such legal title in order to service or supervise the servicing of the mortgage or interest. However, the section further provides that the interest 'becomes property of the estate . . . only to the extent of the debtor's legal title to such property but not to the extent of any equitable interest . . . that the debtor does not hold.'" (citing to 11 U.S.C. § 541(d)).

15

30.     Based upon the express language of the Contract, "[Aurora's] possession . . . shall be at the will of [MidCountry] . . . and such retention and possession by [Aurora] shall be in a custodial capacity only . . . . The ownership of each Mortgage Note, Mortgage, and the content of the Servicing File shall be vested in [MidCountry] . . . and the ownership of all records and documents . . . shall vest in [MidCountry] and shall be retained and maintained in trust by [Aurora] at the will of [MidCountry] in such custodial capacity only." *See* Contract at § 2.01, page 9.

31.     Section 541(d) of the Bankruptcy Code confirms *bona fide* secondary mortgage market transactions as the purchase and sale of assets. S. Rep. No. 989, 95th Cong. 2d Sess. 83-4 (1978). Mortgages or interests in mortgages which have been sold prepetition by the debtor in the secondary market should not, however, be considered as property of the debtor's estate. S. Rep. No. 989, 95th Cong. 2d Sess. 83-4 (1978).

32.     A seller-debtor may frequently have retained the original mortgage notes and related documents in the interest of the efficient servicing of the mortgages or interests in mortgages. The purchaser might not have recorded its ownership of the mortgages or interests in mortgages under applicable recording statutes. Pursuant to Section 541(d) of the Bankruptcy Code, the retention by a seller-debtor of the mortgage documents and the failure of the purchaser to record will not impair the asset sale character of the secondary mortgage market transactions. S. Rep. No. 989, 95th Cong. 2d Sess. 83-4 (1978). Nor will Section 544(a)(3) of the Bankruptcy Code benefit a trustee because the debtor holds the mortgage as security for a note and the note is not real property. Neither of these factors will change any obligation of the trustee to turn the mortgages or interests in mortgages over to the purchaser. 124 Cong. Rec. S17,413 (daily ed. Oct. 6, 1978); *Collier On Bankruptcy*, Volume 5, paragraph 541.27, 541-110 (15th Ed. 2005).

16

33.	The application of Section 541(d) of the Bankruptcy Code to secondary mortgage market transactions will not be affected by the terms of the servicing agreement between the purchaser and the mortgage servicer. *Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg., Inc.)*, 81 F.3d 592 (5th Cir. 1996). It makes no difference whether the parties characterize their relationship, for example, as one of trust, agency, or independent contractor. Whatever the characterization adopted by the parties, it will not affect the status in bankruptcy of bona fide secondary mortgage market purchases and sales. S. Rep. No. 989, 95th Cong. 2d Sess. 83-4 (1978), 124 Cong. Rec. S 17,413 (daily ed. Oct. 6, 1978); *see, e.g., In re Mortgage Funding, Inc.*, 12 C.B.C.2d 529, 48 B.R. 152 (Bankr. D. Nev. 1985); *In re Fidelity Standard Mortgage Corp.*, 36 B.R. 496 (Bankr. S.D. Fla. 1983).

34.	As applied to the secondary mortgages market, the purpose of Section 541(d) is, therefore,

> to make certain that the secondary mortgage market sales as they are currently structured are not subject to challenge by bankruptcy trustees and that the purchasers of mortgages will be able to obtain the mortgages or interests in mortgages which they have purchased from trustees without the trustees asserting that a sale of mortgages is a loan from the purchasers to the seller. 124 Cong. Rec. S17,413 (daily ed. Oct. 6, 1978).

35.	Subsection (d) re-emphasizes the provision of Section 541(a)(1) that the estate is to be comprised of all legal or equitable interests of the debtor in property as of commencement of the case. It also reiterates the general principle that an interest that is limited in the hands of the debtor is equally limited in the hands of the estate. Therefore, where the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest in the property. 124 Cong. Rec. H11,096 (daily ed. Sept. 28, 1978); 124 Cong. Rec. S17,413 (daily ed. Oct. 6, 1978). MidCountry should thus be able to proceed in the Colorado

17

Action to recover its property which, by definition, is not property of this bankruptcy estate, and to otherwise terminate Aurora as its servicer.

36. MidCountry recognizes that Section 362(a) of the Bankruptcy Code operates to stay, among other things "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . any act to create, perfect, or enforce any lien against property of the estate [and] any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a) (3), (4) and (6).

37. But, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay -- (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1).

38. To the extent that LBHI may have any interest in property arising from or relating to the Contract, MidCountry is entitled to relief from stay for "cause." The Mortgage Notes, Mortgages and Serving File (as defined in the Contract) and the related record and documents, are not property of the estate. The Debtor's interest, if any, is in the servicing rights and not the underlying loans. *Cf. In re American Home Mortgage*, 379 B.R. 503, 523 (Bankr. D. Del. 2008) (servicing rights are not an interest in mortgage loans).

39. Moreover, as courts in various jurisdictions have held, where a servicer of home mortgage loans is terminated by the owner for its failure to comply with contractual obligations under an "at will" contract such as the one at issue here, the servicer's ability to service the loans terminates immediately and the servicer is left only a cause of action for damages if the

18

termination was improper. *See, e.g., Federal Home Mortgage Corp. v. American Home Mortgage Corp.*, 2007 WL 2228619 (N.D. Tex., Aug. 3, 2007) (unreported decision) (court holding that, under contract terms identical in material part to contract at issue here, servicer's ability to service loans was terminated immediately upon its termination); *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1412 (9th Cir. 1996) (under contract terms like those at issue here, once terminated, servicer has no contractual right to service owner's loans); *In re LiTenda*, 246 B.R. 185, 192, 193 (Bankr. D.N.J. 2000) (under contract similar to that at issue here, once terminated, servicer's ability to service loans terminated immediately and sole remaining remedy is suit for damages, if any); *Martin v. First Federal Savings and Loan Ass'n of Andalusia*, 559 So. 2d 1075 (Ala. 1990) (preliminary injunction forcing servicer to cease and desist from further servicing and to return property and funds upheld where servicer refused to recognize its termination and refused to return funds).

## CONCLUSION

WHEREFORE, MidCountry requests that this Court enter an Order:

(i) Granting relief from the automatic stay imposed by Section 362(a) of the Bankruptcy Code, if applicable, to continue the Colorado Action against Aurora;

(ii) Allowing the termination of the Contract as to Lehman *nunc pro tunc* to the date that MidCountry issued a notice of termination;

(iii) Determining that LBHI is deemed to have given its consent to MidCountry's preferred successor servicer;

(iv) Determining that Section 362 of the Bankruptcy Code does not prevent recovery by MidCountry of its loan files from Aurora;

(v) Authorizing MidCountry, to the extent necessary, to include LBHI as a party in interest in the Colorado Action;

(vi) Waiving the 10-day stay under Fed. R. Bankr. P. 4001(a)(3); and

(vii) Granting such other and further relief as the Court deems just and proper.

Dated: April 1, 2009
Florham Park, NJ

                DAY PITNEY LLP

By:  /s/ Richard M. Meth
     RICHARD M. METH (RM7791)
     HERBERT K. RYDER (HR5137)

- and -

FAIRFIELD AND WOODS, P.C.
Scott T. Rodgers, #19943
1700 Lincoln Street, Suite 2400
Denver, CO  80203
Phone:  (303) 830-2400
Fax:  (303) 830-1033
Email:  srodgers@fwlaw.com

ATTORNEYS FOR MIDCOUNTRY BANK