# Exhibit "B"

| | |
|---|---|
| **DISTRICT COURT, DOUGLAS COUNTY, STATE OF COLORADO**<br>4000 Justice Way, Suite 2009<br>Castle Rock, Colorado 80109<br>(303)663-7200 | |
| **Plaintiff:**    MIDCOUNTRY BANK<br><br>v.<br><br>**Defendant:**    AURORA LOAN SERVICES LLC, a<br>Colorado limited liability company. | ☐ COURT USE ONLY ☐ |
| **Attorneys for Plaintiff MidCountry Bank:**<br>Scott T. Rodgers, #19943<br>Tamara A. Hoffbuhr, #29391<br>Kieran A. Lasater, #38751<br>Fairfield & Woods, P.C.<br>Wells Fargo Center, Suite 2400<br>1700 Lincoln Street<br>Denver, Colorado  80203<br>Tel:  303-830-2400<br>Fax:  303-830-1033<br>Email:  srodgers@fwlaw.com; thoffbuhr@fwlaw.com;<br>klasater@fwlaw.com | Case No.: 2009cv369<br><br><br>Division: 1 |
| **MOTION FOR TEMPORARY RESTRAINING ORDER<br>AND PRELIMINARY/PERMANENT INJUNCTION** | |

Plaintiff MidCountry Bank ("MidCountry"), by and through its attorneys, Fairfield and Woods, P.C., hereby moves the Court pursuant to Colorado Rule of Civil Procedure 65, for a temporary restraining order and a preliminary/permanent injunction against Defendant Aurora Loan Services LLC ("Aurora"), and, in support thereof, states:

## INTRODUCTION

1.    MidCountry is the owner of approximately 52 home mortgage loans, currently valued at roughly $16,000,000.00 ("Loans"), for which Aurora has been acting as the servicer under a contract dated July 30, 2007 ("Contract").  A copy of the Contact is attached as **Exhibit A.**

2.    In its First Amended Verified Complaint for Replevin and Other Relief against Aurora, dated March 9, 2009, MidCountry alleged four causes of action; breach of contract,

breach of fiduciary duty, accounting and replevin ("Amended Complaint"). Contemporaneous with filing its original Complaint on February 6, 2009, and under the express terms of the Contract, MidCountry terminated Aurora for cause by letter dated February 6, 2009, a copy of which is attached as **Exhibit B**.

3.    Without contractual or other authority, Aurora has refused to recognize its termination under the Contract, and has indicated that it intends to continue to service the Loans.

4.    This Motion for Temporary Restraining Order and Preliminary/Permanent Injunction ("Motion") is brought to secure a Temporary Restraining Order ("TRO"), followed by a Preliminary and Permanent Injunction, which compels Aurora to: (1) cease and desist from taking any further action on the Loans, including on behalf of MidCountry; (2) requires the immediate transfer of all accounts, loan documents and servicing files to Dovenmuehle Mortgage Inc. ("Dovenmuehle"), as well as all payments received from borrowers, less servicing fees earned prior to February 6, 2009 (date of termination); (3) affirmatively forbids any destruction of mortgage documents or servicing files; (4) and orders Aurora to provide MidCountry with a detailed accounting for each of the Loans.

5.    Notice of this Motion was provided to counsel for Aurora, Jamie G. Siler, Esq., Bloom Murr & Accomazzo, P.C., 410 17ᵗʰ Street, Suite 2400, Denver, Colorado, by hand delivery and electronic mail on March 9, 2009.

## FACTUAL ALLEGATIONS

6.    Under the Contract, in fulfilling its obligations as servicer of the Loans, Aurora was obligated to "service and administer the . . . Loans . . . consistent with the terms of [the] Agreement and with Accepted Servicing Practices." **Exhibit A at § 2.01.**

7.    "Accepted Servicing Practices" is defined under the Contract as "those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans . . . ." *Id.* at Article I.

### Short Sales

8.    Under the Contract, Aurora was granted authority to allow a borrower "to pay off a non-performing [loan] at less than its unpaid principal balance, [*i.e.,* a "short sale" or] charge off all or a portion of a non-performing [loan] . . . if [the] discounted payoff . . . or chargeoff . . . is in the best interest of . . . [MidCountry]; provided that in the case of any proposed discounted payoff [or] proposed charge off . . . [, Aurora] shall notify . . . [MidCountry] of the **proposed discounted payoff . . . [or] chargeoff . . . .**" **Exhibit A at § 3.10** (emphasis added).

9.    Despite its contractual obligation to notify MidCountry of short sales, Aurora has on multiple occasions authorized and conducted short sales at unreasonably low sales prices without providing MidCountry with advanced notice, and, thereby, deprived MidCountry of the

opportunity to deny Aurora authority to proceed. *See* Affidavit of Gregory A. Krenz at ¶ 16, attached as **Exhibit C**, and incorporated herein by this reference.

10.     One such short sale occurred on November 26, 2008 and involved the Lindo loan, where Aurora authorized a short sale on a property appraised at $440,000, with an outstanding principal balance and interest of $532,000, for a short sale amount of $300,000, resulting in a loss to MidCountry of $297,840.30. *See* **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 6.   Aurora failed to provide MidCountry with notice of this short sale, which constitutes a breach of Section 3.10 of the Contract.   If provided with notice, MidCountry would have instructed Aurora to reject the proposed short sale price. *Id.* at ¶ 6.

11.     Another short sale occurred on January 15, 2009 and involved the Tran loan, where Aurora authorized a short sale on a property with an outstanding principal balance and interest of $608,000, for a short sale amount of $462,000, resulting in a loss to MidCountry of $179,930.33. *Id.* at ¶ 7.   Aurora failed to provide MidCountry with notice of this short sale, which constitutes a breach of Section 3.10 of the Contract. If provided with notice, MidCountry would have instructed Aurora to reject the proposed short sale price. *Id.* at ¶ 7.

12.     In September, 2008, upon learning of the short sales after the fact, MidCountry, through its former counsel, made demand upon Aurora to provide MidCountry with, *inter alia*, notice of all short sales and detailed information on all the loans.   **Exhibit D**.   Despite this demand, Aurora failed to provide the demanded information.   **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 16.

13.     Despite its termination, upon information and belief, other non-performing loans are or may imminently be extinguished through short sales by Aurora without the contractually-required notice being provided to MidCounty, to its significant detriment. *Id.* at ¶ 17.

14.     Once a short sale is completed, MidCountry is deprived of the opportunity to object to the sale, and, thereby, avoid or reduce the loss on the loan. *Id.* at ¶ 17.

15.     Despite repeated demands for information regarding short sales prior to its termination, Aurora failed to so provide such information, and, upon information and belief, other loans are presently in immediate risk of being compromised in short sales without advanced notice being provided to MidCountry and without contractual authority following its termination.

## Primary Mortgage Guaranty Claims

16.     Some portion of the Loans are termed "LPMI Loans," which are defined under the Contract as loans covered by a "LPMI Policy," which, in turn, is defined as a policy of primary mortgage guaranty insurance. **Exhibit A** at Article I.

3

17.     For an LPMI loan, when a borrower defaults on his or her monthly mortgage payment obligation, an LPMI Policy provides protection to the lender, MidCountry, to make it whole for the loss of payments. **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 9.

18.     On April 1, 2008, one borrower failed to make his or her mortgage payment, and, despite a valid LPMI Policy being in effect, the insurer denied the claim. *Id.* at ¶ 10. The basis of the denial was that the borrower did not intend to occupy the property at the time the cash refinancing was closed which was patently erroneous as the borrower did in fact occupy the property at the time the loan was closed. *Id.* at ¶ 10,12. Aurora was aware of those facts. *Id.* at ¶ 12.

19.     Under the terms of the LPMI Policy, an appeal of the denial had to be made within 60 days or rejection. *Id.* at ¶ 10. However, despite the baseless denial, Aurora failed to timely appeal the denial, or to provide MidCountry with notice of the denial until after the appeal period had expired, resulting in losses of approximately $128,728.08. *Id.* at ¶ 12.

20.     Under the Contract, Aurora was obligated to "take all such actions as are necessary to service, maintain and administer the LPMI Loans in accordance with the LPMI Policy and to perform and enforce the rights of [MidCountry] under such LPMI Policy." **Exhibit A** at § 3.08.

21.     Further, Aurora was contractually obligated to "prepare and present, on behalf of itself and . . . [MidCountry], claims to the insurer under any LPMI Policy in a timely fashion in accordance with the terms of such LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any LPMI Policy respecting a defaulted . . . Loan." *Id.*

22.     Despite the foregoing contractual obligations, Aurora has, on at least 2 occasion(s), failed to timely appeal a patently unfounded denial of an LPMI claim, and, further, failed to timely inform MidCountry so as to allow it to take appropriate action on its own behalf. **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 10,12, and 13.

23.     Upon information and belief, numerous other LPMI claims have or may in the immediate future be denied. Aurora has already been termination as servicer, and, therefore, it cannot "take such action as shall be necessary to permit recovery under any LPMI Policy . . . ." **Exhibit A** at § 3.08; **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 15.

### Aurora's Refusal to Provide Loan-Level Information

24.     Due to Aurora's refusal to provide MidCountry with demanded loan-level information, MidCountry is presently unaware of additional short sales or LPMI claims; however, based upon the known instances of such, and upon information and belief, Aurora has, or in the immediate future will, act contrary to the Contract and against MidCountry's interests.

25.     In addition to refusing to provide MidCountry with loan information, Aurora has also refused to recognize its termination by MidCountry and its current obligation to cooperate in

the transfer of the escrow accounts, mortgage and servicing files, as well as servicing
responsibilities to MidCountry's designee, Dovenmuehle.

### Aurora Loan Services' Viability

26.    Based upon media publications related to Aurora's financial condition and
prospects for future success, there is a substantial present danger that Aurora will file for
bankruptcy protection.

27.    If such were to occur, MidCountry's assets, *i.e.*, the Loans, accounts and all
related documents in Aurora's possession, would be at significant risk of loss or destruction, with
resultant irreparable damage to MidCountry and its borrowers. **Exhibit C** (Affidavit of Mr.
Krenz) at ¶ 18.

28.    Additionally, MidCountry's borrowers are directly adversely affected by Aurora's
inability to service the Loans through missed insurance and/or tax payments. *Id.* at ¶ 18.

### Aurora's Refusal to Recognize its Termination

29.    Under the Contract, MidCountry, as owner of the Loans, accounts and mortgage
files, and on whose behalf Aurora holds the mortgage documents in trust, has the discretion and
authority to unilaterally terminate Aurora for cause. **Exhibit A** at § 9.01. Based upon Aurora's
breach of the Contract and its continuing refusal to provide basic information requested by
MidCountry, on February 6, 2009, MidCountry served written notice to Aurora of its termination
for cause, setting forth in detail the grounds for termination. *See* **Exhibit B**.

30.    Without contractual or other authority, Aurora has refused to recognize its
termination and has refused to transfer escrow accounts, mortgage documents and servicing files
to Dovenmuehle, as demanded by MidCountry. *See* **Exhibit C**. Aurora has, thereby, further
breached its contractual obligation to cooperate in the transfer of serving responsibilities to the
successor servicer. **Exhibit A** at § 10.01.

31.    This refusal to transfer accounts and loan files and related documents represents
an improper interference with MidCountry's property rights as owner of the Loans, accounts and
related documents, but also will result in irreparable harm without adequate legal remedy based
upon Aurora's interference with MidCountry's ability to service the loans on a day-to-day basis
itself through its designated successor servicer Dovenmuehle, and may additionally cause
irreparable harm to the borrowers themselves through the lack of servicing of their loans,
including missed insurance and tax payments. **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 18.

## LEGAL STANDARD

In Colorado, for a plaintiff to prevail on a Motion for Temporary Restraining Order or Preliminary Injunction, it must make a *prima facie* showing that:

1. there is a reasonable probability of success on the merits;
2. [there exists] a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief;
3. that there is no plain, speedy, and adequate remedy at law;
4. that the granting of a preliminary injunction will not disserve the public interest;
5. that the balance of the equities favors the injunction; and
6. that the injunction will preserve the status quo pending a trial on the merits.

*Rathke v. MacFarlane*, 648 P.2d 648, 653-54 (Colo. 1982) (internal citations omitted).

As discussed *infra seriatim*, each of the elements of this standard are satisfied under the facts of this case.

## ARGUMENT

**A.   MidCountry Has a Reasonable Probability of Success on the Merits.**

In order to satisfy the test of reasonable probability of success on the merits, the moving party must establish "the proper legal standard and applicable burden of proof which [will] be required at a subsequent trial on the merits." *Rathke*, 648 P.2d at 655.

In its Complaint, MidCountry brought claims for breach of contract, breach of fiduciary duty, accounting and replevin. *See* Complaint.

1.   Breach of Contract

In order to establish a *prima facie* case for breach of contract under New York law,[1] a plaintiff must establish: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *Noise in Attic Prods., Inc.* v. *London Records*, 782 N.Y.S.2d 1, 3-4 (N.Y. App. Div. 2004).

---

[1] *See* **Exhibit A** at § 10.09 (choice of law provision providing New York law).

6

A valid and enforceable contract exists between the Parties. **Exhibit A.** MidCountry has performed under the Contract. **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 4. As detailed above, Aurora has breached the Contract by, *inter alia*, failing to provide notice to MidCountry of short sales, by failing to represent MidCountry's interests in the administration of the LPMI Loans where denials of coverage occurred, and by refusing to recognize its termination and failure to transfer the accounts and mortgage files to Dovenmuehle. *Id.* at ¶ 16. These breaches have caused MidCountry damages in the form of, *inter alia*, losses equal to the difference between the amount of the short sale and the total principal and interest due under the loans, lost insurance proceeds under the LPMI policies, as well as loss of the ability to service the loans which it owns. *Id.* at ¶ 17.

As demonstrated above, MidCountry can establish a *prima facie* case of breach of contract against Aurora. Therefore, there is a substantial likelihood of success on the breach of contract claim. *See, e.g., Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.,* 2007 WL 2228619 (N.D. Tex. 2007) (unreported decision) (finding substantial likelihood of success on the merits in factually similar case involving termination of a servicer by owner of loans).

2.    Breach of Fiduciary Duty

In order to establish a *prima facie* case for breach of fiduciary duty under New York law, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct[.]" *Fitzpatrick House III, LLC v. Neighborhood Youth & Family Services,* 868 N.Y.S.2d 212, 213 (N.Y. App. Div. 2008) (internal citation omitted).

Due to the remarkable degree of trust, discretion and judgment vested in Aurora by MidCountry under the Contract, a fiduciary relationship existed between the Parties. In point of fact, Aurora was to act for MidCountry as though it was acting for and representing its own interests. Aurora has engaged in misconduct by, *inter alia*, failing to provide notice to MidCountry of short sales, by failing to represent MidCountry's interests in the administration of the LPMI Loans where denials of coverage occurred, and by failing to provide information when requested and by failing to recognize its termination under the Contract. **Exhibit C** (Affidavit of Mr. Krenz). As set forth above, this misconduct has directly resulted in damages to MidCountry. *Id.* Therefore, because MidCountry can make a *prima facie* case for breach of fiduciary duty, there is a reasonable probability of success on the merits.

3.    Accounting

Under New York law, "[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest[.] An allegation of wrongdoing is not an indispensable element of a demand for an accounting where the complaint indicates a fiduciary relationship between the parties or some other special circumstance warranting equitable relief." *Adam v. Cutner & Rathkopf,* 656 N.Y.S.2d 753, 759 (N.Y. App. Div. 1997) (internal quotations and citations omitted).

Under the Contract, MidCountry is entitled to an accounting upon the naming of a successor servicer. **Exhibit A** at § 10.01 ("[Aurora] **shall account for all funds** and shall execute and deliver such instruments and do such other things as may reasonably be required . . . .") (emphasis added). Moreover, under New York common law, because a confidential and fiduciary relationship exists between MidCountry and Aurora, as discussed *supra*, and because MidCountry has alleged that Aurora has engaged in wrongdoing related to MidCountry's property, a common law right to an accounting also exists. *See Adam,* 656 N.Y.S.2d at 759. Therefore, because MidCountry has established its entitlement to an accounting both under the Contract and at common law, there is a reasonably probability of its success on the merits of the accounting claim.

