**Hearing Date: May 13, 2009 at 10:00 a.m. (NYT)**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
                           :

In re:                      :       Chapter 11 Case No.
                           :

LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                           :

              Debtors.    :       (Jointly Administered)
                           :
----------------------------------------------------------- x

### FIRST APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP, COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM SEPTEMBER 17, 2008 THROUGH AND INCLUDING JANUARY 31, 2009

Name of Applicant:                 Milbank, Tweed, Hadley & McCloy LLP

Authorized to Provide
Professional Services to:           Official Committee of Unsecured Creditors

Date of Retention:               November 18, 2008 (effective as of September 17, 2008)

Period for which compensation
and reimbursement is sought:                   September 17, 2008 – January 31, 2009

Amount of Compensation
requested:                                     $12,132,376.00

Amount of Expense
Reimbursement requested:                       $668,388.72

This is an:   X   interim _____ final application.

This is the first interim fee application filed by Milbank, Tweed, Hadley & McCloy LLP in these
cases.

**FIRST INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – JANUARY 31, 2009)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|------|----------------------|----------------|-------------|--------------------|
| Paul Aronzon | Financial Restructuring Partner for 19 years; admitted in 1979. | $995 $950 | 47.20 516.60 | $46,964.00 $490,770.00 |
| Linda Dakin-Grimm | Litigation Partner for 9 years; admitted in 1985. | $995 $950 | 16.20 9.10 | $16,119.00 $8,645.00 |
| Dennis Dunne | Financial Restructuring Partner for 10 years; admitted in 1991. | $995 $950 | 121.90 527.50 | $121,290.50 $501,125.00 |
| Robert Jay Moore | Financial Restructuring Partner for 12 years; admitted in 1977. | $995 $950 | 25.80 377.40 | $25,671.00 $358,530.00 |
| Anthony Root | Global Securities Partner for 12 years; admitted in 1983. | $995 | 1.50 | $1,492.50 |
| John Walker | Global Finance Partner for 8 years; admitted in 1987. | $995 | 7.30 | $7,263.50 |
| Gary Wigmore | Global Project Finance Partner for 19 years; admitted in 1983. | $995 $910 | 4.80 43.50 | $4,776.00 $39,585.00 |
| Thomas Arena | Litigation Partner for 8 years; admitted in 1991. | $950 $885 | 10.40 86.00 | $9,880.00 $76,110.00 |
| Greg Bray | Financial Restructuring Partner for 8 years; admitted in 1984. | $950 | 73.10 | $69,445.00 |
| Warren Cooke | Global Finance Partner for 17 years; admitted in 1973. | $950 | 41.40 | $39,330.00 |
| Luc Despins | Financial Restructuring Partner for 10 years; admitted in 1986. | $950 | 117.70 | $111,815.00 |
| Scott Edelman | Litigation Partner for 13 years; admitted in 1989. | $950 | 22.50 | $21,375.00 |
| Richard Gray | Global Finance Partner for 18 years; admitted in 1982. | $950 $910 | 2.00 46.10 | $1,900.00 $41,951.00 |
| L. Douglas Harris | Global Finance Partner for 18 years; admitted in 1980. | $950 $910 | 3.80 97.50 | $3,610.00 $88,725.00 |
| Michael Hirschfeld | Litigation Partner for 27 years; admitted in 1974. | $950 | 73.90 | $70,205.00 |

---

[1]   Effective January 1, 2009, Milbank implemented an annual increase in billing rates for all Partners, Counsel, Associates and Paraprofessionals.  Accordingly, because the First Interim Compensation Period includes a request for payment for services rendered on and prior to December 31, 2008, as well as time expended on and after January 1,  2009, certain timekeepers have two billing rates listed below.

| | | | | |
|---|---|---|---|---|
| Russell Jacobs | Tax Partner for 8 years; admitted in 1987. | $950 | 2.30 | $2,185.00 |
| Thomas Janson | Global Corporate Partner for 6 years; admitted in 1982. | $950 | 158.70 | $150,765.00 |
| Rainer Magold | Leverage Finance Partner for 4 years; admitted in 1986. | $950 | 65.90 | $62,605.00 |
| Dale Ponikvar | Tax Partner for 19 years; admitted in 1981. | $950 $910 | 18.10 248.60 | $17,195.00 $226,226.00 |
| Anthony Root | Global Securities Partner for 12 years; admitted in 1983. | $950 | 30.80 | $29,260.00 |
| John Walker | Global Finance Partner for 8 years; admitted in 1987. | $950 | 45.40 | $43,130.00 |
| Peter Benudiz | Global Corporate Partner for 1 year; admitted in 1987. | $925 $810 | 104.60 60.50 | $96,755.00 $49,005.00 |
| David Stagliano | Global Finance Partner for 18 years; admitted in 1981. | $910 | 4.60 | $4,186.00 |
| Winthrop Brown | Global Finance Partner for 26 years; admitted in 1975. | $900 $860 | 20.90 47.60 | $18,810.00 $40,936.00 |
| Robert Finkel | Global Corporate Partner for 13 years; admitted in 1988. | $900 $825 | 19.90 146.20 | $17,910.00 $120,615.00 |
| David Lamb | Global Corporate Partner for 19 years; admitted in 1992. | $900 $860 | 39.80 21.90 | $35,820.00 $18,834.00 |
| Eric Moser | Global Finance Partner for 10 years; admitted in 1991. | $900 | 19.90 | $17,910.00 |
| Paul Wessel | Tax Partner for 13 years; admitted in 1988. | $900 $825 | 26.40 69.90 | $23,760.00 $57,667.50 |
| Wilbur Foster | Financial Restructuring Partner for 18 years; admitted in 1982. | $875 $825 | 86.20 266.60 | $75,425.00 $219,945.00 |
| Stuart Harray | Global Corporate Partner for 2 years; admitted in 1993. | $860 | 8.20 | $7,052.00 |
| Crayton Bell | Global Corporate Partner for 6 year; admitted in 1992. | $850 $810 | 9.80 135.50 | $8,330.00 $109,755.00 |
| Catherine Marsh | Global Project Finance Partner for 4 years; admitted in 1995. | $850 $780 | 3.70 4.80 | $3,145.00 $3,744.00 |
| David Wolfson | Global Corporate Partner for 5 years; admitted in 1994. | $850 $810 | 106.00 333.30 | $90,100.00 $269,973.00 |
| Brett Goldblatt | Global corporate Partner for 4 years; admitted in 1998. | $825 $760 | 8.90 2.80 | $7,342.50 $2,128.00 |
| Andrew Walker | Tax Partner for 6 years; admitted in 1995. | $825 | 8.80 | $7,260.00 |

| Debra Alligood White | Global Corporate Partner for 3 years; admitted in 2007. | $825 | 5.70 | $4,702.50 |
| | | $760 | 7.40 | $5,624.00 |
| Andrew Leblanc | Litigation Partner for 2 years; admitted in 1998. | $800 | 25.30 | $20,240.00 |
| | | $740 | 11.90 | $8,806.00 |
| Matthew Barr | Financial Restructuring Partner for 4 years; admitted in 1997. | $780 | 35.30 | $27,534.00 |
| John Griem | Litigation Partner for 4 years; admitted in 1995. | $780 | 3.60 | $2,808.00 |
| Albert Pisa | Global Finance Partner for 4 years; admitted in 1997. | $780 | 6.10 | $4,758.00 |
| Russell Kestenbaum | Tax Partner for 2 years; admitted in 1999. | $775 | 31.10 | $24,102.50 |
| | | $700 | 124.80 | $87,360.00 |
| Darrel Holstein | Global Corporate Partner for 3 years; admitted in 1989. | $760 | 18.40 | $13,984.00 |
| Edward Sun | Global Securities Partner for 12 years; admitted in 1996. | $760 | 8.60 | $6,536.00 |
| Paul Denaro | Global Securities Partner for 1 year; admitted in 2000. | $740 | 18.20 | $13,468.00 |
| | | $700 | 5.10 | $3,570.00 |
| Martin Erhardt | Global Corporate Partner for 1 year; admitted in 2000. | $700 | 7.10 | $4,970.00 |
| | | $635 | 14.60 | $9,271.00 |
| Abhilash Raval | Financial Restructuring Partner for 1 year; admitted in 2003. | $700 | 151.20 | $105,840.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 7 years; admitted in 1984. | $825 | 50.10 | $41,332.50 |
| | | $775 | 380.80 | $295,120.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 2 years; admitted in 1992. | $785 | 270.10 | $212,028.50 |
| | | $735 | 1,031.70 | $758,299.50 |
| Robert Winter | Financial Restructuring Associate for 11 years; admitted in 1997. | $710 | 22.30 | $15,833.00 |
| | | $660 | 8.20 | $5,412.00 |
| Robert Liubicic | Litigation Associate for 10 years; admitted in 1999. | $685 | 74.70 | $51,169.50 |
| | | $635 | 85.50 | $54,292.50 |
| Fred Neufeld | Financial Restructuring Associate for 18 years; admitted in 1990. | $685 | 13.50 | $9,247.50 |
| | | $635 | 26.20 | $16,637.00 |
| Katherine Soanes | Global Corporate Associate for 3 years.; admitted in 1996. | $685 | 3.30 | $2,260.50 |
| Evan Fleck | Financial Restructuring Associate for 8 years; admitted in 2002. | $675 | 277.30 | $187,177.50 |
| | | $605 | 1,023.20 | $619,036.00 |

| Brian Kelly | Global Corporate Associate for 9 years; admitted in 2001. | $675<br>$605 | 1.90<br>89.80 | $1,282.50<br>$54,329.00 |
|---|---|---|---|---|
| Drew Batkin | Tax Associate for 7 years; admitted in 2003. | $650<br>$600 | 33.70<br>88.00 | $21,905.00<br>$52,800.00 |
| David Levine | Global Corporate Associate for 7 years; admitted in 2002. | $650 | 11.50 | $7,475.00 |
| Bradley Edmister | Global Securities Associate for 10 years; admitted in 2000. | $635 | 26.20 | $16,637.00 |
| David Zolkin | Global Securities Associate for 10 years; admitted in 1991. | $635 | 24.30 | $15,430.50 |
| Adrian Azer | Litigation Associate for 6 years; admitted in 2003. | $625<br>$585 | 63.80<br>34.10 | $39,875.00<br>$19,948.50 |
| Irene Bogdashevsky | Financial Restructuring Associate for 6 years; admitted in 2004. | $625<br>$585 | 42.50<br>50.00 | $26,562.50<br>$29,250.00 |
| James Bulger | Financial Restructuring Associate for 6 years; admitted in 2004. | $625<br>$585 | 105.60<br>254.30 | $66,000.00<br>$148,765.50 |
| Brian Kinney | Financial Restructuring Associate for 6 years; admitted in 2004. | $625<br>$585 | 5.70<br>28.20 | $3,562.50<br>$16,497.00 |
| Samir Parikh | Financial Restructuring Associate for 6 years; admitted in 2004. | $625<br>$585 | 50.30<br>89.80 | $31,437.50<br>$52,533.00 |
| Kevin Brown | Tax Associate for 2 years; admitted in 2008. | $600<br>$550 | 15.20<br>41.90 | $9,120.00<br>$23,045.00 |
| Gus Cheliotis | Global Corporate Associate for 5 years; admitted in 2003. | $600 | 35.90 | $21,540.00 |
| Victor Cinco | Global Corporate Associate for 5 years; admitted in 2008. | $600 | 19.40 | $11,640.00 |
| Joanne Collett | Financial Restructuring Associate for 5 years; admitted in 2008. | $600<br>$550 | 96.20<br>163.40 | $57,720.00<br>$89,870.00 |
| Michael Comerford | Financial Restructuring Associate for 7 years; admitted in 2003. | $600 | 3.40 | $2,040.00 |
| Melissa Gambol | Global Securities Associate for 5 years; admitted in 2007. | $600<br>$550 | 130.60<br>164.50 | $78,360.00<br>$90,475.00 |
| Peter Newman | Financial Restructuring Associate for 5 years; admitted in 2005. | $600<br>$550 | 33.40<br>100.50 | $20,040.00<br>$55,275.00 |
| Luisa Nixon | Global Corporate Associate for 3 years; admitted in 2008. | $600 | 168.40 | $101,040.00 |

