WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Miranda Schiller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                  :
In re                                             :        Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS INC., et al.,            :        08-13555 (JMP)
                                                  :
                                    Debtors.      :        (Jointly Administered)
                                                  :
                                                  :
-----------------------------------------------------------------x

## DEBTORS' REPLY TO DK ACQUISITION PARTNERS L.P. OBJECTION TO DEBTORS' MOTION FOR ENFORCEMENT OF THE DECEMBER 23, 2008 ORDER APPROVING THE ASSUMPTION OF OPEN TRADE CONFIRMATIONS PURSUANT TO SETTLEMENT AGREEMENT

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtor,

Lehman Commercial Paper Inc. ("LCPI"), as debtors and debtors in possession submit

this response to the Objection to Debtors' Motion for Enforcement of the December 23,

2008 Order Approving the Assumption of Open Trade Confirmations Pursuant to the

Settlement Agreement (the "Objection") by DK Acquisition Partners L.P. ("DK").

## PRELIMINARY STATEMENT

1.      The Court's December 23, 2008 Order Approving the Assumption of Open Trade Confirmations (the "Order") and the December 18, 2008 Settlement Agreement (the "Settlement") vest this Court with jurisdiction over this matter.  This motion was not required to be brought in state court, as DK claims, nor should this Court abstain from exercising its jurisdiction, as DK urges in the alternative:   the parties expressly agreed that this Court would resolve all disputes relating to the Settlement. This dispute relates to the Settlement.

2.      DK should be ordered to close the August 26, 2008 trade confirmation (the "Trade") pursuant to which DK agreed to purchase an interest in the revolving credit agreement of Tronox Worldwide, LLC ("Tronox").   The Settlement provided that:  (1) LCPI would assume the trade confirmation with Tronox (the "Trade Confirmation"); (2) DK would settle the Trade with LCPI in accordance with the LSTA Standard Terms and Conditions for Par/Near Par Confirmations (the "LSTA Terms"); and (3) DK would waive any and all claims against LCPI relating to the Trade Confirmation.   DK acknowledges the validity of the Trade Confirmation and the Settlement, including its waiver. DK Obj. at ¶ 2.  DK's Objection is barred by its waiver and release of all claims against LCPI relating to the Trade Confirmation; even if DK supposedly did not know the factual basis for the Objection on December 18, 2008 when the Settlement was signed, it is barred from relitigating any objection to closing the Trade.

3.      Even if DK had not waived the objection, it should be rejected as meritless.  According to DK, the LSTA Terms do not obligate it to purchase debt with a

"defaulting buyer" in the chain of title.  DK's entire defense is based on a misreading of Article 10 of the LSTA Terms.  *See* DK Obj., ¶ 8.  Article 10's requirement that the parties negotiate "reasonably acceptable" terms for an assignment does not even apply where, as here, the Credit Agreement expressly provides those terms and even contains a form of assignment.  The price at which the Trade is to close has been agreed and comports with the LSTA Terms, Article 4.[1]  The price was reduced in accordance with Article 4 to reflect that a portion of the debt was unfunded.  There are no open terms that remain to be negotiated.  The terms are set forth in the Trade Confirmation and the Settlement; the form of assignment for the transfer of the debt is attached to the Tronox Worldwide, LLC Credit Agreement (the "<u>Credit Agreement</u>"), relevant excerpts attached hereto as Exhibit 1.  Neither the LSTA Terms nor the Credit Agreement require LCPI to purchase new debt as a condition to closing where, as here, it did not fully fund all of the borrower's draw requests.  DK cites no such contractual undertaking because there is none.

        4.      As demonstrated *infra*, DK's excuses for not closing, that the debt is "tainted," and that its right to repayment could be equitably subordinated, are purely speculative and lack any factual or legal support.

---

[1] LCPI funded $2,317,999 of a revolving credit loan to Tronox.  The borrowing requests by Tronox which were not funded were made on September 25, 26 and 30, 2008, and aggregate $819,578.  LCPI is entitled to repayment of the $2,317,999 under the Credit Agreement plus interest, which Tronox has continued to pay, most recently on March 30, 2009.  Once DK closes the Trade, it will succeed to LCPI's right to repayment of principal and interest from Tronox.  LCPI and DK agreed to close the Trade at the price of $1.45 million, after taking into account the unfunded commitment and before allowing for an additional discount for the delayed payment credit which further reduces the amount due from DK to approximately $1.3 million.

3

<u>**ARGUMENT**</u>

**I.    THIS COURT HAS JURISDICTION OVER THE MOTION**

      5.      DK claims that this motion should have been brought in state court as an action for breach of contract; alternatively, DK argues that even if this Court has jurisdiction, it should abstain from exercising it.  DK Obj. at ¶ 21.  The Order at 7, expressly provides that "this Court retain[s] jurisdiction to hear and determine all matters *arising from or related to the implementation and/or interpretation of* this Order." (Emphasis added).  This matter relates to the implementation of the Settlement.  The Settlement, ¶ 8, provides that this Court retains jurisdiction to determine any dispute arising with respect to the Settlement.  As DK acknowledges, the Settlement provides that the parties "will settle the Trade Confirmation in accordance with the LSTA Standard Terms."  Settlement at ¶ 10 (filed under seal), Motion at Ex. B; *see also*, DK Obj. at ¶ 2.  DK claims it is not required to close the Trade if it is unable to reach agreement "on a manner of closing consistent with the LSTA Standard Terms."  DK Obj. at ¶ 3.  Thus, even under DK's own understanding of its obligations, this dispute is covered by the Settlement and subject to the jurisdiction of the Court.

      6.      DK cites *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship.,* No. 04-708 (GEL), 2004 WL 1048239 (S.D.N.Y. May 7, 2004), for the proposition that this motion should have been filed as a new action in state court.  *Kerusa* involved condominium owners who brought an action against multiple defendants in state court, only one of which had filed for bankruptcy.  *See id.* at *1.  After one of the defendants filed for bankruptcy, the bankruptcy court held that it had jurisdiction but chose not to hear the case because it was only tangentially related to the bankruptcy.  *Kerusa* did not

involve a settlement agreement in which the parties expressly agreed that disputes relating to the settlement would be resolved by the bankruptcy court.  There is no basis to challenge this Court's jurisdiction because jurisdiction to enforce the settlement was retained in the Settlement and the Order.  *See Federation of Puerto Rican Organizations of Brownville, Inc. v. Howe*, 157 B.R. 206, at 210-11 (E.D.N.Y. 1993) ("[d]efendants agreed to have the bankruptcy judge sign the settlement agreement and entered it as an order of that court, thus implicitly consenting to that court's authority to enter a final order in this proceeding.  Defendants cannot challenge that authority now").

7.     DK argues (with no authority) that resolution of this dispute requires "discovery and an evidentiary hearing."  DK Obj. at ¶ 21.  At issue is whether DK must comply with a Court-approved Settlement by closing the Trade Confirmation for Tronox debt at the price agreed to in the Settlement and in accordance with the LSTA Terms.  This question is properly resolved by this Court based on the clear terms of the Settlement, the Trade Confirmation and the Order.

## II.     DK WAIVED AND RELEASED ITS RIGHT TO OBJECT TO THE TRADE

8.     As part of the Settlement, ¶ 7, DK released and waived any defenses it had to closing the Trade in accordance with LSTA Terms.  Specifically, the Settlement provides that "DK will waive any and all claims against LCPI relating to the Trade Confirmation, will not object to the prohibition of setoff in the Order, solely as it relates to the Trade Confirmations, and will forego any other setoff, recoupment, or counterclaims relating to the Trade Confirmations."  Settlement at ¶ 7 (filed under seal), Motion at Ex. B.

9.      DK's release is enforceable and bars it from relitigating its obligation to close the Trade.  "It is well established that a valid release constitutes a complete bar to an action on a claim which is the subject of the release."  *See Global Minerals and Metals Corp. v Holmes*, 35 A.D.3d 93, 98 (1st Dept. 2006).  Having released its objections to the Trade, DK cannot refuse to close the Trade at the price agreed to in the Settlement on the LSTA Terms.

10.      DK claims it is not required to close the Trade because it did not learn until after it signed the Settlement that LCPI had not fully funded all of Tronox's draw requests under the Credit Agreement.  That DK learned of this on December 23, 2008, is irrelevant.  As a sophisticated investor with years of experience trading millions of dollars of debt, DK could easily have discovered that certain Tronox requests were unfunded in September 2008 by simply asking LCPI to confirm whether all draw requests had been funded, as DK did on December 23, 2008.  *See K3 Equipment Corp. v. Kintner*, 233 A.D.2d 556, 558 (3rd Dept. 1996) ("To the extent that plaintiff may be arguing that it was unaware of defendant's conduct prior to its execution of the release, plaintiff's lack of knowledge is irrelevant and does not preclude an award of summary judgment dismissing the complaint.  The facts giving rise to plaintiff's claims were in existence at the time the release was signed").

11.      Allowing DK to avoid closing the Trade would effectively nullify the release provision in the Settlement, ¶ 7.  A release should not be set aside unless there is a showing of fraud by the party who seeks to set it aside.  *See Global Minerals and Metals Corp.*, 35 A.D.3d at 98.  While DK suggests LCPI was required to disclose unfunded draw requests, there is no allegation that this fact was fraudulently concealed

nor could there be.  LCPI informed DK of this on December 23, 2008 when it did inquire and, had it inquired earlier, it would have been so informed.

12.    Moreover, where a release is negotiated between sophisticated parties, as is the case here, the law imposes a duty to investigate and conduct diligence into the risks being assumed.  Indeed, in *Global Minerals and Metals Corp.,* the court upheld a settlement's release even where the defendant misrepresented a fact (which is not the case here) because the parties were sophisticated and the plaintiff had a duty to exercise diligence.  *See Global Minerals and Metals Corp.*, 35 A.D.3d at 100.  When the Settlement was signed, DK knew that LCPI had filed for Chapter 11 protection months earlier.  Since the Trade involved a revolving credit loan, which contemplated periodic borrowings over time, if DK was concerned about whether the Chapter 11 debtor had met its periodic funding obligations, it should have so inquired.  As a sophisticated investor represented by counsel, if DK genuinely believed LCPI's timely satisfaction of funding requests was material, DK should have sought such a representation from LCPI prior to signing the Settlement.  It did not.  Since the Order approving the Settlement was not vacated or reversed it must be obeyed; it should now be enforced to require consummation of the Trade.  *See* Motion, ¶ 25 (citing cases).

13.    Additionally, since DK knew on December 23, 2008 that a draw request had not been honored, if DK believed that this relieved it of its duty to close, it should either have moved the Court not to approve the Settlement or, if the Order had already been entered, moved to vacate it.  DK did neither.  Rather, it told LCPI that it was prepared to close but wished to have an indemnity.  *See* Motion, Ex. D.  Even after

Lehman acceded to DK's demand for an indemnity and agreed to the form of indemnity prepared by DK, it still refused to close.

## III.    DK SHOULD BE ORDERED TO COMPLY WITH THE ORDER

14.    DK claims to have fully complied with the Order by withdrawing its objection to the Trade.[2]  DK's argument that withdrawal of the objection was its only obligation is absurd:  first, under New York law, every party to a contract has an obligation of good faith and fair dealing.[3]   Both the Settlement and the Order contemplated that DK would proceed to close the Trade in accordance with the Trade Confirmation and the LSTA Terms.  Second, the Settlement, ¶ 6, states upon its approval by the Court, "the Objection will be deemed withdrawn, with prejudice."  DK cannot relitigate a claim it withdrew "with prejudice."  DK's continued refusal to close the Trade at the price agreed to in the Settlement after four months of repeated demands by LCPI does not constitute compliance with the Order.

15.    **The Release**.  DK's sole excuse for not closing the Trade is that LCPI did not fund a draw request under the Credit Agreement.  Because of this, DK claims that the Tronox debt is "tainted" and that its right to repayment from Tronox, which filed for Chapter 11 protection on January 9, 2009, would be impaired; it speculates that Tronox will either refuse to repay the loan, or that DK's rights to

---

[2] This Court's Order directed that:  (1) the terms of the Settlement Agreement [are] approved and binding on the parties; (2) the Debtors' assumption of assumed trades set forth on Exhibit A thereto, including specifically, the Trade  [is] approved; and (3) "the Debtors [are] authorized to execute and deliver all instruments and documents, and take such other actions as may be necessary or appropriate to implement and effectuate the assumptions … of Open Trade Confirmations."  Motion, Ex. A.

[3] *See 511 West 232nd Owners Corp. v. Jennifer Realty Co.*, N.Y.S. 2d 144, 154 (2002).

repayment will be subordinated to other lenders under the Credit Agreement.  This claim is unfounded because Tronox broadly released claims against LCPI in the Successor Agent Agreement, dated January 9, 2009, between LCPI and Credit Suisse (the "<u>Successor Agent Agreement</u>").  The release (the "Release") protects LCPI from a claim by Tronox that it does not have to repay the $2.3 million funded by LCPI.  *See* Successor Agent Agreement at ¶ 7; Motion, Ex. E.  Since DK claims it would step into the shoes of LCPI, it would succeed to the same rights as LCPI and the Release would protect it against any claim or defense by Tronox arising from LCPI's actions.  *See infra*, ¶ 21.

16.    **The LSTA Standard Terms**.  DK claims it is willing to settle the Trade Confirmation provided the terms comport with the LSTA Terms.  *See* DK Obj., ¶ 2.  Article 10 of the LSTA Terms provides that:

> In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) or, in the absence of same a reasonably acceptable assignment agreement containing customary provisions for the purchase and sale of par/near par loan assets.

DK Obj., Ex. A.  Not only does the Credit Agreement contain a provision (Article 10.6) which expressly addresses assignments such as this, but it includes a form of assignment as Exhibit D thereto.  *See* Ex. 1, hereto.  Thus, LCPI is not required to negotiate a form of assignment agreement that is "acceptable" to DK.  DK should be directed to execute the form of assignment attached as Exhibit D to the Credit Agreement.  *See id*.  The LSTA Terms do not state or imply that debt may not be assigned where a lender did not timely fund a request for a draw under a revolving credit agreement.  Rather, Article 4 of the LSTA Terms provides for a price adjustment where a portion of the debt is unfunded.

17.    Ironically, when DK moved on October 17, 2008 for an order compelling LCPI to assume or reject certain executory trades, including the Tronox debt, it represented to the Court:

> Such trades are usually settled simply through the execution of an assignment and acceptance agreement, *typically a form of document that is attached as an exhibit to the underlying credit agreement and receipt of all required consents and/or acknowledgments.*[4]

Thus, DK knows full well that it is the custom and practice for par and near par trades to be settled through the execution of the assignment agreement attached to the Credit Agreement.

18.    DK previously represented to the Court that the "Consummation of the Trades required only execution of standard documentation and the transfer of funds."[5] *See also id.* at ¶ 27 ("all that remained to be done with respect to each Trade was the execution of standard documentation and the transfer of funds to which each party obligated itself to pay prepetition"). The only reason that DK seeks to replace a standard form document with a negotiated one, is that it now wishes to avoid the Trade for the obvious reason: the commencement of a chapter 11 case by Tronox.

19.    **The "Taint."**  DK claims that the Tronox debt is "tainted" and, as such, unmarketable.  DK offers no evidence to support this purely speculative assertion.

---

[4] Motion For An Order Compelling Lehman Commercial Paper Inc. To Assume Or Reject Executory Contracts Pursuant To Sections 105(d)(2)(A) and 365(d)(2) Of The Bankruptcy Code, ¶ 12 (emphasis added).

