# EXHIBIT A

BANK OF AMERICA WORLD HEADQUARTERS BUILDING

OFFICE LEASE

555 CALIFORNIA STREET PARTNERS,
A CALIFORNIA LIMITED PARTNERSHIP,
Landlord

and

LEHMAN BROTHERS INC.,
Tenant

DATED AS OF: ~~March __, 1994~~ April 19, 1994

## TABLE OF CONTENTS



| Paragraph | | Page |
|---|---|---|
| 1. | Premises | 1 |
| 2. | Definitions | 1 |
| 3. | Term; Delivery of Possession of Premises | 2 |
| 4. | Condition of Premises | 2 |
| 5. | Monthly Rent | 10 |
| 6. | Deleted | 11 |
| 7. | Additional Rent: Increases in Operating Expenses and Tax Expenses | 11 |
| 8. | Use of Premises; Compliance with Law | 16 |
| 9. | Alterations and Restoration | 18 |
| 10. | Repair | 19 |
| 11. | Abandonment | 20 |
| 12. | Liens | 20 |
| 13. | Assignment and Subletting | 20 |
| 14. | Indemnification | 24 |
| 15. | Insurance | 25 |
| 16. | Mutual Waiver of Subrogation Rights | 26 |
| 17. | Utilities | 26 |
| 18. | Personal Property and Other Taxes | 29 |
| 19. | Rules and Regulations | 29 |
| 20. | Surrender; Holding Over | 29 |
| 21. | Subordination and Attornment | 30 |
| 22. | Financing Condition | 31 |
| 23. | Entry by Landlord | 31 |
| 24. | Insolvency or Bankruptcy | 32 |
| 25. | Default and Remedies | 32 |
| 26. | Damage or Destruction | 35 |
| 27. | Eminent Domain | 36 |
| 28. | Landlord's Liability; Sale of Building | 36 |
| 29. | Estoppel Certificates | 37 |
| 30. | Right of Landlord to Perform | 37 |
| 31. | Late Charge | 37 |
| 32. | Attorneys' Fees; Waiver of Jury Trial | 37 |
| 33. | Waiver | 38 |
| 34. | Notices | 38 |
| 35. | Deleted | 38 |
| 36. | Defined Terms and Marginal Headings | 38 |
| 37. | Time and Applicable Law | 38 |
| 38. | Successors | 38 |
| 39. | Entire Agreement; Modifications | 38 |
| 40. | Light and Air | 39 |
| 41. | Name of Building | 39 |
| 42. | Severability | 39 |
| 43. | Authority | 39 |
| 44. | No Offer | 39 |
| 45. | Hazardous Substance | 39 |
| 46. | Real Estate Brokers | 40 |
| 47. | Parking | 40 |
| 48. | Expansion Option | 40 |
| 49. | Right of First Offer | 42 |
| 50. | Option to Renew | 43 |
| 51. | Tenant's Early Termination Option | 44 |
| 52. | Building Directory | 45 |
| 53. | Arbitration | 45 |

EXHIBITS:
A - Outline of Premises
B - Rules and Regulations
C - Non-Disturbance Agreement

02001\0002L-7 (4=3/16/4)

## LEASE

THIS LEASE is made as of the ___19th___ day of ~~March~~ April, 1994, between 555 CALIFORNIA STREET PARTNERS, a California limited partnership ("Landlord"), and LEHMAN BROTHERS INC., a Delaware corporation ("Tenant").

1. **Premises.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, on the terms and conditions set forth herein, the space outlined on the attached **Exhibit A** (the "Premises"). The Premises are located on the floor(s) specified in Paragraph 2 below of the building (the "Building") presently known as the Bank of America World Headquarters Building, located at 555 California Street, San Francisco, California. The Building, its garage, the parcel(s) of land (the "Land") on which the Building and garage are located and the other improvements on the Land (including the plaza areas and the underground concourse) are referred to herein as the "Real Property".

Tenant's lease of the Premises shall include the right to use, in common with others, the lobbies, entrances, stairs, elevators and other public portions of the Building. All of the windows and outside walls of the Premises and any space in the Premises used for shafts, stacks, pipes, conduits, ducts, electrical equipment or other utilities or Building facilities are reserved solely to Landlord and Landlord shall have rights of access through the Premises for the purpose of operating, maintaining and repairing the same; provided, however, that Landlord's right to access the Premises and perform such work shall be subject to the provisions of Paragraph 23 below.

2. **Definitions.** As used herein, the following terms shall have the meaning specified below:

    a. Floor(s) on which the Premises are located: 30th floor. Landlord and Tenant agree that for the purpose of this Lease, the Premises shall be deemed to contain 29,851 rentable square feet of space.

    b. Lease Term: Approximately ten (10) years, commencing (regardless of whether Tenant's Contractor or Landlord's Contractor, as those terms as defined in Paragraph 4.b. below, constructs the Tenant Improvements described in Paragraph 4.a. below) on the earlier of (i) the date of Substantial Completion (as defined in Paragraph 4.d.iv. hereof) of the Tenant Improvements, or (ii) the date five (5) months following the date Landlord completes items #1 through #3 of Landlord's Work described in Paragraph 4.c. for the Premises and, if Tenant's Contractor is constructing the Tenant Improvements, delivers the Premises to Tenant for construction of the Tenant Improvements; provided that such 5-month period shall be extended by the length of any delay in the Substantial Completion of the Tenant Improvements that is caused by Landlord's performance of the remainder of Landlord's Work or caused by Landlord or Landlord's Contractor (including a delay caused by Landlord's failure to respond to plans submitted by Tenant within the time periods provided in Paragraph 4.a. below or due to any previously existing code violations within the Building) or caused by Force Majeure , except that any extension of such 5-month period on account of Force Majeure shall be limited to a maximum extension of two hundred seventy (270) days. The date the Lease term so commences is referred to herein as the "Commencement Date." Notwithstanding anything to the contrary herein, in no event may the Commencement Date occur prior to the completion of items #4-8 of Landlord's Work unless Tenant has commenced its occupancy of the Premises for the purposes of conducting its business therein. The term of the Lease shall end on the the last day of the one hundred twentieth (120th) full calendar month following the Commencement Date, unless sooner terminated pursuant to the terms of this Lease or by law (the "Expiration Date").

**REDACTED**

    c. **Monthly Rent:** ██████████████████████████████

    d. **Security Deposit:** ████████

    e. **Tenant's Share:** █████████████████████████████
███████████████████████████████████████████

    f. **Base Year:** For Operating Expenses; ████████████
                  For Tax Expenses:

    g. **Business of Tenant:** Brokerage and financial services and
related uses.

    h. **Real Estate Broker:** The Shorenstein Co. and Cushman &
Wakefield of California, Inc.

    3. **Term: Delivery of Possession of Premises.** The term of this Lease shall commence on the Commencement Date (as defined in Paragraph 2.b.) and, unless sooner terminated pursuant to the terms hereof, shall expire on the Expiration Date (defined in Paragraph 2.b.). Subject to the provisions of Paragraph 4.c. below, if Landlord's Contractor constructs the Tenant Improvements and Substantial Completion of the Tenant Improvements (as such terms are defined in Paragraph 4 below) is delayed for any reason whatsoever and/or if delivery of possession of the Premises to Tenant is delayed for any reason whatsoever, this Lease shall not be void or voidable, nor shall the Term of this Lease be extended as a result thereof. Further, if Tenant's Contractor (as defined in Paragraph 4.b. below) constructs the Tenant Improvements, no delay in the completion of Landlord's Work (as defined in Paragraph 4.c. below) shall operate to extend the term of this Lease or amend Tenant's obligations hereunder; subject, however, to the free rent provisions set forth in Paragraph 4.c. below with regard to certain delays in the completion of items #1 through #3 of Landlord's Work and Paragraph 2.b. above with regard to delays caused due to Landlord's completion of the balance of Landlord's Work. Except as otherwise provided herein, in no event shall Landlord be liable to Tenant for any delay in completion of Landlord's Work or the Tenant Improvements caused or occasioned by strikes, lock-outs, labor disputes, shortages of material or labor, fire or other casualty, acts of God or any other cause beyond the reasonable control of Landlord or Tenant, as applicable, excluding causes due to Landlord's financial condition ("Force Majeure") or by Tenant Delays (as defined in Paragraph 4.f. hereof). Landlord shall nonetheless, in each Force Majeure instance, exercise reasonable diligence to effect performance when and as soon as reasonably possible or practicable.

    4. **Condition of Premises.**

    a. **Plans.** Improvements shall be constructed in the Premises in accordance with this Paragraph 4. At Tenant's request, Landlord will review Tenant's proposed space plans for the improvements Tenant desires in the Premises (which the parties acknowledge will include a raised trading floor and supplemental HVAC units) and shall, within five (5) business days of Landlord's receipt thereof, advise Tenant if the plans are reasonably acceptable to Landlord or, if any portions of such plans are not reasonably acceptable, advise Tenant of the modifications Landlord reasonably requires to the space plans. Tenant shall furnish to Landlord for Landlord's review and approval (which approval shall not be unreasonably withheld or delayed) working plans and specifications for the improvements Tenant desires to be constructed in the Premises, prepared by an architect reasonably acceptable to Landlord. (Landlord hereby approves Gensler & Associates as an architect acceptable to Landlord.) The working plans and specifications shall separately note any proposed structural work or extraordinary electrical, plumbing or HVAC requirements, shall show improvements that comply with all applicable laws, ordinances, rules and governmental requirements, and shall be in sufficient detail as to enable the general contractor for the work to obtain all necessary governmental permits for commencement of the improvements and to secure complete bids from qualified contractors to perform the work. Landlord shall respond to each portion of the plans, either in writing or by marking up the submitted plans, or orally if

appropriate, within ten (10) business days of its receipt thereof and, if
Landlord disapproves of any portion of the plans, Landlord shall advise Tenant
of Landlord's reasons therefor and, if practicable, shall offer specific
suggestions to Tenant as to what alternatives may be acceptable to Landlord.
Tenant shall respond promptly to any reasonable objections of Landlord to the
plans and shall resubmit appropriately revised plans within ten (10) business
days of receipt of Landlord's objections.    Landlord shall respond to any
resubmission of the plans within seven (7) business days of Landlord's receipt
thereof, provided that the resubmitted plans shall clearly indicate which
portions of the plans are revised and which portions of the plan remain unchanged
from the previously submitted plans. (The working plans and specifications, as
approved in writing by Landlord, are hereinafter called the "Final Plans" and the
improvements to be performed in accordance with the Final Plans are hereinafter
called the "Tenant Improvements".)    Landlord's failure to respond to plans
submitted by Tenant within the required ten (10) day period, or Landlord's
failure to respond to any resubmission of plans within the required seven (7) day
period, shall constitute a delay by Landlord and the five (5) month period
referenced in Paragraphs 2.b.(ii) and 5.a. of the Lease (regarding the
Commencement Date of the Lease and the Mandatory Rent Commencement Date,
respectively) shall automatically be extended by the length of any delay in the
Substantial Completion of the Tenant Improvements that results from such delay
by Landlord in responding to the plans or resubmissions of the plans.
Notwithstanding anything to the contrary herein, Landlord and Tenant shall
cooperate with each other to resolve any space plan issues raised by applicable
local building codes.

b.    **Bidding Procedure**.    After Landlord's approval of the Final
Plans, Tenant shall provide bidding materials for the construction of the Tenant
Improvements simultaneously to Landlord's contractor, The Shorenstein Company
("Landlord's Contractor"), and to any number of contractors selected by Tenant
that meet the requirements set forth in the first sentence of Paragraph 4.d.ii.
hereof.    Within twenty (20) days thereafter, Tenant shall notify Landlord of
Tenant's selection of either a third party contractor ("Tenant's Contractor") or
Landlord's Contractor to construct the Tenant Improvements.  If Tenant elects to
have Landlord's Contractor construct the Tenant Improvements after bidding the
project out, Landlord shall cause Landlord's Contractor to construct the Tenant
Improvements in compliance with this Paragraph 4 and the terms of the
construction contract to be entered into between Tenant and Landlord's
Contractor.

Notwithstanding anything to the contrary above, Tenant may
elect to bid out the voice and data cabling and fixture installation portion of
the Tenant Improvements (the "Cabling and Fixture Installation Work") separately
from the remainder of the Tenant Improvements. In such instance, the provisions
of this Paragraph 4.b. regarding the selection of the contractor shall be applied
separately in connection with the selection of the contractors for such two (2)
portions of the Tenant Improvements, except that Tenant need not solicit a bid
from Landlord's Contractor for the Cabling and Fixture Installation Work.

c.    **Landlord's Work**.    Regardless of whether Tenant's Contractor
or Landlord's Contractor constructs the Tenant Improvements, Landlord shall cause
the following work ("Landlord's Work") to be performed in the Premises at
Landlord's cost as provided below:

1.   Remove all asbestos fireproofing from the 30th floor (such work
     to be performed in accordance with all applicable laws regarding
     the removal of asbestos containing materials from office space
     and the disposal thereof and Landlord shall provide Tenant with
     an air sampling test result evidencing that the airborne fiber
     content within the Premises is in compliance with such laws) and
     install new fireproofing in compliance with current law; provided
     that Landlord shall not remove the asbestos-containing
     fireproofing from (a) the perimeter columns and curtain walls of
     the Building, or (b) any of the permanent base building core
     walls, so long as allowing the above-described asbestos-
     containing fireproofing to remain in such areas does not violate
     any applicable laws regarding asbestos-containing materials and
     will not interfere with the performance of the . Tenant

Improvements, the balance of Landlord's Work and/or Tenant's occupancy of the Premises.

2.  Demolish and remove all existing improvements in the Premises and prepare any demolition plans required therefor;

3.  Repair and restore all of the base building elements, including columns, core walls, perimeter wall elements and other exposed surfaces (all gypsum wallboard to be taped, bedded and sanded), and provide a concrete subfloor suitable for application of Tenant's floor covering and balance and clean the window convector units.

4.  Install the HVAC main loop and the sprinkler main loop in the Premises in accordance with all applicable building and fire codes and legal requirements. (The distribution of the HVAC and sprinkler systems within the Premises shall be a part of the Tenant Improvements and not a part of Landlord's Work). If Tenant desires Landlord to alter the sprinkler main loop, then, provided that Tenant advises Landlord thereof in time for Landlord to make such adjustments, Landlord shall alter the sprinkler main loop in accordance with Tenant's requirements (which requirements shall be subject to Landlord's reasonable approval and all applicable building and fire codes and legal requirements) and Tenant shall be responsible for the difference between the cost of the installation of the sprinkler main loop in accordance with Tenant's requested adjustments and the cost of installation that would have been incurred without such adjustments.

5.  Provide building standard window coverings throughout the Premises. If Tenant desires to substitute other window coverings for the building standard window coverings, then Tenant shall advise Landlord thereof at such time as Tenant delivers the Final Plans to Landlord. In such event, this item #5 shall be deleted from Landlord's Work and Tenant shall receive a credit in the amount of ███████ which credit shall be added to Landlord's Contribution set forth in Paragraph 4.g.1. below, and the purchase and installation of window coverings on the windows of the Premises shall be part of the Tenant Improvements.

6.  Upgrade the restrooms on the 30th floor to current building standard condition and bring the restrooms into compliance with applicable codes and legal requirements, including, without limitation, the Americans with Disabilities Act.

7.  Perform the work required to bring the elevator lobby and the mechanical, electrical and telephone equipment rooms on the 30th floor into compliance with applicable code and legal requirements.

8.  Cause all of the common areas of the 30th floor to comply with fire safety and public safety requirements, including, without limitation, fire alarms, smoke detectors, strobe lights, exit lights, sprinklers and supporting power panel requirements. (All such code compliance work within the Premises is part of the Tenant Improvements and not a part of Landlord's Work).

Landlord shall use reasonable, good faith efforts and due diligence to complete items #1 through #3 of Landlord's Work on or before April 30, 1994 (such work to be performed in a good and workmanlike manner using first-class materials) so that construction of the Tenant Improvements may begin by such date. If items #4 through #8 of Landlord's Work are not completed by the date items #1 through #3 are completed and the Premises delivered to Tenant for the construction of the Tenant Improvements, then such remaining items of Landlord's Work may be performed concurrently with the construction of the Tenant Improvements in such a manner as not to interfere with the construction of the Tenant Improvements. If Tenant's Contractor constructs the Tenant Improvements, Tenant's Contractor and Landlord's Contractor shall cooperate with each other to ensure that the remaining Landlord's Work and the construction of the Tenant

REDACTED

Improvements are performed in as expeditious and non-disruptive a manner as reasonably possible.

If items #1 through #3 of Landlord's Work are not completed, and the Premises delivered to Tenant for the commencement of construction of the Tenant Improvements, by April 30, 1994, then (i) for each day after April 30, 1994, but on or before May 15, 1994, that the Premises are not delivered to Tenant with items #1 through #3 of Landlord's Work completed, Tenant shall receive one (1) day of free rent under Paragraph 5 of this Lease at the commencement of the Lease term, provided that each such day of free rent shall be conditioned upon Tenant proving to Landlord, with reasonable supporting evidence and documentation, that the delay in delivery of the Premises to Tenant for the commencement of construction of the Tenant Improvements actually delayed the date of Substantial Completion of the Tenant Improvements by the number of days of free rent being requested, and (ii) for each day after May 15, 1994, that the Premises are not delivered to Tenant with items #1 through #3 of Landlord's Work completed, Tenant shall receive one and one-half (1 1/2) days of free rent under Paragraph 5 of this Lease, provided that each such one and one-half days of free rent shall be conditioned upon Tenant proving to Landland, in the manner stated above, that each day of delay in the delivery of the Premises to Tenant for the commencement of construction of the Tenant Improvements actually delayed the date of Substantial Completion of the Tenant Improvements by the number of days for which the free rent is being assessed. Any dispute between Landlord and Tenant as to whether a delay in the completion of items #1 through #3 of Landlord's Work has actually delayed the date of Substantial Completion of the Tenant Improvements, as required for Tenant to receive the free rent provided for above, shall be subject to arbitration pursuant to Paragraph 53 below.

The April 30, 1994, and the May 15, 1994, dates set forth above shall be extended one (1) day for each day that the completion of items #1 through #3 of Landlord's Work is delayed due to actions of Tenant or Tenant's agents or employees or due to Force Majeure, as defined in Paragraph 3 above; provided, however, in no event shall such dates be extended beyond August 30, 1994, for any reason other than a delay caused by the actions of Tenant or Tenant's agents. Further, notwithstanding anything to the contrary above, the above dates may be extended by the length of any delay in the completion of items #1 through #3 that is caused by Tenant or Tenant's agents only as to the portion of the delay that occurs after Landlord has notified Tenant of the cause of the delay so that Tenant may endeavor to minimize any such delay.

Further, if items #1 through #3 of Landlord's Work are not completed by (i) the date one hundred eighty (180) days following April 30, 1994 (which 180-day period shall be extended by the length of any delays resulting from Force Majeure or a delay caused by Tenant or Tenant's agents or employees), or (ii) the date two hundred seventy (270) days following April 30, 1994 (which 270-day period shall be extended by the length of any delays resulting from a delay caused by Tenant or Tenant's agents or employees, but not for any delays caused by Force Majeure), then, at the end of such 180-day period or 270-day period (or extended period), as the case may be, Tenant may terminate this Lease upon written notice to Landlord given within ten (10) days following the end of the subject period but prior to the completion of items #1 through #3 of Landlord's Work.

If Tenant's Contractor constructs the Tenant Improvements, then Landlord may, at Landlord's sole election, require that items #4,6,7 and 8 of Landlord's Work be performed by Tenant's Contractor pursuant to a general construction agreement to be executed by Landlord and Tenant's Contractor. If Tenant selects Tenant's Contractor to perform the Tenant Improvements, then Landlord shall, within a reasonable period of time, advise Tenant of whether Tenant's Contractor or Landlord's Contractor will perform items #4,6,7, and 8 of Landlord's Work. If Landlord desires that Tenant's Contractor construct items #4,6,7 and 8 of Landlord's Work ("Landlord's Assigned Work") then Landlord's Contractor shall bid the Landlord's Assigned Work out to at least three (3) subcontractors. When Landlord's Contractor has received responses to its bid requests and selected the winning bidders, Landlord's Contractor will enter a contract with the recommended winning bidder for one or more elements of Landlord's Assigned Work and then assign such subcontract(s) to Tenant's Contractor under a general construction agreement to be executed by Landlord and Tenant's Contractor. If, for any reason, Tenant's Contractor refuses to accept

5

the subcontracts for the Landlord's Assigned Work to be assigned from Landlord's Contractor to Tenant's Contractor. Landlord may then elect to have Landlord's Contractor perform the subject Landlord's Assigned Work and the provisions of this subparagraph will be inapplicable. Any delay in the Substantial Completion of the Tenant Improvements that results from Landlord's assignment of Landlord's Assigned Work will constitute a Landlord delay that automatically extends the 5-month period referenced in Paragraphs 2.b.(ii) and 5.a. hereof by the length of such delay.

d. **Construction by Tenant's Contractor.** If Tenant's Contractor constructs the Tenant Improvements pursuant to Paragraph 4.b. above, the following provisions shall apply:

i. Tenant's Contractor shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed.

ii. Tenant's Contractor shall (1) have substantial recent experience in the construction of tenant improvements in high-rise office buildings in downtown San Francisco, (2) be licensed by the State of California (as evidenced by Tenant's submission to Landlord of Tenant's Contractor's state license number), and (3) have the capacity to be bonded by a recognized surety company to assure full performance of the construction contract for the work shown on the Final Plans (as evidenced by Tenant's submission to Landlord of a commitment or other writing issued by a recognized surety company confirming that Tenant's Contractor is bondable for construction projects having a contract price not less than the contract price under the construction contract for the Tenant Improvements).

Tenant shall be responsible for Tenant's Contractor, subcontractors, suppliers and materialmen (A) utilizing only union labor on the construction, (B) obtaining Landlord's prior written approval (which Landlord shall not unreasonably withhold, condition or delay) of all subcontractors to be utilized in the performance of such construction work, (C) obtaining all necessary governmental permits and approvals in connection with the Tenant Improvements (and Landlord shall have no responsibility whatsoever in connection with obtaining the same, except that if Tenant is prevented from obtaining any such permit due to conditions outside of the Premises, Landlord will cooperate with Tenant in its efforts to obtain the permits, including the cure of any existing Building or fire code violations outside of the Premises (to the extent required to obtain any such permit) but Landlord shall not be required to incur any costs for alterations, additions or improvements to any areas outside of the Premises that are triggered due to the inclusion in the Tenant Improvements of any improvements other than ordinary office improvements and a supplemental air conditioning system) and (D) furnishing to Landlord, prior to the commencement of any construction in the Premises, certificates evidencing comprehensive public liability insurance with limits of not less than ███████ and property damage insurance with limits of not less than ███████ covering Tenant's Contractor's operations in the Premises and naming Landlord as an additional insured. Landlord shall have no responsibility for furnishing any security services in or about the Building or Premises to safeguard the construction project or materials in connection therewith, other than that customarily provided in the Building for its use as an office building.

