WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David R. Fertig
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                    :
                    Debtors.        :    (Jointly Administered)
                                    :
------------------------------------------------------------------x
```

**DEBTOR'S OBJECTION TO MOTION OF MIDCOUNTRY BANK**
**FOR RELIEF FROM THE AUTOMATIC STAY AND ADDITIONAL RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      Lehman Brothers Holdings Inc. ("LBHI"), by and through its undersigned attorneys, respectfully submits this response in opposition to the motion of MidCountry Bank ("MidCountry"), dated April 1, 2009, for: (i) an order granting relief from the automatic stay extant pursuant to Section 362 of Title 11 of the United States code (the "Bankruptcy Code"); and (ii) additional relief, as set forth in the motion (hereinafter the "Motion For Stay Relief").

**I.      PRELIMINARY STATEMENT**

      1.     LBHI's objection aside, the Court should deny the Motion For Stay Relief sua sponte because: (i) MidCountry, as the proponent of a request for stay relief, has wholly failed to meet its burden of demonstrating that "cause" exists for granting relief from the

automatic stay; and (ii) MidCountry's Motion For Stay relief is, as evidenced by the motion itself and MidCountry's own representations to another court, really just a thinly-veiled and procedurally improper attempt to secure, without commencing an adversary proceeding (as required by Bankruptcy Rule 7001) or filing a motion to compel the assumption of rejection of an executory contract (as required by Section 365 of the Bankruptcy Code), a declaration as to LBHI's interests in property of its estate and the termination of an executory contract as to which LBHI admittedly is a party.

2.      Even apart from these inherent and fatal defects, however, MidCountry's Motion For Stay Relief should also be denied because MidCountry seeks relief for the express purpose of depriving LBHI's estate, and its creditors, of valuable property interests explicitly protected by Section 362(a) of the Bankruptcy Code—namely, LBHI's retained ownership of certain mortgage loan servicing rights (and rights related thereto) and various contractual rights granted to LBHI under a tripartite loan servicing agreement among LBHI, MidCountry and Aurora Loan Services, LLC ("Aurora").

3.      LBHI does not dispute that, prior to the commencement of LBHI's chapter 11 case, MidCountry purchased certain mortgage loans from LBHI (the "Mortgage Loans").  But in that sale transaction, LBHI expressly retained, and did not sell to MidCountry (nor has it ever since sold to MidCountry or any other party) the separate and independent right to service the Mortgage Loans and the rights attendant thereto.  See Mortgage Loan and Purchase and Warranties Agreement, dated as of July 30, 2007, a true and correct copy of which is annexed hereto as **Exhibit A** (the "Purchase Agreement), § 4, p. 6 ("The Mortgage Loans shall be sold by

the Seller to the Purchaser *on a servicing retained basis*.") (emphasis added).[1] Thus, while LBHI

no longer owns the Mortgage Loans, it unquestionably owns the right to service them and to

collect certain payments associated with such servicing.

4.      Prior to the loan sale, LBHI had an agreement with Aurora, an indirect

subsidiary of LBHI, pursuant to which LBHI delegated the servicing the of the Mortgage Loans

to Aurora.  So as to protect this arrangement, following the service-retained sale to MidCountry,

LBHI, MidCountry and Aurora entered into a tripartite agreement whereby the parties agreed

that Aurora would continue to service the Mortgage Loans.  See Servicing Agreement, dated as

of July 30, 2007, a true and correct copy of which is annexed hereto as **Exhibit B** (the "Servicing

Agreement"), second WHEREAS clause, p. 1 ("WHEREAS, [LBHI] has previously contracted

with [Aurora] for the servicing responsibilities associated with the Mortgage Loans and [Aurora]

has assumed the servicing responsibilities to such Mortgage Loans").  The Servicing Agreement

acknowledges that LBHI is the owner of the servicing rights.  See id., at pp. 1, 8 (defining

"Servicing Rights Owner" as LBHI).

5.      The Servicing Agreement also grants LBHI certain valuable property

rights.  For example, while the agreement permits MidCountry (and, separately, LBHI) the right

to terminate Aurora as servicer, it expressly grants to LBHI, as a pre-condition to such

termination, the right to consent to any successor servicer and to collect a termination fee in the

event that MidCountry terminated "without cause."  These rights assure that LBHI's economic

interests as Servicing Rights Owner are preserved in the event that Aurora—LBHI's subsidiary

and its preferred servicer—is terminated.

---

[1] The Purchase Agreement and Servicing Agreement, defined infra ¶¶ 3-4, was entered into by
Lehman Capital, a Division of LBHI, and not a separate legal entity.  References made herein to
LBHI shall include, where appropriate, LBHI and/or Lehman Capital.

6.      On or about March 9, 2009, and with full knowledge of the pending chapter 11 proceedings, MidCountry brought suit in the Douglas County District Court in and of the State of Colorado (the "Colorado Court") under the caption *MidCountry Bank v. Aurora Loan Services, LLC*, Case No. 09-369 (the "Colorado Action"), seeking, among other things, to remove Aurora as the servicer and replace it with a servicer of its choosing (circumventing the clear and unambiguous consent requirement in the agreement), to obtain the servicing files (held in trust, in part, for LBHI), *and to terminate the Servicing Agreement, and LBHI's servicing ownership and attendant rights in their entirety*.

7.      MidCountry then belatedly filed this motion, ostensibly seeking a lifting of the automatic stay so as to proceed with the Colorado Action.  A significant majority of MidCountry's motion, however, is dedicated to arguing that LBHI has no property interest at all. MidCountry's true intentions are further confirmed by statements made in the Colorado Action, where MidCountry characterizes the instant Motion as one for "*a determination that, inter alia, any rights that Lehman had in the [Servicing Agreement] are not property of the estate under Section 541(d) of the bankruptcy code*."  MidCountry's Response in Opposition to Defendant's Motion to Dismiss, dated April 14, 2009, a copy of which is attached hereto as **Exhibit C** at p. 17 (emphasis added).

8.      Putting aside the impropriety of MidCountry's attempt to obtain a finding that the estate does not have an interest in the context of a motion for relief from stay, its assertions are contradicted by the clear language of the agreements, which reflect that LBHI retained ownership of the servicing rights, and that its servicing rights entitle it to various payments and other rights.

9.      Nor can there be a meaningful dispute that the instant motion and the Colorado Action seek to divest LBHI of those rights, notwithstanding MidCountry's disingenuous attempts to assert otherwise in the Motion For Stay Relief.  See, e.g., p. 3, ¶ 5 ("MidCountry does not seek to directly affect or terminate any remaining rights that LBHI may have in the [Servicing Agreement], *i.e.*, as servicing rights owner.").  Indeed, MidCountry's false and misleading assertions to this Court are rebutted entirely by: (i) MidCountry's admission in the motion itself that the very purpose of its Motion For Stay Relief is to "seek relief from the stay … to terminate the [Servicing Agreement] (to the extent not previously terminated) and to terminate Aurora as servicer" (Motion For Stay Relief  ¶ 5 (emphasis in original)); and (ii) its specious view—stated repeatedly in papers filed in the Colorado Action (but conspicuously absent from the Motion For Stay Relief)—that "[w]hile certain obligations survive the termination of the [Servicing Agreement] … [LBHI]'s servicing rights ownership *does not survive*."  **Exhibit C**, at p. 4 (emphasis in original).

10.      MidCountry's position flouts the clear terms of the Servicing Agreement regarding the impact of any termination of Aurora and when and how such a termination becomes effective (including the necessity of obtaining LBHI's consent, which has not been granted), and ignores the fact that LBHI's ownership of the servicing rights were not born out of, and exist irrespective of, the Servicing Agreement.  But, more to the point, MidCountry's position makes patently clear that *both* the Colorado Action and the Motion For Stay Relief place at risk valuable property interests of the estate.

11.      Perhaps in recognition of their fatally contradictory positions, or possibly to give some credence to the title of the Motion For Stay Relief, MidCountry reluctantly reverts to arguing—or, more precisely, nakedly asserting—that it should be granted relief from the

automatic stay *despite* LBHI's clear and irrefutable property interests.  But MidCountry does not even acknowledge the applicable <u>Sonnax</u> factors, much less attempt to apply them (or any other standard) to the facts and circumstances here.  And it is no wonder MidCountry did not so since, upon even cursory consideration, it is eminently clear that the relevant factors weigh heavily in favor or preserving the protections of the automatic stay.

