WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------x

In re:                                                             :    Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :    Case No. 08-13555 (JMP)

          Debtors.                                       :

------------------------------------------x

LEHMAN BROTHERS HOLDINGS INC. and LEHMAN    :
BROTHERS SPECIAL FINANCING INC.

          Plaintiff,                                    :

        -against-                                     :    Adversary Proceeding
                                                             No.: 09-_____ (JMP)

LIBRA CDO LIMITED, BANK OF AMERICA, N.A.,    :
TRUSTEE, LASALLE BANK NATIONAL
ASSOCIATION, TRUSTEE, SOCIÉTÉ GÉNÉRALE,
NEW YORK BRANCH

                                                              :

          Defendants.

------------------------------------------x

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**RELATED TO LIBRA CDO**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in

possession in the above-captioned, jointly-administered chapter 11 case of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors,"), and LBHI, by and through their undersigned counsel, hereby bring this Complaint for declaratory and injunctive relief against Libra CDO Limited ("Libra"), LaSalle Bank National Association ("LaSalle"), acting in its capacity as trustee under an indenture ("Indenture") pursuant to which Libra raised capital through the issuance of certain notes, Bank of America, N.A. ("Bank of America") (as successor in interest to LaSalle and with LaSalle, the "Trustee,"), and Société Générale, New York Branch ("SGNY" or the "Senior Swap Counterparty" and together with Libra and the Trustee, the "Defendants").

## PRELIMINARY STATEMENT[1]

1.  In order to preserve hundreds of millions of dollars of value for the Debtors' estates, this adversary proceeding seeks to set aside an invalid termination notice affecting a valuable executory contract and, by a separate motion filed in the Debtors' main bankruptcy case, to obtain approval for assumption and assignment of that contract. The express terms of the relevant documents require this result, which will restore the other contracting parties to the economic positions they occupied at the time of the chapter 11 filings of LBHI and LBSF.

2.  The contracts and issues involved in this adversary proceeding are at the core of the current credit crisis. LBSF and Libra entered into a contract known as a credit default swap ("Credit Default Swap Agreement"). Defendant Libra is a special purpose entity formed solely for the purpose of investing, primarily through the Credit Default Swap Agreement, in various securities backed directly or indirectly by mortgages. Pursuant to the Credit Default

---

[1] Contemporaneously herewith, the Debtors have filed their Motion for Entry of an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code for Approval of (I) the Letter Agreement, Including the Payment of the Break-Up Fee; and (II) the Assumption, Assignment, and Sale of the Libra Credit Default Swap Agreement in their above-captioned bankruptcy cases, which seeks, among other things, authorization to assume, assign, and sell the Debtors' interests in the Credit Default Swap Agreement.

Swap Agreement, Libra agreed to pay LBSF if losses were incurred on certain mortgage-related securities, referred to in the Credit Default Swap Agreement as "<u>Reference Obligations</u>." Most of these Reference Obligations are residential mortgage-backed securities.[2]

3. In return, LBSF agreed to pay a periodic premium to Libra, similar to an insurance premium. LBSF thus purchased contractual protection that could potentially pay it over a billion dollars if there were losses with respect to the Reference Obligations, while the investors in Libra[3] stood to profit if there were few or no losses on such securities. Because of the steep decline in the housing market and the ensuing poor performance of residential mortgage-backed securities, LBSF's investment is now a very significant asset. In contrast, investors in Libra should be expected to incur a total or near-total loss on their investment.

4. The Credit Default Swap Agreement at issue is "in the money" to LBSF.[4] Nevertheless, the Defendants wrongfully attempted to terminate the Credit Default Swap Agreement and seek to distribute all the remaining assets of Libra to Libra's investors, effectively depriving LBSF of the benefit of its bargain under the Credit Default Swap Agreement. That proposed distribution flows from a purported termination of the Credit Default Swap Agreement, which was keyed to an alleged event of default by LBSF that had no economic impact on Libra or its investors. The express terms of the Indenture that govern the actions of the Trustee and Libra, however, do not allow that purported termination (and would continue to prevent any termination now) because the prerequisite liquidation of certain securities has not yet

---

[2] These securitized pools of residential mortgages are the now "toxic" assets subject to much press and legislation.

