UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>**Case No. 08-13555 (JMP)**<br><br>(Jointly Administered) |
| LIBRA CDO LIMITED,<br>by BANK OF AMERICA, N.A.,<br>as successor by merger to LaSALLE BANK NATIONAL ASSOCIATION, as Trustee, and SOCIÉTÉ GÉNÉRALE, NEW YORK BRANCH,<br><br>Plaintiffs,<br><br>v.<br><br>LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>Defendant. | **Adversary Proceeding No. 09-_____ (JMP)** |

**COMPLAINT FOR DECLARATORY RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

**PRELIMINARY STATEMENT**

1.     Plaintiff Libra CDO Limited ("Libra") is the issuer of a collateralized debt obligation ("CDO") transaction. It was created and organized by Lehman Brothers Inc. ("LBI") and Lehman Brothers International (Europe) ("LBIE"). The CDO is administered by a Trustee, Bank of America, N.A., the successor by merger to LaSalle Bank National Association (the "Libra Trustee"), pursuant to the terms of an Indenture.

2.     Libra sold investments (the "Notes"[1]) to Noteholders, and used the proceeds from those sales to purchase a portfolio of assets (the "Collateral"), which is the sole source of funds for interest and principal payments on the Notes. Those assets were selected and managed for Libra by Lehman Brothers Asset Management ("LBAM"), which serves as Libra's Collateral Manager. The proceeds of the Collateral are distributed to Noteholders and other creditors of Libra according to a Priority of Payments, or "waterfall," specified in the governing Indenture. The market value of the Collateral has now collapsed, to the severe detriment of Libra's Noteholders. As a result of that severe loss of market value of the Collateral, the CDO failed an asset-coverage test, and, on April 30, 2008, the Libra Trustee declared an Event of Default under the Indenture.

3.     The Collateral consists of two broad categories of assets. Libra owns some assets (specifically, asset-backed securities) directly (the "cash" assets). The majority of Libra's investment income and risk, however, comes from the other category, a "reference portfolio," also of asset-backed securities, which Libra holds "synthetically" (the "synthetic" assets). Libra does not own the assets in the reference portfolio. Rather, Libra's investment exposure to the reference portfolio is established through a Credit Default Swap Agreement (the "CDS Agreement") with Defendant Lehman Brothers Special Financing Inc. ("LBSF"). Under the CDS Agreement, Libra receives Fixed Amounts, or "premiums," each quarter from LBSF, and, if any of certain defined events occur with respect to any asset in the reference portfolio, Libra pays a specified amount to LBSF.

4.     One important feature of the CDS Agreement is that it is "Pay-As-You-Go." That means that many of the amounts payable by Libra to LBSF are subject to full or partial

---

[1]    Unless otherwise specified, capitalized terms have the meanings given to them in the CDS Agreement, the Indenture, or the Senior Swap Agreement, as applicable.

2

reimbursement by LBSF throughout the life of the CDS Agreement. For example, an Interest Shortfall occurs when the periodic payment on an asset-backed reference security falls short of the scheduled amount. Such shortfalls, however, are not *defaults* on the reference assets, and they may be temporary. If and when those shortfalls are made up by the issuer of the affected reference asset in subsequent payment periods—by making a payment that is larger than scheduled—any amount previously paid by Libra based on such shortfall is subject to reimbursement by LBSF. Similarly, any amount previously paid by Libra based on mark-to-market losses with respect to a reference asset are reimbursable by LBSF as soon as the mark-to-market value of such asset increases. Thus, an improvement in the residential real estate market, on which many of the reference assets are based, at any time during the life of the CDS Agreement, could result in substantial amounts owed by LBSF to Libra.

