**Hearing Date and Time:  June 3, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  May 28, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                    :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |

-----------------------------------------------------------------x

**NOTICE OF LBHI'S MOTION, PURSUANT TO RULE 9019**
**OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR**
**AUTHORIZATION AND APPROVAL OF SETTLEMENT AGREEMENT**
**WITH THE PENSION BENEFIT GUARANTY CORPORATION THAT**
**PROVIDES FOR, *INTER ALIA*, PAYMENT OF $127,600,000 IN RESPECT OF**
**PENSION BENEFITS FOR PLAN PARTICIPANTS AND THEIR BENEFICIARIES**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization and approval of a settlement agreement with the

Pension Benefit Guaranty Corporation regarding the termination of the Lehman Brothers

Holdings Inc. Retirement Plan, all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **June 3, 2009 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **May 28, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: May 7, 2009
       New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :        08-13555 (JMP)
                                          :
                         Debtors.         :        (Jointly Administered)
                                          :
                                          :
----------------------------------------------------------------x
```

**LBHI'S MOTION, PURSUANT TO RULE 9019 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE,
FOR AUTHORIZATION AND APPROVAL OF SETTLEMENT
AGREEMENT WITH THE PENSION BENEFIT GUARANTY CORPORATION
THAT PROVIDES FOR, *INTER ALIA*, PAYMENT OF $127,600,000 IN RESPECT
OF PENSION BENEFITS FOR PLAN PARTICIPANTS AND THEIR BENEFICIARIES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

1.      The Motion seeks authorization and approval of a settlement agreement

(the "Settlement Agreement"), dated May 4, 2009, a copy of which is attached at Exhibit "A,"

with the Pension Benefit Guaranty Corporation (the "PBGC") regarding the termination of the

Lehman Brothers Holdings Inc. Retirement Plan that provides, *inter alia*, for a payment of

$127,600,000 plus certain interest to the PBGC in respect of its claims against the Debtors and

the LBHI Controlled Group (defined below).  As demonstrated below, LBHI's entry into the

Settlement Agreement is reasonable and in the best interests of the Debtors, their estates and

creditors.  The Settlement Agreement will allow the Debtors to move forward unimpeded in the

administration of their chapter 11 cases, including, most importantly, their ability to dispose of

"controlled group" assets to maximize value for their stakeholders.  The Settlement Agreement

also relieves the Debtors from the distractions posed by the complex and time-consuming district

court action commenced by the PBGC to terminate the Plan and requires, upon consummation of

the Settlement Agreement, that the PBGC release its claims regarding the Plan against the

Debtors' estates and the members of the LBHI Controlled Group (defined below), including its

claims for the unfunded benefit liabilities of the Plan and premiums payable to the PBGC.

Accordingly, the Settlement Agreement should be approved.

### **Background**

2.        Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

3.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

5.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

7.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

9.      LBHI requests the entry of the proposed order, pursuant to Bankruptcy Rule 9019, approving the Settlement Agreement and authorizing LBHI to complete the acts contemplated thereby.  As set forth more fully below, LBHI's decision to enter into the Settlement Agreement falls within the range of reasonableness and is in the best interests of the Debtors, their estates and creditors.  As such, the relief requested in this Motion should be granted.

**The Retirement Plan and Title IV of ERISA**

Lehman Brothers Holdings Inc. Retirement Plan

10.      The Lehman Brothers Holdings Inc. Retirement Plan (the "Plan") is a defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA").   The Plan provides pension benefits to certain present and former employees of Lehman and to their beneficiaries.  The Plan has approximately 22,000 participants.  The Plan is sponsored by LBHI, and the Employee Benefit Plans Committee of LBHI (the "Benefits Committee") is the Plan Administrator.  As of January 1, 2008, the Plan had approximately $1.2 billion in assets and approximately $1.040 billion in total benefit liabilities (calculated in accordance with the actuarial assumptions used for purposes of generally accepted accounting principles, including a discount rate of 6.23%).  Largely due to market events occurring after September 15, 2008, the value of the assets of the Plan declined significantly, which resulted in the Plan being underfunded relative to its total benefit liabilities.

