or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC. In every instance provided herein, unless otherwise expressly stated herein, in which Secured Party may take action or otherwise incur costs it deems reasonably necessary to protect, preserve or realize upon the Collateral, all costs thereof including any attorney's fees shall be at Grantor's sole expense and shall be deemed to be part of the Obligations and the Secured Obligations, due and payable immediately without demand.

## SECTION 2.    GRANT OF SECURITY.

2.1    **Grant of Security**. Grantor hereby grants to the Secured Party a security interest in and continuing lien on all of Grantor's right, title and interest in, to and under all of the Pledged LLC Interests and all dividends, cash, instruments and other property or Proceeds received, receivable or otherwise distributed in respect thereof, in each case whether now owned or existing, hereafter acquired or arising, or in which the Grantor now or hereafter has any rights and wheresoever located (the "**Collateral**").

## SECTION 3.    SECURITY FOR OBLIGATIONS; GRANTOR REMAINS LIABLE.

3.1    **Security for Obligations**. This Agreement secures, and the Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a) (and any successor provision thereof) or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect), of all Obligations of Grantor (the "**Secured Obligations**").

3.2    **Continuing Liability Under Collateral**. Notwithstanding anything herein to the contrary, (a) Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Secured Party, (b) Grantor shall remain liable under any agreements relating to the Collateral to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and the Secured Party shall not have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related hereto and the Secured Party shall not have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreements relating to the Collateral, and (c) the exercise by the Secured Party of any of its rights hereunder shall not release Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral.

# SECTION 4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS.

### 4.1    Generally.

(a)    <u>Representations and Warranties</u>.  Grantor hereby represents and warrants that:

(i)    it owns the Collateral and otherwise has the rights it purports to have in the Collateral and, as to all Collateral whether now existing or hereafter acquired, will continue to own and have such rights in the Collateral, in each case free and clear of any and all Liens, rights or claims of all other persons or entities, including, without limitation, Liens arising as a result of Grantor becoming bound (as a result of merger or otherwise) as debtor under a security agreement entered into by another person or entity;

(ii)    it has indicated on Schedule 4.1(A) (as such schedule may be amended or supplemented from time to time):  (w) the type of organization of Grantor, (x) the jurisdiction of organization of Grantor, (y) its organizational identification number, if any, and (z) the jurisdiction where the chief executive office is;

(iii)    the full legal name of Grantor is as set forth on Schedule 4.1(A) and it has not done in the last five (5) years, business under any other name except for those names set forth on Schedule 4.1(B) (as such schedule may be amended or supplemented from time to time);

(iv)    except as provided on Schedule 4.1(C), it has not changed its name, jurisdiction of organization, chief executive office or its corporate structure in any way (e.g., by merger, amalgamation, consolidation, change in corporate form or otherwise) within the past five (5) years;

(v)    Grantor is not bound (whether by contract or by operation of law) by a security agreement entered into by another person or entity with respect to the Collateral, which has not heretofore been terminated;

(vi)    reserved;

(vii)    (x) upon execution of this Agreement, and (y) upon the filing of a UCC financing statement naming Grantor as "debtor" and the Secured Party as "secured party" and describing the Collateral in the filing office set forth opposite Grantor's name on Schedule 4.1(E) hereof (the "**UCC Filing**")(as such schedule may be amended or supplemented from time to time) the security interests granted to the Secured Party hereunder constitute valid and perfected first priority Liens on all of the Collateral;

(viii)    except as set forth in Section 7.6, all actions and consents, including all filings (other than the UCC Filing to be filed after execution and delivery of this Agreement), notices, registrations and recordings necessary or desirable for the exercise by the Secured Party of the voting or other rights provided for in this Agreement and the exercise of remedies in respect of the Collateral have been made or obtained;

(ix)    other than the financing statement filed in favor of the Secured Party, no effective UCC financing statement or other instrument similar in effect under any applicable law covering all or any part of the Collateral is on file in any filing or recording office;

(x)    no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for either (i) the pledge or grant by Grantor of the Liens created in favor of the Secured Party hereunder or (ii) except as set forth in Section 7.6, the exercise by the Secured Party of any rights or remedies in respect of any Collateral (whether specifically granted or created hereunder or created or provided for by applicable law);

(xi)    except as provided on Schedule 4.1(F) hereof, no action which the Secured Party may take under this Agreement would require, under any presently applicable Requirements of Law, prior approval of any Regulatory Authority, and with respect to each action described therein as requiring such prior approval, every Regulatory Authority from which such prior approval would be required is identified therein;

(xii)    all information supplied by Grantor with respect to any of the Collateral (in each case taken as a whole with respect to the Collateral) is accurate and complete in all material respects; and

(xiii)    Grantor has been duly organized as an entity of the type as set forth opposite Grantor's name on Schedule 4.1(A) solely under the laws of the jurisdiction as set forth opposite Grantor's name on Schedule 4.1(A) and remains duly existing as such. Grantor has not filed any certificates of domestication, transfer or continuance in any other jurisdiction.

(xiv)    The Pledged LLC Interests are comprised solely of limited liability company interests, none of which is a "security" within the meaning of 6

Del C. § 8-102(15) because none of those interests fall within any exception provided under 6 Del C. § 8-103(c).

   (b) <u>Covenants and Agreements</u>. Grantor hereby covenants and agrees that:

     (i) except for the security interest created by this Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, and Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 4.1(a)(vii) and shall defend the Collateral, such security interest and such priority, against all persons or entities at any time disputing such security interest or the priority thereof;

     (ii) it shall not change its name, identity, corporate structure (e.g., by merger, amalgamation, consolidation, change in corporate form or otherwise), type of organization or jurisdiction of organization unless it shall have (a) notified the Secured Party in writing, by delivering an updated version of Schedule 4.1 hereto to the Secured Party, at least fifteen (15) Business Days prior to any such change or establishment, identifying such new proposed name, identity, corporate structure or jurisdiction of organization and providing such other information in connection therewith as the Secured Party may reasonably request and (b) taken all actions necessary or advisable to maintain the continuous validity, perfection and the same or better priority of the Secured Party's security interest in the Collateral intended to be granted and agreed to hereby;

     (iii) upon Grantor or any officer of Grantor obtaining knowledge thereof, it shall promptly notify the Secured Party in writing of any event that may have a material adverse effect on the value of the Collateral or any portion thereof, the ability of Grantor or the Secured Party to dispose of the Collateral or any portion thereof, or the rights and remedies of the Secured Party in relation thereto, including, without limitation, the levy of any legal process against the Collateral or any portion thereof;

     (iv) subject to applicable law, Secured Party shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody at any time while the Collateral is in Secured Party's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other person or entity whatsoever, but the same shall be at Grantor's sole risk;

     (v) it shall not take or permit any action which could reasonably be expected to impair the Secured Party's rights in the Collateral; and

     (vi) it shall not sell, transfer or assign (by operation of law or otherwise) any Collateral.

4.2    **Reserved.**

4.3    **Reserved.**

4.4    **Investment Related Property.**

    4.4.1    **Generally**

      (a)    <u>Covenants and Agreements</u>.  Grantor hereby covenants and agrees that:

        (i)    except as provided in the next sentence, in the event Grantor receives any dividends, interest or distributions on the Investment Related Property, or any securities or other property upon the merger, consolidation, liquidation or dissolution of the issuer of the Investment Related Property; then (a) such dividends, interest, distributions, securities and other property shall be included in the definitions of Collateral, Investment Related Property and Pledged LLC Interests without further action and (b) Grantor shall immediately take all steps, if any, necessary or advisable to ensure the validity, perfection and priority of the Secured Party over such dividends, interest, distributions, securities and other property and pending any such action Grantor shall be deemed to hold such dividends, interest, distributions, securities and other property in trust for the benefit of the Secured Party and shall segregate such dividends, interest, distributions, securities and other property from all other property of Grantor. Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Secured Party authorizes Grantor to retain all ordinary cash dividends and distributions paid in the normal course of the business of the issuer.

      (b)    <u>Voting and Distributions</u>.

        (i)    So long as no Event of Default shall have occurred and be continuing:

          (1)    except as otherwise provided under the covenants and agreements relating to Investment Related Property in this Agreement, Grantor shall be entitled to exercise or refrain from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Agreement; provided, Grantor shall not exercise or shall refrain from exercising any such right if the Secured Party shall have notified Grantor that, in the Secured Party's reasonable judgment, such action would have a material adverse effect on the value of the Investment

Related Property or any part thereof; and provided further, Grantor shall give the Secured Party at least five (5) business days prior written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right;

(2)    the Secured Party shall promptly execute and deliver (or cause to be executed and delivered) to Grantor all proxies, and other instruments as Grantor may from time to time reasonably request for the purpose of enabling Grantor to exercise the voting and other consensual rights when and to the extent which it is entitled to exercise pursuant to clause (1) above;

(ii)    Upon the occurrence and during the continuation of an Event of Default:

(1)    all rights of Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Secured Party, who shall thereupon have the sole right to exercise such voting and other consensual rights; and

(2)    in order to permit the Secured Party to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Secured Party all proxies, dividend payment orders and other instruments as the Secured Party may from time to time reasonably request and (2) Grantor acknowledges that the Secured Party may utilize the power of attorney set forth in Section 6.1 for such purposes.

Grantor hereby consents to the exercise of Grantor's voting and other rights pertaining to the Investment Related Property by the Secured Party upon the occurrence and during the continuation of an Event of Default.

### 4.4.2    Pledged LLC Interests

(a)    Representations and Warranties. Grantor hereby represents and warrants that:

(i)    Schedule 4.4 (as such schedule may be amended or supplemented from time to time) sets forth under the heading "Pledged LLC Interests" all of the Pledged LLC Interests owned by Grantor and such Pledged LLC Interests constitute the percentage of membership interests indicated on such Schedule;

(ii)    it is the record and beneficial owner of the Pledged LLC Interests free of all Liens, rights or claims of other persons or entities and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged LLC interests;

(iii)    without limiting the generality of Section 4.l(a)(vii), no consent of any person or entity including any other member of a limited liability company, or any other trust beneficiary is necessary or desirable in connection with the creation or perfection of the security interest of the Secured Party in any Pledged LLC Interests, the first priority status of the Collateral, the status of the security interest of the Secured Party in any Pledged LLC Interests or, except as set forth in Section 7.6, the exercise by the Secured Party of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof; and

(iv)    none of the Pledged  LLC Interests are or represent interests in issuers that: (a) are registered as investment companies or (b) are dealt in or traded on securities exchanges or markets.

(b)    Covenants and Agreements.  Grantor hereby covenants and agrees that:

(i)    without the prior written consent of the Secured Party, it shall not vote to enable or take any other action to: (a) amend or terminate any limited liability company agreement or other organizational documents in any way that materially and adversely (as determined by the Secured Party) changes the rights of Grantor with respect to any Pledged LLC Interests or adversely affects the validity, perfection or priority of the Secured Party's security interest, (b) permit the issuer of the Pledged LLC Interests to issue any additional limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any equity interest of any nature of such issuer, (c) permit the issuer of the Pledged LLC Interests to dispose of all or a material portion of its assets, (d) waive any default under or breach of any terms of any organizational document relating to the issuer of the Pledged LLC Interests or, (e) cause the issuer of any Pledged

LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged LLC Interests to be treated as securities for purposes of the UCC; provided, however, notwithstanding the foregoing, if the issuer of the Pledged LLC Interests takes any such action in violation of the foregoing in this clause (e), Grantor shall promptly notify the Secured Party in writing of any such election or action and, in such event, shall take all steps necessary or advisable to establish the Secured Party's "control" thereof so as to ensure that the Secured Party has a first priority Lien thereon;

(ii)    it shall comply with all of its obligations under any limited liability company agreement relating to the Pledged LLC Interests and shall enforce all of its rights with respect to any Pledged LLC Interests; and

(iii)    without the prior written consent of the Secured Party, it shall not permit the issuer of the Pledged LLC Interests to merge, amalgamate or consolidate unless (a) such issuer creates a first priority security interest in favor of the Secured Party that is perfected by a filed financing statement (that is not effective solely under section 9-508 of the UCC) in collateral in which such new debtor has or acquires rights, and (b) no lesser amount of the outstanding equity interests of the surviving or resulting corporation, limited liability company, partnership or other entity is, upon such merger, amalgamation or consolidation, pledged and delivered hereunder as Pledged LLC Interests.

## SECTION 5.    FURTHER ASSURANCES

5.1    **Further Assurances**.

(a)    Grantor agrees that from time to time, at the expense of Grantor, that it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Grantor shall:

(i)    file such financing, financing change or continuation statements, or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or desirable, or as the Secured Party may reasonably request, in order to perfect and preserve the security interests granted hereby or the perfection or priority thereof; and

(ii)    at the Secured Party's request, appear in and defend any action or proceeding that may affect Grantor's title to or the Secured Party's security interest in all or any part of the Collateral.

(b)      Grantor hereby authorizes the Secured Party and its counsel and other representatives, at any such time and from time to time, at the expense of Grantor, to file a record or records, including, without limitation, financing, financing change or continuation statements, and amendments thereto, in any jurisdictions and with any filing offices as the Secured Party may determine, in its sole discretion, are necessary or advisable to perfect the security interest granted to the Secured Party herein.  Such financing or financing change statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Secured Party may determine, in its sole discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Secured Party herein.  Grantor shall furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Secured Party may reasonably request, all in reasonable detail.

## SECTION 6.   SECURED PARTY APPOINTED ATTORNEY-IN-FACT.

6.1     <u>Power of Attorney</u>.  Grantor hereby irrevocably appoints the Secured Party (such appointment being coupled with an interest) as Grantor's attorney-in-fact, with full authority in the place and stead of Grantor and in the name of Grantor, the Secured Party or otherwise, upon the occurrence and during the continuance of any Event of Default but subject to the provisions of Section 7.6, from time to time in the Secured Party's discretion to take any action and to execute any instrument that the Secured Party may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)      upon the occurrence and during the continuance of any Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(b)      to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (a) above;

(c)      to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral;

(d)      to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Secured Party in its sole discretion, any such payments made by the Secured Party under this paragraph or payments made by the Secured Party under any other provision of this Agreement to

become Obligations of Grantor to the Secured Party constituting part of the Secured Obligations, due and payable immediately without demand; and

(e)    to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and Grantor's expense, at any time or from time to time, all acts and things that the Secured Party deems reasonably necessary to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as Grantor might do.

6.2    **No Duty on the Part of Secured Party**.  The powers conferred on the Secured Party hereunder are solely to protect the interests of the Secured Party in the Collateral and shall not impose any duty upon the Secured Party to exercise any such powers.  The Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Grantor for any act or failure to act hereunder, except for its gross negligence or willful misconduct.

## SECTION 7.    REMEDIES.

7.1    **Generally**.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of the Secured Party on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may, without notice except to any extent expressly specified below or under the UCC (any such UCC notice requirement hereby being deemed waived by Grantor to the maximum extent permitted by law), sell, assign, lease, license (on an exclusive or nonexclusive basis) or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Secured Party's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Secured Party may deem commercially reasonable.  Grantor hereby consents to any such sale, assignment, lease, licenses or other disposition.

(b)    The Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent the portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and the Secured Party shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Secured Party at

such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Grantor, and Grantor hereby waives (to the fullest extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Grantor agrees that, to any extent notice of sale shall be required by law notwithstanding Grantor's waiver thereof in Section 7.1(a), at least ten (10) days notice to Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Grantor agrees that it would not be commercially unreasonable for the Secured Party to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. Grantor hereby waives any claims against the Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantor shall be liable for the deficiency and the fees of any attorneys employed by the Secured Party to collect such deficiency. Grantor further agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to the Secured Party, that the Secured Party has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against Grantor, and Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred. Nothing in this Section shall in any way be construed as to alter the rights of the Secured Party hereunder in any manner other than to expand such rights.

(c)     The Secured Party may sell the Collateral without giving any warranties as to the Collateral. The Secured Party may specifically disclaim or modify any warranties of title or the like. This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(d)     The Secured Party shall have no obligation to marshal any of the Collateral.

(e)     The Secured Party may, to the extent permitted by applicable law, appoint by instrument in writing a receiver (which term shall include a receiver and manager or agent) of all or any part of the Collateral and remove or replace such receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of a receiver. Where "Secured Party" is referred to in this Section 7. 1,

15

the reference includes, where the context permits, any receiver so appointed and the
officers, employees, servants or agents of such receiver.

7.2    **Application of Proceeds**. Except to any extent expressly provided
elsewhere in this Agreement, all proceeds received by the Secured Party in respect of any
sale, any collection from, or other realization upon all or any part of the Collateral shall
be applied in full or in part by the Secured Party against the Secured Obligations in the
following order of priority: first, to the payment of all costs and expenses of such sale,
collection or other realization, including reasonable compensation to the Secured Party
and its agents and counsel, and all other expenses, liabilities and advances made or
incurred by the Secured Party in connection therewith, and all amounts for which the
Secured Party is entitled to indemnification hereunder and all advances made by the
Secured Party hereunder for the account of Grantor, and to the payment of all costs and
expenses paid or incurred by the Secured Party in connection with the exercise of any
right or remedy hereunder, all in accordance with the terms hereof or thereof; second, to
the extent of any excess of such proceeds, to the payment of all other Secured
Obligations, and third, to the extent of any excess of such proceeds, to the payment to
Grantor.

7.3    **Sales on Credit**. If the Secured Party sells any of the Collateral upon
credit, Grantor will be credited only with payments actually made by purchaser and
received by the Secured Party and applied to indebtedness of the purchaser. In the event
the purchaser fails to pay for the Collateral, Secured Party may resell the Collateral and
Grantor shall be credited with proceeds of the sale.

7.4    **Investment Related Property**. Grantor recognizes that, by reason of
certain prohibitions contained in the Securities Act and applicable state or provincial
securities laws, the Secured Party may be compelled, with respect to any sale of all or any
part of the Investment Related Property conducted without prior registration or
qualification of such Investment Related Property under the Securities Act and/or such
state or provincial securities laws, to limit purchasers to those who will agree, among
other things, to acquire the Investment Related Property for their own account, for
investment and not with a view to the distribution or resale thereof. Grantor
acknowledges that any such private sale may be at prices and on terms less favorable than
those obtainable through a public sale without such restrictions (including a public
offering made pursuant to a registration statement or prospectus under the Securities Act
or applicable state or provincial securities law) and, notwithstanding such circumstances,
Grantor agrees that any such private sale shall be deemed to have been made in a
commercially reasonable manner and that the Secured Party shall have no obligation to
engage in public sales and no obligation to delay the sale of any Investment Related
Property for the period of time necessary to permit the issuer thereof to register or qualify
it for a form of public sale requiring registration or qualification under the Securities Act
or under applicable state or provincial securities laws, even if such issuer would, or
should, agree to so register or qualify it. If the Secured Party determines to exercise its
right to sell any or all of the Investment Related Property, upon written request, Grantor
shall and shall cause the issuer thereof from time to time to promptly furnish to the

Secured Party all such information as the Secured Party may request in order to determine the number and nature of interests or other instruments included in the Investment Related Property which may be sold by the Secured Party in exempt transactions under the Securities Act and the rules and regulations of the Securities and Exchange Commission thereunder or applicable state or provincial securities law, as the same are from time to time in effect.

7.5    **Cash Proceeds**.  After an Event of Default has occurred and is continuing, cash, checks and other non-cash items (x), to the extent not received by the Secured Party, shall be held by Grantor in trust for the Secured Party, segregated from other funds of Grantor, and shall, forthwith upon receipt by Grantor, be turned over to the Secured Party in the exact form received by Grantor (duly indorsed by Grantor to the Secured Party, if required) and held by the Secured Party and (y) may, in the sole discretion of the Secured Party, (A) be held by the Secured Party, as collateral security for the Secured Obligations (whether matured or unmatured) and/or (B) then or at any time thereafter may be applied by the Secured Party against the Secured Obligations then due and owing (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise).

7.6    **Regulatory Compliance**.  (a) Notwithstanding any other provision of this Agreement, the Secured Party shall not, without first obtaining the approval of the applicable Regulatory Authority, take any action under this Agreement that would require, under any Requirements of Law applicable at the time, such prior approval of such Regulatory Authority, provided, however, that for the purpose of determining whether any such approval is required, the Secured Party shall be entitled to rely solely on the accuracy of Grantor's representation and warranty in Section 4.1(a)(xi) and of Schedule 4.1(F), provided pursuant to such representation and warranty, which Schedule 4.1(F) Grantor shall, promptly upon the Secured Party's request confirm in writing remains accurate and complete or otherwise amend Schedule 4.1(F) to ensure such accuracy and completeness. Grantor hereby indemnifies and saves harmless the Secured Party from any claim, action, liability, loss, damage or suit arising from any action taken under this Agreement by the Secured Party in reliance on any inaccuracy or incompleteness in Schedule 4.1(F).

(b)    If the approval of any Regulatory Authority is required in connection with any action taken by the Secured Party (including any of its respective agents, officers and attorneys) in the exercise of rights and remedies hereunder with respect to the Collateral, Grantor shall use all commercially reasonable efforts to obtain each such approval and to cooperate with the Secured Party in any action to obtain such approval. Grantor shall, at any time following the occurrence of an Event of Default which is continuing, upon the written request of the Secured Party, execute and deliver (or cause the execution and delivery of) all relevant applications, certificates, instruments, agreements and other documents which are required to be filed in connection with obtaining any required approval of each Regulatory Authority and take such other action as the Secured Party may request in connection therewith; provided that if Grantor fails to execute and deliver any such applications, certificates, instruments, agreements or other

documents, then, on the order of any court or other forum of competent jurisdiction, the clerk of the court (or officer any other such forum) which has jurisdiction may execute any such applications, certificates, instruments, agreements or other documents on behalf of Grantor. Grantor shall, upon the written request of the Secured Party, execute and deliver such documents and take such other action as may be required to enable the Secured Party (including any of its respective agents, officers and attorneys), to obtain any required consent from a Regulatory Authority for the Secured Party, through any receiver, trustee or otherwise, to operate any entity whose equity interests are pledged hereunder pending the sale or other disposition of such entity hereunder. Grantor acknowledges and agrees that (i) each license, franchise and other similar agreements or authorizations of any Regulatory Authority are unique assets which (or the control of which) may have to be transferred to a another person or entity in order for the Secured Party to adequately realize the full amount of the Obligations from the Collateral and (ii) that the breach of this Section 7.6 by Grantor would result in irreparable harm to the Secured Party for which monetary damages are not readily ascertainable and which might not adequately compensate the Secured Party. Therefore in addition to any remedy which the Secured Party may have at law or in equity, the Secured Party shall have the remedy of specific performance by Grantor of the provisions of this Section 7.6 and Grantor hereby waives, and agrees to waive, any claim or defense that the Secured Party would have an adequate remedy at law for the breach by it of this Section 7.6 and any requirement for posting of a bond or other certificate.

## SECTION 8.   FEES AND EXPENSES.

The Grantor agrees to pay on demand all reasonable out-of-pocket fees, costs, and expenses of the Secured Party in connection with preparation, execution, delivery and enforcement of the Security Documents.

## SECTION 9.   CONTINUING SECURITY INTEREST.

This Agreement shall create a continuing security interest in the Collateral and shall remain in full force and effect until the payment in full of all Secured Obligations, be binding upon Grantor, its successors and assigns, and inure, together with the rights and remedies of the Secured Party hereunder, to the benefit of the Secured Party and its successors, transferees and assigns. Upon the payment in full of all Secured Obligations, the security interest granted hereby shall automatically terminate hereunder and of record and all rights to the Collateral shall revert to Grantor. Upon any such termination the Secured Party shall, at Grantor's expense, execute and deliver to Grantor or otherwise authorize the filing of such documents as Grantor shall reasonably request, including financing statement amendments to evidence such termination. The Secured Party shall, at Grantor's expense, execute and deliver or otherwise authorize the filing of such documents as Grantor shall reasonably request, in form and substance reasonably satisfactory to the Secured Party, including financing statement amendments to evidence such release. Notwithstanding the foregoing provisions of this Section 9, this Agreement shall terminate and be cancelled in its entirety upon the earlier to occur of: (i) the date on which the District Court issues a Final Judgment (as defined in the Letter Agreement)

denying the PBGC the relief it sought in its complaint in the District Court Proceeding, or (ii) immediately upon the PBGC's withdrawal of the District Court Proceeding, unless the Lehman Pension Plan has been terminated with a termination date of December 12, 2008.

## SECTION 10.  STANDARD OF CARE; SECURED PARTY MAY PERFORM.

The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall, notwithstanding any other provision of this Agreement, have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property.  Neither the Secured Party nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Grantor or otherwise.  If Grantor fails to perform any agreement contained herein, the Secured Party may itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by Grantor.

## SECTION 11.  MISCELLANEOUS.

All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, or by facsimile, and addressed to the party to be notified as follows:

(i)     If to the PBGC:

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, D.C. , 20005
Attention: Sara B. Eagle
Fax No.: 202-326-4112

(ii)    If to the Grantor:

Neuberger Berman Holdings LLC
Address: 605 Third Avenue
New York, NY 10158
Attention: George Walker
Joseph Amato

Fax No.: 646-758-3297
with copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Marsha Simms
Fax No. (212) 310-8007

No failure or delay on the part of the Secured Party in the exercise of any power, right or privilege hereunder or any other Security Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement and any other Security Document are cumulative to, and not exclusive of, any rights or remedies otherwise available at law or in equity. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of an Event of Default if such action is taken or condition exists. This Agreement shall be binding upon and inure to the benefit of the Secured Party and Grantor and their respective successors and assigns. Grantor shall not assign any right, duty or obligation hereunder. This Agreement and the Letter Agreement embody the entire agreement and understanding between Grantor and the Secured Party and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, this Agreement may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and. the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

[Signature pages follow]

IN WITNESS WHEREOF, Grantor and the Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**NEUBERGER BERMAN HOLDINGS LLC**, as Grantor

By its Members:

**Lehman Brothers Holdings Inc.**

By: _____
Name:
Title:

**LIBRO Holdings I Inc.**

By: _____
Name:
Title:

[SIGNATURE PAGE TO PLEDGE AGREEMENT]

**PENSION BENEFIT GUARANTY CORPORATION,**
as the Secured Party

By: _____
    Name:
    Title:

[SIGNATURE PAGE TO PLEDGE AGREEMENT]

SCHEDULE 4.1
TO PLEDGE AGREEMENT

## GENERAL INFORMATION

(A)    Full Legal Name, Type of Organization, Jurisdiction of Organization, Chief
Executive Office/Sole Place of Business and Organizational Identification
Number of Grantor:

| Full Legal Name | Type of Organization | Jurisdiction of Organization | Chief Executive Office/Sole Place of Business | Organizational ID # |
|---|---|---|---|---|
| Neuberger Berman Holdings LLC | Limited Liability Company | Delaware | 605 Third Avenue New York, New York 10158 | 3678297 |

(B)    Other Names under which Grantor has conducted business for the past five (5)
years:

| Full Legal Name | Trade Name or Fictitious Business Name |
|---|---|
| Neuberger Berman Holdings LLC | Neuberger Berman Inc. (Incorporated in Delaware on July 3, 2003 until August 28, 2008 when changed to Neuberger Berman Holdings LLC) |

(C)    Changes in Name, Jurisdiction of Organization, Chief Executive Office or Sole
Place of Business and Corporate Structure within past five (5) years:

| Grantor | Date of Change | Description of Change |
|---|---|---|
| Neuberger Berman Holdings LLC | August 28, 2008 | Conversion of Grantor from a Delaware corporation called Neuberger Berman Inc. to a Delaware limited liability company |

(D)    Reserved

(E)    Financing Statements:

| Grantor | Filing Jurisdiction(s) |
| --- | --- |
| Neuberger Berman Holdings LLC | Delaware |

(F)    Governmental and Self-Regulatory Bodies Requiring Notice or Prior Approval of a Change of Control of Pledged Entities:

### United States

1.    U.S. Securities and Exchange Commission

2.    Securities regulators in certain U.S. states and territories

3.    Commodities Futures Trading Commission

4.    National Futures Association

5.    Financial Industry Regulatory Authority, Inc. ("FINRA")

6.    New York Stock Exchange

7.    Nasdaq

8.    Nasdaq OMX BX

9.    NYSE Alternext U.S. (f.k.a. the American Stock Exchange)

10.    International Securities Exchange

11.    Chicago Stock Exchange

12.    National Securities Clearing Corporation

### Canada

1.    Ontario Securities Commission

2.    British Columbia Securities Commission

3.    Alberta Securities Commission

Investment Adviser Consent Requirements

Upon a change in control of Neuberger Berman, LLC and Neuberger Berman Management, LLC, each a registered investment adviser, any contract pursuant to which

that firm provides investment advisory services will be deemed to have been assigned. An assignment of an advisory contract with a registered investment company will trigger a termination of that contract, and a new advisory contract would require approval by the investment company's Board of Directors (including a majority of its "non-interested" directors) and by the holders of a "majority of the outstanding voting securities" of the investment company, as such term is defined in the Investment Company Act of 1940, as amended. Under the Investment Advisers Act of 1940, as amended, any advisory contract with a client that is not a registered investment company must provide that no assignment may be made without the consent of the client. The acquisition of the right to vote more than 25% of the adviser's voting securities would generally constitute a change in control and therefore an assignment

SCHEDULE 4.4
TO PLEDGE AGREEMENT

**Pledged LLC Interests**

| Name of Issuing Entity | Percentage Owned |
|---|---|
| Neuberger Berman Management LLC | 100% |
| Neuberger Berman Asset Management LLC | 100% |
| Neuberger Berman LLC | 100% |

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Michael Tily    212-833-3663

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

michael.tily@weil.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Neuberger Berman Holdings LLC | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 605 Third Avenue | New York | NY | 10158 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | Delaware | DE 3678297 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Pension Benefit Guaranty Corporation | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1200 K Street, N.W. | Washington, D.C. | | 20005 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of the Debtor's right, title and interest in, to and under all of the Pledged LLC Interests and all dividends, cash, instruments and other property or Proceeds received, receivable or otherwise distributed in respect thereof, in each case whether now owned or existing, hereafter acquired or arising, or in which Debtor now or hereafter has any rights and wheresoever located ("Collateral").

"Investment Related Property" shall mean all Pledged LLC Interests.

"Pledged Entities" shall mean Neuberger Berman Management LLC, Neuberger Berman Asset Management, LLC and Neuberger Berman, LLC.

"Pledged LLC Interests" shall mean all of the limited liability company interests owned by the Debtor in the Pledged Entities.

"Proceeds" shall mean (i) all "proceeds" as defined in Article 9 of the Uniform Commerical Code, (ii) payments or distributions made with respect to any Investment Related Property and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.     Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]     [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

Filed with: DE - Secretary of State

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## ESCROW AGREEMENT

This Escrow Agreement dated this ___ day of _____, 2009 (the "Escrow Agreement"), is entered into by and among Neuberger Berman Holdings LLC, a Delaware limited liability company ("Grantor" or "Neuberger"), Pension Benefit Guaranty Corporation ("PBGC" and together with the Grantor, the "Parties," and individually, a "Party"), and Wells Fargo Bank, National Association, as escrow agent ("Escrow Agent").

## RECITALS

A.      The PBGC commenced an action captioned Pension Benefit Guaranty Corporation v. The Employee Benefit Plans Committee of Lehman Brothers Holdings Inc., Civil Action No. 08 CIV 10792 ("District Court Proceeding") in the District Court for the Southern District of New York ("District Court") seeking to terminate the Lehman Brothers Holdings Inc. Retirement Plan ("Lehman Pension Plan") with a termination date of December 12, 2008, pursuant to Section 4042 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  In the event of such termination, Lehman Brothers Holding Inc. ("LBHI") and each other member of its controlled group (as defined in Section 4001(a)(14) of ERISA) as of December 12, 2008 (all members of such controlled group, collectively, the "Lehman Controlled Group"), including Neuberger, would be jointly and severally liable to the PBGC for the amounts due under Section 4062(a) of ERISA by reason of such termination.

B.      Grantor, in substitution and cancellation of that certain Pledge Agreement dated March   , 2009 between Grantor, as grantor, and the PBGC, as the secured party (the "Cancellation"), agrees to place or to cause another member of the Lehman Controlled Group to place in escrow certain funds prior to or concurrent with such Cancellation, and the Escrow Agent agrees to hold and distribute such funds in accordance with the terms of this Escrow Agreement.

In consideration of the promises and agreements of the Parties and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties and the Escrow Agent agree as follows:

## ARTICLE 1
## ESCROW DEPOSIT

Section 1.1.    _Receipt of Escrow Property_.  Upon execution hereof and prior to or concurrent with the Cancellation, Grantor shall deliver or cause to be delivered to the Escrow Agent the estimated amount of the Unfunded Benefit Liabilities (as defined below) in cash (the "Escrow Property").  For purposes of this Escrow Agreement, "Unfunded Benefit Liabilities" shall be defined as that term is defined in that certain Adequate Protection Agreement, dated as of March 23, 2009 (as it may be amended, restated, supplemented or otherwise modified from time to time, the "**Letter Agreement**"), between Grantor and PBGC.  The Parties agree, solely for purposes of funding this Escrow Agreement, the estimated Unfunded Benefit Liabilities as of March 23, 2009, total $150,000,000.00, and that such estimated amount shall be the amount

delivered to the Escrow Agent pursuant to this Section 1.1; provided, however, such estimated amount shall be adjusted before or after the required delivery to the Escrow Agent hereunder, upon agreement by the Parties (which shall not be unreasonably withheld), based on corrections in the 2008 Plan census data (including the elimination of unvested benefit liabilities of participants who left employment with the Lehman Controlled Group prior to December 12, 2008).

Section 1.2.    <u>Investments</u>.

    (a)    The Escrow Agent is authorized and directed to deposit, transfer, hold and invest the Escrow Property and any investment income thereon as set forth in Exhibit A hereto, or as set forth in any subsequent written instruction signed by the Parties. Any investment earnings and income on the Escrow Property shall not become part of the Escrow Property and shall be disbursed to Grantor, as directed in writing by Grantor.

    (b)    The Escrow Agent is hereby authorized and directed to sell or redeem any such investments as it deems necessary to make any payments or distributions required under this Escrow Agreement.  The Escrow Agent shall have no responsibility or liability for any loss which may result from any investment or sale of investment made pursuant to this Escrow Agreement.  The Escrow Agent is hereby authorized, in making or disposing of any investment permitted by this Escrow Agreement, to deal with itself (in its individual capacity) or with any one or more of its affiliates, whether it or any such affiliate is acting as agent of the Escrow Agent or for any third person or dealing as principal for its own account.  The Parties acknowledge that the Escrow Agent is not providing investment supervision, recommendations, or advice.

Section 1.3.    <u>Disbursements</u>.    The Escrow Agent shall disburse the Escrow Property in accordance with the joint written instructions of the Parties. The Escrow Agent shall disburse all interest and investment income on the Escrow Property in accordance with the written instructions of the Grantor.

Section 1.4.    <u>Income Tax Allocation and Reporting</u>.

    (a)    The Parties agree that, for tax reporting purposes, all interest and other income from investment of the Escrow Property shall, as of the end of each calendar year and to the extent required by the Internal Revenue Service, be reported as having been earned by Grantor, whether or not such income was disbursed during such calendar year.

    (b)    Prior to the date hereof, Grantor shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 and such other forms and documents that the Escrow Agent may request.  Grantor understands that if such tax reporting documentation is not provided and certified to the Escrow Agent, the Escrow Agent may be required by the Internal Revenue Code of 1986, as amended, and the Regulations promulgated thereunder, to withhold a portion of any interest or other income earned on the investment of the Escrow Property.

(c)     To the extent that the Escrow Agent becomes liable for the payment of any taxes in respect of income derived from the investment of the Escrow Property, the Escrow Agent shall satisfy such liability to the extent possible from the Escrow Property.  Grantor shall indemnify, defend and hold the Escrow Agent harmless from and against any tax, late payment, interest, penalty or other cost or expense that may be assessed against the Escrow Agent on or with respect to the Escrow Property and the investment thereof unless such tax, late payment, interest, penalty or other expense was directly caused by the gross negligence or willful misconduct of the Escrow Agent.  The indemnification provided by this Section 1.4(c) is in addition to the indemnification provided in Section 3.1 and shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 1.5.    Termination.  This Escrow Agreement shall terminate on the earliest to occur of: (i) the date on which the District Court issues a Final Judgment denying the PBGC the relief it sought in its complaint in the District Court Proceeding, (ii) immediately upon the PBGC's withdrawal of the District Court Proceeding, unless the Lehman Pension Plan has been terminated with a termination date of December 12, 2008, or (iii) the distribution by the Escrow Agent of all of the Escrow Property including any interest and investment earnings thereon, in accordance with Section 1.3, and this Escrow Agreement shall be of no further force and effect except that the provisions of Sections 1.4(c), 3.1 and 3.2 hereof shall survive termination.  for purposes of this Section, "Final Judgment" means a judgment or order of a court of competent jurisdiction as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

ARTICLE 2
DUTIES OF THE ESCROW AGENT

Section 2.1.    Scope of Responsibility.  Notwithstanding any provision to the contrary, the Escrow Agent is obligated only to perform the duties specifically set forth in this Escrow Agreement, which shall be deemed purely ministerial in nature. Under no circumstances will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  The Escrow Agent will not be responsible or liable for the failure of any Party to perform in accordance with this Escrow Agreement. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document other than this Escrow Agreement, whether or not an original or a copy of such agreement has been provided to the Escrow Agent; and the Escrow Agent shall have no duty to know or inquire as to the performance or nonperformance of any provision of any such agreement, instrument, or document.  References in this Escrow Agreement to any other agreement, instrument, or document are for the convenience of the Parties, and the Escrow Agent has no duties or obligations with respect thereto.  This Escrow Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred or implied from the terms of this Escrow Agreement or any other agreement.

Section 2.2.    Attorneys and Agents. The Escrow Agent shall be entitled to rely on and shall not be liable for any action taken or omitted to be taken by the Escrow Agent in accordance with the

3

advice of counsel or other professionals retained or consulted by the Escrow Agent. The Escrow Agent shall be reimbursed as set forth in Section 3.1 for any and all compensation (fees, expenses and other costs) paid and/or reimbursed to such counsel and/or professionals. The Escrow Agent may perform any and all of its duties through its agents, representatives, attorneys, custodians, and/or nominees.

Section 2.3.    Reliance.  The Escrow Agent shall not be liable for any action taken or not taken by it in accordance with the direction or consent of the Parties or their respective agents, representatives, successors, or assigns.  The Escrow Agent shall not be liable for acting or refraining from acting upon any notice, request, consent, direction, requisition, certificate, order, affidavit, letter, or other paper or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, without further inquiry into the person's or persons' authority.  Concurrent with the execution of this Escrow Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit B-1 and Exhibit B-2 to this Escrow Agreement.

Section 2.4.    Right Not Duty Undertaken.  The permissive rights of the Escrow Agent to do things enumerated in this Escrow Agreement shall not be construed as duties.

Section 2.5.    No Financial Obligation.  No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.

ARTICLE 3
PROVISIONS CONCERNING THE ESCROW AGENT

Section 3.1.    Indemnification.  Grantor shall indemnify, defend and hold harmless the Escrow Agent from and against any and all loss, liability, cost, damage and expense, including, without limitation, attorneys' fees and expenses or other professional fees and expenses which the Escrow Agent may suffer or incur by reason of any action, claim or proceeding brought against the Escrow Agent, arising out of or relating in any way to this Escrow Agreement or any transaction to which this Escrow Agreement relates, unless such loss, liability, cost, damage or expense shall have been finally adjudicated to have been directly caused by the willful misconduct or gross negligence of the Escrow Agent. The provisions of this Section 3.1 shall survive the resignation or removal of the Escrow Agent and the termination of this Escrow Agreement.

Section 3.2.    Limitation of Liability.  THE ESCROW AGENT SHALL NOT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) DAMAGES, LOSSES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES, LOSSES OR EXPENSES WHICH HAVE BEEN FINALLY ADJUDICATED TO HAVE DIRECTLY RESULTED FROM THE ESCROW AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, OR (II) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSSES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED

4

OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

Section 3.3.    <u>Resignation or Removal</u>.  The Escrow Agent may resign by furnishing written notice of its resignation to the Parties, and the Parties may remove the Escrow Agent by furnishing to the Escrow Agent a joint written notice of its removal along with payment of all fees and expenses to which it is entitled through the date of termination.  Such resignation or removal, as the case may be, shall be effective thirty (30) days after the delivery of such notice or upon the earlier appointment of a successor, and the Escrow Agent's sole responsibility thereafter shall be to safely keep the Escrow Property and to deliver the same to a successor escrow agent as shall be appointed by the Parties, as evidenced by a joint written notice filed with the Escrow Agent or in accordance with a court order.  If the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following the delivery of such notice of resignation or removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon the Parties.

Section 3.4.    <u>Compensation</u>.  The Escrow Agent shall be entitled to compensation for its services as stated in the fee schedule attached hereto as Exhibit C, which compensation shall be paid by the Grantor. The fee agreed upon for the services rendered hereunder is intended as full compensation for the Escrow Agent's services as contemplated by this Escrow Agreement; provided, however, that in the event that the conditions for the disbursement of funds under this Escrow Agreement are not fulfilled, or the Escrow Agent renders any service not contemplated in this Escrow Agreement, or there is any assignment of interest in the subject matter of this Escrow Agreement, or any material modification hereof, or if any material controversy arises hereunder, or the Escrow Agent is made a party to any litigation pertaining to this Escrow Agreement or the subject matter hereof, then the Escrow Agent shall be compensated by the Grantor for such extraordinary services and reimbursed for all costs and expenses, including reasonable attorneys' fees and expenses, occasioned by any such delay, controversy, litigation or event.  If any amount due to the Escrow Agent hereunder is not paid within thirty (30) days of the date due, the Escrow Agent in its sole discretion may charge interest on such amount up to the highest rate permitted by applicable law.   The Escrow Agent shall have, and is hereby granted, a prior lien upon the Escrow Property with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from the Escrow Property, provided that the balance is restored by the Grantor immediately following any setoff or deduction.

Section 3.5.    <u>Disagreements</u>.  If any conflict, disagreement or dispute arises between, among, or involving any of the Parties concerning the meaning or validity of any provision hereunder or concerning any other matter relating to this Escrow Agreement, or the Escrow Agent is in doubt as to the action to be taken hereunder, the Escrow Agent is authorized to retain the Escrow Property until the Escrow Agent (i) receives a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrow Property, (ii) receives a written agreement executed by each of the Parties involved in such disagreement or dispute directing delivery of the Escrow Property, in which event the Escrow Agent shall be authorized to disburse the Escrow Property

in accordance with such final court order or agreement, or (iii) files an interpleader action in any court of competent jurisdiction, and upon the filing thereof, the Escrow Agent shall be relieved of all liability as to the Escrow Property and shall be entitled to recover from Grantor attorneys' fees, expenses and other costs incurred in commencing and maintaining any such interpleader action. The Escrow Agent shall be entitled to act on any such agreement or court order without further question, inquiry, or consent.

Section 3.6.   Merger or Consolidation. Any corporation or association into which the Escrow Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Escrow Agent is a party, shall be and become the successor escrow agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

Section 3.7.   Attachment of Escrow Property; Compliance with Legal Orders. In the event that any Escrow Property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the Escrow Property, the Escrow Agent is hereby expressly authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders or decrees so entered or issued, or which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction. In the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other person, firm or corporation, should, by reason of such compliance notwithstanding, such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

## ARTICLE 4
## MISCELLANEOUS

Section 4.1.   Successors and Assigns. This Escrow Agreement shall be binding on and inure to the benefit of the Parties and the Escrow Agent and their respective successors and permitted assigns. No other persons shall have any rights under this Escrow Agreement. No assignment of the interest of any of the Parties shall be binding unless and until written notice of such assignment shall be delivered to the other Party and the Escrow Agent and shall require the prior written consent of the other Party and the Escrow Agent (such consent not to be unreasonably withheld).

Section 4.2.   Escheat. The Parties are aware that under applicable state law, property which is presumed abandoned may under certain circumstances escheat to the applicable state. The Escrow Agent shall have no liability to the Parties, their respective heirs, legal representatives, successors and assigns, or any other party, should any or all of the Escrow Property escheat by operation of law.

Section 4.3.   Notices. All notices, requests, demands, and other communications required

6

under this Escrow Agreement (a "Notice") shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) by overnight delivery with a reputable national overnight delivery service, or (iv) by mail or by certified mail, return receipt requested, and postage prepaid. If any Notice is mailed to a Party, it shall be deemed given five business days after the date such notice is deposited in the United States mail. Any other Notice given shall be deemed given on the date received. If Notice is given to a party, it shall be given at the address for such party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

If to Neuberger:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY  10022-4834
Attention:  Chief Restructuring Officer
Phone:  (212) 526-7000
Facsimile:  (212) 759-5532


If to PBGC:

Pension Benefit Guaranty Corporation
1200 K Street, N.W.
Washington, D.C.  20005
Attention:  Sara B. Eagle, Esq.
Telephone:  (202) 326-4020
Facsimile:  (202) 326-4112

If to the Escrow Agent:

Wells Fargo Bank, National Association
625 Marquette Ave., N9311-115
Minneapolis, MN 55479
Attention: Aaron Soper, Corporate, Municipal and Escrow Services
Telephone:  (612) 667-5628
Facsimile: (612) 667-2140

Section 4.4.    Governing Law.  This Escrow Agreement shall be governed by and construed in all respects in accordance with the laws of the State of New York without regard to the conflicts of laws principles thereof.  The Parties irrevocably agree that the federal or state courts located within the County of New York in the State of New York shall have exclusive jurisdiction to hear and determine any dispute arising out of or relating to this Escrow Agreement or any of the transactions contemplated hereby and each party hereby irrevocably submits to the exclusive jurisdiction of such court, agree to accept service of process by mail in connection with any such matter, hereby irrevocably waives, to the fullest extent permitted by applicable Law, any

objection or defense based on lack of personal jurisdiction, improper venue, forum non conveniens or similar objection or defense, and hereby consent to the granting of legal or equitable relief as deemed appropriate by such court.

Section 4.5.    Entire Agreement.  This Escrow Agreement sets forth the entire agreement and understanding of the Parties related to the Escrow Property.

Section 4.6.    Amendment.  This Escrow Agreement may be amended, modified, superseded, rescinded, or canceled only by a written instrument executed by the Parties and the Escrow Agent.

Section 4.7.    Waivers.  The failure of any Party at any time or times to require performance of any provision under this Escrow Agreement shall in no manner affect the right at a later time to enforce the same performance.  A waiver by any party to this Escrow Agreement of any such condition or breach of any term, covenant, representation, or warranty contained in this Escrow Agreement, in any one or more instances, shall neither be construed as a further or continuing waiver of any such condition or breach nor a waiver of any other condition or breach of any other term, covenant, representation, or warranty contained in this Escrow Agreement.

Section 4.8.    Headings.  Section headings of this Escrow Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions of this Escrow Agreement.

Section 4.9.    Counterparts.  This Escrow Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, and such counterparts shall together constitute one and the same instrument.


[The remainder of this page left intentionally blank.]

IN WITNESS WHEREOF, this Escrow Agreement has been duly executed as of the date first written above.

NEUBERGER BERMAN HOLDINGS LLC

By: _____
Name:_____
Title:_____

PENSION BENEFIT GUARANTY CORPORATION

By: _____
Name:_____
Title:_____

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Escrow Agent

By: _____
Name:_____
Title:_____

EXHIBIT A

**Agency and Custody Account Direction
For Cash Balances
Wells Fargo Money Market Deposit Accounts**

Direction to use the following Wells Fargo Money Market Deposit Accounts for Cash Balances for the escrow account or accounts (the "Account") established under the Escrow Agreement to which this Exhibit A is attached.

You are hereby directed to deposit, as indicated below, or as the Parties shall direct further in writing from time to time, all cash in the Account in the following money market deposit account of Wells Fargo Bank, National Association (Bank):

Wells Fargo Money Market Deposit Account (MMDA)

The Parties understand that amounts on deposit in the MMDA are insured, subject to the applicable rules and regulations of the Federal Deposit Insurance Corporation (FDIC), in the basic FDIC insurance amount of $100,000 per depositor, per insured bank. This includes principal and accrued interest up to a total of $100,000. *Note: On October 3, 2008, FDIC deposit insurance temporarily increased from $100,000 to $250,000 per depositor through December 31, 2009.*

The Parties acknowledge that they have full power to direct investments of the Account.

The Parties understand that they may change this direction at any time and that it shall continue in effect until revoked or modified by them by written notice to you.

_____
Authorized Representative
NEUBERGER BERMAN
HOLDINGS LLC

_____
Authorized Representative
PENSION BENEFIT GUARANTY
CORPORATION

_____
Date

_____
Date

EXHIBIT B-1
CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Neuberger Berman Holdings LLC and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-1 is attached, on behalf of Neuberger Berman Holdings LLC.

Name / Title                    Specimen Signature

_____         _____
Name                            Signature

_____
Title

_____         _____
Name                            Signature

_____
Title

_____         _____
Name                            Signature

_____
Title

_____         _____
Name                            Signature

_____
Title

<u>EXHIBIT B-2</u>
CERTIFICATE AS TO AUTHORIZED SIGNATURES

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Pension Benefit Guaranty Corporation and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under the Escrow Agreement to which this Exhibit B-2 is attached, on behalf of the Pension Benefit Guaranty Corporation.

Name / Title                                    <u>Specimen Signature</u>

_____          _____
              Name                                        Signature

_____
              Title

_____          _____
              Name                                        Signature

_____
              Title

_____          _____
              Name                                        Signature

_____
              Title

_____          _____
              Name                                        Signature

_____
              Title

EXHIBIT C
FEES OF ESCROW AGENT

**<u>Acceptance One Time Fee</u>:**                                        **$2,500**

The Acceptance Fee includes review of all related documents and accepting the
appointment of Escrow Agent on behalf of Wells Fargo Bank, National Association. The
fee also includes setting up the required account(s) and accounting records, document
filing, and coordinating the receipt of funds/assets for deposit to the Escrow Account.
The Acceptance Fee is due at the time of closing and covers the life of the Escrow.

*Wells Fargo's bid is based on the following assumptions:*

- Number of escrow accounts to be established:  One (1);
- Investment in the Wells Fargo Money Market Deposit Account

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br><br>LEHMAN BROTHERS HOLDINGS, INC.<br><br>RETIREMENT PLAN<br><br><br>PENSION BENEFIT GUARANTY<br><br>CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>THE EMPLOYEE BENEFIT PLANS COMMITTEE<br>OF LEHMAN BROTHERS HOLDINGS, INC., as<br>administrator of the Lehman Brothers Holdings, Inc.<br>Retirement Plan<br><br>    Defendant. | Civil Action No. 08 CIV 10792 (HB) |

## ORDER APPROVING ADEQUATE PROTECTION AGREEMENT

WHEREAS the Pension Benefit Guaranty Corporation ("PBGC") has determined

that the Lehman Brothers Holdings, Inc. Retirement Plan (the "Plan") will be unable to

pay benefits when due and the possible long run loss to the PBGC may reasonably be

expected to increase unreasonably if the Plan is not terminated pursuant to 29 U.S.C.

§ 1342(a); and

WHEREAS, in accordance with the determination of the PBGC, it has filed an

action under 29 U.S.C. § 1342(c) seeking termination of the Plan and has sought

expedited treatment on the basis that the assets of the Plan sponsor and members of its

controlled group are being dissipated through the chapter 11 cases of Lehman Brothers

Holdings, Inc. ("LBHI") and its affiliated debtors and debtors in possession under the Bankruptcy Code; and

WHEREAS the Court entered a Show Cause Order (the "Show Cause Order") providing for a hearing on December 30, 2008, to show cause why the Plan should not be terminated; and

WHEREAS PBGC and the Employee Benefit Plans Committee of Lehman Brothers Holdings, Inc., as administrator of the Plan (the "Plan Administrator") agreed to adjourn that December 30, 2008 hearing from time to time and in connection with that adjournment, the Court entered a January 5, 2009 Order putting into place certain protections to protect PBGC from the sale or dissipation of assets in the bankruptcy cases; and

WHEREAS the parties wish to further adjourn the hearing in order to allow LBHI and any of its controlled group members, including but not limited to Neuberger Berman Holdings, LLC ("Neuberger"), to pursue settlement discussions with PBGC; and

WHEREAS the Plan Administrator, along with LBHI and Neuberger, wishes to change the form of protection provided to PBGC pending the adjourned hearing and PBGC has agreed to such change in protection; and

WHEREAS the Court has reviewed and considered the Joint Motion for Approval of the Adequate Protection Agreement dated March 23, 2009, and the terms and conditions of the Adequate Protection Agreement dated March 23, 2009 (along with its attachments, the "Adequate Protection Agreement").

On the basis of the foregoing findings and the submissions and proceedings referenced above, NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.     The Court hereby incorporates by reference into this Order the terms of the Adequate Protection Agreement, including the attachments.

2.     The Adequate Protection Agreement provides for the jurisdiction by this Court over all signatories thereto (together with PBGC and the Committee "Parties" or, individually, "Party"). The Court shall have exclusive jurisdiction and authority to administer, interpret, and enforce the terms of the Adequate Protection Agreement, and to consider, rule upon, and issue a final order with respect to suits, whether judicial, administrative or otherwise, which may be instituted by any Person, individually or derivatively, with respect to the Adequate Protection Agreement. Each Party has irrevocably submitted to the exclusive jurisdiction and venue of this Court for any suit, action, proceeding, case, controversy, or dispute relating to the Adequate Protection Agreement and/or the negotiation, performance, or breach of the Adequate Protection Agreement.

3.     The Adequate Protection Agreement, in whole or in part, whether effective, terminated, or otherwise, or any of its provisions or any negotiations, statements, or proceedings relating to it shall not be construed as, offered as, received as, used as, or deemed to be evidence of any kind in any action or proceeding, except to enforce the Adequate Protection Agreement or this Order by injunctive or other relief. Without limiting the foregoing, neither the Adequate Protection Agreement nor any related negotiations, statements, or proceedings shall be construed as, offered as, received as, used as, or deemed to be evidence, or an admission or concession of liability, of wrongdoing or breach of any duty on the part of any Party, or as a waiver by any Defendant of any applicable defense.

4.     The Court's Order dated January 5, 2009 (Document No. 18), as modified in this Court's Orders dated January 29, 2009 (Document No. 52) and March 16, 2009

(Document No. 54) (collectively, the "Stipulation And Order"), shall be deemed superseded by this Order and shall be vacated and of no further force or effect upon the execution and delivery of the Pledge Agreement by the parties.

     5.     This matter is hereby stayed until further order of the Court.

SO ORDERED THIS _____ DAY OF MARCH, 2009.

_____
Hon. Harold Baer, Jr.
United States District Court
Judge