STROOCK & STROOCK & LAVAN LLP
Melvin A. Brosterman
Harold A. Olsen
Dina Kolker
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

Attorneys for Basso Capital Management, L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

| | | |
|---|---|---|
| *In re* | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

------------------------------------------------------------------- x

## MOTION OF BASSO CAPITAL MANAGEMENT, L.P. FOR RELIEF CONCERNING CERTAIN CONTRACTS THAT DEBTOR MOVED TO REJECT, THEN SOUGHT TO ASSUME WITHOUT PROVIDING SUFFICIENT NOTICE AND AN OPPORTUNITY TO OBJECT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Basso Capital Management, L.P., investment manager for Basso Credit Opportunities

Holding Fund Ltd., Basso Fund Ltd., and Basso Multi-Strategy Holding Fund Ltd. (together,

"Movants" or "Basso"), by and through its counsel Stroock & Stroock & Lavan LLP,

respectfully submits this motion for relief (the "Motion") pursuant to Fed. R. Civ. P. 60(b), made

applicable hereto by Fed. R. Bankr. R. 9024; and Section 105(a) of the Bankruptcy Code, by

amending or modifying the Order Approving the Assumption or Rejection of Open Trade

Confirmations entered on December 16, 2008 (Dkt. No. 2258) on the limited issue of whether

Debtor should be permitted to assume three open trade confirmations with Basso.

## PRELIMINARY STATEMENT

1.      Movants here are the victims of a classic "bait and switch" – whether intentional

or not – by Lehman Commercial Paper Inc. ("LCPI" or "Debtor") with regard to the status of

three open bank debt trades with Debtor.  On November 7 and 14, 2008, Debtor provided Basso

with clear and prominent notices of its determination to reject the three trades in the form of (1) a

definitive rejection notice, dated November 7, 2008, provided pursuant to the deadline

established for such notice by order of this Court, dated November 5, 2008; and (2) Debtor's

Section 365 motion listing bank debt trades rejected by Debtor (filed on November 14, 2008,

pursuant to the same Court order).  Basso reasonably relied upon these notifications in good faith

and had no reason to expect that Debtor's rejection decision would, or could, be changed absent

Basso's consent.  First, the Court's November 5, 2008 order made no provision for alterations to

Debtor's decisions to assume or reject open trades after the notification deadline.  Second,

Debtor's Section 365 motion itself contained only a single reservation of rights regarding the

switching of open trades from the "reject" list to the "amended" list.  That reservation of rights

was conditioned upon a counterparty's indication that it was prepared to consent to modifications

of the trade.  Basso had no plans to entertain any modifications to the trades rejected by Debtor

(and no indication from Debtor that Debtor was proposing that Basso consent to any

modifications).  Basso relied on its placement on the rejection list as final and determined not to

object to the Section 365 motion.

2.      Following its initial compliance with the Court's order setting the above

deadlines, the Debtor attempted to reverse its decision by sending an unauthorized and seemingly

innocuous email on November 21, 2008, in derogation of the November 7, 2008 notification

deadline set forth in the Court's order.  Debtor then completed its reversal in violation of the

Court's order with a Sunday night surprise, by filing, on the eve of the hearing, revised exhibits

to its Section 365 motion, through which it sought to assume the same trades it previously had

rejected.

3.      The November 21, 2008 email was not sent to counsel.  The first two-thirds of the

email merely recited the facts concerning the original notices of rejection.  Hidden away, at the

end of the email, was a statement that Debtor had changed its mind and would be filing amended

exhibits reflecting the changes at any time up to the hearing date for the Section 365 motion.

The email arrived only a few days prior to the objection deadline and made no reference to any

order of the Court or other document permitting the late change of status.  Indeed, the November

7, 2008 notification and the Section 365 motion were the *only* notices both required and

permitted by the Court's order.  Due to (1) the ambiguous character of the email dedicating most

of its content to a restatement of the notices of rejection; (2) the absence of any authorizing order

of the Court permitting any non-consensual, much less late, notice of a change in Debtor's

previously filed determinations; and (3) the prior notices filed with the Court specifying that the

three trades were to be rejected, there could be no reasonable expectation that the email would be

understood to mean Debtor would be seeking the Court's approval for the exact opposite of what

it declared in its court-ordered notices.  Neither Basso's in-house counsel nor outside counsel

were aware of the email until months later when Debtor contacted Basso's outside bank debt

settlement counsel seeking to settle the trades; the operations associate who received the email

had no reason to believe it required any action on Basso's part.

4.      As the hearing date approached, no amended exhibits materialized.  Instead, two days before the hearing, Debtor adjourned the hearing without any indication that the past-due objection deadline was to be extended or any indication that Debtor intended changes to the configurations of assumptions and rejections.

5.      The proverbial "switch" finally occurred on Sunday preceding the hearing, when Debtor filed with the Court a "Notice of Revised Exhibits…" which stated that the exhibits filed with the original motion (a little more than a month prior) would be replaced with new exhibits. The Notice of Revised Exhibits, on its face, made no indication that "switches" were made other than those contemplated by Debtor's narrow reservation of rights under the original motion (moving trades from the "reject" list to the "amended" list).

6.      Having received no new motion or amended notice of motion and therefore believing that its trades were still to be rejected, Basso did not object to the motion or attend the hearing, at which the Court granted Debtor's motion as to those entities, including Basso, who did not object.  The Order Pursuant to Section 365 of The Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations is dated December 16, 2008 (the "Assumption/Rejection Order").

7.      Debtor then delayed some four months before seeking to close the Basso trades as to which Movants believe Debtor had improperly gained the Court's approval.  Basso first discovered the "switch" when Debtor's counsel contacted Basso's outside bank debt settlement counsel in mid-April seeking to close the trades, some five months after the November 7, 2008 notification deadline.

8.      The market for the asset at the heart of the trades has been characterized by illiquidity and volatility following Debtor's collapse in September 2008.  This fundamental fact

4

was one of the driving forces underlying the Court's order setting deadlines for notification as to assumption or rejection status. True to form, in the approximately five months from the time Debtor, pursuant to that order, notified Basso of its rejection of the three trades, to mid-April when Debtor finally sought to consummate the trades, the at-issue debt went from a quoted price in the 55-60% range (mid-point of 57.5%) to a price range of 17.5-23.5% (mid-point of 20.5%). This reality presents a potential mark-to-market loss (not including other losses and costs attendant to this Debtor-created delay) to Basso of approximately $750,000 for the aforementioned period if it is forced to consummate the trades. Had Basso been timely notified in early November that Debtor intended to assume the trades, it could have then taken steps to mitigate the potential loss.

9.      Debtor's actions in disregarding the explicit deadlines set by the Court, and acting outside the narrow reservation of rights in the Section 365 motion, constitute unfair surprise that deprived Basso of its ability to mitigate. As a result, Debtor should be prohibited from assuming the trades.

## JURISDICTION

10.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

11.     On June 3, 2008, the three Basso funds agreed with Debtor to purchase distressed commercial debt relating to Greektown Holdings L.L.C. and Greektown Holdings II, Inc. (the

"Trade Confirmations") at a price of 95% of par.  (See Declaration of Cristin Caufield, dated

May 7, 2009 ("Caufield Decl."), at ¶2, Exhibit 1).[1]

12.     On October 5, 2008, LCPI commenced a voluntary case under Chapter 11.  The

Debtor's Chapter 11 case has been consolidated with those of the other Lehman Chapter 11

debtors for procedural purposes only and is being jointly administered pursuant to Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

13.     At the time LCPI sought Chapter 11 protection, it had not yet consummated and

settled the three trades referenced in the Trade Confirmations.

14.     On October 17, 2008, certain counterparties to contracts similar to Basso's Trade

Confirmations (not including Basso) moved for an order compelling LCPI to assume or reject

such open confirmations prior to November 7, 2008.  (Dkt. No. 1117) (the "Motion to Compel").

The moving parties argued that an order requiring Debtor to assume or reject open trades by a

time certain was necessary, as leaving the issue open would have exposed the counterparties to

enormous mark-to-market losses that could result from wide-ranging fluctuations in the market

prices of the loans and claims at issue in the open transactions.

15.     In resolution of the Motion to Compel, Debtor entered into and filed with the

Court a Stipulation and Agreed Order Resolving Motion to Compel (the "Original Stipulation").

(Dkt. No. 1300).  The Original Stipulation provided that Debtor would notify each counterparty

(including Basso) by 5:00 p.m. on November 7, 2008 (the "Notification Deadline") whether that

counterparty's open trade confirmations would be assumed, assumed and assigned, or rejected.

(Original Stipulation at ¶1).  Debtor also agreed to file a motion to assume, assume and assign, or

---

[1] The Declaration of Cristin Caufield is annexed hereto as Exhibit A.

6

reject the open trade confirmations on or before November 16, 2008.  (Original Stipulation at ¶2).

16.     Upon realizing on the eve of the Notification Deadline that it required additional time to consider 49 specific open trade confirmations and would not be able to meet the deadline as to those trades, Debtor entered into a Revised Stipulation and Order Resolving Motion to Compel, which was approved by the Court (Dkt. No. 1400) (the "Stipulation and Order").  The Stipulation and Order continued to provide that Debtor notify all counterparties to open trade confirmations by November 7, 2008 as to its election to assume, assume and assign, or reject open trades, except that Debtor had until December 5, 2008 to notify the counterparties to those 49 open trade confirmations listed on Exhibit B to the Stipulation and Order.  (Stipulation and Order at ¶1).  Basso's Trade Confirmations were *not* listed in Exhibit B.  Therefore, pursuant to the Stipulation and Order, the Notification Deadline as to Debtor's treatment of Basso's trades was November 7, 2008.  The Stipulation and Order made no provision for Debtor to change its election with respect to particular trades once notice was given on November 7, 2008.

17.     The Stipulation and Order also required Debtor to make a motion to assume, assume and assign, or reject by November 16, 2008, with a hearing set for December 3, 2008 as to those trades, including Basso's, that were subject to the first Notification Deadline. (Stipulation and Order at ¶2).  As to trades subject to the December 5, 2008 notification deadline, Debtor was to file its motion by December 15, 2008, to be heard at the first Omnibus Hearing scheduled for January 2009.  (Id.)

18.     In line with the time sensitivity that prompted the Motion to Compel in the first instance, the Stipulation and Order further provided that any assumed trades be closed "as soon as practicable after November 7, 2008," and reserved to the Counterparties the right to seek an

7

order from the Court compelling Debtor to close the trades within a commercially reasonable

time in the event such Counterparties believed, in good faith, that the applicable Debtor was not

acting with due speed. (Stipulation and Order at ¶3). Basso was also deprived of the ability to

enforce this provision against Debtor during Debtor's five-month delay in seeking to

consummate the Trade Confirmations due to Debtor having led Basso to believe the Trade

Confirmations had been rejected.

19.    Pursuant to the Stipulation and Order, on November 7, 2008, Cristin Caufield, a

non-lawyer and Associate in the Basso Operations group, received an email from Debtor with

the subject line "Lehman Trade Reject Notification." (Caufield Decl. at ¶5, Exhibit 2). The

notifications explicitly provided that "LPCI has made the determination to reject the Trade

Confirmation in accordance with its rights under section 365 of the Bankruptcy Code."

20.    Having received notification on the relevant Notification Deadline that its Trade

Confirmations had been rejected, Basso did not object to Debtor's forthcoming motion to the

same effect and proceeded to conduct its business in reliance on that notification. (See id. at ¶6).

21.    The November 7, 2008 notification was then solidified when Debtor filed its

motion for an order pursuant to Section 365, listing Basso's trades as being rejected. (Dkt. No.

1541) (Exhibit B, listing rejected trades, has an entry for Basso entitled "Basso Capital MGMT

(master)". The motion set November 28, 2008 as the deadline for objections, with a hearing to

be held on December 3, 2008. In that motion, Debtor explicitly reserved the right to move trades

from Exhibit B (rejected trades) to Exhibit C (amended trades) *only if* the "parties to Rejected

Trades indicate that they are prepared to make modifications to their Open Trade

Confirmations." (Id. at ¶38). Basso neither offered nor was requested to modify any of its

8

trades.  No other reservation of rights was made, including no reservation of rights to unilaterally move trades from the "reject" list to the "assume" list.

22.    Although nowhere provided for in the Stipulation and Order, after close of business on Friday, November 21, 2008, leaving only a few days to the objection deadline, Debtor sent another email to Cristin Caufield entitled simply "Greektown Trade with Lehman." (Caufield Decl. at ¶7, Exhibit 3).  Unlike the subject of the November 7, 2008  notification which clearly stated up front the import of the email, the subject of the November 21, 2008 email reveals little, if anything, about the message.  The subject of this email had neither a mention of the word "assumption" nor any indication of the email's intended legal significance.  The email did not contain any of the attendant features of a pleading, notice or other document that could have legal effect on a party's rights.

23.    The first three paragraphs of this page-long message reiterated the November 7, 2008 notification of rejection and the listing of the trades in the November 14, 2008 motion as rejected.  In the fifth paragraph, at the bottom of the page, Debtor noted that it had changed its mind and wanted to assume the trades instead of rejecting them.  The email concluded that at some point before or on the day of the hearing (which was set for the week after the deadline for objections), Debtor intended to file an amended set of exhibits listing the trades of various counterparties of the Debtor to be assumed or rejected.

24.    Having relied upon the November 7, 2008 notification and the then-pending motion on file with the Court seeking rejection of the Basso Trade Confirmations as binding, Basso did not expect any further substantive emails relating to the Trade Confirmations.  (See Id. at ¶6).  Ms. Caufield had no reason to anticipate a change in Debtor's decision, was not alerted to this possibility by the email's subject line and, ultimately did not understand that Debtor legally

could or intended, by the November 21, 2008 email, to reverse the determination made in

Debtor's November 7, 2008 notice and in Debtor's then-pending motion. She therefore did not

make either Basso management or counsel aware of the email. (Id. at ¶7).

25.    On December 1, 2008, two days before the hearing date (and after the objection

deadline), no set of amended exhibits had yet been filed with the Court or served on the parties

by Debtor. (See id. at ¶8). So far as the record before the Court reflected at that time, the Basso

trades were rejected by Debtor, subject to Court approval. That same day, Debtor filed a notice

of adjournment moving the hearing from December 3, 2008 to December 16, 2008. (Dkt. No.

1938). The Notice of Adjournment made no mention of the objections deadline (which had

already passed) or any intention to file amended exhibits.

26.    The next day, parties that had signed on to the initial motion to compel filed a

letter with the Court objecting to Debtor's adjournment of the hearing as contrary to both the

purpose and provisions of the Stipulation and Order. (Dkt. No. 1981). Nonetheless, the hearing

did not proceed on December 3, 2009.

27.    Debtor then filed a "Notice of Filing of Revised Exhibits…" ("Notice of Revised

Exhibits") on Sunday evening, December 14, 2008 – less than two calendar days prior to the new

hearing date of December 16, 2008. (Dkt. No. 2206). Also on Sunday evening, amidst a stream

of other emails relating to other aspects of the Lehman bankruptcy, Cristin Caufield received

several emails from Epiq Systems, which provided, in piecemeal format, the Notice of Revised

Exhibits (with attachments) without stating it was seeking to effectuate legal service. (See

Caufield Decl. At ¶¶ 8-9, Exhibit 4). The following day (on the eve of the hearing), she received

another email from Epiq Systems attaching Debtor's reply to objections that had been received.

(See id. at ¶10, Exhibit 5). Neither the emails received nor the Notice of Revised Exhibits itself

10

indicated that Debtor had switched, or had any purported authority to switch, certain trades from the "reject" list to the "assume" list without the consent of the counterparties.  (See id. at ¶¶ 8-9).  One has to search the various ".pdf" format files of spreadsheet lists, consisting of some 61 pages, attached to the emails to find that Basso's Trade Confirmations were for the first time listed on the "assumed" trades list.  (Dkt. No. 2206).  Expecting that the only changes to the lists would be those as to which Debtor has expressly reserved the right – moving trades from the "reject" list to the "amended" list upon consent of the affected counterparties – Cristin Caufield had no reason to and did not search the exhibits for unexpected changes.  (See id. at ¶9).  She also did not forward the emails internally to Basso management or counsel.[2]  (Id.)

28.     That same Sunday evening, as part of an informational blast, Frank Jaklitsch of Esbin & Alter LLP, Basso's outside bank debt settlement counsel, received a similar cluster of emails from Epiq Systems.  (See Declaration of Frank Jaklitsch, dated May 7, 2009 ("Jaklitsch Decl."), at ¶ 5).[3]  As with Ms. Caufield, nothing on the face of the emails suggested that it contained a reversal of what had been stated in the November 14, 2008 motion as to Basso, nor, based the information Mr. Jaklitsch received previously did he anticipate such a change.  For these reasons, Mr. Jaklitsch did not search that annexed .pdf copies of the many spreadsheets and did not forward them to Basso.

29.     The next day, at the hearing, the Court granted the motion with the Revised Exhibits as to those counterparties who did not object.  (Dkt. No. 2258).

---

[2]     Notably, even if Ms. Caufield had forwarded the Revised Exhibits the very next morning and the switch been discovered at the time, some 24 hours would have remained until the hearing itself with the objection deadline had long since passed.  Given the timing, Basso would still have had no meaningful opportunity to respond.

[3] The Declaration of Frank Jaklitsch is annexed hereto as Exhibit B.

30.     Basso did not receive any further communications from Debtor regarding the
Open Trade Confirmations until many months later when, in mid-April, Debtor's outside counsel
contacted Mr. Jaklitsch.  (See Jaklitsch Decl., at ¶¶ 5-6, Exhibit 1).  To Mr. Jaklitsch's
knowledge at the time, this was the first communication he received regarding the Trade
Confirmations since becoming aware of the November 7, 2008 notice from Basso and the
November 14, 2008 motion from Basso and industry news reports.  (Id.)  Having been informed
in November 2008 that the Basso trades had been rejected by Debtor and having been aware of
Debtor's November 14, 2008 motion, Mr. Jaklitsch advised Debtor's counsel of this fact the
same day, April 14, 2009.  (Id.)  In response, on April 16, 2009, Debtor's counsel forwarded the
November 21, 2008 email to Frank Jaklitsch, who forwarded it to and followed up with Basso.
(Id. at ¶6, Exhibit 2).  This was the first time Mr. Jaklitsch or anyone at Basso other than Ms.
Caufield saw that November 21, 2008 email and became aware of the intended import of that
email.  (See Caufield Decl. at ¶7; Jaklitsch Decl. at ¶6).

31.     As would be expected given the impetus for the Motion to Compel, in the five-
month period between Basso's receipt of notification that the Debtor had determined to reject the
trades and Debtor contacting Basso's counsel to attempt to consummate the trades in April 2009,
the debt at issue went from having a quoted price in the 55-60% range (mid-point of 57.5%) to a
price range of 17.5-23.5% (mid-point of 20.5%), a potential mark-to-market loss (not including
other losses and costs attendant to this Debtor-created delay) to Basso for the foregoing period of
approximately $750,000 as of the date hereof.  (Caufield Decl. at ¶12).

## ARGUMENT

**I.    The Stipulation and Order Required Debtor To Decide Whether
To Assume Or Reject The Open Trade Confirmations And To So
Notify Basso By November 7, 2008; It Did Not Permit A "Do Over"**

32.     Permitting the Debtor's eleventh-hour reversal to stand would vitiate the

Stipulation and Order setting out deadlines for both notification and the filing of a motion for

approval, by rendering those deadlines an unreliable nullity.  If actions such as Debtor's here

were countenanced, orders of the type issued by the Court – those granting or resolving motions

to compel assumption or rejection of executory contracts by a date certain – would be

transfigured from a tool designed to protect counterparties from prolonged uncertainty and

resulting damages into a trap for the unwary that uses notification deadlines as a lure, leading

and lulling counterparties into a false sense of security.  To retroactively condone Debtor's "bait

and switch" behavior here would be to invite similar disregard of notification deadlines in this

action as well as others.

33.     Every term of the Stipulation and Order was negotiated by Debtor and its counsel.

Although arising from the Motion to Compel (Dkt. No. 1117) originally filed by a subset of all

affected counterparties, the ultimate Stipulation and Order signed by the Court applied to all

open trade confirmations, including Basso's.  The Stipulation and Order has three key

provisions: (1) a Notification Deadline by which Debtor will notify each counterparty of the

designation of its trades; (2) a motion deadline by which Debtor will file a motion for court

approval of the designations; and (3) a requirement that Debtor attempt to close any assumed

trades "as soon as practicable after November 7, 2008."  (Dkt. No. 1400 at ¶¶ 1-3).  It is clear

from these provisions that time and certainty were of the essence in formulating the Stipulation

and Order.  In a letter to the Court from those counterparties that moved to compel in the first

instance, they themselves explained the impetus for the motion that resulted in the Stipulation

and Order:

> [B]ecause, among other things, absent a Court order requiring the Debtors to assume or reject open trade confirmations by a time certain the Counterparties would have been exposed to enormous losses that could result from wide-ranging fluctuations in the market prices of the loans and claims that are the subject of the Motion. (Dkt. No. 1117).

34.      Debtor revealed by its actions that it understood the November 7, 2008

notification deadline as a date certain by which it had to decide whether to assume or reject a

trade when it sought modification of the Original Stipulation and Order to obtain additional time

to determine whether to assume or reject 49 specific trades.  (Dkt. No. 1400 at ¶K).

Accordingly, the Stipulation and Order provided two parallel schedules.  The first (and larger)

group of counterparties, including Basso, were to be notified of their status by November 7,

2008, with the motion for approval to be filed by November 16, 2008 and to be heard by the

Court on December 3, 2008.  The second group of counterparties, those pertaining to the 49

trades Debtor required additional time to consider, would be notified by December 15, 2008.

(Dkt. No.  1400 at ¶2).  As it turned out, the group of 49 ultimately had more certainty than

Movant, as Debtor clearly notified that group pursuant to the Stipulation and Order that they had

to wait for a definitive decision as to assumption or rejection of those trades.  Movant, however,

was led to believe one thing, while Debtor ultimately sought the opposite.

35.      Nowhere in the 25 paragraphs of the Stipulation and Order did Debtor reserve the

right to a "do over" by providing multiple contradictory notices as to the same determination

after the Notification Deadlines.  The only distinct rights reserved to Debtor in the Stipulation

and Order are to (i) "move this Court to extend the Notification Deadline or the Second

Notification Deadline for good cause shown;" and (ii) to object to any setoff or recoupment.

36.    Debtor agreed in writing (ordered by this Court) that the date by which

notification to Basso and others must be performed may only be extended with leave of the Court

*and* for "good cause shown," yet it disregarded entirely the purpose of the Notification Deadline

by its last minute application to the Court for the exact opposite of what was promised in the

November 7, 2008 notice.  Quite clearly, Debtor never even attempted to establish the requisite

"good cause" much less made an application to the Court to extend the November 7 Notification

Deadline.  Thus, its email of November 21, 2008, was sent in contravention of the most vital

provisions of the Stipulation and Order.

37.    Pursuant to the Stipulation and Order, Debtor, on November 7 and 14, 2008,

unequivocally declared its decision to reject, subject to Court approval, the three Basso Open

Trade Confirmations.  (Caufield Decl. at ¶¶ 4-5, Exhibit 2; Dkt. No. 1541).  The November 7,

2008, notification reads explicitly:

> Subject:  Lehman Trade Rejection Notification
>
> Reference is made to LSTA Distressed Trade Confirmation, LCPI
> sell Greektown Holding for $2,000,000.00 at 95% dated
> 06/03/2008, (the "Trade Confirmation").
>
> Please take notice that LCPI has made the determination to reject
> the Trade Confirmation in accordance with its rights under section
> 365 of the Bankruptcy Code.
>
> (Caufield Decl. at Exhibit B).

38.    This notice was unequivocal and made no reservation of rights as to a potential

change of heart.  Basso reasonably and in good faith relied upon this Court-ordered notification

to mean that Debtor would seek Court approval of the rejection of Basso's trades.  (Caufield

Decl. at ¶6).

39.    Just as the Stipulation and Order required, Debtor followed up this notification

with the filing of a motion for Court approval on November 14, 2008.  (Dkt. No. 1541).

Although the motion did not contain any specific argument in regard to Basso's trades, the trades

were, however, appropriately listed within the 14-page exhibits as being rejected.  Again, Basso

reasonably and in good faith relied upon this Court-filed confirmation of the original notification

that its trades had been rejected by Debtor.

40.    The motion, like the notification, is clear as to the relief it seeks with regard to

Basso – rejection of the open Trade Confirmations.  The motion contained a single reservation of

rights:

> To the extent that  parties to Rejected Trades indicate that they are
> prepared to make modifications to their Open Trade
> Confirmations, the Debtors reserve the right to move such Open
> Trade Confirmations from Exhibit B [the rejected list] to Exhibit C
> [the amended trades list] prior to the date of the hearing with
> respect to this Motion.

(Dkt. No. 1541 at ¶38).

41.    Even this claim of right to switch trades from the rejected list to the amended and

assumed list would be outside the mandates of the Stipulation and Order, as the counterparties

holding such trades would have already been notified of the status of their trades.  This

provisions is saved, however, by the requirement that such change would only result upon the

voluntary agreement of the affected counterparties.  As Basso did not intend to voluntarily

modify the terms of its trades, this provision served only to lead Basso to expect that although

some modifications might occur, they would not relate to Basso's trades.  The motion contained

no statement or reservation of right indicating that a trade could or would be moved from the rejected list (Exhibit B) to the assumed list (Exhibit A) or that any switch could occur without the counterparty's (here, Basso's) consent.

42.    As discussed above, there is no order, document or reservation of rights permitting Debtor to claim a dilatory "do over" of its determination to reject Basso's trades without Basso's consent. While 11 U.S.C. §365(d)(2) permits Debtor in a Chapter 11 to assume or reject an executory contract at any time before the confirmation of a plan, it explicitly provides that the court, on request of a party, "may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." Thus, Debtor's Section 365 rights are circumscribed by the Stipulation and Order. The purpose of permitting such orders is to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate." 11 U.S.C. §365 Legislative History to Section 365(d). This purpose would be subverted by condoning Debtor's actions here.

43.    For the reasons described above, Debtor's attempt to renege on its November 7, 2008 notice and November 14, 2008 motion by way of its November 21, 2008 email and belatedly submitted Revised Exhibits is a violation of the Stipulation and Order and should be precluded. Movants seek an order approving Debtor's rejection of the Basso Trade Confirmations.

## II.    Basso Reasonably and In Good Faith Relied To Its Detriment Upon Debtor's November 7, 2008 Unequivocal Notice of Rejection and November 14, 2008 Motion Seeking Rejection And Were Unlawfully Prejudiced By Debtor's Eleventh Hour Reversal

44.    Basso further asks the Court to declare that Debtor be estopped from assuming Basso's three open Trade Confirmations. As discussed above, Basso substantially relied on the

unambiguous statements and actions of Debtor and will be significantly prejudiced should the
Debtor be permitted to assume the three trades at this late date.

45.    At the time the motion for approval was filed and Debtor's obligations to notify
Basso of its decision and then act on that determination had been discharged, Basso determined
not to object to the rejection of its trades. (Caufield Decl. at ¶6).  Relying on the fact that Debtor
sought to reject the trades, Basso took no action to prepare for or mitigate the potential loss (that
has increased over time) that would result if the trades were to be assumed.  (Id.)  Reasonably
believing Debtor's court-ordered notification and position in the motion to be binding, Basso had
no reason to, and therefore, did not, closely monitor this aspect of the Bankruptcy.  (See Caufield
Decl. at ¶¶ 6-9).

46.    After having substantially relied upon Debtor's notification and motion seeking
rejection, Basso would be significantly prejudiced should Debtor be permitted to assume the
trades at this late date.  Reasonably and in good faith relying on the rejection notices, Basso had
at the time refrained from taking steps to mitigate any potential loss for the period from the trade
date to the Notification Deadline.  Now, the market for the asset Debtor wishes Basso to
purchase has dropped substantially, resulting in a materially larger loss to Basso if the trade is
ordered to proceed.

47.    Bankruptcy courts are courts of equity "empowered to invoke equitable principles
to achieve fairness and justice in the reorganization process."  See In re Momentum Mfg. Corp.,
25 F.3d 1132, 1136 (2d Cir. 1994).  Consistent with this power, the Court may properly apply the
doctrine of estoppel to remedy a creditor's justifiable reliance on a debtor's misrepresentation.
More specifically, equitable estoppel can apply in the context of a debtor's assumption of an
executory contract.  See In re Ionosphere Clubs, Inc., 85 F.3d 992, 1000 (2d Cir. 1996) (holding

that once the debtor assumes a contract under Section 365, equitable estoppel principles can be applied to deny the debtor permission to escape its obligations to perform on that contract).

48.      To prevail on a claim of equitable estoppel, a disadvantaged party must show it "(1) lacked knowledge of the true facts, (2) reasonably relied on debtor's misleading conduct and (3) suffered prejudice as a result of their reliance." In re Texaco Inc., 254 B.R. 536, 561 (S.D.N.Y. 2000) (citing In re Momentum Mfg. Corp., 25 F.3d at 1136). Basso meets all three of these tests.

49.      In re Texaco Inc. is instructive. In that case, lessors of four oil and gas leases sued the reorganized chapter 11 debtor in connection with claims that debtor asserted had been discharged by the confirmation order approving its second amended joint plan of reorganization. The Southern District of New York held, *inter alia*, that such discharge of lessor's claims would be precluded under principles of equitable estoppel based upon lessors' reasonable reliance on certain actions of the debtor during the bankruptcy that are analogous to the actions taken by Debtor here. Id. at 560-63.

50.      Texaco had filed for Chapter 11 protection as a result of a large verdict against it and in favor of Pennzoil. In other respects, Texaco's declared intention for the reorganization proceeding was to continue its business as usual, including the assuming of a large number of oil and gas agreements. Id. at 542. To that end, Texaco filed what it dubbed the "Global Motion," seeking, among other things, an order authorizing assumption of its oil and gas leases. The proposed order annexed to the motion read: "Order (i) approving assumption by Texaco Inc. of its oil and gas leases…". Id. at 543. Supporting sections of the Global Motion provided various statements and explanations all geared to communicating Texaco's intention to continue its business as usual, particularly with regard to its oil and gas operations. Id. at 543-44. These

intentions were echoed in Texaco's disclosure statement. Buried within this barrage of papers was a single relatively short paragraph (number 41) in the Global Motion in which Texaco reserved its right to contend that certain of its leases are conveyances not subject to assumption. Id. at 546.

51.    Ultimately, Texaco did not actually pursue its application for an order approving the assumption of all its oil and gas leases. Instead, at some later date, Texaco filed a notice of "clarification." Id. This notice adjourned the hearing to a later date and "clarified" the proposed order and the procedure for "assuming" the oil and gas leases that were "assumable." The substance of the notice appeared consistent with the prior motion, except for the final paragraph which stated that the proposed order was without prejudice to contentions that any oil and gas leases are not subject to assumption under Section 365. Id. at 547. The order that was ultimately issued was an amalgam of the "clarification" and the Global Motion, but contained two key paragraphs: (i) the reservation of right to contend the leases were not subject to assumption; and (2) if upon notice that a lease is being assumed the party does not object by a certain date, the court will act on the application for approval without further notice. Id. at 548. Pursuant to this order, Texaco sent a notice to each lessor consisting of a printout of leases to be assumed. Each notice, however, had a footnote which declared that Texaco believed oil and gas leases in certain states were not subject to assumption, and that if they were not, Texaco would ask the court to so hold. Just as indicated, to the surprise of the lessors, the court subsequently issued an order holding that a large portion of oil and gas leases were not subject to assumption. With that the transformation of the Global Motion from one seeking assumption of the leases to a vehicle for holding them not susceptible to assumption was complete.

52.     The court held that the lessors' reliance on Texaco's "blizzard" of declarations of its intent to assume the leases was reasonable.  Relying on the few paragraphs and footnotes purporting to reserve its rights, Texaco argued to the contrary that the lessors' had ample notice that Texaco may seek an order declaring the leases not subject to Section 365.  The Court found such inconspicuous notices "palpably insufficient" in light of the other declarations being put forward.  Id. at 562.

53.     Similarly here, Basso was justified in relying on the court-ordered notice and motion in which Debtor unambiguously stated it intended to and sought approval of rejection of the open trades.  Unlike in Texaco, Debtor here cannot point to any notice of a reservation of rights to seek the opposite relief from that plainly sought in its motion.  Debtor's ambiguous November 21, 2008 email, sent a few days before the time to object had expired and which began with an ambiguous and innocuous subject line and went on for two-thirds of its length to reiterate Debtor's past expressions of intent to reject the trades, cannot serve as sufficient notice of its intent to seek the reverse.  Likewise, Debtor's last-minute filing of a Notice of Revised exhibits on Sunday prior to the adjourned hearing date could not have provided adequate notice and, indeed, did not, as Basso was unaware of the switch until April 2009.  Based upon Debtor's reservation of right to move trades from the rejected list to the amended list as a result of voluntary modifications, the filing of amended exhibits was expected.  Thus, the mere fact that amended exhibits were filed did not alert counterparties to the fact that, or state a basis upon which, their trades could jump from the "rejected" list to the "assumed" list.

54.     Therefore, because Basso (1) reasonably relied on Debtor's November 7, 2008 notice and November 14, 2008 motion; (2) was not aware of, and had no reason to expect, that Debtor could or had switched its trades from the rejected list to the assumed list after those dates;

21

and (3) would suffer prejudice to the tune of a mark-to-market approximate loss of $750,000 as a result of such reliance, Debtor should be equitably estopped from assuming the Basso trades.

### III.    Basso Is Entitled To Relief From The December 16, 2008 Order Granting Debtor's Motion For Approval And Any Failure On The Part Of Basso To Object To The Revised Exhibits At The December 16, 2008 Hearing Is Excusable Under Fed. R. Civ. P. 60(b)

55.    Pursuant to Bankruptcy Rule 9024 (applying Fed. R. Civ. P. 60(b) to bankruptcy cases), this Court has the power to, *inter alia*, relieve a party from a final judgment, order or proceeding for the following reasons: mistake, inadvertence, surprise, excusable neglect, or any other reason justifying relief from the operation of the judgment. Fed. R. Civ. P. 60(b)(2) and (6). A motion for relief from an order is within the broad discretion of the Court. See In re AMC Realty Corp., 270 B.R. 132, 143 (Bankr. S.D.N.Y. 2001) (citing Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986). In exercising this discretion, a court should balance serving the ends of justice against favoring finality. AMC Realty Corp., 270 B.R. at 143.

56.    The applicable standard is provided by the Supreme Court's decision in Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship, 507 U.S. 380 (1993).[4] There, the Court held that consideration of whether a party's action or inaction is to be excused is at bottom an equitable one, taking account of all relevant circumstances. Id. at 395. In order to help focus courts' analyses, the Supreme Court delineated several non-exclusive factors to be considered in such cases:

> These include …the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the

---

[4]    The specific facts of Pioneer dealt with interpretation of Bankruptcy Rule 9006(b) pertaining to, *inter alia*, the extension of time to file proof of claim, however, Pioneer is commonly understood to provide guidance beyond the Rule 9006 scenario. See Manus Corporation v. NRG Energy, Inc (In re O'Brien Environmental Energy, Inc.), 188 F.3d 116, n. 7 (3d Cir. 1999) (collecting representative cases).

reasonable control of the movant, and whether the movant acted in good faith.

Id. Each of these factors is discussed below, beginning with the last.

57.    **Reason for delay and good faith.**  As made clear by the Supreme Court in Pioneer, the reason for delay need not be entirely outside the control of the party to be excused. Pioneer, 507 U.S. at 391.  In performing such analysis courts have looked to movant's actions, but been mindful of placing them in the context of reacting to debtor's conduct and the goings on of the case at the time.  See, e.g., In re O'Brien Environmental, 188 F.3d at 128-129 (reversing Bankruptcy Court's denial of Fed. R. Civ. P. 60(b) motion for, *inter alia*, failing to consider debtor's actions in weighing the claimed reason for delay).

58.    In Pioneer, the Supreme Court found relevant that although the notice of the bar date was received by movant, it was "outside the ordinary course" in that it was not, as it should be, "prominently announced and accompanied by an explanation of its significance."  Pioneer, 507 U.S. at 398.  The Court also noted that the "inconspicuous placement" of the deadline in a boilerplate document whose title did not clearly relate to the deadline "left dramatic ambiguity" in the notification.  Id.

59.    Similarly, in In re O'Brien, while movant received the application which ultimately resulted in a court order barring its claim for cure amounts upon assumption of an executory contract, such application was ambiguously titled as seeking an order "establishing reserves and cure amounts" generally as to many claims and did not specify that it challenged that particular movant's rights.  In re O'Brien Environmental, 188 F.3d at 129.  Although the court recognized that the issue of cure amounts in relation to the movant was dealt with in several paragraphs of the applications (as compared to a single sentence in Pioneer), it found compelling that those paragraphs were paragraphs fourteen, fifteen and sixteen, buried in the

23

middle of twelve other pages.  Id.  The Third Circuit held that although movant was careless in

not reading the application carefully and providing it to an attorney for review, such carelessness

was excusable under the circumstances.  Id.

60.    Many of the factual considerations found relevant by both the Pioneer and In re

O'Brien courts are at play here.  Debtor first sent Basso a clear, prominent and unambiguous

notice that the trades were to be rejected.  Indeed, the very subject line of the notice – "Lehman

Trade Reject Notification" – made that fact plain.  (Caufield Decl. at ¶7, Exhibit 3).  This was

followed-up and confirmed by the motion for approval filed with the Court, which, although less

conspicuously, listed Basso's trades as among those rejected, subject to Court approval.  These

two notices of the status of Basso's trades were required by the Stipulation and Order.  They

were the *only* notices both required and permitted by the Stipulation and Order.  Aside from

revised exhibits reflecting trades that had been voluntarily modified by other counterparties and

the Court's ultimate decision itself, Basso had no reason to expect any further notices on this

issue.  It was that expectation (rooted in reliance on Debtor's prior notices) that, coupled with the

ambiguous nature of the November 21, 2008 email, resulted in the buried content of that email

being overlooked.

61.    As discussed above, the November 21, 2008 email was sent to a non-lawyer under

a subject line –- "Greektown Trade with Lehman" – giving no indication as to its import.  The

email went on for several paragraphs to reiterate the original notices of rejection received by

Basso.  It was only at the end of the email that Debtor indicated it had a change of heart and

amended exhibits would be filed at some point.

62.    When the amended exhibits were ultimately filed virtually on the eve of the

hearing, Basso and its counsel had no reason to suspect and were not aware that such Exhibits

24

would contain anything other than changes resulting from voluntary modifications made by counterparties other than Basso.

63.     Once the Court approved the motion at the December 16, 2008 hearing, Debtor, armed with an order approving its improperly sought assumption of the Basso trades, was obligated under the Stipulation and Order to then proceed with due speed to close the trades.  It was Debtor's further postponement in pursuing closure, by some four-five months, that delayed Basso's discovery of the issue.  Upon discovering the issue in mid-April 2009, Basso acted with diligent speed in bringing the instant motion.

64.     **Length of delay and its potential impact on judicial proceedings.**  Courts consider both the actual delay and the stage at which it finds the reorganization process in considering this factor.  In re O'Brien, 188 F.3d at 129-130.  Here, both elements favor excusal: (1) the actual delay is less than one month from discovery of the issue and at most under five months from the hearing approving assumption/rejection; and (2) there is no reorganization plan yet, and it appears that Debtor have not even closed or resolved all of its outstanding executory contracts.

65.     Moreover, at least one other counterparty has found itself in a situation similar to Basso with regard to Debtor's last minute switch.  BLT 39 LLC, a counterparty to certain other open trade confirmations, has filed a motion pursuant to Fed. R. Civ. P. 59 seeking partial reconsideration of the same order at issue here based on similar facts – Debtor first notified BLT 39 LLC that its trades would be rejected only to reverse its position in the Revised Exhibits. (Dkt. No. 2206).  The hearing on that motion has recently been adjourned to May 13, 2009. (Dkt. No. 3224).  Thus, several open issues remain to be worked through in connection with

Debtor's compliance with the Stipulation and Order and generally its assumption or rejection of open trade confirmations.

66.     As discussed above, also relevant to the issue of delay is the role played by Debtor in contributing to the delay.  Despite being required by the Stipulation and Order to close any assumed open trade confirmations within a commercially reasonable time after November 7, 2008, Debtor first contacted Basso regarding closing the trades in mid-April 2009.  Basso filed this motion promptly thereafter.

67.     **Potential prejudice to Debtor**.  The Second Circuit has held that the simple fact that excusing a party's omission may result in additional costs to the debtor is not sufficient to show prejudice or else something as simple as a claim filed a day late would consistently be disallowed.  Midland Cogeneration Venture L.P. v. Enron Corp. (In re Enron), 419 F.3d 115, 130 (2d Cir. 2005).  The same would be true of any claimed cost of litigating the issue sought to be revived.  Instead, the Second Circuit discussed some general factors to consider in determining if a debtor would suffer prejudice: (1) the size of the claim in relation to debtor's estate; (2) whether it would jeopardize the success of reorganization by, for example, forcing the return of amounts already paid out; and (3) whether debtor had advanced notice of the issue.  Id. at 130. See also, In re Bruno Machinery Corp., 2007 WL 2071747, *3 (N.D.N.Y. July 12, 2007).  Thus, for example, where the late claim to be excused constituted but 5-10 % of the unsecured claims in a proceeding, no plan had yet been established and debtor had some notification of the issues being raised, courts have held there is no prejudice to the debtor.  See In re Bruno Machinery Corp., 2007 WL 2071747, *4.  See also, In re O'Brien Environment, 188 F.3d at 126 (holding that mere fact that a plan or reorganization did not already provide for payment of cure claims

sought to be revived under Fed. R. Civ. P. 60(b) did not constitute prejudice for purposes of denying excusable neglect).

68.    Applying the <u>Midland</u> factors here, it is clear there can be no prejudice to the Debtor, within the meaning of Rule 60(b).  In the grand scheme of the Lehman bankruptcy proceeding, the potential cost of rejecting Basso's three trades is like a drop of water in the ocean.  Basso estimates its potential mark-to-market loss (not including other losses and costs attendant to this Debtor-created delay) for the period from the Notification Deadline to its discovery of the issue in mid-April if forced to assume the trades at approximately $750,000.  This figure is dwarfed by the vast scope of the bankruptcy estate in this case.  Given the relatively small scale of the issue for Debtor (although not for Basso), it would have virtually no effect on the reorganization process.

69.    Finally, with respect to the last factor, it was Debtor's own actions that caused the issue and contributed to the delay in Basso's raising it.  Moreover, at least one other counterparty has raised an analogous issue regarding the same actions with respect to similar trades.  Only Debtor knows how many counterparties were affected by its last minute switches.  Given the underlying purpose of the Motion to Compel and the Stipulation and Order – to reduce uncertainty to counterparties – Debtor should have expected that its dilatory reversals would have raised issues such as those asserted here.

## REQUEST FOR RELIEF

WHEREFORE, for the reasons set forth herein and in the accompanying Declarations,

Basso respectfully requests that this Court enter an order substantially in the form annexed hereto

as Exhibit C, (a) granting Basso's motion for relief under Federal Rule of Civil Procedure 60(b);

(b) ordering that, notwithstanding anything in the Order Pursuant to Section 365 of The

Bankruptcy Code Approving The Assumption Or Rejection of Open Trade Confirmations, dated

December 16, 2008, the three Basso Open Trade Confirmations, which were initially rejected by

Debtor, have not and may not be assumed; and (c) granting such other and further relief as this

Court deems just or proper.

Dated:   May 7, 2009
         New York, New York

                              STROOCK & STROOCK & LAVAN, LLP

                              /s/ Melvin A. Brosterman
                              Melvin A. Brosterman
                              Harold A. Olsen
                              Dina Kolker
                              180 Maiden Lane
                              New York, New York 10038
                              Telephone: (212) 806-5400
                              Facsimile: (212) 806-6006

                              Attorneys for Basso Capital Management, L.P.