# **EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- x
*In re*                                                                                : Chapter 11
                                                                                         :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,         : Case No. 08-13555 (JMP)
                                                                                         :
                                                                                         : **(Jointly Administered)**
                              **Debtors.**                                   :
---------------------------------------------------------------------- x

### DECLARATION OF CRISTIN CAUFIELD

Pursuant to 28 U.S.C. §1746, Cristin Caufield declares as follows:

1.     I am an Associate in the Operations group of Basso Capital Management, L.P. ("Basso"), a movant in the above referenced case. My work at Basso relates primarily to bank debt transactions. I am not an attorney. I make this Declaration in support of Basso's Motion For Relief Concerning Certain Contracts That Debtor Moved to Reject, Then Sought To Assume Without Providing Sufficient Notice And An Opportunity To Object (the "Motion").

2.     On June 3, 2008, three funds managed by Basso (Basso Credit Opportunities Holding Fund Ltd., Basso Fund Ltd., and Basso Multi-Strategy Holding Fund Ltd.) entered into three contracts with Lehman Commercial Paper Inc. ("LCPI" or "Debtor") to purchase distressed commercial debt relating to Greektown Holdings L.L.C. and Greektown Holdings II, Inc. (the "Trade Confirmations"). (Copies of the three Trade Confirmations are annexed hereto as Exhibit 1.) I was listed as the contact person on each of the Trade Confirmations. Each of those three Trade Confirmations remains open at this time.

3.     In or around October 2008, I learned that LCPI commenced a voluntary case under Chapter 11. I subsequently learned that, pursuant to a Court order, LCPI was required to notify Basso, on or before November 7, 2008, as to whether LCPI would assume or reject the

open Trade Confirmations.  I was also informed that based upon such notification, LCPI would then seek approval from the Court for the assumption or rejection of the Trade Confirmations by November 16, 2008.

4.  On November 7, 2008, I received an email notice from LCPI stating that it had rejected the Basso Trade Confirmations, subject to Court approval.  (A copy of the November 7, 2008 notice is annexed hereto as Exhibit 2.)

5.  Shortly thereafter, I was advised that on November 14, 2008, LCPI had filed a motion seeking approval of, among other things, the rejection of Basso's Trade Confirmation. [Dkt. No. 1541].

6.  I was not aware of any order, rule or document that permitted LCPI to change the election they made in the November 7 notice and November 14 motion.  Thus, relying on those two notifications, I understood the Trade Confirmations to be rejected.  To my knowledge, Basso management similarly considered the trades rejected and determined not to object to LCPI's motion.  As a result, Basso took no action to mitigate any loss potentially arising from potential future assumption of the trades.  I did not anticipate any further communications from LCPI regarding the Trade Confirmations except an ultimate order from the Court.

7.  After close of business on Friday, November 21, 2008, among several other Lehman-related emails, I received an email with the subject line: "Greektown Trade with Lehman."  In light of the prior notices and my understanding of the deadlines set by the Court, I did not expect the email to contain information substantially different from the November 7, 2008 notice.  Upon quick review, the email appeared to reiterate the prior notices I had already received regarding LCPI's intention to reject the Trade Confirmations.  (A copy of the

November 21, 2008 email is annexed hereto as Exhibit 3.)  I did not forward the email to anyone at Basso or outside Basso.

8. I received no other communications regarding the Trade Confirmations until December 14 and 15, 2008.  On December 14, 2008 I received seven emails from Epiq Systems, six of which each attached a portion of a document referred to as "Notice of Filing of Revised Exhibits and Revised Proposed Order Relating to the Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations."  (Copies of the emails received on December 14, 2008 are annexed hereto as Exhibit 4.)

9. The emails contained only the name of the document attached and the contact information of the sender.  They did not contain any reference to Basso's Trade Confirmations or to any deviation from the information provided in the November 7, 2008 notice.  I had no reason to believe these documents contained any unexpected changes to the status of Basso's Trade Confirmations; therefore, I did not extensively review the various and lengthy attachments to the December 14, 2008 emails sent by Epiq.  For that same reason, I did not forward the emails to anyone at Basso or outside Basso.

10. The following day I received another email from Epiq Systems attaching a document called "Reply to Objections to Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations." (A copy of the email received on December 15, 2008 is annexed hereto as Exhibit 5.)

11. I received no further communications regarding the Trade Confirmations for some four months, until mid-April 2009.  At that time, I learned for the first time from Frank Jaklitsch of Esbin & Alter, LLP, Basso's outside bank debt settlement counsel, who contacted me to

advise that he had just become aware himself through correspondence with Russell Chiappetta at Andrews Kurth LLP that LCPI had assumed the Trade Confirmations and was now seeking to close the transactions. Until April 2009, I did not know that LCPI had reversed its position from the November 7, 2008 notice that it intended to reject the Basso Trade Confirmations.

12.    In November 2008, when the original notice was received indicating the trades would be rejected, the asset that was to be purchased had a quoted price in the 55-60% range (mid-point of 57.5%). In April 2009, some five months later, the market had shifted substantially, with the asset then having a price range of 17.5-23.5% (mid-point of 20.5%). If Basso is forced to now consummate the trades referenced in the Trade Confirmations, the market shift would result in an approximate mark-to-market loss of $750,000 (not including other losses and costs attendant to this Debtor-created delay) to Basso for such period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of May, 2009

                                      /s/ Cristin Caufield
                                      Cristin Caufield