# EXHIBIT  5

[08-13555-mg Doc 3516-9 Filed 05/07/09 Entered 05/07/09 21:32:27 Exhibit A Page 5 of 2
[BUG1] Lehman Brothers Holding Inc. et al. (08-13555) - Docket #2208 - Debtors' Omnibus Page 5 of 2
Pg 2 of 27

| From: | Baer, Herb [HBaer@epiqsystems.com] |
|---|---|
| Sent: | Monday, December 15, 2008 4:09 AM |
| Subject: | [BULK] Lehman Brothers Holding Inc. et al. (08-13555) - Docket #2208 - Debtors' Omnibus Reply to Objections to Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations |
| Importance: | Low |
| Attachments: | Omnibus Reply to Objections to Open Trades Motion.pdf |

> Attached please find:
>
> DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR AN
> ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING
> THE ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS
>
>
> <<Omnibus Reply to Objections to Open Trades Motion.pdf>>
>
> HERB BAER
> Epiq Systems
> Bankruptcy Solutions
> 757 Third Avenue, 3rd Floor
> New York, NY 10017
> Phone: 646.282.2525
> Fax: 646.282.2501
> Email: hbaer@epiqsystems.com
>
> Innovative technology solutions for litigation, bankruptcy and
> financial transactions
> New York | DC | Kansas City | Chicago | London | Miami | Philadelphia
> | Los Angeles | Portland
>

This communication (including any attachment(s) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication to include any copy that may reside in your sent box. Thank you for your cooperation.

CONFIDENTIALITY AND SECURITY NOTICE: This e-mail, including any attachments, may contain confidential and proprietary information and may be legally privileged or otherwise protected by law. It may be read and used solely by the intended recipient(s), and any review, use or dissemination, distribution or copying by others is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system immediately without reading, copying or distributing them. Thank you. Basso Capital Management, L.P. and its affiliated entities retain all proprietary rights they may have in the information. Nothing in this notice shall be construed in any way to grant permission to transmit confidential information via this firm's e-mail system. We cannot give any assurances and make no representation or warranty that this e-mail or any attachments are free of viruses or other harmful code. We do not accept liability for errors or omissions in the contents of this message, or any attachments, that are the result of email transmission. We reserve the right to monitor, intercept and block all

communications involving our computer systems. This message, and any attachments, are neither an offer to sell nor a solicitation to invest; any such offer or solicitation shall be made solely by way of the confidential offering memorandum of the relevant fund or funds. Any views or opinions presented are solely those of the author and do not necessarily represent those of this firm.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
              Debtors.                  :    (Jointly Administered)
                                        :
                                        :
-----------------------------------------------------------x
```

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION FOR AN
ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING
THE ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), as and for their reply to the various objections and joinders to objections (collectively, the "Objections") interposed to the Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations [Docket No. 1541] (the "Motion") respectfully represent:

## Preliminary Statement

1.          On November 14, 2008, the Debtors filed the above-referenced Motion seeking approval of the assumption or rejection of over 800 Open Trade Confirmations.[1] The Open Trade Confirmations are executory contracts for either the purchase or sale of commercial loans, and the Counterparties thereto are participants in the secondary market for such debt, as are the Debtors.  As is often the case with the executory contracts of chapter 11 debtors, time and circumstance have rendered some of the Open Trade Confirmations more valuable to the Debtors than they were when executed, and some less so.  Thus, by invoking their power under section 365 of the Bankruptcy Code to assume certain executory contracts while rejecting others, as their business judgment directs, the Debtors seek to maximize the value of their estates for the benefit of all parties in interest.  The Debtors submit that authorization to assume or reject the Open Trade Confirmations as proposed in the Motion will add significant value to their estates.

2.          The hearing with respect to the Motion was originally scheduled for December 3, 2008 (the "Hearing").  As of December 2, 2008, three days after the objection deadline, 26 Objections had been filed.  Because several Objections were filed on behalf of multiple Counterparties, the total number of objecting parties was 35.  In light of the number of Objections, and the Debtors' belief that many of them could be resolved through negotiations, the Hearing was adjourned until December 16, 2008 (the "Adjourned Hearing Date").

3.          Since the adjournment of the Hearing, the Debtors and their professionals have been in touch with every party who filed a timely Objection (each, an

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion. Interested parties should refer to the Motion for background information regarding these chapter 11 cases and the Debtors' businesses, as well as additional information concerning the transactions at issue here.

"Objector" and, collectively, the "Objectors") in an effort to: (a) reconcile discrepancies and/or errors on the Exhibits A, B, and C to the Motion which set forth Assumed Trades, Rejected Trades, and Amended Trades, respectively; and (b) negotiate resolutions of the factual and legal issues raised in the Objections.

4.      On December 14, 2008, the Debtors filed the Notice of Filing of Revised Exhibits and Revised Proposed Order Relating to the Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations, which reflects the corrections and modifications to the exhibits, and provides a revised version of the proposed order.

5.      The Debtors had hoped to be able to report that they have resolved all of the Objections at this time. Unfortunately, that is not the case. The Debtors have made substantial progress in resolving the Objections and intend to utilize the remaining time before the Adjourned Hearing to continue to try to resolve the remaining disputes. In addition, the Debtors have decided to further adjourn the hearing date with respect to 15 of the Objections, as to which the Debtors believe settlement may still be possible. For the Court's benefit, the Debtors will provide a brief summary of the resolved Objections and then address the issues raised by the remaining Objectors.

## Resolved Objections

### A.    Barclays Bank PLC

6.      In the Motion, LCPI sought to assume 28 trades (the "Barclays Trades") with Barclays Bank PLC or its affiliates (collectively, "Barclays"). Even prior to filing its Objection, Barclays had contended that the Barclays Trades that LCPI sought to assume did

3

not exist. LCPI has conducted further diligence and determined that the Barclays Trades did not exist.[2]

7.        In light of their conclusions, the Debtors have removed the Barclays Trades from Exhibit A to the Motion. Barclays has agreed to withdraw its objection, with the understanding that Barclays is reserving all of its rights to argue all of the issues raised in the Motion, including without limitation, the setoff issue, at a later date in the event such issues become relevant to Barclays.

8.        The Debtors do not believe that the issues raised in Barclays' objection will ever become relevant, because they are unaware of any other Open Trade Confirmations with Barclays.

**B.        York Capital Management, L.P.**

9.        In the Motion, LCPI sought to assume 21 trades with York Capital Management, L.P. ("York Capital") and to reject 2 trades with York Capital (the "York Trades").

10.       Like Barclays, York Capital contacted the Debtors and asserted an objection to the relief sought even before filing its Objection. The gist of York Capital's Objection is that the parties had been negotiating a "portfolio transaction" with respect to numerous positions, each of which was dependent on the whole package. In addition, York Capital contended that the parties had not reached a meeting of the minds on the proposed York Trades.

---

[2] LCPI had a branch office in the United Kingdom, through which many of its trades were negotiated and documented. Accordingly, determining the full list of Open Trade Confirmations required extensive participation of LCPI's UK representatives, which required resolution of disputes with the administrators for Lehman Brothers International Europe over access to employees and data.

11.    As a result of York Capital's Objection, the Debtors conducted further diligence, including in the United Kingdom, and determined that York Capital's Objection was well-founded.

12.    The Debtors deleted the York Trades from Exhibits A and B to the Motion and have agreed to withdraw the Motion, with prejudice, insofar as it applies to the York Trades. The Debtors have also agreed to represent to the Court that there are no other Open Trades with York Capital.

13.    Based upon the foregoing, the Debtors have been advised that York Capital will withdraw its Objection to the Motion.

**C.    Pentwater Capital Management, LP**

14.    In the Motion, the Debtors sought to assume 2 sale trades (the "Pentwater Trades") with Pentwater Capital Management, LP ("Pentwater"). Pentwater filed an Objection on the basis that the Pentwater Trades did not exist.

15.    After further diligence, the Debtors have concluded that the Pentwater Trades did not exist. As a result, revised Exhibit A deletes the two Pentwater Trades from the list of Assumed Trades.

16.    We have been advised by counsel for Pentwater that it will withdraw Pentwater's Objection after the amended exhibits are filed.

**D.    CFIP Master Fund, Ltd./CHGO Funding Ltd.**

17.    In the Motion, the Debtors sought to assume one trade (the "CHGO Trade") with CFIP Master Fund, Ltd. ("CFIP"). CFIP responded that it is not the correct counterparty on the trade and, in any event, objected to the treatment of setoff claims.

18.        LCPI concurs that the correct counterparty on the CHGO Trade is CHGO Funding Ltd. ("CHGO"). LCPI and CHGO have agreed to a consensual resolution of the other issues raised by CHGO. The terms of such agreement are set forth in a side letter among CHGO, CFIP and LCPI.[3] The CHGO Trade, with the correct counterparty name, is now an Amended Trade that is set forth on Exhibit C.

**E.        THL Credit Partners, L.P./THL Nortek (Luxembourg) S.A.R.L.**

19.        In the Motion, the Debtors sought to assume one trade (the "THL Trade") with THL Credit Partners, L.P. ("THL Credit"). THL Credit responded that it is not the correct counterparty on the trade and, in any event, raised other objections to the assumption of the THL Trade.

20.        LCPI concurs that the correct counterparty on the THL Trade is THL Nortek (Luxembourg) S.A.R.L. ("THL Luxco"). LCPI and and THL Luxco have agreed to resolve the issues raised by THL Luxco by agreeing to a termination of the THL Trade. A stipulation providing for the termination of the THL Trade, and withdrawal of the THL Credit Objection, will be submitted to the Court at the Adjourned Hearing.

**F.        Goldentree, Blackrock, Bank of Nova Scotia, D.L. Babson**

21.        Each of the above-referenced parties filed Objections to the Motion.[4] The Debtors have reached agreements with each of the parties which, although not executed yet, will resolve their respective Objections.

---

[3] The terms of the settlement with CHGO and CFIP, like the terms of the settlements with other Objectors, are confidential; however, copies of the letter agreements have been provided to counsel to the Creditors' Committee and will be provided to the Court, upon request.

[4] Although D.L. Babson filed its Objection beyond the objection deadline, it had obtained an extension of its time to object from the Debtors.

G.    **H/2 Credit Partners Master Fund, Ltd.**

22.    The Debtors and H/2 Credit Partners Master Fund Ltd. ("H/2") have agreed to adjourn the hearing on the Debtors' Motion to the extent that it seeks to assume or reject trades to which H/2 is a Counterparty (the "H/2 Trades") until the January 14, 2009 hearing. Accordingly, the Debtors have removed all H/2 Trades from the exhibits.

### The Late Objections

23.    Despite the clear notice of the objection deadline set forth in the Motion, a number of parties (the "Late Objectors") have attempted to file late objections by simply filing late or by attempting to circumvent the deadline by filing joinders in the objections filed by other parties (collectively, the "Late Objections").

24.    The Late Objectors, and the dates that their respective Late Objections were filed, are set forth below:

| Objector | Date filed |
|---|---|
| Pyrrhuloxia, LP | December 10, 2008 |
| M&G Investment Management Limited | December 11, 2008 |
| Evergreen/Wachovia | December 11, 2008 |
| Halbis Distressed Opportunity Master Fund Limited | December 12, 2008 |

25.    The actions of Halbis Distressed Opportunity Master Fund Limited ("Halbis") are particularly egregious. Halbis contacted Debtors' counsel on Wednesday, December 3, 2008, requesting that the Debtors not seek to assume the trade that is the subject of Halbis's Objection. Halbis was advised to file a formal objection, but was told that the Debtors reserved their right to contend that the Objection was untimely. Despite that conversation, Halbis waited until December 12, 2008 to file its Objection.

26.    Each of the foregoing objections was filed well after the Objection Deadline set forth in the Motion and well after the date fixed for the Hearing. If the hearing had

7

proceeded on December 3, 2008, the Late Objectors would have missed the opportunity to object.

27.      The Debtors submit that the Court should not countenance the effort by the Late Objectors to jump on the bandwagon and extract value from the Debtors' estates at this late date and should overrule the Late Objections.

28.      In the event that the Court does not overrule the Late Objections, the Debtors reserve the right to respond to the Late Objections at the Adjourned Hearing or at a later date.

**Adjourned Objections**

29.      While the Debtors continue to attempt to resolve the pending Objections, the Debtors are uncertain whether they will be able to agree on and document additional settlements prior to the Adjourned Hearing.  Accordingly, on December 14, 2008, the Debtors advised the following entities that they will seek to adjourn the Motion as to such entities until the January 14, 2009 omnibus hearing date: USAA High-Yield Opportunities Fund ("USAA"), Aberdeen Asset Management ("Aberdeen"), Deutsche Bank AG ("DB"), Goldman Sachs Credit Partners L.P. and GS Eurpoean Performance Fund Limited (together, "Goldman"), KKR Debt Investors (2006) (Ireland) L.P. ("KKR"), AIB International Finance ("AIBIF"), having filed an Objection on behalf of its affiliate, Tara Hill, B.V. ("Tara Hill," and, together, "AIBIF/Tara Hill"), Putnam Investments Funds (collectively, "Putnam"), Lloyds TSB Bank plc ("Lloyds TSB"), Citigroup Inc. on behalf of itself and its affiliates (collectively, "Citibank"), Whippoorwill Associates, Inc. ("Whippoorwill"), JPMorgan Chase & Co. ("JPMorgan"), AXA Alternative Financing FCP, on behalf of its affiliates AXA Mezzanine II SA, SICAR, and MD Mezzanine SA, SICAR (collectively, the "AXA Entities"), Blue Mountain Alternatives Master

Fund L.P. ("Blue Mountain"), Fir Tree Capital Opportunity Master Fund, LP ("Fir Tree"), and

R3 Capital Management LLC ("R3 Capital").[5]

**Reply to Objections**

**A.    Preliminary Matters**

30.    Many of the Objectors sought clarification that the Debtors do not

intend to affect existing contractual rights of Counterparties to delayed settlement compensation

under the Open Trade Confirmations.  The Debtors have confirmed that settlement of all Open

Trade Confirmations will include all appropriate, usual and customary settlement adjustments

and have included such clarification in the revised proposed order filed on December 14, 2008

(the "Revised Proposed Order").

31.    In addition, several of the Objectors took issue with language in the

Debtors' original Proposed Order that would approve rejection of the Rejected Trades, effective

*nunc pro tunc* to the date of the Motion.  The Revised Proposed Order provides that rejections of

the Open Trade Confirmations shall be effective as of the date of entry of the Order.


**B.    Each Open Trade Confirmation is an Individual Contract That May
Be Assumed or Rejected In Accordance With the Debtors' Reasonable
Exercise of Business Judgment**

32.    Certain Objectors argued that the Open Trade Confirmations that

provide for "buy" trades by the Debtors are part of integrated transactions with the Open Trade

Confirmations that provide for "sell" trades by the Debtors, and, thus, the Debtors should not be

---

[5] The Debtors intend to proceed at the Adjourned Hearing with respect to the Objection to Debtors'
Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or
Rejection of Open Trade Confirmations, dated November 26, 2008, filed by Richards Kibbe & Orbe LLP
(the "RKO Objection") on behalf of various clients, and the Objection of Tennenbaum Capital
Partners ("Tennenbaum").

9

permitted to treat "buy" and "sell" contracts as isolated transactions for the purpose of assuming

or rejecting such contracts. *See* RKO Objection [Docket No. 1841], at ¶¶ 13–19.

33. The Debtors do not take issue with the principle that, under New York

law, "all writings which form part of a single transaction and are designed to effectuate the same

purpose [must] be read together," *This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1988).

The Open Trade Confirmations, however, each stand as independent contracts and were not tied

to one another. Moreover, the Open Trade Confirmations were always intended by all parties

involved to be independent and isolated transactions. Notably, none of the Objectors has

provided any credible evidence that the buy and sell transactions were linked in any way. Thus,

the Debtors may assume or reject the Open Trade Confirmations individually, as their business

judgment dictates.

34. Contrary to the assertions raised by certain Objectors, the Debtors are

not required to prove that the rejected contracts are burdensome to the estate. Rather, in

determining whether to approve the assumption or rejection of executory contracts and leases of

the debtor, courts apply the "business judgment" standard. *See Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *ReGen

Capital I, Inc. v. Halperin (In re U.S. Wireless Data)*, 2008 WL 4724366, at *2 (2d. Cir. Oct. 29,

2008). "In short, § 365 permits the . . . debtor-in-possession, subject to the approval of the

bankruptcy court, to go through the inventory of executory contracts . . . and decide which ones

it would be beneficial to adhere to and which ones it would be beneficial to reject." *Orion

Pictures Corp.*, 4 F.3d at 1098. The United States Court of Appeals for the Second Circuit has

stated that "a bankruptcy court reviewing a . . . debtor-in-possession's decision to assume or

reject an executory contract should examine a contract and the surrounding circumstances and

10

apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Id.* at 1099. To focus on the word "burdensome" while ignoring the court's instructions to examine surrounding circumstances relies on a sleight of hand and is an erroneous expression of the relevant standard. *See* RKO Objection, at ¶ 3. This Court is free to examine the facts in light of the surrounding circumstances and determine that the relief requested by the Debtors is likely to result in a net benefit to their estates.

35.    Many of the Rejected Trades are "buy" trades. Where the Debtors are able, due to the depressed market, to purchase the debt they intended to obtain pursuant to the Rejected Trades at a lower price, it would be beneficial to the Debtors' estates to reject the Rejected Trades. To the extent that Objectors assert this result is "unfair," *see* RKO Objection, at ¶ 19, they misconstrue the purpose of the Court's review of the Debtors' Motion. Although the Rejected Trades will likely give rise to rejection damage claims, the Debtors have determined, and are prepared to present supporting testimony, that the likely profit to be obtained on behalf of their estates by rejecting the Rejected Trades outweighs the cost of any potential rejection damage claims. Similarly, there is no question that it is in the Debtors' best interests to assume contracts to sell loans at prices that are higher than today's market prices. Thus, because the relief sought in the Motion will maximize the recovery to be realized on behalf of the Debtors' estates, it an appropriate and sound exercise of business judgment.

**C.    The Debtors Have Not Defaulted Under Any Assumed Trade, Nor Was Any Assumed Trade Terminated Prepetition**

36.    As has been described by several of the Objectors, the Open Trade Confirmations generally incorporate and are subject to standard terms and conditions published by one of two not-for-profit trade organizations, either the Loan Syndications and Trading Association, Inc. (the "LSTA"), which govern the Debtors' trades in the United States (the

11

"LSTA Trades"), or the Loan Market Association (the "LMA"), which publishes standard terms

and conditions that govern the Debtors' trades in the United Kingdom (the "LMA Trades"). The

LSTA and the LMA are generally recognized as the leading trade associations for the secondary

loan trading market.

37.    Certain Objectors contend that the Debtors are in breach with respect

to the Assumed Trades to which such Objectors are party. Thus, they assert, the Debtors must

cure such defaults prior to assumption, *see* Objection of Blue Mountain [Docket No. 1849], at ¶¶ 27–

28; Objection of USAA [Docket No. 1805], at ¶¶ 10–11, or must provide adequate assurance of

future performance thereunder.[6] For example, one Objector implies that the cure payments to

which it is entitled are equal to the difference between the market value of the relevant debt on

the date the trade was entered into (the "Trade Date") and the current market value of such debt.

*See* Objection of USAA, at ¶ 7. Objectors asserting these cure arguments have missed the point:

under the terms of the Trade Confirmations, and consistent with custom and usage in the

secondary loan trading industry, as described more fully below, there was no outside date by

which the parties were required to close the respective trades. Thus, by definition, there is no

default that is required to be cured in connection with assumption of the Assumed Trades, nor is

any adequate assurance of future performance owed. *See* 11 U.S.C. § 365(b)(1) (providing that

chapter 11 debtor's obligations upon assumption of an executory contract to cure or provide

adequate assurance are triggered only when there has been a default of that contract). Moreover,

the Debtors submit that the Court may approve assumption of the Assumed Trades even if it does

find a default because the Debtors are able to provide adequate assurance of future performance

---

[6] The Objectors who assert that they are entitled to adequate assurance of future performance prior to
assumption by the Debtors of the Assumed Trades are: Whippoorwill [Docket No. 1918], at Objection,
Part II; Citibank [Docket No. 1915], at Objection, Part III; Tennenbaum [Docket No. 1848], at ¶ 10; and
Aberdeen [Docket No. 1854], at ¶ 12.

of the Assumed Trades and are prepared to present supporting testimony should the Court deem it necessary and appropriate.

38.    In a similar vein, certain Objectors have contended that their Assumed Trades cannot be assumed because the relevant contracts were terminated prepetition.[7] Although there is a limited right under the LSTA Standard Terms (as defined below) and the LMA Standard Terms (as defined below) to unilaterally terminate a Trade Confirmation, such right is triggered only if one party has breached, as discussed further below. Because there was no default by the Debtors, however, these Objectors have failed to demonstrate that they validly terminated the Open Trade Confirmations under applicable law. As the Debtors have not breached any Assumed Trade, the Debtors submit that the Assumed Trades are valid, that no Assumed Trade was terminated prepetition,[8] and that the Court may approve their assumption by the Debtors.

---

[7] The Objectors who have asserted that the Assumed Trades were terminated prepetition and thus cannot be assumed by the Debtors are: Field Point IV S.à.r.l. ("Field Point"), BDF Limited, Banc of America Securities Limited ("BancAmerica"), and Bank of America, N.A. ("BofA"), all of whose objections are set forth in the RKO Objection [Docket No. 1841], at ¶¶ 36–52; Blue Mountain, at ¶ 8–26; KKR [Docket No. 1903], at ¶¶ 4–7; AIBIF/Tara Hill [Docket No. 1905], at ¶¶ 5–15; the AXA Entities [Docket No. 2081], at ¶¶ 4–14. Certain of the Assumed Trades subject to such Objections are LSTA Trades, while others are LMA Trades.

[8] Moreover, the Debtors submit that a prolonged investigation into the factual merits of the validity of an executory contract is not the proper focus of the "summary proceeding," in which the Court's role is to apply its business judgment to determine whether the proposed assumption will benefit, rather than harm, the estate. *See Orion Pictures Corp. v. Showtime Networks, Inc.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("In reviewing a . . . debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate.") (citations omitted). Although Counterparties are free to initiate adversary proceedings regarding the validity of the Open Trade Confirmations, and although the Court may assess the likelihood of such claims in its attempt to assess the reasonableness of the Debtors' decision to assume any Assumed Trade, the *Orion* decision stands for the proposition that any finding by the Court on whether the Assumed Trades were terminated prepetition is inappropriate at this time.

   i.   *The Debtors Are Not in Default Under the assumed LSTA Trades or the assumed*
        *LMA Trades*

39.    Secondary loan trades do not settle in the same fashion as trades in

stocks or bonds, which typically settle electronically within three days of Trade Date, or "T + 3."

Rather, the trades on the secondary loan trading market must settle manually via paper

documentation.  Over the last few years, great strides have been made by the LSTA to improve

the timing of settlement for secondary loan markets.  However, due to the unprecedented growth

in the volume of trading, loan trades on the secondary market still do not settle within the

LSTA's suggested time frames.

40.    The secondary loan trading market, self-regulated by the LSTA and

the LMA, uses two types of documentation for trading.  Generally, secondary trades settle on par

documentation when the borrower has a high likelihood of performing its obligations to timely

repay principal and interest (the "Par Trades"), whereas trades settle by more extensive

distressed documentation when there is a likelihood that the borrower will not be able to satisfy

and perform its obligations owed on the underlying loan documents (the "Distressed Trades").

41.    LSTA Trades that are Par Trades generally incorporate and are

governed by the LSTA's Standard Terms and Conditions for Par Confirmations as in effect on

the applicable Trade Date (the "LSTA Par Terms").  LSTA Trades that are Distressed Trades

generally incorporate and are governed by the LSTA's Standard Terms and Conditions for

Distressed Confirmations as in effect on the applicable Trade Date (the "LSTA Distressed

Terms," and, together with the LSTA Par Terms, the "LSTA Standard Terms").  Trades subject

to the LSTA Standard Terms are subject to New York law.

42.    LMA Trades that are Par Trades generally incorporate and are

governed by the LMA's Standard Terms and Conditions for Par Trade Transactions as in effect

14

on the applicable Trade Date (the "LMA Par Terms"), while LMA Trades that are Distressed

Trades generally incorporate and are governed by the LMA's Standard Terms and Conditions for

Distressed Trade Transactions as in effect on the applicable Trade Date (the "LMA Distressed

Terms," and, together with the LMA Par Terms, the "LMA Standard Terms"). Trades subject to

the LMA Standard Terms are subject to the law of the United Kingdom.

43.    Both the LSTA Standard Terms and the LMA Standard Terms contain

provisions relating to the settlement of trades. For example, the LSTA Par Terms require the

seller to use "reasonable efforts" to furnish drafts of the applicable transfer documentation within

six business days of the Trade Date.[9] The LMA Par Terms require the party responsible for

preparing the transfer documentation to "endeavor" to deliver it to the other party within three

business days of the Trade Date, and for that party to "endeavor" to sign and return such

documentation within five business days.[10] For Distressed Trades, both the LMA Standard

Terms and the LSTA Standard Terms provide for extended time frames within which settlement

is targeted to occur. In addition, the LSTA Par Terms provide as a "target" that settlement "shall

be effected as soon as possible after the Trade Date,"[11] while the LMA Par Terms provide that

the settlement date "shall be the date falling ten Business Days after the Trade Date."[12]

44.    What Objectors have neglected to explain to the Court, however, is

that both the LMA Standard Terms and the LSTA Standard Terms, by their terms, anticipate that

settlement may occur after the target settlement dates and provide a structure for compensating

---

[9] *See* LSTA Par Terms, at ¶ 10.

[10] *See* LMA Par Terms, at ¶ 6.

[11] *See* LSTA Par Terms, at ¶ 1.

[12] *See* LMA Par Terms, at ¶ 7.1.

the party injured by the delay. For example, each of the standard forms provides for "delayed compensation."[13] In addition, the LSTA Par Terms explicitly state that "[i]f Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller."[14] Under the terms of the Open Trade Confirmations themselves, therefore, the Debtors did not breach the trades due to tardy settlement alone.

45.     Indeed, although the targeted settlement date for LSTA Par Trades is T+7, and T+20 for LSTA Distressed Trades,[15] the market reality is that these timetables are very infrequently met. The LSTA reported that for the second quarter of 2008, the mean settlement time for par trades was T+19.[16] Tellingly, the percentage of Par Trades that settled within the LSTA aspirational goal of T+7 was only 31% of par trades.[17] The percentage of Par Trades that settled after Trade Date plus 21 business days was reported at 27% of Par Trades.[18] The percentage of Par Trades that settled after Trade Date plus 30 business days was 15%.[19] In a similar vein, the LSTA reports that over 35% of Distressed Trades settled after T+40 business

---

[13] *See* LSTA Par Terms, at ¶ 6; LMA Par Terms, at ¶ 7.2; LSTA Distressed Terms, at ¶ 6; LMA Distressed Terms, at ¶ 9.1.

[14] LSTA Par Terms, at ¶ 1; LSTA Distressed Terms, at ¶ 1.

[15] Theodore Basta & Joe Peng, THE LSTA SETTLEMENT STUDY: 2Q 2008, at 4–7 (2008) available at www.lsta.org.

[16] *Id.* This data was provided to the LSTA by 19 institutions who purportedly transact with the "overwhelming majority of US loan investors." *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

days.[20]  Clearly, the LSTA's aspirational settlement periods of T+7 for Par Trades and T+20 for

Distressed Trades are not met in market practice and settlement of many trades is often delayed

for a substantial period of time.

46.      This market reality is also reflected in a review of the Debtors' Open

Trade Confirmations.  A review of the Assumed Trades and Rejected Trades reflects that there

are many, many trades that have a Trade Date dating back to April, May, June, or July 2008.  It

is clear, therefore, that Counterparties, including many of the Objectors, were not relying on the

Trade Dates set forth in the Open Trade Confirmations.  Rather, after the commencement of

LBHI's chapter 11 case, and the ensuing market dislocations that occurred, such parties sought

unfairly to take advantage of market changes, by reviewing their Open Trade Confirmations and

making disingenuous arguments that the date for closing such trades had passed.

47.      Because settling trades over a period of weeks and months is a

frequent and common occurrence in the secondary loan market, it cannot plausibly be argued

that "timely settlement" was a material term of any Open Trade Confirmation such that the

Debtors could be found to be in default.  The Open Trade Confirmations are not subject to a

"drop-dead" date.  In addition, to the extent that Counterparties argue that the Debtors breached

the Open Trade Confirmations by failing to exert reasonable efforts to settle any trade, the

Debtors are prepared to present testimony as to the reasonableness of their efforts to settle the

Open Trade Confirmations up to and until the time that LCPI filed its chapter 11 case, as well as

to the fact that a temporary pause by the Debtors in continuing to settle Open Trade

Confirmations after that date was reasonable under the circumstances.  Finally, the Debtors

submit that they did not, with regard to any Assumed Trade, evince by words or conduct that

---

[20] *Id.*

they did not intend to perform under any Assumed Trade. The Debtors are similarly prepared to present testimony on this point.

      ii.   *The Alleged Prepetition Terminations Are Invalid*

      48.      One of the most fundamental concepts within the secondary loan markets is that a "trade is a trade." There is no power of any party to a Trade Confirmation using the LSTA Standard Terms to unilaterally terminate the transaction,[21] and there are strong policy considerations for the absence of such a right. The effect on the market would be devastating. Buyers could allege that the trade had been terminated any time a purchased loan dropped significantly in price, with deleterious effects on the $600 billion market. A right to terminate a trade simply because it has been open for too long would have extraordinary repercussions throughout the market and could create major systemic problems.

      49.      Termination rights under the LMA Standard Terms are similarly limited. Pursuant to the LMA Standard Terms, a party to a Trade Confirmation may terminate such contract only upon a default by the other party. Clause 19.1 of the LMA Terms provides the mechanism by which a non-defaulting party may terminate the transaction:

      Clause 19.1(a)(i): if either party defaults in the performance of its obligations to the other under any Transaction Document … the non-defaulting party shall be

---

[21] There is a very limited exception to this rule with regard to LSTA Par Trades. Section 16 of the Par Standard Terms provides the following termination mechanism:

      If Buyer and Seller are unable to effect settlement on or prior to the date that is seven (7) Business Days after the Trade Date because of the failure of either Buyer or Seller to perform its obligations (for any reason whatsoever other than failure to obtain necessary consents), then the nondefaulting party may send to the defaulting party within five (5) Business Days thereafter a written notice advising of the nondefaulting party's intent to terminate its obligations under the Confirmation and to effect a cover transaction for the specified Debt.

Thus, a party to a trade using the LSTA Par Terms is empowered to terminate the trade only within the first 12 days of the Trade Date, and only under certain circumstances. None of the Objectors that have alleged prepetition termination of LSTA Assumed Trades have invoked section 16. The Distressed Standard Terms have no comparable provision to section 16 of the Par Standard Terms.

entitled to give notice to the defaulting party for such period as the non-defaulting party may specify.

Clause 19.1(b): if the default is not remedied within the period specified in the notice referred to in paragraph (a) above, the non-defaulting party may, by written notice to the defaulting party, terminate the transaction immediately.

50.        On September 30, 2008, nearly two months after the Trade Dates for their trades, Field Point and BDF purportedly terminated their Open Trade Confirmations. However, contrary to the requirements of UK law, neither Field Point nor BDF have submitted evidence of any repudiation by LCPI. Rather, in their letters to LCPI dated September 30, 2008, copies of which are attached as Exhibit E to the RKO Objection, Field Point and BDF allege "we have received information concerning Lehman's unwillingness and/or inability to settle the Transaction . . ."

51.        Nor have either Field Point or BDF demonstrated that they provided LCPI with a reasonable opportunity to cure the alleged default. Instead, each of these Objectors "considers Lehman to be in breach of the contract . . . and to have evinced an intention no longer to be bound by the contract. [Field Point or BDF] accepts Lehman's repudiation and, as of 30 September 2008, the Transaction is hereby terminated, cancelled and of no further force or effect." The same weak allegations of repudiation were alleged by BancAmerica, *see* Exhibit F to the RKO Objection, in letters pursuant to which it demanded same day assurances from LCPI's UK branch that Lehman would be able to comply with its obligations under the relevant Trade Confirmations.[22]

---

[22] The Debtors will address the alleged termination arguments made by the parties whose Objections will be adjourned at such time, if any, as such Objections are heard.

19

**D.**   **Setoff by Counterparties of Prepetition Claims Against Their Obligations Under Assumed Trades is Impermissible**

52.      Certain Objectors argued that this Court may not rule that Counterparties may not set off obligations to the Debtors under Assumed Trades or Amended Trades against their prepetition claims against the Debtors, such as any claims for damages based on the Debtors' rejection of the Rejected Trades.[23]   Certain of those counterparties additionally argued that the issue of the existence of setoff rights is not ripe for adjudication.  *See* RKO Objection (¶¶ 21–23).

53.      The Court cannot grant the relief requested without finding that the Debtors have reasonably exercised their business judgment to conclude that their proposed treatment of the Open Trade Confirmations, namely assumption of the Assumed Trades and the Amended Trades, and rejection of the Rejected Trades, will benefit the estate.  The Debtors, in determining which trades to assume and which to reject, must take all of the facts and circumstances into account, including the fact that, in many instances, the Debtors entered into multiple trades with the same Counterparty.  The Debtors are not able to weigh the economic consequences to the estate of assuming or rejecting such contracts without being assured at the outset that they will be able to collect the full purchase price for each assumed "sell" trade.  Thus, contrary to the assertions of the Objectors, the setoff issue is pivotal to a determination of whether to approve the relief requested in the Motion, because the Court cannot make a reasonable determination on assumption of the Assumed Trades without knowing first whether

---

[23] The Objectors who seek to preserve a right to setoff obligations under Assumed Trades against prepetition claims against the Debtors are: Whippoorwill (Objection, Part I); Citibank, at Objection, Part II; the RKO Objectors, at ¶ 24–34; Lloyds TSB [Docket No. 1913], at ¶¶ 6–9; R3 Capital, ¶¶ 9–19; AIBIF/Tara Hill, at ¶¶ 6–18; Goldman [Docket No. 1869], at ¶¶ 2–6; Fir Tree [Docket No. 1876], at ¶ 10; Aberdeen, at ¶ 3–11; DB [Docket No. 1858], at ¶¶ 1–24; and Putnam [Docket No. 1901], at ¶¶ 1–18.

any value gained by the Debtors will be immediately consumed by attempts by Counterparties to
setoff rejection claims and other prepetition claims.

54.    Despite the many pages spent attempting to convince the Court of the
fallacy of the Debtors' assertion that Counterparties may not setoff their obligations to the
Debtors under Assumed Trades against prepetition claims, including any claims they may have
against the Debtors arising from the rejection of the Rejected Trades, not one Objector was able
to produce a single authority that controls the issue in this jurisdiction. Thus, as the Debtors
have noted, "this appears to be a case of first impression in this Court."

55.    Although the Debtors recognize the split in authority with regard to the
question of whether obligations under assumed contracts are prepetition or postpetition
obligations for setoff purposes, the Debtors, for the reasons proposed in the Motion, believe that
the decisions finding such obligations to be postpetition obligations state the better view. *See,
e.g., In re Evatt*, 112 B.R. 405, 415 (Bankr. W.D. Okl. 1989); *In re Walat Farms Inc.*, 69 B.R.
529, 534 (Bankr. E.D. Mich. 1987). *See also* 4 NORTON BANKR. L. & PRAC. 3d § 73:4 (2008).

56.    In addition, to the extent that the Objectors rely on this Court's
decision in *In re Bousa*, 2006 WL 2864964 at *5 (Bankr. S.D.N.Y. 2006), which held that the
contingent nature of a prepetition obligation does not render it ineligible for setoff against a
prepetition claim, even when such liability became fixed only in the postpetition period, they fail
to acknowledge the unique consequences of contract assumption. Assumption of contract by a
debtor in possession changes the nature of a party's obligations under a contract. Moreover, the
rule advocated by the Objectors would have the anomalous result, that the existence of setoff
rights might be affected by a debtor's timing of its decisions to assume or reject. For example, if
such obligations contain the requisite mutuality, a debtor might seek to assume all the contracts

21

that require counterparties to make payments, and to defer decisions to reject executory contracts that generate rejection claims. Through careful timing, a debtor could manipulate the availability of setoff rights. Surely, such a result defies reason.

**E.     The Trade Confirmations Are Executory Contracts**

57.     One Counterparty, Tennenbaum, has taken the position that its Open Trade Confirmations are not executory contracts, because its contracts allegedly had been substantially performed prior to the commencement of LCPI's chapter 11 case. *See* Tennenbaum Objection [Docket No. 1848], at ¶ 8. Ironically, prior to the Commencement Date, LCPI had asserted that it had done all that it was required to do to settle under the relevant trade confirmations. Tennenbaum, on the other hand, refused to close because it was demanding that LCPI obtain additional signatures as a condition of closing.

58.     Now that the Debtors' circumstances are different, Tennenbaum contends that its trade confirmations are not executory contracts because the Debtors' only remaining obligations were ministerial acts. The upshot of Tennenbaum's position, if it is sustained, is that Tennenbaum owes the Debtors cash in the amount of approximately $6 million.

59.     Since the Debtors propose to assume the Tennenbaum Trade Confirmations, whether or not they are executory contracts is only relevant if Tennenbaum has a valid right of setoff. If it has a valid prepetition claims against LCPI, then Tennenbaum would likely argue that its claims have the requisite mutuality, because there would be no issue regarding assumption of their contracts. Thus, they would argue, the purchase price payable under the Tennenbaum Trade Confirmations is a prepetition obligation, against which Tennenbaum may set off any other prepetition claims against the Debtors.

22

60.        Assuming, without conceding, that Tennenbaum's Open Trade
Confirmations are not executory contracts, the fatal flaw in Tennenbaum's argument is that it
*does not* have any claims against LCPI against which it may set off the amount it owes to LCPI
under Tennenbaum's Open Trade Confirmations.  When asked to provide evidence of prepetition
claims, Tennenbaum has made vague allusions to derivatives contracts with affiliates of LCPI, as
to which the requisite mutuality clearly is lacking, as well as allegations that substantive
consolidation of the estates may be relevant some day in the future.  These vague allegations are
not nearly enough to substantiate an alleged right of setoff and, therefore, whether or not
Tennenbaum's Open Trade Confirmations are executory contracts, Tennenbaum should be
required to pay the full price owed thereunder.  Upon payment of such amount, LCPI will deliver
to Tennenbaum the bargained-for consideration.

61.        Finally, Tennenbaum argues that the Debtors are required to provide
adequate assurance of future performance and cannot do so.  *See* Tennenbaum Objection, at ¶ 10.
First, Tennenbaum ignores the fact that adequate assurance is only required if there has been a
default in an executory contract sought to be assumed.  *See* 11 U.S.C. § 365(b)(1).  Second,
Tennenbaum has failed to take into account that LCPI's substantial unencumbered cash on hand
will be more than enough to provide adequate assurance of the Debtors' indemnity obligations
under Assumed Trades.

23

**F.**    **The Objectors' Remaining Arguments are Without Merit**

62.    Certain Objectors contend that facts unique to their particular circumstances rendered impermissible the Debtors' proposed assumption or rejection of the Open Trade Confirmations to which such Objectors are party.  The Debtors reserve the right to supplement this Reply in the event that they are unable to resolve the Objections of the remaining Counterparties.

WHEREFORE the Debtors respectfully request that the Court enter an Order approving the Motion in its entirety.

Dated: December 15, 2008
       New York, New York

   /s/ Jacqueline Marcus
Harvey R. Miller
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession