Hearing Date and Time:  June 3, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  May 28, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|  | : |  |
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |
-----------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY CODE AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO ENTER INTO MORTGAGE LOAN PURCHASE AGREEMENT

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases (together, the "Debtors") for authorization, pursuant to sections 105(a) and

363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") to enter into a Mortgage

Loan Purchase Agreement with Americor Mortgage, Inc. ("Americor") will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **June 3, 2009 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Shai Waisman, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v) Carmel & Carmel PC, 5301 Washington Avenue NW, Suite 570, Washington DC 20015, Attn: Frank J. Carmel, attorneys for Americor, so as to be so filed and received by no later than **May 28, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: May 14, 2009
     New York, New York

          /s/ Shai Y. Waisman
          Shai Y. Waisman

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone: (212) 310-8000
          Facsimile: (212) 310-8007

          Attorneys for Debtors
          and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                      Debtors.            :    (Jointly Administered)
                                          :
                                          :
----------------------------------------------------------------x
```

### DEBTORS' MOTION PURSUANT TO
### SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY
### CODE AUTHORIZING LEHMAN BROTHERS HOLDINGS INC.
### TO ENTER INTO MORTGAGE LOAN PURCHASE AGREEMENT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion

and respectfully represent:

### Background

1.       Commencing on September 15, 2008 and periodically thereafter

(as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries

commenced with this Court voluntary cases under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Debtors are authorized to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

      2.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of

unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

      3.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

      4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas

as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order,

dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's

appointment of the Examiner.

### Jurisdiction

      5.      This Court has subject matter jurisdiction to consider and

determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).

### Lehman's Business

      6.      Prior to the events leading up to these chapter 11 cases, Lehman

was the fourth largest investment bank in the United States.  For more than 150 years,

Lehman had been a leader in the global financial markets by serving the financial needs

of corporations, governmental units, institutional clients and individuals worldwide.

7.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases

is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions

and Applications, filed on September 15, 2008 [Docket No. 2].

**Preliminary Statement**

8.      Beginning in 2006, LBHI and its indirect non-debtor subsidiary,

LB Carillon Construction LLC ("LB Carillon") loaned in excess of $522 million to

certain borrowers to finance the construction of a residential condominium project

commonly known as Canyon Ranch Living Miami Beach Condominiums, located in

Miami Beach, Florida ("Canyon Ranch Miami").  These loans consist of (i) two

Construction Loans (as defined below) made by LB Carillon, which are secured by,

among other things, first lien mortgages on the southern and northern parcels of Canyon

Ranch Miami and (ii) a Mezzanine Loan (as defined below) made by LBHI, which is

secured by, among other things, interests in the entities that own Canyon Ranch Miami.

In connection with the Construction Loans, LB Carillon borrowed $238,850,000 from

Fortress Credit Corp. ("Fortress").

9.      Since construction was completed in 2008, only 209 out of the 580

condominium units located at Canyon Ranch Miami (the "Condominium Units") have

been sold, far fewer sales than needed to generate sufficient proceeds for the borrowers

under the Construction Loans and the Mezzanine Loans to repay their indebtedness to LB

Carillon and LBHI.  Potential purchasers have entered into purchase contracts ("Existing

Contracts") for an additional 193 Condominium Units but have been unable to close such

Existing Contracts as a result of, among other things, the difficulty and expense

associated with securing mortgages for residential condominiums in south Florida in the

current environment.  Specifically, the ability of potential purchasers of real estate to

obtain mortgage loans that cannot be resold to Fannie Mae or to Freddie Mac due to the

failure of such loans to comport with such agencies' guidelines (so called "non-

conforming" loans) is currently severely limited.  Mortgage loans for Condominium

Units at the Canyon Ranch Miami would in all circumstances be non-conforming because

they likely exceed the maximum dollar threshold for conforming loans, and mortgage

loans for units within a condominium and hotel project fail to conform with Fannie Mae

and Freddie Mac's guidelines.  This difficult financing environment likely has precluded

other potential purchasers from proceeding to execute purchase contracts for the other

unsold Condominium Units.

    10. If potential purchasers, including those who have entered into

Existing Contracts, are not able to secure acceptable financing, it is very likely that most,

if not all, of such purchasers will default on their purchase commitments.  As a result of

such defaults, the borrowers under the Construction Loans will be unable to repay such

loans and may ultimately default on their commitments to LB Carillon.  At that point, the

Debtors' only prospect for recovery on their investment would be for LB Carillon to

foreclose, take ownership of Canyon Ranch Miami and attempt to sell the Condominium

Units itself.  Nonetheless, LB Carillon likely would face the very same issues as the

borrowers under the Construction Loans regarding the inability to close Existing

Contracts and sell remaining Condominium Units.

11.     Furthermore, the failure of the borrowers to repay their

indebtedness under the Construction Loans will also impede LB Carillon's ability to

repay the loan from Fortress.

12.     Instead, to facilitate the closing of the Existing Contracts and sale

of the remaining 178 available Condominium Units, and thereby assist the borrowers

under the Construction Loans and Mezzanine Loan in achieving sufficient cash flow to

service their indebtedness to LBHI and LB Carillon, the Debtors have developed a

mortgage financing program (the "Mortgage Program") pursuant to a Mortgage Loan

Purchase Agreement with Americor Mortgage Inc. ("Americor"), which is annexed

hereto as Exhibit A (the "Purchase Agreement").  Under the terms of the Purchase

Agreement, Americor will provide residential condominium mortgage loans

("Residential Loans") to all individuals desiring to purchase the Condominium Units, and

LBHI agrees to purchase such Residential Loans from Americor.  The Debtors estimate

that for the life of the Mortgage Program, they may purchase approximately $100 million

to $200 million worth of Residential Loans pursuant to the Purchase Agreement.[1]  The

increased availability of financing to potential purchasers increases the likelihood that

sale proceeds of the Condominium Units will be available for the repayment of LB

Carillon's senior secured Construction Loans, which will in turn increase the likelihood

---

[1] In the event the face amount of Residential Loans purchased by LBHI under the
Purchase Agreement exceeds $200 million, the Debtors shall seek additional authority to
purchase additional Residential Loans.

that sale proceeds will be available for the repayment of LBHI's subordinated Mezzanine Loan.

## Relief Requested

13.     The Debtors believe that entry into an agreement substantially similar to the Purchase Agreement involves the use of property of the estate in the ordinary course of business and, thus, does not require approval of the Court pursuant to section 363(b)(1) of the Bankruptcy Code.  In order to avoid losing any potential purchasers who are party to Existing Contracts at the Canyon Ranch Miami and in order to maximize value for the Debtors' estates, Americor has begun to accept loan applications and process such applications during the pendency of this Motion.  The Debtors will reimburse Americor for any of its expenses incurred on account thereof.  Out of an abundance of caution, the Debtors are seeking approval of the Court under section 363(b)(1) of the Bankruptcy Code to use property of LBHI's estate in connection with the Purchase Agreement, to the extent such use is other than in the ordinary course of business.

## The Canyon Ranch Miami Loans

14.     On September 8, 2006, LB Carillon, as successor-in-interest of LBHI, and Carillon South Joint Venture L.L.C. (the "South Borrower") entered into that certain Restructured Construction Loan Agreement (as amended, modified and supplemented, the "South Loan Agreement") relating to a loan by LBHI to the South Borrower in the maximum principal amount of $219,186,000 (the "South Loan") to finance the construction of the southern parcel of Canyon Ranch Miami.  The South Loan is secured by, among other things, a first lien mortgage on the southern parcel of Canyon

Ranch Miami pursuant to that certain Notice of Future Advance and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of September 7, 2006 and executed by the South Borrower (the "South Mortgage").

15.     On September 8, 2006, LB Carillon, as successor-in-interest of LBHI, and North Carillon L.L.C. (the "North Borrower") entered into that certain Restructured Construction Loan Agreement (as amended, modified and supplemented, the "North Loan Agreement") relating to a loan by LBHI to the North Borrower in the maximum principal amount of $199,505,000 (the "North Loan" and together with the South Loan, the "Construction Loans") to finance the construction of the northern parcel of Canyon Ranch Miami.  The North Loan is secured in part by a first lien mortgage on the northern parcel of Canyon Ranch Miami pursuant to that certain Notice of Future Advance and Restated Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing, dated as of September 7, 2006 and executed by the North Borrower (the "North Mortgage" and together with the South Mortgage the "Mortgages" ).

16.     In connection with the Construction Loans, Fortress made a loan to LB Carillon in the amount of $238,850,000 (the "Fortress Loan").  LB Carillon intends to use the payment proceeds from the Construction Loans to pay off a portion of the Fortress Loan.  If the North Borrower and the South Borrower fail to repay the Construction Loans, LB Carillon will face great difficulty in repaying the Fortress Loan.

17.     On October 5, 2007, LBHI, Carillon South Mezz LLC, ("CSM"), Carillon North Mezz LLC ("CNM") and Carillon Miami Beach Holding LLC ("Carillon Holding" and, together with CSM and CNM, the "Mezzanine Borrower" and, collectively with the South Borrower and the North Borrower, the "Borrowers") entered into that

certain Amended and Restated Loan Agreement (as amended, modified, and

supplemented, the "Mezzanine Loan Agreement") relating to a mezzanine loan by LBHI

to Mezzanine Borrower in the amount of $103,746,224 (the "Mezzanine Loan" and,

together with the Construction Loans, the "Loans").  The Mezzanine Loan is secured by,

among other things, a security interest in all membership interests in the Borrowers and

certain affiliates of the Mezzanine Borrower.  On July 14, 2007, LBHI made a protective

advance to the Mezzanine Borrower in the amount of $3,000,000.

### The Purchase Agreement

18.     Since construction of Canyon Ranch Miami was completed in

2008, only 209 out of the 580 condominium units located at Canyon Ranch Miami (the

"Condominium Units") have been sold; far fewer sales than needed to generate sufficient

proceeds for the borrowers under the Construction Loans and the Mezzanine Loans to

repay their indebtedness to LB Carillon and LBHI.  While potential purchasers have

entered into 193 Existing Contracts for Condominium Units, the Debtors believe such

potential purchasers have been unable to close on their contracts as a result of, among

other things, the difficulty and expense associated with securing mortgages for residential

condominiums in south Florida in the current environment.  Specifically, the ability of

potential purchasers of residential real estate to obtain mortgage loans that cannot be

resold to Fannie Mae or to Freddie Mac due to the failure of such loans to comport with

such agencies' guidelines (so called "non-conforming" loans) is currently severely

limited.  Mortgage loans for Condominium Units at the Canyon Ranch Miami would in

all circumstances be non-conforming because they likely exceed the maximum dollar

threshold for conforming loans, and mortgage loans for units within a condominium and

hotel project fail to conform with Fannie Mae and Freddie Mac's guidelines. This difficult financing environment likely has precluded other potential purchasers from proceeding to execute purchase contracts for the other unsold Condominium Units.

19.    If potential purchasers, including those who have entered into Existing Contracts, are not able to secure acceptable financing, it is very likely that most, if not all, of such purchasers will default on their purchase commitments under such contracts. As a result of such defaults, the borrowers under the Construction Loans will be unable to repay such loans and may ultimately default on their commitments to LB Carillon. At that point, the Debtors' only hope of recovering their investment would be foreclosure of the Canyon Ranch Miami, upon which the Debtors' could attempt to sell the Condominium Units themselves. Nonetheless, LB Carillon likely would face the very same issues as the Borrowers: difficulty closing Existing Contracts and selling remaining Condominium Units.

20.    Moreover, the failure of the North Borrower and South Borrower to repay their indebtedness under the Construction Loans will also impede LB Carillon's ability to repay the Fortress Loan.

21.    Instead, to facilitate the closing of the Existing Contracts and sale of the remaining 178 available Condominium Units and thereby assist the borrowers under the Construction Loans in achieving sufficient cash flow to service their indebtedness to LB Carillon and LBHI, the Debtors have developed a mortgage financing program pursuant to the Purchase Agreement with Americor. Under the terms of the Purchase Agreement, Americor will provide Residential Loans to all individuals desiring to purchase the Condominium Units, and LBHI agrees to purchase such Residential

Loans from Americor.  The Debtors estimate that for the life of the Mortgage Program,

they may purchase approximately $100 million to $200 million worth of Residential

Loans pursuant to the  Purchase Agreement.

22.    The increased availability of financing to potential purchasers

increases the likelihood that sale proceeds of the Condominium Units will be available

for the repayment of LB Carillon's Construction Loans, which will proportionately

increase the likelihood that sale proceeds will be available for the repayment of LBHI's

subordinated Mezzanine Loan.

23.    The Debtors seek authorization from the Court to enter into a final

agreement substantially similar to the Purchase Agreement.  The salient terms of the

Purchase Agreement are as follows:[2]

| | |
|---|---|
| ***Purchase and Sale of Residential Loans*** | LBHI shall purchase from Americor all Residential Loans that: |
| | (i) have been originated by Americor; |
| | (ii) meet the requirements  of the Purchase Agreement and the underwriting criteria agreed to by LBHI and Americor from time to time; |
| | (iii) have been approved for purchase by LBHI in accordance with the Purchase Agreement; and |
| | (iv) are closed within 30 days after the date LBHI provides written notice to Americor that LBHI has approved such Residential loan for purchase. |
| | LBHI retains the right to originate or purchase mortgage loans secured by Condominium Units from any of LBHI's affiliates or any third party other than Americor ("Third Party Loans"), provided that in the event Americor submits to LBHI loan applications, credit information and other data ("Loan |

---

[2] This summary of the Purchase Agreement (the "Summary") is qualified in its entirety by the provisions of the Purchase Agreement.  The Summary is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Purchase Agreement.

Packages") with respect to Residential Loans substantially similar to Third Party Loans, LBHI must review such Loan Packages for approval in the order that they are received by LBHI.

|  |  |
|---|---|
| ***Origination of Residential Loans*** | Americor shall use commercially reasonable efforts to originate Residential Loans in accordance with the terms of the Purchase Agreement for so long as LBHI has not provided Americor 30 days prior notice that it no longer intends to purchase such Residential Loans. |
| ***Purchase Price of Residential Loans*** | On the date Americor closes each Residential Loan that has been approved by LBHI for purchase, LBHI shall purchase such Residential Loan at a purchase price equal to the sum of:<br><br>(i) the outstanding principal balance of such Residential Loan;<br>(ii) the accrued and unpaid interest on such Residential Loan; and<br>(iii) a premium (the "Premium") equal to the amount remaining, if any, after deducting (A) an origination fee paid by the individual obligor who desires to purchase a Condominium Unit with respect to such Residential Loan equal to 1% of the principal amount of the Residential Loan from (B) an amount equal to 1% of the outstanding principal amount of the Loan.<br><br>LBHI agrees to advance the purchase price for Residential Loans to Americor on the date of the closing of such Loans. |
| ***Indemnification by LBHI*** | In the event that (i) Americor proposes to sell to LBHI Residential Loan(s) that meet LBHI's underwriting requirements and conform to the terms of the Purchase Agreement, (ii) such Residential Loan(s) have been approved for purchase by LBHI in writing, (iii) Americor has complied with each of the terms, covenants and conditions of the Purchase Agreement for the sale of such Residential Loan(s), and (iv) Americor has tendered such Residential Loan(s) for purchase by LBHI, but LBHI fails to purchase such Residential Loan(s), LBHI shall indemnify and hold Americor harmless from and against any claims, damages, losses or reasonable costs and expenses arising out of LBHI's failure to purchase such Residential Loan(s). |
| ***Indemnification by Americor*** | Americor will indemnify and hold LBHI and each of LBHI's direct and indirect subsidiaries and affiliates harmless from and |

against any and all claims, losses, liabilities, obligations, etc. arising out of, under, in connection with, or related in any manner to: (i) any act or omission of Americor or any employee or agent of Americor, (ii) Americor's failure to perform any of its obligations hereunder, or (iii) the falsity, incorrectness or incompleteness of any representation or warranty made by Americor in the Purchase Agreement.

**Release of Servicing**    Each Residential Loan shall be sold to LBHI on a "servicing released" basis, meaning that Americor shall release, transfer and assign to LBHI all right, title and interest in and to the Residential Loan, including, without limitation, any right to provide mortgage servicing in connection therewith.

**Repurchase of Residential Loans**    Americor shall, within 10 business days, unless otherwise mutually agreed upon by LBHI and Americor but not to exceed an additional 20 days, of LBHI's written request, repurchase from LBHI any Residential Loan sold to LBHI if any warranty or representation made by Americor about the Residential Loan is untrue and such impairs the value of the Residential Loan, or if Americor has otherwise breached the Purchase Agreement in whole or in part with regard to any Residential Loan that impair the value of such Residential Loan, or if Americor has failed to deliver any Residential Loan document requested by LBHI or required by the Purchase Agreement that impairs the value of such Residential Loan. Americor shall pay to LBHI in immediately available funds an amount equal to such Residential Loan's then unpaid principal balance, plus accrued interest.

**Termination**    The Purchase Agreement may be terminated without cause at any time by either party after 60 days' prior written notice to the other party.

## Entry into the Purchase Agreement is An
## Appropriate Exercise of LBHI's Business Judgment

24.    Ample authority exists for approval of the Purchase Agreement.

Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1).

25.     As discussed above, entry into the Purchase Agreement involves the use of property of the estate in the ordinary course of business.  Specifically, prior to the Commencement Date, LBHI regularly purchased residential mortgages from third parties.  Nevertheless, out of an abundance of caution, the Debtors are seeking approval of the Court under section 363(b)(1) of the Bankruptcy Code to the extent LBHI's use of the property of its estate in connection with the Purchase Agreement is other than in the ordinary course of business.

26.     While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

27.     The Debtors have determined, in the sound exercise of their business judgment, that entry into the Purchase Agreement and the purchase of the Residential Loans is in the best interests of their estates and creditors.  The Purchase Agreement allows LBHI to make available financing for potential purchasers of the Condominium Units.  This increased availability of financing increases the likelihood that the Condominium Units will be sold and that proceeds of sales will be available for the repayment of the Construction Loans made by LB Carillon, a subsidiary of LBHI and asset of LBHI's estate.  The repayment of the Construction Loans will in turn allow the

Mezzanine Borrower to use further proceeds of sale made available by the Residential

Loans to repay LBHI's subordinated Mezzanine Loan and thereby enhance the value of

LBHI's estate.

28.      The Debtors believe that the terms set forth in the Purchase

Agreement are fair and reasonable under the circumstances.  The Purchase Agreement is

the product of protracted, arms' length negotiations between LBHI and Americor.  Under

the Purchase Agreement, LBHI may still purchase Residential Loans from third party

originators.  In return for purchasing the Residential Loans from Americor for a price

equal to their outstanding purchase price and unpaid accrued interest, plus the Premium

of up to 1% of the outstanding principal amount, Americor will facilitate the availability

of financing to potential purchasers of the Condominium Units, which will ultimately

increase the likelihood that the sale proceeds from such sales will be used to pay down

the Loans.

29.      On the other hand, absent LBHI's entry into the Purchase

Agreement, it will be more difficult for purchasers to close sales of the Condominium

Units, and by extension, for LB Carillon or LBHI to realize any return, let alone prevent

losses, on the Loans.  If potential purchasers of the Condominium Units, including those

who have entered into Existing Contracts are unable to secure acceptable financing, it is

very likely that most, if not all of them will default on their Existing Contracts, and as a

result of such default, cause the Borrowers to default under the Loans.  As discussed

above, in the event the Borrowers default under the Loans, it will be difficult for LBHI

and LB Carillon to foreclose on the collateral securing such loans and, given the current

state of the south Florida residential real estate market, it is unlikely that the full net

proceeds of a foreclosure would be sufficient to recoup the principal, interest and other
expenses payable under the Loans.  Instead, the Debtors would likely encounter the very
same problems facing the Borrowers, including the difficulty of selling Condominium
Units and of potential buyers under Existing Contracts to secure residential mortgage
loans.  As a result, unless LBHI modifies the Loan Documents, it will be difficult for
LBHI to receive repayment for the outstanding principal amount and unpaid, accrued
interest under the Loan.

       30.     Moreover, the failure of the South Borrower and the North
Borrower to repay their indebtedness under the Construction Loans will also impede LB
Carillon's ability to repay the Fortress Loan, which could have the ultimate effect of
causing Fortress to foreclose on the valuable collateral securing the Fortress Loan.  Thus,
the benefit yielded by the Purchase Agreement to the Debtors' estates and creditors far
outweighs any burden to the Debtors' estates arising from LBHI's obligation to purchase
the Residential Loans.  The Debtors have thoroughly discussed and vetted the Purchase
Agreement with the Creditors' Committee and its advisors.  The Debtors have been
advised that the Creditors' Committee fully supports the Purchase Agreement and the
transactions described herein.

       31.     The Purchase Agreement will increase the likelihood that the
Debtors and their estates realize full repayment of the Loans that LBHI and its subsidiary,
LB Carillon, have made to the Borrowers.  Accordingly, in light of the undeniable
benefits of the relief requested herein to the Debtors and their reorganization, the Debtors
clearly have exercised sound business judgment, and approval of the Purchase Agreement
is in the best interests of the Debtors' estates and their creditors.

**Notice**

32.    No trustee has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Motion in accordance with the procedures set forth in

the amended order entered on February 13, 2009 governing case management and

administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii)

the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; (vi) the attorneys for Americor; and (vii) all parties who

have requested notice in these chapter 11 cases.  The Debtors submit that no other or

further notice need be provided.

33.    No previous request for the relief sought herein has been made by

the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: May 14, 2009
       New York, New York


                                          /s/ Shai Y. Waisman
                                          Shai Y. Waisman

                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          Attorneys for Debtors
                                          and Debtors in Possession

**<u>Exhibit A</u>**

Purchase Agreement

## MORTGAGE LOAN PURCHASE AGREEMENT

**THIS MORTGAGE LOAN PURCHASE AGREEMENT** (this "Agreement") is made this 30th day of April 2009 by and between Lehman Brothers Holdings Inc., a Delaware corporation, on behalf of itself and its applicable affiliates (collectively, "Buyer"), and Americor Mortgage, Inc. (d/b/a Vacation Finance and d/b/a Americor Financial Services), a Michigan corporation ("Seller").

### RECITALS:

A.     This Agreement is intended to set forth the entire understanding between the parties whereby Buyer wishes to have the ability to make available residential condominium mortgage loans for condominium properties, in which Buyer has an interest as a lender, to individual obligors who desire to purchase a condominium unit (each an "Obligor" and, collectively, the "Obligors") (which loans, together with all documents evidencing, securing or in any way related to the origination and closing of such loans, are hereinafter referred to as the "Loans");

B.     Buyer wishes to facilitate the availability of such Loans to such Obligors because of the lack of availability of traditional financing sources for such Obligors and Seller has experience in the making and originating of such Loans to condominium unit purchasers and is willing to originate such Loans in accordance with the terms and conditions contained herein based upon Buyer's obligation to purchase all such Loans originated by Seller subject to the terms and conditions contained herein below;

C.     Each of the Loans shall be evidenced by promissory notes (each a "Note" and, collectively, the "Notes") and secured by mortgages or other security instruments (each a "Mortgage" and, collectively, the "Mortgages") covering individual residential condominium units located within the condominium project commonly known as "Canyon Ranch Living Miami Beach Condominiums" located in Miami Beach, Florida (the "Mortgaged Property").

D.     Seller agrees  to originate certain Loans for Buyer to purchase in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter provided, Seller and Buyer agree as follows:

**SECTION 1.    LOAN SUBMISSION.** Seller shall submit to Buyer loan applications, credit information and other data ("Loan Packages") for Loans that Seller has determined, and represents to Buyer, satisfy: (i) the terms of this Agreement, and (ii) the sales criteria agreed to by the Buyer and Seller from time to time, including, without limitation, the Underwriting Score Card and the Product Matrix which are both a part of the Sales Criteria agreed to by the Buyer and the Seller from time to time (the Underwriting Score Card, the Product Matrix and the other underwriting criteria agreed to by Buyer and Seller from time to time are hereinafter sometimes  referred to collectively as the "Sales Criteria").  The initial Sales Criteria agreed to by Seller and Buyer are attached to this

Agreement as <u>Exhibit C</u> and constitute the currently approved standards for underwriting potential borrowers and the types of loans that may be offered to such borrowers based upon the various factors set forth in such Sales Criteria. In the event of a discrepancy between the provisions of this Agreement and the Sales Criteria, the provisions of this Agreement shall control. Seller shall furnish to Buyer at Seller's sole expense such credit, financial, and other information concerning potential borrower that Buyer may require in determining for its own account whether or not such Obligor and the Loan Package to be offered is acceptable to Buyer in its sole and absolute discretion. Notwithstanding the foregoing, it is the intention of Seller that Loans will be made available to Obligors pursuant to this Agreement and that such Loans that meet the requirements set forth in this Agreement and the Sales Criteria will be made available to Buyer for purchase pursuant to the terms of this Agreement until such time as Buyer shall provide Seller thirty (30) days prior notice that Buyer will thereafter discontinue purchasing Loans from Seller pursuant to the terms of this Agreement.

      **SECTION 2.    PURCHASE AND SALE OF LOANS.** Seller shall sell to Buyer, and Buyer shall purchase from Seller, all Loans which (i) have been originated by Seller, (ii) meet the requirements of this Agreement and the Sales Criteria, (iii) have been approved for purchase by Buyer in accordance with the terms of this Agreement, prior to the date sixty (60) days after the date that Buyer delivers notice to Seller that Buyer will discontinue purchasing Loans from Seller pursuant to the terms of this Agreement, and (iv) are closed, in accordance with the terms of this Agreement within thirty (30) days after the date the Buyer provides written notice to Seller that Buyer has so approved such Loan for purchase. Seller may offer to sell a Loan, or Loans, to Buyer from time to time by submitting to Buyer a loan list or spreadsheet of potential Loans in a format acceptable to Buyer that sets forth such Loan or Loans and their criteria as applied to the Sales Criteria. As agreed to herein, Buyer's approval of a Loan for purchase shall mean Buyer's approval of a Loan Package relating to a proposed Loan to be made by Seller to the corresponding Obligor, which approval means Buyer is, subject to the terms of this Agreement, obligated for a period of thirty (30) days after the date Buyer delivers written notice to Seller of such approval, to purchase the Loan made pursuant thereto at closing of the Loan transaction unless Buyer subsequently reasonably determines that such Loan does not satisfy the requirements set forth in this Agreement, the standards set forth in the Underwriting Score Card and/or does not otherwise conform to the Sales Criteria. Neither party shall be obligated to sell or purchase (as the case may be) any Loan, unless and until both Buyer and Seller have approved the sale of such Loan in accordance with the terms of this Agreement. The rights granted to Seller under this Agreement shall be non-exclusive. Buyer shall have the right, from time to time, in its sole and absolute discretion, to originate, or to purchase mortgage from any Buyer affiliate or any third party, loans secured by residential condominium units located within the condominium project commonly known as Canyon Ranch Living Miami Beach Condominiums; provided, however, that in the event that Loan Packages with respect to substantially similar proposed Loans are submitted to Buyer both from Seller and from such Buyer affiliate or third party originator, such Loan Packages shall be reviewed by Buyer for approval in the order that such complete Loan Packages are received by the Buyer.

2

**SECTION 3.    ORIGINATION OF LOANS.**  Seller shall use commercially reasonable efforts to originate Loans in accordance with the terms of this Agreement and the Sales Criteria from any potential Obligor who would be a purchaser of a condominium unit in the Mortgaged Property for so long as Buyer has not provided Seller thirty (30) days prior notice that it no longer intends to purchase such Loans.   All material documents executed and/or delivered in connection with the offering or solicitation of potential Loans or otherwise evidencing, governing, securing or otherwise executed and/or delivered in connection with any such Loans shall be in accordance with the Sales Criteria and shall be subject to the prior written approval of the Buyer except those documents prepared in accordance with FNMA or FHMLC Guidelines which are to be approved by Buyer in advance.  Seller shall deliver all such documentation to Buyer at least fifteen (15) days prior to its intended use of such documents, and unless Buyer shall otherwise object, the documents shall be deemed approved by Buyer after such fifteen day period so long as they meet the terms of this Agreement and the Sales Criteria and comply with applicable state and federal laws and regulations.

**SECTION 4.    THE SALES CRITERIA.**  Buyer and Seller agree to comply with all terms, procedures and provisions of the Sales Criteria.  The Sales Criteria, which consist of Underwriting Score Card, Product Matrix and the other underwriting criteria as determined by Buyer from time to time, set forth the criteria upon which Seller will offer Loans to potential Obligors and the primary criteria for loans that meet Buyer's requirements with respect to the purchase of each Loan by Buyer.

**SECTION 5.    CHANGES TO THE SALES CRITERIA.**  The Sales Criteria are subject to change from time to time as determined by Buyer; provided however, that until Seller shall have received written notice from Buyer of any such change to the Sales Criteria, the previous Sales Criteria shall remain operative and in full force and effect.

**SECTION 6.    PROCEDURAL MATTERS.**  Seller shall process and close each Loan in its own name.  Notwithstanding anything to the contrary contained herein, prior to the sale of each Loan, such Loan must be pre-qualified and approved for purchase by Buyer in writing, and closed and delivered in accordance with the terms hereof and the Sales Criteria. On the date Seller closes each Loan that has been approved by Buyer for purchase, Buyer shall purchase such Loan in accordance with the terms hereof at a purchase price equal to the sum of (i) the outstanding principal balance of such Loan, (ii) the accrued and unpaid interest on such Loan, and (iii) a premium (the "Premium") equal to the amount remaining, if any, after deducting (A) the Origination Fee (as hereinafter defined) paid with respect to such Loan, from (B) an amount equal to one percent (1%) of the outstanding principal amount of the Loan.  Seller agrees that it shall use all reasonable efforts to close each Loan that has been pre-qualified and approved by Buyer.  To the extent Buyer has agreed to purchase, and Seller has agreed to sell, any Loan in accordance with the terms hereof and the Sales Criteria, Buyer shall advance the purchase price for such Loan to Seller on the date of the closing of such Loan between Seller and the Obligor.  Upon the closing of a Loan, Seller shall immediately transfer such Loan to Buyer in accordance with the terms and conditions set forth herein.  The transfer of funds described in this Section shall be subject to the terms of a master escrow agreement to be entered into by and among Buyer, Seller and a third party title company in form and substance acceptable to each of the

3

foregoing parties in each of such party's sole and absolute discretion. The third party title company shall be selected by the mutual agreement of Buyer and Seller in each party's sole and absolute discretion.

**SECTION 7.    UNDERWRITING OF LOANS.**    Seller and Buyer agree that Seller shall offer loans to potential Obligors only in accordance with the terms and conditions of this Agreement and the Sales Criteria and that potential Obligors shall be underwritten by Seller to ensure that they meet the requirements of this Agreement and the Sales Criteria, including, without limitation, the Underwriting Score Card that is a part of the Sales Criteria prior to submission of a proposed Loan to Buyer. So long as Buyer has not notified Seller that it no longer intends to purchase Loans from Seller as provided for herein above, Buyer or its agent shall have an obligation to review, underwrite and approve or disapprove those Loans that Seller presents to Buyer and that Seller proposes to sell to Buyer pursuant to this Agreement to the extent that such Loans meet the Sales Criteria. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, Buyer shall have no obligation to purchase any proposed Loan which, in its sole discretion, does not meet Buyer's requirements set forth in this Agreement, the standards set forth in the Underwriting Score Card and/or does not otherwise conform to the Sales Criteria. In making its determination, Buyer expressly disclaims any conclusions Seller may draw as to the general quality or acceptability of any Loan. Buyer shall notify Seller of Buyer's decision as to whether to purchase any Loan as presented to Buyer by Seller in accordance with the practices and procedures established by Seller and Buyer and/or as set forth in the Sales Criteria within ten (10) days of delivery of a complete Loan Package for such Loan from Seller to Buyer for approval. Buyer retains sole and absolute discretion to refuse to purchase any Loan that does not comply with the terms and conditions of this Agreement, the Sales Criteria, Buyer's underwriting requirements or for any reason whatsoever (except any reason prohibited by law); provided however, that in the event that (i) the Seller proposes to sell to Buyer Loan(s) that meet the Buyer's underwriting requirements and conform to the terms of this Agreement and the Sales Criteria, (ii) such Loan(s) have been approved for purchase by Buyer in writing as provided in this Section 7, (iii) Seller has complied with each of the terms, covenants and conditions of this Agreement for the sale of such Loan(s), and (iv) Seller has tendered such Loan(s) for purchase by Buyer in strict accordance with the terms of this Agreement, but the Buyer fails to purchase such Loan(s) in accordance with the terms of this Agreement, Buyer shall indemnify and hold the Seller harmless from and against any claims, damages, losses (excluding lost profits, but providing for any lost Origination Fee) or reasonable costs and expenses arising out of the Buyer's failure to purchase such Loan(s) to the extent provided in this Agreement. Without limiting the provisions of the preceding sentence, in the event that an action or proceeding is instituted by a third party with respect to any claim covered by the preceding sentence (a "Covered Claim"), Seller shall be entitled to employ attorneys selected by Seller with the approval of the Buyer, which approval shall not be unreasonably withheld or delayed, to appear and defend the action or proceeding at Buyer's sole expense, and to compromise or settle any such action or proceeding on such terms as Seller may reasonably deem appropriate; provided, however, that any such compromise or settlement shall not include any admission of liability or wrongdoing by Buyer without Buyer's prior written consent.

In the event the Seller does not wish to defend such Covered Claim pursuant to the preceding paragraph, the Seller shall promptly notify Buyer of such Covered Claim and Buyer must assume the defense of such Covered Claim with attorneys reasonably acceptable to Seller.  Buyer shall not be responsible for Seller's attorney fees incurred after the Buyer assumes the defense of such Covered Claim unless the Seller and Buyer have claims adverse to each other, in which case the prevailing party's legal fees will be paid by the losing party.  The failure of the Seller to notify the Buyer of such Covered Claim shall not relieve the Buyer of any liability that the Buyer may have with respect to such Covered Claim except to the extent the Buyer demonstrates that the defense of such Covered Claim is materially prejudiced by such failure.  The Seller shall have the right to reject any settlement proposed by the Buyer in connection with Buyer's defense of such Covered Claim; provided, however, that if such settlement is (i) within the financial means of the Buyer, (ii) without cost or liability to the Seller, (iii) includes a full general release of the Seller from any liability in form and content reasonably satisfactory to Seller, and (iv) does not otherwise materially and adversely affect the Seller, the Seller waives its right to reject such settlement offer.  In the event that the Buyer refuses or fails to undertake the defense of any such Covered Claim within ten (10) days after notice of such Covered Claim has been given to the Buyer by the Seller, or at any time the Buyer shall otherwise fail to diligently defend or purse settlement of such Covered Claim or if such Covered Claim could result in damages in excess of the amount that the Seller could reasonably expect to be recoverable from the Buyer, then the Seller shall have the right, but not the obligation, to undertake the defense, compromise or settlement of such Covered Claim with counsel of its own choosing at the sole cost and expense of the Buyer.

Upon determination of the amount of a Covered Claim, whether by agreement between the Buyer and the Seller, by an arbitration award, any other final adjudication or otherwise, the Buyer shall pay to the Seller the amount of such Covered Claim within thirty (30) days of the date such amount is determined.  Thereafter, the amount of such Covered Claim shall bear interest at a rate equal to ten percent (10%) per annum.

**SECTION 8.    RELEASE OF SERVICING.**  Each Loan shall be sold to Buyer on a "servicing released" basis, meaning that Seller shall release, transfer and assign to Buyer all right, title and interest in and to the Loan, including, without limitation, any right to provide mortgage servicing in connection therewith.

**SECTION 9.    REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller hereby makes the following representations and warranties to Buyer.  Such representations and warranties are deemed to be made both as of the date hereof, and as of each and every date Seller sells a Loan to Buyer (each such date, a "<u>Settlement Date</u>"), and Buyer shall be deemed to have relied on the following representations and warranties.

9.01    <u>Seller Representations and Warranties</u>.    Seller makes the following representations and warranties:

(1)    <u>Organization</u>.    Seller is duly organized, validly existing and in good standing under laws of its state of organization and the State of Florida, and has the power to own its assets and to transact the business in which it is presently

5

engaged. Seller is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, including, without limitation, its state of organization and the State of Florida, and where the failure to be so qualified would have a material adverse affect on the business and assets of Seller, taken as a whole. Seller has and shall continue to maintain in full force and effect all licenses, registrations and certifications in all appropriate jurisdictions to conduct all activities performed with respect to the making and selling of Loans.

(2)    Authority. Seller has the power, authority and legal right to make, deliver and perform this Agreement and all of the transactions contemplated hereunder, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement. No consent of any other party and no consent, license, approval or authorization of, or registration with, any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement or the sale of the Loans or if required same has been obtained and remains in effect.

(3)    No Violation. The execution, delivery and performance of this Agreement will not violate any provision of any existing laws or regulation, or any order or decree of any court, or Seller's organizational documents or of any mortgage, indenture, contract or other agreement to which Seller is a party or by which Seller and any of its property or assets may be bound.

(4)    Litigation. No litigation or administrative proceedings of or before any court, tribunal or governmental body is presently pending, or, to the knowledge of Seller, threatened against Seller or any of its properties, which, if adversely determined, would have a material adverse effect on the business, assets, financial condition of Seller or Seller's ability to perform its obligations under this Agreement.

(5)    True and Correct. Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

(6)    Validity. This Agreement has been duly authorized and executed by Seller and is, or upon delivery will be, a legal, valid and binding obligation of Seller enforceable in accordance with its terms, subject only to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting creditor rights generally.

(7)    Commissions to Third Parties. Seller has not dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with the sale of Loans by Seller to Buyer other than the Buyer.

(8)      <u>No Common Ownership</u>.  Seller, any title company, any closing agent and any appraiser shall each be independent parties and shall have no common ownership, employees, management, directors or any other relationship or affiliation unless previously disclosed to and approved by Buyer in writing.  The Obligor(s) shall also be independent of Seller, any title company, any closing agent and any appraiser and shall not be affiliated with Seller, any title company, any closing agent or any appraiser in any way.

(9)      <u>Solvency</u>.  Seller is solvent, has not committed any act of bankruptcy and the execution and consummation of this Agreement will not render Seller insolvent.  Upon payment by Buyer of the purchase price of the Loan, no creditor or stockholder of Seller or any other person will have any claim against Buyer on the Loan.  The consideration received by Seller upon the sale of the Loans will constitute fair consideration and reasonably equivalent value for the Loans.  The sale of the Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.

9.02    <u>Seller Loan Representations, Warranties and Covenants</u>.  Seller makes the following representations, warranties and covenants with respect to each Loan which shall be deemed reaffirmed at the closing of each Loan and simultaneous sale to the Buyer:

(1)      <u>Loan Meets Requirements</u>.  The Loan shall conform in all respects to all the applicable requirements contained in the Sales Criteria and this Agreement.  Upon purchase of a Loan by Buyer, which purchase shall take place at the settlement table of the Loan, such Loan will be fully funded and shall be fully amortizing with no negative amortization.

(2)      <u>Seller Has Full Right to Sell and Assign</u>.  Seller is the sole owner of record and holder of the Loan and has full right and authority to sell and assign it to Buyer.  In addition, Seller's right to sell or assign is not subject to any other party's interest or to an agreement with any other party.

(3)      <u>Seller's Lien on Property</u>.  Upon funding of the Loan by Buyer at the settlement table, the Mortgage securing the Loan is a valid, subsisting and enforceable first priority lien on the Mortgaged Property, free and clear of all encumbrances and liens having priority over it, except for liens for real estate taxes and liens for special assessments that are not yet due and payable and has been properly filed, recorded or otherwise perfected in accordance with applicable law.  No instruments other than those delivered therewith are required under applicable law to evidence the indebtedness represented by the Loan or to perfect a security interest in the collateral for the Loan.  None of the Mortgage Property or any other collateral securing the Loan have been seized by a governmental agency.  The existence of a valid and enforceable title insurance policy insuring such position shall suffice for purposes of meeting the requirements of this subsection.

7

(4)    <u>Documents are Valid and Enforceable</u>.  The Note, Mortgage and any security agreements, chattel mortgages or equivalent documents relating to it have been properly signed, are valid and their terms may be enforced by Buyer, its successors and assigns, subject only to bankruptcy laws, Servicemembers' Civil Relief Act, laws relating to administering descendants' estates, and general principles of equity.  The Note and the Mortgage and every other agreement, if any, executed by the Obligor(s) in connection with the Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms.  All parties to the Note, the Mortgage and each other such related agreement have legal capacity to enter into the Loan and to execute and deliver the Note, the Mortgage and each other related agreement, and the Note, the Mortgage and each other such related agreement have been duly and properly executed by the respective Obligor(s).  Seller had reviewed all of the documents constituting the Loan file and has made such inquires as it deems necessary to make and confirm the accuracy of the representations set forth therein.  All recording or other fees required to be paid in connection with the filing or recording of any document entered into in connection with the Loan have been paid in full by the Seller and/or the Obligor in accordance with the terms of the Loan.  Notwithstanding the foregoing, it is agreed that the use of FNMA and/or FHLMC approved form of loan documents shall be deemed to meet the requirements of this subsection so long as they meet the other requirements of this Agreement.

(5)    <u>Mortgage Property Not Subject to Liens</u>.  The Mortgaged Property is free and clear of all mechanics' liens, materialmen's liens or similar types of liens.  There are no rights outstanding that could result in any of such liens being imposed on the Mortgaged Property.

(6)    <u>Title Insurance</u>.    There is a mortgage title insurance policy on the Mortgaged Property.  The title insurance policy is on a current ALTA form (or other generally acceptable form) issued by an insurance company which, along with the policy itself, meets the requirements set forth in the Sales Criteria.  The title insurance insures Seller and its successors and assigns as holding a first priority lien on the Mortgaged Property.

(7)    <u>No Modification or Subordination of Mortgage</u>.  Seller has not done any of the following: (a) materially modified the Note or Mortgage; (b) satisfied or cancelled the Note or Mortgage in whole or in part; (c) subordinated the Mortgage in whole or in part; (d) released the Mortgaged Property in whole or in part from the Mortgage lien; or (e) signed any release, cancellation, modification or satisfaction of the Note or Mortgage.

(8)    <u>Mortgage in Good Standing</u>.  To the best of Seller's knowledge after due inquiry, there is no default, breach, violation, or event of default or acceleration existing under the Note or Mortgage, nor has there occurred any event that, with the passage of time or the giving of notice or both, could give rise to such default, breach, violation or event of default and/or acceleration.  Seller has not waived

8

any default, breach, violation or event of default or acceleration under the Note or Mortgage and all of the following that have become due and payable have been paid or an escrow of funds sufficient to pay them has been established: (a) taxes; (b) government assessments; (c) insurance premiums; (d) water, sewer and municipal charges; (e) leasehold payments; and (f) ground rents.  No collateral purporting to secure the Loan has been repossessed or disposed of or foreclosed against by Seller or any other person from the Obligor(s).

(9)    <u>Advances</u>.  Seller has not made, or knowingly received from others, any direct or indirect advance of funds in connection with the Loan on behalf of the Obligor, except as provided in the Sales Criteria.  This warranty does not cover payment of interest from the earlier of: (a) the date of the Note; or (b) the date on which the Mortgage proceeds were disbursed; or (c) the date one month before the first installment of principal and interest on the Note is due.

(10)    <u>Property Intact</u>.  To the best of Seller's knowledge after due inquiry, the Mortgaged Property is not damaged by waste, fire, earthquake or earth movement, wind, flood, tornado or other cause of loss.  There are no proceedings pending for the partial or total condemnation of the Mortgaged Property.

(11)    <u>Improvements</u>.  The  underlying property secured by the mortgage constitutes an individual, residential condominium unit and all appurtenant rights as permitted in the Sales Criteria and as reflected in the credit files and other materials submitted to Buyer.  The Seller will perform due diligence in accordance with FNMA/FHLMC Guidelines to confirm the underlying condominium unit is subject to a certificate of occupancy or similar use and occupancy certificate allowing the borrower to use and/or occupy the property.  To the best of Seller's knowledge after due inquiry, (i)  the Mortgaged Property is free of damage and waste including but not limited to hazardous materials and there is no proceeding pending for the total or partial condemnation thereof, (ii) any improvements that are included in the appraised value of the Mortgaged Property are totally within the property's boundaries and building restriction lines, (iii) no improvements on any adjoining property nor any other condominium unit encroaches on the Mortgaged Property, and (iv) any and all home improvement goods and services to be provided or performed under a Loan have been provided in workmanlike manner, and in accordance with applicable regulatory codes, and to the Obligor(s) satisfaction.

(12)    <u>Note Not Usurious</u>.  The Note is not usurious and either meets or is exempt from any usury laws or regulations.

(13)    <u>Compliance with Consumer Protection Laws</u>.  Seller, and any originator if not the Seller, has complied with all applicable federal and state laws, regulations and other requirements including, but not limited to, the Real Estate Settlement Procedures Act and Regulation X; the Federal Fair Housing Act; the National Flood Insurance Act; the Equal Credit Opportunity Act and Regulation B; the Truth in Lending Act and Regulation Z; the Fair Credit Reporting Act; the Fair

9

Debt Collection Practices Act; the Home Mortgage Disclosure Act and Regulation C; the Gramm-Leach-Bliley Act and Regulation P; and all Florida laws relating to mortgage brokerage and mortgage lending activities (including, without limitation, Fla. Stat. 494.001 et seq.). Seller further warrants compliance with the terms of Buyer's "Fair Lending Policy Statement," attached as <u>Exhibit B</u> of this Agreement..

(14)   <u>Property is Insured</u>.   A casualty insurance replacement policy on the Mortgaged Property is in effect and meets the requirements set forth in the Sales Criteria.   The policy is written by an insurance company which meets the requirements set forth in the Sales Criteria and provides fire and extended coverages for an amount at least equal to the amount required by the Sales Criteria.

(15)   <u>Loan Marketability</u>.   Seller knows of nothing involving the Loan, the Mortgaged Property, the Obligor or the Obligor's credit standing that can reasonably be expected to: (a) cause the Loan to be come delinquent; or (b) adversely affect the Loan's value.

(16)   <u>Default</u>.   To the best of Seller's knowledge after due inquiry, no default exists under the Loan.   The Loan is not in the possession of any attorney or collection agency for collection nor is it the subject of any actual or threatened bankruptcy proceeding or other litigation.

(17)   <u>Counterclaim</u>.   To the best of Seller's knowledge after due inquiry, the Obligor has not asserted any defense, set-off, right of rescission or counterclaim, either at law or in equity, in connection with the Loan.

(18)   <u>Genuineness of Signatures</u>.   All Loan documents are genuine and contain genuine signatures.   All Loan documents that Buyer requires to be original documents are original documents.   All certified copies of original documents are true copies and meet the applicable requirements and specifications of this Agreement, the Sales Criteria and any other requirements that Buyer has reasonably made of Seller.

(19)   <u>Full Disbursement of Proceeds</u>.   The Loan has been closed and, subject to table funding by the Buyer at the settlement table, the proceeds of the Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site improvement and as to any escrow funds therefore have been complied with other than any reserves set aside for punch list items.   All costs, fees and expenses incurred in making or closing the Loan and the recording of the Mortgage were paid, and the Obligor is not entitled to any refund of any amounts paid or due under the Note or Mortgage.

(20)   <u>Loan Fees</u>.   All costs, fees, expenses and charges payable directly or indirectly to Seller or any affiliate thereof in connection with the origination, making or closing of the Loan (collectively, the "<u>Loan Closing Fees</u>") have

10

complied with the Sales Criteria and have been paid in full. In any event, without the prior written consent of the Buyer in each instance, the Loan Closing Fees with respect to any Loan do not exceed the sum of (i) an origination fee (the "Origination Fee") equal to one percent (1.0%) of the principal amount of the Loan, (ii) a documentation fee of $250, (iii) a loan underwriting fee of $350, and (iv) a processing fee of $372. Neither Buyer nor any Indemnified Party, as hereinafter defined, shall have any obligation for the payment of any Loan Closing Fees.

(21)   Appraisals. Upon the written request of the Buyer, Seller shall cause to be delivered to Buyer, at the Obligor's sole cost and expense, an appraisal of each Mortgaged Property signed prior to the approval of the applicable Mortgage application by a qualified appraiser, who (i) is licensed in the state where the Mortgaged Property is located (ii) is acceptable to Buyer, (iii) has, no interest, direct or indirect, in the Mortgaged Property or in any loan on the security thereof, and (iv) does not receive compensation that is affected by the approval or disapproval of the Loan. The appraisal shall be completed in compliance with the Uniform Standards of Profession Appraisal Practice, and all applicable federal and state laws and regulations, including FIRREA. There have been no arrangements or agreements between Seller and the appraiser identified in the Federal Register by the Flood Emergency Management Agency as having flood hazards. The Mortgaged Property is covered by flood insurance which shall be in an amount not less than the least of (a) the outstanding principal balance of the Loan, but not less than the minimum amount required to fully compensate for damage or loss in the event of partial loss, on a replacement cost basis, (b) the full insurable value of the Mortgaged Property, or (c) the maximum amount of insurance available under the National Flood Insurance Act of 1968, as amended.

(22)   Obligors are Real. To the best of Seller's knowledge after due inquiry, the Obligor(s) on the Loan are the true and only Obligors thereon, are the real parties in interest thereon and are not straw men, nominees or accommodation parties or representatives of any other person, group or organization as to all or any part of the credit extended thereunder.

(23)   Benefits to Seller. Neither Seller nor any stockholder, director, officer, partner, employee or agent of Seller has received any benefit, consideration or value, other than (a) the increased business to Seller and its affiliated entities represented by the Loan or (b) a prepaid finance charge disclosed to the Obligor(s) on the Loan or (c) insurance commissions from time to time heretofore paid from any Obligor(s) or anyone else in connection with the Loan or (d) the compensation to be paid to Seller by Buyer under this Agreement.

(24)   No Third Party Payments. No payments made on the Loan were made directly or indirectly by any of the Seller, the stockholders, officers, directors, partners, employees or agents of Seller or by an assignor of the Loan or merchant who referred the Obligor(s) under the Loan. Neither Seller nor any such person or entity has made any agreement or reached any understanding with any

Obligor(s) for any variation of the interest rate, schedules of payment or other terms and conditions of the Loan. The Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage or an Obligor on such Loan, directly or indirectly, for the payment of any amount required under such Loan. There is no obligation on the part of the Seller or any other party to make payments on account of the Loan which are in addition to those made by the Obligor(s).

(25)    <u>Prior Payments Made</u>. All payments required under the terms of the Loan to be made on or prior to the Settlement Date have been made; the Loan was not or is not the subject of a first payment default under the Note.

(26)    <u>Transfer of Mortgage Loans</u>. The assignment of mortgage with respect to each Loan is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. The transfer, assignment and conveyance of the Notes and the Mortgages by the Seller are not subject to the bulk transfer or similar statutory provisions in effect in any applicable jurisdiction.

(27)    <u>Collateral Occupied</u>. To the best of Seller's knowledge after due inquiry, The collateral purporting to secure the Loan secures the Loan as of the date of transfer and is lawfully occupied as reflected in the credit files and other materials submitted to Buyer.

(28)    <u>Mortgage Remedies</u>. The Mortgage contains customary and enforceable provisions, subject to applicable law, so as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby including, but not limited to, (a) by judicial or non-judicial foreclosure proceedings as may be authorized by law, and (b) the right, subject to any applicable federal restrictions, to call a default under the Mortgage and to accelerate the Mortgage indebtedness in the event the Mortgaged Property or a portion thereof is sold or transferred without the consent of the holder of the Mortgage. All persons who have or will have an ownership, homestead or dower interest in the Mortgaged Property have signed the Mortgage relating to such property if said signature is permitted by law.

(29)    <u>Servicemembers' Civil Relief Act</u>. The Obligor(s) has not notified the Seller, and the Seller has no actual knowledge of, any relief requested by or allowed to the Obligor(s) under the federal Servicemembers' Civil Relief Act (f/k/a Soldiers' and Sailors' Civil Relief Act of 1940).

(30)    <u>No High Cost Loans</u>. None of the Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 or (b) so called "high cost", "threshold," "covered," or "predatory" loans under any other applicable state, federal or local law.

12

(31)    <u>Authorization to Share Information</u>.   All loan files relating to Loans purchased by Buyer shall contain the authorization to share information described in the Sales Criteria signed by the Obligor(s).  Seller also represents and warrants that it shall not forward any application or credit information of any Obligor(s) who does not authorize the sharing of information.

(32)    <u>No Tribal Law</u>.   The governing laws with respect to the origination, servicing and foreclosure of any Loan are the applicable provision of the laws of the state in which the collateral is located, or the laws of the United States, and not any tribal law, and no tribal court has exclusive jurisdiction of the same.

(33)    <u>Credit Report</u>.   Each credit report obtained in connection with the origination of a Loan was obtained from a major credit reporting agency, and was less than sixty (60) days old at the time of the closing of the related Loan.

(34)    <u>Obligor(s) Are Alive and Solvent</u>.  To the best of the Seller's knowledge after due inquiry, at the time of settlement, none of the Obligor(s) on such Loan is deceased and the Loan is not subject to any pending foreclosure, bankruptcy, insolvency, or reorganization proceeding, survey dispute, quiet title or adverse possession claims.  The debt on the Loan has not been discharged in a previously pending bankruptcy action.

(35)    <u>Sale Transaction</u>.   Under generally accepted accounting principles the transfer of the Loans may be treated as a sale on the books and records of the Seller and the Seller has determined that the disposition of the Loans pursuant to this Agreement will be afforded sale treatment for tax and accounting purposes.

(36)    <u>USA PATRIOT Act</u>.   The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA PATRIOT Act of 2001 (collectively, the "Anti-Money Laundering Laws") and maintains, and will maintain, sufficient information to identify the applicable Obligor for purposes of the Anti-Money Laundering Laws.   The documents, instruments and agreements executed in connection with each of the Loans contain all provisions necessary to require the Obligors to provide any information necessary to allow Buyer or any subsequent holder of the Loan or any interest therein to comply with the requirements of the Anti-Money Laundering Laws.

(37)    <u>True Information</u>.  To the best of Seller's knowledge after due inquiry, all information and documents contained in a Loan file are genuine and the information contained in such documents is true, accurate and complete and such documents do not omit to state a fact necessary to make the statements contained therein not misleading.

(38)    <u>Sole Originator</u>.  Seller warrants that it is the sole originator of all Loans submitted to Buyer by Seller pursuant to this Agreement.

13

(39)    <u>Parties in Interest</u>.  All parties which have had any interest in the Loan, whether as mortgagee, assignee, pledge, mortgage broker or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgage Property is located, and (2) organized under the laws of such state, or (3) qualified to do business in such state, or (4) federal savings and loan associations or national banks having principal offices in such state, or (5) not doing business in such state.

(40)    <u>No Fraud</u>.  No error, omission, negligence, misrepresentation, fraud, identity theft, or similar occurrence has taken place on the part of the Seller.

(41)    These representations, warranties and covenants are made at and as of the time of origination, transfer, and conveyance of each Loan to Buyer, but Buyer's rights with respect to the breach of these representations, warranties and covenants shall continue after the purchase of the Loan by Buyer and after payment by Buyer of the purchase price for such Loan to Seller, and shall survive after any termination of this Agreement.  These representations, warranties and covenants are for the benefit of Buyer as well as the benefit of Buyer's successors and assigns.

**SECTION 10.   INTERIM SERVICING.**  All Loans sold by Seller under this Agreement shall be sold on a servicing-released basis.  Except as otherwise provided in this Agreement, as of the applicable Settlement Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of such Loan shall pass to Buyer, and Seller shall be discharged from all liabilities arising from such servicing from and after the Settlement Date.  Notwithstanding anything to the contrary contained in this Agreement, to the extent that the actual servicing of any Loan cannot be transferred from Seller to Buyer on the Settlement Date due to the requirements governing the timing of notice of transfer of servicing under RESPA, or other applicable laws, then Seller shall immediately transfer the closed Loan to a sub-servicer of Buyer's choice (the "<u>Interim Servicer</u>") pursuant to the terms and conditions of this Section.  Interim Servicer shall service such Mortgage Loan in compliance with reasonable and customary servicing practices and procedures of prudent loan servicers that service mortgage loans similar to the Loans, and in compliance with all applicable law, from and after the Settlement Date until the date on which the servicing of the Loan is transferred from the Interim Servicer to another servicer (the "<u>Servicing Transfer Date</u>"); however, the Servicing Transfer Date shall be no later than twenty-five (25) days past each related Settlement Date, unless otherwise agreed upon by the Buyer and the Seller.

During the interim servicing period, neither Seller nor Interim Servicer shall take any action to compromise, renew, modify or alter the terms of a Loan or to commence any judicial or non-judicial action to collect a Loan without the prior written consent of Buyer.  Any payments or monies received or held by Seller or Interim Servicer from or on behalf of an Obligor after the Servicing Transfer Date shall be held in trust by Seller and/or Interim Servicer, as the case may be, for the benefit of Buyer.  Any payments or monies received by Seller or Interim Servicer

14

from or on behalf of an Obligor after the Servicing Transfer Date shall be delivered to Buyer with forty-eight (48) hours of receipt thereof.

Each party shall be responsible for compliance with Section 6 of RESPA and Section 3500, 21 of Regulation X thereto, as amended, regarding transfer of servicing to the extent applicable to such party, including the obligation of Buyer to send a transferee notice and Seller to send a transferor notice when required.  For the purpose of complying with the information required by Section 6 of RESPA, Seller's address is 255 E. Brown Street, Suite 300, Birmingham, MI 48009; its toll-free telephone number is [888.LOAN.466]; Buyer's address is Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, 46th Floor, New York, New York 10022 its toll-free telephone number is (866) 736-6614.  Each party is responsible for notifying the other in writing in the event of any change in the foregoing information.

No later than five (5) days after each Settlement Date, Seller shall send to all Obligors and grantors, via first class mail, postage prepaid, a letter, the text and format of which shall have been pre-approved by Buyer, which shall advise Obligor that their Loan has been sold to Buyer. The letter shall contain such other information as Buyer may reasonably request.

Notwithstanding the foregoing, it is understood and agreed that Interim Servicing is not currently contemplated to occur pursuant to this Agreement.

**SECTION 11.   INDEMNIFICATION BY SELLER.**  Seller will indemnify and hold Buyer, each of Buyer's direct and indirect subsidiaries and affiliates, and the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (collectively, the "Indemnified Parties") harmless from and against any and all claims, losses, liabilities, obligations, penalties, actions, causes of action, claims of usury, suits, controversies,  damages (whether general, special or punitive), judgments, executions, claims and demands,  costs and expenses, including, without, limitation, attorneys' fees and expenses (whether or not litigation is commenced), liens and indemnities of every kind and nature whatsoever ("Claims") arising out of, under, in connection with, or related in any manner to: (i) any act or omission of Seller or any employee or agent of Seller, (ii) Seller's failure to perform any of its obligations hereunder, or (iii) the falsity, incorrectness or incompleteness of any representation or warranty made by Seller herein.  This indemnification shall include, but not be limited to, indemnification against Claims arising in connection with actions or proceedings instituted by or on behalf of (i) an Obligor with respect to any of the Loans, or (ii) any person prosecuting or defending any action or proceeding as a representative of or on behalf of a class or other interest group relating to the Loans, or (iii) any governmental instrumentality, body, or agency having jurisdiction under any applicable statute, rule, regulation, order or decree relating to the Loans.

Without limiting the provisions of the preceding paragraph, in the event that an action or proceeding is instituted by a third party with respect to a Claim, Buyer or the respective Indemnified Party shall be entitled to employ attorneys of its own selection to appear and defend the action or proceeding at Seller's sole expense, and to compromise or settle any such action or proceeding on such terms as Buyer or such Indemnified Party may reasonably deem appropriate;

15

provided, however, that any such compromise or settlement shall not include any admission of liability or wrongdoing by Seller without Seller's prior written consent.

In the event the Buyer or the respective Indemnified Party does not wish to defend such Claim pursuant to the preceding paragraph, the Buyer or such Indemnified Party shall promptly notify Seller of such Claim and Seller must assume the defense of such Claim with attorneys reasonably acceptable to Buyer or such other Indemnified Party. Seller shall not be responsible for such Indemnified Party's attorney fees incurred after the Seller assumes the defense of such Claim unless the respective Indemnified Party and Seller have claims adverse to each other, in which case the prevailing party's legal fees will be paid by the losing party. The failure of the Indemnified Party to notify the Seller of such Claim shall not relieve the Seller of any liability that the Seller may have with respect to such Claim except to the extent the Seller demonstrates that the defense of such Claim is materially prejudiced by such failure. The respective Indemnified Party shall have the right to reject any settlement proposed by the Seller in connection with Seller's defense of such Claim; provided, however, that if such settlement is (i) within the financial means of the Seller, (ii) without cost or liability to the Buyer, (iii) includes a full general release of the Buyer and each of the Indemnified Parties from any liability in form and content reasonably satisfactory to Buyer, and (iv) does not otherwise materially and adversely affect the Buyer or any of the other Indemnified Parties, the Buyer waives its right to reject such settlement offer. In the event that the Seller refuses or fails to undertake the defense of any such Claim within ten (10) days after notice of such Claim has been given to the Seller by an Indemnified Party, or at any time the Seller shall otherwise fail to diligently defend or purse settlement of such Claim or if such Claim could result in damages in excess of the amount that the Indemnified Party could reasonably expect to be recoverable from the Seller, then the Buyer or any other Indemnified Party shall have the right, but not the obligation, to undertake the defense, compromise or settlement of such Claim with counsel of its own choosing at the sole cost and expense of the Seller.

Upon determination of the amount of a Claim, whether by agreement between the Seller and the applicable Indemnified Parties, by an arbitration award, any other final adjudication or otherwise, the Seller shall pay to each of the applicable Indemnified Parties the amount of such Claim within thirty (30) days of the date such amount is determined. Thereafter, the amount of such Claim shall bear interest at a rate equal to ten percent (10%) per annum.

**SECTION 12.   REPURCHASE OF LOANS.**   Seller shall, within ten (10) business days, unless otherwise mutually agreed upon by Buyer and Seller but not to exceed an additional twenty (20) days, of Buyer's written request, repurchase from Buyer any Loan sold to Buyer if any warranty or representation made by Seller about the Loan is untrue and such impairs the value of the Loan(s), or if Seller has otherwise breached this Agreement in whole or in part with regard to any Loan(s) that impair the value of such Loan(s), or if Seller has failed to deliver any Loan document requested by Buyer or required by this Agreement or the Sales Criteria that impairs the value of such Loan(s). Notwithstanding the foregoing, Seller is not a guarantor of the Loans and is obligated to repurchase only upon the occurrence of the events set forth in the preceding sentence. In the event of such repurchase, Buyer shall tender to Seller all Loan documents required to be repurchased pursuant to this provision, and said documents, where appropriate, shall be endorsed to Seller without recourse to Buyer. Contemporaneous with such tender, Seller shall pay to

16

Buyer in immediately available funds an amount equal to such Loan's then unpaid principal balance, plus accrued interest (the "Repurchase Price").  The Repurchase Price shall include (i) any reasonable costs and expenses incurred in connection with the transfer to the Seller of the servicing rights related to the repurchased Loan, plus (ii) the amount of any unreimbursed servicing advances made by the servicer of the repurchased Loan, plus (iii) any reasonable costs and damages, excluding lost profits, incurred by Buyer or any assignee of Buyer in connection with any violation of any representation or warranty of the repurchased Mortgage Loan by the Seller.  It is understood and agreed by the parties that the repurchase obligations hereunder are in addition to, and not in lieu of, all other remedies available in this Agreement or by law.  Buyer shall have the right to set off of any amounts owed to Buyer hereunder or otherwise by Seller against any and all amounts owed to Seller by Buyer.

SECTION 13.   TERMINATION.   This Agreement may be terminated in the manner provided hereinafter; however, all of Seller's representations, covenants and agreements contained in this Agreement shall survive any termination of the Agreement.

13.01   Termination Without Cause.  This Agreement may be terminated without cause at any time by either party after sixty (60) days prior written notice to the other party.   Termination under this Section 13.01 shall not terminate Seller's agreement to sell and Buyer's agreement to purchase those Loans which, prior to the effective date of termination, Buyer and Seller have agreed to purchase and sell, respectively, provided such Loans: (i) continue to meet the requirements of this Agreement and the Sales Criteria; and (ii) are approved for purchase by Buyer either prior or subsequent to the effective date of termination..

13.02   Termination for Cause.  This Agreement may be terminated immediately "for cause" upon the occurrence of any of the following: (i) if Seller or Buyer is in default under this Agreement, or (ii) if Seller becomes insolvent or bankrupt, or if a receiver is appointed for Seller, or if a petition for reorganization is filed by or against Seller.  If Seller is in default under this Agreement, Buyer shall give Seller written notice of such default and provide Seller with a period of ten (10) days in which to cure such default.  If Seller shall not have cured such default within ten (10) days from the date of Buyer's notification, then Buyer shall have the option to immediately terminate this Agreement upon notification to Seller. If Buyer is in default under this Agreement, Seller shall give Buyer written notice of such default and provide Buyer with a period of ten (10) days in which to cure such default.  If Buyer shall not have cured such default within ten (10) days from the date of Seller's notification, then Seller shall have the option to immediately terminate this Agreement upon notification to Buyer. If Seller becomes insolvent or bankrupt, or if a receiver is appointed for Seller, or a petition for reorganization is filed by or against Seller, this Agreement shall automatically terminate. Termination under this Section 13.02 shall release Buyer from any and all obligations to purchase Loans thereafter.

SECTION 14.   RELATIONSHIP OF PARTIES.   Seller is an independent contractor, and this Agreement and any transactions entered into pursuant hereto shall not

17

be deemed to create between Buyer and Seller a relationship of agency, legal representation, partnership, joint venture, debtor/creditor, or employment.  No party shall be deemed to designate the other party as its agent, and Buyer and Seller agree that neither party is in any way authorized to make any contract, agreement, warranty or representation, or to create any obligation, express or implied, on behalf of the other.  Neither party assumes any liability or incurs any obligations of the other by the execution of this Agreement.  No part of the consideration to be paid for any Loan shall be considered a fee paid for the goodwill of Seller.

**SECTION 15.   CONFIDENTIALITY AND NONDISCLOSURE.**  EXCEPT AS OTHERWISE REQUIRED BY LAW, SELLER, ITS EMPLOYEES AND AGENTS SHALL NOT DISCLOSE THE EXISTENCE OF THIS AGREEMENT OR THE FACT THAT SELLER IS ABLE TO OFFER BUYER'S LOAN PRODUCTS AND PRICES. SELLER AND BUYER SHALL KEEP ALL COMMUNICATIONS BETWEEN SELLER AND BUYER CONFIDENTIAL INCLUDING ALL "NONPUBLIC PERSONAL INFORMATION" (AS THAT TERM IS DEFINED IN TITLE V OF THE GRAMM-LEACH-BLILEY ACT (THE "ACT") AND UNDER APPLICABLE REGULATIONS ISSUED UNDER THE ACT) OF THE CUSTOMERS OR CONSUMERS OF BUYER AND WHICH IS FURNISHED BY OR THROUGH THE BUYER TO THE SELLER. Irreparable harm shall be presumed if the Seller or Buyer breaches this Section.  In addition to any other remedies to which the Buyer or Seller may be entitled as a result of such a breach, the Buyer or Seller shall be entitled to seek injunctive relief immediately enjoining the Seller or Buyer, as applicable, from continuing its breach and without posting bond therefore.

Without limiting the foregoing, Seller acknowledges and agrees that it shall not, except as required by law, and it shall cause its directors, officers, employees, agents and advisors not to, without the prior written consent of Buyer (which consent shall be granted or withheld by Buyer in its sole and absolute discretion) disclose to any third party the existence of this Agreement, the terms hereof, or the involvement of Buyer and/or its affiliates in the transactions contemplated hereby.  Without limiting the generality of the foregoing, Seller shall not, without the prior written consent of Buyer, refer to Buyer or its affiliates verbally or in writing or use the logo of Buyer or its affiliates in connection with engagement of any third party service providers, the origination of any Loan or the marketing of the Loans to prospective Obligors, including, without limitation, in any Loan documents, in any advertisements or other promotional or information materials regarding the Loans, in any press releases or other public announcements or media, or on any internet website.

**SECTION 16.   CONFIDENTIAL INFORMATION; PRIVACY.**  Seller hereby acknowledges that Seller may have access to, or Buyer may provide to Seller information and/or documentation which Buyer regards as confidential or otherwise of a proprietary nature. Buyer hereby acknowledges that Buyer may have access to, or Seller may provide to Buyer information and/or documentation which Seller regards as confidential or otherwise of a proprietary nature.

18

16.01   <u>Definition of Confidential Information</u>.  "<u>Confidential Information</u>" includes, but is not limited to, the following, whether now in existence or hereafter created:

(a) all information, in whatever medium, and copies thereof, marked as "confidential" or with similar designation, or information which Seller or Buyer, as applicable, should, in the exercise of its reasonable business judgment, recognize to be confidential;

(b) all information, including usage, concerning intellectual property or other property protected by rights embodied in copyrights, whether registered or unregistered (including all derivative works), "know how," trade secrets, and any intellectual property rights of Buyer or Seller;

(c) all business, financial or technical information of Buyer or Seller, and any of Buyer's or Seller's vendors, as the case may be;

(d) any and all information about employees or consumer customers of Buyer of any nature whatsoever, and specifically including but not limited to employee or customer lists, employee or customer financial information, and the fact of the existence of a relationship, or potential relationship, between Buyer and its employees or customers, and any and all information about employees of Seller of any nature whatsoever, and specifically including but not limited to employee lists, employee financial information, and the fact of the existence of a relationship, or potential relationship, between Seller and its employees;

(e) all financial information, in whatever medium, and copies thereof, with respect to the condominium project commonly know as Canyon Ranch Living Miami Beach Condominium located in Miami Beach, Florida, any Obligors or potential Obligors;

(f) the names and contact information of any Obligors or potential Obligors provided to Seller or Buyer, as applicable, by, or at the direction of, Buyer or Seller, as applicable, or any affiliate thereof;

(g) this Agreement and the Sales Criteria; and

(h) any and all documents, instruments and agreements, and any and all data or other information, in connection with the sale of Loans by Seller and the purchase of the Loans by Buyer, in accordance with the terms hereof.

16.02   Seller and Buyer agree now and at all times in the future that all such Confidential Information shall be held in strict confidence and disclosed only to those employees or agents whose duties reasonably require access to such information provided, however, that such materials may be disclosed by Buyer to its employees, agents, representatives and counsel and to its subsidiaries and affiliates and their respective employees, agents, representatives and counsel. Seller and Buyer shall protect such Confidential Information using the same degree of care, but no less than a reasonable degree of care, to prevent

19

unauthorized use, disclosure or duplication (except as required for backup systems) of such Confidential Information as Seller and Buyer each use to protect its own confidential information.

16.03   If Seller or Buyer is required by a court or governmental agency having proper jurisdiction to disclose any Confidential Information, Seller shall promptly provide to the Buyer notice of such request so that Buyer may seek an appropriate protection order, and if Buyer is required by a court or governmental agency having proper jurisdiction to disclose any Confidential Information, Buyer shall promptly provide to the Seller notice of such request so that Seller may seek an appropriate protection order.

16.04   Seller and Buyer shall establish data security policies and procedures to ensure compliance with this section and that are designed to:

      1.   Ensure the security and confidentiality of customer(s)' information;

      2.   Protect against any anticipated threats or hazards to the security or integrity of such information;

      3.   Protect against the unauthorized access to, disclosure of, or uses of such information that could result in substantial harm or inconvenience to customer(s); and

      4.   Otherwise comply with the requirements of the Gramm-Leach-Bliley Act and the regulations promulgated thereunder, and any and all local or state privacy laws that are applicable to this Agreement and Seller's and Buyer's businesses.

16.05   In the event of any disclosure or loss of, or inability to account for, any of Buyer's Confidential Information, Seller will promptly notify Buyer. In the event of any disclosure or loss of, or inability to account for, any of Seller's Confidential Information, Buyer will promptly notify Seller.

16.06   <u>Limited Use of Confidential Information and Survival of Obligations</u>.

(a) Seller and Buyer may use the Confidential Information only as necessary for Seller's or Buyer's performance hereunder and for no other use. Seller's or Buyer's limited right to use the Confidential Information shall expire upon the expiration or termination of this Agreement for any reason, but its confidentiality obligations shall survive beyond such termination or expiration.

(b) Upon expiration of Seller's limited right to use the Confidential Information, Seller shall return all physical embodiments thereof to Buyer or, with Buyer's permission, destroy the Confidential Information and provide Buyer written certification of its compliance with this Section. Upon expiration of Buyer's

limited right to use the Confidential Information, Buyer shall return all physical embodiments thereof to Seller or, with Seller's permission, destroy the Confidential Information and provide Buyer written certification of its compliance with this Section

16.07   <u>Disclosure to Third Parties</u>.   If Seller or Buyer is allowed or required to disclose any Confidential Information to any third parties in the context of Seller's or Buyer's presentations or negotiations with third parties, then Seller or Buyer shall ensure that such third parties will have express obligations of confidentiality and non-disclosure, with regard to the Confidential Information, substantially similar to Seller's or Buyer's obligations hereunder.   Liability for damages due to disclosure of the Confidential Information by any such third parties shall be with Seller or Buyer, as the case may be.

16.08   <u>Remedies</u>.   If Seller, its agents or employees, violate the obligations of confidentiality and non-disclosure set forth herein, the parties agree that irreparable injury may result to the Buyer or third parties entrusting Confidential Information to Buyer, that Buyer's remedy at law for damages may be inadequate, and that Buyer will be entitled to an injunction to restrain any continuing breach by Seller its agents or employees with no bond required, or if bond is required, only a nominal bond.   Notwithstanding any other provision of this Agreement purporting to limit Seller's liability, Buyer shall further be entitled to recover any other rights and remedies which it may have at law or in equity. If Buyer, its agents or employees, violate the obligations of confidentiality and non-disclosure set forth herein, the parties agree that irreparable injury may result to the Seller or third parties entrusting Confidential Information to Buyer, that Seller's remedy at law for damages may be inadequate, and that Seller will be entitled to an injunction to restrain any continuing breach by Buyer its agents or employees with no bond required, or if bond is required, only a nominal bond. Notwithstanding any other provision of this Agreement purporting to limit Buyer's liability, Seller shall further be entitled to recover any other rights and remedies which it may have at law or in equity.

Notwithstanding the foregoing, all documents, forms, or other written materials created solely by Seller in order to carry out and perform its obligations under this Agreement shall be deemed the property of Seller and may not be used by Buyer in any other transactions without the express written consent of Seller, which may be withheld in its sole discretion; provided, however, that such materials may be disclosed and used by Buyer to its employees, agents, representatives and counsel and to its subsidiaries and affiliates and their respective employees, agents, representatives and counsel.

**SECTION 17.   NON-SOLICITATION.**  Seller hereby agrees that, with respect to each Loan purchased by Buyer in accordance with the terms hereof, neither Seller nor any affiliate of Seller shall take any action to directly or indirectly solicit the applicable Obligor(s) in order to effect the refinancing of such Loans previously purchased by Buyer for a period of twenty-four (24) months from the date upon which Buyer purchased the applicable Loan.

SECTION 18.   PREPAYMENTS.   In the event that any Loan is prepaid by the Obligor, the Seller shall have no obligation to pay any fees or percentages of the Premium initially paid by Buyer to Seller, and the Buyer shall have no right under this Agreement to collect any such fees or percentages from the Seller.

SECTION 19.   POWER OF ATTORNEY.   In order to enforce Buyer's rights under this Agreement, Seller shall, upon the request of Buyer or its assigns, perform or cause to be done and performed, every reasonable act and thing necessary or advisable to put Buyer or its assigns in position to enforce the payment of the Loans and to carry out the intent of this Agreement, including the execution of and, if necessary, the recordation of additional documents including separate endorsements and assignments upon request of Buyer.  In addition, Seller hereby irrevocable appoints any officer or employee of Buyer or its assigns its true and lawful attorney to do and perform every act necessary, requisite, proper, or advisable to be done to put Buyer or its assigns in position to enforce the payment of the Loans.  At the Buyer's request, the Seller shall execute and deliver to the Buyer one or more separate Limited Powers of Attorney in the form set forth as Exhibit A attached hereto.

SECTION 20.   NOTICES.   Any notice, request, consent, waiver or other communication required or permitted under or in connection with this Agreement will be deemed satisfactorily given if it is in writing and is delivered either personally to the addressee thereof, or by prepaid registered or certified U.S. mail (return receipt requested), or by a nationally recognized commercial courier service with next-day delivery charges prepaid, or by facsimile (voice or transmission confirmed), or by any other reasonable means of personal delivery to the party entitled thereto at its respective address set forth below.  Any party to this Agreement may change its address or facsimile number for notice purposes by giving notice thereof to the other parties hereto in accordance with this Section, provided that such change shall not be effective until two calendar days after notice of such change.  All such notices and other communications will be deemed given and effective (a) if by mail, then upon actual receipt or five calendar days after mailing as provided above (whichever is earlier), or (b) if by facsimile, then upon successful transmittal to such party's designated number, or (c) if by nationally recognized commercial courier service, then upon actual receipt or one business day after delivery to the courier service (whichever is earlier), or (d)  if otherwise delivered, then upon actual receipt.

For the purposes of this Agreement, all notices shall be sent to the addresses set forth below:

If to the Seller:

>Vacation Finance/Americor Mortgage, Inc
>255 East Brown Street
>Birmingham, MI 48009
>Attention:     Bob Waun, Managing Director
>Facsimile:     _____

with copies to:

22

Carmel & Carmel PC
5301 Washington Avenue NW, Suite 570
Washington DC 20015
Attention:       Frank J. Carmel
Facsimile:      (202) 237-1701

If to the Buyer:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention:       Lonnie Rothbort
Facsimile:      (646) 758-3387

with copies to:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention:       Joelle Halperin
Facsimile:      (646) 758-3387

and:

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attention:       Richard A. Morrison
Facsimile:      (305) 374-7159

**SECTION 21.   WAIVERS/CUMULATIVE RIGHTS.**  No course of dealing on the part of either party, its officers or employees, nor any failure or delay by either party with respect to exercising any right, power or privilege under this Agreement shall operate as a waiver thereof.  The parties hereto shall be entitled to all rights and remedies available under applicable law, as well as those available under this Agreement.  All such rights and remedies shall be cumulative and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

**SECTION 22.   ASSIGNMENT.**  Seller may not assign this Agreement without the prior written consent of Buyer.  A change in the ownership or control, merger or consolidation of Seller shall be considered an assignment for purposes of this Agreement.  Buyer may freely assign this Agreement, and this Agreement shall be binding upon and inure to the benefit of Buyer, its successors and assigns.

**SECTION 23.   SEVERABILITY.**  If for any reason a portion of this Agreement is found to be illegal or unlawful under applicable law, that portion of this Agreement will be deleted and remainder of this Agreement shall remain in effect.

23

**SECTION 24.   GOVERNING LAW.**   This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to any principles of conflicts of law.

**SECTION 25.   MODIFICATION.**   This Agreement may be modified only by an instrument in writing signed by both Seller and Buyer.

**SECTION 26.   ATTORNEY'S FEES.**   If Seller or Buyer should breach or fail to perform any provision of this Agreement, the defaulting party shall pay all costs and expenses, including court costs and reasonable attorney's fees incurred by the other party in the enforcement of this Agreement.

**SECTION 27.   FIDELITY BOND.**   Upon request, Seller will deliver to Buyer a true and correct copy of Seller's fidelity bond and Seller's errors and omissions policy, as currently in effect, the amounts and coverages of both of which will be acceptable to Buyer. Seller shall upon request furnish proof of such coverage at or before the first Settlement Date and, upon request, annually thereafter.

**SECTION 28.   FINANCIAL STATEMENTS.**   Seller shall furnish to Buyer for as long as this Agreement is in effect (i) as soon as available, and in any event within ninety (90) days after the end of each fiscal year, certified financial statements consisting of a balance sheet as of the end of such fiscal year, together with related statements of income or loss and reinvested earnings and changes in financial position for such fiscal year, prepared by independent certified public accountants in accordance with generally accepted accounting principles, and (ii) if available, within ten (10) days after the end of each quarterly period interim internal financial.   In addition, Seller shall provide Buyer, from time to time, upon reasonable request and thirty (30) days' notice, any other financial reports or statements reasonably required by Buyer.

**SECTION 29.   POST-SALE LOAN PAYMENTS AND INQUIRIES.**   Seller agrees that it will remit to Buyer, within forty-eight (48) hours after receipt, any payment on a Loan including, without limitations, all payments of principal and interest, late charges, and bad check charges received from an Obligor on or after the Settlement Date for such Loan at the following address: 1271 Avenue of the Americas, 46th Floor, New York, New York 10022 such other address as Buyer may designate.   Seller shall remit such payment via an overnight delivery service.   Seller agrees to forward to Buyer promptly all inquiries, communications and remittances received by Seller with respect to any Loan purchased by Buyer, and to reimburse Buyer upon written demand for any and all losses Buyer may reasonably suffer as a result of Seller's failure to do so.

**SECTION 30.   TRANSFER OF SERVICING RIGHTS AND PMI.**   Seller shall take any and all actions as may be requested by Buyer in order to consummate the transfer from Seller to Buyer of servicing rights for each Loan, including, without limitation, providing   notices to any private mortgage insurance companies.

**SECTION 31.   DELIVERY OF MORTGAGE DOCUMENT.**   With respect to each Loan, the Seller shall cause by no later than ninety (90) days after the Settlement Date

24

for such Loan, the original recorded Mortgage and title policy and, if applicable, the prior assignment of mortgage to be delivered to Buyer.

SECTION 32.    LOCATION OF MORTGAGED PROPERTY.    The loans to be purchased pursuant to the terms of this Agreement shall be secured by real property located in the State of Florida.

SECTION 33.    LENDER'S OBLIGATIONS.    Seller shall, upon reasonable notice from Buyer, provide Buyer with access to Seller's operations, records, and documentation to determine Seller's compliance and monitoring with representations, warranties and covenants made by Seller herein and with the Sales Criteria.  The parties shall agree on a mutually convenient date for each such audit within fifteen (15) days of Seller's receipt of an audit notice.  The audit will be conducted within 45 days of receipt of audit notice.  If the parties are unable to do so, then Buyer may, in its sole discretion, suspend the purchase of loans until the parties reach agreement on the audit date.  Annually, Seller shall, within forty-five (45) days after receipt, furnish Buyer with a copy of its state broker license (or equivalent, if applicable) for each state in which business is or will be conducted with Buyer.

SECTION 34.    SURVIVAL OF REPRESENTATIONS, WARRANTIES AND INDEMNIFICATIONS.    All representations, warranties and indemnifications under this Agreement shall survive the termination of this Agreement and shall be deemed given and shall not be diminished by any or all underwriting or processing of information, data or documents or the omission to underwrite or process said information, data or document supplied to Buyer under this Agreement.

SECTION 35.    CONSTRUCTION.    This Agreement shall not be construed more strictly against Buyer merely by virtue of the fact that the same has been prepared by Buyer or its counsel, it being recognized that Seller has had the opportunity to consult with counsel concerning same.  Seller acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by Buyer in entering into this Agreement.

SECTION 36.    JURISDICTION.

(1)    Commencing on September 15, 2008, the Buyer and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (Manhattan Division) (the "Bankruptcy Court") which are being jointly administered under Case No. 08-13555 (collectively, the "Bankruptcy Case").  The Buyer is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The parties hereto agree that no action relating to the interpretation and enforcement of this Agreement may be brought in a court that is not located within the State of New York.  To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over such actions. Each of the parties hereto agrees that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Buyer, Seller

or any other party may otherwise have to bring any action or proceeding to enforce any Loan or any of the documents, instruments or agreements evidencing or securing any Loan or otherwise relating to any Loan against any Obligor or its respective properties in the courts of any jurisdiction.

(2)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any document executed pursuant hereto in any court referred to in paragraph (1) of this subsection; and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 20 hereof.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**SECTION 37.  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION  HEREWITH, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR IN ANY WAY RELATING TO ORIGINATION, OFFERING, MAKING OR SALE OF LOANS (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.**

IN WITNESS WHEREOF, this Agreement has been executed as of the date set forth above.

SELLER:

VACATION FINANCE/AMERICOR MORTGAGE

By: _____

Name: _____

Title: _____


BUYER:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York


By: _____

Name: _____

Title: _____

**EXHIBIT A**

**Limited Power of Attorney**

VACATION FINANCE/AMERICOR MORTGAGE ("SELLER"), a _____ whose address is _____ through the duly authorized representative whose signature appears below makes and appoints and by this Limited Power of Attorney does make, constitute and appoint Lehman Brothers Holdings Inc. (hereinafter referred to as "LBHI"), a Delaware corporation, whose address is 1271 Avenue of the Americas, 46th Floor, New York, New York 10022, the true and lawful attorney-in-fact for SELLER; and in SELLER's name and stead to execute, by the signature of any authorized LBHI employee or agent, any and all documents for the purpose of assigning and transferring to LBHI any and all mortgages, deeds of trust, security instruments, and the related notes, including, but not limited to the assignments of mortgages, deeds of trust, and security instruments; the note endorsements, affidavit and agreements, for any mortgage loan transaction closed and funded in SELLER's name or transferred and assigned to SELLER and committed to LBHI by SELLER under the Mortgage Loan Purchase Agreement between SELLER and LBHI giving and granting unto the said attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done, and to make, correct, amend, endorse, accept, or deliver all agreements and instruments; as fully, to all intents and purposes, as SELLER might or could do if present at the doing thereof through one of its authorized representatives, with full power of substitution and revocation.  SELLER hereby ratifies and confirms all that the said attorney-in-fact shall lawfully do or cause to be done by virtue of this Limited Power of Attorney.  SELLER may only revoke this Limited Power of Attorney in writing and only upon the expiration of one hundred eighty (180) days from the effective date of the termination of the Mortgage Loan Purchase Agreement in accordance with the terms thereof, and this Limited Power of Attorney shall be deemed to be a power coupled with an interest for such purpose.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal this _____ day of April, 2009.

SELLER: _____
(Full legal name of SELLER entity and, if applicable, full name of any and all d/b/a entities)

BY: _____
(Signature of authorized officer of SELLER)

_____
(Printed name of authorized officer)

_____
(Title of authorized officer)

## ACKNOWLEDGMENT/CORPORATE

STATE OF _____    )
                                                        ) ss
COUNTY OF _____    )

On this _____ day of April, 2009, before me appeared _____, to me personally known, who, being by me duly sworn, did say that (s)he resides at _____, that (s)he is the _____ of _____, a _____, the **[corporation]** described in and which executed the foregoing instrument, and that (s)he signed his/her name thereto by order of the Board of Directors of such corporation.

[Stamp]

_____
                                        Notary Public
                                        My Commission Expires: _____

**This instrument was drafted by and after recording return to:**

Richard A. Morrison, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131

A-2

## EXHIBIT B

## Lehman Brothers Holdings Inc. Fair Lending Policy Statement

Lehman Brothers Holdings Inc. ("LBHI") is committed to lending fairness and fair lending practices.

The *Equal Credit Opportunity Act* and the *Fair Housing Act* expressly prohibit discrimination on the basis of race, color, religion, national origin, marital status, age (provided the applicant is of legal age to have the capacity to enter into a binding legal contract), sex, disability, familial status, receipt of public assistance, or the exercise in good faith of any right under the *Consumer Credit Protection Act* in any aspect of a loan transaction. The aforementioned are commonly known as prohibited bases.

State and federal laws governing unfair and deceptive trade practices prohibit banks from engaging in practices which misrepresent or omit information that causes customers to be mislead as to the true nature of a product or service, or which cause substantial injury to a consumer.

All credit products of LBHI shall be available to all applicants on a consistent and fair basis, provided the applicants meet our guidelines of safe and sound lending along with applicable credit policies and business focuses.

No applicant shall be discouraged on a prohibited basis from applying for loan products offered by LBHI.

LBHI shall comply with all fair lending laws and regulations including the *Equal Credit Opportunity Act,* the *Home Mortgage Disclosure Act*, the *Fair Housing Act*, and the *Community Reinvestment Act.*

LBHI, or any employee thereof, shall not discriminate against any credit request on the basis of race, color, religion, national origin, marital status, age (provided the applicant is of legal age to have the capacity to enter into a binding legal contract), sex, sexual orientation, disability, familial status, receipt of public assistance, or if the individual has exercised in good faith any right under the *Consumer Credit Protection Act*, or on any other prohibited basis.

LBHI shall comply with all laws and regulations prohibiting unfair and deceptive trade practices by adopting policies and procedures to ensure that information provided to customers and potential customers is complete and accurate; to clearly and accurately disclose all material product or service features; and to maintain complaint processes to ensure that any complaints alleging unfair or deceptive practices are researched and adequately addressed.

LBHI shall have such policies, underwriting standards, training, review, and compliance procedures as may be required to ensure compliance with both the technical requirements and spirit of this Fair Lending Policy Statement.

# EXHIBIT C

## Sales Criteria

**Primary Credit Criteria:**

All Loans shall satisfy the following criteria:

- Loans at maximum 70% loan-to-contract price (LTC)
- 680 minimum mid FICO score – seeking portfolio average of 700
- Debt-to-income ratio (DTI) can not exceed 40%, no allowance will be given for property rental income in DTI calculation
- Borrower must prove intent to use the property as primary or pay up to a 50-basis-point premium for non-primary resident status
- Document and sourced funds required for down payment plus 12 months PITI reserve
- 12 month PITI liquid reserves post closing
- Fannie Mae DU automated underwriting system must score "Accept" or higher (in addition to manual underwriting methods)
- Third party Purchase Contracts are not acceptable (no flipping)
- Borrower must be a US citizen or Permanent Resident Alien
- Foreign Nationals require 50% loan-to-value, additional conditions may apply
- Income verified with 4506T prior to closing
- No previous foreclosures or bankruptcy permitted in last 36 months

**Term and Rate Options**

- 30 year fixed rate
- 15 year fixed rate
- 10/1 ARM (10 yrs fixed rate, 1 yr ARM for term of 30 yrs)

**Suggest Rate**

Interest Rate shall be calculated off of the base conforming rate by adding premiums for condo, jumbo and non-residency status, as follows:



**EXHIBIT C**
**(continued)**

**Sales Criteria**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                            :
In re                                       :        **Chapter 11 Case No.**
                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :        **08-13555 (JMP)**
                                            :
                        **Debtors.**            :        **(Jointly Administered)**
                                            :
                                            :
------------------------------------------------------------------x

### ORDER PURSUANT TO
### SECTIONS 105(a) AND 363(b)(1) OF THE BANKRUPTCY
### CODE AUTHORIZING LEHMAN BROTHERS HOLDINGS INC.
### TO ENTER INTO MORTGAGE LOAN PURCHASE AGREEMENT

Upon the motion, dated May 14, 2009 (the "Motion"),[1] of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors" and,

together with their non-debtor affiliates, "Lehman"), pursuant to sections 105 and 363 of

title 11 of the United States Code (the "Bankruptcy Code") for authorization for LBHI to

enter into a final agreement substantially similar to that certain Mortgage Loan Purchase

Agreement by and between LBHI and Americor Mortgage, Inc. ("Americor") annexed

hereto as Exhibit A (the "Purchase Agreement"); and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157

and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in
the Motion.

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to Americor; and (vii) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, the Purchase Agreement is approved, and LBHI is authorized (i) to enter into a final agreement substantially similar to the Purchase Agreement and to consummate all of the transactions contemplated thereby, including the purchase of the Residential Loans, and execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to consummate such transactions and (ii) consent to any

amendment, restatement, waiver, supplement or other modification of any of the

documents contemplated under the Purchase Agreement, it being understood that any

actions described in this paragraph taken by the Debtors or their affiliates may be taken

without the necessity of (x) any further court proceedings or approval or (y) any consent

of any third party, and shall be conclusive and binding in all respects on all parties in

interest in these cases; and it is further

ORDERED, that, in the event the face amount of Residential Loans

purchased by LBHI under the Purchase Agreement exceeds $200 million, the Debtors

shall seek additional authority to purchase additional Residential Loans; and it is further

ORDERED that this Order shall be effective and enforceable immediately

upon entry and its provisions shall be self-executing and shall not be stayed pursuant to

Bankruptcy Rule 6004; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated: June __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Purchase Agreement

## MORTGAGE LOAN PURCHASE AGREEMENT

**THIS MORTGAGE LOAN PURCHASE AGREEMENT** (this "<u>Agreement</u>") is made this 30th day of April 2009 by and between Lehman Brothers Holdings Inc., a Delaware corporation, on behalf of itself and its applicable affiliates (collectively, "<u>Buyer</u>"), and Americor Mortgage, Inc. (d/b/a Vacation Finance and d/b/a Americor Financial Services), a Michigan corporation ("<u>Seller</u>").

## RECITALS:

A.  This Agreement is intended to set forth the entire understanding between the parties whereby Buyer wishes to have the ability to make available residential condominium mortgage loans for condominium properties, in which Buyer has an interest as a lender, to individual obligors who desire to purchase a condominium unit (each an "<u>Obligor</u>" and, collectively, the "<u>Obligors</u>") (which loans, together with all documents evidencing, securing or in any way related to the origination and closing of such loans, are hereinafter referred to as the "<u>Loans</u>");

B.  Buyer wishes to facilitate the availability of such Loans to such Obligors because of the lack of availability of traditional financing sources for such Obligors and Seller has experience in the making and originating of such Loans to condominium unit purchasers and is willing to originate such Loans in accordance with the terms and conditions contained herein based upon Buyer's obligation to purchase all such Loans originated by Seller subject to the terms and conditions contained herein below;

C.  Each of the Loans shall be evidenced by promissory notes (each a "<u>Note</u>" and, collectively, the "<u>Notes</u>") and secured by mortgages or other security instruments (each a "<u>Mortgage</u>" and, collectively, the "<u>Mortgages</u>") covering individual residential condominium units located within the condominium project commonly known as "<u>Canyon Ranch Living Miami Beach Condominiums</u>" located in Miami Beach, Florida (the "<u>Mortgaged Property</u>").

D.  Seller agrees to originate certain Loans for Buyer to purchase in accordance with the provisions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter provided, Seller and Buyer agree as follows:

**SECTION 1.    LOAN SUBMISSION.** Seller shall submit to Buyer loan applications, credit information and other data ("<u>Loan Packages</u>") for Loans that Seller has determined, and represents to Buyer, satisfy: (i) the terms of this Agreement, and (ii) the sales criteria agreed to by the Buyer and Seller from time to time, including, without limitation, the Underwriting Score Card and the Product Matrix which are both a part of the Sales Criteria agreed to by the Buyer and the Seller from time to time (the Underwriting Score Card, the Product Matrix and the other underwriting criteria agreed to by Buyer and Seller from time to time are hereinafter sometimes referred to collectively as the "<u>Sales Criteria</u>").  The initial Sales Criteria agreed to by Seller and Buyer are attached to this

Agreement as <u>Exhibit C</u> and constitute the currently approved standards for underwriting potential borrowers and the types of loans that may be offered to such borrowers based upon the various factors set forth in such Sales Criteria. In the event of a discrepancy between the provisions of this Agreement and the Sales Criteria, the provisions of this Agreement shall control. Seller shall furnish to Buyer at Seller's sole expense such credit, financial, and other information concerning potential borrower that Buyer may require in determining for its own account whether or not such Obligor and the Loan Package to be offered is acceptable to Buyer in its sole and absolute discretion. Notwithstanding the foregoing, it is the intention of Seller that Loans will be made available to Obligors pursuant to this Agreement and that such Loans that meet the requirements set forth in this Agreement and the Sales Criteria will be made available to Buyer for purchase pursuant to the terms of this Agreement until such time as Buyer shall provide Seller thirty (30) days prior notice that Buyer will thereafter discontinue purchasing Loans from Seller pursuant to the terms of this Agreement.

      **SECTION 2.    PURCHASE AND SALE OF LOANS.** Seller shall sell to Buyer, and Buyer shall purchase from Seller, all Loans which (i) have been originated by Seller, (ii) meet the requirements of this Agreement and the Sales Criteria, (iii) have been approved for purchase by Buyer in accordance with the terms of this Agreement, prior to the date sixty (60) days after the date that Buyer delivers notice to Seller that Buyer will discontinue purchasing Loans from Seller pursuant to the terms of this Agreement, and (iv) are closed, in accordance with the terms of this Agreement within thirty (30) days after the date the Buyer provides written notice to Seller that Buyer has so approved such Loan for purchase. Seller may offer to sell a Loan, or Loans, to Buyer from time to time by submitting to Buyer a loan list or spreadsheet of potential Loans in a format acceptable to Buyer that sets forth such Loan or Loans and their criteria as applied to the Sales Criteria. As agreed to herein, Buyer's approval of a Loan for purchase shall mean Buyer's approval of a Loan Package relating to a proposed Loan to be made by Seller to the corresponding Obligor, which approval means Buyer is, subject to the terms of this Agreement, obligated for a period of thirty (30) days after the date Buyer delivers written notice to Seller of such approval, to purchase the Loan made pursuant thereto at closing of the Loan transaction unless Buyer subsequently reasonably determines that such Loan does not satisfy the requirements set forth in this Agreement, the standards set forth in the Underwriting Score Card and/or does not otherwise conform to the Sales Criteria. Neither party shall be obligated to sell or purchase (as the case may be) any Loan, unless and until both Buyer and Seller have approved the sale of such Loan in accordance with the terms of this Agreement. The rights granted to Seller under this Agreement shall be non-exclusive. Buyer shall have the right, from time to time, in its sole and absolute discretion, to originate, or to purchase mortgage from any Buyer affiliate or any third party, loans secured by residential condominium units located within the condominium project commonly known as Canyon Ranch Living Miami Beach Condominiums; provided, however, that in the event that Loan Packages with respect to substantially similar proposed Loans are submitted to Buyer both from Seller and from such Buyer affiliate or third party originator, such Loan Packages shall be reviewed by Buyer for approval in the order that such complete Loan Packages are received by the Buyer.

SECTION 3.    **ORIGINATION OF LOANS.**  Seller shall use commercially reasonable efforts to originate Loans in accordance with the terms of this Agreement and the Sales Criteria from any potential Obligor who would be a purchaser of a condominium unit in the Mortgaged Property for so long as Buyer has not provided Seller thirty (30) days prior notice that it no longer intends to purchase such Loans.  All material documents executed and/or delivered in connection with the offering or solicitation of potential Loans or otherwise evidencing, governing, securing or otherwise executed and/or delivered in connection with any such Loans shall be in accordance with the Sales Criteria and shall be subject to the prior written approval of the Buyer except those documents prepared in accordance with FNMA or FHMLC Guidelines which are to be approved by Buyer in advance.  Seller shall deliver all such documentation to Buyer at least fifteen (15) days prior to its intended use of such documents, and unless Buyer shall otherwise object, the documents shall be deemed approved by Buyer after such fifteen day period so long as they meet the terms of this Agreement and the Sales Criteria and comply with applicable state and federal laws and regulations.

SECTION 4.    **THE SALES CRITERIA.**  Buyer and Seller agree to comply with all terms, procedures and provisions of the Sales Criteria.  The Sales Criteria, which consist of Underwriting Score Card, Product Matrix and the other underwriting criteria as determined by Buyer from time to time, set forth the criteria upon which Seller will offer Loans to potential Obligors and the primary criteria for loans that meet Buyer's requirements with respect to the purchase of each Loan by Buyer.

SECTION 5.    **CHANGES TO THE SALES CRITERIA.**  The Sales Criteria are subject to change from time to time as determined by Buyer; provided however, that until Seller shall have received written notice from Buyer of any such change to the Sales Criteria, the previous Sales Criteria shall remain operative and in full force and effect.

SECTION 6.    **PROCEDURAL MATTERS.**  Seller shall process and close each Loan in its own name.  Notwithstanding anything to the contrary contained herein, prior to the sale of each Loan, such Loan must be pre-qualified and approved for purchase by Buyer in writing, and closed and delivered in accordance with the terms hereof and the Sales Criteria. On the date Seller closes each Loan that has been approved by Buyer for purchase, Buyer shall purchase such Loan in accordance with the terms hereof at a purchase price equal to the sum of (i) the outstanding principal balance of such Loan, (ii) the accrued and unpaid interest on such Loan, and (iii) a premium (the "Premium") equal to the amount remaining, if any, after deducting (A) the Origination Fee (as hereinafter defined) paid with respect to such Loan, from (B) an amount equal to one percent (1%) of the outstanding principal amount of the Loan.  Seller agrees that it shall use all reasonable efforts to close each Loan that has been pre-qualified and approved by Buyer.  To the extent Buyer has agreed to purchase, and Seller has agreed to sell, any Loan in accordance with the terms hereof and the Sales Criteria, Buyer shall advance the purchase price for such Loan to Seller on the date of the closing of such Loan between Seller and the Obligor.  Upon the closing of a Loan, Seller shall immediately transfer such Loan to Buyer in accordance with the terms and conditions set forth herein.  The transfer of funds described in this Section shall be subject to the terms of a master escrow agreement to be entered into by and among Buyer, Seller and a third party title company in form and substance acceptable to each of the

3

foregoing parties in each of such party's sole and absolute discretion. The third party title company shall be selected by the mutual agreement of Buyer and Seller in each party's sole and absolute discretion.

　　　　**SECTION 7.    UNDERWRITING OF LOANS.**  Seller and Buyer agree that Seller shall offer loans to potential Obligors only in accordance with the terms and conditions of this Agreement and the Sales Criteria and that potential Obligors shall be underwritten by Seller to ensure that they meet the requirements of this Agreement and the Sales Criteria, including, without limitation, the Underwriting Score Card that is a part of the Sales Criteria prior to submission of a proposed Loan to Buyer.  So long as Buyer has not notified Seller that it no longer intends to purchase Loans from Seller as provided for herein above, Buyer or its agent shall have an obligation to review, underwrite and approve or disapprove those Loans that Seller presents to Buyer and that Seller proposes to sell to Buyer pursuant to this Agreement to the extent that such Loans meet the Sales Criteria. Notwithstanding the foregoing or anything to the contrary set forth in this Agreement, Buyer shall have no obligation to purchase any proposed Loan which, in its sole discretion, does not meet Buyer's requirements set forth in this Agreement, the standards set forth in the Underwriting Score Card and/or does not otherwise conform to the Sales Criteria.  In making its determination, Buyer expressly disclaims any conclusions Seller may draw as to the general quality or acceptability of any Loan.  Buyer shall notify Seller of Buyer's decision as to whether to purchase any Loan as presented to Buyer by Seller in accordance with the practices and procedures established by Seller and Buyer and/or as set forth in the Sales Criteria within ten (10) days of delivery of a complete Loan Package for such Loan from Seller to Buyer for approval.  Buyer retains sole and absolute discretion to refuse to purchase any Loan that does not comply with the terms and conditions of this Agreement, the Sales Criteria, Buyer's underwriting requirements or for any reason whatsoever (except any reason prohibited by law); provided however, that in the event that (i) the Seller proposes to sell to Buyer Loan(s) that meet the Buyer's underwriting requirements and conform to the terms of this Agreement and the Sales Criteria, (ii) such Loan(s) have been approved for purchase by Buyer in writing as provided in this Section 7, (iii) Seller has complied with each of the terms, covenants and conditions of this Agreement for the sale of such Loan(s), and (iv) Seller has tendered such Loan(s) for purchase by Buyer in strict accordance with the terms of this Agreement, but the Buyer fails to purchase such Loan(s) in accordance with the terms of this Agreement, Buyer shall indemnify and hold the Seller harmless from and against any claims, damages, losses (excluding lost profits, but providing for any lost Origination Fee) or reasonable costs and expenses arising out of the Buyer's failure to purchase such Loan(s) to the extent provided in this Agreement.  Without limiting the provisions of the preceding sentence, in the event that an action or proceeding is instituted by a third party with respect to any claim covered by the preceding sentence (a "Covered Claim"), Seller shall be entitled to employ attorneys selected by Seller with the approval of the Buyer, which approval shall not be unreasonably withheld or delayed, to appear and defend the action or proceeding at Buyer's sole expense, and to compromise or settle any such action or proceeding on such terms as Seller may reasonably deem appropriate; provided, however, that any such compromise or settlement shall not include any admission of liability or wrongdoing by Buyer without Buyer's prior written consent.

In the event the Seller does not wish to defend such Covered Claim pursuant to the preceding paragraph, the Seller shall promptly notify Buyer of such Covered Claim and Buyer must assume the defense of such Covered Claim with attorneys reasonably acceptable to Seller.  Buyer shall not be responsible for Seller's attorney fees incurred after the Buyer assumes the defense of such Covered Claim unless the Seller and Buyer have claims adverse to each other, in which case the prevailing party's legal fees will be paid by the losing party.  The failure of the Seller to notify the Buyer of such Covered Claim shall not relieve the Buyer of any liability that the Buyer may have with respect to such Covered Claim except to the extent the Buyer demonstrates that the defense of such Covered Claim is materially prejudiced by such failure.  The Seller shall have the right to reject any settlement proposed by the Buyer in connection with Buyer's defense of such Covered Claim; provided, however, that if such settlement is (i) within the financial means of the Buyer, (ii) without cost or liability to the Seller, (iii) includes a full general release of the Seller from any liability in form and content reasonably satisfactory to Seller, and (iv) does not otherwise materially and adversely affect the Seller, the Seller waives its right to reject such settlement offer.  In the event that the Buyer refuses or fails to undertake the defense of any such Covered Claim within ten (10) days after notice of such Covered Claim has been given to the Buyer by the Seller, or at any time the Buyer shall otherwise fail to diligently defend or purse settlement of such Covered Claim or if such Covered Claim could result in damages in excess of the amount that the Seller could reasonably expect to be recoverable from the Buyer, then the Seller shall have the right, but not the obligation, to undertake the defense, compromise or settlement of such Covered Claim with counsel of its own choosing at the sole cost and expense of the Buyer.

Upon determination of the amount of a Covered Claim, whether by agreement between the Buyer and the Seller, by an arbitration award, any other final adjudication or otherwise, the Buyer shall pay to the Seller the amount of such Covered Claim within thirty (30) days of the date such amount is determined.  Thereafter, the amount of such Covered Claim shall bear interest at a rate equal to ten percent (10%) per annum.

**SECTION 8.    RELEASE OF SERVICING.**  Each Loan shall be sold to Buyer on a "servicing released" basis, meaning that Seller shall release, transfer and assign to Buyer all right, title and interest in and to the Loan, including, without limitation, any right to provide mortgage servicing in connection therewith.

**SECTION 9.    REPRESENTATIONS AND WARRANTIES OF SELLER.**  Seller hereby makes the following representations and warranties to Buyer.  Such representations and warranties are deemed to be made both as of the date hereof, and as of each and every date Seller sells a Loan to Buyer (each such date, a "Settlement Date"), and Buyer shall be deemed to have relied on the following representations and warranties.

9.01    Seller Representations and Warranties.  Seller makes the following representations and warranties:

(1)    Organization.  Seller is duly organized, validly existing and in good standing under laws of its state of organization and the State of Florida, and has the power to own its assets and to transact the business in which it is presently

5

engaged.  Seller is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, including, without limitation, its state of organization and the State of Florida, and where the failure to be so qualified would have a material adverse affect on the business and assets of Seller, taken as a whole. Seller has and shall continue to maintain in full force and effect all licenses, registrations and certifications in all appropriate jurisdictions to conduct all activities performed with respect to the making and selling of Loans.

(2)    Authority.  Seller has the power, authority and legal right to make, deliver and perform this Agreement and all of the transactions contemplated hereunder, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement.  No consent of any other party and no consent, license, approval or authorization of, or registration with, any governmental authority, bureau or agency is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement or the sale of the Loans or if required same has been obtained and remains in effect.

(3)    No Violation.  The execution, delivery and performance of this Agreement will not violate any provision of any existing laws or regulation, or any order or decree of any court, or Seller's organizational documents or of any mortgage, indenture, contract or other agreement to which Seller is a party or by which Seller and any of its property or assets may be bound.

(4)    Litigation.  No litigation or administrative proceedings of or before any court, tribunal or governmental body is presently pending, or, to the knowledge of Seller, threatened against Seller or any of its properties, which, if adversely determined, would have a material adverse effect on the business, assets, financial condition of Seller or Seller's ability to perform its obligations under this Agreement.

(5)    True and Correct.  Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading.

(6)    Validity.  This Agreement has been duly authorized and executed by Seller and is, or upon delivery will be, a legal, valid and binding obligation of Seller enforceable in accordance with its terms, subject only to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting creditor rights generally.

(7)    Commissions to Third Parties.  Seller has not dealt with any broker or agent or other Person who might be entitled to a fee, commission or compensation in connection with the sale of Loans by Seller to Buyer other than the Buyer.

(8)     <u>No Common Ownership</u>.  Seller, any title company, any closing agent and any appraiser shall each be independent parties and shall have no common ownership, employees, management, directors or any other relationship or affiliation unless previously disclosed to and approved by Buyer in writing.  The Obligor(s) shall also be independent of Seller, any title company, any closing agent and any appraiser and shall not be affiliated with Seller, any title company, any closing agent or any appraiser in any way.

(9)     <u>Solvency</u>.  Seller is solvent, has not committed any act of bankruptcy and the execution and consummation of this Agreement will not render Seller insolvent.  Upon payment by Buyer of the purchase price of the Loan, no creditor or stockholder of Seller or any other person will have any claim against Buyer on the Loan.  The consideration received by Seller upon the sale of the Loans will constitute fair consideration and reasonably equivalent value for the Loans.  The sale of the Loans is not undertaken with the intent to hinder, delay or defraud any of the Seller's creditors.

9.02    <u>Seller Loan Representations, Warranties and Covenants</u>.  Seller makes the following representations, warranties and covenants with respect to each Loan which shall be deemed reaffirmed at the closing of each Loan and simultaneous sale to the Buyer:

(1)     <u>Loan Meets Requirements</u>.  The Loan shall conform in all respects to all the applicable requirements contained in the Sales Criteria and this Agreement.  Upon purchase of a Loan by Buyer, which purchase shall take place at the settlement table of the Loan, such Loan will be fully funded and shall be fully amortizing with no negative amortization.

(2)     <u>Seller Has Full Right to Sell and Assign</u>.  Seller is the sole owner of record and holder of the Loan and has full right and authority to sell and assign it to Buyer.  In addition, Seller's right to sell or assign is not subject to any other party's interest or to an agreement with any other party.

(3)     <u>Seller's Lien on Property</u>.  Upon funding of the Loan by Buyer at the settlement table, the Mortgage securing the Loan is a valid, subsisting and enforceable first priority lien on the Mortgaged Property, free and clear of all encumbrances and liens having priority over it, except for liens for real estate taxes and liens for special assessments that are not yet due and payable and has been properly filed, recorded or otherwise perfected in accordance with applicable law.  No instruments other than those delivered therewith are required under applicable law to evidence the indebtedness represented by the Loan or to perfect a security interest in the collateral for the Loan.  None of the Mortgage Property or any other collateral securing the Loan have been seized by a governmental agency.  The existence of a valid and enforceable title insurance policy insuring such position shall suffice for purposes of meeting the requirements of this subsection.

7

(4)    <u>Documents are Valid and Enforceable</u>.  The Note, Mortgage and any security agreements, chattel mortgages or equivalent documents relating to it have been properly signed, are valid and their terms may be enforced by Buyer, its successors and assigns, subject only to bankruptcy laws, Servicemembers' Civil Relief Act, laws relating to administering descendants' estates, and general principles of equity.  The Note and the Mortgage and every other agreement, if any, executed by the Obligor(s) in connection with the Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms.  All parties to the Note, the Mortgage and each other such related agreement have legal capacity to enter into the Loan and to execute and deliver the Note, the Mortgage and each other related agreement, and the Note, the Mortgage and each other such related agreement have been duly and properly executed by the respective Obligor(s).  Seller had reviewed all of the documents constituting the Loan file and has made such inquires as it deems necessary to make and confirm the accuracy of the representations set forth therein.  All recording or other fees required to be paid in connection with the filing or recording of any document entered into in connection with the Loan have been paid in full by the Seller and/or the Obligor in accordance with the terms of the Loan.  Notwithstanding the foregoing, it is agreed that the use of FNMA and/or FHLMC approved form of loan documents shall be deemed to meet the requirements of this subsection so long as they meet the other requirements of this Agreement.

(5)    <u>Mortgage Property Not Subject to Liens</u>.  The Mortgaged Property is free and clear of all mechanics' liens, materialmen's liens or similar types of liens.  There are no rights outstanding that could result in any of such liens being imposed on the Mortgaged Property.

(6)    <u>Title Insurance</u>.    There is a mortgage title insurance policy on the Mortgaged Property.  The title insurance policy is on a current ALTA form (or other generally acceptable form) issued by an insurance company which, along with the policy itself, meets the requirements set forth in the Sales Criteria.  The title insurance insures Seller and its successors and assigns as holding a first priority lien on the Mortgaged Property.

(7)    <u>No Modification or Subordination of Mortgage</u>.  Seller has not done any of the following: (a) materially modified the Note or Mortgage; (b) satisfied or cancelled the Note or Mortgage in whole or in part; (c) subordinated the Mortgage in whole or in part; (d) released the Mortgaged Property in whole or in part from the Mortgage lien; or (e) signed any release, cancellation, modification or satisfaction of the Note or Mortgage.

(8)    <u>Mortgage in Good Standing</u>.  To the best of Seller's knowledge after due inquiry, there is no default, breach, violation, or event of default or acceleration existing under the Note or Mortgage, nor has there occurred any event that, with the passage of time or the giving of notice or both, could give rise to such default, breach, violation or event of default and/or acceleration.  Seller has not waived

8

any default, breach, violation or event of default or acceleration under the Note or Mortgage and all of the following that have become due and payable have been paid or an escrow of funds sufficient to pay them has been established: (a) taxes; (b) government assessments; (c) insurance premiums; (d) water, sewer and municipal charges; (e) leasehold payments; and (f) ground rents.  No collateral purporting to secure the Loan has been repossessed or disposed of or foreclosed against by Seller or any other person from the Obligor(s).

(9)     Advances.  Seller has not made, or knowingly received from others, any direct or indirect advance of funds in connection with the Loan on behalf of the Obligor, except as provided in the Sales Criteria.  This warranty does not cover payment of interest from the earlier of: (a) the date of the Note; or (b) the date on which the Mortgage proceeds were disbursed; or (c) the date one month before the first installment of principal and interest on the Note is due.

(10)    Property Intact.  To the best of Seller's knowledge after due inquiry, the Mortgaged Property is not damaged by waste, fire, earthquake or earth movement, wind, flood, tornado or other cause of loss.  There are no proceedings pending for the partial or total condemnation of the Mortgaged Property.

(11)    Improvements.  The  underlying property secured by the mortgage constitutes an individual, residential condominium unit and all appurtenant rights as permitted in the Sales Criteria and as reflected in the credit files and other materials submitted to Buyer.   The Seller will perform due diligence in accordance with FNMA/FHLMC Guidelines to confirm the underlying condominium unit is subject to a certificate of occupancy or similar use and occupancy certificate allowing the borrower to use and/or occupy the property. To the best of Seller's knowledge after due inquiry, (i)  the Mortgaged Property is free of damage and waste including but not limited to hazardous materials and there is no proceeding pending for the total or partial condemnation thereof, (ii) any improvements that are included in the appraised value of the Mortgaged Property are totally within the property's boundaries and building restriction lines, (iii) no improvements on any adjoining property nor any other condominium unit encroaches on the Mortgaged Property, and (iv) any and all home improvement goods and services to be provided or performed under a Loan have been provided in workmanlike manner, and in accordance with applicable regulatory codes, and to the Obligor(s) satisfaction.

(12)    Note Not Usurious.   The Note is not usurious and either meets or is exempt from any usury laws or regulations.

(13)    Compliance with Consumer Protection Laws.  Seller, and any originator if not the Seller, has complied with all applicable federal and state laws, regulations and other requirements including, but not limited to, the Real Estate Settlement Procedures Act and Regulation X; the Federal Fair Housing Act; the National Flood Insurance Act; the Equal Credit Opportunity Act and Regulation B; the Truth in Lending Act and Regulation Z; the Fair Credit Reporting Act; the Fair

9

Debt Collection Practices Act; the Home Mortgage Disclosure Act and Regulation C; the Gramm-Leach-Bliley Act and Regulation P; and all Florida laws relating to mortgage brokerage and mortgage lending activities (including, without limitation, Fla. Stat. 494.001 et seq.).  Seller further warrants compliance with the terms of Buyer's "Fair Lending Policy Statement," attached as <u>Exhibit B</u> of this Agreement..

(14)    <u>Property is Insured</u>.   A casualty insurance replacement policy on the Mortgaged Property is in effect and meets the requirements set forth in the Sales Criteria.   The policy is written by an insurance company which meets the requirements set forth in the Sales Criteria and provides fire and extended coverages for an amount at least equal to the amount required by the Sales Criteria.

(15)    <u>Loan Marketability</u>.   Seller knows of nothing involving the Loan, the Mortgaged Property, the Obligor or the Obligor's credit standing that can reasonably be expected to: (a) cause the Loan to be come delinquent; or (b) adversely affect the Loan's value.

(16)    <u>Default</u>.   To the best of Seller's knowledge after due inquiry, no default exists under the Loan.   The Loan is not in the possession of any attorney or collection agency for collection nor is it the subject of any actual or threatened bankruptcy proceeding or other litigation.

(17)    <u>Counterclaim</u>.   To the best of Seller's knowledge after due inquiry, the Obligor has not asserted any defense, set-off, right of rescission or counterclaim, either at law or in equity, in connection with the Loan.

(18)    <u>Genuineness of Signatures</u>.   All Loan documents are genuine and contain genuine signatures.   All Loan documents that Buyer requires to be original documents are original documents.   All certified copies of original documents are true copies and meet the applicable requirements and specifications of this Agreement, the Sales Criteria and any other requirements that Buyer has reasonably made of Seller.

(19)    <u>Full Disbursement of Proceeds</u>.   The Loan has been closed and, subject to table funding by the Buyer at the settlement table, the proceeds of the Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site improvement and as to any escrow funds therefore have been complied with other than any reserves set aside for punch list items.   All costs, fees and expenses incurred in making or closing the Loan and the recording of the Mortgage were paid, and the Obligor is not entitled to any refund of any amounts paid or due under the Note or Mortgage.

(20)    <u>Loan Fees</u>.   All costs, fees, expenses and charges payable directly or indirectly to Seller or any affiliate thereof in connection with the origination, making or closing of the Loan (collectively, the "<u>Loan Closing Fees</u>") have

10

complied with the Sales Criteria and have been paid in full.  In any event, without the prior written consent of the Buyer in each instance, the Loan Closing Fees with respect to any Loan do not exceed the sum of (i) an origination fee (the "Origination Fee") equal to one percent (1.0%) of the principal amount of the Loan, (ii) a documentation fee of $250, (iii) a loan underwriting fee of $350, and (iv) a processing fee of $372.  Neither Buyer nor any Indemnified Party, as hereinafter defined, shall have any obligation for the payment of any Loan Closing Fees.

(21)    Appraisals.  Upon the written request of the Buyer, Seller shall cause to be delivered to Buyer, at the Obligor's sole cost and expense, an appraisal of each Mortgaged Property signed prior to the approval of the applicable Mortgage application by a qualified appraiser, who (i) is licensed in the state where the Mortgaged Property is located (ii) is acceptable to Buyer, (iii) has, no interest, direct or indirect, in the Mortgaged Property or in any loan on the security thereof, and (iv) does not receive compensation that is affected by the approval or disapproval of the Loan.  The appraisal shall be  completed in compliance with the Uniform Standards of Profession Appraisal Practice, and all applicable federal and state laws and regulations, including FIRREA.   There have been no arrangements or agreements between Seller and the appraiser identified in the Federal Register by the Flood Emergency Management Agency as having flood hazards.  The Mortgaged Property is covered by flood insurance which shall be in an amount not less than the least of (a) the outstanding principal balance of the Loan, but not less than the minimum amount required to fully compensate for damage or loss in the event of partial loss, on a replacement cost basis, (b) the full insurable value of the Mortgaged Property, or (c) the maximum amount of insurance available under the National Flood Insurance Act of 1968, as amended.

(22)    Obligors are Real.  To the best of Seller's knowledge after due inquiry, the Obligor(s) on the Loan are the true and only Obligors thereon, are the real parties in interest thereon and are not straw men, nominees or accommodation parties or representatives of any other person, group or organization as to all or any part of the credit extended thereunder.

(23)    Benefits to Seller.  Neither Seller nor any stockholder, director, officer, partner, employee or agent of Seller has received any benefit, consideration or value, other than (a) the increased business to Seller and its affiliated entities represented by the Loan or (b) a prepaid finance charge disclosed to the Obligor(s) on the Loan or (c) insurance commissions from time to time heretofore paid from any Obligor(s) or anyone else in connection with the Loan or (d) the compensation to be paid to Seller by Buyer under this Agreement.

(24)    No Third Party Payments.  No payments made on the Loan were made directly or indirectly by any of the Seller, the stockholders, officers, directors, partners, employees or agents of Seller or by an assignor of the Loan or merchant who referred the Obligor(s) under the Loan.  Neither Seller nor any such person or entity has made any agreement or reached any understanding with any

11

Obligor(s) for any variation of the interest rate, schedules of payment or other terms and conditions of the Loan.  The Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage or an Obligor on such Loan, directly or indirectly, for the payment of any amount required under such Loan.  There is no obligation on the part of the Seller or any other party to make payments on account of the Loan which are in addition to those made by the Obligor(s).

(25)    Prior Payments Made.  All payments required under the terms of the Loan to be made on or prior to the Settlement Date have been made; the Loan was not or is not the subject of a first payment default under the Note.

(26)    Transfer of Mortgage Loans.  The assignment of mortgage with respect to each Loan is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located.  The transfer, assignment and conveyance of the Notes and the Mortgages by the Seller are not subject to the bulk transfer or similar statutory provisions in effect in any applicable jurisdiction.

(27)    Collateral Occupied.  To the best of Seller's knowledge after due inquiry, The collateral purporting to secure the Loan secures the Loan as of the date of transfer and is lawfully occupied as reflected in the credit files and other materials submitted to Buyer.

(28)    Mortgage Remedies.  The Mortgage contains customary and enforceable provisions, subject to applicable law, so as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby including, but not limited to, (a) by judicial or non-judicial foreclosure proceedings as may be authorized by law, and (b) the right, subject to any applicable federal restrictions, to call a default under the Mortgage and to accelerate the Mortgage indebtedness in the event the Mortgaged Property or a portion thereof is sold or transferred without the consent of the holder of the Mortgage.  All persons who have or will have an ownership, homestead or dower interest in the Mortgaged Property have signed the Mortgage relating to such property if said signature is permitted by law.

(29)    Servicemembers' Civil Relief Act.  The Obligor(s) has not notified the Seller, and the Seller has no actual knowledge of, any relief requested by or allowed to the Obligor(s) under the federal Servicemembers' Civil Relief Act (f/k/a Soldiers' and Sailors' Civil Relief Act of 1940).

(30)    No High Cost Loans.  None of the Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 or (b) so called "high cost", "threshold," "covered," or "predatory" loans under any other applicable state, federal or local law.

12

(31)    <u>Authorization to Share Information</u>.    All loan files relating to Loans purchased by Buyer shall contain the authorization to share information described in the Sales Criteria signed by the Obligor(s).    Seller also represents and warrants that it shall not forward any application or credit information of any Obligor(s) who does not authorize the sharing of information.

(32)    <u>No Tribal Law</u>.    The governing laws with respect to the origination, servicing and foreclosure of any Loan are the applicable provision of the laws of the state in which the collateral is located, or the laws of the United States, and not any tribal law, and no tribal court has exclusive jurisdiction of the same.

(33)    <u>Credit Report</u>.    Each credit report obtained in connection with the origination of a Loan was obtained from a major credit reporting agency, and was less than sixty (60) days old at the time of the closing of the related Loan.

(34)    <u>Obligor(s) Are Alive and Solvent</u>.    To the best of the Seller's knowledge after due inquiry, at the time of settlement, none of the Obligor(s) on such Loan is deceased and the Loan is not subject to any pending foreclosure, bankruptcy, insolvency, or reorganization proceeding, survey dispute, quiet title or adverse possession claims.    The debt on the Loan has not been discharged in a previously pending bankruptcy action.

(35)    <u>Sale Transaction</u>.    Under generally accepted accounting principles the transfer of the Loans may be treated as a sale on the books and records of the Seller and the Seller has determined that the disposition of the Loans pursuant to this Agreement will be afforded sale treatment for tax and accounting purposes.

(36)    <u>USA PATRIOT Act</u>.    The Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA PATRIOT Act of 2001 (collectively, the "Anti-Money Laundering Laws") and maintains, and will maintain, sufficient information to identify the applicable Obligor for purposes of the Anti-Money Laundering Laws.    The documents, instruments and agreements executed in connection with each of the Loans contain all provisions necessary to require the Obligors to provide any information necessary to allow Buyer or any subsequent holder of the Loan or any interest therein to comply with the requirements of the Anti-Money Laundering Laws.

(37)    <u>True Information</u>.    To the best of Seller's knowledge after due inquiry, all information and documents contained in a Loan file are genuine and the information contained in such documents is true, accurate and complete and such documents do not omit to state a fact necessary to make the statements contained therein not misleading.

(38)    <u>Sole Originator</u>.    Seller warrants that it is the sole originator of all Loans submitted to Buyer by Seller pursuant to this Agreement.

13

(39)   <u>Parties in Interest</u>.  All parties which have had any interest in the Loan, whether as mortgagee, assignee, pledge, mortgage broker or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgage Property is located, and (2) organized under the laws of such state, or (3) qualified to do business in such state, or (4) federal savings and loan associations or national banks having principal offices in such state, or (5) not doing business in such state.

(40)   <u>No Fraud</u>.  No error, omission, negligence, misrepresentation, fraud, identity theft, or similar occurrence has taken place on the part of the Seller.

(41)   These representations, warranties and covenants are made at and as of the time of origination, transfer, and conveyance of each Loan to Buyer, but Buyer's rights with respect to the breach of these representations, warranties and covenants shall continue after the purchase of the Loan by Buyer and after payment by Buyer of the purchase price for such Loan to Seller, and shall survive after any termination of this Agreement.  These representations, warranties and covenants are for the benefit of Buyer as well as the benefit of Buyer's successors and assigns.

**SECTION 10.   INTERIM SERVICING.**  All Loans sold by Seller under this Agreement shall be sold on a servicing-released basis.  Except as otherwise provided in this Agreement, as of the applicable Settlement Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of such Loan shall pass to Buyer, and Seller shall be discharged from all liabilities arising from such servicing from and after the Settlement Date.  Notwithstanding anything to the contrary contained in this Agreement, to the extent that the actual servicing of any Loan cannot be transferred from Seller to Buyer on the Settlement Date due to the requirements governing the timing of notice of transfer of servicing under RESPA, or other applicable laws, then Seller shall immediately transfer the closed Loan to a sub-servicer of Buyer's choice (the "<u>Interim Servicer</u>") pursuant to the terms and conditions of this Section.  Interim Servicer shall service such Mortgage Loan in compliance with reasonable and customary servicing practices and procedures of prudent loan servicers that service mortgage loans similar to the Loans, and in compliance with all applicable law, from and after the Settlement Date until the date on which the servicing of the Loan is transferred from the Interim Servicer to another servicer (the "<u>Servicing Transfer Date</u>"); however, the Servicing Transfer Date shall be no later than twenty-five (25) days past each related Settlement Date, unless otherwise agreed upon by the Buyer and the Seller.

During the interim servicing period, neither Seller nor Interim Servicer shall take any action to compromise, renew, modify or alter the terms of a Loan or to commence any judicial or non-judicial action to collect a Loan without the prior written consent of Buyer.  Any payments or monies received or held by Seller or Interim Servicer from or on behalf of an Obligor after the Servicing Transfer Date shall be held in trust by Seller and/or Interim Servicer, as the case may be, for the benefit of Buyer.  Any payments or monies received by Seller or Interim Servicer

from or on behalf of an Obligor after the Servicing Transfer Date shall be delivered to Buyer with forty-eight (48) hours of receipt thereof.

Each party shall be responsible for compliance with Section 6 of RESPA and Section 3500, 21 of Regulation X thereto, as amended, regarding transfer of servicing to the extent applicable to such party, including the obligation of Buyer to send a transferee notice and Seller to send a transferor notice when required.  For the purpose of complying with the information required by Section 6 of RESPA, Seller's address is 255 E. Brown Street, Suite 300, Birmingham, MI 48009; its toll-free telephone number is [888.LOAN.466]; Buyer's address is Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, 46th Floor, New York, New York 10022 its toll-free telephone number is (866) 736-6614.  Each party is responsible for notifying the other in writing in the event of any change in the foregoing information.

No later than five (5) days after each Settlement Date, Seller shall send to all Obligors and grantors, via first class mail, postage prepaid, a letter, the text and format of which shall have been pre-approved by Buyer, which shall advise Obligor that their Loan has been sold to Buyer. The letter shall contain such other information as Buyer may reasonably request.

Notwithstanding the foregoing, it is understood and agreed that Interim Servicing is not currently contemplated to occur pursuant to this Agreement.

**SECTION 11.    INDEMNIFICATION BY SELLER.**  Seller will indemnify and hold Buyer, each of Buyer's direct and indirect subsidiaries and affiliates, and the respective officers, directors, shareholders, partners, members, employees, agents, servants, counsel, representatives, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (collectively, the "Indemnified Parties")  harmless from and against any and all claims, losses, liabilities, obligations, penalties, actions, causes of action, claims of usury, suits, controversies,   damages (whether general, special or punitive), judgments, executions, claims and demands,   costs and expenses, including, without, limitation, attorneys' fees and expenses (whether or not litigation is commenced), liens and indemnities of every kind and nature whatsoever ("Claims") arising out of, under, in connection with, or related in any manner to: (i) any act or omission of Seller or any employee or agent of Seller, (ii) Seller's failure to perform any of its obligations hereunder, or (iii) the falsity, incorrectness or incompleteness of any representation or warranty made by Seller herein.  This indemnification shall include, but not be limited to, indemnification against Claims arising in connection with actions or proceedings instituted by or on behalf of (i) an Obligor with respect to any of the Loans, or (ii) any person prosecuting or defending any action or proceeding as a representative of or on behalf of a class or other interest group relating to the Loans, or (iii) any governmental instrumentality, body, or agency having jurisdiction under any applicable statute, rule, regulation, order or decree relating to the Loans.

Without limiting the provisions of the preceding paragraph, in the event that an action or proceeding is instituted by a third party with respect to a Claim, Buyer or the respective Indemnified Party shall be entitled to employ attorneys of its own selection to appear and defend the action or proceeding at Seller's sole expense, and to compromise or settle any such action or proceeding on such terms as Buyer or such Indemnified Party may reasonably deem appropriate;

provided, however, that any such compromise or settlement shall not include any admission of liability or wrongdoing by Seller without Seller's prior written consent.

In the event the Buyer or the respective Indemnified Party does not wish to defend such Claim pursuant to the preceding paragraph, the Buyer or such Indemnified Party shall promptly notify Seller of such Claim and Seller must assume the defense of such Claim with attorneys reasonably acceptable to Buyer or such other Indemnified Party. Seller shall not be responsible for such Indemnified Party's attorney fees incurred after the Seller assumes the defense of such Claim unless the respective Indemnified Party and Seller have claims adverse to each other, in which case the prevailing party's legal fees will be paid by the losing party. The failure of the Indemnified Party to notify the Seller of such Claim shall not relieve the Seller of any liability that the Seller may have with respect to such Claim except to the extent the Seller demonstrates that the defense of such Claim is materially prejudiced by such failure. The respective Indemnified Party shall have the right to reject any settlement proposed by the Seller in connection with Seller's defense of such Claim; provided, however, that if such settlement is (i) within the financial means of the Seller, (ii) without cost or liability to the Buyer, (iii) includes a full general release of the Buyer and each of the Indemnified Parties from any liability in form and content reasonably satisfactory to Buyer, and (iv) does not otherwise materially and adversely affect the Buyer or any of the other Indemnified Parties, the Buyer waives its right to reject such settlement offer. In the event that the Seller refuses or fails to undertake the defense of any such Claim within ten (10) days after notice of such Claim has been given to the Seller by an Indemnified Party, or at any time the Seller shall otherwise fail to diligently defend or purse settlement of such Claim or if such Claim could result in damages in excess of the amount that the Indemnified Party could reasonably expect to be recoverable from the Seller, then the Buyer or any other Indemnified Party shall have the right, but not the obligation, to undertake the defense, compromise or settlement of such Claim with counsel of its own choosing at the sole cost and expense of the Seller.

Upon determination of the amount of a Claim, whether by agreement between the Seller and the applicable Indemnified Parties, by an arbitration award, any other final adjudication or otherwise, the Seller shall pay to each of the applicable Indemnified Parties the amount of such Claim within thirty (30) days of the date such amount is determined. Thereafter, the amount of such Claim shall bear interest at a rate equal to ten percent (10%) per annum.

**SECTION 12.    REPURCHASE OF LOANS.**  Seller shall, within ten (10) business days, unless otherwise mutually agreed upon by Buyer and Seller but not to exceed an additional twenty (20) days, of Buyer's written request, repurchase from Buyer any Loan sold to Buyer if any warranty or representation made by Seller about the Loan is untrue and such impairs the value of the Loan(s), or if Seller has otherwise breached this Agreement in whole or in part with regard to any Loan(s) that impair the value of such Loan(s), or if Seller has failed to deliver any Loan document requested by Buyer or required by this Agreement or the Sales Criteria that impairs the value of such Loan(s). Notwithstanding the foregoing, Seller is not a guarantor of the Loans and is obligated to repurchase only upon the occurrence of the events set forth in the preceding sentence. In the event of such repurchase, Buyer shall tender to Seller all Loan documents required to be repurchased pursuant to this provision, and said documents, where appropriate, shall be endorsed to Seller without recourse to Buyer. Contemporaneous with such tender, Seller shall pay to

16

Buyer in immediately available funds an amount equal to such Loan's then unpaid principal balance, plus accrued interest (the "Repurchase Price"). The Repurchase Price shall include (i) any reasonable costs and expenses incurred in connection with the transfer to the Seller of the servicing rights related to the repurchased Loan, plus (ii) the amount of any unreimbursed servicing advances made by the servicer of the repurchased Loan, plus (iii) any reasonable costs and damages, excluding lost profits, incurred by Buyer or any assignee of Buyer in connection with any violation of any representation or warranty of the repurchased Mortgage Loan by the Seller. It is understood and agreed by the parties that the repurchase obligations hereunder are in addition to, and not in lieu of, all other remedies available in this Agreement or by law. Buyer shall have the right to set off of any amounts owed to Buyer hereunder or otherwise by Seller against any and all amounts owed to Seller by Buyer.

**SECTION 13.    TERMINATION.**  This Agreement may be terminated in the manner provided hereinafter; however, all of Seller's representations, covenants and agreements contained in this Agreement shall survive any termination of the Agreement.

13.01    Termination Without Cause.  This Agreement may be terminated without cause at any time by either party after sixty (60) days prior written notice to the other party. Termination under this Section 13.01 shall not terminate Seller's agreement to sell and Buyer's agreement to purchase those Loans which, prior to the effective date of termination, Buyer and Seller have agreed to purchase and sell, respectively, provided such Loans: (i) continue to meet the requirements of this Agreement and the Sales Criteria; and (ii) are approved for purchase by Buyer either prior or subsequent to the effective date of termination..

13.02    Termination for Cause.  This Agreement may be terminated immediately "for cause" upon the occurrence of any of the following: (i) if Seller or Buyer is in default under this Agreement, or (ii) if Seller becomes insolvent or bankrupt, or if a receiver is appointed for Seller, or if a petition for reorganization is filed by or against Seller. If Seller is in default under this Agreement, Buyer shall give Seller written notice of such default and provide Seller with a period of ten (10) days in which to cure such default. If Seller shall not have cured such default within ten (10) days from the date of Buyer's notification, then Buyer shall have the option to immediately terminate this Agreement upon notification to Seller. If Buyer is in default under this Agreement, Seller shall give Buyer written notice of such default and provide Buyer with a period of ten (10) days in which to cure such default. If Buyer shall not have cured such default within ten (10) days from the date of Seller's notification, then Seller shall have the option to immediately terminate this Agreement upon notification to Buyer. If Seller becomes insolvent or bankrupt, or if a receiver is appointed for Seller, or a petition for reorganization is filed by or against Seller, this Agreement shall automatically terminate. Termination under this Section 13.02 shall release Buyer from any and all obligations to purchase Loans thereafter.

**SECTION 14.    RELATIONSHIP OF PARTIES.**  Seller is an independent contractor, and this Agreement and any transactions entered into pursuant hereto shall not

17

be deemed to create between Buyer and Seller a relationship of agency, legal representation, partnership, joint venture, debtor/creditor, or employment. No party shall be deemed to designate the other party as its agent, and Buyer and Seller agree that neither party is in any way authorized to make any contract, agreement, warranty or representation, or to create any obligation, express or implied, on behalf of the other. Neither party assumes any liability or incurs any obligations of the other by the execution of this Agreement. No part of the consideration to be paid for any Loan shall be considered a fee paid for the goodwill of Seller.

**SECTION 15.    CONFIDENTIALITY AND NONDISCLOSURE.** EXCEPT AS OTHERWISE REQUIRED BY LAW, SELLER, ITS EMPLOYEES AND AGENTS SHALL NOT DISCLOSE THE EXISTENCE OF THIS AGREEMENT OR THE FACT THAT SELLER IS ABLE TO OFFER BUYER'S LOAN PRODUCTS AND PRICES. SELLER AND BUYER SHALL KEEP ALL COMMUNICATIONS BETWEEN SELLER AND BUYER CONFIDENTIAL INCLUDING ALL "NONPUBLIC PERSONAL INFORMATION" (AS THAT TERM IS DEFINED IN TITLE V OF THE GRAMM-LEACH-BLILEY ACT (THE "_ACT_") AND UNDER APPLICABLE REGULATIONS ISSUED UNDER THE ACT) OF THE CUSTOMERS OR CONSUMERS OF BUYER AND WHICH IS FURNISHED BY OR THROUGH THE BUYER TO THE SELLER. Irreparable harm shall be presumed if the Seller or Buyer breaches this Section. In addition to any other remedies to which the Buyer or Seller may be entitled as a result of such a breach, the Buyer or Seller shall be entitled to seek injunctive relief immediately enjoining the Seller or Buyer, as applicable, from continuing its breach and without posting bond therefore.

Without limiting the foregoing, Seller acknowledges and agrees that it shall not, except as required by law, and it shall cause its directors, officers, employees, agents and advisors not to, without the prior written consent of Buyer (which consent shall be granted or withheld by Buyer in its sole and absolute discretion) disclose to any third party the existence of this Agreement, the terms hereof, or the involvement of Buyer and/or its affiliates in the transactions contemplated hereby. Without limiting the generality of the foregoing, Seller shall not, without the prior written consent of Buyer, refer to Buyer or its affiliates verbally or in writing or use the logo of Buyer or its affiliates in connection with engagement of any third party service providers, the origination of any Loan or the marketing of the Loans to prospective Obligors, including, without limitation, in any Loan documents, in any advertisements or other promotional or information materials regarding the Loans, in any press releases or other public announcements or media, or on any internet website.

**SECTION 16.    CONFIDENTIAL INFORMATION; PRIVACY.** Seller hereby acknowledges that Seller may have access to, or Buyer may provide to Seller information and/or documentation which Buyer regards as confidential or otherwise of a proprietary nature. Buyer hereby acknowledges that Buyer may have access to, or Seller may provide to Buyer information and/or documentation which Seller regards as confidential or otherwise of a proprietary nature.

16.01   <u>Definition of Confidential Information</u>.  "<u>Confidential Information</u>" includes, but is not limited to, the following, whether now in existence or hereafter created:

    (a) all information, in whatever medium, and copies thereof, marked as "confidential" or with similar designation, or information which Seller or Buyer, as applicable, should, in the exercise of its reasonable business judgment, recognize to be confidential;

    (b) all information, including usage, concerning intellectual property or other property protected by rights embodied in copyrights, whether registered or unregistered (including all derivative works), "know how," trade secrets, and any intellectual property rights of Buyer or Seller;

    (c) all business, financial or technical information of Buyer or Seller, and any of Buyer's or Seller's vendors, as the case may be;

    (d) any and all information about employees or consumer customers of Buyer of any nature whatsoever, and specifically including but not limited to employee or customer lists, employee or customer financial information, and the fact of the existence of a relationship, or potential relationship, between Buyer and its employees or customers, and any and all information about employees of Seller of any nature whatsoever, and specifically including but not limited to employee lists, employee financial information, and the fact of the existence of a relationship, or potential relationship, between Seller and its employees;

    (e) all financial information, in whatever medium, and copies thereof, with respect to the condominium project commonly know as Canyon Ranch Living Miami Beach Condominium located in Miami Beach, Florida, any Obligors or potential Obligors;

    (f) the names and contact information of any Obligors or potential Obligors provided to Seller or Buyer, as applicable, by, or at the direction of, Buyer or Seller, as applicable, or any affiliate thereof;

    (g) this Agreement and the Sales Criteria; and

    (h) any and all documents, instruments and agreements, and any and all data or other information, in connection with the sale of Loans by Seller and the purchase of the Loans by Buyer, in accordance with the terms hereof.

16.02   Seller and Buyer agree now and at all times in the future that all such Confidential Information shall be held in strict confidence and disclosed only to those employees or agents whose duties reasonably require access to such information provided, however, that such materials may be disclosed by Buyer to its employees, agents, representatives and counsel and to its subsidiaries and affiliates and their respective employees, agents, representatives and counsel. Seller and Buyer shall protect such Confidential Information using the same degree of care, but no less than a reasonable degree of care, to prevent

19

unauthorized use, disclosure or duplication (except as required for backup systems) of such Confidential Information as Seller and Buyer each use to protect its own confidential information.

16.03    If Seller or Buyer is required by a court or governmental agency having proper jurisdiction to disclose any Confidential Information, Seller shall promptly provide to the Buyer notice of such request so that Buyer may seek an appropriate protection order, and if Buyer is required by a court or governmental agency having proper jurisdiction to disclose any Confidential Information, Buyer shall promptly provide to the Seller notice of such request so that Seller may seek an appropriate protection order.

16.04    Seller and Buyer shall establish data security policies and procedures to ensure compliance with this section and that are designed to:

1.    Ensure the security and confidentiality of customer(s)' information;

2.    Protect against any anticipated threats or hazards to the security or integrity of such information;

3.    Protect against the unauthorized access to, disclosure of, or uses of such information that could result in substantial harm or inconvenience to customer(s); and

4.    Otherwise comply with the requirements of the Gramm-Leach-Bliley Act and the regulations promulgated thereunder, and any and all local or state privacy laws that are applicable to this Agreement and Seller's and Buyer's businesses.

16.05    In the event of any disclosure or loss of, or inability to account for, any of Buyer's Confidential Information, Seller will promptly notify Buyer. In the event of any disclosure or loss of, or inability to account for, any of Seller's Confidential Information, Buyer will promptly notify Seller.

16.06    <u>Limited Use of Confidential Information and Survival of Obligations</u>.

(a)    Seller and Buyer may use the Confidential Information only as necessary for Seller's or Buyer's performance hereunder and for no other use. Seller's or Buyer's limited right to use the Confidential Information shall expire upon the expiration or termination of this Agreement for any reason, but its confidentiality obligations shall survive beyond such termination or expiration.

(b)    Upon expiration of Seller's limited right to use the Confidential Information, Seller shall return all physical embodiments thereof to Buyer or, with Buyer's permission, destroy the Confidential Information and provide Buyer written certification of its compliance with this Section. Upon expiration of Buyer's

limited right to use the Confidential Information, Buyer shall return all physical embodiments thereof to Seller or, with Seller's permission, destroy the Confidential Information and provide Buyer written certification of its compliance with this Section

16.07   Disclosure to Third Parties.  If Seller or Buyer is allowed or required to disclose any Confidential Information to any third parties in the context of Seller's or Buyer's presentations or negotiations with third parties, then Seller or Buyer shall ensure that such third parties will have express obligations of confidentiality and non-disclosure, with regard to the Confidential Information, substantially similar to Seller's or Buyer's obligations hereunder.  Liability for damages due to disclosure of the Confidential Information by any such third parties shall be with Seller or Buyer, as the case may be.

16.08   Remedies.   If Seller, its agents or employees, violate the obligations of confidentiality and non-disclosure set forth herein, the parties agree that irreparable injury may result to the Buyer or third parties entrusting Confidential Information to Buyer, that Buyer's remedy at law for damages may be inadequate, and that Buyer will be entitled to an injunction to restrain any continuing breach by Seller its agents or employees with no bond required, or if bond is required, only a nominal bond.  Notwithstanding any other provision of this Agreement purporting to limit Seller's liability, Buyer shall further be entitled to recover any other rights and remedies which it may have at law or in equity. If Buyer, its agents or employees, violate the obligations of confidentiality and non-disclosure set forth herein, the parties agree that irreparable injury may result to the Seller or third parties entrusting Confidential Information to Buyer, that Seller's remedy at law for damages may be inadequate, and that Seller will be entitled to an injunction to restrain any continuing breach by Buyer its agents or employees with no bond required, or if bond is required, only a nominal bond. Notwithstanding any other provision of this Agreement purporting to limit Buyer's liability, Seller shall further be entitled to recover any other rights and remedies which it may have at law or in equity.

Notwithstanding the foregoing, all documents, forms, or other written materials created solely by Seller in order to carry out and perform its obligations under this Agreement shall be deemed the property of Seller and may not be used by Buyer in any other transactions without the express written consent of Seller, which may be withheld in its sole discretion; provided, however, that such materials may be disclosed and used by Buyer to its employees, agents, representatives and counsel and to its subsidiaries and affiliates and their respective employees, agents, representatives and counsel.

**SECTION 17.   NON-SOLICITATION.** Seller hereby agrees that, with respect to each Loan purchased by Buyer in accordance with the terms hereof, neither Seller nor any affiliate of Seller shall take any action to directly or indirectly solicit the applicable Obligor(s) in order to effect the refinancing of such Loans previously purchased by Buyer for a period of twenty-four (24) months from the date upon which Buyer purchased the applicable Loan.

SECTION 18.   PREPAYMENTS.  In the event that any Loan is prepaid by the Obligor, the Seller shall have no obligation to pay any fees or percentages of the Premium initially paid by Buyer to Seller, and the Buyer shall have no right under this Agreement to collect any such fees or percentages from the Seller.

SECTION 19.   POWER OF ATTORNEY.  In order to enforce Buyer's rights under this Agreement, Seller shall, upon the request of Buyer or its assigns, perform or cause to be done and performed, every reasonable act and thing necessary or advisable to put Buyer or its assigns in position to enforce the payment of the Loans and to carry out the intent of this Agreement, including the execution of and, if necessary, the recordation of additional documents including separate endorsements and assignments upon request of Buyer.  In addition, Seller hereby irrevocable appoints any officer or employee of Buyer or its assigns its true and lawful attorney to do and perform every act necessary, requisite, proper, or advisable to be done to put Buyer or its assigns in position to enforce the payment of the Loans.  At the Buyer's request, the Seller shall execute and deliver to the Buyer one or more separate Limited Powers of Attorney in the form set forth as Exhibit A attached hereto.

SECTION 20.   NOTICES.   Any notice, request, consent, waiver or other communication required or permitted under or in connection with this Agreement will be deemed satisfactorily given if it is in writing and is delivered either personally to the addressee thereof, or by prepaid registered or certified U.S. mail (return receipt requested), or by a nationally recognized commercial courier service with next-day delivery charges prepaid, or by facsimile (voice or transmission confirmed), or by any other reasonable means of personal delivery to the party entitled thereto at its respective address set forth below.  Any party to this Agreement may change its address or facsimile number for notice purposes by giving notice thereof to the other parties hereto in accordance with this Section, provided that such change shall not be effective until two calendar days after notice of such change.  All such notices and other communications will be deemed given and effective (a) if by mail, then upon actual receipt or five calendar days after mailing as provided above (whichever is earlier), or (b) if by facsimile, then upon successful transmittal to such party's designated number, or (c) if by nationally recognized commercial courier service, then upon actual receipt or one business day after delivery to the courier service (whichever is earlier), or (d)  if otherwise delivered, then upon actual receipt.

For the purposes of this Agreement, all notices shall be sent to the addresses set forth below:

If to the Seller:

> Vacation Finance/Americor Mortgage, Inc
> 255 East Brown Street
> Birmingham, MI 48009
> Attention:     Bob Waun, Managing Director
> Facsimile:     _____

with copies to:

Carmel & Carmel PC
5301 Washington Avenue NW, Suite 570
Washington DC 20015
Attention:       Frank J. Carmel
Facsimile:      (202) 237-1701

If to the Buyer:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention:       Lonnie Rothbort
Facsimile:      (646) 758-3387

with copies to:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention:       Joelle Halperin
Facsimile:      (646) 758-3387

and:

Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attention:       Richard A. Morrison
Facsimile:      (305) 374-7159

**SECTION 21.   WAIVERS/CUMULATIVE RIGHTS.**  No course of dealing on the part of either party, its officers or employees, nor any failure or delay by either party with respect to exercising any right, power or privilege under this Agreement shall operate as a waiver thereof.  The parties hereto shall be entitled to all rights and remedies available under applicable law, as well as those available under this Agreement.  All such rights and remedies shall be cumulative and the exercise or partial exercise of any such right or remedy shall not preclude the exercise of any other right or remedy.

**SECTION 22.   ASSIGNMENT.**  Seller may not assign this Agreement without the prior written consent of Buyer.  A change in the ownership or control, merger or consolidation of Seller shall be considered an assignment for purposes of this Agreement.  Buyer may freely assign this Agreement, and this Agreement shall be binding upon and inure to the benefit of Buyer, its successors and assigns.

**SECTION 23.   SEVERABILITY.**  If for any reason a portion of this Agreement is found to be illegal or unlawful under applicable law, that portion of this Agreement will be deleted and remainder of this Agreement shall remain in effect.

**SECTION 24.    GOVERNING LAW.**    This Agreement shall be construed in accordance with and governed by the laws of the State of New York, without regard to any principles of conflicts of law.

**SECTION 25.    MODIFICATION.**    This Agreement may be modified only by an instrument in writing signed by both Seller and Buyer.

**SECTION 26.    ATTORNEY'S FEES.**    If Seller or Buyer should breach or fail to perform any provision of this Agreement, the defaulting party shall pay all costs and expenses, including court costs and reasonable attorney's fees incurred by the other party in the enforcement of this Agreement.

**SECTION 27.    FIDELITY BOND.**    Upon request, Seller will deliver to Buyer a true and correct copy of Seller's fidelity bond and Seller's errors and omissions policy, as currently in effect, the amounts and coverages of both of which will be acceptable to Buyer. Seller shall upon request furnish proof of such coverage at or before the first Settlement Date and, upon request, annually thereafter.

**SECTION 28.    FINANCIAL STATEMENTS.**    Seller shall furnish to Buyer for as long as this Agreement is in effect (i) as soon as available, and in any event within ninety (90) days after the end of each fiscal year, certified financial statements consisting of a balance sheet as of the end of such fiscal year, together with related statements of income or loss and reinvested earnings and changes in financial position for such fiscal year, prepared by independent certified public accountants in accordance with generally accepted accounting principles, and (ii) if available, within ten (10) days after the end of each quarterly period interim internal financial.  In addition, Seller shall provide Buyer, from time to time, upon reasonable request and thirty (30) days' notice, any other financial reports or statements reasonably required by Buyer.

**SECTION 29.    POST-SALE LOAN PAYMENTS AND INQUIRIES.**    Seller agrees that it will remit to Buyer, within forty-eight (48) hours after receipt, any payment on a Loan including, without limitations, all payments of principal and interest, late charges, and bad check charges received from an Obligor on or after the Settlement Date for such Loan at the following address: 1271 Avenue of the Americas, 46th Floor, New York, New York 10022 such other address as Buyer may designate.  Seller shall remit such payment via an overnight delivery service.  Seller agrees to forward to Buyer promptly all inquiries, communications and remittances received by Seller with respect to any Loan purchased by Buyer, and to reimburse Buyer upon written demand for any and all losses Buyer may reasonably suffer as a result of Seller's failure to do so.

**SECTION 30.    TRANSFER OF SERVICING RIGHTS AND PMI.**    Seller shall take any and all actions as may be requested by Buyer in order to consummate the transfer from Seller to Buyer of servicing rights for each Loan, including, without limitation, providing   notices to any private mortgage insurance companies.

**SECTION 31.    DELIVERY OF MORTGAGE DOCUMENT.**    With respect to each Loan, the Seller shall cause by no later than ninety (90) days after the Settlement Date

24

for such Loan, the original recorded Mortgage and title policy and, if applicable, the prior assignment of mortgage to be delivered to Buyer.

SECTION 32.    **LOCATION OF MORTGAGED PROPERTY.**  The loans to be purchased pursuant to the terms of this Agreement shall be secured by real property located in the State of Florida.

SECTION 33.    **LENDER'S OBLIGATIONS.**    Seller shall, upon reasonable notice from Buyer, provide Buyer with access to Seller's operations, records, and documentation to determine Seller's compliance and monitoring with representations, warranties and covenants made by Seller herein and with the Sales Criteria.  The parties shall agree on a mutually convenient date for each such audit within fifteen (15) days of Seller's receipt of an audit notice.  The audit will be conducted within 45 days of receipt of audit notice.  If the parties are unable to do so, then Buyer may, in its sole discretion, suspend the purchase of loans until the parties reach agreement on the audit date.  Annually, Seller shall, within forty-five (45) days after receipt, furnish Buyer with a copy of its state broker license (or equivalent, if applicable) for each state in which business is or will be conducted with Buyer.

SECTION 34.    **SURVIVAL OF REPRESENTATIONS, WARRANTIES AND INDEMNIFICATIONS.**  All representations, warranties and indemnifications under this Agreement shall survive the termination of this Agreement and shall be deemed given and shall not be diminished by any or all underwriting or processing of information, data or documents or the omission to underwrite or process said information, data or document supplied to Buyer under this Agreement.

SECTION 35.    **CONSTRUCTION.**  This Agreement shall not be construed more strictly against Buyer merely by virtue of the fact that the same has been prepared by Buyer or its counsel, it being recognized that Seller has had the opportunity to consult with counsel concerning same.  Seller acknowledges and waives any claim contesting the existence and the adequacy of the consideration given by Buyer in entering into this Agreement.

SECTION 36.    **JURISDICTION.**

(1)    Commencing on September 15, 2008, the Buyer and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (Manhattan Division) (the "Bankruptcy Court") which are being jointly administered under Case No. 08-13555 (collectively, the "Bankruptcy Case").  The Buyer is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The parties hereto agree that no action relating to the interpretation and enforcement of this Agreement may be brought in a court that is not located within the State of New York.  To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over such actions. Each of the parties hereto agrees that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Buyer, Seller

25

or any other party may otherwise have to bring any action or proceeding to enforce any Loan or any of the documents, instruments or agreements evidencing or securing any Loan or otherwise relating to any Loan against any Obligor or its respective properties in the courts of any jurisdiction.

(2)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any document executed pursuant hereto in any court referred to in paragraph (1) of this subsection; and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 20 hereof.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**SECTION 37.  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION  HEREWITH, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR IN ANY WAY RELATING TO ORIGINATION, OFFERING, MAKING OR SALE OF LOANS (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.**

IN WITNESS WHEREOF, this Agreement has been executed as of the date set forth above.

SELLER:

VACATION FINANCE/AMERICOR MORTGAGE

By: _____

Name: _____

Title: _____

BUYER:

LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York

By: _____

Name: _____

Title: _____

SIGNATURE PAGE TO MORTGAGE LOAN PURCHASE AGREEMENT (#206743)

**EXHIBIT A**

**Limited Power of Attorney**

VACATION FINANCE/AMERICOR MORTGAGE ("SELLER"), a _____ whose address is _____ through the duly authorized representative whose signature appears below makes and appoints and by this Limited Power of Attorney does make, constitute and appoint Lehman Brothers Holdings Inc. (hereinafter referred to as "LBHI"), a Delaware corporation, whose address is 1271 Avenue of the Americas, 46th Floor, New York, New York 10022, the true and lawful attorney-in-fact for SELLER; and in SELLER's name and stead to execute, by the signature of any authorized LBHI employee or agent, any and all documents for the purpose of assigning and transferring to LBHI any and all mortgages, deeds of trust, security instruments, and the related notes, including, but not limited to the assignments of mortgages, deeds of trust, and security instruments; the note endorsements, affidavit and agreements, for any mortgage loan transaction closed and funded in SELLER's name or transferred and assigned to SELLER and committed to LBHI by SELLER under the Mortgage Loan Purchase Agreement between SELLER and LBHI giving and granting unto the said attorney-in-fact full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done, and to make, correct, amend, endorse, accept, or deliver all agreements and instruments; as fully, to all intents and purposes, as SELLER might or could do if present at the doing thereof through one of its authorized representatives, with full power of substitution and revocation. SELLER hereby ratifies and confirms all that the said attorney-in-fact shall lawfully do or cause to be done by virtue of this Limited Power of Attorney. SELLER may only revoke this Limited Power of Attorney in writing and only upon the expiration of one hundred eighty (180) days from the effective date of the termination of the Mortgage Loan Purchase Agreement in accordance with the terms thereof, and this Limited Power of Attorney shall be deemed to be a power coupled with an interest for such purpose.

IN TESTIMONY WHEREOF, I have hereto set my hand and seal this _____ day of April, 2009.

SELLER: _____
(Full legal name of SELLER entity and, if applicable, full name of any and all d/b/a entities)

BY: _____
(Signature of authorized officer of SELLER)

_____
(Printed name of authorized officer)

_____
(Title of authorized officer)

## ACKNOWLEDGMENT/CORPORATE

STATE OF _____   )
                                                      ) ss
COUNTY OF _____   )

On this _____ day of April, 2009, before me appeared _____, to me personally known, who, being by me duly sworn, did say that (s)he resides at _____, that (s)he is the _____ of _____, a _____, the **[corporation]** described in and which executed the foregoing instrument, and that (s)he signed his/her name thereto by order of the Board of Directors of such corporation.

[Stamp]

_____
                                              Notary Public
                                              My Commission Expires: _____

**This instrument was drafted by and after recording return to:**

Richard A. Morrison, Esq.
Weil, Gotshal & Manges LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131

A-2

**EXHIBIT B**

**Lehman Brothers Holdings Inc. Fair Lending Policy Statement**

Lehman Brothers Holdings Inc. ("LBHI") is committed to lending fairness and fair lending practices.

The *Equal Credit Opportunity Act* and the *Fair Housing Act* expressly prohibit discrimination on the basis of race, color, religion, national origin, marital status, age (provided the applicant is of legal age to have the capacity to enter into a binding legal contract), sex, disability, familial status, receipt of public assistance, or the exercise in good faith of any right under the *Consumer Credit Protection Act* in any aspect of a loan transaction. The aforementioned are commonly known as prohibited bases.

State and federal laws governing unfair and deceptive trade practices prohibit banks from engaging in practices which misrepresent or omit information that causes customers to be mislead as to the true nature of a product or service, or which cause substantial injury to a consumer.

All credit products of LBHI shall be available to all applicants on a consistent and fair basis, provided the applicants meet our guidelines of safe and sound lending along with applicable credit policies and business focuses.

No applicant shall be discouraged on a prohibited basis from applying for loan products offered by LBHI.

LBHI shall comply with all fair lending laws and regulations including the *Equal Credit Opportunity Act,* the *Home Mortgage Disclosure Act*, the *Fair Housing Act*, and the *Community Reinvestment Act.*

LBHI, or any employee thereof, shall not discriminate against any credit request on the basis of race, color, religion, national origin, marital status, age (provided the applicant is of legal age to have the capacity to enter into a binding legal contract), sex, sexual orientation, disability, familial status, receipt of public assistance, or if the individual has exercised in good faith any right under the *Consumer Credit Protection Act*, or on any other prohibited basis.

LBHI shall comply with all laws and regulations prohibiting unfair and deceptive trade practices by adopting policies and procedures to ensure that information provided to customers and potential customers is complete and accurate; to clearly and accurately disclose all material product or service features; and to maintain complaint processes to ensure that any complaints alleging unfair or deceptive practices are researched and adequately addressed.

LBHI shall have such policies, underwriting standards, training, review, and compliance procedures as may be required to ensure compliance with both the technical requirements and spirit of this Fair Lending Policy Statement.

**EXHIBIT C**

**Sales Criteria**

**Primary Credit Criteria:**

All Loans shall satisfy the following criteria:

- Loans at maximum 70% loan-to-contract price (LTC)
- 680 minimum mid FICO score – seeking portfolio average of 700
- Debt-to-income ratio (DTI) can not exceed 40%, no allowance will be given for property rental income in DTI calculation
- Borrower must prove intent to use the property as primary or pay up to a 50-basis-point premium for non-primary resident status
- Document and sourced funds required for down payment plus 12 months PITI reserve
- 12 month PITI liquid reserves post closing
- Fannie Mae DU automated underwriting system must score "Accept" or higher (in addition to manual underwriting methods)
- Third party Purchase Contracts are not acceptable (no flipping)
- Borrower must be a US citizen or Permanent Resident Alien
- Foreign Nationals require 50% loan-to-value, additional conditions may apply
- Income verified with 4506T prior to closing
- No previous foreclosures or bankruptcy permitted in last 36 months

**Term and Rate Options**

- 30 year fixed rate
- 15 year fixed rate
- 10/1 ARM (10 yrs fixed rate, 1 yr ARM for term of 30 yrs)

**Suggest Rate**

Interest Rate shall be calculated off of the base conforming rate by adding premiums for condo, jumbo and non-residency status, as follows:



C-1

**EXHIBIT C**
**(continued)**

**Sales Criteria**