**Hearing Date and Time: June 24, 2009 at 10:00 a.m (Prevailing Eastern Time)**
**Objection Date and Time: June 8, 2009 at 4:00 p.m (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | : | |
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

## NOTICE OF MOTION OF LEHMAN BROTHERS HOLDINGS INC. FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING AND APPROVING ENTRY INTO TRANSACTION AGREEMENT

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. ("LBHI" and together with its affiliated debtors, the "Debtors") for entry of an order pursuant to sections 105(a) and 363 of the Bankruptcy Code authorizing and approving entry into a transactions agreement, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **June 24, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R.

Fife, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy

Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and

Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these

cases; (v) Lowenstein Sandler PC, 1251 Avenue of the Americas, New York, New York 10020,

Attn: Peter D. Greene, Esq., Paul Kizel, Esq., Andres Rueda, Esq., and Ethan A. Skerry, Esq.,

attorneys for LibertyView Capital Management, LLC, and LibertyView GP, LLC; and (vi) any

person or entity with a particularized interest in the Motion, so as to be so filed and received by

no later than **June 8, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "<u>Objection Deadline</u>").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: May 15, 2009
       New York, New York

/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|  |  |
| :--- | :--- |
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-----------------------------------------------------------------x

## MOTION OF LEHMAN BROTHERS HOLDINGS INC. FOR AN ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING AND APPROVING ENTRY INTO TRANSACTION AGREEMENT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as debtor in possession ("LBHI", and together

with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), files this Motion and respectfully

represents:

## Background

1.    Commencing on September 15, 2008, and periodically thereafter, the

Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009, the Court approved the U.S. Trustee's appointment of the Examiner.

5.      By order, dated December 22, 2008, the Court approved the Debtors' entry into that certain Unit Purchase Agreement, dated as of December 1, 2008 (as amended, the "IMD Agreement"), by and between NBSH Acquisition, LLC (or its successor, Neuberger Berman Group LLC, the "IMD Purchaser") and LBHI, and the Debtors' subsequent sale and transfer of, among other things, "Purchased Assets" and "Assumed Liabilities" (as each term is defined in the IMD Agreement) to the IMD Purchaser in connection with Lehman's sale of certain assets and liabilities related to its Investment Management Division.  [Docket No. 2350]. Pursuant to the IMD Agreement, however, Lehman was not required to transfer, and the IMD Purchaser was not required to acquire, certain assets that were defined as "Excluded Assets" in the IMD Agreement.  Likewise, the IMD Agreement provided that, as between LBHI and the IMD Purchaser, the IMD Purchaser was not required to assume, and LBHI would be responsible

for discharging and satisfying, or causing to be discharged and satisfied, those liabilities that

were defined as "Excluded Liabilities" in the IMD Agreement.  The IMD Agreement further

provided that LBHI would indemnify the IMD Purchaser for certain liabilities.  The transactions

described in the IMD Agreement (the "IMD Sale") were consummated on May 4, 2009.

### Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

7.      By this Motion, LBHI seeks authorization, pursuant to sections 105(a) and

363 of the Bankruptcy Code, to enter into that certain Transaction Agreement (the

"Agreement"), dated as of April 23, 2009, and described more fully below, among LBHI, certain

of its non-Debtor affiliates and certain third parties, and to take all actions necessary to comply

with its obligations under the Agreement, including certain indemnification obligations.  A copy

of the Agreement is attached hereto as Exhibit A.

8.      Pursuant to the Agreement, two of LBHI's non-Debtor affiliates, Lehman

Brothers Asset Management Inc. ("LBAM") and  Neuberger Berman Asset Management, LLC

("NBAM"), will transfer certain assets, obligations, and responsibilities to companies that have

been formed by former Lehman employees that previously managed the assets and liabilities

being transferred.  LBHI determined that the expense of maintaining such assets and liabilities

would likely exceed the benefit of doing so, and, therefore, a transfer of the assets and liabilities

is in the best interest of LBHI's estate.  LBHI, LBAM and NBAM have further determined that

entry into the Agreement is the best available means for (i) disposing of such assets, which were

classified as Excluded Assets pursuant to the IMD Agreement, and (ii) limiting LBHI's liability

for associated Excluded Liabilities.  In order to facilitate the transaction, and in return for among

other things, certain releases, LBHI has agreed to provide a limited indemnification for the

parties purchasing the Excluded Assets.

**The Agreement**[1]

9.      LBAM is a direct, wholly-owned, non-Debtor subsidiary of LBHI and was

a seller in connection with the IMD Sale.  Historically, Neuberger Berman, LLC served as the

investment advisor to certain master funds that will be transferred pursuant to the Agreement in

accordance with investment advisory agreements.  Neuberger Berman, LLC was also an

investment manager for a certain trust pursuant to a management agreement, a sole member of a

loan fund pursuant to a loan fund operating agreement, and a collateral agent of another fund.  In

preparation for the closing of the IMD Sale, these functions were transferred to LBAM.

10.      NBAM, now known as LB Hercules Asset Management, LLC, is an

indirect, non-Debtor subsidiary of LBHI and another seller in connection with the IMD sale.  It is

the sole general partner in, among others, the master funds that LBAM advises; it holds certain

interests in another fund; it acts as the sole manager of certain domestic feeder funds; and it

holds the non-participating voting shares (management shares) in certain foreign feeder funds.

11.      Each of the funds referenced above, defined in the Agreement as the

"Funds," is an "Excluded Asset" pursuant to the IMD Agreement.  Certain non-Debtor

subsidiaries of LBHI own limited partner and/or investor interests in certain of the Funds (the

"Fund Investors").[2]

---

[1]      This summary of the Agreement is qualified in its entirety by the terms and provisions of the Agreement.
To the extent there are any inconsistencies between the description of the Agreement contained herein and the terms
and conditions of the Agreement, the terms of the Agreement shall control. Capitalized terms that are used herein,
but not defined, have the meanings ascribed to them in the Agreement.

[2]      These subsidiaries include Lehman Brothers Offshore Partners Ltd., LB I Group Inc., Neuberger Berman
Holdings, LLC, and NBAM.

12.     LBAM, NBAM, the Debtors and their advisors have undertaken a comprehensive review of certain of the Excluded Assets to develop a strategy to maximize their value and, at the same time, limit Lehman's exposure to post-petition liability.  As a result of the historical roles that Richard Meckler ("Meckler"), President and Chief Investment Officer of a division of LBAM, and Randall Hutton (together with Meckler, the "Individual Managers"), Senior Portfolio Manager and Managing Director of the same LBAM division, played in the formation and management of the Funds, their intimate knowledge of the assets held by the Funds, and their personal relationships with the limited partners and other investors of the Funds, LBAM, NBAM, and the Debtors believe that the Individual Managers are uniquely suited to manage the Funds in a manner that will minimize liability and maximize the value of the limited partner and investor interests of the Fund Investors and other interested parties.

13.     Thus, following extensive negotiations, LBAM, NBAM, and LBHI entered into the Agreement with the Individual Managers, LibertyView Capital Management, LLC (the "NewCo Manager"), and LibertyView GP, LLC (the "NewCo General Partner," and together with the NewCo Manager, the "Transferees", and collectively with the Individual Managers the "NewCo Parties").  The NewCo Manager and the NewCo General Partner are Delaware limited liability companies formed to facilitate the transactions described in the Agreement.

**Transferred Assets and Liabilities**

14.     Pursuant to the Agreement, the LBAM and NBAM have agreed to transfer and assign to the Transferees all of their obligations, right, title and interest in, to, and under the "Transferred Assets"[3] related to the Funds, each as defined in the Agreement: (i) the GP

---

[3]        As such term is defined in the Agreement.

Interests, (ii) the Class A Interests, (iii) the Non-Participating Shares, (iv) the Transferred Contracts, (v) all right, title, and membership or any other interest or capital account in the LibertyView Loan Fund, and (vi) the LibertyView IP. The Fund Investors, however, will maintain their limited partner and/or investor interests in certain of the Funds.

15.    Pursuant to the Agreement, the Transferees shall accept and become a substituted general partner, manager and shareholder, as applicable, and assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities[4] of NBAM arising after the Closing out of, relating to or otherwise in respect of the GP Interests, Class A Interests, LLC Agreements and Non-Participating Shares. The Transferees shall also accept the assignment and assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of LBAM, in its capacity as an investment advisor, investment manager, collateral manager and member, arising after the Closing out of, relating to or otherwise in respect of the Investment Advisory Agreements, the Collateral Management Agreement, the Trust D Management Agreement and LibertyView Loan Fund.

**LBHI's Potential Obligations Under the Agreement**

16.    LBHI's obligations under the Agreement are limited. The Transferees required that, and Section 8.2 of the Agreement provides for, LBHI to indemnify and hold the Transferees harmless from and against any and all losses, liabilities, claims, demands, judgments, damages, fines, suits, actions, costs and expenses arising from or relating to any act or omission, during the period prior to the Closing, of LBAM, NBAM, Neuberger Berman, LLC or any other LBHI Subsidiary that has previously served as the investment advisor or the general

---

[4]    "Liability" is defined in the Agreement as "any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or become due), and including all costs and expenses relating thereto. (§ 1.1(a).)

partner of the Funds, taken in their capacity as the investment advisor and the general partner of the Funds, respectively.  In order to be eligible for indemnification, however, the Transferees must provide LBHI with a written notice setting forth the specific claim (including Third Party Claims) and the basis therefor in reasonable detail prior to the second anniversary of the Closing Date.

17.    Section 6.3 of the Agreement provides that the Individual Managers and certain current Lehman employees who have accepted an offer of employment with the Transferees shall receive from LBAM, NBAM or LBHI an aggregate amount equal to $680,000.00 as compensation for services provided in connection with the Funds for the period from January 1, 2009 through and including the Closing Date (i.e., the period during 2009 in which LBAM or Neuberger Berman, LLC[5] received management fees in respect of the Funds). Section 6.6 of the Agreement further provides that each of the parties to the Agreement shall cooperate in good faith and use their respective commercially reasonable efforts to deliver or obtain Third Party Consents at the expense of LBAM, NBAM and LBHI.  LBAM, NBAM and LBHI also agreed to use their commercially reasonable efforts to (a) take all actions, both prior to and after the Closing, necessary to consummate and implement the transactions contemplated by the Agreement, and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by the Agreement.  LBAM shall, and LBHI shall cause LBAM to, make any payments required under the Agreement.  To the extent LBHI is required to make any such payments, it will do so in accordance with the Court approved cash management system and obtain a note from LBAM and / or NBAM to secured repayment.

---

[5]    Pursuant to the IMD Agreement, such funds would have been transferred to Neuberger Berman Holdings LLC, a direct, non-Debtor subsidiary of LBHI, and the former parent company of Neuberger Berman, LLC.

**Release of Claims Against LBHI**

18.    Section 6.14(a) of the Agreement provides that, subject to certain

exceptions set forth in Section 6.14(b) of the Agreement, each of the NewCo Parties, on behalf

of himself or itself and its respective successors and assigns, and on behalf of his or its

Subsidiaries and Affiliates (but excluding the Funds) and their respective successors and assigns

(each a "Releasor") shall forever release, acquit and discharge, to the fullest extent permitted by

Law, IMD Purchaser, and any party to which IMD Purchaser assigns its rights and obligations,

and LBHI and each of its past, present or future Subsidiaries (including each of the Transferors)

and their respective past, present or future officers, directors, employees, stockholders, partners,

members, managers, equity interest holders, Affiliates, successors and assigns from and against

any and all Claims, arising from or relating to acts or omissions occurring on or before the

Closing Date, which such Releasor ever had, now has or may have (the "Release"), including

without limitation any and all Claims arising from:

a.    such Releasor's employment (including with respect to compensation or benefits for past, present or future periods) with, or termination of employment from (including with respect to any severance payments or benefits), LBHI or any other Releasee;

b.    any limited partnership or other investment interest of any Releasor in any Fund or other investment product formed, organized, managed, issued or sold by any Releasee;

c.    any act or omission of the Current General Partner (or any other Subsidiary of LBHI) in its capacity as a general partner or manager of any Fund;

d.    any act or omission of the Current Investment Advisor or the Prior Investment Advisor (or any other Subsidiary of LBHI) in its capacity as the investment advisor, investment manager and/or collateral manager of any Fund; and

e.    any act or omission of any employee, agent or Representative of any Releasee in his or her capacity as a director or Foreign Feeder Fund.

Further, each Releasor agrees not to assert any Claim released, acquitted or discharged by section

6.14 of the Agreement against any Releasee.

### The Court Should Approve The Potential Use Of Estate Funds Pursuant to the Indemnity Provisions of the Agreement and Authorize the Debtors to Take All Corporate Actions Necessary to Consummate the Agreement

19.    The Debtors seek authority to use estate funds to comply with their

obligations under the indemnity provisions of the Agreement pursuant to sections 105 and 363 of

the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code provides, in relevant part, that the

court may issue any order that is "necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]."  11 U.S.C. § 105(a).  Section 363(b)(1) of the Bankruptcy Code provides

that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate."  *Id.* § 363(b)(1).

20.    When considering a transaction outside the ordinary course of business,

courts in the Second Circuit, and others, require that such transaction be based upon the sound

business judgment of the debtor. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143

(2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v.

Schipper (In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l

Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir.

1986).

21.    It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

22.    As described above, LBHI agreed to enter into the Agreement and provide the indemnity contained therein (the "Indemnity Provisions") following extensive negotiations. LBHI is already responsible for managing the assets and satisfying the obligations being transferred to the Transferees that are Excluded Assets and Excluded Liabilities under the IMD Agreement. Additionally, pursuant to the IMD Agreement, LBHI is already obligated to indemnify the IMD Purchaser for certain of these liabilities. LBHI will pursue reimbursement for any expenditures from all appropriate and applicable sources, including, but not limited to, the Funds, non-Debtor and Debtor affiliates, and insurance proceeds.[6] As a result, there will be minimal additional liability for the Indemnification Provisions under the Agreement.

23.    In addition, the Agreement also frees Lehman from its current obligation to manage the Funds. The value of the assets held by the Funds is uncertain, and liquidating them would be difficult and time consuming. LBHI does not believe that any other third party would be interested in acquiring the Transferred Assets or that the Individual Managers will continue to manage the Funds absent consummation of the Agreement. LBHI believes that the expense and effort of employing alternative managers would exceed the value that is likely to be realized by Lehman in its roles as investment advisor for, and manager, general partner and shareholder of, the Funds.

---

[6]    The Debtors do not concede that any particular liabilities exist.

24.     The Release also provides certainty with regard to all future liability.  It will protect the Debtors' estates from future claims and litigation expenses related to the Transferred Assets and free their management and advisors from the necessity of having to respond to such claims.  In light of the benefits accruing to the Debtors and their estates pursuant to the other provisions of the Agreement, LBHI's entry into the Agreement, which includes the Indemnity Provisions, represents an exercise of reasonable business judgment.  Thus entry into the Agreement is a reasonable exercise of LBHI's business judgment and, as such, should be approved.

## Notice

25.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) all parties who have requested notice in these chapter 11 cases; and (vii) attorneys for the NewCo Parties.  No other or further notice need be provided.

26.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: May 15, 2009
        New York, New York

                                    /s/ Lori R. Fife
                                    Lori R. Fife

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    Attorneys for Debtors
                                    and Debtors in Possession

## Exhibit A

**(The Agreement)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                            :

In re                                :       Chapter 11 Case No.
                            :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :       08-13555 (JMP)
                            :

                 Debtors.        :       (Jointly Administered)
                            :

-------------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AUTHORIZING AND APPROVING ENTRY INTO TRANSACTION AGREEMENT

Upon the motion, dated May 15, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc., as debtor in possession ("LBHI," and together with its affiliated debtors in the

above-referenced chapter 11 cases, the "Debtors"), for an order pursuant to sections 105(a) and

363 of title 11 of the United States Code (the "Bankruptcy Code") authorizing and approving

LBHI's entry into a transactions agreement, all as more fully described in the Motion;[1] and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the amended order entered February 13,

2009 governing case management and administrative procedures [Docket No. 2837]; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

---

[1]     Capitalized terms that are used but not defined in this Order have the meanings ascribed to them in the
Motion.

LBHI, its estate and creditors, and all parties in interest and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363 of the Bankruptcy Code,

LBHI is authorized to enter into the Agreement; and it is further

ORDERED that, LBHI is authorized, but not directed, to enter into, and take all

corporate and other actions required by the Agreement, and authorized and, to the extent

necessary, empowered to expend funds of its estate pursuant to the Agreement; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: June ___, 2009
        New York, New York

_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

Execution Version

# TRANSACTION AGREEMENT

BY AND AMONG

LEHMAN BROTHERS HOLDINGS INC.,

LEHMAN BROTHERS ASSET MANAGEMENT, INC.,

NEUBERGER BERMAN ASSET MANAGEMENT, LLC,

RICHARD MECKLER,

RANDALL HUTTON,

LIBERTYVIEW CAPITAL MANAGEMENT, LLC

AND

LIBERTYVIEW GP, LLC

———————————

Dated as of April 23, 2009

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS................................................................. 1
    Section 1.1        Certain Definitions............................................ 1
    Section 1.2        Other Definitional and Interpretive Matters ........................ 9

ARTICLE II        ACQUISITION OF TRANSFERRED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES ............................................... 10
    Section 2.1        Acquisition of Transferred Assets ......................... 10
    Section 2.2        Excluded Assets ........................................ 10
    Section 2.3        Transfers of Transferred Assets; Assumption of Liabilities ............. 10
    Section 2.4        Excluded Liabilities ..................................... 11

ARTICLE III        CLOSING AND TERMINATION ........................................... 11
    Section 3.1        Closing Date.............................................. 11
    Section 3.2        Closing Deliveries...................................... 12
    Section 3.3        Termination of Agreement......................... 13
    Section 3.4        Procedure Upon Termination........................ 13
    Section 3.5        Effect of Termination................................. 13

ARTICLE IV        REPRESENTATIONS AND WARRANTIES OF THE LEHMAN PARTIES ................................................ 14
    Section 4.1        Organization, Authority and Qualification of LBHI............ 14
    Section 4.2        Organization, Authority and Qualification of the Transferors........... 14
    Section 4.3        No Conflicts................................................ 14
    Section 4.4        Title to Transferred Assets............................. 15
    Section 4.5        Consents.................................................... 15
    Section 4.6        No Broker.................................................. 15
    Section 4.7        Insurance.................................................. 15

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF THE TRANSFEREES ................................................... 15
    Section 5.1        Organization, Authority and Qualification ..................... 15
    Section 5.2        No Conflicts............................................... 16
    Section 5.3        Consents.................................................... 16
    Section 5.4        No Broker.................................................. 16
    Section 5.5        No Knowledge of Claims............................. 16

ARTICLE VI        COVENANTS .............................................................. 16
    Section 6.1        Post-Closing Cooperation ..................................... 16

# TABLE OF CONTENTS
## (continued)

**Page**

Section 6.2    Conduct of the Business; Bankruptcy Filings...................................... 17

Section 6.3    Accrued Compensation Payment........................................................ 17

Section 6.4    Management Fee True-Up .................................................................. 18

Section 6.5    Resignation of Employees ................................................................ 18

Section 6.6    Third Party Consents........................................................................ 19

Section 6.7    Further Assurances ........................................................................... 19

Section 6.8    Books and Records ........................................................................... 20

Section 6.9    Office Relocation .............................................................................. 20

Section 6.10   Transaction, Startup and Other Expenses ........................................ 21

Section 6.11   Publicity ............................................................................................ 22

Section 6.12   Intellectual Property.......................................................................... 22

Section 6.13   [Reserved] ......................................................................................... 22

Section 6.14   Release. ............................................................................................. 22

Section 6.15   Non-Disparagement; Non-Solicitation of Claims............................. 24

Section 6.16   Tax Matters ....................................................................................... 25

Section 6.17   Director Resignations and Appointments ......................................... 27

Section 6.18   Indemnification Provisions ............................................................... 28

Section 6.19   Confidentiality .................................................................................. 28

ARTICLE VII      CONDITIONS TO CLOSING ........................................................... 28

Section 7.1    Conditions Precedent to Obligation of the NewCo Parties and
               the Lehman Parties............................................................................ 28

Section 7.2    Conditions Precedent to Obligation of the NewCo Parties............... 29

Section 7.3    Conditions Precedent to Obligation of the Lehman Parties............... 29

Section 7.4    Frustration of Closing Conditions..................................................... 30

ARTICLE VIII     INDEMNIFICATION........................................................................ 30

Section 8.1    Survival of Representations and Warranties; Limited Survival
               of Covenants .................................................................................... 30

Section 8.2    Indemnification by LBHI.................................................................. 31

Section 8.3    Third Party Claims ........................................................................... 31

ARTICLE IX      MISCELLANEOUS .......................................................................... 33

Section 9.1    Payment of Sales, Use or Similar Taxes............................................ 33

Section 9.2    Applicable Withholding..................................................................... 33

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| Section 9.3 | Expenses | 33 |
| Section 9.4 | Entire Agreement; Amendments and Waivers | 33 |
| Section 9.5 | Notices | 34 |
| Section 9.6 | Binding Effect; Assignment | 35 |
| Section 9.7 | Third-Party Beneficiaries | 35 |
| Section 9.8 | Severability | 35 |
| Section 9.9 | Enforcement | 35 |
| Section 9.10 | Counterparts | 35 |
| Section 9.11 | GOVERNING LAW; SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL | 36 |

Annex A – List of Master Funds, Foreign Feeder Funds and Domestic Feeder Funds
Annex B – List of Investment Advisory Agreements
Annex C – List of LLC Agreements
Annex D – List of Partnership Agreements

Schedule 6.1(b) – Cooperation Matters
Schedule 6.2(c) – Transferees' Counsel Email
Schedule 6.3 – Allocation of Accrued Compensation Amount
Schedule 6.5(a) – Offerees
Schedule 6.6 – Third Party Consents
Schedule 6.10(b) – NewCo Startup Expenses
Schedule 6.10(d) – Operating Expenses
Schedule 6.12 – LibertyView IP

Exhibit A – Form of Collateral Management Assumption Agreement
Exhibit B – Form of Transferred Employee Release

TRANSACTION AGREEMENT

       This Transaction Agreement (this "Agreement") is made and entered into as of April 23, 2009, by and among (i) Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI"), (ii) Lehman Brothers Asset Management Inc., a Delaware corporation (the "Current Investment Advisor"), (iii) Neuberger Berman Asset Management, LLC, a Delaware limited liability company (the "Current General Partner", and together with the Current Investment Advisor, the "Transferors"), (iv) Richard Meckler ("RM"), the President and Chief Investment Officer of the LibertyView division of the Current Investment Advisor, (v) Randall Hutton ("RH", and together with RM, the "Individual Managers"), the Senior Portfolio Manager and Managing Director of LibertyView division of the Current Investment Advisor, (vi) LibertyView Capital Management, LLC, a Delaware limited liability company (the "NewCo Manager"), and (vii) LibertyView GP, LLC, a Delaware limited liability company (the "NewCo General Partner", and together with the NewCo Manager, the "Transferees").

W I T N E S S E T H :

       WHEREAS, the Current Investment Advisor is the investment advisor to the Master Funds (as defined below) pursuant to the Investment Advisory Agreements (as defined below), the investment manager to Trust D (as defined below) pursuant to the Trust D Management Agreement (as defined below) and the sole member of LibertyView Loan Fund (as defined below);

       WHEREAS, the Prior Investment Advisor (as defined below) is on the date hereof and the Current Investment Advisor will be prior to the Closing (as defined below) a collateral manager to SKM-LibertyView (as defined below) pursuant to the Collateral Management Agreement (as defined below);

       WHEREAS, the Current General Partner is the sole general partner in the Master Funds and in LibertyView Credit Select Portfolio, L.P., holds the Class A Interests (as defined below), acts as the sole manager of the Domestic Feeder Funds (as defined below) and holds the Non-Participating Shares (as defined below);

       WHEREAS, the Transferors desire to transfer and assign to the Transferees, and the Transferees desire to acquire and assume from the Transferors, all of the Transferred Assets (as defined herein) and Assumed Liabilities (as defined herein) upon the terms and subject to the conditions hereinafter set forth.

       NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereto hereby agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1    Certain Definitions.

      (a)    For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Accrued Compensation Amount" has the meaning set forth in Section 6.3.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing definition of "Affiliate", except as provided herein, no Fund or any Subsidiary thereof shall be deemed an Affiliate of any of the Lehman Parties for purposes of this Agreement.

"Agreement" has the meaning set forth in the preamble.

"Allowed LBHI Claim" means any Claim against LBHI or any other Releasee that (i) is not asserted against any NB Releasee, (ii) arises out of any act or omission of LBHI or any other Releasee (other than LBIE or LBI) that was not actually known to either RM or RH as of the Closing, provided, that neither RM nor RH has a duty to investigate unknown claims, and (iii) with respect to which two out of three AmLaw 150 law firms having substantial experience in the area of providing legal advice to investment advisors and funds provides written advice to such Releasor that such Claim would be reasonably likely to survive a motion to dismiss, provided, that with respect to such condition in this sub-paragraph (iii), (1) the NewCo Parties shall bear all fees and expenses incurred in connection with the retention of such law firms, (2) the NewCo Parties shall not retain the law firms rendering such written advice for the purposes of subsequently litigating such Claim, (3) in order to demonstrate satisfaction of this condition, the NewCo Parties may, in their sole option, (x) provide LBHI with copies of such written advice or (y) certify to LBHI that such condition has been satisfied, and (4) for the avoidance of doubt, such legal advice must be obtained, and the copies provided or certification made, prior to the NewCo Parties filing any complaint or otherwise initiating in any court of Law such Claim.

"Alternative Transaction" means a transaction that involves a sale of all or a material portion of the Transferred Assets other than to any NewCo Party or any Affiliate of a NewCo Party.

"Amendments to the LibertyView Loan Fund Operating Agreement" means the amendments to the LibertyView Loan Fund Operating Agreement, to be executed effective as of the Closing Date, pursuant to which the Current Investment Advisor shall be replaced as the sole member of LibertyView Loan Fund with the NewCo Manager.

"Amendments to the LLC Agreements" means the amendments to each of the LLC Agreements, to be executed effective as of the Closing Date, pursuant to which (i) the Current General Partner shall withdraw and shall cease to serve as the manager of the Domestic Feeder Funds and the NewCo General Partner shall be designated as a substitute manager of the Domestic Feeder Funds, (ii) the Current General Partner shall be replaced in its capacity as the holder of Class A Interests of The LibertyView Fund, LLC with the NewCo General Partner, and (iii) the Current Investment Advisor shall be replaced in its capacity as an investment advisor thereunder with the NewCo Manager.

"Amendments to the Partnership Agreements" means the amendments to each of the Partnership Agreements, to be executed effective as of the Closing Date, pursuant to which (i) the Current General Partner shall be replaced in its capacity as the general partner thereunder with the NewCo General Partner, and (ii) the Current Investment Advisor shall be replaced in its capacity as an investment advisor thereunder with the NewCo Manager.

"Ancillary Agreements" means (i) the Amendments to the LLC Agreements, (ii) the Amendments to the Partnership Agreements, (iii) the Amendments to the LibertyView Loan Fund Operating Agreement, (iv) the Assignment and Assumption Agreements and (v) Deeds of Assignment.

"Approval Order" means an Order of the Bankruptcy Court that, among other things, approves the entry into this Agreement and the Ancillary Agreements by LBHI and any other Lehman Party that becomes subject to the Bankruptcy Case prior to the date of such Order.

"Assignment and Assumption Agreements" means the General Partner Assignment and Assumption Agreement, the Investment Advisor Assignment and Assumption Agreement and the Collateral Management Assumption Agreement.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Bankruptcy Case" means the chapter 11 cases commenced by LBHI and certain of its Subsidiaries on or after September 15, 2008 (including any case commenced after the date of this Agreement), jointly administered in the Bankruptcy Court under Case No. 08-13555 (JMP).

"Bankruptcy Code" means the United States Code, 11 U.S.C. § 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York or such other court as has jurisdiction over a Bankruptcy Case.

"Business Day" means any day of the year on which national banking institutions in the City of New York, New York are open to the public for conducting business and are not required or authorized to close.

"Claims" has the meaning set forth in Section 6.14(a).

"Class A Interests" means the issued and outstanding class A interests held by the Current General Partner in The LibertyView Fund, L.L.C.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Collateral Management Agreement" means the Collateral Management Agreement, dated April 1, 1999, as amended, modified or supplemented from time to time, by and among SKM-LibertyView, SKM CBO, LLC and, as of the Closing, the Current Investment

Advisor, pursuant to which the Current Investment Advisor and SKM CBO, LLC act as the collateral managers.

"Collateral Management Assumption Agreement" means the Assumption Agreement to be entered into by and between the Current Investment Advisor, the NewCo Manager, SKM-LibertyView and SKM CBO, LLC, which will be entered into at the Closing, substantially in the form attached hereto as Exhibit A.

"Confidential Information" has the meaning set forth in Section 6.19.

"Contract" means any binding contract, agreement, indenture, note, bond, mortgage, loan, instrument, lease or license.

"Current General Partner" has the meaning set forth in the preamble.

"Current Investment Advisor" has the meaning set forth in the preamble.

"Deeds of Assignment" means the Deeds of Assignment to be executed by the Current General Partner and the NewCo General Partner at the Closing for the transfer of the GP Interests.

"Domestic Feeder Funds" means the domestic feeder funds identified as such on Annex A.

"Employment Claim" has the meaning set forth in Section 6.5(b).

"Excluded Assets" means any assets of any of the Transferors other than the Transferred Assets.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Foreign Feeder Funds" means the foreign feeder funds identified as such on Annex A.

"Funds" means, collectively, the Master Funds, the Domestic Feeder Funds, the Foreign Feeder Funds, Trust D, SKM-LibertyView and LibertyView Loan Fund.

"Future Unrelated Business Activities" has the meaning set forth in Section 8.2(c).

"General Partner Assignment and Assumption Agreement" means the Assignment and Assumption Agreement to be entered into at Closing by and between the Current General Partner and the NewCo General Partner.

"Governmental Body" means any government, court, regulatory or administrative agency, commission or authority, or other governmental instrumentality, arbitral body or self-regulatory organization, whether federal, state or local, domestic, foreign or multinational.

"GP Interests" means the issued and outstanding general partner interests held by the Current General Partner in each of the Master Funds and in LibertyView Credit Select Portfolio, L.P.

"Indemnified Party" has the meaning set forth in Section 8.2(a) and Section 8.3.

"Indemnifying Party" has the meaning set forth in Section 8.2(a) and Section 8.3.

"Individual Managers" has the meaning set forth in the preamble.

"Investment Advisor Assignment and Assumption Agreement" means the Assignment and Assumption Agreement to be entered into at Closing by and between the Current Investment Advisor and the NewCo Manager.

"Investment Advisory Agreements" means the investment advisory agreements identified on Annex B, as amended, modified or supplemented from time to time, by and between the Current Investment Advisor and each of the Master Funds for the provision of investment advisory or investment management services relating to the Funds.

"IRS" means the United States Internal Revenue Service.

"Knowledge" of any Person or parties means the actual knowledge of such Person or of such parties.

 "█████" means ███████████████████, a fiduciary of ██████████ ████████ of Trust D.

"Law" means any law or statute, code, ordinance, rule or regulation having the force of law, issued by any Governmental Body.

"LBHI" has the meaning set forth in the preamble.

"LBI" means Lehman Brothers, Inc., a Delaware corporation.

"LBIE" means Lehman Brothers International (Europe) Limited.

"Legal Proceedings" means any actions, suits, audits, investigations or proceedings of any nature, in Law or in equity, pending or threatened, by or before any court, tribunal, arbitrator or other Governmental Body.

"Lehman Parties" means LBHI and the Transferors.

"Liability" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or become due), and including all costs and expenses relating thereto.

"LibertyView IP" has the meaning set forth in Section 6.12.

"LibertyView Loan Fund" means LibertyView Loan Fund, LLC, a Delaware limited liability company.

"LibertyView Loan Fund Operating Agreement" means the Operating Agreement of LibertyView Loan Fund, dated March 1, 2004, as amended, modified or supplemented from time to time.

"Lien" means any lien, pledge, mortgage, security interest, right of first refusal, conditional sale agreement or other encumbrance or charge of any kind.

"LLC Agreements" means the limited liability company agreements of each of the Domestic Feeder Funds identified on Annex C, as amended, modified or supplemented from time to time.

"Loss" or "Losses" has the meaning set forth in Section 8.2(a).

"Management Fees" means any investment advisory, administration, investment management, sponsor, subadvisory, supervisory, structuring, transaction, monitoring and any similar management or advisory fees (including custody fees for trust accounts) payable to the Current Investment Advisor, the Prior Investment Advisor or any of the Transferees or their Affiliates in respect of any Investment Advisory Agreement, the Trust D Management Agreement or the Collateral Management Agreement or in the capacity of a general partner, sole member or manager of any of the Funds, including incentive or performance fees or allocations.

"Master Funds" means the master funds identified as such on Annex A.

"NB Parent" means NBSH Acquisition, LLC, a Delaware limited liability company, and any party to which NBSH Acquisition, LLC assigns its rights and obligations under that certain Unit Purchase Agreement, dated as of December 1, 2008, by and between LHBI and NBSH Acquisition, LLC, as amended from time to time, including, for the avoidance of doubt, Neuberger Berman Group LLC.

"NB Releasee" has the meaning set forth in Section 6.14(a).

"NewCo General Partner" has the meaning set forth in the preamble.

"NewCo Manager" has the meaning set forth in the preamble.

"NewCo Parties" means the Individual Managers, the NewCo General Partner and the NewCo Manager.

"NewCo Team" means RM, RH and each of the Transferred Employees.

"NewCo Startup Expenses" has the meaning set forth in Section 6.10(b).

"NewCo Transaction Expenses" has the meaning set forth in Section 6.10(a).

"Non-Participating Shares" means the non-participating voting (management) shares in the Foreign Feeder Funds held by the Current General Partner.

"Offerees" has the meaning set forth in Section 6.5(a).

"Order" means any order, injunction, judgment, decree or ruling of a Governmental Body.

"Outside Date" has the meaning set forth in Section 3.3(b).

"Partnership Agreements" means the partnership agreements of each of the Master Funds and LibertyView Credit Select Portfolio, L.P. identified on Annex D, as amended, modified or supplemented from time to time.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance; (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business not yet delinquent; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body; (v) title of a lessor under a capital or operating lease executed in the ordinary course of business; and (vi) such other imperfections in title, charges, easements, restrictions and encumbrances which do not impair in any material respect the continued use of the property to which they relate in the conduct of the business or operations as currently conducted.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, trust, Governmental Body or other entity or any division thereof.

"Policies" has the meaning set forth in Section 4.7.

"Prior Investment Advisor" means Neuberger Berman, LLC, a Delaware limited liability company.

"Reimbursable Expenses" has the meaning set forth in Section 6.10(c).

"Releasee" has the meaning set forth in Section 6.14(a).

"Releasor" has the meaning set forth in Section 6.14(a).

"RH" has the meaning set forth in the preamble.

"RM" has the meaning set forth in the preamble.

"SKM-LibertyView" means SKM-LibertyView CBO I, Ltd., a Cayman Islands exempted company.

"Straddle Period" has the meaning set forth in Section 6.16(b).

"Subsidiary" means with respect to any Person, any corporation, limited liability company, partnership, trust or other entity of which securities or other ownership interests representing more than fifty per cent (50%) of the equity or control of the ordinary voting power (or, in the case of a partnership, limited liability company or other similar entity, control of the general partnership, managing member or similar interests) are owned, directly or indirectly, by such Person. For the avoidance of doubt, except as provided herein, no Fund (or any Subsidiary of any Fund) shall be deemed to be a Subsidiary of any Lehman Party for purposes of this Agreement.

"Tax" or "Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"Taxing Authority" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"Tax Matter" has the meaning set forth in Section 6.16(d).

"Tax Preparing Party" has the meaning set forth in Section 6.16(a)(i).

"Tax Return" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax.

"Tax Reviewing Party" has the meaning set forth in Section 6.16(a)(i).

"Termination Date" has the meaning set forth in Section 3.3.

"Third Party Claim" has the meaning set forth in Section 8.3.

"Third Party Consents" has the meaning set forth in Section 6.6.

"Transfer Taxes" has the meaning set forth in Section 9.1.

"Transferees" has the meaning set forth in the preamble.

"Transferors" has the meaning set forth in the preamble.

"Transferred Assets" means (i) the GP Interests, (ii) the Class A Interests, (iii) the Non-Participating Shares, (iv) the Transferred Contracts, (v) all right, title, and membership or any other interest or capital account in LibertyView Loan Fund, and (vi) the LibertyView IP.

"Transferred Contracts" means the LLC Agreements, the Partnership Agreements, the Trust D Management Agreement, the Collateral Management Agreement, the Investment Advisory Agreements and the LibertyView Loan Fund Operating Agreement to the extent they relate to the Transferors in their capacity as the general partner, manager, investment advisor, sole member or collateral manager of the Funds.

"Transferred Employee Release" has the meaning set forth in Section 6.5(b).

"Transferred Employees" means each of the Offerees who has accepted offer of employment with the Transferees and has duly executed no later than fourteen days after the Closing Date and not revoked a Transferred Employee Release pursuant to Section 6.5(b).

"Trust D" means "Trust D" for a Portion of the Asset of ███████████, a Delaware business trust.

"Trust D Management Agreement" means the Management Agreement, dated December 1, 2004, as amended, modified or supplemented from time to time, by and between ██ ██ and the Current Investment Advisor, pursuant to which the Current Investment Advisor acts as the investment manager of certain assets of Trust D.

"Willful Breach" means a voluntary, intentional and deliberate action taken with knowledge that such action would be reasonably likely to result in a breach of this Agreement. For the avoidance of doubt, a "Willful Breach" shall not require that the act be malicious or done with bad motive or purpose.

Section 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Including.    The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Calculation of Time Period.    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.    Any reference in this Agreement to "$" or "dollars" shall mean United States Dollars.

Exhibits, Schedules and Annexes.    The Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits, Schedules and Annexes annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any

matter or item disclosed on one Schedule shall be deemed to have been disclosed on any other Schedule to which the relevance of such disclosure is reasonably apparent. Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a material adverse effect. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that breach or violation exists or has actually occurred. Any capitalized terms used in any Exhibit, Schedule or Annex but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## ACQUISITION OF TRANSFERRED ASSETS AND ASSUMPTION OF ASSUMED LIABILITIES

Section 2.1    Acquisition of Transferred Assets. Upon the terms and subject to the conditions contained herein, at the Closing, the Transferors shall transfer, assign, convey and deliver to the Transferees, all of the Transferors' obligations, right, title and interest in, to and under the Transferred Assets and the Transferees shall acquire and accept the Transferred Assets, free and clear of any Liens, except for Permitted Exceptions.

Section 2.2    Excluded Assets. Nothing herein contained shall be deemed to transfer, assign or convey any Excluded Assets to the Transferees, and the Transferors (directly and indirectly) shall retain all right, title and interest in, to and under the Excluded Assets.

Section 2.3    Transfers of Transferred Assets; Assumption of Liabilities. On the terms, and subject to the conditions, set forth in this Agreement, effective as of the Closing, (a) the Current General Partner shall appoint and admit the NewCo General Partner as a substitute general partner of each of the Master Funds and LibertyView Credit Select Portfolio, L.P., the Current General Partner shall transfer all of the GP Interests held by it to the NewCo General Partner, and the NewCo General Partner shall accept to become a substituted general partner of

the Master Funds and LibertyView Credit Select Portfolio, L.P. and to assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of the Current General Partner arising after the Closing out of, relating to or otherwise in respect of the GP Interests, (b) the Current General Partner shall transfer the Class A Interests to the NewCo General Partner, and the NewCo General Partner shall accept to become a substituted member of The LibertyView Fund, LLC with respect to the Class A Interests and to assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of the Current General Partner arising after the Closing out of, relating to or otherwise in respect of the Class A Interests, (c) the Current General Partner shall withdraw and shall cease to serve as the manager of the Domestic Feeder Funds and the NewCo General Partner shall be appointed by each of the Domestic Feeder Funds as a substitute manager in accordance with the LLC Agreements, and the NewCo General Partner shall accept to become a substitute manager under the LLC Agreements and to assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of the Current General Partner, in its capacity as the manager, arising after the Closing out of, relating to or otherwise in respect of the LLC Agreements, (d) all of the Current Investment Advisor's right, title and interest in, in its capacity as an investment advisor, investment manager or collateral manager, under and to the Investment Advisory Agreements, the Collateral Management Agreement and the Trust D Management Agreement shall be assigned from the Current Investment Advisor to the NewCo Manager, and the NewCo Manager shall accept such assignment and assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of the Current Investment Advisor, in its capacity as an investment advisor, investment manager or collateral manager, arising after the Closing out of, relating to or otherwise in respect of the Investment Advisory Agreements, the Collateral Management Agreement and the Trust D Management Agreement, (e) the Current Investment Advisor shall transfer to the NewCo Manager all of the Current Investment Advisor's right, title, and membership or any other interest or capital account in LibertyView Loan Fund, and the NewCo Manager shall accept to become a member of LibertyView Loan Fund and to assume and timely perform, pay and discharge all of the Liabilities of the Current Investment Advisor arising after the Closing out of, relating to or otherwise in respect of such transfer, and (f) the Current General Partner shall transfer to the NewCo General Partner all of the Current General Partner's right, title and interest in the Non-Participating Shares, and the NewCo General Partner shall accept to become a shareholder of the Foreign Feeder Funds with respect to such shares and to assume and timely perform, pay and discharge, in accordance with their respective terms, all of the Liabilities of the Current General Partner arising after the Closing out of, relating to or otherwise in respect of such shares (the Liabilities in (a)-(f) above, collectively, the "Assumed Liabilities").

Section 2.4    Excluded Liabilities.    Neither the Transferees nor any of their Affiliates shall assume or be liable for any Liabilities other than the Assumed Liabilities, and the Transferors shall retain and be responsible for all Liabilities that are not Assumed Liabilities (the "Excluded Liabilities").

ARTICLE III
CLOSING AND TERMINATION

Section 3.1    Closing Date.    The consummation of the transfer and acquisition of the Transferred Assets and the assumption of the Assumed Liabilities provided for in Article II

hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York (or at such other place as the parties may designate in writing) at 10:00 a.m. (New York City time) on a date to be specified by the parties, which date shall be no later than the third Business Day after the satisfaction or waiver of the conditions set forth in Article VII (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at such time), unless another time, date or place is agreed to in writing by the parties hereto. The date on which the Closing is held is referred to herein as the "Closing Date."

Section 3.2    Closing Deliveries.

(a)    Deliveries of the Transferees. At the Closing, the Transferees shall deliver to the Transferors the following items:

(i)    counterpart signature page for each of the Assignment and Assumption Agreements, duly executed by the NewCo General Partner, the NewCo Manager, SKM-LibertyView and SKM CBO, LLC, as applicable;

(ii)    counterpart signature page for each of the Deeds of Assignment, duly executed by the NewCo General Partner;

(iii)    counterpart signature page for each of the Amendments to the LLC Agreements, duly executed by the NewCo General Partner and the Domestic Feeder Funds;

(iv)    counterpart signature page for each of the Amendments to the Partnership Agreements, duly executed by the NewCo General Partner, the Master Funds and LibertyView Credit Select Portfolio, L.P., as applicable;

(v)    counterpart signature page for the Amendments to the LibertyView Loan Fund Operating Agreement, duly executed by the NewCo Manager;

(vi)    stock powers transferring all of the Current General Partner's right, title, and interest in the Non-Participating Shares to the NewCo General Partner, duly countersigned by each of the Foreign Feeder Funds; and

(vii)    counterpart signature pages for the assignment agreement(s) of the LibertyView IP in form agreed by the parties, duly executed by the Transferees, as applicable.

(b)    Deliveries of the Transferors. At the Closing, the applicable Lehman Parties shall deliver to the Transferees the following items:

(i)    counterpart signature page for each of the Assignment and Assumption Agreements, duly executed by the Current Investment Advisor and the Current General Partner, as applicable;

(ii)    counterpart signature page for each of the Deeds of Assignment, duly executed by the Current General Partner;

(iii)    counterpart signature page for each of the Amendments to the LLC Agreements, duly executed by the Current General Partner;

(iv)    counterpart signature page for each of the Amendments to the Partnership Agreements, duly executed by the Current General Partner;

(v)    counterpart signature page for the Amendments to the LibertyView Loan Fund Operating Agreement, duly executed by the Current Investment Advisor;

(vi)    duly executed share transfer certificates transferring all of the Current General Partner's right, title, and interest in the Non-Participating Shares to the NewCo General Partner;

(vii)    an amount equal to the Accrued Compensation Amount payable at Closing pursuant to Section 6.3, by wire transfer of immediately available funds, to the bank account(s) notified by the Transferees to the Lehman Parties in writing no later than three Business Days prior to the Closing Date; and

(viii)    counterpart signature pages for the assignment agreement(s) of the LibertyView IP in form agreed by the parties, duly executed by the Transferors, as applicable.

Section 3.3    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows (the date of any such termination, the "Termination Date"):

(a)    by mutual written consent of the Current General Partner and the NewCo General Partner;

(b)    by either the NewCo General Partner or the Current General Partner in the event that the Closing has not been consummated on or prior to October 1, 2009 (such date, the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 3.3(b) shall not be available to (i) the NewCo General Partner if the failure of the Closing to be consummated on or before the Outside Date is primarily due to the failure of any NewCo Party to perform any of its obligations under this Agreement, or (ii) the Current General Partner if the failure of the Closing to be consummated on or before the Outside Date is primarily due to the failure of any Lehman Party to perform any of its obligations under this Agreement;

(c)    by either the NewCo General Partner or the Current General Partner if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; or

(d)    by the NewCo General Partner upon LBHI or the Transferors entering into an Alternative Transaction or upon the conversion of the Bankruptcy Case to a chapter 7 case.

Section 3.4    Procedure Upon Termination.  In the event of termination by the NewCo General Partner or the Current General Partner, or both, pursuant to Section 3.3, written notice thereof shall forthwith be given by the terminating party to the other parties, and this Agreement shall terminate, and the transfer and acquisition of the Transferred Assets and the assumption of the Assumed Liabilities hereunder shall be abandoned, without further action by any of the parties.

Section 3.5    Effect of Termination.  In the event that this Agreement is validly terminated in accordance with Sections 3.3 and 3.4, then each of the parties hereto shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to the NewCo Parties, the Lehman Parties or their respective Affiliates; provided, however, that no such termination shall relieve any party hereto from liability for any Willful Breach of this Agreement by such party; and provided, further, that the obligations of the parties set forth in this Section 3.5, Section 6.19 and Article IX shall survive any such termination and shall be enforceable hereunder.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES
OF THE LEHMAN PARTIES

The Lehman Parties hereby represent and warrant, jointly and severally, to the NewCo Parties that:

Section 4.1    Organization, Authority and Qualification of LBHI.  (a) LBHI is a Delaware corporation duly organized, validly existing and in good standing (other than the non-payment of that portion of LBHI's franchise taxes relating to the period prior to September 15, 2008, which is the commencement date of the Bankruptcy Case) under the Laws of the State of Delaware and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby, (b) the execution and delivery of this Agreement and the Ancillary Agreements, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action by it, and (c) this Agreement has been duly and validly executed and delivered by it, and (assuming due authorization, execution and delivery by each other party) this Agreement constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with its terms.

Section 4.2    Organization, Authority and Qualification of the Transferors.  (a) Each of the Transferors is an organization duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby, (b) the execution and delivery of this Agreement and the Ancillary Agreements, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action by it, and (c) this Agreement has been duly and validly executed and delivered by it, and (assuming due authorization, execution and delivery by each other party) this Agreement constitutes legal, valid and binding obligations of it, enforceable against it in accordance with its terms.

Section 4.3    No Conflicts.  Neither the execution and delivery by the Lehman Parties of this Agreement, nor the consummation by the Lehman Parties of the transactions contemplated, in accordance with the terms hereof, will violate, conflict with, result in a default (whether after the giving of notice, lapse of time or both) or accelerate the performance required under, or give rise to a right of termination of, (a) any Contract, permit, authorization or obligation to which any of the Lehman Parties is a party or by which the Lehman Parties' respective assets are bound, (b) any provision of the charter, bylaws or other organizational documents of the Lehman Parties, (c) any Order of any Governmental Body applicable to the Lehman Parties or any of their properties or assets as of the date hereof.

Section 4.4    Title to Transferred Assets.  The Transferors own and have good title to each of the Transferred Assets (other than the Collateral Management Agreement which will be assigned to the Current Investment Advisor prior to the Closing and the LibertyView IP), free and clear of any and all Liens other than the Permitted Exceptions.  As of the Closing, the Transferors own and have good title, free and clear of any and all Liens other than the Permitted Exceptions, to (i) the registered intellectual property included in the LibertyView IP as set forth in Schedule 6.12 and (ii) to the Transferors' Knowledge, the unregistered intellectual property included in the LibertyView IP as set forth in Schedule 6.12.

Section 4.5    Consents.  Except for the Third Party Consents and the Approval Order, no consent, waiver, approval, Order, Permit, Contract or authorization of, or declaration or filing with, or notification to, any Governmental Body or other Person is required on the part of a Lehman Party in connection with the execution and delivery of this Agreement or the Ancillary Agreements or the compliance by any Lehman Party with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby.

Section 4.6    No Broker.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Lehman Parties who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 4.7    Insurance.  LBHI has previously provided the NewCo Parties with the current policies of the directors' and officers' liability insurance maintained by the Lehman Parties with respect to matters existing or occurring at or prior to the Closing (the "Policies"). The Policies are in full force and effect.  All premiums in respect of the Policies have been timely paid, no Lehman Party is in material breach or default of such Policy, and no Lehman Party has taken any action or failed to take any action which, with notice or the lapse of time, would constitute a material breach or default under, or permit termination or modification of such Policies.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE TRANSFEREES

The Transferees hereby represent and warrant, jointly and severally, to the Lehman Parties that:

Section 5.1    Organization, Authority and Qualification.    (a) Each of the Transferees is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby, (b) on or before the Closing Date, NewCo General Partner will have become duly registered by the Registrar of the Companies of Cayman Islands as a foreign company doing business in the Cayman Islands, (c) the execution and delivery of this Agreement and the Ancillary Agreements, the performance of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action by it, and (d) this Agreement has been duly and validly executed and delivered by each of the Transferees and the Individual Managers, and (assuming due authorization, execution and delivery by each other party) this Agreement constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with its terms.

Section 5.2    No Conflicts.    Neither the execution and delivery by the Transferees and the Individual Managers of this Agreement, nor the consummation by the Transferees and the Individual Managers of the transactions contemplated, in accordance with the terms hereof, will violate, conflict with, result in a default (whether after the giving of notice, lapse of time or both) or accelerate the performance required under, or give rise to a right of termination of, (a) any Contract, permit, authorization or obligation to which any of the NewCo Parties is a party or by which the Transferees' respective assets are bound, (b) any provision of the charter, bylaws or other organizational documents of the Transferees or (c) any Order of any Governmental Body applicable to the NewCo Parties or any of their properties or assets as of the date hereof.

Section 5.3    Consents.  Except for the Third Party Consents and the Approval Order, no consent, waiver, approval, Order, Permit, Contract or authorization of, or declaration or filing with, or notification to, any Governmental Body or any other Person is required on the part of any Fund or a NewCo Party in connection with the execution and delivery of this Agreement or the Ancillary Agreements or the compliance by any Fund or any NewCo Party with any of the provisions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby.

Section 5.4    No Broker.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the NewCo Parties who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 5.5    No Knowledge of Claims.  To the Knowledge of the NewCo Parties, as of the date hereof and as of the Closing, there is no fact or circumstance and no act or omission of LBHI or any Subsidiary of LBHI (except for LBIE and LBI), that may give rise to a cause of action in litigation by any Fund or a general partner, limited partner or investment advisor of, or any investor, member or trustee in, any Fund against LBHI or any of its Subsidiaries (except for LBIE and LBI).

ARTICLE VI
COVENANTS

Section 6.1    Post-Closing Cooperation.

(a)    After the Closing, the Lehman Parties and the Transferees shall authorize and direct their appropriate officers and employees to discuss matters involving the operations and business of the Funds as is reasonably requested by the other party in connection with the transactions contemplated by this Agreement and subject to the restrictions under applicable Law.

(b)    Without limiting the foregoing, from and after the date hereof and after the Closing, the Transferees shall, and they shall authorize and direct their appropriate Subsidiaries, officers and employees to, provide the Lehman Parties with such cooperation in connection with the matters described on Schedule 6.1(b), as may be reasonably requested from time to time by the Lehman Parties.

Section 6.2    Conduct of the Business; Bankruptcy Filings.

(a)    Prior to the Closing, the Lehman Parties shall use their commercially reasonable efforts to operate the Funds in the ordinary course, including collecting all Management Fees payable, and shall use their commercially reasonable efforts to ensure that RM, RH and the Offerees shall continue to manage and operate the Funds in their capacity as employees and officers of the Lehman Parties or other Subsidiaries of LBHI with substantially the same operational responsibilities and resources available to them in the performance of their duties as on the date hereof, and such Lehman Parties or other Subsidiaries of LBHI shall continue to pay the same base salary compensation and provide the same benefits to RM, RH and the Offerees as provided on the date hereof; provided, however, that, for the avoidance of doubt, such benefits shall not include any performance bonus or other bonus payments (other than the Accrued Compensation Amount payable pursuant to Section 6.3) or any severance or other termination payments set forth in Section 6.5(b). Without limiting the foregoing, prior to Closing, the Lehman Parties shall not terminate the employment of RM, RH or any Offeree, in each case, who is an employee in good standing of any Lehman Party or other Subsidiary of LBHI, or otherwise make any change to the responsibilities or position of RM, RH or any Offeree with respect to the Funds, in each case, without the prior written consent of RM and RH, which shall not be unreasonably withheld.

(b)    Effective upon the Closing, the Transferees will assume all management and operational control of the Funds as contemplated herein. Each of the Lehman Parties shall, and shall cause each of its Affiliates to, immediately after the Closing, cease to hold itself out as having any affiliation with the Funds, except for its limited partner or investor interests in certain of the Funds with no rights greater than the rights afforded to other limited partners or investors of such Funds.

(c)    Within fifteen (15) Business Days following the execution of this Agreement, LBHI shall file with the Bankruptcy Court an appropriate motion seeking entry of the Approval Order. The Transferees agree to cooperate with LBHI in providing any

information and evidence that may reasonably be required to obtain the Approval Order, including by demonstrating to the Bankruptcy Court's satisfaction a finding that the Transferees are good-faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code. LBHI shall give notice to the Transferees at least two (2) Business Day prior to filing any material pleading in the Bankruptcy Case that is related to or affects the Transferred Assets or the transactions contemplated pursuant to this Agreement, by providing a copy or substantially complete draft of such pleading and all exhibits thereto to the Transferees' counsel by email, to the email address set forth on Schedule 6.2(c) attached hereto.

Section 6.3    Accrued Compensation Payment.  In addition to the compensation payable in accordance with Section 6.2(a), the NewCo Team shall receive from the Current Investment Advisor or another Lehman Party as compensation for the services provided for the period from January 1, 2009 through and including the Closing Date an aggregate amount (the "Accrued Compensation Amount") equal to $680,000 (subject to applicable withholding requirements).  The Accrued Compensation Amount shall not in any way be offset or held back by the Lehman Parties, unless otherwise agreed to in writing by the NewCo Parties or as set forth in Section 6.5(b), and shall be paid (A) in the case of RM and RH, at the Closing, and (B) in the case of the other members of the NewCo Team, upon the execution and non-revocation of a Transferred Employee Release pursuant to Section 6.5 at the later of (i) the Closing with respect those members of the NewCo Team who have executed the Transferred Employee Release no later than eight calendar days prior to the Closing Date and have not revoked such Transferred Employee Release prior to the Closing, and (ii) the date when the Transferred Employee Release becomes irrevocable with respect to those members of the NewCo Team who have executed the Transferred Employee Release during the period of eight calendar days prior to the Closing Date and fourteen calendar days after the Closing Date and have not revoked such Transferred Employee Release prior to the expiration of the revocation period thereof.  The NewCo Parties shall apportion the Accrued Compensation Amount among the NewCo Team as set forth on Schedule 6.3.  In the event that any Offeree resigns from his or her employment with LBHI or any other Releasee, or such employment is otherwise terminated, prior to the Closing, the portion of the Accrued Compensation Amount to which that Offeree would be entitled shall not be re-allocated to the remaining members of the NewCo Team and shall not be otherwise payable on the Closing Date (or such other applicable date) without the prior written consent of the Lehman Parties, which shall not be unreasonably withheld.

Section 6.4    Management Fee True-Up.  Subject to Section 6.10(c), if any of the Lehman Parties or the Prior Investment Advisor receives, prior to the Closing, any Management Fees attributable to the periods on or after the Closing Date, the Current Investment Advisor shall reimburse NewCo for such amounts at the Closing or, if such amounts are received after the Closing, promptly after the receipt thereof.  If any of the Transferees or its officers or employees receives, following the Closing, any Management Fees attributable to the periods prior to the Closing Date, the Transferees shall transfer such amounts to the Current Investment Advisor promptly after the receipt thereof.

Section 6.5    Resignation of Employees.

(a)    Offer of Employment.  On or before the Closing Date, the Transferees shall deliver, in writing, an offer of employment to each of the employees of the Lehman Parties

or the Subsidiaries of LBHI identified on Schedule 6.5(a) (the "Offerees") to commence immediately on the Closing Date.

(b)     Resignation and Release.   Each of the Transferees shall use its reasonable best efforts (i) to cause each Offeree to resign, effective from the Closing Date, from all of his or her job positions held with LBHI or any other Releasee, and (ii) to cause each Offeree who accepts a position with the Transferees to execute and deliver to the Lehman Parties, as soon as practicable from the date hereof and no later than eight calendar days prior to the Closing Date, a release substantially in the form set forth in Exhibit B (or in such other form as may be reasonably acceptable to the Lehman Parties) in respect of any and all severance, performance bonus, other bonus or other payments payable or liabilities arising in connection with the employment or the termination of employment of such Offeree (any such payments or liabilities, an "Employment Claim") with LBHI or any other Releasee (a "Transferred Employee Release"). In the event that any Offeree shall fail to execute a Transferred Employee Release no later than fourteen calendar days after the Closing Date or revokes the executed Transferred Employee Release prior to the date when such Transferred Employee Release becomes irrevocable, (A) the Transferees shall not, and shall cause their directors, officers, employees and Affiliates not to, directly or indirectly, hire, employ or otherwise engage any such Offeree, and (B) the Current Investment Advisor or other Lehman Party, as applicable, shall withhold from the payment of the Accrued Compensation Amount pursuant to Section 6.3 such Offeree's portion of the Accrued Compensation Amount and such Offeree's portion of the Accrued Compensation Amount shall not be re-allocated to the remaining members of the NewCo Team and shall not be otherwise payable on the Closing Date or thereafter.   For the avoidance of doubt, the Transferees shall not, and shall cause their directors, officers, employees and Affiliates not to, directly or indirectly, hire, employ or otherwise engage any Offeree until such Offeree has executed the Transferred Employee Release (by no later than the fourteenth day immediately following the Closing) and not revoked it during the period of revocation thereof.

Section 6.6     Third Party Consents.   The parties shall cooperate in good faith and use their respective commercially reasonable efforts to deliver or obtain, as the case may be, at the expense of the Lehman Parties, all notices to and consents (a) of the limited partners of the Master Funds and LibertyView Credit Select Portfolio, L.P. for the transfer of the GP Interests from the Current General Partner to the NewCo General Partner; (b) of the limited partners of the Master Funds for the assignment of the Investment Advisory Agreements from the Current Investment Advisor to the NewCo Manager; (c) of the members of the Domestic Feeder Funds for the replacement of the Current General Partner in its capacity as the manager with the NewCo General Partner; (d) of the members of The LibertyView Fund, L.L.C. for the transfer of the Class A Interests from the Current General Partner to the NewCo General Partner; (e) of the directors of the Foreign Feeder Funds in relation to the removal of the current members of the Boards of Directors of the Foreign Feeder Funds nominated by the Lehman Parties, their replacement with such persons as are designated by the Transferees for membership in such Boards of Directors, for the transfer of the Non-Participating Shares from the Current General Partner to the NewCo General Partner and the acknowledgement of the directors of the Foreign Feeder Funds of the replacement of the Current Investment Advisor with the NewCo Manager as the investment advisor to the Master Funds; (f) for the replacement of the Current Investment Advisor as a collateral manager under the Collateral Management Agreement with the NewCo Manager, and (g) of ██████ for the assignment of the Trust D Management Agreement from the

Current Investment Advisor to the NewCo Manager (such notices and consents in (a)-(g), collectively, the "Third Party Consents"). All of the Third Party Consents are listed on Schedule 6.6. The parties shall cooperate to effect, at the expense of the Lehman Parties, any necessary filings or registrations with the Cayman Islands Monetary Authority and/or any other Governmental Body in relation to the foregoing. For the avoidance of doubt, the NewCo Parties shall bear their own expenses arising in connection with the organization and incorporation of the NewCo Parties, as well as any expenses arising in connection with any registration or regulatory filing of a NewCo Party with any Governmental Body, which expenses shall be deemed to be NewCo Transaction Expenses for purposes of this Agreement.

Section 6.7    Further Assurances.    Each of the parties hereto shall use its commercially reasonable efforts to (a) take all actions, both prior to and after the Closing, necessary or appropriate to consummate and implement the transactions contemplated by this Agreement, and (b) cause the fulfillment at the earliest practicable date of all of the conditions to each party's respective obligations to consummate the transactions contemplated by this Agreement. In furtherance of the foregoing, NewCo Manager shall make or cause to be made all filings required under the Investment Advisers Act of 1940, as amended, to become registered as an investment adviser thereunder as promptly as practicable after the date hereof and, to the extent required under the applicable Laws or the Transferred Contracts (as may be amended from time to time), to maintain such registration and the Lehman Parties shall use commercially reasonable efforts to provide NewCo Manager with such cooperation in connection with the filings as may be reasonably requested by NewCo Manager.

Section 6.8    Books and Records.

(a)    At the Closing, the Lehman Parties shall use commercially reasonable efforts to provide the Transferees with all books, records, ledgers, data, paper and computer files relating primarily to the Transferred Assets, including the books and records required to be maintained by the Transferees under Rule 204-2 promulgated under the Investment Advisers Act of 1940, as amended, in the form reasonably requested by the Transferees; provided, that such materials shall not include any books, documents, records or files prepared in connection with or relating to the transactions contemplated by this Agreement.

(b)    The Transferees and the Lehman Parties agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the respective businesses of the Funds (including, in the case of the Transferees, the books, records and other materials transferred pursuant to Section 6.8(a)) for a period of five years from the Closing Date and for such period of time shall make such books, records and personnel available to the other, subject to restrictions under applicable Law, upon reasonable advance notice as may be reasonably required by such party in connection with, among other things, the preparation of financial statements, regulatory filings or tax returns, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of the Transferees or the Lehman Parties or any of their Affiliates or in order to enable the Transferees or the Lehman Parties to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. The respective party accessing such information shall be entitled, at its sole cost and expense, to make copies of the books and records to which it is entitled to access pursuant to this Section 6.8(b). In the event

the Transferees or the Lehman Parties wish to destroy such records after that time, such party shall first give 90 days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within that 90 day period, to take possession of the records within 180 days after the date of such notice.

Section 6.9    <u>Office Relocation</u>.    The parties acknowledge and agree that, prior to the Closing, the Lehman Parties may, in their sole and absolute discretion, require RM, RH and the Offerees to relocate to the office premises of the Lehman Parties within the Borough of Manhattan different from those occupied by them on the date hereof; <u>provided</u>, <u>however</u>, that the Lehman Parties shall bear all of the reasonable expenses of RM, RH and the Offerees related to any such relocation that occurs prior to Closing at the direction of the Lehman Parties. Notwithstanding the foregoing, at or prior to the Closing, the NewCo Team shall cease to use all office space at the premises, and any of the other facilities, of the Lehman Parties and, at the expense of the Transferees, relocate its offices to premises not affiliated with the Lehman Parties.

Section 6.10    <u>Transaction, Startup and Other Expenses</u>.

(a)    The Transferors agree to reimburse, promptly upon receiving an invoice from the NewCo Parties, all reasonable and documented out-of-pocket legal fees, disbursements and other charges incurred by the NewCo Parties in connection with this Agreement (including the legal costs of Lowenstein Sandler PC and the expenses referred to in the final sentence of <u>Section 6.6</u>), up to a maximum aggregate amount of $100,000, arising out of the negotiation, structuring and consummation of the transactions contemplated by this Agreement, including the participation of Lowenstein Sandler PC in a conference call between the parties on January 29, 2009 (the "<u>NewCo Transaction Expenses</u>"); <u>provided</u>, <u>however</u>, that the Transferors shall not be required to reimburse more than $50,000 of the NewCo Transaction Expenses prior to the Closing Date.

(b)    The Transferors agree to reimburse or pay on behalf of the NewCo Parties, promptly upon receiving an invoice from the Transferees (or initialed by either RM or RH), the reasonable and documented amount of the capital expenses described on <u>Schedule 6.10(b)</u> and such other reasonably necessary capital expenses approved by any Lehman Party, such approval not to be unreasonably withheld, to the extent incurred prior to the Closing in connection with the Funds (such reimbursed amounts, "<u>NewCo Startup Expenses</u>"); <u>provided</u>, <u>however</u>, that the Transferors shall have no obligation to reimburse (or pay) more than $150,076 of NewCo Startup Expenses. For the avoidance of doubt, the expenses incurred in connection with the relocation of the NewCo Team to premises not affiliated with the Lehman Parties as set forth in <u>Section 6.9</u> shall not be included in the NewCo Startup Expenses and shall be borne by the Transferees as provided in <u>Section 6.9</u>.

(c)    Subject to and upon the Closing, the Transferees shall reimburse each Transferor for (i) all of the NewCo Transaction Expenses paid by such Transferor in accordance with <u>Section 6.10(a)</u> and (ii) 65% of the aggregate amount of the NewCo Startup Expenses paid by such Transferor in accordance with <u>Section 6.10(b)</u> (such NewCo Transaction Expenses and 65% of such NewCo Startup Expenses, collectively, the "<u>Reimbursable Expenses</u>"); <u>provided</u>, <u>however</u>, that the Transferees may elect to satisfy such obligation by reducing the amount of the Management Fees payable by the Transferors to the NewCo Parties pursuant to Section 6.4 by

the total amount of the Reimbursable Expenses paid by the Transferors; provided, further, that if the amount of such Management Fees payable by the Transferors to the NewCo Parties at the Closing is less than the total amount of the Reimbursable Expenses paid by the Transferors, the Transferees shall promptly upon the receipt of any Management Fees or other revenue from the Funds pay to the Transferors all such Management Fees and other revenue until such shortfall is paid in full.   None of the NewCo Parties shall have any obligation to reimburse the Transferors for any Reimbursable Expenses paid by the Transferors unless and until the Closing shall occur. The Transferees shall have joint and several liability for their obligations set forth in this Section 6.10(c).

(d)    The Transferors shall bear the reasonable and documented amount of the operating expenses set forth on Schedule 6.10(d), to the extent incurred prior to the Closing and in connection with operating the Funds.

(e)    The Lehman Parties shall bear their own expenses in connection with the transactions contemplated hereunder.

Section 6.11    Publicity.  Neither the Lehman Parties nor the NewCo Parties shall issue, or permit any of their respective Affiliates to issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto, which approval will not be unreasonably withheld, unless, in the sole judgment of the Lehman Parties or the NewCo Parties, as applicable, disclosure is otherwise required by applicable Law or by the applicable rules of any stock exchange on which the Lehman Parties or the NewCo Parties list securities or by the Bankruptcy Court in connection with this Agreement, provided, that the party intending to make such release shall use its commercially reasonable efforts consistent with applicable Law or stock exchange or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

Section 6.12    Intellectual Property.  The Lehman Parties hereby agree and assign to the Transferees and their Affiliates, to the extent otherwise permitted by applicable Law, (i) all rights to track record and related historical performance data exclusively related to the Funds and (ii) any of the Lehman Parties' rights, title and interest in the intellectual property used exclusively in the Funds (collectively, the "LibertyView IP"), including the name "LibertyView" and the intellectual property rights set forth on Schedule 6.12.   After the Closing, the Lehman Parties shall have no right to the use of any LibertyView IP.  Except for the assignment of rights of the LibertyView IP as set forth in this Section 6.12, the NewCo Parties and their Affiliates (including the Funds after the Closing) shall have no right, title or interest in, or to any trademarks, service marks, trade names, domain names, copyrights, proprietary information, know-how or other intellectual property of the Lehman Parties or any of their Affiliates, including the name and logo of "Neuberger Berman", or any income or profit generated thereby.

Section 6.13    [Reserved].

Section 6.14    Release.

(a)    Effective as of the Closing Date upon consummation of the Closing and subject to Section 6.14(b) of this Agreement, each of the NewCo Parties, on behalf of himself or itself and their respective successors and assigns, and on behalf of his or its Subsidiaries and Affiliates (but excluding the Funds) and their respective successors and assigns (each, a "Releasor"), hereby forever releases, acquits and discharges, to the fullest extent permitted by Law, NB Parent and each of its past, present and future Subsidiaries and their respective past, present or future officers, directors, employees, partners, members, managers, and their successors and assigns (each, a "NB Releasee"), and LBHI and each of its past, present or future Subsidiaries (including each of the Transferors) and their respective past, present or future officers, directors, employees, stockholders, partners, members, managers, equity interest holders, Affiliates, successors and assigns (together with the NB Releasees, the "Releasees") of, from and against any and all Liens, actions, causes of action, losses, expenses, fees, charges, complaints, claims, demands, damages, obligations, promises, controversies, rights, taxes, lis pendens, liabilities, judgments, debts, dues, suits and proceedings of every kind, nature and description whatsoever, known or unknown, past, present or future, suspected or unsuspected, subject to dispute or not, including any claim as defined in section 101(5) of the Bankruptcy Code (collectively, "Claims"), arising from or relating to acts or omissions occurring on or before the Closing Date, which such Releasor ever had, now has or may have, including without limitation any and all Claims arising from (i) such Releasor's employment (including with respect to compensation or benefits for past, present or future periods) with, or termination of employment from (including with respect to any severance payments or benefits), LBHI or any other Releasee, (ii) any limited partnership or other investment interest of any Releasor in any Fund or other investment product formed, organized, managed, issued or sold by any Releasee, (iii) any act or omission of the Current General Partner (or any other Subsidiary of LBHI) in its capacity as a general partner or manager of any Fund, (iv) any act or omission of the Current Investment Advisor or the Prior Investment Advisor (or any other Subsidiary of LBHI) in its capacity as the investment advisor, investment manager and/or collateral manager of any Fund and (v) any act or omission of any employee, agent or Representative of any Releasee in his or her capacity as a director or Foreign Feeder Fund.

(b)    Notwithstanding the foregoing in sub-clause (a) above, the release set forth in Section 6.14(a) shall not apply to (i) any Claim against LBIE or LBI, (ii) any Claim of RM or RH pursuant to Section 6.14(a)(ii), so long as (A) RM or RH, as applicable, has not breached Section 6.15(b) and (B) none of the Releasees has suffered actual losses as a result of the gross negligence or willful misconduct of RM or RH, as applicable (whether in his capacity as an employee of a Releasee or otherwise), (iii) any right of RM or RH to indemnification that he may have as a result of his employment with LBHI or any other Releasee, (iv) any Claim that RM or RH may have against LBHI with respect to any restricted stock units or stock options granted to him by LBHI, (v) any Claim of a NewCo Party to enforce its rights under this Agreement, (vi) in the event that any Releasee initiates or pursues litigation against RM or RH, asserting claims in relation to acts or omissions occurring, in whole or in part, on or before the Closing Date, any Claim that RM or RH may have as a counterclaim against such Releasee exclusively related to such litigation, and (vii) any Allowed LBHI Claim. Each Releasor agrees not to assert any Claim released, acquitted or discharged by this Section 6.14 against any Releasee.

(c)      Each of the NewCo Parties confirms that it has fully read and understands all the terms and conditions set forth in this Section 6.14 and their legal consequences, and has had the benefit of advice of legal counsel of his or its own choice. Each of the NewCo Parties acknowledges that there is a risk that subsequent to the Closing Date, he or it may discover, incur or suffer matters or things that were unknown to and/or unanticipated by him or it at the time of execution of this Agreement. Each of the NewCo Parties agrees that this Section 6.14 applies to, and forever releases, acquits and discharges, all such matters or things released by this Section 6.14.

(d)      If, for any reason, any court of competent jurisdiction shall hold by final non-appealable order that any Claim purported to be released, acquitted and discharged hereby is not so released, acquitted and discharged, then this Section 6.14 shall nonetheless be and remain effective with respect to each and every other Claim released, acquitted and discharged hereby.

(e)      The parties agree that the terms of this Section 6.14 are a material inducement to the Lehman Parties entering into this Agreement and breach of this Section 6.14 shall constitute irreparable harm to the Lehman Parties. In the event that any of the NewCo Parties breaches the covenants contained in this Section 6.14, the Lehman Parties shall be entitled to injunctive relief or other equitable relief, without the proof of actual damage, in addition to any other remedies available under applicable Law, and shall not be required to post a bond in any such action or proceeding. Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy. Each party further agrees that the only permitted objection that it may raise in response to any such action for equitable relief is that it contests the existence of a breach of threatened breach of the provisions of this Section 6.14.

(f)      For the avoidance of doubt, the release provisions in this Section 6.14 shall not apply to any Claims that any of the Funds or their investors (except with respect to RM and RH as provided in this Section 6.14) or successors or assigns may have against any Releasee.

Section 6.15    Non-Disparagement; Non-Solicitation of Claims.

(a)      Each of the NewCo Parties expressly acknowledges, agrees and covenants that it will not make, or direct or encourage to be made, any statements, comments, or communications in any form oral, written or electronic, which in any way could constitute libel, slander or disparagement of LBHI or any of its past, present or future Subsidiaries (including the Transferors) or any of their past, present or future officers, directors, employees, partner, members, managers and any of their successors and assigns (including the NB Releasees); provided, that nothing herein shall restrict any of the NewCo Parties (i) from responding truthfully and to the best of their abilities to inquiries or demands for information from any Governmental Body with respect to LBHI or any of its past, present or future Subsidiaries or the Funds, or (ii) from testifying in court, or through a deposition or responding to an interrogatory, on any matter pursuant to a duly issued subpoena or as otherwise required by Law, or (iii) from filing a complaint or other legal papers in connection with any Claim permitted by Section 6.14(b).

(b)    Each of the NewCo Parties further agrees and covenants that it will not, directly or indirectly, solicit, assist, or voluntarily cooperate with or facilitate the solicitation of, any past or present limited partner of any Fund or investor in any other investment product or fund organized, managed, issued or sold by LBHI or any of its past, present or future Subsidiaries (including the Transferors) or any of their past, present or future officers, directors, employees, partners, members, managers and their successors and assigns (including the NB Releasees) for the assertion of any Claim against LBHI or any of its past, present or future Subsidiaries or any of their past, present or future officers, directors, employees, partners, members, managers, and their successors and assigns (including the NB Releasees); provided, that the foregoing shall not apply to, and the NewCo Parties shall not be subject to any limitation under this Section 6.15 in relation to any statements, comments or communications relating to, (i) Claims against LBIE or LBI or (ii) any Allowed LBH Claim.

(c)    For the avoidance of doubt, the parties agree and acknowledge that this Section 6.15 shall prohibit the NewCo Parties, among other things, from participating in or giving advice, whether as general partner, investment advisor, manager or otherwise, with respect to any proceeding asserting a Claim by any Fund that would be subject to the release provisions in Section 6.14(a) if such Claim was asserted by a Releasor.

(d)    The parties agree that the terms of this Section 6.15 are a material inducement to the Lehman Parties entering into this Agreement and breach of this Section 6.15 shall constitute irreparable harm to the Lehman Parties.  In the event that any of the NewCo Parties breaches the covenants contained in this Section 6.15, the Lehman Parties shall be entitled to injunctive relief or other equitable relief, without the proof of actual damage, in addition to any other remedies available under applicable Law, and shall not be required to post a bond in any such action or proceeding.  Each party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedy.  Each party further agrees that the only permitted objection that it may raise in response to any such action for equitable relief is that it contests the existence of a breach of threatened breach of the provisions of this Section 6.15.

Section 6.16    Tax Matters.

(a)    Tax Return Preparation.

(i)    Subject to the remainder of this Section 6.16(a)(i), the NewCo General Partner shall prepare and timely file or cause to be prepared and timely filed (in each case, taking into account applicable extensions) all Tax Returns of each Fund that are required to be filed after the Closing Date, including Tax Returns that pertain to a Straddle Period.  Notwithstanding the prior sentence, the Current Investment Advisor shall prepare and timely file or cause to be prepared and timely filed (in each case, taking into account applicable extensions) all Tax Returns of each Fund that are required to be filed after the Closing Date for any period that ends on or before the Closing Date.  With respect to (x) any Tax Return that pertains to a Straddle Period, the NewCo General Partner (in such capacity, the "Tax Preparing Party") shall provide the Transferors (in such capacity, the "Tax Reviewing Party"), and (y) any Tax Return described in the preceding sentence for any period that ends on or before the Closing Date, the Current

Investment Advisor (in such capacity, the "Tax Preparing Party") shall provide the Transferees (in such capacity, the "Tax Reviewing Party"), in each case with a draft of such Tax Return at least thirty (30) days prior to the due date for filing such Tax Return (taking into account applicable extensions), which draft shall be completed in a manner consistent with the past practices of the applicable entity, except as otherwise required by applicable Law or as otherwise agreed to by the Tax Preparing Party and the Tax Reviewing Party. Within ten (10) days of delivery of such draft Tax Return to the Tax Reviewing Party, the Tax Reviewing Party shall notify the Tax Preparing Party of any objections the Tax Reviewing Party has to such draft Tax Return (provided, that such objections shall be limited to items that could reasonably be expected to affect adversely any of the Transferees or the Transferors), and if the Tax Reviewing Party has no such objections (or fails to timely notify the Tax Preparing Party of such objections), then the Tax Preparing Party shall timely file or cause to be timely filed such Tax Return (taking into account applicable extensions) completed on the basis of the draft provided to the Tax Reviewing Party. If the Tax Reviewing Party timely notifies the Tax Preparing Party of the Tax Reviewing Party's objection(s) to such draft Tax Return, then the Tax Reviewing Party and the Tax Preparing Party shall negotiate in good faith to resolve such objection(s). If the Tax Reviewing Party and the Tax Preparing Party are able to resolve such objection(s) more than fifteen (15) days prior to the filing deadline for such Tax Return (taking into account applicable extensions), then the Tax Preparing Party shall timely file or cause to be timely filed such Tax Return (taking into account applicable extensions) on the basis agreed to by the Tax Reviewing Party and the Tax Preparing Party. If, despite such good faith efforts, the Tax Reviewing Party and the Tax Preparing Party are unable to resolve such objection(s) within such period of time, then the matter shall be submitted to a nationally-recognized independent accounting firm acceptable to the Tax Reviewing Party and the Tax Preparing Party for review and resolution by such accounting firm, which review and resolution shall (i) occur no later than five (5) days prior to the filing deadline for such Tax Return (taking into account applicable extensions), and (ii) be limited to the basis of the Tax Reviewing Party's objection(s); and, thereafter, the Tax Preparing Party shall timely file or cause to be timely filed such Tax Return (taking into account applicable extensions) on the basis of the draft provided to the Tax Reviewing Party, as modified to reflect such accounting firm's resolution of the Tax Reviewing Party's objection(s) thereto. The fees and expenses of such accounting firm shall be paid one-half by the Transferees and one-half by the Current Investment Advisor.

(ii)    Unless otherwise required by applicable Law, neither the NewCo General Partner, the Current Investment Advisor, nor any of their Affiliates (including in the case of the NewCo General Partner after the Closing, the Funds) shall, without the prior written consent of the Transferors (in the case of an amendment by the NewCo General Partner) or the Transferees (in the case of an amendment by the Current Investment Advisor) (in each case such consent not to be unreasonably conditioned or withheld), make or change any election of, affecting, or with respect to any Tax Return of a Fund filed on or before the Closing Date or that is required to be filed after the Closing Date for any period that ends on or before the Closing Date or that pertains to a Straddle Period, or amend or re-file such Tax Return.

(b)    <u>Closing of the Books</u>.  The NewCo General Partner, the Transferors and the Funds shall, to the extent permitted by applicable Law, elect with the relevant Governmental Body to treat for all purposes the Closing Date as the last day of the taxable period for each Fund.  If applicable Law does not permit a Fund to close its taxable period on the Closing Date or in any case in which a Tax is assessed with respect to a taxable period which includes the Closing Date (but does not begin or end on that day) (a "<u>Straddle Period</u>"), the Taxes, if any, attributable to such Straddle Period shall be allocated (i) to the Transferors for the period up to and including the close of business on the Closing Date (and the amount of such allocated Taxes shall be considered Excluded Liabilities for purposes of this Agreement), and (ii) to the NewCo General Partner for the period subsequent to the Closing Date (and the amount of such allocated Taxes shall be considered Assumed Liabilities for purposes of this Agreement).  With respect to any Fund to which the preceding sentence applies, any allocation of income or deductions required to determine any Taxes attributable to a Straddle Period shall be made by means of a closing of the books and records of such Fund as of the close of the Closing Date, <u>provided</u> that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period after the Closing Date in proportion to the number of days in each such period.

(c)    <u>Cooperation on Tax Matters</u>.    The NewCo General Partner, the Transferors and the Funds shall cooperate fully, as and to the extent reasonably requested by each other, in connection with the filing of Tax Returns pursuant to this <u>Section 6.16</u> and any audit, inquiry, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and (upon the other party's request) the provision of records and information which are reasonably relevant to any such audit, inquiry, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(d)    <u>Tax Audits</u>.  The NewCo General Partner shall promptly notify the Transferors upon receipt by the NewCo General Partner or any Affiliate of the NewCo General Partner (including after the Closing, any Fund) of written notice of any inquiries, claims, assessments, audits or similar events with respect to (i) items of income, gain, deduction, expense or credit of any Fund relating to any taxable period ending on or before the Closing Date or any Straddle Period or (ii) any Taxes of any Fund relating to any such periods described in the preceding clause (i), if such inquiry, claim, assessment, audit or similar event could affect the Tax liabilities of any of the Transferors for such periods (any such inquiry, claim, assessment, audit or similar event, a "<u>Tax Matter</u>").    Anything to the contrary in <u>Article VIII</u> hereof notwithstanding, the NewCo General Partner shall have the authority to represent the interests of the Funds in any Tax Matter before any Taxing Authority and shall have the right to control the defense, compromise or other resolution of any Tax Matter, including responding to inquiries, filing Tax Returns and contesting, defending against and resolving any assessment for additional Taxes or notice of Tax deficiency or other adjustment of Taxes of, or relating to, a Tax Matter; <u>provided that</u> (i) the NewCo General Partner shall keep the Transferors fully and timely informed with respect to the commencement, status, conduct and nature of any Tax Matter, (ii) the NewCo General Partner shall consider in good faith the Transferors' recommendations regarding the conduct of or positions taken in connection with any Tax Matter, and (iii) prior to settling, compromising or entering into a final determination with any Taxing Authority with respect to

any Tax Matter, the NewCo General Partner shall obtain the Transferors' approval of such settlement, compromise or determination (such approval not to be unreasonably conditioned, withheld).

(e)    Tax Sharing Agreements.    Prior to the Closing, the Transferors shall cancel or cause to be cancelled any tax sharing, allocation, indemnity or similar agreement or arrangement if, following the Closing, any Fund would have any obligation to make any payment (other than a payment to any Fund) pursuant to such agreement or arrangement.

Section 6.17    Director Resignations and Appointments.    The Lehman Parties shall cause each of the directors of the Foreign Feeder Funds designated by the Lehman Parties to resign effective as of the Closing Date. The NewCo Parties shall, at the Lehman Parties' expense, and the Lehman Parties shall cooperate with the NewCo Parties, to ensure that the directors of the Foreign Feeder Funds approve a resolution consenting to, or take any other action in accordance with the organizational documents of the Foreign Feeder Funds to effect, the replacement of said resigning directors, effective as of the Closing Date, by such substitute directors as the Transferees may select, who shall not be officers or employees of LBHI or any of its Subsidiaries.

Section 6.18    Indemnification Provisions.    From and after the Closing, the NewCo Parties shall not, and shall cause each of their Affiliates not to, amend or otherwise modify any terms, in effect on the date hereof, of any partnership agreement, limited liability company agreement or other operational or organizational document of any of the Funds, or of any investment advisory agreement, management agreement or any other agreement to which any of the Funds and either the Current General Partner or the Current Investment Advisor is a party, in any manner that adversely affects the right of the Current General Partner, the Current Investment Advisor or the Prior Investment Advisor to indemnification thereunder.

Section 6.19    Confidentiality.    From and after the Closing Date, the Lehman Parties shall not and shall cause their directors, officers, employees and Affiliates not to, directly or indirectly, disclose, reveal, divulge or communicate to any Person other than authorized officers, directors and employees of the Transferees or use or otherwise exploit for its own benefit or for the benefit of anyone other than the Transferees, any Confidential Information (as defined below). Notwithstanding the foregoing, the Lehman Parties (and their officers, directors and Affiliates) shall not have any obligation of non-use or confidence with respect to any Confidential Information if and to the extent use or disclosure thereof is (i) reasonably believed by a Lehman Party to be necessary for the administration of the Bankruptcy Case, (ii) for the prosecution or defense of any Claim to which a Lehman Party or its Affiliate is a party or is threatened to become a party, or (iii) required by applicable Law; provided, however, that in the event disclosure is required by applicable Law, the Lehman Parties shall, to the extent reasonably possible, provide the Transferees with prompt notice of such requirement prior to making any disclosure so that Purchaser may seek an appropriate protective order. For purposes of this Section 6.19, "Confidential Information" means any information with respect to the Funds or any of the Transferred Assets, including methods of operation, customer lists, products, prices, fees, costs, technology, inventions, trade secrets, know-how, software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters. "Confidential Information" does not include, and there shall be no obligation hereunder

with respect to, information that (i) is generally available to the public on the date of this Agreement or (ii) becomes generally available to the public other than as a result of a disclosure not otherwise permissible hereunder.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1    Conditions Precedent to Obligation of the NewCo Parties and the Lehman Parties.  The obligation of the NewCo Parties and the Lehman Parties to consummate the transactions contemplated by this Agreement at the Closing is subject to the fulfillment, on or prior to the Closing, of the condition (which may be waived by the NewCo Parties and the Lehman Parties, in whole or in part, to the extent permitted by applicable Law) that there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 7.2    Conditions Precedent to Obligation of the NewCo Parties.  The obligation of the NewCo Parties to consummate the transactions contemplated by this Agreement at the Closing is subject to the fulfillment, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the NewCo Parties, in whole or in part, to the extent permitted by applicable Law):

(a)    the representations and warranties of the Lehman Parties set forth in Article IV qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing (except to the extent such representations and warranties relate to an earlier date, in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and the Transferees shall have received a certificate signed by the Lehman Parties, dated the Closing Date, to the foregoing effect;

(b)    the Lehman Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Transferees shall have received a certificate signed by the Lehman Parties, dated the Closing Date, to the foregoing effect;

(c)    the Bankruptcy Court shall have entered the Approval Order, in the form reasonably satisfactory to the NewCo Parties, and such Approval Order shall be a Final Order on the Closing Date;

(d)    the Lehman Parties shall have fulfilled their obligations under Section 3.2(b);

(e)    each of the Third Party Consents shall have been obtained, in form and substance reasonably satisfactory to the Transferees, and shall not have been revoked and shall remain in full force and effect at the Closing;

(f)    the resignations of the directors of the Foreign Feeder Funds set forth in Section 6.17 shall have been duly completed; and

(g)    NewCo Manager shall have become registered as an investment adviser pursuant to the Investment Advisers Act of 1940, as amended, and such registration shall not have been rescinded as of the Closing Date.

Section 7.3    Conditions Precedent to Obligation of the Lehman Parties.    The obligation of the Lehman Parties to consummate the transactions contemplated by this Agreement at the Closing is subject to the fulfillment, on or prior to the Closing, of each of the following conditions (any or all of which may be waived by the Lehman Parties, in whole or in part, to the extent permitted by applicable Law):

(a)    the representations and warranties of the NewCo Parties set forth in Article V qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing (except to the extent such representations and warranties relate to an earlier date, in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and the Lehman Parties shall have received a certificate signed by the NewCo Parties, dated the Closing Date, to the foregoing effect;

(b)    the NewCo Parties shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Lehman Parties shall have received a certificate signed by the NewCo Parties, dated the Closing Date, to the foregoing effect;

(c)    each of the Third Party Consents shall have been obtained, in the form and substance reasonably satisfactory to the Lehman Parties, and shall not have been revoked and shall remain in full force and effect at the Closing;

(d)    each of the members of the NewCo Team who have executed the Transferred Employee Release no later than eight calendar days prior to the Closing Date and have not revoked such Transferred Employee Release prior to the Closing shall have delivered to the Lehman Parties the documents evidencing such persons' resignations (including any Transferred Employee Releases) in the form and substance reasonably satisfactory to the Lehman Parties;

(e)    the resignations of the directors of the Foreign Feeder Funds set forth in Section 6.17 shall have been duly completed;

(f)    the Bankruptcy Court shall have entered the Approval Order, in the form reasonably satisfactory to the Lehman Parties, and such Approval Order shall be a Final Order on the Closing Date; and

(g)    the Transferees shall have fulfilled their obligations under Section 3.2(a).

Section 7.4    Frustration of Closing Conditions.    Neither the NewCo Parties nor the Lehman Parties may rely on the failure of any condition set forth in Section 7.1, 7.2 or 7.3, as

the case may be, if such failure was primarily due to the failure of such party to comply with any provision of this Agreement.

ARTICLE VIII
INDEMNIFICATION

Section 8.1     <u>Survival of Representations and Warranties; Limited Survival of Covenants</u>.

(a)     All representations and warranties of the Lehman Parties and of the Transferees contained in this Agreement (other than the representations and warranties set forth in <u>Sections 4.6</u>, <u>5.4</u> and <u>5.5</u>) or any other agreement, exhibit, schedule, certificate, instrument or writing delivered in connection with this Agreement shall terminate at the Closing and shall not be subject to any claim after the Closing.

(b)     All of the covenants or other agreements of the parties contained in this Agreement shall terminate at the Closing Date and shall not be subject to any claim after the Closing unless by their terms they require performance after the Closing Date, in which case they will survive until fully performed or fulfilled, unless and to the extent only that non-compliance with such covenants or agreements is waived in writing by the party entitled to such performance.

Section 8.2     <u>Indemnification by LBHI</u>.

(a)     Subject to the provisions of this <u>Article VIII</u>, from and after the Closing, LBHI (in its capacity as an indemnifying party, the "<u>Indemnifying Party</u>"), hereby agrees to indemnify and hold the NewCo General Partner and the NewCo Manager (in their capacity as indemnified parties, collectively, the "<u>Indemnified Parties</u>") harmless from and against any and all losses, liabilities, claims, demands, judgments, damages, fines, suits, actions, costs and expenses (including reasonable attorneys' and accountants' fees) (individually, a "<u>Loss</u>" and, collectively, "<u>Losses</u>") arising from or relating to any act or omission, during the period prior to the Closing, of the Current Investment Advisor, the Prior Investment Advisor or the Current General Partner (or other LBHI Subsidiary that has previously served in the capacity of Current Investment Advisor or Current General Partner) taken in their capacity as the investment advisor and the general partner of the Funds, respectively.  No claim for indemnification of any Losses in accordance with this <u>Section 8.2(a)</u> may be made or brought by any Indemnified Party unless a written notice setting forth the specific claim (including Third Party Claims) and the basis therefor in reasonable detail is given to the Indemnifying Party prior to the second anniversary of the Closing Date.

(b)     To the extent that (i) any Losses are subject to indemnification by any of the Funds, the parties shall cooperate to take all reasonable steps, to the extent permitted by Law, to secure such indemnification, and (ii) RM or RH, in their capacities as former officers of the Current Investment Advisor or the Current General Partner, may be eligible for coverage under any Policy, the parties shall cooperate to take all reasonable steps to submit a claim against the respective insurance carrier.  The amount of any Losses for which indemnification is provided

under Section 8.2(a) shall be net of any amounts recovered by the Indemnified Parties from the Funds, under insurance policies or otherwise with respect to such Losses.

(c)    The NewCo Parties acknowledge and agree that the indemnity provisions of this Agreement shall not be contingent upon the scope of the business activities undertaken by the Transferees following the Closing and that RM, RH and the Transferees may launch any investment fund or managed account ("Future Unrelated Business Activities") without affecting the indemnity provisions of this Agreement; provided, however, that the Indemnifying Party shall have no obligation to indemnify any of the Indemnified Parties in respect of any Loss to the extent it is incurred in connection with a Future Unrelated Business Activity. For the avoidance of doubt, the Indemnifying Party shall not have any liability under any provision of this Agreement for any Loss to the extent that such Loss relates to any act or omission taken by any NewCo Party or any of their Affiliates that does not relate to the Funds.

Section 8.3    Third Party Claims.

(a)    In the event that any Legal Proceedings shall be instituted or that any claim or demand shall be asserted by any third party in respect of which payment may be sought under Section 8.2(a) (a "Third Party Claim"), the Indemnified Party shall promptly cause written notice of the assertion of any Third Party Claim of which it has Knowledge which is covered by this indemnity to be forwarded to the Indemnifying Party. The failure of the Indemnified Party to give reasonably prompt notice of any Third Party Claim shall not release, waive or otherwise affect the Indemnifying Party's obligations with respect thereto except to the extent that the Indemnifying Party is prejudiced as a result of such failure.

(b)    The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, and to assume the defense of any Third Party Claim which relates to any Losses indemnified against hereunder. If the Indemnifying Party elects to assume the defense of any Third Party Claim which relates to any Losses indemnified against hereunder, it shall within 30 days (or sooner, if the nature of the Third Party Claim so requires) notify the Indemnified Party of its intent to do so. If the Indemnifying Party elects not to assume the defense of any Third Party Claim which relates to any Losses indemnified against hereunder, any Indemnified Party may, at the expense of the Indemnifying Party, assume the defense of such Third Party Claim and be represented by counsel of its choice which must be reasonably satisfactory to the Indemnifying Party. If the Indemnifying Party shall assume the defense of any Third Party Claim pursuant to this Section 8.3(b), any Indemnified Party may participate, at its sole option and expense, in the defense of such Third Party Claim, represented by counsel of its choice; provided, however, that any Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnifying Party a conflict or potential conflict exists between any Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and, provided, further, that the Indemnifying Party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all Indemnified Parties in connection with any Third Party Claim.

(c)    The parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Third Party Claim. Notwithstanding

anything in this Section 8.3 to the contrary, neither the Indemnifying Party nor any Indemnified Party shall, without the written consent of the other party, settle or compromise any Third Party Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Third Party Claim. Notwithstanding the foregoing, if a settlement offer solely for money damages is made by the applicable third party claimant, and the Indemnifying Party notifies the Indemnified Party in writing of the Indemnifying Party's willingness to accept the settlement offer and pay the amount called for by such offer, and the Indemnified Party declines to accept such offer, the Indemnified Party may continue to contest such Third Party Claim, free of any participation by the Indemnifying Party, and the amount of any ultimate liability with respect to such Third Party Claim that the Indemnifying Party has an obligation to pay hereunder shall be limited to the lesser of (i) the amount of the settlement offer that the Indemnified Party declined to accept plus the Losses of the Indemnified Party relating to such Third Party Claim through the date of its rejection of the settlement offer or (ii) the aggregate Losses of the Indemnified Party with respect to such Third Party Claim.

(d)    After any judgment or award shall have been rendered by a Governmental Body of competent jurisdiction, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement, in each case with respect to a Third Party Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter and the Indemnifying Party shall pay all of such remaining sums so due and owing to the Indemnified Party pursuant to Section 8.2(a), as the case may be, by wire transfer of immediately available funds within ten (10) Business Days after the date of such notice.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Payment of Sales, Use or Similar Taxes.    All sales, use, transfer, intangible, recordation, documentary stamp or similar Taxes or charges, of any nature whatsoever, applicable to, or resulting from, the transactions contemplated by this Agreement ("Transfer Taxes") shall be borne equally by the Transferees, on the one hand, and the Lehman Parties, on the other hand. The parties hereto shall cooperate with each other in order to minimize applicable Transfer Taxes in a manner that is mutually agreeable and in compliance with applicable Law, and shall to that extent execute such documents, agreements, applications, instruments, or other forms or take such actions as reasonably required, and shall permit any such Transfer Taxes to be assessed and paid in accordance with applicable Law.

Section 9.2    Applicable Withholding.    In the event it is determined by any Taxing Authority that any payment or transfer of property under this Agreement is subject to withholding Tax or reduction under applicable Law, the Transferees shall indemnify the Transferors for the amount of any such withholding Tax or reduction determined by the Taxing Authority to be payable by the either of the Transferors. Such amounts shall be payable within five Business Days of the receipt of notice by the Transferees of such Taxing Authority's determination and (whether or not determined to be payable by the Transferors) shall not be subject to Section 8.2 or Section 8.3.

Section 9.3    Expenses.    Except as otherwise provided in this Agreement, the Lehman Parties, on the one hand, and the Transferees, on the other hand, shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 9.4    Entire Agreement; Amendments and Waivers.    This Agreement (including the Schedules, Exhibits and Annexes hereto) and the Ancillary Agreements represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings between the parties hereto with respect to such subject matter.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 9.5    Notices.    All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to the NewCo Parties, to:

c/o Lowenstein Sandler PC
1251 Avenue of the Americas
New York, New York 10020
Facsimile: (212) 262-7402
Attention:   Steven E. Siesser
                    Peter D. Greene

With a copy (which shall not constitute notice) to:

Lowenstein Sandler PC
1251 Avenue of the Americas
New York, New York 10020
Facsimile: (212) 262-7402
Attention:   Steven E. Siesser
                    Peter D. Greene

If to the Lehman Parties to:

c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue
New York, New York 10020
Facsimile: (646) 758-2652
Attention: Chief Restructuring Officer

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Facsimile: (212) 310-8007
Attention:  Michael E. Lubowitz
David P. Murgio

Section 9.6    Binding Effect; Assignment.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. No assignment of this Agreement or of any rights or obligations hereunder may be made by the parties, directly or indirectly (by operation of Law or otherwise), without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void.

Section 9.7    Third-Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than the parties hereto and their respective successors and permitted assigns, the Releasors and the Releasees any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

Section 9.8    Severability.    Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.9    Enforcement.    The parties agree that irreparable damage would result and that the parties would not have any adequate remedy at Law if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, if either party breaches its obligation to consummate the transactions contemplated by this Agreement, the non-breaching party shall be entitled to equitable relief, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance (including causing the Transferees to acquire, or the Transferors to transfer, the Transferred Assets), in addition to all other remedies available to the parties at Law or in equity as a remedy for any such breach. Each party agrees to (i) cooperate fully in any attempt by the other party in obtaining any such equitable remedy, and (ii) waive any requirement for the security or posting of any bond in connection with any such

equitable remedy. Each party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach of threatened breach of the provisions of this Agreement. Such equitable remedies may be sought in the Supreme Court of the State of New York sitting in New York County (and, if such Supreme Court of the State of New York shall be unavailable, in any other New York State court or in the United States District Court for the Southern District of New York), and any appellate court thereof. The rights set forth in this Section 9.9 shall be in addition to any other rights which a party may have at Law or in equity pursuant to this Agreement.

Section 9.10    Counterparts.    This Agreement may be executed in multiple counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 9.11    GOVERNING LAW; SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)    THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT), OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT) AND THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.

(b)    EACH OF THE PARTIES:

(i)    SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY FEDERAL OR STATE COURT LOCATED WITHIN THE BOROUGH OF MANHATTAN OF THE CITY, COUNTY AND STATE OF NEW YORK OVER ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, AND AGREES THAT ALL CLAIMS IN RESPECT OF SUCH DISPUTE OR ANY SUIT, ACTION OR PROCEEDING RELATED THERETO MAY BE HEARD AND DETERMINED IN SUCH COURTS, PROVIDED, HOWEVER, THAT DURING THE PENDENCY OF THE BANKRUPTCY CASE AND UPON CLOSING OF THE BANKRUPTCY CASE, TO THE EXTENT PERMITTED BY ORDER OF THE BANKRUPTCY COURT, THE BANKRUPTCY COURT SHALL HAVE AND RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES WHICH MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY;

(ii)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE

BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE;

    (iii)    AGREES THAT A JUDGMENT IN ANY SUCH DISPUTE MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW;

    (iv)    IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDINGS ARISING OUT OF OR RELATED TO THIS AGREEMENT; AND

    (v)    CONSENTS TO PROCESS BEING SERVED BY ANY PARTY TO THIS AGREEMENT IN ANY SUIT, ACTION OR PROCEEDING BY THE DELIVERY OF A COPY THEREOF IN ACCORDANCE WITH THE PROVISIONS OF SECTION 9.5.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed by its duly authorized officer, in each case as of the date first above written.

TRANSFEREES:

LIBERTYVIEW CAPITAL
MANAGEMENT, LLC

By:
Name:    Richard Meckler
Title:    Managing Member

LIBERTYVIEW GP, LLC

By:
Name:    Richard Meckler
Title:    Managing Member

INDIVIDUAL MANAGERS:

Richard Meckler

Randall Hutton

<u>LEHMAN PARTIES</u>:


LEHMAN BROTHERS HOLDINGS INC.


By: _____
Name: John K. Suckow
Title: Senior Vice President


LEHMAN BROTHERS ASSET
MANAGEMENT, INC.


By: _____
Name: William Fox
Title: Executive Vice President


NEUBERGER BERMAN ASSET
MANAGEMENT, LLC


By: _____
Name: William Fox
Title: Vice President


[LIBERTYVIEW TRANSACTION AGREEMENT SIGNATURE PAGE]

## ANNEX A

## List of Funds

1.  **Master Fund:**            **LibertyView Alternative Blend Fund, L.P.**
    Domestic Feeder Fund:     LibertyView Alternative Blend Fund, LLC
    Foreign Feeder Fund:      LibertyView Alternative Blend Fund, Ltd.

2.  **Master Fund:**            **LibertyView Convertible Arbitrage Fund, L.P.**
    Domestic Feeder Fund:     LibertyView Convertible Arbitrage Fund, LLC
    Foreign Feeder Fund:      LibertyView Convertible Arbitrage Fund, Ltd.

3.  **Master Fund**             LibertyView **Credit Opportunities Fund, L.P.**
    Domestic Feeder Fund:     LibertyView Credit Opportunities Fund, LLC
    Domestic Feeder Fund:     LibertyView Credit Opportunities Fund II, LLC
    Foreign Feeder Fund:      LibertyView Credit Opportunities Fund, Ltd.
    Foreign Feeder Fund:      LibertyView Credit Opportunities Fund II, Ltd.

4.  **Master Fund:**            **LibertyView Credit Select Fund, L.P.**
    Domestic Feeder Fund:     LibertyView Credit Select Fund, LLC
    Foreign Feeder Fund:      LibertyView Credit Select Fund, Ltd.
    Foreign Feeder Fund:      LibertyView Credit Select Portfolio, L.P.

5.  **Master Fund:**            **LibertyView Funds, L.P.**
    Domestic Feeder Fund:     The LibertyView Fund, L.L.C.
    Foreign Feeder Fund:      LibertyView Plus Fund, Ltd.
    Foreign Feeder Fund:      LibertyView Leverage Plus Fund, Ltd.

6.  **Master Fund:**            **LibertyView Global Risk Arbitrage Fund, L.P.**
    Foreign Feeder Fund:      LibertyView Global Risk Arbitrage Fund, Ltd.

7.  **Master Fund:**            **LibertyView Special Opportunities Fund, L.P.**
    Domestic Feeder Fund:     LibertyView Special Opportunities Fund, LLC
    Foreign Feeder Fund:      LibertyView Special Opportunities Fund, Ltd.

## ANNEX B

### List of Investment Advisory Agreements

1.    Investment Advisory Agreement, dated March 31, 2003, by and between LibertyView Alternative Blend Fund, L.P. and Neuberger Berman, LLC.

2.    Investment Advisory Agreement, dated March 31, 2003, by and between LibertyView Convertible Arbitrage Fund, L.P. and Neuberger Berman, LLC.

3.    Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Credit Opportunities Fund, L.P. and Neuberger Berman, LLC.

4.    Investment Advisory Agreement, dated August 1, 2007, among LibertyView Credit Select Fund, LLC, LibertyView Credit Select Portfolio, L.P., LibertyView Credit Select Fund, L.P. and Neuberger Berman, LLC.

5.    Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Funds, L.P. and Neuberger Berman, LLC.

6.    Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Global Risk Arbitrage Fund, L.P. and Neuberger Berman, LLC.

7.    Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Special Opportunities Fund, L.P. and Neuberger Berman, LLC.

## ANNEX C

### List of LLC Agreements

1.      Limited Liability Company Agreement of LibertyView Alternative Blend Fund, LLC, dated March 31, 2003

2.      Limited Liability Company Agreement of LibertyView Convertible Arbitrage Fund, LLC, dated March 31, 2003

3.      Limited Liability Company Agreement of LibertyView Credit Opportunities Fund, LLC, dated June 1, 2002

4.      Limited Liability Company Agreement of LibertyView Credit Opportunities Fund II, LLC, dated November 1, 2003

5.      Limited Liability Company Agreement of LibertyView Credit Select Fund, LLC, dated August 1, 2007

6.      Amended and Restated Limited Liability Company Agreement of The LibertyView Fund, LLC, dated November 1, 2002 (as amended in December 2002)

7.      Limited Liability Company Agreement of LibertyView Special Opportunities Fund, LLC, dated February 1, 2002 (as amended on December 2, 2002, March 15, 2005 and November 1, 2006)

## ANNEX D

## List of Partnership Agreements

1.      Limited Partnership Agreement of LibertyView Alternative Blend Fund, LP, dated March 31, 2003 (as amended on February 23, 2004)

2.      Amended and Restated Limited Partnership Agreement of LibertyView Convertible Arbitrage Fund, LP, dated March 31, 2003 (as amended on February 23, 2004)

3.      Amended and Restated Limited Partnership Agreement of LibertyView Credit Opportunities Fund, LP, dated June 30, 1998 (as amended on December 31, 2002 and February 23, 2004)

4.      Amended and Restated Limited Partnership Agreement of LibertyView Credit Select Fund, LP, dated December 20, 2007

5.      Amended and Restated Exempted Limited Partnership Agreement of LibertyView Credit Select Portfolio, L.P., dated August 1, 2007

6.      Amended and Restated Limited Partnership Agreement of LibertyView Funds, LP, dated June 30, 1998 (as amended on December 31, 2002 and February 23, 2004)

7.      Amended and Restated Limited Partnership Agreement of LibertyView Global Risk Arbitrage Fund, LP, dated December 31, 1999 (as amended on December 31, 2002 and February 23, 2004

8.      Amended and Restated Limited Partnership Agreement of LibertyView Special Opportunities Fund, LP, dated February 1, 2002 (as amended on December 31, 2002 and February 23, 2004)

**SCHEDULE 6.1(b)**

**Cooperation Matters**

- That certain matter entitled "In the Matter of Liberty View Capital Management (NY-08019)" (the "LibertyView Investigation") conducted by the New York Regional Office of the United States Securities and Exchange Commission, and any and all agency or court matters, investigations or proceedings that may become related to such matter or that may develop or arise out of such matter, whether formal or informal, before or after the Closing

- Any other complaints, claims, demands, causes of action or other legal proceedings relating to the Funds filed or threatened against any Lehman Party (other LBIE or LBI), so long as such legal proceeding is not an Allowed LBHI Claim.

**SCHEDULE 6.2(c)**

**Transferees' Counsel Email**

**Lowenstein Sandler PC**
pgreene@lowenstein.com
pkizel@lowenstein.com
arueda@lowenstein.com
eskerry@lowenstein.com

**SCHEDULE 6.3**

**Allocation of Accrued Compensation Amount**

1.    Richard Meckler - $█████

2.    Randall Hutton - $█████

3.    ████████ - $█████

4.    ██████ - $████

5.    ████████ - $█████

6.    ██████ - $████

7.    ████████ - $█████

8.    ████████ - $█████

9.    ██████ - $████

**SCHEDULE 6.5(a)**

**<u>Offerees</u>**

1.    ████████

2.    ██████

3.    █████████

4.    ███████

5.    █████████

6.    ██████████

7.    ██████

## SCHEDULE 6.6

### Third Party Consents

**1.    Third Party Consents for the transfer by the Current General Partner of the GP Interests to the NewCo General Partner:**

(a)    Written notice to each of the limited partners of LibertyView Alternative Blend Fund, L.P. with respect to the substitution of the Current General Partner with the NewCo General Partner as the general partner of LibertyView Alternative Blend Fund, L.P., given at least 30 days prior to the date of the transfer.

(b)    Written notice to each of the limited partners of LibertyView Convertible Arbitrage Fund, L.P. with respect to the substitution of the Current General Partner with the NewCo General Partner as the general partner of LibertyView Convertible Arbitrage Fund, L.P., given at least 30 days prior to the date of the transfer.

(c)    Written notice to each of the limited partners of LibertyView Credit Opportunities Fund, L.P. informing the limited partners that the Current General Partner is withdrawing as a general partner and the NewCo General Partner will become the general partner of LibertyView Credit Opportunities Fund, L.P., given at least 30 days prior to the date of the transfer.

(d)    Written notice to each of the limited partners of LibertyView Credit Select Fund, L.P. informing the limited partners that the Current General Partner is transferring its general partner interest in LibertyView Credit Select Fund, L.P. to the NewCo General Partner and the NewCo General Partner will be admitted as a substitute general partner of LibertyView Credit Select Fund, L.P., given at least 30 days prior to the date of the transfer.

(e)    Written consent of the limited partners of LibertyView Credit Select Portfolio, L.P. whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates) approving the replacement of the Current General Partner with the NewCo General Partner as the general partner of LibertyView Credit Select Portfolio, L.P.

(f)    Written notice to each of the limited partners of LibertyView Funds, L.P. informing the limited partners that the Current General Partner has transferred its general partner interest to the NewCo General Partner who has been admitted as the general partner of LibertyView Funds, L.P.

(g)    Written notice to each of the limited partners of LibertyView Global Risk Arbitrage Fund, L.P. informing the limited partners that the Current General Partner has transferred its general partner interest to the NewCo General Partner who has been admitted as the general partner of LibertyView Global Risk Arbitrage Fund, L.P.

(h)    Written notice to each of the limited partners of LibertyView Special Opportunities Fund, L.P. informing the limited partners that the Current General Partner is

transferring its general partner interest in LibertyView Special Opportunities Fund, L.P. to the NewCo General Partner and the NewCo General Partner will be admitted as a substitute general partner of LibertyView Special Opportunities Fund, L.P.

**2.      Third Party Consents for the assignment by the Current Investment Advisor of the Investment Advisory Agreements to the NewCo Manager:**

(a)      Written consent of the limited partners of LibertyView Alternative Blend Fund, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated March 31, 2003, by and between LibertyView Alternative Blend Fund, L.P. and Neuberger Berman, LLC.

(b)      Written consent of the limited partners of LibertyView Convertible Arbitrage Fund, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated March 31, 2003, by and between LibertyView Convertible Arbitrage Fund, L.P. and Neuberger Berman, LLC.

(c)      Written consent of the limited partners of LibertyView Credit Opportunities Fund, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Credit Opportunities Fund, L.P. and Neuberger Berman, LLC.

(d)      Written consent (i) by the limited partners of each of LibertyView Credit Select Portfolio, L.P. and LibertyView Credit Select Fund, L.P. whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners of such Fund (other than the Current General Partner and its affiliates), and (ii) by the members of LibertyView Credit Select Fund, LLC, whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all members, for the assignment of the Investment Advisory Agreement, dated August 1, 2007, among LibertyView Credit Select Fund, LLC, LibertyView Credit Select Portfolio, L.P., LibertyView Credit Select Fund, L.P. and Neuberger Berman, LLC.

(e)      Written consent of the limited partners of LibertyView Funds, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Funds, L.P. and Neuberger Berman, LLC.

(f)      Written consent of the limited partners of LibertyView Global Risk Arbitrage Fund, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current

General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Global Risk Arbitrage Fund, L.P. and Neuberger Berman, LLC.

(g)     Written consent of the limited partners of LibertyView Special Opportunities Fund, L.P., whose capital account balances, in the aggregate, represent more than 50% of the aggregate of the balances of the capital accounts of all limited partners (other than the Current General Partner and its affiliates), for the assignment of the Investment Advisory Agreement, dated December 31, 2002, by and between LibertyView Special Opportunities Fund, L.P. and Neuberger Berman, LLC.

## 3.     Third Party Consents for the appointment of the NewCo General Partner as a new manager of the Domestic Feeder Funds:

(a)     Written notice by the Current General Partner mailed to the address of record of each member of each Domestic Feeder Fund (except for LibertyView Special Opportunities Fund, LLC and The LibertyView Fund, LLC) informing such member that the Current General Partner will withdraw as the manager of the respective Domestic Feeder Fund and it will be substituted by the NewCo General Partner as a manager of the respective Domestic Feeder Fund, and there shall be no objection in writing within 30 days of such mailing by the members of any Domestic Feeder Fund whose capital account balances, in the aggregate, represent more than 50% of the aggregate balances of the capital accounts of all members of the respective Domestic Feeder Fund.

(b)     (x) Written consent of members of LibertyView Special Opportunities Fund, LLC having in excess of 50% of total interests or (y) written notice by the Current General Partner mailed to the address of record of each member of LibertyView Special Opportunities Fund, LLC which is not objected to in writing within 30 days of such mailing by the members of LibertyView Special Opportunities Fund, LLC having in excess of 50% of the total interests and the written consent of the Current General Partner, in each case with respect to the amendments to the limited liability company agreement of LibertyView Special Opportunities Fund, LLC pursuant to which the Current General Partner withdraws as the manager and is substituted by the NewCo General Partner as a manager.

(c)     See 4(a) below for a consent from The LibertyView Fund, LLC.

## 4.     Third Party Consents from The LibertyView Fund, LLC for the transfer of Class A Interests from the Current General Partner to the NewCo General Partner:

(a)     (x) Written consent of members of The LibertyView Fund, LLC having in excess of 50% of total interests or (y) written notice by the Current General Partner mailed to the address of record of each member of The LibertyView Fund, LLC which is not objected to in writing within 30 days of such mailing by the members of The LibertyView Fund, LLC having in excess of 50% of the total interests and the written consent of the Current General Partner, in each case with respect to the amendments to the limited liability company agreement of The LibertyView Fund, LLC pursuant to which the Current General Partner withdraws as the manager and is substituted by the NewCo General Partner as a manager and the Class A Interests

held by the Current General Partner are transferred to the NewCo General Partner and the NewCo General Partner is admitted as a member of The LibertyView Fund, LLC in respect thereof.

**5.   Third Party Consents from the directors of Foreign Feeder Funds for the transfer of Non-Participating Shares from the Current General Partner to the NewCo General Partner and the replacement of the directors:**

(a)   Unanimous written consent of the directors of each of the Foreign Feeder Funds approving (x) the transfer of the Non-Participating Shares from the Current General Partner to the NewCo General Partner and the registration of such transfer in the respective company's register of members, (y) the replacement of the directors nominated by the Lehman Parties with the directors nominated by the Transferees, (z) the issuance of the revised private placement memoranda, (aa) the filing of the revised Form MF1 with the applicable Cayman Islands authorities, (bb) the entry into the Amendments to Partnership Agreements and changing the investment advisor to the Master Funds.

**6.   Third Party Consents required to assign the Collateral Management Agreement from the Current Investment Advisor to the NewCo Manager:**

(a)   Written notice from the Current Investment Advisor to each of SKM-LibertyView and SKM CBO, LLC informing them that the Current Investment Advisor resigns and terminates its role as a collateral manager under the Collateral Management Agreement.

(b)   Written consent from each of SKM-LibertyView and SKM CBO, LLC waiving the 180 days' prior written notice requirement for the resignation and termination of the role of the Current Investment Advisor as a collateral manager.

(c)   Written notice by SKM-LibertyView to each of the Noteholders (as defined in the Collateral Management Agreement) of the resignation and termination of the Current Investment Advisor as a collateral manager and the appointment of the NewCo Manager as a successor thereof.

(d)   Written consent of (x) 100% of the Class E-3 Notes, and (y) Moody's (in each case, as such terms are defined in the Collateral Management Agreement) for the replacement of the Current Investment Advisor with the NewCo Manager as a collateral manager under the Collateral Management Agreement.

(e)   Written confirmation by S&P (as defined in the Collateral Management Agreement) that the replacement of the Current Investment Advisor with the NewCo Manager as a collateral manager under the Collateral Management Agreement will not result in the withdrawal or downgrade of the current ratings on Class B Notes, Class C Notes and Class D Notes.

(f)   Written consent of SKM-LibertyView to the appointment of the NewCo Manager as a collateral manager under the Collateral Management Agreement.

7.    **Third Party Consents of** ▮ **required to assign the Trust D Management Agreement from the Current Investment Advisor to the NewCo Manager:**

(a)    Written consent of ▮ to the assignment by the Current Investment Advisor of the Trust D Management Agreement to the NewCo Manager.

**SCHEDULE 6.10(b)**

**NewCo Startup Expenses**

1.    End-User Hardware  - 10 PC Workstations and related hardware.

2.    Network Hardware/Set Up - Stand-alone network including migration off Barclays.

3.    Voice Hardware/Set Up – Stand-alone voice.

[SIGNATURE PAGE TO INVESTMENT ADVISOR ASSIGNMENT AND ASSUMPTION AGREEMENT]

**SCHEDULE 6.10(d)**

**<u>Operating Expenses</u>**

1.    Hedge Fund Suite Rent – 2 offices, 6 trade desks, 2 cubes.

2.    In-Suite Support Services – 10 users per month.

**SCHEDULE 6.12**

**LibertyView IP**

*The following trademark registrations:*

LibertyView Capital Management U.S. Reg. No. 2,440,513

*The following names:*

LibertyView
LibertyView Capital Management, LLC
LibertyView GP, LLC
LibertyView Alternative Blend Fund, L.P.
LibertyView Alternative Blend Fund, LLC
LibertyView Alternative Blend Fund, Ltd.
LibertyView Convertible Arbitrage Fund, L.P.
LibertyView Convertible Arbitrage Fund, LLC
LibertyView Convertible Arbitrage Fund, Ltd.
LibertyView Credit Opportunities Fund, L.P.
LibertyView Credit Opportunities Fund, LLC
LibertyView Credit Opportunities Fund II, LLC
LibertyView Credit Opportunities Fund, Ltd.
LibertyView Credit Opportunities Fund II, Ltd.
LibertyView Credit Select Fund, L.P.
LibertyView Credit Select Fund, LLC
LibertyView Credit Select Fund, Ltd.
LibertyView Credit Select Portfolio, L.P.
LibertyView Funds, L.P.
The LibertyView Fund, L.L.C.
LibertyView Plus Fund, Ltd.
LibertyView Leverage Plus Fund, Ltd.
LibertyView Global Risk Arbitrage Fund, L.P.
LibertyView Global Risk Arbitrage Fund, Ltd.
LibertyView Special Opportunities Fund, L.P.
LibertyView Special Opportunities Fund, LLC
LibertyView Special Opportunities Fund, Ltd.
LibertyView Loan Fund, LLC

*The following domain names:*

| Domain Name | TLD | Country | Status | Renewal Status | Paid Through Date |
|---|---|---|---|---|---|

| libertyview.biz | .biz | gTLD | registered locked | Auto Renewal | 2009-05-17 |
| libertyview.com | .com | gTLD | registered locked | Auto Renewal | 2015-01-12 |
| libertyview.info | .info | gTLD | registered locked | Auto Renewal | 2009-06-16 |
| libertyview.net | .net | gTLD | registered locked | Auto Renewal | 2009-02-27 |
| libertyview.org | .org | gTLD | registered locked | Auto Renewal | 2009-05-12 |
| libertyview.us | .us | United States | registered locked | Auto Renewal | 2009-07-21 |
| libertyviewcapital.biz | .biz | gTLD | registered locked | Auto Renewal | 2009-01-21 |
| libertyviewcapital.com | .com | gTLD | registered locked | Auto Renewal | 2009-08-11 |
| libertyviewcapital.info | .info | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewcapital.net | .net | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewcapital.org | .org | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewcapital.us | .us | United States | registered locked | Auto Renewal | 2009-01-21 |
| libertyviewfunds.biz | .biz | gTLD | registered locked | Auto Renewal | 2009-01-21 |
| libertyviewfunds.com | .com | gTLD | registered locked | Auto Renewal | 2011-10-15 |
| libertyviewfunds.info | .info | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewfunds.net | .net | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewfunds.org | .org | gTLD | registered locked | Auto Renewal | 2009-01-22 |
| libertyviewfunds.us | .us | United States | registered locked | Auto Renewal | 2009-01-21 |

*The following logos:*



**EXHIBIT A**

**Form of Collateral Management Assumption Agreement**

**ASSUMPTION AGREEMENT**

**among**

**Lehman Brothers Asset Management, Inc.,**

**SKM-LibertyView CBO I Limited,**

**SKM CBO, LLC,**

**and**

**LibertyView Capital Management, LLC**

**Dated**

**[__], 2009**

ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT (this "Agreement") is dated as of [    ], 2009 by and between SKM-LibertyView CBO I Limited, a company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), SKM CBO, LLC, a Delaware limited liability company ("SKM CBO"), as a collateral manager, Lehman Brothers Asset Management, Inc., a Delaware corporation ("LBAM"), as a collateral manager, and LibertyView Capital Management, LLC, a Delaware limited liability company (the "Successor").

W I T N E S S E T H:

WHEREAS, the Issuer, SKM CBO and LibertyView Capital Management, Inc, a Delaware corporation ("LVCM") entered into a Collateral Management Agreement, dated as of April 1, 1999 (the "Collateral Management Agreement"), providing for the acquisition and management of certain collateral debt obligations, eligible investments, financial assets and certain other contract rights and other assets for the benefit of the holders of the notes (the "Notes") of the Issuer issued pursuant to an Indenture, dated as of April 1, 1999 (the "Indenture"), among the Issuer, SKM-LibertyView CBO I Corp., JPMorgan Chase Bank (formerly Chase Bank of Texas, National Association) and Financial Security Assurance, Inc.;

WHEREAS, the Issuer, SKM CBO, Neuberger Berman, LLC, a Delaware limited liability company ("Neuberger"), LVCM and Credit Agricole Indosuez entered into a first Assumption Agreement, dated as of December 31, 2002, providing for acknowledgment of the appointment as a Collateral Manager of, and assumption of all rights, duties and obligations of LVCM by, Neuberger;

WHEREAS, the Issuer, SKM CBO, Neuberger and LBAM entered into a second Assumption Agreement, dated as of April [    ], 2009, providing for acknowledgment of the appointment as a Collateral Manager of, and assumption of all rights, duties and obligations of Neuberger by, LBAM;

WHEREAS, LBAM has delivered its resignation as a Collateral Manager to the Issuer and SKM CBO pursuant to Section 15(b) of the Collateral Management Agreement, and the Issuer and SKM CBO have waived the 180 days' prior written notice requirement contained in such Section and, pursuant to Section 19(a)(A) of the Collateral Management Agreement, the Issuer wishes to appoint LibertyView Capital Management, LLC as Successor to all of the rights, duties and obligations of LBAM under the Collateral Management Agreement and under the applicable terms of the Indenture;

WHEREAS, Moody's Investors Services, Inc. ("Moody's") has approved the appointment of LibertyView Capital Management, LLC as Successor to LBAM as Collateral Manager under the Collateral Management Agreement, and together with Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., ("S&P") both have confirmed that the current ratings assigned to the Class B Notes, the Class C Notes and the Class D Notes by each of Moody's and S&P will not be withdrawn or downgraded upon the appointment of

LibertyView Capital Management, LLC as Successor to LBAM as Collateral Manager under the Collateral Management Agreement, and such appointment will not result in the Issuer or the Co-Issuer becoming an "investment company' required to register under the Investment Company Act of 1940, as amended;

WHEREAS, the Issuer desires to acknowledge its appointment of the Successor to assume the rights, duties and obligations of LBAM under the Collateral Management Agreement and under the applicable terms of the Indenture, the Successor desires to assume such rights, duties and obligations to the extent specified herein, and the Issuer and SKM CBO desire to acknowledge such assumption; and

NOW THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Appointment.

The Issuer hereby appoints the Successor to assume all of the rights, duties and obligations of LBAM under the Collateral Management Agreement and under the applicable terms of the Indenture as provided herein.

2.      Assumption by Successor.

The Successor hereby assumes all of the rights, duties and obligations of LBAM under the applicable terms of the Collateral Management Agreement and the Indenture except that (i) the Successor shall have no responsibilities, duties, obligations or liabilities whatsoever with respect to any action taken, or any failure to act, by LBAM or any other previous Collateral Manager under the Collateral Management Agreement or the Indenture prior to the effective date (as set forth in Section 6 below) and (ii) the Successor shall not be entitled to any portion of the compensation earned by LBAM or any other previous Collateral Manager under the Collateral Management Agreement prior to such effective date, even though such compensation is not payable until after such effective date.

3.      Representations and Warranties of the Successor.

The Successor hereby represents and warrants to the Issuer and SKM CBO as follows:

(i)      The Successor is duly organized, is validly existing and in good standing as a limited liability company under the laws of the state of its organization, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified as a foreign corporation and is in good standing under the laws of each jurisdiction where the performance of the Collateral Management Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the ability of the Successor to perform its

obligations under the provisions of the Collateral Management Agreement and the Indenture applicable to the Successor as a Collateral Manager.

   (ii) The Successor has full power and authority to execute, deliver and perform the Collateral Management Agreement and to perform all obligations required thereunder and under the provisions of the Indenture applicable to the Successor as a Collateral Manager and has taken all necessary action to authorize its assumption of the Collateral Management Agreement on the terms and conditions thereof and the execution, delivery and performance of this Agreement and all obligations required under this Agreement and under the terms of the Collateral Management Agreement and the Indenture applicable to the Successor as a Collateral Manager.  No consent of any other person, including, without limitation, stockholders or creditors of the Successor, and, except for those which have been obtained, no license, permit, approval or authorization of, exemption by, notice or report to, or registration (including without limitation, registration under the Investment Advisers Act of 1940, as amended), filing or declaration with, any governmental authority which has not be obtained or made is required by the Successor in connection with the execution, delivery, performance, validity or enforceability of this Agreement or the performance of the obligations required under the terms of the Collateral Management Agreement or under the terms of the Collateral Management Agreement or Indenture applicable to the Successor as a Collateral Manager.  The Collateral Management Agreement has been, and each instrument and document required under the terms of the Collateral Management Agreement or the Indenture will be, executed and delivered by a duly authorized officer of the Successor, and this Agreement constitutes, and each instrument and document required under the terms of the Collateral Management Agreement or the Indenture when executed and delivered by the Successor under the terms of the Collateral Management Agreement or the Indenture will constitute, the valid and legally binding obligations of the Successor enforceable against the Successor in accordance with their terms, subject, as to enforcement, (a) to the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) to general equitable principles (whether enforceability of such principles is considered in a proceeding at law or in equity).

   (iii) The execution, delivery and performance of this Agreement and the performance of the terms of the Collateral Management Agreement and the Indenture applicable to the Successor as a Collateral Manager and the documents and instruments required under the terms of the Collateral Management Agreement or the Indenture will not violate any provision of any existing law or regulation binding on the Successor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Successor, or the organizational documents of, or any securities issued by the Successor or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Successor is a party or by which the Successor or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Successor or any of its subsidiaries or which would have a material adverse effect on its ability to perform its

obligations hereunder and under the Indenture, and will not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Successor, threatened that, if determined adversely to the Successor, would have a material adverse effect upon the business, operations, assets or financial condition of the Successor or upon the performance by the Successor of its duties as a Collateral Manager under the Collateral Management Agreement or the Indenture.

(v)    The Successor is a registered investment adviser under the Investment Advisers Act of 1940, as amended.

(vi)    The Successor is not in violation of its governing instruments or in breach or violation or in default under any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Successor or it properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the Collateral Management Agreement or the Indenture applicable to the Successor or the performance by the Successor of its duties under the Collateral Management Agreement or the Indenture.

4.    Actions and Omissions Prior to the Effective Date

LBAM shall remain liable for actions taken, or omitted to be taken, by it under the Collateral Management Agreement or the Indenture prior to the effective date hereof, and shall remain entitled to any compensation earned by LBAM under the Collateral Management Agreement for periods prior to the effective date hereof, even if such compensation is payable after the effective date hereof.

5.    Acknowledgment of the Issuer and SKM CBO.

The Issuer and SKM CBO hereby acknowledge the assumption by the Successor of all of the rights, duties and obligations of LBAM under the Collateral Management Agreement and under the applicable terms of the Indenture to the extent provided herein.

6.    Effective Date.

The effective date of this Agreement and the assumption by the Successor of the rights, duties and obligations of LBAM under the applicable terms of the Collateral Management Agreement and the Indenture shall be the date of signing this Agreement.

7.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by telegraphic, facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

8.    Severability.

Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**9.    GOVERNING LAW.**

**THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAWS PRINCIPLES THEREOF.**

10.    Definitions.

Any capitalized term used but not defined in this Agreement has the same meaning as in the Collateral Management Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

LIBERTYVIEW CAPITAL MANAGEMENT, LLC
By:_____
Name:_____
Title:_____


SKM-LIBERTYVIEW CBO I LIMITED


By:_____
Name:_____
Title:_____


SKM CBO, LLC


By:_____
Name:_____
Title:_____


LEHMAN BROTHERS ASSET MANAGEMENT, INC.


By:_____
Name:_____
Title:_____

**EXHIBIT B**

**Form of Transferred Employee Release**

This Separation and General Release Agreement must be executed and delivered to Lehman (Attn: **[insert name/title]**) by not later than **[insert date that is 45 days from the date the Transferred Employee Release is first delivered to Employee for review]**.

## SEPARATION AND GENERAL RELEASE AGREEMENT

THIS SEPARATION AND GENERAL RELEASE AGREEMENT (this "Transferred Employee Release") is entered into between (i) **[ __ ]** , with an address at **[ __ ]** (the "Employee") and (ii) Lehman Brothers Holdings Inc., with an address at **[ __ ]**, and its subsidiaries ("Lehman").    Lehman Brothers Holdings Inc., Lehman Brothers Asset Management, Inc., Neuberger Berman Asset Management, LLC, together with their respective past, present and future parents, subsidiaries, affiliates, related companies and divisions and each of their respective past, present and future officers, directors, employees, shareholders, trustees, members, partners, employee benefit plans (and such plans' fiduciaries, agents, administrators and insurers), attorneys, and agents (individually and in their official capacities), as well as any predecessors, future successors or assigns or estates of any of the foregoing, is collectively referred to in this Transferred Employee Release as the "Released Parties."    This Transferred Employee Release is entered into in connection with that certain Transaction Agreement, dated as of April [], 2009, by and between Lehman Brothers Holdings Inc., Lehman Brothers Asset Management, Inc., Neuberger Berman Asset Management, LLC, Richard Meckler, Randall Hutton, LibertyView Capital Management, LLC and LibertyView GP, LLC (the "Transaction Agreement").    This Transferred Employee Release shall be effective only upon the consummation of the Closing under the Transaction Agreement.

1.    Separation of Employment.    Employee acknowledges and agrees that, by reason of Employee's voluntary resignation of employment with any Released Party, by written notice to Lehman, that Employee's last day of employment with the Released Parties is the day immediately prior to the Closing Date (as defined in the Transaction Agreement) (the "Separation Date").    Employee acknowledges and agrees that Employee's employment with Released Parties is terminated in connection with a "change of control" in the form of a sale of certain business assets of Released Parties.    Employee further acknowledges that Employee is not eligible to receive severance pay or benefits from any of the Released Parties in connection with such termination of employment under the Lehman Brothers Inc. Severance Plan or any other plan, arrangement, policy or past practice of any of the Releases Parties.    Employee further acknowledges that Employee has received all compensation and benefits to which Employee is entitled as a result of Employee's employment, except as otherwise provided in this Transferred Employee Release.    Employee understands that, except as otherwise provided in this Transferred Employee Release, Employee is entitled to nothing further from the Released Parties, including any additional compensation, benefits or reinstatement by the Released Parties.    Employee further acknowledges and agrees not to seek reinstatement or re-employment by any of the Released Parties.

2.    Employee General Release of Released Parties.    In consideration of the payment set forth in Section 4 below, Employee hereby unconditionally and irrevocably releases, waives, discharges and gives up, to the full extent permitted by law, any and all Claims (as defined below) that Employee may have against any of the Released Parties, arising on or prior to the

date of Employee's execution and delivery of this Transferred Employee Release to Lehman. "Claims" means any and all actions, charges, controversies, demands, causes of action, suits, rights, and/or claims whatsoever for debts, sums of money, wages, salary, severance pay, expenses, commissions, fees, bonuses, stock options, incentive compensation, synthetic equity units, vacation pay, sick pay, fees and costs, attorneys fees, losses, penalties, damages, including damages for pain and suffering and emotional harm, arising, directly or indirectly, out of any promise, agreement, offer letter, contract, understanding, common law, tort, the laws, statutes, and/or regulations of the State of New York or any other state and the United States, including, but not limited to, federal and state whistleblower laws, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Equal Pay Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act (excluding COBRA), the Vietnam Era Veterans Readjustment Assistance Act, the Fair Credit Reporting Act, the Age Discrimination in Employment Act ("ADEA"), the Older Workers' Benefit Protection Act, the Occupational Safety and Health Act, the Sarbanes-Oxley Act of 2002, the New York State Human Rights Laws, and the New York City Human Rights Laws, as each may be amended from time to time, whether arising directly or indirectly from any act or omission, whether intentional or unintentional. This releases all Claims including those of which Employee is not aware and those not mentioned in this Transferred Employee Release. Employee specifically releases any and all Claims arising out of Employee's employment with the Released Parties or termination therefrom. Employee expressly acknowledges and agrees that, by entering into this Transferred Employee Release, Employee is releasing and waiving any and all rights or Claims, including, without limitation, Claims that Employee may have arising under ADEA, which have arisen on or before the date of Employee's execution and delivery of this Transferred Employee Release to Lehman.

3.    Representations; Covenant not to Sue.  Employee hereby represents and warrants that (A) Employee has not filed, caused or permitted to be filed any pending proceeding (nor has Employee lodged a complaint with any governmental or quasi-governmental authority) against any of the Released Parties, nor has Employee agreed to do any of the foregoing, (B) Employee has not assigned, transferred, sold, encumbered, pledged, hypothecated, mortgaged, distributed, or otherwise disposed of or conveyed to any third party any right or Claim against any of the Released Parties that has been released in this Transferred Employee Release, and (C) Employee has not directly or indirectly assisted any third party in filing, causing or assisting to be filed, any Claim against any of the Released Parties.  Except as set forth in Section 9 below, Employee covenants and agrees that Employee shall not encourage or solicit or voluntarily assist or participate in any way in the filing, reporting or prosecution by him/herself or any third party of a proceeding or Claim against any of the Released Parties.

4.    Accrued Compensation Payment.  As good consideration for Employee's execution, delivery and non-revocation of this Transferred Employee Release, Lehman shall provide Employee with Employee's portion of the Accrued Compensation Amount (as such term is defined in the Transaction Agreement) in accordance with the terms of the Transaction Agreement (less applicable withholdings and other customary payroll deductions, excluding 401(k) contributions) (the "Accrued Compensation Payment").  The Accrued Compensation Payment shall be payable as provided in the Transaction Agreement.

Employee acknowledges that, under the terms of the Transaction Agreement, Lehman is entitled to withhold payment of the Accrued Compensation Payment in the event Employee fails to execute or revokes this Transferred Employee Release and acknowledges that nothing in this Transferred Employee Release shall be deemed to be an admission of liability on the part of any of the Released Parties. Employee agrees that Employee will not seek any further remuneration from any of the Released Parties.

5.      Who is Bound. Lehman and Employee are bound by this Transferred Employee Release. Anyone who succeeds to Employee's rights and responsibilities, such as the executors of Employee's estate, is bound and anyone who succeeds to Lehman's rights and responsibilities, such as its successors and assigns, is also bound.

6.      Released Parties' Property. Employee represents and warrants that Employee has returned to the Released Parties all property in Employee's possession, custody or control belonging to the Released Parties, including, but not limited to, all equipment, computers, pass codes, keys, swipe cards, credit cards, documents or other materials, in whatever form or format, that Employee received, prepared, or helped prepare. Employee represents that Employee has not retained any copies, duplicates, reproductions, computer disks, or excerpts thereof, of Released Parties' documents.

7.      Remedies. If Employee discloses anyone the amount paid to Employee or any other term of this Transferred Employee Release, breaches any other term or condition of this Transferred Employee Release, or if any representation made by Employee in this Transferred Employee Release was false when made, it shall constitute a material breach of this Transferred Employee Release and in addition to and not instead of the Released Parties' other remedies hereunder or otherwise at law or in equity, Employee shall be required to immediately, upon written notice from Lehman, return the Accrued Compensation Payment paid by Lehman under this Transferred Employee Release, less $500.00. Employee agrees that if Employee is required to return the Accrued Compensation Payment, this Transferred Employee Release shall continue to be binding on Employee and the Released Parties shall be entitled to enforce the provisions of this Transferred Employee Release and as if the Accrued Compensation Payment had not been repaid to Lehman and Lehman shall have no further payment obligations to Employee hereunder. Further, in the event of a breach of this Transferred Employee Release, Employee agrees to pay all of the Released Parties' attorneys' fees and other costs associated with enforcing this Transferred Employee Release. It is understood and agreed that Employee shall have no automatic repayment obligations or obligation to pay the Released Parties' attorneys' fees and other costs associated with enforcing this Transferred Employee Release if Employee were to challenge the validity of the ADEA waiver only.

8.      Construction of Agreement. In the event that one or more of the provisions contained in this Transferred Employee Release shall for any reason be held unenforceable in any respect under the law of any state of the United States or the United States, such unenforceability shall not affect any other provision of this Transferred Employee Release, but this Transferred Employee Release shall then be construed as if such unenforceable provision or provisions had never been contained herein or therein. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, such restriction shall be enforced to the maximum extent permitted by applicable law. This Transferred Employee

Release and any and all matters arising directly or indirectly herefrom shall be governed under the laws of the State of New York without reference to choice of law rules.  Lehman and Employee consent to the sole jurisdiction of the federal and state courts of New York. **LEHMAN AND EMPLOYEE HEREBY WAIVE THEIR RESPECTIVE RIGHT TO TRIAL BY JURY IN ANY ACTION CONCERNING THIS SEPARATION AGREEMENT OR ANY AND ALL MATTERS ARISING DIRECTLY OR INDIRECTLY HEREFROM AND REPRESENT THAT THEY HAVE CONSULTED WITH COUNSEL OF THEIR CHOICE OR HAVE CHOSEN VOLUNTARILY NOT TO DO SO SPECIFICALLY WITH RESPECT TO THIS WAIVER.**

9.    Acknowledgments.  Lehman and Employee acknowledge and agree that:

(A)  By entering in this Transferred Employee Release, Employee does not waive any rights or Claims that may arise after the date that Employee executes and deliver this Transferred Employee Release to Lehman;

(B)  This Agreement shall not affect the rights and responsibilities of the Equal Employment Opportunity Commission (the "EEOC") or similar state agency to enforce the ADEA and other laws, and further acknowledge and agree that this Transferred Employee Release shall not be used to justify interfering with Employee's protected right to file a charge or participate in an investigation or proceeding conducted by the EEOC or similar state agency. Accordingly, nothing in this Transferred Employee Release shall preclude Employee from filing a charge with, or participating in any manner in an investigation, hearing or proceeding conducted by, the EEOC or similar state agency, but Employee hereby waives any and all rights to recover under, or by virtue of, any such investigation, hearing or proceeding;

(C)  Notwithstanding anything set forth in this Transferred Employee Release to the contrary, nothing in this Transferred Employee Release shall affect or be used to interfere with Employee's protected right to test in any court, under the Older Workers' Benefit Protection Act, or like statute or regulation, the validity of the waiver of rights under ADEA set forth in this Transferred Employee Release; and

(D)  Nothing in this Transferred Employee Release shall preclude Employee from exercising Employee's rights, if any under Section 601-608 of the Employee Retirement Income Security Act of 1974, as amended, popularly known as COBRA.

10.    Opportunity For Review.

(A)    Employee represents and warrants that Employee: (i) has had sufficient opportunity to consider this Transferred Employee Release; (ii) has read this Transferred Employee Release; (iii) understands all the terms and conditions hereof; (iv) is not incompetent or had a guardian, conservator or trustee appointed for Employee; (v) has entered into this Transferred Employee Release of Employee's own free will and volition; (vi) has duly executed and delivered this Transferred Employee Release; (vii) understands that Employee is responsible for Employee's own attorney's fees and costs; (viii) has had the opportunity to review this Transferred Employee Release with counsel of Employee's choice or has chosen voluntarily not to do so; (ix) understands the Employee has been given forty-five days to review this Transferred

Employee Release before signing this Transferred Employee Release and understands that he/she is free to use as much or as little of the 45-day period as he/she wishes or considers necessary before deciding to sign this Transferred Employee Release; (x) understands that if Employee does not sign and return this Transferred Employee Release to Lehman (Attn: **[insert name/title]**) on or before **[insert date that is 45 days following the date the Transferred Employee Release is first delivered to Employee for review]**, Lehman shall have no obligation to enter into this Transferred Employee Release, Employee shall not be entitled to the Accrued Compensation Payment, and the Separation Date shall be unaltered; and (xi) understands that this Transferred Employee Release is valid, binding and enforceable against the parties in accordance with its terms.

(B)    This Transferred Employee Release shall be effective and enforceable on the eighth (8th) day after execution and delivery to Lehman (Attn: **[insert name/title]**) by Employee (the "Effective Date"). The parties understand and agree that Employee may revoke this Transferred Employee Release after having executed and delivered it to Lehman by so advising Lehman (Attn: **[insert name/title]**) in writing no later than 11:59 p.m. on the seventh (7th) day after Employee's execution and delivery of this Agreement to Lehman. If Employee revokes this Transferred Employee Release, it shall not be effective or enforceable, Employee shall not be entitled to the Accrued Compensation Payment, and the Separation Date shall be unaltered.

Agreed to and accepted on this _____ day of _____, 2009.

Witness:                                         EMPLOYEE:

_____                          _____
                                                 [ __ ]

Agreed to and accepted on this _____ day of _____, 2009.

                                                 LEHMAN BROTHERS HOLDINGS INC.

                                                 BY:    _____

Appendix A
to Transferred Employee Release

[Set forth below are the job titles and ages of employees of all of the LibertyView Capital Management division of Lehman and all of such employees have been selected to be transferred to LibertyView Capital Management, LLC and/or LibertyView GP, LLC.]  [Set forth below are the job titles and ages of employees of the LibertyView Capital Management division of Lehman who have been selected to be transferred to LibertyView Capital Management, LLC and/or LibertyView GP, LLC.  Also set forth below is the job title and age of an employee of the LibertyView Capital Management division of Lehman who was not so selected.  The selection process was based on _____.]

1.    Title:                                Age:

2.    Title:                                Age:

3.    Title:                                Age:

4.    Title:                                Age:

5.    Title:                                Age:

6.    Title:                                Age:

7.    Title:                                Age:

8.    Title:                                Age:

9.    Title:                                Age:

NY2:\1997443\01\16T8J01!.DOC\58399.0003