Hearing Date and Time: June 3, 2009 at 10:00 a.m.
Objection Deadline: May 29, 2009 at 4:00 p.m.

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe
Benjamin Rosenblum

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :    Chapter 11
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                       :    Case No. 08-13555 (JMP)
                                                               :
                    Debtors.                                   :    (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN ORDER,
PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING
<u>DISCOVERY FROM BARCLAYS CAPITAL, INC.</u>**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Debtor" and, collectively with its debtor and non-debtor affiliates, "Lehman"), by and through its undersigned counsel, hereby moves for entry of an order pursuant to Federal Rule of Bankruptcy Procedure 2004, authorizing it to conduct certain discovery against Barclays Capital, Inc. ("Barclays").

**PRELIMINARY STATEMENT**

1.    The Debtor hereby seeks authority to conduct focused discovery against Barclays concerning matters of importance to the estate and its creditors.  As explained below,

Barclays was the purchaser of substantially all of Lehman's North American broker-dealer assets in a sale transaction negotiated, approved and executed within the span of a few days immediately following LBHI's filing for bankruptcy (the "Sale Transaction"). The requested discovery relates to that highly expedited transaction, and related matters, and is specifically focused on whether the estate received appropriate value.

2. Since the completion of this expedited negotiation and sale of one of the largest investment banks in the world, the Debtor has become aware of apparent material discrepancies relating to the liabilities Barclays was to assume and the benefits LBHI (or related entities) was to receive under this and related transactions. As noted below, these apparent discrepancies concern, *inter alia*, Barclays' obligation to pay employee bonuses and certain contract cure amounts (both of which materially impacted the value of the sale) as well as to certain asset transfers related to repurchase transactions conducted during the week the Sale Transaction was negotiated. In the aggregate, these apparent discrepancies may have resulted in a windfall to Barclays at the expense of the estate, its creditors and other parties in interest, in an amount that could reach into the billions of dollars. As a result, the Debtor now seeks discovery from Barclays to enable the estate to properly review these issues and determine Debtor's rights and obligations (and to assess whether it may have claims) under these transactions.

**FACTUAL BACKGROUND**

A.  **The Bankruptcy Proceeding(s)**

3. Starting on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries (collectively, the "Debtors") commenced in this Court voluntary cases under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes and are being jointly

administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      On September 17, 2008, the U.S. Trustee appointed the statutory committee of unsecured creditors pursuant to Section 1102 of the Bankruptcy Code (the "Creditors' Committee"). The Debtor understands that the Creditors' Committee may also be looking into some of the concerns that have prompted this motion.

5.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**B.      The LBHI-Barclays Sale Transaction**

7.      Before LBHI's bankruptcy filing, Barclays had discussed with Lehman a possible acquisition of all its assets, but no transaction was consummated. Just a few hours after LBHI filed for bankruptcy, however, Barclays approached representatives of Lehman seeking to purchase its North American broker-dealer operations. Barclays, LBHI and LB 745 LLC (the Lehman entity that owned the real estate assets being sold) then negotiated this post-bankruptcy sale very quickly as the market value of the LBHI assets in question was declining by many millions of dollars every day. Within one day, LBHI, LB 745 LLC and Barclays came to an agreement on the terms of the contemplated sale and their agreement was embodied in an Asset Purchase Agreement, dated September 16, 2009 (the "APA")).

8. The next morning, September 17, 2008, LBHI and LB 745 LLC filed a motion seeking Court approval for the sale (the "Sale Motion"). On the afternoon of September 17, 2009, the Court heard argument on preliminary motions filed by the Debtors, at which hearing the purported value of the proposed Sale Transaction was first presented to the Court in connection with its approval of Barclays' break-up fee. Two days later, on September 19, 2009, the Court held a hearing on the Sale Motion, during which the terms of the proposed transaction and the need for expedited approval of same were further described to the Court and to creditors of the estate.

9. Among other things, the Court was told at these hearings that, as part of the value given by Barclays in the transaction, Barclays would assume in the aggregate $2 billion in liabilities to pay bonus compensation to Lehman employees who transferred to Barclays and would also assume approximately $1.5 billion in contract cure costs. (*See, e.g.,* 9/19/08 Hearing Tr. at 100:22-25 (employee compensation); *id.* at 101:1-4 (cure costs); 9/17/08 Hearing Tr. at 23:5-24:8 (cure costs)) In the hearings related to the Sale Transaction, the Court took these assumed liabilities, in full, into account in assessing the value of the transaction to the estate. (9/17/08 Hearing Tr. at 23:5-24:8) Ultimately, based on the record before it, the Court found that these assumptions of liabilities by Barclays were integral to the Purchase Agreement. (Sale Order at 10)

10. Barclays' assumption of billions of dollars in liabilities for bonus compensation and contract cures was a critical component of the consideration Barclays was to give in the Sale Transaction in return for the Debtors' assets, but it appears that these assumed liabilities were significantly overstated or inaccurate and, further, that Barclays may not have actually paid these obligations. This raises serious questions regarding whether Barclays'

4

purported assumption of up to $4.25 billion in liabilities, an integral component of the Sale Transaction, was genuine, adequate and fair consideration for the asset purchase as approved by the Court. Moreover, it appears that Barclays' assumption of these liabilities may have been illusory, in that billions of dollars of Lehman assets were transferred to Barclays in connection with certain repurchase agreements not addressed in the Purchase Agreement, which effectively nullified the liabilities Barclays purported to assume under the Purchase Agreement.

11. In the Sale Motion and at the September 19 hearing, the Debtor explained the unusual circumstances surrounding the proposed Sale Transaction – in particular, the fact that time was "of the essence" because its assets were losing many millions of dollars in value on a daily basis. (Sale Motion ¶¶ 6-13; 9/19/08 Hearing Tr. at 244:17-24) In light of these "exigent circumstances" and the "wasting nature" of the assets, this Court approved the Sale Transaction on a highly expedited basis with little chance for creditors or anyone else to thoroughly review the deal. (*See* Sale Order ¶¶ C and D)

12. Accordingly, on September 20, 2008, the Court entered an order (the "Sale Order") approving the Sale Transaction, including the assumed liabilities. The APA subsequently was modified by a First Amendment Clarifying Asset Purchase Agreement, dated as of September 19, 2008 ("First Amendment"), and a letter agreement dated as of September 20, 2008 (the "Clarifying Letter," collectively with the APA and First Amendment, the "Purchase Agreement").

## C.   Newly Uncovered Apparent Discrepancies

13. The Sale Transaction closed on Monday, September 22, 2008. Since then, the Debtor has become aware of certain apparent discrepancies involving the terms of the Sale Transaction.

5

14. In short, this Bankruptcy Rule 2004 motion seeks information concerning three key aspects of the parties' dealings in connection with this unprecedented sale.

15. First, the Purchase Agreement provided that Barclays would pay employee bonuses (accrued as of August 31, 2008) for Lehman employees who transferred to Barclays. Section 9.1(c) of the Purchase Agreement referenced, but did not attach, a certain "financial schedule delivered to" Barclays on September 16, 2008. A copy of such schedule appears to show the accrual amount for employee compensation to have been $2.0 billion. (Copy annexed as Exhibit A) Barclays' assumption of this liability was presented to and relied upon by the Court as an integral component in the value of the transaction and portrayed as such by the Court in connection with its approval of the Barclays' proposed break-up fee (in comparison to the notional value of the transaction) as well as its issuance of the Sale Order. (*See, e.g.,* 9/17/08 Hearing Tr. at 23:5-24:8; 9/19/08 Hearing Tr. at 100:22-25). Under Section 9.1(c) of the Purchase Agreement, Barclays obligation to pay these bonuses, in the stated accrued amount, was mandatory. The Debtor has attempted to conduct a preliminary review of this issue but has no information as to the bonuses Barclays has actually paid to former Lehman employees. Moreover, it appears that the expenses on Lehman's books for up to August 2008 for the transferred employees (reflecting the cash, not the equity, component of bonuses) was in the range of $600-700 million, which is substantially less than the $2-2.5 billion amounts considered by the Court for 2008 bonuses. (*See id.*)

16. If there is, in fact, a large discrepancy between what Barclays paid and what the Court considered, understanding and reconciling such discrepancy is of critical importance to the Debtor and its stakeholders as it goes directly to the value the estate received in the Sale Transaction. In the Sale Transaction, as part of the overall consideration Barclays

6

was to have given, Barclays was given credit for the assumption of a $2 billion obligation to transferred Lehman employees. Exclusive of amounts paid for real estate, and the alleged "credits" for compensation and cure amounts, Barclays paid only $250 million in cash for virtually all of Lehman's North American broker/dealer businesses. If, in fact, the accrual for bonuses was overstated, or Barclays has paid less than its full obligation, it is possible there may be claims the estate should assert to recover the difference and further investigation is warranted to determine if that is so.

17. Second, this Court's approval of the Sale Transaction was premised on Barclays' undertaking an obligation to pay certain contract "cure" amounts described as being in the range of $1.5-$2.25 billion. The above-referenced financial statement listed the accrual for such "cures" at $2.25 billion (*see* Exhibit A hereto), although for some reason (not yet clear to the Debtor) a $1.5 billion figure was presented to the Court during the Sale Motion. (*See* 9/19/08 Hearing Tr. at 101:1-4; *see also* 9/17/09 Hearing Tr. at 23:5-24:8) Either way, there appears to be a large discrepancy between these stated amounts and the actual "cure" costs ultimately paid by Barclays. Indeed, the closing date contract cure amounts publicly posted on September 19th and October 1st were in the range of only $100-$200 million. And based on Debtor's preliminary analysis it appears that Barclays has paid slightly more than $200 million (as of 2/24/09) in contract cure costs. The requested discovery seeks information relating to this apparent material discrepancy concerning the consideration Barclays was to have given in the Sale Transaction.

18. Third, there appear to be several issues arising from certain repurchase agreements entered into between LBI and Barclays and related matters. The Debtor is now conducting a preliminary review of the assets and liabilities transferred to Barclays under these

agreements or related arrangements, including (i) billions of dollars worth of collateral transferred pursuant to a certain repurchase transaction between Barclays and LBI on September 18, 2008, (ii) assets transferred upon the closing of the Purchase Agreement, and (iii) assets transferred pursuant to the December 5, 2008 Settlement Agreement between JPMorgan Chase Bank N.A., Barclays, and LBI's Trustee in the SIPA liquidation.  This review seeks to determine what assets were transferred, whether the Debtor received fair consideration for the assets, and whether the assets transferred in connection with the repurchase agreements were, in fact, improperly transferred to offset the liabilities Barclays assumed as part of the consideration it gave in the Sale Transaction.  Reconciling potential discrepancies related to these transfers is important to the Debtor and its stakeholders, and the requested discovery is needed to allow for a complete review of these complex transactions.

19.    The apparent large size of these discrepancies appears more troubling to the Debtor when considered in connection with Barclays' recent announcement of its financial results for the year ending December 31, 2008.  In that regard, Barclays announced that it had secured a £2.262 billion gain from its acquisition of Lehman's North American business, just over two months after closing the Sale Transaction (and during a period when the global economy was essentially frozen), suggesting that excess assets may have been given to Barclays.

20.    In addition to documents concerning the matters described above, the Debtor also will have a need to take testimony from certain former Lehman executives who are now employed by Barclays and thus unavailable to the Debtor.  These executives include, but are not limited to, persons who were involved in the negotiations of the Sale Transaction and/or persons the Debtor understands may have negotiated lucrative bonus agreements with Barclays before the transaction closed.

8

**D.    Barclays Will Not Voluntarily Provide This Information**

21.     The Debtor has tried to get Barclays to provide voluntarily the information sought in this motion but without success.

22.     On February 19, 2009, the Debtor sent to Barclays a letter requesting information about these employee bonus and contract cure issues. (Copy annexed as Exhibit B)

23.     Initially, Barclays responded with a letter that, among other things, suggested the Debtor should wait until other, possibly similar, inquiries were conducted. (*See* Exhibit B)

24.     The Debtor retained (subject to Court approval) special counsel to look into these issues, but its attempts to obtain documents have also been rebuffed.

25.     On April 13, 2009, Debtor's special counsel wrote to Barclays counsel requesting specific documents. (Copy annexed as Exhibit C)

26.     Through its attorneys, *inter alia*, Barclays demanded that the Debtors' inquiries must "not duplicate the Examiner's work." (Copy annexed as Exhibit D)

27.     In subsequent correspondence on April 24, and at a meeting on May 7, 2009, Debtor's special counsel offered cooperation in trying to avoid excess burden and duplication of efforts, but explained that the Debtor, with its responsibility to investigate whether claims should be made to maximize recovery for the benefit of creditors, had both the right and the obligation to conduct its own inquiries. (Copy of correspondence annexed as Exhibit E)

28.     Debtor's special counsel spoke with Barclays' counsel again on May 13, 2009, but no satisfactory progress was made toward resolving this issue. Although Barclays professed a general desire to provide some of the requested discovery and some "aggregate" information in a voluntary manner, it refused to commit to any deadlines for doing so, and over a month after specific categories of documents were requested, said it cannot be specific as to what

it will produce. On May 15, Barclays finally said it would produce to the Debtor copies of the documents Barclays has already produced to the Creditors' Committee, which is only one of the categories Debtor requested, but also with the proviso that a confidentiality agreement must first be reached.[1]

29.     Thus, over three months have passed since the Debtor first requested information from Barclays about these matters and Barclays has produced nothing to date. Accordingly, the Debtor files this motion as this is the most efficient means for moving this discovery ahead.

## ARGUMENT

**A.     The Applicable Legal Standards**

30.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the court may order the examination of any entity." FED. R. BANKR. P. 2004(a). Under this rule, the "attendance of an entity for examination and the production of documentary evidence may be compelled in the manner provided in Rule 9016 for the attendance of witnesses at a hearing or trial." FED. R. BANKR. P. 2004(c). In turn, Bankruptcy Rule 9016 makes Rule 45 of the Federal Rules of Civil Procedure (governing subpoenas) applicable in cases under the Bankruptcy Code. FED. R. BANKR. P. 9016.

31.     A debtor is a "party in interest" entitled to seek discovery under Bankruptcy Rule 2004. *See, e.g.*, *In re Pub. Serv. Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr. D. N.H. 1988) (granting debtor's motion for discovery under Bankruptcy Rule 2004); *In re Sun Med. Mgmt., Inc.*, 104 B.R. 522, 524-25 (Bankr. M.D. Ga. 1989) (same); *see also* 9

---

[1] Debtors' counsel had asked at the May 7 meeting for a confidentiality proposal, and offered to work from Barclays form of agreement, to avoid having that be a reason for further delay. To date, Barclays has not sent a draft, although it already has a confidentiality agreement finalized with the Creditors Committee.

10

*Collier on Bankruptcy* ¶ 2004.02[6] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006) ("Parties in interest in a bankruptcy case generally include . . . the debtor . . . ."). The debtor is entitled to seek such discovery even before the start of an adversary proceeding or contested matter. *E.g.*, 9 *Collier on Bankruptcy* ¶ 2004.01[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006) ("No contested matter or adversary proceeding need be instituted as a prerequisite" to discovery under Bankruptcy Rule 2004). Indeed, Bankruptcy Rule 2004 is specifically designed for discovery in advance of contested matters and adversary proceedings. *See, e.g.*, *In re Bakalis*, 199 B.R. 443, 448 (Bankr. E.D.N.Y. 1996).

32. An examination under Bankruptcy Rule 2004 may relate "to the acts, conduct or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." FED. R. BANKR. P. 2004(b). And while some courts require a showing of good cause if the target of the requested discovery objects, *see, e.g., In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004); *In re Hammond*, 140 B.R. 197, 201 (S.D. Ohio 1992), the express language of Bankruptcy Rule 2004 does not impose a "good cause" standard or other burden on the movant.

33. In the end, the decision whether to authorize the requested discovery is within the sound discretion of this Court. *See, e.g.*, *In re Hammond*, 140 B.R. at 200.

**B.    The Debtor Is Entitled to Discovery of the Requested Information**

34. The Debtor is, of course, working to preserve and maximize the value of its estate for the benefit of all stakeholders. To that end, the identification of any assets that are potentially property of the estate and the evaluation and, if appropriate, prosecution of potential claims relating to such assets are important to ensuring that all available sources of significant value are identified and pursued. The Debtor's ability to investigate the circumstances surrounding the Sale Transaction and repurchase agreements is therefore critical to determining

11

whether it has any potential claims, causes of action, or remedies with respect to these extraordinary transactions.

36. Prompt discovery of information relating to the Sale Transaction and related dealings (the "Requested Information") is important to permit the Debtor and its advisors fully to understand the complex and expedited Sale Transaction, so they can try to identify and possibly pursue property of the estate or raise potentially valuable claims and causes of action for the benefit of the estate and its stakeholders. Discovery of the Requested Information would allow the Debtor to (a) evaluate its rights and obligations with respect to Barclays and the Sale Transaction and repurchase agreements; (b) investigate the facts, circumstances and events that led to these transactions; (c) identify property potentially in the possession of non-debtor parties that may constitute property of the estate; and (d) determine whether the Debtor has any legal or other claims arising under these transactions.

36. As noted in the enclosed proposed order, discovery of the Requested Information should include both document production and deposition testimony. The Debtor's document requests to Barclays are attached hereto as Exhibit F and are incorporated herein by reference (the "Discovery Requests"). The Debtor expects that it will also need to conduct interviews or depositions of certain Barclays employees (many of whom are former Lehman employees).

37. To allow for this discovery to proceed efficiently, the Debtor has narrowly tailored its requests to focus on the apparent discrepancies noted above. Document Requests 1-7 and 20 (*see* Exhibit F at 1-2, 4) are designed to elicit general background information concerning the Sale Transaction, the parties' negotiations, disclosures made to the Court, and the difficult financial situation in which Lehman found itself immediately before the bankruptcy filings. In

the current circumstances, the Debtor is at a severe disadvantage in trying to reconstruct the discussions between LBHI and Barclays because virtually all the individuals that represented LBHI in those discussions have now left the company and are employed (or were employed for a time) by Barclays. And, of course, the individuals that negotiated the deal for Barclays are or were Barclays employees as well. These general requests are necessary to provide the requisite background information to allow the Debtor to fully understand what happened during these critical two weeks in September 2009.

38. Document Requests 8-11 (*see* Exhibit F at 2) relate to the employee bonus accrual issue. These requests are designed to elicit information about the parties' expectations as to the amounts owed by LBHI in employee bonuses, their understanding as to the purported value that Barclays' assumption of this liability added to the deal, the amounts Barclays has now actually paid in employee bonuses, and any separate bonus agreements Barclays may have made with individuals.

39. Similarly, Document Requests 13-15 (*see* Exhibit F at 2-3) relate to apparent discrepancies associated with the cure amount accruals that formed an integral part of the deal and the amounts Barclays ultimately paid in contract cures. These requests are straightforward and relate directly to the parties' pre-contractual expectations, how the accrual amounts were calculated and agreed upon, and Barclays' payment of cure amounts after the closing.

40. Document Requests 16-19 (*see* Exhibit F at 3) relate to the so-called repurchase transactions entered into by Barclays, Lehman entities, and the Federal Reserve and addressed in the Clarifying Letter and related documents. These requests seek information about

13

the assets transferred to Barclays under these and related transactions and whether the Debtor, in fact, received fair value under these complex transactions.

41. Request 20 is proposed in the interest of efficiency. It requests documents Barclays may have produced to the Creditors' Committee about these issues. Hence, it is designed to reduce Barclays' burden in responding to possibly duplicative requests.

42. In the end, the Requested Information is well within the scope of Bankruptcy Rule 2004. It clearly relates to "property or to the liabilities and financial condition of the debtor, [and] . . . matter[s] which may affect the administration of the debtor's estate." FED. R. BANKR. P. 2004(b). The Debtor's examination of its rights and obligations under the Purchase Agreement and related repurchase agreements, and the identification of estate property and potential claims arising under these expedited and unusual deals clearly fall within the scope of this definition. In addition, without question, Barclays is subject to Rule 2004 discovery, *see* FED. R. BANKR. P. 2004(a) (allowing examination of "any entity"), particularly since it was intimately involved in these transactions and was the ultimate beneficiary of these asset transfers.

43. Further, given the size and strategic importance to the estate of the Sale Transaction and related repurchase and other agreements, any valid claim or defense arising from these complex deals could be substantial. At the time of the Sale Transaction, Lehman was the fourth largest investment bank in the United States. These extraordinary transactions involved the sale of substantially all of Lehman's U.S. and Canadian investment banking and capital markets business. This discovery is critical to the Debtor's efforts to maximize values for all its stakeholders as the discrepancies noted above appear to involve very large dollar amounts. The fact that a deal of this size was done in less than a week, under most extraordinary

circumstances, only serves to underscore the need to examine the transaction closely and to address apparent discrepancies that might provide a recovery for the estate.

44. Finally, the information the Debtor seeks is not readily available without the requested discovery. Most of the former Lehman employees with relevant knowledge (including those who negotiated the deal on behalf of LBHI) became employees of Barclays. Many of these Barclays employees are the only individuals with knowledge of critical facts relating to the Sale Transaction and the repurchase and related agreements. Similarly, many critical documents concerning the liabilities incurred by Barclays and the benefits conferred on LBHI are solely within Barclays' control. And, as noted, Barclays will not voluntarily provide this information to the Debtor.

45. For these reasons, the Debtor is entitled to take the discovery it seeks in this motion.

**NOTICE**

46. No trustee has been appointed in these chapter 11 cases. The Debtor has served notice of this motion in accordance with the procedures set forth in the order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) counsel for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel for Barclays; and (vii) all parties who have requested notice in these chapter 11 cases. The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an order substantially in the form attached hereto as Exhibit G, granting the relief requested herein; and (b) grant such other and further relief to the Debtor as the Court may deem proper.

15

Dated:  May 18, 2009
        New York, New York

Respectfully submitted,

 /s/ Robert W. Gaffey
Robert W. Gaffey
William J. Hine
Jayant W. Tambe
Benjamin Rosenblum
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION