WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Richard W. Slack

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | Case No. 08-13555 (JMP) |
| Debtors. | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | |
| Plaintiff, | |
| -against- | Adversary Proceeding No.: 09-_____ (JMP) |
| Harrier Finance Limited, a.k.a. Rathgar Capital Corporation. | |
| Defendant. | |

## COMPLAINT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

       Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered Chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively

with its non-debtor affiliates "<u>Lehman</u>"), by and through undersigned counsel, hereby brings this complaint for damages.

## PRELIMINARY STATEMENT

1. This adversary proceeding involves a credit default swap that improperly penalizes LBSF by eliminating all of the value in the contract to LBSF – approximately $55 million. This improper penalty results from an alleged default by LBSF (i.e., the bankruptcy of LBHI) that could not have had any effect on the economics of the deal. LBSF fully prepaid all of its financial obligations – approximately $4.5 million – on the effective date of the agreement. The agreement contained a provision whereby LBHI acted as a credit support provider (i.e., a guarantor) in the event that LBSF did not make payments under the contract. But, because LBSF had paid all of its financial obligations in full, there was no need for credit support from LBHI and its bankruptcy should have been a non-event to LBSF's counterparty under the contract, Restructured Asset Certificates with Enhanced Returns, Series 2005-13-C Trust ("Racers Trust"). Nonetheless, Racers Trust seized on the bankruptcy of LBHI to ostensibly justify the termination of the contract and eliminate LBSF's entire position under the contract. As a result, Defendant Harrier Finance Limited ("Harrier"), as sole beneficial interest owner of the Racers Trust, reaped a windfall of approximately $55 million from the elimination of LBSF's position, wholly at the expense of LBSF and its creditors. This contractual provision, therefore, operates as an unenforceable penalty under New York and bankruptcy law. It also is an unenforceable ipso facto provision because it deprives LBSF of property of its estate after the filing of its case based solely on the commencement of a case under the Bankruptcy Code. LBSF, therefore, brings this action to recover the amounts paid to Harrier that should have been paid to LBSF.

2. LBSF and Racers Trust entered into the credit default swap in July 2005. Under this credit default swap, Racers Trust agreed to pay LBSF if any of twelve major financial

institutions (referred to in the credit default swap as "Reference Entities") – Ambac Assurance Corp., American Express, The Bear Stearns Companies, Citigroup, Inc., Countrywide Home Loans, Inc., Financial Guarantee Insurance Co., General Electric Capital Corporation, The Goldman Sachs Group, JP Morgan Chase & Co., Merrill Lynch & Co., MGIC Investment Corp., and the SLM Corporation – were at any time during the five-year period ending in September 2010 to experience certain "credit events."  These credit events included any of the Reference Entities becoming insolvent, becoming subject to the appointment of an administrator, conservator or receiver, or failing to pay its obligations.  If any of the twelve institutions experienced a credit event, then LBSF would be entitled to a payment of up to $25 million from the Racers Trust (for a total potential payment obligation of $300 million).  The condition of the financial sector deteriorated between the time the credit default swap was entered in July 2005 and its termination by Racers Trust in October 2008.  As a result, the value of the credit protection provided to LBSF by the credit default swap at the time of its termination was over $55 million.

   3.  In exchange for this credit protection, LBSF made payments in 2005, on the dates on which the credit protection went into effect, totaling approximately $4.5 million.  These payments were similar to an insurance premium.  Once these payments were made, LBSF had no further obligation to make any payments to Racers Trust in exchange for the credit protection.  LBSF thus purchased and paid up front for protection that could potentially pay it hundreds of millions of dollars if there were credit events with respect to the stated financial institutions.  On the other hand, Harrier, the sole investor in Racers Trust, stood to profit if there were no credit events with respect to such financial institutions.

   4.  Racers Trust terminated the credit default swap as of October 6, 2008 – three days after the commencement of LBSF's bankruptcy case – based solely on the prior Chapter 11

filing of LBHI. Because of significant losses suffered by the Reference Entities in the current financial crisis, and the concomitant risk that one or more of them would experience a credit event, LBSF's investment in the credit default swap was worth – on a mark-to-market basis – more than $55 million at the early termination date designated by Racers Trust. Thus, although there had been no credit events for the underlying Reference Entities, the risk of one or more Reference Entities suffering a credit event had elevated such that LBSF's position under the credit default swap was worth more than $55 million. Accordingly, LBSF's position had increased substantially in value by the time of the termination by Racers Trust, and LBSF already had fulfilled its only material obligation by paying the up-front premium payment to Racers Trust. Nonetheless, U.S. Bank National Association, in its capacity as trustee for the Racers Trust (the "Trustee"), distributed substantially all of Racers Trust's assets (cash of approximately $145 million and AAA-rated securities worth approximately $155 million) to Harrier, which does business as Rathgar Capital Corporation, the sole beneficial owner of the Racers Trust. The Trustee paid none of the assets of Racers Trust to LBSF.

     5. The rationale for distributing all of the Trust's assets to Harrier, rather than paying a portion to LBSF for the then-current-market value of the credit default swap, was that LBSF was the "defaulting party" under the credit default swap because LBHI filed its Chapter 11 petition on September 15, 2008. Under the terms of the credit default swap, if one party is a defaulting party, the other party has the right to terminate the swap. Absent the penalty provision described below, upon such termination a termination payment would have then been made to LBSF based on the market value of LBSF's position under the credit default swap (in this case approximately $55 million at the time of the termination). The credit default swap, however, contains an extraordinary provision that provides that if LBSF is the defaulting party, no such termination payment shall be paid. Thus, the Trustee took the position that because LBSF

"defaulted" when LBHI filed bankruptcy, no termination payment would be made to LBSF. Of course, LBHI's bankruptcy did not have – and could not have had – any consequence to Racers Trust or to Harrier as its sole beneficial interest owner because LBSF owed nothing further under the credit default swap and had no contingent liabilities under the credit default swap.

6. Because of an event that had no impact whatsoever on the transaction, LBSF received nothing for its investment in the credit default swap, even though its position was heavily "in the money" and thus constituted a valuable asset to LBSF and its creditors. Instead, Harrier reaped a windfall. Applicable New York and federal bankruptcy law prevents such a draconian penalty from being imposed on LBSF and its creditors.

7. LBSF brings this adversary proceeding to recover more than $55 million of value that was denied to it when Racers Trust's assets were distributed to Harrier and to recover the amounts that were distributed inappropriately to Harrier. The contractual provision that improperly deprives LBSF of its "in-the-money" position constitutes an unenforceable penalty where, as here, there was no further financial obligation for the credit support provider to guarantee and the only purported default is the bankruptcy of the unnecessary credit support provider.

8. LBSF therefore requests damages and equitable relief in connection with the unlawful retention of the debtors' property by Harrier.

**PARTIES**

9. Plaintiff LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, NY 10020.

10. Upon information and belief, Harrier, d/b/a Rathgar Capital Corporation, is a Cayman Islands corporation. Also upon information and belief, Harrier's manager or managing

member does business in New York as WestLB Asset Management (US) LLC, as Agent for WestLB AG, New York Branch. Further, Harrier was the sole recipient of funds distributed by Racers Trust, which is a trust created under the laws of New York.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

12. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13. The statutory predicates for the relief requested herein are Sections 105(a), 363, 541 and 560 of Title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>"), Rule 65 of the Federal Rules of Civil Procedure, and Rules 7065 and 9006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## BACKGROUND

14. Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

15. Commencing on September 15, 2008, LBHI and certain of its direct and indirect subsidiaries commenced voluntary cases under chapter 11 of the Bankruptcy Code in this Court. LBSF commenced its case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LBSF's Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

16. LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### A. The Debtor's Interest in the Credit Default Swap Is a Substantial Asset of its Estate

17. On July 20, 2005, LBSF and Racers Trust entered into a credit default swap whereby Racers Trust sold credit protection (similar, in concept, to insurance) to LBSF that would pay LBSF if one of ten major financial institutions experienced certain "credit events" during a five-year period ending in September 2010. On August 29, 2005, two additional financial institutions were added as Reference Entities under the credit default swap. Representatives from WestLB in New York negotiated the transaction on behalf of Harrier.

18. LBSF stood to receive up to $25 million per financial institution if that institution experienced a "credit event," for a total potential payment of $300 million if all twelve institutions suffered "credit events."

19. At the inception of the transaction, Racers Trust's ability to make these payments to LBSF was backed by AAA-rated assets in a par amount of $300 million, some of which matured and became cash by October 2008. Racers Trust received the money to invest in these assets from Harrier, which sent the money to the New York trust and consequently acquired all of the beneficial interest in Racers Trust. Harrier stood to gain if there were no "credit events" by the scheduled termination date (September 20, 2010) in which case it would receive the assets of Racers Trust, including any cash from the matured AAA-rated assets and the upfront payment made by LBSF in 2005. If, on the other hand, "credit events" occurred with respect to the referenced financial institutions, Harrier stood to lose some or all of its investment in Racers Trust due to payments that would have to be made by Racers Trust to LBSF.

20. In exchange for the credit protection provided by Racers Trust under the credit default swap, LBSF was obligated to make a payment to Racers Trust in the amount of

$4,534,313 (the "Premium"). Such Premium was prepaid 100% by LBSF to Racers Trust in two parts.[1] On July 20, 2005, the date on which the credit protection went into effect with respect to the first ten financial institutions, LBSF paid the portion of the Premium relating to the protection for those ten financial institutions. On August 29, 2005, the effective date of the credit protection with respect to the two additional financial institutions, LBSF paid the portion of the Premium relating to the protection for those two financial institutions. Thereafter, LBSF had no outstanding obligations to pay additional money under the credit default swap.

21. LBHI acted as a so-called "credit support provider" (*i.e.*, as a guarantor) for the payment obligations of LBSF under the credit default swap. LBHI's only obligation as credit support provider was to guarantee the payment of money from LBSF to Racers Trust. Because LBSF paid its Premium up front, there were no payment obligations that LBHI could be called upon to make.

22. Because of the deterioration in the financial sector between the time the credit default swap was entered into in 2005 and October 2008 when Racers Trust terminated the credit default swap, the risk that one or more of the referenced financial institutions would experience a "credit event" increased considerably. Accordingly, by October 2008, the credit protection for which LBSF paid $4.5 million in 2005 had increased in value to LBSF to an amount in excess of $55 million by reference to the market for similar credit protection.

23. The credit default swap further explicitly provides that LBSF may assign its interests under the credit default swap with the consent of the Racers Trust, "which consent may not be unreasonably withheld." (*See* Sched. Subpart 6(d).) Therefore, the credit default swap provided a mechanism for LBSF to monetize the market value of the credit default swap by selling its interest to another party. Since LBSF had paid the Premium in full, there should have

---

[1] "Prepaying" the premiums means that LBSF paid the entire premium on the Effective Date of the contract.

been no basis upon which Racers Trust could have withheld its consent for such an assignment had LBSF wished to realize the value of the credit default swap at any time.

24.     Under the terms of the credit default swap, upon termination of the credit default swap, whether with respect to a particular Reference Entity or all twelve Reference Entities, absent the penalty provision described below, a payment would have been made to LBSF reflecting the value of the terminated transaction(s) to it.  (*See* ISDA Sched. Subpart 6(h).) However, the credit default swap further contains an extraordinary provision stating that if the termination is due to a default attributed to LBSF, such as the bankruptcy of its superfluous credit support provider, LBHI, no such termination payment shall be paid to LBSF:

> [I]n the event [LBSF] is the Defaulting Party or Affected Party under the terms of this Agreement, no termination payments shall be paid by either party and [the Trustee] shall deliver to the holders of each Series of Certificates, *pro rata*, the Underlying Securities held by [the Trustee].

(*See* ISDA Sched. Subpart 6(h).)  In the context of this transaction, this provision operates as an unenforceable penalty or forfeiture because LBSF had fully prepaid 100% of the Premium owed under the credit default swap when the agreement was first executed.  The bankruptcy of LBHI could not have any material consequence to Racers Trust because the obligation to pay the Premium, which LBHI guaranteed, had already been fully performed by LBSF at the beginning of the transaction.

## B.     The Trustee Has Dispersed LBSF's Assets

25.     As a result of LBHI's commencement of its bankruptcy case, the Trustee sent a letter on September 23, 2008 to Harrier, which was the sole beneficial holder of the Racers Trust certificates, stating that an event of default had occurred under the credit default swap and requesting direction as to whether the Trustee should designate an early termination date.

26. On October 1, 2008, the Trustee sent a letter to LBSF and LBHI to (i) notify LBHI and LBSF of an event of default under the credit default swap, and (ii) to designate October 6, 2008 as an early termination date thereunder.

27. On February 12, 2009, the Trustee sent a letter to counsel for LBSF stating that the twelve transactions under the Racers Trust credit default swap were terminated and that the underlying assets, which consisted of approximately $145 million in cash and securities worth approximately $155 million, were distributed to Harrier.

28. LBSF has received nothing for the loss of the valuable and marketable protection provided to it under the credit default swap.

29. The termination of the twelve transactions under the credit default swap and distribution of all of the assets of the Racers Trust to its sole beneficial interest owner, Harrier, allowed Harrier to recover all of the assets being held in Racers Trust, including LBSF's Premium payments, and thereby reverse the effects of Harrier's poor investment decision. On the other hand, LBSF purchased credit protection on a dozen major financial institutions on the eve of the greatest downturn in the financial sector since the Great Depression. But it received *nothing* in respect of the credit protection it purchased and paid for up front, and which was worth approximately $55 million at the time of Racers Trust's actions. This result is inequitable because LBSF already has performed all material obligations under the credit default swap by paying the Premium at the time the transaction was commenced and LBSF is thus being penalized in a manner that bears no rational or economic relation to any default it may have committed under the credit default swap.

### COUNT I
*(Unjust Enrichment)*

30. LBSF repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

31. Even though LBSF's position under the credit default swap was significantly "in the money," by more than $55 million dollars, at the time of its termination, and even though the Premium had long since been paid in full by LBSF, LBSF's valuable position under the credit default swap was wiped away and all of the assets in the Racers Trust were distributed to Harrier. The purported rationale for such a result was that LBSF was the defaulting party under the credit default swap simply because LBHI – the credit support provider for LBSF under the credit default swap– filed for bankruptcy. Thus, under the terms of the credit default swap, the Trustee asserted that no termination payment is owed to LBSF, even though LBSF otherwise should receive a sizeable payment upon termination of the credit default swap.

32. There is no relationship, however, between any damage to Harrier that could be caused by the purported breach of the credit default swap and the penalty – wiping out LBSF's significant "in the money" position under the credit default swap. Because the Premium had been fully paid when the credit default swap took effect in 2005, neither LBHI's nor LBSF's bankruptcy damaged Harrier or Racers Trust under the credit default swap.

33. A contractual provision that eliminates the "in the money" party's gains under the credit default swap simply because a party or a credit support provider with no future obligations files for bankruptcy does not attempt to approximate actual damages. Instead, such a provision creates a substantial windfall to counterparties and their investors who made poor investment decisions at the expense of others, and is therefore an unenforceable penalty.

34. Further, such a provision is unenforceable because it seeks to take property of the debtor because of a bankruptcy filing. Property of a debtor becomes property of the estate, "notwithstanding any provision in [an] agreement . . . (B) that is conditioned . . . on the commencement of a case under this title . . . and that effects . . . a forfeiture, modification, or

termination of the debtor's interest in property." LBSF's interests are being forfeited because of "the commencement of a case under this title," i.e., LBHI's bankruptcy filing.

35. There is no safe harbor or other exception that would authorize the Trustee to forfeit LBSF's interests solely because of the commencement of LBHI's bankruptcy filing. Although Section 560 of the Bankruptcy Code permits certain swap agreements to be liquidated, terminated or accelerated or the parties' positions under such agreements to be offset or netted out, Section 560 does not apply here. The Trustee's action to wipe out LBSF's significant "in the money" position under the credit default swap is not a liquidation, termination, or acceleration of the credit default swap, or an offset or net out of the parties' positions under that agreement.

36. Harrier has been enriched at the expense of LBSF because Harrier received all of the proceeds of the Trustee's distribution while LBSF received nothing in respect of its valuable protection under the credit default swap. This occurred even though LBSF's position under the credit default swap was "in the money" and it had a market value of $55 million. Equity and good conscience require the Defendant to return the property totaling approximately $55 million to LBSF.

37. For all of the above-stated reasons, the provision under the credit default swap allowing Harrier to receive a distribution of all of the assets of Racers Trust upon termination of the credit default swap to the exclusion of LBSF constituted an unenforceable penalty.

38. Harrier has no right to retain the portion of the amounts distributed to it by the Trustee that should have been paid to LBSF, and Harrier has been improperly enriched at the expense of LBSF.

## COUNT II
### *(Money Had and Received)*

39.  LBSF repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

40.  Harrier has been enriched at the expense of LBSF because Harrier received a distribution of all of the assets of the Racers Trust while LBSF received nothing in return. This occurred even though LBSF's position under the credit default swap was "in the money" and had a market value of $55 million. Equity and good conscience require that the Defendant return approximately $55 million to LBSF.

41.  For all of the above-stated reasons, the provision under the credit default swap allowing Harrier to receive the sole distribution from Racers Trust upon termination to the exclusion of LBSF constituted an unenforceable penalty. Instead of paying LBSF its rightful payments, the Trustee distributed LBSF's property to Harrier, the sole investor in the Racers Trust, either directly or through intermediaries.

42.  Harrier has no right to retain the amounts that should have been paid to LBSF, and Harrier has received the benefit of using LBSF's property since the distribution. As such, Harrier and associated parties should be required to pay to LBSF the amounts that should have been paid to LBSF in the first instance.

## COUNT III
### *(Fraudulent Conveyance Pursuant to Section 273 of the New York Debtor and Creditor Law)*

43.  LBSF repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

44.  Harrier accepted a distribution from Racers Trust despite the fact that the contractual provision allowing that distribution constitutes an unenforceable penalty and the portion of such distribution representing the value of LBSF's position under the credit default swap, namely approximately $55 million, should have been paid to LBSF.

45.     Payment of an unlawful obligation is a conveyance without fair consideration.

46.     A conveyance made without fair consideration by an entity that is thereby rendered insolvent is fraudulent as to creditors without regard to its actual intent.

47.     Upon information and belief, the distribution to Harrier by Racers Trust rendered Racers Trust insolvent and left it without funds to satisfy LBSF's claims.

48.     When a trust engages in fraudulent conveyances to shield funds from adverse judgments, the court may pierce the veil of the trust and recover the fraudulently conveyed assets.

49.     Harrier received via a fraudulent conveyance the amounts that should have been paid to LBSF. As such, Harrier and associated parties should be required to pay to LBSF the amounts that should have been paid to it originally.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that the Court grant the following relief:[2]

A.     Damages in an amount to be proven at trial;

B.     An order stating that Harrier has been unjustly enriched and requiring Harrier to pay to LBSF the amounts Harrier received from the Racers Trust that should have been paid to LBSF;

C.     An order stating that Harrier had and received LBSF's property and requiring Harrier to pay to LBSF this property;

---

[2]  LBSF reserves the right to amend the complaint to state additional causes of action for damages including, without limitation, automatic stay violations.

    D.    An order stating that Harrier received money or assets via a fraudulent conveyance that should have been paid to LBSF and requiring that Harrier pay to LBSF the amounts owed to LBSF from Racers Trust.

    E.    And for such other relief as the Court deems just and proper, including costs and attorneys' fees.

Respectfully submitted,

*/s/ Ralph I. Miller*
Ralph I. Miller
Richard W. Slack
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
       May 20, 2009