**Hearing Date and Time: May 28, 2009, at 10:00 a.m. (Eastern Time)**
**Objection Deadline: May 22, 2009 at 4 p.m. (Eastern Time)**

MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel. (212) 506-2500
Fax (212) 262-1910
Steven Wolowitz
Brian Trust
Amit Trehan
Christopher J. Houpt

*Attorneys for Libra CDO Limited,
by Bank of America, N.A.,
as successor by merger to
LaSalle Bank National Association,
as Trustee, and Société Générale,
New York Branch*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: LEHMAN BROTHERS HOLDINGS INC., *et al.*, <br><br> Debtors. | Chapter 11 <br><br> **Case No. 08-13555 (JMP)** <br><br> (Jointly Administered) |

## OBJECTION TO MOTION FOR APPROVAL OF DEBTORS' LETTER AGREEMENT

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................... 2
    I.     The Motion................................................................................................................. 2
    II.    The CDS Agreement.................................................................................................. 3
    III.   The Proposed Letter Agreement. ............................................................................... 4
ARGUMENT .................................................................................................................................. 7
    I.     The Request for Approval of the Letter Agreement and Break-Up Fee Is
         Premature. .................................................................................................................. 7
    II.    The Proposed Break-Up Fee Does Not Encourage Further Bids. ........................ 13
RESERVATION OF RIGHTS ................................................................................................... 14
CONCLUSION............................................................................................................................. 15

# TABLE OF AUTHORITIES

Page

**CASES**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967)..................................................................................................7

*Gary D. Peake Excavating Inc. v. Town Bd. of the Town of Hancock*,
    93 F.3d 68 (2d Cir. 1996)........................................................................................7, 13

*In re 995 Fifth Avenue Assocs., L.P.*,
    96 B.R. 24 (Bankr. S.D.N.Y. 1989)............................................................................13

*In re AlphaStar Ins. Group Ltd.*,
    383 B.R. 231 (Bankr. S.D.N.Y. 2008)......................................................................8, 9

*In re Contractor Tech., Ltd*,
    Nos. 05-37623, 07-3057, 2007 WL 2819773 (Bankr. S.D. Tex., Sept. 21, 2007) ....................8

*In re Family Snacks Inc.*,
    249 B.R. 915 (Bankr. W.D. Mo. 2000),
    *rev'd in part on other grounds*, 257 B.R. 884 (B.A.P. 8th Cir. 2001).......................................8

*In re Global Crossing Ltd.*,
    295 B.R. 726 (Bankr. S.D.N.Y. 2003) ........................................................................13

*In re Integrated Res., Inc.*,
    135 B.R. 746 (Bankr. S.D.N.Y. 1992),
    *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) .......................................................................11, 13

*In re Integrated Res., Inc.*,
    147 B.R. 650 (S.D.N.Y. 1992)...................................................................................13

*Nutritional Health Alliance v. Shalala*,
    144 F.3d 220 (2d Cir. 1998).......................................................................................8

*S.E.C. v. Credit Bancorp, Ltd.*,
    138 F. Supp. 2d 512 (S.D.N.Y. 2001),
    *rev'd in part on other grounds*, 297 F.3d 127 (2d Cir. 2002)...............................................7, 8

**STATUTE**

11 U.S.C. § 560.................................................................................................................4

TO:  THE HONORABLE JUDGE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Libra CDO Limited, by Bank of America, N.A., as successor by merger to LaSalle Bank National Association, as Trustee ("Libra"), and Société Générale, New York Branch ("SG"), by and through their undersigned counsel, hereby file this objection to the Motion of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above referenced Chapter 11 cases (together with LBHI, the "Debtors") For Entry Of Order Pursuant To Sections 363 And 365 Of the Bankruptcy Code For Approval Of (I) The Letter Agreement, Including The Payment Of The Break-Up Fee, And (II) The Assumption, Assignment, And Sale Of The Libra Credit Default Swap Agreement (Docket No. 3495) (the "Motion").[1]  The Credit Default Swap Agreement referred to in the Motion is the subject of two adversary proceedings pending before this Court (09-ap-1177 and 1178) (the "Adversary Proceedings").

There are several reasons why the Motion—including Part I thereof, seeking approval of a Letter Agreement proposing a break-up fee—should not be ruled on at this time.  First, it is both unripe and premature.  Ripeness is a prerequisite to the exercise of decision-making authority by federal courts, and bankruptcy courts have denied motions as unripe in contexts analogous to this one.  Second, given Debtors' account of the proposal, there is good reason to believe that a thorough evaluation of the financial arrangement, which should not have to be undertaken at this time given its substantial expense and the prematurity of the Motion, would show the proposed break-up fee to be excessive.  Third, by the Debtors' own admissions, the proposed arrangement would not encourage further bids at any juncture before the Adversary

---

[1] Terms used herein but not otherwise defined shall have the meanings given to such terms in the Motion.

Proceedings are concluded, thus further demonstrating that consideration of the proposed break-up fee should be deferred to that time.

Fourth, as shown below, given the terms of the proposed arrangement, there is no legitimate reason why the Debtors or their proposed assignee need to know whether a break-up fee will be approved, or in what amount, at any time before the Adversary Proceedings are concluded (and indeed there is no justifiable reason why the Adversary Proceedings have to be concluded in 90 days from the date of the Letter Agreement).

Because there is no *bona fide* reason why the proposed Letter Agreement and break-up fee need to be considered now, and, by contrast, there are compelling reasons why they should not be considered until a final decision has been reached in the Adversary Proceedings, it is respectfully submitted that the Court should defer consideration of the proposed Letter Agreement and break-up fee to that time. In support of their Objection, Libra and SG respectfully state as follows:

## FACTUAL BACKGROUND

### I. The Motion.

The Motion seeks approval of (1) the assumption of a validly terminated credit default swap agreement (the "CDS Agreement") by Lehman Brothers Special Financing Inc. ("LBSF"), whose default resulted in the termination of that CDS Agreement, and assignment of the CDS Agreement to Deutsche Bank AG, London Branch ("Deutsche Bank") pursuant to an Assignment Agreement and a Payment Agreement, and (2) the Debtors' entry into a Letter Agreement in connection therewith that provides for a break-up fee to be paid by the Debtors to Deutsche Bank if the assignment does not occur, other than as a result of a finding that the termination of the CDS Agreement is valid.

The Debtors have sought a hearing only on their request for approval of the Letter Agreement, and they have not yet sought a hearing on the balance of the relief requested in the Motion, *i.e.*, approval of the assumption, assignment, and sale of the CDS Agreement. The Debtors concede that the latter can be heard only after the Court reaches a determination, in the Adversary Proceedings, as to whether the termination of the CDS Agreement was valid. Accordingly, Libra and SG address herein only the relief sought in conjunction with the scheduled hearing. *See* Debtors' Notice of Motion and accompanying Memorandum of Law ("MOL") ¶ 40. As discussed below, there is no good reason why the Debtors and their proposed assignee need to know whether a break-up fee will be approved, or in what amount, within the 45-day period demanded in the Motion or at any time prior to a determination in the Adversary Proceedings regarding the validity of the termination of the CDS Agreement. Libra and SG respectfully submit that the Court should decide the Adversary Proceedings first. In the event (unlikely in Libra and SG's view) that LBSF were to prevail in the Adversary Proceedings, the Court could then consider the propriety of the proposed break-up fee. Finally, after a reasonable period in which to solicit alternative bids, the Court could consider the propriety of an assumption and assignment. Libra and SG expect that they will prevail in the Adversary Proceedings and that there will be no need to ever consider or decide either Part I or Part II of the Debtors' Motion.

## II.     The CDS Agreement.

The background of the Libra CDO and the CDS Agreement between Libra and LBSF (including the valid termination thereof) is explained in the Complaint for Declaratory Relief filed in 09-ap-1178 and is repeated here only in brief. LBSF was the counterparty to Libra on the CDS Agreement. Under the CDS Agreement, LBSF was required to pay to Libra periodic fixed premiums, while Libra was potentially liable for contingent protection payments upon the

3

occurrence of adverse events relating to assets in a "reference portfolio." The CDS Agreement expressly provided that Libra could designate an Early Termination Date for all outstanding Transactions under the CDS Agreement and terminate the CDS Agreement upon the bankruptcy of either LBSF or its guarantor, LBHI. Libra's right of termination was protected (including from imposition of the automatic stay) by Section 560 of the Bankruptcy Code, because the CDS Agreement was a protected "swap agreement." After LBSF and LBHI filed for bankruptcy, Libra terminated the CDS Agreement. LBSF and LBHI have challenged the validity of the termination, and, almost seven months after the CDS Agreement was terminated, two Adversary Proceedings (09-ap-1177 and 1178) were filed, and are now pending in this Court, to resolve the issue.

### III.    The Proposed Letter Agreement.

In substance, the transaction proposed in the Debtors' Motion is atypical in that the proposed assignee would neither contribute any money to the estate upfront, nor cure the payment defaults—those payments are proposed to be made from estate assets. Rather, the Debtors propose to pay Deutsche Bank large sums merely for being a solvent conduit of funds passing from Libra to LBSF (and of course only if the termination of the CDS Agreement ultimately is determined somehow to have been invalid). Several features of the Letter Agreement and Payment Agreement reveal that the Debtors' professed need for expedition is illusory and that a thorough examination of the suggested value to the estate is likely to show the proposed fee to be excessive:

1.    LBSF, not Deutsche Bank, would be responsible for past due premium payments up to the effective date of the assignment (MOL ¶ 50, third bullet);

2.    On the assignment date, if assignment were to occur, LBSF must pay to Deutsche Bank an amount equal to twice the aggregate premium payments that accrued and were paid by

4

LBSF under the CDS Agreement during the 12 months immediately preceding the effective date of the assignment (MOL ¶ 50, fourth bullet), which amount, according to the Debtors' Motion, is greater than the present value of all future premiums payable under the CDS Agreement (*id.* ¶ 12);

3.   While Deutsche Bank is responsible for any future premium payments that are not covered by the initial payments from LBSF, the credit protection payments that the Debtors expect Deutsche Bank to receive from Libra would far exceed the aggregate premiums payable by Deutsche Bank over the remaining life of the CDS Agreement (MOL ¶ 12);

4.   Credit protection payments to be passed through to LBSF will be held in an escrow account until all potential litigation has concluded (MOL ¶ 50, last bullet);

5.   Deutsche Bank is protected, through a Reserve Account, from the risk of reimbursements that may be payable by Deutsche Bank to Libra with respect to categories of credit protection payments that are subject to reimbursement under the CDS Agreement (MOL ¶ 50, fifth bullet); and

6.   The Letter Agreement expressly contemplates that an assignment to a third party could be worth less than (*i.e.*, that the Debtors would accept an alternative proposal valued at less than) $20 million—or $40 million if offered by SG—and the Letter Agreement provides that, in that case, the break-up fee would be calculated as *50%* of the alternative offer. *See* Letter Agreement, Ex. C to Motion, at Section 4(a)(iii).

These features of the proposal leave virtually all of the risks of the CDS Agreement with LBSF. By contrast, the proposed assignment appears to be a nearly risk-free proposition for Deutsche Bank, regardless of the outcome of the Adversary Proceedings, and could impose significant costs on the estate in the unlikely event that the Debtors were to prevail in the

5

Adversary Proceedings. It is clear, then, that the proposal cannot be viewed as an endorsement by Deutsche Bank either of LBSF's legal positions in its Adversary Proceeding or its purported valuation of the CDS Agreement.

The Debtors' description of the proposed transaction is inaccurate and misleading in certain material respects. For example, the Debtors' assertion that "the credit ratings requirements of any Credit Default Swap Counterparty" are among "the unique circumstances . . . support[ing] LBSF's decision to pursue a private sale" (MOL ¶ 54) is incorrect. Although the Debtors do not mention it in their Motion, the Letter Agreement is expressly contingent on an order from this Court waiving any such ratings requirement for the Debtors' proposed assignee. *See* Letter Agreement, Ex. C to Motion, at Section 2(b)(vi). Thus, there is no justification for narrowing the field of potential bidders as the Debtors claim to have done.

Further, the purported 90-day expiration of the Letter Agreement (the initial 90-day period may be extended for additional 30-day periods by Deutsche Bank in its discretion) suggests that the proposal perhaps has less to do with maximizing value for the LBSF estate than with attempting to influence the Debtors' Adversary Proceeding. Given that the proposed assignment does not require Deutsche Bank to take any real risk or commit any capital, it does not seem logical that it would ever choose not to extend the term of the agreement, nor is there any justifiable need for it to know within 45 days of the Letter Agreement whether it would be entitled to a break-up fee, or in what amount. When the true nature of the proposed arrangement is closely examined, it is clear that the proposed assignment, and the professed deadlines, need not inject any sense of unnecessary urgency into the Adversary Proceedings. Given the virtually risk-free nature of the proposal for Deutsche Bank, it has every incentive to extend the initial 90-day term as necessary pending a final judgment in the Adversary Proceedings.

6

Moreover, for the reasons detailed below, there are dispositive reasons why the proposed Letter Agreement and break-up fee should not be considered until a final decision has been reached in the Adversary Proceedings.

For all of these reasons, Libra and SG respectfully submit that a ruling on the Motion, including Part I thereof, should be deferred until after the Adversary Proceedings are concluded.

## ARGUMENT

**I.    The Request for Approval of the Letter Agreement and Break-Up Fee Is Premature.**

A ruling on Part I of the Motion should be deferred, because the Debtors' application is unripe. This well-established principle militates against deciding the Debtors' request now, because it entails a waste of judicial, party, and estate resources in evaluating a complex and unusual proposed transaction that is unlikely ever to be consummated. Because Libra and SG are confident that they will prevail in the Adversary Proceedings, they are less concerned with the unfavorable economic terms of the proposed assignment—though SG is also a creditor of LBSF—than with the distraction and waste that the premature request would produce, as well as the potential prejudice to the Adversary Proceedings.

Ripeness is a prerequisite to the exercise of decision-making authority by federal courts, whether over an entire case or with respect to a motion. *See S.E.C. v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 529 (S.D.N.Y. 2001), *rev'd in part on other grounds*, 297 F.3d 127 (2d Cir. 2002). "The ripeness doctrine's 'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Gary D. Peake Excavating Inc. v. Town Bd. of the Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). In evaluating ripeness, courts must "consider (1) the fitness of the issues for judicial review, and (2) the injury or hardship to the

7

parties of withholding judicial consideration." *Credit Bancorp*, 138 F. Supp. 2d at 529 (quoting *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998)).

Here, the Debtors' Motion seeks approval of a break-up fee in conjunction with a proposed assignment, neither of which are possible unless LBSF wins the Adversary Proceedings, as Debtors concede. MOL ¶¶ 40, 42. Thus, whether the CDS Agreement should be assumed or assigned at all, and if so on what terms, or whether the estate should be bound to pay a break-up fee, and if so in what amount, are not yet issues—classically—"fit[] . . . for judicial review."

Bankruptcy courts have denied motions as unripe in contexts analogous to this one. For example, in *In re Contractor Technology, Ltd.* the Bankruptcy Court for the Southern District of Texas addressed a motion to determine liability on an indemnification clause that was contingent on a Trustee's success in recovering an alleged preference from the claimant. The court declined to decide the motion, holding that:

> [a]ssuming the Court determined that St. Paul was liable to Aggregate, St. Paul's obligation would be triggered (if at all) only if the Trustee prevailed on its § 547 action or offered a settlement which was accepted by Aggregate. St. Paul's liability is contingent on future events. . . . Accordingly, because this matter is not yet ripe for consideration, the Court denies Aggregate's motion for partial summary judgment.

Nos. 05-37623, 07-3057, 2007 WL 2819773 (Bankr. S.D. Tex., Sept. 21, 2007). Another bankruptcy court denied as unripe a motion for administrative expense treatment that depended on a still-unconsummated assumption. *See In re Family Snacks Inc.*, 249 B.R. 915, 924 (Bankr. W.D. Mo. 2000) ("the UFCW's motion to have its members allowed and unpaid pre-petition medical expenses be treated as administrative expenses is not ripe for decision until such time as [debtor] affirmatively assumes the CBA"), *rev'd in part on other grounds*, 257 B.R. 884 (B.A.P. 8th Cir. 2001); *see also In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231, 276 (Bankr. S.D.N.Y.

8

08-13555-mg    Doc 3642    Filed 05/22/09    Entered 05/22/09 14:48:42    Main Document
            Pg 12 of 18

2008) ("[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve," denying equitable subordination claim).

Delaying consideration of the proposed Letter Agreement until after the Adversary Proceedings are complete would not impose any "hardship" on the estate or third parties. The proposed assignment is a highly attractive transaction for Deutsche Bank. As the Debtors explain the transaction, in exchange for collecting payments from Libra and passing them on to LBSF, Deutsche Bank would collect up to 20% of the protection payments from Libra, virtually risk-free.[2] The Debtors do not propose to commence the assignment, or even to provide notice and schedule a hearing on the propriety thereof, until after the Adversary Proceedings are complete. Since the proposed assignment does not require Deutsche Bank to take any real risk or commit any capital, and in light of the Debtors' admission that the merits of the assignment cannot even be adjudicated until the Court determines whether there is in fact a contract to assign, the commercial expectations of LBSF and Deutsche Bank must be that Deutsche Bank would agree to extend the 90-day term of the Letter Agreement as necessary pending the ultimate outcome of the Adversary Proceedings. For the same reasons, Deutsche Bank should not be expected to terminate the Letter Agreement merely because the break-up fee is not approved within 45 days.

Not only would a deferral of the Debtors' request until after the Adversary Proceedings not impose any hardship, but immediate consideration would impose significant, and

---

[2]     According to the Debtors, this amount could well exceed $100 million. *See* MOL ¶ 12 (noting $836 million to $872 million that the Debtors project would be owed under the CDS Agreement and $694 million to $733 million that LBSF would receive under the proposed assignment). Given the Letter Agreement's express provision for bids less than $20 million (or $40 million if made by SG) and the fact that Lehman was able to attract only five bidders to a transaction that would be at least so lucrative if the Debtors' "projections" were accurate, it seems clear that those estimates are inflated and unreasonable. The significant expenditure of time, money, and resources to establish the real value of the proposed transaction should not have to be incurred unless the Debtors establish that they even have an asset that can be assigned.

9

unnecessary, burdens on the parties and the Court. The evaluation of the proposed break-up fee and assignment will require a significant investment of judicial and party resources, which are not well spent when the very existence of LBSF's interest in the CDS Agreement is in controversy. Debtors suggest that the propriety of the proposed break-up fee depends on, among other things, the present value of the payments that the estate would receive through Deutsche Bank. But the structure of the proposal renders this valuation a rigorous and expensive exercise. Ordinarily, of course, a bankrupt estate assigns an executory contract in exchange for consideration *from* the assignee, typically to cure a monetary default. Here, LBSF proposes to *pay* Deutsche Bank up to 20% of any protection payments that would be received from Libra. In addition, the proposed assignment would result in an immediate cash *outflow* from the estate of all past due premiums, *plus* "an amount [that the Debtors estimate to be] in the approximate range of $30 million to $40 million" to be deposited in a Reserve Account for the benefit of Deutsche Bank. MOL ¶ 50.

Approval of the break-up fee would require a finding that the amount of the fee is reasonable relative to the proposed "purchase price." The Motion cites cases approving fees of no more than 3.24% of the purchase price. *See* MOL ¶ 37. But here, it is not even clear what the "purchase price" is, because Deutsche Bank proposes to make no out of pocket contribution. Moreover, any arguable value to the estate depends on LBSF receiving an uncertain stream of payments over many years, and the amounts of such payments—and whether they are even positive or negative—will depend on the performance of a portfolio of complex asset-backed reference securities. In a very real sense, the "purchase price" to be paid by Deutsche Bank is zero, since it is merely acting as a conduit to pass indeterminate sums of money to LBSF, in which case a break-up fee in any amount would not seem to be commercially justifiable. Indeed,

10

in *In re Integrated Resources, Inc.*, the party opposing the suggested break-up fee pointed out that the bidder's "out of pocket" contribution was far less than the gross value of the transaction, as a result of which the proposed break-up fee would far exceed the "percent of acquisition price that has been authorized in other cases." 135 B.R. 746, 752-53 & n.5 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y.). The bankruptcy court agreed with that concern and, after giving the parties an opportunity to come back with a fee proposal with which the court would feel comfortable, approved the parties' downward adjustment of the fee to a figure that was 3.16 percent of the bidder's out of pocket contribution. *Id.* at 752-53. At a minimum, determining the value of the proposed purchase price would entail an enormous amount of time, resources, and expense that should not have to be incurred before it is even determined whether the Debtors have an asset to assign or sell.

The Debtors assert that the proposed break-up fee is reasonable as a percentage of the estimated value of the assignment to the estate. But the proposal is no more than a sharing arrangement *formula*. The estimated value described by the Debtors is based solely on an opinion by a purported expert witness who has not filed an expert report, has not been qualified as an expert by this Court, and who, oddly, the Debtors decline even to name. *See* MOL ¶ 12. At the very least, appropriate evaluation of the proposed break-up fee in relation to the real value to the estate would include the opportunity for creditors to depose LBSF's expert and determine the true value, if any, of the CDS Agreement to LBSF. The estate's creditors should not be put to the expense and dedication of valuable personnel to prepare to depose Debtors' unidentified expert, determine the purported bases for his or her unrealistic valuation, expose the factors he or she may have overlooked or wrongly analyzed, and reveal other relevant considerations, until after the Adversary Proceedings have been finally resolved.

11

The prospect that discovery would seriously undermine the Debtors' purported valuation is not speculation. First, the Debtors tacitly acknowledge that the proposed assignment has far less value to the estate than they describe in their Motion papers. The Letter Agreement contains a provision—presumably inserted by the party that would benefit from it, LBSF—stating that the dollar amount of the break-up fee will be reduced if LBSF accepts an alternative assignment that is worth less than $20 million (or, if SG is the successful bidder, $40 million). Letter Agreement, Ex. C to Motion, at Section 4(a)(iii).[3] Of course, if the Debtors viewed the proposed assignment to Deutsche Bank as being worth *more* than $20 million, let alone having anywhere near the value they describe in the Motion, there would be no question of their accepting an offer for less than that amount. If the Debtors accept a bid worth less than $20 million, the Letter Agreement that this Court is asked to approve would require the estate to pay *50%* of the value of that bid as a break-up fee to Deutsche Bank, a patently unreasonable amount. *See id.*

Second, if the Debtors' figures were even close to accurate, the formula in the Payment Agreement would give Deutsche Bank well over $100 million (*see* note 2, *supra*) for a transaction in which it takes no risk, commits no capital, and need not even maintain its credit rating. The fact that the Debtors were not able to attract more interest from bidders strongly suggests that the proposed assignee's share is nowhere near that large, and thus that the value to the estate also is commensurately smaller than the Debtors claim.

In short, an appropriate evaluation of the Letter Agreement, and in particular the amount of the proposed break-up fee, would require an enormous expenditure of time and resources

---

[3]  Section 4(a)(iii) provides that "if the aggregate value of the payment, consideration, value or benefit received by the Debtors as a result of [the acceptance of a topping bid] is less than 200% of the Breakup Fee otherwise due and payable . . . , the amount of the Breakup Fee that becomes due and payable under Section 4(c) shall equal 50% of the aggregate value of the payment, consideration, value or benefit received by the Debtors." The break-up fee that is "otherwise due and payable" is defined in the preceding subsections as $20 million if the topping bidder is SG and $10 million otherwise. Thus, Section 4(a)(iii) would have effect if the Debtors accepted a bid of less than $40 million from SG or less than $20 million from any other bidder.

12

before the Court has ruled whether the Debtors even have an interest in the CDS Agreement. The ripeness doctrine's rationale—"to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" (*Peake Excavating*, 93 F.3d at 72)—is particularly apt here.

## II.     The Proposed Break-Up Fee Does Not Encourage Further Bids.

Consideration of the proposed break-up fee should be deferred for the further reason that at this time it does nothing to encourage additional bids. The Debtors acknowledge that the purpose of an appropriate break-up fee is "to encourage the making of bids." *In re Integrated Res., Inc.*, 135 B.R. at 750; *In re 995 Fifth Avenue Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("[i]n the corporate takeover context it is recognized that breakup fees are not illegal where they enhance rather than hamper the bidding"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets. The usual rule is that *if break-up fees encourage bidding, they are enforceable*, if they stifle bidding, they are not enforceable") (emphasis added).

The cases that the Debtors rely on to support the approval of a break-up fee all involved an auction or bidding process, and judicial findings that the initial bid increased the final sale price. *In re 995 Fifth Avenue Assocs., L.P.*, 96 B.R. 24, 25 (Bankr. S.D.N.Y. 1989) ("The spirited auction was the direct result of a contract of sale by and between the debtor and [the break-up fee recipient]"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 654 (S.D.N.Y. 1992) ("Integrated successfully used BT's bid both as a bid comparison to spur existing bidders and as a magnet to attract additional bidders"); *In re Global Crossing Ltd.*, 295 B.R. 726, 735 (Bankr. S.D.N.Y. 2003) ("Starting on or about February 25, 2003, potential additional bidders for Global Crossing or its assets began to surface").

13

Here, by contrast, there is no proposed auction before this Court. The Debtors are not even proposing bid procedures. In fact, the Debtors concede that the most likely assignees already have been contacted and that a public auction is not likely to elicit any better bids. Thus, the Debtors state that "[s]ignificant marketing efforts were made in connection with finding a substitute for LBSF under the Credit Default Swap Agreement, and the Advisor already contacted the parties that would be the most likely potential assignees" (MOL ¶ 54), and they admit that "a public auction likely would not create significant additional value for LBSF's estate." *Id*. The proposed break-up fee will not induce additional bids, because the Debtors do not plan on soliciting any. In fact, they note that "[c]ertain potential assignees were *eliminated*" from consideration merely because they could not "respond on a timely basis." *Id.* ¶ 23. Thus, there is little chance, unless perhaps the Adversary Proceedings are determined in LBSF's favor (again, unlikely in Libra's and SG's view), that other bids will emerge.

## **RESERVATION OF RIGHTS**

Libra and SG reserve their rights to object to the assumption and assignment of the CDS Agreement if and when Debtors seek approval thereof, upon appropriate notice and motion. Furthermore, nothing in this Objection shall constitute a waiver of, and Libra and SG reserve in all respects their rights under all relevant agreements and other documents, the Bankruptcy Code, and applicable State, Federal and foreign law, including (but not limited to) the rights (i) to dispute that certain or all of such agreements do not constitute executory contracts and (ii) to assert that certain or all of such agreements (1) constitute financial accommodations, (2) are subject to the "safe harbor provisions" of the Bankruptcy Code and (3) were validly terminated.

## **CONCLUSION**

WHEREFORE, Libra and SG request that this Court defer a decision on the Motion until the Adversary Proceedings are resolved.

Dated:   New York, New York
         May 22, 2009

Respectfully submitted,

/s/ Brian Trust_____
MAYER BROWN LLP
Steven Wolowitz
Brian Trust
Amit Trehan
Christopher J. Houpt
1675 Broadway
New York, New York 10019
(212) 506-2500 (phone)
(212) 262-1910 (fax)

*Attorneys for Libra CDO Limited,*
*by Bank of America, N.A.,*
*as successor by merger to*
*LaSalle Bank National Association,*
*as Trustee, and Société Générale,*
*New York Branch*