WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |

-------------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO
## SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE
## FOR APPROVAL OF A CROSS-BORDER INSOLVENCY PROTOCOL

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for approval of a Cross-Border Insolvency Protocol, all as more

fully described in the Motion, will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House,

Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on

**June 17, 2009 at 2:00 p.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and

Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee

for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New

York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian

Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley

& McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F.

Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official

Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a

particularized interest in the Motion, so as to be so filed and received by no later than **June 12,**

**2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  May 26, 2009
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                              :
In re                                         :       **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :       **08-13555 (JMP)**
                                              :
                    **Debtors.**               :       **(Jointly Administered)**
                                              :
                                              :
-----------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE**
**FOR APPROVAL OF A CROSS-BORDER INSOLVENCY PROTOCOL**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this motion (the "Motion") and

respectfully represent:

**Background**

        1.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.    On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

4.    On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

5.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

6.    Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

7.    Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications,

filed on September 15, 2008 [Docket No. 2].

## The Need for a Cross-Border Insolvency Protocol

8.    On and after the Commencement Date, nearly eighty of Lehman's foreign

direct and indirect subsidiaries (collectively, the "Foreign Debtors") commenced, or in some

cases, had initiated against them a variety of insolvency, administration, liquidation,

rehabilitation, receivership or like proceedings, as well as ancillary proceedings (the Foreign

Proceedings, and collectively, with the Debtors' chapter 11 cases, the "Proceedings") across

sixteen foreign jurisdictions (each a "Forum") and before different courts and governmental,

regulatory, or administrative bodies (collectively with the Court, the "Tribunals").  In certain of

these Proceedings, the Foreign Debtors remain authorized to operate their businesses and

manage their properties as debtors in possession, while in others, liquidators, administrators,

trustees, custodians, supervisors or curators (the "Administrators") have been appointed to

manage the Foreign Debtors' affairs and represent their insolvent estates (collectively, with the

Debtors, the "Official Representatives").  In certain of the Foreign Proceedings, committees of

creditors have been formed (the "Foreign Creditors' Committees").

9.    Lehman was a truly global group of companies.  To manage its businesses

efficiently, Lehman utilized a centralized cash management system to collect and transfer the

funds generated by its global operations and disburse those funds to satisfy the obligations

required to operate its global businesses.  The cash management system facilitated Lehman's

cash monitoring, forecasting, and reporting, subject to the regulatory requirements of various

jurisdictions.  Furthermore, prior to the commencement of the Proceedings, the Debtors and the

Foreign Debtors, along with the rest of LBHI's direct and indirect subsidiaries, continuously

worked together and shared information in unison.  This information was spread across 2,700 different software applications and dispersed throughout ledger accounts in its subsidiaries across the globe.  Through nearly 4,000 different subsidiary entities across the globe, Lehman's business produced hundreds of thousands of transactions at the speed of light and on a global basis each day.

10.    Given the integrated and global nature of Lehman's businesses, many of the Debtors' and Foreign Debtors' assets and activities are spread across different jurisdictions, and require administration in and are subject to the laws of more than one Forum.  The efficient administration of each of the individual Proceedings would benefit from cooperation among the Official Representatives on a multitude of common issues and matters.  In addition, cooperation and communication among Tribunals, where possible, would enable effective case management and consistency of judgments.

11.    In light of the foregoing, and as described more fully below, the Debtors commenced discussions as early as October 2008 with Official Representatives throughout the world to explore whether or not it was possible to establish among them a framework within which they could discuss and endeavor to resolve most of the common issues and problems that each of them faced as a result of Lehman's global collapse.  The ensuing months of discussions and negotiation have culminated in the proposed Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"), which is designed to facilitate the coordination of the Proceedings, and to enable the Tribunals and Official Representatives to cooperate in the administration of the Proceedings in the interest of the Debtors' creditors, and all of Lehman's creditors worldwide.

## Relief Requested

12.     By the Motion, the Debtors seek entry of an order substantially in the form

attached hereto as <u>Exhibit A</u>, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code,

approving the Protocol attached hereto as <u>Exhibit B</u>, and adoption of the Guidelines (as defined

below) attached hereto as <u>Exhibit C</u>.

## The Protocol

13.     The Protocol is the result of nearly three months of extremely delicate

negotiations.  While there is substantial precedent for similar protocols, most have been arranged

between two (in rare instances, three) countries.  The Proceedings, however, span over sixteen

different jurisdictions.  Moreover, whereas cross-border protocols in the past have been

predominantly bilateral, common-law instruments among Anglo-Saxon jurisdictions such as the

United States, the United Kingdom and Canada – jurisdictions that have a long history of comity

with each other – the Protocol has sought to coordinate insolvency proceedings among multiple

common law and civil law jurisdictions in various continental European countries and, for the

first time, several countries in Asia.

14.     The cultural and legal challenges associated with this task have been

daunting.  Most of the Administrators who have agreed to participate in the Protocol in its

current form are statutorily-appointed judicial auxiliaries with closely circumscribed roles.

While in the past, the Foreign Debtors dealt with each other through the flexible medium of

private international law, the Administrators have been appointed under public national laws, and

have been given strict territorial mandates.  In many instances, they may face personal liability

for the actions that they take in their appointed roles.  Not surprisingly, the Administrators are

sometimes reluctant to take any action that is not specifically and explicitly provided for by the

laws under which they have been appointed.  Scrupulous revision and wording has been

necessary in order to arrive at language to which all parties could safely subscribe.

### The Negotiations

15.     Although preliminary discussions about the possibility of a multi-lateral

protocol began as early as October 2008, the initial draft of the Protocol was first circulated in its

present form on the evening of February 10, 2009 among the key Official Representatives who

could be identified as controlling the majority of the Foreign Debtors' assets outside of the

United States.  The following day, this initial draft was presented to this Court in a status

conference on February 11, 2009.  Over the following weeks, the Debtors received comments

and counterproposals to the Protocol from the Administrators from KPMG China who have been

appointed as "Liquidators" of the Foreign Debtors in Hong Kong[1] and Singapore[2] (respectively,

"KPMG Hong Kong" and "KPMG Singapore"), as well as the Administrators from PPB Pty Ltd.

who have been appointed Joint and Several Voluntary Administrators of several Foreign Debtors

in Australia ("PPB Australia"). [3]

16.     Subsequently, on March 11, 2009, the Debtors held individual meetings in

New York to discuss the Protocol (among other things) with Dr. Michael C. Frege, the

---

[1]     The Hong Kong debtors are the following entities:  Lehman Brothers Securities Asia Limited (In Liquidation); Lehman Brothers Futures Asia Limited (In Liquidation); Lehman Brothers Asia Limited (In Liquidation); Lehman Brothers Asia Holdings Limited (In Liquidation); Lehman Brothers Asia Capital Company (In Liquidation); LBQ Hong Kong Funding Limited (In Liquidation); Lehman Brothers Nominees (H.K.) Limited (In Liquidation); and Lehman Brothers Commercial Corporation Asia Limited (In Liquidation).

[2]     The Singapore debtors are the following entities:  Lehman Brothers Investments Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Finance Asia Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Commodities Pte. Ltd. (In Creditors' Voluntary Liquidation); Lehman Brothers Pacific Holdings Pte. Ltd. (In Creditors' Voluntary Liquidation); Sail Investor Pte. Ltd. (In Creditors' Voluntary Liquidation); and Lehman Brothers Asia Pacific Holdings Pte. Ltd. (In Creditors' Voluntary Liquidation).

[3]     The Australian debtors are the following entities:  Lehman Brothers Australia Granica Pty Limited; Lehman Brothers Real Estate Australia Commercial Pty Limited; Lehman Brothers Australia Real Estate Holdings Pty Limited; Lehman Brothers Australia Finance Pty Limited; Lehman Brothers Australia Holdings Pty Limited; Lehman Brothers Australia Limited; LBHV 1 Pty Limited; HV 1 Pty Limited; and HV 2 Pty Limited.

insolvency administrator ("Insolvenzverwalter") of Lehman Brothers Bankhaus AG (in

Insolvenz) ("LBB"),[4] which is subject to insolvency proceedings in Germany at Frankfurt Lower

District Court; and Rutger Schimmelpenninck, the bankruptcy trustee ("curator") (the "Dutch

Trustee") of Lehman Brothers Treasury Co. B.V. ("LBT") which is subject to bankruptcy

proceedings in the Netherlands at Amsterdam District Court.  Meetings and discussions were had

with, and input regarding the Protocol was sought from other Official Representatives as well.

       17.      Multiple discussions followed.  At first, the legal complications raised by

the Administrators appeared insurmountable.  Gradually, however, negotiations led to an

agreement on certain broad principles.  Multiple drafts were circulated to harmonize the efforts

towards compromise among the most active participants in the Protocol negotiations.  These

participants included KPMG Hong Kong, KPMG Singapore, PPB Australia, LBB, and LBT.

The Dutch Trustee of LBT is in the process of obtaining the requisite approval of the Protocol

and, if such approval is forthcoming, is expected to sign it in early June, 2009.  The remaining

participants including the Debtors have all executed the attached Protocol (collectively, with

LBT, the "Initial Signatories").

       18.      The Debtors are aware of the expectations that surround this Protocol.  It

should be noted, however, that the Protocol is not a legally binding document; it is a statement of

intentions and guidelines.  It imposes no duties or obligations on anyone, and is not intended to

be enforceable against any of the parties.  Rather, the Protocol provides a framework for

cooperation.  In the absence of an international insolvency treaty to which the United States is a

party, the Initial Signatories have sought to forge a privately negotiated treaty.  While no

---

[4]      On April 29, 2009, LBB filed a petition for recognition of the insolvency proceedings in Germany as a
foreign main proceeding under chapter 15 of the Bankruptcy Code, which petition is currently pending before this
Court.  *See* In re *Lehman Brothers Bankhaus AG*, Case No. 09-12704 (JMP) (Bankr. S.D.N.Y. 2009) [Doc. Nos. 1 –
6].

assurances can be given at this time of what the Protocol will achieve, it is hoped that through its framework, agreements may be reached on more substantive issues, and years of protracted and expensive case administration and intercompany litigation may be avoided.

19.    To this end, once the Initial Signatories have secured approval of the Protocol from their respective Tribunals or Foreign Creditors' Committees, it is expected that a series of meetings and teleconferences will follow on the substance of the Protocol.  In particular, as of the date of this Motion, the Initial Signatories have begun planning for an initial conference that will likely take place in mid July (the "Conference") to discuss, among other things, key procedural and substantive differences among the various Proceedings, and a thorough analysis of the intercompany financial matrix.

20.    At any time before or after the Conference, there may be more Official Representatives who are added as signatories to the Protocol.  The Debtors wish to note, however, that there may also be Official Representatives who might be willing to participate in the Conference, and any subsequent work that takes place within the framework of the Protocol, without actually signing the Protocol.  While the Debtors prefer that Official Representatives provide confidence to their counterparts by explicitly signaling their commitment to the Protocol through their signatures, the Debtors, for their part, would welcome such informal participation, as this would further the aims of the Protocol, and facilitate an efficient and fair resolution of the Proceedings for the benefit of all of Lehman's worldwide creditors.

**The Terms of the Protocol**

21.    The Protocol seeks to promote (i) international cooperation and coordination in the Proceedings; (ii) communication among Official Representatives, and, wherever possible, direct communication among Tribunals; (iii) the sharing of relevant

information and data among Official Representatives; (iv) the identification and preservation of

Lehman's worldwide assets to maximize value for all creditors; (v) an efficient and transparent

claims process, including a consistent and measured approach to intercompany claims that

avoids unnecessary intercompany litigation; (vi) cooperation in the marshalling of Lehman's

assets in order to maximize recoveries for all creditors; and (vii) the independent jurisdiction,

sovereignty, and authority of all Tribunals.

22.    While the heart of the Protocol resides in its treatment of Intercompany

Claims (as defined and further explained below), the following is an overview of certain of the

other salient provisions of the proposed Protocol:[5]

(a)    **Notice, Communication, and Data Sharing:**  It is expected that Official Representatives will communicate freely and frequently by keeping each other generally informed about each other's Proceedings and matters in which they may have mutual interests, and providing notice to each other of relevant hearings or meetings.  Having recognized that the Debtors and Foreign Debtors formerly depended on each other for certain types of information, it is expected that Official Representatives will continue to share such information and data, and will cooperate in the gathering and analysis thereof (unless such information and data is already subject to litigation or prospective litigation among the parties).  In particular, if an Official Representative is in the possession of another Debtor's or Foreign Debtor's books and records or other financial accounting data, such materials should be provided to the Official Representative of such other Debtor or Foreign Debtor as expeditiously as possible.

(b)    **Rights to Appear:**  Official Representatives will consent to each other's opportunity to appear and be heard at hearings or statutory meetings. Such appearances may be made in person or in writing, so as not to prejudice those Official Representatives who are not able to travel to meetings or hearings.  Furthermore, Official Representatives shall not be deemed to have submitted to the jurisdiction of a Forum by being a party to the Protocol, or – if an appearance is made – for any purpose beyond the matter for which an appearance is made, except to the extent that the Official Representative otherwise submits to the jurisdiction of a Forum.

---

[5]    This overview is merely intended to provide a short summary of some of the provisions of the Protocol. The terms of the Protocol shall control, to the extent that there is any conflict or inconsistency between the summary and said terms.

(c)    **Communication Among Tribunals and Committees:**  The Protocol
provides for court-to-court communication through the adoption by each
Tribunal, in whole or in part, of the ALI Guidelines Applicable to Court-
to-Court Communication in Cross-Border Cases (the "<u>Guidelines</u>"). It is
expected that Official Representatives will seek adoption of the Guidelines
from their respective Tribunals.  Accordingly, by this Motion, the Debtors
are seeking approval and adoption of the Guidelines in these chapter 11
cases.

(d)    **Asset Preservation:**  The Protocol promotes cooperation among Official
Representatives in the preservation and maximization of estate assets.  For
example, Official Representatives are expected to notify each other if they
learn that the assets of another Official Representative's estate are at risk,
and to cooperate in the preservation of such assets.  Similarly, Official
Representatives should cooperate in segregating and establishing the
ownership of property that may have been inadvertently received or is
being held by the wrong estate.  Finally, Official Representatives should
cooperate to maximize the realizable value of assets in which multiple
Debtors and/or Foreign Debtors have an interest, including funding
towards the asset in order to preserve and maximize its realizable value on
mutually acceptable terms.

(e)    **Claims:**  The Protocol provides for the coordination of claims
administration in instances where the Debtors and Foreign Debtors share
common creditors.  This may occur where certain Debtors and Foreign
Debtors share an obligation as co-debtors, or where one Debtor may have
guaranteed the obligations of another Foreign Debtor.  The Protocol also
provides for circumstances where the Debtors or Foreign Debtors have
commenced Proceedings in more than one country, such as a foreign main
proceeding elsewhere and a chapter 15 case in this Court, and intend to
make distributions in more than one case.  In the event that creditors of
these Foreign Debtors stand to receive payment from the same Foreign
Debtor in cases in more than one country, the Protocol seeks to guide in
the allocation of payments among these Proceedings.

(f)    **Other Provisions:**  In addition to the foregoing, the Protocol (i)
encourages, but does not require Official Representatives to coordinate the
form and procedure through which they submit their respective winding-
up plans, plans of reorganization or liquidation, or deeds of company
arrangement (a "<u>Plan</u>"); (ii) acknowledges the independent sovereignty of
each Tribunal; (iii) provides for amendment and the accession of
additional signatories to the Protocol; and (iv) provides that the Protocol
may be terminated as to a particular Official Representative's Proceeding
either at the end of the Official Representative's Proceedings, or earlier if

it is determined that the Protocol has achieved all of its objectives as to that Official Representative's Proceeding.

### Special Procedures for Intercompany Claims

23.    Over many years – in some cases, decades – the relationships among the Debtors and Foreign Debtors have developed into a complex web of financial balances documented and managed through Lehman's integrated systems so as to allow Lehman to operate its global business seamlessly, quickly, and efficiently.  To untangle this web of intercompany relationships and attempt to reconcile the attendant intercompany claims with the procedural and evidentiary rigors of court proceedings under a multiplicity of local insolvency laws and rules of evidence is likely to be a protracted and expensive labor that could take many years to complete.

24.    Accordingly, the Official Representatives agree that resources and time should not be spent reviewing historical intercompany accounting records to resolve claims asserted in their respective Proceedings by other Official Representatives ("Intercompany Claims").  Rather, it is in the best interests of all creditors to agree to a common set of financial accounting records that form the basis of Intercompany Claims, and to allow those financial records as *prima facie* valid unless there are elements of proof suggesting that a transaction was recorded in error, or that no such transaction ever occurred or is inconsistent with the intercompany accounting records of the relevant Lehman entity.

25.    The Protocol provides that Official Representatives shall establish a committee (the "Procedures Committee") to consensually resolve any differences in the accounting of Intercompany Claims, with members to be appointed by the Official Representatives.  Accordingly, by this Motion, the Debtors seek approval from this Court for the appointment to the Procedures Committee of Daniel Ehrmann, a Vice President of LBHI, or such

other person(s) that he may delegate or may otherwise be delegated by the Debtors.  Once the

Procedures Committee is formed, its members will work together to propose the methods and

elements of proof that they will apply in calculating and consensually resolving the

Intercompany Claims (the "Accounting Procedures").  To the extent required, Official

Representatives will again seek approval of these Accounting Procedures from their respective

Tribunals or Foreign Creditors' Committees, as well as any particularized procedures that are

developed for certain types of Intercompany Claims (such as those arising from Intercompany

Derivative Claims, as defined in the Protocol).

26.    It should be noted that the Debtors are not seeking approval of any

intercompany settlements at this time.  To the extent that Official Representatives are successful

in consensually resolving the Intercompany Claims, the Debtors will seek approval of these

settlements either pursuant to a plan of reorganization or by separate application as a settlement

and compromise pursuant to Rule 9019 of the Bankruptcy Rules.

**Basis for the Relief Requested**

27.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor.  *Comm. of Equity Sec.*

*Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991));

*Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*),
780 F.2d 1223, 1226 (5th Cir. 1986).

  28. It is generally understood that "[w]here the debtor articulates a reasonable
basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),
courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville
Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is
a strong presumption that "the directors of a corporation acted on an informed basis, in good
faith and in the honest belief that the action taken was in the best interests of the company." *In
re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488
A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting
this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.
*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

  29. There are ample business justifications to support approval of the
Protocol. Coordination among the Proceedings is essential to their success. Such coordination
will allow for an orderly, effective, and efficient administration of – and timely *exit* from – the
various Proceedings, at a reduced cost to the various estates of the Debtors and Foreign Debtors,
thus maximizing recoveries for creditors in all of the Proceedings. Cooperation among the
Official Representatives will allow for the effective and efficient administration of these separate
Proceedings, will avoid unnecessary duplication of efforts among the Official Representatives as
they work towards identifying, preserving, and maximizing the value of Lehman's worldwide
assets and businesses while maintaining the integrity of each of the separate Proceedings.
Amongst the goals that the Debtors hope to achieve through the framework established by the
Protocol is a fair and transparent resolution of intercompany claims on a consistent, global basis.

30.    In addition, the Court has the authority under section 105 of the Bankruptcy Code to approve the Protocol.  Pursuant to section 105, this Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of…title [11]."  11 U.S.C. § 105(a).  The Second Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> 11 U.S.C. § 105 is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of powers in the administration of a bankruptcy case. The basic purpose of section 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid at the exercise of their jurisdiction….

*Casse v. Key Nat'l Bank Ass'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999) (citation omitted).

Approving the Protocol is an appropriate use of this Court's powers under section 105.  The Bankruptcy Code currently lacks any other mechanism for the treatment of a corporate group insolvency.  While the need for more legislative guidance in the administration of a global corporate group insolvency has been recognized by the United Nations Commission on International Trade Law,[6] currently only sections 1525 to 1527 appear to mandate that the trustee and the Court cooperate "to the maximum extent possible" with foreign courts and proceedings.[7] In fact, the Legislative History to section 1527 indicates that the purpose of this section is to provide courts with the statutory authority to approve the types of cross-border protocols that have already become commonplace in cross-border cases.  *See* H.R. Rep. No. 109-31, at 117

---

[6]      *See, e.g.*, A/CN.9/WG.V/WP.82/Add.1 – Treatment of enterprise groups in insolvency, ¶ 3 (available at: http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html); *see also* Samuel L. Bufford, *United States International Insolvency Law 2008-2009* 557-574.

[7]      Section 1525 provides that "the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."  Section 1526 provides that "the trustee or other person, including an examiner, authorized by the court, shall, subject to the supervision of the court, cooperate to the maximum extent possible with a foreign court or a foreign representative."  Section 1527 provides that "[c]ooperation referred to in sections 1525 and 1526 may be implemented by any appropriate means…"

(2005) ("United States bankruptcy courts already engage in most of the forms of cooperation described here, but they now have explicit statutory authority for acts like the approval of protocols of the sort used in cases.").  In order for section 1527 to apply to the Foreign Debtors' cases, however, each of the Official Representatives would need to file a petition before this Court under chapter 15 of the Bankruptcy Code seeking recognition of their respective Foreign Proceedings.  Aside from potentially being cumbersome and expensive, there may be other strategic reasons for which an Official Representative may not wish to commence a chapter 15 case in the United States.  Furthermore, if more parties ultimately did consider participation in the Protocol, they could be discouraged if participating in the Protocol with the Debtors required their commencement of a chapter 15 case in the United States.  Since the Bankruptcy Code currently lacks any other mechanism for the treatment of a global corporate group insolvency, the Court should approve the Protocol pursuant to its equitable powers as a mode of case administration that Congress has already explicitly approved in the chapter 15 context.

31.     There is also ample precedent for the Court's approval of the Protocol. Courts both in this District and elsewhere have authorized similar protocols for managing cross-border insolvency proceedings pursuant to section 105 of the Bankruptcy Code.  *See, e.g., In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. 2009) [Doc. No. 54]; *In re Quebecor World (USA) Inc.,* Case No. 08-10152 (JMP) (Bankr. S.D.N.Y. 2008) [Doc. No. 528]; *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. 2007) [Doc. No. 4309]; *In re Federal Mogul Global, Inc.*, Case No. 01-10578 (JKF) (Bankr. D. Del. 2001) [Doc. No. 1241]; *In re PSINet Inc.*, Case No. 01-13213 (REG) (Bankr. S.D.N.Y. 2001) [Doc. No. 182]; *In re Manhattan Inv. Fund Ltd.*, Case No. 00-10922 (BRL) (Bankr. S.D.N.Y. 2000) [Doc. No. 77]; *In re Loewen Group Int'l, Inc.*, Case No. 99-01244 (PM (Bankr. D. Del. 1999) [Doc. No. 210].

32.     Based on the foregoing, the Debtors submit that the Court should approve the Protocol and Guidelines, as well as the appointment of Daniel Ehrmann to the Procedures Committee, or such other person(s) that he may delegate or may otherwise be delegated by the Debtors.  By approving the Protocol, the Court would not be approving a binding agreement among the Official Representatives.  Rather, the Court would be approving a framework for international cooperation, where such a framework is currently lacking.  To the extent that, within the framework of the Protocol, the Debtors need to pursue any actions or decisions that would otherwise require Court approval, the Debtors submit that they would separately seek such approval from this Court.

## Notice

33.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the Initial Signatories; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

34.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  May 26, 2009
      New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |

------------------------------------------------------------------x

### ORDER APPROVING THE PROPOSED
### CROSS-BORDER INSOLVENCY PROTOCOL
### FOR THE LEHMAN BROTHERS GROUP OF COMPANIES

Upon the motion, dated May 26, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (collectively, the "Debtors" and, together with their non-debtor

affiliates, "Lehman"), pursuant to sections 105(a) and 363(b) of title 11 of the United States

Code (the "Bankruptcy Code") for an order approving the proposed Cross-Border Insolvency

Protocol for the Lehman Brothers Group of Companies (the "Protocol"), all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings

Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the amended

order entered February 13, 2009 governing case management and administrative procedures

[Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the

attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) the Initial Signatories (as defined in the Motion); and (vi) all parties

who have requested notice in these chapter 11 cases, and it appearing that no other or further

notice need be provided; and a hearing having been held to consider the relief requested in the

Motion; and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates and creditors, and all parties in interest and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Protocol is approved in all respects; and it is further

ORDERED that the ALI Guidelines Applicable to Court-to-Court

Communication in Cross-Border Cases are approved for use in these chapter 11 cases; and it is

further

ORDERED that the appointment of Daniel Ehrmann to the Procedures Committee

(as defined in the Protocol), or such other person(s) that he may delegate or may otherwise be

delegated by the Debtors, is approved.

Dated: _____, 2009
          New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

## Cross-Border Insolvency Protocol

EXECUTION COPY

# CROSS-BORDER INSOLVENCY PROTOCOL
## FOR THE LEHMAN BROTHERS GROUP OF COMPANIES

This cross-border insolvency protocol (the "Protocol") establishes a framework for the conduct of the Proceedings (as such term is defined herein) concerning Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors worldwide that are parties hereto (collectively, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman") and the management of the estates of the Debtors pursuant to those Proceedings.

## Background[1]

### A.      The Proceedings

Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Dates"), the Debtors commenced (or in some cases, had initiated against them) plenary insolvency, administration, liquidation, rehabilitation, receivership, or like proceedings ("Plenary Proceedings") in different jurisdictions (the "Plenary Fora") and before different courts and governmental, regulatory, or administrative bodies (the "Tribunals"), as well as proceedings that are secondary or ancillary to a Plenary Proceeding ("Limited Proceedings," and together with the Plenary Proceedings, the "Proceedings") in jurisdictions other than the Plenary Fora (together with the Plenary Fora, the "Fora" and each a "Forum").

In certain of these Proceedings, the Debtors remain authorized to operate their businesses and manage their properties as "Debtors in Possession," while in others, liquidators, administrators, trustees, custodians, supervisors or curators have been appointed to manage the Debtors' affairs and represent their insolvency estates (collectively, with Debtors in Possession, the "Official Representatives"). Furthermore, in certain of these Proceedings, one or more statutory committee of creditors or equity holders has or have been appointed (the "Committees").

### B.      Lehman's Global Business

Lehman was a truly global group of companies. Prior to the events leading up to these Proceedings, Lehman was the fourth largest investment bank in the United States, and one of the largest financial services firms in the world. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide. Its headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

To manage their businesses efficiently, Lehman utilized a centralized cash management system to collect and transfer the funds generated by its operations and disburse those funds to satisfy the obligations required to operate their businesses. The cash management

---

[1] Factual statements contained in this Background are for informational purposes only and shall not be deemed admissions by, or binding on, any party hereto.

system facilitated Lehman's cash monitoring, forecasting, and reporting, subject to the regulatory requirements of various jurisdictions. Furthermore, prior to the commencement of the Proceedings, LBHI and its direct and indirect subsidiaries continuously worked together and shared information in unison. This information was spread across 2,700 different software applications and dispersed throughout ledger accounts in its subsidiaries across the globe.

## C.    The Need for a Protocol

Given the integrated and global nature of Lehman's businesses, many of the Debtors' assets and activities are spread across different jurisdictions, and require administration in and are subject to the laws of more than one Forum. The efficient administration of each of the Debtors' individual Proceedings would benefit from cooperation among the Official Representatives. In addition, cooperation and communication among Tribunals, where possible, would enable effective case management and consistency of judgments.

Accordingly, this Protocol is designed to facilitate the coordination of the Proceedings, and to enable the Tribunals and Official Representatives to co-operate in the administration of their respective Debtors' estates in the interest of all of the Debtors' creditors.

## Terms

## 1.    Purpose and Aims

1.1.    The parties acknowledge that this Protocol represents a statement of intentions and guidelines designed to minimize the costs and maximize recoveries for all creditors of the Proceedings, by promoting the sharing of relevant information among the parties and the international coordination of related activities in the Proceedings, while respecting the separate interests of creditors and other interested parties to each Proceeding (which shall be subject at all times to the local laws of the jurisdiction applicable to each Official Representative), and the independence, sovereignty, and authority of each Tribunal.

1.2.    In recognition of the substantive differences among the Proceedings in each jurisdiction, this Protocol shall not be legally enforceable nor impose on Official Representatives any duties or obligations, including (but not limited to) any obligations (i) that may be inconsistent with or that may conflict with the duties or obligations to which the Official Representative is subject under applicable law, or (ii) that are not in the interests of the Debtor's estate represented by the Official Representative and/or its creditors. Furthermore, nothing in this Protocol should be interpreted in any way so as to interfere with (i) the proper discharge of any duty, obligation or function of an Official Representative, or (ii) the exercise of statutory or other powers otherwise available to an Official Representative under applicable law.

1.3.    Official Representatives should coordinate with each other and cooperate in all aspects of the Proceedings, subject in appropriate cases to bilateral protocols and protocols for communication among Official Representatives, Tribunals and Committees, that may be executed in furtherance of this Protocol. In doing so, the Official Representatives acknowledge and agree that the parties shall deal in good faith with each other in the interests of maximizing recovery for all of the Debtors' creditors.

EXECUTION COPY

1.4.    The aims of this Protocol are:

1.4.1.    **Coordination** – To promote international cooperation and the coordination of activities in the Proceedings; and to provide for the orderly, effective, efficient, and timely administration of the various Proceedings in order to reduce their cost and maximize recovery for creditors.

1.4.2.    **Communication** – To promote communication among Official Representatives and Committees; and to provide, wherever possible, for direct communication among Tribunals.

1.4.3.    **Information and Data Sharing** – To provide for the sharing of relevant information and data among Official Representatives in order to promote effective, efficient, and fair administrations, and to avoid duplication of effort and activities by the parties.

1.4.4.    **Asset Preservation** – To identify, preserve, and maximize the value of the Debtors' worldwide assets for the collective benefit of all creditors and other interested parties.

1.4.5.    **Claims Reconciliation** – To coordinate an efficient and transparent claims process; and in particular, to provide for a consistent and measured approach to the calculation and adjudication of intercompany claims that avoids unnecessary intercompany litigation.

1.4.6.    **Maximize Recoveries** – To cooperate in marshalling the assets of the Debtors in order to maximize recovery for all of the Debtors' creditors.

1.4.7.    **Comity** – To maintain the independent jurisdiction, sovereignty, and authority of all Tribunals.

1.5.    Notwithstanding the multilateral nature of this Protocol, nothing herein shall restrict Official Representatives from dealing with other Official Representatives on a bilateral basis on matters that concern only their respective Debtors, provided that Official Representatives should keep each other generally informed of any bilateral protocols with other parties hereto, to the extent that such bilateral protocols address similar aims as this Protocol.

2.    **Notice**

2.1.    Official Representatives should provide adequate notice by email to the parties hereto, as well as to any Committees established in the Proceedings, of relevant matters in which those parties have an interest.

2.2.    Where appropriate, each Official Representative should provide adequate notice by email as far in advance as possible of any matters in which other Official

Representatives have a material interest and that may require preparation and/or travel by such Official Representatives, such as any creditors' or shareholders' meetings, statutory deadlines, administrative deadlines, or hearings before a Tribunal.

## 3.    Rights of Official Representatives and Creditors to Appear

3.1.    Subject to the laws of each Forum, Official Representatives shall have the right to appear in all of the Proceedings, whether before a Tribunal or in statutory meetings convened pursuant to applicable law. If required and available in a particular Forum, an exequatur or similar proceeding may be utilized to implement recognition of the Official Representative.

3.2.    Official Representatives shall not, by virtue of their being a party to this Protocol, be deemed to have submitted to jurisdiction in any Forum, nor shall appearing in a Forum, whether in person or pursuant to Section 3.3, subject an Official Representative to jurisdiction for any purpose other than the matter with respect to which the appearance is made, except, (i) to the extent otherwise set forth herein to the contrary, and (ii) to the extent that an Official Representative otherwise submits to the jurisdiction of a Forum.

3.3.    To the extent that an Official Representative is entitled to appear in the Proceedings under applicable law but cannot be present before the Tribunal or Committee(s) (or similar body, as the case may be) either in person or through counsel, the parties hereto shall consent to the Official Representative's communication of any observations to such Tribunal or Committee(s) prior to any order (or similar action) being made, provided that such communication is made in writing and copies of such communication are non-confidential and delivered to all interested parties or filed on the Tribunal's public records.

## 4.    Communication and Access
## to Data and Information Among Official Representatives

4.1.    Official Representatives should keep each other generally informed when appropriate of any relevant information and material developments in matters involving the Debtors and their Proceedings, and should consent wherever possible to the sharing of information among Official Representatives, which consent should not be unreasonably withheld.

4.2.    Official Representatives should share information regarding the Debtors, and their assets and liabilities, which each may lawfully share with the other; provided, however, that with respect to work product or other privileged information, Official Representatives may, but are not obliged, to share such information with each other, subject to all privileges under the applicable rules of evidence or applicable law, and provided that sharing work product or privileged information shall not be deemed a waiver of any attorney-client privilege or work product protections under the applicable rules of evidence or applicable law.

4.3.    To facilitate access to information, Official Representatives should make available to each other, upon request, any information that is publicly available in their respective Fora; and may, where permitted under applicable laws, share non-public information

with other Official Representatives, subject to appropriate confidentiality arrangements and all privileges under the applicable rules of evidence.

4.4.    Official Representatives agree that each shall not (and shall direct their respective agents and representatives not to) provide any non-public information received from the other to any third party, unless such information is (i) agreed to by the other party, (ii) required by applicable law, or (iii) required by order of any Tribunal.

4.5.    The approval of this Protocol by a Tribunal (by entry of an order or otherwise) shall constitute the recognition by such Tribunal and the Official Representative in that Tribunal's Proceeding that communications among Official Representatives and their respective professionals, employees, agents, and representatives are subject to, and do not waive any attorney-client, work-product, legal, professional, or other privileges recognized under any applicable law; provided, however, that approval of this Protocol by a Tribunal shall not result in the parties hereto, other than the Official Representative in that Proceeding, becoming subject to the jurisdiction and laws of that Tribunal and Forum.

4.6.    Each Official Representative should cooperate in the gathering and sharing of certain data and share analysis of certain transactions by:

4.6.1.    sharing, via free, read-only access, all relevant information and data that it has the right to disclose and for which it is not required to make payment relating to (i) material interest holders of an asset, (ii) restitution of assets, and (iii) relevant information that assists such other Official Representative to fulfill its duties, except where (x) litigation has commenced (or is contemplated), or (y) statutory or regulatory requirements prohibit disclosure;

4.6.2.    if an Official Representative is in possession of the books, records, correspondence and other materials or documents that belong to another Debtor, providing the Official Representative of such other Debtor's estate such books, records, correspondence and other materials or documents;

4.6.3.    coordinating in good faith the investigations of pre-filing activities with any other Official Representative with an interest in such activities, so long as the interests of the Official Representatives coordinating such investigations do not diverge; and

4.6.4.    liaising with any other Official Representatives on matters (i) in which such other Official Representatives have a significant mutual interest, so long as their interests do not diverge and (ii) relating to a significant strategy to exit from a Proceeding in which such other Official Representatives have an interest.

4.7.    Any sharing of information and data shall not include or give an Official Representative a right of automatic access to (i) documents relating to a Debtor's post-filing

transactions, or (ii) working papers, summaries, or other work product drafted by an Official Representative, and any professionals retained in the course of a Proceeding.

## 5.    Communication Among Tribunals

5.1.    The Guidelines Applicable to Court-to-Court Communication in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall, where applicable to the relevant Proceeding and where recognized by the Tribunal of the relevant Proceeding, be incorporated by reference and form part of this Protocol subject to formal adoption of the Guidelines in whatever form by each Tribunal, in whole or in part and with or without modifications (if any). Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

## 6.    Communication Among Committees

6.1.    To the extent permitted and approved by the respective Committee, non-public information available to the Committee in any Forum may, if relevant to a matter in which another Debtor has an interest, be shared with the Committees of such Debtor, subject to appropriate confidentiality arrangements and all privileges under the applicable rules of evidence or applicable law.

## 7.    Asset Preservation

7.1.    Each Tribunal should administer the assets subject to its jurisdiction.

7.2.    If, in the course of a Proceeding, an Official Representative learns or believes that another Debtor could have a material interest in a particular asset whose value and/or recovery is at risk, such Official Representative may notify the Official Representative of the Debtor whose estate includes such asset and, where practicable and consistent with the duties of such Official Representative under applicable laws, the Official Representative of the Debtor whose estate includes such asset should consult with the Official Representative of the Debtor that may have such material interest prior to: (i) the sale, abandonment, or any disposition of such asset; (ii) the termination, suspension, or other transition of any employees managing such asset; or (iii) the commencement of any judicial, or non-judicial, proceeding affecting such asset.

7.3.    In the event that (a) an Official Representative claims to have a legal or beneficial interest in property which is transferred to, or received by another Debtor, or (b) an Official Representative determines that the estate for which it is responsible has improperly received or is improperly holding property transferred from or owned by another estate, such Official Representatives should cooperate in:

7.3.1.    Assessing the ownership of such transferred property and provide all relevant information, to the extent not otherwise restricted, allowing each Official Representative to ascertain ownership of the property; and

7.3.2.    Where ownership of the property has been established and subject to applicable laws: (i) returning the property to the Official

Representative of the Debtor establishing its right to such property; and (ii) refraining (to the extent an Official Representative may do so and subject to applicable laws) from transferring or co-mingling property once another Official Representative establishes ownership of such transferred property.

**7.4.** Official Representatives should, to the extent permitted under applicable law and where appropriate, cooperate to maximize the realizable value of assets for which multiple Debtors have an interest. Official Representatives also recognize that in certain cases such as where a Debtor (the "Funding Estate") has an existing interest in an asset which forms part of another Debtor's estate (the "Funded Estate"), the Official Representative of the Funding Estate may wish to provide funding towards the asset held by the Funded Estate in order to preserve and maximize its realizable value. In such event, the Official Representative of the Funded Estate may, subject to applicable laws, allow such funding to be provided on mutually acceptable bilateral terms

**7.5.** Should the Funded Estate, after appropriate consultation with the Funding Estate and after obtaining any necessary approval in an applicable Proceeding, (i) dispose of the asset after receiving funds from the Funding Estate, and (ii) receive proceeds in respect of such disposition, then the Funding Estate shall receive a fair allocation of share of such proceeds.

**7.6.** Where applicable, compliance with sections 7.2 through 7.6 by Official Representatives is subject to approval from their respective Tribunals or Committees, as the case may be under local law.

## 8.    Claims

**8.1.** Where there are two or more Proceedings pending as to the same Debtor, those being one or more Plenary Proceeding and/or one or more Limited Proceedings, a claim should be filed only in the Proceeding(s) designated by the Official Representative of such Debtor (provided that certain Official Representatives may be required to make such designation in accordance with applicable law).

**8.2.** Without prejudice to secured claims or rights *in rem*, and subject to applicable law, Official Representatives should adjust distributions so that a creditor who has received payment with respect to its claim in one Proceeding may not receive a payment for the same claim in any other Proceeding as to the same Debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received in respect of that claim.

**8.3.** Consistent with section 8.2 above, if any claims against one or more Debtors (a "Direct Claim") is subject to a guarantee issued by another Debtor (a "Guarantee"), the Official Representatives shall seek to adjust distributions on the allowed Direct Claim and allowed Guarantee claim so that distributions on the Direct Claim and distributions on the Guarantee do not exceed in the aggregate the amount of the Direct Claim or the Guarantee, whichever is highest. Subject to the preceding sentence, distributions on a Direct Claim shall not

reduce the amount of any claim asserted under a corresponding Guarantee, and distributions under a Guarantee shall not reduce the amount of any corresponding Direct Claim.

8.4.    Official Representatives should, where possible and subject to the applicable laws of the relevant forum, endeavor to coordinate notice procedures and establish the same deadlines for the filing of claims in their respective Proceedings, and in all other matters regarding the filing, reviewing and objecting to claims.

## 9.    Special Procedures for Intercompany Claims

9.1.    The Official Representatives agree that in order to provide for the efficient and timely administration of these Proceedings, and to reduce their cost and maximize recovery for creditors, resources and time should not be spent reviewing historical intercompany accounting records to resolve claims asserted in their respective Proceedings by other Official Representatives on the basis of (i) the allocation of overhead or expense from one Debtor to another Debtor, (ii) the flow of funds from one Debtor to another Debtor, (iii) the incurrence of a liability by one Debtor on behalf of another Debtor, or (iv) a transaction between Debtors (collectively, "Intercompany Claims"); but that rather, it is in the best interests of the Debtors' creditors for Official Representatives to agree to a common set of financial accounting records that form the basis of Intercompany Claims, and that those financial records shall be *prima facie* valid unless there are elements of proof suggesting that a transaction was recorded in error, or that no such transaction ever occurred or is inconsistent with the inter-company accounting records of the relevant Debtor(s).

9.2.    Subject to the other provisions of this section 9, the Official Representatives shall endeavor to negotiate in good faith to attempt to reach a consensual resolution of any differences in their accounting of Intercompany Claims. Only to the extent that Official Representatives certify that they are unable to consensually resolve in good faith any differences in their accounting of Intercompany Claims, the Official Representatives shall resort to adjudication by the Tribunal holding jurisdiction over such claims.

9.3.    The Official Representatives shall establish a committee (the "Procedures Committee"), whose members shall be jointly appointed by the Official Representatives and, where required, the Committees, and confirmed by the Tribunals (where applicable) overseeing each Proceeding, to consensually resolve, in accordance with section 9.1 above and in good faith, any differences in the accounting of Intercompany Claims.

9.4.    The Procedures Committee shall propose the (i) procedures, (ii) accounting methodologies, and (iii) elements of proof that it intends to use in its calculation and consensual resolution of Intercompany Claims (the "Accounting Procedures"). Furthermore, if two or more Debtors were counterparties to a derivative contract in which the contractual obligations are referenced to one or more underlying assets or indices of asset values and subject to movements in the financial markets (such as contracts for the purchase, sale, or loan of securities; forward contracts; repurchase agreements; or swap agreements; and in some cases, multiple such agreements governed by a master agreement) (the "Intercompany Derivative Contracts"), and if an Intercompany Derivative Contract has been rejected, terminated, liquidated, or accelerated by any of the Debtor counterparties thereto, any damages (the

EXECUTION COPY

"Intercompany Derivatives Claims") that arise shall be measured and fixed by the Procedures Committee, pursuant to a methodology to be agreed upon by the members of the Procedures Committee (the "Derivatives Methodology").

9.5.    As soon as is practicable after the Procedures Committee has agreed upon its Accounting Procedures and Derivatives Methodology, the Official Representatives shall, to the extent required under applicable law, seek approval from their respective Tribunals or Committees (where required) for the use of the Accounting Procedures and Derivatives Methodology in their respective Proceedings in the resolution of Intercompany Claims either as a general rule or on a case by case basis.

9.6.    The Official Representatives should cooperate to submit the findings of the Procedures Committee (the "Procedures Committee Findings"), in a form substantially similar to each other, for approval by their respective Tribunals or Committees to the extent required by applicable law.

9.7.    To the extent that creditors, Committees, or other interested parties object to (i) the application of the Accounting Methodology, or (ii) the application of the Derivatives Methodology, or (iii) any of the Procedures Committee Findings, all Official Representatives should coordinate a response to such objections.

10.    **Submission of Winding-Up Plan, Plan of Reorganization or Liquidation, or Deed of Company Arrangement**

10.1.    Where applicable and permitted under the law of the Forum in a Proceeding, Official Representatives should endeavor to submit a winding-up plan, plan of reorganization or liquidation, or deed of company arrangement (a "Plan") in their respective Proceedings, or to amend a Plan once submitted (to the extent permitted by applicable law) so that each Official Representative's Plan is consistent with Plans filed by other Official Representatives, provided that nothing herein shall require an Official Representative to agree (or shall be deemed to be an agreement), and shall not constitute a waiver of such Official Representative's right to object, to the Plan of another Official Representative.

10.2.    Official Representatives should endeavor to coordinate all procedures in connection with their Plans to the extent permitted by applicable law, including, without limitation, all solicitation proceedings relating to their plans.

10.3.    No provision of this Protocol contemplates that any Official Representative is required to delay filing, prosecuting or consummating a Plan with respect to the estate administered by such Official Representative.

EXECUTION COPY

## 11.    Comity

11.1.    The parties hereto agree that each Tribunal is an independent, sovereign Tribunal, entitled to preserve its independent jurisdiction and authority with respect to matters before it and the conduct of the Official Representatives.

11.2.    Each Tribunal shall have sole jurisdiction and power over the conduct of the Proceeding in that forum; the appointment of the Official Representatives and their professionals, their retention, tenure in office, and compensation; and the hearing and determination of matters arising in that forum.

11.3.    Nothing in this Protocol is intended to interfere with the exercise of jurisdiction by each of the Tribunals in the Proceedings, or to interfere with the natural rules or ethical principles by which an Official Representative is bound according to applicable national law and professional rules.

## 12.    Amendment

12.1.    This Protocol may not be waived, amended, or modified orally or in any other way or manner (including, without limitation, pursuant to a Plan) except by a writing signed by a party to be bound and, where applicable, approved by the Tribunal with jurisdiction over that party.  Notice of any proposed amendment to this Protocol shall be provided via email by the party or parties hereto proposing such to all Official Representatives, and their respective Committees.

12.2.    Additional parties may be added to this Protocol at any time after the effective date of this Protocol by means of an amendment pursuant to section 12.1.

## 13.    Adherence

13.1.    Notwithstanding the provisions of section 12, nothing in this Protocol shall preclude Official Representatives who are not parties hereto from adhering to the terms of this Protocol.

## 14.    Execution and Application

14.1.    This Protocol shall inure to the benefit of the parties hereto and their respective successors, assigns, representatives, heirs, executors, administrators, trustee, receivers, custodians, or curators, as the case may be, to the extent permitted under applicable law. Nothing herein shall create a right for any entity that is not a party to the Protocol, and a party hereto shall not be bound by this Protocol in its dealings with any entity that is not a party hereto.

14.2.    Any request for the entry of an order which is contrary to the provisions of this Protocol must be made on notice to all Official Representatives and their respective Committees by the proponent of the order.

14.3.    This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same

instrument, and may be signed by facsimile signature, which shall be deemed to constitute an original signature.

**14.4.**    A Tribunal having jurisdiction over an Official Representative shall retain jurisdiction over such Official Representative for the purpose of approving any amendments or modifications thereto in accordance with applicable laws; provided, however, in no event shall this or any other provision in this Protocol be deemed to create any liability on the part of an Official Representative for any reason.

**14.5.**    Each Official Representative shall exercise good faith efforts to take such actions and execute such documents as may be necessary and appropriate to implement and effectuate this Protocol.

**14.6.**    This Protocol shall be deemed effective with respect to each Official Representative and the estate administered thereby upon execution by all Official Representatives whose signature blocks appear below, and its approval by the Tribunal with jurisdiction over such estates or the relevant Committee (or similar body), where such approval is required under applicable law.

**14.7.**    This Protocol shall remain in effect with respect to any Official Representative who is a party hereto and the estate administered thereby until the earlier of (i) the conclusion of that Official Representative's Proceeding as respectively defined by applicable law; or (ii) where applicable, and after providing notice to the parties hereto, entry of an order (or similar action) terminating this Protocol by the Tribunal having jurisdiction over such Proceeding, or approval of such termination by the relevant Committee(s) (or similar body) where such approval is required under applicable law, upon a determination by such Tribunal or Committee(s) that the Protocol has achieved all of its objectives as to that Official Representative's Proceeding.

*[signature pages follow]*

EXECUTION COPY

IN WITNESS WHEREOF, the parties hereto have caused this Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

Dated:  As of May 12, 2009

**LEHMAN BROTHERS HOLDINGS INC.,**
**on its own behalf and on behalf of its affiliates that**
**are debtors in cases pending under chapter 11 of**
**Title 11 of the United States Code.**

By:

Name:  Daniel Ehrmann
Title:  Vice President

_____

Rutger Shimmelpenninck in his capacity as bankruptcy trustee ("curator") for **LEHMAN BROTHERS TREASURY CO. B.V.**

_____

Dr. Michael C. Frege in his capacity as insolvency administraton ("Insolvenzverwalter") of **LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

**IN WITNESS WHEREOF**, the parties hereto have caused this Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

Dated:  As of May 12, 2009

**LEHMAN BROTHERS HOLDINGS INC.,**
**on its own behalf and on behalf of its affiliates that**
**are debtors in cases pending under chapter 11 of**
**Title 11 of the United States Code.**

By: _____

      Name:  Daniel Ehrmann
      Title:  Vice President

_____

Rutger Shimmelpenninck in his capacity as bankruptcy trustee ("curator") for **LEHMAN BROTHERS TREASURY CO. B.V.**

_____

Dr. Michael C. Frege in his capacity as insolvency administraton ("Insolvenzverwalter") of **LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

**EXECUTION COPY**

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS INVESTMENTS PTE. LTD. (IN CREDITORS'
VOLUNTARY LIQUIDATION)

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS FINANCE ASIA PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS COMMODITIES PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS PACIFIC HOLDINGS PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)

_____
Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of SAIL
INVESTOR PTE. LTD. (IN CREDITORS' VOLUNTARY
LIQUIDATION)

**EXECUTION COPY**

Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS ASIA PACIFIC (SINGAPORE) PTE. LTD.
(IN CREDITORS' VOLUNTARY LIQUIDATION)

**Executed** for and on behalf of LEHMAN BROTHERS
AUSTRALIA GRANICA PTY LIMITED (Administrators
Appointed) by **Neil Singleton**, as one of the joint and
several administrators

**Executed** for and on behalf of LEHMAN BROTHERS
REAL ESTATE AUSTRALIA COMMERCIAL PTY
LIMITED (Administrators Appointed) by **Neil
Singleton**, as joint and several administrators

**Executed** for and on behalf of LEHMAN BROTHERS
AUSTRALIA REAL ESTATE HOLDINGS PTY LIMITED
(Administrators Appointed) by **Neil Singleton**, as joint
and several administrators

**EXECUTION COPY**

_____

Chay Fook Yuen for himself, Yap Cheng Ghee and Tay
Puay Cheng, as Joint and Several Liquidators, without
personal liability, of and for and on behalf of LEHMAN
BROTHERS ASIA PACIFIC HOLDINGS PTE. LTD. (IN
CREDITORS' VOLUNTARY LIQUIDATION)

_____

**Executed** for and on behalf of LEHMAN BROTHERS
AUSTRALIA GRANICA PTY LIMITED (Administrators
Appointed) by **Neil Singleton**, as one of the joint and
several administrators

_____

**Executed** for and on behalf of LEHMAN BROTHERS
REAL ESTATE AUSTRALIA COMMERCIAL PTY
LIMITED (Administrators Appointed) by **Neil
Singleton**, as joint and several administrators

_____

**Executed** for and on behalf of LEHMAN BROTHERS
AUSTRALIA REAL ESTATE HOLDINGS PTY LIMITED
(Administrators Appointed) by **Neil Singleton**, as joint
and several administrators

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA FINANCE PTY LIMITED (Administrators
Appointed) by Neil Singleton, as joint and several
administrators

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA HOLDINGS PTY LIMITED (Administrators
Appointed) by Neil Singleton, as one of the joint and
several administrators

Executed for and on behalf of LEHMAN BROTHERS
AUSTRALIA LIMITED (Administrators Appointed) by
Neil Singleton, as one of the joint and several
administrators

Executed for and on behalf of LBHV 1 PTY LIMITED
(Administrators Appointed) by Neil Singleton, as one
of the joint and several administrators

**EXECUTION COPY**

_____
Executed for and on behalf of **HV 1 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____
Executed for and on behalf of **HV 2 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
HOLDINGS LIMITED (In Liquidation)**

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
LIMITED (In Liquidation)**

EXECUTION COPY

_____
**Executed** for and on behalf of **HV 1 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____
**Executed** for and on behalf of **HV 2 PTY LIMITED**
(Administrators Appointed) by **Neil Singleton**, as one
of the joint and several administrators

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
HOLDINGS LIMITED (In Liquidation)**

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of **LEHMAN BROTHERS ASIA
LIMITED (In Liquidation)**

EXECUTION COPY

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS FUTURES
ASIA LIMITED (In Liquidation)

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS SECURITIES
ASIA LIMITED (In Liquidation)

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LBQ HONG KONG FUNDING
LIMITED (In Liquidation)

_____

Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS NOMINEES
(H.K.) LIMITED (In Liquidation)

**EXECUTION COPY**

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS ASIA
CAPITAL COMPANY (In Liquidation)

_____
Edward Simon Middleton as one of the Joint and
Several Liquidators, without personal liability, of and
for and on behalf of LEHMAN BROTHERS
COMMERCIAL CORPORATION ASIA LIMITED (In
Liquidation)

# Schedule A

## Guidelines

**A copy of the Guidelines is attached to the Motion as Exhibit C.**

# EXHIBIT C

## Guidelines

THE AMERICAN LAW INSTITUTE

in association with

THE INTERNATIONAL INSOLVENCY INSTITUTE

**Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases**

*As Adopted and Promulgated in Transnational Insolvency:
Principles of Cooperation Among the NAFTA Countries*

BY

THE AMERICAN LAW INSTITUTE
At Washington, D.C., May, 2000

*And as Adopted by*

THE INTERNATIONAL INSOLVENCY INSTITUTE
At New York, June, 2001





The American Law Institute
4025 Chestnut Street
Philadelphia, Pennsylvania 19104-3099
Telephone: (215) 243-1600
Telecopier: (215) 243-1636
E-mail: ali@ali.org
Website: http://www.ali.org

The International Insolvency Institute
Scotia Plaza, Suite 2100
40 King Street West
Toronto, Ontario  M5H 3C2
Telephone:  (416) 869-5757
Telecopier:  (416) 360-8877
Email:  info@iiiglobal.org
Website: http://www.iiiglobal.org

## FOREWORD

In May of 2000 The American Law Institute gave its final approval to the work of the ALI's Transnational Insolvency Project. This consisted of the four volumes eventually published, after a period of delay required by the need to take into account a newly enacted Mexican Bankruptcy Code, in 2003 under the title of *Transnational Insolvency: Cooperation Among the NAFTA Countries*. These volumes included both the first phase of the project, separate Statements of the bankruptcy laws of Canada, Mexico, and the United States, and the project's culminating phase, a volume comprising *Principles of Cooperation Among the NAFTA Countries*. All reflected the joint input of teams of Reporters and Advisers from each of the three NAFTA countries and a fully transnational perspective. Published by Juris Publishing, Inc., they can be ordered on the ALI website (www.ali.org).

A byproduct of our work on the Principles volume, these *Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases* appeared originally as Appendix B of that volume and were approved by the ALI in 2000 along with the rest of the volume. But the *Guidelines* have played a vital and influential role apart from the *Principles*, having been widely translated and distributed, cited and applied by courts, and independently approved by both the International Insolvency Institute and the Insolvency Institute of Canada. Although they were initially developed in the context of a project arrived at improving cooperation among bankruptcy courts within the NAFTA countries, their acceptance by the III, whose members include leaders of the insolvency bar from more than 40 countries, suggests a pertinence and applicability that extends far beyond the ambit of NAFTA. Indeed, there appears to be no reason to restrict the *Guidelines* to insolvency cases; they should prove useful whenever sensible and coherent standards for cooperation among courts involved in overlapping litigation are called for. See, e.g., American Law Institute, International Jurisdiction and Judgments Project §12(e) (Tentative Draft, 2003).

The American Law Institute expresses its gratitude to the International Insolvency Institute for its continuing efforts to publicize the *Guidelines* and to make them more widely known to judges and lawyers around the world; to III Chair E. Bruce Leonard of Toronto, who as Canadian Co-Reporter for the Transnational Insolvency Project was the principal drafter of the Guidelines in English and has been primarily responsible for arranging and overseeing their translation into the various other languages in which they now appear; and to the translators themselves, whose work will make the *Guidelines* much more universally accessible. We hope that this greater availability, in these new English and bilingual editions, will help to foster better communication, and thus better understanding, among the diverse courts and legal systems throughout our increasingly globalized world.

LANCE LIEBMAN
*Director*
*The American Law Institute*

January 30, 2004

## International Insolvency Institute

## Introduction

The International Insolvency Institute, a world-wide association of leading insolvency professionals, judges, academics and regulators, is pleased to recommend the adoption and the application in cross-border and multinational cases of The American Law Institute's *Guidelines for Court-to-Court Communications in Cross-Border Cases*. The *Guidelines* were reviewed and studied by a Committee of the III and were unanimously approved by its membership at the III's Annual General Meeting and Conference in New York in June 2001.

Since their approval by the III, the *Guidelines* have been applied in several cross-border cases with considerable success in achieving the coordination that is so necessary to preserve values for all of the creditors that are involved in international cases. The III recommends without qualification that insolvency professionals and judges adopt the *Guidelines* at the earliest possible stage of a cross-border case so that they will be in place whenever there is a need for the courts involved to communicate with each other, e.g., wherever the actions of one court could impact on issues that are before the other court.

Although the *Guidelines* were developed in an insolvency context, it has been noted by litigation professionals and judges that the *Guidelines* would be equally valuable and constructive in any international case where two or more courts are involved. In fact, in multijurisdictional litigation, the positive effect of the *Guidelines* would be even greater in cases where several courts are involved. It is important to appreciate that the *Guidelines* require that all domestic practices and procedures be complied with and that the *Guidelines* do not alter or affect the substantive rights of the parties or give any advantage to any party over any other party.

The International Insolvency Institute expresses appreciation to its members who have arranged for the translation of the *Guidelines* into French, German, Italian, Korean, Japanese, Chinese, Portuguese, Russian and Swedish and extends its appreciation to The American Law Institute for the translation into Spanish. The III also expresses its appreciation to The American Law Institute, the American College of Bankruptcy, and the Ontario Superior Court of Justice Commercial List Committee for their kind and generous financial support in enabling the publication and dissemination of the *Guidelines* in bilingual versions in major countries around the world.

Readers who become aware of cases in which the *Guidelines* have been applied are highly encouraged to provide the details of those cases to the III (fax: 416-360-8877; email: *info@iiiglobal.org*.) so that everyone can benefit from the experience and positive

results that flow from the adoption and application of the *Guidelines*. The continuing progress of the *Guidelines* and the cases in which the *Guidelines* have been applied will be maintained on the III 's website at *www.iiiglobal.org*.

The III and all of its members are very pleased to have been a part of the development and success of the *Guidelines* and commend The American Law Institute for its vision in developing the *Guidelines* and in supporting their worldwide circulation to insolvency professionals, judges, academics, and regulators. The use of the *Guidelines* in international cases will change international insolvencies and reorganizations for the better forever and the insolvency community owes a considerable debt to The American Law Institute for the inspiration and vision that has made this possible.

E. Bruce Leonard
Chairman
The International Insolvency Institute

Toronto, Ontario
March, 2004

### Judicial Preface

We believe that the advantages of co-operation and co-ordination between Courts is clearly advantageous to all of the stakeholders who are involved in insolvency and reorganization cases that extend beyond the boundaries of one country.  The benefit of communications between Courts in international proceedings has been recognized by the United Nations through the *Model Law on Cross-Border Insolvency* developed by the United Nations Commission on International Trade Law and approved by the General Assembly of the United Nations in 1997.   The advantages of communications have also been recognized in the European Union Regulation on Insolvency Proceedings which became effective for the Member States of the European Union in 2002.

The *Guidelines for Court-to-Court Communications in Cross-Border Cases* were developed in the American Law Institute's Transnational Insolvency Project involving the NAFTA countries of Mexico, the United States and Canada.  The *Guidelines* have been approved by the membership of the ALI and by the International Insolvency Institute whose membership covers over 40 countries from around the world.  We appreciate that every country is unique and distinctive and that every country has its own proud legal traditions and concepts.  The *Guidelines* are not intended to alter or change the domestic rules or procedures that are applicable in any country and are not intended to affect or curtail the substantive rights of any party in proceedings before the Courts.  The *Guidelines* are intended to encourage and facilitate co-operation in international cases while observing all applicable rules and procedures of the Courts that are respectively involved.

The *Guidelines* may be modified to meet either the procedural law of the jurisdiction in question or the particular circumstances in individual cases so as to achieve the greatest level of co-operation possible between the Courts in dealing with a multinational insolvency or liquidation.  The *Guidelines,* however, are not restricted to insolvency cases and may be of assistance in dealing with non-insolvency cases that involve more than one country.  Several of us have already used the *Guidelines* in cross-border cases and would encourage stakeholders and counsel in international cases to consider the advantages that could be achieved in their cases from the application and implementation of the *Guidelines.*

Mr. Justice David Baragwanath
High Court of New Zealand
Auckland, New Zealand

Chief Justice Donald I. Brenner
Supreme Court of British Columbia
Vancouver

Hon. Sidney B. Brooks
United States Bankruptcy Court
District of Colorado
Denver

Hon. Charles G. Case, II
United States Bankruptcy Court
District of Arizona
Phoenix

Mr. Justice Miodrag Dordević
Supreme Court of Slovenia
Ljubljana

Hon. James L. Garrity, Jr.
United States Bankruptcy Court
Southern District of New York (Ret'd)
Shearman & Sterling
New York

Mr. Justice Paul R. Heath
High Court of New Zealand
Auckland, New Zealand

Chief Judge Burton R. Lifland
United States Bankruptcy Appellate
Panel for the Second Circuit
New York

Hon. George Paine II
United States Bankruptcy Court
District of Tennessee
Nashville

Mr. Justice Adolfo A.N. Rouillon
Court of Appeal
Rosario, Argentina

Mr. Justice Wisit Wisitsora – At
Business Reorganization Office
Government of Thailand
Bangkok

Mr. Justice J.M. Farley
Ontario Superior Court of Justice
Toronto

Hon. Allan L. Gropper
Southern District of New York
United States Bankruptcy Court
New York

Hon. Hyungdu Kim
Supreme Court of Korea
Seoul

Mr. Justice Gavin Lightman
Royal Courts of Justice
London

Hon. Chiyong Rim
District Court
Western District of Seoul
Seoul, Korea

Hon. Shinjiro Takagi
Supreme Court of Japan (Ret'd)
Industrial Revitalization Corporation of Japan
Tokyo

Mr. Justice R.H. Zulman
Supreme Court of Appeal of South Africa
Parklands

# Guidelines
## Applicable to Court-to-Court Communications
### in Cross-Border Cases

*Introduction:*

One of the most essential elements of cooperation in cross-border cases is communication among the administrating authorities of the countries involved. Because of the importance of the courts in insolvency and reorganization proceedings, it is even more essential that the supervising courts be able to coordinate their activities to assure the maximum available benefit for the stakeholders of financially troubled enterprises.

These Guidelines are intended to enhance coordination and harmonization of insolvency proceedings that involve more than one country through communications among the jurisdictions involved. Communications by judges directly with judges or administrators in a foreign country, however, raise issues of credibility and proper procedures. The context alone is likely to create concern in litigants unless the process is transparent and clearly fair. Thus, communication among courts in cross-border cases is both more important and more sensitive than in domestic cases. These Guidelines encourage such communications while channeling them through transparent procedures. The Guidelines are meant to permit rapid cooperation in a developing insolvency case while ensuring due process to all concerned.

A Court intending to employ the Guidelines — in whole or part, with or without modifications — should adopt them formally before applying them. A Court may wish to make its adoption of the Guidelines contingent upon, or temporary until, their adoption by other courts concerned in the matter. The adopting Court may want to make adoption or continuance conditional upon adoption of the Guidelines by the other Court in a substantially similar form, to ensure that judges, counsel, and parties are not subject to different standards of conduct.

The Guidelines should be adopted following such notice to the parties and counsel as would be given under local procedures with regard to any important procedural decision under similar circumstances. If communication with other courts is urgently needed, the local procedures, including notice requirements, that are used in urgent or emergency situations should be employed, including, if appropriate, an initial period of effectiveness, followed by further

consideration of the Guidelines at a later time. Questions about the parties entitled to such notice (for example, all parties or representative parties or representative counsel) and the nature of the court's consideration of any objections (for example, with or without a hearing) are governed by the Rules of Procedure in each jurisdiction and are not addressed in the Guidelines.

The Guidelines are not meant to be static, but are meant to be adapted and modified to fit the circumstances of individual cases and to change and evolve as the international insolvency community gains experience from working with them. They are to apply only in a manner that is consistent with local procedures and local ethical requirements. They do not address the details of notice and procedure that depend upon the law and practice in each jurisdiction. However, the Guidelines represent approaches that are likely to be highly useful in achieving efficient and just resolutions of cross-border insolvency issues. Their use, with such modifications and under such circumstances as may be appropriate in a particular case, is therefore recommended.

## Guideline 1

Except in circumstances of urgency, prior to a communication with another Court, the Court should be satisfied that such a communication is consistent with all applicable Rules of Procedure in its country. Where a Court intends to apply these Guidelines (in whole or in part and with or without modifications), the Guidelines to be employed should, wherever possible, be formally adopted before they are applied. Coordination of Guidelines between courts is desirable and officials of both courts may communicate in accordance with Guideline 8(d) with regard to the application and implementation of the Guidelines.

## Guideline 2

A Court may communicate with another Court in connection with matters relating to proceedings before it for the purposes of coordinating and harmonizing proceedings before it with those in the other jurisdiction.

## Guideline 3

A Court may communicate with an Insolvency Administrator in another jurisdiction or an authorized Representative of the Court in that jurisdiction in connection with the coordination and harmonization of the proceedings before it with the proceedings in the other jurisdiction.

## Guideline 4

A Court may permit a duly authorized Insolvency Administrator to communicate with a foreign Court directly, subject to the approval of the foreign Court, or through an Insolvency Administrator in the other jurisdiction or through an authorized Representative of the foreign Court on such terms as the Court considers appropriate.

## Guideline 5

A Court may receive communications from a foreign Court or from an authorized Representative of the foreign Court or from a foreign Insolvency Administrator and should respond directly if the communication is from a foreign Court (subject to Guideline 7 in the case of two-way communications) and may respond directly or through an authorized Representative of the Court or through a duly authorized Insolvency Administrator if the communication is from a foreign Insolvency Administrator, subject to local rules concerning ex parte communications.

## Guideline 6

Communications from a Court to another Court may take place by or through the Court:

(a)     Sending or transmitting copies of formal orders, judgments, opinions, reasons for decision, endorsements, transcripts of proceedings, or other documents directly to the other Court and providing advance notice to counsel for affected parties in such manner as the Court considers appropriate;

(b)     Directing counsel or a foreign or domestic Insolvency Administrator to transmit or deliver copies of documents, pleadings, affidavits, factums, briefs, or other documents that are filed or to be filed with the Court to the other Court in such fashion as may be appropriate and providing advance notice to counsel for affected parties in such manner as the Court considers appropriate;

(c)     Participating in two-way communications with the other Court by telephone or video conference call or other electronic means, in which case Guideline 7 should apply.

## Guideline 7

In the event of communications between the Courts in accordance with Guidelines 2 and 5 by means of telephone or video conference call or other electronic means, unless otherwise directed by either of the two Courts:

(a)    Counsel for all affected parties should be entitled to participate in person during the communication and advance notice of the communication should be given to all parties in accordance with the Rules of Procedure applicable in each Court;

(b)    The communication between the Courts should be recorded and may be transcribed. A written transcript may be prepared from a recording of the communication which, with the approval of both Courts, should be treated as an official transcript of the communication;

(c)    Copies of any recording of the communication, of any transcript of the communication prepared pursuant to any Direction of either Court, and of any official transcript prepared from a recording should be filed as part of the record in the proceedings and made available to counsel for all parties in both Courts subject to such Directions as to confidentiality as the Courts may consider appropriate; and

(d)    The time and place for communications between the Courts should be to the satisfaction of both Courts. Personnel other than Judges in each Court may communicate fully with each other to establish appropriate arrangements for the communication without the necessity for participation by counsel unless otherwise ordered by either of the Courts.

## Guideline 8

In the event of communications between the Court and an authorized Representative of the foreign Court or a foreign Insolvency Administrator in accordance with Guidelines 3 and 5 by means of telephone or video conference call or other electronic means, unless otherwise directed by the Court:

(a)    Counsel for all affected parties should be entitled to participate in person during the communication and advance notice of the

communication should be given to all parties in accordance with the Rules of Procedure applicable in each Court;

(b)    The communication should be recorded and may be transcribed. A written transcript may be prepared from a recording of the communication which, with the approval of the Court, can be treated as an official transcript of the communication;

(c)    Copies of any recording of the communication, of any transcript of the communication prepared pursuant to any Direction of the Court, and of any official transcript prepared from a recording should be filed as part of the record in the proceedings and made available to the other Court and to counsel for all parties in both Courts subject to such Directions as to confidentiality as the Court may consider appropriate; and

(d)    The time and place for the communication should be to the satisfaction of the Court. Personnel of the Court other than Judges may communicate fully with the authorized Representative of the foreign Court or the foreign Insolvency Administrator to establish appropriate arrangements for the communication without the necessity for participation by counsel unless otherwise ordered by the Court.

### Guideline 9

A Court may conduct a joint hearing with another Court. In connection with any such joint hearing, the following should apply, unless otherwise ordered or unless otherwise provided in any previously approved Protocol applicable to such joint hearing:

(a)    Each Court should be able to simultaneously hear the proceedings in the other Court.

(b)    Evidentiary or written materials filed or to be filed in one Court should, in accordance with the Directions of that Court, be transmitted to the other Court or made available electronically in a publicly accessible system in advance of the hearing. Transmittal of such material to the other Court or its public availability in an electronic system should not subject the party filing the material in one Court to the jurisdiction of the other Court.

(c)    Submissions or applications by the representative of any party should be made only to the Court in which the representative making the submissions is appearing unless the representative is specifically given permission by the other Court to make submissions to it.

(d)    Subject to Guideline 7(b), the Court should be entitled to communicate with the other Court in advance of a joint hearing, with or without counsel being present, to establish Guidelines for the orderly making of submissions and rendering of decisions by the Courts, and to coordinate and resolve any procedural, administrative, or preliminary matters relating to the joint hearing.

(e)    Subject to Guideline 7(b), the Court, subsequent to the joint hearing, should be entitled to communicate with the other Court, with or without counsel present, for the purpose of determining whether coordinated orders could be made by both Courts and to coordinate and resolve any procedural or nonsubstantive matters relating to the joint hearing.

## Guideline 10

The Court should, except upon proper objection on valid grounds and then only to the extent of such objection, recognize and accept as authentic the provisions of statutes, statutory or administrative regulations, and rules of court of general application applicable to the proceedings in the other jurisdiction without the need for further proof or exemplification thereof.

## Guideline 11

The Court should, except upon proper objection on valid grounds and then only to the extent of such objection, accept that Orders made in the proceedings in the other jurisdiction were duly and properly made or entered on or about their respective dates and accept that such Orders require no further proof or exemplification for purposes of the proceedings before it, subject to all such proper reservations as in the opinion of the Court are appropriate regarding proceedings by way of appeal or review that are actually pending in respect of any such Orders.

## Guideline 12

The Court may coordinate proceedings before it with proceedings in another jurisdiction by establishing a Service List that may include parties that are entitled to receive notice of proceedings before the Court in the other jurisdiction ("Non-Resident Parties"). All notices, applications, motions, and other materials served for purposes of the proceedings before the Court may be ordered to also be provided to or served on the Non-Resident Parties by making such materials available electronically in a publicly accessible system or by facsimile transmission, certified or registered mail or delivery by courier, or in such other manner as may be directed by the Court in accordance with the procedures applicable in the Court.

## Guideline 13

The Court may issue an Order or issue Directions permitting the foreign Insolvency Administrator or a representative of creditors in the proceedings in the other jurisdiction or an authorized Representative of the Court in the other jurisdiction to appear and be heard by the Court without thereby becoming subject to the jurisdiction of the Court.

## Guideline 14

The Court may direct that any stay of proceedings affecting the parties before it shall, subject to further order of the Court, not apply to applications or motions brought by such parties before the other Court or that relief be granted to permit such parties to bring such applications or motions before the other Court on such terms and conditions as it considers appropriate. Court-to-Court communications in accordance with Guidelines 6 and 7 hereof may take place if an application or motion brought before the Court affects or might affect issues or proceedings in the Court in the other jurisdiction.

## Guideline 15

A Court may communicate with a Court in another jurisdiction or with an authorized Representative of such Court in the manner prescribed by these Guidelines for purposes of coordinating and harmonizing proceedings before it with proceedings in the other jurisdiction regardless of the form of the proceedings before it or before the other Court wherever there is commonality among the issues and/or the parties in the proceedings. The Court should, absent

compelling reasons to the contrary, so communicate with the Court in the other jurisdiction where the interests of justice so require.

### Guideline 16

Directions issued by the Court under these Guidelines are subject to such amendments, modifications, and extensions as may be considered appropriate by the Court for the purposes described above and to reflect the changes and developments from time to time in the proceedings before it and before the other Court. Any Directions may be supplemented, modified, and restated from time to time and such modifications, amendments, and restatements should become effective upon being accepted by both Courts. If either Court intends to supplement, change, or abrogate Directions issued under these Guidelines in the absence of joint approval by both Courts, the Court should give the other Courts involved reasonable notice of its intention to do so.

### Guideline 17

Arrangements contemplated under these Guidelines do not constitute a compromise or waiver by the Court of any powers, responsibilities, or authority and do not constitute a substantive determination of any matter in controversy before the Court or before the other Court nor a waiver by any of the parties of any of their substantive rights and claims or a diminution of the effect of any of the Orders made by the Court or the other Court.

©The American Law Institute 2003

The *Guidelines for Court-to-Court Communications in Cross-Border Cases* were developed by The American Law Institute during and as part of its *Transnational Insolvency Project* and the use of the *Guidelines* in cross-border cases is specifically permitted and encouraged.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The text of the *Guidelines Court-to-Court Communications in Cross-Border Cases* is available in English and several other languages including Chinese, French, German, Italian, Japanese, Korean, Portuguese, Russian, Spanish and Swedish on the website of the International Insolvency Institute at http://www.iiiglobal.org/international/guidelines.html.

Insert A

This translation has been made, published and distributed with the authorization of The American Law Institute. The American Law Institute and the International Insolvency Institute express their appreciation to _____ [Please insert name of translator] for creating and providing this translation.