**Hearing Date and Time: May 28, 2009 at 10:00 a.m. (Eastern Time)**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Ralph I. Miller
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                    :
                    Debtors.        :    (Jointly Administered)
                                    :
                                    :
------------------------------------------------------------------x
```

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER**
**PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR**
**APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE**
**BREAK-UP FEE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing ("LBSF") and its affiliated debtors, including

Lehman Brothers Holdings Inc. ("LBHI," and collectively the "Debtors"), in the above-

referenced chapter 11 cases, as debtors and debtors in possession, file this reply brief in

support of their motion pursuant to sections 363 and 365 of the Bankruptcy Code for

approval of the Letter Agreement among Deutsche Bank AG, London Branch (the

"Assignee") and certain Debtors (the "Letter Agreement"), including LBSF's obligation

thereunder to pay a break-up fee in certain circumstances (the "Motion"), and

respectfully represent:

## INTRODUCTION[1]

The Letter Agreement and Break-Up Fee at issue in this Motion are

critical components in a multi-step process through which LBSF's estate will, if finalized,

realize hundreds of millions of dollars.  Approval of the Letter Agreement, including the

Break-Up Fee, is an essential prerequisite to the estate preserving that value.  Only

creditors of the estate have a legitimate interest in whether or not the Letter Agreement

and Break Up Fee are approved.  Here, the Official Committee of Unsecured Creditors

has taken an active role in LBSF's decision to enter into the Letter Agreement and fully

supports the relief requested by the Motion, as should all other creditors of the estate.

The support by the creditors and the absence of any objections on behalf of genuine

creditors demonstrates the propriety of the relief requested in the Motion.

Nonetheless, Libra CDO Limited ("Libra") and Societe Generale, New

York Branch ("SG") have objected to the Motion.[2]  They do not raise these objections as

creditors of LBSF but rather as counterparties in a related adversary proceeding.  These

two parties have interests diametrically opposed to the estate and its creditors.  If it is

determined that the Credit Default Swap Agreement is not terminated, LBSF stands to

realize hundreds of millions of dollars and Libra and SG would be responsible for paying

---

[1]  Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them herein.

[2]  The objection by Libra and SG made several mischaracterizations regarding the terms of the Letter Agreement.  LBSF will address certain of these issues herein.  By not responding to every factual point raised by Libra and SG in their objection, LBSF does not waive and expressly reserves the right to clarify other inaccuracies at the hearing on the Motion.

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

such funds to the estate. LBSF entered into the Letter Agreement and filed the Motion after settlement discussions with Libra and SG on this issue failed to reach a settlement. Therefore, the position of Libra and SG is nothing more than that of a losing bidder, and such losing bidders are routinely precluded from challenging the debtor's entry into a transaction with another party. Libra and SG have no standing to object to the Motion, which simply seeks approval of the Letter Agreement and its Break-Up Fee.

Critically, the Motion will not resolve the propriety of the purported termination of the Credit Default Swap Agreement. Instead, this Court's approval of the Letter Agreement simply insures that there will be an assignee ready and waiting to assume LBSF's rights under the Credit Default Swap Agreement upon completion of a related adversary proceeding (09-ap-1177) (the "Adversary Proceeding").[3] LBSF is not asking the Court to enter an order regarding the ultimate assignment until the Court has resolved the propriety of the termination in the Adversary Proceeding. While resolution of the Adversary Proceeding and the propriety of the contemplated assignment are, ultimately, necessary steps in this multi-step process, they are collateral issues to this Motion. The only issue before the Court now is the propriety of the Letter Agreement and the Break-Up Fee, and this issue does not concern Libra or SG.

Moreover, the objection fails on the merits. The Motion plainly is ripe because LBSF seeks to enter into a transaction with a third party, which is subject to this Court's approval for the agreement to be effective. LBSF determined in the exercise of its business judgment that it was critical to enter into the Letter Agreement in order to

---

[3] Immediately after the filing by the Debtors of the Adversary Proceeding , Libra and SG filed a mirror-image adversary proceeding (09-ap-1178). To the extent the parties cannot resolve the issue amicably, LBSF intends to seek the dismissal, stay, or consolidation of this mirror-image complaint.

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

3

secure the commitment of an assignee and preserve the value to the estate.  Any delay in
entering into an assignment threatens LBSF's ability to realize value from the transaction
through an assignment, which is a right of LBSF's that is specifically preserved under the
contracts at issue.  Indeed, in its Complaint in a related adversary proceeding, SG
contends that it will not be liable to contribute to any potential termination payment owed
by Libra to LBSF if the Credit Default Swap Agreement is terminated because of a
default by LBSF.  (*See* Compl. in Adv. Proc. 09-01178, ¶ 5.)  LBSF, thus, seeks to secure
the ability to quickly assign the Credit Default Swap Agreement to a party that has
sufficient credit ratings to obviate potential disputes over the rights and obligations of
Libra and SG and restore the transaction to its intended economics.  SG's contention that
it will not be obligated to pay any money in the event that the Credit Default Swap
Agreement is terminated belies SG's contention that LBSF has no need to enter into the
Letter Agreement at this time.

Additionally, contrary to Libra's and SG's arguments, there is no need for
discovery with respect to the dollar value of the assignment, and no risk of estate
resources being depleted conducting discovery.  Because no genuine creditors of the
estate have objected to the Motion, discovery on this issue is not appropriate.  Libra and
SG cannot claim to have standing to take discovery with respect to the value of the
assignment because any such value will inure to the estate and not to them.

Further, Libra and SG are incorrect that the Break-Up Fee has not added
value to the bidding process.  Like most break-up fees that are routinely approved in the
bankruptcy context, the Break-Up Fee secured an important first bid.  LBSF is able to use
this bid with other parties that may be interested in providing their own bids or otherwise

negotiating with LBSF with respect to the Credit Default Swap Agreement. Indeed, after the Motion was filed LBSF received inquiries from a party interested in being an assignee. Thus, the Letter Agreement and its Break-Up Fee already have generated value for the estate, and the Assignee has the right to the potential of a Break-Up Fee to compensate it for the time and resources spent and the opportunities lost while these issues are being resolved.

## ARGUMENT AND AUTHORITIES

### I.    Libra and SG Essentially Are Competing Bidders and Lack Standing to Object to LBSF's Entry into the Letter Agreement.

Libra and SG lack standing to object to the Motion because they are not raising their objection as creditors, but rather as parties that stand to benefit at the estate's expense if the Motion is denied. Libra is not even a creditor of the estate and is not a party in interest under the Bankruptcy Code. *See* 11 U.S.C. § 1109(b). Moreover, while SG claims to be a creditor of the estate, its objection plainly is driven by its position as a counterparty in the Adversary Proceeding that potentially owes the estate hundreds of millions of dollars by virtue of its obligation to fund Libra's obligations to the estate. At least one court has found that a creditor lacked standing when it did not raise issues relating to its position as a creditor. In *Matter of El Paso Refinery, LP*, the Fifth Circuit rejected a creditor's argument that it had standing to file a motion where the motion "did not really seek to assert its rights as creditor." 37 F.3d 230, 234 (5th Cir. 1994). The court found the assertion of standing under 11 USC § 1109(b) to be "specious and disingenuous" because the creditor did not argue that "its position as creditor might be compromised, i.e., that funds expended [by the debtor] would jeopardize [the creditor's]

DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE

5

chance of being paid." *Id.* Likewise, SG is not objecting because its position as creditor

will be enhanced if the Motion is denied. Instead, it apparently is raising an objection to

obtain leverage in future settlement negotiations with the estate with respect to the

propriety of the termination of the Credit Default Swap Agreement.

Courts' routinely deny such "failed bidders" standing to object, reasoning

that such objections serve only to benefit the failed bidders at the expense of the estate.

*See In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 739, 742 (Bankr. N.D. Ala. 2002)

("There are numerous authorities which hold that a non-creditor, whose only connection

with a bankruptcy case is that the party was an unsuccessful bidder at a bankruptcy sale,

lacks standing to challenge the right of other bidders to consummate the sale."); *In re*

*Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 89 and n.5 (Bankr. W.D. Tex. 2000) ("[I]t is

especially important that only parties with standing be able to object to bankruptcy sales,

for few things could more thoroughly undermine the sale process in bankruptcy than the

prospect of strangers to the transaction having the ability to file papers to interfere or

frustrate the sales process. . . . All such persons would love nothing better than the

leverage that can come from litigation delay and expense, so barring such parties from

being able to upset sales with frivolous pleadings designed to obtain such leverage is

essential."). The Court should similarly overrule the objection by Libra and SG because

they lack standing.

## II.    LBSF and its Creditors Should Not Be Forced to Risk Delay in Approving the Letter Agreement.

Even if Libra and SG had standing to assert their objections, and they do

not, their objection is without merit. First, Libra and SG argue that approval of the Letter

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

6

Agreement is not ripe because the obligations under the agreement are contingent upon later events.  This argument is misguided because LBSF determined – and its creditors agree – that it needs to enter into the Letter Agreement to secure the commitment of the Assignee.  Unless there is an Assignee in place, LBSF may not be able to obtain the benefits of the Credit Default Swap Agreement without further litigation over Events of Defaults under that agreement.  On the other hand, if LBSF has an assignee ready and the agreement can continue, Libra and SG will have no argument to avoid paying the new assignee hundreds of millions of dollars, which value will flow indirectly to LBSF.  Thus, LBSF has strong justifications for entering into the Letter Agreement and seeking its immediate approval.

The approval of the Letter Agreement and its Break-Up Fee within forty-five days is an express condition of the overall transaction, and the Assignee has the right to terminate the transaction if such approval is not achieved.  (See Letter Agmt. at § 1.) The Letter Agreement also requires the approval of this Court for it to be effective.  If LBSF does not get that approval, the Assignee could terminate the transaction.  Thus, there is an immediate need for entry of an order approving the Letter Agreement.

Libra and SG argue that the issue is not ripe because there is a possibility that the assignment may never take place.  But this Court routinely approves agreements between debtors and third-parties, even if certain obligations under the agreement are contingent.  For instance, nearly every time the Court approves bidding procedures and break-up fees, the potential obligation to pay those fees is contingent.  (See, e.g., Docket No. 1175 (approval of bidding procedures and break-up fee).)  The contingent nature of

the obligation does not render the decision "unripe" or the need for the Court's approval any less critical.

Indeed, jurisdictional principles like ripeness are not at issue when a bankruptcy court approves a debtor entering into an agreement such as the Letter Agreement. The Court plainly has jurisdiction over these Chapter 11 proceedings and is empowered through Section 363 of the Bankruptcy Code to approve LBSF's entry into the Letter Agreement. The touchstone of the consideration is not one of ripeness or whether there are contingent obligations, but whether the agreement and the use of the debtor's property is an appropriate exercise of business judgment. *See In re Global Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003). This situation is no different. LBSF has a compelling business need to enter into the Letter Agreement. The provisions of the Letter Agreement, including its timing and Break-Up Fee provisions, were necessary to induce the Assignee to enter into the Letter Agreement. Because LBSF needs to have the Letter Agreement approved by the Court for it to remain effective, this issue is appropriate for resolution now.

None of the cases cited by Libra and SG alter this conclusion because none of them involve the situation where a debtor seeks authorization of an agreement entered into by the debtor. Instead, the cases cited concern adversary proceedings or claims issues, and did not involve motions by the debtor. They also concern situations where the relief requested could not be resolved until the court or debtor made decisions on other matters. For instance, in *In re Contractor Technology, Ltd.*, the court declined to issue a declaratory judgment at the summary judgment stage because the relief requested was contingent on future events. Nos. 05-37623, 07-3057, 2007 WL 2819773, at *3

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

8

(Bankr. S.D. Tex. Sept. 21, 2007).  Likewise, in *In re Family Snacks Inc.*, the court did

not rule on a request for expenses to be treated as administrative expenses when that

determination was dependent upon whether the debtor assumed the contract.  249 B.R.

915, 924 (Bankr. W.D. Mo. 2000), *aff'd in part, rev'd in part on other grounds*, 257 B.R.

884 (8th Cir. 2001).

            In contrast to the cases cited by Libra and SG, LBSF seeks approval of an

agreement that already has been agreed upon by the parties and simply awaits this

Court's endorsement.  Without such approval, LBSF will lose the security of having DB

as an assignee and the benefits that come from that security, including drawing further

interest from other potential assignees and enhanced settlement position *vis-a-vis* SG and

Libra.  Even though potential obligations under the agreement are contingent, that fact

does not render the immediate relief requested – *i.e.*, approval of LBSF's entry into the

agreement – somehow unripe.  Moreover, if Libra and SG could somehow prevail in the

Adversary Proceeding, which they should not, then no Break-Up Fee will be paid.  The

Break-Up Fee will be paid only if LSBF realizes value from the Libra Credit Default

Swap Agreement from a transaction with a party other than the Assignee.  There is,

therefore, no harm in approving the Letter Agreement pending a decision in the

Adversary Proceeding, and the Court should approve the Letter Agreement, given

LBSF's legitimate business need for the agreement.

            Next, Libra and SG hypothesize that the Assignee still will be interested in

this transaction after the Adversary Proceeding has concluded.  But this hypothesis is

nothing more than speculation.  As in any significant financial transaction, there is

always a risk that circumstances may change such that the Assignee may no longer be

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

9

willing or able to enter into the transaction.  LBSF and its creditors have decided not to

bear the risk of this occurring, and they certainly should not be forced to bear such risk

based on the objections of the parties that stand to gain if no assignee can be found.

Finally, Libra and SG suggest that the Assignee would not be providing

any value to the estate since "it is merely acting as a conduit to pass indeterminate sums

of money to LBSF, in which case a break-up fee in any amount would not seem to be

commercially justifiable."  (Obj. at 10.)  Libra and SG fail to inform the Court that it is

the failure to have a "conduit" with sufficient credit rating that was the basis for the

purported termination of the Credit Default Swap Agreement.  Libra and SG undeniably

would owe LBSF hundreds of millions of dollars under the Credit Default Swap

Agreement if LBSF and LBHI had not filed bankruptcy petitions.  Libra and SG

opportunistically seized upon those filings to attempt, ineffectively, to terminate the

Credit Default Swap Agreement, yet they have failed to terminate it properly.  And, as a

result, LBSF intends to enter into an assignment to remedy any purported default under

the Credit Default Swap Agreement.  Libra and SG surely cannot object if the estate

wants to use its resources to do so.

## III.    Discovery Is Unnecessary Because No Legitimate Creditors Have Raised Objections.

Libra and SG next argue that the Court should delay approving the Letter

Agreement and Break-Up Fee because the motion requires discovery with respect to the

dollar value to LBSF of the assignment so that the Court can evaluate the Break-Up Fee.

(*See, e.g.*, Obj. at 11.)  Approval of the Letter Agreement, however, will not impose any

significant costs on the parties or the Court because none of the parties that have a

legitimate interest in the Motion have objected to the relief requested therein. Thus, discovery is unnecessary. As stated above, Libra and SG plainly are not asserting their positions as creditors of the estate; they are asserting positions adverse to the interests of the creditors and the estate, and have no standing to object or take discovery on behalf of the creditors. *See In re Refco Inc.*, 505 F.3d 109, 117-118 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else. . . . [I]t is important that a bankruptcy court is not too facile in granting applications for standing. Overly lenient standards may potentially over-burden the reorganization process by allowing numerous parties to interject themselves into the case on every issue, thereby thwarting the goal of a speedy and efficient reorganization."). Because there is no dispute amongst the creditors with respect to the Motion, there is no need for protracted discovery or hearings on the value of the assignment.

Moreover, to the extent there is any question about the dollar value of the Credit Default Swap Agreement, LBSF has attached as Exhibit A hereto the declaration of James B. Kane, an expert in collateralized debt valuations, including the valuation of credit default swap agreements such as the one at issue here. Further, LBSF will make Mr. Kane available to testify at the hearing on the Motion if necessary. Mr. Kane's declaration provides ample support for the valuation of the Credit Default Swap Agreement in the Motion.[4]

---

[4] Certain of Mr. Kane's calculations have been updated and revised since the Motion was filed, but his conclusions still result in a valuation of the assignment that leads to a Break-Up Fee of at most 2.9% of the value of the transaction.

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

**IV.    The Letter Agreement Already Has Induced Further Interest From
Alternative Assignees.**

Finally, Libra and SG argue that the Break-Up Fee should not be approved because it does not encourage further bids.  This argument, however, is simply untrue. The Break-Up Fee was designed to foster other bids from potential assignees and/or enhance LBSF's position in settlement negotiations with SG.  Indeed, as stated below, it has accomplished these goals.

Although LBSF engaged in a market-canvassing process whereby LBSF believes it already spoke to the most likely potential assignees, this does not mean that no further potential assignees will express interest.  Of course, LBSF will entertain any such offers that will create additional value for the estate.  Indeed, as a result of entering into the Letter Agreement, with its Break-Up Fee, and filing the Motion, LBSF already has received interest from at least one alternative potential assignee.  Thus, LBSF's entry into the Letter Agreement already has created value by adding at least one potential additional bidder to the process, and Libra's argument to the contrary should be rejected.

Moreover, even if there were not other potential bidders, the Break-Up Fee has created significant value in any further settlement discussions with Libra and SG by eliminating uncertainty with respect to whether there will be a potential assignee. Indeed, LBSF and SG were engaged in settlement discussions for months leading up to execution of the Letter Agreement and filing of the Adversary Proceeding.  Of course, SG would be in a better position if the Letter Agreement were not approved and there was uncertainty regarding whether LBSF would have an assignee, but such benefit to SG

is not an appropriate consideration for this Court in determining whether LBSF can enter into the Letter Agreement.

Finally, it is irrelevant that LBSF has not sought to spend its resources on a full-blown public auction when it already has conducted a market canvass. There is no need to spend estate resources on a public auction because the Letter Agreement permits LBSF to have unlimited dialogue and contacts with any potentially interested bidder. The focal point of the analysis in approving a break-up fee is not whether there will be a subsequent auction, but whether the break-up fee creates value by creating an initial bid against which other bidders can make offers. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Integrated Res. Inc.*, 135 B.R. 746, 750-51 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (Bankr. S.D.N.Y. 1992) ("Absent a break-up fee, bidders are often reluctant to make the first bid for fear that it will be shopped around and 'topped' by an entity relying on the initial offeror's due diligence."). Here, the Letter Agreement and Break-Up Fee have accomplished that purpose by fostering another potential bidder's interest. The Assignee required the Break-Up Fee because of the significant expense in terms of time, internal resources necessary to commit to the transaction, and missed opportunities while waiting on the transaction to conclude. SG's efforts to "break up" the Break-Up Fee are simply attempts at clearing the field so that there is no assignee on standby, and thereby lowering the value to the estate and the value that SG might pay through any settlement. Because SG

is motivated by its own interests, which are diametrically opposed to the interest of the

estate, its arguments should be rejected.

## CONCLUSION AND REQUESTED RELIEF

The Debtors respectfully request that the Court overrule the objection of

Libra and SG and enter an order approving the Letter Agreement, including its Break-Up

Fee.

Dated: May 26, 2009
　　　 New York, New York

　　　　　　　　　　　　　　　　 /s/ *Ralph I. Miller*　　　　　　　
　　　　　　　　　　　　　　　 Lori R. Fife
　　　　　　　　　　　　　　　 Ralph I. Miller
　　　　　　　　　　　　　　　 Robert J. Lemons
　　　　　　　　　　　　　　　 Weil, Gotshal & Manges LLP
　　　　　　　　　　　　　　　 767 Fifth Avenue
　　　　　　　　　　　　　　　 New York, New York 10153
　　　　　　　　　　　　　　　 Telephone: (212) 310-8000
　　　　　　　　　　　　　　　 Facsimile: (212) 310-8007

　　　　　　　　　　　　　　　 Attorneys for Debtors
　　　　　　　　　　　　　　　 and Debtors in Possession

**DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE LETTER AGREEMENT, INCLUDING THE PAYMENT OF THE BREAKUP FEE**

14

**EXHIBIT A**

**Declaration of James B. Kane**

Under penalty of perjury, James B. Kane hereby declares pursuant to Section 1746 of title 28 of the United States Code:

1.      I am over 21 years of age, and I can testify to the following facts based on my personal knowledge, extensive experience in the credit derivatives markets, including the origination, distribution and valuation of a variety of collateralized debt obligation ("CDO") products and my review of certain transactional documents and data pertaining to Libra CDO Limited listed in Appendix 1.

2.      I am a co-founder and Managing Partner of The GreensLedge Group LLC ("GreensLedge"), an independent structured credit advisory firm focused on financial restructuring and consulting services.  Prior to forming GreensLedge, I was associated with J.P. Morgan Securities Inc. for more than three years as a Managing Director and most recently as Head of Capital Markets for the Global Structured Credit business.  I began my career in the investment management business at Bankers Trust Company in 1990.  In 1993, I shifted my focus to fixed income sales and trading specializing in structured credit from 1996 through today.  I joined Deutsche Bank AG in 1999 through the firm's acquisition of Bankers Trust Company.  I was a Managing Director and member of the Global CDO Group at Deutsche Bank AG prior to joining J.P. Morgan Securities Inc. in 2004.  My area of expertise is developing and managing all aspects of a structured credit banking platform, including origination, distribution and securities valuation, in a wide range of credit derivative products, with an emphasis on CDO's collateralized by cash and synthetic high yield loans, high yield bonds, asset backed securities ("ABS"), residential mortgage backed securities ("RMBS"), investment grade corporate bonds, and trust preferred securities ("TRuPs").  I hold a B.S. degree in Business Administration from the University of Richmond and I am a Chartered Financial Analyst (CFA).

3.      I have reviewed certain transactional documents of Libra CDO Limited, an issuer organized under the laws of the Cayman Islands ("Libra" or the "Issuer") such as the Indenture, the Credit Default Swap Agreement (including the Confirmation for CMBS/RMBS Securities, the Schedule to the Master and the ISDA Master Agreement) between the Issuer and Lehman Brothers Special Financing

Inc. ("LBSF", "Lehman" or "Credit Default Swap Counterparty"), certain Monthly Trustee Reports

produced by LaSalle Bank National Association ("LaSalle" or the "Trustee") and certain other data

pertaining to the Libra portfolio obtained from third-parties, (collectively the "Libra Information").

Please refer to Appendix 1 for a detailed list of the Libra Information.  Based on the Libra Information,

GreensLedge has performed an analysis under my supervision of potential future credit protection

payments and premiums owed by Libra and LBSF under the Libra Credit Default Swap Agreement (the

"GreensLedge Analysis").  The opinions and conclusions expressed in this declaration are based on my

training, experience and analysis.   (Please refer to the Glossary in Appendix 2 for definitions of

capitalized terms used herein and not otherwise defined within the following declaration.)

4.      I submit this declaration in support of Debtors' Motion for Entry of Order Pursuant to

Section 363 and 365 of the Bankruptcy Code for Approval of (I) the Letter Agreement, including the

Payment of the Break-up Fee, and (II) the Assumption, Assignment, and Sale of the Libra Credit Default

Swap Agreement.

## I.    Results of the GreensLedge Analysis

5.      Based on the Libra Information, including market data available as of May 12, 2009, and

the GreensLedge Analysis, the present value of potential credit protection payments owed to LBSF

under the Libra Credit Default Swap Agreement from Libra could range from approximately $837 million

to $877 million.  The present value of potential premiums owed by LBSF to Libra, on the other hand,

could range from approximately $27 million to $30 million.

## II.   Overview of Libra transaction

6.      Libra CDO Limited is a CDO transaction which closed on October 17, 2006 (the "Closing

Date") with Lehman Brothers Asset Management LLC designated as the Collateral Manager.  The

portfolio supporting Libra consists of predominantly synthetic exposure created through the use of

derivatives on RMBS and CDO securities ("Synthetic Securities").  Libra also has the limited ability to

acquire additional collateral including RMBS securities, CMBS securities, CDO securities, and real estate

investment trust debt securities ("REIT Debt Securities") and various other asset-backed securities (together with "Synthetic Securities", the "Collateral Debt Securities").  Libra is capitalized by a Senior Swap Agreement provided by Société Générale, New York Branch ("SocGen") and the issuance of Class A Term Notes, Class B Term Notes, Class C Term Notes, Class D Term Notes, Class X Term Notes and Preference Shares.  Please refer to Figure 1 for a diagram overview of the Libra transaction.

7.     On the Closing Date of Libra, the Collateral Manager had accumulated Collateral Debt Securities of approximately $1,400,000,000 in principal balance, of which approximately $1,200,000,000 were Synthetic Securities executed under a single Credit Default Swap Agreement between LBSF and Libra.  The GreensLedge Analysis focuses solely on the Synthetic Securities under the Credit Default Swap Agreement.  Encompassed within the Credit Default Swap Agreement were over 130 individual credit default swaps ("CDS") (each a "CDS Agreement Transaction") where the "Reference Obligations" were RMBS and CDO securities.  Please refer to Figures 2 and 3 for a diagram overview of the Libra CDS portfolio and an illustrative RMBS transaction.  By the terms of the Credit Default Swap Agreement, LBSF is a buyer of credit protection on the underlying Reference Obligations and is obligated to pay Libra a "premium" amount on a periodic basis based on the payment dates of the Reference Obligations.  Libra is a seller of credit protection and is obligated to pay LBSF "credit protection payments" when certain losses (defined as "Credit Events" or "Floating Amount Events") on the Reference Obligations occur.  Credit protection payments have been paid by Libra prior to September 2008 based on losses defined as "Writedowns".  We assume that potential future credit protection payments will be owed based on future Writedowns under Floating Amount Events[1]  Please refer to Appendix 3 for additional

---

[1] Writedowns may also trigger a credit protection payment under "Credit Events."  The settlement mechanism under a Credit Event would require (a) the credit protection buyer to deliver the Reference Obligation into Libra and (b) Libra to pay the credit protection buyer the par amount of the Reference Obligation so delivered as a credit protection payment.  Alternatively, the settlement mechanism for a Writedown under "Floating Amount Events" would require (a) the credit protection buyer to deliver a notice only (and not deliver the Reference Obligation) and (b) Libra to pay only the Writedown Amount as a credit protection payment.

information on the mechanics of an illustrative CDS Agreement Transaction and a definition of "Writedowns".

8.      The Libra portfolio has performed well below initial expectations experiencing significant Writedowns and defaults since the Closing Date.  Please refer to Figure 4 below for a snapshot of the Libra portfolio according to certain Monthly Trustee Reports.

Figure 4.  Libra Portfolio

|  | December 5, 2006[2] | September 5, 2008[2] |
|---|---|---|
| Aggregate Principal Balance of Collateral Debt Securities | $1,462,776,348 | $1,342,952,535 |
| Aggregate Principal Balance of Synthetic Securities[3] | $1,200,327,388 | $1,073,228,266 |
| Defaulted Synthetic Securities[4] | $0 | $280,684,442 |

### III.  GreensLedge Analysis and Procedure

9.      Based on information derived from the September 2008 Monthly Trustee Report, as of September 5, 2008 there was $1,073,228,266 in CDS Notional Amount outstanding representing 138[5] CDS Agreement Transactions which referenced 105 distinct RMBS bonds[6] and 2 CDO bonds[7].

---

[2] Balances shown based on Monthly Trustee Reports dated December 21, 2006 and September 12, 2008 with data reported as of December 5, 2006 and September 5, 2008, respectively.

[3] Aggregate principal balance of Synthetic Securities is the same as the Notional Amount of CDS Agreement Transactions outstanding.

[4] The Trustee identifies and reports "Defaulted Securities" as defined in the Libra Indenture.  Defaulted Securities balance is shown for Synthetic Securities only.

[5] Several CDS Agreement Transactions were entered into post Closing Date.

[6] In some instances more than one CDS Agreement Transaction referenced the same RMBS bond but may have differed in either Notional Amount and/or Fixed Rate.

[7] The GreensLedge Analysis assumes that the approximately $10.8 million in CDS Agreement Transactions which reference the 2 CDO bonds remain outstanding for the duration of the analysis and are not otherwise terminated (for the purposes of calculating premium due and outstanding balance reported).  Typical CDO mechanics do not include a concept of Writedown at the CDO level.  We did not assume any amount of future credit protection payments due to these 2 CDS Agreement Transactions referencing CDO bonds.

10.    For each of the 105 RMBS Reference Obligations, we evaluated from publicly available sources as of May 12, 2009:

a.    Certain bond level statistics including:

1.    Factors (as of April 25, 2009)[8] – Represents the percentage of the original principal balance of the bond currently outstanding given the cumulative effect of principal payments, Writedowns and capitalized interest since issuance.

2.    Principal Payments – Distributions of principal on the bond.

3.    Credit Enhancement – The ratio of (x) aggregate outstanding principal balance of bonds within the RMBS capital structure which are subordinate to the Reference Obligation RMBS bond over (y) the aggregate outstanding amount of mortgages in the pool.

4.    Tranche Size – The original principal balance of the bond within the RMBS capital structure, expressed as a percentage of the original RMBS capital structure.

b.    Certain key statistics for each of the mortgage pools underlying each Reference Obligation RMBS bond including[9]:

1.    60-Day Delinquency Rates – Represents the percentage of mortgages currently in the pool where the borrower is delinquent for 60-89 days.

2.    90+-Day Delinquency Rates – Represents the percentage of mortgages currently in the pool where the borrower is delinquent for 90+ days.

---

[8] Payment dates on most RMBS securitizations occur on or around the 25th of each month.  Hence factors as of May 12th would likely be based on RMBS monthly trustee reports reflecting April 25th payments.

[9] Source: Intex Solutions, Inc.

3.  Foreclosure – Represents the percentage of mortgages currently in the pool for which foreclosure proceedings have commenced.

4.  Real Estate Owned ("REO") – Represents the percentage of mortgages currently in the pool for which the lender has had to acquire the property in inventory after foreclosure in order to liquidate at a later date.

11.  <u>Analysis 1:  Current portfolio balances and adjustments since September 5, 2008</u>.  Based on the available data as of May 12, 2009 (and assuming the CDS Agreement Transactions were not otherwise altered), we calculated that:

a.  Of the approximately $1,073 million in CDS Agreement Transactions outstanding on September 5, 2008, approximately $638 million in Notional Amount referencing 72 RMBS bonds and 2 CDO bonds would still be outstanding as of April 25, 2009.

b.  Principal payments (adjusted for Notional Amounts of the CDS Agreement Transactions) since September 5, 2008 totaled approximately $32 million.

c.  Writedowns (adjusted for Notional Amounts of the CDS Agreement Transactions) since September 5, 2008 totaled approximately $403 million.  The GreensLedge Analysis assumes that no part of this $403 million credit protection payment owed to LBSF has been paid.   Please refer to Figure 5 for an updated portfolio summary.

Figure 5.  Libra Portfolio Updated with GreensLedge Analysis 1

| CDS Agreement Transaction Notional Amount (September 5, 2008) | $1,073 million |
| --- | --- |
|  |  |
| Principal Payments (since September 5, 2008) | $32 million |
| Writedowns (since September 5, 2008) | $403 million |
| CDS Agreement Transaction Notional Amount (April 25, 2009) | $638 million |

12.  <u>Analysis 2a: Future potential losses based on current mortgages in "distress" and "no government intervention"</u>.  We consider mortgages that are 60 days or more delinquent and in

- 6 -

foreclosure or REO to be in distress. In addition, we assume that without government intervention[10]: (a) 85% of 60-day delinquent mortgages and 90% of 90+-days delinquent mortgages will default (mortgages in foreclosure and REO are already considered defaulted)[11] and (b) all defaulted mortgages experience a 55% loss rate[12]. According to Moody's Investors Service, Inc ("Moody's"), "since September 2008, loss severities on subprime loans have increased rapidly from approximately 50% to greater than 60%. [Moody's] anticipate[s] that loss severities will rise to around 70% based on an expected further 10-15% decline in home values."[13]  Hence, a loss severity assumption of 55% is conservative when estimating potential future Writedowns and credit protection payments.

13.  The default and loss rate assumptions outlined in paragraph 12 were then applied to each mortgage pool underlying the remaining 72 RMBS bonds to arrive at a mortgage pool level "pool future loss amount".  We compared (x) the pool future loss amount against (y) the current Credit Enhancement and tranche size (or "thickness") of the RMBS bond to arrive at a "potential future Writedown".  For example, if a mortgage pool has $100 each in 60-day delinquencies, 90+-day delinquencies, foreclosure and REO, then applying the assumptions above:

---

[10] Potential government sponsored programs could impact the timing and severity of losses on subprime loans. The RMBS Reference Obligations of the Libra CDS Agreement Transactions are backed by subprime RMBS pools.

[11] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." Moody's Structured Finance Rating Methodology.  Moody's Investors Service, Inc. March 5, 2009.  Moody's assumes lifetime "roll rates" (into default) of 85% on 60-89 day delinquencies, 90% on 90+day delinquencies and 100% on foreclosure and REO.  These roll rates are for the 2005-2007 vintage of RMBS securitizations.  The Libra CDS portfolio is predominantly of the 2005 and 2006 vintages. Additionally, the GreensLedge Analysis 2 does not consider additional losses due to either (a) mortgages which are already 30-59 days delinquent or (b) mortgages which are not yet delinquent.

[12] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." Moody's Structured Finance Rating Methodology.  Moody's Investors Service, Inc. March 5, 2009.  In projecting future loss severities, Moody's reviewed "the most recent actual three-month average severity observed on the [recent vintages of subprime RMBS] pools…"… "In addition, the observed average loss severity component is subject to a floor (55%) and a cap (75%) to eliminate data anomalies and any volatility associated with limited sample sizes."

[13] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." Moody's Structured Finance Rating Methodology.  Moody's Investors Service, Inc. March 5, 2009.

|  | | | Default Rate | | Loss Rate | Future loss amount |
|---|---|---|---|---|---|---|
| 60-Day Delinquency | $100 | * | 85% | * | 55% | $46.75 |
| 90+-Day Delinquency | $100 | * | 90% | * | 55% | $49.50 |
| Foreclosure | $100 | * | 100% | * | 55% | $55.00 |
| Real Estate Owned (REO) | $100 | * | 100% | * | 55% | $55.00 |
| Total Principal Amount of Distressed Mortgages | $400 | | | | Total Pool Future Loss Amount | $206.25 |

Assume further, a "generic" RMBS bond is $7 in tranche size and has Credit Enhancement of $200. Then with $206.25 in future loses, a "generic" RMBS bond would experience (a) a wipe out of $200 in Credit Enhancement[14] and (b) incur $6.25 of losses on $7.00 outstanding notional (*i.e.,* a Writedown of 89%). In the GreensLedge Analysis 2, any CDS Agreement Transaction with this "generic" RMBS bond as a Reference Obligation would experience an 89% potential future Writedown.

14.    The 89% potential future Writedown in the example described in paragraph 13 above is a cumulative future Writedown projection based on the current identifiable pipeline of distressed mortgages and gives no indication about the timing of such Writedown. The GreensLedge Analysis 2 assumes that Writedowns (and hence credit protection payments) due to mortgages in REO, foreclosure and delinquencies are realized in bullets at 8, 15 and 21 months into the future, respectively.[15,16] According to data provided by J.P. Morgan ABS Research, properties spend on average 7.9 months in REO until liquidation (and realization/crystallization of loss).[15] Mortgages spend on average 7.3 months in foreclosure before they are either liquidated or rolled into REO.[15] The GreensLedge Analysis 2 conservatively assumes that all mortgages currently in foreclosure spend the next 7 months in the foreclosure process and then roll into REO for another 8 months, resulting in a 15 month bullet assumption for loss realization, Writedown and present value purposes. Additionally, according to the

---

[14] The Credit Enhancement statistic used in the GreensLedge Analysis 2 does not include excess interest. Inclusion of excess interest may have marginally reduced or delayed the timing and/or amount of the potential future credit protection payments.

[15] Flanagan, Chris. "SOS – Summary of Subprime, Alt-A, Prime Jumbo." <u>J.P. Morgan ABS Research</u>. J.P. Morgan Securities Inc. February 27, 2009.

U.S. Department of Housing and Urban Development ("HUD"), "in general, mortgage companies start foreclosure processes about 3-6 months after the first missed mortgage payment."[16] Assuming the 60-day and 90+-day delinquent mortgages roll into foreclosure 6 months from today would then result in a 21 month bullet assumption for loss realization, Writedown and present value purposes.[17] For present value calculations, we consider a high discount rate of 10% to be conservatively appropriate given current interest rates.[18]

15.    Applying the assumptions and methodology outlined in paragraphs 12, 13 and 14 above on the remaining $638 million Libra CDS Agreement Transactions, results in approximately $626 million in additional future Writedowns (and hence credit protection payments).  The combined total of $403 million in actual and yet unpaid credit protection payments from Writedowns since September 5, 2008 plus future credit protection payments owed to LBSF could potentially approach approximately $1,029 million.  Assuming (x) a discount rate of 10 % and (y) Writedowns (and hence credit protection payments) due to mortgages in REO, foreclosure and delinquencies are realized in bullets at 8, 15 and 21 months into the future, respectively, the $626 million in future credit protection payments would have a present value of $557 million.  Hence, under these "base" assumptions we estimate that total potential credit protection payments owed to LBSF could total $960 million on a present value basis.

16.    Analysis 2b: Future potential losses based on current mortgages in "distress" and "limited government intervention".  Some of the largest uncertainties in the mortgage market today are

---

[16] "Foreclosure Process." U.S. Department of Housing and Urban Development Homes & Communities.  Content current as of 30 September 2008.  <http://www.hud.gov/foreclosure/foreclosureprocess.cfm>.

[17] We consider the resulting timeline assumption for losses to be conservative in its (a) periodicity and (b) amount of months until loss recognition.  In reality, we would expect losses to be realized on a monthly basis and not in discrete bullets.  For example, we have conservatively assumed that all foreclosures end up in REO for another 8 months while the expectation is generally for some foreclosures to result in liquidation without passing into the REO cohort.

[18] The 2-year, 5-year and 10-year US Treasury rates (which may be considered "risk free" rates) as of May 22, 2009 were 0.89%, 2.20% and 3.45%, respectively, according to data provided by Bloomberg.  The discount rate used is intended to be a proxy LBSF's funding rate.

the effects of the myriad of potential new government sponsored programs and legislation.  If such loan modification programs are successful, they may reduce the cumulative future losses experienced by the mortgage pools underlying the RMBS bonds.   In Analysis 2b, we assume some amount of loan modification will be successful and lower our default rate assumptions to (a) 42.5% of mortgages 60-day delinquent, 45% of mortgages 90+-days delinquent and 66.7% of mortgages in foreclosure will default (REO is still considered defaulted)[19] and (b) all defaulted mortgages experience a 55% loss rate[20].

17.     Applying (x) the lower default assumptions from paragraph 16 above to (y) the "distressed" mortgages and the methodology outlined in Analysis 2a above, results in approximately $483 million in additional future Writedowns on the remaining $638 million Libra CDS Agreement Transactions.  Under such a scenario, the $403 million in actual and yet unpaid credit protection payments from Writedowns since September 5, 2008 plus future credit protection payments owed to LBSF could potentially total approximately $886 million.  Again, using a discount rate of 10% and assuming that Writedowns due to mortgages in REO, foreclosure and delinquencies are realized in bullets at 8, 15 and 21 months into the future, respectively, would result in a present value of $434 million for the future credit protection payments and $837 million in total potential credit protection payments.  Hence, using the methodology of GreensLedge Analysis 2a and 2b, we estimate that potential credit protection payments owed to LBSF could range from approximately $837 million to $960 million on a present value basis.[21,22,23]

---

[19] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." Moody's Structured Finance Rating Methodology.  Moody's Investors Service, Inc. March 5, 2009.  Moody's identified that under the draft of the Homeowner Affordability and Stability Plan ("HASP") current as of March 2009, 100% of loans classified as REO and 33% of loans currently in foreclosure would be ineligible for modification.  Moody's then applies a 50% "modification rate" assumption on the remaining loans in a subprime pool that are eligible to be modified.

[20] Please see paragraph 12.

[21] We did not assume that any of the mortgages which were modified (and reflected in our lowered default assumptions in Analysis 2b), would re-default in the future.  Moody's, however, applies a future re-default rate of 65% to such modified mortgages.  Additionally, any mortgage modification that involves forgiveness of principal may still cause losses on a RMBS securitization.  Hence both these factors could cause losses to be more severe than estimated by the GreensLedge Analysis 2b.

18.    <u>Analysis 2c:  Potential future premium payments</u>.  If we make a simplifying assumption that the $403 million in Writedowns since September 05, 2008 occurred on April 25, 2009, then LBSF would owe approximately $11 million in premium on the $1,073 million in CDS Notional Amount outstanding from September 05, 2008 to April 25, 2009.   The weighted average premium (or Fixed Rate) on the remaining $638 million in CDS Agreement Transactions is calculated to be approximately 1.46%.  In Analysis 2c, we used the corresponding CDS Notional Amounts outstanding resulting from the same Writedown amounts and timing as calculated from or used in the GreensLedge Analysis 2a and 2b.  We further assumed that the CDS Notional Amounts outstanding after the Writedowns at the end of month 21 (approximately $13 million and $156 million, in Analysis 2a and 2b, respectively) would remain outstanding until the end of month 120 (*i.e.,* the CDS would remain outstanding for a total of 10 years from today.)  Assuming (1) the 1.46% in weighted average premium remains constant, (2) the CDS Notional Amount balances from GreensLedge 2a and 2b, and (3) a 10% discount rate would result in approximately $13 to $31 million in potential future premium payments on a gross basis and $11 to $19 million on a present value basis owed by LBSF to Libra.  Combined with the approximately $11 million in premium owed since September 2008, total premium payments could potentially reach approximately $22 to $30 million on a present value basis.  In reality, we would expect (x) the Writedowns from the current pipeline of distress mortgages to decrease the Notional Amount of the CDS Agreement

---

[22] The GreensLedge Analysis assumes that the credit protection buyer, currently LBSF, does not exercise its right to declare an occurrence of a Distressed Ratings Downgrade Credit Event on the approximately $633 million out of $638 million of CDS Notional Amount outstanding which is rated below Caa2 by Moody's, CCC+ by S&P and/or CCC+ by Fitch as of April 25, 2009.  If the credit protection buyer did exercise such right and deliver the underlying Reference Obligation to Libra in exchange for a credit protection payment of par on the notional amount so delivered, the timing of such credit protection payments would thus be accelerated and the present value increased.

[23] By the terms of the Credit Default Swap Agreement, credit protection payments made to LBSF as a counterparty that currently does not satisfy the "Rating Requirement", would currently be made into a "Floating Payment Escrow" and released to LBSF one year after the deposit of such amounts.  The GreensLedge Analysis 2 does not take into account this delay in payment to the credit protection buyer.  If such disbursement delay were taken into account, the gross amount of credit protection payments would not change, however, the present value of such payments assuming a 10% discount rate would decrease by approximately $40 to 50 million.

Transactions on a monthly basis over the course of the next 21 months and (y) the remaining CDS

Notional Amount at the end of month 21 to either prepay or write down prior to the end of year 10. [24]

Hence, the premium amounts payable could decline at a faster rate and total a lesser amount than

projected by the GreensLedge Analysis 2c.[25]  Please see Figure 6 for a summary of the GreensLedge

Analysis 2 assumptions and results.

Figure 6 Summary of GreensLedge Analysis 2[26]

|  | Base Scenario | Intervention Scenario |
|---|---|---|
| CDS Notional Amount (April 25, 2009) | $638 mm | $638 mm |
| Loss Rate Assumption | 55% | 55% |
|  | Analysis 2a | Analysis 2b |
| Default Rate Assumptions |  |  |
| REO | 100.0% | 100.0% |
| Foreclosure | 100.0% | 66.7% |
| 90+-day Delinquencies | 90.0% | 45.0% |
| 60-day Delinquencies | 85.0% | 42.5% |
|  |  |  |
| Future Writedowns ("gross") | $626 mm | $483 mm |
| Future Writedowns (PV) | $557 mm | $434 mm |
|  |  |  |
| Writedowns since September 5, 2008 | $403 mm | $403 mm |
|  |  |  |
| Total Writedowns ("gross") | $1,029 mm | $886 mm |
| Total Writedowns (PV) | $960 mm | $837 mm |
|  | Analysis 2c:  Premium | |
| Future Premium ("gross") | $13 mm | $31 mm |
| Future Premium (PV) | $11 mm | $19 mm |
|  |  |  |
| Back premium since September 5, 2008 | $11 mm | $11 mm |
|  |  |  |
| Total Premium ("gross") | $24 mm | $42 mm |
| Total Premium (PV) | $22 mm | $30 mm |

---

[24] We consider 10 years in totality for the remaining CDS Notional Amounts to be outstanding as sufficiently conservative.  Alternatively, using 27 years (which is the approximate remaining average term of the Reference Obligations still outstanding after month 21) would not materially change GreensLedge Analysis 2a (because there remains only $13 million of CDS Notional Amount in GreensLedge Analysis 2a) and would increase the total future premium payments by approximately $5 million on a present value basis in GreensLedge Analysis 2b.

[25] We did not take into account any future interest shortfalls which may occur prior to Writedowns on the Reference Obligations.  Any such future interest shortfalls would cause Libra to pay credit protection payments back to LBSF and be netted out against (or lower) the premiums owed.

[26] Amounts shown in Figure 6 are rounded to the nearest million.

19.    <u>Analysis 3a:  More detailed analysis based on current mortgages in "distress" and "no</u> <u>government intervention"</u>.  The GreensLedge Analysis 2 focuses on only certain characteristics of the underlying mortgage pools and uses conservative pool performance assumptions to balance not taking into account certain structural features of the RMBS securitizations.[27]  In order to account for the dynamic structural features of the RMBS securitizations, such as the impact of excess interest[28], in GreensLedge Analysis 3 we performed a more detailed cash-flow analysis[29] on each of the individual RMBS securitizations and converted the resulting bond level cash-flows to CDS level cash-flows using the terms of the CDS Agreement Transactions.   We also further refined our assumptions from Analysis 2.  The weighted average actual loss severity observed within the remaining mortgage pools according to the April 2009 remittance reports is approximately 71% and thus we used a loss severity assumption of 70%.  We used the same default rates of 100%, 90% and 85% for REO and foreclosures, 90+ day delinquent mortgages and 60-day delinquent mortgages, respectively.  Moody's expects cumulative losses on subprime mortgage pools to reach 14%, 33% and 40% of original securitized subprime collateral for 2005, 2006 and 2007 vintages, respectively.[30] We reviewed each of the remaining mortgage pools for (a) the cumulative realized losses to date and (b) the additional pipeline of losses from distressed mortgages projected using the default rates above and then (c) calculated the additional amount of losses necessary, if any, to reach the Moody's expected cumulative losses for each vintage. [31]

---

[27] In GreensLedge Analysis 2, we did not take into account the structural features inherent in a RMBS securitization beyond the rudimentary structural feature that losses are generally allocated (via Writedowns) in reverse-sequential order from the most junior tranches upwards.

[28] Please see Appendix 2 for a definition of Excess Interest.

[29] INTEXnet service as provided by Intex Solutions, Inc.

[30] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." <u>Moody's Structured Finance Rating</u> <u>Methodology</u>.  Moody's Investors Service, Inc. March 5, 2009.

[31] The GreensLedge Analysis 3 assumes for 2005-2007 vintages, if the sum of (a) the cumulative realized losses to date and (b) the additional pipeline of losses from distressed mortgages projected using the default rates above already exceeded (c) the Moody's expected cumulative losses for the vintage, then we reduced the pipeline losses

We further assumed that losses from REO liquidations occur smoothly in equal installments between months 1-8, losses from foreclosure liquidations occur smoothly from months 5-12, losses from 90+ day delinquencies occur smoothly from months 12-15, losses from 60-day delinquencies occur smoothly from months 15-18 and the additional losses necessary to meet Moody's subprime loss projections, if any, occur smoothly from months 18-30.[32]  The weighted average actual annual prepayment rate, if any, observed in the remaining mortgage pools  according to the April remittance reports is approximately 2.2%. [33]  Hence, we assumed the mortgage pools experienced a 5% annual prepayment rate.[34]

20.    Applying the assumptions from paragraph 19, to each of the underlying RMBS securitizations, we arrived at monthly Writedown and principal pay down projections for each of the remaining 72 Reference Obligations.  Applying these projections to the Libra CDS portfolio would result in potential future credit protection payments owed to LBSF totaling approximately $616 million on a gross basis and, again assuming a 10% discount rate, approximately $563 million on a present value basis.  Adding in the $403 million of credit protection payments owed since September 5, 2008 would result in $966 million owed to LBSF on a present value basis.

21.    Analysis 3b:  More detailed analysis based on current mortgages in "distress" and "limited government intervention".  In GreensLedge Analysis 3b, we used the same methodology as 3a

---

such that the securitization only experienced a maximum of the Moody's expected cumulative loss for the vintage. Additionally, GreensLedge Analysis 3 does not assume any additional defaults for the 3 CDS Agreement Transactions with Reference Obligations of 2004 vintage.  The Notional Amount of CDS referencing these 2004 bonds was less than $7.3 million as of April 25, 2009.

[32] The actual inputs for projecting losses in each RMBS securitization are (a) loss severity of 70% and (b) a schedule of default rates for months 1-30 based on each mortgage pool's amount of REOs, foreclosures, 90+ delinquencies and 60-day delinquencies.  The additional losses based on Moody's expectations were translated into a default rate for months 18-30, again assuming a 70% severity rate.

[33] Data on voluntary prepayments was available for 56 out of the 65 remaining mortgage pools.  Remittance reports by the securitization trustees do not always distinguish between voluntary principal payments and REO/foreclosure liquidation proceeds when reporting unscheduled principal payments received.

[34] A higher prepayment rate assumption may result in a lower amount of Writedowns for the Reference Obligations in the Libra CDS Agreement Transactions.

and modified 2 assumptions.  Firstly, we used the lower default rates from GreensLedge Analysis 2b of 100%, 66.7%, 45.0% and 42.5% for REO, foreclosures, 90+ day delinquent mortgages and 60-day delinquent mortgages, respectively.  Secondly, we used the lower Moody's cumulative loss projection given limited government intervention of 13%, 30% and 36% of original securitized subprime collateral for 2005, 2006 and 2007 collateral, respectively.[35]  With these modified assumptions, we re-analyzed each of the RMBS securitizations and arrived at Writedown and principal pay down projections for the Reference Obligations.  Under these GreensLedge Analysis 3b assumptions, the amount of potential future credit protection payments owed to LBSF could total approximately $516 million on a gross basis and $474 on a present value basis.   In addition to the $403 million in past credit protection payments owed, this would imply that a total of $877 million in future credit protection payments could be owed to LBSF on a present value basis.  Hence, the approximate range of credit protection payments from the GreensLedge Analysis 3a and 3b is approximately $877 to $966 million on a present value basis.[36]

22.    <u>Analysis 3c:  More detailed analysis of future premium payments</u>.  In GreensLedge Analysis 3c we use the monthly outstanding CDS Notional Amounts given the Writedowns and principal payments calculated from Analysis 3a and 3b.  Assuming the 1.46% in weighted average premium remains static, the potential future premium owed by LBSF to Libra could total approximately $10 to 30 million on a gross basis and $9 to 17 million on a present value basis assuming a 10% discount rate.  Together with the approximately $11 million in back premium owed, LBSF could owe, on a present value basis, a total of $20 to 27 million in potential premium to Libra using GreensLedge Analysis 3a and 3b assumptions, respectively.  Please see Figure 7 for a summary of the GreensLedge Analysis 3 assumptions and results.

---

[35] Rocco, Joseph.  "Subprime RMBS Loss Projection Update, March 2009." <u>Moody's Structured Finance Rating Methodology</u>.  Moody's Investors Service, Inc. March 5, 2009.

[36] Taking into account the one year delay in payments from the Floating Amount Escrow would decrease the present values by approximately $24-47 million.

Figure 7 Summary of GreensLedge Analysis 3[37]

|  | Base Scenario | Intervention Scenario |
|---|---|---|
| CDS Notional Amount (April 25, 2009) | $638 mm | $638 mm |
| Loss Rate Assumption | 70% | 70% |
| Prepayment Rate Assumption | 5% | 5% |
|  | Analysis 3a | Analysis 3b |
| Default Rate Assumptions |  |  |
| REO | 100.0% | 100.0% |
| Foreclosure | 100.0% | 66.7% |
| 90+-day Delinquencies | 90.0% | 45.0% |
| 60-day Delinquencies | 85.0% | 42.5% |
| Cumulative Loss Rate Assumptions |  |  |
| 2005 vintage | 14.0% | 13.0% |
| 2006 vintage | 33.0% | 30.0% |
| 2007 vintage | 40.0% | 36.0% |
|  |  |  |
| Future Writedowns ("gross") | $616 mm | $516 mm |
| Future Writedowns (PV) | $563 mm | $474 mm |
|  |  |  |
| Writedowns since September 5, 2008 | $403 mm | $403 mm |
|  |  |  |
| Total Writedowns ("gross") | $1,019 mm | $919 mm |
| Total Writedowns (PV) | $966 mm | $877 mm |
|  | Analysis 3c: Premium | |
| Future Premium ("gross") | $10 mm | $30 mm |
| Future Premium (PV) | $9 mm | $17 mm |
|  |  |  |
| Back premium since September 5, 2008 | $11 mm | $11 mm |
|  |  |  |
| Total Premium ("gross") | $21 mm | $40 mm |
| Total Premium (PV) | $20 mm | $27 mm |

## IV. Conclusion

23.      There are a variety of methods for analyzing mortgage pools and RMBS securities.[38]

However, given the use to which the GreensLedge Analysis is being applied and particularly given the

extensive losses already observed in the Libra CDS portfolio ($403 million, or 38% by CDS Notional

Amount, of the CDS Agreement Transactions has written down since September 2008), we believe the

---

[37] Amounts shown in Figure 7 are rounded to the nearest million.

[38] We did not, for example, drill down to the zip code or neighborhood development level of the mortgage pools. Nor did we analyze other important factors such as home price appreciation expectations, loan-to-value ratios or credit worthiness of the borrowers.

methodologies of the GreensLedge Analysis to be reasonable.  By simply applying the lower end of loss

severity expectations to the currently identifiable pipeline of future losses in the mortgage pools

underlying the Libra Reference Obligations, we could already calculate potential future losses of $434

million to $557 million on a present value basis on the remaining $638 million in CDS Notional Amount,

using GreensLedge Analysis 2a and 2b.  Applying actual observed severities for the subprime mortgage

pools and Moody's expectations on future losses to each of the underlying securitizations, we calculated

potential future losses of $474 to $563 million, using GreensLedge Analysis 3a and 3b.  Conservatively

taking the lower end of GreensLedge Analyses 2 and 3, we believe a reasonable estimation of the

present value of (1) total potential future credit protection payments owed to LBSF under the Libra

Credit Default Swap Agreement could range from approximately $837 to $877 million and (2) total

potential future premium payments owed by LBSF which could range from $27 to $30 million.[39]

---

[39] The GreensLedge Analysis focuses solely on potential future amounts owed by either LBSF or Libra under the
Credit Default Swap Agreement and CDS Agreement Transactions.  The GreensLedge Analysis does not take into
account the claims paying ability of either LBSF or Libra.  The GreensLedge Analysis is not a replacement cost
analysis which could include other factors besides expected future cash-flows such as current market CDS spreads
and credit worthiness of counterparties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

James B. Kane
May 26, 2009

Figure 1. Overview of Libra Transaction

[1]Maximum Swap Notional Amount of the Senior Swap Agreement on the Closing Date.
[2]Ratings shown are as provided by S&P/Moody's, respectively, on the Closing Date. The Class X Notes were not rated by Moody's on the Closing Date.

Figure 2. Libra CDS Portfolio



[1] According to the Monthly Trustee Report as of 09-05-2008, there were 2 CDS Agreement Transactions outstanding that referenced CDO bonds with a total Notional Amount of approximately $10.8 mm.

Figure 3a.  Sample RMBS Securitization at Inception[1]



[1] Sample RMBS securitization shown for illustrative purposes only.  Actual RMBS securitizations of the Reference Obligations may vary from the one shown above.

Figure 3b. Sample RMBS Securitization Four Years since Inception[1]

[1] Sample RMBS securitization shown for illustrative purposes only. Actual RMBS securitizations of the Reference Obligations may vary from the one shown above.

**APPENDIX 1: Libra Information**

- Credit Default Swap Agreement dated as of October 17, 2006 between Libra CDO Limited and Lehman Brothers Special Financing Inc. including:
  - ISDA Master Agreement (Multicurrency–Cross Border) dated as of October 17, 2006
  - Schedule to the Master Agreement dated as of October 17, 2006
  - Confirmation for CMBS/RMBS Securities dated as of October 17, 2006 for Credit Derivative Transactions on Mortgage Backed Securities with Pay-As-You-Go or Physical Settlement
  - Confirmation for CDO Securities dated as of October 17, 2006 for Credit Derivative Transactions on Collateralized Debt Obligations with Pay-As-You-Go or Physical Settlement

- Indenture dated as October 17, 2006 between Libra CDO Limited, Libra CDO, LLC and LaSalle Bank National Association

- Monthly Trustee Reports produced by LaSalle Bank National Association dated
  - December 21, 2006 with portfolio data as of December 5, 2006
  - September 12, 2008 with portfolio data as of September 5, 2008

- INTEXnet service as provided by Intex Solutions, Inc.

- INTEXnet service data as of May 12, 2009
  - Original Principal Amount
  - Factors
  - Principal Payments
  - Percentage of Capital Structure
  - Credit Enhancement Rates
  - REO Rates
  - Foreclosure Rates
  - 90+-day Delinquency Rates
  - 60-day Delinquency Rates
- Bloomberg L.P.

**APPENDIX 2:  Glossary**

**"Asset Backed Security" ("ABS")** means a security issued by an entity formed for the purpose of holding or investing and reinvesting in a pool, either fixed or revolving, of receivables, debt obligations, debt securities, finance leases or other similar assets subject to specified acquisition or investment and management criteria designed to assure the servicing or timely distribution of proceeds to holders of the securities.

**"Commercial Mortgage Backed Security" ("CMBS ")** means asset backed securities that entitle the holders thereof to receive payments that depend on the cash flow from a pool of commercial mortgage loans made to finance the acquisition, construction and improvement of properties.

"**Day Count Convention**" means 30/360, Actual Days/360 or Actual Days/Actual Days.

**"Excess Interest"** means the excess of (a) the amount of interest generated from the mortgages loans in an underlying pool over (b) the amount of interest payable on the related bonds and certain administrative expenses of the securitization.  Excess interest is used to offset losses on mortgage loans in a given period and thus serve as protection for the bondholders by mitigating the effect of write downs.  The availability of excess interest to mitigate write downs depends upon many factors including the weighted average coupon on the then outstanding mortgage loan balances, timing of losses and the delinquency level of the mortgage pool.

**"LIBOR"** means the London interbank offer rate.

**"Residential Mortgage Backed Securities" ("RMBS")** means asset backed securities that entitle the holders thereof to receive payments that depend on the cash flow from residential mortgage loans secured by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used).

**"REIT Debt Security"** means a debt security issued by a real estate investment trust (as defined in Section 856 of the Code or any successor provision).

**APPENDIX 3:  Overview of credit default swaps ("CDS")**

A credit default swap ("CDS") is a swap in which the credit protection buyer makes a series of fixed payments (the premium) to the credit protection seller, and in exchange receives a payoff (a credit protection payment) if the underlying credit instrument (typically, a bond or a loan, and referred to as the "Reference Obligation") experiences certain credit events (such as failure to pay interest or principal or Writedowns).

Figure A-1.  Illustrative Credit Default Swap ("CDS")



**Examining the components of a hypothetical CDS**:

- Credit Protection Buyer / Fixed Rate Payer:  party in the position of LBSF

- Credit Protection Seller / Floating Rate Payer:  party in the position of Libra

- Reference Obligation:  Generic RMBS BBB-rated bond, with a coupon of LIBOR+2.00%[40] maturing 2034

- Notional Amount:  $10,000,000

- Premium (also known as the "Fixed Rate"):  1.50%

    o The premium is determined based on the credit risk which the market associates with "insuring" the Reference Obligation and is closely linked to the credit risk also priced into the coupon spread[40] (in this case, LIBOR+2.00%) which the underlying Reference Obligation bears.

---

[40] In this example, the 2.00% is considered the coupon "spread" (or credit spread) over LIBOR.  LIBOR is the floating interest rate at which AA-rated banks lend to each other.  LIBOR is used as a bench mark to price other securities. If LIBOR is the rate at which AA-rated banks can borrow money, then a BBB-rated (*i.e.,* a lesser credit quality) RMBS

- o   The premium amount (1.50 %* Notional Amount*Day Count Convention) is payable on the 5th business day after the payment date of the Reference Obligation.

- Credit protection payment (also known as the "Floating Rate"): either (a) the Notional Amount of the Reference Obligation, in the case of a "Credit Event" or (b) the "Floating Amount" in the case of a "Floating Amount Event".

- Credit Events:  Failure to Pay Principal, Writedown and Distressed Ratings Downgrade

  - o   "Failure to Pay Principal" means (i) a failure of the Reference Obligation to receive an expected principal amount on the final amortization date or the legal final maturity date or (ii) payment on any such day of an actual principal amount that is less than the expected principal amount.

  - o   "Writedown" means the occurrence of

    - i.   (A) a Writedown or applied loss (per the underlying documents of the Reference Obligation) resulting in a reduction in the outstanding principal amount (other than as a result of a scheduled or unscheduled payment of principal) or (B) the attribution of a principal deficiency or realized loss to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation;

    - ii.   the forgiveness of any amount of principal by the holders of the Reference Obligation pursuant to an amendment to the Underlying Instruments resulting in a reduction in the outstanding principal amount.

  - o   "Distressed Ratings Downgrade" means that the Reference Obligation:

    - i.   if publicly rated by Moody's, (A) is downgraded to "Caa2" or below by Moody's or (B) has the rating assigned to it by Moody's withdrawn or

---

bond would likely pay more than LIBOR (*i.e.* a spread above LIBOR), to compensate the investor for the increased risk.

    ii.     if publicly rated by Standard & Poor's, (A) is downgraded to "CCC" or below by Standard & Poor's or (B) has the rating assigned to it by Standard & Poor's withdrawn or

    iii.    if publicly rated by Fitch, (A) is downgraded to "CCC" or below by Fitch or (B) has the rating assigned to it by Fitch withdrawn.

- Floating Amount Events:  Writedown, Failure to Pay Principal or Interest Shortfall

  o  Writedown and Failure to Pay Principal as defined under "Credit Events"

  o  "Interest Shortfall" means on any payment date of the Reference Obligations either (a) non-payment of the expected interest amount or (b) payment of an actual interest amount that is less than the expected interest amount.

**Illustrative numerical example of a CDS :**

Building upon the example described above, and adding assumptions regarding a Floating Amount Event, below is a hypothetical numerical example of premium and credit protection payments in a CDS.

<u>Assumptions</u>:
Original terms of the CDS:

- Reference Obligation:  Generic RMBS BBB-rated bond

- Reference Obligation Payment Date: On the 25th day of each month

- Day Count Convention: 30/360

- Premium (or Fixed Rate):  1.50%

- Notional Amount:  $10,000,000

- Fixed Rate Payment Date:  On the 30th day of each month

Performance of the Reference Obligation:

- Floating Rate Payment Date: 2 years after entering into the CDS

- Floating Amount Event:  Writedown of 80% of the original principal balance of the Reference Obligation

Under the Assumptions above, the Credit Protection Buyer would pay to Libra on the 30th of every month a premium of $12,500 (until the Floating Amount Event occurs and thereafter reduced by 80% due to such Floating Amount Event).  Two years after entering into the CDS, the Floating Amount Event occurs and the Credit Protection Seller would then pay the Credit Protection Buyer $8,000,000 as a credit protection payment.

