**Hearing Date and Time: June 3, 2009 at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                            :
In re                                       :   Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :   08-13555 (JMP)
                                            :
                              Debtors.      :   (Jointly Administered)
                                            :
                                            :
------------------------------------------------------------------x
```

**DEBTORS' REPLY TO OBJECTION OF YARPA INVESTIMENTI**
**S.G.R. S.p.A – RP3 FUND TO DEBTORS' MOTION FOR AN ORDER**
**PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING**
**THE ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtor in the above-

referenced chapter 11 cases, Lehman Commercial Paper Inc. ("LCPI"), as debtors and debtors in

possession (together, the "Debtors"), as and for their reply to the Objection of Yarpa

Investimenti S.G.R. S.p.A. – RP3 Fund to Debtors' Motion for an Order Pursuant to Section 365

of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations,

dated May 22, 2009 [Docket No. 3636] (the "Objection"), respectfully represent:

**Preliminary Statement**

1.     In the Open Trades Motion (as defined below), LCPI sought to assume an open trade with Yarpa Investimenti S.G.R. S.p.A. – RP3 Fund ("Yarpa").  In the Objection, Yarpa contends that the trade was terminated and, therefore, was not amenable to assumption by LCPI.  Yarpa has failed to demonstrate that it terminated the trade in accordance with applicable law.  Moreover, the delay in closing the trade was caused by Yarpa's failure to timely comply with its obligations.  Because Yarpa is ultimately responsible for the delay in settling the trade, it may not benefit from this delay and attempt to terminate the trade unilaterally.  Consequently, the trade has not been effectively terminated and LCPI should be authorized to assume the trade.

**Background**

**A.     Procedural History**

2.     On October 5, 2008 (the "Commencement Date"), LCPI commenced its voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.     On November 14, 2008, the Debtors filed the Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations [Docket No. 1541] (the "Open Trades Motion") seeking, *inter alia*, to assume certain trades, including the trade (the "Yarpa Trade") pursuant to which Yarpa agreed to purchase from LCPI an interest in the mezzanine facility of Lavena Holding 4 GMBH (the "Borrower").  On December 16, 2008, the Court entered the Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations [Docket No. 2258] (the "December 16 Order") and approved, *inter alia*, LCPI's assumption of the Yarpa Trade.  At the time the December 16 Order was entered, Yarpa had not filed an objection to the Open Trades Motion nor apprised the Debtors that Yarpa objected to the relief requested therein.

4.      On April 3, 2009, Yarpa filed the Motion for Relief Concerning Debtors' Assumption of Certain Open Trade Confirmations [Docket No. 3267] (the "Motion for Reconsideration"), seeking relief from the December 16 Order.  Although the Debtors believe that Yarpa had actual notice of the Open Trades Motion, the Debtors consented to the relief sought by Yarpa for the limited purpose of allowing Yarpa to file an objection to the Open Trades Motion.  *See* Order Granting Motion for Reconsideration [Docket No. 3568].

5.      On May 22, 2009, Yarpa filed the Objection, in which it asserts that the Yarpa Trade cannot be assumed because it was terminated by Yarpa prior to the Commencement Date.

**B.      The Yarpa Trade**

6.      On March 4, 2008, Yarpa and LCPI entered into the Yarpa Trade.  The Yarpa Trade was memorialized in a trade confirmation, dated March 12, 2008 (the "Trade Confirmation"), a copy of which is annexed hereto as Exhibit A.

7.      The Trade Confirmation provides that the Yarpa Trade is subject to the Standard Terms and Conditions for Par Trade Transactions of the Loan Market Association (the "LMA Standard Terms").  The LMA Standard Terms provide that the Trade Confirmation is governed by English law.  LMA Standard Terms  ¶ 26.1.  A copy of the LMA Standard Terms in effect on March 4, 2008 is annexed hereto as Exhibit B.

8.      The settlement of a par trade involves the completion and transfer of certain documentation, including a transfer certificate (the "Transfer Certificate"), which evidences the transfer of the interest in the Borrower's loan from the seller to the buyer.  *See* Trade Confirmation, ¶ 11.  In addition to the payment of the purchase price, the Yarpa Trade was

also subject to the consent of the Borrower's agent, Bayerishche Hypo-und Vereinsbank AG (the "Agent").  *See* Trade Confirmation, ¶ 15.

9.      Although the LMA Standard Terms provide that the default settlement date for a par trade (the "Settlement Date") is ten business days after the date on which the trade is entered into (the "Trade Date"), here the Parties expressly agreed that the closing of the Trade Confirmation would occur "as soon as practicable," as permitted by the LMA Standard Terms. *See* Trade Confirmation, ¶ 4.

10.      The Agent conditioned its consent to the Yarpa Trade on the receipt and approval of certain "Know Your Customer" documentation from Yarpa (the "KYC Documents").  The Agent initially requested the KYC Documents from Yarpa on April 8, 2008, and repeated its request for the KYC Documents on April 29, 2008, May 16, 2008, and June 11, 2008 (the "KYC Request Emails").  Copies of the KYC Request Emails are annexed hereto as Exhibit C.  In the email dated June 11, 2008, the Agent requested that Yarpa deliver the KYC Documents "ASAP" by printing the KYC Documents and sending them via post or courier.

11.      LCPI also corresponded with Yarpa and the Agent regarding delivery of the KYC Documents in emails dated April 11, 2008, April 16, 2008, June 16, 2008, and July 3, 2008 (the "LCPI Emails").  The LCPI Emails are annexed hereto as Exhibit D.   In the June 16, 2008 email, LCPI similarly suggested that hard copies should be sent in lieu of emails.

12.      Despite repeated requests, the Agent did not receive the KYC Documents until July 22, 2009.  On July 23, 2008, the Agent notified LCPI and Yarpa that it had received the KYC Documents and that it consented to the Yarpa Trade, and suggested a Settlement Date of July 31, 2008.  The Agent's July 23, 2008 email is annexed hereto as Exhibit E.

13.     Even before its delivery of the KYC Documents to the Agent as required by the Trade Confirmation, Yarpa had already initiated its attempts to terminate the Yarpa Trade. On June 25, 2008, Yarpa delivered a letter to LCPI stating that it would deem the trade cancelled if it did not receive the Transfer Certificate within seven business days (the "June 25 Letter").  A copy of the June 25 Letter is annexed hereto as Exhibit F.  On July 21, 2008, however, one day prior to the Agent's receipt of Yarpa's KYC Documents, and only one week after Yarpa actually sent the KYC Documents, Yarpa sent a letter to LCPI purporting to cancel the Yarpa Trade (the "July 21 Letter").  The July 21 Letter is annexed hereto as Exhibit G.

14.     On August 7, 2008, LCPI explained its position to Yarpa during telephone conversation regarding the purported termination of the Yarpa Trade.  Yarpa claimed that it could not respond until September when certain employees of Yarpa returned from vacation.  *See* Email, dated August 7, 2008, annexed hereto as Exhibit H.  On September 2, 2008, LCPI formally responded by letter to Yarpa's July 21 Letter and explained that LCPI did not agree that the trade had been terminated (the "September 2 Letter").  A copy of the September 2 Letter is annexed hereto as Exhibit I.

## The Yarpa Trade Was Not
## Terminated And Should Be Assumed

15.     A trade subject to the LMA Standard Terms is a "binding contract."  *See* LMA Standard Terms, ¶ 2.  A party to such a trade cannot unilaterally terminate the transaction unless the counterparty is in default and has not cured such default.  *See* LMA Standard Terms, ¶ 19.1.  Here, Yarpa delayed in fulfilling a condition to settlement that it alone could fulfill, and then attempted to use this delay to abrogate the Yarpa Trade.  Inasmuch as Yarpa had no legitimate basis under the Trade Confirmation or the LMA Standard Terms upon which to

terminate the Yarpa Trade, the Yarpa Trade was a binding and enforceable executory contract as of the Commencement Date.

16.     The LMA Standard Terms provide a limited mechanism for terminating trades. Specifically, one party to a trade may terminate the trade in the event of a default by its counterparty after it provides notice and an opportunity to cure. *See* LMA Standard Terms, ¶ 19.1. Those circumstances do not exist here. LCPI was not in default on any of its obligations under the Trade Confirmation, nor has Yarpa alleged that it was. Accordingly, Yarpa had no right to terminate the Yarpa Trade. Yarpa's attempt to terminate the Yarpa Trade in its June 25 Letter and its July 21 Letter was in direct contravention of the express terms of the Trade Confirmation and the LMA Standard Terms.

17.     Yarpa attempts to argue that the Yarpa Trade automatically terminated because it was not settled before the expiration of an arbitrary deadline established by Yarpa. The delay, however, was caused by Yarpa and Yarpa must not be permitted to benefit from its own actions to escape its contractual obligations to the detriment of LCPI and its estate.

**A.     The Parties Did Not Agree to a Deadline for Settling the Yarpa Trade**

18.     Section 4.2 of the LMA Standard Terms provides that if any condition to the closing of a trade is not met by the Settlement Date, the parties to the trade may agree to postpone the date by which the trade must settle "for such period or periods as the Seller and the Buyer agree (the "Postponement Period")." LMA Standard Terms, ¶ 4.2(a)(i). Section 4.2 provides for cancellation of the trade in the event that the parties to the trade fail to agree to a Postponement Period or in the event that the condition remains unfulfilled on the date that the Postponement Period expires. LMA Standard Terms, ¶ 4.2(b). Yarpa argues that the parties *implicitly* agreed to a Postponement Period here, and that the Yarpa Trade was cancelled when

the Postponement Period expired.  *See* Objection, ¶ 24.  Yarpa fails to recognize that section 4.2

is not triggered until the parties to the trade have selected a definite Settlement Date.

Specifically, section 4.2 imposes no obligation upon the parties to select a Postponement Period

until the proposed Settlement Date has passed.  *See* LMA Standard Terms, ¶ 4.2(a)(i).  Here,

however, the Parties *never agreed to a definite Settlement Date*.  Rather, instead of using the

definite 10-day settlement date provided in the LMA Standard Terms, the Parties agreed to give

themselves flexibility with regard to the Settlement Date of the trade and aimed to close the

Yarpa Trade "as soon as practicable."  Moreover, there is no evidence that Yarpa and LCPI

agreed that a Postponement Period was appropriate or that the Postponement Period would

expire on July 4, 2008.  Rather, Yarpa has implied such an agreement so it could rely on

paragraph 4.2(b) of the LMA Standard Terms.  Particularly in light of the extensive email record,

Yarpa cannot manipulate the facts to fit within paragraph 4.2(b)(i).[1]

**B.     Yarpa May Not Rely on Its Own
        Actions to Escape Its Contractual Obligations**

19.     It is well settled under both English and America law that a party to a

contract cannot use its own actions to frustrate or hinder the performance of a condition of a

contract and thereby escape its contractual obligations.  *Cia Barc de Panana S.A. v. George

Wimpey & Co. Ltd.*, 1 Lloyd's Rep. 598, 608-09 (CA Civ. Div. 1980); *Kooleraire Serv. &

Installation Corp. v. Bd. Of  Educ.*, 28 N.Y.2d 101, 106 (N.Y. 1971).  In *Cia Barc*, a party agreed

---

[1] Here, the Parties agreed to settle the Yarpa Trade "as soon as practicable." As described more fully in the Debtors' Omnibus Reply to Objections to Debtors' Motion for an Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations [Docket No. 2208], trades frequently take weeks if not months to settle. This market reality is reflected in a review of the Debtors' hundreds of open trades that had not yet been settled as of the Commencement Date, many of which have a Trade Date dating back to April, May, June or July 2008.  Furthermore, even in instances where a definite Settlement Date has been selected, the LMA Standard Terms expressly anticipate that settlement may occur after the Settlement Date and provide a structure for compensating the party injured by the delay in the form of "delayed compensation." *See* LMA Standard Terms, ¶ 7.2.

to sell his interest in the company, subject to a purchase price adjustment. *Id.* at 600-01. The agreement provided that the seller's share of the company's losses would be set off against the purchase price so long as the seller was involved in the approval of determining such amounts. *Id.* at 605. Notwithstanding this condition in the agreement, the buyer entered into a settlement agreement that resulted in losses for the company without the involvement or approval of the seller and subsequently attempted to set off the seller's share of the losses against the purchase price. *Id.* The English court of appeals held that the buyer could not enforce the purchase price adjustment provision because the buyer's actions prevented the seller from approving the settlement of such losses. *Id.* at 609. As a result, the buyer was required to comply with the terms of the agreement and pay the full purchase without the benefit of the purchase price adjustment. *Id.*

20.    Similarly, it was Yarpa's own failure to provide the KYC Documents to the Agent that prevented the Yarpa Trade from closing. Indeed, as set forth in the July 3 Email from LCPI to Yarpa, "[a]ll trade documents (Trade confirms and Transfer Certificates) were completed and signed by the 8th of April." *See* Exhibit D. Thus, the Yarpa Trade could have closed within a few days of receipt by the Agent of Yarpa's KYC Documents. *See id.*

21.    In addition, Yarpa's actions are wholly inconsistent with its assertion that it purportedly terminated the Yarpa Trade. On June 25, 2008, Yarpa sent a letter unilaterally imposing July 4, 2008 as the date the Yarpa Trade would terminate if it did not receive the Transfer Certificate. *See* Exhibit F. Yet by its own admission, on July 14, 2008 -- ten days after the purported automatic termination of the Yarpa Trade -- Yarpa mailed hard copies of the KYC Documents to the Agent. *See* Exhibit J, January 26, 2008 [sic] Letter to Debtors' Counsel.

Yarpa's mailing of the KYC Documents makes no sense if Yarpa actually believed the Yarpa Trade had been terminated by the June 25 Letter.

22.     Section 4.1 of the LMA Standard Terms imposes a duty on both the buyer and seller to "use all reasonable endeavors to ensure that the conditions referred to in [the Trade Confirmation] are duly fulfilled."  LMA Standard Terms, ¶ 4.1(b).  Here, where the Trade Confirmation made the settlement of the Yarpa Trade subject to the Agent's consent, and where it was Yarpa, not LCPI, that was in possession of the necessary documentation, Yarpa's failure to deliver the KYC Documents to the Agent in a format in which it could be received by the Agent cannot be considered reasonable.  As a result, Yarpa is solely responsible for the delay in settling the Yarpa Trade and cannot demonstrate that it was entitled to terminate the Yarpa Trade under the Trade Confirmation, the LMA Standard Terms, and English law.

**Conclusion**

23.    As of the Commencement Date, the Yarpa Trade was a valid and binding

executory contract.  For all of the reasons set forth in the Open Trades Motion, assumption of the

Yarpa Trade reflects a sound exercise of business judgment because the settlement of the Yarpa

Trade, and the corresponding payment by Yarpa to LCPI of the purchase price, will benefit

LCPI's estate.

WHEREFORE, the Debtors respectfully request that the Court overrule the

Objection in its entirety, grant the Open Trades Motion as to the Yarpa Trade, and grant such

other relief as is just.

Dated: May 29, 2009
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**EXHIBIT A**

**(Trade Confirmation)**

ANNEX "A"    p 1/2

## LEHMAN BROTHERS
### LMA TRADE CONFIRMATION (PAR)

To    Yarpa Investimenti S.G.R. S.p.A – RP3 Fund          Date:   12th March 08

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Par Trade Transactions of the Loan Market Association ("LMA") as in effect on the Trade Date, which are incorporated in this Confirmation:

1.   **Credit Agreement Details:**
    Borrower(s):         Lavena Holding 4 GMBH
    Guarantor(s):        Lavena Holding 3 GMBH
    Agent Bank:          Bayerische Hypo-und Vereinsbank AG
    Date:                2nd March 2007
    Governing Law:       English
    Facility Amount:     EUR 501,378,000.00

2.   **Trade Date:**   4th March 2008

3.   **Settlement Date:**   ☒ As soon as practicable

4.   **Seller:**   Lehman Commercial Paper Inc.,
    UK Branch
    as ☒ principal ☐ agent for
    _____

5.   **Buyer:**   Yarpa Investimenti S.G.R. S.p.A –
    RP3 Fund
    as ☒ principal ☐ agent for
    _____

6.   **Details of Traded Portion:** Splits between
    GLG funds as per Schedule 1.
    Name of Tranche/Facility:
    Mezzanine Facility
    Nature (Revolving, Term, Acceptances)
    Guarantee/Letter of Credit, Other): Term
    Cash Margin:        4.00%
    Pik Margin;         4.25%
    Final Maturity:     120 months from the
    Closing Date
    Traded Portion of Commitment:
    - Amount:

7.   **Pricing**
    Name of Tranche/Facility: Mezzanine Facility
    Purchase Rate:

8.   **Accrued Interest:**
    ☒ settled without accrued Interest
    ☐ paid on Settlement Date
    ☐ discounted from next roll-over date
    ☐ N/A

9.   **Break Costs:**
    ☒ as specified in Condition 12 of LMA
    Terms and Conditions
    ☐ None
    ☐ Other (specify) _____

10.  **Transfer Costs: EUR 2,500.00**
    Recordation and Transfer Payable by:
    ☐ Buyer
    ☒ Buyer and Seller in equal shares
    ☐ Seller
    ☐ N/A (participations)
    Stamp duties and other applicable transfer taxes
    and any costs attributable to transfer of security
    are:
    ☐ payable by Buyer
    ☐ payable by other
    ☒ N/A (participations)

11.  **Form of Purchase:**
    ☒     Transfer Certificate (from Credit
    Agreement)
    ☐     LMA Transfer Agreement
    ☐     LMA Assignment
    ☐     LMA Funded Participation
    ☐     LMA Funded/Risk Participation
    ☐     LMA Risk Participation
    ☐     LMA Risk to Funded Participation
    ☐     Other [specify details]

*ANNEX A*    *p 2/2*

The transaction ☐ will, ☒ will not be, disclosed to the Borrower(s) by the Seller.

**12.**    **Transaction Documentation:**
To be prepared by:
☒ Seller
☒ Buyer

**13.**    **Credit Documentation to be provided:**
☐ Yes  ☒ No

**14.**    **Process Agents:**
Buyer: ☒ No  ☐ Yes
(details)_____

Seller: ☒ No  ☐ Yes
(details)_____

**15.**    **Other Terms of Trade**
☒    This transaction is subject to the granting of any third party consents required under the terms of the Credit Agreement, or otherwise by law.

☐    If any required consent is not obtained by the proposed Settlement Date (or such other date as the parties may agree) each of the Buyer and the Seller agrees to use all reasonable efforts (subject to the terms of the Credit Documentation) to settle this transaction as a:
☐    Funded Participation
☐    Risk Participation
☐    Funded/Risk Participation
☐    Risk to Funded Participation

☐    This transaction is subject to a satisfactory legal review by the Buyer of the sufficiency of the Credit Documentation.

☐    This transaction is subject to a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from the lender of record (applicable only where the Seller is not a lender of record).

☐    This transaction shall also be subject to the successful completion of the sale/purchase or participation by the Buyer/Seller of the asset to be purchased/sold or participated hereunder.

☒    This transaction is subject to compensation for delayed settlement and buy-in/sell-out damages.

Please sign and return this letter to the attention of the contact person mentioned below no later than the close of business on 13ᵗʰ March 08 at the fax number or electronic mail address mentioned below. Please note that, in accordance with the LMA Standard Terms and Conditions for Par Trade Transactions, any disagreement with the terms set out above must be notified to us no later than this time.

If you have any questions, please contact Sehopun Joona at +44 (0)207 102 9826 (tel no)

**SELLER** Lehman Commercial Paper Inc., UK Branch

Contact Person:  Emeka Ilomechina
Fax No:  +44 20 7067 9596
E-Mail:  Emeka.ilomechina@lehman.com
Phone No:  +44 20 7102 8654
By:
Name:
Title:
Date:

**BUYER** Yarpa Investimenti S.G.R. S.p.A –RP3 Fund

Contact Person:  Mauro Rebutto
Fax No:  +39 010 581400
E-Mail:  info@yarpa.it
Phone No:  +39 010 581061
By:
Name:
Title:  DIRECTOR
Date:

**EXHIBIT B**

**(LMA Standard Terms)**

> For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.[1]

## LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR PAR TRADE TRANSACTIONS

1. **APPLICABILITY AND INTERPRETATION**

1.1 **Applicability**

These Conditions apply to a par trade transaction in respect of which:

(a)    they are expressly incorporated; and

(b)    the Trade Date occurs on or after 21 December 2007 and before the date on which they are superseded by revised conditions.

1.2 **Interpretation**

For the purpose of construing these Conditions in relation to a par trade transaction to which they apply (the "**transaction**"):

"**Agreed Terms**" means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

"**Average LIBOR**" means, for the Delayed Settlement Period, the result of dividing (a) the sum of all the individual LIBORs for each day during the Delayed Settlement Period by (b) the total number of days in the Delayed Settlement Period;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in each financial centre appropriate for the transaction;

"**Confirmation**" means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

"**Credit Agreement**" means the credit agreement to which the transaction relates;

"**Credit Documentation**" means the Credit Agreement (including all schedules and appendices to the Credit Agreement), any amendments to the Credit Agreement and all guarantee and security documentation relating to the Credit Agreement;

"**Delayed Settlement Compensation**" means, for any day an amount equal to:-

(a)    the cash pay element of the Contractual Margin and Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the funded principal amount of the Purchased Assets) multiplied by the funded principal amount of the Purchased Assets (excluding the amount of any PIK Interest that has capitalised on or after the Trade Date in respect of the Purchased Assets) for each such day; and

---

[1] Please delete this box before sending out document.

(b)     the Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the unfunded portion of the Purchased Assets) multiplied by the unfunded portion of the Purchased Assets for each such day.

"**Delayed Settlement Costs of Carry**" means, for any day an amount equal to the amount payable for the Purchased Assets (calculated in accordance with Condition 10.1 (*Settlement Amount Calculation*) but without being adjusted to take account of Delayed Settlement Compensation, Delayed Settlement Costs of Carry and any applicable recordation, processing, transfer or similar fee) multiplied by Average LIBOR for each such day minus the amount of interest actually received by the Seller (and not capitalised or deferred) in respect of the Purchased Assets for each such day.

"**Delayed Settlement Period**" means the period from (and including) the later of (i) the date falling 10 Business Days after the Trade Date and (ii) the Settlement Date[2] to (but excluding) the day on which settlement of the transaction actually occurs.

"**LIBOR**" means, for any day, the British Bankers' Association Interest Settlement Rate for the offering of deposits in the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen as of 11.00 a.m. (London time) on such day.  If the appropriate page is replaced or service ceases to be available, the Seller, acting reasonably, may specify another page or service displaying the appropriate rate.

"**Obligor**" means any Borrower or Guarantor and any other obligor under the Credit Documentation;

"**PIK Interest**" means any interest, fees or other amounts payable by an Obligor under the Credit Agreement which are either:-

(a)     automatically deferred or capitalised; or

(b)     deferred or capitalised at the option of any Obligor.

"**Purchased Assets**" means the loans, other utilisations and other rights of the Seller included in the Traded Portion, together with and subject to the obligations and liabilities of the Seller attributable to the Traded Portion (together with corresponding rights and benefits under any guarantee or security relating to the Traded Portion);

"**Relevant Participation**" means, in the case of a risk participation, the commitment included in the Traded Portion including any drawn portion of that commitment;

"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase) and "**Transaction Document**" shall be construed accordingly.

1.3     **Construction**

(a)     Unless a contrary indication appears, capitalised terms used in these Conditions have the meaning given to them in the Confirmation.

---

[2] This ensures that if a Settlement Date of less than 10 business days has been selected, Delayed Settlement Compensation/Costs of Carry will nevertheless only be payable after T + 10.

(b)     If the parties agree to enter into a par trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

(c)     A par trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility, which the parties to a transaction, by applying these Conditions, designate as a par loan or other form of credit.

(d)     Headings are for ease of reference only.

1.4     **Agreed Terms prevail**

In the case of any inconsistency between the Agreed Terms and these Conditions, the Agreed Terms shall prevail.

2.      **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets (and/or, in the case of a risk participation, the Relevant Participation) shall come into effect between the Seller and the Buyer upon oral or, as the case may be, written agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 6 (*Transaction Documentation*) and 7 (*Settlement Date and Payment*).

3.      **CONFIRMATION**

(a)     The Seller shall send to the Buyer not later than the first Business Day after the Trade Date, a duly completed form of confirmation, signed on behalf of the Seller and in the form most recently published by the LMA.

(b)     The Buyer shall sign that confirmation and return it to the Seller not later than the second Business Day after the Trade Date.

(c)     The Buyer shall immediately after receipt of that confirmation and, in any event, not later than the close of business on the second Business Day after the Trade Date, raise with the Seller any disagreement with any of the terms of that confirmation.

4.      **CONDITIONALITY**

4.1     **Conditionality**

(a)     A transaction is subject to any conditions specified in the Agreed Terms.

(b)     Subject to paragraph (c) below, each of the Seller and the Buyer agrees to use all reasonable endeavours to ensure that the conditions referred to in paragraph (a) above are duly fulfilled on or before the Settlement Date.

(c)     The Seller shall use all reasonable endeavours to obtain any third party consents required in connection with the  transaction.

4.2 **Conditions unfulfilled**

(a) If any condition referred to in paragraph (a) of Condition 4.1 (*Conditionality*) remains unfulfilled on the proposed Settlement Date then:

(i) the Settlement Date shall be postponed for such period or periods as the Seller and the Buyer agree ( the "**Postponement Period**"); and

(ii) during the Postponement Period, the Seller and the Buyer shall (A) use all reasonable endeavours to ensure fulfilment of each condition which remains unfulfilled and (B) consider in good faith whether or not there is an alternative means, acceptable to both parties, of implementing the transaction.

(b) If:

(i) within 5 Business Days of the proposed Settlement Date no Postponement Period is agreed; or

(ii) a Postponement Period is agreed within the time specified in paragraph (i) above but one or more condition specified in paragraph (a) of Condition 4.1(*Conditionality*) remains unfulfilled on the last day of the Postponement Period and no alternative means of settling the transaction has been agreed on or before the last day of the Postponement Period,

then the transaction shall be cancelled and neither party shall have any further liability to the other except that if any amounts have already been paid under the transaction by either party to the other those amounts shall promptly be returned.

(c) Neither party is obliged to take any steps under this Condition 4.2, if in the opinion of that party to do so might be prejudicial to it.

(d) Notwithstanding any other provision of this Condition 4.2, if the parties have specified in the Agreed Terms an alternative means of implementing the transaction they shall use all reasonable efforts (subject to the terms of the Credit Documentation and otherwise on such of the Agreed Terms as are applicable) to settle the transaction in that way within 10 Business Days of the original Settlement Date.

5. **DUE DILIGENCE**

5.1 **Credit appraisal by Buyer**

The Buyer agrees that it has satisfied itself as to the creditworthiness of each Obligor and the acceptability of the transaction prior to the Trade Date and the transaction shall not be conditional upon this.

5.2   **Confidentiality**

If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer then:

(a)   the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if none is so prescribed, in the then current form prescribed by the LMA; and

(b)   subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

5.3   **Legal review**

If the Agreed Terms specify that the transaction shall be subject to a satisfactory legal review of the sufficiency of the Credit Documentation, then the Buyer shall review the Credit Documentation as soon as reasonably practicable and promptly notify the Seller if the results of that review are not satisfactory. Any such review shall be limited to a legal review of the sufficiency of the Credit Documentation.

5.4   **Events of default**

The occurrence before the Settlement Date of an event of default or potential event of default under the Credit Documentation, or an event which affects (either adversely or beneficially) the ability of an Obligor to perform its obligations under the Credit Documentation, shall not relieve either party of its obligations in relation to the transaction.

5.5   **Seller not lender of record**

If the Seller is not a lender of record and the Agreed Terms specify that the transaction shall be conditional upon a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from a lender of record then:

(a)   subject to obtaining all necessary consents, the Seller shall make full disclosure of those arrangements to the Buyer (other than any such arrangements which relate to pricing and are not required to establish the Seller's interest in the Traded Portion); and

(b)   the Buyer shall promptly notify the Seller if the results of that review are not satisfactory.

6.   **TRANSACTION DOCUMENTATION**

(a)   The party specified in the Agreed Terms shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant condition specified in the Agreed Terms, endeavour to deliver it to the other party within three Business Days after the Trade Date.

(b)   The parties shall endeavour to sign the Transaction Documentation and, where appropriate, provide copies to the agent bank under the Credit Agreement, within five Business Days after the Trade Date.

(c)     The time limits in this Condition 6 shall be subject to Condition 20 (*When Issued Trades*).

7.     **SETTLEMENT DATE AND PAYMENT**

7.1    **Settlement date**

The transaction shall be settled on the Settlement Date by the taking of all necessary action to complete the transaction.  Subject to Condition 20 in relation to "when issued trades", the Settlement Date shall be the date falling ten Business Days after the Trade Date.

7.2    **Delayed settlement**

(a)     If for any reason the transaction settles after the Settlement Date then, subject to paragraph (b) below, for the purpose of allocating interest and fees (including PIK Interest) under these Conditions and for the purposes of the Seller's representations in paragraphs (a) and (b) of Condition 18.2, the Settlement Date shall be the date of actual settlement of the transaction.

(b)     If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, then if the transaction settles after the Settlement Date, for each day during the Delayed Settlement Period:-

(i)     the Seller shall pay to the Buyer, Delayed Settlement Compensation for each such day; and

(ii)    if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the Delayed Settlement Period, the Buyer shall pay to the Seller the Seller's Delayed Settlement Costs of Carry for each such day unless the Delayed Settlement Costs of Carry in respect of the Delayed Settlement Period result in a negative amount in which case the Seller shall pay to the Buyer the absolute value of that amount.

7.3    **Necessary action**

The action necessary to complete a transaction shall include the payment for the Purchased Assets on the Settlement Date, unless the transaction is to take effect only as a risk participation.

7.4    **Funded participations**

Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

8.     **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets and/or Relevant Participation to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement and, within each facility, *pro rata* to the tranches thereof, if more than one.

9.  **PERMANENT REDUCTION**

(a)   The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively the "**Permanent Reductions**") shall be treated in accordance with Condition 10 (*Settlement Amount Calculation*).  In the case of a risk participation, any permanent commitment reductions relating to the Traded Portion after the Trade Date shall reduce the Relevant Participation accordingly.

(b)   Permanent repayments of principal which occur in respect of the Purchased Assets (or otherwise) after the Trade Date and on or before the Settlement Date are for the account of the Seller.  If on or after the Settlement Date any such repayments of principal in respect of the Purchased Assets are paid to the Buyer, the Buyer shall promptly after receipt pay a corresponding amount to the Seller.

10.  **SETTLEMENT AMOUNT CALCULATION**

10.1  **Settlement amount calculation**

The amount payable for the Purchased Assets shall be equal to the Purchase Rate (as specified in the Agreed Terms) multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date <u>less</u>:

(a)   (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date; and

(b)   (100% minus the Purchase Rate) multiplied by any Permanent Reductions (as defined in Condition 9 (*Permanent Reductions*)) which occur in respect of the Purchased Assets after the Trade Date and on or before the Settlement Date,

adjusted to take account of any Delayed Settlement Compensation and Delayed Settlement Costs of Carry payable in accordance with paragraph (b) of Condition 7.2 (*Delayed Settlement*) and any applicable recordation, processing, transfer or similar fee which under the Agreed Terms is to be payable by either party.

10.2  **Payments**

If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

10.3  **Currencies**

Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 10.

11.  **INTEREST PAYMENTS AND FEES**

11.1  **Interest rates**

All interest and fees referred to in this Condition 11 which are expressed to accrue by reference to time elapsed are based on the rates contained in the Credit Agreement.

**11.2    Settled without accrued interest**

(a)    If "**Settled Without Accrued Interest**" is specified in the Agreed Terms then, subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, upon receipt by the Buyer of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees referred to in paragraph (b) of Condition 11.8 (*Allocation of interest and fees*) which are payable after the Trade Date), the Buyer shall promptly pay to the Seller an amount equal to the amount of such interest or fees.

(b)    If the Buyer pays any amount to the Seller in accordance with paragraph (a) above and either:

(i)    the Buyer does not receive all or part of such amount under the Credit Documentation; or

(ii)    after the Buyer has made that payment to the Seller, the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement requiring the Buyer to repay the whole or any part of any amounts paid by or through such agent to which that payment was attributable,

then the Seller shall promptly, after demand by the Buyer, repay to the Buyer the whole or a proportionate part of such payment.

**11.3    Paid on settlement date**

(a)    If "**Paid on Settlement Date**" is specified in the Agreed Terms then subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, the Buyer shall pay to the Seller on the Settlement Date an amount equal to the amount of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees referred to in paragraph (b) of Condition 11.8 (*Allocation of interest and fees*) which are payable after the Trade Date).

(b)    If, on or after the Settlement Date, any such interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets are paid to the Seller, the Seller shall promptly after receipt pay a corresponding amount to the Buyer.

(c)    The Buyer shall have no right of recourse to the Seller in relation to any amounts paid to the Seller in accordance with paragraph (a) above including, without limitation, in circumstances where the Buyer does not receive all or part of any such interest or fees on their due date or the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement.

**11.4    Discounted from next roll-over date**

If "**Discounted from next roll-over date**" and "**Paid on Settlement Date**" are each specified in the Agreed Terms then any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than PIK Interest) but which are not payable until the next roll-over date applicable under the Credit Agreement shall

be discounted from such roll-over date back to the Settlement Date at IBOR (as such rate is calculated in accordance with Condition 12 (*Breakfunding*)) on a simple interest basis.

11.5    **N/A**

If "**N/A**" is specified in the Agreed Terms then, subject to Condition 11.10 (*PIK Interest*), the Buyer shall not be obliged to make any payment to the Seller in respect of accrued interest or accrued fees, either on the Settlement Date or on receipt of any such interest or fees.

11.6    **Partial payments of interest**

Partial payments of interest shall be applied to payment dates pro rata to the amounts due on such payment dates (unless otherwise specified in the Credit Agreement).

11.7    **Upfront fee**

Any Upfront Fee shall be paid on the Settlement Date in the amount and by the party specified in the Agreed Terms.

11.8    **Allocation of interest and fees**

Unless these Conditions otherwise provide (and save where the transaction is to take effect as a risk participation only):

(a)     any interest or fees (other than PIK Interest) which are payable under the Credit Agreement in respect of the Purchased Assets and which are expressed to accrue by reference to the lapse of time shall, to the extent they accrue in respect of the period before (and not including) the Settlement Date, be for the account of the Seller and, to the extent they accrue in respect of the period after (and including) the Settlement Date, be for the account of the Buyer; and

(b)     all other fees shall, to the extent attributable to the Purchased Assets and payable after the Trade Date, be for the account of the Buyer.

11.9    **Payments clear of deduction or withholding**

All payments made under this Condition 11 shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice. If any such deduction or withholding is made or is required to be made, the payer shall increase the amount to be paid to the payee to ensure that the payee receives and retains a sum equal to the sum which it would have received and retained had no such deduction or withholding been made or required to be made.

11.10   **PIK Interest**

(a)     PIK Interest that is deferred or capitalised before the Trade Date in respect of the Purchased Assets shall be for the account of the Seller and shall therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(b)     PIK Interest that is deferred or capitalised on or after the Trade Date in respect of the Purchased Assets shall be for the account of the Buyer at no cost to the Buyer and shall not therefore be included in the funded principal amount of the

Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(c)    PIK Interest that has accrued but not deferred or capitalised as at the Settlement Date in respect of the Purchased Assets shall be for the account of the Buyer upon capitalisation at no cost to the Buyer and shall not be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

12.    **BREAKFUNDING**

(a)    If the Agreed Terms specify that this Condition will apply then, in relation to each funded portion of the Purchased Assets, the Seller and the Buyer shall agree upon the relevant IBOR.

(b)    For the purposes of this Condition 12 (*Breakfunding*) and each funded portion of the Purchased Assets:

(i)    "**IBOR**" means the Interbank Offered Rate which shall be calculated, where necessary, by interpolating on a linear basis between the rate quoted in respect of the longest period (for which a rate is quoted) which is less than the Relevant Period and that quoted in respect of the shortest period (for which a rate is quoted) which exceeds the Relevant Period on the appropriate Reuters screen specified by the Seller (or if there is no Reuters screen, such other appropriate screen as the Seller may specify) at or about 11.00 a.m. (local time) on the date upon which quotations would ordinarily be given by prime banks in the relevant interbank market for deposits in the relevant currency for delivery on the Settlement Date for the Relevant Period; and

(ii)    "**Relevant Period**" means the period from the Settlement Date to the next roll-over date applicable under the Credit Agreement for that funded portion.

(c)    With respect to any such funded portion, if IBOR is higher than the relevant funding rate in effect for that funded portion under the Credit Agreement on the Settlement Date (the "**Relevant IBOR Rate**") then the Seller will pay to the Buyer on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

(d)    With respect to any such funded portion, if IBOR is lower than the Relevant IBOR Rate then the Buyer will pay to the Seller on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

13.    **TRANSFER COSTS**

13.1    **Transfer fees**

The Buyer shall pay any recordation, processing, transfer or similar fee payable to the agent bank under the Credit Documentation in connection with the transaction.  Such fee shall be paid by the Buyer to such agent bank:

(c)    if the Agreed Terms provide that all or part of such fee is to be payable by the Seller, promptly following receipt by the Buyer of the whole or such part (as applicable) of such fee from the Seller or, if later, on the date upon which such fee is payable under the Credit Documentation; or

(d)    otherwise, on the date upon which such fee is payable under the Credit Documentation.

13.2    **Stamp taxes**

Unless otherwise specified in the Agreed Terms, stamp duties and other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer of security are payable by the Buyer.

14.    **TURNOVER OBLIGATIONS**

(a)    If any amount to which the Buyer is entitled pursuant to the Agreed Terms is received or recovered by the Seller, the Seller shall promptly pay to the Buyer an amount equal to such amount.

(b)    If any amount to which the Seller is entitled pursuant to the Agreed Terms is received or recovered by the Buyer, the Buyer shall promptly pay to the Seller an amount equal to such amount.

15.    **COSTS AND EXPENSES**

Each of the Buyer and the Seller shall pay its own costs and expenses (including legal expenses) in connection with the transaction.

16.    **PRINCIPAL/AGENCY STATUS**

16.1    **Principal or agent**

Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction.

16.2    **Principal**

A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction.  A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to, a third party of the Purchased Assets or Relevant Participation.

16.3    **Agent**

(a)    A Buyer or Seller that holds itself out to its counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction.

(b)     A Buyer or Seller that holds itself out as an agent:

  (i)     is not liable to its counterparty for the successful completion of the transaction; and

  (ii)    shall have no liability or obligation to its counterparty in connection with the transaction other than (a) in circumstances where it does not have authority to bind its principal(s) to the transaction or (b) pursuant to any confidentiality agreement entered into by it in connection with the transaction.

(c)     Notwithstanding the provisions contained in paragraph (b) above, a Buyer or Seller that holds itself out to its counterparty as an agent represents to its counterparty its authority to bind its principal(s) to the transaction (which principal(s) shall be bound as if it/they were named as "Buyer" or "Seller" as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

## 17.    NON-RELIANCE AND INDEPENDENT INVESTIGATION

### 17.1    Acknowledgement

Each party acknowledges to the other that:

(a)     it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction; and

(b)     it has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the obligor(s) under the Credit Agreement, to make an informed decision regarding the transaction.

### 17.2    Independent investigation

Each of the Buyer and the Seller agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms or pursuant to these Conditions).

### 17.3    Exclusion of liability

The Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for;

(a)     the effectiveness, validity or enforceability of the Credit Documentation or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other documentation;

(b)     any non-performance by any party to the Credit Documentation or other documentation; or

(c)      the financial condition, status or nature of any Obligor.

17.4    **No Obligation to repurchase**

The Seller and the Buyer agree that:

(a)      the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets or, as the case may be, the Relevant Participation from the Buyer or to support any losses directly or indirectly sustained or incurred by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b)      any rescheduling or renegotiation of the Purchased Assets or, as the case may be, the Relevant Participation shall be for the account of, and the responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

17.5    **Material information**

Each of the Buyer and Seller acknowledges and agrees that:

(a)      the other may possess material information not known to it;

(b)      the other shall have no liability and no action or proceedings may be taken with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

18.    **REPRESENTATIONS AND UNDERTAKINGS**

18.1    **Representations**

Each of the Buyer and the Seller represents to the other that:

(a)      it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b)      it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation; and

(c)      its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application).

18.2    **Seller's representations**

The Seller represents to the Buyer that:

(a)      as at the Settlement Date, it will own beneficially all the Purchased Assets or, as the case may be, the Relevant Participation to be sold or participated pursuant to the transaction free from any rights of set-off in favour of any Obligor or any lien, security interest or other encumbrance, any purchase or option agreement or arrangement, or any agreement to create or effect any of the same;

(b)  as at the Settlement Date, it will not be in default of any of its obligations in relation to the Purchased Assets or, as the case may be, the Relevant Participation;

(c)  so far as it is aware, no decision has been taken by the lenders party to the Credit Documentation to accelerate or enforce their rights under the Credit Documentation and no amount of principal or interest is due and unpaid under the Credit Documentation; and

(d)  subject to the obtaining of any necessary consents, all rights and benefits (including proprietary rights under any relevant security documentation) and, where applicable, all obligations under the Credit Documentation which the parties have agreed will be novated, assigned or otherwise effectively transferred to the Buyer pursuant to the transaction are capable of being so novated, assigned or otherwise transferred.

### 18.3   Buyer's undertaking

The Buyer undertakes to the Seller that it will not use any information received by it from the Seller in relation to the Obligors, the Purchased Assets or, as the case may be, the Relevant Participation for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction.

### 18.4   Survival of representations

All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation.

### 19.   DEFAULT

### 19.1   Defaults

(a)  Subject to Condition 19.4, if:

(i)  either party defaults in the performance of its obligations to the other under any Transaction Document; or

(ii)  any representation or acknowledgement made by either party to the other in the Agreed Terms or these Conditions proves to have been incorrect when made,

the non-defaulting party shall be entitled to give notice to the defaulting party for such period as the non-defaulting party may specify.

(b)  If the default is not remedied within the period specified in the notice referred to in paragraph (a) above, or such further period or periods as the non-defaulting party may agree, the non-defaulting party may, by written notice to the defaulting party, terminate the transaction immediately.

(c)  If the non-defaulting party terminates the transaction in accordance with paragraph (b) above, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

19.2 **Breach of representation or undertakings**

Each party shall compensate the other for any properly quantified loss, liability or expense which the other suffers as a consequence of a breach of any of its representations or undertakings made pursuant to the Agreed Terms and these Conditions.

19.3 **Notification**

If a claim for any losses, liabilities and expenses is made pursuant to this Condition 19 (*Default*), that claim must be notified by the non-defaulting party to the defaulting party within 60 days after the Settlement Date (such notice to include quantification by the non-defaulting party of such losses, liabilities and expenses) and the defaulting party shall not be liable for any claim not so notified within that period.

19.4 **Buy-in/Sell-out**

   (a)   If the Agreed Terms specify that the transaction shall be subject to delayed settlement compensation and buy-in/sell-out damages then this Condition 19.4 will apply. For the avoidance of doubt, if any transaction has been cancelled in accordance with Condition 4.2 (*Conditions unfulfilled*), this Condition 19.4 will not apply to that transaction.

   (b)   If the transaction is not settled on the Settlement Date because:

      (i)   either party defaults in the performance of its obligations to the other under any Transaction Document; or

      (ii)   any representation or acknowledgement made by either party to the other in any Transaction Document proves to have been incorrect when made,

the other party ("**the non-defaulting party**") may, by no later than 10 Business Days after the Settlement Date, give written notice to that party ("**the defaulting party**") of its intention to terminate its obligations under the Confirmation and to effect a Substitute Transaction (as defined below) in respect of the Traded Portion.

   (c)   During the 3 Business Days following receipt of the notice referred to in paragraph (b) above, the defaulting party shall use all reasonable endeavours to identify a counterparty acceptable to the non-defaulting party to enter into a Substitute Transaction.

   (d)   If the defaulting party:

      (i)   identifies a substitute counterparty acceptable to the non-defaulting party, the Substitute Transaction shall be entered into with such counterparty and the Substitute Trade Date (as defined below) shall be the fifth Business Day following delivery of the notice referred to in paragraph (b) above; or

      (ii)   fails to identify a substitute counterparty acceptable to the non-defaulting party within the time period referred to in paragraph (c) above, then the Seller and the Buyer shall consider in good faith for a further period of up to 5 Business Days whether or not there is an alternative means,

acceptable to both parties, of settling or resolving the failed transaction. If the parties fail to agree such alternative means within such further 5 Business Day period, or such further period or periods as the non-defaulting party may agree, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

(e)     If the transaction is not settled on the Settlement Date because either party defaults in a payment obligation under the Transaction Documents, the defaulting party may remedy such default at any time prior to the Substitute Trade Date by making payment to the non-defaulting party of an amount calculated in accordance with Condition 10 (*Settlement Amount Calculation*).

(f)

    (i)     The non-defaulting party shall send to the defaulting party not later than the first Business Day after the date of signing of the Substitute Confirmation (as defined below) by the parties to it, notice (the "**Purchase Price Notice**") of the purchase price payable under the Substitute Transaction.

    (ii)     If the defaulting party disputes the reasonableness of the purchase price specified in the Purchase Price Notice the defaulting party shall send notice of such dispute (the "**Price Dispute Notice**") to the non-defaulting party not later than the second Business Day after receipt of the Purchase Price Notice.

    (iii)     As soon as reasonably practicable following receipt of the Price Dispute Notice the non-defaulting party shall use reasonable endeavours to obtain indicative quotations for a transaction on the same terms as the Substitute Transaction from three members of the Valuation and Trading Practices Committee of the LMA at that time (or any successor of such Valuation and Trading Practices Committee carrying on substantially the same functions), such three members to be chosen by the non-defaulting party in its sole discretion. The non-defaulting party will calculate the average of the three indicative quotations received and such amount will be the Indicative Price for the purposes of paragraphs (g) and (h) below.

    (iv)     Any determination by the non-defaulting party pursuant to paragraph (iii) above shall, in the absence of manifest error, be conclusive and binding on all parties.

(g)     If the Seller is the defaulting party, the Seller shall pay to the Buyer on the Substitute Settlement Date (as defined below)as follows:

    (i)     if no Price Dispute Notice was issued in relation to the Substitute Transaction, the amount (if any) by which the price in respect of the Buy-

in Transaction (as defined below) exceeds the original price for the Traded Portion; or

(ii)  if a Price Dispute Notice was issued in relation to the Buy-in Transaction the amount (if any) by which the Indicative Price in respect of the Buy-in Transaction exceeds the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, the Seller shall in addition pay an amount equal to (a) Delayed Settlement Compensation for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)  actual settlement of the Buy-in Transaction; and

(ii)  10 Business Days following the Substitute Trade Date; and

(b) if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to above and the Delayed Settlement Costs of Carry calculation for that period results in a negative amount, the absolute value of that amount

(h)  If the Buyer is the defaulting party, the Buyer shall pay to the Seller on the Substitute Settlement Date as follows:

(i)  if no Price Dispute Notice was issued in relation to the Substitute Transaction the amount (if any) by which the price in respect of the Sell-out Transaction (as defined below) is less than the original price for the Traded Portion; or

(ii)  if a Price Dispute Notice was issued in relation to the Sell-out Transaction the amount (if any) by which the Indicative Price in respect of the Sell-out Transaction is less than the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages and if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to below, the Buyer shall in addition pay an amount equal to Delayed Settlement Costs of Carry (if any) for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)  actual settlement of the Sell-out Transaction; and

(ii)  10 Business Days following the Substitute Trade Date.

(i)  For the purposes of this Condition 19.4:

"**Buy-in Transaction**" means a transaction in which the Buyer purchases the equivalent of the Traded Portion from a counterparty other than the Seller;

"**Sell-out Transaction**" means a transaction in which the Seller sells the Traded Portion to a counterparty other than the Buyer;

"**Substitute Confirmation**" means the confirmation signed on behalf of the non-defaulting party and the substitute counterparty in the form most recently published by the LMA evidencing the agreed terms for the Substitute Transaction;

"**Substitute Settlement Date**" means the settlement date specified in the Substitute Confirmation;

"**Substitute Transaction**" means a Buy-in Transaction or, as the case may be, a Sell-out Transaction; and

"**Substitute Trade Date**" means the date on which the non-defaulting party agrees the terms (whether orally or in writing) of the Substitute Transaction with a substitute counterparty.

20.    **WHEN ISSUED TRADES**

If the Trade Date for the transaction is to occur prior to signing of the Credit Agreement (a "**when issued trade**") then the Settlement Date shall be ten Business Days after such signing.  Except with respect to exchanging a Confirmation, all other times for when issued trades shall be calculated from the signing of the Credit Agreement.

21.    **CONFIDENTIALITY**

Either party shall be permitted to make any disclosures regarding the terms of the transaction (other than the identity of the counterparty) subject to the requirements of law or regulation or of the Credit Documentation.  If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

22.    **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

23.    **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party under the transaction.  The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set off.

24.    **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

25.    **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

26.    **GOVERNING LAW AND JURISDICTION**

26.1    **Governing law**

The transaction, the Agreed Terms and these Conditions are governed by English law.

26.2    **Jurisdiction**

The parties submit to the non exclusive jurisdiction of the English courts.

26.3    **Service of process**

The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

27.    **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

27.1    **Counterparts**

Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

27.2    **Fax and electronic communication**

(a)    Transmission by fax of a signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(b)    Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(c)    The Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.

**EXHIBIT C**

**(KYC Request Emails)**

**April 8, 2008 Email**

**From:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Sent:** 08 April 2008 13:13
**To:** Ilomechina, Emeka
**Cc:** Agency@unicreditgroup.co.uk; filippo.nishino@rp3.it
**Subject:** Re: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti

Hi Emeka,

As we haven't dealt with Yarpa Investimenti S.G.R. S.p.A - RP3 Fund before we need the docs listed below so we can complete KYC checks prior to preocessing the trade. We also need to get approval from the borrower for them as a new lender unless they can prove affiliation with an exisiting lender. Please send the docs through at your earliest convenience so I can get started on the KYC asap. Could you also please complete the attached accession agreement and send it back to me for execution with your transfer certificate.

*(See attached file: Lavena.doc)*

Kind Regards,
**Ric**

**April 29, 2008 Email**

----- Forwarded by Richard Langton/Corporate/London/Vereinsbank on 16/05/2008 10:16 -----

|  |  |
|---|---|
| **Richard Langton/Corporate/London/Vereinsbank**<br><br>29/04/2008 10:21 | To "Ilomechina, Emeka" <emeka.ilomechina@lehman.com><br><br>cc Agency@unicreditgroup.co.uk, filippo.nishino@rp3.it<br><br>Subject RE: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti |

Dear Emeka & Filipo,

I have still yet to receive any documents in relation to KYC for Yarpa - please could you send them through at your earliest convenience so I can get started on the KYC asap?

Documents Required:

- **Certified/Notarised** Certificate of Incorporation and certified Memorandums and Articles of Association.
- Proof of ultimate beneficial owner.
- Proof of authority of any individual wishing to represent the company (e.g. signing mandate or board of resolution)
- Proof of identity for any individual wishing to represent the company (passport or national ID card).
- Proof of address for any individual wishing to represent the company (current driving license, utility bill [not mobile phone bill] or national ID card with address [if not used for proof of identification]).
- If the fund is owned by a CLO or CDO the Articles of Association (or equivalent) of their shareholder.
- If the fund is more than one year old an annual/business report.
- Admin details
- **Certificate of Residence (for withholding tax purposes)**
- **One** of the following agreements:

Any agreement drawn up between the other
parties/regulated entities connected and managing the fund

Prospectus
Offering Circular
Offering Memorandum
Warehousing agreement
Variable Note agreement
Interim Collateral Management agreement
Interim Asset Management agreement
Agency agreement
Interim Collateral Administration agreement
Investment Management agreement
Loan Administration agreement
Agreement of Limited Partnership
Variable Funding Note
Cash Management agreement
Master Participation and Forward Purchase Deed
Warehouse Risk Sharing and Funding agreement

----------------------------------------

Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 – Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

**May 16, 2008 Email**

Richard Langton/Corporate/London/Vereinsbank

| | |
|---|---|
| **Richard Langton/Corporate/London/Vereinsbank** <br><br> 16/05/2008 10:18 | To "Ilomechina, Emeka" <emeka.ilomechina@lehman.com> <br><br> cc Agency@unicreditgroup.co.uk, filippo.nishino@rp3.it <br><br> Subject Fw: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti |

Guys I have still yet to receive any KYC documents for this new lender - this trade has been pending for over a month now, please could you forward the requested docs ASAP. Filipo, when I last spoke with Emeka he advised you had sent me the documents before but I have not received anything - could I suggest maybe spreading the docs over several emails rather than sending them in one big one?

----------------------------------------
Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 – Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

**June 11, 2008 Email**

**Da:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Inviato:** mercoledì 11 giugno 2008 16.39
**A:** Agency@unicreditgroup.co.uk; Ilomechina, Emeka; Filippo Nishino
**Cc:** Ilomechina, Emeka; Filippo Nishino
**Oggetto:** [SPAM] - Re: Fw: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti - Found word(s) risk free free guaranteed in the Text body


Dear Filippo,

Please could you send me the requested KYC docs **asap**, I have had this trade sitting on my desk for over 2 months now and have yet to receive any of the docs I requested. If you are having problems emailing them, please print them out & post/courrier them to me at the below address - please note, we do not need original docs.

I cannot get the trade executed until we have completed our KYC checks.

----------------------------------------
Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 – Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

**EXHIBIT D**

**(LCPI Emails)**

**April 11, 2008 Emails**

**From:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Sent:** 11 April 2008 12:44
**To:** Ilomechina, Emeka
**Cc:** Agency@unicreditgroup.co.uk; filippo.nishino@rp3.it
**Subject:** RE: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti

Thanks for this Emeka, I can't give you a settlement date - I have yet to receive the KYC docs I requested.

Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 - Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

"Ilomechina, Emeka" <emeka.ilomechina@lehman.com>

    To<Richard.Langton@unicreditgroup.co.uk>

    cc<Agency@unicreditgroup.co.uk>, <filippo.nishino@rp3.it>

    SubjectRE: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti

Hi Richard,

Please see signed accesion agreement.

If all is in order, kindly advise when we can close.

Regards,

Emeka

**April 16 2008 Emails**

"Ilomechina, Emeka" <emeka.ilomechina@lehman.com>

| | |
|---|---|
| **"Ilomechina, Emeka" <emeka.ilomechina@lehman.com>**<br><br>16/04/2008 12:09 | To<filippo.nishino@rp3.it><br><br>cc<Agency@unicreditgroup.co.uk>,<br>   <Richard.Langton@unicreditgroup.co.uk><br><br>SubjecRE: Tranasfer Lavena Mezz btwn Lehman and<br>t Yarpa investimenti |

Filipo,

I thought you were sending the KYC docs to Richard?

Rgds,

Emeka

**From:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Sent:** 16 April 2008 11:58
**To:** Ilomechina, Emeka
**Cc:** Agency@unicreditgroup.co.uk; filippo.nishino@rp3.it
**Subject:** RE: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti

Emeka, I have still not received any docs.

Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 - Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

"Ilomechina, Emeka" <emeka.ilomechina@lehman.com>

| | |
|---|---|
| **"Ilomechina, Emeka"** **<emeka.ilomechina@lehman.com>** | To <Richard.Langton@unicreditgroup.co.uk> |
| **16/04/2008 11:53** | cc <Agency@unicreditgroup.co.uk>, <filippo.nishino@rp3.it> |
| | Subject RE: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti |

Hi Richard,

Have the KYC checks In relation to Yarpa been satisfied?

If so can we arrange a transfer date?

Many Thanks,

Emeka

**June 16, 2008 Emails**

**To:** "Filippo Nishino" <filippo.nishino@rp3.it>, <Richard.Langton@unicreditgroup.co.uk>, <Agency@unicreditgroup.co.uk>

**Subject:** RE: [SPAM] - Re: Fw: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti - Found word(s) risk free free guaranteed in the Text body

i also forwarded them across.

It may also be an idea to send over hard copies in the meantime?

**From:** Filippo Nishino [mailto:filippo.nishino@rp3.it]
**Sent:** 16 June 2008 10:44
**To:** Richard.Langton@unicreditgroup.co.uk; Agency@unicreditgroup.co.uk
**Cc:** Ilomechina, Emeka
**Subject:** R: [SPAM] - Re: Fw: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti - Found word(s) risk free free guaranteed in the Text body
**Importance:** High

Dear Richard
As you know, I've sent you the docs you're requiring **TWO TIMES, at the second time I've split the docs to e-mail them to you.** Could you please chek it?
I've sent you the e-mails with all the docs listed below on :
24th April 2008
19th May 2008 2nd time

Best rgds
FKN

**Da:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Inviato:** mercoledì 11 giugno 2008 16.39
**A:** Agency@unicreditgroup.co.uk; Ilomechina, Emeka; Filippo Nishino
**Cc:** Ilomechina, Emeka; Filippo Nishino
**Oggetto:** [SPAM] - Re: Fw: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti - Found word(s) risk free free guaranteed in the Text body

Dear Filippo,

Please could you send me the requested KYC docs **asap**, I have had this trade sitting on my desk for over 2 months now and have yet to receive any of the docs I requested. If you are having problems emailing them, please print them out & post/courrier them to me at the below address - please note, we do not need original docs.

I cannot get the trade executed until we have completed our KYC checks.


----------------------------------------
Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 – Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

**July 3 Email**

**Ilomechina, Emeka**

**From:** Ilomechina, Emeka
**Sent:** 03 July 2008 15:54
**To:** 'info@yarpa.it'
**Cc:** 'info@rp3.com.it'; 'Filippo Nishino'; Roberto Perini; Street, Karine M; Ribeiro, Neils
**Subject:** Lehman Sells Lavena to Yarpa 4th March 08

**Attachments:** RE: [SPAM] - Re: Fw: Transfer Lavena Mezz btwn Lehman and Yarpa investimenti - Found word(s) risk free free guaranteed in the Text body;
AR-M450_20080703_163144.pdf

        📎        📎
                   RE: [SPAM] - Re:    AR-M450_20080703
                   Fw: Transfer:...    3_163144.pdf (3...

Dear Mauro,
Thanks for your letter dated 25th June 08.

I understand your disappointment in having not settled this trade after so long. Unfortunately it appears you are not full aware of the facts.

All trade documents (Trade confirms and Transfer certificates) were completed and signed by the 8th of April 3 weeks after the trade date.

At this point the agent requested from Filippo KYC documentation in order to complete the transfer. It is at this stage that the trade stalled.

Filippo advised that he had sent this, however the agent says he has not received this. We suspected it could have been due to the size of the documents. I advise Filippo to send to me and I would forward to the agent. I received the some of the docs (I don't think everything came through), and forwarded to the agent, however, again, the agent did not receive them.

I advised Filippo, that while he is working out the best way to get these docs to the agent via email, he should send hard copies via post. (Please see attached email trail) This conversation took place on the 16th of June 08.

As of yet the agent does not appear to have received these.

As soon as the agent receives these docs, they will be able progress with their KYC checks, and proceed to complete the transfers. I don't anticipate this will take more than a couple of days.

I therefore, ask that these docs are sent over to the agents asap. Once this is done we can finally get this transfer completed.

If you would like to discuss this matter further, please do not hesitate to give me a call.

Kind Regards,

1

**EXHIBIT E**

**(Agent's July 23 Email)**

**From:** Richard.Langton@unicreditgroup.co.uk [mailto:Richard.Langton@unicreditgroup.co.uk]
**Sent:** 23 July 2008 16:00
**To:** Ilomechina, Emeka
**Cc:** filippo.nishino@rp3.it
**Subject:** Re: Tranasfer Lavena Mezz btwn Lehman and Yarpa investimenti

Hi Guys,


I received all the necessary KYC docs from Yarpa yesterday & can now confirm KYC is complete. Settlement for this trade will be 31st July with executed docs to follow tomorrow morning. Please let me know **asap** if this date is unsuitable for either party.



-----------------------------------------
Kind Regards,
**Richard Langton**
Loans Agency

**UniCredit Markets & Investment Banking**
Bayerische Hypo- und Vereinsbank AG
Moor House
120 London Wall
London
EC2Y 5ET
Tel. +44 207 826-1508 – Fax +44 207 826-1520
mailto:Richard.Langton@unicreditgroup.co.uk
www.unicreditmib.eu

**EXHIBIT F**

**(June 25 Letter)**



To:

Emeka Ilomechina

Lehman Commercial Paper Inc, UK Branch
25 Bank Street
London
E14 5LE

_Recorded-delivery letter with advice of receipt_

June 25th, 2008, Genova

Dear Sirs,

Re: LMA TRADE CONFIRMATION (PAR) RELATING TO THE EUR 501,378,000.00 - SUBORDINATION FACILITY AGREEMENT DATED 2nd MARCH 2007 (AS AMENDED AND RESTATED OR SUPPLEMENTED FROM TIME TO TIME THE FACILITY AGREEMENT)

We make reference to the LMA Trade Confirmation in caption executed between Lehman Commercial Paper Inc., UK Branch, as seller (the "Seller") and our company, Yarpa Investimenti S.G.R. S.p.A. - RP3 Fund, as buyer, on 12th March 2008, attached herewith under Annex "A" (the "Confirmation" whose terms defined in capital letters, unless otherwise defined herein, are incorporated in this letter).

According to the Confirmation: (i) the Trade Date has been agreed as being the 4th March 2008 and (ii) the Settlement Date has been agreed as being "as soon as practicable".

Despite several written requests via e-mails dated 11th April 2008, 24th April 2008, 19th May 2008 and 16th June 2008, so far we have not yet been provided by you with the duly completed Transfer Certificate, it being expressly provided in the Confirmation that the Settlement Date will occur ( by delivery of the Transfer Certificate to the Buyer) "as soon as practicable". As you may surely appreciate, the compliance of the obligation to deliver the Transfer Certificate to our company after c.a. 4 months as from the Trade Date cannot be deemed in any manner whatsoever as being fulfilled 'as soon as practicable'.

In light of the foregoing, we hereby formally request you the delivery of the Transfer Certificate duly completed to our company at the following address:

Yarpa Investimenti SGR SpA
Via Roma 3
1621, Genova
Italy
e-mail: info@yarpa.it
e-mail c.c.: info@rp3.it

by and not later than 7 Business Days as from the date hereof, otherwise the transaction provided under the LMA Trade Confirmation will be deemed as being terminated among the parties, thus resulting in the purchase price paid by our company in favour of the Seller undue and without prejudice, however, to our rights to claim any damage incurred by us as a consequence of the failure by the Seller to comply with the obligation provided thereunder.

Kind regards,

Yarpa Investimenti S.G.R. S.p.A. - RP3 Fund
Director: Mauro Rebutto

YARPA Investimenti – Società di Gestione del Risparmio S.p.A.
Sede di Genova –Via Roma, 3 - 16121 - Tel 010/581061 - Fax 010/581400 E-mail :info@yarpa.it
Ufficio di Milano – Via Caldera 21 – 20153
CCIAA Genova N. 360037 Capitale Sociale Euro 3.873.450,00 - Codice Fiscale e Partita IVA 03608700104 – Albo SGR n. 64
Società unipersonale soggetta ad attività di direzione e coordinamento di YARPA S.p.A.

**EXHIBIT G**

**(July 21 Letter)**



To:
Emeka Ilomechina

Lehman Commercial Paper Inc, UK Branch
25, Bank Street
London
E14 5LE

Genoa, 21th July 2008

*Recorded-delivery letter with advice of receipt*

Dear Sirs,

**Re: LMA TRADE CONFIRMATION (PAR) RELATING TO THE EUR 501,378,000.00 - SUBORDINATION FACILITY AGREEMENT DATED 2 MARCH 2007 (AS AMENDED AND RESTATED OR SUPPLEMENTED FROM TIME TO TIME) (the "Facility Agreement" and the "Confirmation")**

We make reference to the LMA Trade Confirmation in caption executed between Lehman Commercial Paper Inc., UK Branch, as seller (the **"Seller"**) and our company, Yarpa Investimenti S.G.R. S.p.A. - RP3 Fund, as buyer, on 12 March 2008 (the **"Confirmation"** whose terms defined in capital letters, unless otherwise defined herein, are incorporated in this letter).

We also make reference to our letter dated 25th June 2008 and to the correspondence exchanged with the Seller and Bayerische Hypo - und Vereinsbank AG, as Facility Agent under the Facility Agreement, evidencing our repeated delivery of the requested documentation (both via email and in hard copy) to the Facility Agent in order to complete the transaction under the Confirmation.

In light of the foregoing and as a consequence of the expiry of the 7-Business Days period referred to in our letter dated 25th June 2008 without any receipt by our company of the requested Transfer Certificate (as defined in the Facility Agreement), we hereby formally notify you the termination of the LMA Trade Confirmation, which, therefore, will be deemed as being "ab initio" as never been entered into and, therefore, ineffective, between you and our company.

Kind regards,

Yarpa Investimenti S.G.R. S.p.A. - RP3 Fund

YARPA Investimenti – Società di Gestione del Risparmio S.p.A.
Sede di Genova –Via Roma, 3 - 16121 - Tel 010/581061 - Fax 010/581400 E-mail :info@yarpa.it
Ufficio di Milano – Via Caldera 21 – 20153
CCIAA Genova N. 360037  Capitale Sociale Euro 3.873.450,00 - Codice Fiscale e Partita IVA 03608700104 – Albo
SGR n. 64
Società unipersonale soggetta ad attività di direzione e coordinamento di YARPA S.p.A.

**EXHIBIT H**

**(August 7 Email)**

-----Original Message-----
From: Filippo Nishino [mailto:filippo.nishino@rp3.it]
Sent: Thursday, August 07, 2008 3:44 PM
To: Street, Karine M
Subject: Prosieben

Dear Karine,

thanks for your call. As I was explaining you, all my colleagues are in vacations (it's impossible to me come back to you at the beginning of September.

Best regards

FKN

1

**EXHIBIT I**

**(September 2 Letter)**

LEHMAN BROTHERS

Without Prejudice

2nd September 2008

RP3 Prosperity SpA
Via Santa Radegonda, 11
20121 Milano
Italy

For the attention of: Filippo K. Nishino and Roberto Perini

Dear Sirs,

**Loan trade between Lehman Commercial Paper Inc., UK Branch ("Lehman") and Yarpa Investimenti SGR SpA – RP3 Fund ("Yarpa") in relation to EUR 2,000,000 of the Mezzanine Facility between, amongst others, Lavena Holding 4 GmbH and Bayersiche Hypo-und Vereinsbank AG (the "Trade")**

We refer to the Trade which was documented by a fully executed trade confirmation dated 12th March 2008 (the "Trade Confirmation"). Under the terms of the Trade Confirmation, the Trade is subject to the standard terms and conditions for Par Trade Transactions of the Loan Market Association. The settlement date for the Trade was stated to be "as soon as practicable" in the Trade Confirmation. As you are aware, following completion of the outstanding "know your customer" ("KYC") documentation process, Lehman requested that Yarpa complete the Trade in accordance with the terms of the contract between the parties.

Our understanding is that Yarpa is claiming that the completion of the Trade has been delayed for an excessive period of time and therefore it is no longer prepared to complete the Trade. We do not recognize the contractual basis for such a claim. Further, we do not accept that this is a legitimate justification as the reason for the delay was the failure by Yarpa to deliver successfully the relevant KYC documentation to the facility agent.

The original request for KYC documents was made by the facility agent on 8th April. Following numerous reminders from the facility agent, we are aware that Yarpa sent an e-mail to the facility agent on 16th June saying the KYC documentation had been sent previously. The facility agent advised that it had not received these documents, as it had advised Yarpa on a previous occasion, and asked for hard copies to be sent to it. Notwithstanding this further request, the documents were not finally received by the facility agent until 22nd July 2008. It is not acceptable for Yarpa to rely on its own actions as a reason for failing to fulfill its contractual obligations.

Under the terms of the contract, there is no basis for Yarpa to refuse to complete the Trade and we are writing to request that Yarpa complies with its contractual obligations without further delay. In the meantime, we reserve fully all of our rights in relation to this matter.

Yours faithfully,

Bruce Hendry
Executive Director & Legal Counsel
Lehman Brothers

**EXHIBIT J**

**(January 26, 2008 [sic]
Letter to Debtors' Counsel)**



Messrs.
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.

Genova, 26 January 2008

**BY COURIER**

Dear Sirs,

**Re.: NOTICE OF FILING OF REVISED EXHIBITS AND REVISED PROPOSED ORDER RELATING TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

Reference is made to your letter dated December 14, 2008 and to the Exhibit A ("**Assumed Trades**") attached thereto (hereinafter, the "**Notice**").

Capitalised terms used in the Notice shall have the same meaning where used in this letter, unless otherwise provided herein.

According to the Notice, our company, Yarpa Investimenti S.G.R. S.p.A. - RP3 Fund ("**our Company**" or "**Yarpa**"), is referred to as Customer of Lehman Commercial Paper Inc., UK Branch ("**LCPIUK**") in connection with the deal named "Lavena Mezz (2 Mar07) Prosieben Holdco" (the **Lavena Deal**"), which has been mistakenly included among the Assumed Trades whilst, on the contrary, such trade has never been completed between our Company and LCPIUK, as the conditions to such completion were not met due to the inactivity of both LCPIUK and the Facility Agent (as defined below).

The rationale of such conclusion is based on the following events which, for the sake of completeness, we deem useful to summarize hereinafter in chronological order:

I.    March 2, 2007:

    (a)    execution of the subordinated facility agreement ,(the "**Execution Version of the Facility Agreement**") as subsequently amended among, *inter alios*, certain lenders (including LCPIUK), Lavena Holding 3 GMBH, as borrower and Bayerische Hypo- und Vereinsbank AG, as agent (the "**Facility Agent) (see *Annex 1* enclosed herewith);

    and

    (b)    execution of the intercreditor agreement (the "**Execution Version of the Intercreditor Deed**") among, *inter alios,* LCPIUK and Bayerische Hypo- und Vereinsbank AG, as security agent (the "**Security Agent**") (see *Annex 2* enclosed herewith);

II.    March 4, 2008: the trade is placed for a nominal value of Euro 2 million (the "**LMA Trade**");

YARPA Investimenti – Società di Gestione del Risparmio S.p.A.
Sede di Genova – Via Roma, 3 - 16121 - Tel 010/581061 - Fax 010/581400 E-mail: info@yarpa.it
Ufficio di Milano – Via Caldera 21 – 20153
CCIAA Genova N. 360037 Capitale Sociale Euro 3.873.450,00 - Codice Fiscale e Partita IVA 03608700104 – Albo SGR n. 64
Società unipersonale soggetta ad attività di direzione e coordinamento di YARPA S.p.A.



III.    June 25, 2008: letter from Yarpa to LCPIUK formally requesting the delivery of the Transfer Certificate within the following 7 Business Days, otherwise the LMA Trade would be deemed as terminated *ab initio* (see _Annex 3_ enclosed herewith);

IV.    July 14, 2008: letter from Yarpa to the Agent enclosing the KYC Documents (see _Annex 4_ enclosed herewith);

V.    July 21, 2008: letter from Yarpa to LCPIUK formally declaring the termination *ab initio* of the LMA Trade (see _Annex 5_ enclosed herewith);

**Without prejudice to the foregoing, we must also notice that one of the reasons why the trade could have not been executed is due to the minimum size of the trade: according to the Clause 21.2 (a) of the Execution Version of the Facility Agreement the minimum size to complete the transaction is Euro 3 million while Yarpa's bid was placed for Euro 2 million.**

We believe that this letter provides sufficient clarifications for the deletion of the Lavena Deal from the list of Assumed Trades. As you may appreciate, notwithstanding the pro-active and constructive behaviour held by Yarpa, during more than 4 months our Company has never been provided with a confirmation or an update of the status of the LMA Trade nor with a clarification or feedback that the LMA Trade was incapable of being completed due to the size of the transaction, thus implying – as a logical consequence - the termination *ab initio* of the transaction, as declared by Yarpa pursuant to the document referred to in paragraph V. above.

Nevertheless, we remain at your full disposal for any additional information you may require or deem useful in connection with the foregoing.

Best regards,

Yarpa Investimenti S.G.R. S.p.A.
RP3 Fund

YARPA Investimenti – Società di Gestione del Risparmio S.p.A.
Sede di Genova –Via Roma, 3 - 16121 - Tel 010/581061 - Fax 010/581400 E-mail: info@yarpa.it
Ufficio di Milano – Via Caldera 21 – 20153
CCIAA Genova N. 360037 Capitale Sociale Euro 3.873.450,00 - Codice Fiscale e Partita IVA 03608700104 – Albo SGR n. 64
Società unipersonale soggetta ad attività di direzione e coordinamento di YARPA S.p.A.