# EXHIBIT 1

## Loan Market Association Standard Terms

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.[1]

# LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR PAR TRADE TRANSACTIONS

1. **APPLICABILITY AND INTERPRETATION**

1.1 **Applicability**

These Conditions apply to a par trade transaction in respect of which:

(a)    they are expressly incorporated; and

(b)    the Trade Date occurs on or after 5 January 2009 and before the date on which they are superseded by revised conditions.

1.2 **Interpretation**

For the purpose of construing these Conditions in relation to a par trade transaction to which they apply (the **"transaction"**):

**"Agreed Terms"** means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

**"Average LIBOR"** means, for the Delayed Settlement Period, the result of dividing (a) the sum of all the individual LIBORs for each day during the Delayed Settlement Period by (b) the total number of days in the Delayed Settlement Period;

**"Business Day"** means a day (other than a Saturday or Sunday) on which banks are open for general business in each financial centre appropriate for the transaction;

**"Confirmation"** means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

**"Credit Agreement"** means the credit agreement to which the transaction relates;

**"Credit Documentation"** means the Credit Agreement (including all schedules and appendices to the Credit Agreement), any amendments to the Credit Agreement and all guarantee and security documentation relating to the Credit Agreement;

**"Delayed Settlement Compensation"** means, for any day an amount equal to:-

(a)    the cash pay element of the Contractual Margin and Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the funded principal amount of the Purchased Assets) multiplied by the funded principal amount of the Purchased Assets

---

[1] Please delete this box before sending out document.

(excluding the amount of any PIK Interest that has capitalised on or after the Trade Date in respect of the Purchased Assets) for each such day; and

(b)    the Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the unfunded portion of the Purchased Assets) multiplied by the unfunded portion of the Purchased Assets for each such day.

"**Delayed Settlement Costs of Carry**" means, for any day an amount equal to the amount payable for the Purchased Assets (calculated in accordance with Condition 10.1 (*Settlement Amount Calculation*) but without being adjusted to take account of Delayed Settlement Compensation, Delayed Settlement Costs of Carry and any applicable recordation, processing, transfer or similar fee) multiplied by Average LIBOR for each such day minus the amount of interest actually received by the Seller (and not capitalised or deferred) in respect of the Purchased Assets for each such day.

"**Delayed Settlement Period**" means the period from (and including) the later of (i) the date falling 10 Business Days after the Trade Date and (ii) the Settlement Date[2] to (but excluding) the day on which settlement of the transaction actually occurs.

"**LIBOR**" means, for any day, the British Bankers' Association Interest Settlement Rate for the offering of deposits in the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen as of 11.00 a.m. (London time) on such day.  If the appropriate page is replaced or service ceases to be available, the Seller, acting reasonably, may specify another page or service displaying the appropriate rate.

"**Obligor**" means any Borrower or Guarantor and any other obligor under the Credit Documentation;

"**PIK Interest**" means any interest, fees or other amounts payable by an Obligor under the Credit Agreement which are either:-

(a)    automatically deferred or capitalised; or

(b)    deferred or capitalised at the option of any Obligor.

"**Purchased Assets**" means (except as provided in Condition 11.4 (*Settled without accrued interest (Pro Rata)*) the loans, other utilisations and other rights of the Seller included in the Traded Portion, together with and subject to the obligations and liabilities of the Seller attributable to the Traded Portion (together with corresponding rights and benefits under any guarantee or security relating to the Traded Portion);

"**Relevant Participation**" means, in the case of a risk participation, the commitment included in the Traded Portion including any drawn portion of that commitment;

---

[2] This ensures that if a Settlement Date of less than 10 business days has been selected, Delayed Settlement Compensation/Costs of Carry will nevertheless only be payable after T + 10.

"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase) and "**Transaction Document**" shall be construed accordingly.

1.3  **Construction**

(a)  Unless a contrary indication appears, capitalised terms used in these Conditions have the meaning given to them in the Confirmation.

(b)  If the parties agree to enter into a par trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

(c)  A par trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility, which the parties to a transaction, by applying these Conditions, designate as a par loan or other form of credit.

(d)  Headings are for ease of reference only.

1.4  **Agreed Terms prevail**

In the case of any inconsistency between the Agreed Terms and these Conditions, the Agreed Terms shall prevail.

2.  **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets (and/or, in the case of a risk participation, the Relevant Participation) shall come into effect between the Seller and the Buyer upon oral or, as the case may be, written agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 6 (*Transaction Documentation*) and 7 (*Settlement Date and Payment*).

3.  **CONFIRMATION**

(a)  The Seller shall send to the Buyer not later than the first Business Day after the Trade Date, a duly completed form of confirmation, signed on behalf of the Seller and in the form most recently published by the LMA.

(b)  The Buyer shall sign that confirmation and return it to the Seller not later than the second Business Day after the Trade Date.

(c)  The Buyer shall immediately after receipt of that confirmation and, in any event, not later than the close of business on the second Business Day after the Trade Date, raise with the Seller any disagreement with any of the terms of that confirmation.

4.  **CONDITIONALITY**

4.1  **Conditionality**

(a)  A transaction is subject to any conditions specified in the Agreed Terms.

(b)    Subject to paragraph (c) below, each of the Seller and the Buyer agrees to use all reasonable endeavours to ensure that the conditions referred to in paragraph (a) above are duly fulfilled on or before the Settlement Date.

(c)    The Seller shall use all reasonable endeavours to obtain any third party consents required in connection with the transaction.

**4.2    Conditions unfulfilled**

(a)    If any condition referred to in paragraph (a) of Condition 4.1 (*Conditionality*) remains unfulfilled on the proposed Settlement Date then:

    (i)    the Settlement Date shall be postponed for such period or periods as the Seller and the Buyer agree ( the "**Postponement Period**"); and

    (ii)    during the Postponement Period, the Seller and the Buyer shall (A) use all reasonable endeavours to ensure fulfilment of each condition which remains unfulfilled and (B) consider in good faith whether or not there is an alternative means, acceptable to both parties, of implementing the transaction.

(b)    If:

    (i)    within 5 Business Days of the proposed Settlement Date no Postponement Period is agreed; or

    (ii)    a Postponement Period is agreed within the time specified in paragraph (i) above but one or more condition specified in paragraph (a) of Condition 4.1(*Conditionality*) remains unfulfilled on the last day of the Postponement Period and no alternative means of settling the transaction has been agreed on or before the last day of the Postponement Period,

then the transaction shall be cancelled and neither party shall have any further liability to the other except that if any amounts have already been paid under the transaction by either party to the other those amounts shall promptly be returned.

(c)    Neither party is obliged to take any steps under this Condition 4.2, if in the opinion of that party to do so might be prejudicial to it.

(d)    Notwithstanding any other provision of this Condition 4.2, if the parties have specified in the Agreed Terms an alternative means of implementing the transaction they shall use all reasonable efforts (subject to the terms of the Credit Documentation and otherwise on such of the Agreed Terms as are applicable) to settle the transaction in that way within 10 Business Days of the original Settlement Date.

5.   **DUE DILIGENCE**

5.1   **Credit appraisal by Buyer**

The Buyer agrees that it has satisfied itself as to the creditworthiness of each Obligor and the acceptability of the transaction prior to the Trade Date and the transaction shall not be conditional upon this.

5.2   **Confidentiality**

If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer then:

(a)   the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if none is so prescribed, in the then current form prescribed by the LMA; and

(b)   subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

5.3   **Legal review**

If the Agreed Terms specify that the transaction shall be subject to a satisfactory legal review of the sufficiency of the Credit Documentation, then the Buyer shall review the Credit Documentation as soon as reasonably practicable and promptly notify the Seller if the results of that review are not satisfactory.  Any such review shall be limited to a legal review of the sufficiency of the Credit Documentation.

5.4   **Events of default**

The occurrence before the Settlement Date of an event of default or potential event of default under the Credit Documentation, or an event which affects (either adversely or beneficially) the ability of an Obligor to perform its obligations under the Credit Documentation, shall not relieve either party of its obligations in relation to the transaction.

5.5   **Seller not lender of record**

If the Seller is not a lender of record and the Agreed Terms specify that the transaction shall be conditional upon a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from a lender of record then:

(a)   subject to obtaining all necessary consents, the Seller shall make full disclosure of those arrangements to the Buyer (other than any such arrangements which relate to pricing and are not required to establish the Seller's interest in the Traded Portion); and

(b)   the Buyer shall promptly notify the Seller if the results of that review are not satisfactory.

6.   **TRANSACTION DOCUMENTATION**

(a)   The party specified in the Agreed Terms shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant condition specified in the Agreed Terms, endeavour to deliver it to the other party within three Business Days after the Trade Date.

(b)   The parties shall endeavour to sign the Transaction Documentation and, where appropriate, provide copies to the agent bank under the Credit Agreement, within five Business Days after the Trade Date.

(c)   The time limits in this Condition 6 shall be subject to Condition 20 (*When Issued Trades*).

7.   **SETTLEMENT DATE AND PAYMENT**

7.1   **Settlement date**

The transaction shall be settled on the Settlement Date by the taking of all necessary action to complete the transaction.  Subject to Condition 20 in relation to "when issued trades", the Settlement Date shall be the date falling ten Business Days after the Trade Date.

7.2   **Delayed settlement**

(a)   If for any reason the transaction settles after the Settlement Date then, subject to paragraph (b) below, for the purpose of allocating interest and fees (including PIK Interest) under these Conditions and for the purposes of the Seller's representations in paragraphs (a) and (b) of Condition 18.2, the Settlement Date shall be the date of actual settlement of the transaction.

(b)   If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, then if the transaction settles after the Settlement Date, for each day during the Delayed Settlement Period:-

(i)   the Seller shall pay to the Buyer, Delayed Settlement Compensation for each such day; and

(ii)   if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the Delayed Settlement Period, the Buyer shall pay to the Seller the Seller's Delayed Settlement Costs of Carry for each such day unless the Delayed Settlement Costs of Carry in respect of the Delayed Settlement Period result in a negative amount in which case the Seller shall pay to the Buyer the absolute value of that amount.

7.3   **Necessary action**

The action necessary to complete a transaction shall include the payment for the Purchased Assets on the Settlement Date, unless the transaction is to take effect only as a risk participation.

7.4 **Funded participations**

Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

8. **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets and/or Relevant Participation to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement and, within each facility, *pro rata* to the tranches thereof, if more than one.

9. **PERMANENT REDUCTION**

(a)    The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively the "**Permanent Reductions**") shall be treated in accordance with Condition 10 (*Settlement Amount Calculation*).  In the case of a risk participation, any permanent commitment reductions relating to the Traded Portion after the Trade Date shall reduce the Relevant Participation accordingly.

(b)    Permanent repayments of principal which occur in respect of the Purchased Assets (or otherwise) after the Trade Date and on or before the Settlement Date are for the account of the Seller.  If on or after the Settlement Date any such repayments of principal in respect of the Purchased Assets are paid to the Buyer, the Buyer shall promptly after receipt pay a corresponding amount to the Seller.

10. **SETTLEMENT AMOUNT CALCULATION**

10.1 **Settlement amount calculation**

The amount payable for the Purchased Assets shall be equal to the Purchase Rate (as specified in the Agreed Terms) multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date <u>less</u>:

(a)    (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date; and

(b)    (100% minus the Purchase Rate) multiplied by any Permanent Reductions (as defined in Condition 9 (*Permanent Reductions*) which occur in respect of the Purchased Assets after the Trade Date and on or before the Settlement Date,

adjusted to take account of any Delayed Settlement Compensation and Delayed Settlement Costs of Carry payable in accordance with paragraph (b) of Condition 7.2 (*Delayed Settlement*) and any applicable recordation, processing, transfer or similar fee which under the Agreed Terms is to be payable by either party.

10.2 **Payments**

If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

10.3 **Currencies**

Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 10.

11. **INTEREST PAYMENTS AND FEES**

11.1 **Interest rates**

All interest and fees referred to in this Condition 11 which are expressed to accrue by reference to time elapsed are based on the rates contained in the Credit Agreement.

11.2 **Settled without accrued interest**

    (a)    Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if "**Settled Without Accrued Interest**" is specified in the Agreed Terms then, subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, upon receipt by the Buyer of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date), the Buyer shall promptly pay to the Seller an amount equal to the amount of such interest or fees.

    (b)    If the Buyer pays any amount to the Seller in accordance with paragraph (a) above and either:

        (i)    the Buyer does not receive all or part of such amount under the Credit Documentation; or

        (ii)    after the Buyer has made that payment to the Seller, the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement requiring the Buyer to repay the whole or any part of any amounts paid by or through such agent to which that payment was attributable,

then the Seller shall promptly, after demand by the Buyer, repay to the Buyer the whole or a proportionate part of such payment.

11.3 **Paid on settlement date**

    (a)    Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if "**Paid on Settlement Date**" is specified in the Agreed Terms then subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, the Buyer shall pay to the Seller on the Settlement Date an amount equal to the amount of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the

fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date).

(b)    Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if, on or after the Settlement Date, any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets are paid to the Seller, the Seller shall promptly after receipt pay a corresponding amount to the Buyer.

(c)    The Buyer shall have no right of recourse to the Seller in relation to any amounts paid to the Seller in accordance with paragraph (a) above including, without limitation, in circumstances where the Buyer does not receive all or part of any interest or fees on their due date or the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement.

**11.4    Settled without accrued interest (Pro Rata)**

If under the terms of the Credit Documentation in relation to a transaction the Seller is to retain the right to receive its portion of any interest or fees, accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date) then, notwithstanding Conditions 11.2 (*Settled without accrued interest*) and 11.3 (*Paid on settlement date*): (a) the Seller shall be so entitled pursuant to these Conditions; and (b) the Seller shall have no recourse whatsoever to the Buyer if such interest or fees are not received by it.

**11.5    Discounted from next roll-over date**

If "**Discounted from next roll-over date**" and "**Paid on Settlement Date**" are each specified in the Agreed Terms then any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than PIK Interest) but which are not payable until the next roll-over date applicable under the Credit Agreement shall be discounted from such roll-over date back to the Settlement Date at IBOR (as such rate is calculated in accordance with Condition 12 (*Breakfunding*)) on a simple interest basis.

**11.6    N/A**

If "**N/A**" is specified in the Agreed Terms then, subject to Condition 11.10 (*PIK Interest*), the Buyer shall not be obliged to make any payment to the Seller in respect of accrued interest or accrued fees, either on the Settlement Date or on receipt of any such interest or fees.

**11.7    Partial payments of interest**

Partial payments of interest shall be applied to payment dates pro rata to the amounts due on such payment dates (unless otherwise specified in the Credit Agreement).

**11.8    Upfront fee**

Any Upfront Fee shall be paid on the Settlement Date in the amount and by the party specified in the Agreed Terms.

11.9    **Allocation of interest and fees**

Unless these Conditions otherwise provide (and save where the transaction is to take effect as a risk participation only) or where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies:

(a)    any interest or fees (other than PIK Interest) which are payable under the Credit Agreement in respect of the Purchased Assets and which are expressed to accrue by reference to the lapse of time shall, to the extent they accrue in respect of the period before (and not including) the Settlement Date, be for the account of the Seller and, to the extent they accrue in respect of the period after (and including) the Settlement Date, be for the account of the Buyer; and

(b)    all other fees shall, to the extent attributable to the Purchased Assets and payable after the Trade Date, be for the account of the Buyer.

11.10    **Payments clear of deduction or withholding**

All payments made under this Condition 11 shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice. If any such deduction or withholding is made or is required to be made, the payer shall increase the amount to be paid to the payee to ensure that the payee receives and retains a sum equal to the sum which it would have received and retained had no such deduction or withholding been made or required to be made.

11.11    **PIK Interest**

(a)    PIK Interest that is deferred or capitalised before the Trade Date in respect of the Purchased Assets shall be for the account of the Seller and shall therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(b)    PIK Interest that is deferred or capitalised on or after the Trade Date in respect of the Purchased Assets shall be for the account of the Buyer at no cost to the Buyer and shall not therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(c)    PIK Interest that has accrued but not deferred or capitalised as at the Settlement Date in respect of the Purchased Assets shall be for the account of the Buyer upon capitalisation at no cost to the Buyer and shall not be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

12.    **BREAKFUNDING**

(a)    If the Agreed Terms specify that this Condition will apply then, in relation to each funded portion of the Purchased Assets, the Seller and the Buyer shall agree upon the relevant IBOR.

(b)    For the purposes of this Condition 12 (*Breakfunding*) and each funded portion of the Purchased Assets:

(i)    "**IBOR**" means the Interbank Offered Rate which shall be calculated, where necessary, by interpolating on a linear basis between the rate quoted in respect of the longest period (for which a rate is quoted) which is less than the Relevant Period and that quoted in respect of the shortest period (for which a rate is quoted) which exceeds the Relevant Period on the appropriate Reuters screen specified by the Seller (or if there is no Reuters screen, such other appropriate screen as the Seller may specify) at or about 11.00 a.m. (local time) on the date upon which quotations would ordinarily be given by prime banks in the relevant interbank market for deposits in the relevant currency for delivery on the Settlement Date for the Relevant Period; and

(ii)    "**Relevant Period**" means the period from the Settlement Date to the next roll-over date applicable under the Credit Agreement for that funded portion.

(c)    With respect to any such funded portion, if IBOR is higher than the relevant funding rate in effect for that funded portion under the Credit Agreement on the Settlement Date (the "**Relevant IBOR Rate**") then the Seller will pay to the Buyer on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

(d)    With respect to any such funded portion, if IBOR is lower than the Relevant IBOR Rate then the Buyer will pay to the Seller on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

13.    **TRANSFER COSTS**

13.1    **Transfer fees**

The Buyer shall pay any recordation, processing, transfer or similar fee payable to the agent bank under the Credit Documentation in connection with the transaction. Such fee shall be paid by the Buyer to such agent bank:

(a)    if the Agreed Terms provide that all or part of such fee is to be payable by the Seller, promptly following receipt by the Buyer of the whole or such part (as applicable) of such fee from the Seller or, if later, on the date upon which such fee is payable under the Credit Documentation; or

(b)    otherwise, on the date upon which such fee is payable under the Credit Documentation.

13.2 **Stamp taxes**

Unless otherwise specified in the Agreed Terms, stamp duties and other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer of security are payable by the Buyer.

14. **TURNOVER OBLIGATIONS**

(a)    If any amount to which the Buyer is entitled pursuant to the Agreed Terms is received or recovered by the Seller, the Seller shall promptly pay to the Buyer an amount equal to such amount.

(b)    If any amount to which the Seller is entitled pursuant to the Agreed Terms is received or recovered by the Buyer, the Buyer shall promptly pay to the Seller an amount equal to such amount.

15. **COSTS AND EXPENSES**

Each of the Buyer and the Seller shall pay its own costs and expenses (including legal expenses) in connection with the transaction.

16. **PRINCIPAL/AGENCY STATUS**

16.1 **Principal or agent**

Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction.

16.2 **Principal**

A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction. A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to, a third party of the Purchased Assets or Relevant Participation.

16.3 **Agent**

(a)    A Buyer or Seller that holds itself out to its counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction.

(b)    A Buyer or Seller that holds itself out as an agent:

(i)    is not liable to its counterparty for the successful completion of the transaction; and

(ii)    shall have no liability or obligation to its counterparty in connection with the transaction other than (a) in circumstances where it does not have authority to bind its principal(s) to the transaction or (b) pursuant to any confidentiality agreement entered into by it in connection with the transaction.

(c)    Notwithstanding the provisions contained in paragraph (b) above, a Buyer or Seller that holds itself out to its counterparty as an agent represents to its counterparty its authority to bind its principal(s) to the transaction (which

principal(s) shall be bound as if it/they were named as "Buyer" or "Seller" as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

17.    **NON-RELIANCE AND INDEPENDENT INVESTIGATION**

17.1    **Acknowledgement**

Each party acknowledges to the other that:

(a)    it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction; and

(b)    it has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the obligor(s) under the Credit Agreement, to make an informed decision regarding the transaction.

17.2    **Independent investigation**

Each of the Buyer and the Seller agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms or pursuant to these Conditions).

17.3    **Exclusion of liability**

The Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for;

(a)    the effectiveness, validity or enforceability of the Credit Documentation or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other documentation;

(b)    any non-performance by any party to the Credit Documentation or other documentation; or

(c)    the financial condition, status or nature of any Obligor.

17.4    **No Obligation to repurchase**

The Seller and the Buyer agree that:

(a)    the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets or, as the case may be, the Relevant Participation from the Buyer or to support any losses directly or indirectly sustained or incurred by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b)    any rescheduling or renegotiation of the Purchased Assets or, as the case may be, the Relevant Participation shall be for the account of, and the

responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

### 17.5 Material information

Each of the Buyer and Seller acknowledges and agrees that:

(a)     the other may possess material information not known to it;

(b)     the other shall have no liability and no action or proceedings may be taken with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

## 18.    REPRESENTATIONS AND UNDERTAKINGS

### 18.1 Representations

Each of the Buyer and the Seller represents to the other that:

(a)     it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b)     it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation; and

(c)     its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application).

### 18.2 Seller's representations

The Seller represents to the Buyer that:

(a)     as at the Settlement Date, it will own beneficially all the Purchased Assets or, as the case may be, the Relevant Participation to be sold or participated pursuant to the transaction free from any rights of set-off in favour of any Obligor or any lien, security interest or other encumbrance, any purchase or option agreement or arrangement, or any agreement to create or effect any of the same;

(b)     as at the Settlement Date, it will not be in default of any of its obligations in relation to the Purchased Assets or, as the case may be, the Relevant Participation;

(c)     so far as it is aware, no decision has been taken by the lenders party to the Credit Documentation to accelerate or enforce their rights under the Credit Documentation and no amount of principal or interest is due and unpaid under the Credit Documentation; and

(d)    subject to the obtaining of any necessary consents, all rights and benefits (including proprietary rights under any relevant security documentation) and, where applicable, all obligations under the Credit Documentation which the parties have agreed will be novated, assigned or otherwise effectively transferred to the Buyer pursuant to the transaction are capable of being so novated, assigned or otherwise transferred.

### 18.3   Buyer's undertaking

The Buyer undertakes to the Seller that it will not use any information received by it from the Seller in relation to the Obligors, the Purchased Assets or, as the case may be, the Relevant Participation for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction.

### 18.4   Survival of representations

All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation.

## 19.    DEFAULT

### 19.1   Defaults

(a)    Subject to Condition 19.4, if:

(i)    either party defaults in the performance of its obligations to the other under any Transaction Document; or

(ii)   any representation or acknowledgement made by either party to the other in the Agreed Terms or these Conditions proves to have been incorrect when made,

the non-defaulting party shall be entitled to give notice to the defaulting party for such period as the non-defaulting party may specify.

(b)    If the default is not remedied within the period specified in the notice referred to in paragraph (a) above, or such further period or periods as the non-defaulting party may agree, the non-defaulting party may, by written notice to the defaulting party, terminate the transaction immediately.

(c)    If the non-defaulting party terminates the transaction in accordance with paragraph (b) above, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

### 19.2   Breach of representation or undertakings

Each party shall compensate the other for any properly quantified loss, liability or expense which the other suffers as a consequence of a breach of any of its representations or undertakings made pursuant to the Agreed Terms and these Conditions.

19.3    **Notification**

If a claim for any losses, liabilities and expenses is made pursuant to this Condition 19 (*Default*), that claim must be notified by the non-defaulting party to the defaulting party within 60 days after the Settlement Date (such notice to include quantification by the non-defaulting party of such losses, liabilities and expenses) and the defaulting party shall not be liable for any claim not so notified within that period.

19.4    **Buy-in/Sell-out**

(a)    If the Agreed Terms specify that the transaction shall be subject to delayed settlement compensation and buy-in/sell-out damages then this Condition 19.4 will apply.  For the avoidance of doubt, if any transaction has been cancelled in accordance with Condition 4.2 (*Conditions unfulfilled*), this Condition 19.4 will not apply to that transaction.

(b)    If the transaction is not settled on the Settlement Date because:

(i)    either party defaults in the performance of its obligations to the other under any Transaction Document; or

(ii)    any representation or acknowledgement made by either party to the other in any Transaction Document proves to have been incorrect when made,

the other party ("**the non-defaulting party**") may, by no later than 10 Business Days after the Settlement Date, give written notice to that party ("**the defaulting party**") of its intention to terminate its obligations under the Confirmation and to effect a Substitute Transaction (as defined below) in respect of the Traded Portion.

(c)    During the 3 Business Days following receipt of the notice referred to in paragraph (b) above, the defaulting party shall use all reasonable endeavours to identify a counterparty acceptable to the non-defaulting party to enter into a Substitute Transaction.

(d)    If the defaulting party:

(i)    identifies a substitute counterparty acceptable to the non-defaulting party, the Substitute Transaction shall be entered into with such counterparty and the Substitute Trade Date (as defined below) shall be the fifth Business Day following delivery of the notice referred to in paragraph (b) above; or

(ii)    fails to identify a substitute counterparty acceptable to the non-defaulting party within the time period referred to in paragraph (c) above, then the Seller and the Buyer shall consider in good faith for a further period of up to 5 Business Days whether or not there is an alternative means, acceptable to both parties, of settling or resolving the failed transaction. If the parties fail to agree such alternative means within such further 5 Business Day period, or such further period or periods as the non-

defaulting party may agree, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

(e)    If the transaction is not settled on the Settlement Date because either party defaults in a payment obligation under the Transaction Documents, the defaulting party may remedy such default at any time prior to the Substitute Trade Date by making payment to the non-defaulting party of an amount calculated in accordance with Condition 10 (*Settlement Amount Calculation*).

(f)

(i)    The non-defaulting party shall send to the defaulting party not later than the first Business Day after the date of signing of the Substitute Confirmation (as defined below) by the parties to it, notice (the "**Purchase Price Notice**") of the purchase price payable under the Substitute Transaction.

(ii)    If the defaulting party disputes the reasonableness of the purchase price specified in the Purchase Price Notice the defaulting party shall send notice of such dispute (the "**Price Dispute Notice**") to the non-defaulting party not later than the second Business Day after receipt of the Purchase Price Notice.

(iii)    As soon as reasonably practicable following receipt of the Price Dispute Notice the non-defaulting party shall use reasonable endeavours to obtain indicative quotations for a transaction on the same terms as the Substitute Transaction from three members of the Valuation and Trading Practices Committee of the LMA at that time (or any successor of such Valuation and Trading Practices Committee carrying on substantially the same functions), such three members to be chosen by the non-defaulting party in its sole discretion.   The non-defaulting party will calculate the average of the three indicative quotations received and such amount will be the Indicative Price for the purposes of paragraphs (g) and (h) below.

(iv)    Any determination by the non-defaulting party pursuant to paragraph (iii) above shall, in the absence of manifest error, be conclusive and binding on all parties.

(g)    If the Seller is the defaulting party, the Seller shall pay to the Buyer on the Substitute Settlement Date (as defined below)as follows:

(i)    if no Price Dispute Notice was issued in relation to the Substitute Transaction, the amount (if any) by which the price in respect of the Buy-in Transaction (as defined below) exceeds the original price for the Traded Portion; or

(ii)   if a Price Dispute Notice was issued in relation to the Buy-in Transaction the amount (if any) by which the Indicative Price in respect of the Buy-in Transaction exceeds the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, the Seller shall in addition pay an amount equal to (a) Delayed Settlement Compensation for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)   actual settlement of the Buy-in Transaction; and

(ii)   10 Business Days following the Substitute Trade Date; and

(b) if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to above and the Delayed Settlement Costs of Carry calculation for that period results in a negative amount, the absolute value of that amount

(h)   If the Buyer is the defaulting party, the Buyer shall pay to the Seller on the Substitute Settlement Date as follows:

(i)   if no Price Dispute Notice was issued in relation to the Substitute Transaction the amount (if any) by which the price in respect of the Sell-out Transaction (as defined below) is less than the original price for the Traded Portion; or

(ii)   if a Price Dispute Notice was issued in relation to the Sell-out Transaction the amount (if any) by which the Indicative Price in respect of the Sell-out Transaction is less than the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages and if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to below, the Buyer shall in addition pay an amount equal to Delayed Settlement Costs of Carry (if any) for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)   actual settlement of the Sell-out Transaction; and

(ii)   10 Business Days following the Substitute Trade Date.

(i)   For the purposes of this Condition 19.4:

"**Buy-in Transaction**" means a transaction in which the Buyer purchases the equivalent of the Traded Portion from a counterparty other than the Seller;

"**Sell-out Transaction**" means a transaction in which the Seller sells the Traded Portion to a counterparty other than the Buyer;

"**Substitute Confirmation**" means the confirmation signed on behalf of the non-defaulting party and the substitute counterparty in the form most recently published by the LMA evidencing the agreed terms for the Substitute Transaction;

"**Substitute Settlement Date**" means the settlement date specified in the Substitute Confirmation;

"**Substitute Transaction**" means a Buy-in Transaction or, as the case may be, a Sell-out Transaction; and

"**Substitute Trade Date**" means the date on which the non-defaulting party agrees the terms (whether orally or in writing) of the Substitute Transaction with a substitute counterparty.

20. **WHEN ISSUED TRADES**

If the Trade Date for the transaction is to occur prior to signing of the Credit Agreement (a "**when issued trade**") then the Settlement Date shall be ten Business Days after such signing. Except with respect to exchanging a Confirmation, all other times for when issued trades shall be calculated from the signing of the Credit Agreement.

21. **CONFIDENTIALITY**

Either party shall be permitted to make any disclosures regarding the terms of the transaction (other than the identity of the counterparty) subject to the requirements of law or regulation or of the Credit Documentation. If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

22. **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

23. **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party under the transaction. The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set off.

24. **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

25. **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

26. **GOVERNING LAW AND JURISDICTION**

26.1 **Governing law**

The transaction, the Agreed Terms, these Conditions and any non-contractual obligations arising out of or in connection with any of them are governed by English law.

26.2 **Jurisdiction**

The courts of England have non-exclusive jurisdiction to settle any dispute arising out of or in connection with the transaction, the Agreed Terms and these Conditions (including a dispute relating to any non-contractual obligation arising out of or in connection with the transaction, the Agreed Terms and these Conditions).

26.3 **Service of process**

The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

27. **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

27.1 **Counterparts**

Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

27.2 **Fax and electronic communication**

(a)     Transmission by fax of a signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(b)     Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(c)     The Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.