1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        May 28, 2009

        10:02 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Debtors' Motion for Entry of Order Pursuant to

3    Sections 363 ad 365 of the Bankruptcy Code for Approval of

4    (i)the Letter Agreement, Including the Payment of the Break-Up

5    Fee; and (ii)the Assumption, Assignment and Sale of the Libra

6    Credit Default Swap Agreement

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors and Debtor Affiliates

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:  LORI R. FIFE, ESQ.

9        ERIC J. PETERMAN, ESQ.

10

11  WEIL, GOTSHAL & MANGES LLP

12        Attorneys for Debtors and Debtor Affiliates

13        1300 Eye Street, N.W.

14        Suite 900

15        Washington, DC 20005

16

17  BY:  RALPH I. MILLER, ESQ.

18

19

20

21

22

23

24

25

4

1

2     MILBANK, TWEED, HADLEY & MCCLOY LLP

3          Attorneys for Official committee of Unsecured Creditors

4          One Chase Manhattan Plaza

5          New York, NY 10005

6

7     BY:   EVAN R. FLECK, ESQ.

8          DAVID C. COHEN, ESQ.

9          WILBUR FOSTER, ESQ.

10

11    MAYER BROWN LLP

12         Attorneys for Societe Generale New York Branch and Libra

13          CDO Limited

14         1675 Broadway

15         New York, NY 10019

16

17    BY:   STEVEN WOLOWITZ, ESQ.

18         BRIAN TRUST, ESQ.

19         CHRISTOPHER J. HOUPT, ESQ.

20

21

22

23

24

25

5

1

2      STUTMAN, TREISTER & GLATT

3            Attorneys for Perry Capital

4            1901 Avenue of the Stars

5            12th Floor

6            Los Angeles, CA 90067

7

8      BY:  ROBERT A. GREENFIELD, ESQ.

9            (TELEPHONICALLY)

10

11     TAFT STETTINIUS & HOLLISTER LLP

12            Attorneys for Buyer

13            200 Public Square

14            Suite 3500

15            Cleveland, OH 44114

16

17     BY:  STEVEN A. MARRER, ESQ.

18            (TELEPHONICALLY)

19

20

21

22

23

24

25

6

1              P R O C E E D I N G S

2        THE COURT:  Be seated, please.  Good morning.

3        MS. FIFE:  Good morning, Your Honor.  Lori Fife, from

4    Weil, Gotshal and Manges, on behalf of the debtors.  We're here

5    this morning on a motion pursuant to Sections 363 and 365 of

6    the Bankruptcy Code, for approval of the letter agreement with

7    Deutsche Bank, including the payments of a break-up fee, and

8    the assumption and assignment and the sale of the Libra Credit

9    default swap.

10        Your Honor, first of all, I'd like to thank you for

11    making time on a non-omnibus hearing date.  And I'd also like

12    to introduce a few people to the Court who I don't believe have

13    been here before.  First of all in the court here today from

14    the debtor is Mr. Rob Hershan, a managing director of Alvarez &

15    Marsal.  Mr. Hershan is responsible and in charge of this

16    particular transaction and also all of the SPV transactions.

17        Also in the courtroom is Mr. Tom Hommel, co-general

18    counsel of Lehman.  Mr. Hommel is the legal attorney in charge

19    of this Libra transaction, and also many of the other

20    derivative transactions.

21        Finally, I'd like to introduce to the Court another

22    Mr. Miller, not Harvey Miller, but Ralph Miller.  Mr. Miller's

23    my partner and a senior litigation partner.  He is in charge of

24    all of the derivative Lehman litigation, so you'll hopefully be

25    seeing a lot of him in the future.

7

1          THE COURT:  Is this why his hair is gray?

2          MS. FIFE:  Yes.

3          MR. MILLER:  Yes, Your Honor.

4          MS. FIFE:  He and we have all been trying to

5    understand the world of derivatives.  But Mr. Ralph Miller's

6    going to be handling the hearing today.  So I will turn it over

7    to him.

8          THE COURT:  All right, fine.

9          MR. MILLER:  Good morning, Your Honor, my name is

10   Ralph Miller with Weil Gotshal and I'm here on behalf of two of

11   the debtors, Lehman Brothers Special Financing Inc., which I

12   will refer to sometimes by its initials LBSF, and Lehman

13   Brothers Holdings, Inc., its parent, which I will sometime

14   refer to as LBHI.

15         May it please the Court, this hearing is the first

16   step in a comprehensive plan that the Lehman group of debtors

17   have developed, to try and maximize value for the various

18   estate from hundreds and perhaps thousands of derivative

19   transactions.  In the next few minutes, I'd like to cover three

20   major topics.  First, in order to explain why the issue before

21   the court today is both critical and urgent.  I plan to start

22   by placing this case in perspective in relationship to other

23   derivatives proceedings that have been filed by the debtors or

24   are in the pipeline.  Next, I'd like to use some visual aids to

25   explain the nature of this transaction and why granting this

8

1    motion today is compelled by the record.

2            And then finally, I want to address the purported

3    objection which is, in reality, not so much an objection to the

4    motion on behalf of a creditor as a preview of the defense of

5    the counter parties in this transaction concerning the

6    purported termination dispute on the credit default swap that

7    lies ahead in two related adversary proceedings.

8            First, Your Honor, on the issue of context, as the

9    Court may know, there are now four adversary proceedings filed

10   by debtors, that deal with a special type of derivatives

11   transaction that includes both swap agreements, and the

12   creation of a special purpose vehicle.  These are usually

13   called SPV transactions.  An important subset of these are the

14   so-called collateralized debt obligation issuers, which are

15   known as CDOs.  The Libra transaction is a CDO with documents

16   that include two swap agreements, an indenture, several classes

17   of notes and some preference shares.

18           With regard to this Libra transaction before the

19   Court today, there are two adversary proceedings filed the same

20   day that both address the validity of the purported termination

21   of one swap agreement, the swap agreement with LBSF, in which

22   Lehman Brothers Holdings Inc. was a guarantor, known as a

23   credit support provider.  That was adversary proceeding No. 09-

24   1177 filed by LBSF and LBHI and asking for declaratory

25   judgment.  The termination was invalid and a more or less

1    mirror image adversary proceeding with the next number, 09-

2    1178, filed by the objectors, who are here, Your Honor, the

3    Bank of America as trustee for Libra CDO and Societe Generale,

4    a senior swap counterparty that's the entity identified in the

5    block over there with a billion dollars under its name.

6         This Libra transaction is the closest example that we

7    have before the Court of an operating SPV transaction.  It has

8    undergone an acceleration and a purported termination of one of

9    the swap agreements.  But no liquidation or distribution of

10   collateral has yet occurred.

11        An assignee has been found, a highly qualified

12   assignee, Deutsche Bank, and the present motion is part of

13   debtors' program to preserve the original economics of this

14   transaction for all the parties by restoring it to normal

15   operations.  This near functional status makes Libra a case

16   that is both logical for the Court to consider first and also

17   urgent.  It's logical because it illustrates how a healthy SPV

18   transaction is supposed to operate, and it's always helpful to

19   start with one that works before we get into other transactions

20   that are in various stages of disassembly.

21        It's urgent because the ability to keep it alive is

22   fragile.  Not surprisingly, the parties that are exposed to

23   hundreds of millions of dollars of risk in Libra, as a result

24   of their original bargain, and that's Libra CDO and Societe

25   Generale, have tried to delay this motion, because that is the

10

1    most logical defense they have to payment of obligations that

2    would clearly have been owed to LBSF, if it did not file

3    Chapter 11.

4           As I shall explain, progress in this case is

5    essential, because changing conditions can endanger the rights

6    of the estate to recover value that's estimated by an expert,

7    who is in the courtroom and available with a declaration that

8    would range from 697 million to 740 million dollars.

9           It's not before the Court yet, but in the pipeline I

10   can represent a very similar transaction involving some of the

11   same parties, including Societe Generale and LBSF, exist.  It's

12   known as the MKP Vela transaction, V-E-L-A, with a similar

13   valuation and status except that it has progressed through

14   liquidation but not yet through distribution.  And we will be

15   bringing that to the Court fairly shortly.

16          Now, let me talk about the relationship between the

17   Libra case and the three other SPB adversary proceedings that

18   have been filed by debtors.  In adversary proceeding number

19   9-1241, Lehman Brothers Special Financing versus Harrier

20   Finance Limited, also known as Rathgar Capital Corp., the

21   debtors have brought before the Court a case in which a

22   purported swap termination has occurred, liquidation and

23   distribution also occurred, but LBSF believes that New York law

24   prevents the severe penalty that has been imposed on it as a

25   result of its Chapter 11 filing.

1        That is further down the pipeline of disassembly, if

2    you will, in that the assets have gone out.  But they've all

3    gone to one party which makes it simpler than transactions we

4    may have later where they've gone to many parties all around

5    the globe.

6        In adversary proceeding number 9-1242, Lehman

7    Brothers Special Financing v. B&Y Corporate Trustee Services

8    Limited, a similar swap termination has occurred.  That one

9    occurred properly.  But LBSF will show that the proposed method

10   of distribution, which has not yet occurred, is an

11   unenforceable ipso facto clause.  That case has documents that

12   are governed by English law.  And it interacts with a case

13   filed in London by one of the noteholders.

14       The fourth adversary proceeding, which the Court's

15   already familiar with, Lehman Brothers Special Financing v.

16   Bally Rock ABSCDO 2007-1 Limited, was filed because a partial

17   distribution had occurred but about 137 million dollars of

18   collateral had not been distributed.  And as a result of that

19   filing, an interpleader by the trustee was started with Wells

20   Fargo Bank.  My partner, Richard Slack, has been in front of

21   you with others.  That case has some overlap in legal issues

22   with this case, Libra.  It also has some overlap with the

23   Harrier Finance case.  But it has more parties yet to be drawn

24   into it.  And the facts there are complicated by the existence

25   of this partial distribution.  It's partly undone and partly

12

1    not done.

2          So I would like to now turn to the motion before the

3    Court and explain what we are trying to accomplish today and

4    how this fits into the somewhat complicated mix of moving

5    parts.  And may I approach that diagram, Your Honor, if I speak

6    loudly over there --

7          THE COURT:  Absolutely.

8          MR. MILLER:  -- and point to it?  Thank you, Your

9    Honor.

10         This was -- these documents were both attached to the

11   declaration that was filed in response to the objection.  And

12   this is a diagram of a transaction prepared by GreensLedge

13   Group, which is a consultant that is retained to do evaluation.

14   And I'm going to use it just to illustrate what the assignment

15   is and why it is so critical to the process.

16         The light blue column in the middle, Your Honor,

17   represents -- excuse me.  Oh, actually, yes, Your Honor, we do

18   have a -- we have small copies of this.

19         THE COURT:  Is it in color, too?

20         MR. MILLER:  Yes, Your Honor.

21         THE COURT:  Oh, great.

22         MR. MILLER:  And two others -- we have two in case

23   you'd like another one for -- and we have some other tabs we

24   may refer to, Your Honor, as we progress.

25         The first two tabs are the chart on top and the chart

13

1    on the bottom.  The light blue column in the middle represents

2    the special purpose vehicle, which was called Libra CDO, that

3    was created for this transaction.  It's a limited liability

4    company under the laws of the Cayman Islands.

5         The dark blue column here is the funding source for

6    that special purpose vehicle.  Now, one way to think of this,

7    although this is not insurance, is as if Libra CDO were a

8    special purpose insurance company, that was created and funded

9    for this one transaction.  It has no other transactions, except

10   things relating to these various swap prints.

11        And it's funding source comes from some actual cash

12   money that was put in by these people with Class A, B, C,D

13   notes, Class X notes, and finally, preference shares.  But most

14   of the funding is a so-called senior swap, which is a

15   commitment by Societies Generale to put in up to a billion and

16   fifty million dollars.  This is an unfunded portion, Your

17   Honor.  This actually is not money but it could become money if

18   the reference obligations that I'm going to talk about in a

19   moment moved in a direction that they have moved.

20        The other movant of LBHI, Lehman Brother Holdings

21   Inc., is not shown but it was a guarantor of LBSF.  If you move

22   over to the left side, the buyer of the credit protection,

23   which could be analogized to insurance, was a swap with LBSF.

24   And the present motion before the Court has to do with

25   replacing both LBSF and LBHI with a new assignee, Deutsche

14

1    Bank, which, among other things, has the necessary credit

2    rating, because the role of LBSF to the economics of the

3    transaction was to pay premium.  And it's called premium just

4    like insurance premium.  And that premium has to be guaranteed

5    in the future.  Under certain circumstances, money might also

6    be paid under so-called periodic payments by the swap and have

7    to be paid back.  So another reason the credit rating is

8    important is if a couple of hundred million dollars were paid

9    to LBSF and although it's very unlikely, it's possible that

10   some of that had to be paid back, whoever is the senior swap

11   party has to have enough credit rating to be good for paying

12   that couple of hundred million dollars back.  Unfortunately, as

13   the Court knows, LBSF and LBHI don't have a very good credit

14   rating anymore.  So Deutsche Bank has the necessary credit

15   rating.

16        Now, I'd like to talk about this bar -- the green

17   bar, light green bar, which is the reference obligations.

18   These are synthetic reference obligations.  They're not

19   actually owned but they are specified on the lists.  There are

20   seventy-two of them left.  A number of them have already been

21   written down and disappeared.  Most of them are, in fact,

22   themselves CDOs.  And the bottom chart is from the offering

23   memorandum which showed how the reference obligations were

24   intended to be distributed.  And they're pretty much still

25   distributed that way.  And most of them are residential

15

1    mortgage backed securities, known as RMBS.

2          The orange chart here is RMBS mid-prime, the orange

3    part of the pie chart on top of -- the light green part is sub

4    prime.  The ABS CBO, the red part, is actually even worse, it's

5    packages of these leading sub prime.  There may be a few

6    commercial backed securities.  But the vast majority of these

7    referenced securities were residential mortgages.  And as the

8    Court knows, residential mortgages are at the heart of the

9    financial crisis, and the value of these referenced obligations

10   has gone down.  This is the equivalent of a loss under an

11   insurance policy.  And the result is, that very substantial

12   periodic payments would have been due, and we believe will be

13   due when this transaction is restored, were it not for the

14   bankruptcy filing of LBSF and LBHI, which are the purported

15   basis for terminating the swap agreement.

16         The expert that has submitted a declaration,

17   GreensLedge Group, which I'm going to talk about further,

18   that's attached to the response, estimates that 400 million

19   dollars worth of write-downs have already occurred since the

20   filing for bankruptcy of LBSF and LBHI.  And that's history.

21   There's no predicting the future in that.  And then something

22   over 430 million of future losses in these -- or write downs in

23   these RMBS securities are projected, so that the total value of

24   this transaction, if it is restored, that would flow over time

25   to LBSF is in the neighborhood of 700 million dollars

16

1    projected.

2         Now, the sole issue today is whether a commitment by

3    Deutsche Bank to step into the shoes of LBSF and its parent can

4    be kept in place through a letter agreement that includes a

5    breakup fee.  I'll return to the podium here.

6         If the assignment is ultimately approved, the parties

7    to the right on the chart are all of the parties in blue,

8    essentially, will have the same rights and obligations that

9    they undertook originally.  They will simply be required to

10   keep the benefit of their bargain.  There will be no additional

11   costs to them other than what they'd agreed to pay.

12        The effect of the Chapter 11 filing of the

13   transaction will be set aside and the credit protection that

14   was wisely purchased by LBSF will be retained in place, with a

15   value of hundreds of millions of dollars.

16        So now with that, as the perspective on why we are

17   trying to do this and maximize money for the estate, I'd like

18   to move on to the purported objection.  In the first place, as

19   our response makes clear, the objectors are not here in their

20   capacity as creditors.  Indeed, Libra CDO is not even a

21   creditor at all of the estates as far as we know.  Societe

22   Generale has said that it is a creditor of some sort, but it

23   admits that it has a much greater interest in this transaction

24   in its role as senior swap counterparty and could provide most

25   of the funding for that 700 million dollars or so of value

17

 1    because the other notes are going to be shown to have also

 2    dropped in value very substantially.

 3            These are the defendants in the adversary proceeding

 4    that was filed and that is Bank of America for Libra CDO and

 5    Societe Generale for the senior swap party.  And they are also

 6    the filers of the mirror image adversary proceeding.

 7            Now, it's very important, Your Honor, to understand

 8    one complication of this particular transaction.  And that is,

 9    that as Societe Generale says in its adversary proceeding, it

10    contends that its obligation to fund only applies to periodic

11    payments if the transaction continues.  If there is a

12    termination of this transaction and there's an early

13    termination payment, Societe Generale contends that it has no

14    obligation to fund early termination payments.  Now, while the

15    debtors are not prepared to admit that that's correct, that

16    certainly places a great premium on keeping the transaction

17    alive.  Because otherwise, whatever claims the assignee and, in

18    turn, Lehman Brothers Special Financing and its relationship

19    that the assignee might have, are going to be against an entity

20    that would not have that billion dollars of funding available

21    to it if Societe Generale is right.  So that's the reason that

22    it's so critical to keep this transaction alive instead of

23    letting it move into a full termination mode.

24            Now, I want to deal first with the point in the

25    objection that it is unlikely that this is going to be set

18

1   aside and that the Court should defer this motion because it's

2   so unlikely that the adversary proceeding is going to result in

3   setting aside the termination.  And I'm not going to go,

4   obviously, into the merits of that but we do have two

5   contractual provisions that are quite clear that in two minutes

6   we can demonstrate to the Court why this is not such an

7   uncertain or complicated process.

8          If you would turn to tab 3, we have a quotation of a

9   provision Section 5.2(c).

10         Why don't you -- you want to take down the --

11         MS. COLLINS:  Yeah.

12         MR. MILLER:  -- chart there, Ms. Collins.  Thank you.

13         This is my colleague, Scarlet Collins, who has

14  supervised most of the brief writing in this matter and is

15  helping us now with the charts.

16         Section 5.2(c) says that "The issuer" -- that's Libra

17  CDO, "shall not terminate the senior swap agreement, the credit

18  default swap agreement or any hedge agreement in effect

19  immediately prior to a declaration of acceleration unless the

20  liquidation of collateral has begun and such declaration is no

21  longer capable of being rescinded or annulled."

22         Debtors expect the undisputed facts will show that

23  the critical credit default swap agreement that was purported

24  to be terminated was, in effect, immediately prior to a

25  declaration of acceleration.  But at the time of the purported

19

1    termination, under any possible analysis of the facts,

2    liquidation had not begun.  Indeed, liquidation still has not

3    begun.  So one of the two conditions for termination in the

4    indenture was not met.

5            Further, the second condition that the declaration

6    had to be no longer capable of rescinded or annulled, we

7    believe was also not met, although there was a declaration of

8    acceleration we think it was still subject to rescission or

9    annulment.

10           Another illustration of a clear provision, which is

11   quite related to the assignment, is at tab 4, Your Honor.  And

12   that's a provision in Section 7.8(a), XI of the indenture, and

13   it says, that the issuer will not terminate the credit swap

14   agreement unless, (a) no transactions remain outstanding and

15   continues; or (b) the issuer has entered into a replacement,

16   therefore, pursuant to a form approved credit default swap

17   agreement.

18           Now, I don't think there's any dispute about the fact

19   that transactions remained outstanding at the time of the

20   purported termination.  We also believe that there's no dispute

21   about the fact that the issuer not only did not enter into a

22   replacement transaction but it didn't try to enter into a

23   replacement transaction.  And the fact that Deutsche Bank and

24   at least one other bidder have shown willingness to step in and

25   replace LBSF is strong evidence that if they tried, they

20

1    would've found a replacement.  So putting an assignee in place

2    is a critical part of the evidence related to this issue as

3    well.

4         Now, there are other provisions at issue in the

5    adversary proceeding.  I won't take the time to discuss them

6    today, but these demonstrate that the uncertainty that

7    objectors have tried to suggest is really not sufficient to put

8    off this critical issue of approving an agreement that's going

9    to keep an assignee in place, particularly, since assignees are

10   not all that easy to find which I know you know what I'm

11   talking about, Your Honor.

12        I want to talk to the criticism that a thorough

13   evaluation of the financial arrangement would show that the

14   proposed break-up fee is excessive.  Now, it's really not clear

15   why these particular objectors should care if the break-up fee

16   is excessive because they're not here as creditors.  But

17   nonetheless, the proof shows that it's not excessive, we

18   believe.

19        Tab 5 contains Exhibit A to the response to the

20   objection, which is an expert report prepared by Mr. Jim Kane

21   who is here in the courtroom.  He was a cofounder of the

22   GreensLedge Group LLC, a structured credit advisory firm.  He

23   was the head of Capital Markets for global structured credit --

24   a global structured credit business of JP Morgan Securities,

25   and he worked as a managing director there and at Deutsche Bank

21

1    before that.

2          We would like to ask the Court to accept the

3    declaration of Mr. Kane as evidence in support of the pending

4    motion.  We're happy to mark it is an exhibit or save some

5    trees by leaving it as an exhibit to our response,.  And we do

6    have Mr. Kane available for cross-examination if either the

7    Court or anyone would like to do that today.

8          Tab 6 is a summary that explains how the GreensLedge

9    analysis demonstrates that the proposed break-up fee is not

10   excessive by the standards that we think should be applied to

11   it.  This is the low scenario.  There's a low scenario and a

12   high scenario, as the Court knows from the GreensLedge

13   declaration.  The low scenario assumes government intervention

14   is successful in the residential market.  And it shows that the

15   periodic payments are estimated to be about 837 million

16   dollars.  As I said, about 400 million of that has already

17   occurred.  And the other is a projection in the future.  Then

18   you'd have to take away the premiums.  There is some debate as

19   to what the premiums are going to be.  They could be twenty

20   million, they could be thirty million.  It depends largely on

21   how long it takes for the transaction to play out.  Subtracting

22   the larger number thirty million, that gets you 807 million.

23   Then if you apply the payments to the assignee and other costs

24   you get down to a potential cash flow to the estate discounted

25   to present value of 697 million.

22

1        If you compare the two break-up fees, there's a ten

2   million dollar break-up fee, as the Court knows from the

3   papers, if a new assignee is accepted by the debtors.  And I

4   want to stress the debtors are more than available and would

5   invite any new assignee to come in and make us a bid.  That's a

6   ten million dollar break-up fee.  If a transaction is done with

7   Societe Generale, who obviously has the greatest interest in a

8   possible transaction, the break-up fee would be twenty million

9   dollars with some possible adjustments downward.  But if it's

10  twenty million dollars, it's still only 2.9 percent of this low

11  valuation scenario.

12       If you go to the next tab, which is 7, this is the

13  high scenario, which is, frankly, I think -- believe my meaning

14  to be more probable.  And that is assuming the government

15  intervention is not very successful.  And it shows that the

16  cash flow is 177 million and then with the other adjustments

17  that comes down to 740 million actually coming into the estate

18  over time discounted to present value.  And the break-up fee is

19  then dropped down, respectively, to 1.35 percent at the ten

20  million dollar level, or 2.7 percent at the twenty million

21  dollar level.

22       The next tab, which is tab 8, is a summary of

23  materials in the motion that stress and explain some cases

24  cited in the motion in which break-up fees in the three percent

25  range and sometimes below have been regularly approved.  We

23

1    think this is well within that area.

2         The other tabs I don't think we need right now, Your

3    Honor, because they deal with questions that the Court might

4    have about how the break-up fee is calculated.

5         I want to talk now a little bit about the request for

6    delay.  There is a claim of the objectors that there's no

7    reason for urgency, that the -- that this should be put off.

8    But the problem is that the assignee that was located is only

9    willing to commit its credit and remain available for a limited

10   period of time.

11        There were, in fact, canvassing efforts to find

12   assignees and these are detailed in the motion.  We also have

13   available, Your Honor, if you needed a witness on this subject,

14   Mr. Rob Hershan, and I could make a proffer if the Court would

15   like and he'd be available for cross-examination concerning

16   those marketing efforts, and that's -- and this is not the

17   proffer but briefly, it's going to show that six qualified

18   potential assignees were identified by the debtors.  They met

19   the rather narrow window of having the necessary credit

20   requirements and also the sophistication to be able to analyze

21   and undertake one of these transactions.  And they all signed

22   confidentiality agreements, all got copies of the documents,

23   and only one of them, Deutsche Bank, progressed to produce a

24   bid.

25        Now, after the papers were filed in court, and the

24

1    legal basis was laid out, and everything was available, one of

2    those original six has come forward and has shown renewed

3    interest and we're pursuing discussions with that assignee.

4           However, there's no certainty that that's going to

5    succeed.  And in any event, if we don't move forward with a

6    letter agreement, it has time limits that the assignee has

7    imposed which will cause that opportunity to slip away.

8           The letter agreement itself provides that the

9    commitment will terminate if this hearing is not approved --

10   the issue in this hearing is not approved within forty-five

11   days.  And that's the reason that we brought this as early as

12   possible.  And we can proffer evidence to say this was at the

13   insistence of the potential assignee, Deutsche Bank.  You can

14   think of Deutsche Bank as a first bidder and stalking horse,

15   Your Honor, in this transaction.

16          Further, at tab 12, there is a summary of the

17   provision of the letter agreement.  And that gives the assignee

18   the sole option to walk away from the assignment and the

19   payment agreement if those documents are not approved within

20   ninety days.

21          Now, while that might be extended, Your Honor, that's

22   in the sole discretion of the assignee, and the estate doesn't

23   want to take that chance.  And we believe that the termination

24   issue can be brought promptly before the court in a motion for

25   summary judgment.  We're going to be shortly submitting a

25

1   letter requesting permission to bring that before the court.

2   And our goal is not to expedite anything but to move in an

3   orderly and efficient fashion to try to get the termination

4   issue before the Court.

5           When that happens, an assignee needs to be ready

6   immediately because otherwise there is another default created

7   by not having the necessary credit ratings and could create

8   another termination scenario, for example, by not having

9   someone ready to move in promptly.  So having these lined up to

10  move together -- they're really two moving targets here, Your

11  Honor, having the assignee and having the termination facts

12  stable so that you can deal with those.

13          Now, I mentioned the possible proffer, Your Honor and

14  we would be happy to offer more evidence on that.  But I want

15  to conclude the overview of position and then let the official

16  unsecured creditors committee state its position.

17          In conclusion, the estate has an extraordinary

18  opportunity to preserve a functional SPV derivatives

19  transaction with a value that's likely to exceed 700 million

20  dollars flowing into the estate.  A key component of that

21  opportunity is having an assignee available to step promptly

22  into the shoes of debtors, as I said, with the necessary credit

23  rating and sophistication.  And we have found such an assignee

24  and bring it before the Court.

25          Despite a diligent search, only one such assignee has

26

1    actually been found who was willing to do that.  And it has

2    imposed time limits.  Obviously, it is committing a substantial

3    amount of its credit capacity to be on standby for 700 million

4    dollars of potential exposure.

5            To protect the estate and its creditors from losing

6    this opportunity, we ask the Court to take this first step and

7    approve the break-up fee today.  We believe the record before

8    the Court is clear and complete.  The debtor has exercised its

9    reasonable business judgment in entering into the letter

10   agreement.  No creditor has objected in its capacity as

11   creditor.  And the only purported objection is by opposing

12   parties whose real economic interest is obviously to avoid

13   their original contractual commitment.

14           For these reasons and for others in the record, the

15   motion should be granted.  At this time, I'd like to yield to

16   the official unsecured creditors' committee to report on its

17   position on the motion before Your Honor.

18           THE COURT:  Okay.  That's fine.  I'll hear from the

19   committee and then I'll hear from the objectors.  And then

20   we'll get into the evidentiary record.

21           MR. MILLER:  Thank you, Your Honor.

22           MR. COHEN:  Good morning, Your Honor, David Cohen

23   with Milbank, Tweed, Hadley and McCloy here on behalf of the

24   committee.  The committee thoroughly reviewed the letter

25   agreement at issue in the motion and was actively involved in

27

1   the negotiations that led to that final document.  The

2   committee believes that the entry into the letter agreement and

3   the motion is well within the debtors' business judgment.  For

4   those reasons, the committee believes the motion should be

5   granted.  Thank you.

6          THE COURT:  That was certainly concise.  Thank you.

7          MR. WOLOWITZ:  Good morning, Your Honor.  Steve

8   Wolowitz with Mayer Brown for the objecting parties, Libra CDO

9   Limited and Societe Generale.

10         THE COURT:  Good morning.

11         MR. WOLOWITZ:  Your Honor, let me begin by addressing

12  a couple of the remarks that counsel for the debtors made this

13  morning.  counsel referred to the Libra CDO as a healthy SPV.

14  The fact is that --

15         THE COURT:  I don't think he used the term healthy.

16  But I think he indicated that it was alive, fragile.  Ability

17  to restore it to full operating health somehow lies with this

18  transaction that you're opposing.  So you seem to want to kill

19  it.

20         MR. WOLOWITZ:  Well, Your Honor, I don't wish to kill

21  the CDS agreement.  The CDS agreement was not terminated

22  because the debtors were lacking in some credit rating as was

23  also suggested here and in the debtors' papers.

24         The CDS agreement was terminated because that was the

25  benefit of the bargain expressly entered into by the parties.

28

1    What counsel did not show you is that the CDS agreement is

2    comprised of, among other things, a standard ISDA master

3    agreement two sections of which, Section 5(a) and Section 6(a),

4    make it crystal clear that when the counterparty to the CDS

5    agreement, in this case, LBSF, or its guarantor, in this case,

6    LBHI, declare bankruptcy that the other side to the CDS

7    agreement, in this case, Libra, has an absolute right to

8    terminate the CDS agreement and the transactions there under.

9            That is what occurred.  And it occurred pursuant to

10   this very standard ISDA agreement and that was the benefit of

11   the bargain that the parties entered into.

12           The -- and that swap agreement, by the way, is a

13   protected contract under Section 560 so the termination was

14   proper there under as well.

15           The -- in the adversary proceeding, because counsel

16   did raise a couple of sections of the indenture, namely,

17   Section 5.2(c) and 7.8(a)(11), we will show in the adversary

18   proceeding, Your Honor, why those provisions do not assist the

19   debtors here at all for a variety of reasons that are plain on

20   the face of the documents themselves, the CDS agreement and the

21   ISDA master and the indenture as well.  I'm sure Your Honor

22   will be hearing less of argument on that in connection with the

23   adversary proceedings so I won't belabor that particular point

24   here today.

25           Let me next address, Judge, the accusation that the

29

1   objectors brought this -- made their objection for some

2   nefarious reason.  That is, again, far from the truth.  We

3   didn't recommend deferral of this part one of the motion, and

4   it's only part one of the motion that's being heard today, to

5   improve our position in a settlement negotiation, as the

6   debtors have suggested in their reply brief.  Frankly, that

7   didn't occur to us.

8        We're also a bit troubled by their references to the

9   settlement talks in the reply papers because there's a

10  confidentiality agreement that was supposed to have prohibited

11  either party from disclosing what was discussed during those

12  talks.  But suffice it to say, it is inaccurate to characterize

13  Softgen (ph) or Libra as losing bidders in that respect.

14       In any event, settlement is behind us, that's long

15  behind us, and that was not a motivation at all for the

16  objection.

17       THE COURT:  Well, it's certainly behind you now.  It

18  may not be out of the question in the future.  And one of the

19  questions I have is why you're so interested in this today.

20  You've made reference to your legal position in the adversary

21  proceeding, both the one you brought as plaintiff and the one

22  that you're defending.  And one of those really should go away

23  or they should be consolidated or something to happen to avoid

24  duplication of effort in those two cases.  And that's a subject

25  for pretrial consideration not necessarily for today.

30

1        But if you're right and you're able to persuade me in

2   the adversary proceeding setting that the termination was

3   effective and pursuant to the sections of the master ISDA

4   agreement that you've just referenced and not otherwise to be

5   disregarded as ineffective then this transaction, which is

6   highly conditional -- even I can see that by reading the letter

7   agreement.  There are a lot of things that have to happen in

8   order for Deutsche Bank to be committed.  It doesn't happen.

9   The deal falls of its own weight.  So why do you care today?

10  Why are you here objecting, other than trying to educate me as

11  to your position?

12       MR. WOLOWITZ:  Judge, there are two reasons.  First

13  of all, Societe Generale is a creditor.  It will be filing a

14  proof of claim before the bar date and that the extent of that

15  number will be perhaps in the hundreds of millions of dollars.

16  So, while I would like to be able to tell my client that I can

17  guarantee the outcome of the adversary proceeding, of course, I

18  cannot.  And we wanted to bring to Your Honor's attention the

19  fact that the break-up fee, by the very terms of the letter

20  agreement, might result in a fifty percent break-up fee, not a

21  three percent break-up fee.  And in Societe Generale's position

22  as creditor, it felt the need to bring that to the Court's

23  attention.

24       Libra is also a party of interest under 1109(b),

25  because it is the counterparty on the very CDS agreement that

31

1    is in question and as to which the debtors hope to enter into

2    an assignment agreement with Deutsche Bank.  The Court -- the

3    case readings of 1109(b) and the question of standing are quite

4    broad.  They make it plain that Libra is a party in interest

5    under 1109(b).  But to Your Honor's question as to why,

6    Libra --

7            THE COURT:  There are lots of parties who have

8    standing who aren't here today objecting.

9            MR. WOLOWITZ:  Right.  As to why, Your Honor, first

10   of all, Libra and Societe Generale are the parties who have the

11   most knowledge of this transaction and who do have a stake in

12   what Libra was very concerned about and why the motion was

13   brought at this time.  Because for reasons I will get into in a

14   moment, in our view, the forty-five day purported deadline is a

15   contrivance and was intended to adversely affect the adversary

16   proceedings.  And that is why Libra saw fit to speak up and to

17   bring that to the Court's attention.

18           In fact, last night in preparing for the hearing

19   today, we did see that in the proposed form of order for this

20   part one of the motion, although it is happening before the

21   adversary proceedings are heard and determined.  There's a

22   provision in the proposed form of order that has a recital in

23   which the Court would be saying having heard and reviewed and

24   made determinations with respect to the complaint, the debtors'

25   adversary complaint, the following is hereby ordered.

32

1          Those are the sorts of things that Libra, as a party

2     in interest, who does have a stake in the outcome of the

3     adversary proceedings, again, saw fit to bring to the Court's

4     attention.

5          Your Honor, in terms of the letter agreement itself,

6     the fifty percent provision, I would direct the Court's

7     attention to Section 4(a)(3) of the letter agreement.  The

8     letter agreement is Exhibit C to the debtors' motion.

9          THE COURT:  I have it.

10         MR. WOLOWITZ:  Okay.  4(a)(3) provides that if this

11    letter agreement were to be approved and if the next week

12    another party came forward and offered to the debtors to take

13    on the assignment, as Deutsche Bank is doing, but offered a

14    total value of less than twice the ten million dollar break-up

15    fee -- so, in other words, although this is written in fairly

16    convoluted fashion, it means if another party came along and

17    offered total aggregate value to the debtors of nineteen

18    million dollars, the break-up fee would be fifty percent.  And

19    again, we felt the need to come, as a creditor of the estate,

20    to point out to the Court something that the debtors had not

21    described in their motion.

22         This break-up fee stands a chance not of resulting in

23    a 2.9 percent or a three percent break-up fee but a fifty

24    percent break-up fee.  In fact, if another assignee were to

25    come along and offer aggregate value of fifty million dollars,

33

1    the break-up fee would be ten million dollars and that would be

2    twenty percent, again, well beyond what the courts have deemed

3    appropriate.

4              In terms of why we believe that the forty-five day

5    time deadline is a contrivance, Your Honor, there was a very

6    negative pregnant in our view, in the debtors' reply papers.

7    They no where say, even though we had raised the issue in our

8    objection, that the forty-five day time period was there at the

9    insistence of the proposed assignee, Deutsche Bank.  Our

10   concern is that it was installed at the insistence of the

11   debtors, again, for purposes of trying to convince the Court

12   that this assignee might well walk away.

13             Our position, Judge, in the objection that Deutsche

14   Bank is not going to walk away, is not speculation.  It's plain

15   old simple common sense.  Deutsche Bank is not taking any risk

16   in this proposed transaction, and in their reply papers, they

17   do not even try to attempt to refute that.  Deutsche Bank is

18   putting up no capital.  Again, they do not refute that in their

19   reply papers.  And contrary to a number of things that were

20   said today, and in debtors' papers, Deutsche Bank does not have

21   to maintain any credit rating whatsoever.  It's a provision in

22   the letter agreement.  And I would direct the Court's attention

23   to Section 2(b)(6).  It's at the bottom of page 2 of Exhibit C

24   to the debtors' motion.

25             It's a condition of the letter agreement that the

34

1    rating condition be waived.  So Deutsche Bank, under this

2    letter agreement, would not have to maintain any particular

3    rating condition or credit rating of its own.  It would not

4    have to do anything.  It is risk free to Deutsche Bank.  It

5    would be foolish for them to walk away from this, even if this

6    consideration of this particular application were not made

7    within this purported forty-five day time period.

8              We submit, Your Honor, that the best indication of

9    the real value being proffered here to the estate is contained

10   in the transaction in the letter agreement that the debtors

11   have entered into with Deutsche Bank.  And again, I would refer

12   the Court to Section 4(a)(3).

13             The debtors expressly contemplate by this provision

14   that they may well accept another assignee who proffers value

15   less than nineteen million dollars.  We are not talking about

16   the stratosphere of numbers of 800 million or 700 million.  The

17   debtors themselves -- and we believe this ought to be the

18   benchmark for the Court's consideration of any break-up fee.

19   The debtors themselves have made plain that they may well

20   accept an assignee who proffers total aggregate value to the

21   debtors of nineteen million dollars.

22             The report that we received only on reply from the

23   debtors from their purported expert obviously was withheld in

24   connection with the motion.  It wasn't prepared over the

25   holiday weekend.  And, in fact, the debtors admit in their

35

1    reply papers that what we received at the eleventh hour was an

2    update of something they already had.

3              THE COURT:  You're talking about Mr. Kane's report?

4              MR. WOLOWITZ:  Mr. Kane's report, Your Honor.  Mr.

5    Kane's report no where attempts to address the discrepancy

6    between these cash flows that he is talking about and the

7    points we made in our objection that the benchmark for

8    valuation ought to be this nineteen million dollar figure, that

9    the parties themselves, the parties being the debtors and

10   Deutsche Bank, have reflected in the letter agreement.

11             Your Honor, I would like to lastly address a

12   statement made in the debtors' reply papers that it was the

13   failure for LBSF to be a conduit with a sufficient credit

14   rating that was the basis for Libra's termination of the CDS

15   agreement.  They make that statement at page 10 of their reply.

16             The termination had nothing to do with LBSF or LBHI

17   not being a conduit with a sufficient credit rating.  Libra had

18   the express right, as we've touched upon briefly, under the

19   clear provisions of the standard ISDA master agreement to

20   terminate due to the debtors' bankruptcy.  That is why there

21   was a termination of the CDS agreement.  That was the benefit

22   of the party's bargain.  And it's the height of cynicism, in

23   our view, Your Honor, to call the exercise of one's clear right

24   under very standard documents to be opportunistic.

25             It's expressly the way the contract was written and

36

1       it's because it's in the standard ISDA master agreement that

2       market participants who are looking at this terminated CDS

3       agreement know full well the importance of enforcing this right

4       of termination.  That may be why more have not come forward.

5       That may be another reason why this needs to wait the outcome

6       of the adversary proceedings.

7               We would just lastly note, Your Honor, that the one

8       party that the debtors have referred to in their reply papers

9       as having surfaced post-motion has merely expressed an inquiry

10      and has not made any sort of offer.  Thank you, Judge.

11              THE COURT:  Okay.  Thank you.  Mr. Miller, do you

12      have some comments on that?

13              MR. MILLER:  Yes, Your Honor.  I think it might make

14      sense for me to respond to some of the specific points that

15      were raised and then we'd like to offer --

16              THE COURT:  Yes.

17              MR. MILLER:  -- the proffer and other evidence for

18      the Court.

19              THE COURT:  I would like you to comment on what has

20      been stated.

21              MR. MILLER:  Yes, Your Honor.  Yes, Your Honor.  Let

22      me begin with this, we think, misunderstanding about the

23      limitation on the break-up fee.  The only way that a break-up

24      fee is paid is if there is a settlement of some kind.  If

25      there's an out right loss or there's an out right victory then

37

1    in the first case, as the Court has noted, the break-up fee

2    goes away completely because it's only payable if the debtors

3    get some value.  If there is a complete victory on termination,

4    the transaction goes forward, the break-up fee is irrelevant,

5    because the way the assignee is paid is then on sliding

6    percentages of the funds that come in.

7            It's only if the debtors accept a settlement and

8    bring it before this Court under Section 9019, because this is

9    outside of the orders that allow expedited settlement, that it

10   could be possible that the break-up fee at that point could be

11   larger than -- or could be approaching this fifty percent.

12           THE COURT:  I'd like to understand for purposes of

13   analyzing Section 4(a)(iii) what kind of transaction we're

14   talking about and what the parties had in mind because the

15   notion of a fifty percent -- it's not even a break-up fee.

16   It's a premium; it's a sharing agreement -- for consideration

17   of that sort is so far beyond what ordinary jurisprudence would

18   permit as to give Libra kind of a free shot at your glass jaw,

19   at least as to that point.

20           MR. MILLER:  Well, Your Honor, I understand that this

21   has to do with the somewhat unlikely scenario that at some

22   later point in the transaction, a smallish settlement might

23   become attractive to the debtors and, candidly, that would be

24   most likely to occur if there were setbacks in determination

25   litigation.  And the break-up fee would have been, at that

38

1      point, a substantial amount, particularly in relation to

2      Societe Generale, and the debtors wanted to limit the break-up

3      fee.

4               It's actually a protection.  It only operates if the

5      debtors came to the Court with a small settlement and tried to

6      push down the break-up fee.  It does not increase the break-up

7      fee, it doesn't set a floor, and it, certainly, does not

8      suggest that the debtors would ever consider a transaction in

9      the price range that was suggested.  And it certainly

10     constrains us, and we're going to respect all of the

11     constraints on settlement.

12              I do want to note that the only thing we've said

13     about settlement, is that there were discussions.  We've not

14     disclosed any contents of those discussions.  And that was in

15     response to the allegation that it was seven months later.  And

16     there was some statement about the passage of time.

17              But it is absolutely a red herring, Your Honor, to

18     suggest that there's any realistic possibility that the debtors

19     would be interested in a settlement in this transaction that

20     could result in a fifty percent break-up fee.  Is it possible

21     that the debtors might accept a settlement that would be, for

22     example, 600 million dollars or 300 million dollars or

23     something else?  That's certainly possible.  Under certain

24     circumstances, you can imagine that the value when that is

25     percolated through might be enough to cut down to say the

39

1    twenty million dollar break-up fee in some way.  And that's the

2    purpose of this provision is to provide a limit on the break-up

3    fee.  The fifty percent of your aggregate value, the payment,

4    was a protection I think that, as I understand it, the assignee

5    wanted just to make sure they got something if, in fact, the

6    debtors had a change of heart and took a very small settlement.

7         But this -- the Court will have another opportunity

8    to deal with this in 9019.  The creditor's committee would have

9    another time to deal with this.  This would be in a settlement

10   context.  And we don't believe that it's any realistic -- that

11   it's a realistic risk.

12        THE COURT:  If it's not realistic, why agree to it at

13   all?  Why not just delete this paragraph from the letter

14   agreement, with the consent of Deutsche Bank?

15        MR. MILLER:  Well, we'd certainly be -- we would be

16   happy to do that, Your Honor, if Deutsche Bank would do that.

17   I don't know whether Deutsche Bank is willing to do that.

18        THE COURT:  I think we should find out.

19        MR. MILLER:  All right.  I don't know whether

20   Deutsche Bank has anyone that we can consult with here.  But we

21   can -- we can certainly take a break.

22        THE COURT:  I'm not proposing this happen on the

23   record.

24        MR. MILLER:  Yes.

25        THE COURT:  I just think that before we close the

40

1   record, I'd like to know the answer as to whether or not this

2   is a provision that can be deleted from the letter agreement by

3   mutual consent.  And if not, I want to know precisely why it

4   can't be deleted.

5        MR. MILLER:  All right.  Your Honor, if we might take

6   a break in a minute and we'll come back to that.  I'd like to

7   deal now with the rating issue, which is a confusion of

8   terminology.  The terms, capitalized terms in the letter

9   agreement are referred to those in the transaction documents.

10  The rating condition is a defined term in Exhibit H to the

11  motion which is the indenture.  And on page 61, rating

12  condition is defined.  It is not what Mr. Wolowitz suggested

13  that it might be.  It is an approval by Moody's and Standard

14  and Poor's in writing that the assignee has a -- has met their

15  requirements.  And it is the action by a third party -- "Rating

16  condition" -- I'm reading now from page 61, Your Honor, in the

17  definition section of the indenture.  "Rating condition means

18  with respect to any action taken or to be taken hereunder.  A

19  condition that is satisfied when each of Moody's and Standard

20  and Poor's, (or if expressly so specified in respect of such

21  action, the specified rating agency) has confirmed in writing

22  to the issuer or the trustee, each hedge counterparty, each

23  senior swap counterparty and the collateral manager that such

24  action will not result in a withdrawal action or other adverse

25  action with respect to its then current rating (including any

41

1    private or confidential ratings or credit estimates) of any

2    class of notes or the senior swap agreement."

3            So all we are asking to have waived there, Your

4    Honor, is the requirement to go to Moody's or Standard and

5    Poor's and get them to agree that this transaction is all

6    right.  And I will represent to the Court that one of the

7    problems there, as you may know, is the rating agencies have

8    been a radio silence for many of these kinds of transactions

9    and the complexity of getting them to agree to anything right

10    now seems to us not to be a condition that would be required in

11    a court-approved assignment.

12            So that is all this has to do with.  The idea, there

13    are many other provisions throughout the documents, that

14    require the swap counterparty and all its credit support

15    provider to have certain credit ratings.  And one of the

16    concerns we have is that if those credit ratings drop, then a

17    new event of termination would arise.  And it is true, and I do

18    want to clarify, that there are a series of different

19    termination provisions one of which could be based expressly on

20    credit downgrades.  There is also the ISDA bankruptcy

21    termination provision.  But the ISDA bankruptcy termination

22    provision, and if I could turn to that now, is part of a group

23    of documents that interact with each other.  And there's

24    actually a case, Your Honor, that I'd like to call the Court's

25    attention that has recently dealt in this court, the Southern

42

1    District of New York by Judge Coates (ph) with this -- a

2    similar collection of documents and has talked about the way

3    they are interrelated to each other.

4        It is the position in the termination adversary

5    proceeding, which we believe is compelling, that the

6    termination rights in the ISDA agreement are expressly limited

7    by a certain limiting provisions in the indenture.  And the

8    senior swap counterparty was a party to that -- may not be a

9    party to that indenture but it certainly informed with and

10    deals with the indenture, but swap counterparty, which is LBSF,

11    is an expressed third party beneficiary of that.

12        In a case, Your Honor, that is now available at 2008

13    WL 5170178 -- I do have copies of that, Your Honor -- which is

14    a little hard to read.  This is in Judge Coates' court, in the

15    Southern District of New York, Cooperative Centra

16    Rafinsingin -- I guess it's -- Barenlebank BA v. Brookfield CDO

17    Limited and Wells Fargo Bank (ph.).  The Court dealt with a

18    request for an injunction to support termination.  And the

19    Court discussed the way these documents interrelate with each

20    other on star page 12 -- page 10.  And this is a very similar

21    transaction to this one, in terms of its documentation.  And

22    the Court said, "These are carefully structured documents with

23    intricately interwoven and balanced duties and rights.  They

24    spell out the party's obligations in exquisite detail.  They

25    exert the minute control over the collateral manager and the

43

1    trustee.  The participation of the hedge counterparty in the

2    enterprise is a material component of its business, and the

3    termination of that participation was a matter of consequence

4    to all the parties."  And the Court then goes on and says, that

5    certain of the provisions in the indenture had not been

6    sufficiently satisfied to allow a termination by that party

7    which was actually in the position of LBSF.  Here it was the

8    swap counterparty.

9            So our position is, Your Honor, that in these

10   documents, you're going to have to look at the indenture and

11   its protections which were applicable.  And that those, as that

12   Court recognized, limit termination rights in the ISDA that you

13   can't read them out of context.  We also believe that there are

14   issues about the extent of the safe harbor from Section 560,

15   that it may not and does not extend to a number of these

16   provisions.

17           So we think this expression of concern again is not

18   based on a real concern that the estate is exposed to an

19   unnecessary expense but whatever the motivation is, Your Honor,

20   we are prepared to go forward with a proffer.  One of the

21   things that the proffer will deal with is the fact that the

22   timing provisions are at the insistence of Deutsche Bank.  It

23   will also deal with the marketing efforts that were made.  And

24   I think perhaps I'll be happy to take any questions on these

25   issues, Your Honor, or I can move into a proof phase.  Or we

44

1    can take a break and explore the issue of adjusting this letter

2    agreement as you would prefer.

3             THE COURT:  I'm going to suggest the following.

4    Let's take a ten minute break so that before the proffer you

5    can confirm whether or not 4(a)(iii) is part of the letter

6    agreement.  And I'd like it not to be but I think the proffer

7    will change depending upon whether it's in or not in because it

8    goes to my ability to approve the break-up fee.  Or, at least,

9    it goes to my exercise of discretion in that area.

10            I'm letting you know and everyone else know that this

11   aspect of the arrangement, I find troublesome, because it's not

12   really a break-up fee.  It converts Deutsche Bank into almost a

13   joint venture partner with a respect to a settlement that's in

14   the low end of the range of foreseeable outcomes.  And some

15   showing's going to have to be made as to why that makes sense.

16   On its face, it doesn't make any sense to me.

17            After the break, I'd like to proceed with the

18   proffer.  But before doing so, I'd like you to confer with your

19   adversary to confirm whether or not there's consent to doing

20   that.  Otherwise, I'll just ask on the record.  But we might as

21   well avoid that step during the break by having you meet and

22   confer for ten seconds to confirm whether we're going to have a

23   live witness or whether we're going to have this by proffer.

24   And we may have a live witness anyway, because there may be

25   desire to cross-examine with respect to the proffer.  I'll see

45

1    you in ten minutes.

2           MR. MILLER:  Thank you, Your Honor, for your time.

3       (Recess from 11:46 a.m. until 12:05 p.m.)

4           THE COURT:  Please be seated.  I was wondering what

5    happened to you.

6           MR. WOLOWITZ:  Excuse me, Your Honor?

7           THE COURT:  You sort of disappeared during that

8    break.  I'm glad you're back.

9           MR. WOLOWITZ:  Your Honor, we conferred about the

10   prospective proffers.  And we will accept a -- Mr. Miller and I

11   have agreed that we'll accept a limited purpose proffer as to

12   Mr. Kane's report.  That is, that we'll accept the proffer of

13   that report for purposes of part one of this motion only and

14   not beyond that since we just received it some twenty-four

15   hours ago.  And most particularly, we would not want it in

16   evidence for any purpose with respect to the adversary

17   proceeding.

18          Secondly, we've conferred as to the prospective

19   proffer regarding Mr. Hershan and that's fine with us.  Mr.

20   Miller told me what he would proffer and that is acceptable

21   with some changes that we made.

22          And then lastly, Your Honor, after those are done, if

23   I may, I would just like to address one point that counsel made

24   in his remarks just prior to the break.

25          THE COURT:  Do you want to address that now?

46

1          MR. WOLOWITZ:  Sure.  With respect to the indenture,

2   Judge, counsel, I think, described half of the indenture and

3   didn't describe a very important piece of the indenture which

4   shows that the indenture itself makes clear that it is not

5   intended to limit the rights of Libra to terminate pursuant to

6   the terms of the ISDA master agreement.

7          Section 7.5(d) of the indenture says that the issuer,

8   which is Libra, shall enforce its rights under the CDS

9   agreement.  And there is nothing in 7.5(d) that says, except as

10  set forth in this indenture, nothing in 7.5(d) that says,

11  except as set forth in Section 5.2(c) or except as set forth in

12  7.8(a)(11), there are no provisos.  So it's clear, Judge, that

13  the indenture itself makes clear that the indenture is not

14  intended to limit Libra's rights to terminate the CDS agreement

15  under the terms of that CDS agreement.

16         As well, there's Section 12.1(b) of the indenture

17  which, if the indenture were to be looked at, is entirely

18  consistent with that approach.  This CDS agreement fits the

19  definition of a defaulted security, and 12.1(b) requires that

20  the defaulted security be terminated within a year, and that

21  was done.  So I just wanted to address the fact that only a

22  portion of the indenture had been brought to the Court's

23  attention.

24         THE COURT:  All right.

25         MR. MILLER:  Thank you, Your Honor.  With regard to

47

1    that last point of Section 7.5, which is on pages 156 and 157,

2    is a long provision and, suffice it to say, we don't believe

3    that it has the reading that's been specified.  It doesn't

4    negate others and can be read together.

5              But in any event --

6              THE COURT:  None of this matters to me for purposes

7    of today's hearing.

8              MR. MILLER:  Right.

9              THE COURT:  I haven't reviewed the indenture.  And

10   just for purposes of advocacy, whenever anybody tells me that

11   something is clear in a setting that's as murky as this, it

12   begins to actually weaken as opposed to strengthen the argument

13   that's being made.  There's litigation to be -- that will

14   ultimately resolve the question of what's clear.

15             MR. MILLER:  Thank you, Your Honor.

16             THE COURT:  If anything.

17             MR. MILLER:  Well, we are grateful that it's clear,

18   Your Honor, that we can go ahead and offer the declaration of

19   GreensLedge for the limited purpose stated by Mr. Wolowitz and

20   we'd like to do so.  I'd like to ask the Court whether you

21   would like that as a separate exhibit or you would like to

22   simply accept it as an Exhibit A to our response to the

23   objection?

24             THE COURT:  Well, before we start with the offer of

25   proof, I'd like to know what the disposition is of Section

48

1    4(a)(iii).

2         MR. MILLER:  Yes, excuse me, Your Honor.  I did want

3    to report on that.  The debtors have agreed to a deletion of

4    Section 4(a)(iii).  We have discussed it with counsel for

5    Deutsche Bank and the last time I had heard, he was trying to

6    get an e-mail authorization from his client to agree to the

7    deletion of that.  I don't know --

8         MR. DORCHAK:  If I may, Your Honor?

9         THE COURT:  Yes.

10        MR. DORCHAK:  I now have that authorization.

11        MR. MILLER:  All right.  So then we --

12        MR. DORCHAK:  I now have my client's authorization.

13        THE COURT:  Okay.  So 4(a)(iii) is no longer part of

14   the letter agreement.

15        MR. MILLER:  That's correct, Your Honor.  We'll so

16   stipulate.

17        THE COURT:  Great, thank you.

18        MR. MILLER:  I'm sorry that we're still awaiting

19   that, Your Honor, and was hopeful we could report at that time.

20        THE COURT:  Sorry.  Did you state your name for the

21   record, so since you're sort of removed from the mics, and you

22   also just said what you said, it's going to come out on the

23   transcript as unidentified voice.

24        MR. DORCHAK:  Yes, Your Honor, thank you, Joshua

25   Dorchak of Bingham, McCutchen on behalf of Deutsche Bank.  And

49

1    I'll confirm that I have e-mail authorization from my client to

2    the elimination of the clause in question --

3          THE COURT:  Fine, thank you.

4          MR. MILLER:  Thank you, Your Honor.  My question was

5    whether the Court would prefer, as a matter of to maintain the

6    record, that we mark as an exhibit and introduce the

7    declaration of Mr. Jim Kane for the limited purpose of this

8    motion, the part of the motion, part one, that is being heard

9    today or whether we could treat it as being accepted in the

10   record as evidenced by the fact that it's already been attached

11   as Exhibit A to our response to the objection.

12         THE COURT:  I think that there's no need to

13   separately mark and introduce the declaration.

14         MR. MILLER:  We thought it might be helpful to

15   minimize the number of records that have to be maintained that

16   way.  Thank you, Your Honor.

17         At this point, I would like to make a proffer of the

18   evidence, that would be offered through the testimony of Mr.

19   Robert Hershan.

20              Your Honor, I would offer as a proffer testimony

21   that would be given by Robert Hershan who is a managing

22   director with Alvarez & Marsal.  Mr. Hershan is thoroughly

23   familiar with all material aspects of the motion to approve the

24   letter agreement including its break-up fee.  He would refer to

25   the debtor, Lehman Brothers Special Financing, Inc., as LBSF.

50

1    Mr. Hershan is here in the courtroom, as I indicated, and if

2    requested by the Court after this proffer, he would be

3    available for cross-examination.  And if I differ in my proffer

4    from what I tried to summarize from -- for Mr. Wolowitz, if he

5    wants cross-examination, he's still here for that purpose.

6         If called to testify, his direct testimony would be

7    as follows:  first, he would cover his background.  Mr. Hershan

8    has more than twenty-five years of diverse legal, financial and

9    restructuring experience in managing complex asset finance

10   transactions.  His experience spans banking, financial

11   services, transportation and manufacturing industries.

12        Mr. Hershan began his career as a tax attorney at

13   White and Case, and at Haight Gardner Poor & Havens in New

14   York.  Prior to joining Alvarez and Marsal, Mr. Hershan was the

15   president and managing director of two privately held U.S.

16   firms with affiliates in Belgium, France and Germany.

17        As the senior U.S. partner, he led a team that

18   carried out multinational structuring and placement of

19   institutional investments for cross-border asset finance

20   transactions based on commercial, tax, accounting and other

21   regulatory requirements across multiple jurisdictions.

22        Mr. Hershan earned his BS from the Wharton School the

23   University of Pennsylvania and his JD from Fordham University

24   School of Law.

25        Mr. Hershan has been intimately involved with LBSF's

51

1   affairs since approximately October 2008 and has been engaged

2   in the Lehman case since September 17, 2008.  Since that time,

3   he has independently reviewed and been advised of transactions

4   that LBSF entered before its bankruptcy and the efforts by LBSF

5   to realize value for those transactions.

6            I'd like to give a little overview now that would be

7   in Mr. Hershan's testimony.  LBSF and its professionals have

8   reviewed the credit default swap agreement between LBS and

9   Libra CDO Limited, which he would refer to as Libra, and other

10  transactional documents related to the agreement including the

11  indenture.  Based on that review, LBSF and its professionals

12  concluded that the Libra credit swap agreement is a valuable

13  asset of LBSF's estate, and the creditors of LBSF would benefit

14  from LBSF's attempts to preserve value in the agreement by,

15  among other things, assigning LBSF's interest in the credit

16  default swap agreement.

17           Mr. Hershan would testify that LBSF sought to

18  identify parties that, as contemplated by the Libra transaction

19  documents, could serve as potential assignees.  Mr. Hershan

20  would testify that the Court authorized the debtors to engage

21  Natixis Capital Markets, Inc.-- that's N-A-T-I-X-I-S -- to

22  analyze, evaluate, and recommend a disposition strategy for

23  certain pre-petition derivative contracts of the debtors

24  involving special purpose vehicles and other assets or

25  financial instruments.  The debtors engaged Natixis because of

52

1   its substantial knowledge of and experience with complex

2   financial instruments and derivative transactions like the

3   Libra transaction.  Most, if not all of these similar

4   transactions entail multiple complex agreements and involve

5   numerous parties.  As these transactions are unwound or

6   otherwise resolved, the goal is to maximize value for the

7   estate.

8          Mr. Hershan would testify that as part of this

9   engagement, Natixis was assigned to work with the estate to

10  market and assign LBSF's interest in the Libra credit default

11  swap agreement.  Mr. Hershan directed and oversaw this process

12  conducted by Natixis.  Natixis identified potential assignees

13  on the basis of a variety of factors including, first, the

14  credit rating required to satisfy the rating provisions that

15  are set out in Libra's indenture and the credit swap -- credit

16  default swap agreement -- excuse me.  Second, sufficient

17  expertise with regard to the complex financial transaction

18  similar to the credit default swap agreement.  And third,

19  familiarity with the other agreements at issue in this matter.

20  The goal was to generate competitive bids.

21         Mr. Hershan would further testify that a key goal was

22  to identify potential assignees that would meet credit rating

23  requirements under the deal and it would not be subject to a

24  significant credit downgrade risk.

25         Mr. Hershan would testify that a number of potential

53

1    assignees are not qualified or are otherwise unable to become

2    assignees.  For instance, Mr. Hershan would testify that many

3    large financial institutions that could otherwise qualify as

4    assignees have been scaling back or cutting down their business

5    lines that deal in mortgage-backed derivatives and CDOs.

6    Others are operating within internal guidelines that make

7    transacting in these financial products a slow and

8    unpredictable process.

9         Mr. Hershan would testify that LBSF and its advisors

10   identified six potential assignees that met the criteria for

11   assignment and LBSF entered into confidentiality agreements

12   with all six parties of those parties.  More detailed

13   discussions of the terms of the assignment were completed with

14   the potential assignees and original documentation was provided

15   to facilitate diligence and bidding.

16        Mr. Hershan would testify the result of this process

17   was that Deutsche Bank provided a bid on terms most attractive

18   to LBSF's estate.  The parties engaged in further negotiations

19   until an agreement was acceptable to both sides.  There were

20   several differentiating factors including, number one, value to

21   the estate; number two, perceived ability to obtain necessary

22   internal improvements; number three, willingness to enter into

23   a structured assignment versus a simple assignment for cash;

24   number four, willingness to take ratings exposure, that is, an

25   obligation to post collateral in the event a downgrade below

54

1   relevant thresholds; number five, willingness to take exposure

2   to ABS, that is, Asset Backed Securities collateral; and number

3   six, willingness to enter into a commitment prior to receiving

4   court approval for the transaction.

5        Mr. Hershan would testify that Deutsche Bank required

6   submission of the letter agreement and payment agreement or

7   approval by this Court at the earliest hearing date that could

8   be set without expedited submission.  This is the reason for

9   the hearing today.

10       Mr. Hershan would further testify that the obligation

11  of Deutsche Bank to accept the assignment will terminate if a

12  declaratory judgment invalidating the purported termination of

13  the Libra swap agreement is not achieved in this Court within

14  ninety days after signing of the letter agreement.  While it is

15  true that time limit might be extended, the decision to extend

16  is within the sole discretion of Deutsche Bank.  In addition,

17  Deutsche Bank would be able to terminate the letter agreement

18  if it is not approved by June 19th, 2009.  That is again the

19  subject of the hearing today.

20       Further, the testimony of Mr. Hershan would explain

21  that the LBS estate will be exposed to loss of a very valuable

22  asset if today's hearing is deferred or if the related

23  adversary proceeding is delayed because of the risk that

24  Deutsche Bank will no longer remain obligated to accept the

25  assignment and the risk that no replacement can be found.

55

1        Mr. Hershan would testify that during this process,

2   LBSF sought comments from the creditor's committee as to the

3   transaction and in certain instances, their comments were

4   incorporated into the terms of the transaction with Deutsche

5   Bank.  Mr. Hershan would further testify that based on

6   communications from the creditor's committee counsel, the

7   creditor's committee is believed to fully support the relief

8   requested by the motion which has been confirmed in court

9   today.

10       Mr. Hershan would testify that on May 5, 2009, the

11  parties entered into the letter agreement.  At that point, LBSF

12  filed a motion to, among other things, approve the letter

13  agreement.  After the letter agreement was entered and the

14  motion filed, an additional potential assignee emerged and has

15  shown significant interest in the transaction.  Mr. Hershan

16  would testify that this party showing interest was one of the

17  original parties identified by Natixis that signed a

18  confidentiality agreement but it has now shown renewed interest

19  and made a counter offer.  He would testify that the estate

20  remains in discussion and open to any better proposal from any

21  potential assignee.

22       In terms of business judgment, Mr. Hershan would

23  testify that LBSF's decision to enter into the letter agreement

24  is well informed and represents a reasonable exercise of

25  debtors' business judgment.  Mr. Hershan would testify the

56

1   agreement was heavily negotiated by LBSF and Deutsche Bank, who

2   are both represented by counsel through the dealings.

3        Moreover, prior to entering into the transaction with

4   Deutsche Bank, LBS considered -- LBSF considered the costs and

5   benefits associated with the transaction.  Based upon an

6   independent review of the circumstances and the advice of

7   LBSF's counsel and business and financial professionals, LBSF

8   believes that the benefits of the transaction far outweigh its

9   costs.  The letter agreement will secure the commitment of

10  Deutsche Bank to enter into the assignment with LBSF.  LBSF

11  believes that securing this commitment is a critical first step

12  to realizing value from the Libra transaction.

13       This concludes the proffer from Mr. Robert Hershan.

14       THE COURT:  Thank you.  Is there any desire to cross-

15  examine with respect to the proffer?

16       MR. WOLOWITZ:  No, Your Honor.

17       THE COURT:  Fine.  The proffer is accepted.

18       MR. MILLER:  Your Honor, this concludes the

19  submission of movants in support of the motion.  If the Court

20  has anymore questions or there's anything else we can provide,

21  we would be, of course, happy to do so.

22       THE COURT:  No.  Thank you for that.  I believe I

23  probably heard all the legal argument that I need to hear.  I

24  just want to confirm that as far as everyone is concerned, the

25  record is closed not only as it relates to the evidentiary

57

1    component but also as to legal argument.  Is there anything

2    more that anyone wishes to say?

3              MR. WOLOWITZ:  Nothing further from the objecting

4    parties, Your Honor.

5              MR. MILLER:  And nothing further from the movants,

6    Your Honor.

7              THE COURT:  All right.  Thank you very much.  The

8    debtors' motion for approval of the letter agreement with

9    Deutsche Bank dated May 5, 2009 as modified by the statements

10   made on the record to delete Section 4(a)(iii) which appears on

11   page six, the section that deals with what the Court concluded

12   was an excessive break-up fee is approved.

13             I'm satisfied that the transaction that is set forth

14   in the letter agreement, based on the proffer of Mr. Hershan's

15   testimony, is the product of good faith efforts to obtain the

16   best possible transaction to preserve the value of the swap

17   agreement.  I note, however, that issues relating to the

18   enforceability of the swap agreement are before me in two

19   separate pending adversary proceedings the outcome of which may

20   well determine whether or not this transaction will bear fruit.

21             I further note that the time horizon for resolution

22   of the issues set forth in those companion adversary

23   proceedings is an aggressive time horizon.  And at some point,

24   not today, I assume that there will be a pretrial conference to

25   discuss procedures to expedite the resolution of those two

58

1    cases.

2        I'll entertain an appropriate order.

3    (Pause)

4        THE COURT:  And you may approach.

5        MR. MILLER:  Thank you, Your Honor.  I have a disk

6    and I believe we also have copies that have been previously

7    submitted to the Court, Your Honor, so I will approach the

8    Court with the disk and a paper copy.

9        THE COURT:  Thank you.  And since I'm not tracking

10   where these adversary proceedings are as to upcoming agendas of

11   Lehman omnibus hearings, I know we have an omnibus hearing date

12   on June 3rd but I'm not sure if these cases are part of that

13   agenda.

14       MR. MILLER:  Your Honor, I believe the pretrial in

15   this case is on June the 24th.  However, it is the intention of

16   the movants and the plaintiffs in the first filed adversary

17   proceeding in this group to approach the Court with a letter

18   very shortly requesting permission to go ahead and submit a

19   summary judgment in advance of the pretrial conference so the

20   Court will have -- or simultaneous with that so the Court will

21   have a summary judgment before it promptly.  And we will

22   certainly discuss with other parties any briefing schedule that

23   can be adjusted within the time frame.

24       THE COURT:  Well, let me make a suggestion that to

25   the extent that it is the debtors' desire to proceed to summary

59

1    judgment, that we have as prompt a conference with respect to

2    that as possible since under the local rules, I'm the

3    gatekeeper of summary judgment practice.  And I don't know

4    going in whether or not counsel for Libra and Societe Generale

5    will agree that this is in the zone for summary disposition or

6    whether or not this is a case that requires, for whatever

7    reason, discovery and other kinds of pre-hearing activity.  I'd

8    like to know that as soon as possible.

9         MR. WOLOWITZ:  Your Honor, let me recommend that Mr.

10   Miller and I confer.  He can tell me what he has in mind in

11   terms of the summary judgment proceeding that he has referred

12   to.  And we can confer and revert to the Court promptly and

13   maybe come in for a conference before the Court on a reasonably

14   prompt schedule.

15        THE COURT:  I think that sounds fine.  Frankly, if it

16   were possible for this to be heard by agreement at the June 3rd

17   omnibus date, that would be desirable from my perspective,

18   particularly, because I'm very familiar with the issues as a

19   result of today's hearing and I don't see a particular reason

20   to wait three weeks.

21        MR. MILLER:  Certainly, Your Honor.  On behalf of

22   debtors, Your Honor, I was already going to be here for the

23   June 3rd omnibus hearing and we have other matters that day and

24   it certainly would be fine for the debtors to shift this

25   pretrial conference to June the 3rd if that's acceptable to --

60

1        THE COURT:  If it can be shifted to that date, I

2   think it would be desirable.  If it can't be -- and I'm not

3   urging that it be if it's inconvenient for counsel.  I just

4   think that we should try to have something set up earlier than

5   June 24.  That seems like it's awfully far away to me.

6        MR. WOLOWITZ:  We'll do that, Judge.  We'll try to

7   set something up before the 24th.  I don't know if the 3rd will

8   be doable but we'll get something done before then.

9        THE COURT:  Well, you can confer and someone will

10   advise my chambers.  Meanwhile, we're adjourned.

11        MR. WOLOWITZ:  Thank you, Judge.

12        MR. MILLER:  Thank you for your time, Your Honor.

13      (Whereupon these proceedings were concluded at 12:28 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

61

1

2                        I N D E X

3

4                      R U L I N G S

5    DESCRIPTION                              PAGE     LINE

6    Debtors' motion for approval of letter    56       12

7    agreement with Deutsche Bank dated May 5,

8    2009 as modified by statements made on the

9    record to delete Section 4(a)(iii) which deals

10   with an excessive break-up fee is approved

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

62

1

2                         C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9       AAERT Certified Transcriber (CET**D-486)

10

11      Veritext LLC

12      200 Old Country Road

13      Suite 580

14      Mineola, NY 11501

15

16      Date:  June 1, 2009

17

18

19

20

21

22

23

24

25