WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Bruce S. Meyer
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                           :
In re                                      :        Chapter 11 Case No.
                                           :
LEHMAN BROTHERS HOLDINGS INC., et al.,     :        08-13555 (JMP)
                                           :
                    Debtors.               :        (Jointly Administered)
                                           :
                                           :
-------------------------------------------------------------------x
```

## NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE CERTAIN LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET. AL.

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for approval, pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") of LBHI's restructuring of certain loans with affiliates of

Broadway Partners Fund Manager, LLC ("Broadway Partners") will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **June 24, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

                PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Bruce S. Meyer, Esq. and Shai Y. Waisman, Esq., attorneys for the Debtors; (iii)

the Office of the United States Trustee for the Southern District of New York, 33 Whitehall

Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul

Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq.,

(iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York

10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys

for the official committee of unsecured creditors appointed in these cases and (v) Fried, Frank,

Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004, Attn:

Brian Pfeiffer, Esq. and Lee Parks, Esq., attorneys for Broadway Partners, so as to be so filed

and received by no later than **June 19, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the

"Objection Deadline").

        PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

        PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: June 4, 2009
     New York, New York

           /s/ Shai Y. Waisman
           Shai Y. Waisman
           Bruce S. Meyer

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Bruce S. Meyer
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                  :
**In re**                                          :   **Chapter 11 Case No.**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       :   **08-13555 (JMP)**
                                                  :
                               **Debtors.**        :   **(Jointly Administered)**
                                                  :
                                                  :
-------------------------------------------------------------------x

### DEBTORS' MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE CERTAIN LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET. AL.

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion

and respectfully represent:

## Background

1.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

5.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to

28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

## Lehman's Business

6.      Prior to the events leading up to these chapter 11 cases, Lehman

was the fourth largest investment bank in the United States.  For more than 150 years,

Lehman had been a leader in the global financial markets by serving the financial needs

of corporations, governmental units, institutional clients and individuals worldwide.

7.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these chapter 11 cases

is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions

and Applications, filed on September 15, 2008 [Docket No. 2].

## Preliminary Statement

8.      In 2007, LBHI loaned in excess of $459 million to entities (the

"Broadway Entities") affiliated with Broadway Partners Fund Manager, LLC

("Broadway Partners") in connection with their acquisition of indirect ownership interests

in various office properties located in Massachusetts, New York, Virginia and California

(the "BIII Portfolio Properties").  In addition to these loans (described further below and

referred to as the "Bridge Mezzanine Loans"), third parties (the "Senior Lenders") loaned

additional amounts (the "Senior Loans") secured by mortgages on and indirect ownership

interests in the BIII Portfolio Properties, the proceeds of which were also used to fund the

Broadway Entities' 2007 acquisition of the BIII Portfolio Properties.

9.      The structure set forth below is a typical representation of the

capital structure for each of the BIII Portfolio Properties[1]:



10.      The first of the Bridge Mezzanine Loans is that certain Amended

and Restated Junior Mezzanine Loan Agreement, dated as of July 10, 2007, as amended

by that certain Agreement dated as of March 19, 2008, as further amended by that certain

Second Amendment to Amended and Restated Junior Mezzanine Loan Agreement dated

as of July 15, 2008 (collectively, the "Bridge A Mezz Loan Agreement") with Broadway

Wall Junior Mezz LLC, Broadway Greensboro Junior Mezz LLC, Broadway Howard

Street Junior Mezz LLC, Broadway Huntington Junior Mezz LLC, Broadway Legato

Junior Mezz LLC, Broadway Wilshire Junior Mezz LLC, Broadway California Street

Junior Mezz LLC, Broadway State Junior Mezz LLC, Broadway BCCC Junior Mezz

---

[1] The chart above is for illustrative purposes only and does not reflect the complete
capital structure of the BIII Portfolio Properties.  Each of the borrower entities above is a
party to loan and while each of the mortgage and mezzanine loans are secured directly or
indirectly by only one of the BIII Portfolio Properties both of the Bridge Mezzanine
Loans are indirectly secured by all of the BIII Portfolio Properties.

LLC, Broadway Beale Junior Mezz LLC, and Broadway Sansome Junior Mezz LLC, as Borrowers (collectively, the "Bridge A Mezzanine Borrowers"), whereby LBHI made a loan to the Bridge A Mezzanine Borrowers in the principal amount of $321,984,921.90 (the "Bridge A Mezzanine Loan"). The Bridge A Mezzanine Loan was secured by the equity of the of the direct subsidiaries of the Bridge A Mezzanine Borrowers. The Bridge A Mezzanine Loan matured on May 11, 2009.

11.    The second of the Bridge Mezzanine Loans is evidenced by that certain Bridge Mezzanine Loan Agreement, dated as of August 15, 2007 and effective as of July 10, 2007, as amended by that certain Agreement dated as of March 19, 2008, as further amended by that certain Second Amendment to Bridge Mezzanine Loan Agreement dated as of July 15, 2008 (collectively, the "Bridge B Mezz Loan Agreement") with Broadway Wall Junior Two Mezz LLC, Broadway Greensboro Junior Mezz Two LLC, Broadway Howard Street Junior Two Mezz LLC, Broadway Huntington Junior Two Mezz LLC, Broadway Legato Junior Two Mezz LLC, Broadway Wilshire Junior Two Mezz LLC, Broadway California Street Junior Two Mezz LLC, Broadway State Junior Two Mezz LLC, Broadway BCCC Junior Two Mezz LLC, Broadway Beale Junior Two Mezz LLC, and Broadway Sansome Junior Two Mezz LLC, as Borrowers (collectively, the "Bridge B Mezzanine Borrowers"), whereby LBHI made a mezzanine loan to the Bridge B Mezzanine Borrowers in the principal amount of $137,627,670.32 (the "Bridge B Mezzanine Loan"). The Bridge B Mezzanine Loan was secured by the equity of the Bridge A Mezzanine Borrowers. The Bridge B Mezzanine Loan also matured on May 11, 2009.

12.       In light of the highly distressed state of the commercial real estate markets and the related challenges confronting the BIII Portfolio Properties, LBHI and the Broadway Entities have entered into the agreements described herein and in the agreement and term sheet (together, the "Term Sheet") attached hereto as Exhibit A[2] to restructure the Bridge Mezzanine Loans for the reasons set forth herein.  The Debtors believe that this restructuring will maximize the value of the Bridge Mezzanine Loans and is thus in the best interest of the Debtors, their estates and their creditors.

13.       While the restructuring is complicated by the numerous entity interests and parties involved its essence is: (i) a forbearance of both of the Bridge Mezzanine Loans effectively extending both of the Bridge Mezzanine Loans to June 11, 2012; (ii) a $20,000,000 pay down to LBHI of the Bridge A Mezzanine Loan; (iii) a foreclosure (or assignment in lieu thereof) of a $20,000,000 portion of the Bridge B Mezzanine Loan that will give LBHI effective control of the BIII Portfolio Properties; (iv) the splitting of each of the Bridge Mezzanine Loans into two separate loans secured by separate pools (Pool I, Pool II and Pool III, as defined below) as described below; (v) a contribution of capital by the Broadway Funds to accomplish the $20,000,000 pay down and a commitment to provide working capital of up to an additional aggregate amount of $17,000,000, inclusive of current and future capital commitments, for the BIII Portfolio Properties; and (vi) the granting of an economic participation interest in both of

---

[2] Capitalized terms that are used but not defined in this Motion have the meanings ascribed to them in the Term Sheet.

the Bridge Mezzanine Loans to the Broadway Funds in exchange for them making such

contributions.

14.    To obtain the control of the BIII Portfolio Properties that is

described above, LBHI will foreclose upon or take an assignment in lieu of a portion of

the collateral for the Bridge B Mezzanine Loan.  The collateral which will be foreclosed

(or conveyed in lieu thereof) is the managing member interest in the Bridge A Mezzanine

Borrowers and the loan amount attributed to the foreclosed interest is $20,000,000.  Other

than this $20,000,000 portion of the Bridge B Mezzanine Loan, the entire outstanding

principal balance of both of the Mezzanine Loans will remain outstanding.

15.    Currently both of the Bridge Mezzanine Loans are secured by all

of the BIII Portfolio Properties.  In connection with the restructuring of each of the

Bridge Mezzanine Loans, each loan will be divided into two separate loans which will be

indirectly secured by the following properties:

> (i) 116 Huntington Street, (ii) 100 California Street,
> (iii) 50 Beale Street, (iv) 1000 Wilshire Boulevard, and (v)
> One Fair Oaks (Collectively, the "Pool I Properties");

> (vi) Greensboro Drive and (vii) One Sansome
> (Collectively, the "Pool II Properties"); and

> (viii) Bay Colony Corporate Center, (ix) 120
> Howard Street, and (x) 100 Wall Street (Collectively the
> "Pool III Properties").

The economics that the Broadway Funds will receive with respect to each pool is in part

based on the characteristics of each pool and the working capital contributed (or

committed)  to each pool by the Broadway Funds.

16.    In structuring the pools and respective participation interests with

the Broadway Funds, described below, the Debtors have sought to maximize potential

recoveries for their estates from the assets with positive cash flow while utilizing capital

contributions from the Broadway funds to support the capital needs of the assets and

minimizing the need for the Debtors to contribute new capital on the BIII Portfolio

Properties.  The Debtors believe that the proposed loan restructuring is in their best

interests and the Debtors seek approval to enter into this restructuring with the

Borrowers, the Broadway Funds and certain of their affiliates upon the terms described

below and in the attached Term Sheet.

**Relief Requested**

17.     By this Motion, LBHI seeks, pursuant to sections 105 and 363 of

the Bankruptcy Code and Bankruptcy Rule 9019, authorization for LBHI to restructure

the Bridge Mezzanine Loans with the Borrowers in accordance with the Term Sheet.

**The Proposed Settlement**

18.     LBHI and the Borrowers have proposed to restructure the terms of

the Bridge Mezzanine Loans in accordance with the Term Sheet attached hereto as

Exhibit A.

19.     In addition, Broadway Partners and certain of its affiliates have

provided non-recourse, carve-out guaranties (the "Broadway Guaranties") intended to

protect the Senior Lenders in the event the borrowers of the senior debt engage in certain

activities, such as: misappropriation of funds; making of intentional misrepresentations;

failure to pay taxes (unless such failure is solely due to the failure of the property to

generate gross income from operations sufficient to pay such taxes); committing

intentional waste or arson; failure to return to or reimburse the holders of the senior debt

for all material personal property taken from any property; failure to comply with certain

environmental provisions; making of certain non-permitted transfers; failure to comply

with certain single purpose entity provisions; and/or filing for bankruptcy in certain

circumstances.  The Broadway Guaranties will remain in place following the

restructuring described in this Motion.  Because LBHI will gain indirect operational

control of the Bridge A Mezzanine Borrowers and therefore control the borrowers of the

senior debt, Broadway Partners has asked for, and LBHI has agreed to provide, an

indemnity in favor of the guarantors under the Broadway Guaranties holding such

guarantors harmless from any loss incurred by the Broadway Funds due to a breach of a

non-recourse event caused solely by the actions of LBHI following the closing of the

transaction.  In addition, in connection with four of the properties, LBHI will cause

Property Asset Management Inc. ("PAMI"), an indirect wholly-owned, non-debtor

subsidiary of LBHI, to enter into guaranties ("PAMI Guaranties").  These guaranties are

similar to the Broadway Guaranties for the benefit of certain lenders who own a portion

of the underlying senior mezzanine loans for such properties, pursuant to the terms of the

intercreditor agreements entered into between such lenders and LBHI.  And, in

connection with such PAMI Guaranties, Broadway Partners will provide a reciprocal

indemnity in favor of PAMI, holding PAMI harmless from any loss caused by the actions

of Broadway Partners or any of their affiliates following the closing of the transaction.

    20.  In light of the nature of the restructuring transaction being

contemplated in the Term Sheet, the Debtors request authority, pursuant to sections

105(a) and 363(b) of the Bankruptcy Code and rule 9019 of the Bankruptcy Rules, to (a)

restructure the existing Bridge Mezzanine Loans substantially in accordance with the

Term Sheet, and (b) enter into and consummate the transactions and related documents

described in the Term Sheet, together with such other transactions and documents as are

reasonably incidental thereto.

## **Major Terms of the Transaction**

21.     Pursuant and subject to the terms of the Term Sheet, the Debtors

have proposed to restructure the obligations under the Bridge Mezzanine Loans in

accordance with the Term Sheet.  The salient terms of the Term Sheet are as follows:[3]

***Broadway Payments:***
- The Broadway Funds will provide an estimated $26,000,000 in cash at closing.
- The Broadway Funds shall also be responsible for (A) all transfer taxes associated with the Pool I and Pool II Properties Transaction and (B) all amounts owing directly or indirectly by Borrowers or their subsidiaries that own a direct or indirect interest in the BIII Portfolio Properties to any party except for (i) any amounts set forth on Schedule III attached to the Term Sheet, (ii) any and all trade payables incurred in the ordinary course of owning and operating the BIII Portfolio Properties which are not 30 or more days past due, (iii) any other ordinary course liabilities and/or expenses that individually are less than $20,000 and in the aggregate do not exceed $200,000 and (iv) amounts then owed but unpaid prior to closing due to the Senior Lenders under the Senior Loans.
- At closing, $20,000,000 of the $26,000,000 cash provided by the Broadway Funds, will be applied to pay down the Bridge Mezzanine Loans.
- $3,000,000 of the $26,000,000 cash provided by the Broadway Funds will be held by Lender and used to provide liquidity for the capital needs of Pool II (see below).
- The Broadway Funds will also commit to provide additional callable capital of $14,000,000, $2,000,000 of which will be solely for Pool I and $12,000,000 of which will be solely for Pool II (Funds shall by callable by Lender at any time that Lender determines that such additional funds are necessary to

---

[3] This summary is qualified in its entirety by reference to the provisions of the Term Sheet.  The Term Sheet will control in the event that there is any inconsistency between this Motion and the Term Sheet.

provide liquidity for capital needs).
- Except with respect to 120 Howard, the Broadway Funds shall pay any and all shortfalls in the debt service payments due and payable under the Senior Loans on the June 2009 payment date.

**Bridge A, Pool I**
**Mezz Loan**
**Tranching:**

- The Pool I Mezz Loan will be participated into three tranches (A, B, and C).
- The Broadway Funds shall have the right to receive a pro rata share (as described below) of payments received and distributed by Lender but shall not have any other rights with respect to the Bridge A Pool I Mezz Loan.
- Lender has agreed to forbear from exercising remedies with respect to the Pool I Mezz Loan until June 11, 2012. The Pool I Mezz Loan shall be prepayable at any time as determined by Lender.

**Tranche A, Pool I**

*Sizing:*

Tranche A, Pool I will have a maximum principal balance (exclusive of any accrued or capitalized interest) of $20,000,000, which will consist of:
(i)   $5,000,000 initially allocated to Lender,
(ii)  $3,000,000 initially allocated to the Broadway Funds and
(iii) up to $12,000,000 of additional capital callable by Lender. The first $2,000,000 of Tranche A, Pool I capital calls are committed solely by the Broadway Funds and shall be contributed solely by the Broadway Funds as contemplated in "Broadway Payments", above. (Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A, Pool I on the date of the capital call) of any capital calls.)

*Failure to Fund:*

The Broadway Funds shall have 15 business days following a call by Lender to provide any additional advances called by Lender (up to $2,000,000). Should the Broadway Funds fail to provide such cash within the timeframe described, the following shall occur:
- The Broadway Funds' participation interest in Tranche A, Pool I will be reduced by $1.00 for every $1.00 the Broadway Funds fail to fund and the Broadway Funds' participation interest in Tranche C, Pool I will be increased by an equivalent amount.
- If Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A, Pool I equal to 125% of its actual cash

contribution and Broadway Funds' participation interest in Tranche C, Pool I will be reduced by an equivalent amount.

- Lender (with 15 days prior notice) may terminate any management agreement or other affiliate agreement related to any Pool I Property with any affiliate of the Broadway Funds.
- The Broadway Funds will lose their preemptive right to maintain their percentage interest in any potential expansion of Tranches A, B and C of Pool I.

*Additional Tranche A Callable Capital:*  After the $2,000,000 is funded by Broadway, Lender may make additional capital calls (up to $10,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A, Pool I).

- If either party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then the non-defaulting party, or any party designated by Lender may provide such cash and receive an interest in Tranche A, Pool I equal to 125% of its actual cash contribution and the participation interest of the party providing such cash in Tranche C, Pool I will be reduced by an equivalent amount.
- If the Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice may terminate the management agreement and any other affiliate agreement related to the Pool 1 Property for which the capital call was intended to be used.

*Interest Rate:*  Interest on Tranche A, Pool I shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize.

*Prepayability:*  At Lender's sole discretion, Tranche A, Pool I may be paid off, in whole or in part, at any time at par plus accrued interest in cash or replaced with a replacement Tranche A, Pool I participation provided that the replacement Tranche A, Pool I is at an equal or lower interest rate.

**Tranche B, Pool I**
*Sizing:*  Tranche B, Pool I will be in the principal amount of $70,000,000. Lender will be entitled to receive 75% of the distributions on Tranche B (Pool I) and the Broadway Funds will be entitled to receive 25% of the distributions.

*Interest Rate:*  Interest on Tranche B, Pool I shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize.

*Tranche C, Pool I*

  *Sizing:*      Tranche C, Pool I will be in the principal amount of $108,568,579.   Lender will be entitled to receive 60% of the distributions on Tranche C, Pool I and the Broadway Funds will be entitled to receive 40% of the distributions.

  *Interest Rate:*    Interest on Tranche C, Pool I shall accrue at a rate of 14% per annum.  Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize.

*Bridge A, Pool II*
*Mezz Loan*
*Tranching:*

- The Pool II Mezz Loan will be participated into three tranches (A, B, and C).
- The Broadway Funds shall have the right to receive a pro rata share (as described below) of payments received and distributed by Lender but shall not have any other rights with respect to the Bridge A Pool II Mezz Loan.
- Lender has agreed to forbear from exercising remedies with respect to the Pool II Mezz Loan until June 11, 2012. The Pool II Mezz Loan shall be prepayable at any time as determined by Lender.

*Tranche A, Pool II*

  *Sizing:*      Tranche A, Pool II will have a maximum principal balance (exclusive of any accrued or capitalized interest) of $49,000,000, which will consist of:
(i) $4,000,000 initially allocated to Lender, (ii) $3,000,000 of the initial new money (as described in "Broadway Payments" above), which shall be used exclusively to pay debt service shortfalls and up to $250,000 of capital needs on the Pool II properties as determined by Lender and (iii) up to $42,000,000 of additional capital callable by Lender.  The first $12,000,000 of Tranche A, Pool II capital calls are committed solely by the Broadway Funds and shall be contributed solely by the Broadway Funds as contemplated in "Broadway Payments" above. (Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A, Pool II on the date of the capital call) of any capital calls.)

  *Failure to Fund*
  *Committed Capital:* The Broadway Funds shall have 15 business days following a call by Lender to provide any additional advances called by Lender (up to $12,000,000) for costs contemplated by an Approved Budget, or if outside an Approved Budget, made in good faith for the benefit of the Pool II Properties. Should the Broadway Funds fail to provide such cash within the timeframe described, the following shall occur:

- The Broadway Funds' participation interest in Tranche A, Pool II will be reduced by $1.00 for every $1.00 the Broadway Funds fail to fund and the Broadway Funds' participation interest in Tranche C, Pool II will be increased by an equivalent amount.
- If Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A, Pool II equal to 125% of its actual cash contribution and Broadway Funds' participation interest in Tranche C, Pool II will be reduced by an equivalent amount.
- Lender with 15 days prior notice may terminate any management agreement or other affiliate agreement related to any Pool II property with any affiliate of the Broadway Funds.
- The Broadway Funds will lose their preemptive right to maintain their percentage interest in any potential expansion of Tranches A, B and C of Pool II.
- The Broadway Funds shall automatically lose their ROFO rights (described below) and Pool II Rights (as defined below) with respect to the Pool II Property for which the capital call was intended to be used.

*Additional Tranche A Callable Capital:*   After the $12,000,000 is funded by Broadway, Lender may make additional capital calls (up to $30,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A, Pool II).

- If either party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then the non-defaulting party, or any party designated by Lender may provide such cash and receive an interest in Tranche A, Pool II equal to 125% of its actual cash contribution and the participation interest of the party providing such cash in Tranche C, Pool II will be reduced by an equivalent amount.
- If the Broadway Funds fail to make such capital contribution, the Broadway Funds shall (i) automatically lose their Pool II Rights (as defined below) with respect to the Pool II Property for which the capital call was intended to be used and (ii) Lender with 15 days prior notice may terminate the management agreement and any other affiliate agreement related to the Pool II property for which the capital call was intended to be used.

*Interest Rate:*   Interest on Tranche A (Pool II) shall accrue at a rate of 14% per annum.  Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize.

| | |
|---|---|
| *Prepayability:* | At Lender's sole discretion, Tranche A, Pool II may be paid off, in whole or in part, at any time at par plus accrued interest in cash or replaced with a replacement Tranche A, Pool II participation at any time provided that the replacement Tranche A, Pool II is at an equal or lower interest rate. |

**Tranche B, Pool II**

| | |
|---|---|
| *Sizing:* | Tranche B, Pool II will be in the principal amount of $31,000,000. Lender will be entitled to receive 60% of the distributions on Tranche B (Pool II) and the Broadway Funds will be entitled to receive 40% of the distributions. |
| *Interest Rate:* | Interest on Tranche B, Pool II shall accrue at a rate of 14% per annum.  Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. |

**Tranche C, Pool II**

| | |
|---|---|
| *Sizing:* | Tranche C, Pool II will be in the principal amount of $23,302,916. Lender and the Broadway Funds will each be entitled to receive 50% of the distributions on Tranche C, Pool II. |
| *Interest Rate:* | Interest on Tranche C, Pool II shall accrue at a rate of 14% per annum.  Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. |

| | |
|---|---|
| **Bridge B, Pool I and Pool II Mezz Loan:** | • The Bridge B Mezzanine Loan will remain outstanding after the $20,000,000 partial foreclosure and will be split into two separate mezzanine loans (Bridge B Pool I Mezz Loan secured by the Pool I Properties and the Bridge B Pool II Mezz Loan secured by the Pool II Properties ). |
| | • The Broadway Funds will receive a 49% participation interest in both the Bridge B Pool I Mezz Loan and the Bridge B Pool II Mezz Loan. |
| | • The Broadway Funds shall have no rights with respect to Pool I and Pool II other than the right to receive a pro rata share of payments received and distributed by Lender. |
| | • Lender has agreed to forbear from exercising remedies with respect to the Bridge B Pool I Mezz Loan and the Bridge B Pool II Mezz Loan until June 11, 2012. The Bridge B Pool I Mezz Loan and the Bridge B Pool II Mezz Loan shall be prepayable at any time as determined by Lender. |
| **Pool III Properties:** | Lender will take such action with respect to the Pool III Properties as it deems necessary, including, without limitation, |

relinquishing any interest in the Pool III Properties to the Senior Lenders.  Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III, at no cost to Lender, will reasonably cooperate with Lender to effectuate such transfers in the manner directed by Lender.

*Equity Interests:*    Lender will complete a partial foreclosure of the Bridge B Mezz Loan in the amount of $20,000,000 and will obtain managing member interests of each JV.  With respect to the Pool I Properties, Broadway Funds shall have consultation rights regarding the budget and negotiations between the managing member and Senior Lenders.  With respect to the Pool II Properties, Broadway Funds shall have the right to prepare and propose annual budgets in addition to having consultation rights regarding negotiations between the managing member and Senior Lenders (the "**Pool II Rights**").

*Broadway Funds Indemnity:*    The Borrowers and the Broadway Funds shall provide indemnities and guaranties satisfactory to Lender covering various transfer tax liabilities and any other out-of-pocket losses incurred by Lender arising from an action alleging that an improper transfer, foreclosure or assignment in lieu has occurred.

*Right of First Refusal:*    Except for some transfers to wholly owned subsidiaries that are detailed in the Term Sheet, no transfers of Broadway Funds' interest in the participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers shall be permitted without Lender's prior written consent, unless transferred in connection with Broadway Fund's liquidation or in accordance with the right of first refusal provisions.  Lender shall have a right of first refusal to purchase any such interests prior to a sale thereof to a third party.

*Purchase Option:*    Lender has the right, exercisable after or in connection with repayment of the Bridge A Mezzanine Loan allowable to such property, to purchase on a property-by-property basis up to 49% of the equity interests in each Bridge B Mezzanine Borrower at an aggregate fixed price of $1,000,000 (split among the Bridge B Mezzanine Borrowers pro rata based on the allocated loan amount for each property).

| | |
|---|---|
| ***Property Management:*** | The Broadway Funds will continue to manage the BIII Portfolio Properties. Such management shall be pursuant to a contract satisfactory to Lender with a term not to exceed two years and a management fee to be agreed upon but not to exceed 2%. To the extent any fees payable to the manager either pursuant to leases or otherwise exceed the management fee, such excess shall be split 50-50 between the Broadway Funds and Lender. |
| | Any such management agreement shall be terminable (i) in connection with the sale of the applicable property, (ii) for cause as defined in the management agreement and (iii) as described in Tranche A, Pool I and Tranche A, Pool II above. |
| | Lender with 15 days prior notice may, in its sole and absolute discretion, terminate the management agreement and any other affiliate agreement related to any Pool III Property and 1000 Wilshire. |
| | All leasing activities will be done through third party leasing agents. |
| ***Guaranties:*** | All guaranties, except for those guaranties specifically designated to be terminated in the Term Sheet, related to any senior debt and Bridge Mezzanine Loans will stay in place; however Lender will indemnify the Broadway Funds for any losses actually incurred by the Broadway Funds because of a breach of a non-recourse matter caused solely by the actions of Lender following the closing of the Transaction (see "Broadway Funds' Indemnity" above) and the Broadway Funds will indemnify Lender for (1) any losses actually incurred by Lender caused solely by the actions of the Broadway Funds or its affiliates following the closing of the Transaction and (2) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. |
| | The existing Guaranty of Recourse Obligations of Borrower for each of the Bridge Mezzanine Loans shall be reaffirmed by the guarantor, and shall be expanded to include: (1) the bankruptcy of any Borrower Party or any Broadway Fund that is not initiated by or approved in writing by Lender, and (2) any interference, frustration, hindrance or delay by any Borrower Party or any Broadway Fund in connection with the exercise by Lender of its rights and remedies as managing member of the JVs and/or its rights and remedies under the participation agreements for the |

Bridge Mezzanine Loans, provided that a good faith claim for breach of an express (but not implied) contractual obligation contained in the participation agreements and/or JV agreements shall not constitute interference.  Notwithstanding the foregoing, with respect to clause (1) above, other than with respect to a bankruptcy filing by Bridge B Mezzanine Borrower or any subsidiary thereof, recourse shall only be triggered if and to the extent such bankruptcy filing (a) is a default under any of the senior debt documents, (b) causes substantive consolidation with the Bridge B Mezzanine Borrower or any of its subsidiaries, (c) causes any interference with the cash management arrangements or cash flow related to the Bridge Mezzanine Loans or (d) causes any loss to Lender under the Bridge Mezzanine Loans.  If and to the extent any of the recourse carve-out matters occur (including the additional matters above), the parties acknowledge and agree that Lender shall have the immediate right to (1) estimate its damages suffered as a result of the occurrence of any such recourse carve-out matter, and (2) offset such damage amount, in its discretion, against any and all participation interests in the Bridge Mezzanine Loans then held by the Broadway Funds.

| | |
|---|---|
| ***Termination of Capital Call Agreement and Related Guaranties:*** | At closing, Lender shall terminate the Amended and Restated Capital Call Agreement, the Amended and Restated Capital Services and Financing Agreement following, the Omnibus Agreement and related guaranties. |
| ***ROFO:*** | The Broadway Funds will have a right of first offer to purchase any of the remaining BIII Portfolio Properties prior to a sale to a third party. (See additional detail in term sheet.) |
| ***Failure to Provide Assurances for New Capital:*** | To the extent that the Broadway Funds cannot provide Lender with adequate assurance that it can provide the $14,000,000 capital commitment, then the Transaction described above shall be modified as follows: |

- Lender will be entitled to receive 90% of the distributions on Tranche B (Pool 1).

- Lender will be entitled to receive 80% of the distributions on Tranche C (Pool 1).

- Lender will be entitled to receive 85% of the distributions on Tranche B (Pool 2).

- Lender will be entitled to receive 75% of the distributions on Tranche C (Pool 2).

- If the Broadway Funds fail to fund within the required time periods set forth in the Term Sheet all or any part of its $2,000,000 of committed capital of Tranche A (Pool 1) and/or its $12,000,000 of committed capital of Tranche A (Pool 2), in addition to all other remedies, the Broadway Funds distributions in Tranche B (Pool 1) and Trance C (Pool 1) and/or  Tranche B (Pool 2) an Tranche C (Pool 2), shall be reduced to 0%, respectively.

- Lender shall have the right to terminate any property management agreement related to any Pool II Property after any  period of time after Lender determines that additional capital is required.

**The Settlement Meets the Legal Standard
Established Under Rule 9019 and Is in the Bests Interests of the Debtors' Estate**

22.    The Debtors submit that the transactions contemplated by the Term Sheet (the "Settlement") are in the Debtors' best interests and should be approved under Rule 9019 of the Bankruptcy Rules.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.) 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Fisher v. Pereira (In re 47-49 Charles St., Inc.), 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).  A decision to accept or reject a compromise or settlement is within the sound

discretion of the Court.  Drexel Burnham Lambert Group, 134 B.R. at 505; see also 9

Collier on Bankruptcy ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in

the best possible outcome for the debtor, but must not "fall below the lowest point in the

range of reasonableness." Drexel Burnham Lambert Group, 134 B.R. at 505 (internal

citations omitted).  See also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608

(2d Cir. 1983); In re Spielfogel, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Indeed,

courts have long considered compromises to be "a normal part of the process of

reorganization."  TMT Trailer Ferry, 390 U.S. at 424 (quoting Case v. Los Angeles

Lumber Prods. Co., 308 U.S. 106, 130 (1939).

   23. The decision to approve a particular compromise lies within the

sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123

(S.D.N.Y. 1994).  Additionally, a court may exercise its discretion "in light of the general

public policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46

(Bankr. S.D.N.Y. 1998).  However, the analysis must focus on the question of whether a

particular compromise is "fair and equitable, . . . and in the best interest of the estate."  In

re Best Products Co., 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations

omitted).

   24. While a court must evaluate "all . . . factors relevant to a full and

fair assessment of the wisdom of the proposed compromise," Anderson, 390 U.S. at 424-

25, a court need not conduct a "mini-trial" of the merits of the claims being settled, or

conduct a full independent investigation.  Drexel Burnham Lambert Group, 134 B.R. at

496.  "The bankruptcy judge does not have to decide the numerous questions of law and

fact. . . . The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." Nellis, 165 B.R. at 123 (internal citations omitted).

25.    The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." Drexel Burnham Lambert Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels, Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgement [sic] for the Trustee's, but only that I test his choice for reasonableness. . . .  If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.") (internal citations omitted).

26.    Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." Ionosphere Clubs, Inc., 156 B.R. at 427.  Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." Id. at 427-28 (quoting City of Detroit v. Grinnell Corp., 495 F.2d 455 n.2 (2nd Cir. 1974).

27.    The Debtors have determined that the Settlement provides the best framework for maximizing the value of the Bridge Mezzanine Loans.  The Settlement provides LBHI with a way to obtain a source of liquidity providing for the capital needs of the BIII Portfolio Properties, operational control over the BIII Portfolio Properties and an opportunity to receive additional pay down on the Bridge A Mezzanine Loan.

28.    The potential benefit of the Settlement substantially outweighs what LBHI is giving up in connection therewith – the contractual ability to collect on the original amount of the Bridge Mezzanine Loans, which is prone to uncertainty. Accordingly, in order to preserve value for the benefit of their estates, the Debtors request that the Court approve the Settlement.

**The Settlement is an Appropriate Exercise of LBHI's Business Judgment**

29.    Ample authority exists for approval of the proposed Settlement. Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In this instance, the Debtors are foregoing the right to seek to collect the Bridge Mezzanine Loans in exchange for a current payment of a portion of the Bridge Mezzanine Loans and the acquisition of a managing member interest in the indirect owners of the BIII Portfolio Properties.

30.    While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

31.    For the reasons set forth above, approval of the Settlement is in the best interests of the Debtors' estates.  The Settlement is necessary, in the Debtors'

judgment, to allow LBHI to maximize return on its investment in the Bridge Mezzanine

Loans.  As such, entry into the Settlement is in the best interests of the Debtors, their

estates, their creditors, and other parties in interest and should be approved.

## Notice

32.     No trustee has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Motion in accordance with the procedures set forth in

the amended order entered on February 13, 2009 governing case management and

administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii)

the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; (vi) the attorneys for Broadway Partners; and (vii) all

parties who have requested notice in these chapter 11 cases.  The Debtors submit that no

other or further notice need be provided.

33.     No previous request for the relief sought herein has been made by

the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: June 4, 2009
      New York, New York


/s/ Shai Y. Waisman
Shai Y. Waisman
Bruce S. Meyer

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **Exhibit A**

Term Sheet

**EXECUTION VERSION**

## AGREEMENT

**THIS AGREEMENT** (this "**Agreement**") dated as of May 29, 2009 is made by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (together with its successors and assigns, "**Lender**"), **THE PARTIES LISTED ON SCHEDULE I ANNEXED HERETO** (collectively, the "**Bridge A Mezzanine Borrower**"), **THE PARTIES LISTED ON SCHEDULE II ANNEXED HERETO** (collectively, the "**Bridge B Mezzanine Borrower**" and together with the Bridge A Mezzanine Borrower, collectively, the "**Borrowers**"), **BROADWAY PARTNERS FUND MANAGER, LLC**, a Delaware limited liability company ("**Fund Manager**"), **BROADWAY PARTNERS REAL ESTATE FUND III, L.P.**, a Delaware limited partnership ("**Broadway Real Estate Fund**"), **BROADWAY PARTNERS PARALLEL FUND P III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund P**"), **BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund B**" and together with Broadway Real Estate Fund and Broadway Parallel Fund P, the "**Broadway Funds**"), **BROADWAY B3 EQUITY LP**, a Delaware limited partnership (the "**Partnership**"), **BROADWAY FUND MANAGER SUB, LLC**, a Delaware limited liability company ("**Broadway Manager Sub**"), **BROADWAY PARTNERS FUND GP III, L.P.**, a Delaware limited partnership ("**GP III**"), **BROADWAY PARTNERS FUND GP II, L.P.**, a Delaware limited partnership ("**GP II**"), and **SCOTT LAWLOR**, an individual ("**Lawlor**" and together with the Broadway Funds, the Fund Manager, GP III and GP II, each a "**Guarantor**" and collectively, the "**Guarantors**"). The Guarantors, the Partnership, Broadway Manager Sub, Bridge A Mezzanine Borrower and Bridge B Mezzanine Borrower are sometimes referred to collectively as the "**Borrower Parties**."

## W I T N E S S E T H:

**WHEREAS**, the Bridge A Mezzanine Borrower and Lender are parties to that certain Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 15, 2008 (collectively, the "**Bridge A Mezz Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge A Mezzanine Borrower in the principal amount of $321,984,921.90 (the "**Bridge A Mezz Loan**");

**WHEREAS**, the Bridge A Mezz Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge A Mezz Loan Agreement), which Loan Documents for the purposes of this Agreement are hereinafter referred to as the "**Bridge A Mezz Loan Documents;**"

**WHEREAS**, the Bridge B Mezzanine Borrower and Lender are parties to that certain Bridge Mezzanine Loan Agreement, dated as of August 15, 2007, effective July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Bridge Mezzanine Loan Agreement, dated as of July 15, 2008

(collectively, the "**Bridge B Mezzanine Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge B Mezzanine Borrower in the principal amount of $137,627,670.32 (the "**Bridge B Mezzanine Loan**" and together with the Bridge A Mezz Loan, collectively, the "**Mezzanine Loans**");

WHEREAS, the Bridge B Mezzanine Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge B Mezzanine Loan Agreement), which Loan Documents for the purpose of this Agreement are hereinafter referred to as the "**Bridge B Mezzanine Loan Documents**" and together with the Bridge A Mezz Loan Documents, the "**Mezzanine Loan Documents;**"

**WHEREAS**, the Mezzanine Loans matured on May 11, 2009;

**WHEREAS**, the Borrower Parties desire to enter into the transaction in accordance with the terms set forth herein;

**NOW, THEREFORE**, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Borrower Parties hereby covenant, agree, represent and warrant as follows:

1.    **Modification to Mezzanine Loans**.  Each Borrower Party hereby covenants and agrees that it will restructure the Mezzanine Loans substantially in accordance with the terms and provisions of that certain term sheet attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") and will take all necessary action and deliver all necessary documents to consummate the Transaction (as defined below) on or before June 26, 2009.  Simultaneously with the execution hereof, the Broadway Funds shall transfer to Lender the West Monroe deposit in cash which amount shall be held by Lender and either (i) be applied to the Broadway Funds payment obligation described in the "Broadway Payments" section of the Term Sheet if the transaction contemplated by the Term Sheet (the "**Transaction**") closes on or before June 26, 2009 (or such later date approved by Lender in writing in its sole discretion) or (ii) retained by Lender as a fee as Lender's sole and only remedy if the Transaction fails to close for any reason whatsoever (including as a result of Lender's unwillingness, in Lender's sole discretion, to close the Transaction) on or before the date specified in clause (i) above (but without prejudice to Lenders' rights under the Mezzanine Loan Documents which shall survive execution of this Agreement and any termination of this Agreement and if this Agreement fails to close for any reason on or before the date specified in clause (i) above, the Mezz Loan Documents shall continue in full force and effect and all parties shall have all of their respective rights and obligations thereunder just as if this Agreement had not been executed (except that the provisions of Paragraphs 2 and 3 hereof shall remain in effect)).  Consummation of the Transaction is also subject to the closing conditions specified in the Term Sheet or waiver thereof by Lender.  The Borrower Parties hereby agree that in no event shall they have any claims or exercise any remedies against Lender for any failure to consummate the Transaction and the Borrower Parties each hereby waive any and all claims they may have against Lender, whether for breach of contract, tort or otherwise, with respect to Lender's failure to close the Transaction for any reason whatsoever. In no event shall the Borrower Parties have any claim or cause of action against Lender if the Transaction fails to close for any reason, including any claim for breach of any duty of good faith or fair dealing.

2

2.      **No Defenses, Counterclaims or Offsets**.  Each Borrower Party for itself and its respective heirs, executors, administrators and successors and assigns, and by its execution hereof (i) hereby acknowledges, admits and agrees that, as of the date hereof, there are no objections, claims, defenses, counterclaims or offsets relating to their obligations under or in respect of the Mezzanine Loans, the Mezzanine Loan Documents, any Event of Default or to the enforcement or exercise by Lender of any of its rights, powers or remedies under or in respect of the Mezzanine Loan Documents, at law or in equity, and (ii) hereby irrevocably waives, relinquishes and releases any and all such objections, claims, defenses, counterclaims or offsets, that may now or hereafter exist, including without limitation, any and all such objections, claims, defenses, counterclaims or offsets whether known or unknown, foreseeable or unforeseeable.

3.      **Consent and Reaffirmation**.  Each Borrower Party hereby confirms and ratifies its respective obligations under the Mezzanine Loan Documents to which it is a party and consents to the terms of this Agreement and the transactions contemplated herein.  Nothing contained in this Agreement or any of the Mezzanine Loan Documents or any of the transactions contemplated herein or thereby shall constitute, and there has not otherwise occurred, any waiver, release or limitation of any obligation of any Borrower Party relating to or otherwise connected to the Mezzanine Loan Documents to which it is a party.  Nothing herein is intended to, nor shall it, constitute, nor has there otherwise occurred, a novation of the indebtedness evidenced by the Mezzanine Loan Documents.

4.      **WAIVER OF JURY TRIAL**.  THE BORROWER PARTIES AND LENDER SHALL NOT SEEK A JURY TRIAL IN ANY ACTION BASED UPON OR ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE MEZZANINE LOANS OR ANY OF THE MEZZANINE LOAN DOCUMENTS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER PARTY AND LENDER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ANY AND ALL RIGHTS TO ANY SUCH JURY TRIAL AND AGREES THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH BORROWER PARTY, LENDER AND THEIR RESPECTIVE COUNSEL, AND SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.

5.      **Counterparts**.  This Agreement may be executed by facsimile or pdf signatures, and in any number of identical counterparts, each of which shall be deemed to be an original, and all of which shall collectively constitute a single agreement, fully binding upon and enforceable against the parties hereto.

6.      **Governing Law**.  This Agreement shall be governed by New York law, without regard to the principles of conflicts of law.

7.      **Expenses**.  The Borrowers or the Broadway Funds shall pay promptly upon demand, whether or not the Transaction closes, all reasonable costs and expenses of Lender in connection with this Agreement and the transactions contemplated hereby, including without limitation, the reasonable fees and disbursements of Lender's counsel.

8.    **Confidentiality**.  The terms and conditions of this Agreement, including the terms and conditions set forth in the Term Sheet, are confidential and may not be disclosed by Borrower Parties to third parties other than Borrower Parties' attorneys and accountants, except as may otherwise be required by applicable law.

9.    **Modification; Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any Mezzanine Loan Document, or any consent to any departure therefrom, shall be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

10.    **Time; Construction; Exhibits and Schedules; Bankruptcy Court Approval**.  Time is of the essence of each provision of this Agreement.  All references to the singular or plural number or masculine, feminine or neuter gender shall, as the context requires, include all others.  All references to sections, paragraphs and exhibits are to this Agreement unless otherwise specifically noted.  The use of words "hereof", "hereunder", "herein" or words of similar import shall refer to this entire Agreement and not to any particular section, paragraph or portion of this Agreement unless otherwise specifically noted.  All schedules and exhibits attached hereto are by this reference made a part of this Agreement for all purposes.  This Agreement is fully binding on all parties hereto.  Lender's obligations under this Agreement are subject to the approval of the Bankruptcy Court of the Southern District of New York .

[Signatures appear on the following pages]

4

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BRIDGE A MEZZANINE BORROWER:**

**BROADWAY WALL JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**BROADWAY HUNTINGTON JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY LEGATO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY WILSHIRE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY STATE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY BCCC JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY BEALE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY SANSOME JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BRIDGE B MEZZANINE BORROWER:**


**BROADWAY WALL JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company


By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR TWO MEZZ
LLC,** a Delaware limited liability company


By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR
TWO MEZZ LLC,** a Delaware limited liability
company


By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR TWO
MEZZ LLC,** a Delaware limited liability company


By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY HUNTINGTON JUNIOR TWO MEZZ LLC**, a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY LEGATO JUNIOR TWO MEZZ LLC**, a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY WILSHIRE JUNIOR TWO MEZZ LLC**, a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY STATE JUNIOR TWO MEZZ LLC**, a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:   Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY BCCC JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company


By: _____
      Name:  Jonathon K. Yorman
      Title:  Authorized Signatory

**BROADWAY BEALE JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company


By: _____
      Name:  Jonathon K. Yorman
      Title:  Authorized Signatory

**BROADWAY SANSOME JUNIOR TWO MEZZ
LLC,** Delaware limited liability company


By: _____
      Name:  Jonathon K. Yo
      Title:  Authorized Signatory


[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a
Delaware corporation as Debtor and Debtor in
Possession in its chapter 11 case in the United States
Bankruptcy Court for the Southern District of New
York, Case No. 08-13555 (JMP)

By: _____

Name:
Title:          Jeffrey Fitts
               Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**FUND MANAGER:**

**BROADWAY PARTNERS FUND MANAGER, LLC,**
a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yormak
     Title:  Authorized Signatory

**BROADWAY REAL ESTATE FUND:**

**BROADWAY PARTNERS REAL ESTATE FUND
III, L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
       Delaware limited liability company, its
       general partner

       By: _____
          Name:  Jonathon K. Yormak
          Title:  Authorized Signatory

**BROADWAY PARALLEL FUND P:**

**BROADWAY PARTNERS PARALLEL FUND P III,
L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
       Delaware limited liability company, its
       general partner

       By: _____
          Name: Jonathon K. Yormak
          Title: Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY PARALLEL FUND B:**

**BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a Delaware
limited partnership, its general partner

By:  Broadway Partners Fund GP III, LLC, a
Delaware limited liability company, its
general partner

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**PARTNERSHIP:**

**BROADWAY B3 EQUITY LP**, a Delaware limited partnership

By:  Broadway Fund Manager Sub LLC., a Delaware
limited liability company, its general partner

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**BROADWAY MANAGER SUB:**

**BROADWAY FUND MANAGER SUB LLC**,
a Delaware limited liability company

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**GP III:**

>   **BROADWAY PARTNERS FUND GP III, L.P.,** a
>   Delaware limited partnership
>
>   >   By:  Broadway Partners Fund GP III, LLC., a
>   >   Delaware
>   >    limited liability company, its general partner
>   >
>   >   By: _____
>   >   Name:  Jonathon K. Yormak
>   >   Title:   Authorized Signatory

**GP II:**

>   **BROADWAY PARTNERS FUND GP II, L.P.,** a
>   Delaware limited partnership
>
>   >   By:  Broadway Partners Fund GP II, LLC., a
>   >   Delaware
>   >    limited liability company, its general partner
>   >
>   >   By: _____
>   >   Name:
>   >   Title:   Jonathon K. Yormak
>   >            Authorized Signatory

**LAWLOR:**

**SCOTT LAWLOR**, an individual

_____

**LAWLOR**:

**SCOTT LAWLOR**, an individual

## Exhibit A

## Term Sheet

This Term Sheet is Exhibit A to that certain Agreement (the "**Agreement**"), dated as of May 29, 2009, among Lehman Brothers Holdings Inc. and the Borrower Parties. The obligations of the parties to the Agreement with respect to the Transaction (as defined in the Agreement) are subject in all respects to the terms and conditions of the Agreement. In the event of any conflict between the terms of this Exhibit A and the Agreement, the terms of the Agreement shall prevail. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

| | |
|---|---|
| ***General Purpose:*** | The final maturity date of each Mezzanine Loan is May 11, 2009. The Borrowers were unable to repay the Mezzanine Loans on the final maturity date and desire to enter into a restructuring of the obligations in lieu of Lender exercising its remedies under the Mezzanine Loan Documents. The primary purpose of this transaction is to: (a) provide for additional funding for the BIII Portfolio Properties (defined below), (b) restructure the obligations under the Mezzanine Loans and (c) comply with the requirements of the BIII Portfolio Properties mortgage and senior mezzanine loan documents and the applicable intercreditor agreements. In consideration of the cooperation of the Borrower Parties in effectuating an orderly transition of control and the investment of certain additional funds as specified herein, Borrower Parties will receive certain benefits as specified herein. |
| ***Properties:*** | The "**BIII Portfolio Properties**" consist of (i) Bay Colony Corporate Center, Waltham, Massachusetts ("**Bay Colony**"), (ii) 116 Huntington Street, Boston, Massachusetts ("**116 Huntington**"), (iii) 120 Howard Street, San Francisco, California ("**120 Howard**"), (iv) 100 California Street, San Francisco, California ("**100 Cal**"), (v) One Sansome, San Francisco, California ("**One Sansome**"), (vi) 50 Beale Street, San Francisco, California ("**50 Beale**"), (vii) 1000 Wilshire Boulevard, Los Angeles, California ("**1000 Wilshire**"), (viii) 100 Wall Street, New York, New York ("**100 Wall**"), (ix) Greensboro Drive, McClean, Virginia ("**Greensboro**") and (x) One Fair Oaks, Fairfax, Virginia ("**One Fair Oaks**"). The "**Pool 1 Properties**" consist of 100 Cal, 1000 Wilshire, 116 Huntington, 50 Beale and One Fair Oaks. The "**Pool 2 Properties**" consist of Greensboro and One Sansome. The "**Pool 3 Properties**" consist of 120 Howard, Bay Colony and 100 Wall. |
| ***Restructuring of Mezzanine Loans*** | At closing, a restructuring of the Mezzanine Loans shall be effected as follows: |

14998975.36

- The Bridge A Mezz Loan shall be split into 2 separate mezzanine loans. The "**Bridge A Pool 1 Mezz Loan**" will have an initial principal balance of $198,568,579 and will be indirectly secured by the Pool 1 Properties and the "**Bridge A Pool 2 Mezz Loan**" will have an initial principal balance of $103,302,916 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge A Mezz Loan as of May 12, 2009 of $304,871,494 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $3,000,000 allocated to the Pool 3 Properties.

- The Bridge B Mezz Loan shall be split into 2 separate mezzanine loans. After giving effect to the foreclosure of $20,000,000 described below, the "**Bridge B Pool 1 Mezz Loan**" will have an initial principal balance of $58,824,267 and will be indirectly secured by the Pool 1 Properties and the "**Bridge B Pool 2 Mezz Loan**" will have an initial principal balance of $ 60,240,775 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge B Mezz Loan as of May 12, 2009 of $141,065,042 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $2,000,000 allocated to the Pool 3 Properties.

- Lender and the Borrowers will engage in (and the other Borrower Parties will not object to or interfere with) a consensual partial strict foreclosure under the UCC or, at Lender's option, an assignment in lieu of foreclosure, pursuant to which the Lender, as holder of the Bridge B Mezzanine Loan, will foreclose out $20,000,000 of the Bridge B Mezz Loan and obtain the managing member interests described in "JV Interests" below as being those to be held by Lender, and all existing obligations of the Borrower Parties with respect to the Bridge B Mezzanine Loan shall, except as otherwise contemplated hereby, survive. The documents evidencing such foreclosure or assignment shall be satisfactory to Lender. Notwithstanding the foregoing, there will be no public auction, general solicitation or marketing

2

associated with the partial strict foreclosure unless (i) a party
with a right under the UCC to object to the strict foreclosure
contemplated hereby objects and strict foreclosure is not an
available remedy or (ii) the Transaction does not close within
the time periods contemplated hereunder. Borrower Parties
agree and acknowledge that this Term Sheet is subject to the
approval of the Bankruptcy Court of the Southern District of
New York and as such will become public record.

- At Lender's option, after the closing of the Transaction, the
Bridge A Pool 1 Mezz Loan, the Bridge A Pool 2 Mezz Loan,
the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2
Mezz Loan may be split into separate cross-collateralized,
cross defaulted loans, one loan for each of the Pool 1
Properties and Pool 2 Properties. Each Borrower in each
pool will enter into a cross indemnity agreement with each
other Borrower in the same pool, in form satisfactory to
Lender whereby each Borrower will agree to reimburse each
other Borrower for any amount paid on the reimbursing
Borrower's behalf.

**Pool 3 Properties:**    Notwithstanding anything contained herein to the contrary, at any
time specified by Lender, either before or after the closing of the
Transaction, Borrowers, Fund Manager, Broadway Funds,
Partnership, Broadway Manager Sub and GP III will take such
actions with respect to the Pool 3 Properties as specified by Lender,
including, without limitation, agreeing to deliver after the closing of
the Transaction an assignment or deed in lieu to Lender or to the
senior lenders or otherwise take such action as may be necessary to
relinquish after the closing of the Transaction any interest in the Pool
3 Properties to Lender or to the senior lenders or any other person.
Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway
Manager Sub and GP III, at no cost to Lender, will reasonably
cooperate with Lender to effectuate such transfers in the manner
directed by Lender (including, without limitation, to minimize any
potential transfer tax liability), which cooperation may include,
without limitation, Broadway Funds remaining an owner of certain
equity in the Pool 3 Properties; provided, however, that Borrowers,
Fund Manager, Broadway Funds, Partnership, Broadway Manager
Sub and GP III shall not be required to do anything that would cause
material adverse income tax or transfer tax consequences to either the
Broadway Funds (or their direct or indirect partners) or their
respective subsidiaries. In no event shall any capital contributed or
committed by Broadway Funds be expended by Lender on the Pool 3
Properties without the approval of the Broadway Funds. The Pool 3
Properties will continue to serve as indirect security for the

3

Mezzanine Loans until the closing of the Transaction. At the closing of the Transaction, the Pool 3 Properties shall, at Lender's option, (i) serve as indirect security for the Bridge A Pool 2 Mezz Loan and/or the Bridge B Pool 2 Mezz Loan and only a nominal amount of the Bridge A Pool 2 Mezz Loan ($3,000,000) and/or the Bridge B Pool 2 Mezz Loan ($2,000,000) shall be allocated to the Pool 3 Properties, as determined by Lender in Lender's sole discretion, (ii) serve as indirect security for a "Pool 3 Mezzanine Loan" which will have a nominal loan amount ($5,000,000) and in which Broadway Funds will have no interests or (iii) subject to the foregoing provisions of this paragraph, as otherwise determined by Lender.

**_Broadway Payments:_**

- The Broadway Funds will provide at least $26,000,000 in cash at closing consisting of (i) $6,000,000 of new money from sources outside the BIII Portfolio Properties, (ii) (x) the remaining proceeds from the Sansome deposit ($4,000,000), which Sansome deposit remaining proceeds the parties hereto acknowledge and agree have been previously provided to Lender, and (y) the remaining proceeds from the Monroe escrow ($10,000,000), (iii) the final, negotiated amount of the 1000 Wilshire deposit, less reasonable third party out-of-pocket costs and (iv) the amounts required by the second to last bullet point in this section, which are estimated to be $3,000,000 (inclusive of Borrower's reasonable third-party out-of-pocket costs incurred in connection with the Transaction).

- At closing, $20,000,000 of the $26,000,000 cash provided by the Broadway Funds, will be applied to pay down the Mezzanine Loans.

- $3,000,000 of the $26,000,000 cash provided by the Broadway Funds will be held by Lender and used to provide liquidity for capital needs (see "Tranche A (Pool 2)" below).

- The Broadway Funds will also commit to provide an additional Tranche A callable capital commitment for each of Pool 1 and Pool 2 of $14,000,000 in the aggregate, $2,000,000 of which will be solely for Pool 1 and $12,000,000 of which will be solely for Pool 2 of new money from sources outside the BIII Portfolio Properties (which new money shall be callable by Lender, subject to the terms and conditions of this Term Sheet, at any time that

4

Lender determines that such additional funds are necessary to provide liquidity for capital needs and restructuring). Prior to closing, Broadway Funds must provide documentation reasonably satisfactory to Lender evidencing that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder. To the extent that Broadway Funds do not satisfy the provisions of the foregoing sentence, the terms described on Schedule IV attached hereto will be deemed incorporated herein.

- At closing, the Broadway Funds shall pay all reasonable third party out-of-pocket fees and expenses incurred by Lender in connection with the transactions contemplated hereby (including, without limitation, attorneys fees). The Broadway Funds shall also be responsible for (A) any transfer taxes associated with the Pool 1 and Pool 2 Properties but not the Pool 3 Properties and (B) all amounts owing directly or indirectly by Borrowers or their subsidiaries that own a direct or indirect interest in the BIII Portfolio Properties to any party except for (i) any amounts set forth on Schedule III attached hereto, (ii) any and all trade payables incurred in the ordinary course of owning and operating the BIII Portfolio Properties which are not 30 or more days past due, (iii) any other ordinary course liabilities and/or expenses that individually are less than $20,000 and in the aggregate do not exceed $200,000 and (iv) amounts due to the senior lenders under the mortgage and mezzanine loans.

- Except with respect to 120 Howard to the extent funds are not available from the working capital reserve account or are otherwise provided by the Broadway Funds, the Broadway Funds shall pay any and all shortfalls in the debt service payments due and payable under the senior loans on the June 2009 payment date under such loans, which payments may be made, in part, from funds then on deposit, if any, in the working capital reserve account. Provided such payment is made, Lender shall provide the Broadway Funds with a credit at the closing of the Transaction against the Bridge A Mezz Loan Tranche A (Pool 2) commitment of the Broadway Funds discussed below in the amount of such shortfall payment amount.

5

*Bridge A Pool 1 Mezz*          The Bridge A Pool 1 Mezz Loan will be participated into 3 tranches.
*Loan Tranching:*              Tranche A (Pool 1) will be a senior participation interest in the
                              Bridge A Pool 1 Mezz Loan.  Tranche B (Pool 1) will be a junior
                              participation interest in the Bridge A Pool 1 Mezz Loan.  Tranche C
                              (Pool 1) will be the junior most participation interest in the Bridge A
                              Pool 1 Mezz Loan.  The named "lender" for the Bridge A Pool 1
                              Mezz Loan shall be Lender.   In consideration of the Broadway
                              Funds' provision of capital and other consideration contemplated
                              hereby, the Broadway Funds shall have a participation interest in
                              Tranche A (Pool 1), Tranche B (Pool 1)  and Tranche C (Pool 1) to
                              receive a pro rata share (as described below) of payments received
                              and distributed by Lender on Tranche A (Pool 1), Tranche B (Pool 1)
                              and Tranche C (Pool 1) (pursuant to participation agreements in form
                              satisfactory to Lender and Broadway Funds) but shall not have any
                              other rights or ability to vote, approve decisions, call for advances,
                              exercise remedies or vote claims or otherwise take any action or
                              make any decision or prevent Lender from doing so with respect to
                              the Bridge A Pool 1 Mezz Loan, i.e., the participation shall be totally
                              "silent."  Such participations may not be amended in any manner that
                              would be adverse to the Broadway Funds without the prior written
                              consent of the Broadway Funds, except that in connection with either
                              any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or
                              Tranche C (Pool 1) or any sale or other transfer by Lender of its
                              interest (in part or in whole) in Tranche A (Pool 1), Tranche B (Pool
                              1) or Tranche C (Pool 1), Lender may amend such participations
                              without the consent of the Broadway Funds so long as (x) the adverse
                              effect on the Broadway Funds resulting from such amendment is not
                              materially disproportionate to the adverse effect on Lender (it being
                              specifically understood and agreed that any increase in the size of
                              Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) will
                              not be deemed to have an adverse effect on Broadway Funds since
                              Broadway Funds will have a pre-emptive right to maintain its
                              percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and
                              Tranche C (Pool 1)) and (y) such amendment does not reduce the
                              interest rate payable on Tranche A (Pool 1).  Subject to the pay off
                              and/or replacement of Tranche A (Pool 1) described in the last
                              sentence of the "Tranche A (Pool 1)" section below, the Broadway
                              Funds will be granted a pre-emptive right to maintain its percentage
                              interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C
                              (Pool 1)  in connection with any increase in the size of Tranche A
                              (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1); provided,
                              however, that the terms of the participation agreement with any party
                              providing additional financing shall be as reasonably determined by
                              Lender; provided, however, that if Broadway Funds are a party to
                              such participation agreement, then Broadway Funds shall be afforded
                              therein the same protections governing amendments thereto as they

6

are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 1 Mezz Loan. The Bridge A Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge A Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 1) and then to Tranche B (Pool 1) and then to Tranche C (Pool 1), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*Tranche A (Pool 1):*

Tranche A (Pool 1) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $20,000,000 (the "**Tranche A (Pool 1) Maximum Principal Amount**") which will consist of:

(A) (i) $5,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00) and (iii) $3,000,000 allocated to Broadway Funds (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 1) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $2,000,000) callable by Lender and both committed and contributed by Broadway Funds as contemplated in "Broadway Payments" above and (ii) the amount of cash contributed by Lender or any party designated by Lender in connection with any capital call.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 1 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its

7

sole and absolute discretion. Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. To the extent any additional capital is actually provided by either Broadway Funds or Lender or any party designated by Lender, such party's Tranche A (Pool 1) interest shall be increased by the amount of such additional capital so provided, and such party's Tranche C (Pool 1) interest shall be correspondingly decreased by such amount. The Broadway Funds shall have 15 business days following a call by Lender to provide any additional advances called by Lender (up to $2,000,000). If the Broadway Funds fail to provide such cash within 15 business days of the date called then (i) (a) Broadway Funds participation interest in Tranche A (Pool 1) will be reduced by $1.00 for every $1.00 Broadway Funds fail to fund, and for every $1.00 that Broadway Funds' Tranche A (Pool 1) interest is reduced, Broadway Funds' Tranche C (Pool 1) interest shall be deemed to be increased, and (b) if Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution (such that such party's Tranche A (Pool 1) interest shall be increased by 125% of the amount provided and Broadway Funds' Tranche C (Pool 1) interest shall be decreased by 125% of the amount provided); provided, however, that the foregoing clause (a) shall only apply to the $2,000,000 committed capital obligation of Broadway Funds and shall not apply to any capital called after the entire $2,000,000 has been funded by Broadway Funds, (ii) Lender with 15 days prior notice may terminate any management agreement or other affiliate agreement related to any Pool 1 Property with any affiliate of Broadway Funds, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), and (iv) Lender may exercise all rights and remedies against the Broadway Funds.

After the $2,000,000 is funded, Lender may make additional capital calls (up to $10,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution and (ii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice

may terminate the management agreement and any other affiliate agreement related to the Pool 1 Property for which the capital call was intended to be used.

The Tranche A (Pool 1) Maximum Principal Amount will be included in the outstanding amount of the Bridge A Pool 1 Mezz Loan. To the extent that any portion of the Tranche A (Pool 1) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 1) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 1) will be deducted from the Tranche A (Pool 1) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 1) proceeds will not be needed. All payments on Tranche A (Pool 1) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded or deemed to be funded from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 1) advances. Interest on Tranche A (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 1) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 1) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 1) is at an equal or lower interest rate.

*Tranche B (Pool 1):*    Tranche B (Pool 1) will be in the principal amount of $70,000,000. Lender will be entitled to receive 75% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche B (Pool 1). All distributions on Tranche B (Pool 1) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 1) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 1). Tranche B (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) have been paid.

*Tranche C (Pool 1):*    Tranche C (Pool 1) will be in the principal amount of $108,568,579 (as may be increased or decreased by any portions of Tranche A (Pool 1) added to or reduced from Tranche C (Pool 1) as described in "Tranche A (Pool 1)" above). Lender will be entitled to receive 60% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche C (Pool 1), as such percentages may be adjusted as discussed in the Section

9

entitled "Tranche A (Pool 1)" above. All distributions on Tranche C (Pool 1) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 1). Tranche C (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) and Tranche B (Pool 1) have been paid.

***Bridge A Pool 2 Mezz Loan Tranching:***

The Bridge A Pool 2 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 2) will be a senior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche B (Pool 2) will be a junior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche C (Pool 2) will be the junior most participation interest in the Bridge A Pool 2 Mezz Loan. The named "lender" for the Bridge A Pool 2 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 2) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2)) and (z) such amendment does not reduce the interest rate payable on Tranche A (Pool 2). Subject to the payoff and/or replacement of Broadway Funds' interest in Tranche A (Pool 2) described in the last sentence of the "Tranche A (Pool 2)" section below, the Broadway Funds will

be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 2 Mezz Loan. The Bridge A Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 2 Property, the Bridge A Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 2) and then to Tranche B (Pool 2) and then to Tranche C (Pool 2), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

***Tranche A (Pool 2):***    Tranche A (Pool 2) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $49,000,000 (the "**Tranche A (Pool 2) Maximum Principal Amount**") which will consist of:

(A) (i) $4,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00), (iii) $3,000,000 of the initial new money (which shall be used exclusively to pay debt service shortfalls and up to $250,000 of capital needs on the Pool 2 Properties as determined by Lender) as contemplated in "Broadway Payments" above (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 2) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $42,000,000) callable by

11

Lender. The first $12,000,000 of Tranche A (Pool 2) capital calls are committed solely by Broadway Funds and shall be contributed solely by Broadway Funds as contemplated in "Broadway Payments" above. Any portion of the $3,000,000 described in clause (A)(iii) above that is not used for the purposes set forth therein shall be refunded to the Broadway Funds after the disposition of the last remaining Pool 2 Property.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 2 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its sole and absolute discretion. Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the date of the capital call) of any capital calls. All capital calls shall specify the Pool 2 Property for which the funds called will be used. Any call against the $12,000,000 committed by the Broadway Funds must be based on costs contemplated by an Approved Budget (as defined below), or if outside an Approved Budget, made in good faith for the benefit of the Pool 2 Properties and/or in connection with any restructuring of any senior debt. To the extent any additional capital is actually provided by either Broadway Funds or Lender or any party designated by Lender, such party's Tranche A (Pool 2) interest shall be increased by the amount of such additional capital so provided, and such party's Tranche C (Pool 2) interest shall be correspondingly decreased by such amount. If the Broadway Funds fail to provide any portion of its $12,000,000 capital commitment in cash within 15 business days of the date called, then (i) (a) if the call was based on costs contemplated by an Approved Budget, or (b) if the call was based on costs contemplated outside an Approved Budget and Lender or any party designated by Lender actually provides the capital called, then, in either case (i)(a) or (i)(b), (A) Broadway Funds participation interest in Tranche A (Pool 2) will be reduced by $1.00 for every $1.00 Broadway Funds fail to fund, and for every $1.00 that Broadway Funds' Tranche A (Pool 2) interest is reduced, Broadway Funds' Tranche C (Pool 2) interest shall be deemed to be increased, and (B) if Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 2) equal to 125% of its actual cash contribution (such that such party's Tranche A (Pool 2) interest shall be increased by 125% of the amount provided and Broadway Funds' Tranche C (Pool 2) interest shall be decreased by 125% of the amount provided), (ii) Lender with 15 days prior notice may terminate the

12

management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), (iv) Broadway Funds shall automatically lose their ROFO rights (described below) and Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (v) Lender may exercise all rights and remedies against the Broadway Funds.

After the $12,000,000 is funded, Lender may make additional capital calls (up to $30,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the date of the capital call) of any capital calls. If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 2) equal to 125% of its actual cash contribution, (ii) if Broadway Funds fail to make such capital contribution, Broadway Funds shall automatically lose their Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (iii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice may terminate the management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used.

The Tranche A (Pool 2) Maximum Principal Amount will be included in the outstanding amount of the Bridge A Pool 2 Mezz Loan. To the extent that any portion of the Tranche A (Pool 2) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 2) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 2) will be deducted from the Tranche A (Pool 2) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 2) proceeds will not be needed.

All payments on Tranche A (Pool 2) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded (or in the case of Lender's initial $4,000,000 deemed to be funded) from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 2) advances. Interest on Tranche A (Pool 2) shall accrue at a rate of 14% per annum. Lender,

13

at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 2) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 2) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 2) is at an equal or lower interest rate.

***Tranche B (Pool 2):***    Tranche B (Pool 2) will be in the principal amount of $31,000,000. Lender will be entitled to receive 60% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche B (Pool 2). All distributions on Tranche B (Pool 2) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 2) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 2). Tranche B (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) have been paid.

***Tranche C (Pool 2):***    Tranche C (Pool 2) will be in the principal amount of $23,302,916 (as may be increased or decreased by any portions of Tranche A (Pool 2) added to or reduced from Tranche C (Pool 2) as described in "Tranche A (Pool 2)" above). Each of Lender and Broadway Funds will be entitled to receive 50% of the distributions on Tranche C (Pool 2), as such percentages may be adjusted as discussed in the Section entitled "Tranche A (Pool 2)" above. All distributions on Tranche C (Pool 2) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 2) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 2). Tranche C (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) and Tranche B (Pool 2) have been paid. Notwithstanding anything to the contrary contained herein, if at anytime Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan would otherwise exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan and Broadway Funds are not qualified transferees under the applicable intercreditor agreements, then a portion of Broadway Funds interest in Tranche C will be automatically allocated to Lender such that Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan shall not exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan.

14

| | |
|---|---|
| ***Bridge B Pool 1 Mezz Loan:*** | The named "lender" for the Bridge B Pool 1 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 1 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 1 Mezz Loan, i.e., the participation shall be totally "silent." Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 1 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 1 Mezz Loan. Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 1 Mezz Loan. The Bridge B Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge B Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 1 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein. |
| ***Bridge B Pool 2 Mezz Loan:*** | The named "lender" for the Bridge B Pool 2 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 2 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not |

have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 2 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 2 Mezz Loan. Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 2 Mezz Loan. The Bridge B Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 2 Property, the Bridge B Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 2 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*JV Interests:*    The common equity interests in the applicable Bridge A Mezz Loan Borrowers (each such entity, a "JV") and Bridge B Mezz Loan Borrowers will be held directly or indirectly by Broadway Funds. The managing member interests in the applicable Bridge A Mezz Loan Borrowers will be held by Lender. Such managing member interests will not be allocated any profits and losses, and will not be entitled to any distributions or any capital accounts. The parties agree that solely for tax purposes the managing member will not be treated as partner of the JV, and in connection therewith, appropriate provisions will be added to the organizational documents of the JVs to protect Broadway Funds and Lender in the event the JVs were treated contrary to the parties intent as partnerships, including,

16

without limitation, that in such event, no partnership elections would be made without the consent of Broadway Funds and Lender. Notwithstanding the foregoing, the intended tax treatment of the JVs as described above shall in no manner whatsoever affect the rights of Lender as managing set member of the JVs as otherwise set forth in this Term Sheet. The equity interests will not accrue preferred return and no payments or distributions will be made on account of equity interests until after the related Bridge A Pool 1 Mezz Loan, Bridge B Pool 1 Mezz Loan, Bridge A Pool 2 Mezz Loan or Bridge B Pool 2 Mezz Loan is paid in full. Future transfers including at the BP REIT (as defined below) and Broadway Funds level will be prohibited to the extent necessary to prevent any controlling interest transfer tax from being imposed; provided, however, that (1) the existing transfer rights of the limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof shall not be limited in any manner; (2) transfers of interests in the equity held by Broadway Funds or their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) between or among the Broadway Funds and their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) shall not be limited in any manner; and (3) redemption of preferred shareholders of BP REITs that does not involve any changes to the preferred terms shall not be prohibited. For all purposes of this Term Sheet, the Partnership and each of the BP REITs shall be treated as wholly owned subsidiaries of the Broadway Funds. Notwithstanding the foregoing to the contrary, no transfer or redemption shall be permitted to the extent any such transfer or redemption would result in an event of default under any senior loan. The Borrowers and the Broadway Funds shall at closing provide indemnities and guarantees satisfactory to Lender to cover, among other things, (A) any transfer tax liability caused by any activity prior to closing and any post-closing transfers of the direct or indirect interests in the BIII Portfolio Properties (other than the Pool 3 Properties) by any person other than Lender (including, without limitation, transfers by limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof or any other transfers or redemptions described above) and (B) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. There shall be no limits on Lender's ability to transfer its interests in any JV and in no event shall Lender be responsible for any associated transfer tax. **"BP REITs"** means the real estate investment trusts that are as of the date hereof the 100% owners of the equity interests in the Bridge B Mezzanine Borrowers.

No direct or indirect transfers of Broadway Funds' interest in the

participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers (except for transfers between or among the Broadway Funds and their wholly owned subsidiaries (so long as (i) they remain at all times wholly owned by the Broadway Funds, (ii) any such transfer would not result in an event of default under any senior loan, (iii) the transferee (but not with respect to any transfer between or among the Broadway Funds and their wholly owned subsidiaries) will be subject to the ROFR rights described below and (iv) Lender is given 5 business days prior written notice of any such transfer)), shall be permitted without the prior written consent of Lender in its sole and absolute discretion, except that, subject to Lender's right of first refusal described in this paragraph below, any such transfers may occur without Lender's prior written consent solely in connection with the liquidation of the Broadway Funds on or after February 6, 2018 (or February 6, 2016 or February 6, 2017, as the case may be, if, after the good faith use of commercially reasonable efforts, the managing member of the Broadway Funds is unable to obtain the applicable one year extension to the term of the Broadway Funds). Lender will have a right of first refusal ("**ROFR**") to purchase any of Broadway Funds' interest in the participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers, in any such case, prior to a sale thereof to a third party. Prior to causing any such sale, Broadway Funds shall provide written notice to Lender of its intent to sell any interest in the participation agreements with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrower, as applicable (the "**ROFR Notice**"), which ROFR Notice shall include the name and address of the prospective purchaser, the purchase price and all other economic and material non-economic terms of the proposed sale transaction, and shall offer to sell such interest to Lender on the same terms and conditions. Lender will have the right for 20 days after the date of the ROFR Notice to notify Broadway Funds in writing of its election to acquire such interest on the same terms and conditions set forth in the ROFR Notice (the "**ROFR Acceptance Notice**") for cash. If Lender sends such ROFR Acceptance Notice, the closing of such purchase by Lender shall occur within 45 days after the date of such ROFR Acceptance Notice. If Lender does not deliver an ROFR Acceptance Notice to Broadway Funds within 20 days after the date of the ROFR Notice, or if Lender rejects the terms and conditions of the ROFR Notice in writing to Broadway Funds within 20 days after the date of the ROFR Notice, then, in either case, Broadway Funds may cause the sale of such interest in such participation agreements, in the JVs, or in the Bridge B Mezzanine Borrowers, as the case may be, to the purchaser identified in the ROFR Notice for a price that is equal to or greater

18

than 96% of the purchase price set forth in the ROFR Notice and otherwise on the same economic and material non-economic terms specified therein for a period of 6 months after the date of the ROFR Notice. If the applicable interest is not sold within said 6 months, the foregoing process shall be repeated for any subsequent offer to purchase such interest. Within 5 days of the date of an ROFR Acceptance Notice, Lender shall deposit in escrow with Broadway Funds an amount equal to 10% of the purchase price. If Lender fails to provide such deposit or close in accordance with the ROFR Acceptance Notice, Broadway Funds shall have the right to retain the deposit as liquidated damages and Lender's ROFR rights will terminate solely with respect to the interest subject to such ROFR Acceptance Notice.

Subject to the last two sentences appearing in the third bullet point in the Section above entitled "Restructuring of the Mezzanine Loans," Lender's managing member equity interest in the JV will be acquired consensually via strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure. The Borrowers shall consent to (and the other Borrower Parties shall not object to or interfere with) this foreclosure or assignment in lieu of foreclosure. To accomplish this, at Lender's option, the Bridge B Mezz Loan may be transferred to a Lender owned single purpose entity and the Bridge B Mezz Loan will be consensually foreclosed upon in part via a strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure such that each Lender owned SPE will become the owner of 100% of the managing member interests of each JV. The common equity interests in the JV entities will remain with the applicable Broadway Funds controlled Bridge B Mezz Borrower and remain pledged to Lender as collateral for the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan.

The organizational documents of each JV entity will be amended and restated as directed by Lender such that the Lender (or its designee) shall be the sole managing member (the "**Managing Member**") of such entity and will have full right and authority to take all actions on behalf of the JV and will control the JV. The Managing Member shall have the right to amend the organizational documents of the JV Entities without the consent of the applicable Broadway non-managing member except that if any such amendment would have a material adverse effect on such Broadway member's interest in any such JV Entity and such material adverse effect would be materially disproportionate to the material adverse effect on the Managing Member's interest in such JV Entity, then the prior written consent of such Broadway member to such amendment shall be required to be obtained by Managing Member. In this regard, the Managing Member will have all powers and rights possessed by a general

partner of a partnership under Delaware law.    To the extent that
Tranche A (Pool 1) is not sufficient to satisfy all capital needs of the
Pool 1 Properties or Tranche A (Pool 2) is not sufficient to satisfy the
capital needs of the Pool 2 Properties, Managing Member may at its
option and in its discretion call capital from the common members of
the JV.  Appropriate remedies for failure to fund capital calls will be
set forth in the JV documents.

The Broadway Fund's only rights will be (i) to receive allocations of
profits and loss and distributions as set forth herein, (ii) to prepare
and propose, in its capacity as property manager, the budget for the
Pool 1 Properties which budget shall be subject to the approval of the
Managing Member, and to have non-binding consultation rights with
respect to (x) any changes made to the Pool 1 Properties budget and
(y) negotiations between Managing Member and the senior lenders
with respect to the Pool 1 Properties, (iii) to prepare and propose, in
its capacity as property manager, the budget for the Pool 2 Properties
which budget shall be subject to the reasonable approval of the
Managing Member and the Broadway Funds, and to have non-
binding consultation rights with respect to negotiations between
Managing Member and the senior lenders with respect to the Pool 2
Properties (clause (iii) is referred to as the **"Pool 2 Rights"**).  The
budget for the Pool 2 Properties approved by Lender and the
Broadway Funds as described in the immediately preceding sentence
shall be referred to herein as the "Approved Budget".  Lender and the
Managing Member shall, to the maximum extent permitted by law,
have no fiduciary duties to the Borrower Parties or any JV.

The tax accountants for the JVs, the owners of the BIII Portfolio
Properties and the Bridge B Mezzanine Borrower shall be any of
(1) Anchin Block & Anchin, (2) The Cornerstone Group /
Schonbraun Group or (3) PWC, the current accountants of the
Broadway Funds, and any change in such accountants shall be
subject to the prior written approval of Lender.

*Purchase Option:*     Lender shall have a purchase option to purchase on a property-by-
property basis up to 49% of the equity interests in each Bridge B
Mezzanine Borrower held by Broadway Partners or its affiliates,
successors or assigns.  The purchase option shall be exercisable with
respect to any such Bridge B Mezzanine Borrower in connection with
or following the repayment of that portion of the Bridge A Mezz
Loan allocable to the property owned indirectly by such Bridge B
Mezzanine Borrower, and the organizational documents governing
the Bridge B Mezzanine Borrowers shall be amended prior to the
closing of the Transaction to provide that if such option is exercised,
then Lender will automatically and without further action have the
same managing member rights set forth above for the JV entities.

20

The Broadway Funds (or Lender as their attorney-in-fact for such purpose) shall execute any documents reasonably requested by Lender to evidence the foregoing, although no such documents shall be necessary. The total exercise price of the purchase option with respect to all of the Bridge B Mezzanine Borrowers shall be $1,000,000, and the exercise price with respect to each individual Bridge B Mezzanine Borrower shall be such Bridge B Mezzanine Borrower's pro-rata share of the Bridge A Mezz Loan based on the allocated loan amount for the property owned by such Bridge B Mezzanine Borrower under the Bridge A Mezz Loan as of the closing date of the Transaction. Lender shall be responsible for the payment of any transfer tax liability caused by (i.e., would not have occurred but for) Lender's exercise of the purchase option. In connection with the exercise of any purchase option, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III agree to reasonably cooperate with Lender in an effort to minimize any potential transfer tax liability.

**Property Management:**     Broadway Funds will continue to manage the BIII Portfolio Properties. Such management shall be pursuant to a contract satisfactory to Lender with a term not to exceed two years and a management fee to be agreed upon but not to exceed the lesser of (i) the current management fee and (ii) 2%. To the extent any fees payable to the manager either pursuant to leases or otherwise exceed the management fee, such excess shall be split 50-50 between Broadway Funds and Lender. Any such management agreement shall be terminable (i) in connection with the sale of the applicable property, (ii) for cause as defined in the management agreement and (iii) as described in Tranche A (Pool 1) and Tranche A (Pool 2) above. All leasing activities would be done through third party leasing agents satisfactory to Lender and, with respect to any Pool 2 Property, Broadway Funds. Broadway Funds shall have no management rights with respect to properties not listed in the first sentence of this paragraph. Nothing contained herein shall limit the ability of Lender to appoint a property or asset manager to advise Lender and assist Lender in exercising its rights with respect to the BIII Portfolio Properties. Notwithstanding anything to the contrary contained herein, Lender with 15 days prior notice may, in its sole and absolute discretion, terminate the management agreement and any other affiliate agreement related to any Pool 3 Property and 1000 Wilshire.

**Senior Loan Guaranties**     Except as expressly set forth in the next section below, all guaranties related to any senior debt and the Mezzanine Loans will stay in place; however Lender will indemnify Broadway Funds for any losses actually incurred by Broadway Funds because of a breach of a non-recourse carve-out caused solely by the actions of Lender following

21

the closing of the Transaction and Broadway Funds will indemnify Lender for (1) any losses actually incurred by Lender or its affiliates caused solely by the actions of Broadway Funds or its affiliates following the closing of the Transaction and (2) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. Any successor (or its parent if such entity is a single purpose entity) to Lender's managing member interest in any JV must assume Lender's indemnification obligations described above and Lender will be released from such indemnification obligations simultaneously with such assumption.

***Existing Broadway Fund, Fund Manager, Lawlor Guaranties, Capital Call Agreement, Capital Services and Financing Agreement and Omnibus Agreement***

At the closing of the Transaction, Lender shall terminate the following guaranties and deliver releases of the obligors thereunder: (1) that certain Amended and Restated Guaranty of Recourse Obligations (Lawlor) dated as of March 19, 2008 made by Scott Lawlor, (2) that certain Amended and Restated Guaranty of Payment (Fund Guaranty) dated as of March 19, 2008 made by Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund B III, L.P., and Broadway Partners Parallel Fund P III, L.P., (3) that certain Amended and Restated Guaranty of Payment (GP Guaranty) dated as of March 19, 2008 made by Broadway Partners Fund Manager, LLC, Broadway Partners Fund GP III, L.P., and Broadway Partners Fund GP II, L.P., (4) that certain Amended and Restated Capital Call Agreement dated as of March 19, 2008 by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP and Lehman Brothers Holdings Inc. (it being acknowledged and agreed, however, with respect to such Amended and Restated Capital Call Agreement, the additional reporting requirements set forth in Section 3.02 thereof shall be incorporated into the documents evidencing the Transaction), (5) that certain Amended and Restated Capital Services and Financing Agreement, dated as of March 19, 2008, by and among Broadway Fund Manager Sub, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc. and (6) that certain Omnibus Agreement, made as of March 19, 2008, by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc.

***Existing Guaranties of Recourse Obligations of***

The existing Guaranty of Recourse Obligations of Borrower for each of the Mezzanine Loans shall be reaffirmed by the guarantor

22

**Borrower Under
Mezzanine Loans**

thereunder as remaining in full force and effect as part of the Transaction, and shall be expanded to include the following matters as additional recourse carve-outs: (1) the bankruptcy of any Borrower Party or any Broadway Fund that is not initiated by or approved in writing by Lender, and (2) any interference, frustration, hindrance or delay by any Borrower Party or any Broadway Fund in connection with the exercise by Lender of its rights and remedies as managing member of the JVs and/or its rights and remedies under the participation agreements for the Mezzanine Loans, provided that a good faith claim for breach of an express (but not implied) contractual obligation contained in the participation agreements and/or JV agreements shall not constitute interference. Notwithstanding the foregoing, with respect to clause (1) above, other than with respect to a bankruptcy filing by Bridge B Mezzanine Borrower or any subsidiary thereof, recourse shall only be triggered if and to the extent such bankruptcy filing (a) is a default under any of the senior debt documents, (b) causes substantive consolidation with the Bridge B Mezzanine Borrower or any of its subsidiaries, (c) causes any interference with the cash management arrangements or cash flow related to the Mezzanine Loans or (d) causes any loss to Lender under the Mezzanine Loans. If and to the extent any of the recourse carve-out matters occur (including the additional matters above), the parties acknowledge and agree that Lender shall have the immediate right to (1) estimate its damages suffered as a result of the occurrence of any such recourse carve-out matter, and (2) offset such damage amount, it its discretion, against any and all participation interests in the Mezzanine Loans then held by the Broadway Funds.

**ROFO:**

Broadway Funds will have a right of first offer ("**ROFO**") to purchase any of the remaining BIII Portfolio Properties prior to a sale to a third party. Prior to causing the sale of any remaining BIII Portfolio Property, the Managing Member shall provide written notice of its intent to offer to sell any such remaining BIII Portfolio Property to Broadway Funds (the "**ROFO Notice**"). Broadway Funds will have the right for 20 days after the date of the ROFO Notice to submit a written offer to the JV to acquire the applicable BIII Portfolio Property (the "**Purchase Offer**") for cash. The Purchase Offer shall set forth all of the material terms of the proposed purchase, including the purchase price. If Managing Member desires to accept the Purchase Offer on behalf of the JV, it shall send a written notice (the "**Acceptance Notice**") to Broadway Funds within 15 days after the date of the Purchase Offer. The closing of such purchase shall occur within 45 days after such Acceptance Notice. If Managing Member does not deliver an Acceptance Notice within 15 days after the date of the Purchase

23

Offer, or if an offer is submitted but is not accepted by Managing Member of the applicable JV, then Managing Member on behalf of the JV may cause the sale of such BIII Portfolio Property on behalf of the JV to any party for a price that is equal to or greater than 95% of the purchase price set forth in the Purchase Offer for a period of 9 months after the Purchase Offer. If the applicable BIII Portfolio Property is not sold within said 9 months, the foregoing process shall be repeated for any subsequent offer to sell such BIII Portfolio Property. The ROFO granted to Broadway Funds is personal to Broadway Funds and can not be assigned or transferred without the prior written consent of Managing Member.

Within 5 days of its receipt of an Acceptance Notice, Broadway Funds shall deposit in escrow with Managing Member an amount equal to 10% of the purchase price. If Broadway Funds fails to provide such deposit or close in accordance with the applicable Purchase Order, Managing Member shall have the right to retain the deposit as liquidated damages and Broadway Funds' ROFO rights will terminate with respect to all BIII Portfolio Properties.

***Closing Conditions:***   Notwithstanding anything to the contrary contained in the Agreement or this Term Sheet, Lender shall not be obligated to close the Transaction without satisfying the following conditions precedent: (1) Lender's internal approval process, including approval by Alvarez & Marsal, (2) Lender's completion of satisfactory due diligence, (3) the entering into of acceptable Transaction documents, all in form reasonably acceptable to Lender, (4) title searches and endorsements reasonably acceptable to Lender, (5) opinion letters reasonably acceptable to Lender, (6) (a) with respect to the Pool 1 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 1 Properties acceptable to Lender and (b) with respect to the Pool 2 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 2 Properties acceptable to Lender and Broadway Funds, (7) receipt by Lender of an updated business plan for the period through and including June 30, 2010 for all of the Properties acceptable to Lender, (8) the consent of the holder of the senior debt to the extent required under any intercreditor agreement, and (9) all necessary approvals in connection with Lender's bankruptcy case, including, without limitation, the approval of the Bankruptcy Court of the Southern District of New York (which Court approval shall include any indemnification obligations of Lender pursuant to the Transaction).

24

| | |
|---|---|
| ***Costs and Expenses:*** | The Borrowers or the Broadway Funds shall pay, whether or not the Transaction closes, all reasonable out-of-pocket costs and expenses in connection with the Transaction, including without limitation, the reasonable fees and disbursements of Lender's counsel. |
| ***Expense Deposit:*** | $400,000 will be provided by Broadway Funds to Lender along with a countersigned copy of the Agreement. This will be applied to the expenses but may not constitute the entirety of the expenses. |
| ***Miscellaneous:*** | This Term Sheet, as well as Transaction generally, shall be governed by the laws of the State of New York. |
| ***Closing Date:*** | Closing shall occur on or prior to June 26, 2009 or such later date approved by Lender in its sole and absolute discretion. Time is of the essence. |
| ***Assignment:*** | The right by Broadway Funds to receive the participations in the Mezzanine Loans can be assigned by Broadway Funds to wholly owned subsidiaries of the Broadway Funds (so long as they remain wholly owned subsidiaries of the Broadway Funds at all times) in such proportions as may be determined by the Broadway Funds in their sole discretion. |

## SCHEDULE I

## BRIDGE A MEZZANINE BORROWER[1]

| |
|---|
| Broadway Wall Junior Mezz LLC |
| Broadway Greensboro Junior Mezz LLC |
| Broadway Howard Street Junior Mezz LLC |
| Broadway Huntington Junior Mezz LLC |
| Broadway Legato Junior Mezz LLC |
| Broadway Wilshire Junior Mezz LLC |
| Broadway California Street Junior Mezz LLC |
| Broadway State Junior Mezz LLC |
| Broadway BCCC Junior Mezz LLC |
| Broadway Beale Junior Mezz LLC |
| Broadway Sansome Junior Mezz LLC |

---

[1] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

14998975.36

## SCHEDULE II

## BRIDGE B MEZZANINE BORROWER[2]

| |
|---|
| Broadway Wall Junior Two Mezz LLC |
| Broadway Greensboro Junior Two Mezz LLC |
| Broadway Howard Street Junior Two Mezz LLC |
| Broadway Huntington Junior Two Mezz LLC |
| Broadway Legato Junior Two Mezz LLC |
| Broadway Wilshire Junior Two Mezz LLC |
| Broadway California Street Junior Two Mezz LLC |
| Broadway State Junior Two Mezz LLC |
| Broadway BCCC Junior Two Mezz LLC |
| Broadway Beale Junior Two Mezz LLC |
| Broadway Sansome Junior Two Mezz LLC |

---

[2] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway
Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

14998975.36

## SCHEDULE III

## ACCOUNTS PAYABLE NOT TO BE SATISFIED PRIOR TO CLOSE

TO BE SATISFACTORY TO LENDER AND COMPLETED BY BORROWER PARTIES

## SCHEDULE IV

To the extent that prior to closing Broadway Funds have not provided documentation reasonably satisfactory to Lender that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder, the terms described below will apply:

- Lender will be entitled to receive 90% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 10% of the distributions on Tranche B (Pool 1).

- Lender will be entitled to receive 80% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 20% of the distributions on Tranche C (Pool 1).

- Lender will be entitled to receive 85% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 15% of the distributions on Tranche B (Pool 2).

- Lender will be entitled to receive 75% of the distributions on Tranche C (Pool 2) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche C (Pool 2).

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 1) ($2,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 1) and Tranche C (Pool 1) shall be reduced to 0%.

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 2) ($12,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 2) and Tranche C (Pool 2) shall be reduced to 0%.

- At any time after the Lockout Period, Lender may, on 15 days prior written notice to Broadway Funds, terminate any management agreement or other affiliate agreement related to any Pool 2 Property. "Lockout Period" means the number of months after the date the Transaction closes that Lender estimates that no capital calls will be needed as a result of Broadway Funds initial capital contributions on such closing date.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                             **:**

In re                                      **:**        **Chapter 11 Case No.**
                                                             **:**

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   **:**        **08-13555 (JMP)**
                                                             **:**

                         **Debtors.**        **:**        **(Jointly Administered)**
                                                             **:**

                                                             **:**
-------------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 105 AND 363
## OF THE BANKRUPTCY CODE AND FEDERAL
## RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING
## LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE CERTAIN
## LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET. AL.

Upon the motion, dated June 4, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession (collectively, the "Debtors" and, together with

their non-debtor affiliates, "Lehman"), pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for authorization and approval of

LBHI's restructuring of certain loans with Broadway Partners Fund Manager, LLC (the

"Settlement") substantially consistent with the agreement and term sheet (together, the

"Term Sheet") annexed hereto as Exhibit A; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in
the Motion.

and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of

New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting

C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

been provided in accordance with the procedures set forth in the amended order entered

February 13, 2009 governing case management and administrative procedures [Docket

No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the

attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and

Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney

for the Southern District of New York; (vi) counsel to Broadway Partners; and (vii) all

parties who have requested notice in these chapter 11 cases, and it appearing that no other

or further notice need be provided; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates and

creditors, and all parties in interest and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefore, it is

ORDERED that the relief requested in the Motion is granted; and it is

further

ORDERED that, pursuant to sections 105 and  363(b) of the Bankruptcy

Code and Bankruptcy Rule 9019, the Term Sheet and the Settlement are hereby

approved, in all respects; and it is further

ORDERED that LBHI is hereby authorized to enter into the transactions contemplated by and in substantial accordance with the Term Sheet and Settlement and to consummate all of the transactions contemplated thereby; and it is further

ORDERED that LBHI is hereby authorized to perform each and every term of the Settlement in accordance with its terms and this Order; and it is further

ORDERED that LBHI is authorized to execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to accomplish the foregoing; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order and any disputes that may arise in the future with respect to the Settlement and the Term Sheet.

Dated: June __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Term Sheet

**EXECUTION VERSION**

## AGREEMENT

THIS AGREEMENT (this "**Agreement**") dated as of May 29, 2009 is made by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (together with its successors and assigns, "**Lender**"), **THE PARTIES LISTED ON SCHEDULE I ANNEXED HERETO** (collectively, the "**Bridge A Mezzanine Borrower**"), **THE PARTIES LISTED ON SCHEDULE II ANNEXED HERETO** (collectively, the "**Bridge B Mezzanine Borrower**" and together with the Bridge A Mezzanine Borrower, collectively, the "**Borrowers**"), **BROADWAY PARTNERS FUND MANAGER, LLC**, a Delaware limited liability company ("**Fund Manager**"), **BROADWAY PARTNERS REAL ESTATE FUND III, L.P.**, a Delaware limited partnership ("**Broadway Real Estate Fund**"), **BROADWAY PARTNERS PARALLEL FUND P III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund P**"), **BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund B**" and together with Broadway Real Estate Fund and Broadway Parallel Fund P, the "**Broadway Funds**"), **BROADWAY B3 EQUITY LP**, a Delaware limited partnership (the "**Partnership**"), **BROADWAY FUND MANAGER SUB, LLC**, a Delaware limited liability company ("**Broadway Manager Sub**"), **BROADWAY PARTNERS FUND GP III, L.P.**, a Delaware limited partnership ("**GP III**"), **BROADWAY PARTNERS FUND GP II, L.P.**, a Delaware limited partnership ("**GP II**"), and **SCOTT LAWLOR**, an individual ("**Lawlor**" and together with the Broadway Funds, the Fund Manager, GP III and GP II, each a "**Guarantor**" and collectively, the "**Guarantors**"). The Guarantors, the Partnership, Broadway Manager Sub, Bridge A Mezzanine Borrower and Bridge B Mezzanine Borrower are sometimes referred to collectively as the "**Borrower Parties.**"

W I T N E S S E T H:

WHEREAS, the Bridge A Mezzanine Borrower and Lender are parties to that certain Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 15, 2008 (collectively, the "**Bridge A Mezz Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge A Mezzanine Borrower in the principal amount of $321,984,921.90 (the "**Bridge A Mezz Loan**");

WHEREAS, the Bridge A Mezz Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge A Mezz Loan Agreement), which Loan Documents for the purposes of this Agreement are hereinafter referred to as the "**Bridge A Mezz Loan Documents;**"

WHEREAS, the Bridge B Mezzanine Borrower and Lender are parties to that certain Bridge Mezzanine Loan Agreement, dated as of August 15, 2007, effective July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Bridge Mezzanine Loan Agreement, dated as of July 15, 2008

(collectively, the "**Bridge B Mezzanine Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge B Mezzanine Borrower in the principal amount of $137,627,670.32 (the "**Bridge B Mezzanine Loan**" and together with the Bridge A Mezz Loan, collectively, the "**Mezzanine Loans**");

WHEREAS, the Bridge B Mezzanine Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge B Mezzanine Loan Agreement), which Loan Documents for the purpose of this Agreement are hereinafter referred to as the "**Bridge B Mezzanine Loan Documents**" and together with the Bridge A Mezz Loan Documents, the "**Mezzanine Loan Documents;**"

**WHEREAS**, the Mezzanine Loans matured on May 11, 2009;

**WHEREAS**, the Borrower Parties desire to enter into the transaction in accordance with the terms set forth herein;

**NOW, THEREFORE**, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Borrower Parties hereby covenant, agree, represent and warrant as follows:

1.    **Modification to Mezzanine Loans**. Each Borrower Party hereby covenants and agrees that it will restructure the Mezzanine Loans substantially in accordance with the terms and provisions of that certain term sheet attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") and will take all necessary action and deliver all necessary documents to consummate the Transaction (as defined below) on or before June 26, 2009. Simultaneously with the execution hereof, the Broadway Funds shall transfer to Lender the West Monroe deposit in cash which amount shall be held by Lender and either (i) be applied to the Broadway Funds payment obligation described in the "Broadway Payments" section of the Term Sheet if the transaction contemplated by the Term Sheet (the "**Transaction**") closes on or before June 26, 2009 (or such later date approved by Lender in writing in its sole discretion) or (ii) retained by Lender as a fee as Lender's sole and only remedy if the Transaction fails to close for any reason whatsoever (including as a result of Lender's unwillingness, in Lender's sole discretion, to close the Transaction) on or before the date specified in clause (i) above (but without prejudice to Lenders' rights under the Mezzanine Loan Documents which shall survive execution of this Agreement and any termination of this Agreement and if this Agreement fails to close for any reason on or before the date specified in clause (i) above, the Mezz Loan Documents shall continue in full force and effect and all parties shall have all of their respective rights and obligations thereunder just as if this Agreement had not been executed (except that the provisions of Paragraphs 2 and 3 hereof shall remain in effect)). Consummation of the Transaction is also subject to the closing conditions specified in the Term Sheet or waiver thereof by Lender. The Borrower Parties hereby agree that in no event shall they have any claims or exercise any remedies against Lender for any failure to consummate the Transaction and the Borrower Parties each hereby waive any and all claims they may have against Lender, whether for breach of contract, tort or otherwise, with respect to Lender's failure to close the Transaction for any reason whatsoever. In no event shall the Borrower Parties have any claim or cause of action against Lender if the Transaction fails to close for any reason, including any claim for breach of any duty of good faith or fair dealing.

2

2.      **No Defenses, Counterclaims or Offsets**.  Each Borrower Party for itself and its respective heirs, executors, administrators and successors and assigns, and by its execution hereof (i) hereby acknowledges, admits and agrees that, as of the date hereof, there are no objections, claims, defenses, counterclaims or offsets relating to their obligations under or in respect of the Mezzanine Loans, the Mezzanine Loan Documents, any Event of Default or to the enforcement or exercise by Lender of any of its rights, powers or remedies under or in respect of the Mezzanine Loan Documents, at law or in equity, and (ii) hereby irrevocably waives, relinquishes and releases any and all such objections, claims, defenses, counterclaims or offsets, that may now or hereafter exist, including without limitation, any and all such objections, claims, defenses, counterclaims or offsets whether known or unknown, foreseeable or unforeseeable.

3.      **Consent and Reaffirmation**.  Each Borrower Party hereby confirms and ratifies its respective obligations under the Mezzanine Loan Documents to which it is a party and consents to the terms of this Agreement and the transactions contemplated herein.  Nothing contained in this Agreement or any of the Mezzanine Loan Documents or any of the transactions contemplated herein or thereby shall constitute, and there has not otherwise occurred, any waiver, release or limitation of any obligation of any Borrower Party relating to or otherwise connected to the Mezzanine Loan Documents to which it is a party.  Nothing herein is intended to, nor shall it, constitute, nor has there otherwise occurred, a novation of the indebtedness evidenced by the Mezzanine Loan Documents.

4.      **WAIVER OF JURY TRIAL**.  THE BORROWER PARTIES AND LENDER SHALL NOT SEEK A JURY TRIAL IN ANY ACTION BASED UPON OR ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE MEZZANINE LOANS OR ANY OF THE MEZZANINE LOAN DOCUMENTS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER PARTY AND LENDER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ANY AND ALL RIGHTS TO ANY SUCH JURY TRIAL AND AGREES THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH BORROWER PARTY, LENDER AND THEIR RESPECTIVE COUNSEL, AND SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.

5.      **Counterparts**.  This Agreement may be executed by facsimile or pdf signatures, and in any number of identical counterparts, each of which shall be deemed to be an original, and all of which shall collectively constitute a single agreement, fully binding upon and enforceable against the parties hereto.

6.      **Governing Law**.  This Agreement shall be governed by New York law, without regard to the principles of conflicts of law.

7.      **Expenses**.  The Borrowers or the Broadway Funds shall pay promptly upon demand, whether or not the Transaction closes, all reasonable costs and expenses of Lender in connection with this Agreement and the transactions contemplated hereby, including without limitation, the reasonable fees and disbursements of Lender's counsel.

8.    **Confidentiality**.  The terms and conditions of this Agreement, including the terms and conditions set forth in the Term Sheet, are confidential and may not be disclosed by Borrower Parties to third parties other than Borrower Parties' attorneys and accountants, except as may otherwise be required by applicable law.

9.    **Modification; Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any Mezzanine Loan Document, or any consent to any departure therefrom, shall be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

10.    **Time; Construction; Exhibits and Schedules; Bankruptcy Court Approval**.  Time is of the essence of each provision of this Agreement.  All references to the singular or plural number or masculine, feminine or neuter gender shall, as the context requires, include all others.  All references to sections, paragraphs and exhibits are to this Agreement unless otherwise specifically noted.  The use of words "hereof", "hereunder", "herein" or words of similar import shall refer to this entire Agreement and not to any particular section, paragraph or portion of this Agreement unless otherwise specifically noted.  All schedules and exhibits attached hereto are by this reference made a part of this Agreement for all purposes.  This Agreement is fully binding on all parties hereto.  Lender's obligations under this Agreement are subject to the approval of the Bankruptcy Court of the Southern District of New York .

[Signatures appear on the following pages]

4

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BRIDGE A MEZZANINE BORROWER:**

**BROADWAY WALL JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**BROADWAY HUNTINGTON JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY LEGATO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY WILSHIRE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY STATE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY BCCC JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:   Jonathon K. Yormak
     Title:    Authorized Signatory

**BROADWAY BEALE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:   Jonathon K. Yormak
     Title:    Authorized Signatory

**BROADWAY SANSOME JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:   Jonathon K. Yormak
     Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BRIDGE B MEZZANINE BORROWER:**


**BROADWAY WALL JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company


By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR TWO MEZZ
LLC,** a Delaware limited liability company


By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR
TWO MEZZ LLC,** a Delaware limited liability
company


By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR TWO
MEZZ LLC,** a Delaware limited liability company


By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY HUNTINGTON JUNIOR TWO MEZZ
LLC**, a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY LEGATO JUNIOR TWO MEZZ LLC**,
a Delaware limited liability company

By: _____
    Name:
    Title:   Jonathon K. Yormak
           Authorized Signatory

**BROADWAY WILSHIRE JUNIOR TWO MEZZ
LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:   Jonathon K. Yormak
           Authorized Signatory

**BROADWAY STATE JUNIOR TWO MEZZ LLC**,
a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY BCCC JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
  Name:  Jonathon K. Yorman
  Title:  Authorized Signatory

**BROADWAY BEALE JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
  Name:  Jonathon K. Yorman
  Title:  Authorized Signatory

**BROADWAY SANSOME JUNIOR TWO MEZZ
LLC,**  Delaware limited liability company

By: _____
  Name:  Jonathon K. Yo
  Title:  Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**, a
Delaware corporation as Debtor and Debtor in
Possession in its chapter 11 case in the United States
Bankruptcy Court for the Southern District of New
York, Case No. 08-13555 (JMP)

By: _____

Name:        Jeffrey Fitts
Title:        Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**FUND MANAGER:**

**BROADWAY PARTNERS FUND MANAGER, LLC,**
a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yormak
     Title:  Authorized Signatory

**BROADWAY REAL ESTATE FUND:**

**BROADWAY PARTNERS REAL ESTATE FUND
III, L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
        Delaware limited liability company, its
        general partner

        By: _____
           Name:  Jonathon K. Yormak
           Title:  Authorized Signatory

**BROADWAY PARALLEL FUND P:**

**BROADWAY PARTNERS PARALLEL FUND P III,
L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
        Delaware limited liability company, its
        general partner

        By: _____
           Name:  Jonathon K. Yormak
           Title:  Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY PARALLEL FUND B:**

**BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a Delaware
        limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
        Delaware limited liability company, its
        general partner

        By: _____
        Name:
        Title: Jonathon K. Yormak
        Authorized Signatory

**PARTNERSHIP:**

**BROADWAY B3 EQUITY LP**, a Delaware limited partnership

By:  Broadway Fund Manager Sub LLC., a Delaware
        limited liability company, its general partner

    By: _____
    Name:
    Title: Jonathon K. Yormak
    Authorized Signatory

**BROADWAY MANAGER SUB:**

**BROADWAY FUND MANAGER SUB LLC,**
a Delaware limited liability company

By: _____
Name:
Title:  Jonathon K. Yormak
       Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**GP III:**

**BROADWAY PARTNERS FUND GP III, L.P.,** a
Delaware limited partnership

By:  Broadway Partners Fund GP III, LLC., a
Delaware
limited liability company, its general partner

By:_____
Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**GP II:**

**BROADWAY PARTNERS FUND GP II, L.P.,** a
Delaware limited partnership

By:  Broadway Partners Fund GP II, LLC., a
Delaware
limited liability company, its general partner

By:_____
Name:
Title:    Jonathon K. Yormak
Authorized Signatory

**LAWLOR:**

**SCOTT LAWLOR,** an individual

_____

**LAWLOR:**

**SCOTT LAWLOR**, an individual

<u>Exhibit A</u>

**Term Sheet**

This Term Sheet is Exhibit A to that certain Agreement (the "**Agreement**"), dated as of May 29, 2009, among Lehman Brothers Holdings Inc. and the Borrower Parties.  The obligations of the parties to the Agreement with respect to the Transaction (as defined in the Agreement) are subject in all respects to the terms and conditions of the Agreement.  In the event of any conflict between the terms of this Exhibit A and the Agreement, the terms of the Agreement shall prevail. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

| | |
|---|---|
| *General Purpose:* | The final maturity date of each Mezzanine Loan is May 11, 2009. The Borrowers were unable to repay the Mezzanine Loans on the final maturity date and desire to enter into a restructuring of the obligations in lieu of Lender exercising its remedies under the Mezzanine Loan Documents.  The primary purpose of this transaction is to: (a) provide for additional funding for the BIII Portfolio Properties (defined below), (b) restructure the obligations under the Mezzanine Loans and (c) comply with the requirements of the BIII Portfolio Properties mortgage and senior mezzanine loan documents and the applicable intercreditor agreements.  In consideration of the cooperation of the Borrower Parties in effectuating an orderly transition of control and the investment of certain additional funds as specified herein, Borrower Parties will receive certain benefits as specified herein. |
| *Properties:* | The "**BIII Portfolio Properties**" consist of (i) Bay Colony Corporate Center, Waltham, Massachusetts ("**Bay Colony**"), (ii) 116 Huntington Street, Boston, Massachusetts ("**116 Huntington**"), (iii) 120 Howard Street, San Francisco, California ("**120 Howard**"), (iv) 100 California Street, San Francisco, California ("**100 Cal**"), (v) One Sansome, San Francisco, California ("**One Sansome**"), (vi) 50 Beale Street, San Francisco, California ("**50 Beale**"), (vii) 1000 Wilshire Boulevard, Los Angeles, California ("**1000 Wilshire**"), (viii) 100 Wall Street, New York, New York ("**100 Wall**"), (ix) Greensboro Drive, McClean, Virginia ("**Greensboro**") and (x) One Fair Oaks, Fairfax, Virginia ("**One Fair Oaks**").  The "**Pool 1 Properties**" consist of 100 Cal, 1000 Wilshire, 116 Huntington, 50 Beale and One Fair Oaks.  The "**Pool 2 Properties**" consist of Greensboro and One Sansome.  The "**Pool 3 Properties**" consist of 120 Howard, Bay Colony and 100 Wall. |
| *Restructuring of Mezzanine Loans* | At closing, a restructuring of the Mezzanine Loans shall be effected as follows: |

14998975.36

- The Bridge A Mezz Loan shall be split into 2 separate mezzanine loans. The "**Bridge A Pool 1 Mezz Loan**" will have an initial principal balance of $198,568,579 and will be indirectly secured by the Pool 1 Properties and the "**Bridge A Pool 2 Mezz Loan**" will have an initial principal balance of $103,302,916 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge A Mezz Loan as of May 12, 2009 of $304,871,494 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $3,000,000 allocated to the Pool 3 Properties.

- The Bridge B Mezz Loan shall be split into 2 separate mezzanine loans. After giving effect to the foreclosure of $20,000,000 described below, the "**Bridge B Pool 1 Mezz Loan**" will have an initial principal balance of $58,824,267 and will be indirectly secured by the Pool 1 Properties and the "**Bridge B Pool 2 Mezz Loan**" will have an initial principal balance of $ 60,240,775 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge B Mezz Loan as of May 12, 2009 of $141,065,042 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $2,000,000 allocated to the Pool 3 Properties.

- Lender and the Borrowers will engage in (and the other Borrower Parties will not object to or interfere with) a consensual partial strict foreclosure under the UCC or, at Lender's option, an assignment in lieu of foreclosure, pursuant to which the Lender, as holder of the Bridge B Mezzanine Loan, will foreclose out $20,000,000 of the Bridge B Mezz Loan and obtain the managing member interests described in "JV Interests" below as being those to be held by Lender, and all existing obligations of the Borrower Parties with respect to the Bridge B Mezzanine Loan shall, except as otherwise contemplated hereby, survive. The documents evidencing such foreclosure or assignment shall be satisfactory to Lender. Notwithstanding the foregoing, there will be no public auction, general solicitation or marketing

2

associated with the partial strict foreclosure unless (i) a party with a right under the UCC to object to the strict foreclosure contemplated hereby objects and strict foreclosure is not an available remedy or (ii) the Transaction does not close within the time periods contemplated hereunder. Borrower Parties agree and acknowledge that this Term Sheet is subject to the approval of the Bankruptcy Court of the Southern District of New York and as such will become public record.

- At Lender's option, after the closing of the Transaction, the Bridge A Pool 1 Mezz Loan, the Bridge A Pool 2 Mezz Loan, the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan may be split into separate cross-collateralized, cross defaulted loans, one loan for each of the Pool 1 Properties and Pool 2 Properties. Each Borrower in each pool will enter into a cross indemnity agreement with each other Borrower in the same pool, in form satisfactory to Lender whereby each Borrower will agree to reimburse each other Borrower for any amount paid on the reimbursing Borrower's behalf.

***Pool 3 Properties:***    Notwithstanding anything contained herein to the contrary, at any time specified by Lender, either before or after the closing of the Transaction, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III will take such actions with respect to the Pool 3 Properties as specified by Lender, including, without limitation, agreeing to deliver after the closing of the Transaction an assignment or deed in lieu to Lender or to the senior lenders or otherwise take such action as may be necessary to relinquish after the closing of the Transaction any interest in the Pool 3 Properties to Lender or to the senior lenders or any other person. Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III, at no cost to Lender, will reasonably cooperate with Lender to effectuate such transfers in the manner directed by Lender (including, without limitation, to minimize any potential transfer tax liability), which cooperation may include, without limitation, Broadway Funds remaining an owner of certain equity in the Pool 3 Properties; provided, however, that Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III shall not be required to do anything that would cause material adverse income tax or transfer tax consequences to either Broadway Funds (or their direct or indirect partners) or their respective subsidiaries. In no event shall any capital contributed or committed by Broadway Funds be expended by Lender on the Pool 3 Properties without the approval of the Broadway Funds. The Pool 3 Properties will continue to serve as indirect security for the

3

Mezzanine Loans until the closing of the Transaction. At the closing of the Transaction, the Pool 3 Properties shall, at Lender's option, (i) serve as indirect security for the Bridge A Pool 2 Mezz Loan and/or the Bridge B Pool 2 Mezz Loan and only a nominal amount of the Bridge A Pool 2 Mezz Loan ($3,000,000) and/or the Bridge B Pool 2 Mezz Loan ($2,000,000) shall be allocated to the Pool 3 Properties, as determined by Lender in Lender's sole discretion, (ii) serve as indirect security for a "Pool 3 Mezzanine Loan" which will have a nominal loan amount ($5,000,000) and in which Broadway Funds will have no interests or (iii) subject to the foregoing provisions of this paragraph, as otherwise determined by Lender.

*Broadway Payments:*

- The Broadway Funds will provide at least $26,000,000 in cash at closing consisting of (i) $6,000,000 of new money from sources outside the BIII Portfolio Properties, (ii) (x) the remaining proceeds from the Sansome deposit ($4,000,000), which Sansome deposit remaining proceeds the parties hereto acknowledge and agree have been previously provided to Lender, and (y) the remaining proceeds from the Monroe escrow ($10,000,000), (iii) the final, negotiated amount of the 1000 Wilshire deposit, less reasonable third party out-of-pocket costs and (iv) the amounts required by the second to last bullet point in this section, which are estimated to be $3,000,000 (inclusive of Borrower's reasonable third-party out-of-pocket costs incurred in connection with the Transaction).

- At closing, $20,000,000 of the $26,000,000 cash provided by the Broadway Funds, will be applied to pay down the Mezzanine Loans.

- $3,000,000 of the $26,000,000 cash provided by the Broadway Funds will be held by Lender and used to provide liquidity for capital needs (see "Tranche A (Pool 2)" below).

- The Broadway Funds will also commit to provide an additional Tranche A callable capital commitment for each of Pool 1 and Pool 2 of $14,000,000 in the aggregate, $2,000,000 of which will be solely for Pool 1 and $12,000,000 of which will be solely for Pool 2 of new money from sources outside the BIII Portfolio Properties (which new money shall be callable by Lender, subject to the terms and conditions of this Term Sheet, at any time that

4

Lender determines that such additional funds are necessary to provide liquidity for capital needs and restructuring). Prior to closing, Broadway Funds must provide documentation reasonably satisfactory to Lender evidencing that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder. To the extent that Broadway Funds do not satisfy the provisions of the foregoing sentence, the terms described on Schedule IV attached hereto will be deemed incorporated herein.

- At closing, the Broadway Funds shall pay all reasonable third party out-of-pocket fees and expenses incurred by Lender in connection with the transactions contemplated hereby (including, without limitation, attorneys fees). The Broadway Funds shall also be responsible for (A) any transfer taxes associated with the Pool 1 and Pool 2 Properties but not the Pool 3 Properties and (B) all amounts owing directly or indirectly by Borrowers or their subsidiaries that own a direct or indirect interest in the BIII Portfolio Properties to any party except for (i) any amounts set forth on Schedule III attached hereto, (ii) any and all trade payables incurred in the ordinary course of owning and operating the BIII Portfolio Properties which are not 30 or more days past due, (iii) any other ordinary course liabilities and/or expenses that individually are less than $20,000 and in the aggregate do not exceed $200,000 and (iv) amounts due to the senior lenders under the mortgage and mezzanine loans.

- Except with respect to 120 Howard to the extent funds are not available from the working capital reserve account or are otherwise provided by the Broadway Funds, the Broadway Funds shall pay any and all shortfalls in the debt service payments due and payable under the senior loans on the June 2009 payment date under such loans, which payments may be made, in part, from funds then on deposit, if any, in the working capital reserve account. Provided such payment is made, Lender shall provide the Broadway Funds with a credit at the closing of the Transaction against the Bridge A Mezz Loan Tranche A (Pool 2) commitment of the Broadway Funds discussed below in the amount of such shortfall payment amount.

5

***Bridge A Pool 1 Mezz***
***Loan Tranching:***

The Bridge A Pool 1 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 1) will be a senior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche B (Pool 1) will be a junior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche C (Pool 1) will be the junior most participation interest in the Bridge A Pool 1 Mezz Loan. The named "lender" for the Bridge A Pool 1 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 1 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1)) and (y) such amendment does not reduce the interest rate payable on Tranche A (Pool 1). Subject to the pay off and/or replacement of Tranche A (Pool 1) described in the last sentence of the "Tranche A (Pool 1)" section below, the Broadway Funds will be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they

6

are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 1 Mezz Loan. The Bridge A Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge A Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 1) and then to Tranche B (Pool 1) and then to Tranche C (Pool 1), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*Tranche A (Pool 1):*

Tranche A (Pool 1) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $20,000,000 (the "**Tranche A (Pool 1) Maximum Principal Amount**") which will consist of:

(A) (i) $5,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00) and (iii) $3,000,000 allocated to Broadway Funds (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 1) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $2,000,000) callable by Lender and both committed and contributed by Broadway Funds as contemplated in "Broadway Payments" above and (ii) the amount of cash contributed by Lender or any party designated by Lender in connection with any capital call.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 1 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its

7

sole and absolute discretion. Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. To the extent any additional capital is actually provided by either Broadway Funds or Lender or any party designated by Lender, such party's Tranche A (Pool 1) interest shall be increased by the amount of such additional capital so provided, and such party's Tranche C (Pool 1) interest shall be correspondingly decreased by such amount. The Broadway Funds shall have 15 business days following a call by Lender to provide any additional advances called by Lender (up to $2,000,000). If the Broadway Funds fail to provide such cash within 15 business days of the date called then (i) (a) Broadway Funds participation interest in Tranche A (Pool 1) will be reduced by $1.00 for every $1.00 Broadway Funds fail to fund, and for every $1.00 that Broadway Funds' Tranche A (Pool 1) interest is reduced, Broadway Funds' Tranche C (Pool 1) interest shall be deemed to be increased, and (b) if Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution (such that such party's Tranche A (Pool 1) interest shall be increased by 125% of the amount provided and Broadway Funds' Tranche C (Pool 1) interest shall be decreased by 125% of the amount provided); provided, however, that the foregoing clause (a) shall only apply to the $2,000,000 committed capital obligation of Broadway Funds and shall not apply to any capital called after the entire $2,000,000 has been funded by Broadway Funds, (ii) Lender with 15 days prior notice may terminate any management agreement or other affiliate agreement related to any Pool 1 Property with any affiliate of Broadway Funds, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), and (iv) Lender may exercise all rights and remedies against the Broadway Funds.

After the $2,000,000 is funded, Lender may make additional capital calls (up to $10,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution and (ii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice

may terminate the management agreement and any other affiliate agreement related to the Pool 1 Property for which the capital call was intended to be used.

The Tranche A (Pool 1) Maximum Principal Amount will be included in the outstanding amount of the Bridge A Pool 1 Mezz Loan. To the extent that any portion of the Tranche A (Pool 1) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 1) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 1) will be deducted from the Tranche A (Pool 1) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 1) proceeds will not be needed. All payments on Tranche A (Pool 1) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded or deemed to be funded from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 1) advances. Interest on Tranche A (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 1) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 1) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 1) is at an equal or lower interest rate.

*Tranche B (Pool 1):*    Tranche B (Pool 1) will be in the principal amount of $70,000,000. Lender will be entitled to receive 75% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche B (Pool 1). All distributions on Tranche B (Pool 1) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 1) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 1). Tranche B (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) have been paid.

*Tranche C (Pool 1):*    Tranche C (Pool 1) will be in the principal amount of $108,568,579 (as may be increased or decreased by any portions of Tranche A (Pool 1) added to or reduced from Tranche C (Pool 1) as described in "Tranche A (Pool 1)" above). Lender will be entitled to receive 60% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche C (Pool 1), as such percentages may be adjusted as discussed in the Section

entitled "Tranche A (Pool 1)" above. All distributions on Tranche C (Pool 1) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 1). Tranche C (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) and Tranche B (Pool 1) have been paid.

***Bridge A Pool 2 Mezz Loan Tranching:***

The Bridge A Pool 2 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 2) will be a senior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche B (Pool 2) will be a junior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche C (Pool 2) will be the junior most participation interest in the Bridge A Pool 2 Mezz Loan. The named "lender" for the Bridge A Pool 2 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 2) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2)) and (z) such amendment does not reduce the interest rate payable on Tranche A (Pool 2). Subject to the payoff and/or replacement of Broadway Funds' interest in Tranche A (Pool 2) described in the last sentence of the "Tranche A (Pool 2)" section below, the Broadway Funds will

10

be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 2 Mezz Loan. The Bridge A Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 2 Property, the Bridge A Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 2) and then to Tranche B (Pool 2) and then to Tranche C (Pool 2), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*Tranche A (Pool 2):*  Tranche A (Pool 2) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $49,000,000 (the "**Tranche A (Pool 2) Maximum Principal Amount**") which will consist of:

(A) (i) $4,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00), (iii) $3,000,000 of the initial new money (which shall be used exclusively to pay debt service shortfalls and up to $250,000 of capital needs on the Pool 2 Properties as determined by Lender) as contemplated in "Broadway Payments" above (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 2) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $42,000,000) callable by

11

Lender. The first $12,000,000 of Tranche A (Pool 2) capital calls are
committed solely by Broadway Funds and shall be contributed solely
by Broadway Funds as contemplated in "Broadway Payments"
above. Any portion of the $3,000,000 described in clause (A)(iii)
above that is not used for the purposes set forth therein shall be
refunded to the Broadway Funds after the disposition of the last
remaining Pool 2 Property.

Lender shall have the right, but not the obligation, to call for
additional capital as and when determined by the Lender, in its sole
and absolute discretion and it is the intention of Lender to utilize cash
flow from the Pool 2 Properties prior to making any such calls,
provided, that in all events Lender, in its sole and absolute discretion
may use any cash flow to pay down the Mezzanine Loans or reserve
all or any portion of such cash flow as it deems appropriate, in its
sole and absolute discretion. Lender shall have the right, but not the
obligation, to provide its ratable share (based on its share of Tranche
A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the
date of the capital call) of any capital calls. All capital calls shall
specify the Pool 2 Property for which the funds called will be used.
Any call against the $12,000,000 committed by the Broadway Funds
must be based on costs contemplated by an Approved Budget (as
defined below), or if outside an Approved Budget, made in good faith
for the benefit of the Pool 2 Properties and/or in connection with any
restructuring of any senior debt. To the extent any additional capital
is actually provided by either Broadway Funds or Lender or any party
designated by Lender, such party's Tranche A (Pool 2) interest shall
be increased by the amount of such additional capital so provided,
and such party's Tranche C (Pool 2) interest shall be correspondingly
decreased by such amount. If the Broadway Funds fail to provide
any portion of its $12,000,000 capital commitment in cash within 15
business days of the date called, then (i) (a) if the call was based on
costs contemplated by an Approved Budget, or (b) if the call was
based on costs contemplated outside an Approved Budget and Lender
or any party designated by Lender actually provides the capital
called, then, in either case (i)(a) or (i)(b), (A) Broadway Funds
participation interest in Tranche A (Pool 2) will be reduced by $1.00
for every $1.00 Broadway Funds fail to fund, and for every $1.00 that
Broadway Funds' Tranche A (Pool 2) interest is reduced, Broadway
Funds' Tranche C (Pool 2) interest shall be deemed to be increased,
and (B) if Lender or any party designated by Lender provides such
cash then the party providing such cash will receive an interest in
Tranche A (Pool 2) equal to 125% of its actual cash contribution
(such that such party's Tranche A (Pool 2) interest shall be increased
by 125% of the amount provided and Broadway Funds' Tranche C
(Pool 2) interest shall be decreased by 125% of the amount
provided), (ii) Lender with 15 days prior notice may terminate the

12

management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), (iv) Broadway Funds shall automatically lose their ROFO rights (described below) and Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (v) Lender may exercise all rights and remedies against the Broadway Funds.

After the $12,000,000 is funded, Lender may make additional capital calls (up to $30,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the date of the capital call) of any capital calls. If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 2) equal to 125% of its actual cash contribution, (ii) if Broadway Funds fail to make such capital contribution, Broadway Funds shall automatically lose their Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (iii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice may terminate the management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used.

The Tranche A (Pool 2) Maximum Principal Amount will be included in the outstanding amount of the Bridge A Pool 2 Mezz Loan. To the extent that any portion of the Tranche A (Pool 2) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 2) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 2) will be deducted from the Tranche A (Pool 2) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 2) proceeds will not be needed.

All payments on Tranche A (Pool 2) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded (or in the case of Lender's initial $4,000,000 deemed to be funded) from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 2) advances. Interest on Tranche A (Pool 2) shall accrue at a rate of 14% per annum. Lender,

13

at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 2) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 2) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 2) is at an equal or lower interest rate.

*Tranche B (Pool 2):*    Tranche B (Pool 2) will be in the principal amount of $31,000,000. Lender will be entitled to receive 60% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche B (Pool 2). All distributions on Tranche B (Pool 2) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 2) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 2). Tranche B (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) have been paid.

*Tranche C (Pool 2):*    Tranche C (Pool 2) will be in the principal amount of $23,302,916 (as may be increased or decreased by any portions of Tranche A (Pool 2) added to or reduced from Tranche C (Pool 2) as described in "Tranche A (Pool 2)" above). Each of Lender and Broadway Funds will be entitled to receive 50% of the distributions on Tranche C (Pool 2), as such percentages may be adjusted as discussed in the Section entitled "Tranche A (Pool 2)" above. All distributions on Tranche C (Pool 2) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 2) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 2). Tranche C (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) and Tranche B (Pool 2) have been paid. Notwithstanding anything to the contrary contained herein, if at anytime Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan would otherwise exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan and Broadway Funds are not qualified transferees under the applicable intercreditor agreements, then a portion of Broadway Funds interest in Tranche C will be automatically allocated to Lender such that Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan shall not exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan.

14

| | |
|---|---|
| ***Bridge B Pool 1 Mezz Loan:*** | The named "lender" for the Bridge B Pool 1 Mezz Loan shall be Lender.  In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 1 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 1 Mezz Loan, i.e., the participation shall be totally "silent."  Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 1 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 1 Mezz Loan.  Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 1 Mezz Loan.  The Bridge B Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender.  On the sale or refinance of a Pool 1 Property, the Bridge B Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 1 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes).  Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein. |
| ***Bridge B Pool 2 Mezz Loan:*** | The named "lender" for the Bridge B Pool 2 Mezz Loan shall be Lender.  In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 2 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not |

have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 2 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 2 Mezz Loan. Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 2 Mezz Loan. The Bridge B Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 2 Property, the Bridge B Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 2 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*JV Interests:*  The common equity interests in the applicable Bridge A Mezz Loan Borrowers (each such entity, a "JV") and Bridge B Mezz Loan Borrowers will be held directly or indirectly by Broadway Funds. The managing member interests in the applicable Bridge A Mezz Loan Borrowers will be held by Lender. Such managing member interests will not be allocated any profits and losses, and will not be entitled to any distributions or any capital accounts. The parties agree that solely for tax purposes the managing member will not be treated as partner of the JV, and in connection therewith, appropriate provisions will be added to the organizational documents of the JVs to protect Broadway Funds and Lender in the event the JVs were treated contrary to the parties intent as partnerships, including,

16

without limitation, that in such event, no partnership elections would be made without the consent of Broadway Funds and Lender. Notwithstanding the foregoing, the intended tax treatment of the JVs as described above shall in no manner whatsoever affect the rights of Lender as managing set member of the JVs as otherwise set forth in this Term Sheet. The equity interests will not accrue preferred return and no payments or distributions will be made on account of equity interests until after the related Bridge A Pool 1 Mezz Loan, Bridge B Pool 1 Mezz Loan, Bridge A Pool 2 Mezz Loan or Bridge B Pool 2 Mezz Loan is paid in full. Future transfers including at the BP REIT (as defined below) and Broadway Funds level will be prohibited to the extent necessary to prevent any controlling interest transfer tax from being imposed; provided, however, that (1) the existing transfer rights of the limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof shall not be limited in any manner; (2) transfers of interests in the equity held by Broadway Funds or their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) between or among the Broadway Funds and their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) shall not be limited in any manner; and (3) redemption of preferred shareholders of BP REITs that does not involve any changes to the preferred terms shall not be prohibited. For all purposes of this Term Sheet, the Partnership and each of the BP REITs shall be treated as wholly owned subsidiaries of the Broadway Funds. Notwithstanding the foregoing to the contrary, no transfer or redemption shall be permitted to the extent any such transfer or redemption would result in an event of default under any senior loan. The Borrowers and the Broadway Funds shall at closing provide indemnities and guarantees satisfactory to Lender to cover, among other things, (A) any transfer tax liability caused by any activity prior to closing and any post-closing transfers of the direct or indirect interests in the BIII Portfolio Properties (other than the Pool 3 Properties) by any person other than Lender (including, without limitation, transfers by limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof or any other transfers or redemptions described above) and (B) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. There shall be no limits on Lender's ability to transfer its interests in any JV and in no event shall Lender be responsible for any associated transfer tax. **"BP REITs"** means the real estate investment trusts that are as of the date hereof the 100% owners of the equity interests in the Bridge B Mezzanine Borrowers.

No direct or indirect transfers of Broadway Funds' interest in the

participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers (except for transfers between or among the Broadway Funds and their wholly owned subsidiaries (so long as (i) they remain at all times wholly owned by the Broadway Funds, (ii) any such transfer would not result in an event of default under any senior loan, (iii) the transferee (but not with respect to any transfer between or among the Broadway Funds and their wholly owned subsidiaries) will be subject to the ROFR rights described below and (iv) Lender is given 5 business days prior written notice of any such transfer)), shall be permitted without the prior written consent of Lender in its sole and absolute discretion, except that, subject to Lender's right of first refusal described in this paragraph below, any such transfers may occur without Lender's prior written consent solely in connection with the liquidation of the Broadway Funds on or after February 6, 2018 (or February 6, 2016 or February 6, 2017, as the case may be, if, after the good faith use of commercially reasonable efforts, the managing member of the Broadway Funds is unable to obtain the applicable one year extension to the term of the Broadway Funds). Lender will have a right of first refusal ("**ROFR**") to purchase any of Broadway Funds' interest in the participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers, in any such case, prior to a sale thereof to a third party. Prior to causing any such sale, Broadway Funds shall provide written notice to Lender of its intent to sell any interest in the participation agreements with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrower, as applicable (the "**ROFR Notice**"), which ROFR Notice shall include the name and address of the prospective purchaser, the purchase price and all other economic and material non-economic terms of the proposed sale transaction, and shall offer to sell such interest to Lender on the same terms and conditions. Lender will have the right for 20 days after the date of the ROFR Notice to notify Broadway Funds in writing of its election to acquire such interest on the same terms and conditions set forth in the ROFR Notice (the "**ROFR Acceptance Notice**") for cash. If Lender sends such ROFR Acceptance Notice, the closing of such purchase by Lender shall occur within 45 days after the date of such ROFR Acceptance Notice. If Lender does not deliver an ROFR Acceptance Notice to Broadway Funds within 20 days after the date of the ROFR Notice, or if Lender rejects the terms and conditions of the ROFR Notice in writing to Broadway Funds within 20 days after the date of the ROFR Notice, then, in either case, Broadway Funds may cause the sale of such interest in such participation agreements, in the JVs, or in the Bridge B Mezzanine Borrowers, as the case may be, to the purchaser identified in the ROFR Notice for a price that is equal to or greater

18

than 96% of the purchase price set forth in the ROFR Notice and otherwise on the same economic and material non-economic terms specified therein for a period of 6 months after the date of the ROFR Notice. If the applicable interest is not sold within said 6 months, the foregoing process shall be repeated for any subsequent offer to purchase such interest. Within 5 days of the date of an ROFR Acceptance Notice, Lender shall deposit in escrow with Broadway Funds an amount equal to 10% of the purchase price. If Lender fails to provide such deposit or close in accordance with the ROFR Acceptance Notice, Broadway Funds shall have the right to retain the deposit as liquidated damages and Lender's ROFR rights will terminate solely with respect to the interest subject to such ROFR Acceptance Notice.

Subject to the last two sentences appearing in the third bullet point in the Section above entitled "Restructuring of the Mezzanine Loans," Lender's managing member equity interest in the JV will be acquired consensually via strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure. The Borrowers shall consent to (and the other Borrower Parties shall not object to or interfere with) this foreclosure or assignment in lieu of foreclosure. To accomplish this, at Lender's option, the Bridge B Mezz Loan may be transferred to a Lender owned single purpose entity and the Bridge B Mezz Loan will be consensually foreclosed upon in part via a strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure such that each Lender owned SPE will become the owner of 100% of the managing member interests of each JV. The common equity interests in the JV entities will remain with the applicable Broadway Funds controlled Bridge B Mezz Borrower and remain pledged to Lender as collateral for the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan.

The organizational documents of each JV entity will be amended and restated as directed by Lender such that the Lender (or its designee) shall be the sole managing member (the "**Managing Member**") of such entity and will have full right and authority to take all actions on behalf of the JV and will control the JV. The Managing Member shall have the right to amend the organizational documents of the JV Entities without the consent of the applicable Broadway non-managing member except that if any such amendment would have a material adverse effect on such Broadway member's interest in any such JV Entity and such material adverse effect would be materially disproportionate to the material adverse effect on the Managing Member's interest in such JV Entity, then the prior written consent of such Broadway member to such amendment shall be required to be obtained by Managing Member. In this regard, the Managing Member will have all powers and rights possessed by a general

19

partner of a partnership under Delaware law.    To the extent that Tranche A (Pool 1) is not sufficient to satisfy all capital needs of the Pool 1 Properties or Tranche A (Pool 2) is not sufficient to satisfy the capital needs of the Pool 2 Properties, Managing Member may at its option and in its discretion call capital from the common members of the JV.  Appropriate remedies for failure to fund capital calls will be set forth in the JV documents.

The Broadway Fund's only rights will be (i) to receive allocations of profits and loss and distributions as set forth herein, (ii) to prepare and propose, in its capacity as property manager, the budget for the Pool 1 Properties which budget shall be subject to the approval of the Managing Member, and to have non-binding consultation rights with respect to (x) any changes made to the Pool 1 Properties budget and (y) negotiations between Managing Member and the senior lenders with respect to the Pool 1 Properties, (iii) to prepare and propose, in its capacity as property manager, the budget for the Pool 2 Properties which budget shall be subject to the reasonable approval of the Managing Member and the Broadway Funds, and to have non-binding consultation rights with respect to negotiations between Managing Member and the senior lenders with respect to the Pool 2 Properties (clause (iii) is referred to as the **"Pool 2 Rights"**).  The budget for the Pool 2 Properties approved by Lender and the Broadway Funds as described in the immediately preceding sentence shall be referred to herein as the "Approved Budget".  Lender and the Managing Member shall, to the maximum extent permitted by law, have no fiduciary duties to the Borrower Parties or any JV.

The tax accountants for the JVs, the owners of the BIII Portfolio Properties and the Bridge B Mezzanine Borrower shall be any of (1) Anchin Block & Anchin, (2) The Cornerstone Group / Schonbraun Group or (3) PWC, the current accountants of the Broadway Funds, and any change in such accountants shall be subject to the prior written approval of Lender.

*Purchase Option:*    Lender shall have a purchase option to purchase on a property-by-property basis up to 49% of the equity interests in each Bridge B Mezzanine Borrower held by Broadway Partners or its affiliates, successors or assigns.  The purchase option shall be exercisable with respect to any such Bridge B Mezzanine Borrower in connection with or following the repayment of that portion of the Bridge A Mezz Loan allocable to the property owned indirectly by such Bridge B Mezzanine Borrower, and the organizational documents governing the Bridge B Mezzanine Borrowers shall be amended prior to the closing of the Transaction to provide that if such option is exercised, then Lender will automatically and without further action have the same managing member rights set forth above for the JV entities.

20

The Broadway Funds (or Lender as their attorney-in-fact for such purpose) shall execute any documents reasonably requested by Lender to evidence the foregoing, although no such documents shall be necessary. The total exercise price of the purchase option with respect to all of the Bridge B Mezzanine Borrowers shall be $1,000,000, and the exercise price with respect to each individual Bridge B Mezzanine Borrower shall be such Bridge B Mezzanine Borrower's pro-rata share of the Bridge A Mezz Loan based on the allocated loan amount for the property owned by such Bridge B Mezzanine Borrower under the Bridge A Mezz Loan as of the closing date of the Transaction. Lender shall be responsible for the payment of any transfer tax liability caused by (i.e., would not have occurred but for) Lender's exercise of the purchase option. In connection with the exercise of any purchase option, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III agree to reasonably cooperate with Lender in an effort to minimize any potential transfer tax liability.

***Property Management:***    Broadway Funds will continue to manage the BIII Portfolio Properties. Such management shall be pursuant to a contract satisfactory to Lender with a term not to exceed two years and a management fee to be agreed upon but not to exceed the lesser of (i) the current management fee and (ii) 2%. To the extent any fees payable to the manager either pursuant to leases or otherwise exceed the management fee, such excess shall be split 50-50 between Broadway Funds and Lender. Any such management agreement shall be terminable (i) in connection with the sale of the applicable property, (ii) for cause as defined in the management agreement and (iii) as described in Tranche A (Pool 1) and Tranche A (Pool 2) above. All leasing activities would be done through third party leasing agents satisfactory to Lender and, with respect to any Pool 2 Property, Broadway Funds. Broadway Funds shall have no management rights with respect to properties not listed in the first sentence of this paragraph. Nothing contained herein shall limit the ability of Lender to appoint a property or asset manager to advise Lender and assist Lender in exercising its rights with respect to the BIII Portfolio Properties. Notwithstanding anything to the contrary contained herein, Lender with 15 days prior notice may, in its sole and absolute discretion, terminate the management agreement and any other affiliate agreement related to any Pool 3 Property and 1000 Wilshire.

***Senior Loan Guaranties***    Except as expressly set forth in the next section below, all guaranties related to any senior debt and the Mezzanine Loans will stay in place; however Lender will indemnify Broadway Funds for any losses actually incurred by Broadway Funds because of a breach of a non-recourse carve-out caused solely by the actions of Lender following

21

the closing of the Transaction and Broadway Funds will indemnify Lender for (1) any losses actually incurred by Lender or its affiliates caused solely by the actions of Broadway Funds or its affiliates following the closing of the Transaction and (2) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. Any successor (or its parent if such entity is a single purpose entity) to Lender's managing member interest in any JV must assume Lender's indemnification obligations described above and Lender will be released from such indemnification obligations simultaneously with such assumption.

***Existing Broadway Fund, Fund Manager, Lawlor Guaranties, Capital Call Agreement, Capital Services and Financing Agreement and Omnibus Agreement***

At the closing of the Transaction, Lender shall terminate the following guaranties and deliver releases of the obligors thereunder: (1) that certain Amended and Restated Guaranty of Recourse Obligations (Lawlor) dated as of March 19, 2008 made by Scott Lawlor, (2) that certain Amended and Restated Guaranty of Payment (Fund Guaranty) dated as of March 19, 2008 made by Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund B III, L.P., and Broadway Partners Parallel Fund P III, L.P., (3) that certain Amended and Restated Guaranty of Payment (GP Guaranty) dated as of March 19, 2008 made by Broadway Partners Fund Manager, LLC, Broadway Partners Fund GP III, L.P., and Broadway Partners Fund GP II, L.P., (4) that certain Amended and Restated Capital Call Agreement dated as of March 19, 2008 by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP and Lehman Brothers Holdings Inc. (it being acknowledged and agreed, however, with respect to such Amended and Restated Capital Call Agreement, the additional reporting requirements set forth in Section 3.02 thereof shall be incorporated into the documents evidencing the Transaction), (5) that certain Amended and Restated Capital Services and Financing Agreement, dated as of March 19, 2008, by and among Broadway Fund Manager Sub, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc. and (6) that certain Omnibus Agreement, made as of March 19, 2008, by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc.

***Existing Guaranties of Recourse Obligations of***

The existing Guaranty of Recourse Obligations of Borrower for each of the Mezzanine Loans shall be reaffirmed by the guarantor

| | |
|---|---|
| ***Borrower Under Mezzanine Loans*** | thereunder as remaining in full force and effect as part of the Transaction, and shall be expanded to include the following matters as additional recourse carve-outs: (1) the bankruptcy of any Borrower Party or any Broadway Fund that is not initiated by or approved in writing by Lender, and (2) any interference, frustration, hindrance or delay by any Borrower Party or any Broadway Fund in connection with the exercise by Lender of its rights and remedies as managing member of the JVs and/or its rights and remedies under the participation agreements for the Mezzanine Loans, provided that a good faith claim for breach of an express (but not implied) contractual obligation contained in the participation agreements and/or JV agreements shall not constitute interference. Notwithstanding the foregoing, with respect to clause (1) above, other than with respect to a bankruptcy filing by Bridge B Mezzanine Borrower or any subsidiary thereof, recourse shall only be triggered if and to the extent such bankruptcy filing (a) is a default under any of the senior debt documents, (b) causes substantive consolidation with the Bridge B Mezzanine Borrower or any of its subsidiaries, (c) causes any interference with the cash management arrangements or cash flow related to the Mezzanine Loans or (d) causes any loss to Lender under the Mezzanine Loans. If and to the extent any of the recourse carve-out matters occur (including the additional matters above), the parties acknowledge and agree that Lender shall have the immediate right to (1) estimate its damages suffered as a result of the occurrence of any such recourse carve-out matter, and (2) offset such damage amount, it its discretion, against any and all participation interests in the Mezzanine Loans then held by the Broadway Funds. |
| ***ROFO:*** | Broadway Funds will have a right of first offer ("**ROFO**") to purchase any of the remaining BIII Portfolio Properties prior to a sale to a third party. Prior to causing the sale of any remaining BIII Portfolio Property, the Managing Member shall provide written notice of its intent to offer to sell any such remaining BIII Portfolio Property to Broadway Funds (the "**ROFO Notice**"). Broadway Funds will have the right for 20 days after the date of the ROFO Notice to submit a written offer to the JV to acquire the applicable BIII Portfolio Property (the "**Purchase Offer**") for cash. The Purchase Offer shall set forth all of the material terms of the proposed purchase, including the purchase price. If Managing Member desires to accept the Purchase Offer on behalf of the JV, it shall send a written notice (the "**Acceptance Notice**") to Broadway Funds within 15 days after the date of the Purchase Offer. The closing of such purchase shall occur within 45 days after such Acceptance Notice. If Managing Member does not deliver an Acceptance Notice within 15 days after the date of the Purchase |

23

Offer, or if an offer is submitted but is not accepted by Managing Member of the applicable JV, then Managing Member on behalf of the JV may cause the sale of such BIII Portfolio Property on behalf of the JV to any party for a price that is equal to or greater than 95% of the purchase price set forth in the Purchase Offer for a period of 9 months after the Purchase Offer. If the applicable BIII Portfolio Property is not sold within said 9 months, the foregoing process shall be repeated for any subsequent offer to sell such BIII Portfolio Property. The ROFO granted to Broadway Funds is personal to Broadway Funds and can not be assigned or transferred without the prior written consent of Managing Member.

Within 5 days of its receipt of an Acceptance Notice, Broadway Funds shall deposit in escrow with Managing Member an amount equal to 10% of the purchase price. If Broadway Funds fails to provide such deposit or close in accordance with the applicable Purchase Order, Managing Member shall have the right to retain the deposit as liquidated damages and Broadway Funds' ROFO rights will terminate with respect to all BIII Portfolio Properties.

***Closing Conditions:***    Notwithstanding anything to the contrary contained in the Agreement or this Term Sheet, Lender shall not be obligated to close the Transaction without satisfying the following conditions precedent: (1) Lender's internal approval process, including approval by Alvarez & Marsal, (2) Lender's completion of satisfactory due diligence, (3) the entering into of acceptable Transaction documents, all in form reasonably acceptable to Lender, (4) title searches and endorsements reasonably acceptable to Lender, (5) opinion letters reasonably acceptable to Lender, (6) (a) with respect to the Pool 1 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 1 Properties acceptable to Lender and (b) with respect to the Pool 2 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 2 Properties acceptable to Lender and Broadway Funds, (7) receipt by Lender of an updated business plan for the period through and including June 30, 2010 for all of the Properties acceptable to Lender, (8) the consent of the holder of the senior debt to the extent required under any intercreditor agreement, and (9) all necessary approvals in connection with Lender's bankruptcy case, including, without limitation, the approval of the Bankruptcy Court of the Southern District of New York (which Court approval shall include any indemnification obligations of Lender pursuant to the Transaction).

24

| | |
|---|---|
| ***Costs and Expenses:*** | The Borrowers or the Broadway Funds shall pay, whether or not the Transaction closes, all reasonable out-of-pocket costs and expenses in connection with the Transaction, including without limitation, the reasonable fees and disbursements of Lender's counsel. |
| ***Expense Deposit:*** | $400,000 will be provided by Broadway Funds to Lender along with a countersigned copy of the Agreement. This will be applied to the expenses but may not constitute the entirety of the expenses. |
| ***Miscellaneous:*** | This Term Sheet, as well as Transaction generally, shall be governed by the laws of the State of New York. |
| ***Closing Date:*** | Closing shall occur on or prior to June 26, 2009 or such later date approved by Lender in its sole and absolute discretion. Time is of the essence. |
| ***Assignment:*** | The right by Broadway Funds to receive the participations in the Mezzanine Loans can be assigned by Broadway Funds to wholly owned subsidiaries of the Broadway Funds (so long as they remain wholly owned subsidiaries of the Broadway Funds at all times) in such proportions as may be determined by the Broadway Funds in their sole discretion. |

## SCHEDULE I

## BRIDGE A MEZZANINE BORROWER[1]

| |
|---|
| Broadway Wall Junior Mezz LLC |
| Broadway Greensboro Junior Mezz LLC |
| Broadway Howard Street Junior Mezz LLC |
| Broadway Huntington Junior Mezz LLC |
| Broadway Legato Junior Mezz LLC |
| Broadway Wilshire Junior Mezz LLC |
| Broadway California Street Junior Mezz LLC |
| Broadway State Junior Mezz LLC |
| Broadway BCCC Junior Mezz LLC |
| Broadway Beale Junior Mezz LLC |
| Broadway Sansome Junior Mezz LLC |

---

[1] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

## SCHEDULE II

## BRIDGE B MEZZANINE BORROWER[2]

| |
|---|
| Broadway Wall Junior Two Mezz LLC |
| Broadway Greensboro Junior Two Mezz LLC |
| Broadway Howard Street Junior Two Mezz LLC |
| Broadway Huntington Junior Two Mezz LLC |
| Broadway Legato Junior Two Mezz LLC |
| Broadway Wilshire Junior Two Mezz LLC |
| Broadway California Street Junior Two Mezz LLC |
| Broadway State Junior Two Mezz LLC |
| Broadway BCCC Junior Two Mezz LLC |
| Broadway Beale Junior Two Mezz LLC |
| Broadway Sansome Junior Two Mezz LLC |

---

[2] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

14998975.36

## <u>SCHEDULE III</u>

## <u>ACCOUNTS PAYABLE NOT TO BE SATISFIED PRIOR TO CLOSE</u>

TO BE SATISFACTORY TO LENDER AND COMPLETED BY BORROWER PARTIES

## SCHEDULE IV

To the extent that prior to closing Broadway Funds have not provided documentation reasonably satisfactory to Lender that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder, the terms described below will apply:

- Lender will be entitled to receive 90% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 10% of the distributions on Tranche B (Pool 1).

- Lender will be entitled to receive 80% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 20% of the distributions on Tranche C (Pool 1).

- Lender will be entitled to receive 85% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 15% of the distributions on Tranche B (Pool 2).

- Lender will be entitled to receive 75% of the distributions on Tranche C (Pool 2) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche C (Pool 2).

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 1) ($2,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 1) and Tranche C (Pool 1) shall be reduced to 0%.

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 2) ($12,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 2) and Tranche C (Pool 2) shall be reduced to 0%.

- At any time after the Lockout Period, Lender may, on 15 days prior written notice to Broadway Funds, terminate any management agreement or other affiliate agreement related to any Pool 2 Property.  "Lockout Period" means the number of months after the date the Transaction closes that Lender estimates that no capital calls will be needed as a result of Broadway Funds initial capital contributions on such closing date.

2