**Hearing Date: June 24, 2009, 10:00 a.m.**
**Objection Deadline: June 5, 2009, 4:00 p.m.**

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                                                          Debtors. | Chapter 11 Case No.<br><br>08-13555 (JMP)<br><br>(Jointly Administered) |

**OBJECTION OF BARCLAYS CAPITAL INC. TO**
**DEBTORS' MOTION FOR AN ORDER UNDER RULE 2004**
**AUTHORIZING DISCOVERY OF BARCLAYS CAPITAL INC.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Barclays Capital Inc. ("Barclays") respectfully objects as follows to the motion of

Lehman Brothers Holdings Inc. ("LBHI") for an order pursuant to Federal Rule of Bankruptcy

Procedure 2004 authorizing it to conduct certain discovery of Barclays (the "Motion," Case No.

08-13555, Docket No. 3596). Terms defined in the Motion have the same meaning below.

**PRELIMINARY STATEMENT**

1.        In what amounts to a wholesale attack on this Court's Order approving the Sale

Transaction, LBHI seeks wide-ranging discovery of Barclays concerning "whether the estate

received appropriate value" in the Sale Transaction that LBHI itself negotiated and this Court

approved.  Motion ¶ 1.  LBHI claims it needs this discovery "to understand the complex and expedited Sale Transaction," so it can develop "potentially valuable claims and causes of action."  Motion ¶ 35.

2.     The discovery cannot possibly benefit the Estate because the potential claims have no merit and the Estate already has access to any information it reasonably could need. LBHI claims that Barclays may not have made bonus payments to Transferred Employees (Motion ¶¶ 15-16) and "cure payments" to contractual counterparties (Motion ¶ 17) in amounts purportedly required by the APA.  But the APA did not require Barclays to pay specific dollar amounts in bonuses and cure payments.  While it obliged Barclays to make certain *categories* of payments, it did not specify precise dollar amounts for either bonuses or cure payments – and it obviously would not have been possible to do so in the exceptionally short time period leading up to the Sale Transaction.  Instead, LBHI presented this Court with *estimates* of these numbers, which were always represented to be estimates and never as specifically required amounts.  In any event, it could not benefit the Estate to investigate and attempt to develop claims concerning bonus and cure payments because those amounts (even if owed) would not be owed to the Estate. Further, and more importantly, the Clarification Letter clearly provides that neither Barclays nor the Estate is entitled to any purchase price adjustment.

3.     Most fundamentally, LBHI should not be permitted discovery to explore a potential claim regarding the "fairness of the consideration."  In its Order approving the Sale, this Court specifically found that the consideration was fair, and that the transaction was entered into in good faith and was in the interest of the Estate.  Those findings were based on representations and evidence proffered by *LBHI's own counsel*, who explained that the consequences of denying the transaction would be catastrophic to the entire financial system, that

Barclays was the only eligible acquirer and made the "highest and best offer," and that the

Lehman assets being acquired were losing millions of dollars in value every day. 9/19/08

Hearing Tr. 146:13-15, 145:5-9, 145:25, 46:19-47:4 (Excerpts of the 9/19/08 transcript are

attached as Exhibit 1). Under these circumstances, a transaction was structured that allowed

Lehman's core broker-dealer operations to be funded by Barclays and to continue to operate,

thereby saving thousands of jobs and ensuring the survival of a critical counterparty in

innumerable transactions. At the request of the Federal Reserve and LBI, Barclays advanced $45

billion pursuant to a tri-party repurchase agreement to fund LBI's operations *before* Barclays

even had any assurances as to whether the transaction would ultimately be approved, and at a

time when the securities underlying that repurchase agreement were rapidly deteriorating in

value. Thereafter, and in reliance on this Court's Sale Order, Barclays also ultimately paid (in

addition to the $45 billion) approximately $1.29 billion for real estate, transferred $250 million

to The Depository Trust & Clearing Corporation ("DTCC") to cover LBI trading activities, and

assumed other liabilities of uncertain amounts – all despite considerable uncertainty regarding

the value of the assets Barclays was acquiring and whether Lehman employees would transfer

their employment to Barclays. There is no basis for alleging that Barclays has failed to comply

with any of the terms of this transaction, much less for requesting that the entire transaction be

reexamined, reevaluated, and "re-traded" as LBHI proposes.

4.    Despite Barclays' attempts to cooperate with LBHI, LBHI has refused to meet

with Barclays executives concerning these issues and LBHI's special counsel abruptly

terminated ongoing meet and confer discussions in order to file this motion. While Barclays

objects to the exceptional burden posed by LBHI's requests and although LBHI already has

access to much of the information it asks Barclays to produce, Barclays is willing to provide

3

LBHI with responsive documents that Barclays intends to produce in response to the ongoing investigation by the Examiner, subject to any objections the Examiner may have and the execution of a confidentiality stipulation patterned on the stipulation entered into between Barclays and the Examiner. In particular, Barclays will produce documents sufficient to show the amounts it has paid in bonus and other compensation, and the amounts it has paid in contractual "cure payments." LBHI already has direct, independent access to much of this and other information it seeks.

5.      To obtain a discovery Order under Rule 2004, LBHI is required to establish "good cause." It has failed to do so. Rule 2004 does not permit discovery that is enormously burdensome, irrelevant to any legitimate issue involving the estate, sought solely in order to explore facially meritless claims, or which seeks information that is already available to the movant. For these reasons, set forth in more detail below, LBHI's motion should be denied.

## BACKGROUND

6.      LBHI inaccurately asserts that its document demands have been outstanding for months and that it brought this motion because of stonewalling by Barclays. Motion ¶¶ 21-29. The chronology of communications between LBHI and Barclays flatly contradicts that assertion.

7.      In a letter dated February 19, 2009, Bryan Marsal, on behalf of LBHI, wrote to Barclays and first raised the cure and bonus claims. Motion Ex. B. The letter alleged "discrepancies" between Barclays' payment obligations under the APA and actual payments made by Barclays, and suggested that LBHI would seek a "reduction [sic] in the purchase price for the business." *Id.*

8.      Barclays responded to Mr. Marsal's letter on February 23, 2009. In that response, Barclays made clear that it was willing to meet with Mr. Marsal to discuss the factual matters

4

raised in his letter, but also made clear that Barclays "reject[s] any suggestion that there is a basis for any adjustment to the APA" or otherwise requiring payment by Barclays to Sellers. Motion Ex. B. Barclays also encouraged LBHI to coordinate with the Examiner to avoid piecemeal and duplicative requests. Motion Ex. B.

9.      Mr. Marsal never responded to the February 23, 2009 letter, and never met with Barclays. Instead, Mr. Marsal's letter somehow became the subject of a March 5, 2009 front-page article in *The Financial Times*.[1]

10.      On April 13, 2009, Barclays received a letter from that Jones Day demanding wide-ranging discovery. Motion Ex. C. This letter appeared to go far beyond the scope of retention the Court had approved for Jones Day, and it also appeared that Jones Day had a conflict of interest, as it had previously indicated it represented Barclays in certain matters. After this was pointed out to Jones Day by Barclays, Motion Ex. D, Jones Day clarified in a letter dated April 24, 2009, that LBHI would apply to expand the scope of Jones Day's retention and would correct Jones Day's previous disclosure that the firm was acting as counsel to Barclays. Motion Ex. E.

11.      In response, Barclays' counsel indicated a willingness to meet and confer with Jones Day concerning the scope of its demands. That meeting occurred on May 8, 2009, at the Jones Day offices. After internal deliberations following that meeting, Barclays' counsel informed Jones Day that Barclays would soon propose a draft confidentiality agreement and was willing to consider making a limited production on certain conditions. One of those conditions was that principals of LBHI and Barclays would meet to discuss the potential LBHI "claims" after that initial limited production.

---

[1] *See* Barclays Questioned on Funds, by Francesco Guerrera, Greg Farrell and Julie MacIntosh, March 5, 2009, *available at* http://www.ft.com/cms/s/0/d22cf3a2-0909-11de-b8b0-0000779fd2ac.html.

12.    Rather than agree to a meeting of principals and to have counsel continue the meet and confer process, LBHI abruptly cut off discussions and filed its motion on May 18, 2009. The financial press immediately and extensively reported on LBHI's claim that Barclays had received a windfall in the transaction and might face a substantial purchase price adjustment.

## ARGUMENT

13.    This court should deny LBHI's motion. The requested discovery is overbroad and unduly burdensome, particularly given LBHI's nebulous and meritless claims and Barclays' willingness to produce more than sufficient information to satisfy any legitimate inquiry.

14.    It is well-established that a Rule 2004 discovery motion should be denied unless the movant can establish "good cause" for the requested discovery. *See In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) ("[T]he Bankruptcy Court was required to make a finding of good cause in order to uphold its Rule 2004 order."); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998). A showing of "good cause" requires that the discovery sought is necessary to establish a legitimate claim by the party seeking the discovery, or that the denial of such discovery would cause the movant undue hardship or injustice. *In re Express One Int'l, Inc.*, 217 B.R. at 217. Courts apply a balancing test in determining whether the "good cause" showing has been met, "weighing the relevance of and necessity of the information sought by the examination." *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (citing *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991)).[2]

---

[2] *See also In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) ("[A] totality of circumstances approach is required [in assessing Rule 2004 motions], taking into account all relevant factors."); *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985) (the party seeking 2004 discovery "bears the burden of proving that good cause exists for taking the requested discovery"); *In Re Silverman*, 36 B.R. 254, 258 (Bankr. S.D.N.Y. 1984) (it is the movant's "duty to make a showing of good cause").

A.    **The Court Should Deny LBHI's Unreasonably
Overbroad And Unduly Burdensome "Background" Requests.**

15.    LBHI has proposed eight different document requests (Requests 1-7, and Request

20) seeking what its Motion refers to as "general background information concerning the Sale

Transaction, the parties' negotiations, disclosures made to the Court, and the difficult financial

situation in which Lehman found itself immediately before the bankruptcy filings." Motion ¶ 37.

16.    Seven of these eight requests should be denied as seeking an exceptionally broad

array of information that is completely irrelevant to anything LBHI even purports to be

investigating. The sole exception is Request 20, which asks for a production of information that

Barclays has produced to the Creditors' Committee. Barclays consents to that request, subject to

an appropriate confidentiality stipulation.

17.    Barclays objects to Requests 1 – 7. These Requests are wholly unjustified, as

they ask for an extraordinary quantity of information that is not relevant to the claims LBHI

purports to be investigating, and because it is not necessary to provide any "background"

information. The Examiner is already charged with investigating matters relating to the

background to the Sale Transaction, and it is well-established that Rule 2004 motions should be

denied when they will be duplicative of ongoing investigations. *See In re Buick*, 174 B.R. 299,

305 (Bankr. D. Colo. 1994) (courts are "reticent to open the door to Rule 2004 examinations

which might be identical to or duplicative of existing discovery needs and activities of other

interested parties"); *see also In re Kreiss,* 46 B.R. 164, 165 (Bankr. E.D.N.Y.1985) (2004

discovery is inappropriate unless the necessity of the examination outweighs the "inconvenience

and intrusion to the witness").

18.    The only argument LBHI provides to justify these requests is to contend it is at a

"severe disadvantage" in "trying to reconstruct the discussions between LBHI and Barclays"

7

because many of its former employees are now employed by Barclays, and therefore it needs this "background information to allow the Debtor to fully understand what happened during these critical two weeks in September 2009 [sic]." Motion ¶ 37. No further explanation is given.

19.    LBHI is not at a "severe disadvantage." To the contrary, it has access to more than enough information "to reconstruct" what happened. *First*, Barclays has consented to allow LBHI direct access to Lehman records archived by Iron Mountain, an electronic and hard copy storage facility, where all Lehman communications concerning the negotiations through the September 22, 2008 closing date are stored. LBHI has, in fact, been actively accessing those documents on its own timetable. Through the process established by the Transition Services Agreement, LBHI has direct access to wide-ranging systems, databases and electronic platforms that allow for user-friendly searches and the ability to extract information on particular topics. *Second*, LBHI has interviewed numerous former Lehman employees and obtained many documents from them, including hard copy documents. Barclays has requested copies of the documents that LBHI gathered in this process, but has still not received them. *Third*, subject to a confidentiality stipulation and resolution of any concerns raised by the Examiner, Barclays will voluntarily provide LBHI with copies of all documents produced to the Creditors' Committee and material produced to the Examiner that is responsive to LBHI's requests. *Fourth*, Alvarez & Marsal and LBHI's counsel (Weil Gotshal and Simpson Thacher) participated directly in negotiations between September 15 through September 22, 2008, and are fully familiar with "the discussions between LBHI and Barclays." LBHI obviously has full and unfettered access to Weil Gotshal, Simpson Thacher and Alvarez & Marsal.

20.    Rule 2004 discovery is inappropriate where, as here, the party seeking discovery already has access to the information. *See In re Symington*, 209 B.R. 678, 688 (Bankr. D. Md.

1997) (Rule 2004 discovery inappropriate "where the information purportedly sought is either already well-known or within the would-be examiner's possession.").

21.      LBHI thus provides no reasonable basis for claiming that it needs more "background" information than it already has direct access to or will otherwise receive from Barclays voluntarily.  Requests 1 – 7 should be denied.

**B.      The Court Should Deny LBHI's Discovery Concerning Bonus Payments To Transferred Employees.**

22.      LBHI demands four broad categories of documents (Requests 8 – 12) concerning whether Barclays has made appropriate bonus payments to Transferred Employees.  These requests should be denied because (1) there is no basis for alleging that Barclays has failed to fulfill its obligation to make the bonus payments to Transferred Employees that were required under the APA, and (2) Barclays will provide information sufficient to show exactly how much was paid with respect to compensation-related liabilities, including bonus, severance, and other compensation-related payments.

23.      LBHI suggests that Barclays had an obligation to pay $2 billion in bonus payments to Transferred Employees, and asserts that Barclays has not paid this amount.  Motion ¶¶ 15-16.  It therefore seeks discovery to explore this supposed "discrepancy."

24.      But Barclays did not assume an obligation to pay $2 billion in bonus payments. The record establishes that the $2 billion figure was provided by LBHI and its counsel solely as an *estimate* of the potential *exposure* that Barclays was agreeing to assume for all compensation-related liabilities (including but not limited to bonuses).  *See* paragraph 30, below, quoting 9/19/08 Hearing Tr. 99:22-25 (Exhibit 1).

25.      Section 9.1 of the APA sets forth three types of obligations Barclays agreed to assume with respect to compensating former Lehman employees.  (Relevant excerpts of the APA

are attached as Exhibit 2.)  Because the scope of each such obligation depended on unknown factors, LBHI necessarily estimated the exposure that Barclays was assuming.

26.    First, Barclays agreed "to continue to employ" or to "offer employment to" every single employee "employed primarily in connection with the Business at the Closing" (i.e., essentially all of the employees of Lehman's North American investment banking and brokerage business).  APA § 9.1(a).  Because only those former Lehman employees who accepted that offer or whose employment transferred automatically would be considered "Transferred Employees," *id.*, the number of Transferred Employees – and thus the scope of Barclays' obligations under § 9.1(a) – was necessarily uncertain when the Sale Transaction was being finalized.

27.    Second, Barclays agreed that if it terminated any Transferred Employees between the Closing and December 31, 2008, it would pay "severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to provisions of the Seller's severance plans or agreements covering such Transferred Employees as in effect immediately prior to the Closing."  APA § 9.1(b).  Because the number of Transferred Employees who would be terminated was unknown, the scope of Barclay's liability under this provision was likewise inherently uncertain.

28.    Finally, in addition to regular compensation and severance payments, Barclays agreed to pay bonuses to the Transferred Employees in accordance with Section 9.1(c), which provides that Barclays "shall … pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the

'Accrued 08 FY Liability')."  Neither Section 9.1(c) nor the financial schedule delivered to

Barclays specifies a minimum dollar amount of total 2008 bonuses that Barclays was required to

pay to Transferred Employees.  Section 9.1(c) provides only that Barclays shall pay the total

"bonus pool amounts *accrued* in respect of amounts payable for incentive compensation" for the

2008 Fiscal Year.  APA § 9.1(c) (emphasis added).  That "accrued" amount was not known at

the time of the transaction, and hence no dollar amount was specified in the APA or the financial

schedule.

29.    Critically, the financial schedule referenced in Section 9.1(c) does not contain a

line item for "bonuses."  Motion Ex. A.  Instead, the schedule, which LBHI never attached to the

APA or filed with the Court, consists of an estimated balance sheet with certain, summary entries

listed under "Assets" and "Liabilities."  Under the heading "Liabilities," there is an entry for

"Comp" with a corresponding number of "2 0."  Based on that line, LBHI suggests that Barclays

was somehow obligated to pay the Transferred Employees a total of $2 billion solely in *bonuses*.

The schedule cannot reasonably be read to suggest that.  First, the entries on the schedule are

clearly LBHI's *estimates,* and LBHI does not seriously contend otherwise.  Second, under

LBHI's reading, the other compensation to Transferred Employees – their base compensation

and severance payments – would be missing completely from the schedule.  There is therefore no

basis for suggesting, as LBHI does, that APA § 9.1(c) required Barclays to pay $2 billion in

bonuses to the Transferred Employees.

30.    Moreover, while LBHI argues that this Court "relied upon" the $2 billion figure,

the hearing transcripts  to which LBHI refers only serve to confirm that the $2 billion number

was an estimate of total compensation-related exposures, not a specific, minimum obligation

solely for bonuses.  For example, at the September 19, 2008 hearing, LBHI's counsel made the

11

following representation to the Court: "Barclays will also assume **exposure** for the employees

that accept offers of employment, which is **estimated to have a value of approximately—an**

**exposure of approximately two billion dollars.**" 9/19/08 Hearing Tr. 99:22-25 (emphasis

added) (Exhibit 1). At no time did LBHI's counsel describe the $2 billion figure as anything

other than an "estimate" of approximate total "exposure" in connection with Transferred

Employees. That "exposure" takes into consideration not only bonus payments, but also base

salaries and severance payments and other compensation-related payments and liabilities. Thus,

the representations to the Court by LBHI's counsel regarding the "estimated" "exposure" of

"approximately" $2 billion confirm that the "Comp 2 0" entry on the schedule LBHI delivered to

Barclays was also an *estimate* of *total* compensation-related liabilities, not merely of *bonuses*.

31.    Moreover, the potential bonus claim could not benefit the Estate. If LBHI intends

to seek a purchase price adjustment, it is directly barred from doing so by the Clarification

Letter, which specifically provides that there shall be no purchase price adjustment. *See*

Clarification Letter dated as of September 20, 2008 (executed at the September 22, 2008 closing)

(the "Clarification Letter") ¶ 9. (The Clarification Letter is attached as Exhibit 3.).

32.    Because the "potential claim" with respect to bonus payments covered by Section

9.1(c) is thus meritless, there is no basis for discovery under Rule 2004.

33.    Although the bonus claim is meritless, in an attempt to cooperate with LBHI,

Barclays has offered to produce aggregate compensation data concerning the Transferred

Employees. Barclays remains willing to produce that information voluntarily.

34.    LBHI's Requests 8-12, however, go far beyond what LBHI could conceivably

need in order to assess its meritless claim. Motion Ex. F. For example, Request 8 calls for "*all*

documents" concerning negotiation and payment of *all* forms of compensation to *all* former

Lehman employees. *Id.* Requests 10 and 11 call for *every* communication concerning

compensation between Barclays and 16 former Lehman executives, even though LBHI already

has direct access to all communications by and to those 16 individuals while they were employed

by Lehman and through the September 22, 2008 closing date. *Id.* Request 12 calls for *all* of

Barclays' internal accounting documents concerning *all* forms of compensation paid or owing to

former Lehman executives. Motion Ex. F. These requests are extremely burdensome and

wholly unjustified, and should be denied.

### C.    The Court Should Deny LBHI's Proposed Discovery Concerning Cure Payments To Counterparties Of Assumed Contracts.

35.     LBHI's discovery demands concerning cure payments should be denied because

(1) the potential claim has no merit, (2) LBHI already has most of the relevant information, and

(3) Barclays has already agreed to provide more information than could reasonably be requested

on this matter.

36.     LBHI's suggested claim relating to "cure payments" cannot be squared with the

plain text of the APA. Nor does it have any other merit or justification. Section 2.5 of the APA

provides that "[f]or a period of 60 days after the Closing," Barclays shall have the right "to

designate any contract related to the assets purchased from the Seller" as a "Purchased Contract."

Upon such designation, Barclays became "obligated to pay or cause to be paid the cure amount

in respect of such Purchased Contract." The APA makes no reference to any obligation to make

mandatory aggregate, or any particular, cure payments at any specified level. *See* Exhibit 2.

37.     Although § 2.5 of the APA does not even reference the financial schedule

delivered to Barclays on September 16, 2008, LBHI relies entirely upon that schedule to suggest

that Barclays had assumed an obligation to pay a specific dollar amount of cure payments. The

schedule has an entry entitled "Cure pmt" with a corresponding number of "2 25." As explained

above, the amounts on this schedule were clearly estimates prepared solely by LBHI. Moreover, there is no contractual language anywhere in the APA to suggest that this line of the schedule establishes a mandatory minimum level of total, or any particular, cure payments that Barclays must make. To the contrary, given that Section 2.5 of the APA provides that Barclays had 60 days *after* the Closing to designate Purchased Contracts, it makes no sense for Barclays to have been obligated *at the time of the Closing* to assume contracts with minimum aggregate cure payments of a specified amount.

38.    LBHI also suggests that Barclays misled the Court concerning future cure payments in seeking approval of the Sale. Motion ¶¶ 2, 9, 17. The transcripts from the September 17, 2008 and September 19, 2008 hearings contradict that assertion. At the September 17 hearing, LBHI's counsel stated that, "the cure amounts and other payments in connection with the contracts, **are estimated to be** a billion five hundred million dollars." 9/17/08 Hearing Tr. 24:2-4 (emphasis added). (Excerpts of the 9/17/08 transcript are attached as Exhibit 4.) At the September 19 hearing, LBHI's counsel, describing the proffered testimony of LBHI executive Bart McDade, stated that, "Barclays is also assuming the cure amounts relating to contracts and leases that will be assumed pursuant to the asset purchase agreement. And that has **potential exposure**, Your Honor, of 1.5 billion dollars that he would testify to." 9/19/08 Hearing Tr. 100:1-4 (emphasis added) (Exhibit 1). Neither LBHI's counsel nor Barclays' counsel ever suggested that Barclays was assuming a fixed or mandatory aggregate cure obligation of either $1.5 billion or $2.25 billion, as LBHI now asserts. The statements by LBHI's own counsel at the September hearings are consistent with a plain reading of the APA. They also confirm that the schedule provided to Barclays on September 16, 2008 reflects nothing more than an estimate of potential cure payments. Moreover, even if there were merit to LBHI's

14

suggestion that Barclays had not paid all cure payments owed under Section 2.5 of the APA, the

parties expressly agreed they would not have the right to a purchase price adjustment. *See*

Exhibit 3, ¶ 9.

39.    As a result of the process by which contracts are assumed and cure payments

made, LBHI should already have the relevant information.  Nevertheless, in negotiations

concerning the scope of LBHI's discovery demands, Barclays indicated that it was willing to

consider providing aggregate information concerning Purchased Contracts and cure amounts

owed and paid under those contracts.  LBHI prematurely terminated the meet and confer process,

but Barclays remains willing to produce that information voluntarily.

40.    In particular, Barclays is willing to produce information sufficient to show the

cure amounts that have been paid.  That is all that can reasonably be expected on this issue.  By

contrast, LBHI's requests 13-15 are far too burdensome.  Motion Ex. F.  For example, Request

13 calls for "*all* documents" concerning *all* contracts that Barclays assumed and under which it is

paying cure amounts.  *Id.*  Similarly, Request 14 calls for "*all* documents" concerning Barclays'

decisions with respect to *all* Lehman contracts, not just those that Barclays assumed.  *Id.*

Request 15 seeks "all documents" concerning Barclays' "accounting, valuing, expensing and

accruing" of contract cure payments.  These Requests are overbroad, unduly burdensome, and

seek irrelevant information.  The information sought has no conceivable bearing on whether

Barclays complied with APA § 2.5.  Requests 13-15 should be denied.

**D.    There Is No Basis For Allowing LBHI's Proposed
Discovery Regarding The Repurchase Agreements
Or The General Fairness Of The Sale Transaction.**

41.    In addition to the foregoing specific claims, LBHI proposes a broader challenge to

the Sale Order, asserting that sweeping discovery is necessary to evaluate whether the

consideration for the Sale Transaction was fair and adequate. Motion ¶¶ 2, 9, 10, 18-20. In particular, this discovery appears focused on "certain repurchase agreements." *Id.* ¶ 10, 18.

42.     There is no basis now for LBHI to challenge this Court's prior findings, as reflected in the Sale Order, that the consideration was fair and that negotiations were at arm's length. *See* Sale Order (attached as Exhibit 5) at page 5 finding J; page 6 findings L and M; and pages 18-19 paragraphs 18 and 19. LBHI itself proffered evidence at the September 19, 2008 hearing that the negotiations were "at arms length, difficult and aggressively negotiated by the parties" and that Barclays' offer was the "highest and best offer for these assets." *See* paragraph 54 below.

43.     First, this Court and other courts have recognized the important policy reasons for protecting the finality of orders approving sales out of bankruptcy and have therefore enforced protections against unwarranted hindsight attacks on such court-approved transactions. *See, e.g.*, *In re HHG Corp.*, No. 01-B-11982, 2006 WL 1288591, at *2 (Bankr. S.D.N.Y. May 2, 2006) ("As a matter of public policy, sale orders entered under section 363(b) of the Bankruptcy Code are accorded a heightened degree of finality in order to prevent precisely the sort of chaos that Movants seek to create – namely, 'the chance the purchasers will be dragged into endless rounds of litigation to determine who has what rights in the [purchased] property.'") (quoting *In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986)); *In re Clinton Street Food Corp.*, 254 B.R. 523, 530-31 (Bankr. S.D.N.Y. 2000) (emphasizing the important public policy favoring the finality of orders transferring ownership of bankruptcy estate assets); *see generally In re Frankel*, 191 B.R. 564, 571-72 (Bankr. S.D.N.Y. 1995) (explaining that bankruptcy courts generally uphold sales to maintain the "stability and the integrity of the process," and holding that "[o]nly fundamental errors or compelling equities arising out of fraud, mistake or like infirmity, such as defective

16

notice to interested parties of the sale or 'grossly inadequate' sales price, justify setting aside a confirmed sale") (quoting *Matter of Chung King, Inc.*, 753 F.2d 547, 551 (7th Cir. 1985)).[3]

44.     Second, the unique circumstances surrounding the Sale Transaction make it especially inappropriate to allow LBHI to challenge this transaction. By entering into the Sale Transaction, Barclays took an enormous financial risk, conferred substantial benefits upon the Estate and the public, and acquired assets of highly uncertain value. Among other things, Barclays faced a considerable risk that many of the assets it acquired would turn out to be worth far less than Lehman represented and that Barclays might not be able to retain key executives and other personnel essential to operating and generating value from the assets Barclays was acquiring.

45.     The days leading to Barclays' acquisition were tumultuous and the acquisition occurred at a time of extreme economic uncertainty. Before the sale transaction was even approved, Barclays was required to advance $45 billion to step into the shoes of the Federal Reserve and provide funding for LBI's operations under a tri-party repurchase agreement – at a time of extraordinary market volatility when the securities underlying that repurchase agreement were rapidly declining in value. Moreover, LBHI's own Sale Motion established that Barclays was the only viable purchaser of the assets associated with Lehman's North American brokerage and investment banking business. Sale Motion at ¶¶ 6-8, 11, 24 (attached as Exhibit 6). At the sale approval hearing, LBHI's counsel explained that there were only a few possible buyers with the financial ability to acquire and operate those assets, stressing that no other acquirer with "sufficient liquidity to operate the business without jeopardizing customer accounts" had come

---

[3] Since its entry, the Sale Order has been affirmed by the district court. *See* Opinion and Order dated March 13, 2009 (D.I. 18 in *Bay Harbour Mgmt., L.C. et. al. v. Lehman Bros. Holdings Inc.*, Case No. 1:08-cv-8869 (DLC)). Although an appeal was taken to the Second Circuit, that appeal has since been dismissed by an order dated May 23, 2009.

forward. 9/19/08 Hearing Tr. 101:15-17 (Exhibit 1). LBHI's counsel also stressed the urgency

of the transaction in order to preserve the value of the business, save the jobs of thousands of

individuals working in the business, and prevent further turmoil and panic in the financial

markets. 9/19/08 Hearing Tr. 101:23-103:7 (Exhibit 1); *see also* Exhibit 4, 9/17/08 Hearing Tr.

18:18-22 (LBHI counsel explaining that consummation of a transaction "would protect the

public interest, stabilize the public markets and offer some assurance to employees.").

46.    As LBHI's own counsel emphasized at the time, the LBI brokerage business was

on the verge of a meltdown. 9/19/08 Hearing Tr. 101:23-103:7; 238:12-243:19; 244:11-245:3

(Exhibit 1). Without an acquisition by a well-capitalized financial institution, the business could

not be sustained. *Id.* Loss of customer and market confidence in the ability of the business to

meet its obligations would have been devastating. *Id.* Thousands of employees would have lost

their jobs and the inherent value of the brokerage and investment banking business would have

melted away rapidly. *Id.* As it was, Lehman's assets were losing millions of dollars in value by

the day. 9/19/08 Hearing Tr. 46:19-47:4 (Exhibit 1).

47.    This Court approached those concerns based on a deliberate, informed and serious

assessment of the transaction and the consequences of not approving the transaction, stressing

the potential harm to the debtor, its estates, customers and the economy generally:

> "We must close this deal this weekend not because the markets demand it,
> although that's certainly a part of it. Lehman Brothers became a victim. In effect,
> the only true icon to fall in the tsunami that has befallen the credit markets. And
> it saddens me. I feel that I have a responsibility to all the creditors, to all of the
> employees, to all of the customers and to all of you. Arguments have been made
> this evening by objectors, some questioning whether or not if I were to delay
> approval another better transaction might be realized or discovered. And that's a
> preposterous notion. As I said on Wednesday, it's very apparent to me that for a
> transaction of this sort to happen, only Barclays can do it. Only Barclays has the
> support of the regulators. Only Barclays is prepared to close. Only Barclays can
> deliver the customer accounts to safe harbors. And the customer property, which

18

is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale.

* * *

I am completely satisfied that I am fulfilling my duty as a United States bankruptcy judge in approving this transaction and in finding that there is no better or alternative transaction for these assets, that the consequences of not approving a transaction could prove to be truly disastrous. And those adverse consequences are meaningful to me as I exercise this discretion. The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable. Moreover, it's not just about avoiding harm. Approving the transaction secures whether for ninety days or for a lifelong career employment for 9,000 employees at Lehman, and holds together an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy.

* * *

And so, as to those objectors who say it would be establishing bad precedent to approve this transaction, I say no. This is not a bad precedent. To the contrary. It's an extraordinary example of the flexibility that bankruptcy affords under circumstances such as this. It's an example that creative minds working diligently day and night even under the worst of circumstances can create remarkably complicated transactions that preserve value. I am proud to have been part of this process."

9/19/08 Hearing Tr. 248:19-249:11; 250:13-251:3; 252:3-11 (Exhibit 1).

48.     Against this backdrop, LBHI fails to provide a single reason for re-examining the

Sale Transaction.

49.     LBHI states that "billions of dollars of Lehman assets were transferred to

Barclays in connection with certain repurchase agreements not addressed in the Purchase

Agreement, which effectively nullified the liabilities Barclays purported to assume under the

Purchase Agreement." Motion ¶ 10. This assertion suggests some level of uncertainty or lack of

disclosure which is simply not supportable. The fact that Barclays agreed to pay $45 billion to

replace the Federal Reserve's financing of LBI's operations, and in exchange was to receive

assets pledged to the Federal Reserve under its repurchase agreement, was disclosed to the Court

19

and reflected in the final contractual documents governing the Sale Transaction. *See* 9/19/08 Hearing Tr. 63:18-22 (LBHI counsel explaining that, "Yesterday, as Your Honor has heard, Barclays basically stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral that Lehman had posted in connection therewith.") (Exhibit 1); Clarification Letter ¶¶ 1(a)(ii), 13 (providing that Barclays acquired the portfolio of securities previously transferred to the Federal Reserve under its repurchase agreement) (Exhibit 3).

50.    These facts have also been disclosed in subsequent filings. For example, in December 2008, the LBI Trustee sought approval of a settlement between Barclays, the LBI Trustee, and JPMorgan concerning a shortfall in the delivery of securities to Barclays after Barclays replaced the Federal Reserve in providing $45 billion in financing to LBI. (A copy of that motion is attached as Exhibit 7.) The parties described fully the terms of the "Fed Replacement Transaction" and the Clarification Letter explicitly terminated that reverse repurchase agreement, so that LBI retained the $45 billion in cash and Barclays retained the "Fed Portfolio" securities.[4] Yet LBHI now proceeds as if the Court and all the major parties in interest were completely unaware of the final terms of the transaction.

51.    Moreover, when the Court approved the settlement, it instructed Barclays to provide the Creditors' Committee informally with information concerning the Fed Replacement Transaction and the securities transferred to Barclays. Barclays executives met with Creditors' Committee counsel and financial advisors on February 3, 2009, to review the chronology of events. Barclays subsequently produced voluminous material reflecting the securities that Lehman proposed to transfer to Barclays, which securities were eventually reflected on

---

[4] The declarations of Shari D. Leventhal of the Federal Reserve Bank and Gerard LaRocca of Barclays, submitted in support of that motion, are attached as Exhibits 8 and 9, respectively.

Schedules A and B of the Clarification Letter and Annex A to the settlement agreement.

Barclays will provide LBHI the same information it provided to the Creditors' Committee

subject to a confidentiality stipulation.

52.    It likewise has been repeatedly disclosed that Barclays was entitled to receive

additional categories of securities and other assets set forth in the Clarification Letter, which

amended the APA.  On the day of the sale hearing, September 19, 2008, it became clear to all

involved that "LBI [wa]s unable to deliver to Barclays the assets that were originally intended [to

be sold to Barclays] under the APA."  9/19/08 Hearing Tr. 64:5–7 (Exhibit 1).  As LBHI's

counsel explained, the Purchased Assets contracted for by Barclays in the APA as of September

16, 2008 either had declined substantially in value or were no longer available to be transferred.

9/19/08 Hearing Tr. 46:19–47:10, 49:8–17, 53:20–25 (Exhibit 1).  Accordingly, as reflected in

the Clarification Letter, there was a concerted effort to identify additional assets to transfer to

Barclays as alternatives to those assets that could not be delivered as contracted for in the

original APA.  These additional assets that were required to be transferred to Barclays included:

- the securities listed on Schedule A to the Clarification Letter, which reflected the Fed Portfolio securities transferred to Barclays after Barclays replaced the Fed's financing of LBI on September 18, 2008, by transferring $45 billion to LBI (Clarification Letter ¶ 1(a)(ii)(A)) (Exhibit 3);

- "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which as of the close of business on September 21, 2008 were as specified on Schedule B . . ." (Clarification Letter ¶ 1(a)(ii)(B)) (Exhibit 3);

- "to the extent permitted by applicable law, and as soon as practicable after the Closing, $769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value." (Clarification Letter ¶ 8) (Exhibit 3);

- "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives)." (Clarification Letter ¶ 1(a)(ii)(C)) (Exhibit 3).

53.    Barclays has not yet received all of these assets, as required under the plain terms of the Clarification Letter. Barclays is currently in discussions with the LBI Trustee in an effort to resolve disputes concerning these undelivered assets. Whatever the outcome of those negotiations, however, there is no basis for LBHI to assert that it was not aware of the obligation to transfer these securities to Barclays, or of any "repurchase agreements" not mentioned in the original APA.

54.    LBHI also insinuates that certain Lehman executives failed to negotiate at arm's length and were essentially bought off by compensation agreements entered into during negotiations. Motion ¶ 20. There is no basis for that accusation. Alvarez & Marsal was retained early in the negotiations and was in a position to challenge any aspect of the negotiations that appeared in any way to be influenced by future employment terms. LBHI's counsel, Weil Gotshal, presumably advised the officers and directors of LBHI concerning their obligation to negotiate in good faith and on an arm's length basis. In addition, LBHI's own Sale Motion stated that, "The terms and conditions of the Purchase Agreement were negotiated by the Debtors and Purchaser at arm's length and in good faith. Each party was represented by sophisticated counsel." Sale Motion ¶ 39 (Exhibit 6). At the sale approval hearing, LBHI proffered testimony of Barry Ridings of Lazard, LBHI's investment banker, that "the negotiations were at arm's length, difficult and aggressively negotiated by the parties, [and] that the asset purchase agreement is the result of good faith negotiations." 9/19/08 Hearing Tr. 144:2-5 (Exhibit 1). The Lazard testimony proffered by LBHI also established that there were "few potential purchasers for this business because any buyer must meet regulatory requirements, have sufficient capital and have the strategic capability to operate the business

from day one" and that the Barclays' offer was "the highest and best offer for these assets." 9/19/08 Hearing Tr. 143:20-23, 145:25 (Exhibit 1).

55.    Further, LBHI has for some time now had direct access to all archived documents and correspondence of its key negotiators for the relevant time frame (the period up through and including the September 22, 2008 closing date). Accordingly, there is no legitimate need for discovery concerning this baseless accusation. *See Symington*, 209 B.R. at 688.

56.    Finally, LBHI also points to the fact that Barclays has recorded a gain for accounting purposes on the transaction and implies that this supports its request for broad discovery. Motion ¶ 19. This accounting gain is irrelevant to the fairness of the sale transaction and is not a basis for seeking discovery. The fact that, thus far, the acquired businesses have performed well and have generated an accounting gain has no bearing on the adequacy of consideration when the transaction closed. Had those businesses performed poorly, or if they perform poorly in the future, Barclays would not be entitled to a purchase price adjustment. Clarification Letter ¶ 9 (Exhibit 3). LBHI is not entitled to a purchase price adjustment based on the positive performance of those businesses thus far under Barclays' management. Further, the accounting gain does not reflect the substantial costs and expenditures relating to integration of the acquired business assets and does not reflect the considerable risk Barclays undertook at the time by entering into the transaction. Governing accounting standards preclude application of liquidity discounts to the significant number of illiquid positions acquired as part of the transaction and require recognition of anticipated future revenue associated with intangible assets (which could depress Barclays' results in future periods, as the intangible assets are amortized over time).

57.    LBHI's motion is based on complete disregard for the governing contractual provisions of the APA and the Clarification Letter, distortion of the record upon which the Court based the Sale Order, and total amnesia concerning the evidence that LBHI itself proffered in support of the Sale Order. LBHI's attempt to suggest that Barclays did not pay fair consideration is nothing more than an unwarranted attempt to reexamine a deal that was fair, in the interest of the Estate, and of utmost urgency when approved by this Court. This Court should not endorse such tactics.

58.    To prevent an enormous waste of resources and, importantly, to preserve the integrity and finality of court-approved sales generally, we respectfully submit that LBHI should not be able to use this Court in an attempt to develop unsustainable claims and baseless challenges to the Sale Order. As the Seventh Circuit (Judge Posner) observed in a case involving claims advanced by a Chapter 7 trustee:

> "The extreme weakness of the trustee's case, both on liability and on damages, invites consideration of the exercise of litigation judgment by a Chapter 7 trustee. The filing of lawsuits by a going concern is properly inhibited by concern for future relations with suppliers, customers, creditors, and other persons with whom the firm deals (including government) and by the cost of litigation. The trustee of a defunct enterprise does not have the same inhibitions. A related point is that while the management of a going concern has many other duties besides bringing lawsuits, the trustee of a defunct business has little to do besides filing claims that if resisted he may decide to sue to enforce. Judges must therefore be vigilant in policing the litigation judgment exercised by trustees in bankruptcy, and in an appropriate case must give consideration to imposing sanctions for the filing of a frivolous suit. The Bankruptcy Code forbids reimbursing trustees for expenses incurred in actions not "reasonably likely to benefit the debtor's estate," 11 U.S.C. § 330(a)(4)(A)(ii)(I), and authorizes an "appropriate sanction" against parties who file such a claim.

*Maxwell v. KPMG LLP*, 520 F.3d 713, 718 (7th Cir. 2008) (citations omitted).

## **CONCLUSION**

59.     Barclays respectfully requests that the Court deny LBHI's Motion and reject

LBHI's attempt to reexamine and renegotiate the final contract and challenge the Sale Order.

Purchasers such as Barclays are entitled to rely on the finality of such a Sale Order, and there has

been no showing of any fact to warrant the reopening or reexamination of negotiations or

reconsideration of the Sale Order.


Dated: June 5, 2009
       New York, New York


                              Respectfully submitted,

                              BOIES, SCHILLER & FLEXNER LLP


                              By: /s/ Hamish P.M. Hume
                              Jonathan D. Schiller
                              Hamish P.M. Hume
                              Jack G. Stern
                              575 Lexington Avenue
                              New York, NY 10022
                              Telephone:  (212) 446-2300
                              Facsimile:  (212) 446-2350

                              Attorneys for Barclays Capital Inc.