BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

# Exhibit 1

# ***Excerpts***

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


       Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 19, 2008

          4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

46

1    going to ask that question.  So --

2              THE COURT:  I hate to be that predictable.

3              MR. MILLER:  There is a document -- maybe it'd be

4    better, Your Honor, if we do it orally.

5              THE COURT:  Fine.

6              MR. MILLER:  My partner, Ms. Fife, will do that.  And

7    with some assistance from Ms. --

8              THE COURT:  Let me just check on something because --

9    and this is purely technical.  During the first phase of the

10   hearing, I was told that those people who are listening in

11   spillover courtrooms had a very hard time hearing me.  I'm

12   having some difficulty as compared with our last hearing with

13   the amplification coming out of the podium.  And I just want to

14   make sure that we're not suffering system overload.  Okay.

15   That's on.  And let me also make the announcement, whenever

16   anyone speaks for the record, this is always true here, but

17   given the number of people, please identify yourself before

18   speaking.

19             MS. FIFE:  Thank you, Your Honor.  Lori Fife from

20   Weil Gotshal & Manges on behalf of the debtors.  Let me try to

21   summarize the changes that were made to the transaction.  In

22   terms of the economic changes, they result largely because of

23   the markets, unfortunately.  And from the time that the

24   transaction was actually entered into till now, the markets

25   dropped and the value of the securities dropped as well.

**VERITEXT REPORTING COMPANY**

212-267-6868                                        516-608-2400

47

1    So, originally, we were selling assets that had a

2    value of seventy -- approximately seventy billion dollars.  And

3    today, Your Honor, we're only selling assets that have a value

4    of 47.4 billion dollars.

5    Barclays is assuming liabilities, however, of 45.5

6    billion dollars in connection with those assets.  So that has

7    not changed from the original transaction.  There was an upside

8    sharing in the original transaction.  There was going to be a

9    true-up twelve months later on and that has been eliminated

10   from this transaction.

11   Barclays is still agreeing to pay the cure amounts on

12   any leases that it assumes or that we assume and assign to it.

13   Barclays is also agreeing to the same employee compensation

14   arrangements.  And it is also agreeing to pay the 250 million

15   dollars of goodwill to LBI.

16   With respect to the real estate assets, Your Honor,

17   that was -- we had said at the last hearing, I believe, it was

18   approximately a billion dollars.  Since that time, an appraisal

19   has come in and it is below that amount.  The contact had a

20   provision which allowed the purchaser really to purchase the

21   building at the appraised amount.  So we have some negotiations

22   to go, but I believe that the purchase price will come down by

23   approximately a hundred million dollars.

24   There were two other real estate properties also

25   which we received appraisals for which, similarly, were lower

49

1    customer accounts were being transferred anyway.

2          There was a change that was made to the license of

3    the Lehman Brothers' name.  It was perpetual.  It is now two

4    years but we don't really believe that that's a problem.  The

5    IMD business, which is essentially Neuberger Berman and some

6    other related entities, will have a perpetual license to use

7    the name.

8          There was a provision in the old agreement pursuant

9    to which the parties were sharing the residential real estate

10   mortgages.  There is no longer that provision.  Barclays was

11   required to post collateral, actually this morning, in order to

12   get DTC to open up trading.  And that collateral was posted --

13   the residential real estate mortgages was posted to DTC.

14   Pursuant to this transaction, Barclays is taking over and

15   guaranteeing all of those transactions.  And they are assuming

16   the risk related to those transactions so that collateral will

17   remain with Barclays.

18          THE COURT:  What's the aggregate value of the posted

19   collateral?

20          MS. FIFE:  One second, Your Honor.

21      (Pause)

22          MS. FIFE:  Your Honor, I'm not -- excuse me?  There

23   are 300,000 trades but we're not sure the value of the

24   collateral.  Perhaps during the rest of the hearing we can find

25   that amount out for Your Honor.

53

1    all of that collateral.  So what the amendment to the APA says

2    is that the fifty percent will be returned, as long as it's

3    there.  If something really terrible happens in the world and

4    the settlements don't work and we have to use that collateral,

5    then there will be nothing to return.  But the anticipation is

6    that if the world remains somewhat stable that the fifty

7    percent that was now transferred to Barclays will be

8    transferred back to Lehman.  That is the expectation.

9              THE COURT:  All right.  I appreciate that

10    explanation.

11              One comment before you continue, Ms. Fife.  I'm just

12    once again hearing the Geiger counter.  And we are connected to

13    two extra courtrooms and I know that there are people

14    participating at various occasions by telephone through

15    CourtCall.  And I'm hearing increased static on the line.  So,

16    I'm just going to request everybody who is participating in

17    this hearing, whether by telephone or in person, who has an

18    electronic device to shut it off.  And if you're on the phone,

19    since you're just listening, please mute your phone.

20              MS. FIFE:  Thank you, Your Honor.  I'll continue

21    going through some of the changes, if that's okay.  There was a

22    provision in a deal originally which required the debtors to

23    transfer 700 million dollars in cash to Barclays.  And that is

24    no longer the case.  There's no cash that's being transferred

25    to Barclays.

63

1   case to protect the public customers and ensure stability and

2   preservation of customer interests.  Their actions are to be

3   commended, Your Honor.  And I believe, Your Honor, that the

4   SIPC proceeding has been referred, I hope, to Your Honor.

5           THE COURT:  I've seen Judge Lynch's order.  I have a

6   certified copy of it and the order includes a decretal

7   paragraph removing those proceedings to this court.  I'm

8   satisfied that the seal is in fact genuine and I'm prepared to

9   proceed with full authority.

10          MR. MILLER:  And, Your Honor, Mr. Giddens is here

11  with Mr. Kevin (sic) Caputo from SIPC and the president of

12  SIPC, Your Honor, Mr. Stephen Harbeck who's sitting in the jury

13  box.

14          THE COURT:  Gentlemen, welcome.

15          MR. GIDDENS:  Thank you, Your Honor.

16          MR. MILLER:  Barclays, Your Honor, has extended the

17  sale to enable this extraordinary transaction and hopefully to

18  be consummated.  Yesterday, as Your Honor has heard, Barclays

19  basically stepped into the shoes of the Federal Reserve in

20  connection with the Primary Dealer Credit Facility as to the

21  45.5 billion dollars Lehman borrowed last Monday and received

22  the collateral that Lehman had posted in connection therewith.

23          Because of the circumstances this week, Your Honor,

24  the operations of LBI have resulted in approximately 300,000

25  sales, which is very significant.  In addition, Your Honor,

64

1    because of the administration proceeding in the United Kingdom

2    for LBIE and the freezing of all of the assets of LBI that were

3    in the possession of LBIE, which I believe, Your Honor, stands

4    for Lehman Brothers England, relating to repo financings, the

5    result is that we were unable -- or LBI is unable to deliver to

6    Barclays the assets that were originally intended under the

7    APA.  That's one of the reasons, Your Honor, for the amendments

8    that we heard about earlier today.

9              There are many moving parts in what we are trying to

10   do, many of which are beyond the control of Lehman or Barclays

11   as market forces operate to affect the value of the transaction

12   and the assets.  Enormous problems did arise in connection with

13   clearing transactions that have caused a number of

14   modifications to the transaction.  The necessity of assuring

15   DTC and other clearing institutions who will not expose

16   themselves to additional liability of some kind has been

17   enormously time consuming.

18             It's because of that, Your Honor, that we have heard

19   about these changes.  But if Your Honor will look at the basic

20   agreement, the amount of cash consideration will be relatively

21   the same except for the issues with respect to the value of the

22   real estate.  The 250 million dollars being paid for the

23   goodwill of LBI will go to LBI.  The real estate, 745 Seventh

24   Avenue, and the two data centers in New Jersey, that's with a

25   variation, Your Honor, and there's some negotiation to be done

99

1   dealer business.  The value of the real estate being

2   transferred to  Barclays pursuant to the transaction is subject

3   to negotiation with respect of the appraised values.  That the

4   building on Seventh Avenue is subject to an appraisal which has

5   been provided to Barclays.  And that appraisal is in the area

6   of 900 million dollars to 100 million dollars.  And that the

7   appraisal was done by CB Richard Ellis.  And it was prepared

8   for the other debtor in this case, LB 745 LLC and Barclays

9   Capital Inc.  And it is a voluminous appraisal of the

10  properties which we will offer into evidence at the appropriate

11  time, Your Honor.

12          And that he would also testify that an appraisal of

13  the two data centers was also directed and that CB Richard

14  Ellis was also engaged to undertake that appraisal.  And that

15  appraisal has established the value for the purpose of the

16  negotiations, Your Honor.  And as pointed out earlier in the

17  proceeding, those values have come in at slightly less -- I

18  shouldn't say slightly, less than was originally projected.

19          So that was a very negotiated term, and the reason

20  for the transfer of these properties, Your Honor, is that they

21  are integral to the smooth transition of the businesses.

22          Barclays will also assume exposure for the employees

23  that accept offers of employment, which is estimated to have a

24  value of approximately -- an exposure of approximately two

25  billion dollars.

100

1    Barclays is also assuming the cure amounts relating

2    to contracts and leases that will be assumed pursuant to the

3    asset purchase agreement.  And that has a potential exposure,

4    Your Honor, of 1.5 billion dollars that he would testify to.

5    Barclays is also paying the real estate transfer

6    taxes, which are estimated to be approximately thirty million

7    dollars.

8    Mr. McDade would testify that the financial community

9    has known that Lehman has been under stress for some time.

10   Certainly, going back to the time that Bear Sterns was bailed

11   out.  Potential purchasers have known that Lehman has been

12   searching for a buyer since well before the Chapter 11 case

13   commenced.  And that those ethics, those strategic alternatives

14   that were being pursued involved parts of Lehman as well as the

15   whole of Lehman.  And that the notoriety attached to that did

16   not produce any interested parties other than the ones I

17   mentioned -- he mentioned.

18   During the meeting at the Federal Reserve Bank last

19   week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20   were all present, showing interest in the broker-dealer assets.

21   It was clear to each party that if Lehman was unable to reach a

22   deal it would most likely have to commence cases under Chapter

23   11 of the Bankruptcy Code.  That would not only have an adverse

24   impact upon their businesses but also upon the international

25   markets.

101

1          He would testify that since the commencement of the

2    Chapter 11 case, Lehman's senior management and its advisors

3    have not undertaken an intensive marketing of the business and

4    the assets to be sold.  But instead focused on reaching an

5    agreement with the most eligible interested buyer for these

6    assets.

7          That notwithstanding the lack of a specific program

8    for marketing, the sale of Lehman's broker-dealer business has

9    been known worldwide.  And, yet, he would say nobody has

10   expressed an interest to step into the shoes of -- excuse me,

11   step into the shoes of Barclays, Your Honor.

12         Lehman has not received any other interest since the

13   commencement of the Chapter 11 cases.  If Lehman was approached

14   by another potential buyer that he would consider the offer,

15   provided that the company had sufficient liquidity to operate

16   the business without jeopardizing customer accounts.  That has

17   not happened, Your Honor.  So it is almost academic.

18         Mr. McDade would testify, Your Honor, that if the

19   sale with Barclays is consummated, customer accounts would

20   continue on a seamless, uninterrupted basis and trading would

21   continue on a normal basis, thereby maintaining the billions of

22   dollars in value.

23         At the same time, the jobs of thousands of employees

24   would be saved and will be entitled to substantial benefits

25   from Barclays in the form of compensation, bonuses and

102

1    severance payments that are based upon the employee's prior

2    performance while with Lehman.

3         He would testify to the consummation of the

4    transactions makes available a greater pool of assets to the

5    debtors' estates, because the exposure under Lehman Holdings

6    guarantee to the broker-dealer will be substantially less.  If

7    the transaction does not close today or over this weekend, Your

8    Honor, Mr. McDade would testify that the effect on the broker-

9    dealers business and on Lehman Holdings would be devastating.

10   First, the failure to consummate the transaction would cause

11   default under the DIP facility and require Lehman Holdings to

12   repay the outstanding amounts under that facility.

13        He would testify that the liabilities in the hundreds

14   of billions of dollars would be triggered against Lehman

15   Holdings which would in turn deplete the property available to

16   distribution to creditors.  It would adversely affect the

17   debtors other nondebtor subsidiaries to the extent they have

18   any value.

19        He would testify, Your Honor, that if the transaction

20   is not consummated, it will result in the largest failure of a

21   broker-dealer in the history of the United States and will

22   cripple the credit markets for some time to come.

23        He would further testify, Your Honor, that the shock

24   of this transaction not being consummated in the public markets

25   could be immeasurable and could ignite a panic in the financial

103

1    condition that we now face in the United States.

2         He would testify that it is essential to an orderly

3    financial market that this transaction be consummated as early

4    as possible in the interest of all stakeholders of these two

5    cases.  And in the interest of the public in general and the

6    economy in general, and to avoid a dislocation in the market,

7    Your Honor.

8         Thank you, Your Honor.

9         THE COURT:  And that concludes the proffer?

10        MR. MILLER:  Yes, Your Honor.

11        THE COURT:  Is there anyone who wishes to cross-

12   examine Mr. McDade with respect to the proffer or may I simply

13   accept the proffer in the form it has been offered by Mr.

14   Miller without further examination?

15        MR. QURESHI:  Your Honor, Abid Qureshi, Akin, Gump,

16   Strauss, Hauer & Feld on behalf of an ad hoc group of

17   noteholders of LBHI.  We would like to cross-examine the

18   witness.

19        THE COURT:  All right.  Mr. McDade should come to the

20   stand then.

21      (Witness is sworn)

22   CROSS-EXAMINATION

23   BY MR. QURESHI:

24   Q.   Good evening, Mr. McDade.  You testified through the

25   proffer that you were involved in the negotiations concerning

144

1    with Barclays.

2         Mr. Ridings would testify that the negotiations were

3    at arm's length, difficult and aggressively negotiated by the

4    parties, that the asset purchase agreement is the result of

5    good faith negotiations.

6         He would testify that the parties worked around the

7    clock to finalize the purchase agreement because they realize

8    that time was of the essence and that the business would not

9    survive without an immediate infusion of new liquidity.

10        Between Monday and Wednesday of this week, he would

11   testify the parties exchanged numerous bids and asks and turned

12   drafts of the agreement countless times.

13        He would also testify that since executing the asset

14   purchase agreement the parties have continued to work nonstop

15   in order to prepare for closing, contracts have been identified

16   for assumption or assignment and, with the authority from the

17   Court, debtor-in-possession financing was obtained for LBHI.

18        He would testify that these assets have substantially

19   greater value if they are sold as a going concern.  Despite the

20   tremendous publicity associated with this case, not one firm,

21   other than Barclays, showed up with an interest in the assets

22   as a whole.  Without Barclays, Lehman would be forced to sell

23   discreet assets for a fraction of the value that will be

24   realized from this transaction.

25        By selling the business as a going concern, Lehman

145

1    has preserved approximately nine to ten thousand jobs for its

2    employees and avoided significant costs and claims that would

3    have resulted if there were mass layoffs and a cessation of

4    operations.

5              He would also testify that calls were placed to a

6    number of prospective bidders over this week.  He would testify

7    that Lehman's situation was widely known in the financial

8    services industry and yet no one really appeared to show an

9    interest.

10             He will testify that Lazard had twenty-one contacts

11   with entities that expressed an interest but not one of them,

12   nor any other entity, had expressed the desire or ability to

13   step into Barclays' shoes.

14             Practically, he would testify there were few

15   potential purchasers for these assets.  Of this universe, most

16   of the funds that could purchase these assets have their own

17   cash flow problems to contend with and are not looking to

18   expand.

19             Any prospective purchaser would need access to the

20   Federal Reserve Funds to operate Lehman's business.  The list

21   of firms authorized to trade directly with the Federal Reserve

22   System and borrow from the so-called "window" is limited.  Each

23   entity must meet stringent capital and regulatory requirements.

24             He would testify that, in his opinion, Barclays'

25   offer is the highest and best offer for these assets.

146

1    Lehman is selling its North American investment

2    banking and capital markets business.  This business focuses on

3    fixed income, equities, trading, advisory services, futures and

4    investment banking.  The costs to Lehman and counterparties, as

5    pending transactions unwind, if this transaction is not

6    approved, will run into the many billions of dollars.

7    Counterparties will be required to liquidate their collateral

8    positions, which may entail a wholesale dumping of the

9    collateral into the marketplace with the attendant erosion of

10   values.  The deficiencies that counterparties may incur will

11   result in massive claims against the assets of the Lehman

12   estates.  Ten to twelve thousand employees may not find any

13   employment.  Any failure to consummate may potentially cause a

14   major shock to the financial system.

15       Although the potential sale of Lehman assets has

16   generally been known to the financial community for many months

17   and that the current transaction has gotten enormous and wide

18   media attention, as previously stated, only twenty very limited

19   inquiries were made from outside parties.

20       Again, he would testify, Your Honor, the universe of

21   potentially qualified and capable purchases is extremely

22   limited by the huge financial commitment that would have to be

23   made and the ability to access federal funds.  At most, there

24   are less than a half dozen possible entities that might

25   qualify, and most of them have their own financial needs.

238

1    sitting out there have not eaten and haven't had a break in a

2    while and I think due process also includes no cruel and

3    inhuman punishment.  And so I think that it may be timely,

4    before I hear from the debtors and/or also from the purchaser,

5    to take a fifteen minute break so everybody can refresh

6    themselves a little bit.

7         So since it's already as late as it is, it might as

8    well be a little bit later and let's take a fifteen minute

9    break and I'll see you at 11:45.

10        (Recess from 11:30 till 11:45 p.m.)

11        THE COURT:  Be seated, please.  Mr. Miller?

12        MR. MILLER:  Good evening again, Your Honor.  And

13   given the lateness of the hour, Your Honor, I expect to be

14   exceedingly brief, Your Honor.  There have been an awful lot of

15   objectors who have stood at the lectern and it's, sort of, hard

16   after listening to twenty odd people, to remember all of the

17   comments that were made and objections that were made.  But

18   there's one basic theme, Your Honor, that has gone through the

19   statements by Mr. Golden, Mr. Rosner and some others.  That

20   apparently there is the ability to stop everything, take two or

21   three weeks or maybe two or three months, while we explore

22   every possible alternative.  And there is no recognition, Your

23   Honor, that we have a patient that is hemorrhaging on the

24   operating table and there is no intensive care ward for this

25   patient.

239

1          Things have happened, Your Honor, in the last two

2     days.  First of all, we have a SIPC proceeding, Your Honor.  A

3     trustee has been appointed for SIPC and the assets of LBI are

4     under the jurisdiction of that proceeding.  They're gone, Your

5     Honor.  And as it was pointed out in the testimony today, there

6     are 639,000 accounts with a value of something like 138 billion

7     dollars that are sitting now waiting transfer.  And if this

8     sale doesn't go through, Your Honor, those accounts are going

9     to be stuck.  And they're going to be stuck for months and

10    months.

11          Mr. Golden says that he protects the interest of

12    creditors.  I would say, Your Honor, the debtor is protecting

13    the interest of creditors.  If this transaction doesn't go

14    through, Your Honor, LBI is out of business.  It already is --

15    will be in a SIPC liquidation proceeding.

16          There is no money at LBHI.  The DIP loan will become

17    due, 200 million dollars, as payable.  Look what happened

18    yesterday, Your Honor.  The CME closed us out and we took a

19    loss of one billion, six hundred million dollars.  This

20    administration is finished if this transaction is not

21    completed, Your Honor.

22          It's a shame, Your Honor, that the 7,000 people who

23    are waiting for transfers today in various computer points

24    throughout the country, did not get what they expected to.  And

25    I'm not being critical of anybody, Your Honor; everybody has a

240

1  right to express their views.  But we are in a situation in

2  which we have a fragile asset that can't.  This is not a case

3  where you can sit and go out and explore every single

4  opportunity.  And in that connection I might say, Your Honor,

5  that for months, certainly going back to the collapse of Bear

6  Sterns and before that, Lehman has been deleveraging.  It has

7  been participating in every effort to deleverage its balance

8  sheet.

9          It got down to -- let me call it the final round,

10  where there only were two possibilities:  the Bank of America

11  and Barclays.  And the Bank of America went off and did

12  something else.  Barclays -- that transaction was unable to be

13  consummated.  So in the exercise of good business judgment,

14  management and the board of directors turned to get the best

15  transactions they could get in the limited time.

16          And, Your Honor, there aren't many candidates that

17  could do this.  You needed somebody with the kind of capital,

18  credit standing of Barclays.  There aren't that many people out

19  there.  And you can't go around and cherry pick these assets,

20  Your Honor.  This is an integrated operation.

21          So what is happening, Your Honor, we are protecting

22  the customers.  There's testimony on the record, Your Honor, as

23  to what the consequences would be if this transaction doesn't

24  go forward.  Both Mr. Ridings and Mr. McDade have indicated

25  there won't be anybody in the building.  If there's no

**VERITEXT REPORTING COMPANY**

241

1    assurance of an ongoing operation for the LBI employees, which

2    are most of the employees in 745 Seventh Avenue, they're not

3    going to stay there, Your Honor.  These are people who have

4    bills that they have to meet, they need employment.  They need

5    some element of certainty.  They're all expecting, and I'm not

6    putting any pressure on Your Honor, they're all expecting that

7    Your Honor will rule --

8                THE COURT:  The pressure is already there, Mr.

9    Miller.

10               MR. MILLER:  I'm sorry?

11               THE COURT:  The pressure is already there.

12               MR. MILLER:  Thank you, Your Honor.

13               THE COURT:  Not from you.

14               MR. MILLER:  No, no.  I was looking for that woman.

15   There is pressure on everybody, Your Honor.  I mean, I was just

16   saying to somebody, here we are sitting in a courtroom at 5

17   minutes after 12, and we've been here for a long time, and that

18   is evidence of the concern that everybody has.  And I

19   understand the issues, Your Honor.  As we said on the very

20   first day, this is an extraordinarily exceptional case.  There

21   is so much at stake here.  And if we miss this opportunity we

22   are talking about a wholesale liquidation with all of the

23   consequences that come out of that liquidation.  And people can

24   speculate as to what's going to happen.

25               I mean, I was a little shocked at Vanguard, who

242

1   happens to be a competitor of Neuberger, saying don't close

2   this.  It'll be a good thing for the marketplace, for somebody

3   maybe.  So I think that argument, Your Honor, just doesn't

4   carry water.

5           Now I would turn, just for a minute, Your Honor, to

6   the LBIE thing, which is confusing this whole matter.  I point

7   out, Your Honor, LBIE went into administration before the

8   Chapter 11 case was filed.  And PWC froze all transactions

9   immediately and it became the administrator.  So those

10  transactions were frozen.

11          Now, what we're talking about, Your Honor, is eight

12  billion or five billion, whatever it might be, Your Honor, that

13  was a cash sweep.  Cash, we're not transferring any cash to

14  Barclays, that's out of the agreement.  So if Mr. Rosner or

15  somebody else has a claim, they can assert a claim.  It has

16  nothing to do with this transaction.

17          And I would also point out, Your Honor, that PWC as

18  the administrator is not opposing the sale.  In fact, they're

19  supporting the sale.  They're just reserving their rights and

20  they should reserve their rights.  If they have a claim, this

21  is all going to be investigated.  But we have to look at the

22  bigger picture, Your Honor, what happens if we don't close this

23  transaction.  And Mr. Ridings testified, Mr. McDade testified

24  as to the consequences that will affect these estates.  We

25  cannot reverse what has already happened.

243

1    And in the short period from Wednesday to Friday,

2    notwithstanding that Your Honor approved the sale procedures,

3    we lost the confidence of the market.  And if you don't approve

4    this transaction, Your Honor, LBI is finished as an operating

5    business.  It will not add any value to anybody.  And all we

6    will have left, Your Honor, is a winding down estate and

7    holdings.  And if that building is empty, Your Honor, it won't

8    be worth 900 million dollars because that's the nature -- that

9    appraisal that we got assumed a value with the building in use.

10    So the dangers here, Your Honor, are extraordinary.

11    This is a good transaction, Your Honor.  We spent a lot of time

12    listening to landlords.  All of those issues, Your Honor, are

13    minor and will be resolved in one way or the other.  Either

14    Your honor will decide them or there will be mutual

15    arrangements and agreements among the parties.

16    The drafting of the order, I think, Your Honor, if we

17    all sit down in good faith we will come up with an order.  I

18    think we will come up with an order tonight if Your Honor were

19    to approve this transaction.

20    THE COURT:  I'm prepared to stay here for as long as

21    it takes if you're prepared to stay here for as long as it

22    takes.

23    MR. MILLER:  Your Honor, I can't think of a better

24    place to be.

25    THE COURT:  Do you want to order pizza?  How do you

244

1  want to nourish yourself between now and the entry of the

2  order?

3            MR. MILLER:  With pepperoni?

4            THE COURT:  Whatever you want.

5            MR. MILLER:  I agree with Mr. Bienenstock -- maybe

6  let me rethink that.  Your Honor, I would stay without food.  I

7  think that's a good thing.  And I would lock all of the

8  latrines.  I'm sorry; I withdraw that remark, Your Honor.

9            THE COURT:  Unfortunately, it's on the record of this

10 proceeding.

11            MR. MILLER:  And, Your Honor, the proceeds of the

12 sale, the 250 million dollars, is going to the SIPC trustee,

13 the one billion 290 million dollars is going to the estate.

14 There is a creditors' committee.  Those proceeds are safe.

15 Hopefully, we're going to go into the more conventional

16 procedures of Chapter 11.

17            I don't want to use the melting ice cube.  It's

18 already half melted, Your Honor.  The steps have had happened,

19 the things that have happened since Wednesday, make it

20 imperative that this sale be approved.  In the interest of all

21 of the stakeholders, including Mr. Golden's clients, they will

22 benefit by this, Your Honor, because if the alternative

23 happens, there will be very little to distribute to creditors,

24 if anything.

25            So we submit to Your Honor that this sale should be

245

1   approved and should be approved tonight.  And we should get the

2   orders entered and get the transfers done before there's any

3   other prejudice and harm.  Thank you, Your Honor.

4            THE COURT:  Thank you, Mr. Miller.

5            MS. GRANFIELD:  Really brief, Your Honor, because I

6   won't tread over any ground that Mr. Miller just went over.

7   The importance, if Your Honor is so disposed to approve the

8   transaction of staying here, getting the order done and getting

9   it entered tonight, my client wanted me to express to you the

10  importance is really not only in terms of the operations, the

11  moving of the money, the preserving of the value for this

12  estate, but the importance in terms of staying here and get it

13  done tonight is really with respect to the employees who we've

14  already heard many times have really had a horrible week.  They

15  have had a bit of hope in terms of being able to return to a

16  more business as usual.  And we're really concerned if they

17  don't wake up tomorrow and see that not only has it been

18  approved but the order's been entered and we're moving forward

19  towards closing.

20           Just generally, with respect to the objections,

21  Barclays Capital cannot pay out the sums that have been put on

22  the record tonight and subject itself to collateral attack.

23  It's not doing this transaction to paint a bullseye on its back

24  for every subsidiary creditor, landlord, fund that wants to

25  figure out who's a deep pocket, oh, Barclays is doing this deal

248

1    have concluded that this is really not a question of due

2    process being denied.  This is a question of due process being

3    pursued in good faith by all parties to the transaction, even

4    the objectors.  It is a testament to the importance of this

5    transaction that this courtroom is still packed.  I have no

6    idea what's going on in the overflow rooms.  This is not an

7    ordinary Chapter 11 case.

8            This is not simply approving the transaction because

9    Mr. Miller is putting pressure on me to do so.  This is not

10   approving the transaction because I know it's the best

11   available transaction.  I have to approve this transaction

12   because it's the only available transaction.

13           I believe that one of the remarkable aspects of our

14   Bankruptcy Code, as it has evolved, is its remarkable

15   flexibility to different circumstances.  The lawyers who are

16   appearing before me this evening are truly among the best and

17   the brightest in the field.  And some have participated in the

18   evolution of bankruptcy as a field, nationally and

19   internationally.  We must close this deal this weekend not

20   because the markets demand it, although that's certainly a part

21   of it.  Lehman Brothers became a victim.  In effect, the only

22   true icon to fall in the tsunami that has befallen the credit

23   markets.  And it saddens me.  I feel that I have a

24   responsibility to all the creditors, to all of the employees,

25   to all of the customers and to all of you.  Arguments have been

249

1   made this evening by objectors, some questioning whether or not

2   if I were to delay approval another better transaction might be

3   realized or discovered.  And that's a preposterous notion.  As

4   I said on Wednesday, it's very apparent to me that for a

5   transaction of this sort to happen, only Barclays can do it.

6   Only Barclays has the support of the regulators.  Only Barclays

7   is prepared to close.  Only Barclays can deliver the customer

8   accounts to safe harbors.  And the customer property, which is

9   the principal concern of the SIPC trustee, a case which is also

10  pending before me now, will be best protected by virtue of

11  approving the sale.

12          The objectors, and I'm not putting them all in the

13  same basket, principally, Mr. Golden and Mr. Rosner's clients,

14  argue passionately that I should not be unduly influenced by

15  the arguments made by the debtors that the markets will, in

16  fact, tank if this deal is not approved and that more time

17  should be afforded to searching for an alternative.  I am

18  persuaded that to do so would be reckless.  I believe that the

19  debtors have acted in the utmost of good faith in trying to

20  make the best out of a terrible situation.  The comments made

21  by the SIPC trustee so many hours ago in reference to the

22  cooperation, the unusual cooperation that has characterized the

23  commencement of the SIPC proceeding and the coordination of

24  that proceeding with this bankruptcy case demonstrate not just

25  that New York lawyers and consultants can be good citizens but

250

1   that we all recognize that we're engaged in something here

2   that's very special.  This is the most momentous bankruptcy

3   hearing I've ever sat through either as a lawyer or as a judge.

4   And I'm guessing I'm not alone in that sense.

5        One could be a theoretical bankruptcy jurist and say

6   transactions such as this should always be subject to more time

7   so that parties can better assess the consequences of the

8   transactions.  Bankruptcy Rule 6003 which was enacted recently

9   was designed among other things to slow down activities in the

10   first twenty days of big bankruptcy cases.  This is Friday.

11   This case was filed on Monday.  What we're doing is unheard of

12   but imperative.

13        I am completely satisfied that I am fulfilling my

14   duty as a United States bankruptcy judge in approving this

15   transaction and in finding that there is no better or

16   alternative transaction for these assets, that the consequences

17   of not approving a transaction could prove to be truly

18   disastrous.  And those adverse consequences are meaningful to

19   me as I exercise this discretion.  The harm to the debtor, its

20   estates, the customers, creditors, generally, the national

21   economy and the global economy could prove to be incalculable.

22        Moreover, it's not just about avoiding harm.

23   Approving the transaction secures whether for ninety days or

24   for a lifelong career employment for 9,000 employees at Lehman,

25   and holds together an operation the value of which is really

251

1    embedded in the talent of the employees, their knowledge, their

2    relationship, their expertise and their ability to create value

3    to the economy.

4            Earlier today, I guess it was yesterday, I said that

5    I was concerned about the real estate value in this

6    transaction.  I still am but I'm getting over it.  I believe

7    that sophisticated negotiations cannot be parsed neatly into

8    the constituent parts because they're integrated and

9    interrelated in the result of give and take.  I'm unable to

10   value a piece of New York City real estate and there's been no

11   real evidence presented although the appraisal has been alluded

12   to.  I suppose it is theoretically possible that if the office

13   building at 745 Seventh Avenue were subject to marketing and

14   auction procedures over a lengthy period of time and were

15   somehow viewed as a quasi trophy property that perhaps it might

16   bring more value.  But that's speculation.  As to the data

17   centers, I have no idea.  I'm not even sure I know what a data

18   center.  I expect it's a place that has servers and deals with

19   the back office needs of a large operation such as this.  And

20   that, in a sense, describes part of the problem for me as a

21   judge here.  I know that I need to approve this transaction.  I

22   am absolutely confident in my judgment.  But I also know that

23   this is so exceptional relative to the experience that I have

24   had both as bankruptcy lawyer and as judge to know that it

25   could never be deemed a precedent for future cases unless

252

1    someone could argue that there is a similar emergency.  It's

2    hard for me to imagine a similar emergency.

3              And so, as to those objectors who say it would be

4    establishing bad precedent to approve this transaction, I say

5    no.  This is not a bad precedent.  To the contrary.  It's an

6    extraordinary example of the flexibility that bankruptcy

7    affords under circumstances such as this.  It's an example that

8    creative minds working diligently day and night even under the

9    worst of circumstances can create remarkably complicated

10   transactions that preserve value.  I am proud to have been part

11   of this process.

12             I'm also satisfied that if everybody stays who needs

13   to comment on the order that some of the legal issues that have

14   been raised during the objection phase of this hearing can be

15   addressed.  I note the arguments made by Mr. Bienenstock on

16   behalf of the Walt Disney Company, that I can't do anything

17   that's illegal.  And he's right.  However, it's not illegal to

18   enter orders that include from time to time language that

19   people dispute or language that may be ambiguous or language

20   that might have been better drafted.  I regret to say that I

21   think I do it every day.  And most of it's because I enter

22   orders that you draft.  So, I don't think it's illegal for me

23   to do something that may lead to an argument in the future as

24   to what the language of the order means.

25             As far as Mr. Rosner's arguments are concerned and