BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Jonathan D. Schiller
Hamish P.M. Hume
Jack G. Stern

Attorneys for Barclays Capital Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

Chapter 11 Case No.

08-13555 (JMP)

(Jointly Administered)

# Exhibit 7

|  | Hearing Date: _____ at _____.m. (prevailing Eastern Time) |
|---|---|
|  | Objection Deadline: _____ at 4:00 p.m. (prevailing Eastern Time) |

James B. Kobak, Jr.
David W. Wiltenburg
Stephen Luger
Christopher K. Kiplok
Jeffrey S. Margolin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS INC.,<br><br>        Debtor. | Case No. 08-01420 (JMP) SIPA |

**MOTION UNDER 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P.**
**9019(a) FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT**

James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of the business of Lehman Brothers Inc. ("Debtor" or "LBI"), by and through his undersigned counsel, hereby files this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C §§ 101-1330 (as amended, the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a settlement and compromise among the Trustee, Barclays Capital Inc. ("Barclays") and JPMorgan Chase Bank, N.A. ("JPMorgan") and as set forth in the settlement agreement, dated

60416369_1 (4).DOC

December 5, 2008, attached hereto as Exhibit "1" (the "Settlement Agreement")[1] pursuant to which the Trustee, Barclays and JPMorgan have agreed to settle and compromise certain claims arising from transactions related to (i) the Replacement Transaction and (ii) the Purchase Agreement, as defined below. In support of the Motion, the Trustee respectfully represents as follows:

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. 1334. This is a core proceeding pursuant to 28 U.S.C. § 157. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code.

## II. BACKGROUND

2. Commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Chapter 11 Debtors") commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

3. On September 16, 2008, certain of the Chapter 11 Debtors, LBI, and Barclays entered into an Asset Purchase Agreement (as amended and clarified from time to time, the "Purchase Agreement").

---

[1] The Settlement Agreement attached hereto does not include a copy of Annex A, as to which Barclays, JPMorgan and the Trustee have filed a motion seeking permission to file under seal.

60416369_1 (4).DOC

4. On September 19, 2008 (the "Filing Date"), the Honorable Gerard E. Lynch, Judge of the United States District Court for the Southern District of New York, entered the Order Commencing Liquidation (the "LBI Liquidation Order") pursuant to the provisions of the Securities Investor Protection Act ("SIPA") in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

5. The LBI Liquidation Order: (i) appointed the Trustee for the liquidation of the business of the Debtor pursuant to SIPA section 78eee(b)(3); (ii) appointed counsel to the Trustee pursuant to section 78eee(b)(3); and (iii) removed this case to this Court pursuant to section 78eee(b)(1).

6. On September 20, 2008, the Court entered an order approving the Purchase Agreement and the various transactions contemplated therein. (Chapter 11 Cases Docket No. 258.) On September 20, 2008, the Court entered a concurrent Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and other Relief in the Lehman Brothers, Holdings Inc. Chapter 11 Proceeding (Docket No. 3) thereby authorizing the Trustee to consummate the sale transaction on behalf of LBI pursuant to the Purchase Agreement.

7. The Settlement Agreement is designed to achieve the intended economic outcome of certain transactions that were carried out under emergency conditions during the days preceding and following the commencement of this SIPA proceeding. Under the leadership of the Federal Reserve Bank of New York ("New York Fed"), the Securities and Exchange Commission ("SEC") and the Secretary of the Treasury, the parties sought first to rescue Lehman, and, when this proved impossible, to create circumstances that would permit an orderly transfer of LBI customer accounts and an orderly liquidation of its business. The following

60416369_1 (4).DOC

factual summary, which includes discussion of events occurring prior to the Trustee's appointment, is based upon the Declarations of Shari D. Leventhal ("Leventhal Decl."), Gerard LaRocca ("La Rocca Decl.") and Jeffrey M. Moore ("Moore Decl.") in Support of Trustee's Motion for Entry of an Order Approving a Settlement Agreement, submitted herewith.

A. **The Replacement Transaction**.

8. During the week of September 15, 2008, following the chapter 11 filing of LBHI, LBI continued to operate. As described by the New York Fed, this was a "carefully thought out decision" designed to "facilitate an orderly wind-down" of LBI, and was supported by New York Fed financing of LBI's payroll and operations. (Leventhal Decl. ¶6.) This financing was on a fully secured basis, supported by LBI collateral. By September 17, the New York Fed had funded to LBI $46.22 billion in cash and Treasury securities against $50.62 billion in collateral. (Leventhal Decl. ¶9.)

9. On September 17, 2008, Barclays agreed to replace the New York Fed in funding LBI – that is, to "step into the shoes of the Fed." (See LaRocca Decl. ¶ 4; Leventhal Decl. ¶7.) The parties understood this to mean that Barclays would provide funding through a reverse repurchase transaction using essentially the same securities that had been pledged by LBI to the New York Fed (the "Fed Portfolio"). (LaRocca Decl. ¶¶ 4-5.)

10. The form of transaction selected by Barclays to effectuate the substitute funding for LBI was a reverse repurchase transaction between Barclays and LBI, entered into on September 18, 2008 (the "Replacement Transaction"). (Leventhal Decl. ¶12.) Pursuant to the Replacement Transaction, LBI was to provide Barclays with $49.7 billion in securities in exchange for $45 billion in cash. (Id.) This ratio was consistent with the ratio of cash to securities used in the earlier repurchase agreement between LBI and the New York Fed on September 17, 2008. (Id.)

4

11. On September 18, 2008, Barclays initiated the process of transferring $45 billion to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the New York Fed. By early evening of that date, the entire sum of $45 billion had been transferred by Barclays to LBI. (Leventhal Decl. ¶11; LaRocca Decl. ¶ 6.)

12. Notwithstanding that both Depository Trust and Clearing Corporation ("DTCC") and the Fedwire Securities Service remained open for hours past their normal closing times on September 18 in an effort to complete the delivery of the Fed Portfolio to Barclays, operational issues interfered with the ability to transfer all of the securities. When DTCC closed at 11 PM on September 18th, Barclays had received $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the Replacement Transaction. (Leventhal Decl. ¶14.)

13. LBI therefore agreed, either late on the night of September 18th or early in the morning of September 19, 2008, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMorgan. (Leventhal Decl. ¶15). The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the Replacement Transaction, and Barclays would transfer the Subject Funds to LBI. (Leventhal Decl. ¶ 15; see LaRocca Decl. ¶ 7.)

14. The transfer of the remaining securities was discussed on Friday September 19 and into the weekend, but did not occur. (LaRocca Decl. ¶9.) On September 19, SIPC commenced this proceeding and the Court approved the Purchase Agreement. The parties then entered into the Clarification Letter to the Purchase Agreement (the "Clarification Letter"), dated September 20, 2008. (LaRocca Decl. ¶10.) The closing pursuant to the Purchase

60416369_1 (4).DOC

Agreement occurred early on Monday, September 22, 2008. (LaRocca Decl. ¶ 8; Leventhal Decl. ¶19.)

15. In the meantime, JPMorgan caused the Subject Funds to be transferred to an LBI account at JPMorgan. (Leventhal Decl. ¶ 16.)

16. The Clarification Letter provided that the Replacement Transaction was terminated, and that the securities that had actually been delivered were "deemed to constitute part of the Purchased Assets" under the Purchase Agreement. Accordingly, LBI would have no further obligation to "repurchase" those securities under the repo and Barclays would not be obligated to deliver such securities back to LBI. (LaRocca Decl. ¶ 10.)

17. Barclays asserts that, at the time the Clarification Letter was finalized, Barclays believed that the $7 billion in cash was in its account at JPMorgan (LaRocca Decl. ¶ 11), and did not learn until Tuesday, September 23 (well after finalizing the Clarification Letter), that the Subject Funds were not in Barclays' account at JPMorgan. (Id. ¶ 12.)

18. As set forth in the accompanying affidavits, it is asserted that these events left Barclays without the full consideration it had contracted for under the Replacement Transaction and the Purchase Agreement. Barclays had neither the $7 billion nor its equivalent value in securities that were originally to have been delivered pursuant to the Replacement Transaction. (LaRocca Decl. ¶ 13; Leventhal Decl. ¶ 17.)

19. The LBI Estate faces claims related to its retention of both the remainder of the Fed Portfolio and the Subject Funds. The proposed settlement would convey to Barclays cash and securities having a lesser value, due to "market events" since September 17. (Moore Decl. ¶¶ 4-5.) The cash portion of the settlement consideration (leaving out distributions received since September 19) is the sum of $1.25 billion and $7.1 million, which is $5.743

billion less than the amount that might be claimed. The securities portion of the settlement consideration, although difficult to value with precision, is today worth "substantially less" than $5.743 billion. (Moore Decl. ¶ 6.) The difference creates a settlement discount for the LBI Estate.

**B.     The Settlement Agreement.**

20.     The principal terms of the proposed Settlement Agreement are as follows:[2]

(a) Barclays will receive (i) (x) the undelivered Fed Portfolio securities that have not been liquidated by JPMorgan (the "Settlement Securities"), together with (y) all principal and interest payments and any other distributions on the Settlement Consideration Fed Portfolio Securities (including, without limitation, the proceeds at maturity of any securities) attributable to the period on and after September 18, 2008, and (ii) $7,103,500 (representing the proceeds of certain Fed Portfolio Securities that initially were understood to be among the Settlement Consideration Fed Portfolio Securities but in fact have been liquidated by JPMorgan), plus, in the case of each of (i)(y) and (ii), interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period.

(b) To partially account for the undelivered Fed Portfolio Securities that will not be delivered to Barclays as part of the Settlement Securities (because they have been liquidated by JP Morgan) and the decline in value of the Settlement Securities since September 19, 2008, Barclays is to receive $1.25 billion in cash.

(c) Barclays will receive $14,942,677.88 (representing principal and interest payments, and any other distributions, on the Delivered Securities attributable to the period on and after September 18, 2008 which were received in LBI and/or JPMorgan accounts and not heretofore paid to Barclays), plus interest accrued thereon from the time of receipt to the time of payment at the effective fed funds rate from time to time during such period (together with the payments described in paragraph (b), the "Settlement Payment").

---

2. This summary is qualified in its entirety by reference to the Settlement Agreement, annexed hereto as Exhibit 1. In the event of any discrepancy between the Settlement Agreement and any description thereof contained in this Motion, the Settlement Agreement controls.

7

(d) The Settlement Securities and Settlement Payment will be remitted to Barclays from LBI accounts at JPMorgan. To facilitate the settlement, JPMorgan has agreed to release all liens on the Settlement Securities and Settlement Payment.

(e) The $7 billion of cash in LBI's account (referred to in paragraph 15 above) is acknowledged to have been applied against LBI's clearance advance obligations to JPMorgan, and the Settlement Securities, Settlement Payment and other amounts described in paragraphs 20(a) through (d) are not applied to such obligations.

(f) The parties will execute mutual limited releases.

### III.  RELIEF REQUESTED

21.  The Trustee has determined that protracted litigation over the foregoing events, with its attendant costs and risks, would not be in the best interest of the LBI Estate. By this Motion, the Trustee requests approval of the Settlement Agreement pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a).

A.   **Basis For Relief**

22.  Under section 363(b) of the Bankruptcy Code, a debtor in possession or trustee may "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. See Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141 (2d Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) of the Bankruptcy Code grants bankruptcy courts authority to

8

employ equitable principles in carrying out the Bankruptcy Code's provisions. See Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994).

23. Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Bankruptcy Rule 9019(a) "empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Accordingly, the Court is authorized to approve the settlement, on the terms set forth in the Settlement Agreement.

24. In determining whether to approve a proposed settlement pursuant to Bankruptcy Rule 9019(a), a court must find that the proposed settlement is fair and equitable, reasonable, and in the best interests of the debtor's estate. Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson, 390 U.S. 414, 424 (1968); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994). A decision to approve a particular compromise or settlement is within the sound discretion of the bankruptcy court. In re Drexel Burnham, 134 B.R. at 505. It is appropriate for the court to consider the opinions of the trustee or debtor in possession that a settlement is fair and reasonable. Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994). In addition, the bankruptcy court should exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., 217 B.R. 31 (Bankr. S.D.N.Y. 1998); see also Shugrue, 165 B.R. at 123 ("the general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above").

25.  In determining whether to approve a proposed settlement, a bankruptcy court need not decide the numerous issues of law and fact raised by the settlement, but rather, should "canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Purofied Down Prods., 150 B.R. 519, 522 (S.D.N.Y. 1993) (in making the determination of reasonableness, the court need not conduct a "mini-trial" on the merits). "All that [the proponent of the settlement] must do is establish [that] it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly [the settlement] might be considerably less (or more) than were the case fought to the bitter end." Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 573 (5th Cir. 1960) (citation omitted).

### B. The Settlement Falls Within the Range of Reasonableness

26.  In the instant case, both as an exercise of his business judgment for purposes of Section 363, and as a weighing of the reasonableness factors for purposes of Rule 9019, the Trustee has concluded that the Settlement Agreement should be approved.

27.  First, litigation based on LBI's retention of both the Subject Funds and the Fed Portfolio would be expensive and protracted, and would divert significant resources and attention of the Trustee, his counsel and staff.

28.  Second, the Estate is facing significant risk in the form of a claim in the amount of not less than $7 billion,. If such a claim were brought, it can be anticipated that a right to pre-judgment interest would also be claimed. Even at a relatively modest 6% rate (the CPLR currently specifies 9%), approximately $35 million per month of interest might be claimed to accrue while the issue remains unresolved. The settlement would avoid these risks in return for settlement consideration in an amount substantially less than the potential exposure.

60416369_1 (4).DOC

29.  <u>Finally</u>, the Settlement Agreement is the product of arm's length negotiations between the Trustee, Barclays, and JPMorgan, with the assistance of the New York Fed and the Securities Investor Protection Corporation.

30.  Accordingly, the Trustee submits that the settlement and compromise embodied in the Settlement Agreement is appropriate in light of the relevant factors, is fair and equitable, and should be approved.

31.  The Trustee's agreement to the settlement is based on the facts as set forth in the accompanying affidavits of knowledgeable representatives of Barclays and the New York Fed, and upon the Trustee's own review. The Trustee believes that the explanations set forth in the affidavits are reasonable and consistent with the facts known to him. As such, the proposed settlement avoids a large claim and the expense and distraction of litigation and produces a benefit to the LBI estate because the settlement consideration consists largely of securities which have declined in value.

32.  In consenting to this settlement, the Trustee does not take any position on any issue related to the Purchase Agreement or Clarification Letter or to the events and actions by various parties that preceded them that is not specifically covered by the Settlement Agreement. The Trustee will be investigating and reporting to the Court and creditors under §78-fff(d) of SIPA on many of these issues and the impact they and the Purchase Agreement and Clarification Letter have had on the wind-down of LBI and transfer of customer accounts. .

## IV.  <u>NOTICE</u>

33.  The Trustee will provide notice of the Motion pursuant to the Court's Order to Show Cause. The Trustee submits that no other or further notice need be given.

### V. NO PRIOR REQUEST

34. No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Trustee respectfully requests that the Court approve the Settlement Agreement and grant such additional and further relief as the Court deems just and appropriate.

Dated:   New York, New York
         December 5, 2008

                                         HUGHES HUBBARD & REED LLP

                                         By: /s/ James B. Kobak, Jr.
                                             James B. Kobak, Jr.
                                             David W. Wiltenburg
                                             Stephen Luger
                                             Christopher K. Kiplok
                                             Jeffrey S. Margolin
                                         One Battery Park Plaza
                                         New York, New York 10004
                                         Telephone: (212) 837-6000
                                         Facsimile: (212) 422-4726
                                         Email: kobak@hugheshubbard.com

                                         Attorneys for James W. Giddens, Trustee for
                                         the SIPA Liquidation of Lehman Brothers
                                         Inc.