**SILVERMANACAMPORA LLP**
Attorneys for Western Digital Corp.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman, Esq.
Jay S. Hellman, Esq.
Katina Brountzas, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re

       LEHMAN BROTHERS HOLDING INC., *et al.*    Case No. 08-013555 (JMP)

                                                                                               (Jointly Administered)

                                           Debtor.
-------------------------------------------------------------------X
WESTERN DIGITAL CORP.,

                Plaintiff,

      -against-                                                         Adv. Pro. No. 09-_____

LEHMAN BROTHERS HOLDING INC., *et al.*

                Defendant.
-------------------------------------------------------------------X

## COMPLAINT

Western Digital Corporation ("WDC"), by it counsel, SILVERMANACAMPORA LLP, as and for its complaint (the "Complaint") against Lehman Brothers Holding Inc. ("LBI" or the "Debtor"), respectfully represents as follows:

## Nature of Case

1.      This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure, 11 U.S.C. §§105, Section 10b-5 of the Exchange Act 15 U.S.C. §78j(b), California Corp. Code §25400, and California state law to recover compensatory and punitive damages against LBI in connection with WDC's investment in auction rate securities ("ARS").

2. As a result of an undisclosed conflict of interest between LBI and its customers, LBI's customers, including WDC, have suffered a devastating financial impact induced by LBI's deceptive sales practices with respect to ARS, a supposedly liquid financial product.

3. In 2005 and 2006, Lehman pitched ARS to WDC – and numerous other customers – as money-market instruments or cash alternatives.

4. LBI explained to WDC that the interest rates on ARS were set through a well-established auction market and that the instruments were readily tradable at such auctions (which typically occurred every 7, 28 or 35 days).

5. LBI represented that, as a consequence of the auctions, ARS would always be liquid, short-term investments.

6. LBI represented that ARS were therefore ideal for investors whose investment goals were principal preservation and liquidity.

7. As to corporate investors specifically, LBI offered ARS as a means for these entities to place operational cash in highly-liquid instruments to be accessed upon short notice for continuing operations and upcoming projects.

8. The reality, well known to LBI but undisclosed to WDC, was that in fact, ARS was not supported by a broad, fully-functioning market and therefore could be subject to failed auctions and illiquidity. LBI concealed from WDC that:

- The auctions were not supported by arms-length transactions consummated in an "open market." In fact, the auction market was supported and directed by only a handful of investment banks.

- LBI, in fact, submitted a support bid for every auction for which it was a broker-dealer to ensure that the auction did not fail. Lehman also set the interest rate in most of the auctions with the bids it submitted.

- LBI actively managed the interest rates so that they would be just high enough to move the ARS it had underwritten but not so high as to make the issuers that were

2                              JSH/D282841v/F056621

        its underwriting clients unhappy.

- The products offered to WDC were products that LBI had underwritten and was trying to distribute. In other words, LBI was serving a dual role in underwriting ARS and, at the same time, selling them to clients.

9. LBI also intentionally concealed the problems with ARS that began to surface in the middle of 2007.

10. During this time period, certain auctions failed because there was an insufficient number of purchasers. As a result, LBI was forced to support the auction market by purchasing increasing amounts of ARS.

11. The troubled auctions meant that LBI was carrying dangerous levels of ARS inventory on its books in the latter half of 2007. This created tension within LBI as it was purchasing ARS at the same time it needed to reduce its ARS inventory.

12. At this point, an incredible conflict of interest existed. LBI desired to have auctions clear thus allowing it to continue its lucrative business of underwriting ARS through the end of 2007. For auctions to clear, however, LBI had to use more and more of its own capital to purchase ARS.

13. At the same time, LBI needed to clear ARS off its books. Instead of acting in the interests of its customers, LBI considered only its own interests and refused to break the cycle created by its inherent conflict of interest.

14. LBI instead embarked on a secret scheme to reduce its inventory by selling to the very customers that LBI should have been protecting, including WDC. In breach of ethics and fiduciary obligations, LBI began an all-out effort to market ARS – often its own ARS – to its investors while it concealed the above facts.

15. LBI's efforts could not have been more harmful to its customers as it was dumping ARS on its customers, including WDC, when those customers should have been exiting ARS.

16. On February 13, 2008, eighty-seven (87%) percent of all ARS failed when several of the major broker-dealers refused to continue to support the auctions.

17. As a result of the withdrawal of support by these broker-dealers, the market for ARS collapsed, leaving the holders of more than $300 billion in ARS with no means of liquidating investments LBI offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

18. LBI soon decided to cease support for ARS thereby leaving WDC with instruments that are now illiquid.

19. By setting up a situation where it was actively controlling whether auctions would clear and at what rate they would clear, LBI had (unbeknownst to its customers, including WDC) set up a situation which put it in a fundamentally conflicted role between its desire to keep its underwriting clients happy with the promise of low financing costs and its need to keep the auctions it had set up afloat.

20. LBI was confronted with a conflict between its customers who thought they had purchased safe, liquid, moneymarket instruments which, without LBI's continued support would no longer be liquid, and its risk management arm which did not want to be stuck holding the very paper LBI underwrote and pushed to its clients. None of these conflicts were visible to LBI's retail clients, including WDC.

21. LBI's conduct amounted to an intentional fraud, a breach of basic fiduciary duties and an abdication of its duties to its customers, including WDC.

22. WDC has been damaged as result and now seeks recovery of all compensatory damages, as well as an award of punitive damages to prevent fiduciaries such as LBI from acting so brazenly and irresponsibly in the future.

### I. Jurisdiction and Venue

23. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 because this adversary proceeding arises in or arises under the chapter 7 case of the Debtor in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

24. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and 157(b) and the Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York.

25. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(1) and 157(b)(2)(O).

26. Venue of this adversary proceeding is proper in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and1409.

## II. Parties

27. On September 15, 2008, LBI filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under title 11 of the United States Code (the "Bankruptcy Code") and, since that date, it has operated its business and managed its properties as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

28. LBI is a corporation organized and incorporated under the laws of Delaware. It is registered for business in this state and has its principal business address at 745 Seventh Avenue, New York, New York 10019.

29. WDC is a corporation organized and incorporated under the laws of Delaware. WDC has principal offices at 20511 Lake Forest Drive, Lake Forest, California.

## III. General Allegations Common to All Claims for Relief

**A.   Background**

30. The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions."

31. ARS generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

32. ARS were first introduced in the 1980s. Since then, the market for ARS grew dramatically and the current estimated value of ARS in existence (prior to the collapse of the auction market) is around $350 billion.

33. The theory behind ARS was simple. Issuers of long-term debt typically have to pay higher interest rates on such debt than comparable issuers of short-term debt. However, if, through an auction mechanism, that long-term debt could be readily tradable as if it were short-term debt, then issuers of such debt could have the benefit of having issued long-term debt but having to pay only a lower interest rate that is more in alignment with short term debt obligations.

34. ARS were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction.

35. The method for auctioning the securities was typically described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities.

36. The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

37. The auction itself was of the type commonly referred to as a "Dutch" auction, *i.e.* one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction.

38. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

39. At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate."

40. The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction.

41. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula.

42. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

43. If there were not enough orders to purchase all the shares being sold at the auction, an auction would be deemed to have failed. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate. Either way, the maximum rate was set out in the prospectus. If the auction failed then none of the current shareholders could sell their shares.

44. The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

45. Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

46. Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts.

47. In 2004, the SEC began to investigate these manipulative practices affecting the auction market.

48. In 2006, the SEC entered into a consent decree with a number of major broker-dealers which required them to disclose certain practices to investors and to stop engaging in certain other practices.

49.     The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed.

50.     The consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

**B.     LBI Materially Misrepresented the Liquidity of and Risks Associated With Auction Rate Securities and Omitted Material Facts About Its Role and the Auction Market**

51.     ARS were extremely profitable for LBI and for the LBI financial advisors who sold the securities.

52.     As one of the largest underwriters of ARS, LBI received significant underwriting fees from the issuers of these securities.

53.     As a broker-dealer, LBI also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process.

54.     LBI also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account.

55.     Individual LBI financial advisors had a significant financial incentive to sell auction rate securities, as they were compensated by LBI for each auction rate security sold.

56.     The multiple income streams from which LBI benefited when ARS were sold were not disclosed to Lehman's customers, including WDC.

57.     In order to perpetuate the auction market and sell as many auction rate securities as possible, LBI represented to investors, including WDC, in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term invest.

58.     Pursuant to uniform sales materials and top-down management directives, LBI financial advisors throughout the United States represented to current and potential LBI clients that the auction rate securities sold by LBI were equivalent to cash or money market funds and were safe,

highly liquid short-term investment vehicles suitable for investors with as little as one week in which to invest.

59. LBI failed to disclose to purchasers of auction rate securities, including WDC, material facts about these securities.

60. LBI failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer.

61. LBI failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because LBI and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability.

62. In fact, at all relevant times, the ability of holders of auction rate securities, including WDC, to liquidate their positions depended on the maintenance of an artificial auction market maintained by LBI and the other broker-dealers.

63. When LBI and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by LBI became illiquid.

64. In sum, LBI failed to disclose that the short-term nature of the securities and the ability of investors, including WDC, to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by LBI and the other broker-dealers.

65. LBI further failed to inform its clients, including WDC, that beginning in the latter half of 2007, certain ARS, which LBI had structured and brought to market, were approaching their interest rate caps and were in danger of becoming unmarketable.

66. Moreover, clients were not informed that LBI was actively considering scenarios which included pulling out of its auction program altogether.

67. LBI also failed to disclose to purchasers of ARS material facts, including WDC, regarding its role in the auctions and the auction market in which these securities were traded.

68. LBI failed to disclose that in connection with the sale of auction rate securities, LBI simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to LBI on its holdings of the auction rate securities.

69. LBI failed to disclose that it and other broker-dealers routinely intervened in auctions by bidding, purchasing and selling ARS for their own benefit, to set rates and prevent all-hold auctions and failed auctions.

70. LBI failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities.

71. LBI continued to aggressively market auction rate securities after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

72. LBI failed to disclose to its customers, including WDC, that the auctions it was conducting were not governed by arms-length transactions but instead suffered from systemic flaws and manipulative practices, including intervening in auctions by bidding and purchasing ARS for LBI's proprietary account or asking customers to make or change orders, preventing failed auctions and all-hold auctions to set the market rate, and submitting or changing orders after auction deadlines.

73. LBI customers, including WDC, were never told that LBI had a policy of placing support bids in every auction for which it was the sole or lead broker-dealer, that LBI routinely intervened in the auction markets to set the interest rates just high enough to move the product but just low enough to keep its issuer clients happy, that certain potential conflicts of interest existed between LBI and its customers and, that in August 2007 LBI changed its policy of placing support

bids in every auction for which it was lead broker-dealer and allowed some of the ARS it had underwritten to fail.

74. LBI also concealed the fact that it was selling ARS from its own account at a time when it was promoting ARS to its customers.

**C.    The Market for Auction Rate Securities Collapses**

75. In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only two to six percent of the entire auction rate securities market.

76. In the fall-winter of 2007, more auctions began to fail.

77. Even though some of the auctions that failed initially were conducted by LBI, it continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

78. On February 13, 2008, eighty-seven (87%) percent of all auctions of auction rate securities failed when the major broker-dealers refused to continue to support the auctions.

79. Soon thereafter, LBI notified its brokers and investment advisors that LBI was no longer supporting the auction market for auction rate securities.

80. This information was not released to LBI investors or to the public, but was leaked to the press and publicly reported the next day.

81. Virtually every other major broker-dealer, including Goldman Sachs, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market.

82. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, rendering more than $300 billion of outstanding securities illiquid.

11

83. The market for auction rate securities sold by LBI appeared to be open, well-developed and efficient until the truth emerged and the auction market collapsed.

84. As a result of the materially false and misleading statements and failures to disclose, auction rate securities sold by LBI traded at artificially inflated prices.

85. LBI's customers purchased and continued to hold auction rate securities sold by Lehman relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

**D. WDC Suffered Quantifiable Economic Loss**

86. LBI served as WDC's financial advisor in 2005.

87. In the context of this relationship, WDC told LBI that it had a significant amount of cash reserves and that it wanted to place these funds in liquid investments based on a strategy of principal preservation and parity.

88. WDC specifically indicated to LBI that it did not want to invest in products with long-term maturities regardless of their returns and that principal preservation and liquidity were priorities.

89. To ensure that WDC's investment risk profile was clear to LBI, its board of directors prepared an investment policy.

90. WDC and LBI discussed the fact that all investments should meet the guidelines set forth in the investment policy.

91. In response to WDC's clear statements regarding its investment objectives, LBI recommended that WDC invest in ARS.

92. In recommending ARS, LBI materially misled the investing public, including WDC, as described in above in greater detail.

93. After WDC's ARS investments were made, LBI continued to conceal the actual risks associated with ARS and the other material facts that had not been previously disclosed.

94. LBI repeatedly reassured WDC that ARS met its investment objectives and remained completely liquid.

95.    Indeed, as described above, LBI, upon discovery of problems with ARS, instead of disclosing those problems to WDC continued to represent that ARS was a liquid investment consistent with WDC's investment objectives.

96.    By doing so, LBI was able to sell ARS on its books directly to its customers such as WDC and reduce LBI's exposure to ARS. This was done solely to help LBI at the direct expense of WDC.

97.    As a result of the representations and non-disclosures made by LBI, WDC invested in significant amounts of ARS through LBI.

98.    Currently, WDC has over $26 million in illiquid ARS positions.

## FIRST CLAIM FOR RELIEF
### (incorporating all previous allegations)

99.    LBI carried out a plan, scheme and course of conduct which was intended to and did: (a) deceive the investing public, including WDC, as alleged herein; (b) enable LBI to sell hundreds of millions, if not billions, of dollars of auction rate securities to current and prospective LBI clients, and on which LBI made substantial commissions; and (c) cause WDC and other members of the public to purchase auction rate securities from LBI at artificially inflated prices.

100.    In furtherance of this unlawful scheme, plan and course of conduct, LBI took the actions set forth herein.

101.    LBI (a) employed devices, schemes, contrivances, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from LBI in an effort to maintain artificially high sales and market prices for such securities.

102.    LBI, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the auction rate securities sold by LBI, as specified herein.

103. LBI employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by LBI were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from LBI.

104. LBI had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.

105. LBI's material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities.

106. If LBI did not have actual knowledge of the misrepresentations and omissions alleged, it was deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

107. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by LBI was artificially inflated.

JSH/D282841v/F056621

108. In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by LBI, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by LBI but not disclosed in public statements by LBI, WDC acquired and continued to hold auction rate securities sold by LBI at artificially high prices and were damaged thereby.

109. At the time of said misrepresentations and omissions, WDC was ignorant of their falsity, and believed them to be true.

110. Had WDC and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by LBI, which were not disclosed by LBI, WDC would not have purchased and continued to hold their auction rate securities, or, if it had acquired such securities, they would not have done so at the artificially inflated prices which they paid.

111. As a direct and proximate result of LBI's wrongful conduct, WDC suffered damages in connection with its purchases of ARS sold by LBI.

112. As a result, LBI is liable to WDC under Section 10b-5 of the Exchange Act 15 U.S.C. §78j(b) and/or California Corp. Code §25400.

### SECOND CLAIM FOR RELIEF

**(incorporating all previous allegations)**

113. As alleged above, WDC reposed trust and confidence in LBI as their financial advisor, and LBI assumed and/or voluntarily accepted WDC's trust and confidence, such that a fiduciary relationship arose between WDC and LBI, pursuant to which LBI was bound to act with the utmost good faith and in the best interests of WDC.

114. As alleged above, LBI breached its fiduciary duty to WDC by failing to recommend suitable and appropriate investments in view of WDC's financial status and investment objectives; churning WDC accounts; defrauding WDC concerning the nature and risks associated with its investments; converting WDC's funds for its own benefit; failing to carry out WDC's stated investment

objectives; failing to adequately determine WDC's actual financial situation and needs; and engaging in transactions in WDC's accounts that were beyond WDC's risk threshold and inconsistent with WDC's investment objectives.

115. As a result of LBI's breaches of fiduciary duty, WDC has suffered damages, in an amount to be proven at trial.

116. In acting as alleged above, LBI acted oppressively and in wanton and conscious disregard of the rights of WDC.

117. Accordingly, punitive damages should be assessed against LBI in an amount which will be sufficient to discourage it from engaging in such conduct in the future, but in no event less than $65 million.

## THIRD CLAIM FOR RELIEF

### (incorporating all previous allegations)

118. LBI, as WDC's financial advisor, owed a duty of care to WDC, including but not limited to a duty to deal fairly with WDC as customers in a manner consistent the standards of conduct imposed upon financial advisors.

119. As alleged above, LBI negligently performed its duties as a financial advisor and breached the duties of care owed to WDC by failing to recommend suitable and appropriate investments in view of WDC's financial status and investment objectives; churning WDC accounts; misleading WDC concerning the nature and risks associated with its investments; converting WDC's funds for its benefit; failing to carry out WDC's stated investment objectives; failing to adequately determine WDC's actual financial situation and needs; and engaging in transactions in WDC' accounts that were beyond WDC's risk threshold and inconsistent with WDC's investment objectives.

120. As a direct result of LBI's negligence, WDC has suffered damages, in an amount to be proven at trial but reasonably believed to be not less than $26 million.

121. LBI's conduct was a direct and proximate cause of WDC's damages.

## FOURTH CLAIM FOR RELIEF
**(incorporating all previous allegations)**

122. At all times relevant herein, LBI, directly and indirectly, conceived of and participated in a scheme and a continuous course of conduct to defraud WDC by engaging in the conduct set forth above.

123. LBI's wrongful conduct included making misrepresentations of fact and omitting and concealing material information regarding the nature and risks associated with WDC's investments.

124. In order to induce WDC to make its recommended investments and engage in its recommended transactions, LBI made and repeated numerous misrepresentations and concealed material information from WDC, as alleged above.

125. Those representations and concealments set forth were material and false and concealed material information, and were known by LBI to be so.

126. WDC relied upon the representations made by LBI in making the investments alleged above, and would not have made the investments but for LBI's recommendations and advice.

127. The misrepresentations, omissions and concealments alleged above were false and misleading when made, were known to LBI to be false and misleading when made and should have been qualified by material facts, as alleged above.

128. LBI made the misrepresentations and omitted and concealed material facts with the intent to deceive WDC regarding the nature and risks associated with WDC's investments.

129. In making the investments described above, WDC reasonably and justifiably relied on LBI's conduct, including its misrepresentations, omissions and concealments of material facts.

130. WDC was unaware of LBI's scheme and misrepresentations, omissions and concealments of material facts.

131. Had the true facts been known, WDC would not have made the investments described above.

132. As a direct and proximate result of LBI's fraudulent conduct, WDC has suffered and will continue to suffer damages in an amount to be proven at trial but reasonably believed to be not less than 26 million.

133. In acting as alleged above, LBI acted oppressively and in wanton and conscious disregard of the rights of WDC.

134. Accordingly, punitive damages should be assessed against LBI in an amount which will be sufficient to discourage LBI and others from engaging in such conduct in the future, but no less than $65 million.

**WHEREFORE**, WDC respectfully demands judgment as follows:

A. Awarding compensatory damages in favor of WDC for all damages sustained as a result of LBI's wrongdoing, in an amount to be proven at trial, but reasonably believed to be no less than $26 million, including interest thereon;

B. Awarding WDC its reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C. Awarding punitive damages in favor of WDC in an amount no less than $65 million; and

D. Such other and further relief as this Court may deem just and proper.

Dated: Jericho, New York
June 9, 2009

**SILVERMANACAMPORA LLP**
Attorneys for Plaintiff Western Digital Corp.

By:    s/ Jay S. Hellman
Jay S. Hellman, Esq.
A Member of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300