# EXHIBIT H

**From:** Byman, Robert L
**Sent:** Friday, June 05, 2009 12:58 PM
**To:** 'JAMIE.WINE@lw.com'
**Cc:** MILES.RUTHBERG@lw.com
**Subject:** RE: Lehman Examiner; Ernst & Young

Jamie --

Unfortunately, your recount and my memory of our conversation Wednesday do not hit on all cylinders -- but while I believe what you have set out is neither entirely accurate nor complete, I see no point in debating that now, and will save it for another day. The bottom, regrettable, line is that we are at impasse.

You have confused our willingness to work with other parties to reach confidentiality agreements with a concession that such orders are automatically appropriate. Where a party has agreed to fully produce what we have requested, we have agreed to confidentiality agreements to expedite the process. E&Y is the first (and so far only) entity with whom we have been required to reach the subpoena and possible motion practice stage, and if we are required to litigate, we might as well also litigate the issue of whether a confidentiality agreement is actually appropriate under the circumstances. We agree in principle that a producing party is entitled to protection for truly confidential material, but you have not demonstrated to us how our subpoena to E&Y calls for such material, and absent that showing we are not inclined to agree to the cumber of a confidentiality agreement with a party who has declined full cooperation.

The simple fact of the matter is that we remain willing -- anxious even -- to enter into a reasonable stipulation for confidentiality in return for a reasonable and expeditious response to our request for documents. But we find that both your requested stipulation and your response fall short.

The form of your second draft order is better than the first but still too over-reaching. The JP Morgan order you worked from has a two tier classification so that Highly Confidential treatment can be applied to such things as existing securities positions, the disclosure of which might affect the value or liquidity of the position. We are aware of nothing in E&Y's case that justifies a similar higher level of confidentiality. And that said, we are not aware that the work papers we seek are entitled to any confidentiality at all.

You concede in your draft that confidential treatment should be reserved for proprietary or competitively sensitive information, intimate or potentially embarrassing personal information, and trade secrets. Given Lehman's current status, it is unclear to

us how much if any of E&Y work papers for 2007 and 2008 actually fit those definitions, but we presume it is something far less than all.  Yet you propose that every bit of information we received from the SEC should be retroactively designated confidential.  Putting aside for the moment whether that horse is already on the wrong side of your barn door, your proposal leads us to conclude that you intend to wholesale designate everything you ultimately produce to us as confidential.  What assurance do we have that you will not do so?

As to your suggestion for limiting your production, you have repeatedly referred to the enormity and burden of producing the entire set of 2007 work papers -- but you have never quantified that burden so we cannot evaluate it.  You suggested that we tell you specifically what portions of the work papers we want -- but I have told you we can't do that because we don't know what the work papers contain and whether a specific request will result in missing something of significance.  So in our call Wednesday, I offered this compromise:  since E&Y knows what is and what is not in the work papers, you should describe and identify portions that are completely irrelevant so that we can exclude them to ease your undefined burden.  You have declined that suggestion and simply reiterated your position that we should make a blind, specific limited request, after which you will *consider* whether to honor it.

I enjoy the dance as much as the next guy, but we aren't getting anywhere.  The failing may be ours in not apprehending your position; it may be yours in not fully articulating it.  Perhaps when we see how you lay out your objections to Judge Peck, you will be more clear and we will have some inspiration for further dialogue.  We will expect to see those objections Monday.

Bob

---

**From:** JAMIE.WINE@lw.com [mailto:JAMIE.WINE@lw.com]
**Sent:** Thursday, June 04, 2009 8:49 PM
**To:** Byman, Robert L
**Cc:** MILES.RUTHBERG@lw.com
**Subject:** RE: Lehman Examiner; Ernst & Young

Bob,

Thanks for taking the time to speak with me yesterday about the Subpoena you issued to EY.  I wanted to confirm some of the points from our discussion and offer some proposed compromises regarding the scope of your requests.

First, you confirmed that the Examiner has no intention at this point to share materials marked confidential with any non-governmental third party.  You also stated that when the Examiner files his

2

report, you anticipate that the report will be filed under seal, with color-coded (or some other) designations identifying which portions of the report and its exhibits various parties contend are confidential, and that to the extent the Examiner wants to contest any of those confidentiality designations and make public any of that confidential information, the Examiner will request that the Bankruptcy Court rule on the propriety of those confidentiality designations.

With this in mind, I have attached a revised draft confidentiality agreement for your conisderation.  Based on the concerns you raised about the prior draft agreement we sent, we have modeled this draft based on the confidentiality agrement you entered with JP Morgan, which has been ordered by the Bankruptcy Court.  We have modified the agreement slightly, primarily (a) to broaden the definition of "confidential" documents to include those materials typically protected under FRCP 45(c)(3)(B)(i) and Federal Rule of Bankruptcy Procedure 9016, (b) to add certain protections regarding EY documents the Examiner receives from sources other than EY, and (c) to include a claw back provision regarding inadvetently produced material.  Please let us know if this draft agreement is acceptable to you.

Second, you confirmed that Request Nos. 1 and 2 in your Subpoena seek workpapers only.  With regarding to Request Nos. 3 and 4, you stated that you are interested in obtaining the support for EY's audit and review procedures relating to LBHI's valuation of assets and that, to the extent those procedures are documented in the workpapers, you are not seeking documents beyond workpapers in response to those requests.

Third, I confirmed that, despite EY's belief that many of the 2008 LBHI review and in-progress audit workpapers are irrelevant to the specifically-defined areas of the Examiner's investigation as set forth in the January 16, 2009 Order, in the spirit of compromise, EY is willing to produce those 2008 review and in-progress audit workpapers in their entirety.

Fourth, we discussed again the Examiner's request for the entirety of the 2007 LBHI audit workpapers.  I conveyed that we continue to believe that the vast majority of the enormous volume of 2007 workpapers (for the time period ending November 30, 2007) is not relevant to the specifcally-defined areas of the Examiner's investigation, most of which are tied to the weeks leading up to LBHI's bankruptcy on September 15, 2008.  You articulated two reasons for wanting the entire set of the 2007 workpapers.  First, you stated that as part of your breach of fiduciary duty analysis, you want to look back to the March 2007 time period, to investigate potential claims that Lehman's officers and directors at that time decided to "double down" on real estate investments, and decided to make risky investments that potentially were not valued properly on Lehman's books.  Second, you stated that also as part of your breach of fiduciary duty analysis, you want to look back to early 2008 to see whether Lehman was solvent at that time and, if not, you may want to look back to earlier periods to determine the earliest possible date that Lehman was not solvent.

In response, I asked whether you could identify for us which categories of assets you believed were relevant to these inquiries, so that we could consider producing to you those portions of EY's 2007 workpapers that related to the assets of interest.  You declined in part because you would have difficulty identifying those areas of EY's workpapers that are relevant, not knowing what is contained in EY's workpapers nor understanding how EY's workpapers are organized.  Instead, you said you would conisder a compromise from EY that might make sense based on your articulated reasons for wanting to obtain the 2007 workpapers.

We thus suggest the following compromise:

On the first point regarding the real estate investment purchased in and after March 2007, we believe the Examiner is required to make a greater showing than simply to assert that unspecified LBHI real estate assets were overvalued.  To the extent you are able to identify real estate assets -- by name, type or category -- that were purchased in or after March 2007 and that you in good faith contend may have been overvalued by LBHI, we are prepared to produce all 2007 workpapers that relate to the valuation of those

3

particular assets.

On the second point regarding LBHI's solvency, we understand you do not at this point contend that the Examiner has a good faith basis for asserting that LBHI was insolvent as of November 30, 2007; only that you may want to look back at solvency in 2007 should you conclude there is support for the position that LBHI was insolvent in early 2008.  (As noted, subject to negotiating an acceptable form of confidentiality agreement, we are prepared to produce copies of EY's 2008 workpapers to the Examiner.)  Accordingly, our proposal is that we defer consideration of access to EY's 2007 workpapers that may address the solvency of LBHI during 2007 until such time as the Examiner has completed its review of EY's 2008 workpapers and his assessment of LBHI's solvency as of early 2008.  At the conclusion of that review, should the Examiner assert in good faith that there is a basis to believe that LBHI was insolvent as of early 2008, we are prepared similarly in good faith to provide those documents from EY's 2007 workpapers that reasonably bear on such solvency analysis.

Please let me know if you agree with the foregoing, and whether our draft confidentiality agreement and our proposed compromise on the 2007 workpapers are acceptable to you.

Jamie