## EXHIBIT B

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

          08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

          Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

          Debtor.

- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                January 14, 2009

                10:12 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

62

1    over to the January 28th date for possible litigation.  The

2    parties have agreed, Your Honor, and they're in the process of

3    reaching a consensual resolution.  So the January 15th day has

4    faded away.  And it's expected by January 28th that we will

5    have a consensual resolution of this matter.  But TPG Austin

6    just wanted to have that on the record for today.  So nothing's

7    going to happen tomorrow, Your Honor.

8                THE COURT:  Fine.

9                MR. MILLER:  Okay, Your Honor.  Now going back to the

10   contested matters, Your Honor, item 13 -- I'm sorry.  Item 14,

11   Your Honor, which is the motion of the Bank of New York Mellon.

12   This is in connection with all of the discussion about

13   examiners, Your Honor.  This brings to the forefront the issue

14   of coordination.

15               THE COURT:  Correct.

16               MR. MILLER:  It is the motion of the bank and I'll

17   let the bank present it.

18               MR. HOROWITZ:  Good afternoon, Your Honor.  Gregory

19   Horowitz from Kramer Levin on behalf of the Bank of New York

20   Mellon as the indenture trustee for I refer to as the Main

21   Street bondholders sometimes.  The Main Street bondholders hold

22   over 700 million dollars worth of claims against LBCS and they

23   also have guaranty claims against LBHI.

24               Your Honor, LBCS is Lehman Brothers Commodity

25   Services.  And the indenture trustee seeks 2004 discovery based

1    on what appeared to be the following facts.  Prior to the

2    bankruptcy, Your Honor, the only Lehman Brothers entity that

3    was ever publicly represented to engage in commodities business

4    at all was LBCS, Lehman Brothers Commodities Trading.  If you

5    looked in the company's, LBHI's, SEC filings, their 10Q, for

6    example, states that the company conducts its commodities

7    business through LBCS.  If you looked at LBI, Lehman Brothers

8    Inc.'s website and you clicked on commodities, what you were

9    directed was a description of LBCS.  There was never any

10   suggestion that there was commodities business conducted

11   through any other Lehman Brothers entity.  And indeed, the

12   offering materials for the bonds at issue similarly described

13   LBCS' repository for Lehman Brothers commodities business.

14          At the time of the Barclays transaction, Your Honor,

15   LBCS was a nondebtor.  And at least one or two LBCS creditors,

16   not, by the way, Your Honor, including the indenture trustee,

17   objected to the inclusion of LBCS in the sale and presumably

18   also the inclusion of the free and clear aspects of the sale

19   order.  The debtor resolved those objections by agreeing to

20   exclude LBCS from the sale.  And at the hearing on the sale

21   order, debtors' counsel expressly represented to the Court that

22   not only was LBCS being excluded from the sale but nothing

23   about the sale would affect LBCS' ability to operate as an

24   ongoing entity.

25          So we were surprised, Your Honor, when slightly more

1  than two weeks later, Barclays issued a press release

2  announcing that it had "fully integrated Lehman Brothers

3  commodities business under the Barclays Capital name.  On the

4  basis of that, Your Honor, the indenture trustee and the Main

5  Street bondholders have ample reason to believe that the

6  creditors and LBCS may have one or more viable causes of

7  action.  And without meaning to give an exhaustive list, the

8  potential causes of action that might arise depending on what

9  the true facts turn to be could include claims by the

10  bondholders against Barclays for successorship liability

11  notwithstanding, I understand, and I've heard Barclays' counsel

12  on the notion that there was a free and clear aspect to the

13  sale order.  As I say, LBCS was not part of that and LBCS was a

14  nondebtor and we don't believe that the Court could approve a

15  transfer of LBCS' assets free and clear when it was not a

16  debtor.  Could also include, to the extent that the facts

17  suggest that Barclays acquired assets of LBCS, business of LBCS

18  that it did not pay for, could involve claims against Barclays

19  for compensation for that unpaid for value.  To the extent that

20  it turns out that Barclays did pay for the commodities business

21  and there was some perhaps last minute reach agreeing LBCS to

22  resolve objections but that it was part of the consideration,

23  then the claims that could arise could be claims by LBCS for

24  its share of the corpus of the sales proceeds.

25       We don't know, Your Honor, and we don't have to know

1    for purposes of 2004.  Rule 2004 is expressly -- exists to

2    allow creditors to investigate potential claims.  It expressly

3    exists, so you do not have to shoot first and ask questions

4    later.  You can ask questions and find out whether there's a

5    basis for shooting.

6           Now, Your Honor, we recognize the need, the enormity

7    of the tasks that the debtor has been faced with in this huge

8    bankruptcy.  And we recognize the need to minimize burden.  We

9    filed the 2004 motion in the first instance in November.  We

10   received unsurprisingly calls from the debtor asking to adjourn

11   the motion explaining that with the holidays and with all the

12   emergent tasks the debtor could not focus on it.  But debtors'

13   counsel said they wanted to endeavor to try to informally give

14   us information responsive to our concerns.  We, actually,

15   during those conversations, said that our most important

16   immediate concerns are understanding what exists at LBCS in

17   light of the Barclays press release, whether there's a wasting

18   asset there in the expression Your Honor used this morning, a

19   melting ice cube.  We needed to know that.  But based on the

20   debtors' representation that they would endeavor to get us at

21   least that information quickly and that they would endeavor to

22   work with us, wee requested an adjournment.  We waited -- we

23   agreed to an adjournment to the stay.  We waited to hear from

24   the debtors.  When we didn't, we asked them are we going to get

25   some information?  We never got any such information, Your

1    Honor.  And parenthetically, I should say that when we

2    expressed that concern about the possibility of a wasting

3    asset, at no time did debtors' counsel suggest to us oh, you

4    have no reason to worry because there is no ongoing business.

5    You have no reason to worry because, as we now hear for the

6    first time in debtors' objection, in fact, LBCS had no ability

7    to engage in ongoing business from the moment that LBHI

8    declared bank -- filed for bankruptcy.  We never heard that.

9    We never heard that there was no basis for urgent concerns.

10            When we talked to the debtor and to Barclays' counsel

11   again, we reiterated we understand that there are a lot of

12   burdens here.  We understand that it's appropriate to talk

13   about what a reasonable scope of discovery is and what a

14   reasonable schedule is.  We asked them to make a proposal in

15   that regard.  Instead, on Friday, what we got was the back of

16   our -- their hand, basically.  We got, you're not going to get

17   anything.  We're resisting your ability to take any discovery

18   into it at all.  We've got objections filed by Barclays and the

19   debtor and the SIPA trustee and the creditors' committee.  And

20   I'll address the latter two of those in a few minutes, Your

21   Honor.

22            But let me just -- with regard to the Barclays and

23   debtors objections claiming that we should not be entitled to

24   2004, I would submit, Your Honor, that those objections are the

25   textbook example of what is not an appropriate way to object to

1    2004 discovery.  You cannot resist 2004 discovery by assuming

2    the conclusion, by assuming that there are no claims on the

3    merits to investigate and therefore you should not be all --

4    the creditors should not be allowed to take discovery into

5    whether those claims exist.  And most certainly, you cannot

6    object by assuming the conclusion and then in support of that

7    making utterly unsupported conclusory assertions of fact in

8    your papers.  There is no evidence attached to those papers.

9    But the objections are replete with factual assertions, many

10   times assertions about facts that we never heard before, on

11   several occasions, facts that seem to be completely contrary to

12   what we've seen before.

13          Your Honor, if all the Court did was to allow us to

14   take discovery into every unsupported factual assertion that's

15   set forth in those objections that would end up being basically

16   the scope of discovery that we sought in the 2004 motion to

17   begin with.  We would be able to take discovery into the

18   assertion that LBI had a commodities business which appears to

19   be completely inconsistent with, as I said before, the debtors'

20   pre-petition public statements that LBCS had no ongoing

21   business at the time of the sale which, as I said, we heard for

22   the first time in the objections and which seems to be

23   contradicted by the assertion, the representation that debtors'

24   counsel made to the Court in connection with the sale motion

25   that nothing in the sale would impact the ability of LBCS to

1    function as an ongoing business.  If what they meant was well,

2    we're not mentioning that LBCS has no ongoing business but, in

3    fact, it does have no ongoing business so the sale won't affect

4    that, I would submit that at the very least, Your Honor, that

5    is misleading and cute, way too cute.

6         We would be entitled to take discovery into the

7    assertion that LBCS did not have its own employees which is

8    contrary to the statement in the offering memorandum in

9    connection with the bonds that LBCS has 200 or had at the time

10   200 employees.  We would be able to take discovery into the

11   assertion that Barclays, in fact, did not acquire any of LBCS'

12   commodities business but, in fact, acquired the distinct

13   business of LBI, commodities business of LBI, which nobody at

14   any time, in these papers or otherwise, has endeavored to tell

15   us, explained to us what is.  What is this supposed LBI

16   commodities business?  How is it distinct from the LBCS

17   commodities business?  Nothing's explained about that.

18        Those are, in fact, Your Honor, basically the issues

19   that we sought discovery of in the 2004 motion.  Your Honor,

20   the laws are very clear.  There is a load threshold of basis

21   for believing there may be a claim for a -- to engage in 2004

22   discovery.  We have amply met that.

23        Now, I want to address the comments made by the

24   unsecured creditors' committee that we should defer to their

25   investigation of these potential claims, not that we have had

1   any basis to believe that they've engaged in any investigation

2   to date, and the assertion of the debtor that we should defer

3   to the examiner.  And obviously, I know, Your Honor, that

4   that's going to be a significant focus of the Court's concern

5   here.

6          Your Honor, the entire basis of our justice system is

7   the belief that the adversary process and open discovery is the

8   best way to bring out facts and to achieve justice.  Bankruptcy

9   is not an exception to that theory.  And to the contrary, the

10  bankruptcy process, and 2004, in particular, depends on various

11  different creditor constituencies with their, to use the word

12  that I like and has been used a lot, their parochial interests.

13  We'll pursue those interests vigorously.  We'll maintain any --

14  assert any arguments that can be made on behalf of those.

15  We'll investigate the facts.  And wonderfully crowded

16  courtrooms, like this one and the overflow courtroom, are a

17  testament to the fact that you've got lots of parochial

18  interest here.

19         There is no basis to deprive the parties with their

20  parochial interests of their right to engage in discovery and

21  to force them to defer to proxies, such as an examiner or the

22  UCC, whose interests may or may not be aligned, who have a lot

23  of other interests on their plate.  Clearly, the agenda for

24  this examiner is going to be enormous.  We cited in our reply

25  brief, Your Honor, the Enron case, a decision from Enron where

1     Judge Gonzales held that the fact that an examiner had been

2     appointed there did not have any relevance, ability to deprive

3     creditors of their ability to take 2004 discovery.  It would

4     only be relevant at all to the extent that it might shed light

5     on whether the creditors have an improper motive in seeking

6     discovery.  And I don't think anyone has asserted that the

7     indenture trustee is pursuing this discovery for coercive or

8     harassment purposes.

9          Your Honor, we tried -- we worked very hard in

10    framing these discovery requests to make sure that they were

11    narrow and avoided undue duplication with other issues in this

12    case.  For instance, our discovery requests do not go to the

13    intercompany transactions and intercompany balances that are

14    obviously going to be an enormous task and a focus of many

15    different parties in this case.  And I think it's clear we

16    succeeded in making our discovery requests appropriately

17    narrowly focused because not one of the objectors has suggested

18    that our requests were overbroad.  Not one objector has pointed

19    to anything about our requests that it was overbroad.

20         Mr. Bienenstock, who left, so he won't hear me

21    endorsing his views, but he made comments about the nature of

22    the UCC's charge and its status as a fiduciary which I agree

23    with Your Honor's take on but I think I also completely agree

24    with and I think shed light on why we should not have to rely

25    on the UCC to pursue discovery, investigation and any potential

1    claims here.

2            THE COURT:  Just so I'm clear on what you're saying.

3    The UCC is the Uniform Commercial Code.

4            MR. HOROWITZ:  I'm sorry.  Unsecured creditors'

5    committee, I apologize, the creditors' committee.

6            THE COURT:  Okay.

7            MR. HOROWITZ:  I --

8            THE COURT:  'Cause I am relying on the UCC.

9            MR. HOROWITZ:  I apologize, Your Honor, the

10   creditors' committee.  Your Honor, I gave a nonexhaustive list

11   of the potential claims that we think might arise here.  And

12   just to -- I think there's a useful distinction.  One set of

13   facts might give rise to a view that Barclays got something it

14   didn't pay for and that there needs to be more consideration

15   coming in.  I call that a pie increasing type of claim that

16   would bring more money into the estate.  But I also suggested

17   that it's possible, the facts will show, that Barclays paid for

18   the business but that LBCS was improperly excluded and LBCS

19   should have a direct claim on its allocable share of the

20   proceeds.  That is what I would call a pie splitting type of

21   claim.  And I do not think it is the province of the creditors'

22   committee to investigate and reach positions as to allocation

23   among different constituencies.  It also happens to be true

24   that the creditors' committee was formed before LBCS was in

25   bankruptcy and, as a factual matter, does not have anyone on

1      there that represents LBCS' interests.  But, like Mr.

2      Bienenstock, I do not rest my view that we should not be forced

3      to defer to the creditors' committee on that basis.

4              Your Honor, the fact that I put in a pitch that

5      parochial interests should be entitled to pursue discovery

6      should not mean in any way that I believe that parties should

7      be allowed to run amuck and engage in duplicative discovery

8      and, basically, subject the debtor and other parties in this

9      case to unbearable burdens.  I don't think there's been any

10     showing that the limited discovery that we are requesting would

11     be unduly burdensome or duplicative.  If, for example, Your

12     Honor, the examiner does wish to examine the issues that are of

13     concern to us, the examiner will request from the debtor and

14     from Barclays precisely the same information that we're

15     requesting, so likewise with the creditors' committee.  It will

16     not be any greater burden for the debtor and Barclays to

17     collect that information and deliver it to us than it

18     simultaneously, seriatim, and to the examiner than it would be

19     simply to give it to the examiner.  Conversely, I would

20     actually suggest that if they're interested in examining those

21     issues, and I hope that they are, the easiest way for them to

22     start is by piggybacking on our discovery by looking at the

23     information that we've identified and that we will be

24     collecting.

25              So I agree that it is important to make sure that

73

1    things are coordinated.  I agree that it's important to avoid

2    duplication but we've narrowly tailored these discovery

3    requests.  We have ample basis for seeking it.  And the proxies

4    are not an adequate substitute for that.

5              THE COURT:  I don't understand why proxies are not an

6    adequate substitute.  I understand your position that you think

7    that Bank of New York Mellon as indenture trustee should be

8    leading the way here on behalf of its constituency.  But in

9    what respect is that constituency disadvantaged if another

10   party in interest, say, the examiner, which will be treated as

11   a party in interest under the order of appointment, elects to

12   do that investigation and you get the benefit of that

13   investigation?  What's the difference other than we avoid

14   having a proliferation potentially of what you have called

15   yourself parochial interests that become actively involved in

16   the pursuit of that which is private to the ultimate detriment

17   of that which is the collective good.

18             MR. HOROWITZ:  Well, you asked the question about the

19   examiner and you deserve an answer with regard to the examiner.

20   I did give an answer with regard to the creditors' committee as

21   to why I believe that they are conflicted.  With regard to the

22   examiner, the answer is a matter -- first of all, a matter of

23   focus, Your Honor.  The examiner has an awful lot -- will have

24   an awful lot on his plate or her plate.  And will not be

25   incentivized to focus on these parochial issues the way that we

74

1    are.

2            THE COURT:  But why is it a question of it being

3    incentivized?  It's a question of duty.  If the examiner,

4    whoever this person may be, is given a mandate to investigate

5    and investigations presumably will focus on all matters

6    relevant to the mandate, which includes what you're concerned

7    with, how are you hurt?  And also, what makes this time

8    sensitive?  Why do you need to know this now?

9            MR. HOROWITZ:  I agree it is not time sensitive.  I

10   started out by explaining to you the chronology of our attempts

11   to negotiate with the debtors and Barclays.  And we did --

12           THE COURT:  I understand you are frustrated by the

13   fact that you have not received the discovery that you hope to

14   receive, that you have been cooperative in agreeing to adjourn

15   this so that it's being heard today.  And it just happens to be

16   heard after an examiner has been appointed.

17           MR. HOROWITZ:  My point was slightly different.

18           THE COURT:  So the examiner is obviously fresh in my

19   mind.

20           MR. HOROWITZ:  No.  My point was slightly different,

21   though.  We were asking, inviting proposals with regard to

22   timing.  And if the proposals had been we're going to be

23   collecting information with regard to an examiner's process.

24   It makes sense to coordinate with that.  That would have been a

25   perfectly legitimate answer.  We are perfectly willing to

75

1    consider all proposals with regard to timing including this may

2    have to wait two or three months.  I'm just guessing, Your

3    Honor, as to what the time frame would be.  My point was that

4    the debtors' and Barclays' position was not one relating to why

5    this is time sensitive.  It was you're not entitled to this now

6    or ever.  You have to defer permanently, basically, as I

7    understood the position.

8            I also want to go back to the examiner because I

9    think it's a more basic point, Your Honor.

10           The examiner is, to some extent, is expected to be

11   unbiased.  I think that's part of the --

12           THE COURT:  Not to some extent.

13           MR. HOROWITZ:  Okay.  Let's say --

14           THE COURT:  Absolutely needs to be unbiased.

15           MR. HOROWITZ:  Well, let me go back to my comment

16   about the adversarial process.  The adversarial process depends

17   on parties not being unbiased.  It depends on vigorous

18   advocacy, on parties will collect information and place it --

19   and make all of the zealous arguments they can in support of

20   their position.  That is a fundamentally different role --

21           THE COURT:  I think the zealous advocacy follows the

22   discovery.  It doesn't have to be a condition to the discovery.

23           MR. HOROWITZ:  Well --

24           THE COURT:  Because we talked about this subject

25   before lunch, the subject of a point of view.  Or maybe we

1    talked about it right after lunch when I was talking to Mr.

2    Dunne.  The issue of advocacy, I think, should not be confused

3    with the issue of entitlement to discovery on a particular

4    schedule.  And in addition to the discretion which the

5    Bankruptcy Code affords the Court with respect to the

6    appointment of an examiner, at least as it relates to scope.

7    The Bankruptcy Rules under 2004 also give the Court vast

8    discretion when it comes to allowing discovery.  Generally

9    speaking, it's freely allowable provided, however, that when

10   that discovery is ultimately duplicative or potentially a

11   source of disruption, I have the power to control, among other

12   things, the timing.  So you've already acknowledged during the

13   course of our discussion that there's actually no time

14   sensitivity to the need to find this out.  And it's also

15   probably true that there's no difference really if the facts

16   are discovered by an examiner or discovered by you.  Is there a

17   difference?

18            MR. HOROWITZ:  Now that I do disagree with, Your

19   Honor.  In just the same way that you suggested that there's no

20   such thing as pure neutrality with regard to recitation of

21   facts in an examiner's report.  It is also true that discovery

22   is not a neutral process.  That a party that is incentivized to

23   develop arguments as strongly as possible.  This has certainly

24   been my experience in all my years as a litigator.  We'll be

25   more focused on pursuing the facts relating to those particular

1    issues.  We'll do a more effective job.  That's really the

2    reason, basically, Your Honor, why we have an adversarial as

3    opposed to an inquisitorial type model like in Europe model in

4    the United States for justice.  We depend on people who are

5    incentivized in the discovery process as well as in advocacy

6    process.  And, you know, the bondholders are going to be

7    footing the bill on this.  They are not incentivized to spend

8    more money than is necessary or appropriate to this.

9         I also -- I certainly agree with Your Honor that you

10   have the discretion to do whatever is necessary to ensure that

11   this is not overbroad or unduly burdensome and to ensure that

12   it's timed correctly but -- which is why I tried to emphasize

13   that we made every effort to make these narrow requests.  And I

14   invite Your Honor to look at the requests.  I think you'll see

15   that they are quite laser like and specific to these issues.

16        THE COURT:  Look, I think I understand fully the

17   reason why you're pressing this motion.  And I'm going to give

18   those who are  opposed to it a chance to be heard if they wish

19   to be heard.

20        MR. HOROWITZ:  Thank you, Your Honor.

21        THE COURT:  I do have some comments, though, before

22   you leave the podium.  I originally thought that there was an

23   issue here as to whether or not you were seeking discovery that

24   was even within the scope of Rule 2004 and I'll tell you why.

25   Nobody raised this point.  It's a subtle point that I probably

1    have wrong.  Because the sale hearing occurred at a time when

2    the borrower that you looked to was not a Chapter 11 debtor,

3    the presumed transfer of assets took place as it relates to

4    nondebtor property.  In fact, your entire focus relates to

5    nondebtor property and the potential impermissible transfer of

6    nondebtor property by the sale order which led me to question

7    whether or not the discovery that you seek is even properly

8    within the scope of Rule 2004.  No one has raised that issue.

9    But I've thought about it.  And before you sit down, I'd like

10   you to comment on it.  in what respect is the subject matter of

11   your discovery, even though you articulate that it's clearly

12   covered by Rule 2004.  Explain to me why it is.

13             MR. HOROWITZ:  Well, Your Honor, LBCS is now a

14   debtor.

15             THE COURT:  Yes.  But this all relates to a time when

16   it wasn't a debtor.

17             MR. HOROWITZ:  Okay.  My understanding of 2004 is

18   that it is not limited to discovery of post-petition facts but

19   it is limited to discovery relating to claims that might exist

20   on behalf of the debtor or on behalf of the debtors' creditors

21   which the bondholders currently are.  If, for example, we are

22   correct, one hypothesis is correct, that LBCS's business pre-

23   petition nondebtor was transferred and therefore LBCS has a

24   claim and quantum meruit, whatever the appropriate legal theory

25   will be against Barclays.  That is now a claim belonging to a

1    debtor, LBCS, and therefore I think 2004 is clearly appropriate

2    for investigating whether such a claim exists.

3            Also, to the -- if they're backs could give rise to

4    successorship liability, that would affect the liabilities to

5    the debtor because if the bondholder claims simply pass through

6    with the business, there would no longer be liabilities at LB.

7    So these are two different hypotheses -- potential causes of

8    action that are within the ambit of what 2004 is legitimate to

9    discovery.

10            THE COURT:  Are the bonds that you represent secured

11   in any way?

12            MR. HOROWITZ:  I have to admit, I don't know the

13   precise answer to that question, Your Honor.  I believe the

14   answer is no.  I do believe that LBCS is a guarantor of the

15   special purpose entity that issued the bonds and then there is

16   additionally a guaranty from LBHI.

17            THE COURT:  And do the bonds have recourse to any

18   other Lehman affiliate other than LBCS?

19            MR. HOROWITZ:  And on the guaranty to LBHI, no, my

20   understanding is they do not.

21            THE COURT:  There's an LBHI guaranty?

22            MR. HOROWITZ:  There is an LBHI guaranty.

23            THE COURT:  Okay.

24            MR. HOROWITZ:  And were there any other comments?

25            THE COURT:  No.  Thank you.

80

1          MR. HOROWITZ:  Thank you.

2          MR. MILLER:  Your Honor, please, Harvey Miller.  Your

3     Honor, this is a matter of case administration really.  Counsel

4     has conceded that this is not time sensitive.  And Your Honor

5     has to bear in mind that LBHI has 4,000 subsidiaries.  Your

6     Honor has to think in the context besides -- anybody could come

7     into this Court and say they're entitled to a investigation --

8     not an investigation, an examination under Bankruptcy Rule

9     2004.  And as Your Honor may recall, we did have a plethora of

10    motions made earlier in the case.  And it really gets down to a

11    question of bandwidths.  First, Your Honor, there is no

12    absolute right on the part of a creditor or any other party to

13    conduct Rule 2004 examinations.  And we constantly use the

14    terminology "discovery".  Discovery in what context, Your

15    Honor?  Unfortunately, I'm old enough to know the derivatives

16    from which 2004 comes from.  Its original form was Section

17    21(a) of the old Bankruptcy Act and the purpose of that section

18    Your Honor was because when a trustee was appointed to become

19    the fiduciary for an estate, generally, when the trustee got

20    there, there was nobody there.  There was nobody to talk to

21    about where are the assets, what happened to them.  So 21(a)

22    was a fishing expedition pursuant to which a trustee could get

23    a subpoena, get the form of principals of the debtor and

24    examine them as to what happened to these assets.  It was --

25    and, in fact, Your Honor, the transcript or the discovery as

1    you call it, coming out of the 21(a) or I think it was Rule

2    2014 or something under the old rules are not even admissible

3    in a proceeding except for the purposes of impeaching a

4    witness.  And the Rules of Evidence don't apply in a Rule 2004

5    examination.  It is a pure fishing expedition.  And what

6    counsel is talking about is trying to find enough facts to

7    support a cause of action on behalf of the bondholders.  That's

8    not what 2004 was intended to do.  It was intended to benefit

9    the estate in finding information that gave rise to perhaps

10   claims on behalf of the estate not on behalf of bondholders,

11   Your Honor.

12          And it's the record to the discretion of the Court.

13   Now we have an examiner.  We don't know who it is yet.  But we

14   will have an examiner.  And within the charter of this examiner

15   and discussed heavily this morning is whether assets and

16   properties which would improvidently transferred to Barclays.

17   That is the issue, Your Honor.

18          Now, in the context of what happened over the past

19   few weeks with respect to this request, it's again a question

20   of bandwidth, Your Honor.  Your Honor will remember the first

21   month of this case.  People were stretched all over the place.

22   And it is only recently that, as Mr. Marsal explained this

23   morning, that he has the 509 employees that can deal with all

24   of the problems.  But this was not on the very top priority

25   list, Your Honor.  And effort has been made to get the

82

1    information.  Most of the information, Your Honor, is not in

2    the control of the debtors.  It's in control of Barclays.  This

3    is a matter that's going to get from what I heard this morning

4    and what I hear from people, Your Honor, is going to get a lot

5    of attention.  What assets went over to Barclays?  Was it

6    consistent with the sale order or did assets improvidently get

7    granted?  And I would submit, Your Honor, that this can be

8    deferred until the examiner looks at it without increasing

9    further pressure on the debtor which is still stretched with

10   509 employees and still doing lots of things, Your Honor.  And

11   that's all I'm suggesting to Your Honor.  This is an

12   administrative matter and it shouldn't be used for a litigant

13   to get facts to support an action for the benefit of a specific

14   group of bondholders.  Thank you, Your Honor.

15              THE COURT:  Thank you.  Others wish to be heard?  A

16   lot of people are getting up.

17              MR. HUME:  Your Honor, very briefly.  Hamish Hume,

18   again, for Barclays.

19              We agree strongly with the points made by Mr. Miller.

20   And I would just reinforce the original purpose of the statute

21   is not to allow an individual bondholder to develop claims.

22   More to the point, it was not to allow an individual bondholder

23   to develop claims against someone other than the debtor,

24   against an outside party against Barclays which is what Mr.

25   Horowitz said was the principal focus of their discovery.

1          Your Honor, this morning you decided -- or earlier

2     this afternoon, that the examiner would look at this issue of

3     whether -- that Mr. Miller referred to in terms of assets of

4     non-debtors being transferred.  Given that you've already

5     indicated that an examiner will look at that, I think the issue

6     presented by Mr. Horowitz' motion is should everyone else get

7     to look at, too, in discovery?  Or is there something special

8     about the Bank of New York motion that says they should get to

9     look at it on their individual subsidiary, but no one else

10    should.  And I didn't hear an argument for why they should be

11    treated differently from other 2004 creditors' requests.

12         And so we would take exception to it and ask to

13    minimize the burden, Your Honor would take that into account.

14         THE COURT:  Okay, thank you.

15         MR. WILTENBURG:  Good afternoon, Your Honor.  David

16    Wiltenburg, Hughes Hubbard & Reed representing the SIPA

17    trustee.

18         Just briefly, we've objected to the relief sought on

19    the additional ground that a subpoena directed to Mr. Giddens

20    would not be well calculated to lead to useful information.

21         As the Court is aware, the trustee was not an

22    architect of the transaction that is the subject matter really

23    of this request.  And all of the LBI employees who were, in

24    fact, involved in that process are now not employees anymore of

25    the LBI estate but employees of Barclays.  So on that ground,

1    we've objected.

2         MR. TECCE:  Good afternoon, Your Honor.  James Tecce

3    of Quinn Emanuel on behalf of the creditors' committee.

4         Very briefly, Your Honor.  The committee agrees that

5    the facts and circumstances surround the seal transaction

6    warrant investigation.  And there's been discussion this

7    morning and this afternoon as to whether that investigation

8    would be subsumed by the examiner.  Whether the work plan

9    ultimately meets that out, that may or may not be the case.

10         But the reason why the creditors' committee filed a

11   limited objection that it did is because up until this point in

12   time the committee has been very focused on this issue of the

13   assets and the liabilities that were transferred to Barclays in

14   connection with the sale transaction.  The Court will recall it

15   was the last omnibus hearing where the committee had appeared

16   to pursue a limited objection to a settlement of a certain

17   portion of that transaction assets that were transferred.  And

18   the committee's position was that it was conducting an

19   investigation and didn't want any factual findings made in

20   connection with that settlement to somehow interfere with that

21   investigation.

22         And recognizing that investigation I think the Bank

23   of New York's trustee's position is that somehow the

24   committee's investigation of the sale transaction will not

25   serve its purposes because it will not focus on the LBCS

1   estate.  But the committee's investigation is not monopoly

2   focused on a single debtor or a single group of creditors.  It

3   seeks to examine any and all assets that were transferred to

4   Barclays in connection with the sale.  And any and all

5   liabilities that were assumed in connection with the sale.  And

6   it's motivated by a purpose and a concern that should be shared

7   by all creditors irrespective of the estate against which they

8   would assert a claim, which is insuring that the final

9   reconciliation and the final determination of that

10  investigation comports with the sale order and the contours of

11  that transaction as it was represented to the Court and to the

12  committee.

13          As a consequence to that, Your Honor, we would submit

14  that the committee has -- and once more, Your Honor, I just

15  note that the committee has expended time already looking into

16  this matter.  The Court may recall it's suggestion at the last

17  omnibus hearing was that the committee attempt to consensually

18  secure the information that it needed to conduct that

19  examination.  And adhering to that direction since the last

20  omnibus hearing, we have -- or at least the committee's

21  professionals have met with Barclay's professionals to try and

22  secure information that will aid in that investigation.  And

23  while we would like to reach an agreement with them, and

24  hopefully we will in the unfortunate universe where we don't

25  reach an agreement with them, we'll be poised to pursue that

86

1   information through other channels.

2         So as a consequence, Your Honor, it would be our

3   position that the committee is in place on this, should not be

4   displaced, and that lesser requests for discovery should be

5   channeled through the committee given its investigation of the

6   sales transaction.

7         And unless Your Honor has any other questions, that

8   concludes that my presentation.

9         THE COURT:  No, that's fine, thank you.

10        MR. TECCE:  Thank you.

11        THE COURT:  Anything more?  Mr. Horowitz, you're --

12        MR. HOROWITZ:  Just a couple of comments.  I just

13  realized that I hadn't addressed the SIPA trustee's issue when

14  I got up before, Your Honor.

15        If it is true that the reason that we included the

16  SIPA trustee was because we thought there was a possibility

17  that the relevant information would be with LBI.  That

18  possibility seems a little greater in light of the assertion

19  that LBI had a commodities business.  But if, as the SIPA

20  trustee asserts, the relevant information isn't with them, it

21  would presumably be very easy for them to simply respond by

22  saying that they don't have the information.  And we would not

23  have a problem with that.  In fact, we think that's consistent

24  with what our suspicion is to what the facts are.

25        I didn't hear anyone who got up here, Your Honor,

1   explain why it would be unduly burdensome to provide us with

2   the information relating to these issues at the same time that

3   its provided to either the committee and/or the examiner.

4          And, finally, Your Honor, I did not get up in

5   connection with the examiner motion.  First of all, I probably

6   didn't have standing to.

7          THE COURT:  You're right, you didn't have standing

8   to.

9          MR. HOROWITZ:  What's that?

10          THE COURT:  You're right; you did not have standing

11   to.

12          MR. HOROWITZ:  And I'm saying this entirely without

13   prejudice to the position that we very strongly take that we

14   should not be forced to defer to the examiner, but in the event

15   that Your Honor does conclude that we should defer to the

16   examiner, I would point out that then we've sort of unwillingly

17   become a party to the examiner process and we should be

18   included in the meet and confer and be allowed to have some

19   input into the way that that process works.

20          THE COURT:  Okay, I understand your position.

21          MR. HOROWITZ:  Thank you, Your Honor.

22          THE COURT:  We've been dealing with 2004 requests

23   since the second week of the case.  I can remember that on

24   either the Monday or the Tuesday following the week of the

25   teleconference with Mr. Miller and other parties-in-interest,

88

1   including dealing with the Harbinger 2004 requests.  And how to

2   deal with certain case management issues that were manifest

3   even in the second week of the case.

4         We've come a long way, but in certain respects we

5   haven't.  We're still dealing with 2004 requests.  And I think

6   that certain 2004 requests are to be distinguished from others.

7   In the SIPA case I wrote a very brief opinion granting the

8   motion for 2004 discovery brought by the DCP parties seeking

9   the discovery of certain targeted information that was clearly

10  relevant to the representation of that group, at least in my

11  opinion it was.

12        I mention it because I don't think there is one law

13  of the case determination that applies to 2004 discovery.  In

14  some respects it may be permissible based upon the needs of a

15  part for cause shown.  In some respects it's a source of

16  interference, and the proliferation of costs, delay and undue

17  expense.

18        This is a close question in my view.  The fact that

19  the committee has weighed in in opposition to their request,

20  the fact that the debtor has weighed in in opposition to their

21  request, in my view goes much more to orderly case

22  administration than it does to the entitlement to take the

23  discovery in the first instance.

24        When I first reviewed this contested matter, it was

25  my initial inclination to believe that the issues surrounding

1    the transfer of the commodities business to Barclays

2    represented a subject matter that might be profitably explored

3    privately, parochially, if you will, by counsel for the

4    indentured trustee.  I understand the reason why the indentured

5    trustee is pressing this; it's consistent certainly with the

6    fiduciary duty of that trustee.  But my thoughts on the matter

7    have changed as a result of today's hearing.

8        The principal reason for my change of perspective is

9    the extensive argument that took place in reference to the

10   motion for appointment of an examiner.  During the course of

11   that argument I made clear and others appeared to concur with

12   my state of mind on this subject, that multiple examinations of

13   the same subject matter represented a remarkably inefficient

14   cumbersome and potentially destructive use of attorney time.

15   We haven't even yet reached the subpoenas to be issued by Mr.

16   Giddens in support of his own independent examination.  And I'm

17   sure we'll address that before too long.

18        So in this setting in which I have been approaching

19   case management issues from the perspective of how can we best

20   deal with the needs of this case, which are in some respects

21   exceptional, I conclude that 2004 discovery of the type sought

22   by the indentured trustee in this instance does not need to be

23   pursued now.  Indeed, in colloquy with Mr. Horowitz, he

24   confirmed that the need for the information was actually in no

25   respect time sensitive.  As a result, what I'm going to do is

1   to deny the 2004 request without prejudice to its being

2   reasserted in the future in the even that the information

3   sought is not otherwise forthcoming by virtue of the work of

4   the creditors' committee or the work of the examiner.

5          Counsel for the committee has stated that the

6   committee is involved as an estate fiduciary in an examination

7   of the facts and circumstances surround the sale of debtors'

8   assets to Barclays.  That investigation would appear to subsume

9   many of the same issues that are the subject matter of the

10   pending 2004 request.

11          Additionally, the argument with respect to

12   appointment of the examiner made clear particularly since the

13   motion was first filed by the Walt Disney Company, that the

14   examiner will be looking into questions of whether or not

15   assets of non-debtor affiliates somehow made their way over to

16   Barclays at the beginning of the case under the authority of

17   the September 20 sale orders.

18          Under the circumstances, it seems to me that we have

19   one examiner and one creditors' committee that will be dealing

20   with the very same subject matter.  Admittedly, they will be

21   dealing with that subject matter not from the perspective of a

22   zealous advocate.  And no doubt Mr. Horowitz would be doing

23   this discovery as a zealous advocate.  But zealous advocacy is

24   not a requirement to obtain information.  I believe under the

25   circumstances that it makes good sense for the case as a whole

1    for particularized requests for information to be put to one

2    side and not to become the subject of ongoing contested matters

3    in this Court unless exception circumstances can be shown.  I

4    believe that no exceptional circumstances have been shown here.

5    But that does not mean that the indentured trustee is not

6    entitled to have questions answered in due course.  And I

7    expect that those questions will be answered at some point over

8    the next several months.

9         In the event that those questions remain outstanding,

10    counsel for the indentured trustee should feel completely free

11    in reasserting its 2004 request and nothing that I've said here

12    is intended to deprive the indentured trustee of the ability to

13    later attempt to assert that the circumstances, in fact, are

14    exceptional.  And that such particularized discovery is, as a

15    result, appropriate.

16         That's my ruling.

17         MR. HOROWITZ:  Your Honor, I ask if we could

18    participate in the examiner meet and confer.

19         THE COURT:  Well, see that's a subject which is no

20    longer before me.  My inclination to that is no.  And it's no

21    for several reasons.  First, as you pointed out in your own

22    comments a few minutes ago, you did not have standing to appear

23    and be heard with respect to the examiner motion because you

24    did not intervene in that proceeding.  Secondly, you are not

25    exceptional as it relates to the multitude of individuals who

1    have curiosity as to the process, or more to the point, a

2    desire to influence the process.  I believe this is a situation

3    in which fewer cooks will make a better broth.  So that

4    request, at least as it relates to me, is denied.  If anybody

5    is willing to give you access that's up to them.

6              MR. MILLER:  Yes, Your Honor.  Item 15 on the agenda

7    is the debtors' amended motion, Your Honor, to further extend

8    the time for the debtors to file schedules, statement of

9    financial affairs and related documents.

10             This is I think the third request, Your Honor.  There

11   have been 105 days which were previously extended.  The debtors

12   are asking for an additional sixty days, Your Honor.  In light

13   of everything that transpired today, I will not belabor the

14   issue that it is an enormous task to do the schedules, the

15   statement of affairs and the statement of executory contracts.

16             I would also say, Your Honor, that as Mr. Rivera

17   pointed out -- Mr. Velez pointed out rather, there is constant

18   communication with the Office of the United States Trustee as

19   to the filing of reports, information, etcetera.  In the

20   context of where we are, Your Honor, the debtors believe that

21   within sixty days they have a real opportunity to complete this

22   this time.

23             Thank you, Your Honor.

24             THE COURT:  Okay.

25             MR. DUNNE:   Your Honor, Dennis Dunne on behalf of