**EXHIBIT C**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

    Debtor.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            January 14, 2009

            10:12 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

142

1  have an immediate reaction which is if the parties to the
2  proposed meet and confer believe it would be efficient to have
3  Barclays in the room for some or all or none of the proposed
4  meeting, I'm not going to order it because I don't think that
5  Barclays is directly involved in the question of scope.  What
6  you're really doing is putting everybody on notice that
7  Barclays, to the extent it is inconvenienced or to the extent
8  that there is a related consequential expense, is reserving its
9  right on the question.  And so you're proposing that maybe it's
10 just as well to head off this issue with a pass.
11         MS. GRANFIELD:  I agree with those comments, Your
12 Honor --
13         THE COURT:  Okay.
14         MS. GRANFIELD:  -- in terms of why I made them.
15         THE COURT:  I understand your point.
16         MS. GRANFIELD:  Very good.  Let me just yield the
17 podium for two minutes then to Mr. Hume.
18         MR. HUME:  Thank you, Your Honor.  Hamish Hume from
19 Boies, Schiller & Flexner also for Barclays.  Your Honor, I
20 think we just have a couple of related points on scope.
21 Nothing major because on most of the issues we don't take a
22 position.  But on a couple, we do want to raise that it's
23 stemmed from our original objection to the original Disney
24 motion.
25         To the extent, Your Honor, there's been back and

143

1  forth on whether the examiner should be assessing claims or
2  developing claims or investigating claims as opposed to facts
3  that may underlie claims, how ever that may be resolved, I
4  think Barclays would simply want it to be clear that the claims
5  that may be looked at would be the claims of the estate for the
6  benefit of all of the estate and all creditors and not -- that
7  the examiner not be allowed to be used to -- with any topic to
8  be used to develop, as Mr. Miller, I think, correctly said, the
9  parochial claims of one or two creditors who may be trying to
10 investigate claims against Barclays.  And we certainly did
11 interpret the original motion by Disney to be in part an effort
12 to do that which we do object to and did object to as
13 inappropriate.  It's not an appropriate use of the resources
14 and it is at odds with the sale order which make clear that
15 there is no successor liability and that we acquired the assets
16 free and clear.
17           THE COURT:  I understand the point you're making but
18 I disagree with the fundamental premise of the point because I
19 believe that what Walt Disney has asserted -- and,
20 incidentally, this stems back to the evening of September 19
21 when there was considerable discussion on this point and what
22 counsel, in a separate matter, on behalf of the Bank of New
23 York Mellon as indenture trustee has asserted with respect to a
24 different Lehman affiliate -- is that claims aren't being made
25 on behalf of individual creditors as much claims are being made

1  that the, at least in the case of Disney, that the examiner
2  should be free on an estate by estate basis to investigate.
3  Hence, the discussion about whether we need fifteen or nineteen
4  or how ever many separate examiners might be needed to pursue
5  the rights of estates that have separate creditor
6  constituencies.  So I'm understanding the argument you're
7  making.  I'm simply distinguishing it because I'm not sure that
8  that's what Disney said.
9              MR. HUME:  Hopefully, if the argument's in apposite
10 then the concern's not there.  I'm simply expressing the
11 concern -- we did receive a letter right before that motion
12 asserting successor liability claims which we think are
13 meritless.  And then we see an examiner motion seeking to
14 develop facts that appear to us to be relevant to those claims.
15 And we don't --
16             THE COURT:  It may be that it's right to conflate the
17 two and it may be that it's not.
18             MR. HUME:  I think, hopefully after today, it is not
19 and that, if I understood Mr. Bienenstock correctly, he said
20 that he was okay with the -- he was no longer pressing the
21 scope as pushed in his original motion but was consenting to
22 what the debtors have proposed.  And if that's true then
23 presumably it does not involve an attempt to develop claims
24 that are at odds with the sale order which we think would both
25 be inappropriate and a waste of resources.

145

1       We would maybe ask that the order make clear,
2  whatever order there is, that it's obviously not intended to
3  obviously amend the sale order or allow for a collateral attack
4  on the sale order.
5       THE COURT:  I would personally resist any such
6  language in the order.  I believe that the examiner motion is
7  free standing, the sale order says what it says and is,
8  incidentally, on appeal.  And as far as I'm concerned, we're
9  dealing only with a matter which is presently before the Court
10 which is the examiner motion.  And I would strike out from any
11 proposed order language that would seek to put a ring fence
12 around an order that has already been entered and that is
13 subject to appeal.
14      MR. HUME:  Your Honor, the only other comment which
15 is related is that to the extent the examiner is being asked --
16 well, there is a request in one of the bullet points, the sixth
17 bullet point, to investigate whether assets of LBHI
18 subsidiaries, LBCC or other LBHI subsidiaries, were transferred
19 to Barclays Capital and whether that could create any claims.
20 Again, we think that request -- there's no basis for it,
21 actually.  I think both the debtors and the creditors'
22 committee agree that there's no basis for asserting that there
23 may be assets of these subsidiaries that were transferred.  The
24 sale order is clear that those assets were not what was being
25 transferred.  The agreement is clear.  Again, we would submit

146

1  that it is not an appropriate topic for investigation.
2          THE COURT: Let me ask you a question just
3  hypothetically. Assume for a moment you have an absolutely
4  clear sale order and absolutely clear representations that were
5  made on the record that led to the sale order concerning what
6  assets were being transferred pursuant to that order but that,
7  in practice, either mistakes were made or through inadvertence
8  or maybe because it was deliberately, I have no idea -- let's
9  just say, it doesn't even have to be in this case, that assets
10 were misappropriated under the guise of a sale order. Are you
11 suggesting that an examiner would have no ability to recover
12 misappropriated assets that were transferred either by mistake
13 or by design under the apparent color of law? You're not
14 saying that?
15         MR. HUME: No, Your Honor, I'm not. But I am saying,
16 I'm agreeing with the debtors and the creditors -- certainly
17 the creditors' committee that, in the first instance, that
18 would be something presumably that the debtors would themselves
19 look at or raise -- if there was a question to be raised that
20 they would raise it. Or the creditors' committee.
21         THE COURT: Well, they've been pretty busy. They've
22 been doing a lot. And it may be that the sale to Barclays
23 having closed that in the compartmentalized world, they moved
24 on to problem 2 and 5 and 12 and 25 or whatever the number of
25 problems that they were dealing more or less simultaneously.

147

1  And so, while I hear you, I think that one of the purposes to
2  be served by the advent of an examiner which is salutary is
3  that someone with no present history or involvement in this
4  massive transaction has a chance to come in for purposes of not
5  only fulfilling the statutory mandate but for purposes of doing
6  something that I think is very beneficial in this case, now and
7  in the future.  Walt Disney has used the term "sunshine".  I'm
8  going to adopt it.
9        The purposes to be served by the examiner include
10 giving everybody involved in this case a heightened sense of
11 confidence that what happened pre-petition and immediately
12 post-petition is something that we can all comfortably rely on
13 for purposes of planning the future of this bankruptcy case.
14 And so while terms like "transparency" have been used so
15 frequently as to take on an almost hackneyed tone, it
16 represents perhaps the most singularly important feature of
17 ongoing case stability which is confidence and trust that the
18 information that we all assume to be true in fact is true.
19       For that reason, I resist your notion that Barclays
20 is entitled to some special immunity by virtue of the sale
21 order.  You have what rights exist under that sale order.  But
22 the examiner is absolutely free in his or her discretion to
23 make sure that what was done in a hurry was done correctly.
24       MR. HUME:  I understand, Your Honor.  We understand.
25 Simply, there have been suggestions made which we think are

1   totally unfounded and we felt the need to reply.
2           THE COURT:  I understand you're protecting the record
3   on behalf of the client and you've done.
4           MR. HUME:  And as a matter of emphasis to the
5   examiner that it not be suggested to it that there's a reason
6   to believe that there are -- that the transaction was different
7   than it was planned to be and stated to be.
8           THE COURT:  But the examiner will have an opportunity
9   to confirm that based upon whatever investigation the examiner
10  deems appropriate.
11          MR. HUME:  Thank you, Your Honor.
12          THE COURT:  Thank you.  The creditors' committee has
13  been, I guess, waiting for this opportunity to back cleanup.
14  And as soon as you're done, we can take a lunch break.
15          MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed
16  on behalf of the creditors' committee.  Your Honor, we have
17  been listening attentively to the Court's comments and the
18  comments of the various parties that responded to the trustee
19  motion, the examiner motion.  We would request, however, at
20  this point, because we see that there may be areas in which we
21  have reached even further agreement.  We want to be responsive
22  to the Court's comments.  That if we could take a brief bit of
23  time now to confer among ourselves to see where that agreement
24  exists, we would appreciate that or, alternatively, following
25  the lunch break.

```
                                                                149
 1              THE COURT:  It's now a quarter past 1 and we've been
 2    at this since about 10:05 a.m. without a break.  And I think
 3    that if you believe a break is something that would be useful
 4    to the process of achieving consensus, that's cause enough to
 5    take a break.  But I also think that biology suggests that it's
 6    time for us all to take a longer break than that.  And I'm
 7    going to suggest that we break now and that we return at 2:30.
 8              MR. FLECK:  Very well.  Thank you, Your Honor.
 9              THE COURT:  We're adjourned.
10         (Recess from 1:15 p.m. until 2:32 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                              150
 1
 2                    C E R T I F I C A T I O N
 3
 4     I, Lisa Bar-Leib, certify that the foregoing transcript is a
 5     true and accurate record of the proceedings.
 6
 7     _____
 8     LISA BAR-LEIB
 9
10     Veritext LLC
11     200 Old Country Road
12     Suite 580
13     Mineola, NY 11501
14
15     Date:   January 15, 2009
16
17
18
19
20
21
22
23
24
25
```