BASE PROSPECTUS

# LEHMAN BROTHERS HOLDINGS INC.
(INCORPORATED IN THE STATE OF DELAWARE)

# LEHMAN BROTHERS TREASURY CO. B.V.
(INCORPORATED WITH LIMITED LIABILITY IN THE NETHERLANDS
AND HAVING ITS STATUTORY DOMICILE IN AMSTERDAM)

# LEHMAN BROTHERS BANKHAUS AG
(INCORPORATED IN THE FEDERAL REPUBLIC OF GERMANY)

## U.S.$100,000,000,000
### EURO MEDIUM-TERM NOTE PROGRAM
UNCONDITIONALLY AND IRREVOCABLY GUARANTEED
AS TO NOTES TO BE ISSUED BY EACH OF LEHMAN BROTHERS TREASURY CO. B.V.
AND LEHMAN BROTHERS BANKHAUS AG BY

# LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Holdings Inc. (including when acting through its London Branch, "*LBHI*"), Lehman Brothers Treasury Co. B.V. ("*LBTCBV*") and Lehman Brothers Bankhaus AG (including when acting through its London Branch, "*LBB*") (each an "*Issuer*" and collectively, the "*Issuers*") have established a program (the "*Program*") under which they may from time to time issue medium-term notes (the "*Notes*") in series (each a "*Series*" or the "*Notes of a Series*") with each Series comprising one or more tranches (each a "*Tranche*") of Notes, outside the United States with maturities of one month or more from the date of issue and denominated in U.S. dollars or, subject to certain conditions and as provided in "*Form of the Notes*" and "*Terms and Conditions of the Notes*" herein, in other currencies or composite currencies herein. Each Note issued by LBTCBV or LBB will have the benefit of an unconditional and irrevocable guarantee (the "*Guarantees*") of LBHI, as guarantor thereunder (in such capacity, the "*Guarantor*"), as to all amounts of principal and premium and interest, if any, thereof and thereon due. The maximum principal amount of Notes outstanding under the Program may not at any time exceed U.S.$100,000,000,000, of which the maximum principal amount of Notes outstanding issued by LBB may not at any time exceed U.S.$2,000,000,000 (or, in each case, the equivalent in other currencies or composite currencies calculated as described herein); provided that the Issuers reserve the right to increase such amount from time to time.

The Notes, which may be issued at their principal amount or at a premium or discount to their principal amount, may bear interest on a fixed or floating rate basis or equity linked interest and/or interest linked to the performance of one or more reference entities or other basis or combination thereof or be issued on a fully discounted basis and not bear interest.

Notes of a Series may be issued on an unsubordinated basis or on a subordinated basis in either bearer or registered form. Notes in bearer form will initially be represented by a temporary global Note which is intended to be issued in new global note form (a "*New Global Note*" or "*NGN*") will be deposited on or around the issue date thereof with a common safekeeper for Euroclear Bank SA/NV ("*Euroclear*") and Clearstream Banking, société anonyme, Luxembourg ("*Clearstream, Luxembourg*"). Each temporary global Note which is not intended to be issued in new global note form (a "*Classic Global Note*" or "*CGN*") will be deposited on or about the issue date thereof with a common depositary for Euroclear and Clearstream, Luxembourg. Notes in bearer form will not be exchangeable for Notes in registered form. Notes in registered form may initially be issued in definitive or global form and, in the latter case, the global Note will be deposited on or about the issue date thereof with either a common depositary for Euroclear and Clearstream, Luxembourg or a custodian for The Depositary Trust Company ("*DTC*"). Notes, in registered form will not be exchangeable for Notes in bearer form. See "Form of the Notes" and "Terms and Conditions of the Notes" herein.

Application has been made to the Irish Financial Services Regulatory Authority (the "*IFSRA*"), which is the Irish competent authority for the purpose of Directive 2003/71/EC (the "*Prospectus Directive*") for approval of this Base Prospectus (the "*Base Prospectus*") as a base prospectus issued in compliance with the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "*Prospectus Regulations*") for the purpose of giving information with regard to the issue of Notes under the Program during the period of twelve months after the date hereof. Application will be made for Notes issued under the Program to be admitted to the Official List of the Irish Stock Exchange and to trading on its regulated market and on the Alternative Securities Market of the Irish Stock Exchange. Such approval relates only to the Notes which are to be admitted to trading on the EU Regulated Market of the Irish Stock Exchange or other regulated markets for the purposes of Directive 2004/39/EC or which are to be offered to the public in any Member State of the European Economic Area. Application has also been made to the Singapore Exchange Securities Trading Limited (the "*Singapore Stock Exchange*") for approval in respect of the listing and quotation on the Official List of the Singapore Stock Exchange of any Notes issued under the Program which are agreed at the time of the issue to be so listed on the Singapore Stock Exchange during the period of 12 months after the date of this Base Prospectus. The Singapore Stock Exchange assumes no responsibility for the correctness of any statements made or opinions or reports contained in this Base Prospectus. Admission of the Notes to the Official List of the Singapore Stock Exchange and quotation of the Notes on the Singapore Stock Exchange is not to be taken as an indication of the merits of the Issuers or the Guarantor, or the Notes.

Notes to be issued pursuant to the Program will have the minimum denomination specified in the relevant Final Terms or Drawdown Prospectus (each term as defined below), subject to compliance with all applicable legal and/or regulatory and/or central bank requirements.

The Program provides that Notes may also be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or that they will be admitted to listing, trading and/or quotation by any other competent authority, stock exchange and/or quotation system as may be agreed between the relevant Issuer and the relevant Dealer(s). In particular, Notes denominated in Australian dollars and issued in the domestic Australian capital markets ("*Australian Domestic Notes*") by LBTCBV or LBHI may be listed on the Australian stock exchange operated by ASX Limited (the "*Australian Stock Exchange*").

Neither the Notes nor the Guarantees have been, or will be, registered under the United States Securities Act of 1933, as amended (the "*Securities Act*"), and may include Notes in bearer form that are subject to United States tax law requirements. Neither the Notes nor the Guarantees may be offered, sold or delivered within the United States or to U.S. persons except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act. The Issuers may offer and sell certain Series of Notes within the United States to persons reasonably believed by such Issuers to be qualified institutional buyers (each, a "*QIB*") within the meaning of Rule 144A under the Securities Act ("*Rule 144A*") in reliance on the exemption provided by Rule 144A.

Arranger and Dealer

## LEHMAN BROTHERS

The date of this Base Prospectus is July 24, 2008.

This Base Prospectus replaces the Base Prospectus dated July 24, 2007.

## INTRODUCTION

In this document, references to the "*Group*" are to Lehman Brothers Holdings Inc. and its direct and indirect subsidiaries (which include LBTCBV and LBB).

LBHI accepts responsibility for all the information contained in this Base Prospectus and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

LBTCBV accepts responsibility for all the information contained in this Base Prospectus to the extent that such information relates to LBTCBV and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus which relates to LBTCBV is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

LBB accepts responsibility for all the information contained in this Base Prospectus to the extent that such information relates to LBB and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus which relates to LBB is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

The information relating to ISDAFIX (as set out herein) has been extracted from information displayed by Reuters and published by ISDAFIX on ISDAFIX page ISDAFIXINFO01. Each of LBHI, LBTCBV and LBB confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information displayed by Reuters and published by ISDAFIX on ISDAFIX page ISDAFIXINFO01, no facts have been omitted which would render the reproduced information inaccurate or misleading.

This Base Prospectus must be read in conjunction with all information deemed to be incorporated by reference (see "Information Incorporated by Reference" on page 45) and shall be read and construed on the basis that such Information is so incorporated and forms part of this Base Prospectus.

This Base Prospectus (together with supplements to this Base Prospectus from time to time (each a "*Supplement*" and together the "*Supplements*")) comprises three base prospectuses in respect of each of LBHI, LBTCBV, and LBB and in respect of LBHI as Guarantor for the purposes of Article 5.4 of the Prospectus Directive as implemented in Ireland by the Prospectus (Directive 2003/71/EC) Regulations 2005 (the "*Irish Prospectus Regulations*").

The Dealers have not independently verified the information contained herein. Accordingly, no representation, warranty or undertaking (express or implied) is made and no responsibility or liability is accepted by the Dealers as to the accuracy or completeness at any time of this Base Prospectus or any supplement hereto.

No person is authorized to give any information or to make any representations other than those contained in this document in connection with the offering or sale of the Notes and, if given or made, such information or representations must not be relied upon as having been authorized by LBHI, LBTCBV, LBB or any Dealer. None of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes is intended to provide the basis of any credit or other evaluation and should not be considered as a recommendation or a statement of opinion, or a report of either of those things, by LBHI, LBTCBV, LBB or the Dealers that any recipient of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes should purchase any of the Notes. Each investor contemplating purchasing Notes should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness of the Issuers, the Guarantor and the Group. None of this Base Prospectus, any supplement, any other financial statements or any further information supplied in connection with the Notes constitutes an offer or invitation by or on behalf of any of LBHI, LBTCBV, LBB or the Dealers to any person to subscribe for, or to purchase, any of the Notes.

The delivery of this Base Prospectus does not at any time imply that the information contained herein concerning LBHI, LBTCBV, LBB or the Group is correct at any time subsequent to the date hereof or that any supplement, any other financial statements or any further information supplied in connection with the Notes is correct as of any time subsequent to the date indicated in the document containing the same. The Dealers expressly do not undertake to review the financial condition or affairs of LBHI, LBTCBV, LBB or the Group during the life of the Program. Investors should review, *inter alia*, the most recent consolidated financial statements of LBHI and the unconsolidated financial statements of LBTCBV and LBB when deciding whether or not to purchase any of the Notes.

Any investment in Notes does not have the status of a bank deposit and is not within the scope of the deposit protection scheme operated by IFSRA. The Issuers are not and will not be regulated by IFSRA as a result of issuing the Notes.

Where an Issuer wishes to issue Notes with a maturity of less than one year, it shall do so in full compliance with the notice issued by IFSRA of exemptions granted under section 8(2) of the Central Bank Act, 1971, as amended.

Copies of this Base Prospectus have been filed with and approved by IFSRA as required by the Irish Prospectus Regulations.

The distribution of this Base Prospectus and the offering of the Notes in certain jurisdictions may be restricted by law. None of LBHI, LBTCBV, LBB or the Dealers represents that this Base Prospectus may be lawfully distributed, or that the Notes may be lawfully offered in compliance with any applicable registration or other requirements in any such jurisdiction, or pursuant to an exemption available thereunder, or assumes any responsibility for facilitating any such distribution or offering. Accordingly, the Notes may not be offered or sold, directly or indirectly, and none of this Base Prospectus, any supplement, any advertisement or any other offering material may be distributed or published in any jurisdiction, except under circumstances that will result in compliance with any applicable laws and regulations and each of the Dealers has represented that all offers and sales by it will be made on the same terms. Persons into whose possession this Base Prospectus comes must inform themselves about, and observe, any such restrictions. In particular, there are restrictions on the distribution of this Base Prospectus and the offer or sale of Notes in the United States, the European Economic Area, the United Kingdom, Japan, The Netherlands, Singapore, Italy, Australia and New Zealand. See "Subscription and Sale" herein.

**Neither the Notes nor, where applicable, the Guarantees have been, or will be, registered under the Securities Act, and may include Notes in bearer form that are subject to U.S. tax law requirements. Subject to certain exceptions, Notes in bearer form may not be offered, sold or delivered within the United States or to, or for the account or benefit of U.S. persons. Accordingly, the Notes may be offered and sold only (A) in registered form in the United States to QIBs in reliance on Rule 144A if the relevant Final Terms, or the Drawdown Prospectus, as the case may be, so provide and/or (B) in registered or bearer form outside the United States (as such term is defined in Regulation S under the Securities Act ("*Regulation S*")) to non-U.S. persons in reliance on Regulation S and, in the case of Notes in bearer form, in compliance with applicable U.S. tax law requirements. Prospective purchasers are hereby notified that sellers of the Notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A. See "Subscription and Sale".**

Notwithstanding any provision herein, any person (and each employee, representative, or other agent of such person) may disclose to any and all other persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such person relating to such U.S. tax treatment and U.S. tax structure.

## NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE

CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

In this Base Prospectus, unless otherwise specified or the context otherwise requires, all references to "dollars", "U.S.$" and "$" are to the currency of the United States of America, references to "pounds", "sterling" and "£" are to the currency of the United Kingdom, references to "A$" and "Australian dollars" are to the currency of the Commonwealth of Australia, references to "NZ$" and "New Zealand dollars" are to the lawful currency of New Zealand, references to "euro", "EUR" and "€" are to the single currency of participating member states of the European Union and references to "S$" are to the currency of Singapore.

In connection with the issue of any Tranche (as defined under "Terms and Conditions of the Notes") of Notes under the Program, the Dealer or Dealers (if any) named as the Stabilizing Manager(s) (or persons acting on behalf of any Stabilizing Manager(s)) in the applicable Final Terms may over-allot Notes or effect transactions with a view to supporting the market price of the Notes of the Series of which such Tranche forms part at a level higher than that which might otherwise prevail. However, there is no assurance that the Stabilizing Manager(s) (or persons acting on behalf of a Stabilizing Manager) will undertake stabilization action. Any stabilization action may begin on or after the date on which adequate public disclosure of the Final Terms of the offer of the relevant Tranche of Notes is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the relevant Tranche of Notes and 60 days after the date of the allotment of the relevant Tranche of Notes. Such stabilization must be conducted by the relevant Stabilizing Manager (or person(s) acting on behalf of any Stabilizing Manager) in accordance with all applicable laws, rules and regulations and in particular may not be conducted in, or on any market in, Australia or New Zealand.

The language of this Base Prospectus is English. Certain legislative references and technical terms have been cited in their original language in order that the correct technical meaning may be ascribed to them under applicable law.

# TABLE OF CONTENTS

| | |
|---|---|
| Summary Of This Base Prospectus | 6 |
| Risk Factors | 20 |
| Available Information | 44 |
| Information Incorporated By Reference | 45 |
| General Description Of The Program | 47 |
| Form Of The Notes | 48 |
| Pro Forma Final Terms | 56 |
| Terms And Conditions Of The Notes | 79 |
| Annex 1 Amendments to the Terms and Conditions of the Notes in respect of Australian Domestic Notes | 122 |
| Annex 2 Amendments To The Terms And Conditions Of The Notes In Respect Of Danish Notes | 128 |
| Annex 3 Amendments To The Terms And Conditions Of The Notes In Respect Of Finnish Notes | 132 |
| Annex 4 Amendments to the Terms and Conditions of the Notes in respect of New Zealand Domestic Notes | 136 |
| Annex 5 Amendments To The Terms And Conditions Of The Notes In Respect Of Norwegian Notes | 141 |
| Annex 6 Amendments To The Terms And Conditions Of The Notes In Respect Of Swedish Notes | 146 |
| Annex 7 Additional Terms and Conditions for Index-Linked Notes | 150 |
| Annex 8 Additional Terms and Conditions for Equity-Linked Notes | 165 |
| Annex 9 Additional Terms And Conditions For Commodity-Linked Notes With Certain Agricultural Products, Energy Products And Metals As A Relevant Commodity | 184 |
| Annex 10 Additional Terms And Conditions For FX Notes | 200 |
| Annex 11 Additional Terms And Conditions For Basket Linked Notes | 212 |
| Annex 12 Additional Terms And Conditions For Range Accrual Notes | 215 |
| Additional Descriptions In Relation To Specific Notes | 217 |
| Use Of Proceeds | 228 |
| Lehman Brothers Holdings Inc. | 229 |
| Summary Financial Information Of Lehman Brothers Holdings Inc. | 231 |
| Lehman Brothers Treasury Co. B.V | 234 |
| Summary Financial Information Of Lehman Brothers Treasury Co. B.V. | 235 |
| Lehman Brothers Bankhaus AG | 237 |
| Summary Financial Information Of Lehman Brothers Bankhaus AG | 238 |
| United States Taxation | 241 |
| Netherlands Taxation | 253 |
| German Taxation | 254 |
| Australian Taxation | 257 |
| New Zealand Taxation | 258 |
| United Kingdom Taxation | 259 |
| Irish Taxation | 262 |
| EU Savings Directive | 263 |
| United States Employee Benefit Plan Considerations | 264 |
| Subscription And Sale | 265 |
| General Information | 274 |

## SUMMARY OF THIS BASE PROSPECTUS

*This summary must be read as an introduction to this Base Prospectus and any decision to invest in the Notes should be based on a consideration of this Base Prospectus as a whole. No civil liability will attach to the persons responsible for this summary in any Member State of the European Economic Area which has implemented the Prospectus Directive solely on the basis of this summary, including any translation thereof, unless it is misleading, inaccurate or inconsistent when read together with the other parts of this Base Prospectus. Where a claim relating to the information contained in this Base Prospectus is brought before a court in a Member State of the European Economic Area, the plaintiff may, under the national legislation of the Member State where the claim is brought, be required to bear the costs of translating the Base Prospectus before the legal proceedings are initiated.*

Issuers:

**Lehman Brothers Holdings Inc.** ("*LBHI*")

LBHI, a Delaware corporation, is the ultimate parent company of the Lehman Brothers group. Lehman Brothers' principal business activities are investment banking, capital markets and investment management.

Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. Lehman Brothers, through predecessor entities, was founded in 1850.

LBHI also acts through its London Branch which is registered at Companies House with Branch Number BR005486.

Summary financial information in respect of LBHI is set out in this Base Prospectus.

**Lehman Brothers Treasury Co. B.V.** ("*LBTCBV*")

LBTCBV was incorporated in The Netherlands as a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) and it acts principally as a Netherlands finance company supporting the working capital needs of various, principally European, subsidiaries of LBHI.

Summary financial information in respect of LBTCBV is set out in this Base Prospectus.

**Lehman Brothers Bankhaus AG** ("*LBB*")

LBB was incorporated under German law as a private Stock Corporation ("*Aktiengesellschaft*"). The principal activity of LBB is to act as a commercial bank supporting the working capital and lending requirements of various institutional clients worldwide and European subsidiaries of LBHI. In addition LBB provides financial advisory services to investment banking clients in Germany and Austria.

LBB also acts through its London Branch which is registered at Companies House with Branch Number BR003960.

Summary financial information in respect of LBB is set out in this Base Prospectus.

Guarantor:

In the case of Notes issued by LBTCBV and LBB, LBHI in each case, pursuant to a guarantee agreement dated July 24, 2008 between the relevant Issuer and the Guarantor (as amended, restated or supplemented from time to time, each a "*Guarantee*" and together the "*Guarantees*").

Under the Guarantees, LBHI will unconditionally and irrevocably guarantee all amounts of principal and premium and interest (if any) on Notes issued by each of LBB and LBTCBV so that should either of LBB or LBTCBV fail to perform or procure the performance of any obligation under the Terms and Conditions of the Notes, upon written demand by the Holders, the Guarantor shall be liable to pay such amounts.

Arranger:

Lehman Brothers International (Europe).

Dealers:

Lehman Brothers International (Europe) and Lehman Brothers Inc. pursuant to an amended and restated distribution agreement dated July 24, 2008 between themselves, the Issuers and the Guarantor (as further amended, restated or supplemented from time to time, the "*Distribution Agreement*") (together with any other dealers appointed from time to time pursuant to the Distribution Agreement, the "*Dealers*").

Fiscal Agent, Principal Paying Agent, Registrar and the Exchange Agent:

The Bank of New York Mellon, acting through its London branch, as the Fiscal Agent and the Principal Paying Agent, and the Bank of New York Mellon, acting through its New York branch, as the Registrar, the agent making payments in the case of Notes registered in the name of a nominee of DTC that are denominated in currency other than U.S. dollars (the "*Exchange Agent*") and the U.S. Sub-Paying Agent, pursuant to an amended and restated fiscal agency agreement dated July 24, 2008 between, inter alia, the Fiscal Agent, the Registrar, the Issuers and the Guarantor (as further amended, restated or supplemented from time to time, the "*Fiscal Agency Agreement*") or such other agent as is specified in the relevant Final Terms.

Irish Listing Agent:

The Bank of New York Mellon.

New York Paying Agent:

The Bank of New York Mellon, acting through its New York branch.

Program Amount:

Up to U.S.$100,000,000,000 (but only up to U.S.$2,000,000,000 of such amount in respect of Notes issued by LBB) aggregate principal amount of Notes outstanding.

Currencies:

Subject to compliance with all applicable legal and/or regulatory and/or central bank requirements, such currencies as may be agreed between the relevant Issuer and the relevant Dealer(s).

7

| | |
|---|---|
| Australian Domestic Notes: | Notes issued pursuant to the Program may include Australian Domestic Notes. Australian Domestic Notes will be issued by LBTCBV or LBHI pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form with Austraclear Limited as operator of the Austraclear System (as defined in "Terms and Conditions of the Notes" herein). |
| Danish Notes: | Notes issued pursuant to the Program may include Danish Notes. Danish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Danish Agency Agreement with Skandinaviska Enskilda Banken A/S as Danish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with Danish Securities Centre ("*VP*"). For so long as it is a requirement of the VP Rules (as defined below), Danish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash. |
| Finnish Notes: | Notes issued pursuant to the Program may include Finnish Notes. Finnish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Finnish Issuing and Paying Agency Agreement with Nordea Bank Finland Plc as Finnish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with the Finnish Central Securities Depository (the "*APK*"). |
| New Zealand Domestic Notes: | Notes issued pursuant to the Program may include Notes denominated in New Zealand dollars that may be cleared through the Austraclear New Zealand System ("*New Zealand Domestic Notes*"). New Zealand Domestic Notes will be issued by LBTCBV or LBHI pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form in the name of New Zealand Central Securities Depository Limited and held in the Austraclear New Zealand System (as defined in "Terms and Conditions of the Notes" herein). |
| Norwegian Notes: | Notes issued pursuant to the Program may include Norwegian Notes. Norwegian Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Norwegian Agency Agreement with DnB NOR Bank ASA as Norwegian Issuing Agent and will be registered in uncertificated and dematerialised electronic book-entry form with the Norwegian Central Securities Depository (the "*VPS*"). |
| Swedish Notes: | Notes issued pursuant to the Program may include Swedish Notes. Swedish Notes will be issued by LBTCBV or LBB pursuant to the Fiscal Agency Agreement as supplemented by a Swedish Agency Agreement with Swedbank AB (publ) as Swedish Issuing Agent and will be registered in uncertificated and dematerialised book-entry form with the Swedish Central Securities Depository (the "*VPC*"). For so |

long as it is a requirement of the VPC Rules (as defined below), Swedish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

Maturities:

Such maturities as may be agreed between the relevant Issuer and the relevant Dealer(s) and as specified in the applicable Final Terms, subject to a minimum maturity of one month or more.

Issue Price:

Notes may be issued at their principal amount, at a premium or discount to their principal amount or on a partly paid basis, as specified in the Final Terms relating to such Notes. The Issuer and the Dealers reserve the right to offer and sell the Notes at one or more prices that differ from the Issue Price.

Fixed Rate Notes:

Fixed Rate Notes will bear interest which will be payable in arrears on each Interest Payment Date as may be specified in the applicable Final Terms and upon redemption or maturity and will be calculated on such basis as may be specified in the applicable Final Terms.

Floating Rate Notes:

Floating Rate Notes will bear interest at a rate determined on the same basis as the floating rate under a nominal interest rate swap transaction in the relevant Specified Currency governed by an agreement incorporating the ISDA Definitions, or calculated by reference to LIBOR or EURIBOR or such other reference rate appearing on the agreed screen page of a commercial quotation service or on such other basis as may be agreed between the relevant Issuer and the relevant Dealer(s) as is specified in the applicable Final Terms, in each case as adjusted by addition or subtraction of any applicable spread or by multiplication by any applicable spread multiplier.

Index-Linked Notes:

Notes issued pursuant to the Program may include Notes which provide for payments of principal or premium in respect of Index-Linked Redemption Amount Notes or of interest in respect of Index-Linked Interest Notes which are linked to a currency or commodity index, securities exchange or commodities exchange index or other index or as otherwise specified in the applicable Final Terms, or linked to a basket of such indices. Specified provisions regarding the manner in which such payments are to be calculated and made will be set forth in the Final Terms relating to such Notes.

Hybrid Rate Notes:

Notes issued pursuant to the Program may include Notes in which interest will be payable in arrears on specified Interest Payment Dates in any combination of rate bases during the term of such Notes including as Zero Coupon Notes, Fixed Rate Notes, Floating Rate Notes and/or Index-Linked Interest Notes (or calculated on any other basis in respect of rate or return), in each case as specified in the applicable Final Terms.

Equity-Linked and Credit-Linked Notes:

Notes issued pursuant to the Program may include Notes which provide for payments of principal, premium or interest which are linked to a single share or a basket of several shares ("*Equity-Linked Notes*"), or Notes which provide for payment upon redemption and/or return based on the credit performance of any one or more reference entities ("*Credit-Linked Notes*"), in each case as specified in the applicable Final Terms. Specified provisions regarding the manner in which such payments are to be calculated and made will be set forth in the Final Terms. In either case the Notes may provide for physical settlement involving transferable securities (provided, however, that in the case of equity securities of U.S. issuers, such equity securities will not include "restricted securities" within the meaning of Rule 144 under the Securities Act) with respect to certain specified obligations in accordance with the provisions of the applicable Final Terms. For the avoidance of any doubt, the Issuer will not issue equity securities (such as shares) or asset-backed securities under this Program and the securities underlying Equity-Linked Notes will not be the securities of the relevant Issuer or another entity belonging to the Lehman Brothers Group.

Other Provisions Relating to Floating Rate Notes and Index-Linked Interest Notes:

Floating Rate Notes and Index-Linked Interest Notes may have a maximum interest rate, a minimum interest rate or both or neither. Interest on Floating Rate Notes and Index-Linked Interest Notes in respect of each Interest Period, as selected prior to issue by the relevant Issuer and the relevant Dealer(s), will be payable on such Interest Payment Dates specified in, or determined pursuant to, the applicable Final Terms and will be calculated on the basis of the relevant Day Count Fraction unless otherwise specified in the applicable Final Terms.

Zero Coupon Notes:

Zero Coupon Notes will, unless otherwise specified in the relevant Final Terms, be offered and sold at a discount to their principal amount and will not bear interest.

Dual Currency Notes:

Notes issued pursuant to the Program may include Notes as to which payments (whether in respect of principal or interest and whether at maturity or otherwise) will be made in such currencies and based upon such rate of exchange as agreed by the relevant Issuer and the relevant Dealer(s) as specified in the applicable Final Terms.

Inflation-Linked Notes:

Notes issued pursuant to the Program may include Notes in respect of which the rate of interest applicable for one or more Interest Periods and /or the redemption amount is calculated by reference to one or more indices relating to the consumer price index or any other formula linked to a measure of inflation in one or more jurisdictions, as specified in the applicable Final Terms.

Quanto Notes:

Notes issued pursuant to the Program may include Notes issued in a currency (the "*Quanto Currency*") in respect of which, the rate of interest for one or more Interest Periods is

calculated by reference to, among other variables, a currency exchange rate or currency exchange rates or interest rate or interest rates in respect of a currency or currencies, or an asset or assets or index or indices denominated in a currency or currencies, that is different to that of the Quanto Currency (each a "*Reference Currency*") as specified in the applicable Final Terms. All interest amounts payable under the Notes and any amounts payable on the redemption of the Notes are paid in the Quanto Currency.

Variable Cap Notes:

Notes issued pursuant to the Program may include Variable Cap Notes, in respect of which the rate of interest applicable for some or all of the term of the Notes is subject to a variable maximum interest rate (or cap) as specified in the applicable Final Terms. The variable maximum rate of interest (the "*Variable Cap*") may be determined by reference to any rate, currency, index or formula (each a "*Variable Cap Factor*"), or any combination of such Variable Cap Factors.

Rates of Interest Determined by Reference to Swap Rates:

Notes issued pursuant to the Program may include Notes in respect of which the redemption amount, rate of interest, maximum rate of interest and/or minimum rate of interest is determined by reference to one or more swap rates specified in the applicable Final Terms.

Steepener Notes:

Notes issued pursuant to the Program may include Steepener Notes, in respect of which the rate of interest applicable for one or more Interest Periods is determined by reference to the difference between two swap rates specified in the applicable Final Terms, which difference may (if so specified in the applicable Final Terms) then be multiplied by a factor, subject to any minimum and/or maximum interest rates specified.

Path-Dependent Notes:

Notes issued pursuant to the Program may include Notes in respect of which, the rate of interest for one or more Interest Periods is calculated by reference to the rate of interest for one or more previous Interest Periods. The rate of interest for any Interest Period may be calculated by reference to the immediately preceding Interest Period (the "*Previous Rate*") and one or more variables. Such variable may include a rate, a currency, an index, a formula and/or a constant. Alternatively, the rate of interest could be subject to a maximum or minimum rate of interest based upon the Previous Rate.

Switchable Notes:

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest or a component of the rate of interest specified in the applicable Final Terms may, on certain dates (each an "*Exercise Date*"), change to a different rate of interest or component of the rate of interest (as the case may be) at the option (each a "*Switch Option*") of either the Issuer and/or the Noteholder and/or a third party (the "*Switch Option Holder*"). The number of Switch Options available to the Switch Option Holder may be limited or unlimited as

specified in the applicable Final Terms. The occurrence of such an event is known as a "*Switch Event*".

Target Redemption Notes:

Notes issued pursuant to the Program may include Notes that will be redeemed if the aggregate amount of interest to be paid under the Notes (the "*Aggregate Interest Amount*") is equal to or exceeds a target amount of interest as specified in the applicable Final Terms. Such redemption will be at an amount and on a date specified in the applicable Final Terms.

Trigger Notes:

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest specified in the applicable Final Terms may convert into a different rate of interest depending upon certain events ("*Trigger Events*") occurring on certain dates (each a "*Trigger Date*") or within a specified period ("*Trigger Period*") each as specified in the applicable Final Terms. Such Trigger Events may be, but are not limited to, events upon which one or more indices, formulae, currency exchange rates, shares, constants, other factors or a combination thereof ("*Trigger Indices*") are greater than and/or equal to and/or lower than and/or equal to one or more other indices, formulae, currency exchange rates, constants, other factors or a combination thereof.

Commodity-Linked Notes:

An Issuer may offer Notes in respect of which the Rate of Interest applicable for one or more Interest Periods and/or the Final Redemption Amount or other redemption amount or the timing of payments, redemption of the Notes and/or any other economic feature, is calculated by reference to the prices of one or more commodities or combinations thereof, including certain agricultural products, energy products (including emissions), metals and plastics, as specified in the Final Terms for the relevant Notes. The relevant agricultural products, energy products (including emissions), metals or plastics and particular type(s) of such products being referenced will be as specified in the Final Terms for the relevant Notes. The price(s) of each such product being referenced may be in respect of a particular contract for the future delivery of such commodity, as may be reported on a particular exchange, screen-based service or other publication source, all as specified in the applicable Final Terms. The price may also be based on the price of the commodity for immediate delivery or for financial settlement. Such Notes may also be, but are not limited to, Index-Linked Redemption Amount or Index-Linked Interest Notes.

FX Notes:

Notes issued pursuant to the Program may include Notes ("*FX Notes*") under the terms of which:

1. such Notes are denominated in an emerging market currency (the "*EM Currency*"), which is any currency other than G-10 Currencies (for the purpose of this section "*G-10 Currencies*" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian

Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona);

2. in respect of one or more interest periods and/or upon redemption of the Notes on the final maturity date, the amount payable per Note is in an EM Currency or is determined by reference to a currency exchange rate (a "*Reference Exchange Rate*"); and/or

3. the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more EM Currencies or is determined by reference to a Reference Exchange Rate.

Such Notes may also be Basket Linked Notes, Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

The Reference Exchange Rate for a currency pair ("*Currency Pair*") will be the spot exchange rate for a currency (the "*Reference Currency*") against another currency (the "*Base Currency*") and will be expressed as: (i) a number of currency units per unit of the Base Currency; or (ii) as otherwise specified in the applicable Final Terms. A Reference Exchange Rate may be determined: (i) pursuant to a Settlement Rate Option (defined below); (ii) pursuant to an alternative price source determined by the Calculation Agent; (iii) by Calculation Agent determination; or (iv) as otherwise determined in the applicable Final Terms. For the avoidance of doubt, a Reference Exchange Rate may be either a continuously traded spot rate or a discretely determined spot rate, or both as specified in the applicable Final Terms.

The "*Settlement Rate Option*" in respect of a Currency Pair will be the rate source (or combination of rate sources) for that Currency Pair as specified in the applicable Final Terms with such amendments, if any, as shall be set out in the applicable Final Terms or such other rate source as may be specified as such in the applicable Final Terms.

Basket Linked Notes:

Notes issued pursuant to the Program may include Notes ("*Basket Linked Notes*") under the terms of which:

1.  in respect of interest accrued during one or more interest periods and/or upon redemption of the Notes, amounts payable are determined by reference to, one or more baskets (each a "*Basket*") each comprised of one or more component values (each a "*Basket Reference Value*"); and/or

2.  the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more Baskets.

The value of a Basket (the "*Basket Value*") will be determined in accordance with the applicable Final Terms.

Basket Linked Notes including more than one Basket are referred to as "*Multiple Basket Linked Notes*". Basket Linked Notes may also be Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

A Basket shall comprise of one or more Basket Reference Values, including, but not limited to currency exchange rates (each a "*Reference Exchange Rate*"), commodity reference prices (each a "*Commodity Reference Price*"), equity prices (each an "*Equity Reference Price*"), debt security prices (each a "*Debt Reference Price*"), reference entities (each a "*Reference Entity Price*"), interest rates (each an "*Interest Rate Reference Price*"), index levels (each an "*Index Reference Price*") or any other component value as specified in the applicable Final Terms.

The Basket Value may be determined by reference to the performance of one or more Basket Reference Values as specified in the applicable Final Terms.

For Multiple Basket Linked Notes, the payments of interest and/or redemption amount, the timing of such payments, any redemption of the Notes and/or any other economic feature of such Notes may also be determined by reference to the best performing Basket, the worst performing Basket, the average performance of the Baskets to which the Notes are linked, the top few best or last few worst performing basket, the aggregate of, the difference between or the ratio of the Basket Value for each Basket or by reference to any other formula or any other payment mechanism, each as specified in the applicable Final Terms.

Each Basket Reference Value and/or, in respect of Multiple Basket Linked Notes, each Basket Value, may be ascribed a weighting factor (a "*Weighting*") in order to alter the influence of the performance of that Basket Reference Value or Basket Value (as the case may be). The Weighting of a Basket Reference Value or Basket Value, may be expressed as a percentage, a fraction, a decimal or in such other manner as provided in the Final Terms and may be defined in such a way that it has either an increased or decreased positive or negative influence on the value of the Notes relative to the influence exerted by other Basket Reference Values or Basket Values (as the case may be).

Payments in respect of Basket Linked Notes may additionally be determined by reference to a factor (the "*Leverage*") specified in the applicable Final Terms of such Notes. With respect to such Notes, the degree to which the Basket Value impacts upon the amount of such payments, on the timing of such payments, on the redemption of such Notes or any other economic factor, will vary according to the level of the Leverage.

14

Range Accrual Notes:

Notes issued pursuant to the Program may include Notes in respect of which, any interest payable for one or more Interest Periods and/or any amount payable on redemption of the Notes (as specified in the applicable Final Terms) is determined by reference to the number of days during a specified period (an "*Observation Period*") that a predetermined event or events (each a "*Fixing Event*") occurs or does not occur (as specified in the applicable Final Terms) as a proportion of the total number of days (each an "*Observation Day*") within such Observation Period (such portion, the "Index Ratio").

The Fixing Event may be, but is not limited to, the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof (the "*Observable Rate*"), exceeding and/or equalling and/or being lower than and/or equalling one or more predetermined criteria (the "*Strike*" or "*Strikes*"), as specified in the applicable Final Terms. The Strike may also be defined with reference to the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof.

The Fixing Event may be observed on each Observation Date at a specified time or may be continually observed during the Observation Period or may be observed on such other date or time as specified in the applicable Final Terms.

The total number of days during the Observation Period in which the Fixing Event is observed may vary.

Option Notes:

Notes issued pursuant to this Program may include Notes in respect of which, any interest payable for one or more Interest Periods, any amount payable on redemption of the Notes, the timing of payments and/or dates on which the Notes are redeemed and/or any other economic feature of the Notes (as specified in the applicable Final Terms) may be determined by, among other things, (i) reference to one or more prices, values or levels of a reference asset or assets (each a "*Reference Asset*") exceeding and/or equalling and/or being lower than and/or equalling (or any combination thereof) one or more strike values (the "*Strike*") or (ii) reference to the difference between, or the corresponding values of, two or more prices, values or levels of such Reference Assets or (iii) such other formula specified in the applicable Final Terms. Such formula(s) may be referred to as an "*Option*".

The Reference Assets from which the value of the Option may be derived may include one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof.

The calculation of the value of the Option may be determined by, among other things, reference to:

15

1.   the price, value or level of the Reference Asset(s) on a date or dates specified in the applicable Final Terms minus the price, value or level of the Strike(s). Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Call Option*";

2.   the price, value or level of the Strike(s) minus the price, value or level of Reference Asset(s) on a date or dates specified in the applicable Final Terms. Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Put Option*"; and/or

3.   whether the price, value or level of the Reference Asset exceeds and/or equals and/or is lower than and/or equals one or more predetermined criteria, as specified in the applicable Final Terms.

The prices, values or levels of the Reference Asset and/or the value of the Option may be determined on one or more dates during the term of the Notes.

The Strike may also be determined by reference to the level of one or more Reference Assets or a factor of such level or levels on a date or dates specified in the applicable Final Terms.

| | |
|---|---|
| Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes: | Autocallable Index-Linked Notes are Notes linked to an index or a basket of indices (each, an "*Index*" and together, the "*Indices*"). Autocallable Equity-Linked Notes are Notes linked to reference equities (each, a "*Share*" and together, the "*Shares*"). Under the terms of such Notes the Notes may redeem early on one or more specific dates at a specific amount per Note (the "*Mandatory Early Redemption Amount*") if an event linked to the performance of the Index or some or all of the Indices, or in the case of Autocallable Equity-Linked Notes some or all of the Shares occurs, as further described in the applicable Final Terms (a "*Mandatory Early Redemption Event*"). |

In addition, Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may provide that some or all of the interest or of the principal payable at maturity in respect of them shall be linked to the performance of some or all of the Indices, or in the case of Autocallable Equity-Linked Notes some or all of the Shares.

Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may be capital protected or not. Autocallable Equity-Linked Notes may redeem in cash or through delivery of Shares ("*Physical Settlement*").

| | |
|---|---|
| Form of Notes: | Notes of a Series may be issued in either bearer or registered form except that Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes and Swedish Notes will be issued in registered, uncertificated and dematerialised book-entry form. Bearer |

Notes in global form may be issued either in Classic Global Note Form or in New Global Note Form as specified in the applicable Final Terms. Notes in registered form which are offered and sold outside the United States in reliance on Regulation S will be represented by interests in a global note in registered form (the "*Unrestricted Global Note*"), deposited with a common depositary for Euroclear and Clearstream, Luxembourg and registered in the name of such common depositary or its nominee or deposited with a custodian for DTC and registered in the name of a nominee for DTC on or about the date of issue of the relevant Tranche.

Notes which are offered and sold in the United States in reliance on Rule 144A will be represented by interests in a global note (the "*Restricted Global Note*") or notes (the "*Restricted Global Notes*") in registered form, deposited with a custodian for and registered in the name of a nominee of DTC on or about the date of issue of the relevant Tranche. Interests in the global Notes in registered form will be shown on, and transfers thereof will be effected only through, records maintained by DTC and/or Euroclear and Clearstream, Luxembourg and their respective direct and indirect participants.

Denomination of Notes:

Subject to compliance with the Prospectus Directive and all applicable legal and/or regulatory and/or central bank requirements, Notes may be issued in any denomination, subject to:

(a)  in the case of Notes to be admitted to trading on a regulated market and/or publicly offered in an EEA Member State, the minimum denomination of the Notes will be:

  (1)  where the Issuer of the Notes is LBB, at least EUR 50,000 (or nearly equivalent in any other currency on the issue date); and

  (2)  in all other cases, at least EUR 1,000 (or nearly equivalent in any other currency on the issue date) or the Notes will give the right to acquire transferable securities (provided, however, that in the case of equity securities of U.S. issuers, such equity securities will not include "restricted securities" within the meaning of Rule 144 under the Securities Act) or to receive a cash amount, as a consequence of their being converted or the rights conferred by them being exercised, provided that the issuer of the underlying securities is not the relevant Issuer or another entity belonging to the Lehman Brothers group; and

(b)  in the case of Notes issued by LBHI and having a maturity of 183 days or less, the minimum denomination of such Notes will be at least U.S.$500,000 or its equivalent).

17

| | |
|---|---|
| Redemption: | Redemption for taxation reasons or as may be specified in the relevant Final Terms. |
| Taxation: | Payments of principal, and premium, if any, and interest, if any, on the Notes will be made without deduction for or on account of United States, the United Kingdom, The Netherlands or the Federal Republic of Germany (or any other country in which such payments are regarded as being sourced) withholding taxes, save as required by law. In that event, the Issuer will, subject to certain exceptions, pay such additional amounts as will result in the Noteholders receiving such amounts as they would have received in respect of such Notes had no such deduction been required. |
| Status of the Senior Notes and Senior Guarantees; Negative Pledge: | The Senior Notes and the Senior Guarantees will constitute direct, unconditional and unsecured obligations of the relevant Issuer and Guarantor, respectively, and will rank *pari passu* in right of payment among themselves, and equally with all other unsecured and unsubordinated obligations of such Issuer and the Guarantor, respectively.<br><br>The Senior Notes and the Senior Guarantees will have the benefit of a negative pledge. |
| Status of the Subordinated Notes and Subordinated Guarantees: | Subordinated Notes and Subordinated Guarantees will constitute direct, unsecured and subordinated obligations of the relevant Issuer and the Guarantor, respectively, and will rank *pari passu* among themselves and pari passu with all other present and future unsecured, unconditional and subordinated indebtedness of such Issuer and the Guarantor, respectively. |
| Listing and Trading: | Applications have been or will be made for Notes to be admitted during the period of twelve months after the date hereof to the Official List of the Irish Stock Exchange and to trading on its regulated market, to trading on the Alternative Securities Market of the Irish Stock Exchange and/or to the Official List of the Singapore Stock Exchange. The Program also permits Notes to be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or to be admitted to listing, trading and/or quotation by such other or further competent authorities, stock exchanges and/or quotation systems as may be agreed between the relevant Issuer and the relevant Dealer(s) and specified in the relevant Final Terms. Australian Domestic Notes may be listed on the Australian Stock Exchange. |
| Final Terms or Drawdown Prospectus: | Notes issued under the Program may be issued either (1) pursuant to this Base Prospectus and associated Final Terms or (2) pursuant to a Drawdown Prospectus (each, a "*Drawdown Prospectus*") prepared in connection with a particular Tranche of Notes.<br><br>For a Tranche of Notes which is the subject of Final Terms, those Final Terms will, for the purposes of that Tranche only, supplement the Terms and Conditions of the Notes and this |

18

Base Prospectus and must be read in conjunction with. Base Prospectus and any subsequently published suppleme. to this Base Prospectus. The terms and conditions applicable to any particular Tranche of Notes which is the subject of Final Terms are the Terms and Conditions of the Notes as supplemented, amended and/or replaced to the extent described in the relevant Final Terms.

The terms and conditions applicable to any particular Tranche of Notes which is the subject of a Drawdown Prospectus will be the Terms and Conditions of the Notes as supplemented, amended and/or replaced to the extent described in the relevant Drawdown Prospectus. In the case of a Tranche of Notes which is the subject of a Drawdown Prospectus, each reference in this Base Prospectus to the relevant or applicable Final Terms shall be read and construed as a reference to the relevant or applicable Drawdown Prospectus.

**Selling Restrictions:**

Each Dealer and each purchaser of Notes must observe all applicable laws and regulations in any jurisdiction in which it may offer, sell or deliver Notes or distribute this Base Prospectus or any offering material in relation to Notes.

The Base Prospectus contains a summary of certain selling restrictions in the United States, the European Economic Area, the United Kingdom, Italy, Japan, The Netherlands, Australia, New Zealand and Singapore. These are set out in more detail on pages 265 to 273 of this Base Prospectus.

**Governing Law:**

The Notes (save for Australian Domestic Notes and New Zealand Domestic Notes) will be governed by English law. Australian Domestic Notes and New Zealand Domestic Notes will be governed by the laws of New South Wales, Australia. Guarantees will be governed by the laws of the State of New York.

**Risk Factors:**

There are certain risks related to any issue of Notes under the Program which investors should ensure they fully understand. Additionally, Lehman Brothers' financial condition and results of operations may be affected by uncertain or unfavourable economic, market, legal and other conditions. These conditions include but are not limited to market and competitive risk, changes in investor sentiment, liquidity risk, changes to credit ratings, credit exposure and operational risk and legal regulatory risk. These risks are set out in more detail on pages 20 to 43 of this Base Prospectus.

*Some Notes are subject to risks associated with foreign exchange rates, particularly where an emerging market currency is involved*

The performance of an investment in certain Notes may be affected either because the Notes are denominated in a currency other than the investor's '*home-currency*', or because the amount payable will be affected by a foreign exchange rate. This may affect interest as well as principal payments (as applicable) under the terms of some Notes. Any variation in the exchange rates is based on a number of interrelated factors, including economic, financial and political events that Lehman Brothers cannot control. The exchange rates, which depend on the supply and demand for the relevant currencies, may be affected by political, economic, legal, accounting and tax matters specific to the countries in which such currencies are circulated as legal tender. These matters include, among other things, the possibility that exchange controls with respect to the currencies could be imposed or modified. Such value also varies with market expectations as to future exchange rates and other current and anticipated conditions. The effects of any of these factors may be particularly pronounced when one of the currencies is an emerging market currency or other currency (each an "*EM Currency*"). EM Currencies are often less liquid than, for instance, G-10 Currencies. In addition, the exchange rates may be affected by the operation of, and the fact that persons and entities (including Lehman Brothers) will be trading currencies on, interbank and interdealer foreign exchange markets in the United States, Europe and elsewhere. For the purposes of this risk factor, "*G-10 Currencies*" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona.

### *Risks related to the structure of a particular issue of Notes*

A wide range of Notes may be issued under the Program. A number of these Notes may have features which contain particular risks for potential investors. Set out below is a description of the most common features and the risks associated with them:

### *Fixed Rate Notes and Zero Coupon Notes*

Investment in Fixed Rate Notes and Zero Coupon Notes involves the risk that subsequent changes in market interest rates may adversely affect the value of the Notes.

### *Index Linked Notes, Dual Currency Notes and Notes linked to Swap Rates, interest, formula or other underlying*

The Issuers may issue Notes with principal or interest determined by reference to interest or swap rates or an index or formula, to changes in the prices of securities or commodities, to movements in currency exchange rates or other factors (each, a "*Relevant Factor*"). In addition, the Issuers may issue Notes with principal or interest payable in one or more currencies which may be different from the currency in which the Notes are denominated.

Potential investors should be aware that:

(i)     the market price of such Notes may be very volatile;

(ii)    they may receive no interest;

(iii)   payment of principal or interest may occur at a different time or in a different currency than expected;

(iv)    they may lose all or a substantial portion of their principal;

(v)     a Relevant Factor may be subject to significant fluctuations that may not correlate with changes in interest rates, currencies or other indices;

(vi)    if a Relevant Factor is applied to Notes in conjunction with a multiplier greater than one or contains some other leverage factor, the effect of changes in the Relevant Factor on principal or interest payable is likely to be magnified; and

(vii)   the timing of changes in a Relevant Factor may affect the actual yield to investors, even if the average level is consistent with their expectations. In general, the earlier the change in the Relevant Factor, the greater the effect on yield.

*Investing in Notes is not the same as investing in a Relevant Factor*

Prospective investors should be aware that the market value of the Notes may not have a direct relationship with the prevailing level of any Relevant Factor or price of any component assets of a Relevant Factor, in that changes in the level of any such Relevant Factor or market price of any such component assets will not necessarily result in a comparable change in the market value of the Notes.

Prospective investors should also note that dividends paid to holders of any such component asset will not be paid to the Issuer or to the Noteholders and will not, unless such component asset is comprised in an Index which is a "Total Return Index", be reflected in the level of the applicable Relevant Factor. The return on the Notes will thus generally not reflect any dividends or other income that would be paid to investors that have made a direct investment in the relevant component asset. Consequently, the return on the Notes may be less than the return from a direct investment in the component assets comprising each Relevant Factor.

*Historical levels of a Relevant Factor should not be taken as an indication of the future performance of such Relevant Factor during the term of the Notes*

The Final Terms may contain historical levels of a Relevant Factor for information purposes. The actual performance of such Relevant Factor over the term of the Notes may bear little relation to the historical levels of the Relevant Factor. Fluctuations in the performance of a Relevant Factor make the amount payable at maturity or upon redemption difficult to predict.

*Risk-excluding or risk-limiting transactions*

Prospective investors may not rely upon being able to enter into transactions which may exclude or limit loss exposure to the Notes during the term of the Notes. The possibility of entering into risk-excluding or risk-limiting transactions depends in particular on market conditions and the relevant underlying circumstances. Noteholders may be able to enter into such transactions only at an unfavourable market price resulting in an additional loss for such Noteholders.

Prospective investors intending to purchase Notes to hedge the market risk associated with investing in any Relevant Factor or any component asset of a Relevant Factor should be aware of the difficulties associated therewith. For example, the value of the Notes may not exactly correlate with the value of the component assets comprised in such Relevant Factor.

*Adjustments of the terms of Index-Linked Notes or Equity-Linked Notes and Cancellation of Index-Linked or Equity-Linked Notes upon the occurrence of certain events relating to any Index or Shares*

The Calculation Agent has certain discretions to determine whether certain events, as set out in Annex 7 (*Additional Terms and Conditions for Index-Linked Notes*) and Annex 8 (*Additional Terms and Conditions for Equity-Linked Notes*) below, have occurred, and the consequences thereof.

For example, the Calculation Agent may determine that a market disruption in respect of any Index or the Shares of any Share Issuer has occurred or exists at a relevant time or that an adjustment to the terms and conditions of the Notes is required following the occurrence of a correction of the level of an Index or of any corporate action in respect of any Shares. Any such determination may have an adverse impact on the value of the Notes.

In addition, in certain circumstances, the Issuer may be entitled to cancel the Notes and, if permitted by applicable law, pay each Noteholder an amount as determined by the Calculation Agent in its sole and absolute discretion by reference to the fair market value of the Notes less the costs incurred by the Issuer in unwinding any related hedging arrangements. Prospective investors should note that such amount may be

less than the Issue Price of the Notes or the amount required to be paid for acquiring the Notes, and may even be nil.

Prospective investors should note that any discretion exercised by, or any determination made by the Calculation Agent shall (in the absence of manifest error) be binding.

*Replacement of any Index*

Any Index may be replaced by a successor index in certain circumstances as set out in Annex 7 (*Additional Terms and Conditions for Index-Linked Notes*) and the performance of that successor index over time may be different from the performance of the relevant Index.

*Substitution of the Shares in a Share Basket*

The Calculation Agent may replace the Shares of any Share Issuer by other shares as a consequence of any one or more Extraordinary Events. Such replacement shares will, to the extent practicable, be selected from the same industry, be denominated in the same currency and have a similar market capitalisation to the relevant replaced Shares. Such substitution may have an adverse impact on the value of the Notes. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding.

*Repayment of principal may be at risk and may be substantially less than the amount originally invested*

The terms of Index-Linked Notes and Equity-Linked Notes may be capital protected upon the occurrence of a Mandatory Early Redemption Event and/or at maturity. The level of Capital Protection may be expressly stated as a percentage of the nominal amount of each such Note at issuance or may be inherent in the formula or formulae for determining the amount payable on the redemption of such Notes. Where there is no Capital Protection, or where the level of Capital Protection is less than 100 per cent. of the nominal amount of each such Note at issuance, the amount payable upon redemption of such Notes may be significantly less than the amount originally invested and in certain circumstances may be nil.

*Principal risks related to Physical Settlement*

In the event that Physical Settlement applies (as provided in the applicable Final Terms), the value of the Shares to be delivered as described herein may be less than the value of such Shares as of the issue date of the Notes, and may in fact be nil. An investor may thus sustain a total loss of the amounts invested in the Notes. In addition, if a Settlement Disruption Event occurs in respect of the Maturity Date, settlement may be indefinitely postponed if delivery of the relevant Shares cannot be effected in a commercially reasonable manner. The occurrence of such postponement may have an adverse effect on the value of an investment in the Notes.

*Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes*

With respect to Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes, generally, where no specific Capital Protection is specified in the applicable Final Terms, or where such Capital Protection is specified to be less than 100 per cent. of the nominal amount of each Note, the return of capital at maturity will only be protected so long as the Final Level (or in the case of an Index Basket, the relevant Final Level), or in the case of Autocallable Equity-Linked Notes the Final Price, is not, as specified in the applicable Final Terms, either (i) less than or (ii) equal to or less than either (a) the Strike Level or, where applicable, the product of such Strike Level, or in the case of Autocallable Equity-Linked Notes the Strike Price, and (b) either the Barrier Percentage or the Strike Level Adjustment Percentage, or in the case of Autocallable Equity-Linked Notes the Strike Price Adjustment Percentage. If such Final Level, or in the case of Autocallable Equity-Linked Notes the Final Price, is less than any such percentage, an investment in the Notes will be exposed to the negative performance of the relevant Index, or in the case of Autocallable Equity-Linked Notes relevant Shares, and consequently the Final Redemption Amount, or in the case of physically settled Autocallable Equity-Linked Notes the cash equivalent value of any Physical Settlement

24

Amount, will be less than the amount originally invested in the Notes. Where a Barrier Percentage or Strike Level Adjustment Percentage, or in the case of Autocallable Equity-Linked Notes Strike Price Adjustment Percentage, is specified in the applicable Final Terms, prospective investors should understand that the higher any such Barrier Percentage or Strike Level Adjustment Percentage, or Strike Price Adjustment Percentage, as the case may be, is, the more repayment of principal at maturity will be at risk.

Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes will be automatically redeemed prior to the Maturity Date if a Mandatory Early Redemption Event occurs. The Mandatory Early Redemption Amount payable upon the occurrence of a Mandatory Early Redemption Event may be significantly less than the amount originally invested and in certain circumstances may be zero. In addition, a Noteholder may not be able to reinvest the redemption proceeds in a comparable security and receive a return on investment which is as high as that of the Notes. The Issuer is not liable for any disadvantage a Noteholder may incur in respect of the new investment or non-investment of its capital.

In the case of Notes linked to either an Index Basket or a Share Basket with a "worst of" feature, because the amount to be repaid at maturity of such Autocallable Index-Linked Notes is not dependant on the average level of each Index, or in the case of such Autocallable Equity-Linked Notes on the average value of the Shares, but rather on the performance of the Worst Performing Index, or in the case of such Autocallable Equity-Linked Notes of the Worst Performing Shares, it is likely that the value of the Notes will be correlated to the performance of such Worst Performing Index, or in the case of Autocallable Equity-Linked Notes of the Worst Performing Shares. In addition, a specific event affecting any one Index, or in the case of Autocallable Equity-Linked Notes the Shares of any one Share Issuer, could have an adverse effect on the value of the Notes. For example, if a Trigger Event is specified in the applicable Final Terms, the occurrence of such event in relation to any one Index (which may or may not be the Worst Performing Index), or in the case of Autocallable Equity-Linked Notes in relation to the Shares of any one of the Share Issuers (which may or may not be the Worst Performing Share), is likely to affect negatively the value of the Notes since it would make it more likely that the Notes are redeemed at an amount which is less than the amount originally invested in the Notes.

*Partly-paid Notes*

The Issuers may issue Notes where the issue price is payable in more than one instalment. Failure to pay any subsequent instalment could result in an investor losing all of his investment.

*Notes with a multiplier, other leverage factor, caps, floors or other options*

Notes with variable interest rates can be volatile investments. If they are structured to include multipliers or other leverage factors, or caps or floors, or any combination of those features, their market values may be even more volatile than those for securities that do not include those features.

*Inverse Floating Rate Notes*

Inverse Floating Rate Notes have an interest rate equal to a fixed rate minus a rate based upon a reference rate such as LIBOR. The market values of those Notes typically are more volatile than market values of other conventional floating rate debt securities based on the same reference rate (and with otherwise comparable terms). Inverse Floating Rate Notes are more volatile because an increase in the reference rate not only decreases the interest rate of the Notes, but may also reflect an increase in prevailing interest rates, which further adversely affects the market value of these Notes.

*Fixed/Floating Rate Notes*

Fixed/Floating Rate Notes may bear interest at a rate that the relevant Issuer may elect to convert from a fixed rate to a floating rate, or from a floating rate to a fixed rate. The relevant Issuer's ability to convert the interest rate will affect the secondary market and the market value of the Notes since the relevant Issuer may be expected to convert the rate when it is likely to produce a lower overall cost of borrowing. If the relevant Issuer converts from a fixed rate to a floating rate, the spread on the Fixed/Floating Rate Notes may

be less favourable than then prevailing spreads on comparable Floating Rate Notes tied to the same reference rate. In addition, the new floating rate at any time may be lower than the rates on other Notes. If the relevant Issuer converts from a floating rate to a fixed rate, the fixed rate may be lower than then prevailing rates on its Notes.

*Notes issued at a substantial discount or premium*

The market values of securities issued at a substantial discount or premium from their principal amount tend to fluctuate more in relation to general changes in interest rates than do prices for conventional interest-bearing securities. Generally, the longer the remaining term of the securities, the greater the price volatility as compared to conventional interest-bearing securities with comparable maturities.

*Inflation-Linked Notes*

A relevant consumer price index or other formula linked to a measure of inflation to which the Notes are linked may be subject to significant fluctuations that may not correlate with other indices. Any movement in the level of the Index may result in a reduction in the interest payable on the Notes or, in the case of Notes with a redemption amount linked to inflation, in a reduction in the amount payable on redemption which in some cases could result in Noteholders receiving back less than the amount originally invested.

The seasonal nature of an Index may result in higher or lower inflation rates being observed for any sub-period than the rate in relation to any particular Interest Period.

An Index to which interest payments and/or the redemption amount of Inflation-Linked Notes are linked is only one measure of inflation for the relevant jurisdiction, and such Index may not correlate perfectly with the rate of inflation experienced by residents in such jurisdiction.

Interest Payments and/or the redemption amount of Inflation-Linked Notes may be based on a calculation made by reference to the inflation rate for a period which has no relation to the date of payment on the Notes and therefore could be substantially different from the level of inflation at the time of the payment of interest or, as the case may be, principal on the Notes.

*Quanto Notes*

The market value of the Notes will be affected by, among other things, the rate of interest payable in each Interest Period and/or the amount payable on redemption. The principal risk associated with Quanto Notes is that the rate of interest that is payable on the Notes is lower than the rate of interest usually payable in relation to the Quanto Currency.

By way of an example, the interest amount on a Quanto Note may be paid in Euro but be calculated by adding 0.25 per cent. of the nominal amount of such Note to USD-LIBOR with a designated maturity of 3 months. In this example, the Quanto Currency is Euro and the Reference Currency is United States Dollars and any increase in interest rates in respect of the Quanto Currency will not result in a corresponding increase in the rate of interest payable for an Interest Period in respect of the Notes.

The above analysis sets out just one example of how Quanto Notes may operate and the risks associated with such circumstances. It is not intended to be an exhaustive list of risks associated with Quanto Notes and additional risk factors may be associated with different coupon structures of Quanto Notes.

*Variable Cap Notes*

The market value of Variable Cap Notes will be affected by, among other things, the amount of interest payable in each Interest Period in comparison to the prevailing rates of interest available on other investments in the market at the time in question. The rate of interest payable on Variable Cap Notes is subject to a variable maximum rate of interest (a "*Variable Cap*") as specified in the Final Terms. The Variable Cap may be determined by reference to any rate, currency, security, index, formula or other factor (each a "*Variable Cap Factor*"), or any combination of such Variable Cap Factors. In the event that the Variable Cap for an

Interest Period is close to or equal to zero, the rate of interest applicable in respect of the relevant Interest Period will be close to or equal to zero (unless any minimum rate of interest has been specified in the applicable Final Terms and applies, in which event the rate of interest applicable in respect of the relevant Interest Period will equal that minimum rate of interest) and the value of the Variable Cap Notes will be effected commensurately.

In addition, the Variable Cap may fluctuate independently of any fluctuation in the interest rate which would have been payable on the Notes if there had not been a Variable Cap and this may have a detrimental or positive effect on the market value of the Variable Cap Notes.

If a Variable Cap contains a leverage factor, the effects of changes in the Variable Cap on interest payable (and therefore the impact on the value of the Variable Cap Notes) is likely to be magnified.

*Steepener Notes*

The market value of Steepener Notes will be affected by, among other things, the amount of interest payable in each Interest Period. The rate of interest on Steepener Notes is obtained by taking the amount (if any) by which a designated swap rate (the "*First Swap Rate*") exceeds another designated swap rate (the "*Second Swap Rate*") and multiplying that amount by the factor (the "*Leverage Factor*") (all as specified in the applicable Final Terms), subject to any maximum and minimum rate of interest. Subject to any minimum and maximum rate of interest, as the difference between the First Swap Rate and the Second Swap Rate decreases the rate of interest payable will fall by the amount of that decrease multiplied by the relevant Leverage Factor. In the event that the First Swap Rate does not exceed the Second Swap Rate on a date which is relevant to the calculation of interest for an Interest Period, the rate of interest on the Notes for that period will equal zero or, if any minimum rate of interest has been specified in the applicable Final Terms and applies, will equal that minimum rate of interest.

*Path-Dependent Notes*

The market value of any Notes is affected by, among other things, the rate of interest payable on such Notes. The rate of interest payable on the Path-Dependent Notes in respect of an Interest Period will affect the rate of interest payable in respect of one or more subsequent Interest Periods. If the rate of interest payable on the Notes in respect of any Interest Period has a negative impact on the rate of interest payable in respect of subsequent Interest Periods, this will have a negative effect on the market value of the Path-Dependent Notes. Hence the market value of such Notes will be considerably more volatile than comparable Notes where the rate of interest for any Interest Period is determined independently from those other Interest Periods.

By way of an example, the rate of interest on Path-Dependent Notes may be calculated by using a formula as shall be specified in the applicable Final Terms. Such formula may be similar to any of the formulae in A, B or C below or as otherwise specified in the applicable Final Terms:

(A)     Previous Rate + Y * (X – 6m EURIBOR); or

(B)     Previous Rate + Y * (6m EURIBOR – X); or

(C)     6m EURIBOR + X subject to a maximum rate of interest of the Previous Rate +Y

Where:

"X" and "Y" are constants; and

"6m EURIBOR" means, in respect of any Interest Period, the rate for deposits in Euro for a period of six months which appears on Reuters Page EURIBOR01 (or any successor or replacement page) as of 11.00 a.m. Brussels time on the date specified in the applicable Final Terms.

The analysis below sets out just some of the risks associated with Path-Dependent Notes with a rate of interest calculated in respect of an Interest Period in accordance with the formulae specified in A, B or C above. It is not intended to be an exhaustive list and other risk factors may be associated with these and different coupon structures for which reference should be made to other relevant risk disclosures contained herein.

In example (A) above, the rate of interest payable on the Path-Dependent Notes is inversely correlated to the direction of 6m EURIBOR. If, in relation to any Interest Period, 6m EURIBOR increases, the rate of interest in respect of such Interest Period will decrease. Since the rate of interest for such Interest Period then forms the basis for determining the rate of interest for the subsequent Interest Period, this decrease will also have a detrimental effect on the rate of interest in respect of the subsequent Interest Periods. This, in turn, will have a negative impact on the market value of the Notes which will be leveraged compared to Notes with a comparable rate of interest but which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

In example (B) above, the rate of interest payable on the Path-Dependent Notes is positively correlated to the direction of 6m EURIBOR. If, in relation to an Interest Period, 6m EURIBOR decreases, the rate of interest in respect of such Interest Period will also decrease. As in the case of example (A), since the rate of interest for such Interest Period then forms the basis for determining the rate of interest for the subsequent Interest Period, this decrease will also have a detrimental effect on the rate of interest in respect of the subsequent Interest Periods. This, in turn, will have a negative impact on the market value of the Path-Dependent Notes which are leveraged compared to Notes which pay a rate of interest which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

In example (C) above, the rate of interest payable on the Path-Dependent Notes is subject to a variable maximum rate of interest (or cap) which is calculated by reference to the interest rate payable in respect of the preceding Interest Period. In such circumstances if 6m EURIBOR increases following any Interest Period, the rate of interest payable in respect of that Interest Period may cap the rate of interest in respect of the subsequent Interest Periods at a rate lower than that which would have been applicable to those subsequent Interest Periods had the rate of interest not been capped, which will have a negative effect on the maximum rate of interest payable in respect of each subsequent Interest Period. This means that a lower rate of interest for one Interest Period will have a detrimental effect on the market value of the Notes where 6m EURIBOR subsequently increases. Such effect will be leveraged compared to Notes which pay a rate of interest which is determined without taking into account the rate of interest applicable to the previous Interest Periods.

*Range Accrual Notes*

The indices, formulae, currency exchange rates, rates and other factors or combination thereof used to determine the Fixing Event and, consequently, the Index Ratio for Range Accrual Notes may be different from the Reference Rate for such Notes and may therefore fluctuate independently of such rate. This may result in the market value of the Notes falling even when the Reference Rate in respect of an Interest Period is rising. If, during the relevant Observation Period, the Fixing Event occurs only on a small number of days or does not occur at all, the Index Ratio may be very low or, as the case may be, zero and, as a result, the rate of interest payable on the Notes in respect of such Interest Period may be very low, or, as the case may be, zero (save for any minimum rate of interest specified in the applicable Final Terms). This will have a detrimental effect on the market value of the Notes.

Where the Observation Days fall in a different chronological period from the Interest Period, the indices, formulae, currency exchange rates, rates or combination thereof which were used to determine the Index Ratio may be different from those which prevail at the time at which the interest amount is being paid. This may have a detrimental effect on the market value of the Notes.

For example, the rate of interest for each Interest Period for a Range Accrual Note may be calculated by multiplying the Reference Rate by the Index Ratio for one specified Observation Period. If the Index Ratio determined by the Calculation Agent is contingent upon the number of days in the Observation Period on which USD LIBOR with a designated maturity of 6 months ("*6m USD LIBOR*") falls within a range of

values set out in the relevant Final Terms and during that Observation Period the number of days in which 6m USD LIBOR is within such range is low (for example, 5 days in an Observation Period of 30 days, giving an Index Ratio equal to 5/30), then the rate of interest payable for each Interest Period in relation to such Note will be calculated by reference to such Index Ratio and any change in 6m USD LIBOR will not affect the Index Ratio in subsequent Interest Periods. In such circumstances, the rate of interest payable in respect of all Interest Periods and the market value of the Notes will be detrimentally affected in a material and significant way.

### Switchable Notes

The rate of interest payable in respect of Switchable Notes may change adversely when a Switch Event occurs. Where the number of Switch Options available to the Switch Option Holder is limited, once the Switch Option Holder exercises the final Switch Option the rate of interest payable may convert into a rate that is below the rate that would have been payable had the Switch Option not been exercised and the initial rate of interest remained. Such rate may, in some instances, be as low as zero until the stated Maturity Date. This may result in the market value of the Switchable Notes falling even where the rate of interest payable prior to the relevant Switch Event is rising. Therefore, the performance of Switchable Notes is highly dependant on the actions of the Switch Option Holder which, in the case of the Issuer and/or a third party, may be a person or entity that has no obligation to act in the best interest of the Noteholders.

By way of example, the Switch Option Holder may exercise its Switch Option on the Exercise Date which results in the rate of interest payable for an Interest Period converting from a rate of interest equal to 6.00 per cent. annum of the nominal amount of the Notes to a rate of interest equal to EURIBOR with a designated maturity of 12 months ("*12m EURIBOR*") plus 0.50% of the nominal amount of the Notes. In this instance if 12m EURIBOR is at a low rate (for example, 2.00 per cent.) then the coupon payable in respect of the relevant Interest Period would switch from 6.00 per cent. to 12m EURIBOR + 0.50%, or 2.50%. If 12m EURIBOR remained at this rate for the remainder of the term of the Notes and the Switch Option Holder was not permitted under the terms of the Notes to switch the rate of interest payable back to the fixed rate previously payable or another rate of interest, all future interest payments would be significantly less than would have been payable had the Switch Option not been exercised. This lower rate of interest for the remainder of the term of the Notes will have a detrimental effect on the market value of the Notes. The above analysis is one example of the operation of Switchable Notes. For other Switchable Notes the rate of interest payable may switch between fixed and/or floating and/or Index-Linked and/or any combination thereof. This example is not intended to be exhaustive.

Where the Switch Option may be exercised at the option of the Issuer and/or a third party only, it may be more likely that a Switch Event occurs during a period in which the rate of interest payable to the Noteholder is increasing and where the resulting rate of interest payable following a Switch Event is lower than that which would have been payable had the Switch Event not occurred.

### Target Redemption Notes

The automatic redemption feature of Target Redemption Notes may limit the market value of the Notes. Hence, even in a favourable market/interest environment their market value may not rise substantially above the price at which they are redeemed.

The automatic redemption may take place when the investor would not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the Target Redemption Notes being redeemed, and may only be able to do so at a significantly lower rate. Potential investors should consider reinvestment risk in light of other investments available at that time.

For example, consider Notes issued under a Final Terms that specify that the Target Interest Amount is 20 per cent. of the nominal value of the Notes, that any interest calculated in excess of the Target Interest Amount will be reduced so that the Aggregate Interest Amount equals the Target Interest Amount, and that upon maturity any interest calculated for the final Interest Period may be increased so that the Aggregate Interest Amount equals the Target Interest Amount.

If on an Interest Determination Date:

(a)     the Aggregate Interest Amount as at the end of the previous Interest Period is equal to 18 per cent. of the nominal amount and the amount of interest determined to be payable in respect of the current Interest Period (save for the application of the target redemption feature) is 8 per cent. of the nominal amount, then due to the target redemption feature, the amount of interest payable would be reduced to 2 per cent. (being the Target Interest Amount less the Aggregate Interest Amount);

(b)     the Aggregate Interest Amount is equal to 10 per cent. of the nominal amount and the amount of interest determined to be payable in respect of the final Interest Period is 8 per cent. of the nominal amount, then due to the target redemption feature, the amount of interest payable would be increased to 10 per cent. (being the Target Interest Amount less the Aggregate Interest Amount).

In both of the above examples the Notes will redeem at an amount specified in the applicable Final Terms. The above analysis sets out just two examples of how the early redemption mechanism may operate for Target Redemption Notes and the risks associated with such circumstances. It is not intended to be an exhaustive list of the risks associated with Target Redemption Notes and additional risk factors may be associated with these and different redemption structures.

*Commodity-Linked Notes*

The prices of commodities may be subject to significant fluctuations. The prices of commodities may be volatile and, for example, may fluctuate substantially if natural disasters or catastrophes, such as hurricanes, fires or earthquakes, affect the supply or production of such commodities. The price of commodities may also fluctuate substantially if a conflict or war affects the supply or production of such commodities. If any interest and/or the redemption amount payable in respect of a Note is linked to the price of a Commodity, any change in the price of such commodity may result in the reduction of the amount of interest and/or the redemption amount payable. The reduction in the amount of interest payable may result, in some cases, in no interest being payable on the Notes. The reduction in the amount payable on the redemption of the Notes may result, in the case of Notes which are not principal protected, in a Noteholder receiving a smaller sum on redemption of a Note than the amount originally invested in such Note and could potentially result in the complete loss of capital. In the case of Notes where the redemption date changes based on the price of one or more commodities, any change in the price of such commodity could also result in significant change in the redemption date of the Notes.

*FX Notes*

Additional risk factors applicable to FX Notes (which may be more pronounced where the Reference Currency or Base Currency is an EM Currency) include:

–     risks of partial or complete loss of principal, subject to the level of principal protection (if any) specified in the Final Terms

–     risks of receiving no, or only low, payments of interest and/or payments on redemption as a result of exchange rate movements and/or (in the case of FX Notes) any condition to payment not being satisfied

–     payments of interest and/or on redemption being based on exchange rate values as of specified dates only, with exchange rate values as of other dates not being taken into account

–     Noteholders being entitled to receive payments in a specified currency only, and having no entitlement to receive the Reference Currency

–     risks of the introduction of exchange controls and/or other developments and conditions affecting the currency markets resulting in determinations of the Reference Exchange Rate on unscheduled valuation dates and/or determinations of the Settlement Rate by reference to

alternative price sources and/or on a discretionary basis by the Calculation Agent and/or at a different time than would otherwise be the case and/or alternative settlement procedures including postponement of settlement until the cessation of any effect of the relevant developments and conditions

– the right of the Issuer to appoint the Calculation Agent

– the risk that the trading price of the Notes will fluctuate over time and may remain at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, the value of the Reference Currency and other factors) which may interrelate in complex ways

– risk of variations in exchange rates for the Reference Currency (which may result from, or from the interaction of, many factors) affecting the market value of the Notes and/or that on a sale of the Notes an investor may receive less than the amount invested

– risks that the market value of the Notes may be detrimentally affected by factors affecting the liquidity, trading value and amount payable under the Notes, including:

  • increased volatilities of exchange rates; and/or

  • actions of sovereign governments that could change or interfere with currency valuations, fluctuations in response to other market forces and the movement of currencies across borders; and/or

  • changes in interest rates; and/or

  • the effect of the time remaining to maturity decreasing on the "time premium or discount" factor; and/or

  • hedging, trading and other transactions by Lehman Brothers through any of its affiliates affecting the exchange rates for any or all of the Reference Currency.

*Basket Linked Notes*

Additional risk factors applicable to Basket Linked Notes (which may be more pronounced where the formula for determining payments linked to Basket Value includes a leverage factor exceeding 100%) include:

– risks of partial or complete loss of principal, subject to the level of principal protection (if any) specified in the Final Terms

– risks of receiving no or low or reduced payments under the Notes as a result of movements in the Basket Reference Values and/or (in the case of 6 Basket Digital Notes (as defined below)), any condition to payment not being satisfied

– risks of favourable movements in a Basket Reference Value and/or in respect of Multiple Basket Linked Notes, a Basket Value, being offset by unfavourable movements in other Basket Reference Values or Basket Values (as the case may be)

– payments of interest and/or on redemption and/or the timing of such payments or redemption or any other economic factor being based on the Basket Reference Value levels as of specified dates only, with Basket Reference Value levels as of other dates not being taken into account

– Noteholders being entitled to receive payments in a specified currency only, and having no entitlement to receive delivery of, or any interest in, the Basket Reference Values

– the right of the Issuer to appoint the Calculation Agent (who may be an affiliate of the Issuer)

   –   the risk that the trading price of the Notes will fluctuate over time and may remain at levels significantly below that at which the Notes were originally issued, due to factors (including supply and demand for the Notes, the value of each Basket Reference Value and other factors) which may interrelate in complex ways

   –   risk of variations in Basket Reference Values (which may result from, or from the interaction of, many factors) affecting the market value of the Notes and/or that on a sale of the Notes an investor may receive less than the amount invested

   –   risk of Basket Value of Basket Linked Note and Multiple Basket Linked Notes, as the case may be, being affected by the Basket Reference Values which are of the same class of underlyings or for which the weighting assigned to a particular Basket Reference Value is higher than for other Basket Reference Values. Additionally, if the Basket Reference Values of the underlyings included is concentrated in a particular industry, the Basket Value will be more affected by the economic, financial and other factors affecting that industry than if the Basket Reference Values were comprised of underlyings in various industries.

*Trigger Notes*

The rate of interest payable in respect of Trigger Notes may change adversely when a Trigger Event occurs. Furthermore, the occurrence of a Trigger Event on a Trigger Date or during a Trigger Period may cause the rate of interest payable to convert into a rate that is below the rate which would have been payable had the initial rate of interest remained and may, in some instances, be as low as zero until the stated Maturity Date. This may result in the market value of the Trigger Notes falling even when the original rate of interest which is stated to be payable in respect of an Interest Period is rising.

Trigger Events may cause the rate of interest payable in respect of Trigger Notes to fall substantially even if such Trigger Events were caused by temporary market occurrences. The performance of Trigger Notes is highly dependant on the movements of the Trigger Indices over the periods around the Trigger Dates or during the Trigger Period, regardless of whether these movements represent long-term trends or not.

Trigger Notes may be structured so that a Trigger Event will occur during a period in which the rate of interest payable to the Noteholder is increasing and where the resulting rate of interest payable following a Trigger Event will be lower than that which would have been payable had the Trigger Event not occurred.

*Option Notes*

Where the Notes are linked to a Call Option and the Strike is set at the beginning of the term of the Notes (for example, on the Issue Date), any decrease in the level of the Reference Asset subsequent to that date will have a detrimental effect on the market value of the Notes and if the level of such Reference Asset falls below the level of the Strike, the amount payable on such Note may be reduced to zero. Conversely, the market value of Notes that are linked to a Put Option will decrease where the level of each Reference Asset increases relative to the level of the Strike over the term of the Notes.

Fluctuations in the value of the relevant Reference Asset will affect the value of the Notes. The risk of the loss of some or all of the amount payable on redemption means that, in order to recover and realise a return upon his/her investment, a purchaser of the Note must generally have correctly anticipated the direction, timing and magnitude of an anticipated change in the value of the Reference Asset.

The Strike or Strikes of an Option may be determined on a predetermined date or dates as specified in applicable Final Terms. The Strike may be calculated as the arithmetic or geometric average of the level of the Strike determined on each day during a specified period of days during the term of the Notes or may not be reflective of any actually realized or anticipated level of the trading level of the Reference Asset. If the Option is a Call Option and the Strike is determined as the mean of the levels of the Strike, any increase in such level over the dates or during the period during which the Strike is monitored will result in a decrease in the value of the Option. This may have a detrimental effect on the market value of the Notes. The Strike may be set significantly higher or lower than current trading levels of the Reference Asset.

The date on which the price, value or level of the Reference Asset is determined may be determined in a different period from the date on which amounts are paid under the Notes. Thus, the price, value or level of each Reference Asset which is used to determine the value of the Option may be different from such value, price or level at the time at which the relevant amount is being paid. This may have a detrimental effect on the market value of the Notes.

In relation to Option Notes with a digital payment, the payment of any interest and/or amounts on redemption which depends on the value of the Option will be conditional upon the Option meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms. Such criteria may include a requirement that the value of the Option must exceed a benchmark value by a specified threshold. With respect to such Notes, no such interest and/or Final Redemption Amount will be payable unless such condition is met on the relevant date specified in the applicable Final Terms.

Where payments in respect of Option Notes are additionally determined by reference to a leverage, scaling or multiplication factor (the "*Leverage*"), the degree to which the Reference Exchange Rate impacts upon the amount of such payments will vary according to the level of such Leverage.

The value of the Option or the difference in the value of the Reference Asset and the Strike Price at any time prior to maturity may be reflective of the trading price of such Note at that time. The difference between the trading price of the Note and the value of the Option will reflect, among other things, a "time value" for the Note. Such Notes pose risks with regard to time value. The time value of the Note varies with the price and/or level of the Reference Asset, as well as by a number of other interrelated factors, including the length of the period remaining to maturity (or the date on which the value of the Option is determined) and expectations concerning the value of the Reference Asset.

If further Notes relating to a particular Reference Asset are subsequently issued the supply of such Series of Notes in the market may increase, which may cause the price at which the Notes trade in the secondary market to decline.

The market value of the Notes may not have a direct relationship with the prevailing price of the Reference Asset, in that changes in the prevailing price, level or value of the Reference Asset will not necessarily result in a comparable change in the market value of the Notes.

*Hybrid Notes*

Notes issued pursuant to the Program may include Notes that combine features of different types of Notes described herein, for example, by combining the features of Autocallable Index-Linked Interest Notes with those of Equity-Linked Redemption Notes or by combining the features of Equity Linked Notes with those of Commodity Linked Notes and those of FX Notes. As a consequence of the combination of several features, not only will such Notes be subject to the risks relating to each of the relevant features but the combination of features may itself be, or result in, an additional risk. Potential investors should particularly evaluate the potential impact and risks of such a combination of features and risks.

**Transparency Directive**

Directive 2004/109/EC of the European Parliament and of the Council of 15 December 2004 on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on an EEA Regulated Market and amending Directive 2001/34/EC (the "*Transparency Directive*") entered into force on January 20 2005. It requires member states to take measures necessary to comply with the Transparency Directive by 20 January 2007. If, as a result of the Transparency Directive or any legislation implementing the Transparency Directive, LBHI could be required to publish financial information either more regularly than it otherwise would be required to or according to accounting principles which are materially different from the accounting principles which it would otherwise use to prepare its published financial information, LBHI may seek an alternative admission to listing, trading and/or quotation for the Notes on a different section of the Irish Stock Exchange or by such other competent authority, stock exchange and/or quotation system inside or outside the European Union as it may (with the approval of the Dealers) decide.

**Risks relating to LBHI as Issuer and Guarantor**

*Market Risk*

As a global investment bank, risk is an inherent part of the Group's business. The Group's businesses are materially affected by conditions in the financial markets and economic conditions generally around the world. A favourable business environment is generally characterized by, among other factors, high global gross domestic product growth, stable geopolitical conditions, transparent and efficient capital markets, liquid markets with active investors, low inflation, high business and consumer confidence and strong business earnings. Slowing growth, contraction of credit, increasing energy prices, declines in business or investor confidence or risk tolerance, increases in inflation, higher unemployment, outbreaks of hostilities or other geopolitical instability, corporate, political or other scandals that reduce investor confidence in capital markets and natural disasters, among other things, can affect the global financial markets. In addition, economic or political pressures in a country or region may cause local market disruptions and currency devaluations, which may also affect markets generally. In the event of changes in market conditions, such as interest or foreign exchange rates, equity, fixed income, commodity or real estate valuations, liquidity, availability of credit or volatility, the Group's businesses could be adversely affected in many ways, including those described below.

*The Group's Client-Flow Revenues May Decline in Adverse Market Conditions.* Recently, the residential real estate market in the U.S. has experienced a significant downturn due to declining real estate values, substantially reducing mortgage loan originations and securitizations, and precipitating more generalized credit market dislocations and a significant contraction in available liquidity globally, which negatively impacted the Group's revenues. These factors have continued into the beginning of fiscal 2008 and, combined with rising oil prices, declining business and consumer confidence and increased unemployment, have precipitated an economic slowdown and fears of a possible recession. Further declines in real estate values in the U.S. or elsewhere and continuing credit and liquidity concerns could further reduce the Group's level of mortgage loan originations and securitisations and increase the Group's mortgage inventory while adversely affecting its value. In addition, continued or further credit market dislocations or sustained market downturns may reduce client flow revenues and adversely affect the value of the Group's inventory in other businesses.

Changes in interest rates, and in particular long-term rates, especially if such changes are rapid, may create a less favourable environment for certain of the Group's businesses. Rising interest rates may cause a decline in the Group's mortgage origination and securitization businesses in particular, as the volume of the Group's origination and securitization activity may decline.

The Group's Investment Banking revenues, in the form of financial advisory and debt and equity underwriting fees, are directly related to the number and size of the transactions in which the Group participates and therefore they were adversely affected in the latter half of 2007 by the mortgage and credit market dislocations, and may be further impacted by continued or further credit market dislocations or sustained market downturns.

Sustained market downturns or continued or further credit market dislocations and liquidity issues would also likely lead to a decline in the volume of capital market transactions that the Group executes for its clients and, therefore, to a decline in the revenues it receives from commissions and spreads earned from the trades it executes for its clients. In addition, because the fees that it charges for managing its clients' portfolios are in many cases based on the value of those portfolios, a market downturn that reduces the value of its clients' portfolios would reduce the revenues it receives from its asset management business. Heightened risk aversion among investors may cause them to shift their trading activity to higher quality and more liquid products, which are generally somewhat less profitable for the Group.

Even in the absence of a market downturn, below-market investment performance by the Group's fund and portfolio managers could reduce Investment Management revenues and assets under management and result in reputational damage that might make it more difficult to attract new investors.

*The Group May Incur Losses Due to Fluctuations in Market Rates, Prices and Volatility.* Market risk is inherent in the Group's client-driven market-making transactions and proprietary trading and principal investment activities in equity and fixed income securities, commodities, currencies and derivatives and the Group's mortgage and loan origination and syndication activities. Fluctuations in market rates, prices and volatility, especially if the changes are rapid and without warning, can adversely affect the market value of the Group's long or short inventory and proprietary and principal positions and, to the extent that such positions are not adequately hedged, cause the Group to incur losses. To the extent that the Group holds long inventory positions, a downturn in the market could result in losses from a decline in the value of those positions. On the other hand, to the extent that the Group has sold inventory short, an upturn in those markets could expose it to losses as it attempts to cover its short positions by acquiring assets in a rising market. The adverse conditions in the U.S. housing market, dislocations in the credit markets and corrections in certain asset-backed security market segments resulted in substantial valuation reductions in the past fiscal year, most significantly on mortgage- and real estate-related positions and lending obligations. Market credit spreads have recently gone from historically tight to historically wide levels, and a further widening of credit spreads or worsening of credit market dislocations or sustained market downturns could have additional negative effects on the value of the Group's inventory.

In the Group's market-making and specialist transactions, the Group maintains substantial inventory positions from time to time, acting as a financial intermediary for LBHI clients, and holds inventory positions in the normal course of business to allow clients to rebalance their portfolios and diversify risks across market cycles. Current NYSE rules generally require the Group's specialist business to maintain orderly markets in the securities for which it is a specialist. Specialists are obligated to take positions in their issues counter to the direction of the market in order to minimize short-term imbalances in the market, involving risk of loss during periods of market fluctuation and volatility.

In the Group's mortgage and loan origination and securitisation businesses, the Group is also subject to risks from decreasing interest rates. Most residential mortgages and consumer loans provide that the borrower may repay them early. Borrowers often exercise this right when interest rates decline. As prepayments increase, the value of mortgages and other loans with prepayment features held in inventory prior to securitisation generally will decrease, and to the extent that prepayment risk has not been hedged, prepayments may result in a loss.

The Group also maintains long and short positions through its other proprietary trading activities and makes principal investments (such as in real estate and real estate-related products and private equity), which are also subject to market risks. The value of these positions can be adversely affected by changes in market rates, prices and volatility. The Group has increased its proprietary trading and principal investing activities and expects to continue to do so, which increases its exposure to market risk.

On the other hand the Group's client-flow and proprietary trading businesses generally depend on market volatility to provide trading and arbitrage opportunities, and a decline in volatility may reduce these opportunities and adversely affect the results of these businesses.

*Holding Large and Concentrated Positions May Expose the Group to Losses.* Concentration of risk may reduce revenues or result in losses in the Group's market-making, specialist, block trading, underwriting, proprietary trading, principal investment and lending businesses in the event of unfavourable market movements even when economic and market conditions are generally favourable for others in the industry. The Group has committed substantial amounts of capital to these businesses, which often require it to take large positions in the securities of, or make large loans to, a particular issuer or issuers in a particular industry, country or region. Moreover, the trend in all major capital markets is towards larger and more frequent commitments of capital in many of these activities, and the Group expects this trend to continue. For example, large positions of securities are increasingly being sold in block trades rather than on a marketed basis, which could increase the risk that the Group may be unable to resell the securities at favorable prices. While its activities expose it to many different counterparties, the Group routinely executes a high volume of transactions with counterparties in the financial services industry, including brokers and dealers, commercial banks, investment funds and other institutional clients, resulting in significant credit concentration with respect to this industry. In the ordinary course of business, the Group may also be subject

to a concentration of credit risk to a particular counterparty, borrower or issuer. Concentration of risk will increase as the Group expands its proprietary trading and principal investing activities or commits additional capital to facilitate client-driven business.

*Market Risk May Increase the Other Risks That the Group Faces.* In addition to the potentially adverse effects on the Group's businesses described above, market risk could exacerbate other risks that the Group faces. For example, if the Group were to incur substantial market risk losses, its need for liquidity could rise significantly, while its access to liquidity could be impaired. In addition, in conjunction with a market downturn, the Group's clients and counterparties could incur substantial losses of their own, thereby weakening their financial condition and increasing the Group's credit risk exposure to them.

### Credit Risk

*The Group May Incur Losses Associated with its Credit Exposures.* Credit risk represents the possibility a counterparty or an issuer of securities or other financial instruments the Group holds or a borrower of funds from the Group will be unable to honour its contractual obligations to the Group. These parties may default on their obligations to the Group due to bankruptcy, lack of liquidity, operational failure or other reasons. Default risk may also arise from events or circumstances that are difficult to foresee or detect, such as fraud. Credit risk may arise, for example, from holding securities of third parties; entering into swap or other derivative contracts under which counterparties have obligations to make payments to the Group; executing securities, futures, currency or commodity trades that fail to settle at the required time due to non-delivery by the counterparty or systems failure by clearing agents, exchanges, clearing houses or other financial intermediaries; and extending credit to the Group's clients through bridge or margin loans or other arrangements. As a clearing member firm, the Group finances its client positions, and the Group could be held responsible for the defaults or misconduct of its clients. the Group's principal focus has been acting as an intermediary of credit. In recent years, the Group has expanded its activities associated with providing its clients access to credit and liquidity and has also expanded its swaps and derivatives businesses. The amount and duration of the Group's credit exposures have been increasing, as has the diversity of the entities to which the Group has credit exposures. The extension and pricing of credit is subject to competitive pressure. In addition, corporate clients sometimes seek to require credit commitments from the Group in connection with investment banking and other assignments. Further, the recent widening of credit spreads and dislocations in the credit markets have in some cases made it more difficult to syndicate credit commitments to investors, and further widening of credit spreads or worsening of these dislocations could increase these difficulties, resulting in increased credit exposures.

*Defaults by Another Large Financial Institution Could Adversely Affect Financial Markets Generally.* The commercial soundness of many financial institutions may be closely interrelated as a result of credit, trading, clearing or other relationships between the institutions. As a result, concerns about, or a default by, one institution could lead to significant market-wide liquidity problems, losses or defaults by other institutions. This is sometimes referred to as "systemic risk" and may adversely affect financial intermediaries, such as clearing agencies, clearing houses, banks, securities firms and exchanges, with which the Group interacts on a daily basis, and therefore could adversely affect it.

### Liquidity Risk

Liquidity, that is ready access to funds, is essential to the businesses of the Group. Financial institutions rely on external borrowings for the vast majority of their funding, and failures in this industry are typically the result of insufficient liquidity.

*An Inability to Access the Debt Markets Could Impair the Group's Liquidity.* The Group maintains a liquidity pool available to the Group that is intended to cover all expected cash outflows for one year in a stressed liquidity environment, which assumes, among other things, that during that year the Group cannot issue unsecured debt.

To the extent that a liquidity event lasts for more than one year, or the Group's expectations concerning the market conditions that exist during a liquidity event, or the Group's access to funds, prove to be inaccurate (*e.g.*, the level of secured financing "haircuts" (the difference between the market and pledge

value of the assets) required to fund the Group's assets in a stressed market event is greater than expected, or the amount of drawdowns under the Group's commitments to extend credit in a stressed market environment exceeds its expectations), the Group's ability to repay maturing indebtedness and fund operations could be significantly impaired. Even within the one-year time frame contemplated by the Group's liquidity pool, the Group depends on continuous access to secured financing in the repurchase and securities lending markets, which could be impaired by factors that are not specific to it, such as a severe disruption of the financial markets.

*Structured Instruments May Have Limited Liquidity.* The financial instruments that the Group holds and the contracts to which it is a party are increasingly complex, as the Group employs structured products to benefit its clients and itself, and these complex structured products often do not have readily available markets to access in times of liquidity stress. The growth of the Group's proprietary investing activities may lead to situations where the holdings of structured instruments represent a significant portion of specific markets, which could restrict liquidity for its positions. Further, the Group's ability to sell assets may be impaired if other market participants are seeking to sell similar assets at the same time.

*LBHI is a Holding Company and is Dependent on its Subsidiaries for Funds.* Since LBHI is primarily a holding company, the Group's cash flow and consequent ability to pay dividends and satisfy its obligations under securities it issues are dependent upon the earnings of its subsidiaries and the distribution of those earnings as dividends or loans or other payments by those subsidiaries to LBHI. Several of the Group's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. These regulatory rules, and certain covenants contained in various debt agreements, may restrict the Group's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. Additionally, the Group's ability to participate as an equity holder in any distribution of assets of any subsidiary upon liquidation is generally subordinate to the claims of creditors of the subsidiary.

### Credit Ratings

The Group's borrowing costs and its access to the debt capital markets depend significantly on its credit ratings. A reduction in the Group's long- or short-term credit ratings could increase its borrowing costs, limit its access to the capital markets and trigger additional collateral requirements in derivative contracts and other secured funding arrangements. Credit ratings are also important to the Group when competing in certain markets, such as longer-term over-the-counter derivatives. Therefore, a substantial reduction in its credit ratings would reduce the Group's earnings and adversely affect its liquidity and competitive position.

### Risks Relating to Use of Estimates and Valuations

The Group makes various estimates that affect reported amounts and disclosures. Broadly, those estimates are used in measuring fair value of certain financial instruments, accounting for identifiable intangible assets and goodwill, establishing provisions for potential losses that may arise from litigation, regulatory proceedings and tax examinations, assessing its ability to realize deferred taxes and valuing equity-based compensation awards. Estimates are based on available information and judgment. Therefore, actual results could differ from the Group's estimates and that difference could have a material effect on the Group's consolidated financial statements.

Financial instruments and other inventory positions owned (including commitments and guarantees, but excluding real estate held for sale), and financial instruments and other inventory positions sold but not yet purchased, are presented at fair value, with realized and unrealized gains or losses reflected in principal transactions in the Group's Consolidated Statement of Income. The Group accounts for real estate held for sale at the lower of its carrying amount or fair value less cost to sell. In addition, certain long and short-term borrowing obligations, principally hybrid financial instruments, and certain deposits at U.S. banks, are reflected at fair value. Fair value is defined as the price at which an asset could be exchanged in a current transaction between knowledgeable, willing parties. A liability's fair value is defined as the amount that would be paid to transfer the liability to a new obligor, not the amount that would be paid to settle the liability

with the creditor. Where available, fair value is based on observable market prices or parameters or derived from such prices or parameters. Where observable prices or inputs are not available, valuation models are applied. These valuation techniques involve some level of management estimation and judgment, the degree of which is dependent on the price transparency for the instruments or market and the instruments' complexity. In particular, certain mortgage and asset-backed securities, certain corporate debt, certain private equity investments, certain commitments and guarantees and certain derivatives have no direct observable levels, and their valuations require significant estimation and judgment and therefore are subject to significant subjectivity. Reliance on estimation and judgment increases in adverse market conditions with decreased liquidity, such as those experienced recently.

### *Risks Relating to Off-Balance Sheet Entities*

In the normal course of the Group's business, it enters into various transactions with special purpose entities ("*SPEs*"). The Group does not consolidate certain SPEs in which it does not have a controlling financial interest as defined under applicable accounting standards. When the Group does not consolidate an entity, it either presents its investment in the entity at fair value or applies the equity method of accounting. The assessment of whether the accounting criteria for consolidation are met requires management to exercise significant judgment. A determination of whether the Group has a controlling financial interest in an entity, and therefore its assessment of consolidation of that entity, is initially made at the time it becomes involved with the entity. If certain events occur that require the Group to re-assess its initial determination of non-consolidation or if its judgment of non-consolidation is in error, the Group could be required to consolidate the assets and liabilities of an SPE onto its consolidated balance sheet and recognize its future gains or losses in its consolidated statement of income. Further, existing accounting standards may be changed, or interpretations of those standards may change, in the future in a manner that requires or increases the risk of consolidation of some SPEs. Consolidation could affect the size of the Group's consolidated balance sheet and related funding requirements, its financial and regulatory capital ratios and, if the SPE's assets include unrealized losses, could require it to recognize those losses.

In addition, the Group has various commitments to and obligations associated with SPEs, including liquidity commitments and funded loans to certain conduits and other SPEs, limited downside protection guarantees to investors in certain SPEs, obligations as a general partner and investment advisor to private equity and other investment partnerships, indemnification obligations to investors in certain securitization vehicles it sponsors with respect to customary representations and warranties it makes about the assets of SPEs, proprietary investments and retained interests in various SPEs and others.

### *Operational Risk*

*Operational Risks May Disrupt the Group's Businesses, Result in Losses or Reputational Damage or Limit the Group's Growth.* The Group faces operational risk arising from errors made in the execution, confirmation or settlement of transactions or from transactions not being properly recorded, evaluated or accounted for. Derivative contracts are not always confirmed by the counterparties on a timely basis; while the transaction remains unconfirmed, the Group is subject to heightened credit and operational risk and in the event of a default may find it more difficult to enforce the contract. The Group's businesses are highly dependent on its ability to process, on a daily basis, a large number of transactions across numerous and diverse markets in many currencies and the transactions it processes have become increasingly complex. Consequently, the Group relies heavily on its financial, accounting and other data processing systems. If any of these systems do not operate properly or are disabled, the Group could suffer financial loss, a disruption of its businesses, liability to clients, regulatory intervention or reputational damage. The inability of the Group's systems to accommodate an increasing volume of complex transactions could also constrain its ability to expand its businesses. In recent years, the Group has substantially upgraded and expanded the capabilities of its data processing systems and other operating technology, and it expects that it will need to continue to upgrade and expand in the future to avoid disruption of, or constraints on, its operations.

The Group's businesses and operations rely on the secure processing, storage and transmission of confidential and other information, and, increasingly, on the internet. The Group routinely transmits and receives personal, confidential and proprietary information by email and other electronic means. The Group

has made available to clients and counterparties certain secure transmission capabilities; however, the Group's clients and counterparties do not always choose to avail themselves of these capabilities. The Group takes extensive protective measures for its computer systems, internet sites, software and networks to protect against vulnerabilities to unauthorized access, computer viruses, denial of service attacks or other events that could have a security or business impact. If, nevertheless, such events should occur, they could result in significant losses or reputational damage. The Group is exposed to similar risks arising from the interception of personal, confidential or proprietary information sent to or received from, or the misuse or mishandling thereof by, vendors, service providers and other third parties who may receive such information from it, and the Group's ongoing efforts to improve security over email and encrypted file transfers and to ensure that these third parties have appropriate controls in place may not be successful.

The Group also faces the risk of operational or business failure of any of the clearing agents or other financial intermediaries or data providers it uses, and as the Group's interconnectivity with its clients grows, it faces higher levels of operational risk that could adversely affect its ability to effect transactions, service its clients and manage its exposure to risk.

When the Group originates or purchases residential mortgage loans, it relies heavily upon information supplied by third parties, including the information contained in the loan application, property appraisal, title information and employment and income documentation. If any of this information is intentionally or negligently misrepresented, whether by the loan applicant, the mortgage broker, another third party or one of the Group's employees, and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected and/or be unsaleable or subject to repurchase if it is sold prior to detection of the misrepresentation. While relevant laws may not explicitly hold the originating lenders responsible for the legal violations of mortgage brokers, increasingly federal and state agencies have sought to impose such assignee liability.

In addition, despite the contingency plans the Group has in place, its ability to conduct business may be adversely impacted by a disruption in the infrastructure that supports its businesses and the communities in which it is located. This may include a disruption involving electrical systems, communications, transportation or other services used by the Group or third parties with which the Group conducts business, terrorist activities or disease pandemics.

*Acquisitions or Joint Ventures Could Present Unforeseen Integration Obstacles or Costs.* Acquisitions and joint ventures involve a number of risks and present financial, managerial and operational challenges, including difficulty with integrating personnel and financial and other systems, hiring additional management and other critical personnel and increasing the scope, geographic diversity and complexity of the Group's operations. In addition, the Group may not realize the anticipated benefits from an acquisition, and it may be exposed to additional liabilities of any acquired business.

### *Legal, Regulatory and Reputational Risk*

The Group faces the risk of litigation and intervention by regulatory authorities in all jurisdictions in which it conducts its businesses. Among other things, it could be subjected to judgments or fines, be prohibited from engaging in some of its business activities or be subjected to limitations or conditions on its business activities, all of which could result in significant losses or reputational damage.

*The Group Faces Significant Litigation Risks in its Businesses.* The volume of litigation against financial services firms and the amount of damages claimed have increased over the past several years. The Group is exposed to potential liability as an underwriter under securities or other laws for materially false or misleading statements made in connection with securities and other transactions, potential liability for the "fairness opinions" and other advice it provides to participants in corporate transactions and disputes over the terms, conditions and risks of trading arrangements. The Group also faces the possibility that counterparties will claim that it improperly failed to tell them of the risks or that they were not authorized or permitted to enter into these transactions with it and that their obligations to the Group are not enforceable. In the Group's Investment Management segment, the Group is exposed to claims against it for recommending investments that are not consistent with a client's investment objectives or engaging in unauthorized or excessive trading. The downturn in the mortgage and mortgage-backed securities markets

may result in increased claims of this type, and during a prolonged market downturn, the Group would expect these claims to further increase. The Group is also subject to claims arising from disputes with employees for alleged discrimination or harassment, among other things. These risks often may be difficult to assess or quantify, and their existence and magnitude often remain unknown for substantial periods of time. The Group incurs significant legal expenses every year in defending against litigation, and the Group expects to continue to do so in the future.

*Extensive Regulation of its Businesses Limits its Activities and May Subject the Group to Significant Penalties.* The Group, as a participant in the financial services industry, is subject to extensive regulation under both federal and state laws in the U.S. and under the laws of the many global jurisdictions in which it does business. It is also regulated by a number of self-regulatory organizations. The industry has experienced increased scrutiny from a variety of regulators, including the SEC, FINRA and state attorneys general. Over the last several years, penalties and fines sought by regulatory authorities in the Group's industry have increased substantially, and certain regulators have been more likely to commence enforcement actions.

The requirements imposed by the Group's regulators are designed to ensure the integrity of the financial markets and to protect customers and other third parties who deal with it. Consequently, these regulations often serve to limit the Group's activities, including through net capital, customer protection and market conduct requirements. If the Group was found to have breached certain of these rules or regulations, it could face the risk of significant intervention by regulatory authorities in all jurisdictions in which it conducts its businesses, including extended investigation and surveillance activity, adoption of costly or restrictive new regulations and judicial or administrative proceedings that may result in substantial penalties. Among other things, the Group could be fined or prohibited from engaging in some of its business activities.

Additional legislation and regulations, changes in rules imposed by regulatory authorities, self-regulatory organizations and exchanges or changes in the interpretation or enforcement of existing laws and rules may adversely affect the Group's business and profitability. The Group's business may be materially affected not only by regulations applicable to it as an investment bank, but also by regulations of general application, including existing and proposed tax legislation and other governmental regulations and policies (including the interest rate and monetary policies of the Federal Reserve Board and other central banks) and changes in the interpretation or enforcement of existing laws and rules that affect the business and financial communities.

In emerging markets in particular, the Group may be subject to risks of possible nationalization, expropriation, price controls, capital controls, currency exchange controls and other restrictive governmental actions. In many countries, the laws and regulations applicable to the securities and financial services industries are uncertain and evolving, and it may be difficult for the Group to determine the exact requirements of local laws in every market. The Group is also subject to greater risk in these jurisdictions that transactions it structures might not be legally enforceable in all cases. In addition, in conducting business in these jurisdictions, the Group is often faced with the challenge of ensuring that its activities are also consistent with U.S. or other laws with extra-territorial application, such as the USA Patriot Act and the U.S. Foreign Corrupt Practices Act. The Group's failure to comply with such laws could result in significant losses or reputational damage.

In the past several years, intensified scrutiny of the energy market by federal, state and local authorities and the public has resulted in increased regulatory and legal proceedings involving electricity, natural gas and other energy commodities merchants. The Group's business and reputation may be adversely affected by legal and regulatory proceedings arising out of its energy commodities activities.

The Group is subject to the income tax laws of the jurisdictions in which it has business operations. These tax laws are complex and may be subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. The Group must make judgments and interpretations about the application of these inherently complex tax laws when determining the provision for income taxes. The Group is subject to contingent tax risk that could adversely affect its results of operations, to the extent that its interpretations of tax laws are disputed upon examination or audit, and are settled in amounts in excess of established reserves for such contingencies.

*The Group's Mortgage Origination Business is Subject to Special Litigation and Regulatory Risks.* The laws and regulations of the various jurisdictions in which the Group conducts its mortgage lending business are complex, frequently changing and, in some cases, in direct conflict with each other. In particular, this business is subject to various laws, regulations and guidance that restrict non-prime loan origination or purchase activities. Some of these laws and regulations provide for assignee liability for warehouse lenders, whole loan buyers and securitization trusts. In addition, the downturn in the U.S. residential real estate market has resulted in increased regulatory scrutiny, and may result in increased complaints and claims, relating to non-prime mortgage origination practices, and further difficulties in the mortgage markets could result in increased exposure to liability, including possible civil and criminal liability, demands for indemnification or loan repurchases from purchasers of the Group's loans (including securitisation trusts), class action lawsuits or administrative enforcement actions. Moreover, the Group's customer base and counterparties in this business are substantially different from the high-net-worth and institutional customers and counterparties of most of its other businesses, which presents a different litigation risk profile.

*Exposure to Reputational Risks Could Impact the Value of the Group's Brand.* The Group's reputation is critical in maintaining its relationships with clients, investors, regulators and the general public, and is a key focus in its risk management efforts. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by employees in the financial services industry, and the Group runs the risk that misconduct by its employees could occur. Misconduct by employees could include binding the Group to transactions that exceed authorized limits or present unacceptable risks, or hiding from it unauthorized or unsuccessful activities, which, in either case, may result in unknown and unmanaged risks or losses. Employee misconduct could also involve the improper use or disclosure of confidential information, which could result in regulatory sanctions and serious reputational or financial harm. It is not always possible to deter employee misconduct, and the precautions taken by the Group to prevent and detect this activity may not be effective in all cases. In addition, in certain circumstances the Group's reputation could be damaged by activities of its clients in which it participates, or of hedge funds or other entities in which it invests, over which it has little or no control.

*Potential Conflicts of Interest Are Increasing.* As the Group has expanded the scope of its businesses and its client base, it increasingly has to address potential conflicts of interest, including those relating to its proprietary activities. For example, conflicts may arise between its position as a financial advisor in a merger transaction and a principal investment it holds in one of the parties to the transaction. In addition, hedge funds and private equity funds are an increasingly important portion of the Group's client base, and also compete with the Group in a number of its businesses. In addition, the SEC, FINRA, other federal and state regulators and regulators outside the U.S., including in the U.K. and Japan, have increased their scrutiny of potential conflicts of interest. The Group has extensive procedures and controls that are intended to ensure that any potential conflicts of interest are appropriately addressed. However, properly dealing with conflicts of interest is complex and difficult, and the Group's reputation could be damaged if it fails, or appears to fail, to deal appropriately with conflicts of interest and, it is possible that potential or perceived conflicts could give rise to litigation or enforcement actions.

**Competitive Environment**

All aspects of the Group's business are highly competitive. The Group's competitive success depends on many factors, including its reputation, the quality of its services and advice, intellectual capital, product innovation, execution ability, pricing, sales efforts, and the talent of the Group's personnel. Many of the Group's competitors have greater capital resources and greater geographic reach than it does, which enhances their competitive positions.

*The Group Faces Increased Competition Due to a Trend Toward Consolidation.* In recent years, there has been substantial consolidation and convergence among companies in the financial services industry. In particular, a number of large commercial banks, insurance companies and other broad-based financial services firms have established or acquired broker-dealers or have merged with other financial institutions. Many of these firms have the ability to offer a wide range of products, from loans, deposit-taking and insurance to brokerage, asset management and investment banking services, which may enhance their

competitive position. They also have the ability to support investment banking and securities products with commercial banking, insurance and other financial services revenues in an effort to gain market share. These abilities have resulted in pricing pressure in the Group's businesses. The Group has experienced intense price competition in some of its businesses in recent years. For example, equity and debt underwriting and trading spreads and fees for lending and other activities have been under competitive pressure for a number of years.

*The Group's Revenues May Decline Due to Competition from Alternative Trading Systems.* Securities and futures transactions are now being conducted through the internet and other alternative, non-traditional trading systems, and it appears that the trend toward alternative trading systems will continue and probably accelerate. A dramatic increase in computer-based or other electronic trading may adversely affect the Group's commission and trading revenues, including in its specialist business. The NYSE's adoption of its hybrid market for trading securities may increase pressure on its Equities business as customers execute more of their NYSE-related trades electronically. The Group has invested significant resources into the development of electronic trading systems and expect to continue to do so, but there is no assurance that the revenues generated by these systems will yield an adequate return on its investment, particularly given the relatively lower commissions arising from electronic trades.

*The Group's Ability to Retain its Key Employees is Critical to the Success of its Business.* The Group's people are its most important resource. The Group's ability to continue to compete effectively in its businesses will depend upon its ability to attract top talent and retain and motivate its existing employees while managing compensation costs.

### Risk Management

The Group has devoted significant resources to develop its risk management policies and procedures and expects to continue to do so in the future. Although the Group deploys various risk mitigation and risk monitoring techniques, they are subject to judgments as to the timing and duration of their application. Additionally, no risk management procedure can anticipate every market event, and the Group's hedging strategies and other risk management techniques may not be fully effective in mitigating its risk exposure in all market environments or against all types of risk, including risks that are unidentified or unanticipated. Some of the Group's methods of managing risk are based upon its use of observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. The models that the Group uses to assess and control its risk exposures reflect historical correlations among prices of various asset classes or other market indicators, and in times of market stress or other unforeseen circumstances there may be material changes in correlations between asset classes. In the past, including during the recent mortgage and credit market downturn, these types of market movements have at times limited the effectiveness of the Group's hedging strategies and have caused it to incur significant losses, and they may do so in the future. An increase in volatility would increase the Group's measured risk, which might cause it to reduce certain of its business activities. In such circumstances, the Group may not be able to reduce its positions or its exposure in a timely, cost-effective way or in a manner sufficient to offset the increase in measured risk. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events, and these policies and procedures may not be fully effective.

### Risks Relating To New Business Initiatives and New Markets

A number of the Group's recent and planned business initiatives and expansions of existing businesses may bring it into contact, directly or indirectly, with new markets and new asset classes and with entities and individuals that are not within its traditional client base. For example, the Group has expanded its businesses and investments in emerging markets such as Russia, the Middle East, India, Turkey and China, increased its activities in the markets for derivatives, commodities and foreign exchange and begun providing loans to small and mid-sized businesses and students. In addition, the Group is increasingly offering complex structured products and alternative investments to a wider investor base, both directly and through third-party distribution channels. These business activities expose the Group to new and enhanced risks, including increased credit-related and operational risks, regulatory risks and reputational concerns. As the Group's business expands into new markets and new geographical regions, it will face competitors with more

experience and more established relationships with clients, regulators and industry participants in the relevant market, which could adversely affect its ability to expand.

## Risks relating to LBB

The risk factors set out above are not considered to affect the ability of LBB to fulfil its obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

## Risks relating to LBTCVB

The risk factors set out above are not considered to affect the ability of LBTCBV to fulfil its respective obligations to investors under Notes issued by it because such obligations are irrevocably and unconditionally guaranteed by LBHI pursuant to the relevant Guarantee.

43

## AVAILABLE INFORMATION

LBHI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission ("*SEC*"). You may read and copy any document LBHI files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at +1 800 SEC 0330 (or +1 202 551 8090). The SEC maintains an internet site that contains annual, quarterly and current reports, proxy and information statements and other information regarding issuers that file electronically with the SEC. LBHI's electronic SEC filings are available to the public at http://www.sec.gov.

LBHI's public internet site is http://www.lehman.com. LBHI makes available free of charge through its internet site, via a link to the SEC's internet site at http://www.sec.gov, its annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), as soon as reasonably practicable after it electronically files such material with, or furnishes it to, the SEC. LBHI also makes available through its internet site, via a link to the SEC's internet site, statements of beneficial ownership of LBHI's equity securities filed by its directors, officers, 10 per cent. or greater shareholders and others under Section 16 of the Exchange Act.

In addition, LBHI makes available on http://www.lehman.com its most recent annual report on Form 10-K, its quarterly reports on Form 10-Q for the current fiscal year, its most recent proxy statement and its most recent annual report to stockholders, although in some cases these documents are not available on that site as soon as they are available on the SEC's site.

Copies of the materials referred to in the preceding paragraph, as well as copies of any current amendment or supplement to this Base Prospectus, may also be obtained from the persons set forth under "Information Incorporated By Reference".

So long as any of the Notes are outstanding and if LBHI ceases to be a reporting company under Section 13 or Section 15(d) of the Exchange Act, LBHI has agreed to furnish to a Holder of a Note and a prospective purchaser designated by such Holder, upon the request of such Holder in connection with a transfer or proposed transfer of such Note pursuant to Rule 144A, the information required to be delivered under Rule 144A(d)(4) under the Securities Act.

## INFORMATION INCORPORATED BY REFERENCE

The following information (the "*Information Incorporated by Reference*") has been filed with the Irish Financial Services Regulatory Authority (IFRSA) and/or the Irish Stock Exchange in connection with the Program listed on the EU Regulated Market in Luxembourg, and shall be deemed to be incorporated in, and to form part of, this Base Prospectus:

(a) the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended November 30, 2007 of LBHI filed with the SEC on Form 10-K including the consolidated and unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBHI in respect of the years ended November 30, 2007 and November 30, 2006 (set out on pages 82 to 138 and F-1 to F-14, respectively);

(b) the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended February 29, 2008 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three months ended February 29, 2008 and February 28, 2007 (set out on pages 4 to 73);

(c) the quarterly report pursuant to Section 13 or 15(d) of the Exchange Act for the quarterly period ended May 31, 2008 of LBHI filed with the SEC on Form 10-Q including the consolidated interim quarterly financial statements of LBHI in respect of the three and six months ended May 31, 2008 and 2007 (set out on pages 4 to 53);

(d) the current report pursuant to Section 13 or 15(d) of the Exchange Act dated June 12, 2008 of LBHI on Form 8-K;

(e) the LBHI notice of 2008 Annual Meeting of Stockholders and proxy statement dated March 5, 2008 (including the details relating to LBHI's board of directors, director independence, audit committee and shareholders set out on pages 4 to 45 thereof);

(f) the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBTCBV in respect of the years ended November 30, 2007 and November 30, 2006 (set out on pages 3 to 14 and 3 to 12, respectively, of the 2007 and 2006 annual reports of LBTCBV);

(g) the short form audit reports of LBB including the audited unconsolidated financial statements (including the auditors' report thereon and notes thereto) of LBB in respect of the years ended November 30, 2006 and November 30, 2007; and

(h) the terms and conditions set out on pages 62 to 108 and in Annexes 1 to 8 of the Base Prospectus dated July 24, 2007 relating to the Program (the "*2007 Conditions*"), the terms and conditions set out on pages 54 to 95 of the Debt Issuance Program Prospectus dated August 9, 2006 relating to the Program (the "*2006 Conditions*") and the terms and conditions set out on pages 37 to 72 of the Debt Issuance Program Prospectus dated August 26, 2005 relating to the Program (the "*2005 Conditions*").

Certain of the financial data set out in the Information Incorporated by Reference in items (a) to (d) above is not audited and is derived from Lehman Brothers' internal management and accounting records or publicly available information.

The table below sets out the relevant page references for the notes to the financial statements and the auditors' reports for the financial statements referred to above:

|  | **Page reference** |
|---|---|
| **LBHI 2006 Financial Statements (on Form 10-K)** | |
| 1.    Cash Flow Statement.................................................................................................... | 80 |
| 2.    Notes to Financial Statements...................................................................................... | 81-120 |
| 3.    Auditors' Report .......................................................................................................... | 74 |
| **LBHI 2007 Financial Statements (on Form 10-K)** | |
| 1.    Cash Flow Statement.................................................................................................... | 91 |
| 2.    Notes to Financial Statements...................................................................................... | 92-137 |
| 3.    Auditors' Report .......................................................................................................... | 85 |
| **LBHI February 29, 2008 Quarterly Financial Statements (on Form 10-Q)** | |
| 1.    Notes to Financial Statements...................................................................................... | 7-39 |
| 2.    Auditors' Review Report............................................................................................... | 40 |
| **LBHI May 31, 2008 Quarterly Financial Statements (on Form 10-Q)** | |
| 1.    Notes to Financial Statements...................................................................................... | 8-52 |
| 2.    Auditors' Review Report............................................................................................... | 53 |
| **LBTCBV 2006 Financial Statements** | |
| 1.    Notes to Financial Statements...................................................................................... | 6-10 |
| 2.    Auditors' Report .......................................................................................................... | 12 |
| **LBTCBV 2007 Financial Statements** | |
| 1.    Notes to Financial Statements...................................................................................... | 3-13 |
| 2.    Auditors' Report .......................................................................................................... | 15 |
| **LBB 2006 Financial Statements** | |
| 1.    Notes to Financial Statements...................................................................................... | 6-12 |
| 2.    Auditors' Report .......................................................................................................... | 3 |
| **LBB 2007 Financial Statements** | |
| 1.    Notes to Financial Statements...................................................................................... | 6-14 |
| 2.    Auditors' Report .......................................................................................................... | 3 |

Any information which appears in the documents described above but which is not expressed to be incorporated by reference into this Base Prospectus is either not relevant for the investor or covered elsewhere in this Base Prospectus.

The Issuers will provide, without charge, to each person to whom a copy of this Base Prospectus has been delivered, upon the oral or written request of such person, a copy of any or all of the documents which or portions of which are incorporated herein by reference. Written or oral requests for such documents should be directed to the Issuers at their specified offices below. In addition, such documents and copies of the relevant Final Terms will be available without charge from the registered offices of the Issuers during usual business hours on any weekday (Saturdays and public holidays excepted).

Documents in relation to listed Notes other than Notes admitted to listing on the Official List of the Irish Stock Exchange and to trading on its regulated market or listed and quoted on the official list of the Singapore Stock Exchange will be available in an alternative manner as specified in the relevant Final Terms.

If the terms of the Program are modified or amended in a manner which would make this Base Prospectus, as so modified or amended, inaccurate or misleading, a new Base Prospectus will be prepared to the extent required by law.

## GENERAL DESCRIPTION OF THE PROGRAM

The applicable terms of any Notes will be agreed between the relevant Issuer and the relevant Dealer(s) prior to the issue of the Notes and will be set out in the Terms and Conditions of the Notes endorsed on, or annexed to, the Notes, as supplemented by the applicable Final Terms attached to, or endorsed on, such Notes, as more fully described under "Form of the Notes" below.

Notes issued under the Program may be issued pursuant to this Base Prospectus and associated Final Terms ("*Final Terms*") or pursuant to a drawdown prospectus ("*Drawdown Prospectus*") prepared in connection with a particular Tranche of Notes. Accordingly references to terms and conditions and other items being as set out in this Base Prospectus and relevant Final Terms should, as the context requires, be construed as being as set out in the relevant Drawdown Prospectus and references to Final Terms should be construed as referring to the Drawdown Prospectus as applicable.

This Base Prospectus and any supplement will only be valid for the issuing of Notes in an aggregate principal amount which, when added to the aggregate principal amount then outstanding of all Notes previously or simultaneously issued under this Program, does not exceed U.S.$100,000,000,000 (or its equivalent in other currencies). For the purpose of calculating the U.S. dollar equivalent of the aggregate principal amount of Notes issued under the Program from time to time:

(a)    the U.S. dollar equivalent of Notes denominated in another Specified Currency (as hereafter defined) shall be determined as of the date of agreement to issue such Notes (the "*Agreement Date*") on the basis of the forward rate for the sale of the U.S. dollar against the purchase of such Specified Currency in the London foreign exchange market quoted by any leading bank selected by the relevant Issuer on the Agreement Date;

(b)    the U.S. dollar equivalent of Dual Currency Notes and Index-Linked Notes (each as hereafter defined) shall be calculated in the manner specified above by reference to the original principal amount of such Notes;

(c)    the principal amount of Zero Coupon Notes (as hereafter defined) and other Notes issued at a discount or a premium shall be deemed to be the net proceeds received by the relevant Issuer for the relevant issue of Notes; and

(d)    the face principal amount of Partly Paid Notes (as hereafter defined) will be taken into account regardless of the amount of the subscription price paid.

47

## FORM OF THE NOTES

The Notes may be issued from time to time in one or more Series pursuant to an Amended and Restated Fiscal Agency Agreement dated July 24, 2008 (as amended, restated or supplemented from time to time, the "*Fiscal Agency Agreement*") between, amongst others, LBHI, LBTCBV, LBB, The Bank of New York Mellon, acting through its London branch, as Fiscal Agent (together with its successors, the "*Fiscal Agent*") and Principal Paying Agent, The Bank of New York Mellon, acting through its New York branch, as Registrar, (together with its successors, the "*Registrar*"), Exchange Agent and U.S. Sub-Paying Agent, and the other paying agents referred to therein (together with the Principal Paying Agent and the U.S. Sub-Paying Agent, the "*Paying Agents*", which expression shall include any additional or successor paying agents), provided that Australian Domestic Notes and New Zealand Domestic Notes are issued pursuant to the Deeds Poll (as defined below). The terms of any particular Tranche (as defined under "Terms and Conditions of the Notes" below) of Notes will be set forth in a Final Terms relating to such Tranche, as described under "Final Terms" below. The statements in this section include summaries of, and are subject to, the detailed provisions of the Fiscal Agency Agreement, any calculation agency agreement entered into by the Issuer of the relevant Tranche of Notes, the Notes and any applicable Final Terms. Copies of the Fiscal Agency Agreement and each calculation agency agreement are available for inspection and copies of each Final Terms are obtainable at the specified office of the Fiscal Agent in London, being at the date hereof at 48th Floor, One Canada Square, London E14 5AL, and at the specified offices of such other Paying Agents as may be appointed from time to time. The Final Terms relating to a Note which is not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system may only be inspected by the Holder who must produce evidence satisfactory to the relevant Paying Agent as to his identity. The Holders (as defined below) of Notes other than Australian Domestic Notes and New Zealand Domestic Notes and the Holders of any interest coupons ("*Coupons*"), receipts ("*Receipts*") and talons ("*Talons*") appertaining to the Notes are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Fiscal Agency Agreement applicable to them.

Notes may be issued on either an unsubordinated basis or a subordinated basis in either bearer form or registered form, except that Extendible Notes will only be issued in registered form, bearer Notes will not be issued in the Australian domestic capital markets and Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes and Swedish Notes (as defined below) will be issued in registered uncertificated and dematerialised book-entry form. Unless otherwise specified in the applicable Final Terms, the Notes will be in bearer form and denominated in such denominations and integral multiples as the relevant Issuer and the relevant Dealer(s) shall agree, except that, in any case, the Notes will be in such minimum denominations as may be allowed or required from time to time by the relevant central bank (or equivalent body) or any laws or regulations applicable to the relevant Specified Currency and that (a) in the case of Notes to be admitted to trading on a regulated market and/or publicly offered in an EEA Member State, the minimum denomination of the Notes will be: (1) where the Issuer of the Notes is LBB, at least EUR 50,000 (or nearly equivalent in any other currency on the issue date); and (2) in all other cases, at least EUR 1,000 (or nearly equivalent in any other currency on the issue date) or the Notes will give the right to acquire transferable securities or to receive a cash amount, as a consequence of their being converted or the rights conferred by them being exercised, provided that the issuer of the underlying securities is not the relevant Issuer or another entity belonging to the Lehman Brothers group; and (b) in the case of Notes issued by LBHI and having a maturity of 183 days or less, the minimum denomination of such Notes will be at least U.S.$500,000 or its equivalent).

The minimum subscription price payable by each offeree for Australian Domestic Notes will be A$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the offeror or its associates) unless the offer or invitation giving rise to the subscription otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act 2001 of Australia (the "*Corporations Act*"). Australian Domestic Notes and New Zealand Domestic Notes issued by LBTCBV or LBHI are to be issued in registered (or inscribed) form, to be constituted by the relevant Deed Poll (as defined below) and will take the form of entries on a register maintained by the Australian Registrar or the New Zealand Registrar, as the case may be, as described in the relevant Final Terms. The minimum subscription price payable by each offeree for New Zealand Domestic Notes will be NZ$500,000 (or the equivalent in another currency and, in either case, disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or

Issuer) unless the Notes are issued or transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand.

Each Tranche of Notes in bearer form will initially be represented by a temporary global Note, or, in the case of an Issuer other than LBHI provided that such Notes have a maturity of one year or less, or for any notes that have a maturity of 183 days or less if LBHI is the Issuer, a permanent global Note, without Coupons, Receipts or Talons attached. Each global Note which is not intended to be issued in NGN form, as specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system and each global Note which is intended to be issued in NGN form, as specified in the applicable Final Terms, will be deposited on or around the issue date thereof with a common safekeeper for Euroclear and/or Clearstream, Luxembourg.

Notes in NGN form may only be issued through Euroclear and Clearstream, Luxembourg. Subject to this, any reference in this section "Form of the Notes" to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system specified in the applicable Final Terms.

Upon deposit of such temporary global Note or permanent global Notes, as applicable, Euroclear and Clearstream, Luxembourg will credit the relevant Dealer(s) with principal amounts of Notes of such Tranche equal to the principal amount thereof for which they have paid. If so specified in the applicable Final Terms, interests in the temporary global Note of any Tranche will be exchangeable, free of charge to the Holder, for, in whole (i) interests in a permanent global Note in bearer form of such Series or (ii) definitive Notes in bearer form of such Series with, if applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms) in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes), in each case, on or after the date (the "*Exchange Date*") that is the first Business Day (as defined in the Terms and Conditions of the Notes of such Tranche) following the expiration of a period of 40 days after the original issue date of the Notes of such Tranche (or, if later, the First Business Day following the expiration of the "restricted period" within the meaning of U.S. Treasury Regulations Section 1.163-5(c)(2)(i)(D)(7)). If definitive Notes in bearer form have previously been issued in exchange for an interest in a permanent global Note representing Notes of the same Series, then (unless the Notes which would continue to be represented by any such permanent global Note would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Notes) interest in the temporary global Note will henceforth only be exchangeable, in whole, for definitive Notes in bearer form of the same Series. Pursuant to the Fiscal Agency Agreement, the Fiscal Agent shall arrange that, where a further Tranche of Notes is issued, the Notes of such Tranche shall be assigned a common code number and International Security Identification Number ("*ISIN*") by Euroclear and Clearstream, Luxembourg which is different from the common code and ISIN number assigned to Notes of any previously issued Tranche of the same Series until the Exchange Date of the Notes of such new Tranche and receipt by Euroclear and/or Clearstream, Luxembourg of certification of non-U.S. beneficial ownership as required by U.S. Treasury regulations in respect of the Notes of such new Tranche. References herein to the Notes of a Series shall be deemed to include any temporary or permanent global Notes, any global Notes in registered form and any definitive Notes in bearer or registered form of such Series, unless the context requires otherwise.

If:

(a)    a global Note has not been delivered or the principal amount thereof increased in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for an interest in a global Note; or

(b)    definitive Notes in registered form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the seventh day after the bearer has

requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in registered form; or

(c)    definitive Notes in bearer form have not been delivered in accordance with the terms of a temporary global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of an interest in the temporary global Note in accordance with such terms for definitive Notes in bearer form; or

(d)    a temporary global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a temporary global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest thereon has not been made to the bearer in accordance with the terms of the temporary global Note on the due date for payment,

then the temporary global Note (including the obligation to deliver a global Note or definitive Notes (as the case may be)) will become void at 5.00 p.m. (London time) on such seventh day (in the case of (a) above or (b) above) or at 5.00 p.m. (London time) on such thirtieth day (in the case of (c) above) or at 5.00 p.m. (London time) on such due date (in the case of (d) above) and the bearer of the temporary global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the temporary global Note or others may have under a deed of covenant (as amended, supplemented or replaced from time to time, the "*Deed of Covenant*") dated July 24, 2008 executed by the Issuers. Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a temporary global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the temporary global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

If so specified in the applicable Final Terms, interests in a permanent global Note in bearer form will be exchangeable free of charge to the Holder, upon not less than 60 days' notice expiring at least 30 days after the Exchange Date to the Fiscal Agent and upon the presentation thereof made at any time to or to the order of the Fiscal Agent for in whole or in part, definitive Notes in bearer form of the same Series, with, as applicable, Coupons, Receipts and/or Talons attached (as indicated in the applicable Final Terms) and (whether specified or not in the applicable Final Terms) in the case of Notes issued by LBHI, at the request of each Holder (with respect to its own Notes); provided that if definitive Notes in bearer form are issued in partial exchange for an interest in such permanent global Note, such issuance shall (unless the Notes which would continue to be represented by such permanent global Note of such Series would be regarded by Euroclear and Clearstream, Luxembourg as fungible with any such definitive Notes in bearer form issued in partial exchange for interests in any such permanent global Note) give rise to the exchange of such permanent global Note in whole for, at the option of the Holders entitled thereto, definitive Notes in bearer form. In the case of Notes issued by LBTCBV or LBB, if the applicable Final Terms specifies that interests in a permanent global Note in bearer form will be exchangeable for definitive Notes in bearer form "in the limited circumstances described in the permanent global Note", then interests in the permanent global Note will be exchangeable in whole, but not in part, for definitive Notes in bearer form if (a) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce their intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business or (b) an Event of Default has occurred and is continuing with respect to the Notes represented by such permanent global Note.

If:

(a)    definitive Notes in bearer form have not been delivered in accordance with the terms of a permanent global Note by 5.00 p.m. (London time) on the thirtieth day after the bearer has requested exchange of the permanent global Note in accordance with such terms for definitive Notes in bearer form; or

(b)    a permanent global Note was originally issued in exchange for part only of a temporary global Note representing a Tranche of Notes and such temporary global Note becomes void in accordance with its terms; or

(c)    a permanent global Note (or any part thereof) has become due and payable in accordance with the Conditions or the date for final redemption of a permanent global Note has occurred and, in either case, payment in full of the amount of principal falling due with all accrued interest thereon has not been made to the bearer in accordance with the terms of the permanent global Note on the due date for payment,

then the permanent global Note (including the obligation to deliver definitive Notes) will become void at 5.00 p.m. (London time) on such thirtieth day (in the case of (a) above) or at 5.00 p.m. (London time) on the date on which such temporary global Note becomes void (in the case of (b) above) or at 5.00 p.m. (London time) on such due date (in the case of (c) above) and the bearer of the permanent global Note will have no further rights thereunder (but without prejudice to the rights which the bearer of the permanent global Note or others may have under the Deed of Covenant). Under the Deed of Covenant, persons shown in the records of Euroclear and/or Clearstream, Luxembourg as being entitled to an interest in a permanent global Note will acquire directly against the Issuer all those rights to which they would have been entitled if, immediately before the permanent global Note became void, they had been the holders of definitive Notes in an aggregate principal amount equal to the principal amount of Notes they were shown as holding in the records of Euroclear and/or Clearstream, Luxembourg.

Notes in registered form may initially be issued (i) in the form of global Notes in registered form in an aggregate principal amount equal to the principal amount of the Notes of such Tranche or (ii) in the form of definitive Notes in registered form. Global Notes in registered form will be represented by global Notes in fully registered form without Coupons, Receipts or Talons and will be deposited with a common depositary for Euroclear and Clearstream, Luxembourg and/or a custodian for DTC, as the case may be, and registered in the name of such common depositary or its nominee and/or in the name of a nominee of DTC, as the case may be. Unless (i) DTC or any successor depositary notifies the relevant Issuer that it is no longer willing or able to discharge properly its responsibilities as depositary in respect of Restricted Global Note, or (ii) DTC or any successor depositary ceases to be a "clearing agency" (as defined in the U.S. Securities Exchange Act of 1934, as amended) or is at any time no longer eligible to act as such and the relevant Issuer is unable to appoint a qualified successor within 90 days of it giving notice of such ineligibility to the relevant Issuer and the Guarantor, or (iii) both Euroclear and Clearstream, Luxembourg are closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or both Euroclear and Clearstream, Luxembourg announce an intention permanently to cease business or do in fact do so, and a replacement or replacements is or are not appointed by the relevant Issuer within 90 days from the commencement of such closure, announcement or cessation of business, or (iv) an Event of Default (as hereafter defined) has occurred and is continuing with respect to the Notes represented by such global Note in registered form, or (v) the relevant Issuer in its sole discretion notifies the Registrar that definitive Notes in registered form shall be delivered in exchange for such global Note in registered form, owners of beneficial interest in global Notes in registered form will not be entitled to have any portion of such global Note registered in their names, will not receive or be entitled to receive physical delivery of definitive Notes in registered form in exchange for their interests in a global Note in registered form and will not be considered to be the owners or holders of any Notes under the Fiscal Agency Agreement for the Notes. If so specified in the applicable Final Terms, definitive Notes in registered form will be exchangeable for, in whole or in part, interests in a global Note in registered form of the same Series upon written notification to the Registrar and surrender thereof made at any time at the office of the Registrar. Notes in registered form will not be exchangeable for Notes in bearer form.

Pursuant to the Fiscal Agency Agreement, the Agent shall arrange that, where a further Tranche of Notes is issued which is intended to form a single Series with an existing Tranche of Notes, the Notes of such further Tranche shall be assigned a temporary common code and ISIN which are different from the common code and ISIN assigned to the Notes of any other Tranche of the same Series until at least the expiry of the distribution compliance period (as defined in Regulation S under the Securities Act) applicable to the Notes of such Tranche.

Any Note sold by a Dealer to a QIB will be represented by interests in a Restricted Global Note in registered form, deposited with a custodian for and registered in the name of a nominee of DTC.

The following procedures shall apply with respect to the Notes issued in reliance on Rule 144A in book-entry form through DTC:

- DTC will act as securities depository for the Notes. The Notes will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Restricted Global Note will be issued for each issue of the Notes, in the aggregate principal amount of such issue, and will be deposited with DTC. If, however, the aggregate principal amount of any issue exceeds U.S.$500 million, one certificate will be issued with respect to each U.S.$500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

- DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC's direct participants ("*Direct Participants*") include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("*DTCC*"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("*Indirect Participants*"). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com and www.dtc.org.

- Purchases of Notes under the DTC system must be made by or through Direct Participants, which will receive a credit for the Notes on DTC's records. The ownership interest of each actual purchaser of each Note ("*Beneficial Owner*") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Notes are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in Notes, except in the event that use of the book-entry system for the Notes is discontinued.

- To facilitate subsequent transfers, all Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Notes with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Notes; DTC's records reflect only the identity of the Direct Participants to whose accounts such Notes are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

- Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

- Redemption notices shall be sent to DTC. If less than all of the Notes within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

- Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Notes unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Issuers as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts Notes are credited on the record date (identified in a listing attached to the Omnibus Proxy).

- Redemption proceeds, distributions, and dividend payments on the Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Issuers or Registrar and U.S. Sub-Paying Agent, on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar and U.S. Sub-Paying Agent, or the Issuers, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Issuers or the Registrar and U.S. Sub-Paying Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

- DTC may discontinue providing its services as depository with respect to the Notes at any time by giving reasonable notice to the Issuers or Registrar and U.S. Sub-Paying Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive Note certificates are required to be printed and delivered.

- The Issuers may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Note certificates will be printed and delivered to DTC.

- The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Issuers believe to be reliable, but the Issuers take no responsibility for the accuracy thereof.

In the case of Notes issued by LBHI with an original maturity of 184 days or more, and in the case of Notes issued with an original maturity of more than one year, the following legend will appear on all global Notes in bearer form, definitive Notes in bearer form, Coupons, Receipts and Talons: "Any United States person who holds this obligation will be subject to limitations under United States income tax laws, including the limitations provided in sections 165(j) and 1287(a) of the Internal Revenue Code.".

In the case of Notes issued by LBHI with an original maturity of 183 days or less, the following legend will also appear on all global Notes, definitive Notes, Coupons, Receipts and Talons:

"By accepting this obligation, the holder represents and warrants that it is not a United States person (other than an exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder) and that it is not acting for or on behalf of a United States person (other than an

exempt recipient described in section 6049(b)(4) of the Internal Revenue Code and the regulations thereunder)."

LBTCBV and LBHI may issue Australian Domestic Notes and New Zealand Domestic Notes.

Australian Domestic Notes:

- will be issued in registered (or inscribed) form, constituted by a Deed Poll to be executed by LBTCBV or LBHI, as the case may be, and governed by the laws of New South Wales, Australia (each a "*Deed Poll*" and together, the "*Deed Polls*") and take the form of entries on a register to be maintained by an Australian registrar to be appointed by LBTCBV or LBHI, as the case may be, and specified in the applicable Final Terms (the "*Australian Registrar*");

- will provide for payments of principal and interest to be made in Sydney, Australia;

- will provide for LBTCBV or LBHI, as the case may be, to submit to the jurisdiction of the courts of New South Wales, Australia and appoint such person as is specified in the applicable Final Terms as its agent for the service of process in New South Wales, Australia;

- may be listed on the Australian Stock Exchange; and

- will be eligible for lodgement into the system ("*Austraclear System*") operated by Austraclear Limited (ABN 94 002 060 773) ("*Austraclear*").

It is not intended LBB will issue Australian Domestic Notes.

LBTCBV or LBHI, as the case may be, will apply to Austraclear for approval for each Series of Australian Domestic Notes to be eligible for lodgement in the Austraclear System. Such approval by Austraclear is not a recommendation or endorsement by Austraclear of such Australian Domestic Notes.

If accepted for admission to the respective system, interests in Australian Domestic Notes may be held through Euroclear or Clearstream, Luxembourg. In these circumstances, entitlements in respect of holdings of interests in such Australian Domestic Notes in Euroclear would be held in the Austraclear System by Westpac Custodian Nominees Limited as nominee of, or another nominee appointed by, Euroclear while entitlements in respect of holdings of interests in such Australian Domestic Notes in Clearstream, Luxembourg would be held in the Austraclear System by ANZ Nominees Limited as nominee of, or another nominee appointed by, Clearstream, Luxembourg.

The rights of a holder of interests in Australian Domestic Notes held through Euroclear or Clearstream, Luxembourg are subject to the respective rules and regulations for accountholders of Euroclear and Clearstream, Luxembourg, the terms and conditions of agreements between Euroclear and Clearstream, Luxembourg and their respective nominee and the rules and regulations of the Austraclear System.

In addition, any transfer of interests in Australian Domestic Notes which are held through Euroclear or Clearstream, Luxembourg will, to the extent such transfer will be recorded in the Austraclear System, be subject to the Corporations Act and the requirements for minimum consideration set out in Condition 1(j) (Australian Domestic Notes) of such Notes.

Neither LBTCBV nor LBHI, as the case may be, will be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their nominees, their participants and the investors.

New Zealand Domestic Notes:

- will be issued in registered form, constituted by a Deed Poll and take the form of entries on a register to be maintained by a New Zealand registrar to be appointed by LBTCBV or LBHI, as the case may be, and specified in the applicable Final Terms (the "*New Zealand Registrar*");

- will provide for payments of principal and interest to be made in Auckland, New Zealand;

- will provide for LBTCBV or LBHI, as the case may be, to submit to the jurisdiction of the courts of New South Wales, Australia and appoint such person as is specified in the applicable Final Terms as its agent for the service of process in New South Wales, Australia; and

- will be eligible for lodgement into the system ("*Austraclear New Zealand System*") operated by the Reserve Bank of New Zealand ("*RBNZ*")

It is not intended LBB will issue New Zealand Domestic Notes.

LBTCBV or LBHI, as the case may be, will apply to the RBNZ for approval for each Series of New Zealand Domestic Notes to be eligible for lodgement in the Austraclear New Zealand System. Such approval by the RBNZ is not a recommendation or endorsement by the RBNZ of such New Zealand Domestic Notes.

If accepted for admission to the Austraclear New Zealand system, interests in New Zealand Domestic Notes may be held through Euroclear or Clearstream, Luxembourg. In these circumstances, entitlements in respect of holdings of interests in such New Zealand Domestic Notes would be held through investors' securities accounts in their respective names on the books of the respective New Zealand sub-custodians (being HSBC Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Euroclear or ANZ Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Clearstream, Luxembourg) which in turn would hold such interests in investors' securities accounts in the names of the New Zealand sub-custodians on the books of New Zealand Central Securities Depository Limited. The rights of a holder of interests in New Zealand Domestic Notes held through Euroclear or Clearstream, Luxembourg are subject to the respective rules and regulations for accountholders of Euroclear and Clearstream, Luxembourg, the terms and conditions of agreements between Euroclear and Clearstream, Luxembourg and their respective nominee and the rules and regulations of the Austraclear New Zealand System.

Neither LBTCBV nor LBHI, as the case may be, will be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their nominees, their participants and the investors.

## PRO FORMA FINAL TERMS

*Set out below is a pro forma Final Terms which, subject to completion and amendment, will be issued
in respect of issues of Notes under the Program. Text in this section appearing in italics does not form part
of the Final Terms but denotes guidance for completing the Final Terms.*

Final Terms dated [    ]

### [LEHMAN BROTHERS HOLDINGS INC. [acting through its London Branch]
### LEHMAN BROTHERS TREASURY CO. B.V./ LEHMAN BROTHERS BANKHAUS AG
### [acting through its London Branch]

### Issue of [Aggregate Nominal Amount of Tranche] [Title of Notes]
### [Guaranteed by Lehman Brothers Holdings Inc.]
### under the U.S.$100,000,000,000
### Euro Medium-Term Note Program

The Base Prospectus referred to below (as completed by these Final Terms) has been prepared on the
basis that, except as provided in sub-paragraph (ii) below, any offer of Notes in any Member State of the
European Economic Area which has implemented the Prospectus Directive (2003/71/EC) (each, a "*Relevant
Member State*") will be made pursuant to an exemption under the Prospectus Directive, as implemented in
that Relevant Member State, from the requirement to publish a prospectus for offers of the Notes.
Accordingly any person making or intending to make an offer of the Notes may only do so:

(i)     in circumstances in which no obligation arises for the Issuer or any Dealer to publish a
        prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus
        pursuant to Article 16 of the Prospectus Directive, in each case, in relation to such offer; or

(ii)    in those Public Offer Jurisdictions mentioned in Paragraph 35 of Part A below, provided such
        person is one of the persons mentioned in Paragraph 35 of Part A below and that such offer is
        made during the Offer Period specified for such purpose therein.

Neither the Issuer[, the Guarantor] nor any Dealer has authorised, nor do they authorise, the making
of any offer of Notes in any other circumstances.

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth
in the Base Prospectus dated July 24, 2008 [and the supplemental Prospectus dated [    ] which [together]
constitute[s] a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the
"*Prospectus Directive*"). This document constitutes the Final Terms of the Notes described herein for the
purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with such Base
Prospectus [as so supplemented].

*[The following alternative language applies if the first tranche of an issue which is being increased
was issued under a base prospectus with an earlier date and either (1) the Notes which are the subject of the
Final Terms are not being (a) offered to the public in a Member State (other than pursuant to one or more
of the exemptions set out in Article 3.2 of the Prospectus Directive) or (b) admitted to trading on a regulated
market in a Member State or (2) the Conditions (as defined in the next paragraph) do not contain, by
comparison with the Base Prospectus, any "significant new factor" within the meaning of Article 16.1 of the
Prospectus Directive. If neither (1) nor (2) applies the Issuer will need to consider effecting the issue by
means of a supplement to the Base Prospectus or a stand alone prospectus rather than by Final Terms.]*

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the
"*Conditions*") set forth in the Base Prospectus, dated [original date] [and the supplemental Prospectus dated
[    ]]. This document constitutes the Final Terms of the Notes described herein for the purposes of Article
5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in
conjunction with the Base Prospectus dated July 24, 2008 [and the Supplemental Prospectus dated [    ]],
which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect

of the conditions which are extracted from the Base Prospectus dated original date [and the supplemental Prospectus dated [    ]] and are attached hereto.

*[The following alternative language applies if the first tranche of an issue which is being increased was issued under a base prospectus with an earlier date and the relevant terms and conditions from that base prospectus with an earlier date were incorporated by reference in the Base Prospectus.]*

[Terms used herein shall be deemed to be defined as such for the purposes of the [date] Conditions (the "*Conditions*") incorporated by reference in the Base Prospectus dated July 24, 2008. This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive (Directive 2003/71/EC) (the "*Prospectus Directive*") and must be read in conjunction with the Base Prospectus [and the Supplemental Prospectus dated [    ]], which [together] constitute[s] a base prospectus for the purposes of the Prospectus Directive, save in respect of the Conditions which are set forth in the Base Prospectus dated [    ] [and the supplemental Prospectus dated [    ]] and incorporated by reference in the Base Prospectus.

Full information on the Issuer [, the Guarantor] and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus. [The Base Prospectus [and the supplemental Prospectus] [is/are] available for viewing [at [website]] [and] during normal business hours at [*address*] and copies may be obtained from [*address*].

[These Notes are issued in the Australian domestic capital markets and are Australian Domestic Notes. Holders of the Australian Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [    ] executed by the Issuer constituting the Australian Domestic Notes.] *[This paragraph need only be included if the Final Terms relates to Australian Domestic Notes.]*

[These Notes are Danish Notes. Holders of the Danish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Danish Notes. *[This paragraph need only be included if the Final Terms relates to Danish Notes.]*

[These Notes are Finnish Notes. Holders of the Finnish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Finnish Notes. *[This paragraph need only be included if the Final Terms relates to Finnish Notes.]*

[These Notes are New Zealand Domestic Notes. Holders of the New Zealand Domestic Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the Deed Poll dated [    ] executed by the Issuer constituting the New Zealand Domestic Notes.] *[This paragraph need only be included if the Final Terms relates to New Zealand Domestic Notes.]*

[These Notes are Norwegian Notes. Holders of the Norwegian Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Norwegian Notes. *[This paragraph need only be included if the Final Terms relates to Norwegian Notes.]*

[These Notes are Swedish Notes. Holders of the Swedish Notes are entitled to the benefit of, and are bound by and are deemed to have notice of, the provisions of the deed of covenant dated [    ] executed by the Issuer constituting the Swedish Notes. *[This paragraph need only be included if the Final Terms relates to Swedish Notes.]*

*[Include whichever of the following apply or specify as "Not Applicable" (N/A). Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs or sub-paragraphs. Italics denote guidance for completing the Final Terms.]*

*[When adding any other final terms or information (including final terms at items 9, 10, 15, 16, 17, 29 or 31 of Part A or information in relation to the interest of natural and legal persons involved in the issue/offer in Part B), consideration should be given as to whether such terms or information constitute "significant new factors" and will consequently be issued pursuant to a Drawdown Prospectus.]*

1.  [(i)] Issuer:                                           [  ][1]

    [(ii) Guarantor:                                        [  ]]

2.  [(i)] Series Number:                                    [  ]

    [(ii) Tranche Number:                                   [  ]

    (If fungible with an existing Series, details
    of that Series, including the date on which
    the Notes become fungible).]

3.  Specified Currency or Currencies:                       [  ]

4.  Aggregate Nominal Amount:                               [  ] [(being the equivalent of [  ] Units)][2]

    [(i)] Series:                                           [  ]

    [(ii) Tranche:                                          [  ]]

5.  Issue Price:                                            [  ] per cent. of the Aggregate Nominal Amount [plus
                                                            accrued interest from [insert date] (*if applicable*)]
                                                            [/[*amount in specified currency*] per Unit][2]

6.  Specified Denomination(s) and Units

    (i) Specified Denomination(s):                          [  ] *[(i) Notes (including Notes denominated in
                                                            Sterling) in respect of which the issue proceeds are to
                                                            be accepted by the Issuer in the United Kingdom or
                                                            whose issue otherwise constitutes a contravention of
                                                            Section 19 of the FSMA and which have a maturity of
                                                            less than one year must have a minimum redemption
                                                            value of £100,000 (or its equivalent in other
                                                            currencies); (ii) in the case of Notes to be admitted to
                                                            trading on a regulated market and/or publicly offered
                                                            in an EEA Member State, the minimum denomination
                                                            of the Notes will be: (1) where the Issuer of the Notes
                                                            is LBB, at least EUR 50,000 (or nearly equivalent in
                                                            any other currency on the issue date); and (2) in all
                                                            other cases, at least EUR 1,000 (or nearly equivalent
                                                            in any other currency on the issue date) or the Notes
                                                            will give the right to acquire transferable securities or
                                                            to receive a cash amount, as a consequence of their
                                                            being converted or the rights conferred by them being
                                                            exercised, provided that the issuer of the underlying
                                                            securities is not the relevant Issuer or another entity
                                                            belonging to the Lehman Brothers group; and (c) in
                                                            the case of Notes issued by LBHI and having a
                                                            maturity of 183 days or less, the minimum
                                                            denomination of such Notes will be at least
                                                            U.S.$500,000 or its equivalent).]*

                                                            *[If the Notes will be issued in Australia, the
                                                            denominations may be any amount provided that the
                                                            minimum aggregate consideration payable by each
                                                            offeree is at least A$500,000 (or the equivalent in
                                                            another currency, in either case disregarding moneys
                                                            lent by the offeror or to its associates) or the offer or*

---

1.      In the case of LBHI or LBB, specify if acting through its London Branch.

2.      Insert only in case Trading in Units is specified as being applicable.

*invitation otherwise does not require disclosure to investors in accordance with Part 6D.2 of the Corporations Act 2001 of Australia.]*

*[The denominations of New Zealand Domestic Notes may be any amount provided that in relation to New Zealand Domestic Notes offered in New Zealand the minimum aggregate consideration payable by each offeree is at least NZ$500,000 (or the equivalent in another currency, in either case disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or Issuer) unless the New Zealand Domestic Notes are issued or transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand.]*

| | | |
|---|---|---|
| (ii) Calculation Amount: | | [   ] |
| (iii) Trading in Units: | | [Applicable/Not Applicable] |

If Trading in Units is specified as being Applicable then the Notes will be tradeable by reference to the number of Notes being traded (each having the Specified Denomination) as opposed to the aggregate principal amount of Notes being traded.

*[Trading in Units may only be specified as being Applicable if the Notes have a single Specified Denomination.]*

| | | |
|---|---|---|
| 7. | [(i)] Issue Date: | [   ] |
| | [(ii)] Interest Commencement Date: | [Not Applicable] [*only include if date is different to the Issue Date]* |
| 8. | Maturity Date: | [*Specify date*] [or if that is not a Business Day the immediately [succeeding/preceding] Business Day [unless it would thereby fall into the next calendar month, in which event it will be brought forward to the immediately preceding Business Day]. |

*[Fixed Rate – specify date/Floating Rate – specify Interest Payment Date falling in or nearest to month and year]*

*[If the Maturity Date is less than one year from the Issue Date, the Notes must have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be sold only to "professional investors" (or another applicable exemption from Section 19 of the FSMA must be available).]*

| | | |
|---|---|---|
| 9. | Interest Basis: | [[   ] per cent. Fixed Rate] |
| | | [*specify reference rate* +/– [   ] per cent. Floating Rate] |
| | | [Zero Coupon] |

[Index-Linked Interest]/[Equity-Linked Interest]
[Other (*specify*)]
(further particulars specified below)

10. Redemption/Payment Basis:

[Redemption at par]
[Index-Linked Redemption]
[Equity-Linked Redemption]
[Dual Currency Redemption]
[Partly Paid]
[Instalment]
[Extendible]
[Other (*specify*)]

11. Change of Interest or Redemption/Payment Basis:

[(*Specify details of any provision for convertibility of Notes into another interest or redemption/payment basis*)]

12. Put/Call Options:

[Investor Put]
[Issuer Call]
[(further particulars specified below)]

13. [(i)] Status of the Notes:

[Senior Notes/Subordinated Notes]

[(ii)] Status of the Guarantee:

[Senior Guarantee/Subordinated Guarantee]]

14. Method of distribution:

[Syndicated/Non-syndicated]

## PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE

15. **Fixed Rate Note Provisions**

[Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

(i) Fixed Rate[(s)] of Interest:

[   ] per cent. per annum [payable [annually/semi-annually/quarterly/monthly/other (*specify*)] in arrear]

(ii) Interest Payment Date(s):

[   ] in each year up to and including the Maturity Date]/[*specify other – consider whether to adjust in accordance with a Business Day Convention – see items 15(vi) and (vii)] (NB: this will need to be amended in the case of long or short coupons*)]

(iii) Fixed Coupon Amount[(s)]:

[   ] per Calculation Amount

(iv) Day Count Fraction]/

[30/360]/[Actual/Actual (ICMA)]
[*If neither of these options applies, give details*]

(v) Broken Amount(s):

[   ] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [   ]

(vi) Other terms relating to the method of calculating interest for Fixed Rate Notes:

[Not Applicable/*give details*]

(vii) Business Day Convention:

[Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)]

(viii) Option to defer interest payments:

[Not Applicable/Condition 3(e) is applicable]

16. **Floating Rate Note Provisions**

[Applicable/Not Applicable. (*If not applicable, delete the remaining sub-paragraphs of this paragraph*)]

(i) Interest Period(s)/Interest Payment Date(s):

[    ]

(ii) Business Day Convention:

[Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/other (*give details*)]

(iii) Additional Business Centre(s) for interest accrual only (Condition 3(b)(B)):

[*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*]

(iv) Manner in which the Rate(s) of Interest is/are to be determined:

[Screen Rate Determination/ISDA Determination/ other (*give details*)]

(v) Party responsible for calculating the Rate(s) of Interest and Interest Amount(s) (if not the Fiscal Agent):

[[Name] shall be the Calculation Agent (no need to specify if the Fiscal Agent is to perform this function)]

(vi) Screen Rate Determination:

– Reference Rate:

[*For example, LIBOR, EURO LIBOR BBA, EURIBOR or HIBOR*]]

– Interest Determination Date(s):

[(*Second London business day prior to the start of each Interest Period if LIBOR (other than sterling or euro LIBOR), first day of each Interest Period if sterling LIBOR or if HK Dollars, HIBOR and the second day on which the TARGET System is open prior to the start of each Interest Period if EURIBOR or euro LIBOR*)]

– Relevant Screen Page:

[*For example, Reuters page LIBOR01 for LIBOR/EURIBOR01 for EURIBOR*]

– Relevant Time:

[*For example, 11.00 a.m. London time in the case of LIBOR/Brussels time in the case of EURIBOR*]

– Relevant Financial Centre:

[*For example, London/Euro-zone (where Euro-zone means the region comprised of the countries whose lawful currency is the euro)*]

(vii) ISDA Determination:

– Floating Rate Option:

[    ]

– Designated Maturity:

[    ]

– Reset Date:

[*For example, Reset Date, for USD-LIBOR-BBA should be the first day of each Interest Period*]

(viii) Margin(s):

[+-][    ] per cent. per annum

(ix) Multiplier:

[Not Applicable/*give details*]

(x) Minimum Interest Rate:

[    ] per cent. per annum

| | | |
|---|---|---|
| (xi) | Maximum Interest Rate: | [  ] per cent. per annum |
| (xii) | Day Count Fraction: | [  ] |
| (xiii) | Fall back provisions, rounding provisions, denominator and any other terms relating to the method of calculating interest on Floating Rate Notes, if different from those set out in the Conditions: | [Not Applicable/*give details*] |
| (xiv) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |

**17.  Zero Coupon Note Provisions**  [Applicable/Not Applicable]
(*If not applicable, delete the remaining subparagraphs of this paragraph*)

| | | |
|---|---|---|
| (i) | Accrual Yield: | [  ] per cent. per annum |
| (ii) | Reference Price: | [  ] |
| (iii) | Day Count Fraction (for the purposes of Condition 5): | [  ] |
| (iv) | Any other formula/basis of determining amount payable: | [  ] |

**18.  Index-Linked Interest Provisions**  [Applicable/Not Applicable]
(*If not applicable, delete the remaining subparagraphs of this paragraph*)

| | | |
|---|---|---|
| (i) | Index/Index Sponsor: | [  ] |
| (ii) | Bloomberg Code: | [  ] |
| (iii) | Provisions for determining Index-Linked Interest Amount where calculated by reference to Index: | [*Insert calculation method*] [*If Trigger Event applies, insert details here*] |
| (iv) | Disrupted Day: | [As set out in the Conditions] |
| (v) | Calculation Agent responsible for calculating the interest due: | [  ] [*Address*] |
| (vi) | Provisions for determining Index-Linked Interest Amount where calculation by reference to Index is impossible or impracticable: | [  ]/[As set out in the Conditions] |
| (vii) | Interest Period(s)/ Interest Payment Date(s): | [  ] |
| (viii) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (ix) | Day Count Fraction: | [  ]/[Not Applicable] |
| (x) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [  ]] |

| | | |
|---|---|---|
| | | [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply] |
| (xi) | Strike Date/ Strike Level: | [   ] |
| (xii) | Interest Determination Date(s): | [*Specify*]/[Not Applicable] |
| (xiii) | Observation Date(s): | [[   ]/Not Applicable]] |
| | | [In the event that an Observation Date is a Disrupted Day/[Omission/Postponement/Modified Postponement] will apply.] |
| (xiv) | Observation Period: | [*Specify*/Not Applicable] |
| (xv) | Scheduled Trading Day: | [As set out in the Conditions]/[Per Index Basis] |
| (xvi) | Exchange(s): | [   ]/[Multi-Exchange Index] |
| (xvii) | Related Exchange: | [*Specify*/[All Exchanges]] |
| (xviii) | Weighting: | [Not Applicable/*specify*] |
| (xix) | Valuation Time: | [As set out in the Conditions]/[*Specify*] |
| (xx) | Additional Disruption Events: | (a) [The following Additional Disruption Events apply to the Notes:] |
| | | (*Specify each of the following which applies*) |
| | | [Change in Law] |
| | | [Hedging Disruption] |
| | | (b) [[The Trade Date is [   ].] |
| | | (*Only applicable if Change in Law is applicable*) |
| **19.** | **Equity-Linked Interest Provisions** | [Applicable/Not Applicable] |
| | | (*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| (i) | Share(s): | [   ] |
| (ii) | ISIN of Share(s): | [*Specify*] |
| (iii) | Bloomberg Code: | [*Specify*] |
| (iv) | Provisions for determining Equity-Linked Index Amount where calculated by reference to Share(s): | [*insert Calculation Method*]<br>[*If Trigger Event applies, insert details here*] |
| (v) | Disrupted Day: | [As set out in the Conditions] |
| (vi) | Calculation Agent responsible for calculating the interest due: | [   ]<br><br>[*Address*] |
| (vii) | Provisions for determining Equity-Linked Interest Amount where calculation by reference to Share(s) is impossible or impracticable: | [   ]/[As set out in the Conditions] |

| (viii) | Interest Period(s)/ Interest Payment Date(s): | [    ] |
|---|---|---|
| (ix) | Business Day Convention | [Following Business Day Convention/ Modified Following Business Day Convention/ other (*give details*)] |
| (x) | Day Count Fraction: | [    ]/[Not Applicable] |
| (xi) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [    ].] |
| | | [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply.] |
| (xii) | Strike Date/ Strike Price: | [    ] |
| (xiii) | Interest Determination Date(s): | [*Specify*]/[Not Applicable] |
| (xiv) | Observation Date(s): | [    ]/Not Applicable]] |
| | | [In the event that an Observation Date is a Disrupted Date/[Omission/Postponement/Modified Postponement] will apply] |
| (xv) | Observation Period: | [*Specify*/Not Applicable]] |
| (xvi) | Scheduled Trading Day: | [As set out in the Conditions]/[Per Share Basis] |
| (xvii) | Exchange(s): | [    ] |
| (xviii) | Related Exchange(s): | [*Specify*/All Exchanges] |
| (xix) | Weighting: | [Not Applicable/*specify*] |
| (xx) | Valuation Time: | [As set out in the Conditions]/[*Specify*] |
| (xxi) | Additional Disruption Events: | (a) [The following Additional Disruption Events apply to the Notes:]<br>(*Specify each of the following which applies*)<br><br>[Change in Law]<br><br>[Hedging Disruption]<br><br>[Failure to Deliver due to Illiquidity]<br>(*Only applicable in the case of Physical Delivery Notes - Failure to Deliver due to Illiquidity is applicable to certain Equity Linked Notes. Careful consideration should be given to whether Failure to Deliver due to Illiquidity would apply to other Physical Delivery Notes*)<br><br>(b)[[The Trade Date is [    ].]<br>(*N.B. only applicable if Change in Law is applicable*)] |
| 20. | **Other Variable-Linked Interest Note Provisions** | [Applicable/Not Applicable]<br>(*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| (i) | Formula/other variable: | [(*give or annex details*)] |

| | | |
|---|---|---|
| (ii) | Name and address of Calculation Agent, if any, responsible for calculating the principal and/or interest due: | [   ] |
| (iii) | Provisions for determining Coupon where calculated by reference to Formula and/or other variable: | [   ] |
| (iv) | Provisions for determining Coupon where calculation by reference to Formula and/or other variable is impossible or impracticable or otherwise disrupted: | [   ] |
| (v) | Interest Period(s)/Interest Payment Dates: | [   ] |
| (vi) | Business Day Convention: | [Floating Rate Convention/ Following Business Day Convention/Modified Following Business Day Convention/ Preceding Business Day Convention/ other (*give details*)] |
| (vii) | Additional Business Centre(s) (Condition 3(b)(B)): | [*If Euro is the Specified Currency and Business Days are defined only by reference to TARGET or London, specify "Not Applicable". If any other currency is the Specified Currency and Business Days are defined only by reference to London and the principal financial centre of that currency, specify "Not Applicable". Otherwise give details*] |
| (viii) | Minimum Interest Rate for interest accrual only (Condition 3(b)(B)): | [   ] per cent. per annum |
| (ix) | Maximum Interest Rate: | [   ] per cent. per annum |
| (x) | Interest Determination Date(s): | [   ] |
| (xi) | Day Count Fraction: | [   ] |
| (xii) | Option to defer interest payments: | [Not Applicable/Condition 3(e) is applicable] |
| 21. | **Dual Currency Note Provisions** | [Applicable/Not Applicable] (*If not applicable, delete the remaining sub-paragraphs of this paragraph*) |
| (i) | Rate of exchange/method of calculating rate of exchange: | [*give details*] |
| (ii) | Name and address Calculation Agent, if any, responsible for calculating the principal and/or interest due: | [   ] |
| (iii) | Provisions applicable where calculation by reference to rate of exchange is impossible or impracticable: | [   ] |

(iv)   Person at whose option Specified Currency(ies) is/are payable:   [  ]

## PROVISIONS RELATING TO REDEMPTION

22.  **Call Option**

[Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

   (i)   Optional Redemption Date(s) (Call):

[(*Consider for Fixed Rate Notes adjustment in accordance with a Business Day Convention – see items 16(ii) and 16(iii))*]

   (ii)   Optional Redemption Amount(s) of each Note (Call) and method, if any, of calculation of such amount(s):

[  ] per Calculation Amount

   (iii)   If redeemable in part:

      (a)   Minimum Redemption Amount:   [  ] per Calculation Amount

      (b)   Higher Redemption Amount:   [  ] per Calculation Amount

   (iv)   Notice period (if other than as set out in the Conditions):

(*N.B. If setting notice periods which are different to those provided in the Conditions, the relevant Issuer is advised to consider the practicalities of distribution of information through intermediaries, for example, clearing systems and custodians, as well as any other notice requirements which may apply, for example, as between such Issuer and the Agent.*)

23.  **Put Option**

[Applicable/Not Applicable]
(*If not applicable, delete the remaining sub-paragraphs of this paragraph*)

   (i)   Optional Redemption Date(s):

[(*Consider for Fixed Rate Notes adjustment in accordance with a Business Day Convention – see items 16(ii) and 16(iii))*]

   (ii)   Optional Redemption Amount(s) of each Note (Call) and method, if any, of calculation of such amount(s):

[  ] per Calculation Amount

   (iii)   If redeemable in part:

   (a)   Minimum Redemption Amount:   [  ] per Calculation Amount

   (b)   Higher Redemption Amount:   [  ] per Calculation Amount

   (iv)   Notice period (if other than as set out in the Conditions):

(*N.B. If setting notice periods which are different to those provided in the Conditions, the relevant Issuer is advised to consider the practicalities of distribution of information through intermediaries, for example, clearing systems and custodians, as well as any other notice requirements which may apply, for example, as between such Issuer and the Agent.*)

24.  **Index-Linked Redemption Provisions**

[Applicable/Not Applicable]
(*If not applicable, delete the remaining subparagraphs of this paragraph*)

| | | | |
|---|---|---|---|
| (i) | Index/Index Sponsor: | [  ] | |
| (ii) | Bloomberg Code: | [  ] | |
| (iii) | Provisions for determining Final Redemption Amount where calculated by reference to Index: | [insert calculation method] [*If Trigger Event applies, insert details here*] | |
| (iv) | Disrupted Day: | [As set out in the Conditions] | |
| (v) | Calculation Agent responsible for calculating the Final Redemption Amount due: | [  ] [*Address*] | |
| (vi) | Provisions for determining Final Redemption amount where calculation by reference to Index is impossible or impracticable: | [  ]/[As set out in the Conditions] | |
| (vii) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [  ]] [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply] | |
| (viii) | Strike Date/ Strike Level: | [  ] | |
| (ix) | Valuation Date: | [*Specify*] | |
| (x) | Observation Date(s): | [[  ]/Not Applicable]] [In the event that an Observation Date is a Disrupted Day/[Omission/Postponement/Modified Postponement] will apply] | |
| (xi) | Observation Period: | [*Specify*/Not Applicable]] | |
| (xii) | Scheduled Trading Day: | [As set out in the Conditions]/[Per Index Basis] | |
| (xiii) | Exchange(s): | [  ]/[Multi Exchange Index] | |
| (xiv) | Related Exchange: | [*Specify*/All Exchanges]] | |
| (xv) | Weighting: | [Not Applicable/*specify*] | |
| (xvi) | Valuation Time: | [As set out in the Conditions]/[*specify*] | |
| (xvii) | Additional Disruption Events: | (a) [(The following Additional Disruption Events apply to the Notes:] (*Specify each of the following which applies*) [Change in Law] [Hedging Disruption] (b) [[The Trade Date is [  ].] (*Only applicable if Change in Law is applicable*) | |
| (xviii) | Knock-in Event: | [Applicable/Not Applicable] (*Specify mechanics, such as Knock-in Event, Knock-in Level, Knock-in Determination Day, Knock-in Period Beginning and End Dates, Knock-in Valuation Time*) | |

67

| | | |
|---|---|---|
| (xix) | Knock-out Event: | [Applicable/Not Applicable] *(Specify mechanics, such as Knock-out Event, Knock-out Level, Knock-out Determination Day, Knock-out Period Beginning and End Dates, Knock-out Valuation Time)* |

**25.  Equity-Linked Redemption Provisions**     [Applicable/Not Applicable]
*(If not applicable, delete the remaining sub-paragraphs of this paragraph)*

| | | |
|---|---|---|
| (i) | Share(s): | [   ] |
| (ii) | ISIN of Share(s): | [*Specify*] |
| (iii) | Bloomberg Code: | [*Specify*] |
| (iv) | Provisions for determining Final Redemption Amount where calculated by reference to Share(s): | [*If Cash Settlement applies, insert Calculation Method*] [*If Trigger Event applies, insert details here*] |
| (v) | Disrupted Day: | [As set out in the Conditions] |
| (vi) | Calculation Agent responsible for calculating the Final Redemption Amount due: | [   ] [*Address*] |
| (vii) | Provisions for determining Final Redemption Amount where calculation by reference to Share(s) is impossible or impracticable: | [   ]/[As set out in the Conditions] |
| (viii) | Averaging: | Averaging [applies/does not apply] to the Notes. [The Averaging Dates are [   ].] [In the event that an Averaging Date is a Disrupted Day [Omission/Postponement/Modified Postponement] will apply] |
| (ix) | Strike Date/ Strike Price: | [   ] |
| (x) | Valuation Date(s): | [*Specify*] |
| (xi) | Observation Date(s): | [The Observation Date(s) is/are [   ]/Not Applicable] [In the event that an Observation Date is a Disrupted Date/[Omission/Postponement/Modified Postponement] will apply] |
| (xii) | Observation Period: | [*Specify*/Not Applicable]] |
| (xiii) | Scheduled Trading Day: | [As set out in the Conditions]/[Per Share Basis] |
| (xiv) | Exchange(s): | [   ] |
| (xv) | Related Exchange(s): | [*Specify*/All Exchanges] |
| (xvi) | Weighting: | [Not Applicable/*specify*] |
| (xvii) | Valuation Time: | [As set out in the Conditions]/[*Specify*] |
| (xviii) | Additional Disruption Events: | (a)   [The following Additional Disruption Events apply to the Notes:] |

*(Specify each of the following which applies.)*

[Change in Law]

[Hedging Disruption]

[Failure to Deliver due to Illiquidity]
*(N.B. Only applicable in the case of Physical Delivery Notes - Failure to Deliver due to Illiquidity is applicable to certain Share Linked Notes. Careful consideration should be given to whether Failure to Deliver due to Illiquidity would apply to other Physical Delivery Notes).*

(b)    [[The Trade Date is [    ].]

(N.B. only applicable if Change in Law is applicable)]

(xix)  Knock-in Event:
[Applicable/Not Applicable]
*(Specify mechanics, such as Knock-in Event, Knock-in Price, Knock-in Determination Date, Knock-in Period Beginning and End Dates, Knock-in Valuation Time)*

(xx)   Knock-out Event:
[Applicable/Not Applicable]
*(Specify mechanics, such as Knock-out Event, Knock-out Price, Knock-out Determination Date, Knock-out Period Beginning and End Dates, Knock-out Valuation Time)*

26    **Physical Settlement:**
[Applicable]/[Not Applicable][If Physical Settlement applies[1], Condition 25 applies]

(i)    Physical Settlement Amount per Note: [*give details*]

(ii)   Number of Shares                         [    ]

27.    **Final Redemption Amount of each Note:**    [[    ] per Calculation Amount

[In cases where the Final Redemption Amount is other variable-linked:

(i)    Formula/variable:                              [give or annex details]

(ii)   Calculation Agent responsible for determining the Final Redemption Amount:    [    ]

(iii)  Provisions for determining Final Redemption Amount where calculated by reference to Formula and/or other variable:    [    ]

(iv)   Provisions for determining Final Redemption Amount where calculation by reference to Formula and/or other variable is impossible or impracticable or otherwise disrupted:    [    ]

---

[1]    In the event that the Notes provide for physical settlement involving equity securities of U.S. issuers, the relevant Shares may not include "restricted securities" within the meaning of Rule 144 under the Securities Act.

(v)    Payment Date:    [  ]

(vi)    Minimum Final Redemption Amount:    [  ] per Calculation Amount

(vii)    Maximum Final Redemption Amount:    [  ] per Calculation Amount

28.    **Early Redemption Amount of each Note**    [  ]

Early Redemption Amount(s) per Calculation Amount payable on redemption for taxation reasons or on event of default and/or the method of calculating the same (if required or if different from that set out in the Conditions):

29.    **Mandatory Early Redemption**
(Condition 8(j)):

[Applicable / Not Applicable]
(*If not applicable, delete the remaining subparagraphs of this paragraph*)

(i)    Mandatory Early Redemption Event:

[*Specify* / [  ] is [greater than/greater than or equal to/less than/less than or equal to/the Mandatory Early Redemption [Price(s)/Level(s)] as of [the/any] Mandatory Early Redemption Valuation Date]

(ii)    Mandatory Early Redemption [Price(s)/Level(s)]:

[*give details*]

(iii)    Mandatory Early Redemption Date(s):

[*specify date(s)*] [or if such day is not a Business Day the immediately [succeeding/preceding] Business Day [unless it would thereby fall into the next calendar month, in which event it will be brought forward to the immediately preceding Business Day].

(iv)    Mandatory Early Redemption Valuation Date(s):

[*specify date(s)*]

(v)    Mandatory Early Redemption Rate(s):

[*give details*]

(vi)    Other terms relating to the method of calculating the Mandatory Early Redemption Amount, if different from those set out in the Conditions:

[Not Applicable / *give details*]

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

30.    Form of Notes:

[*In the case of Notes issued by LBHI*]

[Bearer form. Interests in a temporary global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for, at the request of each Holder (with respect to its own Notes in bearer form), definitive Notes in bearer form.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not] be exchangeable for interests in a global Note in registered form.]

[Australian/New Zealand Domestic Notes in registered, uncertificated and dematerialised book-entry form]

[*In the case of Notes issued by LBTCBV or LBB*]

[Bearer form. Interests in a temporary global Note will be exchangeable for definitive Notes in bearer form.]

[Bearer form. Interests in a temporary global Note will be exchangeable for interests in a permanent global Note in bearer form. Interests in a permanent global Note will be exchangeable for definitive Notes in bearer form in the limited circumstances described in the permanent global Note.]

[Registered form. Interests in a global Note in registered form will be exchangeable for definitive Notes in registered form in the limited circumstances described in the global Note. Definitive Notes in registered form will [not] be exchangeable for interests in a global Note in registered form.]

[Australian/New Zealand Domestic Notes in registered, uncertificated and dematerialised book-entry form]

[*Australian Domestic Notes and New Zealand Domestic Notes can not be issued by LBB*]

[*In the case of [Danish/Finnish/Norwegian/Swedish] Notes*] The Notes are [Danish/Finnish/Norwegian/Swedish] Notes and are in uncertificated and dematerialised book-entry form.

| | | |
|---|---|---|
| 31. | New Global Note Form: | [Applicable /Not Applicable][4] |
| 32. | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | [Yes/No/Not Applicable. *If yes, give details*] |

_____

4.    If "Not Applicable" is specified here ensure that "Not Applicable" is specified for Eurosystem eligibility in the relevant paragraph of section 9 of Part B of the Final Terms and if "Applicable" is specified here ensure that the appropriate specification is made in respect of Eurosystem eligibility in the relevant paragraph of section 9 of Part B of the Final Terms.

33.  Details relating to Partly Paid Notes: amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any right of the Issuer to forfeit the Notes and interest due on late payment:

[Not Applicable/*give details*]

34.  Details relating to Instalment Notes: Instalment Amounts and Instalment Dates:

[Not Applicable/*give details*]

35.  Details relating to Extendible Notes:

[Not Applicable/Condition 4[(a)/(b)] applies – give details (*see Condition 4* (*Extendible Notes*))]

36.  Consolidation provisions:

[Not Applicable/The provisions [in Condition 18 (Further Issues of Notes)] [annexed to these Final Terms] apply]

37.  Other final terms:

[Not Applicable/*give details*]
(*When adding any other final terms consideration should be given as to whether such terms constitute "significant new factors" and consequently trigger the need for a supplement to the Base Prospectus under Article 16 of the Prospectus Directive.*)

**DISTRIBUTION**

38.  (i)  If syndicated, names [and addresses] of Managers [and underwriting commitments]:

[Not Applicable/*give names, addresses and underwriting commitments*]
(*Include names and addresses of entities agreeing to underwrite the issue on a firm commitment basis and names and addresses of the entities agreeing to place the issue without a firm commitment or on a "best efforts" basis if such entities are not the same as the Managers.*)

     (ii)  Date of Syndicated Trade Agreement:

[   ]

     (iii)  Stabilizing Manager (if any):

[Not Applicable/*give name, addresses and underwriting commitments*]

39.  If non-syndicated, name and address of Dealer:

[Not Applicable/*give name and address*]

40.  Total commission and concession:

[   ] per cent. of the Aggregate Nominal Amount

41.  Selling restrictions:

     (i)  Additional Selling Restrictions:

[Not Applicable/*give details*]

42.  Non-exempt Offer:

[Not Applicable] [An offer of the Notes may be made by the Managers [and [*specify, if applicable*]] other than pursuant to Article 3(2) of the Prospectus Directive in [*specify relevant Member State(s) - which must be jurisdictions where the Base Prospectus and any supplements have been approved or passported*] ("**Public Offer Jurisdictions**") during the period from [*specify date*] until [*specify date*] ("**Offer Period**"). See further Paragraph 10 of Part B below.

## PURPOSE OF FINAL TERMS

These Final Terms comprise the final terms required for issue [and] [public offer in the Public Offer Jurisdictions] [and] [admission to trading on [*specify relevant regulated market*] of the Notes described herein pursuant to the U.S.$100,000,000,000 Euro Medium-Term Note Program of Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V. and Lehman Brothers Bankhaus AG.]

## RESPONSIBILITY

The Issuer accepts responsibility for the information contained in these Final Terms. [[*Relevant third party information*] has been extracted from [*specify source*]. The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware, and is able to ascertain from information published by [*specify source*], no facts have been omitted which would render the reproduced inaccurate or misleading.]

Signed on behalf of the Issuer:

By:    ...................................................................

Duly authorised

## PART B – OTHER INFORMATION

1. **LISTING**

    (i)    Listing:            [The Irish Stock Exchange/The Singapore Exchange Securities Trading Limited/The Australian Stock Exchange/ other (*specify*)/ None]

    (ii)   Admission to Trading:    [Application has been made for the Notes to be admitted to listing and/or trading on [the Official List of the regulated Irish Stock Exchange and to trading on its regulated market]/[the alternative securities market of the Irish Stock Exchange]/ [the Australian Stock Exchange]/ [other (*specify*)]/ with effect from [·]/ Not Applicable]

                            No assurance can be given as to whether or not or when such application for listing/admission to trading will be granted.

                            (*Where documenting a fungible issue need to indicate that original securities are already admitted to trading.*)

    [(iii)  Cost of admission to trading]

2. **RATINGS**

    Ratings:            The Program has been rated:

| | | |
|---|---|---|
| **Standard & Poor's** | | |
| Senior Debt (Long Term) | [ | ] |
| Subordinated Debt | [ | ] |
| Short Term Debt | [ | ] |
| **Moody's** | | |
| Senior Debt (Long Term) | [ | ] |
| Subordinated Debt | [ | ] |
| Short Term Debt | [ | ] |
| **Fitch** | | |
| Senior Debt (Long Term) | [ | ] |
| Subordinated Debt | [ | ] |
| Short Term Debt | [ | ] |

3. **[INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

Need to include a description of any interest, including conflicting ones, that is material to the issue/offer, detailing the persons involved and the nature of the interest. May be satisfied by inclusion of the following statement:

"Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer."]

*[(When adding any other description, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

4. **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES\***

    [(i)    Reasons for the offer:

*(See "Use of Proceeds" wording in the Base Prospectus – if reasons for offer differ from making profit and or hedging certain risks will need to include those reasons here)]*

[(ii)]  Estimated net proceeds:                    [   ]

[(iii)]  Estimated total expenses:                 [   ] *[Include breakdown of expenses]*

*(If the Notes are derivative securities to which Annex XII of the Prospectus Directive Regulation applies it is only necessary to include disclosure of net proceeds and total expenses at (ii) and (iii) above where disclosure is included at (i) above.)*

5.    **YIELD (Fixed Rate Notes only)**

Indication of yield:                               [   ]

Calculated as [*include method of calculation in summary form*] on the Issue Date.*

As set out above, the yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield.]

6.    **HISTORIC INTEREST RATES (Floating Rate Notes only)**

Details of historic [LIBOR/EURIBOR/other] rates can be obtained from [Reuters].]*

7.    **PERFORMANCE OF INDEX/ FORMULA/ OTHER VARIABLE, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS AND OTHER INFORMATION CONCERNING THE UNDERLYING (Index-linked or other variable Linked Notes only)**

*Need to include details of where past and future performance and volatility of the index/formula/other variable can be obtained and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident. [Where the underlying is an index need to include the name of the index and a description if composed by the Issuer and if the index is not composed by the Issuer need to include details of where the information about the index can be obtained. Where the underlying is a security need to include the name of the issuer of the security and the ISIN code. Where the underlying is an interest rate need to include a description of the interest rate. Where the underlying is a basket of underlyings need to include the relevant weightings of each underlying in the basket. Where the underlying is not any of the above need to include equivalent information.*]

[*Where Annex XII of the Prospectus Directive applies, include a description of: how any return on the derivative securities takes place, the payment or delivery date and the way such return is calculated, the type of underlying and details of where relevant information can be obtained, any market disruption or settlement disruption event and any adjustment rules with relation to events concerning the underlying.*]

[*(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)*]

The Issuer [intends to provide post-issuance information [*specify what information will be reported and where it can be obtained*]] [does not intend to provide post-issuance information].

---

\*      Not required for Notes with a denomination per unit of at least €50,000.

8. **PERFORMANCE OF RATE[S] OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (Dual Currency Notes only)**

*[Need to include details of where past and future performance and volatility of the relevant rate[s] can be obtained [and a clear and comprehensive explanation of how the value of the investment is affected by the underlying and the circumstances when the risks are most evident.\*]*

*[(When completing this paragraph, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Prospectus under Article 16 of the Prospectus Directive.)]*

9. **OPERATIONAL INFORMATION**

| | |
|---|---|
| ISIN Code: | [  ] |
| Common Code: | [  ] |
| CUSIP No.: | [  ] |
| New Global Note intended to be held in a manner which would allow Eurosystem eligibility: | [Not Applicable°/Yes/No]<br><br>Note that the designation "Yes" simply means that the Notes are intended upon issue to be deposited with Euroclear or Clearstream, Luxembourg as common safekeeper and does not necessarily mean that the Notes will be recognised as eligible collateral for Eurosystem monetary policy and intra-day credit operations by the Eurosystem either upon issue or at any or all times during their life. Such recognition will depend upon an appropriate application being made and upon satisfaction of the Eurosystem eligibility criteria.] To check whether an application has been successfully made see the following page on the website of the European Central Bank [*insert URL*] [*Include this text if "Yes" selected in which case the Notes must be issued in NGN form*] |
| Any clearing system(s) other than DTC, Euroclear and Clearstream, Luxembourg and the relevant identification number(s): | [Not Applicable/*give name(s) and number(s)*] |
| Delivery: | Delivery [against/free of] payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of [  ]=$[  ] producing a sum of (for Notes not denominated in U.S. Dollars): | $[  ] |
| Names and addresses of Additional Paying Agent(s) (if any): | [  ] |

[In the case of Australian Domestic Notes:

(i)     Notes to be listed on the Australian        [Yes/No]
         Stock Exchange:

---

\*      Not required for Notes with a denomination per unit of at least €50,000.

76

|      |                                                                  |                                                                                                                          |
| ---- | ---------------------------------------------------------------- | ------------------------------------------------------------------------------------------------------------------------ |
| (ii) | Agent for service of process in New South Wales:                 | [   ] of [address]                                                                                                       |
| (iii) | Transfer restrictions:                                          | Transfers of Australian Domestic Notes are restricted as provided by Condition 1(j) (Australian Domestic Notes).        |
| (iv) | Australian Registrar:                                            | [   ] of [address]                                                                                                      |
| (v)  | Australian Administration Agent:                                 | [[   ] (see Condition 7(i) (Payments in respect of Australian Domestic Notes))/Not required]                            |

The Notes will be eligible for lodgement into the Austraclear System. Distributions of principal and interest with respect to Notes held through the Austraclear System will be credited to the cash accounts of members of the Austraclear System in accordance with the regulations and the operating manual applicable to the Austraclear System.

Interests in the Notes may be held through Euroclear and Clearstream, Luxembourg indirectly through institutions which are participants in Euroclear and Clearstream, Luxembourg. In such circumstances, Westpac Custodian Nominees Limited (as nominee of, or another nominee appointed by, Euroclear) or ANZ Nominees Limited (as nominee of, or another nominee appointed by, Clearstream, Luxembourg) would hold the interests in the Notes in the Austraclear System. Austraclear Limited will be inscribed as the Holder of such Notes and will therefore be treated by the Issuer and the Australian Registrar as the absolute owner of such Notes for all purposes.

The Issuer will not be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their participants and the investors.]

[In the case of New Zealand Domestic Notes:

(i)    Agent for service of process in New South Wales: [   ] of [address]

(ii)   Transfer restrictions: Transfers of New Zealand Domestic Notes are restricted as provided by Condition 1(j) (New Zealand Domestic Notes)

(iii)  New Zealand Registrar: [   ] of [address]

The Notes will be eligible for lodgement into the Austraclear New Zealand System. Trading of Notes and distributions of principal and interest with respect to Notes held through the Austraclear New Zealand System takes place in accordance with the Austraclear New Zealand Regulations, meaning the rules issued by the Reserve Bank of New Zealand or its successor from time to time and includes the Austraclear New Zealand operating guidelines published by the Reserve Bank of New Zealand, any documentation or advice which is expressly stated to form part of such rules and guidelines, all schedules and appendices of the foregoing, and all amendments or new versions.

Interests in the Notes may be held through Euroclear and Clearstream, Luxembourg indirectly through institutions which are participants in Euroclear and Clearstream, Luxembourg. In such circumstances, entitlements in respect of such Notes would be held through respective New Zealand sub-custodians (being HSBC Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Euroclear or ANZ Nominees Limited as sub-custodian of, or another sub-custodian appointed by, Clearstream, Luxembourg) which in turn would hold such interests in the names of the New Zealand sub-custodians on the books of New Zealand Central Securities Depository Limited. New Zealand Central Securities Depository Limited would be registered as the Holder of such Notes.

The Issuer will not be responsible for the operation of the clearing arrangements which is a matter for the clearing institutions, their participants and the investors.]

---

5.     Specify "Not Applicable" if the Notes being issued are Classic Global Notes/CGNs.

10. **TERMS AND CONDITIONS OF THE OFFER**

| | |
|---|---|
| Offer Price: | [Issue Price][*specify*] |
| Conditions to which the offer is subject: | [Not Applicable/*give details*] |
| Description of the application process: | [Not Applicable/*give details*] |
| Description of possibility to reduce subscriptions and manner for refunding excess amount paid by applicants: | [Not Applicable/*give details*] |
| Details of the minimum and/or maximum amount of application: | [Not Applicable/*give details*] |
| Details of the method and time limits for paying up and delivering the Notes: | [Not Applicable/*give details*] |
| Manner in and date on which results of the offer are to be made public: | [Not Applicable/*give details*] |
| Procedure for exercise of any right of pre-emption, negotiability of subscription rights and treatment of subscription rights not exercised: | [Not Applicable/*give details*] |
| Categories of potential investors to which the Notes are offered and whether tranche(s) have been reserved for certain countries: | [Not Applicable/*give details*] |
| Process for notification to applicants of the amount allotted and the indication whether dealing may begin before notification is made: | [Not Applicable/*give details*] |
| Amount of any expenses and taxes specifically charged to the subscriber or purchaser: | [Not Applicable/*give details*] |
| Name(s) and address(es), to the extent known to the Issuer, of the placers in the various countries where the offer takes place: | [None/*give details*] |

78

## TERMS AND CONDITIONS OF THE NOTES

*The following are the Terms and Conditions of the Notes which will be incorporated by reference in each temporary or permanent global Note in bearer form, each global Note in registered form and will be attached to each definitive Note, in the latter case, only if permitted by the relevant stock exchange or other relevant authority (if any) and agreed by the relevant Issuer and the relevant Dealer(s) at the time of issue but if not so permitted and agreed, such Terms and Conditions will be endorsed upon such definitive Note. The applicable Final Terms in relation to any Tranche of Notes may specify other terms and conditions which shall, to the extent so specified or to the extent inconsistent with such Terms and Conditions, replace or modify the following Terms and Conditions for the purpose of such Notes. The applicable Final Terms or the relevant provisions thereof will be incorporated by reference in each temporary or permanent global Note and each global Note in registered form and endorsed on each definitive Note. Reference should be made to "Form of the Notes" above for a description of the content of Final Terms which will include the definitions of certain terms used in the following Terms and Conditions or specify which of such terms are to apply in relation to the relevant Notes.*

This Note is one of a Series of Notes (the "*Notes*") issued and to be issued pursuant to the Amended and Restated Fiscal Agency Agreement dated July 24, 2008 (as amended, supplemented or replaced from time to time, the "*Fiscal Agency Agreement*") between, amongst others, Lehman Brothers Holdings Inc., a Delaware corporation ("*LBHI*"), Lehman Brothers Treasury Co. B.V., incorporated in The Netherlands as a private company with limited liability ("*LBTCBV*"), Lehman Brothers Bankhaus AG a company incorporated in the Federal Republic of Germany ("*LBB*"), The Bank of New York Mellon, acting through its London Branch, as fiscal agent (the "*Fiscal Agent*", which expression shall include any successor fiscal agent) and as principal paying agent (the "*Principal Paying Agent*"), The Bank of New York Mellon, acting through its New York branch, as registrar (the "*Registrar*"), exchange agent making payments in the case of Notes registered in the name of a nominee of DTC that are denominated in currency other than U.S. Dollars (the "*Exchange Agent*") and the U.S. sub-paying agent (the "*U.S. Sub-Paying Agent*") (together with the Fiscal Agent in its capacity as Principal Paying Agent, the "*Paying Agents*", which expression shall include any additional or successor paying agents). Unless otherwise specified in the applicable Final Terms, The Bank of New York Mellon shall act as calculation agent (The Bank of New York Mellon, or any other or additional calculation agent appointed from time to time by the Issuer, which may include any of the Dealers, the "*Calculation Agent*") for purposes of determining, among other things, the interest rates on Floating Rate Notes, pursuant to the terms of a calculation agency agreement (the "*Calculation Agency Agreement*") agreed to by the relevant Issuer, the Guarantor (if applicable) and the relevant Calculation Agent. The Notes (other than Australian Domestic Notes) have the benefit of a deed of covenant (as amended, supplemented or replaced from time to time, the "*Deed of Covenant*") dated July 24 2008, executed by the Issuers.

The Notes are to be issued by LBHI (such Notes, including when acting through its London Branch "*LBHI Notes*") or LBTCBV ("*LBTCBV Notes*") or LBB (including when acting through its London Branch) ("*LBB Notes*"). The applicable Final Terms will specify which of LBHI, LBTCBV or LBB is the Issuer (the "*Issuer*"). Each LBTCBV Note or LBB Note (as the case may be) shall have the benefit of an unconditional guarantee of LBHI (in such capacity, the "*Guarantor*") as to, inter alia, the payment of principal (including premium, if any, and in the case of Zero Coupon Notes (as hereafter defined), the Accrual Yield Amount (as hereafter defined) payable in respect thereof) and interest, if any, in respect thereof, as evidenced by guarantees in respect of each of LBTCBV and LBB (in respect of each such Note, the "*Guarantee*", and together the "*Guarantees*") each dated July 24, 2008 as amended or supplemented from time to time, among the Guarantor and the third parties referred to therein.

Interest bearing definitive Notes in bearer form (unless otherwise indicated in the applicable Final Terms) have interest coupons ("*Coupons*") and, if indicated in the applicable Final Terms, talons for further Coupons ("*Talons*") attached on issue. Any reference herein to Coupons shall, unless the context otherwise requires, be deemed to include a reference to Talons. Definitive Notes in bearer form repayable in instalments have receipts ("*Receipts*") for the payment of the instalments of principal (other than the final instalment) attached on issue.

The Final Terms in relation to this Note or the relevant provisions thereof is attached hereto, or is endorsed hereon and supplements these Terms and Conditions and may specify other terms and conditions which shall, to the extent so specified or to the extent inconsistent with these Terms and Conditions, replace or modify these Terms and Conditions. References herein to the "*applicable Final Terms*" are to the Final Terms or the relevant provisions thereof attached hereto or endorsed hereon.

As used herein, "*Series*" means each original issue of Notes together with any further issues expressed to form a single series with the original issue which are issued by the same Issuer and which are denominated in the same currency and which have the same Maturity Date, Interest Basis and interest payment dates (if any) (all as indicated in the applicable Final Terms) and the terms of which (except for the Issue Date, the Interest Commencement Date and/or the Issue Price (as indicated as aforesaid)) are otherwise identical (including whether or not the Notes are listed). As used herein, "*Tranche*" means all Notes of the same Series with the same Issue Date, Issue Price and Interest Commencement Date.

Copies of the Fiscal Agency Agreement, the form of Final Terms and each Calculation Agency Agreement are available for inspection and copies of each Final Terms are obtainable at the specified offices of the Fiscal Agent and each of the other Paying Agents, save that a Final Terms relating to an unlisted Note of any Series will only be available for inspection by a Noteholder holding one or more unlisted Notes of that Series and such Noteholder must produce evidence satisfactory to the relevant Paying Agent as to his identity. The holders of the Notes (the "*Noteholders*" or the "*Holders*", which expression shall, in relation to any registered Notes and any Notes represented by a global Note, be construed as provided in Condition 1 (Form and Transfer) below), the holders of the Receipts (the "*Receiptholders*") and the holders of the Coupons (the "*Couponholders*", which expression shall, unless the context otherwise requires, include the holders of the Talons (the "*Talonholders*")) are deemed to have notice of, and are entitled to the benefit of, all the provisions of the Fiscal Agency Agreement, the relevant Deed Poll (if applicable), the relevant Calculation Agency Agreement, if any, and the applicable Final Terms, which are binding on them. The Deed of Covenant is held by the Fiscal Agent and the Bank of New York Mellon, acting through its New York Branch as registrar (the "*Registrar*").

Words and expressions defined in the Fiscal Agency Agreement or used in the applicable Final Terms (which term as used herein means, in relation to this Note, the Final Terms attached hereto) shall have the same meanings where used in these Terms and Conditions unless the context otherwise requires or unless otherwise stated.

1.    **Form and Transfer**

(a)    *Form.* The Notes are either in bearer form or in registered form and, in the case of definitive Notes, serially numbered in the Specified Currency or Currencies and the Specified Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

(b)    *Interest; Instalment Basis.* This Note is a Fixed Rate Note, a Floating Rate Note, a Zero Coupon Note, an Index-Linked Redemption Amount Note, an Index-Linked Interest Note, a Dual Currency Note or an Extendible Note (each as hereafter defined), depending upon the Interest Basis shown in the applicable Final Terms. If so indicated in the applicable Final Terms, this Note may combine any of the foregoing at any one time or may be one or more of the foregoing types of Note for one part of its term and one or more other of the foregoing types for another part of its term. If so indicated in the applicable Final Terms, this Note is also a Partly Paid Note and/or an Instalment Note.

(c)    *Coupons attached.* Bearer Notes in definitive form are issued with Coupons attached, unless they are Zero Coupon Notes in which case reference to Coupons and Couponholders in these Terms and Conditions are not applicable.

(d)    *Transfer of Bearer Notes.* For so long as any Notes are represented by a temporary or permanent global Note in bearer form (i) such Notes will be transferable in accordance with the rules and procedures for the time being of Clearstream Banking, société anonyme, Luxembourg ("*Clearstream, Luxembourg*") and/or Euroclear Bank SA/NV ("*Euroclear*") as the case may be, and (ii) each person

(other than Euroclear or Clearstream, Luxembourg) who is for the time being shown in the records of Clearstream, Luxembourg and/or Euroclear, as the case may be, as the owner of a particular nominal amount of such Notes (in which regard any certificate or other document issued by Clearstream, Luxembourg and/or Euroclear, as the case may be, as to the nominal amount of Notes standing to the account of any person shall be conclusive and binding for all purposes except in the case of manifest error) shall be treated by the Issuer, the Guarantor (if applicable), the Fiscal Agent, and any Paying Agent as a Holder of such nominal amount of Notes (and the term *"Holder"* shall be construed accordingly) for all purposes other than with respect to the payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount (as herein defined) payable in respect thereof) and interest, if any, and any other amounts payable, on such Notes, the right to which shall be vested, as against the Issuer, the Guarantor (if applicable), the Fiscal Agent and any Paying Agent, solely in the bearer of the temporary or permanent global Note or solely in the common depositary for Euroclear and Clearstream, Luxembourg or its nominee as the Registered Holder (as defined below) of the global Note in registered form in accordance with and subject to its terms and the Fiscal Agency Agreement. References to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to any additional or alternative clearing system approved by the Issuers and the Agent. The term *"Holder"* shall also include the bearer of a definitive Note in bearer form.

(e)    *Title to Definitive Notes*. Title to definitive Notes in bearer form, Coupons, Receipts and Talons will pass by delivery. The Issuer, the Guarantor (if applicable), the Fiscal Agent and any Paying Agent may (except as ordered by a court of competent jurisdiction or as required by applicable law) deem and treat the bearer of any definitive Note in bearer form, Couponholder, Receiptholder, or Talonholder as the owner thereof for all purposes (notwithstanding any notice of ownership given or any writing thereon made by anyone) whether or not such definitive Note in bearer form or Coupon, or any Coupon to which any Talon appertains, or Receipt shall be overdue.

(f)    *Note register*. The Registrar shall maintain the Note register in which shall be recorded the names and addresses of Holders of global and definitive Notes in registered form, the numbers of the Notes and other details with respect to issuance, transfer and exchange of such Notes.

(g)    *Transfer of Registered Notes*. All Notes in registered form presented for registration of transfer shall be surrendered to the Registrar at its specified office or at the specified office of any Paying Agent, duly endorsed or accompanied by a written instrument of transfer, in a form satisfactory to the relevant Issuer and the Registrar, duly executed by the Holder thereof or his attorney duly authorised in writing. Upon satisfaction of the above requirements for registration of transfer, and subject to such reasonable and customary regulations as the relevant Issuer may from time to time prescribe, the Registrar shall authenticate and deliver to the transferee or send by mail (at the risk of the transferee) to such address as the transferee may request, definitive Notes in registered form in the name of such transferee, for the same aggregate principal amount as shall have been transferred. Subject to any applicable requirements for minimum denomination, in the case of the transfer of any definitive Note in registered form in part the Registrar shall also authenticate and deliver to the transferor or send by mail (at the risk of the transferor) to such address as the transferor may request, definitive Notes or Notes in registered form registered in the name of the transferor, for the aggregate principal amount that was not transferred.

(h)    *Sums payable on Transfer*. No service charge shall be made for any registration of transfer. However, in connection with any such registration of transfer the relevant Issuer may require payment of a sum sufficient to cover any applicable stamp, tax or any other governmental charge that may be imposed.

(i)    *Owner of Registered Notes*. Prior to satisfaction of the applicable requirements for registration of transfer, the relevant Issuer, the Guarantor (if applicable), the Fiscal Agent, the Registrar and each Paying Agent may (except as ordered by a court of competent jurisdiction or as required by applicable law) deem and treat the Holder of any registered Note as the absolute owner of such Note for the purpose of receiving payment of the principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on such Note

and for all other purposes whatsoever whether or not such Note shall be overdue, and none of such Issuer, the Guarantor (if applicable), the Fiscal Agent, the Registrar or any Paying Agent shall be affected by notice to the contrary. No person shall have any right to enforce any term or condition of any Note under the Contracts (Rights of Third Parties) Act 1999.

## 2.    Status of Notes and Guarantees

(a)    *Status of Senior Notes and Senior Guarantees*

The Senior Notes and the Senior Guarantees will constitute direct, unconditional and (subject to the provisions set forth below in Condition 11 (Negative Pledge with respect to Senior Notes) and in the Fiscal Agency Agreement) unsecured obligations of the Issuer and the Guarantor, respectively, and will rank pari passu in right of payment among the Notes of such Issuer and the Guarantees, respectively, prior to the equity securities of the Issuer and the Guarantor (if applicable) and equally with all other unsecured and unsubordinated obligations of the Issuer and the Guarantor (if applicable) (subject, in the event of insolvency, to laws affecting creditors' rights generally).

(b)    *Status of Subordinated Notes and Subordinated Guarantees*

If the Notes and Guarantees are Subordinated Notes and Subordinated Guarantees, the Subordinated Notes and Subordinated Guarantees and (if applicable) the relative Coupons are direct, unsecured and subordinated obligations of the Issuer and the Guarantor (if applicable), respectively and rank pari passu among themselves and *pari passu* with all other present and future unsecured, unconditional and subordinated indebtedness of such Issuer and the Guarantor (if applicable), respectively.

The Notes and the Guarantees constituting part of the subordinated debt of an Issuer and Guarantor, respectively (the "*Subordinated Debt*"), will be subordinate and junior in the right of payment, to the extent and in the manner set forth in Conditions 2(b), 2(c) (*Status of LBHI Subordinated Notes*) and 10(a)(x) (*Events of Default*), to all present or future Senior Debt. "*Senior Debt*" is defined to mean (a) any indebtedness for money borrowed or evidenced by bonds, notes, debentures or similar instruments, (b) any indebtedness under capitalized leases, (c) any indebtedness representing the deferred and unpaid purchase price of any property or business, and (d) all deferrals, renewals, extensions and refundings of any such indebtedness or obligation; except that the following does not constitute Senior Debt: (i) indebtedness evidenced by the Subordinated Debt, and (ii) indebtedness which is expressly made equal in right of payment with the Subordinated Debt or subordinate and subject in right of payment to the Subordinated Debt. Additionally, in the case of LBHI, the following also does not constitute Senior Debt: (x) indebtedness for goods or materials purchased in the ordinary course of business or for services obtained in the ordinary course of business or indebtedness consisting of trade payables or (y) indebtedness which is subordinated to any obligation of LBHI of the type specified in clauses (a) through (d) above. The effect of clause (y) is that LBHI may not issue or assume any indebtedness for money borrowed which is junior to the Senior Debt and senior to the Subordinated Debt. The Fiscal Agency Agreement does not limit the amount of Senior Debt or other indebtedness that may be issued.

Subordinated Notes issued by LBTCBV will be subordinated and junior in right of payment to the prior payment in full of all Senior Creditors of LBTCBV. "*Senior Creditors*" means all unsubordinated creditors of LBTCBV and all subordinated creditors of LBTCBV whose claims against LBTCBV rank or are expressed to rank ahead of the claims of the Holders of Subordinated Notes.

In respect to Subordinated Notes (Tier 2) issued by LBB, the following provisions will apply:

In the event of the dissolution, liquidation, insolvency, composition or other proceedings for the avoidance of insolvency of, or against, LBB, such obligations will be subordinated to the claims of all unsubordinated creditors of LBB so that in any such event no amounts shall be payable under such obligations until the claims of all unsubordinated creditors of LBB shall have been satisfied in full. No Holder may set off his claims arising under the Notes against any claims of LBB. No security of

82

whatever kind is, or shall at any time be, provided by LBB or any other person securing rights of the Holders under such Notes. No subsequent agreement may limit the subordination pursuant to the provision set out in this Condition 2 or amend the Maturity Date in respect of the Notes to any earlier date or shorten any applicable notice period (*Kündigungsfrist*). If the Notes are redeemed before the Maturity Date otherwise than in the circumstances described in this Condition 2 or as a result of an early redemption according to Condition 5 (2) or repurchased by LBB otherwise than in accordance with the provisions of § 10 (5a) sentence 6 of the German Banking Act (*Kreditwesengesetz*), then the amounts redeemed or paid must be returned to LBB irrespective of any agreement to the contrary unless the amounts paid have been replaced by other liable capital (*haftendes Eigenkapital*) of at least equal status within the meaning of the German Banking Act, or the German Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*) has consented to such redemption or repurchase.

In respect to Subordinated Notes (Tier 3) issued by LBB, the following provisions will apply:

In the event of the dissolution, liquidation, insolvency, composition or other proceedings for the avoidance of insolvency of, or against, LBB, such obligations will be subordinated to the claims of all unsubordinated creditors of LBB so that in any such event no amounts shall be payable under such obligations until the claims of all unsubordinated creditors of LBB shall have been satisfied in full. No Holder may set off his claims arising under the Notes against any claims of LBB. No security of whatever kind is, or shall at any time be, provided by LBB or any other person securing rights of the Holders under such Notes. No payment in respect of the Notes (whether of principal, interest or otherwise) may be made by LBB if such payment would have the consequences that the own funds (*Eigenmittel*) of LBB would no longer meet the statutory requirements applicable from time to time, any payment made in violation of the foregoing must be repaid to LBB irrespective of any agreement to the contrary. No subsequent agreement may limit the subordination pursuant to the provisions set out in this Condition 2 or change the Maturity Date in respect of the Notes to any earlier date or shorten any applicable notice period (*Kündigungsfrist*). If the Notes are redeemed before the Maturity Date otherwise than in the circumstances described in this Condition 2 or repurchased by LBB otherwise than in accordance with the provisions of § 10 (7) sentence 5 of the German Banking Act (*Kreditwesengesetz*), then the amounts redeemed or paid must be returned to LBB irrespective of any agreement to the contrary unless the amounts paid have been replaced by other own funds (*Eigenmittel*) of at least equal status within the meaning of the German Banking Act, or the German Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht*) has consented to such redemption or repurchase.

Subject, in the case of LBHI Subordinated Notes (as defined below) to Condition 2(c) (*Status of LBHI Notes*), in the event (a) of any insolvency or bankruptcy proceedings, or any receivership, liquidation, reorganization or other similar proceedings in respect of the Issuer or the Guarantor (if applicable) or a substantial part of its property, (b) that (i) a default shall have occurred with respect to the payment of principal of or interest on or other monetary amounts due and payable on any Senior Debt or (ii) there shall have occurred an event of default (other than a default in the payment of principal of or interest or other monetary amounts due and payable) with respect to any Senior Debt, as defined therein or in the instrument under which the same is outstanding, permitting the holder or holders thereof to accelerate the maturity thereof (with notice or lapse of time, or both), and such event of default shall have continued beyond the period of grace, if any, in respect thereof, and such default or event of default shall not have been cured or waived or shall not have ceased to exist, or (c) that the principal of and accrued interest on the Subordinated Debt shall have been declared due and payable upon an Event of Default under the Fiscal Agency Agreement and such declaration shall not have been rescinded and annulled as provided therein, then the holders of all Senior Debt shall first be entitled to receive payment of the full amount unpaid thereon in cash before the holders of any of the Subordinated Debt are entitled to receive a payment on account of the principal, premium, if any, or interest, if any, on such Subordinated Debt.

(c)    *Status of LBHI Subordinated Notes*

    (i)    *Agreement to Subordinate*

LBHI, for itself, its successors and assigns, covenants and agrees, and each Holder of Subordinated Notes issued by LBHI ("*LBHI Subordinated Notes*"), by accepting the same, likewise covenants and agrees, that the payment of the principal and interest payable in respect of the LBHI Subordinated Notes is hereby expressly subordinated, to the extent and in the manner set forth in this Condition 2(c), in right of payment to the prior payment in full of all Senior Debt.

    (ii)    *Distribution on Dissolution, Liquidation and Reorganization; Subrogation of the LBHI Subordinated Notes*

Upon any distribution of assets of LBHI upon any dissolution, winding up, liquidation or reorganization of LBHI, whether in bankruptcy, insolvency, reorganization or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of LBHI or otherwise (subject to the power of a court of competent jurisdiction to make other equitable provision reflecting the rights conferred in these Conditions applicable to LBHI Subordinated Notes upon the Senior Debt and the holders thereof with respect to the LBHI Subordinated Notes and the Holders thereof by a lawful plan or reorganization under applicable bankruptcy law),

(A)    the holders of all Senior Debt shall be entitled to receive payment in full of the principal thereof, premium, if any, interest or additional amounts required in respect of certain taxes, and any interest thereon, due thereon before the Holders of the LBHI Subordinated Notes are entitled to receive any payment upon the principal of or interest on the LBHI Subordinated Notes of or interest on overdue amounts thereof; and

(B)    any payment or distribution of assets of LBHI of any kind or character, whether in cash, property or securities, to which the Holders of the LBHI Subordinated Notes or the Fiscal Agent would be entitled except for the provisions of this Condition 2(c) shall be paid by the liquidating trustee or agent or other person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Debt or their representative or representatives or to the agent, trustee or trustees under any agency agreement or indenture under which any instruments evidencing any of such Senior Debt may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of, premium, if any, interest or additional amounts required in respect of certain taxes, and any interest thereon, on the Senior Debt held or represented by each, to the extent necessary to make payment in full of all Senior Debt remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt; and

(C)    in the event that, notwithstanding the foregoing, any payment or distribution of assets of LBHI of any kind or character, whether in cash, property or securities, shall be received by the Fiscal Agent or the Holders of the LBHI Subordinated Notes before all Senior Debt is paid in full, such payment or distribution shall be paid over to the holders of such Senior Debt or their representative or representatives or to the agent, trustee or trustees under any agency agreement or indenture under which any instruments evidencing any of such Senior Debt may have been issued, ratably as aforesaid, for application to the payment of all Senior Debt remaining unpaid until all such Senior Debt shall have been paid in full, after giving effect to any concurrent payment or distribution to the holders of such Senior Debt.

Subject to the payment in full of all Senior Debt, the Holders of the LBHI Subordinated Notes shall be subrogated to the rights of the holders of Senior Debt to receive payments or distributions of cash, property or securities of LBHI applicable to Senior Debt until the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes shall be paid in full and no such payments or distributions to the Holders of the LBHI Subordinated Notes of cash, property or securities otherwise

distributable to the Senior Debt shall, as between LBHI, its creditors other than the holders of Senior Debt, and the Holders of the LBHI Subordinated Notes, be deemed to be a payment by LBHI to or on account of the LBHI Subordinated Notes. It is understood that the provisions of this Condition 2(c) are and are intended solely for the purpose of defining the relative rights of the Holders of the LBHI Subordinated Notes, on the one hand, and the holders of Senior Debt, on the other hand. Nothing contained in this Condition 2(c) or elsewhere in the Fiscal Agency Agreement or in the LBHI Subordinated Notes is intended to or shall impair, as between LBHI, its creditors other than the holders of Senior Debt, and the Holders of the LBHI Subordinated Notes, the obligation of LBHI, which is unconditional and absolute, to pay to the Holders of the LBHI Subordinated Notes the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holders of the LBHI Subordinated Notes and creditors of LBHI other than the holders of Senior Debt, nor shall anything in the Fiscal Agency Agreement or in the LBHI Subordinated Notes prevent the Fiscal Agent or the Holder of any of the LBHI Subordinated Notes from exercising all remedies otherwise permitted by applicable law upon default under the Terms and Conditions applicable to the LBHI Subordinated Notes or the Fiscal Agency Agreement, subject to the rights, if any, under this Condition 2(c) or under the Fiscal Agency Agreement of the holders of Senior Debt in respect of cash, property or securities of LBHI received upon the exercise of any such remedy. Upon any payment or distribution of assets of LBHI referred to in this Condition 2(c), the Fiscal Agent shall be entitled to conclusively rely upon a certificate of the liquidating trustee or agent or other person making any distribution to the Fiscal Agent for the purpose of ascertaining the persons entitled to participate in such distribution, the holders of Senior Debt and other indebtedness of LBHI, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon, and all other facts pertinent thereto or to this Condition 2(c).

The Fiscal Agent, however, shall not be deemed to owe any fiduciary duty to the holders of Senior Debt. The Fiscal Agent shall not be liable to any such holder if it shall pay over or distribute to or on behalf of Holders of the LBHI Subordinated Notes or LBHI moneys or assets to which any holder of Senior Debt shall be entitled by virtue of this Condition 2(c). The rights and claims of the Fiscal Agent under Clause 8 of the Fiscal Agency Agreement shall not be subject to the provisions of this Condition 2(c).

If the Fiscal Agent or any Holder of LBHI Subordinated Notes does not file a proper claim or proof of debt in the form required in any proceeding referred to above prior to 30 days before the expiration of the time to file such claim in such proceeding, then the holder of any Senior Debt is hereby authorized, and has the right, to file an appropriate claim or claims for or on behalf of such Holder of LBHI Subordinated Notes.

(iii)    *No Payment on LBHI Subordinated Notes in Event of Default on Senior Debt*

No payment by LBHI on account of principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes shall be made unless full payment of amounts then due for principal, premium, if any, sinking funds, and interest or additional amounts on Senior Debt has been made or duly provided for in money or money's worth.

(iv)    *Payments on LBHI Subordinated Notes Permitted*

Nothing contained in the Fiscal Agency Agreement or in the LBHI Subordinated Notes shall (a) affect the obligation of LBHI to make, or prevent LBHI from making, at any time except as provided in paragraphs (ii) and (iii), payments of principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes or (b) prevent the application by the Fiscal Agent of any moneys deposited with it hereunder to the payment of or on account of the principal or interest, and any interest thereon, of or on the LBHI Subordinated Notes unless the Fiscal Agent shall have received written notice of any event prohibiting the making of such payment more than two Business Days prior to the date fixed for such payment.

(v)    *Authorization of Holders of LBHI Subordinated Notes to Fiscal Agent to Effect Subordination*

Each Holder of LBHI Subordinated Notes by accepting the same authorizes and directs the Fiscal Agent on its behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in this Condition 2(c) and appoints the Fiscal Agent its attorney-in-fact for any and all such purposes.

(vi)    *Notices to Fiscal Agent*

LBHI shall give prompt written notice to the Fiscal Agent of any fact known to LBHI which would prevent the making of any payment to or by the Fiscal Agent in respect of the LBHI Subordinated Notes. Notwithstanding the provisions of this 2(c) or any other provisions of these Terms and Conditions applicable LBHI Subordinated Notes and the Fiscal Agency Agreement, neither the Fiscal Agent nor any Paying Agent shall be charged with knowledge of the existence of any Senior Debt or of any event which would prohibit the making of any payment of moneys to or by the Fiscal Agent or such Paying Agent, unless and until the Fiscal Agent or such Paying Agent shall have received written notice thereof from LBHI or from the holder of any Senior Debt or from the agent or trustee for any such holder, together with proof satisfactory to the Fiscal Agent of such holding of Senior Debt or of the authority of such trustee; provided, however, that if at least two Business Days prior to the date upon which by the terms hereof any such moneys may become payable for any purpose (including, without limitation, the payment of the principal of or interest on the LBHI Subordinated Notes, or any interest thereon) the Fiscal Agent shall not have received with respect to such moneys or the moneys deposited with it as a condition to such satisfaction and discharge the notice provided for in this paragraph (vi), then, anything herein contained to the contrary notwithstanding, the Fiscal Agent shall have full power and authority to receive such moneys and to apply the same to the purpose for which they were received, and shall not be affected by any notice to the contrary, which may be received by it on or after such two Business Days prior to such date. The Fiscal Agent shall be entitled to conclusively rely on the delivery to it of a written notice by a person representing himself to be a holder of Senior Debt (or an agent or trustee on behalf of such holder) to establish that such a notice has been given by a holder of Senior Debt or an agent or trustee on behalf of any such holder. In the event that the Fiscal Agent determines in good faith that further evidence is required with respect to the right of any person as a holder of Senior Debt to participate in any payment or distribution pursuant to this 2(c), the Fiscal Agent may request such person to furnish evidence to the reasonable satisfaction of the Fiscal Agent as to the amount of Senior Debt held by such person, the extent to which such person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such person under this 2(c) and, if such evidence is not furnished, the Fiscal Agent may defer any payment to such person pending judicial determination as to the right of such person to receive such payment.

(vii)    *Fiscal Agent as holder of Senior Debt.*

The Fiscal Agent shall be entitled to all the rights set forth in this 2(c) in respect of any Senior Debt at any time held by it to the same extent as any other holder of Senior Debt and nothing in these Condition applicable to LBHI Subordinated Notes or in the Fiscal Agency Agreement shall be construed to deprive the Fiscal Agent of any of its rights as such holder.

(viii)    *Modification of Terms of Senior Debt.*

Any renewal or extension of the time of payment of any Senior Debt or the exercise by the holders of Senior Debt of any of their rights under any instrument creating or evidencing Senior Debt, including without limitation the waiver of default thereunder, may be made or done all without notice to or assent from Holders of the LBHI Subordinated Notes or the Fiscal Agent.

No compromise, alteration, amendment, modification, extension, renewal or other change of, or waiver, consent or other action in respect of, any liability or obligation under or in respect of, or of any of the terms, covenants or conditions of any agency agreement, indenture or other instrument

under which any Senior Debt is outstanding or of such Senior Debt, whether or not such release is in accordance with the provisions of any applicable document, shall in any way alter or affect any of the provisions of this 2(c) relating to the subordination thereof.

## 3.    Interest

(a)    *Interest on Fixed Rate Notes*

Each Fixed Rate Note bears interest on its outstanding nominal amount (or, if it is a Partly Paid Note, the amount paid up) from (and including) the Interest Commencement Date at the rate(s) per annum equal to the Fixed Rate(s) of Interest payable in arrear on the Interest Payment Date(s) in each year and on the Maturity Date (if that does not fall on an Interest Payment Date).

Interest will be paid subject to and in accordance with the provisions of Condition 7 (*Payment of Principal and Interest; Paying Agents*). Interest will cease to accrue on each Fixed Rate Note (or, in the case of the redemption of part of a Note, that part only of such Note) on the due date for redemption thereof unless, upon due presentation thereof, payment of principal is improperly withheld or refused in which event interest will continue to accrue (as well after as before any judgment) until whichever is the earlier of (A) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the Holder of such Note and (B) the day on which the Fiscal Agent has notified the Holder thereof (either in accordance with Condition 15 (*Notices*) or individually) of receipt of all sums due in respect thereof up to that date.

Except as provided in the applicable Final Terms, the amount of interest payable on each Interest Payment Date in respect of the Fixed Interest Period ending on such date will amount to the Fixed Coupon Amount. Payments of interest on any Interest Payment Date or the Maturity Date will, if so specified in the applicable Final Terms, amount to the Broken Amount so specified.

As used in these Terms and Conditions, the expression "*Fixed Interest Period*" means the period from (and including) an Interest Payment Date (or the Interest Commencement Date) to (but excluding) the next (or first) Interest Payment Date

If interest is required to be calculated for a period ending other than on an Interest Payment Date, such interest shall be calculated by applying the Fixed Rate of Interest to the Calculation Amount, multiplying such sum by the applicable Day Count Fraction, rounding the resultant figure to the nearest sub-unit of the relevant Specified Currency, half of any such sub-unit being rounded upwards and multiplying such rounded figure by a fraction equal to the Specified Denomination of the relevant Note divided by the Calculation Amount or otherwise in accordance with applicable market convention.

(b)    *Interest on Floating Rate Notes and Index-Linked Interest Notes*

    (i)    *Interest Payment Dates*

Each Floating Rate Note and Index-Linked Interest Note bears interest on its nominal amount (or, if it is a Partly Paid Note, on the amount paid up) from and including the Interest Commencement Date and such interest will be payable in arrear on either:

    (A)    the Interest Payment Date(s) in each year specified in the applicable Final Terms (the period from and including the Interest Commencement Date to but excluding the first Interest Payment Date and each successive period from and including an Interest Payment Date to but excluding the next Interest Payment Date each being an "*Interest Period*"); or

    (B)    if no express Interest Payment Date(s) is/are specified in the applicable Final Terms, each date (each an "*Interest Payment Date*") which falls the number of months or other period specified as the Interest Period in the applicable Final Terms after the preceding

Interest Payment Date or, in the case of the first Interest Payment Date, after the Interest Commencement Date.

If a Business Day Convention is specified in the applicable Final Terms and if any Interest Payment Date would otherwise fall on a day which is not a Business Day, then, if the Business Day Convention specified is:

(1)    in any case where Interest Periods are specified in accordance with Condition 3(b)(i)(B) (Interest Payment Dates) above, the Floating Rate Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such Interest Payment Date shall be brought forward to the immediately preceding Business Day and (B) each subsequent Interest Payment Date shall be the last Business Day in the month which falls the number of months or other period specified as the Interest Period in the applicable Final Terms after the preceding applicable Interest Payment Date occurred; or

(2)    the Following Business Day Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day; or

(3)    the Modified Following Business Day Convention, such Interest Payment Date shall be postponed to the next day which is a Business Day unless it would thereby fall into the next calendar month, in which event such Interest Payment Date shall be brought forward to the immediately preceding Business Day; or

(4)    the Preceding Business Day Convention, such Interest Payment Date shall be brought forward to the preceding Business Day.

In these Terms and Conditions:

"*Business Day*" means for all Conditions:

(A)    in relation to any sum payable in euro, any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007 (TARGET2) is open (a "*TARGET Settlement Day*") and a day on which commercial banks and foreign exchange markets settle payments generally in London and each (if any) Additional Business Centre; and

(B)    in relation to any sum payable in a currency other than euro, a day on which commercial banks and foreign exchange markets settle payments generally in London, in the Principal Financial Centre of the relevant currency and in each (if any) Additional Business Centre; and

"*Principal Financial Centre*" means, in relation to any currency, the principal financial centre for that currency provided, however, that in relation to euro, it means the principal financial centre of such Member State of the European Communities as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent.

(ii)    *Interest Payments*

Interest will be paid subject to and in accordance with the provisions of Condition 7 (Payment of Principal and Interest; Paying Agents). Interest will cease to accrue on each Floating Rate Note or Index-Linked Interest Note (or, in the case of the redemption of part of a Note, that part only of such Note) on the due date for redemption thereof unless, upon due presentation thereof, payment of principal is improperly withheld or refused in which event interest will continue to accrue (as well after as before any judgment) until whichever is the earlier of (A)

88

the day on which all sums due in respect of such Note up to that day are received by or on behalf of the Holder of such Note and (B) the day on which the Fiscal Agent has notified the Holder thereof (either in accordance with Condition 15 (Notices) or individually) of receipt of all sums due in respect thereof up to that day.

(iii)    *Rate of Interest*

The Rate of Interest payable from time to time in respect of Floating Rate Notes and Index-Linked Interest Notes will be determined in the manner specified in the applicable Final Terms, including where the Rate of Interest is to be determined by reference to an index and/or formula or otherwise.

(A)    *ISDA Determination for Floating Rate Notes*

Where ISDA Determination is specified in the applicable Final Terms as the manner in which the Rate of Interest is to be determined, the Rate of Interest for each Interest Period will be the relevant ISDA Rate plus or minus (as indicated in the applicable Final Terms) the Margin (if any) and/or multiplied by the Multiplier (if any). For the purposes of this sub-paragraph (A), "*ISDA Rate*" for an Interest Period means a rate equal to the Floating Rate that would be determined by the Calculation Agent specified in the applicable Final Terms under an interest rate swap transaction if the Calculation Agent was acting as Calculation Agent for that swap transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(1)    the Floating Rate Option is as specified in the applicable Final Terms;

(2)    the Designated Maturity is a period specified in the applicable Final Terms; and

(3)    the relevant Reset Date is either (i) if the applicable Floating Rate Option is based on the London inter-bank offered rate (LIBOR) for a currency, the first day of that Interest Period or (ii) in any other case, as specified in the applicable Final Terms.

For the purposes of this sub-paragraph (A), "*Floating Rate*", "*Calculation Agent*" "*Floating Rate Option*", "*Designated Maturity*", and "*Reset Date*" have the meanings given to those terms in the ISDA Definitions, where "*ISDA Definitions*" means the ISDA 2006 Definitions (as amended and updated as at the date of issue of the first Tranche of the Notes of the relevant Series (as specified in the relevant Final Terms) as published by the International Swaps and Derivatives Association, Inc. (formerly the International Swap Dealers Association, Inc.)).

When this sub-paragraph (A) applies in respect of each relevant Interest Period, the Calculation Agent will be deemed to have discharged its obligations under Condition 3 (b)(iii) (Rate of Interest) in respect of the determination of the Rate of Interest if it has determined the Rate of Interest in respect of such Interest Period in the manner provided in this sub-paragraph (A).

(B)    *Screen Rate Determination for Floating Rate Notes*

Where Screen Rate Determination is specified in the applicable Final Terms, the Rate of Interest for each Interest Period will, subject as provided below, be either:

(1)    the offered quotation; or

(2)    the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of the offered quotations;

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as of the Relevant Time on the

89

relevant Interest Determination Date plus or minus (as indicated in the applicable Final Terms) the Margin (if any) and/or multiplied by the Multiplier (if any), all as determined by the Calculation Agent. If five or more such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean (rounded as provided above) of such offered quotations.

If, in respect of any Interest Period, the Relevant Screen Page is not available or if, in the case of (1) above, no such offered quotation appears or, in the case of (2) above, fewer than three of such offered quotations appear, in each case as at the time specified in the preceding paragraph, the Calculation Agent shall request the principal Relevant Financial Centre office of each of the Reference Banks (as defined below) to provide the Calculation Agent with its offered quotation (expressed as a percentage rate per annum) for the Reference Rate at approximately the Relevant Time on the Interest Determination Date in question. If two or more of the Reference Banks provide the Calculation Agent with such offered quotations, the Rate of Interest for such Interest Period shall be the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of such offered quotations plus or minus (as appropriate) the Margin (if any), all as determined by the Calculation Agent.

If the provisions of the preceding paragraph are applicable and on the relevant Interest Determination Date one only or none of the Reference Banks provides the Calculation Agent with such offered quotations as provided in the preceding paragraph, the Rate of Interest for the relevant Interest Period shall be the rate per annum which the Calculation Agent determines as being the arithmetic mean (rounded if necessary to the fourth decimal place, with 0.00005 being rounded upwards) of the rates, as communicated to (and at the request of) the Calculation Agent by the Reference Banks or any two or more of them, at which such banks were offered, at approximately 11.00 a.m. local time in the Principal Financial Centre of the Specified Currency on such Interest Determination Date, deposits in the Specified Currency, in an amount approximately equal to the nominal amount of the relevant Tranche, for a period equal to the relevant Interest Period plus or minus (as appropriate) the Margin (if any) or, if only one of the Reference Banks provides the Calculation Agent with such offered rates, the offered rate for deposits in the Specified Currency, in an amount approximately equal to the nominal amount of the relevant Tranche, for a period equal to the relevant Interest Period or the arithmetic mean (rounded as provided above) of the offered rates for deposits in the Specified Currency for a period equal to the relevant Interest Period, at which, at approximately 11.00 a.m. local time in the Principal Financial Centre of the Specified Currency on the relevant Interest Determination Date, any one or more banks in the Principal Financial Centre of the Specified Currency (which bank or banks is or are in the opinion of the Issuer suitable for such purpose) informs the Calculation Agent it is quoting to leading European banks plus or minus (as appropriate) the Margin (if any), provided that, if the Rate of Interest cannot be determined in accordance with the foregoing provisions of this paragraph, the Rate of Interest shall be determined as at the last preceding Interest Determination Date at which the Rate of Interest could be determined in accordance with the foregoing provisions (though substituting, where a different Margin is to be applied to the relevant Interest Period from that which applied to the last preceding Interest Period, the Margin relating to the relevant Interest Period in place of the Margin relating to that last preceding Interest Period).

In this Condition 3 (Interest), the expression *"Reference Banks"* means, in the case of (1) above, those banks whose offered rates were used to determine such quotation when such quotation last appeared on the Relevant Screen Page and, in the case of (2) above,

those banks whose offered quotations last appeared on the Relevant Screen Page when no fewer than three such offered quotations appeared.

If "*BBSW*" is specified in the applicable Final Terms it shall mean the average mid rate for Bills (having the meaning that term has in the Bills of Exchange Act 1909 of Australia) having a tenor closest to the Interest Period as displayed on the "BBSW" page of the Reuters Monitor System on the first day of that Interest Period.

(iv)    *Determination of Rate of Interest and Calculation of Interest Amount*

The Calculation Agent will, at or as soon as practicable after each time at which the Rate of Interest is to be determined, determine the Rate of Interest for the relevant Interest Period. The Calculation Agent will notify the Fiscal Agent of the Rate of Interest for the relevant Interest Period as soon as practicable after calculating the same. The Fiscal Agent will calculate the amount of interest payable in respect of each Specified Denomination (each an "*Interest Amount*") for the relevant Interest Period. Each Interest Amount shall be calculated by applying the Rate of Interest to the Calculation Amount, multiplying such sum by the relevant Day Count Fraction, rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards) and multiplying such rounded figure by a fraction equal to the Specified Denomination divided by the Calculation Amount.

(v)    *Notification of Rate of Interest and Interest Amount*

The Calculation Agent will cause each Rate of Interest and Interest Amount determined by it, together with the relevant Interest Payment Date, and any other amount(s) required to be determined by it together with any relevant payment date(s) to be notified to the Paying Agents and each competent authority, stock exchange and/or quotation system (if any) by which the Notes have then been admitted to listing, trading and/or quotation as soon as practicable after such determination but (in the case of each Rate of Interest, Interest Amount and Interest Payment Date) in any event not later than the first day of the relevant Interest Period.

(vi)    *Minimum and/or Maximum Rate of Interest*

If the applicable Final Terms specifies a Minimum Interest Rate for any Interest Period, then, in the event that the Rate of Interest in respect of such Interest Period determined in accordance with the above provisions is less than such Minimum Interest Rate, the Rate of Interest for such Interest Period shall be such Minimum Interest Rate. If the applicable Final Terms specifies a Maximum Interest Rate for any Interest Period, then, in the event that the Rate of Interest in respect of such Interest Period determined in accordance with the above provisions is greater than such Maximum Interest Rate, the Rate of Interest for such Interest Period shall be such Maximum Interest Rate.

(vii)    *Certificates to be Final*

All certificates, communications, opinions, determinations, calculations, quotations and decisions given, expressed, made or obtained for the purposes of the provisions of this Condition 3 (Interest), whether by the Fiscal Agent or, if applicable, the Calculation Agent, shall (in the absence of wilful default, bad faith or manifest error) be binding on the Issuer, the Guarantor (if applicable), the Fiscal Agent, the Calculation Agent (if applicable), the other Paying Agents and all Noteholders, Couponholders and Receiptholders and (in the absence as aforesaid) no liability to the Issuer, the Guarantor (if applicable), the Noteholders, the Receiptholders or the Couponholders shall attach to the Fiscal Agent or the Calculation Agent (if applicable) in connection with the exercise or non-exercise by it of its powers, duties and discretions pursuant to such provisions.

91

(c)  *Dual Currency Notes*

In the case of Dual Currency Notes, if the rate or amount of interest fails to be determined by reference to an exchange rate, the rate or amount of interest payable shall be determined in the manner specified in the applicable Final Terms and payment shall otherwise be made in accordance with Condition 7 (Payment of Principal and Interest; Paying Agents).

(d)  *Partly Paid Notes*

In the case of Partly Paid Notes (other than Partly Paid Notes which are Zero Coupon Notes) interest will accrue as aforesaid on the paid-up nominal amount of such Notes and otherwise as specified in the applicable Final Terms.

(e)  *Option to Defer Interest Payments*

The applicable Final Terms will indicate whether this Condition 3(e) is applicable. If this Condition 3(e) is applicable, the Issuer can defer interest payments on the Notes for up to five years if the Notes are not in default. A deferral of interest payments cannot extend, however, beyond the Maturity Date of the Notes. The period between (a) the Interest Payment Date (the "*Reference Interest Payment Date*") immediately preceding the first Interest Payment Date for which the Issuer has elected to defer interest pursuant to these Conditions and (b) the Interest Payment Date falling closest to the fifth anniversary of the Reference Interest Payment Date or, if earlier, the date on which all interest which has been deferred pursuant to these Conditions is paid in full at the option of the Issuer shall be referred to as a "Deferral Period". During the Deferral Period, interest will continue to accrue on the Notes, compounded on each Interest Payment Date during the Deferral Period. No interest will be due and payable on the Notes until the end of the Deferral Period except upon a redemption of the Notes during a Deferral Period. The Issuer may pay at any time all or any portion of the interest accrued to that point during a Deferral Period. At the end of the Deferral Period or on any redemption date, the Issuer will be obligated to pay all accrued and unpaid interest. Once the Issuer makes all interest payments on the Notes, with accrued and unpaid interest, it can again defer interest payments on Notes as described above.

During any Deferral Period, if LBHI is the Issuer it will not be permitted to:

(i)  declare or pay any dividend on its shares of common stock; or

(ii)  repurchase or redeem any of its non-cumulative preferred stock or common stock at its option.

The above restriction shall not apply to:

(A)  dividends or distributions in the form of the Issuer's common stock;

(B)  any declaration of a dividend in connection with the implementation of a shareholders' rights plan, or the issuance of stock under any such plan in the future, or the redemption or repurchase of any such rights pursuant thereto; and

(C)  purchases of common stock related to the issuance of common stock or rights under any of the Issuer's benefit plans.

(f)  *Interpretation*

For the purposes of these Terms and Conditions, "*Day Count Fraction*" means, in respect of the calculation of an amount of interest for any Interest Period or for any other period of time (such Interest Period or other period, the "*Calculation Period*"), such day count fraction as may be specified in these Conditions on the relevant Final Terms and:

(i)  if "*Actual/Actual (ICMA)*" is specified in the applicable Final Terms:

(a)    where the Calculation Period is equal to or shorter than the Regular Period during which it falls, the actual number of days in the Calculation Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year; and

(b)    where the Calculation Period is longer than one Regular Period, the sum of:

(A)    the actual number of days in such Calculation Period falling in the Regular Period in which it begins divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods in any year; and

(B)    the actual number of days in such Calculation Period falling in the next Regular Period divided by the product of (a) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year;

(ii)    if "**Actual/360**" is so specified, means the actual number of days in the Interest Period divided by 360;

(iii)    if "**Actual/Actual (ISDA)**" is so specified means the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (i) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366; and (ii) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365);

(iv)    if "**Actual/365 (Fixed)**" is so specified means the actual number of days in the Calculation Period divided by 365;

(v)    if "**30/360**" is so specified, means the number of days in the Calculation Period divided by 360 calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Interest Period falls;

"$M_2$" is the calendar month, expressed as number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case $D_1$ will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31 and $D_1$ is greater than 29, in which case $D_2$ will be 30;

(vi)    if "**30E/360" or "Eurobond Basis**" is so specified, means

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

93

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case $D_1$ will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31, in which case $D_2$ will be 30; and

(vii)    if "**30E/360 (ISDA)**" is so specified, means the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$" is the first calendar day, expressed as a number, of the Calculation Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case $D_1$ will be 30; and

"$D_2$" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case $D_2$ will be 30;

"*Regular Period*" means:

(i)    in the case of Notes where interest is scheduled to be paid only by means of regular payments, each period from and including the Interest Commencement Date to but excluding the first Interest Payment Date and each successive period from and including one Interest Payment Date to but excluding the next Interest Payment Date;

(ii)    in the case of Notes where, apart from the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "*Regular Date*" means the day and month (but not the year) on which any Interest Payment Date falls; and

(iii)    in the case of Notes where, apart from one Interest Period other than the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "*Regular Date*" means the day and month (but not the year) on which any Interest Payment Date falls other than the Interest Payment Date falling at the end of the irregular Interest Period.

"*sub unit*" means, with respect to any currency other than euro, the lowest amount of such currency that is available as legal tender in the country of such currency and, with respect to euro, means one cent.

94

**4.    Extendible Notes**

(a)    The applicable Final Terms will indicate whether this Condition 4(a) is applicable. If this Condition 4(a) is applicable, this Note is a Note the Maturity Date of which will be automatically extended for such periods and at such times as are set forth in the applicable Final Terms unless the Holder of such Note elects to terminate the automatic extension of such Note. The applicable Final Terms will set forth the periods and times for which the maturity of such Note is to be automatically renewed, the date beyond which the maturity may not be so renewed, the procedures for Noteholders to elect repayment of such Note in the event of such renewal and other details of such Notes. Notes to which this Condition 4(a) applies may only be issued in registered form.

(b)    The applicable Final Terms will indicate whether this Condition 4(b) is applicable. If this Condition 4(b) is applicable, this Note is a Note as to which the Issuer will have the option to extend the original Maturity Date of such Note. The applicable Final Terms will set forth the number of periods for which the maturity of such Note is extendible, the date beyond which the final maturity may not be extended, the procedure for notification to the Noteholders of such extension, the procedure, if any, for Noteholders to elect repayment of such Notes in the event of such extension and other details of such Notes. Notes to which this Condition 4(b) applies may only be issued in registered form.

**5.    Zero Coupon and Inflation-Linked Notes**

(a)    The applicable Final Terms will indicate whether this Note is a Zero Coupon Note.

*Early redemption of Zero Coupon Notes*

Unless otherwise specified in the applicable Final Terms, the principal amount payable on redemption of a Zero Coupon Note at any time before the Maturity Date shall be an amount (the "*Accrual Yield Amount*") equal to the sum of:

(i)     the Reference Price; and

(ii)    the product of the Accrual Yield (compounded annually) being applied to the Reference Price from (and including) the Issue Date to (but excluding) the date fixed for redemption or (as the case may be) the date upon which the Note becomes due and payable.

Where such calculation is to be made for a period which is not a whole number of years, the calculation in respect of the period of less than a full year shall be made on the basis of such Day Count Fraction as may be specified in the applicable Final Terms for the purposes of this Condition 5 (Zero Coupon Notes) or, if none is so specified, a Day Count Fraction of 30E/360.

*Late payment on Zero Coupon Notes:*

If the principal amount payable in respect of any Zero Coupon Note is improperly withheld or refused, the principal amount shall thereafter by an amount equal to the sum of:

(i)     the Reference Price; and

(ii)    the product of the Accrual Yield (compounded annually) being applied to the Reference Price from (and including) the Issue Date to (but excluding) whichever is the earlier of (i) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Fiscal Agent has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(b)    Notes issued pursuant to the Program may include Notes in respect of which the rate of interest applicable for one or more Interest Periods and/or the redemption amount is calculated by reference to one or more indices relating to the consumer price index or any other formula linked to a measure of inflation in one or more jurisdictions, as specified in the applicable Final Terms. Such Notes are

referred to as "*Inflation-Linked Notes*". Such Notes shall also be Index Linked Interest Notes or Index Linked Redemption Amount Notes.

Section 1.12 of the 2006 ISDA Inflation Derivatives Definitions published by the International Swaps and Derivatives Association, Inc. (the "*ISDA Inflation Definitions*") shall be deemed incorporated by reference into this condition (provided that such terms may be amended in the applicable Final Terms).

The Final Terms for the Inflation-Linked Notes shall specify the relevant Index (or Indices) and Index Sponsor (or Index Sponsors).

For the purposes of this Base Prospectus and any Inflation-Linked Note (unless otherwise specified in the applicable Final Terms):

"*Index*" means each index specified as such in the Final Terms, or any Successor Index determined in accordance with the provisions below.

"*Index Sponsor*" means the entity that publishes or announces (directly or through an agent) the level of the relevant Index.

The applicable Final Terms of Inflation-Linked Notes shall include the following Index and Disruption Event provisions, subject to modification in respect of any particular Tranche of Inflation-Linked Notes.

*Delay of Publication*

(i)     If any level of an Index for a month which is relevant to the calculation of a payment under the Notes (a "*Relevant Level*") has not been published or announced by the day that is five Business Days prior to the next Interest Payment Date in respect of which it is required, or as the case may be, five Business Days prior to the date scheduled for redemption of the Notes, the Calculation Agent shall determine a Substitute Index Level by using the following methodology:

(I)     if applicable, the Calculation Agent will take the same action to determine the Substitute Index Level for the Interest Payment Date as that taken by the calculation agent pursuant to the terms and conditions of the Related Bond; or

(II)     if (I) above does not result in a Substitute Index Level for the Interest Payment Date, then the Calculation Agent shall determine the Substitute Index Level as follows:

Substitute Index Level = Base Level x (Latest Level/Reference Level)

Where:

"*Base Level*" means the level of the Index (excluding "flash estimates") published or announced by the Index Sponsor in respect of the month which is 12 calendar months prior to the month for which the Substitute Index Level is being determined.

"*Latest Level*" means the latest level of the Index (excluding "flash estimates") published or announced by the Index Sponsor prior to the month in respect of which the Substitute Index Level is being calculated.

"*Reference Level*" means the level of the Index (excluding "flash estimates") published or announced by the Index Sponsor in respect of the month that is 12 calendar months prior to the month referred to in "Latest Level" above.

(ii)     If a Relevant Level is published or announced at any time after the day that is five Business Days prior to the next Interest Payment Date in respect of which it is required or, as the case may be, five Business Days prior to the date scheduled for redemption of the Notes, such

Relevant Level will not be used in any calculations. The Substitute Index Level so determined pursuant to paragraph (i) above will be the definitive level for that month.

*Cessation of Publication*

If a level for the Index has not been published or announced for two consecutive months or the Index Sponsor announces that it will no longer continue to publish or announce the Index then the Calculation Agent shall determine a Successor Index (in lieu of any previously applicable Index) for the purposes of the Notes by using the following methodology:

(i)     if at any time (other than after an Early Redemption Event has been designated by the Calculation Agent pursuant to (v) below) a successor index has been designated by the calculation agent pursuant to the terms and conditions of the Related Bond, such successor index shall be designated a "Successor Index" for the purposes of all subsequent payment dates in relation to the Notes, notwithstanding that any other Successor Index may previously have been determined under the other sub-paragraphs of this section; or

(ii)    if, a Successor Index has not been determined under sub-paragraph (i) above and there has been no designation of an Early Redemption Event by the Calculation Agent pursuant to (v) below and a notice has been given or an announcement has been made by an Index Sponsor, specifying that an Index will be superseded by a replacement Index specified by the Index Sponsor, and the Calculation Agent determines that such replacement index is calculated using the same or substantially similar formula or method of calculation as used in the calculation of the previously applicable Index, such replacement index shall be the Index for purposes of the Notes from the date that such replacement Index comes into effect; or

(iii)   if a Successor Index has not been designated by the Calculation Agent under sub-paragraph (i) or (ii) above and there has been no designation of an Early Redemption Event by the Calculation Agent pursuant to (v) below, the Calculation Agent shall ask five leading independent dealers to state what the replacement index for the Index should be. If between four and five responses are received, and of those four or five responses, three or more leading independent dealers state the same index, this index will be deemed the "Successor Index". If three responses are received, and two or more leading independent dealers state the same index, this index will be deemed the "Successor Index", otherwise, no "Successor Index" will be determined under this sub-paragraph (iii). If fewer than three responses are received, no "Successor Index" will be determined under this sub-paragraph and the Calculation Agent will proceed to sub-paragraph (iv) hereof; or

(iv)    if no Successor Index has been deemed under sub-paragraph (i), (ii) or (iii) by the fifth Business Day prior to an Interest Payment Date or, as the case may be, by the fifth Business Day prior to the date scheduled for redemption of the Notes the Calculation Agent will determine an appropriate alternative index for such date, and such index will be deemed a "Successor Index"; or

(v)     if the Calculation Agent determines that there is no appropriate alternative index (an "*Early Redemption Event*"), the Notes will be redeemed at an amount calculated by the Calculation Agent as the Final Redemption Amount of the Notes plus any interest accrued but unpaid less any Unwind Costs. For the purposes of this sub-section, "*Unwind Costs*" means the value (determined in the currency in which the Notes are denominated) of any transfer or stamp tax cost, any early redemption or termination cost, if any, borne by the Issuer or Calculation Agent, as determined by the Calculation Agent, in its sole and absolute discretion, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by, or on behalf of, the Calculation Agent or the Issuer in relation to the issuance of the Notes.

### Rebasing of the Index

If the Calculation Agent determines that the Index has been or will be rebased at any time, the Index as so rebased (the "*Rebased Index*") will be used for purposes of determining the level of an Index from the date of such rebasing; provided, however, that the Calculation Agent shall make such adjustments as are made by the calculation agent pursuant to the terms and conditions of the Related Bond, if any, to the past levels of the Rebased Index so that the Rebased Index levels prior to the date of rebasing reflect the same rate of inflation as the Index before it was rebased. If there is no Related Bond, the Calculation Agent shall make adjustments to the past levels of the Rebased Index so that the Rebased Index levels reflect the same rate of inflation as the Index before it was rebased. Any such rebasing shall not affect any prior payments made under the Notes.

### Material Modification Prior to Interest Payment Date

If, on or prior to the day that is five Business Days before the next Interest Payment Date in respect of which it is required or, as the case may be, five Business Days prior to the date scheduled for redemption of the Notes, the Index Sponsor announces that it will make a material change to an Index then the Calculation Agent shall make any such adjustments to the Index consistent with the adjustments made to the Related Bond, or, if there is no Related Bond, only those adjustments necessary for the modified Index to continue as the Index.

### Manifest Error in Publication

If, within 30 days of publication, the Calculation Agent determines that the Index Sponsor has corrected the level of the Index to remedy a manifest error in its original publication, the Calculation Agent will notify the Fiscal Agent and the Noteholders in accordance with the Terms and Conditions of the Notes of (i) that correction and (ii) the amount that is payable as a result of that correction and the Calculation Agent will take such other action as it may deem necessary to give effect to such correction.

### Related Bond

The Related Bond shall be a bond specified in the Final Terms or if no bond is specified as the Related Bond therein, the Related Bond shall be the Fallback Bond. If the bond specified to be the Related Bond redeems or matures during the term of the Notes, the Related Bond shall be the Fallback Bond.

### Fallback Bond

The Fallback Bond will be a bond selected by the Calculation Agent and issued by the government of the country to whose level of inflation the Index relates and which pays a coupon or redemption amount which is calculated by reference to the Index, with a maturity date which falls on (a) the same day as the Maturity Date (b) the next longest maturity after the Maturity Date if there is no such bond maturing on the Maturity Date, or (c) the next shortest maturity before the Maturity Date if no bond defined in (a) or (b) is selected by Calculation Agent. If the Index relates to the level of inflation in the European Monetary Union, the Calculation Agent will select an inflation-linked bond that constitutes a debt obligation of one of the governments (but not any government agency) of France, Italy, Germany or Spain which pays a coupon or redemption amount which is calculated by reference to the level of inflation in the European Monetary Union. In each case, the Calculation Agent will select the Fallback Bond from those inflation-linked bonds issued on or before the Issue Date of the Notes. If there is more than one bond maturing on the same date, the Fallback Bond shall be selected by the Calculation Agent from those bonds. If the Fallback Bond redeems the Calculation Agent will select a new Fallback Bond on the same basis, but selected from all eligible bonds in issue at the time the original Fallback Bond redeems (including any bond for which the redeemed bond is exchanged).

*Determinations by the Calculation Agent*

All determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for the determination and calculation of any and all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation, any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of this functions, except such as may result from its own wilful default, negligence or bad faith or that of its officers or agents.

Nothing contained herein shall prevent the Calculation Agent from dealing in these Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes.

6.    **Payment Currency**

(a)    *Payment in Specified Currency*

Except as provided below or in the applicable Final Terms, payment of the principal of (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, on each Note will be made in the Specified Currency of such Note (or, if the Specified Currency at the time of such payment is no longer used by the government of the country issuing such currency or for the settlement of transactions by public institutions of or within the international banking community, in such other coin or currency of the country which issued the Specified Currency which at the time of payment is used by the government of the country issuing such currency and for the settlement of transactions by public institutions of or within the international banking community).

(b)    *Specified Currency Unavailable*

Except as provided in Condition 6(a) (Payment in Specified Currency), if the Specified Currency is unavailable due to the imposition of exchange controls or other circumstances beyond the control of the Issuer, or is no longer used by the government of the country which issued such currency or for the settlement of transactions by public institutions of or within the international banking community, such Issuer will be entitled to make such payments in such coin or currency of the United States as is at the time of payment legal tender for the payment of public and private debts on the basis of the most recently available Market Exchange Rate (defined below) for such Specified Currency preceding the day on which such payment is due. Any payment made under such circumstances in U.S. dollars will not constitute an Event of Default (as defined in Condition 10 (Events of Default)) under the Notes. "*Market Exchange Rate*" means the noon buying rate in New York City for cable transfers in non-U.S. currencies as certified for customs purposes by the Federal Reserve Bank of New York for the applicable Specified Currency.

(c)    *Redenomination of Specified Currency*

In the event of an official redenomination of the Specified Currency the obligations of the Issuer to make payments in or with reference to such currency shall, in all cases, be deemed immediately following such redenomination to be obligations to make payments in or with reference to that amount of redenominated currency representing the amount of such currency immediately before such redenomination. Except to the extent the Notes provide for Index-Linked Interest or an Index-Linked Redemption Amount in the applicable Final Terms provide for the adjustment of the amount of principal or interest payable in respect of such Notes pursuant to application of the formulas provided for in the applicable Final Terms, no adjustment will be made to any amount payable under such Notes

99

as a result of any change in the value of the Specified Currency thereof relative to any other currency due solely to fluctuations in exchange rates.

(d)  *Determinations Conclusive*

All determinations referred to in Conditions 6(b) (Specified Currency Unavailable) or 6(c) (Redenomination of Specified Currency) above made by the Fiscal Agent shall be at its sole discretion and shall, in the absence of manifest error, be conclusive for all purposes and binding on the Issuer and all Holders of Notes and any Coupons, Receipts or Talons relating thereto. Holders of Notes and any Coupons, Receipts or Talons relating thereto shall not be entitled to make any claim whatsoever against the Issuer on account of or in relation to such determinations regardless of any errors or omissions with respect thereto which may be made by the Fiscal Agent.

## 7.  Payment of Principal and Interest; Paying Agents

(a)  *Place of Payment*

No payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or interest, if any, in respect of any Note in bearer form (and any Notes in registered form issued by LBHI and having a maturity of 183 days or less) will be made at an office of LBHI, LBTCBV or LBB or any agent of LBHI, LBTCBV or LBB in the United States or by check mailed to any address in the United States or by transfer to an account maintained with a bank located in the United States, except as may be permitted by United States tax law in effect at the time of such payment without detriment to LBHI, LBTCBV or LBB. Notwithstanding the foregoing, such payments may be made in U.S. dollars at an office or agency located in the United States, if (but only if) the Specified Currency is the U.S. dollar and payment of the full amount so payable in U.S. dollars at each office of the Fiscal Agent and of each Paying Agent outside the United States appointed and maintained pursuant to the Fiscal Agency Agreement is illegal or effectively precluded by exchange controls or other similar restrictions and the relevant payment is permitted by applicable U.S. law. Any payment made under such circumstances will not constitute an Event of Default under the Notes. As used in this Condition 7 (Payment of Principal and Interest; Paying Agents), "*United States*" means the United States of America (including the States and the District of Columbia); and its possessions include Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands.

(b)  *Payments on Global Notes*

The principal (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, due in respect of any portion of a temporary global Note in bearer form will be paid in immediately available funds to each of Euroclear and Clearstream, Luxembourg with respect to that portion of such temporary global Note held for its account but only upon receipt by the Fiscal Agent of written certification with respect to such portion from Euroclear or Clearstream, Luxembourg, as the case may be, delivered prior to each such date in the form required by the Fiscal Agency Agreement, dated no earlier than such payment date, which certificate must be based on certifications provided to it by its account holders as to non-U.S. beneficial ownership of interests in such temporary global Note as required by U.S. Treasury regulations and as set forth in the Fiscal Agency Agreement. Payments of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, due in respect of any portion of a permanent global Note in bearer form or a global Note in registered form will be made in immediately available funds to each of Euroclear, Clearstream, Luxembourg or DTC, as applicable, as is appropriate with respect to the portion of such permanent global Note or a global Note in registered form, as the case may be, held for its account without certification as aforesaid. Each of Euroclear, Clearstream, Luxembourg or DTC, as applicable, will undertake in such circumstances to credit any such amounts received by it to the respective accounts of the persons who are the owners of such interests on the date on which such amounts are paid. Any such amounts so received by Euroclear, Clearstream, Luxembourg or DTC, as

applicable, and not so paid shall be returned to the Fiscal Agent immediately prior to the expiration of two years after the receipt thereof.

(c)    *Payments on Definitive Bearer Notes*

Any interest on definitive Notes in bearer form (and any Notes in registered form issued by LBHI and having a maturity of 183 days or less) of a Series shall be payable by check mailed to an address outside the United States or by wire transfer to an account maintained outside the United States upon surrender of any applicable Coupon; payment of instalments of principal (if any), shall be payable by check mailed to an address outside the United States or by wire transfer to an account maintained outside the United States upon surrender of the applicable Receipt and presentation of the Note to which such Receipt relates (without which presentation such Receipt shall not be valid); and principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) on definitive Notes in bearer form of such Series at their maturity shall be payable by check or by wire transfer upon surrender of such Notes, in each case at such offices or agencies of the Fiscal Agent or any Paying Agent outside the United States as LBHI, LBTCBV or LBB may from time to time designate, unless LBHI, LBTCBV or LBB shall have otherwise instructed the Fiscal Agent, or additionally or alternatively, in such other manner as may be set forth or provided for in the applicable Final Terms.

(d)    *Payments on Definitive Registered Notes*

Any interest (other than interest payable at maturity or upon redemption) on definitive Notes in registered form (other than any Notes in registered form issued by LBHI and having a maturity of 183 days or less) of a Series shall be payable by check or (if a Registered Holder shall have designated an account to which payment should be made at least 15 calendar days prior to the date on which payment is due) by wire transfer, to the Holders in whose name such definitive Notes are registered (*"Registered Holders"*) at the close of business on the 15th calendar day (whether or not a Business Day) preceding the date such interest is due and any principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, payable at maturity or upon redemption of definitive Notes in registered form of a Series shall be payable by check or (subject as aforesaid) by wire transfer upon surrender of such Notes, to the Registered Holders, in each case at such offices or agencies of any Paying Agent as LBHI, LBTCBV or LBB may from time to time designate, unless LBHI, LBTCBV or LBB shall have otherwise instructed the Registrar, or additionally or alternatively, in such other manner as may be set forth or provided for in the applicable Final Terms. If registered Notes are issued, a register will be maintained in accordance with the Fiscal Agency Agreement.

(e)    *Payments on Non-Business Days*

Subject to Condition 3(b)(i) (Interest Payment Dates), if any date for payment of any amount in respect of any Note, Receipt or Coupon is not a business day, then the payment to be made on such date may be made on the next day which is a business day, with the same force and effect as if made on the due date. As used in this Condition 7(e) (Payments on Non-Business Days), the term "*business day*" means any day which is both a Business Day (as defined in Condition 3 (Interest)) and, in the case of any Note in bearer form, a day on which commercial banks and foreign exchange markets settle payments generally in the relevant place of presentation of such Note.

(f)    *Stamp Duties, Etc.*

LBHI, LBTCBV and LBB will pay all stamp and other duties, if any, which may be imposed by the United States, The Netherlands or the Federal Republic of Germany or any political subdivision or taxing authority thereof with respect to the execution and delivery of the Fiscal Agency Agreement or the issuance of the Notes.

(g)     *Exchange of Coupons and Talons*

On and after the Interest Payment Date on which the final Coupon on any Coupon sheet matures, the Talon (if any) forming part of such Coupon sheet may be surrendered at the specified office of the Fiscal Agent or any Paying Agent in exchange for a further Coupon sheet including (if such further Coupon sheet does not include Coupons to and including the final date for the payment of interest due in respect of the Note to which it appertains) a further Talon, subject to the provisions of Condition 17 (Prescription). Each Talon shall, for the purposes of these Terms and Conditions, be deemed to mature on the Interest Payment Date on which the final Coupon comprised in the related Coupon sheet matures.

(h)     *Fiscal Agent, Registrar and Paying Agents*

The names of the initial Fiscal Agent, Registrar and Paying Agents and their initial specified offices are set forth below. LBHI, LBTCBV and LBB have initially designated the Fiscal Agent, acting through its principal offices in London, as its Principal Paying Agent for the Notes in bearer form. The Paying Agent located in London is also referred to herein as the *"Principal Paying Agent"*. LBHI, LBTCBV and LBB have covenanted that until the Notes of a Series have been delivered to the Fiscal Agent or the Registrar for cancellation, or monies sufficient to pay the principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on the Notes of such Series will have been made available for payment and either paid or returned to the Issuer as provided in the Notes, there will at all times be (i) a Paying Agent in a Western European city, (ii) if and for so long as the Notes of any Series are listed on the Irish Stock Exchange and/or are admitted to trading and/or quotation by any other competent authority, stock exchange and/or quotation system, a Paying Agent with a specified office in Ireland and/or in such other place as may be required by the rules of such other competent authority, stock exchange and/or quotation system and (iii) a paying agent in an EU Member State that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive. A notice of any change of the Fiscal Agent, Registrar, Principal Paying Agent or Paying Agents will be given to the Holders of the Notes in accordance with Condition 15 (Notices).

**8.      Repayment, Redemption and Repurchase**

(a)     *At Maturity*

Unless previously redeemed or purchased and cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (Payment Currency)). Unless otherwise specified in the applicable Final Terms, the Final Redemption Amount shall be 100% of the Aggregate Nominal Amount outstanding of each Note.

(b)     *Instalment Notes*

If the Notes are repayable in instalments, they will be repaid in the Instalment Amounts on the Instalment Dates specified in the applicable Final Terms.

(c)     *Redemption for Tax Reasons*

The Notes may be redeemed prior to their Maturity Date for tax reasons as provided in Condition 9 (Payments of Additional Amounts; Tax Redemption).

(d)    *Redemption at the Option of the Issuer*

If so specified in the applicable Final Terms, the Issuer may, having (unless otherwise specified in the applicable Final Terms) given not more than 60 nor less than 30 days' notice to the Holders of the Notes in accordance with Condition 15 (Notices) (which notice shall be irrevocable), redeem all or only some of the Notes then outstanding on any Optional Redemption Date and at the Optional Redemption Amount(s) specified in, or determined in the manner specified in, the applicable Final Terms together with accrued interest (if any) to the date fixed for redemption (which date, in the case of Floating Rate Notes or Index-Linked Interest Notes, must be an Interest Payment Date). If the Notes are to be redeemed in part only on any date in accordance with this Condition 8(d) (Redemption at the Option of the Issuer), the Notes to be redeemed shall be in an amount at least equal to the Minimum Redemption Amount and not greater than the Higher Redemption Amount (in each case as may be specified in the applicable Final Terms) and shall be selected by the drawing of lots in such place as the Fiscal Agent (or, if any such option is being exercised in respect of Notes in registered form, the Registrar) approves and in such manner as the Fiscal Agent (or, if any such option is being exercised in respect of Notes in registered form, the Registrar) considers appropriate, subject to compliance with applicable law and the rules of each competent authority, stock exchange and/or quotation system (if any) by which the Notes have then been admitted to listing, trading and/or quotation, and the notice to Noteholders referred to in this Condition 8(d) (Redemption at the Option of the Issuer) shall specify the serial numbers of the Notes so to be redeemed.

(e)    *Redemption at the Option of the Noteholders*

If and to the extent specified in the applicable Final Terms, upon the Holder of any Note giving to the Issuer in accordance with Condition 15 (Notices) not more than 60 nor less than 30 days' notice (unless otherwise specified in the applicable Final Terms), which notice shall be irrevocable, the Issuer will, upon the expiry of such notice, redeem subject to, and in accordance with, the terms specified in the applicable Final Terms in whole or in part such Note (and, if in part, in an amount at least equal to the Minimum Redemption Amount and not greater than the Higher Redemption Amount) on the Optional Redemption Date and at the Optional Redemption Amount specified in, or determined in the manner specified in, the applicable Final Terms together with accrued interest (if any) to the date fixed for redemption. In order to exercise the option contained in this Condition 8(e) (Redemption at the Option of the Noteholders), the Holder of a Note must, not more than 60 nor less than 30 days' (unless otherwise specified in the applicable Final Terms) before the date fixed for redemption, deposit with any Paying Agent such Note together with all unmatured Coupons and Talons relating thereto and a duly completed Put Option Notice in the form obtainable from any Paying Agent. The Paying Agent with which a Note is so deposited shall deliver a duly completed Put Option Receipt to the depositing Noteholder. No Note, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(e) (Redemption at the Option of the Noteholders), may be withdrawn; provided, however, that if, prior to the date fixed for redemption, any such Note becomes immediately due and payable or, upon due presentation of any such Note on the date fixed for redemption, payment of the redemption moneys is improperly withheld or refused, the relevant Paying Agent shall mail notification thereof to the depositing Noteholder at such address as may have been given by such Noteholder in the relevant Put Option Notice and shall hold such Note at its specified office for collection by the depositing Noteholder against surrender of the relevant Put Option Receipt. For so long as any outstanding Note is held by a Paying Agent in accordance with this Condition 8(e) (Redemption at the Option of the Noteholders), the depositor of such Note and not such Paying Agent shall be deemed to be the Holder of such Note for all purposes, *provided, however, that* for so long as any Notes are represented by a temporary or permanent global Note in bearer form, the Notes to be redeemed shall be selected in accordance with the rules and procedures of Euroclear and Clearstream, Luxembourg (to be reflected in the records of Euroclear and Clearstream, Luxembourg as either a pool factor or a reduction in principal amount, at their discretion).

(f)    *Early Redemption Amounts*

For the purposes of paragraph 8(c) (Redemption for Tax Reasons) above and Conditions 9 (Repayment of Additional Amounts; Tax Redemption) and 10 (Events of Default), the Notes will be redeemed at an amount (the "*Early Redemption Amount*") calculated as follows (unless otherwise specified in the applicable Final Terms):

 (i)    in the case of Notes with a Final Redemption Amount equal to the Issue Price, at the Final Redemption Amount thereof;

 (ii)    in the case of Notes with a Final Redemption Amount which is or may be less or greater than the Issue Price, or which is payable in a Specified Currency other than that in which the Notes are denominated, at the amount set out in, or determined in the manner set out in, the applicable Final Terms or, if no such amount or manner is set out in the Final Terms, at their principal amount; or

 (iii)    in the case of Zero Coupon Notes, at their Accrual Yield Amount.

(g)    *Purchases*

The Issuer or any of its subsidiaries or affiliates may at any time purchase Notes (provided that, in the case of definitive Notes in bearer form, all unmatured Receipts and Coupons appertaining thereto are surrendered therewith) in the open market or by tender at any price. Notes purchased as aforesaid may, at the option of the purchaser thereof, be held, resold or surrendered for cancellation.

(h)    *Cancellation*

All Notes redeemed in full by the Issuer will be cancelled forthwith (together with all unmatured Receipts and Coupons surrendered therewith or attached thereto) and may not be reissued or resold.

(i)    *Procedure for Payment upon Redemption*

If notice of redemption has been given in the manner set forth herein, the Notes of a Series to be redeemed shall become due and payable on the redemption date specified in such notice and upon presentation and surrender of the Notes at the place or places specified in such notice, together with all appurtenant Coupons and Talons, if any, maturing subsequent to the redemption date, the Notes shall be paid and redeemed by the Issuer thereof at the places and in the manner and currency therein specified and at the redemption price therein specified together with accrued interest, if any, to the redemption date. If any Fixed Rate Note (other than an Index-Linked Redemption Amount Note or a Dual Currency Note) surrendered for redemption shall not be accompanied by all appurtenant Coupons, if any, maturing after the redemption date (which expression shall include Coupons which are to be issued on exchange of Talons which will have matured on or before the relevant redemption date), such Note may be paid after deducting from the amount otherwise payable an amount equal to the face amount of all such missing Coupons (or, in the case of payment not being made in full, that proportion of the full amount of such missing unmatured Coupons which the sum so paid bears to the total amount due) or the surrender of such missing Coupon or Coupons may be waived by the Issuer, the Guarantor, if applicable, and the Fiscal Agent if they are furnished with such security or indemnity as they may require to save each of them and each other paying agent of the Issuer and, if applicable, the Guarantor harmless. If a deduction is made from the redemption price in the case of any such missing Coupon and thereafter, but prior to five years after the redemption date, the bearer of such Coupon shall surrender such Coupon at a place specified for redemption, such bearer shall be entitled to receive the amount so deducted with respect to such Coupon. Upon any Fixed Rate Note becoming due and payable prior to its Maturity Date, all unmatured Talons, if any, appertaining thereto and maturing on or after such due date will become void and no further Coupons will be issued in respect thereof. Any unmatured Coupons and Talons, whether attached to or missing from any Floating Rate Note, Dual Currency Note or Index-Linked Note surrendered for redemption, will become void at the redemption date for such Note. From and after the redemption date, if monies for the redemption of

Notes called for redemption shall have been made available at the corporate trust office of the Fiscal Agent for redemption on the redemption date, the Notes called for redemption shall cease to bear interest (and in the case of Zero Coupon Notes, cease to increase the Accrual Yield Amount payable in respect thereof), and the only right of the Holders of such Notes shall be to receive payment of the redemption price together with accrued interest, if any, to the redemption date as aforesaid.

**9.      Payment of Additional Amounts; Tax Redemption**

(a)      *Additional Amounts*

The Issuer or the Guarantor, as the case may be, will pay, subject to certain exceptions set forth below and to the right of redemption as provided in Condition 9(b) (Tax Redemption) below, to a Holder of a Note, Coupon or Receipt such additional amounts ("*Additional Amounts*") as may be necessary in order that every net payment of the principal (including premium, if any, and in the case of a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) and interest, if any, on any Note, Coupon or Receipt appertaining thereto, after deduction or withholding for or on account of any present or future tax, assessment or other governmental charge imposed upon such Holder, or by reason of the making of such payments, by the country in which such Issuer or the Guarantor (as the case may be) is organized or in which such payments are regarded as being sourced, or any taxing authority thereof or therein, will not be less than the amount provided for in such Note, such Coupon or in such Receipt to be then due and payable. Neither the Issuer nor the Guarantor, as the case be, shall be required, however, to make any payment for any Additional Amounts for or on account of:

(i)      any tax, assessment or other governmental charge which would not have been imposed but for (A) the existence of any present or former connection between such Holder (or between a fiduciary, settlor, beneficiary of, member or shareholder of, or possessor of a power over, such Holder, if such Holder is an estate, trust, partnership or corporation) and the jurisdiction in which such Issuer or the Guarantor, as the case may be, is organized or in which such payments are regarded as being sourced, including, without limitation, such Holder (or such fiduciary, settlor, beneficiary, member, shareholder or possessor) being or having been a citizen or resident or treated as a resident thereof or being or having been engaged in trade or business or present therein, or having or having had a permanent establishment therein or (B) the presentation of a Note or any Coupon or Receipt appertaining thereto for payment on a date more than 10 days after the Relevant Date (as defined below);

(ii)     any estate, inheritance, gift, sales, transfer, excise, personal property or similar tax, assessment or other governmental charge;

(iii)    in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed by reason of such Holder's past or present status as a passive foreign investment company, a controlled foreign corporation, a personal holding company or foreign personal holding company with respect to the United States, as a private foundation or other tax exempt organization for United States federal income tax purposes, or as a corporation which accumulates earnings to avoid United States federal income tax;

(iv)    any tax, assessment or other governmental charge which is payable otherwise than by withholding from payment of principal of, or interest on, such Note, Coupon or Receipt;

(v)     any tax, assessment or other governmental charge required to be withheld by any Paying Agent from any payment of principal of, or interest on, any Note, Coupon or Receipt (A) if such payment can be made without withholding by any other Paying Agent or (B) in the case of any tax imposed by the United Kingdom, which is presented for payment in the United Kingdom;

(vi)    any tax, assessment or other governmental charge which would not have been imposed but for the failure to comply with certification, information, documentation or other reporting requirements concerning the nationality, residence, identity or connections with the relevant tax authority of the Holder or beneficial owner of such Note, Coupon or Receipt, if such

compliance is required by statute or by regulation as a precondition to relief or exemption from such tax, assessment or other governmental charge;

(vii) in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed on (A) interest received by a Holder or beneficial owner of a Note, Coupon or Receipt that is a 10% shareholder (as defined in Section 871 (b) (3) (B) of the United States Internal Revenue Code of 1986, as amended (the "*Code*"), and the regulations that may be promulgated thereunder) of LBHI or (B) interest that is treated as contingent interest described in Section 871(h)(4) of the Code;

(viii) any withholding or deduction imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income;

(ix) a Noteholder, Receiptholder or Couponholder who would have been able to avoid such withholding or deduction by presenting the relevant Note, Receipt or Coupon to, or arranging to receive payment through, another Paying Agent in a Member State of the EU, or

(x) in the case of any tax imposed by the United States, any tax, assessment or other governmental charge imposed in respect of any Notes issued by (i) LBHI that are not fully principal protected (which means that the Final Redemption Amount may be less than the nominal amount of the Notes); or (ii) LBB or LBTCBV, that are not fully principal protected (as defined in (i) above) and that are linked to an underlying asset which consists (wholly or partly) of a share issued by a U.S. issuer;

(xi) any combination of items (i) through (x);

nor shall any Additional Amounts be paid to any Holder who is a fiduciary or partnership or other than the sole beneficial owner of such Note, Coupon or Receipt appertaining thereto to the extent that a beneficiary or settlor with respect to such fiduciary, or a member of such partnership or a beneficial owner thereof would not have been entitled to the payment of such Additional Amounts had such beneficiary, settlor, member or beneficial owner been the Holder of the Note or any Coupon or Receipt appertaining thereto.

The term "*Relevant Date*" means either (i) the date on which such payment first becomes due or (ii) if the full amount of the moneys payable has not been received by the Fiscal Agent on or prior to such due date, the date on which all moneys then due for payment shall have been so received and notice to that effect shall have been duly given to the Noteholders in accordance with Condition 15 (Notices).

(b)     *Tax Redemption*

Subject to the conditions described below, the Notes of any Series may be redeemed, as a whole but not in part, at the option of the Issuer (or, in the case of LBTCBV Notes and LBB Notes, at the option of the Guarantor), upon not more than 60 days' nor less than 30 days' prior notice (given in accordance with Condition 15 (Notices)) to the Holders thereof at a redemption price equal to the Early Redemption Amount (as defined in Condition 8(f) (Early Redemption Amount)), together with interest accrued, if any, to but excluding the date fixed for redemption (which date, in the case of Floating Rate Notes or Index-Linked Interest Notes, must be an Interest Payment Date), if on the next succeeding Interest Payment Date the Issuer (or, in the case of LBTCBV Notes and LBB Notes, in the case of any payment by the Guarantor pursuant to the Guarantee, the Guarantor) determines that, as a result of any change in or amendment to the laws or treaties, or any regulations or rulings promulgated thereunder, of the country in which the Issuer or the Guarantor, as the case may be, is organized affecting taxation, or any proposed change in such laws, treaties, regulations or rulings, or any change in the official application, enforcement or interpretation of such laws, treaties, regulations or rulings (including a holding by a court of competent jurisdiction in the country in which the Issuer or the Guarantor, as the case may be, is organized affecting taxation) which change or amendment

becomes effective or is proposed on or after the Issue Date of the first Tranche of Notes of that Series, or any other action predicated on such amendment or change taken by any taxing authority or court of competent jurisdiction in the country in which the Issuer or the Guarantor, as the case may be, is organized or the official proposal of such action, whether or not such action or proposal was taken or made with respect to the Issuer or the Guarantor, the Issuer or the Guarantor, as the case may be, has or will or, if the Guarantees were called, would become obligated to pay Additional Amounts on any Note, Coupon or Receipt and such obligation cannot be avoided by the Issuer or the Guarantor, as the case may be, by any reasonable measures available to it which (in the good faith opinion of the Issuer or the Guarantor, as the case may be) will not have a material adverse impact on the conduct of its business; provided that the Notes of any Series may not be so redeemed if, as of the date of an assumption of the obligations of LBTCBV or LBB (as applicable) under the Notes and under the Fiscal Agency Agreement and each Calculation Agency Agreement by any wholly-owned subsidiary of LBHI, such obligation to pay Additional Amounts arises because of the official application or interpretation of the laws or regulations affecting taxation in the country of which such wholly-owned subsidiary is organized. If the relevant Issuer or the Guarantor, as the case may be, provides an opinion of independent counsel licensed to practice law in the appropriate jurisdiction, dated as of the date of such assumption, that no obligation to pay Additional Amounts arises, then that opinion shall be final and binding, solely for purposes of this paragraph, on such Issuer, the Guarantor, the Fiscal Agent, the Registrar and the Holders of the Notes of such Series as to the law of the relevant jurisdiction at the date of such opinion.

Prior to the giving of any notice of redemption pursuant to the preceding paragraph, the Issuer shall deliver to the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) (i) a certificate stating that the Issuer is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Issuer to so redeem have occurred and (ii) an opinion of counsel to such effect based upon such statement of facts.

In addition, no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Issuer or the Guarantor, as the case may be, would be obligated to pay Additional Amounts were a payment in respect of the Notes (or the Guarantees, as the case may be) then due.

If the Issuer (or, in the case of payments made by the Guarantor pursuant to the Guarantee, the Guarantor) determines that any payment made outside the United States by the Issuer or the Guarantor, as the case may be, or any of their paying agents of principal, interest, original issue discount or premium due in respect of any Note in bearer form, Coupon or Receipt would be, under any present or future laws or regulations of the United States, subject to any certification, information or other reporting requirement of any kind, the effect of which requirement is the disclosure to the Issuer or the Guarantor, as the case may be, any paying agent or any governmental authority of the nationality, residence or identity of a beneficial owner of such Note, Coupon or Receipt who is a United States Alien (other than such a requirement (i) that would not be applicable to a payment made by the Issuer or the Guarantor, as the case may be, or any of their paying agents (A) directly to the beneficial owner or (B) to a custodian, nominee or other agent of the beneficial owner, or (ii) that can be satisfied by such custodian, nominee or other agent certifying to the effect that such beneficial owner is a United States Alien, or (iii) that would not be applicable in the case of payment made by any other paying agent, provided that in each case referred to in clauses (i) (B) and (ii) payment by such custodian, nominee or agent to such beneficial owner is not otherwise subject to any such requirement), the Issuer at its election will either (X) redeem the Notes, in whole, at a redemption price equal to the Early Redemption Amount, together with interest accrued, if any, to but excluding the date fixed for redemption, or (Y) if and so long as the conditions of the next succeeding paragraph are satisfied, pay the Additional Amounts specified in such paragraph; provided that if any Holder fails to present its Note, together with all appurtenant Coupons, Receipts and Talons, if any, for redemption specified in clause (X) above, such Holder will not be entitled to any Additional Amounts. The Issuer will make such determination and such election and notify the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) as soon as practicable, and the Fiscal Agent (or, if an option is being exercised in respect of Notes in registered form, the Registrar) will promptly give notice thereof (the "*Determination Notice*"), stating the effective date of such

certification, information or other reporting requirement, whether the Issuer has elected to redeem the Notes or to pay the Additional Amounts specified in the next succeeding paragraph, and (if applicable) the last date by which the redemption of the Notes must take place. If the Issuer elects to redeem the Notes, such redemption will take place on such date, not later than one year after the publication of the Determination Notice, as the Issuer elects by notice to the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) at least 60 days before the redemption date, unless shorter notice is acceptable to the Fiscal Agent. Notwithstanding the foregoing, the Issuer will not so redeem the Notes if the Issuer subsequently determines, not less than 30 days prior to the redemption date, that subsequent payments would not be subject to any such requirement, in which case the Issuer will notify the Fiscal Agent (and, if an option is being exercised in respect of Notes in registered form, the Registrar) which will give prompt notice of such determination and any earlier redemption notice will be revoked and will have no further effect. If the Issuer elects as provided in clause (Y) above to pay Additional Amounts, and as long as the Issuer is obligated to pay such Additional Amounts, the Issuer may subsequently redeem the Notes, at any time, as a whole but not in part, at a redemption price equal to the Early Redemption Amount, together with interest accrued, if any, to but excluding the date fixed for redemption, but without reduction for United States withholding taxes discussed in this paragraph. The term "*United States Alien*" means any person that is, as to the United States, a foreign corporation, a non-resident alien individual, a non-resident alien fiduciary of a foreign estate or trust or a foreign partnership one or more of the members of which is, as to the United States, a foreign corporation, a non-resident alien individual or a non-resident alien fiduciary of a foreign estate or trust.

If and so long as certification, information or other reporting requirements referred to in the immediately preceding paragraph would be fully satisfied by payment of a backup withholding tax or similar charge, the Issuer may elect (or the Guarantor may cause the Issuer to elect, as the case may be), by so stating in the Determination Notice, to have the provisions of this paragraph apply in lieu of the provisions of the preceding paragraph. In such event, the Issuer or the Guarantor, as the case may be, will pay Additional Amounts to Holders who are United States Aliens, provided that the backup withholding tax or similar charge is not a charge which:

(i)    would not be applicable to a payment made to a custodian, nominee or other agent of the beneficial owner or which can be satisfied by such a custodian, nominee or other agent certifying to the effect that such beneficial owner is a United States Alien; provided, however, in each case that payment by such custodian, nominee or agent to such beneficial owner is not otherwise subject to any requirement referred to in this paragraph;

(ii)   is applicable only to payment by a custodian, nominee or other agent of the beneficial owner to such beneficial owner;

(iii)  would not be applicable to a payment made by any other paying agent;

(iv)   is imposed as a result of the fact that the Issuer or the Guarantor, as the case may be, or any paying agent has actual knowledge that the beneficial owner of such Note, Coupon or Receipt is a U.S. person; or

(v)    is imposed as a result of presentation of such Note, Receipt or Coupon for payment more than 10 days after the date on which such payment becomes due and payable or on which payment thereof is duly provided for, whichever occurs later.

## 10.    Events of Default

(a)    *Events of Default*

An "*Event of Default*" with respect to any Note of a particular Series shall mean any one or more of the following:

(i)     default in the payment of any interest or Additional Amounts, if any, upon any Note of that Series and any related Coupon when it becomes due and payable, and continuance of such default for a period of 30 days;

(ii)     default in the payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount thereof) any Note of that Series when it becomes due and payable;

(iii)     default in the making or satisfaction of any sinking fund payment or analogous obligation when the same becomes due and payable by the terms of any Note of that Series, and continuance of such default for a period of 30 days;

(iv)     default in the observance or performance, or breach, of any other material covenants or agreements of the Issuer (or, if applicable, the Guarantor) in respect of the Notes of that Series contained in the Fiscal Agency Agreement or such Notes (other than a covenant or warranty in respect of the Notes of such Series, a default in the performance of which or the breach of which is elsewhere in this section specifically dealt with or which has expressly been included in the Fiscal Agency Agreement or such Notes solely for the benefit of Series of Notes other than that Series), and continuance of such default or breach for a period of 90 days after there has been given, by registered or certified mail, to (A) the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) or, if applicable, the Guarantor and (B) the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) by the Holders of at least 25% in principal amount of the Outstanding (as defined in Condition 12 (Meetings and Amendments)) Notes of that Series a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "*Notice of Default*";

(v)     the entry by a court having jurisdiction in the premises of (A) a decree or order for relief in respect of LBHI in an involuntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or (B) a decree or order adjudging LBHI bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of LBHI under any applicable U.S. federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of LBHI or of any substantial part of its property, or ordering the winding-up or liquidation of its affairs, and the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive days;

(vi)     the commencement by LBHI of a voluntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated bankrupt or insolvent, or the consent by it to the entry of a decree or order for relief in respect of it in an involuntary case or proceeding under any applicable U.S. federal or state bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable U.S. federal or state law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of LBHI or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by LBHI in furtherance of any such action;

(vii)     except as provided in Condition 13 (Assumption of Obligations) hereof, any of the Guarantees shall cease to be in full force or effect, or LBHI shall deny or disaffirm any of its obligations under any of the Guarantees;

(viii)     in the case of LBTCBV Notes, if LBTCBV applies for suspension of payment ("*surséance van betaling*") or is declared bankrupt ("*failliet verklaard*"), in both cases within the meaning of the

Netherlands Bankruptcy Act ("*Faillissementswet*"), or becomes subject to analogous proceedings under the Netherlands Financial Market Supervision Act (*Wet op het financieel toezicht, the "WFT"*), or is unable to pay or shall admit in writing its inability to pay, or shall threaten to stop or suspend payment of, its debts as they fall due or shall otherwise become insolvent or applies for or consents to or suffers the appointment of an administrator, liquidator or receiver of LBTCBV or of the whole or any substantial part of the undertaking, property, assets or revenues of LBTCBV or takes any proceeding under any law for a readjustment or deferment of its obligations or any substantial part of them or makes or enters into a general assignment or an arrangement or composition with or for the benefit of its creditors, or ceases or threatens to cease to carry on all or any substantial part of its business or is wound up;

(ix)    in the case of LBB Notes, if (aa) LBB stops payments or announces that it is not in a position to meet its financial obligations; (bb) bankruptcy, composition or any insolvency proceedings are instituted against LBB which shall not have been dismissed or stayed within 60 days after institution; (cc) LBB applies for institution of such proceedings, or LBB offers or makes an arrangement for the benefit of its creditors generally, due to financial difficulties; or (dd) LBB ceases or through an official action of the Board of Directors of LBB threatens to cease to carry on business, in any case otherwise than in connection with a Reorganisation (as defined below); or

(x)    In the case of LBHI Subordinated Notes, other than as specified in Conditions 10(a)(v) and 10(a)(vi) no event or circumstance described in Conditions 10(a)(i) to 10(a)(ix) shall constitute an "*Event of Default*".

For the purposes of these Terms and Conditions, "*Reorganisation*" means a consolidation, amalgamation, merger or reorganisation of LBB with another company, and

(A)    the terms of the Reorganisation provide that:

–    the obligations of LBB under the Notes (the "*Predecessor*") are assumed by a successor company of the Predecessor which succeeds to the rights and assets of the Predecessor substantially proportionate to the liabilities of the Predecessor, and

–    such successor company does not assume any other substantial obligations or liabilities unless other rights and assets are transferred to it in approximately the same proportion as described above, and

(B)    the Reorganisation does not have any material adverse effect on the Holders or 10 per cent. or more of them.

(b)    *Automatic Rescission in Certain Circumstances*

So long as no other Event of Default has then occurred and is continuing or would result therefrom, if an Event of Default specified in paragraph (viii) shall have occurred, said Event of Default shall automatically be deemed rescinded and annulled if LBHI shall have assumed the obligations of LBTCBV or LBB (as applicable) under such Notes as referred to under Condition 13 (Assumption of Obligations) below within 30 days of the occurrence of such Event of Default.

(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series and any related Coupons or Receipts at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately at their Early Redemption Amount, by a notice in writing to the Issuer and, if applicable, the Guarantor, and upon any such declaration

such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and, if applicable, the Guarantor, and the Fiscal Agent (or, in the case of Notes in registered form, the Registrar), may rescind and annul such declaration and its consequences if (i) the Issuer or, if applicable, the Guarantor, has paid or deposited with the Fiscal Agent a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable: (A) all overdue interest, if any, on all Notes of that Series and any related Coupons and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series and any related Coupons or Receipts may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

## 11.    Negative Pledge with respect to Senior Notes

Except as may be otherwise provided in the Notes of a Series and in the applicable Final Terms, so long as any Senior Note remains Outstanding and unpaid, LBHI will not, and will not permit any Designated Subsidiary (as defined below) to, directly or indirectly, create, issue, assume, incur or guarantee any indebtedness for money borrowed which is secured by a mortgage, pledge, lien, security interest or other encumbrance of any nature on any of the present or future common stock of a Designated Subsidiary unless the Senior Guarantees and the Senior Notes issued by LBHI (and, if LBHI so elects, any other indebtedness of LBHI ranking at least pari passu with the Senior Guarantees and such Senior Notes) shall be secured equally and rateably with (or prior to) such other secured indebtedness for money borrowed so long as it is outstanding. As used herein, the following terms shall have the following meanings: "*Consolidated Net Worth*" means consolidated assets minus consolidated liabilities as calculated in accordance with generally accepted accounting principles in effect in the United States from time to time; "*Designated Subsidiary*" means any present or future consolidated Subsidiary the Consolidated Net Worth of which constitutes at least 5% of the Consolidated Net Worth of LBHI; and "*Subsidiary*" means a corporation more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by LBHI or by one or more other Subsidiaries, or by LBHI and one or more other Subsidiaries. For the purposes of this definition, "*voting stock*" means stock which ordinarily has voting power for the election of directors, whether at all times or only as long as no senior class of stock has such voting power by reason of any contingency.

**12.    Meetings and Amendments**

(a)    *Meetings*

A meeting of Holders of Notes of one or more Series may be called at any time and from time to time by the Issuer to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Notes of such Series to be made, given or taken by Holders of Notes of such Series or to modify, amend or supplement the terms of the Notes of such Series or the Fiscal Agency Agreement as hereinafter provided. The Fiscal Agent (or, in the case of Notes in registered form, the Registrar) may at any time, and shall upon the request of the Issuer, call a meeting of Holders of Notes of one or more Series for any such purpose to be held at such time and at such place as the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) shall determine. Notice of every meeting of Holders of Notes of a Series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given as specified in Condition 15 (Notices) not less than 30 nor more than 60 days' prior to the date fixed for the meeting. In case at any time the Holders of at least 10% in aggregate principal amount of the Outstanding Notes of a Series shall have requested the Issuer to call a meeting of the Holders of Notes of such Series to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Fiscal Agency Agreement or the Notes of such Series, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, the Issuer shall call such meeting for such purposes by giving notice thereof.

(b)    *Quorum Requirements*

To be entitled to vote at any meeting of Holders of Notes of a Series, a person shall be (i) a Holder of Outstanding Notes of such Series or (ii) a person appointed by an instrument in writing as proxy for a Holder or Holders of Outstanding Notes of such Series by such Holder or Holders, which proxy need not be a Holder of Notes. The persons entitled to vote 10% in aggregate principal amount of the Outstanding Notes which may be affected by the action to be taken at such meeting, except as hereinafter provided, shall constitute a quorum for the transaction of all business referred to in the preceding paragraph. No business shall be transacted in the absence of a quorum unless a quorum is represented when the meeting is called to order. In the absence of a quorum within 30 minutes of the time appointed for any such meeting, the meeting shall, if convened at the request of the Holders of Notes (as provided above), be dissolved. In any other case the meeting may be adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. In the absence of a quorum at any such adjourned meeting, such adjourned meeting may be further adjourned for a period of not less than 10 days as determined by the chairman of the meeting prior to the adjournment of such meeting. Notice of the reconvening of any adjourned meeting shall be given as provided in Condition 15 (Notices) except that notice must be given not less than five days prior to the date on which the meeting is scheduled to be reconvened. Subject to the foregoing, at the reconvening of any meeting adjourned for a lack of a quorum two or more persons who are present in person holding Notes which may be affected by the action to be taken at such meeting or who have been appointed by an instrument in writing as proxy for a Holder of such Notes by such Holder, which proxy need not be a Holder of Notes, shall constitute a quorum for the taking of any action set forth in the notice of the original meeting. Notice of the reconvening of such an adjourned meeting shall state expressly the quorum requirements for any such reconvened meeting. Any Holder of a Note who has executed an instrument in writing appointing a person as his proxy shall be deemed to be present for the purposes of determining a quorum and be deemed to have voted; provided that such Holder shall be counted as present or voting only with respect to the matters covered by such instrument in writing (which may include authorization to vote on any other matters as may come before the meeting).

(c)    *Regulations for Meetings*

The Fiscal Agent (or, in the case of a Series of Notes in registered form, the Registrar) may make such reasonable and customary regulations as it shall deem advisable for any meeting of Holders of Notes

of any Series with respect to the proof of the holding of Notes of such Series, the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of votes, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem appropriate.

(d)    *Certain Amendments*

Any meeting of Holders of Notes at which a quorum is present may be adjourned from time to time by a vote of more than 50% in aggregate principal amount of the Outstanding Notes represented at the meeting, and the meeting may be held as so adjourned without further notice. Except as provided in paragraphs 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders) and 12(f) (Amendments without the Consent of Noteholders), any modifications, amendments or waivers to the Fiscal Agency Agreement or the terms and conditions of the Notes of a Series shall require (i) the consent of the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) and (ii) (A) the written consent of Holders of more than 50% in aggregate principal amount of the Outstanding Notes of such Series or (B) the approval of more than 50% of the aggregate principal amount of such Notes represented at a meeting of the Holders of Notes of such Series called in accordance with the provisions set forth above; provided that any such modification, amendment or waiver which affects the Outstanding Notes of more than one Series (as determined by the relevant Issuer (and LBHI, if LBTCBV or LBB is the Issuer)) shall require (X) the written consent of Holders of more than 50% in aggregate principal amount of the Outstanding Notes affected thereby or (Y) the approval of more than 50% of the aggregate principal amount of such Notes represented at such meeting of the Holders of Notes. Except as otherwise provided in paragraph 12(e) (Amendments Requiring Extraordinary Resolution of Noteholders), any such modification, amendment or waiver shall be conclusive and binding on all Holders of Notes, whether or not they have given such consent or were present at such meeting and whether or not notation of such modification, amendment or waiver is made upon the Notes, and on all future Holders of Notes. Any instrument given by or on behalf of any Holder of a Note in connection with any consent to any such modification, amendment or waiver shall be irrevocable once given and shall be conclusive and binding on all subsequent Holders of such Note.

(e)    *Amendments Requiring Extraordinary Resolution of Noteholders*

Notwithstanding the foregoing, no action at any meeting of Holders of Notes, and no modification, amendment, or supplement to the Notes, the Fiscal Agency Agreement or the Guarantees, may (i) change the due date for the payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or any instalment of interest, if any, on any Note of such Series, (ii) reduce the principal amount of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) any Note of such Series, the portion of such principal amount which is payable upon acceleration of the maturity of such Note, the interest rate thereon or the premium payable upon redemption thereof, (iii) change the obligation of the Issuer or the Guarantor, as the case may be, to pay Additional Amounts on any Note of such Series, (iv) except as provided in Conditions 13 (Assumption of Obligations) and 14 (Merger or Consolidation of the Issuer or the Guarantor), modify the obligation of the Guarantor to make payment under the Guarantees, (v) change the Specified Currency in which or the required places at which payment with respect to principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) or interest, if any, in respect of Notes of such Series or the Guarantees related thereto is payable, (vi) impair the right to institute suit for the enforcement of any such payment on or with respect to any Note of such Series or any Coupon or Receipt or the Guarantee, as the case may be, related thereto, (vii) amend the procedures provided for or the circumstances under which the Notes of such Series may be redeemed, (viii) reduce the proportion of the principal amount of Notes of such Series the consent of the Holders of which is necessary to modify or amend the Fiscal Agency Agreement or the terms and conditions of the Notes of such Series or the Guarantees related thereto or to make, take or give any consent, waiver or other action provided hereby or thereby to be made, taken or given, or (ix) reduce the percentage of aggregate principal amount of Notes Outstanding required for the adoption of a resolution or the

113

quorum required at any meeting of Holders of Notes at which a resolution is adopted, in each case, unless such action or modification, amendment or supplement is approved by an extraordinary resolution (an "*Extraordinary Resolution*") as follows: (A) in the case of a Series of Notes issued only in bearer form, the quorum at any meeting of Holders of Notes for passing an Extraordinary Resolution will be any person or persons holding or representing not less than 75%, or at any such adjourned meeting not less than 25%, in aggregate principal amount of the Notes of such Series for the time Outstanding and entitled to be voted at such meeting and an Extraordinary Resolution may be passed by the affirmative vote of not less than 75% in aggregate principal amount of such Notes voted in respect of such Extraordinary Resolution; (B) in the case of a Series of Notes issued only in registered form, an Extraordinary Resolution may only be passed by the affirmative vote of the Registered Holder of each Note of such Series then Outstanding; and (C) in the case of a Series of Notes issued both in bearer and registered form, such Series will be deemed, for the purposes of determining which Extraordinary Resolution voting provisions shall apply, to have been issued only in bearer form.

(f)    *Amendments without the Consent of Noteholders*

LBHI, LBTCBV, LBB and, in the case of the Fiscal Agency Agreement, the Fiscal Agent (or, in the case of Notes in registered form, the Registrar), may agree, without the vote or consent of any Holder of Notes, Couponholder, Receiptholder or Talonholder, to any modification (except as aforesaid) of, or to any waiver or authorization of any breach or proposed breach of, any of the terms and conditions of the Notes or any other provisions of the Fiscal Agency Agreement for the purpose of (i) adding to the covenants of LBHI, LBTCBV or LBB for the benefit of the Holders of Notes, Couponholders, Receiptholders or Talonholders, (ii) surrendering any right or power conferred upon LBHI, LBTCBV or LBB which does not adversely affect the interest of any holders of Notes, Coupons, Receipts or Talons in any material respect, (iii) securing the Notes pursuant to the requirements of the Notes or otherwise for the benefit of the Holders of Notes, Coupons, Receipts or Talons, (iv) subject to the existence of the conditions set forth in Condition 7(a) (Place of Payment), permitting the payment of principal (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, in respect of Notes in bearer form in the United States, (v) evidencing the succession of another corporation to LBHI, LBTCBV or LBB as described in Condition 14 (Merger or Consolidation of the Issuer or the Guarantor) and the assumption by such successor of the covenants and obligations of LBHI or LBTCBV in the Fiscal Agency Agreement and in the Notes, Coupons, Receipts and Talons as permitted by the Notes, (vi) evidencing the assumption by LBHI of the obligations of LBTCBV or LBB under the Fiscal Agency Agreement and the Notes issued by LBTCBV or LBB or the designation by LBHI of one of its wholly-owned Subsidiaries to be the issuer of the Notes previously issued by LBTCBV or LBB, as described in Condition 13 (Assumption of Obligations), (vii) correcting or supplementing any defective provision contained in the Fiscal Agency Agreement or in the Notes, Coupons, Receipts or Talons in a manner which does not adversely affect the interest of any Holders of the Notes, Coupons, Receipts or Talons in any material respect, (viii) amending the certification requirements referred to in Condition 7 (Payment of Principal and Interest; Paying Agents) in order to allow LBHI, LBTCBV or LBB to comply with the certification requirements with respect to nationality or status as required by applicable laws, (ix) making any modification, or granting any waiver or authorization of any breach or proposed breach of, any of the terms and conditions of the Notes or any other provisions of the Fiscal Agency Agreement in any manner which LBHI, LBTCBV or LBB and, in the case of the Fiscal Agency Agreement, the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) may determine and which does not adversely affect the interest of any Holders of Notes, Coupons, Receipts or Talons in any material respect, or (x) making any modification which is of a minor or technical nature or correcting a manifest error.

(g)    *Effect of Amendments*

Notes of a Series authenticated and delivered after the effectiveness of any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other

action may bear a notation in the form approved by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) and the Issuer (and LBHI, if LBTCBV or LBB is the Issuer) as to any matter provided for in such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action. New Notes of such Series modified to conform, in the opinion of the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) and LBHI, to any such modification, amendment, supplement, request, demand, authorization, direction, notice, consent, waiver or other action may be prepared by LBHI, LBTCBV or LBB, authenticated by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) (or any authenticating agent appointed pursuant to the Fiscal Agency Agreement) and delivered in exchange for the Outstanding Notes of such Series.

(h)    *Notes Deemed to be Outstanding*

As used herein, any Note authenticated and delivered pursuant to the Fiscal Agency Agreement shall, as of any date of determination, be deemed to be "*Outstanding*", except: (i) Notes theretofore cancelled by any Paying Agent, the Fiscal Agent or the Registrar or delivered to any Paying Agent, the Fiscal Agent or the Registrar for cancellation or held by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) for reissuance but not reissued by the Fiscal Agent (or, in the case of Notes in registered form, the Registrar); (ii) Notes which have been called for redemption in accordance with their terms or which have become due and payable at maturity or otherwise and with respect to which monies sufficient to pay the principal thereof (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, thereon shall have been made available to the Fiscal Agent; or (iii) Notes in lieu of or in substitution for which other Notes shall have been authenticated and delivered pursuant to the Fiscal Agency Agreement; provided, however, that in determining whether the Holders of the requisite principal amount of Outstanding Notes of a Series are present at a meeting of Holders of Notes of such Series for quorum purposes or have consented to or voted in favour of any request, demand, authorization, direction, notice, consent, waiver, amendment, modification or supplement hereunder, Notes of such Series owned directly or indirectly by LBHI, LBTCBV or LBB or any Affiliate of LBHI, LBTCBV or LBB shall be disregarded and deemed not to be Outstanding. As used herein, the term "*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with LBHI, LBTCBV or LBB. For the purposes of this definition, (i) "*control*" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "*controlling*" and "*controlled*" have meanings correlative to the foregoing; and (ii) "*Person*" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

(i)    *Number of Votes*

The Holder of a Note may, at any meeting of Holders of a Series of Notes at which such Holder is entitled to vote, cast one vote for each currency unit in principal amount of the Notes held by such Holder in which such Notes are denominated. Notwithstanding the foregoing, at any meeting of Holders of more than one Series of Notes, a Holder of a Note which does not specify regular payments of interest, including, without limitation, Zero Coupon Notes, shall be entitled to one vote at any such meeting for each such currency unit of the redemption value of such Note calculated as of the date of such meeting. Where Notes are denominated in one or more currencies other than U.S. dollars, the U.S. dollar equivalent of such Notes shall be calculated at the exchange rates prevailing in the Principal Financial Centre on the date of such meeting or, in the case of written consents or notices, on such date as LBHI shall designate for such purpose and each Holder of such a Note shall have one vote for every U.S. dollar of Notes (converted as aforesaid) which he holds.

(j)    *Written Resolutions*

A resolution in writing signed by or on behalf of all Holders of Notes of a Series who for the time being are entitled to receive notice of a meeting of Holders of Notes of that Series will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Holders of Notes of that Series.

## 13.    Assumption of Obligations

LBHI or any wholly-owned Subsidiary of LBHI may assume the obligations of LBTCBV or LBB (or any corporation which shall have previously assumed the obligations of LBTCBV or LBB (as applicable) as provided in this Condition 13 (Assumption of Obligations); LBTCBV or LBB (as applicable) or such corporation in each case being referred to herein as the "*prior Issuer*") for the due and punctual payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on and Additional Amounts, if any, in respect of the Notes issued by it and the performance of every covenant of the Fiscal Agency Agreement, the Notes and each Calculation Agency Agreement on the part of the prior Issuer to be performed or observed; provided that: (i) LBHI or such Subsidiary of LBHI, as the case may be, shall expressly assume such obligations by an amendment or supplement to the Fiscal Agency Agreement, executed by LBHI and such Subsidiary, if applicable, and delivered to the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) for the benefit of the Holders of the Notes, Coupons, Receipts and Talons; (ii) if such Subsidiary assumes such obligations, LBHI shall, by such amendment or supplement, confirm that its Guarantees shall apply to such Subsidiary's obligations under the Notes, Coupons, Receipts and Talons and the Fiscal Agency Agreement and each Calculation Agency Agreement, as modified by such amendment or supplement; provided, however, that this subsection (ii) shall not apply in the event of such an assumption by a Subsidiary of LBHI, not being incorporated in The Netherlands, the long-term debt securities of which, as of the effective date of such assumption and after giving effect thereto, have a rating from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. which is equal to or higher than those of LBHI; (iii) LBHI or such Subsidiary, as the case may be, shall confirm in such amendment or supplement that LBHI or such Subsidiary, as the case may be, will pay to the Holders such Additional Amounts as provided by, and subject to the limitations set forth in, Condition 9 (Payment of Additional Amounts; Tax Redemption) as may be necessary in order that every net payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, on the Notes will not be less than the amount provided for in the Notes to be then due and payable; provided, that such obligation shall extend to any deduction or withholding for or on account of any present or future tax, assessment or governmental charge imposed upon such payment by any taxing authority of or in the country in which LBHI or any such Subsidiary is organized (it being understood that, except as aforesaid, neither LBHI nor such Subsidiary shall be obligated to make any indemnification or payments in respect of any tax consequences to any Holder of a Note or Couponholder, Receiptholder or Talonholder as a result of the assumption of rights and obligations described herein and which arise as a result of the domicile or residence of such Holder in, or connection of such Holder with, or subjection of such Holder to, any jurisdiction); and (iv) immediately after giving effect to such assumption, no Event of Default and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing.

Upon any such assumption, LBHI or such Subsidiary, as the case may be, shall succeed to, and be substituted for, and may exercise every right and power of, the prior Issuer under the Fiscal Agency Agreement, the Notes issued by the prior Issuer and each Calculation Agency Agreement, with the same effect as if LBHI or such Subsidiary, as the case may be, had been named as the prior Issuer in the Fiscal Agency Agreement, and the prior Issuer shall be released from all liability under the Fiscal Agency Agreement, the Notes issued by it and each Calculation Agency Agreement.

For the avoidance of doubt, no consent of any Holder of Notes is required for the transactions contemplated by this Condition 13 (Assumption of Obligations).

116

In the event that LBHI, during the term of this Program, no longer complies with the conditions described in clause 3.1.19 of the Distribution Agreement (as defined under "*Subscription and Sale*" below), in particular as soon as it becomes aware that it may not continue to have a positive consolidated shareholder's equity (*positief geconsolideerd eigen vermogen*) within the meaning of Section 2:373 of the Dutch Civil Code, either

(a)     the obligations of LBTCBV shall be assumed (in the manner described above) by LBHI or any wholly-owned Subsidiary of LBHI, such Subsidiary not being incorporated in The Netherlands; or

(b)     LBHI shall arrange for its substitution as guarantor of any Notes issued by LBTCBV by a different entity (the "*New Guarantor*") provided that: (i) the New Guarantor shall have a positive consolidated shareholder's equity (as defined above); (ii) the New Guarantor and LBTCBV shall belong to one group (*concern*) as defined in the WFT and (iii) LBTCBV shall be a subsidiary (*dochtermaatschappij*) of the New Guarantor within the meaning of Section 2:24a of the Dutch Civil Code; or

(c)     any Notes issued by LBTCBV shall, in addition to the existing Guarantee by LBHI, be guaranteed by a credit institution that is subject to prudential supervision in The Netherlands, another European Economic Area member state, the U.S., Canada, Japan, Australia or Switzerland.

## 14.    Merger or Consolidation of the Issuer or the Guarantor

So long as any Note remains Outstanding, neither the Issuer nor the Guarantor, if applicable, shall consolidate or amalgamate with or merge into any other corporation or convey, transfer or lease its properties and assets substantially as an entirety to any person unless: (i) the corporation formed by such consolidation or amalgamation or into which such Issuer or the Guarantor, as the case may be, is merged or the person which acquires by conveyance or transfer, or which leases, the properties and assets of such Issuer or the Guarantor, as the case may be, substantially as an entirety shall expressly assume, by an amendment to the Fiscal Agency Agreement executed and delivered to the Fiscal Agent (A) (1) in the case of a successor to an Issuer, the due and punctual payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof), and interest, if any, and Additional Amounts, if any, on all of the Notes and the performance of every covenant in the Notes, each Calculation Agency Agreement and the Fiscal Agency Agreement to be performed by such Issuer and (2) in the case of a successor to LBTCBV or LBB, LBHI shall confirm that the Guarantee shall apply to the obligations of such successor under the Notes, each Calculation Agency Agreement and the Fiscal Agency Agreement; provided that this subsection (i) (A) (2) shall not apply in the event of a conveyance or transfer of the properties and assets of LBTCBV or LBB (as applicable) substantially as an entirety to any corporation, the long-term debt securities of which, as of the effective date of such conveyance or transfer and after giving effect thereto, have a rating from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. which is equal to or higher than those of the Guarantor, so long as such corporation shall assume the obligations of LBHI under the Guarantees, the Fiscal Agency Agreement and each Calculation Agency Agreement in the manner contemplated by the following subsection (i) (B) and (B) in the case of a successor to the Guarantor, the due and punctual performance of the Guarantees and the performance of every covenant in the Fiscal Agency Agreement and each Calculation Agency Agreement on the part of the Guarantor to be performed, which assumption shall provide in each case that such corporation or person, as the case may be, shall pay to the Holder of any Note and any Couponholder, Receiptholder or Talonholder such Additional Amounts as provided by, and subject to the limitations set forth in, Condition 9 (Payment of Additional Amounts; Tax Redemption) as may be necessary in order that every net payment of the principal of (including premium, if any, and in the case of Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) and interest, if any, will not be less than the amount provided for in the Notes to be then due and payable; provided that such obligation shall extend to any deduction or withholding for or on account of any present or future tax, assessment or governmental charge imposed upon such payment by any taxing authority of or in the country in which any such corporation or person is organized (it being understood that except as aforesaid, no such corporation or

person shall be obligated to make any indemnification or payment in respect of any tax consequences to any individual Holder of a Note or Couponholder, Receiptholder or Talonholder as a result of the assumption of rights and obligations described herein and which arise as a result of the domicile or residence of such Holder in, or connection of such Holder with, or subjection of such Holder to, any jurisdiction); (ii) immediately after giving effect to such transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; (iii) if, as a result of any such consolidation, amalgamation or merger or such conveyance, transfer or lease, properties or assets of LBHI, LBTCBV or LBB would become subject to a mortgage, pledge, lien, security interest or other encumbrance which would not be permitted by the Fiscal Agency Agreement or the Notes, LBHI, LBTCBV or LBB such successor corporation or person, as the case may be, shall take such steps as shall be necessary effectively to secure the Notes equally and rateably with (or prior to) all indebtedness secured thereby; and (iv) a certificate, signed by a duly authorized officer of such Issuer or the Guarantor, as the case may be, and a written opinion of counsel, each stating that such consolidation, amalgamation, merger, conveyance, transfer or lease and such document evidencing the assumption by such corporation or person complies with all conditions precedent herein provided for relating to such transaction shall have been made available for inspection by Holders of the Notes at the principal office of the Fiscal Agent and, in the case of Notes in registered form, the Registrar.

Upon any such assumption, such corporation or person, as the case may be, shall succeed to, and be substituted for, and may exercise every right and power of, such Issuer or the Guarantor, as the case may be, under the Fiscal Agency Agreement with the same effect as if such corporation or person had been named as "*Issuer*" or the "*Guarantor*", as the case may be, under the Fiscal Agency Agreement, and thereafter, except in the case of a lease, the predecessor corporation shall be relieved of all obligations and covenants under the Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes, the Coupons, the Receipts and the Talons.

For the avoidance of doubt, no consent of any Holder of Notes is required for the transactions contemplated by this Condition 14 (Merger or Consolidation of the Issuer or the Guarantor).

## 15. Notices

### (a)  *Bearer Notes*

Notices to redeem Notes in bearer form and all other notices to Holders of Notes in bearer form will be valid if published (i) in one leading London daily newspaper (which is expected to be the *Financial Times*), (ii) if any Notes are admitted to trading on the Irish Stock Exchange and the rules of that exchange so require, a daily newspaper having general circulation in Dublin (which is expected to be the Irish Times) and (iii) if any Notes are listed on the Singapore Exchange Securities Trading Limited and the rules of that exchange so require, a daily English language newspaper having general circulation in Singapore (which is expected to be *The Business Times*) or, in the case of (i) or (ii), if such publication is not practicable in the opinion of the Issuer, in another leading English language daily newspaper which is approved by the Issuer with circulation in Europe. The Issuer shall also ensure that notices are duly published in a manner which complies with the rules and regulations of any other stock exchange on which the Notes are for the time being listed. Any notice published in a newspaper as aforesaid shall be deemed to have been given on the date of such publication or, if published more than once, on the date of the first such publication.

In the case of global Notes in bearer form of a Series, there may, so long as such global Notes are held in their entirety on behalf of Euroclear and Clearstream, Luxembourg, be substituted for such publication as aforesaid, the delivery of the relevant notice to Euroclear and Clearstream, Luxembourg for communication by them to Holders of Notes. Any such notice shall be deemed to have been given to Holders of Notes three Business Days after the day on which the said notice was given to Euroclear and Clearstream, Luxembourg.

(b)  *Registered Notes*

Notices to redeem definitive Notes in registered form and all other notices to Holders of definitive Notes in registered form shall (except to the extent otherwise expressly provided) be in writing and shall be addressed to such Holders at their addresses appearing in the note register maintained pursuant to the Fiscal Agency Agreement. In the case of Notes which are listed on the Irish Stock Exchange and, if the rules of that exchange so require, such notices will also be published in a leading newspaper having general circulation in Dublin (which is expected to be the Irish Times).

In the case of global Notes in registered form of a Series, such notices shall be sent to the common depositary for Euroclear and Clearstream, Luxembourg or its nominee, as the Registered Holder, who will in turn forward such notices to Euroclear and Clearstream, Luxembourg for communication by them to Holders of such Notes. Any such notice shall be deemed to have been given to Holders of Notes three Business Days after the day on which the said notice was given to Euroclear and Clearstream, Luxembourg.

(c)  *Notices to the Issuers*

Notices given by any Holders of Notes to LBHI, LBTCBV or LBB shall be in writing and given by delivering the same: (i) in the case of LBHI, to Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, U.S.A., Attention: Treasurer, (ii) in the case of LBTCBV, to Lehman Brothers Treasury Co. B.V., Atrium, Strawinskylaan 3105, 1077 2X Amsterdam, The Netherlands, Attention: L. Kho and (iii) in the case of LBB, to Lehman Brothers Bankhaus AG, Rathenauplatz 1, D-60313 Frankfurt am Main, Germany, Attention: Treasury.

## 16.  Replacement of Notes, Coupons, Receipts and Talons

If any Note, Coupon, Receipt or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Fiscal Agent (or, in the case of Notes in registered form, the Registrar) (and, if the Notes are then admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system which requires the appointment of a Paying Agent in any particular place, the Paying Agent having its Specified Office in the place required by such competent authority, stock exchange and/or quotation system), subject to all applicable laws and competent authority, stock exchange and/or quotation system requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Issuer may reasonably require.

## 17.  Prescription

All amounts paid by the Issuer or the Guarantor, as the case may be, to a Paying Agent for payment of the principal of or premium or interest on any Note and remaining unclaimed for two years after such payment has been made shall be repaid to the Issuer or the Guarantor, as the case may be, and to the extent permitted by law, the Holder of such Note or related Coupon or Receipt thereafter may look only to the Issuer or the Guarantor, as the case may be, for payment. Definitive Notes in bearer form, Receipts and Coupons will become void unless presented for payment within periods of 10 years (in the case of principal) and 5 years (in the case of interest) from the Relevant Date (as defined in Condition 9 (Payment of Additional Amounts; Tax Redemption)). Talons will become void unless presented for exchange for a fresh Coupon sheet within a period of 5 years from the date on which all Coupons on the Coupon sheet to which the Talon appertains have matured. Under the State of New York's statute of limitations, any legal action upon the Notes must be commenced within six years after the payment thereof is due.

## 18.  Further Issues of Notes

Each original issue of Notes together with any further issues expressed to form a single series with the original issue which are issued by the same Issuer, denominated in the same currency, having the same maturity date, bearing interest, if any, on the same basis and at the same rate and the terms of which (but for

the issue date, issue price and the date from which interest accrues) are otherwise identical will constitute a Series (a "*Series*" or the "*Notes of a Series*").

**19.    Governing Law; Consent to Jurisdiction**

(a)    *Governing Law*

The Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes (other than Condition 2(b) in respect of Subordinated Notes issued by LBB), the Coupons, the Receipts, the Talons and the Deed of Covenant and all matters arising from or connected with the Fiscal Agency Agreement, each Calculation Agency Agreement, the Notes (other than Condition 2(b) in respect of Subordinated Notes issued by LBB), the Coupons, the Receipts, the Talons and the Deed of Covenant are governed by, and shall be construed in accordance with, English law. The Guarantees and all matters arising from or connected with the Guarantees, are governed by, and shall be construed in accordance with, the laws of the State of New York.

In case of Subordinated Notes issued by LBB, Condition 2(b) (Status of Subordinated Notes and Subordinated Guarantees) is governed by German law.

In the case of LBHI Subordinated Notes, Condition 2(c) (*Status of LBHI Subordinated Notes*) and all matters arising from or connected with Condition 2(c) (*Status of LBHI Subordinated Notes*), are governed by, and shall be construed in accordance with, the laws of the State of New York.

(b)    *English courts*

The courts of England have exclusive jurisdiction to settle any dispute (a "*Dispute*") arising from or connected with the Notes.

(c)    *Appropriate forum*

Each of LBHI, LBTCBV and LBB agrees that the courts of England are the most appropriate and convenient courts to settle any Dispute and, accordingly, that it will not argue to the contrary.

(d)    *Rights of the Noteholders to take proceedings outside England*

Condition 20(b) (English courts) is for the benefit of the relevant Noteholders only. As a result, nothing in this Condition 20 (Governing law; Consent to jurisdiction) prevents any Noteholder from taking proceedings relating to a Dispute ("*Proceedings*") in any other courts with jurisdiction. To the extent allowed by law, Noteholders may take concurrent Proceedings in any number of jurisdictions.

(e)    *Service of process*

Each of LBHI, LBTCBV and LBB agrees that the documents which start any Proceedings and any other documents required to be served in relation to those Proceedings may be served on it by being delivered to it at 25 Bank Street, London, E14 5LE, England or at any other address in Great Britain at which service of process may be served on it in accordance with Part XXIII of the Companies Act 1985. This Condition 20 (Governing law; Consent to jurisdiction) applies to Proceedings in England and to Proceedings elsewhere. If the appointment of the person mentioned in this Condition 20(e) (Service of Process) ceases to be effective, each of LBHI, LBTCBV and LBB shall forthwith appoint a person in England to accept service of process on its behalf in England and notify the name and address of such person to the Fiscal Agent and, failing such appointment within fifteen days, any Holder of a Note, shall be entitled to appoint such a person by written notice addressed to LBHI, LBTCBV or LBB, as the case may be, and delivered to the relevant Issuer or to the specified office of the Fiscal Agent. Nothing in this paragraph shall affect the right of any Noteholder to serve process in any other manner permitted by law.

### 20.    Fiscal Agent; Registrar

The Fiscal Agency Agreement contains provisions for the indemnification of the Fiscal Agent and the Registrar and for their relief from responsibility. The Fiscal Agent, the Registrar and the Paying Agents are entitled to enter into business transactions with the Issuers without accounting for any profit resulting therefrom.

In acting under the Fiscal Agency Agreement and in connection with the Notes, Coupons, Receipts and Talons, the Fiscal Agent and the Registrar are acting solely as agents of the Issuer and do not assume any obligation towards or relationship of agency or trust for or with any Noteholder, Couponholder, Receiptholder or Talonholder, except that any funds held by the Fiscal Agent or the Registrar for payment of any sums due in respect of the Notes or any Coupons or Receipts shall be held in trust by it for the Noteholders, the Couponholders and the Receiptholders (as the case may be) until the expiration of the period set forth in Condition 17 (Prescription) and shall be applied as set forth herein, but need not be segregated from other funds held by it, except as required by law. For a description of the duties and the immunities and rights of the Fiscal Agent and the Registrar under the Fiscal Agency Agreement, reference is made to the Fiscal Agency Agreement, and the obligations of the Fiscal Agent and the Registrar to the Holder of each Note are subject to such immunities and rights.

### 21.    Rounding

For the purposes of any calculations referred to in these Conditions (unless otherwise specified in these Conditions or the relevant Final Terms), (a) all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with 0.000005 per cent. being rounded up to 0.00001 per cent.), (b) all United States dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one half cent being rounded up), (c) all Japanese Yen amounts used in or resulting from such calculations will be rounded downwards to the next lower whole Japanese Yen amount, and (d) all amounts denominated in any other currency used in or resulting from such calculations will be rounded to the nearest two decimal places in such currency, with 0.005 being rounded upwards.

### 22.    Descriptive Headings

The descriptive headings appearing in these Terms and Conditions are for convenience of reference only and shall not alter, limit or define the provisions hereof.

**Annex 1**

**Amendments to the Terms and Conditions of the Notes in respect of Australian Domestic Notes**

*The terms and conditions of Australian Domestic Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Australian Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Australian Conditions, the Australian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)    **General**

For the purpose of this Base Prospectus, *"Australian Domestic Notes"* means any Tranche of Notes denominated in Australian dollars and issued by LBTCBV or LBHI in the Australian domestic capital markets, as specified in the applicable Final Terms.

The Australian Domestic Notes will be issued pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form with Austraclear Limited as operator of the Austraclear System.

(B)    **Amendments to the Terms and Conditions in respect of the Australian Domestic Notes**

(a)    **Form, Denomination and Title**

The following paragraph shall be added to the end of Condition 1 (*Form and Transfer*):

"(j) *Australian Domestic Notes*

In the case of Australian Domestic Notes, the following provisions of this Condition 1(j) (*Australian Domestic Notes* shall apply in lieu of the foregoing provisions of this Condition 1 in the event of any inconsistency. Australian Domestic Notes will be debt obligations of LBTCBV or LBHI, as the case may be, owing under separate deeds poll to be executed by LBTCBV and LBHI (each as amended, supplemented or replaced from time to time, a "*Deed Poll*" and together, the "*Deeds Poll*") and will take the form of entries in a register (the "*Australian Register*") to be maintained by an Australian registrar to be appointed by LBTCBV or LBHI, as the case may be, as specified in the applicable Final Terms (the "*Australian Registrar*"). Australian Domestic Notes will have the benefit of the Guarantee of the Guarantor. The Fiscal Agency Agreement is not applicable to Australian Domestic Notes.

Australian Domestic Notes will not be serially numbered. Each entry in the Australian Register constitutes a separate and individual acknowledgement to the relevant Noteholder of the indebtedness of LBTCBV to the relevant Noteholder. The obligations of LBTCBV and LBHI, as the case may be, in respect of each Australian Domestic Note constitute separate and independent obligations which the Holder to whom those obligations are owed is entitled to enforce without having to join any other Holder or any predecessor in title of a Holder. No certificate or other evidence of title will be issued by or on behalf of LBTCBV or LBHI, as the case may be, to evidence title to an Australian Domestic Note unless LBTCBV or LBHI, as the case may be, determines that certificates should be made available or it is required to do so pursuant to any applicable law or regulation.

No Australian Domestic Note will be registered in the name of more than four persons. A Note registered in the name of more than one person is held by those persons as joint tenants. Australian Domestic Notes will be registered by name only without reference to any trusteeship. The person registered in the Australian Register as a Noteholder of an Australian Domestic Note will be treated by LBTCBV or LBHI, as the case may be, and the Australian Registrar as absolute owner of that Australian Domestic Note and none of LBTCBV, LBHI, the Guarantor or the Australian Registrar is, except as ordered by a court or as required by statute,

obliged to take notice of any other claim to an Australian Domestic Note. For the avoidance of doubt, where an Australian Domestic Note is entered into the Austraclear System, the expression Holder includes Austraclear as operator of the Austraclear System.

Upon a person acquiring title to any Australian Domestic Note by virtue of becoming registered as the owner of that Australian Domestic Note, all rights and entitlements arising by virtue of the relevant Deed Poll in respect of that Australian Domestic Note vest absolutely in the registered owner of the Australian Domestic Note, such that no person who has previously been registered as the owner of the Australian Domestic Note has or is entitled to assert against the LBTCBV or LBHI, as the case may be, or the Australian Registrar or the registered owner of the Australian Domestic Note for the time being and from time to time any rights, benefits or entitlements in respect of the Australian Domestic Note.

Conditions 1(c) (*Coupons Attached*) to 1(i) (*Owner of Registered Notes*) inclusive do not apply to Australian Domestic Notes. Australian Domestic Notes may be transferred in whole but not part.

Australian Domestic Notes will be transferable by duly completed and (if applicable) stamped transfer and acceptance forms in the form specified by, and obtainable from, the Australian Registrar or by any other manner approved by LBTCBV or LBHI, as the case may be, and the Australian Registrar. Notes entered in the Austraclear System (as defined below) will be transferable only in accordance with the Austraclear Regulations (as defined below).

Unless the Australian Domestic Notes are lodged in the Austraclear System, application for the transfer of Australian Domestic Notes must be made by the lodgement of a transfer and acceptance form with the Australian Registrar. Each transfer and acceptance form must be accompanied by such evidence (if any) as the Australian Registrar may require to prove the title of the transferor or the transferor's right to transfer the Australian Domestic Note and be signed by both the transferor and the transferee.

The transferor of an Australian Domestic Note is deemed to remain the Holder of that Australian Domestic Note until the name of the transferee is entered in the Australian Register in respect of that Australian Domestic Note. Transfers will not be registered later than eight days prior to the Maturity Date of the Australian Domestic Note.

Australian Domestic Notes may only be transferred in, to or from Australia if (a) the aggregate consideration payable by the transferee at the time of transfer is at least A$500,000 (or the equivalent in another currency and, in either case disregarding moneys lent by the transferor or its associates) or the offer or invitation giving rise to the transfer otherwise does not require disclosure to investors in accordance with Part 6D.2 of the Corporations Act 2001 of Australia, and (b) the transfer is in compliance with all other applicable laws, regulations or directives and does not require any document to be lodged or registered with the Australian Securities and Investments Commission. Australian Domestic Notes may only be transferred between persons in a jurisdiction or jurisdictions other than Australia if (a) a transfer and acceptance form is signed outside Australia, and (b) the transfer is in compliance with the laws of the jurisdiction in which the transfer takes place. A transfer to an unincorporated association is not permitted.

Transfers will be registered without charge provided taxes, duties or other governmental charges (if any) imposed in relation to the transfer have been paid.

A person becoming entitled to an Australian Domestic Note as a consequence of the death or bankruptcy of a Holder or of a vesting order or a person administering the estate of a Holder may, upon producing such evidence as to that entitlement or status as the Australian Registrar considers sufficient, transfer the Australian Domestic Note or, if so entitled, become registered as the Holder of the Australian Domestic Note.

Where the transferor executes a transfer of less than all Australian Domestic Notes registered in its name, and the specific Australian Domestic Notes to be transferred are not identified, the

Australian Registrar may register the transfer in respect of such of the Australian Domestic Notes registered in the name of the transferor as the Australian Registrar thinks fit, provided the aggregate principal amount of the Australian Domestic Notes registered as having been transferred equals the aggregate principal amount of the Australian Domestic Notes expressed to be transferred in the transfer.

If Austraclear Services Limited (ABN 28 003 284 419) is the Australian Registrar and the Australian Domestic Notes are lodged in the Austraclear System, despite any other provision of these Terms and Conditions, the Australian Domestic Notes are not transferable on the Australian Register, and LBTCBV or LBHI, as the case may be, may not, and must procure that the Australian Registrar does not, register any transfer of the Australian Domestic Notes issued by it and no member of the Austraclear System has the right to request any registration of any transfer of such Australian Domestic Notes, except:

(a)    in the case of any repurchase, redemption or cancellation (whether on or before the Maturity Date of the Australian Domestic Notes) of such Australian Domestic Notes, a transfer of the relevant Australian Domestic Notes from Austraclear to LBTCBV or LBHI, as the case may be, may be entered in the Australian Register; and

(b)    if Austraclear exercises any power it may have under the Austraclear Regulations or these Terms and Conditions to require the relevant Australian Domestic Notes to be transferred on the Australian Register to a member of the Austraclear System, the relevant Australian Domestic Notes may be transferred on the Australian Register from Austraclear to the member of the Austraclear System.

In any of these cases, the relevant Australian Domestic Notes will cease to be held in the Austraclear System.

Where Austraclear is recorded in the Australian Register as the holder of an Australian Domestic Note, each person in whose Security Record (as defined in the Austraclear Regulations) an Australian Domestic Note is recorded is deemed to acknowledge in favour of the Australian Registrar and Austraclear that:

(a)    the Australian Registrar's decision to act as the Australian Registrar of that Australian Domestic Note does not constitute a recommendation or endorsement by the Australian Registrar or Austraclear in relation to that Australian Domestic Note, but only indicates that the holding of such Australian Domestic Note is considered by the Australian Registrar to be compatible with the performance by it of its obligations as Australian Registrar under the Agency and Registry Services Agreement (as defined in Condition 7); and

(b)    the holder of the Australian Domestic Note does not rely on any fact, matter or circumstance contrary to paragraph (a).

In this Condition 1(j) (*Australian Domestic Notes*):

*Austraclear* means Austraclear Limited (ABN 94 002 060 773).

*Austraclear Regulations* means the rules and regulations established by Austraclear from time to time to govern the use of the Austraclear System.

*Austraclear System* means the system operated by Austraclear for holding securities and the electronic recording and settling of transactions in those securities between members of that system."

(b)    **Interest**

(i)    The definition of "Business Day" in Condition 3(b)(i) shall not apply to Condition 7(i) (*Payments in respect of Australian Domestic Notes*).

124

(ii)    The definition of "Principal Financial Centre" in Condition 3(b)(i) shall be deleted and replaced with the following:

""*Principal Financial Centre*" means, in relation to any currency, the principal financial centre for that currency provided, however, that:

(i)    in relation to euro, it means the principal financial centre of such Member State of the European Communities as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent; and

(ii)    in relation to Australian dollars, it means either Sydney or Melbourne, as selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent."

(iii)    Condition 3(b)(iv)(G) shall be deleted and replaced with the following:

"if "*RBA Bond Basis*" is specified as the applicable day count fraction in the applicable Final Terms, it shall mean one divided by the number of Interest Payment Dates in a year."

(c)    **Payment of Principal and Interest; Paying Agents**

(i)    Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to Australian Domestic Notes.

(ii)    The following paragraph shall be added at the end of Condition 7:

"(i) *Payments in respect of Australian Domestic Notes*

The Australian Registrar or, depending on the identity of the Australian Registrar, an administration agent appointed by LBTCBV or LBHI, as the case may be, *("Australian Administration Agent")* will act (through an office in Sydney) as principal paying agent for the Australian Domestic Notes pursuant to an Agency and Registry Services Agreement (as amended, supplemented or replaced from time to time, the *"Agency and Registry Services Agreement")* to be entered into between LBTCBV or LBHI, as the case may be, the Australian Registrar and (depending on the identity of the Australian Registrar) the Australian Administration Agent as described in the applicable Final Terms. If required, the Australian Administration Agent will act as the agent of LBTCBV or LBHI, as the case may be, for certain purposes pursuant to an Issuing and Payment Administration Agreement to be entered into between LBTCBV or LBHI, as the case may be, and the Australian Administration Agent (as amended, supplemented or replaced from time to time, the "*Issuing and Payment Administration Agreement*").

For the purposes of this Condition 7(i) (Payments in respect of Australian Domestic Notes), "*Business Day*" will have the meaning given to it in the relevant Agency and Registry Services Agreement.

Payments of principal and interest will be made in Sydney in Australian dollars to the persons registered at the close of business on the relevant Record Date (as defined below) as the Holders of such Australian Domestic Notes, subject in all cases to normal banking practice and all applicable laws and regulations. Payment will be made by check drawn on the Sydney branch of an Australian bank despatched by post on the relevant payment day at the risk of the Noteholder or, at the option of the Noteholder, in the case of principal or interest, by the Australian Registrar giving in Sydney irrevocable instructions for the effecting of a transfer of the relevant funds to an Australian dollar account in Australia specified by the Noteholder to the Australian Registrar, or in any other manner in Sydney which the Australian Registrar and the Noteholder agree.

In the case of payments made by electronic transfer, payments will for all purposes be taken to be made when the Australian Registrar gives irrevocable instructions in Sydney

for the making of the relevant payment by electronic transfer, being instructions which would be reasonably expected to result, in the ordinary course of banking business, in the funds transferred reaching the account of the Noteholder and, in the case of accounts maintained in Australia, reaching the account on the same day as the day on which the instructions are given.

If a check posted or an electronic transfer for which irrevocable instructions have been given by the Australian Registrar is shown, to the satisfaction of the Australian Registrar, not to have reached the Noteholder and the Australian Registrar is able to recover the relevant funds, the Australian Registrar may make such other arrangements as it thinks fit for the effecting of the payment in Sydney.

Interest will be payable in the manner specified in Condition 3 (*Interest*) above, to the persons who are registered as Noteholders at the close of business in Sydney on the relevant Record Date and a check will be made payable to the Noteholder (or, in the case of joint Noteholders, to the first-named) and sent to his registered address, unless instructions to the contrary are given by the Noteholder (or, in the case of joint Noteholders, by all such Noteholders) in such form as may be prescribed by the Australian Registrar. Payment of principal will be made to, or to the order of, the persons who are registered as Noteholders at the close of business in Sydney on the relevant Record Date, subject, if so directed by the Australian Registrar, to receipt from them of such instructions as the Australian Registrar may require.

If any day for payment in respect of any Australian Domestic Note is not a Business Day, such payment shall not be made until the next following day which is a Business Day, and no further interest shall be paid in respect of the delay in such payment.

Payments will be subject in all cases to any fiscal or other laws and regulations applicable thereto. None of LBTCBV or LBHI, as the case may be, or the Australian Registrar shall be liable to any Holder or other person for any commissions, costs, losses or expenses in relation to or resulting from such payments.

In this Condition 7(i) (*Payments in respect of Australian Domestic Notes*), "*Record Date*" means, in the case of payments of principal or interest, the close of business in Sydney on the date falling 8 calendar days before each Interest Payment Date and the Maturity Date (as the case may be)."

(d)    **Notices**

The following paragraph shall be added at the end of Condition 15:

"(d) *Notices in respect of Australian Domestic Notes*

Notices in respect of Australian Domestic Notes will be published in a leading daily newspaper of general circulation in Australia (which is expected to be The Australia Financial Review). Any such notice will be deemed to have been given to the Holders on the date of publication."

(e)    **Replacement of Notes, Coupons, Receipts and Talons**

Condition 16 shall not apply to Australian Domestic Notes.

(f)    **Prescription**

Condition 17 shall not apply to Australian Domestic Notes.

(g)    **Governing Law; Consent to Jurisdiction**

(i)    The following paragraph shall be added to Condition 19(a) (*Governing Law*):

126

"Any Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement in respect of such Australian Domestic Notes are, or will be, governed by, and construed in accordance with, the laws of New South Wales, Australia."

(ii)     Condition 19(b) (*English courts*) shall not apply to Australian Domestic Notes.

(iii)    The following paragraph shall be added at the end of Condition 19:

"(f) *Australian Domestic Notes*

In respect of Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement, LBTCBV and LBHI will agree to submit to the jurisdiction of the courts of New South Wales, Australia and courts of appeal from then. LBCTCBV and LBHI will irrevocably waive any objection which it may have to the laying of the venue of any suit, action or proceedings arising out of or in connection with the Australian Domestic Notes, the relevant Deed Poll, the relevant Agency and Registry Services Agreement or any relevant Issuing and Paying Administration Agreement ("*Australian Proceedings*") in any such court and any claim that any such Australian Proceedings have been brought in an inconvenient forum and will further irrevocably agree that a judgment in any such Australian Proceedings brought in the courts of New South Wales, Australia and courts of appeal from them shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. LBTCBV will ensure, in respect of Australian Domestic Notes, that there is an agent for service of process in New South Wales, Australia as specified in the relevant Final Terms."

## Annex 2

### Amendments to the Terms and Conditions of the Notes in respect of Danish Notes

*The terms and conditions of Danish Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Danish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Danish Conditions, the Danish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

#### (A)  General

For the purpose of this Base Prospectus, "*Danish Notes*" means any Tranche of Notes issued by LBTCBV or LBB and designated as "*Danish Notes*" in the applicable Final Terms.

The Danish Notes will be registered in uncertificated and dematerialised book-entry form with the Danish Securities Centre (*Værdipapircentralen*) ("*VP*"). Danish Notes registered in VP are negotiable instruments and not subject to any restrictions on free negotiability under Danish law. For so long as it is a requirement of the VP Rules (as defined below), Danish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

#### (B)  Amendments to the Terms and Conditions in respect of the Danish Notes

As the Danish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Danish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement as may be entered into in relation to the Danish Notes (as amended, supplemented or replaced from time to time, the "*Danish Agency Agreement*") between the Issuers, the Guarantor and Skandinaviska Enskilda Banken A/S which has its registered address at Landemaerket 10, 1014 Copenhagen K, Denmark (the "*Danish Issuing Agent*").

#### (a)  Form, Denomination and Title

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Danish Securities Trading Act (Da. *lov om værdipapirhandel 479/2006 (as amended)*) in each case in the Specified Currency or Currencies and Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Danish laws, regulations and operating procedures applicable to and/or issued by VP (the "*VP Rules*") and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to VP. No physical notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VP.

(iii)    Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the "*Register*") maintained by the Registrar on behalf of the Issuer in accordance with the VP Rules. The Danish Issuing Agent is acting as account holding institute (Da. *kontoførende institut*) in relation to VP. The Issuer shall be entitled to obtain information from the Register in accordance with the VP Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it or its theft or loss and no person shall be liable for so treating the Holder.

Settlement of purchase and sale transactions take place on registration against payment basis. Transfer of ownership of the Notes will be made in accordance with the VP Rules.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered or the person on whose book-entry securities account the Danish Notes are held (as the case may be) including any person duly authorised to act as a nominee and registered for the Notes.

(iv)    Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

In Condition 3 (*Interest*), where any period is expressed to run from (and including) a particular date to (but excluding) another date, for the purposes of the Notes such period shall instead run from (but excluding) the first date to (and including) the second date.

Payments of interest shall be made in accordance with the VP Rules.

**(c)    Payment of Principal and Interest; Paying Agents**

(v)    Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the VP Rules*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the third business day (as defined by the then applicable VP Rules) before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in said rules and will be made in accordance with said rules. Such day shall be the "*Record Date*" in respect of the Notes in accordance with the VP Rules."

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be a duly authorised central securities depository under the Danish Securities Trading Act (or any successor thereto) and an Issuing Agent in Denmark duly authorised as an account holding institute under the Danish Securities Trading Act (or any successor thereto)."

(vi)    Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to the Notes.

**(d)    Repayment Redemption and Repurchase**

(i)    The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

"Any such redemption shall be in accordance with the VP Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in

129

respect of which such option has been so exercised and the procedures for partial redemptions laid down in the VP Rules."

(ii)     The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

"Any such notice from the Holder of any Notes will not be take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Danish Issuing Agent and blocked for further transfer by the Danish Issuing Agent.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the VP Rules.

(e)     **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Danish Issuing Agent and blocked for further transfer by the Danish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Danish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Danish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series or Receipts may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a