Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Danish Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon."

### (f)   Meetings and Amendments

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with VP.

### (g)   Assumption of Obligations

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v) VP, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

### (h)   Merger or Consolidation of the Issuer or the Guarantor

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii) VP, if required has given its consent to such a transaction and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

### (i)   Notices

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Danish Notes shall be in writing and shall be addressed to such Holders at their respective address appearing in the Register maintained by the Registrar in accordance with the VP Rules."

### (j)   Governing Law, Consent to Jurisdiction

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Danish law and jurisdiction will be applicable with regard to the registration of the Notes in VP.

## Annex 3

### Amendments to the Terms and Conditions of the Notes in respect of Finnish Notes

*The terms and conditions of Finnish Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Finnish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Finnish Conditions, the Finnish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A) General**

For the purpose of this Base Prospectus, "*Finnish Notes*" means any Tranche of Notes issued by LBTCBV or LBB and designated as "*Finnish Notes*" in the applicable Final Terms.

The Finnish Notes will be registered in uncertificated and dematerialised book-entry form with the Finnish Central Securities Depository Ltd., Visiting Address, Urho Kekkosen katu 5 C, PO Box 1110, 00101 Helsinki, Finland (the "*APK*"). Finnish Notes registered in APK are negotiable instruments and not subject to any restrictions on free negotiability under Finnish law.

**(B) Amendments to the Terms and Conditions in respect of the Finnish Notes**

As the Finnish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Finnish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement (as amended, supplemented or replaced from time to time, the "*Finnish Issuing and Paying Agency Agreement*") as may be entered into in relation to the Finnish Notes between the Issuers, the Guarantor and Nordea Bank Finland Plc, Aleksanterinkatu 36, Helsinki, Finland (the "*Finnish Issuing Agent*").

**(a) Form and Transfer**

 (i) Condition 1(a) (*Form*) shall be amended to read:

  "(a) *Form*. The Notes are in uncertificated and dematerialised book-entry form in accordance with the Finnish Act on the Book-Entry System (*Fin. laki arvo-osuusjärjestelmästä (826/1991)*) and with the Finnish Act on Book-Entry Accounts (*Fin. laki arvo-osuustileistä (827/1991)*). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

  The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Finnish laws, regulations and operating procedures applicable to and/or issued by the APK (the "*APK Rules*") and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to the APK. No physical Notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

 (ii) Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to the APK.

(iii)    Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes*. Title to the Notes shall pass by transfer from a Noteholder's book-entry securities account to another securities book-entry account within the APK (except where the Finnish Notes are nominee-registered and are transferred from one account to another account with the same nominee). Notwithstanding any secrecy obligation, the Issuer shall be entitled to obtain information (including but not limited to information on Noteholders) from the register (the "*Register*") maintained by the Registrar on behalf of the Issuer in accordance with the APK Rules, and the APK shall be entitled to provide such information to the Issuer notwithstanding any secrecy obligation. The Issuer shall be entitled to pass such information to the Finnish Issuing Agent, Paying Agent or Fiscal Agent or to authorise such Agent to acquire such information from the APK directly. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it or its theft or loss and no person shall be liable for so treating the Holder.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered or the person on whose book-entry securities account the Notes are held including a nominee account holder (as the case may be)"

(iv)    Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

Condition 3(d) (*Partly Paid Notes*) shall not apply to the Notes.

**(c)    Payments of Principal and Interest; Paying Agents**

(i)    Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the APK Rules*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders on the basis of information recorded in the relevant Noteholder's book-entry securities account on the due date in accordance with the APK Rules. Noteholders will not be entitled to any interest or other compensation for any delay after the due date in receiving the amount due as a result of the due date for payment not being a business day. In this Condition 7(b) (*Payments on Global Notes*), "*business day*" means a day, other than a Saturday or Sunday on which APK and its relevant system in which the Notes are registered are open for business in accordance with the APK Rules.

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be the duly authorised Finnish central securities depository under the Finnish Act on the Book-Entry System and a Finnish Issuing Agent duly authorised as an account operator (*Fin. tilinhoitajayhteisö*) under the Act on the Book-Entry System.

(ii)    Condition 7(d) (*Payments on Definitive Registered Notes*) and 7(g) (*Exchange of Coupons and Talons*) shall not apply to the Notes.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the APK Rules.

(d)     **Repayment, Redemption and Repurchase**

(i)     The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

Any such redemption shall be in accordance with the APK Rules and the notice to Noteholders shall also specify the Notes (recognizing that the Notes are not numbered or otherwise separable from each other) or amounts of the Notes to be redeemed or in respect of which such option has been so exercised and the procedures for partial redemptions laid down in the APK Rules.

(ii)    The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

Any such notice from the Holder of any Note will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Finnish Issuing Agent and blocked for further transfer by the Finnish Issuing Agent.

(e)     **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"*(c)   Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Finnish Issuing Agent and blocked for further transfer by the Finnish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Finnish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Finnish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder

with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon."

(f)   **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with the APK.

(g)   **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v)   the APK, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(h)   **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii)   the APK, if required has given its consent to such a transaction and;"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii).

(i)   **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Finnish Notes will be in writing and shall be addressed to such Holders at its address appearing in the Register maintained by the Registrar in accordance with the APK Rules."

(j)   **Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Finnish law and jurisdiction will be applicable with regard to the registration of the Notes in APK.

Annex 4

**Amendments to the Terms and Conditions of the Notes in respect of New Zealand Domestic Notes**

*The terms and conditions of the New Zealand Domestic Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "New Zealand Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the New Zealand Conditions, the New Zealand Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

(A)  **General**

For the purpose of this Base Prospectus, *"New Zealand Domestic Notes"* means any Tranche of Notes denominated in New Zealand dollars and issued by LBTCBV or LBHI in the New Zealand domestic capital markets, as specified in the applicable Final Terms.

The New Zealand Domestic Notes will be issued pursuant to a deed poll to be entered into by the relevant Issuer and will be registered in uncertificated and dematerialised book-entry form with Austraclear New Zealand System.

(B)  **Amendments to the Terms and Conditions in respect of the New Zealand Domestic Notes**

(a)  **Form, Denomination and Title**

The following paragraph shall be added to the end of Condition 1 (*Form and Transfer*):

"(j) *New Zealand Domestic Notes*

In the case of New Zealand Domestic Notes, the following provisions of this Condition 1(j) (*New Zealand Domestic Notes*) shall apply in lieu of the foregoing provisions of this Condition 1 in the event of any inconsistency. New Zealand Domestic Notes will be debt obligations of LBTCBV or LBHI, as the case may be, owing under separate deeds poll to be executed by LBTCBV and LBHI (each as amended, supplemented or replaced from time to time, a "*Deed Poll*" and together, the "*Deeds Poll*") and will take the form of entries in a register (the "*New Zealand Register*") to be maintained by a New Zealand registrar to be appointed by LBTCBV or LBHI, as the case may be, as specified in the applicable Final Terms (the "*New Zealand Registrar*"). New Zealand Domestic Notes will have the benefit of the Guarantee of the Guarantor. The Fiscal Agency Agreement is not applicable to New Zealand Domestic Notes.

New Zealand Domestic Notes will not be serially numbered. Each entry in the New Zealand Register constitutes a separate and individual acknowledgement to the relevant Noteholder of the indebtedness of LBTCBV to the relevant Noteholder. The obligations of LBTCBV and LBHI, as the case may be, in respect of each New Zealand Domestic Note constitute separate and independent obligations which the Holder to whom those obligations are owed is entitled to enforce without having to join any other Holder or any predecessor in title of a Holder. No certificate or other evidence of title will be issued by or on behalf of LBTCBV or LBHI, as the case may be, to evidence title to a New Zealand Domestic Note unless LBTCBV or LBHI, as the case may be, determines that certificates should be made available or it is required to do so pursuant to any applicable law or regulation.

No New Zealand Domestic Note will be registered in the name of more than four persons. A Note registered in the name of more than one person is held by those persons as joint tenants. New Zealand Domestic Notes will be registered by name only without reference to any trusteeship. The person registered in the New Zealand Register as a Noteholder of a New Zealand Domestic Note will be treated by LBTCBV or LBHI, as the case may be, and the New Zealand Registrar as absolute owner of that New Zealand Domestic Note and none of LBTCBV, LBHI, the Guarantor or the New Zealand Registrar is, except as ordered by a court

or as required by statute, obliged to take notice of any other claim to a New Zealand Domestic Note. For the avoidance of doubt, where a New Zealand Domestic Note is entered into the Austraclear New Zealand System, the expression Holder includes the Reserve Bank of New Zealand as operator of the Austraclear New Zealand System.

Upon a person acquiring title to any New Zealand Domestic Note by virtue of becoming registered as the owner of that New Zealand Domestic Note, all rights and entitlements arising by virtue of the relevant Deed Poll in respect of that New Zealand Domestic Note vest absolutely in the registered owner of the New Zealand Domestic Note, such that no person who has previously been registered as the owner of the New Zealand Domestic Note has or is entitled to assert against the LBTCBV or LBHI, as the case may be, or the New Zealand Registrar or the registered owner of the New Zealand Domestic Note for the time being and from time to time any rights, benefits or entitlements in respect of the New Zealand Domestic Note.

Conditions 1(c) (*Coupons Attached*) to 1(i) (*Owner of Registered Notes*) inclusive do not apply to New Zealand Domestic Notes. New Zealand Domestic Notes may be transferred in whole but not part. New Zealand Domestic Notes will be transferable by duly completed and (if applicable) stamped transfer and acceptance forms in the form specified by, and obtainable from, the New Zealand Registrar or by any other manner approved by LBTCBV or LBHI, as the case may be, and the New Zealand Registrar. Notes entered in the Austraclear New Zealand System will be transferable only in accordance with the Austraclear New Zealand Regulations, meaning the rules issued by the Reserve Bank of New Zealand or its successor from time to time and including the Austraclear New Zealand operating guidelines published by the Reserve Bank of New Zealand, any documentation or advice which is expressly stated to form part of such rules and guidelines, all schedules and appendices of the foregoing, and all amendments or new versions.

Unless the New Zealand Domestic Notes are lodged in the Austraclear New Zealand System, application for the transfer of New Zealand Domestic Notes must be made by the lodgement of a transfer form with the New Zealand Registrar. Each transfer form must be accompanied by such evidence (if any) as the New Zealand Registrar may require to prove the title of the transferor or the transferor's right to transfer the New Zealand Domestic Note and be signed by both the transferor and the transferee.

The transferor of a New Zealand Domestic Note is deemed to remain the Holder of that New Zealand Domestic Note until the name of the transferee is entered in the New Zealand Register in respect of that New Zealand Domestic Note. Transfers will not be registered later than ten days prior to the Maturity Date of the New Zealand Domestic Note.

New Zealand Domestic Notes may only be transferred in New Zealand if (a) the aggregate consideration payable in respect of the transfer is not less than NZ$500,000 (or the equivalent in another currency and, in either case, disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or Issuer) unless the Notes are transferred to persons whose principal business is the investment of money, or who, in the ordinary course of or for the purposes of their business, habitually invest money within the meaning of the Securities Act 1978 of New Zealand. A transfer to an unincorporated association is not permitted.

Transfers will be registered without charge provided taxes, duties or other governmental charges (if any) imposed in relation to the transfer have been paid.

A person becoming entitled to a New Zealand Domestic Note as a consequence of the death or bankruptcy of a Holder or of a vesting order or a person administering the estate of a Holder may, upon producing such evidence as to that entitlement or status as the New Zealand Registrar considers sufficient, transfer the New Zealand Domestic Note or, if so entitled, become registered as the Holder of the New Zealand Domestic Note.

Where the transferor executes a transfer of less than all New Zealand Domestic Notes registered in its name, and the specific New Zealand Domestic Notes to be transferred are not identified, the New Zealand Registrar may register the transfer in respect of such of the New Zealand Domestic Notes registered in the name of the transferor as the New Zealand Registrar thinks fit, provided the aggregate principal amount of the New Zealand Domestic Notes registered as having been transferred equals the aggregate principal amount of the New Zealand Domestic Notes expressed to be transferred in the transfer.

Upon entry of the New Zealand Domestic Notes into the Austraclear New Zealand System, New Zealand Central Securities Depository Limited (in its capacity as depository of the Austraclear New Zealand System) will become the sole registered holder of New Zealand Domestic Notes.

Each of the persons shown in the records of the Austraclear New Zealand System as having an interest in New Zealand Domestic Notes must look solely to that system for such person's share of each payment made by the Issuer to the registered holder, subject to and in accordance with the Austraclear New Zealand Regulations.

The Reserve Bank of New Zealand, as operator, may in its absolute discretion and, to the extent not prohibited by the Austraclear New Zealand Regulations, instruct the New Zealand Registrar to transfer the New Zealand Domestic Note to the person in whose Security Account (as defined in the Austraclear New Zealand Regulations) that Note is recorded without any consent or action of such transferee and, as a consequence, remove that Note from the Austraclear New Zealand System.

For the avoidance of doubt, where a New Zealand Domestic Note is held in the Austraclear New Zealand System, references to a Noteholder include the Reserve Bank of New Zealand as operator of that system or any nominee or custodian of that system (in each case acting in accordance with the Austraclear New Zealand Regulations).

In this Condition 1(j) (*New Zealand Domestic Notes*):

*Austraclear New Zealand System* means the settlement system operated by the Reserve Bank of New Zealand."

(b)    **Interest**

(i)    The definition of "Business Day" in Condition 3(b)(i) shall not apply to Condition 7(i) (*Payments in respect of New Zealand Domestic Notes*).

(ii)    The definition of "Principal Financial Centre" in Condition 3(b)(i) shall be deleted and replaced with the following:

""*Principal Financial Centre*" means, in relation to any currency, the principal financial centre for that currency provided, however, that:

(i)    in relation to euro, it means the principal financial centre of such Member State of the European Communities as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent; and

(ii)    in relation to New Zealand dollars, it means either Wellington or Auckland, as selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent.

(iii)    The following paragraph shall be added to the end of Condition 3(b)(iii)(B) (*Screen Rate Determination for Floating Rate Notes*):

"If "FRA" is specified in the applicable Final Terms it shall mean the "FRA" rate for Bills (having the meaning that term has in the Bills of Exchange Act 1908 of New Zealand) having

a tenor closest to the Interest Period as displayed on the "BKBM" page of the Reuters Monitor System at or about 10.45am (New Zealand time) on the first day of that Interest Period."

(iv)  Condition 3(b)(iv)(G) shall be deleted and replaced with the following:

"if *"RBNZ Bond Basis"* or *"NZ Government Bond Basis"* is specified as the applicable day count fraction in the applicable Final Terms, it shall mean one divided by the number of Interest Payment Dates in a year."

(c)  **Payment of Principal and Interest; Paying Agents**

(i)  Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to New Zealand Domestic Notes.

(ii)  The following paragraph shall be added at the end of Condition 7:

"(i) *Payments in respect of New Zealand Domestic Notes*

The New Zealand Registrar will act (through an office in Auckland) as principal paying agent for the New Zealand Domestic Notes pursuant to a New Zealand Agency and Registry Services Agreement (as amended, supplemented or replaced from time to time, the *"New Zealand Agency and Registry Services Agreement"*) to be entered into between LBTCBV or LBHI, as the case may be, and the New Zealand Registrar.

For the purposes of this Condition 7(i) (*Payments in respect of New Zealand Domestic Notes*), *"Business Day"* will have the meaning given to it in the relevant Agency and Registry Services Agreement.

Payments of principal and interest will be made in New Zealand in New Zealand dollars to the persons registered at the close of business on the relevant Record Date (as defined below) as the Holders of such New Zealand Domestic Notes, subject in all cases to normal banking practice and all applicable laws and regulations. Payment will be made by cheque despatched by post on the relevant payment day at the risk of the Noteholder or, at the option of the Noteholder, in the case of principal or interest, by the New Zealand Registrar giving in Auckland irrevocable instructions for the effecting of a transfer of the relevant funds to a New Zealand dollar account in New Zealand specified by the Noteholder to the New Zealand Registrar, or in any other manner in which the New Zealand Registrar and the Noteholder agree.

In the case of payments made by electronic transfer, payments will for all purposes be taken to be made when the New Zealand Registrar gives irrevocable instructions for the making of the relevant payment by electronic transfer, being instructions which would be reasonably expected to result, in the ordinary course of banking business, in the funds transferred reaching the account of the Noteholder and, in the case of accounts maintained in New Zealand, reaching the account on the same day as the day on which the instructions are given.

If a cheque posted or an electronic transfer for which irrevocable instructions have been given by the New Zealand Registrar is shown, to the satisfaction of the New Zealand Registrar, not to have reached the Noteholder and the New Zealand Registrar is able to recover the relevant funds, the New Zealand Registrar may make such other arrangements as it thinks fit for the effecting of the payment in Auckland.

Interest will be payable in the manner specified in Condition 3 (*Interest*) above, to the persons who are registered as Noteholders at the close of business in Auckland on the relevant Record Date (as defined below) and a cheque will be made payable to the Noteholder (or, in the case of joint Noteholders, to the first-named) and sent to his registered address, unless instructions to the contrary are given by the Noteholder (or, in

the case of joint Noteholders, by all such Noteholders) in such form as may be prescribed by the New Zealand Registrar. Payment of principal will be made to, or to the order of, the persons who are registered as Noteholders at the close of business in Auckland on the relevant Record Date, subject, if so directed by the New Zealand Registrar, to receipt from them of such instructions as the New Zealand Registrar may require.

If any day for payment in respect of any New Zealand Domestic Note is not a Business Day, such payment shall not be made until the next following day which is a Business Day, and no further interest shall be paid in respect of the delay in such payment.

Payments will be subject in all cases to any fiscal or other laws and regulations applicable thereto. None of LBTCBV or LBHI, as the case may be, or the New Zealand Registrar shall be liable to any Holder or other person for any commissions, costs, losses or expenses in relation to or resulting from such payments.

In this Condition 7(i) (*Payments in respect of New Zealand Domestic Notes*), "*Record Date*" means, in the case of payments of principal or interest, the close of business on the date falling 10 calendar days before each Interest Payment Date and the Maturity Date (as the case may be)."

(d)    **Replacement of Notes, Coupons, Receipts and Talons**

Condition 16 shall not apply to New Zealand Domestic Notes.

(e)    **Prescription**

Condition 17 shall not apply to New Zealand Domestic Notes.

(f)    **Governing Law; Consent to Jurisdiction**

(i)    The following paragraph shall be added to the first paragraph in Condition 19(a) (*Governing Law*):

"Any New Zealand Domestic Notes and the relevant Deed Poll in respect of such New Zealand Domestic Notes are, or will be, governed by and construed in accordance with, the laws of New South Wales, Australia.

The relevant Agency and Registry Services Agreement in respect of the New Zealand Domestic Notes is, or will be, governed by, and construed in accordance with, New Zealand law."

(ii)    Condition 19(b) (*English courts*) shall not apply to New Zealand Domestic Notes.

(iii)    The following paragraph shall be added at the end of Condition 19 (*Governing Law*):

"(f)    New Zealand Domestic Notes

In respect of New Zealand Domestic Notes and the relevant Deed Poll, LBTCBV and LBHI will agree to submit to the jurisdiction of the courts of New South Wales, Australia and courts of appeal from them. LBTCBV and LBHI will irrevocably waive any objection which it may have to the laying of the venue of any suit, action or proceedings arising out of or in connection with the New Zealand Domestic Notes and the Deed Poll ("*Australian Proceedings*") in any such court and any claim that any such Australian Proceedings have been brought in an inconvenient forum and will further irrevocably agree that a judgement in any such Australian Proceedings brought in the courts of New South Wales, Australia and courts of appeal from them shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction. LBTCBV and LBHI will ensure, in respect of New Zealand Domestic Notes, that there is an agent for service of process in New South Wales, Australia as specified in the relevant Final Terms."

### Annex 5

### Amendments to the Terms and Conditions of the Notes in respect of Norwegian Notes

*The terms and conditions of Norwegian Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Norwegian Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Norwegian Conditions, the Norwegian Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

### (A)    General

For the purpose of this Base Prospectus, "*Norwegian Notes*" means any Tranche of Notes issued by LBTCBV or LBB and designated as "*Norwegian Notes*" in the applicable Final Terms.

The Norwegian Notes will be registered in uncertificated and dematerialised electronic book-entry form with a Norwegian Central Securities Depository which will be Verdipapirsentralen ASA ("*VPS*"). Norwegian Notes registered in VPS are negotiable instruments and not subject to any restrictions on free negotiability under Norwegian law.

### (B)    Amendments to the Terms and Conditions in respect of the Norwegian Notes

As the Norwegian Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant by which the Norwegian Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement for the management of a bond and commercial paper Issuer's account in VPS (as amended, supplemented or replaced from time to time, the "*Norwegian Agency Agreement*") as may be entered into in relation to the Norwegian Notes between the Issuers, the Guarantor and DnB NOR Bank ASA Stranden 21, 0021 Oslo, Norway (the "*Norwegian Agent*").

### (a)    Form and Transfer

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form.* The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Norwegian Securities Register Act (in *Norwegian: lov om registrering av finansielle instrumenter 2002 5. juli nr. 64*). This is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Norwegian laws, regulations and operating procedures applicable to and/or issued by VPS for the time being (the "*VPS Rules*"). No physical notes or certificates will be issued in respect of the Notes and the provisions in these Terms and Conditions relating to presentation, surrendering or replacement of such physical notes or certificates shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*), Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPS.

(iii)    Condition 1(f) (*Note register*) shall be amended to read:

141

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the "*VPS Register*") maintained by the Norwegian Agent on behalf of the Issuer in accordance with the Norwegian VPS Rules. The Issuer shall be entitled to obtain information from VPS in accordance with the VPS Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes, whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it and no person shall be liable for so treating the Holder.

One or more Notes may be transferred in accordance with the VPS Rules. In the case of an exercise of an option resulting in Notes of the same holding having different terms, separate Notes registered with the VPS Register shall be issued in respect of those Notes of that holding having the same terms. Such Notes shall only be issued against surrender of the existing Notes in accordance with the VPS Rules. Each new Note to be issued pursuant to the above, shall be available for delivery within three business days of receipt of the request and the surrender of the Notes for exchange. Delivery of the new Note(s) shall be made to the same VPS account on which the original Notes were registered. In this Condition 1(f) (*Title to the Notes*), "*business day*" means a day, other than a Saturday or Sunday on which VPS is open for business.

Exchange and transfer of Notes on registration, transfer, partial redemption or exercise of an option shall be effected without charge by or on behalf of the Issuer or the Norwegian Agent, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Norwegian Agent may require).

No Noteholder may require the transfer of a Norwegian Note to be registered during any closed period pursuant to the then applicable VPS Rules.

In these Terms and Conditions, "*Noteholder*" or "*Holder*" means the person in whose name a Note is registered in the VPS Register and shall also include any person duly authorised to act as a nominee (in Norwegian: *forvalter*) and registered as a holder of the Norwegian Notes.

(iv)    Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Payments of Principal and Interest; Paying Agents**

(i)    The last sentence of Condition 7(d) (*Payments on Definitive Registered Notes*) shall be deleted and replaced by the following:

If Registered Notes (other than Australian Domestic Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Danish Notes) are issued, a register will be maintained in accordance with the Fiscal Agency Agreement.

(ii)    A new paragraph shall be inserted in Condition 7 (*Payment of Principal and Interest; Paying Agents*) as Condition 7(j) (*Payments in respect of Norwegian Notes; Norwegian Agent*) and it shall read:

"(j) *Payments in respect of Norwegian Notes; Norwegian Agent*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPS Rules before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in the VPS Rules and will be made in accordance with said Rules. Such day shall be the "*Record Date*" in respect of the Notes in accordance with the VPS Rules.

(c)    **Repayment, Redemption, and Repurchase**

    (i)    The following shall be added as an additional paragraph to Condition 8(d) (*Redemption at the option of the Issuer*) and shall read:

    Any redemption in part must comply with the requirements of the VPS Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has so been exercised and any procedures for partial redemption laid down by the VPS Rules that will be observed.

    (ii)    The following shall be added as an additional paragraph to Condition 8(e) (*Redemption at the Option of the Issuer*):

    To exercise such option or any other Noteholders' option that may be set out in the applicable Final Terms (which must be exercised in accordance with the applicable Final Terms) the Holder must register in the relevant VPS account a transfer restriction in favour of the Norwegian Agent and deliver to the Norwegian Agent a duly completed option exercise notice (the "*Exercise Notice*") in the form obtainable from the Norwegian Agent which the Issuer will provide to the Norwegian Agent on request within the notice period. An Exercise Notice will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent or blocked for further transfer by the Norwegian Agent. No Note so transferred or blocked and option exercised may be withdrawn (except as provided in the Norwegian Agency Agreement) without the prior consent of the Issuer.

    (iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

    Any such redemption shall be in accordance with the APK Rules.

(d)    **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

    (c)    *Remedies; Rescission; Waiver*

    If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Norwegian Agent and blocked for further transfer by the Norwegian Agent the VPS Rules) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

    At any time after such declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Norwegian Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or, if applicable, the Guarantor, has paid or deposited with the Fiscal Agent or the Norwegian Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Norwegian Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

(e)  **Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to the Notes.

(f)  **Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v)  VPS, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

(g)  **Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii)  VPS, if required has given its consent to such a transaction; and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

(h)  **Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Norwegian Notes will be in writing and shall be addressed to such Holders at address appearing in the Register maintained by the Registrar in accordance with the VPS Rules."

(i)    **Further Issues of Notes**

A new paragraph shall be inserted in Condition 18 (*Further Issues of Notes*) following the first paragraph and shall read:

Each Holder agrees and gives consent to VPS to provide the Norwegian Agent, upon request, information registered with VPS relating to the Notes and the Noteholders in order that the Norwegian Agent may provide any relevant Norwegian authorities, including the Financial Supervisory Authority of Norway (in Norwegian: *Kredittilsynet*) and the Norwegian tax authorities with any information required under applicable Norwegian laws. Such information shall include, but not be limited to, the identity of the registered holder of the Notes, the residency of the registered holder of the Notes, the number of Notes registered with the relevant holder, the address of the relevant holder, the account operator in respect of the relevant VPS account (in Norwegian: *Kontofører*) and whether or not the Notes are registered in the name of a nominee and the identity of any such nominee.

### Annex 6

### Amendments to the Terms and Conditions of the Notes in respect of Swedish Notes

*The terms and conditions of Swedish Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") as amended by the additional terms and conditions set forth below (the "Swedish Conditions"), subject to completion and/or amendment in the applicable Final Terms. In the event of any inconsistency between the General Conditions and the Swedish Conditions, the Swedish Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

#### (A)   General

For the purpose of this Supplement, *"Swedish Notes"* means any Tranche of Notes issued by LBTCBV or LBB and designated as *"Swedish Notes"* in the applicable Final Terms.

The Swedish Notes will be registered in uncertificated and dematerialised book-entry form with a Swedish Central Securities Depository which will be VPC AB (*"VPC"*). Swedish Notes registered in VPC are negotiable instruments and not subject to any restrictions on free negotiability under Swedish law. For so long as it is a requirement of the VPC Rules (as defined below), Swedish Notes may not provide for any form of settlement in respect of payment of interest, principal or premium other than payment in cash.

#### (B)   Amendments to the Terms and Conditions in respect of the Swedish Notes

For the purposes of all Swedish Notes the Terms and Conditions of the Notes shall be amended as set forth in below in this Part B of Annex 6 (*Amendments to the Terms and Conditions of the Notes in respect of Swedish Notes*) of this Supplement. Furthermore, as the Swedish Notes will be in uncertificated and dematerialised book-entry form, the Terms and Conditions of the Notes as so amended shall be deemed to be incorporated by reference in, and to form part of, the Deed of Covenant executed by the Issuers by which the Swedish Notes are constituted.

All references to the "Fiscal Agency Agreement" shall include such agreement (as amended, supplemented or replaced from time to time, the *"Swedish Agency Agreement"*) as may be entered into in relation to the Swedish Notes between the Issuers, the Guarantor and Swedbank AB (publ), Brunkebergstorg 8, SE-105 34 Stockholm, Sweden (the *"Swedish Issuing Agent"*).

#### (a)   Form, Denomination and Title

(i)    Condition 1(a) (*Form*) shall be amended to read:

"(a) *Form*. The Notes are issued in uncertificated and dematerialised book-entry form in accordance with the Swedish Financial Instruments Accounts Act (Sw. *lag (1998:1479) om kontoföring av finansiella instrument*) in each case in the Specified Currency or Currencies and Denomination(s). This Note is a Senior Note or a Subordinated Note, as indicated in the applicable Final Terms. Notes of one Specified Denomination may not be exchanged for Notes of another Specified Denomination.

The Notes shall be regarded as Registered Notes for the purposes of these Terms and Conditions save to the extent these Terms and Conditions are inconsistent with Swedish laws, regulations and operating procedures applicable to and/or issued by VPC (the *"VPC Rules"*) and all references in these Terms and Conditions to the "Registrar" shall be deemed to be references to VPC. No physical notes or certificates will be issued in respect of Notes and the provisions relating to presentation, surrendering or replacement of Notes shall not apply to the Notes.

(ii)    Condition 1(c) (*Coupons attached*) , Condition 1(d) (*Transfer of Bearer Notes*) and Condition 1(e) (*Title to Definitive Notes*) shall not apply to the Notes, save that

146

references to Euroclear and/or Clearstream, Luxembourg shall, whenever the context so permits, be deemed to include a reference to VPC.

(iii) Condition 1(f) (*Note register*) shall be amended to read:

"(f) *Title to the Notes*. Title to the Notes shall pass by registration in the register (the *"Register"*) maintained by the Registrar on behalf of the Issuer in accordance with Swedish laws, regulations and the VPC Rules. The Swedish Issuing Agent is acting as account operator (*Sw. Kontoförande institute*) in relation to VPC. The Issuer shall be entitled to obtain information from the Register in accordance with the VPC Rules. Except as ordered by a court of competent jurisdiction or as required by law, the Holder (as defined below) of any Note shall be deemed to be and may be treated as its absolute owner for all purposes and no person shall be liable for so treating the Holder.

In these Terms and Conditions, *"Noteholder"* or *"Holder"* means the person in whose name a Note is registered or the person on whose book-entry securities account the Swedish Notes are held (as the case may be) including any person duly authorised to act as a nominee (*Sw. förvaltare*) and registered for the Notes.

(iv) Condition 1(g) (*Transfer of Registered Notes*), Condition 1(h) (*Sums payable on Transfer*) and Condition 1(i) (*Owner of Registered Notes*) shall not apply to the Notes.

**(b)    Interest**

In Condition 3 (*Interest*), where any period is expressed to run from (and including) a particular date to (but excluding) another date, for the purposes of the Notes such period shall instead run from (but excluding) the first date to (and including) the second date.

**(c)    Payment of Principal and Interest; Paying Agents**

(i) Condition 7(b) (*Payments on Global Notes*) shall be amended to read:

"(b) *Payments in accordance with the VPC Rules*. Payments of principal and/or interest in respect of the Notes shall be made to the Noteholders registered as such on the fifth business day (as defined by the then applicable VPC Rules) before the due date for such payment, or such other business day falling closer to the due date as then may be stipulated in said rules and will be made in accordance with said rules. Such day shall be the *"Record Date"* in respect of the Notes in accordance with the VPC Rules."

In respect of each Series of Notes, the Issuer shall at all times maintain a Registrar which shall be a duly authorised central securities depository under the Swedish Financial Instruments Accounts Act and an Issuing Agent in Sweden duly authorised as an account operator under the Swedish Financial Instruments Accounts Act."

(ii) Condition 7(d) (*Payments on Definitive Registered Notes*) shall not apply to the Notes.

**(d)    Repayment Redemption and Repurchase**

(i) The following shall be added to the end of Condition 8(d) (*Redemption at the Option of the Issuer*):

"Any such redemption shall be in accordance with the VPC Rules and the notice to Noteholders shall also specify the Notes or amounts of the Notes to be redeemed or in respect of which such option has been so exercised and the procedures for partial redemptions laid down in the VPC Rules."

(ii) The following shall be added to the end of Condition 8(e) (*Redemption at the Option of the Noteholders*):

147

"Any such notice from the Holder of any Notes will not take effect against the Issuer before the date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent.

(iii)    The following shall be added to the end of Condition 8(i) (*Procedure for Payment upon Redemption*):

Any such redemption shall be in accordance with the VPC Rules.

(e)    **Events of Default**

Condition 10(c) (*Remedies; Rescission; Waiver*) shall be deleted and replaced by the following:

"(c)    *Remedies; Rescission; Waiver*

If an Event of Default with respect to Notes of any Series at the time Outstanding occurs and is continuing, then in every such case, unless the principal of all of the Notes of such Series shall have already become due and payable, the Holders of at least 25% in principal amount of the Outstanding Notes of that Series may declare the principal amount (or, if the Notes of that Series are Zero Coupon Notes, the Accrual Yield Amount payable in respect thereof) of all of the Notes of that Series to be due and payable immediately (or on such later date on which the relevant Notes have been transferred to the account designated by the Swedish Issuing Agent and blocked for further transfer by the Swedish Issuing Agent) at their Early Redemption Amount, by a notice in writing to the Issuer and the Guarantor, and upon any such declaration such Early Redemption Amount, together with the premium, if any, accrued and unpaid interest, if any, and Additional Amounts, if any, shall become immediately due and payable.

At any time after such a declaration of acceleration with respect to Notes of any Series has been made and before a judgment or decree for payment of the money due has been obtained, the Holders of at least a majority in principal amount of Outstanding Notes of that Series, by written notice to the Issuer and the Guarantor and the Fiscal Agent or the Swedish Issuing Agent (as the case may be), may rescind and annul such declaration and its consequences if (i) the Issuer or the Guarantor has paid or deposited with the Fiscal Agent or the Swedish Issuing Agent (as the case may be) a sum sufficient to pay in the Specified Currency in which the Notes of such Series are payable:

(A) all overdue interest, if any, on all Notes of that Series and (B) the principal of (and premium, if any, on, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) any Notes of that Series which have become due otherwise than by such declaration of acceleration and interest thereon at the Fixed Rate of Interest, Rate of Interest or Accrual Yield, as the case may be, applicable to that Series; and (ii) all Events of Default with respect to Notes of that Series, other than the non-payment of the principal of Notes of that Series, which have become due solely by such declaration of acceleration, have been cured or waived as provided below. No such rescission shall affect any subsequent default or impair any right consequent thereon.

The Holders of at least a majority in principal amount of the Outstanding Notes of any Series may on behalf of the Holders of all the Notes of such Series waive any past default hereunder with respect to such Series and its consequences, except a default (i) in the payment of the principal of (or premium, if any, and, if such Note is a Zero Coupon Note, the Accrual Yield Amount payable in respect thereof) or interest, if any, on any Note of such Series, or in the payment of any sinking fund instalment or analogous obligation with respect to the Notes of such Series, or (ii) in respect of a covenant or provision hereof which as described under Condition 12(e) (*Amendments Requiring Extraordinary Resolution of Noteholders*) below cannot be modified or

amended without the passing of an Extraordinary Resolution (as hereafter defined) by the Holders of the Outstanding Notes of such Series affected. Upon any such waiver, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Fiscal Agency Agreement or the Swedish Agency Agreement (as the case may be) and the Notes of such Series, but no such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

For the avoidance of doubt, any action to be taken by VPC pursuant to this Condition 10 (c) (*Remedies; Rescission; Waiver*), may only be taken in accordance with the VPC Rules.

**(f)   Meetings and Amendments**

Each reference in Condition 12 (*Meetings and Amendments*) to Notes being "authenticated" shall not apply to any Notes for so long as they are registered in uncertificated book-entry form with VPC.

**(g)   Assumption of Obligations**

The following shall be added as a new sub-paragraph (v) in the first paragraph of Condition 13 (*Assumption of Obligations*) immediately following sub-paragraph (iv) after the words "any jurisdiction);":

"(v) VPC, if required, has given its consent to the assumption;"

and the original sub-paragraph (v) shall be read as sub-paragraph (vi).

**(h)   Merger or Consolidation of the Issuer or the Guarantor**

The following shall be added as a new-sub paragraph (ii) in the first paragraph of Condition 14 (*Merger or Consolidation of the Issuer or the Guarantor*) immediately following the words "any jurisdiction);":

"(ii) VPC, if required has given its consent to such a transaction and"

and the original sub-paragraph (ii) shall be read as sub-paragraph (iii), the original sub-paragraph (iii) shall be read as sub-paragraph (iv) and the original sub-paragraph (iv) shall be read as sub-paragraph (v).

**(i)   Notices**

The following shall be added as a new paragraph to the end of Condition 15 (*Notices*):

"Notices in respect of Swedish Notes will be in writing and shall be addressed to such Holders at its address appearing in the Register maintained by the Registrar in accordance with the VPC Rules."

**(j)   Governing Law, Consent to Jurisdiction**

Notwithstanding Condition 19 (*Governing Law, Consent to Jurisdiction*) Swedish law and jurisdiction will be applicable with regard to the registration of the Notes in VPC.

## Annex 7

**Additional Terms and Conditions for Index-Linked Notes**

*The terms and conditions of Index-Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

### (A)   Definitions and General Terms

The following definitions shall be included in the Terms and Conditions of the Index-Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"*Additional Disruption Event*" means any of Change in Law and/or Hedging Disruption, in each case if specified in the applicable Final Terms.

"*Averaging Date*" means each date specified as an Averaging Date in the applicable Final Terms or, if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent any such day is a Disrupted Day. If any such day is a Disrupted Day, then:

(a)   If "*Omission*" is specified as applying in the applicable Final Terms, then such date will be deemed not to be an Averaging Date for the purposes of determining the relevant level provided that, if through the operation of this provision no Averaging Date would occur, then the provisions of Condition 23 (*Disrupted Days*) will apply for purposes of determining the relevant level on the final Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day; or

(b)   if "*Postponement*" is specified as applying in the applicable Final Terms, then the provisions of Condition 23 (*Disrupted Days*) will apply for the purposes of determining the relevant level on that Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day irrespective of whether, pursuant to such determination, that deferred Averaging Date would fall on a day that already is or is deemed to be an Averaging Date; or

(c)   if "*Modified Postponement*" is specified as applying in the applicable Final Terms then:

(i)   where the Notes are Index-Linked Notes relating to a single Index, the Averaging Date shall be the first succeeding Valid Date (as defined below), provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Index, and (B) the Calculation Agent shall determine the relevant level for that Averaging Date in accordance with sub-paragraph (i)(B) of Condition 23 (*Disrupted Days*) below;

150

(ii)    where the Notes are Index-Linked Notes relating to an Index Basket, the Averaging Date for each Index not affected by the occurrence of a Disrupted Day shall be the originally designated Averaging Date (the "*Scheduled Averaging Date*") and the Averaging Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Valid Date (as defined below) in relation to such Index, provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Index, and (B) the Calculation Agent shall determine the relevant level for that Averaging Date in accordance with sub-paragraph (ii)(B) of Condition 23 (*Disrupted Days*) below; and

(iii)   for the purposes of these Terms and Conditions "*Valid Date*" means a Scheduled Trading Day that is not a Disrupted Day and on which another Averaging Date does not or is not deemed to occur.

"*Calculation Agent*" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"*Cancellation Amount*" means an amount per Note in the Specified Currency:

(i)     determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, if the Calculation Agent determines that would not be commercially reasonable, as of such date following the date that the Notes are cancelled as the Calculation Agent determines would be commercially reasonable; and

(ii)    to be paid to the Noteholders following a cancellation, being (a) the fair market value of a Note and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a)     quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b)     information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c)     information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"*Change in Law*" means that, on or after the Trade Date (as specified in the applicable Final Terms) (A) due to the adoption of or any change in any applicable law or regulation (including,

without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Issuer determines in its sole and absolute discretion that it has become illegal to hold, acquire or dispose of relevant hedge positions relating to an Index;

"*Closing Level*" means, in relation to an Index and any Scheduled Trading Day, the closing level of such Index, as calculated and announced by the Index Sponsor at the Valuation Time on such day, as determined by the Calculation Agent;

"*Component Asset*" means, in relation to an Index, any security or other property which comprises such Index;

"*Disrupted Day*" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which a relevant Exchange or any Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred, and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor fails to publish the level of the Index; (ii) the Related Exchange fails to open for trading during its regular trading session or (iii) a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the Issuer of the occurrence of a Disrupted Day on any day that is, or but for the occurrence of a Disrupted Day, would have been a Valuation Date, an Averaging Date, or an Observation Date, as the case may be. Without limiting the obligation of the Calculation Agent to notify the Issuer as set forth in the preceding sentence, failure by the Calculation Agent to notify the Issuer of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day;

"*Early Closure*" means in respect of an Index the closure on any Exchange Business Day of (A)(a) in relation to an Index other than a Multi-exchange Index, any relevant Exchange relating to securities that comprise 20 per cent. or more of the level of the relevant Index, and (b) with respect to any Multi-exchange Index, the Exchange in respect of any Component Asset of such Index or (B) any Related Exchange, prior to its Scheduled Closing Time unless, where the level of the relevant Index is to be determined at the Valuation Time, such earlier closing is announced by such Exchange or Related Exchange (as the case may be) at least one hour prior to the earlier of: (i) the actual closing time for the regular trading session on such Exchange or Related Exchange (as the case may be) on such Exchange Business Day; and (ii) the submission deadline for orders to be entered into such Exchange or Related Exchange system for execution at the relevant Valuation Time on such Exchange Business Day;

"*Exchange*" means (i) in relation to an Index other than a Multi-exchange Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in the securities or other property comprised in such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the securities or other property comprised in such Index on such temporary substitute exchange or quotation system as on the original Exchange), and (ii) with respect to any Multi-exchange Index, and in respect of each Component Asset, the principal stock exchange on which such Component Asset is principally traded, as determined by the Calculation Agent;

"*Exchange Business Day*" means (a) except with respect to a Multi-exchange Index, any Scheduled Trading Day on which each Exchange and each Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Scheduled Closing Time and (b) with respect to any Multi-exchange Index, any Scheduled Trading Day on which (i) the Index Sponsor publishes the level of the Index and (ii) the Related Exchange is open for trading during its regular trading

session, notwithstanding any Exchange or the Related Exchange closing prior to its Scheduled Closing Time;

"*Exchange Disruption*" means, in respect of an Index, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general to effect transactions in, or obtain market values for:

(i)     (a) in relation to an Index other than a Multi-exchange Index on any relevant Exchange, securities that comprise 20 per cent. or more of the level of the relevant Index, or (b) with respect to any Multi-exchange Index any Component Asset of such Index on the Exchange in respect of such Component Asset; or

(ii)    futures or options contracts relating to such Index on the relevant Related Exchange;

"*Final Level*" means, unless otherwise specified in the applicable Final Terms, and subject as referred to in "Valuation Date" below or "Averaging Date" above, as the case may be:

(i)     in the case of Index-Linked Notes relating to a single Index, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Level of the Index on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Levels of the Index on each Averaging Date; and

(ii)    in the case of Index-Linked Notes relating to an Index Basket and in respect of each Index comprising the basket, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Level of such Index on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Levels of such Index on each Averaging Date and, in either case, multiplied by the relevant Weighting;

"*Final Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Hedging Disruption*" means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"*Index Basket*" means the basket of indices (each an "*Index*" and collectively the "*Indices*" which shall refer to any one or more of the Indices included in the Index Basket, as the context requires) described in the applicable Final Terms;

"*Index Sponsor*" means each index sponsor specified as such in the applicable Final Terms, or any successor sponsor accepted by the Calculation Agent;

"*Initial Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Market Disruption Event*" means in relation to Notes relating to a single Index or an Index Basket either:

(a)     in respect of an Index which is not a Multi-exchange Index:

    (A)     the occurrence or existence at any time of:

        (1)     a Trading Disruption; or

(2)    an Exchange Disruption,

which in either case the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances ends at the relevant Valuation Time; or

(B)    an Early Closure;

for the purposes of determining whether a Market Disruption Event in respect of an Index exists at any time, if a Market Disruption Event occurs in respect of a Component Asset at any time, then the relevant percentage contribution of that Component Asset to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset and (ii) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event, or

(b)    with respect to any Multi-exchange Index either:

(i)

(A)    the occurrence or existence at any time, in respect of any Component Asset, of:

(1)    a Trading Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances, ends at the relevant Valuation Time, in respect of the Exchange on which such Component Asset is principally traded;

(2)    an Exchange Disruption in respect of such Component Asset, which the Calculation Agent determines is material and, where the level of the relevant Index is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the level of such Index triggers respectively the Knock-in Level or the Knock-out Level or (y) in all other circumstances, ends at the relevant Valuation Time, in respect of the Exchange on which such Component Asset is principally traded; OR

(3)    an Early Closure in respect of such Component Asset; AND

(B)    the aggregate of all Component Assets in respect of which a Trading Disruption, an Exchange Disruption or an Early Closure occurs or exists comprises 20 per cent. or more of the level of the Index; or

(ii)    the occurrence or existence, in respect of futures or options contracts relating to the Index, of: (A) a Trading Disruption, (B) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the relevant Valuation Time in respect of the Related Exchange; or (C) an Early Closure, in each case in respect of such futures or options contracts;

for the purposes of determining whether a Market Disruption Event exists in respect of a Component Asset at any time, if a Market Disruption Event occurs in respect of such

Component Asset at that time, then the relevant percentage contribution of that Component Asset to the level of the Index shall be based on a comparison of (i) the portion of the level of the Index attributable to that Component Asset to (ii) the overall level of the Index, in each case using the official opening weightings as published by the Index Sponsor as part of the market "opening data".

The Calculation Agent shall give notice as soon as practicable to the Noteholders in accordance with Condition 12 (*Notices*) of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day would have been an Averaging Date, an Observation Date, a Knock-in Determination Day, a Knock-out Determination Day, a Trigger Event Date or a Valuation Date.

"*Multi-exchange Index*" means any Index in respect of which "Multi-exchange" is specified as the relevant Exchange in the applicable Final Terms;

"*Observation Date*" means each date specified as an Observation Date in the applicable Final Terms, or if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the provisions relating to "Omission", "Postponement" or "Modified Postponement", as the case may be, contained in the definition of "Averaging Date" shall apply *mutatis mutandis* as if references in such provisions to "Averaging Date" were to "Observation Date".

"*Observation Period*" means the period specified as the Observation Period in the applicable Final Terms.

"*Related Exchange*" means, in relation to an Index, each exchange or quotation system specified as such for such Index in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Index has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Index on such temporary substitute exchange or quotation system as on the original Related Exchange); provided that where "*All Exchanges*" is specified as the Related Exchange in respect of an Index in the applicable Final Terms, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Index;

"*Scheduled Closing Time*" means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"*Scheduled Trading Day*" means, unless otherwise stated in the Final Terms:

(1) with respect to Index Linked Notes relating to a single Index, a day on which (a) with respect to an Index that is not a Multi-exchange Index, each relevant Exchange and each relevant Related Exchange are scheduled to be open for trading for their respective regular trading sessions; or (b) with respect to a Multi-exchange Index, (i) the Index Sponsor is scheduled to publish the level of such Index and (ii) the relevant Related Exchange is scheduled to be open for trading for its regular trading session; or

(2) with respect to Index Linked Notes relating to an Index Basket, a day which is both (a) with respect to each Index in the Basket that is not a Multi-exchange Index (as applicable), a day on which each relevant Exchange and each relevant Related Exchange are scheduled to be open for trading for their respective regular trading sessions; and (b) with respect to each Multi-exchange Index in the Basket (as applicable), a day on which (i) the Index Sponsor is scheduled to publish the level of such Index and (ii) the relevant Related Exchange is scheduled to be open

for trading for its regular trading session, *provided*, however that if, with respect to Index Linked Notes relating to an Index Basket "Scheduled Trading Day (Per Index Basis)" applies, as stated in the applicable Final Terms, the conditions for a Scheduled Trading Day shall be determined separately in respect of each Index in the Basket in accordance with paragraph 1 (a) or (b) above (as applicable to such Index) as if the Notes were Index linked Notes relating to a single Index, with the consequence that each of such Indices be valued independently of each other, and the provisions in relation to Disrupted Day, Averaging Date, Observation Date, Closing Level, Final Level and Exchange Business Day shall be applied and construed by the Calculation Agent accordingly;

"*Trading Disruption*" means any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise: (A) with respect to any Index that is not a Multi-exchange Index, (i) relating to securities that comprise 20 per cent. or more of the level of the relevant Index on any relevant Exchange, or (ii) in futures or options contracts relating to the relevant Index on any relevant Related Exchange or (B) with respect to any Multi-exchange Index, (i) relating to any Component Asset on the Exchange in respect of such Component Asset; or (ii) in futures or options contracts relating to the Index on the Related Exchange;

"*Valuation Date*" means each date specified as such in the applicable Final Terms (including the Initial Valuation Date and the Final Valuation Date), or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Valuation Time*" means:

(a)    with respect to any Index that is not a Multi-exchange Index, the official close of trading on the relevant Exchange; and

(b)    with respect to any Multi-exchange Index, (i) for the purposes of determining whether a Market Disruption Event has occurred, (1) in respect of any Component Asset, the Scheduled Closing Time on the Exchange in respect of such Component Asset and (2) in respect of any options contracts or future contracts on the Index, the close of trading on the Related Exchange; and (ii) in all other circumstances, the time at which the official closing level of the Index is calculated and published by the Index Sponsor.

"*Weighting*" for each Index means the weighting of such Index in the Basket as specified in the applicable Final Terms.

(B)    **Amendments to, and Restatements of, the Terms and Conditions**

1.    The following Condition 3(f) *Index linked Interest* is inserted in Condition 3 (*Interest*):

"(f)    *Index linked Interest*

Interest linked to a Single Index or to an Index Basket, as the case may be, may become payable on each Note on any Interest Payment Date (including if so specified the Maturity Date), as may be specified in the applicable Final Terms. Any rights to payment of interest may be conditional upon the satisfaction of all such conditions as may be set forth in the applicable Final Terms.

Subject to Condition 23 (*Disrupted Days*), the Calculation Agent will, at or as soon as practicable after each applicable Valuation Date (except the Initial Valuation Date), final Averaging Date or final Observation Date, as the case may be, determine the interest linked to the Index or the Index Basket, as the case may be, payable in respect of each Note (the "*Index Linked Interest Amount*") and notify the Fiscal Agent as soon as practicable after calculating the same. Each Index Linked Interest Amount shall be calculated in accordance with the

formulae set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards)."

2.  Condition 8(a) (*At Maturity*) is hereby amended and restated as follows:

"(a)   *At Maturity*

(A)   **Final Redemption Amount**

Unless previously redeemed or purchased or cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount (the "*Final Redemption Amount*") specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (*Payment Currency*)). If applicable, the Calculation Agent will, on or as soon as practicable after the Final Valuation Date, determine the Final Redemption Amount of each Index Linked Note and notify the Fiscal Agent as soon as practicable after calculating the same. The Calculation Agent shall calculate the Final Redemption Amount of each Index-Linked Note in accordance with the formula set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards).

(B)   **Certificates to be Final**

The provisions of Condition 3(b)(vii) (*Certificates to be Final*) shall apply, *mutatis mutandis* to any certificate, communication, opinion, calculation, determination, quotation and decision given, expressed, made or obtained by the Calculation Agent for the purposes of this Condition 8 (*Repayment, Redemption and Repurchase*)."

3.  The following Condition 8(j) (*Mandatory Early Redemption*) is inserted in Condition 8 (*Repayment, Redemption and Repurchase*):

"(j)   *Mandatory Early Redemption*

Unless the Notes have been previously redeemed or purchased and cancelled, if on any Mandatory Early Redemption Valuation Date a Mandatory Early Redemption Event occurs, then the Notes will be automatically redeemed in whole, but not in part, on the Mandatory Early Redemption Date immediately following such Mandatory Early Redemption Valuation Date and the redemption amount payable by the Issuer on such date upon redemption of each Note shall be an amount in the Specified Currency equal to the relevant Mandatory Early Redemption Amount.

As used herein:

"*Mandatory Early Redemption Amount*" means, in respect of each Mandatory Early Redemption Date, an amount equal to the product of (i) the Calculation Amount and (ii) the relevant Mandatory Early Redemption Rate relating to that Mandatory Early Redemption Date;

"*Mandatory Early Redemption Date*" means each date specified as such in the applicable Final Terms, subject in each case to adjustment in accordance with the Business Day Convention specified in the applicable Final Terms;

"*Mandatory Early Redemption Event*" means an event as further specified in the relevant Final Terms whereby the Closing Level of a specified Index or of all Indices in a basket, as the case may be, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is, as specified in the relevant Final Terms, (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Mandatory Early Redemption Level, or as the case may be, any other specified value;

"*Mandatory Early Redemption Level*" means the level per Index (which may be expressed as a percentage) specified as such or otherwise determined in the applicable Final Terms;

157

"*Mandatory Early Redemption Rate*" means, in respect of any Mandatory Early Redemption Date, the rate specified as such in the applicable Final Terms; and

"*Mandatory Early Redemption Valuation Date*" means each date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the corresponding provisions in Condition 23 (*Disrupted Days*) in relation to the Valuation Date shall apply *mutatis mutandis* as if references in such provisions to "Valuation Date" were to "Mandatory Early Redemption Valuation Date".

If the Notes are interest bearing, no further amounts of interest or principal would be payable after a Mandatory Early Redemption Date, unless otherwise specified in the Final Terms".

4.    The following Condition 23 (*Disrupted Days*) is hereby inserted into the Terms and Conditions:

"23    **Disrupted Days**

If, in respect of any Index, the Calculation Agent determines that any Valuation Date is a Disrupted Day, then

(i)    in the case of Index-Linked Notes relating to a single Index, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Index, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Index (the "*Deemed Date*") and (B) the Calculation Agent shall determine the level of that Index as of the Valuation Time on the Deemed Date in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on the Deemed Date of each relevant Component Asset (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant Component Asset on the Deemed Date, its good faith estimate of the value for the relevant Component Asset as of the Valuation Time on the Deemed Date); or

(ii)    in the case of Index-Linked Notes relating to an Index Basket, the Valuation Date for each Index not affected by the occurrence of a Disrupted Day shall be the scheduled Valuation Date and the Valuation Date for each Index affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Index, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Index (the "*Deemed Date*") and (B) the Calculation Agent shall determine the level of that Index as of the Valuation Time on the Deemed Date in accordance with the formula for and method of calculating that Index last in effect prior to the occurrence of the first Disrupted Day using the Exchange traded or quoted price as of the Valuation Time on the Deemed Date of each relevant Component Asset (or, if an event giving rise to a Disrupted Day has occurred in respect of the relevant Component Asset on the Deemed Date, its good faith estimate of the value for the relevant Component Asset as of the Valuation Time on the Deemed Date)."

5.  The following Condition 24 (*Adjustments to the Index*) is hereby inserted into the Terms and Conditions:

"24.  **Adjustments to the Index**

(a)  *Successor Index*

If the Closing Level of any Index is (i) not calculated and announced by the relevant Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case the index (the "*Successor Index*") will be deemed to be the relevant Index.

(b)  *Index Adjustment Event*

If (i) on or prior to the Final Valuation Date, last Observation Date, last Averaging Date, the last day of the Trigger Event Observation Period, the last Knock-in Determination Date or the last Knock-out Determination Date, a relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating the relevant Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain the relevant Index in the event of changes in constituent stock and capitalisation and other routine events) (an "*Index Modification*") or permanently cancels the relevant Index and no Successor Index exists (an "*Index Cancellation*") or (ii) on any Valuation Date, Observation Date, Averaging Date, Knock-in Determination Date or Knock-out Determination Day, an Index Sponsor fails to calculate and announce the relevant Index (an "*Index Disruption*" (provided that the Calculation Agent may, in its discretion, determine that such event instead results in the occurrence of a Disrupted Day) (and together with the Index Modification and the Index Cancellation, each, an "*Index Adjustment Event*"), then the Issuer may take the action described in (A) or (B) below:

A.  require the Calculation Agent to determine if such Index Adjustment Event has a material effect on the Notes and, if so, require the Calculation Agent to make its determination for the purposes of calculating the relevant level using, in lieu of a published level for the relevant Index, the level for that Index as at the relevant Valuation Date, Observation Date, Averaging Date, Knock-in Determination Date or Knock-out Determination Day, as the case may be, as determined by the Calculation Agent in accordance with the formula for and method of calculating the relevant Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event; or

B.  give notice to the Noteholders in accordance with Condition 15 (Notices) and redeem all, but not some only, of the Notes each nominal amount of Notes equal to the Calculation Amount being redeemed at the Cancellation Amount."

6.  The following Condition 25 (*Correction of Index*) is hereby inserted into the Terms and Conditions:

"25.  **Correction of Index**

In the event that the Closing Level of any Index is subsequently corrected and the correction is published by the relevant Exchange or Index Sponsor within one Settlement Cycle after the original publication, the Calculation Agent will determine the amount that is payable as a result of that correction, and, to the extent necessary, will adjust the relevant provisions to account for such correction, provided that any correction effected and published after the third weekday (meaning any day of the week except a Saturday or Sunday) prior to any Mandatory Early

Redemption Date, Interest Payment Date or the Maturity Date, as the case may be, shall be ignored.

For the purposes of this Condition, the following terms shall have the following respective meanings:

"*Clearance System*" means, in respect of an Index at any time, the domestic clearance system customarily used for settling trades in the relevant Component Assets at that time;

"*Clearance System Business Day*" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"*Settlement Cycle*" means, in respect of an Index, the period of Clearance System Business Days following a trade in the relevant Component Assets on the relevant Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of the relevant Index, the longest such period); and

"*Settlement Disruption Event*" means, in respect of an Index, an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of relevant Component Assets."

7.      The following Condition 26 (*Additional Disruption Events*) is hereby inserted into the Terms and Conditions:

"26.   **Additional Disruption Events**

In the event that an Additional Disruption Event occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (a)(1) make such adjustment to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (b) if the Calculation Agent determines that no adjustment that it could make under (a) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each Noteholder the Cancellation Amount with respect to each Note held by such Noteholder."

8.      The following Condition 27 (K*nock-in, Knock-out Provisions*) is hereby inserted into the Terms and Conditions:

"27    **Knock-in, Knock-out Provisions**

If "*Knock-in Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-in Event shall be conditional upon the occurrence of such Knock-in Event.

If "*Knock-out Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-out Event shall be conditional upon the occurrence of such Knock-out Event.

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is the Valuation Time and if on any Knock-in Determination Day or Knock-out Determination Day at any time during the one hour period that begins and/or ends at the Valuation Time the level of the Index triggers the Knock-in Level or the Knock-out Level, and a Trading Disruption, Exchange Disruption or Early Closure occurs or exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred; provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the

160

Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the level of the Index as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is any time or period of time during the regular trading hours on the relevant Exchange and if on any Knock-in Determination Day or Knock-out Determination Day and at any time during the one-hour period that begins and/or ends at the time on which the level of the Index triggers the Knock-in Level or the Knock-out Level, a Trading Disruption, Exchange Disruption or Early Closure occurs or exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred, provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the level of the Index as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

Definitions

Unless otherwise specified in the applicable Final Terms:

"*Knock-in Event*" means (i) in the case of a single Index, that the level of the Index determined by the Calculation Agent as of the Knock-in Valuation Time on any Knock-in Determination Day is and (ii) in the case of an Index Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Index as the product in respect of each Index of (x) the level of such Index as of the Knock-in Valuation Time on any Knock-in Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-in Level specified in the applicable Final Terms.

"*Knock-in Level*" means (i) in the case of a single Index, the level of the Index specified and (ii) in the case of an Index Basket, the level in each case specified as such or otherwise determined in the applicable Final Terms, subject to adjustment from time to time in accordance with the provisions of Condition 24 (*Adjustments to the Index*) above.

"*Knock-in Determination Day*" means the date(s) specified as such in the applicable Final Terms, or each Scheduled Trading Day during the Knock-in Determination Period.

"*Knock-in Determination Period*" means, in respect of a single Index or an Index Basket, the period which commences on, and includes, the Knock-in Period Beginning Date and ends on, and includes, the Knock-in Period Ending Date.

"*Knock-in Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Valuation Time*" means the time or period of time on any Knock-in Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-in Valuation Time, the Knock-in Valuation Time shall be the Valuation Time.

"*Knock-out Determination Day*" means the date(s) as specified in the applicable Final Terms, or each Scheduled Trading Day during the Knock-out Determination Period.

"*Knock-out Determination Period*" means the period which commences on, and includes, the Knock-out Period Beginning Date and ends on, and includes, the Knock-out Period Ending Date.

"*Knock-out Event*" means (i) in the case of a single Index, that the level of the Index determined by the Calculation Agent as of the Knock-out Valuation Time on any Knock-out Determination Day is and (ii) in the case of an Index Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Index as the product in respect of each Index of (x) the level of such Index as of the Knock-out Valuation Time on any Knock-out Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-out Level as specified in the applicable Final Terms.

"*Knock-out Level*" means (i) in the case of a single Index the level of the Index and (ii) in the case of an Index Basket, the level, in each case specified as such or otherwise determined in the applicable Final Terms, subject to adjustment from time to time in accordance with the provisions of Condition 24 (*Adjustments to the Index*) above.

"*Knock-out Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Valuation Time*" means the time or period of time on any Knock-out Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-out Valuation Time, the Knock-out Valuation Time shall be the Valuation Time.

9.    The following Condition 28 (*Autocallable Index-Linked Note Definitions*) is hereby inserted into the Terms and Conditions:

"28    **Autocallable Index-Linked Note Definitions**

"*Adjusted Strike Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Strike Level Adjustment Percentage and (ii) the Strike Level of such Index;

"*Adjusted Strike Level$_{Worst}$*" means the Adjusted Strike Level in respect of the Worst Performing Index;

"*Barrier Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level of such Index;

"*Barrier Level$_{Worst}$*" means, in relation to the Worst Performing Index, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Level Worst;

"*Barrier Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Closing Level$_{Worst}$*" means, in relation to the Worst Performing Index and any Scheduled Trading Day, the Closing Level in respect of such Worst Performing Index on such day, as determined by the Calculation Agent;

"*Performance*" means, in relation to an Index, a value determined by the Calculation Agent in accordance with the following formula:

**Performance = Final Level/Strike Level**

"*Strike Level*" means, in relation to an Index, the Closing Level of such Index on the Initial Valuation Date;

"*Strike Level Adjustment Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Strike Level*ₓₒᵣₛₜ" means the Strike Level of the Worst Performing Index;

"*Trigger Event*" means either a Trigger Event (Closing Observation), a Trigger Event (Intraday Observation) or such other event as specified in the applicable Final Terms;

"*Trigger Event (Closing Observation)*" means the determination by the Calculation Agent that on any Trigger Event Observation Date the Closing Level of any Index as calculated and announced by the Index Sponsor at the Trigger Event Valuation Time is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"*Trigger Event Date*" means a date on which a Trigger Event has occurred as determined by the Calculation Agent;

"*Trigger Event (Intraday Observation)*" means the determination by the Calculation Agent that at any time during the regular trading session hours on any Trigger Event Observation Date the level of any Index is less than or equal to the relevant Trigger Level, as determined by the Calculation Agent;

"*Trigger Event Observation Date*" means each Scheduled Trading Day during the Trigger Event Observation Period provided that if at any relevant time on any such Scheduled Trading Day there is a Market Disruption Event, as determined by the Calculation Agent in its sole and absolute discretion, then notwithstanding the fact that there is a Market Disruption Event on such Trigger Event Observation Date, the Calculation Agent shall determine in good faith and in a commercially reasonable manner whether a Trigger Event has occurred during such Market Disruption Event;

"*Trigger Event Observation Period*" means the period from and including the Initial Valuation Date to and including the Final Valuation Date or as otherwise specified in the Final Terms;

"*Trigger Event Valuation Time*" means the time or period of time on any Trigger Event Observation Date specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Trigger Event Valuation Time, the Trigger Event Valuation Time shall be the Valuation Time.

"*Trigger Level*" means, in relation to an Index, an amount equal to the product of (i) the relevant Trigger Percentage and (ii) the Strike Level of such Index;

"*Trigger Percentage*" means, in relation to an Index, the percentage specified in the applicable Final Terms;

"*Worst Performing Index*" means the Index with the lowest Performance, as determined by the Calculation Agent.

10.    The following Condition 29 (Determinations by the Calculation Agent) is hereby inserted into the Terms and Conditions:

"29.    **Determinations by the Calculation Agent**

All determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding on all holders of the Notes. The Calculation Agent will be appointed by the Issuer and may be an affiliate of the Issuer. The

Calculation Agent is obligated to carry out its duties and functions as Calculation Agent in good faith and using its commercially reasonable judgment. Furthermore, the Calculation Agent will not act as a fiduciary or as an advisor to the Noteholders in respect of its duties as Calculation Agent. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own wilful default, negligence or bad faith or that of its officers or agents.

Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes."

## Annex 8

**Additional Terms and Conditions for Equity-Linked Notes**

*The terms and conditions of Equity-Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

**(A)    Definitions and General Terms**

The following definitions shall be included in the Terms and Conditions of the Equity-Linked Notes of any Series, subject as otherwise provided in the applicable Final Terms:

"*Additional Disruption Event*" means any of Change in Law, Failure to Deliver and/or Hedging Disruption, in each case if specified in the applicable Final Terms.

"*Averaging Date*" means each date specified as an Averaging Date in the applicable Final Terms or, if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent any such day is a Disrupted Day. If any such day is a Disrupted Day, then:

(a)    If "*Omission*" is specified as applying in the applicable Final Terms, then such date will be deemed not to be an Averaging Date for the purposes of determining the relevant price provided that, if through the operation of this provision no Averaging Date would occur, then the provisions of Condition 23 (*Disrupted Days*) will apply for purposes of determining the relevant price on the final Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day; or

(b)    if "*Postponement*" is specified as applying in the applicable Final Terms, then the provisions of Condition 23 (*Disrupted Days*) will apply for the purposes of determining the relevant price on that Averaging Date as if such Averaging Date were a Valuation Date that was a Disrupted Day irrespective of whether, pursuant to such determination, that deferred Averaging Date would fall on a day that already is or is deemed to be an Averaging Date; or

(c)    if "*Modified Postponement*" is specified as applying in the applicable Final Terms then:

(i)    where the Notes are Equity-Linked Notes relating to a single Share, the Averaging Date shall be the first succeeding Valid Date (as defined below), provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth following Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Share, and (B) the Calculation Agent shall determine the relevant price for that Averaging Date in accordance with sub-paragraph (i)(B) of Condition 23 (*Disrupted Days*) below;

(ii) where the Notes are Equity-Linked Notes relating to a Share Basket, the Averaging Date for each Share not affected by the occurrence of a Disrupted Day shall be the originally designated Averaging Date (the "*Scheduled Averaging Date*") and the Averaging Date for each Share affected by the occurrence of a Disrupted Day shall be the first succeeding Valid Date (as defined below) in relation to such Share, provided that (A) such day shall not be later than and shall be deemed to be the earlier to occur of (i) the eighth following Scheduled Trading Day immediately following the date that, but for the occurrence of another Averaging Date or Disrupted Day, would have been an Averaging Date; and (ii) the third weekday (meaning a day any day other than a Saturday or a Sunday) prior to a relevant Interest Payment Date, Mandatory Early Redemption Date or Maturity Date, as the case may be, notwithstanding that such day is not a Valid Date in respect of such Share, and (B) the Calculation Agent shall determine the relevant price for that Averaging Date in accordance with sub-paragraph (ii)(B) of Condition 23 (*Disrupted Days*) below; and

(iii) for the purposes of these Terms and Conditions "*Valid Date*" means a Scheduled Trading Day that is not a Disrupted Day and on which another Averaging Date does not or is not deemed to occur.

"*Calculation Agent*" means Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, or any other entity as specified in the applicable Final Terms;

"*Cancellation Amount*" means an amount per Note in the Specified Currency:

(i) determined by the Calculation Agent in its sole and absolute discretion acting in good faith in order to produce a commercially reasonable result and determined as of the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket or, if the Calculation Agent determines that would not be commercially reasonable, as of such date following the date that the Notes are cancelled or, as the case may be, one or more Share Issuers are removed from the Share Basket as the Calculation Agent determines would be commercially reasonable; and

(ii) to be paid to the Noteholders following a cancellation or removal of one or more Share Issuers from the Share Basket, being (a) the fair market value of a Note or, as the case may be, the amount of losses or gains resulting from the removal of one or more Share Issuers from the Share Basket, and (b) adjusted to account fully for any losses, expenses and costs to the Issuer (or any of its affiliates) of unwinding any underlying or related hedging and funding arrangements, all as determined by the Calculation Agent in its sole and absolute discretion;

and, in determining such amount, the Calculation Agent may in its sole and absolute discretion, consider any relevant information, including, without limitation, one or more of the following types of information:

(a) quotations (either firm or indicative) supplied by one or more third parties that may take into account the current creditworthiness of the Calculation Agent at the time the quotation is provided and the terms of any relevant documentation, including credit support documentation, between the Calculation Agent and the third party providing the quotation;

(b) information consisting of relevant market data in the relevant markets supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads correlation or other relevant market data in the relevant market; or

(c) information of the types described in (a) or (b) above from internal sources (including any affiliates of the Calculation Agent) if that information is of the same type used by the Calculation Agent in the regular course of its business for the valuation of similar transactions;

"*Cash Settlement*" has the meaning given in Condition 8(a) (*At Maturity*);

"*Change in Law*" means that, on or after the Trade Date (as specified in the applicable Final Terms) (A) due to the adoption of or any change in any applicable law or regulation (including, without limitation, any tax law), or (B) due to the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), the Issuer determines in its sole and absolute discretion that it has become illegal to hold, acquire or dispose of any relevant Share;

"*Clearance System*" means Euroclear and/or Clearstream, Luxembourg or any successor to any such clearance system as determined by the Calculation Agent or, if such clearance system does not or ceases to settle trades in the Shares, such other clearance system as is determined by the Calculation Agent to be the principal domestic clearance system customarily used for settling trades in the relevant Shares;

"*Clearance System Business Day*" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"*Closing Price*" means, in relation to the Shares of a Share Issuer and any Scheduled Trading Day, the price per Share in respect of such Shares on the applicable Exchange at the Valuation Time on such day, as determined by the Calculation Agent;

"*Closing Price$_{Worst}$*" means, in relation to the Worst Performing Shares and any Scheduled Trading Day, the Closing Price in respect of such Worst Performing Shares on such day, as determined by the Calculation Agent;

"*Disrupted Day*" means any Scheduled Trading Day on which a relevant Exchange or Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred. The Calculation Agent shall as soon as reasonably practicable under the circumstances notify the Issuer of the occurrence of a Disrupted Day on any day that is, or but for the occurrence of a Disrupted Day, would have been a Valuation Date, an Averaging Date, or an Observation Date, as the case may be. Without limiting the obligation of the Calculation Agent to notify the Issuer as set forth in the preceding sentence, failure by the Calculation Agent to notify the Issuer of the occurrence of a Disrupted Day shall not affect the validity of the occurrence and effect of such Disrupted Day;

"*Early Closure*" means, in respect of the Shares of a Share Issuer, the closure on any Exchange Business Day of the relevant Exchange or Related Exchange prior to its Scheduled Closing Time unless, where the price of the relevant Shares is to be determined at the Valuation Time, such earlier closing time is announced by such relevant Exchange or Related Exchange at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on the relevant Exchange or Related Exchange on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the relevant Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day;

"*Exchange*" means, in respect of the Shares of a Share Issuer, the exchange or quotation system specified as such for such Shares in the applicable Final Terms or any successor to such exchange or quotation system or any substitute exchange or quotation to which trading in such Shares has temporarily relocated, provided however that if the specified Exchange ceases to list or otherwise include the relevant Shares, the Calculation Agent will select another exchange or quotation system (if any) in relation to such Shares; and "*Exchanges*" means, as the context requires, such stock exchanges or quotation systems in respect of the Shares of all of the Share Issuers;

"*Exchange Business Day*" means any Scheduled Trading Day on which the relevant Exchange and the Related Exchange are open for trading during their respective regular trading sessions, notwithstanding any such relevant Exchange or Related Exchange closing prior to its Scheduled Closing Time;

"*Exchange Disruption*" means, in respect of the Shares of a Share Issuer, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions in, or obtain market values for, such Shares on the relevant Exchange, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to such Shares on the relevant Related Exchange;

"*Extraordinary Dividend*" means a dividend or portion thereof characterised as such by the Calculation Agent;

"*Extraordinary Event*" means a Merger Event, Tender Offer, Nationalisation, Insolvency or Delisting (as such terms are defined in Condition 24 (*Potential Adjustment Events and Extraordinary Events*));

"*Failure to Deliver*" means failure of the Issuer and/or any of its affiliates to deliver, when due, the Shares comprising the Physical Settlement Amount, where such failure to deliver is due to illiquidity in the market for such Shares.

"*Final Price*" means in relation to the Shares of a Share Issuer, unless otherwise specified in the applicable Final Terms, and subject as referred to in "Valuation Date" below or "Averaging Date" above, as the case may be:

(i)     in the case of Equity-Linked Notes relating to a single Share, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Price of the Shares on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Prices of the Shares on each Averaging Date; and

(ii)    in the case of Equity-Linked Notes relating to a Share Basket and in respect of each Share comprising the basket, (A) if Averaging is not specified in the applicable Final Terms, an amount equal to the Closing Price of such Share on the Valuation Date or the Observation Date or (B) if Averaging is specified in the applicable Final Terms, an amount equal to the arithmetic mean of the Closing Prices of such Shares on each Averaging Date and, in either case, multiplied by the relevant Weighting;

"*Final Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Fractional Share Amount*" has the meaning given in Condition 25(A)(ii) (*Fractions of a Share*);

"*Hedging Disruption*" means that the Issuer or any of its affiliates is unable, after using commercially reasonable efforts, to (a) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the equity or other price risk (or any other relevant price risk including, but not limited to, the currency risk) of the Issuer issuing and performing its obligations with respect to the Notes, or (b) realise, recover, receive, repatriate, remit or transfer the proceeds of any such transaction(s) or asset(s);

"*Initial Valuation Date*" means the date specified as such in the applicable Final Terms, or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Market Disruption Event*" means, in relation to Notes relating to the Shares of a Share Issuer, the occurrence or existence at any time of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material and, where the price of the relevant Shares is to be determined at the Valuation Time, which occurs at any time during the one hour period that (x) for the purposes of the occurrence of a Knock-in Event or a Knock-out Event begins or ends at the time when the price of such Shares triggers respectively the Knock-in Price or the Knock-out Price or (y) in all other circumstances ends at the relevant Valuation Time, or (iii) an Early Closure;

168

The Calculation Agent shall give notice as soon as practicable to the Noteholders in accordance with Condition 12 (*Notices*) of the occurrence of a Disrupted Day on any day that, but for the occurrence of a Disrupted Day would have been an Averaging Date, an Observation Date, a Knock-in Determination Day, a Knock-out Determination Day, a Trigger Event Date or a Valuation Date.

"*Number of Shares*" means, in respect of each Note and in relation to the Shares of a Share Issuer, the number of Shares specified as such in the applicable Final Terms;

"*Number of Shares*ₒᵣₛₜ" means the Number of Shares in respect of the Worst Performing Shares;

"*Observation Date*" means each date specified as an Observation Date in the applicable Final Terms, or if any such date is not a Scheduled Trading Day, the immediately following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the provisions relating to "Omission", "Postponement" or "Modified Postponement", as the case may be, contained in the definition of "Averaging Date" shall apply *mutatis mutandis* as if references in such provisions to "Averaging Date" were to "Observation Date".

"*Observation Period*" means the period specified as the Observation Period in the applicable Final Terms.

"*Performance*" means, in relation to the Shares of a Share Issuer, a value determined by the Calculation Agent in accordance with the following formula:

**Performance = Final Price/Strike Price**

"*Physical Settlement*" has the meaning given in Condition 8(a) (*At Maturity*);

"*Physical Settlement Amount*" has the meaning given in Condition 25(A) (*Physical Settlement Amount*);

"*Proceeds of Sale*" has the meaning given in Condition 25(C) (*Procedure for Physical Settlement*);

"*Related Exchange*" means, in respect of the Shares of a Share Issuer, the exchange specified as such for such Shares in the applicable Final Terms, any successor to such exchange or quotation system or any substitute exchange or quotation system to which trading in futures or options contracts relating to such Shares has temporarily relocated (provided that the Calculation Agent has determined that there is comparable liquidity relative to the futures or options contracts relating to such Shares on such temporary substitute exchange or quotation system as on the original Related Exchange); and "*Related Exchanges*" means, as the context requires, such exchanges or quotation systems in respect of all or any one or more of the Shares; provided that where "*All Exchanges*" is specified as the Related Exchange in respect of the Shares of a Share Issuer in the applicable Final Terms, "Related Exchange" shall mean each exchange or quotation system where trading has a material effect (as determined by the Calculation Agent) on the overall market for futures or options contracts relating to such Shares;

"*Scheduled Closing Time*" means, in respect of a relevant Exchange or Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such relevant Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"*Scheduled Trading Day*" means any day on which each Exchange and each Related Exchange are scheduled to be open for trading for their respective regular trading sessions, *provided*, however that if, with respect to Equity Linked Notes relating to a Share Basket "Scheduled Trading Day (Per Share Basis)" applies, as stated in the applicable Final Terms, the conditions for a Scheduled Trading Day shall be determined separately in respect of each Share in the Basket, with the consequence that each of such Shares be valued independently of each other, and the provisions in relation to Disrupted Day, Averaging Date, Observation Date, Closing Price, Final Price and Exchange Business Day shall be applied and construed by the Calculation Agent accordingly;

"*Settlement Disruption Event*" means, in respect of the Shares of a Share Issuer, an event beyond the control of the Issuer as a result of which the relevant Clearance System cannot clear the transfer of such Shares;

"*Share Basket*" means the basket of shares (each a "*Share*" and collectively the "*Shares*" which shall refer to any one or more of the Shares included in the Share Basket, as the context requires) of the companies described in the applicable Final Terms or any Replacement Share Issuer (as defined below) selected by the Calculation Agent in accordance with the terms hereof (each a "*Share Issuer*");

"*Strike Price*" means, in relation to the Shares of a Share Issuer, the Closing Price of such Shares on the Initial Valuation Date;

"*Strike Price*<sub>Worst</sub>" means the Strike Price of the Worst Performing Shares;

"*Trading Disruption*" means, in respect of the Shares of a Share Issuer, any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) relating to the relevant Share on the relevant Exchange, or (ii) in futures or options contracts relating to the relevant Share on the relevant Related Exchange;

"*Valuation Date*" means each date specified as such in the applicable Final Terms (including the Initial Valuation Date and the Final Valuation Date), or if such day is not a Scheduled Trading Day, the next following Scheduled Trading Day, and subject to Condition 23 (*Disrupted Days*);

"*Valuation Time*" means in respect of the Shares of a Share Issuer, unless otherwise specified in the applicable Final Terms, the official close of trading on the relevant Exchange; and

"*Weighting*" for each Share means the weighting of such Share in the Basket as specified in the applicable Final Terms, or if Weighting is specified as not applicable, the Shares shall be deemed to be equally weighted.

"*Worst Performing Shares*" means the Shares of the Share Issuer with the lowest Performance, as determined by the Calculation Agent.

**(B)    Amendments to, and Restatements of, the Terms and Conditions**

1.    The following Condition 3(f) *Equity linked Interest* is inserted in Condition 3 (*Interest*):

"(f) *Equity linked Interest*

Interest linked to a single Share or to a Share Basket, as the case may be, may become payable on each Note on any Interest Payment Date (including if so specified the Maturity Date), as may be specified in the applicable Final Terms. Any rights to payment of interest may be conditional upon the satisfaction of all such conditions as may be set forth in the applicable Final Terms.

Subject to Condition 23 (*Disrupted Days*), the Calculation Agent will, at or as soon as practicable after each applicable Valuation Date (except the Initial Valuation Date), final Averaging Date or final Observation Date, as the case may be, determine the interest linked to the Share or the Share Basket, as the case may be, payable in respect of each Note (the "*Equity Linked Interest Amount*") and notify the Fiscal Agent as soon as practicable after calculating the same. Each Equity Linked Interest Amount shall be calculated in accordance with the formulae set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards)."

2.    Condition 8(a) (*At Maturity*) is hereby amended and restated as follows:

"(a)    *At Maturity*

(A)    **Final Redemption Amount**

Unless Physical Settlement applies and unless previously redeemed or purchased or cancelled as specified below, each Note will be redeemed by the Issuer at its Final Redemption Amount (the "*Final Redemption Amount*") specified in, or determined in the manner specified in, the applicable Final Terms in the relevant Specified Currency (except as otherwise provided in Condition 6 (*Payment Currency*)) ("*Cash Settlement*"). If applicable, the Calculation Agent will, on or as soon as practicable after the Final Valuation Date, determine the Final Redemption Amount of each Equity Linked Note and notify the Fiscal Agent as soon as practicable after calculating the same. The Calculation Agent shall calculate the Final Redemption Amount of each Equity Linked Note in accordance with the formula set forth in the applicable Final Terms and rounding the resultant figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards).

(B)    **Physical Settlement**

If the applicable Final Terms so provide, physical settlement shall apply to the Notes, in which case the Issuer shall, on the Maturity Date, deliver the Physical Settlement Amount to or to the order of each Noteholder in accordance with, and subject to, Condition 25 (*Physical Settlement*) ("*Physical Settlement*").

(C)    **Certificates to be Final**

The provisions of Condition 3(b)(vii) (*Certificates to be Final*) shall apply, *mutatis mutandis* to any certificate, communication, opinion, calculation, determination, quotation and decision given, expressed, made or obtained by the Calculation Agent for the purposes of this Condition 8 (*Repayment, Redemption and Repurchase*)."

3.    The following Condition 8(j) (*Mandatory Early Redemption*) is inserted in Condition 8 (*Repayment, Redemption and Repurchase*):

"(j)    *Mandatory Early Redemption*

Unless the Notes have been previously redeemed or purchased and cancelled, if on any Mandatory Early Redemption Valuation Date a Mandatory Early Redemption Event occurs, then the Notes will be automatically redeemed in whole, but not in part, on the Mandatory Early Redemption Date immediately following such Mandatory Early Redemption Valuation Date and the redemption amount payable by the Issuer on such date upon redemption of each Note shall be an amount in the Specified Currency equal to the relevant Mandatory Early Redemption Amount.

As used herein:

"*Mandatory Early Redemption Amount*" means, in respect of each Mandatory Early Redemption Date, an amount equal to the product of (i) the Calculation Amount and (ii) the relevant Mandatory Early Redemption Rate relating to that Mandatory Early Redemption Date;

"*Mandatory Early Redemption Date*" means each date specified as such in the applicable Final Terms, subject in each case to adjustment in accordance with the Business Day Convention specified in the applicable Final Terms;

"*Mandatory Early Redemption Event*" means an event as further specified in the relevant Final Terms whereby the Closing Price of a specified Share or of all Shares in a basket, as the case may be, as determined by the Calculation Agent as of any Mandatory Early Redemption Valuation Date is, as specified in the relevant Final Terms, (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Mandatory Early Redemption Price, or as the case may be, any other specified value;

"*Mandatory Early Redemption Price*" means the price per Share (which may be specified as a percentage) specified as such or otherwise determined in the applicable Final Terms;

"*Mandatory Early Redemption Rate*" means, in respect of any Mandatory Early Redemption Date, the rate specified as such in the applicable Final Terms; and

"*Mandatory Early Redemption Valuation Date*" means each date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day unless, in the opinion of the Calculation Agent, any such day is a Disrupted Day. If any such day is a Disrupted Day, then the corresponding provisions in Condition 23 (*Disrupted Days*) in relation to the Valuation Date shall apply *mutatis mutandis* as if references in such provisions to "Valuation Date" were to "Mandatory Early Redemption Valuation Date".

If the Notes are interest bearing, no further amounts of interest or principal would be payable after a Mandatory Early Redemption Date, unless otherwise specified in the Final Terms."

4.    The following Condition 23 (*Disrupted Days*) is hereby inserted into the Terms and Conditions:

"23    **Disrupted Days**

If, in respect of the Shares of any Share Issuer, the Calculation Agent determines that any Valuation Date is a Disrupted Day, then

(i)    in the case of Equity-Linked Notes relating to a single Share, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Share, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Share (the "*Deemed Date*") and (B) the Calculation Agent shall determine its good faith estimate of the value for such Shares that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date.; or

(ii)    in the case of Equity-Linked Notes relating to a Share Basket, the Valuation Date for the Shares of each Share Issuer not affected by the occurrence of a Disrupted Day shall be the scheduled Valuation Date and the Valuation Date for the Shares of each Share Issuer affected by the occurrence of a Disrupted Day shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to such Shares, provided that (A) such day shall not be later than, and shall be deemed to be the earlier of (i) the eighth succeeding Scheduled Trading Day and (ii) the third weekday (meaning any day other than a Saturday or a Sunday) immediately prior to the relevant Interest Payment Date, the relevant Mandatory Early Redemption Date or the Maturity Date, as the case may be, notwithstanding that such day is a Disrupted Day in respect of such Share (the "*Deemed Date*") and (B) the Calculation Agent shall determine its good faith estimate of the value for such Shares that would have prevailed but for that Disrupted Day as of the Valuation Time on that Deemed Date."

5.    The following Condition 24 (*Potential Adjustment Events and Extraordinary Events*) is hereby inserted into the Terms and Conditions:

"24    **Potential Adjustment Events and Extraordinary Events**

(A)    *Definitions*: In these Terms and Conditions, the following terms will have the following meaning:

(i)    "*Delisting*" means that the relevant Exchange announces that pursuant to the rules of such Exchange, the Shares of a Share Issuer cease (or will cease) to be listed, traded or publicly quoted on the relevant Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted (i) in respect of any Share whose Exchange is located in the United States of America, on the New York Stock Exchange, the American Stock Exchange or the NASDAQ NMS, (ii) in respect of

172

any Share whose Exchange is located in the European Union, in any member state of the European Union and (iii) in respect of any Share whose Exchange is located elsewhere, on an exchange or quotation system located in the same country as the Exchange;

(ii)    "*Insolvency*" means that by reason of the voluntary or involuntary liquidation, bankruptcy, insolvency, dissolution or winding-up of or any analogous proceedings affecting a Share Issuer (i) all the Shares of a Share Issuer are required to be transferred to a trustee, liquidator or other similar official or (ii) holders of the Shares of a Share Issuer, become legally prohibited from transferring them;

(iii)   "*Merger Date*" means the closing date of a Merger Event or, where a closing date cannot be determined under the local law applicable to such Merger Event, such other date as determined by the Calculation Agent;

(iv)    "*Merger Event*" means, as determined by the Calculation Agent in its sole discretion in respect of any relevant Shares, any (i) reclassification or change of such Shares that results in a transfer of or an irrevocable commitment to transfer all of such Shares outstanding to another entity or person, (ii) consolidation, amalgamation, merger or binding share exchange of the Share Issuer with or into another entity or person (other than a consolidation, amalgamation, merger or binding share exchange in which such Share Issuer is the continuing entity and which does not result in a reclassification or change of all of such Shares outstanding), (iii) takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person to purchase or otherwise obtain 100 per cent. of the outstanding Shares of the Share Issuer that results in a transfer of or an irrevocable commitment to transfer all such Shares (other than such Shares owned or controlled by such other entity or person), or (iv) consolidation, amalgamation, merger or binding share exchange of the Share Issuer or its subsidiaries with or into another entity in which the Share Issuer is the continuing entity and which does not result in a reclassification or change of all such Shares outstanding but results in the outstanding Shares (other than Shares owned or controlled by such other entity) immediately prior to such event collectively representing less than 50 per cent. of the outstanding Shares immediately following such event (a "*Reverse Merger*"), in each case if the Merger Date is on or before the Final Valuation Date;

(v)     "*Nationalisation*" means that all the Shares or all or substantially all the assets of a Share Issuer are nationalised, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof;

(vi)    "*Potential Adjustment Event*" means any of the following:

(1)    a subdivision, consolidation or reclassification of Shares (unless resulting in a Merger Event) or, a free distribution or dividend of any Shares to existing holders by way of bonus, capitalisation or similar issue;

(2)    a distribution, issue or dividend to existing holders of the Shares of (a) such Shares or (b) other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of a Share Issuer equally or proportionately with such payments to holders of such Shares or (c) share capital or other securities of another issuer acquired or owned (directly or indirectly) by the Share Issuer as a result of a spin-off or other similar transaction, or (d) any other type of securities, rights or warrants or other assets, in any case for payment (in cash or otherwise) at less than the prevailing market price as determined by the Calculation Agent;

(3)    an Extraordinary Dividend;

(4)    a call by a Share Issuer in respect of the relevant Shares which are not fully paid;

(5)   a repurchase by a Share Issuer or any of its subsidiaries of relevant Shares whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise;

(6)   in respect of a Share Issuer, an event that results in any shareholder rights being distributed or becoming separated from shares of common stock or other shares of the capital stock of the Share Issuer pursuant to a shareholder rights plan or arrangement directed against hostile takeovers that provides upon the occurrence of certain events for a distribution of preferred stock, warrants, debt instruments or stock rights at a price below their market value, as determined by the Calculation Agent, provided that any adjustment effected as a result of such an event shall be readjusted upon any redemption of such rights; or

(7)   any other event having, in the opinion of the Calculation Agent, a diluting or concentrative effect on the theoretical value of the Shares or of the composition of the Share Basket;

(vii)   "*Tender Offer*" means a takeover offer, tender offer, exchange offer, solicitation, proposal or other event by any entity or person that results in such entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10 per cent. and less than 100 per cent. of the outstanding Shares, as determined by the Calculation Agent, based upon the makings of filings with governmental or self-regulatory agencies or such other information as the Calculation Agent deems relevant; "*Tender Offer Date*" means, in respect of a Tender Offer, the date on which Shares in the amount of the applicable percentage threshold are actually purchased or otherwise obtained (as determined by the Calculation Agent).

*(B)*   **Potential Adjustment Events**: Following the declaration by a Share Issuer of the terms of any Potential Adjustment Event, the Calculation Agent will, in its sole and absolute discretion, determine whether such Potential Adjustment Event has a diluting or concentrative effect on the theoretical value of the relevant Shares or on the composition of the Share Basket and, if so, the Calculation Agent will determine in its sole and absolute discretion the appropriate adjustment(s), if any, to be made to the terms of the Conditions as the Calculation Agent determines appropriate to account for the Potential Adjustment Event and determine the effective date(s) of that adjustment(s) (including but not limited to adjustment(s) to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Share). The Calculation Agent may (but need not) determine the appropriate adjustment(s) by reference to the adjustment(s) in respect of the Potential Adjustment Event made by an options exchange to options on the Shares traded on that options exchange.

*(C) Merger Event or Tender Offer*: In respect of each Merger Event or Tender Offer, the following terms have the meanings given below:

**Share-for-Share** means, (i) in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists (or, at the option of the holder of such Shares, will consist) solely of New Shares and (ii) a Reverse Merger;

**Share-for-Other** means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists solely of Other Consideration;

**Share-for-Combined** means, in respect of a Merger Event or Tender Offer, that the consideration for the relevant Shares consists of Combined Consideration;

**New Shares** means ordinary or common shares, whether of the entity or person (other than the Share Issuer) involved in the Merger Event or the making of the Tender Offer or a third party, that are, or that as of the Merger Date or Tender Offer Date are promptly scheduled to be, (A) publicly quoted, traded or listed (i) in respect of the Shares of any Share Issuer which Exchange is located in the United States of America, on the New

174

York Stock Exchange, the American Stock Exchange or the NASDAQ NMS, (ii) in respect of the Shares of any Share Issuer which Exchange is located in the European Union, in any member state of the European Union and (iii) in respect of the Shares of any Share Issuer which Exchange is located elsewhere, on an exchange or quotation system located in the same country as the Exchange and (B) not subject to any currency exchange controls, trading restrictions or other trading limitations;

***Other Consideration*** means cash and/or any securities (other than New Shares) or assets (whether of the entity or person (other than the Share Issuer) involved in the Merger Event or the making of a Tender Offer or a third party); and

***Combined Consideration*** means New Shares in combination with Other Consideration.

If a Merger Event or Tender Offer occurs, the Calculation Agent will in its sole and absolute discretion take any of the actions described in (1) (2) (3) and/or (4) below, as applicable:

(1)    (a)    in respect of each Share-for-Share Merger Event or, as the case may be, each Share-for-Share Tender Offer, on or after the relevant Merger Date or, as the case may be, the Tender Offer Date make such adjustment(s) the Calculation Agent acting in its sole discretion considers appropriate to reflect the number of New Shares to which a holder of one relevant Share immediately prior to the occurrence of the Merger Event or, as the case may be, the Tender Offer would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer and the New Shares will be deemed to be the relevant Shares and the issuer thereof will be deemed the Share Issuer, respectively, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

(b)    in respect of each Share-for-Other Merger Event or, as the case may be, each Share-for-Other Tender Offer, on or after the relevant Merger Date or, as the case may be, the Tender Offer Date, the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one relevant Share would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer will be applied by the Calculation Agent to determine such adjustment(s) as it acting in its sole discretion considers appropriate in respect of such Share, and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares); or

(c)    in respect of each Share-for-Combined Merger Event or, as the case may be, each Share-for Combined Tender Offer, on or after the Merger Date or, as the case may be, the Tender Offer Date, the number of New Shares and the amount of Other Consideration (as subsequently modified in accordance with any relevant terms and including the proceeds of any redemption, if applicable) to which a holder of one of the relevant Shares would be entitled upon consummation of the Merger Event or, as the case may be, the Tender Offer will be applied by the Calculation Agent to determine such adjustment(s) as it acting in its sole discretion considers appropriate with respect to the affected Shares and the issuer of such New Shares and, if necessary, the Calculation Agent will adjust any other relevant terms (including, without limitation, adjustments to account for

changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares);

(2)    if, in the case of Equity-Linked Notes relating to a Share Basket, at any time the Calculation Agent determines that a Merger Event or Tender Offer has led, or would lead, to the merger, consolidation or any other combination of the Shares of two or more Share Issuers (a "**Share Issuer Merger**"), the Calculation Agent will determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions (each a "**Replaced Share Issuer**") and shall be entitled either (i) to select one or more new entities (as the case may be) (each a "**Replacement Share Issuer**") to be a Share Issuer in place of the Replaced Share Issuer or Share Issuers as of a date determined by the Calculation Agent (a "**Replacement Date**") or (ii) to adjust the Weighting of the Shares of the remaining Share Issuers in the basket. Any Replacement Share Issuer will, to the extent practicable, be selected from the same industry, have shares denominated in the same currency and have a similar market capitalisation to the relevant Replaced Share Issuer;

(3)    on or after the relevant Merger Date or Tender Offer Date (A) make such adjustment(s) to the exercise, interest, payment or any other terms of the Notes as the Calculation Agent determines appropriate to account for the economic effect on the Notes of such Merger Event or Tender Offer (provided in the case of a Tender Offer, the Shares will not change) including adjustments to account for changes in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares or to the Notes, which may, but need not, be determined by reference to the adjustment(s) made in respect of such Merger Event or Tender Offer by an options exchange to options on the relevant Shares traded on such options exchange and (B) determine the effective date(s) of such adjustment(s); and/or

(4)    either:

    (a)    cancel the Notes in whole only and pay the Cancellation Amount (if any); or

    (b)    determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and pay the Cancellation Amount (if any).

If a Merger Date or Tender Offer Date is scheduled to be after the Final Valuation Date, the Calculation Agent will determine, with respect to the theoretical value of the Notes, the economic effect of the announcement of a potential Merger Event or Tender Offer Event (including but not limited to any change in volatility, expected dividends, stock loan rate or liquidity relevant to the Shares) from the announcement date to such Final Valuation Date, as applicable. If such economic effect is material, the Calculation Agent shall (acting in its sole and absolute discretion) adjust the terms of the Conditions to reflect such economic effect.

*(D) Nationalisation and Insolvency*: If a Nationalisation or Insolvency occurs, the Calculation Agent shall, in its sole and absolute discretion take any of the actions described in (1) and (2) below:

(1)    on a Nationalisation, acting in its sole and absolute discretion, either:

    (a)    treat the affected Share Issuer as a Replaced Share Issuer and select a Replacement Share Issuer in the manner specified in paragraph (C) (2) above; or

176

(b)   make such other adjustment(s) to the terms of the Conditions or such determination as the Calculation Agent, acting in its sole and absolute discretion, considers appropriate to account for the Nationalisation;

(2)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

*(E) Delisting*: If a Delisting occurs, the Calculation Agent shall, in its sole and absolute discretion, take either of the actions described in (1) or (2) below:

(1)   treat the affected Share Issuer as a Replaced Share Issuer and select a Replacement Share Issuer in the manner specified in (C) (2) above; or

(2)   either:

(a)   request the Issuer to cancel the Notes in whole only and pay the Cancellation Amount (if any); or

(b)   determine which original Share Issuer or Share Issuers should cease to be treated as a Share Issuer or Share Issuers for the purpose of these Conditions and request the Issuer to pay the Cancellation Amount (if any).

*(F) Valuation of Shares of Replacement Share Issuers*: In calculating any Equity Linked Interest Amount, Early Redemption Amount, Mandatory Early Redemption Amount, the Final Redemption Amount or the Physical Settlement Amount, as the case may be, the Strike Price for the Replacement Share Issuer Share shall be deemed to be the product of (a) the Closing Price of the Replacement Share Issuer Share on the relevant Replacement Date, and (b) the quotient of the relevant Strike Price for the Replaced Share Issuer Share and the Closing Price for the Replaced Share Issuer Share on the relevant Replacement Date (as adjusted by the Calculation Agent in its discretion to reflect the cost to the Issuer or any affiliate of replacing the affected replaced Share and adjusting any associated hedging arrangements)."

6.   The following Condition 25 (*Physical Settlement*) is hereby inserted into the Terms and Conditions:

"25   **Physical Settlement**

*(A)   Physical Settlement Amount*

(i)   Determination of Physical Settlement Amount: If Physical Settlement applies, the amount to be delivered to, or to the order of, each Noteholder in respect of each Note shall be the Number of Shares, together with any Fractional Share Amount to which a Noteholder may be entitled in accordance with paragraph (ii) below (*Fractions of a Share*), or any other amount as provided in the applicable Final Terms (the "*Physical Settlement Amount*").

(ii)   Fractions of a Share: If Physical Settlement applies and the aggregate Number of Shares to be delivered to a Noteholder in respect of its holding of Notes is not an integral number, as determined by the Calculation Agent, the Issuer shall, on the Maturity Date, in lieu of delivery of the fractional entitlement of the Number of Shares (the "*Fraction*"), make or procure that there is made to the relevant Noteholder a cash payment in the Specified Currency (the "*Fractional Share Amount*") as determined by the Calculation Agent in accordance with the following formula:

**Fractional Share Amount = Fraction X Final Price**

*provided that* if the Fractional Share Amount is of a *de minimis* amount, as determined by the Calculation Agent, the Noteholder shall not receive any such amount and shall not be entitled to the delivery of a fractional entitlement of the relevant Shares but shall only receive the applicable Number of Shares rounded down to the nearest whole number of Shares.

### (B)    *Delivery of Physical Settlement Amount*

(i)    *Delivery on the Maturity Date*: If Physical Settlement applies, provided that the conditions for Physical Settlement are fulfilled, the Issuer shall deliver to the Noteholder the Physical Settlement Amount through the Clearance System on the Maturity Date (or, if such day is not a Clearance System Business Day, the first succeeding Clearance System Business Day), subject as provided in this paragraph and in paragraph (C) below (*Procedure for Physical Settlement*).

(ii)    *Settlement Disruption Event*: If Physical Settlement applies and a Settlement Disruption Event prevents the Issuer from effecting delivery of any Shares on the Clearance System Business Day which would, but for the Settlement Disruption Event, have been the Maturity Date (the "*Scheduled Maturity Date*"), then the Maturity Date shall be deemed to be the first succeeding day on which delivery of the Shares can take place through the relevant Clearance System unless, in the opinion of the Issuer, a Settlement Disruption Event prevents the Issuer from delivering the Shares on each of the eight Clearance System Business Days immediately following the Scheduled Maturity Date. In that case:

(a)    if the Calculation Agent determines that the Shares can be delivered in any other commercially reasonable manner, then payment and/or delivery of the Physical Settlement Amount, as the case may be, shall be effected on the first day on which settlement of a sale of Shares executed on that eighth Clearance System Business Day customarily would take place using such other commercially reasonable manner of delivery of the Shares (which other manner of delivery will be deemed the Clearance System for the purposes of delivery of the relevant Shares); or

(b)    if the Calculation Agent determines that the Shares cannot be delivered in any other commercially reasonable manner, then payment and/or delivery of the Physical Settlement Amount, as the case may be, shall be postponed until such day as the Calculation Agent determines that it can be effected through the Clearance System or in any other commercially reasonable manner.

(iii)    Manner of delivery: For the avoidance of doubt, the Issuer makes no representation that the Shares will be deliverable in any particular manner.

(iv)    Risk of any postponement: The risk of any postponement of payment and/or delivery of the Physical Settlement Amount, as the case may be, as described in paragraph (ii) above (*Settlement Disruption Event*) shall be borne by the Noteholders, and no Noteholder shall be entitled to any payment whatsoever in respect of such postponement or of any loss suffered or incurred by such Noteholder by reason of such postponement.

(v)    Rights arising on Physical Settlement: For the avoidance of doubt, if Physical Settlement applies, the Noteholder shall not be entitled to receive any dividend or other distribution declared, paid or made, or any rights granted (including, but not limited to, voting rights), on any Shares prior to delivery of the relevant Shares to the Noteholder.

178

### (C)    Procedure for Physical Settlement

(i)    Settlement details and U.S. certification: If Physical Settlement applies, in order to receive the Physical Settlement Amount to which it is entitled each Noteholder shall, within the three Business Days immediately following the Final Valuation Date, final Averaging Date or final Observation Date, as the case may be (hereafter in this Annex the "*Relevant Date*"):

(a)    complete, execute and deposit at the Noteholder's own expense during normal business hours with the Principal Paying Agent any documents which may be required by any of (a) the laws of England or of any part thereof, (b) the jurisdiction in which the Principal Paying Agent's specified office is then located or (c) the jurisdiction in which the Issuer is to effect delivery of the Physical Settlement Amount to, or to the order of, the Noteholder;

(b)    transfer any amount to be paid by the Noteholder pursuant to this paragraph (C) and/or under paragraph (D) below (*Expenses and taxes*) to the account of the Principal Paying Agent with Euroclear and/or Clearstream, Luxembourg;

(c)    provide to the Principal Paying Agent and the Issuer in writing details of the accounts with the Clearance System to which the Issuer is to deliver the Physical Settlement Amount and/or any other details which may be necessary in order to effect delivery of the relevant Shares and cash; and

(d)    represent in writing, delivered to the Principal Paying Agent, that such Noteholder, or the person who has the beneficial interest in that Note, is not in the United States (within the meaning of Regulation S under the United States Securities Act of 1933 ("*Regulation S*")) and it, or such person, purchased such Note, or the beneficial interest therein, in a transaction made in accordance with Rule 903 or Rule 904 of Regulation S.

(ii)    Failure to satisfy conditions for Physical Settlement: If Physical Settlement applies and a Noteholder fails to take any of the actions referred to in paragraph (i) above (*Settlement details and U.S. certification*) within the three Business Days immediately following the Relevant Date, in lieu of delivery of the Shares, the Issuer shall instead pay an amount in the Specified Currency equal to the Proceeds of Sale (calculated in accordance with paragraph (iii) below (*Proceeds of sale*)), in addition to any Fractional Share Amount, to the Noteholder on the Maturity Date.

(iii)    Proceeds of sale: For the purposes of paragraph (ii) above (*Failure to satisfy conditions for physical settlement*), "*Proceeds of Sale*" shall mean an amount in the Specified Currency which the Issuer or its affiliates on its behalf actually receives as consideration for the sale of the relevant Shares, plus any amounts paid by the relevant Noteholder and received by the Principal Paying Agent pursuant to this paragraph (C) and/or paragraph (D) below (*Expenses and taxes*), less the expenses and taxes incurred by the Issuer or by the Calculation Agent on its behalf in respect of such sale, *provided that* the Issuer shall not be obliged to pay to the Noteholder any amount, which is in excess of the amount for which such Shares could have been sold on the Relevant Date, all as determined by the Calculation Agent (together with any amounts paid by the relevant Noteholder pursuant to this paragraph (C) and/or pursuant to paragraph (D) (*Expenses and taxes*), but after deduction of the expenses and taxes incurred by the Issuer or by the Calculation Agent on its behalf in respect of such sale).

### (D) Expenses and taxes

As condition precedent to the delivery of the Physical Settlement Amount, the relevant Noteholder must pay to the Issuer all applicable stamp, issue, registration, transfer or other taxes and duties, including withholding taxes (if any) arising out of the delivery of the relevant Shares which may be determined by the Calculation Agent to be payable:

(i)     in the country in which the Principal Paying Agent's specified office is situated; and

(ii)    in any other jurisdiction as a result of the issue or delivery of the relevant Shares to or to the order of the Noteholder."

7.      The following condition 26 (*Additional Disruption Events*) is hereby inserted into the Terms and Conditions:

### "26.  Additional Disruption Events

In the event that an Additional Disruption Event occurs as determined by the Calculation Agent in its sole and absolute discretion, then the Calculation Agent shall either (a)(1) make such adjustment to the exercise, settlement, payment or any other terms of the Notes as the Calculation Agent in its sole and absolute discretion determines appropriate and (2) determine the effective date of that adjustment, or (b) if the Calculation Agent determines that no adjustment that it could make under (a) will produce a commercially reasonable result, notify the Issuer thereof in which event the Issuer shall redeem the Notes as of such date as the Calculation Agent shall determine by notice given to the Noteholders and in the event of such early redemption the Issuer will pay to each Noteholder the Cancellation Amount with respect to each Note held by such Noteholder."

8.      The following Condition 27 (K*nock-in, Knock-out Provisions*) is hereby inserted in the Terms and Conditions:

### "27    Knock-in, Knock-out Provisions

If "*Knock-in Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-in Event shall be conditional upon the occurrence of such Knock-in Event.

If "*Knock-out Event*" is specified as applicable in the Final Terms, then, unless otherwise specified in such Final Terms, payment under the relevant Notes subject to a Knock-out Event shall be conditional upon the occurrence of such Knock-out Event.

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is the Valuation Time and if on any Knock-in Determination Day or Knock-out Determination Day at any time during the one hour period that begins and/or ends at the Valuation Time the price of the Share triggers the Knock-in Price or the Knock-out Price, and a Trading Disruption, Exchange Disruption or Early Closure occurs or exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred; provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the price of the Share as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

If the Knock-in Valuation Time or the Knock-out Valuation Time specified in the applicable Final Terms is any time or period of time during the regular trading hours on the relevant Exchange and if on any Knock-in Determination Day or Knock-out Determination Day and at any time during the one-hour period that begins and/or ends at the time on which the price of the Share triggers the Knock-in Price or the Knock-out Price, a Trading Disruption, Exchange Disruption or Early Closure occurs or

exists, then the Knock-in Event or the Knock-out Event shall be deemed not to have occurred, provided that if, by operation of this provision, no Knock-in Determination Day or Knock-out Determination Day would occur in the Knock-in Determination Period or Knock-out Determination Period, the Knock-in Period Ending Date or Knock-out Period Ending Date shall be treated as a Valuation Date and the Calculation Agent shall determine the price of the Share as at the Knock-in Valuation Time or Knock-out Valuation Time in accordance with the provisions contained in Condition 23 (*Disrupted Days*).

Definitions

Unless otherwise specified in the applicable Final Terms:

"*Knock-in Event*" means (i) in the case of a single Share, that the price of the Share determined by the Calculation Agent as of the Knock-in Valuation Time on any Knock-in Determination Day is and (ii) in the case of a Share Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Share as the product in respect of each Share of (x) the price of such Share as of the Knock-in Valuation Time on any Knock-in Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-in Price specified in the applicable Final Terms.

"*Knock-in Price*" means (i) in the case of a single Share, the price of the Share specified and (ii) in the case of a Share Basket, the price in each case specified as such or otherwise determined in the applicable Final Terms.

"*Knock-in Determination Day*" means the date(s) specified as such in the applicable Final Terms, or each Scheduled Trading Day during the Knock-in Determination Period.

"*Knock-in Determination Period*" means, in respect of a single Share or a Share Basket the period which commences on, and includes, the Knock-in Period Beginning Date and ends on, and includes, the Knock-in Period Ending Date.

"*Knock-in Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-in Valuation Time*" means the time or period of time on any Knock-in Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-in Valuation Time, the Knock-in Valuation Time shall be the Valuation Time.

"*Knock-out Determination Day*" means the date(s) as specified in the applicable Final Terms, or each Scheduled Trading Day during the Knock-out Determination Period.

"*Knock-out Determination Period*" means the period which commences on, and includes, the Knock-out Period Beginning Date and ends on, and includes, the Knock-out Period Ending Date.

"*Knock-out Event*" means (i) in the case of a single Share, that the price of the Share determined by the Calculation Agent as of the Knock-out Valuation Time on any Knock-out Determination Day is and (ii) in the case of a Share Basket, that the amount determined by the Calculation Agent equal to the sum of the values of each Share as the product in respect of each Share of (x) the price of such Share as of the Knock-out Valuation Time on any Knock-out Determination Day and (y) the relevant Weighting is (i) "greater than", (ii) "greater than or equal to", (iii) "less than" or (iv) "less than or equal to" the Knock-out Price as specified in the applicable Final Terms.

"*Knock-out Price*" means (i) in the case of a single Share the price of the Share and (ii) in the case of a Share Basket, the price, in each case specified as such or otherwise determined in the applicable Final Terms.

"*Knock-out Period Beginning Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Period Ending Date*" means the date specified as such in the applicable Final Terms or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day.

"*Knock-out Valuation Time*" means the time or period of time on any Knock-out Determination Day specified as such in the applicable Final Terms or in the event that the applicable Final Terms do not specify a Knock-out Valuation Time, the Knock-out Valuation Time shall be the Valuation Time.

9. The following Condition 28 (*Autocallable Equity-Linked Note Additional Definitions*) is hereby inserted in the Terms and Conditions:

"28    **Autocallable Equity-Linked Note Additional Definitions**

"*Adjusted Strike Price*" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Strike Price Adjustment Percentage and (ii) the Strike Price of such Shares;

"*Adjusted Strike Price*$_{Worst}$" means the Adjusted Strike Price in respect of the Worst Performing Shares;

"*Barrier Percentage*" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

"*Barrier Price*" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Price of such Shares;

"*Barrier Price*$_{Worst}$" means, in relation to the Worst Performing Shares, an amount equal to the product of (i) the relevant Barrier Percentage and (ii) the Strike Price$_{Worst}$;

"*Strike Price Adjustment Percentage*" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

10. The following Condition 29 (*Trigger Event Provisions*) is hereby inserted in the Terms and Conditions:

"29    **Trigger Event Provisions**

Trigger Event: A Trigger Event shall be deemed to occur on the occurrence of either (a) a Trigger Event (Closing Observation), or (b) a Trigger Event (Intraday Observation) as determined by the Calculation Agent, and may be specified in the applicable Final Terms in relation to Mandatory Early Redemption, the Final Redemption Amount, Physical Settlement and Interest provisions, as the case may be.

"*Trigger Event*" means a Trigger Event (Closing Observation), a Trigger Event (Intraday Observation) or such other event as specified in the applicable Final Terms;

"*Trigger Event (Closing Observation)*" means the determination by the Calculation Agent that on any Trigger Event Observation Date the Closing Price of the Shares of any Share Issuer is less than or equal to the relevant Trigger Price, as determined by the Calculation Agent;

"*Trigger Event Date*" means a date on which a Trigger Event has occurred as determined by the Calculation Agent;

"*Trigger Event (Intraday Observation)*" means the determination by the Calculation Agent that at any time during the regular trading session hours on any Trigger Event Observation Date the price of a Share of a Share Issuer is less than or equal to the relevant Trigger Price, as determined by the Calculation Agent;

"*Trigger Event Observation Date*" means each Scheduled Trading Day during the Trigger Event Observation Period *provided that* if at any relevant time on any such Scheduled Trading Day there is a Market Disruption Event, as determined by the Calculation Agent in its sole and absolute discretion,

then notwithstanding the fact that there is a Market Disruption Event on such Trigger Event Observation Date, the Calculation Agent shall determine in good faith and in a commercially reasonable manner whether a Trigger Event has occurred during such Market Disruption Event;

"*Trigger Event Observation Period*" means the period from and including the Initial Valuation Date to and including the Final Valuation Date;

"*Trigger Percentage*" means, in relation to the Shares of a Share Issuer, the percentage specified in the applicable Final Terms;

"*Trigger Price*" means, in relation to the Shares of a Share Issuer, an amount equal to the product of (i) the relevant Trigger Percentage and (ii) the Strike Price of such Shares.

11.   The following Condition 30 (*Determinations by the Calculation Agent*) is hereby inserted into the Terms and Conditions:

   "30.   **Determinations by the Calculation Agent**

   All determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding on all holders of the Notes. The Calculation Agent will be appointed by the Issuer and may be an affiliate of the Issuer. The Calculation Agent is obligated to carry out its duties and functions as Calculation Agent in good faith and using its commercially reasonable judgment. Furthermore, the Calculation Agent will not act as a fiduciary or as an advisor to the Noteholders in respect of its duties as Calculation Agent. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own wilful default, negligence or bad faith or that of its officers or agents.

   Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer or any holder of Notes."

## Annex 9

## Additional Terms and Conditions for Commodity-Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity

*The terms and conditions of Commodity-Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

### 1.    Determination of a Commodity Price

"*Commodity*" means the commodity specified in the relevant Final Terms, and if more than one commodity is so specified in the relevant Final Terms, then each such commodity.

"*Commodity Business Day*" means:

(i)    where the Commodity Reference Price is a price announced or published by an Exchange, a day that is (or, but for the occurrence of a Disruption Event, would have been) a day on which that Exchange is open for trading during its regular trading session, notwithstanding any such Exchange closing prior to its scheduled closing time; and

(ii)    where the Commodity Reference Price is not a price announced or published by an Exchange, a day that is (or, but for the occurrence of a Disruption Event, would have been) a day in respect of which the relevant Price Source published (or, but for the occurrence of a Disruption Event, would have published) a price.

"*Commodity Reference Price*" means, in respect of a Commodity, the relevant reference price for such Commodity which may be one of the following:

(i)    a reference price set out in the Annex hereto ("Certain Commodity Reference Prices") (with such amendments, if any, as shall be set out in the applicable Final Terms); or

(ii)    a reference price as specified in the relevant Final Terms where:

(A)    if that Commodity Reference Price is a price announced or published by an Exchange, the following is specified: (1) the relevant Commodity (including, if relevant, the type or grade of that Commodity, the location of delivery and any other details); (2) the relevant Unit; (3) the relevant Exchange; (4) the relevant currency in which the Specified Price is expressed; (5) the Specified Price; and, if applicable, (6) the Delivery Date, in which case the price for any relevant date will be that day's Specified Price per Unit of that Commodity on that Exchange and, if applicable, for delivery on that Delivery Date, stated in that currency, as announced or published by that Exchange on that date; and

(B)    if that Commodity Reference Price is not a price announced or published by an Exchange, the following is specified: (1) the relevant Commodity (including, if relevant, the type or grade of that Commodity, the location of delivery and any other details); (2) the relevant Unit; (3) the relevant Price Source (and, if applicable, the location in that

Price Source of the Specified Price (or the prices from which the Specified Price is calculated)); (4) the relevant currency in which the Specified Price is expressed; (5) the Specified Price; and, if applicable, (6) the Delivery Date, in which case the price for any relevant date will be that day's Specified Price per Unit of that Commodity and, if applicable, for that Delivery Date, stated in that currency, published (or shown) in the issue of that Price Source that reports prices effective on that date.

"*Delivery Date*" means, in respect of a Commodity Reference Price, the relevant date or month for delivery of the underlying Commodity (which must be a date or month reported, or capable of being determined from information reported, in or by the relevant Price Source) as follows:

(i)    if a date is, or a month and year are, specified in the relevant Final Terms, that date or that month and year;

(ii)   if a Nearby Month is specified in the relevant Final Terms, that date or the month of expiration of the relevant Futures Contract; and

(iii)  if a method is specified for the purpose of determining the Delivery Date in the relevant Final Terms, the date or the month and year determined pursuant to that method.

"*Disruption Events*" means, Commodity Valuation Date Disruption Events (see section 3 below) and/or Commodity Observation Date Disruption Events (see section 4 below), as applicable.

"*Disruption Fallbacks*" means, Commodity Valuation Date Fallbacks (see section 3 below) and/or Commodity Observation Date Fallbacks (see section 4 below), as applicable.

"*Exchange*" means the exchange or principal trading market specified in the relevant Final Terms or Commodity Reference Price and any Successor Exchange, and shall include the following, if referred to in the relevant Commodity Reference Price:

### Exchanges and Principal Trading Markets:

(i)     "*APX*" means the Amsterdam Power Exchange N.V., or its successor, which reports market prices on its website at www.apx.nl or its successor;

(ii)    "*CBOT*" means the Chicago Board of Trade or its successor;

(iii)   "*CME*" means the Chicago Mercantile Exchange or its successor;

(iv)    "*COMEX*" means the COMEX Division, or its successor, of the New York Mercantile Exchange, Inc. or its successor;

(v)     "*EEX*" means the European Energy Exchange AG, or its successor, which reports market prices on its website at www.eex.de or its successor;

(vi)    "*EURONEXT LIFFE*" means Euronext B.V. London International Financial Futures and Options Exchange or its successor;

(vii)   "*ICE Futures*" or "*IPE*" means ICE Futures, a wholly owned subsidiary of Intercontinental Exchange™, or its successor;

(viii)  "*KCBOT*" means the Kansas City Board of Trade or its successor;

(ix)    "*LEBA*" means The London Energy Brokers' Association or its successor;

(x)     "*LME*" means The London Metal Exchange Limited or its successor;

(xi)    "*London Gold Market*" means the market in London on which members of The London Bullion Market Association ("*LBMA*"), amongst other things, quote prices for the buying and selling of Gold;

185

(xii)    "*London Silver Market*" means the market in London on which members of LBMA, amongst other things, quote prices for the buying and selling of Silver;

(xiii)    "*LPPM*" means The London Platinum and Palladium Market in London on which members quote prices for the buying and selling of Platinum and Palladium;

(xiv)    "*MDEX*" means the Malaysian Derivatives Exchange or its successor;

(xv)    "*NYBOT*" means the New York Board of Trade or its successor;

(xvi)    "*NYMEX*" means the NYMEX Division, or its successor, of the New York Mercantile Exchange, Inc. or its successor;

(xvii)    "*SICOM*" means the Singapore Commodity Exchange Limited or its successor;

(xviii) "*TOCOM*" means The Tokyo Commodity Exchange or its successor;

"*Futures Contract*" means, in respect of a Commodity Reference Price, the contract for future delivery of a contract size in respect of the relevant Delivery Date relating to the Commodity referred to in that Commodity Reference Price.

"*kL*" means kiloliter.

"*Nearby Month*", when preceded by a numerical adjective, means, in respect of a Delivery Date and any date on which a Relevant Price is to be determined, the month of expiration of the Futures Contract identified by that numerical adjective, so that, for example, (A) "*First Nearby Month*" means the month of expiration of the first Futures Contract to expire following the relevant date; (B) "*Second Nearby Month*" means the month of expiration of the second Futures Contract to expire following the relevant date; and (C) "*Sixth Nearby Month*" means the month of expiration of the sixth Futures Contract to expire following the relevant date.

"*Price Source*" means the publication (or such other origin of reference, including an Exchange) containing (or reporting) the Specified Price (or prices from which the Specified Price is calculated) specified in the relevant Commodity Reference Price or in the relevant Final Terms, and shall include the following, if referred to in the relevant Commodity Reference Price:

(i)    "APPI", which means the Asian Petroleum Price Index, or any successor report, prepared by KPMG Corporate Services Limited, Hong Kong or its successor and reported on the Energy Market Information Service or its successor;

(ii)    "*Argus*" means Argus European Natural Gas, or any successor publication, published by Argus Media Limited or its successor;

(iii)    "*Argus/McCloskey's*" and "Argus/McCloskey's Coal Price Index Report" each means the Argus/McCloskey's Coal Price Index Report, or any successor publication, published by Argus Media Limited or its successor and The McCloskey Group Limited;

(iv)    "*Dow Jones Power*" and "*Dow Jones Energy Service - Dow Jones Electricity Price Indexes*" each means the Dow Jones Energy Service - Dow Jones Electricity Price Indexes, or any successor indexes, published by Dow Jones Newswires, a division of Dow Jones & Company, Inc. or its successor;

(v)    "*globalCOAL*" means globalCOAL, or its successor, which reports market prices on its website at http://www.globalcoal.com or its successor;

(vi)    "*Heren*" means European Spot Gas Markets, or any successor publication, published by Heren Energy Ltd. or its successor;

(vii)    "*OMEL*" means the Operador del Mercado Ibérico de Energía – Polo Español, S.A., or its successor, which reports market prices on its website at www.omel.es or its successor;

186

(viii) "*Platts Marketwire*" means Platts Crude Oil Marketwire, or any successor publication, published by The McGraw-Hill Companies Inc. or its successor;

(ix) "*Powernext*" means Powernext S.A., or its successor, which reports market prices on its website at www.powernext.fr or its successor;

"*Specified Price*" means, in respect of a Commodity Reference Price, any of the following prices (which must be a price reported in or by, or capable of being determined from information reported in or by, the relevant Price Source), as specified in the relevant Final Terms (and, if applicable, as of the time so specified): (A) the high price; (B) the low price; (C) the average of the high price and the low price; (D) the closing price; (E) the opening price; (F) the bid price; (G) the asked price; (H) the average of the bid price and the asked price; (I) the settlement price; (J) the official settlement price; (K) the official price; (L) the morning fixing; (M) the afternoon fixing; (N) the spot price; or (O) any other price specified in the relevant Final Terms.

"*Strike Date*" means the date as specified in the relevant Final Terms, or as otherwise determined by the Calculation Agent, in its sole discretion provided that the Commodity Valuation Date Disruption Events and Fallbacks shall apply to any Strike Date.

"*Successor Exchange*" means, in respect of a Commodity where the relevant Exchange is no longer the principal exchange or trading market for the Commodity, such other exchange or principal trading market as determined in good faith by the Calculation Agent which serves as the source of prices for the Commodity and any principal exchanges where options or futures contracts on the Commodity are traded.

"*Trade Date*" means the date as specified in the relevant Final Terms.

"*Unit*" means the unit of measure of the relevant Commodity, as specified in the relevant Commodity Reference Price or the relevant Final Terms.

## 2.    Commodity Business Day Convention

If any date on which a Commodity Reference Price is to be determined is not a Commodity Business Day then (subject to application of the Disruption Events and Fallbacks) that date will be adjusted to the first following day that is a Commodity Business Day (unless otherwise specified in the relevant Final Terms).

## 3.    Commodity Valuation Date Disruption Events and Fallbacks

### 3.1    Commodity Valuation Date Disruption Events

For the purposes of this Supplement and any Commodity-Linked Note (unless otherwise specified in the relevant Final Terms):

"*Commodity Valuation Date Disruption Event*" means, in respect of a relevant Commodity, an event that, if provided by the relevant Final Terms to be applicable to the Notes, would give rise, in accordance with an applicable Disruption Fallback, to an alternative basis for determining the relevant price in respect of a specified Commodity Reference Price or Price Source were the event to occur or exist on any day.

The following events, if specified in the relevant Final Terms to be applicable, shall be Commodity Valuation Date Disruption Events:

(i)    "*Price Source Disruption*", which means (A) the failure of the Price Source to announce or publish the Specified Price (or the information necessary for determining the Specified Price) for the relevant Commodity Reference Price, or (B) the temporary or permanent discontinuance or unavailability of the Price Source.

(ii)    "*Trading Disruption*", which means the material suspension of, or the material limitation imposed on, trading in the Futures Contract or the Commodity on the Exchange or in any

additional futures contract, options contract or commodity on any Exchange as determined by the Calculation Agent. For these purposes:

(a) a suspension of the trading in the Futures Contract or the Commodity on any Commodity Business Day shall be deemed to be material only if:

 (I) all trading in the Futures Contract or the Commodity is suspended for the entire Commodity Business Day; or

 (II) all trading in the Futures Contract or the Commodity is suspended subsequent to the opening of trading on the Commodity Business Day, trading does not recommence prior to the regularly scheduled close of trading in such Futures Contract or such Commodity on such Commodity Business Day and such suspension is announced less than one hour preceding its commencement; and

(b) a limitation of trading in the Futures Contract or the Commodity on any Commodity Business Day shall be deemed to be material only if the relevant Exchange establishes limits on the range within which the price of the Futures Contract or the Commodity may fluctuate and the closing or settlement price of the Futures Contract or the Commodity on such day is at the upper or lower limit of that range;

(iii) "*Disappearance of Commodity Reference Price*", which means (A) the permanent discontinuation of trading, in the relevant Futures Contract on the relevant Exchange; (B) the disappearance of, or of trading in, the relevant Commodity; or (C) the disappearance or permanent discontinuance or unavailability of the Commodity Reference Price, notwithstanding the availability of the related Price Source or the status of trading in the relevant Futures Contract or the relevant Commodity;

(iv) "*Material Change in Formula*", which means the occurrence since the Trade Date of a material change in the formula for or the method of calculating the relevant Commodity Reference Price; and

(v) "*Material Change in Content*", which means the occurrence since the Trade Date (or such other date as may be specified) of a material change in the content, composition or constitution of the Commodity or relevant Futures Contract.

If the relevant Final Terms specify that the "Additional Bullion Provisions" shall apply to any Commodity, then, in respect of such Commodity, (iv) Material Change in Formula and (v) Material Change in Content, shall not be Commodity Valuation Date Disruption Events with respect to such Commodity.

## 3.2 Commodity Valuation Date Fallbacks

The relevant Final Terms may provide that if the Calculation Agent determines that in respect of any day in respect of which a relevant price is to be determined, a Disruption Event has occurred or exists on such day (each such Commodity, an "*Affected Commodity*" and any such date, a "*Disrupted Date*"), the Calculation Agent will determine the relevant price in accordance with the first Disruption Fallback (applied in accordance with its terms) specified as being applicable in the relevant Final Terms.

The relevant Final Terms may provide that one or more Disruption Fallbacks may apply to any Disrupted Date, and that such applicable Disruption Fallbacks may apply concurrently or sequentially, in such manner as specified in the relevant Final Terms.

The following events, as are provided by the relevant Final Terms to be applicable in respect of a Disrupted Date, shall be "Disruption Fallbacks" (and the relevant Final Terms may provide for different Disruption Fallbacks to be applicable to different dates):

(i) "*Postponement*" which means that the relevant date will be deemed, for the purposes of the application of this Disruption Fallback only, to be the first succeeding Commodity Business

Day on which the Commodity Valuation Date Disruption Event ceases to exist, provided that, where the relevant Commodity Valuation Date Disruption Event has been in existence (measured from and including the first Disrupted Date) for 5 consecutive Commodity Business Days (or where the Maturity Date is less than 7 Commodity Business Days from the date of the first Disrupted Date, for such number of consecutive Commodity Business Days measured from and including the Disrupted Date and ending on the date which is 2 Business Days prior to the Maturity Date), the next Disruption Fallback specified in the relevant Final Terms will apply;

(ii) "*Calculation Agent Determination*" which means that the Calculation Agent will determine the relevant price (or a method for determining a relevant price), taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant.

## 4. Commodity Observation Date Disruption Events and Fallbacks

### 4.1 Commodity Observation Date Disruption Events

For the purposes of this Supplement and any Commodity-Linked Note (unless otherwise specified in the relevant Final Terms):

"*Commodity Observation Date Disruption Event*" means, in respect of a relevant Commodity, an event that, if provided by the relevant Final Terms to be applicable to the Notes, would give rise, in accordance with an applicable Disruption Fallback, to an alternative basis for determining the relevant price in respect of a specified Commodity Reference Price or Price Source were the event to occur or exist on any relevant day. The following events, if specified in the relevant Final Terms to be applicable, shall be Commodity Observation Date Disruption Events:

(i) "*Price Source Disruption*", which means (A) the failure of the Price Source to announce or publish the Specified Price (or the information necessary for determining the Specified Price) for the relevant Commodity Reference Price, or (B) the temporary or permanent discontinuance or unavailability of the Price Source.

(iii) "*Disappearance of Commodity Reference Price*", which means (A) the permanent discontinuation of trading, in the relevant Futures Contract on the relevant Exchange; (B) the disappearance of, or of trading in, the relevant Commodity; or (C) the disappearance or permanent discontinuance or unavailability of the Commodity Reference Price, notwithstanding the availability of the related Price Source or the status of trading in the relevant Futures Contract or the relevant Commodity;

### 4.2 Commodity Observation Date Fallbacks

The relevant Final Terms may provide that if the Calculation Agent determines that in respect of a Commodity, a Commodity Observation Date Disruption Event has occurred or exists on any relevant day (each such Commodity, an "*Affected Commodity*" and any such date, a "*Disrupted Date*"), the Calculation Agent will determine the relevant price in accordance with the first Disruption Fallback (applied in accordance with its terms) specified as being applicable in the relevant Final Terms. The relevant Final Terms may provide that one or more Disruption Fallbacks may apply to any relevant date, and that such applicable Disruption Fallbacks may apply concurrently or sequentially, in such manner as specified in the relevant Final Terms.

The following events, as are provided by the relevant Final Terms to be applicable in respect of any day, shall be "*Disruption Fallbacks*" (and the relevant Final Terms may provide for different Disruption Fallbacks to be applicable to different days):

(i) "*Preceding*" which means that for the purposes of the application of this Disruption Fallback only, the Calculation Agent will use the relevant price for such Commodity published by the

Price Source in respect of the Commodity Business Day falling immediately prior to the relevant date provided that where the relevant Commodity Observation Date Disruption Event has been in existence (measured from and including the first Disrupted Date) for 5 consecutive Commodity Business Days, the next Disruption Fallback specified in the relevant Final Terms will apply;

(ii)   "*Calculation Agent Determination*" which means that the Calculation Agent will determine the relevant price (or a method for determining a relevant price), taking into consideration the latest available quotation for the relevant Commodity Reference Price and any other information that in good faith it deems relevant.

## 5.    Commodity Early Redemption Events

The relevant Final Terms may provide that in respect of a relevant Commodity where the Calculation Agent determines that:

(i)    the Price Source has permanently ceased to announce or publish the Commodity Reference Price;

(ii)   trading in the relevant Futures Contract on the relevant Exchange has permanently ceased; or

(iii)  the Commodity Reference Price has disappeared, been permanently discontinued, or become permanently unavailable, and

the Calculation Agent determines that there is no appropriate alternative Price Source or Commodity Reference Price (as the case may be) (a "*Commodity Early Redemption Event*"), then the Notes will be redeemed at an amount calculated by the Calculation Agent as the Final Redemption Amount of the Notes plus any interest accrued but unpaid less any Unwind Costs (the "*Early Redemption Amount*"). For the purposes of this section, "*Unwind Costs*" means the value (determined in the currency in which the Notes are denominated) of any transfer or stamp tax cost, early redemption or termination cost, if any borne by the Issuer or Calculation Agent, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement, financing arrangement or other hedging transaction entered into by or on behalf of, the Calculation Agent or the Issuer in relation to the issuance of the Notes.

## 6.    Correction of Published Prices

The relevant Final Terms may provide that for the purpose of determining the relevant price for any day, if the price published or announced on a given day and used or to be used by the Calculation Agent to determine a relevant price is subsequently corrected and the correction is published or announced by the person responsible for that publication or announcement within 30 calendar days (or such other time frame as the Calculation Agent acting in its absolute discretion deems appropriate; where different time frames may be deemed appropriate for different dates) after the original publication or announcement, such corrected price shall be the relevant price, and the Calculation Agent, to the extent it deems necessary, may make such adjustments to any of the terms of the Notes that it determines in its sole and absolute discretion to account for such correction.

## 7.    Determinations by the Calculation Agent

The relevant Final Terms may provide that all determinations, calculations or valuations made by the Calculation Agent under or pursuant to the terms of the Notes shall be made in its sole and absolute discretion and the Calculation Agent shall be solely responsible for all determinations, calculations or valuations in accordance with the terms of the Notes. All such determinations, calculations or valuations made by the Calculation Agent shall be conclusive and binding on all holders of the Notes. The Calculation Agent shall not be liable for any loss, liability, cost, claim, action, demand or expense (including without limitation any costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions in relation to the Notes, except as such may result from its own wilful default, negligence or bad faith or that of its

officers or agents. Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transactions, including without limitation, any swap or hedging transactions, with the Issuer or any holder of the Notes.

## 8.    Additional Bullion Provisions

8.1    If the relevant Final Terms specify that the "Additional Bullion Provisions" shall apply to any Commodity, then, in respect of such Commodity, paragraphs 1 to 7 of this section "Additional Description of Commodity Linked Notes" shall be deemed to be amended as follows:

(i)    each reference to "Commodity Business Day" shall be deemed to be a reference to "Bullion Business Day"

8.2    The following terms and expressions shall have the following meanings in relation to any Commodity to which Notes to which the "Additional Bullion Provisions" shall apply:

"*Bullion Business Day*" means any day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in London and New York and (if applicable) in such Bullion Business Day Centers specified in the relevant Final Terms.

"*Bullion Business Day Centers*" means such places as may be specified in the relevant Final Terms.

"*Bullion Reference Dealers*" means, if the relevant Commodity Reference Price is "Commodity-Reference Dealers", the four major dealers that are members of the LBMA specified in the relevant Final Terms, or if no such Bullion Reference Dealers are specified, selected by the Calculation Agent, in each case, acting through their principal London offices.

"*Gold*" means gold bars or unallocated gold complying with the rules of the LBMA relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Ounce*" means, in the case of Gold, a fine troy ounce, and in the case of Silver, Platinum, and Palladium, a troy ounce.

"*Palladium*" means palladium ingots or plate or unallocated palladium complying with the rules of the LPPM relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Platinum*" means platinum ingots or plate or unallocated platinum complying with the rules of the LPPM relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

"*Silver*" means silver bars or unallocated silver complying with the rules of the LBMA relating to good delivery and fineness from time to time in effect, unless otherwise specified in the relevant Final Terms.

## 9.    Notification of Early Redemption Events, Disruption Events and other Events

(i)    *Notice of Disruption Event*: The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the existence or occurrence of a Disruption Event on any relevant date however any delay or failure to notify will not affect the application of the applicable Disruption Fallbacks.

(ii)    *Notice of Commodity Early Redemption Event*: The Calculation Agent shall as soon as reasonably practicable notify the Issuer of the occurrence of a Commodity Early Redemption Event and the Early Redemption Amount however any delay or failure to notify will not affect the application of the applicable Early Redemption provisions.

(iii)  *Notice of Published Price Correction Event*: Upon the occurrence of a correction to a published price which changes the relevant price determined with respect to any date, the Calculation Agent shall as soon as reasonably practicable notify the Issuer stating the occurrence of such event, giving details of such correction and the action proposed to be taken in relation thereto.

(iv)  *Notice to Noteholders*: Adjustments and calculations in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (Notices) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

## CERTAIN COMMODITY REFERENCE PRICES

### Definitions

For the purpose of this Annex and the Commodity Reference Prices listed below (unless otherwise specified in the relevant Final Terms):

"*Delivery Date*" means any date specified as such in the applicable Final Terms.

"*Futures Contract*" means the contract for future delivery of a contract size in respect of a Delivery Date (excluding any Futures Contract that is due to expire on such date) relating to the Commodity referred to in that Commodity Reference Price.

"*Specified Price*" means any price specified as such in the applicable Final Terms.

### *Commodity Reference Prices for certain Agricultural Products:*

Cocoa

- **"COCOA-NYBOT"** means that the price for a relevant date will be that day's settlement price per metric ton of deliverable grade cocoa beans on the NYBOT of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the NYBOT and displayed on Bloomberg Screen page "CC1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the NYBOT and displayed on Bloomberg Screen page "CC2 Cmdty <GO> on that relevant date.

Coffee

- **"COFFEE ARABICA-NYBOT"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade washed arabica coffee on the NYBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the NYBOT and displayed on Bloomberg Screen page "KC1 Cmdty <GO>" on that relevant date provided the term if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the NYBOT and displayed on Bloomberg Screen page "KC2 Cmdty <GO> on that relevant date.

- **"COFFEE ROBUSTA-EURONEXT LIFFE"** means that the price for a relevant date will be that day's settlement price per tonne of deliverable grade robusta coffee on EURONEXT LIFFE of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as determined by EURONEXT LIFFE and displayed on Bloomberg Screen page "CF1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract

to expire following such date shall be used, as made public by the EURONEXT LIFFE and displayed on Bloomberg Screen page "CF2 Cmdty <GO>' on that relevant date.

Corn

- **"CORN-CBOT"** means that the price for a relevant date will be that day's settlement price per bushel of deliverable grade corn on the CBOT of the first monthly futures contract to expire following such date following such date, stated in U.S. cents, as made public by the CBOT and displayed on Bloomberg page "C 1 Cmtdy <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "C2 Cmdty <GO>" on that relevant date.

Cotton

- **"COTTON NO. 2-NYBOT"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade cotton No. 2 on the NYBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the NYBOT and displayed on Bloomberg Screen page "CT1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the NYBOT and displayed on Bloomberg Screen page "CT2 Cmdty<GO> on that relevant date.

Livestock

- **"FEEDER CATTLE-CME"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade medium and large frame #1 feeder steers on the CME of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the CME and displayed on Bloomberg Screen page "FC1 Cmdty <GO>" on that relevant date.

- **"LEAN HOGS-CME"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade lean value hog carcasses on the CME of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the CME and displayed on Bloomberg Screen page "LH1 Cmdty <GO>" on that relevant date.

- **"LIVE CATTLE-CME"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade live steers on the CME of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the CME and displayed on Bloomberg Screen page "LC1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CME and displayed on Bloomberg Screen page "LC2 Cmdty <GO> on that relevant date.

Milk

- **"MILK – CLASS III – CME"** means that the price for a relevant date will be that day's settlement price per 100 pounds of deliverable grade Class III milk on the CME, stated in U.S. Dollars, as made public by the CME and displayed on Bloomberg Screen page "DA1 Cmdty <GO>" on that relevant date.

Orange Juice

- **"FROZEN CONCENTRATED ORANGE JUICE NO. 1-NYBOT"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade orange solids on the NYBOT of the first monthly futures contract to expire following such date, stated in U.S.

193

cents, as made public by the NYBOT and displayed on Bloomberg Screen page "JO1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the NYBOT and displayed on Bloomberg Screen page "JO2 Cmdty <GO> on that relevant date.

Palm Oil

- **"CPO-MDEX"** means that the price for a relevant date will be that day's settlement price per ton of deliverable crude palm oil on the MDEX of the first monthly futures contract to expire following such date, stated in Malaysian Ringgit, as made public by the MDEX and displayed on Bloomberg page "KO1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the MDEX and displayed on Bloomberg Screen page "KO2 Cmdty <GO>" on that relevant date.

Rice

- **"RICE-CBOT"** means that the price for a relevant date will be that day's settlement price per 100 pounds of deliverable grade Rough Rice on the CBOT of the first monthly futures contract, stated in U.S. Dollars, as made public by the CBOT and displayed on Bloomberg Screen page "RR1 Comdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "RR2 Cmdty <GO>" on that relevant date.

Rubber

- **"RUBBER-RSS3-SICOM"** means that the price for a relevant date will be that day's settlement price per kilogram of ribbed smoked sheets grade 3 rubber on the SICOM of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the SICOM and displayed on Bloomberg Screen page "RG1 Cmdty <GO>" on that relevant date.

Soybeans

- **"SOYBEAN MEAL-CBOT"** means that the price for a relevant date will be that day's settlement price per ton of deliverable grade soybean meal on the CBOT of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the CBOT and displayed on Bloomberg Screen page "SM1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "SM2 Cmdty <GO> on that relevant date.

- **"SOYBEAN OIL-CBOT"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade crude soybean oil on the CBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the CBOT and displayed on Bloomberg Screen page "BO1 Cmdty <GO>" on that relevant date provided that if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "BO2 Cmdty <GO> on that relevant date.

- **"SOYBEANS-CBOT"** means that the price for a relevant date will be that day's settlement price per bushel of deliverable grade of soybean on the CBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the CBOT and displayed on Bloomberg page "S 1 Cmdty <GO>" on that relevant date provided that if such

194

date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "S2 Cmdty <GO> on that relevant date.

Sugar

- **"SUGAR #11 (WORLD)-NYBOT"** means that the price for a relevant date will be that day's settlement price per pound of deliverable grade cane sugar on the NYBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the NYBOT and displayed on Bloomberg Screen page "SB1 Cmdty <GO>" on that relevant date.

Wheat

- **"WHEAT-CBOT"** means that the price for a relevant date will be that day's settlement price per bushel of deliverable rate wheat on the CBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by CBOT and displayed on Bloomberg page "W 1 Cmdty <GO>" on that relevant date _provided that_ if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the CBOT and displayed on Bloomberg Screen page "W2 Cmdty <GO>" on that relevant date.

- **"WHEAT HRW-KCBOT"** means that the price for a relevant date will be that day's settlement price per bushel of deliverable grade hard red winter wheat on the KCBOT of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the KCBOT and displayed on Bloomberg Screen page "KW1 Cmdty <GO>" on that relevant date _provided that_ if such date is on or after the first notice date (in accordance with the terms of such futures contract) then the second monthly futures contract to expire following such date shall be used, as made public by the KCBOT and displayed on Bloomberg Screen page "KW2 Cmdty <GO> on that relevant date.

***Commodity Reference Prices for certain Energy Products:***

Gas Oil

- **"GAS OIL-ICE"** means that the price for a relevant date will be that day's settlement price per metric ton of gas oil on ICE Futures of the first monthly futures contract to expire following such date, stated in U.S. dollars, as made public by ICE Futures and displayed on Bloomberg Screen page "QS1 Cmdty <GO>" on that relevant date.

- **"RBOB GASOLINE-NEW YORK-NYMEX"** means that the price for a relevant date will be that day's settlement price per gallon of New York Harbor RBOB unleaded gasoline on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the NYMEX and displayed on Bloomberg Screen page "XB1 Cmdty <GO>" on that relevant date.

Heating Oil

- **"HEATING OIL-NEW YORK-NYMEX"** means that the price for a relevant date will be that day's settlement price per gallon of New York Harbor No. 2 heating oil on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the NYMEX and displayed on Bloomberg Screen page "HO1 Cmdty <GO>" on that relevant date.

Natural Gas

- **"NATURAL GAS-MONTHLY-ICE"** means that the price for a relevant date will be that day's settlement price per therm of natural gas on ICE Futures of the monthly first monthly

futures contract to expire following such date, stated in pence, as made public by ICE Futures and displayed on Bloomberg Screen page "FN1 Cmdty <GO>"on that relevant date.

- **"NATURAL GAS-NYMEX"** means that the price for a relevant date will be that day's settlement price per MMBTU of natural gas on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Bloomberg Screen page "NG1 Cmdty <GO>" on that relevant date.

Oil

- **"OIL-WTI-NYMEX"** means that the price for a relevant date will be that day's settlement price per barrel of West Texas Intermediate light sweet crude oil on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Bloomberg Screen page "CL1 Cmdty <GO>"on that relevant date.

- **"OIL-BRENT-ICE"** means that the price for a relevant date will be that day's settlement price per barrel of Brent blend crude oil on the ICE Futures of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by ICE Futures and displayed on Bloomberg Screen page "CO1 Cmdty <GO>" on that relevant date.

Coal

- **"COAL-API2"** means that the price for a relevant date, will be that day's settlement price per tonne of steam coal, 6,000 kcal/kg, up to 1% sulphur NAR basis, cif ARA, stated in U.S. Dollars, for swaps on the calendar month of the month following such date as determined by Argus/McCloskey and displayed on Bloomberg page "API22MON MCCL Index" on that relevant date.

- **"COAL-API2-YEAR"** means that the price for a relevant date, will be that day's settlement price per tonne of steam coal, 6,000 kcal/kg, up to 1% sulphur NAR basis, cif ARA, stated in U.S. Dollars, for swaps on the calendar year of the year following such date as determined by Argus/McCloskey and displayed on Bloomberg page "API2YR1 MCCL Index" on that relevant date.

- **"COAL – TFS API 2 – ARGUS/MCCLOSKEY'S"** means that the price for a relevant date will be the previous week's official price (currently published each Friday) or, if determined on a Friday, the weekly official price published on such day per tonne of steam coal 6,000 kcal/kg, up to 1% sulphur NAR basis, cif ARA, stated in U.S. Dollars, published under the heading "International Coal Indexes incorporating the TFS APITM Indices: Monthly Coal Price Indexes: TFS API2 (cif ARA)" in the issue of Argus/McCloskey's Coal Price Index Report that reports prices effective on that relevant date.

- **"COAL-API4"** means that the price for a relevant date, will be that day's price per tonne of steam coal, 6,000 kcal/kg, up to 1% sulphur NAR basis, fob Richards Bay, stated in U.S. Dollars, for swaps on the calendar month of the month following the such date as determined by Argus/McCloskey and displayed on Bloomberg page "API42MON MCCL Index" on that relevant date.

- **"COAL-API4-YEAR"** means that the price for a relevant date, will be that day's price per tonne of steam coal, 6,000 kcal/kg, up to 1% sulphur NAR basis, fob Richards Bay, stated in U.S. Dollars, for swaps on the calendar year of the year following the such date as determined by Argus/McCloskey and displayed on Bloomberg page "API4YR1 MCCL Index" on that relevant date.

- **"COAL – TFS API 4 – ARGUS/MCCLOSKEY'S"** means that the price for a relevant date will be the previous week's official price (currently published each Friday) or, if determined on a Friday, the weekly official price published on such day per tonne of steam coal 6,000 kcal/kg, up to 1% sulphur NAR basis, fob Richards Bay, stated in U.S. Dollars, published under the

heading "International Coal Indexes incorporating the TFS APITM Indices: Monthly Coal
Price Indexes: TFS API4 (fob Richards Bay)" in the issue of Argus/McCloskey's Coal Price
Index Report that reports prices effective on that relevant date.

- **"COAL-NYMEX"** means that the price for a relevant date will be that day's settlement price
  per tonne of steam coal, stated in U.S. Dollars, on the NYMEX of the first monthly futures
  contract to expire following such date, stated in U.S. Dollars, as made public by the NYMEX
  and displayed on Bloomberg Screen page "QZ1 Cmdty <GO>"on that relevant date.

Emissions

- **"EUA-ICE"** means that the price for a relevant date will be that day's settlement price per
  tonne of EU Allowance, stated in Euros, on ICE Futures of the first December futures contract
  to expire following such date, as made public by ICE Futures and displayed on the relevant
  Bloomberg Screen page (as specified in the applicable Final Terms) on that relevant date.

Power

- **"ELECTRICITY-GERMAN-BASE-YEAR"** means that the price for a relevant date will be
  that day's settlement price per MWh of German base year electricity, on the EEX of the first
  year futures contract to expire following such date, stated in Euro, as made public by the
  NYMEX and displayed on Bloomberg Screen page "HP1 Cmdty <GO>"on that relevant date
  provided that if such date is on or after the first notice date (in accordance with the terms of
  such futures contract) then the second year futures contract to expire following such date shall
  be used, as made public by the NYMEX and displayed on Bloomberg Screen page "HP2
  Cmdty <GO> on that relevant date.

Uranium

- **"URANIUM OXIDE-NYMEX"** means that the price for a relevant date will be that day's
  settlement price per pound of Uranium on the NYMEX of the first futures contract to expire
  following such date, stated in U.S. Dollars, as made public by the NYMEX and displayed on
  Bloomberg page "UXA1 Cmdty <GO>" on that relevant date.

*Commodity Reference Prices for certain Metals:*

Aluminium

- **"ALUMINIUM-LME CASH"** means that the price for a relevant date will be that day's
  second ring spot fix price per tonne of high grade Primary Aluminium on the LME for spot
  delivery, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page
  "LOAHDY Cmdty <GO>" that displays prices effective on that relevant date.

Copper

- **"COPPER-LME CASH"** means that the price for a relevant date will be that day's second
  ring spot fix price per tonne of Copper Grade A on the LME for spot delivery, stated in U.S.
  Dollars, as determined by the LME and displayed on Bloomberg page "LOCADY Cmdty
  <GO>" that displays prices effective on that relevant date.

Gold

- **"GOLD–A.M. FIX"** means that the price for a relevant date will be that day's morning Gold
  fixing price per troy ounce of Gold for delivery in London through a member of the LBMA
  authorized to effect such delivery, stated in U.S. Dollars, as determined by the London Gold
  Market and displayed on Bloomberg page "GOLDLNAM Cmdty <GO>" that displays prices
  effective on that relevant date.

197

- **"GOLD–COMEX"** means that the price for a relevant date will be that day's settlement price per troy ounce of Gold on the COMEX of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the COMEX and displayed on Reuters Screen page "O#GC:" on that relevant date.

- **"GOLD–P.M. FIX"** means that the price for a relevant date will be that day's afternoon Gold fixing price per troy ounce of Gold for delivery in London through a member of the LBMA authorized to effect such delivery, stated in U.S. Dollars, as calculated by the London Gold Market and displayed on Bloomberg page "GOLDLNPM Cmdty <GO>" that displays prices effective on that relevant date.

- **"GOLD–TOCOM"** means that the price for a relevant date will be that day's settlement price per gram of fine Gold on the TOCOM of the first monthly futures contract to expire following such date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#GL:" on that relevant date.

Lead

- **"LEAD–LME CASH"** means that the price for a relevant date will be that day's second ring spot fix price per tonne of Standard Lead on the LME for spot delivery, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOPBDY Cmdty <GO>" that displays prices effective on that relevant date.

Nickel

- **"NICKEL-LME CASH"** means that the price for a relevant date will be that day's second ring spot fix price per tonne of Primary Nickel on the LME for spot delivery, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LONIDY Cmdty <GO>"that displays prices effective on that relevant date.

Palladium

- **"PALLADIUM–A.M. FIX"** means that the price for a relevant date will be that day's morning Palladium fixing price per troy ounce gross of Palladium for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Bloomberg page "PLDLNAM Cmdty <GO>" that displays prices effective on that relevant date.

- **"PALLADIUM–NYMEX"** means that the price for a relevant date will be that day's settlement price per troy ounce of palladium on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the NYMEX on that and displayed on Reuters Screen page "O#PA:" on the relevant date.

- **"PALLADIUM–P.M. FIX"** means that the price for a relevant date will be that day's afternoon Palladium fixing price per troy ounce gross of Palladium for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Bloomberg page "PLDLNPM Cmdty <GO>" that displays prices effective on that relevant date.

- **"PALLADIUM–TOCOM"** means that the price for a relevant date will be that day's settlement price per gram of fine palladium on the TOCOM of the first monthly futures contract to expire following such date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JPA:" on that relevant date.

Platinum

- **"PLATINUM–A.M. FIX"** means that the price for a relevant date will be that day's morning Platinum fixing price per troy ounce gross of Platinum for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the

198

LPPM and displayed on Bloomberg page "PLTMLNAM Cmdty <GO>" that displays prices effective on that relevant date.

- **"PLATINUM–NYMEX"** means that the price for a relevant date will be that day's settlement price per troy ounce of platinum on the NYMEX of the first monthly futures contract to expire following such date, stated in U.S. Dollars, as made public by the NYMEX and displayed on Reuters Screen page "O#PL:" on that relevant date.

- **"PLATINUM–P.M. FIX"** means that the price for a relevant date will be that day's afternoon Platinum fixing price per troy ounce gross of Platinum for delivery in Zurich through a member of the LPPM authorized to effect such delivery, stated in U.S. Dollars, as calculated by the LPPM and displayed on Bloomberg page "PLTMLNPM Cmdty <GO>" that displays prices effective on that relevant date.

- **"PLATINUM–TOCOM"** means that the price for a relevant date will be that day's settlement price per gram of fine Platinum on the TOCOM of the first monthly futures contract to expire following such date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JPL:" on that relevant date.

Silver

- **"SILVER–COMEX"** means that the price for a relevant date will be that day's settlement price per troy ounce of Silver on the COMEX of the first monthly futures contract to expire following such date, stated in U.S. cents, as made public by the COMEX and displayed on Reuters Screen page "O#SI:" on that relevant date.

- **"SILVER–FIX"** means that the price for a relevant date will be that day's Silver fixing price per troy ounce of Silver for delivery in London through a member of the LBMA authorized to effect such delivery, stated in U.S. cents, as calculated by the London Silver Market and displayed on Bloomberg page "SLVRLN Cmdty <GO>" that displays prices effective on that relevant date.

- **"SILVER–TOCOM"** means that the price for a relevant date will be that day's settlement price per ten (10) grams of fine Silver on the TOCOM of the first monthly futures contract to expire following such date, stated in Japanese Yen, as made public by the TOCOM and displayed on Reuters Screen page "O#JSV:" on that relevant date.

Tin

- **"TIN-LME CASH"** means that the price for a relevant date will be that day's second ring spot fix price per tonne of Tin on the LME for spot delivery, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOSNDY Cmdty <GO>" that displays prices effective on that relevant date.

Zinc

- **"ZINC-LME CASH"** means that the price for a relevant date will be that day's second ring spot fix price per tonne of Special High Grade Zinc on the LME for spot delivery, stated in U.S. Dollars, as determined by the LME and displayed on Bloomberg page "LOZSDY Cmdty <GO>" that displays prices effective on that relevant date.

## Annex 10

### Additional Terms and Conditions for FX Notes

*The terms and conditions of FX Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above, as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

### (A)    Examples of FX Notes

*The following provisions set out specific examples of FX Notes and are not intended to be a comprehensive or exhaustive description of all of the structures which may constitute an FX Note.*

### *Payments on FX Notes - Coupons*

(a)    *FX Linked Coupons*: FX Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is determined by reference to the Reference Exchange Rate (each a "*FX Linked Coupon*"). If so specified in the applicable Final Terms, the FX Linked Coupon in respect of an interest period will be calculated as being an amount per Note equal to the minimum denomination of such Note multiplied by the Performance (defined below). Payment of a FX Linked Coupon may also be subject to a requirement that the Performance exceeds or falls short of a benchmark value by a specified threshold (as specified in the applicable Final Terms).

(b)    *FX Linked Digital Coupons*: FX Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is contingent upon the Performance meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (each a "*FX Linked Digital Coupon*"). The FX Linked Digital Coupon in respect of an interest period will be an amount determined according to the method (other than the method referred to in (a) above) specified in the applicable Final Terms.

### *Payments on FX Notes - Final Redemption Amount*

*FX Final Redemption Amount*: FX Notes *may* include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to the performance (the "*Performance*") of a Reference Exchange Rate (a "*FX Final Redemption Amount*"). Examples of how the FX Final Redemption Amount may be calculated are as follows:

(a)    **Method A**: The FX Final Redemption Amount will be calculated as an amount per Note equal

to:

(I)    the minimum denomination of such Note; multiplied by

(II)    (1 + Performance),

where the Performance is positive; or

(III)    (1 – the absolute value of the Performance),

200

where the Performance is negative.

(b) **Method B**: The FX Final Redemption Amount will be calculated as an amount per Note equal to:

    (I)    the minimum denomination of such Note; multiplied by

    (II)   a percentage defined in the Final Terms as being the 'Principal Protection' level; and adding the result to

    (III)  an amount per currency unit of the nominal amount of each Note equal to the Performance (if positive) multiplied by a factor.

Payment of an FX Final Redemption Amount may also be subject to a requirement that the Performance, the Reference Exchange Rate and/or a percentage thereof, is equal to, exceeds or falls short of a benchmark value by a specified threshold (as specified in the applicable Final Terms).

*FX Digital Final Redemption Amount*: FX Notes may include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is contingent upon the Performance and/or Reference Exchange Rate being equal to, exceeding or falling short of one or more criteria specified in the applicable Final Terms (a "*FX Digital Final Redemption Amount*"). The FX Digital Final Redemption Amount will be an amount determined according to the method specified in the applicable Final Terms.

### Principal Protection

The Final Terms of FX Notes may specify a minimum amount payable in respect of the redemption of such Notes at maturity (the "*Principal Protection*"). The level of Principal Protection may be expressly stated as a percentage of the nominal amount of each Note at issuance or may be inherent in the formula or formulae for determining the amount payable on the redemption of such Notes. Where there is no Principal Protection, or the level of Principal Protection of less than 100% of the nominal amount of each Note at issuance, the amount of principal that is to be repaid at redemption of the note may be less than the principal invested and in certain circumstances may be equal to zero.

### Leverage

Payments, the timing of payments, redemption of the Notes and/or any other economic feature in respect of FX Notes may additionally be determined by reference to a multiplication factor (the "*Leverage*") specified in the applicable Final Terms of such Notes. With respect to such Notes, the degree to which the Reference Exchange Rate impacts upon the amount of such payments will vary according to the level of the Leverage.

### General

Payments under FX Notes will usually be settled (unless otherwise specified in the Final Terms) in the currency in which the note is denominated (the "*Specified Currency*"). Such currency may be different from a Reference Currency and investors will not be legally or beneficially entitled to any amounts in (if different from the Specified Currency) a Reference Currency.

**(B)**   **Disruption Events and Fallback Provisions**

The relevant Final Terms may provide that the following Disruption Event and Disruption Fallback provisions apply to a particular series of FX Notes (and the applicable Final Terms may also provide for different Disruption Events and Fallback provisions to be applicable to different series of FX Notes).

The Disruption Event and Fallback provisions for FX Notes that are denominated in a G-10 Currency and/or that refer to a Reference Exchange Rate where either the Reference Currency or the Base Currency are G-10 Currencies, will be determined by the Calculation Agent acting in good faith and in a commercially reasonable manner as specified in the applicable Final Terms.

For Notes, in respect of which, the Reference Exchange Rate is not determined by reference to a Settlement Rate Option or, under the terms of which, the Reference Exchange Rate is determined on a continuous basis, that is, not at any specified time, the Disruption Event and Disruption Fallback provisions will be determined in accordance with the applicable Final Terms.

1.    **Disruption Events**

In these provisions, "*Disruption Event*" shall mean, with respect to a series of FX Notes, the occurrence as determined by the Calculation Agent in its sole and absolute discretion of any of Price Source Disruption, Dual Exchange Rate, Illiquidity, Price Materiality, Inconvertibility, Non-Transferability, Material Change in Circumstance and Additional Disruption Event, in each case if specified as applicable in the applicable Final Terms as either a Category 1 Disruption Event (each event so specified a "*Category 1 Disruption Event*") or a Category 2 Disruption Event (each event so specified a "*Category 2 Disruption Event*") provided that no event shall be a Disruption Event unless the Calculation Agent determines in its sole discretion that it may have a materially prejudicial effect on the Issuer's ability to effect, maintain or terminate any hedge relating to its exposure under the Notes;

For the purposes of these provisions:

"*Affected Valuation Date*" means a Valuation Date in relation to which a Disruption Event has occurred;

"*Alternative Settlement Rate Option*" with respect to a Reference Currency, means any rate source in respect of such Reference Currency, other than the Settlement Rate Option with respect to such Reference Currency;

"*Dual Exchange Rate*" means that, with respect to a Reference Currency, the currency exchange rate specified in the Settlement Rate Option applicable to that Reference Currency splits into dual or multiple currency exchange rates;

"*FX Basket Supplement*" means the Base Prospectus Supplement dated 6 September 2006.

"*Illiquidity*" means that it becomes impossible to obtain a firm quote of the Settlement Rate for a Reference Currency for the minimum amount specified in the Final Terms;

"*Non-convertibility*" means that it becomes impossible to convert generally in the currency markets a Reference Currency into the Base Currency or the Specified Currency as appropriate through customary legal channels; or to convert any Reference Currency into the Base Currency or the Specified Currency as appropriate at a rate at least as favourable as the rate for domestic institutions located in a Reference Currency Jurisdiction;

"*Non-Transferability*" means that it becomes generally impossible in the markets to deliver amounts denominated in the Base Currency or the Specified Currency as appropriate from accounts inside a Reference Currency Jurisdiction to accounts outside that Reference Currency Jurisdiction or amounts denominated in any Reference Currency between accounts inside the relevant Reference Currency Jurisdiction or to a party that is a non-resident of that Reference Currency Jurisdiction;

"*Material Change in Circumstance*" means that any event (other than any other Disruption Event or an Event of Default) has occurred and/or is in existence which is beyond the control of the Issuer or the Calculation Agent, with respect to a Reference Currency, that:

(a)    prevents, materially delays or makes it impossible for the Issuer or the Calculation Agent to fulfil any of their obligations under the Notes; or

(b)    generally makes it impossible for the Issuer or any of its affiliates through which it hedges its exposure under the Notes to continue to hedge with other market participants such exposure in its entirety or in any material part or to terminate any hedge of such exposure;

"*Price Materiality*" means the Calculation Agent determines that, with respect to a Reference Currency, the Settlement Rate Option materially differs from any quote obtained by the Calculation Agent on the currency markets;

"*Price Source Disruption*" means that it becomes impossible to obtain the Reference Exchange Rate from the pricing source with respect to a Reference Currency on any Valuation Date (or if different, the day on which rates for that Reference Currency would, in the ordinary course, be published or announced by the relevant pricing source with respect to that Valuation Date);

"*Reference Currency Jurisdiction*" with respect to any Reference Currency, means the country of which such Reference Currency is the lawful currency;

"*Settlement Rate*" means with respect to a Reference Currency and subject to any disruption event or fallback provisions, means the level of the Reference Exchange Rate for such Reference Currency, as determined by the Calculation Agent in good faith and in a commercially reasonable manner (including but not limited to making such adjustments as are necessary to published quoting conventions and/or implying the Reference Exchange Rate from one or more Settlement Rate Options in relation to a Reference Currency);

"*Valuation Date*" means each date specified as such in the applicable Final Terms.

2.  **Disruption Fallbacks**

    (i)    *Category 1 Disruption Event on a Valuation Date*

    If the Calculation Agent determines in its sole discretion and acting in a commercially reasonable manner that a Category 1 Disruption Event has occurred on a Valuation Date in respect of a Settlement Rate (an "*Affected Settlement Rate*"), then such Affected Settlement Rate for such Valuation Date will be the rate determined by the Calculation Agent:

    (A)    using the Alternative Settlement Rate Option for the relevant Reference Currency (or, if there is more than more than one such Alternative Settlement Rate Option, following any order of such rates specified in the applicable Final Terms, using the Alternative Settlement Rate which is not, in the determination of the Calculation Agent, affected by the occurrence of a Category 1 Disruption Event); or

    (B)    if there is no Alternative Settlement Rate Option for the relevant Reference Currency, or the Alternative Settlement Rate Option (or, if there is more than one Alternative Settlement Rate Option, each Alternative Settlement Rate Option), in the determination of the Calculation Agent, is affected by the occurrence of a Category 1 Disruption Event, in its sole discretion, acting in good faith and taking into account such information available to it that it deems relevant.

    (ii)   *Category 2 Disruption Event*

    If, at any time (the "*Determination Time*") on any day (which may but need not be a Valuation Date), the Calculation Agent determines in its sole discretion acting in a commercially reasonable manner that a Category 2 Disruption Event has occurred and is outstanding in respect of a Settlement Rate or a Reference Currency, other than in relation to any calculations or determinations under the Notes which have already been made by the Calculation Agent, then:

    (A)    the Issuer will, subject to (B) and (C) below, fix the relevant Settlement Rate for such Reference Currency at the prevailing rate of exchange immediately prior to the Determination Time with such adjustment as the Calculation Agent determines is necessary to compensate the Issuer for the costs of unwinding or re-establishing any transaction required in order to hedge its exposure under the Notes; or

(B)    if at the time of such fixing (referred to in (A) above) the fixing date is not a Valuation Date and a Category 1 Disruption Event would have occurred in respect of the relevant Settlement Rate Option had such date been a Valuation Date, then, subject to (C) below, the Settlement Rate shall be determined by the Calculation Agent in accordance with the provisions of paragraph 2(i) above and such date will be treated as if it were a Valuation Date; or

(C)    if the Issuer determines that for any reason it is unable to fix the Settlement Rate for the Reference Currency as contemplated in (A) above and the Calculation Agent is unable to determine such Settlement Rate as contemplated in (B) above:

(i)    the Affected Valuation Date will be deferred until the next succeeding Business Day on which the applicable Disruption Event ceases to be outstanding, as determined by the Calculation Agent, subject as provided in (iii) below;

(ii)    if the Affected Valuation Date is postponed to a date such that the Calculation Agent determines that payment of any amount linked to the Settlement Rate in respect of the Reference Currency cannot be made on the relevant Interest Payment Date or the Redemption Date, as the case may be, in respect of that Affected Valuation Date, then such Interest Payment Date or the Redemption Date, as the case may be, will be postponed until the next date, determined by the Calculation Agent to be the first practicable date for settlement in such Reference Currency for payments from the relevant Affected Valuation Date (as so deferred); and

(iii)    where the relevant Disruption Event has remained outstanding for a period of ten consecutive Business Days (1) the relevant Affected Valuation Date will be deferred until the Business Day immediately following the expiry of such period on which date the Settlement Rate will be determined by the Calculation Agent in its sole discretion, acting in good faith and taking into account such information available to it that it deems relevant and (2) if the Affected Valuation Date is postponed to a date such that the Calculation Agent determines that payment of any amount linked to the Settlement Rate in respect of the Reference Currency cannot be made on the relevant Interest Payment Date or the Redemption Date, as the case may be, in respect of that Affected Valuation Date, then such Interest Payment Date or the Redemption Date, as the case may be, will be postponed until the next date, determined by the Calculation Agent to be the first practicable date for settlement in such Reference Currency for payments made from the Affected Valuation Date (as so deferred).

**(C)    Settlement Rate Options Applicable to FX Notes**

The Reference Exchange Rate may be calculated (or any other date specified in the relevant Final Terms) by reference to a Settlement Rate Option for that relevant Currency Pair. The relevant Settlement Rate Option with respect to any Tranche of Notes will be set out in the applicable Final Terms. The relevant Settlement Rate Option may be one of the standard Settlement Rate Options set out in the table below (with such amendments, if any, as shall be set out in the applicable Final Terms) or such other Settlement Rate Option as specified in the Final Terms.

The standard Settlement Rate Options specified below may change over time in accordance with the then prevailing market practice, or due variations in price sources details or the addition of new currencies, and the fact that a currency other than EUR or USD may become a Specified Currency.

| Code | Currency Pair | Settlement Rate Option |
|------|---------------|------------------------|
| ARS1 | USDARS | The spot rate for a Valuation Date will be the Argentine Peso/U.S. Dollar Specified Rate, expressed as the amount of Argentine Pesos per one U.S. Dollar, for settlement on the same day which appears on the Reuters Screen ARSMCMEEMTA Page at approximately 11:00 a.m., New York time, on that Valuation Date. |
| AUD1 | AUDUSD | The spot rate for a Valuation Date will be the U.S. Dollar/Australian Dollar official fixing rate, expressed as the amount of U.S. Dollars per one Australian Dollar, for settlement in two Business Days which appears on Reuters Screen HSRA at approximately 10.00 a.m. Sydney time, on that Valuation Date. |
| BRL1 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacões para Contabilidade" or "Rates for Accounting Purposes") by approximately 6:00 p.m., São Paulo time, on that Valuation Date. |
| BRL2 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacões para Contabilidade" or Rates for Accounting Purposes), which appears on Reuters Screen BRFR Page under the caption "Dolar PTAX" at approximately 8:30 a.m., São Paulo time, on the first Business Day following that Valuation Date. |
| BRL3 | USDBRL | The spot rate for a Valuation Date will be the Brazilian Real/U.S. Dollar offered rate for U.S. Dollars, expressed as the amount of Brazilian Reais per one U.S. Dollar, for settlement in two Business Days reported by the Banco Central do Brasil on SISBACEN Data System under transaction code PTAX-800 ("Consulta de Cambio" or Exchange Rate Inquiry), Option 5 ("Cotacoes para Contabilidade" or Rates for Accounting Purposes), which appears on Reuters Screen BRFR Page under the caption "Dolar PTAX" at approximately 6:30 pm Sao Paolo time on the Valuation Date |
| CAD1 | USDCAD | The spot rate for a Valuation Date will be the U.S. Dollar/Canadian Dollar fixing rate, expressed as the amount of Canadian Dollar per one U.S. Dollar, for settlement in two Business Days, which appears on Reuters Screen USDCADFIXM=WM at approximately 4.00 p.m. London time, on that Valuation Date |
| CAD2 | USDCAD | The spot rate for a Valuation Date will be the Canadian Dollar/U.S. Dollar official fixing rate, expressed as the amount of Canadian Dollars per one U.S. Dollar, for settlement in one Business Day which appears on Reuters Screen CADFIX= as published by Bank of Canada at approximately 10.00 a.m. New York time, on that Valuation Date. |
| CHF1 | USDCHF | The spot rate for a Valuation Date will be the U.S. Dollar/Swiss Franc fixing rate, expressed as the amount of Swiss Francs per one U.S. Dollar, |

|       |         | for settlement in two Business Days, which appears on Reuters Screen USDCHFFIXM=WM at approximately 4.00 p.m. London time, on that Valuation Date |
|-------|---------|---|
| CLP1  | USDCLP  | The spot rate for a Valuation Date will be the Chilean Peso/U.S. Dollar observado rate, expressed as the amount of Chilean Pesos per one U.S. Dollar, for settlement on the same day reported by the Banco Central de Chile which appears on the Reuters Screen CLPOB= Page below the caption "Value" at approximately 10:00 a.m., Santiago time, on the first Business Day following that Valuation Date. |
| CLP2  | USDCLP  | The spot rate for a Valuation Date will be the Chilean Peso/U.S. Dollar interbank rate, expressed as the amount of Chilean Pesos per one U.S. Dollar, for settlement on the same day reported by the Banco Central de Chile for the formal exchange market which appears on the Reuters Screen CLP= Page at the Specified Time on that Valuation Date. |
| CNY1  | USDCNY  | The spot rate for a Valuation Date will be the Chinese Renminbi/U.S. Dollar official fixing rate, expressed as the amount of Chinese Renminbi per one U.S. Dollar, for settlement in two Business Days reported by The State Administration of Foreign Exchange of the People's Republic of China, Beijing, which appears on the Reuters Screen SAEC Page opposite the symbol "USDCNY=" at approximately 5:00 p.m., Beijing time, on that Valuation Date. |
| COP1  | USDCOP  | The spot rate for a Valuation Date will be the Colombian Peso/U.S. Dollar fixing rate, expressed as the amount of Colombian Pesos per one U.S. Dollar, for settlement on the same day reported by the Colombian Banking Superintendency which appears on the Reuters Screen CO/COL03 Page to the right of the caption "TCRM" ("Tasa de Cierre Representative del Mercado" or closing market price) below the heading "Hoy" at approximately 9:30 a.m., Bogota time, on the first Business Day following that Valuation Date. |
| CZK1  | USDCZK  | The spot rate for a Valuation Date will be the Czech Koruna/U.S. Dollar official fixing rate, expressed as the amount of Czech Koruna per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen CNB2 at approximately 2.15 p.m. Central European time, on that Valuation Date. |
| DKK1  | USDDKK  | The spot rate for a Valuation Date will be the Danish Krone/U.S. Dollar official fixing rate, expressed as the amount of Danish Krone per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDFIX=CO at approximately 1.30 p.m. London time, on that Valuation Date. |
| GBP1  | GBPUSD  | The spot rate for a Valuation Date will be the U.S. Dollar/Sterling official fixing rate, expressed as the amount of U.S. Dollars per one Sterling, for settlement in two Business Days which appears on Reuters Screen FXFIX to the right of the caption "GBP" at approximately 11.00 a.m. London time, on that Valuation Date. |
| HKD1  | USDHKD  | The spot rate for a Valuation Date will be the Hong Kong Dollar/U.S. Dollar spot rate, expressed as the amount of Hong Kong Dollar per one U.S. Dollar, which appears on the Reuters Page HKDFIX= at approximately 11:15 a.m., Hong Kong time, on that Valuation Date. |

206

| HUF1 | USDHUF | The spot rate for a Valuation Date will be the Hungarian Forint/U.S. Dollar official fixing rate, expressed as the amount of Hungarian Forint per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDHUFFIX= at approximately 10.30 a.m. London time, on that Valuation Date |
|------|--------|---|
| IDR1 | USDIDR | The spot rate for a Valuation Date will be the Indonesian Rupiah/U.S. Dollar spot rate, expressed as the amount of Indonesian Rupiah per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "IDR" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| IDR2 | USDIDR | The spot rate for a Valuation Date will be the Indonesian Rupiah/U.S. Dollar spot rate, expressed as the amount of Indonesian Rupiah per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page 50157 to the right of the caption "Spot" under the column "IDR" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| ILS1 | USDILS | The spot rate for a Valuation Date will be the Israeli Shekel/U.S. Dollar Specified Rate, expressed as the amount of Israeli Shekels per one U.S. Dollar, for settlement in two Business Days which appears on the Reuters Screen FXIL Page at 5.00 p.m., Tel Aviv time on that Valuation Date. |
| INR1 | USDINR | The spot rate for a Valuation Date will be the Indian Rupee/U.S. Dollar reference rate, expressed as the amount of Indian Rupee per one U.S. Dollar, for settlement in two Business Days reported by the Reserve Bank of India which appears on the Reuters Screen RBIB Page at approximately 2:30 p.m., Mumbai time, or as soon thereafter as practicable, on that Valuation Date. |
| ISK1 | USDISK | The spot rate for a Valuation Date will be the Icelandic Krona/U.S. Dollar official fixing rate, expressed as the amount of Icelandic Krona per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDISKFIX= at approximately 12.00 p.m. London time, on that Valuation Date |
| JPY1 | USDJPY | The spot rate for a Valuation Date will be the Japanese Yen/U.S. Dollar official fixing rate, expressed as the amount of Japanese Yen per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen TKFE at approximately 3.00 p.m. Tokyo time, on that Valuation Date. |
| JPY2 | USDJPY | The spot rate for a Valuation Date will be the Japanese Yen/U.S. Dollar official fixing rate, expressed as the amount of Japanese Yen per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen FXFIX at approximately 11.00 a.m. London time, on that Valuation Date. |
| KRW1 | USDKRW | The spot rate for a Valuation Date will be the Korean Won/U.S. Dollar market average rate, expressed as the amount of Korean Won per one U.S. Dollar, for settlement in two Business Days reported by the Korea Financial Telecommunications and Clearing Corporation which appears on the Reuters Screen KFTC18 Page to the right of the caption "USD Today" that is available at approximately 5:30 p.m., Seoul time, on the Valuation Date or as soon thereafter as practicable, but in no event later |

|         |         |                                                                                                                                                                                                                                                                                                                                         |
|---------|---------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         |         | than 9:00 a.m., Seoul time, on the first Business Day following the Valuation Date.                                                                                                                                                                                                                                                        |
| MXN1    | USDMXN  | The spot rate for a Valuation Date will be the Mexican Peso/U.S. Dollar fixing rate, expressed as the amount of Mexican Pesos per one U.S. Dollar, for settlement in two Business Days reported by Banco de Mexico which appears on Reuters Screen MEX01 Page under the heading "USDMXNFIX=", at the close of business in Mexico City on that Valuation Date. |
| MYR1    | USDMYR  | The spot rate for a Valuation Date will be the Malaysian Ringgit/U.S. Dollar spot rate, expressed as the amount of Malaysian Ringgit per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore, which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "MYR" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| MYR2    | USDMYR  | The spot rate for a Valuation Date will be the Malaysian Ringgit/U.S. Dollar spot rate, expressed as the amount of Malaysian Ringgit per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore, which appears on the Reuters Page 50157 to the right of the caption "Spot" under the column "MYR" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| NOK1    | USDNOK  | The spot rate for a Valuation Date will be the Norwegian Krone/U.S. Dollar official fixing rate, expressed as the amount of Norwegian Krone per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDFIX=OL at approximately 1.30 p.m. London time, on that Valuation Date. |
| NZD1    | USDNZD  | The spot rate for a Valuation Date will be the U.S. Dollar/New Zealand Dollar fixing rate, expressed as the amount of New Zealand Dollar per one U.S. Dollar, for settlement in two Business Days, which appears on Reuters Screen USDNZDFIXM=WM at approximately 4.00 p.m. London time, on that Valuation Date. |
| PHP1    | USDPHP  | The spot rate for a Valuation Date will be the Philippine Peso/U.S. Dollar morning weighted average rate for that Valuation Date, expressed as the amount of Philippine Pesos per one U.S. Dollar, for settlement in one Business Day reported by the Philippine Dealing system which appears on the Reuters Screen PDSPESO Page to the right of the caption "AM WT AVE" at approximately 12:30 p.m., Manila time, on that Valuation Date. |
| PHP2    | USDPHP  | The spot rate for a Valuation Date will be the Philippine Peso/U.S. Dollar morning weighted average rate for that Valuation Date, expressed as the amount of Philippine Pesos per one U.S. Dollar, for settlement in one Business Day reported by the Philippine Dealing system which appears on the Reuters Screen PHPFIX=PDSP Page at approximately 12:30 p.m., Manila time, on that Valuation Date. |
| PLN1    | USDPLN  | The spot rate for a Valuation Date will be the Polish Zloty/U.S. Dollar official fixing rate, expressed as the amount of Polish Zloty per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDPLNFIX= at approximately 11.00 a.m. London time, on that Valuation Date |
| RON1    | USDRON  | The spot rate for a Valuation Date will be the Romanian Leu/U.S. Dollar official fixing rate, expressed as the amount of Romanian Leu per one U.S. |

|  |  | Dollar, for settlement in two Business Days which appears on Reuters Screen USDRONFIX= at approximately 11.00 a.m. London time, on that Valuation Date |
|---|---|---|
| RUB1 | USDRUB | The spot rate for a Valuation Date will be the Russian Ruble/U.S. Dollar Specified Rate, expressed as the amount of Russian Rubles per one U.S. Dollar, for settlement in one Business Day, calculated by the Chicago Mercantile Exchange ("CME") and as published on CME's website, which appears on the Reuters Screen EMTA Page, at approximately 1:30 p.m., Moscow time, on that Valuation Date. |
| SEK1 | USDSEK | The spot rate for a Valuation Date will be the Swedish Krona/U.S. Dollar official fixing rate, expressed as the amount of Swedish Krona per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen USDFIX=ST at approximately 9.00 a.m. London time, on that Valuation Date. |
| SGD1 | USDSGD | The spot rate for a Valuation Date will be the Singapore Dollar/U.S. Dollar spot rate, expressed as the amount of Singapore Dollar per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "SGD" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| SGD2 | USDSGD | The spot rate for a Valuation Date will be the Singapore Dollar/U.S. Dollar spot rate, expressed as the amount of Singapore Dollar per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page 50157 to the right of the caption "Spot" under the column "SGD" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| THB1 | USDTHB | The spot rate for a Valuation Date will be the Thai Baht/U.S. Dollar spot rate, expressed as the amount of Thai Baht per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page ABSIRFIX01 to the right of the caption "Spot" under the column "THB" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| THB2 | USDTHB | The spot rate for a Valuation Date will be the Thai Baht/U.S. Dollar spot rate, expressed as the amount of Thai Baht per one U.S. Dollar, for settlement in two Business Days, reported by the Association of Banks in Singapore which appears on the Reuters Page 50157 to the right of the caption "Spot" under the column "THB" at approximately 11:00 a.m., Singapore time, on that Valuation Date. |
| TRY1 | USDTRY | EURTRY1 divided by EUR1 |
| TWD1 | USDTWD | The spot rate for a Valuation Date will be the Taiwanese Dollar/U.S. Dollar spot rate, expressed as the amount of Taiwanese Dollars per one U.S. Dollar, for settlement in two Business Days, reported by the Taipei Forex Inc. which appears on the Reuters Screen TAIFX1 Page under the heading "Spot" as of 11:00 a.m. Taipei time, on that Valuation Date, or if no rate appears as of 11:00 a.m., Taipei time, the rate that first appears in any of the next succeeding 15 minute intervals after such time, up to and including 12:00 noon, Taipei time on that Valuation Date. |
| ZAR1 | USDZAR | The spot rate for a Valuation Date will be the South African Rand/U.S. Dollar official fixing rate, expressed as the amount of South African Rand |

| | | |
|---|---|---|
| | | per one U.S. Dollar, for settlement in two Business Days which appears on Reuters Screen ZARL at approximately 4.00 p.m. Johannesburg time, on that Valuation Date. |
| EUR1 | EURUSD | The spot rate for a Valuation Date will be the U.S. Dollar/Euro fixing rate, expressed as the amount of U.S. Dollar per one Euro which appears on Reuters Screen ECB37 to the right of the caption "USD" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| InvEUR2 | EURUSD | One divided by the spot rate in X (A):<br>X(A) The spot rate for a Valuation Date will be the U.S. Dollar/Euro fixing rate, expressed as the amount of U.S. Dollar per one Euro which appears on Reuters Screen ECB37 to the right of the caption "USD" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURAUD1 | EURAUD | The spot rate for a Valuation Date will be the Australian Dollar/Euro fixing rate, expressed as the amount of Australian Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "AUD" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURCAD1 | EURCAD | The spot rate for a Valuation Date will be the Canadian Dollar/Euro fixing rate, expressed as the amount of Canadian Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CAD" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURCHF1 | EURCHF | The spot rate for a Valuation Date will be the Swiss Franc/Euro fixing rate, expressed as the amount of Swiss Francs per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CHF" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURCNY1 | EURCNY | The spot rate for a Valuation Date will be the Chinese Renminbi/Euro official fixing rate, expressed as the amount of Chinese Renminbi per one Euro, for settlement in two Business Days reported by The State Administration of Foreign Exchange of the People's Republic of China, Beijing, which appears on the Reuters Screen SAEC Page opposite the symbol "EURCNY=" at approximately 5:00 p.m., Beijing time, on that Valuation Date. |
| EURCZK1 | EURCZK | The spot rate for a Valuation Date will be the Czech Koruna/Euro fixing rate, expressed as the amount of Czech Koruna per one Euro which appears on Reuters Screen ECB37 to the right of the caption "CZK" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURDKK1 | EURDKK | The spot rate for a Valuation Date will be the Danish Krone/Euro fixing rate, expressed as the amount of Danish Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "DKK" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURGBP1 | EURGBP | The spot rate for a Valuation Date will be the Sterling/Euro fixing rate, expressed as the amount of Sterling per one Euro which appears on Reuters Screen ECB37 to the right of the caption "GBP" at approximately 2:15 p.m., Central European time, on that Valuation Date. |
| EURHUF1 | EURHUF | The spot rate for a Valuation Date will be the Hungarian Forint/Euro fixing rate, expressed as the amount of Hungarian Forint per one Euro which appears on Reuters Screen ECB37 to the right of the caption "HUF" at approximately 2:15 p.m., Central European time, on that Valuation Date. |

EURISK1    EURISK    The spot rate for a Valuation Date will be the Icelandic Krona/Euro fixing rate, expressed as the amount of Icelandic Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "ISK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURJPY1    EURJPY    The spot rate for a Valuation Date will be the Japanese Yen/Euro fixing rate, expressed as the amount of Japanese Yen per one Euro which appears on Reuters Screen ECB37 to the right of the caption "JPY" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURNOK1    EURNOK    The spot rate for a Valuation Date will be the Norwegian Krone/Euro fixing rate, expressed as the amount of Norwegian Krone per one Euro which appears on Reuters Screen ECB37 to the right of the caption "NOK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURNZD1    EURNZD    The spot rate for a Valuation Date will be the New Zealand Dollar/Euro fixing rate, expressed as the amount of New Zealand Dollars per one Euro which appears on Reuters Screen ECB37 to the right of the caption "NZD" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURPLN1    EURPLN    The spot rate for a Valuation Date will be the Polish Zloty/Euro fixing rate, expressed as the amount of Polish Zloty per one Euro which appears on Reuters Screen ECB37 to the right of the caption "PLN" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURRON1    EURRON    The spot rate for a Valuation Date will be the Romanian Leu/Euro fixing rate, expressed as the amount of Romanian Leu per one Euro which appears on Reuters Screen ECB37 to the right of the caption "RON" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURSKK1    EURSKK    The spot rate for a Valuation Date will be the Slovak Koruna/Euro fixing rate, expressed as the amount of Slovak Koruna per one Euro which appears on Reuters Screen ECB37 to the right of the caption "SKK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURSEK1    EURSEK    The spot rate for a Valuation Date will be the Swedish Krona/Euro fixing rate, expressed as the amount of Swedish Krona per one Euro which appears on Reuters Screen ECB37 to the right of the caption "SEK" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURTRY1    EURTRY    The spot rate for a Valuation Date will be the Turkish Lira/Euro fixing rate, expressed as the amount of Turkish Lira per one Euro which appears on Reuters Screen ECB37 to the right of the caption "TRY" at approximately 2:15 p.m., Central European time, on that Valuation Date.

EURZAR1    EURZAR    The spot rate for a Valuation Date will be the South African Rand/Euro fixing rate, expressed as the amount of South African Rand per one Euro which appears on Reuters Screen ECB37 to the right of the caption "ZAR" at approximately 2:15 p.m., Central European time, on that Valuation Date.

## Annex 11

## Additional Terms and Conditions for Basket Linked Notes

*The terms and conditions of Basket Linked Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domestic Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

### (A)    General Description of Basket Linked Notes

#### Basket

A Basket shall comprise of one or more Basket Reference Values, including, but not limited to currency exchange rates (each a "*Reference Exchange Rate*"), commodity reference prices (each a "*Commodity Reference Price*"), equity prices (each an "*Equity Reference Price*"), debt security prices (each a "*Debt Reference Price*"), reference entities (each a "*Reference Entity Price*"), interest rates (each an "*Interest Rate Reference Price*"), index levels (each an "*Index Reference Price*") as specified in the applicable Final Terms.

#### Basket Value

The Basket Value is calculated by reference to any combination or multiple of one or more Basket Reference Values as specified in the applicable Final Terms.

#### Multiple Baskets

For Multiple Basket Linked Notes, the payment of interest and/or the redemption amount, the timing of any payment, redemption of the Notes and/or any other economic feature of such Notes may also be determined by reference to the best performing Basket, worst performing Basket, the average performance of the Baskets to which the Notes are linked, the top few best or the last few worst performing baskets, the aggregate of or the difference between or ratio of the Basket Value for the Baskets or by reference to any other formula or any other payment mechanism, each as specified in the applicable Final Terms.

#### Weighting

Each Basket Reference Value and/or, in respect of Multiple Basket Linked Notes, each Basket Value, may be ascribed a weighting factor (a "*Weighting*") in order to alter the influence of the performance of that Basket Reference Value or Basket Value (as the case may be). The Weighting of a Basket Reference Value or Basket Value, may be expressed as a percentage, or a fraction or in such other manner as provided in the Final Terms and may be defined in such a way that it has either an increased or decreased positive or negative influence on the value of the Notes relative to the influence exerted by other Basket Reference Values or Basket Values (as the case may be).

### (B)    Examples of Basket Linked Notes

*The following provisions set out specific examples of Basket Linked Notes and are not intended to be a comprehensive or exhaustive description of all of the structures which may constitute a Basket Linked Note.*

#### Payments on Basket Linked Notes – Coupons

*Basket Linked Coupons*: Basket Linked Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is determined by reference to one or more Basket Values (each a "*Basket Linked Coupon*"). For example, the Basket Linked Coupon in respect of an interest period may be calculated as being an amount per Note equal to the specified denomination of such Note multiplied by the Basket Value. Payment of a Basket Linked Coupon may also be subject to a requirement that one or more the Basket Values exceed or fall short of one or more benchmark values by a specified threshold (as specified in the Final Terms).

*Basket Linked Digital Coupons*: Basket Linked Notes *may* include Notes under the terms of which an amount is payable in respect of one or more interest periods which is contingent upon one or more Basket Values meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (each a "*Basket Linked Digital Coupon*"). The Basket Linked Digital Coupon in respect of an interest period will be an amount determined according to the method specified in the applicable Final Terms.

#### Payments on Basket Linked Notes – Final Redemption Amount

*Basket Linked Final Redemption Amount*: Basket Linked Notes *may* include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to one or more Basket Values (a "*Basket Linked Final Redemption Amount*"). For example, the Basket Linked Final Redemption Amount may be (but is not limited to being) calculated according to the following alternative methodologies:

(a)    **Method A**: The Basket Linked Final Redemption Amount will be calculated as an amount per Note equal to:

    (I)    the specified denomination of such Note; multiplied by

    (II)   (1+ Basket Value),

        where the Basket Value is positive; or

    (III)  (1 - the absolute amount of the Basket Value),

        where the Basket Value is negative.

(b)    **Method B:** The Basket Linked Final Redemption Amount will be calculated as an amount per Note equal to:

    (I)    the specified denomination of such Note; multiplied by

    (II)   a percentage defined in the Final Terms as being the 'Principal Protection' level; and adding the result to

    (III)  an amount per currency unit of the nominal amount of each Note equal to the Basket Value (if positive).

Payment of a Basket Linked Final Redemption Amount *may* also be subject to a requirement that one or more Basket Values exceed or fall short of one or more benchmark values by a specified threshold (as specified in the Final Terms).

*Basket Linked Digital Final Redemption Amount*: Basket Linked Notes **may** include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is contingent upon one or more Basket Values meeting, exceeding or falling short of one or more criteria specified in the applicable Final Terms (a "*Basket Linked Digital Final Redemption Amount*"). The Basket Linked Digital Final Redemption Amount will be an amount determined according to the method specified in the applicable Final Terms.

*Principal Protection*

The Final Terms of Basket Linked Notes may specify (as "*Principal Protection*") a minimum amount payable in respect of the redemption of such Notes at maturity (usually expressed as a percentage of the nominal amount of each Note at issuance). Where no Principal Protection, or Principal Protection of less than 100 per cent. of the nominal amount of each Note at issuance is specified, the amount of principal that is to be repaid at redemption of the note may be less than the principal invested and in certain circumstances may be equal to zero.

*Leverage*

Payments, the timing of payments, redemption of the Notes and/or any other economic feature, in respect of Basket Linked Notes may additionally be determined by reference to a multiplication factor (the "*Leverage*") specified in the Final Terms of such Notes. With respect to such Notes, the degree to which the Basket Value impacts upon such matters will vary according to the level of the Leverage.

**(C)    Supplements**

For the purposes of the General Conditions, all references therein to an "Index" or "Indices" may be deemed to be references to "Basket Value" or "Basket Values", as the case may be, if and to the extent so specified in the applicable Final Terms.

### Annex 12

### Additional Terms and Conditions for Range Accrual Notes

*The terms and conditions of Range Accrual Notes shall comprise the Terms and Conditions of the Notes set forth on page 79 above (the "General Conditions") and the additional terms and conditions set forth below (the "Special Conditions"), in each case subject to completion and/or amendment in the applicable Final Terms. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then the General Conditions applicable to such Notes shall, in addition, be amended as described in Annexes 1 to 6 above , as applicable (the "Applicable Domestic Conditions"). In the event of any inconsistency between the General Conditions and the Special Conditions, the Special Conditions shall prevail. If any such Notes are Australian Domestic Notes, Danish Notes, Finnish Notes, New Zealand Domestic Notes, Norwegian Notes or Swedish Notes then in the event of any inconsistency between (1) the General Conditions as amended by the Special Conditions and (2) the Applicable Domesticn Conditions, the Applicable Domestic Conditions shall prevail. In the event of any inconsistency between any of the foregoing and the applicable Final Terms, the applicable Final Terms shall prevail.*

Notes issued pursuant to the Program may include Notes in respect of which, any interest payable for one or more Interest Periods and/or any amount payable on redemption of the Notes (as specified in the applicable Final Terms) is determined by reference to the number of days during a specified period (an "*Observation Period*") that a predetermined event or events (each a "*Fixing Event*") occurs or does not occur (as specified in the applicable Final Terms) as a proportion of the total number of days (each an "*Observation Day*") within such Observation Period (such portion, the "*Index Ratio*"). Amounts payable under Range Accrual Notes may also be determined by multiplying the Index Ratio by one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof (each an "*Underlying Coupon*").

The calculation of the numerator component of the Index Ratio may be determined by reference to:

1. the number of days during an Observation Period that a Fixing Event occurs;

2. the number of days during an Observation Period before a Fixing Event occurs;

3. the number of days during an Observation Period before a Fixing Event does not occur;

4. the number of days during an Observation Period that no Fixing Event occurs;

5. the number of days during an Observation Period before a Fixing Event occurs for a specified number of times; or

6. a multiple of the number of days during an Observation Period that a Fixing Event occurs minus a multiple of the number of days that the Fixing Event does not occur in that Observation Period.

The above sets out just some of the methodologies that may be used to determine the numerator component of the Index Ratio. It is not intended to be an exhaustive list and other calculation methodologies may be used to determine such ratio as set out in the applicable Final Terms.

The Fixing Event may be, but is not limited to, the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof (the "*Observable Rate*"), exceeding and/or equalling and/or being lower than and/or equalling one or more predetermined criteria (the "*Strike*" or "*Strikes*"), as specified in the applicable Final Terms. The Strike may also be defined with reference to the value or other function of, one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable or a combination thereof.

The Fixing Event may be observed on each Observation Date at a specified time or may be continually observed during the Observation Period or may be observed on such other date or time as specified in the applicable Final Terms.

The total number of days during the Observation Period in which the Fixing Event is observed may vary. For example, if a Fixing Event:

(a)     occurs on an Observation Date during the Observation Period, observation of the Fixing Event may continue to be observed on each subsequent Observation Date during the Observation Period; or

(b)     does not occur on an Observation Date, the observation of the Fixing Event (and the number of days on which a Fixing Event is determined to have occurred) may cease on such date, notwithstanding the total number of Observation Days left in such Observation Period. Such Notes are referred to as "*Knock-Out Range Accrual Notes*"; or

(c)     does not occur on an Observation Date for a specified number of times, the observation of the Fixing Event (and the number of days on which a Fixing Event is determined not to have occurred) may cease on such date, notwithstanding the total number of Observation Days left in such Observation Period. Such Notes are referred to (also know as Knock-Out Range Accrual Notes).

By way of example:

1.     The interest rate for an Interest Period or amount payable on redemption of a Range Accrual Note may be calculated by reference to the number of Observation Days during an Observation Period in which USD LIBOR with a designated maturity of 6 months (the "*Observed Rate*") is equal to or exceeds 2% but is less than 4% (together, the "*Strike*"); divided by the total number of days in that Observation Period. For the purpose of this example, the total number of Observation Days during the Observation Period is equal to 10. If on the second Observation Day during that Observation Period, the Observed Rate is outside the Strike, but is within the Strike on each other Observation Date during such period (including the first day of such period) then the Index Ratio will be calculated by dividing 9, being the number of days on which the Observed Rate was within the Strike, by 10, being the total number of Observation Days within the Observation Period, giving 0.9.

2.     For Knock-Out Range Accrual Notes referred to in (b) above, if the Index Ratio is determined by reference to the number of Observation Days during an Observation Period in which Observed Rate is within the Strike until the first Observation Day on which it is outside the Strike; divided by the total number of days in that Observation Period, if the Observed Rate was within the Strike on the first Observation Day but outside the Strike on the second Observation Date, then the Index Ratio will be calculated by dividing 1, being the number of days on which the Observed Rate was within the Strike, by 10, being the total number of Observation Days within the Observation Period, giving 0.1

The above are just two examples of how the Index Ratio may be determined and are not intended to be an exhaustive description of the operation of the structure for Range Accrual Notes.

The Observation Period and the period in which the interest payable and/or any amount payable on redemption of the Notes are determined maybe the same or they may relate to different chronological periods and may be of different lengths. For the avoidance of doubt, the days upon which the Fixing Event is observed could be any subset of days within such period or any other period or periods, including, but not limited to, a period of one day only.

## ADDITIONAL DESCRIPTIONS IN RELATION TO SPECIFIC NOTES

*The following is a description of certain specific types of Notes and provides examples of types of Notes. It is not intended to be an exhaustive list of structures or types of Notes. Any Series of Notes may incorporate different components of each of the specific Notes described below and of other types of Notes described in this Base Prospectus. The descriptions in this section should be read in conjunction with the section "Terms and Conditions of the Notes".*

### Quanto Notes

Notes issued pursuant to the Program may include Notes issued in a currency (the "*Quanto Currency*") in respect of which, the amount payable on redemption and/or the rate of interest for one or more Interest Periods is calculated by reference to, among other variables, a currency exchange rate or currency exchange rates, interest rate or interest rates in respect of a currency or currencies, or an asset or assets or index or indices denominated in a currency or currencies, that is different to that of the Quanto Currency (each a "*Reference Currency*") as specified in the applicable Final Terms. All interest amounts payable under the Notes and any amounts payable on the redemption of the Notes are paid in the Quanto Currency. Such Notes are referred to as "*Quanto Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

### Variable Cap Notes and Notes in respect of which Rates of Interest are determined by Swap Rates

Notes issued pursuant to the Program may include Notes in respect of which the amount payable on redemption and/or the rate of interest applicable for one or more Interest Periods is subject to a variable maximum interest rate (or cap) as specified in the Final Terms. The variable maximum redemption amount and/or rate of interest may be determined by reference to any rate, currency, index, formula or any other factor (each a "*Variable Cap Factor*"), or any combination of such Variable Cap Factors. Such Notes are referred to as "*Variable Cap Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

In addition, Notes issued pursuant to the Program may include Notes in respect of which the redemption amount, rate of interest, the maximum rate of interest and/or the minimum rate of interest applicable for one or more Interest Periods is determined by reference to one or a combination of swap rates specified in the applicable Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

### *Information relating to Swap Rates*

Swap rates are fixed rates on interest rate swaps. Commonly used benchmarks for such swap rates include (i) the service known as ISDAFIX; (ii) the service known as IFR Derivatives; and (iii) rates determined by the Calculation Agent. Notes may make reference to swap rates quoted according to market standard conventions which are swap rates for swap transactions denominated in currencies including Euro, United States Dollars, Swiss Francs, Pounds Sterling, Japanese Yen, Swedish Kroner and Polish Zloty, each of which are quoted for a variety of designated maturities and expressed as a percentage. Unless otherwise specified in the applicable Final Terms, such rates will be determined by the Calculation Agent on the relevant Interest Determination Dates. "*Interest Determination Date*" in this context means the day which is specified in the applicable Final Terms.

Swap rates relevant to a particular Note will be identified in the Final Terms by reference to the screen page (the "*Relevant Screen Page*") and, where applicable, the heading below which the relevant swap rate appears, the caption above which the relevant swap rate appears and the time (the "*Relevant Time*") as of which the relevant swap rate appears. By way of example, the annual swap rate for Euro denominated swap rates provided by ISDAFIX with a designated maturity of two years will be specified in the Final Terms as appearing on the Reuters Screen ISDAFIX2 Page (or any successor to that page) under the heading "EURIBOR Basis" and above the caption "11.00 AM Frankfurt." as of 11 a.m., Frankfurt time.

*Fallback rate*: With respect to such Notes unless otherwise specified in the applicable Final Terms, if, on any Interest Determination Date, the Calculation Agent determines in its sole and absolute discretion that a relevant swap rate:

(1)    does not appear on the Relevant Screen Page (or any successor to that page); or

(2)    for any other reason, is unavailable or cannot reasonably be calculated;

in each case as at the Relevant Time, then, in relation to the relevant Interest Determination Date, such swap rate will be the rate determined by the Calculation Agent as the rate specified in the Final Terms as being defined in Section 7.1 of the Annex to the 2000 ISDA Definitions (June 2000 version) with a Designated Maturity equivalent to the designated maturity of the original swap rate, in each case as if such rate had been elected. For the purposes of determining any Fallback rate, the ISDA Definitions shall be construed as set out in the Final Terms.

Details on historical levels of swap rates can be found on the website http://www.isda.org/fix/historicaldata.html.

**Steepener Notes**

Notes issued pursuant to the Program may include Steepener Notes, which are Notes in respect of which the rate of interest applicable for one or more Interest Periods is determined by reference to the difference (or spread) between two swap rates specified in the applicable Final Terms, which difference (or spread) may (if so specified in the applicable Final Terms) then be multiplied by a factor (the "*leverage factor*") specified in the applicable Final Terms, subject to any minimum and/or maximum interest rates specified in the applicable Final Terms. The paragraph above contains further information relating to Swap Rates.

**Path-Dependent Notes**

Notes issued pursuant to the Program may include Notes in respect of which, the rate of interest for one or more Interest Periods is calculated by reference to the rate of interest for one or more previous Interest Periods (the "*Previous Rate*"), as specified in the applicable Final Terms. The rate of interest for an Interest Period may be calculated by adding to or subtracting from the Previous Rate, or multiplying or dividing the Previous Rate by one or more variables (or any combination thereof). Such variables may include a rate, a currency, an index, a formula and/or a constant. Alternatively, the rate of interest could be subject to a maximum or minimum rate of interest based upon the Previous Rate. Such Notes are referred to as "*Path-Dependent Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

**Range Accrual Notes**

Notes issued pursuant to the Program may include Notes in respect of which, (i) for one or more Interest Periods, the rate of interest specified in the applicable Final Terms is calculated by multiplying a rate, currency exchange rate, index, formula or other factor or combination thereof (each a "*Reference Rate*") by a fraction (the "*Index Ratio*") whose denominator is the total number of days (each an "*Observation Day*") within a period (an "*Observation Period*") and whose numerator is the actual number of days during that Observation Period in respect of which a predetermined event (the "*Fixing Event*") occurs and/or (ii) the amount payable on redemption is determined by reference to the resulting rate described under (i) above. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

The Fixing Event could be, but is not limited to, one or more indices, formulae, currency exchange rates, rates or a combination thereof, exceeding and/or equalling and/or becoming lower than and/or equalling a predetermined level or levels of another rate, currency, exchange rate, index, formula, or constant, as specified in the applicable Final Terms.

By way of example, the interest rate for an Interest Period on a Range Accrual Note may be calculated by multiplying the principal amount of the Notes by: (i) EURIBOR with a designated maturity of 6 months;

218

and (ii) the Index Ratio. The Index Ratio may be determined by: (a) calculating the number of Business Days during such Interest Period in which USD LIBOR with a designated maturity of 6 months is equal to or exceeds 2% but is less than 4%; and (b) dividing the result by the total number of days in that period.

In this instance the Interest Period and the Observation Period are the same, but in certain Range Accrual Notes, they may relate to different chronological periods and may be of different lengths. For the avoidance of doubt, the days upon which the Fixing Event is observed could be any subset of days within such Interest Period or any other Interest Period or periods, including, but not limited to, a period of one day only.

**Switchable Notes**

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest or a component of the rate of interest specified in the applicable Final Terms may, on certain dates (each a "*Exercise Date*"), change to a different rate of interest or component of the rate of interest or to zero (as the case may be) at the option (each a "*Switch Option*") of either the Issuer and/or the Noteholder and/ or a third party (the "*Switch Option Holder*"). The number of Switch Options available to the Switch Option Holder may be limited or unlimited as specified in the applicable Final Terms. The occurrence of such an event is known as a "*Switch Event*". Such Notes are referred to as "*Switchable Notes*". Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

By way of example, the Switch Option Holder may exercise its Switch Option on the Exercise Date which results in the rate of interest payable for an Interest Period converting from a rate of interest equal to 6.00 per cent. annum of the nominal amount of the Notes to a rate of interest equal to EURIBOR with a designated maturity of 12 months ("*12m EURIBOR*") plus 0.50% of the nominal amount of the Notes. In this instance if 12m EURIBOR is at a low rate (for example, 2.00 per cent.) then the coupon payable in respect of the relevant Interest Period would switch from 6.00 per cent. to 12m EURIBOR + 0.50%, or 2.50%.

The above analysis is one example of the operation of Switchable Notes. For other Switchable Notes the rate of interest payable may switch between fixed and/or floating and/or Index-Linked and/or any combination thereof. This list is not intended to be exhaustive.

**Target Redemption Notes**

Notes issued pursuant to the Program may include Notes that will be redeemed if, with respect to one or more Interest Periods, the aggregate amount of interest to be paid under the Notes, that is, the amount of interest payable for an Interest Period added to all previous amounts of interest paid under the Notes (the "*Aggregate Interest Amount*") is equal to or exceeds a target amount of interest as specified in the applicable Final Terms (the "*Target Interest Amount*"). Such redemption will be at an amount and on a date specified in the applicable Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

In some instances, on an Interest Determination Date, the Aggregate Interest Amount may exceed the Target Interest Amount. In such circumstances, the Notes will be redeemed at the end of such Interest Period and, depending on the provisions in the Final Terms, the amount of interest payable in respect of that Interest Period will either be: (i) reduced to an amount such that the Aggregate Interest Amount in respect of such Interest Period is equal to the Target Interest Amount; (ii) the full amount of interest calculated for such Interest Period; or (iii) changed to a different amount of interest as specified in the applicable Final Terms.

In other circumstances, the Aggregate Interest Amount upon maturity may be lower than the Target Interest Amount. In these circumstances, the Notes will be redeemed on the scheduled maturity date and, depending on the provisions in the Final Terms, the final payment of interest will either be: (i) increased so that the Aggregate Interest Amount equals the Target Interest Amount specified in the Final Terms; or (ii) the amount of interest paid will be unchanged by the target redemption feature.

The operation of the early redemption mechanism may differ depending on the specific redemption provisions contained in the applicable Final Terms. Notes of this type are referred to as "*Target Redemption Notes*".

### Trigger Notes

Notes issued pursuant to the Program may include Notes in respect of which, for one or more Interest Periods, the rate of interest specified in the applicable Final Terms may convert into a different rate of interest depending upon certain events ("*Trigger Events*") occurring on certain dates (each a "*Trigger Date*") or during a specified period ("*Trigger Period*") each as specified in the applicable Final Terms. Such Trigger Events may be, but are not limited to, events upon which one or more indices, formulae, currency exchange rates, shares, constants, other factors or a combination thereof ("*Trigger Indices*") are greater than and/or equal to and/or lower than and/or equal to one or more other indices, formulae, currency exchange rates, constants, other factors or a combination thereof. Such Notes are referred to as "*Trigger Notes*". Such Notes may also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

By way of example, the rate of interest payable for an Interest Period on a Trigger Note may switch from 12m EURIBOR plus 2.00% of the nominal amount of the Notes to 1.00 per cent. of the nominal amount of the Notes if on a Trigger Date, 12m EURIBOR is equal to or higher than 5.00 per cent. In this instance, if the Trigger Event occurs, the coupon payable in respect of an Interest Period would switch from floating to fixed.

The above analysis sets out just one example of how Trigger Notes may operate. It is not intended to be an exhaustive description of the coupon structure for Trigger Notes.

### Commodity-Linked Notes

Notes issued pursuant to the Program may include Notes in respect of which the Rate of Interest applicable for some or all of the Interest Periods and/or the Final Redemption Amount or other redemption amount is calculated by reference to the prices of one or more commodities, including oil, as specified in the relevant Final Terms. Such Notes are referred to as "*Commodity-Linked Notes*", and the type of commodity in respect of which the price of such Notes is linked is referred to as the "*Relevant Commodity*", each as specified in the relevant Final Terms. Such Notes shall also be Index-Linked Redemption Amount or Index-Linked Interest Notes.

### Commodity Linked Notes with certain Agricultural Products, Energy Products and Metals as a Relevant Commodity

Notes issued pursuant to the Program may include Notes in respect of which the Rate of Interest applicable for one or more Interest Periods and/or the Final Redemption Amount or other redemption amount or the timing of payments, redemption of the Notes and/or any other economic feature, is calculated by reference to the prices of one or more commodities, on any relevant dates, as specified in the relevant Final Terms. Commodities that may be referenced include without limitation certain agricultural products, such as cocoa, coffee, corn, livestock, orange juice, rubber, soybeans, sugar, cotton, or wheat, certain energy products, such as electricity, gas oil, unleaded gasoline, heating oil, natural gas, oil or oil products such as propane and fuel oil, emissions (including carbon emissions), certain metals, such as aluminium, aluminium alloy, copper, gold, lead, nickel, palladium, platinum, silver, tin or zinc and plastic.

By way of example, the relevant Final Terms may specify that the Final Redemption Amount of the Notes is determined as the sum of the nominal amount of each Note, and the nominal amount of each Note the greater of zero and (i) the price of coffee on a Strike Date (as specified in the Final Terms) minus the price of coffee on the Valuation Date (as specified in the Final Terms), divided by (ii) the price of coffee on the Strike Date (as specified in the Final Terms). In this instance, if the price of coffee on the Strike Date is U.S.$ 100, and the price of coffee on the Valuation Date is U.S.$ 80, then the holder of a Note will receive on redemption a Final Redemption Amount of 120 per cent.. Conversely, if the price of coffee on the Strike Date is U.S.$ 100, and the price of coffee on the Valuation Date is U.S.$ 100 or any higher amount, then the holder of a Note would receive on redemption a Final Redemption Amount of 100 per cent.

The relevant type(s) of a commodity being referenced (for example, a type of coffee such as coffee arabica or robusta coffee, or type of livestock such as feeder cattle or live cattle) will be as specified in the Final Terms for the relevant Notes. The price(s) of a particular commodity being referenced may be in respect of a particular contract for the future or immediate delivery or financial settlement of such commodity, as may be reported on a particular exchange, screen-based service or other publication source, all as specified in the Final Terms for the relevant Notes.

Commodity-Linked Notes in respect of any Commodity in the area of Agricultural Products, Energy and Metals will include provisions for the determination of the Commodity Reference Price, the designation of Disruption Events and Disruption Fallbacks (arising from such events), allowances for the corrections for published prices, and determinations by the Calculation Agent, all as set forth in the Final Terms in respect of the relevant Notes, and as described in Annex 9 above.

**FX Notes**

Notes issued pursuant to the Program may include Notes ("*FX Notes*") under the terms of which:

1.   The denomination of the Notes is an emerging market currency (an "*EM Currency*"), which is a currency other than a G-10 Currency (for the purpose of this section a "*G-10 Currency*" means the U.S. Dollar, the Euro, the Japanese Yen, the Swiss Franc, the British Pound, the Australian Dollar, the New Zealand Dollar, the Canadian Dollar, the Norwegian Krone and the Swedish Krona);

2.   in respect of one or more interest periods and/or upon redemption of the Notes on the final maturity date, the amount payable per Note is in an EM Currency or is determined by reference to a currency exchange rate (a "*Reference Exchange Rate*"); and/or

3.   the timing of payments, redemption of the Notes and/or any other economic feature, is determined by reference to one or more EM Currencies or is determined by reference to a Reference Exchange Rate.

Such Notes may also be Basket Linked Notes, Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes or Debt Security Linked Notes.

The Reference Exchange Rate for a currency pair ("*Currency Pair*") will be the spot exchange rate for a currency (the "*Reference Currency*") against another currency (the "*Base Currency*") and will be expressed as: (i) a number of currency units per unit of the Base Currency; or (ii) as otherwise specified in the applicable Final Terms. A Reference Exchange Rate may be determined: (i) pursuant to a Settlement Rate Option (defined below); (ii) pursuant to an alternative price source determined by the Calculation Agent; (iii) by Calculation Agent determination; or (iv) as otherwise determined in the applicable Final Terms. For the avoidance of doubt, a Reference Exchange Rate may be either a continuously traded spot rate or a discretely determined spot rate, or both as specified in the applicable Final Terms.

The "*Settlement Rate Option*" in respect of a Currency Pair will be the rate source (or combination of rate sources) for that Currency Pair as specified in the applicable Final Terms (which may be by reference to any rate source for such Currency Pair described in section (C) (Settlement Rate Options Applicable to FX Notes) with such amendments, if any, as shall be set out in the applicable Final Terms or such other rate source as may be specified as such in the applicable Final Terms.

**Basket Linked Notes**

Notes issued pursuant to the Program may include Notes ("*Basket Linked Notes*") under the terms of which:

1.   in respect of interest accrued during one or more interest periods and/or upon redemption of the Notes, amounts payable are determined by reference to one or more baskets (each a

"*Basket*"), each comprised of one or more component values (each a "*Basket Reference Value*"); and/or

2.     the timing of payments, redemption of the Notes and/or any other economic feature, is determined, by reference to one or more Baskets.

The value of a Basket (the "*Basket Value*") will be determined in accordance with the applicable Final Terms. A Basket shall comprise of one or more "Basket Reference Values", including, but not limited to, currency exchange rates (each a "*Reference Exchange Rate*"), commodity reference prices (each a "*Commodity Reference Price*"), equity prices (each an "*Equity Reference Price*"), debt security prices (each a "*Debt Reference Price*"), reference entities (each a "*Reference Entity Price*"), interest rates (each an "*Interest Rate Reference Price*"), index levels (each an "*Index Reference Price*") or any other component value as specified in the applicable Final Terms.

Basket Linked Notes including more than one Basket are referred to as "*Multiple Basket Linked Notes*". Basket Linked Notes may also be Index Linked Notes, Index Linked Interest Notes, FX Linked Notes, Commodity Linked Notes, Floating Rate Notes, Dual Currency Linked Notes, Equity Linked Notes, Debt Security Linked Notes or other Notes.

### Option Notes

Notes issued pursuant to this Program may include Notes in respect of which, any interest payable for one or more Interest Periods, any amount payable on redemption of the Notes, the timing of payments and/or dates on which the Notes are redeemed and/or any other economic feature of the Notes (as specified in the applicable Final Terms) may be determined by, among other things, (i) reference to one or more prices, values or levels of a reference asset or assets (each a "*Reference Asset*") exceeding and/or equalling and/or being lower than and/or equalling (or any combination thereof) one or more strike values (the "*Strike*") or (ii) reference to the difference between, or the corresponding values of, two or more prices, values or levels of such Reference Assets. Such formula(s) may be referred to as an "*Option*".

The Reference Assets from which the value of the Option may be derived may include one or more indices, formulae, currency exchange rates, rates, commodities, debt securities, equities or other variable, option or combination thereof.

The calculation of the value of the Option may be determined by, among other things, reference to:

1.     the price, value or level of the Reference Asset(s) on a date or dates specified in the applicable Final Terms minus the price, value or level of the Strike(s). Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Call Option*";

2.     the price, value or level of the Strike(s) minus price, value or level of Reference Asset(s) on a date or dates specified in the applicable Final Terms. Should the difference be negative, the value will be floored at zero. Such Option may be referred to as "*Put Option*"; and/or

3.     whether the price, value or level of the Reference Asset exceeds and/or equals and/or is lower than and/or equals one or more predetermined criteria, as specified in the applicable Final Terms.

The above sets out just some of the methodologies that may be used to determine the value of the Option. It is not intended to be an exhaustive list and other methodologies may be used to determine such value as set out in the applicable Final Terms.

The prices, values or levels of the Reference Asset and/or the value of the Option may be determined on one or more dates during the term of the Notes.

The Strike may also be determined by reference to the level of one or more Reference Assets or a factor of such level or levels on a date or dates specified in the applicable Final Terms. For example, the Strike may be determined by reference to the level of EURIBOR with a designated maturity of 12 months measured on the issue date in respect of the Notes and will remain constant for the term of the Notes.

Alternatively, the Strike may be determined as the arithmetic or geometric average of the level of EURIBOR with a designated maturity of 12 months determined on each day during a specified period of days during the term of the Notes.

Payments, the timing of payments, redemption of the Notes and/or any other economic feature in respect of Option Notes may additionally be determined by reference to a scaling or leverage factor (the "*Leverage*") specified in the applicable final terms of such Notes. With respect to such Notes, the degree to which the value of the Option impacts upon the amount of such payments (or other economic feature of the Notes) will vary according to the level of the Leverage. The Leverage may be a constant value or may be a variable value, such as the price, value or level of a Reference Asset on a date or dates specified in the applicable Final Terms.

### Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes

Terms used in this paragraph shall be deemed to be defined as set out in the Terms and Conditions of the Notes. Notes issued pursuant to the Program may include Notes ("Autocallable Index-Linked Notes" and "Autocallable Equity-Linked Notes") linked to an Index or a basket of Indices or to a Share or a Share Basket, as the case may be, under the terms of which the Notes may redeem early on one or more Mandatory Early Redemption Dates at the applicable Mandatory Early Redemption Amount if a Mandatory Early Redemption Event occurs. In addition, Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may provide that Interest Amounts and/or a Final Redemption Amount linked to the performance of an Index or a basket of Indices, or in the case of Autocallable Equity-Linked Notes linked to the performance of a Share or of a Share Basket, shall be payable on the relevant Interest Payment Dates and/or the Maturity Date. Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may be capital protected or not. Autocallable Equity-Linked Notes may redeem in cash or through the delivery of Shares.

Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may include Notes under the terms of which an amount is payable on specified interest payment dates which is determined by reference to the performance of an Index or one or more Indices in a basket of Indices, or in the case of Autocallable Equity-Linked Notes by reference to the performance of a Share or a Share Basket, and whether such performance exceeds, is equal to and/or falls short of one or more specified thresholds, as specified in the applicable Final Terms. For example, the applicable Final Terms may specify that a particular Interest Amount shall be payable if on a particular Valuation Date the Final Level, or in the case of Autocallable Equity-Linked Notes the Final Price, is less than the Strike Level, or in the case of Autocallable Equity-Linked Notes the Strike Price, but greater than the Barrier Level or in the case of Autocallable Equity-Linked Notes the Barrier Price. Autocallable Index-Linked Notes and Autocallable Equity-Linked Notes may include Notes under the terms of which the Final Redemption Amount payable at maturity of the Notes is determined by reference to the performance of an Index or one or more Indices in a basket of Indices, or in the case of Autocallable Equity-Linked Notes by reference to the performance of a Share or a Share Basket, as specified in the relevant Final Terms.

The performance of some or all of the Indices, or in the case of Autocallable Equity-Linked Notes the performance of a Share or a Share Basket, as recorded on particular dates may result in the redemption of Notes prior to their scheduled maturity date because a Mandatory Early Redemption Event has occurred. If such event occurs, the Notes may be redeemed at a premium to their nominal amount, at their nominal amount or at an amount which is less than their nominal amount, depending on the definition of the Mandatory Early Redemption Rate in the applicable Final Terms.

### Hybrid Notes

Notes issued pursuant to the Program may include Notes that combine features of different types of Notes described herein, for example, by combining the features of Autocallable Inflation Linked Interest Notes with those of Equity-Linked Redemption Notes or by combining the features of Equity Linked Notes with those of Commodity Linked Notes and those of FX Notes. Such Notes will be subject to any relevant general Terms and Conditions and any of the additional definitions and conditions set out in the Annexes to the Terms and Conditions that are relevant to the features combined in such Notes.

**Index-Linked Notes and Equity-Linked Notes - Information on the Indices and the Stock Exchanges**

1.    Indices - Index-Linked Notes and Equity-Linked Notes

Notes issued pursuant to the Program may include Notes which provide for payments of principal or premium in respect of Index-Linked Redemption Amount Notes or of interest in respect of Index-Linked Interest Notes which are linked to one or more currency or commodity indices, securities exchange or commodities exchange indices or other indices or as otherwise specified in the applicable Final Terms, which may include one or more of the indices specified below.

Notes issued pursuant to the Program may include Notes which provide for payments of principal or premium in respect of Equity-Linked Redemption Amount Notes or of interest in respect of Equity-Linked Interest Notes which are linked to a single share or a basket of shares, which may include shares which are included in one (or more) of the indices specified below.

Information about each index specified below and about the past and the further performance of each such index and its volatility can be obtained from the website specified as such for such Index in the list below.

| Index | Bloomberg Code | Website | Index Sponsor |
|---|---|---|---|
| CAC 40 Index | CAC | www.euronext.com | Euronext Paris S.A. |
| CECE Traded Index | CECEEUR | www.wienerborse.at | Wiener Börse AG |
| Czech Traded Index | CCTX | www.wienerborse.at | Wiener Börse AG |
| DAX Index | DAX | www.deutsche-boerse.com | Deutsche Börse AG |
| DAX MidCap Index | MDAX | www.deutsche-boerse.com | Deutsche Börse AG |
| Deutsche Börse India Index | D1AV | www.deutsche-boerse.com | Deutsche Börse AG |
| DivDAX Index (Price/Total Return) | DDAXK / DIVDAX | www.deutsche-boerse.com | Deutsche Börse AG |
| Dow Jones Dividend Select US Index | DJDVY | www.djindexes.com | Dow Jones & Company |
| Dow Jones Euro STOXX 50 Index | SX5E | www.djindexes.com | STOXX Limited |
| Dow Jones Euro STOXX Select Dividend Index | SD3E | www.djindexes.com | STOXX Limited |
| Dow Jones Global Titans 50 Index | DJGT | www.djindexes.com | Dow Jones & Company |
| Dow Jones Industrial Average Index | INDU | www.djindexes.com | Dow Jones & Company |
| Dow Jones Islamic Market Titans 100 Index | IMXL | www.djindexes.com | Dow Jones & Company |
| Dow Jones STOXX 50 PR Index | SX5P | www.djindexes.com | STOXX Limited |
| Dow Jones STOXX MID 200 Index | MCXP | www.djindexes.com | STOXX Limited |
| Dow Jones STOXX Select Dividend 30 Index | SD3P | www.djindexes.com | STOXX Limited |
| ECPI Ethical Euro Tradable Index (Price / Total Return) | ECAPTRDP / ECAPTRDR | www.e-cpartners.com | E. Capital Partners |
| ECPI Ethical Global Tradable Index (Price / Total Return) | ECAPGTP / ECAPGTR | www.e-cpartners.com | E. Capital Partners |
| EPRA Eurozone Index | EPEU | www.ftse.com | FTSE International Limited |
| European Public Real Estate Index | EPRA | www.ftse.com | FTSE International Limited |
| FTSE 100 Index | UKX | www.ftse.com | FTSE International Limited |
| FTSE 250 Index | MCX | www.ftse.com | FTSE International Limited |
| FTSE4Good Europe 50 Index | 4EU5X Index | www.ftse.com | FTSE International Limited |
| FTSE/JSE Africa TOP40 IX Index | TOP40 | www.ftse.com | FTSE International Limited |
| FTSE Eurofirst 80 Index | FTEF80 | www.ftse.com | FTSE International Limited |

| Index | Bloomberg Code | Website | Index Sponsor |
|---|---|---|---|
| FTSE Nordic 30 Index (EUR / SEK) | FTNOEUR / FTNOTRSK | www.ftse.com | FTSE International Limited |
| FTSE Xinhua 50 Index | XIN50 | www.ftse.com | FTSE International Limited |
| Hang Seng Index | HSI | www.hsi.com.hk | Hang Seng Indexes Company Limited |
| Hang Seng China Enterprises Index | HSCEI | www.hsi.com.hk | Hang Seng Indexes Company Limited |
| Hungarian Traded Index | CHTX | www.wienerborse.at | Wiener Börse AG |
| IBEX 35 Index | IBEX | www.bolsasymercados.es | Bolsas y Mercados Españoles |
| KOSPI 200 Index | KOSPI2 | www.kse.or.kr | Korea Exchange |
| Malaysian Composite Index | KLCI | www.klse.com | Bursa Malaysia Berhad |
| MSCI Kokusai | MXKO | www.msci.com | MSCI Barra |
| MSCI Malaysia Index | MXMY | www.msci.com/ | MSCI Barra |
| MSCI Singapore | SGY | www.msci.com | MSCI Barra |
| MSCI Taiwan Index | TWY | www.msci.com/ | MSCI Barra |
| MSCI World | MXWO World | www.msci.com | MSCI Barra |
| NASDAQ 100 Index | NDX | www.nasdaq.com | The NASDAQ Stock Market, Inc. |
| Nikkei 225 Index | NKY | www.nni.nikkei.co.jp | Nikkei Inc. |
| OMX Index | OMX | www.omxgroup.com | OMX AB (publ) |
| OMX Copenhagen 20 Index | KFX | www.omxgroup.com | OMX AB (publ) |
| Philadelphia Stock Exchange Housing Sector Index | HGX | www.phlx.com | Philadelphia Stock Exchange |
| Polish Traded Index | CPTX | www.wienerborse.at | Wiener Börse AG |
| Russian Depositary Index | RDX | www.wienerborse.at | Wiener Börse AG |
| Russian Depository Index (USD) | RDXUSD | www.wienerborse.at | Wiener Börse AG |
| S&P/ASX 200 Index | AS51 | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P/ASX 200 Property Trust Index | AS51PROP | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P/BusinessWeek Global Innovation Index (Price/Total Return/USD / EUR) | SPBWIV/ SPEWIVTR/ SPBWIVE/ SPBWIVET | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P/TSX Composite Index | SPTSX | www.standardandpoors.com | The McGraw-Hill |
| S&P 500 Index | SPX | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Asia 50 Index | SPA50 | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P BRIC 40 Index (Price / Total Return) | SPPRBRIC / SPTRBRIC | www.standardandpoors.com | The McGraw_Hill Companies, Inc. |
| S&P BRIC Shariah Index (Price / Total Return / USD / EUR) | SPSHBR SPSHBRT SPSHBRE SPSHBRET | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Dividend Growth Index (EUR / USD) | SPDGEEP / SPDGUDP | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Europe 350 Index | SPEURO | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Global 100 Index | OOI | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Global Agribusiness Index (USD/EUR) | SPAGREDP/ SPAGREEP | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Global Clean Energy Index (Price / Total Return / USD / EUR) | SPGTCLEN / SPGTCLTR / SPGTCLEE / SPGTCTRE | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |

| Index | Bloomberg Code | Website | Index Sponsor |
|---|---|---|---|
| S&P Global Infrastructure Index (Price / Total Return / USD / EUR) | SPGTINFR / SPGTINTR / SPGTINFE / SPGTITRE | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Global Nuclear Energy (Price/Total Return/ USD / EUR) | SPATNE/ SPATNET/ SPINTNEE/ SPGTNETE | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Global Water Index (Price / Total Return / USD / EUR) | SPGTAQUA / SPGTAQTR / SPGTAQUE / SPGTATRE | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P India 10 (Price/Total Return/USD/EUR) | SPINTUP/ SPINTNUT/ SPINTNEP/ SPINTNET | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Infrastructure Shariah Index (Price / Total Return / USD / EUR) | SPSHIF SPSHIFT SPSHIFE SPSHIFN | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Listed Private Equity Index (Price / Total Return / USD / EUR) | SPLPEQTY / SPLPEQTR / SPLPEQTE / SPLPETRE | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P MIB Index | SPMIB | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Pan Asia 50 High Dividend Index (Price / Total Return) | SPA5HDP / SPA5HDT | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Select Plus (Price/Total Return/USD/EUR) | SPSPU/SPSPUTR/ SPSPE/SPSPETR | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P Select Plus II Indices (Price/Total Return/USD/EUR) | SPSPU2/ SPSPU2TR/ SPSE2/ SPSE2TR | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| S&P South East Asia 40 Index (Price / Total Return) | SPSEA4DP / SPSEA4DT | www.standardandpoors.com | The McGraw-Hill Companies, Inc. |
| Swiss Market Index - SMI | SMI | www.swx.com | SWX Swiss Exchange AG |
| Tel Aviv 25 Index | TA-25 | www.tase.co.il | Tel Aviv Stock Exchange Ltd |
| TOPIX Index | TPX | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TOPIX Real Estate Index | TPREAL | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TSE REIT Index | TSEREIT | www.tse.or.jp | Tokyo Stock Exchange Group, Inc. |
| TWSE/TAIEX Index | TWSE | www.tse.com.tw | Taiwan Stock Exchange Corp. |
| VINX 30 Index | VINX30 | www.omxgroup.com | OMX AB (publ) |

2.    Stock Exchanges - Equity-Linked Notes

Notes issued pursuant to the Program may include Notes which provide for payments of principal or premium in respect of Equity-Linked Redemption Amount Notes or of interest in respect of Equity-Linked Interest Notes which are linked to a single share or a basket of shares, which will be shares which may be listed and/or admitted to trading on one or more stock exchanges specified below, the website address of each of which is also specified in the list below.

| Stock Exchange | Website address of Stock Exchange |
|---|---|
| American Stock Exchange – AEX | www.amex.com |
| Amsterdam Stock Exchange – Euronext-Amsterdam | www.euronext.com |
| Australian Securities Exchange – ASX | www.asx.com.au |
| Brussels Stock Exchange – Euronext-Brussels | www.euronext.com |
| Copenhagen Stock Exchange – OMX | www.omxgroup.com |
| Frankfurt Stock Exchange – Deutsche Börse | www.deutsche-boerse.com |
| Helsinki Stock Exchange – OMX | www.omxgroup.com |
| Hong Kong Stock Exchange | www.hkex.com.hk |
| Johannesburg Stock Exchange – JSE | www.jse.co.za |
| Korean Stock Exchange – KRX | www.kse.or.kr |
| Lisbon Stock Exchange – Euronext-Lisbon | www.euronext.com |
| London Stock Exchange – LSE | www.londonstockexchange.com |
| Madrid Stock Exchange – Bolsa de Madrid | www.bolsamadrid.es |
| Malaysia Stock Exchange – Bursa Malaysia | www.klse.com.my |
| Milan Stock Exchange – Borsa Italiana | www.borsaitaliana.it |
| National Association of Securities Dealers Automated Quotations – NASDAQ | www.nasdaq.com |
| New York Stock Exchange – NYSE | www.nyse.com |
| Oslo Børs – OMX | www.oslobors.no |
| Paris Stock Exchange – Euronext-Paris | www.euronext.com |
| Philadelphia Stock Exchange | www.phlx.com |
| Prague Stock Exchange | www.pse.cz |
| Singapore Stock Exchange | www.ses.com.sg |
| Stockholm Stock Exchange – OMX | www.omxgroup.com |
| SWX Swiss Exchange | www.swx.com |
| Taiwan Stock Exchange | www.tse.com.tw/ |
| Tel Aviv Stock Exchange – TASE | www.tase.co.il |
| Tokyo Stock Exchange | www.tse.or.jp |
| Vienna Stock Exchange – Wiener Börse | www.wienerborse.at |
| Virt-x | www.virt-x.com |
| Warsaw Stock Exchange | www.gpw.pl |
| Bombay Stock Exchange | www.bseindia.com |

## USE OF PROCEEDS

The net proceeds from each issue of Notes will be used for the general corporate purposes of the Group.

## LEHMAN BROTHERS HOLDINGS INC.

### Information about LBHI

Lehman Brothers Holdings Inc., a Delaware corporation, was incorporated on December 29, 1983, for an indefinite term, pursuant to the General Corporation Law of the State of Delaware, U.S.A., with registration number 2024634. LBHI and its subsidiaries are collectively referred to as "Lehman Brothers". LBHI's executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A., and its telephone number is + 1 212 526 7000. The common stock of LBHI is listed on the New York Stock Exchange under the symbol "LEH".

The stated legal purpose of LBHI is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware (as set out in article 3 of LBHI's Restated Certificate of Incorporation).

To the best of LBHI's knowledge, it is in material compliance with the applicable corporate governance regimes in the United States of America.

LBHI also acts through its London Branch which is registered at Companies House with Branch Number BR005486.

### Business Overview

Lehman Brothers, an innovator in global finance, serves the financial needs of corporations, governments and municipalities, institutional clients and high-net-worth individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. Lehman Brothers, through predecessor entities, was founded in 1850.

Through its subsidiaries, Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate its market-making activities, Lehman Brothers is a member of all principal securities and commodities exchanges in the United States, as well as FINRA (the Financial Industry Regulatory Authority formed in 2007 by the consolidation of NASD, Inc, and the member regulation, enforcement and arbitration functions of the New York Stock Exchange ("*NYSE*"), and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client flow business model, which is based on its principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates client flow revenues from institutional, corporate, government and high-net-worth customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and diversify risks across different market cycles; (iii) originating loans for distribution to clients in the securitisation or principals market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of its client-flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, Lehman Brothers also takes proprietary trading and investment positions. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its client-flow orientation helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Capital Markets, Investment Banking, and Investment Management. Financial information concerning Lehman Brothers for the fiscal years ended

November 30, 2007, 2006 and 2005, including the amount of net revenues contributed by each segment in such periods, is set forth in the Consolidated Financial Statements and Notes thereto which are incorporated by reference in this Base Prospectus.

**Organizational Structure**

LBHI is the ultimate parent company of the Lehman Brothers group. Since LBHI is primarily a holding company, its cash flow and consequent ability to satisfy its obligations under the Notes issued by it and under the Guarantees are dependent upon the earnings of its subsidiaries and the distribution of those earnings or dividends or loans or other payments by those subsidiaries to LBHI. Except for the other Issuers and certain other subsidiaries as issuers of Notes and other securities (and then solely with respect to the Notes and other securities issued by them), LBHI's subsidiaries will have no obligation to pay any amount in respect of Notes or to make any funds available therefor. Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The requirements referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinated to the claims of creditors of the subsidiary.

As disclosed in the Information Incorporated by Reference, Lehman Brothers is involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of its business, including actions brought against Lehman Brothers and others with respect to transactions in which Lehman Brothers acted as an underwriter or financial advisor, actions arising out of its activities as a broker or dealer in securities and commodities and actions brought on behalf of various classes of claimants against many securities and commodities firms, including Lehman Brothers. Although there can be no assurance as to the ultimate outcome, Lehman Brothers generally has denied, or believe it has a meritorious defense and will deny, liability in all significant cases pending against it, including the matters described in the Documents Incorporated by Reference, and it intends to defend vigorously each such case. Based on information currently available, Lehman Brothers believes the amount, or range, of reasonably possible losses in connection with the actions against it, including the matters described in the Documents Incorporated by Reference, in excess of established reserves, in the aggregate, not to be material to Lehman Brothers' consolidated financial condition or cash flows. However, losses may be material to Lehman Brothers' operating results for any particular future period, depending on the level of its income for such period.

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS HOLDINGS INC.

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated. The selected consolidated financial information as of and for the twelve month periods ended November 30, 2007 and 2006 and as of and for the three months periods ended May 31, 2008 and May 31, 2007 is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Annual Report on Form 10-K for the twelve month period ended November 30, 2007, filed with the SEC and from the unaudited consolidated financial statements of LBHI included in LBHI's Quarterly Report on Form 10-Q for the quarter ended May 31, 2008.

### Consolidated Statement of Income Information

| | Three months ended May 31, 2008 | Three months ended May 31, 2007 | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|---|---|
| | *(in U.S.$ millions)* | | | |
| **Revenues:** | | | | |
| Principal transactions | (3,442) | $2,889 | 9,197 | $9,802 |
| Investment banking | 858 | 1,150 | 3,903 | 3,160 |
| Commissions | 639 | 568 | 2,471 | 2,050 |
| Interest and dividends | 7,771 | 10,558 | 41,693 | 30,284 |
| Asset management and other | 414 | 414 | 1,739 | 1,413 |
| Total revenues | 6,240 | 15,579 | 59,003 | 46,709 |
| Interest expense | 6,908 | 10,067 | 39,746 | 29,126 |
| Net revenues | (668) | 5,512 | 19,257 | 17,583 |
| **Non-Interest Expenses:** | | | | |
| Compensation and benefits | 2,325 | 2,718 | 9,494 | 8,669 |
| Other expenses | 1,094 | 915 | 3,750 | 3,009 |
| **Total non-interest expenses** | 3,419 | 3,633 | 13,244 | 11,678 |
| Income before taxes and cumulative effect of accounting change | (4,087) | 1,879 | 6,013 | 5,905 |
| Provision for income taxes | (1,313) | 606 | 1,821 | 1,945 |
| Cumulative effect of accounting change | – | – | – | 47 |
| Net income | (2,774) | 1,273 | 4,192 | $4,007 |
| Net income applicable to common stock | (2,873) | 1,256 | 4,125 | $3,941 |
| Earnings per common share (diluted): | (5.14) | 2.21 | 7.26 | $6.81 |

## Consolidated Statement of Financial Condition Information

### Balance Sheet Data

|  | At 30 November, 2007 | At 30 November, 2006 | At 31 May, 2008 |
|---|---|---|---|
|  | *(in US$ millions)* | | |
| Total assets | 691,063 | 503,545 | 639,432 |
| Net assets[1] | 372,959 | 268,936 | 327,774 |
| Short-term borrowings and current portion of long-term borrowings | 28,066 | 20,638 | 35,302 |
| Long-term borrowings | 123,150 | 81,178 | 128,182 |
| **Total liabilities** | 668,573 | 484,354 | 613,156 |
| **Total stockholders' equity** | 22,490 | 19,191 | 26,276 |
| **Total long-term capital[2]** | 145,640 | 100,369 | 154,458 |

———————

Notes:

1. Net assets represent total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes, (2) collateralized lending arrangements and (3) identifiable intangible assets and goodwill. LBHI believes net assets is a measure more useful to investors than total assets when comparing companies in the securities industry because it excludes certain assets considered to have a low-risk profile and identifiable intangible assets and goodwill. Net assets as presented are not necessarily comparable to similarly-titled measures provided by other companies in the securities industry because of different methods of calculation.

2. Total long-term capital includes long-term borrowings (excluding any borrowings with remaining maturities of less than twelve months) and total stockholders' equity. LBHI believes total capital is useful to investors as a measure of its financial strength.

## Consolidated Stockholders' Equity of LBHI

All of the financial information below is extracted without material adjustment from the unaudited consolidated financial statements of LBHI included in LBHI's Quarterly Report on Form 10-Q for the quarter ended 31 May 2008 filed with the SEC. The following table sets forth the consolidated capitalisation of LBHI and its subsidiaries as of 30 November 2007 and 31 May 2008[1]:

|  | At 31 May, 2008 | At 30 November, 2007 |
|---|---|---|
|  | *(US$ millions except share data)* | |
| **Stockholders' equity:** | | |
| Preferred Stock: | 6,993 | 1,095 |
| Common Stock: $0.10 par value | | |
| Shares authorised: 1,200,000,000 in 2008 and 2007 | | |
| Shares issued: 612,948,910 in 2008 and 612,882,506 in 2007 | | |
| Shares outstanding: 552,704,921 in 2008 and 531,887,419 in 2007 | 61 | 61 |
| Additional paid-in capital | 11,268 | 9,733 |
| Accumulated other comprehensive income/(loss), net of tax | (359) | (310) |
| Retained earnings | 16,901 | 19,698 |
| Other stockholders' equity, net | (3,666) | (2,263) |
| Common stock in treasury, at cost: 60,243,989 in 2008 and 80,995,087 in 2007 | (4,922) | (5,524) |
| **Total common stockholders' equity** | 19,283 | 21,395 |
| **Total stockholders' equity** | 26,276 | 22,490 |

Notes:

1. There has been no material change in the capitalisation of LBHI since 31 May 2008. For more information about LBHI's common stock and preferred stock, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the 12 months ended 30 November 2007.

2. All shares issued are fully paid and non-assessable.

## LEHMAN BROTHERS TREASURY CO. B.V

### General

LBTCBV was incorporated in The Netherlands on March 8, 1995 (under the Dutch Civil Code (*Burgerlijk Wetboek*)) with registration number 33267322 with the Chamber of Commerce and Industry of Amsterdam (Kamer van Koophandel en Fabrieken) as a private company with limited liability ("*besloten vennootschap met beperkte aansprakelijkheid*") for an unlimited duration. LBTCBV is a wholly-owned subsidiary of Lehman Brothers U.K. Holdings (Delaware) Inc., a company incorporated under the laws of the State of Delaware, which is in turn wholly-owned by LBHI. The principal activity of LBTCBV is to act as a Netherlands finance company supporting the working capital needs of various, principally European, subsidiaries of LBHI. LBTCBV does not have any subsidiary undertakings. LBTCBV has no employees.

The registered office and principal place of business of LBTCBV is at Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands and the telephone number is +31 20 406 4444.

The objects for which LBTCBV was established (which can be found at article 2 of its articles of association) are to finance companies and other enterprises with which it forms a group, to borrow, to lend and to raise funds, to participate in all sorts of financial transactions including the issue of bonds, promissory notes or other securities or debt instruments, to invest in securities in the widest sense of the word, to grant guarantees, to assume liability and to grant security over its assets for the obligations of companies and other enterprises with which it forms a group and of third parties.

To the best of LBTCBV's knowledge, it is in material compliance with the applicable corporate governance regimes in The Netherlands.

### LBTCBV has share capital consisting of:

Ordinary shares, EUR 454 par value; 7,500 authorized; 4,406 allotted, called up and fully paid.

### Directors of LBTCBV

Set forth below are the names and the principal occupations of the current members of the Board of Management of LBTCBV:

| Name | Function of LBTCBV | Principal Outside Activities |
|---|---|---|
| Leonard M. Fuller | Director | None |
| Dave Rushton | Director | None |
| Christian Fischer | Director | None |
| Wolbert Kamphuijs | Director | Proxyholder of Equity Trust |
| Rumoldus de Schutter | Director | Director of Equity Trust NV Amsterdam |

The business address of Leonard Fuller is Talstrasse 82, 8021 Zurich, Switzerland. The business address of Dave Rushton is 25 Bank Street, London E14 5LE. The business address of Christian Fischer is Rathenauplatz 1, D-60313, Frankfurt am Main, Germany.

The business address of Wolbert Kamphuijs and Rumoldus de Schutter is Atrium Strawinskylaan 3105, 1077 ZX Amsterdam, The Netherlands.

There are no known conflicts of interest between any duties of the members of the Board of Management to LBTCBV and their respective private interests or other duties.

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS TREASURY CO. B.V.

**Year-End Financial Information**

The following tables set forth selected financial information of LBTCBV for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBTCBV for the year ended November 30, 2007.

**Profit and Loss Account Data**

|  | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|
|  | US$ '000 | |
| Operating Income | 33,188 | 1,167 |
| Operating expense | (32,964) | (111) |
| Net Operating Income and Expense | 224 | 1,056 |
| Interest and similar income | 1,415,884 | 770,179 |
| Interest and similar expense | (1,384,562) | (748,632) |
| Net financial income and expense | 31,322 | 21,547 |
| Result from ordinary operations before tax | 31,546 | 22,603 |
| Tax on result from ordinary operations | (4,430) | (6,916) |
| Result form ordinary operations after tax | 27,116 | 15,687 |

**Balance Sheet Data**

|  | 2007 | 2006 |
|---|---|---|
|  | US$ '000 | |
| **Assets** | | |
| **Financial Fixed Assets** | | |
| Due from group companies – amounts due more than one year | 23,014,032 | 19,080,440 |
| **Current Assets** | | |
| Due from group companies – amounts due within one year | 11,331,314 | 3,502,636 |
| Cash at bank | 24,623 | 91,035 |
| Taxation receivable | 147 | |
| Other assets | 68,034 | |
|  | 11,424,118 | 3,593,671 |
| Total Assets | 34,438,150 | 22,674,111 |

**Shareholder's Equity and Liabilities**

**Shareholder's Equity**

Common shares – EUR 454 par value; authorised – 7,500 shares;

|  | 2007 | 2006 |
|---|---|---|
| Issued and fully paid – 4,406 shares (EUR 2,000,324) | 2,545 | 2,545 |
| Retained earnings | 77,412 | 50,296 |
| Total Shareholder's Equity | 79,957 | 52,841 |

**Long-Term Liabilities**

| | 2007 | 2006 |
|---|---|---|
| Guaranteed notes payable – amounts due after more than one year | 29,857,275 | 19,275,620 |

|  | 2007 | 2006 |
|---|---|---|
|  | US$ '000 | |
| **Current Liabilities** | | |
| Guaranteed notes payable – amounts due within one year | 4,271,283 | 3,106,544 |
| Bank overdrafts | 26,012 | 46,027 |
| Payable to group company | 3,962 | 4,566 |
| Accrued interest payable | 199,309 | 150,387 |
| Taxation payable | 0 | 2,350 |
| Other accrued liabilities | 352 | 35,776 |
| **Total Current Liabilities** | 4,500,918 | 3,345,650 |
| **Total Shareholder's Equity and Liabilities** | 34,438,150 | 22,674,111 |

|  | 2007 | 2006 |
|---|---|---|
|  | US$ '000 | |
| **Cash flow from operating activities** | | |
| Net profit for the year after taxation | 27,116 | 15,687 |
| Adjustments to Reconcile net income to net cash used in operating activities | | |
| (Gain)/Loss on early redemption of debt | (32,873) | 1,088 |
| Amortisation of Debt Discount | 40,040 | 16,227 |
| Amount due from group companies waived | 32,873 | |
| (Increase) in amounts due from group companies | (11,795,143) | (6,395,508) |
| Increase/(Decrease) in Creditors | 10,544 | 73,217 |
| (Increase)/Decrease in Debtors | (68,181) | 0 |
| **Net cash flow from operating activities** | (11,785,624) | (6,289,289) |
| **Cash flows from financing activities** | | |
| Net Increase in issued debt | 11,739,227 | 6,322,860 |
| Net Increase/(Decrease) in Bank overdraft | (20,015) | 46,026 |
| Net Increase in share capital | 0 | 1,457 |
| **Net cash flow from financing activities** | 11,719,212 | 6,370,343 |
| Net cash flow, movement in cash | (66,412) | 81,054 |
| Net Cash at beginning of year | 91,035 | 9,981 |
| Net Cash at end of year | 24,623 | 91,035 |

## LEHMAN BROTHERS BANKHAUS AG

### General

LBB was incorporated under German law in Frankfurt, Germany on June 3, 1987 as a private Stock Corporation ("*Aktiengesellschaft*") for an unlimited duration and entered into the Commercial Register of the District Court in Frankfurt am Main under the number 28139 on September 14, 1987. The principal activity of LBB is to act as a commercial bank supporting the working capital and lending requirements of various institutional clients worldwide and European subsidiaries of LBHI. In addition LBB provides financial advisory services to investment banking clients in Germany and Austria. LBB does not have any subsidiaries but also acts through its branch office in London, UK which is registered at Companies House with Branch Number BR003960 and in Milan, Italy. LBB opened an office in Seoul, Korea in June 2008. LBB had an average of 88 employees during the fiscal year.

The registered office and principal place of business of LBB is at Rathenauplatz 1, 60313 Frankfurt am Main, Germany and the telephone number is + 49-69-15307-0.

The sole shareholder of LBB is LBHI. Since 1987, LBB has operated in accordance with the rules and regulations of German Corporate and Banking laws and been supervised by the Supervisory Board of LBB and controlled by the German banking regulator.

LBHI issues consolidated financial statements for the largest group of consolidated companies. The consolidated financial statements of LBHI are available from LBB.

In this fiscal year, all transactions with affiliated companies were executed on an arm's length basis consistent with transactions with third parties. No disadvantages from dealings with affiliated parties have been experienced by LBB.

LBB is a member of the Banking Association Hessen, Registered Association, the Association of Foreign Banks in Germany, Registered Association, and the Audit Association of German Banks, Registered Association. In addition, LBB participates in the Deposit Protection Fund of the Federal Association of German Banks, Registered Association.

LBB's share capital is EUR 59,000,000 represented by 115,100 ordinary shares, each of which has been allotted, called up and fully paid.

The object of LBB (which can be found at article 2 of its articles of association) is the operation of a business involving bank transactions of every type (with the exception of mortgage banking, savings and loan and investment business).

### Directors of LBB

Set forth below are the names and the principal occupations of the current members of the Board of Management of LBB, each of whose business address in their capacity as Director is Rathenauplatz 1, 60313 Frankfurt am Main, Germany. There are no conflicts of interest between any duties of the Board of Management of LBB to LBB and their private duties or other interests.

| Name | Principal Occupation with LBB | Principal Outside Activities |
| --- | --- | --- |
| Michael Bonacker | Director | – |
| Hans Martin Bury | Director | Member of the Supervisory Board of Deutsche Telekom AG, Bonn |
| Helmut Olivier | Director | Member of the Supervisory Board of D. Logistics AG, Hofheim, Germany. Member of the Stock Exchange Council of Eurex Deutschland AG |
| Dr Patrick Schmitz-Morkranuer | Director | – |
| Christian Spieler | Director | – |

## SUMMARY FINANCIAL INFORMATION OF LEHMAN BROTHERS BANKHAUS AG

### Year-End Financial Information

The following tables set forth selected financial information of LBB for the periods indicated.

The selected financial information is extracted without material adjustment from the audited financial statements of LBB for the year ended November 30, 2007. Financial statements of LBB are consolidated in the consolidated financial statements of LBHI.

### Balance Sheet

|  | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|
|  | *(in EUR thousands)* | |
| **Assets** | | |
| Cash reserve | 46,416 | 6,435 |
| Receivables from banks | 238,174 | 110,124 |
| Receivables from customers | 15,674,155 | 9,053,395 |
| Shares and other variable-interest securities | – | 6,639 |
| Investments | 1 | 1 |
| Trust assets | 6,153 | 49,740 |
| Intangible assets | 34 | 74 |
| Property, plant and equipment | 2,728 | 2,981 |
| Other assets | 189,343 | 79,729 |
| Prepaid Expenses | 68 | 1,828 |
| **Total Assets** | 16,157,072 | 9,310,946 |
| **Liabilities** | | |
| Liabilities to banks | 3,476,250 | 1,379,587 |
| Liabilities to customers | 10,909,514 | 6,846,070 |
| Securitized liabilities | 330,321 | 148,913 |
| Trust liabilities | 6,153 | 49,740 |
| Other liabilities | 186,580 | 82,691 |
| Deferred income | 43,864 | 18,452 |
| Accruals and Provisions | 51,560 | 45,485 |
| Subordinated liabilities | 331,273 | 201,338 |
| Equity Capital | 821,557 | 538,669 |
| **Total Liabilities** | 16,157,072 | 9,310,946 |

**Profit and Loss Account Data**

| | Year ended November 30, 2007 | Year ended November 30, 2006 |
|---|---|---|
| | *(in EUR thousands)* | |
| **Expenses** | | |
| Interest expenses | (654,815) | (460,988) |
| Commission expenses | (18,550) | (9,716) |
| Net expenses from financial transactions | (7,956) | (7,486) |
| Administrative expenses | (53,362) | (44,255) |
| Other expenses | (2,276) | (9,570) |
| Taxation | (31,918) | (14,887) |
| **Total expenses** | (768,877) | (546,902) |
| **Income** | | |
| Interest income | 809,036 | 554,461 |
| Commission income | 75,865 | 37,363 |
| Other operating income | 5,221 | 3,432 |
| **Total income** | 890,122 | 595,256 |
| **Net Profit for the year** | 121,245 | 48,355 |

**Cash flow Statement**

| | 2007 | 2006 |
|---|---|---|
| | €'000 | |
| Profits for this period ( including pro rata profits of minority shareholders) before extraordinary results . | | |
| Items not affecting payments in profits for this period and transfers to cashflow From current business | 121,245 | 48,355 |
| Depriciation, adjustments and write ups on loans and advances tangible and financial fixed assets | 626 | 657 |
| Increase in provisions | 42,063 | 43,229 |
| Reduction in provisions | (3,831) | (6,695) |
| Other income/ expenditure affecting payments | 39,565 | (3,037) |
| Sub-total | 199,668 | 82,509 |

|  | 2007 | 2006 |
|---|---|---|
|  | €'000 | |

**Change in assets and liabilities relating to operating activities**

Loans and advances

| | | |
|---|---|---|
| To banks | (122,561) | (48,233) |
| To customers | (6,564,817) | (4,310,061) |
| Other assets relating to operating activities | (66,508) | (23,225) |

Liabilities

| | | |
|---|---|---|
| To Banks | 2,066,660 | 654,955 |
| To customers | 4,021,254 | 3,405,115 |
| Securitised liabilities | 180,191 | 65,168 |
| Other liabilities from current business | 28,210 | 24,016 |
| Interest and dividends received | 0 | 0 |
| Interest paid | 0 | 0 |
| Extraordinary credits | 0 | 0 |
| Extraordinary debits | 0 | 0 |
| Tax paid on earnings | 0 | (11,826) |
| Cashflows from current business | (257,904) | (161,582) |

Cash receipt from disposal of

| | | |
|---|---|---|
| Financial fixed assets | 6,639 | 4,039 |
| Tangible assets | 176 | 0 |

Debits from investments in

| | | |
|---|---|---|
| Financial fixed assets | | |
| Tangible assets | (509) | (471) |
| Credits from sales of consolidated companies and other business units | 0 | 0 |
| Debits from sales of consolidated companies and other business units | 0 | 0 |
| Changes in funds relating to other investing activities (net) | 0 | 0 |
| Cashflows from investments | 6,306 | 3,568 |
| Cash receipts from the issue of capital increases, sale of the enterprise's shares, etc. | 210,000 | 110,000 |
| Credits from additions to equity capital | 0 | 0 |

Dividends to proprietors and minority shareholders

| | | |
|---|---|---|
| Dividends paid | (48,355) | (25,504) |
| Other payments | 0 | 0 |
| Net changes in funds, capital otherwise | 129,934 | 62,466 |
| Cash flows from financial activity | 291,579 | 146,961 |
| Change in financial funds affecting payments | 39,981 | (11,053) |
| Change in financial funds due to exchange rates, scope of consolidation and valuions | 0 | 0 |
| Financial funds, opening balance | 6,435 | 17,488 |
| Financial funds, closing balance | 46,416 | 6,435 |

1   Interest received in cash 2007:EUR 730,682 k (2006: EUR 527,784 k)

2   Interest paid in cash 2007: EUR 589,400 k (2006: EUR 435,915 k)

3   Paid taxes on income 2007: EUR 13,467 k (2006: EUR 476 k)

## UNITED STATES TAXATION

**The following discussion is not intended or written to be used, and cannot be used by any person, for the purpose of avoiding U.S. federal tax penalties, and was written to support the promotion or marketing of Notes issued under the Program. Each taxpayer should consult its own tax advisor regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of its particular circumstances.**

The following is a general summary of material U.S. federal income and withholding tax considerations to U.S. Holders, Non-U.S. Registered Noteholders, and Non-U.S. Bearer Noteholders (each, defined below, and together, "*Beneficial Owners*"), of the purchase, ownership and disposition of Notes. This summary discusses only the principal United States federal income and withholding tax consequences to Beneficial Owners that purchased Notes at their original issuance and issue price and hold them as capital assets within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "*Code*"). This summary does not address all of the U.S. federal income tax consequences that may be relevant to a Beneficial Owner in light of the Beneficial Owner's particular circumstances or to Beneficial Owners subject to special rules (including, without limitation, pension plans and other tax-exempt investors, banks, thrift institutions, insurance companies, real estate investment trusts, regulated investment companies, dealers in securities, currencies and Beneficial Owners so treated for U.S. federal income tax purposes, Beneficial Owners whose functional currency is other than the United States dollar, Beneficial Owners who hold Notes as part of a straddle, hedging or conversion transaction, Beneficial Owners liable for the alternative minimum tax and Beneficial Owners who are expatriates). In addition, this summary does not address the application to Beneficial Owners of the purchase, ownership and disposition of Notes, of state, local, or other tax laws of the United States or its political subdivisions, nor the tax law of any non-U.S. jurisdiction.

This summary is based on the Code, its legislative history, applicable U.S. Treasury Regulations, judicial authority and administrative rulings and practice in effect as of the date of this Base Prospectus any of which may be appealed, revoked or otherwise altered with retroactive effect, thereby changing the U.S. federal income tax consequences discussed below. There is no assurance that the U.S. Internal Revenue Service (the "*IRS*") will not take a contrary view, and no ruling from the IRS has been or will be sought.

As used herein, the term "*U.S. Holder*" means a beneficial owner of a Note in registered form ("*Registered Note*") that is, for U.S. federal income tax purposes, (i) a citizen or individual resident of the United States, (ii) a corporation or other entity (treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any State thereof or the District of Columbia, (iii) an estate whose income is subject to U.S. federal income taxation regardless of its source, (iv) a trust, if both (a) a court within the United States is able to exercise primary jurisdiction over the administration of the trust, and (b) one or more United States persons have the authority to control all substantial decisions of the trust, or (v) a trust in existence on August 20, 1996, and treated as a United States person prior to such date, that has elected to continue to be treated as a United States person. As used herein, the term "*Non-U.S. Registered Note Holder*" means a beneficial owner of a Registered Note that is not a U.S. Holder. As used herein, the term "*Non-U.S. Bearer Note Holder*" means a beneficial owner of a Note in bearer form that is not a U.S. Holder and that purchases the Note in bearer form in compliance with the requirements of the applicable U.S. Treasury regulations ("*Bearer Note*").

U.S. federal income and withholding tax treatment of the Notes held by a partnership or other entity (that is treated as a partnership for U.S. federal income tax purposes) will depend on the activities of such partnership or other entity and the status of the partners. **Partners in a partnership (or other entity that is treated as a partnership for U.S. federal income tax purposes) holding a Note should consult their own tax advisors regarding the U.S. federal income and withholding tax consequences of the acquisition, ownership and disposition of a Note by the partnership.**

**Treatment of Notes as Indebtedness**

The following discussion addresses the U.S. federal income tax treatment of Notes that will be issued in a manner consistent with, and with characteristics that are typical of, indebtedness for U.S. federal income tax purposes. The Issuers believe that, and the following summary assumes that, unless expressly indicated below, such Notes are properly treated as indebtedness for U.S.federal income tax purposes. However, Notes that are not fully principal protected and possibly certain other Notes may be characterized as instruments other than debt for U.S. federal income tax purposes. Where such Notes are issued by LBHI, or where such Notes are issued by LBTCBV or LBB and are linked to one or more securities or a basket containing one or more securities issued by a U.S. issuer, it is possible that payments of principal, interest or disposition proceeds on the Note may be characterized, in whole or in part, as U.S. source income and may be subject to U.S. income or withholding tax. Where this is the case, such payments may be made subject to U.S. withholding tax, generally at a rate of 30 per cent. or at such other rate as may be available under the provisions of any applicable double tax treaty. Supplemental disclosure may be provided in connection with such Notes. Prospective purchasers of the Notes should consult their own tax advisors regarding the application of U.S. federal income tax law, as well as any state, local, foreign or other tax laws, to the purchase, ownership and disposition of Notes in light of their particular circumstances.

**Treatment of the Guarantees**

Each Note issued by LBTCBV or LBB will have the benefit of the Guarantee of LBHI as to all amounts of principal and premium and interest, if any, thereof and thereon due. Based on terms and conditions of each Guarantee, the Issuers believe, and the following summary assumes, that the Guarantees will not cause the Notes issued by LBTCBV or LBB to be treated as debt of LBHI for U.S. federal income tax purposes.

**Taxation of U.S. Holders**

**A.    Interest**

1.    General

The taxation of interest on a Note depends on whether the interest is "qualified stated interest" (as defined below). Interest that is qualified stated interest is includible in a U.S. Holder's income as ordinary income when actually or constructively received (if such U.S. Holder uses the cash method of accounting for U.S. federal income tax purposes) or when accrued (if such U.S. Holder uses an accrual method of accounting for U.S. federal income tax purposes). Interest that is not qualified stated interest is includible in a U.S. Holder's income under the rules governing "original issue discount", described below, regardless of such U.S. Holder's method of accounting.

Generally, for foreign tax credit purposes, interest on Notes issued by LBHI will be classified as income from U.S. sources while interest on Notes issued by LBTCBV or LBB will be classified as income from non-U.S. sources. To the extent that any non-U.S. income or withholding tax is imposed on interest on the Notes issued by LBTCBV or LBB in the hands of a U.S. Holder, such tax may be used either as (i) a credit that offsets the U.S. federal income tax that the U.S. Holder would owe on its income from non-U.S. sources, or (ii) a deduction that reduces the amount of income of the U.S. Holder subject to U.S. federal income tax. Prospective purchasers should consult their tax advisers concerning the applicability of the foreign tax credit and source of income rules to income attributable to Notes.

2.    Definitions

(a)    Qualified Stated Interest

Interest on a Note is "qualified stated interest" if the interest is unconditionally payable in cash or in property (other than debt instruments of the Issuer) at least annually at a single fixed rate (in the case of a Fixed Rate Note) or at a single "qualified floating rate" or "objective rate" (in the case of a Note

that qualifies as a "VRDI" as defined below). If a Note that qualifies as a VRDI provides for interest other than at a single qualified floating rate or single objective rate, special rules apply to determine the portion of such interest that is treated as though it were qualified stated interest. See "4. VRDIs with Original Issue Discount".

(b)    Variable Rate Debt Instruments (VRDI), Qualified Floating Rate and Objective Rate

A Note, such as a Floating Rate Note or an Indexed Interest Note, is a variable rate debt instrument ("*VRDI*") if all four of the following conditions are met. First, the "issue price" (as defined under "Original Issue Discount") of the Note must not exceed the total noncontingent principal payments by more than an amount equal to the lesser of (i).015 multiplied by the product of the total noncontingent principal payments and the number of complete years to maturity from the issue date (or, in certain cases, its weighted average maturity) and (ii) 15% of the total noncontingent principal payments. See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

Second, except as provided in the preceding paragraph, the Note must not provide for any principal payments that are contingent.

Third, the Note must provide for stated interest (compounded or paid at least annually) at (a) one or more qualified floating rates, (b) a single fixed rate and one or more qualified floating rates, (c) a single objective rate or (d) a single fixed rate and a single objective rate that is a "qualified inverse floating rate" (as defined below).

Fourth, the Note must provide that a qualified floating rate or objective rate in effect at any time during the term of the Note is set at the value of the rate on any day that is no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day. For example, a Note could not provide for an interest rate based on the LIBOR rate in effect two years prior to each Interest Payment Date.

Subject to certain exceptions, a variable rate of interest on a Note is a "qualified floating rate" if variations in the value of the rate can reasonably be expected to measure contemporaneous fluctuations in the cost of newly borrowed funds in the currency in which the Note is denominated. This includes a variable rate equal to (i) the product of an otherwise qualified floating rate and a "spread multiplier" that is greater than 0.65 but not more than 1.35 or (ii) an otherwise qualified floating rate (or the product described in clause (i)) plus or minus a spread. If the variable rate equals the product of an otherwise qualified floating rate and a single spread multiplier greater than 1.35 or less than or equal to 0.65, however, such rate generally is an objective rate. A variable rate is not considered a qualified floating rate if the variable rate is subject to a cap, floor, governor or similar restriction that is not fixed throughout the term of the Note and is reasonably expected as of the issue date to cause the yield on the Note to be significantly more or less than the expected yield determined without the restriction.

Subject to certain exceptions, an "objective rate" is a rate (other than a qualified floating rate) that is determined using a single fixed formula and that is based on objective financial or economic information that is neither within the control of the Issuer (or a related party) nor unique to the circumstances of the Issuer (or a related party). A rate is not an objective rate if it is reasonably expected that the average value of the rate during the first half of the Note's term will be either significantly less than or significantly greater than the average value of the rate during the final half of the Note's term. The IRS may designate rates other than those specified above that will be treated as objective rates. As of the date of this Base Prospectus, no such other rates have been designated. An objective rate is a "qualified inverse floating rate" if (a) the rate is equal to a fixed rate minus a qualified floating rate and (b) the variations in the rate can reasonably be expected to reflect inversely contemporaneous variations in the cost of newly borrowed funds (disregarding any caps, floors, governors or similar restrictions that would not, as described above, cause a rate to fail to be a qualified floating rate).

If interest on a Note is stated at a fixed rate for an initial period of one year or less, followed by a variable rate that is either a qualified floating rate or an objective rate for a subsequent period, and the value of the variable rate on the issue date is intended to approximate the fixed rate, the fixed rate and the variable rate together are treated as a single qualified floating rate or objective rate.

(c)    Original Issue Discount

Original issue discount is the excess, if any, of a Note's "stated redemption price at maturity" over its "issue price." A Note's "stated redemption price at maturity" is the sum of all payments provided by the Note (whether designated as interest or as principal) other than payments of qualified stated interest. The "*issue price*" of a Note is the first price at which a substantial amount of the Notes in the issuance that includes the Note is sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). See "7. Extendible Notes, Puts and Calls" below for determination of maturity.

The amount of original issue discount with respect to a Note will be treated as zero if the original issue discount is less than an amount equal to 0.0025 multiplied by the product of the stated redemption price at maturity and the number of complete years to maturity (or weighted average maturity, as applicable) ("*de minimis* OID"). Generally, a U.S. Holder must include the *de minimis* OID in income as stated principal payments are made, in an amount equal to the product of the total *de minimis* OID and a fraction, the numerator of which is the amount of principal payment and denominator of which is the total stated principal amount of the Note. Generally, such *de minimis* OID will be treated as capital gain in the hands of the U.S. Holder.

3.    Fixed Rate Notes with Original Issue Discount

In the case of a Fixed Rate Note with original issue discount, the amount of original issue discount includible in the income of a U.S. Holder for any taxable year is determined under the constant yield method, as follows. First, the "yield to maturity" of the Note is computed. The yield to maturity is the discount rate that, when used in computing the present value of all interest and principal payments to be made under the Note (including payments of qualified stated interest) produces an amount equal to the issue price of the Note. The yield to maturity is constant over the term of the Note and, when expressed as a percentage, must be calculated to at least two decimal places.

Second, the term of the Note is divided into "accrual periods". Accrual periods may be of any length and may vary in length over the term of the Note, provided that each accrual period is no longer than one year and that each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period.

Third, the total amount of original issue discount on the Note is allocated among accrual periods. In general, the original issue discount allocable to an accrual period equals the product of the "adjusted issue price" of the Note at the beginning of the accrual period and the yield to maturity of the Note, less the amount of any qualified stated interest allocable to the accrual period. The adjusted issue price of a Note at the beginning of the first accrual period is its issue price. Thereafter, the adjusted issue price of the Note is its issue price, increased by the amount of original issue discount previously includible in the gross income of any beneficial owner and decreased by the amount of any payment previously made on the Note other than a payment of qualified stated interest. For purposes of computing the adjusted issue price of a Note, the amount of original issue discount previously includible in the gross income of any beneficial owner is determined without regard to "premium" and "acquisition premium", as those terms are defined below under "C. Premium and Acquisition Premium".

Fourth, the "daily portions" of original issue discount are determined by allocating to each day in an accrual period its ratable portion of the original issue discount allocable to the accrual period.

A U.S. Holder includes in income in any taxable year the daily portions of original issue discount for each day during the taxable year that such U.S. Holder held Notes. Under the constant yield method

described above, U.S. Holders generally are required to include in income increasingly greater amounts of original issue discount in successive accrual periods.

4.    VRDIs with Original Issue Discount

In the case of a VRDI that provides for qualified stated interest, the amount of qualified stated interest and original issue discount, if any, includible in income during a taxable year are determined under the rules applicable to Fixed Rate Notes by assuming that the variable rate is a fixed rate equal to (i) in the case of a qualified floating rate or a qualified inverse floating rate, the value, as of the issue date, of the qualified floating rate or qualified inverse floating rate, and (ii) in the case of an objective rate (other than a qualified inverse floating rate), the rate that reflects the yield that is reasonably expected for the Note. Qualified stated interest allocable to an accrual period is increased (or decreased) if the interest actually paid during an accrual period exceeds (or is less than) the interest assumed to be paid during the accrual period.

If a VRDI does not provide for qualified stated interest as described above and does not provide for a fixed rate, the amount of interest and original issue discount accruals are determined by constructing an equivalent fixed rate debt instrument, as follows.

First, a fixed rate substitute for each variable rate provided by the Note is determined. The fixed rate substitute for each qualified floating rate provided by the Note is the value of that qualified floating rate on the issue date. If the Note provides for two or more qualified floating rates with different intervals between interest adjustment dates (e.g., the 30-day commercial paper rate and quarterly LIBOR), the fixed rate substitutes are based on intervals that are equal in length (e.g., the 90-day commercial paper rate and quarterly LIBOR, or the 30-day commercial paper rate and monthly LIBOR). The fixed rate substitute for an objective rate that is a qualified inverse floating rate is the value of the qualified inverse floating rate on the issue date. The fixed rate substitute for an objective rate (other than a qualified inverse floating rate) is a fixed rate that reflects the yield that is reasonably expected for the Note.

Second, a hypothetical equivalent fixed rate debt instrument is constructed that has terms identical to those provided under the Note, except that the equivalent fixed rate debt instrument provides for the fixed rate substitutes determined in the first step, in lieu of the qualified floating rates or objective rate provided by the Note.

Third, the amount of qualified stated interest and original issue discount for the equivalent fixed rate debt instrument are determined under the rules described above for Fixed Rate Notes. These amounts are taken into account as if the U.S. Holder held the equivalent fixed rate debt instrument.

Fourth, appropriate adjustments are made for the actual values of the variable rates. In this step, qualified stated interest or original issue discount allocable to an accrual period is increased (or decreased) if the interest actually accrued or paid during the accrual period exceeds (or is less than) the interest assumed to be accrued or paid during the accrual period under the equivalent fixed rate debt instrument.

If a VRDI provides for stated interest either at one or more qualified floating rates or at a qualified inverse floating rate, and in addition provides for stated interest at a single fixed rate, the amount of interest and original issue discount accruals are determined as in the preceding four paragraphs with the modification that the VRDI is treated, for purposes of the first three steps of the determination, as if it provided for a qualified floating rate (or qualified inverse floating rate) rather than the fixed rate. The qualified floating rate (or qualified inverse floating rate) replacing the fixed rate must be such that the fair market value of the VRDI as of the issue date would be approximately the same as the fair market value of an otherwise identical debt instrument that provides for the qualified floating rate (or qualified inverse floating rate) rather than the fixed rate.

5.    Contingent Notes

Certain types of Notes (the "*Contingent Notes*"), may be taxable under the rules applicable to contingent payment debt instruments (the "*Contingent Debt Regulations*"), as follows.

First, the Issuer is required to determine, as of the issue date, the comparable yield for the Contingent Note. The comparable yield is generally the yield at which the Issuer would issue a fixed rate debt instrument with terms and conditions similar to those of the Contingent Note (including the level of subordination, term, timing of payments and general market conditions) but not taking into consideration the risk of the contingencies or the liquidity of the Contingent Note. Further, the comparable yield may not be less than the Applicable Federal Rate announced monthly by the IRS (the "*AFR*"). In certain cases where Contingent Notes are marketed or sold in substantial part to tax-exempt investors or other investors for whom the prescribed inclusion of interest is not expected to have a substantial effect on their United States tax liability, the comparable yield for the Contingent Note is, without proper evidence to the contrary, presumed to be the AFR.

Second, solely for tax purposes, the Issuer constructs a projected schedule of payments determined under the Contingent Debt Regulations for the Contingent Note (the "*Schedule*"). The Schedule is determined as of the issue date and generally remains in place throughout the term of the Contingent Note. If a right to a contingent payment is based on market information, the amount of the projected payment is the forward price of the contingent payment. If a contingent payment is not based on market information, the amount of the projected payment is the expected value of the contingent payment as of the issue date. The Schedule must produce the comparable yield determined as set forth above. Otherwise, the Schedule must be adjusted under the rules set forth in the Contingent Debt Regulations.

Third, under the usual rules applicable to Notes issued with original issue discount and based on the Schedule, the interest income on the Contingent Note for each accrual period is determined by multiplying the comparable yield of the Contingent Note (adjusted for the length of the accrual period) by the Contingent Note's adjusted issue price at the beginning of the accrual period (determined under rules set forth in the Contingent Debt Regulations). The amount so determined is then allocated on a ratable basis to each day in the accrual period that the U.S. Holder held the Contingent Note.

Fourth, appropriate adjustments are made to the interest income determined under the foregoing rules to account for any differences between the Schedule and actual contingent payments. Under the rules set forth in the Contingent Debt Regulations, interest income is generally increased (or decreased) if the actual contingent payment is more (or less) than the projected payment. Differences between the actual amounts of any contingent payments in respect of a Contingent Note made in a calendar year and the projected amounts of such payments are generally aggregated and taken into account, in the case of a positive difference, as additional interest income, or, in the case of a negative difference, first as a reduction in interest income for such year and thereafter, subject to certain limitations, as ordinary loss.

The Contingent Debt Regulations require the Issuer to provide each beneficial owner of a Contingent Note with the Schedule. If the Issuer does not create the Schedule or the Schedule is unreasonable, a U.S.Holder must set its own projected payment schedule and explicitly disclose the fact that the U.S.Holder's schedule is being used and the reason therefor. Unless otherwise prescribed by the IRS, the U.S. Holder must make such disclosure on a statement attached to the U.S. Holder's timely filed U.S. federal income tax return for the taxable year in which the Contingent Note was acquired.

6.    Election to Treat All Interest as Original Issue Discount

U.S. Holders may elect to include in gross income all interest that accrues on a Note, including any stated interest, acquisition discount, original issue discount, market discount, *de minimis* OID, *de minimis* market discount and unstated interest (as adjusted by amortizable bond premium and acquisition premium), by using the constant yield method described above under "Original Issue

Discount." Such an election for a Note with amortizable bond premium results in a deemed election to amortize bond premium for all taxable debt instruments owned and later acquired by the U.S. Holder with amortizable bond premium and may be revoked only with the permission of the IRS. Similarly, such an election for a Note with market discount results in a deemed election to accrue market discount in income currently for such Note and for all other debt instruments acquired by the U.S. Holder with market discount on or after the first day of the taxable year to which such election first applies, and may be revoked only with the permission of the IRS. A U.S. Holder's tax basis in a Note is increased by each accrual of the amounts treated as original issue discount under the constant yield election described in this paragraph.

The application of the foregoing rules may be different in the case of Contingent Notes. Accordingly, prospective purchasers should consult with their tax advisors with respect to the application of the market discount, acquisition premium and amortizable bond premium rules to such Notes.

7.    Extendible Notes, Puts and Calls

Generally, the maturity date of a Note will be the maturity date specified in the applicable Final Terms. However, the maturity date of a Note that provides either the Issuer or the U.S. Holder with an unconditional option or options, exercisable on one or more dates during the term of the Note, that, if exercised, requires payments to be made on the Note under an alternative payment schedule or schedules (such as an option to extend or an option to call a debt instrument at a fixed premium) will be determined under the special rules in the U.S. Treasury Regulations. Under these rules, the Issuer will be deemed to exercise or not exercise an option or combination of options in a manner that will minimize the yield on the Note while the U.S. Holder will be deemed to exercise or not exercise an option or options in a manner that will maximize the yield on the Note. In addition, depending on the terms and conditions of an Extendible Note, a U.S. Holder may be subject to other special rules under U.S. federal income tax law. **Prospective purchasers of or Extendible Notes should consult their own tax advisors regarding the application of U.S. federal income tax law such Notes.**

8.    Integration of Notes with Other Financial Instruments

Any U.S. Holder that also acquires or has acquired any financial instrument which, in combination with a Note, would permit the calculation of a single yield-to-maturity or could generally constitute a VRDI of an equivalent term, may in certain circumstances treat the Note and the financial instrument as an integrated debt instrument for purposes of the U.S. federal income tax law, with a single determination of issue price and the character and timing of income, deductions, gains and losses. For purposes of determining original issue discount, none of the payments in respect of the integrated debt instrument would be treated as qualified stated interest. Moreover, under the Contingent Debt Regulations, the IRS may require in certain circumstances that a U.S. Holder that owns a Note integrate the Note with a financial instrument held or acquired by the U.S. Holder or a related party.

9.    Maximum and Minimum Interest Rates

Certain Notes issued with adjustable interest rate, such as Floating Rate Notes, may provide for a maximum and/or minimum interest rate. In addition, certain Notes may provide for a maximum and/or minimum redemption amount. Such restriction on interest rate or redemption amount may alter the U.S. federal income tax consequences generally applicable to a U.S. Holder of purchasing, owning and disposing of a Note.

10.    Instalment Notes

Notes may be issued with instalment payment of principal through the term of the Notes. Such Note may be subject to special rules in respect of the accrual of interest. **Prospective purchasers of Instalment Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

11. Partly Paid Notes

Notes may be issued where purchasers of the Notes pay for the Notes on an instalment schedule or similar arrangement. Such Partly Paid Notes may be subject to special rules for U.S. federal income tax purposes. **Prospective purchasers of Partly Paid Notes should examine the applicable Final Terms or Supplement and consult their own tax advisors regarding the application of U.S. federal income tax law to such Notes.**

12. Other Notes

To the extent that Notes are issued that do not fall within the discussion set forth herein, additional discussion of the applicable U.S. federal income tax rules will be provided in the relevant Final Terms, Drawdown Prospectus or any Supplemental Prospectus. **Prospective investors should examine the applicable Final Terms of such Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Notes.**

**B.    Premium**

If a U.S. Holder purchases a Note for an amount in excess of the sum of all amounts payable on the Note after the date of acquisition (other than payments of qualified stated interest), such U.S. Holder will be considered to have purchased such Note with "amortizable bond premium" equal in amount to such excess, and generally will not be required to include any original issue discount in income. Generally, a U.S. Holder may elect to amortize such premium as an offset to qualified stated interest income, using a constant yield method similar to that described above (see "2. Definitions — c. Original Issue Discount" above), over the remaining term of the Note (where such Note is not redeemable prior to its maturity date). In the case of Notes that may be redeemed prior to maturity, the premium is calculated assuming that the Issuer or the U.S. Holder will exercise or not exercise its redemption rights in a manner that maximizes the U.S. Holder's yield. A U.S. Holder that elects to amortize bond premium must reduce such Owner's tax basis in the Note by the amount of the premium used to offset qualified stated interest income as set forth above. An election to amortize bond premium applies to all taxable debt obligations held during or after the taxable year for which the election is made and may be revoked only with the consent of the IRS.

**C.    Early Redemptions**

Certain Notes having original issue discount may be redeemed prior to maturity through the exercise of a put or call option. Generally, proceeds received in redemption of a Note will be treated in the same manner as the sale or other taxable disposition of the Note. However, such Note may be subject to rules that differ from the general rules discussed above relating to the U.S. federal income tax treatment of original issue discount.

**D.    Sale and Other Taxable Disposition of Notes**

A U.S. Holder generally recognizes gain or loss upon the sale or other taxable disposition of a Note equal to the difference between the amount realized upon such sale or disposition and the U.S. Holder's adjusted basis in the Note. Such adjusted basis in the Note generally equals the cost of the Note, increased by original issue discount, acquisition discount previously included in respect thereof, and reduced (but not below zero) by any payments on the Note other than payments of qualified stated interest and by any premium that the U.S. Holder has taken into account. To the extent attributable to accrued but unpaid qualified stated interest, the amount realized by the U.S. Holder is treated as a payment of interest. Subject to the discussion under "Foreign Currency Notes" below, any gain or loss is capital gain or loss, except as provided under "Short-Term Notes," below. The excess of net long-term capital gains over net short-term capital losses is taxed at a lower rate than ordinary income for certain non-corporate taxpayers. The distinction between capital gain or loss and ordinary income or loss is also relevant for purposes of, among other things, limitations on the deductibility of capital losses. In addition, generally, gain upon the sale or other taxable disposition will be from U.S. sources.

248

Generally, a U.S. Holder must recognize any gain upon the sale, redemption or other taxable disposition of a Note that is a Contingent Note as interest income until there are no remaining contingent payments on the Note at the time of the sale, redemption or other taxable transaction. A U.S. Holder must generally also recognize any loss upon the sale or other taxable disposition of a Note that is a Contingent Note as ordinary loss to the extent that the holder's total interest inclusions in respect of the Note exceed the total negative adjustments on the Note the holder took into account as ordinary loss and any additional loss is treated as capital loss.

## E.    Short-Term Notes

In the case of a Note with a maturity of one year or less from its issue date (a "Short-Term Note"), no interest is treated as qualified stated interest, and therefore all interest is included in original issue discount. U.S. Holders that report income for U.S. federal income tax purposes on an accrual method and certain other U.S. Holders are required to include original issue discount in income on such Short-Term Notes on a straight-line basis, unless an election is made to accrue the original issue discount according to a constant yield method based on daily compounding.

Any other U.S. Holder of a Short-Term Note is not required to accrue original issue discount for U.S. federal income tax purposes, unless it elects to do so. In the case of a U.S. Holder that is not required, and does not elect, to include original issue discount in income currently, any gain realized on the sale, exchange or retirement of a Short-Term Note is ordinary income to the extent of the original issue discount accrued on a straight-line basis (or, if elected, according to a constant yield method based on daily compounding) through the date of sale, exchange or retirement. In addition, U.S. Holders that are not required, and do not elect, to include original issue discount in income currently are required to defer deductions for any interest paid on indebtedness incurred or continued to purchase or carry a Short-Term Note in an amount not exceeding the deferred interest income with respect to such Short-Term Note (which includes both the accrued original issue discount and accrued interest that are payable but that have not been included in gross income), until such deferred interest income is realized. A U.S. Holder of a Short-Term Note may elect to apply the foregoing rules (except for the rule characterizing gain on sale, exchange or retirement as ordinary) with respect to "acquisition discount" rather than original issue discount. Acquisition discount is the excess of the stated redemption price at maturity of the Short-Term Note over the U.S. Holder's basis in the Short-Term Note. This election applies to all obligations acquired by the taxpayer on or after the first day of the first taxable year to which such election applies, unless revoked with the consent of the IRS. A U.S. Holder's tax basis in a Short-Term Note is increased by the amount included in such U.S. Holder's income on such a Note.

## F.    Foreign Currency Notes

Generally, except specifically discussed below, interest, original issue discount and other payments in respect of Notes denominated in, or that provide for payments determined by reference to, a currency other than the United States dollar ("*Foreign Currency Notes*") are determined in such foreign currency based on the U.S. federal income tax rules described above and translated into the United States dollar in the manners described below. Certain Foreign Currency Notes may be subject to special rules discussed in "4. Dual Currency Notes and Foreign Currency Notes that are CPDIs" below.

1.    Interest Includible In Income Upon Receipt

A payment of interest on a Foreign Currency Note that is not required to be included in income by the U.S. Holder prior to the receipt of such payment (e.g., qualified stated interest received by a cash method U.S. Holder) is includible in income by the U.S. Holder based on the United States dollar value of the foreign currency determined on the date such payment is received, regardless of whether the payment is in fact converted to United States dollars at that time. If the interest payment is not so converted, such United States dollar value is the U.S. Holder's tax basis in the foreign currency received.

2.    Interest Includible In Income Prior To Receipt

In the case of interest income on a Foreign Currency Note that is required to be included in income by the U.S. Holder prior to the receipt of payment (e.g., stated interest on a Foreign Currency Note held by an accrual basis U.S. Holder or accrued original issue discount), a U.S. Holder is required to include in income the United States dollar value of the amount of interest income that has accrued and is otherwise required to be taken into account with respect to a Foreign Currency Note during an accrual period. Unless the U.S. Holder makes the election discussed in the next paragraph, the United States dollar value of such accrued income is determined by translating such income at the average rate of exchange for the accrual period or, with respect to an accrual period that spans two taxable years, at the average rate for the portion of the accrual period within the taxable year. The average rate of exchange for the accrual period (or partial period) is the simple average of the spot exchange rates for each business day of such period (or other method if such method is reasonably derived and consistently applied). Such U.S. Holder recognizes, as ordinary gain or loss, foreign currency exchange gain or loss with respect to accrued interest income on the date such income is actually received, reflecting fluctuations in currency exchange rates between the last day of the relevant accrual period and the date of payment. The amount of gain or loss recognized equals the difference between the United States dollar value of the foreign currency payment received in respect of such accrual period determined based on the exchange rate on the date such payment is received and the United States dollar value of interest income that has accrued during such accrual period (as determined above).

Under the so-called "spot rate convention election", a U.S. Holder may, in lieu of applying the rules described in the preceding paragraph, elect to translate accrued interest income into United States dollars at the exchange rate in effect on the last day of the relevant accrual period for original issue discount, market discount or accrued interest, or in the case of an accrual period that spans two taxable years, at the exchange rate in effect on the last day of the taxable year. Additionally, if a payment of such income is actually received within five business days of the last day of the accrual period or taxable year, an electing U.S. Holder may instead translate such income into United States dollars at the exchange rate in effect on the day of actual receipt. Any such election applies to all debt instruments held by the U.S. Holder at the beginning of the first taxable year to which the election applies or thereafter acquired by the U.S. Holder and is irrevocable without the consent of the IRS.

3.    Purchase, Sale, Exchange or Retirement

A U.S. Holder that converts United States dollars to a foreign currency and immediately uses that currency to purchase a Foreign Currency Note denominated in the same foreign currency normally does not recognize gain or loss in connection with such conversion and purchase. However, a U.S. Holder that purchases a Foreign Currency Note with previously owned foreign currency does recognize ordinary income or loss in an amount equal to the difference, if any, between such U.S. Holder's tax basis in the foreign currency and the United States dollar market value of the Foreign Currency Note on the date of the purchase. A U.S. Holder's tax basis in a Foreign Currency Note (and the amount of any subsequent adjustment to such U.S. Holder's tax basis) is the United States dollar value of the foreign currency amount paid for such Foreign Currency Note (or of the foreign currency amount of the adjustment) determined on the date of such purchase or adjustment. In the case of an adjustment resulting from accrual of original issue discount or market discount, such adjustment is made at the rate at which such original issue discount or market discount is translated into United States dollars under the rules described above.

Gain or loss realized upon the sale, exchange or retirement of, or the receipt of principal on, a Foreign Currency Note, to the extent attributable to fluctuations in currency exchange rates, is generally ordinary income or loss. Gain or loss attributable to fluctuations in exchange rates equals the difference between (i) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such Note is disposed of, and (ii) the United States dollar value of the foreign currency purchase price for such Note, determined on the date such U.S. Holder acquired such Note. Any portion of the proceeds of such sale, exchange or retirement attributable to accrued interest

250

income may result in exchange gain or loss under the rules set forth above. Such foreign currency gain or loss is recognized only to the extent of the overall gain or loss realized by a U.S. Holder on the sale, exchange or retirement of the Foreign Currency Note. In general, the source of such foreign currency gain or loss is determined by reference to the residence of the U.S. Holder or the "qualified business unit" of such U.S. Holder on whose books the Note is properly reflected. Any gain or loss realized by a U.S. Holder in excess of such foreign currency gain or loss is capital gain or loss (except to the extent of any accrued market discount not previously included in such U.S. Holder's income or, in the case of a Short-Term Note having original issue discount, to the extent of any original issue discount not previously included in such U.S. Holder's income).

The tax basis of a U.S. Holder in any foreign currency received on the sale, exchange or retirement of a Foreign Currency Note is equal to the United States dollar value of such foreign currency, determined at the time of such sale, exchange or retirement. Treasury regulations provide a special rule for purchases and sales of publicly traded securities by a cash method taxpayer under which units of foreign currency paid or received are translated into United States dollars at the spot rate on the settlement date of the purchase or sale. Accordingly, no exchange gain or loss results from currency fluctuations between the trade date and the settlement date of such a purchase or sale. An accrual method taxpayer may elect the same treatment with respect to the purchase and sale of publicly traded securities provided the election is applied consistently. Such election cannot be changed without the consent of the IRS. U.S. Holders should consult their tax advisors concerning the applicability to Foreign Currency Notes of the special rules summarized in this paragraph.

Amortizable bond premium of a Foreign Currency Note is determined in the relevant foreign currency. The amount of such exchange gain or loss with respect to amortizable bond premium is determined by treating the portion of premium amortized with respect to any period as a return of principal. With respect to a U.S. Holder of a Foreign Currency Note that does not elect to amortize premium, the amount of premium, if any, is treated as a capital loss when such Note matures.

4.    Dual Currency Notes and Foreign Currency Notes that are CPDIs

The tax consequences of the acquisition of a Foreign Currency Note that is a Dual Currency Note or that is treated as a Contingent Note will be described in the relevant Final Terms or Supplement. **Prospective investors should examine the applicable Final Terms, or Supplement of Foreign Currency Notes that are Dual Currency Notes or Contingent Notes and consult their own tax advisors with respect to the purchase, ownership and disposition of such Foreign Currency Notes.**

5.    Redenomination

Under certain circumstances, a Foreign Currency Note may be redenominated in another non-U.S. currency. Generally, if such redenomination is from a legacy currency to the Euro, such redenomination is not treated as a taxable conversion for U.S. federal income tax purposes. In other circumstances, a redenomination may be treated as a taxable conversion.

6.    Tax Shelter Reporting Requirements

U.S. Treasury Regulations (the "*Tax Shelter Regulations*") intended to address so-called tax shelters and other potentially tax-motivated transactions require participants in a "reportable transaction" to disclose certain information about the transaction on IRS Form 8886 and retain information relating to the transaction. In addition, organizers and sellers of reportable transactions are required to maintain lists identifying the transaction investors and furnish to the IRS upon demand such investor information as well as detailed information regarding the transactions. A transaction may be a "reportable transaction" based upon any of several indicia, including the existence of confidentiality agreements, certain indemnity arrangements or potential for recognizing investment or other losses, including foreign currency losses, one or more of which may be present with respect to or in connection with an investment in the Notes. If a U.S. Holder participates in a "reportable transaction,"

in connection with its investment in a Note (because, for example, the U.S. Holder realizes a foreign currency loss over a threshold amount), the U.S. Holder will be treated as participating in a "reportable transaction" and will have to disclose its participation in such transaction while organizers and sellers of reportable transactions will be required to maintain lists described above.

U.S. federal backup withholding and information reporting requirements may apply to certain payments of interest on, and proceeds from the sale, retirement or other taxable disposition of a Registered Note held by a U.S. Holder. A portion of any such payment may be withheld as a backup withholding against such U.S. Holder's potential U.S. federal income tax liability if such U.S. Holder fails to establish it is exempt from these rules, furnish its correct taxpayer identification number, or otherwise fails to comply with such information reporting requirements. Corporate U.S. Holders are generally exempt from the backup withholding and information reporting requirements but may be required to comply with certification and identification requirements in order to prove their exemption. Any amounts withheld under the backup withholding rules from a payment to a U.S. Holder will be credited against such U.S. Holder's US federal income tax liability, if any, or refunded if the amount withheld exceeds such tax liability provided the required information is furnished to the IRS.

### Taxation of Non-U.S. Holders

This subsection describes the material U.S. federal income and withholding tax consequences to a Non-U.S. Holder of a Note. "*Non-U.S. Holder*" means a beneficial owner of a Note or Coupon that is, for United States federal income tax purposes: a nonresident alien individual; a foreign corporation; or an estate or trust that in either case is not subject to United States federal income tax on a net income basis on income or gain from a Note or Coupon.

This summary does not address all of the U.S. federal income and withholding tax consequences that may be relevant to a Non-U.S. Holder in light of the Non-U.S. Holder's particular circumstances including Non-U.S. Holders who hold the Note in a manner that is effectively connected with the conduct of a trade or business in the United States, are present in the United States for 183 days or more in the taxable year the Non-U.S. Holder disposes of the Note, are banks receiving interest described in Section 881(c)(3)(A) of the Code, are controlled foreign corporations related to LBHI, or are owners actually or constructively of 10% or more of the total combined voting power of all classes of stock of LBHI entitled to vote.

### A.    Principal and Interest

Subject to the discussion of backup withholding below, payments of principal and interest (including original issue discount) with respect to a Registered Note issued by LBTCBV or LBB to a Non-U.S. Holder will be treated as non-U.S. sourced payments and will not be subject to U.S. federal income or withholding tax. Payments of principal and interest (including original issue discount) by LBHI to Non-U.S. Holders are not subject to U.S. federal income or withholding tax, provided that the interest is not contingent interest as described in Section 871(h)(4) of the Code (relating primarily to interest based on or determined by reference to income, profits, cash flow and other comparable attributes of the obligor or a party related to the obligor), and, in the case of Registered Notes (or Notes that may otherwise be characterised as not being in bearer form for U.S. Federal Income tax purposes), the Holder provides a properly completed IRS Form W-8BEN, or other such applicable form.

### B.    Sale and Other Taxable Exchange

Subject to the discussion of backup withholding below, gain realized upon the sale or retirement or other taxable disposition of a Note by a Non-U.S. Holder is not subject to U.S. federal income or withholding tax.

**Information Reporting and Backup Withholding**

Payments on and proceeds from the sale of the Notes made outside the United States by a payor that is not a "U.S. connected person" generally will be exempt from the U.S. information reporting and backup withholding rules; however, payments on Registered Notes issued by LBHI will be subject to certain U.S. information reporting rules and may be subject to backup withholding if the Non-U.S. Holder does not provide the form described in the discussion under "Principal and Interest" above (though the same payment will not be subject to both withholding and backup withholding). A U.S. connected person, for these purposes includes but is not limited to (a) a United States person, (b) a controlled foreign corporation, (c) a United States branch of a foreign bank or foreign insurance company, (d) a foreign partnership controlled by United States persons or engaged in a United States trade or business or (e) a foreign person 50% or more of whose gross income is effectively connected with the conduct of a United States trade or business for a specified three-year period.

Backup withholding is not an additional tax. Rather amounts withheld from a payment under the backup withholding rules are credited against any U.S. federal tax liability of the Non-U.S. Holder and may entitle the Non-U.S. Holder to a refund, provided that the required information is timely furnished to the IRS.

## NETHERLANDS TAXATION

*The following summary of certain Dutch taxation matters is based on the laws and practice in force as of the date of this Base Prospectus and is subject to any changes in law and the interpretation and application thereof, which changes could be made with retroactive effect. The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of the Notes, and does not purport to deal with the tax consequences applicable to all categories of investors, some of which (such as dealers in securities) may be subject to special rules. Save as otherwise indicated, this summary only addresses the position of investors who do not have any connection with The Netherlands other than the holding of the Notes. Investors should consult their professional advisers on the tax consequences of their acquiring, holding and disposing of the Notes under the laws of their country of citizenship, residence, domicile or incorporation.*

### 1.    Withholding Tax

All payments of interest and principal by the Issuer under the Notes, Coupons, Talons or Receipts can be made free of withholding or deduction for any taxes of whatsoever nature imposed, levied, withheld or assessed by The Netherlands or any political subdivision or taxing authority thereof or therein, unless the Notes qualify as debt effectively functioning as equity within the meaning of Article 10, paragraph 1 sub d of the Dutch Corporate Income Tax Act 1969 (*Wet op de vennootschapsbelasting 1969*).

### 2.    Taxes on Income and Capital Gains

A holder of a Note, Coupon, Talon or Receipt who derives income from a Note, Coupon, Talon or Receipt or who realises a gain on the disposal or redemption of a Note, Coupon, Talon or Receipt will not be subject to Dutch taxation on such income or capital gains unless:

(i)     the holder is, or is deemed to be, resident in The Netherlands or, where the holder is an individual, such holder has elected to be treated as, a resident of The Netherlands; or

(ii)     such income or gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or a permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(iii)     the holder is not an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) or a deemed substantial interest in the Issuer and such interest does not form part of the assets of an enterprise; or

(iv)    the holder is an individual and has, directly or indirectly, a substantial interest (*aanmerkelijk belang*) in the Issuer or such income or gain otherwise qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) in The Netherlands as defined in the Dutch Income Tax Act 2001 (*Wet inkomstenbelasting 2001*).

## 3.    Gift, Estate or Inheritance Taxes

Dutch gift, estate or inheritance taxes will not be levied on the occasion of the transfer of a Note, Coupon, Talon or Receipt by way of gift by, or on the death of, a holder, unless:

(i)    the holder is, or is deemed to be, resident in The Netherlands for the purpose of the relevant provisions; or

(ii)    the transfer is construed as an inheritance or as a gift made by, or on behalf of, a person who, at the time of the gift or death, is or is deemed to be resident in The Netherlands for the purpose of the relevant provisions; or

(iii)    such Note, Coupon, Talon or Receipt is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment or a permanent representative in The Netherlands.

## 4.    Value Added Tax

There is no Dutch value added tax payable by a holder of a Note, Coupon, Talon or Receipt in respect of payments in consideration for the issue of the Notes, Coupons, Talons or Receipts or in respect of the payment of interest or principal under the Notes, Coupons, Talons or Receipts, or the transfer of the Notes, Coupons, Talons or Receipts.

## 5.    Other Taxes and Duties

There is no Dutch registration tax, stamp duty or any other similar tax or duty payable in The Netherlands by a holder of a Note, Coupon, Talon or Receipt in respect of or in connection with the execution, delivery and/or enforcement by legal proceedings (including any foreign judgement in the courts of The Netherlands) of the Notes, Coupons, Talons or Receipts or the performance of the Issuer's obligations under the Notes, Coupons, Talons or Receipts.

## 6.    Residence

A holder of a Note, Coupon, Talon or Receipt will not be treated as a resident of The Netherlands by reason only of the holding of a Note, Coupon, Talon or Receipt or the execution, performance, delivery and/or enforcement of the Notes, Coupons, Talons or Receipts.]

## GERMAN TAXATION

The information below is not intended as tax advice, and it does not purport to describe all of the tax considerations that may be relevant to a prospective purchaser of the Notes. Prospective purchasers are urged to satisfy themselves as to the overall tax consequences of purchasing, holding and/or selling the Notes. As each Tranche of the Notes may be subject to a different tax treatment due to the specific terms of each Trance, the following section only provides some very generic information on the possible tax treatment and has to be read in conjunction with more specific information on the taxation of each Tranche of the Notes as provided in the relevant Final Terms.

**PROSPECTIVE PURCHASERS OF NOTES ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF NOTES, INCLUDING THE EFFECT OF ANY STATE OR LOCAL TAXES, UNDER THE TAX LAWS OF GERMANY AND EACH COUNTRY OF WHICH THEY ARE RESIDENTS.**

1.    **German tax residents**

Persons (individuals and corporate entities) who are tax resident in Germany (in particular, persons having a residence, habitual abode, seat or place of management in Germany) are subject to income taxation (income tax or corporate income tax, as the case may be, plus solidarity surcharge thereon plus, if applicable, church tax) on their worldwide income, regardless of its source, including interest from debt of any kind (such as the Notes) and, in some cases, capital gains.

a.    **Private Investors (being individuals)**

The taxation of investors (being individuals) in the Notes (the "*Investors*") holding the Notes as private assets (the "*Private Investors*") will change as from the assessment period 2009 onwards.

*(1)    Assessment period 2008*

With regard to the assessment period 2008, all interest paid under a Note is taxable. Accrued (unpaid) interest paid as a part of the sales price of the Notes (the "*Accrued Interest*") is deemed to be interest and taxed accordingly. Furthermore, if a Note qualifies as a financial innovation (*Finanzinnovation*) and accordingly falls within the scope of section 20 para 2 no 4 of the German Income Tax Act ("*ITA*" – *Einkommensteuergesetz*) in the form applicable up to 31 December 2008, income received upon sale, transfer or redemption of such Note by a Private Investor is regarded as taxable interest income (the "*Deemed Interest*"). Deemed Interest will be calculated as part of the sale proceeds or redemption amount which corresponds with the yield attributable to the holding period of the respective Private Investor reduced by the interest and Accrued Interest which has already been subject to income tax (*Besteuerung nach der Emissionsrendite*). If there is no yield under the Note or if the Private Investor is not able to bring evidence concerning such yield, Deemed Interest will be calculated as the difference between the proceeds from sale, assignment or redemption and the issue or purchase price (*Besteuerung nach der Marktrendite*). If such difference is negative, this may result in negative income from capital investments (*Einkünfte aus Kapitalvermögen*), which may be set off against other income.

Capital gains from the sale, transfer or redemption of a Note (which do not qualify as Deemed Interest or Accrued Interest) will only be taxable if the sale, transfer or redemption of such Note by the Private Investor occurs within one year after the acquisition of the Note (so-called private disposals within the meaning of section 23 ITA).

Capital losses from the sale, transfer or redemption of a Note suffered within the one-year-holding-period are ring-fenced and, thus, can only be set off against capital gains from other private disposals. Capital losses suffered after the one-year-holding-period cannot be set off against taxable capital gains from other assets or other taxable income.

The taxable income from the Notes will be taxed at the Private Investor's individual income tax rate plus solidarity surcharge (*Solidaritätszuschlag*) thereon plus, if applicable, church tax.

With regard to income from capital investments (*Einkünfte aus Kapitalvermögen*), a lump-sum of income-related expenses (*Werbungskosten*) in the amount of 51 EUR (or the actual income-related expenses of the Private Investor if they exceed this amount) and the savers tax-free amount (*Sparer-Freibetrag*) in the amount of 750 EUR (respectively 102 EUR and 1,500 EUR in the case of jointly assessed husband and wife) can be deducted.

*(2)    As from the assessment period 2009*

As from the assessment period 2009, all capital gains from the sale, transfer or redemption of a Note will be taxable, irrespective of whether or not the Note qualifies as a financial innovation or carries Accrued Interest and irrespective of the holding period (i.e. also if the Note has been held by the Private Investor for more than one year). Interest received under a Note will also be taxable.

The taxable income from the Notes will be taxed, in principle, at a flat income tax rate of 25% plus solidarity surcharge (*Solidaritätszuschlag*) thereon plus, if applicable, church tax. Certain exemptions apply.

With regard to income from capital investments (*Einkünfte aus Kapitalvermögen*), only the savers lump-sum amount (*Sparer-Pauschbetrag*) in the amount of 801 EUR (respectively 1,602 EUR in the case of jointly assessed husband and wife) can be deducted; a deduction of the actual income-related expenses is, in general, excluded.

With regard to Notes acquired before 1 January 2009, certain grandfathering rules may apply, depending on, *inter alia*, the time of acquisition and the specific terms of such Note.

**b.    Non-Private Investors**

Where the Notes are held as business assets by individuals, corporations or other entities, interest income, Accrued and Deemed Interest, and capital gains will be subject to income tax or corporate income tax, as the case may be, plus solidarity surcharge thereon plus, if applicable, church tax. If the Notes form part of a German trade or business (*Gewerbebetrieb*), such income will also be subject to German trade tax.

Depending on the specific terms of the respective Note, the annual increase in value of the Note, as calculated at the time of acquisition, must be taken into account *pro rata temporis* as interest income.

**2.    Non-residents**

Persons (individuals and corporate entities) who are not tax resident in Germany are subject to income tax or corporate income tax (plus solidarity surcharge thereon plus, if applicable, church tax) and, if applicable, trade tax in Germany with interest, Deemed Interest and Accrued Interest and capital gains if the proceeds received from the Notes fall into a category of income from German sources under section 49 ITA such as income effectively connected with a German trade or business or (b) if the proceeds are paid over the counter upon presentation of Notes.

**3.    German withholding tax**

German withholding tax (*Kapitalertragsteuer*) will be levied if a Note is held in a custodial account which the Investor maintains with a German credit institution or financial services institution, which term includes a German branch of a foreign credit institution or financial services institution, but excludes a foreign branch of a German credit institution or financial services institution, or a German Issuer ("*German Disbursing Agent*"). As from 1 January 2009, the term German Disbursing Agent will also comprise securities trading businesses (*Wertpapierhandelsunternehmen*) and securities trading banks (*Wertpapierhandelsbanken*).

With regard to proceeds received before 1 January 2009, only interest payments (including Accrued Interest and Deemed Interest) will be subject to withholding tax. Withholding tax will be levied, in principle, at a rate of 30% plus solidarity surcharge thereon at a rate of 5.5%. If the proceeds are paid over the counter upon presentation of the Notes, withholding tax will be levied at a rate of 35% plus solidarity surcharge thereon at a rate of 5.5%. The withholding tax (including solidarity surcharge) is an advance payment on income tax if the recipient of the interest payment is subject to German income taxation by assessment.

With regard to proceeds received after 31 December 2008, also proceeds from the sale, transfer or redemption of the Notes will be subject to withholding tax. Withholding tax will be levied at a flat withholding tax rate of 25% plus solidarity surcharge at a rate of 5.5% thereon plus, if applicable, church tax. With regard to Private Investors, the withholding tax (including solidarity surcharge and church tax) is, in principle, a final tax and shall replace the Private Investor's income taxation by assessment. If no tax is withheld, the Private Investor is still obliged to file a tax return. With regard to Non-Private Investors, the withholding tax (including solidarity surcharge) is still an advance payment on (corporate) income tax if the recipient of the payment is subject to German income taxation by assessment. With regard to Notes acquired before 1 January 2009, certain grandfathering rules may apply, depending on, *inter alia*, the time of acquisition and the specific terms of such Note.

In the case of interest and Accrued Interest, withholding tax will be levied on the interest / Accrued Interest amount. As regards Deemed Interest (in 2008) and capital gains from the sale, transfer or redemption

of Notes (as from 2009 onwards), withholding tax will be levied, in principle, on an amount equal to the difference between the issue or purchase price of the Notes and the redemption amount or sales proceeds. If the difference cannot be determined, withholding tax is levied on 30% of the amounts paid in partial or final redemption of the Notes or the proceeds from the sale of the Notes.

In general, no withholding tax will be levied if the Investor is a Private Investor who has filed a withholding exemption certificate (*Freistellungsauftrag*) with the German Disbursing Agent, but only to the extent the sum of taxable income from the Notes and other capital investments does not exceed the maximum exemption amount shown on the withholding exemption certificate. Similarly, no withholding tax will be deducted if the Investor has submitted to the German Disbursing Agent a certificate of non-assessment (*Nichtveranlagungsbescheinigung*) issued by the relevant local tax office.

Persons who are not resident in Germany are, in principle, only subject to German withholding tax if (a), according to German income tax law, the proceeds received from the Notes fall into a category of income from German sources under section 49 ITA such as income effectively connected with a German trade or business or (b) if the proceeds are paid over the counter upon presentation of Notes.

### 4.    Taxation if Notes qualify as equity or equity-like instruments

If a Note qualifies as equity or equity-like instrument from a German tax perspective, in addition to the rules set out above, income and deemed income may be subject to income taxation, trade tax and to withholding tax (even if interest on the Note is not paid out by a German Disbursing Agent).

Further, capital gains achieved by a Private Investor might be re-qualified as business income and, thus, taxable at the Private Investor's individual income tax rate. Capital gains and dividend income might also be partly tax-exempt according to section 8b German Corporate Income Tax Act and section 3 no 40 ITA, respectively.

## AUSTRALIAN TAXATION

The following is a summary of the Australian taxation treatment under the Income Tax Assessment Act of 1936 and 1997 of Australia (together "*Australian Tax Act*") at the date of this Base Prospectus, of payments of interest (as defined in the Australian Tax Act) on Notes to be issued by LBTCBV or LBHI under the Program and certain other matters.

This summary is not exhaustive and, in particular, does not deal with the position of certain classes of holders of Notes (including dealers in securities, custodians or other third parties who hold Notes on behalf of any holders of Notes). Prospective holders of Notes should also be aware that particular terms of issue of any Series of Notes may affect the tax treatment of that Series of Notes. The following is a general guide and should be treated with appropriate caution. The following summary may be amended, supplemented or replaced (in part or in whole) or qualified in relation to a particular issue of Notes in the applicable Final Terms. This summary is not intended to be, nor should it be construed as, legal or tax advice to any particular investor. Prospective holders of Notes should consult their professional advisors on the legal and tax implications of an investment in the Notes for their particular circumstances.

### 1.    Interest withholding tax

So long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and the Notes (including, without limitation, the Australian Domestic Notes) issued by it are not attributable to a permanent establishment of it in Australia, payments of principal and interest made under the Notes issued by it should not be subject to Australian interest withholding tax.

So long as the Guarantor continues to be a non-resident of Australia and the Guarantee is not attributable to a permanent establishment of the Guarantor in Australia, any payment by the Guarantor under the Guarantee should not be subject to Australian interest withholding tax.

2.    **Other tax matters**

Under Australian laws as presently in effect:

(a)    *death duties* – no Notes will be subject to death, estate or succession duties imposed by Australia, or by any political subdivision or authority therein having power to tax, if held at the time of death; and

(b)    *stamp duty and other taxes* – no ad valorem stamp, issue, registration or similar taxes are payable in Australia on the issue or transfer of any Notes; and

(c)    *other withholding taxes* – so long as LBTCBV or LBHI, as the case may be, continues to be a non-resident of Australia and does not carry on business at or through a permanent establishment in Australia and does not issue the Notes, use the proceeds of Notes issuance or make payments on the Notes in the course or furtherance of an enterprise carried on in Australia, payments in respect of the Notes should not be subject to the tax file number requirements of, or the "supply withholding tax" imposed under, Australia's tax legislation; and

(d)    *goods and services tax (GST)* – none of the issue or receipt of the Notes, the payment of principal or interest by LBTCBV or LBHI nor the disposal of the Notes will give rise to any GST liability in Australia.

## NEW ZEALAND TAXATION

*The following is a summary of the New Zealand withholding tax treatment at the date of this Prospectus of payments of principal and interest to holders of the Notes. It does not address all New Zealand tax issues (including income tax issues) which may be relevant to holders of Notes. Prospective holders of a Note (including prospective holders of a beneficial interest in a Note) should seek independent advice on the New Zealand tax implications applicable to them.*

To the extent that a beneficial interest in a Note is held by a New Zealand resident, payments of principal and/or interest by the Issuer should not be subject to New Zealand resident withholding tax, provided that:

(a)    the Issuer (and any other related entity through which the payments of principal and/or interest are made) continues to be a non-New Zealand resident, and does not carry on a taxable activity in New Zealand through a fixed establishment in New Zealand; and

(b)    if Computershare Investor Services Limited (or any other third party) receives principal and/or interest payments on behalf of or as agent of the holder of that beneficial interest, the holder has provided Computershare Investor Services Limited (or the other third party) with a copy of a valid certificate of exemption from New Zealand resident withholding tax prior to the payment being made, and that certificate of exemption remains valid at the time the payment is made.

To the extent that a beneficial interest in a Note is held by a non-New Zealand resident, payments of principal and/or interest on that Note by the Issuer should not be subject to New Zealand withholding tax.

*Important Definitions*: For the purposes of these New Zealand withholding tax considerations a "*New Zealand resident*" is a person who is resident in New Zealand for New Zealand income tax purposes or who carries on business in New Zealand through a fixed establishment in New Zealand, and a "*non-New Zealand resident*" is a person who is neither resident in New Zealand for New Zealand income tax purposes nor carries on business in New Zealand through a fixed establishment in New Zealand.

## UNITED KINGDOM TAXATION

The following is a summary of the United Kingdom withholding taxation treatment at the date hereof in relation to payments of principal and interest in respect of the Notes. It is based on current law and the practice of Her Majesty's Revenue and Customs ("*HMRC*"), which may be subject to change, sometimes with retrospective effect. The comments do not deal with other United Kingdom tax aspects of acquiring, holding or disposing of Notes. The comments are made on the assumption that LBHI is resident in the United Kingdom, but that LBTCBV and LBB are not resident in the United Kingdom, for United Kingdom tax purposes. The comments relate only to the position of persons who are absolute beneficial owners of the Notes. Prospective Noteholders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. Noteholders who are in any doubt as to their tax position should consult their professional advisers. Noteholders who may be liable to taxation in jurisdictions other than the United Kingdom in respect of their acquisition, holding or disposal of the Notes are particularly advised to consult their professional advisers as to whether they are so liable (and if so under the laws of which jurisdictions), since the following comments relate only to certain United Kingdom taxation aspects of payments in respect of the Notes. In particular, Noteholders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of the United Kingdom.

## A.    UK Withholding Tax

### A1.    UK Withholding Tax on Payments of UK Source Interest

Interest on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax.

Interest on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax except in circumstances where such interest has a United Kingdom source. LBHI wishes Noteholders to be aware that interest on Notes issued by it is likely to be considered to have a United Kingdom source. Depending on the circumstances, interest on Notes issued by LBTCBV and LBB may have a United Kingdom source where, for example, the Notes are issued for the purposes of a trade or other business carried on by the relevant Issuer in the United Kingdom, or are secured on assets situated in the United Kingdom or the interest is paid out of funds maintained in the United Kingdom, or where the relevant Issuer has substantial assets situated in the United Kingdom to which Noteholders may be able to seek recourse for repayment of the Notes and/or payment of interest thereon. LBHI wishes Noteholders to be aware that interest on the Notes issued by LBTCBV and LBB may be considered to have a United Kingdom source.

Interest which has a United Kingdom source ("*UK interest*") may be paid by the relevant Issuer without withholding or deduction for or on account of United Kingdom income tax if the Notes in respect of which the UK interest is paid constitute "quoted Eurobonds". Notes which carry a right to interest will constitute quoted Eurobonds provided they are and continue to be listed on a recognised stock exchange. Notes will be treated as "listed on a recognised stock exchange" for this purpose if (and only if) they are admitted to trading on an exchange designated as a recognised stock exchange by an order made by the Commissioner for HMRC and either they are included in the United Kingdom official list (within the meaning of Part 6 of the Financial Services and Markets Act 2000) or they are officially listed, in accordance with provisions corresponding to those generally applicable in European Economic Area states, in a country outside the United Kingdom in which there is a recognised stock exchange.

The Irish Stock Exchange is a recognised stock exchange for these purposes. The Issuers' understanding of current HMRC practice is that securities which are officially listed and admitted to trading

on the main market or the Alternative Securities Market of that exchange may be regarded as "listed on a recognised stock exchange" for these purposes.

The Issuers' understanding of HMRC practice is that since the merger of Australian Stock Exchange Limited and SFE Corporation Limited and the subsequent adoption of the name Australian Securities Exchange ("*ASX*") by both the Australian Stock Exchange and the Sydney Futures Exchange, only that part of ASX that can be recognised as the former Australian Stock Exchange is designated as a recognised stock exchange. In the case of Notes to be traded on that part of the ASX, the Notes will be treated as "listed on a recognised stock exchange" if (and only if) they are admitted to trading on that part of the exchange and they are officially listed, in Australia, in accordance with provisions corresponding to those generally applicable in European Economic Area states.

The Issuers' understanding of HMRC practice is that the market known as Singapore Exchange Securities Trading Limited ("*SGX-ST*") is a recognised stock exchange for these purposes, and that securities listed and quoted on the official list of SGX-ST may be regarded as "listed on a recognised stock exchange" for these purposes.

In addition, UK interest may be paid without withholding or deduction for or on account of United Kingdom income tax so long as the relevant Issuer is a "bank" for the purposes of section 878 of the Income Tax Act 2007 and so long as such payments are made by the relevant Issuer in the ordinary course of its business. The Issuers have confirmed that Lehman Brothers Bankhaus AG is a "bank" for these purposes. In accordance with published practice of HMRC, such payments will be accepted as being made by the relevant Issuer in the ordinary course of its business unless either:

(i)     the borrowing in question conforms to any of the definitions of tier 1, 2 or 3 capital adopted by the Financial Services Authority whether or not it actually counts towards tier 1, 2 or 3 capital for regulatory purposes; or

(ii)    the characteristics of the transaction giving rise to the interest are primarily attributable to an intention to avoid United Kingdom tax.

In all other cases, UK interest on the Notes may fall to be paid under deduction of United Kingdom income tax at the basic rate (currently 20 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply.

## A2.   UK Withholding Tax on Other UK Source Payments

Where a payment on a Note does not constitute (or is not treated as) interest for United Kingdom tax purposes, and the payment has a United Kingdom source, it would potentially be subject to United Kingdom withholding tax if, for example, it constitutes (or is treated as) an annual payment or a manufactured payment for United Kingdom tax purposes (which will be determined by, amongst other things, the terms and conditions specified by the Final Terms of the Note). In such a case, the payment may fall to be made under deduction of United Kingdom tax (the rate of withholding depending on the nature of the payment), subject to any exemption from withholding which may apply and to such relief as may be available under the provisions of any applicable double tax treaty.

## B.   Payments by Guarantor

If the Guarantor makes any payments in respect of interest on the Notes (or other amounts due under the Notes other than the repayment of amounts subscribed for the Notes) such payments may be subject to United Kingdom withholding tax at the basic rate (currently 20 per cent.) subject to such relief as may be available under the provisions of any applicable double taxation treaty or to any other exemption which may apply. Such payments by the Guarantor may not be eligible for the exemptions described in A above.

## C.   Payments under Deed of Covenant

Any payments made by the Issuers under the Deed of Covenant may not qualify for the exemptions from United Kingdom withholding tax described above.

### D.    Provision of Information

Noteholders should note that where any interest on Notes is paid to them (or to any person acting on their behalf) by LBHI or any other Issuer acting out of a UK branch or any person in the United Kingdom acting on behalf of the relevant Issuer (a "*paying agent*"), or is received by any person in the United Kingdom acting on behalf of the relevant Noteholder (other than solely by clearing or arranging the clearing of a cheque) (a "*collecting agent*"), then the relevant Issuer, the paying agent or the collecting agent (as the case may be) may, in certain cases, be required to supply to HMRC details of the payment and certain details relating to the Noteholder (including the Noteholder's name and address). These provisions will apply whether or not the interest has been paid subject to withholding or deduction for or on account of United Kingdom income tax and whether or not the Noteholder is resident in the United Kingdom for United Kingdom taxation purposes. In certain circumstances, the details provided to HMRC may be passed by HMRC to the tax authorities of certain other jurisdictions.

For the above purposes, "interest" should be taken, for practical purposes, as including payments made by a guarantor in respect of interest on Notes.

With effect from April 6, 2009 the provisions referred to above may also apply, in certain circumstances, to payments made on redemption of any Notes which constitute "deeply discounted securities" for the purposes of section 18 of the Taxes Management Act 1970.

Information may also be required to be reported in accordance with regulations made pursuant to the EU Savings Directive (see below).

### E.    Other Rules Relating to United Kingdom Withholding Tax

1.    Where interest or any other payment has been paid under deduction of United Kingdom income tax, Noteholders who are not resident in the United Kingdom may be able to recover all or part of the tax deducted if there is an appropriate provision in any applicable double taxation treaty.

2.    The references to "interest" above mean "interest" as understood in United Kingdom tax law. The statements above do not take any account of any different definitions of "interest" or "principal" which may prevail under any other law or which may be created by the terms and conditions of the Notes or any related documentation. Noteholders should seek their own professional advice as regards the withholding tax treatment of any payment on the Notes which does not constitute "interest" or "principal" as those terms are understood in United Kingdom tax law.

3.    Notes may be issued at an issue price of less than 100 per cent. of their principal amount. Any discount element on any such Notes will not generally be subject to any United Kingdom withholding tax pursuant to the provisions mentioned above, but may be subject to reporting requirements as outlined above.

4.    Where Notes are to be, or may fall to be, redeemed at a premium, as opposed to being issued at a discount, then any such element of premium may constitute a payment of interest. Payments of interest are subject to United Kingdom withholding tax and reporting requirements as outlined above.

5.    The above description of the United Kingdom withholding tax position assumes that there will be no assumption of obligations of an Issuer of the Notes pursuant to Condition 13 or any substitution of an Issuer of the Notes and does not consider the tax consequences of any such assumption or substitution.

## IRISH TAXATION

### Introduction

The following is a summary of the principal Irish tax consequences for individuals and companies of ownership of the Notes based on the laws and the practices of the Irish Revenue Commissioners currently in force in Ireland and may be subject to change. It deals with Noteholders who beneficially own their Notes thereon as an investment. Particular rules not discussed below may apply to certain classes of taxpayers holding Notes, such as dealers in securities, trusts etc. Noteholders should be aware that the particular terms of issue of any series of Notes as specified in the relevant Final Terms may affect the tax treatment of that and other series of Notes. The following is a general guide and should be treated with appropriate caution. The summary does not constitute tax or legal advice and the comments below are of a general nature only. Prospective investors in the Notes should consult their professional advisers on the tax implications of the purchase, holding, redemption or sale of the Notes and the receipt of interest thereon under the laws of their country of residence, citizenship or domicile. In particular, Noteholders should be aware that they may be liable to taxation under the laws of other jurisdictions in relation to payments in respect of the Notes even if such payments may be made without withholding or deduction for or on account of taxation under the laws of Ireland.

### 1.    Withholding Tax

Tax at the standard rate of income tax (currently 20 per cent.), is required to be withheld from payments of Irish source annual interest and premium. No withholding applies to payments of discount. Interest or premium on Notes issued for a term of less than one year (and which are not issued under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) should not be annual interest and may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax.

Interest and premium on Notes issued for a term of one year or more (or under arrangements the effect of which is to render the Notes part of a borrowing with a total term of one year or more) may be paid by the relevant Issuer without withholding or deduction for or on account of Irish income tax so long as such payments do not constitute Irish source income. LBHI wishes Noteholders to be aware that income derived from the Notes should not constitute Irish source income.

### Payments by the Guarantor

Payments by the Guarantor should not have an Irish source and so should not be subject to Irish withholding taxes.

### Payments under the Deed of Covenant

So long as the Deed of Covenant is not held in Ireland, payments under the Deed of Covenant should not have an Irish source and so should not be subject to Irish withholding taxes.

### 2.    Taxation of Receipts

Noteholder that are not resident or (in the case of a person other than a body corporate) ordinarily resident in Ireland for tax purposes and whose Notes are not attributable to a permanent establishment, branch or agency in Ireland should not be subject to Irish income tax or corporation tax on income derived from the Notes provided that such income does not constitute Irish source income. Ireland operates a self-assessment system in respect of income and corporation tax, and each person must assess its own liability to Irish tax.

### 3.    Encashment Tax

In certain circumstances, Irish tax will be required to be withheld at the standard rate of income tax (currently 20 per cent.) from Irish interest on any Note, where such Irish interest is collected or realised by

a bank or encashment agent in Ireland on behalf of any Noteholder. There is an exemption from encashment tax where the beneficial owner of the interest is not resident in Ireland and has made a declaration to this effect in the prescribed form to the encashment agent or bank.

### 4.    Capital Gains Tax

A holder of Notes will not be subject to Irish tax on capital gains on a disposal of Notes unless such holder is either resident or ordinarily resident in Ireland or carries on a trade or business in Ireland through a branch or agency in respect of which the Notes were used or held.

### 5.    Capital Acquisitions Tax

A gift or inheritance comprising of Notes will be within the charge to capital acquisitions tax (which subject to available exemptions and reliefs, is currently levied at 20 per cent.) if either (i) the disponer or the donee/successor in relation to the gift or inheritance is resident or ordinarily resident in Ireland (or, in certain circumstances, if the disponer is domiciled in Ireland irrespective of his residence or that of the donee/successor) on the relevant date or (ii) if the Notes are regarded as property situated in Ireland (i.e. if the Notes are in bearer form and are physically located in Ireland.

Bearer notes are generally regarded as situated where they are physically located at any particular time. Notes in registered form are property situate in Ireland if the register is in Ireland. The Notes may, however, be regarded as situated in Ireland regardless of their physical location if they secure a debt due by an Irish resident debtor and/or are secured over Irish property. Accordingly, if such Notes are comprised in a gift or inheritance, the gift or inheritance may be within the charge to tax regardless of the residence status of the disponer or the donee/successor.

### 6.    Stamp duty

Stamp duty will not arise on a document effecting a transfer of the Notes so long as the instrument of transfer does not relate to:

(a)    any immoveable property in Ireland; or

(b)    stocks or marketable securities of a company registered in Ireland

## EU SAVINGS DIRECTIVE

Under EC Council Directive 2003/48/EC on the taxation of savings income, each Member State is required to provide to the tax authorities of another Member State details of payments of interest or other similar income paid by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in that other Member State; however, for a transitional period, Austria, Belgium and Luxembourg may instead apply a withholding system in relation to such payments, deducting tax at rates rising over time to 35 per cent. The transitional period is to terminate at the end of the first full fiscal year following agreement by certain non-EU countries to the exchange of information relating to such payments.

A number of non-EU countries, and certain dependent or associated territories of certain Member States, have adopted similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in a Member State. In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or collected by such a person for, an individual resident or certain limited types of entity established in one of those territories.

## UNITED STATES EMPLOYEE BENEFIT PLAN CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "*ERISA Plans*") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan.

Section 406 of ERISA and Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*") prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "*Plans*")) and certain persons (referred to as "*parties in interest*" or "*disqualified persons*") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. In general, unless otherwise permitted pursuant to a supplemental prospectus relating to any Notes, Plans may not purchase, hold or hold any interest in any Note. Each purchaser of Notes, unless otherwise provided in a supplemental prospectus, will be deemed to represent that it is not and for as long as it holds such Notes (or any interest therein) will not, be a Plan.

To the extent a purchaser of any Note (or an interest in a Note) is permitted pursuant to a supplemental prospectus, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if any Notes are acquired by a Plan with respect to which any of the Issuers, the Guarantor, the Arranger or the Dealers or any of their respective affiliates are a party in interest or a disqualified person. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire Notes and the circumstances under which such decision is made. There can be no assurance that any exemption will be available with respect to any particular transaction involving the Notes, or that, if an exemption is available, it will cover all aspects of any particular transaction. Unless otherwise provided in a supplemental prospectus, by its purchase of any Notes, or interest in a Note, to the extent permitted, whether in the case of the initial purchase or in the case of a subsequent transfer, the purchaser thereof will be deemed to have represented and agreed that it is not and for so long as it holds Notes (or any interest therein) will not be a Plan, or an entity the assets of which are deemed to constitute the assets of any benefit plan investor for the purposes of Section 3(42) of ERISA, or otherwise.

Governmental plans and certain church and other plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state or other federal or foreign laws that are substantially similar to ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

The foregoing discussion is general in nature and not intended to be all-inclusive. Any Plan fiduciary who proposes to cause a Plan to purchase any Notes should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA.

The sale of Notes or an interest in a Note to a Plan is in no respect a representation by the Issuers, the Guarantor, the Arranger or the Dealers that such an investment meets all relevant requirements with respect to investments by Plans generally or any particular Plan, or that such an investment is appropriate for Plans generally or any particular Plan.

## SUBSCRIPTION AND SALE

Subject to the terms and conditions set out in the Amended and Restated Distribution Agreement, dated July 24, 2008 (as amended, supplemented or replaced from time to time, the "*Distribution Agreement*") between, amongst others, LBHI, LBTCBV, LBB and the Dealers named therein, the Notes may be offered from time to time on a continuing basis by the Issuers through the Dealers, which have agreed to use their reasonable best efforts to solicit purchasers of the Notes. The Issuer of a Note will pay the relevant Dealer a commission, based on the principal amounts of the Notes sold by such Dealer, depending upon maturity, for sales made through it as the Dealer.

The Issuers may also sell Notes to the Dealers as principals for their own accounts at a discount to be agreed upon at the time of sale, or the purchasing Dealer may receive from the relevant Issuer a commission or discount equivalent of that described in the preceding paragraph in the case of any such principal transaction in which no other discount is agreed. In addition, the Notes may be sold from time to time through syndicates of financial institutions, for which a Dealer shall act as lead manager. Such Notes may be resold at prevailing market prices, or at prices related thereto, at the time of such resale, as determined by the relevant Dealer. The Issuer and the Dealers reserve the right to offer and sell the Notes of one or more prices that differ from the Issue Price.

The Issuers have reserved the right to sell Notes directly on their own behalf and have agreed with the Dealers that in such event they will comply with the restrictions described in this "Subscription and Sale" section as if they were Dealers. In the case of any sale by an Issuer directly, no commissions will be payable with respect to such sale.

The Issuers have agreed to indemnify the Dealers against certain liabilities and expenses.

The following selling restrictions may be modified by the Issuers and the relevant Dealers following a change in the relevant law, regulation or directive. Any such modification will be set out in the Final Terms issued in respect of the Series to which it is related or in a supplement to this Base Prospectus.

### United States

Neither the Notes nor, where applicable, the Guarantees have, or will be, registered under the Securities Act and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons except in transactions exempt from, or not subject to, the registration requirements of the Securities Act. Terms used in this paragraph have the meanings given to them in Regulation S.

Each Dealer represents, warrants and agrees that (a) except to the extent permitted under United States Treasury Regulation §1.163-5(c)(2)(i)(D) (the "*D Rules*"), (i) it has not offered or sold, and during the restricted period will not offer or sell, any Notes in bearer Form to a person who is within the United States or its possessions or to a United States person and (ii) it has not delivered and will not deliver within the United States or its possessions any Definitive Notes in bearer Form that are sold during the restricted period; (b) it has and throughout the restricted period will have in effect procedures reasonably designed to ensure that its employees or agents who are directly engaged in selling Notes in bearer Form are aware that such Notes may not be offered or sold during the restricted period to a person who is within the United States or its possessions or to a United States person, except as permitted by the D Rules; (c) if it is a United States person, it is acquiring the Notes in bearer Form for the purposes of resale in connection with their original issuance and if it retains Notes in bearer Form for its own account, it will only do so in accordance with the requirements of United States Treasury Regulation §1.163-5(c)(2)(i)(D)(6); and (d) with respect to each affiliate that acquires from it Notes in bearer Form for the purpose of offering or selling such Notes during the restricted period, such Dealer repeats and confirms the representations and agreements contained in this Subscription and Sale section. Terms used in this paragraph have the meanings given to them by the United States Internal Revenue Code and regulations thereunder, including the D Rules.

Each Dealer has severally agreed, and each further Dealer appointed under the Program will be required to agree, with the Issuers and the Guarantor (in its capacity as such) that, except as permitted by the Distribution Agreement, it will not offer, sell or deliver the Notes (a) as part of their distribution at any time

or (b) otherwise until 40 days after the completion of the distribution of the Series of which such Notes are a part, as determined and certified to the relevant Issuer by such Dealer (or, in the case of a Series of Notes sold to or through more than one Dealer, by each of such Dealers with respect to Notes of such Series purchased by or through it, in which case the relevant Issuer shall notify each such Dealer when all such Dealers have so certified), other than in accordance with Regulation S or, in the case of Notes sold in the United States, Rule 144 A, and it will have sent to each Dealer to which it sells Notes during the distribution compliance period (other than pursuant to Rule 144A) a confirmation or other notice setting forth the restrictions on offers and sales of the Notes within the United States or to, or for the account or benefit of, U.S. persons. Each Dealer has represented and agreed that neither it, nor its affiliates nor any persons acting on its or their behalf have engaged or will engage in any directed selling efforts with respect to the Notes, and it and they have complied and will comply with the offering restrictions requirements of Regulation S. In addition, each Dealer has represented and agreed that neither it, nor its affiliates, nor any person acting on its or their behalf has engaged or will engage in any form of general solicitation or general advertising (as those terms are used in Rule 502(c) under the Securities Act) in connection with any offer or sale of Notes in the United States. Terms used in the preceding sentence have the meanings given to them in Regulation S.

In addition, until 40 days after the later of commencement of the offering of any Series of Notes and the Issue Date therefor, an offer or sale of Notes of such Series within the United States by a Dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act if such offer or sale is made otherwise than in accordance with Rule 144A.

Each prospective Purchaser of Notes pursuant to Rule 144A will, by accepting delivery of this Base Prospectus and by its purchase of such Notes, be deemed to have represented and agreed as follows:

(1)     it acknowledges that this Base Prospectus is personal to it and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Notes other than pursuant to Rule 144A or in offshore transactions to non-U.S. persons in accordance with Regulation S. Distribution of this Base Prospectus, or disclosure of any of its contents to any person other than such prospective purchaser and those persons, if any, retained to advise such prospective purchaser with respect thereto, is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuers, is prohibited; and

(2)     it agrees to make no photocopies of this Base Prospectus or any documents referred to herein and, if it does not purchase Notes or the offering is terminated, to return this Base Prospectus and all documents referred to herein to the Dealer or the affiliate thereof who furnished this Base Prospectus and those documents.

The Distribution Agreement provides that a Dealer nominated by a relevant Issuer may arrange for the placing of Notes in the United States to QIBs. Each purchaser of Notes in reliance on Rule 144A will be deemed to have represented and agreed as follows:

(1)     it is a QIB and it is acquiring such Notes for its own account or for the account of a QIB and it is aware, and each beneficial owner of such Notes has been advised, that the sale of such Notes is being made in reliance on Rule 144A;

(2)     it understands that the Notes are being offered, and may be transferred, only in a transactions not involving any public offering within the meaning of the Securities Act. It understands that none of the Notes have been, or will be, registered under the Securities Act and it agrees, for the benefit of LBHI, the Issuers, the Dealers and their affiliates that, if in the future it decides to offer, resell or otherwise transfer such Notes purchased by it, (A) any offer, sale or transfer of such Notes will be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the relevant Issuer or an affiliate of the Issuer (upon the redemption of such Notes or otherwise); (ii) outside of the United States in a transaction not subject to the registration requirements of the Securities Act pursuant to Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that it reasonably believes is a QIB purchasing for its own account or for the account or for the account of a QIB whom it has

informed, in each case, that the offer, resale or other transfer is being made in reliance on Rule 144A; (iv) to a Dealer; or (v) if available, pursuant to the exemption from the registration requirements of the Securities Act provided by Rule 144 thereunder and that (B) it will, and each subsequent holder is required to, notify any purchaser of these Notes from it of the transfer restrictions referred to in (A) above. It further understands that no representation can be made by LBHI, the Issuers, any Dealer or any of their respective affiliates, representatives or agents as to the availability of the exemption provided by Rule 144 for resales of the Notes; and

(3)   it understands that any Notes purchased pursuant to Rule 144A will be issued in registered form and, in the case of any Notes issued by LBHI and having maturiy of 183 days or less, in minimum denominations of $500,000 and all Notes purchased pursuant to Rule 144A will bear a legend to the following effect:

THIS NOTE HAS NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED STATES. THE OFFER, SALE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS AND RESTRICTIONS, INCLUDING THOSE SET FORTH IN THE AMENDED AND RESTATED FISCAL AGENCY AGREEMENT DATED JULY 24 2008 RELATING TO THIS NOTE. THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT THIS NOTE IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER THAT (A) THIS NOTE MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES AND ONLY (1) TO THE ISSUER OR AN AFFILIATE OF THE ISSUER (UPON REDEMPTION HEREOF OR OTHERWISE), (2) OUTSIDE OF THE UNITED STATES IN A TRANSACTION NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PURSUANT TO REGULATION S UNDER THE SECURITIES ACT, (3) PURSUANT TO AND IN ACCORDANCE WITH RULE 144A UNDER THE SECURITIES ACT TO AN INSTITUTIONAL INVESTOR THAT THE HOLDER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER WHOM THE HOLDER HAS INFORMED, IN EACH CASE, THAT THE OFFER, RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT, (4) TO A DEALER OR (5) IF AVAILABLE, PURSUANT TO THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER AND THAT (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE TRANSFER RESTRICTIONS REFERRED TO IN (A) ABOVE. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT FOR RESALES OF THIS NOTE. IF REQUESTED BY THE ISSUER, THE FISCAL AGENT, THE REGISTRAR OR A DEALER, ANY PURCHASER OF THIS NOTE AGREES TO PROVIDE THE INFORMATION NECESSARY TO DETERMINE WHETHER TRANSFER OF THIS NOTE IS PERMISSIBLE UNDER THE SECURITIES ACT. UNLESS OTHERWISE PROVIDED IN A SUPPLEMENTAL PROSPECTUS, IT IS DEEMED TO REPRESENT THAT IT IS NOT AND FOR SO LONG AS IT HOLDS THE NOTE OR ANY INTEREST THEREIN IT WILL NOT BE AN EMPLOYEE BENEFIT PLAN THAT IS SUBJECT TO PART 4 OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN THAT IS DESCRIBED IN AND IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR ANY

ENTITY THE ASSETS OF WHICH ARE DEEMED TO CONSTITUTE THE ASSETS OF ANY "BENEFIT PLAN INVESTOR" FOR PURPOSES OF SECTION 3(42) OF ERISA, OR OTHERWISE.

(4)   It acknowledges that the Issuers, the Guarantor, the Dealers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements. If it is acquiring any Notes for the account of one or more QIBs it represents that is has sole investment discretion with respect to each such account and that it has full power to make the foregoing acknowledgments, representations and agreements on behalf of each such account.

(5)   It acknowledges that, unless otherwise provided in a supplemental prospectus, it is not and for so long as it holds a Note (or any interest therein) will not be an employee benefit plan that is subject to Part 4 of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan that is described in and is subject to Section 4975 of the Code, or any entity the assets of which are deemed to constitute the assets of any "benefit plan investor" for purposes of Section 3(42) of ERISA, or otherwise.

Each person purchasing Notes from a Dealer or through an affiliate of a Dealer pursuant to Rule 144A acknowledges that (i) it has been afforded an opportunity to request from the relevant Issuer, and to review, and it has received, all additional information considered by it to be necessary to verify the accuracy of the information herein; (ii) it has not relied on any Dealer or any person affiliated with any Dealer in connection with its investigation of the accuracy of the information contained in this Base Prospectus or its investment decision; and (iii) no person has been authorized to give any information or to make any representation concerning the relevant Issuer or the Notes other than those contained in this Base Prospectus and, if given or made, such other information or representation should not be relied upon as having been authorized by the relevant Issuer or any Dealer.

Notes represented by an interest in a Restricted Global Note may also be transferred to a person who wishes to hold such Notes in the form of an interest through an Unrestricted Global Note, but only upon receipt by the Registrar of a written certification from the transferor (in the form set out in Exhibit Q or R, as appropriate, to the Fiscal Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144 (if available) under the Securities Act.

Each Purchaser of Notes outside the United States in reliance on Regulation S will, by accepting delivery of this Base Prospectus and by its purchase of such Notes, be deemed to have represented and agreed as follows:

(1)   it is, or will be at the time Notes are purchased by it, the beneficial owner of such Notes and (a) it is not a U.S. person and it is located outside the United States (within the meaning of Regulation S) and (b) it is not an affiliate of the Issuer or the Guarantor or a person acting on behalf of such an affiliate;

(2)   it understands that the Notes are being offered, and may be transferred, only in transactions not involving any public offering within the meaning of the Securities Act. It understands that none of the Notes have been, or will be, registered under the Securities Act and it agrees, for the benefit of the relevant Issuer, the Dealers and their affiliates that, if prior to the expiration of the distribution compliance period (as defined in Regulation S) it decides to offer, resell or otherwise transfer such Notes purchased by it, any offer, sale or transfer of such Notes will be made in compliance with the Securities Act and other applicable law of the states, territories and possessions of the United States governing the offer and sale of securities and only (i) to the relevant Issuer or an affiliate of the Issuer (upon the redemption of such Notes or otherwise); (ii) outside of the United States in a transaction not subject to the registration requirements of the Securities Act pursuant to Regulation S; (iii) pursuant to and in accordance with Rule 144A to an institutional investor that it reasonably believes is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account of a qualified institutional buyer whom it has informed, in each case, that the offer, resale or other

transfer is being made in reliance on Rule 144A; (iv) to a Dealer; or (v) if available, pursuant to the exemption from the registration requirements of the Securities Act provided by Rule 144 thereunder. It further understands that no representation can be made by, the relevant Issuer, the Guarantor, any Dealer or any of their respective affiliates, representatives or agents as to the availability of the exemption provided by Rule 144 for resales of the Notes;

(3)   It acknowledges that the Issuers, the Guarantor, the Dealers and their affiliates, and others will rely upon the truth and accuracy of the foregoing acknowledgements, representation and agreements.

The Issuers and the Dealers reserve the right to reject any offer to purchase, in whole or part, for any reason, or to sell less than the number of Notes which may be offered pursuant to Rule 144A. This Base Prospectus does not constitute an offer to any person in the United States or to any U.S. person other than any QIB to whom an offer has been made directly by one of the Dealers or an affiliate of one of the Dealers. Distribution of this Base Prospectus to any U.S. person or to any person within the United States, other than those persons, if any, retained to advise it with respect thereto, is unauthorized and any disclosure of any of its contents, without prior written consent of the Issuers, is prohibited.

### Public Offer Selling Restriction under the Prospectus Directive

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "*Relevant Member State*"), each Dealer has represented and agreed, and each further Dealer appointed under the Program will be required to represent and agree, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "*Relevant Implementation Date*") it has not made and will not make an offer of Notes which are the subject of the offering contemplated by this Base Prospectus as completed by the Final Terms in relation thereto (or which are the subject of the offering contemplated by a Drawdown Prospectus, as the case may be) to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of such Notes to the public in that Relevant Member State:

(a)   if the Final Terms or Drawdown Prospectus in relation to the Notes specify that an offer of those Notes may be made other than pursuant to Article 3(2) of the Prospectus Directive in that Relevant Member State (a "*Non-exempt Offer*"), following the date of publication of a prospectus in relation to such Notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, provided that any such prospectus which is not a Drawdown Prospectus has subsequently been completed by the Final Terms contemplating such Non-exempt Offer, in accordance with the Prospectus Directive, in the period beginning and ending on the dates specified in such prospectus or Final Terms, as applicable;

(b)   at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(c)   at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than EUR43,000,000; and (3) an annual net turnover of more than EUR50,000,000, as shown in its last annual or consolidated accounts;

(d)   at any time to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Issuer for any such offer; or

(e)   at any time in any other circumstances falling within Article 3(2) of the Prospectus Directive,

provided that no such offer of Notes referred to in (b) to (e) above shall require the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "*offer of Notes to the public*" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression **Prospectus Directive** means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

### Selling Restrictions Addressing Additional United Kingdom Securities Laws

Each Dealer has represented and agreed and each further Dealer appointed under the Program will be required to represent and agree that:

(a)    *No deposit-taking:* in relation to any Notes having a maturity of less than one year:

    (i)    it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business; and:

    (ii)    it has not offered or sold and will not offer or sell any Notes other than to persons:

        (A)    whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses; or

        (B)    who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses,

where the issue of the Notes would otherwise constitute a contravention of Section 19 of the FSMA by the Issuer;

(b)    *Financial promotion:* it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer or the Guarantor; and

(c)    *General compliance:* it has complied with and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving the United Kingdom.

### Japan

The Notes have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No.25 of 1948, as amended) and, accordingly, each Dealer has undertaken that it will not offer to sell any Notes directly or indirectly, in Japan or to, or for the benefit of, any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person except under circumstances which will result in compliance with all applicable laws, regulations and ministerial guidelines promulgated by the relevant Japanese governmental and regulatory authorities and in effect at the relevant time. For the purposes of this paragraph, "*Japanese Person*" shall mean any person resident in Japan, including any corporation or other entity organised under the laws of Japan.

### Selling Restrictions Addressing Additional Netherlands Securities Laws

For selling restrictions in respect of The Netherlands, see "Public Offer Selling Restriction under the Prospectus Directive" above and the additional restrictions set forth below.

Each Dealer that did or does not have the requisite Dutch regulatory capacity to make offers or sales of financial instruments in The Netherlands will represent and agree with the Issuers that it has not offered or sold or will not offer or sell, respectively, any of the Notes in The Netherlands, other than through one or

more investment firms acting as principals and having the Dutch regulatory capacity to make such offers or sales.

Zero Coupon Notes (as defined below) in definitive form of either LBTCBV, LBHI or LBB may only be transferred and accepted, directly or indirectly, within, from or into The Netherlands through the mediation of either the relevant Issuer or a member firm of Euronext Amsterdam N.V. in full compliance with the Dutch Savings Certificates Act (*Wet inzake Spaarbewijzen*) of 21 May 1985 (as amended) and its implementing regulations. No such mediation is required: (a) in respect of the transfer and acceptance of rights representing an interest in a Zero Coupon Note in global form or (b) in respect of the initial issue of Zero Coupon Notes in definitive form to the first holders thereof or (c) in respect of the transfer and acceptance of Zero Coupon Notes in definitive form between individuals not acting in the conduct of a business or profession, or (d) in respect of the transfer and acceptance of such Zero Coupon Notes within, from or into The Netherlands if all Zero Coupon Notes (either in definitive form or as rights representing an interest in a Zero Coupon Note in global form) of any particular Series are issued outside The Netherlands and are not distributed into The Netherlands in the course of initial distribution or immediately thereafter. As used herein "*Zero Coupon Notes*" are Notes that are in bearer form and that constitute a claim for a fixed sum against the relevant Issuer and on which interest does not become due during their tenor or on which no interest is due whatsoever.

### Selling Restrictions Addressing Additional Italian Securities Laws

The offering of the Notes has not been registered pursuant to the Italian securities legislation and, accordingly, each of the Dealers has represented and agreed that it has not offered or sold, and will not offer or sell, any Notes in the Republic of Italy in a solicitation to the public unless the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71 and relevant Italian CONSOB regulations, and that sales of the Notes in the Republic of Italy shall be effected in accordance with all Italian securities, tax and exchange control and other applicable laws and regulation.

Accordingly, each of the Dealers has represented and agreed that it will not offer, sell or deliver any Notes or distribute copies of the Base Prospectus and any other document relating to the Notes in the Republic of Italy except:

(1)　to "*Professional Investors*", as defined in Article 31.2 of CONSOB Regulation No. 11522 of 1 July 1998, as amended ("*Regulation No. 11522*"), pursuant to Article 30.2 and 100 of Legislative Decree No. 58 of 24 February 1998, as amended ("*Decree No. 58*");

(2)　in a solicitation to the public provided that the Base Prospectus has been authorised in accordance with chapter IV of the Prospectus Directive No. 2003/71, Decree No. 58 and CONSOB Regulation No. 11971 of 14 May 1999, as amended; or

(3)　in any other circumstances where an express exemption from compliance with the solicitation restrictions applies, as provided under Decree No. 58 or CONSOB Regulation No. 11971 of 14 May 1999, as amended.

Any such offer, sale or delivery of the Notes or distribution of copies of the Base Prospectus or any other document relating to the Notes in the Republic of Italy must be:

(a)　made by investment firms, banks or financial intermediaries permitted to conduct such activities in the Republic of Italy in accordance with Legislative Decree No. 385 of 1 September 1993 as amended ("*Decree No. 385*"), Decree No. 58, CONSOB Regulation No. 11522 and any other applicable laws and regulations; and

(b)　in compliance with any other applicable notification requirement or limitation which may be imposed by CONSOB or the Bank of Italy.

### Provisions relating to the secondary market in Italy

Investors should also note that, in any subsequent distribution of the Notes in the Republic of Italy, Article 100-bis of Decree No. 58 may require compliance with the law relating to public offers of securities.

Furthermore, where the Notes are placed solely with professional investors and are then systematically resold on the secondary market at any time in the 12 months following such placing, purchasers of Notes who are acting outside of the course of their business or profession may in certain circumstances be entitled to declare such purchase void and to claim damages from any authorised person at whose premises the Notes were purchased, unless an exemption provided for under Decree No. 58 applies.

### Australia

No prospectus or other disclosure document (as defined in the Corporations Act) in relation to the Program or any Notes has been or will be lodged with the Australian Securities and Investments Commission ("*ASIC*"). Each Dealer has represented and agreed and each further Dealer appointed under the Program will be required to represent and agree that, unless the relevant Final Terms (or a supplement to the Base Prospectus) otherwise provides, it:

(a)    has not (directly or indirectly) offered or invited applications, and will not offer or invite applications, for the issue, sale or purchase of the Notes, in, to or from Australia (including an offer or invitation which is received by a person in Australia); and

(b)    has not distributed or published, and will not distribute or publish, any Base Prospectus or other offering material or advertisement relating to any Notes in Australia,

unless (i) the aggregate consideration payable by each offeree is at least A$500,000 (or the equivalent in other currencies but disregarding moneys lent by the offeror or its associates); (ii) the offer or invitation otherwise does not require disclosure to investors under Part 6D.2 of the Corporations Act; (iii) such action complies with all applicable laws, regulations and directives; and (iv) such action does not require any document to be lodged with ASIC.

### New Zealand

No action has been or will be taken in relation to the Program or any Notes which would permit a public offering of any of the Notes, or possession or distribution of any offering material in relation to the Notes, in New Zealand. Each Dealer has represented and agreed, and each further Dealer appointed under the Program will be required to represent and agree, that:

(a)    it has not offered or sold, and will not offer or sell, directly or indirectly, any Notes; and

(b)    it has not distributed and will not distribute, directly or indirectly, any offering materials or advertisements in relation to any offer of Notes,

in each case in New Zealand other than:

(i)     to persons whose principal business is the investment of money or who, in the course of and for the purposes of their business, habitually invest money within the meaning of section 3(2)(a)(ii) of the Securities Act 1978 of New Zealand; or

(ii)    to persons who are each required to pay a minimum subscription price of at least NZ$500,000 for the Notes (disregarding any amount lent by the offeror, the Issuer or any associated person of the offeror or Issuer) before the allotment of those Notes and who have a minimum holding of the Notes of at least NZ$500,000; or

(iii)   in other circumstances where there is no contravention of the Securities Act 1978 of New Zealand.

### Singapore

Each Dealer has acknowledged that this Base Prospectus has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, each Dealer has represented, warranted and agreed that it has not offered or sold any Notes or caused the Notes to be made the subject of an invitation for subscription or purchase and will not offer or sell any Notes or cause the Notes to be made the subject

of an invitation for subscription or purchase, and has not circulated or distributed, nor will it circulate or distribute, this Base Prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Notes, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "*SFA*"), (ii) to a relevant person pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Each Dealer has further represented, warranted and agreed to notify (whether through the distribution of this Base Prospectus or otherwise) each of the following relevant persons specified in Section 275 of the SFA which has subscribed or purchased Notes from or through such Dealer, namely a person which is:

(a)    a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)    a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an individual who is an accredited investor,

that shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferable for six months after that corporation or that trust has acquired the Notes under Section 275 of the SFA except:

(1)    to an institutional investor under Section 274 of the SFA or to a relevant person (as defined in Section 275(2) of the SFA) and in accordance with the conditions, specified in Section 275 of the SFA;

(2)    (in the case of a corporation) where the transfer arises from an offer referred to in Section 275(1A) of the SFA, or (in the case of a trust) where the transfer arises from an offer that is made on terms that such rights or interests are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets;

(3)    where no consideration is or will be given for the transfer; or

(4)    by operation of law.

**General**

Each Dealer has severally agreed with the Issuers that it will observe all applicable laws and regulations in any country or jurisdiction in which it may offer, sell or deliver Notes and that it will not, directly or indirectly, offer, sell or deliver Notes or distribute or publish any prospectus, circular, advertisement or other offering material in relation to the Notes in or from any country or jurisdiction except under circumstances that will to the best of its knowledge and belief result in compliance with any applicable laws and regulations and all offers, sales and deliveries of Notes by it will be made on the foregoing terms.

Each purchaser of Notes must observe all applicable laws and regulations in any jurisdiction in which it may offer, sell, or deliver the Notes and it may not, directly or indirectly, offer, sell, resell, reoffer or deliver any Notes or distribute this Base Prospectus or any circular, advertisement or other offering material (including, without limitation, any supplement to this Base Prospectus) in any country or jurisdiction except under circumstances that will result, to the best of its knowledge and belief, in compliance with all applicable laws and regulations.

The restrictions on offerings may be modified by the agreement of the Issuers and the Dealers following a change in a relevant law, regulation or directive. Any such modification will be set forth in the relevant Final Terms or in a supplement to this Base Prospectus.

## GENERAL INFORMATION

1.  The consolidated financial statements for the years ended November 30, 2006 and November 30, 2007 of LBHI have been prepared in accordance with generally accepted accounting principles in the United States and have been reported upon without qualification for LBHI by Ernst & Young LLP, certified public accountants, which has its principal place of business at 5 Times Square, New York, New York 10036, U.S.A. Ernst & Young LLP is an independent registered public accounting firm with respect to LBHI and its subsidiaries within the meaning of the Securities Act of 1933, as amended and the applicable rules and regulations thereunder adopted by the Securities and Exchange Commission and the Public Company Accounting Oversight Board (United States) (PCAOB). The financial statements for the years ended November 30, 2006 and November 30, 2007 of LBTCBV have been prepared in accordance with generally accepted accounting principles in The Netherlands and have been reported upon without qualification by Ernst & Young Accountants, Amsterdam, certified public accountants of NIvRA (*Nederlands Instituut voor Register Accountants*), Drentestraat 20, 1083 HK Amsterdam, P.O. Box 7883, 1008 AB Amsterdam, The Netherlands. The financial statements for the years ended November 30, 2006 and November 30, 2007 of LBB have been prepared on the basis of generally accepted accounting principles in the Federal Republic of Germany and have been audited by Ernst & Young AG Wirtschaftsprüfungsgesellschaft, independent auditors of the Institut der Wirtschaftsprüfer (Institute of Public Auditors in Germany), Eschersheimer Landstr. 14, D-60322 Frankfurt am Main. Ernst & Young AG Wirtschaftsprüfungsgesellschaft issued unqualified auditor's reports thereon.

2.  Since May 31, 2008, the date to which the latest unaudited consolidated financial statements of LBHI were prepared, there has been no significant change in the consolidated financial or trading position of LBHI (which includes LBTCBV and LBB) and, save as disclosed in the Information Incorporated by Reference, since November 30, 2007, the date to which the latest audited consolidated financial statements of LBHI were prepared, there has been no material adverse change in the prospects of LBHI and its subsidiaries. Since November 30, 2007, the date to which the latest audited financial statements of LBTCBV were prepared, there has been no significant change in the financial or trading position of LBTCBV, and there has been no material adverse change in the prospects of LBTCBV. Since November 30, 2007, the date to which the latest audited financial statements of LBB were prepared, there has been no significant change in the financial or trading position of LBB and there has been no material adverse change in the prospects of LBB.

3.  Except as otherwise disclosed in this Base Prospectus, neither LBHI nor any of its subsidiaries (including LBTCBV and LBB) is or has been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which LBHI, LBTCBV or LBB is aware) during the 12 months before the date of this Base Prospectus which may have, or have had in the recent past, significant effects on the financial position or profitability of the Group, LBTCBV or LBB.

4.  The authority to approve issuance of debt in the Euro markets, including the issuance of the Guarantee, was delegated to the Executive Committee of the Board of Directors of LBHI pursuant to resolutions (the "*Resolutions*") adopted by the Board of Directors of LBHI as of September 28, 1998. The Executive Committee of the Board of Directors of LBHI, in accordance with the provisions of the Resolutions, authorized the Guarantees on the Notes issued thereunder by LBTCBV or LBB, as the case may be, on July 23, 2007. The Program was authorized pursuant to resolutions of the Board of Managing Directors of LBTCBV passed on March 31, 1995, August 12, 2002, August 19, 2003, August 17, 2004, August 17, 2005, August 3, 2006, July 23, 2007 and July 22, 2008. This Program was authorised pursuant to resolutions of the Board of Directors of LBB passed on August 18, 2003, August 18, 2004 and August 17, 2005.

5.  From the date hereof and during the lifetime of the Program copies of the following documents in physical and/or electronic form, and English translations thereof where relevant, may be inspected during normal business hours on any weekday (excluding Saturdays) at the principal place of business and registered office of LBHI (in its capacity as Issuer and as Guarantor), at the registered office of

LBTCBV, at the registered office of LBB, at the offices of the Fiscal Agent in London and at the office of the listing agent in Singapore referred to in this Base Prospectus:

(a)    the Restated Certificate of Incorporation and the Amended and Restated By-Laws of LBHI, the Deed of Incorporation ("*akte van oprichting*") and the amended Articles of Association ("*statuten*") of LBTCBV and the Articles of Association ("*Satzung*") of LBB;

(b)    the audited consolidated financial statements of LBHI (including the audit report thereon) for each of the years ended November 30, 2006 and November 30, 2007, together with the quarterly interim unaudited consolidated financial statements for the three months ended February 28, 2008 and for the three months ended May 31, 2008;

(c)    the audited financial statements of LBTCBV (including the audit report thereon) for the years ended November 30, 2006 and November 30, 2007. No publicly available interim financial statements financial statements are currently prepared by LBTCBV;

(d)    the audited financial statements of LBB (including the audit report thereon) for the years ended November 30, 2006 and November 30, 2007. No publicly available interim financial statements financial statements are currently prepared by LBB;

(e)    the Amended and Restated Fiscal Agency Agreement dated July 24, 2008 and any amendments or supplements thereto;

(f)    the Amended and Restated Distribution Agreement dated July 24, 2008 and any amendments or supplements thereto;

(g)    the Deed of Covenant dated July 24, 2008 and any amendments or supplements thereto;

(h)    each of the Guarantee Agreements dated July 24, 2008 and any amendments or supplements thereto;

(i)    each Calculation Agency Agreement;

(j)    each Final Terms (for issues of listed Notes);

(k)    any Drawdown Prospectus (for issues of listed notes);

(l)    the Base Prospectus and all amendments and supplements thereto; and

(m)    in the case of each issue of listed Notes subscribed pursuant to a subscription agreement, the subscription agreement (or equivalent document).

If Australian Domestic Notes or New Zealand Domestic Notes are issued by LBTCBV or LBHI, as the case may be, the relevant Deed Poll, the relevant Agency and Registry Services Agreement and (if required) the relevant Issuing and Payment Administration Agreement in relation to the Australian Domestic Notes or New Zealand Domestic Notes may be inspected during normal business hours on any weekday (excluding Saturdays) at the principal place of business and registered office of LBTCBV or LBHI, as the case may be, and at the office of the Australian Registrar in Sydney or the New Zealand Registrar in Auckland as the case may be, as specified in the applicable Final Terms.

6.    Regulations in Australia and certain laws in New Zealand restrict or prohibit payments, transactions and dealings with assets having a prescribed connection with certain countries or named individuals or entities subject to international sanctions or associated with terrorism.

7.    Notes have been accepted for clearance through DTC and Euroclear and Clearstream, Luxembourg. The Common Code, the ISIN and the CUSIP number for each Series of Notes will be set out in the relevant Final Terms.

8.    Neither LBHI, LBTCBV nor LBB intends to publish any post issuance information in relation to any securities, index or other product underlying such Note.

### PRINCIPAL PLACE OF BUSINESS OF LBHI

**Lehman Brothers Holdings Inc.**
745 Seventh Avenue
New York, New York 10019

### REGISTERED OFFICE OF LBTCBV

**Lehman Brothers Treasury Co. B.V.**
Strawinskylaan 3105
1077 ZX Amsterdam

### REGISTERED OFFICE OF LBB

**Lehman Brothers Bankhaus AG**
Rathenauplatz 1, D-60313
Frankfurt am Main

### LONDON BRANCH OF LBHI AND LBB

25 Bank Street
London E14 5LE

### ARRANGER

**Lehman Brothers
International (Europe)**
25 Bank Street
London E14 5LE

### DEALERS

**Lehman Brothers
International (Europe)**
25 Bank Street
London E14 5LE

**Lehman Brothers Inc.**
745 Seventh Avenue
New York, NY 10019

### FISCAL AGENT, PRINCIPAL PAYING AGENT

### REGISTRAR, EXCHANGE AGENT AND U.S. SUB-PAYING AGENT

**The Bank of New York Mellon, acting through
its London Branch**
One Canada Square
London E14 5AL

**The Bank of New York Mellon, acting through
its New York Branch**
101 Barclay Street
New York, New York 10028

### IRISH LISTING AGENT

**The Bank of New York Mellon**
One Canada Square
London E14 5AL

## LEGAL ADVISORS TO THE ISSUERS

*as to United States Law*

**Andrew M.W. Yeung**
Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019

## LEGAL ADVISORS TO THE DEALERS

*as to English Law*

**Clifford Chance LLP**
10 Upper Bank Street
London E14 5JJ

*as to German law*

**Clifford Chance
Partnerschaftsgesellschaft**
Mainzer Landstraße 46
D-60325 Frankfurt am Main

*as to Netherlands Law*

**Clifford Chance LLP**
Droogbak 1A
1013 GE Amsterdam

*as to Australian law*

**Mallesons Stephen Jaques**
Level 61
Governor Phillip Tower
1 Farrer Place
Sydney NSW 2000

*as to New Zealand law*

**Russell McVeagh**
Vero Centre
48 Shortland Street
PO Box 8
Auckland

*as to United States Law*

**Clifford Chance
US LLP**
31 West 52nd Street
New York, NY 10019-6131

*as to Singapore Law*

**Wong Partnership**
One George Street
20th Floor
Singapore 049145

**AUDITORS OF LBHI**

Ernst & Young LLP
5 Times Square
New York
New York 10036

**AUDITORS OF LBTCBV**

Ernst & Young Accountants,
Amsterdam
Drentestraat 20
1083 HK
Amsterdam

**AUDITORS OF LBB**

Ernst & Young AG
Wirtschaftsprüfungsgesellschaft
Eschersheimer Landstr. 14
D-60322 Frankfurt am Main