Hearing Date: June 17, 2009 at 2:00 p.m. (EST)
Objection Date: June 12, 2009 at 12:00 noon (EST)

| | |
|---|---|
| Katherine Darras | Joshua Cohn |
| Rosario Chiarenza | Vinod Aravind |
| International Swaps and Derivatives Association, Inc. | Allen & Overy LLP |
| 360 Madison Avenue | 1221 Avenue of the Americas |
| New York, NY 10017 | New York, NY 10020 |
| (212) 901-6000 | (212) 610-6300 |

*ATTORNEYS FOR THE INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC., AS AMICUS CURIAE*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

---

**BRIEF AND MEMORANDUM OF LAW OF AMICUS CURIAE IN SUPPORT OF VARIOUS DERIVATIVES COUNTERPARTIES' OBJECTIONS TO THE DEBTORS' MOTION FOR ESTABLISHMENT OF THE DEADLINE FOR FILING PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER OF <u>NOTICE THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM</u>**

# TABLE OF AUTHORITIES

## CASES

In re Burkett,
   329 B.R. 820 (Bankr. S.D. Ohio 2005) .................................................................. 3, 6

In re Congoleum Corp.,
   No. 03-51524, 2008 WL 314699 (Bankr. D.N.J. Feb. 4, 2008) ................................... 5

In re Handy Andy Home Improv. Centers, Inc.,
   199 B.R. 276 (Bankr. N.D. Ill. 1996) ............................................................................ 7

In re Hughes,
   313 B.R. 205 (Bankr. E.D. Mich. 2004) ........................................................................ 6

In re Irons,
   343 B.R. 32 (Bankr. N.D.N.Y. 2006) ............................................................................ 5

In re Reilly,
   245 B.R. 768 (B.A.P 2d Cir. 2000) ............................................................................... 6

In re Shank,
   315 B.R. 799 (Bankr. N.D. Ga. 2004) ........................................................................... 6

In re Stoecker,
   5 F.3d 1022 (7th Cir. 1993) ............................................................................................ 8

In re Waterman S.S. Corp.,
   200 B.R. 770 (Bankr. S.D.N.Y. 1996) .......................................................................... 6

## RULES AND STATUTES

11 U.S.C. § 101(53B) ............................................................................................................ 9

11 U.S.C. § 107(b) ................................................................................................................. 7

11 U.S.C. § 362(b)(17) .......................................................................................................... 9

11 U.S.C. § 546(g) ................................................................................................................. 9

11 U.S.C. § 560 ...................................................................................................................... 9

11 U.S.C. § 561 ...................................................................................................................... 9

Fed. R. Bankr. P. 1001 ................................................................................................... 9

Fed. R. Bankr. P. 3001 ............................................................................................... 5, 6

Fed. R. Bankr. P. 9018(1) ............................................................................................. 7

## OTHER AUTHORITIES

136 Cong. Rec. S7534-01 (June 6, 1990) ............................................................................ 3

**TABLE OF CONTENTS**

| | |
|---|---|
| STATEMENT OF INTEREST | 1 |
| PRELIMINARY STATEMENT | 2 |
| ARGUMENT | 4 |
| CONCLUSION | 9 |

The International Swaps and Derivatives Association, Inc. ("ISDA") respectfully submits this memorandum in support of the objections of various derivatives counterparties (the "Counterparties") to the Debtors' Motion for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice thereof and Approval of the Proof of Claim Form (the "Motion"), to the extent such Counterparties have briefed the issues treated below.

## STATEMENT OF INTEREST

ISDA, which represents participants in the privately negotiated derivatives industry, is the largest global financial trade association by number of member firms. ISDA was chartered in 1985 and today has over 825 member institutions from 57 countries on six continents. These members include most of the world's major institutions that deal in privately negotiated derivatives, as well as many of the businesses, governmental entities and other end users that rely on over-the-counter derivatives to manage efficiently the risks inherent in their core economic activities.

Since its inception, ISDA has pioneered efforts to identify and reduce the sources of risk in the derivatives and risk management industry. Among its most notable accomplishments are: developing the ISDA Master Agreement; publishing a wide range of related documentation materials and instruments covering a variety of transaction types; producing legal opinions for its members on the enforceability of netting and collateral arrangements; securing recognition of the risk-reducing effects of netting in determining capital requirements; promoting sound risk management practices; and advancing the understanding and treatment of derivatives and risk management from public policy and regulatory capital perspectives. ISDA played a significant role in the development and drafting of the Bankruptcy Code's safe harbors for swap agreements.

1

ISDA Master Agreements serve as the contractual foundation for more than 90% of derivatives transactions globally, including, presumably, those transactions involved in this case.

## PRELIMINARY STATEMENT

The Motion states that the Debtors were party to more than 906,000 derivatives contracts and that these derivatives contracts were often documented under an ISDA Master Agreement.[1] Motion at ¶ 21. The Debtors argue that because the valuation of claims arising under derivatives contracts is a complex process that may require market quotations or other calculations, the substantiation of derivatives claims will require the submission of "massive amounts of data on printed pages". Id. The Debtors propose that holders of derivatives contracts submit, in addition to a proof of claim, an electronic questionnaire relating to each derivatives contract and the valuation methodology of any claims arising under the contract (the "Derivative Questionnaire"), along with a wide variety of supporting documentation in electronic form.[2] The Debtors propose to create a new website, not yet unveiled, that would require claimants to manually enter trade-specific information prior to uploading, on a trade-by-trade basis, electronic versions of requested transaction documentation. Id. Under the proposed order, any claimant that fails to file a proof of claim in accord with the above procedures would be "forever barred, estopped, and enjoined from asserting such claim against the Debtors". Motion at ¶ 26.

The Debtors' proposed procedures relating to derivatives contracts (and guarantees relating to derivatives contracts) are unjust, inexpedient, and costly. The proposed procedures unduly burden the Debtor's derivatives counterparties by reversing the usual burden of proof

---

[1] Copies of the 1992 ISDA Master Agreement and 2002 ISDA Master Agreement, the dominant editions of the ISDA Master Agreement, are attached hereto as Exhibits 1 and 2, respectively.
[2] Holders of claims based on a guarantee by a Debtor of another entity's obligations under a Derivative Contract must submit a Proof of Claim, a Derivative Questionnaire (again, with supporting documentation in electronic form) and a separate questionnaire relating to the guarantee.

relating to claims under the Bankruptcy Code and Rules. The proposed procedures rob Debtors' derivatives counterparties' claims of the *prima facie* validity that is their due. They require derivatives counterparties to provide a level of detail in their initial proofs of claim that greatly exceeds the requirements of the Bankruptcy Rules and goes beyond what any other class of claimants in this proceeding must produce. Debtors' requirements would go far beyond what the ISDA Master Agreement itself requires in the ordinary default setting. This discrimination against derivatives claimants is implicitly at odds with well-established Congressional intent to protect the derivatives markets from the full disruptive effect of bankruptcy proceedings. C.f. 136 Cong. Rec. S7534-01 (June 6, 1990) (statement of Sen. Deconcini) (noting that the effect of the swap safe harbor provisions is to allow "the terms of a swap agreement to apply notwithstanding the bankruptcy filing").

The Debtors proposed procedures are wasteful on their face. A large portion of the Debtors' derivatives positions will be readily identifiable and reconcilable against those claimed on the basis of either the Debtors' own substantial records (including records of prior, ordinary course trade reconciliations) or third party data resources accessible to the Debtors (e.g., the DTCC Deriv/SERV LLC Automated Confirmation and Matching System and Trade Information Warehouse). Furthermore, in a large number of cases, the Debtors will be happy to accept claimants' valuation results without any need for inquiry or additional documentation. Finally, we must observe that the Debtors, without legitimate reason, would require claimants to provide an ocean of material, much of which is irrelevant or unnecessary. Wading through this ocean will ultimately waste the Debtors' resources, to the detriment of all creditors, thereby undermining the intended efficiency of the claims adjudication process. See In re Burkett, 329 B.R. 820, 829 (Bankr. S.D. Ohio 2005).

3

ISDA respectfully submits that while it is inescapable that the review and valuation of some claims will take time and effort, the Debtors' motion inappropriately shifts the cost of this exercise with respect to the entire Lehman portfolio on an anticipatory and speculative basis to all derivatives contract counterparties. While the relative burden of these costs may be variable from claimant to claimant, they represent an enormous and unfair cost to the derivatives market as a whole.

## ARGUMENT

The Motion seeks an order establishing a bar date,[3] as well as procedures for the filing of proofs of claim. The Motion requires that a claimant under a derivatives contract must include with its claim "copies of all master agreements, schedules, netting arrangements, confirmations, credit support documentation, guarantees *and other documents relating to the transaction*". Motion at Ex. C., p 2 (emphasis added). Under the Debtors' motion, a failure to include such information presumably for even one derivatives contract results in a claim being barred. Motion at ¶ 26. As further described below, Debtors' proposed Motion is at odds with the established standards of the Bankruptcy Rules and customary practice in the derivatives market.

It is understood that a claimant must produce a threshold level of evidence identifying and supporting its claims. The proposed requirement that derivatives counterparties submit an array of additional documentation supporting their claims, however, contradicts the allocation of the burden of proof firmly established in the Bankruptcy Code, the Bankruptcy Rules, and case law. The Bankruptcy Rules make clear that a proof of claim consists of a written statement

---

[3] ISDA is not opposed to the establishment of a claims bar date, but notes that the Debtors' proposed claims submission procedures will make compliance with the proposed bar date difficult for ISDA members. To the extent that the proposed (or similar) procedures are established, the claims bar date should be adjusted to take into account the logistical difficulties derivatives claimants may face.

4

executed by the claimant or its agent that "conform[s] substantially to the appropriate Official Form", i.e., Bankruptcy Form 10. See Fed. R. Bankr. P. 3001(a), (b). A claim that is based on a writing should include the original or a duplicate of such writing. See Fed. R. Bankr. P. 3001(c). The requirements of Bankruptcy Form 10 are self-evidently modest. Although Bankruptcy Form 10 is not "set in stone", any deviation from the standard the form sets should be reasonably related to facilitating the claims process and should not be unduly burdensome on the claimants. See, e.g., In re Congoleum Corp., No. 03-51524, 2008 WL 314699, at *3 (Bankr. D.N.J. Feb. 4, 2008). Debtors' proposed procedures, however, will require substantial time- and labor-intensive collecting, formatting and uploading of materials (see Motion at ¶ 21), and will add enormously to the burden imposed on derivatives contracts claimants, particularly considering the Debtors acknowledge that they are party to more than 900,000 derivatives contracts. Further, Bankruptcy Form 10 does not require the claimant to provide *any* calculations regarding the amount of a claim; indeed, where the documents supporting a claim are voluminous (as is the case with respect to large quantities of transaction confirmations), the form allows a claimant to provide a summary of the documents. See Bankruptcy Form 10; Fed. R. Bankr. P. 3001 (advisory comments). The right to summarize extends to discrete transactional information in cases involving numerous transactions. See, e.g., In re Irons, 343 B.R. 32, 40 (Bankr. N.D.N.Y. 2006) (noting, with respect to credit card transactions, that "[r]equiring transactional data for every transaction that the creditor has included within their claim could become so voluminous as to burden the parties involved. In such an instance, courts have allowed summaries of the writings that created the debt.").

The rationale behind Rule 3001 and Bankruptcy Form 10 is two-fold. First, the "attachments required by the rule and form are intended to enable the debtor or trustee to

5

evaluate the claim's amount and validity and to challenge, when necessary, portions of the claim that may be inaccurate". <u>In re Burkett</u>, 329 B.R. 820, 827 (Bankr. S.D. Ohio 2005) (citations omitted); <u>see also</u> <u>In re Hughes</u>, 313 B.R. 205, 212 (Bankr. E.D. Mich. 2004) (stating that the claims form merely requires "creditors to provide sufficient information so that a Debtor may identify the creditor and match the creditor and the amount of claim with the claims scheduled by the Debtor"). Second, the rules governing claims are "intended to simplify the claims allowance process and provide a *fair and inexpensive process for all parties including creditors*." <u>In re Burkett</u>, 329 B.R. at 826 (emphasis added); <u>In re Shank</u>, 315 B.R. 799, 814 (Bankr. N.D. Ga. 2004) (stating that the rules are designed to ensure "a *fair and inexpensive procedure* for the proper determination of claims on the merits.")

A proof of claim that is submitted in accordance with the Rules constitutes *prima facie* evidence of the validity and amount of such claim. Fed. R. Bankr. P. 3001(f). To overcome this *prima facie* evidence, the Debtors must object to the claim and provide evidence which would refute at least one of the elements essential to the claim. <u>In re Reilly</u>, 245 B.R. 768, 773 (B.A.P 2d Cir. 2000); <u>In re Waterman S.S. Corp.</u>, 200 B.R. 770 (Bankr. S.D.N.Y. 1996). Once the Debtor has objected to the claim, the burden of proof shifts back to the Claimant. <u>See</u> <u>In re Reilly</u>, 245 B.R. at 773 ("Once the presumption [of validity] is overcome, the ultimate burden to establish the validity of the claim in placed on the creditor" (citing the Federal Bankruptcy Rules of Procedure, Advisory Committee Notes, Rule 3001(f)).

The ISDA Master Agreement (in its multiple forms) establishes the standard in the industry for making a claim against a defaulting counterparty with regard to terminated transactions. Section 6(d) of the ISDA Master Agreement and related provisions establish a

6

standard of reasonableness. See 1992 ISDA Master Agreement and 2002 ISDA Master Agreements at Section 6(d); 1992 ISDA Master Agreement at Section 14, definition of "Loss"; 2002 ISDA Master at Section 14, definition of "Close-out Amount". The information the Motion would require, however, goes well beyond the scope of information to which a derivatives counterparty receiving a valuation notice in a pre-insolvency setting would be entitled under the terms of the ISDA Master Agreement. See ISDA Master Agreement at Section 6(d). Although we understand that the Bankruptcy Rules may require some additional information, we believe that the standard of reasonableness set in the ISDA Master Agreement should guide the Court in determining, for the entire class of derivatives counterparties, what information is required to establish a proof of claim.

Essentially, the proposed procedures permit the Debtors to engage in a preemptive, informal discovery process. Were the typical Rule 2004 pre-litigation examination process to be followed, various protections would be available to all parties. See, e.g.; 11 U.S.C. § 107(b); Fed. R. Bankr. P. 9018(1); In re Handy Andy Home Improv. Centers, Inc., 199 B.R. 276 (Bankr. N.D. Ill. 1996) (noting that protection orders are available for confidential trade information in response to a Rule 2004 request for document production). On their face, the proposed procedures would not offer such protections. For example, the proposed procedures would require claimants to reveal confidential valuation methodologies. See, e.g. Motion at Ex. C (Derivative Questionnaire), Section (e) (requiring that claimants provide narrative descriptions of the methodology employed, including "how quotations, if any, were utilized and all other inputs, assumptions, values and applicable parameters"). Such valuation methodologies are themselves highly sensitive, valuable assets that are not disclosed between counterparties in the normal course. If the proposed claims procedures are allowed, it is incumbent upon the Court to make

7

adequate provision for the protections of proprietary valuation methodologies and other confidential information and to ensure that other evidentiary proprieties are observed.

Debtors proposed procedures require derivatives counterparties to submit a substantial (*but still undefined and ultimately discretionary*) amount of additional documentation. The Motion thus would allow the Debtors to decide, post-hoc, whether a claim has (or has not) included sufficient information. Instead of being forced to request additional information or dispute the validity of the claim on the basis of its own trade information, the Debtors will be able to raise the formalistic argument that a claimant's claim submission does not include each "document relating to the transaction" (Motion at Ex 2, p 2) and should therefore be barred. This is an extreme proposal: as Judge Posner has noted, "[i]f the documentation [relating to a proof of claim] is missing, the creditor cannot rest on the proof of claim. It does not follow that he is forever barred from establishing the claim. Nothing in the principles or practicalities of bankruptcy or in the language of any rule or statute justifies so disproportionate a sanction for a harmless error." In re Stoecker, 5 F.3d 1022, 1028 (7th Cir. 1993). This is especially true if the Debtors are provided with trade identification numbers, or, through third party providers such as the DTCC or their own records, already have access to other information, that would enable them to identify and reconcile trade amounts and counterparties.

Derivatives counterparties that file a proof of claim in accordance with the Bankruptcy Code and Rules should be entitled to the same evidentiary presumptions, and protections, as other claimants. It is inconsistent with the rules and underlying policy of the Bankruptcy Code to hold derivatives counterparties to a more stringent standard for purposes of filing a proof of claim. This is particularly so given that the Bankruptcy Code has been amended repeatedly to

8

protect the rights of derivatives counterparties by exempting derivatives transactions from the operation of the automatic stay (11 U.S.C. § 362(b)(17)) and most fraudulent conveyance and preference claims (11 U.S.C. § 546(g)), and by protecting the rights of derivatives counterparties to liquidate or terminate swap transactions (11 U.S.C. § 560), to net transactions under a master agreement and set off derivatives claims against certain other amounts owed to a debtor (11 U.S.C. § 561), and to access related credit support (11 U.S.C. § 101(53B)). The principles underlying the safe harbor provisions are undermined where derivatives counterparties are required to endure an onerous, and potentially fatal, preliminary discovery process prior to having their claims recognized.

## CONCLUSION

All parties to a bankruptcy case should support an efficient claims reconciliation process (one of the stated goals of the proposed Motion, see Motion at ¶¶ 21-22). Indeed, the Federal Rules of Bankruptcy Procedure explicitly state that the "rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding." Fed. R. Bankr. P. 1001. These goals, however, are subverted by the proposed claims process, which will inequitably force an entire class of creditors to bear administrative and logistical costs usually associated with party-specific discovery. This will inevitably slow the claims reconciliation process and increase the total cost of claims adjudication.

For the foregoing reasons, the Counterparties' objections to the Motion should be heeded and the proposed procedures amended accordingly.

DATED:   New York, NY
                June 12, 2009

                                              Respectfully submitted,

                                              <u>/s/ Joshua Cohn</u>

| | |
|---|---|
| Katherine Darras | Joshua Cohn |
| Rosario Chiarenza | Vinod Aravind |
| International Swaps and Derivatives | ALLEN & OVERY LLP |
| Association, Inc. | 1221 Avenue of the Americas |
| 360 Madison Avenue | New York, New York 10020 |
| New York, NY 10017 | (212) 610-6300 |
| (212) 901-6000 | |

10