Hearing Date and Time: June 17, 2009 at 2:00 p.m.

Mark C. Ellenberg, Esq., *Pro Hac Vice*
John H. Thompson, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street N.W., Suite 1100
Washington, DC  20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

- and -

Howard R. Hawkins, Jr. Esq.
Ellen M. Halstead, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Morgan Stanley*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>Jointly Administered |

**LIMITED OBJECTION OF MORGAN STANLEY TO MOTION OF THE DEBTORS
PURSUANT TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 3003(c)(3) FOR ESTABLISHMENT OF THE DEADLINE FOR
FILING PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER
OF NOTICE THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM**

Morgan Stanley & Co. Incorporated and certain of its affiliates, including Morgan Stanley Capital Group Inc., Morgan Stanley Capital Services Inc. and Morgan Stanley & Co. International plc (collectively, "Morgan Stanley"), by its undersigned counsel, hereby submits this limited objection (the "Limited Objection") to the motion (the "Bar Date Motion") [Docket No. 3654] of the above-captioned debtors and debtors-in-possession (the "Debtors") pursuant to

section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for establishment of the deadline for filing proofs of claim, approval of the form and manner of notice thereof and approval of the proof of claim form.

## PRELIMINARY STATEMENT

1.  The "Derivative Questionnaire" attached as Exhibit C to the proposed Proof of Claim Form imposes on the Debtors' trading partners extensive, unprecedented—and wholly unnecessary—document and information demands. The Debtors and their major trading partners, such as Morgan Stanley, routinely reconciled open positions every business day prior to the commencement of these cases, and they have been working cooperatively to update those reconciliations subsequent to the bankruptcy. Rather than digesting the volumes of information available to them through ordinary commercial practice and a standard proof of claim process, the Debtors are attempting to force across-the-board production of documents and data they almost certainly do not need for the vast majority of their trades. If, after digesting the available data, the Debtors identify specific areas of material disagreement that they wish to investigate, they will have more than adequate informal and formal tools at their disposal for obtaining additional information from the claimants.

2.  The impact of the Debtors' excessive demands in the Derivative Questionnaire will be substantial. As of the date Lehman Brothers Holdings Inc. ("LBHI") filed its petition for relief under the Bankruptcy Code, Morgan Stanley and the Debtors had over 50,000 open trades in place. The vast majority of these trades were plain-vanilla, liquid transactions. On the last business day before the LBHI petition date, the normal daily reconciliation process applicable to the vast majority of the open trades showed on a trade level information basis Morgan Stanley and the Debtors agreed on the terms of 99% of the trades and they also agreed on the valuation of the portfolio for purposes of collateral posting.

3. On the petition date, Morgan Stanley terminated the open trades and, in due course, sent the Debtors close-out statements, as required by the applicable ISDA master agreements. These statements, which comply with standard commercial practices for closing out ISDA master agreements, and which will provide the basis for the proofs of claim to be filed by Morgan Stanley in this case, were supported by voluminous trade-by-trade level data. Following the delivery of the close-out statements, Morgan Stanley and the Debtors began working together to reconcile them against the Debtor's records. While these efforts are still in progress, the Debtors have reviewed Morgan Stanley's close-out statement with respect to Lehman Brothers Commercial Corporation ("LBCC") and confirmed that they agree on the terms of trade information and other identification of approximately 97% of the trades with that debtor.

4. Ignoring their own pre-petition experience and their post-petition reconciliation efforts, the Debtors now seek to impose on Morgan Stanley and their other trading partners—as a hurdle to the filing of a timely proof of claim—extensive, wasteful and unnecessary document production obligations. If the Derivative Questionnaire were approved, trading partners would be forced both to resubmit, in different form, data and documents already provided in accordance with routine commercial practice, and to upload volumes of data that the Debtors will not need. For example, the Debtors have no need to receive copies of confirmations for trades that they have already reconciled. Yet, without exception (or reason), the Derivative Questionnaire would demand that Morgan Stanley upload each and every of the more than 50,000 confirmations that relate to its claims.

5. The issue is not whether, at some appropriate point, the Debtors may be entitled to some portion of information demanded in the Derivative Questionnaire. The issue is whether Morgan Stanley, as a condition to filing a timely proof of claim, should be forced to incur the burden and cost of meeting the Debtors' demands without any concrete showing of

need. The law and the facts—and reason—suggest that the Debtors should first examine the volumes of information that they already have received under standard commercial practices and that they will receive in standard proofs of claims.

6. Accordingly, Morgan Stanley requests that the Derivative Questionnaire requirement be deleted, at least with respect to Morgan Stanley and similarly situated parties.[1] Morgan Stanley does not otherwise object to the establishment of an August 24, 2009 Bar Date. If the Derivative and Guarantee Questionnaires are not deleted, then Morgan Stanley objects to the proposed Bar Date as being unachievable. Compliance with the Derivative and Guarantee Questionnaires would require the Bar Date to be extended by at least six months.

**FACTS**

7. On September 15, 2008, and thereafter, LBHI and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy Code in this Court. Prior to the petition date, Morgan Stanley and certain of the Debtors engaged in the trading of derivative contracts. Morgan Stanley and various of the Debtors traded all manner of derivatives, from interest-rate, currency, energy and credit derivatives to more complex or bespoke derivatives such as asset-backed, basket and CDO credit default swaps. The vast majority of the 50,000 trades were highly liquid and readily priced. As of the petition date, Morgan Stanley and the Debtors had over 50,000 trades between them.

8. There are well-accepted and established dealer market practices concerning how parties to derivative contracts communicate with each other and reconcile trades

---

[1] Morgan Stanley also objects to requirement of a Guarantee Questionnaire, attached as Exhibit D to the proposed Proof of Claim Form. The Debtors seek to require that a Guarantee Questionnaire be completed for each claim a creditor has against a Debtor under a guarantee. LBHI guaranteed many of the derivative trades of its subsidiaries, thus in many cases, the Derivative Questionnaire and Guarantee Questionnaire request the same information and are, therefore, duplicative of one another.

-4-

in their normal course of business. Before the Debtors' bankruptcy filings, Morgan Stanley and the Debtors, like other major derivatives dealers, followed these practices and successfully calculated and agreed upon the amounts due on payments, deliveries and collateral on hundreds of thousands of trades on a daily basis. The Debtors, like Morgan Stanley and all derivatives dealers, maintained their own extensive computerized records and proprietary models, detailing all required information on all their derivative positions, and the Debtors, like all other dealers, had no need for mountains of trade documentation from their counterparties absent a dispute.

9. In the daily normal course of business, derivatives dealers, such as Morgan Stanley and the Debtors, communicate with each other and share information in order to reconcile their respective portfolios. Derivatives dealers share information on the identity and valuation of trades, which is referred to as portfolio reconciliation. The communication and reconciliation ensures that dealers agree on the universe of trades to which they are counterparties so that they can resolve any significant differences between their respective valuations of trades for collateral-calculation purposes.

10. In most cases, dealers employ an outside vendor to match the trades and identify any valuation differences. The vendor used by Morgan Stanley was triOptima, through its triResolve system. Systems like triResolve are able to quickly reconcile large portfolios of derivative transactions and show any differences in terms of identification or valuation of trades. At the start of each business day, the Debtors would send to Morgan Stanley substantially all of the Debtors' trade level detail concerning the over 50,000 trades then existing between the parties. In order to identify any differences, Morgan Stanley would upload the Debtors' trade detail along with its own trade detail into triResolve. Similarly, Morgan Stanley would send substantially all of its trade level detail to the Debtors, who would upload the information into a comparable system.

11. Morgan Stanley and the Debtors performed their last daily reconciliation of their portfolios on the last business day prior to the chapter 11 filing by certain of the Debtors. That reconciliation showed that, on a trade level information basis, Morgan Stanley and the Debtors were in agreement on the terms of **_99% of the trades_** and on the valuation of the portfolio for purposes of collateral posting.

12. Upon the chapter 11 filing of certain of the Debtors on September 15, 2008, Morgan Stanley terminated the trades and the parties began to close-out the agreements. The ISDA master agreement, which governs derivative contracts, requires that a party terminating trades upon their counterparty's bankruptcy, calculate the payments due on account of the termination, and submit to the counterparty a statement summarizing the calculation. Section 6(d) of the ISDA master agreement, which reflects the industry's views as to the information required to validate the calculation, simply requires "reasonable detail" of the calculations for this close-out statement.

13. In February 2009, Morgan Stanley commenced submitting ISDA close-out statements to the Debtors, setting out the amounts due or owed on each group of derivative trades. As part of the close-out process, Morgan Stanley also provided to the Debtors electronic data on a trade-by-trade level as back-up for its close-out statement. The back-up includes excel spreadsheets, in electronic and paper form, which provide detail of each trade. An example of such back-up information that one Morgan Stanley entity sent to the Debtors in support of a close-out statement for LBCC is attached as Exhibit A hereto.[2]

14. On June 9, 2009, a representative of the Debtors advised Morgan Stanley that 97% of the approximately 1,100 trades covered by Morgan Stanley's first close-out

---

[2] Certain financial information has been redacted in Exhibit A.

statement (for trades done with LBCC), matched the Debtors' records in terms of trade information and other identification. This process was accomplished without the exchange of any documents or information other than the ISDA close-out statement and accompanying spreadsheets.

15. The Debtors have filed the Bar Date Motion seeking entry of an order (i) establishing August 24, 2009 as the Bar Date for filing Proofs of Claim, (ii) approving the form and manner of notice of the Bar Date and (iii) approving the proposed Proof of Claim form and the exhibits thereto.

16. The Bar Date Motion seeks approval of certain procedures with respect to claims based on Derivative Contracts and Guarantees of Derivative Contracts with the Debtors, including completing the Derivative Questionnaire.

17. The Derivative Questionnaire requires the resubmission, in a form different from ISDA dealer market practice, of information the Debtors already have received or will receive through normal commercial practice. This duplicative information includes: claim amounts; collateral values; costs and expenses; interest; trade identifying information (including trade reference IDs; trade type; product; trade date; reference obligation or reference entity; notional amount; quantity/unit of measure; currency; price or strike price; buy/sell; call or put; cap or floor; location; maturity date; termination date) and trade values.

18. The Derivative Questionnaire, however, goes well beyond this, requiring the following additional information, and more, for every single transaction:

- all confirmations (tens of thousands of which relate to trades as to which past practice and progress in the Debtors' current trade-reconciliation process suggest Morgan Stanley and the Debtors will be in agreement);
- collateral CUSIP and ISIN numbers (although the collateral in most cases consists of asset types, rather than specific assets);

- statements supporting any cash disbursements in respect of collateral securities;
- documentation, inputs, assumptions, parameters and narrative description;
- explanations of contractual interpretations; and
- descriptions of replacement transactions, including "any external communications (including all transaction confirmations, other documents, e-mails, or any other writings or information) evidencing or concerning the replacement transactions."

## ARGUMENT

### The Derivative Questionnaire Goes Far Beyond The Bankruptcy Rule Requirements For Documentation To Be Provided With A Proof Of Claim

19. A proof of claim is meant to be a straightforward device to allow for the prompt accounting of claims against a debtor. See First Fidelity Bank, N.A., N.J. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.), 937 F.2d 833, 840 (2d Cir. 1991) ("[a] bar order serves the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims"). If no objection is filed to a proof of claim, the claim is deemed allowed. See 11 U.S.C. § 502(a). The Bankruptcy Rules provide that a proof of claim satisfying the minimal requirements is *prima facie* evidence of the validity of a claim. See Fed. R. Bankr. P. 3001(f).

20. Bankruptcy courts routinely find that a proof of claim necessitates only a summary of the underlying transaction(s) in order to be *prima facie* valid. A lengthy documentation of each transaction is not required. See Heath v. American Exp. Travel Related Servs. Co. (In re Heath), 331 B.R. 424, 432 (9th Cir. B.A.P. 2005) (holding that because credit card transaction "records are likely to be voluminous . . . the creditor can comply with [Bankruptcy] Rule 3001 . . . by using some sort of summary"); In re Crowe, 321 B.R. 729, 732

(Bankr. W.D. Wash. 2005) ("a creditor may attach a summary where supporting documents are voluminous").

21. Further, by making the Derivative Questionnaire a condition to the filing of a proof of claim, the Debtors are effectively imposing a higher standard of documentation and proof on creditors than would normally be required to prove their case outside of bankruptcy. The Bankruptcy Code does not allow debtors to impose higher evidentiary burdens on creditors. See Raleigh v. Illinois Dep't of Rev., 530 U.S. 15, 17 (2000) ("bankruptcy does not alter the burden imposed by the substantive law").

22. The Debtors fail to cite any precedent for their request to exceed the limits of the Bankruptcy Code and Rules. Indeed, in the SIPA proceeding for Lehman Brothers Inc., a broker-dealer, the proof of claims form did not require this type of detail. See Securities Investor Protection Corp. v. Lehman Brothers Inc., Adv. Proc. No. 08-01420 (JMP) (Bankr. S.D.N.Y), Dkt. Nos. 147, 241. Similarly, in In re Enron Corp., in which the debtors had a $60 billion mark-to-market trading book containing hundreds of thousands of transactions with thousands of counterparties, the proof of claim form did not require a comparable level of detail. See Case No. 01-16034 (AJG) (Bankr. S.D.N.Y), Dkt. Nos. 5492, 5518. In another chapter 11 proceeding involving a trading company, In re Calpine Corp., the proof of claim form also did not require this level of detail. See Case No. 05-60200 (BRL) (Bankr. S.D.N.Y), Dkt. Nos. 1256, 1348.

23. The Derivative Questionnaire shifts the allocation of evidentiary burdens between creditors and debtors established in the Bankruptcy Rules. Worse, it makes the enhanced burden a hurdle to the filing of a timely proof of claim. In a context where the Debtors and traders such as Morgan Stanley routinely matched their books and historically differed on only a small percentage of the trades, it is difficult to understand how this avalanche of material will be helpful to either side. Without question, it will place additional cost and resource burdens

on Morgan Stanley and other counterparties who already stand to receive less than full recoveries on their claims. It also would appear to do no more than impose costly burdens on the Debtors' estates and unnecessarily slow down the process.

24. The Debtors state in their motion that they need the Derivative Questionnaire because they have over 906,000 transactions in their portfolios and the calculation of derivative trades is complex. See Bar Date Motion ¶ 21. These appear to be the Debtors' only justification for requesting the information in the Derivative Questionnaire. These facts, alone, do not justify the relief requested. The Debtors were dealers in these derivative transactions, and, pre-petition and post-petition have been able to reconcile trades without the information they now request.

25. In order to justify the provision of such an extraordinary amount of trade level information, the Debtors need to show that the information they are requesting is both necessary and will actually assist them in more efficiently administering the estate. The facts are decidedly to the contrary. The facts suggest that a much more focused approach to more in depth information gathering is the most reasonable course.

26. Consistent with the Bankruptcy Code and Rules, the Debtors should first examine the volumes of data that they already have received and that will be provided in the standard proof of claim process. If and when areas of material disagreement are identified, the Debtors can take appropriate steps to obtain additional information.

## **CONCLUSION**

For the reasons set forth above, Morgan Stanley respectfully requests that this Court strike the requirements of a Derivative and Guarantee Questionnaires from the proposed Proof of Claim form for Morgan Stanley and other parties similarly situated, and grant such other and further relief as this Court may deem just or proper.

Dated:  Washington, DC
        June 12, 2009

CADWALADER, WICKERSHAM & TAFT LLP

/s/  *Mark C. Ellenberg*
Mark C. Ellenberg, Esq., *Pro Hac Vice*
John H. Thompson, Esq.
1201 F Street N.W., Suite 1100
Washington, DC  20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

- and -

Howard R. Hawkins, Jr. Esq.
Ellen M. Halstead, Esq.
One World Financial Center
New York, NY  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Morgan Stanley*