Hearing Date and Time: June 24, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: June 16, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WHYTE HIRSCHBOECK DUDEK S.C.
555 East Wells Street
Suite 1900
Milwaukee, WI 53202-3819
Telephone: (414) 273-2100
Facsimile: (414) 223-5000
Bruce G. Arnold, Esq.
Daryl L. Diesing, Esq.
Daniel J. McGarry, Esq.

Attorneys for Metavante Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | ) | Case No. 08-13555 (JMP) |
| | ) | |
| **LEHMAN BROTHERS HOLDINGS INC.,** | ) | Chapter 11 |
| *et al.,* | ) | |
| | ) | (Jointly Administered) |
| **Debtors.** | ) | |
| | ) | Judge James M. Peck |

**OBJECTION OF METAVANTE CORPORATION TO DEBTORS' MOTION,
PURSUANT TO SECTIONS 105(a) AND 365 OF THE BANKRUPTCY CODE, TO
COMPEL PERFORMANCE OF OBLIGATIONS UNDER AN EXECUTORY
CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Metavante Corporation ("Metavante") submits this objection to the Debtors' Motion to

Compel Performance of Metavante Corporation's Obligations Under an Executory Contract and

to Enforce the Automatic Stay (the "Motion"), and respectfully states as follows:

### Background

1.      Metavante is a provider of banking and payments technologies to approximately

8,000 financial services firms and businesses worldwide.  It is headquartered in Milwaukee,

Wisconsin.

2.      Metavante is the principal subsidiary of Metavante Technologies, Inc.

(NYSE:MV), a holding company.  Metavante was spun off from M&I Corporation in

November 2007.  In connection with that transaction Metavante entered into a credit agreement

that provides for a term loan facility in the aggregate principal amount of $1,750,000,000 and a

revolving credit facility in the aggregate principal amount of $250,000,000.  The term loan

facility matures on November 1, 2014 and bears interest based on the three (3) month London

Interbank Offered Rate ("LIBOR") plus a margin of 1.75%.  Based on the materiality of the

interest expense on the term loan borrowings, Metavante utilizes derivative financial instruments

to mitigate interest rate risk.  Such derivatives are intended to qualify as cash flow hedges in

accordance with U.S. generally accepted accounting principles.  Metavante does not enter into

derivatives for speculative purposes.  In November 2007, Metavante entered into an amortizing

interest rate swap with an initial notional value of $600,000,000 with Lehman Brothers Special

Financing Inc. ("LBSF").  Metavante carefully considered its choices to place this trade, and

Metavante chose LBSF because of its ability to meet the institutional needs and requirements for

a transaction of this magnitude, and because of its inducement to offer Lehman Brothers

Holdings Inc. ("LBHI") as the Credit Support Provider.  Because interest rate swap agreements

are bilateral agreements through which payment obligations between the parties may reverse

time and again during the life of the agreement, Metavante placed great trust in LBSF, including

LBSF's ability to make payments to Metavante, and LBHI's ability to provide credit support.

3.      On November 20, 2007, Metavante and LBSF entered into an International Swaps

and Derivatives Association, Inc. ("ISDA") Master Agreement.  Under the ISDA Master

Agreement, Metavante and LBSF entered into an interest rate swap transaction, the terms of

which were documented pursuant to a trade confirmation dated December 4, 2007 (collectively,

the "Metavante Swap Agreement").  Under the Metavante Swap Agreement, Metavante agreed

2

to pay a fixed rate of interest to LBSF in exchange for payment of a variable rate of interest based upon the three (3) month LIBOR rate. The Metavante Swap Agreement, which has an initial notional value of $600,000,000, is set to expire on February 1, 2012.

4.       On September 15, 2008, LBHI and certain of its subsidiaries (collectively, the "Debtors") commenced voluntary cases under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). LBHI is the Credit Support Provider for LBSF under the Metavante Swap Agreement. Under the terms of the Metavante Swap Agreement, LBHI's voluntary filing was an event of default giving Metavante the right, but not the obligation, to terminate the Metavante Swap Agreement.

5.       On September 22, 2008, LBHI sold its U.S. and Canadian Capital Markets and Investment Banking business, including the fixed income and equities trading, brokerage, dealing, trading and advisory business, and investment banking operations to Barclays Capital Inc.

6.       On October 3, 2008, LBSF commenced a voluntary case under chapter 11 of the Bankruptcy Code. The subsequent filing by LBSF was an additional and independent event of default under the Metavante Swap Agreement giving Metavante the right, but not the obligation, to terminate the Metavante Swap Agreement.

7.       LBHI's and LBSF's chapter 11 filings not only created events of default under the Metavante Swap Agreement, but also left Metavante without an effective counterparty. The markets were extremely volatile in the period both before and after the chapter 11 filings, and Metavante was concerned about the collectibility of any reset payments due from LBSF, LBSF's ability to perform under the Metavante Swap Agreement, and LBHI's ability to provide credit support for LBSF's substantial obligations. Metavante accounted for the absence of an effective counterparty in its publicly filed financial statements for the period ending September 30, 2008.

3

WHD\6502012.11

Metavante concluded that the Metavante Swap Agreement could not be treated as a hedge for accounting purposes because it was no longer probable that LBSF could make contractually required cash payments in the event that three (3) month LIBOR was in excess of the fixed rate of interest set forth in the Metavante Swap Agreement.

8.      Subsequent to the chapter 11 filings, Metavante received no communications from either LBSF or LBHI regarding the Metavante Swap Agreement.  When LBSF did not even send a reset notice for the Metavante Swap Agreement at the end of October 2008, Metavante concluded that it had no alternative except to protect itself by entering into a replacement hedge that covers the period from November 3, 2008 through February 1, 2010, to protect Metavante from a potential rise in interest rates.

**Argument**

**I.      THE DEBTORS ARE NOT ENTITLED TO LIMIT METAVANTE'S RIGHT TO SUSPEND PAYMENTS**

**A.      The Relief Sought in the Debtors' Motion Would Subvert the Rights of a Non-Defaulting Party to a Swap Agreement to Preserve Its Contractual Rights to Net or Set-Off Its Damages Against the Debtors Upon Termination of a Swap Agreement**

**1.      LBHI's Actions Triggered a Default Under the Metavante Swap Agreement Prior to the Filing of LBSF's Bankruptcy Proceeding**

9.      This Motion represents an unprecedented effort by the Debtors to circumvent the requirements of section 365 of the Bankruptcy Code (the "Code") relating to the assumption or rejection of executory contracts, and to rewrite sections 560 and 561 of the Code, which expressly provide that certain rights of parties to interest rate swap agreements may not be altered by the Debtors, or any order of the Court.

10.      Under the standard terms of a swap agreement, a voluntary bankruptcy filing by a counterparty (or its credit support provider) is an event of default giving the non-defaulting counterparty the right, but not the obligation, to terminate all outstanding derivative transactions

4

under the swap agreement. Because LBHI guaranteed the obligations of LBSF, the bankruptcy filing by LBHI on September 15, 2008, was an event of default under the Metavante Swap Agreement, giving Metavante the right, but not the obligation, to terminate the Metavante Swap Agreement.[1] Although the Debtors attempt to divert attention from the LBHI filing by conveniently conjoining the independent defaults caused by LBHI's and LBSF's separate filings, the fact remains that LBHI -- Metavante's Credit Support Provider -- filed for relief on September 15, 2008, and subsequently sold all of its assets to Barclays Capital Inc. LBHI's failure doomed the Metavante Swap Agreement, effectively depriving Metavante of an effective counterparty.

11.    Moreover, the Metavante Swap Agreement, which was drafted by the Debtors, incorporates the Cross Default Provisions of Section 5(a)(vi) in the Metavante Swap Agreement. Pursuant to this provision, if a "Specified Indebtedness" of LBSF *or* a Credit Support Provider (here, LBHI) above a threshold amount can be declared due and payable, the Debtors are in default.

12.    The Debtors chose to use the standard definition of "Specified Indebtedness," which provides that Specified Indebtedness is "any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money."[2] This means that the default of either LBSF or LBHI on a threshold amount of either's obligations for borrowed money caused a default in the Metavante Swap Agreement, providing an independent and non-bankruptcy ground to excuse Metavante's performance under the Metavante Swap Agreement.

---

[1]  The subsequent bankruptcy filing by LBSF on October 3, 2008, was an additional and independent event of default under many of the Swap Agreements, giving Metavante the right, but not the obligation, to terminate the Metavante Swap Agreement.

[2]  See Part 1(c) of the Schedule and Section 14 of the Metavante Swap Agreement.

WHD\6502012.11

13.     The parties' decision to include these provisions is both customary and appropriate. The Metavante Swap Agreement provides that if the financial condition of LBSF or its Credit Support Provider (LBHI) deteriorated to the point that an existing lender to either LBSF or LBHI could accelerate its debt (i.e., declare the debt due and payable), then the essential security provided in the financial accommodation evidenced by the swap agreement was jeopardized, and the Debtors' financial condition triggers an independent default under the Metavante Swap Agreement. Stated differently, the ISDA Master Agreement preserves the benefit of the bargain when a non-defaulting counterparty loses an effective counterparty for any reason, here because of the rights of LBSF's and LBHI's lenders to declare amounts due and payable.[3]

14.     Upon information and belief, and subject to the outcome of discovery to be conducted in connection with this contested matter, LBSF and LBHI were in default for borrowed money such that their obligations for borrowed money could be declared due and payable.

## 2.     Metavante is Permitted to Suspend Payments Pending the Termination of the Swap Agreement

15.     Metavante's unequivocal right to suspend payments until the termination of the Metavante Swap Agreement is fundamental to the manner in which swap parties govern themselves. While the Debtors point to inapposite cases involving routine executory contracts, this is not a case where a court is asked to compel a non-debtor landlord to supply space to a debtor pending the debtor's decision whether to assume or reject the lease. It is no accident that

---

[3] The typical ISDA Master Agreement contains numerous provisions which trigger an Event of Default. For example, in the instant case, even those non-defaulting counterparties which did not have LBHI as a Credit Support Provider were able to declare an Event of Default based on, inter alia, ratings downgrades, the failure of the Lehman counterparty to make a payment or the failure of the Lehman counterparty to transfer collateral in accordance with the terms of the applicable Credit Support Agreement.

WHD\6502012.11

the Debtors carefully avoid quoting the actual language of the Metavante Swap Agreement, which provides that Metavante's obligation to make the reset payments *is conditioned* upon the absence of any other defaults.

> 16.   Section 5(a) of the Metavante Swap Agreement provides that:
>
> > The occurrence at any time with respect to a party [to the Metavante Swap Agreement], or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes . . . an event of default (an "Event of Default") with respect to such party: --
> >
> > (vii) Bankruptcy. The party, [or] any Credit Support Provider of such party . . . (4) institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights.

(Id. at 5-6.)

The bankruptcy filing of LBHI as Credit Support Provider constitutes an Event of Default under the Metavante Swap Agreement.[4]

> 17.   In addition, Section 2 of the Metavante Swap Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it," provided, however, that the obligation to make payment is subject to "the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing." (Metavante Swap Agreement at §§ 2(a)(i) and (iii)) (emphasis added). Thus, since the filing of LBHI's chapter 11 petition and the occurrence of other pre-petition (from LBSF's perspective) Events of Default which rendered LBSF an ineffective counterparty, Metavante was entitled to invoke the "condition precedent" provision which exempts counterparties from their payment obligations because of an Event of Default, and to

---

[4] LBSF's bankruptcy filing also constitutes an Event of Default and, upon information and belief, the rights of LBSF's and LBHI's lenders to accelerate constitute defaults.

WHD\6502012.11

suspend payment under the ineffective hedge pursuant to Section 2(a)(iii) of the Metavante Swap

Agreement.

18.    In response, the Debtors urge this Court to treat a swap agreement like a garden-variety executory contract, and to ignore the important chronology of this case.  The Debtors' motion misses the mark because it ignores the fact that the Debtors cannot provide the essential item of value Metavante bargained for -- an effective counterparty.  This is precisely why the ISDA Master Agreements incorporate the default provisions as a "condition precedent" to payment, and it is precisely why Metavante cannot be compelled to pay the interim amounts. See, e.g., In re Lucre, Inc., 339 B.R. 648, 660 (Bankr. W.D. Mich. 2006), dismissed on other grounds, 471 F. Supp. 2d 845 (W.D. Mich. 2007) (the debtor's uncured prepetition breach of its executory contract will, in and of itself, justify continued nonperformance by the non-debtor party, and mere commencement of bankruptcy proceeding and the imposition of the automatic stay does not empower the debtor to compel performance from the non-debtor party that the debtor has no right to compel prepetition).  Thus, the Debtors simply cannot provide the benefit of the bargain, and Metavante is not prepared to consent to an assignment on the terms so far proposed by the Debtors.[5]

19.    That Metavante cannot be compelled to pay the interim amounts is also confirmed by New York contract law.[6]  New York courts review a contract as a whole to divine its purpose and intent, Comprehensive Health Solutions Inc. v. Trustco Bank, 715 N.Y.S.2d 796, 798 (N.Y.

---

[5]  As both Metavante and other objecting counterparties observed, LBHI's bankruptcy filing and its triggering of other Events of Default under the standard 1992 ISDA Master Agreement creates significant implications for the resolution of the Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (the "Procedures Motion") (Dkt. No. 1498). See, e.g., Lifemark Hosp., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters., Inc.), 304 F.3d 410, 445 (5th Cir. 2002) (enforcement of cross-default provision should not be refused where to do so would thwart the non-debtor party's bargain).

[6]  Bankruptcy courts routinely consult state law in order to determine parties' rights under a contract. See, e.g., In re Emilio Cavallini, Ltd., 112 B.R. 73, 76 (Bankr. S.D.N.Y. 1990).

WHD\6502012.11

App. Div. 2000), and also decide, as a matter of law, whether a condition precedent to performance exists under the contract's terms, <u>Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assoc.</u>, 472 N.E.2d 315, 318 (N.Y. 1984).  Importantly, however, in construing a contract, the court must "avoid an interpretation that would leave contractual clauses meaningless."  <u>Two Guys</u>, 472 N.E.2d at 318.

20.    New York follows the Restatement's rule on conditions.  <u>Ergonomic Sys. Philippines Inc. v. CCS Int'l Ltd.</u>, 777 N.Y.S.2d 446, 447 (N.Y. App. Div. 2004).  A condition is defined as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."  Restatement (Second) of Contracts § 224 (1981); <u>Pan Am Corp. v. Delta Air Lines, Inc.</u>, 175 B.R. 438, 506 (S.D.N.Y. 1994) ("A condition precedent [to a contract] is one which must be performed before . . . the other party is obligated to perform.") (internal quotation omitted).  Failure to satisfy a condition -- including any ongoing conditions -- relieves the other party of its obligations.  <u>Ergonomic Sys.</u>, 777 N.Y.S.2d at 447 (if a party fails to satisfy a condition precedent, the other party's performance of its "duties (including the duty to make . . . scheduled payments) [does] not become due while [the breaching party is] in breach of the agreement . . . .") (citing Restatement (Second) of Contracts §§ 225, 237); <u>Pan Am Corp.</u>, 175 B.R. at 506-07 (Delta not required to make payment because two conditions precedent had not been satisfied, and if a "condition remains unsatisfied, the obligations of the parties are at an end.") (internal quotation omitted); <u>see, e.g.</u>, <u>Transport Props., Inc. v. ABC Treadco, Inc.</u>, 589 F. Supp. 445, 448 (S.D.N.Y. 1984) (failure to sell property within 18 months -- as required by contract condition -- relieved defendants' obligation to pay real estate brokerage commission) (citing Restatement (Second) of Contracts § 225).

21.    For example, in <u>Ergonomic Systems</u>, the parties entered into an agreement under which the plaintiff "was to act as the exclusive distributor of defendant's products in the

Philippines." 777 N.Y.S.2d at 447. In exchange, the plaintiff was required to pay the defendant

a $75,000 deposit, and was also required to make scheduled payments as the defendant sent the

plaintiff more of its goods for distribution. Id. However, after making the deposit, the plaintiff

refused to make the other scheduled payments because it discovered that the defendant had

entered into a similar Philippines distributorship agreement with a third party. Id. The plaintiff

then sued the defendant, arguing that the defendant breached an ongoing condition, *i.e.*, the

obligation to protect the plaintiff's exclusive distributorship rights. Id. Reversing the trial court,

the appellate court held that the plaintiff's obligation to make payments, "including the duty to

make the scheduled payments[,] did not become due while defendant was in breach of the

agreement by reason of the contract with [the third party]." Id. (citing Restatement (Second) of

Contracts §§ 225, 237). In addition, the court held, "by entering into the agreement with [the

third party], defendant effectively repudiated the agreement with plaintiff, thereby discharging

plaintiff's remaining contractual duties and giving plaintiff a claim for damages for total breach."

Id.

22.    In this case, Section 2(a) of the Metavante Swap Agreement is entitled "General

Conditions," and Section 2(a)(iii) provides that "[e]ach obligation of each party under Section

2(a)(i) is subject to (1) the condition precedent that no Event of Default . . . with respect to the

other party has occurred and is continuing . . . ." As such, there is no ambiguity as to whether

these terms were conditions. And, as courts have held, if "the occurrence of a condition is

required by the agreement of the parties, rather than as a matter of law, a rule of strict

compliance traditionally applies." Pan Am, 175 B.R. at 506 (quoting Wakefield v. Northern

Telecom, Inc., 769 F.2d 109, 113 (2d Cir. 1985)). Thus, LBHI's filing was a failure of a

condition precedent, the strict compliance with which was required under the Metavante Swap

Agreement. Because the condition precedent was not satisfied, Metavante is not required to pay

the interim amounts. See Ergonomic Sys., 777 N.Y.S.2d at 447.

### 3. The Debtors are Not Entitled to Impair Metavante's Set-Off Rights Under the Swap Agreements and the Bankruptcy Code

23.     As a result of LBHI's and LBSF's defaults, Metavante has suffered and will in the

future suffer substantial damages.

24.     The damages include (i) added financing and related costs for procuring a

replacement hedge, which Metavante presently estimates to be in excess of $9.0 million; and

(ii) the legal and other costs incurred as a result of LBHI's and LBSF's defaults.

25.     The significance of the unprecedented relief sought by the Debtors for the credit

markets and the procedures established by virtually every ISDA Master Agreement cannot be

overstated. The Debtors' motion is contrary to sections 560 and 561 of the Bankruptcy Code,

which expressly state that the contractual right of a non-defaulting party to a swap agreement to

terminate the swap may not be affected or abridged by *any* provision of the Code or by *any* order

of the court. Because the liabilities of parties to a swap (such as the interest rate swaps to which

Metavante was a party) can change based upon market changes, swap agreements, including the

one between Metavante and the Debtors, give the non-defaulting party the essential right,

following default by the other party, to determine when to terminate the swap transaction. The

non-defaulting party is *not* required to terminate its swap within any fixed or specified period of

time, but is instead permitted to wait as long as it deems appropriate to permit the market to

recover so that its termination payments upon any such termination will be reduced and so that it

will not be penalized by the defaulting party's conduct. The Debtors' Motion would

fundamentally alter those rights by forcing a non-defaulting party to make payments, which in

turn deprives Metavante of its right, as provided by sections 560 and 561 of the Bankruptcy

Code, to set-off or net its damages, such as the cost of the replacement hedge Metavante was

required to put in place in the absence of an effective counterparty.

26.    Sections 560 and 561 were adopted by Congress to preserve Metavante's set-off

rights.  Congress recognized that, due to the unique nature of swap agreements, "[t]he setoff

process, which is at the center of the swap agreement, may be skewed if one of the parties has

filed for bankruptcy."  H.R. Rep. No. 101-484, at 3 (1990), reprinted in 1990 U.S.C.C.A.N. 223,

225.

27.    The Courts interpreting sections 560 and 561 recognize that the need to maintain

certainty and stability in the financial markets justifies departures from traditional bankruptcy

law in the case of swaps and other derivative contracts.  The discussion in Hutson v. Smithfield

Packing Co. (In re Nat'l Gas Distribs., LLC), 556 F.3d 247, 252-53 (4th Cir. 2009), is instructive:

> Since enactment of the 1978 Bankruptcy Code, Congress has
> provided safe harbors from the destabilizing effects of bankruptcy
> proceedings for parties to specified commodities and financial
> contracts in order to protect financial markets.  To do this,
> Congress limited the application to these parties of Bankruptcy
> Code provisions such as the automatic stay and trustee avoidances
> of preferences and fraudulent conveyances.  It was thought that
> financial market stabilization would be achieved under the
> following rationale:
>
> > These exceptions or "safe harbors" are necessary, it is thought,
> > for the protection of financial markets, including over-the-
> > counter ("OTC") markets on which most derivatives contracts
> > are executed.  Without these safe harbors, markets might suffer
> > serious shocks—perhaps even a systemic liquidity crisis,
> > causing markets to collapse—when debtors enter bankruptcy.
> > Counterparties to financial contracts would find themselves
> > subject to the automatic stay for extended periods.  They would
> > be unable to liquidate volatile contracts and thereby limit their
> > exposure to market movements.  Additionally, a debtor in
> > bankruptcy would be free to "cherrypick" multiple contracts
> > with the same party.  Instead of netting the contracts—i.e.,
> > setting-off losses under some contracts against gains under
> > others with the same counterparty—the debtor could dispose of
> > the contracts independently.  "In-the-money" contracts could

be assumed; "out-of-the-money" contracts could be rejected. In this way, the debtor could lock-in gains on profitable contracts and (due to its insolvency), limit liability for losses under unprofitable ones. The counterparty to these contracts would find itself paying in full on the assumed contracts and receiving only a fraction of its claim on the rejected. Losses from indefinite exposure to market movements and from cherry picking could produce financial distress in the counterparty itself, forcing it to default on its own contracts with other parties. As one distressed party infects another, a domino effect could ensue, undermining the entire financial market.

Edward R. Morrison & Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets From Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr.Inst. L.Rev. 641, 642 (2005) (footnotes omitted).

28.     The right to elect to terminate -- or not to terminate -- the swap at any time prior to maturity is an essential and critical right of a non-defaulting party because the non-defaulting party's rights and obligations, including its obligation to make termination payments upon any termination, can fluctuate dramatically, particularly in markets like those which existed as of the time of the filing and again today. If Metavante defers its termination and the markets turn so that Metavante is "in the money," Metavante must have the right under section 560 to minimize the loss resulting from the Debtors' defaults by netting or offset. Thus, the Debtors' motion to compel Metavante to make interim payments deprives Metavante of any effective right to employ the termination, netting and offset rights protected by section 560 of the Bankruptcy Code.

29.     The Metavante Swap Agreement gives Metavante the right to set-off any liabilities which Metavante might have upon an eventual termination of the swap transactions against any liabilities of LBHI or LBSF under the Metavante Swap Agreement. Although the Debtors meekly assert that they are not in default, the testimony to be presented at the evidentiary hearing on this contested matter will establish that the Debtors are in material

13

default, and that Metavante has been substantially damaged.  Metavante already has claims

against the Lehman entities that likely aggregate more than $9.0 million, and it is possible that

Metavante will have additional claims accruing in the future as a result of the Debtors' defaults

which it will be entitled to offset against any swap termination obligations.

**B.**    **The Debtors' Motion is a Thinly Disguised Attempt to Force Metavante to Make An Election to Terminate the Swap Agreement, Which is Absolutely Prohibited by the Bankruptcy Code**

30.    Pursuant to paragraph 6(a) of the Swap Agreement, Metavante has elected not to

terminate the Swap Agreement with LBSF.  Metavante continues to reserve its contractual right

to do so.

31.    In an apparent effort to put pressure on Metavante to make an election to

terminate the Metavante Swap Agreement, or perhaps to consent to an assignment of the

Metavante Swap Agreement,[7] the Debtors now seek to "compel" Metavante's performance

under the Metavante Swap Agreement.  However, because the Debtors cannot overcome the

critical flaw that crippled their Procedures Motion -- the Debtors' defaults cannot be cured and

these same defaults excuse performance by the counterparty -- the instant Motion must fail for

this independent reason.

32.    Here, the Debtors must concede that the triggering event for Metavante's

non-performance was LBHI's decision to commence voluntary chapter 11 bankruptcy

proceedings and, upon information and belief, LBHI's defaults under LBHI's own credit

facilities.  Nothing in the case law, or section 560 of the Bankruptcy Code, supports Debtors'

contention that Metavante as the non-defaulting counterparty can now be compelled to take <u>any</u>

---

[7]  In the Procedures Motion, the Debtors originally sought to establish procedures purportedly allowing the Debtors to assume and assign the Metavante Swap Agreement.  Metavante objected, asserting (like many other objecting parties) that the Debtors could not assume the Metavante Swap Agreement for the simple reason that the Debtors cannot "cure" the Events of Default which deprived Metavante of an effective counterparty in the first place.  The hearing on Metavante's Objection to the Debtors' Procedures Motion is set for September 16, 2009.

action under the Metavante Swap Agreement.[8]  The critical flaw in the Debtors' analysis is that

it overlooks the protections of section 560 of the Bankruptcy Code.  Metavante has the absolute

right to enforce the terms of the Metavante Swap Agreement until an Event of Termination.

Metavante has not terminated the swap and is not in default.

33.    Sections 560 and 561 of the Bankruptcy Code unequivocally provide that a

contractual right of termination in a swap agreement following a bankruptcy default by the other

party may not be limited or abridged in any way by the provisions of the Bankruptcy Code or by

any order of the Court.  Section 560 states that the non-defaulting party's right of termination

resulting from a bankruptcy default shall not be "stayed, avoided, *or otherwise limited*" by the

Code *or by any order of the Court*:

> The exercise of any contractual right of any swap participant or
> financial participant to cause the liquidation, termination, or
> acceleration of one or more swap agreements because of a
> condition of the kind specified in section 365(c)(1) of this title or
> to offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation, or
> acceleration of one or more swap agreements <u>shall not be stayed,
> avoided, or otherwise limited by operation of any provision of this
> title or by order of a court or administrative agency in any
> proceeding under this title.</u>

11 U.S.C. § 560 (emphasis added).  Section 561(a) further states:

> (a) Subject to subsection (b), the exercise of any contractual right,
> because of a condition of the kind specified in section 365(e)(1), to
> cause the termination, liquidation, or acceleration of or to offset or
> net termination values, payment amounts, or other transfer

---

[8] One of the few cases to address the rights of a non-defaulting party under these circumstances is <u>Enron Australia v. TXU Electricity</u>, [2003] NSWSC 1169.  There, the New South Wales Supreme Court considered whether a non-defaulting party under a swap agreement which chose not to declare automatic termination upon a bankruptcy event, and thereafter declined to designate an early termination event because it was "out of the money," could be compelled to do so.  The court enforced the applicable contract provisions, declining to compel TXU to designate an early termination date.  In a holding which sheds an important insight on the global impact of decisions in this area, the court refused to allow Enron to "disclaim" the swap because it would otherwise require the court to rewrite the terms of the swap.  For the Court's and the parties' convenience, we attach a copy of the <u>Enron Australia</u> decision.

WHD\6502012.11

obligations arising under or in connection with one or more (or the
termination, liquidation, or acceleration of one or more) --
    (1) securities contracts, as defined in section 741(7);
    (2) commodity contracts, as defined in section 761(4);
    (3) forward contracts;
    (4) repurchase agreements;
    (5) swap agreements; or
    (6) master netting agreements,
shall not be stayed, avoided, or otherwise limited by operation of
any provision of this title or by any order of a court or
administrative agency in any proceeding under this title.

11 U.S.C. § 561(a).

34.    In enacting sections 560 and 561, Congress sought to preserve the full termination

rights of a party under a swap agreement as those rights would have existed under the terms of

the agreement outside of bankruptcy.  See, e.g., In re Mirant Corp., 314 B.R. 347, 352 n. 10

(Bankr. N.D. Tex. 2004) (rejecting claim that swap participant had waived its right to terminate

swap because of failure to comply with a court's order in a timely way, emphasizing that

"Congress, in enacting sections 560 and related provisions, did not intend that its will would be

frustrated by the courts creating barriers to the exercise by a debtor's contract parties of the rights

so given them.").

35.    Accordingly, the Debtors' Motion, which effectively asks this Court to alter or

"otherwise limit" (in the words of section 560) Metavante's rights to elect to terminate and

Metavante's rights upon termination of the Metavante Swap Agreement, is in direct violation of

sections 560 and 561 of the Bankruptcy Code and should be denied.

## II.    THE METAVANTE SWAP AGREEMENT IS A FINANCIAL ACCOMMODATION CONTRACT AND IS NOT SUBJECT TO SECTION 365(e)(1) OF THE BANKRUPTCY CODE

36.    The Debtors' entire request for relief relies on the Debtors' efforts to shoe horn

the Bankruptcy Code's limitations on the enforcement of *ipso facto* clauses contained in section

365(e)(1) of the Bankruptcy Code, totally ignoring section 365(e)(2)(B), which provides:

16

(2)     Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if —

\* \* \* \*

(B)  such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

37.     The Metavante Swap Agreement and related documents clearly involve the granting of credit and the making of financial accommodations to LBSF, and between LBSF, LBHI and Metavante.  The essence of a swap transaction such as this one is the extension of credit by each party to the other party.  This is best illustrated by the fact that at any point in time, either party may be "in the money" or "out of the money," depending on market forces.

38.     While there is little guidance on the question of whether all swap agreements fall within the Bankruptcy Code's definition of "financial accommodations," there is little doubt that the Metavante Swap Agreement elevates the parties' relationship to one which makes it a financial accommodation contract.

39.     In the instant case, Metavante was unwilling to rely solely on LBSF's credit. Metavante sought and obtained the guaranty of a "Credit Support Provider" to secure LBSF's obligations which, while they constituted contingent debt at the time the parties entered into the transaction, would become fixed in the event LBSF was "out of the money" on the swap.  On the reverse side of the swap, LBSF negotiated to become one of the secured "Lenders" under the credit documents between Metavante and its banks and other senior secured lenders.  The credit arrangements flowing from and to LBSF unquestionably make the Metavante Swap Agreement a financial accommodation contract within the meaning of section 365(e)(2). See, e.g., In re United Airlines, Inc., 368 F.3d 720, 723-24 (7th Cir. 2004 ("[a]lthough the Bankruptcy Code does not define 'financial accommodation,' it is common ground among the parties that a

17

guaranty or other form of suretyship fits the bill"); <u>Citizens S. Nat'l Bank v. Hamilton (In re</u>

<u>Thomas B. Hamilton Co., Inc.)</u>, 969 F.2d 1013, 1018-19 (11th Cir. 1992).  Accordingly, even

absent the Debtors' failure to satisfy a condition precedent for Metavante's performance, there is

no "ipso facto" limitation under section 365(e)(1) on Metavante's ability to enforce the

Metavante Swap Agreement, including the right to suspend making payments under Section

2(a)(iii) of the Metavante Swap Agreement.

> 40.     This result and Metavante's position is entirely consistent with the spirit and
conceptual framework of the Bankruptcy Code.  Contracts for financial accommodations are
excepted from modification by a court in section 365(e), and from assumption and assignment
under section 365(c).  Sections 546(g) and 548(d) also protect the non-debtor swap participant,
and the automatic stay does not apply to a swap participant under section 362(b)(17).  Similarly,
as seen from the legislative history quoted above, in 2005, Congress chose to prohibit a court
from limiting other rights of parties to swap agreements under sections 560 and 561 of the
Bankruptcy Code.  In the face of Congress' deliberate and systematic plan to make swap
agreements immune from restrictions under the Bankruptcy Code, the Debtors request should be
seen for what it is -- an attempt to prevent Metavante from relying on the only provision of the
Metavante Swap Agreement that keeps the Debtors from obtaining a windfall in this matter due
to the Debtors' inability to perform.

## III.    THE DEBTORS' MOTION CREATES MATERIAL ISSUES OF DISPUTED FACT

> 41.     The Debtors' Motion implicates a wide array of contested facts, including the
nature and impact of the Debtors' defaults[9], and the scope and extent of Metavante's set-off

---

[9]  In addition to Sections 5(a) (iii) ("Credit Support Default") and 5(a) (vii) ("Bankruptcy") of the Metavante Swap Agreement, the Debtors have likely also defaulted under Section 5(a) (vi) ("Cross Default") by virtue of LBHI's failure.  Metavante reserves all of its rights to assert further grounds for default uncovered through discovery.

18

claim[10] based on its prudent decision to re-hedge.  Consistent with Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993), Metavante requests that the Court schedule a reasonable period of time to conduct discovery, followed by an evidentiary hearing.

## Conclusion

For all the reasons set forth herein, Metavante respectfully requests that this Court enter an Order (i) denying the relief requested in the Motion, and (ii) granting such other relief as is just and equitable.

Dated: June 15, 2009
        Milwaukee, Wisconsin

/s/ Bruce G. Arnold

Bruce G. Arnold, Esq.
Daryl L. Diesing, Esq.
Daniel J. McGarry, Esq.

WHYTE HIRSCHBOECK DUDEK S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202
Telephone: (414) 273-2100
Facsimile: (414) 223-5000
Attorneys for Metavante Corporation

---

[10] Metavante's claims include, without limitation, its lost benefit of the bargain, its added costs of funding and the losses incurred as a result of obtaining and reestablishing its hedge.  Metavante reserves all of its rights to assert further claims for damages arising out of the Debtors' breaches.

WHD\6502012.11

 LexisNexis·

1 of 3 DOCUMENTS

© 2004 Reed International Books Australia Pty Limited trading as LexisNexis

Australian Law Reports

SIMMS and Another (in their capacity as liquidators of Enron Australia Finance Pty Ltd (in liq)) v TXU ELECTRICITY LTD and Another

2003 NSWSC 1169

SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

*204 A.L.R. 658*

4 July 2003 -- Sydney, heard

24 December 2003 -- Sydney, delivered

## CATCHWORDS:

Corporations - Winding up - Liquidators - Disclaimer of contracts - Requirement to obtain leave of court - Powers of court on applications for leave - Scope of power to make such orders in connection with matters arising under or relating to contract as thought just - (CTH) Corporations Act 2001 ss 568(1A), 568(1B)(b), 568(9), 568D.

## HEADNOTES:

The plaintiff was a liquidator of a company that had entered into a contract with the defendant. The plaintiff believed that, under the contract, the defendant would eventually have to pay a large amount of money to the company. To obtain these amounts promptly, the plaintiff applied to the court for leave to disclaim the contract under s 568(1A) of the Corporations Act 2001 (Cth). However, the plaintiff was concerned that the disclaimer would, without more, enable the defendant to pay a lesser amount. On this basis, he also sought orders from the court under s 568(1B)(b) of the Corporations Act that effectively varied the defendant's payment obligations. The question of whether the court had power to make those orders was set down for separate determination.

**Held,** answering the question in the negative:

Section 568(1B)(b) of the Corporations Act, in enabling the court to make orders in connection with matters arising under, or relating to, a contract, refers to the contract in its present form. Accordingly, the provision does not enable the court to make orders varying the rights and obligations of the parties to the contract: at [40], [42].

## INTRODUCTION:
### Application

This was an application under s 568(1A) of the Corporations Act 2001 (Cth) for leave to disclaim a contract.

## COUNSEL:

J Sheahan SC and V F Kerr instructed by Baker & McKenzie for the plaintiffs.

A C Archibald QC and S R Horgan instructed by Blake Dawson Waldron for the defendants.

## JUDGES: Austin J

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

**JUDGMENTS:** Austin J.

[1]  This judgment follows the hearing of separate questions conducted on the basis of an agreed statement of facts, pursuant to s 191 of the Evidence Act 1995 (NSW).

[2]  The plaintiffs are the liquidators of Enron Australia Finance Pty Ltd (in liq) (Enron). Enron was placed into voluntary administration on 3 December 2001, and was placed into liquidation by its creditors on 29 January 2002.

[3]  Prior to its liquidation, Enron traded in the Australian electricity derivatives market, by entering into electricity swap contracts with various counterparties. An electricity swap contract or "trade" is for the notional sale and purchase of electricity to be delivered in the future. One party agrees to pay a fixed price for a nominated type and quantity of electricity or the other party agrees to pay a floating price for the same electricity. The terms of each trade include a start date and an end date, which define the period over which payments fall due under the swap contract. The contractual arrangements provide that payment obligations are set off and the counterparties settle up periodically by one of them paying a net amount to the other. Thus, if the fixed price exceeds the spot price then the fixed price payer is liable to pay the difference to the floating price payer, and vice versa.

[4]  The statement of agreed facts gives the following explanation:

The fixed price is the price which the payer agrees to pay and the payee (the floating price payer) agrees to receive, calculated by reference to the electricity referred to in the trade. The floating price is nominated as the spot price for the electricity referred to in the trade as determined under the National Electricity Code over the duration of the trade. The spot price for electricity is subject to market fluctuation.

[5]  One counterparty to electricity swap contracts entered into by Enron was the first defendant, TXU Electricity Ltd (TXU). Another was the second defendant, Yallourn Energy Pty Ltd (Yallourn). In each case, particular swap contracts were entered into pursuant to a master contract.

[6]  TXU and Enron entered into a master contract on 15 December 2000 to govern trading between them (the TXU agreement). It was the standard master agreement for multicurrency-crossborder transactions issued in 1992 by the International Swap Dealers Assn, Inc, supplemented and modified by a Schedule and by "Australian Addendum No 13 - - Electricity Transactions". TXU and Enron then entered into particular electricity swap contracts with each other governed by the TXU agreement. In some cases Enron took the fixed price position and TXU took the floating price position, and in others, the positions were reversed. When a swap contract was made, Enron issued a swap confirmation setting out the terms of the transaction, including the notional quantity of electricity measured in mega-watts per hour, the effective date and termination date, and the fixed price for each calculation period, stipulating which party was the fixed price payer and which was the floating price payer. Prior to the appointment of voluntary administrators to Enron, Enron and TXU settled the amounts which fell due under the trades by net payments on a weekly basis.

[7]  Enron ceased to make new contracts with TXU prior to the commencement of its voluntary administration on 3 December 2001. However, 78 swap contracts between them remained "open" as at that time, in the sense that the time for performing the contract by ascertaining and paying amounts due had not then arrived. In fact, the time for performance of some open swap contracts extends out to 31 December 2005. Since 3 December 2001 TXU has not made any payments to Enron.

[8]  The plaintiffs contend (and TXU denies) that, as at 28 February 2003, the total present value of the TXU agreement to Enron was approximately $ 3.3m (plus interest, if interest is payable). That sum is said to comprise:

(a)  out of all settlements which would have "accrued" to that time:

   (i)  approximately $ 10.5m payable by TXU to Enron; and

   (ii)  approximately $ 3.2m payable by Enron to TXU;

(b)  the present value of the open trades which were yet to accrue at that time, calculated at AFMA mid-point prices, which would be:

   (i)  approximately $ 1.1m payable by TXU to Enron; and

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

(ii) approximately $ 5.1m payable by Enron to TXU.

(AFMA mid-point prices are prices taken from the mid-point of the
forward pricing curve produced daily by the Australian Financial
Markets Assn.)

[9]  Yallourn's position is not conceptually different from the position of TXU. The Yallourn agreement was dated 10 August 2000. Under that agreement, as at 3 December 2001 33 swap contracts were open, extending out to 31 December 2003. The plaintiffs' calculation (denied by Yallourn) is that, as at 28 February 2003, the total present value of the Yallourn agreement to Enron was approximately $ 2.9m (plus interest if payable). That sum is said to comprise:

(a)  out of all settlements which would have accrued:

(i)  approximately $ 5.1m payable by Yallourn to Enron; and

(ii)  approximately $ 2.2m payable by Enron to Yallourn;

(b)  the present value of those trades which are yet to accrue
calculated at AFMA mid-point prices, which would be:

(i)  approximately nil payable by Yallourn to Enron; and

(ii)  approximately $ 70,000 payable by Enron to Yallourn.

[10]  For convenience, I shall concentrate on the position of TXU, but my observations will be applicable, mutatis mutandis, to Yallourn.

### The agreements

[11]  Section 2(a) of the TXU agreement deals with the payment obligations of the parties (and also delivery obligations). Section 2(a)(i) says that each party will make the payments specified in each confirmation, and subpara (ii) sets out the manner and place of payment. There are netting provisions in s 2(c) and Pt 4(i) (the Schedule).

[12]  Section 2(a)(iii) provides that the payment obligations specified in each confirmation are subject to: (1) the condition precedent that no event of default or potential event of default with respect to the other party has occurred and is continuing; and also (2) the condition precedent that no early termination date in respect of the relevant transaction has occurred or been effectively designated. Since these two conditions are conditions precedent to the payment obligations of the counterparties, if either condition has not been met at any given time, there is no payment obligation under any of the trades that have been made under the TXU agreement. However, a payment obligation will spring up under a pre-existing trade once the relevant condition is satisfied, and in that sense it might be said (with only approximate accuracy) that the payment obligation is "suspended" while the condition remains unfulfilled, and that amounts "accrue" notwithstanding that the condition is unfulfilled.

[13]  Condition (1) relates to events of the default, which are defined in s 5(a). The definition includes failure to pay or deliver (s 5(a)(i)), breach of the agreement (s 5(a)(ii)), and "bankruptcy", defined to include (to the extent relevant here), having a resolution passed for winding-up (s 5(a)(vii)(5)) and becoming subject to the appointment of an administrator (s 5(a)(vii)(6)).

[14]  An event of default as defined by s 5(a)(vii)(6) occurred when Enron went into voluntary administration on 3 December 2001, and continued during the course of the administration until 29 January 2002. Therefore during that time, the payment obligations of TXU in respect of its trades with Enron under the TXU agreement were "suspended". Then an event of default as defined by s 5(a)(vii)(5) occurred on 29 January 2002, when Enron was placed into liquidation by its creditors, and that event of default has continued since that time, with the result that the payment obligations have continued to be "suspended".

[15]  Section 6(a) deals with the right to terminate following an event of default. It enables the non-defaulting party to give a notice to the defaulting party designating an early termination date in respect of all outstanding transactions.

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

[16]   Section 6(c) says that if an early termination date has been effectively designated, no further payments or deliveries are required in respect of the terminated transactions, and the amount (if any) payable is determined under s 6(e).

[17]   Section 6(e)(i) deals with the payments to be made if an early termination date has been designated because of an event of default. The relevant method of calculation is in s 6(e)(i)(3), called the "Second Method and Market Quotation". "Market Quotation", a defined term, applies where the amount determined is based on quotations from reference market-makers. Generally speaking, the calculation has the effect of preserving the economic equivalent of payment or delivery under the terminated transaction has if the early termination date had not been designated. Under this method, the non-defaulting party works out the settlement amount in respect of the terminated transactions owing to it, from which are deducted the unpaid amounts owing to the defaulting party, all converted into the termination currency. If the amount so calculated is a positive number, the defaulting party must pay it to the non-defaulting party; if it is a negative number, the non-defaulting party must pay the absolute value of that amount to the defaulting party.

[18]   In the present case these clauses gave TXU, but not Enron, the contractual right to designate an early termination date in respect of all outstanding transactions, and then to settle by making or receiving a payment calculated under s 6(e)(i)(3), thereby terminating those transactions. According to the plaintiffs' contention, set out above, TXU would be obliged to pay a substantial amount to Enron, rather than the reverse, if it were to designate an early termination date.

[19]   While the TXU agreement in terms authorises TXU as the non-defaulting party to initiate the early termination procedure, it does not oblige TXU to do so. If the plaintiffs' contention as to the value of accrued and open trades is correct, it would obviously not be in TXU's economic interest to take steps that would generate an obligation to make a large payment, when the obligation does not presently exist.

[20]   The present position under the TXU agreement is that, in the absence of any such step being taken by TXU, there will continue to be no payment obligations in respect of any outstanding transactions. The agreed statement of facts says that as a consequence of the occurrence of an event of default, TXU is not required to make any payments before the last trade expires on 31 December 2005 (31 December 2003 in the case of Yallourn).

[21]   The plaintiffs take the view that, once the last outstanding transaction expires on 31 December 2005, Enron will be entitled to designate an early termination date and cause a net settlement of all outstanding transactions to occur under s 6(e)(ii) (which has the effect, in the present case, of making the method of calculation described in s 6(e)(i)(3) apply if an early termination date has been designated resulting from a termination event). This is because s 6(b) permits Enron to give a notice designating an early termination date, in respect of all affected transactions, if a termination event occurs. Section 5(b) defines termination events to include an additional termination event specified in the Schedule.

[22]   Part 1(h) of the Schedule is as follows, to the extent relevant:

*Additional Termination Events*: Will apply. The following shall constitute Additional Termination Events:

(i)   An Event of Default occurs with respect to a party ("Party X"),
      Party X has satisfied all its payment and delivery obligations
      under Section 2(a)(i) with respect to all Transactions and has no
      future payment or delivery obligations to the other party ('
      'Party Y") whether absolute or contingent under Section 2(a)(i),
      and Party Y refuses to make a payment to Party X based upon the
      condition precedent in Section 2(a)(iii).

For the purpose of the foregoing Termination Event, the Affected Party shall be Party X. However, despite Section 6(b)(iv) [which would allow either party to designate an early termination date], Party X is the party entitled to give the notice under Section 6(b)(iv) designating the Early Termination Date for the foregoing Termination Event ...

[23]   As I understand the plaintiffs' position, set out in their written submissions (especially paras 33, 42 and 43), they say that when the last outstanding transaction expires, Enron will be in the position of party X in Pt 1(h) of the Schedule and will therefore be entitled to designate an early termination date, and thereby cause a net amount to become payable by TXU under s 6(e)(ii). In the plaintiffs' view, Enron will be entitled to do so notwithstanding that it will continue to be in liquidation, but its right to do so will not arise until the expiry of the last open trade. They apply the same analysis to the Yallourn agreement, which is to the same effect.

[24]   The plaintiffs say that, because on their calculations large amounts will eventually be payable by TXU and Yallourn respectively, the two agreements are valuable "assets" of Enron. Their commercial objective is to realise those "assets" promptly, rather than waiting for the expiry of the last trades. They do not have the contractual right to do so, and indeed, the word "assets" must be used with caution because no value can be realised by Enron under the agreements except according to their terms.

### The originating process and the orders for the determination of separate questions

[25]   In order to achieve their commercial objective, the plaintiffs wish to disclaim the TXU agreement and the Yallourn agreement. Since the parties accept that the agreements are not "unprofitable contracts" for the purposes of s 568(1A) of the Corporations Act, the plaintiffs need the leave of the court to disclaim them.

[26]   The plaintiffs are concerned that, if the agreements were to be disclaimed without further orders, they would forfeit their right to recover the net value of the agreements, except in respect of payment obligations that had fallen due prior to 3 December 2001. In other words, they are concerned that by disclaiming they would forgo the potential benefit of the open trades. Their concern arises because of s 568D(1), and they have presented an analysis of the effect of s 568D(1), having regard to relevant case law, to reveal the legal basis for their concern. It is unnecessary for me, in the present judgment, to decide directly how s 568D(1) would operate if the plaintiffs were to terminate without additional orders, and I shall not do so. To overcome the perceived difficulty under s 568D(1), the plaintiffs seek orders that would enable them, forthwith upon disclaimer, to recover the value of the agreements.

[27]   By their further amended originating process filed on 6 February 2003, the plaintiffs seek orders that leave be granted to them to disclaim the TXU agreement and the Yallourn agreement under s 568(1A) of the Corporations Act 2001 (NSW). They also seek orders under s 568(1B) which would have the effect of varying the payment obligations of the defendants. The order sought in the case of TXU, replicated in the case of Yallourn, is as follows:

2. An order that, in the event the plaintiffs disclaim the TXU contract pursuant to the leave granted in order 1:

(a)   TXU determine an amount payable in respect of an Early
    Termination Date in accordance with Section 6(e) of the TXU
    contract, as though TXU had designated the date the disclaimer
    takes effect under s 568C as the Early Termination Date and TXU
    was the Non-defaulting Party;

(b)   if the amount so determined is a negative number, TXU pay the
    absolute value of that amount, together with interest thereon
    calculated in accordance with Section 6(d)(ii), to Enron; and

(c)   if the amount so determined is a positive number, TXU lodge a
    proof of debt for that amount with the plaintiffs.

[28]   The purpose of this order, and the corresponding order for Yallourn, would be to make the disclaimer an event triggering the final settlement of all open trades pursuant to the terms of the agreements, on the same basis as if the respective defendants had designated the date of disclaimer as an early termination date as the non-defaulting party under s 6(a). Although the order would make provision for TXU (and Yallourn) to lodge a proof of debt if the calculation produced a figure owing by Enron, obviously the plaintiffs' expectation is that the amount so determined will be a substantial negative number, so that TXU (and Yallourn) will have an obligation to make a payment to Enron.

[29]   If the orders are made, the defendants' payment obligations under the agreements will be substantially changed, because in the absence of the order, they have no payment obligations until 31 December 2005 and 31 December 2003 respectively, and then their payment obligations will depend on calculations based upon mid-point prices not yet available.

[30]   The further amended originating process also seeks declarations with respect to the proper construction of other parts of the agreements, which need not concern us for the purpose of determining the separate questions.

[31]   On 24 March 2003 the court made the following order by consent:

The following questions be set down for separate determination pursuant to Part 31 Rule 2 of the Supreme Court Rules 1970 (NSW):

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

(a)  whether a disclaimer by the Plaintiffs of the contract entitled
ISDA Master Agreement between Enron Australia Finance Pty Ltd and
TXU Electricity Limited dated 15 December 2000 would take effect
as the occurrence or designation under the said contract of an
Early Termination Date;

(b)  whether a disclaimer by the Plaintiffs of the contract entitled
ISDA Master Agreement between Enron Australia Finance Pty Ltd and
Yallourn Energy Pty Limited dated 10 August 2001 would take
effect as the occurrence or designation under the said contract
of an Early Termination Date;

(c)  whether this Honourable Court has power under Division 7A of Part
5.6 of the Corporations Act 2001 (Cth) to make such orders
imparting such an effect to a disclaimer.

**[32]**  When the hearing for the determination of these separate questions began, the parties informed me they had agreed, for the purposes of that hearing, that a disclaimer of the two agreements by the plaintiffs would not have the effect described in subparas (a) and (b) of the order. In other words, it was agreed between the parties that the correct answer, in the case of each of subparas (a) and (b), is "It would not". Consequently the only question before the court is subpara (c). The plaintiffs say that the correct answer to subpara (c) is "It does", and the defendants say that the correct answer is "It does not".

**[33]**  It is worth emphasising that the question relates to the power of the court to make orders of the kind contemplated by para 2 of the further amended originating process. If it is held that the court has the power to make such orders, questions will arise at the final hearing of the proceeding as to whether the court should exercise its discretion to make some such order as the plaintiffs seek. The plaintiffs will succeed with respect to the separate questions if I decide that the court has the power to make orders of the kind sought, even if my view is that it would rarely do so and would be unlikely to do so in this case.

**The statutory provisions**

**[34]**  Division 7A (ss 568-568F) of the Corporations Act deals with the disclaimer of "onerous property". It is contained in Pt 5.6, the subject of which is "winding up generally", as opposed to "winding up in insolvency or by the Court on other grounds" (Pts 5.4, 5.4A and 5.4B) and "voluntary winding up" (Pt 5.5). In general, therefore, Div 7A applies to disclaimer both by a liquidator in a voluntary winding up and by a court-appointed liquidator.

**[35]**  Section 568(1) says that, subject to the section, a liquidator may disclaim property of the company that consists of (inter alia) a contract. The two provisions of critical importance in the present case are as follows:

568(1A) A liquidator cannot disclaim a contract (other than an unprofitable contract or a lease of land) except with the leave of the Court.

568(1B) On an application for leave under subsection (1A), the Court may:

(a)  grant leave subject to such conditions; and

(b)  make such orders in connection with matters arising under, or
relating to, the contract;

as the Court considers just and equitable.

**[36]**  Section 568B allows an interested person to apply to the court for an order setting aside a disclaimer before it takes effect. Section 568C explains when the disclaimer takes effect.

**[37]**  Section 568D is also important in this case. It provides:

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

568D(1) A disclaimer is taken to have terminated, as from the day on which it is taken because of subsection 568C(3) to take effect, the company's rights, interests, liabilities and property in or in respect of the disclaimer property, but does not affect any other person's rights or liabilities except so far as necessary in order to release the company and its property from liability.

(2) A person aggrieved by the operation of a disclaimer is taken to be a creditor of the company to the extent of any loss suffered by the person because of the disclaimer and may prove such a loss as a debt in the winding up.

[38]  The plaintiffs' case is that s 568(1B) is a very wide provision that gives the court a discretionary power to vary the contractual arrangements between the parties in such a manner as the plaintiffs propose here. To establish their case, they have presented to me a very thorough and well-researched argument about the proper construction of that provision, having regard to its legislative history and purpose, in the context of the overall structure and purpose of Pt 5.6 Div 7A. I have concluded, however, that s 568(1B) does not empower the court to make orders of the kind sought by the plaintiffs. Therefore notwithstanding their impressive endeavours, the plaintiffs are unsuccessful on the separate questions. I shall endeavour to explain my reasons, by reference to the plaintiffs' four principal submissions, which relate to the statutory language, the structure of the provisions, their legislative history, and general legislative intent.

**The statutory language**

[39]  The court's powers under s 568(1B) arise upon an application for leave under subs (1A). There is a power to grant that leave subject to conditions, and a power to "make such orders in connection with matters arising under, or relating to, the contract". The plaintiffs emphasise the breadth of these words. It is well established that expressions such as "in connection with" and "relating to" are expressions of wide import, although their precise scope will always be informed by the context in which they appear: for example, *Workers Compensation Board (Qld) v Technical Products Pty Ltd* (1988) 165 CLR 642 at 653-4; 81 ALR 260. Where the expressions "in connection with" and "relating to" are used in the same provision to confer a power of the court, their cumulative effect is to reinforce the breadth of the power.

[40]  I accept the submission that the words of s 568(1B) are words of wide import. Nevertheless, they are not boundless in scope. The words identify matters arising under or relating to the contract to be disclaimed, and the order must be in connection with such matters. As a matter of construction of the statutory language, the subsection does not authorise the court to make orders in connection with matters arising under a contract that was not the subject of an application for leave to disclaim. Likewise, it does not authorise the court to make orders unconnected with any matters arising under a contract between the parties. By parity of reasoning, the subsection does not authorise the court to make orders in connection with matters that do not arise under or relate to the terms of the existing contract, but would arise if the terms of the contract were altered.

[41]  The order sought by the plaintiffs against TXU would, if the plaintiffs were to disclaim the TXU agreement, require TXU to take a step under the agreement that it would not otherwise be obliged to take, namely the step of designating an early termination date and thereby causing final net payment to be calculated under s 6(e). The order sought against Yallourn would operate in the same way. The plaintiffs say that these orders provide a mechanism by which the interests, albeit contingent, of Enron and the two counterparties, which are "matters arising under, or relating to" the respective agreements, can be crystallised. They say this crystallisation is squarely "[connected] with" those matters.

[42]  I disagree with this contention. In my opinion, the orders vary the rights and obligations of the parties to the contracts. It is, in substance, a term of the agreements that for as long as an event of default continues there will be no liability on the non-defaulting party to make any payment pursuant to any trade or confirmation. Arguably this term is subject to the implied limitation that a payment obligation may arise if there is an additional termination event entitling the defaulting party to designate an early termination date. But subject to any such qualification, there is such a term and it will be effectively varied, indeed negated, if the orders are made. That being so, the orders cannot be described as orders "in connection with" anything that arises under or relates to the contracts in their present form.

[43]  The plaintiffs' argument is not improved by speaking in terms of the interests of the parties, as opposed to their strict legal rights and obligations under the agreements. The interests of the parties under the agreements are defined by the provisions of the agreements. Assuming the plaintiffs' calculations are correct, Enron has, by virtue of the terms of the agreements considered together with the movement in electricity prices over the relevant time, a commercial "interest" (perhaps more activity, and expectancy or aspiration for commercial reasons) that TXU and Yallourn will exercise their contractual rights to designate early termination dates so as to generate payment obligations in favour of Enron. But that "interest" is not a matter arising under or relating to the agreements themselves, but rather a matter aris-

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

ing under or relating to the way in which the counterparty will exercise its contractual rights in the economic circumstances that have emerged after the contract was made.

[44]    The wording of s 568(1B) does not permit the court to bestow on the company in liquidation substantive rights that it did not have under the contract which is to be disclaimed. It does not, as a matter of construction, permit the court to deprive the counterparty of its contractual rights, such as the right not to designate an early termination date under s 6(a) after an event of default occurs and the right under s 2(a)(iii) not to make a payment under s 2(a)(i) while an event of default continues.

### The structure of the provision

[45]    The plaintiffs say that the scope of para (b) of s 568(1B) needs to be assessed in light of para (a), which gives the court a power to impose conditions on the grant of leave to disclaim. They say, and I agree, that the power to grant leave subject to conditions is apt to permit the court to impose obligations on the company or the liquidator in the event of disclaimer. It is the next step in the submission that I find unacceptable. The plaintiffs say that if para (b) is to add anything, it must be to permit the court to give the company rights, or to impose obligations on the other party to the contract, in the event of disclaimer.

[46]    But if one has regard to how provisions analogous to para (b) in the bankruptcy and liquidation law of the United Kingdom have been used, it becomes evident that there is a field of operation for para (b) that does not involve altering the rights of the contractual counterparty, a step that has not in fact been taken in any of the English cases. As the defendants point out in their written submissions, the English cases offer the following examples of the use of the ancillary power to make other orders that are just:

(a)   where a trustee in bankruptcy or liquidator in possession of
      leased property, after the date of liquidation or sequestration
      and for the purpose of winding up or bankruptcy, is to be liable
      to pay the rent for the period of occupation as an expense of the
      winding up or bankruptcy (rather than leaving the landlord to
      prove for such amounts): *Re Lundy Granite Co* (1871) 6 Ch App
      462 at 466-7; *Re Oak Pits Colliery* (1882) 21 Ch D 322 at
      330; [1881-85] All ER Rep 1157; *Re Knight; Ex parte
      Isherwood* (1882) 21 Ch D 384 at 395; *Re Witton; Ex parte
      Arnal* (1883)


      24 Ch D 26; *Re ABC Coupler and Engineering Co Ltd (No 3)*
      [1970] 1 All ER 650 at 657; *Re Downer Enterprises Ltd*
      [1974] 2 All ER 1074 at 1082;

(b)   orders concerning the removal by the liquidator, or purchase by
      the landlord, of tenants' fixtures: *Re Moser* (1884) 13 QBD
      738.

[47]    The plaintiffs submit that, in the words of their senior counsel, Div 7A contains a "miscellany of provisions to create a flexible regime". There are, in the plaintiffs' submission, three discrete powers of the court to adjust the interests of parties affected by ongoing contracts with a company in liquidation: under ss 568(9), 568B or 568E, and under ss 568F or 568D(2).

[48]    First, the plaintiff refers to s 568(9). That subsection permits the court, on the application of the person who is, as against the company, entitled to the benefit or subject to the burden of the contract made with the company, to make an order discharging the contract on terms as to the payment by or to either party of damages for non-performance of the contract, or otherwise, as the court thinks proper. The court is also empowered to make an order rescinding the contract on such terms as to restitution by or to either party, or otherwise, as the court thinks proper.

[49]    Section 568(9) does permit to party to a contract to apply to have the court bring the contract to an end, independently of the liquidator exercising any rights of disclaimer, and if such an application is made, the court has a wide power to adjust the interests of the parties under the contract. The plaintiff says it is important that the subsection envis-

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

ages both a resultant liability that is inconsistent with the strict contractual rights of the parties (because no actual enti-tlement to discharge or rescind the contract has arisen or been exercised), and a calculation of the relevant liability on the premise of a non-performance breach. There is said to be some similarity between such an order and the order that the plaintiffs seek in the present case, which gives effect to the contractual right of the defendants to recover agreed damages for breach by Enron, and is precisely the kind of order that the court would be likely to grant if one of the de-fendants made an application for an order under s 568(9).

[50]   In my opinion s 568(9) sheds no light on the problem that I have to decide. The subsection is available only upon the application of the counterparty to a contract with the company, and is not available to the company or its liqui-dator. In most cases, the application will arise in circumstances where the company has not performed its contract. Fur-ther, the court's power under the subsection is a power to discharge the contract or rescind it, in each case on terms. It does not purport to authorise the court to vary the parties' vested contractual rights. It is not a power to require a con-tracting party to exercise rights under the contract on the basis that the contract remains on foot.

[51]   Perhaps most importantly, s 568(9) demonstrates, to my mind, that when the legislature wished to give the court a power to make an order affecting contractual rights and liabilities by permitting an order for discharge or rescis-sion, it did so in express terms which stipulated the kind of order that would be permissible. In contrast, the plaintiffs' contention about s 568(1B) would mean that this provision would entitle the court to vary contractual rights and liabili-ties more or less at large, subject only to discretionary considerations. That would be out of line with the approach taken in s 568(9).

[52]   Secondly, the plaintiffs refer to ss 568B and 568E. Those sections permit a person who claims to have an in-terest in disclaimed property to apply to the court for an order setting aside the disclaimer. Section 568B applies before the disclaimer takes effect, and s 568E after the disclaimer has taken effect. Both provisions authorise the court to make an order setting aside the disclaimer, and to make further orders as it thinks appropriate. In both cases, the court may make an order only if it is satisfied that the disclaimer would cause, to persons who have or claim to have interests in the property, prejudice that is grossly out of proportion to the prejudice that setting aside the disclaimer would cause to the company's creditors. Where the application is made after the disclaimer has taken effect, the applicant must jump some additional hurdles which need not be particularised here.

[53]   The plaintiffs say that these provisions demonstrate two matters: first, that the legislature permits a disclaimer to prejudice persons with interests in the disclaimed property to a significantly greater extent that the prejudice caused to creditors, by allowing the court to make an order only if the prejudice is grossly disproportionate; secondly, the court has the widest possible powers under these provisions to adjust the interests of the parties in the event that it selects to set aside the disclaimer. The first point is correct but does not assist. Sections 568B and 568E address quite a different problem from the one addressed by s 568(1B). When the liquidator has purported to disclaim, very good reasons must be established for the court to reverse the liquidator's decision. The position is that the disclaimer is likely to have prejudiced the interests (not the vested contractual rights) of the counterparty and of the creditors respectively, and the court's task is to weigh those prejudices to decide whether there is a case for intervention. As to the second point, the court's power to make other orders is conditional upon an order being made to set aside the disclaimer. There is nothing in these sections to indicate that, having set aside the disclaimer and having restored the contract, the court would be empowered to embark on a new course by interfering with the contractual rights and liabilities.

[54]   Thirdly, the plaintiffs refer to ss 568F(1) and 568D(2). Section 568F(1) allows the court, on the application of a person who claims an interest in disclaimed property or is under liability in respect of the property, to order that the disclaimed property vest in an appropriate person. In my opinion this provision sheds no light on the proper meaning of s 568(1B), because it deals with a very different problem.

[55]   Section 568D(2) states that a person aggrieved by the operation of a disclaimer is taken to be a creditor to the extent of any loss suffered because of the disclaimer. Thus, says the plaintiff, a person adversely affected by an order under s 568(1B) which interferes with the operation of the contract in accordance with its strict terms would not be en-tirely deprived of any remedy, because this provision would allow that person to prove in the winding up. I agree that s 568D(2) would be available if the court were empowered to vary contractual rights and liabilities under s 568(1B), but its existence does not provide any basis for adopting the liberal construction of s 568(1B) for which the plaintiffs con-tend.

[56]   While the various provisions addressed in the plaintiffs' submissions are provisions under which the court has a discretion to make orders reflecting the interests of contractual counterparties or dealing with prejudice to them, the

204 A.L.R. 658 SUPREME COURT OF NEW SOUTH WALES -- EQUITY DIVISION

existence of such provisions in specific and different contexts provides no basis, in my view, for imposing on s 568(1B) a construction that the words of that provision do not naturally bear.

[57]  There is, however, a provision which provides a context for s 568(1B) and an indication that the section was not intended to authorise the variation of contractual rights and obligations in the manner contended for by the plaintiffs. Under s 568D(1) a disclaimer terminates the company's rights and liabilities in respect of the disclaimed contract, while not affecting the counterparty's rights and liabilities except so far as necessary to release the company from liability. I agree with the defendants that under s 568D(1), in its application to an unperformed contract:

.    disclaimer deprives the company of its right to future performance of the contract by the counterparty: see *Hindcastle Ltd v Barbara Attenborough Ltd* [1997] AC 70; [1996] 1 All ER 737 at AC 87 per Lord Nicholls; *Sandtara Pty Ltd v Abigroup Ltd* (1996) 42 NSWLR 491; 19 ACSR 578 at NSWLR 500-1 per Cole JA; and

.    the counterparty's existing, vested contractual rights and benefits are, generally speaking, unaffected by the disclaimer: *Capital Prime Properties Plc v Worthgate Ltd (in liq)* [2000] 1 BCLC 647 at 654 per Neuberger J; *Re Tulloch Ltd (in liq)* (1977) 3 ACLR 808 at 813 per Needham J; *Rothwells Ltd (in liq) v Spedley Securities Ltd (in liq)* (1990) 20 NSWLR 417 at 422 per Hodgson J.

[58]  The defendants submit that the orders proposed by the plaintiffs would have the effect of overriding the operation of s 568D(1), and cannot therefore be regarded as authorised by s 568(1B). I agree with this submission in part.

[59]  The orders proposed by the plaintiff would countermand proposition (a) because they would proceed on the basis that Enron would have the benefit of a final settlement made under the terms of s 6(e). Strictly, however, Enron's entitlement to final settlement would arise under the terms of the orders, rather than by way of future performance of the contracts by the counterparties, and so there would be no direct inconsistency between the orders and s 568D(1). However, I agree with the defendants that the orders would be directly inconsistent with proposition (b), because they would deprive the defendants of their contractual rights, under contracts which expressly contemplate and deal with the consequences of liquidation, to decline to trigger early termination, and of the benefits they would derive from that course. It cannot be contended that such an outcome is "necessary in order to release the company and its property from liability" within the wording of s 568D(1) -- the very fact that the orders are sought in the exercise of the court's discretion demonstrates that there is no necessity involved.

[60]  In my opinion, the general, authorising words of s 568(1B) must be read subject to the specific, non-discretionary provisions of s 568D(1) with respect to the consequences of disclaimer, and those words are therefore not to be construed so as to authorise the court to override the latter provisions.

**Legislative history**

[61]  In written and oral submissions senior counsel for the plaintiffs gave extensive consideration to the history of the disclaimer provisions in Pt 5.6 Div 7A. The disclaimer provisions in corporate liquidation have for a large part of their history been placed in the shadow of the comparable bankruptcy provisions. There is, of course, an important distinction between disclaimer by a trustee in bankruptcy and disclaimer by a liquidator of a company, namely that in the former case but not in the latter, the estate vests in the external administrator. Nevertheless it was appropriate for the plaintiffs to pay attention to disclaimer in bankruptcy law, since it is obvious that the statutory provisions dealing with disclaimer in corporate liquidation have been largely borrowed from bankruptcy law. As their submissions show in detail, the identification of the property that can be disclaimed, and the extent to which the court's leave is required to do so, are matters that have changed from time to time as the provisions have evolved.

[62]  The Bankruptcy Act 1869 (32 & 33 Vict Ch 71) s 23, dealt with the disclaimer of onerous property by a trustee in bankruptcy. The section immediately followed provisions dealing with the trustee's dominion over the bankrupt's property. It authorised the trustee to disclaim property of various descriptions, which burdened the possessor to the performance of some onerous act, including "unprofitable contracts". It did not permit disclaimer, in the case of a contract, unless it was unprofitable. In this respect, s 23 was narrower in scope than the present s 568(1). It said that, in the case

of a contract, disclaimer would have the effect of determining the contract from the date of the order of adjudication. The parallel provisions in corporate liquidation are now in s 568C (as to the effective date of the disclaimer) and s 568D(1) as to the effect of disclaimer. The section said that a person injured by its operation was deemed a creditor of the bankrupt to the extent of that injury, and could accordingly lodge a proof of debt. The comparable provision is now s 568D(2). There was a provision to permit the court to make a vesting order, comparable to s 568F.

[63]   Section 23 of the 1869 Act did not provide for the leave of the court to be sought, nor for the court to make orders imposing conditions or terms. This caused particular difficulties in relation to leases. Since the effect of disclaimer under s 23 was deemed surrender of the lease, it was held that neither party was able to take the benefit of provisions that would operate on the ordinary expiry of the term of the lease. Thus, it was held that a tenant could not retrieve tenant's fixtures: *Re Lavies; Ex parte Stephens* (1877) 7 Ch D 127; *Re Roberts; Ex parte Brook* (1878) 10 Ch D 100; *Re Latham; Ex parte Glegg* (1881) 19 Ch D 7.

[64]   In his submissions, senior counsel for the plaintiff dwelt upon the decision in *Re Morrish; Ex parte Hart-Dyke* (1882) 22 Ch D 410. He said that this case exemplified the position under the 1869 Act from the perspectives of both the lessor and the bankrupt estate of the tenant. In that case it was held that the tenant's trustee could not rely on the terms of the lease to compel the lessor to pay for the value of cottages erected by the tenant, on the principle that I have stated. It was also held, on the same principle, that the lessor was not entitled to rely on a term of the lease so as to pay for mown hay left on the land by the tenant at a rate lower than the market rate.

[65]   The Bankruptcy Act 1883 (46 & 47 Vict, Ch 52) took a different form, evidently in order to overcome such difficulties. Sections (1) and (2) were broadly similar to the previous law, but s (3) was new. It provided:

(3) A trustee shall not be entitled to disclaim a lease without the leave of the Court, except in any cases which may be prescribed by general rules, and the Court may, before or on granting such leave, require such notices to be given to persons interested, and may impose such terms as a condition of granting leave, and make such orders with respect to fixtures, tenants' improvements, and other matters arising out of the tenancy as the Court thinks just.

[66]   Senior counsel for the plaintiffs drew attention to observations by the authors of *Williams & Muir Hunter on Bankruptcy*, 19th ed, p 390, to the effect that the change introduced by this provision permitted the court to give a remedy in a case such as *Re Morrish; Ex parte Hart-Dyke*. He sought to draw the inference that the provision was understood to permit the court to grant leave to disclaim on a basis that would, if appropriate, put the parties in positions equivalent to what they would enjoy in the event of termination in the ordinary course.

[67]   The plaintiffs relied on *Re Moser* (1884) 13 QBD 738. In that case a question arose as to the appropriate form of order to be made in respect of a tenant's fixtures on disclaimer. Wills J made an order that the tenant's trustee have leave to disclaim, on terms that he pay rent in respect of his occupation of the premises from the time of commencement of the bankruptcy; but he ordered the lessor to elect within 2 days whether to pay for the fixtures at valuation, failing which the trustee could remove them.

[68]   The reasoning in the case is very short and rather cryptic. His Lordship said:

I think the principles applicable to fixtures on the determination of the tenancy under ordinary circumstances should be applied when a lease is determined by the disclaimer of a trustee in bankruptcy.

[69]   Senior counsel for the plaintiffs sought to draw from this case the proposition that the power granted by s 55(3) was treated as permitting the court to alter the parties' rights inter se, and in particular, to make them equivalent to the position where the lease had been brought to an end by effluxion of time. He submitted that the power in s 568(1B) should be given no narrower scope.

[70]   This argument deserves careful consideration. In the end, however, I have decided that it is unpersuasive, when weighed against the wording of the modern provision and its context in Div 7A. Section 55(3) of the 1883 Act was not a provision applying to contracts generally, but only with respect to fixtures, tenants' improvements and other matters arising out of the tenancy. Secondly, it seems to me that the *Moser* decision does no more than recognise the rights of the parties under the lease, while making ancillary orders to assist the implementation of those rights. It does not, as here, purport to alter contractual rights and liabilities which expressly govern the position of the parties after the commencement of liquidation of one of them.

[71]   The remainder of the legislative history outlined in the plaintiffs' submissions, though interesting, does not, in my opinion, bear upon the question before me for determination.

### General legislative intent

[72]   The plaintiffs submit that the broad reading of s 568(1B) for which they contend is supported by reflection on the legislative purpose of the disclaimer provisions in Pt 5.6 Div 7A. The plaintiff relies on some observations in *Re Middle Harbour Investment Ltd (in liq) (No 2)* [1977] 2 NSWLR 652 and *Global Television Pty Ltd v Sportsvision Australia Pty Ltd (in liq)* (2000) 35 ACSR 484.

[73]   In the *Middle Harbour* case, Bowen CJ in Eq said ( at 657):

The purpose of providing for disclaimer by an official receiver or trustee in bankruptcy or by a liquidator in a winding up seems clear enough. It is to enable him to rid himself, or, in the case of liquidation, the company, of burdensome financial obligations which might otherwise continue to the detriment of those interested in the administration; it is given to enable the official receiver, or trustee, or the liquidator to advance the prompt, orderly and beneficial administration of the bankrupt estate or, in the case of a company, of the winding up of its affairs ...

[74]   In the *Global Television* case, Santow J said ( at 498):

Very obviously, the disclaimer provisions are intended to enable insolvency administrators to relieve themselves of ongoing liabilities which so prolong the administration and delay the dividend ...

[75]   The plaintiffs extract from these observations the proposition that Div 7A is intended to enable the liquidator promptly to wind up the affairs of the company by bringing to an early end ongoing contractual obligations of the company, thereby avoiding difficulties, risks and delay in the liquidation that would operate to the detriment of creditors. They say that the court should construe s 568(1B) so as to facilitate the achievement of this statutory purpose.

[76]   I agree that one of the legislative purposes of Div 7A is to facilitate the efficient administration and distribution of the insolvent estate. Another purpose, not relevant in the present case but at issue in both the *Middle Harbour* and *Global Television* cases, is the purpose of permitting the liquidator to rid the company of ongoing and burdensome financial obligations. These purposes are implemented in the legislation in specific ways by provisions that establish the metes and bounds of the disclaimer regime. The power to disclaim is not a power given to the liquidator at large. It does not, except to a very circumscribed degree, enable the liquidator to affect the rights of others with whom the company has dealt. When one considers the implementation of the legislative intention in provisions such as ss 568(9), 568B, 568D(1), 568E and 568F, there is nothing to indicate that the effectuation of the legislative purpose is intended to include the variation of contractual rights and liabilities of other parties existing before the disclaimer, even where such a variation might contribute to the efficient administration of the liquidation.

### Conclusions

[77]   For the reasons I have given, my opinion is that s 568(1B) does not empower the court to make an order requiring the defendants to designate an early termination date under s 6(a) of the respective agreements, or to participate in any final settlement of payment obligations under s 6(e) as if such a designation had occurred. Therefore the answer to para (c) of the questions set down for separate determination by me is "It does not". The parties have agreed that the answer to question (a) and the answer to question (b) is, in each case, "It would not".

[78]   Since the plaintiffs have failed to make out their case at the hearing for the separate determination of these questions, and my orders will finally dispose of those questions (subject to appeal), I am inclined to order the plaintiffs to pay the defendants' costs. However, I shall give the parties the opportunity to make submissions with respect costs, and any submissions as to the form of my orders, by standing the matter over for mention before me at 9.30 am on 4 February 2004.

### Order

Separate question answered to the effect that s 568(1B) of the Corporations Act 2001 (Cth) does not empower the court to make an order varying contractual rights and liabilities in the manner sought.

**WRITTENBY:** OLIVER R JONES, SOLICITOR