Hearing Date:  June 24, 2009 at 10:00 a.m. (Prevailing Eastern Time)

Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

and

David S. Cohen (*pro hac vice*)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | No. 08-13555 (JMP) |
| Debtors. | : | (Jointly Administered) |

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
IN SUPPORT OF DEBTORS' MOTION TO COMPEL PERFORMANCE OF
METAVANTE CORPORATION'S OBLIGATIONS UNDER AN
EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

The Official Committee of Unsecured Creditors (the "Committee") of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession (collectively, the

"Debtors"), hereby files this statement in support of Debtors' Motion, Pursuant to Sections

105(a), 362 and 365 of the Bankruptcy Code, to Compel Performance of Metavante

Corporation's Obligations Under an Executory Contract and To Enforce the Automatic Stay [Docket No. 3691] (the "Motion").[1]

## PRELIMINARY STATEMENT

1.  Metavante Corporation ("Metavante") is manipulating the bankruptcy system. Metavante and Lehman Brothers Special Financing Inc. ("LBSF") entered into an interest-rate swap agreement (the "Swap Agreement") that required Metavante to pay LBSF if a specified interest rate fell below 3.865 percent. The specified interest rate has fallen well below this level, and Metavante currently owes LBSF $6,640,138.01 for past-due payments, including interest thereon. Metavante, however, is wrongfully withholding payment to LBSF based on an unenforceable *ipso facto* clause. Moreover, Metavante refused to terminate the Swap Agreement, which would have also resulted in a significant termination payment owing by Metavante to LBSF. Metavante's nonperformance violates both (a) section 365 of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") and (b) the automatic stay provided under section 362 of the Bankruptcy Code.

2.  First, the Swap Agreement is an executory contract that LBSF has neither assumed nor rejected pursuant to section 365 of the Bankruptcy Code. As such, Metavante is obligated to perform under the Swap Agreement. Metavante, nevertheless, has refused to do so, predicating its nonperformance solely on LBSF's and LBHI's bankruptcy filings. But any provision in an executory contract that relieves a party of a performance obligation because of the commencement of a case under the Bankruptcy Code is an unenforceable *ipso facto* clause. Metavante therefore must perform under the Swap Agreement, and this Court should compel such performance.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

2

3. <u>Second</u>, Metavante's failure to perform violates the automatic stay. The payments that Metavante owes to LBSF are property of LBSF's estate. By withholding those payments, Metavante is "exercise[ing] control over [LBSF's] property" in violation of the automatic stay. Such a violation cannot be countenanced. Metavante should be compelled to make the payments to LBSF.

## BACKGROUND

4. LBHI and LBSF filed voluntary petitions under chapter 11 of the Bankruptcy Code on September 15 and October 3, 2008, respectively. The Debtors' chapter 11 cases have been consolidated for procedural purposes and are being jointly administered by this Court pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

5. On September 17, 2008, the Office of the United States Trustee appointed the Committee. The Committee is a statutory body, comprising seven of the largest creditors of the Debtors, that is mandated to safeguard the interests of all the Debtors' unsecured creditors. Pursuant to section 1103(c) of the Bankruptcy Code, the Committee is empowered to, *inter alia*, (a) "consult with the trustee or the debtor in possession concerning the administration of the case," and (b) "investigate the acts, conduct, assets, liabilities and financial condition of the debtor, the operation of the debtor's business and desirability of the continuation of such business, and any other matter relevant to the case or to the formulation of a plan."

**FACTUAL BACKGROUND**

6.      LBSF and Metavante entered into the Swap Agreement pursuant to a standard 1992 ISDA Master Agreement (the "Master Agreement"), dated November 20, 2007, and a trade confirmation, dated December 4, 2007.  The Swap Agreement obligated (a) LBSF to make a floating payment, at three-month USD-LIBOR-BBA, and (b) Metavante to make a fixed payment, at 3.865 percent, both on the notional amount of USD $600 million.  Payments are made quarterly on a net basis, with only the party owing the larger amount making a payment.  LBHI was the credit support provider, or guarantor, of LBSF's payment obligations under the Swap Agreement.

7.      Under the Swap Agreement, the filing of a voluntary bankruptcy petition by either LBSF or LBHI constitutes an event of default (an "Event of Default") that permits Metavante to terminate the Swap Agreement.  (See Master Agreement §§ 5(a)(vii)(4), 6(a).)  Section 2(a)(iii) of the Master Agreement, moreover, subjects Metavante's performance of its payment obligations to the condition precedent that no Event of Default with respect to LBSF "has occurred and is continuing."

8.      Since November 2008, Metavante has not performed its payment obligations under the Swap Agreement.  During this time, Metavante has been the net payor because its fixed payments exceeded LBSF's floating payments.  Metavante currently owes LBSF more than $6,640,138.01 in outstanding, unpaid net payments.  Metavante has refused to make any payment because it claims that the commencement of LBSF's and LBHI's bankruptcy cases constitute Events of Default that relieve Metavante of its payment obligation pursuant to section 2(a)(iii) of the Master Agreement.

**ARGUMENT**

**I.  THE BANKRUPTCY CODE REQUIRES METAVANTE
TO PERFORM UNDER THE SWAP AGREEMENT**

9.   A swap agreement under which the parties have continuing obligations to exchange payments is an executory contract. See In re Enron Corp., 2005 WL 3874285, at *4 n.11 (Bankr. S.D.N.Y. 2005) ("Enron II").[2] Pursuant to the terms of the Swap Agreement, both LBSF and Metavante are obligated to make quarterly payments on a net-out basis because the Master Agreement has not been terminated, the payment obligations of both parties continue, and the Swap Agreement is an existing, executory contract.

10.  Executory contracts are enforceable by a debtor before it assumes or rejects them. McLean Indus., Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.), 96 B.R. 440, 448 (Bankr. S.D.N.Y. 1989); see Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.), 2009 WL 1578282, at *6 (Bankr. S.D.N.Y. 2009); In re Stone Barn Manhattan LLC, 398 B.R. 359, 365-66 (Bankr. S.D.N.Y. 2008) ("It is well accepted that during the post-petition, pre-rejection period, the debtor is entitled to performance from the counterparty").[3] Courts have explicitly held that a nondebtor must provide a debtor with value

---

[2]   The Enron Court noted that the Bankruptcy Code does not define the term "executory contract," but the legislative history to section 365 states that an executory contract "generally includes contracts on which performance remains due to some extent on both sides." S. Rep. No. 95-989, at 58 (1978) (hereinafter "Senate Report"), reprinted in 1978 U.S.C.C.A.N. 5787, 5844. Courts in the Second Circuit have generally adopted the definition proposed by Professor Countryman: an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that failure of either to complete performance would constitute a material breach excusing the performance of the other." Regen Capital I, Inc. v. Halperin (In re U.S. Wireless Data), 547 F.3d 484, 488 n.1 (2d Cir. 2008).

[3]   See also United States v. Dewey Freight Sys., Inc., 31 F.3d 620, 624 (8th Cir. 1994) ("After a debtor commences a Chapter 11 proceeding, but before executory contracts are assumed or rejected . . . those contracts remain in existence, *enforceable by the debtor but not against the debtor*.") (citations omitted) (emphasis in original); Univ. Med. Ctr. v. Sullivan, 973 F.2d 1065, 1078-79 (3d Cir. 1992) (nondebtor obligated to perform under agreement before debtor rejected contract); Public Service Co. v. Elec. Cooperative, Inc. (In re Public Service Co.), 884 F.2d 11, 14 (1st Cir. 1989) (prior to debtor's assumption or rejection, the "executory contract remains in effect and creditors are bound to honor it") (citations omitted); Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage Co., 715 F.2d 375, 378 (7th Cir. 1983)

5

due and owing to the estate under an executory contract before the debtor rejects the contract. See generally In re McLean, 96 B.R. at 541; Skeen v. Denver Coca-Cola Bottling Co. (In re Feyline Presents, Inc.), 81 B.R. 623, 627 (Bankr. D. Colo. 1988).

11.     For example, in In re McLean, McLean, the debtor, brought an adversary proceeding to compel MLA, a nondebtor, to issue shares pursuant to an option contract between McLean and MLA. See 96 B.R. at 441. MLA refused to tender the stock pursuant to the option, alleging that, as a matter of law, McLean could not enforce the agreement prior to formally assuming it. Id. at 443. The Court rejected MLA's argument, finding that "a debtor-in-possession should be able to enforce an assumable executory contract prior to formal assumption or rejection." Id. at 449. The Court went on to state that to allow the nondebtor to withhold performance prior to formal assumption or rejection would be "highly inequitable and unjust." Id. McLean, therefore, was entitled to specific performance of the option contract. Id. at 451.

12.     Similarly, in In re Feyline, the court found that a nondebtor was obligated to continue paying fees to a debtor that had not yet rejected the executory contract. See 81 B.R. at 627. The defendant, Denver Coca-Cola Bottling Company ("Coke"), was party to a multiyear contract with the debtor, Feyline Presents, Inc. ("Feyline"). Id. at 624-25. Under the contract, Coke was obligated to make a series of payments in exchange for Feyline's sale and promotion of Coke's products. Id. After Feyline filed its chapter 11 petition, Coke ceased making the payments. Id. at 626-27. Coke claimed that no binding agreement existed until the contract was assumed. Id. at 627. The court rejected Coke's position. Id. The court found Coke's unilateral decision to suspend performance "simply not acceptable," reasoning that such a decision effectively destroyed Feyline's right to choose whether to assume or reject the contract: "it

---

(executory contract remains in effect and nondebtor is obligated to perform thereunder until debtor rejects it).

6

would make no sense for [Feyline] to assume a contract on which Coke had already indicated it would not perform." Id.

13.     The circumstances here are similar to those in In re McLean and In re Feyline.  Metavante is unilaterally withholding payments that it owes to LBSF under an executory contract.  Such a refusal to perform is prohibited.  In re McLean, 96 B.R. at 449, 451; In re Feyline, 81 B.R. at 627.  As in In re McLean and In re Feyline, this Court should find Metavante's conduct "highly inequitable and unjust" and "simply not acceptable," and compel Metavante's performance.  In re McLean, 96 B.R. at 449;  In re Feyline, 81 B.R. at 627.

## II.    SECTION 2(a)(iii) IS AN UNENFORCEABLE *IPSO FACTO* CLAUSE

14.     Despite clear law to the contrary, Metavante has refused to perform under the Swap Agreement based on section 2(a)(iii) and its contention that the commencement of LBHI's and LBSF's bankruptcy cases constitute Events of Default that excuse performance.  (See Motion ¶¶ 22, 27.)  Metavante's reliance on the commencement of LBHI's and LBSF's bankruptcy cases as Events of Default is contrary to section 365 of the Bankruptcy Code and therefore does not excuse Metavante's performance under section 2(a)(iii).

### A.    *Ipso Facto* Clauses Are Unenforceable Against a Debtor

15.     Section 365(e)(1) of the Bankruptcy Code prohibits the enforcement of *ipso facto* clauses, *i.e.*, contract provisions that terminate or modify an executory contract, or any right or obligation under an executory contract, because of the commencement of a bankruptcy case.  See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.), 1993 WL 159969, at *5 (S.D.N.Y. 1993) (stating that section 365(e)(1) "rendered unenforceable contract provisions that altered the rights or obligations of a debtor as a result of the debtor's commencement of a case under the Bankruptcy Code"); In re Texaco, 73 B.R. 960, 964 (Bankr. S.D.N.Y. 1987) ("A termination or

7

modification clause in a contract which is triggered by the filing of a bankruptcy case is expressly denounced and is unenforceable pursuant to 11 U.S.C. § 365(e)(1)(B)"). Simply put, section 365(e)(1) "abrogates the power of *ipso facto* clauses. No default may occur pursuant to an *ipso facto* clause . . . ." In re Chateaugay Corp., 1993 WL 159969, at *5 (citations omitted).

16.  The general unenforceability of *ipso facto* clauses reflects a legislative determination that "the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets[,]" which is contrary to the general purpose of bankruptcy protections. In re Enron, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004) ("Enron I"); see also Senate Report at 59, reprinted in 1978 U.S.C.C.A.N. at 5845 (stating that *ipso facto* clauses "frequently hamper rehabilitation efforts"). Consequently, courts construe section 365(e)(1) broadly. Dicello v. United States (In Re Railway Reorganization Estate), 133 B.R. 578, 583 (Bankr. D. Del. 1991) ("Today courts continue to read the Code's *ipso facto* sections broadly to effectuate code policy and in recognition that bankruptcy matters are also inherently proceedings in equity").

17.  In In re Chateaugay Corp., for example, the lessor-appellants brought an action seeking to recover attorneys' fees from LTV Aerospace, the lessee-debtor, pursuant to an *ipso facto* clause that provided for the payment of such fees upon default. See 1993 WL 159969, at *1, *5. The Court held that LTV's bankruptcy filing could not be considered an event of default because "no default was triggered under the leases because the *ipso facto* clause is unenforceable and may not be considered an event of default." See id. at *5. Similarly, in In re Child World, Inc., 161 B.R. 349 (Bankr. S.D.N.Y. 1993), this Court denied a claim by the nondebtor for payment of attorneys' fees, finding that a claim based on a breach of a covenant was not enforceable against the debtor if the asserted breach was the debtor's bankruptcy. See

8

id. at 354, 355 ("The filing of a bankruptcy petition does not constitute a default with respect to an executory contract"); see also Century Bank at Broadway v. Peacock (In re Peacock), 87 B.R. 657, 659-60 (Bankr. D. Colo. 1988) (holding that "the filing of a bankruptcy Petition by the Debtors does not, as a matter of law, constitute a default under the bankruptcy clause, or 'ipso facto' clause, of the Contract" and that creditor therefore could not enforce its rights under the default portion of the Contract).

18.    Metavante contends that the commencement of LBHI's and LBSF's bankruptcy cases constitute Events of Default that excuse Metavante's performance under section 2(a)(iii). Section 365(e)(1) is clear, however, that the commencement of a bankruptcy case cannot act as an event of default to excuse performance. Indeed, in In re Chateaugay Corp. and In re Child World, Inc., this Court compelled performance of a nondebtor because the commencement of a bankruptcy case cannot constitute an event of default to excuse performance. See In re Chateaugay Corp., 1993 WL 159969, at *5; In re Child World, Inc., 161 B.R. at 355. Accordingly, Metavante cannot rely on the commencement of LBHI's and LBSF's bankruptcy cases as a predicate to excuse performance under section 2(a)(iii). Metavante should therefore be compelled to perform under the Swap Agreement.

**B.      Section 560 Does Not Excuse Metavante's Nonperformance**

19.    To the extent that Metavante attempts to rely on the Safe Harbor Provisions, those provisions do not apply here. By their plain terms, the Safe Harbor Provisions protect only the liquidation, termination, or acceleration of a swap agreement, and the offsetting or netting out of positions under or in connection with a swap agreement, neither of which Metavante has done or is seeking to do. See 11 U.S.C. § 560; see also Enron I, 306 B.R. at 473 ("[s]ection 560 . . . preserves the rights of a non-defaulting counterparty to a swap agreement to *terminate* the contract based upon . . . the filing of a bankruptcy petition") (emphasis added). The Safe Harbor Provisions do not otherwise protect the modification of rights or obligations under a swap agreement.

20.    In In re Calpine Corp., 2009 WL 1578282, the Court held that section 556 of the Bankruptcy Code, a Safe Harbor Provision for commodities contracts and forward contracts that is similar to section 560,[4] "clearly limits its reach to <u>only those clauses that trigger termination</u> upon the occurrence of a condition specified in section 365(e)(1) of the Code." Id. at *7 (emphasis added); see id. at *6 ("[S]ection 556 of the Code allows a creditor to exercise a prepetition contractual right to terminate a forward contract based upon the debtor's filing of a bankruptcy petition. However, by its terms, section 556 of the Code is limited to enforcing <u>only those terms that trigger termination</u> upon the occurrence of one of the three specified conditions listed in section 365(e)(1) of the Code." (emphasis added)); see also Enron II, 2005 WL 3874285, at *4 ("to avail itself of the [section 560] 'safe harbor' provisions of the Bankruptcy Code . . . the swap participant must opt for the early termination of the swap agreement . . . made fairly contemporaneously with the bankruptcy filing."). Thus, section 560 safe harbors only the

---

[4]     Compare 11 U.S.C. § 556 with 11 U.S.C. § 560.

timely exercise of a contractual right to *terminate* (or to offset or net out under) a swap agreement upon the filing of a bankruptcy petition; it does not otherwise protect the modification of rights or obligations under a swap agreement.

21. The legislative history of section 560 supports such a conclusion. In enacting section 560, Congress stated:

> The new section 560 makes clear that a swap participant may exercise other contractual rights to *terminate or net out* a swap agreement in the event that the other party files a bankruptcy petition, notwithstanding the automatic stay and trustee avoidance provisions of the Bankruptcy Code. . . . The *intent* of this provision is to permit either the non-debtor swap participant or the trustee to *terminate* a swap agreement, so that a swap agreement may continue after the bankruptcy petition is filed only by mutual consent of both the non-debtor swap participant and the trustee.

H.R. Rep. No. 101-484, at 6 (1990), reprinted in 1990 U.S.C.C.A.N. 233, 228 (emphasis added).

22. Here, under the auspices of section 2(a)(iii), Metavante is attempting to deprive LBSF of a contractual right to payment. Because section 560 of the Bankruptcy Code does not protect this attempted modification of LBSF's rights and Metavante's obligations, this Court should compel performance of Metavante's obligations under the Swap Agreement.

### III.    METAVANTE'S NONPERFORMANCE VIOLATES THE AUTOMATIC STAY

23. Metavante's nonperformance of its obligations under the Swap Agreement also violates of the automatic stay. Upon the commencement of a debtor's bankruptcy case, section 362(a) provides for an automatic stay against, *inter alia*, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The scope of section 362(a)(3) is very broad, and "it bars any action which would inevitably have an adverse impact on the property of the bankruptcy estate." Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.), 119

B.R. 430, 432 (S.D.N.Y. 1990) ("Prudential Lines I"), aff'd, Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines Inc.), 928 F.2d 565 (2d Cir. 1991) ("Prudential Lines II") (internal citations and quotations omitted).

24. Property of the debtor includes "all legal or equitable interests of the debtor in property as of the commencement of the case . . . wherever located and by whomever held." 11 U.S.C. § 541(a)(1). "Property of the estate" is to interpreted broadly, as "Congress intended to 'bring anything of value that the debtors have into the estate.'" Prudential Lines II, 928 F.2d at 569, 573 (citing H.R. Rep. No. 95-595 at 176, reprinted in 1978 U.S.C.C.A.N. 5963, 6163). Moreover, property of the estate includes a debtor's right to value owed under an executory contract. See Enron Power Mktg., Inc. v. Public Util. Dist. No. 1 of Snohomish County (In re Enron Corp.), 2006 WL 3140640, at *4 (Bankr. S.D.N.Y. 2006) ("Enron III") (holding that a termination payment owed to the debtor pursuant to a contract is property of the debtor's estate); Slater v. Smith (In re Albion Disposal), 152 B.R. 794, 798 (Bankr. W.D.N.Y. 1993) ("A Chapter 11 Debtor's rights under an executory contract are 'property of the estate,' protected by the automatic stay of 11 U.S.C. § 362").

25. For example, in Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290 B.R. 487 (Bankr. S.D.N.Y. 2003), the debtor brought an adversary proceeding seeking to compel the defendants to turn over its property pursuant to section 542(a) of the Bankruptcy Code. See id. at 488. The Court held that the refusal to turn over the debtor's property constituted an "exercise of control over debtor's property" and therefore, was a violation of the automatic stay. See id. at 490. Similarly, in In re University Medical Center, 973 F.2d 1065 (3d Cir. 1992), debtor University Medical Center ("UMC") brought an adversary proceeding against the Department of Health and Human Services ("HHS")

12

alleging that HHS's actions in withholding post-petition Medicare reimbursements to UMC violated the automatic stay. See id. at 1071. The court held that the automatic stay prevented HHS from withholding payments to UMC. See id. at 1075, 1082.

26. In the instant case, Metavante has refused to pay its quarterly net payments required under the Swap Agreement. LBSF's right to the payments makes them property of LBSF's estate. See Enron III, 2006 WL 3140640, at *4. Accordingly, similar to the defendants' refusal to turn over the debtor's property in In re Metromedia Fiber Network and HHS's refusal to make payments to the debtor in In re University Medical Center, Metavante's refusal constitutes an "exercise of control" over LBSF's property that violates the automatic stay. See In re Metromedia Fiber Network, Inc., 290 B.R. at 493 (stating that the automatic stay must be complied with at the risk of sanctions for violation).[5]

---

[5] If Metavante wanted to withhold payment, it should have sought relief from the automatic stay, rather than self-help. See Shimer v. Fugazy (In re Fugazy Express, Inc.), 982 F.2d 769 (2d Cir. 1992) ("Nothing in the [Bankruptcy] Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay. Only the court may lift the stay.").

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court grant the Motion and compel Metavante to perform under the Swap Agreement.

Dated:   New York, New York
         June 15, 2009

                    MILBANK, TWEED, HADLEY & McCLOY LLP

                    By:  /s/ Dennis F. Dunne
                    Dennis F. Dunne
                    Wilbur F. Foster, Jr.
                    Evan R. Fleck
                    1 Chase Manhattan Plaza
                    New York, NY  10005
                    Telephone: (212) 530-5000
                    Facsimile: (212) 530-5219

                    David S. Cohen (*pro hac vice*)
                    1850 K Street N.W., Suite 1100
                    Washington, DC 20006
                    Telephone: (202) 835-7500
                    Facsimile: (202) 835-7586

                    Counsel for the Official Committee of Unsecured
                    Creditors of Lehman Brothers Holdings Inc., et al.