WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
:
In re                                          :   Chapter 11 Case No.
                                               :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :   08-13555 (JMP)
                                               :
              Debtors.                         :   (Jointly Administered)
                                               :
                                               :
------------------------------------------------------------------x

**LBHI'S MOTION, PURSUANT TO SECTIONS**
**105(a) AND 363 OF THE BANKRUPTCY CODE AND RULE**
**6004(h) OF THE BANKRUPTCY RULES, FOR AUTHORIZATION**
**TO MAKE A CAPITAL CONTRIBUTION TO AURORA BANK FSB**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Preliminary Statement**

1.      LBHI seeks authorization to make a capital contribution to its indirect wholly-owned non-debtor subsidiary Aurora Bank FSB f/k/a Lehman Brothers Bank, FSB (the

US_ACTIVE:\43063036\07\43063036_7.DOC\58399.0003

"Bank" or "FSB").[1] As this Court is aware, since approximately October 2008, LBHI has taken a series of actions to preserve the opportunity to realize the value of its equity interest in FSB and Woodlands Commercial Bank f/k/a Lehman Brothers Commercial Bank ("Woodlands"). To best achieve this goal, LBHI has always contemplated that the Bank would develop and implement a strategic business plan under which it would resume normal lending and other business operations. Moreover, in order to fund its operations under the business plan, the Bank would resume issuance of brokered certificates of deposit – the primary means by which the Bank has historically funded its operations. Under regulatory requirements and credit market conditions, in order to issue brokered certificates of deposit, the Bank needs to achieve and maintain at least a "well-capitalized" status as determined under applicable regulations.

2. The Bank, with LBHI's support, has recently submitted a three-year business plan to the Office of Thrift Supervision (the "OTS"), the Bank's primary regulator, that contemplates that the Bank will regain and maintain its "well-capitalized" status. Approval of the business plan is pending before the OTS. A continuing "well-capitalized" status is a minimum requirement under the business plan in support of the OTS approving the business plan and abolishing the current restrictions imposed on the Bank's operations. To regain "well-capitalized" status, the Bank must maintain certain minimum capital ratios as set forth in the applicable regulations. The OTS will also need to lift certain capital maintenance restrictions currently affecting the Bank.

3. The Bank is required to report to the OTS its capital levels as of June 30, 2009 on its next quarterly thrift financial report (the "TFR"). Although the Bank's condition has improved as a result of various actions taken by the Bank and LBHI's prior actions in support of

---

[1] On April 27, 2009, Lehman Brothers Bank, FSB changed its name to Aurora Bank FSB.

the Bank, there is a possibility that, due to the effect of fair value accounting, which subjects the Bank's capital level to the volatility of the marketplace, the Bank could fall somewhat below the "well-capitalized" mark that is contemplated in the business plan. To avoid potential adverse consequences from a dip in the Bank's capital level on approval of the business plan by the OTS and to ensure that implementation of LBHI's business strategy for the Bank is not delayed as a result, LBHI seeks authorization to make a capital contribution of up to $25 million to the Bank prior to June 30, 2009. As explained below, LBHI believes that this capital investment is appropriate and necessary to protect its prior investments in the Bank and to realize the value of its equity interest in the Bank for the benefit of creditors.

## Background

4. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

7. On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

8. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

9. Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

10. Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

11. By this Motion, LBHI seeks authorization, but not direction, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(h), to invest up to $25 million in cash into the Bank to the extent such investment is determined by LBHI to be necessary to assure that the Bank's total risk-based capital ratio satisfies the 10% "well-

capitalized" mark as of June 30, 2009 and to subsequently maintain such capital level (the "Capital Contribution"). Given the importance to the Bank's business strategy of maintaining a "well-capitalized" status on June 30, 2009, LBHI requests that the Court waive the requirements of Bankruptcy Rule 6004(h) and direct that the order granting the relief requested herein be effective immediately. As set forth more fully below, LBHI's decision to make the Capital Contribution represents a reasonable exercise of its business judgment and should be approved.

## The Prior Capital Support Actions

The PCA and the Capital Restoration Motion

12. In response to the diminished capital level reported in the Bank's December 31, 2008 TFR, on February 4, 2009, the OTS issued a Prompt Corrective Action directive (the "PCA") requiring the Bank to (i) achieve the "adequate" capital levels required under the applicable regulations by February 28, 2009 and (ii) to demonstrate how it would thereafter maintain those levels, including by virtue of the support from its holding company, LBHI, which would be available for this purpose. The PCA directive imposed serious restrictions on the Bank's operations, including, most significantly, prohibiting the Bank from issuing certificates of deposit, which was the primary source of funding for the Bank's operations, as well as restrictions on issuing new loans and conducting new business without the approval of the OTS. While the Bank's total risk-based capital ratio exceeded 10% as of March 31, 2009, the PCA directive remains in effect until it is terminated by the OTS. The capital maintenance restrictions in the PCA will cause the Bank to be considered only "adequately capitalized" until they are lifted by the OTS. However, the Bank could issue brokered certificates of deposit again with a waiver from the Federal Deposit Insurance Corporation (the "FDIC").

13. To allow FSB to comply with the PCA and avoid further adverse regulatory action, including possible seizure of the Bank, LBHI sought and obtained authority from the Court to take certain actions to restore the Bank's diminished capital level as of December 31, 2008. *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 17, 2009) [Docket No. 2847].[2] Pursuant to the order authorizing the relief requested in the Capital Restoration Motion, on February 27, 2009, LBHI consummated a settlement agreement with Aurora Loan Services, LLC ("Aurora"), the Bank's wholly-owned loan servicing subsidiary, that transferred approximately $189 million in economic benefit to Aurora and the Bank and also made a cash contribution of $9,838,000 to the Bank's capital. LBHI's actions were intended to preserve the value of its equity interest in the Bank, as well as the value of Woodlands,[3] which was subject to the risk of regulatory seizure in the event of a seizure of the Bank pursuant to a statutory cross-liability provision.

14. LBHI believed, and continues to believe, that the reported value of the Bank's assets in the December 31, 2008 TFR, which was the basis of the issuance of the PCA, did not reflect the true value that could be achieved for the Bank's assets and was largely the result of the application of "fair value" accounting. As the Court will recall, in 2007, in order to

---

[2] Order Approving *LBHI's Motion, Pursuant to Section 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, for Authorization to Increase the Capital Level of Lehman Brothers Bank, FSB Through (I) the Settlement of Pending Disputes and (II) a Direct Capital Contribution of up to $15 Million* [Docket No. 2800] (the "Capital Restoration Motion"). The Capital Restoration Motion and the record of the February 17, 2009 hearing on such motion, including the testimony and presentation made by LBHI's Chief Executive Officer, Mr. Bryan Marsal, are incorporated by reference herein.

[3] The Court also authorized LBHI to invest up to $272 million into Woodlands in exchange for a right of first recovery in Woodlands' claim filed against LBI with respect to certain municipal bonds as explained in greater detail in *LBHI's Motion, Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, for Authorization to Fund a Capital Contribution Into Woodlands Commercial Bank* [Docket No. 2742] (the "Woodlands Motion"). *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 17, 2009) (Order Granting Woodlands Motion) [Docket No. 2846]. The Woodlands Motion is incorporated by reference herein.

be consistent with the accounting practices of LBHI and its subsidiaries, the Bank (unlike most banks) adopted the Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 159, Fair Value Option for Financial Assets and Financial Liabilities ("FAS 159"). FAS 159 requires entities that adopt such treatment to measure certain financial instruments and other items at fair value for financial reporting purposes. For this purpose, "fair value" is the price that would be received to sell assets or paid to transfer a liability in an orderly transaction between market participants at the measurement date and the preferred method of determining "fair value" is based on comparable market transactions. Under the recent extraordinary credit market conditions, LBHI believes that the application of fair value accounting conventions results in a distortedly negative portrayal of the Bank's financial position.

The Capital Support Motion

15. Subsequent to the capital restoration actions, LBHI and the Bank began developing, in accordance with the PCA, a business plan for future operations of the Bank for submission to and approval of the OTS. As a long-term business strategy for the Bank was being developed, the Bank determined, primarily to bolster its liquidity reserves, to sell certain non-core assets that were not considered to be important for the long-term success of the Bank. That sale was expected to cause the Bank's capital on its March 31, 2009 TFR to fall below the 8% total risk-based capital ratio considered "adequate."

16. To sustain the Bank's capital adequacy and avoid adverse regulatory action, on March 23, 2009, LBHI and its affiliated chapter 11 Debtor, Lehman Commercial Paper Inc. ("LCPI"), filed a motion seeking authority to take various actions to support the Bank's capital level before March 31, 2009 (the "Capital Support Motion"). *See In re Lehman*

*Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Mar. 23, 2009) [Docket No. 3193].[4] Specifically, LBHI and LCPI sought authorization to: (i) enter into one or more assignment agreements with Aurora to transfer all or part of a portfolio of LBHI's unencumbered mortgage servicing rights to Aurora; (ii) enter into a settlement agreement with the Bank and Aurora, pursuant to which LBHI conveyed and confirmed Aurora's ownership of approximately $6 - $7 million in disputed funds; (iii) invest up to $15 million in cash in one or more capital contributions; and (iv) terminate certain loan commitments aggregating $1.375 billion (collectively, the "Capital Support Actions").

17. The Capital Support Motion also requested that LBHI be authorized, subject to the consent of the Creditors' Committee, to take the Capital Support Actions to support the implementation of the Bank's business strategy, including to achieve a "well-capitalized" status, even if such actions were not required to achieve an 8% capital adequacy level. *See* Capital Support Motion ¶¶ 12, 20. A total risk-based capital ratio of at least 10% is required for "well-capitalized" status under the regulations. At a "well-capitalized" status, it was anticipated that the Bank might be able to once again raise deposit funds to provide long-term funding for its ongoing operations, thereby facilitating the positioning of the Bank so that LBHI can realize over time on the values of its investments and equity interest. By order, dated March 31, 2009, the Court granted the Capital Support Motion. *See In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Mar. 31, 2009) (Order Granting Capital Support Motion) [Docket No. 3243].

---

[4] The Capital Support Motion is incorporated by reference herein.

The March 31, 2009 TFR

18.     Pursuant to the order granting the Capital Support Motion, all of the Capital Support Actions (with the exception of assignment of an incidental portion of the mortgage servicing rights, which were retained by LBHI for separate business purposes) were consummated on March 31, 2009. With the consent of the Creditors' Committee, the Capital Support Actions were taken not only to satisfy the 8% capital adequacy mark, but also to allow the Bank to achieve a 10% "well-capitalized" status as of March 31, 2009. Indeed, at that date, the Bank attained a 10.4% total risk-based capital ratio. In addition, on the Bank's March 31, 2009 TFR, the value of LBHI's equity interest in the Bank was reported at approximately $687 million.

The Bank's Business Strategy

19.     The Bank, with LBHI's support after review with the Creditors' Committee, has submitted a three-year business plan (the "Business Plan") for approval by the OTS. The Business Plan is premised on the Bank maintaining a "well-capitalized" status and, based on such status, pursuing a strategy under which, among other things, the Bank recommences certain lending operations and funding its business through certificate of deposit issuances upon obtaining the necessary regulatory approvals. The Bank and LBHI expect to address further with the OTS the capital level to be achieved by the Bank in connection with the implementation of the Business Plan.

The Current Need for a Capital Contribution

20.     The Bank's next quarterly TFR will report its capital levels as of June 30, 2009. Despite the improvements to the Bank's financial condition, there is a possibility that the Bank may fall somewhat below the 10% total risk-based capital level as a result of the effect of

fair value accounting. Failure of the Bank to maintain its total risk-based capital at the 10% "well-capitalized" level pending finalization of the Business Plan would be inconsistent with the Business Plan as submitted to the OTS, and the Bank and LBHI expect that such a failure would materially and adversely affect the Bank's ability to finalize the Business Plan and obtain the regulatory approvals necessary to carry out the Business Plan.

21. If the Bank is unable to obtain the approvals needed for it to implement the Business Plan, recovery of LBHI's prior investments and equity interest could be delayed and potentially jeopardized. Accordingly, LBHI seeks authority to invest up to $25 million into the Bank for the purpose of the Bank maintaining a "well-capitalized" status consistent with the Business Plan.

## Sound Business Reasons Support
## LBHI's Decision to Invest the Capital Contribution

22. Pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI requests authorization to invest the Capital Contribution to preserve the value of the Bank for the benefit of its creditors. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such transaction be based upon the sound business judgment of the debtor. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

23.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

24.     There are ample business justifications in support of the Motion.  If the Bank is not at a "well-capitalized" level on June 30, 2009, there is a material risk that the OTS will not approve the Business Plan, which will delay and could potentially jeopardize LBHI's recovery of the value of its equity interest for the benefit of its creditors.  By making the Capital Contribution, if needed, LBHI would maintain momentum on implementing the Bank's long-term business strategy and fulfilling its goal of putting the Bank in a position to resume normal lending and other business operations without extraordinary regulatory restriction.  Additionally, if the OTS and FDIC authorize the Bank to access funds from the brokered certificate of deposit market, the Bank will be able to conduct normal business operations without the need for further capital support from LBHI.

25.     LBHI has invested a substantial amount of time, money, and effort into preserving the opportunity to realize the value of its equity interest in the Bank and preparing the Business Plan.  If the Business Plan is approved and the Bank's business operations normalize,

the risk to LBHI's equity interest in the Bank, most recently reported at $687 million, will be substantially reduced. It would be a gross waste of LBHI's prior efforts, including the significant contributions that have been made to the Bank aggregating over $220 million in value, and unreasonable as a matter of business judgment to, at this juncture, put at risk obtaining approval of the Business Plan from the OTS because of an aberrational decrease in the Bank's capital level. LBHI believes that the Capital Contribution, which is relatively minor in comparison to the value of LBHI's equity interest and prior investments, is a necessary step to maximize recoveries for its creditors.

26.     For these reasons, LBHI's decision to make the Capital Contribution is in the best interest of its estate and creditors and represents a reasonable exercise of its business judgment. Accordingly, the relief requested by the Motion should be granted.

### Notice

27.     No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

28.     Except for as set forth above, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 16, 2009
      New York, New York

/s/ Alfredo R. Perez
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
　　　　　　　　　　　　　　　　　　　　　　　　：
In re　　　　　　　　　　　　　　　　　　　　：　Chapter 11 Case No.
　　　　　　　　　　　　　　　　　　　　　　　　：
LEHMAN BROTHERS HOLDINGS INC., *et al.*,　　：　08-13555 (JMP)
　　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　Debtors.　　　　　　：　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　　　　　　：
　　　　　　　　　　　　　　　　　　　　　　　　：
------------------------------------------------------------------x

**ORDER GRANTING LBHI'S MOTION, PURSUANT TO
SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND
RULE 6004(h) OF THE BANKRUPTCY RULES, FOR AUTHORIZATION
TO MAKE A CAPITAL CONTRIBUTION TO AURORA BANK FSB**

　　　　　Upon the motion, dated June 16, 2009 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to invest up to $25 million in cash into Aurora Bank FSB (the "Bank") to the extent such investment is determined by LBHI to be necessary to assure that the Bank's total risk-based capital ratio satisfies the 10% "well-capitalized" mark as of June 30, 2009 and to subsequently maintain such capital level (the "Capital Contribution"), all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

      ORDERED that the Motion is granted; and it is further

      ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI is authorized, but not required, to fund the Capital Contribution; and it is further

      ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and this Order shall be effective immediately upon its entry; and it is further

      ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: June __, 2009
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE