1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

          08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

          Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

          Debtor.

- - - - - - - - - - - - - - - - - - - -x

                    United States Bankruptcy Court

                    One Bowling Green

                    New York, New York


                    January 14, 2009

                    10:12 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    I.   UNCONTESTED MATTERS:

3    HEARING re Case Conference

4

5    HEARING re Debtors Application Pursuant to Sections 327(a) and

6    328(a) of the Bankruptcy Code for an Order Authorizing the

7    Retention and Employment of Ernst & Young LLP as Auditors and

8    Tax Services Provider Nunc Pro Tunc to the Commencement Date

9

10   HEARING re Debtors Motion Pursuant to Section 365(d)(4) of the

11   Bankruptcy Code for an Extension of the Time to Assume or

12   Reject Unexpired Leases of Nonresidential Real Property

13

14   HEARING re Debtors Motion Pursuant to Section 1121(d) of the

15   Bankruptcy Code Requesting Extension of Exclusive Periods for

16   the Filing of a Chapter 11 Plan and Solicitation of Acceptances

17   Thereof

18

19   HEARING re Debtors Motion, Pursuant to Sections 105(a), 363,

20   and 365 of the Bankruptcy Code, for Authorization to (i) Assume

21   a Subscription Agreement and Certain Other Agreements with

22   Wilton Re Holdings Limited, (ii) Amend Said Subscription

23   Agreement, and (iii) Fund the Capital Commitment Pursuant to

24   Said Subscription Agreement

25

3

1

2     HEARING re Motion for Relief from Stay to Prosecute Adversary

3     Proceeding Against Lehman Commercial Paper, Inc., Pending in

4     the Bankruptcy Court for the Eastern District of California and

5     for Other Appropriate Relief and supporting Declaration of

6     Walter E. Alexander and supporting Declaration of T. Scott

7     Belden

8

9     HEARING re Motion for Relief from Stay NOTICE OF MOTION OF

10    CORUS BANK, N.A. FOR (I) A DETERMINATION THAT THE AUTOMATIC

11    STAY DOES NOT APPLY, OR ALTERNATIVELY (II) RELIEF FROM THE

12    AUTOMATIC STAY

13

14    HEARING re Debtors' Motion Requesting Joint Administration of

15    Chapter 11 Cases (Luxembourg Residencial Properties Loan

16    Finance S.a.r.l.)

17

18    HEARING re Debtors' Motion Requesting Joint Administration of

19    Chapter 11 Cases (BNC Mortgage LLC)

20

21    HEARING re Debtors' Motion Directing that Certain Orders and

22    Other Pleadings Entered or Filed in the Chapter 11 Cases of

23    Affiliated Debtors be Made Applicable to Luxembourg Residential

24    Properties Loan Finance S.a.r.l. and BNC Mortgage LLC

25    (Luxembourg Residencial Properties Loan Finance S.a.r.l.)

4

1

2   HEARING re Debtors' Motion Directing that Certain Orders and

3   Other Pleadings Entered or Filed in the Chapter 11 Cases of

4   Affiliated Debtors be Made Applicable to Luxembourg Residential

5   Properties Loan Finance S.a.r.l. and BNC Mortgage LLC (BNC

6   Mortgage LLC)

7

8   II.   CONTESTED MATTERS:

9   HEARING re Motion of The Walt Disney Company for Appointment of

10  Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code

11

12  HEARING re New York State Comptroller's Motion To Appoint A

13  Trustee

14

15  HEARING re Motion of The Bank Of New York Mellon Trust Company,

16  N.A. as Indenture Trustee, for Order Pursuant to Bankruptcy

17  Rule 2004 Directing Examination of, and Production of,

18  Documents by Lehman Brothers Holdings, Inc., Lehman Brothers,

19  Inc., Lehman Brothers Commodity Services Inc. and Barclays

20  Capital Inc.

21

22  HEARING re Debtors' Amended Motion Pursuant to Bankruptcy Rule

23  1007(c) to Further Extend the Time to File the Debtors

24  Schedules, Statements of Financial Affairs, and Related

25  Documents

5

1

2    HEARING re Notice of Presentment of Stipulation and Agreed

3    Order Providing for Lehman Brothers Inc.'s Assumption and

4    Assignment of Administrative Agency Agreements to Lehman

5    Commercial Paper Inc.

6

7    HEARING re Debtors' Second Motion for an Order Pursuant to

8    Section 365 of the Bankruptcy Code Approving the Assumption of

9    Open Trade Confirmations

10

11   HEARING re Debtors' Motion for an Order Pursuant to Section 365

12   of the Bankruptcy Code Approving the Assumption or Rejection of

13   Open Trade Confirmations

14

15   HEARING re Debtors' Motion for an Order Pursuant to Sections

16   105 and 365 of the Bankruptcy Code to Establish Procedures for

17   the Settlement or Assumption and Assignment of Pre-Petition

18   Derivative Contracts

19

20   **A.   ADVERSARY PROCEEDINGS:**

21   **Federal Home Loan Bank of Pittsburgh v. Lehman Brothers Special**

22   **Financing Inc., et al.**

23

24   Pre-Trial Conference

25

6

1

2      Sola Ltd. v. Lehman Brothers Special Financing Inc.

3

4      Pre-Trial Conference

5

6      SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

7      III. UNCONTESTED MATTERS:

8      HEARING re Trustee's Motion for an Order Pursuant to 365(d)(4)

9      of the Bankruptcy Code Extending Time to Assume or Reject

10     Unexpired Leases of Nonresidential Real Property

11

12     IV.   CONTESTED MATTERS:

13     HEARING re Trustee's Motion for an Order Granting Authority to

14     Issue Subpoenas for the Production of Documents and the

15     Examination of the Debtors' Current and Former Officers,

16     Directors and Employees and Other Persons

17

18     HERAING re Notice of Presentment of Stipulation and Agreed

19     Order Providing for Lehman Brothers Inc.'s Assumption and

20     Assignment of Administrative Agency Agreements to Lehman

21     Commercial Paper Inc.

22

23

24

25     Transcribed by:  Lisa Bar-Leib

7

1

2      A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          SHAI WAISMAN, ESQ.

10         LORI R. FIFE, ESQ.

11         RICHARD P. KRASNOW, ESQ.

12         ALFREDO R. PEREZ, ESQ.

13         JOHN W. LUCAS, ESQ.

14         JACQUELINE MARCUS, ESQ.

15         RONIT J. BERKOVICH, ESQ.

16         DIANE HARVEY, ESQ.

17

18

19

20

21

22

23

24

25

8

1

2    HUGHES HUBBARD & REED LLP

3         Attorneys for James W. Giddens, SIPC Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7    BY:   JAMES B. KOBAK, JR.

8         JEFFREY S. MARGOLIN, ESQ.

9         DAVID W. WILTENBURG, ESQ.

10        SARAH L. CAVE

11

12

13   SECURITIES INVESTOR PROTECTION CORPORATION

14        Senior Associate General Counsel

15        805 15th Street, N.W.

16        Suite 800

17        Washington, DC 20005

18

19   BY:   KENNETH J. CAPUTO, ESQ.

20

21

22

23

24

25

9

1    MILBANK, TWEED, HADLEY & MCCLOY LLP

2        Attorneys for the Official Committee of Unsecured

3         Creditors

4        One Chase Manhattan Plaza

5        New York, NY 10005

6

7    BY:  LUC A. DESPINS, ESQ.

8        DENNIS F. DUNNE, ESQ.

9        DENNIS C. O'DONNELL, JR.

10       PAUL S. ARONZON, ESQ.

11       EVAN R. FLECK, ESQ.

12       THOMAS A. ARENA, ESQ.

13       GREGORY A. BRAY, ESQ.

14       ROBERT J. MOORE, ESQ.

15

16

17

18

19

20

21

22

23

24

25

10

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2        Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

3         Partners L.P. and GS European Performance Fund Limited;

4         Wachovia Bank, N.A.; Evergreen Investment Management

5         Company, LLC

6        One Liberty Plaza

7        New York, NY 10006

8

9   BY:  LINDSEE P. GRANFIELD, ESQ.

10        LISA M. SCHJWEITZER, ESQ.

11        THOMAS J. MOLONEY, ESQ.

12        AVRAM E. LUFT, ESQ.

13        BOAZ S. MORAG, ESQ.

14        MELISSA MARLER, ESQ.

15        CARMINE D. BOCCUZZI, JR.

16        JEFFREY A. ROSENTHAL, ESQ.

17        ZOE SEGAL-REICHLIN, ESQ.

18

19

20

21

22

23

24

25

11

1  UNITED STATES DEPARTMENT OF JUSTICE

2      Office of the United States Trustee

3      33 Whitehall Street

4      Suite 2100

5      New York, NY 10004

6

7  BY:  TRACY HOPE DAVIS, ESQ.

8      ANDREW D. VELEZ-RIVERA, ESQ.

9

10  ALSTON & BIRD LLP

11      Attorneys for Bank of America National Association

12       Successor by Merger with LaSalle Bank National

13       Association, as Trustee under Certain Trust Agreements

14      90 Park Avenue

15      New York, NY 10016

16

17  BY:  MARTIN G. BUNIN, ESQ.

18      CRAIG E. FREEMAN, ESQ.

19      WILLIAM HAO, ESQ.

20

21

22

23

24

25

12

1    ALSTON & BIRD LLP

2        Attorneys for Bank of America National Association

3         Successor by Merger with LaSalle Bank National

4         Association, as Trustee under Certain Trust Agreements

5        1201 West Peachtree Street

6        Atlanta, GA 30309

7

8    BY:  JOHN C. WEITNAUER, ESQ.

9

10   ANDREWS KURTH LLP

11       Attorneys for EPCO Holdings, Inc.

12       450 Lexington Avenue

13       15th Floor

14       New York, NY 10017

15

16   BY:  PETER S. GOODMAN, ESQ.

17

18

19

20

21

22

23

24

25

13

1    ARENT FOX LLP

2       Attorneys for The Vanguard Group; Georgetown University

3       1675 Broadway

4       New York, NY 10019

5

6    BY:  GEORGE P. ANGELICH, ESQ.

7       DAVID DUBROW, ESQ.

8       HUNTER T. CARTER, ESQ.

9

10   ARENT FOX LLP

11      Attorneys for The Vanguard Group; Georgetown University

12      1050 Connecticut Avenue, N.W.

13      Washington, DC 20036

14

15   BY:  CHRISTOPHER J. GIAIMO, ESQ.

16

17   BAKER & MCKENZIE LLP

18      Attorneys for Portfolio Green German CMBS GMBH; Lincore

19       Limited, E-Capital Profits Limited and Cheung Kong Bond

20       Finance Limited; Natixis Environnement & Infrastructures

21      1114 Avenue of the Americas

22      New York, NY 10036

23

24   BY:  IRA A. REID, ESQ.

25

14

1    BAKER & MCKENZIE LLP

2         Attorneys for Portfolio Green German CMBS GMBH; Lincore

3          Limited, E-Capital Profits Limited and Cheung Kong Bond

4          Finance Limited; Natixis Environnement & Infrastructures

5         One Prudential Plaza

6         Suite 3500

7         Chicago, IL 60601

8

9    BY:  CARMEN H. LONSTEIN, ESQ.

10

11   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

12        1285 Avenue of the Americas

13        New York, NY 10019

14

15   BY:  JOHN P. COFFEY, ESQ.

16

17   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

18        1248 High Bluff Drive

19        Suite 300

20        San Diego, CA 92130

21

22   BY:  DAVID R. STICKNEY, ESQ.

23

24

25

15

1    BINGHAM MCCUTCHEN LLP

2        Attorneys for Harbinger Capital Partners Special

3          Situations Fund, L.P. and Harbinger Capital Master

4          Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed

5          Opportunity Master Fund Limited

6        399 Park Avenue

7        New York, NY 10022

8

9    BY:   JEFFREY S. SABIN, ESQ.

10         ROBERT M. DOMBROFF, ESQ.

11         JARED R. CLARK, ESQ.

12         JOSHUA DORCHAK, ESQ.

13         CAROL WEINER LEVY, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

16

```
 1    BLANK ROME LLP

 2         Attorneys for Iconix Brand Group, Inc.; Capital Automotive

 3          L.P.; Delaware River Port Authority; BANCA ITALEASE,

 4          S.p.A.; ITALEASE FINANCE, S.p.A.; New Jersey Housing and

 5          Mortgage Financing Agency

 6         The Chrysler Building

 7         405 Lexington Avenue

 8         New York, NY 10174

 9

10    BY:  ROCCO A. CAVALIERE, ESQ.

11         ANDREW B. ECKSTEIN, ESQ.

12

13    BOIES, SCHILLER & FLEXNER LLP

14         Attorneys for Barclays Capital

15         5301 Wisconsin Avenue, NW

16         Washington, DC  20015

17

18    BY:  HAMISH P.M. HUME, ESQ.

19

20

21

22

23

24

25
```

17

1    CADWALADER, WICKERSHAM & TAFT LLP

2        Attorneys for Citigroup Inc. and all of its affiliates,

3         including Citibank, N.A. and Citibank International plc;

4         Whippoorwill Associates Inc.

5        One World Financial Center

6        New York, NY 10281

7

8    BY:  HOWARD R. HAWKINS, JR.

9         DERYCK A. PALMER, ESQ.

10        JOHN J. RAPISARDI, ESQ.

11        GEORGE A. DAVIS, ESQ.

12        ANDREW TROOP, ESQ.

13        GARY D. TICOLL, ESQ.

14        JESSICA FINK, ESQ.

15

16    CADWALADER, WICKERSHAM & TAFT LLP

17        Attorneys for Citigroup Inc. and all of its affiliates,

18         including Citibank, N.A. and Citibank International plc;

19         Whippoorwill Associates Inc.

20        1201 F Street N.W.

21        Suite 1100

22        Washington, DC 20004

23

24    BY:  PETER M. FRIEDMAN, ESQ.

25

18

```
1    CHAPMAN & CUTLER LLP

2         Attorneys for National Australia Bank Limited; Bank of

3          Montreal; U.S. Bank National Association

4         111 West Monroe Street

5         Chicago, IL 60603

6

7    BY:  ANN E. ACKER, ESQ.

8         JAMES E. SPIOTTO, ESQ.

9         FRANKLIN H. TOP, III, ESQ.

10

11   CLIFFORD CHANCE US LLP

12        Attorneys for M&G Investment Management Limited; FirstBank

13         of Puerto Rico; Calyon; Dexia Banque Internationale a

14         Luxembourg SA; Dexia Credit Local; Dexia Kommunalbank

15         Deutschland AG; Dexia Banque Belgique SA; and Banif-Banco

16         de Investimento, S.A.

17        31 West 52nd Street

18        New York, NY 10019

19

20   BY:  JENNIFER C. DEMARCO, ESQ.

21        DAVID A. SULLIVAN, ESQ.

22        SARA M. TAPINEKIS, ESQ.

23        ANDREW BROZMAN, ESQ.

24        WENDY ROSENTHAL, ESQ.

25
```

19

1    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

2        Attorneys for Federal Home Loan Bank of Pittsburgh;

3         Northcrest, Inc.

4        900 Third Avenue

5        16th Floor

6        New York, NY 10022

7

8    BY:  LAURENCE MAY, ESQ.

9         NOLAN E. SHANAHAN, ESQ.

10        ERIN E. WIETECHA, ESQ.

11

12   CROWE & DUNLEVY PC

13        Attorneys for Oklahoma Municipal Power Authority

14        20 North Broadway

15        Suite 1800

16        Oklahoma City, OK 73102

17

18   BY:  JUDY HAMILTON MORSE, ESQ.

19

20

21

22

23

24

25

20

1    DEWEY & LEBOEUF LLP

2          Attorneys for American Express Travel Related Services

3           Company, Inc.; The Walt Disney Company

4          1301 Avenue of the Americas

5          New York, NY 10019

6

7    BY:  MARTIN J. BIENENSTOCK, ESQ.

8         IRENA M. GOLDSTEIN, ESQ.

9         DONNA L. GORDON, ESQ.

10

11   DUANE MORRIS LLP

12         Attorneys for National Agricultural Cooperative Federation

13         1540 Broadway

14         New York, NY 10036

15

16   BY:  LAWRENCE J. KOTLER, ESQ.

17        JOHN DELLAPORTAS, ESQ.

18        JUNGHYE JUNE YEUM, ESQ.

19

20

21

22

23

24

25

21

```
 1    DUFFY & ATKINS LLP

 2         Attorneys for South Mississippi Electric Power Association

 3          and Coast Electric Power Association

 4         Seven Penn Plaza

 5         Suite 420

 6         New York, NY 10001

 7

 8    BY:  TODD E. DUFFY, ESQ.

 9         JAMES E. ATKINS, ESQ.

10         DENNIS J. NOLAN, ESQ.

11

12    ENTWISTLE & CAPPUCCI LLP

13         Attorneys for State Comptroller, Thomas P. DiNapoli, as

14         Administrative Head of New York State and Local Retirement

15         Systems and Sole Trustee of New York State Common

16         Retirement Fund

17         280 Park Avenue

18         26th Floor West

19         New York, NY 10017

20

21    BY:  ANDREW J. ENTWISTLE, ESQ.

22

23

24

25
```

22

1   FABYANSKE, WESTRA, HART & THOMSON, P.A.

2       Attorneys for Bremer Financial Corporation

3       800 LaSalle Avenue

4       Suite 1900

5       Minneapolis, MN 55402

6

7   BY:  PAUL L. RATELLE, ESQ.

8

9   GREENBERG TRAURIG, LLP

10      Attorneys for FPL Energy Power Marketing, Inc. and Florida

11      Power & Light Company

12      200 Park Avenue

13      New York, NY 10166

14

15  BY:  MARIA J. DICONZA, ESQ.

16

17  HENNIGAN, BENNETT & DORMAN LLP

18      Attorneys for the DCP Parties

19      245 Park Avenue

20      Suite 3962

21      New York, NY 10167

22

23  BY:  A. BRENT TRUITT, ESQ.

24

25

23

1    HENNIGAN, BENNETT & DORMAN LLP

2         Attorneys for the DCP Parties

3         865 South Figueroa Street

4         Suite 2900

5         Los Angeles, CA 90017

6

7    BY:  BRUCE BENNETT, ESQ.

8         MICHAEL A. MORRIS, ESQ.

9         JOSHUA D. MORSE, ESQ.

10

11   HOLME ROBERTS & OWEN LLP

12        Attorneys for National Cinemedia, LLC

13        1700 Lincoln Street

14        Suite 4100

15        Denver, CO 80203

16

17   BY:  LAWRENCE BASS, ESQ.

18

19

20

21

22

23

24

25

24

1    KATTEN MUCHIN ROSENMAN LLP

2         Attorneys for The City of Milwaukee, Wisconsin

3         575 Madison Avenue

4         New York, NY 10022

5

6    BY:  JEFF J. FRIEDMAN, ESQ.

7         MERRITT A. PARDINI, ESQ.

8

9    KAYE SCHOLER LLP

10        Attorneys for Caisse de Depot et Placement du Quebec;

11         Total Gas and Power Limited; Wells Fargo Bank, N.A. and

12         Wells Fargo & Co.; Bank of America, N.A.

13        425 Park Avenue

14        New York, NY 10022

15

16   BY:  LAUREN ATTARD, ESQ.

17        MADLYN G. PRIMOFF, ESQ.

18

19

20

21

22

23

24

25

25

1    KELLEY DRYE & WARREN LLP

2         Attorneys for Tullett Prebon Holdings Corporation; The

3         Juilliard School; S.W.I.F.T. SCRL; Murphy & Durieu, L.P.

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:  JAMES S. CARR, ESQ.

8         BENJAMIN BLAUSTEIN, ESQ.

9         BENJAMIN D. FEDER, ESQ.

10        ERIC R. WILSON, ESQ.

11        HOWARD S. STEEL, ESQ.

12        MARTIN KROLEWSKI, ESQ.

13        W. CHRISTIAN DREWES, ESQ.

14

15   KIESELSTEIN LAW FIRM, PLLC

16        Attorneys for Tennenbaum Opportunities Partners V, L.P.;

17         Special Value Expansion Fund, LLC; and Special Value

18         Opportunities Fund, LLC

19        1187 Troy-Schenectady Road

20        Latham, NY 12110

21

22   BY:  STEVE KIESELSTEIN, ESQ.

23

24

25

26

1    KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL, LLP

2         Attorneys for Superior Pipelines, Inc.

3         4550 California Avenue

4         Second Floor

5         Bakersfield, CA 93309

6

7    BY:  T. SCOTT BELDEN, ESQ.

8         LISA HOLDER, ESQ.

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11        Attorneys for Bank of New York Mellon as Indenture

12         Trustee; York Capital Management, L.P.

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  JONATHAN M. WAGNER, ESQ.

17        P. BRADLEY O'NEILL, ESQ.

18        DANA L. POST, ESQ.

19

20

21

22

23

24

25

27

1    LATHAM & WATKINS LLP

2        Attorneys for Asurion Corporation; MEG Energy Corp.;

3         NetApp, Inc.

4        885 Third Avenue

5        New York, NY

6

7    LAW OFFICE OF JEAN LOUIS CAMUZAT

8        Attorneys for AXA Mezzanine II SA, SICAR; MD Mezzanine SA,

9         SICAR

10        7 Rue de la Chapelle

11        L-1325 Luxembourg

12

13    LOCKE LORD BISSELL & LIDDELL LLP

14        Co-Counsel to Southern Community Financial Corporation and

15         Southern Community Bank and Trust; Reynolds American

16         Defines Benefit Master Trust; Carolina First Bank

17        885 Third Avenue

18        26th Floor

19        New York, NY 10022

20

21    BY:   JAY G. SAFER, ESQ.

22

23

24

25

28

1    LOVELLS LLP

2        Attorneys for Lloyds TSB Bank plc; Babson Capital

3         Management LLC; BRE Bank SA; Carlton Communications

4         Limited; QVT Financial LP; Standard Chartered Bank and

5         Certain Affiliates; Instituto de Credito Oficial

6        590 Madison Avenue

7        New York, NY 10022

8

9    BY:  MATTHEW P. MORRIS, ESQ.

10        ROBIN E. KELLER, ESQ.

11

12   LOWENSTEIN SANDLER PC

13       Attorneys for First Choice Power, L.P.; EnergyCo Marketing

14        and Trading, LLC; Reliant Energy Services, Inc.; Reliant

15        Energy Power Supply, LLC; Blue Mountain Credit

16        Alternatives Master Fund L.P.

17       65 Livingston Avenue

18       Roseland, NJ 07068

19

20   BY:  PAUL KIZEL, ESQ.

21        IRA M. LEVEE, ESQ.

22

23

24

25

29

1    LOWENSTEIN SANDLER PC

2        Attorneys for First Choice Power, L.P.; EnergyCo Marketing

3          and Trading, LLC; Reliant Energy Services, Inc.; Reliant

4          Energy Power Supply, LLC; Blue Mountain Credit

5          Alternatives Master Fund L.P.

6        1251 Avenue of the Americas

7        18th Floor

8        New York, NY 10022

9

10   BY:  MICHAEL S. ETKIN, ESQ.

11        S. JASON TEELE, ESQ.

12

13   MAYER BROWN LLP

14        Attorneys for Sumitomo Mitsui Banking Corporation; Societe

15          Generale; and Canadian Imperial Bank Commerce

16        1675 Broadway

17        New York, NY 10019

18

19   BY:  JOHN M. CONLON, ESQ.

20        FREDERICK D. HYMAN, ESQ.

21        BRIAN TRUST, ESQ.

22        JEFFREY G. TOUGAS, ESQ.

23        AMIT TREHAN, ESQ.

24

25   MCCARTER & ENGLISH LLP

30

1          Attorneys for Occidental Energy Marketing, Inc.

2          245 Park Avenue

3          27th Floor

4          New York, NY 10167

5

6     BY:  EDUARDO J. GLAS, ESQ.

7

8     MCGUIRE WOODS LLP

9          Attorneys for The Toronto-Dominion Bank

10         1345 Avenue of the Americas

11         Seventh Floor

12         New York, NY 10105

13

14    BY:  PATRICK L. HAYDEN, ESQ.

15

16    MCGUIRE WOODS LLP

17         Attorneys for The Toronto-Dominion Bank

18         One James Center

19         901 East Cary Street

20         Richmond, VA 23219

21

22    BY:  DION W. HAYES, ESQ.

23         JOSEPH S. SHEERIN, ESQ.

24

25

31

1    MORRISON & FOERSTER LLP

2        Attorneys for Brookfield Properties; BRM Group, Ltd.; WFP

3         Tower A Co. L.P.

4        1290 Avenue of the Americas

5        New York, NY 10104

6

7    BY:   TODD M. GOREN, ESQ.

8        LORENZO MARINUZZI, ESQ.

9        LARREN M. NASHELSKY, ESQ.

10        NORMAN S. ROSENBAUM, ESQ.

11

12   MORRITT HOCK HAMROFF & HOROWITZ LLP

13        Co-Counsel to the Hotchkiss School

14        400 Garden City Plaza

15        Garden City, NY 11530

16

17   BY:   LESLIE ANN BERKOFF, ESQ.

18        THERESA A. DRISCOLL, ESQ.

19

20

21

22

23

24

25

32

1    MUNGER, TOLLES & OLSON LLP

2        Attorneys for Southern California Edison Company

3        355 South Grand Avenue

4        Suite 3500

5        Los Angeles, CA 90071

6

7    BY:   MARK SHINDERMAN, ESQ.

8        SETH GOLDMAN, ESQ.

9

10   NIXON PEABODY, LLP

11       Attorneys for Metropolitan Transportation Authority;

12        Bryant University; Deutsche Bank Trust Company Americas

13        and Deutsche Bank National Trust Company, each in their

14        roles as Trustee, Indenture Trustee, Supplemental

15        Interest Trust Trustee and in other related fiduciary,

16        agency and administrative capacities

17       100 Summer Street

18       Boston, MA 02110

19

20   BY:   MARK N. BERMAN, ESQ.

21       AMANDA D. DARWIN, ESQ.

22       RICHARD C. PEDONE, ESQ.

23

24

25

33

```
 1    NIXON PEABODY, LLP

 2         Attorneys for Metropolitan Transportation Authority;

 3          Bryant University; Deutsche Bank Trust Company Americas

 4          and Deutsche Bank National Trust Company, each in their

 5          roles as Trustee, Indenture Trustee, Supplemental

 6          Interest Trust Trustee and in other related fiduciary,

 7          agency and administrative capacities

 8         437 Madison Avenue

 9         New York, NY 10022

10

11    BY:  ROBERT N.H. CHRISTMAS, ESQ.

12         VICTOR G. MILIONE, ESQ.

13         CHRISTOPHER M. DESIDERIO, ESQ.

14

15    PATTERSON BELKNAP WEBB & TYLER LLP

16         Attorneys for Asbury Atlantic, Inc. and Asbury-Solomons,

17          Inc.; Training the Street, Inc.

18         1133 Avenue of the Americas

19         New York, NY 10036

20

21    BY:  DAVID W. DYKHOUSE, ESQ.

22         DANIEL A. LOWENTHAL, ESQ.

23         BRIAN P. GUINEY, ESQ.

24

25
```

34

1    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2         Attorneys for Houlihan Lokey Howard & Zukin Capital, Inc.

3         1285 Avenue of the Americas

4         New York, NY 10019

5

6    BY:  ALAN W. KORNBERG, ESQ.

7

8    PILLSBURY WINTHROP SHAW PITTMAN LLP

9         Attorneys for Misys IQ LLC; Summit Systems, Inc.;

10         Embarcadero Aircraft Securitization Trust

11        1540 Broadway

12        New York, NY 10036

13

14   BY:  LEO TO. CROWLEY, ESQ.

15        ERICA CARRIG, ESQ.

16        RICK B. ANTONOFF, ESQ.

17        C. PAYSON COLEMAN, ESQ.

18        MARK N. LESSARD, ESQ.

19

20

21

22

23

24

25

35

1    RICHARDS KIBBE & ORBE LLP

2         Attorneys for DK Acquisition Partners, L.P., Farallon

3         entities, Goldman Sachs Credit Partners L.P., Greywolf

4         entities, Halcyon Structured Asset Management European

5         CLO 2007-1 B.V., Longacre entities, Morgan Stanley Bank

6         International Limited, Morgan Stanley Senior Funding,

7         Inc. Rowayton Loan Funding Company, Royal Bank of

8         Scotland, PLC

9         One World Financial Center

10        New York, NY 10281

11

12   BY:  MICHAEL FRIEDMAN, ESQ.

13

14   ROPES & GRAY LLP

15        Attorneys for R3 Capital Management LLC; AIB International

16         Finance; Putnam Investment Funds; THL Credit Partners,

17         L.P.; West Corporation

18        One International Place

19        Boston, MA 02110

20

21   BY:  PATRICIA I. CHEN, ESQ.

22        D. ROSS MARTIN, ESQ.

23        SHUBA SATYAPRASAD, ESQ.

24

25

36

1    ROPES & GRAY LLP

2         Attorneys for R3 Capital Management LLC; AIB International

3          Finance; Putnam Investment Funds; THL Credit Partners,

4          L.P.; West Corporation

5         1211 Avenue of the Americas

6         New York, NY 10036

7

8    BY:  KEITH H. WOFFORD, ESQ.

9         MARK R. SOMERSTEIN, ESQ.

10        NILA W. WILLIAMS. ESQ.

11        DAVID S. ELKIND, ESQ.

12        W. JANE ROGERS, ESQ.

13        MORGAN E. BRADYLYONS, ESQ.

14

15   SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

16        280 King of Prussia Road

17        Radnor, PA 19087

18

19   BY:  JOHN A. KEHOE, ESQ.

20

21

22

23

24

25

37

1    SHEARMAN & STERLING LLP

2         Attorneys for Banc of America Securities; Bank of America,

3          N.A.

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:   FREDERICK SOSNICK, ESQ.

8          JAMES L. GARRITY, JR.

9          DANIEL LAGUARDIA, ESQ.

10         NED S. SCHODEK, ESQ.

11

12   SHEPPARD MULLIN RICHTER & HAMPTON, LLP

13         Attorneys for Norton Gold Fields Limited

14         30 Rockefeller Plaza

15         24th Floor

16         New York, NY 10112

17

18   BY:   EDWARD H. TILLINGHAST, III

19         MALANI J. CADEMARTORI, ESQ.

20

21

22

23

24

25

38

1    SIDLEY AUSTIN LLP

2        Attorneys for KKR Debt Investors (2006)(Ireland) LP

3        787 Seventh Avenue

4        New York, NY 10019

5

6    BY:  LEE S. ATTANASIO, ESQ.

7        DAVID H. LEO, ESQ.

8

9    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

10       Attorneys for BlackRock Financial Management, Inc.; H/2

11        Credit Partners Master Fund Ltd.; Region Marche; JA Solar

12       Holdings Co., Ltd.

13       Four Times Square

14       New York, NY 10036

15

16   BY:  DENISE KALOUDIS, ESQ.

17       SALLY MCDONALD HENRY, ESQ.

18       JAY GOFFMAN, ESQ.

19       MARK A. MCDERMOTT, ESQ.

20

21

22

23

24

25

39

```
 1     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

 2          Attorneys for BlackRock Financial Management, Inc.; H/2

 3           Credit Partners Master Fund Ltd.; Region Marche; JA Solar

 4          Holdings Co., Ltd.

 5          300 South Grand Avenue

 6          Los Angeles, CA 90046

 7

 8     BY:  VAN C. DURRER II, ESQ.

 9

10     THOMPSON HINE LLP

11          Attorneys for the A.M. McGregor Home

12          335 Madison Avenue

13          12th Floor

14          New York, NY 10017

15

16     BY:  MARTIN EISENBERG, ESQ.

17

18     U.S. DEPARTMENT OF JUSTICE

19          United States Attorney's Office

20          Southern District of New York

21          86 Chambers Street

22          New York, NY 10007

23

24     BY:  DANNA DRORI, ESQ.

25
```

40

1    WACHTELL, LIPTON, ROSEN & KATZ

2         Attorneys for JPMorgan Chase Bank, N.A.

3         51 West 52nd Street

4         New York, NY 10019

5

6    BY:  DAVID C. BRYAN, ESQ.

7         RICHARD G. MASON, ESQ.

8         HAROLD S. NOVIKOFF, ESQ.

9         PHILIP MINDLIN, ESQ.

10        AMY R. WOLF, ESQ.

11

12   WHYTE HIRSCHBOECK DUDECK, S.C.

13        Attorneys for Metavante Corporation

14        555 East Wells Street

15        Milwaukee, WI 53202

16

17   BY:  BRUCE G. ARNOLD, ESQ.

18        DARYL L. DIESING, ESQ.

19        DANIEL J. MCGARRY, ESQ.

20

21

22

23

24

25

41

1    WILLKIE FARR & GALLAGHER LLP

2         Attorneys for Lexington Insurance Company; AIG CDS, Inc.;

3          SunAmerica Life Insurance Company and Affiliates; Fir

4          Tree Value Master Fund, L.P.; and Fir Tree Capital

5          Opportunity Master Fund, L.P.

6         787 Seventh Avenue

7         New York, NY 10019

8

9    BY:  MARC ABRAMS, ESQ.

10         SHELLEY C. CHAPMAN, ESQ.

11

12   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

13        Attorneys for Hartford Investment Management Company; The

14         Hartford Floating Rate Fund; The Hartford High Yield

15         Fund; and Hartford High Yield HCS Fund

16        3 Gannett Drive

17        White Plains, NY 10604

18

19   BY:  MARK G. LEDWIN, ESQ.

20

21

22

23

24

25                 P R O C E E D I N G S

42

1          THE COURT:  Please be seated.  Good morning, Mr.

2     Miller.

3          MR. MILLER:  Good morning, Your Honor.  Harvey

4     Miller, Weil Gotshal on behalf of the debtors.  This is sort of

5     an auspicious date, Your Honor.  Tomorrow is the end of the

6     first four months of these Chapter 11 cases.  And from the

7     perspective of some of the persons who worked on the case, Your

8     Honor, it doesn't seem like four months.  It seems like a lot

9     more than four months.

10          THE COURT:  Seems like a longer time to me, too.

11          MR. MILLER:  Well, then we're in the same boat, Your

12     Honor.  Your Honor, we thought this would be a good occasion to

13     give a status report to the Court as to the state of the

14     estate.  And Mr. Bryan Marsal is here, the chief executive

15     officer of Lehman Brothers Holdings Inc. and he will make the

16     presentation with Your Honor's permission.

17          THE COURT:  That will be terrific.  Mr. Marsal?

18          MR. MARSAL:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. MARSAL:  I appreciate the opportunity to provide

21     the financial and operational update.  The Court and U.S.

22     trustee and unsecured committee have been very patient with us

23     trying to prepare our numbers and trying to get the financials

24     out to the marketplace.  So I think this is a -- I think it's

25     an important meeting and this will be really the first time

43

1    we've had an opportunity to say where we are operationally and

2    financially.

3         We have prepared a presentation which I know we've

4    shared with the Court.  At least I think we shared it with the

5    Court.  I hope you've gotten a copy of it.

6         THE COURT:  I have a copy.

7         MR. MARSAL:  Okay.  And we've also made copies for

8    members attending today and we have filed a Form 8K with the

9    attached presentation so that this public -- it's been

10   distributed to the public as we speak.  It can also be found on

11   our website in the complete presentation.

12        In terms of the first page of the presentation, the

13   Executive Summary, what I'd like to point out is the -- there's

14   been significant progress been made in this case since the

15   filing.  The chaos of September 15th where we had melting

16   assets, a loss of all accounting systems, no inventory of

17   assets, a loss of operational support and, maybe most

18   importantly, we lost 10,000 people with the transfer to BarCap

19   four days after the filing.

20        Today I believe we have a stable situation where an

21   orderly disposition of the assets can take place.  Teams have

22   been put in place to work those assets and I really believe the

23   situation is very much under control.  In terms of those teams

24   or that head count, if you go to the next page, which is page

25   4, what I would highlight here is that today -- in the --

44

1   again, in the horizontal columns, you have 9/15 versus January

2   1.  Today we have 509 people in total head count at Lehman, the

3   Lehman that we're really working on.  The remaining head count

4   is at Neuberger Berman and at Aurora, which is our mortgage

5   servicing entity.  The 509 head count, we have rehired 229

6   primarily Legacy Lehman personnel to assist us in addition to

7   the 130 Legacy that we have on and supplemented by an A&M team,

8   full time team, of 150 head count.  As you can see, the Lehman

9   -- we had 9,972 at Lehman on the 15th and, again, four days

10  later that was transferred to BarCap.

11          Moving on to page 5, the key A&M responsibilities, we

12  regard our responsibilities three-fold and probably more than

13  that but they are the three key responsibilities.  First, to

14  maximize the recovery value of the assets.  We have six teams

15  in place, six asset teams in place.  Tasks are defined and

16  really plans are either in the process of being developed or

17  have been developed for the realization of value on those

18  assets.  The second issue is the mitigation of potential

19  liabilities and to reconcile claims.  There are some major

20  pending questions such as the derivative claims, the unfunded

21  commitments, parent guaranties.  And we have, as Your Honor

22  knows, some potential clearing bank claim issues.

23          And last but not least, meet the needs of the Court,

24  the U.S. trustee and the unsecured creditors' committee with

25  timely reporting.  We hope that in the near future, we will

45

1    begin to correct some of the problems we've had with the

2    reporting.  And last item on that is to really identify a

3    timely completion of an exit from this Chapter 11.

4         Turning the page to page 6, the cash flow -- where we

5    are today, when we went into the proceeding, we had

6    approximately 1.8 billion dollars of cash.  Today in the debtor

7    estates, the debtor entities have segregated, as identified in

8    this presentation, we have 4.7 billion.  The total cash

9    position of the company, total cash balance, is at 3.3 heading

10   into nondebtor entities at 9/14 versus approximately six

11   billion today.  In addition to that, we have a setoff of funds

12   by JPMorgan which occurred of 484 million and a setoff by Bank

13   of America which occurred after the filing of 509 million.

14   Both of these occurred after the filing.  Without those two

15   setoffs, we would have 6.9 billion but I think for our

16   purposes, we should just consider that we have six billion in

17   the bank today.

18        This only covers, by the way, domestic operations.

19   It does not include certain international operations which

20   there's a little bit of a dispute going on between some of the

21   administrators over there as to whose cash it is.  So for

22   purposes of this, we did not include that cash.

23        In terms of the next page, page 7, the financial cash

24   flow -- this is just a cash flow of Holdings which is where we

25   have the primary receipts and disbursements, as you see.  The

46

1    receipts during this four month period, or three and a half

2    month period, at Holdings was 1.9 billion.  Our disbursements

3    are 293 million of which you see significant amount is

4    compensation, rent and payables with a balance being -- meeting

5    the capital calls of real estate to preserve the value of real

6    estate and the private equity portfolio.  And this just

7    reconciles to the prior, Your Honor.

8         Moving on to the next page of the presentation, this

9    is a summary, on page 8 of -- the way the organization is set

10   up, we have six asset teams.  Those asset teams are working --

11   we've taken the portfolio and broken it down into a Bankbook.

12   Bankbook is where Lehman was simply a commercial lender.  It

13   was where it would be a revolver term loan senior note type

14   lender.  The second category, Principal Investments, this is

15   where it would be a private equity investor limited partner or

16   general partner or just simply a proprietary investment that

17   Lehman had made.  The third category, Real Estate Assets, this

18   constitutes about forty-two billion dollars worth of real

19   estate, mostly in commercial but also residential real estate,

20   mortgages.  The fourth category is Derivatives Book.  And

21   again, you'll see this -- this has a global value of about

22   thirty-eight billion dollars.  I think it's thirty-eight

23   billion dollars or thereabouts.  We'll discuss what we're

24   responsible for today.  The next category, Neuberger Berman,

25   this is the asset management company, which we retained a

1      forty-nine percent interest in.  And the last category,

2      Miscellaneous Assets, including aircraft and artwork that the

3      estate has.

4              In terms of the Bankbook, if we go to the next page,

5      page 9 of the presentation -- and again, the full presentation

6      is available on the website.  So if you're looking for the

7      missing pages, just check out the website.  We just wanted to

8      highlight this for the Court.  On the Bankbook, which again is

9      the commercial loan book, and again, I stress it because what

10     you discover with Lehman is Lehman was an investment bank, it

11     was a merchant bank, it was a trading house and it was a

12     commercial bank.  And for some reason, there is a distinction

13     made between bondholders and depositors which eludes me.  But

14     in essence, this was a bank and would have applied for the Bank

15     Holding Company Act had it still been around.

16             In terms of the Bankbook, the thing to focus on, if

17     you look across the vertical axis -- or the horizontal axis,

18     you see Total Funded and Unfunded.  What that means, is the

19     funded is what was actually -- is actual loans.  The unfunded

20     is commitments that have not been funded at this time.  The

21     estate at the time of the bankruptcy was -- it had

22     approximately thirty-two billion dollars worth of unfunded

23     commitments.  Again, a bank with thirty-two billion dollars of

24     unfunded commitments to various companies and all of the

25     liabilities associated with deciding not to fund those

48

1    liabilities.  So one of our big tasks has been to try and get

2    out of those -- find new homes, if you would, for our revolver

3    commitment or try and get out of the revolving commitment

4    without having potential claim liability against us for not

5    meeting the terms of our original contract.  On the funded

6    side, we've had issues of just trying to collect the loans.

7    We've made significant headway on that score which we'll

8    discuss.  What I'd urge you to focus on is the bottom line is

9    the total commitment of 41.4 billion dollars of which 15.1 is

10   unfunded -- is funded, excuse me, and 26.3 today remains

11   unfunded and that we need to work on.

12        Turning the page to page 10, the relevance of this is

13   while this was a bank, it was not managed as a commercial bank.

14   It was managed really as a trading house.  What we discovered

15   was that the Bankbook was really managed by the trading floor.

16   So what that meant is that you would assess a mark-to-market

17   value to your loan and that was really -- there was really no

18   grading of the loans, A, B, C, D, the quality of the loans as

19   you would find in a commercial bank, very much a trading house

20   approach to commercial lending.  One of the first things we did

21   was well, what have we got here.  We took the loan portfolio,

22   the outstandings, and we put them into -- we graded them.  And

23   we said -- both the outstandings and the unfunded.  And the

24   exercise has been to find out what kind of loan quality -- the

25   good news is the quality is pretty decent.  The quality of the

49

1    loan portfolio is pretty decent.  The market is terrible, as

2    you know, from a liquidity standpoint and the mark-to-market.

3    But what you have here in a hold to maturity environment is a

4    pretty good portfolio.

5            Turning the page to the next page, page 11, we took a

6    look at the -- again, we started off with 32.6 billion dollars

7    of unfunded revolver liability.  Today we have twenty-six

8    billion.  We've made 6.3 billion go away at a cost of twenty

9    million dollars.  So to the extent that there is a cost

10   associated with the elimination of this claim, this potential

11   claim liability, it has cost the estate twenty million dollars

12   to get out of the 6.3 billion dollars.  We expect that that

13   situation will continue through the coming months.

14           Next page, page 12, is the bank loan.  This was

15   something that has created somewhat of a stir but we think it's

16   actually been very positive in that the open trades -- at the

17   time of the filing, we had 1,055 open trades.  We, going

18   through those trades, assumed 750 of them.  We rejected 253 and

19   voided -- they just were not real trades -- fifty-two of the

20   transactions.  We believe that will generate for the estate

21   approximately 600 million dollars when this -- when we take our

22   inventory and finalize these assumed trades.  That has created

23   certain counterparty objections.  We have approximately

24   eighteen to twenty of those objections remaining.  And we have

25   been working through the original forty-three objections.  So

50

1    better than fifty percent have been resolved.

2    Next page, on page 19 (sic), the principal

3    investments, the private equity, is addressed.  What you see on

4    the Private Equity side, again, going down to the bottom, Total

5    Principal Investments, we have 1409 investments.  That totals

6    12.3 billion dollars in carrying value as of 9:30.  Probably a

7    little less today but they took a fairly conservative mark at

8    9:30.

9    Moving on to -- and if one looks at it, the invested

10    capital is about what we have in the way of a carrying value.

11    So there should be -- it should be worth about book value is

12    what it looks to us to be.

13    Turning the page to page 14, in terms of the

14    principal investments, again, we have a problem here in that

15    with the private -- as we had with the revolvers in the bank,

16    we have a problem with the private equity side in that we had

17    four billion four of unfunded private equity commitments,

18    investment commitments that we made to various funds.  So we

19    have been working away trying to get out of some of those

20    commitments.  We've also had to step up and make some of the

21    commitments.  We've made 226 million dollars, as you see in the

22    second column, during this period.  But by and large, it's been

23    a reduction period.  At this point in time, we've gone from 4.4

24    to approximately 1.9 or two billion dollars in the last column.

25    So we are well on our way to getting out of the unfunded

51

1    private equity.  And the reason that's relevant, Your Honor, is

2    in many of these private equity deals, if you don't come up

3    with the money for the -- at the capital call, it seriously

4    dilutes your existing position.

5         Moving on to the real estate assets, the real estate

6    assets -- I would like to correct something on this chart.  The

7    12/31 date is incorrect.  It's really 9/14.  We have not

8    completed the revaluation of the real estate portfolio but it

9    should be as of 9/14.

10        The real estate portfolio, some of this is within our

11   control and some of it's outside our control.  As you read down

12   the list, you'll see that there's a total of 42.9 billion of

13   real estate.  Some of it has been pledged.  Most of it is still

14   under our control with the exception of the -- in Europe, the

15   receiver in Europe and UK has approximately 8.5 billion under

16   their control.  And the two receivers in Asia have 6.3 billion

17   under their responsibility.  The balance of the portfolio is

18   either under ours or in the -- I guess with the exception of

19   Bankhaus.  Bankhaus also is managing its own position at this

20   point in time.  So, other than that --

21        THE COURT:  Mr. Marsal, I have a question for you.

22        MR. MARSAL:  Yes.  Yes.

23        THE COURT:  It's a question that has been occurring

24   to me throughout the presentation but I'm really focused on

25   page 15 when I ask a particular question about source of

52

1    information.  When you come up with a number that totals 42.9

2    billion dollars for real estate asset values as of 9/14, where

3    does that come from?

4            MR. MARSAL:  It comes from the valuations that were

5    done for accounting purposes as of 9/14.  So we are very

6    shortly going to be coming out with a balance sheet closing for

7    9/14.  And the basis of the 9/14 valuation would be going asset

8    by asset and valuing those assets, a mark-to-market process --

9            THE COURT:  Does the --

10           MR. MARSAL:  -- as of 9/14.  Now what we're --

11           THE COURT:  Does the 42.9 billion dollar number

12   represent numbers reflected on Lehman's internal books and

13   records as of this date or does it reflect an independent

14   valuation process performed by your firm?

15           MR. MARSAL:  No, it does not.  It reflects the

16   valuation that was done by the Lehman personnel as of that

17   point in time.  And what we're doing now is a complete

18   revaluation of that -- is underway as we speak.

19           THE COURT:  All right.  So that --

20           MR. MARSAL:  And then we'll be able to give you a

21   different answer on this 42.9.

22           THE COURT:  So that it's clear then, the number that

23   we're talking about as of 9/14, when it's ultimately updated,

24   will be a number that bears the imprimatur of an independent

25   assessment by your firm?

53

1        MR. MARSAL:  At this point in time -- that's correct.

2    This is not an independent.

3        THE COURT:  This does not --

4        MR. MARSAL:  This is not.  Will be.

5        THE COURT:  -- but in the future will?

6        MR. MARSAL:  Yes, it will.

7        THE COURT:  Okay.

8        MR. MARSAL:  Turning the page to page 16, where we

9    were on 9/15, institutional knowledge was departing.  Many

10   projects were dying on the vine.  Many life safety issues had

11   arisen, particularly in projects that were underway.  Today we

12   have a real estate company in place.  The personnel has been

13   hired.  We see this as being a very important component.  The

14   hiring of this real estate team in the future in terms of

15   organizing any kind of -- a plan of reorganization around in a

16   liquid asset such as the real estate which will take a lot

17   longer to dispose of.  So this will be the core company or the

18   core team that will be managing that real estate portfolio for

19   the benefit of the creditors.

20       Lehman is fully operational on this score.  We're

21   meeting our funding requirements, collecting those rents that

22   need to be collected, operating as a real company again on the

23   real estate side.

24       Turning the page to page 17, in terms of the asset

25   teams, on the derivatives portfolio, which I know has

54

1   everyone's interest, we have collected over the four month

2   period approximately two billion dollars of the derivative

3   portfolio.  We've collected since the last unsecured creditors'

4   committee meeting approximately a billion dollars since the

5   November 13th meeting.  And as you see, of that billion

6   dollars, 484,000 was set off by JPMorgan on -- I'm sorry?  Oh,

7   I'm sorry 484 million -- a setoff occurred on the 3rd of

8   October.

9           Turning the page to the breakdown of those

10  derivatives, we have a derivative receivable.  Again, the

11  company's number as of 9/12 -- we're in the process of

12  revaluing all the derivative portfolio, but the valuation as of

13  9/12, prepared by Lehman management, was a 23.8 billion dollar

14  receivable.  That's the portion of the derivatives that we

15  manage.  There's other derivatives which are managed by the

16  receiver in the UK and the receivers in Asia.  But this is the

17  portion that we're managing today, 23.8.

18          The 23.8 is made up of --

19          THE COURT:  Can I stop you for a second?

20          MR. MARSAL:  Yes.

21          THE COURT:  You say that there is a portion being

22  managed in Asia and a portion being managed in Europe.

23          MR. MARSAL:  Principally, Europe.  Principally, UK.

24          THE COURT:  Do you have those numbers?

25          MR. MARSAL:  Yes.  We have an approximation of it.

55

1    We have the total number and by backing into it, we can

2    subtract -- I think -- the total number is, I think, thirty-

3    seven, thirty-eight billion of derivatives of which we're

4    managing twenty-four.  So the balance would be what are in the

5    other jurisdictions as of --

6              THE COURT:  Okay.

7              MR. MARSAL:  -- as of that date.

8              THE COURT:  Thank you.  I'm bringing this up now

9    because -- and this is probably a question for Mr. Miller

10   later.  I have some concern as to the coordination, if any,

11   that is going on globally between and among the various pending

12   insolvency proceedings around the world.  And as part of the

13   status report, I simply want to know what protocols exist, if

14   any, whether or not any cross-border protocols of this sort

15   contemplated by the model law and cross-border insolvency may

16   be contemplated.  And to what extent globally the

17   administration of Lehman's assets wherever located are being --

18   that administration may be adversely affected by the lack of

19   concrete coordination procedures.  It may be that it's not

20   being adversely affected at all.  But it's something that

21   concerns me.

22             MR. MARSAL:  Well, I think, Your Honor, it is being

23   adversely affected.  I mean, it is being adversely affected

24   today.  The difficulty we're having is getting the various

25   receivers to pay any attention to this action is -- been very

56

1   difficult.  And while they have cooperated, it has been, as

2   you'll see later in the presentation, it's been more of best

3   efforts than really working together but not --

4          THE COURT:  I understand.  It's my strong sense that

5   best efforts in this setting is not good enough.  And that --

6          MR. MARSAL:  Yeah.

7          THE COURT:  -- it would be desirable to come up

8   with -- and this may be aspirational -- to come up with

9   something that is a global protocol to minimize dissonance as

10  between and among the pending cases thereby maximizing

11  coordination and ultimately recoveries for all.

12         MR. MARSAL:  Your Honor, we've even called this the

13  Peck Protocol to try and get some clout behind it.  And they

14  haven't paid much attention to that.

15         THE COURT:  So much for my name.

16         MR. MARSAL:  Noted --

17         THE COURT:  By the way, you used that term without my

18  authority.

19         MR. MARSAL:  We changed it in the presentation.  We

20  call it the Lehman Protocol.  We didn't want take those

21  liberties.  But for the other side, for the other receivers, it

22  was effective to a point.

23         Turning to page 18, when we look at the derivatives,

24  the key parts on the derivative presentation, on page 18, is --

25  bottom line, there are 464,000 trades that represent 23.8

57

1    billion dollars.  Now, those 464,000 trades, however, are only

2    with 3930 counterparties.  So there is a concentration.  And

3    for example, JPMorgan has well over 50,000 trades with it

4    alone.  So the number of people we're dealing with is not quite

5    as cumbersome as it might seem, although it will be a challenge

6    going through all those trades and figuring out where we are.

7    But I think that this task is starting to come into focus.  A

8    significant amount of momentum is building here.  And maybe

9    this won't take quite as long as we thought.  At least I hope.

10            On the next page, page 19, the offset to that --

11   again, Lehman was large bookie, if you would.  We had some

12   people we owed money to and some people owed us money.  This is

13   owed --

14           THE COURT:  You know that's going to make some quote.

15           MR. MARSAL:  Bookie?

16           THE COURT:  I'm sure you didn't -- did you mean to

17   say just that?

18           MR. MARSAL:  Well, Your Honor, that's what the

19   matchbook's all about.  You and I can -- you can bet on the

20   Eagles and I'll bet on the Giants and we'll have a bookie do it

21   and he'll match our book.  And that's what Lehman did.  And

22   they're vigorous, in essence.  But they did it in -- they

23   actually had a matchbook, Your Honor, which is important.  I

24   mean, they were not like some other institutions which were in

25   the financial insurance business.  This was offset by pretty

58

1    much close to a matchbook.  The only problem is it was a

2    worldwide book which, when the bankruptcy occurred, everybody

3    went their various ways and an ability to do those matches

4    became much more difficult if not impossible.

5           Anyway, the total here, you see, we have 2190

6    counterparties representing 442,000 trades and thirteen billion

7    dollars worth of payables that we believed we owed at this

8    point in time.  Again, we will be -- we're taking a look at

9    that.  As soon as we get the valuations done, which we hope

10   will be by the end of February, we'll be in a better position

11   to put, as you say, a more independent spin on this as opposed

12   to where we were at the time of the filing.

13          The next page, page 20, Neuberger Berman, this is

14   just a summary of something that Court has already blessed.  So

15   I just wanted to tell you where we are.  This transaction is

16   going well.  This has actually brought new life to, I think,

17   the management team and the business -- the erosion has

18   stopped.  We're looking at -- we pulled 800 million dollars out

19   of the transaction, the right-hand column.  And we believe that

20   our investment there is worth approximately a billion dollars

21   provided we can get to 150 million dollar EBITDA.  We are

22   assisting the company in getting to that 150 million dollar

23   EBITDA.  The company had a significant amount of overhead

24   associated with a much bigger plan.  We're going to skinny the

25   plan down and make 150 million of EBITDA.  And the management

59

1    of the company is fully in support of that.  So this is a

2    positive from where we were.

3           Turning the page to page 21, we look at other assets.

4    We've been active on selling plane front. We have sold

5    approximately -- we have sold the used aircraft for

6    approximately fifty-three million dollars, a book value of

7    fifty-seven.  We have some new aircraft that we're trying to

8    dispose of and some of other aircraft that we're trying to

9    dispose of.  And it's our hope that we'll realize book value or

10   possibly a little greater than book value in today's

11   environment.  But at the end of the day, this is about 200

12   million dollars of miscellaneous assets.  But the fleet's been

13   grounded.  Nobody is flying around these planes and no one is

14   using the helicopter.

15          Moving on to Claims Management, Claims Management

16   Forensic Work Streams.  Again, Your Honor, in anticipation of a

17   request for a review of certain actions of the various parties,

18   we have -- for the last three months, there's been extensive

19   forensic work streams underway.  Those work streams would

20   include pre-filing forensic streams.  This is where the estate

21   is trying to reconstruct the actions of what happened to Lehman

22   in the weeks preceding and the week after the filing to try and

23   reconstruct who did what.  In terms of the clearing banks,

24   JPMorgan, Bank of America and Citibank -- their actions that

25   might have taken place there and what those actions meant.  In

1    addition, we thought it necessary to reconstruct the actions of

2    Lehman clearing banks, the DTC and Federal Reserve.  And the

3    reason -- I would underscore the Federal Reserve's actions,

4    Your Honor.  I think it is very important that we understand

5    that in the -- that this examination or whatever examination

6    happens, the examination has to be someone who is fiercely

7    independent, highest integrity and is not afraid to take on

8    everyone including the Federal Reserve for the actions that

9    occurred in this case because I think -- I'm not accusing

10   anybody at this time.  But they have to be in a position where

11   everyone can be examined for the conduct that occurred in this

12   case.

13          In any event, Your Honor, those process -- that

14   information is being gathered.  And I would hope that we could

15   economically -- we could use that information in the future as

16   we do get into the examination of this.

17          The other forensic work streams are post-filing.

18   This is the review of the disposition of the Lehman collateral

19   by the various clearing banks.  A significant amount of our

20   collateral has been disposed of.  We need a reasonable

21   assessment of that disposition process.  In addition, we need

22   to take a look at the value of the collateral that was given to

23   Barclays at the time of the LBI acquisition and determine

24   whether that valuation was appropriate or not.

25          Page 24, the challenges to achieving objectives, A&M

61

1    responsibility, maximize the recovery value of the assets, what

2    are the key issues there.  The biggest problem we have is it's

3    a very depressed ill-liquid market.  Everyone is bottom-

4    fishing.  Very few people have any cash to be able to make

5    these investments except at extraordinarily unacceptable

6    prices.

7         We need access on the TSA to the interactive system

8    so we can manage our assets.  For example, get pricing on the

9    derivatives on an ongoing basis, get the accounting system to a

10   point where we can provide the Court and the U.S. trustee with

11   timely financials.

12        We need to resolve collateral disposition issues with

13   JPMorgan.  JPMorgan remains, basically, in control of or a

14   significant amount of assets have been pledged to JPMorgan and

15   against potential exposure that JPMorgan might have in getting

16   that clarified as to where we are is important to the ultimate

17   outcome of the case.

18        We need to coordinate with the LBI trustee as to the

19   disposition of the remaining of the remaining assets which are

20   not part of the broker dealer.  We think that it would be

21   efficient for us to -- and I think the LBI trustee concurs with

22   this.  We need to find ways that we have existing teams in real

23   estate and various areas where they may not have that

24   capability.  We have no capability on the broker dealer side

25   but we have the capability in these other asset categories.  So

62

1    to help us help them manage those assets.

2         LBH is -- and this is one that may hold up the exit

3    from Chapter proceedings.  And that is, LBH is a large

4    creditor.  Holdings was the bank for the world.  So to the

5    extent that -- until the world gets their cases resolved,

6    there's going to be a very large receivable that is going to

7    remain hanging out there in terms of uncertain value, until

8    those estates get resolved.

9         In terms of -- turning the page to page 25, we look

10   at the A&M responsibility to mitigate claims and reconcile

11   claims, large numbers of derivative trades and counterparties.

12   We need to have the systems in place in order to deal with

13   that, as we talked about.  And there has to be a resolution of

14   the intercompany accounts.  And this will be a very

15   controversial matter among the creditors so it's got to be

16   done.  We've got to go through this and slug away through the

17   various intercompany accounts, who owes what to who at the end

18   of the day as you decide how you're going to divide the pie up

19   with whatever that pie is.

20        And again, resolution of the clearing bank claims,

21   there will become obvious issues on that score, both with the

22   Bank of America and with JPMorgan that we will be undoubtedly

23   presenting to you in the -- well, I guess we've already

24   presented the Bank of America motion to you.  That's the 500

25   million dollar setoff.

63

1          The next item on page 26, meet the needs of the

2     court, timely reporting, that's dependent upon the systems.

3     We've made some headway there.  Barclays, I think, is trying

4     hard.  We are optimistic that we're going to overcome the TSA

5     problems that we've had in the recent past.

6          And then the appointment of an examiner and the scope

7     will affect the timeliness of the exit and the cost

8     effectiveness of the estate.  We would hope that we would be

9     economical.  We would hope that we could -- the examiner could

10    take materials that had been gathered, to the extent that they

11    have been gathered, and utilize them as opposed to replicating

12    them.

13         As to --

14         THE COURT:  I'll take that as a plug for the examiner

15    dispute to come later.  But this is just a status report.

16    We're not --

17         MR. MARSAL:  Yes.

18         THE COURT:  We're not pre-arguing anything.

19         MR. MARSAL:  The -- I didn't mean to do that.  But I

20    don't --

21         THE COURT:  I know it's tough sometimes but --

22         MR. MARSAL:  I don't get my time in front of you very

23    often so I take advantage of it.

24         Closing.  Closing from a business perspective, Your

25    Honor, the administration of the case has progressed to a

64

1    stability and a control of the assets.  I'm pleased with where

2    we are on that score.  I think we understand what needs to be

3    done and I think people are doing it.  We've got teams in

4    place.  In terms of a plan, I believe in the coming weeks we

5    will be talking about a conceptual framework for a plan that we

6    will be shooting toward.  I don't think that that's that far-

7    fetched of an idea at all at this time.  Our internal objective

8    is we would like to be out of this situation within eighteen to

9    twenty--four months.  And the one thing, again, not a plug but

10   I think we need to all be moving.  Too many people are saying

11   this case is going to take five, six, maybe ten years.  We

12   don't see that being necessary unless people want to make it

13   happen.  And I will tell you, my team and I have no interest in

14   working on this case for six years.  There is absolutely no

15   interest.  So we are going to try and move this case along at a

16   pace which, I think, is consistent with the objectives of the

17   unsecured creditors' committee as well, Your Honor.  At a pace

18   that's sensible but there's no reason for this thing to be in

19   bankruptcy for that amount of time, from our perspective

20   anyway.

21          In closing, substantial progress has been made on the

22   derivatives and will continue to be made to resolve those

23   issues.  And again, one of the biggest impediments, I think, as

24   Your Honor has pointed out, that this is a global

25   administration.  Our timetables of getting out in two years may

1    not be at all consistent with the timetables of the UK receiver

2    or of the Hong Kong receiver.  So on that score, we share your

3    desire to have better coordination, certainly on timetables.

4         THE COURT:  Well, and apropos of that point, in order

5    to achieve the stated objective as being in a position to exit

6    bankruptcy in eighteen to twenty-four months -- which I think

7    is clearly a desirable goal.  Whether or not it's attainable is

8    another question.  And it seems to me that the ability to

9    attain it depends, to some extent, upon the willingness of

10   people subject to the jurisdiction of this Court to work

11   cooperatively and to be rolling in the same direction.  But

12   more particularly, it requires a level of cross-border

13   coordination that either may not be possible because of the

14   differences in liquidation regimes or may not be possible

15   because of the unwillingness of parties to cooperate.

16        But it seems to me that coming up with a global

17   solution is a necessary prerequisite to being able to achieve

18   goals within the bankruptcy case on the timetable that you've

19   laid out.  So it occurs to me that this is a high priority.

20        MR. MARSAL:  Yes.  That's all I have, Your Honor.

21        THE COURT:  Thank you very much.

22        MS. WARREN:  Your Honor, may I be heard for a moment?

23   Mary Warren of Linklaters for the joint administrators of

24   Lehman Brothers International Europe and the other UK companies

25   in administration.  I'd like to just briefly address some of

66

1    Mr. Marsal's remarks.  I understand that Mr. Marsal is

2    present --

3              THE COURT:  Before you do that --

4              MS. WARREN:  Yes.

5              THE COURT:  I'm perfectly happy to hear from you.  In

6    the ordinary course of bankruptcy court events, people, even if

7    they represent administrators in the UK proceeding simply just

8    don't show up.  And what I'm going to ask you do is to sit back

9    down and I'll call on you and others who may wish to comment

10   after I hear from Mr. Miller.  So I don't want to hear --

11             MS. WARREN:  That's fine, Your Honor.

12             THE COURT:  I don't want to hear from you now.

13             MS. WARREN:  That's fine, Your Honor.  I thought --

14             THE COURT:  I also think in terms of good order --

15             MS. WARREN:  -- the presentation was over.

16             THE COURT:  -- that just because people are

17   aggressive doesn't mean I hear from them.  So you can sit down.

18             MS. WARREN:  Thank you, Your Honor.  Let me know when

19   it's appropriate for me to speak.

20             THE COURT:  I sure will.

21             MR. MILLER:  Good morning again, Your Honor.  I would

22   just like, if I might, Your Honor, correct one statement that

23   Mr. Marsal said.  In terms of the setoff of the 484 million

24   dollars by JPMorgan, Mr. Marsal said that occurred after the

25   filing.  It was after the filing of LBHI but prior of the

67

1   filing of the two entities who were obligated to JPM.  So it

2   was a pre-filing setoff.

3           In connection, Your Honor, with the international

4   coordination, just to amplify some of the things that Mr.

5   Marsal said, there have been ongoing efforts and continuing

6   efforts first to get a state of cooperation and then to work

7   towards protocol with each of the foreign fiduciaries.  And

8   that has been a slow progress.  But I think progress has been

9   made in each case.  As Your Honor points out, there are

10  different governing laws and rules.  And each jurisdiction

11  works in accordance with its own jurisdiction and rules.  But

12  there has been a great deal of discussion.  There has been a

13  great deal of negotiations with the different fiduciaries.  And

14  a lot of discussion, Your Honor, with the LBIE administrators

15  on a fairly frequent basis.  And I don't know the exact status

16  of the protocol, Your Honor, but I know there is a protocol in

17  progress.  And there is a recognition that this is a global

18  problem.  Whether we can achieve what Your Honor may have in

19  mind in terms of a global resolution or a global stipulation, I

20  simply don't know at this point in time, Your Honor.

21          THE COURT:  Well, in the most generic sense, my

22  concept is as follows.  When Lehman was an operating global

23  enterprise, command and control, as I understand it, resided in

24  the New York office.  It seems to me that at some level,

25  command and control should continue to reside in the New York

68

1   office and that the concepts of Chapter 15 and the model law

2   contemplate a main proceeding in situations involving multiple

3   international insolvencies.  I find it startling that in what

4   is undoubtedly the most massive cross-border insolvency in the

5   history of the world that the only thing that seems to be going

6   on that I'm aware of are bilateral discussions.  An example is

7   the LBIE/LBHI protocol in whatever state it's in.  And I'm

8   perfectly happy to hear from counsel for the administrator in

9   the LBIE case shortly on that score.

10       But I have broader concerns that this is a

11   multilateral problem involving multiple liquidation regimes

12   around the world.  I don't even know off the top of my head,

13   although you did provide me with a chart at a recent hearing,

14   every single jurisdiction where the liquidation is currently

15   pending.  I know the number of countries to be fifteen based

16   upon papers I've read.  And I know the number of pending cases

17   to be seventy-six based upon papers that I've read.  That's an

18   enormous coordination problem to the extent relevant.  And what

19   I'm hearing from Mr. Marsal is that it's very relevant on the

20   most basic question of the timing of an exit strategy from this

21   case.  And it's probably relevant on a whole bunch of other

22   fronts as well.

23       One example that comes to mind is simply the claims

24   management process which I don't recall hearing about in the

25   current status report.  And it may be that we're way ahead of

69

1    ourselves in discussing it.   The claims process has been

2    undertaken in the LBIE SIPA proceeding.

3           In terms of claims against these estates globally, I

4    assume that there are creditors with claims against entities

5    that are in liquidation in foreign proceedings where the

6    primary obligation arises within that foreign proceeding but

7    where there is a guaranty claim that would be asserted against

8    one of the debtors in the cases pending in this court.   It

9    seems to me, at a minimum, that there should be some effort to

10   coordinate the claims process.   I don't know what efforts are

11   underway to do that.   And I don't need to hear a report on that

12   now.   I'm simply identifying that as an example of a global

13   case management issue that would not ordinarily be considered

14   in the first 120 days of a massively complex case where assets

15   are being disposed, assets are being preserved, records are

16   being identified, employees are being hired and there are major

17   issues of case management being addressed such as the issues

18   identified by Mr. Marsal and his very helpful report.   But I do

19   note that there are here some unprecedented issues of

20   coordination.   And one of my concerns is that if every case is

21   being managed in its separate silo, that is not necessarily a

22   positive for each individual silo.   And so, some overlay of

23   global coordination, I believe, is needed.   How it can be

24   achieved is another story.

25           MR. MILLER:   Yes, sir.   I would just add to that,

70

1    Your Honor.  One, there are A&M teams that are responsible for

2    Europe, responsible for Asia.  LBHI is a member of the five

3    entity creditors' committee of LBIE.  And there is constant

4    dialogue that is going on.  I believe what Mr. Marsal was

5    referring to, Your Honor, is that LBHI will be a major creditor

6    in many of these cases.  And as a consequence of that, that was

7    the reason why we made a very strong attempt and it was

8    satisfied to be on the LBIE creditors' committee.  I think you

9    can view LBIE as sort of like a small Lehman.  It ran basically

10   the same kind of business that Lehman was running out of New

11   York with its own accounts, its own trading.  It traded with

12   New York and so on.  Probably that's the biggest area.  Asia is

13   behind that, Your Honor.  There's also another team in Asia

14   which is following very closely.  And also we are trying to

15   coordinate as much as possible with Mr. Giddens as the LBI

16   trustee because there are mutual interests in there.  But

17   clearly, an overall global management, as Your Honor suggests,

18   would be very appropriate.  And we have been moving to that.

19        As I said, knowing the LBI situation, there is

20   constant communication.  The PWC administrators very often

21   visit New York and there are meetings to discuss mutual issues.

22   And one of the big issues, as Your Honor may be aware of, is

23   mistake in payments that come to one estate and belong to the

24   other estate which took a long period of time to work out in a

25   formal way.

71

1          So Mr. Marsal and the estate is very conscious of the

2     need to coordinate internationally.  And that's why there are

3     separate teams in each locality.  But if we can achieve an

4     overall global settlement, something in the order of Chapter

5     15, that would be beneficial, Your Honor.

6          But there are different objectives by the different

7     fiduciaries.  While there are seventy-six proceedings, there

8     are fifteen main proceedings that we are concerned with.  From

9     the LBI perspective, Your Honor, the main thing under the

10    statute is get the customer accounts satisfied, transferred,

11    paid, whatever has to be done.  And that's the goal.  The goal

12    in London with the LBIE administration is to get control of

13    that estate, follow the dictates of that insolvency law.  And

14    there has been some litigation, Your Honor, LBIE, where there

15    were prime brokerage accounts, primarily hedge funds, who have

16    been trying to get their securities and cash out of that.  And

17    that's created a lot of disorder, let me put it that way. And

18    we have cooperated with those funds who have clearing accounts

19    and tried to find where their assets are and work with all of

20    the different entities that are involved.

21         So that is underway, Your Honor.  And at the next --

22    maybe not the next omnibus hearing, which is just two weeks,

23    but certainly the one in February, we will prepare a report on

24    what is happening internationally.

25         THE COURT:  Thank you very much.  Now, in terms of

72

1     the status report phase of today's agenda, I am not interested

2     in opening up the floor to comments that members of the

3     audience or other interested constituencies may wish to add to

4     the status report because I think just in the interest of good

5     order, the status report is the debtors' report to the Court

6     and to those who have a need to find out information about the

7     current state of the case.

8            To the extent that counsel for the administrators in

9     the LBIE proceeding believes that there is a need now to

10    express something on the record, to correct the record, or to

11    clarify the state of play as it relates to the administration

12    of that estate, to the extent there have been references to

13    that during the status report, I am now comfortable in having

14    counsel appear to be heard.  But it is not a general invitation

15    to the room to say what's on your mind.

16           MR. MILLER:  I would just add to that, Your Honor, if

17    I may.  If there are any questions about the presentation, the

18    Lehman website does have a list of names of A&M personnel.  And

19    I'm sure Mr. Marsal agrees, inquiries can be made off that

20    website to the appropriate person just by looking at the

21    website.  You'll see the subject matter.  And as we have done

22    before, Your Honor, every inquiry will be responded to, maybe

23    not satisfactorily, but we will respond to every inquiry that's

24    made.  Thank you, Your Honor.

25           THE COURT:  Thank you.

73

1          MS. WARREN:  Your Honor, thank you for the

2   opportunity.  Again, Mary Warren of Linklaters for the joint

3   administrators of Lehman Brothers International Europe and the

4   other UK companies and administration.  I did want to briefly

5   correct some aspects of Mr. Marsal's comments and then give

6   Your Honor perhaps a bit of a broader report that might be

7   useful.

8          I can't really sit here and agree with Mr. Marsal's

9   characterization that the joint administrators are not paying

10  attention to the U.S. proceeding.  That is flat out incorrect.

11  I appreciate Mr. Miller's comments on that regard.  And I do

12  want to assure Your Honor that, as you know, we've appeared at

13  each of these hearings.  We have had, as between

14  PriceWaterHouseCoopers and Alvarez & Marsal, we've had nonstop

15  meetings, calls and other communications about intercompany

16  balances as between Libby, which is what we call Lehman

17  Brothers International Europe, and LBHI.  There have been

18  tripartite discussions among PriceWaterHouseCoopers for Libby,

19  the SIPC trustee for LBI and A&M for LBHI.

20         As Mr. Miller noted, LBHI participates on the Libby

21  creditors' committee.  Libby and LBI and LBHI have all worked

22  jointly on the open trades and derivatives contracts that Mr.

23  Marsal was referring to.  That's been a cooperative process to

24  try to resolve those all along.

25         Finally, Libby is working -- the joint administrators

1   are working with the SIPC trustee on a protocol for filing

2   Libby-related claims in the SIPC proceeding.

3        As to a general protocol, Your Honor, a global

4   protocol of the type you referred to, those discussions were

5   fully participated in by the joint administrators.  It's our

6   understanding that due to lack of interest or lack of

7   participation by some other parties to the proposed global

8   agreement that that was temporarily abandoned in favor of more

9   individual agreements, like the transition services agreements.

10  On that score, as Your Honor knows because you approved it,

11  LBHI and the joint administrators for LBIE entered into a

12  transition services agreement.  The joint administrators for

13  LBIE are regularly called on under that transition services

14  agreement along with their personnel at PWC to provide all

15  kinds of assistance to LBHI, which we are doing, sometimes at

16  the expense of diverting resources from needs of our own

17  creditors which we have to balance and which the joint

18  administrators have been doing a very good job of balancing.

19       Your Honor, on -- Mr. Miller's description of Libby

20  is generally accurate.  It is sort of a small version of Lehman

21  International.  It was the major trading center for the Lehman

22  Global Group outside of New York.  I would say one major

23  difference is that Libby never had its own bank accounts.  All

24  its bank accounts were with LBHI and that's been a continuing

25  problem and a source of negotiation between the parties.

75

1          Your Honor, in terms of the report on international

2    status that Mr. Miller plans on giving, we're happy to provide

3    information for that to the extent permissible under UK law and

4    consistent with the joint administrators' obligations under UK

5    law.

6          And finally, I just want to state I know that Mr.

7    Marsal's presentation was a status report.  It's not evidence

8    because it wasn't subject to cross-examination.  But I did feel

9    it necessary to correct some of the statements.

10          And the last thing I would just say is that you can

11    be comforted that the term "Peck Protocol" was never used, at

12    least in my hearing.  So I don't think anyone used your name in

13    vain without your authorization.

14          THE COURT:  It's okay.  I now authorize it to be so

15    used.

16          MS. WARREN:  All right.  So noted.

17          THE COURT:  I'm actually entirely teasing when I say

18    that.  There is no protocol in place that can be given

19    anybody's name at the moment.  What I am concerned about and

20    what I'd like you to consider with your clients, particularly,

21    as it relates to the status report that will now be expanded to

22    include Lehman global issues, I'd like you to consider whether

23    or not there is either a need or if it would be desirable for

24    there to be a standard form, although it would be specially

25    tailored to these circumstances, cross-border protocol

76

1    permitting court-to-court communication as between this court

2    and courts of other jurisdictions where Lehman liquidation

3    proceedings are pending.  Obviously, you'd only be most

4    concerned with what your clients think about such communication

5    as between the UK and the United States.

6         But I am concerned that absent some ability to tie

7    together all of these estates that we run the risk of a mouse

8    that roared problem in which some estate in some other

9    jurisdiction may control the timing of the exit in this case.

10   And I would consider that to be an unattractive and undesirable

11   consequence for all estates suggesting to me -- and I have

12   limited information.  I only know what everybody tells me in

13   court or what pleadings tell me.  Suggesting to me that some

14   creative and heroic effort needs to be undertaken for global

15   cooperation.  And it has to start somewhere.  And since you

16   were bold enough to step forward, you're going to end up with

17   job 1, which is to deal with the UK side of this 'cause I've

18   given you that assignment.

19        MS. WARREN:  Your Honor, we've been fulfilling that

20   assignment.  And we're happy to take it further at your

21   direction.

22        THE COURT:  Okay.  Thank you.

23        MS. WARREN:  Thank you.

24        MR. KOBAK:  Your Honor, may I be heard for two

25   minutes on behalf of the SIPC trustee?

77

1          THE COURT:  Sure.

2          MR. KOBAK:  Thank you.

3          THE COURT:  Although it does not open the door to

4   further volunteering.

5          MR. KOBAK:  No.  I -- Your Honor, James Kobak, Hughes

6   Hubbard & Reed for the SIPC trustee.  I just want it to be

7   clear that, as Ms. Warren said, we have discussed trying to

8   work cooperatively on claims.  And we indeed are in the process

9   of trying to draft up a protocol.  If I may, I'd like to go

10  back to my office and use your name to accelerate that process.

11  We were going to start really with LBIE because our immediate

12  concern is how some of the claims, customer type claims, that

13  are on both sides of the Atlantic are going to be treated.  And

14  we think there are some real -- very difficult issues there

15  that do need to be decided on a global basis.

16          But I just wanted to make it clear that we, too,

17  think there's a real need for a protocol.  There may be some

18  aspects of a protocol between the other entities as to

19  realizing on property and so forth which aren't quite as much

20  of a concern as ours as they are and it may be that we don't

21  need to be part of that.  But we do think that there is a need

22  and we do intend to -- in fact, people are supposed to be

23  drafting up something as we speak.

24          THE COURT:  Thank you.

25          MR. KOBAK:  And, Your Honor, I didn't intend to give

78

1    a report today.  But we did give a report to -- or had a

2    meeting with creditors right before the holidays.  And if you'd

3    like, I can hand to Your Honor, or we can give to chambers

4    later, the slide presentation that we had for that.  It's on

5    our website.  Most of the people that are in the courtroom have

6    already heard that presentation.  But I just thought it might

7    be of interest to Your Honor.

8            THE COURT:  If you have a handy extra copy to deliver

9    to chambers, that would be fine.  Thank you.

10           MR. KOBAK:  Good.  Fine.  Thank you, Your Honor.

11           MR. MILLER:  Your Honor reminds me that in the

12   Chapter 11 case of Maxwell Publishing -- or Maxwell

13   Communications, there was actually a protocol that included

14   court-to-court communications and Judge Brozman and Chancellor

15   Hoffman very often were in communication directly and sometimes

16   with the parties involved.  And that really expedited the

17   conclusion of those Chapter 11 and those administration

18   proceedings in the UK.

19           Your Honor, now I think we can turn to the agenda.

20   And, with Your Honor's permission, I thought we would change

21   the process a little bit today and go right to, as the first

22   matters to be heard, the contested matters and deal

23   immediately, Your Honor, with the motions relating to the

24   appointment of the examiner.  I would just point out, Your

25   Honor, there are eleven uncontested matters which we can deal

79

1    with fairly quickly at the end of the hearing.  And in

2    connection with the contested matters, really, it's -- the

3    major contested matter -- I don't think it's contested -- is

4    the appointment of the examiner, Your Honor.

5        THE COURT:  I have no objection to that change-up

6    that you propose.  And I think it's important that we address

7    the issues of the appointment of the examiner harmonizing

8    differences in positions, to the extent they still exist, and

9    dealing with that in the context of having Mr. Marsal's report

10   fresh in our minds because I do think that Mr. Marsal's report

11   does tie neatly into this next phase of the agenda.

12       MR. MILLER:  In that connection, Your Honor, what I

13   would hope to do is to give the Court some perspective on the

14   motions and the differences between the parties as they exist

15   at this point in time.  As we have previously stated to Your

16   Honor, very early in the debtors' cases, there was

17   consideration given to the desirability of seeking the

18   appointment of an examiner because of all the hyperbole and

19   media hype that emerged from the commencement of the case.

20   That decision was deferred, Your Honor, because at the time it

21   was under consideration, the state of the record, so to speak,

22   was chaotic.  The examiner would have to wait until there was

23   further processing and the case was actually gotten under

24   control.

25       The issue came to the forefront, Your Honor, on

80

1    October 20, 2008, by the motion that was filed by the Disney

2    Company for the appointment of an examiner under Section

3    1104(c)(2) of the Bankruptcy Code.  And as Your Honor is well

4    aware, and I think everybody in the courtroom is well aware,

5    there is no choice, there has to be an examiner appointed

6    pursuant to that provision because under the words of the

7    statute it's mandatory.

8            The actual request, Your Honor, of the Disney Company

9    was rather a parochial request, primarily directed to the claim

10   of the Disney Company that it had transmitted, on September

11   16th, I believe it was, approximately 100 million dollars in a

12   foreign exchange transaction.  And that money got caught in the

13   system.  We seem to think that it's at Citibank someplace, but

14   it got in the system and Disney never got the money.  And what

15   Disney was concerned about was the relationship between Lehman

16   Brothers commercial corporation, which was the foreign exchange

17   entity, Lehman Brothers Holdings, Inc., which was the

18   guarantor.

19           And after the motion was filed, Your Honor, and the

20   recognition by the estate that there would be an examiner,

21   negotiations proceeded with the Disney Company as to the scope

22   of the examiner's duties.  And actually, Your Honor, we reach

23   an agreement with the Disney Company as to the scope of the

24   examiner's duties and the investigation that the examiner would

25   proceed.

81

1          And the Disney Company agreed, Your Honor, based upon

2     the representations that were made on behalf of the estate,

3     that it would be much more appropriate after the estate has

4     been settled, control has been gotten of the systems and so on,

5     that the examiner come in at that point in time when more

6     concrete information could be presented to the examiner.  So

7     there was a consent to adjourn the examiner's motion to January

8     14, today.

9          The filing of any pleading in this case somehow

10    results in joinders and additional motions.  So a number of

11    pleadings were filed.  They were joinders by the Bank of

12    America, by the Harbinger Funds.  And then subsequently, Your

13    Honor, a motion was filed on behalf of Mr. DiNapoli, the New

14    York State controller, seeking the appointment of a trustee, or

15    in the alternative, an appointment of an examiner with expanded

16    powers.

17         And then there was another joinder to the

18    controller's motion by the leading plaintiffs in a pending

19    class action.  All of those motions were considered, Your

20    Honor, and at one point in time -- I think it was in the

21    November omnibus hearing, I reported to the Court that we were

22    in negotiations about expanding the scope of the examiner's

23    duties.  And Your Honor was quite clear, very clear in saying

24    that don't think that you're going to submit an order to me and

25    I'm going to rubber stamp it.  That the Court had discretion as

82

1    to the scope of the examiner, you would consider suggestions,

2    but ultimately the scope of the examiner's duties lies in your

3    discretion.

4            And it was in that context, Your Honor, that we

5    proceeded thinking about what would be the suggestions to the

6    Court in terms of what the examiner's duties were.  And we had

7    discussions with the United States Trustee.  We had discussions

8    with the creditors' committee and we got submissions by other

9    parties.  And as we went through all of that, the law of

10   unintended consequences has taken effect.  The debtors'

11   suggestions that are set forth in the response in our position

12   to the motion of the New York State controller, which was filed

13   on January 5th, and in paragraphs 31 and 32 of that response we

14   set forth suggestions for the scope of the duties of the

15   examiner.

16           As a result, there has been another burst of

17   pleadings, Your Honor, in this matter, some of which came in

18   last evening.  Even Disney, with whom the debtors negotiated a

19   resolution, has seen fit to criticize the debtors as attempting

20   to limit the duties of an examiner.  And I want to make it

21   perfectly clear, Your Honor, for Mr. Marsal and the estate, the

22   debtors are very cognizant of Your Honor's desire for complete

23   transparency.  That is the goal and that's what the debtors

24   want.

25           But the debtors are being excoriated from both sides.

83

1   The unsecured creditors' committee says that our suggestions

2   are too broad.  Disney basically accuses the debtors of some

3   kind of bad faith.  Mr. DiNapoli complains that the debtors are

4   trying to limit and contain the examiner from hiring

5   professionals.  The LBI trustee wants to make sure that the

6   examiner is not appointed in a SIPA proceeding or it should not

7   be appointed.  And I think everybody agrees to that.  So I

8   think that's out of the picture.  Barclays essentially is

9   concerned as to certain of the debtors' suggestions and says

10   that they are too broad.

11          The debtors' suggestions, Your Honor, incorporate the

12   agreement that we reached with Disney.  It is focused on the

13   relationship between LBHI, LBCC and the transactions that

14   occurred prior to the commencement of the case and transactions

15   that occurred -- the LBHI case, I should say, Your Honor, and

16   subsequent to that.  And as far as Mr. Marsal is concerned and

17   the estate is concerned, all of those transactions should be

18   within the realm of what the examiner has to do.

19          The suggestion was that inter-company transactions,

20   which Mr. Marsal alluded to, for the thirty days prior to the

21   commencement of the Chapter 11 cases, should be reviewed.  And

22   I think we used the date September 15, Your Honor.  In

23   connection with those debtors who filed subsequently, it would

24   be thirty days from that filing date would be the suggestion.

25          I could go through, Your Honor, but I think it would

1    be unnecessary to go through all of the suggestions which are

2    contained in the estate's proposal, which as I say, is set

3    forth in paragraphs 31 and 32 of the response.  The creditors'

4    committee, Your Honor, thinks that some of those are too broad.

5    Our suggestion, Your Honor, and I think it's in one of the

6    papers, Your Honor, once the examiner is appointed he or she

7    should have the opportunity to craft and suggest to Your Honor

8    what he or she should be within the scope.  But there should be

9    an initial order at least setting forth the initial program for

10   the examiner and let the examiner get undated into this case

11   and then make determinations.

12        But then we also made two other suggestions, Your

13   Honor.  We suggested that at least initially the examiner

14   should use the resources that have been in place since

15   September 14, and that's the work of Alvarez & Marsal.  The New

16   York State controller has raised an issue as to the

17   independence and impartiality of Alvarez & Marsal.  And I would

18   just point out, Your Honor, Alvarez & Marsal and Mr.  Marsal

19   had no prior relationship with Lehman.

20        The first time that Mr.  Marsal appeared on the

21   premises of Lehman was the evening of September 14.  And the

22   first time that they actually began working was September 15.

23   Mr.  Marsal, as I pointed out, Your Honor, is not the chief

24   executive officer of LBHI.  He and other officers, members of

25   Alvarez & Marsal have actually become directors of many of the

85

1    subsidiaries and assumed that responsibility and those

2    fiduciary duties.  We believe that the work product which they

3    have produced, which has been very laborious, very Herculean

4    tasks, is valuable information, which initially an examiner

5    should resort to before coming up with a blunderbuss approach

6    to hiring all kinds of professionals, Your Honor.  So we made

7    that suggestion.

8         We also suggested, Your Honor, that the examiner be a

9    person, as Mr. Marsal alluded to, fiercely independent, ready

10   to devote a substantial amount of time to his or her duties in

11   this case and to answer the questions which have arisen.  In

12   constructing the suggestions that we put in, Your Honor, we

13   took into account everything that we had heard from various

14   parties, and not only official parties, but individual

15   creditors who called and raised questions about what happened

16   in Lehman; what are the relationships between the various

17   corporations and entities.  And in our suggestions, we thought

18   that we covered those areas.

19        The only area, and we didn't use these famous words,

20   Your Honor, fraud, criminal conduct and so on.  But we're not

21   limiting the examiner.  Our view, speaking for Mr. Marsal,

22   Your Honor, is that the examiner should do what the examiner

23   thinks is appropriate within the suggestions that we made.  And

24   if there is a need for additional investigatory work, the

25   examiner should come back to the Court and say I want to expand

86

1   my charter.  And we don't propose, if we had the power, which

2   we don't, to limit the examiner's engagement of professionals,

3   but as the examiner believes that such professionals are

4   necessary.  This is an expensive estate to administer, Your

5   Honor.  It is running at a very high rate.  I think Mr. Marsal

6   said the run rate is thirty million dollars.

7        UNIDENTIFIED SPEAKER:  Twenty-five million a month.

8        MR. MILLER:  Twenty-five million dollars a month, and

9   that's without professional fees, Your Honor.  To date, there

10  haven't been any allowed professional fees in this case.  My

11  estimation is that will go up substantially.  We know, from

12  what was reported in connection with the LBIE administration,

13  at a meeting of creditors that PWC, the administration of LBIE,

14  was running at, I believe it was four million pounds of week.

15  That's a substantial amount of money.  And it may be -- I have

16  no idea, Your Honor, but it may be close to that.

17        So we are talking about an expensive administrative.

18  And basically who's picking up the tab on this, it's the

19  unsecured creditors.  So the unsecured creditors' committee

20  really has a vested interest here.  And I don't wish to take

21  the arguments from any of the other parties, Your Honor.  But

22  as far as the estate and Mr. Marsal is concerned, we are one

23  in favor of transparency.

24        We think we covered the waterfront in our

25  suggestions.  They are not delimiting of the examiner.  The

87

1   examiner has a perfect right to come back to this Court if he

2   or she believes it appropriate to expand.  But we think it

3   should be sort of a gating issue.  Get the examiner in there,

4   get the examiner oriented.  And then the examiner is fully free

5   to come back to this Court and seek whatever relief he needs.

6   And frankly, Your Honor, I can tell you in advance, we will

7   support the examiner.  We want transparency.

8           So with that, Your Honor, I'll leave it to the other

9   speakers, unless Your Honor has questions.

10          THE COURT:  No, I don't have any questions, but I

11  have some comments.

12          MR. MILLER:  Yes, sir.

13          THE COURT:  And the comments are really intended to

14  inform the observations and remarks of other counsel who may

15  wish to be heard in connection with the appointment of an

16  examiner.

17          First of all, I recognize that as it relates to the

18  appointment process, I have no discretion to deny the motion

19  based upon, not only the wording of the statute, but the case

20  law that has interpreted that wording.  The determination of

21  scope, however, as you correctly observed in your remarks, is

22  something which is left to the Court's discretion.  It is my

23  understanding that the applicable case law does not provide any

24  meaningful guidance as to how the Court is to exercise that

25  discretion.  Accordingly, I could be arbitrary, and I don't

88

1    think that anybody would suggest that I'm abusing my

2    discretion.  But that would be a bad idea under the

3    circumstances or probably under any circumstances.

4         It's for that reason that -- and I'm going to state

5    this publicly, I suggested that a telephone conference take

6    place involving parties in interest who had weighed in with

7    respect to the examiner motion.  And that included the United

8    States Trustee who is present in court today with counsel.  And

9    the principal purpose of that telephone conference was to

10   express some of the Court's concerns regarding the process that

11   we were in the midst of, concerning the examiner motion,

12   determination of the scope of the engagement.

13        And in particular, one of the things that I requested

14   was that parties in interest at today's hearing provide

15   guidance to the Court as to the appropriate scope of the

16   mandate to be granted to the examiner.  I asked for that

17   informally because I believed it significant to me, in the

18   exercise of the discretion I have just described, to know the

19   perspectives of the various parties in interest as to the

20   proper scope.

21        I don't think there's any one right answer to this

22   question because it's very complicated.  But I also think that

23   it is unwise for us to talk about the examiner motion in

24   isolation.  I note that there are pending matters before me on

25   today's agenda that overlap.  For example, in the SIPA case, I

1    know that there is a motion to be heard later concerning the

2    SIPA trustee's ability to issue subpoenas.  I know that in the

3    committee responsive papers in connection with the motion for

4    appointment of an examiner that the committee speaks in terms

5    of its fiduciary duty to investigate claims of the estate, that

6    it's already involved in such an investigation, and without

7    characterizing its position, I would say that it is suggesting

8    that it is the appropriate fiduciary to do just that.

9         Additionally, there are individual discovery requests

10   by individual creditors, a process that started early in the

11   case but which, for purposes of today's agenda, includes a

12   request by the Bank of New York Mellon, as indenture trustee

13   with respect to certain issues that we'll hear later but that

14   involve an investigation into certain facts.

15        Accordingly, I am concerned that we discuss not

16   everything at once, but that we discuss the examiner motion in

17   the context of the case that's before me.  And that context is

18   broader than simply getting started with a statutorily mandated

19   process.  For that reason, I'm letting everybody know that in

20   order for this to be a truly efficient process, I'm viewing it

21   holistically.  And I believe that some rational approach to the

22   allocation of responsibilities between and among those parties

23   that have fiduciary duties to their constituencies be adopted

24   so that parties are efficient, coordinated, and do not step on

25   each other's toes.

90

1          Additionally, from the perspective of the overall

2    costs of administration of the estate, unless some efficient

3    protocol is adopted -- that's becoming an overused term this

4    morning -- unless some efficient protocol is adopted to

5    minimize the risk of unnecessary work being done, this process

6    is going to be counterproductive, in my view.

7          For that reason, what I would like to hear from the

8    parties is as follows.  First, with respect to the scope of the

9    examiner and the examiner's duties, please provide such

10   guidance as you can as to what scope is appropriate.  And

11   please provide reasons as to why you believe such scope is

12   appropriate.

13         Second, as to the ability of the examiner to retain

14   professionals in addition to counsel at the outset,

15   notwithstanding the fact that both the debtor and the committee

16   had suggested that at least initially the examiner should

17   depend upon the work product of Alvarez & Marsal, subject to

18   the possible need to hire a professional later for cause shown,

19   I believe, upon reflection, and this is not the first I've

20   thought about it, that in order for the examiner to conduct his

21   or her mission, however it may be defined, given the

22   complexities of this case, that a financial professional is

23   needed at the very beginning of the process.  Because without

24   having such a professional available, the examiner will be

25   immediately subject to the disability of perhaps not knowing

1    the right questions to ask and perhaps not having the correct

2    interpretive prism with which to assess the information

3    provided.

4         For that reason, my inclination, and I want to hear

5    comment on this, is to permit the examiner to engage a

6    financial advisor, or for that matter, any other professional

7    deemed material to carrying out the task defined.  With the

8    understanding that I am loathe to duplicate costs of

9    administration unnecessarily.  For that reason, my notion would

10   be that those professionals would not be doing any duplicative

11   work at all, but would be simply be available as sources of

12   intelligence, good judgment, and interpretive assistance so as

13   to enable the examiner to carry out his or her job.

14        Third, I am deeply concerned about the overall costs

15   and expenses of this case.  There is a tremendous amount of

16   money in the bank.  But at the burn rate described, and as it

17   might be augmented by the additional administrative expenses

18   associated with an examiner, over time, available cash will be

19   expended.  Just because the case is large does not mean the

20   case should be viewed as a blank check for professionals.

21        I'm fully aware of the comments made the Walt Disney

22   Company in its recently filed papers that are quite well done.

23   By the way, most every pleading in this case is quite well

24   done.  And there is a notation within those papers that because

25   the creditors' committee was appointed early in the case, prior

92

1    to the advent of some of the other affiliated debtors, and

2    because there is only one set of professionals acting on behalf

3    of the creditors' committee, that in effect this case can

4    afford additional professionals at the examiner level.  That's

5    true up to a point.  What's not true is my inclination to give

6    the examiner what amounts to an open ended process.

7            My current thinking, and I'd like people to comment

8    on this, is that the examiner, once appointed, following a

9    dialogue with other interested parties, move forward along the

10   lines proposed by the creditors' committee to develop a work

11   plan and budget.  And that the budget be geared to a thoughtful

12   and deliberative process of the work that actually needs to be

13   done, the time for getting it done, and the critical path to

14   completing it.

15           Assuming such a process is undertaken, it seems to me

16   that whatever professional may be selected by the examiner

17   should be in a position to provide a reasonable estimate of

18   what that work plan should cost.  Now, I know that other

19   professionals are not being so encumbered.  And I am not, by

20   this comment, seeking to limit what the examiner would do or

21   should do.  I'm simply stating that as to this additional layer

22   of administrative expense, because it involves an investigation

23   that is at some level being duplicated -- at some level being

24   duplicated within the SIPA case, that there needs to be an

25   attempt to carve out what truly needs to be done above and

1    beyond what has already been done by Alvarez & Marsal, which

2    has been partly reported on this morning, and above and beyond

3    what will be done by Mr. Giddens in his capacity as SIPA

4    trustee.

5         Accordingly, I would be interested in comments by

6    those affected, as to whether or not such a budgeting process

7    is reviewed as acceptable or unacceptable.  And if so, why.

8         Finally, I think it appropriate that there be what

9    I'll call a meet and confer session.  And I'm not designing it

10   on the fly at this moment, but I'm simply describing my general

11   views of what it might consist of, that would include the

12   debtor, the committee, the New York State controller, the

13   Office of the United States Trustee, to the extent that office

14   deems it appropriate, Mr. Giddens, and those parties that have

15   joined in the pending motions for appointment of a trustee, and

16   of course, the Walt Disney Company as the original proposer of

17   this concept.

18        For purposes of drawing up a plan that is designed to

19   minimize interference, avoid costs, and maximize efficiency,

20   the purpose of this meet and confer session would be to

21   develop, not so much in the context of the examiner motion, but

22   rather in the context of the multiple parallel paths of

23   investigation that are currently being let loose within the

24   case.  What I'm going to call a master plan.  We'll call it the

25   Peck Master Plan.  That last comment was intended to be a joke

1    and it did produce its intended result, which was a little

2    laughter.  A master plan that would provide for coordination

3    without limitation.  The goal would be that each group that is

4    charged, or believes itself to be charged with the

5    responsibility to investigate, to be able to reasonably rely

6    upon work product generated by others.  Not terribly different

7    from what an expert witness would do in relying on the work

8    product of others working for that expert.

9         The goal, as I view it, of the examiner motion, is to

10   not merely fulfill a statutory duty, but because we need to

11   fulfill a statutory duty, to advance the overall interests of

12   the case as a whole and those parties in interest who are

13   looking to this case.  And so what I want to accomplish here is

14   not something which merely gets the job done, but something

15   that gets an A plus.  I want to see the talent surrounding me

16   in this courtroom work together with the goal to make the

17   examiner process one that is truly value added, not cost

18   accumulated.

19        Those are my observations.  And I wanted to lay them

20   out before everybody else had a chance to step in because

21   everybody needs to know what I've been thinking about.  And I'd

22   like anybody who wishes to to feel complete freedom to take a

23   shot at what I have said.

24        MR. MILLER:  Your Honor, I apologize, I was remiss,

25   but as we pointed out in our response, we did point out the

95

1    overlapping investigations.  The investigation which Mr.

2    Giddens intends to pursue, the investigation that the

3    creditors' committee has been pursuing under its Rule 2004

4    motions, and even the investigations that governmental

5    authorities have been pursuing.  And that was why we made the

6    suggestion about holding off on professionals.  But I find it

7    to be in my best interest to agree with the Court whenever the

8    Court has observations.  So in that context, Your Honor, I

9    would just ask a question that the meet and confer, is that

10   pre-appointment or post-appointment?

11        THE COURT:  I was thinking post-appointment because

12   if it happens pre-appointment, we're missing the benefit of

13   what the examiner and the examiner's professionals may wish to

14   bring to the table.

15        MR. MILLER:  Well, in that context, Your Honor, we

16   agree with everything that Your Honor has said.  We think there

17   should be a protocol, to use that expression.  We did confer

18   with the creditors' committee on its suggestions about a work

19   plan, etcetera.  And we did not disagree with what was put in

20   by the creditors' committee.  But there are other differences

21   with other parties with the creditors' committee's proposals.

22   The question that I would have, Your Honor, on the appointment,

23   the description of the examiner's duties, I'm a little confused

24   about.  How would they be expressed in the order, or they would

25   be subject to the meet and confer?

96

1          THE COURT:  I'm actually looking for guidance from

2     the parties as to the scope of the engagement of the examiner

3     initially.  And the scope of the engagement of the examiner

4     would not be subject to the meet and confer.  The meet and

5     confer that I described was really designed to avoid dissonance

6     as among the various parties who are engaged in what be

7     competing efforts to obtain information as opposed to

8     collaborative efforts to obtain information.

9          So I'm still looking for guidance from all parties

10    concerned as to the proper scope.  To the extent that there is

11    an agreement concerning the proper scope, as I said in

12    November, that's helpful.  That doesn't necessarily mean that I

13    will rubber stamp it, but I will certainly take it into

14    consideration.  The fact that different parties in this case

15    are able to agree as to an appropriate scope is certainly

16    persuasive but not necessarily determinative.

17         MR. MILLER:  Yes, sir.  In that context, Your Honor,

18    and subject to whatever provisions there may be in terms of a

19    development of a work plan and setting a date for reporting and

20    all of those things which the estate has not objection to, I

21    would suggest, Your Honor, that in looking at what the debtors

22    have proposed at page 20 of its response to the New York State

23    controller's motion, the elements which relate to the Disney

24    Company, I don't think anybody has raised any objection with

25    those, which basically relate to an investigation, if you will

1    call it that, as to whether Lehman Brothers Commercial

2    Corporation has any administrative claims against LBHI

3    resulting from LBHI cash sweeps of LBCC cash balances, if any,

4    after the filing date.  I don't think that should be a very

5    complicated matter.  "An investigation of all voluntary and

6    involuntary transfers to and transactions with affiliates,

7    insiders and creditors of LBCC or its affiliates in respect of

8    foreign exchange transactions."  These are all very centered on

9    the relationship between the Disney Company and LBCC.  So I'm

10   just going to skip over those because they're all very --

11            THE COURT:  Everything that's Disney-specific is part

12   of the engagement.

13            MR. MILLER:  Right.  Then, Your Honor, we went on to

14   "whether there are more than colorable claims for fiduciary

15   duties and/or aiding or abetting any such breaches against the

16   officers and directors of LBCC and/or other debtors arising in

17   connection with the financial distress of the Lehman enterprise

18   prior to the commencement of the LBHI Chapter 11 case on

19   September 15."  That may conflict, Your Honor, with the

20   committee's suggestion that all the examiner should do is make

21   a factual investigation and report facts and not evaluate

22   claims.  So that's one issue that will be brought up before

23   Your Honor.  "Whether the assets of LBCC or other direct and

24   indirect subsidiaries of LBHI were transferred to Barclays

25   Capital, Inc. as a result of the sale to Barclays Capital, Inc.

98

1    that was approved by order of the bankruptcy court dated

2    September 20" -- it's actually the 19th, Your Honor -- "2008

3    and whether consequences --

4           THE COURT:  It actually was September 20.

5           MR. MILLER:  It was but the order's actually dated

6    the 19th, Your Honor.  It was entered on the 20th.

7           THE COURT:  It was entered on the 20th.  It's a typo

8    if it says the 19th.  I remember that very well.

9           MR. MILLER:  A long night and a long morning.  "And

10   whether consequences to LBCC of the consummation of the

11   transaction created more than colorable causes of action that

12   inure to the benefit of its creditors."  That again is contra

13   to the committee's suggestion of a factual investigation, a

14   factual report.  "The inter-company accounts and transfers

15   among LBHI and its direct and indirect subsidiaries, including

16   but not limited to LBI, LBIE, Lehman Brothers Special Finance

17   and LBCC during the thirty day period preceding the

18   commencement of the LBHI Chapter 11 case on September 15,

19   2008."

20          And as I said before, Your Honor, we would amend that

21   to the thirty days prior to the commencement of any of the

22   debtor cases.  Because some of them commenced on October 3 or

23   thereabouts.  The transactions and transfers, including but not

24   limited to the pledging or granting of collateral security

25   interests among the debtors and the pre-Chapter 11 lenders

99

1   and/or financial participants, including but not limited to

2   JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal

3   Reserve Bank of New York, and others.  The transfer of the

4   capital stock of certain subsidiaries of LBI, Lehman Brothers,

5   Inc., on or about September 19 of 2008 to Lehman Ali, Inc.  The

6   events that occurred from September 4 through September 15,

7   2008 that may have resulted in the commencement of the LBHI

8   Chapter 11 case."  These were a distillation, Your Honor, of

9   questions that were constantly being propounded to Mr. Marsal,

10  to his representatives, that we thought should be within the

11  general scope.  And they're broad enough so that the examiner

12  has flexibility within each one of those.

13          Then, Your Honor, we added in paragraph 32

14  suggestions which were made by the Office of the United States

15  Trustee and also a suggestion which was made by the United

16  States attorney for the Southern District of New York.  These

17  are basically provisions directing the examiner and the other -

18  - not the examiner, Your Honor, the other professionals and

19  fiduciaries in this estate to cooperate with the examiner in

20  conjunction with the performance of the examiner's duties.  And

21  that until the examiner has filed his or her report, neither

22  the examiner nor the examiner's representatives or agents shall

23  make any public disclosures concerning the performance of the

24  investigation or the examiner's duties.  And "the examiner" --

25  we propose this, Your Honor -- "may retain counsel and any

1    professionals if he or she determines that such a retention is

2    necessary to discharge his duties in connection with his or her

3    appointment."  As modified by Your Honor's suggestions, we

4    would accept that.

5            "The examiner and any professionals retained by the

6    examiner would be subject to the provisions of the Bankruptcy

7    Code and compensation under Section 330.  And the examiner

8    should have fully cooperated with any governmental agencies

9    (such cooperation shall not be deemed a public disclosure as

10   referenced above) including but not limited to any federal,

11   state or local government agency that currently or in the

12   future may be investigating the debtors, their management or

13   their financial condition.  And the examiner shall use best

14   efforts to coordinate with such agencies in order to avoid

15   unnecessary interference with or duplication of any

16   investigations conducted by such agencies."  Which is a theme

17   that Your Honor has expressed.  "The examiner will follow a

18   protocol to be established with the governmental agencies for

19   the sharing of information to the extent that such sharing

20   benefits the debtors' estates and such sharing of information

21   shall be subject to appropriate conditions to protect the

22   debtors' estates."

23           And finally, Your Honor, "The examiner shall have a

24   standing of a party in interest with respect to matters that

25   are within the scope of the investigation and shall be entitled

1   to appear and be heard at any and all hearings in these cases."

2   And then, Your Honor, we suggested that every effort be made to

3   avoid duplication.  We would incorporate, within those

4   suggestions, Your Honor, most of the suggestions of the

5   creditors' committee.

6        We think that covers a huge waterfront.  And if

7   somebody wants to put in the words investigation into fraud,

8   gross incompetence, etcetera, those, Your Honor, are not

9   objectionable to us either.  We just think that it wasn't

10  necessary at this stage of the process.  So our suggestions are

11  set forth, Your Honor.

12       We agree with the concept of meet and confer.  We

13  think that's a very good process and we also, Your Honor, we

14  endorse and we support the concept that the professionals

15  engaged by the examiner should be in the context of counsel to

16  the examiner in terms of interpreting what has happened to

17  date, interpreting the information that is being given, and

18  then if there's a desire to go further, then there's always

19  leave to come back before this Court.  Thank you, Your Honor.

20       THE COURT:  All right.  Thank you.  It seems to me

21  that it makes sense now for those parties, including the Walt

22  Disney Corporation, that started this process, which seems like

23  a long time ago, to comment on what Mr. Miller has said, what I

24  have said and whether or not there is agreement or disagreement

25  concerning both scope, as proposed, and conditions attached to

1    the engagement as proposed.

2          So I'll hear from Mr. Bienenstock and then from other

3    parties in interest who have either joined in the Walt Disney

4    motion, or like the New York State controller, filed an

5    independent motion for appointment of a trustee which has been

6    modified in a recent pleading which withdrew that aspect of the

7    request, or any other party, like the creditors' committee,

8    that has weighed in with responsive papers in connection with

9    the pending examiner motion.  Everyone else is free to listen.

10         MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

11   Bienenstock of Dewey & LeBoeuf for the Walt Disney Corporation.

12   As Your Honor knows, we commenced this by a motion dated

13   October 20, 2008.  The relief we requested, being a creditor of

14   LBHI and LBCC, Lehman Brothers Commercial Corporation, we

15   requested an examiner or examiners to investigate issues

16   relevant to those two entities within the context of Section

17   1106 of the Bankruptcy Code which sets the broad scope of -- I

18   should point out the examiner's duty.  And that's the first

19   comment I wanted to make.  The examiner has a duty under the

20   Code.  And I don't think many of the requests to limit the

21   examination would have the examiner do less than his duty.

22   Now, that said, we recognize the Court has the discretion to

23   approve an investigation but we submit even the Court would not

24   properly exercise its discretion if it prevented the examiner

25   from conducting the investigation set forth in Section 1106 as

103

1    his or her duty to do so.

2         Your Honor, we appreciate -- Your Honor invited us to

3    take shots, at least in our case, we didn't find very much in

4    Your Honor's comments to take shots.  But I would direct Your

5    Honor's recollection to perhaps one thing the Court said that

6    you might not even remember saying or the way you said it, but

7    Your Honor said in this case, Your Honor -- and I know Your

8    Honor knows this, there are fifteen debtor cases.  We are very

9    much opposed to what I would call a stealth consolidation.

10    These are fifteen cases.  Many of them, in their own rights,

11    would be among the largest ever filed in the United States.

12    And there are different creditors of different entities, which

13    is a large reason why we're here.  There's some overlap,

14    there's some lack of overlap.

15         There are issues that Mr.  Marsal referred to this

16    morning that he labeled as very controversial on the inter-

17    debtor claim issues.  And we ask the Court in the strongest

18    possible terms, not to lose track of the notion that this

19    should not be a stealth consolidation.  There are creditors of

20    different estates that need to find out facts for those estates

21    because it directly impacts their claims.  And I know Your

22    Honor certainly did not intentionally mean to suggest that

23    there should be any type of stealth consolidation or otherwise.

24    But there is this danger in these jointly administered cases,

25    one committee, etcetera, etcetera, that things get done that

104

1   really are not in the interest, necessarily, of the creditors

2   of a particular debtors' debtor.

3          As a for instance, and then I'll move on to Your

4   Honor's questions, there was an application for a bonus formula

5   for the Alvarez & Marsal firm which we had no problem with.

6   And we didn't weigh into that.  But if that motion is read

7   carefully, it compensates based on the gross amount produced

8   for creditors in all of these fifteen debtor cases.  Well, it

9   could be that one debtors' estate really gets shortchanged and

10  its creditors are hurting.  And yet that has no impact.  It's

11  just the gross amount.  That's what I mean by this danger of

12  stealth consolidation.  Things get done even unintentionally

13  that actually prejudice the rights of creditors of individual

14  estates.

15         Now, in respect of the debtors' response this

16  morning, Your Honor, we just take issue with one thing Mr.

17  Miller said.  He said Disney, in its reply, accused the debtor

18  of bad faith.  Your Honor, I immediately reviewed our pleading

19  because that wasn't in our heads and that wasn't what we

20  remembered writing.  And the only thing we say about the debtor

21  that I can find is that we think its recommendation that the

22  examiner not retain a financial advisor, at least initially, is

23  inappropriate.  I just wanted to correct the record on that.

24         And we agree with Your Honor wholeheartedly, so I

25  won't spend much time, that the examiner needs the financial

105

1    advisor at the outset.  And the reason it does is that you have

2    to know what questions to ask Mr.  Marsal.  You can't make

3    sense of the data or know how to go behind it or know whether

4    something should be reviewed unless you have financial

5    expertise at your side.

6            As an overarching comment, Your Honor, based on logic

7    and I hope experience, we want to urge this on the Court.  It's

8    much harder to negotiate and script a protocol than it is to

9    have one when people are trying to do the right things.

10   Specifically, by that I mean the following.  We have every

11   faith the United States Trustee is going to propose and this

12   Court will approve an examiner candidate who's going to go

13   forward in good faith to be the value added, do the A plus job

14   Your Honor wants to see.  It's inconceivable to me that any

15   professional in that position would not first try to benefit

16   from Mr.  Marsal's work product and the committee's work

17   product, to the extent the committee is willing to share it.

18   And then determine what needs to be perhaps verified,

19   confirmed, checked.  Lots of assumptions are made in accounting

20   entries.  Some assumptions will benefit some debtors' estates,

21   some will prejudice debtors.  So you have to make a judgment as

22   to whether to go behind it.

23           There's no question in my mind that if two or more of

24   the fiduciaries want to depose the same witness, whether it be

25   at Barclays, at one of the banks or anyone else, and they'll of

106

1    course want to have document production in advance of a

2    deposition.  They shouldn't each serve separate document

3    requests and deposition notices.  They should coordinate and

4    work together.  These are the types of things that if they

5    don't happen I think they can be brought to the Court and

6    simply the knowledge that they can be brought to the Court will

7    cause the parties to cooperate.

8         It's hard to script all of this, but among people

9    trying to do the right thing, it happens.  So we very much hope

10   that whenever the Court deems appropriate, hopefully as soon as

11   possible, today or in the next several days, the examiner will

12   be appointed without the need to try to negotiate or craft lots

13   of procedures and protocols.  And let's just have a broad

14   mandate to the examiner and the other fiduciaries that they all

15   have to get together to cooperate.  And we think that's the

16   most efficient way to achieve the Court's goal.

17        Now, on the specific questions.  The first, as to the

18   SIPA trustee, we're not asking for an examiner for the SIPA

19   trustee's estates.  It may well be that the examiner for LBHI

20   and LBCC needs to investigate facts relating to those estates

21   or transactions with them, etcetera.  And that's certainly both

22   with the examiner's duty under 1106 and it would be

23   inappropriate to limit the examiner.  But as we say in our

24   reply, we're not trying to have an examiner for those estates.

25   We recognize the SIPA trustee is there and is conducting his

1    own investigation.

2         THE COURT:  Mr. Bienenstock, let me ask you a

3    question.  Is it your position, and this goes back to your

4    colorful reference to so-called stealth consolidation, that

5    there should be a separate examiner appointed in the LBCC case,

6    or is it your position that the same examiner appointed in the

7    LBHI case, with a mandate to examine the circumstances

8    surrounding LBCC, will be capable of doing both?

9         MR. BIENENSTOCK:  Your Honor, if I were to say there

10   should be separate examiners, then the next question would be

11   well, then do I need fifteen examiners mandatory under the

12   statute, I think.  I don't want to put words in the Court's

13   mouth.  And I think the prospect of fifteen examiners would

14   very quickly lead to one examiner.  So without taking a

15   position on what the statute requires, suffice it to say for

16   now, if there's one examiner, and I suspect this is going to go

17   beyond LBCC, just I could only ask for an examiner where my

18   client is a creditor and my client could only ask where it's a

19   creditor.  I expect there's going to be one examiner who will

20   understand that he or she is not an advocate of any one estate

21   but is simply an agnostic, unbiased fiduciary to find the facts

22   in good faith, as best as he or she is capable of.  So let me

23   put it this way, Disney Company will not object if there's one

24   examiner for the two estates we've asked.

25        THE COURT:  Provided, however, that we incorporate

108

1    into that appointment the comment that you made that just

2    because there's a single examiner it should not be deemed to be

3    an indication that there's anything approaching consolidation

4    by virtue of the fact that that examiner may be looking at

5    multiple estates because he or she will be agnostic.

6         MR. BIENENSTOCK:  That's right.  That's right.

7         THE COURT:  Fine.

8         MR. MILLER:  Just to correct the record, Your Honor,

9    there are nineteen different ones.

10        MR. BIENENSTOCK:  Sorry.  Thank you.  I took it from

11   the Marsal report.  He listed eight then said seven others.

12   But I guess there are four more.

13        THE COURT:  Well, there are two that have been filed

14   within the last week or so.

15        MR. BIENENSTOCK:  Okay.  In respect of these

16   fiduciaries we've been talking about, I also want to caution

17   the Court, and I won't belabor it because I think we did

18   mention it in our reply, that a fiduciary is a nice, good-

19   sounding term, but one has to go behind it.  The statutory

20   committee is a fiduciary.  As we point out, it was appointed

21   after the first, I think, debtors' cases were filed.  It has

22   members on it, indentured trustees who are created solely by

23   contract, who can only do what their contract says they can do

24   which is support the creditors they represent, who are

25   bondholders of LBHI.  To say that the committee, as it exists

1    now, is a fiduciary for all the debtors' creditors, we submit

2    would be completely wrong, both legally and factually.  We also

3    do not believe that that particular situation can be corrected

4    by changing the membership because then you get into the

5    Adelphia issue, which we cited in our reply, which is where you

6    had, just like here, one committee for all debtors, if that's

7    what we end up with.  Judge Gerber ordered and wrote a lengthy

8    decision explaining why he had to tell the debtors' management

9    and the committee basically not to take positions on the inter-

10   debtor issues.  And it was left to ad hoc committees of

11   creditors, which had its own set of issues.  But it was what it

12   was.

13        So we don't think by saying this committee is a

14   fiduciary that that means that in Disney's case LBCC's claims

15   are going to be found with any objectivity or zealous advocacy

16   because they have people on the committee who have opposed them

17   as a matter of law.  And they weren't even created to be a

18   committee for LBCC.  So we think the notion that there is a

19   committee and it's conducting an investigation is factually

20   true.  We don't think legally it in any way should impinge on

21   what the examiner does.

22        Now, I said earlier, of course there should be the

23   cooperation, which I think would get to the result the Court

24   was looking for.  But let there be no mistake, we certainly

25   contend that this committee is not acting as a fiduciary for

110

1    LBCC and cannot do it and it has no requirement to make any

2    report public.  It doesn't satisfy any of the fairness and

3    appearance of fairness objectives of Congress in having the

4    examiner statute.

5        And although it shouldn't even be necessary to say,

6    because I think it's obvious, but I'll say it nevertheless, the

7    fact that the committee came first and the examiner comes

8    second doesn't mean that the examiner should in any way be

9    subordinated to the committee.  And the committee's retort that

10   it can sue and the examiner can't, there are two problems with

11   that, as we point out.  Judge Gerber found in Adelphia, no, the

12   committee can't sue because how can you sue when you're a

13   fiduciary for both sides you're suing on, on inter-debtor

14   disputes.  And second, Congress wrote the statute and obviously

15   didn't think that because a committee can sometimes get

16   derivative standing to sue that the examiner should have a

17   lesser investigation.  So we think --

18       THE COURT:  One second.  Let me just understand what

19   you're saying.  Is this argument you're now making an argument

20   suggesting that it would be inappropriate to limit the

21   employment of the examiner to simply the investigation of

22   facts, but that it should extend as well to claims.  Or are you

23   making a different argument?

24       MR. BIENENSTOCK:  I was definitely setting up the

25   predicate for that.  And we attack that on several grounds.

111

1    The first ground is what I just said, that because of the

2    composition of the committee, the timing of its appointment,

3    etcetera, the Adelphia decision, its investigation, whatever

4    that is, and we don't know because by right it's secret except

5    to the extent they want to tell people about it or except to

6    the extent you see them file pleadings and subpoenas and

7    things.  That can't substitute for an examiner investigation.

8         Additionally, the notion that the examiner should be

9    censored in advance and told no matter what you find don't

10   purport to write a report disclosing claims you find of

11   different entities, we think, number one, is tantamount to

12   negating the mandatory aspect of the statute.  This should not

13   be conceptualized.  If you have to have an examiner, so all

14   Congress meant was you have to have a person.  But you can

15   basically take it all back by censoring her or him in advance.

16        THE COURT:  It's known as a derivative.

17        MR. BIENENSTOCK:  Thank you, Your Honor.  For the

18   committee to say you can have an examiner but shouldn't write

19   claims is just -- whatever you want to call it, it's taking

20   back what Congress mandated and it would be wrong.  And one has

21   to ask what would be so bad about an examiner who identifies

22   claims for the different estates.  Why do they want to keep

23   that under the rug?  This is the person who's agnostic, who, if

24   you're going to have faith in a report, this is the report

25   that's coming from someone who's not an advocate for any

1       particular estate or creditor.

2               THE COURT:  That's not how I interpreted the

3       committee's papers.  And I'm not taking away from anything that

4       you're saying in your present argument.  I viewed, and I'll

5       hear from the committee on this, this argument not to be geared

6       to limitation of mandate, although that's certainly what

7       they're saying, as much as it is concern to protect the record

8       with respect to legal interpretations to be made from agreed

9       facts.  And I suspect, but don't know, that the concern was

10      that the examiner report not become a blueprint for use against

11      an estate representative with authority that might otherwise be

12      able to articulate a cognizable claim based on those facts.

13      That's how I interpreted what I read.  The committee will

14      comment as to what they actually meant.

15              MR. BIENENSTOCK:  Well, I would say assuming the

16      committee meant what Your Honor infers, or not, the examiner,

17      in conducting an investigation, should definitely be free to

18      report what claims it and its professionals believe arise out

19      of that investigation.  It's one of the --

20              THE COURT:  And so there's no mistake as to my

21      thinking on this, and I'll give the committee a full

22      opportunity to be heard on it, my inclination is to give the

23      examiner complete freedom to write a report that extends both

24      to facts and to identified causes of action, if any, that might

25      be implied by those facts with the understanding that that's

113

1    the view of one individual and one individual's law firm and is

2    not binding upon any other party.

3        MR. BIENENSTOCK:   Okay.  And we agree with that.  So

4    I'll move on to the next issue.  As Your Honor's four points,

5    the scope and the reasons for the scope, as I mentioned at the

6    outset, I think the primary scope is governed by the examiner

7    duty to do the investigation, which I think is set forth in

8    1106(a)(3) and (4), but it's set forth in the Code.  We think

9    that the scope that the debtor has proposed, which includes

10   what we agreed with the debtor on and then apparently they had

11   other discussion to their own ideas and they added a bunch of

12   things, is completely appropriate.

13        I just want to correct the record on one item.  While

14   Disney clearly has its claim and its issues, if one looks at

15   the scope, there's nothing Disney-specific.  There are things

16   specific to Lehman Brothers Commercial Corp.  We think all

17   creditors of Lehman Brothers Commercial Corp. will want to know

18   what is claims are against LBHI.  But we didn't get into any of

19   the Disney-specific issues with -- that the money is now at

20   Citibank or Barc -- or anything like that.  Everything in that

21   scope has a benefit to every creditor of LBCC or LBHI,

22   depending on how it comes out.  And we were very careful not to

23   make it Disney-specific.

24        So the only guidance I can offer, Your Honor, is what

25   we wrote down is definitely within the scope and the statute in

114

1    the examiner's duty.  And we're heartened by the debtors'

2    statement this morning that if the examiner comes back to

3    expand, the debtors will support that.  We think that's a very

4    rational way to go forward.

5         We've covered the examiner's ability to retain

6    professionals, which was your second point.  The third point

7    was a deep concern for the overall costs and expenses and the

8    Court not wanting the case to be a blank check for

9    professionals.  As we pointed out, and Your Honor alluded to,

10   this case, which is the largest ever, has probably the fewest

11   professionals, certainly per claim dollar and perhaps per

12   estate value dollar, of almost any case.  And that's not an

13   excuse just to spend money because it may be very efficient as

14   it's currently structured.

15        But while on the one hand, no one wants to spend

16   unnecessary money, and we're in the forefront of that.  I mean,

17   Disney is going to have a claim here that's going to get

18   whatever the distribution is.  So we certainly don't want to

19   incur expenses that will reduce our distribution.  But we do

20   think that it's one thing to be efficient, it's another thing

21   to create rules that effectively prevent the carrying out of

22   the statute or the professional's duties who are going to be

23   retained.  And so we don't think that saving money is an excuse

24   to limit an examiner's scope or the number of professionals the

25   examiner can retain.  Saving money is an excuse to do what we

1   suggested, which is to require cooperation so they don't

2   unnecessarily duplicate.

3            And I want to emphasize that reviewing something Mr.

4   Marsal or the committee has done is not, per se, unnecessary

5   duplication, if they have a reason for wanting to go behind it.

6   And we have to rely on the professionals, in good faith, to

7   determine whether the underpinnings of the claims they come up

8   with, etcetera, should be reviewed or not.  And presumably,

9   some will be and some won't be.

10           Your Honor made a comment about the -- well, Your

11  Honor thought there should be a financial advisor at the outset

12  that Your Honor thought that it should -- not to duplicate,

13  should be there for intelligence, good judgment and to be

14  interpretive, if I got that right.  We agree with all that, but

15  I don't think, and I hope Your Honor did not mean to suggest,

16  that the examiner's financial advisor cannot also ask for the

17  underlying source documents, the work papers to look at it.  He

18  may want to look at it on a spot basis to see if it was done,

19  to see what type of judgments were done.  We have to rely on

20  the good faith and professionalism of these people to know when

21  they need to roll up their sleeves and go to the source

22  documents.  And I hope the Court's comments did not mean to

23  preclude checking out certain key facts or conclusions,

24  etcetera, that the examiner's professional's financial advisor

25  thinks is appropriate.

116

1        THE COURT:  I will  interject to confirm that that

2   was not the intention of those remarks.  It was rather to

3   suggest that the financial advisor chosen by the examiner

4   should be sensitive to the fact that, at significant expense to

5   the estate, a job has already been done and that it would be

6   unwise to duplicate that effort.  That doesn't mean to suggest

7   that the financial advisor, after asking questions, wouldn't

8   perhaps, if appropriate, investigate more deeply into

9   particular issues of concern.

10       MR. BIENENSTOCK:  Okay.  Your Honor's fourth point

11  was the meet and confer, which I actually, in substance,

12  started out with.  We wholeheartedly agree that that's the way

13  to get cooperation rather than trying to negotiate a protocol

14  in advance.

15       The only other point I want to make, I think I

16  responded to the committee's objections or requests to lessen

17  the scope.  We likened it to an examiner with reduced powers as

18  opposed to one with expanded ones.  Barclays objects to the

19  scope, essentially saying that it got a sale free and clear and

20  shouldn't be bothered.  And our point -- or really two points.

21  Number one, at that sale hearing, it knew there were open

22  issues.  Your Honor raised the issues because nondebtors were,

23  let's just say, in the neighborhood, and we were concerned

24  about their assets.  At warp speed, which Barclays required

25  this deal to be done --

117

1          THE COURT:  It wasn't that Barclays required it to be

2     done at warp speed, the transaction itself, by its very nature,

3     mandated that it be done at warp speed.

4          MR. BIENENSTOCK:  Okay.

5          THE COURT:  So I don't think it's fair to tag that

6     particular disability on Barclays.  It was just the nature of

7     the melting ice cube.

8          MR. BIENENSTOCK:  Fair enough.  They did it with eyes

9     open.  They heard all the open issues at the hearing.  They

10    heard Your Honor say that there were certain ambiguous things

11    that would have to be dealt with later perhaps.  With all that

12    on the record, it would completely unfair and inappropriate for

13    the examiner not to develop the facts to see whether those

14    ambiguities will in fact make a difference and whether

15    creditors do have rights.  And this is all creditors of

16    subsidiaries who might have been impacted by the sale, whether

17    they do have rights that should be pursued.

18          Thank you, Your Honor.

19          THE COURT:  Mr. Bienenstock, thank you very much.

20          MS. ADAMS:  Good afternoon, Your Honor.  Diana Adams,

21    United States Trustee.  I'm speaking now, I think, because I

22    might be able to address some issues that will help guide

23    further responses and also perhaps to set -- I'll say minds at

24    rest that some of these issues have been discussed.  And my

25    office is well aware of the concern about coordination and

118

1    cost.

2         Your Honor referred to the telephone conference call

3    we had last week.  And at that time I told the Court as well as

4    the parties that my office had begun to solicit recommendations

5    and would begin interviewing.  And I have been interviewing

6    possible candidates on Monday and Tuesday of this week and I

7    can tell the Court and the parties that virtually everyone, if

8    not everyone, in a general description without knowing the

9    exact scope of course, but having read the pleadings, said that

10   one of their first tasks would be to sit down with the debtors,

11   the creditors' committee, the SIPA trustee, the other parties

12   in interest, the U.K. representatives, and begin discussions

13   for coordination for nonduplication.  That is everyone is aware

14   of that, Your Honor.  I think that probably will lead to some

15   protocols.  I certainly hope so.

16        The other issue that all of them addressed was the

17   need to have financial advisors.  Everyone spoke highly of

18   Alvarez & Marsal, immediately said that they had no problem

19   relying on the information that they would have gathered, would

20   not seek to duplicate it, but they would need to have their own

21   financial advisors to vet -- I think the word was used by

22   several of the people -- to vet, as Mr. Bienenstock pointed

23   out, perhaps on a spot basis or other individual areas of

24   concern.  One applicant actually went so far as to say that if

25   he could not hire his own financial advisors he would not take

119

1      the assignment.  They all felt strongly that it was important

2      for them to have their own professionals.

3           As for the scope, what Mr. Miller has, the debtor has

4      in its pleadings, my office had not problem with.  We had only

5      wanted a catch-all phrase which I think the Court has referred

6      to and Mr. Miller actually has stated that if the examiner

7      finds that there's additional area, come back to the Court.  I

8      think the protocols that Your Honor has talked about are best

9      worked out by the examiner and the other parties you mentioned.

10          I think the meet and confer is absolutely necessary.

11     I also take to heart, and I know we will make sure the examiner

12     does as well and I hope the other parties do too, Your Honor's

13     comment that the examination should be value added and A plus.

14     And I make this comment with another case in mind, that I'm

15     sure most of the professionals, if not all of them, are fully

16     aware of where my office appointed an examiner and the protocol

17     process took over four months.

18          And I think with the comments that Your Honor has

19     made that there should be a cooperative meeting to enhance and

20     not impede the examiner, is very, very important.  And I don't

21     anticipate that that will happen but it was certainly a grave

22     concern and delay in a previous case.  So my office fully

23     adopts all of Your Honor's recommendations, not surprisingly.

24     And I think that any concerns that the committee has, or any

25     other party in interest, about what should be in the report can

120

1   be handled in the meet and confer or as the report is developed

2   and need not be determined at this point.  Thank you, Your

3   Honor.

4         THE COURT:  Thank you very much.  Mr. Sabin, good

5   afternoon.

6         MR. SABIN:  Good afternoon, Your Honor.  Jeffrey

7   Sabin from Bingham McCutchen on behalf of the Harbinger Funds

8   who, unlike the Disney entity that brought this motion, did

9   join in this motion.  At that time Harbinger had disclosed its

10  creditor status or asserted creditor status of LBSF, which is a

11  debtor, one of the nineteen, its creditor status or asserted

12  status of LBHI and it is also, in its most recent pleadings,

13  and I'm going to follow your lead and deal with several other

14  pleadings in this case that we have responded to in the context

15  of answering your questions, it has creditor status at LBIE.

16  And it will soon file a proof of claim at LBI.

17        In that context, Your Honor, I want to respond

18  generally and then specifically.  As to a general matter, you

19  may recall that Harbinger was probably the first to ask for

20  transparency in this case.  It continues to do so and continues

21  to think that this examiner scope, duties, and the matters

22  related thereto should be seen in the context of continued need

23  for transparency.

24        Number two, the need for timing for that

25  transparency, especially when viewed in connection with the

121

1    concerns of cost.  And third, the need for coordination and

2    cooperation, not only between the examiner, in this case, but

3    the SIPA trustee in connection with his examination, which

4    otherwise is before this Court by virtue of its 2004 motion, to

5    do his duties under the SIPA statute.  And by virtue of the

6    2004 examination already ongoing by the official creditors'

7    committee at LBHI and the other initial debtors in connection

8    with questions related to the clearinghouse banks.

9            In that matter, Your Honor, we find ourselves -- to

10   respond to question number one on scope, to also include

11   duties.  As we read the statute and as we read the debtors'

12   proposal, and in particular I'm referring to Section 31 of

13   their response, in essence, to the trustee motion, and on page

14   21 where they ask for, as part of the scope, investigation of

15   various claims of breach of fiduciary duty.  In order to have

16   that scope, I think that it is needed, and our client does

17   believe that while we are not asking for this examiner to have

18   standing to bring any actions, I think in the context of

19   transparency, not only is it important for the examiner to

20   develop facts within the scope, but we think the examiner needs

21   to be free to at least talk about its view without binding

22   anyone else who may or may not have standing to bring claims

23   about claims that may arise in connection with that

24   examination.

25           As to scope itself, Your Honor, we have some limited

122

1    suggested comments because we find ourselves in almost complete

2    agreement with Mr. Miller and the debtors as set forth in

3    Sections 31 through 34.  As to the first bullet point in

4    paragraph 31, we do not believe it should be limited to what

5    otherwise Mr. Miller said what should be an easy issue.  Right

6    now it's limited to "Whether Lehman Brothers Commercial Corp.

7    may have administrative claims against LBHI  in connection with

8    cash sweeps, cash balances after September 15th."  We think

9    that should be expanded to deal with the same issue as to any

10   other subsidiary that is currently a debtor in these U.S.

11   proceedings or could be a debtor in the future in these U.S.

12   proceedings.

13          Second point, Your Honor, is in that same paragraph.

14   It is the third bullet point on page 21.  "We are not clear by

15   the proposal of what is meant by whether there are more than

16   colorable claims for breach of fiduciary duties."  I think the

17   issue is whether there are claims, whether they're colorable or

18   not should be free to be discussed, as we suggest.  And I

19   think, as I heard, Mr. Miller and the debtors are not opposed

20   to expanding that.  I don't think there's a need to include

21   every litigationable claim, whether it's fraud or otherwise.

22   But I think limiting just to breach of fiduciary duty would be

23   inappropriate, and I would suggest that it simply be breach of

24   fiduciary duty or other state law claims or similar claims

25   would be within the scope.

123

1          As to paragraph 32 which is not necessarily within

2     scope, but it's more within process, I will answer your

3     questions as to process as part of our coordination.  We do

4     believe, as the committee indicated, that there should be a

5     work plan.  And as part of transparency we believe that work

6     plan should be disclosed as soon as possible so the world knows

7     what's the work plan and what's the timing.  We understand, in

8     connection with the second bullet point on paragraph 32, that

9     until there's a filing of the report by the examiner that there

10    would be no public disclosures regarding performance of the

11    investigation.  However, it would not be fair for me to stand

12    here, in connection with the examiner motion and not also

13    address our response to the SIPA trustee's request in

14    connection with its investigation which was otherwise filed by

15    the SIPA trustee as a 2004 request and issue of subpoenas.

16         THE COURT:  Well, I heard you say it would not be

17    fair for you to not discuss it.  I'm questioning whether it

18    would be fair for you to discuss it in light of where we are in

19    the agenda.

20         MR. SABIN:  My only issue, Your Honor, is whether the

21    parties in interest in the context of 2004s will have an

22    ability, as part of whether it's the examiner's motion or the

23    SIPA trustee's examination to participate to the extent there

24    is or is not a signing of a confidentiality agreement or

25    otherwise.  That's the only reason I raise it.

124

 1          THE COURT:  I understand that point.  But in no way

 2    will the order relating to the appointment of the examiner

 3    control the outcome of that point.  So I think we can put it to

 4    one side, reserve it for a later discussion this afternoon.

 5          MR. SABIN:  Done.  As to the use of Alvarez & Marsal,

 6    I fully concur with this Court and with Mr. Bienenstock's and

 7    this Court's additional modification, if you will, or

 8    amplification of what this Court meant.  I fully adopt that.

 9    Fully adopt the -- and would participate in the meet and

10    confer.

11          And lastly, Your Honor, I think that timing, which

12    has not been raised, but timing, in effect, has been raised by

13    the cost concerns and the work plan.  I think timing is

14    critical here.  And if there were a way, if necessary, so that

15    certain aspects of the report were ready sooner rather than

16    later and were independent that that work plan itself permitted

17    that kind of flexibility so that if there is aspects of the

18    report, if they were ready, could be revealed as opposed to

19    waiting to the conclusion of all of that.  Thank you, Your

20    Honor.

21          THE COURT:  Thank you, Mr. Sabin.  They're coming at

22    me from the left.  They're coming at me from the right.

23          MR. ENTWISTLE:  Oh, I know, Your Honor.  There were

24    lots of reserved seats in here this morning.  So finding a seat

25    was at a premium even coming in a half an hour early.  Andrew

125

1    Entwistle of Entwistle & Cappucci for comptroller, DiNapoli.  I

2    appreciate the opportunity to talk to Your Honor and I'm going

3    to try to focus as much on your questions directly as possible.

4    That was our intent anyway following the conference call the

5    other day.

6              It may be easier to start with the last point you

7    made regarding the meet and confer.  That's the easy one, I

8    think.  I think that makes terrific sense.  I think

9    appropriately, as has been observed, it should happen after the

10   appointment of the examiner.  I'm sure that was your intent

11   from the beginning.  We're ready, willing and able to

12   participate in that process.  And I'd observe that the types of

13   protocols that would be at issue there are done in lots of

14   different contexts and lots of different cases outside of

15   bankruptcy as well.  And I think we can bring a lot of value to

16   that process.  So we appreciate that.

17             The third point -- the third issue regarding the work

18   plan which kind of came out of this issue of cost and balance,

19   we're obviously very sensitive to the costs.  The comptroller's

20   interests here are kind of at the back of the line.  We

21   recognize that.  We're very oriented toward maximizing the

22   value of this estate and achieving transparency at all levels.

23   We think a work plan is a good part of the process but not in

24   the way the committee had suggested it.  Not one that would

25   have to receive preliminary approval by the committee, by

1    debtors, by others but rather in the form of a report to the

2    Court.  In other words, there should be an initial scope, which

3    we'll talk to in a second.  But once that scope is set, the

4    examiner should have to come to Court and then let the Court

5    know its intended course of work, what it intends to do to

6    carry out or to act in accordance with its statutory obligation

7    under 1106 and 1104 and then take that forward.  So I think a

8    work plan makes sense.  It is a good way of assuring that

9    whatever protocols are agreed to in the meet and confer are

10   actually being undertaken in real life.  But I think that,

11   again, it should be by way of a report and not something that

12   needs approval by any participant in the process or party in

13   interest before it comes to the Court.

14         In that regard, I think in terms of transparency and

15   something Mr. Sabin said, you know, provoke this thought, it

16   might be worthwhile that while we do have provisions, and we

17   have no issue with the provisions that talk about the examiner

18   not disclosing or having parties disclose information about the

19   investigation, etcetera, before it's time, that if we're going

20   to have a work plan, it may make sense and benefit everyone

21   concerned that there be periodic status reports, maybe along

22   the lines of what was done in Enron or in other cases, so that

23   this way the Court's aware of the progress being made in

24   implementing the work plan and so are all the rest of the

25   parties in interest.  I think that benefits transparency and

127

1    helps advance the process.

2         With regard to retaining professionals, I think

3    that's been spoken to a lot.  Our major concern there, Your

4    Honor, is really that the trustee not have to view the world to

5    the prism of Alvarez & Marsal.  Mr. Marsal's presentation today

6    was excellent.  It really is the first opportunity that we've

7    had to see the progress that's being made.  I think it was a

8    terrific way to start.  And it is, as you observed, one of the

9    main reasons why the comptroller has deferred the trustee

10   application at this point.  It's clear that Mr. Marsal has made

11   progress as the CEO here and that we are getting some order to

12   this process of unwinding the affairs of the estate.  We still

13   have concerns, as we observed in our motion, with regard to the

14   presence of the remaining board members overseeing the process.

15   But I think we can table that discussion appropriately for

16   another day.

17        It does, however, I think, speak to two issues.  One,

18   I think it's clear that the ability to retain professionals, I

19   think, as you observed, one, we can deal with the issue of

20   deference in these protocols that we're talking about and even

21   in the context of the work plan, speak to the issue of looking

22   first to materials by Alvarez & Marsal or other investigations.

23   If the committee wants to provide materials to that process,

24   certainly, that's welcome and I think that should be part of

25   this work plan process and the meet and confer.  And I think we

128

1   can easily establish a protocol for that information being made

2   available to the examiner.

3          But I think Mr. Bienenstock's point was well made.

4   And that is that those professionals shouldn't be limited from

5   being able to go beyond what's provided.  They can look at it

6   but they should be able to go beyond in a way that's not

7   duplicative and consistent with your views.

8          With regard to scope, which is the overarching issue,

9   I thought I heard Mr. Miller say that he didn't have an

10  objection to including what, in essence, we have been

11  purporting all along which is the statutory language regarding

12  looking at issues of fraud or misconduct, etcetera, in addition

13  to the breach of fiduciary duty provisions that they had

14  included in paragraph 31, bullet point 5, of their suggestion.

15  So if we have -- I think it's important, especially if we're

16  talking about work plan and context, that we do have a broad

17  scope in the sense of looking at the -- carrying out the

18  statutory mandate along the lines of what the comptroller has

19  suggested at the third ordered paragraph of its proposed order

20  and in -- at the same time, in paragraph 5 of its submission in

21  reply.  And that is, to assure that the examiner has the

22  authority and power to investigate all allegations of

23  pre-imposed petition fraud, dishonesty, incompetence, etcetera,

24  in particular, in the context of, among other things, mortgage

25  origination, mortgage-backed securities, credit default swaps

129

1    and the like -- and through the period, through 2004.  And

2    we've set forth in our pleadings some of the reasons why we

3    think that the examiner should have the ability to look back

4    through that period.

5         I think it's important, again, consistent with

6    submitting a work plan that we not, in essence, have this same

7    proceeding all over again once the examiner is appointed.  I

8    think we run the risk if the scope is too narrow and just

9    really a series of questions to be answered that an examiner

10   when appointed will be forced to come back to the Court very

11   quickly.  And while I take heart with the notion that the

12   debtor as it's represented today will be supportive of whatever

13   the examiner wants to do, I think that's really judicially

14   inefficient.  I think we're much better off having a scope

15   along the lines of what we've suggested.  And if it's, as I

16   understood Mr. Miller to say, he's fine with having that

17   statutory language imported into the order, an appropriate

18   place to do it is that paragraph that we've just spoken about,

19   paragraph 31, bullet 4.  And if we import the language we have

20   there, we have no objection.

21        And then I think we're all pretty much in agreement

22   about scope other than possibly the committee.  But then I

23   think within that scope, the Court then receives this report of

24   a work plan and we all move forward with the examination.  I

25   think we assure all the things we're looking for here:

130

1    transparency, independence, and we assure no bias but, again, a

2    very cost-effective and judicially effective approach because

3    my concern really mirrors Your Honor's.  And that is that this

4    examiner's report is something that benefits everyone in all of

5    the various estates that are at issue here.  I think one

6    examiner is appropriate, obviously, to answer the Court's

7    question about that earlier.  But I think we save a lot of

8    time, energy and effort if the work plan, the overall scope

9    provides a framework, if you will, where all of the parties in

10   interest who might otherwise be running to court to seek

11   independent discovery can have comfort that this examiner is

12   going to bring into the light much of that information that

13   they would look for in the ordinary course.  And once that's

14   done, then I think we can officially look at the issues that

15   individuals may have in a much more cost-effective process than

16   we would otherwise have today.

17        So, I thank Your Honor for your time.  And unless

18   you've got any questions, I'll sit.

19        THE COURT:  Thank you, Mr. Entwistle.

20        MR. ENTWISTLE:  Thank you.

21        MR. SOSNICK:  Good afternoon, Your Honor.  Fred

22   Sosnick from Shearman & Sterling on behalf of Bank of America.

23   One of the benefits of being in the back of the room and being

24   last is that most of the points were covered so I won't belabor

25   them with the Court.

131

 1            I just wanted to point out a couple of things.  And I

 2     think most of what we've heard addresses all of the concerns we

 3     had.  The principal concerns we had were the fact that we were,

 4     in the initial phase of this case, seeing a slew of 2004

 5     requests, in effect, independent examinations.  And then the

 6     Disney motion, which was yet another request for an examiner or

 7     an examination but that was limited in its scope and context.

 8     And what we're really concerned about was just being examined

 9     to death in this case as a collective group.  And with everyone

10     having an uncoordinated approach, that was our biggest fear.

11            So we think where this is now gelled around is

12     exactly what we would have hoped for as an outcome to this

13     process.  We think -- just to address a couple of -- or just to

14     address the Court's questions.  We do think the scope outlined

15     by the debtors is largely what we would have envisioned it to

16     have expanded to.  We -- I think we're sort of in between as to

17     whether in between the two positions taken by the debtor and

18     the one described by the Court as to whether or not there needs

19     to be a separate financial assistance for the examiner.  We do

20     think that we've seen the type of cooperation, accessibility

21     from Alvarez & Marsal that is really very beneficial to this

22     case.  That having been said, I do understand the points and

23     took the comments of the U.S. trustee on those points.  So

24     we're sort of agnostic ourselves on that.

25            We do think the most important thing is the

132

1    coordination aspect of this and that this be, whether or not

2    there are additional professionals brought in by the examiner,

3    that the examination be done in a coordinated manner with the

4    debtor and the committee so that we're not seeing multiple

5    examinations of the same issues.

6           We think -- we do like the idea of a work plan.  We

7    think it's really very helpful to have a meet and confer in the

8    initial phases of this so that the examiner -- he or she can

9    help develop the plan itself because that's really, I think,

10   the best way to help to bring the parties together in terms of

11   the various aspects of coordination.  So we like that and think

12   that it's a great way to proceed.

13          Other than that, Your Honor, as I said, I would be

14   brief.  So that concludes my comments.

15          THE COURT:  Thank you.

16          MR. ETKIN:  Good afternoon, Your Honor.  Michael

17   Etkin, Lowenstein Sandler, on behalf of the court-appointed

18   lead plaintiffs in the Securities litigation.  As you know, we

19   filed a joinder to that aspect of the comptroller's motion

20   requesting the appointment of an examiner.

21          I was unaware of the conference call that took place

22   last week so --

23          THE COURT:  I didn't set it up.

24          MR. ETKIN:  -- I might be -- that wasn't for purposes

25   of blame, Your Honor, just to --

133

1        THE COURT:  I'm just letting you know that --

2        MR. ETKIN:  -- indicate that I might be a little --

3        THE COURT:  -- if you were left out, I'm sure it

4    wasn't deliberately.

5        MR. ETKIN:  Well, perhaps the invitation got lost in

6    the mail but I might be a little behind the curve with respect

7    to that.  But --

8        THE COURT:  You're not behind the curve if you've

9    been sitting through this morning's hearing.

10        MR. ETKIN:  That is correct, Your Honor.  I just have

11    a couple of things to add to Mr. Entwistle's presentation which

12    we support.  First of all, in the bullet point suggested by the

13    debtor, with respect to the investigation of claims that Mr.

14    Entwistle discussed and with the modifications discussed on the

15    record thus far, it appears to be limited to potential claims

16    against former or current directors and officers of one or more

17    of the debtors.  I don't think that it should contain that kind

18    of limitation.  The facts should lead the examiner wherever it

19    takes him or her.  So to the extent that there are claims

20    developed with respect to pre-petition conduct that involve

21    third parties other than directors and officers of the debtors

22    themselves, I don't think that limitation should be contained

23    in the scope of the examiner's investigation.

24        And just a brief comment with respect to the issue of

25    whether the investigation should be limited to facts and not

134

1    move over to potential claims.  First of all, I don't know

2    exactly where you would draw that line, Your Honor, in the

3    first instance, in terms of spending the time to stop dead

4    before creating any implication that a claim or a cause of

5    action exists as a result of particular conduct.

6          But more importantly, there's precedent for all of

7    this.  And my own recent experience with the examiner in the

8    Refco Chapter 11 in this court, in the New Century case in

9    Delaware, I think in the Syncrude case, most recently, in

10   Delaware where examiners have been appointed, those all involve

11   investigating and commenting on potential claims and causes of

12   action at the end of the day.  I think in Refco, nobody

13   involved in that case could disagree that that aspect of the

14   examiner's report, as well as the examiner's report in New

15   Century, a subprime case, was extremely helpful to all parties

16   in interest.  They were both at least A if not A plus jobs.

17   And I don't think anybody suffered by virtue of the fact that

18   causes of action were identified.  In fact, I think it probably

19   was indeed a benefit, from at least my perspective, to all

20   parties in interest in each of those cases.

21         THE COURT:  Thank you, Mr. Etkin.

22         MS. ATTARD:  Good afternoon, Your Honor.  Lauren

23   Attard of Kaye Scholer for Wells Fargo.  Wells Fargo, just so

24   you know, is a creditor of Lehman Brothers Holdings Inc.,

25   Lehman Brothers Special Finance and Lehman Brothers Inc.  And

135

1   we sent a letter this morning to chambers -- about 8:30 this

2   morning.  So I apologize for the late notice.  But it was a

3   simple comment about the scope of the examiner's investigation.

4           THE COURT:  What sort of letter did you send?

5           MS. ATTARD:  It was just a letter to you copying Mr.

6   Miller, Mr. Dunne, Mr. Bienenstock and Mr. Velez-Rivera.

7           THE COURT:  Just so I know your standing to be heard

8   at this point --

9           MS. ATTARD:  Yes.

10          THE COURT: -- did Wells Fargo at any time prior to

11  this morning do anything to join in the fray with respect to

12  the scope of the examiner?  Or is it --

13          MS. ATTARD:  No --

14          THE COURT:  -- just what happened this morning that

15  gives you the reason to step forward now?

16          MS. ATTARD:  Your Honor, we did not file a joinder in

17  this motion.  But we are commenting on what the debtors

18  proposed in their January 8th motion and the suggestions of the

19  scope of the examination.

20          THE COURT:  You're saying you're commenting with

21  respect to the debtors' response to the trustee motion?

22          MS. ATTARD:  Correct.  And then the response to the

23  Disney examiner motion.

24          THE COURT:  Okay.  I'm hesitating because I think it

25  inappropriate for me to hear what you have to say simply as a

136

1    matter of orderly case administration, although it may be that

2    you have something very valuable to add.  I'm going to suggest

3    that if you have something valuable to add, you do it during

4    the lunch break because I don't want to establish for purposes

5    of this case what I would consider to be a very unfavorable

6    case management -- I'm not going to use the word "protocol"

7    because it's a bad word to use -- a case management practice.

8         MS. ATTARD:  Sure.

9         THE COURT:  And that is, I have enough to read in

10   preparation for every one of these omnibus hearings based upon

11   what's filed by the stated deadlines.  And in order for me to

12   be adequately prepared for the multiplicity of issues that get

13   heard routinely on the omnibus hearing is I plan my week around

14   pleading deadlines that have been established.  Yet, I also

15   know that it makes good sense for me to check the ECF system

16   before I come out here.  And I do.  I'm going to suggest that

17   you simply pass along your concerns to counsel for the debtor,

18   counsel for the committee and the U.S. trustee or other parties

19   who are actually active in the process.  And not that I am

20   shutting you down for reasons relating to the substance of what

21   you have to say but rather because of the timeliness with which

22   you're seeking mitigative admission to say it.

23        MS. ATTARD:  I understand, Your Honor.  Thank you.

24        MS. DRORI:  Your Honor, Danna Drori, assistant United

25   States attorney for the Southern District of New York.  And

1    keeping in mind what Your Honor just stated, I'm appearing

2    today on behalf of the criminal divisions of the U.S.

3    attorney's offices for the Southern District of New York, the

4    Eastern District of New York and the District of New Jersey,

5    which, as Your Honor is aware, are currently investigating

6    certain aspects of the activities of the debtor.

7           Our comments today are directed only to one of the

8    paragraph 32 process conditions that was mentioned earlier by

9    Mr. Miller and about which Your Honor spoke about wanting

10   comment.  I will say that our offices have been involved in

11   negotiating that language so that while we did not put in a

12   filing because we did not deem it necessary, I'm hoping Your

13   Honor might allow me to very briefly address some of the

14   concerns of those offices that came --

15          THE COURT:  Well --

16          MS. DRORI:  -- with that language.

17          THE COURT:  -- I'm going to permit you to address it

18   and here's the distinction.  I reviewed forms of order in

19   reference to the proposed retention of an examiner that

20   included some blacklined language offered by -- I believe it

21   was Mr. Entwistle in his recently filed papers which laid out

22   proposed language to deal with certain issues involving pending

23   governmental investigations.  And so I am familiar with the

24   proposed language.  And if you wish to comment on it, that's

25   fine.

138

1          MS. DRORI:  Thank you, Your Honor.  That language is

2     the same language that appears as one of the bullet points of

3     paragraph 32 of the debtors' response and as well, I believe,

4     in Disney's most recent revised order.  The criminal divisions

5     of these three offices just wish very briefly to alert the

6     Court to potential interference with federal criminal

7     authorities that may arise in the future once the Court has

8     appointed an examiner.  Your Honor has indicated that it plans

9     to.  And therefore, we have concerns about, to use this word,

10    the "protocol" for interaction between the examiner and our

11    offices.  And we have sought language in any examiner order

12    regarding the establishment of a protocol of consultation and

13    cooperation by the examiner with the criminal authorities to

14    avoid interference by the examiner with any ongoing

15    investigation.  We've proposed to the parties the language that

16    Your Honor mentioned that Your Honor had seen.  It's very

17    similar to the language that was adopted by Judge Drain in the

18    Refco examiner order.  And to our knowledge, the relevant

19    parties have either expressed in papers or to me that they do

20    not object to that language and I certainly haven't heard any

21    objections raised today.

22          As to the coordination issue raised by Your Honor

23    with the various parties who are either investigating or

24    seeking to do investigations, I would note that our offices

25    have also been in touch with the SIPA trustees in this matter

139

1    and in the Madoff matter.  And both trustees agreed to include

2    in their proposed subpoena power orders language that's

3    substantially similar to the language that we've proposed for

4    the examiner orders.  And in fact, Judge Lifland so ordered

5    that language on Monday in the Madoff order when it granted the

6    trustee's motion there for a subpoena power.  So to the extent

7    that there is a meet and confer or any master plan as well

8    concerning these investigations, these are certainly concerns

9    that we would raise there and would seek this language as well

10   to address the criminal divisions' concerns.

11        THE COURT:  All right.  We'll find out if there's any

12   objection to that language.  I don't know if there is or there

13   isn't.  But if anybody has an objection to the language you

14   propose, we'll find out.

15        As it relates to the language that is comparable to

16   this proposed language that appears in the Madoff order that

17   was entered by Judge Lifland on Monday, I'm going to defer that

18   to the SIPA portion of the hearing and when we get to the

19   question of the SIPA trustee's subpoena powers.  So that's

20   something which will be later this afternoon.

21        MS. DRORI:  Thank you, Your Honor.

22        THE COURT:  Okay.

23        MS. GRANFIELD:  Good morning, Your Honor.  Lindsee

24   Granfield of Cleary Gottlieb Steen & Hamilton --

25        THE COURT:  It's actually good afternoon.

1      MS. GRANFIELD:  Oh, afternoon.  Sorry.  The

2  afternoon.

3          THE COURT:  We started out this morning but it's now

4  1 p.m.

5          MS. GRANFIELD:  Cleary Gottlieb Steen & Hamilton LLP

6  on behalf of Barclays Capital.  I would like to propose a way

7  of proceeding because there's an issue -- Boies Schiller filed

8  a response to the Disney motion because Cleary Gottlieb has

9  conflict with Disney.  I will not be speaking on the scope

10  issues.  And so, I'd just like permission, if it's acceptable

11  to Your Honor, to take two minutes on the coordination issue

12  'cause I think that -- and the protocol issue 'cause I think

13  that's a broader kind of non-Disney specific issue.

14          THE COURT:  It's your conflict.  If you feel

15  comfortable, it's up to you.

16          MS. GRANFIELD:  Okay.  But then have permission for

17  Mr. Hume to just make a couple of comments on scope.

18          THE COURT:  That's fine.

19          MS. GRANFIELD:  Thank you very much, Your Honor.

20  Your last issue, Your Honor, the last comment that you made

21  about meet and confer and protocol and coordination -- and this

22  comes up, and it'll come up this afternoon with respect to the

23  trustee, that we're obviously very concerned about

24  coordination.  And the specific reason we are is that with

25  respect to the sale, Barclays did come into possession of

1   systems and information that, in many cases, is information

2   that, through the TSA and other avenues, it is giving access to

3   LBHI, to the trustee.  And with respect to coordination and a

4   protocol, while it could be done in a few different ways, we

5   don't necessarily have to be involved in every step of a meet

6   and confer.  But I'd like to suggest that want to avoid having

7   big cost issues relating to parties asking Barclays to do many

8   things in responding to an examiner or responding to other

9   people's request or helping other people respond that will come

10  in because it's under the TSA and other issues.  It has the

11  ability to ask for its cost to be reimbursed.  And that we also

12  avoid any issues where the examiner is asking one party, LBHI,

13  the LBI estate, for information.  And instead of going to those

14  parties to ask for it, it kind of just comes to Barclays.

15  Barclays has to obviously involve those parties because it's

16  really their information.  And so it's just an aspect of

17  coordination that makes us believe it probably does make sense

18  to have Barclays be part of that meet and confer.  But we will

19  obviously leave it to the parties and Your Honor.  And we would

20  assume that any protocol that comes out of that will come

21  before Your Honor and there'll be a chance for people to look

22  at it and that it be only approved after notice and hearing.

23          Those are just the preliminary comments, Your Honor.

24          THE COURT:  Okay.  I understand those comments.  I

25  have an immediate reaction which is if the parties to the

142

1    proposed meet and confer believe it would be efficient to have

2    Barclays in the room for some or all or none of the proposed

3    meeting, I'm not going to order it because I don't think that

4    Barclays is directly involved in the question of scope.  What

5    you're really doing is putting everybody on notice that

6    Barclays, to the extent it is inconvenienced or to the extent

7    that there is a related consequential expense, is reserving its

8    right on the question.  And so you're proposing that maybe it's

9    just as well to head off this issue with a pass.

10              MS. GRANFIELD:  I agree with those comments, Your

11   Honor --

12              THE COURT:  Okay.

13              MS. GRANFIELD:  -- in terms of why I made them.

14              THE COURT:  I understand your point.

15              MS. GRANFIELD:  Very good.  Let me just yield the

16   podium for two minutes then to Mr. Hume.

17              MR. HUME:  Thank you, Your Honor.  Hamish Hume from

18   Boies, Schiller & Flexner also for Barclays.  Your Honor, I

19   think we just have a couple of related points on scope.

20   Nothing major because on most of the issues we don't take a

21   position.  But on a couple, we do want to raise that it's

22   stemmed from our original objection to the original Disney

23   motion.

24              To the extent, Your Honor, there's been back and

25   forth on whether the examiner should be assessing claims or

1    developing claims or investigating claims as opposed to facts

2    that may underlie claims, how ever that may be resolved, I

3    think Barclays would simply want it to be clear that the claims

4    that may be looked at would be the claims of the estate for the

5    benefit of all of the estate and all creditors and not -- that

6    the examiner not be allowed to be used to -- with any topic to

7    be used to develop, as Mr. Miller, I think, correctly said, the

8    parochial claims of one or two creditors who may be trying to

9    investigate claims against Barclays.  And we certainly did

10   interpret the original motion by Disney to be in part an effort

11   to do that which we do object to and did object to as

12   inappropriate.  It's not an appropriate use of the resources

13   and it is at odds with the sale order which make clear that

14   there is no successor liability and that we acquired the assets

15   free and clear.

16            THE COURT:  I understand the point you're making but

17   I disagree with the fundamental premise of the point because I

18   believe that what Walt Disney has asserted -- and,

19   incidentally, this stems back to the evening of September 19

20   when there was considerable discussion on this point and what

21   counsel, in a separate matter, on behalf of the Bank of New

22   York Mellon as indenture trustee has asserted with respect to a

23   different Lehman affiliate -- is that claims aren't being made

24   on behalf of individual creditors as much claims are being made

25   that the, at least in the case of Disney, that the examiner

144

1    should be free on an estate by estate basis to investigate.

2    Hence, the discussion about whether we need fifteen or nineteen

3    or how ever many separate examiners might be needed to pursue

4    the rights of estates that have separate creditor

5    constituencies.  So I'm understanding the argument you're

6    making.  I'm simply distinguishing it because I'm not sure that

7    that's what Disney said.

8            MR. HUME:  Hopefully, if the argument's in apposite

9    then the concern's not there.  I'm simply expressing the

10   concern -- we did receive a letter right before that motion

11   asserting successor liability claims which we think are

12   meritless.  And then we see an examiner motion seeking to

13   develop facts that appear to us to be relevant to those claims.

14   And we don't --

15           THE COURT:  It may be that it's right to conflate the

16   two and it may be that it's not.

17           MR. HUME:  I think, hopefully after today, it is not

18   and that, if I understood Mr. Bienenstock correctly, he said

19   that he was okay with the -- he was no longer pressing the

20   scope as pushed in his original motion but was consenting to

21   what the debtors have proposed.  And if that's true then

22   presumably it does not involve an attempt to develop claims

23   that are at odds with the sale order which we think would both

24   be inappropriate and a waste of resources.

25           We would maybe ask that the order make clear,

145

1   whatever order there is, that it's obviously not intended to

2   obviously amend the sale order or allow for a collateral attack

3   on the sale order.

4        THE COURT:  I would personally resist any such

5   language in the order.  I believe that the examiner motion is

6   free standing, the sale order says what it says and is,

7   incidentally, on appeal.  And as far as I'm concerned, we're

8   dealing only with a matter which is presently before the Court

9   which is the examiner motion.  And I would strike out from any

10  proposed order language that would seek to put a ring fence

11  around an order that has already been entered and that is

12  subject to appeal.

13       MR. HUME:  Your Honor, the only other comment which

14  is related is that to the extent the examiner is being asked --

15  well, there is a request in one of the bullet points, the sixth

16  bullet point, to investigate whether assets of LBHI

17  subsidiaries, LBCC or other LBHI subsidiaries, were transferred

18  to Barclays Capital and whether that could create any claims.

19  Again, we think that request -- there's no basis for it,

20  actually.  I think both the debtors and the creditors'

21  committee agree that there's no basis for asserting that there

22  may be assets of these subsidiaries that were transferred.  The

23  sale order is clear that those assets were not what was being

24  transferred.  The agreement is clear.  Again, we would submit

25  that it is not an appropriate topic for investigation.

146

1          THE COURT:  Let me ask you a question just

2   hypothetically.  Assume for a moment you have an absolutely

3   clear sale order and absolutely clear representations that were

4   made on the record that led to the sale order concerning what

5   assets were being transferred pursuant to that order but that,

6   in practice, either mistakes were made or through inadvertence

7   or maybe because it was deliberately, I have no idea -- let's

8   just say, it doesn't even have to be in this case, that assets

9   were misappropriated under the guise of a sale order.  Are you

10  suggesting that an examiner would have no ability to recover

11  misappropriated assets that were transferred either by mistake

12  or by design under the apparent color of law?  You're not

13  saying that?

14          MR. HUME:  No, Your Honor, I'm not.  But I am saying,

15  I'm agreeing with the debtors and the creditors -- certainly

16  the creditors' committee that, in the first instance, that

17  would be something presumably that the debtors would themselves

18  look at or raise -- if there was a question to be raised that

19  they would raise it.  Or the creditors' committee.

20          THE COURT:  Well, they've been pretty busy.  They've

21  been doing a lot.  And it may be that the sale to Barclays

22  having closed that in the compartmentalized world, they moved

23  on to problem 2 and 5 and 12 and 25 or whatever the number of

24  problems that they were dealing more or less simultaneously.

25  And so, while I hear you, I think that one of the purposes to

147

1    be served by the advent of an examiner which is salutary is

2    that someone with no present history or involvement in this

3    massive transaction has a chance to come in for purposes of not

4    only fulfilling the statutory mandate but for purposes of doing

5    something that I think is very beneficial in this case, now and

6    in the future.  Walt Disney has used the term "sunshine".  I'm

7    going to adopt it.

8           The purposes to be served by the examiner include

9    giving everybody involved in this case a heightened sense of

10   confidence that what happened pre-petition and immediately

11   post-petition is something that we can all comfortably rely on

12   for purposes of planning the future of this bankruptcy case.

13   And so while terms like "transparency" have been used so

14   frequently as to take on an almost hackneyed tone, it

15   represents perhaps the most singularly important feature of

16   ongoing case stability which is confidence and trust that the

17   information that we all assume to be true in fact is true.

18          For that reason, I resist your notion that Barclays

19   is entitled to some special immunity by virtue of the sale

20   order.  You have what rights exist under that sale order.  But

21   the examiner is absolutely free in his or her discretion to

22   make sure that what was done in a hurry was done correctly.

23          MR. HUME:  I understand, Your Honor.  We understand.

24   Simply, there have been suggestions made which we think are

25   totally unfounded and we felt the need to reply.

148

1        THE COURT:  I understand you're protecting the record

2   on behalf of the client and you've done.

3        MR. HUME:  And as a matter of emphasis to the

4   examiner that it not be suggested to it that there's a reason

5   to believe that there are -- that the transaction was different

6   than it was planned to be and stated to be.

7        THE COURT:  But the examiner will have an opportunity

8   to confirm that based upon whatever investigation the examiner

9   deems appropriate.

10       MR. HUME:  Thank you, Your Honor.

11       THE COURT:  Thank you.  The creditors' committee has

12   been, I guess, waiting for this opportunity to back cleanup.

13   And as soon as you're done, we can take a lunch break.

14       MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed

15   on behalf of the creditors' committee.  Your Honor, we have

16   been listening attentively to the Court's comments and the

17   comments of the various parties that responded to the trustee

18   motion, the examiner motion.  We would request, however, at

19   this point, because we see that there may be areas in which we

20   have reached even further agreement.  We want to be responsive

21   to the Court's comments.  That if we could take a brief bit of

22   time now to confer among ourselves to see where that agreement

23   exists, we would appreciate that or, alternatively, following

24   the lunch break.

25       THE COURT:  It's now a quarter past 1 and we've been

149

1    at this since about 10:05 a.m. without a break.  And I think

2    that if you believe a break is something that would be useful

3    to the process of achieving consensus, that's cause enough to

4    take a break.  But I also think that biology suggests that it's

5    time for us all to take a longer break than that.  And I'm

6    going to suggest that we break now and that we return at 2:30.

7            MR. FLECK:  Very well.  Thank you, Your Honor.

8            THE COURT:  We're adjourned.

9        (Recess from 1:15 p.m. until 2:32 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

150

1                    C E R T I F I C A T I O N

2

3        I, Lisa Bar-Leib, certify that the foregoing transcript is a

4        true and accurate record of the proceedings.

5

6        _____

7        LISA BAR-LEIB

8

9        Veritext LLC

10       200 Old Country Road

11       Suite 580

12       Mineola, NY 11501

13

14       Date:  January 15, 2009

15

16

17

18

19

20

21

22

23

24

25