1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

        08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        January 14, 2009

        2:32 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    I.    UNCONTESTED MATTERS:

3    HEARING re Case Conference

4

5    HEARING re Debtors Application Pursuant to Sections 327(a) and

6    328(a) of the Bankruptcy Code for an Order Authorizing the

7    Retention and Employment of Ernst & Young LLP as Auditors and

8    Tax Services Provider Nunc Pro Tunc to the Commencement Date

9

10   HEARING re Debtors Motion Pursuant to Section 365(d)(4) of the

11   Bankruptcy Code for an Extension of the Time to Assume or

12   Reject Unexpired Leases of Nonresidential Real Property

13

14   HEARING re Debtors Motion Pursuant to Section 1121(d) of the

15   Bankruptcy Code Requesting Extension of Exclusive Periods for

16   the Filing of a Chapter 11 Plan and Solicitation of Acceptances

17   Thereof

18

19   HEARING re Debtors Motion, Pursuant to Sections 105(a), 363,

20   and 365 of the Bankruptcy Code, for Authorization to (i) Assume

21   a Subscription Agreement and Certain Other Agreements with

22   Wilton Re Holdings Limited, (ii) Amend Said Subscription

23   Agreement, and (iii) Fund the Capital Commitment Pursuant to

24   Said Subscription Agreement

25

3

1

2    HEARING re Motion for Relief from Stay to Prosecute Adversary

3    Proceeding Against Lehman Commercial Paper, Inc., Pending in

4    the Bankruptcy Court for the Eastern District of California and

5    for Other Appropriate Relief and supporting Declaration of

6    Walter E. Alexander and supporting Declaration of T. Scott

7    Belden

8

9    HEARING re Motion for Relief from Stay NOTICE OF MOTION OF

10   CORUS BANK, N.A. FOR (I) A DETERMINATION THAT THE AUTOMATIC

11   STAY DOES NOT APPLY, OR ALTERNATIVELY (II) RELIEF FROM THE

12   AUTOMATIC STAY

13

14   HEARING re Debtors' Motion Requesting Joint Administration of

15   Chapter 11 Cases (Luxembourg Residencial Properties Loan

16   Finance S.a.r.l.)

17

18   HEARING re Debtors' Motion Requesting Joint Administration of

19   Chapter 11 Cases (BNC Mortgage LLC)

20

21   HEARING re Debtors' Motion Directing that Certain Orders and

22   Other Pleadings Entered or Filed in the Chapter 11 Cases of

23   Affiliated Debtors be Made Applicable to Luxembourg Residential

24   Properties Loan Finance S.a.r.l. and BNC Mortgage LLC

25   (Luxembourg Residencial Properties Loan Finance S.a.r.l.)

4

1

2    HEARING re Debtors' Motion Directing that Certain Orders and

3    Other Pleadings Entered or Filed in the Chapter 11 Cases of

4    Affiliated Debtors be Made Applicable to Luxembourg Residential

5    Properties Loan Finance S.a.r.l. and BNC Mortgage LLC (BNC

6    Mortgage LLC)

7

8    II.   CONTESTED MATTERS:

9    HEARING re Motion of The Walt Disney Company for Appointment of

10   Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code

11

12   HEARING re New York State Comptroller's Motion To Appoint A

13   Trustee

14

15   HEARING re Motion of The Bank Of New York Mellon Trust Company,

16   N.A. as Indenture Trustee, for Order Pursuant to Bankruptcy

17   Rule 2004 Directing Examination of, and Production of,

18   Documents by Lehman Brothers Holdings, Inc., Lehman Brothers,

19   Inc., Lehman Brothers Commodity Services Inc. and Barclays

20   Capital Inc.

21

22   HEARING re Debtors' Amended Motion Pursuant to Bankruptcy Rule

23   1007(c) to Further Extend the Time to File the Debtors

24   Schedules, Statements of Financial Affairs, and Related

25   Documents

5

1

2     HEARING re Notice of Presentment of Stipulation and Agreed

3     Order Providing for Lehman Brothers Inc.'s Assumption and

4     Assignment of Administrative Agency Agreements to Lehman

5     Commercial Paper Inc.

6

7     HEARING re Debtors' Second Motion for an Order Pursuant to

8     Section 365 of the Bankruptcy Code Approving the Assumption of

9     Open Trade Confirmations

10

11    HEARING re Debtors' Motion for an Order Pursuant to Section 365

12    of the Bankruptcy Code Approving the Assumption or Rejection of

13    Open Trade Confirmations

14

15    HEARING re Debtors' Motion for an Order Pursuant to Sections

16    105 and 365 of the Bankruptcy Code to Establish Procedures for

17    the Settlement or Assumption and Assignment of Pre-Petition

18    Derivative Contracts

19

20    A.    ADVERSARY PROCEEDINGS:

21    **Federal Home Loan Bank of Pittsburgh v. Lehman Brothers Special**

22    **Financing Inc., et al.**

23

24    Pre-Trial Conference

25

6

1

2      Sola Ltd. v. Lehman Brothers Special Financing Inc.

3

4      Pre-Trial Conference

5

6      SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

7      III. UNCONTESTED MATTERS:

8      HEARING re Trustee's Motion for an Order Pursuant to 365(d)(4)

9      of the Bankruptcy Code Extending Time to Assume or Reject

10     Unexpired Leases of Nonresidential Real Property

11

12     IV.   CONTESTED MATTERS:

13     HEARING re Trustee's Motion for an Order Granting Authority to

14     Issue Subpoenas for the Production of Documents and the

15     Examination of the Debtors' Current and Former Officers,

16     Directors and Employees and Other Persons

17

18     HEARING re Notice of Presentment of Stipulation and Agreed

19     Order Providing for Lehman Brothers Inc.'s Assumption and

20     Assignment of Administrative Agency Agreements to Lehman

21     Commercial Paper Inc.

22

23

24

25     Transcribed by:  Lisa Bar-Leib

7

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:  HARVEY R. MILLER, ESQ.

9        SHAI WAISMAN, ESQ.

10        LORI R. FIFE, ESQ.

11        RICHARD P. KRASNOW, ESQ.

12        ALFREDO R. PEREZ, ESQ.

13        JOHN W. LUCAS, ESQ.

14        JACQUELINE MARCUS, ESQ.

15        RONIT J. BERKOVICH, ESQ.

16        DIANE HARVEY, ESQ.

17

18

19

20

21

22

23

24

25

8

1

2     HUGHES HUBBARD & REED LLP

3          Attorneys for James W. Giddens, SIPC Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7     BY:   JAMES B. KOBAK, JR.

8          CHRISTOPHER K. KIPLOK, ESQ.

9          DANIEL S. LUBELL, ESQ.

10          JEFFREY S. MARGOLIN, ESQ.

11          DAVID W. WILTENBURG, ESQ.

12          JAMES W. GIDDENS, ESQ.

13

14     SECURITIES INVESTOR PROTECTION CORPORATION

15          Senior Associate General Counsel

16          805 15th Street, N.W.

17          Suite 800

18          Washington, DC 20005

19

20     BY:   KENNETH J. CAPUTO, ESQ.

21

22

23

24

25

9

```
1

2     MILBANK, TWEED, HADLEY & MCCLOY LLP

3          Attorneys for the Official Committee of Unsecured

4           Creditors

5          One Chase Manhattan Plaza

6          New York, NY 10005

7

8     BY:  DENNIS F. DUNNE, ESQ.

9          DENNIS C. O'DONNELL, JR.

10         PAUL S. ARONZON, ESQ.

11         EVAN R. FLECK, ESQ.

12         THOMAS A. ARENA, ESQ.

13         GREGORY A. BRAY, ESQ.

14         ROBERT J. MOORE, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

08-13555-mg   Doc 4030   Filed 01/15/09   Entered 06/18/09 10:13:19   Main Document
Pg 10 of 142

10

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

4          Partners L.P. and GS European Performance Fund Limited;

5          Wachovia Bank, N.A.; Evergreen Investment Management

6          Company, LLC

7         One Liberty Plaza

8         New York, NY 10006

9

10   BY:  LINDSEE P. GRANFIELD, ESQ.

11        LISA M. SCHJWEITZER, ESQ.

12        THOMAS J. MOLONEY, ESQ.

13        AVRAM E. LUFT, ESQ.

14        BOAZ S. MORAG, ESQ.

15        MELISSA MARLER, ESQ.

16        CARMINE D. BOCCUZZI, JR.

17        JEFFREY A. ROSENTHAL, ESQ.

18        ZOE SEGAL-REICHLIN, ESQ.

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

11

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:  TRACY HOPE DAVIS, ESQ.

9         ANDREW D. VELEZ-RIVERA, ESQ.

10

11   ALSTON & BIRD LLP

12        Attorneys for Bank of America National Association

13         Successor by Merger with LaSalle Bank National

14         Association, as Trustee under Certain Trust Agreements

15        90 Park Avenue

16        New York, NY 10016

17

18   BY:  MARTIN G. BUNIN, ESQ.

19        CRAIG E. FREEMAN, ESQ.

20        WILLIAM HAO, ESQ.

21

22

23

24

25

12

```
 1

 2     ALSTON & BIRD LLP

 3          Attorneys for Bank of America National Association

 4           Successor by Merger with LaSalle Bank National

 5           Association, as Trustee under Certain Trust Agreements

 6          1201 West Peachtree Street

 7          Atlanta, GA 30309

 8

 9     BY:  JOHN C. WEITNAUER, ESQ.

10

11     ANDREWS KURTH LLP

12          Attorneys for EPCO Holdings, Inc.

13          450 Lexington Avenue

14          15th Floor

15          New York, NY 10017

16

17     BY:  PETER S. GOODMAN, ESQ.

18

19

20

21

22

23

24

25
```

13

1

2    ARENT FOX LLP

3         Attorneys for The Vanguard Group; Georgetown University

4         1675 Broadway

5         New York, NY 10019

6

7    BY:   GEORGE P. ANGELICH, ESQ.

8         DAVID DUBROW, ESQ.

9         HUNTER T. CARTER, ESQ.

10

11   ARENT FOX LLP

12        Attorneys for The Vanguard Group; Georgetown University

13        1050 Connecticut Avenue, N.W.

14        Washington, DC 20036

15

16   BY:   CHRISTOPHER J. GIAIMO, ESQ.

17

18   BAKER & MCKENZIE LLP

19        Attorneys for Portfolio Green German CMBS GMBH; Lincore

20         Limited, E-Capital Profits Limited and Cheung Kong Bond

21         Finance Limited; Natixis Environnement & Infrastructures

22        1114 Avenue of the Americas

23        New York, NY 10036

24

25   BY:   IRA A. REID, ESQ.

14

1

2    BAKER & MCKENZIE LLP

3         Attorneys for Portfolio Green German CMBS GMBH; Lincore

4          Limited, E-Capital Profits Limited and Cheung Kong Bond

5          Finance Limited; Natixis Environnement & Infrastructures

6         One Prudential Plaza

7         Suite 3500

8         Chicago, IL 60601

9

10   BY:  CARMEN H. LONSTEIN, ESQ.

11

12   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

13        1285 Avenue of the Americas

14        New York, NY 10019

15

16   BY:  JOHN P. COFFEY, ESQ.

17

18   BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

19        1248 High Bluff Drive

20        Suite 300

21        San Diego, CA 92130

22

23   BY:  DAVID R. STICKNEY, ESQ.

24

25

15

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for Harbinger Capital Partners Special

4          Situations Fund, L.P. and Harbinger Capital Master

5          Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed

6          Opportunity Master Fund Limited

7         399 Park Avenue

8         New York, NY 10022

9

10   BY:   JEFFREY S. SABIN, ESQ.

11         ROBERT M. DOMBROFF, ESQ.

12         JARED R. CLARK, ESQ.

13         JOSHUA DORCHAK, ESQ.

14         CAROL WEINER LEVY, ESQ.

15

16

17

18

19

20

21

22

23

24

25

16

1

2    BLANK ROME LLP

3          Attorneys for Iconix Brand Group, Inc.; Capital Automotive

4          L.P.; Delaware River Port Authority; BANCA ITALEASE,

5          S.p.A.; ITALEASE FINANCE, S.p.A.; New Jersey Housing and

6          Mortgage Financing Agency

7          The Chrysler Building

8          405 Lexington Avenue

9          New York, NY 10174

10

11   BY:  ROCCO A. CAVALIERE, ESQ.

12         ANDREW B. ECKSTEIN, ESQ.

13

14   BOIES, SCHILLER & FLEXNER LLP

15         Attorneys for Barclays Capital

16         5301 Wisconsin Avenue, NW

17         Washington, DC  20015

18

19   BY:  HAMISH P.M. HUME, ESQ.

20

21

22

23

24

25

17

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for Citigroup Inc. and all of its affiliates,

4         including Citibank, N.A. and Citibank International plc;

5         Whippoorwill Associates Inc.

6        One World Financial Center

7        New York, NY 10281

8

9    BY:   HOWARD R. HAWKINS, JR.

10        DERYCK A. PALMER, ESQ.

11        JOHN J. RAPISARDI, ESQ.

12        GEORGE A. DAVIS, ESQ.

13        ANDREW TROOP, ESQ.

14        GARY D. TICOLL, ESQ.

15        JESSICA FINK, ESQ.

16

17   CADWALADER, WICKERSHAM & TAFT LLP

18        Attorneys for Citigroup Inc. and all of its affiliates,

19         including Citibank, N.A. and Citibank International plc;

20         Whippoorwill Associates Inc.

21        1201 F Street N.W.

22        Suite 1100

23        Washington, DC 20004

24

25   BY:   PETER M. FRIEDMAN, ESQ.

18

1

2    CHAPMAN & CUTLER LLP

3         Attorneys for National Australia Bank Limited; Bank of

4          Montreal; U.S. Bank National Association

5         111 West Monroe Street

6         Chicago, IL 60603

7

8    BY:  ANN E. ACKER, ESQ.

9         JAMES E. SPIOTTO, ESQ.

10        FRANKLIN H. TOP, III, ESQ.

11

12   CLIFFORD CHANCE US LLP

13        Attorneys for M&G Investment Management Limited; FirstBank

14         of Puerto Rico; Calyon; Dexia Banque Internationale a

15         Luxembourg SA; Dexia Credit Local; Dexia Kommunalbank

16         Deutschland AG; Dexia Banque Belgique SA; and Banif-Banco

17         de Investimento, S.A.

18        31 West 52nd Street

19        New York, NY 10019

20

21   BY:  JENNIFER C. DEMARCO, ESQ.

22        DAVID A. SULLIVAN, ESQ.

23        SARA M. TAPINEKIS, ESQ.

24        ANDREW BROZMAN, ESQ.

25        WENDY ROSENTHAL, ESQ.

19

1

2    COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.

3          Attorneys for Federal Home Loan Bank of Pittsburgh;

4           Northcrest, Inc.

5          900 Third Avenue

6          16th Floor

7          New York, NY 10022

8

9    BY:  LAURENCE MAY, ESQ.

10         NOLAN E. SHANAHAN, ESQ.

11         ERIN E. WIETECHA, ESQ.

12

13   CROWE & DUNLEVY PC

14         Attorneys for Oklahoma Municipal Power Authority

15         20 North Broadway

16         Suite 1800

17         Oklahoma City, OK 73102

18

19   BY:  JUDY HAMILTON MORSE, ESQ.

20

21

22

23

24

25

20

1

2    DEWEY & LEBOEUF LLP

3         Attorneys for American Express Travel Related Services

4          Company, Inc.; The Walt Disney Company

5         1301 Avenue of the Americas

6         New York, NY 10019

7

8    BY:  MARTIN J. BIENENSTOCK, ESQ.

9         IRENA M. GOLDSTEIN, ESQ.

10        DONNA L. GORDON, ESQ.

11

12   DUANE MORRIS LLP

13        Attorneys for National Agricultural Cooperative Federation

14        1540 Broadway

15        New York, NY 10036

16

17   BY:  LAWRENCE J. KOTLER, ESQ.

18        JOHN DELLAPORTAS, ESQ.

19        JUNGHYE JUNE YEUM, ESQ.

20

21

22

23

24

25

21

```
 1
 2    DUFFY & ATKINS LLP
 3         Attorneys for South Mississippi Electric Power Association
 4          and Coast Electric Power Association
 5         Seven Penn Plaza
 6         Suite 420
 7         New York, NY 10001
 8
 9    BY:  TODD E. DUFFY, ESQ.
10         JAMES E. ATKINS, ESQ.
11         DENNIS J. NOLAN, ESQ.
12
13    ENTWISTLE & CAPPUCCI LLP
14         Attorneys for State Comptroller, Thomas P. DiNapoli, as
15         Administrative Head of New York State and Local Retirement
16         Systems and Sole Trustee of New York State Common
17         Retirement Fund
18         280 Park Avenue
19         26th Floor West
20         New York, NY 10017
21
22    BY:  ANDREW J. ENTWISTLE, ESQ.
23
24
25
```

22

1

2    FABYANSKE, WESTRA, HART & THOMSON, P.A.

3         Attorneys for Bremer Financial Corporation

4         800 LaSalle Avenue

5         Suite 1900

6         Minneapolis, MN 55402

7

8    BY:  PAUL L. RATELLE, ESQ.

9

10    GREENBERG TRAURIG, LLP

11         Attorneys for FPL Energy Power Marketing, Inc. and Florida

12         Power & Light Company

13         200 Park Avenue

14         New York, NY 10166

15

16    BY:  MARIA J. DICONZA, ESQ.

17

18    HENNIGAN, BENNETT & DORMAN LLP

19         Attorneys for the DCP Parties

20         245 Park Avenue

21         Suite 3962

22         New York, NY 10167

23

24    BY:  A. BRENT TRUITT, ESQ.

25

23

1

2    HENNIGAN, BENNETT & DORMAN LLP

3         Attorneys for the DCP Parties

4         865 South Figueroa Street

5         Suite 2900

6         Los Angeles, CA 90017

7

8    BY:  BRUCE BENNETT, ESQ.

9         MICHAEL A. MORRIS, ESQ.

10        JOSHUA D. MORSE, ESQ.

11

12   HOLME ROBERTS & OWEN LLP

13        Attorneys for National Cinemedia, LLC

14        1700 Lincoln Street

15        Suite 4100

16        Denver, CO 80203

17

18   BY:  LAWRENCE BASS, ESQ.

19

20

21

22

23

24

25

24

1

2    KATTEN MUCHIN ROSENMAN LLP

3         Attorneys for The City of Milwaukee, Wisconsin

4         575 Madison Avenue

5         New York, NY 10022

6

7    BY:   JEFF J. FRIEDMAN, ESQ.

8          MERRITT A. PARDINI, ESQ.

9

10   KAYE SCHOLER LLP

11        Attorneys for Caisse de Depot et Placement du Quebec;

12         Total Gas and Power Limited; Wells Fargo Bank, N.A. and

13         Wells Fargo & Co.; Bank of America, N.A.

14        425 Park Avenue

15        New York, NY 10022

16

17   BY:   LAUREN ATTARD, ESQ.

18         MADLYN G. PRIMOFF, ESQ.

19

20

21

22

23

24

25

25

1

2    KELLEY DRYE & WARREN LLP

3         Attorneys for Tullett Prebon Holdings Corporation; The

4         Juilliard School; S.W.I.F.T. SCRL; Murphy & Durieu, L.P.

5         101 Park Avenue

6         New York, NY 10178

7

8    BY:  JAMES S. CARR, ESQ.

9         BENJAMIN BLAUSTEIN, ESQ.

10        BENJAMIN D. FEDER, ESQ.

11        ERIC R. WILSON, ESQ.

12        HOWARD S. STEEL, ESQ.

13        MARTIN KROLEWSKI, ESQ.

14        W. CHRISTIAN DREWES, ESQ.

15

16   KIESELSTEIN LAW FIRM, PLLC

17        Attorneys for Tennenbaum Opportunities Partners V, L.P.;

18         Special Value Expansion Fund, LLC; and Special Value

19         Opportunities Fund, LLC

20        1187 Troy-Schenectady Road

21        Latham, NY 12110

22

23   BY:  STEVE KIESELSTEIN, ESQ.

24

25

26

KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL, LLP

    Attorneys for Superior Pipelines, Inc.

    4550 California Avenue

    Second Floor

    Bakersfield, CA 93309

BY:  T. SCOTT BELDEN, ESQ.

    LISA HOLDER, ESQ.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

    Attorneys for Bank of New York Mellon as Indenture

     Trustee; York Capital Management, L.P.

    1177 Avenue of the Americas

New York, NY 10036

BY:  JONATHAN M. WAGNER, ESQ.

    P. BRADLEY O'NEILL, ESQ.

    DANA L. POST, ESQ.

27

1

2    LATHAM & WATKINS LLP

3         Attorneys for Asurion Corporation; MEG Energy Corp.;

4          NetApp, Inc.

5         885 Third Avenue

6         New York, NY

7

8    LAW OFFICE OF JEAN LOUIS CAMUZAT

9         Attorneys for AXA Mezzanine II SA, SICAR; MD Mezzanine SA,

10         SICAR

11        7 Rue de la Chapelle

12        L-1325 Luxembourg

13

14   LOCKE LORD BISSELL & LIDDELL LLP

15        Co-Counsel to Southern Community Financial Corporation and

16         Southern Community Bank and Trust; Reynolds American

17         Defines Benefit Master Trust; Carolina First Bank

18        885 Third Avenue

19        26th Floor

20        New York, NY 10022

21

22   BY:  JAY G. SAFER, ESQ.

23

24

25

28

1

2      LOVELLS LLP

3           Attorneys for Lloyds TSB Bank plc; Babson Capital

4            Management LLC; BRE Bank SA; Carlton Communications

5            Limited; QVT Financial LP; Standard Chartered Bank and

6            Certain Affiliates; Instituto de Credito Oficial

7           590 Madison Avenue

8           New York, NY 10022

9

10     BY:   MATTHEW P. MORRIS, ESQ.

11           ROBIN E. KELLER, ESQ.

12

13     LOWENSTEIN SANDLER PC

14           Attorneys for First Choice Power, L.P.; EnergyCo Marketing

15            and Trading, LLC; Reliant Energy Services, Inc.; Reliant

16            Energy Power Supply, LLC; Blue Mountain Credit

17            Alternatives Master Fund L.P.

18           65 Livingston Avenue

19           Roseland, NJ 07068

20

21     BY:   PAUL KIZEL, ESQ.

22           IRA M. LEVEE, ESQ.

23

24

25

29

```
 1

 2    LOWENSTEIN SANDLER PC

 3          Attorneys for First Choice Power, L.P.; EnergyCo Marketing

 4            and Trading, LLC; Reliant Energy Services, Inc.; Reliant

 5            Energy Power Supply, LLC; Blue Mountain Credit

 6            Alternatives Master Fund L.P.

 7          1251 Avenue of the Americas

 8          18th Floor

 9          New York, NY 10022

10

11    BY:  MICHAEL S. ETKIN, ESQ.

12          S. JASON TEELE, ESQ.

13

14    MAYER BROWN LLP

15          Attorneys for Sumitomo Mitsui Banking Corporation; Societe

16            Generale; and Canadian Imperial Bank Commerce

17          1675 Broadway

18          New York, NY 10019

19

20    BY:  JOHN M. CONLON, ESQ.

21          FREDERICK D. HYMAN, ESQ.

22          BRIAN TRUST, ESQ.

23          JEFFREY G. TOUGAS, ESQ.

24          AMIT TREHAN, ESQ.

25
```

30

1    MCCARTER & ENGLISH LLP

2         Attorneys for Occidental Energy Marketing, Inc.

3         245 Park Avenue

4         27th Floor

5         New York, NY 10167

6

7    BY:  EDUARDO J. GLAS, ESQ.

8

9    MCGUIRE WOODS LLP

10        Attorneys for The Toronto-Dominion Bank

11        1345 Avenue of the Americas

12        Seventh Floor

13        New York, NY 10105

14

15   BY:  PATRICK L. HAYDEN, ESQ.

16

17   MCGUIRE WOODS LLP

18        Attorneys for The Toronto-Dominion Bank

19        One James Center

20        901 East Cary Street

21        Richmond, VA 23219

22

23   BY:  DION W. HAYES, ESQ.

24        JOSEPH S. SHEERIN, ESQ.

25

31

1

2    MORRISON & FOERSTER LLP

3         Attorneys for Brookfield Properties; BRM Group, Ltd.; WFP

4          Tower A Co. L.P.

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8    BY:   TODD M. GOREN, ESQ.

9         LORENZO MARINUZZI, ESQ.

10        LARREN M. NASHELSKY, ESQ.

11        NORMAN S. ROSENBAUM, ESQ.

12

13   MORRITT HOCK HAMROFF & HOROWITZ LLP

14        Co-Counsel to the Hotchkiss School

15        400 Garden City Plaza

16        Garden City, NY 11530

17

18   BY:   LESLIE ANN BERKOFF, ESQ.

19        THERESA A. DRISCOLL, ESQ.

20

21

22

23

24

25

32

1

2    MUNGER, TOLLES & OLSON LLP

3         Attorneys for Southern California Edison Company

4         355 South Grand Avenue

5         Suite 3500

6         Los Angeles, CA 90071

7

8    BY:  MARK SHINDERMAN, ESQ.

9         SETH GOLDMAN, ESQ.

10

11   NIXON PEABODY, LLP

12        Attorneys for Metropolitan Transportation Authority;

13         Bryant University; Deutsche Bank Trust Company Americas

14         and Deutsche Bank National Trust Company, each in their

15         roles as Trustee, Indenture Trustee, Supplemental

16         Interest Trust Trustee and in other related fiduciary,

17         agency and administrative capacities

18        100 Summer Street

19        Boston, MA 02110

20

21   BY:  MARK N. BERMAN, ESQ.

22        AMANDA D. DARWIN, ESQ.

23        RICHARD C. PEDONE, ESQ.

24

25

33

1

2    NIXON PEABODY, LLP

3         Attorneys for Metropolitan Transportation Authority;

4          Bryant University; Deutsche Bank Trust Company Americas

5          and Deutsche Bank National Trust Company, each in their

6          roles as Trustee, Indenture Trustee, Supplemental

7          Interest Trust Trustee and in other related fiduciary,

8          agency and administrative capacities

9         437 Madison Avenue

10        New York, NY 10022

11

12   BY:  ROBERT N.H. CHRISTMAS, ESQ.

13        VICTOR G. MILIONE, ESQ.

14        CHRISTOPHER M. DESIDERIO, ESQ.

15

16   PATTERSON BELKNAP WEBB & TYLER LLP

17        Attorneys for Asbury Atlantic, Inc. and Asbury-Solomons,

18         Inc.; Training the Street, Inc.

19        1133 Avenue of the Americas

20        New York, NY 10036

21

22   BY:  DAVID W. DYKHOUSE, ESQ.

23        DANIEL A. LOWENTHAL, ESQ.

24        BRIAN P. GUINEY, ESQ.

25

34

1

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3         Attorneys for Houlihan Lokey Howard & Zukin Capital, Inc.

4         1285 Avenue of the Americas

5         New York, NY 10019

6

7    BY:  ALAN W. KORNBERG, ESQ.

8

9    PILLSBURY WINTHROP SHAW PITTMAN LLP

10        Attorneys for Misys IQ LLC; Summit Systems, Inc.;

11         Embarcadero Aircraft Securitization Trust

12        1540 Broadway

13        New York, NY 10036

14

15   BY:  LEO TO. CROWLEY, ESQ.

16        ERICA CARRIG, ESQ.

17        RICK B. ANTONOFF, ESQ.

18        C. PAYSON COLEMAN, ESQ.

19        MARK N. LESSARD, ESQ.

20

21

22

23

24

25

35

RICHARDS KIBBE & ORBE LLP

    Attorneys for DK Acquisition Partners, L.P., Farallon

    entities, Goldman Sachs Credit Partners L.P., Greywolf

    entities, Halcyon Structured Asset Management European

    CLO 2007-1 B.V., Longacre entities, Morgan Stanley Bank

    International Limited, Morgan Stanley Senior Funding,

    Inc. Rowayton Loan Funding Company, Royal Bank of

    Scotland, PLC

    One World Financial Center

    New York, NY 10281

BY:  MICHAEL FRIEDMAN, ESQ.

ROPES & GRAY LLP

    Attorneys for R3 Capital Management LLC; AIB International

     Finance; Putnam Investment Funds; THL Credit Partners,

     L.P.; West Corporation

    One International Place

    Boston, MA 02110

BY:  PATRICIA I. CHEN, ESQ.

    D. ROSS MARTIN, ESQ.

    SHUBA SATYAPRASAD, ESQ.

36

```
 1

 2    ROPES & GRAY LLP

 3         Attorneys for R3 Capital Management LLC; AIB International

 4          Finance; Putnam Investment Funds; THL Credit Partners,

 5          L.P.; West Corporation

 6         1211 Avenue of the Americas

 7         New York, NY 10036

 8

 9    BY:  KEITH H. WOFFORD, ESQ.

10         MARK R. SOMERSTEIN, ESQ.

11         NILA W. WILLIAMS. ESQ.

12         DAVID S. ELKIND, ESQ.

13         W. JANE ROGERS, ESQ.

14         MORGAN E. BRADYLYONS, ESQ.

15

16    SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

17         280 King of Prussia Road

18         Radnor, PA 19087

19

20    BY:  JOHN A. KEHOE, ESQ.

21

22

23

24

25
```

37

1

2   SHEARMAN & STERLING LLP

3       Attorneys for Banc of America Securities; Bank of America,

4        N.A.

5       599 Lexington Avenue

6       New York, NY 10022

7

8   BY:  FREDERICK SOSNICK, ESQ.

9        JAMES L. GARRITY, JR.

10       DANIEL LAGUARDIA, ESQ.

11       NED S. SCHODEK, ESQ.

12

13  SHEPPARD MULLIN RICHTER & HAMPTON, LLP

14       Attorneys for Norton Gold Fields Limited

15       30 Rockefeller Plaza

16       24th Floor

17       New York, NY 10112

18

19  BY:  EDWARD H. TILLINGHAST, III

20       MALANI J. CADEMARTORI, ESQ.

21

22

23

24

25

38

```
 1
 2    SIDLEY AUSTIN LLP
 3          Attorneys for KKR Debt Investors (2006)(Ireland) LP
 4          787 Seventh Avenue
 5          New York, NY 10019
 6
 7    BY:   LEE S. ATTANASIO, ESQ.
 8          DAVID H. LEO, ESQ.
 9
10    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11          Attorneys for BlackRock Financial Management, Inc.; H/2
12           Credit Partners Master Fund Ltd.; Region Marche; JA Solar
13          Holdings Co., Ltd.
14          Four Times Square
15          New York, NY 10036
16
17    BY:   DENISE KALOUDIS, ESQ.
18          SALLY MCDONALD HENRY, ESQ.
19          JAY GOFFMAN, ESQ.
20          MARK A. MCDERMOTT, ESQ.
21
22
23
24
25
```

39

```
 1
 2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 3        Attorneys for BlackRock Financial Management, Inc.; H/2
 4         Credit Partners Master Fund Ltd.; Region Marche; JA Solar
 5        Holdings Co., Ltd.
 6        300 South Grand Avenue
 7        Los Angeles, CA 90046
 8
 9   BY:  VAN C. DURRER II, ESQ.
10
11   THOMPSON HINE LLP
12        Attorneys for the A.M. McGregor Home
13        335 Madison Avenue
14        12th Floor
15        New York, NY 10017
16
17   BY:  MARTIN EISENBERG, ESQ.
18
19   U.S. DEPARTMENT OF JUSTICE
20        United States Attorney's Office
21        Southern District of New York
22        86 Chambers Street
23        New York, NY 10007
24
25   BY:  DANNA DRORI, ESQ.
```

40

1

2    WACHTELL, LIPTON, ROSEN & KATZ

3          Attorneys for JPMorgan Chase Bank, N.A.

4          51 West 52nd Street

5          New York, NY 10019

6

7    BY:   DAVID C. BRYAN, ESQ.

8          RICHARD G. MASON, ESQ.

9          HAROLD S. NOVIKOFF, ESQ.

10         PHILIP MINDLIN, ESQ.

11         AMY R. WOLF, ESQ.

12

13   WHYTE HIRSCHBOECK DUDECK, S.C.

14         Attorneys for Metavante Corporation

15         555 East Wells Street

16         Milwaukee, WI 53202

17

18   BY:   BRUCE G. ARNOLD, ESQ.

19         DARYL L. DIESING, ESQ.

20         DANIEL J. MCGARRY, ESQ.

21

22

23

24

25

41

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Lexington Insurance Company; AIG CDS, Inc.;

4          SunAmerica Life Insurance Company and Affiliates; Fir

5          Tree Value Master Fund, L.P.; and Fir Tree Capital

6          Opportunity Master Fund, L.P.

7         787 Seventh Avenue

8         New York, NY 10019

9

10   BY:  MARC ABRAMS, ESQ.

11        SHELLEY C. CHAPMAN, ESQ.

12

13   WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

14        Attorneys for Hartford Investment Management Company; The

15         Hartford Floating Rate Fund; The Hartford High Yield

16         Fund; and Hartford High Yield HCS Fund

17        3 Gannett Drive

18        White Plains, NY 10604

19

20   BY:  MARK G. LEDWIN, ESQ.

21

22

23

24

25

                                                                        42

1              (Recess from 1:15 p.m. until 2:32 p.m.)

2              THE COURT:  Be seated, please.

3              MR. DUNNE:  Good afternoon, Your Honor.  At the

4    outset, I'd like to thank you for the accommodation.  I think

5    we've used the hour to reflect on the comments, particularly --

6              THE COURT:  We were going to take a lunch break

7    anyway.

8              MR. DUNNE:  Right.  Thank you, Your Honor.  The --

9              THE COURT:  Trust me on that.

10             MR. DUNNE:  So I think we've narrowed the issues or

11   at least what I'm going to address in my remarks.  At the

12   outset, I want to just touch on the statements you made several

13   hours ago now on points that you were considering.  We

14   obviously think that a meet and confer makes sense.  We're fine

15   with the parties you identified in terms of participation.

16   Obviously, the work plan, we're also in support of that, was in

17   our pleadings with the goal that that work plan is supposed to

18   accommodate what will, in any event, be a broad scope for the

19   examiner but with a recognition of what other parties are doing

20   in the case from the SIPC trustee to the creditors' committee

21   and the debtors.

22             With respect to the financial advisor issue, I think

23   that's precisely what we were trying to get to which was an

24   assessment that the FA would come in but not replicate what A&M

25   was already doing.  But understanding that, at the end of the

43

1    day, the examiner needs somebody for interpretive guidance with

2    respect to that raw data and the reports coming out of A&M.  So

3    we're fine with that suggestion as well.

4         With that, let me just briefly go through what our

5    proposal was and why we suggested drawing the line on scope

6    where we did.  And, again, to come back to something Your Honor

7    said, what we were trying to accommodate was to come up with a

8    principal basis for the exercise of discretion recognizing, at

9    the end of the day, it's simply a recommendation to you and you

10   will exercise that discretion as you see fit.  And we were also

11   trying to balance the goal that it would be nice to get it

12   right today to get a scope that we don't have to keep coming

13   back to today that's broad enough to allow the examiner some

14   discretion himself to pursue different avenues and paths.  But

15   then not also, on the other hand, defaulting to just including

16   everybody's recommendation and then ending up with a very broad

17   and in some cases, and this is going to be a touchstone of my

18   comments, a parochial set of tasks for the examiner.

19        With respect to the large core of consensus, I think

20   it comes down to this.  I think everybody agrees that the

21   examiner should write a narrative on how, when, why Lehman

22   collapsed.  And that the public, the parties in interest, can

23   all benefit from that.  Mr. Miller, in his opening remarks, had

24   mentioned that there was a fair amount of media, hype and

25   hyperbole.  We agree with that.  We think that the examiner's

44

1    report can shed some light on that and perhaps calm some of

2    that noise down.

3           Within that kind of broad headline, we think we cover

4    a lot of ground.  We think that that covers all the pre-

5    petition transfer of assets, the pledging of collateral, the

6    dealing -- the numerous dealings among financial institutions

7    such as JPM, Barclays, etcetera.  But through the work plan,

8    we'll manage that so as not to duplicate the efforts of the

9    committee with respect to some of those investigations.  It

10   also deals with the movement of cash.  We heard about the LBIE

11   from the beginning of the case, the transfer of funds in the

12   days before the filing.  That's also under that rubric.  The

13   transfer of the stock of the LBI subsidiaries to LBIE prior to

14   the prior to the commencement of the SIPC proceeding also falls

15   under that category.  The role of the Treasury Department and

16   various federal agencies falls under that rubric.  And lastly,

17   this is a point that I'm not sure the Disney companies fully

18   understand, that from LBCC's perspective, their filing date was

19   October 3rd.  The scope of the pre-petition acts and

20   occurrences for that debtor would include the Barclays sale

21   because the Barclays sale predated their filing.  And to the

22   extent that Mr. Bienenstock is seeking to see whether there

23   were nondebtor assets involved with respect to that transfer,

24   that would fall under our rubric.  We didn't think it was

25   appropriate to go beyond that and I'll touch on that briefly.

45

1          The areas of disagreement really go to how specific

2     to we need to be in connection with the initial examiner's

3     report.  Mr. Miller also stated at the outset that I think he

4     viewed the original scope as a bit parochial.  And that is, in

5     essence, our issue.  Meaning, the examiner will decide within

6     that broad rubric where to spend his or her time.  And if he

7     follows a path that he thinks is particularly productive, he's

8     going to do that.  We struggled with why you singled out LBCC

9     and not LCPI, not LBSF.  I'm sure creditors who have had

10    pending Rule 2004 motions could come up with a laundry list of

11    things that they would like the examiner to investigate.  So

12    that's where we thought there was a principal basis to draw the

13    line and give the examiner broad charge, not give the

14    specificity.  And sometimes, Your Honor's order carries with it

15    a little weight that we believe for reasons that these things

16    should be looked into.  I've certainly been involved in other

17    cases where that has, in fact, been the case, that we want the

18    examiner drilled down in a specific potential cause of action

19    that we think may exist.  And we focused the examiner on that.

20    We did not think that those rose to this level.  The examiner

21    can decide for him or herself.

22          Similarly, with respect to pre-imposed petition

23    occurrences.  We think the respective debtors' filing dates

24    deal with eighty, ninety percent of what was suggested anyway.

25    With respect to the Barclays sale per -- call a Barclays sale,

46

1    we didn't think that, and couldn't find a precedent for, an

2    examiner kind of seeing whether the sale order was proper,

3    whether objections should have been sustained or not.  That

4    doesn't seem -- I mean, it's a final res judicata order.  The

5    committee is investigating whether the assets actually

6    transferred foots with the order that Your Honor entered.  And

7    there could be issues with respect to that.  We hope to resolve

8    issues consensually.

9         Similarly on the TSA, there have been discussions

10   with the debtors and the committee and Barclays on that but not

11   sure that that's an appropriate scope for the examiner to weigh

12   in on.  And again, it's in large part because the examiner --

13   they can do a report which other parties are already doing but

14   they don't have prosecutorial power.  They don't have the

15   ability to pursue these causes of action.  And while they're

16   doing this report, in the background, the debtors and the

17   committee and Barclays are working to try to resolve any of

18   those issues consensually.

19        I think Your Honor dealt with this a little bit in

20   the work plan because I think that's precisely where you

21   were -- at least how I heard those comments -- trying to

22   reconcile those things so that we come up with a work plan if

23   everybody puts their heads together and try to avoid those

24   types of issues to the best that we can.

25        The other issue, Your Honor, is whether or not the

47

1    examiner is kind of limited, at least at the outset, to a

2    factual report.  We know that in other cases, clearly, there

3    have been analyses of causes of action.  And we don't mean that

4    that should be off limits forever.  It's just that starting

5    from what we view as the appropriate scope is what happened

6    when and why pre-petition.  That's enough for the initial

7    report.  If we thought that other parties couldn't take it from

8    there for some reason then maybe we would need an analysis of

9    certain causes of action.  But in some respects, you can argue

10   that having a factual report allows it to be a touchstone for

11   all the parties in the case regardless of the positions that

12   they would take.  Once it's colored with a position on the

13   merits of the law, parties either agree or disagree and you

14   find that the parties that agree love the examiner's report;

15   the parties that disagree never cite it.  And it can be a

16   benefit to avoid that, because they can't bring the claims

17   anyway, and just lay out what happened to whom, how, in the

18   report.

19           THE COURT:  I have something of a cognitive problem

20   with what you're proposing and I want to just explore it with

21   you a little bit.  It seems to me that there's almost no such

22   thing as pristine and pure fact finding.  I think that

23   investigations are conducted with a frame of reference and a

24   point of view.  And we've used the terms just before lunch

25   several times, agnostic.  There is no such thing as a totally

48

1    agnostic analysis, at least in my experience because depending

2    upon the perspective point of view and mandate associated with

3    the investigation, certain things are within the zone and

4    certain things are not.  Because this is a bankruptcy case and

5    because sophisticated practitioners are aware that bankruptcy

6    cases occasionally involve causes of action for the recovery of

7    assets or to pursue estate claims, and we all know what kinds

8    of claims those are, how is it possible for an examiner to

9    conduct an examination that will be useful ultimately unless

10   there's some connection between the investigation and the

11   possible use of the fruits of that investigation.

12            MR. DUNNE:  I understand that, Your Honor.  And it is

13   difficult.  And let me start -- I want to respond on the other

14   side of the spectrum and just give an example of what I found

15   particularly difficult in another case.  Which is, the examiner

16   in another case we were involved with went into defenses to the

17   causes of action.  And the report was published right as we

18   were talking about settling some of these claims and, actually,

19   became somewhat counterproductive in the ability for the

20   fiduciaries to maximize the values of those claims.  And so,

21   that is why I'm starting to kind of narrow it -- I would like

22   to see it narrowed in some degree to avoid that.  Now, I

23   recognize, on the other side, is precisely where Your Honor's

24   question comes from which is if you're building up a factual

25   record, that factual record's either going to lead you down a

49

1    path where you think there might be claims and causes of action

2    or not.  And that you're going to be reviewing those facts

3    against the backdrop of some legal landscape.  And I recognize

4    that.  And it may be an impossible task.  I have two proposals.

5    One is that we try to work something out in the work plan phase

6    of this and the meet and confer phase to see if we could

7    somehow limit that.  Or maybe we deal with the defensive.  But

8    if this examiner perceives potential causes of action, they

9    identify them and they leave it at that and they don't

10   necessarily weigh in on whether the potential targets of those

11   causes of action or claims have what, in the examiner's view,

12   would be meritorious defenses because the examiner doesn't

13   bring those claims.  And we may have a different view, we may

14   agree, but I'm not sure that's part necessary.  So that would

15   be my suggestion as to how to potentially deal with -- I hear

16   Your Honor's concern about this and I understand it.  And I do

17   want the examiner to shed as much light on these things.  And,

18   in fact, there's a benefit to kind of pointing in the direction

19   that he or she may think is fruitful.  But I'm trying to avoid

20   what I perceive as the negative on the other side of the

21   spectrum.

22          With that, Your Honor, that's basically where we are

23   in terms of scope limitations and other limitations.  I do need

24   to address some of counsel for the Walt Disney Company's

25   comments with respect to the committee.  I debated whether to

50

1    do this because -- while, some of the what I view is kind of

2    baseless or needless disparity rankled, I do think that I

3    should correct the record on the committee's role to date who

4    we've been representing and the constitution of the committee.

5    Some of this falls within the category, Your Honor, of no good

6    deed goes unpunished.  Mr. Bienenstock focused on the indenture

7    trustee's -- and I think made such a broad statement that he

8    calls into question the propriety of the constitution of

9    virtually every official committee when there are multiple

10   debtors and indenture trustee serving on the official

11   committee.

12        THE COURT:  Well, I think the question he was

13   raising -- and I don't know if we actually need to get into

14   this at this point because I'm perfectly prepared to let you

15   continue if you feel it's appropriate.  But I thought the point

16   he was making was that the committee as constituted may not be

17   ultimately capable in light of some of the findings and

18   conclusions in the Adelphia case of pursuing claims as to which

19   it may itself be conflicted.  I think that's what I was

20   hearing.

21        MR. DUNNE:  I thought -- I heard slightly more than

22   that which was that he was positing a world that we're

23   basically imputing the ability of the creditors' committee's

24   members to discharge their duties at certain subsidiary levels

25   given their holdings.

51

1        THE COURT:  I think you were hearing maybe more than

2   I was hearing and maybe it's because you're appropriately

3   defensive of your client and the constituency within the

4   committee.

5        I heard -- and, Mr. Bienenstock, I'm not inviting to

6   come back to the podium to clarify this.

7        MR. DUNNE:  Nor am I, Your Honor.

8        THE COURT:  I think he's had -- he's had his chance.

9   But for purposes -- the record speaks for itself but we're now

10  just talking about the residue of that record which is what we

11  remember and take away from what was said.  And I believe that

12  he was suggesting that the examiner should be liberated from

13  the restrictions that the committee would seek to impose on the

14  examiner with respect, in particular, to the identification of

15  causes of action because the distinction made in your objection

16  between an examiner that has no ability, as a matter of law, to

17  pursue claims and a committee that's engaged in an

18  investigation but has that ability is actually a false

19  distinction because, he would argue, the committee you're

20  represent -- may actually not be in a position as an estate

21  fiduciary to pursue those claims once they're identified if

22  some of the same issues that Judge Gerber found in Adelphia

23  apply here.

24        MR. DUNNE:  Well, yes.

25        THE COURT:  That's what I think I was hearing.

52

1        MR. DUNNE:  Okay.  I like what you heard, Your Honor,

2   and I'll just say then that sounds like an issue for another

3   day.  Right?  That sounds --

4        THE COURT:  Exactly.

5        MR. DUNNE:  That sounds like an issue for another

6   day.  Let me just say, the committee members have been working

7   hard on this case.  A lot of what they've been doing, for

8   instance, are at the subsidiary levels.  You've seen the fruits

9   of it in terms of the open trades and the derivatives which are

10  at LCPI and LBSF.  And they take their fiduciary duties very

11  seriously.  And I'll leave it at that for now, Your Honor.

12       THE COURT:  I'm confident that they do and everything

13  that I've seen so far in the case indicates that they're doing

14  just that.

15       MR. DUNNE:  And unless Your Honor has any further

16  questions, that concludes my remarks.

17       THE COURT:  Let me just ask this one question.  Based

18  upon the remarks that you've just expressed, I gather there is

19  presently no consensus as between the parties as to the precise

20  form of order because there are still some open issues.

21       MR. DUNNE:  That's correct, Your Honor.

22       THE COURT:  Okay.

23       MR. MILLER:  Good afternoon, Your Honor.

24       THE COURT:  Good afternoon.

25       MR. MILLER:  Harvey Miller again, Your Honor.  Your

53

1    Honor, I would make a suggestion that may, I hope, resolve this

2    afternoon.  The suggestions which the debtors have made that

3    have been referred to throughout the hearing and contained in

4    paragraphs 31 and 32 of the response to the New York State

5    comptroller's motion, I think everybody agrees they're pretty

6    broad in perspective.  I would suggest, Your Honor, that that

7    form the basis of an order and we tweak it just a little bit to

8    put in the thirty-day provision as to the filing dates and we

9    add a provision at the end that would state that as part of the

10   trustee's -- I mean, I'm sorry, the examiner's investigation

11   that he determine whether there are any facts -- ascertained

12   whether any facts pertaining to fraud, dishonest, incompetence,

13   misconduct, mismanagement or irregularity in the management of

14   the affairs of the debtor or to a cause of action available to

15   the estate.  Taking that out of Section 1106(a)(4).  And also

16   add a provision, a decretal provision, directing the parties --

17   or directing the examiner when appointed to meet and confer

18   with the debtors, the creditors' committee, the SIPA trustee,

19   the Walt Disney Company -- the representatives of these people,

20   the New York State comptroller, Harbinger, Bank of America,

21   everybody who put pleadings in, Your Honor, to meet as to the

22   development of a work plan and a plan of coordination and other

23   matters pertinent to the examiner's investigation and to submit

24   an appropriate order in connection therewith to the Court as

25   soon as possible.  Words to that effect, Your Honor.  And then

54

1    I think we have a starting point and we can go forward and the

2    U.S. trustee can nominate the person and submit an order to

3    Your Honor for the approval of that person.  And we have the

4    process started.

5            THE COURT:  I think that's a perfectly fine

6    suggestion and I'm prepared to adopt it.  However, as to the

7    form of the order to be entered to start the process, because

8    there have been so many nuanced expressions of support that

9    actually are expressions of disagreement, I think it would be

10   useful to have a form of order that is submitted after it has

11   been --

12           MR. MILLER:  Circulated.

13           THE COURT:  -- at least vetted within that universe -

14   -

15           MR. MILLER:  Yes, sir.

16           THE COURT:  -- of objectors and those who have

17   intervened.  And that I'm going to so order today's record with

18   the understanding that a form of order acceptable to the

19   parties I've just identified, or you've adverted to in your

20   comments, will have a chance to review the order and it's going

21   to be submitted to me as an order that I can then enter with

22   everybody's consent as to form.  If it turns out that there are

23   areas of fundamental disagreement which emerge concerning the

24   language of the order, I will be available for consultation

25   concerning breaking the tie --

55

1          MR. MILLER:  Yes, sir.

2          THE COURT:  -- because it ultimately will be my order

3    and my discretion as to what will go into it.  But I would hope

4    that that could all be accomplished within perhaps the next

5    forty-eight hours or so.

6          MR. MILLER:  We will circulate a proposed order

7    tomorrow morning, Your Honor.

8          THE COURT:  Fine.

9          MR. MILLER:  Thank you, Your Honor.

10         THE COURT:  So an examiner is being appointed.

11         MR. MILLER:  Yes, sir.  You don't want to tell us

12    who?  No.

13         THE COURT:  And the U.S. trus -- Mr. Bienenstock?

14         MR. BIENENSTOCK:  Your Honor, we have incorporated

15    the debtors' scope in our proposed order and our reply.  We

16    incorporated the U.S. attorney's language.  I think with the

17    additions that Mr. Miller just recited earlier that that order

18    should do it.

19         MR. MILLER:  That's the order we will circulate.

20         THE COURT:  Well, that, in fact, may do it.  However,

21    I know that there were some comments made by Mr. Sabin on

22    behalf of Harbinger concerning some adjustments that he would

23    like to see.  I'm not saying that those are all adjustments

24    that anybody should accept.  It's just something that I recall

25    hearing this morning.  I know that the creditors' committee has

56

1    some stated reservations with respect to the articulation of

2    claims and defenses.  I'm not particularly receptive to that

3    point of view but it's nonetheless a point of view that they

4    have outstanding.  And I think that they should have an

5    opportunity to give up after they've seen the language.

6            MR. MILLER:  Yes, sir.  We don't want to prejudge it,

7    Your Honor, but -- okay, Your Honor.  I think that would end

8    this items 12 and 13, I think, on the agenda for today.

9            THE COURT:  I think with a great sigh of relief we

10   can move on.

11           MR. MILLER:  The question now, Your Honor, is should

12   we go back to the uncontested matters since there are a lot of

13   people, I think, who came to the court today on the basis that

14   the matters were uncontested and they would be out very

15   quickly.

16           THE COURT:  This is the old bait and switch.

17           MR. MILLER:  Sometimes you have to do that, Your

18   Honor.

19           THE COURT:  Okay.  So let's go to the uncontested so

20   that we can allow people to go back and do their work at their

21   offices.

22           MR. BIENENSTOCK:  Your Honor, with your permission,

23   since we're not parties, we're going to --

24           THE COURT:  You're excused.  In fact, if there's

25   anybody who wishes to just get up and leave now, that's fine.

57

1    I won't be offended.  I even got a little wave.

2        (Pause)

3            THE COURT:  Okay.  Let's proceed.

4            MR. MILLER:  Yes, Your Honor.  The first uncontested

5    matter, Your Honor, is the debtors' application to employ Ernst

6    & Young LLP.  The debtors seek authority to employ Ernst &

7    Young in connection with auditing and tax services.  There is

8    no opposition to that, Your Honor.

9            THE COURT:  The motion's granted.

10           MR. MILLER:  Number 2, Your Honor, is the debtors'

11   motion for an extension of time to assume or reject unexpired

12   leases of nonresidential real property.  No opposition, Your

13   Honor.

14           THE COURT:  Motion granted.

15           MR. MILLER:  Item 3, Your Honor, is the debtors'

16   motion requesting an extension of the exclusive periods for the

17   filing of the Chapter 11 plan and solicitation of acceptances.

18   There is no objection to that motion either, Your Honor.

19           THE COURT:  That is granted as well.

20           MR. MILLER:  Thank you, Your Honor.  Number 4 is the

21   debtors' motion to extend the time within which the debtors

22   must comply with Section 345(b) of the Bankruptcy Code.  Again,

23   Your Honor, there is no objection to that and we have been in

24   close coordination with the Office of the United States

25   Trustee.

58

1          THE COURT:  I'm prepared to grant that but I would

2     simply like confirmation on the record that this is a matter

3     that the U.S. trustee's office has reviewed and is comfortable

4     with.

5          MR. VELEZ-RIVERA:  Your Honor, we've initiated a

6     series of weekly meetings with both some of the attorneys from

7     Weil Gotshal as well as with Alvarez & Marsal.  And on the

8     basis of the debtors' progress with respect to a series of cash

9     management issues, we have no objection.

10         THE COURT:  Right.  And I've paid some attention to

11    this motion and see that there are a variety of practical

12    issues involving rights of offset in connection with depositary

13    accounts.  And it makes good sense that you have more time to

14    work things out with those lenders that are within the zone of

15    acceptable utility to the --

16         MR. MILLER:  Yes, sir.

17         THE COURT:  -- debtor and acceptable to the U.S.

18    trustee's guidelines.

19         MR. MILLER:  Item number 5, Your Honor, is the

20    debtors' motion to assume a subscription agreement and certain

21    other agreements with Wilton Re Holdings Limited.  There are no

22    objections to this one, either, Your Honor.

23         THE COURT:  That motion's granted.

24         MR. MILLER:  Thank you, Your Honor.  Number 6 is a

25    motion by Superior Pipeline for relief from the automatic stay

59

1    to prosecute an adversary proceeding against Lehman Commercial

2    Paper Inc.  There is a stipulation, Your Honor, which has been

3    entered into.  Do we have the stipulation, John?

4         MR. LUCAS:  We have a stipulation, Your Honor, but we

5    need to add an extra attachment to the proposed stipulation so

6    that includes the complaint and all exhibits which we just

7    received and we'll e-mail with the Court's permission.

8         THE COURT:  So you have the stipulation but it's not

9    yet ready to offer up?

10        MR. MILLER:  That's correct, Your Honor.

11        THE COURT:  Okay.

12        MR. MILLER:  And all the stipulation provides, Your

13   Honor, is to modify the stay so that Superior may prosecute its

14   claim that it holds a mechanic's lien.  No other relief other

15   than that at this point, Your Honor.

16        THE COURT:  That's fine.  I understand that this

17   relates to --

18        MR. MILLER:  SunCal.

19        THE COURT:  -- a project in California --

20        MR. MILLER:  Yeah.  SunCal, Your Honor.

21        THE COURT:  -- that's related to SunCal.  And I

22   looked at the papers and this appears to be routine.  And so,

23   I'm prepared to approve the stipulation even without seeing

24   it --

25        MR. MILLER:  Thank you, Your Honor.

60

1          THE COURT:  -- based on the representations.

2          MR. MILLER:  Number 7, Your Honor, is another motion

3     for relief from the automatic stay by Corus Bank, N.A.  Again,

4     Your Honor, we have a stipulation.  You have it?  Okay.  The

5     stipulation -- LBHI, Your Honor, is a mezzanine financier in

6     connection with this transaction.  And, basically, the

7     modification of the stay is to allow the creditor to give

8     notice to LBHI and give LBHI the opportunity to determine

9     whether or not it wants to take any action.

10         THE COURT:  Is Corus Bank represented in court today?

11         MR. FRIEDMAN:  Your Honor, I am.  Jeff Friedman,

12    Katten Muchin Rosenman for Corus Bank.

13         THE COURT:  Maybe you even want to come forward.

14    It's your motion.  Is there a stipulation?  And I guess my only

15    question is this.  As I remember this motion, it was quite in

16    the alternative, that either the stay didn't apply or if it did

17    apply, relief should be granted.

18         MR. FRIEDMAN:  That's correct, Your Honor.  The --

19         THE COURT:  What does the stipulation provide?  Does

20    it provide --

21         MR. FRIEDMAN:  The stipulation provides that the stay

22    is granted without necessarily either side admitting that it

23    applied in the first place or it didn't apply in the first

24    place.

25         THE COURT:  Sounds like a lawyer-like response.

61

1    Okay.

2              MR. FRIEDMAN:  And the stipulation gives the debtor

3    two weeks before we send the notice that Mr. Miller just

4    referred to for Lehman to consider a proposal that they had

5    requested we make about a possible extension of time.  We don't

6    think they're going to opt for that but they have two weeks to

7    make a decision under the stipulation.

8              THE COURT:  Okay.  Is that stipulation in form to

9    submit?

10             MR. MILLER:  I believe it is, Your Honor.

11             MR. FRIEDMAN:  Yes, it is, Your Honor.

12             THE COURT:  Okay.  Fine.  I'll approve it.

13             MR. FRIEDMAN:  Thank you, Your Honor.

14             MR. MILLER:  Thank you, Your Honor.  In connection

15   with the two most recent filings, Your Honor, items 8, 9 and 10

16   and 11, Your Honor, the motions that we have made in the past

17   as there have been sequential filings incorporating prior

18   orders of the Court.  So I would ask Your Honor if you would

19   grant the motions in respect of 8, 9, 10 and 11.

20             THE COURT:  They're all granted.

21             MR. MILLER:  Thank you, Your Honor.  Your Honor,

22   there's one other thing that's not on the calendar.  It relates

23   to TPG Austin.  There was an agreement, I think, at the prior

24   omnibus hearing that we would have until January 15 to make a

25   decision in connection with a motion or otherwise it would go

62

1    over to the January 28th date for possible litigation.  The

2    parties have agreed, Your Honor, and they're in the process of

3    reaching a consensual resolution.  So the January 15th day has

4    faded away.  And it's expected by January 28th that we will

5    have a consensual resolution of this matter.  But TPG Austin

6    just wanted to have that on the record for today.  So nothing's

7    going to happen tomorrow, Your Honor.

8              THE COURT:  Fine.

9              MR. MILLER:  Okay, Your Honor.  Now going back to the

10   contested matters, Your Honor, item 13 -- I'm sorry.  Item 14,

11   Your Honor, which is the motion of the Bank of New York Mellon.

12   This is in connection with all of the discussion about

13   examiners, Your Honor.  This brings to the forefront the issue

14   of coordination.

15             THE COURT:  Correct.

16             MR. MILLER:  It is the motion of the bank and I'll

17   let the bank present it.

18             MR. HOROWITZ:  Good afternoon, Your Honor.  Gregory

19   Horowitz from Kramer Levin on behalf of the Bank of New York

20   Mellon as the indenture trustee for I refer to as the Main

21   Street bondholders sometimes.  The Main Street bondholders hold

22   over 700 million dollars worth of claims against LBCS and they

23   also have guaranty claims against LBHI.

24             Your Honor, LBCS is Lehman Brothers Commodity

25   Services.  And the indenture trustee seeks 2004 discovery based

63

1    on what appeared to be the following facts.  Prior to the

2    bankruptcy, Your Honor, the only Lehman Brothers entity that

3    was ever publicly represented to engage in commodities business

4    at all was LBCS, Lehman Brothers Commodities Trading.  If you

5    looked in the company's, LBHI's, SEC filings, their 10Q, for

6    example, states that the company conducts its commodities

7    business through LBCS.  If you looked at LBI, Lehman Brothers

8    Inc.'s website and you clicked on commodities, what you were

9    directed was a description of LBCS.  There was never any

10   suggestion that there was commodities business conducted

11   through any other Lehman Brothers entity.  And indeed, the

12   offering materials for the bonds at issue similarly described

13   LBCS' repository for Lehman Brothers commodities business.

14           At the time of the Barclays transaction, Your Honor,

15   LBCS was a nondebtor.  And at least one or two LBCS creditors,

16   not, by the way, Your Honor, including the indenture trustee,

17   objected to the inclusion of LBCS in the sale and presumably

18   also the inclusion of the free and clear aspects of the sale

19   order.  The debtor resolved those objections by agreeing to

20   exclude LBCS from the sale.  And at the hearing on the sale

21   order, debtors' counsel expressly represented to the Court that

22   not only was LBCS being excluded from the sale but nothing

23   about the sale would affect LBCS' ability to operate as an

24   ongoing entity.

25           So we were surprised, Your Honor, when slightly more

64

1    than two weeks later, Barclays issued a press release

2    announcing that it had "fully integrated Lehman Brothers

3    commodities business under the Barclays Capital name.  On the

4    basis of that, Your Honor, the indenture trustee and the Main

5    Street bondholders have ample reason to believe that the

6    creditors and LBCS may have one or more viable causes of

7    action.  And without meaning to give an exhaustive list, the

8    potential causes of action that might arise depending on what

9    the true facts turn to be could include claims by the

10   bondholders against Barclays for successorship liability

11   notwithstanding, I understand, and I've heard Barclays' counsel

12   on the notion that there was a free and clear aspect to the

13   sale order.  As I say, LBCS was not part of that and LBCS was a

14   nondebtor and we don't believe that the Court could approve a

15   transfer of LBCS' assets free and clear when it was not a

16   debtor.  Could also include, to the extent that the facts

17   suggest that Barclays acquired assets of LBCS, business of LBCS

18   that it did not pay for, could involve claims against Barclays

19   for compensation for that unpaid for value.  To the extent that

20   it turns out that Barclays did pay for the commodities business

21   and there was some perhaps last minute reach agreeing LBCS to

22   resolve objections but that it was part of the consideration,

23   then the claims that could arise could be claims by LBCS for

24   its share of the corpus of the sales proceeds.

25          We don't know, Your Honor, and we don't have to know

65

1    for purposes of 2004.  Rule 2004 is expressly -- exists to

2    allow creditors to investigate potential claims.  It expressly

3    exists, so you do not have to shoot first and ask questions

4    later.  You can ask questions and find out whether there's a

5    basis for shooting.

6         Now, Your Honor, we recognize the need, the enormity

7    of the tasks that the debtor has been faced with in this huge

8    bankruptcy.  And we recognize the need to minimize burden.  We

9    filed the 2004 motion in the first instance in November.  We

10   received unsurprisingly calls from the debtor asking to adjourn

11   the motion explaining that with the holidays and with all the

12   emergent tasks the debtor could not focus on it.  But debtors'

13   counsel said they wanted to endeavor to try to informally give

14   us information responsive to our concerns.  We, actually,

15   during those conversations, said that our most important

16   immediate concerns are understanding what exists at LBCS in

17   light of the Barclays press release, whether there's a wasting

18   asset there in the expression Your Honor used this morning, a

19   melting ice cube.  We needed to know that.  But based on the

20   debtors' representation that they would endeavor to get us at

21   least that information quickly and that they would endeavor to

22   work with us, wee requested an adjournment.  We waited -- we

23   agreed to an adjournment to the stay.  We waited to hear from

24   the debtors.  When we didn't, we asked them are we going to get

25   some information?  We never got any such information, Your

66

1    Honor.  And parenthetically, I should say that when we

2    expressed that concern about the possibility of a wasting

3    asset, at no time did debtors' counsel suggest to us oh, you

4    have no reason to worry because there is no ongoing business.

5    You have no reason to worry because, as we now hear for the

6    first time in debtors' objection, in fact, LBCS had no ability

7    to engage in ongoing business from the moment that LBHI

8    declared bank -- filed for bankruptcy.  We never heard that.

9    We never heard that there was no basis for urgent concerns.

10        When we talked to the debtor and to Barclays' counsel

11   again, we reiterated we understand that there are a lot of

12   burdens here.  We understand that it's appropriate to talk

13   about what a reasonable scope of discovery is and what a

14   reasonable schedule is.  We asked them to make a proposal in

15   that regard.  Instead, on Friday, what we got was the back of

16   our -- their hand, basically.  We got, you're not going to get

17   anything.  We're resisting your ability to take any discovery

18   into it at all.  We've got objections filed by Barclays and the

19   debtor and the SIPA trustee and the creditors' committee.  And

20   I'll address the latter two of those in a few minutes, Your

21   Honor.

22        But let me just -- with regard to the Barclays and

23   debtors objections claiming that we should not be entitled to

24   2004, I would submit, Your Honor, that those objections are the

25   textbook example of what is not an appropriate way to object to

67

1    2004 discovery.  You cannot resist 2004 discovery by assuming

2    the conclusion, by assuming that there are no claims on the

3    merits to investigate and therefore you should not be all --

4    the creditors should not be allowed to take discovery into

5    whether those claims exist.  And most certainly, you cannot

6    object by assuming the conclusion and then in support of that

7    making utterly unsupported conclusory assertions of fact in

8    your papers.  There is no evidence attached to those papers.

9    But the objections are replete with factual assertions, many

10   times assertions about facts that we never heard before, on

11   several occasions, facts that seem to be completely contrary to

12   what we've seen before.

13          Your Honor, if all the Court did was to allow us to

14   take discovery into every unsupported factual assertion that's

15   set forth in those objections that would end up being basically

16   the scope of discovery that we sought in the 2004 motion to

17   begin with.  We would be able to take discovery into the

18   assertion that LBI had a commodities business which appears to

19   be completely inconsistent with, as I said before, the debtors'

20   pre-petition public statements that LBCS had no ongoing

21   business at the time of the sale which, as I said, we heard for

22   the first time in the objections and which seems to be

23   contradicted by the assertion, the representation that debtors'

24   counsel made to the Court in connection with the sale motion

25   that nothing in the sale would impact the ability of LBCS to

68

1    function as an ongoing business.  If what they meant was well,

2    we're not mentioning that LBCS has no ongoing business but, in

3    fact, it does have no ongoing business so the sale won't affect

4    that, I would submit that at the very least, Your Honor, that

5    is misleading and cute, way too cute.

6          We would be entitled to take discovery into the

7    assertion that LBCS did not have its own employees which is

8    contrary to the statement in the offering memorandum in

9    connection with the bonds that LBCS has 200 or had at the time

10   200 employees.  We would be able to take discovery into the

11   assertion that Barclays, in fact, did not acquire any of LBCS'

12   commodities business but, in fact, acquired the distinct

13   business of LBI, commodities business of LBI, which nobody at

14   any time, in these papers or otherwise, has endeavored to tell

15   us, explained to us what is.  What is this supposed LBI

16   commodities business?  How is it distinct from the LBCS

17   commodities business?  Nothing's explained about that.

18         Those are, in fact, Your Honor, basically the issues

19   that we sought discovery of in the 2004 motion.  Your Honor,

20   the laws are very clear.  There is a load threshold of basis

21   for believing there may be a claim for a -- to engage in 2004

22   discovery.  We have amply met that.

23         Now, I want to address the comments made by the

24   unsecured creditors' committee that we should defer to their

25   investigation of these potential claims, not that we have had

69

1    any basis to believe that they've engaged in any investigation

2    to date, and the assertion of the debtor that we should defer

3    to the examiner.  And obviously, I know, Your Honor, that

4    that's going to be a significant focus of the Court's concern

5    here.

6         Your Honor, the entire basis of our justice system is

7    the belief that the adversary process and open discovery is the

8    best way to bring out facts and to achieve justice.  Bankruptcy

9    is not an exception to that theory.  And to the contrary, the

10   bankruptcy process, and 2004, in particular, depends on various

11   different creditor constituencies with their, to use the word

12   that I like and has been used a lot, their parochial interests.

13   We'll pursue those interests vigorously.  We'll maintain any --

14   assert any arguments that can be made on behalf of those.

15   We'll investigate the facts.  And wonderfully crowded

16   courtrooms, like this one and the overflow courtroom, are a

17   testament to the fact that you've got lots of parochial

18   interest here.

19        There is no basis to deprive the parties with their

20   parochial interests of their right to engage in discovery and

21   to force them to defer to proxies, such as an examiner or the

22   UCC, whose interests may or may not be aligned, who have a lot

23   of other interests on their plate.  Clearly, the agenda for

24   this examiner is going to be enormous.  We cited in our reply

25   brief, Your Honor, the Enron case, a decision from Enron where

70

1    Judge Gonzales held that the fact that an examiner had been

2    appointed there did not have any relevance, ability to deprive

3    creditors of their ability to take 2004 discovery.  It would

4    only be relevant at all to the extent that it might shed light

5    on whether the creditors have an improper motive in seeking

6    discovery.  And I don't think anyone has asserted that the

7    indenture trustee is pursuing this discovery for coercive or

8    harassment purposes.

9         Your Honor, we tried -- we worked very hard in

10   framing these discovery requests to make sure that they were

11   narrow and avoided undue duplication with other issues in this

12   case.  For instance, our discovery requests do not go to the

13   intercompany transactions and intercompany balances that are

14   obviously going to be an enormous task and a focus of many

15   different parties in this case.  And I think it's clear we

16   succeeded in making our discovery requests appropriately

17   narrowly focused because not one of the objectors has suggested

18   that our requests were overbroad.  Not one objector has pointed

19   to anything about our requests that it was overbroad.

20        Mr. Bienenstock, who left, so he won't hear me

21   endorsing his views, but he made comments about the nature of

22   the UCC's charge and its status as a fiduciary which I agree

23   with Your Honor's take on but I think I also completely agree

24   with and I think shed light on why we should not have to rely

25   on the UCC to pursue discovery, investigation and any potential

71

1    claims here.

2              THE COURT:  Just so I'm clear on what you're saying.

3    The UCC is the Uniform Commercial Code.

4              MR. HOROWITZ:  I'm sorry.  Unsecured creditors'

5    committee, I apologize, the creditors' committee.

6              THE COURT:  Okay.

7              MR. HOROWITZ:  I --

8              THE COURT:  'Cause I am relying on the UCC.

9              MR. HOROWITZ:  I apologize, Your Honor, the

10   creditors' committee.  Your Honor, I gave a nonexhaustive list

11   of the potential claims that we think might arise here.  And

12   just to -- I think there's a useful distinction.  One set of

13   facts might give rise to a view that Barclays got something it

14   didn't pay for and that there needs to be more consideration

15   coming in.  I call that a pie increasing type of claim that

16   would bring more money into the estate.  But I also suggested

17   that it's possible, the facts will show, that Barclays paid for

18   the business but that LBCS was improperly excluded and LBCS

19   should have a direct claim on its allocable share of the

20   proceeds.  That is what I would call a pie splitting type of

21   claim.  And I do not think it is the province of the creditors'

22   committee to investigate and reach positions as to allocation

23   among different constituencies.  It also happens to be true

24   that the creditors' committee was formed before LBCS was in

25   bankruptcy and, as a factual matter, does not have anyone on

72

1    there that represents LBCS' interests.  But, like Mr.

2    Bienenstock, I do not rest my view that we should not be forced

3    to defer to the creditors' committee on that basis.

4            Your Honor, the fact that I put in a pitch that

5    parochial interests should be entitled to pursue discovery

6    should not mean in any way that I believe that parties should

7    be allowed to run amuck and engage in duplicative discovery

8    and, basically, subject the debtor and other parties in this

9    case to unbearable burdens.  I don't think there's been any

10   showing that the limited discovery that we are requesting would

11   be unduly burdensome or duplicative.  If, for example, Your

12   Honor, the examiner does wish to examine the issues that are of

13   concern to us, the examiner will request from the debtor and

14   from Barclays precisely the same information that we're

15   requesting, so likewise with the creditors' committee.  It will

16   not be any greater burden for the debtor and Barclays to

17   collect that information and deliver it to us than it

18   simultaneously, seriatim, and to the examiner than it would be

19   simply to give it to the examiner.  Conversely, I would

20   actually suggest that if they're interested in examining those

21   issues, and I hope that they are, the easiest way for them to

22   start is by piggybacking on our discovery by looking at the

23   information that we've identified and that we will be

24   collecting.

25           So I agree that it is important to make sure that

73

1    things are coordinated.  I agree that it's important to avoid

2    duplication but we've narrowly tailored these discovery

3    requests.  We have ample basis for seeking it.  And the proxies

4    are not an adequate substitute for that.

5            THE COURT:  I don't understand why proxies are not an

6    adequate substitute.  I understand your position that you think

7    that Bank of New York Mellon as indenture trustee should be

8    leading the way here on behalf of its constituency.  But in

9    what respect is that constituency disadvantaged if another

10   party in interest, say, the examiner, which will be treated as

11   a party in interest under the order of appointment, elects to

12   do that investigation and you get the benefit of that

13   investigation?  What's the difference other than we avoid

14   having a proliferation potentially of what you have called

15   yourself parochial interests that become actively involved in

16   the pursuit of that which is private to the ultimate detriment

17   of that which is the collective good.

18           MR. HOROWITZ:  Well, you asked the question about the

19   examiner and you deserve an answer with regard to the examiner.

20   I did give an answer with regard to the creditors' committee as

21   to why I believe that they are conflicted.  With regard to the

22   examiner, the answer is a matter -- first of all, a matter of

23   focus, Your Honor.  The examiner has an awful lot -- will have

24   an awful lot on his plate or her plate.  And will not be

25   incentivized to focus on these parochial issues the way that we

74

1    are.

2           THE COURT:  But why is it a question of it being

3    incentivized?  It's a question of duty.  If the examiner,

4    whoever this person may be, is given a mandate to investigate

5    and investigations presumably will focus on all matters

6    relevant to the mandate, which includes what you're concerned

7    with, how are you hurt?  And also, what makes this time

8    sensitive?  Why do you need to know this now?

9           MR. HOROWITZ:  I agree it is not time sensitive.  I

10   started out by explaining to you the chronology of our attempts

11   to negotiate with the debtors and Barclays.  And we did --

12          THE COURT:  I understand you are frustrated by the

13   fact that you have not received the discovery that you hope to

14   receive, that you have been cooperative in agreeing to adjourn

15   this so that it's being heard today.  And it just happens to be

16   heard after an examiner has been appointed.

17          MR. HOROWITZ:  My point was slightly different.

18          THE COURT:  So the examiner is obviously fresh in my

19   mind.

20          MR. HOROWITZ:  No.  My point was slightly different,

21   though.  We were asking, inviting proposals with regard to

22   timing.  And if the proposals had been we're going to be

23   collecting information with regard to an examiner's process.

24   It makes sense to coordinate with that.  That would have been a

25   perfectly legitimate answer.  We are perfectly willing to

75

1    consider all proposals with regard to timing including this may

2    have to wait two or three months.  I'm just guessing, Your

3    Honor, as to what the time frame would be.  My point was that

4    the debtors' and Barclays' position was not one relating to why

5    this is time sensitive.  It was you're not entitled to this now

6    or ever.  You have to defer permanently, basically, as I

7    understood the position.

8            I also want to go back to the examiner because I

9    think it's a more basic point, Your Honor.

10           The examiner is, to some extent, is expected to be

11   unbiased.  I think that's part of the --

12           THE COURT:  Not to some extent.

13           MR. HOROWITZ:  Okay.  Let's say --

14           THE COURT:  Absolutely needs to be unbiased.

15           MR. HOROWITZ:  Well, let me go back to my comment

16   about the adversarial process.  The adversarial process depends

17   on parties not being unbiased.  It depends on vigorous

18   advocacy, on parties will collect information and place it --

19   and make all of the zealous arguments they can in support of

20   their position.  That is a fundamentally different role --

21           THE COURT:  I think the zealous advocacy follows the

22   discovery.  It doesn't have to be a condition to the discovery.

23           MR. HOROWITZ:  Well --

24           THE COURT:  Because we talked about this subject

25   before lunch, the subject of a point of view.  Or maybe we

76

1    talked about it right after lunch when I was talking to Mr.

2    Dunne.  The issue of advocacy, I think, should not be confused

3    with the issue of entitlement to discovery on a particular

4    schedule.  And in addition to the discretion which the

5    Bankruptcy Code affords the Court with respect to the

6    appointment of an examiner, at least as it relates to scope.

7    The Bankruptcy Rules under 2004 also give the Court vast

8    discretion when it comes to allowing discovery.  Generally

9    speaking, it's freely allowable provided, however, that when

10   that discovery is ultimately duplicative or potentially a

11   source of disruption, I have the power to control, among other

12   things, the timing.  So you've already acknowledged during the

13   course of our discussion that there's actually no time

14   sensitivity to the need to find this out.  And it's also

15   probably true that there's no difference really if the facts

16   are discovered by an examiner or discovered by you.  Is there a

17   difference?

18            MR. HOROWITZ:  Now that I do disagree with, Your

19   Honor.  In just the same way that you suggested that there's no

20   such thing as pure neutrality with regard to recitation of

21   facts in an examiner's report.  It is also true that discovery

22   is not a neutral process.  That a party that is incentivized to

23   develop arguments as strongly as possible.  This has certainly

24   been my experience in all my years as a litigator.  We'll be

25   more focused on pursuing the facts relating to those particular

77

1    issues.  We'll do a more effective job.  That's really the

2    reason, basically, Your Honor, why we have an adversarial as

3    opposed to an inquisitorial type model like in Europe model in

4    the United States for justice.  We depend on people who are

5    incentivized in the discovery process as well as in advocacy

6    process.  And, you know, the bondholders are going to be

7    footing the bill on this.  They are not incentivized to spend

8    more money than is necessary or appropriate to this.

9           I also -- I certainly agree with Your Honor that you

10   have the discretion to do whatever is necessary to ensure that

11   this is not overbroad or unduly burdensome and to ensure that

12   it's timed correctly but -- which is why I tried to emphasize

13   that we made every effort to make these narrow requests.  And I

14   invite Your Honor to look at the requests.  I think you'll see

15   that they are quite laser like and specific to these issues.

16          THE COURT:  Look, I think I understand fully the

17   reason why you're pressing this motion.  And I'm going to give

18   those who are  opposed to it a chance to be heard if they wish

19   to be heard.

20          MR. HOROWITZ:  Thank you, Your Honor.

21          THE COURT:  I do have some comments, though, before

22   you leave the podium.  I originally thought that there was an

23   issue here as to whether or not you were seeking discovery that

24   was even within the scope of Rule 2004 and I'll tell you why.

25   Nobody raised this point.  It's a subtle point that I probably

78

1    have wrong.  Because the sale hearing occurred at a time when

2    the borrower that you looked to was not a Chapter 11 debtor,

3    the presumed transfer of assets took place as it relates to

4    nondebtor property.  In fact, your entire focus relates to

5    nondebtor property and the potential impermissible transfer of

6    nondebtor property by the sale order which led me to question

7    whether or not the discovery that you seek is even properly

8    within the scope of Rule 2004.  No one has raised that issue.

9    But I've thought about it.  And before you sit down, I'd like

10    you to comment on it.  in what respect is the subject matter of

11    your discovery, even though you articulate that it's clearly

12    covered by Rule 2004.  Explain to me why it is.

13          MR. HOROWITZ:  Well, Your Honor, LBCS is now a

14    debtor.

15          THE COURT:  Yes.  But this all relates to a time when

16    it wasn't a debtor.

17          MR. HOROWITZ:  Okay.  My understanding of 2004 is

18    that it is not limited to discovery of post-petition facts but

19    it is limited to discovery relating to claims that might exist

20    on behalf of the debtor or on behalf of the debtors' creditors

21    which the bondholders currently are.  If, for example, we are

22    correct, one hypothesis is correct, that LBCS's business pre-

23    petition nondebtor was transferred and therefore LBCS has a

24    claim and quantum meruit, whatever the appropriate legal theory

25    will be against Barclays.  That is now a claim belonging to a

79

1    debtor, LBCS, and therefore I think 2004 is clearly appropriate

2    for investigating whether such a claim exists.

3         Also, to the -- if they're backs could give rise to

4    successorship liability, that would affect the liabilities to

5    the debtor because if the bondholder claims simply pass through

6    with the business, there would no longer be liabilities at LB.

7    So these are two different hypotheses -- potential causes of

8    action that are within the ambit of what 2004 is legitimate to

9    discovery.

10        THE COURT:  Are the bonds that you represent secured

11   in any way?

12        MR. HOROWITZ:  I have to admit, I don't know the

13   precise answer to that question, Your Honor.  I believe the

14   answer is no.  I do believe that LBCS is a guarantor of the

15   special purpose entity that issued the bonds and then there is

16   additionally a guaranty from LBHI.

17        THE COURT:  And do the bonds have recourse to any

18   other Lehman affiliate other than LBCS?

19        MR. HOROWITZ:  And on the guaranty to LBHI, no, my

20   understanding is they do not.

21        THE COURT:  There's an LBHI guaranty?

22        MR. HOROWITZ:  There is an LBHI guaranty.

23        THE COURT:  Okay.

24        MR. HOROWITZ:  And were there any other comments?

25        THE COURT:  No.  Thank you.

80

1          MR. HOROWITZ:  Thank you.

2          MR. MILLER:  Your Honor, please, Harvey Miller.  Your

3    Honor, this is a matter of case administration really.  Counsel

4    has conceded that this is not time sensitive.  And Your Honor

5    has to bear in mind that LBHI has 4,000 subsidiaries.  Your

6    Honor has to think in the context besides -- anybody could come

7    into this Court and say they're entitled to a investigation --

8    not an investigation, an examination under Bankruptcy Rule

9    2004.  And as Your Honor may recall, we did have a plethora of

10   motions made earlier in the case.  And it really gets down to a

11   question of bandwidths.  First, Your Honor, there is no

12   absolute right on the part of a creditor or any other party to

13   conduct Rule 2004 examinations.  And we constantly use the

14   terminology "discovery".  Discovery in what context, Your

15   Honor?  Unfortunately, I'm old enough to know the derivatives

16   from which 2004 comes from.  Its original form was Section

17   21(a) of the old Bankruptcy Act and the purpose of that section

18   Your Honor was because when a trustee was appointed to become

19   the fiduciary for an estate, generally, when the trustee got

20   there, there was nobody there.  There was nobody to talk to

21   about where are the assets, what happened to them.  So 21(a)

22   was a fishing expedition pursuant to which a trustee could get

23   a subpoena, get the form of principals of the debtor and

24   examine them as to what happened to these assets.  It was --

25   and, in fact, Your Honor, the transcript or the discovery as

81

1    you call it, coming out of the 21(a) or I think it was Rule

2    2014 or something under the old rules are not even admissible

3    in a proceeding except for the purposes of impeaching a

4    witness.  And the Rules of Evidence don't apply in a Rule 2004

5    examination.  It is a pure fishing expedition.  And what

6    counsel is talking about is trying to find enough facts to

7    support a cause of action on behalf of the bondholders.  That's

8    not what 2004 was intended to do.  It was intended to benefit

9    the estate in finding information that gave rise to perhaps

10   claims on behalf of the estate not on behalf of bondholders,

11   Your Honor.

12         And it's the record to the discretion of the Court.

13   Now we have an examiner.  We don't know who it is yet.  But we

14   will have an examiner.  And within the charter of this examiner

15   and discussed heavily this morning is whether assets and

16   properties which would improvidently transferred to Barclays.

17   That is the issue, Your Honor.

18         Now, in the context of what happened over the past

19   few weeks with respect to this request, it's again a question

20   of bandwidth, Your Honor.  Your Honor will remember the first

21   month of this case.  People were stretched all over the place.

22   And it is only recently that, as Mr. Marsal explained this

23   morning, that he has the 509 employees that can deal with all

24   of the problems.  But this was not on the very top priority

25   list, Your Honor.  And effort has been made to get the

82

1    information.  Most of the information, Your Honor, is not in

2    the control of the debtors.  It's in control of Barclays.  This

3    is a matter that's going to get from what I heard this morning

4    and what I hear from people, Your Honor, is going to get a lot

5    of attention.  What assets went over to Barclays?  Was it

6    consistent with the sale order or did assets improvidently get

7    granted?  And I would submit, Your Honor, that this can be

8    deferred until the examiner looks at it without increasing

9    further pressure on the debtor which is still stretched with

10   509 employees and still doing lots of things, Your Honor.  And

11   that's all I'm suggesting to Your Honor.  This is an

12   administrative matter and it shouldn't be used for a litigant

13   to get facts to support an action for the benefit of a specific

14   group of bondholders.  Thank you, Your Honor.

15          THE COURT:  Thank you.  Others wish to be heard?  A

16   lot of people are getting up.

17          MR. HUME:  Your Honor, very briefly.  Hamish Hume,

18   again, for Barclays.

19          We agree strongly with the points made by Mr. Miller.

20   And I would just reinforce the original purpose of the statute

21   is not to allow an individual bondholder to develop claims.

22   More to the point, it was not to allow an individual bondholder

23   to develop claims against someone other than the debtor,

24   against an outside party against Barclays which is what Mr.

25   Horowitz said was the principal focus of their discovery.

83

1        Your Honor, this morning you decided -- or earlier

2    this afternoon, that the examiner would look at this issue of

3    whether -- that Mr. Miller referred to in terms of assets of

4    non-debtors being transferred.  Given that you've already

5    indicated that an examiner will look at that, I think the issue

6    presented by Mr. Horowitz' motion is should everyone else get

7    to look at, too, in discovery?  Or is there something special

8    about the Bank of New York motion that says they should get to

9    look at it on their individual subsidiary, but no one else

10   should.  And I didn't hear an argument for why they should be

11   treated differently from other 2004 creditors' requests.

12        And so we would take exception to it and ask to

13   minimize the burden, Your Honor would take that into account.

14        THE COURT:  Okay, thank you.

15        MR. WILTENBURG:  Good afternoon, Your Honor.  David

16   Wiltenburg, Hughes Hubbard & Reed representing the SIPA

17   trustee.

18        Just briefly, we've objected to the relief sought on

19   the additional ground that a subpoena directed to Mr. Giddens

20   would not be well calculated to lead to useful information.

21        As the Court is aware, the trustee was not an

22   architect of the transaction that is the subject matter really

23   of this request.  And all of the LBI employees who were, in

24   fact, involved in that process are now not employees anymore of

25   the LBI estate but employees of Barclays.  So on that ground,

84

1    we've objected.

2         MR. TECCE:  Good afternoon, Your Honor.  James Tecce

3    of Quinn Emanuel on behalf of the creditors' committee.

4         Very briefly, Your Honor.  The committee agrees that

5    the facts and circumstances surround the seal transaction

6    warrant investigation.  And there's been discussion this

7    morning and this afternoon as to whether that investigation

8    would be subsumed by the examiner.  Whether the work plan

9    ultimately meets that out, that may or may not be the case.

10        But the reason why the creditors' committee filed a

11   limited objection that it did is because up until this point in

12   time the committee has been very focused on this issue of the

13   assets and the liabilities that were transferred to Barclays in

14   connection with the sale transaction.  The Court will recall it

15   was the last omnibus hearing where the committee had appeared

16   to pursue a limited objection to a settlement of a certain

17   portion of that transaction assets that were transferred.  And

18   the committee's position was that it was conducting an

19   investigation and didn't want any factual findings made in

20   connection with that settlement to somehow interfere with that

21   investigation.

22        And recognizing that investigation I think the Bank

23   of New York's trustee's position is that somehow the

24   committee's investigation of the sale transaction will not

25   serve its purposes because it will not focus on the LBCS

85

1    estate.  But the committee's investigation is not monopoly

2    focused on a single debtor or a single group of creditors.  It

3    seeks to examine any and all assets that were transferred to

4    Barclays in connection with the sale.  And any and all

5    liabilities that were assumed in connection with the sale.  And

6    it's motivated by a purpose and a concern that should be shared

7    by all creditors irrespective of the estate against which they

8    would assert a claim, which is insuring that the final

9    reconciliation and the final determination of that

10   investigation comports with the sale order and the contours of

11   that transaction as it was represented to the Court and to the

12   committee.

13        As a consequence to that, Your Honor, we would submit

14   that the committee has -- and once more, Your Honor, I just

15   note that the committee has expended time already looking into

16   this matter.  The Court may recall it's suggestion at the last

17   omnibus hearing was that the committee attempt to consensually

18   secure the information that it needed to conduct that

19   examination.  And adhering to that direction since the last

20   omnibus hearing, we have -- or at least the committee's

21   professionals have met with Barclay's professionals to try and

22   secure information that will aid in that investigation.  And

23   while we would like to reach an agreement with them, and

24   hopefully we will in the unfortunate universe where we don't

25   reach an agreement with them, we'll be poised to pursue that

86

1    information through other channels.

2           So as a consequence, Your Honor, it would be our

3    position that the committee is in place on this, should not be

4    displaced, and that lesser requests for discovery should be

5    channeled through the committee given its investigation of the

6    sales transaction.

7           And unless Your Honor has any other questions, that

8    concludes that my presentation.

9           THE COURT:  No, that's fine, thank you.

10          MR. TECCE:  Thank you.

11          THE COURT:  Anything more?  Mr. Horowitz, you're --

12          MR. HOROWITZ:  Just a couple of comments.  I just

13   realized that I hadn't addressed the SIPA trustee's issue when

14   I got up before, Your Honor.

15          If it is true that the reason that we included the

16   SIPA trustee was because we thought there was a possibility

17   that the relevant information would be with LBI.  That

18   possibility seems a little greater in light of the assertion

19   that LBI had a commodities business.  But if, as the SIPA

20   trustee asserts, the relevant information isn't with them, it

21   would presumably be very easy for them to simply respond by

22   saying that they don't have the information.  And we would not

23   have a problem with that.  In fact, we think that's consistent

24   with what our suspicion is to what the facts are.

25          I didn't hear anyone who got up here, Your Honor,

1    explain why it would be unduly burdensome to provide us with

2    the information relating to these issues at the same time that

3    its provided to either the committee and/or the examiner.

4           And, finally, Your Honor, I did not get up in

5    connection with the examiner motion.  First of all, I probably

6    didn't have standing to.

7           THE COURT:  You're right, you didn't have standing

8    to.

9           MR. HOROWITZ:  What's that?

10          THE COURT:  You're right; you did not have standing

11    to.

12          MR. HOROWITZ:  And I'm saying this entirely without

13    prejudice to the position that we very strongly take that we

14    should not be forced to defer to the examiner, but in the event

15    that Your Honor does conclude that we should defer to the

16    examiner, I would point out that then we've sort of unwillingly

17    become a party to the examiner process and we should be

18    included in the meet and confer and be allowed to have some

19    input into the way that that process works.

20          THE COURT:  Okay, I understand your position.

21          MR. HOROWITZ:  Thank you, Your Honor.

22          THE COURT:  We've been dealing with 2004 requests

23    since the second week of the case.  I can remember that on

24    either the Monday or the Tuesday following the week of the

25    teleconference with Mr. Miller and other parties-in-interest,

88

1    including dealing with the Harbinger 2004 requests.  And how to

2    deal with certain case management issues that were manifest

3    even in the second week of the case.

4         We've come a long way, but in certain respects we

5    haven't.  We're still dealing with 2004 requests.  And I think

6    that certain 2004 requests are to be distinguished from others.

7    In the SIPA case I wrote a very brief opinion granting the

8    motion for 2004 discovery brought by the DCP parties seeking

9    the discovery of certain targeted information that was clearly

10   relevant to the representation of that group, at least in my

11   opinion it was.

12        I mention it because I don't think there is one law

13   of the case determination that applies to 2004 discovery.  In

14   some respects it may be permissible based upon the needs of a

15   part for cause shown.  In some respects it's a source of

16   interference, and the proliferation of costs, delay and undue

17   expense.

18        This is a close question in my view.  The fact that

19   the committee has weighed in in opposition to their request,

20   the fact that the debtor has weighed in in opposition to their

21   request, in my view goes much more to orderly case

22   administration than it does to the entitlement to take the

23   discovery in the first instance.

24        When I first reviewed this contested matter, it was

25   my initial inclination to believe that the issues surrounding

89

1    the transfer of the commodities business to Barclays

2    represented a subject matter that might be profitably explored

3    privately, parochially, if you will, by counsel for the

4    indentured trustee.  I understand the reason why the indentured

5    trustee is pressing this; it's consistent certainly with the

6    fiduciary duty of that trustee.  But my thoughts on the matter

7    have changed as a result of today's hearing.

8         The principal reason for my change of perspective is

9    the extensive argument that took place in reference to the

10   motion for appointment of an examiner.  During the course of

11   that argument I made clear and others appeared to concur with

12   my state of mind on this subject, that multiple examinations of

13   the same subject matter represented a remarkably inefficient

14   cumbersome and potentially destructive use of attorney time.

15   We haven't even yet reached the subpoenas to be issued by Mr.

16   Giddens in support of his own independent examination.  And I'm

17   sure we'll address that before too long.

18        So in this setting in which I have been approaching

19   case management issues from the perspective of how can we best

20   deal with the needs of this case, which are in some respects

21   exceptional, I conclude that 2004 discovery of the type sought

22   by the indentured trustee in this instance does not need to be

23   pursued now.  Indeed, in colloquy with Mr. Horowitz, he

24   confirmed that the need for the information was actually in no

25   respect time sensitive.  As a result, what I'm going to do is

1    to deny the 2004 request without prejudice to its being

2    reasserted in the future in the even that the information

3    sought is not otherwise forthcoming by virtue of the work of

4    the creditors' committee or the work of the examiner.

5            Counsel for the committee has stated that the

6    committee is involved as an estate fiduciary in an examination

7    of the facts and circumstances surround the sale of debtors'

8    assets to Barclays.  That investigation would appear to subsume

9    many of the same issues that are the subject matter of the

10   pending 2004 request.

11           Additionally, the argument with respect to

12   appointment of the examiner made clear particularly since the

13   motion was first filed by the Walt Disney Company, that the

14   examiner will be looking into questions of whether or not

15   assets of non-debtor affiliates somehow made their way over to

16   Barclays at the beginning of the case under the authority of

17   the September 20 sale orders.

18           Under the circumstances, it seems to me that we have

19   one examiner and one creditors' committee that will be dealing

20   with the very same subject matter.  Admittedly, they will be

21   dealing with that subject matter not from the perspective of a

22   zealous advocate.  And no doubt Mr. Horowitz would be doing

23   this discovery as a zealous advocate.  But zealous advocacy is

24   not a requirement to obtain information.  I believe under the

25   circumstances that it makes good sense for the case as a whole

1   for particularized requests for information to be put to one

2   side and not to become the subject of ongoing contested matters

3   in this Court unless exception circumstances can be shown.  I

4   believe that no exceptional circumstances have been shown here.

5   But that does not mean that the indentured trustee is not

6   entitled to have questions answered in due course.  And I

7   expect that those questions will be answered at some point over

8   the next several months.

9        In the event that those questions remain outstanding,

10  counsel for the indentured trustee should feel completely free

11  in reasserting its 2004 request and nothing that I've said here

12  is intended to deprive the indentured trustee of the ability to

13  later attempt to assert that the circumstances, in fact, are

14  exceptional.  And that such particularized discovery is, as a

15  result, appropriate.

16       That's my ruling.

17       MR. HOROWITZ:  Your Honor, I ask if we could

18  participate in the examiner meet and confer.

19       THE COURT:  Well, see that's a subject which is no

20  longer before me.  My inclination to that is no.  And it's no

21  for several reasons.  First, as you pointed out in your own

22  comments a few minutes ago, you did not have standing to appear

23  and be heard with respect to the examiner motion because you

24  did not intervene in that proceeding.  Secondly, you are not

25  exceptional as it relates to the multitude of individuals who

92

1    have curiosity as to the process, or more to the point, a

2    desire to influence the process.  I believe this is a situation

3    in which fewer cooks will make a better broth.  So that

4    request, at least as it relates to me, is denied.  If anybody

5    is willing to give you access that's up to them.

6         MR. MILLER:  Yes, Your Honor.  Item 15 on the agenda

7    is the debtors' amended motion, Your Honor, to further extend

8    the time for the debtors to file schedules, statement of

9    financial affairs and related documents.

10        This is I think the third request, Your Honor.  There

11   have been 105 days which were previously extended.  The debtors

12   are asking for an additional sixty days, Your Honor.  In light

13   of everything that transpired today, I will not belabor the

14   issue that it is an enormous task to do the schedules, the

15   statement of affairs and the statement of executory contracts.

16        I would also say, Your Honor, that as Mr. Rivera

17   pointed out -- Mr. Velez pointed out rather, there is constant

18   communication with the Office of the United States Trustee as

19   to the filing of reports, information, etcetera.  In the

20   context of where we are, Your Honor, the debtors believe that

21   within sixty days they have a real opportunity to complete this

22   this time.

23        Thank you, Your Honor.

24        THE COURT:  Okay.

25        MR. DUNNE:   Your Honor, Dennis Dunne on behalf of

93

1          the Official Creditors' Committee, which is the OCC I think.

2                  We filed a position statement and we were urging some

3          disclosures earlier, as soon as appropriate, as part of that

4          statement.  But that pleading was part of a broader agenda.  I

5          mean, since the very early days of the case we have been urging

6          the debtors to file financial information publicly.  Our

7          constituents have been starved for that information.  The

8          debtors have shared that goal all along but it took a while to

9          assemble the date in a form that was appropriate to

10         disseminate.  But we all saw the fruits of that shared goal

11         today.  And that was, frankly, a larger objective for the

12         committee.  And this is a long way of me saying we withdraw our

13         response and support the debtors.

14                 THE COURT:  All right.  Mr. Sabin, this may make you

15         the lone objector unless you're prepared to withdraw your

16         objection now.

17                 MR. SABIN:  Your Honor, we had alternative relief

18         also requested as part of our objection.  And, obviously, I

19         think the filings today, which are made public by Mr. Marsal

20         and the report by Alvarez, go a long way.  In fact, borrowing

21         the term of this global case, perhaps it's a universal case.

22         As I recall that first step on the moon, "it was one giant leap

23         forward," and I think the filing today is one giant leap

24         forward in terms of information available for transparency in

25         this case.  So I do ask this Court to take Mr. Miller, and the

94

1    debtors, and Mr. Marsal at their word and hopefully say it is

2    one last time.  And by sixty days you will file your schedules.

3    Or, at least, monthly reports during this period.  Thank you,

4    Your Honor.

5         THE COURT:  Okay.  Thank you, Mr. Sabin.

6         It's not quite uncontested at this point.  But it

7    appears that it's largely consensual.  I'm going to grant the

8    extension with the knowledge that while it is debtors hope that

9    this is the last such extension, given the volume of

10   information which needs to be collected, comprehended and

11   reported, it's at least conceivable that we may have another

12   hearing at which somebody's asking for more time.  I think that

13   the themes present in both the committee response and the

14   Harbinger objection recognized that the task associated with

15   the assembly of information for the schedules and statement of

16   financial affairs in the instance of these jointly administered

17   cases, represent an absolutely enormous unprecedented

18   undertaking.  And that the volume of information to be sliced

19   and diced and reported probably goes beyond that that has ever

20   been the subject of schedules in any other case anywhere.

21        But it's also true that they are not only mandated as

22   a matter of law, but these documents represent an important

23   resource for creditors.  The report that was prepared and

24   delivered by Mr. Marsal this morning was, indeed, a giant step

25   forward in terms of transparency and providing information

95

1      concerning what the report, itself, describes as the "state of

2      the estate."  But it's not the functional equivalent of

3      schedules and a statement of financial affairs.  And Mr.

4      Marsal, by his own comments during the presentation this

5      morning, made clear that many of the numbers that are set forth

6      in this report are subject to adjustment.  Additionally, these

7      are very much top line type numbers as opposed to the kinds of

8      detailed disclosures that one would expect on a line-by-line

9      basis in the schedules and SOFA.

10             I'm granting the motion but I'm also going to make

11     what is not a direction as much as it is a strong case

12     management request.  I believe that the interest of

13     transparency will be substantially advanced if we don't have to

14     have another hearing such as this relating to further

15     extensions.

16             Additionally, and to state the obvious, at some point

17     as the saying goes, it gets old, it gets old to talk about how

18     big the case is.  It's one really big case and we all know it.

19     But if we're really going to mover forward on what I view as

20     the ambitious and aspirational schedule laid out by Mr. Marsal

21     this morning in terms of exiting bankruptcy, the sooner the

22     schedules and the statement of financial affairs are done and

23     filed and available for examination, the sooner we're going to

24     be in a position to determine whether or not that aspirational

25     goal for exiting bankruptcy is anything close to realistic.

96

1          And so the motion's granted with the general

2    commentary that I hope it is the last time that I have to grant

3    such an extension.

4          MR. MILLER:  Thank you, Your Honor.

5          MS. MARCUS:  Good afternoon, Your Honor.  Jacqueline

6    Marcus, Weil Gotshal & Manges for the Lehman estate.

7          Your Honor, the next matter on the agenda is number

8    16, which is the notice of presentment of stipulation and order

9    providing for Lehman Brothers Inc. to assume and assign

10   administrative agency agreements to LCPI.

11         In light of the hour, Your Honor, I'm not going to

12   give you the background unless you want it.

13         THE COURT:  I don't.

14         MS. MARCUS:  One objection filed.  And the party that

15   filed the objection, U.S. Bank, whose counsel was on the phone,

16   may still be on the phone, has authorized me to advise the

17   Court that they are withdrawing the objection provided that I

18   read a statement into the record.

19         THE COURT:  Before you read that statement into the

20   record, let me simply ask if counsel for U.S. Bank NA is still

21   on the line listening into these proceedings?

22         MR. TOP:  Your Honor, we are.

23         THE COURT:  And who are you?

24         MR. TOP:  My name is Frank Top from Chapman & Cutler

25   on behalf of U.S. Bank.

97

1    THE COURT:  Okay.  Apparently, you're going to be in

2    a position then to speak up if what Ms. Marcus says on the

3    record is anything other than what you've agreed.

4    Go ahead, Ms. Marcus.

5    MS. MARCUS:  Okay, Your Honor.  "The stipulation is

6    solely intended to assign the rights and obligations of LBI to

7    LCPI under the administrative agency agreements.  Nothing in

8    the stipulation shall affect or act as a waiver or forbearance

9    of the obligations of the parties, including without

10    limitation, LBI, LCPI or other Lehman affiliates under any

11    transaction documents relating to CDO transactions.  And

12    nothing in this stipulation shall affect or act as a waiver or

13    forbearance of the rights of any holders of interest in CDO

14    transactions."

15    Based on that that, Your Honor, the withdrawal of the

16    objection, the notice of presentment is, in affect, unopposed,

17    and we would request that the Court approve the stipulation and

18    actually enter it in both the LBI and LCPI cases.

19    THE COURT:  Is that acceptable to counsel for U.S.

20    Bank NA?

21    MR. TOP:  Your Honor, on behalf of U.S. Bank NA as

22    trustee, we concur with the debtors' presentation.

23    THE COURT:  Fine.  I will treat it now as an

24    unopposed stipulation and agreed order.  And I will enter it in

25    due course.

98

1        MS. MARCUS:  Thank you, Your Honor.

2        The next item on the agenda, number 17, is the

3    debtors' second motion for an order approving the assumption of

4    open trade confirmations.  This motion is virtually identical

5    to the first open trades motion.  It just refers to or deals

6    with some additional trades, I think there were about fifteen

7    originally that were filed later.

8        We have received two objections.  One by GE Corporate

9    Financial Services on behalf of Fusion Funding.  And one by

10   Hartford Investment Management Co.  The debtors have not been

11   able to resolve the disputes with those two parties yet, but

12   we're hopeful that we'll be able to do so.  Therefore, the

13   debtors request entry of an order approving the second open

14   trades motion as to those parties who have not objected and

15   adjourning the hearing with respect to the GE Fusion Trades and

16   the Hartford Trades to January 20th.

17       THE COURT:  Is there any objection to what's been

18   proposed?  I can't imagine that there would be because it only

19   applies today to those parties that don't object.

20       MS. MARCUS:  And there were only, I believe, three

21   trades that weren't objected to.

22       THE COURT:  That's fine.

23       MS. MARCUS:  And we'll submit an order at the

24   conclusion of the hearing.

25       THE COURT:  Please do.

99

1          MS. MARCUS:  Number 18, Your Honor, is the infamous

2     debtors' motion for an order assuming the assumption or

3     rejection of open trades.

4          This matter includes the remaining objections to the

5     first open trades motion which was filed on November 14th.

6     Since the last time we were here on December 22nd, the debtors

7     have entered into letter agreements provided for resolution of

8     their disputes with the following entities, MS International,

9     JPMorgan Chase, Tannenbaum Capital, Evergreen Investments,

10    Wachovia Bank NA, Bank of America NA, Putnam Investments, and

11    M&G Investment Management Ltd.

12         In addition, we have resolved disputes with three

13    additional parties through the withdrawal of objections or

14    portions of the motion.  And those are Fur Tree, which has

15    agreed to withdraw its objection.  Fur Tree's counsel was here

16    earlier but left.  Subject to the inclusion of some additional

17    language in the first open trades order, and I would like to

18    refer to the Court to what that language is going to be.  Fur

19    Tree is going to acquire at least one of the debt positions by

20    participation from LCPI.  They are prepared to do that and they

21    have requested that the order provide that any distributions

22    received by LCPI in respect of Fur Tree's piece of that debt be

23    deemed not property of the estate.  The debtors have taken the

24    position that that would not be property of the estate.  And I

25    believe that committee counsel concurs with that conclusion.

100

1        And, similarly, because some of these loans are

2    revolvers, Fur Tree would actually be advancing revolver draws

3    to LCPI which would then be sent to the respective borrower and

4    they'd ask for a determination that that doesn't constitute

5    property of the estate.  The debtors are fine with that and we

6    would like to submit an order to the Court later this afternoon

7    which includes that language.

8        The other two objections that have been resolved are

9    the debtors had requested some relief with respect to some open

10   trades having to do with H2.  The debtors have been persuaded

11   that those trades, perhaps, were not fully documented and the

12   debtor is prepared to withdraw its request with respect to the

13   H2 trades.  And has taken those trades off the motion.

14       And, finally, the third one P. Schoenfeld Asset

15   Management has agreed to withdraw its pending objection.  So

16   that one would be resolved as well.

17       I would like to list for the Court's benefit a number

18   of parties with whom we are still conducting negotiations.

19   We're hopeful that we'll be able to reach settlements with

20   many, perhaps not all of these parties.  And those are Deutsche

21   Bank, Citigroup Inc., Goldman Sachs, Whippoorwill Associates,

22   R3 Capital Management, AIB International Finance, Lloyds TSB

23   Bank, AXA Mezzanine II SA and it's affiliate, Avenue

24   Investments, and KKR Investments.

25       And the last two, Your Honor, are two remaining

101

1    objectors with whom the debtors have reached an impasse.  The

2    debtors believe, and I think the counterparties agree, that the

3    time for adjourning with respect to these two parties is past

4    and that we should move forward.

5           One of those is Blue Mountain.  And as to Blue

6    Mountain we're going to agree on a discovery schedule and ask

7    the Court to set a hearing for the trial on the merits.  And

8    the other is Field Point and the Field Point controversy is a

9    little further advanced.  We have already agreed on a discovery

10    schedule and I've been asked to request a hearing -- a date for

11    an evidentiary hearing with respect to Field Point.  And we

12    have certain dates in mind.  Field Point's counsel was here as

13    well, I think they have gone, but the gave me the dates.  So if

14    we can agree on one of those dates subject to the Court's

15    convenience, otherwise I'll have to go back to Field Point as

16    to a date.

17           THE COURT:  Let me just confirm.  Is anybody here on

18    behalf of Field Point?  Apparently not.  Is anybody here on

19    behalf of Blue Mountain?

20           MR. KIZEL:  Yes, Your Honor.

21           THE COURT:  First of all, I'd like to confirm.  And

22    this is just a yes or a no or a maybe.  Is it, in fact, true

23    that based upon where things stand with the debtors that you

24    are, in fact, at impasse as has been suggested?

25           MR. KIZEL:  Paul Kizel from Lowenstein Sandler on

102

1   behalf of Blue Mountain.

2         Your Honor, we have engaged in some negotiations with

3   the debtor.  We believe, as debtors' counsel stated, that there

4   is an impasse at this point.  And we believe the most

5   expeditious and truthful process is to set a discovery

6   schedule, set a trial date.  We're not saying that the

7   possibility of a settlement is nil, but at this point I think

8   the most expeditious way to resolve the matter is to set a

9   trial date and a discovery schedule.

10        THE COURT:  Okay.  From my perspective, although this

11  is a contested matter, what effectively is taking place is that

12  you are converting it into something akin to an adversary

13  proceeding in terms of its practice.  It would be helpful to me

14  for there to be something like a pre-hearing or pretrial order

15  crafted by the parties that lays out not only the discovery

16  schedule, but also lays out the possibility for dispositive

17  motion practice with respect to that discovery in the event

18  that one party or the other concludes, as a result of such

19  discovery, that this matter can be decided either on agreed

20  facts or as a matter of law.  I'd like you to do that.

21        Additionally, because this is but one of a multitude

22  of open trades items, I can't tell you that I, sitting here,

23  know the specifics of Blue Mountain Credit Alternatives Master

24  Fund LP's issues or why you have distinguished yourselves by

25  being among the few parties not to be able to work this out.

103

1   So it would be helpful to me to understand what the issues are.

2   I don't need to know that now.  As part of your submission,

3   which will be made in establishing a schedule, I would like

4   there to be some pretrial statement of the nature of the

5   factual and legal disputes as between the debtor and Blue

6   Mountain.  Only that way will I have a fair appreciation of why

7   this kind of effort is going into this one aspect of this

8   particular motion.  That's not to suggest for a moment that the

9   effort isn't appropriate, I just don't know what's going on at

10  the moment.  And given that we have still a full courtroom and

11  it's ten after four in the afternoon, I think that putting this

12  into some kind of orderly process makes sense.  Do you agree?

13       MR. KIZEL:  We agree, Your Honor.  And we'll work

14  cooperatively with debtors' counsel to do that.

15       THE COURT:  Fine.  The same will apply to Field

16  Point.

17       MR. KIZEL:  Thank you, Judge.

18       THE COURT:  Thank you.

19       MS. MARCUS:  Just as a point of clarification, Your

20  Honor, I assume that the Court doesn't want to set a date until

21  you hear from us with respect to a pretrial order?

22       THE COURT:  I don't want to set a date until I know

23  that the date makes sense.

24       MS. MARCUS:  Okay.

25       THE COURT:  And the parties are probably best

104

1    equipped to do that.  I think that you can work out, as

2    sophisticated counsel on both sides of the table, the terms of

3    a discovery schedule that makes sense, a time for submission of

4    written statements describing the legal and factual issues, and

5    a proposed time for either dispositive motions or trial.  I am

6    assuming, however, that when we're talking about trial time

7    we're going to push this into the non-omnibus hearing phase.

8    Or it will be at the end of an omnibus calendar.  Depending on

9    the amount of time that's involved, it seems to me that it may

10   be best to give this some time all by itself for purposes of an

11   evidentiary hearing.

12           MS. MARCUS:  That's fine with us, Your Honor.

13           THE COURT:  If it's going to be argued as a

14   dispositive motion, it can be on the omnibus calendar.

15           MS. MARCUS:  That's fine.  We had assumed based on

16   your prior statements that you didn't want it to be handled as

17   part of an omnibus hearing.  But either way is fine with us.

18           THE COURT:  If it involves the taking of evidence,

19   not part of the omnibus calendar.  If it involves simply legal

20   argument, the omnibus calendar works.

21           MS. MARCUS:  That's fine.  Thank you, Your Honor.

22           Number 19, Your Honor, is the continued hearing on

23   the debtors' motion to establish procedures for the settlement

24   or assumption and assignment of pre-petition derivatives

25   contracts.

105

1      The supplemental order on this motion, Your Honor,

2   was filed January 13th, which I think was yesterday.  It

3   doesn't change any of the substantive terms of the order that

4   was signed on December 16th.  But it provides that the December

5   16th order, in affect, applies to nine additional

6   counterparties with whom we have been able to agree that those

7   procedures are appropriate.

8      The one change in the order that we'll submit this

9   afternoon from the order that was filed yesterday, is that

10  there was one party, Toronto Dominion Bank, who, although we

11  think we'll reach agreement with, wasn't prepared as of last

12  night to give its blessings and, therefore, asked us to take

13  them off this order and presumably we'll deal with them next

14  time.

15      As to the remainder of that motion, Your Honor, I

16  think we should adjourn to the January 28th hearing.

17      THE COURT:  That's fine.  One question.  I think it's

18  right that we had Mr. Brozman in on the derivative contracts

19  matters in December.  And he was talking in terms of a major

20  evidentiary hearing today.  Whatever happened to that?

21      MS. MARCUS:  I have been told that Mr. Brozman's

22  clients are within this group of nine that are now on board.

23      THE COURT:  There you go.  Okay.

24      MS. MARCUS:  Thank you, Your Honor.  With respect to

25  the adversary proceedings, I think Mr. Lucas is going to take

106

1    over.

2              THE COURT:  Mr. May and Mr. Lucas.

3              MR. LUCAS:  Your Honor, John Lucas, Weil Gotshal.

4              Today, Your Honor, is the first pretrial conference

5    in Federal Home Loan Bank of Pittsburgh v. Lehman Brothers

6    Special Finance Inc.

7              THE COURT:  It's actually the second.  It was heard

8    in December and it was adjourned to today so that parties would

9    have sufficient time to talk about a rationale schedule.

10             MR. LUCAS:  And that's just what we've done, Your

11   Honor.  The parties have had their Rule 26(f) conference and

12   they've agreed that the discovery will be completed by 8/4.

13   And all dispositive motions will be done by Rule 56 and will be

14   completed by August 31s.  And that the parties suggest that the

15   next pretrial conference will be held on or about November 2nd,

16   subject to the Court's calendar and whatever the applicable

17   omnibus date is.  And that we will submit a stipulation

18   memorializing what I've just presented to the Court.

19             THE COURT:  It seems like a lot of time to me.  Why

20   is that much time needed?

21             MR. MAY:  Your Honor, Lawrence May of Cole Schotz

22   Meisel Forman & Leonard.  We're attorneys for Federal Home Loan

23   Bank.

24             We originally had a shorter discovery schedule but

25   then the parties --

107

1          THE COURT:  That's a better one.  A shorter one is a

2     better one.  This is not a good pattern.

3          MR. MAY:  Then the parties had some discussion with

4     respect to expert -- possible expert testimony and expert

5     reports.  And that's why we pushed out the discovery schedule.

6     But we're prepared if the Court believes that this discovery

7     should be done --

8          THE COURT:  I have no special insight as to the

9     problems you may be encountering in either lining up experts or

10    what the expert issues may be.  And it's not my practice to

11    interfere with the consensual scheduling of things by counsel

12    in adversary proceedings.  But I would simply note this is

13    January and November is a really long way off.  We're talking

14    about next Thanksgiving?

15         MR. MAY:  What we had discussed with both, counsel

16    for the debtor and counsel for JPMorgan, was a discovery cutoff

17    by August 4th, dispositive motions by August 31st, and a final

18    pretrial conference, should one be required, early November or

19    earlier depending upon what the Court's schedule was.

20         We wanted to push the final pretrial conference out

21    sufficiently beyond the dispositive motion date so that the

22    Court would have an opportunity if such motions were made to

23    review them in advance of that final pretrial.

24         THE COURT:  I hear you.  My immediate reaction to

25    this is this should be done over again.  And you should rethink

108

1    the dates.  I think that there's much too much time between the

2    commencement of the proceeding, it's been pending for a while

3    now and the proposed completion of discovery.  Absent some

4    reason to think that there are extraordinary facts, and I know

5    a little about this, because I heard the motion that was

6    pursued by Beverly Mann in respect of the modification of the

7    sale order a number of months ago.  This seems to be pretty

8    straightforward to me.  And I don't believe it is a good

9    practice for this much time to be allowed for discovery that as

10   far as I can tell, shouldn't be all that complicated.

11       So I'm not going to ask you to come back to do it,

12   I'm going to suggest to you that without arbitrarily imposing

13   deadlines, that I don't think the discovery schedule should be

14   longer than 120 days.  And that's really generous, I think it

15   should be ninety days really.  And if you need more than

16   ninety days for discovery okay, maybe an extra thirty.  But

17   August, that makes no sense to me.

18       MR. MAY:  All right.  That's fine, Your Honor.  We

19   can live with 120-day discovery schedules.

20       THE COURT:  Fine.  120 days, move everything back.

21   And I'm not counting the months, but that's February, March,

22   April, May.  I see no reason why you can't have a trial date

23   before the July 4th holiday.

24       MR. MAY:  Should we put any particular date in the

25   order, or should we contact chambers, or leave it --

109

1          THE COURT:  Maybe we'll make it July 3rd.

2          MR. MAY:  Okay.

3          THE COURT:  I'm teasing.  I think that this is

4    something which should be disposed of expeditiously.  And I

5    think that we should also establish a pattern.  Adversary

6    proceedings should move briskly.  There's absolutely no reason

7    to put in extra months of delay.  I'm working hard, you should,

8    too.

9          MR. MAY:  We have no problem with 120-days timeframe,

10   Your Honor.  I can't speak for the defendants, but from the

11   plaintiff's standpoint it's not an issue.

12         MR. LUCAS:  Your Honor, we will discuss with the

13   plaintiffs and we will submit a schedule that is responsive to

14   your request here today.

15         THE COURT:  Right.  We're going to have a pattern in

16   the adversary proceedings in this case of tight discovery,

17   tight deadlines, and limited extensions only for good cause

18   shown.

19         MR. KROLEWSKI:  Your Honor, Martin Krolewski from

20   Kelley Drye & Warren for JPMorgan Chase Bank NA.

21         We have no problem with that and fully support your

22   opinion and position on this case as well.

23         THE COURT:  Fine, thank you.

24         MR. LUCAS:  Your Honor, there was one other adversary

25   proceeding that was on the amended agenda.  However, during the

110

1   meeting the parties met and they determined that they're

2   actually very, very close to settlement.

3          THE COURT:  That's great.

4          MR. LUCAS:  They would like to move it off in hopes

5   of finalizing the settlement.

6          THE COURT:  This is the one that's being adjourned to

7   2/11?

8          MR. LUCAS:  Correct.

9          THE COURT:  Fine.

10          MR. LUCAS:  I'm sorry, Your Honor.  Just to be clear,

11   this is Solar v. Lehman Brothers Special Finance Inc., case

12   number 08-1638.

13          THE COURT:  That's the one that involves three

14   million dollars?

15          MR. LUCAS:  Your Honor, I don't have the facts right

16   here at my fingertips.

17          MS. WOLFE:  Amy Wolfe on behalf of JPMorgan Case.

18   That's correct.

19          THE COURT:  It does involve three million dollars,

20   okay.  Thank you.

21          MR. KOBAK:  Good afternoon, again, Your Honor.  James

22   Kobak, Hughes Hubbard & Reed for the SIPA trustee.

23          If we could go out of order and take the -- we've got

24   a couple of uncontested matters basically that should be very

25   brief.  But if we could go out of order and hear the subpoena

111

1    motion, I think that would be our preference if it's all right

2    with Your Honor.

3           THE COURT:  I think that's consistent with what Mr.

4    Miller did this morning.  That's fine.

5           MR. KOBAK:  Okay.  Well, that's a good precedent,

6    Your Honor.

7           Your Honor, I'll try to make this as brief as

8    possible.  I think there are a few misconceptions about our

9    investigation and about what we're asking for.  The statute

10   says that the trustee shall conduct an investigation.  And I

11   don't think anyone any longer is contesting the right and

12   necessity that we do that.  The reason that we're here today is

13   really solely to get authority to issue subpoenas in aid of

14   that investigation.  A lot of the other parties have referred

15   to it as a 2004 examination, but in a real sense it really

16   isn't that.  It's really the section of SIPA that governs the

17   scope of the investigation and what's involved and so forth.

18          I also want to make clear that the statute does talk

19   about an investigation.  And an investigation I think

20   presupposes a certain degree of confidentiality and discretion

21   and so forth by the party conducting the investigation.  And

22   that's very important to us in our experience in other SIPA

23   liquidations, it's been very important.

24          We ask for subpoena authority.  My personal belief is

25   that we will actually exercise that, need to exercise it rather

112

1    sparingly.  Because in our experience, we've often been able to

2    talk to people informally, get their documents and so forth.

3    But, frankly, in order to do that, it's often helpful to say if

4    you don't cooperate we'll be issuing a subpoena tomorrow.  And

5    I think that will be the pattern in a lot of instances in this

6    case.

7            I want to say at the outset, we think this is an

8    independent investigation.  We think it's independent in a

9    sense of the examiner's investigation -- examination, just as

10   our proceeding is independent, in a sense, of the Chapter 11.

11           THE COURT:  Let me break in and ask you a question,

12   though, because this is an important issue for the case as a

13   whole.

14           Are you suggesting, and I realize you aren't quite

15   done, but are you suggesting that the independent investigation

16   to be undertaken by the SIPA trustee is one that in any way is

17   inconsistent with cooperative efforts to avoid unnecessary

18   duplication of effort with the examiner?

19           MR. KOBAK:  I was just going to get to that, Your

20   Honor.

21           First of all, we're strongly in favor of

22   participating in the meet and confer that Your Honor has

23   directed take place in the examination when the examiner is

24   appointed.  And we think that will be very valuable.  We've

25   said many times in our papers and many of the parties and

1    others-in-interest have asked us what our intentions are, and

2    we've said all along that we intend to cooperate.

3           Frankly, there are issues that are of some relevance

4    to us but might be of somewhat peripheral or background

5    relevance to us that we expect the examiner will take the

6    laboring oar on.  And we're quite content to have the examiner

7    or other parties do that.  We may need to participate to some

8    limited extent.  We may need access to some of the information

9    that's developed and so forth.  But I see no need to duplicate

10   efforts.

11          On the other hand, I think there are some issues that

12   are of particular concern to us that really ought to be within

13   our bail of wick at least as the main party conducting the

14   investigation.  And I can give you a couple of examples.

15          One of the purposes of our report is to report to

16   SIPC and other regulatory authorities about matters that,

17   frankly, are pertinent to future liquidations of this kind if

18   there should be some.  And Ms. Leventhal from the fed and Mr.

19   Caputo from SIPC are both hear today, and I think are prepared

20   to speak about that a little bit.  But I can certainly see that

21   there are some issues with respect to the sale to Barclays and

22   so forth that could be of great concern where there are things

23   that need to be investigated further, which have to do with is

24   this a good way if a situation like this ever arises again, to

25   do a transaction like this.  Is this a good way to transfer

114

```
1     accounts to customers?  Are there problems with the way the

2     clearing agencies worked and so forth?  So those are issues

3     that are of great significance to us.  I'm not sure, frankly,

4     that they're really of a lot of concern, except in a very

5     marginal kind of curiosity sense, to the creditors in the

6     LBH/Triad case.

7          There are other issues that I think are of great

8     concern to us that are also of some concern to creditors in the

9     LBH/Triad case.  An example of that would be the sale of the

10    subsidiaries to LBHILE which several parties alluded to earlier

11    today.  They obviously have an interest in that.  We, the

12    trustee, has an interest in that.  I don't think that our

13    interest is necessarily parallel to theirs.  So what I would

14    envision happening, assuming good faith on all sides, and I

15    think there would be, is that when an issue like that needs to

16    be investigated we would sit down with the examiner, whoever,

17    and decide who's going to do that.  It might be that in that

18    case there would be a -- say Mr. X was going to be deposed with

19    respect to those matters, perhaps there would be some matters

20    in which the examiner or some other party would take the lead

21    and there would be some other areas that would be ours to deal

22    with.

23          And then if you get to a broader question, what were

24    the causes of the failure of Lehman Brothers and so forth to

25    the extent it involves the entire enterprise, I'm not sure that
```

115

1    we need to take the lead on that.  It seems to me that's

2    something the examiner or some other party can take the lead

3    on.  If there are little aspects of that are particularly

4    relevant to what happened to brokerage assets that would be an

5    issue for us.  So that's basically the way we see this

6    operating.  And we're very happy to coordinate.  I mean, we --

7    as Mr. Miller has said, I think with respect to his proceeding,

8    there's much more than enough on everybody's plate.  And if we

9    can take some of the load off the examiner we're happy to do

10   that.  If they can take some of the load off of us we're happy

11   to have them do that, and coordinate.

12          One thing that does concern us is the desire of

13   Harbinger and certain of the other parties to participate in

14   this process.  And we really don't think there's any precedence

15   for that in a SIPA liquidation.  We really don't think that's

16   consistent with the nature of the proceeding that we're talking

17   about, which is really an investigatory proceeding, not a

18   public examination.  And as I've said, there may be some

19   depositions.  But I think to the large extent, things will be

20   done in a voluntary cooperative way.

21          Now, having said that, we're certainly happy to

22   report to people and, indeed, we have duties to report on what

23   our investigation uncovers, what kinds of causes of action

24   there are and so forth.  We do intend, to the extent there are

25   notices of deposition, to file them, to file an affidavit of

116

1    service.  So that will give interested parties and the targets

2    the opportunity to come to Court if there's a need to come to

3    Court for some special relief.  And we're happy to talk to

4    people.  But beyond that, we don't think it's necessary or

5    appropriate that anyone else have a right to participate.  And

6    we do intend, and we will do a very comprehensive report at the

7    end of the day.

8            THE COURT:  Is it your contemplation that the only

9    disclosure that would be publicly available concerning your

10   investigation would be the filing of these deposition notices

11   within the docket of the case?  Or would there be any other

12   means by which interested parties, like Harbinger, for example,

13   or the DCP parties, who also filed some papers on this?  But

14   they're just examples of parties-in-interest to -- are anxious

15   to gain some visibility as to what you're up to.  Is there any

16   other way to keep parties advised so that they don't

17   necessarily have to be in the room when a deposition is being

18   taken, that they can get some sense as to how things are going?

19           MR. KOBAK:  We will certainly be happy to talk to

20   parties like that.  I would anticipate that the Harbinger

21   parties, for instance, the DCP parties, might call us up and

22   ask us what we're doing to the extent that it was consistent

23   with our not tipping our hands to some adversary or something,

24   I think we'd be happy to tell them that.  If they had questions

25   they thought we should ask, things we should be aware of I'm

117

1    sure we would be grateful for that information and would try to

2    use it in any examination that we conducted.  And we certainly

3    wouldn't get -- be adverse to getting back to them on

4    particular issues.  I don't want to lock myself into a

5    schedule, it may well be that periodically we would report to

6    the Court or put on our website things that indicate what we

7    had been looking into and any tentative conclusions that we had

8    reached and so forth.

9          I certainly think we'll try to be as transparent as

10   possible, but it does have to be consistent with keeping this

11   investigation an investigation and not letting targets

12   necessarily and others know what it is exactly that we're

13   doing.

14         I do think that there are a lot of parties -- we've

15   already talked to parties who we probably will be part of the

16   investigation who have very legitimate concerns about

17   confidentiality.  So having third parties involved in the

18   process I think would just impeded the efficiency of an

19   investigation and make them much less cooperative than they

20   might otherwise be.  So all of that I think has to be taken

21   into account.

22         THE COURT:  Do you have any sense as to the time

23   horizon associated with the completion of the investigation and

24   the preparation of the report?

25         MR. KOBAK:  I don't have a definite time horizon.

118

1   The statute says as soon as practicable, I think.  In fact, I

2   think it says that repeatedly.  So we feel that we are under a

3   real mandate to get started quickly and to conclude as quickly

4   as possible.  But I really find it hard to give you an estimate

5   because a lot depends on how cooperative people are and so

6   forth.  It's possible, and, again, I don't want to commit to

7   this.  I think we've done this in other cases that we might

8   issue and interim report on certain issues even though there

9   may be other issues that are still under investigation.  I

10  think it's quite likely that we might do that.

11          THE COURT:  There's an aspect of this -- this just

12  occurs to me as we're having this conversation, and I don't

13  want to in any way by these comments impede the ability of Mr.

14  Giddens to fulfill his mandate.  But it occurs to me from your

15  comments, that there are parts of what you are undertaking to

16  do that are completely independent of what an examiner would

17  do.  And there are parts of what you're undertaking to do that

18  are cooperative and harmonious with what an examiner would do.

19          MR. KOBAK:  Yes.

20          THE COURT:  For example, issues that relate to

21  overall systemic risk probably are of less concern to the

22  examiner or the examiner may want to deal with that, at least,

23  generically, than they would be to SIPC and to the New York Fed

24  which stepped in with some late filed papers in your support on

25  this issue.  So here's what I'm wondering, does it make any

119

1      sense for you to stage this investigation so that your

2      resources are dedicated principally to things that the examiner

3      would be doing on a front-loaded basis, so that you can do it

4      cooperatively?  And without in anyway slowing down or deferring

5      the other aspects of the project, to view the aspects of that

6      project as being separate and dependent, and perhaps,

7      severable?

8              MR. KOBAK:  I'm not sure they're completely

9      severable, but probably to a large extent they are, yes.  In

10     fact, that frankly, is probably what we were intending to do.

11     I mean, we want to reconcile accounts as they would have been

12     on September 19th.  We want to start investigating potential

13     causes of action and so forth.  Now, we have causes of action

14     that are different than LBHI's or creditors, but certainly a

15     lot of the same facts would be relevant to that.  Certainly we

16     would do that first.  And as I say, we're very happy to

17     cooperate with the examiner.  We do not want to duplicate

18     this -- duplicate efforts.  I anticipate that if we're all

19     subpoenaing or calling on the same witnesses and the same

20     entities time after time, the likelihood that any of them will

21     cooperate to a reasonable degree decreases.  So I think it's in

22     all our benefit to do this cooperatively and that is what we

23     intend to do.

24              I do want to note that we have been in contact, as

25     the U.S. Attorney said earlier, with her.  And we have adopted

120

1    language.  The language of our order is really quite similar to

2    that entered in the Madoff case.  In fact, it's to some extent

3    modeled on what we've submitted.

4         And, basically, that ends my presentation unless Your

5    Honor has further questions.

6         THE COURT:  I have one question.  I don't know if

7    this came up before Judge Lifland in the context of the Madoff

8    order.  But I did note that the Madoff order and the proposed

9    form of order for Mr. Giddens has some fairly tight timeframes

10   built into the order for compliance.

11        MR. KOBAK:  Yes.

12        THE COURT:  I noticed ten days and fifteen days.

13        MR. KOBAK:  Yes.

14        THE COURT:  But I didn't notice flexibility built

15   into the order for modifying the response time.  How is this

16   going to work in practice?

17        MR. KOBAK:  We'll be flexible.  We've already talked

18   to a couple of parties about notifying them in advance of the

19   time that we would actually serve the subpoena and starting to

20   talk to them about a reasonable timeframe.  You know, if we

21   serve an extensive document request on a major clearing bank,

22   for instance, it's obviously going to take them more than ten

23   days to get the documents together and there are going to be

24   issues to work out.  And we're perfectly prepared to do that.

25   I think what are order actually says is the documents can be

1    made available on a rolling basis.  Again, it doesn't have to

2    be within ten days.  We do anticipate that there may be some

3    people that are uncooperative or where there is a very urgent

4    need for information.  I don't think those occasions will be

5    frequent, but we did want to have a fairly tight timetable for

6    those circumstances.  But we're quite prepared to be flexible.

7    And as I've said, I really think that more often than not we're

8    going to be able to do things cooperatively to a large extent

9    without having actually to resort to taking somebody's

10   deposition.  But I think having the ability and threat to do it

11   is obviously crucial to us.

12           THE COURT:  Okay, fine.  Is there anyone else now who

13   wishes to comment or be heard in connection --

14           MR. KOBAK:  I think Mr. Caputo wishes to be heard.

15           THE COURT:  I'd be delighted to hear from Mr. Caputo.

16           MR. CAPUTO:  Thank you, Your Honor.

17           I think the starting point for examination of this

18   issue, Your Honor, and there are really two -- we rise in

19   support of the trustee's motion.  There are really two

20   categories of objections, it's coordination and participation,

21   as I see it.

22           And I think the starting point is to recognize the

23   difference for where the trustee gains his powers to

24   investigate from that of any other investigator in this related

25   proceedings of LBI or LBHI or the other cases.  And that is --

122

1    as the Court has recognize, a SIPA proceeding is for all

2    intents and purposes a bankruptcy court proceeding, Chapters 1,

3    3, 5, and subchapters 1 and 2 of Chapter 7 apply in a SIPA

4    case.  But the authorities granted to an examiner are in

5    Chapter 11 and those that may be from the committee stem from a

6    different section of the code than any applicable under SIPA.

7    These are all Bankruptcy Code provisions.  SIPA is enacted

8    under Title 15, completely different basis.  It's a remedial

9    statute designed to affect a different purpose than a Chapter

10   11 proceeding.  And designed to aid in the fair and orderly

11   markets.  And to provide enhanced fiscal responsibility rules.

12        So the basis for which the trustee is performing his

13   investigation is really entirely different.  And the result of

14   the investigation, therefore, goes down a little bit different

15   path.  Neither the trustee nor SIPC have any problem with

16   attempting to coordinate the trustee's investigation with any

17   other investigatory activity whatsoever.  Whether it is by the

18   examiner to be appointed or actions undertaken by the committee

19   or the U.S. Attorney's Office.

20        We have a long history of cooperation, especially in

21   the Southern District of New York, Your Honor, of working with

22   various agencies to investigate and to examine the acts and

23   conduct that lead to the demise of securities broker dealers,

24   and to prosecute any wrongdoing.  Indeed, this cooperation is

25   viewed by SIPC as an essential component of our program and

123

1     it's mandate to enhance those financial reporting rules and

2     investor protection.  But that cooperation has to be managed

3     and balanced with other enumerated goals of the Securities

4     Investor Protection Act.

5            For example, SIPA requires in no fewer than seven

6     separate times in the statute, that the trustee carry out his

7     duties and liquidate the debtor promptly.  And it's that

8     promptness that provides the focus for teeing up this

9     investigation and getting going as quickly as possible.  Under

10    78, triple F, sub (a), the purpose of a liquidation proceeding,

11    for example, it begins with the introductory clause "as

12    promptly as possible."  Under triple F-2 the special provisions

13    of a liquidation proceeding, the statute requires that the

14    claims treatment must being promptly after the appointment of a

15    trustee.  And that any party, and that includes the parties

16    here today who are objecting to the trustee's motion, any party

17    that seeks to establish its claim against the estate may do so

18    by formal proof or otherwise, Harbinger, DCP parties, etcetera.

19    But -- and I quote from the statute "without limiting the

20    powers and duties of the trustee to discharge obligations

21    promptly as specified."  These obligations include the

22    trustee's investigation, which the statute mandates

23    specifically must be conducted as Mr. Kobak stated, and I quote

24    "as soon as practicable."  Courts have supported this mandate,

25    this goal.

124

1          For example, Government Securities Corp. case in the

2     Southern District of Florida.  Various parties sought a stay of

3     the trustee's action in that case because there were other

4     pending investigations.  In that case Judge Crystal held "that

5     the trustee has a significant interest in pursuing this action

6     as quickly as possible.  The failure of the debtor necessitated

7     the appointment of a trustee to review and where appropriate

8     satisfy thousands of claims.  We must be able as quickly as

9     possible to determine what assets are at his disposal and to

10    satisfy those claims.  He has a right to marshal assets.  Any

11    delay should be avoided."  And more importantly, the Court

12    concluded with "the public interest warrants prompt disposition

13    of this case.  The existence of SIPA and SIPC indicates a clear

14    intention by Congress that broker liquidations should be

15    accomplished as swiftly as possible.  Members of the investing

16    public who look for SIPC membership and a broker need the

17    assurance that a business failure by a SIPC member will be

18    remedied expeditiously in all its phases.  And all its phases

19    include the trustee's investigation."

20          In this case involving LBI, the Court should deny any

21    requests by the parties, such as the committee, to delay the

22    trustee's investigation.  And in keeping with the Court's

23    stated desire earlier in regard to the examiner motion that was

24    pending, should encourage the trustee to proceed forthwith.

25          As the Court has also stated, Your Honor, there's a

125

1    cost factor here as well.  You know, as the entity that must

2    pay the administrative costs of the LBI case should it become

3    necessary, SIPC is keenly aware of the cost and expense factor

4    in this case.  And we will be diligently attempting to limit,

5    if not avoid, any duplicative practices or efforts and any

6    unnecessary extension of projects or any other efforts that

7    encompass matters that are not clearly designed to comply with

8    SIPA and its clear mandate.  So we believe the Court should

9    deny the objections that seek to require the trustee to delay

10   his investigation.  And we will attempt to coordinate the

11   trustee's efforts where ever possible and practicable with all

12   of the other parties.  Promptness is the most important factor,

13   we think, dealing with the cooperation issue.

14        The cost factor I think also provides one basis for

15   denying the request by Harbinger and the DCP parties.  They

16   should be able to participate without limitation in the

17   trustee's investigatory efforts.  More parties, more costs.  Or

18   as the Court -- paraphrasing the Court more cooks in the

19   kitchen more expense brew.

20        There are other bases --

21        THE COURT:  That's a mixed metaphor if I ever heard

22   one.

23        MR. CAPUTO:  Indeed.  There are other bases to deny

24   it.  As I stated earlier there's a strong public interest in

25   SIPC's work and SIPA's goals to enhance the financially

126

1    responsibility rules.  That public interest must include

2    maintaining the integrity of the trustee's investigation free

3    from interference from third parties who's interest as

4    creditors of the estate is necessarily limited to their claim

5    and free from disclosure of information to parties where that

6    disclosure would have a chilling effect on person willing to

7    provide confidential information.

8            The trustee's mandate is to consider matters, many of

9    which will become public in his reports to the Court.  But may

10   of which may not.  For example, the trustee may make references

11   to prosecutors under Title 18 of the U.S. Code.  That is

12   something that has happened in numerous SIPA cases in the

13   Southern District of New York.  Or he may have discovery from

14   confidential sources to assist in developing various causes of

15   action.  This likely component of the trustee's investigation

16   which has been long recognized as essential in cases of McCray

17   v. Illinois, Supreme Court.  Novak v. Kovack, Second Circuit.

18   Vital to societies arsenal of defense, we believe that this

19   component should not be compromised by permitting unlimited

20   access to the process to third parties with only limited

21   interest.  Courts have recognized the strong public interest in

22   maintaining the integrity of the process of that affective

23   regulatory activity, which in this case entails the trustee's

24   investigation.  In once case Ross v. Bolton in the Southern

25   District of New York it recognized that courts have wide

127

1    discretion in supervising discovery efforts, especially in the

2    context of securities industry cases involving quasi

3    governmental entities, or in that case, non-governmental

4    entities, such as the NESD.  Paraphrasing and borrowing from

5    that court's decision we submit, Your Honor, the strong public

6    interest would clearly be undermined by permitting any of the

7    thousands of potential creditors in LBI to be intertwined with

8    the trustee's investigatory process and his statutorily

9    governed work.

10          Specifically in that case, Your Honor, the district

11   court held and I quote "the public interest in maintaining

12   certain functions and relationships has been a primary factor

13   in limiting discovery."  That concept has been applied in the

14   context of a SIPA case by the bankruptcy court in the Southern

15   District of New York in Adler Coleman Clearing Corp.  In that

16   case a party sought to compel the NESD to reveal information

17   through discovery proceedings, but the court denied the motion.

18   And the court held "that the investigatory privilege that's

19   created by the trustee's powers is a qualified common law

20   privilege protecting civil as well as criminal law enforcement

21   activity.  The privilege has been extended to quasi

22   governmental and non-governmental entities.  Premature

23   disclosure of factual information to the target of a pending

24   investigation could impair that investigation and thereby

25   defeat the important public interest in maintaining the

128

1     integrity of effective industry self-regulation."  The Court

2     here should similarly limit access by creditors and other

3     parties to the investigation.

4              Finally, Your Honor, SIPA specifically contemplates

5     that the process of a trustee's investigation would not be open

6     to creditor or public participation.  But that the product --

7     the process would not, the product would be part of the public

8     domain through the trustee's report to this Court.  The statute

9     provides that the trustee shall, as soon as practicable,

10    investigate the debtor.  It does not provide that the trustee

11    and creditors shall or that the trustee and other interested

12    parties shall.

13             And investigation, as Mr. Kobak stated, by its very

14    nature, has a confidential nature to it.  And it's efficacy I

15    believe would be compromised if it were to be open to third

16    party participation without limitation.

17             Thank you, Your Honor.

18             THE COURT:  I understand your argument and it was

19    effective and impassioned where appropriate.  But I have a

20    question for you.

21             MR. CAPUTO:  Sure.

22             THE COURT:  The statue clearly talks about the

23    trustee being the party who is empowered to conduct the

24    investigation.  But it doesn't state that it has to occur in

25    the dark.  So my question is this, is there any precedent of

129

1     which you are aware that stands for the proposition which you

2     have asserted that the discovery that's being conducted in aid

3     of the investigation needs to occur without creditor knowledge?

4            MR. CAPUTO:  No.  And no one has challenged this

5     particular aspect of the statute.  So there's -- you know, it's

6     a scare case law and that's why I allude to cases that are

7     similar but not on point.  There are no cases on point.  And

8     this case, of course, provides such a unique perspective, it's

9     different than anything that has ever gone on before.  So in

10    that regard, we don't intend to keep all parties in the dark

11    forever about some process and then have some star chamber

12    report that comes out of it to the Court and it's all of a

13    sudden finally provided to the public five years hence.

14           THE COURT:  I think that's what's going on here,

15    though, I think that part of the motivation, and I can't speak

16    to anybody's motivations, I'm only making an inference, in the

17    Harbinger position paper and the papers filed by the DPC

18    parties.  Is there anybody from Hennigan Bennett on the phone,

19    by the way?

20           MR. MORSE:  Yes, Your Honor.  Joshua Morse from

21    Hennigan Bennett on behalf of --

22           THE COURT:  You better turn up the volume on your

23    phone, it's pretty hard to hear you.  But I believe that those

24    papers are to some extent motivated by not so much the desire

25    to get in the way as to get information.  And perhaps not to

130

1    have to wait till the end of the process to find the fruits of

2    the investigation.  Is there any precedent for interim sharing

3    of information?

4            MR. CAPUTO:  Not in the context of a trustee's

5    investigation.  No precedent in case law.  But that being said,

6    we concur with the representation made by Mr. Kobak, that we

7    will be open to communication with many parties, including

8    Harbinger and the DCP parties and others with whom we have

9    already been in contact with many times, to elicit their

10   concerns, their questions.  But have them participate at

11   various levels.  What we are most concerned about -- and SIPA

12   contemplates this in another context, which is that all of the

13   documents that are elicited and created during the course of a

14   liquidation proceeding are -- SIPA provides for this in section

15   KKK, it says that the reports are public essentially.  All this

16   information is open to the public except where SIPC and the

17   commission have deemed that it's not in the public interest.

18   Well, the trustee's investigation is going to contain

19   necessarily some sensitive information.  And information that

20   has already been asked for by the house finance committee.  For

21   example, testifying last week, SIPC was already called before

22   the committee to testify on matters related to Lehman and

23   Madoff.  There is a host of information that we provide to the

24   commission on a confidential basis.  So there may be a fair

25   amount of sensitive information that really won't ever see the

131

1   light -- the public light until it's massaged and edited

2   sufficiently to make it into a public report that is

3   recommended.

4          But that being said, there's a tremendous amount of

5   information and a tremendous amount of duplicity I think to be

6   covered by those items that the examiner covers, that the U.S.

7   Attorney covers, etcetera, that we intend to coordinate with,

8   share information.  Again, as a cost factor, it's certainly not

9   duplicate anything.  And hopefully get the cooperation coming

10  back to us from those parties to give us questions to ask for

11  having Barclays, for example, which may be the key holder to

12  much of the information on their system.  To get them to open

13  up that -- to use that key and open up the system so that we

14  can gain access to it readily.  Thanks.

15         THE COURT:  Okay.  Before hearing from any objectors,

16  to the extent that the New York Fed wishes to be heard, this is

17  the time for that.  Are you going to rest on your papers?

18         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.  Given the

19  hour and the amount of statements that have been made, we

20  concur with much of what Mr. Caputo says to the importance of

21  the trustee's investigation.

22         THE COURT:  Fine.  I'll hear from the objectors.

23         MS. RUTKOWSKY:  Good afternoon, Your Honor.  Rheba

24  Rutkowski, Bingham McCutchen on behalf of the Harbinger funds.

25         We really aren't an objector, we joined the trustee's

132

1    motion because we support that investigation and the scope as

2    defined in the trustee's motion.  We believe those areas need

3    to be investigated, they're the areas we're interested in,

4    wholly apart from LBI's role with respect to customer accounts.

5    There's the issue of LBI as the pay master conduit as LBI has

6    been described in the cash management system that was in place

7    pre-petition.  So LBI has a central role.  We're all for

8    promptness, we're all for getting on the stick right now and

9    jumping on this investigation.  So we fully support the

10    trustee's motion.

11            THE COURT:  There's a but coming.

12            MS. RUTKOWSKY:  The only reason -- I'll put it this

13    way, Your Honor.  I feel that your inferences about what we

14    were trying to say in our motion, I won't speak for DCP, but

15    certainly for Harbinger, that's absolutely right.  We're

16    seeking information.  I've heard everything that transpired in

17    Court today.  I've heard what Mr. Kobak had to say about

18    willingness to work, perhaps to provide interim reports.  I

19    heard Your Honor's suggestions about whether that kind of thing

20    might be possible.  Mr. Sabin earlier suggested that perhaps in

21    the course of the examiner's work there could be monthly

22    reports or some such thing as certain areas are resolved.

23    Reports can come out so that information is provided to

24    creditors.  And that's basically all we're seeking here.  We're

25    not interested in getting a status report in the sense of

133

1   here's what we're working on this week.

2        THE COURT:  You're not interested in showing up in

3   the deposition room and asking five questions?

4        MS. RUTKOWSKY:  Well, if the Court wants to allow us

5   to do that, fine.  But certainly --

6        THE COURT:  No, I don't want you to do that.

7        MS. RUTKOWSKY:  I didn't think you did, Your Honor.

8   And certainly that was not our intention to gum up the works or

9   impede the course of the investigation.  We're just trying to

10  find a way to get access to information of some kind as it

11  becomes available to parties-in-interest and creditors.  And I

12  think the Court's suggestion about interim reports -- and I

13  think it was Mr. Kobak who might have suggested toward the end

14  of his presentation that as certain issues are resolved those

15  facts may come to light and become public or disseminated to

16  creditors and parties-in-interest somehow.  And so with that, I

17  will just leave it.  We hope that something will be in place

18  that will allow for that kind of interim reporting.  And that's

19  all we're looking for here, Your Honor.

20       THE COURT:  Okay.  I hear you.  Is there anything

21  from the DCP parties?

22       MR. MORSE:  Yes, Your Honor.  Joshua Morse for the

23  DCP parties again.  Today we've heard a lot of discussion about

24  transparency as well as the reduction of duplication of

25  efforts.  That's really the key to our objection.  We're not

1    attempting to materially burden the trustee or increase the

2    costs of the investigation whatsoever.  We simply believe that

3    increased transparency to parties such as us who have an

4    interest in the case should be increased.  Although we did ask

5    not only for access to documents that were produced to the

6    trustee, and an opportunity to participate in examinations of

7    witnesses.  Our primary focus is essentially the access to the

8    documents so as to avoid duplicative discovery down the road.

9         We assume that Hughes Hubbard is sophisticated enough

10   of a law firm that it does plan to maintain all the documents

11   attained through the discovery process electronically.  As

12   we've been privy to in other cases in this district, technology

13   exists to efficiently and cost effectively provide access to

14   third parties to virtual data rooms that contain information

15   that has been received during discovery and things that such a

16   mechanism can be implement in this case.

17        The trustee has not provided a good enough reason why

18   that cannot occur.  Having a single repository of relevant

19   information will actually, we think, reduce costs to the future

20   discovery request that may be target of the trustee and

21   minimizes, again, duplicative and time consuming efforts on our

22   part.

23        To the extent that any of those matters or

24   information are confidential I assume that we will be able to

25   work out various restrictions to the access of that

135

1    confidential information.

2         Other than that, Your Honor, we simply request that

3    the motion, if granted, be conditioned upon reasonable

4    allowance for access by the parties or any other third parties

5    who do have an interest.

6         THE COURT:  I hear what you're saying and I don't

7    want to reopen the argument along the lines that you have just

8    taken it candidly.  Because I think that nothing in the motion

9    deals with such things as electronic data access.  Nothing in

10   the motion deals with a repository for the benefit of creditors

11   of the LBI estate.  And nothing in the motion is geared to

12   facilitate any discovery that the DCP parties, or any other

13   party for that matter, might wish to take more efficiently as a

14   result of the investigation which is being conducted by the

15   SIPA trustee.  So while I have heard what you've said, and

16   while it doesn't sound unreasonable as you say it, I think it's

17   completely unreasonable in the context of the motion that's

18   pending.

19        To the extent that you are seeking conditions with

20   respect to the trustee's request for the right to have subpoena

21   powers to conduct its own investigation, I think your position

22   goes far beyond reasonable.  This is going to be a clean

23   unconditional order.  The trustee will get the very same power

24   that was granted to the SIPA trustee in the Madoff case.  He's

25   entitled to it.  He has a statutory mandate to fulfill and he's

136

1    entitled to do that.  My comments that were made during the

2    course of the argument were not entitled to convert this into

3    an opportunity for any individual creditor to dip into the work

4    product of the SIPA trustee and gain what amounts to access to

5    the work papers of the investigation.  You've gone well beyond

6    what I consider reasonable and appropriate in the argument you

7    just made and I reject it.

8            The motion's granted.

9            MR. MILLER:  There are a couple of uncontested

10   matters I believe.

11           UNIDENTIFIED ATTORNEY:  Your Honor, may I be excused?

12           THE COURT:  Yes.  If anybody -- it's now 5:00, if

13   anybody wants to be excused before hearing the uncontested

14   agenda on the SIPC proceedings this is the time when you may

15   feel free to leave.  I also have a matter listed at 5:00.

16           MR. WILTENBURG:  Your Honor, we can do this quite

17   quickly.

18           THE COURT:  I'm not trying to rush you along, I'm

19   just mentioning there's going to be some likely traffic, both

20   going in and out of the room while you're talking.

21           MR. WILTENBURG:  Your Honor, once again, David

22   Wiltenburg, Hughes Hubbard & Reed on behalf of the SIPA

23   trustee.

24           There is, in fact, only one uncontested matter that

25   we need to talk about briefly as the others were talked about

137

1    in the context of the LBHI docket.  And that is item 22, which

2    is the trustee's motion for an order pursuant to Section

3    365(d)(4) of the Bankruptcy Code extending the time to assume

4    or reject unexpired leases of non-residential real property.

5            Your Honor, no formal objections were received to

6    that motion, but we did receive an inquiry from one of the

7    affected landlords.  And that involves premises located at 555

8    California Street in San Francisco.  And for the purposes of

9    allowing that discussion to proceed and potentially reach a

10   resolution of it, we have submitted a proposed order that

11   carves out that particular lease.  That is the lease for the

12   premises at 555 California Street in San Francisco.  And Your

13   Honor will see in the blackline version of the revised order

14   that that -- the matter with respect to that property is

15   referred to the omnibus on January 28th.  And in the interim

16   the trustee's time to assume or reject is extended.  And we'll

17   be in a position to hand that order up at the end of the

18   hearing today.

19           THE COURT:  I think this is the end of the hearing.

20           MR. WILTENBURG:  In all other respects, the order is

21   unopposed and we would ask that it be granted.

22           THE COURT:  It's granted.  Is there anything more?

23           MR. MILLER:  That's it for the holdings case, Your

24   Honor.

25           THE COURT:  And that's it for the SIPC case.

138

1          MR. KOBAK:  Yes, Your Honor, that's it.

2          THE COURT:  Then we are at the end of the hearing.

3     Although, I  have something at 5:00 I don't know if there are

4     people in the room for that hearing or not, I'm going to take a

5     fifteen-minute recess.  We're adjourned.

6          (Whereupon these proceedings were concluded at 5:04 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

139

I N D E X


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of the Walt Disney Company for appointment of an examiner granted | 55 | 10 |
| Debtors' application to employ Ernst & Young LLP granted | 57 | 9 |
| Debtors' motion for an extension of time to assume or reject unexpired leases of nonresidential real property granted | 57 | 14 |
| Debtors' motion requesting an extension of the exclusive periods for the filing of the Chapter 11 plan and solicitation of acceptances granted | 57 | 19 |
| Debtors' motion to extend the time within which the debtors must comply with Section 345(b) of the Bankruptcy Code granted | 58 | 1 |

```
                                                                    140
 1

 2                         I N D E X,  cont'd

 3

 4                         R U L I N G S

 5    DESCRIPTION                                  PAGE    LINE

 6    Debtors' motion to assume a subscription      58      23

 7    agreement and certain other agreements with

 8    Wilton Re Holdings Limited granted

 9

10    Motion by Superior Pipeline for relief from   59      23

11    the automatic stay to prosecute an

12    adversary proceeding against Lehman

13    Commercial Paper Inc - stipulation entered

14    into and approved

15

16    Motion for relief from the automatic stay     61      12

17    by Corus Bank, N.A. approved

18

19    Debtors' motions requesting joint             61      20

20    administration of Chapter 11 cases granted

21

22    Motion of the Bank of New York Mellon Trust   90       1

23    Company directing examination of, and production

24    of, documents by LBHI denied

25
```

141

1

2                              I N D E X,  cont'd

3

4                              R U L I N G S

5    DESCRIPTION                                    PAGE      LINE

6    Debtors' amended motion to further extend the    96         1

7    time for the debtors to file schedules, statement

8    of financial affairs and related documents granted

9

10   Notice of presentment of stipulation and order    97        24

11   providing for Lehman Brothers Inc. to assume and

12   assign administrative agency agreements to LCPI

13   granted

14

15   Debtors' second motion for an order approving the   98      22

16   assumption of open trade confirmations granted as

17   to the non-objected trades

18

19   Trustee's motion for an order pursuant to         137        22

20   Section 365(d)(4) of the Bankruptcy Code

21   extending the time to assume or reject

22   unexpired leases of non-residential real

23   property granted

24

25

142

1

2                    C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  January 15, 2009

16

17

18

19

20

21

22

23

24

25