# Exhibit A



**PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**

---

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

### TRANSACTION SUMMARY

| | |
|---|---|
| **Trade Date:** | **July 30, 2008** |
| **Agreement Date:** | **February 19, 2009** |
| **Seller:** | **Lehman Commercial Paper Inc.** |
| **Buyer:** | **(i) Levine Leichtman Capital Partners Deep Value Fund, L.P., solely with respect to $2,379,977.08 of the Loans and a 3.105846771% interest in the Note** |
| | **(ii) LLCP DV Plastech Foreign, LLC, solely with respect to $248,802.61 of the Loans and a .324684968% interest in the Note** |
| | **(iii) LLCP DV Plastech B, LLC, a Delaware limited liability company, solely with respect to the Class B Units** |
| | **(iv) LLCP DV Plastech C, LLC, a Delaware limited liability company, solely with respect to the Class C Units** |
| **Credit Agreement:** | **(i) First Lien Term Loan Credit and Guaranty Agreement, dated as of February 12, 2007 among Plastech Engineered Products, Inc., as Borrower, certain Subsidiaries of Borrower, as Guarantors, the Lenders from time to time party thereto, and Goldman Sachs Credit Partners L.P., as Syndication Agent, as Administrative Agent and as Collateral Agent.** |
| | **(ii) Limited Liability Company Agreement of JCIM, LLC, dated as of July 1, 2008, among Johnson Controls U.L.C., Johnson Controls Nova Scotia U.L.C., Johnson Controls, Inc., and the entities set forth on Exhibit A-1 thereto (the "LLC Agreement"); and** |
| | **(iii) Company Second Lien Note (as defined in the LLC Agreement).** |
| **Borrower:** | **Plastech Engineered Products, Inc.** |
| **Purchase Amount and Tranche:** | **(i) $2,628,779.69 of Term Loans**<br>**(ii) 73,356 Class B Units** |

Copyright © LSTA 2006. All rights reserved.

| TRANSACTION SUMMARY | |
|---|---|
| | (iii) 90,345 Class C Units |
| | (iv) 3.430532% interest in the Note. |
| **CUSIP Number(s), if available:** | N/A |
| **Pre-Settlement Date Accruals Treatment:** | ☐ Settled Without Accrued Interest<br>☒ Trades Flat |
| **Type of Assignment:** | ☒ Original Assignment, with respect to the Note and the Units.<br>☒ Secondary Assignment, with respect to the Loans. |
| **Immediate Prior Seller (if any):** | Solely with respect to the Loans, each of Avery Point CLO, Limited, Castle Hill I - Ingots, Ltd., Chatham Light II CLO, Limited, Chatham Light III CLO, Limited, Katonah III, Ltd., Katonah IV, Ltd., LOAN FUNDING XI LLC for itself or as agent for Corporate Funding XI, Race Point II CLO, Ltd., Race Point III CLO, Race Point IV CLO, Limited, Sankaty High Yield Partners II, L.P., Sankaty High Yield Partners III, L.P., Long Lane Master Trust IV, Harbour Town Funding LLC, Veer Cash Flow CLO, Ltd., Orix Finance Corp.<br><br>Solely with respect to the portion of the Note and a portion of the Units, Veer Cash Flow CLO, Ltd. with respect to a .3783039% interest in the Note, 8,090 Class B Units and 9,963 Class C Units and Orix Finance Corp. with respect a 1.509434% interest in the Note, 32,277 Class B Units and 39,752 Class C Units. |
| **Borrower in Bankruptcy:** | Yes ☒        No ☐ |
| **Delivery of Credit Documents:** | Yes ☐        No ☒ |
| **Netting Arrangements:** | Yes ☐        No ☒ |
| **Flip Representations:** | Yes ☐[1]        No ☒ |
| **Step-Up Provisions:** | Yes ☐[1]        No ☒ |
| | Shift Date[2]:    N/A |
| **Transfer Notice:** | Yes ☐[3]        No ☒ |

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

la-996072

## A.  **DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"<u>Agent</u>" means Goldman Sachs Credit Partners L.P., as Administrative Agent, pursuant to the Credit Agreement.

"<u>Assignment</u>" means, collectively:  (i) the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments from Seller to Buyer (the "Loan Assignment"), (ii) the Assignment Agreement from Veer Cash Flow CLO, Ltd. ("Veer") to LLCP DV Plastech B, LLC with respect to 8,090 Class B Units (the "First Veer Assignment"), (iii) the Assignment Agreement from Veer to LLCP DV Plastech C, LLC with respect to 9,963 Class C Units (the "Second Veer Assignment" and, together with the First Veer Assignment, the "Veer Assignments"),  (iv) the Assignment Agreement from Orix Funds Corp. ("Orix") to LLCP DV Plastech B, LLC with respect to 32,277 Class B Units (the "First Orix Assignment"), (v) the Assignment Agreement from Orix Funds Corp. to LLCP DV Plastech C, LLC with respect to 39,752 Class C Units (the "Second Orix Assignment" and, together with the First Orix Assignment, the "Orix Assignments"), (vi) the Assignment Agreement from Lehman Brothers Inc. ("LBI") to LLCP DV Plastech B, LLC with respect to 32,989 Class B Units (the "First LBI Assignment"), and (vii) the Assignment Agreement from Lehman Brothers Inc. to LLCP DV Plastech C, LLC with respect to 40,630 Class C Units (the "Second LBI Assignment" and, together with the First LBI Assignment, the "LBI Assignments"), in each case, together with any Required Consents to such assignment.

"<u>Bankruptcy Case</u>" select one:
- ☐ none.
- ☒ means the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re Plastech Engineered Products, Inc. et al., No. 08-42417-(PJS), Jointly Administered.

"<u>Bankruptcy Court</u>" select one:
- ☐ none.
- ☒ means the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (and, if appropriate, the United States District Court for that District).

"<u>Bar Date</u>" select one:
- ☐ not applicable.
- ☐ none has been set.
- ☒ means June 30, 2008.

"<u>Buyer Purchase Price</u>" select one:
- ☒ not applicable.
- ☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
- ☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"<u>Commitments</u>" select one:
    ☒ none.

"<u>Covered Prior Seller</u>" select one:
    ☒ not applicable.
    ☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"<u>Filing Date</u>" select one:
    ☐ none.
    ☒ means February 1, 2008.

"<u>Loans</u>" means Term Loans in the outstanding principal amount of $2,628,779.69

"<u>Netting Letter</u>" select one:
    ☒ not applicable.
    ☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"<u>Original Buyer</u>" select one:
    ☒ not applicable.
    ☐ means [specify original buyer in the netting arrangement].

"<u>Penultimate Buyer</u>" select one:
    ☒ not applicable.
    ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
    ☐ means [_____].

"<u>Required Consents</u>" means (i) notice to the Borrower and the Agent with respect to the Loans and (ii) acceptance and recordation by JCIM, LLC with respect to each Assignment Agreement.

"<u>Seller Purchase Price</u>" select one:
    ☒ not applicable.
    ☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"<u>Transfer Fee</u>" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"<u>Unfunded Commitments</u>" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

---

[4] If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, <u>e.g.</u>, "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5] Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6] The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

**B.**    **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (<u>Title</u>) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (<u>Proceedings</u>) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (<u>Principal Amount</u>) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (<u>Future Funding</u>) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (<u>Acts and Omissions</u>) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (<u>Performance of Obligations</u>) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (<u>Setoff</u>) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(i) |
| Section 4.1(t) (<u>Consents and Waivers</u>) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (<u>Other Documents</u>) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (<u>Proof of Claim</u>) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (<u>Purchase Price</u>); <u>Netting Arrangements</u>.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

    "(k) [intentionally omitted]."[7]

Section 4.1(r) (<u>Predecessor Transfer Agreements</u>).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (<u>Other Documents</u>).
    ☒ None.

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

la-996072

☐ The following: _____.

Section 4.1(v) (Proof of Claim).
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.[8]
        ☐ Seller or a Prior Seller.
    ☒ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

## C.    SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)

C.1    Section 5.1(n) (Buyer Status).

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate [substitute Credit Agreement defined term if different] (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

C.2    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

## D.    SECTION 6 (INDEMNIFICATION)

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

## E.    SECTION 7 (COSTS AND EXPENSES)

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

---

[8] Please "X" the proper box(es).

**F.**     **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

**F.1**     Section 8.2 (<u>Distributions</u>); <u>Step-Up Distributions Covenant</u>.

(i)     If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

(ii)     If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

**F.2**     Section 8.4 (<u>Wire Instructions</u>).

<u>Buyer's Wire Instructions</u>:

Bank Name: Citibank, N.A.
ABA #       322271724
Account Name: Levine Leichtman Capital Partners Deep Value Fund, L.P.
Account Number: 202225074


<u>Seller's Wire Instructions</u>:

Bank:  Citibank NYC
ABA Number:  021-000-089
Account Number:  30434133
A/C:  LCPI Bank Loans
Reference:  Plastech

**G.**     **SECTION 9 (NOTICES)**

<u>Seller's Address for Notices and Delivery</u>:

**Operations Contact**
**(For Notices on Borrowings, Paydowns, Interest & Fees)**

Tina Chen
1271 6th Ave., 35th Floor
New York, NY  10020
Telephone:  646.333.8873
E-mail: tina.chen@lehman.com


**Credit Contact**
**(For Credit, Legal & Financial Documents)**

Randall Braunfeld
Lehman Commercial Paper Inc.
1271 6th Ave., 35th Floor
New York, NY  10020
Telephone:  646.333.9878
E-mail:  randall.braunfeld@lehman.com

7

Buyer's Address for Notices and Delivery:

Levine Leichtman Capital Partners Deep Value Fund, L.P.
335 N. Maple Drive, Suite 240
Beverly Hills, CA 90210

Operations Contact:
Primary Contact:
Mila Laparan
mlaparan@llcp.com
Phone: 310-275-5335, Ext. 308
Fax: 310-275-1305

Secondary Contact:
Stephen Hogan
shogan@llcp.com
Phone: 310-275-5335, Ext. 226
Fax: 310-246-0620

Credit Contact:
Primary Contact:
Brian Stewart
bstewart@llcp.com
Phone: 310-275-5335
Fax: 310-275-1305


H.     **SECTION 26 (FURTHER PROVISIONS)**

The following additional provisions, including any modifications to existing provisions, shall apply:

1.     Seller and Buyer agree that the definition of Transferred Rights contained in Section 1 of the Standard Terms is hereby amended by amending and restating clause (j) in its entirety and inserting new clauses (k) through (o) to read in their entirety as follows:

"(j)     all proceeds under the Veer Purchase Agreement (as defined on Annex 1), which reflected a purchase amount of $736,605.64, whereas the correct purchase amount was $293,866.69 including proceeds paid prior to the Trade Date except for the cash principal payment of $255,875.52 made on or about July 1, 2008 and specifically including 8,090 Class B Units and 9,963 Class C Units which Units are being assigned directly from Veer Cash Flow CLO, Ltd. to the applicable Buyer;

(k)     all proceeds under the Orix Purchase Agreement (as defined on Annex 1), which reflected a purchase amount of $2,939,056.49, whereas the correct purchase amount was $1,172,528.30, including proceeds paid prior to the Trade Date, except for the cash principal payment of $1,020,943.50 made on or about July 1, 2008, and specifically including 32,277 Class B Units and 39,752 Class C Units which Units are being assigned directly from Orix Funds Corp. to the applicable Buyer;

(l)     32,989 Class B Units and 40,630 Class C Units which are being assigned by Lehman Brothers Inc. to the applicable Buyer;

(m)     a 3.430532% interest in the Note;

(n)     without duplication of items specifically referred to in clauses (j) through (m) above, 3.430532% of any and all distributions and/or proceeds payable under each of (i) that certain Asset Purchase Agreement, dated as of June 19, 2008, among JCIM, LLC, as buyer, Plastech

8

Engineered Products, Inc., as Parent, LDM Technologies, Inc., MBS Polymet, Inc., Plastech Exterior Systems, Inc., Plastech Frenchtown, Inc., Plastech Romulus, Inc., LDM Holding Mexico, Inc., Plastech Decorating Systems, Inc. and LDM Holding Canada, Inc., as sellers and Goldman Sachs Credit Partners, L.P., solely in its capacity as collateral agent for the first lien term lender parties, and (ii) that certain Asset Purchase Agreement, entered into as of June 2008, among Plastech Engineered Products, Inc., as Parent, LDM Technologies, Inc., Plastech Decorating Systems, Inc. and Plastech Exterior Systems, Inc., as sellers, Goldman Sachs Credit Partners, L.P., solely in its capacity as collateral agent for the first lien term lender parties and Decoma International of America, Inc., as purchaser; and

(o)     all proceeds of the foregoing."

2.      Seller and Buyer agree that the following definitions shall be added in alphabetical order to Section 1 of the Standard Terms as follows:

"Assignment Agreement" means the form specified by the JCIM, LLC for an assignment of Units.

"Note" means that certain second lien Promissory Note, dated as of July 1, 2008 issued by JCIM, LLC with an aggregate principal amount of $10,000,000.00.

"Units" means, collectively, 73,356 Class B Units (as such term is defined in Section 1.8(b) of the LLC Agreement) and 90,345 Class C Units (as such term is defined in Section 1.8(c) of the LLC Agreement), together with any additional Units as described in clause (o) of the definition of "Transferred Rights."

3,      Seller and Buyer agree that Section 3 of the Standard Terms is hereby deleted in its entirety and replaced with the following:

3.1     Buyer's obligations to acquire the Transferred Rights and to assume the Assumed Obligations shall be subject to the conditions that (a) Seller's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 4.1), (b) Seller shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date, (c) Buyer shall have received (i) the Transaction Specific Terms duly executed on behalf of Seller, (ii) the Purchase Price Letter duly executed on behalf of Seller, and (iii) (A) the Veer Assignments duly completed and executed on behalf of Veer, (B) the Orix Assignment duly completed and executed on behalf of Orix and (C) the Loan Assignment duly completed and executed on behalf of Seller and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents, and (d) Buyer shall have received the Purchase Price from Seller.

3.2     Seller's obligation to sell, transfer, assign, grant, and convey the Transferred Rights to Buyer shall be subject to the conditions that (a) Buyer's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 5.1), (b) Buyer shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date, (c) Seller shall have received (i) the Transaction Specific Terms duly executed on behalf of Buyer, (ii) the Purchase Price Letter duly executed on behalf of Buyer, and (iii) (A) the Veer Assignments duly completed and executed on behalf of Veer and Buyer, (B) the Orix Assignment duly completed and executed on behalf of Orix and Buyer and (C) the Loan Assignment duly completed and executed on behalf of Buyer and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents.

la-996072

3.3     Seller shall use all reasonable commercial efforts to deliver to Buyer the LBI Assignments duly completed and executed on behalf of LBI and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents as soon as reasonably practicable and in any event on or before June 15, 2009.

4.     Seller and Buyer agree that Section 4.1(d) of the Standard Terms is hereby deleted in its entirety and replaced with the following:

Seller is the sole legal and beneficial owner of and has good title to each of the Note, the Loans, the Commitments (if any) and the other Transferred Rights, free and clear of any Encumbrance. Seller is the sole beneficial owner of the Units described in clause (l) of the definition of "Transferred Rights." The Units described in clause (j) of the definition of "Transferred Rights" constitute proceeds of the Veer Purchase Agreement, and Seller is the sole beneficial owner of such Units. The Units described in clause (k) of the definition of "Transferred Rights" constitute proceeds of the Orix Purchase Agreement, and Seller is the sole beneficial owner of such Units.

5.     Seller and Buyer agree that Section 4.(h) of the Standard Terms is hereby deleted in its entirety and replaced with the following:

Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller's holding any funds or property of, or owing amounts or property to, Borrower or any Obligor), that will result in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans, commitments or units of the same tranche, class or type as the Loans, Commitments, Note and Units.

la-996072

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

**LEHMAN COMMERCIAL PAPER INC.**

By: _____

Name:

Title:                    TINA CHEN
                         AUTHORIZED SIGNATORY

**BUYER**

**LEVINE LEICHTMAN CAPITAL PARTNERS DEEP VALUE FUND, L.P.**

By: _____

Name:

Title:

**LLCP DV PLASTECH FOREIGN, LLC**

By: _____

Name:

Title:

**LLCP DV PLASTECH B, LLC**

By: _____

Name:

Title:

**LLCP DV PLASTECH C, LLC**

By: _____

Name:

Title:

11

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

**SELLER**

**LEHMAN COMMERCIAL PAPER INC.**

By:_____
    Name:
    Title:

**BUYER**

**LEVINE LEICHTMAN CAPITAL PARTNERS DEEP VALUE FUND, L.P.**

By: _____
    Name: Stephen Hogan
    Title:

**LLCP DV PLASTECH FOREIGN, LLC**

By: _____
    Name: Stephen Hogan
    Title:

**LLCP DV PLASTECH B, LLC**

By: _____
    Name: Stephen Hogan
    Title:

**LLCP DV PLASTECH C, LLC**

By: _____
    Name: Stephen Hogan
    Title:

11

la-996072

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.    If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

With respect to $72,516.83 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Avery Point CLO, Limited, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $97,358.25 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Castle Hill I - Ingots, Ltd., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $79,040.93 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Chatham Light II CLO, Limited, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $82,804.70 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Chatham Light III CLO, Limited, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $60,430.50 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Katonah III, Ltd., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $37,324.84 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Katonah IV, Ltd., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $75,276.99 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between LOAN FUNDING XI LLC for itself or as agent for Corporate Funding XI, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $78,204.44 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Race Point II CLO, Ltd., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $90,332.40 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Race Point III CLO, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $60,221.60 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Race Point IV CLO, Limited, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

la-996072

With respect to $215,007.27 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Sankaty High Yield Partners II, L.P., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $141,406.01 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Sankaty High Yield Partners III, L.P., as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

With respect to $36,470.08 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Long Lane Master Trust IV, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

> Assignment and Assumption Agreement, dated as of February 21, 2007, by and among Goldman Sachs Credit Partners, as assignor, Long Lane Master Trust IV, as assignee, and the Agent.

With respect to $55,831.35 principal amount of Term Loans, that certain Purchase and Sale Agreement, dated as of March 10, 2008, by and between Harbour Town Funding LLC, as seller, Seller, as buyer, and the related Assignment and Assumption Agreement.

> Assignment and Assumption Agreement, dated as of February 21, 2007, by and among Goldman Sachs Credit Partners, as assignor, Harbour Town Funding LLC, as assignee, and the Agent.

With respect to $289,890.44 principal amount of Term Loans, that certain Purchase and Sale Agreement dated as of July 15, 2008 (the "Veer Purchase Agreement") by and between Veer Cash Flow CLO, Ltd., and Seller, as buyer and the related Assignment and Assumption Agreement.

> Assignment and Assumption Agreement, dated as of June 1, 2007, by and among Goldman Sachs Credit Partners L.P., as assignor, Veer Cash Flow CLO, Ltd. (f/k/a Veer Loan Opportunities Fund, Limited), as assignee, and the agent.

With respect to $1,156,663.06 principal amount of Term Loans, that certain Purchase and Sale Agreement dated as of July 15, 2008 (the "Orix Purchase Agreement") by and between Orix Finance Corp. ("Orix"), and Seller, as buyer and the related Assignment and Assumption Agreement.

> Assignment and Assumption, dated as of February 15, 2007, by and among Goldman Sachs Credit Partners, L.P., as assignor, Orix, as assignee, and the Agent.

2.    List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

   None.

3.    Description of Proof of Claim (if any).[2]

   Obligations under the Credit Agreement were scheduled claims by the Borrower and were not listed as contingent, unliquidated or disputed.  The scheduled amount is not disputed as to amount, classification or identity of debtor.  Accordingly no Proof of Claim was required.

---

[2]  May apply only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

4.    Description of Adequate Protection Order (if any).[2]

None.

5.    List any exceptions to Section 4.1(w) (<u>Notice of Impairment</u>).

None.

6.    The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.



**PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES**

---

**LSTA STANDARD TERMS AND CONDITIONS**

**Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006**

The following are the LSTA Standard Terms and Conditions for Purchase and Sale published by the LSTA as of December 1, 2006, which shall govern the Transaction described in the Transaction Specific Terms.

**1.    Definitions**

1.1    General.  Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the relevant Transaction Specific Terms, and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the provisions of the Standard Terms, the Transaction Specific Terms shall govern and control.

1.2    In this Agreement:

**"Adequate Protection Order"** means any order of the Bankruptcy Court authorizing or ordering Borrower or any Obligor to make adequate protection payments to the Lenders, including any adequate protection order specifically identified in the Annex.

**"Adequate Protection Payments"** means, with respect to the Transferred Rights, amounts (other than PIK Interest) authorized and/or ordered to be paid by the Bankruptcy Court (if any) as adequate protection for the loans and obligations owed under the Credit Agreement pursuant to an Adequate Protection Order that accrue during the period before (but excluding) the earlier of (a) the Settlement Date and (b) T+20.

**"Affiliate"** means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

**"Agent Expenses"** means any costs, liabilities, losses, claims, damages, and expenses incurred by, and any indemnification claims of, the Agent, for which the Agent has recourse under the Credit Documents and that are attributable or allocable to the Transferred Rights.

**"Agreement"** means this Purchase and Sale Agreement between Seller and Buyer dated as of the Agreement Date governing the Transaction, such Agreement consisting of the Standard Terms as modified and supplemented by the Transaction Specific Terms.

**"Agreement Date"** means the date specified as such in the Transaction Summary.

**"Annex"** means the document attached to the Transaction Specific Terms captioned "Annex to Purchase and Sale Agreement."

1



**"Assumed Obligations"** means all obligations and liabilities of Seller with respect to, or in connection with, the Transferred Rights resulting from facts, events or circumstances arising or occurring on or after the Settlement Date; excluding, however, the Retained Obligations.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

**"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure and any corresponding or other local rules of the Bankruptcy Court.

**"Bar Date"** means the last date fixed by the Bankruptcy Court (if any) pursuant to the Bankruptcy Code or the Bankruptcy Rules on which proofs of claim or interest may be filed in the Bankruptcy Case with respect to the Transferred Rights, as specified in Section A of the Transaction Specific Terms.

**"Benefit Plan"** means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code or any Entity whose assets include (for purposes of U.S. Department of Labor Regulations Section 2510.3-101 or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

**"Borrower"** means, collectively, the Entity or Entities specified as such in the Transaction Summary and such other borrower(s) as may be identified in the Credit Agreement.

**"Buyer"** means the Entity specified as such in the Transaction Summary.

**"Business Day"** means any day that is not (a) a Saturday, (b) a Sunday, (c) any other day on which the Federal Reserve Bank of New York is closed[1] or (d) only with respect to the determination of T+20, any other day on which the New York Stock Exchange is closed.

**"Buyer Excluded Information"** has the meaning specified in Section 5.1(h).

**"Buyer Indemnitees"** has the meaning specified in Section 6.1.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

**"Collateral"** means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to (or otherwise created) or for the benefit of the Lenders under the Credit Documents.

**"Credit Agreement"** means the agreement specified as such in the Transaction Summary (including all intercreditor agreements, subordination agreements, waivers and amendments entered into pursuant thereto or in connection therewith).

**"Credit Documents"** means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

and all other agreements, documents or instruments executed and delivered in connection therewith.

**"Distribution"** means any payment or other distribution, whether received by setoff or otherwise, of cash (including interest), notes, securities, or other property (including Collateral) or proceeds under or in respect of the Transferred Rights; excluding, however, any Retained Interest Distribution.

**"Encumbrance"** means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement other than as specified in the Credit Documents; (d) prior sale, transfer, assignment or participation by Seller of the Transferred Rights, the Loans or the Commitments (if any) other than pursuant to the Predecessor Transfer Agreements (if any) specified in the Annex; or (e) agreement or arrangement to create or effect any of the foregoing.

**"Entity"** means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it.

**"Federal Funds Rate"** means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Parties from three federal funds brokers of recognized standing selected by the Parties.  For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

**"Governmental Authority"** means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

**"Guaranty"** means a guaranty of any of Borrower's obligations under the Credit Documents, including Borrower's obligations in connection with the Loans.

**"Immediate Prior Seller"** means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, none or (b) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, the Entity or, collectively, the Entities from which Seller acquired the Loans, the Commitments (if any) and the other Transferred Rights.

**"Impairment"** means any claim, counterclaim, setoff, defense, action, demand, litigation (including administrative proceedings or derivative actions), Encumbrance, right (including expungement, avoidance, reduction, contractual or equitable subordination, or otherwise) or defect, other than those created pursuant to the Credit Documents, the effect of which does, or would, materially and adversely affect the Transferred Rights, in whole or in part.

**"Indemnified Party"** has the meaning specified in Section 6.3.

**"Indemnifying Party"** has the meaning specified in Section 6.3.

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

**"Insider"** means insider as defined in Bankruptcy Code §101(31).

**"Interest and Accruing Fees"** means all interest and accruing ordinary course fees (such as commitment, facility, letter of credit and other similar fees) that are paid in connection with the Loans and Commitments (if any) in accordance with the Credit Documents from and after the Trade Date; provided that Interest and Accruing Fees shall not include any PIK Interest.

**"Lender"** means a lender under the Credit Agreement, and its successors, transferees and permitted assigns.

**"Loans"** means the Loan(s) in the amount(s) specified in the Transaction Specific Terms, and includes the note(s) (if any) evidencing such Loan(s) issued under the Credit Agreement.

**"LSTA"** means The Loan Syndications and Trading Association, Inc.®

**"Majority Holders"** has the meaning specified in Section 11.

**"Manager"** has the meaning specified in Section 10.1.

**"Non-Recurring Fees"** means amendment, consent, waiver and other similar non-ordinary course fees that are paid in connection with the Loans and Commitments (if any) under the Credit Documents from and after the Trade Date and any other amounts not constituting Interest and Accruing Fees.

**"Obligor"** means any Entity (other than Borrower, the Lenders and any administrative, collateral, syndication, documentation or other similar agent under the Credit Agreement) that is obligated under the Credit Documents.

**"Operative Documents"** means (a) if "No" is specified opposite "Netting Arrangements" in the Transaction Summary, (i) this Agreement, (ii) the Assignment, (iii) the Purchase Price Letter and (iv) if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice, and (b) if "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary, (i) this Agreement, (ii) the Assignment, (iii) the Netting Letter and (iv) if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice.

**"Party"** means Buyer or Seller, as applicable.

**"PIK Interest"** means any paid-in-kind interest, fees or other amounts paid or payable from and after the Trade Date in connection with the Loans and Commitments (if any) in accordance with the Credit Documents or Adequate Protection Order (if any), as applicable.

**"Predecessor Transfer Agreements"** means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary and Seller is a signatory to the Credit Agreement, none, (b) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary and Seller is a not signatory to the Credit Agreement, the Assignment that names Seller as assignee therein and that relates to the primary syndication or (c) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, the transfer agreements under which Seller and any Prior Seller acquired the rights and obligations underlying or constituting a part of the Transferred Rights.

**"Pre-Settlement Date Accruals"** means all Interest and Accruing Fees that accrue during the period before (but excluding) the earlier of (a) the Settlement Date and (b) T+20; so long as payment or distribution of such Interest and Accruing Fees is made (i) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit

# LSTA
### THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (ii) before a default by Borrower or any Obligor in connection with other payment obligations of Borrower or any Obligor under the Credit Agreement; otherwise such Interest and Accruing Fees (if and when paid) and any other accrued amounts due thereafter shall be for the account of Buyer, and Seller shall not be entitled to any part thereof.

**"Prior Sellers"** means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, none or (b) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, (i) Immediate Prior Seller and (ii) any other Entity or Entities that transferred any of the rights and obligations underlying or constituting a part of the Transferred Rights.

**"Proof of Claim"** means (a) if "No" is specified opposite "Borrower In Bankruptcy" in the Transaction Summary, none or (b) if "Yes" is specified opposite "Borrower In Bankruptcy" in the Transaction Summary, any and all proofs of claim filed in the Bankruptcy Case in respect of the Transferred Rights, including any proof of claim specifically identified in the Annex.

**"PTEs"** means the prohibited transaction class exemptions issued by the U.S. Department of Labor.

**"Purchase Price"** has the meaning given to it in the Purchase Price Letter.

**"Purchase Price Letter"** means the letter agreement between Buyer and Seller that specifies the calculations determining the Purchase Price with respect to the Transferred Rights.

**"Purchase Rate"** means the purchase rate specified in the Purchase Price Letter.

**"Reimbursement Claims"** means any claim of Seller arising in connection with the return, disgorgement or reimbursement by Seller to Borrower, or any other Entity, of all or any portion of any payment or transfer received by Seller on account of the Transferred Rights prior to the Settlement Date, including any claims arising under Bankruptcy Code §502(h).

**"Retained Interest"** means, if "Settled Without Accrued Interest" is specified in the Transaction Specific Terms, the right retained by Seller to receive, in accordance with the provisions of Section 8.3, payments or other distributions, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds paid or delivered in respect of the Pre-Settlement Date Accruals or the Adequate Protection Payments (if any); provided that Retained Interest shall not include any PIK Interest.

**"Retained Interest Distribution"** means a payment or other distribution, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds payable or deliverable to Seller in respect of a Retained Interest.

**"Retained Obligations"** means (a) if "No" is specified opposite "Step-Up Provision, all obligations and liabilities of Seller relating to the Transferred Rights that (i) result from facts, events or circumstances arising or occurring prior to the Settlement Date, (ii) result from Seller's breach of its representations, warranties, covenants, or agreements under this Agreement, the Credit Documents or the Predecessor Transfer Agreements, (iii) result from Seller's bad faith, gross negligence, or willful misconduct or (iv) are attributable to Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents, and (b) if "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, all obligations and liabilities of Seller and each Covered Prior Seller relating to the Transferred Rights that (i) result from facts, events or circumstances arising or occurring prior to the Settlement Date, (ii) result from Seller's breach

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

of its representations, warranties, covenants or agreements under this Agreement, the Credit Documents or the Predecessor Transfer Agreements, (iii) result from any Covered Prior Seller's breach of its representations, warranties, covenants or agreements contained in the Credit Documents or the Predecessor Transfer Agreements, (iv) result from Seller's or any Covered Prior Seller's bad faith, gross negligence, or willful misconduct or (v) are attributable to Seller's or any Covered Prior Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents.

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

"**Seller**" means the Entity specified as such in the Transaction Summary.

"**Seller Excluded Information**" has the meaning specified in Section 4.1(o).

"**Seller Indemnitees**" has the meaning specified in Section 6.2.

"**Settlement Date**" means (a) if "No" is specified opposite "Netting Arrangements" in the Transaction Summary, the date on which Seller receives the Purchase Price, and (b) if "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary, the date on which Seller receives the Seller Purchase Price.

"**Shift Date**" means, if applicable, the date specified as such in the Transaction Summary.

"**Standard Terms**" means the LSTA Standard Terms and Conditions for Purchase and Sale in the form published by the LSTA as of December 1, 2006.

"**T+20**" means the date that is twenty (20) Business Days after the Trade Date.

"**Trade Date**" means the date(s) specified as such in the Transaction Summary.

"**Transaction**" means the purchase and sale of Loans, Commitments (if any) and the other Transferred Rights to which this Agreement relates.

"**Transaction Documents**" means the Credit Documents, the Operative Documents and the Predecessor Transfer Agreements (if any).

"**Transaction Specific Terms**" means the specific terms and elections governing the Transaction that are set forth in the Transaction Summary and Sections A through H of this Agreement.

"**Transaction Summary**" means the Transaction Summary set forth in the Transaction Specific Terms.

"**Transfer Notice**" means any notice and evidence of transfer with respect to the Transferred Rights filed in the Bankruptcy Case in accordance with the Bankruptcy Rules, including Bankruptcy Rule 3001(e).

"**Transferred Rights**" means any and all of Seller's right, title, and interest in, to and under the Loans and the Commitments (if any) and, to the extent related thereto, the following (excluding, however, the Retained Interest, if any):

    (a)    all other amounts (including any PIK Interest) funded by or payable to Seller or any Prior Seller (if any) under the Credit Documents, and all obligations owed to

la-996035

Seller or any Prior Seller in connection with the Loans and the Commitments (if any);

(b)     the Credit Documents;

(c)     the Proof of Claim (if any);

(d)     the Predecessor Transfer Agreements (if any) (but only to the extent related to the Loans or the Commitments (if any), as specified in the Annex);

(e)     all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of Seller or any Prior Seller, whether known or unknown, against Borrower, any Obligor, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Seller or any Prior Seller against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby;

(f)     all Guarantees and all Collateral and security of any kind for or in respect of the foregoing;

(g)     all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of Seller or any Prior Seller under the Loans or the Commitments (if any) and other extensions of credit under the Credit Documents (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the Trade Date (unless excluded pursuant to Section 8.1), including all Distributions obtained by or through redemption, consummation of a plan of reorganization, restructuring, liquidation, or otherwise of Borrower, any Obligor or the Credit Documents, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(h)     the economic benefit of permanent commitment reductions, permanent repayments of principal and Non-Recurring Fees received by Seller or any Prior Seller from and after the Trade Date; and

(i)     all proceeds of the foregoing.

## 2.    Assignment and Assumption

In consideration of the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

(a)     subject to the satisfaction or waiver of the conditions in Section 3.2, Seller irrevocably sells, transfers, assigns, grants and conveys the Transferred Rights to Buyer with effect on and after the Settlement Date;

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

(b)     subject to the satisfaction or waiver of the conditions in Section 3.1, Buyer irrevocably acquires the Transferred Rights, and assumes and agrees to perform and comply with the Assumed Obligations, with effect on and after the Settlement Date; and

(c)     Seller agrees to remain responsible for, and assumes and agrees to perform and comply with, the Retained Obligations.  Buyer assumes no obligations other than the Assumed Obligations.

## 3.    Conditions Precedent

3.1     Buyer's obligations to pay the Purchase Price to Seller, to acquire the Transferred Rights and to assume the Assumed Obligations shall be subject to the conditions that (a) Seller's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 4.1), (b) Seller shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date and (c) Buyer shall have received (i) the Transaction Specific Terms duly executed on behalf of Seller, (ii) the Purchase Price Letter duly executed on behalf of Seller, and (iii) the Assignment duly completed and executed on behalf of Seller and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents.

3.2     Seller's obligation to sell, transfer, assign, grant, and convey the Transferred Rights to Buyer shall be subject to the conditions that (a) Buyer's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 5.1), (b) Buyer shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date, (c) Seller shall have received (i) the Transaction Specific Terms duly executed on behalf of Buyer, (ii) the Purchase Price Letter duly executed on behalf of Buyer, and (iii) the Assignment duly completed and executed on behalf of Buyer and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents and (d) Seller shall have received payment of the Purchase Price from Buyer.

3.3     If "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary:  (a) the reference to the phrase "Purchase Price to Seller" in the first clause of Section 3.1 shall be deemed a reference, in lieu thereof, to "the Buyer Purchase Price to Original Buyer or Penultimate Buyer, as applicable,"; (b) clause (ii) of Section 3.1(c) and clause (ii) of Section 3.2(c) shall be revised as follows: "the Netting Letter duly executed on behalf of all parties thereto"; and (c) clause (d) of Section 3.2 shall be revised to read as follows:  "(d) Seller shall have received payment of the Seller Purchase Price from Original Buyer or Penultimate Buyer, as applicable."

## 4.    Seller's Representations and Warranties

4.1     Seller represents and warrants to Buyer (as of the Settlement Date and, where specifically indicated, the Agreement Date) that:

(a)     Seller (i) is, and was on the Agreement Date, duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is, and was on the Agreement Date, in good standing under such laws and (iii) has, and had on the Agreement Date, full power and authority to execute, deliver and perform its obligations under the Transaction Documents to which it is or will become a party.

(b)     Seller's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted, did not result on the Agreement Date and will not result in a breach or violation of any provision of (i) Seller's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Seller, (iii) any judgment, injunction, decree or determination of any Governmental



Authority applicable to Seller or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which Seller may be a party, by which Seller may be bound or to which any of the assets of Seller is subject.

(c)    (i)    The Transaction Documents to which Seller is, and was on the Agreement Date, a party (A) have been duly and validly authorized, executed and delivered by Seller and (B) are the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except that such enforceability against Seller may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii)    other than the Required Consents, no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is, will be or was on the Agreement Date required for Seller to execute, deliver, and perform its obligations under, the Transaction Documents (other than, if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice) to which Seller is or will become a party.

(d)    As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)    Seller is the sole legal and beneficial owner of and has good title to each of the Loans, the Commitments (if any) and the other Transferred Rights free and clear of any Encumbrance; OR

(ii)    To the same extent that Seller received such ownership and title from Immediate Prior Seller, Seller is the sole legal and beneficial owner of and has good title to each of the Loans, the Commitments (if any) and the other Transferred Rights free and clear of any Encumbrance.

(e)    As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)    Other than the Bankruptcy Case (if any) and any proceedings thereunder, no proceedings are pending against Seller or, to the best of Seller's knowledge, threatened against Seller before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect (A) the Transferred Rights or Assumed Obligations or (B) any action taken or to be taken by Seller under this Agreement; OR

(ii)    Other than the Bankruptcy Case (if any) and any proceedings thereunder, no proceedings are pending against Seller or any Covered Prior Seller or, to the best of Seller's knowledge, threatened against Seller or any Covered Prior Seller before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect (A) the Transferred Rights or Assumed Obligations or (B) any action taken or to be taken by Seller under this Agreement.

(f)    As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)    (A) The outstanding principal amount(s) of the Loans and the principal amount(s) of the Commitments (if any) as of the Settlement Date are accurately stated in the Transaction Specific Terms, (B) any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is specified in

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

Section 6 of the Annex and is a proportionate share of PIK Interest that accreted during such period to all of Seller's loans of the same tranche under the Credit Agreement as the Loans, and (C) all PIK Interest, if any, that accreted to the principal amount of the Loans after the applicable settlement date on which Seller acquired the Loans from each Immediate Prior Seller but on or prior to the Settlement Date is included in the outstanding principal amount(s) of the Loans listed in the Transaction Specific Terms; OR

(ii)      Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, (A) the outstanding principal amount(s) of the Loans and the principal amount(s) of the Commitments (if any) as of the Settlement Date are accurately stated in the Transaction Specific Terms, (B) any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is specified in Section 6 of the Annex and is a proportionate share of PIK Interest that accreted during such period to all of Seller's loans of the same tranche under the Credit Agreement as the Loans, and (C) all PIK Interest, if any, that accreted to the principal amount of the Loans after the applicable settlement date on which Seller acquired the Loans from each Immediate Prior Seller but on or prior to the Settlement Date is included in the outstanding principal amount(s) of the Loans listed in the Transaction Specific Terms.

(g)      As specified in the Transaction Summary and Section B of the Transaction Specific Terms, one of the following:

(i)      Except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full.  The principal amount of the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms; OR

(ii)      Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) the Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full.  Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms; OR

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

(iii)    Except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller, any Covered Prior Seller or Buyer is or shall be required to pay or otherwise perform that Seller or any Covered Prior Seller has not paid or otherwise performed in full.  The principal amount of the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms.

(h)    As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)    Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller's holding any funds or property of, or owing amounts or property to, Borrower or any Obligor), that will result in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche, class or type as the Loans and Commitments (if any); OR

(ii)    Neither Seller nor any Covered Prior Seller has engaged in any acts or conduct or made any omissions (including by virtue of Seller's or any Covered Prior Seller's holding any funds or property of, or owing amounts or property to, Borrower or any Obligor), that will result in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche, class or type as the Loans and the Commitments (if any).

(i)    As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)    Seller has complied with, and has performed, all obligations required to be complied with or performed by it under the Credit Documents and the Predecessor Transfer Agreements (if any), and Seller has not breached any of its representations, warranties, obligations, agreements or covenants under any of the Credit Documents or the Predecessor Transfer Agreements; OR

(ii)    Seller and each Covered Prior Seller have complied with, and have performed, all obligations required to be complied with or performed by it or them under the Credit Documents and the Predecessor Transfer Agreements, and neither Seller nor any Covered Prior Seller has breached any of its representations, warranties, obligations, agreements or covenants under any of the Credit Documents or the Predecessor Transfer Agreements.

(j)    No broker, finder or other Entity acting under the authority of Seller or any of its Affiliates is entitled to any broker's commission or other fee in connection with the Transaction for which Buyer could be responsible.

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

(k)     The amounts utilized in calculating the Purchase Price as specified in the Purchase Price Letter are true and correct as of each applicable date, and the Purchase Price specified in the Purchase Price Letter has been calculated in accordance with that certain Distressed Trade Confirmation between Seller and Buyer dated as of the Trade Date.

(l)     As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)     Seller has not effected or received the benefit of any setoff against Borrower or any Obligor on account of the Transferred Rights; OR

(ii)    Neither Seller nor any Covered Prior Seller has effected or received the benefit of any setoff against Borrower or any Obligor on account of the Transferred Rights.

(m)    Seller acknowledges that the consideration paid under this Agreement for the purchase of the Transferred Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(n)     Seller (i) is a sophisticated Entity with respect to the sale of the Transferred Rights and the retention of the Retained Obligations, (ii) has adequate information concerning the business and financial condition of Borrower and Obligors and the status of the Bankruptcy Case (if any) to make an informed decision regarding the sale of the Transferred Rights and the retention of the Retained Obligations and (iii) has independently and without reliance upon Buyer, and based on such information as Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Seller has relied upon Buyer's express representations, warranties, covenants, agreements and indemnities in this Agreement.    Seller acknowledges that Buyer has not given Seller any investment advice, credit information or opinion on whether the sale of the Transferred Rights or the retention of the Retained Obligations is prudent.

(o)     Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights, the Retained Obligations, Borrower, Obligors or any of their respective Affiliates that is not known to Seller and that may be material to a decision to sell the Transferred Rights and to retain the Retained Obligations ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights and to retain the Retained Obligations notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller or any Seller Indemnitee, and Seller waives and releases any claims that it might have against Buyer or any Buyer Indemnitee whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(p)     Seller is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Seller has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Transferred Rights in violation of any applicable securities laws.

(q)     Either (i) no interest in the Transferred Rights is being sold by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent

# LSTA
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Transferred Rights.[2]

(r)     As specified in the Transaction Summary, either:

(i)     If "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, Seller (A) became a Lender on the closing date of the Credit Agreement or in connection with the primary syndication therefor, as applicable, and (B) made the Loans and made available the Commitments (if any) on the closing date of the Credit Agreement or in connection with the primary syndication therefor, as applicable; OR

(ii)     If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the type of Predecessor Transfer Agreements executed in connection with Seller's purchase of the Transferred Rights. With respect to the portion (if any) of the Transferred Rights that Seller or any Prior Seller acquired pursuant to Predecessor Transfer Agreements relating to distressed loans, Seller has provided to Buyer (A) true, correct and complete copies of each such Predecessor Transfer Agreement to which Seller is a party and (B) to the extent and in the form received by Seller from Immediate Prior Seller, any other Predecessor Transfer Agreements specified in the Annex. A true and complete list of such Predecessor Transfer Agreements is set forth in the Annex. With respect to the portion (if any) of the Transferred Rights that Seller acquired pursuant to Predecessor Transfer Agreements relating to par/near par loans, Seller acquired such portion of the Transferred Rights from Immediate Prior Seller pursuant to a document or documents substantially in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any), which document(s) effected the transfer of such portion of the Transferred Rights from Immediate Prior Seller to Buyer pursuant to and in accordance with the terms of the Credit Agreement. A true and complete list of such Predecessor Transfer Agreements between Seller and Immediate Prior Seller is set forth in the Annex.

(s)     (i)     If "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, and if a proof of claim was filed individually by Seller or any Prior Seller (i.e., not by the Agent on behalf of the Lenders), Seller provided to Buyer, on or prior to the Settlement Date, a true, correct and complete copy of the Proof of Claim; and

(ii)     If as of the Trade Date Buyer was not a Lender and if "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Seller provided to Buyer, on or prior to the Settlement Date (A) the Credit Agreement and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and (B) any other Credit Documents reasonably

---

[2] If the Parties agreed in their Distressed Trade Confirmation that Seller may make an alternative ERISA representation, such alternative representation shall be included in Section H of the Transaction Specific Terms. Suggested language for such alternative representation may be found on the LSTA website at www.lsta.org/lsta-documents/lsta-MarketAdvisories.php.

la-996035

requested by Buyer and set forth in the Annex. A true and complete list of the Credit Documents specified in the immediately preceding sentence is set forth in the Annex.

(t)     As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)     Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, Seller has not given its consent to change, nor has it waived, any term or provision of any Credit Document or the Predecessor Transfer Agreements (if any), including with respect to the amount or time of any payment of principal or the rate or time of any payment of interest; <u>OR</u>

(ii)     Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, neither Seller nor any Covered Prior Seller has given its consent to change, nor has it waived, any term or provision of any Credit Document or the Predecessor Transfer Agreements, including with respect to the amount or time of any payment of principal or the rate or time of payment of interest.

(u)     As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)     Seller is not a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, (B) the Predecessor Transfer Agreements (if any), (C) the other documents, if any, set forth in Section B of the Transaction Specific Terms and (D) orders entered in the Bankruptcy Case (if any) by which all Lenders are bound) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement; <u>OR</u>

(ii)     Neither Seller nor any Covered Prior Seller is a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, (B) the Predecessor Transfer Agreements, (C) the other documents, if any, set forth in Section B of the Transaction Specific Terms and (D) orders entered in the Bankruptcy Case by which all Lenders are bound) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement.

(v)     As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)     Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the status and the filing of the Proof of Claim and the setting of the Bar Date; <u>OR</u>

(ii)     Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the status and the filing of the Proof of Claim and the setting of the Bar Date, which representation and warranty assume the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller.

(w)     Except as set forth in the Annex, Seller has not received any written notice other than those publicly available in the Bankruptcy Case (if any) or otherwise, that (i) any payment or other transfer made to or for the account of Seller from or on account of Borrower or any Obligor under the Transferred Rights is or may be void or voidable as an actual or

# LSTA
**THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®**

constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment.

4.2 Except as expressly stated in this Agreement and the Assignment, Seller makes no representations or warranties, express or implied, with respect to the Transaction.

4.3 Seller acknowledges that: (a) its sale of the Transferred Rights to Buyer is irrevocable; (b) Seller shall have no recourse to the Transferred Rights; and (c) Seller shall have no recourse to Buyer, except for (i) Buyer's breaches of its representations, warranties or covenants and (ii) Buyer's indemnities, in each case as expressly stated in this Agreement.

## 5. Buyer's Representations and Warranties

5.1 Buyer represents and warrants to Seller (as of the Settlement Date and, where specifically indicated, the Agreement Date) that:

(a) Buyer (i) is, and was on the Agreement Date, duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is, and was on the Agreement Date, in good standing under such laws and (iii) has, and had on the Agreement Date, full power and authority to execute, deliver and perform its obligations under, the Transaction Documents to which it is or will become a party.

(b) Buyer's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted, did not result on the Agreement Date and will not result in a breach or violation of any provision of (i) Buyer's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Buyer, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Buyer or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument by which Buyer may be a party, by which Buyer may be bound or to which any of the assets of Buyer is subject.

(c) (i) The Transaction Documents to which Buyer is, and was on the Agreement Date, a party (A) have been duly and validly authorized, executed and delivered by Buyer and (B) are the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except that such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general applicability affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii) except as provided in the Credit Documents, no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is, will be or was on the Agreement Date required for Buyer to execute, deliver, and perform its obligations under the Transaction Documents (other than, if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice) to which Buyer is or will become a party.

(d) Without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Buyer is not purchasing the Transferred Rights with a view towards the sale or distribution thereof in violation of the Securities Act; _provided, however_, that Buyer may resell the Transferred Rights if such resale is in compliance with Section 10.

15

la-996035



(e)     Buyer acknowledges that the consideration paid under this Agreement for the purchase of the Transferred Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(f)     Buyer (i) is a sophisticated Entity with respect to the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (ii) is able to bear the economic risk associated with the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (iii) has adequate information concerning the business and financial condition of Borrower and Obligors and the status of the Bankruptcy Case (if any) to make an informed decision regarding the purchase of the Transferred Rights and the assumption of the Assumed Obligations, (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement and (v) has independently and without reliance upon Seller, and based on such information as Buyer has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Buyer has relied upon Seller's express representations, warranties, covenants, agreements and indemnities in this Agreement. Buyer acknowledges that Seller has not given Buyer any investment advice, credit information or opinion on whether the purchase of the Transferred Rights or the assumption of the Assumed Obligations is prudent.

(g)     Except as otherwise provided in this Agreement, Buyer has not relied and will not rely on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition or business of Borrower or any Obligor, or any other matter concerning Borrower or any Obligor.

(h)     Buyer acknowledges that (i) Seller currently may have, and later may come into possession of, information with respect to the Transferred Rights, the Assumed Obligations, Borrower, Obligors or any of their respective Affiliates that is not known to Buyer and that may be material to a decision to purchase the Transferred Rights and assume the Assumed Obligations ("Buyer Excluded Information"), (ii) Buyer has determined to purchase the Transferred Rights and assume the Assumed Obligations notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) Seller shall have no liability to Buyer or any Buyer Indemnitee, and Buyer waives and releases any claims that it might have against Seller or any Seller Indemnitee, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the Transaction; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of Seller's representations or warranties in this Agreement.

(i)     No broker, finder or other Entity acting under the authority of Buyer or any of its Affiliates is entitled to any broker's commission or other fee in connection with the Transaction for which Seller could be responsible.

(j)     Either (i) no interest in the Transferred Rights is being acquired by or on behalf of an Entity that is, or at any time while the Transferred Rights are held thereby will be, one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

determined by in-house asset managers) is applicable with respect to the purchase and holding of the Transferred Rights and the exercise of Buyer's rights thereunder.[3]

(k)    Buyer acknowledges that (i) it has received copies of the Predecessor Transfer Agreements (if any) designated as Predecessor Transfer Agreements that relate to distressed loans in Section 1 of the Annex and, if applicable, the Credit Documents referenced in Section 2 of the Annex and (ii) without in any way limiting the representations and warranties of Seller contained in this Agreement, it is assuming all risk with respect to the accuracy or sufficiency of the Predecessor Transfer Agreements (if any) and the Credit Documents, other than any representations, warranties or covenants made by Seller in this Agreement, the Credit Documents or in the Predecessor Transfer Agreements (if any) to which Seller is a party.

(l)    Buyer is an "accredited investor" as defined in Rule 501 under the Securities Act.

(m)    No proceedings are (i) pending against Buyer or (ii) to the best of Buyer's knowledge, threatened against Buyer before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect any action taken or to be taken by Buyer under this Agreement.

(n)    Buyer has the status under the Credit Agreement specified in Section C.1 of the Transaction Specific Terms.

5.2    Except as expressly stated in this Agreement and the Assignment, Buyer makes no representations or warranties, express or implied, with respect to the Transaction.

5.3    Buyer acknowledges that (a) Seller's sale of the Transferred Rights to Buyer, and Buyer's assumption of the Assumed Obligations, are irrevocable and (b) Buyer shall have no recourse to Seller, except for (i) Seller's breaches of its representations, warranties or covenants and (ii) Seller's indemnities, in each case as expressly stated in this Agreement.

6.    **Indemnification**

6.1    As specified in the Transaction Summary and D of the Transaction Specific Terms, either:

(a)    Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "Buyer Indemnitees") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Seller's representations, warranties, covenants or agreements in this Agreement, (ii) any obligation of any Entity to disgorge, in whole or in part, or otherwise reimburse (by setoff or otherwise) Borrower, any Obligor, the Agent or any other Entity for any payments, property (including Collateral), setoffs or recoupments received, applied or effected by or for the account of Seller under or in connection with the Transferred Rights or any other claim that Seller may have from, against or on account of Borrower or any Obligor, except to the extent any such amounts have been distributed by Seller to Buyer (whether by a credit to the Purchase Price or Buyer Purchase Price, as applicable, or otherwise), or (iii) Seller's being an Insider or Affiliate of Borrower or any Obligor or being a member of or participating in

---

[3] If the Parties agreed in their Distressed Trade Confirmation that Buyer may make an alternative ERISA representation, such alternative representation shall be included in Section H of the Transaction Specific Terms. Suggested language for such alternative representation may be found on the LSTA website at www.lsta.org/lsta-documents/lsta-MarketAdvisories.php

la-996035



any official or unofficial creditors' committee or other similar committee (whether appointed or otherwise constituted in the Bankruptcy Case (if any) or formed prior to the commencement of the Bankruptcy Case (if any)), which condition results in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche as the Loans and Commitments (if any). Seller shall have no obligation to indemnify Buyer, and Buyer shall have no recourse against Seller, if any adequate protection payments (whether or not Adequate Protection Payments) in respect of the Transferred Rights or any Collateral are subsequently recharacterized by the Bankruptcy Court (whether by stipulation, settlement order or otherwise) in such a manner as to be treated other than as payments of interest or fees due under the Credit Agreement or the Adequate Protection Order; <u>OR</u>

(b)    Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees (collectively, "<u>Buyer Indemnitees</u>") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (i) a breach of any of Seller's representations, warranties, covenants or agreements in this Agreement, (ii) any obligation of any Entity to disgorge, in whole or in part, or otherwise reimburse (by setoff or otherwise) Borrower, any Obligor, the Agent or any other Entity for any payments, property (including Collateral), setoffs or recoupments received, applied or effected by or for the account of Seller or any Covered Prior Seller under or in connection with the Transferred Rights or any other claim that Seller may have from, against or on account of Borrower or any Obligor, except to the extent any such amounts have been distributed by Seller to Buyer (whether by a credit to the Purchase Price or Buyer Purchase Price, as applicable, or otherwise), or (iii) Seller's being an Insider or Affiliate of Borrower or any Obligor or being a member of or participating in any official or unofficial creditors' committee or other similar committee (whether appointed or otherwise constituted in the Bankruptcy Case (if any) or formed prior to the commencement of the Bankruptcy Case (if any)), which condition results in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche as the Loans and Commitments (if any). Seller shall have no obligation to indemnify Buyer, and Buyer shall have no recourse against Seller, if any adequate protection payments (whether or not Adequate Protection Payments) in respect of the Transferred Rights or any Collateral are subsequently recharacterized by the Bankruptcy Court (whether by stipulation, settlement order or otherwise) in such a manner as to be treated other than as payments of interest or fees due under the Credit Agreement or the Adequate Protection Order.

6.2    Buyer shall indemnify, defend, and hold Seller and its officers, directors, agents, partners, members, controlling Entities, and employees (collectively, "<u>Seller Indemnitees</u>") harmless from and against any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Seller Indemnitee incurs or suffers as a result of or arising out of (a) a breach of any of Buyer's representations, warranties, covenants or agreements in this Agreement or (b) Seller's acting or refraining to act pursuant to any direction of (i) Buyer or (ii) under the circumstances described in the proviso in Section 11, the Majority Holders; <u>provided</u>, <u>however</u>, that Buyer's share of the indemnity under clause (b)(ii) shall be limited to a fraction, the numerator of which is (A) the outstanding principal amount of the Transferred Rights or (B) if Seller has consented to transfers of the Transferred Rights (or a portion thereof) pursuant to Section 10.1(b), the then outstanding principal amount of the claims beneficially held by Buyer in respect of which the action involved is taken by Seller, and the denominator of which is the then aggregate outstanding principal amount of all claims in respect of which the action involved is taken by Seller.

6.3    If a third party commences any action or makes any demand against either Party for which such Party ("<u>Indemnified Party</u>") is entitled to indemnification under this Agreement, such Indemnified Party shall promptly notify the other Party ("<u>Indemnifying Party</u>") in writing of such action or demand; <u>provided</u>, <u>however</u>, that if the Indemnified Party assumes the defense of the action and fails to

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

provide prompt notice to the Indemnifying Party, such failure shall not limit in any way the Indemnifying Party's obligation to indemnify the Indemnified Party except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend the action. The Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, participate in the defense of such action with counsel reasonably satisfactory to the Indemnified Party, or the Indemnifying Party may, at its own expense and without limiting its obligation to indemnify the Indemnified Party, assume the defense of such action with counsel reasonably acceptable to the Indemnified Party. In any event, the Party that has assumed the defense of such action shall provide the other Party with copies of all notices, pleadings, and other papers filed or served in such action. Neither Party shall make any settlement or adjustment without the other Party's prior written consent, which consent (a) in the case of the Indemnifying Party will not be unreasonably withheld if the settlement or adjustment involves only the payment of money damages by the Indemnifying Party and (b) in the case of the Indemnified Party may be withheld for any reason if the settlement or adjustment involves performance or admission by the Indemnified Party.

6.4    Each indemnity in this Agreement is a continuing obligation, separate and independent from the other obligations of the Parties and survives termination of this Agreement or any transfer pursuant to Section 10 of this Agreement. It is not necessary for a Party to incur expense or make payment before enforcing a right of indemnity conferred by this Agreement.

## 7.    Costs and Expenses

7.1    If either Party pays any Agent Expenses, Assumed Obligations or Retained Obligations for which the other Party is responsible in accordance with the definitions thereof and the terms of this Agreement, such other Party shall, promptly upon the written request of the Party that shall have paid such amounts, reimburse such paying Party for the full amount paid on such other Party's behalf.

7.2    The Parties agree to bear their own respective legal and other costs and expenses for preparing, negotiating, executing and implementing this Agreement and any related documents and consummating the Transaction.

7.3    The Transfer Fee shall be paid on or before the Settlement Date as provided in Section E of the Transaction Specific Terms.

## 8.    Distributions; Interest and Fees; Payments

8.1    The treatment of Pre-Settlement Date Accruals is set forth in the Transaction Summary. (a) If "Trades Flat" is specified, all Pre-Settlement Date Accruals and Adequate Protection Payments, if and when paid, shall be for the account of Buyer, and for purposes of this Agreement, the Transferred Rights shall include all Pre-Settlement Date Accruals and Adequate Protection Payments, Seller shall have no Retained Interest and Section 8.3 shall have no force or effect. (b) If "Settled Without Accrued Interest" is specified, Seller shall have a Retained Interest and all Retained Interest Distributions shall be for the account of Seller.

8.2    As specified in the Transaction Summary and Section F.1 of the Transaction Specific Terms, either:

(a)    (i)    If at any time after the Trade Date (whether before, on or after the Settlement Date) Seller received or receives a Distribution, Seller shall (A) accept, and from and after the Settlement Date, hold such Distribution for the account and sole benefit of Buyer, (B) from and after the Settlement Date have no equitable or beneficial interest in such Distribution and (C) deliver such Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Distribution received (1) on or prior to the Settlement Date, in no event later than the Settlement Date, and (2) after the Settlement Date, in no event later than two (2)

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

Business Days after the date on which Seller receives such Distribution) to Buyer in the same form received and, when necessary or appropriate, with Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule or order. If Seller fails to pay any cash Distribution to Buyer in accordance with the time periods set forth in clause (i)(C) of this Section 8.2(a), then Seller shall pay interest on such payment for the period from (and including) the day on which such payment is actually received by Seller to (but excluding) the day such payment is actually paid to Buyer, in accordance with Section 8.6.

(ii)    If a Distribution includes securities or other non-cash Distribution, Seller shall, to the extent permitted by law, endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at Buyer's sole expense) to assist Buyer to cause to be registered in Buyer's name, or such name as Buyer may direct in writing, and deliver such securities to Buyer or to such Entity as Buyer may direct as soon as practicable. Pending such transfer, Seller shall (from and after the Settlement Date) hold the same on behalf and for the sole benefit of Buyer, and Seller shall have no legal, equitable or beneficial interest in any such Distribution.

(iii)    Subject to applicable law, Buyer is entitled to receive any Distribution to be remitted by Seller under this Agreement without the withholding of any tax. If Seller receives a Distribution that it is required to remit to Buyer, Buyer shall furnish to Seller such forms, certifications, statements and other documents as Seller may reasonably request in writing to evidence Buyer's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable Seller to comply with any applicable laws or regulations relating thereto, and Seller may refrain from remitting such Distribution until such forms, certifications, statements and other documents have been so furnished.

(iv)    If all or any portion of a Distribution received by Seller and transferred to Buyer pursuant to this Section 8.2(a) is required to be returned or disgorged by Seller to any Entity, Buyer shall promptly return such Distribution (or portion thereof) to Seller together with all related interest and charges payable by Seller in respect thereof.

OR

(b)    (i)    If at any time after the Trade Date (whether before, on or after the Settlement Date) Seller or any Covered Prior Seller received or receives a Distribution, Seller shall (A) accept and from and after the Settlement Date hold such Distribution (to the extent received by Seller or delivered to Seller by a Covered Prior Seller) for the account and sole benefit of Buyer, (B) from and after the Settlement Date have no equitable or beneficial interest in such Distribution and (C) deliver such Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Distribution received by Seller or any Covered Prior Seller (1) on or prior to the Settlement Date, in no event later than the Settlement Date, and (2) after the Settlement Date, in no event later than two (2) Business Days after the date on which Seller or any Covered Prior Seller receives such Distribution) to Buyer in the same form received and, when necessary or appropriate, with Seller's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule or order. If Seller fails to pay any cash Distribution to Buyer in accordance with the time periods set forth in clause (i)(C) of this Section 8.2(b), then Seller shall pay interest on such payment for the period from (and including) the day on which such payment is actually received by Seller to (but excluding) the day such payment is actually paid to Buyer, in accordance with Section 8.6.

(ii)    If a Distribution includes securities or other non-cash Distribution, Seller shall, to the extent permitted by law, endorse or use commercially reasonable efforts to cause any Covered Prior Seller to endorse (without recourse, representation or warranty) or use commercially reasonable efforts (at Buyer's sole expense) to assist Buyer to cause to be registered in Buyer's name, or such name as Buyer may direct in writing, and deliver such securities to Buyer or to such Entity as Buyer

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

may direct as soon as practicable. Pending such transfer, Seller shall (from and after the Settlement Date) hold, and use commercially reasonable efforts to cause any Covered Prior Seller to hold, the same on behalf and for the sole benefit of Buyer and neither Seller nor any Covered Prior Seller shall have any legal, equitable or beneficial interest in any such Distribution.

(iii)    Subject to applicable law, Buyer is entitled to receive any Distribution to be remitted by Seller under this Agreement without the withholding of any tax. If Seller or any Covered Prior Seller receives a Distribution that it is required to remit to Buyer, Buyer shall furnish to Seller such forms, certifications, statements and other documents as Seller may reasonably request in writing to evidence Buyer's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable Seller or any Covered Prior Seller to comply with any applicable laws or regulations relating thereto and Seller or any Covered Prior Seller may refrain from remitting such Distribution until such forms, certifications, statements and other documents have been so furnished.

(iv)    If all or any portion of a Distribution received by Seller or any Covered Prior Seller and transferred to Buyer pursuant to this Section 8.2(b) is required to be returned or disgorged by Seller or any Covered Prior Seller to any Entity, Buyer shall promptly return such Distribution (or portion thereof) to Seller together with all related interest and charges payable by Seller or any Covered Prior Seller in respect thereof.

8.3    (a)    If at any time after the Settlement Date Buyer receives a Retained Interest Distribution, Buyer shall (i) accept and hold such Retained Interest Distribution for the account and sole benefit of Seller, (ii) have no equitable or beneficial interest in such Retained Interest Distribution and (iii) deliver such Retained Interest Distribution (free of any withholding, setoff, recoupment, or deduction of any kind except as required by law) promptly (but in the case of a cash Retained Interest Distribution, in no event later than two (2) Business Days after the date on which Buyer receives it) to Seller in the same form received and, when necessary or appropriate, with Buyer's endorsement (without recourse, representation, or warranty), except to the extent prohibited under any applicable law, rule or order. If Buyer fails to pay any cash Retained Interest Distribution to Seller within two (2) Business Days of receipt thereof, then Buyer shall pay interest on such Retained Interest Distribution for the period from (and including) the day on which such Retained Interest Distribution is actually received by Buyer to (but excluding) the day such Retained Interest Distribution is actually paid to Seller, in accordance with Section 8.6.

(b)    If a Retained Interest Distribution includes securities or other non-cash Distribution, Buyer shall, to the extent permitted by law, endorse (without recourse, representation or warranty), or use commercially reasonable efforts (at Seller's sole expense) to assist Seller to cause to be registered in Seller's name, or such name as Seller may direct in writing, and deliver such securities to Seller or to such Entity as Seller may direct as soon as practicable. Pending such transfer, Buyer shall hold the same on behalf and for the sole benefit of Seller and Buyer shall have no legal, equitable or beneficial interest in any such Retained Interest Distribution.

(c)    Subject to applicable law, Seller is entitled to receive any Retained Interest Distribution to be remitted by Buyer under this Agreement without the withholding of any tax. If Buyer receives a Retained Interest Distribution that it is required to remit to Seller, Seller shall furnish to Buyer such forms, certifications, statements and other documents as Buyer may reasonably request in writing to evidence Seller's exemption from the withholding of any tax imposed by the United States of America or any other jurisdiction, whether domestic or foreign, or to enable Buyer to comply with any applicable laws or regulations relating thereto, and Buyer may refrain from remitting such Retained Interest Distribution until such forms, certifications, statements and other documents have been so furnished.

la-996035

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

(d)    If all or any portion of a Retained Interest Distribution received by Buyer and transferred to Seller pursuant to this Section 8.3 is required to be returned or disgorged by Buyer to any Entity, Seller shall promptly return such Retained Interest Distribution (or portion thereof) to Buyer together with all related interest and charges payable by Buyer in respect thereof.

8.4    If Borrower fails to pay on or prior to the scheduled due date thereof (taking into account any applicable grace period) in accordance with the Credit Agreement or the Adequate Protection Order, as applicable, any Interest and Accruing Fees or Adequate Protection Payments that were paid or credited to Buyer on the Settlement Date pursuant to Section 6(b) of the Distressed Trade Confirmation, then Buyer shall, upon demand by Seller, pay Seller an amount equal to the portion of such Interest and Accruing Fees or Adequate Protection Payments that were not paid to Seller, plus interest that would accrue for each day on such amounts at the Federal Funds Rate.

8.5    Except as provided in Sections 8.2, 8.3 or 8.4 or the Purchase Price Letter, all payments made by Buyer to Seller or by Seller to Buyer under this Agreement shall be made in the lawful currency of the United States by wire transfer of immediately available funds to Seller or Buyer, as applicable, in accordance with the wire instructions specified in Section F.2 of the Transaction Specific Terms.

8.6    With respect to the payment of any funds or other property under this Agreement (including the delivery of Distributions under Section 8.2 and Retained Interest Distributions under Section 8.3), whether from Seller to Buyer or from Buyer to Seller, (a) the Party required to deliver a Distribution or a Retained Interest Distribution may withhold therefrom any tax required by law to be withheld, and (b) the Party failing to make full payment of any amount when due shall, upon demand by the other Party, pay such defaulted amount together with interest on it (for each day from (and including) the date when due to (but excluding) the date when actually paid) at a rate equal to the Federal Funds Rate.

9.    **Notices**

9.1    All communications between the Parties in respect of, or notices or other information sent under, this Agreement shall be in writing, hand delivered or sent by overnight courier, electronic transmission or telecopier, addressed to the relevant Party at its address, electronic mail or facsimile number specified in Section G of the Transaction Specific Terms or at such other address, electronic mail or facsimile number as such Party may subsequently request in writing. All such communications and notices shall be effective upon receipt.

9.2    From the Settlement Date through the 45th day after the Settlement Date, if Seller receives any notices, correspondence or other documents in respect of the Transferred Rights or any Credit Document that, to the best of Seller's knowledge, were not sent to the Lenders generally, Seller shall promptly forward them to Buyer.

10.    **Further Transfers**

10.1    Buyer may sell, assign, grant a participation in, or otherwise transfer all or any portion of the Transferred Rights, this Agreement, its rights under this Agreement and the Predecessor Transfer Agreements (if any), or any interest in any of the foregoing without the consent of or notice to Seller; provided, however, that (a) such sale, assignment, participation or transfer shall comply with any applicable requirements in the Transaction Documents and shall not violate any applicable laws, rules or regulations, including any applicable securities laws, rules or regulations; (b) notwithstanding any such sale, assignment, participation or transfer, unless Seller otherwise consents in writing (which consent Seller shall not unreasonably withhold or delay), (i) Buyer's obligations to Seller under this Agreement shall remain in full force and effect until fully paid, performed, and satisfied and (ii) Seller shall continue to deal solely and directly with Buyer in connection with Buyer's obligations under this Agreement; and (c) with respect to a transfer by Buyer of its rights against Seller under this Agreement and, if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, against any Prior

la-996035

# LSTA
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

Sellers under the Predecessor Transfer Agreements (i) the transferee must represent and warrant that (A) no interest in the Transferred Rights is being acquired by the transferee by or on behalf of an Entity that is, or at any time while the Transferred Rights are held thereby will be, one or more Benefit Plans, (B) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to the acquisition and holding of the Transferred Rights by the transferee and the exercise of the transferee's rights thereunder or (C) the funds being used by the transferee to purchase all or any portion of the Transferred Rights are from a fund managed by a Qualified Professional Asset Manager (the "Manager") within the meaning of Part V of PTE 84-14, the Manager made the investment decision on behalf of the transferee to acquire the Transferred Rights from the transferor, the acquisition and holding of the Transferred Rights hereunder satisfies the requirements of subsections (b) through (g) of Part I of PTE 84-14 and the individual making the investment decision to purchase the Transferred Rights on behalf of the transferee has no actual knowledge (without duty of inquiry or investigation) that the requirements of subsection (a) of Part I of PTE 84-14 are not satisfied and (ii) the transferee must agree that it will obtain from each of its direct transferees the representations, warranties and covenants contained in this clause (c) (including this subclause (ii)).

10.2    Seller may assign its rights under this Agreement without the prior written consent of Buyer; provided, however, that Seller may not delegate its obligations under this Agreement without the prior written consent of Buyer.

## 11.    Voting

On and after the Settlement Date, (a) Buyer shall have sole authority to make, grant and exercise (or refrain from making, granting and exercising) all votes, whether pursuant to amendments, consents or waivers, and otherwise to exercise (or refrain from exercising) all other rights and remedies with respect to the Transferred Rights and Assumed Obligations and (b) if for any reason Seller is entitled to exercise any such rights or remedies (including the right to vote) after the Settlement Date, Seller (i) shall not take (or refrain from taking) any action with respect thereto other than in accordance with the prior written instructions of Buyer and (ii) shall take (or refrain from taking) any action with respect thereto in accordance with the prior written instructions of Buyer except (A) as prohibited under applicable law, rule, order or the Credit Documents or (B) if following such instructions might (in Seller's reasonable determination) expose Seller to any obligation, liability or expense that in Seller's reasonable judgment is material and for which Seller has not been provided adequate indemnity; provided, however, that if the vote or other action involved is not divisible or may not be cast or taken separately in respect of the Transferred Rights and Assumed Obligations (or the relevant portion thereof) and any other claim against Borrower or any other Entity (whether or not included in the Transferred Rights), then Seller shall take (or refrain from taking) such action in accordance with instructions received by Seller and believed by Seller in good faith to have been given by the then current holders (including, as the case may be, Seller) of more than 50% of the aggregate principal amount of the claims then outstanding in respect of which such action is to be taken by Seller (the "Majority Holders") that direct Seller to take action with respect thereto. For purposes of determining the Majority Holders pursuant to the preceding sentence, Seller shall only be required to obtain instructions relating to any action to be taken in respect of the Transferred Rights and Assumed Obligations from (x) Buyer or (y) if Seller has consented to transfers of the Transferred Rights (or any portion thereof) pursuant to Section 10.1(b), the then current holders of the aggregate principal amount of the claims outstanding in respect of which such action is to be taken by Seller.

la-996035



## 12.    Exercise of Rights and Remedies

12.1    No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the Parties, and no waiver of any provision of this Agreement, nor consent to any departure by either Party from it, shall be effective unless it is in writing and signed by the affected Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.2    No failure on the part of a Party to exercise, and no delay in exercising, any right or remedy under this Agreement shall operate as a waiver by such Party, nor shall any single or partial exercise of any right or remedy under this Agreement preclude any other or further exercise thereof or the exercise of any other right or remedy.  The rights and remedies of each Party provided herein (a) are cumulative and are in addition to, and are not exclusive of, any rights or remedies provided by law (except as otherwise expressly set forth in this Agreement) and (b) are not conditional or contingent on any attempt by such Party to exercise any of its rights or remedies under any other related document or against the other Party or any other Entity.

12.3    If Buyer is or at any time will be a Benefit Plan, Buyer's right to exercise any right or remedy against a Prior Seller under a Predecessor Transfer Agreement is conditioned upon such exercise not constituting or giving rise to a nonexempt prohibited transaction under Section 406(a) of ERISA or Section 4975 of the Code.  Buyer hereby agrees that it will obtain from each of its direct transferees the exclusion contained in the foregoing sentence and the undertaking contained in this sentence.

## 13.    Survival; Successors and Assigns

13.1    All representations, warranties, covenants, indemnities and other provisions made by the Parties shall be considered to have been relied upon by the Parties, shall (as to representations and warranties) be true and correct as of the Settlement Date and any other date set forth in Sections 4.1 or 5.1, as the case may be, and shall survive the execution, delivery and performance of this Agreement and the other Operative Documents.

13.2    This Agreement, including the representations, warranties, covenants and indemnities contained in this Agreement, shall inure to the benefit of, be binding upon and be enforceable by and against the Parties and their respective successors and permitted assigns.

## 14.    Further Assurances

Each Party agrees to (i) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (ii) take or cause to be taken all such other and further actions as the other Party may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement, including the procurement of the Required Consents.  Without limiting the generality of the foregoing, Seller agrees that if (i) notes have been issued evidencing all or any portion of the Loans and the Commitments (if any), (ii) Buyer or Buyer's designee or assignee requests that a new note or notes be issued to it, and (iii) the Agent, Borrower or any Governmental Authority requires either (x) the delivery of any note(s) evidencing the Loans and the Commitments (if any) previously issued to Seller or any Prior Seller or (y) the delivery of customary lost note documentation by Seller or any Prior Seller prior to the issuance thereof, then Seller shall use commercially reasonable efforts to either deliver such note(s) or customary lost note documentation to the Agent or to obtain such note(s) or customary lost note documentation from such Prior Seller; provided that Seller shall not be required to deliver either a note or such lost note documentation if no note was ever issued or delivered to it.



## 15.    Disclosure

15.1    Each Party agrees that, without the prior consent of the other Party, it shall not disclose the contents of this Agreement (or the Purchase Price Letter (including the Purchase Price and the Purchase Rate) to any Entity, except that any Party may make any such disclosure (a) as required to implement or enforce this Agreement, (b) if required to do so by any law, court, regulation, subpoena or other legal process, (c) to any Governmental Authority or self-regulatory Entity having or asserting jurisdiction over it, (d) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may   result in it incurring a liability to any other Entity or sanctions that may be imposed by any Governmental Authority, (e) to its Affiliates, professional advisors and auditors or (f) as set forth in Section 15.2.

15.2    Buyer may disclose the contents of this Agreement (but not the contents of the Purchase Price Letter (including the Purchase Price and the Purchase Rate)) to any proposed transferee, assignee, participant, or other Entity proposing to enter into contractual relations with Buyer in respect of the Transferred Rights or any part of them.

15.3    Buyer agrees to comply with the requirements of the Credit Documents regarding confidentiality.

15.4    If "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary, (a) Section 15.1 shall be deemed to be revised by deleting the following parenthetical therefrom:  "(or the Purchase Price Letter (including the Purchase Price and the Purchase Rate))" and (b) Section 15.2 shall be deemed to be revised by deleting the following parenthetical therefrom: "(but not the contents of the Purchase Price Letter (including the Purchase Price and the Purchase Rate))."[4]

## 16.    Parties' Relationships

Each Party and any of its Affiliates may engage in any kind of lawful business or other relationship with Borrower, any Obligor or any of their respective Affiliates without liability to the other Party or any obligation to disclose such business or relationship to the other Party.

## 17.    Entire Agreement; Conflict

17.1    This Agreement and the other Operative Documents constitute the entire agreement of the Parties with respect to the Transaction and supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, representations and warranties in respect thereof, all of which have become merged and finally integrated into this Agreement and the other Operative Documents.

17.2    This Agreement supplements the Assignment.  As between Seller and Buyer, if there is any inconsistency or conflict between this Agreement and any of the other Operative Documents, the provisions of this Agreement shall govern and control.   If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

## 18.    Counterparts; Telecopies

This Agreement and the other Operative Documents may be executed in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

---

[4]  The LSTA form of netting agreements contain comparable confidentiality provisions.

**LSTA**
THE LOAN SYNDICATIONS AND TRADING ASSOCIATION®

Transmission by telecopier, facsimile or other form of electronic transmission of an executed counterpart of any Operative Document shall be deemed to constitute due and sufficient delivery of such counterpart. Each fully executed counterpart of this Agreement and any other Operative Document shall be deemed to be a duplicate original.

**19.    Relationship Between Buyer and Seller**

The relationship between Seller and Buyer shall be that of seller and buyer.  Neither is a trustee or agent for the other, nor does either have any fiduciary obligations to the other.  This Agreement shall not be construed to create a partnership or joint venture between the Parties.

**20.    Severability**

The illegality, invalidity or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

**21.    Governing Law**

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION).

**22.    Waiver of Trial by Jury**

THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTION (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**23.    Jurisdiction**

23.1    The Parties irrevocably and unconditionally submit to and accept the exclusive jurisdiction of the United States District Court for the Southern District of New York located in the Borough of Manhattan or the courts of the State of New York located in the County of New York for any action, suit or proceeding arising out of or based upon this Agreement or any matter relating to it and waive any objection that they may have to the laying of venue in any such court or that any such court is an inconvenient forum or does not have personal jurisdiction over them.

23.2    The Parties irrevocably agree that, should either Party institute any legal action or proceeding in any jurisdiction (whether for an injunction, specific performance, damages or otherwise) in relation to this Agreement or the Transaction, no immunity (to the extent that it may at any time exist, whether on the grounds of sovereignty or otherwise) from such action or proceeding shall be claimed by it

la-996035



or on its behalf, any such immunity being hereby irrevocably waived, and each Party irrevocably agrees that it and its assets are, and shall be, subject to such legal action or proceeding in respect of its obligations under this Agreement.

## 24.    Subrogation; Reimbursement Claims

24.1    To the extent that Buyer enforces any claim for indemnification or other right, claim or remedy against Seller under this Agreement and receives payment or another remedy from Seller in respect of such right, claim or remedy, the Parties agree that, to the extent permitted by law, the Credit Documents and the Predecessor Transfer Agreements (if any), without the need for further action on the part of either Party, Seller shall be subrogated to the rights of Buyer against any other Entity, including Prior Sellers (if any), with respect to such right, claim or remedy to the extent that Buyer receives such payment or other remedy from Seller.

24.2    To the extent that Borrower or any other Entity enforces any claim for return, disgorgement or reimbursement against Seller or any Prior Seller for all or any portion of any payment or transfer received by Seller or such Prior Seller on account of the Transferred Rights prior to the Settlement Date and receives payment or satisfaction from Seller or such Prior Seller in respect thereof, the Parties agree that, to the extent permitted by law, the Credit Documents and the Predecessor Transfer Agreements (if any), without the need for further action on the part of either Party, Seller or such Prior Seller shall be subrogated to the rights of Buyer against any other Entity, including Borrower and Prior Sellers (if any), with respect to such claim (including the right to assert any Reimbursement Claims); provided that, if applicable, Seller or such Prior Seller has fully indemnified Buyer with respect thereto pursuant to Section 6.1.

## 25.    Interpretation

25.1    This Agreement includes the Annex and any other annexes, schedules or other documents attached to or incorporated by reference into the Agreement.

25.2    Terms used in the singular or the plural include the plural and the singular, respectively; "includes" and "including" are not limiting; and "or" is not exclusive.

25.3    Any reference to a Party includes such Party's successors and permitted assigns.

25.4    Unless otherwise indicated, any reference to:

(a)    this Agreement or any other agreement, document or instrument shall be construed as a reference to this Agreement or, as the case may be, such other agreement, document or instrument as the same may have been, or may at any time before the Settlement Date be, in effect as modified, amended or supplemented as of the Settlement Date; and

(b)    a statute, law, order, rule or regulation shall be construed as a reference to such statute, law, order, rule or regulation as it may have been, or may at any time before the Settlement Date be, in effect as modified, amended or supplemented as of the Settlement Date.

25.5    Section and other headings and captions are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

25.6    This Agreement shall be deemed to have been jointly drafted by the Parties and no provision of it shall be interpreted or construed for or against either Party because such Party actually or purportedly prepared or requested such provision, any other provision or the Agreement as a whole.

la-996035



**26.    Additional Provisions**

The additional provisions, if any, set forth in Section H of the Transaction Specific Terms shall apply.

**27.    Transfer Notice**

If "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the following transfer notice provisions shall apply:

> The Parties shall execute and deliver, and Buyer shall promptly file or cause to be filed with the Bankruptcy Court to the extent permitted by the Bankruptcy Rules, a Transfer Notice to duly reflect the assignment of the Transferred Rights to Buyer under Bankruptcy Rule 3001(e). Seller (a) agrees to take such other reasonable steps as Buyer requests to help Buyer effect and evidence the assignment of the Transferred Rights to Buyer in the Bankruptcy Case, (b) waives notice of, and the right to object to, any filing in respect thereof under Bankruptcy Rule 3001(e) and (c) agrees that it will not object to any such filing.

la-996035

# TABLE OF CONTENTS

Page

1.   Definitions ...................................................................................................1

2.   Assignment and Assumption .........................................................................7

3.   Conditions Precedent ....................................................................................7

4.   Seller's Representations and Warranties ........................................................7

5.   Buyer's Representations and Warranties ......................................................14

6.   Indemnification ...........................................................................................16

7.   Costs and Expenses ....................................................................................18

8.   Distributions; Interest and Fees; Payments ................................................18

9.   Notices .......................................................................................................21

10.  Further Transfers ........................................................................................21

11.  Voting .........................................................................................................22

12.  Exercise of Rights and Remedies ...............................................................22

13.  Survival; Successors and Assigns ..............................................................22

14.  Further Assurances .....................................................................................23

15.  Disclosure ..................................................................................................23

16.  Parties' Relationships .................................................................................24

17.  Entire Agreement; Conflict .........................................................................24

18.  Counterparts; Telecopies ............................................................................24

19.  Relationship Between Buyer and Seller ......................................................24

20.  Severability .................................................................................................24

21.  Governing Law ...........................................................................................24

22.  Waiver of Trial by Jury ...............................................................................25

23.  Jurisdiction .................................................................................................25

24.  Subrogation; Reimbursement Claims .........................................................25

25.  Interpretation ..............................................................................................25

26.  Additional Provisions .................................................................................26

27.  Transfer Notice ..........................................................................................26

la-996035