WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
In re                                                             :   Chapter 11 Case No.
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                          :   08-13555 (JMP)
                                                                  :
            Debtors.                                              :   (Jointly Administered)
                                                                  :
------------------------------------------------------------------x

**DEBTORS' OBJECTION TO KALAIMOKU-KUHIO
DEVELOPMENT CORP.'S MOTION FOR AN ORDER
(A) COMPELLING PAYMENT OF POST-PETITION RENT AND
CHARGES; (B) GRANTING RELATED RELIEF FROM THE AUTOMATIC
STAY; AND (C) COMPELLING ASSUMPTION OR REJECTION OF LEASES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, including LB 2080 Kalakaua Owners LLC ("LB 2080"), as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman") respectively submit this objection (this "Objection") in opposition to the Motion of Kalaimoku Kuhio Development Corp. (the "Landlord") for an order compelling payment of post-petition rent and charges, granting relief from the automatic stay, and compelling assumption or rejection of leases, dated June 4, 2009 [Docket No. 3768] (the "Motion"):

US_ACTIVE:\43073769\05\43073769_5.DOC\58399.0003

**Preliminary Statement**

1.  LB 2080 owns a four-story commercial building (the "Building") which it obtained as a result of the foreclosure of a $45 million dollar loan made by LBHI. The parcels of land underlying the Building are owned by the Landlord and leased to LB 2080 pursuant to the Ground Leases (as defined below). The income generated by LB 2080 from the Building has been, and currently is, insufficient to cover the Building's current monthly operating costs. LB 2080 does not dispute that it is in arrears for its accrued postpetition rent obligations under the Ground Leases. Upon information and belief, the Landlord seeks to effect a forfeiture of the Building in its favor under Hawaii law. To avoid forfeiture of the Debtors' investment of over $45 million in the Building and a corresponding windfall to the Landlord, LB 2080 is attempting to sell the Building and assume and assign the Ground Leases to a prospective purchaser. LB 2080 is currently negotiating a definitive agreement for the sale of the Building and is hopeful that the agreement will be executed by the prospective purchaser this week. LB 2080 simply needs more time to finalize the sale and, while there can be no assurance a sale will be consummated, such sale will provide sufficient proceeds to cure all defaults under the Ground Leases, avoid forfeiture of the Building and provide a return to creditors. LB 2080 is working with the Landlord, and the Landlord is fully aware of the sale process and current negotiations with the prospective purchaser.

2.  Despite LB 2080's ongoing efforts to sell the Building to obtain proceeds to satisfy its mounting costs, the Landlord requests that this Court vacate the automatic stay to permit the Landlord to exercise all of its rights and remedies, including any right to seize the Building. Lifting the automatic stay will immediately harm LB 2080 and its creditors and deprive LB 2080 of one of the primary intended benefits of Chapter 11, a breathing spell to

permit a debtor to make rational choices regarding the disposition of its assets for the benefit of its estate and <u>all</u> of its creditors. Accordingly, LB 2080 respectfully requests that the Court adjourn the Motion until July 15, 2009, the next omnibus hearing date. By adjourning this matter to the next omnibus hearing, the Court will preserve value for LB 2080's estate and its creditors, a benefit that will outweigh any harm to the Landlord that may arise from such a brief adjournment.

3.  The additional relief requested by the Landlord is similarly objectionable. Despite LB 2080's ongoing efforts to finalize the Proposed Sale, the Landlord is attempting to force LB 2080 to make an early decision to assume or reject the Ground Leases. The Landlord's request fails as a matter of fact and law. The controlling case law could not be clearer: a debtor is entitled to defer its decision to assume or reject a lease for nonresidential real property until the earlier of the date that is 120 days after the commencement of such debtor's case or the date of the entry of an order confirming a plan; provided, however, that upon a showing of compelling circumstances and significant prejudice to a contract counterparty, the time to assume or reject may be shortened. The Landlord's mere allegations of financial hardship do not demonstrate compelling circumstances or significant prejudice. LB 2080 must be afforded the full period allotted under the Bankruptcy Code for assumption or rejection of the Ground Leases to allow for the sale of the Building and concomitant preservation of value for the benefit of LB 2080's estate.

**Background**

4.  Commencing on September 15, 2008, and periodically thereafter, Lehman Brothers Holdings Inc. ("<u>LBHI</u>," together with its affiliated debtors in the above-captioned chapter 11 cases, the "<u>Debtors</u>," and collectively with their non-debtor affiliates, "<u>Lehman</u>") and

certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On April 23, 2009, LB 2080, a wholly-owned, indirect subsidiary of LBHI, commenced its chapter 11 case.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

**Jurisdiction**

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Lehman's Business**

7.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**The Building**

9.     In 1997, LBHI loaned King Kalakaua Owners ("KKO") $45 million (the "Loan").  The Loan was secured by a first lien mortgage lien and security interest in and to, among other things, (i) the leasehold estate created by that certain Ground Lease and Sublease, dated October 6, 1995, by and between the predecessor-in-interest of the Landlord and KKO (f/k/a Consolidated Amusement Company, Limited) (as amended by that certain Amended and Restated Ground Lease, dated as of July 1, 2003, the "Ground Lease") and (ii) the subleasehold estate created by that certain Ground Lease and Sublease, dated October 6, 1995, by and between the predecessor-in-interest of the Landlord and KKO (f/k/a Consolidated Amusement Company, Limited) (as amended by that certain Amended and Restated Sublease, dated as of July 1, 2003, the "Ground Sublease" and, together with the Ground Lease, the "Ground Leases"), and (iv) all structures, improvements and fixtures located on the land subject to the Ground Lease and Ground Sublease, including the Building.

10.    In 2006, LBHI assigned its rights and interests in the Loan and the collateral securing the Loan to LB 2080.  As a result of KKO's default under the Loan, LB 2080 foreclosed on its collateral and obtained title to the Building and the Ground Leases for the land upon which the Building is situated.  The Building comprises LB 2080's only substantial asset.

11.    The Building currently has one tenant, which pays approximately $65,850 in monthly rent and other charges.  LB 2080 is also obligated to provide parking spaces to the owner of the premises adjacent to the Building and receives approximately $10,000 per month in connection with the provision of such spaces.  Such amounts are insufficient to cover LB 2080's monthly costs for the Ground Leases of approximately $205,000 or the additional monthly costs for utilities, taxes, maintenance and other costs associated with the Building.  Accordingly, prior

to the filing of its chapter 11 case, LB 2080 engaged a broker to extensively market the Building to prospective purchasers. While LB 2080 marketed the Building and has received multiple offers, an inability to pay mounting costs compelled LB 2080 to commence its chapter 11 case before a definitive transaction could be fully negotiated or consummated. As of June 18, 2009, LB 2080 has only approximately $140,000 in cash on hand, insufficient cash to pay the Landlord the over $600,000 of rent that has allegedly accrued under the Ground Leases post-petition. Nonetheless, since the commencement of its case, LB 2080 has actively negotiated the sale of the Building and is currently in negotiations with a prospective purchaser. LB 2080 is hopeful that the prospective purchaser will execute a definitive sale contract this week. While there can be no assurance a sale will be consummated, such sale will provide sufficient proceeds to cure all defaults under the Ground Leases, avoid forfeiture of the Building and provide a return to creditors.

**Payment of Accrued and Unpaid Post-Petition Rent**

12. LB 2080 respectfully requests that the Court adjourn the Motion until July 15, 2009, the next omnibus hearing date. By adjourning this matter to the next omnibus hearing, the Court will preserve value for LB 2080's estate and its creditors, a benefit that will outweigh any harm to the Landlord that would arise from such a brief adjournment. In accordance with the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837], LB 2080 requests that, notwithstanding the adjournment of the Motion to a date more than 30 days after the filing of the Motion, the Court order the automatic stay continued pending the final hearing and determination of the Motion.

**The Landlord's Request to Lift the Automatic Stay Must be Denied;**
**The Relief the Landlord Seeks Goes Beyond Lifting the Automatic Stay**

13.  Despite LB 2080's ongoing efforts to negotiate the sale of the Building to obtain proceeds to satisfy its mounting costs and the claims of its creditors, the Landlord requests that this Court vacate the automatic stay to permit the Landlord to "exercise all of its rights and remedies under the Ground Leases and applicable laws" to the detriment of LB 2080's other creditors.  See Motion, ¶2.  However, these remedies extend well beyond lifting the automatic stay.  In the event of default under the Ground Leases, the Landlord may be entitled to seize the Building under the terms of the Ground Leases and Hawaii law.  Given that the Building constitutes LB 2080's only substantial asset, if the Court grants relief from the automatic stay and the Landlord is successful in its attempts to seize the Building, LB 2080's estate will be left with no significant assets to satisfy the claims of its remaining creditors.  The effect of this would be to allow the Landlord to end run section 507 of the Bankruptcy Code through obtaining the first priority payment of all of its prepetition unsecured claims to the detriment of LB 2080's other creditors.  Moreover, stay relief may allow the Landlord to seize a property in which the Debtors have invested in excess of $45 million and a corresponding windfall to the Landlord, solely for LB 2080's failure to pay approximately $600,000 in rent.  There is no indication that Section 365 of the Bankruptcy Code was intended to provide such an inequitable benefit for a lessor as a result of the insolvency of its tenant.  The Debtors reserve all of their rights and remedies against the Landlord for such unjust enrichment in the event that it successfully seizes the Building.

14.  Section 362(a)(1) of the Bankruptcy Code provides, in relevant part, that a bankruptcy petition

> operates as a stay, applicable to all entities, of … the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code].

11 U.S.C. § 362(a)(1).

15. The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." Mid-Atlantic Natl'l Bank v. New Jersey Dep't of Envtl. Prot., 474 U.S. 494, 503 (1986). It provides a debtor with a "'breathing spell' from the collection process." See, e.g., Eastern Refractories Co. Inc. v. Forty Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir. 1998). "The principal purpose of the automatic stay of acts against property of the estate … is to preserve that property for distribution or use in reorganization of the debtor." Official Creditors' Comm. of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.), 114 B.R. 27, 29 (Bankr. S.D.N.Y. 1989). The automatic stay "is necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization." Fidelity Mortgage Inv. v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976). Indeed, "[t]he automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding." In re AP Indus., 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990). Acts precluded by the automatic stay include postpetition termination of a prepetition executory contract (termination provisions contained therein notwithstanding). See, e.g., In re 48th Street Steakhouse, Inc., 835 F.3d 427 (2d Cir. 1987). Accord In re Computer Communications, Inc., 824 F.2d 725, 728 (9th Cir. 1987).

16. Section 362(d) of the Bankruptcy Code provides that a party may be entitled to relief from the automatic stay only under certain circumstances. 11 U.S.C. § 362(d);

In re Éclair Bakery Ltd., 255 B.R. 121, 132 (Bankr. S.D.N.Y. 2000). Specifically, the pertinent portion of section 362(d) provides:

> (d) On a grant of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>>
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>>
>>> (A) the debtor does not have an equity in such property; and
>>>
>>> (B) such property is not necessary to an effective reorganization

11 U.S.C. § 362(d) (emphasis added).

17.     The party seeking to lift or modify the automatic stay bears the initial burden to show cause why the stay should be lifted. Sonnax Indus., Inc. v. Tri-Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1285 (2d Cir. 1990) ("If the movant fails to make an initial showing of cause … the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection"). As demonstrated below, the Landlord has not carried their burden of establishing "cause" under section 362(d)(1) for any stay relief, let alone the potentially expansive stay relief it requests that may allow it to seize the Building.

18.     It is well established that the party seeking to lift or modify the automatic stay bears the initial burden to show cause why the stay should be lifted. Sonnax, 907 F.2d at 1285. "Conclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause. In re Texaco Inc., 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988) (citing In re Penn Dixie, 6 B.R. 832 (Bankr. S.D.N.Y. 1980)).

"If the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection". Sonnax, 907 F.2d at 1285.

19. In its argument, the Landlord fails to make any allegations of harm that may befall it, other than generalized assertions of economic difficulty and the allegation that it lacks adequate protection of the accruing post-petition rent, charges and obligations under the Ground Leases. See Motion, ¶¶ 13, 23. Such statements of harm are insufficient to establish cause for stay relief, particularly in light of the genuine harm faced by LB 2080 and its estate if the Landlord obtains stay relief and successfully seizes the Building. Accordingly, the Court should deny the Landlord's request for stay relief.

20. The term "cause" is not defined in the Bankruptcy Code. However, the Court in the seminal Second Circuit case, In re Sonnax Industries, Inc. set forth twelve factors that may constitute "cause" for the purposes of determining whether the automatic stay should be lifted:

(1) whether relief would result in a partial or complete resolution of the issues;

(2) lack of any connection with or interference with the bankruptcy case;

(3) whether the other proceeding involves the debtor as a fiduciary;

(4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

(5) whether the debtor's insurer has assumed full responsibility for defending it;

(6) whether the action primarily involves third parties;

(7) whether litigation in another forum would prejudice the interests of other creditors;

(8) whether the judgment claim arising from the other action is subject to equitable subordination;

(9) whether Movants' success in the other proceeding would result in a judicial lien avoidable by the debtor;

(10) the interests of judicial economy and the expeditious and economical resolution of litigation;

(11) whether the parties are ready for trial in the other proceeding; and

(12) impact of the stay on the parties and the balance of harms.

Sonnax, 907 F.2d at 1286.

21.     Not all of these factors are relevant to every instance in which relief from the stay is sought. Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999). A court need not assign equal weight to each factor. In re Keene Corporation, 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

22.     The two Sonnax factors that are relevant to the instant case are the balance of harms between the Landlord and LB 2080 and the interference with LB 2080's bankruptcy case. An analysis of these factors also indicates that the Court must deny the Landlord's request to lift the automatic stay.

A.     **The Impact of the Automatic Stay and the Balance of Harms**

23.     The Landlord fails to cite any of the Sonnax factors; however, the twelfth Sonnax factor, the impact of the automatic stay on the parties and the balance of harms, is the most relevant to the instant case and strongly weighs against stay relief.

24.     As discussed, the Landlord fails to make any allegations of harm that may befall it, other than generalized allegations and the assertion that it lacks adequate protection of the accruing post-petition rent, charges and obligations under the Ground Leases. On the other hand, if the Landlord is successfully able to seize the Building, LB 2080's estate will be left with no significant assets to satisfy the claims of its remaining creditors. The effect of this would be to allow the Landlord to end run section 507 of the Bankruptcy Code through obtaining the payment of all of its prepetition unsecured claims before LB 2080's other creditors. Lifting the automatic stay will immediately harm LB 2080 and its creditors and deprive LB 2080 of one of the primary intended benefits of Chapter 11, a breathing spell to permit a debtor to maximize the

value of its properties by making rational choices regarding their disposition for the benefit of its estate and all of its creditors.

25. In its Motion, the Landlord quickly dismisses the claims of PAMI LLC as insider claims that should seemingly be ignored in determining LB 2080's liabilities. Yet such claims represent $30,920,101 that were loaned to LB 2080 by an indirect subsidiary of LBHI and asset of LBHI's estate. These loans represent the inter-company transfer of LBHI's interest in the Building, through its subsidiary PAMI LLC, to LB 2080 and correspond with a portion of the considerable funds provided by the Debtors to significantly improve the Landlord's property. Thus, the Landlord is dismissing the very claims that correspond with the creation of value that the Landlord seeks to seize from LB 2080's estate. Moreover, because such claims correspond with loans made by LBHI and its subsidiary, forfeiture of the Building will also prejudice LBHI's creditors by reducing the value of LBHI's estate.

26. If the Landlord is granted stay relief and subsequently seizes the Building, the Landlord not only will receive compensation for unpaid accrued post-petition rent under the Ground Leases but also will improve its position relative to that if LB 2080 had not commenced its chapter 11 case. Upon lifting the stay the Landlord may be able to take possession of a building in which over $45 million has been invested, solely because of LB 2080's failure to pay only $600,000 of allegedly accrued post-petition rent due under section 365(d)(3) of the Bankruptcy Code. However, this Court has noted that there is no indication that the intent of section 365 was to allow a Landlord to receive a windfall benefit as a result of its tenant's insolvency. See In re Westview 74th Street Drug Corp., 59 B.R. 747, 755 (Bankr. S.D.N.Y. 1986) (internal citations omitted) ("Section 365 gives no indication that a landlord ... is to improve its position upon the bankruptcy of a tenant."). The Court must not allow the Landlord

to exploit the Bankruptcy Code to obtain a windfall at the detriment of LB 2080's estate and creditors.

**B.      Interference with the Bankruptcy Case**

27.     The second Sonnax Factor, interference with the bankruptcy case, also weighs against lifting the automatic stay. Lifting the automatic stay would have a direct and destructive impact upon the administration of LB 2080's estate. The Landlord astoundingly argues it is entitled to stay relief under section 363(d)(2) because the Building is not necessary for LB 2080's effective reorganization. To the contrary, as the only significant asset of LB 2080's estate, the Building is necessary for LB 2080's other creditors to realize any significant recovery on their claims.

28.     While the Landlord fails to cite the Sonnax factors, it asserts in the Motion that a debtor's failure to pay accrued postpetition rent under a lease for non residential constitutes "cause" under section 362(d). See Motion, ¶ 20. To support this proposition, the Landlord relies on In re Pudgies Dev. NY, 239 B.R. 688, 696 (Bankr. S.D.N.Y. 1998), and In re Rocchio, 125 B.R. 345, 347 (Bankr. R.I. 1991). However, unlike in the cases cited by the Landlord, in the instant case the lifting of the automatic stay will deprive the debtor's creditors of any prospect of any significant recovery and provide the lessor with the windfall of a commercial building in which over $45 million has been invested. Accordingly, the Landlord's request to lift the automatic stay should be denied.

**The Landlord Has Not Demonstrated Cause to Compel
LB 2080 to Immediately Assume or Reject the Loan Agreement**

29.     Pursuant to section 365(d)(4) of the Bankruptcy Code, a chapter 11 debtor has until the earlier of the date of the order confirming a plan or the date that is 120 days after the commencement of its case to decide whether to assume or reject an executory contract. 11

U.S.C. § 365(d)(4). A movant must establish a compelling reason to shorten the debtor's time for assumption or rejection. Theatre Holding Corp. v. Mauro, 681 F.2d 102, 105 (2d Cir. 1983); South St. Seaport Ltd. P'ship v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir. 1996) (factors include: the nature of interests at stake, the balance of harm to the litigants, the good to be achieved); Enron, 279 B.R. at 703 (using same factors).

30.    The law in the Second Circuit is clear that, despite the flexibility provided to the Court by section 365, a debtor is nonetheless entitled to a "reasonable" amount of time to decide whether to assume or reject an executory contract. Theatre Holding, 681 F.2d at 105 ("the trustee or debtor in reorganization is allowed a reasonable time to decide whether to assume or reject"). An absolute or fixed timeframe for reasonableness has not been established. In re Taber Farm Assocs., 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990) ("There is no fixed time limit under the Bankruptcy Code as to what constitutes a reasonable time within which a debtor must either assume or reject"). Instead, reasonableness is left to the bankruptcy court's discretion to be determined on a case-by-case basis. Theatre Holding, 681 F.2d at 105 ("What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances in each case").

31.    The Landlord fails to demonstrate compelling circumstances or significant prejudice that would justify premature assumption or rejection of the Ground Leases. The Landlord only makes the naked assertion that it is experiencing difficulty meeting its obligations to its lender and a third party lessor with respect to the premises under the Ground Sublease. See Motion ¶ 13. On the other hand, by seeking to prematurely compel the assumption or rejection of the Ground Leases before the Landlord has had adequate time to negotiate a sale of the Building, the Landlord will deprive LB 2080's other creditors from any prospect of significant

recovery with respect to their claims. As the Landlord notes in the Motion, it is the largest non-insider creditor of LB 2080. If LB 2080 were to assume the lease at this stage, LB 2080 would be required to promptly cure approximately $900,000 worth of pre- and post-petition defaults under the Ground Leases without the benefit of the proceeds of the sale of the Building. Given that LB 2080 has only $140,000 in cash and that LB 2080's other creditor's have claims estimated at over $190,000, premature assumption would likely deprive such creditors of any meaningful recovery.

32.   Similarly, upon rejection of the Ground Leases, LB 2080 will be unable to sell the Property, which would also deny LB 2080's other creditors of the proceeds of such sale to satisfy their claims. Thus, by seeking to compel the premature assumption or rejection of the Ground Leases before LB 2080 has been afforded sufficient time to sell the Property, the Landlord will impale LB 2080 on Morton's Fork, either prong of which, like relief from the automatic stay, will deprive LB 2080's other creditors from any prospect of significant recovery with respect to their claims.

33.   If LB 2080 has not entered into a definitive purchase contract for the sale of the Property by the next omnibus hearing date, July 15, 2009, LB 2080 will reject the Ground Leases. Until then, the Court should afford LB 2080 with the full period allotted under the Bankruptcy Code to permit LB 2080 to sell the Property and thereby maximize the value of its estate, not for the sole benefit of the Landlord, but for the benefit of all of LB 2080's creditors.

34.   For all of the foregoing reasons and authorities, as well as those to be advanced at oral argument, the Debtors respectfully request that the Court deny the Motion.

WHEREFORE the Debtors respectfully request that the Court deny the relief requested and grant the Debtors such other and further relief as is just.

Dated:  June 20, 2009
       New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession