JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
William J. Hine
Jayant W. Tambe

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :    Case No. 08-13555
                                                              :
                              Debtors.                        :    (Jointly Administered)
                                                              :
---------------------------------------------------------------x

**DEBTOR'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR AN ORDER,**
**PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING**
**DISCOVERY FROM BARCLAYS CAPITAL, INC.**

## PRELIMINARY STATEMENT

1.        Shortly after closing the Sale Transaction, Barclays declared a £2.262 billion

(approximately $4.2 billion[1]) gain on its acquisition of LBHI's assets, resulting from "the excess

of the fair market value of net assets acquired over [the] consideration paid" in the transaction.

(*See* Ex. 4, "Barclays Results Announcement: Figures 2008" at 95)  This windfall could be

explained by the answers to the very questions that prompted LBHI to seek discovery in this

case.  As shown in LBHI's moving papers, there appear to be significant discrepancies that raise

serious questions about the economics of the Sale Transaction, the adequacy of disclosures made

to the Court, and even whether former Lehman executives breached duties owed to Lehman in

agreeing to this and related transactions.  These discrepancies provide "good cause" for the

discovery the Debtor seeks.  As any responsible debtor can and must do, LBHI is examining the

potential for claims to determine whether there are assets that should be recovered by the Estate

for the benefit of creditors.  Contrary to Barclays' suggestions, this is not a "wholesale attack" on

the Sale Transaction.  LBHI has not formulated "potential claims" against Barclays.  Nor is it

seeking to retrade the deal.  Rather, LBHI is asking for discovery to find out exactly what

happened during the short, tumultuous, period of time at issue.

2.        In its opposition papers, Barclays sheds no light on the issues.  Barclays does not

say how much it has actually paid in Lehman-related compensation and contract cure liabilities.

Nor does Barclays address how or why it appears to have received a discount of approximately

$5 billion on its purchase of LBHI's assets, through the September 18 repurchase transaction.

Barclays does not explain how this ancillary transaction, which was hardly mentioned in Court

and was merely supposed to provide overnight financing in the days before the Sale Transaction

---

[1] Based on the approximate foreign exchange rate as of September 22, 2008.

closed, ended up providing Barclays all the funds it needed to buy Lehman's North American

businesses and then some.

3.       LBHI does not yet know if it has claims it should assert, but it has good cause to

seek answers.  The best way for Barclays to put these issues to rest is to provide full disclosure

about the issues raised in LBHI's motion.  Barclays has instead opted to fight or delay discovery.

## ARGUMENT

4.       Contrary to Barclays' suggestion, a Rule 2004 movant does not first have to

demonstrate that it has a claim.  (Opp. Br. at ¶ 14)  The purpose of Rule 2004 is to assist in

identifying potential claims.  *See, e.g.*, *In re the Bennet Funding Group*, 203 B.R. 24, 28 (Bankr.

N.D.N.Y. 1996) (Rule 2004 "is properly used as a pre-litigation device to determine whether

there are grounds to bring an action ...."); *In re Bakalis*, 199 B.R. 443, 447 (Bankr. E.D.N.Y.

1996) (Rule 2004 examinations are "typically implemented in the pre-litigation stage of a

bankruptcy case" and such "examinations may be used to prepare for initiation of litigation").[2]

Barclays' Opposition to Discovery About Compensation Payments
Misstates the Basis for the Requested Discovery

5.       When the Court was told at the hearings that, as part of the value given by

Barclays in the transaction, Barclays would assume (i) $2 billion in liabilities to pay

compensation and (ii) approximately $1.5 billion in contract cure costs, the Court relied on those

numbers, in full, in assessing the value of the Sale Transaction.  (*See, e.g.,* Ex. 17, 9/19/08

---

[2]   The cases cited by Barclays are not to the contrary.  *See, e.g., In re Metiam, Inc.*, 318 B.R. 263, 271 n.6 (S.D.N.Y. 2004) ("The purpose of a Rule 2004 examination is to assist a trustee in a bankruptcy proceeding to 'learn quickly about the debtor entity' so that he or she may 'maximize the realization of the debtor's estate'") (citation omitted); *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (E.D.N.Y. 1991) ("The scope of a Rule 2004 examination is very broad and can be in the nature of a fishing expedition."); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 712, 708 (S.D.N.Y. 1991); *In re Silverman*, 36 B.R. 254, 258 (S.D.N.Y. 1984) (involving Rule 205 (predecessor to Rule 2004), "the broad latitude of which has been characterized as a 'fishing expedition'") (citation omitted).

Hearing Tr. at 100:22-25; *id.* at 101:1-4; Ex. 18, 9/17/08 Hearing Tr. at 23:5-24:8)  In fact, the

Court found that these assumptions of liabilities were "integral" to the deal.  (Sale Order at 10)

6.     Nevertheless, Barclays contends that LBHI should get no discovery about

compensation paid to former Lehman employees because: (1) "Barclays did not assume an

obligation to pay $2 billion in bonus payments" to Transferred Employees, and that figure was

purportedly only an "estimate of the potential exposure" Barclays agreed to assume (Opp. Br. at

¶ 24); (2) LBHI can get no purchase price adjustment (*id.* at ¶¶ 31-32); and (3) Barclays offers to

provide aggregate information about what it paid Transferred Employees (*id.* at ¶ 4).  Barclays is

wrong on all fronts.

7.     First, Barclays' assumed liability for compensation, an integral component of the

consideration it was required to pay, was, according to the Asset Purchase Agreement the Court

approved, a contractual obligation to pay a specified amount.  Article 9.1(c) of the APA states

that Barclays

> ***shall*** … pay each Transferred Employee an annual bonus (the "08
> Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the
> aggregate, are equal in amount to 100 percent of the bonus pool
> amounts accrued in respect of amounts payable for incentive
> compensation (but not base salary) and reflected on the financial
> schedule delivered to Purchaser on September 16, 2008 and
> initialed by an officer of each of Holdings and Purchaser (the
> "Accrued 08 FY Liability").  ***Such 08 Annual Bonuses shall be
> awarded … so that the aggregate amount awarded shall equal
> the Accrued 08 FY Liability***.

(APA § 9.1(c) (emphasis added))  And the financial schedule to which the APA refers shows the

Accrued '08 FY Liability to have been $2.0 billion.  (*See* Motion Ex. A)  There was nothing

optional or estimated about this obligation or amount.

8.     Second, LBHI is entitled to determine the source of that $2.0 billion number,

which emanates from the September 16, 2008 financial schedule about which the Estate has little

3

or no information. (Motion Ex. A)  The Court, and LBHI's board, was told that Barclays was

assuming real liabilities and otherwise giving equivalent value for the assets it was buying.  The

fact that Barclays has apparently paid much less than $2.0 billion in compensation suggests that

the number was not based on a valid calculation and could have been overstated simply to justify

a gratuitous transfer of property to Barclays.  Some documents that the Debtor has been able to

uncover indicate that this may be so.  In the early morning of September 16, 2008, Martin Kelly[3]

wrote an e-mail to Ian Lowitt and Paolo Tonucci saying:

> Well, it took all night and lots of back and forth but the deal is
> done and ready for the Board.  Final price did not change
> meaningfully—approximately a $5 bn all in economic loss versus
> our marks and $3.6 bn of resi assets left behind.  Assume we can
> fund this after everything else winds down but paolo you need to
> review this.  **Also, an extra $1 bn of comp beyond our accrual**
> and assumption of all trade payables in LBI and LBHI.  Took 745
> for $1b, and several data centers for $400 mm.  Bart [McDade]
> reviewed all of it before final agreement.

(Ex. 1, 9/16/09 E-mail from Kelly to Lowitt and Tonucci (emphasis added)) [4]

9.      Thus, LBHI needs discovery to determine whether the $2.0 billion assumed

liability for compensation was a properly calculated number, with a basis, or just an invented

number, or something in-between.  The assumption of this liability by Barclays was a critical

component of the Sale Transaction.  If the number was simply made up to cover for the transfer

of the Debtor's property to Barclays, or wrongly calculated, claims to recover assets for the

---

[3] Kelly was Lehman's Managing Director of Finance & Administration.  We believe he is now Barclays' CFO.

[4] The day before he wrote to Lowitt about "an extra 1 bn of comp beyond our accrual," Kelly himself said that a bonus number of "$1.4B" did "not seem right" because "cash bonus for [the] entire firm is $1.9 b." (Ex. 2, 9/15/08 e-mail from Kelly to Edmond Coku).  Barclays, of course, did not purchase the "entire firm."  So if the compensation accrual for all of Lehman Brothers was used, the stated assumption of liability was inflated and the consideration the Court was told Barclays was giving was overstated.

Estate might well be viable.  Thus, even if the $2.0 billion began as an "estimate," LBHI should be entitled to discovery to test whether it was arrived at in good faith and was reasonable.

10.     Third, Barclays' assertion that LBHI could not secure a purchase price adjustment because of paragraph 9 in the Clarification Letter (Opp. Br. at ¶ 31) is incorrect and irrelevant. LBHI is investigating, among other things, whether former executives may have breached fiduciary duties they owed to Lehman when they negotiated this deal and its post-approval amendments.  If such misconduct occurred (and LBHI takes no position on that yet) the surrender of a remedy that was put in place by the persons accused of such a breach of duty would be unenforceable, both as a matter of tort law and public policy.  Besides, other remedies could be available to LBHI if it has viable claims, including a review of the Sale Order.

11.     Finally, Barclays' offer to provide unspecified "aggregate" compensation information is not enough.[5]  Not only is LBHI entitled to examine whether Barclays fully complied with Section 9.1(c) of the APA, it also must depose the former Lehman executives (now working for Barclays) who were, directly or indirectly, involved in or affected by the negotiations with Barclays.  Barclays' discussions with these individuals about their post-transfer compensation, while the Sale Transaction was being negotiated, raises possible conflicts of interest that require examination.  The limited documents in LBHI's possession indicate that significant amounts of money, including "special cash awards," may have been promised by Barclays to select former Lehman executives, including some from whom we seek discovery. (*See* Ex. 3, Declaration of Rajesh Ankalkoti at ¶¶ 5-7)  Other information the Estate has been able to develop suggests that e-mail communications about this post-transfer compensation may

---

[5]  (*See* Ex. 3, Declaration of Rajesh Ankalkoti, dated June 22, 2009)

have been deliberately avoided in favor of delivering sealed envelopes. This provides "good cause" for discovery on this issue.

Barclays Should Provide Discovery About Cure Amounts

12.     Barclays argues that LBHI should get no discovery about contract cure payments because (1) LBHI allegedly can have no claim as to this issue (Opp. Br. at ¶ 35); (2) LBHI allegedly has the most relevant information (*id.*); and (3) Barclays says it has agreed to provide enough information. (*Id.*) These contentions miss the point. Here, Barclays points to the text of the APA in arguing that the $2.25 billion entry under "Cure pmt" in the financial schedule attached to the APA was merely an estimate. (Opp. Br. at ¶ 37) But LBHI does not contend that $2.25 billion was an amount Barclays was obligated under the APA to pay in full. The issue is just how far off the mark this purported "estimate" was, why that was so, and how that affected the total consideration Barclays paid. Against an "estimate" of, first, $2.25 billion (in the 9/16/08 financial schedule) and then $1.5 billion (in Court the next day), Barclays wound up paying only about $200 million for contract cures. Again, the Court and the LBHI board were told that equivalent value was being exchanged in the Sale Transaction. The assumption of cure liabilities estimated to be at least $1.5 billion was a critical component of this value. If that "estimate" for assumed cure liabilities was inflated, the value the Court was told Barclays would give in the deal was inflated. This issue, therefore, warrants examination.

13.     In addition to the fact that Barclays apparently ended up paying only a fraction of these amounts after the transaction closed, another good reason discovery is necessary lies in the fact that shortly after concluding the Sale Transaction, Barclays reported a £2.26 billion (approximately $4.2 billion based on the September 22, 2008 exchange rate) gain on the acquisition of Lehman's assets. Barclays now contends that this enormous gain was earned

because the "acquired businesses have performed well." (Opp. Br. at ¶ 56)  That assertion,

however, is belied by Barclays' own report, which stated that "[t]he excess of the fair value of

net assets acquired over consideration paid resulted in £2.262m in gains *on acquisition*." (*See*

Ex. 4, "Barclays Results Announcement: Figures 2008" at 95 (emphasis added); *see also id.*

(suggesting it would be impractical to disclose profits and losses from the acquired businesses at

the time of the report))

       14.    Barclays' contention that LBHI already has the information it needs is not true.

LBHI has insufficient information as to how the numbers included in the Sale Transaction and

presented to the Court were derived because Lehman's key former employees now work for

Barclays.  Nor does LBHI have information about what Barclays and these former Lehman

employees discussed (either before or after the closing) as to the contract cure issue.  LBHI also

lacks information about Barclays' internal decisions as to which contracts to designate as

"Purchased Contracts" under the APA.

The Details of the Repurchase Transaction Were
Not Fully Disclosed and Require Further Examination

       15.    Much of what occurred with regard to the repurchase transactions was not

disclosed to the Court before its approval of the Sale Transaction and LBHI does not have access

to the people who negotiated the agreements.  Nonetheless, Barclays contends that information

should remain immune from discovery because:  (1) public policy disfavors "unwarranted

hindsight attacks on such court-approved transactions" (Opp. Br. at ¶ 43); (2) Barclays allegedly

took an "enormous [] risk" in this deal (*id.* at ¶ 44); and (3) the Court approved these transactions

based on its "informed" assessment of the transaction.  (*Id.* at ¶ 47)  Again, Barclays' assertions

lack merit.

16.     First, the cases Barclays cites are inapplicable.  None addresses anything like the

unprecedented circumstances that gave rise to the Sale Transaction, and the expedited manner in

which it was negotiated and approved by the Court.  Indeed, while Barclays' cases point to a

policy generally favoring the finality of court-approved sales, they do not address the

countervailing policy of ensuring that expediency does not shield an otherwise unfair transaction

from scrutiny.[6]  Moreover, Barclays' arguments against revisiting the Court's Sale Order come

with ill grace from an entity that has *itself* filed two post-closing Rule 60 motions to re-examine

purported mistakes in the deal, and also has applied to approve a December 5, 2008 Settlement

Agreement whereby Barclays received additional money it claims mistakenly was not paid to it

under the original agreements.  If facts emerge to support it, the Debtor clearly has the same right

to revisit the Sale Order.

17.     Second, information uncovered to date calls into question Barclays' contentions

that it undertook "enormous" risks and that the Court was fully informed.  For example, e-mail

communications among senior Lehman executives indicate that the parties may have intended to

employ the September 18 repurchase transaction, in which Lehman posted some $50 billion in

collateral against Barclays' $45 billion in overnight financing, to effect a gratuitous transfer of

additional billions in securities to Barclays, essentially giving Barclays an undisclosed discount

on the Sale Transaction.[7]  Among other things, this effectively would negate Barclays'

---

[6]  Barclays' quotation from Judge Posner (Opp. Br. at ¶ 58) and its insinuation that sanctions may be appropriate are
way off base.  Not only has the Estate not filed any claims (so the case is inapplicable on its face), but LBHI is
engaging in a wholly appropriate investigation as to how Barclays acquired billions of dollars in assets, through
seemingly one-sided agreements, with limited creditor and judicial review.  That is what any reasonable debtor-
in-possession should be encouraged to do under these circumstances.

[7]  Nowhere in the APA or related documents is there mention of a discount, as acknowledged in e-mails between
Messrs. Reilly and Lowitt (both from Lehman) the night before the September 18 repurchase transaction.  (*See*
Ex. 5 [9/17 e-mail chain]) Reilly wrote:  "I went thru all docs and did not see reference to the price haircut.  If

8

assumption of a purported $4.25 billion in liabilities as the consideration the Court was told

Barclays would give in the Sale Transaction.[8]  This e-mail traffic suggests that Lehman and

Barclays planned for LBI to intentionally default on the repurchase transaction or otherwise

through the repurchase agreement to roll the pledged collateral into the Sale Transaction at a

discounted price.  Martin Kelly's description of the "final price" in the deal as including "a $5 bn

all in economic loss versus our marks" (Ex. 1) further supports the possibility that the $50 billion

in collateral in the repurchase agreement was given to Barclays for only $45 billion, thus giving

Barclays an undisclosed discount. The Court was never told about this.  Even the disclosures

noted in Barclays' opposition fail to mention it.  (Opp. Br. at ¶¶ 49-52)

18.    Again, there is some e-mail indicating good cause for further examination.  On

September 18 at 6:04 a.m. (before Barclays and LBI executed their repurchase transaction),

Gerard Reilly (Lehman) wrote to Ian Lowitt (Lehman's CFO) and Michael Gelband (another

senior Lehman executive):

> I need some help resolving these issues today …
>
> 3)  Not clear on the amount of block discount or how we make it
> happen.  **Defaulting on repo could be the best as discount could
> be taken from haircut.**  If not that then we need to give business
> an allocation of block discount so they can mark down the books
> tonight.  Does this create a problem as it could tip the broker early?
> Would we rather have that be in the sale price tomorrow?

(Ex. 9 (emphasis added))

---

(continued…)

we want conservative marks to reflect block nature we need to know how much and then can allocate to most
logical assets."  (*Id.*)  Lowitt replied:  "Since not in contract hard to see what to d[o]."  (*Id.*)

[8]  Documents prepared by Lehman employees purporting to draft "opening balance sheets" for Barclays' first day
of operations after the closing of the Sale Transaction indicate that the assets being transferred under the
September 18 repurchase transaction plus additional cash and securities were to be balanced against the $4.25
billion in liabilities Barclays was to assume, plus an unknown $3.38 billion "equity" component that was never
explained to the Court.  (*See* Exs. 6-8)

19.    In this regard, the make up of the collateral supporting the September 18 repurchase transaction also requires further investigation.  There are some indications that, rather than "step into the shoes" of the Federal Reserve repurchase agreement to provide overnight financing, Barclays cherry picked higher-quality collateral and used the repurchase agreement to take it out of the Estate.  On September 18, 2008, Eric Felder, a senior Lehman executive, wrote: "The barclays guys chose the assets we did not have anything to do with it."  (*Id.*)  Other e-mails suggest Barclays selected only the most liquid and non-risky securities to purchase under the APA and the September 18 repurchase transaction.  (*See, e.g.,* Ex. 10)  These indications that Barclays itself appears to have chosen the assets posted as collateral call into question Barclays' assertion that it simply "stepped into the shoes" of the Fed and assumed significant financial risk in the Sale Transaction, especially because Barclays appears to have been protected by $5 billion of the house's money.

20.    These questions are further complicated by modifications the parties made to the APA and the September 18 repurchase transaction after the Court approved the Sale Transaction.  On September 22, 2008, the parties to the APA submitted a so-called Clarification Letter, which reflected substantial changes to the deal after it had been approved.  Among other things, the Clarification Letter fundamentally changed the APA definitions of Purchased Assets and Assumed Liabilities (allowing Barclays to receive for unknown reasons so-called "Schedule B" assets), and deleted from the APA a purchase price adjustment clause (*see* Clarif. Letter ¶ 9), which would have ensured that Barclays would not gain a windfall from post-closing price fluctuations in the securities it purchased, "including repos," subject to a ceiling of $750 million. (APA ¶ 3.3)

21.    The Clarification Letter also terminated the September 18 repurchase transaction and stated that "Seller and Purchaser shall be deemed to have no further obligations to each other under [that agreement] (including, without limitation, any payment or delivery obligations) …." (Clarif. Letter at ¶ 13)  Notwithstanding this termination, Barclays later sought to enforce the September 18 repurchase transaction, demanding that LBI transfer approximately $7 billion. (*See* Ex. 11, Leventhal Decl. at ¶¶ 13-15)[9]  Under the December 5, 2008 settlement between the trustee for the SIPA liquidation of LBI, Barclays and JPMorgan Chase, securities and cash with a total value of over $6 billion appears to have been transferred to Barclays.  (*Id.* at ¶ 22)[10]

22.    These post-approval alterations to the Sale Transaction raise a number of questions, including why the Clarification Letter or statements to the Court never mentioned the parties' purported agreement for Lehman to pay additional billions in cash and collateral to Barclays.  The complex machinations undertaken by the parties to transfer these assets to Barclays are impossible to accurately retrace without discovery.  Nor is it possible without discovery to know for certain whether Barclays received consideration to which it was not entitled.  In fact, when it addressed the December 5, 2008 settlement, the Court itself noted that future discovery might be necessary about this issue.  (*See* Ex. 14, Dec. 22, 2008 Hearing Tr. at 50:18-51:6)

The Requested Discovery Is Not Unduly Burdensome, Overbroad or Duplicative

23.    Barclays complains about the purported burden and overbreadth of the requested discovery.  (*See* Opp. Br. at ¶¶ 16-17, 34, 39-40, 58)  The Debtor's request, however, covers a

---

[9]  It appears that by late afternoon or early evening on September 19, the parties may have known that the $7 billion in question was not in Barclays' account at JPMC, and Bob Diamond, Barclays' chairman, contacted JPMC regarding these funds.  (*See* Exs. 12-13)

[10]  LBHI is not a party to the December 5, 2008 settlement.

defined set of individuals and documents generated over only a few weeks.  Compliance will not

disrupt Barclays' operations.[11]  There should be little burden for Barclays, for example, in

isolating and reviewing the documents and e-mails of the relatively small number of its

employees involved in these short-lived negotiations.  Likewise, the files of former Lehman

employees retained by Barclays (from September 22 onward) likely are not extensive.

24.    Furthermore, Barclays' repeated contentions that LBHI already has access to

sufficient information on these transactions are meritless.  (Opp. Br. at ¶¶ 16, 19-21, 35, 39, 55)

As noted in LBHI's Motion, the Lehman executives involved in these negotiations went to work

for Barclays and therefore are not available to LBHI.  And contrary to Barclays' assertion (*id.* at

¶ 19), personnel at Alvarez & Marsal are not a substitute; they did not participate in the

negotiations at issue.  (*See* Ex. 15, Declaration of Bryan Marsal)

25.    Finally, Barclays' contention that the Debtor rushed into this motion is baseless.

The Debtor moved for an order under Rule 2004 only when it became evident that Barclays

intended to resist or delay cooperative discovery.  (*See* Ex. 16, Declaration of Robert W. Gaffey)

## CONCLUSION

For the foregoing reasons and those set forth in the Motion, LBHI respectfully requests

that the Court issue an order allowing LBHI to take the requested document and deposition

discovery and granting such other relief as the Court deems just and proper.

---

[11] LBHI does not contemplate lengthy depositions involving multiple questioners.  For the sake of efficiency and to reduce burden, LBHI opposes the recent attempts by third parties, WesternBank and Bank of New York, to piggyback on this Rule 2004 motion to secure discovery on unrelated matters.  Indeed, the transactions about which they seek discovery involve separate repurchase agreements and potential claims.

Dated:  June 23, 2009
      New York, New York

                                      Respectfully submitted,

                                        /s/ Robert W. Gaffey
                                      Robert W. Gaffey
                                      William J. Hine
                                      Jayant W. Tambe
                                      JONES DAY
                                      222 East 41st Street
                                      New York, New York  10017
                                      Telephone:  (212) 326-3939

                                      ATTORNEYS FOR DEBTOR AND DEBTOR
                                      IN POSSESSION

# Exhibit 1

| | |
|---|---|
| From: | Tonucci, Paolo [paolo.tonucci@lehman.com]. | Sent:9/16/2008 5:57 AM. |
| To: | Lowitt, Ian T [ilowitt@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]. |
| Cc: | . |
| Bcc: | . |
| Subject: | Re:. |

Fantastic. Great work.
Paolo

—————————————

—— Original Message ——
From: Lowitt, Ian T
To: Kelly, Martin
Cc: Tonucci, Paolo
Sent: Tue Sep 16 05:33:59 2008
Subject: Re:

You are a hero. Well done. Ian
——Original Message——
From: Martin Kelly
To: Ian Lowitt
Cc: Tonucci, Paolo
Sent: Sep 16, 2008 5:10 AM
Subject:

Well it took all night and lots of back and forth but the deal is done and ready for the Board. Final
price did not change meaningfully - approx a $5b all in economic loss versus our marks and
$3.6b of resi assets left behind. Assume we can fund this after everything else winds down but
paolo you need to review this. Also, an extra $1b of comp beyond our accrual and assumption of
all trade payables in LBI and LBHI. Took 745 for $1b and several data centers for $400mm. Bart
reviewed all of it before final agreement. I'm going to try to get some sleep and will be in mid
morning.

—————————————

# Exhibit 2

**Unknown**

**Sent:** Wednesday, March 25, 2009 10:34 AM

| | |
|---|---|
| **From:** | Coku, Edmond Z [edmond.coku@lehman.com] |
| **Sent:** | Monday, September 15, 2008 7:27 PM (GMT) |
| **To:** | Kelly, Martin [martin.kelly@lehman.com] |
| **Subject:** | RE: LBI Comp expense |

Thanks.

> _____
> From:     Kelly, Martin
> Sent: Monday, September 15, 2008 3:27 PM
> To:  Coku, Edmond Z
> Subject:    RE: LBI Comp expense
>
> Go back to Anthony Collerton - this # does not seem right - cash bonus
> for entire firm is $1.9b
>
>
> _____
> From:     Coku, Edmond Z
> Sent: Monday, September 15, 2008 3:26 PM
> To:  Kelly, Martin
> Subject:    LBI Comp expense
>
> Martin - who was the source of the Comp expense estimates we used for
> LBI last night. We're getting a bonus number of $1.4B associated with
> the headcount in LBI and wanted to make sure we're being consistent.
>
>
> Edmond Coku
> Corporate Strategy
> LEHMAN BROTHERS
> 1271 Sixth Avenue, 43 Floor
> New York, NY 10020
> Office:     646 333 9116
> Mobile:     917 859 7080
> Fax:  646 758 1397
> edmond.coku@lehman.com
>

# Exhibit 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                      :

In re:                          :    Chapter 11
                      :

LEHMAN BROTHERS HOLDINGS INC., *et al.,*  :    Case No. 08-13555 (JMP)
                      :

               Debtors.     :    (Jointly Administered)
                      :

---------------------------------------------------------------x

### DECLARATION OF RAJESH ANKALKOTI IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. BANKR. P. 2004, <u>AUTHORIZING DISCOVERY FROM BARCLAYS CAPITAL, INC.</u>

I, RAJESH ANKALKOTI, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.    I am a Senior Director in the Dispute Analysis and Forensic Services group of the firm of Alvarez & Marsal. I am a Chartered Accountant and hold an M.B.A. from Columbia Business School. I have worked in the field of forensic accounting and analysis for about 13 years. I submit this declaration in support of the Rule 2004 motion filed by Lehman Brothers Holdings Inc. ("LBHI") seeking discovery from Barclays Capital, Inc. ("Barclays") in the above-captioned proceeding. I make this declaration based on my personal knowledge, except where noted otherwise.

2.    Alvarez & Marsal was retained by the Estate of LBHI and related entities to provide restructuring and other services. Our duties include providing forensic analysis and advice with respect to various aspects of the Debtors' businesses and issues relating to potential claims to recover assets for the Estate.

3.      Among the issues that Alvarez & Marsal is examining are (i) the compensation payments made by Barclays to former Lehman employees who went to work for Barclays (the "Transferred Employees"); (ii) Barclays' assumption of LBHI's compensation-related liabilities upon the September 22, 2008 closing of the sale transaction whereby substantially all of Lehman's North American broker-dealer assets (and certain real estate and other assets) were sold to Barclays (the "Sale Transaction"); and (iii) negotiations between the parties on these issues. In that regard, we have assembled and reviewed (and continue to search for) the limited set of documents within LBHI's control relating to these questions, and we have attempted to interview the few remaining Lehman employees still working for the Estate with any knowledge about these and related issues. The amount of information available to LBHI in this regard, however, is necessarily limited.

4.      Thus, as a preliminary matter, I disagree with Barclays' contention in its objection to LBHI's Rule 2004 motion that LBHI "has access to more than enough information 'to reconstruct' what happened" (Opp. Br. ¶ 19) with respect to the above-mentioned compensation issues. LBHI does not have enough information, either in its own files or in the Iron Mountain facility (that I am aware of), to fully reconstruct what happened in connection with negotiating, documenting or implementing compensation issues relating to the Sale Transaction. On information and belief, this is because (i) virtually all the Lehman executives involved in the negotiations with Barclays and/or in deriving the $2.0 billion figure for potential compensation liabilities in the schedule referred to in the September 18, 2008 Asset Purchase Agreement ("APA") transferred to and/or now work for Barclays and therefore are not available for interview by LBHI; (ii)

documents concerning what Barclays ultimately paid the Transferred Employees have
always been within Barclays' exclusive control; (iii) most of the documents concerning
offers made to certain select employees and negotiations concerning their expected future
employment with Barclays appear to have been retained by them and/or Barclays and do
not reside on LBHI's computers or in its files.

     5.     I also disagree with Barclays' contention in opposing LBHI's Rule 2004
motion that "aggregate compensation data" is sufficient to address LBHI's questions
about compensation of all Transferred Employees. (Opp. Br. ¶ 33) While aggregate
information about compensation may be helpful, it will not answer all of LBHI's queries
in this regard. In particular, aggregate information will not allow us to analyze whether
select individuals received a disproportionate share of the total compensation paid by
Barclays or to reconstruct how the aggregate pool of compensation funds expended by
Barclays for former Lehman employees was distributed. Aggregate information also will
not allow us to analyze so-called "Special Cash" bonuses apparently paid to certain
former Lehman employees, as noted below. In the end, to allow us to properly do our job,
LBHI requires the information sought in its motion.

     6.     In connection with our investigation of these compensation-related issues,
we have reviewed, among other things, the September 12-22, 2008 e-mail files of select
Transferred Employees, former Lehman executives, to which the Estate has access. In
that review we located certain purported employment agreements between some
Transferred Employees and Barclays. Some of these are in draft form, others appear to
be in final form although not fully executed.

7.      These documents indicate that certain executives were to receive multi-million dollar compensation packages from Barclays, both for 2008 (during which they worked until September 22 for Lehman and, presumably, would work the remainder of the year for Barclays) and 2009 (during which they would work only for Barclays). These documents also indicate that several of these executives were to receive what Barclays termed "Special Cash" payments (also in the multi-million dollar range), about which we have little information. We have no confirmation that this will be their actual compensation for these periods.

8.      In addition, we have looked into the question of how much, in the aggregate, Lehman's bonus pool was for 2008. As noted in LBHI's February 19, 2009 letter to Barclays (*see* Motion Ex. B), we estimated that the bonus pool for the Transferred Employees was approximately $700 million through August 2008. It is my understanding that this amount may need to be increased to include an equity portion of such bonuses. While we have insufficient information to determine with any degree of precision the total bonus pool for the Transferred Employees, it is estimated to be in the region of $700 million (or $1.2 billion if the equity portion is included) for the period from December 2007 to August 2008. These amounts are significantly less than the $2.0 billion figure for such potential liabilities listed in the financial schedule referred to in the APA (which figure, I am informed, was also used in proceedings before the Court to value the Sale Transaction).

9.      Once again, we have incomplete data on this issue. These $700 million and $1.2 billion estimates were both obtained from a report derived from a compensation model used by LBHI to estimate the bonus amounts owing to the employees who

transferred to Barclays.  LBHI continues to examine why there appears to be such a large

disparity between these amounts and the $2.0 billion figure referred to in the financial

schedule referenced in APA.

Dated: June 22, 2009
       New York, New York

_____
          RAJESH ANKALKOTI

# Exhibit 4



Results Announcement

Barclays PLC

Figures 2008

Notes

### 9.    Share of Post-Tax Results of Associates and Joint Ventures

|  | Year Ended 31.12.08 | Year Ended 31.12.07 |
|---|---|---|
|  | £m | £m |
| Profit from associates | 22 | 33 |
| (Loss)/profit from joint ventures | (8) | 9 |
| Share of post-tax results of associates and joint ventures | 14 | 42 |

The overall share of post-tax results of associates and joint ventures decreased £28m to £14m (2007: £42m).The share of results from associates decreased £11m mainly due to reduced contribution from private equity associates. The share of results from joint ventures decreased £17m mainly due to reduced contribution from Barclays Capital joint ventures.

### 10.    Profit on Disposal of Subsidiaries, Associates and Joint Ventures

|  | Year Ended 31.12.08 | Year Ended 31.12.07 |
|---|---|---|
|  | £m | £m |
| Profit on disposal of subsidiaries, associates and joint ventures | 327 | 28 |

On 31st October 2008 Barclays completed the sale of Barclays Life Assurance Company Ltd to Swiss Reinsurance Company for a net consideration of £729m leading to a net profit on disposal of £326m.

### 11.    Acquisitions

The Group made the following material acquisitions in 2008:

a)   Lehman Brothers North American businesses

On 22nd September 2008 Barclays completed the acquisition of Lehman Brothers North American businesses.

The acquired assets and liabilities summarised in the following table do not represent the entire balance sheet of Lehman Brothers North American businesses, or of discrete business lines within those operations. For this reason it is not practical to reliably determine the carrying amount of the assets and liabilities in the pre-acquisition books and records of Lehman Brothers.

Certain assets were received subsequent to the acquisition date, since it was first necessary to agree their status as assets of the Group with the relevant regulators, custodians, trustees, exchanges and bankruptcy courts. Such assets were initially classified within loans and advances. Once they were received, the related receivable was derecognised and the resulting asset recognised within the appropriate balance sheet category. In the table such assets are classified accordingly.

The initial accounting for the acquisition has been determined only provisionally. Any revisions to fair values that result from the conclusion of the acquisition process with respect to assets not yet received by the Group will be recognised as an adjustment to the initial accounting. Any such revisions must be effected within 12 months of the acquisition date and would result in a restatement of the 2008 income statement and balance sheet.

The excess of the fair value of net assets acquired over consideration paid resulted in £2,262m of gains on acquisition.

It is impracticable to disclose the profit or loss of the acquired Lehman Brothers North American businesses since the acquisition date. The acquired business has been integrated into the corresponding existing business lines and there is no reliable basis for allocating post-acquisition results between the acquirer and the acquiree. Similarly, it is impracticable to disclose the revenue and profit or loss of the combined entity as though the acquisition date had been 1 January 2008. Only parts of Lehman Brothers US and Canadian businesses, and specified assets and liabilities, were acquired. There is no reliable basis for identifying the proportion of the pre-acquisition results of Lehman Brothers that relates to the business acquired by the Group.



# Exhibit 5

Re: Are we set up to do the marking of the positions? Ian

| | |
|---|---|
| **From:** | Lowitt, Ian T [ilowitt@lehman.com] |
| **Sent:** | Thursday, September 18, 2008 1:45 AM (GMT) |
| **To:** | Reilly, Gerard [greilly@lehman.com] |
| **Subject:** | Re: Are we set up to do the marking of the positions? Ian |

Since not in contract hard to see what to dp.  Ian
------Original Message------
From: Gerry Reilly
To: Ian Lowitt
Sent: Sep 17, 2008 9:41 PM
Subject: Re: Are we set up to do the marking of the positions?  Ian

I went thru all docs and did not see reference to the price haircut.  If we want conservative marks to reflect block nature we need to know ho
much and then can allocate to most logical assets.
-----------

----- Original Message -----
From: Reilly, Gerard
To: Lowitt, Ian T
Sent: Wed Sep 17 21:35:24 2008
Subject: Re: Are we set up to do the marking of the positions?  Ian

Ian I told business guys they must get counterparts at barcap comfortable tomorrow night via front end systems.  We will not have time to d
friday.  We are going to send last nights assets and marks over so they can see mix and marks
-----------

----- Original Message -----
From: Lowitt, Ian T
To: Reilly, Gerard
Sent: Wed Sep 17 21:29:29 2008
Subject: FW: Are we set up to do the marking of the positions?  Ian


What I meant was for barcap to mark the positions further?  Ian

From: Lowitt, Ian T
Sent:  Wednesday, September 17, 2008 9:29 PM
To:    Reilly, Gerard
Subject:    Are we set up to do the marking of the positions?  Ian

# Exhibit 6

| From: | Stucchio, Anthony [astucchi@lehman.com]. | Sent:9/20/2008 6:08 PM. |
|---|---|---|
| To: | Crepeau, Alex F [acrepeau@lehman.com]; Blackwell, Alastair [ablackwe@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]; Azerad, Robert [RAzerad@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Beldner, Brett [brett.beldner@lehman.com]. | |
| Cc: | Stewart, Marie [marie.stewart@lehman.com]; Reilly, Gerard [greilly@lehman.com]; Veksler, Irina [irina.veksler@lehman.com]; McLaughlin, Kendall J [kmclaugh@lehman.com]. | |
| Bcc: | . | |
| Subject: | Re: Opening balance sheet. | |

We have the guys running the numbers from home will coordinate with kendall


----- Original Message -----
From: Crepeau, Alex F
To: Blackwell, Alastair; Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett; Stucchio, Anthony
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; McLaughlin, Kendall J
Sent: Sat Sep 20 18:01:13 2008
Subject: Re: Opening balance sheet

Tony, apparently we need to do anew reserve calc immediately, Kendall is calling you.

----- Original Message -----
From: Blackwell, Alastair
To: Tonucci, Paolo; Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina; Crepeau, Alex F
Sent: Sat Sep 20 17:26:52 2008
Subject: Re: Opening balance sheet

Alex,
Fyi
Thanks,
Alastair



---------------------------------

----- Original Message -----
From: Tonucci, Paolo
To: Fleming, Dan (TSY); Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina
Sent: Sat Sep 20 17:19:50 2008
Subject: RE: Opening balance sheet

Dan, can you provide a contact at Wells. Mike Macciaroli has agreed to release and there is a letter to provide to them.

Paolo

-----Original Message-----
From: Fleming, Dan (TSY)
Sent: 20 September 2008 17:01
To: Tonucci, Paolo; Azerad, Robert; Kelly, Martin; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Veksler, Irina
Subject: RE: Opening balance sheet

slightly bigger because it also contains Lehman debt

Robert

PS: Prices will be per the repo file sent by Ops on Friday morning and per the box report as of Friday morning.


-----Original Message-----
From: Kelly, Martin
Sent: Saturday, September 20, 2008 9:36 AM
To: Azerad, Robert; Blackwell, Alastair; Beldner, Brett
Cc: Stewart, Marie; Reilly, Gerard; Tonucci, Paolo
Subject: Opening balance sheet

Barclays (James Walker) called this am. They want an "opening balance sheet" today. 3 pieces to this. (1) Robert - do you have the final list of assets under the repo which they took possession of - need by gaap asset class versus the financing. Could you please assemble in a file which can be sent direct back to barclays (2) did we end up transferring the shorts and related reverse repo? If so, Robert/Alistair who has that list, were tickets booked for this etc.same as above need a list to be emailed back (3) Brett - could you please update the summary BS once we have this information later in the day.

I think we need to deliver back to narclays the simple BS together with inventory list and possibly shorts/reverses depending on what was done with this. Robert - could you please compile and coordinate with brett around BS.

Please give me ETA so I can update James at Barclays.

Thx - M

--------------------------------

# Exhibit 7

| From: | Kelly, Martin [martin.kelly@lehman.com]. | Sent:9/21/2008 2:16 PM. |
|---|---|---|
| To: | Azerad, Robert [RAzerad@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | Fw: Balance Sheet. | |

------------------------------

----- Original Message -----
From: Beldner, Brett
To: Kelly, Martin
Cc: Azerad, Robert; Stewart, Marie
Sent: Sat Sep 20 20:39:33 2008
Subject: Balance Sheet

Here's where we are so far before it gets forwarded to the rest of the group. While Robert focused on the asset side, I added the liabilities and equities to the form.

As you can see, Robert has tracked down the detailed information. However, there are a few open items:

1) There is about $2bn of assets included in the file that may be locked up (can't be transferred) for which we may need to substitute with different collateral - so asset classification may change..

2) Although everyone believes it to be the case, Robert did not receive legal confirmation that the shorts did not go.

3) We do not have any information as to which subsidiaries went (e.g., Eagle), so the balance sheet does not include any information about these.

4) I have not heard back from Kristie or Rose (Heather is out on vacation) on the three foreign subs that supposedly transferred.

5) The $1bn 15-C-3 receivable is an estimate from Paolo.

6) The comp accrual and cure payments accrual are just estimates. (Comp for a year should probably not be the full accrual and cure payments should be actual).

Robert, feel free to add any other comments a <<Opening Balance Sheet vBB.xls>> s you see fit.

<<Opening Balance Sheet vBB.xls>>

| | | |
|---|---:|---:|
| Cash and cash equivalent | | 7,000 |
| | | |
| Inventory | | |
| Government & Agencies | 29,810 | |
| Corporate Equities | 8,764 | |
| Mortgages & Mortgage Backed Securities | 3,241 | |
| Corporate Debt & Other | 2,998 | |
| Commercial Paper & Money Market Instruments | 32 | |
| Inventory Total | | 44,846 |
| | | |
| Receivables (15c3 lock up release) | | 1,000 |
| | | |
| Total Assets | | 52,846 |
| | | |
| Financing for Cash received from Barclays ($45b for repo and $250m for purchase) | | 45,250 |
| | | |
| Accrued Bonuses (Assumed to be all accrued) | | 2,000 |
| | | |
| Cure Payments (Placeholder for actual accrual) | | 2,250 |
| | | |
| Equity | | 3,346 |
| | | |
| Total Liabilities and Equity | | 52,846 |

# Exhibit 8

| From: | Goldfarb, David [dgoldfar@lehman.com]. | Sent:9/22/2008 2:03 PM. |
|---|---|---|
| To: | O'Meara, Chris M (NY) [comeara@lehman.com]; Reilly, Gerard [greilly@lehman.com]; Kelly, Martin [martin.kelly@lehman.com]; Wong, Kristie [Kristie.Wong@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | FW: Balance sheet for remain co. | |

Where is CRE and private equity positions? The accrued bonus, is this in
addition to what was absorbed by Barclays? Does this include positions
remaining in Asia and Europe as well? Are we assuming that most repo'ed
positions are blown out, or are they included?
Thanks,
Dave

> _____
> From: Reilly, Gerard
> Sent: Monday, September 22, 2008 1:53 PM
> To: Goldfarb, David
> Subject: FW: Balance sheet for remain co
>
> fyi
>
> _____
> From: Wong, Kristie
> Sent: Monday, September 22, 2008 1:45 PM
> To: Reilly, Gerard
> Cc: Kelly, Martin
> Subject: RE: Balance sheet for remain co
>
> We're working on a proforma balance sheet assuming the asset transfers
> according to Robert Azerad's attached schedule. Since Operations has
> not processed the trades (net off the inventory against repo), all of
> our systems are still reflecting the inventory on LBI's balance sheet.
> Will do the best we can given this inaccuracy.
>
> _____  <<Copy of Opening Balance Sheet vBB2.xls>>
> _____
> From: Reilly, Gerard
> Sent: Monday, September 22, 2008 1:13 PM
> To: Wong, Kristie
> Cc: Kelly, Martin
> Subject: Balance sheet for remain co
>
> Unwind guys are looking for a bs that lays out the remaining assets in
> LEH

| | | |
|---|---:|---:|
| Cash and cash equivalent | | 7,000 |
| Inventory | | |
|     Government & Agencies | 29,526 | |
|     Corporate Equities | 8,843 | |
|     Mortgages & Mortgage Backed Securities | 3,150 | |
|     Corporate Debt & Other | 3,186 | |
|     Commercial Paper & Money Market Instruments | 95 | |
|     Derivatives & Other Contr. | 80 | |
| Inventory Total | | 44,880 |
| Receivables (15c3 lock up release) | | 1,000 |
| Total Assets | | 52,880 |
| Financing for Cash received from Barclays ($45b for repo and $250m for purchase) | | 45,250 |
| Accrued Bonuses (Assumed to be all accrued) | | 2,000 |
| Cure Payments (Placeholder for actual accrual) | | 2,250 |
| Equity | | 3,380 |
| Total Liabilities and Equity | | 52,880 |

# Exhibit 9

| From: | Felder, Eric [efelder@lehman.com]. | Sent:9/18/2008 7:30 AM. |
|---|---|---|
| To: | Reilly, Gerard [greilly@lehman.com]; Lowitt, Ian T [ilowitt@lehman.com]; Gelband, Michael [mgelband@lehman.com]. | |
| Cc: | Kelly, Martin [martin.kelly@lehman.com]; Lee, Hyung S [hyung.lee@lehman.com]. | |
| Bcc: | . | |
| Subject: | RE: Open issues on deal. | |

The barclays guys chose the assets we did not have anything to do with
it

-----Original Message-----
From: Reilly, Gerard
Sent: Thursday, September 18, 2008 6:57 AM
To: Lowitt, Ian T; Gelband, Michael
Cc: Kelly, Martin; Felder, Eric; Lee, Hyung S
Subject: Re: Open issues on deal

Let's just meet in the fid room at 730. Does that work?
----------

----- Original Message -----
From: Lowitt, Ian T
To: Reilly, Gerard; Gelband, Michael
Cc: Kelly, Martin; Felder, Eric; Lee, Hyung S
Sent: Thu Sep 18 06:52:28 2008
Subject: RE: Open issues on deal

Gerry, please set up a meeting first thing this morning to work through
these issues with mike, Eric and hyunag. Probably want martin as well.
and how to approach. Must be a huge priority for today.
Ian

-----Original Message-----
From: Reilly, Gerard
Sent: Thursday, September 18, 2008 6:04 AM
To: Lowitt, Ian T; Gelband, Michael
Cc: Tonucci, Paolo; Kelly, Martin
Subject: Open issues on deal

I need some help resolving these issues today.

1) Auction rate book: we have been making the assumption that this is
going. I am not sure barcap knows that and assume there could be no
auction process if it stayed. Can we leave it behind?

2) Looks like we will have PB financing balances left in LBI and
according to cogs they do not want it. What does it mean to leave it
behind?

3) Not clear on the amount of block discount or how we make it happen.
Defaulting on repo could be the best as discount could be taken from
haircut. If not that then we need to give business an allocation of
block discount so they can mark down the books tonight. Does that
create a problem as it could tip the broker early? Would we rather have
that be in the sale price tomorrow?
----------

# Exhibit 10

Sent:9/17/2008 9:09 AM.

From:    Freeman, Roger [roger.freeman@lehman.com].

To: [ - ]    McDade, Bart [bmcdade@lehman.com]; Donini, Gerald [gdonini@lehman.com]; Cunningham, Richard [rcunning@lehman.com]; Corcoran, Joseph J [jcorcora@lehman.com]; Nagpal, Ajay [ajay.nagpal@lehman.com]; Whalen, Patrick J [patrick.whalen@lehman.com]; Linde, Stuart M [slinde@lehman.com]; Mattu, Ravi [rmattu@lehman.com]; Meyers, William (EQR) [wmeyers@lehman.com]; Johnston, Gillin Lefever, Ann [ann.gillin@lehman.com]; Gresdo, Stephen J [stephen.gresdo@lehman.com]; Johnston, Eric [ejohnsto@lehman.com]; Everett, James [James.Everett@lehman.com]; Abrahamsen, Ryan [ryan.abrahamsen@lehman.com]; Bertrand, Eric [Eric.Bertrand@lehman.com]; Kramm, Alex [nils.kramm@lehman.com]; Truong, Steven M [minhsang.truong@lehman.com]; Goldberg, Jason [jason.m.goldberg@lehman.com]; Harting, Bruce W [bharting@lehman.com]; Gelb, Jay [jgelb@lehman.com]; Berg, Eric [eberg@lehman.com]; Jao, Andrea [ajao@lehman.com]; Gross II, Richard G [rgross@lehman.com]; Cornell, Robert [rcornell@lehman.com]; Chase, Gary [gchase@lehman.com]; Freeman, Roger [roger.freeman@lehman.com].

Cc:

Bcc:

Subject:    Barclay's Conference Call Highlights From This Morning.

Feel free to follow-up if you have additional questions or to pass along to anyone else who would be interested.

HISTORY OF DEAL
* Looked at LEH months ago, but they were only interested in it at the right price
* Did intense due diligence late last week and over the weekend.
* They have approval from key shareholders who have committed to buy more stock

RATIONALE FOR THE DEAL
* Strong franchise at a great price
* BARC believes the advantage goes to those with a universal banking model with capital markets businesses that are well integrated
* BARC believes there will be continued consolidation, particularly between investment banking and investment management and wants to have strong global presence in wealth, asset management and investment banking.

WHAT IS BEING ACQUIRED
* Trading assets of $72bn, liabilities of $68bn
* Risk-weighted assets being acquired are only $15bn, $13.5bn of which is trading assets (suggesting a low 18% risk-weighting across the trading assets) and $1.5bn for the real estate acquired.
* Of the $72bn in assets acquired, risks are quite low as the vast majority are quoted equity and debt, government debt, agency debt, derivatives and cash in addition to the matched book.
* There is a small amount of mortgage paper (< 5% of total assets), but this has been heavily marked including once more in conjunction with this transaction. Management noted that since it had done extensive due diligence over the weekend, it was in a position to know exactly which assets to bring over when it came time to making those decisions.
* When asked why the net assets acquired were such a small fraction of the LEH balance sheet (essentially just a little more than 10%) relative to the number of people being brought over, BARC indicated that a significant number of positions have run off over the last week. In essence, LEH saw dramatic balance sheet shrinkage over the last week. Of course, the illiquid assets remain behind. BARC plans to ramp risk-weighted assets back up, but it will happen over time, not immediately.
  10,000 employees
  Core of old LEH broker-dealer including all infrastructure
  LEH HQ and 2 data centers
* Cash consideration is $250mm.

• Total consideration (incl real estate) of $1.75bn

## REVENUES OF LEHMAN BUSINESSES BEING ACQUIRED
• BARC indicated that the revenue generating capacity of the businesses being acquired is about half of what LEH has done historically.

## RELATIVE STRENGTHS AND WEAKNESSES
• BARC noted LEH rel strength in (1) cash equities and origination franchise (2) credit trading and research and (3) M&A. Specifically, BARC labeled the US cash equities franchise as a "machine" and suggested the integrated sales, trading, research and investment banking platform at LEH is stellar and does not want to interfere with it. BARC was highly complementary of existing cash equities management.
• BARC considers its own rates, currencies, commodities and IG debt businesses as stronger than LEH's.
• Other businesses such as leveraged finance can together be stronger players.

## NON-US INTEREST
• BARC said it is in active discussions to bring equivalent talent in the integrated sales, trading, research and investment banking platform in Europe into the combined organization. They understand that they need to act fast on this.

## APPROVALS
• BARC has the blessing of the FSA and has already received approvals from the SEC. Only outstanding approval is from the bankruptcy court, and management wouldn't comment on the likely outcome of those proceedings for obvious reasons.

## INTEGRATION
BARC plans to move swiftly to integrate, suggesting it will be done over a couple of weeks and expects everyone to be "adults" about it. That said, management emphasized the highly complementary nature of the transaction.

## CAPITAL REQUIREMENTS
• This transaction, due to $2bn in after-tax negative goodwill is accretive to capital ratios immediately.
• BARC is planning to raise $1bn in additional equity, half of which will be to grow the business and half of which will be to build an extra capital buffer relative to target ratios (presumably to shield against potential future writedowns)
• Will be accretive to earnings in year 1 including the impact of the additional capital raise
• BARC views this as a high ROE transaction

## RETENTION
• BARC believes LEH and BARC have shared vision and values
• BARC believes in pay for performance and believes that is aligned with LEH culture. No more specifics were discussed.

Regards,
Roger A. Freeman, CFA
Senior Vice President
Lehman Brothers U.S. Equity Research
Brokers, Asset Managers and Market Structure
745 7th Ave, 17th Floor
New York, NY 10019
Phone: (212) 526-4662
Fax: (646) 758-1454

E-Mail: roger.freeman@lehman.com

# Exhibit 11

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES INVESTOR PROTECTION                    :
CORPORATION,                                       :
                                                   :
                    Plaintiff,                     :
                                                   :
          v.                                       :
                                                   :
LEHMAN BROTHERS INC.,                              :
                                                   :
                    Debtor.                        :
                                                   :
-------------------------------------------------------------X

## DECLARATION OF SHARI D. LEVENTHAL
## IN SUPPORT OF TRUSTEE'S MOTION
## FOR ENTRY OF AN ORDER
## APPROVING A SETTLEMENT AGREEMENT

Pursuant to 28 U.S.C. § 1746, SHARI D. LEVENTHAL declares as

follows:

1.      I am Assistant General Counsel and Senior Vice President at the

Federal Reserve Bank of New York ("New York Fed").  In that capacity, except where

stated otherwise, I have personal knowledge of the matters set forth in this declaration.  I

submit this declaration in support of the Motion for Entry of An Order Approving a

Settlement Agreement filed by James W. Giddens as Trustee for the Securities Investor

Protection Act ("SIPA") liquidation of the business of Lehman Brothers Inc. ("LBI").

Background

2.      On Friday evening, September 12, 2008, an historic meeting began

at the New York Fed's head office in downtown Manhattan.  Participating in this meeting

were the senior management of the New York Fed, the Chairman of the Securities and

Exchange Commission, the Secretary of the Treasury, and the most senior leadership of

the major global financial firms. The goal of the meeting was to find a way to rescue Lehman Brothers, which was on the verge of insolvency. All of the participants recognized the impact that a Lehman bankruptcy filing could have on an already fragile financial system.

3.    The effort to save Lehman was directed toward an acquisition of the firm and it naturally focused on possible suitors. By Saturday, September 13th, two institutions had expressed interest in acquiring Lehman, Bank of America and Barclays Capital. By mid-day Saturday, Bank of America had found another bride, which left Barclays Capital as the one viable party. By Sunday, September 14th, the major global financial firms agreed to facilitate an acquisition by financing some of the transaction. All were hopeful that Lehman would be saved.

4.    For Lehman to continue as a viable entity pending closing of the deal, it was necessary for the purchaser to guarantee all of Lehman's short-term obligations. This guarantee was vital to stave off the effects of a panic that would likely result from the markets' reaction to Lehman's condition. By mid-day on Sunday, September 14th, however, it became apparent that a number of technical legal issues arising under the laws of the United Kingdom presented a barrier that would become insurmountable.

5.    By Sunday evening it became certain that an acquisition of Lehman by Barclays was not possible. Lehman's Board of Directors, therefore, made the decision that Lehman Brothers Holdings International ("Lehman Holdings") would commence a voluntary Chapter 11 case on September 15th.

6.    LBI, the broker-dealer subsidiary of Lehman Holdings, did not commence a Chapter 11 case on September 15th. This represented a carefully thought out decision that would enable LBI to continue to operate so as to facilitate an orderly wind down of its trading positions. To keep LBI operating, however, its operations and payroll had to be funded. The New York Fed agreed to finance LBI overnight. JPMorgan Chase Bank, N.A. ("JPMC"), as LBI's clearing bank, agreed to provide certain intra-day funding.

7.    On Tuesday, September 16th, Barclays returned with an offer to purchase certain assets, and assume certain liabilities, of LBI. Recognizing that Barclays' offer provided an opportunity for an orderly transfer of thousands of customer accounts, as well as the possibility of preserving the jobs of thousands of LBI employees, the New York Fed decided to support the transaction. However, we also explained to Barclays that the New York Fed's commitment to provide overnight funding for LBI was based on the assumption that we were facilitating an orderly wind down of the business. If Barclays wanted the New York Fed to continue funding LBI so as to facilitate an orderly transition (instead of an orderly wind down), and thus assist with the implementation of Barclays' purchase-and-assumption agreement, then Barclays needed to take out the New York Fed's exposure to LBI prior to the closing of its transaction. Barclays and the New York Fed entered an agreement on the morning of September 17th to the effect that Barclays would take over the New York Fed's place in providing Lehman overnight funding.

8.    On the night of September 17th, the New York Fed was funding Lehman through various lending programs: the Primary Dealer Credit Facility

("PDCF"), the Term Securities Lending Facility ("TSLF"), and Open Market Operations

("OMO"). The PDCF is a financing facility, where the New York Fed funds dealers

using the repurchase agreement ("repo") form. Open Market Operations are, by contrast,

transactions done by the New York Fed to implement monetary policy directives of the

Federal Open Market Committee. These OMO transactions are also done in the form of

repos. The TSLF is not a cash lending facility. Rather, through the TSLF, the New York

Fed lends U.S. Treasury securities against other forms of collateral.

      9.     Overnight on September 17th, the New York Fed had the following

exposures to LBI:

        a.  $20.43 billion in cash against $23.866 billion in collateral through
            the PDCF;

        b.  $7.0 billion in cash against $7.159 billion in collateral through
            OMO; and

        c.  $18.79 billion in treasury securities against $19.596 billion in other
            collateral through the TSLF.

In total, the New York Fed had funded LBI $46.22 billion in cash and Treasury securities

against $50.62 billion in collateral.

      10.    On the morning of September 18th, in accordance with the terms of

the applicable repurchase agreements, the New York Fed's PDCF and OMO positions

with LBI were unwound. As a result of Barclays' agreement to take out the New York

Fed's exposures to LBI, the TSLF contract with LBI was terminated. The New York Fed

was paid cash, and the Treasury securities borrowed by Lehman were delivered back.

The securities that the New York Fed had held overnight on September 17th were

returned to LBI through its account at JPMC. JPMC then funded LBI intra-day on September 18th.

11.    Beginning in the afternoon of September 18th, Barclays initiated the process of transferring $45 billion in cash to LBI to fund LBI overnight. A series of funds transfers were made using the Fedwire Funds Service, which is operated by the Federal Reserve Banks. By early evening, the entire sum of $45 billion in cash had been transferred by Barclays to LBI.

12.    Pursuant to the repurchase agreement between Barclays and LBI (the "September 18th Repo"), which was the form selected by Barclays to fund LBI overnight, LBI was to provide Barclays with approximately $49.7 billion in securities in return for the $45 billion in cash funded by Barclays. This ratio was consistent with the ratio of cash to securities used in the New York Fed's repurchase agreement with LBI on the night of September 17th.

13.    As the Court knows, the events of the week of September 15th as they related to Lehman Holdings and LBI were unprecedented in nature, and they unfolded at an unprecedented speed, in turbulent markets. The effect of these events was to push the operational components of the financial system nearly to their limits. It is not surprising, therefore, that the intended transfer of $49.7 billion in securities from LBI to Barclays on the night of September 18th came with a hitch.

14.    Notwithstanding that both Depository Trust Company ("DTC") and the Fedwire Securities Service remained open for several hours past their normal closing times in an effort to complete this transaction, operational issues interfered with

the ability to transfer all of the intended securities to Barclays. When, at 11 PM, DTC had to close, Barclays had received approximately $42.7 billion of the approximately $49.7 billion in securities it was expecting under the terms of the September 18th Repo.

15.     LBI, therefore, agreed, either late on the night of September 18th, or early in the morning of September 19th, to transfer $7 billion in cash (the "Subject Funds") to Barclays at an account at JPMC. The expectation at that time was that, the next day, LBI would transfer the remaining securities originally due under the September 18th Repo, and Barclays would transfer the Subject Funds to LBI. The transfer of securities, however, did not occur prior to the entry by the United States District Court for the Southern District of New York on September 19, 2008 of the Order Commencing Liquidation ("LBI Liquidation Order") pursuant to the provisions of SIPA in the case captioned Securities Investor Protection Corporation v. Lehman Brothers Inc., Case No. 08-CIV-8119 (GEL).

16.     I have been informed by JPMC that, after the Subject Funds were transferred by LBI to an account at JPMC, as described above, JPMC caused the Subject Funds to be transferred to an LBI account at JPMC.

17.     As a result of the operational issues that arose on the night of September 18th, and JPMC's transfer of the Subject Funds to an LBI account at JPMC, LBI was unjustly enriched. LBI had both Barclays' cash (the $45 billion transferred on September 18th), and approximately $7 billion in securities that had been intended to be transferred to Barclays.

## The Settlement Agreement

18.    Barclays' purchase of LBI's assets and its assumption of certain liabilities pursuant to an Asset Purchase Agreement was approved by the Court in the early hours of September 20th.

19.    Only after the purchase transaction closed on Monday, September 22nd, did Barclays learn that the Subject Funds it believed were in its account at JPMC had been transferred to LBI's account.  This is crucial to understanding paragraph 13 of the September 20th letter from Barclays to Lehman Holdings that sought to clarify the intention of the parties with respect to certain provisions of the Asset Purchase Agreement (the "Clarification Letter").  Some of the provisions of the Clarification Letter were discussed during conference calls in which I participated on Sunday, September 21st.  During those calls, Barclays' representatives made statements that clearly reflected their belief that the Subject Funds were in Barclays' account at JPMC.

20.    Because Barclays believed that the $7 billion was in its account, it agreed in the Clarification letter that:

> all securities and other assets held by Purchaser under the
> September 18, 2008 repurchase arrangement . . . shall be
> deemed to constitute part of the Purchased Assets . . . .
> Seller and Purchaser shall be deemed to have no further
> obligations to each other under the [September 18[th] Repo]
> (including, without limitation, any payment or delivery
> obligations), and . . . the [September 18[th] Repo] shall
> terminate.

21.    When Barclays learned for the first time, on or about September 23rd, that it had neither all of the securities intended to be transferred under the September 18th Repo, nor the Subject Funds, Barclays came to the New York Fed.

Barclays sought the New York Fed's assistance in facilitating negotiations with JPMC regarding JPMC's movement of the Subject Funds. The proposed settlement agreement is the result of those negotiations.

22.    The proposed settlement agreement provides that Barclays will receive the securities that remain from the pool of LBI securities previously held by the New York Fed under its repo with LBI on the night of September 17th and that were intended to have been transferred to Barclays under the September 18th Repo. These securities are identified in Annex A to the Settlement Agreement as the "Settlement Consideration Fed Portfolio Securities". I have been told that some of the securities that the New York Fed held on the night of September 17th have since been liquidated by JPMC. To make up for the shortfall resulting from those liquidations, and the decline in the value of the remaining securities since September 19th, the proposed settlement provides that Barclays is to receive $1.25 billion in cash. In addition, approximately $7.1 million of cash would also be provided to Barclays in the proposed settlement, representing proceeds of certain Settlement Consideration Fed Portfolio Securities that were inadvertently liquidated by JPMC after the parties reached agreement on the terms of the proposed settlement.

23.    The securities and cash that Barclays will receive under the proposed Settlement will come from LBI accounts at JPMC. JPMC has a lien on these accounts, and, consequently, on the relevant cash and securities which Barclays will receive. JPMC has agreed to release its liens on the above-mentioned cash and securities to facilitate this settlement.

24.    The proposed settlement is, in the New York Fed's opinion, a fair one.  It addresses the unjust enrichment to the LBI estate caused by the operational failures on September 18th and 19th; and restores the parties, and the LBI estate, to the positions they would have been in had the September 18th Repo been executed as originally planned.  It is also, in the New York Fed's opinion, consistent with the intent of the Clarification Letter.

I declare under penalties of perjury that the foregoing is true and correct.

Executed on:

_____

Shari D. Leventhal

# Exhibit 12

| From: | Hraska, James W [JHraska@lehman.com]. | Sent:9/19/2008 6:30 PM. |
|---|---|---|
| To: | Palchynsky, John N [jpalchyn@lehman.com]; Tonucci, Paolo [paolo.tonucci@lehman.com]; Feraca, John [joferaca@lehman.com]; Aronow, David G [daronow@lehman.com]. | |
| Cc: | Blackwell, Alastair [ablackwe@lehman.com]; Forrest, Monty [mforrest@lehman.com]; Ullman, Neal (NY) [Neal.Ullman@lehman.com]; Fleming, Dan (TSY) [dfleming@lehman.com]; Jones, Craig L [cljones@lehman.com]. | |
| Bcc: | . | |
| Subject: | RE: Urgent tri unwind. | |

Agreed. In addition, I just want to make sure that everyone is clear
the 7B $ that was locked up for Barcap in Tri was returned to JP Chase.
If anyone has any questions, please call me.


-----Original Message-----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 6:28 PM
To: Tonucci, Paolo; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

I guess to address our overdraft before Lehman's assets are locked
during bankruptcy?

Anyway, see you all at Barcap.

It has been one hell of a week, challenging, but exhilarating too.

Have a great weekend! ;)

JP


-----Original Message-----
From: Tonucci, Paolo
Sent: Friday, September 19, 2008 6:15 PM
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G
Cc: Blackwell, Alastair; Forrest, Monty; Ullman, Neal (NY); Fleming, Dan
(TSY); Jones, Craig L
Subject: Re: Urgent tri unwind

Why are they doing this?


-----------------------


----- Original Message -----
From: Palchynsky, John N
To: Palchynsky, John N; Hraska, James W; Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Sent: Fri Sep 19 16:05:09 2008
Subject: RE: Urgent tri unwind

Also, as per Bill Gallagher, it looks like JPChase is moving DTC
positions out of Lehman's pledge account to the bank's account at DTC.

----Original Message----
From: Palchynsky, John N
Sent: Friday, September 19, 2008 3:57 PM
To: Hraska, James W; Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Fleming, Dan (TSY); Jones, Craig L
Subject: RE: Urgent tri unwind

As per Barclay's request, $7 billion in cash was allocated to their
lockup last night. If securities were/can be used instead, that would
free up margin collateral by reducing the amount of higher haircut
securities allocated to the JPChase bank loan. This could potentially
help last night's situation with JPChase and one that could potentially
develop today.

----Original Message----
From: Hraska, James W
Sent: Friday, September 19, 2008 3:43 PM
To: Feraca, John; Aronow, David G
Cc: Tonucci, Paolo; Blackwell, Alastair; Forrest, Monty; Ullman, Neal
(NY); Palchynsky, John N; Fleming, Dan (TSY); Jones, Craig L
Subject: Urgent tri unwind

7B in barcap tri unwinds today? Are we rolling ? We had 14 B in chase
that could be allocated buit not sure the status of that relationship at
this point. We pledged only 800mm of new collat to barcap. All is
frozen.

# Exhibit 13

| From: | Fleming, Dan (TSY) [dfleming@lehman.com]. | Sent:9/19/2008 4:42 PM. |
|---|---|---|
| To: | Tonucci, Paolo [paolo.tonucci@lehman.com]. | |
| Cc: | . | |
| Bcc: | . | |
| Subject: | Bob Diamond is speaking to JPM about the 7bn of cash allocated to Barclays in triparty last night. | |

# Exhibit 14

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

         08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

      Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

      Debtor.

- - - - - - - - - - - - - - - - - - - -x

             United States Bankruptcy Court

             One Bowling Green

             New York, New York


             December 22, 2008

             10:14 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

50

1   together and we can talk about it sometime in mid-January.  You

2   know, I guess, that's where we are.  They said they don't think

3   it's appropriate for the Court to have to order them to comply

4   and I said you're just causing us to file a motion to do that.

5   It's hard to argue that the information shouldn't be made

6   available.  But, I guess, that's probably where we are.  We'd

7   have to file something if they don't give us the information.

8         THE COURT:  All right.  I'll just make the general

9   comment.  It's not a ruling and I'm not ordering anybody to do

10  anything because there's nothing before me that leads to the

11  entry of an order at least at this point other than an order

12  with respect to the settlement agreement itself.

13        It's obviously in the best interest of orderly case

14  administration that information be shared as promptly as it can

15  be consistent with the other conflicting obligations that the

16  financial advisors and lawyers have in this massive case with

17  enormously complicated issues.

18        Nonetheless, I consider it to be important for us to

19  get to what I'll call closure with respect to the basics of the

20  transaction that was approved by order entered September 20th.

21  And this motion with respect to the settlement agreement is a

22  reasonable platform on which to address some of these issues

23  because while this is not fairly to be characterized as a

24  cleanup item, it's a very significant matter.  It does draw all

25  of our attention back to what happened in September.  And I

51

1    think it important that there be reasonably prompt resolution

2    of outstanding questions that the committee may have on the

3    subject.  I would hope that it's not necessary for the

4    committee to have to file 2004 requests in order to get the

5    information that it seeks which seems to be reasonable and

6    consistent with its mandate.

7         As it relates to the issue of standing that has been

8    alluded to during the course of this hearing and in your own

9    remarks at the outset, by making this comment, I am not making

10   any judgment as to the standing of the creditors' committee

11   appointed in the LBHI case to participate actively and directly

12   in the LBI case.  But it is apparent to me that the transaction

13   that was approved on September 20th was approved by means of

14   two orders, one entered in the LBHI case and one entered in the

15   LBI case.  It is reasonable for the creditors' committee which

16   represents substantial creditor interest in LBHI to have access

17   to information so that it can fulfill its functions in the LBHI

18   case.

19        Additionally, it appears to me reasonable for the

20   LBHI committee not just in the context of what's before me now

21   but in other settings to be a party in interest for purposes of

22   major transactions affecting the LBI case.

23        This does not constitute a ruling with respect to

24   standing.  I do, however, note that these cases operate off the

25   same agenda, very frequently have overlapping agenda items and

# Exhibit 15

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                          :
In re:                                    :    Chapter 11
                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*  :    Case No. 08-13555 (JMP)
                                          :
                      Debtors.            :    (Jointly Administered)
                                          :
-------------------------------------------------------------------x

## DECLARATION OF BRYAN MARSAL IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING DISCOVERY FROM BARCLAYS CAPITAL, INC.

I, BRYAN MARSAL, declare under penalty of perjury pursuant to 28 U.S.C. §

1746 that the following is true and correct:

1.    I am Co-Chief Executive Officer of the firm of Alvarez & Marsal ("A&M") and I

also am the Chief Executive Officer of the Lehman Brothers Holdings Inc. ("LBHI") estate.    I

submit this declaration in support of LBHI's Rule 2004 motion, which seeks discovery from

Barclays Capital, Inc. ("Barclays") in the above-captioned litigation concerning the Sale

Transaction between LBHI and Barclays that was submitted to this Court for approval on

September 19, 2008.    I make this declaration based on my personal knowledge, except where

noted otherwise.

2.    Pursuant to an engagement agreement dated September 15, 2008 and approved by

the Court *nunc pro tunc* by order dated October 16, 2008, Alvarez & Marsal was retained by

LBHI, to, among other things, provide analysis and advice with respect to various aspects of the

Debtors' businesses and issues relating to potential claims to recover assets for the Estate and the

liquidation of the Estate's assets.

3.    I am informed that, in Paragraph 19 of its Opposition to LBHI's Rule 2004

Motion ("Opposition"), Barclays states that A&M "participated directly in negotiations between

September 15 through September 22, 2008" and is "fully familiar with 'the discussions between LBHI and Barclays.'" I am further informed that Barclays stated in Paragraph 54 of its Opposition that A&M "was retained early in the negotiations [between LBHI and Barclays] and was in a position to challenge any aspect of the negotiations that appeared in any way to be influenced by future employment terms."

4.      Those assertions are not correct. A&M was not involved in negotiating the Sale Transaction, nor was it privy to negotiations between Barclays and LBHI during the time the Sale Transaction was negotiated during the week of September 15, 2008. I, and some of my associates at A&M, were present at LBHI's offices at 745 Fifth Avenue during the week beginning September 15, 2008 to begin our work for the Estate.

5.      However, neither I, nor to my knowledge anyone else from A&M, participated in the negotiation of the Sale Transaction as the deal developed and was agreed between LBHI and Barclays. Nor were we asked to participate in those negotiations. Hence, we did not "participate[] directly in negotiations between September 15 through September 22, 2008," we were not "fully familiar with 'the discussions between LBHI and Barclays," and we were not "in a position to challenge any aspect of the negotiations that appeared in any way to be influenced by future employment terms," as Barclays contends in its opposition.

Dated: June 19, 2009
       New York, New York

_____
                BRYAN MARSAL

# Exhibit 16

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                 :

In re:                               :    Chapter 11
                                 :

LEHMAN BROTHERS HOLDINGS INC., *et al.,*   :    Case No. 08-13555 (JMP)
                                 :

                   Debtors.     :    (Jointly Administered)
                                 :

------------------------------------------------------------x

### DECLARATION OF ROBERT W. GAFFEY IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. BANKR. P. 2004, AUTHORIZING DISCOVERY FROM BARCLAYS CAPITAL, INC.

I, ROBERT W. GAFFEY, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a partner in the law firm of Jones Day, Special Counsel to movant Lehman Brothers Holdings, Inc. ("LBHI") in the above-captioned proceeding.  I submit this declaration in support of LBHI's Motion for An Order, Pursuant to Federal Rule of Bankruptcy 2004, Authorizing Discovery From Barclays Capital, Inc. (the "2004 Motion").  I make this declaration based on my personal knowledge.

2.      On April 13, 2009, I sent a letter to the attorneys for Barclays Capital Inc. ("Barclays") informing that Jones Day had been hired as Special Counsel to LBHI and was working to obtain clarity and understanding of the sale transaction between Barclays, on one hand, and on the other, LBHI, Lehman Brothers, Inc., and LB 745 LLC.  (*See* Exhibit C to LBHI's 2004 Motion)  The letter also stated that its purpose was to follow-up on Alvarez & Marsal's February 19, 2009 letter request to Barclays for information regarding bonus accrual and cure amounts related to the Sale Transaction.  (*See* Exhibit B to LBHI's 2004 Motion)  To that end, the April 13 letter attached specific document requests as Schedule A (the "Requests").

Barclays was asked to inform Jones Day by April 20, 2009 whether it would agree to an expeditious production of documents on a voluntary basis.

3.    Barclays' counsel responded alleging that Jones Day had a conflict of interest. (*See* Exhibit D to LBHI's 2004 Motion)  On April 24, I sent a letter to Barclays' counsel (1) explaining that no conflict of interest existed, and (2) reiterating LBHI's request for production of documents responsive to LBHI's Requests, to which Barclays' counsel had not responded. (*See* Exhibit E to LBHI's 2004 Motion)

4.    Following this exchange of letters, Barclays' counsel, Jack Stern of Boies, Schiller & Flexner LLP, and I scheduled a meeting to discuss LBHI's Requests.  This meeting took place on May 8, 2009 at Jones Day's New York office.

5.    During this meeting, Barclays' counsel and I reviewed each of LBHI's 20 Requests in detail.  Barclays' counsel asked specific questions about the Requests and we discussed issues including the purpose of LBHI's seeking certain information.

6.    At the meeting, Barclays' counsel objected to certain of the Requests as calling for "all documents."  Barclays also has raised this issue in its opposition to LBHI's 2004 Motion. In ¶ 40 of its opposition, Barclays argues that LBHI's requests 13-15 "are far too burdensome." Barclays cites Request 13 as being overbroad because it calls for "all documents' concerning all contracts that Barclays assumed and under which it is paying cure amounts."  However, during our May 8 meeting, Jones Day agreed to consider reasonable requests to modify the Requests where appropriate to reduce production burden or to avoid a duplication of effort.  As one example of several such efforts to compromise, with respect to Request 13, I told Barclays' counsel that I would be willing to change "all documents" in the request to "documents sufficient to show."

7.    At the conclusion of this meeting, Barclays' counsel stated that he could not commit to producing any documents but would discuss the issue with Barclays. Barclays' counsel cautioned that any document production, should Barclays determine that it would voluntarily comply with LBHI's Requests, would likely take longer than LBHI would expect because his client could take a long time to make a decision. To at least start the production process and to avoid yet more delay, I asked Barclays' counsel to send to me a draft confidentiality agreement to which it could agree and suggested that it could be based on the agreements that Barclays had already signed with the Creditors Committee and the Examiner to avoid excessive negotiation of any agreement I might propose.

8.    During a follow-up call on May 13, 2009, Barclays' counsel advised that Barclays would agree only to provide certain unspecified "aggregate" compensation information to LBHI, and some unspecified information it might also eventually produce to the Examiner and, even then, he emphasized that it could not provide any estimate of when any documents would be produced. Barclays' counsel also stated that his inability to provide a timeline was based on the fact that information still needed to be gathered. Among the things Barclays purportedly would need to figure out was whether the Barclays employees named in LBHI's Requests dated April 13, 2009, who I believe hold high visibility positions, were still Barclays employees. This, of course, is a fact that ought to have been easily and quickly determined and was an indication of Barclays' desire to delay discovery. During the May 13, 2009 call, Barclays' counsel again agreed to send to me a draft confidentiality agreement based on the agreements that Barclays had already signed with the Creditors Committee and the Examiner. Also demonstrating Barclays' evident ambition to delay matters, they never sent one.

3

9.      In its opposition, Barclays now states that a "condition" of Barclays producing any documents "was that principals of LBHI and Barclays would meet to discuss the potential LBHI 'claims.'" (Opp. at ¶11) This is inaccurate. While counsel for Barclays indicated during our May 8 meeting and our May 13, 2009 call that Barclays desired a meeting between principals, at no time was such a meeting presented as a condition for document production.  In addition, I told Barclays' counsel multiple times that LBHI was in an investigatory stage and was not yet in a position, based on a lack of information, to determine whether LBHI had any claims, but that LBHI had to duty to investigate the issues which are the subject of the Requests.

10.      Further, Barclays' contention that LBHI cut short the meet and confer process is inaccurate. (Opp. at ¶ 12.)  During both the May 8 and May 13 conversations, counsel for LBHI and counsel for Barclays both raised the possibility that document production issues would be brought before this Court because of Barclays' inability to commit to a timeline to produce documents, even including responsive documents that had already been produced to the Creditors Committee and those that, at the time, were about to be produced to the Examiner.

11.      LBHI filed its 2004 Motion only after Barclays' counsel advised that Barclays could not commit to any timeline under which it would produce any documents.  Shortly before we filed the 2004 Motion, I called Mr. Stern and left him a voicemail stating that, absent a timeline for production, the Estate needed to move forward to seek the Court's assistance, but that it remained our hope that, if at least some area could be resolved, we could lessen the Court's burden.  Unfortunately, no resolution has been reached to date.  In fact, when I read in Barclays' opposition its statements that it was willing to produce some documents (*see* Opp. Br. at ¶¶ 4, 16 and 19), I wrote to Barclays' counsel on June 16, 2009 and asked for those documents and enclosed a proposed confidentiality order patterned on the confidentiality agreement

4

between Barclays and the Examiner.  As of this date, I have not received a response to my letter,

attached as Exhibit A.


Dated: June 22, 2009
       New York, New York


_____
ROBERT W. GAFFEY

# EXHIBIT A

# JONES DAY

222 EAST 41ST STREET • NEW YORK, NEW YORK 10017-6702
TELEPHONE 212-326-3939 • FACSIMILE 212-755-7306

Direct Number: (212) 326-7838
rwgaffey@jonesday.com

JP019220:dh                          June 16, 2009
125426-600002

Mr. Jack G. Stern
Boies, Schiller & Flexner LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022

Re:    In re Lehman Brothers Holding Inc., Case No. 08-13555 (JMP)

Dear Jack:

As you know, when I let you know we were going to file our Rule 2004 motion after our attempts to resolve Lehman's discovery request by agreement were unsuccessful, I expressed the hope that we could at least keep trying to narrow the issues before Judge Peck. Hence, I write in response to Barclays' offer in its opposition papers to provide Lehman (i) copies of all responsive documents that Barclays has (or intends to) produce to the Examiner, subject to the execution of a confidentiality stipulation patterned on the stipulation entered into between Barclays and the Examiner, and (ii) Barclays' offer to produce documents responsive to LBHI's Request Number 20, which seeks documents Barclays has produced to the Creditors' Committee. (*See* Objection of Barclays Capital Inc. to Debtors' Motion for An Order Under Rule 2004 Authorizing Discovery of Barclays Capital Inc. ¶¶ 4, 16 and 19.)

We hope this production by Barclays will narrow the focus of the issues before the Court, but, of course, we cannot know if it will until we see the documents so we reserve Lehman's right to additional documents responsive to its Requests.

Please let us know if and when this information will be produced. As you undoubtedly recognize, our concern is that there are documents responsive to Lehman's Requests that may not be produced to the Examiner. To ensure efficiency, please send us the search terms Barclays used to collect responsive documents for the Examiner, and the list of custodians Barclays searched. Also, attached is a draft confidentiality stipulation, patterned on the stipulation entered into between Barclays and the Examiner, and approved by the Court.

Very truly yours,

Robert W. Gaffey

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                 :

In re:                             :     Chapter 11
                                   :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :     Case No. 08-13555 (JMP)
                                 :

               Debtors.          :     (Jointly Administered)
                                 :

------------------------------------------------------------x

## CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER BETWEEN LEHMAN BROTHERS HOLDINGS, INC. AND BARCLAYS CAPITAL INC.

This Stipulation (the "Stipulation" or "Protective Order") is entered into by and between the undersigned counsel, acting for and on behalf of their respective clients: (a) Lehman Brothers Holdings, Inc. and its affiliated debtors and debtors-in-possession. (the "Debtor") in the Chapter 11 Cases, and (b) Barclays Capital Inc. and its affiliates ("Barclays").

WHEREAS, on May 18, 2009, the Debtor moved for entry of an order pursuant to Federal Rule of Bankruptcy Procedure 2004 authorizing it to conduct certain discovery concerning Barclays' purchase of substantially all of Lehman's North American broker-dealer assets in a sale transaction concluded shortly after the Debtor's filing for bankruptcy (the "Sale Transaction");

WHEREAS, Barclays has voluntarily agreed to provide to Debtor certain of the documents Debtor has requested and certain other categories of information that are the subject of Debtor's Rule 2004 motion;

WHEREAS, Barclays has requested, and the Debtor has agreed, that certain documents and information (whether produced voluntarily, as noted above, or pursuant to the Court's ruling on the Debtor's Rule 2004 motion (collectively, "Discovery Materials")) be subject to a

protective order, pursuant to Fed. R. Bankr. P. 7026, to protect the confidentiality of sensitive information; and

WHEREAS, the Debtor and Barclays have entered into this Stipulation and agreed to be bound by its terms:

NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:

1.    Barclays may designate as "Highly Confidential" that portion of any Discovery Materials that Barclays in good faith believes meets any of the following criteria in subparagraphs (A) – (E) below, provided that "Highly Confidential" information shall not include:  information that is at any time independently developed by the Debtor without use of or reliance on any of Barclays' Discovery Materials; information rightfully acquired by the Debtor from an independent source without restrictions as to use; information that was, prior to disclosure, rightfully in the possession or knowledge of the Debtor, information that is publicly available in substantially the same form in which it was provided by Barclays; information that is required by law to be made available to third parties; information that was, is or becomes public knowledge, not in violation of this Protective Order, or information that is voluntarily de-designated by Barclays.  Subject to these conditions and limitations, Barclays may designate the following as "Highly Confidential"

A.    information that identifies specific securities, loans, instruments or other property now or previously held, maintained or possessed by Barclays or any of its customers which was not previously held, maintained or possessed by the Debtors or any of the Debtor's former customers;

B.      information that Barclays is required by law or regulation to protect from

disclosure;

C.      information that reveals Barclays' methodology in regard to risk-rating,

valuation or other forms of financial or credit analysis or that is otherwise of a proprietary and

competitively-sensitive nature;

D.      information that is of a personal or intimate nature regarding any

individual that will cause undue harm to the reputation of or embarrassment to the individual;

E.      any other category of information hereinafter given "Highly Confidential"

status by agreement of the Debtor or further Order of the Court.

2.      Barclays may designate as "Confidential" that portion of any Discovery Materials

that Barclays in good faith believes meets any of the following criteria in subparagraphs (A) –

(G) below, provided that "Confidential" information shall not include:  information that is at any

time independently developed by the Debtor without use of or reliance on any of Barclays'

Discovery Materials; information rightfully acquired by the Debtor from an independent source

without restrictions as to use; information that was, prior to disclosure, rightfully in the

possession or knowledge of the Debtor, information that is publicly available in substantially the

same form in which it was provided by Barclays; information that is required by law to be made

available to third parties; information that was, is or becomes public knowledge, not in violation

of this Protective Order, or information that is voluntarily de-designated by Barclays.  Subject to

these conditions and limitations, Barclays may designate the following as "Confidential":

A.      non-public information concerning the negotiation and documentation of

any sale of all or a portion of Debtor's businesses or assets to Barclays;

B.    non-public information concerning the Replacement Transaction, as that term is defined in the December 5, 2008 Settlement Agreement among JPMorgan Chase N.A., Barclays and the SIPA Trustee;

C.    information that identifies specific securities, loans, instruments or other property of or formerly of the Debtors that are currently held, maintained or possessed by Barclays or that are listed in schedules of assets that Barclays considered acquiring or acquired (including, without limitation, Schedules A and B to the September 20, 2008 Clarification Letter between Barclays, Lehman Brothers Holdings Inc., Lehman Brothers Inc. and LB 745 LLC; Annex A to the December 5, 2008 Settlement Agreement among JP Morgan Chase, N.A., Barclays, and the SIPA Trustee; and Exhibit C to the February 11, 2009 Settlement Agreement among Barclays, SIPA Trustee, the Depository Trust & Clearing Corporation (on behalf of itself and certain subsidiaries));

D.    information concerning Financial Services Agreements designated as Purchased Contracts (each defined in the Court's October 3, 2008 Order Granting Debtors' Motion Pursuant to Sections 105, 365, and 554(a) of the Bankruptcy Code to Establish Procedures for the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases of Non-Residential Real Property and Abandonment of Related Personal Property);

E.    information concerning employee and executive compensation;

F.    any other category of information hereinafter given "Confidential" status by agreement of the Debtor or further Order of the Court.

3.    Barclays may designate Discovery Materials as Confidential or Highly Confidential by applying the applicable legend to the Discovery Materials. In the case of data

stored in electronic form, the applicable legend, if any, shall be printed on the cover or container of the disk, tape, or other medium in which the electronic data is stored.

4.      Discovery Materials that have been designated Highly Confidential shall be maintained in confidence and shall not be shared by the Debtor with any person other than: (i) persons who have lawfully already seen or received the document at issue; (ii) Jones Day, in its capacity as counsel to the Debtor, including Jones Day attorneys, legal assistants, paralegals, secretaries, and other staff; (iii) in-house counsel at LBHI and their support staff; (iv) professional firms or persons that are retained by the Debtor to provide specialized advice to the Debtor, including employees of Alvarez & Marsal; (v) former or current Barclays' employees and advisors in connection with and at their depositions or in interviews; (vi) all the individuals whose oral depositions may be ordered by Judge Peck, pursuant to the above-referenced Rule 2004 motion (vii) outside vendors such as copy services or document management vendors used by the Debtor; (viii) the Bankruptcy Court (in accordance with paragraph 8); and (ix) other persons upon further order of the Court or consent of Barclays.  In the event the Debtor in good faith believes that providing Highly Confidential Discovery Materials to a witness or other person providing information to the Debtor would assist the Debtor, the Debtor shall provide notice to Barclays of the Discovery Materials the Debtor seeks to use (except with respect to interviews of persons who have lawfully already seen or received the document at issue, provided that no other parties are present at the interview), and the parties shall use their best efforts within five business days to allow use of such Discovery Materials while protecting Barclays' need for confidentiality, including, but not limited to, considering whether portions of such Discovery Materials can be redacted and re-evaluating whether such Discovery Materials must be protected as "Highly Confidential." In addition, in the event the Debtor in good faith

believes that providing Highly Confidential Discovery Materials to the Examiner, the SIPA

Trustee and/or the Creditors Committee (or individuals employed or retained thereby) would

assist the Debtor in its investigation, the Debtor may provide such Highly Confidential

Discovery Materials to such entities or individuals provided that the Debtor must first inform the

Examiner, the SIPA Trustee and/or the Creditors Committee, as the case may be, that such

Discovery Materials are Highly Confidential and must be treated in accordance with the terms of

this Protective Order, and provided further that the Examiner, the SIPA Trustee and/or the

Creditors Committee (and the applicable individuals employed or retained thereby), as the case

may be, agrees to be bound by the terms of this Protective Order and executes a Non-Disclosure

Declaration in accordance with paragraph 6 below.  In the event the Debtor and Barclays cannot

resolve an issue concerning the use or sharing of "Highly Confidential" Discovery Materials, the

matter may be present to the Bankruptcy Court for resolution on an expedited basis.

     5.     Discovery Materials that have been designated Confidential (but not Highly

Confidential) may be shown to any of the individuals or entities identified in paragraph 4

(including the Examiner, the SIPA Trustee and/or the Creditors Committee (and individuals

employed or retained thereby) as provided in paragraphs 4 and 6), as well as to witnesses or

other persons who are providing information to the Debtor in connection with the Debtor

Investigation (without providing notice to Barclays) provided that counsel for the Debtor has

provided such person with a copy of this Protective Order and such entity or person has executed

a Non-Disclosure Declaration in the form annexed as Exhibit A hereto.  If Confidential or Highly

Confidential Discovery Materials are used in a deposition or other recorded interview, then it

shall be indicated on the record by counsel for the Debtor (or, if counsel for Barclays is present

by counsel for Barclays) that a question concerning a particular subject matter calls for

Confidential or Highly Confidential information, in which case the transcript of the designated testimony shall be bound in a separate volume and marked "Confidential Information Governed by Protective Order" by the reporter.

6.      Counsel for the Debtor shall provide a copy of this Protective Order to: (i) in-house counsel at LBHI; (ii) a representative of any firm or individual other than Jones Day who is retained by the Debtor (including Alvarez & Marsal); and (iii) to the extent they are provided any Highly Confidential or Confidential Discovery Materials under paragraphs 4 or 5 above, a representative of the Examiner, the SIPA Trustee and/or the Creditors Committee, as the case may be, and the firm, entity representative or individual (and any individuals employed or retained thereby who are provided access to such information), as the case may be, must execute a Non-Disclosure Declaration in the form annexed as Exhibit A hereto prior to the firm, entity or individual receiving any Highly Confidential or Confidential Discovery Materials.

7.      If at any time Barclays determines or realizes that certain testimony or some portion(s) of Discovery Material that it previously produced should be designated as Confidential or Highly Confidential, Barclays may apprise the Debtor in writing, and such designated testimony or portion(s) of Discovery Material will thereafter be treated as Confidential or Highly Confidential under the terms of this Protective Order, provided, however, that Barclays shall, at its cost, provide the Debtor with substitute copies, bearing the appropriate legend, of any such Discovery Material.

8.      All Confidential and Highly Confidential Discovery Materials filed with the Bankruptcy Court, and all portions of pleadings, motions or other papers filed with the Bankruptcy Court that disclose such Confidential or Highly Confidential Discovery Materials,

shall be filed under seal with the Clerk of Court and kept under seal until further order of the Bankruptcy Court.

9.    In the event the Debtor objects to any designation of testimony or Discovery Materials as Confidential or Highly Confidential, the Debtor shall so inform Barclays, stating the grounds for the objection, and the parties shall have seven business days to attempt to resolve the Debtor's objection, at the end of which the Debtor may seek a ruling from the Bankruptcy Court that such Discovery Materials should not be treated as Confidential or Highly Confidential, provided that no Confidential or Highly Confidential Discovery Materials shall be filed in the public record prior to such a determination by the Court, and provided further that the burden shall be on Barclays to justify the claim that disputed material has been properly designated.

10.    In the event the Debtor is required by law to provide Confidential or Highly Confidential Discovery Materials to any third party, the Debtor shall first provide prompt prior written notice to counsel for Barclays and Barclays shall be give a reasonable opportunity to seek protection from a court.

11.    Notwithstanding Barclays' designation of Discovery Materials as Confidential or Highly Confidential, nothing in this Protective Order shall limit any third party's right to challenge such designation in the Bankruptcy Court or any other court of competent jurisdiction.

Dated: June ___, 2009           Dated: June ___, 2009
      New York, New York              New York, New York

By: _____     By: _____
Robert W. Gaffey                Jack G. Stern
JONES DAY                    Hamish Hume
222 East 41st Street          BOIES, SCHILLER & FLEXNER LLP
New York, New York  10017    575 Lexington Avenue
Telephone:  (212) 326-3939    New York, NY 10022
Facsimile:  (212) 755-7306     (212) 446-2300

ATTORNEYS FOR DEBTOR AND    ATTORNEYS FOR BARCLAYS
DEBTOR IN POSSESSION         CAPITAL INC.

**SO ORDERED:** this ____ day of June 2009

_____

HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

NON-DISCLOSURE DECLARATION

I, _____, declare under penalty of perjury, the

following:

I reside at _____ in the City / County of

_____and State of_____;

I have read the annexed Confidentiality Stipulation and Protective Order between the

Debtor and Barclays Capital Inc., dated _____, 2009, in the matter entitled *In re Lehman*

*Brothers Holdings, Inc. et al.*, Case No. 08-1355 (JMP), which is pending in the United States

Bankruptcy Court for the Southern District of New York;

I am fully familiar with and agree to comply with and be bound by the provisions of the

Protective Order and consent to the jurisdiction of the United States Bankruptcy Court for the

Southern District of New York;

I will not divulge to persons other than those specifically authorized by the Protective

Order, and will not copy or use, except solely for the purpose of this litigation, any information

designated as Confidential or Highly Confidential.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated: _____

_____

NYI-4187375v4

10

# Exhibit 17

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                September 19, 2008

                4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

100

1    dealer business.   The value of the real estate being

2    transferred to   Barclays pursuant to the transaction is subject

3    to negotiation with respect of the appraised values.   That the

4    building on Seventh Avenue is subject to an appraisal which has

5    been provided to Barclays.   And that appraisal is in the area

6    of 900 million dollars to 100 million dollars.   And that the

7    appraisal was done by CB Richard Ellis.   And it was prepared

8    for the other debtor in this case, LB 745 LLC and Barclays

9    Capital Inc.   And it is a voluminous appraisal of the

10   properties which we will offer into evidence at the appropriate

11   time, Your Honor.

12           And that he would also testify that an appraisal of

13   the two data centers was also directed and that CB Richard

14   Ellis was also engaged to undertake that appraisal.   And that

15   appraisal has established the value for the purpose of the

16   negotiations, Your Honor.   And as pointed out earlier in the

17   proceeding, those values have come in at slightly less -- I

18   shouldn't say slightly, less than was originally projected.

19           So that was a very negotiated term, and the reason

20   for the transfer of these properties, Your Honor, is that they

21   are integral to the smooth transition of the businesses.

22           Barclays will also assume exposure for the employees

23   that accept offers of employment, which is estimated to have a

24   value of approximately -- an exposure of approximately two

25   billion dollars.

VERITEXT REPORTING COMPANY

212-267-6868                                      516-608-2400

101

1          Barclays is also assuming the cure amounts relating

2     to contracts and leases that will be assumed pursuant to the

3     asset purchase agreement.  And that has a potential exposure,

4     Your Honor, of 1.5 billion dollars that he would testify to.

5          Barclays is also paying the real estate transfer

6     taxes, which are estimated to be approximately thirty million

7     dollars.

8          Mr. McDade would testify that the financial community

9     has known that Lehman has been under stress for some time.

10    Certainly, going back to the time that Bear Sterns was bailed

11    out.  Potential purchasers have known that Lehman has been

12    searching for a buyer since well before the Chapter 11 case

13    commenced.  And that those ethics, those strategic alternatives

14    that were being pursued involved parts of Lehman as well as the

15    whole of Lehman.  And that the notoriety attached to that did

16    not produce any interested parties other than the ones I

17    mentioned -- he mentioned.

18         During the meeting at the Federal Reserve Bank last

19    week, Bank of America, JPMorgan, Merrill Lynch and Barclays

20    were all present, showing interest in the broker-dealer assets.

21    It was clear to each party that if Lehman was unable to reach a

22    deal it would most likely have to commence cases under Chapter

23    11 of the Bankruptcy Code.  That would not only have an adverse

24    impact upon their businesses but also upon the international

25    markets.

# Exhibit 18

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 17, 2008

            4:28 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

23

1    And there were negotiations in respect of that amount.  And

2    what it came out to be, Your Honor, was a proposed breakup fee

3    of a hundred million dollars plus reimbursement of expenses of

4    up to twenty-five million dollars.

5            THE COURT:  May I ask you a question --

6            MR. MILLER:  Yes, sir.

7            THE COURT:  -- about how to equate that breakup fee

8    and expense reimbursement with the purchase price?  And I've

9    attempted to assess the notional value of the transaction

10   because in addition to the 1.7 billion dollars, there's a

11   reference to 1.5 billion dollars in cure amounts and possibly

12   as much as 2.5 billion dollars in certain employee related --

13           MR. MILLER:  Yes, sir.

14           THE COURT:  -- severance expenses which may or may

15   not be triggered.  For purposes of my evaluating the fairness

16   of the overall proposed breakup fee and expense reimbursement

17   as a percentage of the transaction, not that I need to do that

18   but frequently Courts are viewed as approving breakup fees

19   within a certain market range.  How should I view the fair

20   value of the overall transaction?

21           MR. MILLER:  I think, Your Honor, if you start with

22   the billion seven hundred million dollars, which is the cash

23   component, as Your Honor obviously read in the papers, there

24   will be an exposure for 2.5 billion dollars in connection with

25   the retention of these 10 to 12,000 employees.

24

1          In addition to that, Your Honor, in connection with

2    the assumption and assignment of contracts, the cure amounts

3    and other payments in connection with the contracts, are

4    estimated to be a billion five hundred million dollars.  So we

5    have four billion dollars right there, Your Honor.

6          In addition, Your Honor, the purchaser is paying 250

7    million dollars for the goodwill of LBI.  So there you have

8    4,250,000,000 dollars in that respect, Your Honor.

9          And then, Your Honor, in the interim, LBI has entered

10   into an arrangement with the prospective purchaser where

11   there's a repo agreement in which they are backing up and

12   allowing these repos to be settled and to be financed.  In

13   addition, if this goes forward, there will be a support

14   agreement for this interim period of two or three days where

15   Barclays Capital will be on premises, will be offering

16   oversight and in the sole discretion, may be willing to advance

17   some monies in the interim period.

18          So the problem we had, Your Honor, there are so many

19   different elements in this transaction that to do the usual

20   calculation of whether it should be two percent, three percent,

21   etcetera, became enormously complex during the course of the

22   proceedings.  As Your Honor knows, as these transactions go up

23   in value, very often the breakup fee goes up in value.  And

24   this -- if Your Honor just took the 1.7, I would say to Your

25   Honor, it's above three percent, clearly above three percent.