WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION OF THE
DEBTORS, PURSUANT TO SECTION 502(b)(9)OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 3003(c)(3), FOR ESTABLISHMENT OF THE DEADLINE
FOR FILING PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER
OF NOTICE THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. and its affiliated debtors in the above-captioned

chapter 11 cases, as debtors and debtors in possession, file this omnibus reply to the objections

interposed to their motion, dated May 26, 2009, for, among other things, an order approving the

form of proofs of claim for prepetition claims in these chapter 11 cases, establishing a deadline for

the filing proofs of claim, and approving proposed notice thereof (the "Bar Date Motion")[1] and

respectfully represent:

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Bar Date
Motion.

**Preliminary Statement**

1.      The Debtors have made incredible progress in the initial nine months of these chapter 11 cases.  With the mayhem surrounding the filings, not many would have believed that the Debtors would be in a position to seek a claims bar date this quickly.  Throughout the process, the Debtors have acted in good faith, attempted to avoid conflict wherever possible, and have been as accommodating as possible.  The Bar Date represents the next step towards preparation of chapter 11 plans.  The Bar Date is both the springboard and largest roadblock to confirmation:  it will permit the Debtors to begin to quantify claims arising from the cataclysmic, sudden implosion of a great financial institution, but the process could very well stall and become mired in endless litigation, costing hundreds of millions of dollars and running beyond the next decade.  Such delay would be caused by one category of claims—derivative claims—but would prejudice all creditors of the Debtors.

2.      As the fourth largest investment bank in the United States prior to the Commencement Date, Lehman was in the business of structuring cutting-edge financial instruments and investments for both its clients and the Debtors and their non-debtor affiliates.  As of the Commencement Date, the Debtors were some of the largest counterparties to Derivative Contracts in the Unites States.  As of the Commencement Date, Lehman estimates that it had over 10,000 separate Derivative Contracts with over 1,000,000 underlying transactions.

3.      The enormity of the task of reconciling claims against the Debtors, including claims based on Derivative Contracts, demands procedures that enable the Debtors to receive and review claims and supporting documentation in an organized and efficient manner.  Without such procedures, the Debtors fear their estates will be mired in needless and costly litigation for several years or more, unnecessarily delaying the administration of these cases, depleting assets that would impact recoveries to creditors and delaying distributions to all

creditors for an extraordinary period of time.  To expedite the claims reconciliation process, the

Debtors seek approval of several procedures in the Bar Date Motion related to the filing of claims

based on Derivative Contracts, Guarantees and securities issued by the Debtors.  The Debtors and

their professionals developed the procedures set forth in the Bar Date Motion, including the

Derivative Questionnaire, in close consultation with the attorneys and financial advisors to the

Creditors' Committee.  All parties were focused on creating fair and reasonable procedures that

will ensure the Debtors obtain the basic information required to analyze the claims that are filed.

4.     Though there were many objections with much rhetoric, there are relatively

few broad issues raised in the objections interposed to the Bar Date Motion, and one topic

predominates: the Derivative Questionnaire.  Generally, the objections complain that the

information requested by the Debtors is in excess of the information requested in a typical chapter

11 case.  But courts have long recognized that the typical procedures do not fit every case, and

courts have been flexible and modified proof of claim forms and related procedures in large cases

with complex claims.  Typical procedures are inadequate in the context of the these unprecedented

chapter 11 cases.

5.     Valid comparisons to any other chapter 11 cases involving Derivative

Contracts cannot be made.  The Debtors' portfolio of Derivative Contracts is many times the scale

of the portfolio of Derivative Contracts involved in any previous chapter 11 case.  This Court is

not bound by procedures implemented in other cases, particularly in light of the totally

unprecedented magnitude and complexity of the derivative trades at hand.

6.     As the Debtors have done with every issue of import in these cases, they

have carefully collected and considered the views of parties in interest.  As such, the Debtors have

made numerous modifications to the Bar Date Order, the Derivative Questionnaire and the

Guarantee Questionnaire where more precise language was required or counterparties were able to

illustrate why certain information was not needed or appropriate for submission with a bar date. The revisions to the Bar Date Order and its exhibits (as amended, the "Revised Order") are reflected in the comparison attached hereto as Exhibit B.  A declaration of Gary H. Mandelblatt (the "Declaration"), a Managing Director of LBHI, in support of the Bar Date Motion is attached hereto as Exhibit C.

7.    For the reasons set forth in the Bar Date Motion, below, the table attached hereto as Exhibit A,[2] and the Declaration, any outstanding objections should be overruled, and the Revised Order should govern all parties in interest in these cases.

**The Debtors are One of the Largest Derivative Contracts Counterparties in the World**

8.    The Derivative Questionnaire is justified, as the Proof of Claim does not provide the Debtors sufficient information to evaluate and prosecute the complex derivative claims for which the Debtors may be liable.  As noted above, Lehman estimates that it was party to over approximately 10,000 Derivative Contracts and over 1,000,000 underlying transactions as of the Commencement Date.[3]  Generally, Derivative Contracts are financial contracts whose value is derived from the values of one or more underlying assets, reference rates, or indices of asset values or reference rates. The Derivative Contracts to which the Debtors are party include those covering interest rate swaps, FX transactions, credit swaps, exotics (highly structured), commodity swaps and forwards, equity swaps, and other products.  Derivative Contracts are complex financial instruments and their valuation is not science.  The Debtors currently have over

---

[2] Failure of the Debtors to address arguments made in the Objections shall not constitute a waiver of the Debtors' rights to object to such arguments at the hearing to consider the Bar Date Motion or at a later date.  The Debtors deny many of the factual and legal assertions and characterizations contained in the Objections.  Nothing contained herein shall be deemed an admission or acceptance of any statement contained in the Objections.

[3] Of the 10,000 Derivative Contracts, almost 6,500 were directly with the Debtors and 3,500 were with non-Debtor affiliates.  It is expected that counterparties will file guaranty claims against LBHI for those Derivative Contracts with non-Debtor affiliates.

300 individuals tasked with unwinding their portfolio of Derivative Contracts plus the services of third parties to assist in the valuation of Derivative Contracts.  No other chapter 11 debtor, including <u>Enron</u>, which, prior to these chapter 11 cases, likely involved the largest numbers of Derivative Contracts, has ever had Derivative Contracts that compare to the Debtors in number or complexity.  Upon information and belief, the debtors in <u>Enron</u> had only 300 Derivative Contracts counterparties compared to Lehman's 10,000.  And, because Enron was primarily trading in power, oil and natural gas contracts, its Derivative Contracts were of a limited scope of type and complexity.

9.     In the wake of Lehman's failure, the United States Congress analyzed and considered the effect of derivatives in the recent financial turmoil.  But ultimately, as exemplified by Senator Tom Harkin's statement, even Congress is left without a complete understanding of Derivative Contracts:

> That is what got us into this mess in the first place --- derivatives on derivatives on derivatives on derivatives, ad infinitum, with nobody knowing what was going on, without anybody knowing the value of [them].  To this day, [the United States Department of the] Treasury has been unable to tell us how they came up with the value of those derivatives.  It is kind of voodoo.  It is some kind of mathematical calculation they put into a computer somehow.

111 Cong. Rec. S5583 (daily ed. May 19, 2009) (statement of Sen. Harkin).  Congressman Lynch of Massachusetts has stated that "these complex instruments, the CDOs, the credit default swaps, these complex derivatives, based on models are so complex, our own rating agencies couldn't figure out who owned what or how to value them." *Systemic Risk and the Financial Markets: Hearing Before the H. Comm. on Financial Services*, 110th Cong. 38 (2008) (statement of Rep. Lynch, Member, House Comm. on Financial Services).

10.     To state the obvious, establishing the value of a terminated Derivative Contract is exponentially more complex than valuing the damages resulting from almost any other contract.  The damages resulting from the termination of an ordinary contract can usually be

derived by determining the revenue that would have been generated by such contract and

deducting the costs.  In contrast, valuing terminated Derivative Contracts requires some of the

most complex formulations that cannot be accomplished without obtaining numerous information

inputs from counterparties.

### Information Required by the Derivative Questionnaire
### Is Required To Terminate and Settle a Derivative Contract

11.    Upon the occurrence of an event of default in a Derivative Contract, a

termination amount must be calculated to determine the payments required from one party to

another.  The three most common methods for calculating the termination amounts in the Debtors'

Derivative Contracts are "market quotation," "loss," and "close-out amount," in each case, as such

terms are defined in a Master Agreement published by the International Swaps and Derivatives

Association, Inc. ("ISDA").[4]  The calculation of termination payments based on "market

quotation" is determined by quotes, provided to the non-defaulting party by third party financial

institutions, as to the amount that such party would pay or require to be paid in order to enter into

a swap in place of the defaulting party on the identical terms to such swap.  The calculation of

termination payments based on "loss" is determined by the non-defaulting party in good faith

based on its calculation of its total loss (or gain) and costs resulting from termination of such

transaction.  Counterparties often determine the loss (or gain) by inputting data and assumptions

into their own financial models.  The calculation of termination payments based on "close-out

amount" is a hybrid of the "market quotation" and "loss" methods.  It permits a non-defaulting

party, in certain circumstances, to use the inputs and data from both methods.  None of these

---

[4] The vast majority of the Debtors' Derivative Contracts were transacted under ISDA
documentation.  Other documents contain similar valuation processes, albeit usually less intricate
in detail.  Nevertheless, the effort of reconciling portfolios and validating counterparty valuations
remains similar under all Derivative Contracts.

methods are simple, especially when a counterparty might have many thousands of individual swaps, and none is transparent to the party not making the calculations.

12.     The non-defaulting party in a Derivative Contract is required to calculate the termination amount and deliver certain supporting information and documents to the defaulting party upon the occurrence of an event of default under a Derivative Contract governed by an ISDA Master Agreement.  Such information and documents include: (i) a notice of termination identifying the event of default and specifying the termination date; and (ii) a valuation statement (a) showing, in *reasonable detail*, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e) of the ISDA Master Agreement) and (b) giving details of the relevant account to which any amount payable to it is to be paid.

13.     As set forth in the Declaration, in the ordinary course of closing out a Derivative Contract, parties also provide each other with:  (i) information so the parties can confirm the universe of transactions subject to the Derivative Contract being terminated; (ii) a description of the methodology used to determine the valuation of transactions, including quotations, inputs, assumptions, values and parameters, as applicable, and documentation from market-makers concerning the valuations of a transaction; (iii) documentation of replacement transactions entered into; and (iv) information so the parties can confirm unpaid amounts and collateral posted by each party.  Decl. ¶ 51.  Parties require such information to be provided particularly in the context of insolvency proceedings because such information is necessary to evaluate the calculation of a termination amount.

14.     The provision of a notice of termination is essential because it terminates the transactions as of a particular effective date, which is the date as of when the transactions are to be valued.  Typically, Derivative Contracts entered into under ISDA Master Agreements provide that a termination notice must be delivered to an address specified in such contract that is

"in writing and delivered in person or by courier" or "sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested)." ISDA Master Agreement §§4(a), 12(a). The date on which a termination notice is received may be the relevant date on which the clock stops and the parties look to value the underlying assets or indices and determine termination payments under a Derivative Contract.

15.     Information with respect to the methodology used in the calculation of the termination amount is the most important piece of information that the counterparty is required to provide in connection with the termination of a Derivative Contract.  The non-defaulting party is the only party that has information regarding:  (i) which market-makers provided quotes, the number of quotes received and how the averaging of the quotes was effectuated; (ii) the particular methodology used to determine the "loss," including the data included in the calculation and the assumptions made; (iii) whether the counterparty deviated from the required procedures of the method of calculating the termination amount and the reason for such deviation; and (iv) the terms and conditions under which parties entered into replacement transactions.  All of this information goes directly to the claim amount.  There is no way for the Debtors to obtain such information other than from the counterparty.  Because some of the methodologies under ISDA Master Agreements, such as "loss" or "close-out amount," grant parties considerable latitude to determine their "loss" amount, counterparties have broad discretion within the parameters of "good faith." The Debtors would have no way to know of the method used, and whether such method was in good faith, unless the counterparty provides a description.

16.     Many of the Debtors' Derivative Contracts counterparties have already denied the Debtors' requests for information and are, instead, seeking to use the information inequality to their advantage.  The current objections and refusal to provide the requested information are further attempts by certain counterparties to conceal the true value of the

8

Derivative Contracts and avoid a thorough vetting of their claim amounts, or at least significantly delay such process and force the Debtors to expend extraordinary sums in the hopes that such leverage will compel the Debtors to ignore significant discrepancies.

**The Revised Order and Derivative Questionnaire Request No More Than**
**Is Required Under Derivative Contracts To Terminate and Settle Derivative Contracts**

17.    As is evident from the curtailed description above, Derivative Contracts are highly technical contracts.  They require greater amounts of information to establish claim amounts – inside or outside of bankruptcy – than virtually any other form of contract.  It is in this context that the Debtors request information regarding Derivative Contracts from their contract counterparties filing proofs of claim.  When the magnitude of claims is extraordinary, ordinary claims procedures are inadequate.  Any suggestion by objecting parties that counterparties to Derivative Contracts are only required to submit a simple standard Proof of Claim Form, without more, is ludicrous.

18.    To clarify and streamline the Derivative Questionnaire for the benefit of all parties in interest, the Debtors have agreed to eliminate many of the initial requirements that potential claimants considered burdensome.[5]  As reflected in the Revised Order, the Debtors have removed the requirement for creditors to provide:

- information and supporting documentation with respect to Derivative Contracts that have not been terminated or have not matured;

- confirmations (which was the most common basis for objection and could be the most voluminous if required to provide);

- any evidence of any consent or other condition required to be satisfied in order to effect termination of the derivative contract;

---

[5] The Debtors may require and may request additional information (including confirmations) from counterparties in the future.

- with respect to valuations done by market quotation, contact individual, when requests were made, the form of request that was made, in what manner the market-maker responded and the nature of any follow-up requests;

- with respect to replacement transactions, any external communications (including all transaction confirmations, other documents, e-mails, or any other writings or information) evidencing or concerning the replacement transactions;

- with respect to unpaid amounts, supporting documentation of such unpaid amounts; and

- with respect to collateral posted to secure a Derivative Contract, the bank wire advice, Fed Reference numbers and other statement supporting the original posting of cash collateral and any cash disbursements on the securities.

19.     In addition, the Debtors have agreed to modify the procedures related to the completion of the Derivative Questionnaire.  The Revised Order provides an additional 30 days for creditors to complete and submit the Derivative Questionnaire after the Bar Date – for a total of 90 days from mailing of the Bar Date Notice.

20.     The Debtors believe that the revisions described above and additional ones reflected in the Revised Order should resolve many of the objections to the scope of the information requested.  As revised, the Derivative Questionnaire requests documents and information that are not in excess of the requirements under the Derivative Contracts or the requirements for the settlement of Derivative Contracts outside of a bankruptcy case.    Decl. ¶ 51.

**The Bar Date Order and Derivate Questionnaire Are**
**Authorized by the Bankruptcy Rules and Are Otherwise Fair and Reasonable**

21.     The Debtors received objections to the Bar Date Motion from only a relatively small number – approximately 200 of 10,000, or fewer than 2% – of their Derivative Contracts counterparties.[6]  The objectors assert that the information requested by the Debtors in the Derivative Questionnaire exceeds the information required under the Bankruptcy Rules.  As

---

[6]  ISDA filed a motion in support of such objections (Docket No. 3874), but ISDA is not a creditor of any of the Debtors, has no interest in the effective administration of these cases, and, as such, lacks standing to assert a claim and object to the Bar Date Motion.

described below, the objections lack legal merit.  Requirements for documentation and responses to supplemental questionnaires are neither novel nor abusive.

22.     The objectors also argue that the information requested by the Debtors in the Derivative Questionnaire exceeds the information required by the Debtors to value claims based on Derivatives Contracts and that providing such information would be burdensome.  Some argue that the documents and information requested in the Derivative Questionnaire are in excess of the requirements the Derivative Contracts as well as the requirements for the settlement of Derivative Contracts outside a bankruptcy proceeding.  Notably, none of the objecting parties offered any evidence by way of affidavit, declaration or otherwise, to support their arguments. The objections are devoid of factual support for their equitable claims of hardship and burden.

> Objection:  Information requested exceeds the requirements of Bankruptcy Rule
>              3001(c) and modifications to the Official Form should be disallowed
> Reply:

23.     Bankruptcy Rule 3001(a) requires only that "[a] proof of claim shall conform substantially to the Official Form," FED. R. BANKR. P. 3001(a).  Modifications to the Official Form are permitted.  Bankruptcy Rule 9009 states that the "Official Form… shall be observed and used with ***alterations as appropriate***."  FED. R. BANKR. P. 9009 (emphasis added). "Courts have permitted the use of customized proof of claim forms in appropriate circumstances…"  In re The Babcock & Wilcox Co., Case No. 00-0558, Order at 19 (E.D. La. Aug. 25, 2000).  Courts have approved the use of specialized claim forms to gather information in a variety of cases.  See e.g., In re USG Corp., Case No. 01-2094 (RJN) (Bankr. D. Del. Apr. 30, 2002) (approving use of specialized proof of claim form for asserting asbestos-related property damage claims); see also Babcock, Case No. 00-0558, Order at 4 (E.D. La. Oct. 30, 2000) ("The form and content of the Babcock & Wilcox Special Claims Form . . . are authorized by Bankruptcy Rule 3001(a) and are otherwise fair and reasonable."); In re Celotex Corp., 204 B.R.

586, 593 (Bankr. M.D. Fla. 1996) (permitting the use of a customized, three-page proof of claim

form);  In re A.H. Robins Co., 862 F.2d 1092, 1093 (4th Cir. 1988) (approving a proof of claim

form that, in addition to basic background information, elicited "information of the claimant's use

of the Dalkon Shied, they type of injury alleged and the names of physicians or clinics visited by

the claimant").

   24. The Debtors' proposed Proof of Claim Form substantially conforms to the

Official Form and contains only two slight modifications: the addition of two check-boxes for

parties to indicate that their claim is based on a Derivative Contract or a Guarantee, and the

inclusion of a Unique ID Number.  As discussed above, the Debtors are party to an extraordinary

number of Derivative Contracts.  The Debtors issued Guarantees of most of the Derivative

Contracts as well as various other obligations of Lehman entities.  As claims based on Derivative

Contracts and Guarantees are two of the largest types of claims that the Debtors expect to be filed,

the check-boxes will assist the Debtors in organizing such filed claims.

   25. The proposed Proof of Claim Form also includes a Unique ID Number

which will enable the Debtors to reconcile the filed claims efficiently.  The Unique ID Number

will be used solely for organizational purposes.  Creditors are not disadvantaged in anyway for

failing to receive, use or submit a Proof of Claim that has a Unique ID Number.  Creditors will be

able to complete the Derivative Questionnaire and the Guarantee Questionnaire without entering a

Unique ID Number.  These slight modifications to the Official Form in no way burden creditors,

"confuse or confound a streamlined administrative process," or frustrate "a quick and easy

comprehension of information presented."  Compare, In re Mitchell, 255 B.R. 345, 363 (Bankr. D.

Mass. 2000) (disallowing modifications to the Official Form where such modifications confused

and frustrated the claims process), and In re Mack, 132 B.R. 484, 485 (Bankr. M.D. Fla. 1991)

(finding modified forms unsatisfactory in part because they failed to "facilitate a quick and easy

comprehension of the information presented").  Accordingly, the Proof of Claim Form should be approved.

> Objection:  Information requested exceeds the requirements of Bankruptcy Rule 3001(c)
>
> Reply:

26.    The Debtors' request that claimants be required to submit documentation in support of their claims is also reasonable and supported by the Bankruptcy Rules and case law. Bankruptcy Rule 3001(c) requires that "the original or a duplicate shall be filed with the proof of claim" when a claim is based on a writing.  FED. R. BANKR. P. 3001(c).  Dispositive of this issue is that Official Form No. 10 itself requires copies of documents that support the claim to be attached to the proof of claim form!  Official Form No. 10 at 7.

27.    Indeed, numerous courts in typical chapter 11 cases have required claimants submit more than simply the claim amount in order for a proof of claim to be deemed valid.  The process is meant to be flexible, accommodate the circumstances of each case and avoid inefficiencies.  For example:

- In In re Rosetta Armstrong, a case cited in several of the objections, the bankruptcy court held that supporting evidence and documentation must accompany claims based on convoluted credit card agreements that required various intricate calculations.  320 B.R. 97, 106 (Bankr. N.D. Tex. 2005) (requiring a creditor to "attach an account statement containing the debtor's name, account number, the prepetition account balance, interest rate and a break down if the interest charges, finance charges and other fees that make up the balance of the debt").

- In In re Kemmer, the bankruptcy court stated that "the failure to attach a monthly account statement, or a similar computer-generated account summary, evidencing the required account information will result in loss of the creditor's prima facie presumption of validity."  315 B.R. 706, 715 (Bankr. E.D. Tenn. 2004).

- In In re Cluff, the bankruptcy court held that a claim that listed the debtor's name, account number, current balance, previous balance and payment due but failed to itemize charges, list late fees and state the annual percentage rate was not entitled to prima facie validity.  313 B.R. 323, 336-38 (Bank. D. Utah 2004).

28.    Courts in larger and more complex chapter 11 cases have upheld the use of questionnaires and required claimants to provide additional information contemporaneously with the filing of a proof of claim for claim validation purposes.  Courts have further required claimants to comply with additional, substantial procedural requirements in order to recover as creditors of a debtor.  For example:

- In <u>In re Ephedra Products Liability Litigation; In re TL Admin. Corp.</u>, 04 MD 1598 (JSR) (S.D.N.Y.), No. 03-15564 (Bankr. S.D.N.Y.), personal injury claimants that filed proofs of claim against the debtors were required to convert their claims into civil actions by filing complaints and verified fact sheets by a date certain.  All claims that were not timely converted were deemed waived and expunged, invalid and/or disallowed.  A copy of the relevant District Court order is attached hereto as <u>Exhibit D</u>.  A copy of the 69 page fact sheet is attached hereto as <u>Exhibit E</u>.  A copy of the Bankruptcy Court's order identifying and directing the debtors' claims agent to expunge more than half of the ephedra-related claims (233 of 440) pursuant to the District Court's order is attached hereto as <u>Exhibit F</u>.

- In <u>In re Enron</u>, Case No. 01-16034 (AJG), the bankruptcy court required employees asserting claims for retiree benefits, wages, salary, and compensation to complete an eight-page Employee Proof of Claim Form and provide information regarding: the period of work performed and unpaid; amounts owed to the employee for unpaid vacation; amounts owed for unpaid severance or separation pay including the period of the claimed unpaid severance and copies of any agreements, letters or forms supporting the claims; amounts owed for unpaid benefits due from employee benefit plans, the name of the employee benefit plans, a detailed explanation of how the employee computed the unpaid amount owed under the employee benefit plan(s), and attachments of any plan agreements that describe how payment is calculated; amounts owed for unpaid bonuses/incentives and the details regarding the incentive programs or plans including attachments of any plans, programs, or award agreements that describe the applicable payout formula; amounts owed for unpaid sales commissions including any agreements, letters or forms supporting the claim; amounts claimed for unpaid reimbursable expenses and a descriptions of such items, the date expense incurred, and the amount and copies of receipts and/or expense reports; and amounts for other unpaid amounts, the basis of the claim, and copies of any applicable agreement.  <u>See</u> Order at 2, Exhibit C (Bankr. S.D.N.Y. Aug. 1, 2002).  A copy of the Employee Proof of Claim Form is attached hereto as <u>Exhibit G</u>.

- In <u>In re Federal-Mogul Global Inc.</u>, No. 01-10578 (Bankr. D. Del. June 4, 2002), the bankruptcy court approved a specialized proof of claim form for claims regarding asbestos property damage which required claimants to fill out a three-page form that requested information about each property that was the basis of an asbestos property damage claim, the type and brand name of the asbestos-containing product installed there, the dates of installation and removal of that product, and the resulting damages.  The claimants were also required to attach all supporting documents such as invoices,

contracts, product samples and test results.  A copy of the specialized proof of calim form is attached hereto as <u>Exhibit H</u>.

- In <u>In re Celotex</u>, the bankruptcy court approved a special, three-page proof of claim form for asbestos bodily injury claims that required claimants to identify the debtor(s) against which they asserted a claim and basic identifying information including name, address, phone number, social security number, date of birth, gender and date of death if deceased.  The form also asked claimants for injury history which required a claimant to check a box to indicate whether the claimant had been diagnosed with mesothelioma, lung cancer, gastro-intestinal cancer, asbestosis, or pleural injury and to indicate the year of diagnosis.  If the claimant had asbestosis or pleural injury, the proof of claim form also required a statement of the claimant's most recent ILO X-ray results and the claimant's most recent pulmonary function test ratings, if available.  Finally, the form asked for exposure history, including whether the claimant had been exposed to asbestos supplied by the debtors; the number of years of exposure; the first and last year of exposure; the appropriate industry code; and the amount of the claim.  <u>In re Celotex Corp.</u>, Nos. 90-10016-8B1 c/w 90-10017-8B1 (Bankr. M.D. Fla.) (Bar Date Mot. Ex. 2 at 1-2), cited in <u>Babcock</u>, Case No. 00-0558, Order at 19-20 (Bankr. E.D. La. Aug. 25, 2000).

- In <u>In Re A.H. Robbins</u>, the court devised a two-step process whereby creditors were required to first submit a statement to the court that provided the claimant's name and address and that they were "making a Dalkon Shield claim."  <u>Id</u>.  The court then sent all claimants who had filed the required statement a questionnaire that requested additional information, such as the claimants' name, address, telephone number, social security number, date of birth, dates of insertion and removal of the Dalkon Shield, type of injury allegedly suffered, and the names of physicians or clinics consulted.  <u>Id</u>.  In the bar date order, the court ordered that the "questionnaire must be completed under penalty of perjury and timely returned to the court or the claim may be disallowed".  The United States Court of Appeals for the Fourth Circuit subsequently held that the claims-filing procedures established by the district court, including the use of the questionnaire, were valid and the disallowance of claims for non-compliance with the claims-filing process was appropriate.  <u>Id</u>. at 1094-95

29.    In many ways, the claims the Debtors expect to receive are similar if not significantly more complex to the claims received by previous debtors with mass tort liabilities. The Debtors anticipate receiving thousands of claims relating to Derivative Contracts alone and, prior to receipt of the claims, the Debtors lack the information necessary to evaluate the claims. When the magnitude of the claims is extraordinary, ordinary claims procedures are inadequate.

30.    There is no question that claimants can and should be required to submit additional written information with their Proofs of Claim – Official Form No. 10 says so.  But, as

described below, the objecting parties have also objected to the specific information requested.

The Debtors anticipate receiving a large number of claims based on alleged guarantees.  The Bar

Date Order requires a claimant filing such a claim complete the Guarantee Questionnaire.

Because the Guarantee Questionnaire requires a claimant to provide only basic information and

supporting documentation about the entity against whom the claimant has a direct claim and

information and supporting documentation regarding the claimant's claim against a Debtor, as

guarantor of the obligor's payment/obligations, see Proof of Claim Form Ex. D, the Guarantee

Questionnaire does not require information beyond what is required by the Bankruptcy Rules and

Official Form No. 10 itself.  See Fed. R. Bankr. P. 3001(c); Official Form 10 at 7.

> Objection:  The procedures in the Bar Date Order modify the
> evidentiary burdens provided for in Bankruptcy Rules 3001(f) and 3007
> Reply:

      31.    A number of objecting parties argue that the procedures set forth in the Bar

Date Order requiring claimants to complete the Derivative Questionnaire shift the evidentiary

burden set forth by the Bankruptcy Rules.  Such arguments are misguided.  Bankruptcy Rule

3001(f) does provide a presumption of *prima facie* validity to an appropriately filed claim.  Fed.

R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules [i.e.,

the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the

claim.")  However, not every proof of claim that is filed is entitled to such presumption.  A proof

of claim "must be sufficiently detailed and substantial so as to allow it to be considered as prima

facie evidence of its validity."  In re Scholz, 57 B.R. 259, 261 (Bankr. N.D. Ohio 1986).  As set

forth above, Bankruptcy Rule 3001(a) provides, in relevant part, that "[a] proof of claim shall

conform substantially to the appropriate Official Form," Fed. R. Bankr. P. 3001(a), and Official

Form No. 10 itself requires copies of documents that support the claim to be attached to the proof

of claim form.  Official Form No. 10 at 7.  Thus, contrary to the assertions made, the Bankruptcy

Rules and Official Forms require documentation for a claim to have *prima facie* validity.  The objectors have argued that a mere summary would suffice.  For the reasons set forth above and in the Declaration, a summary alone would not provide sufficient information to enable the Debtors to analyze a claim related to a Derivative Contract.  Thus the information requested in the Revised Order and Derivative Questionnaire is required to establish a prima facie case for a claim related to a Derivative Contract.  The Debtors' proof of claim form does not shift the burden.

32.    Assuming, *arguendo*, that some of the information required by the Revised Order or the Derivative Questionnaire is in excess of what is required to establish a *prima facie* claim, the issue of burden shifting is, nonetheless, a red herring.  The objecting parties confuse (i) the shifting burden of ultimate proof of validity of a claim with (ii) the burden that the Debtors would be required to overcome to obtain, in discovery, any requested information that could be considered in excess of what is required to establish a *prima facie* case.  The Debtors do not dispute that a creditor is required to prove the amount and validity of its claim by a preponderance of the evidence only after the Court determines that the burden of proof has been shifted to the creditor.  Certain objections mistakenly argue that the presumptive validity of a filed proof of claim is rebutted only if evidence is introduced, however.  E.g., Docket No. 3829, ¶ 15.  They are incorrect.  An "objection raising only legal issues is sufficient," without more, to rebut a claim's *prima facie* validity. See Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless International Corporation), 295 B.R. 140, 145 (10th Cir. 2003) (citing In re Lenz, 110 B.R. 523, 525 (D. Colo. 1990)).  "It has been said that the filing of a proof of claim is tantamount to the filing of a complaint in a civil action … and the trustee's formal objection to the claim, the answer." Simmons v. Savell (In re Simmons), 765 F.2d 547, 552 (5th Cir. 1985).  Nonetheless, if proofs of claim are not accompanied by sufficient information, and the amount of the claim does not correspond with the Debtors' books and records, the Debtors will be compelled to file

objections to the claims.  Once a contested matter has been initiated, the Debtors will be free to conduct discovery and obtain the relevant information from the claimants.  The Debtors are not required to undertake an evidentiary battle or oppose or accept the merits of a proof of claim without the opportunity for discovery.  By proposing the procedures that they have in the Revised Order, the Debtors seek to streamline the process and avoid needless administrative costs and delays.  Suffice it to say, the minimal information requested will in no way avoid significant claims litigation as to Derivative Contracts.

33.    Certain objectors lament the "effective collapsing [of] the three-stage claims reconciliation process."  Docket No. 3829, ¶ 18.  They suggest that, in the context of some of the most complex contracts and financial instruments in the world, the best interests of all parties would somehow be served by having "the filing of the proof of claim … be a *simple exercise* where the claimant provides a *basic level* of information to support the claim *and place the onus on the Debtors to come forward* with a basis for objecting" to proofs of claim for over 1,000,000 transactions. Id. ¶ 17 (emphasis added).  Statements such as this make clear that the objecting parties are not seeking to protect the best interests of the Debtors' estates or the economies of justice, but are seeking to continue to withhold after over twelve months information they already have and are required to produce under the Bankruptcy Code and Bankruptcy Rules and in the ordinary course of business.

Objection:    Information requested in the Derivative Questionnaire exceeds the information required by the Debtors to value claims based on Derivatives Contracts

Reply:

34.    As set forth above, the revisions reflected in the Revised Order should resolve many of the objections to the scope of the information requested.  As revised, the Derivative Questionnaire requests documents and information that are not in excess of the requirements under the Derivative Contracts or the requirements for the settlement of Derivative

Contracts outside of a bankruptcy proceeding.  Decl. ¶ 51.  Nonetheless, provisions of the

Derivative Contract and the standards of ISDA agreements are not determinative of the required

supporting documentation required to be filed with a proof of claim.  The requirements for

submitting a proof of claim are governed by the Bankruptcy Code and the Bankruptcy Rules, not

by market practice or industry groups.

> <u>Objection</u>:  <u>The procedures in the Bar Date Order are unduly burdensome on creditors</u>
>
> <u>Reply</u>:

35.    When considering any remaining arguments that the procedures in the

Revised Order are burdensome on the creditors, the Court must balance the burden on the

Debtors' estate of alternative procedures.  In these cases, the burdens do not compare.

36.    September 15, 2008 was one of the most significant days in the history of

Wall Street and the financial industry.  In the immediate aftermath, sophisticated parties across the

globe took stock of their exposure to Lehman and determined the effect of the Lehman's

bankruptcy.  These contract parties likely were required to "mark to market" on the very day they

terminated their Derivative Contracts.  Certainly they were required to do so at the end of a fiscal

quarter or year in order to close their books and prepare and issue financial statements.  Between

the Commencement Date and the Bar Date, at least one year end and three separate quarters will

have passed.  Importantly, there can be no question, therefore, that counterparties to Derivative

Contracts collected all of the data necessary to value their terminated contracts on the very day of

termination and have all such information in hand.  The reason that any counterparty would refuse

to provide to the Debtors information it already has compiled and that it would provide to a

terminated counterparty outside of bankruptcy can only be surmised.

37.    Certain objecting parties argued they would further be prejudiced by

comparing the information request in the Revised Order and the Derivative Questionnaire to one-

sided discovery.  Where parties have complained that providing the basic information to calculate

their claims would somehow prejudice them and reveal their "weaknesses" and "defenses,"

Docket No. 3814, ¶ 13, the fact remains that even a bare Proof of Claim with only a claim amount

is filed under penalty of perjury and requires complete veracity.  Official Form No. 10.

Furthermore, creditors suffer no prejudice by complying with the proposed procedures.  If the

Debtors agree with the validity and amount of a creditors' claim, the creditor will have no need for

discovery of the Debtors.  If the Debtors disagree with the validity or amount of a creditor's claim,

the Debtors will object to the claim, the matter will become a contested matter, and the creditor

may be entitled to discovery of the Debtors.

38.    Certain parties have objected, arguing that they have already provided the

Debtors with sufficient documentation and information.  This situation is not unlike a typical

chapter 11 case, where a creditor sends an invoice to the debtor demanding payment and, the

creditor subsequently is required file a proof of claim with an additional copy of the invoice.  In

these cases, additional facts compel the possible resubmission of supporting information.

Contrary to assertions made in the objections, the Debtors do not in all cases have in their

possession a termination notice, proof of its valid delivery date or other requisite information with

respect to each of the purportedly terminated Derivative Contracts.  This is due, in part, to the fact

that Lehman's headquarters, which was the address to which notices of termination were to be

provided pursuant to most of Lehman's Derivative Contracts, was sold to Barclays Bank PLC

shortly after the Commencement Date.  Following the sale, Lehman's remaining employees, a

small fraction of Lehman's former employee base, were forced to leave the building.  Many of

Lehman's records (electronic and physical), including those related to Derivative Contracts,

remained in Barclays' control subsequent to the sale.  In the chaos that ensued, thousands of

notices purportedly terminating Derivative Contracts were delivered to 745 Seventh Avenue, New

20

York, New York, Lehman's former global headquarters, an office no longer controlled by Lehman or containing Lehman employees. Termination notices sometimes took days or even, in certain circumstances, weeks to arrive in Lehman's offices and in the hands of the appropriate Debtors' employees or may not have arrived at all. Furthermore, even with respect to termination notices that were received by Lehman, there is frequently no evidence of the date upon which such termination notices were delivered to the address specified in the Derivative Contracts. The Debtors dedicated four or five people to the full-time task of simply opening and date stamping mail on the date opened by Lehman (this did not include reading and reviewing the termination notices themselves), but such date could have been a significant period of time after such termination notice was validly delivered. Additionally, prior to the Commencement Date, Lehman's records of Derivative Contracts were not centrally organized. The records existed on multiple electronic systems and in different locations.

39.    If the Debtors did not receive the requested information along with a counterparty's Proof of Claim, the Debtors would be compelled to either contact the thousands of counterparties, each individually, and request the information requested in the Derivative Questionnaire or commence examinations of each counterparty. This alternative would be an enormous and wasteful drain on the assets of the Debtors' estates and the time of its employees and advisors and, ultimately, would prejudice all creditors. The procedures set forth in the Bar Date Motion and Revised Order are appropriate, fair and reasonable and should be approved.

> Objection:    Claims filed by counterparties to Derivative Contracts should not be subject to disallowance for failure to complete the Derivative Questionnaire
>
> Reply:

40.    One of the most common objections is that it would be contrary to the Bankruptcy Rules and simply unfair to disallow claims due to the failure of a creditor to comply with the Bar Date Order and its procedures. The objections take issue with language in the Bar

Date Order that provides that parties that are required to, but do not, file a claim in accordance with the Bar Date Order, shall be forever barred, estopped and enjoined from asserting such claim against the Debtors.  Language to this effect is included in most bar date orders, and is included in the form of bar date order attached to Order M-350 issued by the United States Bankruptcy Court Southern District of New York.[7]  The only addition by the Debtors to the standard bar date order is the obligation to comply with the Derivative Questionnaire and Guarantee Questionnaire.

41.     Creditors in A.H. Robins interposed similar objections to the ones filed here.  They argued that a required questionnaire was "merely a step in a discovery process and not an essential step in perfecting their proof of claim" and, if not fulfilled, does not "support the extreme sanction of a dismissal of their claim."  862 F.2d at 1095.  They further argued that the value of the information on the questionnaire "was of such minimal value that the Debtor could not have been prejudiced by their failure to file the completed questionnaires."  Id.  But the court in A.H. Robins rejected these arguments and determined that the questionnaire was an "essential part of the proof of claim."  Id.

42.     Despite the fears of, and allegations made by, the objecting parties, the Debtors are not engaging in a game of "gotcha."  To resolve the objections, and unlike any other case the Debtors have reviewed, the Debtors have included revised language regarding the disallowance of claims in the proposed Bar Date Order.  The relevant provision of the order now reads:

> ORDERED that no claim of any creditor shall be disallowed due to the failure by such creditor to strictly comply with the procedures set forth in this Order related to Derivative Contracts (including the completion of the Derivative Questionnaire) so long as such creditor substantially and in good faith complies with such procedures

---

[7]  Order M-350 provides that "all persons and entities . . . that assert a claim . . . against the Debtors . . .shall file a proof of claim in writing so that it is received on or before [the Bar Date]" and that the "procedures for the filing of proofs of claim shall apply."

related to Derivative Contracts set forth in this Order (including the completion of the Derivative Questionnaire);

The Debtors believe this revised language addresses and resolves the objections to issues in the Bar Date Order.  Of course, no good deed goes unpunished, and the Debtors no doubt will still face objectors who would argue that the language meant to address their objection is too vague and unacceptable to them.  The Debtors submit that the Court will be the ultimate arbiter of whether a creditor has complied or made a good faith effort to comply or otherwise proves excusable neglect.

## Conclusion

WHEREFORE, for the reasons set forth above and in Exhibit A hereto, and based upon the arguments to be made in support of the Bar Date Motion on the record at the hearing, the Debtors respectfully request that the Court (i) overrule the objections to the Bar Date Motion; (ii) grant the Bar Date Motion and enter the Revised Order; and (iii) grant such other and further relief as the Court may deem just and appropriate.

Dated: June 23, 2009
       New York, New York

/s/ Shai Y. Waisman
Lori R. Fife
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for the Debtors and Debtors in Possession

## EXHIBIT A

| Objection | Resolution/Reply |
|---|---|
| 1.  The following language in the Bar Date Order is unclear and restricts the ability of trustees or banks to file Proofs of Claim on behalf of their customers: "ORDERED that any claims asserted, other than claims asserted by parties that are legally entitled and authorized to assert such claim, shall be disallowed;" | The Debtors do not intend to modify the Bankruptcy Code or the Bankruptcy Rules with respect to the authority of parties to file claims.  The language will be replaced in its entirety with the following language:<br><br>**"ORDERED that Proofs of Claims may only be filed by parties that are authorized to file such claims in accordance with Bankruptcy Code and the Bankruptcy Rules;"** |
| 2.  The definition of "Derivative Contract" is not precise and does not provide claimants with fair notice as to whether their claims are subject to the procedures in the Bar Date Motion related to Derivative Contracts. | The Debtors have replaced the definition of "Derivative Contract" in the Revised Order with the following:<br><br>**"Derivative Contract" means a contact that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code, (ii) a "commodities contract" as such term is defined in section 761(4) of the Bankruptcy Code, (iii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code or (iv) a "securities contract" as such term is defined in section 741(7) of the Bankruptcy Code; <u>provided</u> that, any guarantee or reimbursement obligations which would otherwise be included in the definition of "swap agreement", "commodities contract", "forward contract" and "securities contract" pursuant to the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition.** |
| 3.  The Bar Date Order should include a specific length of time for the Debtors to respond to inquiries for the Master List of Securities and also include a cutoff near the Bar Date for final changes, so that creditors can take comfort that such list is final and will have time to file their Proof of Claim. | The Revised Order will replace the language relating the process for parties to inquire about adding securities to the Master List of Securities in its entirety with the following:<br><br>**"ORDERED that, any holder of a security that is not listed on the Master List of Securities may request that a security be added to the Master List of Securities by completing the form entitled "Inquiry Regarding Security Not on Master List of Securities" available on the Debtors' website http://www.lehman-docket.com and submitting it to the Debtors as directed on such form on or prior to August 5, 2009.  The Debtors will investigate the inquiry and within 15 days of the receipt of such inquiry, the Debtors will, (x) add the security to the Master List of Securities (if appropriate) or (y) provide an explanation solely to the party submitting such inquiry as to why the security will not be added to the Master List of Securities:  The Master List of Securities listed on the website shall be final as of August 20, 2009; and it is further"** |

| **Objection** | **Resolution/Reply** |
|---|---|
| 4. Information submitted to the website should be considered part of the Proof of Claim and be subject to the same rules and standards with respect to amendment and supplements as proofs of claim. | The Revised Order will include the following language to address this objection:<br><br>**"ORDERED that the website http://www.lehman-claims.com and the information submitted thereon will remain accessible by the party that submitted such information following the Bar Date and the information submitted on the website will be subject to the same rules and standards as amendments and supplements to proofs of claim; and it is further"** |
| 5. Creditors that have previously filed a Proof of Claim should not have to re-file to comply with revised Proof of Claim Form and/or the procedures related to the filing Proofs of Claim based on Derivative Contracts and Guarantees. | The Revised Order includes the following language:<br><br>**"ORDERED that the following persons or entities are <u>not</u> required to file a Proof of Claim on or before the Bar Date…(f) any holder of a claim who has already properly filed a Proof of Claim with the Clerk of the Court or Debtors' court-approved claims agent, Epiq against the Debtors utilizing a claim form which substantially**<br><br>A creditor that submitted a claim prior to entry of the Bar Date Order will not have to re-file a Proof of Claim if the claim was submitted on an Official Form and is not based, in whole or in part, on a Derivative Contract or a Guarantee.<br><br>However, creditors that filed proofs of claim prior to entry of the Bar Date Order, whose claims are based on Derivative Contracts or Guarantees will be obligated to comply with the procedures of the Bar Date Order and complete the Derivative Questionnaire or Guarantee Questionnaire, as applicable. One of the guiding principles of a chapter 11 case is to treat similarly situated creditors similarly. Creditors should not be advantaged for filing prior to the establishment of such procedures.<br><br>As no Bar Date has yet been established, creditors were under no obligation to file proofs of claim. Having done so prior to the implementation of Court-approved procedures, certain creditors are entitled to no privilege or accommodations. |
| 6. The Bar Date Motion fails to address whether the information uploaded to the website will be confidential, may be redacted prior to submission to protect proprietary or confidential information, and whether such information would be disclosed to other parties without a court order. | Typically all information filed in connection with a proof of claim is publicly available for review. However, in response to the objections, the Revised Order will include the following:<br><br>**"ORDERED that the information submitted on the website http://www.lehman-claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the website other than by the party that submitted such information and the Debtors, the Creditors' Committee and their respective advisors and counsel; and it is further"** |

| **Objection** | **Resolution/Reply** |
|---|---|
| 7.   The following language should be added to the Order:<br><br>"ORDERED that nothing in this Order shall reduce, restrict or otherwise adversely impact in any way, any indebtedness or liability reasonably claimed or asserted by a creditor to be within the Bankruptcy Code's Safe Harbor provisions;". | Nothing in the Order modifies the provisions of Section 560 of the Bankruptcy Code.  The law of the jurisdiction on the issue raised by the objections shall not be affected by the Order.  The objecting party seeks affirmative relief in the nature of an advisory opinion.  Such relief is both procedurally improper and inappropriate. |
| 8.   The website http://www.lehman-claims.com would not be able to handle the traffic and volume of information that will be uploaded in the days preceding the Bar Date.  The Bar Date Motion does not provide an alternative method of submitting information if the website fails. | The Debtors have discussed the expected traffic and volume of the data that will be uploaded to the website with Epiq Systems, Inc., the administrator of the website, and have been assured by Epiq Systems, Inc. that the website has the capacity to handle the expected traffic and volume of data.<br><br>Furthermore, the Debtors have provided an additional 30 days for creditors to submit information on the website.  Use of the website will be spread over a longer period of time. |
| 9.   Creditors should be able to submit supporting documents on a CD or in paper format. | The supporting documentation for the number of Derivative Contracts to which the Debtors are party could be millions upon millions of printed pages in a variety of nonconforming formats, which would be extremely difficult for the Debtors to review and organize.  The Debtors have determined that the having the information submitted on the website http://www.lehman-claims.com is the most efficient manner for the Debtors to organize and reconcile claims.  It is absurd to imagine that information which is stored on computers and relate to transactions in the millions or tens of millions of dollars cannot be uploaded. |
| 10. Creditors should be able to summarize voluminous supporting documentation. | The Debtors have deleted from the Derivative Questionnaire the obligation of creditors to provide the confirmation for each Derivative Contracts, which is the item that received the most objections and could be the most voluminous.<br><br>The process of submitting documents electronically makes the need to summarize documents unnecessary and would increase the effort required.  The electronic process will require the documents be uploaded to a website in a similar manner to attaching a document to an email.  Creating a summary from a complete document and submitting the summary to the website is more burdensome than simply submitting the entire document. |
| 11. The Bar Date should be extended beyond August 24, 2009. | Creditors have already had more than 9 months to review and evaluate their claims.  They will have an additional 60 days from the date that Bar Date Notices are mailed to prepare and file a Proof of Claim Form and complete the applicable questionnaires.  In addition, in recognition of certain additional procedures in the Bar Date Motion, the Debtors have extended the deadline |

| Objection | Resolution/Reply |
|---|---|
| | for the completion and submission of the Derivative Questionnaire for an additional 30 days beyond the Bar Date to October 1, 2009. This timeframe is well in excess of the 35-day notice period required under the Bankruptcy Rules and Local Rule M-350.<br><br>(For the avoidance of doubt, all counterparties will be required to submit a Proof of Claim by the Bar Date, but will have additional time to submit the Derivative Questionnaire.) |
| 12. Certain parties have asked for express authority in the Revised Order from the Debtor and the Court for the right to file a Proof of Claim on behalf of a customer or client. Certain parties have also requested that the Debtor establish procedures for the filing of proofs of claims for securities with no indenture trustee (e.g. permitting the bank that serves as the record holder to file one Proof of Claim on behalf of their hundred or thousands of clients). This issue was raised in connection with the European Medium Term Notes and the Main Street Bonds. | The Debtors do not acknowledge that holders of the European Medium Term Notes are creditors of their estate. Parties who believe they hold prepetition claims against the Debtors' estates should file Proofs of Claims in accordance with the procedures set forth in the Bar Date Order. The court ought not issue an advisory opinion with respect to the standing of certain parties who may file Proofs of Claim. |
| 13. Securities issued by non-debtors, but guaranteed by LBHI, should be included on the Master List of Securities. These securities should not be treated differently than securities issued by the Debtors. | The Debtors do not believe that holders of securities issued by non-Debtors are direct creditors of their estates. However, parties who believe they hold prepetition claims against the Debtors' estates should file Proofs of Claims in accordance with the procedures set forth in the Bar Date Order. The court ought not issue an advisory opinion with respect to the standing of certain parties who may file Proofs of Claim. |
| 14. The procedures related to the Master List of Securities are unclear with respect to the filing of proofs of claim arising from guarantees by LBHI of securities included on the Master List of Securities. | The Revised Order will provide the following:<br><br>**"ORDERED that holders of any security that is guaranteed by a Debtor shall be required to file a Proof of Claim against such Debtor based on the Guarantee and complete the Guarantee Questionnaire;"** |
| 15. The Bar Date Notice should be distributed to each beneficial holder of securities that do not have trustees such as the Euro Medium Term Notes. | The Debtors will seek to provide notice to as many of the interested parties in interest in the Euro Medium Term Note Program ("EMTNs") as is commercially reasonable and in accordance with its obligations under the Bankruptcy Code and the Bankruptcy Rules, including, (i) proving notice to Euroclear and Clearstream, as the depository for the EMTNs, (ii) requesting that Euroclear and Clearstream deliver the notices to the record holders of the EMTNs and (iii) publishing the Bar Date Notice in international editions of prominent |

| **Objection** | **Resolution/Reply** |
|---|---|
| | newspapers. |
| | Euroclear has informed the Debtors that upon request, Euroclear would send the Bar Date Notice to all of the participants in Euroclear via their SWIFT message system or Euclid message system. Clearstream is not able to send a copy of the Bar Date Notice to all of its participants, but will send the notice to all holders of securities with ISINs included on a list provided by the Debtors, post the notice on their website and on their "information message system", to which some of the participants subscribe. As the objection filed by The Bank of New York Mellon [Docket No, 3835] notes, book-entry notes are typically held in "street name" therefore neither the Debtors nor the applicable trustees are aware of the beneficial owners of any such securities. Therefore it is market practice for notices provided to beneficial holders of book-entry notes to be provided through Euroclear and ClearStream. Providing notice to the participants is as thorough a notice procedure with respect to the EMTNs as the Debtors are able to accomplish. The participants either holds the EMTNs for their own behalf, or as custodian or agent for clients and customers.

The Debtors have downloaded a list of securities issued by Lehman Brothers Treasury Co. B.V. from the official website with information about the bankruptcy of Lehman Brothers Treasury Co. B.V.  The Debtors will provide this list of securities to ClearStream pursuant to the previous paragraph. |
| 16. Wilmington Trust Company proposed language to clarify that holders of securities identified on the Master List of Securities do not need to file a Proof of Claim because the trustee will file such Proof of Claim. | The Revised Order and the Bar Date Notice include the language requested in paragraph 30 of the objection filed by Wilmington Trust Company.

The new definition of "Derivative Contract" in the Revised Order as well as the addition of the following language address the objection in paragraph 27 of Wilmington's objection regarding certain structured notes not being considered a "Derivative Contract"

**"ORDERED that any security that is listed on the Master List of Securities is not a Derivative Contract and the holders of such security are not required to complete the Derivative Questionnaire;"** |
| 17. Wilmington Trust Company requests the Master List of Securities identify their securities in a particular manner. | The Debtors do not agree that Wilmington's suggestion provides the listing of the securities in the most efficient and clear manner.  The organization of the Master List of Securities does not have a substantive effect. |
| 18. The Debtors are calculation agents for certain securities for which Wilmington Trust Company serves as | The objection raised by Wilmington Trust Company on this issue is not relevant to the timing, procedures or mechanics of the filing of proofs of claim.  Wilmington Trust Company should |

| **Objection** | **Resolution/Reply** |
|---|---|
| indenture trustee and the Debtors are not performing its obligations and the indenture trustee does not know how to determine the claim amount. | address their concerns in their proof of claim or a separate proceeding. |
| 19. The Bar Date Notice should be translated into foreign languages and published in foreign newspapers. | The notice of the Bar Date, including the publication in three internationally circulated newspapers, in conjunction with the fact that the Debtors' chapter 11 cases are closely followed by a variety of international news services, is sufficient to provide notice of the Bar Date. |
| 20. The websites should be translated into foreign languages. | Local Rule M-350 requires that Proofs of Claim be completed in English. |
| 21. Creditors should not have to translate the supporting documentation that they upload to the website or attach to a Proof of Claim. | The Debtors do not require that any underlying contracts that were executed in foreign languages be translated into English prior to submitting such documents to the website or otherwise attaching them to a Proof of Claim. |
| 22. The procedures in the Bar Date Order related to the Derivative Contracts violates Due Process since the time leasing up to the Bar Date is insufficient.. An indenture trustee would not be able to provide proper notice to all holders of the applicable securities, since notice would have to be provided through a depository, and the indenture trustee would need to receive sufficient votes or direction in order to be authorized to file a proof of claim. | 60 days is sufficient time for the indenture trustees to provide notice to the relevant holders and prepare a proof of claim.  As stated in the objection number 11 above, the 60 days is well in excess of the minimum amount of days that debtors are required to give prior to a bar date. |