WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

------------------------------------------------------------------x

**DECLARATION OF GARY H. MANDELBLATT**
**IN SUPPORT OF DEBTORS' MOTION PURSUANT**
**TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 3003(c)(3) FOR ESTABLISHMENT OF THE DEADLINE FOR FILING**
**PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER OF NOTICE**
**THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM**

Pursuant to 28 U.S.C. § 1746, I, Gary H. Mandelblatt, declare:

1.     I am over the age of 18 years and make these statements of my own personal knowledge.  If called to testify as to the truth of the matters stated herein, I could testify to the matters set forth herein.

2.     I have served as a Managing Director at Lehman Brothers Holdings Inc. ("LBHI") since 2006.  From 2006 to 2008, I served as Head of Risk Strategy and Governance, and Head of the Global Fixed Income Strategy.  In those roles, among other things, I was charged with analyzing our risk exposures across markets, developing

business strategies in Global Fixed Income for growing revenues, and developing strategies to expand the firm's sales and trading business into commodity and emerging markets. Currently, I am Head of Trading and Valuation of derivative transactions. In that role, I oversee the valuation the Debtors' Derivative Contracts.[1] As of the Commencement Date, the Debtors estimate that there were over approximately 10,000 Derivative Contracts, of which almost 6,500 were directly with the Debtors and 3,500 were with non-Debtor affiliates. It is expected that counterparties will file guaranty claims against LBHI for those Derivative Contracts with non-Debtor affiliates, and accordingly those will need to be analyzed to the same extent as transactions directly with the Debtors. It is estimated that the Derivative Contracts document over one million underlying transactions ("Transactions").

3.      I am submitting this declaration ("Declaration") in support of the Debtors' Motion Pursuant To Section 502(B)(9) Of The Bankruptcy Code And Bankruptcy Rule 3003(C)(3) For Establishment Of The Deadline For Filing Proofs Of Claim, Approval Of The Form And Manner Of Notice Thereof And Approval Of The Proof Of Claim Form (the "Bar Date Motion"). I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

4.      Attached to this Declaration as Exhibit A is a one-page PowerPoint presentation detailing the six-step process by which the Debtors are unwinding and

---

[1] Defined terms in this Declaration shall have the meanings given to them in the Bar Date Motion, defined herein.

settling Derivative Contracts.  In my capacity as a Managing Director, I have personal

knowledge of and am familiar with the facts summarized in the presentation.

5.    The valuation of our Derivative Contracts is a massive undertaking.  As

described below, the Debtors require basic information from counterparties to these

Derivative Contracts to reconcile the Transactions with our books and records and

adequately assess whether the amounts set forth on a claim form are accurate.  Absent

this information, our ability to assess the Proofs of Claim will be delayed immeasurably

and will likely result in the objection to virtually all claims followed by time-consuming

discovery to obtain information that is basic to the valuation of the Derivative Contracts.

Background in Risk Management and Valuation of Derivatives

6.    I am a graduate of Tulane University, where I received a Bachelor of

Science in Management, *magna cum laude*, with majors in business and economics.

Following graduation from Tulane University, I worked as a senior analyst from 1983-

1990 at First Manhattan Consulting Group, in New York.  My primary role while at First

Manhattan was as a consultant to banks on their business unit strategies.  In that role, I

developed strategic management information systems (MIS) to determine business unit

profitability for eight of the largest U.S. banks.  MIS financials were used to develop

strategic plans and mission statements and to quantify the economic value for each

business unit.

7.    From 1990-1991, I was a principal with Kellett Group, in Boston,

Massachusetts. With Kellett Group, I worked in the Financial Institutions Acquisition

Partnerships group, and performed profitability and credit risk diligence on numerous

banks and financial institutions.

8.      From 1992-1994, I was a senior managing associate at Coopers & Lybrand, in New York.  I developed a comprehensive risk management, measurement and monitoring capability for a leading global capital markets institution.  I consulted several diversified financial institutions on their risk tolerance and capital exposures.  In this capacity, I consulted on the risk associated with derivative products, such as foreign exchange transactions and interest rate swaps, as well as bond and equity portfolios.

9.      In 1994, I joined Smith Barney ("SB") in New York, as a Director for the Global Risk Management Division.  My role was to define risk limits, policies and procedures.  I developed an understanding of the intricacies in measuring and setting limits on risk and I managed the valuation of derivatives in our portfolio.  I continued to work with Salomon Smith Barney ("SSB") following the merger of Salomon Brothers with Travelers Group.  Following the merger of Travelers and Citicorp, I co-authored Citgroup's prospective risk management capability for the Federal Reserve.  In my role at Citigroup, I was required to evaluate the risk of the Fixed Income derivatives portfolios, including interest rate, FX and Commodities derivatives (including swaps, options and swaptions), applying valuation and risk measurement methodologies to both products governed by the International Swap And Derivatives Association agreements ("ISDA" and the standard form, the "ISDA Master Agreement") and non-ISDA products.

10.      In 1999, I became a Managing Director for Citigroup in Global Market Risk Management.  I served as Head of Global Rates, Currencies and Commodities Risk Management in Citigroup's Global Corporate and Investment Bank.  At Citigroup, my roles included the risk management oversight of fixed income businesses including interest rates, FX, commodities and mortgages, government and agency bond trading,

global treasuries, and municipal bonds cash and derivatives businesses.  In addition, I managed a $22 billion bond portfolio, that periodically used Fixed Income derivatives to hedge interest rate and spread risk exposures.

11.    From 2006 until May 2008, I was a Managing Director at Lehman Brothers in Global Fixed Income.  I managed Global Fixed Income Strategy and developed strategies to support new opportunities including building Lehman's Commodities and Emerging Markets businesses.  In May 2008, I moved to Lehman's Global Risk Management department to help redefine the firm's global risk management, measurement and monitoring capability.  I oversaw the implementation of weekly senior management reports, designed a stress testing framework, and developed risk limit structures.

The Scope of the Debtors' Derivative Contracts

12.    The Debtors estimate that on September 15, 2008, their portfolio contained over one million Transactions documented by Derivative Contracts with over 10,000 counterparties.  In the wake of the bankruptcy filings of the Debtor entities, many of the counterparties to the Derivative Contracts terminated, attempted to terminate (but did so improperly), or have elected to not terminate the Derivative Contracts.[2]

13.    As a result of the bankruptcy filing, the Debtors were faced with the combined substantial hurdles of open risk exposures with depleting values, loss of employee focus, inaccessible systems, and degrading systems and controls.  These

---

[2]  LBHI was a Credit Support Provider under many of the transactions between the Debtor entities and counterparties that were governed by ISDA Master Agreements, and was a guarantor for virtually all of the other transactions not governed by ISDA Master Agreements.  Under many of the agreements governing derivative transactions, the bankruptcy petition filing of a Credit Support Provider or a guarantor is an event of default, which triggered the right of counterparties to elect to terminate the derivative transactions.

difficulties were compounded by the substantial loss of key personnel in the Lehman sale
to Barclays Capital Inc. ("Barclays").

14.    Under the oversight of the derivatives unwind team, key steps have been
taken to stabilize the Debtors' operations and define new processes and procedures to
perform the valuation of the Derivatives Contracts.  First, the Debtors' management
undertook to inventory the derivatives portfolio.  Second, the estate was resourced with
specialists designated to assist in the unwind of the Derivative Contracts.  Third, the
Debtors developed a blueprint for the unwind processes and established systems of
documentation for records.

15.    The inventory revealed that under the Derivative Contracts, the Debtors
are counterparties to over one million Transactions globally.  The Derivative Contracts
include plain vanilla, complex (highly structured), swaps, swaptions, options, forwards
and structured products, across all financial products including interest rates, FX, credit,
mortgage backs, equities and commodities.  The Debtors' portfolio includes over 10,000
counterparties in a wide variety of industry segments including municipalities,
corporations, sovereign entities, special purpose vehicles, hedge funds, investment
advisors to insurance companies and large financial institutions.

16.    The Debtors' unwind process for the Derivative Contracts is likely
unparalleled in complexity to that in any other bankruptcy to date.  The Debtors,
therefore, have developed a process to reconcile the Derivative Contracts and
Transactions on their books with the information received from counterparties and then
value the counterparties' positions with respect to each Derivative Contract.  The

methodology for valuation under each Derivative Contract is dependent upon the type of Transaction and product.

17.    The task the Debtors face in unwinding Derivative Contracts and Transactions is extremely difficult due to the number, complexity and breadth of derivative products involved.  Currently, there are over 300 employees tasked with managing the derivatives unwind process on a full time basis and are divided into teams including (1) individuals who interface with counterparties (broken into sub-teams for each type of counterparty, i.e., municipal counterparties, corporations, etc.); (2) trading and valuation experts across derivative products; (3) professionals devoted to the management of the assignment of open Transactions and structuring products for assignment; (4) professionals devoted to reconciling trade populations with counterparties and identifying and reviewing collateral; (5) legal professionals; and (6) finance and accounting professionals who manage the books and records for all Transactions.  The Debtors have also engaged third parties to assist in the valuation of Transactions.

<u>The Process of Valuing Terminated Derivative Contracts</u>

18.    Given the complexity and volume of the derivative transactions, the Debtors have designed and have implemented a six-step process, illustrated on <u>Exhibit A</u>, to unwind the derivative trades in order to maximize value for the estate.

Step 1:    <u>Review Documents</u>;

Step 2:    <u>Counterparty Due Diligence</u>;

Step 3:    <u>Reconciliation of Trades</u>;

Step 4:    <u>Reconciliation of Cash and Collateral</u>;

<u>Step 5:</u>      <u>Transaction Valuation</u>; and

<u>Step 6:</u>      <u>Counterparty Negotiation/Resolution</u>.

19.      Each step in this process is described in more detail below along with a description of the immense challenges, at each step, that the Debtors face with respect to the lack of information or documentation.

20.      <u>Step 1: Document Review</u>:    For each of the Derivative Contracts and Transactions, the Debtors must undertake to review all key counterparty documents, which may include master agreements, schedules, termination notices and valuation statements.    The basic documents include the governing agreements (such as ISDA Master Agreements and schedules), the termination notice, if any, and the valuation statement, if any.    Any counterparty that believes it has a claim must have collected, reviewed, and/or prepared these key documents in order to substantiate the basis for a claim.    Moreover, providing this information is a standard contractual requirement in the governing documents including ISDA Master Agreements.    Thus, there should be no extra burden in requiring a counterparty to provide those documents to the Debtors.    The governing agreements will provide the Debtors with basic essential information that will allow the Debtors to reconcile their records with those of the counterparty and describe the termination and valuation methodology employed by the counterparty.

21.      The termination notice is essential because it terminates the Transactions as of an effective date, which represents the date as of when the transactions are valued. In the event of a default, the termination notice must be in writing and delivered in person to a specified address by courier (or certified or registered mail) and will be effective upon the date of receipt.    In the days following the Commencement Date, the Debtors

received massive quantities of termination notices and valuation statements.  In fact, the

Debtors staffed four or five people with the full-time task of merely opening and date-

stamping incoming notices, which tasks did not include reading and reviewing the

termination notices themselves.

22.    Lehman's bankruptcy estate currently operates out of premises at 1271

Sixth Avenue in New York City.  However, many termination notices were delivered to

old Lehman addresses and specifically to Lehman's former global headquarters at 745

Seventh Avenue, New York City, which was sold to Barclays effective September 19,

2008.  Thus, there are situations where the Debtors do not know when a termination

notice was delivered and there may well be discrepancies between the dates of receipt of

by the Debtors of the termination notices and the date when counterparties claim such

notices were delivered.  It is therefore critical that the counterparties maintain and supply

the underlying information substantiating the date and method of delivery of the

termination notice.  For this reason, counterparties typically retain proof of delivery as a

matter of good business practice.

23.    In the event of a valid termination under the governing documents,

typically the non-defaulting party must promptly provide a "valuation statement" that sets

out in reasonable detail the methodology of the asserted valuation of the contract so that

one party or the other can make a termination payment.  The Debtors must have the

valuation statement to understand the calculation of the counterparties' claim.

24.    It is critical that the counterparty identify whether the Proof of Claim is

against LBHI or against another Debtor entity, and that the counterparty identify all

counterparties, guarantors and/or credit support providers for the relevant Derivative

Contract. This information is fundamental to even the most basic review of a claim. Importantly, in certain circumstances, LBHI acted as the credit support provider under Derivative Contracts which were entered into by Lehman affiliates that are currently in foreign insolvency proceedings, overseen by an administrator who has exclusive access to records. LBHI may have no documentation for those Derivative Contracts because the contracts are in the foreign entity's files, which are not accessible to the Debtors, and such contracts have not been located or delivered. The Debtors need to know whether LBHI is the guarantor for such transactions, and would need the basic underlying documents to begin even a preliminary analysis of the claim.

25.     Step 2: Counterparty Due Diligence:   Under Step 2 of our process, the Debtors seek to confirm the contact information for the counterparty under the governing documents, and determine the termination and valuation dates according to the documentation provided by the counterparty. Then, the Debtors will reach out to the counterparty to begin a dialogue to reach an agreement as to the value of their Transactions. In certain circumstances the counterparties have moved or changed their contact information. There have been instances when we have resorted to internet search engines or other methods to track down the latest contact information. Once the Debtors have the counterparties' contact information and the underlying documentation supporting the Proofs of Claim, the Debtors will be able to engage in a diligence process without having to use significant resources to track down the most recent contact information for the counterparty.

26.     Step 3: Reconciliation of Trades:   After the Debtors have the key documents, the Debtors must then make sure that their records reflect the identical

Transactions as those claimed by the counterparty.  This reconciliation process requires a detailed review of the voluminous back office books and records of the Debtors to ensure a match between the Debtors' population of trades and those of the counterparty.  The Derivative Transactions are recorded across numerous systems according to product and Debtor entity.  Reconciliation of the Transaction populations occurs in the normal course of business, not just in a bankruptcy context, and it is a complicated process even then.  But the complexity of this reconciliation process is magnified due to the fact that the Debtors are in bankruptcy.

27.    Under normal circumstances, at any one time most derivatives transactions of a major dealer such as Lehman remain outstanding and reconciliation is a continuous process with its clients and professional counterparties.  Here, reconciliation needs to occur with respect to nearly all of the more than one million derivative Transactions at the same time.  Moreover, many counterparties employ different trade population booking procedures and recording methods for Transactions—meaning that the Transactions are recorded in internal tracking systems incongruent with the Debtors' systems.

28.    Given the massive quantity of Transactions, the Debtors face significant challenges and immense delay if Counterparties do not provide basic information requested in the proposed Proof of Claim form such as trade id, electronic trade id, trade type, product, date, reference obligation, reference entity, credit events, factored and original contract notional amount, quantity/unit of measure, currency, price and strike price, buy/sell, call or put, cap or floor, location, effective date, maturity date, termination date, and value.  This information should be in the counterparties' systems and readily

available because it is used to mark-to-market their portfolios on daily basis (for most large financial institutions or funds) or monthly or, at most, quarterly (for most if not all other counterparties) for periodic reporting requirements.   Since the Commencement Date, nine months, several quarters and a fiscal year end have passed.   Counterparties are supposed to deliver this information upon termination of the Derivative Contracts.   If requested, we would be able to pull this information for a defaulting party in a matter of hours.   The reconciliation process, which takes more time, requires this readily-available trade detail from both counterparties.

29.    Step 4: Reconciliation of Posted Collateral and Payments:   In the valuation process, the Debtors must account for and reconcile any cash payments already received, made, or missed.   Further, the Debtors must assess the amount of collateral posted by either party, and whether there has been any deduction or setoff against such collateral. For example, if a Debtor posted collateral greater than the value of the amount owed to the counterparty with respect to its Derivative Contract, the Debtor is owed the excess. Accounting for posted collateral (and any payments received), is an essential component of deriving the net value of a claim.   The counterparty should submit such information as proof that collateral and payments were considered in the calculations presented to the Debtors, so that the Debtors will be able to efficiently evaluate the accuracy of the Proof of Claim.   Without knowing the specific amounts of existing payments and collateral postings, and being able to reconcile the records, the Debtors would almost certainly have to file objections to each claim in order to obtain an accurate accounting through discovery.   While there may ultimately be discovery in a later stage of the evaluation of the claim, discovery for this basic information, which is necessary to determine the

baseline of valuation, would overwhelm the current staffing, require significant additional resources of the Debtors and the court in overseeing discovery, significantly increase expenses and would likely take up more time from the counterparties to respond formally.

30.    <u>Step 5: Trade Valuation</u>:  Once the proper termination has been verified and the Debtors are able to reconcile the Transactions and match them to the correct Derivative Contract, the Debtors must value the Transactions, on the same date as that particular counterparty's Transactions were terminated and determine whether the Debtors' valuation matches the counterparty's valuation.  The Derivative Contracts, including the ISDA Master Agreements and schedules, describe standard methodologies for valuation upon early termination of the Transactions.  Such valuation methods include obtaining market quotations, or using a "loss" calculation.

31.    The Debtors must verify the methodology the counterparty utilized, and depending on the methodology, the Debtors need additional critical information to assess the validity of the Proof of Claim.  If the counterparty was required or chose to use a market quotation method (going out into the market to determine what the market value for the trade would be) it must typically follow a specific process of seeking four quotes and then calculating value according to a formula that assesses the mean market value using such quotes.  In order to verify the legitimacy of the quotes and the counterparties' good faith compliance with the defined method, the Debtors need to know the identity of the third parties providing the market quotes and the values quoted.  The ISDA Master Agreements require that the market quotation be from "Reference Market-makers," meaning under the 1992 (Multi-Currency Cross-Border) ISDA Master Agreement:

> [F]our leading dealers in the relevant market selected by
> the party who determine a market quotation (a) from
> among dealers of the highest credit standing which satisfy
> all the criteria that such party applies generally at the time
> in deciding whether to offer or to make an extension of
> credit and (b) to the extent practicable, from among such
> dealers having an office in the same city.

Thus, the identity of the party providing the quotes is critical to understanding whether the market quote process was completed appropriately. The 1992 (Multi-Currency Cross-Border) ISDA Master Agreement requires in section 6(d)(i) that counterparties performing market quotations provide "a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations. . .)" and counterparties can reasonably be expected to provide proof of such quotations.

32.     In addition, the quotes received from Reference Market-makers must represent the actual replacement value of a Transaction as quoted by the Reference Market-maker, which preserves the economic value of the Transaction including the credit support consideration. The quote is intended to represent the price at which the Reference Market-makers would enter into the same Transaction. The only way to verify the validity of the quotes is to review them—which is why the Debtors need the requested documentation.

33.     Under the typical governing contract, if counterparties are unable to obtain the required number of market quotations, they must resort to a "loss" calculation. Loss calculation allows the counterparty to consider factors other than market quotations in valuing the Transaction under the Derivative Contract. It is critical that the Debtors receive the necessary information required to understand the counterparty's loss

calculation to verify the reasonableness and validity of the calculation because minor differences in loss methodology can lead to significant differences in valuation.

34.     <u>Step 6: Counterparty Resolution</u>: In the last step of the Debtors' unwind process, the Debtors seek to negotiate and finalize settlements of terminated Derivative Contracts.

<u>Derivative Questionnaire</u>

35.     The Derivative Questionnaire was designed with the specific purpose of facilitating the Debtors' six-step unwind of the Derivative Contracts.  Without the information requested in the Derivatives Questionnaire, the Debtors' ability to evaluate the Proofs of Claim with respect to the date of effective termination, the methodology of valuation, and the accuracy of such valuation would be severely impaired.  Given the sheer volume of Transactions, the manpower and expense of contacting each counterparty individually and requesting documentation and information regarding valuation and methodology would require an exponential increase of resources and expenses devoted to the cost of unwinding the Derivative Contracts.

36.     Importantly, the documentation requested complies with standard industry practice for substantiating a Derivative Contract claim in the event of early termination, is required to be maintained by the counterparties to value their positions on a periodic basis, and is easily deliverable to the Debtors.

37.     Specifically, the Derivative Questionnaire asks for the following information:

38.     <u>Question 1:  Is the Debtor identified above (i) a counterparty to the derivative contract or (ii) a guarantor or credit support provider?  Please identify the</u>

counterparties, guarantors and/or credit support providers to the derivative contract. This request is for the basic information substantiating a Proof of Claim and is necessary in order to understand the relationship of the Debtor entity to the counterparty under the Derivative Contract. As explained in paragraph 24 above, in some cases, LBHI was a credit support provider for foreign entities under the Derivative Contracts, which entities are now in insolvency administration and, as a result, the Debtors do not have access to their records nor have they received them. Identifying the other counterparties, credit support providers and guarantors to the Derivative Contract will assist the Debtors in the claims process.

39.    Question 2: Have Termination Agreement(s) related to the allowance of a claim in respect of derivatives been entered into with the debtor? If Yes---Enter the amount of the derivative claim. _Please attach Termination Agreement and go to (end). If No, proceed to #3. A Termination Agreement settles the Transaction at a mutually-agreeable value. The Debtors need to know if a Proof of Claim is for a claim to which the Debtors and the counterparty already executed a Termination Agreement and the amount at which the Debtors agreed to allow the counterparty's claim. This information, and a copy of the Termination Agreement will assist the Debtors in rapidly verifying and allowing the claim.

40.    Question 3: Have the derivatives matured or been terminated?  If Yes, enter the derivative claim amount and each line item included in the calculation thereof on the provided table and provide the information in 4. The Debtors need to know if a Transaction or Derivative Contract has not been terminated or is still open. With respect

to those Derivative Contracts that have been terminated the information in Question 4 is requested.

41.      <u>Question 4(a): Documentation of Transactions.  Please provide copies of master agreements, schedules, netting arrangements, credit support documentation, guarantees and other agreements (other than confirmations) evidencing the transactions:</u> As mentioned in paragraph 20, this information is essential to understanding the governing provisions for the Transactions and the methodology for termination and valuation as well as the calculation of the net value considering collateral, and other credit support.

42.      <u>Question 4(b): Termination Notice.  Please provide the termination notice including evidence supporting delivery date of the termination notice.</u>  As explained in paragraphs 21-22, the termination notice is important in verifying whether the Transaction(s) were properly terminated, the date as of when such Transactions are to be valued, and the applicable interest rate on amounts not timely paid.

43.      <u>Question 4(c):  Valuation Statement. Please provide the valuation statement, and to the extent such valuation statement has been delivered prior to the Bar Date, evidence supporting delivery date of the valuation statement.  Please identify any collateral that has been posted by any party in connection with this transaction and any claims of set-off against other transactions.</u>  As stated in paragraph 23, the valuation statement is the basic evidence of a counterparty's claim under a Derivative Contract and without the information required to be provided therein the Debtors have no way of understanding how the claim was calculated or if any posted collateral was netted or set off.  Further, different rates of interest are applied depending upon the date of delivery of

the valuation statement.  Confirmation of evidence of delivery, will assist the Debtors in

properly verifying the amount of accruing interest.

44.    Question 4(d):  Individual Trade Level Detail.  Please provide details with

respect to each trade (e.g., as applicable, including trade id, electronic trade reference id,

trade type, product, trade date, reference obligation or reference entity, credit events,

factored and original contract notional amount, quantity/unit of measure, currency, price

or strike price, buy/sell, call or put, cap or floor, location, effective date, maturity date,

termination date, and value).  Please provide this information in Microsoft Excel format.

As mentioned in paragraphs 26-28, this information is critical to the trade reconciliation

process because without it the Debtors cannot identify the Transactions in their internal

records across different systems of accounting, and reconcile them with the respective

amount claimed to be owed under the Derivative Contract.  Every counterparty utilizes its

own system of tracking Transactions.  Accordingly, the Debtors need certain identifying

characteristics to confirm a match of the Transaction populations.  The counterparties

need not supply every detail—just those that are applicable to each particular

Transaction.  Providing this information in Microsoft Excel format is not unreasonably

burdensome to the counterparties and will allow the Debtors to sort the data in a more

efficient manner, as necessary in order to minimize delays and complications.

45.    Question 4(e):  Trade Methodology and Quotations.  Please check the box

next to each valuation methodology used to support the claim (if multiple methodologies

were used, please check the multiple boxes and identify the trade population listed in

clause d. above to which each valuation method applies):    Identification of the

methodology used to value the claim is critical to the evaluation of the claim because the

method prescribes the criteria for valuation of the counterparties' Transactions.  Each methodology is distinct and requires different information be provided to the Debtors.

46.    <u>Market Quotation Methodology:  Provide documentation of quotations from Reference Market-makers or other persons concerning the transactions.  Include the name of the Reference Market-makers that provided the quotations.  If document specifies "Market Quotation" methodology and Creditor utilized a different methodology, please provide a narrative description of why the Market Quotation method was not used and check the box and complete the applicable part of this section (e) below.</u>  As explained above in paragraphs 31-32, the identity of the Reference Market-makers as well as the quotes provided are necessary to evaluate the quote.  Furthermore, the Debtors must verify that the counterparty's decision to not employ the market quotation method when it was specified was consistent with the governing contracts.  Absent this information, the Debtors would almost certainly be required to object to the Proof of Claims in order to undergo discovery to verify the validity of the selected methodology.  Counterparties should reasonably be expected to provide this information in order to verify the validity of their use of market quotations.

47.    With respect to the request for information for valuations conducted according to other methodologies, such as "Loss", "Close-Out Amount," and non-ISDA standard valuation methods, the Debtors request that counterparties:

> Provide a narrative description of the methodology used to determine the valuations of transactions, including how quotations, if any, were utilized and all other inputs, assumptions, values and applicable parameters. Provide documentation from market-makers or other persons concerning any applicable quotations relating to the transactions.  If the methodology used involved any

> interpretation or deviation from the wording of the
> applicable documentation, provide a narrative description
> of the basis for such interpretation or deviation.

The narrative description is important for the Debtors because without it, the Debtors have no insight into what methodology the counterparty employed. As is explained in paragraph 33, absent this information, the Debtors could never verify the accuracy of the calculations or the claim. Additionally, if the counterparty deviated from the process set forth in the relevant documentation, the narrative would provide that counterparty an opportunity to explain its reasons for deviating without having to undergo a claims objection proceeding.

48.    <u>Unpaid Amounts. Please specify any unpaid amounts and interest accrued thereon included in calculation of any amounts due with respect to the transactions. Please provide a description of the type of unpaid amount and the amount of interest accrued thereon (i.e. Premium payment, periodic interest, etc.).</u>  It would be impossible for the Debtors to verify the calculation of the claim and the net amount owed without taking into account the unpaid amounts and interest accruing on the amounts. This is standard information required in substantiating any claim. This information will permit the Debtors to verify the calculation of interest according to the governing documents.

49.    <u>Collateral. Please provide CUSIP/ISIN for collateral listed, the valuation of the collateral as well as support for such valuation (e.g. market quotes, emails, etc.) for the amounts included in the claim calculation. Please provide this information in Microsoft Excel format.</u>  Identification of collateral is critical to the evaluation of the claim. It permits the Debtors to accurately value the Transaction taking into account how

much collateral was posted by either party, and thereby determining the net payable or net receivable. Additionally, the Debtors must reconcile their collateral records to those of the counterparty. Identification of collateral is uncomplicated and requires little labor by the counterparty to provide in Microsoft Excel format.

50.    Other costs. (i) If claim includes other costs, please include a detailed description of nature of the costs, valuation support, third party invoices (including a detailed description of the scope of services) and basis for including such costs in the claim. (ii) If claim includes interest charges, please provide calculation in Microsoft Excel format of interest including principal amount, interest rate, term and assumptions. This information is essential to the Debtors' verification of the calculation of the claim and is required as fundamental information to substantiate the claim. Without it the Debtors may object to the claim on the basis of a simple calculation error, wasting time and resources.

51.    Finally, these requests do not present a burden on our counterparties because the information requested should be readily available in the ordinary course of business for any counterparty. Counterparties are required to maintain this information for valuation and accounting purposes and/or to perform regular financial reporting. This request does not require counterparties to submit more than is typically required in the resolution of derivative claims. Requiring the information in the Derivatives Questionnaire would simply identify and supply us with the necessary information to begin to evaluate the counterparty's claim—a result that would be beneficial to *all* creditors.

52.    The Debtors' bankruptcy is unprecedented in its undertaking to unwind and resolve over a million Transactions under Derivative Contracts with over 10,000 counterparties.  While the Debtors have developed systems and processes to resolve claims, the enormity of the challenge facing the Debtors to unwind the Derivative Contracts, upon their simultaneous termination, will be greatly reduced if the counterparties provide the information requested in connection with their Proofs of Claim.  Failure to provide the information will significantly increase the cost of unwinding the transactions resulting in greater expense to the creditors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 23rd  day of June, 2009.

/s/ Gary H. Mandelblatt
Gary H. Mandelblatt

Exhibit A to the Declaration of Gary H. Mandelblatt

# Six-Step Derivatives Unwind Processes

➢ Robust process established to unwind derivatives assets and liabilities

➢ Process ensures organization wide effort is devoted to maximizing return to creditors

| 1. Review Key Counterparty Documents | 2. Counterparty Due Diligence | 3. Reconcile Transaction Populations | 4. Reconcile Cash Payments | 5. Transaction Valuation | 6. Counterparty Negotiation/ Resolution |
|---|---|---|---|---|---|
| • Master Agreements<br>• Trade Confirms<br>• Termination Notices<br>• Valuation Statements | • Confirm Contact Information<br>• Determine Termination & Valuation Dates<br>• Begin Dialogue | • Detailed trade level reconciliation to ensure population views match between estate and counterparty | • Expected Cash<br>• Actual Cash<br>• Missed payments<br>• Collateral | • Value at Specified Valuation Date<br>• Compare to Counterparty Valuations | • Assign or negotiate terminations on open contracts<br>• Negotiate and Finalize settlement on terminated contracts<br>• Formal Settlement Approval |

1