4.    Replevin

In order to succeed on a claim for replevin, a plaintiff must establish its ownership interest in some chattel or its right to possession of same, the source of the title or right, that the chattel is being detained against the title or right, the means by which the defendant came into possession, and the facts constituting the detention against the right to possession. C.R.C.P. 104(b)(1)-(2). Additionally, the plaintiff must describe the property and its value, its location, and provide that the property has not been taken for tax assessment, etc. *Id.* at 104(b)(3)-(4).

In its Amended Complaint, as well in the Motion for Replevin, MidCountry set forth and provided evidence of each of the foregoing elements. Therefore, there is a reasonable probability that MidCountry will succeed on the merits of the replevin claim as well.

**B.    Danger of Real, Immediate and Irreparable Injury Preventable by Injunctive Relief**

Colorado's courts have not addressed the precise issue presented herein, *i.e.,* whether an owner of home mortgage loans, and its borrowers, face immediate and irreparable harm when a servicer has or is improperly servicing loans and refuses to recognize its termination and fails to transfer the loan documents, accounts and servicing obligations to a successor. Other jurisdictions have directly considered the issue and have uniformly held that irreparable harm will result and that injunctive relief is appropriate.

8

In *Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.*, 2007 WL 2228619 (N.D. Tex. 2007) (unreported decision), the court was asked to issue a temporary restraining order (TRO) where the plaintiff, Freddie Mac, as owner of certain home mortgage loans, presented evidence that it terminated the servicer/defendant for cause based upon its insolvency, as well as, *inter alia*, its failure to report and remit funds to Freddie Mac. *Id.* at \*2. After receiving written notice of termination of its right to service the loans, the servicer/defendant refused to turn over the loan documents and servicing files as demanded in the termination letter, and generally refused to recognize its termination. *See id.*

In response, Freddie Mac moved for a TRO, seeking the delivery of its mortgage files to its designated successor servicer, the delivery of all funds derived from the loans, a command that the defendant/servicer refrain from destroying any mortgage files or documents, and to refrain from taking any additional action on Freddie Mac's loans. *Id.* at \*3. In considering the elements required for the granting of a TRO, and, in particular, the possibility of irreparable harm, the court agreed with the owner of the loans and held that, without the loan documents and servicing files, Freddie Mac could not transfer the servicing of the loans to a successor servicer and could not service the loans it owned. *Id.* at \*5. Further, the court found that ordering the transfer of the files to the successor servicer would prevent harm to the borrowers as well by allowing the maintenance of insurance and tax payments. *Id.*

Just as in *Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.*, *supra*, here Aurora has been terminated for cause, yet has refused to recognize its termination and has refused to relinquish the mortgage files it holds in trust for MidCountry. **Exhibits B, C.** Aurora's refusal to recognize its termination—a contractual right of MidCountry which immediately divests Aurora of servicing rights and leaves Aurora with the limited remedy of suing for damages for any alleged wrongful termination—[2]and refusal to transfer loan documents and servicing files to MidCountry's designated successor servicer, will cause irreparable harm to MidCountry in that it is unlawfully prevented from servicing its loans, to the additional irreparable harm of its borrowers. *See id.*

The issue was likewise addressed in *Martin v. First Federal Savings & Loan Assoc. of Andalusia*, 556 So.2d 1075 (Ala. 1990) where the Supreme Court of Alabama upheld a trial court's granting of a TRO where a terminated loan servicer in financial difficulty refused to acknowledge its termination and attempted to continue to service loans and collect mortgage payments. *Id.* at 1077. The court, finding that sufficient evidence had been presented to establish that the servicer was affirmatively attempting to disregard its termination and actively attempted to continue to service the loans, including the receipt of mortgage payments, found

---

[2] *See, e.g., In re LiTenda Mortgage Corp.*, 246 B.R. 185, 192-93 (Bankr. D. N.J. 2000) (finding that Freddie Mac, as owner of loans had contractual right to terminate debtor for cause which immediately terminated all rights to service loans and where resulting remedy, if any, was suit for damages for wrongful termination); *see also, American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1411-12 (9th Cir. 1996) (same).

that if a TRO was not issued, permanent and irreparable harm would be occasioned upon the owner of the loans and that there was no adequate remedy at law. *Id.* at 1079.

Based upon the foregoing, it is well established that, where a servicer refuses to recognize its termination, refuses to relinquish mortgage files and attempts to continue to service loans, thereby depriving the owner of the ability to service the loans and risking further harm to the borrowers, immediate and irreparable harm is established so as to support this element of the injunctive relief sought. *See, e.g., Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.*, 2007 WL 2228619 (N.D. Tex. 2007) (unreported decision); *Martin v. First Federal Savings & Loan Assoc. of Andalusia*, 556 So.2d 1075 (Ala. 1990).

C.    **No Plain, Speedy and Adequate Remedy at Law**

As recognized by the court in *Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.*, *supra*, an argument that an owner of loans suffers only monetary damages where a servicer refuses to return mortgage documents is without merit. *Federal Home Loan Mortgage Corp. v. American Home Mortgage Corp.*, 2007 WL 2228619, *5 (N.D. Tex. 2007) (unreported decision). This is especially true where the terminated servicer is in financial peril. *Id.* The inadequacy of legal damages was likewise found by the court in *Martin v. First Federal Savings & Loan Assoc. of Andalusia*, 556 So.2d 1075 (Ala. 1990), where it upheld the trial court's grant of a TRO in a factually-similar case.

The mortgage files and loan documents are the property of MidCountry as owner, and are held by Aurora only in trust for MidCountry. **Exhibit A** at § 2.01 ("Each Servicing File delivered to [Aurora] shall be held by . . . [Aurora] in order to service the Mortgage Loans pursuant to . . . [the Contract] and are and shall be held in trust by . . . [Aurora' for the benefit of . . . [MidCountry] as the owner thereof . . . ."). By depriving MidCountry of the servicing files and loan documents, Aurora unlawfully prevents MidCountry from ensuring the servicing of the Loans. Monetary damages cannot compensate MidCountry (or its borrowers) for the myriad harms that flow from a lack of servicing, including, but not limited to, any failure to maintain insurance policies and any timely remittance of tax payments. *See, e.g., Federal Home Loan Mortgage Corp.*, 2007 WL 2228619, *5. Accordingly, MidCountry can establish this element of a claim for a TRO.

D.    **The Public Interest Favors Granting the Relief**

In the absence of an order from the Court compelling the transfer of the escrow accounts, mortgage documents and servicing files, MidCountry is unable to service not less than 52 loans in multiple jurisdictions, thereby impacting the various borrowers, their families and related service providers. **Exhibit C** (Affidavit of Mr. Krenz) at ¶ 18. The public interests in the protection of ownership rights, the enforcement of contracts, and the ability to choose a service provider at will, are also furthered by granting the TRO.

10

There is no conceivable public interest in allowing a loan servicer—who merely holds documents in trust for the owner—to refuse to return such documents based upon a disagreement with the owner's discretionary decision to terminate for cause. As recognized by numerous courts, once terminated, a loan servicer immediately looses its servicing rights, and is left with the remedy of a suit for damages. *See, e.g., In re LiTenda Mortgage Corp.*, 246 B.R. 185, 192-93 (Bankr. D. N.J. 2000) (finding that Freddie Mac, as owner of loans had contractual right to terminate debtor for cause which immediately terminated all rights to service loans and where resulting remedy, if any, is suit for damages for wrongful termination); *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1411-12 (9th Cir. 1996) (same).

Therefore, the public interest is decidedly and conclusively in favor of granting the TRO.

**E.      The Balance of Equities Favors the Relief Sought**

With respect to the balancing of the equities, the harm to MidCountry (and its borrowers) if the relief sought is denied grossly outweighs any harm to Aurora if the TRO is granted. At most, Aurora will be forced to expend resources provided under the contract and is compiling and transmitting the escrow accounts, mortgage documents and loan files, which, as recognized by the courts in *Federal Home Loan Mortgage Corp.* and *In re LiTenda Mortgage Corp., supra*, the servicer is obligated to do immediately after its termination anyway. Aurora's proper remedy is a counterclaim for breach, which can adequately be addressed in this action, not the unlawful retention and conversion of escrow accounts and loan documents.

On the other hand, if the TRO is not granted, MidCountry will be deprived of the ability to service the 53 Loans, which could result in the lapse of insurance coverage for LPMI Loans, tax delinquencies by borrowers with resulting liens, as well as deprive MidCountry of its property rights. Plainly, the balancing of the equities favors granting the TRO.

**F.      The Remedy Will Preserve the Status Quo**

The injunction will preserve the *status quo* pending the resolution of the claims at issue at trial. Once the notice of termination was provided on February 6, 2009, Aurora immediately lost any right to service the Loans and was compelled to transfer the escrow accounts and mortgage documents and files to Dovenmuehle, and, further, to cooperate fully with the transition of servicing rights. *See, e.g., In re LiTenda Mortgage Corp.*, 246 B.R. 185, 192-93 (Bankr. D. N.J. 2000) (finding that Freddie Mac, as owner of loans had contractual right to terminate debtor for cause which immediately terminated all rights to service loans and where resulting remedy, if any, is suit for damages for wrongful termination); *American Bankers Mortgage Corp. v. Federal Home Loan Mortgage Corp.*, 75 F.3d 1401, 1411-12 (9th Cir. 1996) (same); *see also* **Exhibit A** at § 10.01 (duty to cooperate with transfer of servicing rights). Through the issuance of the injunction, the *status quo* will be preserved because Aurora will be compelled to do that which it is immediately obligated to do following its termination on February 6, 2009.

11

Moreover, MidCountry will be able to ensure the continued servicing of its Loans through the return of its property.

## CONCLUSION

Based upon the foregoing, and because each requirement of Colorado Rule of Civil Procedure 65 has been met, the Court should issue an injunction which temporarily, preliminarily, and permanently enjoins Aurora from: (1) taking any further action on the Loans, including on behalf of MidCountry; (2) requires the immediate transfer of all accounts, loan documents and servicing files to Dovenmuehle Mortgage Inc., as well as all payments received from borrowers, less servicing fees earned prior to February 6, 2009 (date of termination); (3) affirmatively forbids any destruction of mortgage documents or servicing files; (4) and orders Aurora to provide MidCountry with a detailed accounting for each of the Loans.

WHEREFORE, MidCountry Bank respectfully requests a temporary restraining order, followed by a preliminary injunction (at the appropriate time under Rule 65), ordering Aurora Loan Services LLC:

      a.    to cease and desist from taking any further action on the Loans, including on behalf of MidCountry Bank;

      b.    to immediately transfer of all accounts, loan documents and servicing files to Dovenmuehle Mortgage Inc., as well as all payments received from borrowers, less servicing fees earned prior to February 6, 2009 (date of termination);

      c.    to refrain from destroying mortgage documents or servicing files;

      d.    to provide MidCountry with an accounting for each of the Loans within five calendar days of the entry of the order; and

      e.    such other and further relief as the Court deems just and proper.

Respectfully submitted this 9th day of March, 2009.

FAIRFIELD AND WOODS, P.C.

By:_____

Scott T. Rodgers
Tamara A. Hoffbuhr
Kieran A. Lasater

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following via hand delivery on the 9th day of March , 2009.

Jamie G. Siler, Esq.,
Bloom Murr & Accomazzo, P.C., 410 17th Street, Suite 2400
Denver, Colorado 80202

s/Meghan M. Betz
Meghan M. Betz

EXECUTION

SERVICING AGREEMENT

between

MIDCOUNTRY BANK,

OWNER,

LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC.,

SERVICING RIGHTS OWNER

and .

AURORA LOAN SERVICES LLC,

SERVICER

Dated as of July 30, 2007

Residential Mortgage Loans
Group No. 2007-1



10386/76
02/06/2009 2190030.03

# TABLE OF CONTENTS

**Section**                                                                                                   **Page**

ARTICLE I. DEFINITIONS                                                                                        1

ARTICLE II. OWNER'S ENGAGEMENT OF SERVICER TO PERFORM SERVICING RESPONSIBILITIES                             9

Section 2.01.    Contract for Servicing; Possession of Servicing Files. ...............................9
Section 2.02.    Books and Records. ...............................................................................9
Section 2.03.    Custodial Agreement or Owner's Possession of the Mortgage Loan Documents. ...............................................................................10
Section 2.04.    Original Documents. ...............................................................................10

ARTICLE III. SERVICING OF THE MORTGAGE LOANS                                                                 11

Section 3.01.    Servicer to Service. ...............................................................................11
Section 3.02.    Collection of Mortgage Loan Payments. ...............................................12
Section 3.03.    Establishment of and Deposits to Custodial Account. .........................13
Section 3.04.    Permitted Withdrawals From Custodial Account. ...............................14
Section 3.05.    Establishment of and Deposits to Escrow Account. ............................15
Section 3.06.    Permitted Withdrawals From Escrow Account. ...................................16
Section 3.07.    Notification of Adjustments. ...............................................................16
Section 3.08.    Maintenance of LPMI Policy; Claims. ................................................16
Section 3.09.    Protection of Accounts. .......................................................................17
Section 3.10.    Title, Management and Disposition of REO Property. .........................18
Section 3.11.    Real Estate Owned Reports. ...............................................................20
Section 3.12.    Credit Reporting. .................................................................................20

ARTICLE IV. PAYMENTS TO OWNER                                                                                20

Section 4.01.    Remittances. ........................................................................................20
Section 4.02.    Statements to Owner. ..........................................................................21
Section 4.03.    Monthly Advances by Servicer. ..........................................................22

ARTICLE V. GENERAL SERVICING PROCEDURES                                                                      22

Section 5.01.    Servicing Compensation. .....................................................................22
Section 5.02.    Annual Statement as to Compliance. ...................................................23
Section 5.03.    Annual Independent Public Accountants' Servicing Report. .................23
Section 5.04.    Owner's Right to Examine Servicer Records. ......................................23

ARTICLE VI. REPRESENTATIONS, WARRANTIES AND AGREEMENTS       .   23

Section 6.01.        Representations, Warranties and Agreements of the Servicer. ...................23
Section 6.02.        Remedies for Breach of Representations and Warranties of the Servicer. 25
Section 6.03.        Representations and Warranties of the Owner................................25
Section 6.04.        Remedies for Breach of Representations and Warranties of the Owner....27

ARTICLE VII. INDEMNIFICATION BY THE SERVICER                    27

Section 7.01.        Additional Indemnification by the Servicer; Third Party Claims .............27

ARTICLE VIII. THE SERVICER                                      28

Section 8.01.        Merger or Consolidation of the Servicer.............................................28
Section 8.02.        Limitation on Liability of the Servicer and Others. ...................................28
Section 8.03.        Limitation on Resignation and Assignment by the Servicer......................29

ARTICLE IX. TERMINATION                        .               29

Section 9.01.        Termination for Cause. ................................................................29
Section 9.02.        Termination Without Cause. ...........................................................31

ARTICLE X. MISCELLANEOUS PROVISIONS                            32

Section 10.01.       Successor to the Servicer. ..............................................................32
Section 10.02.       Closing. ................................................................................................33
Section 10.03.       Closing Documents.......................................................................34
Section 10.04.       Costs............................................................................................34
Section 10.05.       Notices. .........................................................................................34
Section 10.06.       Severability Clause. ...................................................................35
Section 10.07.       No Personal Solicitation. ...............................................................36
Section 10.08.       Counterparts.................................................................................36
Section 10.09.       Governing Law. ...........................................................................36
Section 10.10.       Further Agreements.......................................................................36
Section 10.11.       Successors and Assigns; Assignment of Servicing Agreement. ...........36
Section 10.12.       Waivers. .......................................................................................37
Section 10.13.       Exhibits. .......................................................................................37
Section 10.14.       General Interpretive Principles. ...................................................37
Section 10.15.       Reproduction of Documents. .......................................................37
Section 10.16.       Reconstitution ..............................................................................38
Section 10.17.       Confidentiality ............................................................................38
Section 10.18.       Safeguarding Customer Information.............................................38

# EXHIBITS

EXHIBIT A-1 MORTGAGE LOAN SCHEDULE
EXHIBIT A-2 LPMI MORTGAGE LOAN SCHEDULE
EXHIBIT B    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT C    CUSTODIAL ACCOUNT CERTIFICATION
EXHIBIT D    ESCROW ACCOUNT CERTIFICATION
EXHIBIT E    MORTGAGE LOAN DOCUMENT RELEASE FORM
EXHIBIT F    S50Y PRIVATE POOL DETAIL REPORT DATA FIELD ELEMENTS

## SERVICING AGREEMENT

This is a Servicing Agreement (the "Agreement"), dated as of July 30, 2007, by and between MidCountry Bank (the "Owner"), Aurora Loan Services LLC (the "Servicer") and Lehman Capital, A Division of Lehman Brothers Holdings Inc. (the "Servicing Rights Owner").

## WITNESSETH

WHEREAS, the Owner has acquired ownership of certain fixed or adjustable rate first or second lien mortgage loans, excluding any of the related Servicing Rights (the "Mortgage Loans") from Lehman Capital, A Division of Lehman Brothers Holdings Inc. (the "Servicing Rights Owner"); and

WHEREAS, the Servicing Rights Owner has previously contracted with the Servicer for the servicing responsibilities associated with the Mortgage Loans and the Servicer has assumed the servicing responsibilities to such Mortgage Loans.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which is hereby acknowledged, the Owner and Servicer hereby agree the Servicer shall continue to service the Mortgage Loans as follows:

## ARTICLE I.

## DEFINITIONS

The following terms are defined as follows (except as otherwise agreed in writing by the parties):

Accepted Servicing Practices:  With respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loans in the jurisdiction where the related Mortgaged Property is located.

Agreement:  This Servicing Agreement and all amendments hereof and supplements hereto.

Ancillary Income:  All incidental income derived from the Mortgage Loans, other than Servicing Fees, including but not limited to, interest received on funds deposited in the Custodial Account or the Escrow Account, late charges, fees received with respect to checks or bank drafts returned by the related bank for non-sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges (but excluding prepayment charges, which shall be the property of the Owner).  The Servicer shall retain all Ancillary Income.

<u>Appraised Value</u>: The value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property.

<u>Assignment Fee</u>: $9.25 per Assignment of Mortgage plus all reasonable out-of-pocket recording expenses incurred in connection with recording such Assignments of Mortgage.

<u>Assignment of Mortgage</u>: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein, which assignment, notice of transfer or equivalent instrument may be in the form of one or more blanket assignments covering the Mortgage Loans secured by Mortgaged Properties located in the same jurisdiction, if permitted by law.

<u>Best Efforts</u>: Efforts determined to be reasonably diligent by the Owner or Servicer, as the case may be, in its sole discretion. Such efforts do not require the Owner or Servicer, as the case may be, to enter into any litigation, arbitration or other legal or quasi-legal proceeding, nor do they require the Owner or Servicer, as the case may be, to advance or expend fees or sums of money in addition to those specifically set forth in this Agreement.

<u>Business Day</u>: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the States of Nebraska, New York or Colorado are authorized or obligated by law or executive order to be closed.

<u>Closing Date</u>: July 30, 2007.

<u>Code</u>: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of the Treasury regulations issued pursuant thereto.

<u>Condemnation Proceeds</u>: All awards of settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan documents.

<u>Costs</u>: For any Person, any actual claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses of such Person, excluding however, any and all consequential and punitive damages.

<u>Custodial Account</u>: The separate account or accounts created and maintained pursuant to Section 3.03.

<u>Custodial Agreement</u>: The agreement(s) governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents. If more than one Custodial Agreement is in effect at any given time, all of the individual Custodial Agreements shall collectively be referred to as the "Custodial Agreement."

<u>Custodian</u>: LaSalle Bank National Association and its successors.

-2-

Customer Information:  Shall have the meaning set forth in the Interagency Guidelines Establishing Information Security Standards, published in final form on December 28, 2004, 69 Fed. Reg. 77610.

Determination Date:  For each month that this Agreement is in effect, the date which is two (2) Business Days prior to the Remittance Date.

Due Date:  The day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.  With respect to the Mortgage Loans for which payment from the Mortgagor is due on a day other than the first day of the month, such Mortgage Loans will be treated as if the Monthly Payment is due on the first day of the month following the actual Due Date.

Due Period:  With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month in which the Remittance Date occurs.

Eligible Investments:  Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than the Determination Date in each month:

(i)  direct obligations of, and obligations fully guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America; and

(ii)  federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as at the time of such investment or contractual commitment providing for such investment the commercial paper or other short-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such holding company) are rated "P-1" by Moody's Investors Service, Inc. and the long-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the long-term debt obligations of such holding company) are rated at least "Aa" by Moody's Investors Service, Inc.;

provided, however, that no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations

-3-

underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations.

> Escrow Account:  The separate account or accounts created and maintained pursuant to Section 3.05.

> Escrow Payments:  With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other document.

> Event of Default:  Any event set forth in Section 9.01.

> Fannie Mae:  Fannie Mae, or any successor thereto.

> Fannie Mae Guides:  The Fannie Mae Selling Guide and the Fannie Mae Servicing Guide and all amendments or additions thereto.

> FDIC:  The Federal Deposit Insurance Corporation, or any successor thereto.

> Freddie Mac:  Freddie Mac, or any successor thereto.

> Insurance Proceeds:  With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property.

> Liquidation Proceeds:  Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, discounted payoff, foreclosure sale or otherwise, or the sale of the related REO Property, if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

> LPMI Loan:  A Mortgage Loan covered by an LPMI Policy, as set forth in the LPMI Mortgage Loan Schedule attached hereto as Exhibit A-2.

> LPMI Fees:  With respect to each LPMI Loan, the portion of the Mortgage Interest Rate which, during such period prior to the required cancellation of the LPMI Policy, shall be used to pay the premium due on the related LPMI Policy.

> LPMI Policy:  A policy of primary mortgage guaranty insurance pursuant to which the related premium is to be paid from payments of interest made by the Mortgagor.

> MERS:  Mortgage Electronic Registration Systems, Inc., a Delaware corporation or any successor in interest thereto.

MERS Eligible Mortgage Loan: Any Mortgage Loan that has been designated by the Servicer as recordable in the name of MERS.

MERS Mortgage Loan: Any Mortgage Loan as to which the related Mortgage, or an Assignment of Mortgage, has been or will be recorded in the name of MERS, as agent for the holder from time to time of the Mortgage Note.

Monthly Advance: With respect to each Remittance Date and each Mortgage Loan, an amount equal to the Monthly Payment (with the interest portion of such Monthly Payment adjusted to the Mortgage Loan Remittance Rate) which was due on the Mortgage Loan, and (i) which was delinquent at the close of business on the immediately preceding Determination Date and (ii) which was not the subject of a previous Monthly Advance; provided, for the purpose of clarification, that the Servicer shall not be required to make a Monthly Advance for any payments of principal or interest with respect to a reduction in the value of a Mortgage Note upon the order of a bankruptcy court of competent jurisdiction.

Monthly Payment: The scheduled monthly payment of principal, as set forth in the related Mortgage Note or a related modification agreement, and interest on a Mortgage Loan.

Mortgage: The mortgage, deed of trust or other instrument securing a Mortgage Note, including all riders thereto, which creates a first or second lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note.

Mortgage Interest Rate: The annual rate of interest borne on a Mortgage Note, which for adjustable rate Mortgage Loans may be subject to adjustment from time to time in accordance with the terms of the Mortgage Note.

Mortgage Loan: An individual Mortgage Loan which is the subject of this Agreement, each Mortgage Loan subject to this Agreement being identified on the Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage Loan documents, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

Mortgage Loan Remittance Rate: With respect to each Mortgage Loan, the annual rate of interest remitted to the Owner, which shall be equal to the Mortgage Interest Rate minus the applicable Servicing Fee minus any LPMI Fees.

Mortgage Loan Schedule: A schedule of the Mortgage Loans setting forth information with respect to such Mortgage Loans attached hereto as Exhibit A-1, including a prepayment charge indicator and related provisions.

Mortgage Note: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage, including all riders thereto.

Mortgaged Property: The real property securing repayment of the debt evidenced by a Mortgage Note.

-5-

Mortgagor: The obligor on a Mortgage Note.

Net Sale Proceeds: The proceeds from the sale of REO Property, net of all expenses incurred by the Servicer in connection with such sale, including, without limitation, legal fees and expenses, referral fees, brokerage commissions, conveyance taxes and any other related expense.

Nonrecoverable Advance: Any Monthly Advance or Servicing Advance previously made or proposed to be made in respect of a Mortgage Loan by the Servicer which, in the reasonable discretion of the Servicer, will not or, in the case of a proposed Servicing Advance, would not, ultimately be recoverable by the Servicer from the related Mortgagor, related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds or otherwise.

Opinion of Counsel: A written opinion of counsel, who may be an employee of the Servicer, reasonably acceptable to the Owner.

Owner: MidCountry Bank, or its successors in interest and assigns.

Person: Any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

PMI Policy: A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

Prepayment Interest Excess Amount: With respect to any Principal Prepayment in full which is applied to the related Mortgage Loan from the first day of the month of any Remittance Date through the sixteenth day of the month of such Remittance Date, all amounts paid in respect of interest on such Principal Prepayment in full. A Prepayment Interest Excess Amount cannot result from a Principal Prepayment in part, but only from a Principal Prepayment in full.

Prepayment Interest Shortfall Amount: With respect to any Remittance Date and any Principal Prepayment in full which is applied to the related Mortgage Loan from the seventeenth day of the month immediately preceding the month of such Remittance Date through the last day of the month immediately preceding the month of such Remittance Date, the amount of interest (net the related Servicing Fee) that would have accrued on the amount of such Principal Prepayment in full from the date on which such Principal Prepayment was applied to such Mortgage Loan until the last day of the month immediately preceding the month of such Remittance Date, inclusive. With respect to any Remittance Date and any Principal Prepayment in part (other than a Principal Prepayment in part received on the first day of the month) which is applied to the related Mortgage Loan during the related Prepayment Period, the amount of interest that would have accrued on the amount of such Principal Prepayment in part from the date on which such Principal Prepayment in part was applied to such Mortgage Loan until the end of the Prepayment Period, inclusive.

-6-

Prepayment Period:  With respect to any Remittance Date and a Principal Prepayment in full, the period from the seventeenth day of the month immediately preceding the month of such Remittance Date to the sixteenth day of the month of such Remittance Date.  With respect to any Remittance Date and a Principal Prepayment in part, the calendar month immediately preceding the month of such Remittance Date.

Prime Rate:  The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal Northeast Edition.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment charge or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Qualified Depository:  Any of (i) a depository the accounts of which are insured by the FDIC and the debt obligations of which are rated AA (or its equivalent) or better by each Rating Agency; (ii) the corporate trust department of any bank the debt obligations of which are rated at least A-1 or its equivalent by each Rating Agency; or (iii) Lehman Brothers Bank, FSB, a federal savings bank.

Qualified Insurer:  A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae.

Rating Agency:  Any of Fitch, Moody's or Standard & Poor's or their respective successors.

Reconstitution Agreement:  As such term is defined in Section 10.16.

REMIC:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

Remittance Date:  The 18th day (or if such 18th day is not a Business Day, the first Business Day immediately following) of any month.

REO Disposition:  The final sale by the Servicer of any REO Property.

REO Disposition Proceeds:  All amounts received with respect to an REO Disposition pursuant to Section 3.10.

REO Property:  A Mortgaged Property acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure, pursuant to Section 3.10.

Servicer: Aurora Loan Services LLC or its successor in interest or assigns or any successor to the Servicer under this Agreement as herein provided.

Servicing Advances:  All customary, reasonable and necessary "out of pocket"
costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the
performance by the Servicer of its servicing obligations, including, but not limited to, the cost of
(a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or
administrative or judicial proceedings, including foreclosures and bankruptcies, (c) the
management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in
satisfaction of the Mortgage, (d) taxes, assessments, water rates, sewer rents and other charges
which are or may become a lien upon the Mortgaged Property, and PMI Policy premiums and fire
and hazard insurance coverage and (e) any losses sustained by the Servicer with respect to the
liquidation of the Mortgaged Property.

Servicing Fee:  With respect to each Mortgage Loan, the amount of the annual fee
the Owner shall pay to the Servicer, which shall, for a period of one full month, be equal to (i)
one-twelfth the product of (a) the Servicing Fee Rate and (b) the outstanding principal balance of
such Mortgage Loan and (ii) any Prepayment Interest Excess Amount.  Such fee shall be payable
monthly, computed on the basis of the same principal amount and period respecting which any
related interest payment on a Mortgage Loan is computed.

Servicing Fee Rate:  With respect to each Mortgage Loan, 0.25% (twenty-five
basis points).

Servicing File:  The items pertaining to a particular Mortgage Loan including, but
not limited to, the computer files, data disks, books, records, data tapes, notes, and all additional
documents generated as a result of or utilized in originating and/or servicing each Mortgage
Loan, which are held in trust for the Owner by the Servicer.

Servicing Officer:    Any officer of the Servicer involved in or responsible for,
the administration and servicing of the Mortgage Loans whose name appears on a list of
servicing officers furnished by the Servicer to the Owner upon request, as such list may from
time to time be amended.

Servicing Rights:  Any and all of the following: (a) any and all rights to service
the Mortgage Loans; (b) any payments to or monies received by the Servicer for servicing the
Mortgage Loans; (c) any late fees, penalties or similar payments with respect to the Mortgage
Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights
to the extent they relate to such servicing rights and all rights of the Servicer thereunder; (e)
Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts
actually collected by the Servicer with respect thereto; (f) all accounts and other rights to
payment related to any of the property described in this paragraph; and (g) any and all
documents, files, records, servicing files, servicing documents, servicing records, data tapes,
computer records, or other information pertaining to the Mortgage Loans or pertaining to the
past, present or prospective servicing of the Mortgage Loans.

Servicing Rights Owner:    Lehman Capital, A Division of Lehman Brothers
Holdings Inc.

-8-

## ARTICLE II.

### OWNER'S ENGAGEMENT OF SERVICER TO
### PERFORM SERVICING RESPONSIBILITIES

Section 2.01.  Contract for Servicing; Possession of Servicing Files.

With respect to the Mortgage Loans, from and after the Closing Date, the
Servicer, as an independent contractor, shall service and administer the Mortgage Loans, by
execution and delivery of this Agreement, does hereby contract and shall have full power and
authority, acting alone, to do any and all things in connection with such servicing and
administration which the Servicer may deem necessary or desirable, consistent with the terms of
this Agreement and with Accepted Servicing Practices. Each Servicing File delivered to the
Servicer shall be held by the Servicer in order to service the Mortgage Loans pursuant to this
Agreement and are and shall be held in trust by the Servicer for the benefit of the Owner as the
owner thereof and the Servicing Rights Owner. The Servicer's possession of any portion of the
Mortgage Loan documents shall be at the will of the Owner for the sole purpose of facilitating
servicing of the related Mortgage Loan pursuant to this Agreement, and such retention and
possession by the Servicer shall be in a custodial capacity only. The ownership of each Mortgage
Note, Mortgage, and the contents of the Servicing File shall be vested in the Owner and the
ownership of all records and documents with respect to the related Mortgage Loan prepared by or
which come into the possession of the Servicer shall immediately vest in the Owner and shall be
retained and maintained, in trust, by the Servicer at the will of the Owner in such custodial
capacity only. The portion of each Servicing File retained by the Servicer pursuant to this
Agreement shall be segregated from the other books and records of the Servicer (which, except
for collateral documents such as the Mortgage and the Mortgage Note, may be stored as imaged
files) and shall be appropriately marked to clearly reflect the ownership of the related Mortgage
Loan by the Owner. The Servicer shall release from its custody the contents of any Servicing
File retained by it only in accordance with this Agreement.

Section 2.02.  Books and Records.

The Servicer shall perform any initial endorsements of the Mortgage Notes and
shall prepare or cause to be prepared and record or cause to be recorded any initial Assignments
of Mortgage (A) with respect to each MERS Eligible Mortgage Loan, in the name of MERS (or
such party shall ascertain that such assignment has previously been so recorded) or (B) with
respect to each non-MERS Mortgage Loan, in the name as the Owner shall designate (other than
the Servicer), unless instructions to the contrary are delivered to the Servicer. The Servicer shall
pay all necessary fees associated with the preparation and recording of the initial Assignments of
Mortgage. The Owner shall pay all necessary fees associated with the subsequent endorsements
of the Mortgage Notes and the preparation and recording of the subsequent Assignments of
Mortgage. Record title to each MERS Mortgage and the related Mortgage Note shall vest in
MERS (solely as nominee for the Owner and the Owner's successors and assigns) and the
successors and assigns of MERS. Notwithstanding the foregoing, the Servicer shall cooperate
with the Owner in the Owner's preparation and recording of any and all Assignments of
Mortgage. All funds received on or in connection with a Mortgage Loan shall be received and

-9-

held by the Servicer in trust for the benefit of the Owner as the owner of the Mortgage Loans pursuant to the terms of this Agreement.

Section 2.03.  Custodial Agreement or Owner's Possession of the Mortgage Loan Documents.

With respect to all Mortgage Loans subject to this Agreement, the Owner shall have either taken possession of the Mortgage Loan documents for each Mortgage Loan, or shall have delivered and released or caused to have been delivered and released to the related Custodian on or prior to the date hereof those Mortgage Loan documents required with respect to each Mortgage Loan.  In the event of any conflict, inconsistency or discrepancy between any of the provisions of this Agreement and any of the provisions of the related Custodial Agreement, the provisions of this Agreement shall control and be binding upon the Owner and the Servicer.

Subsequent to the closing evidenced by this Agreement, the Owner or the Custodian, as the case may be, shall have certified its receipt of all Mortgage Loan documents required to be delivered pursuant to the Custodial Agreement or the terms of this Agreement, as the case may be, as evidenced by the trust receipt and initial certification of the Owner or the Custodian in the form annexed to the Custodial Agreement, or as may be prescribed by the Owner.  The Owner shall be responsible for maintaining the Custodial Agreement, if any, and shall pay all other fees and expenses of the Custodian including but not limited to, (i) any and all annual and warehousing fees, (ii) any and all termination fees in the event the Custodian is terminated by the Owner, except that the Servicer shall pay such termination fees in the event the Custodian is terminated pursuant to the Servicer's request, if applicable, and (iii) any and all fees due in connection with the deposit, shipment or retrieval of a Mortgage Loan document or documents (collectively, the "Custodial Fees").

The Servicer shall forward to the Owner or the Custodian, as the case may be, original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with this Agreement within two (2) weeks of their execution, provided, however, that the Servicer shall provide the Owner or the Custodian, as the case may be, with a certified true copy of any such document submitted for recordation within two (2) weeks of its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within three hundred sixty (360) days of its submission for recordation.  If such copy has not been returned by the applicable recording office within three hundred sixty (360) days of its submission, the Servicer shall use commercially reasonable efforts to obtain such copy.

Section 2.04.  Original Documents.

Upon the submission by the Servicer of a Mortgage Loan Document release form in the form of Exhibit E, the Custodian or the Owner, as the case may be, shall release to the Servicer any original mortgage loan documents necessary for the Servicer to carry out its obligations hereunder not later than two (2) Business Days of receipt of such request.  Servicer shall have no liability for any losses, expenses or costs resulting from the inability of the

Custodian or the Owner, as the case may be, to deliver requested documents to the Owner on or prior to the date which is two (2) Business Days from receipt of the related request. Further, the Owner shall indemnify the Servicer for any losses, expenses or costs incurred by the Servicer resulting from the inability of the Custodian or the Owner, as the case may be, to deliver requested documents to the Servicer on or prior to the date which is two (2) Business Days from the date of receipt of the related request.

The Custodian's or the Owner's address, as the case may be, for purposes of delivering Mortgage Loan Document release forms shall be:

> LaSalle Bank National Association
> 2571 Busse Road, Suite 200
> Elk Grove Village, Illinois 60007
> Attention: Collateral Services Manager

## ARTICLE III.

## SERVICING OF THE MORTGAGE LOANS

Section 3.01.  Servicer to Service.

The Servicer, as an independent contractor, shall service and administer the Mortgage Loans from and after the Closing Date and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Servicing Practices.

It is understood and agreed that the Owner shall approve all foreclosures prior to the commencement of any foreclosure proceedings. In the event that Owner does not disapprove of any such foreclosure within three (3) days of receipt of notice of such foreclosure, then the Owner is deemed to have approved such foreclosure.

The Owner's address for purposes of all foreclosure consent requests is:

> MidCountry Bank
> 201 Main Street South
> Hutchinson, MN 55350
> Attention: Mr. Vu Pearson
> E-mail address: vu.pearson@midcountrybank.com

Notwithstanding the foregoing paragraph, the Owner and the Servicer hereby agree as follows:

(a)    The Servicer shall, if required, in accordance with the relevant provisions of the Cranston-Gonzales National Affordable Housing Act of 1990, as the same may be amended from time to time, and the regulations provided in accordance with the Real Estate

Settlement Procedures Act, provide notice to the Mortgagor of each Mortgage of the transfer of the servicing thereto to the Servicer.

(b)    The Servicer shall retain all Ancillary Income.

(c)    The Servicer shall have no obligation to make any Monthly Advance or Servicing Advance which it deems to be a Nonrecoverable Advance.

Consistent with the terms of this Agreement, the Servicer may (i) waive, modify or vary any term of any Mortgage Loan or (ii) consent to the postponement of strict compliance with any such term or (iii) in any manner grant indulgence to any Mortgagor, if the Servicer reasonably determines that such action is in the best interests of the Owner.

Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments of satisfaction or cancellation, or of partial or full release, discharge or note endorsements and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. If reasonably required by the Servicer, within five (5) Business Days following the Servicer's request, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

In servicing and administering the Mortgage Loans, the Servicer shall employ procedures (including collection procedures) and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, giving due consideration to Accepted Servicing Practices where such practices do not conflict with the requirements of this Agreement and the Owner's reliance on the Servicer.

In the event that the Mortgage Loan documents relating to a Mortgage Loan contain provisions requiring the related Mortgagor to arbitrate disputes (at the Owner's option), the Owner hereby authorizes the Servicer to waive the Owner's right or option to arbitrate disputes and to send written notice of such waiver to the Mortgagor, although the Mortgagor may still require arbitration at its option.

Section 3.02.    Collection of Mortgage Loan Payments.

Continuously from and after the Closing Date, the Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable. Notwithstanding anything herein to the contrary, the Servicer shall have no obligation to collect, or make payments to the Owner with respect to, any prepayment charges, late fees, fees or other items which are prohibited under any applicable law, rule, regulation or order of any governmental authority.

-12-

Section 3.03.  Establishment of and Deposits to Custodial Account.

The Servicer shall segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled as directed by the Owner, which direction shall be given by the Owner to the Servicer no later than fifteen (15) days prior to the Closing Date. The Custodial Account shall be established with a Qualified Depository. Any funds deposited in the Custodial Account may be invested in Eligible Investments subject to the provisions of Section 3.09 hereof. Funds deposited in the Custodial Account may be drawn on by the Servicer in accordance with Section 3.04. The creation of any Custodial Account shall be evidenced by a certification in the form of Exhibit C. A copy of such certification shall be furnished to the Owner and, upon request, to any subsequent owner of the Mortgage Loans.

The Servicer shall deposit in the Custodial Account on a daily basis, within two (2) Business Days of receipt, and retain therein, the following collections received by the Servicer and payments made by the Servicer after the date hereof:

(i)  all payments on account of principal on the Mortgage Loans, including all Principal Prepayments and prepayment charges;

(ii)  all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Loan Remittance Rate;

(iii)  all Liquidation Proceeds;

(iv)  all Insurance Proceeds (other than those Insurance Proceeds deposited in the Escrow Account);

(v)  all Condemnation Proceeds that are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor;

(vi)  with respect to each Principal Prepayment in full the Prepayment Interest Shortfall Amount, if any, for the month of distribution. Such deposit shall be made from the Servicer's own funds, without reimbursement therefor up to a maximum amount per month of the Servicing Fee actually received for such month for the Mortgage Loans;

(vii)  any amounts required to be deposited by the Servicer in connection with the deductible clause in any blanket hazard insurance policy;

(viii)  any amounts received with respect to or related to any REO Property or REO Disposition Proceeds; and

(ix)  any other amount required to be deposited in the Custodial Account hereunder.

-13-

Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Servicer and the Servicer shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 3.04. Additionally, any other benefit derived from the Custodial Account associated with the receipt, disbursement and accumulation of principal, interest, taxes, hazard insurance, mortgage insurance, etc. shall accrue to the Servicer.

Section 3.04.  Permitted Withdrawals From Custodial Account.

The Servicer shall, from time to time, withdraw funds from the Custodial Account for the following purposes:

(i)    to make payments to the Owner in the amounts and in the manner provided for in Section 4.01;

(ii)    in the event the Servicer has elected not to retain the Servicing Fee out of any Mortgagor payments on account of interest or other recovery of interest with respect to a particular Mortgage Loan (including late collections of interest on such Mortgage Loan, or interest portions of Insurance Proceeds or Liquidation Proceeds) prior to the deposit of such Mortgagor payment or recovery in the Custodial Account, to pay to itself the related Servicing Fee from all such Mortgagor payments on account of interest or other such recovery for interest with respect to that Mortgage Loan;

(iii)    to reimburse itself for Monthly Advances of the funds made pursuant to Section 4.03, the Servicer's right to reimburse itself pursuant to this subclause (iii) with respect to any Monthly Advance (other than Nonrecoverable Advances) being limited to amounts received on the related Mortgage Loan which represent late payments of principal and/or interest respecting which any such advance was made, it being understood that, in the case of any such reimbursement, the Servicer's right thereto shall be prior to the rights of Owner;

(iv)    to reimburse itself for unreimbursed Servicing Advances, the Servicer's right to reimburse itself pursuant to this subclause (iv) with respect to any Servicing Advance (other than Nonrecoverable Advances) being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds and such other amounts as may be collected by the Servicer from the Mortgagor or otherwise relating to the Mortgage Loan ;

(v)    to reimburse itself for Nonrecoverable Advances, it being understood that, in the case of any such reimbursements, the Servicer's right thereto shall be prior to the rights of the Owner;

(vi)    to pay itself interest on funds deposited in the Custodial Account;

(vii)    to clear and terminate the Custodial Account upon the termination of this Agreement;

(viii)    to transfer funds to another Qualified Depository in accordance with Section 3.09 hereof;

-14-

> (ix)   to invest funds in certain Eligible Investments in accordance with Section 3.09 hereof;

> (x)   to reimburse itself for expenses incurred by or reimbursable to the Servicer to the extent not previously reimbursed under clauses (iii) and (iv) of this Section 3.04;

> (xi)   to remit any prepayment charges to the Owner; and

> (xii)   to withdraw funds deposited in error.

Section 3.05.  Establishment of and Deposits to Escrow Account.

The Servicer shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of time deposit or demand accounts, titled as directed by the Owner, which direction shall be given by the Owner to the Servicer no later than fifteen (15) days prior to the Closing Date. The Escrow Accounts shall be established with a Qualified Depository in a manner that shall provide maximum available insurance thereunder.  Funds deposited in the Escrow Account may be drawn on by the Servicer in accordance with Section 3.06. The creation of any Escrow Account shall be evidenced by a certification in the form of Exhibit D.  A copy of such certification shall be furnished to the Owner and, upon request, to any subsequent owner of the Mortgage Loans.

The Servicer shall deposit in the Escrow Account or Accounts on a daily basis, within two (2) Business Days of receipt, and retain therein:

> (i)   all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement; and

> (ii)   all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property (without regard to the Fannie Mae Guides).

The Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 3.06. The Servicer shall retain any interest paid on funds deposited in the Escrow Account by the depository institution, other than interest on escrowed funds required by law to be paid to the Mortgagor.  Additionally, any other benefit derived from the Escrow Account associated with the receipt, disbursement and accumulation of principal, interest, taxes, hazard insurance, mortgage insurance, etc. shall accrue to the Servicer.  To the extent required by law, the Servicer shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account may be non-interest bearing or that interest paid thereon is insufficient for such purposes.

-15-

Section 3.06.    Permitted Withdrawals From Escrow Account.

Withdrawals from the Escrow Account or Accounts may be made by the Servicer only:

(i)    to effect timely payments of ground rents, taxes, assessments, water rates, sewer rents, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage;

(ii)    to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan;

(iii)    for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(iv)    for application to restoration or repair of the Mortgaged Property in accordance with Accepted Servicing Practices;

(v)    to pay to the Servicer, or any Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

(vi)    to clear and terminate the Escrow Account on the termination of this Agreement; and

(vii)    to withdraw funds deposited in error.

Section 3.07.    Notification of Adjustments.

With respect to each adjustable rate Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related interest rate adjustment date and shall adjust the Monthly Payment on the related mortgage payment adjustment date, if applicable, in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Servicer shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and Monthly Payment adjustments. The Servicer shall promptly, upon written request therefor, deliver to the Owner such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Servicer or the receipt of notice from the Owner that the Servicer has failed to adjust a Mortgage Interest Rate or Monthly Payment in accordance with the terms of the related Mortgage Note, the Servicer shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss or deferral caused the Owner thereby.

Section 3.08.    Maintenance of LPMI Policy; Claims.

-16-

The Servicer shall take all such actions as are necessary to service, maintain and administer the LPMI Loans in accordance with the LPMI Policy and to perform and enforce the rights of the insured under such LPMI Policy. Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it reasonably deems appropriate or desirable in connection with the servicing, maintenance and administration of the LPMI Policy. The Servicer shall not modify or assume a Mortgage Loan covered by the LPMI Policy or take any other action with respect to such Mortgage Loan which would result in non-coverage under the LPMI Policy of any loss which, but for the actions of the Servicer, would have been covered thereunder. The Servicer shall cooperate with the LPMI Insurer and shall use its commercially reasonable best efforts to furnish all reasonable aid, evidence and information in the possession of the Servicer to which the Servicer has access with respect to any LPMI Loans; provided, however, notwithstanding anything to the contrary contained in any LPMI Policy, the Servicer shall not be required to submit any reports to the LPMI Insurer until a reporting date that is at least 15 days after the Servicer has received sufficient loan level information to appropriately code its servicing system in accordance with the LPMI Insurer's requirements.

In connection with its activities as servicer, the Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the Insurer under any LPMI Policy in a timely fashion in accordance with the terms of such LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any LPMI Policy respecting a defaulted Mortgage Loan.

Section 3.09.  Protection of Accounts.

The Servicer may transfer the Custodial Account or the Escrow Account to a different Qualified Depository from time to time.  The Servicer may transfer the Custodial Account or the Escrow Account to a depository which is not a Qualified Depository only upon obtaining the consent of the Owner, which consent shall not be withheld unreasonably.

The Servicer shall bear any expenses, losses or damages sustained by the Owner if the Custodial Account and/or the Escrow Account are not demand deposit accounts.

Amounts on deposit in the Custodial Account and the Escrow Account may at the option of the Servicer be invested in Eligible Investments. Any such Eligible Investment shall mature no later than the Determination Date next following the date of such Eligible Investment, provided, however, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account or the Escrow Account, then such Eligible Investment may mature on such Remittance Date. Any such Eligible Investment shall be made in the name of the Servicer in trust for the benefit of the Owner. All income on or gain realized from any such Eligible Investment shall be for the benefit of the Servicer and may be withdrawn at any time by the Servicer. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account or the Escrow Account, by the Servicer out of its own funds immediately as realized.

-17-

Section 3.10.  Title, Management and Disposition of REO Property.

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Servicer as nominee for the Owner or MERS, as applicable, or in the event the Servicer is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, or as otherwise directed by the Owner, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an Opinion of Counsel obtained by the Servicer from any attorney duly licensed to practice law in the state where the REO Property is located.  The Person or Persons holding such title other than the Owner shall acknowledge in writing that such title is being held as nominee for the Owner.

The Servicer shall manage, conserve, protect and operate each REO Property for the Owner solely for the purpose of its prompt disposition and sale.  The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed.  The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Owner.

The Servicer may permit an obligor to pay off a non-performing Mortgage Loan at less than its unpaid principal balance, chargeoff all or a portion of such non-performing Mortgage Loan or sell the indebtedness related to a non-performing Mortgage Loan, if such discounted payoff, chargeoff or sale is in accordance with Accepted Servicing Practices and the Servicer believes that such discounted payoff, chargeoff or sale is in the best interest of the Owner; provided that in the case of any proposed discounted payoff, proposed chargeoff or sale, the Servicer shall notify the Owner of the proposed discounted payoff, chargeoff or sale.  The Owner's address for purposes of all discounted payoff, chargeoff or sale notifications is:

MidCountry Bank
201 Main Street
Hutchinson, MN 55350
Attention: Mr. Vu Pearson
E-mail address: vul.pearson@midcountrybank.com

The Servicer shall use its commercially reasonable efforts to dispose of the REO Property as soon as possible and, in the event that a REMIC election has been made with respect to the arrangement under which the Mortgage Loans and the REO Property are held, shall sell such REO Property within three years after title has been taken to such REO Property unless the Servicer determines that a period longer than three years is necessary for the orderly liquidation of such REO Property and so notifies the Owner and reports monthly to the Owner as to the progress being made in selling such REO Property.  Notwithstanding anything herein to the contrary, the Servicer shall not be required to provide financing for the sale of any REO Property.

-18-

The Servicer shall also maintain on each REO Property fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in the amount required above.

The disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Owner. With respect to any REO Property, upon a REO Disposition, the Servicer shall be entitled to retain from REO Disposition Proceeds a disposition fee equal to $1,500. The proceeds of sale of the REO Property shall be promptly deposited in the Custodial Account. After the expenses of such disposition shall have been paid, the Servicer shall submit a reasonably detailed invoice for reimbursement of Servicing Advances it incurred thereunder.

The Servicer shall make monthly distributions on each Remittance Date to the Owner of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in this Section 3.10 and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses).

Notwithstanding anything to the contrary contained herein in connection with a foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Owner otherwise requests an environmental inspection or review of such Mortgaged Property to be conducted by a qualified inspector, the Servicer shall cause the Mortgaged Property to be so inspected, which inspection shall be at the expense of the Owner. Upon completion of the inspection, the Servicer shall promptly provide the Owner with a written report of the environmental inspection. After reviewing the environmental inspection report, the Owner shall determine how the Servicer shall proceed with respect to the Mortgaged Property.

Notwithstanding anything to the contrary contained herein in connection with an REO Property, the Owner shall have the right to list price approval, offer approval and approval of expenditures in excess of $2,000 (unless the Servicer determines, in accordance with Accepted Servicing Practices, that such expenditure is urgent and delay may be reasonably expected to cause damage to the REO Property or lead to additional expense of any nature). The Owner shall respond to a request for any such approval within five (5) Business Days of notice by approving or denying such request; provided, further, if the Owner does not respond in such time, the Servicer shall take such actions as it deems appropriate in accordance with Accepted Servicing Practices. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be liable for damages of any nature or otherwise owe indemnification obligations of any nature to any Person for taking or omitting actions in accordance with the response of the Owner. The Owner's address for purposes of notice pursuant to this paragraph is: MidCountry Bank, 201 Main Street, Hutchinson, MN 55350, Attention: Mr. Vu Pearson, E-mail address: vul.pearson@midcountrybank.com.

Section 3.11.  Real Estate Owned Reports.

Upon the request of the Owner, the Servicer shall provide the Owner with access to a secure website containing data with respect to any REO Property covering the operation of such REO Property for the previous month and the Servicer's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month and including, *inter alia*, broker's price opinions, appraisals, realtor comments, Servicer personnel comments, bids, monthly inspections from realtors, offers (with offer status) and such other typical REO Property information.  The Servicer shall provide the Owner with such other information related to the REO Property as the Owner shall reasonably request.

Section 3.12.  Credit Reporting.

The Servicer shall fully furnish, on a monthly basis, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information on the Mortgagor credit files to Equifax, Experian and Trans Union Credit Information Company on a monthly basis.

## ARTICLE IV.

## PAYMENTS TO OWNER

Section 4.01.  Remittances.

On each Remittance Date the Servicer shall remit by wire transfer of immediately available funds to the Owner (i) all amounts deposited in the Custodial Account as of the close of business on the Determination Date (net of charges against or withdrawals from the Custodial Account pursuant to Section 3.04), plus (ii) all Monthly Advances, if any, which the Servicer is obligated to make pursuant to Section 4.03, minus (iii) any amounts attributable to Principal Prepayments, Liquidation Proceeds, Insurance Proceeds, Condemnation Proceeds or REO Disposition Proceeds received after the applicable Prepayment Period, which amounts shall be remitted on the following Remittance Date, together with any additional interest required to be deposited in the Custodial Account in connection with such Principal Prepayment in accordance with Section 3.03(vi), and minus (iv) any amounts attributable to Monthly Payments collected but due on a Due Date or Due Dates subsequent to the first day of the month in which such Remittance Date occurs, which amounts shall be remitted on the Remittance Date next succeeding the Due Date related to such Monthly Payment.

With respect to any remittance received by the Owner after the date which is three (3) Business Days after the Business Day on which such payment was due, the Servicer shall pay to the Owner interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus two percentage points, but in no event greater than the maximum amount permitted by applicable law.  Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the day following such Business Day and ending with the Business Day on which such payment is made, both inclusive.  Such interest shall be remitted along with the

distribution payable on the next succeeding Remittance Date. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

The Owner's wire transfer instructions for purposes of all remittances and payments related to the Mortgage Loans and the Servicing Agreement are:

> United Bankers' Bank
> ABA# 091001322
> Beneficiary Bank:
> MidCountry Bank
> Account Number: 291970033
> Final Credit: MidCountry Bank

Section 4.02.  Statements to Owner.

Not later than the 4th Business Day of each calendar month, the Servicer shall forward to the Owner a report for the immediately preceding calendar month, for each Mortgage Loan, the loan number, the next due date and the unpaid principal balance. Not later than the 10th calendar day of each month, the Servicer shall furnish to the Owner a "Private Pool Detail Report" generated by the servicing system commonly referred to as CPI, Alltel, Fidelity or MSP, containing the data field elements listed on Exhibit F in a mutually agreeable electronic format as to the related remittance and the immediately preceding calendar month.

In addition, not more than 60 days after the end of each calendar year, commencing December 31, 2007, the Servicer shall furnish to each Person who was an Owner of the Mortgage Loans at any time during such calendar year as required by applicable law or if not required by applicable law, at the request of the Owner as to the aggregate of remittances for the applicable portion of such year.

Such obligation of the Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Servicer pursuant to any requirements of the Internal Revenue Code as from time to time are in force.

Beginning with calendar year 2008, the Servicer shall prepare and file any and all tax returns, information statements or other filings for the portion of the tax year 2007 and the portion of subsequent tax years for which the Servicer has serviced some or all of the Mortgage Loans hereunder as such returns, information statements or other filings are required to be delivered to any governmental taxing authority or to the Owner pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans as is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

The Owner's address for purposes of delivering the reports required pursuant to this section shall be:

MidCountry Bank
201 South Main Street
Hutchinson, MN 55350
Attention: Ms. Deb Rath
E-mail address: deb.rath@midcountrybank.com

Section 4.03.  Monthly Advances by Servicer.

On the Remittance Date, the Servicer shall deposit in the Custodial Account from its own funds or from amounts held for future distribution, or both, an amount equal to the aggregate of all Monthly Advances relating to Monthly Payments which were due on the Mortgage Loans during the applicable Due Period and which were delinquent at the close of business on the immediately preceding Determination Date or which were deferred pursuant to Section 3.01 and/or Section 4.01. Any amounts held for future distribution and so used shall be replaced by the Servicer by deposit in the Custodial Account on or before any future Remittance Date if funds in the Custodial Account on such Remittance Date shall be less than remittances to the Owner required to be made on such Remittance Date. The Servicer shall keep appropriate records of such amounts. The Servicer's obligation to make such Monthly Advances as to any Mortgage Loan will continue through the last Monthly Payment due prior to the payment in full of the Mortgage Loan, or through the last Remittance Date prior to the Remittance Date for the distribution of all Liquidation Proceeds and other payments or recoveries (including Insurance Proceeds and Condemnation Proceeds) with respect to the Mortgage Loan unless the Servicer deems such Monthly Advances to be unrecoverable, as evidenced by an Officer's Certificate of the Servicer delivered to the Owner. The Servicer shall have no obligations to make any Monthly Advance which it deems a Nonrecoverable Advance.

## ARTICLE V.

## GENERAL SERVICING PROCEDURES

Section 5.01.  Servicing Compensation.

As consideration for servicing the Mortgage Loans subject to this Agreement, the Servicer shall retain (a) the relevant Servicing Fee for each Mortgage Loan remaining subject to this Agreement during any month and (b) all Ancillary Income. Such Servicing Fee shall be payable monthly.

The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

With respect to any Mortgage Loans from which the related Liquidation Proceeds are insufficient to reimburse the Servicer for outstanding Servicing Advances or Monthly Advances with respect to such loan, the Owner shall reimburse the Servicer for such unreimbursed advances upon the delivery by the Servicer to the Owner of an invoice with appropriate backup detailing such unreimbursed amounts.

-22-

Section 5.02.  Annual Statement as to Compliance.

The Servicer shall deliver to the Owner, on or before March 15 of each year, beginning March 15, 2008, a Servicing Officer Certificate stating that (i) a review of the activities of the Servicer during the preceding calendar year and of the Servicer's performance under this Agreement has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all of its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such Servicing Officer and the nature and status thereof and the action being taken by the Servicer to cure such default.

Section 5.03.  Annual Independent Public Accountants' Servicing Report.

On or before March 15 of each year, beginning March 15, 2008, the Servicer, at its expense, shall cause a firm of independent public accountants that is a member of the American Institute of Certified Public Accountants to furnish a statement to the Owner to the effect that such firm has examined certain documents and records relating to the servicing of mortgage loans in the Servicer's portfolio.  On the basis of this examination, the CPA firm will disclose any exceptions or errors relating to the servicing of mortgage loans, as required by paragraph four (4) of "The Uniform Single Audit Program for Mortgage Bankers."

Section 5.04.  Owner's Right to Examine Servicer Records.

The Owner (and its agents, which shall include but not be limited to regulators, independent auditors and examiners) shall have the right, at its expense, upon reasonable notice to the Servicer, during business hours or at such other times as might be reasonable under applicable circumstances and on the Servicer's premises, to examine and audit any and all of the books, records or other information of the Servicer whether held by the Servicer or by another on behalf of the Servicer, which relate to the performance or observance by the Servicer of the terms, covenants or conditions of this Agreement, and to discuss such books, records or other information with an officer or employee of the Servicer who is knowledgeable about the matters contained therein, upon Owner's reasonable request.

## ARTICLE VI.

## REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 6.01.  Representations, Warranties and Agreements of the Servicer.

The Servicer, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to the Owner as of the date hereof:

(a)    Due Organization and Authority.  The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware and has all licenses, necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if

-23-

the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the terms of this Agreement; the Servicer has the full power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Servicer and the consummation of the transactions contemplated hereby have been duly and validly authorized, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights and to the application of equitable principles in any proceeding, whether at law or in equity; this Agreement evidences the valid, binding and enforceable obligation of the Servicer and all requisite action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms;

(b)    <u>Ordinary Course of Business</u>.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer;

(c)    <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement nor the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's organizational documents or any legal restriction or any agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject, or impair the ability of the Servicer to service the Mortgage Loans;

(d)    <u>No Litigation Pending</u>.    There is no action, suit, proceeding or investigation pending or, to the best of the Servicer's knowledge, threatened against the Servicer which, either in any one instance or in the aggregate, would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein, or which would be likely to impair materially the ability of the Servicer to perform under the terms of this Agreement;

(e)    <u>No Consent Required</u>.  No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer or of compliance by the Servicer with this Agreement, or if required, such consent, approval, authorization or order shall have been obtained prior to the date hereof;

(f)    <u>Ability to Service</u>.  The Servicer is an approved seller/servicer of conventional residential mortgage loans for Fannie Mae or Freddie Mac with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans.  The Servicer is in good standing to service mortgage loans for Fannie Mae or Freddie Mac;

(g)    <u>No Untrue Information</u>.  Neither this Agreement nor any statement, report or other document furnished in writing or to be furnished in writing pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of

-24-

material fact or omits to state a material fact necessary to make the statements contained therein not misleading; and

(h)    No Commissions to Third Parties.  The Servicer has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction other than the Owner.

Section 6.02.  Remedies for Breach of Representations and Warranties of the Servicer.

It is understood and agreed that the representations and warranties set forth in Section 6.01 shall survive the engagement of the Servicer to perform the servicing responsibilities hereunder and the delivery of the Servicing Files to the Servicer and shall inure to the benefit of the Owner.  Upon discovery by either the Servicer or the Owner of a breach of any of the foregoing representations and warranties which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement, the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days of the earlier of either discovery by or notice to the Servicer of any breach of a representation or warranty set forth in Section 6.01 which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement, the Servicer shall use its Best Efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Servicer shall, at the Owner's option, assign the Servicer's rights and obligations under this Agreement (or respecting the affected Mortgage Loans) to a successor servicer, subject to the approval of the Owner, which approval shall be in the Owner's sole discretion.  Such assignment shall be made in accordance with Section 10.01.

In addition, the Servicer shall indemnify the Owner and hold it harmless against any Costs resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the Servicer representations and warranties contained in this Agreement.  It is understood and agreed that the remedies set forth in this Section 6.02 constitute the sole remedies of the Owner respecting a breach of the foregoing representations and warranties.

Any cause of action against the Servicer relating to or arising out of the breach of any representations and warranties made in Section 6.01 shall accrue upon (i) discovery of such breach by the Servicer or notice thereof by the Owner to the Servicer, (ii) failure by the Servicer to cure such breach within the applicable cure period, and (iii) demand upon the Servicer by the Owner for compliance with this Agreement.

Section 6.03.  Representations and Warranties of the Owner.

The Owner, as a condition to the consummation of the transactions contemplated hereby, makes the following representations and warranties to the Servicer as of the date hereof:

(a)    Due Organization and Authority.  The Owner is a federally chartered savings bank duly organized, validly existing and in good standing under the laws of the United

-25-

States of America and has all licenses necessary to carry on its business as now being conducted; the Owner has the full corporate power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement by the Owner and the consummation of the transactions contemplated hereby have been duly and validly authorized, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights and to the application of equitable principles in any proceeding, whether at law or in equity; this Agreement evidences the valid, binding and enforceable obligation of the Owner; and all requisite corporate action has been taken by the Owner to make this Agreement valid and binding upon the Owner in accordance with its terms;

(b)    <u>Ordinary Course of Business</u>.    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Owner;

(c)    <u>No Conflicts</u>.    Neither the execution and delivery of this Agreement, the conveyance of the servicing responsibilities to the Servicer or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Owner's charter or by-laws or any legal restriction or any agreement or instrument to which the Owner is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Owner or its property is subject, or impair the value of the servicing contract consummated hereby;

(d)    <u>No Litigation Pending</u>.    There is no action, suit, proceeding or investigation pending or, to the best of the Owner's knowledge, threatened against the Owner which, either in any one instance or in the aggregate, which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Owner contemplated herein, or which would be likely to impair materially the ability of the Owner to perform under the terms of this Agreement;

(e)    <u>No Consent Required</u>.    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Owner of or compliance by the Owner with this Agreement, or if required, such approval has been obtained prior to the date hereof;

(f)    <u>Ownership</u>.    As of the Closing Date, the Owner is the sole owner and holder of the Mortgage Loans. With respect to each Mortgage Loan subject to this Agreement, the servicing responsibilities contracted for have not been assigned or pledged, and, the Owner has good and marketable interest therein, and has full right to transfer the servicing responsibilities to the Servicer free and clear of any encumbrance, equity, interest, lien, pledge, charge, claim or security interest, and has full right and authority subject to no interest, or agreement with, any other party, (other than any notice required by law, regulation or otherwise, to be delivered to the Mortgagors) to assign the servicing responsibilities pursuant to this Agreement; and

-26-

(g)    No Commissions to Third Parties.  The Owner has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction other than the Servicer.

Section 6.04.    Remedies for Breach of Representations and Warranties of the Owner.

It is understood and agreed that the representations and warranties set forth in Section 6.03 shall survive the engagement of the Servicer to perform the servicing responsibilities and the delivery of the Servicing Files to the Servicer and shall inure to the benefit of the Servicer. Upon discovery by either the Servicer or the Owner of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of the servicing contract established herein or the interest of the Servicer, the party discovering such breach shall give prompt written notice to the other.

Within sixty (60) days of the earlier of either discovery by or notice to the Owner of any breach of a representation or warranty set forth in Section 6.03 which materially and adversely affects the value of the servicing contract, the Owner shall use its Best Efforts promptly to cure such breach in all material respects.

The Owner shall indemnify the Servicer and hold it harmless against any Costs resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, (i) a breach of the Owner representations and warranties contained in Section 6.03 of this Agreement; (ii) the failure of the Owner to cause any event to occur which requires its Best Efforts under this Agreement; (iii) the failure of the Owner to perform its duties in compliance with the terms of this Agreement or (iv) any failure by the Custodian or the Owner to timely deliver original mortgage loan documents to the Servicer upon the Servicer's request. It is understood and agreed that the obligation of the Owner to indemnify the Servicer pursuant to this Section 6.04 constitutes the sole remedy of the Servicer respecting a breach of the foregoing representations and warranties.

Any cause of action against the Owner relating to or arising out of the breach of any representations and warranties made in Section 6.03 shall accrue upon (i) discovery of such breach by the Owner or notice thereof by the Servicer to the Owner, (ii) failure by the Owner to cure such breach within the applicable cure period, and (iii) demand upon the Owner by the Servicer for compliance with this Agreement.

## ARTICLE VII.

## INDEMNIFICATION BY THE SERVICER

Section 7.01.    Additional Indemnification by the Servicer: Third Party Claims

The Servicer shall indemnify the Owner and hold it harmless against any and all Costs that the Owner may sustain resulting from (i) the failure of the Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement or (ii) the

-27-

failure of the Servicer to cause any event to occur which requires its Best Efforts under this Agreement. The Servicer shall immediately notify the Owner if a claim is made by a third party with respect to this Agreement or the Mortgage Loans, shall assume (with the prior written consent of the Owner) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Owner in respect of such claim and follow any written instructions received from the Owner in connection with such claim. The Owner promptly shall reimburse the Servicer for all amounts advanced by it pursuant to the preceding sentence except when the claim is in any way related to the Servicer's indemnification pursuant to Section 6.02, or the failure of the Servicer to service and administer the Mortgage Loans in compliance with the terms of this Agreement. In the event a dispute arises between the Servicer and the Owner with respect to any of the rights and obligations of the parties pursuant to this Agreement, and such dispute is adjudicated in a court of law, by an arbitration panel or any other judicial process, then the losing party shall indemnify and reimburse the winning party for all attorney's fees and other costs and expenses related to the adjudication of said dispute.

## ARTICLE VIII.

### THE SERVICER

Section 8.01.  Merger or Consolidation of the Servicer.

The Servicer shall keep in full effect its existence, rights and franchises as a limited liability company, and shall obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Servicer may be merged or consolidated, or any limited liability company or corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, provided, however, that the successor or surviving Person shall be an institution (i) having a net worth of not less than $1,500,000, and (ii) which is a Fannie Mae or a Freddie Mac-approved servicer in good standing.

Section 8.02.  Limitation on Liability of the Servicer and Others.

Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein. The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may, with the consent of the Owner, undertake any such action which it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto. In such event, the Servicer shall be entitled to reimbursement from the Owner for the reasonable legal expenses and costs of such action.

Section 8.03.    Limitation on Resignation and Assignment by the Servicer.

The Owner has entered into this Agreement with the Servicer and subsequent transferees of the Owner will purchase the Mortgage Loans in reliance upon the independent status of the Servicer, and the representations as to the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof. Therefore, the Servicer shall not assign this Agreement or the servicing responsibilities hereunder or delegate its rights or duties hereunder or any portion hereof without the prior written consent of the Owner, which consent shall not be unreasonably withheld. Notwithstanding anything set forth herein, the Servicer may employ vendors and subservicers to carry out its obligations under this Agreement, provided, that the use by the Servicer of any such vendors or subservicer shall not release the Servicer from any of its obligations hereunder and the Servicer shall remain responsible hereunder for all acts and omissions of such vendors and subservicers as fully as if such acts and omissions were those of the Servicer. Except as set forth in this Agreement, the Servicer shall pay all fees and expenses of its third party vendors or subservicers from its own funds.

The Servicer shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Servicer and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer. Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner which Opinion of Counsel shall be in form and substance acceptable to the Owner. No such resignation shall become effective until a successor shall have assumed the Servicer's responsibilities and obligations hereunder in the manner provided in Section 10.01.

## ARTICLE IX.

## TERMINATION

Section 9.01.    Termination for Cause.

This Agreement shall be terminable at the sole option of the Owner if any of the following events of default exist on the part of the Servicer:

(i)    any failure by the Servicer to remit to the Owner any payment required to be made under Section 4.01 or other payment required to be made under the terms of this Agreement which continues unremedied for a period of three (3) Business Days after the date

-29-

upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(ii)    failure by the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement which continues unremedied for a period of thirty (30) days; or

(iii)    failure by the Servicer to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located; or

(iv)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, including bankruptcy, marshaling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(v)    the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(vi)    the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency, bankruptcy or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations or cease its normal business operations for three Business Days; or

(vii)    the Servicer ceases to meet the qualifications of a Fannie Mae and Freddie Mac seller/servicer; or

(viii)    the Servicer fails to maintain a minimum net worth of $1,500,000.

In each and every such case, so long as an event of default shall not have been remedied, in addition to whatever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate all the rights and obligations of the Servicer under this Agreement and in and to the servicing contract established hereby and the proceeds thereof.

Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in a successor servicer appointed by the Owner pursuant to Section 10.01 hereof. Upon written request from the Owner, the Servicer shall prepare, execute and deliver to the successor entity designated by the Owner any and all documents and other instruments, place in such successor's possession all Servicing Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but

-30-

not limited to the transfer and endorsement or assignment of the Mortgage Loans and related documents, at the Servicer's sole expense. The Servicer shall cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

By a written notice, the Owner may waive any default by the Servicer in the performance of its obligations hereunder and its consequences. Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

With respect to any termination pursuant to this Section 9.01, the Owner shall reimburse the Servicer on the related transfer date for all previously unreimbursed Servicing Fees, Servicing Advances and Monthly Advances made by Servicer under this Agreement and other reasonable expenses of the Servicer, including those fees, advances and expenses incurred by the Servicer but not yet billed as of the related transfer date.

Section 9.02.    Termination Without Cause.

This Agreement shall terminate upon:  (i) the later of (a) the distribution of the final payment or liquidation proceeds on the last Mortgage Loan to the Owner (or advances by the Servicer for the same), and (b) the disposition of all REO Property acquired upon foreclosure of the last Mortgage Loan and the remittance of all funds due hereunder, or (ii) mutual consent of the Servicer and the Owner in writing or (iii) upon sixty days notice from the Owner. Any such notice of termination shall be in writing and delivered to the Servicer by registered mail to the address set forth at the beginning of this Agreement. The Owner and the Servicer shall comply with the termination procedures set forth in Sections 9.01, 9.02 and 10.01 hereof. In the event that Servicer is terminated as servicer pursuant Subsection 9.02(b)(iii) above, the Owner shall pay a termination fee to the Servicing Rights Owner equal to six (6) times the applicable Servicing Fee Rate of the unpaid principal balance of the Mortgage Loans then being serviced pursuant to this Agreement as of the Determination Date immediately prior to the date that the notice of termination was received by the Servicing Rights Owner.

Notwithstanding and in addition to the foregoing, the Servicing Rights Owner shall have the right to terminate the Servicer's rights and obligations as servicer under this Agreement on sixty (60) days notice and upon appointment of a successor servicer reasonably acceptable to the Owner. With respect to a termination pursuant to the previous sentence the Servicer shall not be entitled to a termination fee.

With respect to any termination pursuant to this Section 9.02, the Owner shall reimburse the Servicer on the related transfer date for all previously unreimbursed Servicing Fees, Servicing Advances and Monthly Advances made by Servicer under this Agreement and

-31-

other reasonable expenses of the Servicer, including those fees, advances and expenses incurred by the Servicer but not yet billed as of the related transfer date.

Notwithstanding and in addition to the foregoing, in the event a Mortgage Loan is repurchased by the original owner, such Mortgage Loan shall thereafter be excluded from this Agreement.

## ARTICLE X.

## MISCELLANEOUS PROVISIONS

Section 10.01. Successor to the Servicer.

Simultaneously with the termination of the Servicer's responsibilities and duties under this Agreement pursuant to Sections 6.02, 8.03, 9.01 or 9.02, the Owner shall appoint a successor servicer (with the consent of the Servicing Rights Owner, which consent may not be unreasonably withheld) which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Servicer under this Agreement simultaneously with the termination of the Servicer's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Owner may make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree, provided, however, that no such compensation shall be in excess of that permitted the Servicer under this Agreement without the consent of the Owner. In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned sections, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The resignation or removal of the Servicer pursuant to the aforementioned sections shall not become effective until a successor shall be appointed pursuant to this Section 10.01 and shall in no event relieve the Servicer or the Owner of the representations and warranties made pursuant to Sections 6.01 and 6.03, respectively. and the remedies available to the Owner and the Servicer under Sections 6.02 and 6.04, respectively, it being understood and agreed that the provisions of such Sections 6.01, 6.02, 6.03 and 6.04 shall be applicable to the Servicer and the Owner, as applicable, notwithstanding any such resignation or termination of the Servicer, or the termination of this Agreement.

Within a reasonable period of time, but in no event longer than thirty (30) days of the appointment of a successor entity by the Owner, the Servicer shall prepare, execute and deliver to the successor entity any and all documents and other instruments, place in such successor's possession all Servicing Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer and endorsement of the Mortgage Notes and related documents, and the preparation and recordation of Assignments of Mortgage, at the discretion of the Owner and, at the Owner's sole expense, unless otherwise specified in this Agreement. The Servicer shall cooperate with the Owner and such successor in effecting the termination of the Servicer's

responsibilities and rights hereunder and the transfer of servicing responsibilities to the successor servicer, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Servicer and to the Owner an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Servicer, with like effect as if originally named as a party to this Agreement. Any termination or resignation of the Servicer or termination of this Agreement pursuant to Sections 6.02, 8.03, 9.01 or 9.02 shall not affect any claims that the Owner may have against the Servicer arising out of the Servicer's actions or failure to act prior to any such termination or resignation.

The Servicer shall deliver promptly to the successor servicer the funds in the Custodial Account and Escrow Account and all Mortgage Loan documents and related documents and statements held by it hereunder and the Servicer shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Servicer. At the time that Servicer delivers the Mortgage Loan documents, Servicing Files, records and funds in the Custodial Account and Escrow Account to the successor servicer, the Servicer will be entitled to reimbursement of all unreimbursed Servicing Advances made by the Servicer with respect to the Mortgage Loans including those fees, advances and expenses incurred by the Servicer but not yet billed as of the related transfer date.

Upon a successor's acceptance of appointment as such, the Servicer shall notify by mail the Owner of such appointment in accordance with the procedures set forth in Section 10.05.

Notwithstanding anything to the contrary set forth herein, the Servicer shall not be prohibited from retaining copies of Mortgage Loan documents, Servicing Files and other records related to the Mortgage Loans as the Servicer reasonably deems necessary.

Section 10.02. Closing.

At the Owner's option, the closing for the engagement of the Servicer as herein provided shall be either: by facsimile or electronic mail, or conducted in person, at such place as the parties shall agree.

The closing shall be subject to each of the following conditions:

(a)     all of the representations and warranties of the Servicer and the Owner under this Agreement shall be true and correct as of the Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

-33-

(b)    the Owner and Servicer each shall have received, or the Owner's attorneys shall have received in escrow, all closing documents as specified in Section 10.03 hereof, in such forms as are agreed upon and acceptable to the Servicer and the Owner, duly executed by all signatories as required pursuant to the respective terms thereof; and

(c)    all other terms and conditions of this Agreement shall have been complied with.

Section 10.03. Closing Documents.

The closing documents shall consist of fully executed originals of the following documents:

(a)    this Agreement;

(b)    a Custodial Account Certification in the form of Exhibit C hereto; and

(c)    an Escrow Account Certification in the form of Exhibit D hereto;

Section 10.04. Costs.

The Owner shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys.

Section 10.05. Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if sent by facsimile or mailed by overnight courier, addressed as follows (or such other address as may hereafter be furnished to the other party by like notice):

(i)    if to the Owner:

MidCountry Bank
14525 Highway 7, Woodhill Plaza
Suite 335
Attention: Mr. David Turk
Telephone No.: (952)-400-2821
Telecopier No.:(952)-697-2076

(ii)    if to the Servicer:

Aurora Loan Services LLC
10350 Park Meadows Drive
Littleton, CO  80124
Attention:  James L. Greene (MidCountry Bank, 2007-1)
Telephone:  (720) 945-4849

-34-

Facsimile: (720) 945-5735

with a copy to:

Aurora Loan Services LLC
2617 College Drive
Scottsbluff, Nebraska 69363
Attention: Manager, Loan Administration (MidCountry Bank, 2007-1)
Telephone: (308) 220-2000
Facsimile: (308) 632-4287

(iii)    if to the Servicing Rights Owner:

Lehman Capital, A Division of Lehman Brothers Holdings Inc.
745 Seventh Avenue
13th Floor
New York, New York
Attention: Manager, Contract Finance
Telephone: (212) 526-7527
Facsimile: (212) 526-0323

Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be obligated to provide notices pursuant to this Agreement to any party whose address is not provided in this Section until thirty (30) days after the Servicer has received notice of the appointment of such party (including the name, address, telephone number and facsimile number of such party).

Section 10.06. Severability Clause.

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

-35-

Section 10.07. <u>No Personal Solicitation.</u>

The Servicer hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on the Servicer's behalf, to personally, by telephone or mail, solicit the borrower or obligor under any Mortgage Loan (on a targeted basis) for any purposes of prepayment, refinancing or modification of the related Mortgage Loan, provided, however, that this limitation shall not prohibit the Servicer from soliciting such Mortgagor for purposes of prepayment, refinance or modification of any loan owned or serviced by the Servicer other than a Mortgage Loan. Notwithstanding the foregoing, it is understood and agreed that, among other marketing activities, promotions and solicitations (including, without limitation, those for purposes of prepayment, refinance or modification) undertaken by the Servicer which are directed to the general public at large or which are directed generally to a segment of the then existing customers of the Servicer or any of its affiliates (including, without limitation, the mailing of promotional materials to the Servicer's or its affiliates' deposit customers by inserting such materials into customer account statements, mass mailings based on commercially acquired mailing lists and newspaper, radio and television advertisements and solicitations made on the basis of information acquired by the Servicer or its affiliates that indicates that a borrower may be planning to refinance) shall not constitute solicitation under this section.

Section 10.08. <u>Counterparts.</u>

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 10.09. <u>Governing Law.</u>

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.10. <u>Further Agreements.</u>

The Owner and the Servicer each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 10.11. <u>Successors and Assigns; Assignment of Servicing Agreement.</u>

This Agreement shall bind and inure to the benefit of and be enforceable by the Servicer and the Owner and the respective successors and assigns of the Servicer and the Owner; provided that, the Owner may not assign its rights hereunder to more than two (2) Persons and each such Person must execute and deliver an Assignment and Assumption Agreement in the

-36-

form of Exhibit B hereto.  This Agreement shall not be assigned, pledged or hypothecated by the Servicer to a third party without the prior written consent of the Owner, which consent shall be given at the sole discretion of the Owner.

Notwithstanding any limitations on the assignment of this Agreement, the Servicing Rights Owner may assign the Servicing Rights on written notice to the Owner.

Section 10.12. Waivers.

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 10.13. Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 10.14. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)      the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)      accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)      references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)      a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)      the term "include" or "including" shall mean by reason of enumeration.

Section 10.15. Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other

-37-

information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 10.16. Reconstitution

The Servicer hereby agrees and acknowledges that the Owner may securitize or otherwise transfer some or all of the Mortgage Loans (each, a "Transfer"), and the Servicer shall consent thereto; provided that the Servicer shall not consent to more than two (2) Transfers and shall be reimbursed by the Owner for all reasonable cost and expenses, including without limitation attorney's fees, incurred by the Servicer in connection with any Transfer. Each Transfer may entail the Owner assigning its rights under this Agreement to a securitization trust or other entity, and may require the Servicer to enter into a reconstituted servicing agreement (a "Reconstitution Agreement") acceptable to the Servicer, with terms and provisions which are no more onerous to the Servicer than those set forth herein. All Mortgage Loans subject to any Transfer will continue to be subject to the terms of this Agreement, as modified by the related Reconstitution Agreement. The Owner, in its sole discretion, may appoint a master servicer (a "Master Servicer") in connection with any Transfer. The Servicer hereby agrees to remit to and report to the Master Servicer, if so directed pursuant to a Reconstitution Agreement. If a Master Servicer has been appointed, the Master Servicer shall become the designee of the Owner under the Reconstitution Agreement and may enforce the Servicer's representations, covenants and warranties set forth in this Agreement.

Section 10.17. Confidentiality

The Servicer shall keep confidential and shall not divulge to any party, without the Owner's prior written consent, the price paid by the Owner for the Mortgage Loans, except to the extent that it is reasonable and necessary for the Servicer to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies.

Section 10.18. Safeguarding Customer Information

The Owner and the Servicer agree they (i) shall comply with all applicable laws and regulations regarding the privacy or security of Customer Information, (ii) shall not collect, create, use, store, access, disclose or otherwise handle Customer Information in any manner inconsistent with any applicable laws or regulations regarding the privacy or security of Customer Information, (iii) shall not disclose Customer Information to any affiliated or non-affiliated third party except to third party vendors engaged by the Servicer to prepare billing statements or to enforce or preserve its rights, as otherwise permitted or required by applicable law (or by regulatory authorities having jurisdiction in the premises) or, in the case of the Servicer, at the specific written direction of the Owner, (iv) shall maintain appropriate administrative, technical and physical safeguards to protect the security, confidentiality and

-38-

integrity of customer information, including security measures designed to meet the objectives of the Interagency Guidelines Establishing Information Security Standards, published in final form on December 28, 2004, 69 Fed. Reg. 77610, as amended from time to time.  The restrictions set forth herein shall survive the termination of this Agreement.

[SIGNATURES APPEAR ON NEXT PAGE]

-39-

IN WITNESS WHEREOF, the Servicer, the Servicing Rights Owner and the Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

MIDCOUNTRY BANK

(Owner)

By: _____
Name: _____
Title: _____

AURORA LOAN SERVICES LLC

(Servicer)

By: _____
Name: James L. Greene.
Title: Assistant Vice President

LEHMAN CAPITAL, A DIVISION OF
LEHMAN BROTHERS HOLDINGS INC.

(Servicing Rights Owner)

By: _____
Name: Jack B. Desens
Title: Authorized Signatory

-40-

**EXHIBIT A-1-1**

**MORTGAGE LOAN SCHEDULE**

A-1-1

**EXHIBIT A-2-1**

## MORTGAGE LOAN SCHEDULE

A-2-1

**EXHIBIT B**

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

ASSIGNMENT AND ASSUMPTION, dated _____ __, 200__, between MidCountry Bank, having an office at _____ ("Assignor") and _____, having an office at _____ ("Assignee"):

For and in consideration of the sum of TEN DOLLARS ($10.00) and other valuable consideration the receipt and sufficiency of which hereby are acknowledged, and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.      The Assignor hereby grants, transfers and assigns to Assignee all of the right, title and interest of Assignor, as owner, in, to and under that certain Servicing Agreement, Residential Mortgage Loans, Group No. 2007-1 (the "Servicing Agreement"), dated as of July 30, 2007, by and between the Assignor, Lehman Capital, A Division of Lehman Brothers Holdings Inc., as servicing rights owner and Aurora Loan Services LLC (the "Servicer").

2.      The Assignor warrants and represents to, and covenants with, the Assignee that:

a.      The Assignor is the lawful owner of the Mortgage Loans with the full right to transfer the Mortgage Loans free from any and all claims and encumbrances whatsoever;

b.      The Assignor has not received notice of, and has no knowledge of, any offsets, counterclaims or other defenses available to the Servicer with respect to the Servicing Agreement;

c.      The Assignor has not waived or agreed to any waiver under, or agreed to any amendment or other modification of, the Servicing Agreement, including without limitation the transfer of the servicing obligations under the Servicing Agreement; and

d.      Neither the Assignor nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans or the Servicing Agreement, any interest in the Mortgage Loans, the Servicing Agreement or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans, the Servicing Agreement or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, the Servicing Agreement, any interest in the Mortgage Loans or any other similar security with, any person in any manner, or made any general solicitation by means of general advertising or in any other manner, or taken any other action which would constitute a distribution of the Mortgage Loans under the Securities Act of 1933 (the "33 Act") or which would render the disposition of the Mortgage Loans a violation of Section 5 of the 33 Act or require registration pursuant thereto.

B-1

3. The Assignee warrants and represents to, and covenants with, the Assignor and the Servicer that:

a. The Assignee agrees to be bound, as "Owner", by all of the terms, covenants and conditions of the Servicing Agreement, and from and after the date hereof, the Assignee assumes for the benefit of each of the Servicer and the Assignor all of the Assignor's obligations as "Owner" thereunder;

b. The Assignee understands that the Mortgage Loans have not been registered under the 33 Act or the securities laws of any state;

c. The purchase price being paid by the Assignee for the Mortgage Loans are in excess of $250,000 and will be paid by cash remittance of the full purchase price within 60 days of the sale;

d. The Assignee is acquiring the Mortgage Loans for investment for its own account only and not for any other person. In this connection, neither the Assignee nor any Person authorized to act therefor has offered the Mortgage Loans by means of any general advertising or general solicitation within the meaning of Rule 502(c) of U.S. Securities and Exchange Commission Regulation D, promulgated under the 33 Act;

e. The Assignee considers itself a substantial, sophisticated institutional investor having such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investment in the Mortgage Loans;

f. The Assignee has been furnished with all information regarding the Mortgage Loans, the Servicing Agreement that it has requested from the Assignor or the Servicer;

g. Neither the Assignee nor anyone acting on its behalf has offered, transferred, pledged, sold or otherwise disposed of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security to, or solicited any offer to buy or accept a transfer, pledge or other disposition of the Mortgage Loans, any interest in the Mortgage Loans or any other similar security from, or otherwise approached or negotiated with respect to the Mortgage Loans, any interest in the Mortgage Loans or any other similar security with, any person in any manner which would constitute a distribution of the Mortgage Loans under the 33 Act or which would render the disposition of the Mortgage Loans a violation of Section 5 of the 33 Act or require registration pursuant thereto, nor will it act, nor has it authorized or will it authorize any person to act, in such manner with respect to the Mortgage Loans; and

h. Either: (1) the Assignee is not an employee benefit plan ("Plan") within the meaning of section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan (also "Plan") within the meaning of section 4975(e)(1) of the Internal Revenue Code of 1986 ("Code"), and the Assignee is not directly or indirectly purchasing the Mortgage Loans on behalf of, investment manager of, as named fiduciary of, as

B-2

Trustee of, or with assets of, a Plan; or (2) the Assignee's purchase of the Mortgage Loans will
not result in a prohibited transaction under section 406 of ERISA or section 4975 of the Code.

(i)    The Assignee's address for purposes of all notices and correspondence
related to the Mortgage Loans and the Servicing Agreement is:

_____
_____
_____

E-mail address:_____

Attention:_____

The Custodian's address for purposes of all notices and correspondence related to
the Mortgage Loans is:

_____
_____
_____

E-mail address:_____

Attention:_____

The Assignee's address for purposes of all remittance reports is:

_____
_____

E-mail address:_____

Attention:_____

The Assignee's address for purposes of all REO Property reports is:

_____
_____

E-mail address:_____

Attention:_____

The Assignee's address for purposes of all foreclosure and chargeoff consent
requests is:

_____
_____

E-mail address:_____

Attention:_____

The Assignee's wire transfer instructions for purposes of all remittances and payments related to the Mortgage Loans and the Servicing Agreement are:

_____

_____

_____

[SIGNATURES COMMENCE ON FOLLOWING PAGE]

B-4

IN WITNESS WHEREOF, the parties have caused this Assignment and Assumption to be executed by their duly authorized officers as of the date first above written.

| | |
|---|---|
| Assignor | Assignee |
| By:_____ | By:_____ |
| Its:_____ | Its:_____ |

B-5

**EXHIBIT C**

**CUSTODIAL ACCOUNT CERTIFICATION**

_____, 200_

Aurora Loan Services LLC hereby certifies that it has established the account described below as a Custodial Account pursuant to Section 3.03 of the Servicing Agreement, dated as of July 30, 2007, Residential Mortgage Loans, Group No. 2007-1.

Title of Account:    Aurora Loan Services LLC in trust for MidCountry Bank, Residential Mortgage Loans, Group No. 2007-1.

Account Number: _____

Address of office or branch of the firm at which Account is maintained:

_____

_____

_____


AURORA LOAN SERVICES LLC


By:_____
Name: James L. Greene
Title:  Assistant Vice President


C-1

## EXHIBIT D

## ESCROW ACCOUNT CERTIFICATION

_____ ___, 200_

Aurora Loan Services LLC hereby certifies that it has established the account described below as an Escrow Account pursuant to Section 3.05 of the Servicing Agreement, dated as of July 30, 2007, Residential Mortgage Loans, Group No. 2007-1.

Title of Account:   Aurora Loan Services LLC in trust for MidCountry Bank, Residential Mortgage Loans, Group No. 2007-1, and various Mortgagors.

Account Number: _____

Address of office or branch of the firm at which Account is maintained:

_____

_____

_____


AURORA LOAN SERVICES LLC


By:_____
Name: James L. Greene
Title: Assistant Vice President


D-1

EXHIBIT E

MORTGAGE LOAN DOCUMENT RELEASE FORM

[Date]

LaSalle Bank National Association
[Address]
Attention: [_____]

In connection with the administration of the mortgages held by you as Custodian under a certain Servicing Agreement dated as of July 30, 2007, between MidCountry Bank as Owner, Aurora Loan Services LLC as Servicer and Lehman Capital, A Division of Lehman Brothers Holdings Inc. as Servicing Rights Owner (the "Servicing Agreement"), the undersigned Servicer hereby requests a release of the Mortgage File held by you as Custodian with respect to the following described Mortgage Loan for the reason indicated below.

Mortgagor's Name:

Address:

Loan No.:

Reason for requesting file:

_____        Mortgage Loan paid in full. (The Servicer hereby certifies that all amounts
               received in connection with the loan have been or will be credited to the
               Custodial Account pursuant to the Servicing Agreement.)

_____        The Mortgage Loan is being foreclosed.

_____        Mortgage Loan substituted. (The Servicer hereby certifies that a
               Qualifying Substitute Mortgage Loan has been assigned and delivered to you
               along with the related Mortgage File pursuant to the Servicing Agreement or
               Mortgage Loan Purchase and Warranties Agreement.)

_____        Mortgage Loan repurchased. (The Servicer hereby certifies that the Purchase
               Price has been credited as required pursuant to the Servicing Agreement or
               Mortgage Loan Purchase and Warranties Agreement.)

_____        Other. (Describe)

_____        California Mortgage Loan expected to be paid in full.

E-1

The undersigned acknowledges that the above Mortgage File will be held by the undersigned in accordance with the provisions of the Servicing Agreement and will be returned to you within ten (10) days of our receipt of the Mortgage File, except if the Mortgage Loan has been paid in full, or repurchased or substituted for a Qualifying Substitute Mortgage Loan (in which case the Mortgage File will be retained by us permanently) and except if the Mortgage Loan is being foreclosed or is a California Mortgage Loan specified above (in which case the Mortgage File will be returned when no longer required by us for such purpose).

Capitalized terms used herein shall have the meanings ascribed to them in the Servicing Agreement.

AURORA LOAN SERVICES LLC

By: _____

Name:
Title:  Servicing Officer

E-2

## EXHIBIT F

## S50Y PRIVATE POOL DETAIL REPORT DATA FIELD ELEMENTS

Loan Number
Investor Number
Category
Investor Loan Number
Interest Rate
Due Date
Beginning Principal Balance
Remittance
ARM
Beginning Scheduled Principal Balance
Scheduled Principal
Servicing Fee Rate*
NET Interest Rate
P&I constant
Net Scheduled Interest
Ending Principal Balance
Principal Collected
Interest Collected
Servicing Fee Collected
Buydown

\* For purposes of clarification, for each Mortgage Loan, the Servicing Fee Rate field contains a single entry equal to the sum of the Servicing Fee Rate plus the applicable LPMI Fee, if any

F-1

07/30/2007    10:07    LEHMAN BROTHERS → 916467582126    NO.613    002

IN WITNESS WHEREOF, the Servicer, the Servicing Rights Owner and the Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

MIDCOUNTRY BANK

(Owner)

By: _____
Name: DAVID P. TURK
Title: CHIEF FINANCIAL OFFICER

AURORA LOAN SERVICES LLC

(Servicer)

By: _____
Name: James L. Greene
Title: Assistant Vice President

LEHMAN CAPITAL, A DIVISION OF
LEHMAN BROTHERS HOLDINGS INC.

(Servicing Rights Owner)

By: _____
Name: Jack E. Desens
Title: Authorized Signatory

-40-

IN WITNESS WHEREOF, the Servicer, the Servicing Rights Owner and the Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written:

MIDCOUNTRY BANK

(Owner)

By: _____
Name: _____
Title: _____

AURORA LOAN SERVICES LLC

(Servicer)

By: _____
Name: Janice L. Strenc
Title: Assistant Vice President

TECHNICAL, A DIVISION OF
LEHMAN BROTHERS HOLDINGS INC.

(Servicing Rights Owner)

By: _____
Name: JACK B. Deines
Title: Authorized Signatory

-20-

# FAIRFIELD AND WOODS P.C.
### ATTORNEYS AND COUNSELORS SINCE 1934

Wells Fargo Center, Suite 2400 • 1700 Lincoln St. • Denver, CO 80203-4524
Tel: 303-830-2400 • Fax: 303-830-1033 • www.fwlaw.com

Scott T. Rodgers
direct: 303-894-4464
email: srodgers@fwlaw.com

February 6, 2009

**VIA FACSIMILE, HAND DELIVERY and REGISTERED MAIL, RETURN RECEIPT
REQUESTED (with enclosures)**

Aurora Loan Services LLC
10350 Park Meadows Drive
Littleton, CO 80124
Attention: James L. Greene (MidCountry Bank, 2007-1)
Telephone: (702) 945-4849
Facsimile: (720) 945-5735

Lehman Capital, A Division of Lehman Brothers Holdings Inc.
745 Seventh Avenue
13th Floor
New York, New York 10019
Attention: Manager, Contract Finance
Telephone: (212) 526-7527
Facsimile: (212) 526-0323

RE:    **TERMINATION FOR CAUSE AND APPOINTMENT OF SUCCESSOR**

Dear Mr. Greene:

We represent MidCountry Bank ("MidCountry") in relation to that certain contract dated July 30,
2007 ("Contract"). This letter will serve to terminate Aurora Loan Services LLC ("Aurora") for
cause, as well as to appoint a successor servicer entity.

<u>Termination for Cause</u>

Pursuant to Section 9.01 of the Contract, a copy of which is attached hereto as **Attachment A**,
MidCountry terminates Aurora for cause based on the following grounds:

    A.    Section 9.01(ii) of the Contract provides that MidCountry may terminate Aurora
        for cause in the event of Aurora's failure to duly "observe or perform in any
        material respect any other of the covenants or agreements on the part of [Aurora]
        set forth in this [Contract] which continues unremedied for a period of thirty (30)
        days . . . ."

        Aurora breached this term of the agreement, by, among other things, failing to
        observe the practices of prudent mortgage lending institutions which service
        mortgage loans of the same type in the respective jurisdictions at issue (*see*
        Section 2.01, referencing "Accepted Servicing Practices," as defined in Article I



EXHIBIT
B



FAIRFIELD AND WOODS P.C.
ATTORNEYS AND COUNSELORS SINCE 1934

Aurora Loan Services LLC
Lehman Capital
February 6, 2009
RE: TERMINATION FOR CAUSE
AND APPOINTMENT OF SUCCESSOR

of the Contract) with respect to not less than the Adams Loan (Servicer Loan No. 45697588) and the Cisneros Loan (Servicer Loan No. 40402422). Aurora breached the above-reference Contract provisions, as well as Section 3.08 (relating to LPMI Claims), by failing to timely object to Triad's denial of mortgage insurance coverage for both the Adams and Cisneros Loans, where the grounds for such denial were baseless and/or in doubt, as well as by failing to timely inform MidCountry of such denial of coverage until after the expiration of the objection/appeal deadline. The aforementioned breaches have or will cause significant pecuniary damages to MidCountry, which breaches have remained unremedied for a period in excess of thirty (30) days.

B.    Aurora additionally breached Section 9.01(ii), as well as Section 3.01(c) of the Contract, with respect to the Lindo Loan (Servicer Loan No. 40552739), by, among other things, failing to notify MidCountry or to secure its pre-approval of the short sale at a significantly discounted price, which failure constitutes a violation of Section 3.10 (requiring notice/pre-approval), as well as a violation of the practices of prudent mortgage lending institutions which service mortgage loans of the same type in the respective jurisdictions at issue. See Sections 3.10; 2.01; see also Article I, defining "Accepted Servicing Practices"); see also Section 3.01(c) (regarding duty to exercise same care as though servicing or administering loans for Aurora's own account). This breach has or will caused significant pecuniary damage to MidCountry, which breach has remained unremedied for a period in excess of thirty (30) days.

C.    During the course of its servicing and administration of the loans at issue, Aurora has failed to confer with, and to keep informed, MidCountry in numerous aspects of such servicing and administration, which constitutes an additional breach of its duties under the Contract. MidCountry, through its former counsel and by letter dated September 3, 2008 (attached hereto as Attachment B), advised Aurora of its repeated failure to communicate with MidCountry in a timely and meaningful manner regarding delinquent loans and to seek required pre-approvals. MidCountry sought additional information for delinquent loans on an ongoing basis, which request has been ignored by Aurora.

Accordingly, based upon the foregoing, MidCountry terminates for cause all rights and obligations of Aurora under the Contract, except those obligations which survive such termination.

Appointment of Successor Servicer

Pursuant to Section 10.01, MidCountry hereby appoints as Aurora's successor:



# FAIRFIELD AND WOODS P.C.
### ATTORNEYS AND COUNSELORS SINCE 1934

Aurora Loan Services LLC
Lehman Capital
February 6, 2009
RE: TERMINATION FOR CAUSE
AND APPOINTMENT OF SUCCESSOR

Dovenmuehle Mortgage, Inc.
1 Corporate Drive, Suite 360
Lake Zurich, IL 60047

By this correspondence, and pursuant to Section 10.01 of the Contract, MidCountry requests that Lehman Capital, A Division of Lehman Brothers Holdings Inc., as Servicing Rights Owner, forthwith grant its consent to the appointment of Dovenmuehle Mortgage, Inc. ("Dovenmuehle") as successor servicer, which consent cannot be unreasonably withheld.

Aurora shall prepare, execute and deliver to Dovenmuehle, at the above-address, any and all documents and other instruments, place into Dovenmuehle's possession all Servicing Files, and do all other acts necessary or appropriate to effect the purpose of this termination, as detailed in Section 10.01. Such actions and transfers of Servicing Files, Mortgage Loan Documents and Mortgage Notes, etc., shall occur within a reasonable time, and not later than thirty (30) days following receipt hereof. Further, Aurora shall cooperate with MidCountry and Dovenmuehle so as to affect an efficient and timely transfer of servicing obligations, including the transfer of the Custodial and Escrow Accounts to Dovenmuehle. Additionally, Aurora will account to MidCountry for all funds associated in any way with the loans. *See* Section 10.01.

Contemporaneous herewith, Dovenmuehle will provide to Aurora and MidCountry an Acceptance of Appointment document, by hand delivery, facsimile and registered mail, return receipt requested.

Thank you for your prompt attention to this matter.

Very truly yours,

Scott T. Rodgers
FAIRFIELD AND WOODS, P.C.

cc:    Aurora Loan Services LLC
2617 College Drive
Scottsbluff, Nebraska 69363
Attention: Manager, Loan Administration (MidCountry Bank, 2007-1)
Telephone: (308) 220-2000
Facsimile: (308) 632-4287

| | |
|---|---|
| **DISTRICT COURT, DOUGLAS COUNTY,**<br>**STATE OF COLORADO**<br>4000 Justice Way, Suite 2009<br>Castle Rock, Colorado 80109<br>(303)663-7200 | |
| **Plaintiff:**   MIDCOUNTRY BANK<br><br>v.<br><br>**Defendant:**   AURORA LOAN SERVICES LLC, a<br>Colorado limited liability company. | ☐ COURT USE ONLY ☐ |
| **Attorneys for Plaintiff MidCountry Bank:**<br>Scott T. Rodgers, #19943<br>Tamara A. Hoffbuhr, #29391<br>Kieran A. Lasater, #38751<br>Fairfield & Woods, P.C.<br>Wells Fargo Center, Suite 2400<br>1700 Lincoln Street<br>Denver, Colorado  80203<br>Tel:  303-830-2400<br>Fax: 303-830-1033<br>Email:  srodgers@fwlaw.com; thoffbuhr@fwlaw.com;<br>klasater@fwlaw.com | Case No.: 2009cv369<br><br><br>Division: 1 |

**AFFIDAVIT OF GREGORY A. KRENZ IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY/PERMANENT  INJUNCTION**

STATE OF MINNESOTA          )
                            ) ss.
COUNTY OF RAMSEY            )

The undersigned, being over the age of eighteen and having been duly sworn, and having personal knowledge of the facts stated herein, or have been provided with the facts by those at MidCountry Bank with personal knowledge, or having possession of the facts which were found in the records kept by MidCountry Bank in the ordinary course of its regular business, made at or near the time of their occurrence, by individuals with actual knowledge, hereby states and affirms as follows:

1.      I am the President of MidCountry Mortgage , a division of MidCountry Bank and Senior Vice President of MidCountry Bank ("MidCountry"), and have been employed in that



EXHIBIT
C

capacity since November 2004. In my capacity, my duties include monitoring the status of the 52 loans ("Loans") serviced by Aurora Loan Services LLC ("Aurora"), including whether the individual loans are delinquent, and if so, what steps are taken by Aurora to remedy a delinquency.

2.      In performing my duties, I make and review reports and other records, which are made at or near the time by, or from information transmitted by, a person with knowledge, and the reports are kept in the regular course of MidCountry's business, which is its regular practice to make and keep such reports and records.

3.      This affidavit is provided in support of MidCountry Bank's Motion for Temporary Restraining Order and Preliminary/Permanent Injunction.

4.      On July 30, 2007, MidCountry, as owner of the Loans, Aurora, as Servicer, and Lehman Capital, a Division of Lehman Brothers Holdings, Inc., as Servicing Rights Owner, entered into a contract entitled "Servicing Agreement" ("Contract"), which is a valid contract and under which MidCountry has performed. MidCountry has performed its obligations under the Contract.

### Short Sales/REO Sales

5.      Under the Contract, in the event of a non-performing loan, Aurora was required to "notify . . . [MidCountry] of the proposed discounted payoff, chargeoff or sale." Motion, **Exhibit A** at § 3.10. A term of art for such a disposition is a "short sale."

6.      On or about January 5, 2009, I received information that the Lindo loan has been compromised by Aurora in a short sale for $300,000 which occurred on November 26, 2008. The total principal and interest on the loan at the time of the short sale was approximately $532,000, and the property securing the loan was appraised at $440,000, resulting in a loss of $297,840.30. MidCountry was not provided notice of the proposed short sale price prior to the sale. If informed of the proposed short sale amount, MidCountry would have instructed Aurora not to authorize the short sale due to the excessively low short sale price.

7.      On or about February 1, 2009, I received information that the Tran loan had been compromised by Aurora in a short sale for approximately $462,000.00, which occurred on January 15, 2009. The total principal and interest on the loan at the time of the short sale was approximately $608,000, resulting in a loss of $179,930.33. MidCountry was not provided notice of the proposed short sale price prior to the sale. If informed of the proposed short sale amount, MidCountry would have instructed Aurora not to authorize the short sale due to the excessively low short sale price.

8.      Based upon the approximate 20% delinquency rate of the 52 loans that were serviced by Aurora, there is a substantial likelihood that other loans are or will soon be

2

compromised by Aurora through short sales without providing MidCountry with advanced notice, thereby preventing it from objecting and avoiding the loss associated with same.

<u>Mortgage Insurance</u>

9.    Some of the 52 Loans are covered by mortgage insurance, whereby, if a borrower defaults on the loan payments, the insurance company will make MidCountry whole for the loss.

10.    On April 1, 2008, a borrower failed to make a mortgage payment, and, thereafter, the mortgage insurance claim was denied by the insurance company claiming the borrower did not intend to occupy the property at the time the cash refinancing was closed.  Under the insurance policy, Aurora and/or MidCountry was obligated to appeal a denial within 60 days of rejection.

11.    Under the Contract, Aurora was to act on behalf of MidCountry as though it were acting on its own behalf.  The Contract provides that, with respect to loans covered by mortgage insurance, Aurora shall "take all such actions as are necessary to service, maintain and administer the LPMI Loans in accordance with the LPMI Policy and to perform and enforce the rights of [MidCountry] under such LPMI Policy."  Motion, **Exhibit A at § 3.08**.  Further, Aurora was contractually obligated to "prepare and present, on behalf of itself and . . . [MidCountry], claims to the insurer under any LPMI Policy in a timely fashion in accordance with the terms of such LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any LPMI Policy respecting a defaulted . . . Loan." *Id*.

12.    The denial of coverage was baseless based upon the fact that the borrower did occupy the property at the time the loan was closed, which facts were known to Aurora.  Despite the baseless denial, Aurora failed to timely appeal the denial, or provide MidCountry with notice of the denial until after the appeal period has expired, resulting in losses of approximately $128,728.08.

13.    On another occasion, the denial was based upon the alleged misstatement of income when both Aurora and MidCounty had verified that the income was appropriate for the level of the employee.

14.    Despite its contractual obligations, Aurora failed to appeal the denial of coverage, and failed to inform MidCountry of the denial until after the appeal period had expired.  This has occurred on multiple loans, and, based upon the degree of delinquency in the loan portfolio, upon information and belief, additional instances of Aurora's failure to properly protect MidCountry's interest will imminently occur.

15.    Additionally, because Aurora has been terminated as servicer, it no longer has the contractual right or ability to "take such action as shall be necessary to permit recovery under any LPMI Policy . . . ."  Motion, **Exhibit A at § 3.08**.

3

16.    In September 2008, upon learning of the short sales after the fact, MidCountry, through its former counsel, made demand upon Aurora to provide MidCountry with, *inter alia*, notice of all short sales and detailed information on all the Loans. Motion at **Exhibit E**. Despite this demand, Aurora failed to provide the demanded information, and has failed to recognize its termination, and has refused to transfer escrow accounts, mortgage documents and servicing files to Dovenmuehle, as demanded by MidCountry.

17.    Based upon the loan portfolio's twenty percent (20%) delinquency rate, Aurora's failure to provide notice of proposed short sales, etc., as well as its refusal to recognize its termination, Aurora may in the immediate future compromise other loans through short sales or REO sales without providing MidCountry notice, to its direct and irreparable harm. This is because once a short sale or REO sale occurs, MidCountry is deprived of the opportunity to object to the sale and avoid the loss, or elect to proceed to foreclosure and retain or sell the foreclosed asset.

18.    Based upon media articles, Aurora has laid off much of its workforce, is in financial peril and at risk of bankruptcy or receivership. If Aurora files for bankruptcy or is placed in receivership, the loan documents and servicing files, which, under the Contract are MidCountry's property, as well as the escrow accounts, could be destroyed, converted or otherwise encumbered, to MidCountry's irreparable harm. Further, MidCountry's borrowers could also be irreparably harmed through the failure to service the loans, resulting in possible insurance lapses, as well as missed tax payments and resulting liens. Moreover, the failure to service the loans at issue may also harm service providers.

FURTHER THE AFFIANT SAYETH NOT.

_Gregory A. Krenz_

    **SUBSCRIBED AND SWORN** to before me this _6th_ day of March , 2009, by Gregory A. Krenz.

_Janelle K. Raboi_
Notary Public

    **WITNESS** my hand and official seal.

My Commission Expires: _1/31/2010_ .

Ann Arbor   Bloomfield Hills   Kalamazoo   Las Vegas   Peoria

# Howard & Howard
### law for business·

direct dial: 309.672.1483                Sandra M. Traicoff                email: STraicoff@howardandhoward.com

September 3, 2008

*Via UPS Overnight Delivery*

Aurora Loan Services LLC
103520 Park Meadows Drive
Littleton, Colorado 80124
Attention: James L. Greene

Lehman Capital a Division of
  Lehman Brothers Holdings, Inc.
745 Seventh Avenue, 13th Floor
New York, New York 10019
Attention: Leslie Gelber, Senior Vice
  President, Contract Finance

RE:    MidCountry Bank, 2007-1

Dear Mr. Greene and Ms. Gelber:

We represent MidCountry Bank (the "Bank") which entered into a Servicing Agreement among the Bank, Lehman Capital, a Division of Lehman Brothers Holdings, Inc. ("Lehman"), and Aurora Loan Services LLC ("Aurora") dated as of July 30, 2007 (the "Agreement"). Pursuant to the Agreement, Aurora has servicing responsibilities associated with mortgage loans (the "Loans") acquired by the Bank from Lehman and for which Lehman retained the servicing rights.

The Bank has significant and material issues with respect to Aurora's servicing of Loans which are delinquent. Currently, eight (8) of the Loans are delinquent. Two of these loans are shown as REO on the First American REO website, res.net, access to which was finally provided to the Bank in June 2008, after many requests by the Bank over several months beginning in December 2007. The Bank also has authorized Aurora to proceed with foreclosures on four (4) more of the delinquent loans. Aurora's monthly reports that are provided to the Bank do not contain sufficient information for the Bank to determine the status of the delinquent Loans in order to properly account for the delinquent Loans and to determine that Aurora's servicing of the delinquent Loans is consistent with its obligations under the Agreement. Further, all delinquent Loans for which the Bank has authorized foreclosure have not been entered on the res.net website, and the information on the website does not include complete information on the Loans and the property securing the Loans, such as information on insurance, taxes and expenses. Aurora itself has acknowledged that it has failed to comply with the Bank's repeated requests regarding these

EXHIBIT

D

September 3, 2008
Page 2

difficulties. As an example, we are attaching the property notes from the res.net website for one of the delinquent loans.

Finally, for at least one Loan (Adams) on which Aurora reached a settlement with the borrower for less than the full balance, Aurora failed to reflect the status of the Loans on monthly reports and did not notify the Bank of the settlement in accordance with Section 3.10 of the Agreement. It also appears that Aurora has failed to remit liquidation proceeds from this Loan in accordance with Section 4.01.

In light of these significant continuing problems, the Bank requests that Aurora take the following actions:

1. For each Loan that becomes 60 days delinquent, Aurora will provide to the Bank collection notes and loss mitigation information on a monthly basis until the Loan is paid current or listed on the res.net website.

2. For each Loan for which the Bank authorizes foreclosure, Aurora will place the Loan on the res.net website within 30 days of such approval.

3. For each Loan that is placed on the res.net website, Aurora will include all information relevant to the Loan and the property securing the Loan necessary for the Bank to determine the status of the Loan and whether Aurora is fulfilling its servicing obligations with respect to the Loan.

4. Aurora will comply with the notification provisions of Section 3.10 for each Loan on which a settlement is reached with the borrower or for which the property securing the Loan is sold, and will promptly report the sale or compromise to the Bank and remit the funds from the sale or compromise to the Bank in accordance with the Agreement.

The Bank believes that the actions by Aurora outlined above are essential to permit the Bank to determine if Loans are being properly serviced and to protect the interest of the Bank as the owner of the Loans. The Bank also believes that the failure by Aurora to take the requested actions will result in an obligation by Aurora to indemnify the Bank pursuant to Section 7.01 of the Agreement.

**Howard & Howard.**

September 3, 2008
Page 3


     If you have any questions regarding this matter, please feel free to contact me or David Turk, Chief Financial Officer of the Bank, at (952) 400-2821.

                        Sincerely,

                        HOWARD & HOWARD ATTORNEYS, P.C.

                        *Sandra M. Traicoff*

                        Sandra M. Traicoff

cc:    Larry D. Flowers, President, MidCountry Bank
       Marian Mackle, Executive Vice President, MidCountry Financial Corp.
       David Turk, CFO, Mid Country Bank
       Richard A. Hills, Jr., General Counsel, MidCountry Bank (*via email*)
       Gannon Schaefer, Vice President, Lehman Brothers (*via UPS Next Day Air*)
       Aurora Loan Services LLC (*via UPS Next Day Air*)
       2617 College Drive
       Scottsbluff, Nebraska 69363
       Attn:  Manager, Loan Administration
         (MidCountry Bank, 2007-1)

---

# Howard ⊠ Howard.