| James Pascal | Global Finance Associate for 5 years; admitted in 2003. | $600 | 11.20 | $6,720.00 |
| Scott Rozic | Global Securities Associate for 5 years; admitted in 2004. | $600 | 38.00 | $22,800.00 |
| Maximillian Schneider | Leverage Finance Associate for 3 years; admitted in 2005. | $600<br>$550 | 13.30<br>105.30 | $7,980.00<br>$57,915.00 |
| Jonathan Goldstein | Global Transportation Finance Associate for 6 years; admitted in 2004. | $585 | 23.30 | $13,630.50 |
| Douglas Barnes | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 27.40 | $15,755.00 |
| Jonah Crane | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 119.00 | $68,425.00 |
| John Spader | Global Finance Associate for 4 years; admitted in 2006. | $575 | 37.60 | $21,620.00 |
| Nicholas Bassett | Litigation Associate for 3 years; admitted in 2007. | $550<br>$495 | 68.40<br>17.90 | $37,620.00<br>$8,860.50 |
| Jonathan Brown | Global Finance Associate for 3 years; admitted in 2007. | $550<br>$495 | 13.30<br>120.00 | $7,315.00<br>$59,400.00 |
| Melissa Ann Clark | Global Corporate Associate for 3 year; admitted in 2006. | $550<br>$495 | 65.40<br>31.70 | $35,970.00<br>$15,691.50 |
| Rachel Fink | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 81.60 | $44,880.00 |
| Jennie Govey | Financial Restructuring Associate for 3 years; admitted in 2008. | $550<br>$495 | 59.30<br>221.20 | $32,615.00<br>$109,494.00 |
| Daniel Gubitz | Global Corporate Associate for 3 years; admitted in 2004. | $550 | 7.50 | $4,125.00 |
| Aluyah Imoisili | Litigation Associate for 3 years; admitted in 2006. | $550<br>$495 | 87.10<br>27.20 | $47,905.00<br>$13,464.00 |
| Jason Karaffa | Financial Restructuring Group Associate for 3 years; admitted in 2007. | $550<br>$495 | 34.20<br>133.30 | $18,810.00<br>$65,983.50 |
| Linda Lee | Global Transportation Finance Associate for 3 years; admitted in 2008. | $550 | 3.50 | $1,925.00 |
| Ada Liu | Global Project Finance Associate for 5 years; admitted in 2005. | $550 | 19.20 | $10,560.00 |
| Gabriel Mpubani | Global Project Finance Associate for 3 years; admitted in 2006. | $550 | 30.90 | $16,995.00 |

| | | | | |
|---|---|---|---|---|
| Richard Owen | Global Corporate Associate for 3 years; admitted in 2006. | $550 | 10.60 | $5,830.00 |
| Scott Rozic | Global Securities Associate for 5 years; admitted in 2004. | $550 | 89.60 | $49,280.00 |
| Jed Schwartz | Litigation Associate for 3 years; admitted in 2007. | $550<br>$495 | 34.10<br>64.40 | $18,755.00<br>$31,878.00 |
| Naomi Slavinski | Tax Associate for 5 years; admitted in 2005. | $550 | 22.20 | $12,210.00 |
| Jeremy Sussman | Financial Restructuring Associate for 3 years; admitted in 2007. | $550<br>$495 | 85.10<br>174.40 | $46,805.00<br>$86,328.00 |
| Catherine Yu | Financial Restructuring Associate for 3 years; admitted in 2007. | $550<br>$495 | 195.80<br>687.20 | $107,690.00<br>$340,164.00 |
| Victoria Zhu | Global Corporate Associate for 5 years; admitted in 2008. | $550 | 26.70 | $14,685.00 |
| Douglas Barnes | Global Corporate Associate for 2 years; admitted in 2006. | $525 | 145.60 | $76,440.00 |
| Timo Bauer | Leverages Finance Associate for 2 years; admitted in 2007. | $525 | 3.00 | $1,575.00 |
| Jonah Crane | Global Corporate Associate for 4 years; admitted in 2006. | $525 | 427.90 | $224,647.50 |
| Michal Dahan | Litigation Associate for 4 years; admitted in 2006. | $525 | 9.50 | $4,987.50 |
| Timothy Mackey | Global Corporate Associate for 4 years; admitted in 2005. | $525 | 7.30 | $3,832.50 |
| Husam Badawi | Global Securities Associate for 2 years; admitted in 2008. | $515 | 9.90 | $5,098.50 |
| Constance Beverley | Litigation Associate for 2 years; admitted in 2008. | $515<br>$420 | 61.20<br>24.90 | $31,518.00<br>$10,458.00 |
| Andrew Butville | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 20.80<br>73.40 | $10,712.00<br>$30,828.00 |
| Juliet Curtin | Litigation Associate for 2 years; admitted in 2008. | $515<br>$420 | 26.70<br>49.20 | $13,750.50<br>$20,664.00 |
| James Doench | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 46.80<br>46.40 | $24,102.00<br>$19,488.00 |
| David Eastlake | Financial Restructuring Associate for 2 years; admitted in 2008. | $515<br>$420 | 37.90<br>241.60 | $19,518.50<br>$101,472.00 |
| Alison Fraser | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 6.20<br>70.50 | $3,193.00<br>$29,610.00 |
| Laura Kilian | Global Corporate Associate for 2 years; admitted in 2008. | $515<br>$420 | 2.20<br>6.40 | $1,133.00<br>$2,688.00 |

| Michael Lee | Global Securities Associate for 2 years; admitted in 2008. | $515 | 5.70 | $2,935.50 |
|---|---|---|---|---|
| Nicole Leyton | Tax Associate for 2 years; admitted in 2008. | $515 $420 | 9.60 140.90 | $4,944.00 $59,178.00 |
| Michael Lynch | Global Corporate Associate for 2 years; admitted in 2007. | $515 $420 | 4.30 101.60 | $2,214.50 $42,672.00 |
| Karen Ma | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 11.00 | $5,665.00 |
| Jonathan Petts | Litigation Associate for 2 years; admitted in 2008. | $515 $420 | 65.00 17.50 | $33,475.00 $7,350.00 |
| Harsha Rao | Global Finance Associate for 2 years; admitted in 2008. | $515 $420 | 15.90 2.30 | $8,188.50 $966.00 |
| Charles Rubio | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 $420 | 19.30 115.80 | $9,939.50 $48,636.00 |
| Andrew Sullivan | Global Securities Associate for 2 years; admitted in 2008. | $515 | 12.50 | $6,437.50 |
| Jennie Utsinger | Global Corporate Associate for 2 years; admitted in 2008. | $515 $420 | 3.10 45.20 | $1,596.50 $18,984.00 |
| Andrew Young | Financial Restructuring Associate for 2 years; admitted in 2006. | $515 $420 | 169.20 581.20 | $87,138.00 $244,104.00 |
| Jeremy Hollembeak | Financial Restructuring Associate for 3 years; admitted in 2007. | $495 | 29.10 | $14,404.50 |
| Elad Roisman | Global Corporate Associate for 3 years; admitted in 2007. | $495 | 151.70 | $75,091.50 |
| Hongyan Wang | Global Securities Associate for 2 years; admitted in 2008. | $495 | 3.90 | $1,930.50 |
| Jeeseon Ahn | Global Finance Associate for 5 months; admission pending. | $440 | 5.00 | $2,200.00 |
| Jennifer Beaudry | Global Securities Associate for 5 months; admission pending. | $440 | 49.50 | $21,780.00 |
| Andrea Conis | Financial Restructuring Associate for 5 months; admission pending. | $440 $275 | 147.70 416.90 | $64,988.00 $114,647.50 |
| Patten Courtnell | Global Corporate Associate for 5 months; admission pending. | $440 | 31.40 | $13,816.00 |
| Rachel Dobson | Litigation Associate for 5 months; admitted in 2009. | $440 $275 | 113.40 53.20 | $49,896.00 $14,630.00 |
| Andrew Everett | Global Corporate Associate for 5 months; admitted in 2009. | $440 $275 | 19.40 10.70 | $8,536.00 $2,942.50 |

| Peter Idziak | Financial Restructuring Associate for 5 months; admission pending. | $440 $275 | 4.20 35.40 | $1,848.00 $9,735.00 |
| Marianna Kosharovsky | Global Securities Associate for 5 months; admission pending. | $440 | 44.50 | $19,580.00 |
| Karen Kringen | Global Securities Associate for 5 months; admission pending. | $440 | 37.20 | $16,368.00 |
| Alan Lawn | Financial Restructuring Associate for 5 months; admission pending. | $440 $275 | 85.30 362.00 | $37,532.00 $99,550.00 |
| Roger Lee | Financial Restructuring Associate for 5 months; admission pending. | $440 | 35.40 | $15,576.00 |
| Ulric Lewen | Global Securities Associate for 5 months; admitted in 2009. | $440 | 50.50 | $22,220.00 |
| Jan Nishizawa | Global Corporate Associate for 5 months; admission pending. | $440 | 8.60 | $3,784.00 |
| Stephen Rose | Global Securities Associate for 5 months; admission pending. | $440 | 32.40 | $14,256.00 |
| Matthew Squires | Global Securities Associate for 5 months; admission pending. | $440 | 34.80 | $15,312.00 |
| Jeremy Steckel | Global Securities Associate for 5 months; admission pending. | $440 | 55.80 | $24,552.00 |
| Stephanie Swanson | Global Securities Associate for 5 months; admitted in 2009. | $440 | 38.20 | $16,808.00 |
| Joseph Wang | Financial Restructuring Associate for 5 months; admitted in 2009. | $440 $275 | 45.20 19.10 | $19,888.00 5,252.50 |
| Andrea Al-Attar | Global Corporate Associate for 5 months; admission pending. | $420 | 13.30 | $5,586.00 |
| Apoorv Kurup | Global Corporate Associate for 2 years; admitted in 2009. | $420 | 17.50 | $7,350.00 |
| Masamichi Yamamoto | Global Project Finance Associate for 2 years; admitted in 2008. | $420 | 20.30 | $8,526.00 |
| Julie Constantinides | Global Corporate Associate for 5 months; admission pending. | $275 | 15.20 | $4,180.00 |
| Oscar Castrillon | Case Manager | $245 | 42.50 | $10,412.50 |
| Jennifer Russo | Case Manager | $235 | 4.50 | $1,057.50 |
| Rena Ceron | Case Manager | $210 $200 | 62.00 386.10 | $13,020.00 $77,220.00 |

| | | | | |
|---|---|---:|---:|---:|
| Richard Cosentino | Legal Assistant | $270 | 92.50 | $24,975.00 |
| | | $265 | 263.50 | $69,827.50 |
| Randy Hooks | Legal Assistant | $270 | 61.50 | $16,605.00 |
| | | $265 | 176.50 | $46,772.50 |
| Kim Strosser | Legal Assistant | $270 | 68.20 | $18,414.00 |
| | | $255 | 137.30 | $35,011.50 |
| Charles Sheehah | Legal Assistant | $260 | 99.20 | $25,792.00 |
| | | $255 | 182.40 | $46,512.00 |
| Patrice Metz | Legal Assistant | $240 | 97.60 | $23,424.00 |
| Mayuko Fukui | Legal Assistant | $235 | 2.00 | $470.00 |
| | | $225 | 16.40 | $3,690.00 |
| Takamichi Okubo | Legal Assistant | $235 | 6.00 | $1,410.00 |
| | | $225 | 92.60 | $20,835.00 |
| Marika Tanaka | Legal Assistant | $225 | 8.80 | $1,980.00 |
| Dennis Bodenbenner | Legal Assistant | $220 | 9.50 | $2,090.00 |
| Kurt Maitland | Legal Assistant | $215 | 59.40 | $12,771.00 |
| Ken Forman | Legal Assistant | $200 | 15.40 | $3,080.00 |
| Angel Anderson | Legal Assistant | $185 | 1.80 | $333.00 |
| | | $170 | 21.00 | $3,570.00 |
| Paul Butters | Legal Assistant | $185 | 25.70 | $4,754.50 |
| | | $155 | 126.50 | $19,607.50 |
| Grace Green | Legal Assistant | $185 | 6.80 | $1,258.00 |
| | | $165 | 17.80 | $2,937.00 |
| Maria Nunez | Legal Assistant | $185 | 4.00 | $740.00 |
| Peter Delfausse | Legal Assistant | $170 | 13.80 | $2,346.00 |
| | | $155 | 82.70 | $12,818.50 |
| Bryn Fuller | Legal Assistant | $170 | 13.30 | $2,261.00 |
| | | $155 | 66.90 | $10,369.50 |
| Elliot Law | Legal Assistant | $170 | 103.30 | $17,561.00 |
| | | $155 | 434.80 | $67,394.00 |
| Charmaine Thomas | Legal Assistant | $170 | 60.80 | $10,336.00 |
| | | $155 | 219.60 | $34,038.00 |
| Toi Carrion | Legal Assistant | $160 | 18.50 | $2,960.00 |
| | | $155 | 52.30 | $8,106.50 |
| Lorena Lucero | Legal Assistant | $160 | 29.10 | $4,656.00 |
| | | $155 | 74.60 | $11,563.00 |
| Catherine Cho | Legal Assistant | $155 | 21.00 | $3,255.00 |
| Louisa Kiu | Legal Assistant | $155 | 4.00 | $620.00 |
| Zhong Li | Legal Assistant | $155 | 6.00 | $930.00 |
| Ziyi Zhou | Legal Assistant | $155 | 4.00 | $620.00 |

| | | | | |
|---|---|---|---|---|
| Jacqueline Brewster | Managing Attorney Clerk | $165 | 16.40 | $2,706.00 |
| | | $160 | 112.70 | $18,032.00 |
| Lena Mandel | Senior Attorney | $680 | 52.00 | $35,360.00 |
| | | $670 | 227.20 | $152,224.00 |
| Matthew Ottenstein | Librarian | $200 | 3.00 | $600.00 |
| | | $190 | 4.00 | $760.00 |
| Megan Scanlon | Librarian | $200 | 4.30 | $860 |
| Robin Traylor | Librarian | $200 | 3.50 | $700 |
| | | $190 | 4.50 | $855.00 |
| Jose Vialet | Litigation Support Specialist | $320 | 4.80 | $1,536.00 |
| | | $310 | 3.70 | $1,147.00 |
| Miguel Checo | Litigation Support Specialist | $295 | 35.80 | $10,561.00 |
| Rohan Lee | Litigation Support Specialist | $260 | 57.90 | $15,054.00 |
| Alexander Sacklowski | Litigation Support Specialist | $260 | 23.20 | $6,032.00 |
| Louisa Crespi | Administrative  Assistant | $215 | 5.00 | $1,075.00 |
| Mitchell Gaines | Programmer | $215 | 68.50 | $14,727.50 |
| Gabrielle Zsebi | Librarian | $205 | 7.30 | $1,496.50 |
| Theartis Everett | Litigation Support Specialist | $200 | 12.60 | $2,520.00 |
| Joshua Wallach | File Clerk | $135 | 33.40 | $4,509.00 |
| | | | | |
| **Total** | | **$564.38 (blended rate)[2]** | **21,496.80 hours** | **$12,132,376.00** |

---

[2]     The blended rate <u>excluding</u> paraprofessionals is $638.14 per hour.

FIRST INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – JANUARY 31, 2009)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| Adequate Protection Issues | 1.00 | 910.00 |
| Asset Sales | 708.00 | 504,811.50 |
| Automatic Stay Enforcement | 482.20 | 246,404.50 |
| Business Plan Review and Analysis | 1.20 | 1,092.00 |
| Claims Analysis and Estimation | 1,326.90 | 632,164.50 |
| Committee Administration | 1,397.20 | 829,705.00 |
| Committee Meetings | 1,212.80 | 894,121.00 |
| Communication with Creditors | 841.00 | 301,104.50 |
| Corporate Matters | 48.90 | 40,955.50 |
| Court Hearings | 695.20 | 335,971.00 |
| Debtor in Possession Meetings | 246.70 | 167,662.50 |
| Derivative Issues | 623.30 | 381,175.50 |
| DIP and Exit Financing | 212.40 | 132,632.00 |
| Employee Issues | 164.20 | 107,661.50 |
| Exclusivity Issues | 2.30 | 1,479.50 |
| Executory Contracts | 282.10 | 132,689.50 |
| Fee Application – Other | 16.70 | 6,466.50 |
| File, Docket and Calendar Maintenance | 1,586.70 | 425,891.50 |
| Insurance Matters | 176.80 | 107,642.00 |
| International Insolvency | 188.80 | 101,568.00 |
| Litigation | 921.40 | 481,950.00 |
| Pension Issues | 326.90 | 208,654.50 |
| Committee Retention Applications | 1,001.10 | 624,672.50 |
| Real Estate Matters | 804.50 | 557,655.00 |
| Regulated Business Asset Sales | 33.50 | 18,397.00 |
| Regulatory Issues | .90 | 606.50 |

| | | |
|---|---:|---:|
| Reorganization Plan | 32.70 | 12,341.50 |
| Reporting Requirements | 26.10 | 13,640.50 |
| Retention of Professionals | 306.70 | 174,565.50 |
| Rule 2004 Examinations | 215.60 | 134,187.00 |
| SEC Investigations and Securities | .60 | 381.00 |
| Substantive Consolidation | 199.70 | 83,609.50 |
| Tax Issues | 507.90 | 338,580.00 |
| Trading Book | 445.70 | 269,569.50 |
| Travel Time | 47.10 | 42,056.50 |
| Trustee Issues | 160.60 | 79,010.50 |
| Utilities Matters | 1.40 | 1,069.50 |
| Voidable Transfers and Other Potential Claims | 66.50 | 38,303.50 |
| German Bank Issues | 388.70 | 258,552.00 |
| Japan Issues | 292.50 | 140,330.50 |
| China Issues | 87.80 | 59,660.00 |
| Intercompany Issue | 17.90 | 11,696.50 |
| SIPC Issues | 194.10 | 112,756.50 |
| Bank Issues | 300.20 | 211,685.50 |
| LBI Sale | 720.60 | 484,993.00 |
| Neuberger Sale | 1,665.00 | 1,164,088.50 |
| UK Issues | 163.90 | 100,616.00 |
| Equity Committee | 67.00 | 37,024.50 |
| Examiner Issues | 226.90 | 147,050.50 |
| Bank Book | 127.80 | 86,187.00 |
| Private Equity Issues | 782.60 | 466,317.00 |
| Cash Management Issues | 92.40 | 62,871.00 |
| Milbank Fee Statements and Applications | 1,056.10 | 357,189.50 |
| | | |
| **Total** | **21,496.80** | **$12,132,376.00** |

**FIRST INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(SEPTEMBER 17, 2008 – JANUARY 31, 2009)**

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,122.78 |
| Binding | 349.50 |
| Cab Fares/Local Travel | 36,035.33 |
| Computer Database Research | 322,758.38 |
| Document Processing/Overtime | 88,320.75 |
| US Mail | 778.93 |
| Meals | 20,073.80 |
| Messenger | 2,447.15 |
| Outside Reproduction | 43,215.52 |
| Photocopies | 89,089.35 |
| Telephone | 9,367.04 |
| Transcripts | 5,036.50 |
| Translation Services | 3,432.39 |
| Travel | 46,361.30 |
| **TOTAL DISBURSEMENTS** | **$668,388.72** |

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
|  | : |  |
| In re: | : | Chapter 11 Case No. |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

------------------------------------------------------------- x

**FIRST APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**SEPTEMBER 17, 2008 THROUGH AND INCLUDING JANUARY 31, 2009**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & MᶜCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), and the

Second Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and

Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation And

Reimbursement Of Expenses of Professionals, dated March 13, 2009 (the "Interim

Compensation Order"), for the allowance of interim compensation for professional services

rendered from September 17, 2008 through and including January 31, 2009 (the "First Interim

Compensation Period"), and for reimbursement of expenses incurred in connection with such

services, and in support thereof respectfully represents as follows:

## I.
## INTRODUCTION

**A.    Background**

       1.    Bankruptcy Filing.  On September 15, 2008 (the "Petition Date"), and

periodically thereafter, the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to section 1107(a)

and 1108 of the Bankruptcy Code.

2.      Creditors' Committee.  On September 17, 2008, the United States Trustee

appointed the Committee in the Chapter 11 Cases.

3.      SIPA Trustee.  On September 19, 2008, a proceeding ("SIPA

Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA")

with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a

registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"SIPA Trustee") and is administering LBI's estate.

4.      Examiner.  The United States Bankruptcy Court for the Southern District

of New York approved the appointment of Anton R. Valukas as examiner (the "Examiner") in

the Chapter 11 Cases in the Order Approving the Appointment of Examiner dated January 20,

2009.

5.      Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local

Guidelines is attached hereto as Exhibit "A."

## B.    **Retention of Milbank and Billing History**

6.      Authorization for Milbank's Retention.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002

Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & McCloy LLP, As

Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the "Retention Order"), the Court authorized Milbank's retention as counsel for the Committee in these cases.  The Retention Order, which became a final order on November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.

   7. Application.  Milbank makes this first interim application for approval and allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.

   8. In accordance with the Interim Compensation Order, Milbank submitted monthly fee statements to the Debtors seeking interim compensation and reimbursement of expenses.  During the First Interim Compensation Period, Milbank submitted the following fee statements:

  (a) On November 26, 2008, pursuant to the Interim Compensation Order, Milbank served its first fee statement for the period from September 17, 2008 through and including October 31, 2008 (the "First Fee Statement").  The First Fee Statement sought (i) an allowance of $4,946,201.75 as compensation for services rendered and (ii) the reimbursement of $255,395.95 in expenses.  As of the date hereof, Milbank has received a total of $4,212,357.35, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred.

  (b) On January 7, 2009, pursuant to the Interim Compensation Order, Milbank served its second fee statement for the period from November 1, 2008 through and including November 30, 2008 (the "Second Fee Statement").  The Second Fee Statement sought (i) an allowance of $2,174,377.00 as compensation for services rendered and (ii) the reimbursement of $135,608.03 in expenses.  As of the date hereof, Milbank has received a total of $1,875,109.63, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Second Fee Statement.

  (c) On February 24, 2009, pursuant to the Interim Compensation Order, Milbank filed and served its third fee statement for the period from December 1, 2008 through and including December 31, 2008 (the "Third Fee Statement").  The Third Fee Statement sought (i) an allowance of $1,975,565.50 as compensation

for services rendered and (ii) the reimbursement of $169,702.96 in expenses. As of the date hereof, Milbank has received a total of $1,750,155.36, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Third Fee Statement.

(d)     On March 13, 2009, pursuant to the Interim Compensation Order, Milbank filed and served its fourth fee statement for the period from January 1, 2009 through and including January 31, 2009 (the "<u>Fourth Fee Statement</u>" and, together with the First Fee Statement, Second Fee Statement and Third Fee Statement, the "<u>Fee Statements</u>"). The Fourth Fee Statement sought (i) an allowance of $3,018,932.25 as compensation for services rendered and (ii) the reimbursement of $145,175.42 in expenses. As of the date hereof, Milbank has received a total of $2,560,321.22, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Fourth Fee Statement.

9.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases. No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## <u>APPLICATION</u>

10.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the First Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the First Interim Compensation Period.

11.     In this Application, Milbank seeks approval of $12,132,376.00[1] for legal services rendered on behalf of the Committee during the First Interim Compensation Period and

---

[1]     The compensation sought by this Application reflects a voluntary reduction from Milbank's customary fees of approximately $129,111.00. However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

$668,388.72 for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $12,800,764.72.  Milbank has taken all possible measures to reduce its fees in these cases given the overall amount of professional fees incurred.

12.    Pursuant to the Interim Compensation Order, Milbank has already received payment of $10,397,943.56 during the First Interim Compensation Period.  Milbank will seek a total payment of $2,402,821.16 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the First Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[2]

13.    The fees sought by this Application reflect an aggregate of 21,496.80 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the First Interim Compensation Period, at a blended average hourly rate of $564.38 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $638.14.

14.    Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

15.    Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in

---

[2]    In connection with preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the First Interim Compensation Period is $20,194.14 less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

interest, a billing summary for the First Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  Except as reduced voluntarily by Milbank, the compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

16.    Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[3]

17.    Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

---

[3]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

18.     To provide an orderly summary of the services rendered on behalf of the

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, Milbank has

established the following separate project billing categories in connection with these cases:

| | |
|---|---|
| 00100 | Adequate Protection Issues |
| 00200 | Asset Sales |
| 00300 | Automatic Stay Enforcement & Litigation |
| 00400 | Business Plan Review and Analysis |
| 00500 | Change of Control Transactions |
| 00600 | Chapter 7 Issues |
| 00700 | Claims Analysis and Estimation |
| 00800 | Committee Administration |
| 00900 | Committee Meetings |
| 01000 | Communication with Creditors |
| 01100 | Corporate Matters |
| 01200 | Court Hearings |
| 01300 | Customer Contracts & Programs |
| 01400 | Debtor-in-Possession Meetings and Communications |
| 01500 | Derivatives Issues |
| 01600 | DIP and Exit Financing |
| 01700 | Disclosure Statement |
| 01800 | Employee Issues |
| 01900 | Environmental Issues |
| 02000 | Equipment/Personal Property Leases |
| 02100 | Estimation Issues |
| 02200 | Exclusivity Issues |
| 02300 | Executory Contracts |
| 02400 | Fee Applications - Other |
| 02500 | File, Docket & Calendar Maintenance |
| 02600 | Insurance Matters |
| 02700 | International Insolvency Matters |
| 02800 | Litigation |
| 02900 | Pension Issues |
| 03000 | Committee Retention Applications |
| 03100 | Real Estate Matters |
| 03200 | Regulated Business Asset Sales |
| 03300 | Regulatory Issues |
| 03400 | Reorganization Plan |
| 03500 | Reporting Requirements |
| 03600 | Retention of Professionals |
| 03700 | Rule 2004 Examinations |

| 03800 | SEC Investigations and Securities Litigation |
| 03900 | Secured Transactions |
| 04000 | Substantive Consolidation |
| 04100 | Tax Issues |
| 04200 | Trading Book |
| 04300 | Travel Time |
| 04400 | Trustee Issues |
| 04500 | Utilities Matters |
| 04600 | Vendor Issues |
| 04700 | Voidable Transfers and Other Potential Claims |
| 04800 | German Bank Issues |
| 04900 | Japan Issues |
| 05000 | China Issues |
| 05100 | Intercompany Issues |
| 05200 | SIPC Issues |
| 05300 | Bank Issues |
| 05400 | LBI Sale |
| 05500 | Neuberger Sale |
| 05600 | UK Issues |
| 05700 | Equity Committee |
| 05800 | Examiner Issues |
| 05900 | Bank Book |
| 06000 | Private Equity |
| 06100 | Cash Management |
| 06200 | Milbank Fee Statements and Applications |

19.     The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the

9

Committee and its professional advisors, including Milbank, to address the many complex

issues and problems that are presented by these extraordinary and complex cases.

A.      **Asset Sales, Including Neuberger Management Buyout and LBI Sale**

20.      The Committee and its professionals have worked in tandem with the

Debtors and the Debtors' professionals to address the myriad challenges arising during the First

Interim Compensation Period.  Among these challenges were the evaluation of multiple

complex Bankruptcy Code section 363 asset sales within a period of just over four months  On

behalf of the Committee, Milbank's Employee Benefits, Financial Restructuring, Global

Corporate, Intellectual Property, Tax, Strategic Sourcing and Technology and other practice

groups worked closely with the Committee's financial advisors, FTI Consulting Inc.

("FTI") and Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan"), to

analyze proposed transactions, negotiate enhanced asset sale values and terms for the unsecured

creditors of each of the Debtors' estates.

21.      Milbank reviewed and analyzed numerous transactions during the First

Interim Compensation Period, including sales of the Debtors' broker-dealer operations,

investment management division, overseas assets, back office operations in India and other

numerous individual assets and contracts.  Given the dramatic commencement of the Debtors'

Chapter 11 Cases, certain of the Debtors' assets faced severe deterioration in value if not

promptly sold.  Milbank worked to maximize the value of the assets sold by both zealously

advocating the interests of unsecured creditors of each of the Debtors and working

cooperatively with the Debtors to prevent deterioration in asset value occasioned by delay.

Throughout the First Interim Compensation Period, Milbank drafted and disseminated

memoranda to the Committee analyzing proposed transactions and providing the Committee

with recommended courses of action.  In addition, Milbank regularly updated the Committee as to the material terms of bids received and the status of the sale processes through written memoranda, electronic mail and telephonic meetings.

22.    **LBI**.  On September 17, 2008, the same day the United States Trustee appointed the Committee and the Committee selected Milbank as its proposed counsel, the Debtors filed a motion establishing sale procedures and scheduling a final sale hearing for September 19, 2008 (the "LBI Sale Hearing") with respect to the sale of the assets of Lehman Brothers Inc. ("LBI"), the Debtors' North American capital markets business, to Barclays Capital, Inc. ("Barclays").  Given the extraordinary nature of the sale transaction, with respect to complexity and the extremely limited time available for review of its terms, Milbank worked around the clock with Houlihan to, among other things, review the transaction documentation and sale procedures, analyze the financial merits of the sale, analyze legal issues associated with the sale, evaluate the proposed closing conditions, advise the Committee with respect to the foregoing, and prepare for the Sale Hearing.

23.    Following approval of the LBI sale at the Sale Hearing, which lasted into the early morning hours of September 20, 2008, Milbank continued to work on matters related to the LBI transaction to ensure that the rights of the unsecured creditors of each of the Debtors were protected to the fullest extent possible under the extraordinary circumstances of these chapter 11 cases.  Milbank also participated in the drafting of, and monitoring performance under, the transition services agreement with Barclays (the "Barclays TSA"), the effective implementation of which, given the interrelatedness of the Debtors' operations, is of particular importance to the Committee and to unsecured creditors generally.  Accordingly, Milbank worked diligently throughout the First Interim Compensation Period to monitor and assess

11

compliance with the Barclays TSA through numerous meetings, telephonic conferences and correspondence.

24.    **Investment Management Division**.  In connection with the sale of Neuberger Berman and other assets in LBHI's investment management division ("IMD"), Milbank, together with the Committee's other professionals, consulted extensively with the Debtors and the Debtors' professionals regarding the terms and conditions of the initial bid for the IMD assets by Bain Capital Group and Hellman & Friedman (the "IMD Stalking Horse Bid").  Milbank also met with the potential acquirers and their respective counsel to discuss the terms and conditions of the IMD Stalking Horse Bid.  Milbank was instrumental in negotiating substantially more favorable bidding procedures, including a significantly reduced break-up fee, compared to the terms initially contemplated by the IMD Stalking Horse Bid.

25.    In the weeks following approval of the IMD Stalking Horse Bid by the Bankruptcy Court, it became clear that, as a result of certain purchase price adjustments that were likely to be triggered and closing conditions that were unlikely to be satisfied, the IMD Stalking Horse Bid would not be in the best interests of the Debtors' estates.  Milbank and Houlihan worked extensively to structure an alternative pursuant to which IMD management would acquire a significant equity interest in the IMD business, with LBHI retaining the rest (the "IMD Management Bid"). Milbank and the Committee's other professionals attended the auction for the IMD assets on December 1, 2008, and approved the Debtors' selection of the IMD Management Bid as the successful bid.

26.    Milbank continues to work with the Debtors and their professionals in drafting and negotiating the documentation that will govern the operation of the IMD business following the closing of the sale.  Milbank's efforts on behalf of the Committee resulted in a

12

significant value enhancement that will ultimately be realized by unsecured creditors of each of the Debtors' estates.

27. **Eagle Energy Sale**.  Milbank spent considerable time during the First Interim Compensation Period in connection with the sale of the general and limited partnership interests in Eagle Energy Partners I, L.P. ("Eagle Energy") and the associated transfer of intercompany indebtedness and an office lease.  Milbank worked in close coordination with Debtors' counsel to review and analyze the terms of each draft of the purchase agreement, along with related ancillary documents such as a transition services agreement.  Milbank also spent significant time conducting due diligence to confirm the need for an expedited sale and a variety of legal issues associated with the sale.  Through Milbank's efforts, a purchase agreement was entered into on September 26, 2008, thereby preserving value for the benefit of the Debtors' estates.

28. **India Back Office, Powai Operations Sale.**  During the First Interim Compensation Period, in connection with the sale of the Debtors' Indian back office operations to Nomura Holdings Inc. and Nomura Securities Co. Ltd., Milbank carefully reviewed and commented on several drafts of the share purchase agreement, along with the accompanying ancillary agreements, including the transition services agreement.  Milbank also spent a substantial amount of time assessing potential issues related to the sale of the shares, the treatment of the intercompany receivables and transition services issues.

29. **Spinnaker Sale.** With respect to the sale of the Debtors' 25% equity stake in Spinnaker Capital ("Spinnaker"), Milbank worked together with the Committee's other professionals and the Debtors' counsel to review, analyze and comment on numerous draft purchase agreements.  Milbank also consulted with the Committee's other professionals

regarding the terms and conditions of the various draft purchase agreements, including deferred

consideration protections under such draft purchase agreements.

30.    **Other Asset Sales**.  During the First Interim Compensation Period,

Milbank worked on several other asset sales involving the Debtors non-U.S. subsidiaries,

aircraft and other assets.  Milbank also worked in conjunction with the Committee's other

professionals, and the Debtors' counsel to identify potential purchasers, negotiate the terms and

conditions of purchase agreements and related transaction documents with potential purchasers

of such assets and advise the Committee on the legal issues implicated by such transactions.

**B.    Automatic Stay Enforcement**

31.    During the First Interim Compensation Period, Milbank reviewed the

numerous motions filed by parties in interest seeking to lift the automatic stay to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates.

32.    **DnB Lift Stay Motion**.  In particular, Milbank reviewed the motion filed

by DnB Nor Bank ASA (the "DnB Motion"), in which the movant (i) sought relief from the

automatic stay to exercise its right to set off funds in the deposit account that LBHI maintained

at DnB (the "DnB Account") against amounts allegedly owed to it by LBHI under a certain

revolving credit facility between DNB, as lender, and LBHI, as borrower (the "Credit

Agreement"); (ii) in the alternative, sought adequate protection of its interest in the funds in the

DnB Account.  According to DNB, the DNB Account contained $18,538,059.21, and

$25,071,256.94 was due under the Credit Agreement.  At the direction of the Committee,

Milbank drafted and filed a joinder to the Debtors' objection to the DnB Motion.  On

January 22, 2009, the Committee, the Debtors, and DnB entered into a stipulation partially

resolving the DnB Motion, and setting February 2, 2009 as the deadline for the parties to submit

supplemental briefing on the disputed amount of DnB's claim against LBHI.  On February 2,

2009, Milbank filed a legal brief on the Committee's behalf.  The matter is now *sub judice*.

**C.    <u>Claims Analysis</u>**

33.    During the First Interim Compensation Period, Milbank developed an

analytical framework for the review of the Debtors' publicly-traded outstanding debt

instruments.  Milbank worked with third-party providers, reference librarians, legal assistants

and litigation technology specialists to obtain the Debtors' offering documents and to develop

an operating database ("<u>Database</u>") to store, in a readily retrievable format, data relating to the

Debtors' outstanding debt instruments.  The database will be used by Milbank and other

Committee advisors to determine and analyze the Debtors' capital structure, establishing a basis

upon which to determine and validate claim amounts and analyzing substantive consolidation,

preference and other potential issues.

34.    Milbank also drafted numerous Committee memoranda on certain current

controversies involving Lehman debt issuances, including the class action lawsuits brought with

respect to Lehman's principal protected notes and the actions commenced on account of the

minibonds in Singapore, Hong Kong, Taiwan and elsewhere in Asia.

**D.    <u>Committee Administration</u>**

35.    Promptly following the Committee's formation, Milbank prepared

numerous documents necessary for the efficient administration of the Committee's affairs, <u>e.g.</u>,

by-laws to govern internal Committee decisions and governance, a working-group contact list,

and memoranda summarizing matters requiring the Committee's immediate attention.  Milbank

also developed an elaborate protocol for the organization and delegation of the massive number

of tasks involved in ensuring the Committee is kept aware and apprised of the multiple aspects

of these Chapter 11 Cases, including frequent meetings among internal team members and the maintenance of comprehensive rolling task lists, distribution lists, calendar notifications, project calendars and research status lists on a daily basis.  Milbank's efforts in setting up efficient and comprehensive methods of administering the Committee's needs will ensure that the Committee has the logistical tools necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

**E.**      **Committee Meetings**

36.      During the First Interim Compensation Period, numerous issues arose which required both telephonic and in-person meetings of the Committee to be held multiple times per week.  Prior to each Committee meeting, and in accordance with the Bylaws Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., <u>et al.</u> (the "<u>Committee Bylaws</u>"), Milbank prepared an Agenda listing topics for discussion.  Milbank also prepared and distributed related materials on behalf of the Committee's professionals for the Committee members' review.  During the Committee meetings, Milbank discussed with Committee members and their counsel all significant matters arising during the First Interim Compensation Period, and assisted the Committee in formulating positions with respect to such issues.

37.      Through Committee meetings and conference calls, and numerous other communications with members of the Committee, Milbank has assisted the Committee in (i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates and (ii) making informed decisions regarding the numerous issues that have arisen in these cases.

**F.      Communication with Creditors**

38.    During the First Interim Compensation Period, Milbank led the

Committee's efforts to establish a court-approved information-sharing protocol in accordance

with section 1102(b)(3) of the Bankruptcy Code (the "Creditor Information Protocol").  The

Creditor Information Protocol provides for the Committee to establish and maintain an Internet-

accessed website (the "Committee Website") to communicate with creditors.  In connection

therewith, Milbank filed the Stipulation and Agreed Order Between the Debtors and the Official

Committee of Unsecured Creditors Regarding Creditor Access to Information Pursuant to 11

U.S.C §§ 105(a), 1102(b)(3) and 1103(c) (Docket No. 498), which the Bankruptcy Court

entered on October 1, 2008.

39.    Upon the Court's approval of the Creditor Information Protocol,

Milbank, on behalf of the Committee, developed the Committee Website.  The Committee

Website contains a significant amount of content produced by Milbank, designed to provide

information to creditors, including, among other things, (i) general information concerning the

Debtors' chapter 11 cases, including adversary proceedings and the SIPA Proceeding;

(ii) highlights of significant events; (iii) a case calendar; and (iv) answers to frequently asked

questions, available in several languages.

40.    During the First Interim Compensation Period, hundreds of creditors

contacted Milbank regarding the Debtors' Chapter 11 Cases via the Committee Website and

telephonically.  In accordance with the Creditor Information Protocol, Milbank reviewed and

responded to all such creditor inquiries.  In addition, at the Court's direction, Milbank has acted

as an information liaison between the Debtors and the Informal Noteholder Group and other

creditors.  Accordingly, Milbank spent a considerable amount of time discussing these cases

with counsel to the Informal Noteholder Group, including analysis of pending motions.
Milbank continues to implement the Creditor Information Protocol, including by maintaining
and updating the Committee Website and reviewing and responding to creditor inquiries.

**G.    Court Hearings**

41.    During the First Interim Compensation Period, Milbank prepared for and
appeared at numerous hearings before this Court, including, among others, (i) numerous
regularly scheduled omnibus hearings; (ii) special hearings and case conferences; (iii) SIPA
hearings; and (iv) proceedings before the United States District Court for the Southern District
of New York.  To prepare for each hearing, among other things, Milbank reviewed and
analyzed documents, including correspondence and pleadings, conducted both factual and legal
research, and met with numerous parties to work towards consensual resolution of Committee
objections and motions.

**H.    Derivatives Issues**

42.    During the First Interim Compensation Period, the Committee established
a derivatives subcommittee (the "Derivatives Subcommittee") comprised of Committee
members, Milbank attorneys, and the Committee's other professionals.  The Derivatives
Subcommittee held regular meetings during the First Interim Compensation Period to address
and make recommendations to the full Committee with regard to specific issues surrounding the
Debtors' portfolio of more than 900,000 third-party derivatives transactions and worked with
the Debtors to negotiate a protocol to memorialize the level of Committee oversight of
transactions related to the derivatives book.  Substantial attorney time was devoted to analyzing
derivatives contracts and developing and evaluating strategies to monetize complicated
derivatives transactions for the benefit of unsecured creditors of each of the Debtors' estates.

43.     **Procedures Motion.**  On November 13, 2008, the Debtors filed a motion (the "Procedures Motion") seeking approval of procedures for (i) the Debtors' assumption and assignment of certain prepetition derivative contracts (the "Derivative Contracts") to which one of the Debtors is party (the "Assignment Procedures") and (ii) entry into settlement agreements that may establish termination payments and the return of collateral and/or property under terminated Derivative Contracts (the "Settlement Procedures" and, together with the Assignment Procedures, the "Procedures").  Pursuant to the Procedures Motion, the Debtors proposed to assume and assign those remaining Derivative Contracts that were "in the money." At the direction of the Committee, Milbank drafted and filed an objection to the Procedures Motion.  In addition, more than one hundred objections were filed by the counterparties to these Derivative Contracts (the "Counterparties"), which Milbank, at the request of the Committee, closely evaluated.

44.     To address the objections of the Counterparties and the Committee, the Committee worked closely with the Debtors to revise the Procedures to provide for a more active role for the Committee in the Procedures, including requiring the Debtors to obtain the Committee's consent in order to invoke the Procedures.  The Committee continued working with the Debtors to resolve the outstanding objections to the Procedures Motion.

45.     On January 16, 2009, the Court addressed and granted the Debtors' further motion (the "Consensual Motion") seeking approval of the assumption and assignment of certain Derivatives Contract either (a) in accordance with their terms or (b) with the consent of the applicable Counterparties.  Further, the Consensual Motion sought prospective authorization of a protocol between the Debtors and the Committee to reduce the costs

associated with the consensual assignment of Derivative Contracts, and to maximize the

Debtors' ability to market Derivative Contracts.

## I.   DIP and Exit Financing

46.   During the First Interim Compensation Period, Milbank reviewed the

debtor-in-possession ("DIP") financing arrangements proposed by the Debtors, including the

motion for DIP financing filed with the Bankruptcy Court and the proposed financing

agreement.  Milbank was actively involved in proposing modifications to the form of credit

agreement to be used for the final DIP financing proposed by the Debtors, and participated in

various telephone calls with representatives of the Debtors with respect to such documentation.

47.   Milbank also prepared, filed and served a motion for reconsideration of

the Court's interim order approving the DIP financing arrangements, when it became apparent

to the Committee that the DIP facility was no longer required.  The hearing on the motion for

reconsideration is currently scheduled to be heard on April 22, 2009.

## J.   Employee Issues

48.   As a result of the sale of many of the Debtors' core businesses and assets

during the First Interim Compensation Period, the Debtors faced an enormous personnel

shortage at the commencement of these cases that threatened the stabilization and value of the

Debtors' estates.  On October 28, 2008, the Debtors filed their Motion Pursuant to

Sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004 for

Authorization to Implement the Retention and Recruitment Program (the "Employee Retention

Motion") seeking to retain and recruit employees having the knowledge and skill to effectively

manage and monetize the Debtors' assets for the benefit of all stakeholders.  Prior to the filing

of the Employee Retention Motion, Milbank analyzed the financial and legal issues raised by

the Employee Retention Motion and negotiated with the Debtors' counsel the parameters of the

retention and recruitment program ultimately implemented.  After having received concessions

satisfactory to the Committee regarding limits on recruiting and retention bonuses, Milbank

filed a statement in support of the Employee Retention Motion, which was approved by this

Court on November 21, 2008.

49.     Additionally, during the First Interim Compensation Period, several

parties purporting to represent the Debtors' employees approached the United States Trustee

and requested the appointment of an official committee of employees.  The United States

Trustee solicited the Committee's views as to the need for an official committee of employees

and Milbank researched, drafted and corresponded with the United States Trustee regarding the

Committee's opposition to the appointment an official employee's committee.  Owing, in large

part, to these effort, the U.S. Trustee declined to appoint such a Committee, as did the Court

when it denied a subsequent motion seeking the same relief.

## K.      Executory Contracts

50.     During the First Interim Compensation Period, Milbank reviewed and

analyzed pleadings filed with respect to the Debtors' executory contracts, including: the

Debtors' and SIPA Trustee's proposed procedures for assuming or rejecting executory

contracts; numerous motions by the Debtors and SIPA Trustee to assume or reject particular

executory contracts; third parties' motions seeking to compel assumption or rejection of their

executory contracts; and objections and responses with respect to all of the foregoing.  Such

review and analysis included legal research regarding the relief sought by such pleadings,

analysis of the Debtors' rights and obligations under the applicable executory contracts,

correspondence with the Debtors' financial advisors regarding the financial context and

implications of the proposed courses of action, and analysis of the potential impact on the Debtors' estates.

51.    Based upon such review and analysis, Milbank prepared memoranda for the Committee summarizing such pleadings, applicable legal issues, corresponding financial consideration, and the potential impact on the Debtors' estates and, where appropriate and requested by the Committee, Milbank prepared responsive pleadings.

**L.    Fee Applications – Other**

52.    During the First Interim Compensation Period, Milbank internally recorded and reviewed monthly fee statements received from other professionals pursuant to the Interim Compensation Order.  Additionally, Milbank researched and analyzed the potential role and impact of a fee examiner and fee committee for the Debtors' Chapter 11 Cases, and the legal basis for appointment of such an examiner or committee.

**M.    File, Docket & Calendar Maintenance**

53.    During the First Interim Compensation Period, Milbank maintained internal filing, record-keeping, docket-monitoring, and calendaring systems to organize and track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, and related adversary proceedings; (ii) ongoing projects, and (iii) upcoming deadlines.  On a real-time basis, Milbank downloaded, consolidated, and organized pleadings in order to ensure efficient access.  Milbank also monitored the dockets on a real-time basis and summarized and circulated substantive pleadings to the Lehman team.  These summaries enabled Milbank to stay abreast of ongoing developments in these cases, facilitated the assignment of projects, and helped ensure that deadlines were not missed.

54.     Additionally, Milbank maintained a comprehensive internal calendar of active matters in these cases.  This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved invaluable in responding to inquiries and discussing these matters with the Committee and other parties in interest.  Milbank also maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines.

**N.**    **Insurance Matters**

55.     During the First Interim Compensation Period, at the direction of the Committee, and in an effort to understand the Debtors' indemnification obligations, Milbank expended considerable time investigating and evaluating the Debtors' directors and officers insurance program in order to ascertain the nature and extent of the Debtors' insurance coverage.  To obtain all relevant insurance policies and information, Milbank participated in numerous conferences and meetings, and exchanged correspondence, with the Debtors' counsel.

56.     On November 13, 2008, the Debtors filed a Motion, Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Advance Certain Legal Costs to Former Employees, in which the Debtors sought permission to advance $3 million in legal costs to several unidentified former employees.  Milbank spent significant time evaluating the basis for this motion and the relationship of the claims at issue to the available insurance coverage, with the result that the related Order was ultimately modified to maximize preservation of the Debtors' rights under the applicable insurance policies.

O.    **International Insolvency Matters**

57.    During the First Interim Compensation Period, Milbank attorneys and paraprofessionals across various jurisdictions communicated with each other, Debtors' counsel, and third party administrators regarding the status of proceedings initiated by or against Lehman-related entities in countries outside of the U.S., or jurisdictions where Lehman entities may have assets and/or liabilities, including, without limitation, (i) the United Kingdom; (ii) Hong Kong; (iii) Japan; (iv) France; (v) the Netherlands; (vi) Switzerland; (vii) Germany; (viii) Australia; (ix) Singapore; (x) Korea; (xi) the Philippines; (xii) China; (xiii) Cayman Islands; (xiv) Luxembourg; (xv) Taiwan; and (xvi) Bermuda  (collectively, the "International Jurisdictions").  Milbank liaised with the Committee and provided updates regarding the international proceedings.   Milbank spent considerable time searching publicly available information for updates and information regarding foreign proceedings, and prepared memoranda detailing the background, issues, procedures and likely next steps in such proceedings for each of the International Jurisdictions.

58.    Milbank also researched the implementation, effect and status of the UNCITRAL Model Law on Cross Border Insolvency (the "Model Law"), and considered the possible use of the Model Law in the these Chapter 11 Cases.  This analysis included research into which of the International Jurisdictions have implemented the Model Law, the possible outcomes of a case initiated under the Model Law (as enacted in each of the relevant jurisdictions), any departure from or modification of the Model Law in each of the domestic jurisdictions and procedural steps which would be required to initiate a case under the Model Law as enacted in the United Kingdom.  Milbank also researched and prepared summaries of international protocols implemented in other cross-border insolvency matters in order to

effectively negotiate a similar protocol for these Chapter 11 Cases.  As of the end of the First

Interim Compensation Period, Milbank continued to work with the Debtors and administrators

in each of the International Jurisdictions to develop an international protocol to implement the

principles of comity and administrative efficiency embodied in the Model Law.

59.     **Asia Issues**.  Due to the size and complexity of issues related to

insolvency proceedings commenced against the Debtors' Asian subsidiaries and affiliates in

various jurisdiction (the "Asian Proceedings"), the Committee established a subcommittee (the

"Asia Subcommittee") composed of Milbank attorneys, Committee members and the

Committee's other professionals to monitor, review and analyze issues specific to the Asian

Proceedings.  The Asia Subcommittee held regular meetings throughout the First Interim

Compensation Period to address and make recommendations to the full Committee and

frequently liaised with the Debtors' professionals in Asia and various Asian administrators and

regulators to represent the Committee's interests.

60.     **German Bank Issues**.  Lehman Brothers Bankhaus AG ("Bankhaus") is

a wholly-owned subsidiary of LBHI.  The Frankfurt Local Court (*Amtsgericht*) commenced

formal insolvency proceedings against Bankhaus on November 13, 2008.  During the First

Interim Compensation Period, Milbank's domestic and German offices analyzed numerous

issues relating to Bankhaus, including general insolvency procedures in a German insolvency

proceeding, subordination provisions under German insolvency law and the enforceability of

guarantees given by LBHI in favor of Bankhaus.  In connection therewith, Milbank and the

Committee's other professionals conducted numerous meetings with German regulatory

authorities and the Debtors and Debtors' professionals and provided regular updates to the

Committee on Bankhaus' status.

61.    **UK Issues**.  Lehman Brothers International (Europe) ("LBIE"), the

Debtors' principal trading company in the United Kingdom, along with several other British

subsidiaries and affiliates of the Debtors, were placed into insolvency administration (the

"Administration") in the United Kingdom ("UK") and the English High Court appointed Tony

Lomas, Steven Pearson, Dan Schwarzmann and Mike Jervis, partners at

PricewaterhouseCoopers LLP, as joint administrators (the "Joint Administrators") on

September 15, 2008.  During the First Interim Compensation Period, Milbank monitored

developments in the Administration of LBIE, conferred with professional advisors involved in

the Administration and delivered memoranda to the Committee with regard thereto.  In

particular, Milbank performed extensive legal research into the provisions and practical

mechanics of the administration process under English law.  Milbank also attended the first

meeting of the creditors of LBIE and conducted a teleconference with the Joint Administrators

regarding the formation of the UK creditors' committee and other developments in the

Administration.

## P.    Litigation

62.    During the First Interim Compensation Period, Milbank conducted

research and prepared memoranda regarding the claims and issues raised by a wide range of

pending lawsuits impacting the Debtors' estates.  Milbank also conducted multiple

teleconferences and meetings, both internally and with the Debtors and their professionals, with

regard to the foregoing and provided regular updates to the Committee.

63.    More specifically, with the exception of cases in which the Committee's

interests are represented by the Committee's conflicts counsel, Milbank monitored

developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits

commenced prepetition against the Debtors and pre- and post-petition against non-debtor affiliates, officers, directors, and related parties; and (iii) litigations raising issues similar to those raised or to be raised in the Chapter 11 cases.  Where appropriate and directed by the Committee, Milbank also sought to intervene in such matters on the Committee's behalf.

## Q.   Pension Issues

64.   During the First Interim Fee Period, Milbank analyzed numerous issues related to the various pleadings filed by the Pension Benefit Guaranty Corporation ("PBGC") in the United States District Court for the Southern District of New York (the "District Court") seeking to terminate the Debtors' retirement plan.  In connection therewith, Milbank attended hearings before the District Court and conducted several meetings via teleconference with the PBGC and the Debtors to resolve outstanding issues.   Milbank researched standards for involuntary plan termination, assessed the impact of involuntary plan termination on the Debtors' estates and prepared the joinder (the "Joinder") filed on December 19, 2008 with respect to the Defendants' Memorandum of Law (the "Benefits Committee Opposition") in opposition to the PBGC's Order to Show Cause Why Lehman Brothers Holding Inc. Retirement Plan (the "Retirement Plan") Should Not Be Terminated in accordance with Section 4042© of the Employee Retirement Income Security Act Of 1974.  Milbank researched and drafted several letter briefs to the District Court in response to the PBGC's motion to strike the Joinder and in support of the Committee's motion to intervene in the PBGC action.  Finally, the Committee has been an active participant in ongoing settlement negotiations between the Debtors and the PBGC.

**R.**    **Committee Retention Applications**

65.    During the First Interim Compensation Period, Milbank worked with the

Committee to interview and engage other Committee professionals, including (i) Houlihan as

investment banker; (ii) FTI as financial advisors;, and (iii) Quinn Emanuel Urquhart Oliver &

Hedges, LLP, as special counsel.  In this connection, at the request of the Committee, Milbank

assisted in the preparation of the Committee's retention applications for each of these

professionals, as well as preparing Milbank's own retention application.

**S.**    **Real Estate Matters**

66.    Due to the size, complexity and potential for exposure of the Debtors'

extensive real estate portfolio, the Committee established a real estate subcommittee (the "Real

Estate Subcommittee") comprised of Committee members, Milbank attorneys, and the

Committee's other professionals.  The Real Estate Subcommittee held regular meetings

throughout the First Interim Compensation Period to address and make recommendations to the

full Committee with regard to issues related to the Debtors' real estate holdings in order to both

assess discrete issues, i.e. the SunCal and Archstone situations, and formulate protocols with the

Debtors to attempt to maximize the value of the Debtors' real estate assets.

67.    The Debtors' real estate portfolio includes commercial, residential and

corporate interests in which the Debtors hold both debt and equity positions, often in the form

of joint ventures to develop large commercial projects.  Given the precipitous fall in the real

estate market, Milbank has been working closely with the Committee's financial advisors to

assess whether the Debtors should continue to meet various funding obligations and to respond

to numerous motions seeking to lift the automatic stay or seeking to have the Debtors assume

outstanding funding commitments.  In connection therewith, Milbank have reviewed the

Debtors' rights, obligations and exposures relative to joint venture partners, senior secured lenders, unsecured creditors and other third parties to make an impact analysis of the failure to fund capital calls. Milbank has also prepared numerous pleadings, at the Committee's request, joining in the Debtors' objections against the assumption of certain loan agreements. Milbank has also participated in the consensual resolution of several outstanding real estate-related motions.

68.     **SunCal.**  During the First Interim Compensation Period, Milbank addressed several lift stay motions filed by the Debtors' real estate joint venture partners and borrowers. Among them was a lift stay motion (the "SunCal Entities Motion") filed by several companies (the "SunCal Entities") formed to develop residential real estate projects (the "Projects") with funds borrowed from LBHI and Lehman ALI, Inc. (together with Lehman Commercial Paper Inc., "Lehman"). In the SunCal Entities Motion, the SunCal Entities sought relief from the automatic stay to administer their own bankruptcy cases to the extent that such cases, and the relief requested by the debtors therein, may affect the rights of Lehman, including, without limitation: (i) filing a motion to authorize the use of Lehman's cash collateral; (ii) filing a motion to approve post-petition debtor-in-possession ("DIP") financing on a priming lien basis that would subordinate Lehman's interests to those of a proposed DIP lender; (iii) filing motions to authorize the sale of the Project assets free and clear of all liens, claims and encumbrances; and (iv) seeking confirmation of a plan of reorganization or liquidation that may impair Lehman's claims or interests. This Court denied this motion without prejudice. Milbank continues to monitor the SunCal Entities' bankruptcies for further developments that might impact Debtors' cases.

T.    **Lehman Bank Issues**

69.    During the First Interim Compensation Period, Milbank also expended considerable time in connection with Lehman Brothers Bank, a federally-chartered thrift headquartered in Delaware ("LBB") overseen by the Office of Thrift Supervision, and Lehman Brothers Commercial Bank, a Utah industrial bank ("LBCB" and, together with LBB, the "Banks") overseen by the Federal Deposit Insurance Company ("FDIC").  Due to a number of factors, capital levels at each of the Banks dropped below levels generally considered adequate by the Banks' respective regulators.  As a result, the regulators indicated that, unless LBHI took action to support the capital levels at the Banks, the regulators would seize the Banks and liquidate their respective assets.  Because the Committee's financial advisors agreed with the Debtors and their professionals that significant value could be recovered if the Banks' capital and liquidity issues could be successfully addressed, the Committee supported the Debtors' efforts to preserve value at the Banks.

70.    In this connection, Milbank has been actively monitoring developing legal and regulatory changes by analyzing legislative proposals and participating in meetings of a related subcommittee (the "Bailout Subcommittee").  During the First Interim Compensation Period, Milbank, working together with the Committee's financial advisors, have analyzed various governmental programs with respect to details such as the specific type of assets eligible for the programs, the amount of funding available, and restrictions applicable to participants in the program, in order to assess the Debtors' eligibility to participate in such programs and the potential impact of such participation on the value of certain of the Debtors' assets.

71.      During the First Interim Compensation Period, Milbank also worked closely and cooperatively with the Debtors and the Debtors' professionals in attempting to structure solutions to the various issues confronting the Banks, including meeting with the Banks' regulators to discuss the Banks' alternatives and to negotiate a mutually acceptable solution to the Banks' regulatory issues.  Milbank has also expended significant time, together with the Committee's other professionals, analyzing the potential value to the Debtors' estates of making capital infusions into the Banks, including in connection with two motions filed by the Debtors seeking authority to (i) make a cash infusion into LBCB and (ii) make certain non-cash capital infusions into LBB, in each case to improve the Banks' respective capital positions to levels the Banks' regulators would find acceptable (the "Bank Motions").  The Court granted the Bank Motions on February 17, 2009, and Milbank continues to work with the Debtors, regulators and other Committee professionals to maximize the value of the Debtors' regulated business assets.

**U.      Retention of Professionals**

72.      During the First Interim Compensation Period, Milbank reviewed and scrutinized the retention applications of professionals employed by the Debtors and the Debtors estate, including the applications of: (i) Alvarez & Marsal North America, LLC, as chief restructuring officer and restructuring personnel; (ii) Weil, Gotshal & Manges LLP, as Debtors' counsel; (iii) Lazard Frères & Co. LLC, as investment banker; (iv) Curtis, Mallet-Prevost, Colt & Mosle LLP, as conflicts counsel; (v) McKenna Long & Aldridge LLP, as special counsel; (vi) Simpson, Thacher & Bartlett LLP, as special counsel; (vii) Bortstein Legal LLC, as special counsel; (viii) Dechert LLP as special counsel; (ix) Ernst & Young LLP as auditors and tax services providers; and (x) Kelly Matthew Wright, as an art consultant.  Milbank also reviewed

the retention applications of professionals retained by the SIPA Trustee and the Examiner.  In

evaluation of the retention applications, Milbank prepared tables of comparable professional

fees and discussed with the Committee, the Committee's other professionals and the Debtors,

concerns about conflicts of interest, amount of fees and scope of employment.

## V.    Rule 2004 Investigations

73.    During the First Interim Compensation Period, Milbank analyzed

Rule 2004 motions filed by interested parties including, among others, the Harbinger Funds, the

Federal Loan Mortgage Corporation, Bank of New York Melon, and 25 Broad, LLC seeking to

obtain information from one or more of the Debtors.  In response to certain of the pleadings not

otherwise handled by the Committee's conflicts counsel, Milbank prepared objections to

prevent duplicative requests for information, which would unnecessarily drain the debtor's

resources and impede upon the Committee's statutory mandate to investigate the acts, conduct,

liabilities and financial condition of the Debtors.

74.    On December 11, 2008 the SIPA Trustee filed a motion requesting

subpoena powers pursuant to Bankruptcy Rule 2004 to further his investigation into the

Debtors' conduct, property, liabilities, and financial condition.  In order to prevent unnecessary

administrative expense because of duplicative requests between the Examiner, the Committee

and the SIPA Trustee, Milbank filed a response to the motion and have been exploring ways

with the SIPA Trustee to harmonize various investigations.

75.    On January 20, 2009 the Court issued an order appointing the Examiner

to investigate certain aspects of the Debtors' businesses that occurred before and around the

Petition Date.  The Examiner filed a motion on January 30, 2009, requesting subpoena powers

pursuant to Bankruptcy Rule 2004 to further his investigation.  Milbank worked with the

Examiner to establish guidelines for cooperation and coordination in the investigation of the

Debtors between the Examiner and Committee. A stipulation, effective January 28, 2009, was

filed and reflects the agreement between the Examiner and the Committee.

**W.    Substantive Consolidation**

76.    During the First Interim Compensation Period, Milbank drafted a

memorandum for the Committee providing a comprehensive analysis of the doctrine of

substantive consolidation in the United States Court of Appeals for the Second Circuit and a

discussion of factors and questions to be investigated in order to decide how the doctrine might

apply to the Debtors.  In preparing this memorandum, Milbank researched case law and

secondary sources pertaining to substantive consolidation, prepared tables summarizing salient

information about these cases, and conferred with financial advisors regarding future due

diligence necessary to complete the substantive consolidation analysis.

**X.    Tax Issues**

77.    During the First Interim Compensation Period, Milbank devoted

substantial time to analyzing and evaluating federal, state, and international tax issues relating

to the Debtors' estates.  In this connection, Milbank participated in weekly Committee calls,

met with Debtors' tax department and tax counsel, and reviewed and analyzed (i) tax issues on

the disposition of certain assets; (ii) tax issues surrounding the Debtors' banks; (iii) transactions

that are the subject of an Internal Revenue Service ("IRS") audit against the Debtors' estate; (iv)

Debtors' tax exposure and potential refund claims; (v) Debtors' corporate-owned life insurance

deductions; (vi) motions and orders to restrict trading; (vii) Debtors' request for a ruling from

the IRS; (viii) foreign tax claims against certain Debtor foreign operations; and (ix) impact of

receipt of government program funds on the Debtors' use of their net operating losses.  In

connection with the foregoing, Milbank met with the Debtors' tax litigation counsel and

prepared a memorandum for the Committee explaining the tax exposure associated with the IRS

audit.

78.     On behalf of the Committee, Milbank researched, prepared legal

memoranda, and corresponded with the Debtors regarding (i) implications of current IRS

guidance and legislative developments related to the Debtors' estate, e.g., limitation on banks'

ability to take tax losses and the tax treatment of certain derivatives in bankruptcy; (ii) setting

off tax penalties with refunds and the allowance of certain refund claims; and (iii) Debtors' right

to interest on tax refunds.  Milbank participated in a weekly telephone conference with Debtors'

tax department and Debtors' tax counsel to discuss the numerous tax issues that arise in

Debtors' continuous dialogue with the IRS and other taxing authorities.

**Y.     Trading and Bank Book**

79.     **Open Trades Motions**.  During the First Interim Compensation Period,

LBHI and Lehman Commercial Paper Inc. ("LCPI," and together with LBHI, the "Movants")

filed a motion, dated November 14, 2008 (the "First Open Trades Motion"), seeking authority,

pursuant to section 365(a) of the Bankruptcy Code, to assume, reject or modify certain pending

trade agreements among the Debtors and certain counterparties (the "Counterparties") to

purchase or sell positions or participations in par or distressed loans at an agreed upon price (the

"Open Trades").  Further, on or about December 15, 2008, the Movants filed a second motion

(the "Second Open Trades Motion," and together with the First Open Trades Motion, the "Open

Trades Motion") seeking the same relief for a second group of Open Trades.

80.     On behalf of the Committee, Milbank worked closely with Houlihan and

FTI to review the Movants' proposed treatment of various Open Trades pursuant to the Open

Trades Motions and negotiate modifications to the terms and settlements of the Open Trades to enhance value for the Debtors' estates.  Milbank also reviewed myriad Counterparty objections and motions relating to the Open Trades Motions, researched and addressed the legal issues raised therein, including issues involving setoff under section 553 of the Bankruptcy Code, and also filed a Statement in Support of the First Open Trades Motion, dated December 15, 2008.

81.    In connection with the foregoing, the Committee established a subcommittee comprised of Milbank attorneys, Committee members and Committee professionals created to review matters relating to the Debtors' bank and loan books, analyze responsive courses of action and make recommendations to the Committee (the "Bank Book Subcommittee").  Milbank also spent considerable time reviewing issues raised relating to the Open Trades in pleadings filed by GE Corporate Financial Services, Inc. ("GE"), including GE's objection to the Second Open Trades Motion, and its related motion to lift the automatic stay to terminate certain Open Trades, both dated December 24, 2008.  Such issues included whether the automatic stay prevented termination of Open Trades that contained terminable-at-will provisions.  Milbank has focused, and continue to focus, their efforts on resolving the GE pleadings and other unsettled objections to the Open Trades Motions, including preparation for evidentiary hearings on certain Prepetition Termination Objections.

82.    In addition to the Open Trades matters, Milbank, the Bank Book Subcommittee members, and the Committee's advisors have worked together to review specific matters relating to the Debtors' loan book, including potential elevations of participating lenders to replace the Debtors as administrative agents and/or lenders in certain credit facilities, as well as motions where borrowers sought direct relief relating to their credit agreements, such as the motion of Jarden Corporation, dated December 10, 2008, seeking, among other things, to

35

compel LCPI to resign as Administrative Agent and Swing Line Lender under its Credit Agreement.  On October 6, 2008, the Bankruptcy Court issued an order authorizing LCPI, among other things, to elevate loan participations and thereby have the participants replace LCPI as the lender of record with respect to the participated loans, provided that LCPI must consult with the Creditors' Committee on such elevations.

83.    Finally, during the First Interim Compensation Period, Milbank conducted an in-depth legal analysis of characteristics distinguishing true loan participations from financing transactions by reviewing LCPI's participation agreements on a case-by-case basis.

## Z.    Trustee Issues

84.    During the First Interim Compensation Period, Milbank reviewed and analyzed issues with the Committee regarding a motion filed by the New York State Comptroller (the "Comptroller") for the appointment of a chapter 11 trustee in the Debtors' cases (the "Trustee Motion").  Milbank, upon the Committee's request, drafted and filed an objection to the Trustee Motion, and prepared to appear in Court to oppose the request for a chapter 11 trustee, which was ultimately denied by the Court.

## AA.    Voidable Transfers and Other Potential Claims

85.    Milbank also has devoted time to researching and evaluating potential claims on behalf of the Debtors' estates, including voidable transfer claims.  In connection with these potential claims, Milbank researched the applicable law, performed factual investigations relying on public material concerning the events leading up to Debtors' filing with this Court of their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and drafted motions seeking discovery pursuant to Bankruptcy Rule 2004.

**BB.**    **SIPC Issues**

86.    During the First Interim Compensation Period, Milbank monitored, evaluated and analyzed numerous issues related to the SIPA Proceeding in order to keep the Committee fully apprised of potential ramification to the Debtors' estates.  Among other things, Milbank evaluated distribution procedures under SIPA, attended SIPA hearings and meetings, negotiated with the SIPA Trustee regarding the role of the Committee in the SIPA Proceedings, analyzed the scope of the SIPA Trustee's mandate and drafted numerous memoranda regarding the foregoing.

**CC.**    **Equity Committee**

87.    On September 19, 2008, the Wilson Law Firm PC, on behalf of Greg Georgas, filed a motion seeking appointment of an equity committee pursuant to section 1102(a)(2) of the Bankruptcy Code (the "Equity Committee Motion").  During the First Interim Compensation Period, Milbank reviewed the Equity Committee Motion and researched the legal issues raised therein.  Milbank then drafted and filed an objection thereto setting forth the Committee's arguments as to why an equity committee should not be appointed in these Chapter 11 Cases.  On October 16, 2008, the Bankruptcy Court entered an order denying the Equity Committee Motion.

**DD.**    **Examiner Issues**

88.    Also during this period, Milbank reviewed and analyzed issues with the Committee regarding a motion filed by The Walt Disney Company for the appointment of an examiner in the Debtors' cases (the "Examiner Motion").  Multiple parties in interest joined in the Examiner Motion.  At the direction of the Committee, Milbank drafted and filed a response to the Examiner Motion.

**EE.**   **Private Equity**

89.     The Committee established a private equity subcommittee (the "Private Equity Subcommittee") composed of Milbank attorneys, Committee members and the Committee's other professionals.  The Private Equity Subcommittee held regular meetings during the First Interim Compensation Period to address and make recommendations to the full Committee with regard to specific issues surrounding the Debtors' portfolio of private equity assets and formulated protocols with the Debtors to attempt to maximize the value of such portfolios.  Milbank, as part of the Private Equity Subcommittee, worked closely with the Debtors, the Debtors' professionals and the Committee's other professionals in connection with the sale of several lines of business that were part of the Debtors' private equity businesses, including the sale of the Debtors' venture capital and merchant banking funds.

90.     With respect to the sale of the Debtors' limited partnership interest the venture capital funds to HarbourVest Partners and the sale of the Debtors' general partnership interests in the venture capital funds to the existing management of the funds, Milbank worked closely with Debtors' counsel in reviewing and commenting on several drafts of each purchase agreement and the related disclosure schedules and ancillary agreements.  Milbank also conducted significant due diligence to verify structuring issues and required consents, and communicated the terms of the transaction to the Committee.

91.     With respect to the sale of the merchant banking funds, Milbank worked closely with Debtors' counsel in reviewing and comparing the terms and conditions of all bids submitted in connection with the auction held for these assets.  Milbank commented on several drafts of the purchase agreement, conducted confirmatory due diligence to verify structuring

issues and consents required in connection with the sale, and Milbank briefed the Committee on the terms of the transaction.

**FF.    Cash Management**

92.    During the First Interim Compensation Period, Milbank reviewed the procedures proposed by the Debtors with respect to cash management, as set forth in the cash management motion filed October 3, 2008, and analyzed issues related thereto.  After numerous discussions with the Committee, Committee's professionals and the Debtors, Milbank prepared and filed a limited objection to the Debtors' cash management motion on October 14, 2008. Furthermore, Milbank engaged in numerous telephonic meetings with the Committee's financial advisors and Debtors' counsel regarding cash management issues and worked on drafting a proposed cash management order acceptable to the Committee.  The Court approved the interim cash management order on October 20, 2008 and the final cash management order was entered on November 6, 2008.

**GG.    Milbank Fee Statements and Applications**

93.    During the First Interim Compensation Period, Milbank reviewed Milbank's monthly fee statements for, among other purposes, compliance with the Interim Compensation Order and the Local Guidelines.  Milbank also prepared and served its Fee Statements on all parties required by the Interim Compensation Order.

**IV.**

**ALLOWANCE OF COMPENSATION**

94.    The professional services rendered by Milbank have required a high degree of professional competence and expertise to address, with skill and dispatch, the numerous issues requiring evaluation and action by the Committee.  Milbank respectfully

submits that the services rendered to the Committee were performed efficiently, effectively and

economically, and that the results obtained to date have benefited not only the members of the

Committee, but also the unsecured creditors of each of the Debtors' estates.

95.     The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

96.     With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)     the time spent on such services;
>
> (B)     the rates charged for such services;
>
> (C)     whether the services were necessary to the administration of, or
>         beneficial at the time which the service was rendered toward the
>         completion of, a case under this title;
>
> (D)     whether the services were performed within a reasonable amount
>         of time commensurate with the complexity, importance, and nature
>         of the problem, issue, or task addressed;
>
> (E)     with respect to a professional person, whether the person is board
>         certified or otherwise has demonstrated skill and expertise in the
>         bankruptcy field; and

(F)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

97.     The congressional policy expressed above provides for adequate compensation in order to continue to attract qualified and competent professionals to bankruptcy cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994) ("Congress rather clearly intended to provide sufficient economic incentive to lure competent bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y. 1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys' rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

98.     In assessing the "reasonableness" of the fees requested, courts have looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by most courts.[4]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First Colonial/Johnson analysis);  In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds., 15th ed. rev. 2009) (enumerating First Colonial and Johnson as the "leading cases to be considered in determining a reasonable allowance of compensation").  Milbank respectfully

---

[4]     The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

submits that the consideration of these so-called <u>Johnson</u> factors should result in this Court's

allowance of the full compensation requested.

(A)   <u>The Time and Labor Required</u>.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

(B)   <u>The Novelty and Difficulty of Questions</u>.  Novel and complex issues have arisen in the course of these chapter 11 cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

(C)   <u>The Skill Requisite to Perform the Legal Services Properly</u>.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

(D)   <u>The Preclusion of Other Employment by Applicant Due to Acceptance of the Case</u>.  Due to the size of Milbank's financial restructuring department and the firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients.  However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)   <u>The Customary Fee</u>.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)   <u>Whether the Fee is Fixed or Contingent</u>.  Milbank charges customary hourly rates for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)    Time Limitations Imposed by Client or Other Circumstances.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)    The Amount Involved and Results Obtained.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of  dollars, in what has been widely described as the largest chapter 11 cases ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)    The Experience, Reputation and Ability of the Attorneys.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

99.    The total time spent by Milbank attorneys and paraprofessionals during the First Interim Compensation Period was 21,496.80 hours and has a fair market value of $12,132,376.00.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the

43

work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

100.    Milbank has incurred a total of $668,388.72 in expenses in connection with representing the Committee during the First Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

101.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

102.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (a) twenty cents ($0.20) per page for photocopying; (b) no charge for incoming facsimiles; (c) toll charges only for outgoing facsimiles; and (d) an average of nineteen cents ($0.19) per minute for long distance.  In

accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[5]

103.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

104.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

105.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the First Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

106.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, and (c) the Office of the United States Trustee.

---

[5]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

# VII.

## <u>CONCLUSION</u>

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "<u>D</u>" (a) allowing Milbank (i) interim compensation for professional services rendered as counsel for the Committee during the First Interim Compensation Period in the amount of $12,132,376.00 and (ii) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $668,388.72, for a total award of $12,800,764.72; (b) authorizing and directing the Debtors to pay to Milbank $2,402,821.16, which is an amount equal to the difference between (i) this $12,800,764.72 award and (ii) $10,397,943.56, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation

Order for services rendered and expenses incurred during the First Interim Compensation Period;

and (c) granting such further relief as is just and proper.

Dated: New York, New York
        April 10, 2009

MILBANK, TWEED, HADLEY & McCLOY LLP

By:    /s/  Dennis F. Dunne
Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

and

Paul Aronzon
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                                            :
In re:                                      :          Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :          08-13555 (JMP)
                                            :
                    Debtors.                :          (Jointly Administered)
                                            :
--------------------------------------------------------------- x

## CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS FOR PROFESSIONALS IN RESPECT OF FIRST APPLICATION OF MILBANK, TWEED, HADLEY & M$^{c}$CLOY LLP, COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM SEPTEMBER 17, 2008 THROUGH AND INCLUDING JANUARY 31, 2009

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "U.S. Trustee Guidelines" and,

together with the Local Guidelines, the "Guidelines"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & M$^{c}$Cloy LLP ("Milbank"), counsel to the Official Committee of

Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc. and its affiliated

debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby certifies

with respect to Milbank's first application for allowance of compensation for services rendered

and for reimbursement of expenses, dated April 10, 2009 (the "Application"), for the period of

September 17, 2008 through and including January 31, 2009 (the "<u>First Compensation Period</u>")

as follows:

1.    I am the professional designated by Milbank in respect of compliance with

the Guidelines.

2.    I make this certification in support of the Application, for interim

compensation and reimbursement of expenses for the First Compensation Period, in accordance

with the Local Guidelines.

3.    In respect of section B.1 of the Local Guidelines, I certify that:

a.    I have read the Application.

b.    To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought fall within
the Guidelines.

c.    Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

d.    In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

4.    In respect of section B.2 of the Local Guidelines, I certify that Milbank

has provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

the Application), except that completing reasonable and necessary internal accounting and

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

5.      In respect of section B.3 of the Local Guidelines, I certify that copies of

the Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors

and (d) the Office of the United States Trustee.

Dated:        New York, New York
              April 10, 2009

                                        By:    /s/  Dennis F. Dunne
                                               Dennis F. Dunne

# **<u>EXHIBIT B</u>**

**Time Entry Records**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

# EXHIBIT C

**Expenses**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; and (iv) counsel for the Debtors.

# <u>EXHIBIT D</u>

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. [X] | $12,132,376.00 | $12,132,376.00 | $2,423,015.30 | $2,402,821.16[1] | $668,388.72 | $668,388.72 |

---

[1]    In connection with preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the First Interim Compensation Period is $20,194.14 less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

**FEE SCHEDULE A(1)**