[5] Objection To Debtor's Motion For An Order Pursuant To Section 365 Of The Bankruptcy Code Approving The Assumption Or Rejection Of Open Trade Confirmations, ¶ 9.

Moreover, any supposed "taint" would be attributable to DK's public assertion that it is "unmarketable" as opposed to any deficiency in LCPI's contractual rights.

20.    **Equitable Subordination**.  DK claims that the Tronox debt may be equitably subordinated.  This claim is equally baseless.  Section 510(c) of the Bankruptcy Code authorizes a bankruptcy court to subordinate all or part of an allowed claim pursuant to judicially developed principles of equitable subordination.  *See* 11 U.S.C. § 510(c)(1).  Courts are consistent in recognizing that equitable subordination is a remedial measure that should be used only sparingly.[6]  Here, at the time of LCPI's failure to fund, it was not a fiduciary or an insider, nor did it control Tronox.  Rather, LCPI and Tronox have a mere creditor-debtor relationship; the Credit Agreement that governs their relationship was negotiated at arms length.  LCPI is not the only lender which did not fund borrowing requests by Tronox under the Credit Agreement.  DK, which already owns Tronox debt which it purchased from another seller on December 8, 2008, omits to point out that two other lenders which are parties to the Credit Agreement failed to fund over $3 million of draw requests by Tronox.  The facts here bear no resemblance to cases in which courts have found fraud and overreaching as grounds for preferring certain creditors within a class over others.  Ironically, DK prevailed in its appeal in *In re Enron Corp.*, 379 B.R. 425 (S.D.N.Y. 2007), where it argued that as the purchaser of a $14.5 million revolving credit agreement claim from Credit Suisse First Boston, its claim could

---

[6] *In re U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994).  In the case of a claimant that is not an insider or a fiduciary, " 'evidence of more egregious misconduct such as fraud, spoliation or overreaching is necessary.' "  *In re 604 Columbus Ave. Realty Trust*, 968 F.2d 1332, 1360 (1st Cir. 1992) (citations omitted); *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F. 2d 1458 (5th Cir. 1991); *In re 80 Nassau Associates, et al.*, 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994).

not be equitably subordinated.  Here, DK has failed to demonstrate that LCPI's right to repayment from Tronox is subject to equitable subordination or that other creditors will even raise such a claim.  DK's Objection is notable for its failure to cite *Enron* even though DK was the appellant in *Enron* and *Enron* involved the same claim that DK raises as its sole defense to closing the Trade, that the debt was supposedly tainted by the transferor's misconduct.[7]

21.    DK's Objection is also notable for its failure to even address the Release discussed at length in LCPI's motion.  The Release by Tronox of any claims against LCPI protects DK from the very claims it raises as a defense to closing.  All of DK's excuses for not closing were rendered moot by the undisputed fact that the Release protects a buyer such as DK who succeeds to LCPI's rights.  *See Allstate Insurance Co. v. Administratia Asigurarilor De State*, 875 F. Supp. 1022, 1026 (S.D.N.Y. 1995) (a successor-in-interest to a prior owner steps into their shoes and acquires the same rights as its predecessor).

22.    DK should be directed to close the Trade within 24 hours of an order so directing.  *See United States Lines, Inc. v. GAC Marine Fuels Ltd. (In re McLean Indus., Inc.),* 68 B.R. 690, 695 (Bankr. S.D.N.Y. 1986) ("The duty of any court to hear and resolve legal disputes carries with it the power to enforce the order").

---

[7] *See* Memorandum of Law of Appellants DK Acquisition Partners, L.P. et al. filed in *Enron Corp. v. Springfield Associates (In re Enron Corp.)*, 379 B.R. 425 (S.D.N.Y. 2007); Ex. 2, hereto.

## CONCLUSION

23.    For the foregoing reasons, LCPI requests that its motion be

granted.

Dated: April 15, 2009
         New York, New York

                                    WEIL, GOTSHAL & MANGES LLP


                            By:      /s/ Jacqueline Marcus
                                    Miranda Schiller
                                    Jacqueline Marcus
                                    767 Fifth Avenue
                                    New York, New York 10153-0119
                                    Telephone:     (212) 310-8000
                                    Facsimile:     (212) 310-8007

                                    Attorneys for Debtors and
                                    Debtors in Possession

# EXHIBIT 1

**Execution Copy**

---

$450,000,000

CREDIT AGREEMENT

AMONG

TRONOX INCORPORATED,

TRONOX WORLDWIDE LLC,

AS BORROWER,

THE SEVERAL LENDERS

FROM TIME TO TIME PARTIES HERETO,


LEHMAN BROTHERS INC.

AND

CREDIT SUISSE,


AS ARRANGERS AND

BOOKRUNNERS,


ABN AMRO BANK N.V.,

AS SYNDICATION AGENT,


JPMORGAN CHASE BANK, N.A.

AND

CITICORP USA, INC.

AS CO-DOCUMENTATION AGENTS


AND

LEHMAN COMMERCIAL PAPER INC.,

AS ADMINISTRATIVE AGENT


DATED AS OF NOVEMBER 28, 2005

---

information transmission systems that are intercepted by such persons, except to the extent resulting from the gross negligence or willful misconduct of such indemnitee, as determined by a final decision of a court of competent jurisdiction or for any special, indirect, consequential or punitive damages in connection with the Facilities. Without limiting the foregoing but subject to the proviso of the second preceding sentence, and to the extent permitted by applicable law, each of Holdings and the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section shall be payable not later than ten Business Days after written demand therefor. Statements payable by the Borrower pursuant to this Section shall be submitted to the Borrower in accordance with Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

10.6    Successors and Assigns; Participations and Assignments. (a) This Agreement shall be binding upon and inure to the benefit of Holdings, the Borrower, the Lenders, the Arrangers, the Agents, all future holders of the Loans and Letters of Credit and their respective successors and assigns permitted hereby, except that neither Holdings nor the Borrower may assign or transfer any of their respective rights or obligations under this Agreement without the prior written consent of the Administrative Agent and each Lender.

(b)    Any Lender may, without the consent of the Borrower or any other Person, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "Participant") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and the Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees payable hereunder, or postpone the date of the final maturity of the Loans, in each case to the extent subject to such participation. The Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds

005431.0029 West 5805150.20

thereof as provided in Section 10.7(a) as fully as if such Participant were a Lender hereunder. The Borrower also agrees that each Participant shall be entitled to the benefits of Sections 2.19, 2.20 and 2.21 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; provided that, in the case of Section 2.20, such Participant shall have complied with the requirements of Section 2.20(e); and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c)    Any Lender (an "Assignor") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to (i) an Arranger and its affiliates, (ii) any Lender or any Lender Affiliate or Affiliated Fund of the assigning Lender or another Lender thereof (in the case of (i) and (ii), each, an "Eligible Assignee"), or (iii) with the consent of (x) the Administrative Agent, (y) in the case of an assignment of all or any portion of a Revolving Credit Commitment or a Revolving Credit Loan, each Issuing Lender, and (z) if no Event of Default has occurred and is continuing, the Borrower (which, in each case, shall not be unreasonably withheld or delayed), to an additional bank, financial institution or other entity (an "Assignee") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit D (an "Assignment and Acceptance"), executed by such Assignee and such Assignor (and, where the consent of the Borrower, each Issuing Lender or the Administrative Agent is required pursuant to the foregoing provisions, by the Borrower and such other Persons) and delivered to the Administrative Agent for its acceptance and recording in the Register together with a processing and recordation fee of $3,500; provided that no such assignment to an Assignee (other than any Lender or any Lender Affiliate thereof or Affiliated Fund of any Lender) shall be in an aggregate principal amount of less than $1,000,000 (with respect to Term Loans and Term Loan Commitments and $2,500,000 with respect to all other Loans and Commitments (other than, in each case, in the case of an assignment of all of a Lender's interests under this Agreement), unless otherwise agreed by the Borrower and the Administrative Agent. Any such assignment need not be ratable as among the Facilities. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with  Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Section 2.19, 2.20, 2.21, 9.12 and 10.5 in respect of the period prior to such effective date).  Notwithstanding any provision of this Section, the consent of the Borrower shall not be required for any assignment that occurs at any time when any Event of Default shall have occurred and be continuing.

(d)    The Administrative Agent shall, on behalf of the Borrower, maintain at its address referred to in Section 10.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitment of, and principal amount of the Loans owing to, each Lender from time to time.

The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee (if requested by such Assignee), and the old Notes shall be returned by the Administrative Agent to the Borrower marked "canceled". The Register shall be available for inspection by the Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 10.6(c), by each such other Person) together with any tax forms required under Section 2.20 and payment to the Administrative Agent of a registration and processing fee of $3,500 (except that no such registration and processing fee shall be payable in the case of an Assignee which is already a Lender or is a Lender Affiliate or an Affiliated Fund (and in the case of assignments on the same day from a Lender to more than one fund managed or advised by the same investment advisor (which funds are not then Lenders hereunder), only a single $3,500 registration and processing fee shall be payable for all such assignments by such Lender to such funds)), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Borrower. On or prior to such effective date, the Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the Revolving Credit Note and/or applicable Term Notes, as the case may be, of the assigning Lender) a new Revolving Credit Note and/or applicable Term Notes, as the case may be, such Assignee or its registered assigns in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Revolving Credit Commitment and/or Term Loans, as the case may be, upon request, a new Revolving Credit Note or Term Note, as the case may be, the Assignor or its registered assigns in an amount equal to the Revolving Credit Commitment or applicable Term Loans, as the case may be, retained by it hereunder. Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(f)    For the avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. In the case of any Lender that is a fund that invests in bank loans, such Lender may, without the

consent of the Borrower or the Administrative Agent, assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund as security for such obligations or securities; provided that any foreclosure or similar action by such trustee or representative shall be subject to the provisions of this Section 10.6 concerning assignments.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof. In addition, notwithstanding anything to the contrary in this Section 10.6(g), any SPC may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of the Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; provided that non-public information with respect to Holdings, the Borrower and its Subsidiaries may be disclosed only with the Borrower's consent which will not be unreasonably withheld. This paragraph (g) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

10.7    Adjustments; Set-off. (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefitted Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TRONOX INCORPORATED

By: _____
Name:  Mary Mikkelson
Title:  Senior Vice President and Chief Financial Officer

TRONOX WORLDWIDE LLC

By: _____
Name:  Mary Mikkelson
Title:  Senior Vice President and Chief Financial Officer

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____
Name:  LAURIE B PERPER
Title:  VP

LEHMAN BROTHERS INC.,
as Joint Lead Arranger

By: _____
Name:  LAURIE B PERPER
Title:  VP

CREDIT SUISSE,
Cayman Islands Branch,
as Joint Lead Arranger

By: _____
Name:
Title:

By: _____
Name:
Title:

*[Signature Page to Credit Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be
duly executed and delivered by their proper and duly authorized officers as of the day and year
first above written.

TRONOX INCORPORATED


By: _____
    Name: Mary Mikkelson
    Title: Senior Vice President and Chief
    Financial Officer


TRONOX WORLDWIDE LLC


By: _____
    Name: Mary Mikkelson
    Title: Senior Vice President and Chief
    Financial Officer


LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent


By: _____
    Name:
    Title:


LEHMAN BROTHERS INC.,
as Joint Lead Arranger


By: _____
    Name:
    Title:


CREDIT SUISSE,
Cayman Islands Branch,
as Joint Lead Arranger

By: _____
    Name:    VANESSA GOMEZ
    Title:    VICE PRESIDENT

By: _____
    Name:
    Title:    NUPUR KUMAR
             ASSOCIATE


*[Signature Page to Credit Agreement]*

ABN AMRO BANK N.V.,
as Syndication Agent

By: _____
   Name:    Jamie Conn
   Title:     Managing Director

By: _____
   Name:    Joshua Wolf
   Title:     Vice President

*[Signature Page to Credit Agreement]*

**EXHIBIT D**

**ASSIGNMENT AND ACCEPTANCE**

ASSIGNMENT AND ACCEPTANCE dated as of [_____ ___, ____] between _____ (the "*Assignor*") and _____ (the "*Assignee*").

Reference is made to the Credit Agreement, dated as of November 28, 2005 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*"), among TRONOX INCORPORATED, a Delaware corporation, TRONOX WORLDWIDE LLC, a Delaware limited liability company (the "*Borrower*"), the several banks and other financial institutions or entities from time to time parties thereto (the "*Lenders*"), LEHMAN BROTHERS INC. and CREDIT SUISSE, as joint lead arrangers and joint bookrunners, ABN AMRO BANK N.V., as syndication agent, JPMORGAN CHASE BANK, N.A. and CITICORP USA, INC., as co-documentation agents, and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "*Administrative Agent*"). Capitalized terms used herein and not otherwise defined herein are used herein as defined in the Credit Agreement.

The Assignor and the Assignee hereby agree as follows:

1. The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, an interest in the Assignor's rights and obligations under the Credit Agreement equal to the portion of **[the Revolving Credit [Commitment] [Loans[1]]] [and] [the Term Loans]** of the Assignor specified on Section 1 of Schedule I hereto. The **[Revolving Credit Commitment and]** principal amount of the Loans assigned to the Assignee are set forth in Section 1 of such Schedule I.

2. The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document or any other instrument or document furnished pursuant thereto or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other Loan Document or any other instrument or document furnished pursuant thereto; (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower and any Loan Party or the performance or observance by the Borrower and any Loan Party of any of its obligations under the Credit Agreement or any other Loan Document or any other instrument or document furnished pursuant thereto; and, if applicable, (iv) attaches the Note(s) held by the Assignor and requests that the Administrative Agent exchange such Note(s), if any, for new Note(s) in accordance with Section 10.6(e) of the Credit Agreement.

3. The Assignee (i) agrees that it will, independently and without reliance upon the Administrative Agent, the Assignor or any other Lender and based on such documents and

---

[1] Include only if Revolving Credit Commitment has been reduced to zero.

information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (ii) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and the other Loan Documents as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iii) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender; **[(iv) represents and warrants that it is an Eligible Assignee]**; (v) confirms it has received such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; **[and]** (vi) specifies as its Domestic Lending Office (and address for notices) and LIBO Lending Office the offices set forth beneath its name on the signature pages hereof[; **and[2] (vii) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty]**.

4.  Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Administrative Agent (together with a processing and recordation fee (if applicable) in the amount of $3,500 payable by the Assignee to the Administrative Agent pursuant to Section 10.6(c) of the Credit Agreement, an administrative questionnaire and the applicable tax forms) for acceptance and recording by the Administrative Agent. Subject to Section 10.6 of the Credit Agreement, the effective date of this Assignment and Acceptance shall be the Effective Date specified in Section 2 of Schedule I hereto (the "***Effective Date***").

5.  Upon such acceptance and recording by the Administrative Agent, then, as of the Effective Date, (i) the Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations under the Credit Agreement of a Lender and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights (except those which survive the payment in full of the Obligations) other than those relating to events or circumstances occurring prior to the Effective Date and be released from its obligations under the Loan Documents.

6.  Upon such acceptance and recording by the Administrative Agent, from and after the Effective Date, the Administrative Agent shall make all payments under the Loan Documents in respect of the interest assigned hereby (i) to the Assignee, in the case of amounts accrued with respect to any period on or after the Effective Date, and (ii) to the Assignor, in the case of amounts accrued with respect to any period prior to the Effective Date.

7.  This Assignment and Acceptance shall be governed by, and be construed and interpreted in accordance with, the law of the State of New York.

---

[2] Insert if Assignee is a Non-U.S. Lender (as such term is defined in the Credit Agreement).

8. This Assignment and Acceptance may be executed in any number of counterparts and by different parties on separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. Delivery of an executed counterpart of this Assignment and Acceptance by telecopier shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**[ASSIGNOR]**

By: _____
Name: _____
Title: _____

**[ASSIGNEE]**

By: _____
Name: _____
Title: _____

Domestic Lending Office (and address for notices):

**[Address]**

LIBO Lending Office:

**[Address]**

[3]Accepted this ___ day of _____, ____

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

---

[3] Omit if Assignee is an Eligible Assignee.

Signature Page

Consented to this ____ day
of _____, ____

[4]TRONOX WORLDWIDE, LLC

By: _____
Name: _____
Title: _____


[5]ABN AMRO BANK N.V.,
as an Issuing Lender

By: _____
Name: _____
Title: _____

JPMORGAN CHASE BANK, N.A.,
as an Issuing Lender

By: _____
Name: _____
Title: _____

---

[4] Omit if Assignee is an Eligible Assignee or an Event of Default has occurred and is continuing.

[5] Omit if Assignee is an Eligible Assignee or if assignment relates to Term Loans.

**SCHEDULE I**
**TO**
**ASSIGNMENT AND ACCEPTANCE**

**Section 1.**

[Revolving Credit Commitment assigned to Assignee                              $_____ ]

[6][Aggregate Outstanding Principal Amount of Revolving
Credit Euro Loans Assigned to Assignee                                         €_____ ]

[7][Aggregate Outstanding Principal Amount of Revolving
Credit Loans denominated in Dollars Assigned to Assignee                       $_____ ]

[Aggregate Outstanding Principal Amount of Term Loans
Assigned to Assignee]
**Section 2.**

Effective Date:                                                                _____, _____

---

[6] Include only if Revolving Credit Commitment has been reduced to zero.

[7] Include only if Revolving Credit Commitment has been reduced to zero.

# EXHIBIT 2

Westlaw.

For Opinion See 2008 WL 718284 , 388 B.R. 131 , 380 B.R. 307 , 2007 WL 2780394 , 379 B.R. 425 , 364 B.R. 482 , 2006 WL 2548592 , 2006 WL 1724516 , 2006 WL 1222035 , 2005 WL 1020917 , 2004 WL 3015256 , 316 B.R. 767 , 55 UCC Rep.Serv.2d 31 , 2004 WL 726088

United States District Court, S.D. New York.
In re: ENRON CORP., et al., Reorganized Debtors;
Springfield Associates, L.L.C., Defendant-Appellant,
v.
Enron Corp., Plaintiff-Appellee;
DK Acquisition Partners, et al., Defendant-Appellants,
v.
Enron Corp., Plaintiff-Appellee;
DK Acquisition Partners, LP, et al., Defendant-Appellants,
v.
Enron Corp., Plaintiff-Appellee;
Bear, Stearns & Co., Inc., Defendant-Appellant,
v.
Enron Corp., Plaintiff-Appellee;
DK Acquisition Partners, L.P., Defendant-Appellant,
v.
Enron Corp., Plaintiff-Appellee;
Strategic Value Master Fund, Ltd., et al., Defendant-Appellants,
v.
Enron Corp., Plaintiff-Appellee;
Bear, Stearns & Co., Inc., Defendant-Appellant,
v.
Enron Corp., et al., Plaintiff-Appellees.
Nos. 01-16034 (AJG) Jointly Administered, 06-07828 (RJH), 06-07837 (RCC), 06-07838 (PKC), 06-07829 (VM), 06-07803 (JGK), 06-07804 (NRB), 06-07805 (KMK).
October 10, 2006.

Memorandum of Law of Appellants DK Acquisition Partners, L.P., RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C. and Rushmore Capital-II, L.L.C.

*TABLE OF CONTENTS*

Table Of Contents ... i

Table Of Authorities ... ii

JURISDICTION ... 1

ISSUES PRESENTED ... 1

APPLICABLE STANDARD OF REVIEW ... 2

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

PRELIMINARY STATEMENT ... 2

STATEMENT OF THE CASE AND FACTS ... 8

RELEVANT STATUTES ... 13

I THE BANKRUPTCY COURT'S EQUITABLE SUBORDINATION ORDERS SHOULD BE REVERSED ... 13

A. The Bankruptcy Court Improperly Applied The Doctrine Of "Equitable Subordination" To Subordinate The Claims Of Innocent Purchasers ... 14

B. The Bankruptcy Court Disregarded The Long-Standing Congressional Policy Of Protecting Innocent Transferees ... 18

C. Instead Of Adhering To Principles Of Equitable Subordination, The Bankruptcy Court Substituted Inapt Analogies To The Law Of Assignment And Priority Wage Claims ... 24

D. The Bankruptcy Court's Decision Impermissibly Extended The Doctrine Of Equitable Subordination, Making Decisions "At The Level Of Policy Choice" That Should Be Reserved For Congress To Decide ... 27

II THE BANKRUPTCY COURT'S SECTION 502(D) RULING SHOULD BE REVERSED ... 34

A. The Statutory Language ... 34

B. Section 502(d) Does Not Provide For Disallowance Of Claims Of Innocent Purchasers ... 38

C. Metiom Was Wrongly Decided ... 43

CONCLUSION ... 45

*TABLE OF AUTHORITIES*

CASES

*Aguilar v. United States (In re Aguilar)*, 312 B.R. 394 (D. Ariz. 2003) ... 16

*In re America's Shopping Channel, Inc.*, 110 B.R. 5 (Bankr. S.D. Cal. 1990) ... 41

*BedRoc Ltd., LLC v. Unites States*, 541 U.S. 176 (2004) ... 35

*Begier v. I.R.S.*, 496 U.S. 53 (1990) ... 17

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th. Cir. 1977) ... 5, 15, 25

*Caminetti v. United States*, 242 U.S. 470 (1917) ... 35

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Campbell v. U. S. (Matter of Davis)*, 889 F.2d 658 (5th Cir. 1989) ... 36

*Carnegia v. Georgia Higher Educ. Assistance Corp.*, 691 F.2d 482 (11th Cir. 1982) ... 25

*In re Centennial Textiles, Inc.*, 227 B.R. 606 (Bankr. S.D.N.Y. 1998) ... 30

*Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266 (2d Cir. 1983) ... 25

*Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.)*, No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501 (W.D. Tex. June 20, 1988) ... 36, 37, 40, 44

*Connecticut Nat'l Bank v. Garmain*, 503 U.S. 249 (1992) ... 35

*Dorr Pump & Mfg. Co. v. Heath (In re Dorr Pump & Mfg. Co.)*, 125 F.2d 610 (7th Cir. 1942) ... 25

*Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613 (2d Cir. 1997) ... 29

*Edelman v. Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen Foods, Inc.)*, 80 B.R. 848 (Bankr. W.D. Mich. 1987) ... 41

*Elliott Assocs. L.P. v. Banco de la Nacion*, 194 F.3d 363 (2d Cir. 1999) ... 28

*Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205 (Bankr. S.D.N.Y. 2005) ... 8, 10

*Enron Corp. v. Avenue Special Situations Fund, II, LP (In re Enron Corp.)*, 340 B.R. 180 (Bankr. S.D.N.Y. 2006) ... 12

*Esposito v. Noyes (In re Lake Country Invs.)*, 255 B.R. 588 (Bankr. D. Idaho 2000) ... 16

*First Int'l Servs. Corp. v. Apollo Sign Co. (In re First Int'l Servs. Corp.)*, 37 B.R. 856 (Bankr. D. Conn. 1984) ... 41

*Fletcher v. Peck*, 10 U.S. 87 (1810) ... 21

*Goldie v. Cox*, 130 F.2d 695 (8th Cir. 1942) ... 25

*In re Grab ill Corp.*, 976 F.2d 1126 (7th Cir. 1992) ... 43

*Greenville Banking & Trust Co. v. Selcow*, 25 F.2d 78 (3d Cir. 1928) ... 36

*Holloway v. Internal Revenue Service (In re Odom Antennas, Inc.)*, 340 F.3d 705 ... 36

*Holt v. Federal Deposit Ins. Corp. (In re CTS Truss, Inc.)*, 868 F.2d 146 (5th Cir. 1989) ... 15

*In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990) ... 2

*In re Iridium Operating LLC*, No. 01 Civ. 5429 (GBP)2005 WL. 756900 (S.D.N.Y. April 4, 2005) ... 2

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Isaac v. Temex Energy, Inc. (In re Amarex, Inc.),* 853 F.2d 1526 (10th Cir. 1988) ... 33

*Jizarian v. Raichle (In re Stirling Homex Corp.),* 579 F.2d 206 ... 32

*Jodson v. Corcoran,* 58 U.S. 612 (1854) ... 21

*Katchen v. Landy,* 382 U.S. 323 (1966) ... 41, 44

*Kendall v. Sorani, et al. (In re Richmond Produce Co.),* 195 B.R. 455 (N.D. Cal. 1996) ... 23

*Kingsway Revocable Trust v. Fed. Says. & Loan Ins. Corp. (In re C.P. C. Dev. Co. No. 5),* 113 B.R. 637 (Bankr. C.D. Cal. 1990) ... 18

*Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC),* 316 B.R. 451 (Bankr. S.D.N.Y. 2004) ... 15

*Lazar v. California (In re Lazar),* 237 F.3d 967 (9th Cir. 2001) ... 16

*In re Lifschultz Fast Freight,* 132 F.3d at 349 ... 31, 33

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248 (1st Cir. 1991) ... 23

*In re Metiom,* 301 B.R. 634 (Bankr. S.D.N.Y. 2003) ... 42, 43, 44

*Midlantic Nat'l Bank v. N.J. Dep't of Env'l Prot.,* 474 U.S. 494 (1986) ... 41

*Missouri Dept. of Revenue v. L.J. O'Neill Shoe Co. (In re L.J. O'Neill Shoe Co.),* 64 F.3d 1146 (8th Cir. 1995) ... 33

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.),* 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ... 15, 16, 25

*People's Sav. Bank v. Bates,* 120 U.S. 556 (1887) ... 21

*Petitioning Creditors of Melon Produce, Inc. v. Braunstein,* 112 F.3d 1232 (1st Cir. 1997) ... 37

*Rodriguez v. United States,* 480 U.S. 522 (1987) ... 31

*Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.),* 352 F.3d 671 (2d Cir. 2003) ... 33

*Shropshire, Woodlife & Co. v. Bush,* 204 U.S. 186 (1907) ... 26

*Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World Techs., LLC),* 423 F.3d 166 (2d Cir. 2005) ... 32

*Spacek v. Thomen (In re Universal Farming Indus.),* 873 F.2d 1334 (9th Cir. 1989)) ... 16

*Swarts v. Siegel,* 117 F. 13 (8th Cir. 1902) ... 44

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Trone v. Smith (In re Westgate-California Corp.)*, 642 F.2d 1174 (9th Cir. 1981) ... 20

*United States v. California & Oregon Land Co.*, 148 U.S. 31 (1893) ... 21

*United States v. Dunn*, 268 U.S. 121 (1925) ... 21

*United States v. Noland*, 517 U.S. 535 (1996) ... 6, 15, 26, 31

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ... 35

*Westgate-California Corp v. First Nat'l. Fin. Corp.*, 650 F.2d 1040 (9th Cir. 1981) ... 16

*Wilson v. Huffman (In re Missionary Baptist Found. of America)*, 818 F.2d 1135 (5th Cir. 1987) ... 18

STATUTES

11 U.S.C. § 105(a) ... 32, 33

11 U.S.C. § 502(d) ... 7, *passum*

11 U.S.C. § 510(c) ... 1, *passum*

11 U.S.C. § 550(b)(1) ... 19

28 U.S.C. § 158(a) ... 1

28 U.S.C. § 1930 ... 33

11 U.S.C.A. § 93[g] ... 36

LEGISLATIVE HISTORY

124 Cong. Rec. 32,416 (1978) ... 32

124 Cong. Rec. 32350 (1978) ... 17

124 Cong. Rec. 32989 (1978) ... 17

124 Cong. Rec. 33989 (1978) ... 32

124 Cong. Rec. 517406 (daily ed. Oct. 6, 1978); 124 Cong. Rec. 11089 ... 17

Bankrupcy Code. H.R. No. 95-595, 95th Cong., 1st Sess. 375-376 (1977) ... 41

H.R. 8200, 95th Cong., 1st Sess., § 510 (1977) ... 32

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. Rep. No. 95-595 at 359 (1978) ... 14, 17, 37

H.R. Rep. No. 595, 95th Cong., 1st Sess. 359 (1977) ... 32

S. Rep. No. 989, 95th Cong., 2d Sess. 74 (1978) ... 14, *passum*

MISCELLANEOUS

4 *Collier on Bankruptcy* ¶¶ 502.05[3], 510.05[1] (15th ed. rev. 2005) ... 39

Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law. 417, 428 (1985) ... 31

Pursuant to 28 U.S.C. § 158(a) and Rules 8009 and 8010 of the Federal Rules of Bankruptcy Procedure, Defendants-Appellants DK Acquisition Partners, LP, RCG Carpathia Master Fund Ltd., Rushmore Capital-I, L.L.C., and Rushmore Capital-II, L.L.C. ("Defendants" or "Appellants") submit this Memorandum of Law, in the adversary proceedings styled *In re Enron Corp.*, Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. Nos. 05-01025, 05-01029, 05-01074 and 05-01105 (AJG) (the "Coordinated Actions"), in support of their appeals from (a) the Orders Denying Defendants' Motions to Dismiss Plaintiffs' First Cause of Action For Equitable Subordination of Claims Held by Defendants, entered by the Bankruptcy Court for the Southern District of New York (Gonzalez, J.) (the "Bankruptcy Court") in the Coordinated Actions on or around December 23, 2005 (collectively, the "Subordination Orders"), and (b) the Order Denying Defendants' Motion to Dismiss Plaintiffs' Second Cause of Action For Disallowance of Claims Held by Defendants entered by the Bankruptcy Court in one of the Coordinated Actions on April 28, 2006 (the "Disallowance Order").[FN1]

> FN1. Although the parties to all of the Coordinated Actions fully briefed the issues concerning both plaintiffs' equitable subordination and disallowance causes of action, the Bankruptcy Court has entered an opinion and order with respect to the disallowance cause of action in only one of the Coordinated Actions, Adv. Pro. No. 05-01029 (AJG).

## JURISDICTION

This Court has jurisdiction pursuant to section 158(a)(3) of title 28 of the United States Code.

## ISSUES PRESENTED

The issues presented on appeal are:

1. Did the Bankruptcy Court err in holding that a claim asserted by a transferee is subject to subordination under Section 510(c) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") solely because a predecessor-in-interest -- but not the transferee -- allegedly engaged in conduct that would warrant equitable subordination if the predecessor-in-interest still held the claim;

2. Did the Bankruptcy Court err in further holding that a transferee whose claim is subject to subordination based solely on the alleged misconduct of a predecessor-in-interest cannot assert defenses of an innocent transferee that acquires a claim in good faith and for value;

3. Did the Bankruptcy Court err in holding that a claim asserted by a transferee is subject to disallowance under Section 502(d) of the Bankruptcy Code solely because a predecessor-in-interest of the transferee -- but not the transferee -- allegedly received and failed to repay an avoidable transfer; and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

4. Did the Bankruptcy Court err in further holding that a transferee whose claim is subject to disallowance solely because a predecessor-in-interest allegedly received and failed to repay an avoidable transfer is not permitted to assert defenses of an innocent transferee that acquires claims in good faith and for value.

### APPLICABLE STANDARD OF REVIEW

Each of these four issues involves a pure question of law, and is thus subject to *de novo* review. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990) (explaining that a district court reviews a bankruptcy court's conclusions of law *de novo); In re Iridium Operating LLC*, no. 01 Civ. 5429 (GBP), 2005 WL 756900, at *4 (S.D.N.Y. April 4, 2005) (same).

### PRELIMINARY STATEMENT

This is an appeal from two series of decisions by the Bankruptcy Court which held that a purchaser of loans or other debt in the distressed markets can have its claims equitably subordinated or disallowed in a Chapter 11 proceeding if a debtor has a claim against any prior owner of the claim -- (i) even if the purchaser purchased its loan or claim in good faith, for value, and without any knowledge of any claims by the debtor against the earlier owner of such claim, and (ii) even if the debtor's claims against the prior owner of the loan or claim are completely unrelated to the loan or claim bought by the purchaser.

Defendants are financial firms which regularly purchase and sell debt in the distressed markets -- well established markets on which billions of dollars of bank loans and debt are purchased and sold each day. Early in the Enron Chapter 11 proceedings, Defendants purchased the participations of Fleet National Bank ("Fleet") in certain ordinary-course-of-business, prepetition bank loans made to Enron under short-term and long-term revolving lines of credit. Specifically, Defendants purchased, in the aggregate, in excess of $29 million of prepetition loans made by Fleet to Enron as part of the consortiums of lending banks under a $1.75 billion short-term revolving credit facility and under a $1.25 billion long-term credit facility, for which Fleet has not been repaid. In each instance, Defendants purchased their loans in the market from other financial institutions and did not purchase the loans directly from Fleet.

It is undisputed that Defendants purchased the revolving credit loans for value long before any claims were asserted by Enron against Fleet, and that at the times of the purchases, Defendants had no knowledge of any claims by Enron against Fleet. Long after Defendants had purchased the loans -- in some instances up to a full year after the loans were purchased -- Enron asserted certain claims against Fleet arising out of transactions totally unrelated to the revolving credit loans which had been acquired by the Defendants.

A significant period of time after that, Enron brought the proceedings from which these appeals are taken, including the proceeding against Defendants, seeking (i) to "equitably subordinate" the revolving credit loans purchased by the Defendants under Section 510 of the Bankruptcy Code or (ii) to disallow those claims under Section 502(d) of the Bankruptcy Code. In that proceeding, no claim was made that the Defendants had engaged in any improper conduct, that Defendants had any knowledge of any claims against Fleet at the times of their purchases, or that the claims purchased by Defendants indirectly from Fleet in the distressed market were in any way related to any wrongdoing, preferences or avoidable transfers. Enron sought to equitably subordinate or disallow the claims not on the basis of any alleged inequitable or wrongful conduct by any of the Defendants, but rather on basis of Enron's contention that it had legal claims against Fleet.

In essence, Enron argued, and the Bankruptcy Court held, that, if a bank or other party enters into dozens or even hundreds of pre-petition transactions with a debtor, and is alleged to have engaged in improper conduct or to have received a preference or fraudulent conveyance in connection with *any one* of those numerous transactions, then the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

debtor can seek to equitably subordinate or disallow the claims of any direct or indirect purchaser which has pur-
chased a loan, notes, or a claim from that bank or other seller, even if the purchaser purchased its claim in good
faith, for value, with no notice of any preference or wrongdoing and the loan, note or other claim purchased is unre-
lated to any preference, fraudulent conveyance, or claim of wrongdoing.

The Bankruptcy Court's decisions not only threaten to seriously disrupt the well-established markets for distressed
loans, bonds and other debt, but are contrary to long established precedent governing the doctrine of "equitable sub-
ordination" and the Congressional understanding of the doctrine when it adopted Section 510(c) of the Bankruptcy
Code, the plain language of Section 502(d) of the Bankruptcy Code, and the Congressional policies set forth in that
and other provisions of the Bankruptcy Code. Moreover, Congress has, in the past, carefully limited the liability of
innocent purchasers under the Bankruptcy Code. The rulings by the Bankruptcy Court represent impermissible and,
we believe misplaced, extensions of the law "at the level of policy choice" which should be reserved for Congress,
rather than the Bankruptcy Court; if there is a policy decision to be made as to whether the doctrine of "equitable
subordination" should be expanded to apply to innocent purchasers, it should be made by Congress.

Contrary to the Bankruptcy Court's "equitable subordination" rulings, the doctrine of "equitable subordination" is a
judicially-created remedy which has been applied where the holder of the claim to be equitably subordinated has
*itself* engaged in wrongful conduct. "Equitable subordination" is meant to be applied only in "extraordinary" cir-
cumstances, and the statute which authorizes the judicially-created remedy -- Section 510(c) of the Bankruptcy Code
-- prohibits the imposition of such a remedy unless it is consistent with well-established "principles of equitable
subordination." Under numerous decisions, including the leading decision by the Fifth Circuit in *Benjamin v. Dia-
mond (In re Mobile Steel Co.), 563 F.2d 692, 699-700 (5th. Cir. 1977)*, the fundamental requirement for equitable
subordination of a claim is a finding of misconduct on the part of the particular claimant holding the claim, and "eq-
uitable subordination" is not applicable to innocent claimholders. (*See* cases at pp. 15-16 below.) Likewise, the leg-
islative history of Section 510(c), which authorized subordination of claims "under the principals of equitable sub-
ordination," shows that Congress understood the doctrine to apply only where the holder of the claim *itself* engaged
in wrongdoing. (*See* discussion at pp. 16-17 below.)

As the Supreme Court has held, if the doctrine of equitable subordination is to be extended "at the level of policy
choice," it should be done by Congress, not by the courts. *See United States v. Noland, 517 U.S. 535, 543 (1996)*.
That is plainly what the Bankruptcy Court did here in extending the doctrine of equitable subordination to innocent
purchasers. Moreover, as discussed in the *amicus* brief submitted by the major industry associations, the Bankruptcy
Court's decision, if left to stand, would inflict significant damage on major segments of the financial markets for
distressed securities, in which billions of dollars of loans and debt are traded each day, by creating legal uncertain-
ties, impairing the pricing of loans and debt because of increased risks, and creating the potential for extensive liti-
gation up and down chains of title of loans, notes and other debt traded actively in the distressed markets.

Indeed, in other provisions of the Bankruptcy Code which are helpful at the very least by analogy, Congress has
itself provided protection to parties which have purchased their claims or property in "good faith" without knowl-
edge of wrongful conduct. The Bankruptcy Code permits liability to be imposed on subsequent transferees only in
very limited circumstances -- and in all such circumstances Congress included express protections for innocent
transferees. Even where the purchaser of property itself purchases the very property that is subject to the fraudulent
conveyance or preference claim (which is not the case here), the Bankruptcy Code provides that purchaser a safe
harbor if it purchased its claim in good faith without knowledge of the avoidable transfer. The Bankruptcy Court
ignored this long-standing Congressional policy of protecting innocent transferees and instead erected *a per se* strict
liability standard under which all participants in the market for bankruptcy claims purchase claims at their peril. In
so doing, the Bankruptcy Court announced a rule that is inequitable, punitive, and highly disruptive to the distressed
debt market.

The absence of any precedent permitting the equitable subordination of claims held by innocent transferees demon-
strates that subordinating such claims cannot be grounded in "principles of equitable subordination," as provided in

Section 510(c). Indeed, neither the Bankruptcy Court nor the plaintiffs below offered any authority for the proposition that principles of equitable subordination permit subordination in such circumstances, and the Bankruptcy Court instead justified its holding by reference to areas of law that have nothing to do with equitable subordination at all and cases that are simply inapposite.

Similarly, the Bankruptcy Court's rulings that it can disallow the claims of innocent purchasers under Section 502(d) is flatly at odds with the language of Section 502(d), as well as a long line of cases interpreting the provision. Section 502(d) provides that the court may disallow the claim "of any entity from which property is recoverable" under the preference or fraudulent conveyance provisions and which is *itself* the holder of the property constituting the preference or fraudulent conveyance and is therefore in a position to return the property:

"(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim *of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title* or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, *unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.*" (Emphasis added)

As Section 502(d) states, and as the courts have repeatedly emphasized, the purpose of the statute is to require an entity which is *itself* holding an avoidable conveyance (*i.e.*, property constituting a preference or fraudulent conveyance), and is *itself* in a position to return that property to the estate, to either return the property or face the disallowance of its claims. (*See* cases at pp. 35-36 below) Section 502(d) does not entitle a debtor to seek disallowance of the claims of an innocent purchaser who does not hold an avoidable transfer simply because some prior holder of one of its claims received a preference or fraudulent conveyance in connection with some completely unrelated transaction.

## STATEMENT OF THE CASE AND FACTS

On or about May 14, 2001, long before the filing of Enron's Chapter 11 petitions, Enron and various participating banks, including Fleet, entered into a 364-day Revolving Credit Agreement (the "Short-Term Revolving Credit Agreement") pursuant to which the foregoing banks loaned Enron $1,750,000,000 in secured loans. *See* the complaint filed by Enron in *In re Enron Corp.*, Ch. 11 Case No. 01-16034 (AJG), Adv. Pro. No. 05-01029 (the "Complaint") Appendix at Tab 1, Ex. A ¶ 41 (hereinafter App. ___ at ___). As one of the participating banks, Fleet loaned Enron $53,666,666.67 or approximately 3 percent of the $1,750,000,000 facility. *See* the Declaration of David Elkind filed in support of the Defendant's Motion to Dismiss (the "Elkind Dec.") ¶ 2 (citations other than to the Appendix shall be to documents listed in the Designation of Record).

On or about May 18, 2000, Enron and various participating banks, including Fleet, entered into a $1,250,000,000 Long-Term Revolving Credit Agreement (the "Long-Term Revolving Credit Agreement" and, together with the Short-Term Revolving Credit Agreement, the "Revolving Credit Agreements") pursuant to which the foregoing banks loaned Enron $1,250,000,000 in secured loans. (Complaint ¶ 41) As one of the participating banks, Fleet loaned Enron $20,833,333.33 or approximately 17% of the $1,250,000,000 facility.

On or about December 2, 2001, Enron and various of its affiliates (collectively, the "Debtors") filed petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. *See In re Enron Corp., et al.*, Case No. 01-16034 (AJG). *See Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005). Additional Enron affiliates filed Chapter 11 petitions thereafter. (*Id.*)

Between March 12, 2002, and March 12, 2003 -- long before any claims were asserted by Enron against Fleet -- Defendants purchased, through the distressed debt market, portions of the short-term and long-term revolving credit loans, and the claims against Enron arising out of those loans, which had originally been owned by Fleet. In each instance, Defendants purchased the loans in the market from financial institutions which had themselves purchased

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the loans originally held by Fleet. None of the Defendants acquired the loans directly from Fleet.[FN2]

> FN2. On or about March 12, 2002, Defendant Rushmore-I purchased $10 million principal amount of the claim arising out of the Short-Term Revolving Credit Agreement originally held by Fleet from Goldman Sachs Credit Partners, L.P. (Elkind Dec. ¶ 4; Complaint ¶ 48)
>
> On or about March 25, 2002, Defendant Rushmore-II purchased a $2,750,000 principal amount claim arising out of the Long-Term Revolving Credit Agreement originally held by Fleet from JP Morgan Chase Bank. (Elkind Dec. ¶ 5; Complaint ¶ 49)
>
> On or about October 24, 2002, Credit Suisse First Boston ("CSFB") purchased from Fleet $29.5 million of Fleet's claim arising out of the Short-Term Revolving Credit Agreement. (Elkind Dec. ¶ 5) On or about March 12, 2003, Defendant DK Acquisition purchased from CSFB $14.5 million of the foregoing claim arising out of Short-Term Revolving Credit Agreement. (Elkind Dec. ¶ 6; Complaint ¶ 46) On or about November 27, 2002, Defendant RCG Carpathia acquired $5 million principal amount of the claim arising out of the Short-Term Revolving Credit Agreement which CSFB had purchased from Fleet. (Elkind Dec. ¶ 6; Complaint ¶ 47)

On or about September 24, 2003 -- long after Defendants had purchased the revolving credit claims -- Enron filed an action (Adversary Proceeding No. 03-09266, the "MegaClaim Action") against various banks and other defendants other than Fleet seeking, among other things, equitable subordination or disallowance of the banks' claims based on allegations that the banks had engaged in wrongful conduct or had received preferences or fraudulent conveyances under Sections 547 or 548 of the Bankruptcy Code. (See, e.g., App. 1 Ex. A at ¶¶ 1266J-66N.) Fleet was not even named as a defendant in the initial complaint in the MegaClaim Action. (Id.) Indeed, no claims were asserted against Fleet until December, 2003, eight months to a year and a half after Defendants had purchased their revolving credit loans. In Enron's subsequent "Amended Megacomplaints" in the MegaClaim Action, the first of which was filed in December, 2003, Enron joined Fleet and an entity organized by Fleet as "Additional Defendants" in the case, rather than as one of the principal "Bank Defendants," asserting against them preference and fraudulent conveyance claims relating to two transactions. (First Amended Megacomplaint ¶¶ 124-126, 369, 377 and Counts 1-3 and 6-10 ; App. 1 Ex. A at ¶¶ 124-126A, 316-317, 374-377 and Counts 1-3 and 6-10) None of the claims against Fleet in the Mega-Claim Action had anything to do with the Revolving Credit Agreements or the revolving credit loans made thereunder. (Id.) Specifically, the Fourth Amended Megacomplaint alleged that Fleet had received partial repayments of obligations owed by the Debtors in connection with two transactions unrelated to the revolving credit loans, and that those repayments allegedly constituted preferences or fraudulent conveyances under Sections 547 or 548 of the Bankruptcy Code. Fleet disputes the claims against it in the MegaClaim Action.

Starting on January 10, 2005, Enron filed the adversary complaints against various purchasers of bank debt, all of whom were alleged to have purchased their debt prior to the assertion of and without knowledge of any claims by Enron against the original bank holders of those loans.[FN3] On January 12, 2005, Enron filed this proceeding against Defendants in the Bankruptcy Court. (See Enron Corp. v. Avenue Special Situations Fund II, LP, et al., Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01029 (AJG) (Bankr. S.D.N.Y.)) In this proceeding, as in the others, Enron sought either (i) to equitably subordinate under Section 510(c) of the Bankruptcy Code, or (ii) to disallow under Section 502(d) of the Bankruptcy Code, the revolving credit claims purchased by Defendants based upon the completely unrelated claims asserted against Fleet in the MegaClaim Action. (App. 1 at ¶¶ 1-4, 51, 52, 56, 60)

> FN3. In addition to the complaint in the proceeding against the Defendants, see Enron Corp. v. Springfield Associates, L.L.C., et al., Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01025 (AJG) (Bankr. S.D.N.Y.), Enron Corp. v. Bear, Stearns & Co. and Rushmore Capital-I L.L.C., Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01074 (AJG) (Bankr. S.D.N.Y.) and Enron Corp. v. Bear, Stearns & Co. et al, Ch. 11 Case No. 01-16034 (AJG), Adv. No. 05-01105 (AJG) (Bankr. S.D.N.Y.).

There is no claim in the MegaClaim Action or the Complaint in this proceeding that the revolving credit loans which were purchased by Defendants involved any illegal or wrongful conduct of any kind or that any preferences, fraudulent conveyances or avoidable transfers were made to Fleet, to the Defendants, or to any other party in connection with those loans. Nor is any claim made that Defendants in this proceeding engaged in any wrongful conduct or had

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

any knowledge whatsoever, at the time they purchased the revolving credit claims, of any of the claims asserted against Fleet in the MegaClaim Action -- claims which were not even asserted until long after Defendants had purchased the revolving credit loans. Similarly, no claim is made in the Megaclaim Action or in the Complaint in this proceeding that the loans made to Enron pursuant to the Revolving Credit Agreements caused Enron any harm; to the contrary, since no portion of the $3 billion of loans to Enron under the Revolving Credit Agreements was repaid prior to Enron's Chapter 11 petition date, the loans have provided Enron and its estate with a sizeable windfall. (Similarly, no claim is made in any of the related actions that any of the defendants therein engaged in any wrongful conduct, that they had any knowledge of any claims by any of the original bank holders of their loans, or that the claims against the banks are in any way related to the loans which they purchased in good faith and for value.)

On April 1 and May 18, 2005, respectively, Defendants, and the defendants in the related actions, filed motions to dismiss their actions on the grounds, among other things, that Section 510(c) did not permit equitable subordination of the claims of innocent transferees and that Section 502(d) does not permit disallowance of the claim of an innocent transferee simply because a prior owner of the claim is alleged to have received a preference or a fraudulent conveyance in some unrelated transaction.[FN4]

> FN4. On April 27, 2005, the Bankruptcy Court entered an order (the "Scheduling and Intervention Order") in each of the Coordinated Actions that, among other things, authorized the Intervenor Banks to intervene in each of the Coordinated Actions for the purpose of submitting briefs and making oral arguments in support of the Motions to Dismiss in the Bankruptcy Court and on any subsequent appeals.

The Bankruptcy Court held a hearing on the Defendants' motions and the motions in the related actions on August 9, 2005.

By decision dated November 17, 2005 (the "Subordination Opinion"), and order dated December 23, 2005 (the "Subordination Order"), the Bankruptcy Court denied Defendants' motions to dismiss Enron's equitable subordination claims. (Between November 17 and November 28, 2005, the Bankruptcy Court issued substantially identical opinions denying the motions to dismiss the equitable subordination claims in the related actions, and between December 20 and 23, 2005, the Bankruptcy Court entered the orders implementing those decisions.)

On January 19, 2006, Defendants (and the defendants in the related actions) filed motions for leave to appeal the orders denying the motions to dismiss the equitable subordination claims. Enron opposed those motions for leave to appeal.

By decision dated March 31, 2006 (the "Section 502(d) Opinion"), and order dated April 28, 2006, the Bankruptcy Court denied Defendants' motion to dismiss Enron's claims for disallowance under Section 502(d) of the Bankruptcy Code. See App. 4. On April 28, 2006, the Bankruptcy Court entered an order implementing the Section 502(d) Decision. On May 26, 2006, Defendants filed their motion for leave to appeal the orders denying the motions to dismiss the Section 502(d) claims, and Enron thereafter filed papers opposing those motions.

By Opinion and Order dated September 5, 2006, this Court granted the motions for leave to appeal the decisions and orders of the Bankruptcy Court denying the motions to dismiss Enron's equitable subordination claims and its claims for disallowance under Section 502(d) of the Bankruptcy Code. On September 11, 2006, this Court so ordered an Agreed Scheduling Order setting forth the briefing schedule for and other procedural matters related to the Appeal.

## *RELEVANT STATUTES*

Section 510(c) of the Bankruptcy Code provides, in relevant part:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may -
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Section 502(d) of the Bankruptcy Code provides:

"(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."

## I THE BANKRUPTCY COURT'S EQUITABLE SUBORDINATION *ORDERS SHOULD BE REVERSED*

In holding that a debtor can assert "equitable subordination" claims against an innocent purchaser of loans, debt or other claims in the marketplace simply because the debtor has some unrelated claim against a prior holder in the chain of title, the Bankruptcy Court committed fundamental errors with far-reaching consequences to the distressed debt markets and impermissibly expanded the doctrine of "equitable subordination" to allow the subordination of claims of innocent purchasers. The Bankruptcy Court (i) disregarded the well-established body of case law governing "equitable subordination" and "principles of equitable subordination" referred to in Section 510(c) of the Bankruptcy Code that constrain a bankruptcy court's ability to subordinate an otherwise-allowed claim under that provision of the Bankruptcy Code; (ii) ignored the statements of Congressional intent in adopting Section 510(c) of the Bankruptcy Code; and (iii) ignored the Congressional policy in the Bankruptcy Code of protecting innocent transferees. Moreover, even if there were a policy decision to be made as to whether the doctrine of "equitable subordination" should or should not be expanded to apply to innocent purchasers, that is a fundamental policy decision which should be made by Congress, not the courts, particularly given the protection that Congress has provided to "good faith" purchasers throughout the Bankruptcy Code.

### A. The Bankruptcy Court Improperly Applied The Doctrine Of "Equitable Subordination" To *Subordinate The Claims Of Innocent Purchasers*

Section 510(c) of the Bankruptcy Code instructs courts to adhere to "principles of equitable subordination" in determining whether to subordinate a claim under the provision. ("[A]fter notice and a hearing, the court may ... under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...."). As both the cases and the legislative history of Section 510 show, an essential element for the subordination of an otherwise allowable claim is a showing that the holder of the claim, *itself*, engaged in some form of wrongdoing, and Congress clearly understood that to be the case when it enacted Section 510(c) of the Bankruptcy Code.[FN5]

> FN5. The legislative history of Section 510(c) demonstrates that Congress's use of the phrase "principles of equitable subordination" referred to well-settled case law existing at the time Congress enacted Section 510. See S. Rep. No. 95-989 at 74 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5860 ("[A]ny subordination ordered under this provision must be based on principles of equitable subordination. These principles are defined by case law ..."; H.R. Rep. No. 95-595 at 359 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6315 ("[Section 510(c)] is intended to codify case law, such as *Pepper v. Litton* ... and *Taylor v. Standard Gas and Electric Co.*...."); see also *Holt v. Fed. Deposit Ins. Corp. (In re CTS Truss, Inc.),* 868 F.2d 146, 148 (5th Cir. 1989) (noting that Congress's intent in drafting Section 510(c) was to "incorporate doctrines that had been well-developed in the courts for several decades preceding the enactment of the Bankruptcy Code").

As the Fifth Circuit held in *Benjamin v. Diamond (In re Mobile Steel Co.), 563 F.2d 692, 700 (5th. Cir. 1977)*, and as many other decisions similarly have held, it has long been established that a claim may be disallowed under the doctrine of "equitable subordination" only if the claimant, itself, has engaged in some type of wrongful conduct. As recognized by the Supreme Court and numerous other courts and commentators, the Fifth Circuit's decision in *Mo-*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*bile Steel,* provides the controlling three-part test for determining if a claim can be equitably subordinated. *See United States v. Noland,* 517 U.S. at 539-39; *Kittay v. Atlantic Bank of New York (In re Global Service Group, LLC),* 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.),* 284 B.R. 355, 363 (Bankr. S.D.N.Y. 2002); 4 ALAN N. RESNICK, ET AL., Collier on Bankruptcy ¶ 510.05[1] (15th ed. 2005). The *Mobile Steel* test provides that a claim may be subordinated upon the basis of three essential findings:

(i) The *claimant* must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors ... or conferred an unfair advantage on the claimant. And

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel,* 563 F.2d at 700 (citations omitted) (emphasis added).[FN6]

> FN6. Courts require a greater showing to establish grounds for equitable subordination of the claims of a non-insider. As against non-insiders, equitable subordination is warranted only if the claimant's conduct is "egregious" and "severely unfair" to other creditors. *In re Sunbeam Corp.,* 284 B.R. at 364.

Similarly, other courts have emphasized that a fundamental prerequisite for equitable subordination of a claim is some wrongful conduct by the holder of that claim. *See, e.g., Schulman v. California (In re Lazar),* 237 F.3d 967, 985, n.19 (9th Cir. 2001) ("Equitable subordination requires that ... the *claimant* who is to be subordinated has engaged in inequitable conduct ....") (citations omitted) (emphasis added) *Spacek v. Thomen (In re Universal Farming Indus.),* 873 F.2d 1334, 1337 (9th Cir. 1989) (same); *Aguilar v. United States (In re Aguilar),* 312 B.R. 394, 399 (D. Ariz. 2003) (same); *Esposito v. Noyes (In re Lake Country Invs.),* 255 B.R. 588, 604 (Bankr. D. Idaho 2000) (same); *In re Sunbeam Corp),* 284 B.R. at 363 (the purpose of Section 510(c) is "to subordinate an otherwise legally valid claim when the *claimant* has engaged in conduct that makes it unjust or unfair for the *claimant* to share pro rata with similarly situated creditors") (emphasis added); *Westgate-California Corp v. First Nat'l. Fin. Corp.,* 650 F.2d 1040, 1043-44 (9th Cir. 1981) (noting that a creditor's claim could not be subordinated solely on the basis of principal's alleged misconduct without a finding that principal acted on behalf of creditor or that creditor was the principal's alter ego).[FN7]

> FN7. As discussed in the Intervenors' Memorandum of Law on these appeals, the only exception to the requirement of wrongdoing for equitable subordination of claims is for claims for tax penalties and for claims which are, in substance, claims for equity rather than creditor claims. As discussed in the Intervenors' Memorandum of Law, those exceptions are completely inapposite here and do not provide a basis for subordinating the claims good faith purchasers of creditor claims. (Intervenor Banks Memorandum of Law on the Issue of Equitable Subordination and Disallowance of Transferred Claims dated October 10, 2006, 16-20.)

In adopting Section 510, Congress indicated its clear understanding that misconduct by the holder of the claim was the essential element for subordination of a claim under the "principles of equitable subordination" referred to in Section 510(c).

The Senate Report expressly stated that a "claim may normally be subordinated only if its *holder* is guilty of misconduct." S. Rep. No. 95-989 at 74 (emphasis added). Floor statements by Congressmen DeConcini and Edwards similarly stated that misconduct by the holder of the claim was a prerequisite to equitable subordination:

It is intended that the term "principles of equitable subordination" follow existing case law and leave to the courts development of this principle. To date, under existing law, a claim is generally subordinated *only if [sic] holder of such claim is guilty of inequitable conduct,* or the claim itself is of a status susceptible to subordination, such as a penalty or a claim for damages arising from the purchase or sale of a security of the debtor.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

124 CONG. REC. 32989, 33998 (1978) (statement of Hon. Dennis DeConcini) (emphasis added); 124 CONG. REC. 32350, 32398 (1978) (statement of Rep. Don Edwards) (same).[FN8]

> FN8. Floor statements of Congressmen DeConcini and Edwards are persuasive evidence of Congressional intent with respect to its passage of the Bankruptcy Code. See *Begier v. I.R.S.*, 496 U.S. 53, 64 n.5 (1990).

In discussing a different subsection of Section 510, the House Report (at 194-196) illuminated the limits of the equitable subordination doctrine:

Professor Kripke has made clear that ... *the doctrine of equitable subordination is inapplicable as between two innocent third parties.* His statement is supported by the opinion of the Second Circuit in *In re Credit Industrial Corp.*, in which the court noted:

"Equitable subordination, which is founded upon estoppel, is the doctrine invoked by the courts to *deny equal treatment to creditors based on some inequitable or unconscionable conduct in which they have engaged,* or a special position which they occupy vis-a-vis the bankrupt that justifies subordination of their claims...."

H.R. Rep. No. 95-595 at 196 (1978) (emphasis added).

It is significant that neither Enron, nor the Bankruptcy Court in its decision, could cite even a single decision which has actually held that the doctrine of "equitable subordination" could be applied to subordinate the claims held by innocent purchasers, let alone purchasers who had acquired claims completely unrelated to any alleged misconduct. The one case cited by the Bankruptcy Court as somehow authorizing the application of the doctrine to someone other than a wrongdoer-- *Wilson v. Huffman (In re Missionary Baptist Found. of America),* 818 F.2d 1135, 1146 (5th Cir. 1987) (App. 3 at p. 23) -- in fact provides no support whatsoever for the Bankruptcy Court's ruling. To the contrary, in *Missionary Baptist,* the Court held that the creditor's claim could be subordinated only because of its *own* implication in wrongful conduct, and that the situation might well be entirely different if the claim had been sold and the claimant was itself an innocent purchaser, as is precisely the case here.[FN9]

> FN9. In *Missionary Baptist,* the Court actually held that the creditor's claim could be subordinated only because of its *own* implication in wrongful conduct, and that the situation would be different if the claimant were itself an innocent party. In *Missionary Baptist,* the claimant was the general partner of an insider who breached his fiduciary obligations to the Debtor, and an equal co-owner with the same insider of a corporation which, along with the partnership, engaged in insider transactions with the Debtor. Based on that set of facts, the court found that the non-insider claimant's "connection to the [wrongdoer] and his involvement in the transactions that form the basis of his claim against the Debtor allow us to conclude that subordination of the [claimant's] claim could be supported on the basis of identifiable inequitable conduct on the [insider's] part." *Id* at 1146. The court *expressly contrasted* that scenario to one in which a claim "is in some way passed by an inequitable actor to an innocent, uninvolved bystander," commenting that, in that situation, "there might be reasons to find that subordination ... would be contrary to the principles of equitable subordination..." *Id.*
> See also *Kingsway Revocable Trust v. Fed. Says. & Loan Ins. Corp. (In re C.P.C. Dev. Co. No. 5),* 113 B.R. 637 (Bankr. C.D. Cal. 1990) (noting that California law distinguishes between a claimant who succeeds to a claim by operation of law -- who may be subject to equitable subordination -- and a "bonafide purchaser for value who takes without notice").

In short, the cases and the legislative history of Section 510(c) make clear that the doctrine of equitable subordination requires a showing of wrongful conduct by the holder of the claim, and does not authorize the subordination of claims of an innocent purchaser simply because the debtor can assert some claim of wrongful conduct by a prior owner which is completely unrelated to the claim purchased by the transferee.

B. The Bankruptcy Court Disregarded The Long-Standing *Congressional Policy Of Protecting Innocent Transferees*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

As set forth above, the Bankruptcy Court's expansion of Section 510(c) to permit subordination of claims held by innocent transferees based solely on the alleged misconduct of a predecessor-in-interest in connection with an unrelated transaction is contrary to well established "principles of equitable subordination." In addition to the case law governing "equitable subordination" and the statements of Congressional understanding underlying Section 510(c), other provisions of the Bankruptcy Code reflect a strong Congressional intent favoring the protection of innocent purchasers and demonstrate, at the very least, that the policy decisions adopted by the Bankruptcy Court should be made by Congress, not the courts. The Bankruptcy Court compounded its error by misstating the relevance of those provisions to the issues involved here and by mischaracterizing the applicable standard of "good faith."

The Bankruptcy Code permits trustees and debtors-in-possession to pursue remedies against subsequent transferees in only a handful of circumstances and, in each instance, expressly protects innocent, good faith, for-value transferees. For example, Section 550(b)(1), which deals with the estate's rights to recover property from a subsequent transferee of an "avoided transfer," provides that the trustee may sue to recover the transferred property or its value from a subsequent transferee, but provides a defense for "a transferee that takes for value ... and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). Section 550(b)(1) demonstrates (a) that, where Congress intended to impose liability on subsequent transferees, it knew how to do so (and chose not to do so in Section 510(c) by not referring to transferees); and (b) that, where Congress did create a remedy against subsequent transferees, it provided protection to "good faith" purchasers for value.

In addition to Section 550(b)(1), many other sections of the Bankruptcy Code protect innocent transferees. *See, e.g.,* Section 363(m) (protecting the validity of a post-petition sale or lease of property to good faith purchasers); Section 364(e) (protecting the validity of debts incurred to and security interests granted in favor of good faith post-petition lenders); Section 365(i) (protecting the expectations of good faith purchasers under rejected executory contracts for the sale of real property); Section 542(c) (protecting good faith post-petition transferors of property of the estate); Section 542(d) (permitting insurance companies required to make automatic transfers under existing contracts to transfer property of the estate in good faith); Section 548(c) (granting a lien to good faith transferees whose transfer is voidable under Section 548 to the extent of value given); and Section 549(c) (protecting good faith post-petition purchasers of real property). As demonstrated by the foregoing provisions, the entire structure of the Bankruptcy Code reveals a Congressional intent to protect innocent transferees.

In adopting its "strict liability" rule for transferees, the Bankruptcy Court focused on the fact that there is no explicit provision in the Bankruptcy Code establishing a defense to equitable subordination under Section 510(c) for good faith transferees. But this is a classic "Catch 22." As discussed above, at the time the Bankruptcy Code was enacted, the well-established "principles of equitable subordination" made clear that misconduct by the holder of the claim was the *sine qua non* of equitable subordination. Since no case had ever subordinated claims in the hands of any innocent party -- and Congress regarded equitable subordination as entirely unavailable against innocent parties (*see* pp. 16-17 above) -- there was no conceivable reason for Congress to provide a defense to equitable subordination for good faith transferees. Equitable subordination simply had no applicability to the innocent.

If the Bankruptcy Court was going to depart from established principles of equitable subordination and expand the reach of equitable subordination to claims transferees, fundamental principles of equity mandate the recognition of a good faith defense. See *Trone v. Smith (In re Westgate-California Corp.),* 642 F.2d 1174 (9th Cir. 1981) ("Subordination is an equitable power and is therefore governed by equitable principles.")

For nearly two centuries, courts have consistently protected the rights of an innocent transferee against challenges by parties with equity-based claims against the transferor. Chief Justice Marshall acknowledged this in 1810:
Titles, which, according to every legal test, are perfect, are acquired with that confidence which is inspired by the opinion that the purchaser is safe. If there be any concealed defect, arising from the conduct of those who had held the property long before he acquired it, of which he had no notice, that concealed defect cannot be set up against him. He has paid his money for a title good at law, he is innocent, whatever may be the guilt of others, and equity

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

will not subject him to the penalties attached to that guilt. All titles would be insecure, and the intercourse between man and man would be very seriously obstructed, if this principle be overturned.

*Fletcher v. Peck*, 10 U.S. 87, 133-34 (1810) (Marshall, C.J.). Since then, courts of equity have repeatedly recognized this principle. *See United States v. Dunn*, 268 U.S. 121, 132 (1925) (The "beneficiary of a trust may ... follow the trust res fraudulently diverted until it reaches the hands of an innocent purchaser for value."); *United States v. California & Oregon Land Co.*, 148 U.S. 31, 40-41 (1893) (referencing different contexts in which parties who take for value and without notice of a defect are protected from disputes between prior parties); *People's Sav. Bank v. Bates*, 120 U.S. 556, 564 (1887) (Harlan, J.) (acknowledging that a party who takes for value and without notice is "unaffected by any equities existing between antecedent parties"); *Jodson v. Corcoran*, 58 U.S. 612, 615 (1854) ("a purchaser of a *chose in action*, or of an equitable title, must abide by the case of the person from whom he buys, and will only be entitled to the remedies of the seller; and yet, there may be cases in which a purchaser, by sustaining the character of a *bona fide* assignee, will be in a better situation than the person was of whom he bought..."); 3 JOHN NORTON POMEROY & SPENCER W. SYMONS, A TREATISE ON EQUITY JURISPRUDENCE, §777 at 111 (5th Ed. 1941) (a bona fide purchaser for value without notice will take property protected against the equitable remedies of the original defrauded owner). The Bankruptcy Court's refusal to recognize a good faith defense to an equitable doctrine is clearly erroneous.

Compounding its error, the Bankruptcy Court concluded that *even if* a good faith defense was available with respect to the equitable subordination of claims under Section 510(c), no claims transferee could ever establish the prerequisites of the defense. According to the Bankruptcy Court, because all claim transferees, by definition, know they are purchasing claims of a debtor and know that a debtor (or trustee) is obliged to investigate each claim and assert any defense, including equitable subordination, all claim transferees are "on notice" of potential claims for equitable subordination. (*See* App. 3 at pp. 47-50.) Under the Bankruptcy Court's formulation, purchasers are on notice of any and every conceivable claim -- including preference, fraudulent conveyance, and even securities and antitrust claims -- simply because the debtor has an obligation to investigate such claims if they exist.

The Bankruptcy Court's interpretation of "good faith" in this context is completely unprecedented and untenable. The fact that a debtor is in Chapter 11 does not mean that the purchaser of a claim knows or is on notice that some earlier owner of a loan, claim, or note received a preference or fraudulent conveyance or engaged in any improper conduct -- particularly where, as here, the claims against the earlier owner are based upon completely unrelated claims and the preference, fraudulent conveyance, or improper conduct does not even relate to the revolving credit loans that were purchased by the Defendants.

In support of its interpretation of the "good faith" requirement, the Bankruptcy Court cited to preference and fraudulent conveyance decisions in which the purchaser of property knew that a prior owner had received the property from the debtor during the statutory preference period and the question was whether the subsequent owner knew or was on notice of the fact that the debtor was insolvent *at time of the transfer*. The elements of a preference claim are the receipt of a transfer within 90 days of the debtor's bankruptcy at a time when the debtor was insolvent; the elements of a fraudulent conveyance are a transfer by the debtor without reasonably equivalent consideration in return which leaves the debtor insolvent or without adequate capital. (*See* Sections 547 and 548 of the Bankruptcy Code.) In those circumstances, knowledge by a purchaser of the debtor's financial impairment *at the time of a transfer from the debtor to the prior owner* can create an inference that the purchaser knew or was on notice of the preference or fraudulent conveyance claim, and it was *that* knowledge -- *not* knowledge of the debtor's bankruptcy months or years later -- which can give rise to an inference of knowledge or notice of the claim against the prior owner. *See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991) (recipient of transfer of property had contemporaneous knowledge of the nature and scope of the transfers and was well aware of the unmanageable indebtedness and the likelihood of bankruptcy). *See also Kendall v. Sorani, et al. (In re Richmond Produce Co.)*, 195 B.R. 455, 464 (N.D. Cal. 1996) (transferee was aware that the transferor had been experiencing financial difficulties in the months leading up to the transfer). Here, by contrast, there is no basis for an inference that the Defendants were on notice of the claims against Fleet. First, the claims against Fleet arise out of transactions

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

which are completely unrelated to the loans purchased by the Defendants; second, the claims against Fleet arise out of transactions occurring *well before* the Chapter 11 proceedings; and, third, there is not even a suggestion that the Defendants had any knowledge of the transactions between Enron and Fleet giving rise to the claims against Fleet.

Knowledge of the debtor's bankruptcy at the time of a claim transfer is not an element of an equitable subordination action and thus would not put a transferee on notice of any but the most theoretical risk of equitable subordination.[FN10] To adopt such a test in the context of 510(c) is to define away the good faith defense because any purchaser of a bankruptcy claim must, by definition, be aware of the debtor's bankruptcy.[FN11]

> FN10. By contrast, the debtor's solvency is generally an element of an avoidance claim. Knowledge of the debtor's insolvency at time of transfer arguably puts a transferee on notice that the trustee may have a viable avoidance claim.

> FN11. Moreover, the Bankruptcy Court's contention that "a purchaser of a claim, by definition, knows that it is purchasing a claim against a debtor and is on notice that any defense or right of the debtor, including equitable subordination, may be asserted against that claim" (App. 3 at p. 48) is mere question-begging. Until the Bankruptcy Court's ruling, no court had ever held that the trustee or debtor in possession may seek equitable subordination of claims held by transferees that have not themselves engaged in misconduct. How can it then be said that all transferees are on notice of the risk of equitable subordination of their claims?

The only logical application of a good faith defense to <u>Section 510(c)</u> would consider whether the transferee knew or had reason to know of misconduct by a predecessor-in-interest at the time of the transfer. Here, there is no contention that the Defendants knew or had reason to know of any misconduct by a predecessor-in-interest.

C. Instead Of Adhering To Principles Of Equitable Subordination, The Bankruptcy Court Substituted Inapt Analogies *To The Law Of Assignment And Priority Wage Claims*

In ruling that <u>Section 510(c)</u> permits a court to subordinate a claim held by an innocent transferee based solely on the misconduct of a predecessor-in-interest, the Bankruptcy Court ignored the well-developed case law defining the doctrine of equitable subordination. Instead, the Bankruptcy Court justified this erroneous expansion of the doctrine by analogizing to two inapposite areas of law: the law of assignments and case law addressing transferees of priority wage claims. Of the 53 pages of the Subordination Opinion, the Bankruptcy Court devoted only five to explaining the legal foundation for its conclusion that a court may equitably subordinate the claims of an innocent transferee on the basis of a transferor's misconduct. (*See* App. 3 at pp. 29-33.) In those pages, the Bankruptcy Court failed to cite a single case involving equitable subordination. Instead, the Bankruptcy Court cited four cases involving the law of assignments (*see* App. 3 at pp. 29-30) and two cases involving the priority of assigned wage claims (*see* App. 3 at pp. 30-32). Neither the law of assignments nor the law governing the priority of assigned wage claims has any bearing whatsoever on whether <u>Section 510(c)</u> permits subordination of a claim in the hands of an innocent transferee.

Invoking case law dealing with claims assignments, the Bankruptcy Court reasoned that "[t]he transfer of a claim does not change the nature of the claim" (App. 3 at pp. 30).[FN12] But here, the Bankruptcy Court simply assumed its conclusion. If the potential for equitable subordination in the hands of a transferor changes the very "nature" of the claim -- becoming an attribute of the claim (as Enron argued) -- then assignment law dictates that this attribute will travel with the claim upon assignment. However, if (as the case law reflects) equitable subordination is a remedy available only against particular claimants found to have engaged in misconduct, equitable subordination cannot be an attribute that travels with a claim but, rather, a remedy whose availability depends on the attributes of the particular claimant.[FN13] The law of assignments simply has no bearing on the question.

> FN12. The Bankruptcy Court cites four cases discussing the law of assignments. A discussion of equitable subordination appears in the concurring opinion of one of those cases, *see Goldie v. Cox, 130 F.2d 695 (8th*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Cir. 1942), and the other four make no mention of equitable subordination, *see Dorr Pump &Mfg. Co. v. Heath (In re Dorr Pump & Mfg. Co.), 125 F.2d 610 (7th Cir. 1942); Carnegia v. Georgia Higher Educ. Assistance Corp., 691 F.2d 482 (11th Cir. 1982); Citibank, N.A. v. Tele/Resources, Inc., 724 F.2d 266 (2d Cir. 1983).* None of these cases provide any reason to establish a rule that is contrary to the *Mobile Steel* test.

FN13. *Mobile Steel* makes clear that equitable subordination does not address the validity of a claim., 563 F.2d at 688. It is, instead, a remedy available against particular claimants. *Id.; in re Sunbeam Corp., 284 B.R. at 363.*

In addition to relying on the law of assignment, the Bankruptcy Court turned to a case involving the priority of assigned wage claims, and specifically *Shropshire, Woodlife & Co. v. Bush,* 204 U.S. 186 (1907). (*See* App. 3 at pp. 32 ("The principle set forth in *Shropshire* can be applied to the instant case").) In *Shropshire,* the Supreme Court held that an assignment does not affect the statutory priority afforded to wage claims, reasoning that "[t]he character of the debts was fixed when they were incurred, and could not be changed by an assignment. They were precisely one of the classes of debts which the statute says are 'debts to have priority.' " *Id.* at 189.

*Shropshire* simply has no relevance to the scope of Section 510(c). The statutory priority of wage claims derives from the "character" of the claim itself. The "character" of the claim -- *i.e.,* a claim for wages -- does not change upon its assignment. But the priority adjustment resulting from equitable subordination does not derive from the "character" of the claim, but from a particular claimant's misconduct (which, as the Bankruptcy Court found, may be entirely unrelated to the claim to be subordinated, *see* App. 3 at pp. 22-28). *See Noland,* 517 U.S. at 541, 543 (holding that the Sixth Circuit had improperly authorized equitable subordination of claims based on their "nature"). In relying on Shropshire, the Bankruptcy Court once again has simply assumed the truth of the proposition it set out to prove: that the potential for "equitable subordination" in the hands of a predecessor-in-interest becomes an attribute of a claim rather than remaining a remedy available against a particular type of claimant. There is nothing in the principles of equitable subordination that would support the Bankruptcy Court's conclusion that the availability of equitable subordination against a particular prior holder becomes "attached to such claim and it travels with any subsequent transfer" (App. 3 at p. 33).

### D. The Bankruptcy Court's Decision Impermissibly Extended The Doctrine Of Equitable Subordination, Making Decisions "At The Level Of Policy Choice" *That Should Be Reserved For Congress To Decide*

In expanding the doctrine of equitable subordination to allow the claims of an innocent purchaser to be subordinated on the basis of completely unrelated transactions by a prior owner of a claim, the Bankruptcy Court adopted a far-reaching new rule which would have a serious adverse effect upon the important market for loans, debt, and claims. The Bankruptcy Court's decision would allow a debtor to seek subordination of the claim of any entity purchasing loans, notes, debt or claims post-petition if the debtor could assert any claim against a prior owner in the chain of title for alleged preferences, fraudulent conveyances or for any other allegedly "wrongful" conduct, even if the purchaser had no knowledge of the claim and the claim arose out of completely unrelated transactions. As is explained more fully in the accompanying Brief *of Amici Curiae* The Bond Market Association, The International Swaps and Derivatives Association, The Securities Industry Association, and the Loan Syndication and Trading Association submitted on this appeal, such a rule would have serious adverse consequences upon the markets for distressed loans, debt, and claims.

The rule adopted by the Bankruptcy Court would result in a proliferation of litigation. Debtors believing that they had preference, fraudulent conveyance, or other claims against banks or financial institutions would not only file claims against such banks or financial institutions, but could also file legal equitable subordination (and Section 502(d) claims for disallowance) against any entity which had directly or indirectly purchased a loan, note, debt, or other claim from such bank or financial institution. In the first instance, the Bankruptcy Court ruling would result in a significant increase in litigation by debtors seeking to increase their litigation leverage and generate additional recoveries by suing innocent purchasers in the chain of title. Here, for example, the Debtors have a complete remedy

against each of the banks which they sued in the MegaClaim Litigation, and no claim is made that any such banks sold any of their loans to avoid a judgment or to secret their assets or that any of the banks did not receive fair consideration for the loans which they sold in the market. Similarly, with the proliferation of litigation by debtors would come a proliferation of litigation up and down the chain of ownership. Transferees who found that claims purchased in good faith were now objected to on the basis of some unrelated transaction by a prior owner, and that distributions declared in a Chapter 11 case were not being paid in respect of such claims, would naturally commence litigation against prior owners up and down the chain of title.

In addition to litigation that would result, the Bankruptcy Court's ruling would significantly impact the market for distressed loans, debt and claims. Buyers cannot possibly do due diligence into all of the transactions between the prior owners of the loans, debt or claims and the debtors. Banks may have literally hundreds of pre-petition transactions with a debtor. There is no conceivable way that a purchaser buying a loan, note, debt, or claim on the distressed market can research every transaction between prior owners and the debtors. As a result, the Bankruptcy Court's ruling would significantly increase the risks in purchasing loans, debt and claims, and the prices at which such loans, debt and claims could be bought or sold. Indeed, it is possible that some issues would no longer be bought or sold at all because of the risks and potential litigation cost associated with such claims. As the Second Circuit held in _Elliott Assocs. L.P. v. Banco de la Nacion_, 194 F.3d 363, 380 (2d Cir. 1999), a case involving the secondary claim market, the markets for distressed debt and claims play an important part in the commercial marketplace and rulings which impair those markets should be disfavored.[FN14]

FN14. In _Elliott Assocs. L.P. v. Banco de la Nacion_, 194 F.3d 363, 380 (2d Cir. 1999), the Second Circuit recognized the important role that the secondary claim market plays in providing lenders with an incentive to extend credit and took care not to adopt a construction of New York's champerty statute that would disrupt that market. In reversing the district court's construction of the statute, which would have allowed sovereign debtors to assert the champerty defense with greater ease, the Second Circuit observed:
Given the mandate that "whenever possible, statutes should be interpreted to avoid unreasonable results," _Dougherty v. Carver Fed. Sav. Bank_, 112 F.3d. 613, 624 (2d Cir. 1997), we also take note of the unreasonable results that might ensue were we to accept the district court's interpretation of Section 489. While the district court's rule might benefit the Debtors in the short run, the long term effect would be to cause significant harm to Peru and other developing nations and their institutions seeking to borrow capital in New York. The district court's interpretation would mean that holders of debt instruments would have substantial difficulty selling those instruments if payment were not voluntarily forthcoming. This would therefore add significantly to the risk of making loans to developing nations with poor credit ratings. The additional risk would naturally be reflected in higher borrowing costs to such nations. It could even make loans to some of them unobtainable in New York. A well-developed market of secondary purchasers of defaulted sovereign debt would thereby be disrupted and perhaps destroyed even though its existence provides incentives for primary lenders to continue to lend to high-risk countries.
_Id._ at 380.
The Second Circuit's discussion of the importance of the secondary market for defaulted sovereign debt in _Elliott Assocs._ applies with equal force to the market for bankruptcy claims. But in stark contrast to the Second Circuit's concern over the market implications of a tenuous interpretation of a statute, the Bankruptcy Court ignored the issue altogether by simply denying that its decision would have any impact on the market. As explained above, the Bankruptcy Court's decision will, in fact, severely impact the distressed debt market. Just as the Second Circuit rejected as "unreasonable" a construction of the New York champerty statute that risked harming the secondary market in sovereign debt claims, so too should this Court undo the harm to the market for bankruptcy claims resulting from that interpretation.

The Bankruptcy Court devoted a substantial portion of its opinion to "policy arguments" supporting its decision. The opinion focuses on the burden that the debtor allegedly would face if it was not permitted to subordinate the claims of innocent transferees based on misconduct by their predecessors-in-interest. (_See_ Subordination Op. 34.) According to the Bankruptcy Court, that alleged burden includes the "necessity of collecting damages" in "lawsuits against

each of the original or previous holders who engaged in inequitable conduct," which would "delay the ultimate distributions by the debtor" (Subordination Op. 36).

The Bankruptcy Court's argument, however, ignores the fact that, even under that Court's ruling, a debtor can only equitably subordinate the claims of an innocent transferee once it *establishes* misconduct by a predecessor-in-interest. Whether that factual question is litigated in an equitable subordination action against an innocent transferee or in a direct action by the debtor against the alleged wrongdoer, the burden or attendant delay will not be significantly different.[FN15] Moreover, any purported incremental "administrative burden" on a debtor unable to assert an equitable subordination claim against an innocent transferee is minor in comparison to the unfair burden it imposes on the innocent transferee and the disruptive effect it will have on the entire claims trading market.

> FN15. In this action, of course, Enron has already instituted a lawsuit, the MegaClaim Action, against the Intervenor Banks and additional defendants seeking damages for the very same allegedly inequitable conduct underlying its claims for equitable subordination against the transferees. Enron instituted these multiple actions despite the fact that the law is clear that Enron cannot recover damages from the Intervenor Banks or the additional defendants in the MegaClaim Action and equitably subordinate the Credit Facility Claims based on the same conduct. *See In re Centennial Textiles, Inc.*, 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) ("[A] trustee cannot recover damages and equitably subordinate a claim based on the same wrong.") Thus any hypothetical concern about increased administrative burdens is entirely inapplicable in this case.

Even assuming that there were policy considerations to argue in favor of extending the doctrine of equitable subordination to subordinate the claims of innocent purchasers, those decisions involve fundamental policy issues which should be left for Congress, not the courts, to decide. Throughout the Bankruptcy Code, Congress has carefully limited remedies against purchasers -- even purchasers of the very property constituting a preference or fraudulent conveyance; Congress has also provided protections throughout to the Bankruptcy Code to "good faith" purchasers for value. (*See* discussion at pp. 19-24 above) Moreover, in the legislative history of Section 510(c) Congress indicated its understanding that applicable "principles of equitable subordination" required a showing of wrongdoing by the holder whose claim is to be subordinated. (*See* discussion at pp. 16-18 above) In the face of such evidence, and the impact of its ruling upon the markets, the issue addressed by the Bankruptcy Court's decision involves, at the very least, important policy considerations and judgments which should be left for Congress to decide.

As the courts have made clear, conditional grants of power to a bankruptcy court, such as Section 510(c), should not be deemed to allow the courts to legislate new rules and doctrines involving important policy considerations simply because a court might deem it consistent with its own view of "equity" or its own broad interpretation of the statute's purpose. Indeed, in the context of Section 510(c) itself, the Supreme Court has emphasized that the statute does not permit a court to "adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." *United States v. Noland*, 517 U.S. 535, 539 (1986) (*quoting* Andrew DeNatale and Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus. Law 417, 428 (1985)) (internal quotations omitted); *see also In re Lifschultz Fast Freight*, 132 F.3d at 349 ("A bankruptcy court should be doubly wary of using its power of equitable subordination.").[FN16] As the Supreme Court further wrote in *Noland*, "the circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." *Id.*, at 543.

> FN16. *See also Rodriguez v. United States*, 480 U.S. 522, 525-526 (1987) (per curiam) ("But no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice -- and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.") (emphasis in original).

Indeed, in adopting Section 510(c) of the Bankruptcy Code, Congress specifically rejected language that would have given the courts broad power to reorder priorities under a broad power of "doing equity" or "preventing unfairness."

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The House of Representatives' first version of Section 510(c) would have allowed the subordination of claims "on
equitable grounds." H.R. 8200, 95th Cong. § 510 (1977). The report accompanying H.R. 8200 emphasized that this
language differed from, and was broader than, the existing doctrine of equitable subordination, because it would
allow courts to order "subordination on any equitable grounds." H.R. Rep. No. 95 - 595 at 359 (1977). The final
legislation, however, uses the narrowing phrase "under principles of equitable subordination." *See* S. Rep. No. 95-
989, 74 (1978); 124 Cong. Rec. 33989, 34016 (1978) (Statement of Sen. DeConcini); 124 Cong. Rec. 32350, 32416
(Statement of Rep. Edwards).[FN17] The legislative history of Section 510(c) thus confirms that Congress consciously
limited operation of the statute to circumstances consistent with historically-rooted principles of equitable subordi-
nation.

> FN17. Notably, the authority that Enron has cited in earlier briefing to support its proposition that "[the
> Second Circuit] has also recognized that the legislative history does not require misconduct" referred to the
> earlier, *superceded* version of the statute. (*See* App. 6 at p. 35) (citing *Jizarian v. Raichle (In re Stirling
> Homex Corp.),* 579 F.2d Cir. 206, 215).

Decisions under Section 105(a) of the Bankruptcy Code are also instructive. That section grants bankruptcy courts
the equitable power to issue any order, process or judgment "that is necessary or appropriate to carry out the provi-
sions of this title." Bankruptcy Code, Section 105(a). As courts have widely recognized, however, Section 105(a) is
not a roving commission to do equity, and bankruptcy courts may exercise that power only where its preconditions
are satisfied (*i.e.*, where issuance of the order, process or judgment is necessary or appropriate to carry out a specific
provision of the Bankruptcy Code). *See Smart World Techs., LLC v. Juno Online Svcs., Inc. (In re Smart World
Techs., LLC),* 423 F.3d 166, 184 (2d Cir. 2005) (noting that "[t]he statutory language [of Section 105(a)] supports
[a] limit on the equitable powers of the bankruptcy court" and that "the equitable power conferred by section 105(a)
is the power to exercise equity in carrying out the provisions of the Bankruptcy Code, rather than to further the pur-
poses of the Code generally, or otherwise to do the right thing"); *Schwartz v. Aquatic Dev. Group, Inc. (In re
Aquatic Dev. Group, Inc.),* 352 F.3d 671, 680 (2d Cir. 2003). Thus, in *Schwartz,* the bankruptcy court invoked
Section 105(a) to excuse the debtor from paying certain fees to the United States Trustee as required by 28 U.S.C. §
1930, reasoning that such relief was equitable and consistent with the Bankruptcy Code's purpose of providing a
fresh start to deserving debtors. *Id.* at 676. The Second Circuit reversed the bankruptcy court's order, ruling that the
relief granted by the bankruptcy court was not authorized by the Bankruptcy Code and that Section 105(a) does not
grant courts the "power to invoke equity to further the purposes of the Code generally, or otherwise to do the right
thing." *Id.* at 680.

Similarly, in keeping with the general bankruptcy policy of treating creditors equally, courts have held that provi-
sions of the Bankruptcy Code which create disparities or priorities among creditors should be narrowly construed.
*See, e.g., Missouri Dept. of Revenue v. L.J. O'Neill Shoe Co. (In re L.J. O'Neill Shoe Co.),* 64 F.3d 1146, 1148 (8th
Cir. 1995) ("It is well settled, however, that because ... priorities in distribution ... are contrary to the Bankruptcy
Code's general policy of equal distribution, these priorities should be narrowly construed."); *Isaac v. Temex Energy,
Inc. (In re Amarex, Inc.),* 853 F.2d 1526, 1530 (10th Cir. 1988) ("Statutory priorities are to be narrowly construed
because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among
his creditors.") (internal quotations omitted). This principle applies with equal force in the subordination context.
*See Lifschultz,* 132 F.3d at 349.

If Congress had intended to give courts the power to subordinate claims whenever subordination is necessary to
"prevent injustice or unfairness in the bankruptcy context," Congress would have done so. Instead, Congress re-
ferred specifically in the statute to "principles of equitable subordination." Bankruptcy Code, Section 510(c). If a
decision is to be made on expanding the doctrine of "equitable subordination" to apply to innocent purchasers, it
should be made by Congress, which should determine under what circumstances, if at all, the doctrine should apply
to subsequent transferees or innocent purchasers.

## II *THE BANKRUPTCY COURT'S SECTION 502(D) RULING SHOULD BE REVERSED*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In its separate decision denying the motions of the Defendants to dismiss Enron's claims under Section 502(d) of the Bankruptcy Code, the Bankruptcy Court held that Section 502(d) could be applied to disallow the claims of innocent purchasers who neither received nor held property constituting preferences or fraudulent conveyances based upon preference or fraudulent conveyance claims by the debtors against a prior owner of the claims. The Bankruptcy Court held that Section 502(d) could disallow the claim of a good faith purchaser of a loan, claim or note, even if the purchaser acquired its claim in good faith, for value, and without any notice of the preference or fraudulent convey-ance claim against a prior owner, and even if the debtor's claim relates to a transaction between the debtor and the prior owner which is completely unrelated to the loan, claim or note that was purchased. The Bankruptcy Court's holding is directly at odds with the plain language of Section 502(d), the legislative history of the provision, the pur-poses of the statute, and the applicable authorities.

### A. *The Statutory Language*

As the courts have held, the "preeminent canon of statutory interpretation requires us to 'presume that [the] legisla-ture says in a statute what it means and means in a statute what it says'" *BedRoc Ltd., LLC v. Unites States,* 541 U.S. 176, 183 (2004) (quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992)). When the "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'" *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917)).

Section 502(d) of the Bankruptcy Code provides that the court may disallow the claim of an entity which is *itself* the holder of property constituting a preference or fraudulent conveyance and from whom the preference or fraudulent conveyance is recoverable and which refuses to return that property to the estate. Section 502(d) states: "(d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim *of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title* or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, *unless such entity or trans-feree has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.*" (Emphasis added)

As Section 502(d) states on its face, the statute allows the court to disallow a holder's claim only if the holder is *it-self* the recipient of a preference or fraudulent conveyance, is *itself* the party holding the preference or fraudulent conveyance, and is *itself* in a position to return that property to the estate but refuses to do so. Thus, Section 502(d) permits disallowance of the claim of *"any entity from which property is recoverable"* under section 542, 543, 550, or 553 of this title" or "any entity ... that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title" unless "*such entity or transferee has paid the amount, or turned over the prop-erty for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.*" Bankruptcy Code, Section 502(d) (emphasis added).

In addition to the plain text of Section 502(d), the purpose of the statute makes clear that the statute applies to hold-ers of property constituting a preference or fraudulent conveyance, not innocent purchasers of claims who neither received, nor hold, property returnable to the estate. As the courts have repeatedly emphasized, Section 502(d) is intended to coerce entities which are *themselves* recipients and holders of avoidable transfers to return the property to the estate or face disallowance of their claims. *See Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.),* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501, at *7-9 (W.D. Tex. June 20, 1988); *Campbell v. U. S. (Matter of Davis),* 889 F.2d 658, 661 (5th Cir. 1989) ("The legislative history and policy behind Section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders [requiring a party to return property to the estate]."); *Holloway v. Internal Revenue Service (In re Odom An-tennas, Inc.),* 340 F. 3d 705, 708 (8th Cir. 2003) (same);[FN18] *Greenville Banking & Trust Co. v. Selcow,* 25 F.2d 78, 79 (3d Cir. 1928) ("Section 57g of the Bankruptcy Act (11 USCA § 93[g]), permitting claimants to surrender prefer-ences, was not intended as a penalty, but as a privilege, giving those holding preferences the option to keep their security and take no dividends from the estate, or surrender them and share in the distribution equally with the other

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

creditors."); *Petitioning Creditors of Melon Produce, Inc. v. Braunstein,* 112 F.3d 1232, 1239 (1st Cir. 1997) ("The overall purpose of section 502 ... was not 'to punish, but to give creditors an option....' "); *1102(a)(1) Committee of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.),* 1988 U.S. Dist LEXIS 19501, *at 7-9 (W.D. Tex. June 20, 1988) (Holding that claims transferred by the original owner to a bank could not be disallowed under Section 502(d) on the basis of preference or fraudulent conveyance claims by the debtors against the original owner because the bank was not an entity holding property constituting the preference or fraudulent conveyance).

> FN18. As the Court wrote in the *Odom* case:
> "[T]he purpose of section 502(d) is to ensure compliance with judicial orders. *See In re Davis,* 889 F.2d 658, 661 (5th Cir. 1989). The language of *section 502(d)* expressly provides that the entity's claim is not disallowed if the entity or transferee 'paid the amount, or turned over any such property, for which such entity or transferee is liable.' 11 U.S.C. § 502(d). This language indicates section 502(d) should be used to disallow a claim after the entity is first adjudged liable; otherwise, the court could not determine if the exception applies. *Davis,* 889 F.2d at 661-62 (observing 'the legislative history and policy behind *section 502(d)* illustrate[] that the section is intended to have the coercive effect of insuring compliance with judicial orders' and *section 502(d)* 'is designed to be triggered after a creditor has been afforded a reasonable time in which to turn over amounts adjudicated to belong to the bankruptcy estate')." 340 F.3d at 706.

Similarly, in discussing the purposes of Section 502(d), both the Senate and House Reports issued with the adoption of the statute noted that the statute was intended to provide a remedy against the transferees of avoidable transfers who themselves have liability under one of the avoidance provisions of the Bankruptcy Code:
Subsection (d) is derived from present law. It requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over the property received *as required under the sections under which the transferee's liability arises.*

*See* H.R. Rep. No. 95-595, at 353 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6309; S. Rep. No. 95-989, at 65 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5785, 5851 (emphasis added).

The Defendants, as the innocent purchasers of claims, meet none of the requirements of the statute. Defendants are not the recipients of preferences or fraudulent conveyances, are not in possession of the property constituting preferences or fraudulent conveyances, and are not in a position to return such property to the estate. To the contrary, Defendants are innocent purchasers of claims who purchased loans *completely unrelated* to any transactions in which Fleet is alleged to have received any preferences or fraudulent conveyances. In the words of the statute, Defendants are neither (a) "entit[ies] from which property is recoverable under section 542, 543, 550, or 553 of this title" nor (b) "any entity...that is a transferee[s] of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title." Nor are the Defendants (x) entities which can possibly turn over the property claimed by Enron to constitute preferences or fraudulent transfers or (y) entities which are "liable under sections 522(i), 542, 543, 550, or 553 of [the Bankruptcy Code]." *Id.*

Section 502(d) does not entitle a debtor to seek disallowance of the claims of an innocent purchaser who does not hold an avoidable transfer simply because some prior holder of one of its claims received a preference or fraudulent conveyance in connection with some completely unrelated transaction.

### B. Section 502(d) Does Not Provide For *Disallowance Of Claims Of Innocent Purchasers*

Largely disregarding the language of Section 502(d), the Bankruptcy Court held that Section 502(d) disallows claims, rather than providing a remedy in against the holders of claims who are also holders of property constituting a preference or fraudulent conveyance. The Bankruptcy Court held that an entity purchasing a loan, claim or note can have its claim objected to under Section 502(d) if a prior holder in the chain of title is alleged to have received a preference or fraudulent conveyance, even in connection with a completely unrelated transaction. Nothing in the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

language or purposes of the statute supports such a result. Contrary to the Bankruptcy Court's ruling, the language of the statute, the cases, and the commentators all make clear that Section 502(d) applies to *holders* of claims who themselves received and hold property constituting avoidable transfers; it does not apply to *claims* so as to cause their disallowance in the hands of any and all innocent purchasers.

Section 502(d) is notable for what it does *not* say: it does *not* say that the court shall disallow any claim that *"originated"* with, *"was at some point held by,"* or *"was held as of the date of the filing of the petition by,"* any entity fitting the statutory categories. It provides for disallowance of any claim "of an entity from which property is recoverable" where "such entity" is in a position to return the property and fails to do so. If Congress had wanted to say "... any claim of, *or claim acquired against the debtor from* an entity ..." described in the section, Congress could easily have done so.

Where Congress intended the Bankruptcy Code to apply to transferees, it knew exactly how to do so, and it did so with great care. In Section 502(d), itself, Congress provided, in certain circumstances, for the disallowance of claims of transferees of the avoidable property, but Congress provided no authorization to the Bankruptcy Court for applying the statute to transferees of claims, to claims transferred to innocent purchasers, or to claims held by transferees of claims. In Section 502(d), Congress granted the Bankruptcy Courts the power to disallow claims of "any entity ... that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title" unless *"such* entity or transferee has paid the amount, or turned over the property for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." Similarly, under Section 550(b), dealt with transferees: under that provision, a transferee of avoidable property is liable for a return of the property only if it did not purchase the property in good faith and without knowledge of the voidability of the transfer avoided ...." By contrast with the carefully crafted provisions of Sections 502(d) and 550(b), which, under certain circumstances, provide carefully delimited remedies against the transferees of the very property constituting the preference or fraudulent conveyance, there is *no* grant of any power in Section 502(d), or anywhere else in the Bankruptcy Code, to disallow the claims of claim transferees, let alone innocent purchasers of such claims.

In ruling that Section 502(d) could be applied to the claims of innocent purchasers, the Bankruptcy Court held that Section 502(d) imprints "disallowability" onto the *claim*, rather than just providing a remedy against a *creditor*. *See* App. 4 at pp. 26-32. In effect, the Bankruptcy Court held that Section 502(d) focuses on claims, rather than the holder of the claim. As the cases cited at pages 35-36 above, and the commentators, make clear, however, the focus of Section 502(d) is on the holders of a claim, not the claim itself. The statute not imprint claims with disallowability in the hands of innocent purchasers. Indeed, as stated in 4 *Collier on Bankruptcy* ¶ 502.05 [3] at 502-59-60 (15th ed. rev. 2005):

"The point of Section 502(d) is that the claim is disallowed *if the holder of that claim* is subject to action by the trustee for the avoidability of the transfer or the recovery of property. *Rather than addressing itself solely to claims, the focus of Section 502(d) is upon creditors who receive voidable transfers."* (Emphasis added.)

*See, also, 1102(a)(1) Committee of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.),* 1988 U.S. Dist LEXIS 19501, \*at 7-9 (W.D. Tex. June 20, 1988) (holding that claims transferred to a bank could not be disallowed in the hands of the bank because the debtor had avoidance claims against the party which had transferred the claims to the bank):

"The analytical tool to unlock the mysteries of Sec. 502(d) is to examine the enumerated sections to determine whether the transferee has liability [for a return of the avoidable transfer]. Where there is no liability under those sections, Sec 502(d) is not triggered ...

[T]here is no reason in law to overturn the Bankruptcy Court's finding that because the Bank is not the 'kind of creditor' from whom the trustee can recover property under Sec. 550, or the kind of creditor who is liable under Sec. 547, Sec. 502(d)['s] disallowance provision is not triggered."

The Supreme Court, commenting on the predecessor of 502(d) (which Congress presumptively had in mind when it adapted old Section 57g and inserted it as section 502(d) of the Bankruptcy Code),[FN19] spoke to the very interpreta-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tive point in dispute here. In *Katchen v. Landy,* 382 U.S. 323, 331 n.5 (1966), the Court concluded that Section 57g of the Bankruptcy Act, "is concerned with *creditors* rather than *claims*" (emphasis in original). Cases decided under section 502(d) continue to rely on *Katchen* in construing the statute. "Section 57(g) of the Act is very similar to section 502(d) of the Code, and the essential import of section 57(g) appears unchanged. Thus, the teachings of *Katchen v. Lindy* remain relevant." *In re America's Shopping Channel, Inc.,* 110 B.R. 5, 8 (Bankr. S.D. Cal. 1990); *see also, e.g., Edelman v. Michigan Blueberry Growers Ass'n (In re Silver Mill Frozen Foods, Inc.),* 80 B.R. 848, 850 (Bankr. W.D. Mich. 1987) ("The present Bankruptcy Code has a similar provision, § 502(d), which states that the court shall disallow any claim filed by an entity which has not returned any preference it has received. The legislative history to § 502(d) states that it is derived from the then present law, which would have been Section 57, sub. g of the Bankruptcy Act. S.Rep. No. 989, 95th Cong., 2nd Sess. 65, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5851. Therefore the *Katchen* analysis remains relevant and viable."); *First Int'l Servs. Corp. v. Apollo Sign Co. (In re First Int'l Servs. Corp.),* 37 B.R. 856, 860 (Bankr. D. Conn. 1984) ("It would therefore appear that Code § 502(d) essentially tracks Act § 57g, that the *Katchen* rationale applies to cases and proceedings under the Code ...").

     FN19. *See Midlantic Nat ' Bank v. N.J. Dep't of Env'l Prot.,* 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.") (internal citation omitted).

Given the limited and specific purpose of section 502(d), the Bankruptcy Court engaged in result-oriented judicial legislating when it extended the scope of section 502(d) to avoid the perceived "pernicious" result of "claims washing." *See* Section 502(d) Op. at 199-210.[FN20] Enron's assertion that disallowing transferred claims advances section 502(d)'s statutory purpose because "disallowing transferred claims can be very effective in coercing the recipients of avoidable transfers to return them" amounts to an effort to create a policy rationale for such mischief. Nothing in the legislative history of Section 502(d) or its predecessor, 57g, or any case interpreting either of these provisions -- including *In re Metiom,* 301 B.R. 634 (Bankr. S.D.N.Y. 2003), on which the Bankruptcy Court heavily relied -- reveals any Congressional intent to conscript innocent transferees to enforce a debtor's defense against an unrelated third party.

     FN20. Significantly, the legislative history of section 550 of the Bankruptcy Code indicates Congress was well aware of the "pernicious" effects of "washing" a transaction through an innocent third party at the time it enacted the Bankruptcy Code. H.R. No. 95-595, 95th Cong., 1st Sess. 375-376 (1977); S.R. No. 95-989, 95th Cong., 2d Sess. 90 (1978) (noting that the "good faith" language in section 550 is intended to prevent a transferee from "washing" the transaction through an innocent third party). The fact that section 502(d) and its legislative history is mute on this point compels the conclusion that Congress did not anticipate nor intend section 502(d) to apply to subsequent transferees. The reason why is obvious -- section 502(d) applies to *creditors,* not claims.

What Enron's arguments make abundantly clear, however, is that the Section 502(d) Opinion, should it stand, will (a) substantially increase claims litigation, both by the estate against innocent transferees and as between creditors (mostly for the economic benefit of their respective attorneys), (b) depress the price of distressed debt, if it does not eliminate its liquidity entirely, and (c) hold distributions on otherwise allowable claims of innocent transferees hostage to completely unrelated litigation -- litigation over which the transferees have no control, and which may, like the MegaClaim Action, continue for years.[FN21] All these results directly contradict core bankruptcy purposes. *See, e.g., in re Grabill Corp.,* 976 F.2d. 1126, 1126 (7th Cir. 1992) (noting that "[t]he whole scheme of bankruptcy administration rests on a swift, efficient resolution of claims in a speedy trial...").

     FN21. Indeed, Enron's argument threatens to put innocent transferees into the untenable position of having to defend their transferor's prior actions to prove that the transferors did not receive an avoidable transfer or recoverable property. This may cause transferees to seek intervention in adversary proceedings against their

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

transferors if the transferees feel the transferor is not motivated to defend the action, or lacks the funds to do so. Clearly, Congress did not intend to multiply the number of lawsuits and parties necessary to resolve avoidance actions when it enacted section 502(d).

### C. Metiom Was Wrongly Decided

In support of its arguments, the Bankruptcy Court relied upon the decision of another Bankruptcy Court in *In re Metiom*, 301 B.R. 634 (Bankr. S.D.N.Y. 2003), a case that no other court has ever cited for the proposition at issue here. When viewed in the context of its facts, however, the *Metiom* decision is completely inapposite to the facts presented here[FN22]; and, in any event, to the extent the *Metiom* decision (a bankruptcy court decision with no precedential weight), is deemed applicable, that decision was decided and nothing in that decision should give this Court pause in holding, as the Supreme Court has already held with respect to the predecessor statute, that section 502(d) "is concerned with *creditors* rather than *claims.*" *Katchen*, 382 U.S. at 331 n.5. Three points about *Metiom* deserve emphasis:

> FN22. In *Metiom*, Intira, a trade vendor, had a pre-petition contract with Metiom. Prior to Metiom's chapter 11 filing, Intira had received a $170,000 payment on that contract, which was alleged to be a preference under Section 547. After the filing of Metiom's chapter 11, and in plain violation of section 549 of the Bankruptcy Code, Intira had demanded and obtained a post-petition payment of $92,672 from Metiom, outside of the "ordinary course" of Metiom's business and without approval of the Bankruptcy Court, by refusing to return certain equipment unless the payment was made. Divine Acquisition, Inc. ("Divine") then acquired substantially all of Intira's assets, including its claim against Metiom arising out of the very same contract pursuant to which the preferential and unauthorized payments had been received, putting it virtually in the position of Intira's successor.
>
> In *Metiom,* unlike this case, Divine purchased substantially all of Intira's assets and claims, and either was, or should have been, on notice of the transactions between Intira and Metiom. In *Metiom*, unlike this case, the pre-and post-petition payments to Intira challenged under Sections 547 and 549 of the Bankruptcy Code arose out of the very same transactions under which Divine's bankruptcy claims (as successor to Intira) were asserted. Indeed, it is unclear from the decision whether Divine did or did not have knowledge of the transfers that were challenged under Section 547 and 549 at the time it acquired its claims, and there is no discussion in the decision of that issue. Here, by contrast, (i) Defendants did not purchase all of the assets of an assignor, but purchased only a single claim from a major financial institution which had numerous transactions with the Debtor, (ii) the claims which Defendants purchased are totally unrelated to the avoidable transfers alleged against Fleet, and (iii) there is no claim made that Defendants had any knowledge of any alleged preference or fraudulent conveyance.

*First*, it ignores the plain language of Section 502(d). *Metiom* was the first instance in which a court picked up the pen and rewrote the section to say that a court shall disallow any "claim that originated with an entity [with certain characteristics]" *or* any "claim that was at any time held by an entity [with such characteristics]" *or* perhaps any "claim held as of the date of the filing of the petition by an entity [with such characteristics]." These phrases do not appear in section 502(d), and nothing in its language warrants reading them in. Based on the plain language, *Metiom* reached the wrong result.

*Second,* the *Metiom* court worried about post-petition alteration of a claim. *See Metiom*, 301 B.R. at 643. But that very concern begins with the conclusion -- an erroneous one -- that section 502(d) has to do with the "claim" itself, rather than with the creditor holding it. A for-value claim transfer to an entity that owes nothing to the estate does not make the claim any "better." Rather, the claim in the hands of the transferee is no longer subject to *the personal* defenses aimed at the transferor.

*Third, Metiom's* only relevant citation is the century-old decision in *Swarts v. Siegel*, 117 F. 13 (8th Cir. 1902). However, as the District Court held in *Section 1102(a)(l) Comm. of Unsecured Creditors v. Williams Patterson, Inc. (In re Wood & Locker, Inc.),* No. MO 88 CA 011, 1988 U.S. Dist. LEXIS 19501, at *8 (W.D. Tex. June 20, 1988) in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

refusing to follow *Swartz,* the decision in that case involved facts far removed from the application of <u>Section 502(d)</u> to claims of innocent purchasers of claims. Thus, not only did the *Metiom* court perform an incorrect analysis, but it supported its conclusion with inapposite case law.

*CONCLUSION*

For the foregoing reasons, this Bankruptcy Court's decisions denying the motions of Defendants to dismiss the Debtors' Complaint should be reversed.

In re: ENRON CORP., et al., Reorganized Debtors; Springfield Associates, L.L.C., Defendant-Appellant, v. Enron Corp., Plaintiff-Appellee; DK Acquisition Partners, et al., Defendant-Appellants, v. Enron Corp., Plaintiff-Appellee; DK Acquisition Partners, LP, et al., Defendant-Appellants, v. Enron Corp., Plaintiff-Appellee; Bear, Stearns & Co., Inc., Defendant-Appellant, v. Enron Corp., Plaintiff-Appellee; DK Acquisition Partners, L.P.,
2006 WL 3619097 (S.D.N.Y. ) (Trial Motion, Memorandum and Affidavit )

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.