REDACTED

iii. Following selection of Tenant's Contractor, Tenant shall promptly enter into a contract with Tenant's Contractor for construction of the Tenant Improvements. Landlord shall deliver the Premises to Tenant with Landlord's Work complete in the order and manner set forth in Paragraph 4.c. above, free and clear of tenancies and rights of occupancy by third parties. Tenant shall then cause Tenant's Contractor to promptly commence and diligently pursue to completion the Tenant Improvements. The Tenant Improvements shall be constructed by Tenant's Contractor on a straight-time basis (unless Tenant elects to bear the cost of overtime labor) in conformance with the Final Plans (subject to approved Changes, as defined in Paragraph 4.e.i. below) and Tenant's Contractor shall comply with the Building's reasonable construction procedures and

with applicable governmental requirements regarding the performance of the work.

iv.    "Substantial Completion" of the Tenant Improvements shall be deemed to have occurred when (1) Tenant's Contractor has substantially completed construction of the Tenant Improvements, subject only to the completion of Tenant's architect's "Punch List" items, which items shall mean minor or insubstantial details of construction, mechanical adjustment or decoration which are incomplete or defective and which do not materially impair Tenant's use of the Premises for the conduct of Tenant's business therein, (2) any governmental approvals (which may be oral approvals by inspectors or other officials, and may be temporary or conditional in accordance with local practice) and permits required for the legal occupancy of the Premises have been issued, and (3) the Premises are free and clear of any tenancy or occupancy other than Tenant's tenancy pursuant to this Lease.

v.    During the period prior to the commencement of the Term of this Lease that Tenant has possession of any portion of the Premises for the purposes of construction of the Tenant Improvements by Tenant's Contractor, the provisions of Paragraph 14 of the Lease, entitled Indemnification, shall apply in full to such space.

e.    Construction By Landlord's Contractor.    If Tenant elects to have the Tenant Improvements constructed by Landlord's Contractor pursuant to Paragraph 4.b. above, the following provisions shall apply:

i.    Changes.    If Tenant requests any change, addition or alteration in or to the Final Plans ("Changes"), Tenant shall cause Tenant's architect to prepare additional plans implementing such Change; provided, however, that any Change to the Final Plans shall be subject to Landlord's approval, which approval Landlord agrees shall not be unreasonably withheld or delayed. As soon as practicable, using diligent efforts, after the completion of such additional construction documents (or, if the cost of the Change can reasonably be determined prior to the completion of the additional plans, then upon Landlord's receipt from Tenant of the information necessary for Landlord's Contractor to estimate the cost of the Change), Landlord's Contractor shall notify Tenant of the estimated cost of the Change. Further, at the time Landlord advises Tenant of the estimated cost of the Change, Landlord shall advise Tenant of Landlord's Contractor's good faith estimate of the length of the Tenant Delay (if any) that may result from the Change; provided that such estimate shall not be binding on Landlord. Within five (5) business days after receipt of such cost estimate, Tenant shall notify Landlord in writing whether Tenant approves the Change. If Tenant fails to approve the Change within such five (5) day period, construction of the Tenant Improvements shall proceed as provided in accordance with the Final Plans as they existed prior to the requested Change.

ii.    Construction.    Landlord shall cause Landlord's Contractor to commence and diligently pursue construction of the Tenant Improvements to completion in a good and workmanlike manner using first-class materials at the earliest possible date and Landlord's Contractor shall keep Tenant apprised of the extent of any unanticipated delays in construction. With regard to telephone and computer systems, subject to the provisions of Paragraph 4.b. above, Landlord's Contractor shall provide and cause to be installed only those wall terminal boxes and/or floor monuments required for Tenant's telephone or computer systems as are shown on the Final Plans.    Landlord will provide ordinary power wiring to locations shown on the Final Plans and shall provide and cause Landlord's Contractor to install conduits as required for Tenant's telephone and computer systems as shown on the Final Plans, but unless required by Tenant and specifically indicated on the Final Plans, Landlord's Contractor shall not install, pull or hook up such wires, supply jacks or plugs or provide wiring necessary for special conditioned power to the Premises. The Tenant Improvements shall be constructed by Landlord's Contractor in conformance with the Final Plans (subject to approved Changes) and Landlord's Contractor shall comply with applicable governmental requirements regarding the performance of the work; provided, however, that the foregoing shall in

no event require Landlord's Contractor to identify and correct any violations of codes or laws reflected in the Final Plans, it being agreed that, as expressly stated in Paragraph 4.a. hereof, Tenant is responsible for submitting to Landlord Final Plans that comply with all applicable laws.

 iii. **Substantial Completion.** Possession of the Premises shall be delivered to Tenant upon Substantial Completion of the Tenant Improvements by Landlord's Contractor. "Substantial Completion" shall have the meaning set forth in Paragraph 4.d.iv. above, with the references therein to Tenant's Contractor being deemed to refer to Landlord's Contractor. Upon notice from Landlord's Contractor that the Tenant Improvements have been Substantially Completed, Landlord, Tenant, Tenant's architect, and Landlord's Contractor shall tour the Premises and prepare a joint list of Punch List Items. If Tenant disputes whether the Tenant Improvements have been Substantially Completed, Tenant shall notify Landlord thereof promptly after Tenant becomes aware of such fact, and Landlord and Tenant shall thereupon endeavor in good faith to resolve any dispute regarding the occurrence of Substantial Completion.

 iv. **Early Entry.** Notwithstanding anything to the contrary in this Lease, Tenant may, prior to the Substantial Completion of the Tenant Improvements, enter the Premises for the purpose of installing telephones, electronic communication or related equipment, fixtures, furniture and equipment, provided that Tenant shall be solely responsible for any of such equipment, fixtures, furniture or material and for any loss or damage thereto from any cause whatsoever, excluding only the negligent acts, omissions or deliberate misconduct of Landlord or Landlord's contractors. Such early access to the Premises and such installation shall be permitted only to the extent that Landlord's Contractor determines that such early access and installation activities will not delay Landlord's Contractor's completion of the construction of the Tenant Improvements, unless Tenant agrees in writing that the date of Substantial Completion shall be deemed to have occurred when it would otherwise have occurred but for the occurrence of such delay. Landlord's Contractor and Tenant shall cooperate in the scheduling of Tenant's early access to the Premises and of Tenant's installation activities in an attempt to maximize the benefits to Tenant of this Paragraph 4.e.iv. without interfering with Landlord's Contractor's completion of the construction of the Tenant Improvements.

 f. **Tenant Delays.** Tenant shall be responsible for, and shall pay to Landlord, any and all costs and expenses for labor and material (as well as lost rent as provided in Paragraph 5.a. below if the Tenant Improvements are not Substantially Completed by the Mandatory Rent Commencement Date) incurred by Landlord in connection with any delay in the commencement or completion of the Tenant Improvements directly caused by (i) if Landlord's Contractor constructs the Tenant Improvements, any changes in the working drawings and specifications or the Final Plans requested or caused by Tenant, after submission thereof to Landlord, unless due to the inaccuracy of Landlord's base Building plans on which the Final Plans were based or the existence of asbestos-containing materials not previously disclosed to Tenant, (ii) if Landlord's Contractor constructs the Tenant Improvements, any delay by Tenant beyond any grace period permitted to Tenant in this Paragraph 4 in responding to inquiries regarding the construction of the Tenant Improvements or in granting Tenant's approval of materials or finishes for the Tenant Improvements, (iii) if Landlord's Contractor constructs the Tenant Improvements, the inclusion in the Tenant Improvements of any so-called "long-lead" materials (such as fabrics, panelling or carpeting, or other items that must be imported or are of unusual character or limited availability) which, despite Landlord's having performed "Landlord's long-lead time item obligations" in respect thereof, are not available when required by Landlord's Contractor in connection with the construction of the Tenant Improvements, or (iv) any other delay to the extent caused by Tenant. Each of the foregoing is referred to herein as a "Tenant Delay". As used above, the term "Landlord's long lead-time item obligations" shall mean in respect of each item designated as a long lead-time item, (A) ordering or causing the ordering of such item reasonably promptly after the approval of the Final Plans or, if applicable, after the relevant Change order selecting the long-lead item, (B) installing or causing the installation of such item with reasonable diligence after it is delivered or otherwise becomes available and in a good and workmanlike manner in

8

accordance with the Final Plans, and (C) delivering or causing the delivery to
the appropriate contractor or supplier of payment therefor. If Landlord's
Contractor constructs the Tenant Improvements, Landlord shall give Tenant notice
of "long lead items" as soon as reasonably practicable after being advised of the
delay by the suppliers involved, or otherwise becoming aware of the delay.
Landlord's Contractor will suggest alternative products to alleviate the delay,
if possible.    Further, if Landlord's Contractor constructs the Tenant
Improvements, Landlord's Contractor shall use good faith, reasonable efforts to
keep Tenant apprised of the progress of the construction and of any Tenant Delays
or other delays that Landlord's Contractor anticipates may materially delay the
Substantial Completion of the Tenant Improvements.

       g.   Cost of Improvements.    The cost of the construction and
installation of the Tenant Improvements shall be borne as follows:

       1.   Landlord's Contribution.    Landlord shall contribute
toward the cost of the construction and installation of the Tenant
Improvements an amount not ~~exceed~~ ███████ ("Landlord's Contribution").    The
following provisions shall govern the payment of Landlord's Contribution:

       A.   If Landlord's Contractor constructs the Tenant
Improvements, and the cost of construction exceeds the funds available
therefor from Landlord's Contribution, then Tenant shall reimburse
Landlord for such excess costs after the full amount of Landlord's
Contribution has been disbursed hereunder upon verification by
Tenant's architect that such work has been performed in accordance
with the requirements of the Final Plans and such construction is in
place, or that such materials have been delivered to the site (which
verifications shall be performed in a prompt and timely fashion), and
within fifteen (15) days after Landlord's written demand.

       B.   If Tenant's Contractor constructs the Tenant
Improvements, Landlord shall disburse Landlord's Contribution directly
to Tenant's Contractor, or subcontractors, or to Tenant as Landlord
and Tenant may agree, in monthly installments.    Each disbursement
shall be conditioned upon Landlord's receipt of invoices to be
furnished by Tenant covering work actually performed (which work may
include architectural services provided to Tenant in connection with
the preparation of the Final Plans and other professional services in
connection with the Tenant Improvements, such as engineering and
mechanical consultants, provided that not more ███████ of
Landlord's Contribution may be applied to architectural and other
professional services), construction in place and materials delivered
to the site (as may be applicable).    No payment will be made for
materials or supplies not on site.    To the extent permitted by law,
Landlord may withhold the amount of any and all retention percentages
provided for in original contracts or subcontracts until the earlier
of (i) the expiration of the applicable lien period or (ii) Landlord's
receipt of a waiver of lien rights from Tenant's contractor,
subcontractors or suppliers whose invoices are applicable to the
respective disbursement for, and/or on account of, the work or
materials covered by such invoice.    In the event the cost of the
Tenant Improvements exceeds Landlord's Contribution set forth above,
Tenant shall pay all such excess costs after the full amount of
Landlord's Contribution has been disbursed hereunder directly to the
contractor or suppliers involved and shall furnish to Landlord copies
of receipted invoices therefor and such waivers of lien rights as
Landlord may reasonably require.

       C.   If Tenant's Contractor constructs the Tenant
Improvements, Landlord shall retain from the amount of Landlord's
Contribution, in the manner described below, a sum equal to ███████
███████ (the "Construction Operations Fee") as
compensation to Landlord for review of plans and specifications and
for construction inspection, administration and management with regard
to the Tenant Improvements.    At the time Landlord makes each of the
two (2) disbursements of Landlord's Contribution, Landlord shall

REDACTED

62001\00021-7  04-17-0040

**REDACTED**

retain ███████████████████████████████ from each such
disbursement as a partial payment of the Construction Operations Fee.

ii.   **Landlord's Work**.   In additional to Landlord's
Contribution, Landlord shall pay for the entire cost of Landlord's
Work described in Paragraph 4.c. above.

iii.   **Building Services During Construction**.  Landlord shall
provide Tenant with free electrical service and water throughout the
construction period.  Further, Tenant may use the Building's freight
elevator and loading dock, on a non-exclusive basis during normal
business hours, free of charge throughout the construction period.  If
Tenant desires use of the freight elevator or loading dock during non-
business hours, then Tenant may reserve such use in compliance with
the Building rules and shall pay Landlord an amount equal to
Landlord's actual direct cost in providing such freight elevator
service or loading dock use during non-business hours.  If Tenant's
use of the freight elevator or loading dock during non-business hours
is shared with any other person or entity, then the costs of such use
shall be proportionately allocated between Tenant and such other user
or users based upon the extent of their respective uses.   If
Landlord's actual direct cost of so providing such service during non-
business hours includes a mark-up for Landlord's administrative
services or otherwise, such mark-up shall be reasonable and shall not
exceed the amount customarily paid by other tenants of the Building
for similar services.  Landlord shall also provide HVAC service to the
Premises during the construction period for the sole purpose of
testing the HVAC system within the Premises.

iv.   **Additional Asbestos Costs**.  After completion by Landlord
of the asbestos removal work described in item #1 of Landlord's Work
(as detailed in Paragraph 4.c. above) minor amounts of asbestos
fireproofing will remain on the 30th floor.  If, in the course of
construction of the Tenant Improvements, any remaining asbestos
fireproofing is encountered on the 30th floor or elsewhere in the
Building having an impact on the construction of the Tenant
Improvements, then Landlord shall, in addition to all other amounts
required to be paid by Landlord under this Paragraph 4.e., pay (A) the
entire cost of removing such asbestos fireproofing, and (B) all other
incremental costs of the construction of the Tenant Improvements that
are directly attributable to any delay in construction caused by the
removal of the asbestos fireproofing.   If Tenant's Contractor
constructs the Tenant Improvements, Tenant shall provide Landlord with
reasonable documentation evidencing the delay in construction and the
incremental costs resulting therefrom.    Further, if following the
completion of items #1 through #3 of Landlord's Work but during the
construction of the Tenant Improvements, any asbestos fireproofing
(other than the asbestos fireproofing permitted by Paragraph 4.c.1. to
remain in the Premises) is encountered within the Premises, then (i)
for the first (15) days that the Substantial Completion of the Tenant
Improvements is delayed due to the additional work required to remove
the asbestos containing materials from the Premises, Tenant shall
receive one (1) day of free rent under Paragraph 5 of this Lease at
the commencement of the Lease term, and (ii) for each day of delay in
the Substantial Completion of the Tenant Improvements beyond the
initial fifteen (15) days of delay that is due to the additional work
required to remove the asbestos containing materials from the
Premises, Tenant shall receive one and one-half (1 1/2) days of free
rent under Paragraph 5 of this Lease.   Any dispute between Landlord
and Tenant as to the length of the delay, if any, in the Substantial
Completion of the Tenant Improvements caused by the additional work
required to remove the asbestos containing material from the Premises
shall be subject to arbitration pursuant to Paragraph 53 below.

5.   **Monthly Rent**.

a.   On or before the first day of each calendar month during the
term hereof, Tenant shall pay to Landlord, as monthly rent for the Premises, the

Monthly Rent specified in Paragraph 2 above; provided, however, that no Monthly
Rent shall accrue or be payable during the first ten (10) days following the
Commencement Date, except that if any of such ten (10) days fall on or after the
Mandatory Rent Commencement Date, as hereinafter defined, then Monthly Rent shall
accrue and be payable for all such days that fall on or after the Mandatory Rent
Commencement Date. The "Mandatory Rent Commencement Date" is the date five (5)
months following the date Landlord completes items #1 through #3 of Landlord's
Work described in Paragraph 4.c. above; provided, however, if the Tenant
Improvements described in Paragraph 4.a. above are not completed by the date ten
(10) days prior to the Mandatory Rent Commencement Date due to a delay caused by
the performance of items #4 through #8 of Landlord's Work or a delay caused by
Landlord or Landlord's Contractor, Athen the Mandatory Rent Commencement Date
shall be extended by the length of such delay.  If the term of this Lease
commences on a day other than the first day of a calendar month, or terminates
on a day other than the last day of a calendar month, then the Monthly Rent
payable for such partial month shall be appropriately prorated on the basis of
a thirty (30) day month. Monthly Rent and the Additional Rent specified in
Paragraph 7 shall be paid by Tenant to Landlord, in advance, without deduction,
offset, prior notice or demand, except as otherwise provided herein, in
immediately available funds of lawful money of the United States of America, or
by good check as described below, at the office of The Shorenstein Co., at 555
California Street, 14th floor, San Francisco, California 94104, or to such other
person or at such other place as Landlord may from time to time designate in
writing.  Payments made by check must be drawn either on a California financial
institution or on a financial institution that is a member of the federal reserve
system. Notwithstanding the foregoing, but subject nonetheless to the provisions
of Paragraph 4.f. above, if the Tenant Improvements described in Paragraph 4.a.
above are constructed by Landlord's Contractor and the date of Substantial
Completion of the Tenant Improvements is delayed beyond the Mandatory Rent
Commencement Date as a result of a Tenant Delay, then Tenant's obligation to pay
rent for the Premises shall be accelerated by the number of days of such delay.

          b.  All amounts payable by Tenant to Landlord under this Lease in
addition to the Monthly Rent hereunder and Additional Rent under Paragraph 7
shall constitute rent owed by Tenant to Landlord hereunder.

          c.  Any rent not paid by Tenant to Landlord within five (5) days
of written notice that such sum is due, shall bear interest from the date due to
the date of payment by Tenant at an annual rate of interest (the "Interest Rate")
equal to the lesser of (i) the maximum annual interest rate allowed by law on
such due date for business loans (not primarily for personal, family or household
purposes) not exempt from the usury law, or (ii) a rate equal to the sum of three
(3) percentage points over the publicly announced reference rate (the "Reference
Rate") charged on such due date by the San Francisco Main Office of Bank of
America, NT&SA (or any successor bank thereto) (or if there is no such publicly
announced rate, the rate quoted by such bank in pricing ninety (90) day
commercial loans to substantial commercial borrowers).

          d.  No security or guaranty which may now or hereafter be
furnished to Landlord for the payment of rent due hereunder or for the
performance by Tenant of the other terms of this Lease shall in any way be a bar
or defense to any of Landlord's remedies set forth in Paragraph 25 below.

          6.  Deleted.

          7.  Additional Rent: Increases in Operating Expenses and Tax Expenses.

          a.  Operating Expenses.    Tenant shall pay to Landlord as
Additional Rent under this Lease at the times hereinafter set forth Tenant's
Share, as specified in Paragraph 2.e. hereof, of any increase in the Operating
Expenses (as defined below) incurred by Landlord in each calendar year subsequent
to the Base Year specified in Paragraph 2.f. hereof, over the Operating Expenses
incurred by Landlord during the Base Year.

          The term "Operating Expenses" shall mean the total costs and expenses
incurred by Landlord in connection with the management, operation, maintenance,
repair and ownership of the Real Property, as determined in accordance with

generally accepted accounting principles, consistently applied, excluding "Tax Expenses" as defined in Paragraph 7.b. below, and including, without limitation, the following costs: (1) salaries, wages, bonuses and other compensation (including hospitalization, medical, surgical, retirement plan, pension plan, union dues, life insurance, including group life insurance, welfare and other fringe benefits, and vacation, holidays and other paid absence benefits) relating to employees of Landlord or its agents engaged in the operation, repair, or maintenance of the Real Property; (2) payroll, social security, workers' compensation, unemployment and similar taxes with respect to such employees of Landlord or its agents, and the cost of providing disability or other benefits imposed by law or otherwise, with respect to such employees; (3) uniforms (including the cleaning, replacement and pressing thereof) provided to such employees; (4) premiums and other charges incurred by Landlord with respect to fire, other casualty, rent and liability insurance, any other insurance as is deemed necessary or advisable in the reasonable judgement of Landlord, or any insurance required by the holder of any Superior Interest (as defined in Paragraph 21) and, after the Base Year, costs of repairing an insured casualty to the extent of the deductible amount under the applicable insurance policy; (5) water charges and sewer rents or fees; (6) license, permit and inspection fees necessary for the operation of the Building as a first-class office building; (7) sales, use and excise taxes on goods and services purchased by Landlord in connection with the operation, maintenance or repair of the Real Property and Building systems and equipment; (8) telephone, telegraph, postage, stationery supplies and other expenses incurred in connection with the operation, maintenance, or repair of the Real Property; (9) management fees and expenses not to exceed in any given year ▇▇▇▇▇▇▇▇▇▇▇ of the gross rent (including additional rent based on increases in Operating Expenses and Tax Expenses over applicable base year amounts) of the Building for that year; (10) repairs to and physical maintenance of the Real Property, including building systems and appurtenances thereto and normal repair and replacement of worn-out equipment, facilities and installations, but excluding the replacement of major building systems (except to the extent provided in (16) and (17) below); (11) janitorial, window cleaning, guard, extermination, water treatment, rubbish removal, plumbing and other services and inspection or service contracts for elevator, electrical, mechanical and other building equipment and systems or as may otherwise be necessary or proper for the operation or maintenance of the Real Property; (12) supplies, tools, materials, and equipment used in connection with the operation, maintenance or repair of the Real Property; (13) accounting, legal and other professional fees and expenses; (14) painting the exterior or the public or common areas of the Building and the cost of maintaining the sidewalks, landscaping and other common areas of the Real Property; (15) all costs and expenses for electricity, chilled water, air conditioning, water for heating, gas, fuel, steam, heat, lights, power and other energy related utilities required in connection with the operation, maintenance and repair of the Real Property; (16) the cost of any capital improvements made by Landlord to the Real Property or capital assets acquired by Landlord after the Base Year required under any governmental law, regulation or insurance requirement enacted after the date hereof or with which the Real Property was not required to comply during the Base Year, such cost or allocable portion to be amortized over the useful life thereof, together with interest on the unamortized balance at a rate per annum equal to the Reference Rate (as defined in Paragraph 5.c. hereof) charged at the time such capital improvements or capital assets are constructed or acquired or such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing or acquiring such capital improvements or capital assets, but in either case not more than the maximum rate permitted by law at the time such capital improvements or capital assets are constructed or acquired; (17) the cost of any capital improvements made by Landlord to the Building or capital assets acquired by Landlord after the Base Year that are (based on Landlord's good faith and reasonable judgment with regard to the efficacy of the capital improvement) designed to reduce other Operating Expenses, such cost or allocable portion thereof to be amortized over the useful life thereof, together with interest on the unamortized balance at a rate per annum equal to the Reference Rate charged at the time such capital improvements or capital assets are constructed or acquired or such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing or acquiring such capital improvements or capital assets, but in either case not more than the maximum rate permitted by law at the time such capital improvements or capital assets are constructed or acquired, provided that the useful life of the improvement or asset shall not be less than the number of years over which the improvement or

REDACTED

asset must be in place for the cost thereof to be recovered through savings on other Operating Expenses; (18) the cost of furniture, draperies, carpeting, landscaping and other customary and ordinary items of personal property (excluding paintings, sculptures and other works of art) provided by Landlord for use in common areas of the Building or in the Building office (to the extent that such Building office is dedicated to the operation and management of the Real Property), such costs to be amortized over the useful life thereof; and (19) Building office rent or rental value, not to exceed fair market rent.

Operating Expenses shall not include the following: (i) depreciation on the Building or equipment or systems therein; (ii) debt service; (iii) rental under any ground or underlying lease; (iv) interest (except as expressly provided in this Paragraph 7.a.); (v) Tax Expenses or income, franchise, transfer, inheritance or capital stock taxes levied or assessed against Landlord or the Building; (vi) attorneys' fees and expenses incurred in connection with lease negotiations with prospective Building tenants or the enforcement of leases with tenants in the Building; (vii) the cost of any repairs, improvements, alterations or equipment which would be properly classified as capital expenditures according to generally accepted accounting principles and practices (except for any capital expenditures expressly included in Operating Expenses pursuant to this Paragraph 7.a.); (viii) the cost (including permits, licenses and inspection fees) of decorating, improving for tenant occupancy, renovating, painting or redecorating portions of the Building to be demised to tenants; (ix) wages, salaries or other compensation or fringe benefits paid to or for the benefit of any executive employees of Landlord or of Landlord's agents above the function of Building manager; (x) advertising and promotional expenditures; (xi) real estate broker's or other leasing commissions; (xii) penalties or other costs incurred due to a violation by Landlord, as determined by written admission, stipulation, final judgment or arbitration award, of any of the terms and conditions of this Lease or any other lease relating to the Building except to the extent such costs reflect costs that would have been incurred by Landlord absent such violation; (xiii) subject to the provisions of item (4) above, repairs and other work occasioned by fire, windstorm or other casualty, to the extent Landlord is reimbursed by insurance proceeds, and other work paid from insurance or condemnation proceeds; (xiv) costs, penalties or fines arising from Landlord's violation of any applicable governmental rule or authority except to the extent such costs reflect costs that would have been incurred by Landlord absent such violation; (xv) overhead and profit increments paid to subsidiaries or affiliates of Landlord for management or other services on or to the Building or for supplies or other materials to the extent that the cost of the services, supplies or materials materially exceed the amounts normally payable for similar goods and services under similar circumstances (taking into account the market factors in effect on the date any relevant contracts were negotiated) in comparable buildings in the San Francisco financial district; (xvi) all direct costs of refinancing, selling or exchanging the Building, including broker commissions, attorney's fees and closing costs; (xvii) Landlord's general corporate office overhead and administrative expenses (which shall not be deemed to include a management fee); (xviii) rentals and other related expenses incurred in leasing air conditioning systems, elevators or other equipment ordinarily considered to be of a capital nature (except equipment that is not affixed to the Building and is used in providing janitorial services, and except to the extent such costs would otherwise be includable pursuant to items (16) and (17) as set forth in the immediately preceding paragraph); (xix) costs solely attributable to the garage in the Building, including, without limitation, payroll for clerks, attendants, book-keeping, parking, insurance premiums, parking management fees, parking tickets, janitorial services, striping and painting of surfaces (provided, however, that the cost of providing utilities to the garage shall be included in Operating Expenses); (xx) the cost of any large-scale asbestos abatement or removal activities, provided, however, Operating Expenses may include the minor costs attributable to those actions taken by Landlord to comply with any laws, rules and regulations in connection with the ordinary operation and maintenance of the Building, including costs incurred in removing limited amounts of asbestos containing materials from the Building when such removal is directly related to such ordinary maintenance and operation; (xxi) any expense for which Landlord is actually reimbursed by a tenant or other party other than pursuant to a provision of this nature in another lease in the Building; (xxii) the cost of services made available to any tenant in the Building, which services are in excess of the comparable service furnished to Tenant (but only to the extent of such excess); (xxiii) material costs incurred in connection with compliance of the Base

6220:0302L-7 (4-13/1-00                                    13

Building with the Americans with Disabilities Act, as such Act may hereafter be amended; (xxiv) costs incurred in connection with the making of repairs which are the obligation of another tenant of the Building; (xxv) interest and other finance charges, except as otherwise expressly provided for herein for inclusion in Operating Expenses, or (xxvi) premiums for insurance for lost rent other than the lost rent insurance that is a part of Landlord's casualty insurance.

b. **Tax Expenses**. Tenant shall pay to Landlord as Additional Rent under this Lease at the times hereinafter set forth Tenant's Share, as specified in Paragraph 2.e. hereof, of any increase in Tax Expenses (as defined below) incurred by Landlord in each calendar year subsequent to the Base Year specified in Paragraph 2.f. hereof, over Tax Expenses incurred by Landlord during the Base Year; provided, however, that no payment of Additional Rent shall accrue or be payable under this Paragraph 7.b. until January 1, 1995.

The term "Tax Expenses" shall mean all taxes, assessments (whether general or special), excises, transit charges, housing fund assessments or other housing charges, levies or fees, ordinary or extraordinary, unforeseen as well as foreseen, of any kind, which are assessed, levied, charged, confirmed or imposed on the Real Property, on the Landlord with respect to the Real Property, on the act of entering into this Lease or any other lease of space in the Real Property, on the use or occupancy of the Real Property or any part thereof, with respect to services or utilities consumed in the use, occupancy or operation of the Real Property, or on or measured by the rent payable under this Lease or in connection with the business of renting space in the Real Property, including, without limitation, any gross income tax or excise tax levied with respect to the receipt of such rent, by the United States of America, the State of California, the City and County of San Francisco, any political subdivision, public corporation, district or other political or public entity or public authority (measured as if the receipts from the Real Property (excluding the garage) were the only receipts of Landlord), and shall also include any other tax, fee or other excise, however described, which may be levied or assessed in lieu of, as a substitute (in whole or in part) for, or as an addition to, any other Tax Expense. Notwithstanding the foregoing, transit charges, housing fund assessments or other housing charges may only be included in Tax Expenses to the extent that such charges or assessments are imposed upon all building owners similarly situated with Landlord. Tax Expenses shall include reasonable attorneys' fees, costs and disbursements incurred in connection with proceedings to contest, determine or reduce Tax Expenses. If it shall not be lawful for Tenant to reimburse Landlord for any increase in Tax Expenses as defined herein, the Monthly Rent payable to Landlord prior to the imposition of such increases in Tax Expenses shall be increased to net Landlord the same net Monthly Rent after imposition of such increases in Tax Expenses as would have been received by Landlord prior to the imposition of such increases in Tax Expenses.

Tax Expenses shall not include any interest or penalties due by reason of late payment of the Tax Expense by Landlord, or income, franchise, transfer, inheritance or capital stock taxes, unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord in lieu of or as a substitute (in whole or in part) for any other charge which would otherwise constitute a Tax Expense. Landlord and Tenant acknowledge and agree that certain other buildings exist or encroach upon the Land, that Tenant shall have no liability as to any item of Tax Expense attributable or allocable to, or assessed against, buildings other than the Building and that Landlord's good faith determination of the proper allocation of any item of Tax Expense allocable to buildings other than the Building shall be binding on Landlord and Tenant. Notwithstanding the foregoing, when allocating the amount of Landlord's tax bill for the Land and the buildings located thereon in any given year, Landlord may not allocate more than 100% of the amount of the tax bill among such Land and buildings. For purposes of determining Tenant's Additional Rent under this Paragraph 7.b., the portion of Tax Expenses that are allocated by Landlord to the Real Property during the Base Year for purposes of this Lease shall not be less than the portion of Tax Expenses that are allocated by Landlord to the Real Property in any subsequent Base Year during the term hereof.

c. **Adjustment for Occupancy Factor**. Notwithstanding any other provision herein to the contrary, in the event the Building is not at least ▮▮▮▮▮▮▮▮▮▮▮ occupied on average during the Base Year, or any subsequent year of the term of this Lease, an adjustment shall be made by

REDACTED

Landlord in computing Operating Expenses for such year so that the Operating Expenses shall be computed for such year (including the Base Year) as though the Building had been ████████████████████ occupied on average during such year. The parties agree that statements in this Lease to the effect that Landlord is to perform certain of its obligations hereunder at its own or sole cost and expense shall not be interpreted as excluding any cost from Operating Expenses or Tax Expenses if such cost is an Operating Expense or Tax Expense pursuant to the terms of this Lease.

d. **Intention Regarding Expense Pass-Through.** It is the intention of Landlord and Tenant that the Monthly Rent paid to Landlord throughout the term of this Lease shall be absolutely net of Tenant's Share ⌃all increases, respectively, in Tax Expenses and Operating Expenses over, respectively, Tax Expenses and Operating Expenses for the Base Year, and the foregoing provisions of this Paragraph 7 are intended to so provide.

**REDACTED**

e. **Notice and Payment.** On or before the first day of each calendar year during the term hereof subsequent to the Base Year, or as soon as practicable thereafter, Landlord shall give to Tenant notice of Landlord's estimate of the Additional Rent, if any, payable by Tenant pursuant to Paragraphs 7.a. and 7.b. for such calendar year subsequent to the Base Year; provided, however, that no Additional Rent shall accrue or be payable under Paragraph 7.b. until January 1, 1995. Such estimate of the Additional Rent payable by Tenant shall be based upon the estimate of the Operating Expenses and Tax Expenses that Landlord uniformly applies to all tenants of the Building. On or before the first day of each month during such subsequent calendar year, Tenant shall pay to Landlord one twelfth (1/12th) of the estimated Additional Rent; provided that if Landlord's notice is not given prior to the first day of any calendar year, Tenant shall continue to pay Additional Rent on the basis of the prior year's estimate until the month after Landlord's notice is given. If at any time it appears to Landlord that the Additional Rent payable under Paragraphs 7.a. and/or 7.b. will vary from Landlord's estimate by more than ██████████ Landlord may, by written notice to Tenant, revise its estimate for such year, and subsequent payments by Tenant for such year shall be based upon the revised estimate.

f. **Annual Accounting.** Landlord shall maintain adequate records of the Operating Expenses and Tax Expenses in accordance with generally accepted accounting principles, consistently applied. Within ninety (90) days after the close of each calendar year subsequent to the Base Year, or as soon after such ninety (90) day period as practicable, Landlord shall deliver to Tenant a statement of the Additional Rent payable under Paragraphs 7.a. and 7.b. for such year. The statement shall be based on the results of an audit of the operations of the Building prepared for the applicable year by a reputable nationally recognized certified public accounting firm selected by Landlord. Upon Tenant's request, Landlord shall promptly deliver to Tenant a copy of the auditor's statement on which Landlord's annual statement is based and such other information regarding the annual statement as may be reasonably required by Tenant to ascertain Landlord's compliance with this Paragraph 7. If the annual statement shows that Tenant's payments of Additional Rent for such calendar year pursuant to Paragraph 7.a. hereof exceeded Tenant's obligations for the calendar year, Landlord shall at its option either (1) credit the excess to the next succeeding installments of estimated Additional Rent or (2) pay the excess to Tenant within thirty (30) days after delivery of such statement. If the annual statement shows that Tenant's payments of Additional Rent for such calendar year pursuant to Paragraph 7.a. hereof were less than Tenant's obligation for the calendar year, Tenant shall pay the deficiency to Landlord within thirty (30) days after delivery of such statement. Landlord's annual statement shall be final and binding upon Landlord and Tenant unless either party, within one hundred twenty (120) days after Tenant's receipt thereof, shall contest any item therein by giving written notice to the other, specifying each item contested and the reason therefor. Paragraph 7.g. below provides Tenant with specific audit rights in connection with Tenant's contest of the annual statement.

g. **Tenant's Audit Rights.** Tenant shall have the right to cause a reputable nationally recognized accounting firm to audit Landlord's books and records pertaining to Operating Expenses for the immediately prior calendar year, provided that Tenant notifies Landlord in writing of Tenant's intention to exercise such audit right within one hundred twenty (120) days after receipt of

15

REDACTED

the relevant annual statement described in Paragraph 7.f., actually begins such audit within thirty (30) days after such notice from Tenant, and diligently pursues such audit to completion as quickly as reasonably possible. Landlord agrees to make available to Tenant's auditors, at Landlord's office in San Francisco, the books and records relevant to the audit for review and copying, but such books and records may not be removed from Landlord's offices. Tenant shall bear all costs of such audit, including Landlord's incidental costs (e.g., for personnel time, copying, making space available to Tenant's auditors) incurred in connection with such audit, except that, if the audit (as conducted and certified by Tenant's nationally recognized accounting firm) shows an aggregate overstatement of Operating Expenses of ▮▮▮▮▮ or more, and Landlord's auditors concur in such findings (or, in the absence of such concurrence, such overstatement is confirmed by arbitration), then Landlord shall bear all costs of the audit, including, but without limitation, the costs of Tenant's auditor, such payment to be made by Landlord within thirty (30) days of Landlord's receipt of the invoice (with reasonably satisfactory supporting documentation) for such costs. The costs paid by Landlord under this Paragraph 7.g. shall not be reimbursable to Landlord as an Operating Expense under Paragraph 7.a. If the agreed or confirmed audit shows an underpayment of Operating Expenses by Tenant, Tenant shall pay to Landlord, within thirty (30) days after the audit is agreed to or confirmed, the amount owed to Landlord, and, if the agreed or confirmed audit shows an overpayment of Operating Expenses by Tenant, Landlord shall reimburse Tenant for such overpayment within thirty (30) days after the audit is agreed to or confirmed. If Landlord and Tenant disagree as to the results of an audit so conducted by Tenant, then the dispute shall be submitted to arbitration as set forth in Paragraph 53 below. The provisions of this Paragraph 7.g. shall survive the expiration or termination of the Lease term.

h. **Proration for Partial Lease Year.** If this Lease terminates on a day other than the last day of a calendar year, the Additional Rent payable by Tenant pursuant to this Paragraph 7 applicable to the calendar year in which the Lease terminates shall be prorated on the basis that the number of days from the commencement of such calendar year to and including such termination date bears to three hundred sixty-five (365).

i. **Capital Improvements Designed to Reduce Operating Expenses.** If, pursuant to item (17) of Paragraph 7.a. above, Landlord includes in Operating Expenses the cost of a capital improvement that is designed to reduce other Operating Expenses and Tenant questions whether such capital improvement does, in fact, reduce other Operating Expenses, then Tenant may request that Landlord advise Tenant in writing of Landlord's good faith and reasonable rationale for determining that such capital improvement will, in fact, reduce Operating Expenses and will have a useful life of the duration required by item (17). If, following Tenant's receipt of such explanation from Landlord, Tenant disagrees with Landlord's reasoning and contends that the capital improvement does not reduce Operating Expenses or will not have a useful life of the duration required by item (17), then Tenant shall be entitled to demonstrate such fact to Landlord. In the absence of proof by Tenant, Landlord's inclusion of the cost of the capital improvement in Operating Expenses shall be permitted so long as Landlord has acted reasonably and in good faith in making the capital improvement for the purpose of reducing other Operating Expenses.

8. **Use of Premises; Compliance with Law.**

a. **Use of Premises.** The Premises shall be used solely for general office purposes for the business of Tenant as described in Paragraph 2.g. hereof and all lawful uses incidental thereto or for any other general office use consistent with the operation of the Building as a first-class office building, and for no other use or purpose without the prior written consent of Landlord.

Tenant shall not do or suffer or permit anything to be done in or about the Premises or the Real Property, nor bring or keep anything therein, which would in any way subject Landlord, Landlord's agents or the holder of any Superior Interest (as defined in Paragraph 21) to any liability, increase the premium rate of or adversely affect any fire, casualty, liability, rent or other insurance relating to the Real Property or any of the contents of the Building in excess of any such increase or affect which would be generally incurred by Landlord by reason of the rental of the Premises for general and executive office

uses, or cause a cancellation of, or give rise to any defense by the insurer to
any claim under, or conflict with, any policies for such insurance. If any act
or omission of Tenant results in any such increase in premium rates, Tenant shall
pay to Landlord upon demand the amount of such increase. Tenant shall not do or
suffer or permit anything to be done in or about the Premises which will in any
way obstruct or interfere with the rights of other tenants or occupants of the
Building or injure or annoy them, or use or suffer or permit the Premises to be
used for any immoral, unlawful or objectionable purpose, nor shall Tenant cause,
maintain, suffer or permit any nuisance in, on or about the Premises.  Tenant
agrees not to handle, store or dispose of any substance on the Premises which is
prohibited by federal, state or local law or regulation.  Without limiting the
foregoing, no loudspeakers or other similar device which can be heard outside the
Premises shall, without the prior written approval of Landlord, be used in or
about the Premises. Tenant shall not commit or suffer to be committed any waste
in, to or about the Premises.

Tenant agrees not to employ any person, entity or contractor for any
work in the Premises (including moving Tenant's equipment and furnishings in, out
or around the Premises) whose presence may give rise to a labor or other
disturbance in the Building and, if necessary to prevent such a disturbance in
a particular situation, Landlord may require Tenant to employ union labor for the
work.

b.  Compliance with Law.  Tenant shall not do or permit anything
to be done in or about the Premises which will in any way conflict with any law,
ordinance or governmental requirement now in force or which may hereafter be
enacted. From and after the Commencement Date of this Lease, Tenant, at its sole
cost and expense, shall promptly comply with all such laws, ordinances and
governmental requirements and with the requirements of any board of fire
underwriters or other similar body now or hereafter constituted relating to the
condition, use or occupancy of the Premises, except that Tenant (i) shall not be
required to make any structural changes to the Building or Base Building (as
defined below) systems unless the compliance with the law is related to or
affected by Tenant's Alterations (as defined in Paragraph 9 below) or Tenant's
particular use of the Premises other than for general office purposes, and (ii)
shall not be responsible for any other matter or element for which Landlord is
expressly responsible under this Lease.  The judgment of any court of competent
jurisdiction or the admission of Tenant in an action against Tenant, whether or
not Landlord is a party thereto, that Tenant has violated any law, ordinance or
governmental requirement shall be conclusive of that fact as between Landlord and
Tenant. Tenant shall immediately furnish Landlord with any notices received from
any insurance company or governmental agency or inspection bureau regarding any
unsafe or unlawful conditions within the Premises.  Notwithstanding anything to
the contrary herein, any and all costs of causing the Premises to comply with any
law regarding asbestos containing materials that is presently in effect or
enacted after the Commencement Date of this Lease shall be borne by Landlord;
except that if compliance with any such law is triggered because of an Alteration
pursuant to Paragraph 9 hereof, the provisions of Paragraph 9 regarding the costs
of compliance with laws pertaining to asbestos-containing materials shall govern,
and if the compliance is required for construction of initial improvements in
space leased by Tenant pursuant to Paragraph 49 below, entitled Right of First
Offer, then the responsibility for the costs of complying with such laws shall
be negotiated by Landlord and Tenant in connection with the determination of fair
market rent for the subject space.

Landlord will use diligent and reasonable efforts to cause the
tenants of the Building to comply with those laws for which the failure of
compliance by the tenants may adversely affect Tenant's right to occupy its
Premises or Tenant's use and enjoyment thereof.

Landlord warrants that the "Base Building" presently complies,
and will comply as of the Commencement Date, with all codes and laws applicable
to the Building when constructed. Landlord shall be responsible for ensuring
that the Base Building continues to comply with such laws, as the same may be
amended, throughout the Lease term. "Base Building" means the structural
portions of the Building (including exterior walls, roof, foundation and core of
the Building), the exterior of the Building and all Base Building systems,
including, without limitation, elevator, plumbing, air conditioning, heating,
electrical, security, life safety and power, except those special systems

installed for specific tenants and the portion of any other Building system within any specific tenant space which is the responsibility of such tenant. Further, Landlord warrants that (i) the Base Building presently complies, and will comply throughout the Lease term, with all codes and laws which have become applicable to the Building since its construction and which must be complied with in order for the Building to be occupied as an office building, and (ii) that the Building complies with all laws required for Tenant to occupy the Premises for the purposes leased.

Throughout the Lease term, Landlord shall comply with all laws applicable to the operation of the Building (including, without limitation, laws regarding hazardous substances and the Americans with Disabilities Act).

c. **Applicability of Paragraph.** The provisions of this Paragraph 8 are for the benefit of Landlord and Tenant only and are not nor shall they be construed to be for the benefit of any other tenant or occupant of the Building.

9. **Alterations and Restoration.**

a. Except as provided in Paragraph 4 above with regard to the construction of the Tenant Improvements, Tenant shall not make or suffer to be made any alterations, additions or improvements to the Premises ("Alterations"), except as expressly provided in this Paragraph 9. Tenant shall have the right, without Landlord's consent, to make any Alteration to the Premises, provided that (a) the Alteration is decorative in nature (such as paint, carpet or other wall or floor finishes, partitions or other such work), (b) Tenant provides Landlord with ten (10) days' advance notice of the commencement of any such Alteration, (c) such Alteration does not affect the Building's electrical, mechanical or HVAC systems or any part of the Building other than the Premises, (d) the work will not decrease the value of the Premises, does not require a building permit or other governmental permit, uses only first-class materials and is performed in a workmanlike manner and in accordance with all applicable laws and regulations, (e) the work does not involve opening the ceiling of the Premises and (f) the work does not involve the Building's asbestos procedures. At the time Tenant notifies Landlord of any such work, Tenant shall give Landlord a copy of Tenant's plans for the work. If the Alterations are of such a nature that formal plans will not be prepared for the work, Tenant shall provide Landlord with a reasonably specific description of the work. If Tenant desires any Alteration that is not covered in the preceding sentence, Tenant must obtain Landlord's prior written approval of such Alteration, which approval Landlord agrees, shall not be unreasonably withheld or delayed. All Alterations shall be made at Tenant's sole cost and expense (excluding the expense of complying with laws regarding asbestos if the Alteration is to the initial Premises lease hereunder, but including such expenses if the Alteration is to any other space leased by Tenant in the Building, including space leased pursuant to Paragraphs 48 or 49 below). For those Alterations which require Landlord's consent, Tenant shall either (i) arrange for Landlord's contractor to perform the work (in which case Landlord and Tenant shall negotiate regarding Landlord's charge for the work) or (ii) bid the project out to contractors (which may include Landlord's Contractor) approved by Landlord in writing in advance (which approval Landlord agrees shall not be unreasonably withheld). If the Alterations required Landlord's consent, but Landlord does not perform the work pursuant to the above, Tenant shall pay Landlord on demand an "Alteration Operations Fee" equal to Landlord's reasonable out-of-pocket expenses incurred in connection with the Alteration (e.g., Landlord's cost of reviewing plans, providing after hours freight elevator service or other miscellaneous costs).

All such work shall be performed diligently and in a first-class workmanlike manner and in accordance with plans and specifications approved by Landlord as aforesaid, and shall comply with all applicable laws and Landlord's reasonable construction procedures for the Building. In no event shall Tenant employ any person, entity or contractor to perform work in the Premises whose presence may give rise to a labor or other disturbance in the Building. Default by Tenant in the payment of any sums agreed to be paid by Tenant for or in connection with an Alteration (regardless of whether such agreement is pursuant to this Paragraph 9 or separate instrument) shall entitle Landlord to all the same remedies as for non-payment of rent hereunder. Any Alterations, including,

without limitation, moveable partitions that are affixed to the Premises (but excluding moveable, free standing partitions, Tenant's cabling and wiring that can be removed from the Premises or other areas of the Building without damage thereto, Tenant's artwork and furniture, personal property and equipment) and all carpeting, shall at once become part of the Building and the property of Landlord. Tenant shall give Landlord not less than five (5) days prior written notice of the date the construction of the Alteration is to commence, but any change in the exact commencement date of the construction of the Alteration following the delivery of such notice to Landlord shall not constitute a default hereunder so long as Tenant reissues such written notice so that Landlord receives not less than five (5) days prior written notice of the date construction actually commences.   Landlord may post and record an appropriate notice of nonresponsibility with respect to any Alteration and Tenant shall maintain any such notices posted by Landlord in or on the Premises.

b.   Landlord shall advise Tenant at the time of Landlord's approval of any Alteration requested by Tenant whether Landlord will require the removal of the Alteration at the expiration or sooner termination of this Lease; provided, however, that Landlord may only require Tenant to remove those Alterations that are structural in nature or are not in the nature of typical office improvements.  Those Alterations required by Landlord to be removed from the Premises at the expiration or sooner termination of this Lease shall be so removed by Tenant and any damage caused by such removal repaired by Tenant.  The removal of the Alterations and the repair of the Premises shall be performed by a general contractor selected by Tenant and approved by Landlord (which approval Landlord agrees shall not be unreasonably withheld or delayed), in which event Tenant shall pay the general contractor's fees and costs in connection with such work.  Any separate work letter or other agreement which is hereafter entered into between Landlord and Tenant pertaining to Alterations shall be automatically incorporated into this Lease without the necessity for further reference thereto.  The provisions of this Paragraph 9 are inapplicable to the Tenant Improvements described in Paragraph 4.a. hereof and in no event shall Tenant be required to remove any of the Tenant Improvements at the expiration of the Lease term.

10.  Repair.

a.   Except as specifically provided in this Paragraph 10 and elsewhere in this Lease, Tenant agrees that the Premises are in good condition and repair.  From and after the date that possession of the Premises is delivered to Tenant, Tenant, at Tenant's sole cost and expense, shall keep the Premises and every part thereof in good condition and repair; provided that Tenant shall not be responsible for repairs to the extent such repairs are (i) necessitated because of fire, earthquake, act of God or the elements, (ii) necessitated by the negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors, or (iii) Landlord's obligation pursuant to Paragraph 10.b. below. Tenant waives all rights to make repairs at the expense of Landlord as provided by any law, statute or ordinance now or hereinafter in effect.   It is specifically understood and agreed that, except as specifically set forth in this Lease, Landlord has no obligation and has made no promises to alter, remodel, improve, repair, decorate or paint the Premises or any part thereof, and that no representations respecting the condition of the Premises or the Building have been made by Landlord to Tenant.   Tenant hereby waives the provisions of California Civil Code Sections 1932(1), 1941 and 1942 and of any similar law, statute or ordinance now or hereafter in effect.

b.   Landlord shall repair the Premises if they are damaged due to items (i) and (ii) described in the second sentence of Paragraph 10.a. above; subject, however, to the limitations on Landlord's right of entry set forth in Paragraph 23 below.  Further, (1) if Landlord constructs the Tenant Improvements described in Paragraph 4.a. above, then Landlord shall, at Landlord's sole cost and expense, repair any defect in the construction of the Tenant Improvements that exists in the Premises as of the date Tenant takes possession of the Premises and is of a nature which would not normally be discoverable by Tenant in the exercise of reasonable diligence in inspecting the Premises at the commencement of the term of this Lease, provided Tenant gives prompt notice of such matter to Landlord, and (2) Landlord shall repair and maintain in good condition and repair the structural portions and common areas of the Building and all Building systems, including plumbing, air conditioning, heating, electrical, life safety and other systems installed or furnished by Landlord, but excluding

XXXX\XXXXL-7 (4-3/16/90)                    19

(i) non-Building standard lighting and electrical wiring within the Premises or
located outside of the Premises but installed for the sole purpose of providing
non-Building standard lighting or electrical service to the Premises, and (ii)
extraordinary quantities of electrical, plumbing, HVAC or other Building
facilities or distribution thereof; provided, however, that to the extent repairs
which Landlord is required to make pursuant to this item (2) are necessitated by
the negligence or deliberate misconduct of Tenant or Tenant's agents, employees
or contractors, then after prior notice thereof to Tenant, Tenant shall reimburse
Landlord for the cost of such repair to the extent Landlord is not reimbursed
therefor by insurance.  Landlord shall in no event be obligated to repair any
wear and tear to the Premises.

    11.  **Abandonment.**  Tenant shall not abandon or surrender the Premises
or any part thereof to Landlord (other than pursuant to Paragraph 13 below) at
any time during the term hereof.  If Tenant abandons or surrenders all or any
part of the Premises or is dispossessed of the Premises by process of law, or
otherwise, any movable furniture, equipment, trade fixtures, or other personal
property belonging to Tenant and left on the Premises shall at the option of
Landlord be deemed to be abandoned and, whether or not the property is deemed
abandoned, Landlord shall have the right to remove such property from the
Premises and charge Tenant for the removal and any restoration of the Premises
as provided in Paragraph 9.  Landlord may charge Tenant for the storage of
Tenant's property left on the Premises at such rates as Landlord may from time
to time reasonably determine, or, Landlord may, at its option, store Tenant's
property in a public warehouse at Tenant's expense.  Notwithstanding the
foregoing, neither the provisions of this Paragraph 11 nor any other provision
of this Lease shall impose upon Landlord any obligation to care for or preserve
any of Tenant's property left upon the Premises, and Tenant hereby waives and
releases Landlord from any claim or liability in connection with the removal of
such property from the Premises and the storage thereof and specifically waives
the provisions of California Civil Code Section 1542 with respect to such
release.  Landlord's action or inaction with regard to the provisions of this
Paragraph 11 shall not be construed as a waiver of Landlord's right to require
Tenant to remove its property, restore any damage to the Building caused by such
removal, and make any restoration required pursuant to Paragraph 9 hereof.
Tenant's vacancy of the Premises during the term hereof shall not constitute an
Event of Default (as provided in Paragraph 25.a.) so long as Tenant continues to
pay Monthly Rent, Additional Rent and all other sums due Landlord under this
Lease and maintains the insurance coverage required pursuant to Paragraph 15 of
this Lease.

    12.  **Liens.**  If any mechanic's, materialman's or other lien arising out
of work performed at the Premises by or on behalf of Tenant is filed against the
fee of the Real Property or against Tenant's interest in the Premises, then
Tenant, within fifteen (15) days of its notice or actual knowledge of such lien
or as soon thereafter as is reasonably practicable, shall commence the process
necessary to remove the same of record (by bonding or otherwise) and shall
continue with due diligence to effect such removal as soon thereafter as is
reasonably possible.  Landlord shall have the right to post and keep posted on
the Premises any notices which it deems necessary for protection from such liens.
If any such lien is filed and the same is not timely removed by Tenant as
provided above or Tenant is not diligently proceeding with its good faith efforts
to remove such lien of record as provided above, then Landlord may, after ten
(10) days' written notice to Tenant, without waiving its rights based on such
breach by Tenant and without releasing Tenant from any obligations hereunder, pay
and satisfy the same and in such event the sums so paid by Landlord shall be due
and payable by Tenant within thirty (30) days after Landlord's written demand
therefor, with interest from the date paid by Landlord through the date Tenant
pays Landlord, at the Interest Rate.

    13.  **Assignment and Subletting.**

    a.  **Landlord's Consent.**  Landlord's and Tenant's agreement with
regard to Tenant's right to transfer all or part of its interest in the Premises
is as expressly set forth in this Paragraph 13.  Tenant agrees that, except upon
Landlord's prior written consent, which consent Landlord agrees shall not
(subject to Landlord's rights under Paragraph 13.d. below) be unreasonably

withheld or delayed, neither this Lease nor all or any part of the leasehold interest created hereby shall, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, be assigned, mortgaged, pledged, encumbered or otherwise transferred by Tenant or Tenant's legal representatives or successors in interest (collectively an "assignment") and neither the Premises nor any part thereof shall be sublet or be used or occupied for any purpose by anyone other than Tenant (collectively, a "sublease"). Tenant agrees that any instrument by which Tenant assigns or sublets all or any portion of the Premises shall expressly provide that the subtenant or assignee may not further assign or sublet the assigned or sublet space without Landlord's prior written consent (which consent Landlord agrees shall not, subject to Landlord's rights under Paragraph 13.d. below, be unreasonably withheld), and that the assignee or subtenant will comply with all of the provisions of this Lease and that Landlord may enforce the Lease provisions directly against such assignee or subtenant. Except as otherwise provided herein, any assignment or subletting without Landlord's prior written consent shall, at Landlord's option, be void and shall constitute an Event of Default entitling Landlord to terminate this Lease and to exercise all other remedies provided in Paragraph 25 of this Lease.

In determining whether to approve a proposed assignment or sublease, Landlord shall place primary emphasis on the ability of the proposed transferee to meet its monetary and other obligations under the sublease, the character of the business to be conducted by the proposed transferee at the subject premises and the effect of such assignment or subletting on the first-class character of the Building.  In no event shall Landlord be obligated to consent to an assignment or subletting which materially increases (a) the operating costs for the Building, (b) the burden on the Building services, or (c) the foot traffic, elevator usage or security concerns in the Building, or creates an increased probability of the comfort and/or safety of the Landlord and other tenants in the Building being unreasonably compromised or reduced (for example, but not exclusively, Landlord may deny consent to an assignment or subletting where the space will be used for a school or training facility, an entertainment, sports or recreation facility, retail sales to the public (unless Tenant's permitted use is retail sales), a personnel or employment agency, or an embassy or consulate or similar office).  Landlord shall not be obligated to approve an assignment or subletting to a current tenant of the Building if Landlord has available space in the Building that meets such tenant's needs or to a prospective tenant of the Building with whom Landlord is then negotiating with regard to space in the Building that meets such prospective tenant's needs.  Landlord's foregoing rights and options shall continue throughout the entire term of this Lease.

For purposes of this Paragraph 13, the following events shall be deemed an assignment or sublease, as appropriate:  (i) the issuance of equity interests (whether stock, partnership interests or otherwise) in Tenant or any subtenant or assignee, or any entity controlling any of them, to any person or group of related persons, in a single transaction or a series of related or unrelated transactions, such that, following such issuance, such person or group shall have Control (as defined below) of Tenant; or (ii) a transfer of Control of Tenant or any subtenant or assignee, or any entity controlling any of them, in a single transaction or a series of related or unrelated transactions (including, without limitation, by consolidation, merger, acquisition or reorganization), except that the transfer of outstanding capital stock or other listed equity interests by persons or parties other than "insiders" within the meaning of the Securities Exchange Act of 1934, as amended, through the "over-the-counter" market or any recognized national or international securities exchange, shall not be included in determining whether Control has been transferred.  "Control" shall mean direct or indirect ownership of 50% or more of all of the voting stock of such corporation or 50% or more of all the legal and equitable interest in any other business entity.  In furtherance of the foregoing, it is expressly agreed that a public offering of the stock of Tenant or any Affiliate thereof in occupancy of the Premises pursuant to Paragraph 13.g. shall not constitute an assignment of this Lease for purposes of this Paragraph 13.

If this Lease is assigned, whether or not in violation of the terms of this Lease, Landlord may collect rent from the assignee.  If the Premises or any part thereof is sublet, Landlord may, upon an Event of Default by Tenant hereunder, collect rent from the subtenant.  In either event, Landlord may apply the amount collected from the assignee or subtenant to Tenant's monetary obligations hereunder.

The consent by Landlord to an assignment or subletting hereunder shall not relieve Tenant or any assignee or subtenant from obtaining Landlord's express prior written consent to any other or further assignment or subletting, which consent shall not, subject to Landlord's rights under Paragraph 13.d. below, be unreasonably withheld. Neither an assignment or subletting nor the collection of rent by Landlord from any person other than Tenant, nor the application of any such rent as provided in this Paragraph 13.a. shall be deemed a waiver of any of the provisions of this Paragraph 13.a. or release Tenant from its obligation to comply with the provisions of this Lease and Tenant shall remain fully and primarily liable for all of Tenant's obligations under the Lease. If Landlord approves of an assignment or subletting hereunder and this Lease contains any renewal options, expansion options, rights of first refusal, rights of first negotiation or any other rights or options pertaining to additional space in the Building, such rights and/or options may be transferred by Tenant to an assignee but may not be transferred by Tenant to any subtenant other than a subtenant that is an Affiliate of Tenant pursuant to Paragraph 13.g. below.

b. **Processing Expenses.** Tenant shall pay to Landlord, within ten (10) days after Landlord's demand, the amount of Landlord's cost of processing each proposed assignment or subletting (including, without limitation, attorneys' and other professional fees, and the cost of Landlord's administrative, accounting and clerical time) (collectively "Processing Costs"), provided, however, that the Processing Costs shall not exceed ████████████████ proposed assignment or subletting, and the amount of all direct and indirect expense incurred by Landlord arising from the assignee or sublessee taking occupancy of the subject space (including, without limitation, costs of freight elevator operation for moving of furnishings and trade fixtures, security service, janitorial and cleaning service, and rubbish removal service).

c. **Consideration to Landlord.** In the event of any assignment or sublease, except with respect to an assignment or sublease pursuant to Paragraph 13.g. or 13.h., Landlord shall be entitled to receive, as additional rent hereunder, (i) in the case of an assignment, ████████████████ consideration paid by the assignee for the assignment and, (ii) in the case of a sublease, ████████████ of the excess of the amount of rent payable for the sublet space by the subtenant (such rent to include all consideration paid for the sublet space, including, without limitation, payment for leasehold improvements) over the total amount of Monthly Rent under Paragraph 5 hereof and Additional Rent under Paragraph 7 hereof; except that Tenant may first recapture, any brokerage commissions paid by Tenant in connection with the subletting or assignment (not to exceed commissions typically paid in the market at the time of such subletting or assignment), Tenant's reasonable costs of advertising the space for sublease or assignment, any improvement allowance paid by Tenant to the subtenant or assignee or other economic concession (planning allowance, moving expenses, etc.) paid by Tenant to the subtenant or assignee, any free-rent period under the sublease (not to exceed the length of free-rent periods typically granted in the market at the time of the subletting), and reasonable legal fees paid by Tenant in connection with such assignment or subletting (not to exceed ████████████████) in legal fees for any single proposed assignment or subletting) (collectively the "Assignment or Subletting Costs"), provided that, as a condition to Tenant recapturing the Assignment or Subletting Costs, Tenant shall provide to Landlord, within one hundred twenty (120) days of Landlord's execution of Landlord's consent to the assignment or subletting, a detailed accounting of the Assignment or Subletting Costs and supporting documents, such as receipts and construction invoices. After Tenant has recaptured the Assignment or Subletting Costs, Tenant shall deduct from the monthly amounts subsequently received by Tenant from the subtenant or assignee as rent or consideration the Monthly Rent and Additional Rent payable by Tenant to Landlord for the subject space and ████████████ of the then remaining sum shall be paid promptly to Landlord.

REDACTED

d. **Procedures.** Except with respect to an assignment or subletting pursuant to Paragraph 13.g. below or an office sharing arrangement pursuant to Paragraph 13.h. below, if Tenant desires to assign this Lease or any interest therein or sublet all or part of the Premises, Tenant shall give Landlord written notice thereof designating the space proposed to be sublet and the terms proposed. Landlord shall have the prior right and option (to be exercised by written notice to Tenant given within fifteen (15) days after receipt of Tenant's notice) (i) to sublet from Tenant any portion of the Premises

proposed by Tenant to be sublet, for the term for which such portion is proposed to be sublet, but at the same rent (including additional rent as provided for in Paragraph 7 hereof) as Tenant is required to pay to Landlord under this Lease for the same space, computed on a pro rata footage basis, and during the term of such sublease Tenant shall be released of its obligations under the Lease with regard to the subject space, (ii) in the event of an assignment of the Lease, or a subletting of more than ▓▓▓▓▓▓▓▓▓▓▓ of the Premises for a lease term that expires during the final eighteen (18) months of the initial Lease term (or if Tenant has exercised a renewal option, then during the final eighteen (18) months of the subject renewal period), to terminate this entire Lease in the case of an assignment and, in the event of any such sublease, terminate the Lease as it pertains to the portion of the Premises so proposed by Tenant to be sublet, or (iii) to approve Tenant's proposal to sublet conditional upon Landlord's subsequent written approval of the specific sublease obtained by Tenant and the specific subtenant named therein. If Landlord exercises its option in (i) above, then Landlord may, at Landlord's sole cost, construct improvements in the subject space on the condition that, upon the termination of the sublease, Landlord shall return the subject space to Tenant in substantially the same condition as received by Landlord (i.e., prior to the making of such improvements by Landlord), ordinary wear and tear excepted. Further, notwithstanding anything to the contrary in Paragraph 9.b. hereof, if Landlord exercises its option in (i) or (ii) above, in no event shall Tenant be required at the expiration of the Lease term to remove any improvements constructed by Landlord in the subject space. If Landlord exercises its option described in (iii) above, Tenant shall submit to Landlord for Landlord's written approval (which shall be granted or denied by Landlord pursuant to the provisions of this Paragraph 13 within fifteen (15) days of Landlord's receipt of the required information) Tenant's proposed sublease agreement (in which the proposed subtenant shall be named) together with a current financial statement of such proposed subtenant. If Landlord fails to exercise any aforesaid option to sublet or to terminate, this right shall not be construed as or constitute a waiver of any of the provisions of Paragraphs 13.a., b., c. or d. herein. If Landlord exercises any such option to sublet or to terminate, Landlord shall not have any liability for any real estate brokerage commission(s) or with respect to any of the costs and expenses that Tenant may have incurred in connection with its proposed subletting, and Tenant agrees to indemnify, defend and hold harmless Landlord from and against any and all claims (including, without limitation, claims for commissions) arising from such proposed subletting. Landlord's foregoing rights and options shall continue throughout the entire term of this Lease. For purposes of this Paragraph 13.d., a proposed assignment of this Lease in whole or in part shall be deemed a proposed subletting of such space.

e. **Documentation**. No permitted subletting by Tenant shall be effective until there has been delivered to Landlord a counterpart of the sublease in which the subtenant agrees to be and remain jointly and severally liable with Tenant for the payment of rent pertaining to the sublet space and for the performance of all of the terms and provisions of this Lease from and after the effective date thereof; provided, however, that the subtenant shall be liable to Landlord for rent only in the amount set forth in the sublease. No permitted assignment shall be effective unless and until there has been delivered to Landlord a counterpart of the assignment in which the assignee assumes all of Tenant's obligations under this Lease arising on or after the date of the assignment. The failure or refusal of a subtenant or assignee to execute any such instrument shall not release or discharge the subtenant or assignee from its liability as set forth above.

f. **No Merger**. Without limiting any of the provisions of this Paragraph 13 and with the provisions of Paragraph 13.c. and 13.d. being inapplicable, if Tenant has entered into any subleases of any portion of the Premises, the voluntary or other surrender of this Lease by Tenant, or a mutual cancellation by Landlord and Tenant, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subleases or subtenancies or, at the option of Landlord, operate as an assignment to Landlord of any or all such subleases or subtenancies.

g. **Affiliates**. Notwithstanding anything to the contrary in Paragraphs 13.a. and 13.d., but subject to Paragraph 13.f., Tenant may assign this Lease or sublet the Premises or any portion thereof, without Landlord's consent (and with the provisions of Paragraph 13.c. and the recapture rights of

23

Paragraphs 13.d.(1) and (ii) being inapplicable), to any partnership, corporation or other entity which controls, is controlled by, or is under common control with Tenant or Tenant's parent (control being defined for such purposes as ownership of at least 50% of the equity interests in, or the power to direct the management of, the relevant entity) or to any partnership, corporation or other entity resulting from a merger or consolidation with Tenant or Tenant's parent, or to any person or entity which acquires substantially all the assets of Tenant as a going concern (either directly or indirectly through the acquisition of all or substantially all of the stock of Tenant) (collectively, an "Affiliate"), provided that (i) Landlord receives prior written notice of an assignment or subletting, (ii) the business to be conducted by the Affiliate is substantially the same as that of Tenant or otherwise of a type consistent with the use of the Building as a first-class office Building, (iii) the Affiliate remains an Affiliate for the duration of the term or the balance of the term in the event of an assignment, (iv) the Affiliate assumes (in the event of an assignment) in writing all of Tenant's obligations under this Lease and (v) Landlord receives a fully executed copy of an assignment or sublease agreement between Tenant and the Affiliate.

h. **Shared Space Arrangement.** Notwithstanding anything to the contrary in this Paragraph 13, Tenant may from time to time permit clients of Tenant or other persons with whom Tenant has an ongoing business association to use a portion of the Premises and such use shall not be deemed to be a sublease so long as (i) no more than ▓▓ rentable square feet of the Premises is so used at any one time, and (ii) the space occupied by such parties is not separately demised from the balance of the Premises (i.e. separated from the balance of the space by a wall or other constructed device and having separate entrances to the common areas). The rights set forth in this paragraph are personal to Lehman Brothers Inc. and shall not inure to the benefit of any successor, assignee or subtenant of Tenant other than an Affiliate as defined in Paragraph 13.g. above. Any persons or entities occupying space in the Premises pursuant to this Paragraph 13.h. shall comply with with the rules and regulations of the Building and Tenant shall be fully responsible for the conduct of such parties within the Premises and the Real Property. Upon Landlord's request, Tenant shall supply Landlord with the terms of such space sharing arrangement.

14. **Indemnification.**

a. Landlord and the holders of any Superior Interests (as defined in Paragraph 21 hereof) shall not be liable to Tenant and Tenant hereby waives all claims against such parties for any loss, injury or other damage to person or property in or about the Premises or the Real Property from any cause whatsoever, including without limitation, water leakage of any character from the roof, walls, basement or other portion of the Premises or the Real Property, or gas, fire, explosion or other electricity within the Premises or the Real Property, or acts of other tenants of the Building; provided, however, that the foregoing waiver shall be inapplicable to any loss, injury or damage resulting directly from Landlord's gross negligence or willful misconduct or the negligence or willful misconduct of Landlord's Contractor in the performance of Landlord's Work.

b. Subject to Paragraph 16 below, Tenant shall hold Landlord and the holders of any Superior Interest, and the constituent shareholders, partners or other owners thereof, and all of their agents, contractors, servants, officers, directors, employees and licensees (hereinafter collectively called the "Indemnitees") harmless from and indemnify the Indemnitees against any claims, liability, damages, costs or expenses (but expressly excluding consequential damages, except for those consequential damages expressly provided for in Paragraph 20.c. below with regard to a holding over by Tenant at the Premises), including reasonable attorneys' fees and costs incurred in defending against the same ("Claims"), to the extent arising from (a) the acts or omissions of Tenant, Tenant's employees, agents, contractors, licensees, subtenants, customers, guests or invitees in or about the Real Property, or (b) any construction or other work undertaken by Tenant on the Premises, whether prior to or during the term of this Lease, or (c) any breach or Event of Default under this Lease by Tenant, or (d) any accident, injury or damage, howsoever caused, to any person or property, occurring in or about the Premises; except for such Claims to the extent they are caused directly by the gross negligence or willful acts or

omissions of Landlord or its authorized representatives. In case any action or proceeding be brought against any of the Indemnitees by reason of any such claim or liability, Tenant, upon notice from Landlord, covenants to resist and defend at Tenant's sole expense such action or proceeding by counsel reasonably satisfactory to Landlord. The provisions of this Paragraph 14.b. shall survive the termination of this Lease with respect to any injury, illness, death or damage occurring prior to such termination.

c.  Subject to Paragraph 16 below, Landlord shall hold Tenant and Tenant's partners, agents, contractors, servants, licensees, subtenants and employees ("Tenant's Indemnitees") harmless from and against any and all Claims incurred in connection with or arising from any injury, illness, or death to any person or damage to any property or from any other cause whatsoever occurring in, on or about any part of the Real Property when such injury, illness, death or damage shall be caused by the negligent acts or omissions of Landlord, its agents, contractors, partners, servants, officers, directors, licensees or employees, except to the extent caused by the negligence or willful misconduct of Tenant's Indemnitees. The provisions of this Paragraph 14.c. shall survive the termination of this Lease with respect to any injury, illness, death or damage occurring prior to such termination. In case any action or proceeding be brought against Tenant or Tenant's agents and employees by reason of any such Claim, Landlord, upon notice from Tenant, covenants to resist and defend at Landlord's sole expense such action or proceeding by counsel reasonably satisfactory to Tenant. Notwithstanding anything to the contrary set forth in this Paragraph 14.c. or elsewhere in this Lease, in no event shall Landlord be liable for any consequential or remote damages, or for loss of or damage to artwork, currency, jewelry, bullion, securities or other property in the Premises, not in the nature of ordinary fixtures, furnishings, equipment and other property used in general business office activities and functions.

15.  Insurance.

a.  Tenant's Insurance.  Tenant shall, at Tenant's expense, maintain during the term of this Lease (and, if Tenant shall occupy or conduct activities in or about the Premises prior to or after the term hereof, then also during such pre-term or post-term period):  (i) commercial general liability insurance including contractual liability coverage, with a minimum coverage of

**REDACTED**

████████████████████████ umbrella, for injuries to, or illness or death of, persons and damage to property occurring in or about the Premises or otherwise resulting from Tenant's operations in the Building, (ii) property insurance protecting Tenant against loss or damage by fire and such other risks as are insurable under then-available standard forms of "all risk" insurance policies (excluding earthquake and flood but including water damage), covering Tenant's property in or about the Premises or the Real Property and also covering any fixtures that may belong to Tenant and any Alterations not in the nature of ordinary office improvements, but excluding the improvements existing in the Premises as of the date of Tenant's initial occupancy of the Premises, for the full replacement value thereof without deduction for depreciation; and (iii) workers' compensation insurance in statutory limits.  The above described commercial general liability insurance shall protect Tenant, as named insured, and Landlord and all the Indemnitees and any other parties designated by Landlord, as additional insureds; shall insure Landlord's and such other parties' contingent liability with regard to acts or omissions of Tenant; and shall specifically include all liability assumed by Tenant under this Lease (provided, however, that such contractual liability coverage shall not limit or be deemed to satisfy Tenant's indemnity obligations under this Lease).  Landlord reserves the right to increase the foregoing amount of liability coverage from time to time as Landlord determines is required to adequately protect Landlord and the other parties designated by Landlord from the matters insured thereby.

b.  Policy Form.  Each insurance policy required pursuant to this Paragraph 15 shall be issued by an insurance company licensed to do business in the State of California and approved by Landlord. Each insurance policy, other than Tenant's workers' compensation insurance, shall (i) provide that it may not be materially changed, cancelled or allowed to lapse unless thirty (30) days' prior written notice to Landlord and any other insureds designated by Landlord is first given, and (ii) provide that no act or omission of Tenant shall affect

**REDACTED**

or limit the obligations of the insurer with respect to any other insured. Each such insurance policy or a certificate thereof shall be delivered to Landlord by Tenant on or before the effective date of such policy and thereafter Tenant shall deliver to Landlord renewal policies or certificates at least thirty (30) days prior to the expiration dates of expiring policies. If Tenant fails to procure such insurance or to deliver such policies or certificates, Landlord may, at its option, procure the same for Tenant's account, and the cost thereof shall be paid to Landlord by Tenant upon demand.

Nothing in this Paragraph 15 shall be construed as creating or implying the existence of (i) any ownership by Tenant of any fixtures, additions, Alterations, or improvements in or to the Premises or (ii) any right on Tenant's part to make any addition, Alteration or improvement in or to the Premises.

c.   Landlord's Insurance.  During the term hereof, Landlord shall keep the Building and all Tenant Improvements to the Premises made pursuant to Paragraph 4 hereof (but excluding any Alterations made pursuant to Paragraph 9 hereof that are not in the nature of ordinary office improvements, and any personal property, fixtures, office equipment, furniture, artwork and other decoration not affixed to and a part of the Building) insured through reputable insurance underwriters against perils covered by a standard "all risk" insurance policy or policies as such policies are in use as of the date of this Lease (excluding perils such as earthquake, flood and other standard "all risk" policy form exclusions), if such a policy is reasonably available, with a deductible provision, if any, that does not materially exceed that which prudent, efficient operators of first-class high-rise office buildings in the downtown San Francisco financial district would carry from time-to-time in the exercise of reasonable business judgment, in an amount or amounts equal to not less than ███████████ ███ of the full replacement value of the Building (excluding the land and the footings, foundations and installations below the basement level) and the Tenant Improvements made pursuant to Paragraph 4 hereof, without deduction for depreciation, including the costs of demolition and debris removal, or such other fire and property damage insurance as Landlord shall reasonably determine to give substantially equal or greater protection. During the term hereof, Landlord shall keep in force general liability insurance in the amount and coverage as Landlord deems commercially reasonable.

16.   Mutual Waiver of Subrogation Rights.  Each party hereto hereby releases the other respective party and, in the case of Tenant as the releasing party, the other Indemnitees identified in Paragraph 14 hereof, and the respective partners, shareholders, agents, employees, officers, directors and authorized representatives of such released party, from any claims such releasing party may have for damage to the Building, the Premises or any of such releasing party's fixtures, personal property, improvements and alterations in or about the Premises, the Building or the Real Property that is caused by or results from risks insured against under any fire and extended coverage insurance policies actually carried by such releasing party or deemed to be carried by such releasing party; provided, however, that such waiver shall be limited to the extent of the net insurance proceeds payable by the relevant insurance company with respect to such loss or damage. For purposes of this Paragraph 16, Landlord and Tenant shall be deemed to be carrying any of the insurance policies that they are required to carry pursuant to Paragraph 15 but do not actually carry. Each party hereto shall cause each such fire and extended coverage insurance policy obtained by it to provide that the insurance company waives all rights of recovery by way of subrogation against the other respective party and the other aforesaid released parties in connection with any matter covered by such policy.

17.   Utilities.

a.   Description of Utilities and Services.  Landlord shall furnish to the Premises during the period from 8 A.M. to 6 P.M. ("Business Hours") Monday through Friday (except public holidays, which public holidays presently are New Years Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and Christmas) ("Business Days") and from 8 A.M. to 1 P.M. on Saturday (except public holidays) ("Regular Saturday Hours"), and subject to the Rules and Regulations of the Building and to applicable governmental laws or agencies or the rules or actions of the public utility company furnishing the service, the following: (i) electricity for lighting and power in the Premises

totalling 1.06 kilowatts per rentable square foot of the Premises per month; (ii) heat and air conditioning required for the comfortable use and occupancy of the Premises for ordinary office purposes; (iii) water for restroom and drinking purposes; (iv) elevator service (by a number of elevators adequate to provide a level of service to the Premises appropriate for a first-class office building, provided that in no event may the number of elevators serving the Premises be reduced from the number of elevators serving the Premises as of the date of this Lease if such reduction would materially increase the length of time that passengers have to wait to obtain an elevator either in the lobby of the Building or in 30th floor lobby) by nonattended automatic elevators for general office pedestrian usage; (v) janitorial services as required to maintain the Premises in a clean and orderly condition consistent with other first-class office buildings in the San Francisco financial district; and (vi) window washing at least two (2) times a year. Further, Tenant may use the Building's chilled water for Tenant's supplemental air conditioning system at no additional cost to Tenant for such water and with no "tap-in" charges (although the cost of making and maintaining any such connections and the cost of electricity used to pump the water to the Premises (as monitored by separate meter) shall be borne entirely by Tenant). Landlord acknowledges that Tenant's supplemental air conditioning system may require up to 30 tons of capacity and that Tenant estimates the condenser water requirements to be 135 gallons per minute at 85 degrees EWT maximum. Tenant agrees to keep closed, when necessary, draperies which, because of the sun's position, must be closed to provide for the efficient operation of the air conditioning system, and Tenant agrees to cooperate with Landlord and to abide by the regulations and requirements which Landlord may prescribe for the proper functioning and protection of the heating, ventilating and air conditioning system.    If Tenant requires heating, ventilating and air conditioning to the Premises other than during Business Hours on Business Days or during Regular Saturday Hours, Landlord shall, upon Tenant's request given not later than 3 P.M. of the Business Day on which Tenant requires the after hour service, and not later than 3 P.M. on the Friday before any Saturday or Sunday on which Tenant requires such service, and not later than 3 P.M. of the day before any holiday on which Tenant requires such service, furnish such heating, ventilating and air conditioning. If Tenant requests and receives such services, then Tenant shall pay, upon demand, for the number of hours so requested by Tenant, an amount equal to Tenant's proportionate share of the actual out-of-pocket direct cost to Landlord in providing the heating, ventilating and air conditioning to Tenant and all other tenants of the Building requesting such services at such time.  Notwithstanding the above, (subject to any temporary shutdown for repairs, for security purposes, for compliance with any legal restrictions, or due to strikes, lockouts, labor disputes, fire or other casualty, acts of God, or other causes beyond the reasonable control of Landlord) (A) Tenant shall have access to the Premises 24 hours a day, each day of the Lease term, (B) the services described in (iii) and (iv) above shall be provided to the Premises 24 hours a day, each day of the Lease term, without additional charge to Tenant, and (C) subject to the provisions of Paragraph 17.b. below regarding Tenant's payment for after-hour services and utilities, the services described in (i) and (ii) above shall be available to the Premises 24 hours a day, each day of the Lease term.

b.  **Payment for Excess Utilities and Services.**  All services and utilities for the Premises not required to be furnished by Landlord pursuant to the first sentence of Paragraph 17.a. shall be paid for by Tenant.  If Tenant requires, on a regular basis, water, heat, air conditioning, electric current, elevator or janitorial service in excess of that provided for in the first sentence of Paragraph 17.a., Tenant shall first obtain the written consent of Landlord which consent Landlord agrees shall not be unreasonably withheld or delayed.   In the event of such excess use, Landlord may install an electric current or water meter (including, without limitation, any additional wiring, conduit or panel required therefor) to measure the excess electric current or water consumed by Tenant or may cause the excess usage to be measured by other reasonable methods (e.g. by temporary "check" meters or by survey). Tenant shall pay to Landlord upon demand (i) the cost of any and all water, heat, air conditioning, electric current, janitorial, elevator or other services or utilities required to be furnished to Tenant in excess of the services and utilities required to be furnished by Landlord as provided in the first sentence of Paragraph 17.a. (provided that the charge for any such excess use shall be allocated ratably among all tenants requesting the excess service or utility

during the applicable period); (ii) the cost of installation, maintenance and repair of any meter installed in the Premises; (iii) the cost of all electricity consumed by Tenant in connection with any dedicated heating, ventilating and/or air conditioning, computer power and/or air conditioning, telecommunications or other special systems of Tenant, including any power usage other than through existing standard 110-volt AC outlets; and (iv) any cost incurred by Landlord in keeping account of or determining such excess utilities or services furnished to Tenant; including, without limitation, the cost of installing and maintaining meters therefor. Landlord's failure to bill Tenant for any such excess utilities or services shall not waive Landlord's right to bill Tenant for the excess at a later time.  All "costs" referred to in this Paragraph 17.b. shall mean Landlord's direct, out-of-pocket costs, without profit. Any disagreement between Landlord and Tenant as to amounts required to be paid by Tenant to Landlord under this Paragraph 17.b. shall be arbitrated pursuant to Paragraph 53 below.

c.  **Temperature Balance**.  Landlord makes no representation to Tenant regarding the adequacy or fitness of the heating, air conditioning or ventilation equipment in the Building to maintain temperatures that may be required for, or because of, any of Tenant's equipment which uses other than the fractional horsepower normally required for office equipment, and Landlord shall have no liability for loss or damage suffered by Tenant or others in connection therewith.

d.  **Special Electrical or Water Connections**.  Tenant will not connect or use any apparatus or device in the Premises (i) using current in excess of 110 volts or (ii) which will cause the amount of electricity, water, heating, air conditioning or ventilation furnished to the Premises to exceed any limits established in Paragraph 17.a.  Tenant shall not connect with electric current (except through existing outlets in the Premises or additional outlets that may be installed as a part of approved Alterations made pursuant to Paragraph 9 hereof) or water pipes any apparatus or device for the purpose of using electrical current or water.

Landlord will not permit additional coring of the floor of the Premises in order to install new electric outlets in the Premises unless Tenant furnishes Landlord with X-ray scans of the floor area where the Tenant wishes to place additional electrical outlets and Landlord, in its absolute discretion, is satisfied, on the basis of such X-ray scans and other information obtained by Landlord, that coring of the floor in order to install such additional outlets will not weaken the structure of the floor.

e.  **Interruption of Services**.  In the event of an interruption in, or failure or inability to provide any of the above described services or utilities (hereinafter an "Interruption"), such Interruption shall not constitute an eviction of Tenant, constructive or otherwise, or impose upon Landlord any liability whatsoever, including, but not limited to, liability for consequential damages or loss of business by Tenant, but Landlord shall use diligent efforts to correct any such Interruption as soon as reasonably possible. Notwithstanding the foregoing, if an Interruption is (i) within Landlord's reasonable control and continues for three (3) or more consecutive days after Tenant's written notice to Landlord that such Interruption has affected Tenant's use of the Premises, or (ii) outside Landlord's reasonable control and continues for thirty (30) or more consecutive days after Tenant's written notice to Landlord that such Interruption has affected Tenant's use of the Premises, and Tenant, in the exercise of its good faith and reasonable business judgment, is unable to and does not use a material portion of the Premises for Tenant's business purposes as a result thereof, then Tenant shall be entitled to an abatement of Monthly Rent under Paragraph 5 hereof and Additional Rent under Paragraph 7 hereof, which abatement shall be based on the extent of Tenant's inability to use the Premises. Further, if the Interruption is (i) within Landlord's reasonable control and continues for ninety (90) or more consecutive days after Tenant's written notice to Landlord that such Interruption has affected Tenant's use of the Premises, or (ii) outside Landlord's reasonable control and continues for one hundred twenty (120) or more consecutive days after Tenant's written notice to Landlord that such Interruption has affected Tenant's use of the Premises, and Tenant, in the exercise of its good faith and reasonable business judgment, is unable to and does not use a material portion of the Premises for Tenant's business purposes as a result thereof, then, Tenant may, upon written notice provided to Landlord before the Interruption is corrected, but in no event later than five (5) days after the

expiration of the relevant period, terminate this Lease as of the date specified
in such notice, which date shall be not more than thirty (30) days after the date
of such notice. Subject to Paragraph 16 above, if applicable, the abovementioned
rental abatement and lease termination rights shall be unavailable to Tenant if
the Interruption results from the negligence of wilfull misconduct of Tenant or
Tenant's agents, employees, contractors, licensees or invitees. Tenant hereby
waives the provisions of California Civil Code Section 1932(1) or any other
applicable existing or future law, ordinance or governmental regulation
permitting the termination of this Lease due to such Interruption, failure or
inability. Notwithstanding anything to the contrary above, the requirements set
forth above that Tenant advise Landlord in writing that an Interruption has
affected Tenant's use of the Premises shall be inapplicable if the Interruption
affects the entire Building so that Landlord will (or should) necessarily be
aware of such Interruption.  In such instance, the time periods provided for
above with regard to the abatement of rent and Tenant's termination rights shall
begin to run upon the commencement of the Interruption rather than upon the
delivery of any such written notice to Landlord.

    f.  **Governmental Controls.**   In the event any governmental
authority having jurisdiction over the Real Property or the Building promulgates
or revises any law, ordinance or regulation or building, fire or other code or
imposes mandatory or voluntary controls or guidelines on Landlord or the Real
Property or the Building relating to the use or conservation of energy or
utilities or the reduction of automobile or other emissions (collectively
"Controls") or in the event Landlord is required or elects to make alterations
to the Real Property or the Building in order to comply with such mandatory or
voluntary Controls, Landlord may, in its sole discretion, comply with such
Controls or make such alterations to the Real Property or the Building related
thereto; provided that in making any such alterations, Landlord shall use
reasonable efforts to minimize any disruption to Tenant's business in the
Premises.  Such compliance and the making of such alterations shall not
constitute an eviction of Tenant, constructive or otherwise, or impose upon
Landlord any liability whatsoever, including, but not limited to, liability for
consequential damages or loss of business by Tenant.

    18.  **Personal Property and Other Taxes.**  Tenant shall pay, at least ten
(10) days before delinquency, any and all taxes, fees, charges or other
governmental impositions levied or assessed against Landlord or Tenant (a) upon
Tenant's equipment, furniture, fixtures, improvements and other personal property
(including carpeting installed by Tenant) located in the Premises, (b) by virtue
of any Alterations made by Tenant to the Premises, and (c) upon this transaction
or any document to which Tenant is a party creating or transferring an interest
or an estate in the Premises.  If any such fee, charge or other governmental
imposition is paid by Landlord, Tenant shall reimburse Landlord for Landlord's
payment upon demand.

    19.  **Rules and Regulations.**  Tenant shall comply with the Rules and
Regulations set forth on **Exhibit B** attached hereto, as such Rules and Regulations
may be modified or amended by Landlord from time to time, provided such
amendments or modifications shall be reasonable and non-discriminatory, not
inconsistent with the terms of this Lease, enforced in a non-discriminatory
manner and shall not materially increase the burdens or obligations upon Tenant
or be used to prohibit the conduct of any business in the Premises which Tenant
is permitted to conduct pursuant to Paragraphs 2.g. and 8 hereof. Landlord shall
not be responsible to Tenant for the nonperformance by any other tenant or
occupant of the Building of any of the Rules and Regulations, provided that
Landlord shall use reasonable efforts to encourage such compliance.

    20.  **Surrender: Holding Over.**

    a.  **Surrender.**  Upon the expiration or other termination of this
Lease, Tenant shall surrender the Premises and all improvements and Alterations
to Landlord broom-clean and in their original condition, except for reasonable
wear and tear, damage from casualty or condemnation, work which is Landlord's
obligation under this Lease to repair or restore, and any changes resulting from
approved Alterations; provided, however, that prior to the expiration or
termination of this Lease Tenant shall remove from the Premises all of Tenant's
personal property and trade fixtures that Tenant is required by Landlord to
remove under the provisions of this Lease.  If such removal is not completed at

the expiration or other termination of this Lease, Landlord may remove the same at Tenant's expense. Any damage to the Premises or the Building caused by such removal shall be repaired promptly by Tenant or, if Tenant fails to do so, Landlord may do so and Landlord's direct, out-of-pocket expense in connection therewith shall be reimbursed by Tenant. The removal of Alterations from the Premises shall be governed by Paragraph 9 hereof. Tenant's obligations under this Paragraph shall survive the expiration or other termination of this Lease. Upon expiration or termination of this Lease or of Tenant's possession, Tenant shall surrender all keys to the Premises or any other part of the Building and shall make known to Landlord the combination of locks on all safes, cabinets and vaults that may be located in the Premises.

b.  **Holding Over.**  If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease with the express written consent of Landlord, Tenant's occupancy shall be a month-to-month tenancy at a rent agreed upon by Landlord and Tenant, but in no event less than the Monthly Rent and Additional Rent payable under this Lease during the last full month prior to the date of the expiration of the Lease. Except as provided in the preceding sentence, the month-to-month tenancy shall be on the terms and conditions of this Lease. Landlord's acceptance of rent after such holding over with Landlord's written consent shall not result in any other tenancy or in a renewal of the original term hereof. If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease without Landlord's consent, Tenant's continued possession shall be on the basis of a tenancy at sufferance and Tenant shall pay as Monthly Rent during the holdover period an amount equal to one hundred twenty-five percent (125%) of the Monthly Rent and Additional Rent payable under this Lease for the last full month prior to the date of such expiration.

c.  **Indemnification.**  Tenant shall indemnify and hold Landlord harmless from and against all claims, liability, damages, costs or expenses, including reasonable attorneys fees and costs of defending the same, incurred by Landlord and arising directly or indirectly from Tenant's failure to timely surrender the Premises, including (i) any rent payable by or any loss, cost, or damages, including lost profits, claimed by any prospective tenant of the Premises or any portion thereof, and (ii) Landlord's damages as a result of such prospective tenant rescinding or refusing to enter into the prospective lease of the Premises or any portion thereof by reason of such failure to timely surrender the Premises; provided, however, that such indemnification obligation shall be conditioned upon Landlord's having advised Tenant within thirty (30) days of the date Landlord required Tenant to surrender the Premises of the existence of a prospective successor tenant for the Premises.

21.  Subordination and Attornment.

a.  Landlord represents that it is the owner in fee of the Real Property and that as of the date hereof there are no existing ground or underlying leases affecting the Building or the Real Property or any part of either. Landlord shall provide Tenant with a non-disturbance and attornment agreement substantially in the form attached as Exhibit C hereto from Bank of America NT&SA and from any other holder of any mortgage, deed of trust, ground lease, underlying lease or like encumbrance affecting any part of the Real Property or any interest of Landlord therein (such encumbrances to the Real Property are referred to hereinafter as "Encumbrances") that exists as of the Commencement Date of this Lease. This Lease is expressly made subject and subordinate to those existing Encumbrances for which Tenant receives a non-disturbance agreement, without the necessity of any further documentation evidencing such subordination.

b.  If an Encumbrance is created following the Commencement Date of this Lease, then this Lease shall be automatically subject and subordinate to such Encumbrance upon delivery to Tenant of a non-disturbance agreement executed by the holder of the Encumbrance on Tenant's behalf which provides in content (i) that if Tenant is not in default under this Lease beyond any applicable grace period, the holder of the Encumbrance or any purchaser at a foreclosure sale or at a sale under a trustee's power of sale or any transferee designated in any deed given in lieu of foreclosure ("Successor") will recognize this Lease and Tenant's rights hereunder and will not disturb Tenant's possession hereunder pursuant to and in accordance with the terms of this Lease, (ii) if this Lease

is by operation of law terminated in a foreclosure, that a new lease will be entered into between Tenant and the Successor on the same terms as this Lease for the remaining term hereof, (iii) that Successor shall not be liable for any act or omission of Landlord (except that if Landlord's Contribution has not been disbursed pursuant to Paragraph 4 hereof prior to the date the Successor succeeds to Landlord's interest in the Lease, Successor shall be liable for the obligation to make Landlord's Contribution), shall not be subject to any offsets or defenses which Tenant might have against Landlord applicable to periods prior to such foreclosure or sale, shall not be bound by prepaid rent in excess of one month's rent or by a security deposit unless such amount is actually transferred to Successor, and shall not be bound by any agreement or modification of the Lease made without the written consent of the holder of the Encumbrance (but such requirement of written consent shall apply only to the Encumbrance holder that was a holder of the subject Encumbrance at the time the relevant agreement or modification was entered into), and (iv) such further matters as may be customarily and reasonably required by the holder of the Encumbrance.

c.   If the interest of Landlord in the Real Property or the Building is transferred to any person ("Purchaser") pursuant to or in lieu of proceedings for enforcement of any encumbrance, Tenant shall immediately attorn to the Purchaser, and this Lease shall continue in full force and effect as a direct lease between the Purchaser and Tenant on the terms and conditions set forth herein upon notice from Landlord of such transfer.   The holder of an Encumbrance that is superior to Tenant's leasehold interest is referred to elsewhere in this Lease as a "Superior Interest."

22.   **Financing Condition**.  If at any time or times Landlord desires to obtain financing for the Real Property, if any lender which intends to take, or is holding, a mortgage or deed of trust encumbering the Real Property should require, as a condition to such financing, execution by Tenant of an agreement requiring Tenant to send such lender written notice of any default by Landlord under this Lease, giving such lender the right to cure such default within any period afforded to Landlord to cure the same and preventing Tenant from terminating this Lease unless such default remains uncured after such period, then Tenant agrees to execute and deliver such agreement as required by such lender.  Tenant acknowledges and agrees that its failure to execute any such agreement required by such lender may cause Landlord serious financial damage by causing the failure of a financing transaction and Landlord shall have all of its rights and remedies under Paragraph 25 hereof, including its right to damages caused by the loss of said financing, if Tenant shall fail or refuse to execute any such agreement.

23.   **Entry by Landlord**.  Landlord may, at any and all reasonable times, and upon reasonable advance notice (provided that no advance notice need be given if an emergency necessitates an immediate entry or prior to entry to provide routine janitorial services), enter the Premises to (a) inspect the same and to determine whether Tenant is in compliance with its obligations hereunder, (b) supply janitorial and any other service Landlord is required to provide hereunder, (c) show the Premises to prospective purchasers or, during the final eighteen (18) months of the Lease term, to prospective tenants, (d) post notices of nonresponsibility, and (e) alter, improve or repair the Premises or any portion of the Real Property. In connection with any such alteration, improvement or repair, Landlord may erect in the Premises or elsewhere in the Real Property scaffolding and other structures reasonably required for the work to be performed.  Upon completion of the work, Landlord shall repair any damage caused to the Premises in connection therewith.  In no event shall Tenant's rent abate as a result of any such entry or work; provided, however, that all such work shall be done in such a manner as to cause as little interference to Tenant as reasonably possible.  Further, Landlord will endeavor (to the extent reasonably possible taking into account the type of work being done in the Premises) to minimize the size of Landlord's work area within the Premises and to store Landlord's working materials outside of the Premises.  In exercising Landlord's right of entry, Landlord shall comply with Tenant's reasonable security regulations of which Landlord has been advised in writing and which do not unreasonably interfere with Landlord's rights hereunder. Except in the event of Landlord's gross negligence or willful misconduct, Landlord shall not be liable in any manner for any inconvenience, loss of business or other damage to Tenant or other persons arising out of Landlord's entry on the Premises as provided in this paragraph.  Landlord shall at all times retain a key with which to unlock

all of the doors in the Premises, except Tenant's vaults and safes.  If an emergency necessitates immediate access to the Premises, Landlord may use whatever force is necessary to enter the Premises and any such entry to the Premises shall not constitute a forcible or unlawful entry into the Premises, a detainer of the Premises, or an eviction of Tenant from the Premises, or any portion thereof.

If necessary to avoid an interruption in Tenant's business, Tenant may require Landlord to perform maintenance, repairs or improvements in the Premises during non-business hours (unless performance of the work during business hours is required because of an emergency); provided, however, if the foregoing necessitates Landlord to incur excess costs for over-time or after-hour labor, Tenant shall, after notice from Landlord that such excess costs will be required, either agree to reimburse Landlord for such excess costs or allow Landlord to perform the work during regular business hours.

24.  Insolvency or Bankruptcy.  The occurrence of any of the following shall constitute an Event of Default under Paragraph 25 hereof:

a.  Tenant ceases doing business as a going concern, makes an assignment for the benefit of creditors, is adjudicated an insolvent, files a petition (or files an answer admitting the material allegations of such petition) seeking for Tenant any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any state or federal bankruptcy or other law, or Tenant consents to or acquiesces in the appointment, pursuant to any state or federal bankruptcy or other law, of a trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets;

b.  Tenant fails within sixty (60) days after the commencement of any proceedings against Tenant seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any state or federal bankruptcy or other law, to have such proceedings dismissed, or Tenant fails, within sixty (60) days after an appointment pursuant to any state or federal bankruptcy or other law without Tenant's consent or acquiescence, of any trustee, receiver or liquidator for the Premises, for Tenant or for all or any substantial part of Tenant's assets, to have such appointment vacated;

c.  Tenant is unable, or admits in writing its inability, to pay its debts as they mature;

d.  Tenant gives notice to any governmental body of its insolvency or pending insolvency, or of its suspension or pending suspension of operations.

Unless prohibited by applicable law, in no event shall this Lease be assigned or assignable by reason of any voluntary or involuntary bankruptcy proceedings, nor shall any rights or privileges hereunder be an asset of Tenant, the trustee, debtor-in-possession, or the debtor's estate in any bankruptcy, insolvency or reorganization proceedings.

25.  Default and Remedies.

a.  Events of Default.  The occurrence of any of the following shall constitute an "Event of Default" by Tenant:

1.  Tenant fails to pay Monthly Rent or any regular installment of Additional Rent within five (5) days of written notice from Landlord that such sum is due.

2.  Tenant fails to pay any other sum due under this Lease within fifteen (15) days of written notice from Landlord that such sum is due. However, if Landlord is entitled to give written notice to Tenant under this Paragraph 25.a.2. and Landlord actually gives two (2) such notices, then thereafter the period within which Tenant must cure any subsequent default in the payment of any sums covered by the immediately foregoing sentence after written notice from Landlord shall be five (5) days until a period of twelve (12) months passes during which Landlord does not give a written notice under this Paragraph

32

25.a.2. following a default by Tenant hereunder, at which time the fifteen (15) day cure period shall again apply.

3. Tenant fails to deliver any estoppel certificate requested by Landlord within the period described in Paragraph 29 hereof.

4. Tenant violates the bankruptcy and insolvency provisions of Paragraph 24 hereof.

5. Tenant fails to comply with any other provision of this Lease in the manner required within thirty (30) calendar days after written notice of such failure (or if the noncompliance cannot by its nature be cured within the 30-day period, if Tenant fails to commence to cure such noncompliance within the 30-day period and thereafter diligently prosecute such cure to completion). The parties acknowledge that the "time of the essence" clause set forth in Paragraph 37 of this Lease is not intended to reduce the time period within which Tenant is required to cure any noncompliance that is covered by the parenthetical in the immediately preceding sentence, it being agreed that Tenant shall be afforded such time period as is reasonably required for the cure of such noncompliance provided that Tenant continues to diligently prosecute such cure to completion.

b. Remedies. Upon the occurrence of an Event of Default Landlord shall have the following remedies, which shall not be exclusive but shall be cumulative and shall be in addition to any other remedies now or hereafter allowed by law:

1. Landlord may terminate Tenant's right to possession of the Premises at any time by five (5) days prior written notice to Tenant. Tenant expressly acknowledges that in the absence of such written notice from Landlord, no other act of Landlord, including, but not limited to, its re-entry into the Premises, its efforts to relet the Premises, its reletting of the Premises for Tenant's account, its storage of Tenant's personal property and trade fixtures, its acceptance of keys to the Premises from Tenant or its exercise of any other rights and remedies under this Paragraph 25, shall constitute an acceptance of Tenant's surrender of the Premises or constitute a termination of this Lease or of Tenant's right to possession of the Premises.

Upon such termination in writing of Tenant's right to possession of the Premises, this Lease shall terminate and Landlord shall be entitled to recover damages from Tenant as provided in California Civil Code Section 1951.2 or any other applicable existing or future law, ordinance or regulation providing for recovery of damages for such breach, including but not limited to the following:

(i) The reasonable cost of recovering the Premises; plus

(ii) The reasonable cost of removing the trade fixtures and improvements (other than the Tenant Improvements described in Paragraph 4.a. above) from the Premises; plus

(iii) All unpaid rent due or earned hereunder prior to the date of termination, less the proceeds of any reletting or any rental received from subtenance prior to the date of termination applied as provided in Paragraph 25.b.2. below, together with interest at the Interest Rate specified in Paragraph 5.c. of this Lease, on such sums from the date such rent is due and payable until the date of the reward of damages; plus

(iv) The amount by which the rent which would be payable by Tenant hereunder, including Additional Rent under Paragraph 7 hereof, as reasonably estimated by Landlord, from the date of termination until the date of the award of damages, exceeds the amount of such rental loss as Tenant proves could have been reasonably avoided together with interest at the Interest Rate specified in Paragraph 5 hereof on such sums from the date such rent is due and payable until the date of the award of damages; plus

(v) The amount by which the rent which would be payable by Tenant hereunder, including Additional Rent under Paragraph 7 hereof, as reasonably estimated by Landlord, for the remainder of the then term, after the date of the award of damages exceeds the amount such rental loss as Tenant proves

could have been reasonably avoided, discounted at the discount rate published by the Federal Reserve Bank of San Francisco for member banks at the time of the award plus one percent (1%); plus

(vi)   Such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

2.   Landlord may continue this Lease in full force and effect and may enforce all of its rights and remedies under this Lease, including, but not limited to, the right to recover rent as it becomes due.   During the continuance of an Event of Default, Landlord may enter the Premises without terminating this Lease and sublet all or any part of the Premises for Tenant's account to any person, for such term (which may be a period beyond the remaining term of this Lease), at such rents and on such other terms and conditions as Landlord deems advisable.   In the event of any such subletting, rents received by Landlord from such subletting shall be applied (i) first, to the payment of the costs of maintaining, preserving, altering and preparing the Premises for subletting, the other costs of subletting, including but not limited to brokers' commissions, attorneys' fees and expenses of removal of Tenant's personal property, trade fixtures and Alterations; (ii) second, to the payment of rent then due and payable hereunder; (iii) third, to the payment of future rent as the same may become due and payable hereunder; (iv) fourth, the balance, if any, shall be paid to Tenant upon (but not before) expiration of the term of this Lease.   If the rents received by Landlord from such subletting, after application as provided above, are insufficient in any month to pay the rent due and payable hereunder for such month, Tenant shall pay such deficiency to Landlord monthly upon demand.   Notwithstanding any such subletting for Tenant's account without termination, Landlord may at any time thereafter, by written notice to Tenant, elect to terminate this Lease by virtue of a previous Event of Default.

During the continuance of an Event of Default, for so long as Landlord does not terminate Tenant's right to possession of the Premises and subject to Paragraph 13, entitled Assignment and Subletting, and the options granted to Landlord thereunder, Landlord shall not unreasonably withhold its consent to an assignment or sublease of Tenant's interest in the Premises or in this Lease.

3.   During the continuance of an Event of Default, Landlord may enter the Premises without terminating this Lease and remove all Tenant's personal property, Alterations and trade fixtures from the Premises and store them at Tenant's risk and expense.   If Landlord removes such property from the Premises and stores it at Tenant's risk and expense, and if Tenant fails to pay the cost of such removal and storage after written demand therefor and/or to pay any rent then due, then after the property has been stored for a period of thirty (30) days or more Landlord may sell such property at public or private sale, in the manner and at such times and places as Landlord deems commercially reasonable following reasonable notice to Tenant of the time and place of such sale.   The proceeds of any such sale shall be applied first to the payment of the expenses for removal and storage of the property, the preparation for and the conducting of such sale, and for attorneys' fees and other legal expenses incurred by Landlord in connection therewith, and the balance shall be applied as provided in Paragraph 25.b.2. above.

Tenant hereby waives all claims for damages that may be caused by Landlord's reentering and taking possession of the Premises or removing and storing Tenant's personal property pursuant to this Paragraph 25, and Tenant shall hold Landlord harmless from and against any loss, cost or damage resulting from any such act.   No reentry by Landlord shall constitute or be construed as a forcible entry by Landlord.

4.   Landlord may require Tenant to remove any and all Alterations (which shall not include the Tenant Improvements described in Paragraph 4.a. above) from the Premises or, if Tenant fails to do so within ten (10) days after Landlord's request, Landlord may do so at Tenant's expense.

5.   Landlord may cure the Event of Default at Tenant's expense.   If Landlord pays any sum or incurs any expense in curing the Event of Default, Tenant shall reimburse Landlord upon demand for the amount of such payment or expense with interest at the Interest Rate specified in Paragraph 5 from the date the sum is paid or the expense is incurred until Landlord is

34

reimbursed by Tenant.   Any amount due Landlord under this subsection shall
constitute additional rent hereunder.

26.  **Damage or Destruction.**  If all or a part of the Premises are
damaged by fire or other casualty, or if the Building is so damaged that access
to or use and occupancy of the Premises is materially impaired, Landlord shall
promptly give Tenant notice of Landlord's reasonable estimate of the time
required to make such repairs (the "Damage Estimate") measured from the date of
such damage.  If the Damage Estimate is one hundred twenty (120) days or less,
then Landlord shall repair the damage and this Lease shall remain in full force
and effect.  If the Damage Estimate is more than one hundred twenty (120) days,
Landlord, at its option exercised by written notice to Tenant within sixty (60)
days of the date of the damage, shall either (a) repair the damage as soon as
reasonably possible, in which event this Lease shall continue in full force and
effect, or (b) terminate this Lease as of the date specified by Landlord in the
notice, which date shall be not less than thirty (30) days nor more than sixty
(60) days after the date such notice is given, and this Lease shall terminate on
the date specified in the notice; provided, however, that Landlord may terminate
this Lease pursuant to the foregoing only if Landlord also terminates the leases
of all other tenants of the Building that were, in Landlord's sole, but good
faith and commercially reasonable judgment, similarly affected by the damage.
If the Damage Estimate is more than one hundred eighty (180) days, and Landlord
does not give notice terminating this Lease, then Tenant may give notice to
Landlord, within thirty (30) calendar days after Tenant receives the Damage
Estimate, terminating this Lease as of the date of such fire or casualty.
Further, if the Damage Estimate is less than one hundred eighty (180) days and
Landlord did not terminate the Lease but elected to repair the damage, and the
repair has not been completed by the date one hundred eighty (180) days from the
date of the damage (which 180-day period shall be extended by the length of any
delay in the completion of the repairs caused by any subsequent Force Majeure
event or any delay caused by Tenant, provided that Landlord has, prior to the
subsequent Force Majeure event or delay caused by Tenant, actually commenced the
making of such repairs and provided, further, that such extension shall not be
for more than ninety (90) additional days unless the delay is caused by Tenant)
then Tenant may terminate this Lease by providing Landlord with written notice
of such termination prior to the date the repair is completed and the Premises
are delivered to Tenant, but in any event within thirty (30) days following the
end of such 180-day period (or extended period) as the case may be.

    Notwithstanding anything to contrary contained in this Paragraph 26,
if the initial Damage Estimate is more than ninety (90) days, and the date on
which Landlord reasonably anticipates the repairs of such damage will be
completed is during the last twelve (12) months of the Lease term, Landlord and
Tenant shall each have the option to terminate this Lease as of the date of such
damage by giving written notice to the other, in the case of Landlord together
with the Damage Estimate, or, in the case of Tenant, within thirty (30) days of
Tenant's receipt of the Damage Estimate.

    During the period the Premises or any part thereof are rendered
unusable by such damage and repair, Tenant's Monthly Rent and Additional Rent
under Paragraphs 5 and 7 hereof shall be proportionately reduced based upon the
extent to which the damage and repair prevents Tenant from conducting its
business at the Premises or any portion thereof; provided, however, if the damage
results from the negligence or willful misconduct of Tenant or Tenant's agents,
employees, contractors, licensees or invitees, then Tenant's Monthly Rent and
Additional Rent will not abate unless Tenant reimburses Landlord for the
deductible required under Landlord's property damage/rental loss insurance.
Landlord shall not be obligated to repair or replace any of Tenant's movable
furniture, equipment, trade fixtures, and other personal property, nor any
Alterations installed in the Premises by Tenant, and Tenant shall, at Tenant's
sole cost and expense, repair and replace such items.  All such repair and
replacement of Alterations shall be constructed in accordance with Paragraph 9
hereof regarding Alterations.

    A total destruction of the Building shall automatically terminate this
Lease.  Tenant hereby waives California Civil Code Sections 1932(2) and 1933(4),
providing for termination of hiring upon destruction of the thing hired and
Sections 1941 and 1942, providing for repairs to and of premises.

27. **Eminent Domain**.

a. If all or any part of the Premises are taken by any public or quasi-public authority under the power of eminent domain, or any agreement in lieu thereof (a "taking"), this Lease shall terminate as to the portion of the Premises taken effective as of the date of taking. If only a portion of the Premises is taken, Landlord or Tenant may terminate this Lease as to the remainder of the Premises upon written notice to the other party within ninety (90) days after the taking; provided, however, that Tenant's right to terminate the Lease is conditioned upon the remaining portion of the Premises being of such size or configuration that such remaining portion of the Premises is unuseable or uneconomical for Tenant's business. Landlord shall be entitled to all compensation, damages, income, rent awards and interest thereon whatsoever which may be paid or made in connection with any taking and Tenant shall have no claim against Landlord for the value of any unexpired term of this Lease or of any of the improvements or Alterations in the Premises; provided, however, that the foregoing shall not prohibit Tenant from prosecuting a separate claim against the taking authority for an amount separately designated for Tenant's relocation expenses or the interruption of or damage to Tenant's business or as compensation for Tenant's personal property, trade fixtures, Alterations or other improvements paid for by Tenant.

In the event of a partial taking of the Premises which does not result in a termination of this Lease, the Monthly Rent and Additional Rent under Paragraphs 5 and 7 hereunder shall be equitably reduced. If all or any part of the Real Property other than the Premises is taken, Landlord may terminate this Lease upon written notice to Tenant given within ninety (90) days after the date of taking; provided that such termination right shall be conditioned upon Landlord's terminating the leases of all tenant's similarly affected by the taking.

b. Notwithstanding the foregoing, if all or any portion of the Premises is taken for a period of time shorter than twelve (12) months and ending prior to the end of the term of this Lease, this Lease shall remain in full force and effect and Tenant shall continue to pay all rent and to perform all of its obligations under this Lease; provided, however, that Tenant shall be entitled to all compensation, damages, income, rent awards and interest thereon that is paid or made in connection with such temporary taking, except that any such compensation in excess of the rent or other amounts payable to Landlord hereunder shall be promptly paid over to Landlord as received. Landlord and Tenant each hereby waive the provisions of California Code of Civil Procedure Section 1265.130 and any other applicable existing or future law, ordinance or governmental regulation providing for, or allowing either party to petition the courts of the state in which the Real Property is located for, a termination of this Lease upon a partial taking of the Premises and/or the Building.

28. **Landlord's Liability; Sale of Building**. The term "Landlord", as used in this Lease, shall mean only the owner or owners of the Real Property at the time in question. Notwithstanding any other provision of this Lease, the liability of Landlord for its obligations under this Lease is limited solely to Landlord's interest in the Real Property as the same may from time to time be encumbered, and no personal liability shall at any time be asserted or enforceable against any other assets of Landlord or against Landlord's stockholders, directors, officers or partners on account of any of Landlord's obligations or actions under this Lease. In addition, in the event of any conveyance of title to the Real Property, then from and after the date of such conveyance, Landlord shall be relieved of all liability with respect to Landlord's obligations to be performed under this Lease after the date of such conveyance. Upon any conveyance of title to the Real Property, the grantee or transferee, by accepting such conveyance, shall be deemed to have assumed Landlord's obligations to be performed under this Lease from and after the date of transfer, subject to the limitations on liability set forth above in this Paragraph 28. If Tenant provides Landlord with any security for Tenant's performance of its obligations hereunder, and Landlord transfers such security to the grantee or transferee of Landlord's interest in the Real Property, Landlord shall be released from any further responsibility or liability for such security. Notwithstanding any other provision of this Lease, Landlord shall not be liable for any consequential damages, nor shall Landlord be liable for loss of or damage to artwork, currency, jewelry, bullion, unique or valuable

36

04-13-2007 SCANNED

documents, securities or other valuables, or for other property not in the nature of ordinary fixtures, furnishings and equipment used in general administrative and executive office activities and functions. Wherever in this Lease Tenant (a) releases Landlord from any claim or liability, (b) waives or limits any right of Tenant to assert any claim against Landlord or to seek recourse against any property of Landlord or (c) agrees to indemnify Landlord against any matters, the relevant release, waiver, limitation or indemnity shall run in favor of and apply to Landlord, the constituent shareholders, partners or other owners of Landlord, and the directors, officers, employees and agents of Landlord and each such constituent shareholder, partner or other owner.

29.  **Estoppel Certificates.**  At any time and from time to time, upon not less than ten (10) business days' prior notice from Landlord or Tenant, the other party shall execute, acknowledge and deliver to the requesting party a statement certifying the commencement date of this Lease, stating that this Lease is unmodified and in full force and effect (or if there have been modifications, that this Lease is in full force and effect as modified and the date and nature of each such modification), that such party is not in default under this Lease (or, if such party is in default, specifying the nature of such default), that, to the best of the responding party's knowledge, the requesting party is not in default under this Lease (or if the requesting party is in default, specifying the nature of the default of which the responding party is aware), the current amounts of and the dates to which the Monthly Rent and Additional Rent has been paid, and setting forth such other matters as may be reasonably requested by the requesting party.  Any such statement may be conclusively relied upon by a prospective purchaser of the Real Property or by a lender obtaining a lien on the Real Property as security.

30.  **Right of Landlord to Perform.**  If Tenant fails to make any payment required hereunder (other than Monthly Rent and Additional Rent) or fails to perform any other of its obligations hereunder, Landlord may, upon five (5) days prior notice to Tenant, but shall not be obliged to, and without waiving any default of Tenant or releasing Tenant from any obligations to Landlord hereunder, make any such payment or perform any other such obligation on Tenant's behalf. All sums so paid by Landlord and all necessary incidental costs in connection with the performance by Landlord of an obligation of Tenant (together with interest thereon from the date of such payment by Landlord until paid at the Interest Rate set forth in Paragraph 5 hereof) shall be payable by Tenant to Landlord upon demand, and Tenant's failure to make such payment upon demand shall entitle Landlord to the same rights and remedies provided Landlord in the event of non-payment of rent.

31.  **Late Charge.**  Tenant acknowledges that late payment of any installment of Monthly Rent or Additional Rent will cause Landlord to incur costs not contemplated by this Lease and that the exact amount of such costs would be extremely difficult and impracticable to fix.  Such costs include, without limitation, processing and accounting charges, late charges that may be imposed on Landlord by the terms of any encumbrance or note secured by the Real Property and the loss of the use of the delinquent funds.  Therefore, if any installment of Monthly Rent or Additional Rent due from Tenant is not received within five (5) days of written notice that such sum is due, Tenant shall pay to Landlord on demand an additional sum of ▓▓▓▓▓▓▓▓ of the overdue installment, which sum represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant.  Acceptance of any late charge shall not constitute a waiver of Tenant's default with respect to the overdue amount, nor prevent Landlord from exercising any of the other rights and remedies available to Landlord.

32.  **Attorneys' Fees: Waiver of Jury Trial.**  In the event of any action or proceeding between Landlord and Tenant (including an action or proceeding between Landlord and the trustee or debtor in possession while Tenant is a debtor in a proceeding under any bankruptcy law) to enforce any provision of this Lease, the losing party shall pay to the prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses, incurred in such action and in any appeal in connection therewith by such prevailing party.  The "prevailing party" will be determined by the court before whom the action was brought based upon an assessment of which party's major arguments or positions taken in the suit or proceeding could fairly be said to have prevailed

**REDACTED**

37

over the other party's major arguments or positions on major disputed issues in the court's decision.

If any action or proceeding between Landlord and Tenant to enforce the provisions of this Lease (including an action or proceeding between Landlord and the trustee or debtor in possession while Tenant is a debtor in a proceeding under any bankruptcy law) proceeds to trial, Landlord and Tenant hereby waive their respective rights to a jury in such trial.

33. **Waiver.** No provisions of this Lease shall be deemed waived by Landlord or Tenant unless such waiver is in a writing signed by the party giving such waiver. The waiver by either party of any breach of any provision of this Lease by the other party shall not be deemed a waiver of any subsequent breach of the same or any other provision of this Lease. No delay or omission in the exercise of any right or remedy of Landlord upon any default by Tenant, or of Tenant upon any default of Landlord, shall impair such right or remedy or be construed as a waiver. Landlord's acceptance of any payments of rent due under this Lease shall not be deemed a waiver of any default by Tenant under this Lease (including Tenant's recurrent failure to timely pay rent) other than Tenant's nonpayment of the accepted sums, and no endorsement or statement on any check or accompanying any check or payment shall be deemed an accord and satisfaction. Tenant's payment of rent due and Tenant's continuance in possession shall not constitute a waiver by Tenant of any default of Landlord. Landlord's consent to or approval of any act by Tenant requiring Landlord's consent or approval shall not be deemed to waive or render unnecessary Landlord's consent to or approval of any subsequent act by Tenant.

34. **Notices.** Except as otherwise expressly provided in this Lease, all notices and demands which may or are required to be given by either party to the other hereunder shall be in writing. All notices and demands by Landlord to Tenant shall be delivered personally, sent by recognized overnight courier, or sent by United States mail, postage prepaid, addressed to Tenant at the Premises, with a copy sent concurrently and in the same manner to: Lehman Brothers Inc., 2 World Trade Center, 16th Floor, Corporate Real Estate Department, New York, NY 10048, Att'n: Thomas A. Savoca, V.P., or to such other place as Tenant may from time to time designate by notice to Landlord hereunder. All notices and demands by Tenant to Landlord shall be sent as stated above, but addressed to Landlord in care of The Shorenstein Co., 555 California Street, 49th floor, San Francisco, California 94104, or to such other place as Landlord may from time to time designate by notice to Tenant hereunder. Notices shall be deemed given upon receipt if the notice is sent by overnight courier or personal delivery and, if given by U.S. mail, shall be deemed given three (3) days after deposit in the U.S. mail.

35. **Deleted.**

36. **Defined Terms and Marginal Headings.** When required by the contents of this Lease, the singular includes the plural. If more than one person or entity signs this Lease as Tenant, the obligations hereunder imposed upon Tenant shall be joint and several. The headings and titles to the paragraphs of this Lease are for convenience only and are not to be used to interpret or construe this Lease. Wherever the term "including" or "includes" is used in this Lease it shall be construed as if followed by the phrase "without limitation".

37. **Time and Applicable Law.** Time is of the essence of this Lease and of each and all of its provisions. This Lease shall be governed by and construed in accordance with the laws of the State of California.

38. **Successors.** Subject to the provisions of Paragraphs 13 and 28 hereof, the covenants and conditions hereof shall be binding upon and inure to the benefit of the heirs, successors, executors, administrators and assigns of the parties hereto.

39. **Entire Agreement; Modifications.** This Lease (including any exhibit, rider or attachment hereto) constitutes the entire agreement between Landlord and Tenant with respect to Tenant's lease of the Premises. Neither Landlord nor Landlord's agents have made any representations or warranties with respect to the Premises or the Real Property or this Lease except as expressly

set forth herein, and no rights, easements or licenses shall be acquired by Tenant by implication or otherwise unless expressly set forth herein.

40. **Light and Air**. Tenant agrees that no diminution of light, air or view by any structure which may hereafter be erected (whether or not by Landlord) shall entitle Tenant to any reduction of rent hereunder, result in any liability of Landlord to Tenant, or in any other way affect this Lease.

41. **Name of Building**. Tenant shall not use the name of the Building for any purpose other than as the address of the business conducted by Tenant in the Premises without the written consent of Landlord. Landlord reserves the right to change the name of the Building at any time by written notice to Tenant and Landlord shall not be liable to Tenant for any loss, cost or expense on account of any such change of name.

42. **Severability**. If any provision of this Lease or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Lease and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

43. **Authority**. If Tenant is a corporation, partnership, trust, association or other entity, Tenant and each person executing this Lease on behalf of Tenant, hereby covenants and warrants that (a) Tenant is duly incorporated or otherwise established or formed and validly existing under the laws of its state of incorporation, establishment or formation, (b) Tenant has and is duly qualified to do business in California, (c) Tenant has full corporate, partnership, trust, association or other appropriate power and authority to enter into this Lease and to perform all Tenant's obligations hereunder, and (d) each person (and all of the persons if more than one signs) signing this Lease on behalf of Tenant is duly and validly authorized to do so.

44. **No Offer**. Submission of this instrument for examination and signature by Tenant does not constitute a reservation of or option for lease, and is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

45. **Hazardous Substance**.

a. California law requires landlords to disclose to tenants the existence of certain hazardous substances. Accordingly, the existence of tobacco smoke and asbestos containing materials ("ACM") must be disclosed. Although smoking is prohibited in the public areas of the Building, these areas may, from time to time, be exposed to tobacco smoke. Further, certain areas of the Building contain ACM, but these areas are generally inaccessible to tenants, such as machinery rooms, the inside of sealed walls and above suspended ceilings. Landlord covenants to comply, at its own sole cost and expense (subject to the applicable provisions of Paragraph 7.a. above) during the Lease term with all local, state and federal laws and regulations requiring disclosure to tenants regarding the existence of hazardous substances within the Building. Tenant agrees not to expose or disturb any ACM unless Landlord has given Tenant prior written consent thereto and Tenant complies with all applicable legal requirements and Landlord's written procedures for handling ACM. Tenant's failure to comply with the immediately preceding sentence shall constitute an Event of Default under Paragraph 25 of the Lease. Tenant may obtain a copy of Landlord's written procedures for handling asbestos from the Building office.

b. Landlord shall indemnify and defend Tenant against and hold Tenant harmless from any loss, cost, liability or expense (including, without limitation, reasonable attorney's fees and disbursements) incurred by Tenant to the extent the same arises solely from death or illness of a natural person caused by the presence of ACM in the Premises or the Building. The foregoing indemnity shall not apply to any loss, cost, liability or expense (i) arising out of negligence or willful acts or omissions, or a violation of the Lease or of applicable laws, rules and regulations concerning ACM, on the part of Tenant or Tenant's partners, owners, employees, agents or contractors, (ii) resulting from loss or disruption of personnel or productivity, or difficulty in attracting personnel, or (iii) resulting from a partial or total vacating of the Premises; provided, however, that the matters described in (i) above shall not be excluded

from Landlord's indemnity obligations to the extent caused by any violation by Landlord of applicable laws, rules and regulations concerning ACM during the Lease term or during Landlord's removal of asbestos from the Premises pursuant to Paragraph 4.c. of the Lease prior to the Commencement Date. If continued occupancy by Tenant will, or is likely to, result in any repeated or ongoing material loss, cost, liability or expense covered by the foregoing indemnity, Landlord may terminate this Lease upon written notice to Tenant, such termination to be effective on a date selected by Tenant but falling not more than one hundred and eighty (180) days after such notice.

46.  **Real Estate Brokers.**  Landlord and Tenant each represents and warrants to the other that such party has negotiated this Lease directly with the Real Estate Broker(s) identified in Paragraph 2 and has not authorized or employed, or acted by implication to authorize or to employ, any other real estate broker or salesman to act for such party in connection with this Lease. Each party shall hold the other harmless from and indemnify and defend the other against any and all claims by any real estate broker or salesman other than the Real Estate Broker(s) identified in Paragraph 2 for a commission, finder's fee or other compensation as a result of the inaccuracy of such party's representation above.  Landlord shall be responsible for the brokerage commissions due to the brokers listed in Paragraph 2 hereof in connection with the execution of this Lease pursuant to separate written agreements.

47.  **Parking.**  Landlord shall provide Tenant with valet-type parking for ten (10) automobiles in the garage of the Building. Tenant shall pay for such parking at the regular rate or charge from time to time in effect for parking in the garage. Tenant shall provide Landlord with written notice of the names of each party to whom Tenant from time to time distributes Tenant's parking rights hereunder, and shall cause each such party to execute the standard waiver form for garage users. If the parking charge is not paid within five (5) days of the date due then, in addition to any other remedies afforded Landlord under this Lease for nonpayment of rent, Landlord may suspend Tenant's rights under this Paragraph 47 until such parking charge is paid in full.  The parking rights set forth in this Paragraph 47 are non-transferrable, are personal to Lehman Brothers, Inc. and shall not inure to the benefit of any successor, assignee or subtenant of Tenant other than an Affiliate of Tenant, as defined in Paragraph 13.g. above; provided, however, that Tenant may assign to an assignee of all of Tenant's interest in the Lease up to five (5) of the valet-type parking spaces. Further, if at any time during the term hereof, Tenant releases to Landlord any parking space provided for in this paragraph, then Tenant's right under this paragraph to use such released parking space is terminated for the remainder of the Lease term and Tenant shall have no further monetary obligations with respect thereto.  If Tenant desires additional monthly parking spaces for Tenant's employees beyond those provided for hereunder, then such employees may apply for parking in the garage in accordance with the garage rules, but shall not be afforded any special treatment with regard to the waiting list for spaces in the garage.

48.  **Expansion Option.**

    a.  **Expansion Space.**  Tenant shall have the option to lease additional space comprised of approximately 20,000 contiguous rentable square feet of space located on a floor above the lobby level in the Building (the exact size of which, and the exact location of which, to be within Landlord's sole discretion) (the "Expansion Space") for a term commencing on the Delivery Date specified in Paragraph 48.c. below. Tenant shall exercise the expansion option, if at all, by providing Landlord with written notice thereof on or before April 1, 1997.  The rentable square footage of the Expansion Space shall be calculated by Landlord in the same manner as Landlord then calculates the rentable square footage of all other space in the Buidling.

    b.  **Prerequisite to Exercise of Right.**  Notwithstanding anything in this Paragraph 48 to the contrary, if on the date of exercise of the expansion option or the date immediately preceding the date the Lease term for the Expansion Space is to commence, Tenant is in default hereunder beyond any applicable notice and grace period, then Tenant shall have no right to lease the Expansion Space and the exercise of the expansion option shall be null and void, and, in such case, Landlord shall have the right to lease the Expansion Space to

a third party and all of Tenant's rights to lease the Expansion Space shall terminate.

c. **Delivery of Expansion Space; Rent Commencement.** If Tenant exercises the expansion option, Landlord shall deliver the Expansion Space to Tenant on or before August 1, 1998, with the Landlord's Work referenced in Paragraph 48.d.(ii) below completed. Notwithstanding anything to the contrary herein, Tenant's rental obligations for the Expansion Space shall not commence until the earlier of (i) December 1, 1998, (ii) the Substantial Completion of the tenant improvements Tenant desires to have constructed in the Expansion Space prior to Tenant's occupancy thereof, or (iii) the date that Tenant commences its occupancy of the Expansion Space for the purpose of conducting its business therein.

d. **Terms and Conditions.** If Tenant leases the Expansion Space pursuant to this Paragraph 48, then Landlord and Tenant shall enter into a written amendment of this Lease adding the Expansion Space to the Premises on all of the terms and conditions set forth in this Lease as to the Premises originally demised hereunder, except that (i) Tenant shall have no further right to expand the Premises as set forth in this Paragraph 48, (ii) Tenant shall take the Expansion Space in its then "as-is" state and condition, but with items #1 through 6 of Landlord's Work (as set forth in Paragraph 4.c. above) completed, with all references to the 30th floor being deemed to be refer solely to the Expansion Space), unless otherwise agreed by Landlord and Tenant in writing in connection with their determination of the fair market rent for the Expansion Space (as provided for below) in which event the Expansion Space shall be delivered to Tenant in the condition so agreed upon by Landlord and Tenant, (iii) the term of the lease of the Expansion Space shall commence on the date the Expansion Space is delivered to Tenant, (iv) the Monthly Rent payable by Tenant for the Expansion Space shall be the then-fair market rent (as hereinafter defined) for the Expansion Space, and (v) the Base Year for the Expansion Space shall be the calendar year in which the Expansion Space is added to the Premises. For the purposes of this Paragraph 48, the term "fair market rent" shall mean the rental rate for comparable space under primary lease (and not sublease), taking into consideration the Base Year, any free rent, brokerage commissions and any other factors then prevalent in the marketplace, and taking into consideration such amenities as existing improvements (but only to the extent of any existing improvements that Tenant elects to retain rather than have demolished); improvements to be made prior to Tenant's occupancy of the Expansion Space (if any) as agreed by Landlord and Tenant at Landlord's expense, view, floor on which the Premises are situated and the like, situated in first-class, reputable, established high-rise office buildings in comparable location in the San Francisco Financial District, in sound physical and economic condition, engaged in then-prevailing ordinary rental market practices with respect to tenant concessions (if any) (e.g. not offering extraordinary rental, promotional deals and other concessions to tenants in an effort to alleviate cash flow problems, difficulties in meeting loan obligations or other financial distress, or in response to a greater than average vacancy rate), as shall be mutually agreed upon by Landlord and Tenant in writing within the thirty (30) day period commencing six (6) months prior to commencement of the term of this Lease as to the Expansion Space.

If Landlord and Tenant are unable to agree upon the fair market monthly rent within such thirty (30)-day period, then the fair market rent shall be established by arbitration pursuant to Paragraph 53 below. If the fair market monthly rent for the Expansion Space has not been established prior to the date the Expansion Space is to be added to the Lease, then, until such time as the fair market monthly rent has been determined, Tenant shall pay as Monthly Rent for the Expansion Space the same rate per rentable square foot that is then in effect for the original Premises, and as soon as the fair market rent for the Expansion Space is determined, an appropriate adjustment shall be made with regard to the Monthly Rent paid prior to such determination, with any excess Monthly Rent refunded by Landlord to Tenant or credited against the next installment of Monthly Rent and any deficiency in the Monthly Rent paid by Tenant to Landlord within thirty (30) days of written notice to Tenant.

e. **Affect of Expansion Option on Early Termination Right.** If Tenant exercises the expansion option provided for herein, then Tenant's early

41

termination option provided for in Paragraph 51 below shall automatically be void.

49.  **Right of First Offer.**

a.  **First Offer Right.** If, at any time during the Lease term (as such term may be extended), Tenant anticipates that Tenant will need additional space on the 31st floor of the Building, then Tenant may notify Landlord thereof in writing and, for the twelve (12) month period following the date of such written notice, the provisions of this Paragraph 49 shall apply. The provisions of this Paragraph 49 shall be inapplicable during any twelve (12) month period that was not preceded by the required written notice from Tenant to Landlord.

During any twelve (12) month period of the Lease term (as such term may be extended) for which Tenant has delivered to Landlord the notice referenced above, Tenant shall have a continuing right of first refusal to lease each increment of space on the 31st floor of the Building (each of which is a "First Offer Increment") which becomes "available for lease". An increment of space shall not be deemed "available for lease" if the tenant under an expiring lease of such space desires to renew or extend its lease or if any tenant of the building exercises an option or right of first refusal to lease such space, which option or right of first refusal has been granted prior to the date of this Lease. Upon Landlord obtaining knowledge of any such increment of space becoming available, Landlord shall so notify Tenant in writing, identifying the space and specifying the availability date (or estimated availability date).

b.  **Terms and Conditions.** If Tenant elects to lease a First Offer Increment, Tenant shall so notify Landlord in writing within ten (10) days after the date of Landlord's notice. If Tenant does not exercise its right to lease a First Offer Increment within such 10-day period, then Landlord shall be released of its obligation to lease such First Offer Increment to Tenant and the provisions of this Paragraph 49 shall not apply to that particular First Offer Increment unless the First Offer Increment (either as-is or with more or less space) becomes "available for lease" at a future date.

Upon Tenant's election to lease a First Offer Increment, Landlord and Tenant shall promptly enter into an amendment of this Lease, adding such increment of First Refusal Space to the Premises on all the terms and conditions set forth in this Lease as to the Premises originally demised hereunder, except that (i) the term of the lease to Tenant of such First Offer Increment shall commence upon the availability date (but in no event sooner than thirty (30) days after the date of Landlord's notice to Tenant) and shall continue coextensively with the remaining term hereof and any extension thereof, (ii) Tenant shall take the First Offer Increment in its then "as-is" condition, (iii) the Monthly Rent payable by Tenant under Paragraph 5 of the Lease for the First Offer Increment shall be as provided in Paragraph 49.c. below, (iv) Tenant's proportionate share payable under Paragraph 7 hereof with respect to such First Offer Increment shall be determined by dividing the rentable square footage of such First Offer Increment by the rentable square footage of the Building, and (v) the "Base Year" with respect to such First Offer Increment shall be the calendar year in which such First Offer Increment is added to the Lease.

c.  **Monthly Rent.** The Monthly Rent for each First Offer Increment shall be the then-fair market rent for the First Offer Increment, which fair market rent shall include the periodic rental increases, if any, that would be included for space leased for the period that the First Offer Increment will be covered by the Lease. For purposes of this Paragraph 49.c., the term "fair market rent" shall have the meaning set forth in Paragraph 48.d. above. The fair market rent shall be mutually agreed upon by Landlord and Tenant in writing within the thirty (30) day period following Landlord's notice to Tenant regarding the availability of the First Offer Increment. If Landlord and Tenant are unable to agree upon the fair market monthly rent within said 30-day period, then the fair market rent shall be established by arbitration pursuant to Paragraph 53 below. If the fair market monthly rent for a First Offer Increment has not been established prior to the date the First Offer Increment is to be added to the Lease, then, until such time as the fair market monthly rent has been determined, Tenant shall pay as Monthly Rent for the First Offer Increment the same rate per rentable square foot that is then in effect for the original Premises, and as soon as the fair market rent for the First Offer Increment is determined, an

62003133632-7  (bu)41896)

appropriate adjustment shall be made with regard to the Monthly Rent paid prior to such determination, with any excess Monthly Rent refunded by Landlord to Tenant or credited against the next installment of Monthly Rent and any deficiency in the Monthly Rent paid by Tenant to Landlord within thirty (30) days of written notice to Tenant.

    d.  <u>Prerequisite to Exercise of Right</u>.  Notwithstanding anything in this Paragraph 49 to the contrary, if at the time of Tenant's exercise of its right to lease any First Offer Increment or at the time the Lease term for the First Offer Increment is to commence, Tenant is in default under this Lease after the passage of applicable notice and grace periods, or if on the date immediately preceding the date the Lease term for the First Offer Increment is to commence Tenant named herein is not in occupancy of at least seventy-five percent (75%) of the Premises then demised hereunder or does not intend to occupy at least seventy-five percent (75%) of the Premises, including the First Offer Increment (but intends to assign this Lease or sublet more than twenty-five percent (25%) of the Premises) then Landlord may, by written notice to Tenant, terminate Tenant's right to lease the First Offer Increment and the exercise of the option to lease the First Offer Increment shall be null and void, and in any such case Landlord shall have the right to lease such First Offer Increment to a third party for a term of Landlord's sole discretion.

    50.  <u>Option to Renew</u>.

    a.  <u>Exercise of Renewal Option</u>.  Tenant shall have the option to renew this Lease for one (1) additional term of five (5) years, commencing upon the expiration of the initial term of the Lease. The renewal option must be exercised, if at all, by written notice given by Tenant to Landlord not later than twelve (12) months prior to the expiration of the initial term of this Lease. Notwithstanding the foregoing, this renewal option shall, at Landlord's option, be null and void and Tenant shall have no right to renew this Lease if on the date Tenant exercises the option or on the date immediately preceding the commencement date of the renewal period Tenant is in default, beyond any applicable notice and grace period, of any of its obligations under this Lease.

    b.  <u>Terms and Conditions</u>.  If Tenant exercises the renewal option, then during the renewal period all of the terms and conditions set forth in this Lease as applicable to the Premises during the initial term shall apply during the renewal term, except that (i) Tenant shall have no further right to renew this Lease, (ii) Tenant shall take the Premises in their then "as-is" state and condition, (iii) the Base Year for the Premises shall be the calendar year in which the renewal term commences, and (iv) the Monthly Rent payable by Tenant for the Premises shall be the then-fair market rent for a 5-year lease for the Premises based upon the terms of this Lease, as renewed. Fair market rent shall include the periodic rental increases, if any, that would be included for space leased for the period that such space will be covered by the lease. For purposes of this Paragraph 50, the term "fair market rent" shall have the meaning set forth in Paragraph 48.d. above. The fair market rent shall be mutually agreed upon by Landlord and Tenant in writing within the thirty (30) calendar day period commencing six (6) months prior to commencement of the renewal period. If Landlord and Tenant are unable to agree upon the fair market monthly rent within said thirty (30)-day period, then the fair market rent shall be established by arbitration in accordance with Paragraph 53 below.

    If the fair market rent is not established prior to the commencement of the renewal period, then Tenant shall continue to pay as Monthly Rent and Additional Rent the sums in effect as of the last day of the initial term of the Lease or the first renewal term, as the case may be and, as soon as the fair market rent is determined, the appropriate adjustment shall be made with regard to the Monthly Rent so paid, with any excess Monthly Rent refunded by Landlord to Tenant or credited against the next installment of Monthly Rent and any deficiency in the Monthly Rent paid by Tenant to Landlord within thirty (30) days of written notice to Tenant.

51. **Tenant's Early Termination Option.**

   a. **Termination Date.** Tenant may terminate this Lease effective
as of the last day of the sixtieth (60th) full calendar month of the Lease term
(the "Termination Date"), provided that Tenant provides Landlord with not less
than twelve (12) months prior written notice of such termination and complies
with the provisions of Paragraph 51.b. below.

   b. **Termination Fee; Additional Compensation to Landlord.**

      i. **Termination Fee.** If Tenant terminates this Lease
pursuant to this Paragraph 51, Tenant shall pay to Landlord on or before
the Termination Date a termination fee (the "Termination Fee") equal to (A)
████ times the Monthly Rent and monthly Additional Rent under Paragraphs
5 and 7 of this Lease as of the Termination Date, plus (B) the then
unamortized cost of Landlord's Contribution (as defined in Paragraph 4.g.i.
above) and of the leasing commissions paid by Landlord in connection with
the execution of this Lease by Landlord and Tenant. For purposes of
calculating the unamortized costs referred to above, the amortization
period shall be the ten (10) year term of this Lease and the applicable
interest rate for such amortization shall be ████████ per annum.
As soon after the execution of this Lease as the total Landlord's
Contribution and leasing commissions are determined, Landlord shall confirm
such amounts to Tenant in writing.

**REDACTED**

      ii. **Additional Compensation.**

         A. **Definition of Net Loss and Net Profit.** If (A) the
Termination Fee plus the Monthly Rent and Additional Rent that Landlord
will receive from any replacement tenant or tenants that Landlord obtains
for the Premises or any portions thereof after the termination of the
Lease, minus (B) the Monthly Rent and Additional Rent that Landlord would
have received from Tenant under Paragraphs 5 and 7 of this Lease during the
portion of the Lease term that is terminated plus all of the costs incurred
by Landlord in entering into the lease or leases with such replacement
tenant or tenants (including, without limitation, leasing commissions and
build-out costs) is a negative dollar amount, then such amount shall
constitute Landlord's "net loss". If (A) minus (B) above is a positive
dollar amount rather than a negative dollar amount, then such amount shall
constitute Landlord's "net profit."

         B. **Compensation to Landlord.** If Tenant terminates this
Lease and Landlord has incurred a net loss as a result of Tenant's early
termination of this Lease, then Tenant shall pay to Landlord, within thirty
(30) days of Landlord's written demand, the amount of Landlord's net loss;
provided, however, in no event shall the amount payable by Tenant to
Landlord under this Paragraph 51.b.ii.B. exceed an amount equal to four (4)
times the Monthly Rent and Additional Rent under Paragraphs 5 and 7 of the *Monthly*
Lease as of the Termination Date. The parties acknowledge that Landlord *(as)*
will be unable to calculate the net loss or net profit until the
replacement tenant or tenants have been obtained and all costs of entering
into the lease(s) with such tenant(s) have been determined. As soon as
Landlord has determined those costs, and if the costs result in a net loss,
Landlord shall provide its written demand for payment under this paragraph
to Tenant, which demand shall include a detailed breakdown of the
calculation of the net loss. If a proposed lease with a replacement tenant
is at a rental rate materially less than the rental rate at which Landlord
then enters into leases for similar space in the Building, or if the
proposed lease involves financial incentives in favor of the replacement
tenant that exceed the financial incentives Landlord customarily provides
to tenants of similar space in the Building, then, prior to entering into
any such lease, Landlord shall provide Tenant with written notice of the
specifics of the proposed lease transaction and relevant information
regarding current leasing rates and concessions for space in the Building.
If Tenant desires that Landlord not enter into the proposed lease, Tenant
shall notify Landlord thereof in writing within five (5) business days of
Tenant's receipt of such written information regarding the proposed lease.
If Landlord receives such timely notice from Tenant requesting that
Landlord not enter into such lease, then Landlord shall not enter into such

lease and Tenant's monetary obligations to Landlord under this Paragraph
50.b.ii.B. shall continue unaffected by such proposed lease. If Tenant
notifies Landlord in writing within such 5-business day period that Tenant
desires for Landlord to enter into the proposed Lease, or if Tenant fails
to notify Landlord in writing within such five (5) business day period that
Tenant does or does not desire for Landlord to enter into such proposed
lease, then Landlord may enter into such proposed lease and Tenant shall be
precluded from challenging such lease on the grounds that Landlord did not
use good faith efforts to maximize the reduction of Tenant's monetary
obligations under this Paragraph 50.b.ii.B.

C. __Compensation to Tenant__.  If Tenant terminates this
Lease and Landlord has a net profit, then Landlord shall pay to Tenant,
within thirty (30) days of Landlord's determination that a net profit
exists, an amount equal to ▓▓▓▓▓▓▓▓ of the net profit.  Any
payment made by Landlord to Tenant under this Paragraph 51.b.ii.C. shall be
accompanied by a detailed breakdown of the calculation of the amount due
Tenant.

**REDACTED**

c. __Tenant's Option to Waive Termination Right in Exchange for
Deletion of Landlord's Recapture Rights__. On or before the date thirty (30)
months following the Commencement Date of this Lease, Tenant shall notify
Landlord in writing of whether (x) Tenant elects to retain its termination right
under Paragraphs 51.a. and b. above or (y) Tenant elects to waive Tenant's
termination right under Paragraphs 51.a. and b., in which event, effective as of
the date of such written notice to Landlord waiving the termination right (A) the
provisions of Paragraphs 51.a. and b. above shall be of no further force or
affect, and (B) items (i) and (ii) of Paragraph 13.d. of the Lease (providing
Landlord certain recapture rights in the event of a sublease or an assignment of
this Lease) shall be deleted from Paragraph 13.d. so that Landlord's sole option
in the event of a proposed assignment or subletting by Tenant is the option set
forth in item (iii) of such Paragraph 13.d.  If Tenant does not deliver such
written notice to Landlord on or before the date thirty (30) days following the month
Commencement Date of this Lease advising Landlord of whether Tenant elects either
option (x) or (y) above, then, effective as of the date thirty (30) days month
following the Commencement Date of this Lease, Tenant shall be deemed to have
elected option (y) and the provisions of Pargraphs 51.a. and b. above shall be
of no further force or effect.

52.  __Building Directory__. Landlord, at Tenant's request, shall maintain
listings on the Building directory of the names of Tenant and the names of any
of Tenant's officers and employees, provided that the names so listed shall not
total more than seventy-five (75) names.  Listings made at the commencement of
this Lease shall be at Landlord's expense.  Modifications to such initial
listings shall be subject to Landlord's standard charges, if applicable.

53.  __Arbitration__.  If (i) Tenant disputes the amount claimed by
Landlord as Fair Market Rent, or (ii) a dispute arises between the parties
concerning any matter pertaining to (A) Operating Expenses or Tax Expenses, (B)
whether an actual delay in the Substantial Completion of the Tenant Improvements
has resulted for purposes of the third subparagraph of Paragraph 4.c. hereof or
Paragraph 4.g.iv. hereof, (C) the Substantial Completion of the Tenant
Improvements under Paragraph 4.d.iv. or 4.e.iii. hereof, (D) the cost of any
excess services or utilities under Paragraph 17.b. hereof, (E) the standard of
Building operation, (F) issues arising under __Exhibit B__, (G) matters pertaining
to rental abatement, (H) the determination of the Commencement Date, or (I) the
determination of any Tenant Delay under Paragraph 4.f., and any such dispute
cannot be resolved by mutual agreement, the dispute shall be submitted to
arbitration.  The judgment or the award rendered in any such arbitration may be
entered in any court having jurisdiction and shall be final and binding between
the parties.

a.  With respect to disputes concerning Fair Market Rent, Tenant
shall make demand for arbitration in writing within ten (10) business days after
the expiration of the thirty (30) day period provided for in the Lease for
Landlord and Tenant to agree upon the Fair Market Rent, specifying therein the
name and address of the person to act as the arbitrator on its behalf.  The
arbitrator shall be qualified as a real estate appraiser familiar with the Fair

45

Market Rent of first-class commercial office space in the downtown San Francisco Financial District who would qualify as an expert witness over objection to give testimony addressed to the issue in a court of competent jurisdiction. Failure on the part of Tenant to make a timely and proper demand for such arbitration shall constitute a waiver of the right thereto. Within ten (10) business days after the service of Tenant's demand for arbitration, Landlord shall give notice to Tenant, specifying the name and address of the person designated by Landlord to act as arbitrator on its behalf who shall be similarly qualified. If Landlord fails to notify Tenant of the appointment of its arbitrator, within or by the time above specified, then the arbitrator appointed by Tenant shall be the sole arbitrator to determine the issue.

b.   If the issue pertains to a matter other than a dispute over Fair Market Rent, and the dispute has continued for more than thirty (30) days following written notice from either party to the other that such thirty (30) day period for the resolution of the matter shall commence as of the date of such written notice, then at the end of such 30-day period, either party may demand arbitration in writing following the procedures stated in Paragraph 53.a.  The arbitrator or arbitrators shall be accountants familiar with matters pertaining to first-class office building operation, if the issue concerns matters of Operating Expenses or Tax Expenses, building managers (including supervisory executives of building management companies) with substantial experience in first-class office building operation if the issue concerns matters of service or operation, or construction managers if the issue concerns matters of construction. Each arbitrator shall be a person who would qualify as an expert witness over objection to give testimony addressed to the issue in controversy in a court of competent jurisdiction.

c.   If two (2) arbitrators are chosen pursuant to Paragraph 53.a. or 53.b. above, the arbitrators so chosen shall, within five (5) business days after the second arbitrator is appointed, request in writing that Landlord and Tenant submit to the arbitrators in writing, within five (5) business days following their receipt of the arbitrators' request, their proposed resolution to the subject dispute.  (The written proposed resolutions submitted to the arbitrators by Landlord and Tenant are respectively referred to herein as the "Landlord's Demand" and the "Tenant's Demand").  Within five (5) business days following the receipt by the arbitrators of the Landlord's Demand and the Tenant's Demand, the two arbitrators shall meet and, if within ten (10) business days after such first meeting the two arbitrators shall be unable to agree promptly upon a determination of the matter in issue, they shall appoint a third arbitrator, who shall be a competent and impartial person with qualifications similar to those required of the first two arbitrators pursuant to Paragraph 53.a. or 53.b., whichever applies.  If they are unable to agree upon such appointment within five (5) business days after expiration of said ten (10) day period, the third arbitrator shall be selected by the parties themselves, if they can agree thereon, within a further period of ten (10) business days.  If the parties do not so agree, then either party, on behalf of both, may request appointment of such a qualified person by the then Chief Judge of the United States District Court having jurisdiction over the City and County of San Francisco, acting in his private non-judicial capacity or, upon his failure to do so within ten (10) days, upon application to the American Arbitration Association in accordance with the rules of such association. Request for appointment shall be made in writing with a copy given to the other party. Each party agrees that said Judge shall have the power to make the appointment. The three (3) arbitrators shall decide the dispute, if it has not previously been resolved, by following the procedure set forth in Paragraph 53.d. or 53.e. below, as applicable.

d.   Where the issue concerns the determination of Fair Market Rent, the role of the three (3) arbitrators shall be limited to determining by majority vote whether the Fair Market Rent proposed in Landlord's Demand or in Tenant's Demand most closely approximates Fair Market Rent as it would be determined by said arbitrators. The proposed Fair Market Rent so selected shall be Fair Market Rent for purposes of this Lease. The arbitrators shall have no right to impose a middle ground or any modification of either of the two proposals for Fair Market Rent. The resolution so chosen shall constitute the decision of the arbitrators and be final and binding upon the parties.

e.   Where the issue concerns a determination other than a determination of Fair Market Rent, the issue shall be resolved in accordance with the decision of a majority of the arbitrators as between the solution to the issue as stated in the Landlord's Demand and the solution to the issue as stated in the Tenant's Demand as most closely approximating the correct solution as viewed by said majority. They shall have no right to impose a middle ground between the Landlord's Demand and the Tenant's Demand or any modification of either of the two. The resolution so chosen shall constitute the decision of the arbitrators and be final and binding upon the parties.

f.   If any arbitrator fails, refuses or is unable to act, his successor shall be appointed by him, but in the case of the third arbitrator, his successor shall be appointed in the same manner as provided for appointment of the third arbitrator. The arbitrators shall attempt to decide the issue within ten (10) business days after the appointment of the third arbitrator. Any decision derived from the foregoing arbitration process shall be binding and conclusive upon the parties. The losing party shall pay the fees and costs of the arbitrators and of the expert witnesses (if any) of the prevailing party as well as those of its expert witnesses. For purposes hereof, the losing party shall be that party whose Demand was not selected by the arbitrators.

g.   The arbitrators shall have the right to consult experts and competent authorities with factual information or evidence pertaining to determination of the matter at issue, but any such consultation shall be made in the presence of both parties with full right on their part to cross-examine. The arbitrators shall render their decision and award in writing with counterpart copies to each party. The arbitrators shall have no power to modify the provisions of this Lease.

THIS LEASE IS EXECUTED by Landlord and Tenant as of the date set forth at the top of page 1 hereof.

555 CALIFORNIA STREET PARTNERS, a California limited partnership,

By The Shorenstein Company, a California limited partnership, Manager

By The Shorenstein Co., a California corporation, its Agent

By: _____
Douglas W. Shorenstein
President

Landlord

LEHMAN BROTHERS INC., a Delaware corporation

By: _Robert E. Genirs_

Name: _____
Robert E. Genirs

Title: _____
Managing Director

Tenant

TSC

Pine St.

"Premises"
(entire 30th floor)

California St.

Bank of America Center
FLOOR 30

Exhibit A

## EXHIBIT B

### RULES AND REGULATIONS

The Bank of America World
Headquarters Building
555 California Street

1. No sign, placard, picture, advertisement, name or notice shall be inscribed, displayed or printed or affixed on or to any part of the outside or inside of the Building without the written consent of Landlord first had and obtained and Landlord shall have the right to remove any such sign, placard, picture, advertisement, name or notice without notice to and at the expense of tenant.

All approved signs or lettering on doors and walls shall be printed, painted, affixed or inscribed at the expense of tenant by a person approved of by Landlord.

If Landlord by a notice in writing to tenant shall object to any curtains, blinds, shades or screens attached to or hung in or used in connection with any window or door of the premises, such use of such curtains, blinds, shades or screens shall be forthwith discontinued by tenant. No awning shall be permitted on any part of the premises.

2. No tenant shall obtain for use upon the premises ice, drinking water, towel and other similar services or accept barbering or bootblacking or shoeshining or repair services on the premises, except from persons authorized by the Landlord and at the hours and under regulations fixed by the Landlord.

3. The bulletin board or directory of the Building will be provided exclusively for the display of the name and location of tenants only and Landlord reserves the right to exclude any other names therefrom.

4. The sidewalks, halls, passages, exits, entrances, elevators and stairways shall not be obstructed by any of the tenants or used by them for any purpose other than for ingress to and egress from their respective premises. The halls, passages, exits, entrances, elevators, stairways, balconies and roof are not for the use of the general public and the Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence in the judgment of the Landlord shall be prejudicial to the safety, character, reputation and interests of the Building and its tenants, provided that nothing herein contained shall be construed to prevent such access to persons with whom a tenant normally deals in the ordinary course of tenant's business unless such persons are engaged in illegal activities. No tenant and no employees or invitees of any tenant shall go upon the roof of the Building.

5. Tenants shall not alter any lock nor install any new or additional locks or any bolts on any door of the premises without the written consent of the Landlord.

6. The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed and no foreign substance of any kind whatsoever shall be thrown therein and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose employees or invitees, shall have caused it.

7. Tenants shall not overload the floor of the premises or mark, drive nails, screw or drill into the partitions, woodwork or plaster or in any way deface the premises or any part thereof, reasonable wear and tear excepted.

8. No furniture, freight or equipment of any kind shall be brought into the Building without the consent of Landlord and all moving of the same into or out of the Building shall be done at such time and in such manner as Landlord shall designate. Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy equipment brought into the Building and also the times and manner of moving the same in and out of the Building. Safes

1

or other heavy objects shall, if considered necessary by Landlord, stand on a platform of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property from any cause, and all damage done to the Building by moving or maintaining any such safe or other property shall be repaired at the expense of the tenant.

9.   Tenants shall not employ any person or persons other than the janitor of Landlord for the purpose of cleaning the premises unless otherwise agreed to by Landlord.  Except with the written consent of Landlord no person or persons other than those approved by Landlord shall be permitted to enter the Building for the purpose of cleaning the same.   Tenants shall not cause any unnecessary labor by reason of tenants' carelessness or indifference in the preservation of good order and cleanliness.  Except to the extent caused by the negligent or willful act of Landlord and its agents, servants, employees, and invitees, Landlord shall in nowise be responsible to any tenant for any loss of property on the premises, however occurring, or for any damage done to the effects of any tenant by any employee or any other person.

10.   Tenants shall not use, keep or permit to be used or kept any foul or noxious gas or substance in the premises, or permit or suffer the premises to be occupied or used in a manner offensive or objectionable to the Landlord or other occupants of the Building by reason of noise, odors and/or vibrations, or interfere in any way with other tenants or those having business therein, nor shall any animals or birds be brought in or kept in or about the premises or the Building.

11.   No cooking shall be done or permitted by any tenant on the premises, nor shall the premises be used for the storage of merchandise, for washing clothes, for lodging, or for any improper, objectionable or immoral purposes.

12.   Tenants shall not use or keep in the premises or the Building any kerosene, gasoline, or inflammable or combustible fluid or material, or use any method of heating or air conditioning other than that supplied by the Landlord.

13.   Landlord will direct electricians as to where and how telephone and telegraph wires are to be introduced.  No boring or cutting for wires will be allowed without the consent of Landlord.  The location of telephones, call boxes and other office equipment affixed to the premises shall be subject to the approval of Landlord.

14.   Each tenant, upon the termination of the tenancy, shall deliver to the Landlord the keys of offices, rooms and toilet rooms which shall have been furnished the tenant or which the tenant shall have had made, and in the event of loss of any keys so furnished, shall pay the Landlord therefor.

15.   No tenant shall lay linoleum, tile, carpet or other similar floor covering so that the same shall be affixed to the floor of the premises in any manner except as approved by the Landlord.  The expense of repairing any damage resulting from a violation of this rule or removal of any floor covering shall be borne by the Tenant by whom, or by whose contractors, employees or invitees, the damage shall have been caused.

16.   No furniture, packages, supplies, equipment or merchandise will be received in the Building or carried up or down in the elevators, except between such hours and in such elevators as shall be designated by the Landlord.

17.   On Sundays and legal holidays, and on other days between the hours of 6:00 P.M. and 8:00 A.M., access to the Building, or to the halls, corridors, elevators or stairways in the Building, or to the premises may be refused unless the person seeking access is known to the person or employee of the Building in charge and has a pass or is properly identified.  The Landlord shall in no case be liable for damages for any error with regard to the admission to or exclusion from the Building of any person.   In case of invasion, mob, riot, public excitement, or other commotion, the Landlord reserves the right to prevent access to the Building during the continuance of the same by closing the doors or otherwise, for the safety of the tenants and protection of property in the Building.

2

18.   Each tenant shall see that the doors of the premises are closed and securely locked before leaving the Building and must observe strict care and caution that all water faucets or water apparatus are entirely shut off before tenant or tenant's employees leave the Building, and that all electricity, gas or air shall likewise be carefully shut off, so as to prevent waste or damage, and for any default or carelessness tenant shall make good all injuries sustained by other tenants or occupants of the Building or Landlord.

19.   Landlord reserves the right to exclude or expel from the Building any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Building.

20.   The requirements of any tenant will be attended to only upon application at the office of the Building.  Employees of Landlord shall not perform any work or do anything outside of their regular duties unless under special instructions from the Landlord, and no employee will admit any person (tenant or otherwise) to any office without specific instructions from the Landlord.

21.   No vending machine or machines of any description shall be installed, maintained or operated upon the premises without the written consent of the Landlord.

22.   Subject to tenant's right of access to the premises in accordance with Building security procedures, Landlord reserves the right to close and keep locked all entrance and exit doors of the Building on Sundays and legal holidays and on other days between the hours of 6:00 P.M. and 8:00 A.M., and during such further hours as Landlord may deem advisable for the adequate protection of said Building and the property of its tenants.

23.   Landlord shall have the right, exercisable without notice and without liability to tenant, to change the name and the street address of the Building of which the premises are a part.

24.   The word "Building" as used herein means the Building of which the premises are a part.

25.   These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the agreements, covenants, conditions and provisions of any lease of premises in the Building. In the event of a conflict between the provisions of the Lease and the provisions of these Rules and Regulations, the provisions of the Lease shall control.

26.   Subject to Paragraph 19 of the Lease, Landlord reserves the right to make such other rules and regulations as in its judgment may from time to time be needed for the safety, care and cleanliness of the Building and for the preservation of good order therein.

EXHIBIT C

NON-DISTURBANCE AND ATTORNMENT AGREEMENT


        This Agreement is executed as of the _____ day of March, 1994,
between LEHMAN BROTHERS INC., a Delaware corporation ("Tenant"), 555 CALIFORNIA
STREET PARTNERS, a California limited partnership ("Landlord"), and BANK OF
AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION ("Beneficiary").


                                RECITALS


        A.    Beneficiary is beneficiary under that certain Deed of Trust,
Assignment of Rents, Security Agreement and Fixture Filing (the "Deed of Trust"),
recorded September 30, 1985, as Instrument No. D698385, Book D930, Page 13, in
the Official Records of the City and County of San Francisco, California, which
Deed of Trust encumbers the real property located at 555 California Street, San
Francisco, California (the "Property").

        B.    Landlord and Tenant entered into a lease agreement, dated
_____, 1994 (the "Lease"), pursuant to which Tenant leases from Landlord
premises on the 30th floor of the building situated on the Property (the
"Premises").

        C.    Tenant has requested that Beneficiary agree not to disturb
Tenant's possessory rights in the Premises if Beneficiary exercises its rights
under the Deed of Trust.


        NOW, THEREFORE, in consideration of the foregoing, the parties
agree as follows:


        1.    Foreclosure and Sale.

        a.    If Beneficiary or any purchaser at a foreclosure sale under
the Deed of Trust or at a sale of the Property under the trustee's power of sale
or any transferee of the Property designated in any deed given in lieu of
foreclosure succeeds to the interest of Landlord under the Lease ("Successor"),
then, so long as Tenant complies with this Agreement and is not in default under
any of the terms of the Lease (beyond any cure periods in the Lease), Successor,
for the term of the Lease, and any extensions or renewals thereof provided for
therein, shall not disturb Tenant's possession of the Premises and the Lease
shall continue in full force and effect as a direct lease between Successor and
Tenant for the balance of such term (and as the same may be extended) of the
Lease.  Tenant agrees to accept Successor and to attorn to Successor, as the
landlord under the Lease and Successor shall be bound by the obligations of the
landlord under the Lease. Notwithstanding the foregoing, Successor shall not be:

(i)  liable for any act or omission of Landlord or its successors other than Successor and other than the obligation to make Landlord's Contribution (as defined in the Lease);

(ii)  subject to any offsets or defenses which Tenant might have against Landlord or its successors, other than Successor;

(iii)  bound by any prepaid rent advanced by Tenant in excess of one month's rent or by any security deposit, cleaning deposit or other prepaid charge paid by Tenant to Landlord or its successors unless such amount is actually transferred to Successor; or

(iv)  bound by any agreement or modification of the Lease made without the written consent of Beneficiary, at a time when Beneficiary is the holder of the Deed of Trust, which consent Beneficiary agrees shall not be unreasonably withheld, delayed or deferred provided such modifications do not decrease the monetary obligations of Tenant under the Lease or materially adversely affect the leasehold interest thereby created.

b.  Upon the written request of either Beneficiary or Tenant given to the other any time after termination of the Lease, the parties agree to execute a new lease of the Premises upon the same terms and conditions as the Lease, for the then unexpired term of the Lease (and any extensions or renewals thereof provided for in the Lease).

2.  **Acknowledgment and Agreement by Tenant**.  Tenant acknowledges and agrees as follows:

a.  The Lease shall be subject and subordinate to the lien of the Deed of Trust and to all of the terms thereof, to all advances made thereunder and to any renewals, extensions, modifications or replacements thereof.

b.  Beneficiary has no obligation to oversee the use of by Landlord the proceeds of the loan secured by the Deed of Trust and Tenant acknowledges that such proceeds, in fact, may be used by Landlord for purposes other than improvement of the Property.

c.  In the event of any act or omission by Landlord which would give Tenant the right to terminate the Lease, to abate the rent payable thereunder or to claim a partial or total eviction, Tenant's exercise of any such right shall not be effective until (i) Tenant has given written notice of such act or omission to Beneficiary, (ii) the same period of time granted under the Lease to Landlord to cure such act or omission shall have elapsed following Tenant's notice to Beneficiary and (iii) Beneficiary has failed to remedy the same.

d.  If Beneficiary notifies Tenant that Landlord is in default under the Deed of Trust and demands that Tenant pay rent and other sums due under the Lease to Beneficiary, Tenant shall pay such amounts directly to Beneficiary or as otherwise required in such notice.

e.  This Agreement satisfies any condition or requirement in the Lease relating to the granting of a non-disturbance agreement with respect to existing Encumbrances (as defined in the Lease) on the Property.  Landlord represents that the Deed of Trust is the only existing Encumbrance on the Property at the date hereof.

3.  **Acknowledgment and Agreement by Landlord**.  Landlord, as landlord under the Lease and trustor under the Deed of Trust, acknowledges and agrees as follows:

a. This Agreement does not constitute a waiver by Beneficiary of any of its rights under the Deed of Trust or release Landlord from its obligations under the Deed of Trust.

b. In the event of a default under the Deed of Trust, Tenant may pay all rent and all other sums due under the Lease to Beneficiary as provided in this Agreement.

4. **Notices**. All notices required hereunder shall be in writing and sent, transmitted or delivered to the party personally by telex, telecopy, or private courier, or sent by United States certified or registered mail, postage prepaid, return receipt requested, addressed to the party for whom it is intended at its address as follows:

To Beneficiary:      Bank of America NT&SA
Corporate Real Estate
560 Davis Street
San Francisco, California 94137

To Tenant:      Lehman Brothers Inc.
555 California Street
San Francisco, CA 94104

with copy to:      Lehman Brothers Inc.,
2 World Trade Center, 16th Floor
Corporate Real Estate Department
New York, New York 10048
Attn: Thomas A. Savoca, Vice President

All notices will be effective (i) upon receipt if delivered personally or sent by telex or telecopy, and (ii) three days after posting when sent via registered or certified mail as provided above. Either party may designate a change of address by written notice to the other party as provided in this Section.

5. **Miscellaneous**.

a. This Agreement supersedes any inconsistent provision of the Lease.

b. If Beneficiary acquires title to the Property, Beneficiary's liability shall be limited to, and Tenant shall look exclusively to Beneficiary's then equity interest, if any, in the Property for any obligations imposed upon Beneficiary hereunder or under the Lease. Tenant hereby releases Beneficiary from any other liability.

c. Tenant's rights hereunder may not be assigned or transferred without the prior written consent of Beneficiary except in connection with any assignment of the Lease which is permitted by the terms of the Lease. Subject to the foregoing, this Agreement shall inure to the benefit of and bind the parties hereto and their respective heirs, successors and permitted assigns; provided however, that upon the assignment of Beneficiary's interest hereunder, Beneficiary's obligations and liabilities hereunder shall terminate and all such obligations and liabilities shall be the responsibility of Beneficiary's assignee.

d. This Agreement shall be governed by and construed in accordance with the laws of the state of California.

02001\3002.nda (pe\031794)      6

e.   In the event that any claim or action is filed or instituted under this Agreement to enforce its terms and provisions, the prevailing party will be entitled to receive from the other party all costs, damages, and expenses, including reasonable attorneys' fees, incurred by the prevailing party, whether or not such controversy or claim is litigated or prosecuted by judgment. The prevailing party will be that party who was awarded judgment as a result of trial or arbitration, or who receives a payment of money from the other party in settlement of claims asserted by that party.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BENEFICIARY:   BANK OF AMERICA NATIONAL TRUST
               AND SAVINGS ASSOCIATION

               By_____

               Name_____

               Title_____


TENANT:        Lehman Brothers Inc.,
               a Delaware corporation

               By   _Robert E. Genirs_

               Name _Robert E. Genirs_

               Title _Managing Director_


LANDLORD:      555 CALIFORNIA STREET PARTNERS, a
               California limited partnership

               By The Shorenstein Company, a
                  California limited partnership,
                  Manager

                  By The Shorenstein Co., a
                     California corporation,
                     its Agent

                     By_____
                        Douglas W. Shorenstein
                        President