12.    The impropriety of MidCountry's motion is further demonstrated by the incongruous relief sought—to wit, declaratory judgments: (i) that the Servicing Agreement has been terminated; (ii) that LBHI is "deemed" to have consented to the replacement of Aurora by the proposed successor servicer unilaterally designated by MidCountry, despite the undisputed fact that LBHI has not so consented; and (iii) that Section 362 of the Bankruptcy Code permits MidCountry to divest Aurora, and thus LBHI, of possession of the servicing files.  MidCountry also improperly seeks an order terminating the Servicing Agreement—an executory agreement protected by the Bankruptcy Code—itself.

13.    For these reasons, and as more fully detailed below, MidCountry's Motion For Stay Relief must be denied in its entirety.

## II.    <u>BACKGROUND</u>

### A.    LBHI's Bankruptcy Proceedings

14.    Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its affiliates (collectively, "Debtors") commenced with this Court voluntary cases under Chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

15.     The Debtors are authorized to operate their businesses and manage their

properties as debtors in possession pursuant to Sections 1107(a) and 1008 of the Bankruptcy

Code.

**B.     LBHI's Business And Servicing Of The Mortgage Loans**

16.     Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

17.     Additional information regarding Debtors' businesses, capital structures,

and the circumstances leading to the commencement of these chapter 11 cases is contained in the

Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

Southern District of New York in Support of First-Day Motions and Applications, filed on

September 15, 2008 [Docket No. 2].

18.     Among other businesses in which Debtors were engaged prepetition,

LBHI was engaged in the business of selling and servicing (either directly or through one or

more sub-servicers) residential mortgage loans to third parties.  Typically, LBHI would appoint

Aurora Loan Services, LLC ("Aurora"), a wholly-owned subsidiary of Lehman Brothers Bank

("LBB"),[2] to service the loans on LBHI's behalf.

19.     Prior to July 30, 2007, LBHI originated a portfolio of approximately fifty

conventional, adjustable-rate, residential first-lien mortgage loans (the "Mortgage Loans") and

appointed Aurora to perform the servicing of those loans on LBHI's behalf.

---

[2] As this Court is well aware, LBB is an indirect, wholly-owned non-debtor subsidiary of LBHI.
See *Debtors' Motion, Pursuant To sections 105(a) and 363 of the Bankruptcy Code and Rules
9019 and 6004, For Authorization to Invest Capital And To Perform Certain Related Actions To
Support The Capital Level of Lehman Brothers Bank* [Docket 3193].

C.      **LBHI's Sale Of The Mortgage Loans To MidCountry On
A Servicing Retained Basis And The Tripartite Servicing
Agreement Among LBHI, MidCountry, And Aurora**

20.      On or about July 30, 2007, LBHI entered into a Mortgage Loan Purchase

And Warranties Agreement, dated as of July 30, 2007 (the "Purchase Agreement"), pursuant to

which LBHI, as Seller, sold the Mortgage Loans to MidCountry, as Purchaser, *on a servicing-*

*retained basis*.  Indeed, the Purchase Agreement expressly and unequivocally provided that

"[t]he Mortgage Loans [were] sold by the Seller to the Purchaser *on a servicing retained basis*."

See **Exhibit A**, at p. 6, § 4 (emphasis added).  See also id., at p. 1, Second WHEREAS Clause

("WHEREAS, the Seller desires to sell to the Purchaser, and Purchaser desires to purchase from

the Seller, certain conventional adjustable rate residential first lien mortgage loans (the

'Mortgage Loans') *on a servicing retained basis* as described herein….") (emphasis added).

Thus, following execution of the Purchase Agreement, MidCountry became the owner of the

Mortgage Loans *exclusive of the servicing rights relating thereto*, and LBHI continued to own all

rights to service the Mortgage Loans, and the rights and responsibilities relating thereto.

21.      On or about July 30, 2007, LBHI, MidCountry, and Aurora entered into a

tripartite Servicing Agreement (the "Servicing Agreement"), pursuant to which MidCountry, as

Owner of the Mortgage Loans, consented to the continued servicing of the Mortgage Loans by

Aurora, as Servicer, on behalf of LBHI, as Servicing Rights Owner.  Indeed, the Servicing

Agreement explicitly recognized that "[LBHI] ha[d] previously contracted with [Aurora] for the

servicing responsibilities associated with the Mortgage Loans and [that] [Aurora] ha[d] assumed

the servicing responsibilities for such Mortgage Loans," and went on to declare that "[Aurora]

shall continue to service the Mortgage Loans," subject to the terms and conditions set forth in the

Servicing Agreement.  See **Exhibit B**, at p. 1, WITNESSETH Clauses.

22.     The Servicing Agreement expressly recognized that, notwithstanding MidCountry's ownership of the Mortgage Loans and its consent to the continued servicing of those loans by Aurora (on behalf of LBHI and for the benefit of both LBHI and MidCountry), LBHI continued to own—and would at all times in the future continue to own—the exclusive right to service the Mortgage Loans (either directly or through a designee acceptable to LBHI) and all rights relating thereto.  Indeed, the Servicing Agreement specifically identified LBHI as the "Servicing Rights Owner."  See **Exhibit B**, at pp. 1, 8.  In addition, the Servicing Agreement expressly recognized and reiterated that which was made abundantly clear in the Purchase Agreement—namely, that the sale of the Mortgage Loans from LBHI to MidCountry had been effectuated on a *servicing-retained* basis; for, the Servicing Agreement expressly stated that MidCountry had acquired ownership of the Mortgage Loans "*excluding any of the related Servicing Rights*" and made clear that the "Servicing Rights" that had been retained and not sold by LBHI included, among other things, the following (collectively, the "Servicing Rights"):

> (a) any and all rights to service the Mortgage Loans; (b) any payments to or monies received by the Servicer [i.e., Aurora] for servicing the Mortgage Loans; (c) any late fees, penalties or similar payments with respect to the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such servicing rights to the extent they relate to such servicing rights and all rights of the Servicer [i.e., Aurora] thereunder; (e) Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts collected by the Servicer [i.e., Aurora] with respect thereto; (f) all accounts and other rights to payment related to any of the property described in this paragraph; and (g) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans [collectively, the "Servicing Files"].

See **Exhibit B**, at p. 1 (First WHEREAS Clause) (emphasis added), 8 (definition of "Servicing Rights").

23.     In addition to acknowledging that LBHI *retained* rights in and to the

Servicing Rights, the Servicing Agreement also *provided* LBHI with a number of valuable rights

and interests relating to the Mortgage Loans.  For example, in order to permit LBHI to exercise

and to monitor its receipt and enjoyment of its retained Servicing Rights, the Servicing

Agreement expressly provided that all Servicing Files relating to the Mortgage Loans would be

"held in trust by the Servicer [i.e., Aurora] for the benefit of the Owner [i.e., MidCountry], as the

owner thereof, *and the Servicing Rights Owner [i.e., LBHI]*."  See **Exhibit B**, at pp. 8-9, § 2.01.

24.     Moreover, in order to ensure that LBHI would continue to enjoy the

economic and other benefits flowing from its retained ownership of the Servicing Rights and that

it would not be divested of those benefits by any decision by MidCountry to terminate Aurora—

LBHI's subsidiary and its preferred servicer—in favor of some alternative servicer who (a)

would have no experience with the Mortgage Loans, (b) might be unknown to LBHI, and (c)

would have *neither* a parent-subsidiary relationship with LBHI *nor* a pre-existing arrangement

with LBHI pursuant to which LBHI would be assured of receiving the economic benefits to

which it is entitled in its capacity as owner of the Servicing Rights,[3] the Servicing Agreement

expressly granted to LBHI a contractual right of consent over the appointment of any successor

servicer if MidCountry ever invoked its contractual right under the Servicing Agreement to

---

[3] As noted above—and as the Servicing Agreement itself memorializes (see **Exhibit B** at p. 1)—
Aurora served as LBHI's delegated servicer of the Mortgage Loans even prior to the sale of the
Mortgage Loans to MidCountry and therefore had a separate, pre-existing arrangement with
LBHI, its ultimate parent company, concerning the allocation of all monies collected by Aurora
in connection with its servicing of the Mortgage Loans and the division and distribution of the
same among LBHI and Aurora after giving effect to any servicing fees to which Aurora was
entitled to keep.  For this reason, there was no need to specify in the Servicing Agreement—and
the Servicing Agreement was thus silent on—the mechanics relating to the "Servicer's" payment
obligations to LBHI in order to ensure that LBHI received the full economic benefit of its
retained Servicing Rights.

revoke its consent to Aurora's continued servicing of the Mortgage Loans.[4]  Specifically, the

Servicing Agreement provides that "[s]imultaneously with the termination of [Aurora's]

responsibilities and duties under this Agreement pursuant to Sections 6.02, 8.03, 9.01 or 9.02,

[MidCountry] shall appoint a successor servicer (*with the consent of [LBHI]*, which consent may

not be unreasonably withheld) which shall succeed to all rights and assume all of the

responsibilities, duties and liabilities of the Servicer under this Agreement simultaneously with

the termination of [Aurora's] responsibilities, duties and liabilities under this Agreement."  See

**Exhibit B**, at p. 31, § 10.01 (emphasis added).  Furthermore, the Servicing Agreement expressly

provides that "[t]he … removal of [Aurora] pursuant to the aforementioned sections shall not

become effective until a successor shall be appointed pursuant to this Section 10.01…."  Id. at p.

31, § 10.01.

> 25.    In addition, in order to dissuade MidCountry from lightly or arbitrarily

terminating Aurora, LBHI's subsidiary and preferred servicer, the Servicing Agreement provided

LBHI with a right to collect a "termination fee" from MidCountry ("Termination Fee") in the

event that MidCountry ever sought to revoke its consent to Aurora's continued servicing of the

Mortgage Loans "without cause."  More specifically, the Servicing Agreement provides that

"[i]n the event that [Aurora] is terminated as servicer pursuant to Subsection 9.02(b)(iii) above,

[MidCountry] shall pay a termination fee to [LBHI] equal to six (6) times the applicable

Servicing Fee Rate of the unpaid principal balance of the Mortgage Loans then being serviced

---

[4] In light of MidCountry's interests as Owner of the Mortgage Loans, Sections 9.01 and 9.02 of
the Servicing Agreement granted to MidCountry, subject to the provisions of Sections 9.01, 9.02
and 10.01 of the Servicing Agreement, the contractual right to terminate Aurora's responsibilities
as "Servicer," and to appoint a successor servicer, either "for cause" or "without cause."  See
**Exhibit B** at pp. 29-31, §§ 9.01, 9.02, 10.01.  Given its interests as Servicing Rights Owner,
LBHI also had the right to terminate Aurora's responsibilities as Servicer and to appoint a
successor servicer reasonably acceptable to MidCountry.  See id. at p. 31, § 9.02.

pursuant to this Agreement as of the Determination Date immediately prior to the date that the notice of termination was received by [LBHI]." See **Exhibit B**, at p. 30, § 9.02.

> **D.    MidCountry's Attempted Termination Of Aurora And Unilateral Appointment Of A Successor Servicer, And The Subsequent Colorado State Court Action**

26.    On or about January 12, 2009, MidCountry notified Aurora by email that it had "decided to terminate its Servicing Agreement with Aurora Loan Services, effective [as of] February 1, 2009," and that MidCountry had unilaterally purported to appoint "Dovenmuehle Mortgage, Inc. ["Dovenmuehle"] to assume the servicing responsibility" with respect to the Mortgage Loans. In that same correspondence, despite having failed to seek or secure LBHI's consent to the appointment of Dovenmuehle as successor servicer, MidCountry "demanded" that Aurora transfer all servicing responsibilities relating to the Mortgage Loans, and all related Servicing Files, to Dovenmuehle. See January 12, 14, 2009 email, a true and correct copy of which is attached hereto as **Exhibit D**.

27.    By email dated January 14, 2009, Aurora responded to MidCountry's January 12th correspondence, but noted that it was not in a position to resign or assign its servicing responsibilities inasmuch as the terms of the Servicing Agreement relating to Aurora's termination and the appointment of a successor servicer had not been complied with. Aurora explained, however, that "[o]nce the notice provisions detailed in the [S]ervicing [A]greement … are complied with, we will make every effort to cooperate fully." See id.

28.    Thereafter, by letter dated February 6, 2009, MidCountry again purported "to terminate Aurora Loan Services, LLC ('Aurora') … [and] appoint a successor servicer entity," despite having not secured LBHI's consent to its unilateral appointment of Dovenmeuhle as successor servicer. See February 6, 2009 Letter, a true and correct copy of which is attached hereto as **Exhibit E**.

29.    By letter dated February 13, 2009, Aurora again notified MidCountry that it was "unable to effectuate any transfer of servicing obligations to a successor servicer unless and until MidCountry received the consent of [LBHI], as Servicing Rights Owner, pursuant to Section 10.01 of the [Servicing] Agreement."  In addition, Aurora expressly advised MidCountry that LBHI "is currently a debtor and debtor-in-possession in a proceeding for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York."  See February 13, 2009 Letter, a true and correct copy of which is attached hereto as **Exhibit F**.

30.    Subsequently, on or before March 9, 2009, MidCountry, despite its knowledge of LBHI's rights and interests as set forth above, commenced the Colorado Action, asserting claims for breach of the Servicing Agreement and breach of fiduciary duty against Aurora, and seeking, among other things, an order compelling Aurora to turn over possession of the Servicing Files to MidCountry.  In addition, and also on March 9, 2009, MidCountry, in disregard of LBHI's rights under the Servicing Agreement and in violation of the stay extant under section 362 of the Bankruptcy Code, filed a motion for Temporary Restraining Order and a Preliminary and Permanent Injunction (the "PI Motion") compelling Aurora to, among other things: (a) immediately cease and desist from servicing or taking any further action with respect to the Mortgage Loans; and (b) immediately transfer all Servicing Files relating to the Mortgage Loans to Dovenmuehle.  See Motion for Temporary Restraining Order and Preliminary/Permanent Injunction, dated March 9, 2009, Exhibit B to Motion For Stay Relief, at p. 2.

31.    As evidenced by MidCountry's Motion for Stay Relief and by papers filed by MidCountry in the Colorado Action, through the Colorado Action and the PI Motion,

MidCountry does not seek merely to recover damages from Aurora on account of its alleged breaches of the Servicing Agreement and/or Aurora's alleged fiduciary duty to MidCountry. Nor does MidCountry merely seek unilaterally (and without the consent of LBHI) to divest Aurora of its possession of the Servicing Files and its responsibilities as Servicer under the Servicing Agreement—relief which, alone, would deprive LBHI of its unequivocal rights as Servicing Rights Owner under the Servicing Agreement. Rather, as MidCountry has admitted both before this Court and in the Colorado Action, MidCountry seeks a ruling in connection with the PI Motion and the Colorado Action *that the Servicing Agreement is terminated and that LBHI no longer possesses the Servicing Rights, or any other rights or interests, with respect to the Mortgage Loans*.

32. Indeed, MidCountry admits in its Motion For Stay Relief that it seeks relief from stay in order to "proceed against Aurora in the Colorado Action, *to terminate the [Servicing Agreement] (to the extent not previously terminated) and to terminate Aurora as servicer.*" See Motion for Stay Relief at p. 3. And in papers filed in the Colorado Action, MidCountry expressly has argued—and seeks a ruling from this Court decreeing that— "MidCountry may terminate Aurora at its sole option and discretion *without regard to Lehman* or Aurora, *at which time the [Servicing Agreement], and Lehman's servicing rights, terminate with it.*" See MidCountry's Response In Opposition To Aurora's Motion To Dismiss, annexed hereto as **Exhibit C**, at p. 6. See also id. at 6, n. 5 (arguing that "Lehman's limited opportunity to reasonably object to the successor servicer is questionable given he fact that … the [Servicing Agreement] itself terminated"); id. at 11 (arguing that "MidCountry's unilateral and discretionary decision to terminate Aurora extinguished not only Aurora's ability to service the loans, *it also terminated the [Servicing Agreement] itself and, with it, Lehman's servicing rights*

*ownership. Therefore, Lehman's former servicing rights are not a present right to be affected by this action.*") (emphasis added and internal citation omitted).

33.     By letter dated March 11, 2009, counsel for Aurora again notified MidCountry of the pendency of LBHI's chapter 11 case, of the fact that LBHI "owns the mortgage servicing rights that are the subject of [MidCountry's] claims in [the Colorado Action]," and MidCountry's actions "appear[ed] to willfully violate the automatic stay under the Bankruptcy Code."

34.     In addition, by letter dated March 18, 2009, Debtors' counsel also advised MidCountry and its counsel of LBHI's rights and interests in the subject matter of the Colorado Action and the PI Motion, and urged them to refrain from (further) violating the automatic stay extant under section 362 of the Bankruptcy Code.

35.     Nevertheless, MidCountry and its counsel proceeded with the PI Motion and participated in an evidentiary hearing regarding the same held by the Colorado Court on March 18, 2009.

36.     In an order entered following the Mach 18, 2009 evidentiary hearing on the PI Motion, the Colorado Court refused to grant the relief requested by MidCountry in its PI Motion and instead expressly "permit[ed] [Aurora] to continue servicing the mortgage loans that are in question in this case." See Order dated March 20, 2009, a true and correct copy of which is annexed hereto as **Exhibit G**, at p. 1. The Colorado Court, did, however, order Aurora to promptly make available to MidCountry *copies* of the Servicing Files. Id. at pp. 1-2.

**E.     MidCountry's Motion For Stay Relief**

37.     Having failed to obtain the relief it desired by knowingly disregarding and willfully violating the automatic stay, MidCountry now purports to seek relief from stay for the ostensible purpose of allowing it to proceed "unfettered with [the Colorado Action] against

Aurora [ ], which is neither a debtor before this (or any other bankruptcy) Court, nor otherwise

protected by the Court, or the Bankruptcy Code, in connection [with] these cases."  Motion For

Stay Relief at p. 2, ¶ 1.  As set forth above, however, MidCountry, in connection with the

Colorado Action, does not seek to affect *only* the rights of Aurora under the Servicing

Agreement; rather, as demonstrated above—and *despite MidCountry's wholly contradictory*

*representations to this Court*[5]—MidCountry *admittedly* seeks in the Colorado Action and the PI

Motion to eviscerate admitted and unequivocal rights and property interests of LBHI by, <u>inter</u>

<u>alia</u>: (a) seeking to terminate an executory contract with LBHI (<u>i.e.</u>, the Servicing Agreement);

and (b) seeking to obtain a judicial determination that LBHI no longer possesses any Servicing

Rights, or any other rights or property interests, with respect to the Mortgage Loans.

Accordingly, MidCountry cannot possibly meet its burden of demonstrating an entitlement to

relief from stay—something which, as discussed below, MidCountry has not even attempted to

do.

   38.  Moreover, MidCountry, through its Motion For Stay Relief, does not

merely seek relief from stay in order to proceed in the Colorado Action and on its PI Motion

against Aurora.  Rather, MidCountry improperly requests various additional forms of relief as

well, including three forms of declaratory relief —to wit, a declaration that (i) the Servicing

Agreement has been terminated post-petition; (ii) LBHI is deemed to have given its consent to

the appointment of Dovenmuehle as successor servicer to Aurora; and (iii) LBHI does not have

---

[5] <u>See</u> Motion For Stay Relief at p. 3, ¶ 5 ("MidCountry does not seek to directly affect or
terminate any remaining rights that LBHI may have in the [Servicing Agreement], *i.e.*, as
servicing rights owner."; <u>id</u>. at p. 15, ¶ 28 ("MidCountry does not seek to directly impact *any*
property right of th[e] Debtor.  Specifically, MidCountry does not seek to directly terminate the
[Servicing Agreement] with respect to LBHI, nor does MidCountry seek to change any of the
rights that LBHI might have under the Contract as servicing rights owner or other rights that may
exist under the Contract in favor of [ ] LBHI.").

any property rights or interests (including in the Servicing Files that Aurora contractually holds in trust for the benefit of MidCountry *and* LBHI) that prevents MidCountry from obtaining the relief it seeks in the Colorado Action.  See Motion For Stay Relief at p. 19.  As demonstrated below, such relief is wholly inappropriate and may not be granted pursuant to a motion for relief from stay, and MidCountry has, in any event, wholly failed to provide any colorable basis upon which such relief should be granted.

39.     Accordingly, LBHI respectfully requests that the Court deny MidCountry's Motion For Stay Relief in its entirety.

### III.    ARGUMENT

### MIDCOUNTRY'S  MOTION FOR STAY RELIEF SHOULD BE DENIED IN ITS ENTIRETY

**A.    LBHI Unquestionably Possesses Property Rights And Interests That MidCountry Seeks To Impair In The Colorado Action**

40.     Although MidCountry seeks relief from the automatic stay, thereby implicitly *conceding* that LBHI possesses property rights over which MidCountry seeks to exercise control in the Colorado Action, MidCountry devotes the overwhelming majority of its Motion For Stay Relief to arguing that LBHI does not, in fact, have such rights.  In fact, in papers filed with the Colorado Court, MidCountry has expressly characterized its Motion For Stay Relief *not* as an attempt to obtain relief from the automatic stay, but rather, as a motion which "*seek[s] a determination that … any rights that Lehman had in the [Servicing Agreement] are not property of the estate under Section 541(d) of the Bankruptcy Code*."  See **Exhibit C**, at p. 17 (emphasis added).  For this reason alone, the Court should deny MidCountry's Motion For Stay Relief because a determination as to a debtor's interest in property may not be obtained through a motion for stay relief or other motion practice.  Rather, Bankruptcy Rule 7001 clearly requires that a determination regarding the extent of a debtor's interest in property must be

obtained via a request for declaratory relief in the context of an adversary proceeding.  See Fed.

R. Bankr. P. 7001 (defining an adversary proceeding as, inter alia, "a proceeding … (2) *to*

*determine the validity, priority, or extent of a lien or other interest in property,* other than a

proceeding under Rule 4003(d) … [or] … (9) *to obtain a declaratory judgment relating to any of*

*the foregoing.…*") (emphasis added).

41.    Nevertheless, it is clear that LBHI *does* possess various property interests

with which MidCountry seeks to interfere in the Colorado Action.  For example, as explained

above, LBHI unequivocally *retained*, and continues to own, all Servicing Rights relating to the

Mortgage Loans, including the right to service the Mortgage Loans, the right to collect all

payments and fees associated therewith, and all rights under, in, and to any agreement

evidencing such servicing rights, and all rights of Aurora thereunder.  See ¶¶ 2, 20-23, supra.

42.    In addition, LBHI has a property interest in various contractual rights that

were granted to LBHI under the terms of the Servicing Agreement—an executory contract—

including (a) the right to consent (or to reasonably withhold consent) to any successor servicer

proposed by MidCountry; and (b) the right to collect a Termination Fee from MidCountry in the

event MidCountry ever terminates, or is found to have terminated, Aurora's servicing

responsibilities "without cause."  Such rights are unquestionably property of the estate.  See, e.g.,

Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),

138 B.R. 687 (Bankr. S.D.N.Y. 1992) ("[W]e hold that executory contracts are property of the

estate within the meaning of § 541."); 11 U.S.C. § 541(a)(1) ("[A debtor's] estate is comprised of

all the following property, wherever located and by whomever held: (1) Except as provided in

subsections (b) and (c)(2) of this section [which are inapplicable], all legal or equitable interests

of the debtor in property as of the commencement of the case.…").

43.     Notably, in papers filed with the Colorado Court, MidCountry acknowledges that LBHI in fact possesses these property rights.  See, e.g., **Exhibit C**, at p. 8 ("As the Servicing Rights Owner … Lehman held the right to service the loans, which responsibility was given to Aurora ….  Lehman was also entitled to all servicing fees received by Aurora for the servicing of the loans.").  Moreover, as MidCountry's own pleadings and admissions confirm, MidCountry seeks in the Colorado Action a judicial determination that the Servicing Agreement was, or is, terminated, and that LBHI somehow no longer possesses either its retained Servicing Rights or its contractual rights under the Servicing Agreement.  See ¶¶ 99-10, 31-32, supra.  See also MidCountry's Response in Opposition to Aurora's Motion to Dismiss, at 2 ("the [Serving Agreement] was terminated in its entirety by its express terms upon Aurora's termination, and with it, Lehman's servicing rights");  see also id. at 3 ("At the time MidCountry terminated Aurora for cause on February 6, 2009, by its terms, the [Servicing Agreement] itself was likewise terminated, including Lehman's servicing rights.");  id. at 4 ("While certain obligations survive the termination of the [Servicing Agreement]. . . Lehman's servicing rights ownership *does not survive*" (emphasis in original));  id. ("Other than a potential termination fee if Aurora terminated without cause, Lehman has no further rights under the [Servicing Agreement] because the [agreement] itself has terminated, and, along with it, its servicing rights.").  There is, therefore, no genuine dispute that LBHI possesses property rights with which MidCountry seeks to interfere in the Colorado Action, and that relief from stay is, accordingly, a prerequisite to MidCountry's maintenance of the Colorado Action.

44.     Hoping to evade the automatic stay, MidCountry argues, in reliance on Section 541(d) of the Bankruptcy Code and a host of inapposite authority, that LBHI no longer retains the above-described property rights because LBHI sold its interests in the Mortgage

Loans to MidCountry.  See Motion For Stay Relief at pp. 15-18, ¶¶ 29-35.  More specifically, MidCountry argues that, as evidenced by the language of Section 541(d), "interests in mortgages which have been sold prepetition by the debtor in the secondary market should not … be considered property of the debtor's estate" and that "the retention by a seller-debtor of [ ] mortgage documents … [can]not impair the asset sale character of [ ] secondary mortgage market transactions." Id. at ¶¶ 31, 32.  But these red-herring arguments completely miss the mark because, while LBHI did sell its interests in the Mortgage Loans to MidCountry, LBHI expressly retained—and as evidenced by the plain language of both the Purchase Agreement and the Servicing Agreement, did not sell to MidCountry—its interests in the Servicing Rights relating to the Mortgage Loans.[6]

45.    Thus, far from demonstrating the absence of any relevant property rights owned by LBHI, Section 541(d) of the Bankruptcy Code actually confirms that LBHI does have property interests in the Servicing Rights that MidCountry seeks to eviscerate through the Colorado Action; for, under Section 541(d), even "[p]roperty in which the debtor holds, as of the commencement of the case only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate … to the extent of the debtor's legal title to such property…."

---

[6] For this reason, MidCountry's reliance on Jenkins v. Chase Home Mortg. Corp., 81 F.3d 592 (5th Cir. 1996), is completely misplaced.  In Jenkins, a debtor—who owned the servicing rights to mortgages, but not the underlying mortgages—tried to avoid transferring funds in its possession that included, among other things, mortgage payments.  See id. at 595-96.  The court held that the debtor had no right to these funds because it did not own the underlying mortgages, and the funds at question did not include any of the service fees that the debtor was entitled as owner of the servicing rights."  See id. at 597.  Here, LBHI makes no claim to the underlying mortgages or any of the mortgage payments, aside those to which it is expressly entitled as servicer.  Instead, LBHI asserts that it owns the right to service those mortgages and, therefore, its right must be protected from divesture.

Here, by virtue of its retention of all Servicing Rights relating to the Mortgage Loans, LBHI

holds not merely "legal title" to service or supervise the servicing of the Mortgage Loans, but an

*equitable* interest in all Servicing Rights relating to the Mortgage Loans (including the payments

and fees derived from servicing the Mortgage Loans), and such an interest unequivocally

constitutes property of LBHI's estate.  See, e.g., In re American Home Mortgage, Inc. (Calyon

New York Branch v. American Home Mortgage Corp.), 379 B.R. 503, 523-524 & 524n. 57

(Bankr. D. Del. 2008) (automatic stay applied to bank's action against debtor seeking to compel

transfer of servicing rights relating to portfolio of mortgage loans debtor had originated and sold

to bank on a "servicing-retained" basis because the retained right to service the mortgage loans

constituted "property of the estate" and was not subject to the Bankruptcy Code's "safe harbor"

provisions"); In re LiTenda Mortgage Corp., 246 B.R. 185, 193 (Bankr. D.N.J. 2000) ("it is

certainly true that the income derived from the servicing of a portfolio of loans can constitute a

valuable property interest").[7]

      46.    MidCountry also argues that, whatever the nature of LBHI's interest in the

Servicing Rights and its contractual rights under the Servicing Agreement, those rights somehow

---

[7] Notably, in support of its irrelevant assertion that servicing rights owners may terminate
agreements with contracted servicers, MidCountry cites to several cases where the servicer did
*not* own or retain the servicing rights relating to the mortgage loans at issue, but merely held the
right to service the mortgage loans at the will of the owners of the mortgage loans (who, in turn,
owned the servicing rights).  See In re LiTenda, 246 B.R. at 193 (noting that "there is absolutely
no reference in the Guide or the purchase documents to any retained ownership interest in the
mortgages sold by LiTenda to Freddie Mac" and that the debtor "does not point to any document
which evidences a retention of any interest in any underlying note by LiTenda"); Federal Home
Mortgage Corp v. American Home Mortgage Corp., 2007 WL 2228619, at *1-2 (N.D. Tex. Aug.
3, 2007) (regarding Freddie Mac's termination of agreement with American Home Mortgage
Corp. as "seller and servicer" of Freddie Mac's mortgages); American Bankers Mortgage Corp.
v. Federal Home Loan Mortgage Corp., 75 F.3d 1401, 1411 (9th Cir. 1996) ("ABM's status as a
seller/servicer and its relationship with Freddie Mac were governed by contract … ABM had no
right to service any mortgage owned by Freddie Mac unless it was a 'Servicer'"); Martin v. First
Federal Savings and Loan Ass'n of Andalusia, 559 So. 2d 1075, 1076 (regarding termination of
agreement where one party "agreed to service [] mortgage loans" for owner).

were unilaterally "terminated" by MidCountry, upon its decision to terminate Aurora's

responsibilities as "Servicer" pursuant to Section 9.01 or 9.02 of the Servicing Agreement. See,

e.g., Motion For Stay Relief at pp. 18-19, ¶ 39.   The short answer to this, however, is that

MidCountry does not have the power unilaterally to terminate the Servicing Agreement, even if

the provisions of the Servicing Agreement otherwise gave it that right (which, as explained

below, it does not in any event).  For, as explained in Section III.C, infra, the Servicing

Agreement was – even by MidCountry's own admission—a valid and subsisting executory

contract as to which LBHI was a party on September 15, 2008, the date of LBHI's bankruptcy

petition, and so the Bankruptcy Code prevents the unilateral termination of that agreement.

47.     Indeed, actions to enforce rights and obligations under an executory

contract clearly are subject to the automatic stay, and "[f]rom the moment of filing to the

moment of assumption or rejection, the non-debtor party is held to be barred from enforcing [a]

contract and its terms."    In re El Paso Refinery, L.P., 220 B.R. 37, 43 (Bankr. W.D. Tex. 1998)

(citing NLRB v. Bildisco, 465 U.S. 513, 532 (1984)).  In fact, as bankruptcy courts have

recognized, "the rights of a party to an executory contract with the debtor are not 'stayed' by

[Bankruptcy Code] section 362; those rights are rendered temporarily unenforceable by

[Bankruptcy Code] section 365." Id. (citations omitted).  Thus, absent an order from this Court

terminating the Servicing Agreement following a motion to compel its assumption or rejection,

MidCountry had, and has, no ability to terminate the Servicing Agreement.

48.     Moreover, and in any event, LBHI's rights in and to the Servicing Rights

do not emanate from, and exist independent of, the Servicing Agreement.  For, as explained

above—and as the Purchase Agreement *and* Servicing Agreement each expressly reflect—*LBHI*

*owned the Servicing Rights long before entering into the Servicing Agreement, and expressly*

*retained those rights upon the sale of the Mortgage Loans to MidCountry and execution of the Servicing Agreement*.  See ¶¶ 3, 20-22, supra.

49.    Thus, regardless of whether the Servicing Agreement was unilaterally terminated by MidCountry when MidCountry purported to terminate Aurora's responsibilities as Servicer (which, as explained below, it was not), LBHI nevertheless would continue to have valuable property rights (i.e., its rights as owner of the Servicing Rights), which MidCountry admittedly seeks to abrogate in the Colorado Action.[8]  Indeed, to hold otherwise would be to grant MidCountry a right that explicitly was *not* given to it in the bargain that was struck between LBHI and MidCountry—i.e., the right to permit MidCountry to unilaterally "convert" LBHI's sale of the Mortgage Loans to MidCountry from a sale on a "servicing retained" basis to a sale on a "servicing-released" basis.[9]

50.    Furthermore, and in all events, it is clear that the right provided to MidCountry under Sections 9.01 and 9.02 of the Servicing Agreement is *not* the right to terminate the Servicing Agreement itself, but is merely the right to terminate *Aurora's responsibilities* as Servicer and to appoint a successor servicer (subject to the provisions of Section 10.01 of the Servicing Agreement, including LBHI's right of consent).  Indeed, Section

---

[8] For this reason, the cases cited in ¶ 39 of MidCountry's Motion For Stay Relief are inapposite and unpersuasive.  As noted above, see n. 7, supra, the servicers in those cases did not own the servicing rights, but instead had the right to service the mortgage loans solely by virtue of, and pursuant to, servicing agreements with the owner of the servicing rights, which right terminated immediately upon the termination of that servicing agreement.

[9] Not only is this an absurd result, but it is a result that clearly and unequivocally is precluded by the terms of the Purchase Agreement.  For, as the express terms of the Purchase Agreement make clear, LBHI agreed to sell the Mortgage Loans to MidCountry on a "servicing retained" basis, and Section 19 of the Purchase Agreement provides that "[n]o term or provision of [the Purchase Agreement] may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced."  See **Exhibit A** at p. 11, § 19.

9.01 specifically provides that, "so long as an[y] event of default [specified in Section 9.01(i)-(viii)] shall not have been remedied, … [MidCountry], by notice in writing to [Aurora], may terminate *all the rights and obligations of [Aurora] under this Agreement*…." <u>See</u> **Exhibit B**, at pp. 29-30, § 9.01 (emphasis added).  And Section 9.02 of the Servicing Agreement likewise provides that "[MidCountry] and [Aurora] *shall comply with the termination procedures set forth in Sections 9.01, 9.02 and 10.01 hereof*," the latter of which specifically provides that, "[s]imultaneously with the termination *of [Aurora's] responsibilities and duties under this Agreement pursuant to Sections … 9.01 or 9.02*, [MidCountry] shall appoint a successor servicer (with the consent of [LBHI], which consent may not be unreasonably withheld) which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of [Aurora] under this Agreement simultaneously with the termination of [Aurora's] responsibilities." <u>Id</u>. at pp. 30-31, §§ 9.02, 10.01 (emphasis added).

51.    In fact, Section 10.01 of the Servicing Agreement expressly provides that the "removal of [Aurora] pursuant to [Sections 9.01 or 9.02 of the Servicing Agreement] *shall not become effective until a successor shall be appointed pursuant to this Section 10.01*." <u>Id</u>. at p. 31, § 10.01 (emphasis added).  Thus, and insofar as termination of the Servicing Agreement would result in the termination of Aurora's servicing rights and responsibilities, Section 9.01 *cannot possibly* be read to provide MidCountry with a right to unilaterally terminate the entire Servicing Agreement, and even if it did, the conditions precedent to such termination have not occurred; for, under Section 10.01, Aurora may not be removed unless and until a successor servicer is appointed pursuant to Section 10.01 (which requires LBHI's consent, which was not obtained), and Section 10.01, in turn, requires any successor servicer to "assume all of the responsibilities, duties and liabilities of [Aurora] *under this Agreement*." (emphasis added).  It is

thus clear that, notwithstanding any argument by MidCountry to the contrary, the right afforded

to it under Sections 9.01 and 9.02 of the Servicing Agreement is merely the right to terminate

Aurora's responsibilities, not the Servicing Agreement in its entirety.[10]

52.     Consequently, it is beyond dispute that LBHI continues to possess

property interests not only in the Servicing Rights, but in the contractual rights afforded to LBHI

under the Servicing Agreement—an agreement which MidCountry seeks to have declared

"terminated" in the Colorado Action.[11]

**B.      MidCountry Has Not Met Its Burden Of Demonstrating An
Entitlement To Relief From The Automatic Stay In Order To
Proceed With The Colorado Action, Nor Could It Possibly Do So**

53.     Because MidCountry seeks in the Colorado Action to divest LBHI's estate

of valuable property rights, including LBHI's rights as owner of the Servicing Rights relating to

the Mortgage and its contractual rights under the Servicing Agreement, MidCountry must

demonstrate an entitlement to relief from the automatic stay.  This, MidCountry has not done,

nor could it possibly.

---

[10] Moreover, the right of "termination" granted to MidCountry in Section 9.01 of the Servicing Agreement is expressly subject to another condition precedent—to wit, the requirement that one of the events of default specified in Sections 9.01(i)-(viii) shall have occurred and not have been remedied.  See **Exhibit B**, at p. 28, § 9.01.  Here, while LBHI does not intend in respond to the Motion For Stay Relief to address the validity of MidCountry's allegations against Aurora, the fact that the Colorado Court – following a day-long evidentiary hearing—refused to grant the relief requested by MidCountry in its PI Motion and permitted Aurora to continue servicing the Mortgage Loans suggests that, at a bare minimum, there is a legitimate question regarding the existence vel non of any of the events of default specified in Section 9.01(i)-(viii).

[11] Indeed, if MidCountry's rights under Section 9.01 of the Servicing Agreement included a right to unilaterally terminate the entire Servicing Agreement – and, with it, LBHI's rights as Servicing Rights Owner – it would have made no sense for MidCountry to even have granted to LBHI the right of consent provided for in Section 10.01 of the Servicing Agreement (i.e., a right of consent over MidCountry's appointment of a successor servicer upon termination of Aurora's responsibilities under Section 9.01).

1.     MidCountry Has Failed To Make *Any* Showing Of "Cause"
For Relief From Stay, Or Even To Address The *Sonnax* Factors

54.     Section 362(a) of the Bankruptcy Code provides, in relevant part, that a

bankruptcy petition operates as a stay, applicable to all entities, of

> (1) the commencement or continuation … of a judicial,
> administrative or other action or proceeding against the debtor that
> was or could have been commenced before the commencement of
> the [bankruptcy case], or to recover a claim against the debtor that
> arose before the commencement of the [bankruptcy case]; …(3)
> any act to obtain possession of property of the estate or of property
> from the estate or to exercise control over property of the estate; …
> [and] (6) any act to collect, assess, or recover a claim against the
> debtor that arose before the commencement of [the bankruptcy
> case]….

11 U.S.C. § 362(a).

55.     The automatic stay is "one of the fundamental debtor protections provided

by the bankruptcy laws." Mid-Atlantic Natl'l Bank v. New Jersey Dep't of Envtl. Prot., 474

U.S. 494, 503 (1986). It provides a debtor with a "'breathing spell' from the collection process."

See, e.g., Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir.

1998). "The principal purpose of the automatic stay of acts against property of the estate … is to

preserve that property for distribution or use in reorganization of the debtor." Official Creditors'

Comm. of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.), 114 B.R. 27,

29 (Bankr. S.D.N.Y. 1989). The automatic stay "is necessary to exclude any interference by the

acts of others or by proceedings in other courts where such activities or proceedings tend to

hinder the process of reorganization." Fidelity Mortgage Inv. v. Camelia Builders, Inc., 550 F.2d

47, 53 (2d Cir. 1976).

56.     The decision to lift or modify the automatic stay is committed to the

discretion of the bankruptcy court. See Sonnax Indus., Inc. v. Tri-Component Prods. Corp. (In re

Sonnax Indus., Inc.), 907 F.2d 1280, 1286 (2d Cir. 1990). Because Section 362(d) does not

define "cause," courts determine what constitutes such cause based on the totality of the

circumstances.  In re Wilson, 116 F.3d 87, 90 (3d Cir. 1997); In re George, 315 B.R. 624, 628

(Bankr. S.D. Ga. 2004).

57.    The party requesting relief from stay bears the initial burden to show cause

why the automatic stay should be lifted.  Sonnax, 907 F.2d at 1285 ("If the movant fails to make

an initial showing of cause … the court should deny relief without requiring any showing from

the debtor that it is entitled to continued protection").  Further, "[c]onclusory statements that a

continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are

insufficient to establish cause."  In re Texaco Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988)

(citing In re Penn Dixie, 6 B.R. 832 (Bankr. S.D.N.Y. 1980)).  Rather, a party seeking relief from

stay must demonstrate "cause" for stay relief with reference to the twelve factors outlined by the

Second Circuit in Sonnax for determining whether the automatic stay should be lifted.  Sonnax,

907 F.2d at 1286.[12]  Not all of the Sonnax factors are relevant in every case, Mazzeo v. Lenhart

(In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), and a court need not assign equal weight to

each factor.  In re Keene Corporation, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

58.    Assuming, arguendo, that filing a motion for relief from the automatic stay

was an appropriate procedure for MidCountry to pursue, MidCountry has not demonstrated—as

---

[12] Those factors are: (1) Whether relief would result in a partial or complete resolution of the
issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the
other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the
necessary expertise has been established to hear the cause of action; (5) whether the debtor's
insurer has assumed full responsibility for defending it; (6) whether the action primarily involves
third parties; (7) whether litigation in another forum would prejudice the interests of other
creditors; (8) whether the judgment claim arising from the other action is subject to equitable
subordination; (9) whether movant's success in the other proceeding would result in a judicial
lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and
economical resolution of litigation; (11) whether the parties are ready for trial in the other
proceeding; and (12) impact of the stay on the parties and the balance of harms.  Sonnax, 907
F.2d at 1286.

was its burden—cause for relief from the automatic stay. Indeed, as noted above, MidCountry

devotes the lion's share of its Motion For Stay Relief to arguing, in effect, that no relief from

stay is necessary because LBHI has no property rights that are even arguably affected by the

Colorado Action. It is only in one paragraph of its motion—to wit, Paragraph 38 (the

penultimate paragraph of MidCountry's 39-paragraph motion)—that MidCountry even alleges,

for the first and only time, that it "is entitled to relief from stay for 'cause.'" Motion For Stay

Relief at p. 18, ¶ 38. MidCountry, however, offers *no* support whatsoever for this proposition.

59.     Indeed, MidCountry does not so much as even mention <u>Sonnax</u>, much less

demonstrate that *any* of the Sonnax factors weigh in favor of lifting of the automatic stay to

permit MidCountry to proceed with the Colorado Action.[13] Accordingly, the Motion must be

denied. <u>See Sonnax</u>, 907 F.2d at 1285 ("If the movant fails to make an initial showing of cause .

. . the court should deny relief without requiring any showing from the debtor that it is entitled to

continued protection."); <u>see also In re Pioneer Commercial Funding Corp.</u>, 114 B.R. 45, 48

(Bankr. S.D.N.Y. 1990) ("[T]he debtor does not start out by proving the absences of cause if a

creditor with an unsecured claim fails to show some evidence of good cause for relief.").

2.     Application Of The *Sonnax* Factors Shows That Relief From The
Automatic Stay Is Not Warranted

60.     Application of the appropriate standard, ignored by MidCountry, confirms

that the Court should exercise its discretion in favor of preserving the protection of the automatic

stay. To the extent applicable, each of the following <u>Sonnax</u> factors weighs in favor of LBHI

and the continued protection of the automatic stay:

---

[13] Of course, this is hardly surprising since, as noted above and as MidCountry itself represented
to the Colorado Court, its Motion For Stay Relief is not really designed to secure relief from stay
but is instead a thinly-veiled attempt to secure a procedurally improper declaratory judgment that
"any rights that Lehman had in the [Servicing Agreement] are not property of the estate under
Section 541(d) of the Bankruptcy Code." <u>See</u> **Exhibit C**, at p. 17 (emphasis added).

- *Whether relief would result in a partial or complete resolution of the issues.* Relief from the automatic stay would initiate the commencement of a multi-step, prolonged and expensive litigation process in connection with the Colorado Action, which could include, inter alia, discovery, hearings, motion practice, and possibly trial. Moreover, full participation in this process would not necessarily lead to a full resolution of the issues, as rulings and decisions at the trial level may be subject to several levels of appeal by the parties to the Colorado Action. Furthermore, MidCountry has made clear that the potential claims not yet asserted in the Colorado Action might in the future be asserted in the action if relief from stay is granted, including, potentially, claims against LBHI. See **Exhibit C**, at pp. 2, 9, 11 (suggesting LBHI's potential need to intervene in the Colorado Action); id. at p. 17 (noting that MidCountry may seek to "*inter alia*, bring claims against Lehman related to th[e] [Servicing Agreement] if any are later determine to exist.").

- *Lack of any connection with or interference with the bankruptcy case.* As described above, MidCountry seeks a determination of LBHI's interest in property of its estate. This is a core proceeding that should be determined by this Court, not by the Colorado Court. Further, lifting the automatic stay would divert LBHI's limited resources and have a direct and destructive impact upon the administration of LBHI's and the other Debtors' estates. The implications of an adverse ruling in this one, relatively minor case may have broader implications and affect the value of LBHI's estate in other, more significant instances. Additionally, permitting the Colorado Action to proceed at this time could encourage other contract counterparties, who may argue they are similarly situated, to seek permission from this Court to proceed with their state or federal court litigations. Responding to stay relief motions in this Court, and defending against cases in other courts, would further distract LBHI and the Debtors from their efforts to administer their cases for the benefit of all creditors. Courts have regularly denied requests to lift the automatic stay in such instances. See, e.g., Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.), 40 B.R. 219, 223-25 (S.D.N.Y. 1984) (affirming bankruptcy court finding that lifting the automatic stay would divert debtors' and debtors' employees' attention away from the chapter 11 case and affirming bankruptcy court's denial of motion for relief from the automatic stay).

- *Whether a specialized tribunal with the necessary expertise has been established to hear the cause of action.* No specialized tribunal has been established to hear disputes between LBHI and MidCountry. A state court, such as the one in which the Colorado Action is pending, is not a specialized tribunal. In re Cicale, 2007 WL 1893301, *3 n.3 (Bankr. S.D.N.Y. June 29, 2007). Additionally, both the Purchase Agreement and the Servicing Agreement are governed by New York, not Colorado, law. See **Exhibit A,** at p. 10 § 15; **Exhibit B**, at p. 36 § 10.09.

- *Whether the debtor's insurer has assumed full responsibility for defending it.* By information and belief, LBHI lacks insurance coverage to satisfy the litigation costs that will be incurred if the automatic stay is lifted. As a result, LBHI's estate will be directly burdened by the postpetition litigation costs for resolution of an action arising out of prepetition conduct. Granting relief from the automatic stay would therefore reduce the assets available for distribution to LBHI's other creditors.

- *Whether the action primarily involves third parties.* The Court "may lift a stay for actions which bear little relation to the bankruptcy case." <u>City Ins. Co. v. Mego Int'l Inc. (In re Mego Int'l, Inc.)</u>, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983). "Such lack of connection with the title 11 case occurs where the action essentially involves third parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and resolution of the issue in no way frustrates the orderly distribution of assets of the estate." <u>Id.</u> (citing <u>In re Columbia Ribbon & Carbon Manufacturing Co., Inc.</u>, 13 B.R. 276. (Bankr. S.D.N.Y. 1981)). Where, however, as in the present case, the debtor is "more than a mere conduit for the flow of proceeds" and the property recovered would "constitute property of the estate," relief from the automatic stay should be denied. <u>Id.</u>

- *Whether litigation in another forum would prejudice the interests of other creditors.* Litigation regarding LBHI's property and contract interests would properly be conducted in the Bankruptcy Court, not the Colorado Court. No creditors will be prejudiced by this.

- *The interests of judicial economy and the expeditious and economical resolution of litigation.* Lifting the automatic stay would not serve the interests of judicial economy. Determination of LBHI's interests by this Court would have a more far-reaching impact on other parties' attempts to take or exercise control over property of LBHI's estate. A "one off" decision in Colorado Action would do nothing to address or resolve issues that other creditors may have with respect to similar rights.

- *Whether the parties are ready for trial in the other proceeding.* LBHI is not yet a party to the Colorado Action, which itself is in its initial pre-trial stages.

- *Impact of the stay on the parties and the balance of harms.* Diverting LBHI's resources would be harmful. LBHI has not been compelled to assume or reject the Servicing Agreement, and LBHI is considering all available options to maximize the value of its assets for the benefit of its creditors. Forcing LBHI to act prematurely could limit LBHI's options and limit recoveries of LBHI's creditors and other parties in interest. Moreover, MidCountry could still pursue a damages claim against Aurora for its alleged breaches of contract and fiduciary duty. Further, there is no immediate harm to MidCountry, as reflected by the Colorado Court's decision to permit Aurora to continue servicing the Mortgage Loans. <u>See</u> **Exhibit G**, at p. 1. Further, the Colorado Court directed Aurora to provide MidCountry with a copy of the loan documents (Motion for Relief ¶¶ 4, 27), thereby enabling MidCountry to monitor the servicing of the loans.

61.    Thus, while this Court should need not and should not undertake a <u>sua sponte</u> assessment of appropriateness of MidCountry's stay request, were the Court to do so, it would do nothing to resuscitate MidCountry's Motion.

### C.    MidCountry's Motion is an Improper Attempt to Gain Declaratory Relief

62.    As noted above, in addition to ostensibly seeking relief from the automatic stay to permit it to proceed with the Colorado Action, MidCountry also seeks various *additional* forms of relief, including three forms of declaratory relief—to wit, a declaration: (i) that the Servicing Agreement has been terminated post-petition; (ii) that LBHI is deemed to have given its consent to the appointment of Dovenmuehle as successor servicer to Aurora; and (iii) that LBHI does not have any property rights or interests (including in the Servicing Files that Aurora contractually holds in trust for the benefit of MidCountry *and* LBHI) that prevents MidCountry from obtaining the relief it seeks in the Colorado Action.  See Motion For Stay Relief at p. 19. As demonstrated below, such relief is wholly inappropriate and may not be granted pursuant to a motion for relief from stay, and MidCountry has, in any event, wholly failed to provide any colorable basis upon which such relief should be granted.

1.    Termination of an Executory Contract Is Not Permitted By Way of Relief from Stay

63.    Under the guise of a request for relief from stay, MidCountry requests "an Order … [a]llowing the termination of the [Servicing Agreement] as to Lehman *nunc pro tunc* to the date that MidCountry issued a notice of termination."  See Motion For Stay Relief at p. 19. By its own admission, however, MidCountry did not purport to terminate the Servicing Agreement until February 6, 2009 or, at the very earliest, January 12, 2009.  See ¶ 28, supra. Accordingly, there is no question that the Servicing Agreement was a valid, effective, executory contract as to which the Debtor was a party on September 15, 2008, the date on which LBHI commenced its voluntary Chapter 11 proceedings.[14]

---

[14] The Second Circuit has generally followed a broad definition of executory contracts, as ones in which "performance remains due to some extent on both sides."  See Eastern Air Lines Inc. v.

64.    The Bankruptcy Code expressly provides a mechanism for dealing with executory contracts. Specifically, pursuant to Section 365 of the Bankruptcy Code, a debtor may assume or reject an executory contract on behalf of the estate. 11 U.S.C. § 365(a). The Bankruptcy Code provides no provision for termination as an alternative to the assumption/rejection mechanism for handling executory contracts. See In re El Paso Refinery, L.P., 220 B.R. 37, 46 (Bankr. W.D. Tex. 1998). Termination "is not viewed as an alternative remedy to be invoked unilaterally by the non-debtor party to the contract, regardless of the estate's decision to assume or reject." Id. The proper procedure for addressing a debtor's prepetition contracts

> will be found under 11 U.S.C. § 365, and … the proper role for this court in such matters will be in overseeing the 'breathing space' afforded by § 365 and its relevant caselaw, a space in which the debtor enjoys a decisively privileged position, and not in policing a hybrid process that involves flanking maneuvers against executory contracts via a § 362 motion to modify the stay.

Id. at 50, n. 30.

> By limiting the non-debtor party to the § 365 remedies, the value of the executory contract can be preserved for the estate, while allowing the estate an appropriate period of time to evaluate its options. If the contract is terminated at the request (or behest) of the non-debtor party, then the estate's options are literally foreclosed, undermining the structure and intent of the drafters of the Code. A

---

Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.), 85 F. 3d 992 (2nd Cir. 1996) (citing National Labor Relations Board v. Bildisco & Bildisco, 265 U.S. 513, 522 n.6 (1984)). As discussed, all of the parties to the Servicing Agreement had on September 15, 2008 – and continue to have – outstanding rights and obligations thereunder (e.g., Aurora to service the loans; LBHI to receive payments and to terminate the "Servicer" or reasonably give consent to any successor "Servicer" appointed by MidCountry; MidCountry to pay certain servicer fees and/or to reimburse for certain advances made by Aurora). As such, the Servicing Agreement is an executory contract and property of LBHI's estate. See Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 138 B.R. 687 (Bankr. S.D.N.Y. 1992) ("[W]e hold that executory contracts are property of the estate within the meaning of § 541."); 11 U.S.C. § 541(a)(1) ("[A debtor's] estate is comprised of all the following property, wherever located and by whomever held: (1) Except as provided in subsections (b) and (c)(2) of this section [which are inapplicable], all legal or equitable interests of the debtor in property as of the commencement of the case….").

party to an executory contract has no more right to "relief from stay" to
'terminate' a contract with the estate than does any other unsecured creditor
whose contract (executory or not) has been breached.

Id. at 44.

65.     MidCountry did not seek to compel LBHI to assume or reject the

Servicing Agreement pursuant to Section 365 of the Bankruptcy Code.  To the extent

MidCountry seeks in its Motion For Stay Relief an order declaring that Servicing Agreement

terminated, MidCountry's request is procedurally improper, and its Motion For Stay Relief must

be denied.

>           2.      MidCountry's Request for Declaratory Relief Is Likewise
>                   Improper

66.     Though not labeling it as such, MidCountry asks the Court for a

declaratory judgment "(iii) [d]etermining that LBHI is deemed to have given its consent to

MidCountry's preferred successor servicer; (iv) [d]etermining that Section 362 of the

Bankruptcy Code does not prevent recovery by MidCountry of its loan files from Aurora…. "

Motion For Stay Relief, at p. 19.   But the Bankruptcy Code is explicit that such relief cannot be

obtained by motion practice.

67.     Bankruptcy Rule 7001 clearly requires the commencement of an adversary

proceeding to obtain a declaratory judgment relating to both equitable relief and the

determination of the extent of a debtor's interest in property.  Fed. R. Bankr. P. 7001 (defining an

adversary proceeding as "a proceeding (1) to recover money or property, except a proceeding to

compel the debtor to deliver property to the trustee, or a proceeding under § 554(b) or § 725 of

the Code, Rule 2017, or Rule 6002, (2) *to determine the validity, priority, or extent of a lien or

other interest in property, other than a proceeding under Rule 4003(d)*, (3) to obtain approval

pursuant to § 363(h) for the sale of both the interest of the estate and of a co-owner in property,
(4) to object to or revoke a discharge, (5) to revoke an order of confirmation of a chapter 11,
chapter 12, or chapter 13 plan, (6) to determine the dischargeability of a debt, (7) to obtain an
injunction or other equitable relief, (8) to subordinate any allowed claim or interest, except when
subordination is provided in a chapter 9, 11, 12, or 13 plan, (9) *to obtain a declaratory judgment
relating to any of the foregoing*, or (10) to determine a claim or cause of action removed pursuant
to 28 U.S.C. § 1452 (emphasis added)).  Accordingly, the Court may not grant the requested
declaratory relief.

68.    Furthermore, even if such relief were proper—and it is not—MidCountry
failed to provide <u>any</u> factual or legal basis upon which the Court could grant the declaratory
relief sought.  As described above, LBHI (i) has the right of consent over the appointment of any
successor servicer following MidCountry's decision to revoke its consent to Aurora's continued
servicing of the Mortgage Loans; and (ii) LBHI has reasonably refused to give its consent to the
appointment of Dovenmeuhle, MidCountry's "preferred" successor servicer.   And while, for the
reasons discussed (<u>i.e.</u>, the relief sought is improper), the Court need not make a determination
regarding the propriety of LBHI's actions, LBHI's withholding of consent was, and remains,
eminently reasonable because, among other things, no assurances have been provided by
MidCountry that either it or Dovenmuehle would honor – or that LBHI would continue to enjoy
– the economic and other rights and benefits that LBHI currently enjoys as Servicing Rights
Owner and by virtue of its relationship with Aurora (<u>e.g.</u>, the right to all or a part of servicing
fees collected by and/or paid to Aurora in connection with its servicing of the Mortgage Loans).
In fact, to the contrary, MidCountry has taken the flatly erroneous position that LBHI no longer
possesses or is entitled to any such rights or benefits because, among other things, its termination

of Aurora's servicing responsibilities somehow divests LBHI of its status as owner of the retained Servicing Rights.

69.    Nor has MidCountry put forth a colorable argument that Section 362 of the Bankruptcy Code does not prevent LBHI from recovering the loan files.  To the contrary, the Servicing Agreement is clear that LBHI has a property interest in the loans files.  <u>See</u> **Exhibit B**, at § 2.01 p. 9 ("Each Servicing File delivered to the Servicer shall be held by the Servicer in order to service the Mortgage Loans pursuant to this agreement and shall be held in trust by the Servicer for the benefit of the Owner as the Owner as the owner thereof and the Servicing Rights Owner") (emphasis added).

70.    In sum, MidCountry's requests for declaratory relief must be denied, as it is procedurally improper on its face, and, further, since they have no basis in fact.

3.    MidCountry's Request for Relief from the 10-day stay is <u>Inappropriate</u>

71.    Bankruptcy Rule 4001(a)(3) provides that an order granting a motion for relief from the automatic stay is stayed until the expiration of ten days after the entry of the order, unless the court orders otherwise.  Fed. R. Bankr. P. 4001(a)(3).

72.    MidCountry provides no factual basis or discussion whatsoever to support its request the relief from the ten-day stay pursuant to Bankruptcy Rule 4001(a)(3).  And the facts, as described by MidCountry, suggest that such relief is wholly inappropriate.  The hearing for the Court to consider the instant Motion is scheduled for April 22, 2009.  Assuming, *arguendo*, the Court were to grant the Motion and the ten-day stay were remain in effect, the order granting the Motion would be effective on May 2, 2009.  That is thirteen days before the next hearing in the Colorado Action.  <u>See</u> Motion For Stay Relief ¶ 27 ("That hearing was …

continued until May 15, 2009."). Further, the Colorado Court already directed Aurora to provide MidCountry with a copy of the loan documents (id. ¶¶ 4, 27), thereby providing MidCountry with all information it may need to monitor the servicing and make whatever assessments it deems appropriate. Finally, any notion of immediacy is undercut by the Colorado courts decision—after a full day evidentiary hearing—to modify the TRO to permit Aurora to continue to service the Mortgage Loans.

## IV.   <u>CONCLUSION</u>

73.    For the foregoing reasons, LBHI respectfully requests that the Court deny the Motion.

Dated:       April 20, 2009
             New York, New York

                                         /s/ Robert J. Lemons
                                         David R. Fertig
                                         Robert J. Lemons

                                         WEIL, GOTSHAL & MANGES LLP
                                         767 Fifth Avenue
                                         New York, New York 10153
                                         Telephone: (212) 310-8000
                                         Facsimile: (212) 310-8007

                                         *Attorneys for Debtors and Debtors in
                                         Possession*