[3] The term "investors" as used throughout this complaint means the holders of rated bonds and certain equity interests referred to as "preference shares," as well as the Senior Swap Counterparty, whose role is described more fully in pages 8-11 below.

[4] That is, LBSF will be entitled to much larger payments from Libra than the premiums due from LBSF to Libra because credit impairments with respect to the Reference Obligations will entitle LBSF to substantial payments from Libra under provisions of the Credit Default Swap Agreement.

begun and a declaration of acceleration of certain obligations remains subject to rescission. In addition, applicable New York and bankruptcy law do not allow the proposed result of this purported termination, which would provide a significant windfall to investors of Libra, including third-party foreign investors, while imposing an unenforceable penalty on LBSF and its creditors.

5. Because the purported termination of the Credit Default Swap Agreement was invalid, the Credit Default Swap Agreement remains an executory contract that may be assumed and assigned to a third party under the Bankruptcy Code. To capitalize on the value of the Credit Default Swap Agreement, by separate motion in the Debtors' main bankruptcy case, LBSF is seeking this Court's authorization to enter into an agreement whereby LBSF will assume and assign its rights and obligations under the Credit Default Swap Agreement for substantial consideration.

6. The requested relief is necessary to protect LBSF's rights as a party to the Credit Default Swap Agreement that the Trustee purportedly terminated because such termination was ineffective under the terms of the Credit Default Swap Agreement, the Indenture, and pursuant to the automatic stay, and therefore unenforceable and void. Moreover, because LBSF's position in the Credit Default Swap Agreement is "in the money" to such a significant extent, upon assumption and assignment of that agreement, LBSF likely will receive significant assets in return for the benefit of LBSF's bankruptcy estate and its creditors.

7. In the absence of the relief sought herein, LBSF's legal and transferable rights under the Credit Default Swap Agreement will be impaired or destroyed, resulting in an immediate loss of hundreds of millions of dollars of value and irreparable harm to its estate. Irreparable injury exists when the threatened injury cannot be redressed by an award of monetary damages, or damages are difficult to establish and measure. Similarly, irreparable injury exists

when the collection of a distribution would be impracticable for the plaintiff. Here, if a wrongful distribution is effectuated, the Trustee will have liquidated and disbursed substantially all of the collateral and LBSF will have received nothing. If the Trustee is not restrained or enjoined from such a distribution, LBSF will be irreparably harmed because, if this Court later determines that the Trustee and/or the other Defendants erred in (i) terminating the Credit Default Swap Agreement, (ii) liquidating the collateral, or (iii) any subsequent distribution, it will be virtually impossible for LBSF to bring all of the parties receiving proceeds from such a distribution before the jurisdiction of this Court.

**PARTIES**

8. Plaintiff LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.

9. Plaintiff LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.

10. Upon information and belief, defendant LaSalle was a national banking association with its principal business address at 135 S. LaSalle Street, Floor 5 Chicago, IL 60603. LaSalle was a subsidiary of LaSalle Bank Corporation, a bank holding company headquartered in Chicago, Illinois. LaSalle Bank Corporation was a subsidiary of ABN AMRO North America Holding Company and may be served with process by serving CT Corporation System, 208 S LaSalle Street, Suite 814, Chicago, IL 60604.

11. Upon information and belief, defendant Bank of America is a Delaware corporation with its principal business address at Bank of America Corporate Center, 100 N. Tyron Street, Charlotte, North Carolina 28255. Upon information and belief, on October 1,

2007, defendant Bank of America acquired all the outstanding shares of ABN AMRO North America Holding Company, parent of LaSalle Bank Corporation, including its interest in defendant LaSalle. Defendant Bank of America may be served with process by serving The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

12. Upon information and belief, defendant Libra is a company registered in the Cayman Islands with its principal place of business in the Cayman Islands and may be served with process by serving CT Corporation, 111 Eighth Avenue, New York, NY 10011.

13. Upon information and belief, defendant SGNY, is a branch, duly licensed under the laws of the State of New York, of Société Générale, a banking corporation organized under the laws of the Republic of France and may be served with process by serving the New York Superintendent of Banks, Richard H. Neiman, at One State Street, New York, NY 10004-1511, or on SGNY's legal department at 1221 Avenue of the Americas, 7th Floor, New York, NY 10020.

**JURISDICTION AND VENUE**

14. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

15. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16. The statutory predicates for the relief requested herein are sections 105(a), 363, 541 and 560 of Title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), Rule 65 of the Federal Rules of Civil Procedure, and Rules 7065 and 9006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

17. In the Indenture, Libra "irrevocably and unconditionally submit[ted]" to the jurisdiction of the United States District Court for the Southern District of New York "in any

action or proceeding arising out of or relating to" the Indenture. (Indenture ¶ 14.10.) In the Credit Default Swap Agreement, Libra "submit[ted] to the…exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City…." (Credit Default Swap Agr. § 13(b); subpt. 5(i).)

## BACKGROUND

18. Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region.

19. On September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. LBSF commenced its case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's, LBSF's, and their affiliated debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**A.    LBSF's Interest in the Credit Default Swap
       Agreement is a Substantial Asset of its Estate**

20. On October 17, 2006, LBSF and Libra entered into the Credit Default Swap Agreement. In that agreement, Libra sold credit protection (similar, in concept, to insurance) to LBSF to cover exposure associated with, among other things, losses and other credit impairments with respect to certain securities backed directly or indirectly by residential

mortgages, referred to in the Credit Default Swap Agreement as Reference Obligations).  Under the Credit Default Swap Agreement, LBSF is obligated to make periodic payments to Libra, called "premiums."  In exchange, Libra is obligated to pay LBSF if losses and other credit impairments are incurred on the Reference Obligations, including failure to pay interest, writedowns of principal, and severe downgrades by rating agencies.  LBHI acts as a so-called "credit support provider" (similar to a guarantor) for payment obligations of LBSF under the Credit Default Swap Agreement.

21.    The Credit Default Swap Agreement between LBSF and Libra is part of a complex transaction (the "Transaction") designed to enable Libra's investors to invest in the Reference Obligations through their investment in Libra.  Income from and gains in respect of the Reference Obligations inure to the benefit of Libra's investors, while losses on the Reference Obligations are borne by Libra's investors.  Conversely, LBSF will have gains under the Credit Default Swap Agreement if there are losses on the Reference Obligations, but will have paid premiums to Libra and received no payments in return if there are no losses or credit impairments with respect to the Reference Obligations.

22.    Libra also entered into an agreement called a senior credit default swap agreement (the "Senior Swap Agreement"), a valuable item of collateral securing the obligations owed to LBSF under the Credit Default Swap Agreement.  Pursuant to the Senior Swap Agreement, the Senior Swap Counterparty (SGNY) is obligated to advance funds to Libra as needed in order to meet Libra's obligations to LBSF under the Credit Default Swap Agreement.  As such, the greater the obligations of Libra to LBSF under the terms of the Credit Default Swap Agreement, the greater the obligations of SGNY under the Senior Swap Agreement.

23.    Libra has pledged its rights under the Credit Default Swap Agreement to the Trustee under the Indenture.  Libra raised debt financing by issuing notes (the "Notes") in

various classes, or "tranches," based on their seniority or priority of payment. The Notes were issued under the Indenture. Libra invested the proceeds of the sale of the Notes, as well as the sale of its equity, in certain qualified investments, such as asset-backed securities and money-market securities (collectively, the "Investments"). The Investments are included in the collateral (the "Collateral") securing the Libra's obligations to investors in its Notes (the "Noteholders"), to LBSF under the Credit Default Swap Agreement, to the Senior Swap Counterparty, and to certain other secured parties. Libra's rights under the Senior Swap Agreement also constitute part of the Collateral securing its obligations to the Noteholders, to LBSF, and to certain other secured parties.

24. The Credit Default Swap Agreement has substantial value to LBSF because of the replacement cost of its credit protection. In fact, as the Credit Default Swap Counterparty, LBSF's position is vastly "in the money." Due to the increased exposure associated with the Reference Obligations, the cost of obtaining that same credit protection provided in the Credit Default Swap Agreement in today's market would be substantially greater than the premiums provided for in the Credit Default Swap Agreement.

25. LBSF is expressly permitted to assign its interest in the Credit Default Swap Agreement to a substitute party under the terms of Credit Default Swap Agreement. (*See* Credit Default Swap Agr. subpt. 5(e)(2) (permitting assignment to an appropriate, creditworthy, replacement counterparty).) Such an assignment will cure any defaults of LBSF or LBHI and provide adequate assurance of future performance, thereby allowing the estate to realize the value of the Credit Default Swap Agreement. Accordingly, LBSF's interest in the Credit Default Swap Agreement represents a valuable asset of its estate.

### B.  Actions That Threaten to Immediately Deprive the Estate of Value

26.  On April 30, 2008, the Trustee issued a notice of event of default under the Indenture as Libra failed to meet a certain financial ratio (the "Ratio").  The Ratio requires Libra to maintain an amount, equal to or exceeding 0.99, obtained when dividing (a) the aggregate par value of all collateral debt securities, principal proceeds held as cash, and Investments purchased with the principal proceeds, by (b) the sum of the maximum notional amount of the Senior Swap Agreement and the aggregate outstanding amount of the "Class A" Notes.  This notice was the first step in the contractual mechanism that protects LBSF when the Collateral has decreased in value.

27.  On May 2, 2008, the Trustee, reportedly at the direction of the Senior Swap Counterparty, declared an acceleration of maturity of the Notes and the obligations under the Senior Swap Agreement.  One effect of this acceleration was to provide additional protections against premature termination for any credit default swap agreement in effect at that time under Section 5.2 of the Indenture, as discussed below.  The Trustee did not purport to terminate the Credit Default Swap Agreement prior to declaring such acceleration.

28.  Thereafter, LBHI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 15, 2008.  Because LBHI was a credit support provider with respect to LBSF's payment obligations under the Credit Default Swap Agreement, the filing of LBHI's voluntary petition constitutes an event of default under the Credit Default Swap Agreement.

29.  Subsequently, LBSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 6, 2008.  The filing of this petition also constitutes an event of default under the Credit Default Swap Agreement.

30. By letter dated October 10, 2008, in violation of the automatic stay, the Trustee designated that date as the "Early Termination Date" for the Credit Default Swap Agreement, thereby purporting to terminate the Credit Default Swap Agreement. As explained more fully below, this purported termination was prohibited by provisions in Section 5.2 and Section 7 of the Indenture because numerous contractual prerequisites for termination were not followed by the Trustee or the Issuer.

31. Under section 5.5(a)(ii) of the Indenture, the Trustee must receive a direction from a 66 ⅔ % majority of Noteholders, as well as from the Senior Swap Counterparty, before it can begin to sell the Collateral. On October 31, 2008, the Trustee issued a notice to the Noteholders soliciting their vote to begin disposition of the Collateral in accordance with section 5.5(a)(ii) of the Indenture.

32. As of the date hereof, the Trustee is seeking, but has not yet received, the approval of the required Noteholders to liquidate some or all of the Collateral. Meanwhile, LBHI and LBSF have located a third party that is ready, willing, and able to receive assignment of LBHI's and LBSF's rights and obligations under the Credit Default Swap Agreement. A successful assignment of LBHI's and LBSF's rights and obligations under the Credit Default Swap Agreement would monetize LBSF's position in that agreement and provide value to its estate.

33. Though such an assignment will result in substantial value being realized by LBSF's estate, it will only proceed if the Trustee's improper termination of the Credit Default Swap Agreement is declared null and void and this Court grants an order permanently enjoining the Trustee from taking any action in furtherance of its wrongful attempt to terminate the Credit Default Swap Agreement, including liquidating the Collateral and taking actions that would terminate any obligations of the Senior Swap Counterparty under the Senior Swap Agreement.

34.     Because the Credit Default Swap Agreement was inappropriately and ineffectively terminated, it remains an existing executory contract that can be assumed and assigned.  As more fully explained below, termination of the Credit Default Swap Agreement was prohibited by Section 5.2 of the Indenture because "liquidation had not begun" and, independently, because "acceleration remained capable of being rescinded."  Under Section 7 of the Indenture, as explained below, the Issuer was required to find a replacement for LBSF, but it failed to do so.  Such a replacement (with the necessary credit ratings and other qualifications) is now being provided by LBHI and LBSF through the assignment process in their main bankruptcy proceeding, demonstrating that a replacement would have been available if the Issuer had followed the required procedures in Section 7.  Violation by the Trustee and the Issuer of the clear terms of the Indenture makes this purported termination invalid, null, and void.

35.     In the absence of the relief requested herein, LBSF's rights and interests in the Credit Default Swap Agreement cannot be assigned, which will result in irreparable harm to LBSF's estate.

## COUNT I

*(Declaratory Judgment –*
*The Purported Termination of the Credit Default Swap Agreement Was Improper)*

36.     LBHI and LBSF repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

**1.  The Trustee Wrongfully Terminated the Credit Default Swap Agreement Because it Did Not and Cannot Liquidate the Collateral Pursuant to Article 5 of the Indenture**

37.     Section 5.5(a) of the Indenture provides that the Collateral cannot be liquidated by the Trustee following an event of default under the Indenture unless either: (i) the proceeds of the liquidation would be sufficient to pay all of Libra's obligations to the Noteholders, the Senior Swap Counterparty, and the Credit Default Swap Counterparty, or (ii) a

Supermajority of the Noteholders[5] and the Senior Swap Counterparty, direct the Trustee to liquidate the Collateral. If neither of these two conditions is satisfied, section 5.5(a) mandates that the Trustee maintain the Collateral (including the Investments, the Credit Default Swap Agreement, and the Senior Swap Agreement ) intact. (*See* Indenture §§ 5.5(a)(i)-(ii).)

38. On information and belief, neither event has occurred. As to section 5.5(a)(i), upon information and belief, the liquidation of the Collateral under current market circumstances would not yield proceeds sufficient to pay all of Libra's obligations. As to section 5.5(a)(ii), upon information and belief, a Supermajority of the Noteholders and the Senior Swap Counterparty have not directed the Trustee to liquidate the Collateral.

39. Because the conditions of section 5.5 of the Indenture have not been satisfied, the Trustee is required to maintain the Collateral, including the Investments, the Credit Default Swap Agreement, and the Senior Swap Agreement, intact. The Trustee is precluded from terminating the Credit Default Swap Agreement or the Senior Swap Agreement, and from liquidating the Investments.

40. Similar to section 5.5 of the Indenture, section 5.4 (which sets out remedies following an event of default) provides that the Trustee "may not sell or liquidate the Collateral" unless either of the conditions set out in section 5.5(a) is met, or the preservation of the Collateral by the Trustee is prohibited by law. The termination of the Credit Default Swap Agreement and the Senior Swap Agreement would necessarily result in the liquidation of the Collateral because such action would terminate any further benefits or obligations thereunder. The Trustee's purported termination of the Credit Default Swap Agreement, therefore, is prohibited under the Indenture and should be declared null and void.

---

[5] A "Supermajority" means 66 ⅔ % of the Controlling Class and 66 ⅔ % of all of the other classes of Notes voting as a single class.

41. Accordingly, LBHI and LBSF are entitled to a declaratory judgment that the Trustee's purported termination of the Credit Default Swap Agreement is void for the reasons set forth above, and that the Credit Default Swap Agreement remains in full effect.

**2. Termination of the Credit Default Swap Agreement Was Invalid Under Section 5.2(c) of the Indenture.**

42. The purported termination of the Credit Default Swap Agreement is inconsistent with the terms of the Indenture and the Credit Default Swap Agreement.

43. By way of example only and not limitation, section 5.2(c) of the Indenture sets out the conditions under which the Trustee may terminate the Credit Default Swap Agreement. Under section 5.2(c) of the Indenture:

> The Issuer [the right of which may be exercised by the Trustee] shall not terminate the Senior Swap Agreement, Credit Default Swap Agreement or any Hedge Agreement in effect immediately prior to a declaration of acceleration unless the liquidation of the Collateral has begun and such declaration is no longer capable of being rescinded or annulled.

44. Termination is proper only if (i) the liquidation of the Collateral has begun and (ii) the Trustee's declaration of acceleration may not longer be rescinded or annulled. Upon information and belief, the Trustee has not begun liquidation of the Collateral.

45. The Indenture further provides that the Trustee shall, at the direction of the majority of the controlling class of Noteholders, accelerate the Notes, but section 5.2(b) of the Indenture specifically states:

> At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the Cash due has been obtained by the Trustee as hereinafter provided in this Section 5, a Majority of the Controlling Class, by written notice . . . **may rescind and annul such declaration and its consequences** . . . [listing satisfaction of certain conditions]. (emphasis added)

46. Because the Trustee has not obtained a judgment or decree against Libra for payment of the cash due, the declaration of acceleration has, at all times, remained capable of being rescinded and annulled.

47. Accordingly, the Credit Default Swap Agreement may not be terminated under section 5.2(c) of the Indenture. Therefore, the purported termination of the Credit Default Swap Agreement was in violation of section 5.2(c) of the Indenture.

48. A necessary consequence of the unlawful declaration of termination of the Credit Default Swap Agreement is that actions taken on the basis of such termination, including attempts to liquidate the Collateral, also are unauthorized.

**3. The Trustee's Purported Termination of the Credit Default Swap Agreement Without Taking Reasonable Steps to Obtain a Substitute Credit Default Swap Counterparty Violates the Express Terms of the Indenture.**

49. Pursuant to the express terms of the Indenture, Libra, whose rights may be exercised by the Trustee, was prohibited from terminating the Credit Default Swap Agreement unless "(A) no Transactions remain outstanding under (and as defined in) the Credit Default Swap Agreement or (B) the Issuer has entered into a replacement therefor . . .." (Indenture, section 7.8(a)(xi).)

50. Libra was further obligated to use "reasonable efforts to enter into a replacement Credit Default Swap Agreement" upon termination of the Credit Default Swap Agreement. (Indenture § 7.5(f).)

51. Upon information and belief, Transactions (as defined in the Credit Default Swap Agreement) remain outstanding.

52. Based on sections 7.5(f) and 7.8(a)(xi) of the Indenture, the Trustee is obligated to take reasonable steps to find a replacement Credit Default Swap Counterparty before terminating the Credit Default Swap Agreement.

53. Upon information and belief, the Trustee terminated the Credit Default Swap Agreement without reasonably attempting to find a replacement Credit Default Swap Counterparty. Such purported termination violated the rights of LBSF under the Credit Default Swap Agreement and the Indenture, including its rights to transfer its rights and obligations under the Credit Default Swap Agreement.

## COUNT II

*(Declaratory Judgment – The Trustee's Purported Termination of the Credit Default Swap Agreement Violates the Automatic Stay)*

54. LBHI and LBSF repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

55. The automatic stay, set forth in section 362 of the Bankruptcy Code, independently prohibits the Trustee from taking any action under the Indenture to terminate the Credit Default Swap Agreement or liquidate the Collateral. Actions taken that affect LBSF's property pursuant to the terms of the Indenture are stayed by the automatic stay provisions of the Bankruptcy Code. Accordingly, any action pursuant to the Indenture that results in the diminution of the value of LBSF's estate and that benefits non-debtors at the expense of LBSF violates the automatic stay. *See* 11 U.S.C. § 362(a).

56. The Indenture, to which LBSF is an express third party beneficiary, provides LBSF with significant economic rights that constitute valuable assets of its estate. (*See* Credit Default Swap Agr. subpt. 5(m).). Were the Trustee permitted to liquidate the Collateral and terminate the Credit Default Swap Agreement, such actions would extinguish LBSF's rights under the Indenture, and would irretrievably unwind the Transaction.

57. The automatic stay prohibits the Trustee from taking any action under the Indenture to deprive the Debtor's estate of these valuable rights and assets. Accordingly, the

purported termination of the Credit Default Swap Agreement and unsuccessful solicitation of the Noteholders to liquidate the Collateral violated the automatic stay.

58. There is no safe harbor or other exception to the automatic stay that would authorize the Trustee to take action under the Indenture to liquidate the Collateral. Although the safe harbor provision of section 560 excludes from the automatic stay the contractual right to terminate a Credit Default Swap Agreement, it does not apply here. Because no exception applies, the automatic stay is applicable and precludes the Trustee and Libra from liquidating the Collateral or taking any action pursuant to the Indenture to deprive the Debtor's estate of a valuable asset.

59. Accordingly, LBHI and LBSF are entitled to a declaratory judgment that the Trustee's attempts to terminate the Credit Default Swap Agreement violated the automatic stay and that the Credit Default Swap Agreement remains in full effect.

## COUNT III

*(Declaratory Judgment –
The Credit Default Swap Agreement is an Existing Executory Contract)*

60. LBHI and LBSF repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

61. The Trustee's purported termination of the Credit Default Swap Agreement was invalid and violated the automatic stay.

62. Libra and LBSF continue to have unperformed obligations under the Credit Default Swap Agreement, and therefore, such agreement remains an executory contract.

## COUNT IV

*(Request for Immediate and Permanent Injunction Pursuant to
Bankruptcy Rules 7001(7) and 7065 and Bankruptcy Code § 105(a))*

63. LBHI and LBSF repeat and reallege each allegation set forth in the preceding paragraphs, which are hereby incorporated by reference.

64. For the reasons set forth herein, LBHI and LBSF seek immediate and permanent injunctive relief enjoining the Trustee, Libra, and the Senior Swap Counterparty from taking any action in furtherance of the wrongful termination of the Credit Default Swap Agreement, and enjoining them from taking actions that would terminate any obligations of the Senior Swap Counterparty under the Senior Swap Agreement.

65. If the wrongful termination of the Credit Default Swap Agreement is effectuated, LBHI and LBSF will suffer immediate and irreparable injury. LBHI and LBSF will be prevented from realizing value from the Credit Default Swap Agreement for the benefit of their estate because they will lose the ability to assume and assign their interests in the Transaction. Moreover, LBHI and LBSF will be irreparably harmed if the wrongful termination is permitted. If a distribution is made pursuant to a wrongful termination of the Credit Default Swap Agreement, then LBHI and LBSF (i) may be unable to locate all of the parties to whom that wrongful distribution would have been made, (ii) likely would have difficulty locating the funds that would have been distributed to all such parties, and (iii) may be unable to bring before this Court all of the parties to whom such a distribution would have been made.

66. While LBHI and LBSF will suffer the loss of value if the injunctive relief requested is not granted, in contrast, the Trustee, Libra, and Senior Swap Counterparty would suffer little or no harm as a consequence other than being required to perform their obligations under the Transaction documents to which they are parties.

67. As a result, LBHI and LBSF are entitled to an injunction enjoining the Trustee, Libra, and the Senior Swap Counterparty from taking any action in furtherance of the wrongful termination of the Credit Default Swap Agreement.

### Prayer for Relief

WHEREFORE, LBHI and LBSF respectfully request that the Court grant the following relief:

A. Enter a declaratory judgment that:

1. the Trustee's purported termination of the Credit Default Swap Agreement was in violation of the Transaction documents, was null and void, and the Credit Default Swap Agreement remains in full effect;

2. the Trustee's attempts to terminate the Credit Default Swap Agreement violated the automatic stay provisions of the Bankruptcy Code, and the Credit Default Swap Agreement remains in full effect;

3. the Credit Default Swap Agreement is an existing executory contract that can be assumed and assigned,

B. For a permanent injunction, enjoining the Trustee, Libra, and the Senior Swap Counterparty from taking any action in furtherance of the wrongful attempt to terminate the Credit Default Swap Agreement, including liquidation of the Collateral or distribution of the proceeds from the sale of such Collateral.

C. And for such other relief as the Court deems just and proper, including costs and attorneys' fees.

                Respectfully submitted,

                */s/ Ralph I. Miller*
                Lori R. Fife
                Ralph I. Miller
                Robert J. Lemons
                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Attorneys for Debtors
                and Debtors in Possession

Dated: New York, New York
       May 5, 2009