5. Plaintiff Société Générale, New York Branch ("SG") is counterparty to Libra with respect to some (but not all) payments payable by Libra under the CDS Agreement (the "Permitted Use Payments"), pursuant to a swap transaction known as the Senior Swap Agreement. Under the Indenture, Permitted Use Payments due to LBSF from Libra under the CDS Agreement are paid first out of certain accounts held by Libra: the Reserve Account, the Uninvested Proceeds Account, and the Principal Collection Account. To the extent that funds in those accounts are insufficient to pay Permitted Use Payments pursuant to the CDS Agreement, the Senior Swap Agreement provides that, under certain circumstances, SG will provide liquidity to Libra to be used by Libra to pay such Permitted Use Payments to LBSF. The Indenture provides that any such funds advanced by SG to Libra must be repaid to SG, with interest, at the top of the Priority of Payments. The Senior Swap Agreement does not, however, cover (and SG is not required to advance) any funds to Libra to fund a Payment on Early Termination by Libra

3

(a "termination payment") to a CDS Counterparty that, like LBSF, has defaulted under the CDS Agreement; such a termination payment is treated as a "Defaulted Synthetic Termination Payment" under the Indenture and is payable solely out of the above-described Libra accounts according to the Priority of Payments.

*Termination of the CDS Agreement*

6.     LBSF is now in bankruptcy. It also has ceased paying the Fixed Amounts it owes to Libra under the CDS Agreement. When the Lehman Brothers entities created Libra, they purported to protect it against such a result by obtaining a guaranty of LBSF's obligations from LBSF's parent, Lehman Brothers Holdings Inc. ("LBHI"), which accordingly serves as the Credit Support Provider on the CDS Agreement. LBHI, however, is also bankrupt and has not made any payment in satisfaction of its guaranty of LBSF's payment obligations to Libra. Under the ISDA Master Agreement (the "ISDA Master"), an industry-standard form used for countless swap transactions, which is part of the CDS Agreement, the bankruptcy of a Credit Support Provider (here, LBHI) is an Event of Default by the party (here, LBSF) that received credit support from the bankrupt Credit Support Provider. Under the ISDA Master, a non-Defaulting Party (such as Libra) is entitled to terminate the CDS Agreement because of the bankruptcy of the other party or its Credit Support Provider. Because of the LBHI bankruptcy, which constituted an Event of Default by LBSF under the CDS Agreement, Libra terminated the CDS Agreement on October 10, 2008.

7.     The Senior Swap Agreement does not obligate SG to fund a termination payment payable by Libra to the CDS Counterparty where the CDS Agreement has been terminated on account of a default by the CDS Counterparty (here, LBSF). Because the only amount payable

4

by Libra to LBSF under the CDS Agreement is such a termination payment, SG does not, and will not, owe anything to Libra under the Senior Swap Agreement.

8.  Since the termination of the CDS Agreement, however, LBSF has asserted that the termination was "void" under Section 5.2(c) of the Indenture.  LBSF's position finds no support in the governing documents or the law.  Libra's termination of the CDS Agreement was valid under the express terms of the ISDA Master (which, as noted, is part of the CDS Agreement) because of the bankruptcy of LBHI, which was LBSF's Credit Support Provider.  The Indenture, in turn, makes clear that it is not intended to limit Libra's rights and remedies as against LBSF under the CDS Agreement.  Further, the termination was valid under Title 11 of the U.S. Code (the "Bankruptcy Code"), because the CDS Agreement is a protected financial contract under Section 560 of the Bankruptcy Code.

9.  As noted, the ISDA Master is part of the documentation of the CDS Agreement signed by LBSF.  Section 6(a) of the ISDA Master gives Libra the clear right to terminate the CDS Agreement upon default by LBSF, and the bankruptcy of LBSF's Credit Support Provider indisputably was an Event of Default by LBSF under Section 5(a) of the ISDA Master.  Thus, LBSF's assertion that the termination of the CDS Agreement was invalid simply ignores the specific and plain terms of the agreement between the parties.  Instead, LBSF bases its assertion that the termination was invalid on Section 5.2(c) of the Indenture.  The Indenture, however, was not intended to limit the rights of Libra as against LBSF with respect to the CDS Agreement.  Indeed, the plain language of Section 7.5(d) of the Indenture states that Libra "shall enforce all of its material rights and remedies under . . . the Credit Default Swap Agreement."  Section 7.5(d) does not provide that this clear expression of the primacy of Libra's rights under the CDS Agreement is subject to Section 5.2(c), or any other provisions, of the Indenture.  Accordingly,

5

the Indenture itself makes clear that nothing therein can limit Libra's rights as against LBSF under the CDS Agreement, including the right to terminate the CDS Agreement in the event of LBSF's default. Furthermore, LBSF's reliance on Section 5.2(c) of the Indenture to avoid termination is flatly inconsistent with Section 12.1(b) of the Indenture. That section, consistent with Libra's rights against LBSF under the CDS Agreement, provides for the termination or other disposal of any "Defaulted Security," the definition of which the CDS Agreement indisputably satisfies. Finally, the automatic stay does not limit Libra's right to terminate the CDS Agreement: the contract is a protected "swap agreement" under Section 560 of the Bankruptcy Code, and, in any event, the automatic stay does not apply because Libra is not attempting "to obtain possession of property of the estate."

10. In short (and as explained in detail below), Libra had a clear right to terminate the CDS Agreement. The continuing uncertainty, created by LBSF's assertions, over whether the CDS Agreement remains in place has cast doubt over the ongoing management of the CDO, its potential liquidation, and the distributions that the Libra Trustee is required to make each quarter. Moreover, any dispute concerning the termination of the CDS Agreement creates uncertainty concerning the ongoing validity or potential termination of the Senior Swap Agreement. Plaintiffs therefore request declaratory relief to resolve the dispute.

11. LBSF has taken positions with respect to the CDS Agreement and the Indenture that would allow it to reap profits from the CDS Agreement at the expense of the Noteholders, notwithstanding its own undisputed default. LBSF contends that it is entitled either to assign the terminated contract to a third-party or to receive a termination payment from Libra without regard to its default on the CDS Agreement. Either result would produce a windfall to LBSF that is expressly prohibited by the governing documents. In order to sell the Notes, LBI and LBIE

6

drafted those documents in a way that unambiguously guaranteed Libra's right to terminate the CDS Agreement upon an Event of Default by LBSF. Now that the market value of the Collateral selected by LBAM has collapsed, leaving Libra in default with respect to the Noteholders, LBSF seeks to drain assets from the CDO by retroactively rewriting the terms of the deal.

## PARTIES

12. Plaintiff Libra is a Cayman Islands limited liability company, to which notice may be given care of Deutsche Bank (Cayman) Limited, P.O. Box 1984GT, Elizabethan Square, Grand Cayman, Cayman Islands.

13. Trustee Bank of America, N. A., successor by merger to LaSalle Bank National Association, is a national banking association, with a principal place of business at 100 North Tryon Street, Charlotte, North Carolina 28255. Pursuant to the Granting Clauses of the Indenture, the Libra Trustee has "full power (in the name of [Libra] or otherwise) to exercise all rights of the Issuer with respect to the Collateral."

14. Plaintiff SG is a branch of a French banking institution, with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020. SG's parent, Société Générale SA, has its principal place of business at Tour Société Générale, 17 cours Valmy, Paris-La Defense, 92987, France.

15. Upon information and belief, Defendant LBSF is a Delaware corporation with its former principal place of business at 745 Seventh Avenue, New York, New York 10019 and its current principal place of business at 1271 Avenue of the Americas, 45th Floor, New York, New York 10020.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

17. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

18. LBSF is a debtor in the above-captioned proceeding under Chapter 11 of the Bankruptcy Code.

19. The statutory predicates for the relief requested herein are Sections 105(a), 362(b)(17), 362(o), and 560 of the Bankruptcy Code.

## FACTUAL BACKGROUND

### *The Libra CDO and the CDS Agreement*

20. Libra is a CDO issuer, established in 2006 by two Lehman Brothers entities, LBI and LBIE, and managed by a third, LBAM. A CDO is an investment vehicle that issues securities (here, Notes), which give their owners investment exposure to a pool of Collateral, which the CDO purchases with proceeds from the sale of those securities. The payments by the CDO of interest and principal to the investors are made solely from the proceeds received by the CDO from the Collateral.

21. The Libra Trustee collects proceeds from the Collateral, including amounts paid by LBSF under the CDS Agreement, and distributes those funds to SG, the Reserve Account, Noteholders, and other creditors of Libra (including LBSF), according to a Priority of Payments provision, or "waterfall," in the Indenture.

22. Libra is a "hybrid" CDO, meaning that it holds two types of assets: (1) traditional "cash" assets, such as asset-backed securities, which Libra purchased with proceeds from the

sale of Notes, and (2) "synthetic" assets, which Libra does not own but whose credit risk is borne by Libra, in return for premiums paid to Libra, through the CDS Agreement with LBSF.

23. A credit default swap is a contract by which the parties buy and sell "protection" against the credit risk posed by one or more underlying (or "reference") obligations. The credit protection buyer (here, LBSF) pays a periodic fixed premium. The credit protection seller (here, Libra), in turn, makes payments if and when certain adverse events, such as payment shortfalls or writedowns, occur with respect to the reference obligations. The amount of each such payment depends on the nature and severity of the particular event. The credit default swap at issue in this case, the CDS Agreement, is described in paragraphs 3 and 4, *supra*. Under the CDS Agreement, LBSF bought credit protection on the reference portfolio from Libra.

24. The CDS Agreement consists of the ISDA Master, a Schedule, and a Pay-As-You-Go Confirmation.

25. The CDS Agreement gives Libra a synthetic exposure to a portfolio of Reference Obligations selected by LBAM. Under the CDS Agreement, LBSF is required to pay periodic Fixed Amounts to Libra, while Libra pays certain defined amounts to LBSF upon the occurrence of certain defined events with respect to any asset in the reference portfolio. Holding assets in this synthetic form permits the Libra Noteholders to earn a return from a large and diverse portfolio without having to purchase any of those assets and invest a correspondingly large amount of cash upfront.

26. The synthetic assets created through the CDS Agreement accounted for the vast majority of the total value of the Libra Collateral. As a result, the CDS Agreement was Libra's most important item of Collateral: the income from the CDS Agreement, due from LBSF, was critical to funding the Priority of Payments each month.

27. LBSF's assertion that the Indenture bars Libra from terminating the CDS Agreement—aside from ignoring Libra's right to terminate under the ISDA Master and the unequivocal mandate of Section 7.5(d) of the Indenture—turns the Indenture on its head. The Indenture evinces a clear intent, in Section 12.1(b) and Section 12.2, to ensure that income-producing assets—and *only* income-producing assets—remain in the Collateral. Because performing Collateral is essential to generate sufficient income for timely and full payment of Libra's liabilities, Section 12.1(b) of the Indenture provides for the removal of assets that do not produce income, *i.e.*, any Defaulted Security in the Collateral. The CDS Agreement, on which a payment default had occurred, was a Defaulted Security at the time it was terminated by Libra. In parallel fashion, Section 12.2 of the Indenture provides that after an Event of Default and acceleration of the Notes, when Libra is in "run-off," Libra does not have authority to acquire any Collateral Debt Security, including any replacement credit default swap agreement. These provisions clearly show that the Indenture was not, as LBSF suggests, designed to hamstring Libra by preventing the Libra Trustee from exercising unambiguous contractual rights in the interest of Libra's Noteholders.

*The Senior Swap Agreement*

28. The Senior Swap Agreement provides that, under certain circumstances, SG will provide liquidity to Libra to make Permitted Use Payments to LBSF, if and as necessary, under the CDS Agreement. The Senior Swap Agreement allows Libra, under certain circumstances, to draw on SG to make required Permitted Use Payments to LBSF, if any, above and beyond the funds in the various Libra accounts described in paragraph 5, *supra*. If and when SG advances those funds, it is entitled to repayment from Libra in each future payment period, near the top of the Priority of Payments.

29. The Senior Swap Agreement consists of an ISDA Master, a Schedule, and a Confirmation.

30. Both the Indenture and the Senior Swap Agreement Schedule clearly provide that the Senior Swap Agreement does not cover, and SG is *not* obligated to fund, any termination payment when the CDS Agreement is terminated on account of a default by the CDS Counterparty (here, LBSF). Because Libra did, in fact, terminate the CDS Agreement on account of LBSF's default (the bankruptcy of LBSF's Credit Support Provider), the resulting termination payment is not covered by the Senior Swap Agreement, and SG is not liable to Libra for any termination payment due to LBSF.

31. Because the only amount owed to LBSF by Libra in connection with the terminated CDS Agreement is a "Defaulted Synthetic Termination Payment," which indisputably is not a "Permitted Use Payment" and is therefore not covered by the Senior Swap Agreement, the uncertainty created by LBSF's erroneous assertions regarding the termination of the CDS Agreement creates uncertainty as to when SG, or SG and Libra, can terminate the Senior Swap Agreement.

### *The CDO Default and Acceleration*

32. Section 5.1 of the Indenture governs Events of Default with respect to the Libra CDO. Section 5.1(h) provides that an Event of Default under the Indenture occurs if the ratio between the values of certain assets and certain liabilities of Libra (each as set forth in Section 5.1(h)) is less than 99%.

33. The Collateral assets selected for Libra by LBAM have suffered a severe loss of market value. As a result, on April 30, 2008, the Libra Trustee determined that an Event of Default under Section 5.1(h) of the Indenture had occurred.

11

34. Section 5.2(a) of the Indenture provides that, upon the occurrence of an Event of Default, the Controlling Class may direct the acceleration of the Libra Notes.

35. According to the definition of "Controlling Class" in Section 1.1(a) of the Indenture, SG, as Senior Swap Counterparty, was at that time the Controlling Class. On May 2, 2008, SG delivered a Notice of Acceleration of the Notes to Libra and the Libra Trustee.

36. Following the Event of Default and acceleration, the CDO entered a "run-off" phase, in which the Libra Trustee continued to collect and distribute income from the Collateral, but LBAM, as Collateral Manager, no longer actively managed the Collateral portfolio and was not permitted to acquire any new assets. *See* Sections 5.5(a) and 12.2 of the Indenture.

***The LBSF Default and Termination of the CDS Agreement Pursuant to Sections 5(a) and 6(a) of the ISDA Master***

37. Section 5(a) of the ISDA Master provides that:

***Events of Default.*** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes an event of default . . . with respect to such party: —

> . . .
>
> (vii) ***Bankruptcy.*** The party [or] any Credit Support Provider of such party . . . : —
>
>> (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation

38. LBSF's obligations under the CDS Agreement were guaranteed by LBHI, which was the Credit Support Provider to LBSF.

39. LBHI filed for bankruptcy on September 15, 2008.

40. The bankruptcy filing by LBHI constituted an Event of Default with respect to LBSF under Section 5(a)(vii) of the ISDA Master.

12

41. Section 6 of the ISDA Master provides that:

(a) ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.

42. Because of the Credit Support Provider bankruptcy Event of Default by LBSF, the Libra Trustee, on October 10, 2008, delivered to LBSF a Notice of Termination of the CDS Agreement, specifying that same date as the Early Termination Date of the CDS Agreement, in full satisfaction of the requirements of Section 6(a) of the ISDA Master.

43. Pursuant to Section 6(e) of the ISDA Master, a termination payment may be payable upon termination of the CDS Agreement.

### *The CDS Agreement Was, and Remains, Duly Terminated*

44. As a "credit swap," the CDS Agreement is a "swap agreement" within the meaning of Section 101(53B) of the Bankruptcy Code.

45. Before the filing of the LBSF petition, Libra had an outstanding swap agreement with LBSF. Accordingly, Libra is a "swap participant" within the meaning of Section 101(53C) of the Bankruptcy Code.

46. As was its right as a swap participant with respect to which the automatic stay does not operate (*see* Sections 362(b)(17) and 560 of the Bankruptcy Code), Libra, on October 10, 2008, exercised its contractual right to terminate the CDS Agreement because of the LBHI bankruptcy filing.

47. Such contractual right of Libra to terminate was exercised via the delivery, on October 10, 2008, by Libra, acting through the Libra Trustee, to LBSF, of the contractually-prescribed form of notice of termination.

13

48. Therefore, the CDS Agreement was, on October 10, 2008, duly and irrevocably terminated in all respects.

*The Dispute*

49. Notwithstanding all the foregoing, on November 6, 2008, LBSF sent a letter to the Libra Trustee and Libra stating, among other things, that "[p]ursuant to Section 5.2(c) of the Indenture, we do not believe that [the Libra Trustee] or [Libra] is entitled to terminate the Swap Agreement and any action taken in that regard is void."

50. On November 13, 2008, the Libra Trustee responded with a letter stating that Libra had the contractual right to terminate the CDS Agreement because of the LBHI bankruptcy and that the termination was also proper under the Indenture.

**COUNT I**

*(Declaratory Judgment—The Termination of the CDS Agreement Was Valid Under the Plain Terms of the CDS Agreement)*

51. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth herein.

52. There is an actual controversy between the parties as to the validity of the termination of the CDS Agreement, because LBSF has asserted that the termination of the CDS Agreement was invalid. LBSF's assertion is wholly without merit.

53. Section 5(a)(vii) of the ISDA Master provides that a bankruptcy filing by a party's Credit Support Provider is an Event of Default with respect to such party.

54. LBSF's Credit Support Provider, LBHI, filed for bankruptcy on September 15, 2008.

55. Therefore, an Event of Default with respect to LBSF existed as of September 15, 2008.

14

56. The bankruptcy Event of Default gave Libra the right to terminate the CDS Agreement under Section 6(a) of the ISDA Master.

57. Pursuant to Section 6(a) of the ISDA Master, which as stated above is not limited as against LBSF by the terms of the Indenture, Libra terminated the CDS on October 10, 2008, by delivering a Notice of Early Termination designating October 10, 2008 as the Early Termination Date of the CDS Agreement and all outstanding transactions thereunder.

58. Accordingly, Plaintiffs are entitled to a declaratory judgment that the termination of the CDS Agreement is valid.

## COUNT II

### *(Declaratory Judgment—The Automatic Stay Does Not Bar or Invalidate the Termination of the CDS Agreement)*

59. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if set forth herein.

60. There is an actual controversy between the parties as to the effect, if any, of the automatic stay upon the termination of the CDS Agreement, because LBSF has asserted that the automatic stay renders void the termination of a credit default swap agreement. LBSF's assertion is wholly without merit.

61. The CDS Agreement is a protected "swap agreement" under Sections 101(53B) and 560 of the Bankruptcy Code.

62. Thus, pursuant to Section 560 of the Bankruptcy Code, "the exercise of [Libra's] contractual right" to "cause the liquidation, termination, or acceleration of" the CDS Agreement "shall not be stayed, avoided, or otherwise limited by operation of any provision of [the Bankruptcy Code] or by order of a court or administrative agency in any proceeding under" the Bankruptcy Code.

63. In addition, pursuant to Section 362(o) of the Bankruptcy Code, the exercise of such rights to cause the termination of the CDS Agreement may not be stayed by any order of this Court.

64. The automatic stay does not limit Libra's right to terminate the CDS Agreement, because the termination was not an attempt "to obtain possession of property of the estate."

65. Accordingly, Plaintiffs are entitled to a declaratory judgment that the automatic stay does not bar or invalidate Libra's termination of the CDS Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue a declaration that:

a) that the termination of the CDS Agreement by Libra is valid; and

b) that the automatic stay does not bar or invalidate the termination of the CDS Agreement.

and grant such other relief as the Court deems just and proper.

New York, New York
May 5, 2009

                Respectfully submitted,

                /s/ Brian Trust
                MAYER BROWN LLP
                Steven Wolowitz
                Brian Trust
                Mark G. Hanchet
                1675 Broadway
                New York, New York  10019
                (212) 506-2500

                *Attorneys for Plaintiffs*
                *Libra CDO Limited,*
                *by Bank of America, N.A.,*
                *as successor by merger to LaSalle Bank National*
                *Association, as Trustee, and*
                *Société Générale, New York Branch*