Title IV of ERISA and the PBGC

11.      The PBGC is a federal agency and wholly owned United States government corporation.  The PBGC administers the termination insurance program under Title

IV of ERISA and acts as an insurer of certain pension benefits under certain defined benefit pension plans.

12.      Title IV of ERISA provides the exclusive means of terminating a defined benefit pension plan that is subject to ERISA.  Plan termination can be initiated by the plan sponsor or by the PBGC.  The plan sponsor may terminate the plan in a standard termination under 29 U.S.C. § 1341(b) if the plan has sufficient assets to cover all future benefit payments or in a distress termination under 29 U.S.C. § 1341(c) if the plan is underfunded and the plan sponsor meets certain statutory criteria.  In addition, the plan sponsor may agree to make additional contributions to an underfunded plan so that the plan has sufficient assets for a standard termination.  Alternatively, the PBGC has discretion to initiate the termination of an underfunded plan if it determines, among other reasons, that either of the following criteria is satisfied:

- the plan will be unable to pay benefits when due; and

- the possible long-run loss of the PBGC with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. §§ 1342(a)(2) and (4).  Once the PBGC has determined that a plan should be terminated, it may apply to a United States District Court for a decree that "the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund."  29 U.S.C. § 1342(c).

13.      When an underfunded pension plan covered by Title IV terminates in an involuntary or distress termination, the PBGC pays guaranteed benefits to participants and beneficiaries in accordance with Title IV.

14.    The plan sponsor and each member of its "controlled group"[1] as of the termination date of the plan are jointly and severally liable to the PBGC for the amount of unfunded benefit liabilities of the pension plan.  29 U.S.C. §§ 1362(a) and (b).  Title IV also provides for the payment by the plan sponsor and its controlled group of a termination premium.  29 U.S.C. §§ 1306(a)(7), 1307.  If the plan sponsor and its controlled group members fail to pay the liability upon demand, the PBGC may file statutory liens against any property of the plan sponsor or controlled group members in an amount not to exceed 30% of the aggregate positive net worth of the controlled group as determined under 29 U.S.C. § 1362.

**The District Court Action**

15.    On December 12, 2008, the PBGC issued a "Notice of Determination" (the "NOD") to the Benefits Committee of the PBGC's determination that, *inter alia*, the Plan will be unable to pay benefits when due and that the possible long-run loss of the PBGC with respect to the Plan may reasonably be expected to increase unreasonably if the Plan is not terminated.  *Citing* 29 U.S.C. § 1342(a)(2) and (4).  Immediately thereafter, on December 12, 2008, the PBGC filed a complaint (the "Complaint") against the Benefits Committee to terminate the Plan in the United States District Court for the Southern District of New York (the "District Court"), Civ. No. 08 CIV 10792 (HB) (the "District Court Action").  The Complaint seeks, among other things, (i) an adjudication that the Plan is terminated, (ii) the appointment of the PBGC as statutory trustee of the Plan, and (iii) a finding that the Plan termination date be set at December 12, 2008.

---

[1] The members of LBHI's controlled group consist of those entities, both Debtors and non-Debtors, under "common control" of LBHI that satisfy the requirements of 29 U.S.C. § 1301(a)(14) (the "LBHI Controlled Group").

16.     If the PBGC is successful on all counts of the Complaint and the Plan is involuntarily terminated, the PBGC would assume the Plan's assets, as the Plan's statutory trustee, have a claim for the amount of unfunded benefit liabilities, which the PBGC currently estimates to be $115,200,000[2] and have an additional premiums claim in the aggregate amount of approximately $81.5 million in accordance with 29 U.S.C. § 1306(a)(7).[3]  These amounts would be recoverable against LBHI, its affiliated Debtors that are members of the LBHI Controlled Group (as claims against their bankruptcy estates) and the non-Debtor members of the LBHI Controlled Group, including Neuberger Berman Holdings LLC – the holding company of Lehman's investment management business.

17.     On December 12, 2008, upon the PBGC's application, the District Court issued an order scheduling a hearing on December 30, 2008 to show cause why the Plan should not be terminated (the "Show Cause Order").  In support of the Show Cause Order, the PBGC alleged that its ability to recover the unfunded benefit liabilities in full was at risk because LBHI was selling its equity interest in or assets of members of the LBHI Controlled Group in connection with its chapter 11 case, including entities comprising Lehman's investment management business.[4]  The Benefits Committee opposed the Show Cause Order.  The

---

[2] To complete a standard termination, LBHI's actuary has estimated, using discount rates likely available in purchasing annuities to settle the Plan's benefit obligations, that such termination could cost as much as approximately $267 million.

[3] This statutory obligation to pay additional premiums to the PBGC for a period of three years, calculated at an annual rate of $1,250 multiplied by the total number of participants in the Plan as of the termination date, is owed by LBHI and the members of the LBHI Controlled Group.  As of December 12, 2008, the Plan had 21,725 participants, which could result in an aggregate premium of $81,468,750.  The additional premiums appear to be owed upon any involuntary or certain distress terminations of an underfunded plan during a chapter 11 case, regardless of the amount of recovery by the PBGC on its claim for the unfunded benefit liabilities of the plan.

[4] On December 22, 2008, this Court issued an Order authorizing and approving the Debtors' sale of certain purchased assets, pursuant to a Unit Purchase Agreement, dated December 1, 2008, by and between LBHI and NBSH Acquisition, LLC (as amended, from time to time, the "Neuberger Purchase

Creditors' Committee moved to intervene in the District Court Action and joined the Benefits Committee's opposition.[5]

18.    Before a determination was made on the Show Cause Order, the District Court entered an agreed order adjourning the hearing to allow the Benefits Committee to pursue alternatives. *See PBGC v. Employee Benefits Plans Committee of Lehman Brothers Holdings Inc.*, Civ. No. 08 CIV 10792 (HB) (S.D.N.Y. Jan. 5, 2009) [Docket No. 18] (the "Agreed Order").[6]  Significantly, the Agreed Order imposed certain restrictions on LBHI and the LBHI Controlled Group that were intended to preserve the status quo (particularly the PBGC's ability to recover the Plan's unfunded benefit liabilities against the non-Debtor members of the LBHI Controlled Group) pending a determination of whether the Plan should be terminated.  More specifically, the Agreed Order set forth the following restrictions on LBHI and the LBHI Controlled Group:

*    *    *

2.    LBHI shall cause each corporation, limited liability company or other entity which is a member of its controlled group…or would be a member of the [Lehman Controlled Group] but for the argument that it is not a "trade or business," as of December 12, 2008, other than Excluded Subsidiaries…not to consummate on or prior to February 3, 2009…or until further order of this Court, whichever is earlier ("Expiration Date"), the sale or other transfer of any equity interest in any member of the Lehman Controlled Group …which would result in such member being excluded from LBHI's controlled group after such sale or transfer….

---

Agreement").  *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 22, 2008) [Docket No. 2350].

[5] Currently, the Benefits Committee and the PBGC have filed competing motions for summary judgment that have been adjourned *sine die* pending approval of the Settlement Agreement.

[6] The Agreed Order was subsequently "so ordered" by this Court.  *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 3, 2009) [Docket No. 2720].  A copy of the Agreed Order is attached at Exhibit "B."

3.      LBHI shall not merge or otherwise consolidate on or prior to the Expiration Date, any member of the Lehman Controlled Group with any other member of the Lehman Controlled Group or other person which would result after such merger or consolidation in a reduction in the number of the members of LBHI's controlled group.

5.      The Acquired Subsidiaries and General Partner Entities…shall not, and LBHI shall not cause any of the Acquired Subsidiaries or General Partner Entities to, commence a proceeding under the U.S. Bankruptcy Code or similar law of any state on or prior to the Expiration Date.  For purposes of this paragraph "General Partner Entities" means… [listing 15 Lehman entities].

6.      The assets of any member of the Lehman Controlled Group as of December 12, 2008 (other than any direct or indirect subsidiary of Lehman Brothers Inc. or any [Lehman entity in a foreign insolvency or similar proceeding]) shall not be transferred [through] the Expiration Date to another member of the Lehman Controlled Group that is a debtor in a proceeding under the Bankruptcy Code or any insolvency, receivership, administration or similar laws.

*        *        *

19.      The Agreed Order and the Expiration Date were subsequently extended to March 23, 2009.  On March 26, 2009, as settlement negotiations progressed, the parties agreed to change the form of protection provided to the PBGC pending the hearing on the Show Cause Order.  More specifically, to preserve the PBGC's interest, an adequate protection agreement (the "Adequate Protection Agreement")[7] was executed by and among Neuberger Berman Holdings LLC ("NBH") and the PBGC to secure the amount of unfunded benefit liabilities of the Plan, which agreement replaced the restrictions imposed under the Agreed Order.  To secure payment of the unfunded benefit liabilities, the PBGC was granted a security interest in and continuing lien on all of NBH's limited liability interests in Neuberger Berman Management

---

[7] Copies of the Adequate Protection Agreement and the District Court order approving such agreement are attached at Exhibits "C" and "D" respectively.  *See PBGC v. Employee Benefits Plans Committee of Lehman Brothers Holdings Inc.*, Civ. No. 08 CIV 10792 (HB) (S.D.N.Y. Mar. 23, 2009 and Mar. 26, 2009) [Docket Nos. 56 and 57].

LLC, Neuberger Berman Asset Management, LLC and Neuberger Berman, LLC (the "Pledge"),
all of which are non-Debtors.  In addition, NBH and the PBGC agreed to subsequently enter into
an escrow agreement (the "Escrow Agreement") on or about the closing date of the Neuberger
Purchase Agreement, pursuant to which NBH would cause one or more members of the LBHI
Controlled Group to deliver cash in an amount equal to the Plan's unfunded benefit liabilities to
an escrow account (the "Escrow Account").  On April 29, 2009, in connection with the closing
of the Neuberger Purchase Agreement, NBH caused the Escrow Account to be funded entirely
by non-Debtor entities.  Upon the execution of the Escrow Agreement and funding of the Escrow
Account, the PBGC released the Pledge.

### The Settlement Agreement

20.    LBHI, the Benefits Committee, NBH and the PGBC entered into the
Settlement Agreement that provides for termination of the Plan with a termination date of
December 12, 2008 and resolution of the PBGC's claims for unfunded benefit liabilities and
additional premiums.  The Settlement Agreement also requires, upon the satisfaction of certain
conditions, that the PBGC not file any liens on the assets of the LBHI Controlled Group and
cause any previously filed liens to be released.  The Settlement Agreement includes the
following salient terms:[8]

- Trusteeship Agreement.  If the Settlement Agreement is approved by
  the Bankruptcy Court, the PBGC and the Benefits Committee shall
  enter into a trusteeship agreement (the "Trusteeship Agreement," a
  copy of which is attached at Exhibit "E") pursuant to which the PBGC
  shall be appointed as the Plan's statutory trustee and December 12,
  2008 shall be set as the date of termination of the Plan.

- Settlement Amount.  An aggregate payment to the PBGC in cash
  totaling $127,600,000 (plus interest as agreed) (the "Settlement

---

[8] To the extent there is any inconsistency between this summary of the Settlement Agreement and the
Settlement Agreement itself, the terms of the Settlement Agreement control.

Amount") shall be made in full settlement and release of all claims of the PBGC against the LBHI Controlled Group and all claims against the LBHI Controlled Group in the chapter 11 cases arising from or relating to the Plan; *provided, however*, that claims for fiduciary breach against any non-debtor member of the LBHI Controlled Group shall not be released.

- Adequate Protection.  In accordance with the Adequate Protection Agreement, the Escrow Agreement was executed on April 29, 2009 establishing the Escrow Account to cover the Settlement Amount.  A copy of the executed Escrow Agreement is attached at Exhibit "F."  In the event the Settlement Agreement is not approved, the parties have agreed, pursuant to a side letter agreement attached at Exhibit "G," that (i) $12,400,000 will be released and returned to NBH, and (ii) the remaining $115,200,000 will remain in the Escrow Account according to the terms of the Escrow Agreement and the Adequate Protection Agreement.

- Payment.  If there is a Final Judgment approving the Settlement Agreement, within three business days of the later of (i) the earlier of the Closing or June 30, 2009, and (ii) the date upon which the PBGC and the Benefits Committee shall have entered into the Trusteeship Agreement (the "Effective Date"), NBH shall instruct, or LBHI shall cause such other LBHI Controlled Group member with authority to instruct, the Escrow Agent (as defined in the Escrow Agreement) to release the Settlement Amount to the PBGC.

- Liens.  PBGC agrees to not file any liens on the assets of any member of the LBHI Controlled Group as of December 12, 2008 while the Escrow Agreement is in place.  Upon payment of the Settlement Amount, PBGC shall cause any previously filed liens to be forever released.

- Withdrawal of Claims.  On the later of (i) the payment in full of the Settlement Amount and (ii) the Effective Date, the PBGC will withdraw all filed claims in the chapter 11 cases regarding the Plan and agrees not to file any claims in any of the chapter 11 cases or in a case that may be commenced in the future under the Bankruptcy Code or other similar proceeding by or against any member of the LBHI Controlled Group, other than claims for breach of fiduciary duty.

- District Court Action.  The District Court Action shall be stayed pending a Final Judgment regarding the Settlement Agreement.  If there is a Final Judgment denying approval of the Settlement Agreement or if the Benefits Committee fails for any reason to execute the Trusteeship Agreement by the later of (i) June 30, 2009 or (ii) the

third day after a Final Judgment approving the Settlement Agreement, the PBGC may, in its sole discretion, reactivate the District Court Action.  If the Settlement Agreement is approved, then, on the later of (i) payment in full of the Settlement Amount and (ii) the Effective Date, the PBGC will dismiss the District Court Action.

### The Settlement Agreement is Reasonable and in the Best Interests of the Debtors and their Estates and Creditors

21.    The Settlement Agreement should be approved.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  *Id.*   The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness."  *Id.*

22.    Bankruptcy courts have applied the following factors in determining whether a settlement should be approved:  (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of

ultimate success should the claim be litigated."); *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804

(Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

23.     While a court must "evaluate … all … factors relevant to a fair and full

assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699

F.2d at 608, or conduct a full independent investigation.  *In re Drexel Burnham Lambert Group,*

*Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).  "[T]he bankruptcy judge does not have to

decide the numerous questions of law and fact… .  The court need only canvass the settlement to

determine whether it is within the accepted range of reasonableness."  *Nellis v. Shugrue*, 165

B.R. 115, 123 (S.D.N.Y. 1994) (internal citations omitted).

24.     The court may give weight to the informed judgment of the debtor that a

compromise is fair and equitable.  *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522

(S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. at 802 ("Significantly, that test

does not contemplate that I substitute my judgment for the Trustee's, but only that I test his

choice for reasonableness….  If the Trustee chooses one of two reasonable choices, I must

approve that choice, even if, all things being equal, I would have selected the other.").

25.     The Settlement Agreement satisfies the standard for approval.  In light of

Lehman's demise as a leader in the global financial market, the impact of market conditions (past

and future) on the value of the Plan's assets and the risks associated with the amount of the

unfunded benefit liabilities of the Plan, none of the members of the LBHI Controlled Group

appears suitable to assume sponsorship of and continue to maintain the Plan.  As a result, the

Plan must inevitably be terminated either voluntarily in a standard termination in which all

benefit liabilities under the Plan are satisfied or through a distress or involuntary termination in

which responsibility for paying guaranteed benefit liabilities in accordance with Title IV is assumed by the PBGC.  Thus, although the Settlement Amount may be sufficient to fund a substantial portion, and possibly all, of the unfunded benefit liabilities, continuation of the Plan under the market and business risks associated therewith cannot be justified.  Accordingly, the Debtors believe they have taken sufficient steps through the Settlement Agreement to avoid disruption, if any, to the Plan's participants and beneficiaries, while at the same time minimizing the costs to their estates associated with a termination of the Plan.

26.    More specifically, the Settlement Agreement provides for an aggregate payment of $127,600,000, plus interest thereon from December 12, 2008, in full satisfaction of all obligations of the LBHI Controlled Group in respect of the PBGC's claims regarding the Plan.  Such amount represents a substantial discount from the total amount of $212,700,000 potentially owed by the LBHI Controlled Group to the PBGC.  Moreover, the December 2008 discount rates applied by the PBGC in calculating its claim for unfunded benefit liabilities of the Plan of 7.97% for the first 20 years and 6.92% for the period after the first 20 years are considerably higher than the market rates believed to be available in December 2008 for purchasing annuities pursuant to a standard termination of the Plan.  As a result, the Debtors believe that the Settlement Amount is considerably less expensive than the cost of a standard termination, notwithstanding that the potential additional premiums to the PBGC (estimated at approximately $81.5 million) do not apply to a standard termination.[9]

---

[9] In agreeing to the premium payments, the Debtors have considered the Second Circuit's recent holding that an employer's obligation to pay a termination premium pursuant to 29 U.S.C. § 1306(a)(7) on a pension plan that is terminated during the course of a chapter 11 case is enforceable and is not dischargeable as a prepetition claim.  *See PBGC v. Oneida Ltd. (In re Oneida Ltd.)*, Docket No. 08-2964 – bk, 2009 U.S. App. LEXIS 7176, at *7-8 (2d Cir. Apr. 8, 2009).  Rather, in the case of a termination due to reorganization, the liability for the termination premium does not arise until the employer is discharged from the reorganization proceeding.  *Id.*

27.     Furthermore, by settling their disputes with the PBGC regarding the Plan, the Debtors regain the unfettered ability to maximize the values of their estates, including the ability to liquidate valuable assets such as LBHI's equity interest in various entities that are members of the LBHI Controlled Group.  The restrictions of the Agreed Order caused serious complications in the administration of the chapter 11 cases, such as unnecessary delay in the marketing, sale and dissolution of Lehman's non-debtor assets.  In addition, the District Court Action is extremely complex, time-consuming, costly and distracting.  If the Settlement Agreement is approved, the Debtors can resolve all of the issues surrounding the Plan and refocus their attention and resources to the administration of their chapter 11 cases.

28.     In addition, although the Debtors believe they have sufficient legal and factual support to be successful in the District Court Action, the results of litigation are never guaranteed.  Not only is there a risk that LBHI and the LBHI Controlled Group may be unsuccessful and incur a judgment in excess of the Settlement Amount, but the PBGC could also impose statutory liens on non-Debtor assets making such assets less marketable.  Thus, recoveries for creditors could be reduced if the Settlement Agreement is not approved and the PGBC is successful in the District Court Action.  The Debtors also obtain the benefit of withdrawal of the PBGC's claims related to the Plan against their estates.

29.     The Debtors have negotiated the Settlement Agreement at arm's-length to come to a fair resolution regarding the Plan and the PBGC's claims.  The Settlement Agreement enables the Debtors to reduce the cost of administration of the estates, while also ensuring that the Plan's beneficiaries will continue to receive their benefits uninterrupted.  Having assessed the risks associated with the District Court Action and the benefits of the Settlement Agreement, including giving due consideration to the understanding that the Plan will inevitably need to be

terminated as the Debtors wind down their estates, the Debtors believe the Settlement Agreement is reasonable and in the best interests of the estates and creditors.  Accordingly, the Settlement Agreement should be approved.

### Notice

30.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.

31.    The Debtors have also served a personalized notice of the Settlement Agreement and the relief requested by the Motion (the "Personalized Notice") on each of the Plan participants and their beneficiaries (1 per household).  A copy of the Personalized Notice is attached at Exhibit "H."  The Personalized Notice informs the recipient that a complete copy of the Settlement Agreement and/or the Motion can be retrieved at no cost at www.lehman-docket.com or by request to the Lehman Legal Hotline at lehmanteam@weil.com or (212) 310-8040.  Notice of the Settlement Agreement and the Motion has also been posted on the Debtors' website at www.lehman-docket.com.  The Debtors submit that no other or further notice need be provided.

32.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  May 7, 2009
        New York, New York


                                    /s/ Richard P. Krasnow
                                    Richard P. Krasnow

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession