**Hearing Date and Time: July 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  July 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                              :
**In re**                                                     :        **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :        **08-13555 (JMP)**
                                                              :
                         **Debtors.**                         :        **(Jointly Administered)**
                                                              :
                                                              :
-------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 FOR AUTHORIZATION**
**AND APPROVAL OF SETTLEMENT AGREEMENT WITH KOJAIAN AFFILIATES**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases (together, the "Debtors"), pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 6004 and 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for approval of a settlement agreement among

certain entities owned or controlled, directly or indirectly, by Mike Kojaian and/or C. Michael

Kojaian (the "Kojaian Affiliates"), as more fully described in the Motion (the "Settlement

Agreement"), will be held before the Honorable James M. Peck, United States Bankruptcy

Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom

601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **July 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

        PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:  Shai Waisman, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v) Barris, Sott, Denn & Driker, PLLC, 211 West Fort Street, Fifteenth Floor, Detroit, Michigan 48226-3281, Attn: William G. Barris, Esq., attorneys for the Kojaian Affiliates, so as to be so filed and received by no later than **July 10, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: June 24, 2009
       New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                           :
In re                                      :        Chapter 11 Case No.
                                           :
LEHMAN BROTHERS HOLDINGS INC., et al.,     :        08-13555 (JMP)
                                           :
                        Debtors.           :        (Jointly Administered)
                                           :
                                           :
-------------------------------------------------------------------x
```

### DEBTORS' MOTION PURSUANT TO
### SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL
### RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 FOR AUTHORIZATION
### AND APPROVAL OF SETTLEMENT AGREEMENT WITH KOJAIAN AFFILIATES

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and their affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors-in-possession (together, the "Debtors"

and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

### Background

1.       Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.    On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.    On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

### Jurisdiction

5.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

6.    Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

7.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## The Joint Ventures and Loans

8.    Beginning around 1995, LBHI, Property Asset Management, Inc. ("PAMI"), a non-debtor subsidiary of LBHI, and certain of their affiliates entered into certain loan and joint venture agreements with Kojaian Management Corporation ("KMC"), a real estate management, development and leasing company, and its related companies (collectively the "Kojaian Affiliates") with respect to a variety of real estate projects.  In connection with the joint venture agreements, PAMI and/or various other non-debtor subsidiaries of LBHI (collectively, the "Lehman Affiliates") are members of various joint ventures (the "Joint Ventures"), through which the Lehman Affiliates own equity interests in certain real estate projects.

9.    PAMI and the KMC have provided guaranties (the "PAMI Guaranties") of loans made by National City Bank to one of the Joint Ventures, Van Buren Industrial Investors, L.L.C. ("VBI"), and by JPMorgan Chase Bank, N.A. to two of the Joint Ventures, K/LB Funding LLC ("KLB Funding") and K/LB Bloomfield Associates, L.L.C ("KLB

3

Bloomfield"). PAMI and KMC have joint and several obligations of $19.6 million under the

PAMI Guaranties.

10.     LBHI has provided secured financing, primarily on a senior basis (the

"Loans") to several of the Joint Ventures in respect of real estate projects located in and around

the Detroit, Michigan area. Each of the Loans is secured by a first lien mortgage on real

properties owned by the borrower under such loan. Currently, LBHI has Loans to the Joint

Ventures in the aggregate amount of approximately $198 million. LBHI holds first lien

mortgages on the real properties owned by the following Joint Ventures:

- Alpha Drive Development Associates, L.L.C.;
- Alpha Drive Development Associates-North, L.L.C.;
- K/LB Twelve Mile Associates, L.L.C.;
- Maple Stephenson Development Associates, L.L.C.;
- New Van Buren Industrial Investors, L.L.C.;
- New West Michigan II Industrial Investors, L.L.C.;
- Northville Technology Park Associates, L.L.C.;
- Shelby Industrial Investors-II, L.L.C.;
- Shelby III Industrial Investors, L.L.C.;
- Shelby IV Industrial Investors, L.L.C.;
- Venoy Wick Development Associates, L.L.C.;
- KLB Bloomfield;
- Farmington Hills Corporate Investors, L.L.C.;
- Farmington Hills IV Corporate Investors, L.L.C.; and
- Milford Road West Development Associates L.L.C.

11.     Currently, LBHI also has senior loans outstanding in the aggregate amount

of approximately $61.5 million to the following Kojaian Affiliates: (i) Shelby Industrial

Investors, L.L.C., (ii) One Woodward Avenue Associates Limited Partnership, and (iii) Hamlin

Development Associates Limited Partnership.

12.     Currently, third party lenders have loans (the "Third Party Loans")

outstanding in the aggregate amount of $237.7 million to the following Joint Ventures:

- 900 Tower Drive Associates, L.L.C.;

4

- 2100 Woodward Associates, L.L.C.;
- Farmington Hills Corporate Investors-II, L.L.C.;
- Farmington Hills V Corporate Investors, L.L.C.;
- KLB Funding;
- KLB Bloomfield;
- SMC Investors, L.L.C.;
- Van Buren Business Park Associates, L.L.C.; and
- VBI

13.     LBHI currently also has Loans in the aggregate amount of approximately

$72.2 million outstanding to its affiliate, TTERTT Associates, L.L.C. ("TTERTT"), which is the

owner of the property commonly known as Travelers Tower I and Travelers Tower II (the

"Travelers Towers").

14.     Additionally, LBHI has made non-recourse mezzanine loans (the

"Mezzanine Loans") in the aggregate amount of approximately $13.2 million outstanding to

Michael Kojaian and C. Michael Kojaian, who control the Kojaian Affiliates, and Van Buren

Industrial Investors, a Kojaian Affiliate.

15.     On or around December 31, 2008, several of the borrowers under the

Loans, the Mezzanine Loans, and certain of the Third Party Loans failed to make payment upon

the maturity of such loans.

16.     Given the state of the real estate market in the Detroit area and the

expenses and delays attendant to foreclosure proceedings, in lieu of immediately exercising all of

its remedies under the Loans and the Mezzanine Loans, LBHI and the Kojaian Affiliates

commenced negotiations regarding a potential consensual resolution of the terms of the Loans

and Joint Ventures that would maximize recoveries to the Debtors' estates in a cost efficient

manner.  Those negotiations culminated in a settlement agreement, dated June 18, 2009, by and

between LBHI, certain Lehman Affiliates, and certain Kojaian Affiliates, a copy of which is

attached hereto as Exhibit A (the "Settlement Agreement"), pursuant to which, among other

5

things the Lehman Affiliates and the Kojaian Affiliates will separate their interests in the Joint

Ventures.  Specifically, the Kojaian Affiliates will transfer to the Lehman Affiliates or LBHI's

designees title to certain properties, pay certain sums to LBHI or certain of the Lehman Affiliates

and cause the release of the PAMI Guarantees.  In exchange, LBHI or the Lehman Affiliates will

transfer certain property and assign the Mezzanine Loans to the Kojaian Affiliates or their

designee(s), and grant a one year option to the Kojaian Affiliates to purchase certain property, all

as described below.

## The Settlement Agreement

17.    The salient terms of the Settlement Agreement are as follows:[1]

***Transfer to Lehman of Properties securing the Loans***

LBHI or its designee(s) will take full ownership of the properties securing the Loans made to the following Joint Ventures via a deed-in-lieu of foreclosure or an assignment of interests in certain limited liability companies that own such properties:

- Alpha Drive Development Associates, L.L.C.;
- Alpha Drive Development Associates-North, L.L.C.;
- K/LB Twelve Mile Associates, L.L.C.;
- Maple Stephenson Development Associates, L.L.C.;
- New Van Buren Industrial Investors, L.L.C.;
- New West Michigan II Industrial Investors, L.L.C.;
- Northville Technology Park Associates, L.L.C.;
- Shelby Industrial Investors-II, L.L.C.;
- Shelby III Industrial Investors, L.L.C.;
- Shelby IV Industrial Investors, L.L.C.; and
- Venoy Wick Development Associates, L.L.C.

LBHI or its designee(s) will take full ownership of the properties securing the Loans made to the following Kojaian Affiliates via a deed-in-lieu of foreclosure or an assignment of interests in certain limited liability companies that own such properties:

---

[1] This summary of the Settlement Agreement (this "<u>Summary</u>") is qualified in its entirety by the provisions of the Settlement Agreement.  This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the Settlement Agreement. Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the Settlement Agreement.

- Shelby Industrial Investors, L.L.C.;
- One Woodward Avenue Associates Limited Partnership; and
- Hamlin Development Associates Limited Partnership.

**Transfer to Lehman of Property owned by K/LB Mineral Holdings LLC**

KMC and PAMI are joint venturers in an entity known as K/LB Mineral Holdings, L.L.C. ("Mineral Holdings"). Mineral Holdings holds a one-half interest in property consisting of a driveway to certain buildings owned by New West Michigan II Industrial Investors, L.L.C. Mineral Holdings will transfer its one-half interest in the driveway to New West Michigan II Industrial Investors, L.L.C.

**Transfer to the Kojaian Affiliates of the Property owned by Joint Ventures party to Third Party Loans**

PAMI or the applicable Debtor, as the case may be, will assign its membership interests in the ten Joint Ventures where a third party lender holds the first mortgage to the property owned by the Joint Venture to an entity or entities designated by KMC;

**Assignment of the Mezzanine Loans**

LBHI will assign its interest in the Mezzanine Loans to a designee of the Kojaian Affiliates.

**Release of the PAMI Guaranties**

The Kojaian Affiliates will cause JP Morgan Chase Bank, N.A. and National City Bank to execute unconditional and irrevocable releases of the PAMI Guaranties.

In exchange for the releases of the PAMI Guaranties: (a) the Kojaian Affiliates will, at the election of LBHI, transfer to a Lehman entity their interests in, or alternatively cause the transfer to a Lehman entity vacant land parcels (the "Vacant Land Parcels") owned by, the following Joint Ventures:

- Farmington Hills Corporate Investors, LLC,
- Farmington Hills IV Corporate Investors LLC,
- KLB Bloomfield
- Milford Road West Development Associates, LLC; and
- KLB Funding;

(b) LBHI will discharge the mortgages it holds on the Vacant Land Parcels; and immediately thereafter, Lehman will transfer its interests in such Joint Ventures or such parcels to the Kojaian Affiliates, as applicable, in exchange for a payment of $3,250,000 by the Kojaian Affiliates to LBHI.

| | |
|---|---|
| ***Repayment of Advances by TTERTT*** | KLB Funding, a Joint Venture owned in equal shares by PAMI and KMC, will pay TTERTT the amount of $4,764,666 as a repayment of advances made by TTERTT. |
| | LBHI will cause TTERTT to enter into a one-year option agreement with an entity designated by KMC for the purchase of the Travelers Towers for $20 million the recently appraised value of the property. |

18.     In sum, the Debtors and their affiliates will receive unencumbered title to 15 real properties, cash payments totaling $8,014,666, and full releases of their obligations of $19.6 million under the PAMI Guaranties in consideration for the transfer of membership interests in eleven Joint Ventures to designees of the Kojaian Affiliates (including KLB Funding), the assignment of the Mezzanine Loans, which have $13,212,023 outstanding, transfer of title to three vacant parcels, and providing a one year option to KMC or its designee to purchase property for $20 million.

## Relief Requested

19.     By this Motion, pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors seek approval of the compromise and settlement of the debts of the Kojaian Affiliates pursuant to the terms set forth in the Settlement Agreement.

## The Settlement Agreement Meets the Legal Standard
## Established Under Rule 9019 and is in the Bests Interests of LBHI's Estate

20.     The Debtors submit that the proposed Settlement Agreement is in the Debtors' best interests and should be approved under Rule 9019 of the Bankruptcy Rules. Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy courts to approve settlements "if they are in the best

interests of the estate." Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.) 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Fisher v. Pereira (In re 47-49 Charles St., Inc.), 209 B.R. 618, 620 (S.D.N.Y. 1997); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).  A decision to accept or reject a compromise or settlement is within the sound discretion of the Court.  Drexel Burnham Lambert Group, 134 B.R. at 505; see also 9 Collier on Bankruptcy ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." Drexel Burnham Lambert Group, 134 B.R. at 505.  See also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Spielfogel, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).  Indeed, courts have long considered compromises to be "a normal part of the process of reorganization." TMT Trailer Ferry, 390 U.S. at 424 (quoting Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939).

21.    The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court.  Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate." In re Best Products, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

22.    While a court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," Anderson, 390 U.S. at 424-25, a court

need not conduct a "mini-trial" of the merits of the claims being settled, W.T. Grant Co., 699

F.2d at 608, or conduct a full independent investigation. Drexel Burnham Lambert Group, 134

B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and

fact…. The court need only canvass the settlement to determine whether it is within the accepted

range of reasonableness." Nellis, 165 B.R. at 123 (internal citations omitted).

23.    The court may give weight to the "informed judgments of the … debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise." Drexel Burnham Lambert

Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp.,

150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels Ltd., 226 B.R. 797, 802 (Bankr.

S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for

the Trustee's, but only that I test his choice for reasonableness…. If the Trustee chooses one of

two reasonable choices, I must approve that choice, even if, all things being equal, I would have

selected the other.").

24.    There is no requirement that "the value of the compromise … be dollar-

for-dollar the equivalent of the claim." Ionosphere Clubs, Inc., 156 B.R. at 427. Instead, "there

is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or

even a thousandth part of a single percent of the potential recovery." Id. at 427-28 (quoting City

of Detroit v. Grinnell Corp., 495 F.2d 448 (2nd Cir. 1974).

25.    The Debtors have concluded that the Settlement Agreement provides the

best framework to reduce Lehman's exposure to the Detroit real estate market, obtain a recovery

from the Loans and Mezzanine Loans, relieve PAMI of its obligations under the joint and several

10

guarantees to third party lenders, and release LBHI's obligations under the various real estate

loans to the Kojaian Affiliates and Joint Ventures.

26.     By entering into the Settlement Agreement, the Debtors will maximize the

value of their estates.  In connection with the release of the PAMI Guaranties, the Debtors and

their affiliates will release their interest in approximately $25 million of outstanding amounts

under the Loans to the Farmington Hills Corporate Investors LLC; KLB Bloomfield, and Milford

Road West Development Associates, LLC Joint Ventures.  The Debtors and their affiliates will

additionally assign to the Kojaian Affiliates LBHI's interest in the Mezzanine Loans, which have

outstanding amounts of approximately $13,212,023.00, and the Lehman Affiliates' interest the

properties securing the Third Party Loans.  Nonetheless, such concessions are far outweighed by

the benefits of obtaining, on a consensual basis, unencumbered title to 15 real properties, cash

payments totaling $8,014,666, and full releases of PAMI's obligations of $19.6 million under the

PAMI Guaranties.

27.     The Settlement Agreement also eliminates the need for LBHI to expend

resources to attempt to collect repayment of the Kojaian Affiliates' indebtedness under the loans

made by LBHI or to foreclose on the collateral securing such loans.  Indeed, foreclosing on such

collateral could be protracted and costly, and given the current economic environment and the

current depressed value of the real estate market, LBHI would be unlikely to realize significant

value from the properties that will be transferred to the Kojaian Affiliates under the Settlement

Agreement.

28.     On the other hand, under the Settlement Agreement LBHI is able to obtain

unencumbered title to 15 inherently valuable properties via a deed-in-lieu of foreclosure or an

assignment of interests in certain limited liability companies from the Kojaian Affiliates.  As a

11

result, the Debtors believe that once the transaction contemplated by the Settlement Agreement is complete, they will hold a portfolio of Michigan real estate that is both reduced in scope and projected to produce a positive cash flow.

29.    Additionally, under the terms of the Settlement Agreement, the Lehman Affiliates will assign to the Kojaian Affiliates their membership interests in each Joint Venture where a third party lender holds a first mortgage on such Joint Venture's property.  While the Lehman Affiliates will not receive a cash payment from the Kojaian Affiliates for such assignments, the Debtors estimate that the outstanding debt owed to third parties with respect to the properties well exceeds the estimated value of such properties.  Furthermore, the assignment of the membership interests in certain Joint Ventures releases the Lehman Affiliates from any future funding or payment obligations with respect to the properties held by such Joint Ventures. As a result, the assignment of the membership interests benefits the Debtors, their estates and creditors.

30.    Accordingly, in light of its benefits, the Settlement Agreement is in the best interest of the Debtors and their estates.

### The Settlement Agreement is an Appropriate<br>Exercise of the Business Judgment of LBHI

31.    Ample authority exists for approval of the proposed Settlement Agreement.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  <u>See</u>

In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

32.    For the reasons set forth above, i.e. the transfer to LBHI of inherently valuable property, the receipt of not less than approximately $8 million and potentially an additional $20 million, and the release of the PAMI Guaranties, all in consideration for the transfer of Lehman's interests in certain third-party encumbered properties and assignment of certain loans that would be difficult to collect to the Kojaian Affiliates, entry into the Settlement Agreement represents an exercise of the Debtors' sound business judgment and is in the best interests of the Debtors' estates.

## Relief Under Bankruptcy Rule 6004(h)

33.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  Because the Debtors and their affiliates seek as prompt a closing as possible of the transactions contemplated by the Settlement to avoid additional expenses with respect to the Joint Ventures and quickly realize the benefit of their bargain, the Debtors respectfully request that any order approving the settlement be effective immediately by providing that the 10-day stay is inapplicable.

## Notice

34.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) counsel to the Kojaian

Affiliate(s); and (vii) all parties who have requested notice in these chapter 11 cases.  The

Debtors submit that no other or further notice need be provided.

       35.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

      WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: June 24, 2009
     New York, New York


          /s/ Richard P. Krasnow           
          Richard P. Krasnow
          Shai Y. Waisman

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone: (212) 310-8000
          Facsimile: (212) 310-8007

          Attorneys for Debtors
          and Debtors in Possession

## **Exhibit A**

Settlement Agreement, dated June 18, 2009

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Agreement"), made and entered into this 18th day of June, 2009 by and among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), and certain other entities affiliated with LBHI, which entities are more particularly listed on **Exhibit 1** attached hereto (each of the entities listed on **Exhibit 1** is a "Lehman Affiliate" and are collectively referred to herein as the "Lehman Affiliates"; the Lehman Affiliates, together with LBHI, are hereinafter collectively called "Lehman"), and certain entities owned or controlled, directly or indirectly, by Mike Kojaian ("MK") and/or C. Michael Kojaian ("CMK") which entities, and not MK or CMK, are the parties to this Agreement, which entities are  more particularly listed on **Exhibit 2** attached hereto (each of the entities listed on **Exhibit 2** is a "Kojaian Affiliate" and collectively,  the "Kojaian Affiliates").

W I T N E S S E T H:

The following is a recital of facts underlying this Agreement:

A.    PAMI (as hereafter defined) and/or Lehman Affiliates and KMC (as hereafter defined) and/or Kojaian Affiliates are members of various Joint Ventures (as hereafter defined).  The parties hereto have agreed to separate their interests as joint venturers therein upon the terms and conditions hereinafter set forth.

B.    Kojaian Affiliates and Lehman have agreed upon (a) terms and conditions on which (i) the Schedule A Joint Ventures (as hereafter defined) will be conveyed, assigned and/or transferred by the Kojaian Affiliates to one or more Lehman Designee(s) (as hereafter defined), (ii) the Schedule B Joint Ventures (as hereafter defined) will be conveyed, assigned and/or transferred by the Lehman Affiliates to one or more Kojaian Designee(s) (as hereafter defined), (iii) the Schedule D Joint Ventures (as hereafter defined) will be conveyed, assigned and/or transferred by the respective Lehman Affiliates to one ore more Kojaian Designee(s), (iv) Kojaian Affiliates and KMC shall secure the release of certain PAMI Guaranties (as hereafter defined), and (v) certain other transactions, as more particularly set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals (which are hereby incorporated into and deemed a part of this Agreement), the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, it is agreed by and among the parties hereto as follows:

1.    Recital of Facts.  The foregoing recitals are incorporated herein by reference and shall be deemed a part of this Agreement.

2.    Definitions.  Except as otherwise defined herein or elsewhere in this Agreement, the following terms shall have the following meanings:

(a)    "Assignment Agreement" shall mean an Assignment Agreement in the form of **Exhibit 3** attached hereto.

(b)    "Assignment of Membership Interest" shall mean an Assignment of Membership Interest in the form of **Exhibit 4** attached hereto.

(c)    "Covenant Deed" shall mean a Covenant Deed in the form of **Exhibit 5** attached hereto.

(d)    "Environmental Laws" shall mean all federal, State of Michigan and local environmental health and safety statutes, ordinances, codes, rules, regulations, orders and decrees regulating, relating to or imposing liability or standards concerning or in connection with Hazardous Materials.

(e)    "Hazardous Materials" shall mean any substance, material, waste, gas or particulate matter which is regulated by any local governmental authority, the State of Michigan or the United States of America, including, but not limited to, any material or substance which is (i) defined as a "hazardous waste", "hazardous material", "hazardous substance", "extremely hazardous waste" or "restricted hazardous waste" or words of similar import under any provision of any applicable Environmental Laws, (ii) petroleum or petroleum products, (iii) asbestos, (iv) polychlorinated biphenyl, (v) radioactive material, (vi) radon gas, (vii) defined as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. §1251, et seq. (33 U.S.C. §1317), (viii) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq. (42 U.S.C. §6903), or (ix) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601, et seq. (42 U.S.C. §9601).

(f)    "Joint Venture" shall mean an entity in which the membership interests are owned by a Lehman Affiliate, PAMI and/or a PAMI Affiliate, on the one hand, and by a Kojaian Affiliate on the other hand.

(g)    "KMC" shall mean Kojaian Management Corporation, a Michigan corporation.

(h)    "Kojaian Designee" shall mean an entity or entities designed by KMC.

(i)    "Lehman Designee" shall mean an entity or entities designated by LBHI.

(j)    "OFAC" shall mean the U.S. Department of the Treasury's Office of Foreign Assets Control.

(k)    "OFAC List" shall mean any list of prohibited countries, individuals, organizations and entities that is administered or maintained by OFAC, including: (i) Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001) issued by the President of the United

States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), any related enabling legislation or any other similar executive orders, (ii) the List of Specially Designated Nationals and Blocked Persons (the "SDN List") maintained by OFAC), and/or on any other similar list ("Other Lists") maintained by OFAC pursuant to any authorizing statute, executive order or regulations, or (iii) a "Designated National" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515.

(l)     "PAMI" shall mean Property Asset Management Inc., a Delaware corporation.

(m)     "PAMI Affiliate" shall mean PAMI Michigan, Inc. and PAMI Michigan Mezzanine II, LLC.

(n)     "Schedule A Joint Venture" shall mean those Joint Ventures itemized on **Exhibit 6** attached hereto, other than Hamlin Development Associates Limited Partnership ("Hamlin Development"), One Woodward Avenue Associates Limited Partnership ("One Woodward") and Shelby Industrial Investors, L.L.C. ("Shelby Industrial").

(o)     "Schedule B Joint Venture" shall mean those Joint Ventures itemized on **Exhibit 7** attached hereto.

(p)     "Schedule D Joint Venture" shall mean those Joint Ventures itemized on **Exhibit 8** attached hereto.

3.     Schedule A Joint Ventures. LBHI holds first mortgages on the real properties owned by the Schedule A Joint Ventures, as well as a first mortgage on the real properties owned by Hamlin Development, Shelby Industrial and One Woodward. On the Closing Date (as defined in Section 17 hereof), the respective Kojaian Affiliate(s) owning an interest in each Schedule A Joint Venture shall cause the following to occur:

A.     Assign, transfer and convey its membership interest(s) in each such Schedule A Joint Venture to Lehman Designee(s) pursuant to an Assignment of Membership Interest;

B.     Transfer to Lehman Designee(s) all right, title and interest of KMC and/or any Kojaian Affiliate in and to any member loans, or preferred equity contributions, made by KMC or any Kojaian Affiliate to any Schedule A Joint Venture (the "Kojaian Affiliate Member Loans"), including, but not limited to, any and all right to the repayment thereof and any interest or other return thereon;

C.     Transfer to Lehman Designee(s) all right, title and interest of Shelby Industrial and/or any Kojaian Affiliate under the Cherry Creek Corporate Park Master Deed and the Cherry Creek Corporate Park Condominium Association By-Laws, including, without limitation, (x) any and all rights as the "Developer" or "Declarant" under such Master Deed and By-Laws, (y) any and all rights held or reserved by Shelby Industrial

12595226\V-11

and/or Kojaian Affiliate(s) pertaining to oil, gas and mineral rights with regard to the real estate owned by it and (z) any and all rights to appoint and/or remove any board member or officer of the condominium association. Moreover, the Kojaian Affiliate(s) shall cause the transfer of any accounts pertaining to the operation of the Cherry Creek condo association to such Lehman Designee, including, without limitation, any accounts pertaining to or other otherwise holding condominium assessments collected pursuant to terms of the Cherry Creek Master Deed or By-Laws. Notwithstanding anything contained herein to the contrary, such Kojaian Affiliate(s) shall execute any documents necessary to effectuate such transfer of rights and shall cooperate with the applicable Lehman Affiliates and/or Lehman Designees;

D.    Transfer to Lehman Designee(s) all right, title and interest of Northville Technology Park Associates, L.L.C. ("Northville") and/or any Kojaian Affiliate under the Northville Technology Park Condominium Master Deed and the Northville Technology Park Condominium Association By-Laws, including, without limitation, (x) any and all rights as the "Developer" or "Declarant" under such Master Deed and By-Laws, (y) any and all rights held or reserved by Northville and/or Kojaian Affiliate(s) pertaining to oil, gas and mineral rights with regard to the real estate owned by it and (z) and any and all rights to appoint and/or remove any board member or officer of the condominium association. Moreover, the Kojaian Affiliate(s) shall cause the transfer of any accounts pertaining to the operation of the Northville condo association to such Lehman Designee, including, without limitation, any accounts pertaining to or other otherwise holding condominium assessments collected pursuant to terms of the Northville Master Deed or By-Laws. Notwithstanding anything contained herein to the contrary, such Kojaian Affiliate(s) shall execute any documents necessary to effectuate such transfer of rights and shall cooperate with the applicable Lehman Affiliates and/or Lehman Designees;

E.    Transfer to Lehman Designee(s) all right title and interest of Alpha Drive Development Associates, L.L.C. ("Alpha Drive"), Alpha Drive Development Associates-North, L.L.C. ("Alpha Drive North") and/or any Kojaian Affiliates under the Alpha Drive Condominium Master Deed and the Alpha Drive Condominium Association By-Laws, including, without limitation, any and all rights, if any, as the "Developer" or "Declarant" under such Master Deed and By-Laws, as well as any and all rights held by Alpha Drive, Alpha Drive North and/or any Kojaian Affiliates to appoint and/or remove any board member or officer of the condominium association; such Kojaian Affiliate(s) shall execute any documents necessary to effectuate such transfer of rights and shall cooperate with the applicable Lehman Affiliates and/or Lehman Designees;

F.    For each of Hamlin Development and Shelby Industrial, the respective Kojaian Affiliate shall (i) cause the real estate owned by such entity to be transferred to a Lehman Designee pursuant to a Covenant Deed, (ii) cause all leases, agreements and intangibles pertaining to the property owned by Hamlin Development and Shelby Industrial to be assigned and transferred to the Lehman Designee pursuant to an Assignment Agreement, (iii) deliver to the respective Lehman Designee a Bill of Sale conveying title to

any personal property owned by such entity in connection the ownership and operation of the corresponding real property, (iv) execute such customary Owner's Affidavits and/or GAP Undertaking Agreements as are customarily required by title companies in order to issue an Owner's Policy of Title Insurance with certain of the so-called "general exceptions" deleted, (v) shall deliver a non-foreign status affidavit as required by Section 1445 of the Internal Revenue Code (a "**FIRPTA**"), executed by Hamlin Development or Shelby Industrial, as the case may be, and (vi) where applicable, shall deliver to the respective Lehman Designee an assignment of any management agreement with Grubb & Ellis pertaining to such real property being conveyed by such entity to the Lehman Designee. In addition, the Kojaian Affiliate shall execute any documents reasonably necessary to effectuate the transfers contemplated hereinabove; and

G.       Cause (i) the real estate (x) owned by One Woodward to be transferred to a Lehman Designee pursuant to a Covenant Deed, and (y) ground leased by One Woodward to be transferred to a Lehman Designee pursuant to a recordable assignment of ground lease in the form attached hereto as **Exhibit 9**, (ii) the improvements located on the real property owned or leased by One Woodward to be transferred to a Lehman Designee pursuant to a quit claim deed, (iii) the leases, agreements and intangibles pertaining to the property owned or ground leased by One Woodward to be assigned and transferred to the Lehman Designee pursuant to an Assignment Agreement, (iv) the personal property owned by One Woodward in connection the ownership and operation of the corresponding real property to be conveyed to the Lehman Designee pursuant to a Bill of Sale, (v) execute such customary Owner's Affidavits and/or GAP Undertaking Agreements as are customarily required by title companies in order to issue a Leasehold Owner's Policy of Title Insurance with certain of the so-called "general exceptions" deleted, (vi) shall deliver a FIRPTA executed by One Woodward, and (vii) the assignment of the management agreement with Grubb & Ellis pertaining to the property being conveyed by One Woodward to such Lehman Designee. Moreover, such Kojaian Affiliate shall cause One Woodward to cooperate with the Lehman Designee in executing such additional notices and/or other documents reasonably necessary to effectuate the transfer of any ground lease interests, to provide notice to any ground lessors under any such ground leases regarding the assignment and transfer thereof and to effectuate the transfers contemplated hereinabove; and

H.       Cause the assignment to the respective Lehman Designee of (i) all monies then held by Trimont Real Estate Advisors ("Trimont") on behalf of the respective Schedule A Joint Ventures (which sums shall be turned over and deemed to be the property of such respective Lehman Designee), and (ii) the then-remaining tenant security deposits currently held by or on behalf of the Schedule A Joint Venture; such remaining tenant security deposits are more particularly scheduled on **Exhibit 19** attached hereto and made a part hereof.

I.       Transfer to the entity designated by LBHI on behalf of each respective Lehman Affiliate, keys to locks for each improvement located on real property owned by

each Schedule A Joint Venture in the possession of the respective Kojaian Affiliate, and originals (or if originals are not available, copies) of all of the property documents relating to each Schedule A Joint Venture, to the extent not previously delivered to Lehman.

4.    <u>Property Owned by K/LB Mineral Holdings, L.L.C.</u>  KMC and PAMI are joint venturers in an entity known as K/LB Mineral Holdings, L.L.C. ("<u>Mineral Holdings</u>").  On the Closing Date, KMC and PAMI shall cause Mineral Holdings to execute and deliver to New West Michigan II Industrial Investors, L.L.C.  ("<u>New West Michigan II</u>") a Covenant Deed conveying its undivided one-half interest in a rectangular parcel of real estate located in Norton Shores, Michigan over which the entrance drive from Pontaluna Road to the buildings located at 1210 and 1218 East Pontaluna Road, Norton Shores, Michigan owned by New West Michigan II is located.

5.    <u>Schedule B Joint Ventures</u>.  Each of the properties owned by each Schedule B Joint Venture is encumbered with a mortgage held by a third party lender other than LBHI.  On the Closing Date, the respective Lehman Affiliates and/or the respective PAMI Affiliate owning an interest in each Schedule B Joint Venture shall:

      A.    Assign, transfer and convey its membership interest(s) in each such Schedule B Joint Venture to a Kojaian Designee pursuant to an Assignment of Membership Interest; and

      B.    Transfer to a Kojaian Designee all right, title and interest of LBHI and/or any Lehman Affiliate and/or any PAMI Affiliate in and to those member loans, or preferred equity contributions, made by LBHI, such Lehman Affiliate or such PAMI Affiliate to any Schedule B Joint Venture (the "<u>Lehman Affiliate Member Loans</u>"), including, but not limited to, any and all right to the repayment thereof and any interest or other return thereon.

6.    <u>Assignment of LBHI Mezzanine Loans</u>. On the Closing Date, LBHI shall assign, transfer and convey those certain mezzanine loans made by LBHI to (i) MK and CMK (the "<u>Kojaian Mezzanine Loan</u>"), and (ii) Van Buren Industrial Investors, L.L.C. (the "<u>Van Buren Mezzanine Loan</u>", and, together with the Kojaian Mezzanine Loan, hereafter referred to, collectively, as the "<u>LBHI Mezzanine Loans</u>"), and all documents evidencing, securing or executed in conjunction with the LBHI Mezzanine Loans, to a Kojaian Designee pursuant to the Assignment of Promissory Note attached hereto as **Exhibit 10** and the Assignment of Secured Note and Other Loan Documents attached hereto as **Exhibit 11**, in consideration of the payment of One ($1.00) Dollar, as to each such LBHI Mezzanine Loan.  Immediately prior to the transfer of the Kojaian Mezzanine Loan, LBHI shall release any collateral assignments of membership or partnership interests or collateral stock pledges of any stock pertaining to each of (i) One Woodward Avenue, (ii) Hamlin Development, and (iii) New West Michigan II held by LBHI as security for the Kojaian Mezzanine Loan.

7.    <u>PAMI Guaranties and Various Assignments and Conveyances</u>. PAMI and KMC have provided guaranties of loans made by banks to various entities itemized on **Exhibit 12** attached

hereto (which guaranties made by PAMI are hereafter referred to, collectively, as the "PAMI Guaranties"). PAMI and KMC each own a fifty (50%) percent membership interest in K/LB Funding, LLC ("K/LB Funding"). The Schedule D Joint Ventures are each owners of vacant land. On the Closing Date, the following transactions shall be completed in the following order:

    A.    First, at the election of LBHI, the respective Kojaian Affiliate owning an interest in each Schedule D Joint Venture shall either: (i) assign, transfer and convey its or their membership interest(s) in each such Schedule D Joint Venture to the corresponding Lehman Affiliate or to a Lehman Designee, or (ii) join with the corresponding Lehman Affiliate owning an interest in each such Schedule D Joint Venture to cause the real estate owned by such Schedule D Joint Venture to be transferred to a Lehman Designee pursuant to a Covenant Deed for the consideration of One ($1.00) Dollar, and, where applicable, join with such Lehman Affiliate in causing certain leases, agreements and intangibles pertaining to such Schedule D Joint Venture to be assigned and transferred to the Lehman Designee pursuant to an Assignment Agreement;

    B.    Second, immediately thereafter, LBHI shall discharge any mortgages held by LBHI encumbering the real property owned by any Schedule D Joint Venture;

    C.    Third, immediately thereafter, a Kojaian Designee or Kojaian Designee(s) shall purchase each such Schedule D Joint Venture property from either (i) the Schedule D Joint Venture if the membership interest of the Kojaian Affiliate was assigned, transferred and conveyed to the corresponding Lehman Affiliate or to a Lehman Designee pursuant to subsection 7A.(i) above, or (ii) the respective Lehman Designee if the real estate owned by such Schedule D Joint Venture was conveyed by a Covenant Deed to a Lehman Designee pursuant to subsection 7A.(ii) above, free and clear of, and unencumbered by, any mortgage thereon formerly held by LBHI, for the aggregate sum of Three Million Two Hundred Fifty Thousand ($3,250,000.00) Dollars, in exchange for which such Kojaian Designee shall receive a Covenant Deed and an Assignment Agreement as to each such property; and

    D.    Fourth, PAMI shall assign, transfer and convey its membership interest in K/LB Funding to KMC or a Kojaian Designee pursuant to an Assignment of Membership Interest for the consideration of One ($1.00) Dollar;

provided, however, that the obligations of LBHI, PAMI and any applicable Lehman Affiliate and/or Lehman Designee to perform the transactions set forth in subparagraphs 7.A. through D, inclusive, above are conditioned upon the receipt by PAMI of the following executed releases on the Closing Date:

    (i)    an unconditional and irrevocable Release of Guaranty executed by National City Bank, as successor to National City Bank of the Midwest ("National City"), in favor of PAMI relating to that certain Guaranty dated June 16, 2005 made by PAMI in favor of National City (the "National City Guaranty") relating to the

loan by National City to Van Buren Industrial Investors, L.L.C. ("Van Buren"), which Release of Guaranty shall include the consent of National City to the assignment by each of LB Van Buren Inc. and LW-LP Inc. of their respective membership interests in Van Buren to a Kojaian Designee and shall otherwise be in form and substance acceptable to PAMI, in PAMI's sole and absolute discretion;

(ii)    an unconditional and irrevocable Release of Guaranty executed by JPMorgan Chase Bank, N.A. ("JPMorgan") in favor of PAMI relating to that certain Guaranty dated February 9, 2005 made by PAMI in favor of JPMorgan (the "K/LB Funding Guaranty") relating to the loan made by JPMorgan to K/LB Funding, which Release of Guaranty shall include the consent of JPMorgan to the assignment by PAMI of its membership interest in K/LB Funding to a Kojaian Designee and shall otherwise be in form and substance acceptable to PAMI, in PAMI's sole and absolute discretion; and

(iii)    an unconditional and irrevocable Release of Guaranty executed by JPMorgan in favor of PAMI relating to that certain Guaranty dated April 22, 2005 made by PAMI in favor of JPMorgan (the "K/LB Bloomfield Guaranty") relating to the loan made by JPMorgan to K/LB Bloomfield Associates, L.L.C. ("K/LB Bloomfield"), which Release of Guaranty shall include the consent of JPMorgan to the assignment by LB Bloomfield LLC of its membership interest in K/LB Bloomfield to a Kojaian Designee and shall otherwise be in form and substance acceptable to PAMI, in PAMI's sole and absolute discretion.

8.    Casualty Losses.  In the event of any casualty loss at any property owned by any Joint Venture prior to the transfer, assignment or conveyance thereof or any interest therein, upon consummation of the transfer and/or assignment of such property or interests in the Joint Venture which owns such property, the transferee or assignee (or its designee) shall receive all insurance proceeds in respect of such casualty loss.  Moreover, the applicable Kojaian Affiliate or Lehman Affiliate, whichever the case may be, shall cooperate with all requests of the Kojaian Designee or Lehman Designee, whichever the case may be, in order to cause all such payments and insurance proceeds to be paid to the correct Lehman Designee and/or Kojaian Designee, as applicable.

9.    Repayment of Advances by TTERTT Associates, L.L.C..  Simultaneously with the execution and delivery of this Agreement, K/LB Funding will pay to TTERTT Associates, L.L.C. ("TTERTT"), by wire transfer of immediately available federal funds to the account designated on **Exhibit 13** attached to this Agreement, the amount of $4,764,666.00.

10.    Option to Acquire TTERTT Property.  TTERTT is currently the owner of fee simple title to property commonly known as Travelers Tower I and Travelers Tower II located in the City of Southfield, Oakland County, Michigan (collectively, the "Travelers Tower I and II Properties"), and more particularly described in **Exhibit 14** attached hereto, respectively.  The sole member of TTERTT is LB TTERTT Inc., a Delaware corporation, which is owned, directly or indirectly, by a

Lehman Affiliate(s).  On the Closing Date, TTERTT shall enter into an option agreement (the "Option Agreement"), in the form of **Exhibit 15** attached hereto, granting to a Kojaian Designee the option to purchase the Travelers Tower I and II Properties on an "As-Is", "Where-Is" basis with no representations or warranties given by TTERTT, exercisable at any time within three hundred sixty-five (365) days after the Closing Date (the "Option Period") for the total cash consideration of Twenty Million ($20,000,000.00) Dollars, by delivery of written notice of exercise of such option (the "Option Notice") at any time prior to the expiration of the Option Period.  The Option Notice shall specify a date for closing of the purchase of the Travelers Tower I and II Properties, which shall be not less than ten (10) days nor more than thirty (30) days after the date of the Option Notice. The parties to the Option Agreement shall also execute a Memorandum of Option Agreement, in the form of **Exhibit 16** attached hereto, and the optionee thereunder shall have the right to record such notice, at its sole cost and expense, with the Oakland County Register of Deeds. Moreover, on the Closing Date, the Kojaian Designee shall execute a Release of Memorandum of Option, which shall be deposited with the Escrow Agent (as hereafter defined) pursuant to mutually acceptable joint order escrow instructions, which instructions shall provide that Escrow Agent shall cause the recordation of such Release of Memorandum of Option in the event that the Option Notice is not timely provided as set forth above and in the Option Agreement.

11.    <u>Closing Adjustments, Costs and Expenses</u>.

A.    <u>Lehman Closing Costs</u>.  The respective Lehman Affiliate, as to each respective Schedule A  Joint Venture, shall be responsible for the following costs and expenses of the transactions contemplated by this Agreement:

(i)    any and all transfer taxes, if any, applicable to the assignments, transfers or deeds pertaining to the Schedule A Joint Ventures or the real estate owned by such Schedule A Joint Ventures;

(ii)    the costs of any new title commitments or title policies or endorsements to existing policies, or any new environmental site assessment or update(s) of any existing environmental site assessment, with regard to the real estate owned by the Schedule A Joint Ventures that were ordered in connection or in contemplation of the transactions set forth in this Agreement;

(iii)    one-half (1/2) of any fees and charges of any escrow agent used in connection with the closing of the transactions contemplated by this Agreement, which ½ shall not to exceed Five Thousand Dollars ($5,000.00);

(iv)    all obligations with respect to the ownership of the properties owned by the Schedule A Joint Ventures which a Lehman Designee, as to each such Joint Venture, shall take subject to on the Closing Date, including, without limitation, accrued but unpaid real estate taxes and assessments; and

12595226\V-11

(v)      all other closing costs incurred by LBHI, the respective Lehman Affiliates, PAMI and the PAMI Affiliates in connection with the transactions contemplated hereby, including the attorneys' fees and expenses incurred by LBHI, the respective Lehman Affiliates, PAMI and the respective PAMI Affiliates in connection with this Agreement and the transactions contemplated hereby.

B.      Kojaian Closing Costs.  The respective Kojaian Affiliates, each as to each respective Schedule B or Schedule D Joint Venture, shall be responsible for the following costs and expenses of the transactions contemplated by this Agreement:

(i)      any and all transfer taxes, if any, applicable to the assignments, transfers or deeds pertaining to the Schedule B Joint Ventures or the real estate owned by such Schedule B Joint Ventures;

(ii)      any and all transfer taxes, if any, applicable to the assignments, transfers or deeds pertaining to the Schedule D Joint Ventures or the real estate owned by such Schedule D Joint Ventures, including, without limitation, any and all closing costs related to the completing the transactions contemplated in Section 7 hereinabove;

(iii)      the costs of any new title commitments or title policies or endorsements to existing policies, or any new environmental site assessment or update(s) of any existing environmental site assessment, with regard to the real estate owned by the Schedule B Joint Ventures and/or the Schedule D Joint Ventures that were ordered by any Kojaian Affiliates in connection or in contemplation of the transactions set forth in this Agreement;

(iv)      one-half (1/2) of any fees and charges of any escrow agent used in connection with the closing of the transactions contemplated by this Agreement, which ½ shall not to exceed Five Thousand Dollars ($5,000.00);

(v)      all obligations with respect to the ownership of the properties owned by the Schedule B Joint Ventures and/or the Schedule D Joint Ventures which a Kojaian Designee, as to each such Joint Venture, shall take subject to on the Closing Date, including, without limitation, accrued but unpaid real estate taxes and assessments; and

(vi)      all other closing costs incurred by the respective Kojaian Affiliates in connection with the transactions contemplated hereby, including the attorneys' fees and expenses incurred by such Kojaian Affiliates in connection with this Agreement and the transactions contemplated hereby.

Except for the payments to be made by the parties, respectively, as set forth above in this <u>Section 11</u>, there shall be no other prorations or adjustments between the parties at closing.

12.    <u>Indemnification of Lehman Affiliates by Kojaian Affiliates</u>.  On the Closing Date, (i) the respective Kojaian Affiliate owning an interest in each corresponding Schedule A Joint Venture, as to such Schedule A Joint Venture (other than Hamlin Development, One Woodward and Shelby Industrial), (ii) Hamlin Development, One Woodward and Shelby Industrial, as to the real properties owned by each of them, and (iii) the respective Kojaian Designee that ultimately shall own each corresponding Schedule D Joint Venture (following the completion of the transactions more particularly described in <u>Section 7</u> hereinabove), as to such Schedule D Joint Venture, shall execute and deliver: (x) a hazardous materials indemnity agreement pertaining to the real estate owned by such Joint Ventures or by Hamlin Development, One Woodward and Shelby Industrial to and in favor of, and reasonably satisfactory in form and substance to, the respective Lehman Affiliate and/or Lehman Designee and each of their respective present and former parents, subsidiaries, affiliates, members (managing or otherwise), partners, shareholders principals, officers, directors, agents, employees, legal counsel, successors, and assigns and each of their respective present and former parents, subsidiaries, affiliates, members (managing or otherwise), partners, shareholders principals, officers, directors, agents, employees, legal counsel, successors, and assigns (collectively, the "<u>Indemnitees</u>") pursuant to which such respective indemnitor shall indemnify, protect, and defend and hold harmless such Indemnitees from and against all Losses (as hereafter defined) relating to or arising out of Environmental Liabilities  (as hereafter defined), and (y) an indemnity executed by each of the Kojaian Designees identified in subsection (iii) immediately above, in favor of the Indemnitees as to such Joint Venture, pursuant to which such Indemnitees are indemnified, protected, defended and held harmless from and against any and all Losses that they may incur by virtue of any of the transactions involving the Schedule D Joint Ventures as contemplated in <u>Section 7</u>, including, without limitation, any Environmental Liabilities resulting from such Lehman Affiliate's and/or Lehman Designee's period of ownership of such Schedule D Joint Ventures.  As used herein, the term "<u>Environmental Liabilities</u>" shall mean all Losses incurred or suffered by or asserted or awarded against, the Indemnitee, directly or indirectly, relating to or arising out of any of the following: (A) as to the real estate owned by a Schedule A Joint Venture, Hamlin, One Woodward or Shelby Industrial, the inaccuracy of the representations and warranties set forth in <u>Section 13.A(xi)</u> hereof; (B) as to the real estate owned by a Schedule D Joint Venture, the presence of any Hazardous Material on or about the property owned by the Schedule D Joint Venture.  As used herein, the term "<u>Losses</u>" shall mean all claims, actions, causes of action, damage, demands, liabilities, obligations, penalties, fines, judgments, suits, proceedings, costs and expenses.

13.    <u>Representations and Warranties</u>.

A.    <u>Representations by Kojaian Affiliates</u>. As an inducement to LBHI, PAMI, the Lehman Affiliates and the PAMI Affiliates to enter into the transactions contemplated by this Agreement, each of the Kojaian Affiliates hereby represents and warrants to each of LBHI, PAMI, the Lehman Affiliates and the PAMI Affiliates as to any Schedule A Joint Venture and any Schedule D Joint Venture in which such Kojaian Affiliate owns an interest:

12595226\V-11

(i)      that the persons executing this Agreement and all documents required to consummate the transaction contemplated hereby by MK, CMK, KMC or any Kojaian Affiliate have been and on the Closing Date will be duly authorized to execute this document on behalf of MK, CMK, KMC and/or each of the respective Kojaian Affiliates, as the case may be, and this Agreement has been, and all other documents to be delivered hereunder by each of the Kojaian Affiliates have been and will have been, duly authorized, executed and delivered by such parties, and do not or will not violate the provisions of other agreements to which any of MK, CMK, KMC and/or any Kojaian Affiliates is a party or by which it is bound;

(ii)      (a) there are no leases or occupancy agreements with respect to any of the properties owned or ground leased by any Schedule A Joint Ventures, other than those leases identified in the rent roll attached hereto as **Exhibit 18**, and there are no defaults under any such leases or occupancy agreements unless otherwise set forth on such **Exhibit 18**, (b) there are no security deposits under any of the tenant leases at the properties owned or ground leased by the Schedule A Joint Ventures other than those identified on **Exhibit 19**, (c) there are no contracts, subcontracts or agreements affecting any of the properties owned or leased by any Schedule A Joint Venture, other than those contracts listed on **Exhibit 20**, and there are no defaults under any such contracts unless otherwise set forth on such **Exhibit 20**, (d) to its actual knowledge, there is no litigation pending against any Schedule A Joint Venture, other than as listed on **Exhibit 21**, (e) there are no management agreements, leasing agreements, marketing agreements or other agreements or arrangements relating to the properties owned or ground leased by the Schedule A Joint Ventures under which any fees or commissions are or will be payable, other than those fees claimed due and payable to each of (x) Grubb & Ellis Management Services, Inc., and (y) KMC, as are each more particularly itemized on the schedule attached hereto as **Exhibit 22**, and there are no defaults under any such agreements unless otherwise set forth on such **Exhibit 22**; and (f) to the actual knowledge of the Kojaian Affiliates, there are no liens, pledges or security interests in favor of any person, except LBHI, in any of the Schedule A Joint Ventures;

(iii)      that each of the property management agreements with Grubb & Ellis Management Services, Inc. relating to each of the Schedule A Joint Ventures may be terminated by such Schedule A Joint Venture or any successor or assign of such Schedule A Joint Venture upon no less than thirty (30) days prior notice;

(iv)      it has not received any written notice, nor does it have any actual notice, asserting that any of the real property owned or ground leased by a Schedule A Joint Venture or the operation of such real property violates any applicable laws, ordinances, codes, regulations (including, without limitation, any zoning, building, fire, health code or environmental control laws, ordinances, codes or regulations) or any other restrictions affecting the use of any such real property owned or ground leased by such Schedule A Joint

Venture imposed by any governmental or quasi-governmental authority having jurisdiction over such property;

(v)      that each of the improvements located on any of the real properties owned and/or ground leased by each respective Schedule A Joint Venture is insured for all risk and casualty loss in an amount equal to such respective improvement's full replacement cost and that any and all insurance premiums relating to such casualty coverage have been paid in full and are current;

(vi)      it has not received any notice of, nor does it have any actual knowledge of, any pending or proposed special assessments affecting the properties owned or leased by such Schedule A Joint Venture or any proposed or pending public improvements which may give rise to any special assessments affecting the properties owned or leased by such Schedule A Joint Venture;

(vii)      it has not received any notice of, nor does it have any actual knowledge of, any pending or threatened condemnation or transfer in lieu thereof affecting the properties owned or leased by any such Schedule A Joint Venture;

(viii)    to its actual knowledge, other than personal injury claims covered by policies of liability insurance and any pending litigation disclosed on **Exhibit 21** attached hereto, there are no outstanding litigation, liens or claims pending which would affect any portion of any property owned or leased by such Schedule A Joint Venture, any of the leases pertaining to any property owned or ground leased by such Schedule A Joint Venture, or the ability of any of such Kojaian Affiliate to enter into or perform its respective obligations pursuant to and as contemplated by this Agreement;

(ix)      with regard to any membership interests in any Schedule A Joint Venture that are transferred from a Kojaian Affiliate to a Lehman Designee, each respective Kojaian Affiliate transferring such Schedule A Joint Venture membership interests is the sole owner of such Schedule A Joint Venture Interests, subject to the transfer to the Lehman Designee, free and clear of any and all restrictions, security interests, liens, encumbrances and claims whatsoever;

(x)      each respective Kojaian Affiliate, CMK, MK and KMC is in compliance with all applicable anti-money laundering and anti-terrorist laws, regulations, rules, executive orders and government guidance, including the reporting, record keeping and compliance requirements of the Bank Secrecy Act ("BSA"), as amended by The International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, Title III of the USA PATRIOT Act (the "Patriot Act"), and other authorizing statutes, executive orders and regulations administered by OFAC, and related Securities and Exchange Commission, SRO or other agency rules and regulations, and has policies, procedures, internal controls and systems that are reasonable designated to ensure such compliance;

(xi)    Neither: (i) any Koajain Affiliate, any affiliate of any Kojaian Affiliate, nor any person controlling or controlled by a Kojaian Affiliate; nor (ii) KMC or any person controlling or controlled by KMC; nor (iii) CMK or MK, individually, is a country, territory, person, organization, or entity named on an OFAC List, nor is a prohibited country, territory, person, organization, or entity under any economic sanctions program administered or maintained by OFAC; and

(xii)    to the actual knowledge of such Kojaian Affiliate, and except as disclosed in the environmental reports listed on **Exhibit 17** (x) no Hazardous Materials in excess of permissible limits under Environmental Laws have been installed, used, generated, manufactured, treated, handled, refined, produced, processed, stored or otherwise exist in or on any property owned or ground leased by any Schedule A Joint Venture or any Schedule D Joint Venture, or any portion thereof, or have been disposed of or discharged from any such real property or any portion thereof; (y) no activity has been undertaken with respect to any property owned or ground leased by any Schedule A Joint Venture or any Schedule D Joint Venture, or any portion thereof, which would cause a violation or support a claim under any Environmental Law; and (z) no investigation, administrative order, litigation or settlement with respect to any Hazardous Materials is threatened or in existence with respect to any property owned or ground leased by any Schedule A Joint Venture or any Schedule D Joint Venture, or any portion thereof, and no notice has been served on such Kojaian Affiliate from any entity, governmental body or individual claiming any violation of any Environmental Laws, or demanding payment or contribution for environmental damage or injury to natural resources.

B.    Lehman Affiliate Representations.    As an inducement to the Kojaian Affiliates to enter into the transactions contemplated by this Agreement, each of the Lehman Affiliates on behalf of itself and each PAMI Affiliate on behalf of itself hereby represents and warrants to the respective Kojaian Affiliates as to any Schedule B Joint Venture in which any Lehman Affiliate and/or the PAMI Affiliate owns an interest:

(i)    that, subject to the BK Court Approval (as hereafter defined), the persons executing this Agreement and all documents required to consummate the transaction contemplated hereby by such Lehman Affiliate and/or such PAMI Affiliate have been and on the Closing Date will be duly authorized to execute this document on behalf of each of said parties, and this Agreement has been, and all other documents to be delivered hereunder by each of said parties have been and will have been duly authorized, executed and delivered by said parties, and do not or will not violate the provisions of any agreements to which any of said parties is a party or by which it is bound;

(ii)    to its actual knowledge, no fees or commissions are or will be payable to any such Lehman Affiliate or any such PAMI Affiliate, as the case may be, with respect to any of the Schedule B Joint Ventures;

12595226\V-11

(iii)    it has not received any written notice asserting that any of the real property owned or ground leased by a Schedule B Joint Venture or the operation of such real property violates any applicable laws, ordinances, codes, regulations (including, without limitation, any zoning, building, fire, health code or environmental control laws, ordinances, codes or regulations) or any other restrictions affecting the use of any such real property owned or ground leased by such Schedule B Joint Venture imposed by any governmental or quasi-governmental authority having jurisdiction over such property;

(iv)    with regard to any membership interests in any Schedule B Joint Ventures that are transferred from it to a Kojaian Designee, it is the sole owner of such Schedule B Joint Venture Interests, subject to the transfer to the Kojaian Designee, free and clear of any and all restrictions, security interests, liens, encumbrances and claims whatsoever; and

(v)    to its actual knowledge, and except as disclosed in the environmental reports listed on **Exhibit 17** and received or obtained by Kojaian prior to the Closing Date, (x) no Hazardous Materials in excess of permissible limits under Environmental Laws have been installed, used, generated, manufactured, treated, handled, refined, produced, processed, stored or otherwise exist in or on any property owned or ground leased by any Schedule B Joint Venture, or any portion thereof, or have been disposed of or discharged from any such real property or any portion thereof; (y) no activity has been undertaken with respect to any property owned or ground leased by any Schedule B Joint Venture, or any portion thereof, which would cause a violation or support a claim under any Environmental Law; and (z) no investigation, administrative order, litigation or settlement with respect to any Hazardous Materials is threatened or in existence with respect to any property owned or ground leased by any Schedule B Joint Venture, or any portion thereof, and no notice has been served on it  from any entity, governmental body or individual claiming any violation of any Environmental Laws or demanding payment or contribution for environmental damage or injury to natural resources.

C.    LBHI Representations.  As an inducement to the Kojaian Affiliates to enter into the transactions contemplated by this Agreement, LBHI hereby represents and warrants to the Kojaian Affiliates that, subject to the BK Court Approval, (x) the persons executing this Agreement and all documents required to consummate the transaction contemplated hereby by LBHI have been and on the Closing Date will be duly authorized to execute this Agreement, (y) this Agreement has been, and all other documents to be delivered hereunder by LBHI have been and will have been duly authorized, executed and delivered by LBHI, and (z) do not and will not violate the provisions of any agreements to which LBHI is a party or by which it is bound.

D.    PAMI Representations.  As an inducement to the Kojaian Affiliates to enter into the transactions contemplated by this Agreement, PAMI hereby represents and warrants

−15−

to the Kojaian Affiliates that, subject to the BK Court Approval, (x) the persons executing this Agreement and all documents required to consummate the transaction contemplated hereby by PAMI have been and on the Closing Date will be duly authorized to execute this Agreement, (y) this Agreement has been, and all other documents to be delivered hereunder by PAMI have been and will have been duly authorized, executed and delivered by PAMI, and (z) do not and will not violate the provisions of any agreements to which PAMI is a party or by which it is bound.

14.    Additional Schedule A Joint Venture Covenants.

A.    Tenant Estoppel Certificates.  The respective Kojaian Affiliate shall use its best efforts to obtain and deliver to LBHI and the respective Lehman Designee on or before July 13, 2009, an executed tenant estoppel certificate in form and substance substantially similar to form estoppel letter previously provided by each such tenant to LBHI from each of the following tenants: (a) Quicken (a tenant of K/LB Twelve Mile Associates, L.L.C.), (b) Entertainment Publication (a tenant of Maple Stephenson Development Associates, L.L.C.) and (c) Comerica Bank (a tenant of One Woodward).

B.    Alpha Drive Condominium Association Estoppel.  Alpha Drive and Alpha Drive North each hereby covenant to use best efforts to obtain and deliver to LBHI and the respective Lehman Designee on or before July 13, 2009, an executed estoppel certificate executed by the condominium association governing the real properties owned by Alpha Drive and Alpha Drive North in form and substance reasonably acceptable to LBHI, which shall state, among other things, that neither Alpha Drive nor Alpha Drive North is in default under the applicable Master Deed or any of the applicable condominium documents and that no sums or amounts are due and payable by either Alpha Drive or Alpha Drive North to such condominium association.

15.    Survival.  All representations, warranties, covenants, indemnities and agreements of each party hereto contained in this Agreement, or in any exhibit or document delivered pursuant hereto, shall survive the execution and delivery of this Agreement and any documents required to be executed and delivered in connection herewith and shall be deemed remade as of the Closing Date. Moreover, all such representations, warranties and indemnities shall be binding upon the existing parties hereto as well as to any of their respective successors and assigns and shall not be merged into any of the conveyance documents or other closing documents executed in connection with the transactions contemplated by this Agreement, and such representations, warranties and indemnities shall inure to the benefit of successors and assigns.

16.    Conditions Precedent to Closing.

A.    The following conditions are conditions precedent to Lehman's obligation to close on the transactions contemplated hereby:

(i)        LBHI shall have received a reliance letter from NTH Consultants regarding each of the Environmental Phase I Site Assessments Reports referenced on **Exhibit 17** attached hereto, which reliance letter shall be in form and substance reasonably acceptable to LBHI;

(ii)        LBHI and the respective Lehman Designee shall have received an executed estoppel certificate (in form and substance reasonably acceptable to LBHI) executed by the board of directors of the condominium association governing the real properties owned by Northville, which shall state, among other things, that no Northville Technology Park condominium unit owners are in default under the governing master deed and/or condominium documents (except as scheduled on **Exhibit 24** attached hereto) and that all Northville Technology Park condominium unit owners are current in the payment of any assessments and fees under pursuant to the master deed and/or condominium documents (except as scheduled on **Exhibit 24** attached hereto);

(iii)        LBHI and the respective Lehman Designee shall have received evidence, in form and substance reasonably satisfactory to LBHI, of a recorded amendment to the Northville Technology Park Master Deed which shall clarify and confirm that to the extent of any conflicting provisions between the recorded Northville Technology Park Master Deed dated January 24, 2008 (the "Northville Master Deed") and those contained in that certain Declaration of Covenants and Building and Use Restrictions for Northville Technology Park, recorded on June 24, 2002 in Liber 36455, Page 274, the terms set forth in the Northville Master Deed shall prevail, govern and control;

(iv)        LBHI and the respective Lehman Designee shall have received an executed estoppel certificate (in form and substance reasonably acceptable to LBHI) executed by the board of directors of the condominium association governing the real properties that are part of the Cherry Creek Corporate Park Condominium, which shall state, among other things, that no Cherry Creek Corporate Park condominium unit owners are in default under the governing master deed and/or condominium documents (except as scheduled on **Exhibit 24** attached hereto) and that all Cherry Creek Corporate Park condominium unit owners are current in the payment of any assessments and fees under pursuant to the master deed and/or condominium documents (except as scheduled on **Exhibit 24** attached hereto);

(v)        LBHI and the respective Lehman Designee shall have received an estoppel certificate executed by One Woodward in the form attached hereto as **Exhibit 25** confirming no defaults under any of the ground lease agreements to which One Woodward is a tenant;

(vi)        PAMI shall have received the releases to each of the PAMI Guaranties required to be provided pursuant to the terms of Section 7 hereinabove, each in form and substance acceptable to PAMI in PAMI's sole and absolute discretion;

(vii)        LBHI has received each of the indemnities required to be provided pursuant

to the terms of <u>Section 12</u> hereinabove, each in form and substance substantially similar to those provisions set forth in <u>Section 12</u> hereinabove;

(viii)    No action, suit or other proceeding shall be threatened or pending which would materially and adversely affect any of the Schedule A Joint Ventures or the real property owned or ground leased by any of said Schedule A Joint Ventures, or which seeks to restrain or prohibit, or to obtain damages or a discovery order with respect to this Agreement or the consummation of the transactions contemplated hereby;

(ix)    the condition and status of title relating to the real properties owned and/or ground leased by each of the respective Schedule A Joint Ventures (including Hamlin, One Woodward and Shelby Industrial) is substantially and materially in the condition as shown on the proforma title commitments attached hereto as **<u>Exhibit 26</u>**.

(x)    All of the representations and warranties made by the respective Kojaian Affiliates in this Agreement are true and accurate in all material respects when made and as of the Closing Date;

(xi)    On the Closing Date: (1) except for matters caused by the acts of LBHI, PAMI, any PAMI Affiliate, any Lehman Affiliate or any Lehman Designee, there shall not be any action, legal or administrative proceedings, or investigations pending or threatening against any of the Schedule A Joint Ventures, any of the respective Kojaian Affiliates owning an interest in any Schedule A Joint Venture, Schedule B Joint Venture and/or Schedule D Joint Venture, any of the respective Kojaian Designees to whom interests in any Schedule B Joint Venture(s) and/or any Schedule D Joint Venture(s) will be transferred to, and/or any of KMC, MK and CMK, before any court or before any governmental department, commission, board, agency or instrumentality which might (A) affect the validity or enforceability of this Agreement, (B) the performance of any such Kojaian Affiliate's obligations hereunder or (C) any of the obligations of any of KMC, MK or CMK under any of the documents to be executed by any of them in connection with the transactions contemplated by this Agreement, or (D) the accuracy of any Kojaian Affiliate representation or warranty made hereunder; (2) there shall be no new uncured violations of zoning, subdivision, fire, safety, pollution, health or Environmental Laws, ordinances, rules, regulations or orders of any federal, state, county, or local governmental authority or of any pending or threatened proceedings relating to any such violations relating to any property owned by any such Schedule A Joint Venture or Schedule D Joint Venture; and

(xii)    this Agreement and all of the transactions contemplated and/or required by this Agreement shall have been approved by a final Order entered by the United States Bankruptcy Court for the Southern District of New York (hereinafter the "<u>BK Court Approval</u>").

If the foregoing conditions set forth in this <u>Section 16</u> have not been fully satisfied by September 20,

2009, then LBHI, on behalf of the Lehman Affiliates, PAMI and the PAMI Affiliates may elect to terminate this Agreement by providing written notice thereof to KMC on behalf of the Kojaian Affiliates, in which event this Agreement shall terminate and be of no further force and effect and, in such event, (x) the parties hereto shall have no further obligations under this Agreement and (y) no party to this Agreement shall be liable under this Agreement to any other party to this Agreement. Moreover, LBHI, acting on behalf of the Lehman shall have the right at any time to waive any of the conditions precedent contained in this <u>Section 16(i) through (x)</u>, in its sole and uncontrolled discretion, by delivery of written notice of such waiver to KMC.

Notwithstanding anything to the contrary contained in this Agreement, each of the parties hereto agrees that the effectiveness of this Agreement and each of the terms and provisions set forth in this Agreement and any of the transactions contemplated in this Agreement shall be subject, in their entirety, to the issuance of the BK Court Approval.

B.      The Kojaian Affiliates' obligation to close on the transactions contemplated in this Agreement is conditioned on receipt of evidence of the BK Court Approval.  At least three (3) business days prior to filing any motion seeking such BK Court Approval, LBHI shall provide to KMC, on behalf of the Kojaian Affiliates, for approval, a copy of the proposed motion and proposed order requested to be entered with the U.S. Bankruptcy Court if such motion for approval is granted, and KMC, on behalf of the Kojaian Affiliates, shall have the right to reasonably approve the content of such motion and order.  If the BK Court Approval has not been issued by September 20, 2009, then KMC, acting on behalf of the Kojaian Affiliates, may elect to terminate this Agreement by providing written notice thereof to LBHI, in which event this Agreement shall terminate and be of no further force and effect, and, in such an event, (x) the parties hereto shall have no further obligations under this Agreement and (y) no party to this Agreement shall be liable under this Agreement to any other party to this Agreement.

17.      <u>Closing</u>.  Provided that the conditions precedent in <u>Section 16</u> hereinabove have been satisfied, then the parties hereto shall close all of transactions contemplated by this Agreement on or before the date which is ten (10) business days after satisfaction or waiver (if waivable) of all of the conditions precedent (the "<u>Closing Date</u>"), all documents required to be executed pursuant to this Agreement (the "<u>Closing Documents</u>") shall be so executed and delivered to Chicago Title Insurance Company (the "<u>Escrow Agent</u>"), in escrow, to be held pursuant to the terms of a mutually acceptable joint order escrow agreement.

If following the issuance of the BK Approval and the satisfaction or waiver (if waivable) of all of the conditions precedent set forth in <u>Section 16</u>, the Kojaian Affiliates, on the one hand, or Lehman, on the other hand, (the "Non-Performing Party") fails to close the transactions contemplated by this Agreement, then the party who is willing and able to close (the "Performing Party") may elect as its sole and exclusive remedy, to seek from the Non-Performing Party either: (i) specific performance of all of the transactions contemplated by this Agreement, to the extent the remedy is available pursuant to applicable law, or (ii) an amount equal to the Performing Party's actual proven direct damages not to exceed Five Millions Dollars ($5,000,000) in the aggregate; it

–19–

being understood and agreed that the Performing Party must choose clause (i) or (ii) above, not both nor a combination thereof.  Failure to commence an action for specific performance within thirty (30) days of the Closing Date shall be deemed a waiver by the Non-Performing Party of the right to commence an action for specific performance as well as a waiver by it of any right it may have to file a record of notice of lis pendens or notice of pendency of action or any other similar notice against any of the properties involved in the transactions contemplated by this Agreement.  Other than as set forth in this paragraph, no party to this Agreement shall have any liability hereunder for failure to perform or close the transactions contemplated by this Agreement and, except as set forth in this paragraph, no party may seek any remedy or damages on account of the Non-Performing Party's failure to close the transactions contemplated by this Agreement.

18.     Releases.  On the Closing Date, (i) LBHI, PAMI, PAMI Affiliate and each of the Lehman Affiliates which currently own membership interests in any of the Joint Ventures itemized in any of the exhibits attached hereto, on the one hand, and (ii) KMC, MK, CMK and each of the Kojaian Affiliates which currently own membership interests in any of the Joint Ventures itemized in any of the exhibits attached hereto, on the other hand, shall each execute and deliver a mutual release in the form attached hereto as **Exhibit 23** (the "Mutual Release").

19.     Expenses.   Except as otherwise provided herein and subject to the closing adjustments set forth in Section 11 hereinbove, each of the parties hereto shall pay its own fees and expenses in connection with this Agreement and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated.

20.     Headings.  The section headings herein are for convenience of reference only, do not constitute a part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

21.     Notices.   Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) expedited delivery service with proof of delivery, (c) United States registered or certified mail, return receipt requested, postage prepaid, or (d) telecopy (provided that such telecopy is confirmed by expedited delivery service or by mail in the manner previously described), sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided herein, or, in the case of telecopy, upon receipt.  Unless changed in accordance with the preceding sentence, the address for notices given pursuant to this Agreement shall be as follows:

If to LBHI or any Lehman Affiliate:  Lehman Brothers Holdings Inc.
                                     1271 Avenue of the Americas
                                     Forty-Sixth Floor
                                     New York, New York   10020

12595226\V-11

|  | Attn:  Mr. Steven Gorey |
|  | Telephone No. 646/333-8718 |
|  | Telecopy No. 212/520-0435 |

And to:                         Lehman Brothers Holdings Inc.
                               1271 Avenue of the Americas
                               Forty-Sixth Floor
                               New York, New York   10020
                               Attn:  Joelle Halperin, Esq.
                               Telephone No. 212/526-0170
                               Telecopy No. 646/834-0874

With a copy to:                Sonnenschein Nath & Rosenthal LLP
                               7800 Sears Tower
                               233 South Wacker Drive
                               Chicago, Illinois   60606-6404
                               Attn:  Linda D. White, Esq.
                               Telephone No. 312/876-8950
                               Telecopy No. 312/876-7934

If to any Kojaian Affiliate:   Kojaian Management Corporation
                               39400 Woodward Avenue
                               Suite 250
                               Bloomfield Hills, Michigan   48304
                               Attn:  Mr. C. Michael Kojaian
                               Telephone No. 248/644-7600
                               Telecopy No. 248/644-7620

With a copy to:                Barris, Sott, Denn & Driker, P.L.L.C.
                               211 West Fort Street
                               Fifteenth Floor
                               Detroit, Michigan   48226-3281
                               Attn:  William G. Barris, Esq.
                               Telephone No. 313/965-9725
                               Telecopy No. 313/983-3321

22.    _Entire Agreement_.  This Agreement (including all other documents delivered in connection herewith) embodies the entire agreement and understanding of the parties with respect to the transactions contemplated hereby, and supersedes all prior written or oral commitments, arrangements or understandings with respect thereto.  Notwithstanding the foregoing, following the date hereof and continued through and beyond the Closing Date, each of the respective Kojaian Affiliates and/or Lehman Affiliates, whichever the case may be, hereby agrees cooperate with all requests of the Kojaian Designee or Lehman Designee, as the case may be, to effectuate any of the

–21–

transactions contemplated by this Agreement and carry out the intent of this Agreement.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms or covenants hereof may be waived, only by a written instrument signed by all of the parties hereto, or in the case of a waiver, by the party waiving compliance.  This Agreement constitutes the binding, definitive written agreement between the parties hereto and hereby supersedes and wholly replaces that certain the letter of intent dated March 19, 2009.

23.    Evaluation of Agreements; Acknowledgment by the Kojaian Affiliates and Lehman. Each of the parties hereto has been represented and advised by legal counsel, certified public accountants and other business advisors of its choice in connection with its evaluation of, and the negotiations relating to, this Agreement and the transactions provided for herein.  Each of LBHI, PAMI, the Lehman Affiliates, the PAMI Affiliates, on the one hand,  and the Kojaian Affiliates, and such counsel, representatives and advisors have made such factual inquiries and other investigations as they deem appropriate to fully qualify themselves to be able to evaluate the acceptability and fairness of this Agreement and the transactions provided for herein.  Consequently, the terms and provisions of this Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties hereby expressly waive and disclaim in connection with the interpretation and construction of this Agreement, any rule of law or procedure requiring otherwise, including, without limitation, any rule of law to the effect that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the party whose attorney prepared this Agreement or any earlier draft of this Agreement.  In addition, each such party acknowledges that (i) it has given due consideration to the acceptability and fairness to it of this Agreement and the transactions provided for herein, and (ii) it has given due consideration to the advice of its counsel, accountants and advisors in deciding to execute and deliver this Agreement and all documents and instruments to be executed and delivered pursuant to this Agreement and to consummate the transaction contemplated by this Agreement.  Among other things, each such party has evaluated and compared (a) the value of (i) the Schedule A Joint Ventures and (ii) the value of the releases of the PAMI Guaranties, (iii) the value of the Mutual Release, and (iv) all the other benefits and consideration granted and parted with by each of the Kojaian Affiliates, CMK, MK or KMC in favor of Lehman and the Lehman Affiliates pursuant to this Agreement (collectively, the "Kojaian Value Conveyed"), and (b) the value of (i) the Schedule B Joint Ventures, (ii) the value of the Schedule D Joint Ventures, (iii) the value of the LBHI Mezzanine Loans, (iv) the value of the Mutual Release, and (v) all the other benefits and consideration granted to and obtained by the respective Kojaian Affiliates, CMK, MK and KMC pursuant to the terms of this Agreement (collectively, the "Kojaian Value Received"), and all of the parties hereto have determined the Kojaian Value Conveyed pursuant to this Agreement is not greater than the Kojaian Value Received pursuant to this Agreement, and that this Agreement and the transactions to be consummated pursuant hereto are fair and in the best interests of Lehman and the Kojaian Affiliates.

Moreover, each Kojaian Affiliate hereby represents and warrants to Lehman that (a) it is each fully aware and clearly understands all of the terms and provisions contained in this Agreement; (b) it is each fully aware and acknowledges that LBHI is not only the current "lender" to the Schedule A Joint Ventures and the Schedule D Joint Ventures, but also is the owner of an indirect

interest in many of the Joint Ventures; (c) it is fully aware and acknowledges that LBHI, as lender, may have distinct and divergent interests as lender to the Joint Ventures than it may have as an indirect owner of any Joint Venture, and, as such, may make decisions that are in LBHI's best interests, notwithstanding any consideration to the interests of any of the Joint Ventures, and that the same shall not give rise to any claims against LBHI; (d) it has voluntarily, with full knowledge and without coercion or duress of any kind, entered into this Agreement; and (e) it is not relying on any representation, whether written or oral, express or implied, made by Lehman, other than as set forth in this Agreement.

24.    <u>Time of Essence</u>.  Time is of the essence with respect to this Agreement.

25.    <u>Waiver of Breach</u>.  The failure of any party at any time or times to require performance of any provisions hereof shall in no manner affect that party's right at a later time to enforce the same.  No waiver by any party of the breach of any term or covenant shall be deemed to be, or construed as, a further or continuing waiver of any such breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

26.    <u>Governing Law</u>.  This Agreement shall be governed by the internal or domestic laws of the State of New York (without regard to laws that might be applicable under the principles of conflicts of law) as to all matters (except laws governing the conveyance or transfer of real estate that is located within the State of Michigan), including, but not limited to, matters of validity, construction, effect and performance.  Notwithstanding the foregoing, all parties agree that any legal action or proceeding against them with respect to their respective obligations under this Agreement shall be brought exclusively in the Circuit Court for New York County, New York or the U.S. Federal District Court in New York, New York (except to the extent such action or proceeding must, by law, be conducted in any court administering the bankruptcy proceeding pertaining to any party). Subject to the foregoing exception, each party submits to and accepts, for itself and its property, generally and unconditionally, the jurisdiction of those courts with regard to such action or proceeding and waives any claim that the State of New York is not a convenient forum or proper venue for such action or proceeding.

27.    <u>Severability</u>.  If any provision of this Agreement shall be invalid or enforceable to any extent or in any application, then the remainder of this Agreement, and such term and condition, except to such extent or in such application, shall not be affected thereby, and each and every term and condition of this Agreement shall be valid and enforced to the fullest extent and in the broadest application permitted by law.

28.    <u>Waiver of Trial by Jury</u>.  EACH PARTY HERETO AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, ANY COMMUNICATIONS OR NEGOTIATIONS.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH PARTY HERETO AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO TRIAL BY JURY WOULD OTHERWISE ACCRUE OR EXIST.  EACH PARTY HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS AGREEMENT IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTIES.

29.    <u>Attorneys' Fees and Expenses</u>.  In any legal proceedings brought by any party to this Agreement against any other party to this Agreement relating to any alleged misrepresentation, or any breach by such other party of its obligations hereunder, the prevailing party shall be entitled to recover its legal expenses from the other party.

30.    <u>2009 Income Tax Filing Preparation</u>.  Notwithstanding anything contained in this Agreement to the contrary, the parties hereto agree that any and all income tax returns and filings for each of the Joint Ventures pertaining to 2009 shall be prepared by the same accounting firm that prepare such tax returns and filings pertaining to 2008.  The costs and expenses of any such accounting, tax preparation and return filings shall be shared equally between the respective Lehman Affiliate and the respective Kojaian Affiliate.

31.    <u>Liability of Respective Signatories to this Agreement</u>.  It is agreed and understood by the parties hereto that each party executing this Agreement is signing solely with respect to its respective obligations, covenants, representations and/or warranties set forth in this Agreement and, (x) in the case of each of the Kojaian Affiliates, the Lehman Affiliates and the PAMI Affiliates, only as to the respective Joint Venture or Joint Ventures in which it owns a direct interest, (y) in the case of LBHI, only as a lender to any of the Joint Ventures or to any members of the Joint Ventures, and (z) in the case of PAMI and KMC only to the extent provided under its signature and that the fact that each party hereto has executed this Agreement does not create, imply or impose any additional liabilities beyond the respective obligations, covenants, representations and/or warranties set forth herein for such signatory; <u>provided</u>, <u>however</u>, that the foregoing shall in no manner limit any of the benefits specifically conferred by this Agreement on any of the aforesaid entities and each of the entities mentioned in this Section 31 shall be considered a beneficiary of this Agreement.

32.    <u>Exhibits and Schedules</u>.  The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

|     |     |     |
|-----|-----|-----|
| (a) | Exhibit 1 | List of Lehman Affiliates |
| (b) | Exhibit 2 | List of Kojaian Affiliates |
| (c) | Exhibit 3 | Form of Assignment Agreement |
| (d) | Exhibit 4 | Form of Assignment of Membership Interest |
| (e) | Exhibit 5 | Form of Covenant Deed |
| (f) | Exhibit 6 | List of Schedule A Joint Ventures |
| (g) | Exhibit 7 | List of Schedule B Joint Ventures |
| (h) | Exhibit 8 | List of Schedule D Joint Ventures |
| (i) | Exhibit 9 | Form of Assignment of Ground Lease |
| (j) | Exhibit 10 | Form of Assignment of Promissory Note |
| (k) | Exhibit 11 | Form of Assignment of Secured Note and Other Loan Documents |
| (l) | Exhibit 12 | List of Entities in which PAMI has Guaranteed Loans |
| (m) | Exhibit 13 | TTERTT Wire Instruction |

| (n) | Exhibit 14 | Legal Description of Travelers Tower I and Tower II Property |
| (o) | Exhibit 15 | Form of Option Agreement |
| (p) | Exhibit 16 | Form of Memorandum of Option Agreement |
| (q) | Exhibit 17 | NTH Consultants Phase I ESA Reports |
| (r) | Exhibit 18 | List of Schedule A Joint Venture Leases and Occupancy Agreements |
| (s) | Exhibit 19 | List of Schedule A Joint Venture Security Deposits |
| (t) | Exhibit 20 | List of Schedule A Joint Venture Contracts and Subcontracts |
| (u) | Exhibit 21 | List of Schedule A Joint Venture Pending Litigation and Claims |
| (v) | Exhibit 22 | List of Fees and Commissions due to Grubb & Ellis Management Services, Inc. and KMC |
| (w) | Exhibit 23 | Form of Mutual Release |
| (x) | Exhibit 24 | Northville and Cherry Creek Condo Association Defaults and Outstanding Assessment Due and Payable by Unit Owners |
| (y) | Exhibit 25 | Form of One Woodward Ground Lease Estoppel |
| (z) | Exhibit 26 | Schedule A Joint Venture Real Property Title Proformas |

33.   <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

34.   <u>Counterpart Execution</u>.  This Agreement may be executed in multiple counterparts, all of which, taken together, shall constitute one and the same agreement.  Signatures transmitted by electronic mail or facsimile shall be deemed and treated the same as original signatures.

–25–

IN WITNESS WHEREOF, the parties hereto have executed this Settlement Agreement as of the day and year first above written.

Signed:

**"LBHI":**

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
Name:_____ Jeffrey Fitts
Title:_____ Authorized Signatory


**"LEHMAN AFFILIATES":**

LB ALPHA TECH INC., a Delaware corporation

By: _____
    Its: _____
                        Jeffrey Fitts
                     Authorized Signatory

LB ALPHA TECH NORTH LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

       By: _____
           Its: _____ Jeffrey Fitts
                         Authorized Signatory

LB TWELVE MILE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

       By: _____
           Its: _____ Jeffrey Fitts
                         Authorized Signatory

(Signatures continued on following page)

LB MAPLE STEPHENSON LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By: _____

        Its _____
                Jeffrey Fitts
                Authorized Signatory


LB NEW VAN BUREN LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By: _____

        Its: _____
                Jeffrey Fitts
                Authorized Signatory


LB NORTHVILLE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By: _____

        Its: _____
                Jeffrey Fitts
                Authorized Signatory


(Signatures continued on following page)

12595226\V-11

LB SHELBY INDUSTRIAL INVESTORS LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

      By: _____
                       Jeffrey Fitts
      Its: _____
                       Authorized Signatory

LB SHELBY INDUSTRIAL INVESTORS III LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

      By: _____
      Its: _____
                       Jeffrey Fitts
                       Authorized Signatory

LB SHELBY INDUSTRIAL INVESTORS IV LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

      By: _____
      Its: _____
                       Jeffrey Fitts
                       Authorized Signatory

LB VENOY WICK LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

      By: _____
      Its: _____
                       Jeffrey Fitts
                       Authorized Signatory

(Signatures continued on following page)

12595226\V-11

LB 900 TOWER DRIVE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:_____

Its:_____

        Jeffrey Fitts
        Authorized Signatory

LB STONERIDGE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:_____

Its:_____

        Jeffrey Fitts
        Authorized Signatory

LB FARMINGTON HILLS II LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:_____

Its:_____

        Jeffrey Fitts
        Authorized Signatory

LB FARMINGTON HILLS V LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:_____

Its:_____

        Jeffrey Fitts
        Authorized Signatory

(Signatures continued on following page)

12595226\V-11

LB SMC/LIVONIA INC., a Delaware corporation

By: _____

Its: _____
Jeffrey Fitts
Authorized Signatory

LB BUSINESS PARK LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

By: _____

Its: _____
Jeffrey Fitts
Authorized Signatory

LB VAN BUREN INC., a Delaware corporation

By: _____

Its: _____
Jeffrey Fitts
Authorized Signatory

LW-LP, INC., a Delaware corporation

By: _____

Its: _____
Jeffrey Fitts
Authorized Signatory

LB BLOOMFIELD LLC, a Delaware limited liability company

By:   PAMI LLC, a Delaware limited liability company, Managing Member

By: _____
Jeffrey Fitts
Its: _____
Authorized Signatory

(Signatures continued on following page)

LB FARMINGTON HILLS LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Sole Member

By:    _____
       Jeffrey Fitts
Its:   _____
       Authorized Signatory


LB FARMINGTON HILLS IV LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:    _____
       Jeffrey Fitts
Its:   _____
       Authorized Signatory


LB MILFORD WEST LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:    _____
Its:   _____
       Jeffrey Fitts
       Authorized Signatory

TTERTT ASSOCIATES, L.L.C., a Delaware limited liability company

By:    LB TTERTT Inc., Managing Member

By:    _____
Its:   _____
       Jeffrey Fitts
       Authorized Signatory


(Signatures continued on following page)

12595226\V-11

–31–

**"PAMI":**

PROPERTY ASSET MANAGEMENT INC., a
Delaware corporation

By: _____

Its: _____
        Jeffrey Fitts
        Authorized Signatory

**[NOTE:** Property Asset Management Inc. is
executing this Settlement Agreement solely in its
capacity as a member of K/LB Funding, LLC and any
obligations, covenants, representations or warranties
of Property Asset Management Inc. set forth in the
foregoing Agreement shall be expressly limited to its
undertakings as a member of K/LB Funding and do
not and shall not create, imply or impose on Property
Asset Management Inc. any additional liabilities
beyond such obligations, covenants, representations
and/or warranties.]

(Signatures continued on following page)

12595226\V-11

–32–

**"PAMI AFFILIATES":**

PAMI MICHIGAN INC., a Delaware corporation

By: _____

Its: _____
        Jeffrey Fitts
        Authorized Signatory

PAMI MICHIGAN MEZZANINE II LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

       By: _____
                    Jeffrey Fitts
       Its: _____
                  Authorized Signatory

(Signatures continued on following page)

"KOJAIAN AFFILIATES":

KOJAIAN ALPHA DRIVE ASSOCIATES, L.L.C., a
Michigan limited liability company

By:    KOJAIAN ALPHA DRIVE ASSOCIATES-
       MM INC., a Michigan corporation, Manager

       By:    _____
              C. Michael Kojaian, Vice President

KOJAIAN ALPHA DRIVE ASSOCIATES-NORTH,
L.L.C., a Michigan limited liability company

By:    KOJAIAN ALPHA DRIVE ASSOCIATES
       NORTH-MM INC., a Michigan corporation,
       Manager

       By:    _____
              C. Michael Kojaian, Vice President

HAMLIN    DEVELOPMENT    ASSOCIATES
LIMITED PARTNERSHIP, a Michigan limited
partnership

By:    HAMLIN INVESTMENT CORPORATION,
       a Michigan corporation, General Partner

       By:    _____
              C. Michael Kojaian, Vice President

KOJAIAN TWELVE MILE ASSOCIATES, L.L.C., a
Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan
       limited liability company, Managing Member

       By:    KOJAIAN VENTURES-MM INC., a
              Michigan corporation, Manager

              By:    _____
                     C. Michael Kojaian, President

(Signatures continued on following page)

–34–

12595226\V-10

KOJAIAN          MAPLE          STEPHENSON
DEVELOPMENT   ASSOCIATES,   L.L.C.,   a
Michigan limited liability company

By:   KOJAIAN VENTURES, L.L.C., a Michigan
      limited liability company, Managing Member

      By:   KOJAIAN VENTURES-MM INC., a
            Michigan corporation, Manager

            By:   _____
                  C. Michael Kojaian, President


NEW VBI INVESTORS, L.L.C., a Michigan limited
liability company

By:   NEW     VAN     BUREN     INDUSTRIAL
      INVESTORS-MM,   INC.,   a   Michigan
      corporation, Manager

      By:   _____
            C. Michael Kojaian, Vice President


KOJAIAN II INDUSTRIAL INVESTORS, L.L.C., a
Michigan limited liability company

By:   KOJAIAN II INDUSTRIAL INVESTORS-
      MM,   INC.,   a   Michigan   corporation,
      Operations Manager

      By:   _____
            C. Michael Kojaian, Vice President


(Signatures continued on following page)

12595226\V-10

KOJAIAN NORTHVILLE TECHNOLOGY PARK
ASSOCIATES, L.L.C., a Michigan limited liability
company

By:    KOJAIAN NORTHVILLE TECHNOLOGY
       PARK-MM, INC., a Michigan corporation,
       Manager

       By:    _____
              C. Michael Kojaian, Vice President


ONE WOODWARD AVENUE ASSOCIATES
LIMITED PARTNERSHIP, a Michigan limited
partnership

By:    WOODWARD    JEFFERSON,    INC.,    a
       Michigan corporation, General Partner

       By:    _____
              C. Michael Kojaian, Vice President


SHELBY INDUSTRIAL INVESTORS, L.L.C., a
Michigan limited liability company

By:    SHELBY INDUSTRIAL INVESTORS-MM,
       INC., a Michigan corporation, Manager

       By:    _____
              C. Michael Kojaian, Vice President


KOJAIAN SHELBY INDUSTRIAL INVESTORS-II,
L.L.C., a Michigan limited liability company

By:    KOJAIAN    SHELBY    INDUSTRIAL
       INVESTORS-MM, INC., a Michigan
       corporation, Manager

       By:    _____
              C. Michael Kojaian, Vice President


(Signatures continued on following page)

–36–

1259522GV-10

KOJAIAN SHELBY III INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN SHELBY III INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

By:   _____
      C. Michael Kojaian, Vice President

KOJAIAN SHELBY IV INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN SHELBY IV INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

By:   _____
      C. Michael Kojaian, Vice President

KOJAIAN VENOY WICK DEVELOPMENT ASSOCIATES, L.L.C., a Michigan limited liability company

By:   KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

      By:   KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

            By:   _____
                  C. Michael Kojaian, President

(Signatures continued on following page)

12595226\V-10

KOJAIAN 900 TDA ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN 900 TDA-MM, INC., a Michigan corporation, Manager

      By:    _____
              C. Michael Kojaian, Vice President

2100 WOODWARD GP, INC., a Michigan corporation

By: _____
      C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-II, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-II MM, INC., a Michigan corporation, Manager

      By:    _____
              C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON-II SPE, INC., a Michigan corporation

By: _____
      C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS V CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS V CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

      By: _____
              C. Michael Kojaian, Vice President

(Signatures continued on following page)

–38–

VPA ASSOCIATES, L.L.C., a Michigan limited liability company

By:   VICTOR PARKWAY GP, INC., a Michigan corporation, Manager

      By:   _____
              C. Michael Kojaian, Vice President

KOJAIAN SMC-SPE, INC., a Michigan corporation

By:_____
          C. Michael Kojaian, President

KOJAIAN SEVEN CROSSING, L.L.C., a Michigan limited liability company

By:   KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

      By:   KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

         By:   _____
               C. Michael Kojaian, President

TCC ASSOCIATES, L.L.C., Michigan limited liability company

By:   TROY CORPORATE CENTER, INC., a Michigan corporation, Manager

      By:_____
          C. Michael Kojaian, Vice President

(Signatures continued on following page)

12595226\V-10

—39—

KOJAIAN VAN BUREN BUSINESS PARK
ASSOCIATES, L.L.C., a Michigan limited liability
company

By:    KOJAIAN VENTURES, L.L.C., a Michigan
limited liability company, Manager

By:    KOJAIAN VENTURES-MM, INC., a
Michigan corporation, Manager

By:    _____
C. Michael Kojaian, President


VBI INVESTORS, L.L.C., a Michigan limited
liability company

By:    VAN BUREN INDUSTRIAL INVESTORS-
MM, INC., a Michigan corporation, Manager

By:    _____
C. Michael Kojaian, Vice President


KOJAIAN BLOOMFIELD ASSOCIATES, L.L.C., a
Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan
limited liability company, Managing Member

By:    KOJAIAN VENTURES-MM, INC., a
Michigan corporation, Manager

By:    _____
C. Michael Kojaian, President


(Signatures continued on following page)

12595226\V-10

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN   FARMINGTON   HILLS CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

       By:   _____
              C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS IV CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN   FARMINGTON   HILLS   IV CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

       By:   _____
              C. Michael Kojaian, Vice President

KOJAIAN   MILFORD   ROAD   WEST DEVELOPMENT ASSOCIATES, L.L.C., a Michigan limited liability company

By:   KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

       By:   KOJAIAN VENTURES-MM, INC., a Michigan corporation, Manager

          By:   _____
                C. Michael Kojaian, President

(Signatures continued on following page)

12595226\W-10

**"KMC":**

KOJAIAN MANAGEMENT CORPORATION, a
Michigan corporation

By: _____
        C. Michael Kojaian, Executive Vice President

**[NOTE:**    Kojaian Management Corporation is
executing this Settlement Agreement solely in its
capacity as a member of K/LB Funding, LLC and any
obligations, covenants, representations or warranties
of Kojaian Management Corporation set forth in the
foregoing Agreement shall be expressly limited to its
undertakings as a member of K/LB Funding and do
not and shall not create, imply or impose on Kojaian
Management Corporate any additional liabilities
beyond such obligations, covenants, representations
and/or warranties.]

J2595226\V-10

## **Exhibit 1**

### List of Lehman Affiliates

1. LB 900 Tower Drive LLC, a Delaware limited liability company
2. LB Alpha Tech Inc., a Delaware corporation
3. LB Alpha Tech North LLC, a Delaware limited liability company
4. LB Bloomfield LLC, a Delaware limited liability company
5. LB Business Park LLC, a Delaware limited liability company
6. LB Farmington Hills LLC, a Delaware limited liability company
7. LB Farmington Hills II, LLC, a Delaware limited liability company
8. LB Farmington Hills IV LLC, a Delaware limited liability company
9. LB Farmington Hills V LLC, a Delaware limited liability company
10. LB Maple Stephenson LLC, a Delaware limited liability company
11. LB Milford West LLC, a Delaware limited liability company
12. LB New Van Buren LLC, a Delaware limited liability company
13. LB Northville LLC, a Delaware limited liability company
14. LB Shelby Industrial Investors LLC, a Delaware limited liability company
15. LB Shelby Industrial Investors III LLC, a Delaware limited liability company
16. LB Shelby Industrial Investors IV LLC, a Delaware limited liability company
17. LB SMC/Livonia Inc., a Delaware corporation
18. LB Stoneridge, LLC, a Delaware limited liability company
19. LB Twelve Mile LLC, a Delaware limited liability company
20. LB Van Buren, Inc., a Delaware corporation
21. LB Venoy Wick LLC, a Delaware limited liability company
22. LW-LP, Inc., a Delaware corporation
23. TTERTT Associates, L.L.C., a Delaware limited liability company

12595226\V-11

## Exhibit 2

### List of Kojaian Affiliates

1.     Hamlin Development Associates Limited Partnership, a Michigan limited partnership
2.     Kojaian Alpha Drive Associates, L.L.C., a Michigan limited liability company
3.     Kojaian Alpha Drive Associates-North, L.L.C., a Michigan limited liability company
4.     Kojaian Bloomfield Associates, L.L.C., a Michigan limited liability company
5.     Kojaian Farmington Hills Corporate Investors, L.L.C., a Michigan limited liability company
6.     Kojaian Farmington Hills IV Corporate Investors, L.L.C., a Michigan limited liability company
7.     Kojaian II Industrial Investors, L.L.C., a Michigan limited liability company
8.     Kojaian Management Corporation, a Michigan corporation
9.     Kojaian Maple Stephenson Development Associates L.L.C., a Michigan limited liability company
10.    Kojaian Milford Road West Development Associates, L.L.C., a Michigan limited liability company
11.    Kojaian Northville Technology Park Associates, L.L.C., a Michigan limited liability company
12.    Kojaian Shelby Industrial Investors-II, L.L.C., a Michigan limited liability company
13.    Kojaian Shelby III Industrial Investors, L.L.C., a Michigan limited liability company
14.    Kojaian Shelby IV Industrial Investors, L.L.C., a Michigan limited liability company
15.    Kojaian Twelve Mile Associates, L.L.C., a Michigan limited liability company
16.    Kojaian Venoy Wick Development Associates, L.L.C., a Michigan limited liability company
17.    New VBI Investors, L.L.C., a Michigan limited liability company
18.    One Woodward Avenue Associates Limited Partnership, a Michigan limited partnership
19.    Shelby Industrial Investors, L.L.C., a Michigan limited liability company
20.    VPA Associates, L.L.C., a Michigan limited liability company
21.    Kojaian 900 TDA Associates, L.L.C., a Michigan limited liability company
22.    2100 Woodward GP, INC., a Michigan corporation
23.    Kojaian Farmington Hills Corporate Investors-II, L.L.C., a Michigan limited liability company
24.    Kojaian Farmington-II SPE, INC., a Michigan corporation
25.    Kojaian Farmington Hills V Corporate Investors, L.L.C., a Michigan limited liability company
26.    Kojaian SMC-SPE, INC., a Michigan corporation
27.    Kojaian Seven Crossing, L.L.C., a Michigan limited liability company
28.    TCC Associates, L.L.C., Michigan limited liability company
29.    Kojaian Van Buren Business Park Associates, L.L.C., a Michigan limited liability company
30.    VBI Investors, L.L.C., a Michigan limited liability company

12595226\V-11

## Exhibit 3

Form of Assignment Agreement

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "Assignment") is made this ___ day of _____, 2009 (the "Effective Date"), from _____, a _____, whose address is _____ (hereinafter called "Assignor"), to _____, a _____, whose address is 39400 Woodward Avenue, Suite 250, Bloomfield Hills, Michigan 48304-5155 (hereinafter called "Assignee").

W I T N E S S E T H :

The following is a recital of facts underlying this Assignment:

A.    Concurrently with the execution and delivery of this Assignment, Assignor is conveying to Assignee, by Covenant Deed (the "Deed"), that certain tract of land (the "Land") more particularly described on **Exhibit A** attached hereto and made a part hereof for all purposes, together with the improvements located thereon (the "Improvements").

B.    Assignor desires to assign, transfer and convey to Assignee, and Assignee desires to obtain, all of Assignor's right, title and interest in and to the Leases, Operating Agreements, Personal Property, Warranties and Intangibles (as hereinafter defined), subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration to Assignor in hand paid by Assignee, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, convey, transfer, set over and deliver to Assignee all of Assignor's right, title and interest in and to the following:

(a)    all written agreements pursuant to which any portion of the Land or Improvements is occupied by anyone other than Assignor (collectively, the "Leases"), including, without limitation, the Leases more particularly described on **Exhibit B** attached hereto, and Assignor represents that said Leases constitute all of the written leases pursuant to which tenants have the right to occupy any portion of such Land or Improvements and that there are no other agreements, whether written or oral, permitting any person or entity to occupy any portion of such Land or Improvements;

(b)    all monies held by Trimont Real Estate Advisors ("Trimont") relating to the Property, and (ii) the remaining tenant security deposit monies currently held on behalf of

−45−

tenants at the Property as such remaining tenant security deposits are more particularly scheduled on **Exhibit C** attached hereto;

(c)        all of those contracts itemized in **Exhibit D** attached hereto (collectively, the "Operating Agreements"); provided, however, that Assignor makes no representation or warranty with respect to the assignability of any of the Operating Agreements; and provided, further, that Assignor represents that said Operating Agreements constitute all of the agreements, written or oral, pursuant to which services are provided to the Land and Improvements.

(d)        the personal property and fixtures owned by Assignor upon the Land or within the Improvements, including specifically, without limitation, heating, ventilation and air conditioning systems and equipment, appliances, furniture, carpeting, draperies and curtains, tools and supplies and other items of personal property used in connection with the operation of the Land and the Improvements (collectively, the "Personal Property");

(e)        all of Assignor's right, title and interest, if any, in and to all warranties and guaranties (express or implied) issued to Assignor in connection with the Improvements or the Personal Property (collectively, the "Warranties"); provided, however, that Assignor makes no representation or warranty with respect to the existence, availability or assignability of any Warranties; and

(f)        all of Assignor's right, title and interest, if any, (i) to connect with and to utilize any private or public utility facilities now or hereafter serving the Land, to the extent transferable, (ii) in and to all licenses, permits, certificates of occupancy and governmental approvals with respect to the Land or the Improvements, and all development and similar agreements relating to governmental permits or utility services relating thereto, to the extent transferable, (iii) in and to the building names and assumed names associated with the Improvements, (iv) **[FOR ONE WOODWARD ONLY** in and to any bonds, if any, posted with the City of Detroit or any other governmental agency relating to the Land, and (v)**]** in and to all plans and specifications, if any, in Assignor's possession, for the Improvements, to the extent transferable (collectively, the "Intangibles").

All representations, warranties, covenants and agreements of each party hereto contained in this Assignment, or in any exhibit or document delivered pursuant hereto, shall survive the execution and delivery of this Agreement.

Subject to the representations and warranties set forth in this Assignment **[,] [and] those** representations and warranties made by Assignor under that certain Settlement Agreement dated as of _____, 2009 **[and the indemnities to be provided for pursuant to the terms of Section 12 of the Settlement Agreement - DO NOT INCLUDE IN TRANSFERS TO KOJAIAN DESIGNEES]**, by execution of this Assignment, (x) Assignee assumes and agrees to perform all of the covenants, agreements and obligations under the Leases and the Operating Agreements binding

–46–

on Assignor or the Land, the Improvements or the Personal Property (such covenants, agreements and obligations being herein collectively referred to as the "Contractual Obligations"), as such Contractual Obligations shall arise or accrue from and after the date of this Assignment, and (y) Assignee hereby agrees to indemnify, hold harmless and defend Assignor from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Contractual Obligations that are attributable to the period of time from and after the date of this Assignment.

Assignor agrees to indemnify, hold harmless and defend Assignee from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Contractual Obligations that are attributable to the period of time prior to the date of this Assignment.

TO HAVE AND TO HOLD the Leases, Operating Agreements, Personal Property, Warranties and Intangibles unto Assignee, its successors and assigns, forever.

This Assignment shall inure to the benefit of, and be binding upon, Assignor and Assignee, and their respective successors and assigns.

This Assignment shall be governed by the laws of the State of New York without regard to its conflict of laws rules.

This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement as of the day and year first above written.

Signed:

[Signature block for Assignor]

By:    _____
        Its: _____

                        "Assignor"

[Signature block for Assignee]

By:    _____
        Its: _____
                        "Assignee"

–47–

12595226\V-11

STATE OF _____                    )
                                              ) ss.
COUNTY OF _____                     )


      The foregoing instrument was acknowledged before me this ___ day of _____, 2009, by
_____, the _____ of _____
_____, a _____, on
behalf of said _____.


                                                    _____

                                                    Notary Public, County of _____, State of_____
                                                    My Comm. Expires: _____


STATE OF MICHIGAN          )
                           ) ss.
COUNTY OF OAKLAND          )


      The foregoing instrument was acknowledged before me this ___ day of _____, 2009, by
_____, a _____ of
_____, a _____, on behalf of said _____.


                                                      _____

                                                    Notary Public, _____ County, Michigan
                                                    My Comm. Expires: _____

12595226\V-11

Exhibit A

Legal Description of Real Estate

<u>Exhibit B</u>

<u>Schedule of Leases</u>

12595226\V-11

<u>Exhibit C</u>

<u>Tenant Security Deposits Dollars Transferred to Assignee</u>

12595226\V-11

<u>Exhibit D</u>

<u>Schedule of Operating Agreements</u>

12595226\V-11

**Exhibit 4**

Form of Assignment of Membership Interest

**ASSIGNMENT OF MEMBERSHIP INTEREST**

THIS ASSIGNMENT (the "Assignment") is made and entered into by and between
_____, a _____(hereinafter, and together with its
successors and assigns, referred to as the "Assignor"), and _____, a
_____ (hereinafter, and together with its successors and assigns, referred to as
the "Assignee").

# RECITALS

A.    Assignor is a member of, and holds a _____% [managing] membership interest **[and
a _____% non-managing membership interest] ([collectively,]** the "Membership Interest") in,
_____, a _____ limited liability company (the
"Company"), existing under and evidenced by a Limited Liability Company Operating Agreement of
Company dated as of _____ (the "Operating Agreement"), by and among Assignor
and _____;

B.    Assignor desires to assign, transfer and convey all of its right, title and interest in and
to the Membership Interest to Assignee, as such interest is described in the Operating Agreement,
and withdraw as a Member of the Company; and

C.    Assignee desires to accept the assignment, transfer and conveyance of the
Membership Interest and to be admitted to the Company as a substituted Member in the Company in
the place and stead of Assignor.

**NOW, THEREFORE**, Assignor and Assignee agree as follows:

**SECTION 1.  Incorporation of Recitals.**   The foregoing recital of facts is incorporated
herein by reference and shall be deemed a part of this Assignment.

**SECTION 2.  Assignment of Membership Interest.**   For One ($1.00) Dollar and other
good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and
effective for all purposes as of the date of this Assignment, Assignor hereby sells, assigns, transfers
and conveys to Assignee all of Assignor's right, title and interest in and to the Membership Interest
and all of its rights under the Operating Agreement, including, without limitation, (i) all rights of
Assignor to receive monies and other property or assets which may have heretofore accrued and/or
which may now be due or which may hereafter become due to Assignor under or pursuant to the
Operating Agreement, including, but not limited to, preferred equity, if any, contributed by Assignor
to Company, together with any and all right to the repayment thereof and any interest or other return

–53–

thereon, (ii) all claims of Assignor for damages arising out of or for breach of or default under the Operating Agreement, (iii) all rights of Assignor to receive proceeds or benefit of any indemnity, warranty or other payments with respect to the Operating Agreement, and (iv) all rights of Assignor to perform thereunder and to compel performance and otherwise exercise all remedies thereunder. Subject to the representations and warranties set forth in this Assignment **[,] [and]**, those representations and warranties made by Assignor under that certain Settlement Agreement dated as of _____, 2009 (the "Settlement Agreement") **[and the indemnities provided by Assignor pursuant to Section 12 of the Settlement Agreement - DO NOT INCLUDE IN TRANSFERS TO KOJAIAN DESIGNEES]**, Assignee hereby accepts from Assignor the Membership Interest as of the date of this Assignment and assumes all covenants, conditions, obligations, liabilities and responsibilities required to be kept, performed and fulfilled by Assignor with respect to the Membership Interest arising and accruing from and after the date of this Assignment and agrees to become a substituted Member of the Company in the place and stead of Assignor.

### SECTION 3.  Indemnity.

(a)    Subject to the representations and warranties set forth in this Assignment, **[,] [and]** those representations and warranties made by Assignor under the Settlement Agreement **[and the indemnities provided by Assignor - DO NOT INCLUDE IN TRANSFERS TO KOJAIAN DESIGNEES]** pursuant to the terms of Section 12 of the Settlement Agreement, by execution of this Assignment, Assignee agrees to indemnify, defend and hold Assignor harmless from and against all liabilities, claims, demands and expenses of any kind or nature, known or unknown, fixed or contingent, relating to the Membership Interest, and all reasonable, out-of-pocket expenses related thereto, including, without limitation, court costs and reasonable attorneys' fees, to the extent arising or accruing on or after the date of this Assignment.

(b)    Assignor agrees to indemnify, defend and hold Assignee harmless from and against all liabilities, claims, demands and expenses of any kind or nature, known or unknown, fixed or contingent, relating to the Membership Interest, and all reasonable, out-of-pocket expenses related thereto, including, without limitation, court costs and reasonable attorneys' fees, to the extent arising or accruing prior to the date of this Assignment.

### SECTION 4.  Representations and Warranties.  Assignor hereby represents and warrants to and for the benefit of Assignee that: (a) Assignor is the sole owner of the Membership Interests, free and clear of any and all restrictions, security interests, liens, encumbrances and claims whatsoever; (b) Assignor has the power to make this Assignment; (c) this Assignment has been or will be duly authorized by _____; (d) Assignor's interests in the Company consist of a _____ percent (_____%) interest as member in the Company, including the same percentage interest in all distributions by the Company to its members of cash or other property, whether in complete or partial liquidation or otherwise; and (e) upon the transfer of the Membership Interests from Assignor to Assignee, Assignor shall have no other interests in the Company.

**SECTION 5. Survival.**  All representations, warranties, covenants and agreements of each party hereto contained in this Assignment, or in any exhibit or document delivered pursuant hereto, shall survive the execution and delivery of this Assignment.

**SECTION 6.  Admission as a Substituted Member.**  Assignee is hereby admitted to the Company as a substituted Member having, in the aggregate, the same rights and percentage interest as Assignor with respect to its Membership Interest.  Assignee hereby agrees to be bound by the terms and conditions of the Operating Agreement as if it had been a party which had joined in the execution thereof with respect to the transferred Membership Interest.

**SECTION 7. Withdrawal.**  Assignor hereby withdraws from the Company and is no longer a Member in the Company.

**SECTION 8.  Effect of Withdrawal and Substitution.**  From and after the effective date hereof, the portion of the Profits or Losses of the Company and the portions of all other items of income, gain, loss, deduction or credit allocable to the Membership Interest on or after such date shall be credited or charged, as the case may be, to Assignee and not to Assignor.  Assignee shall be entitled to all distributions or payments in respect of the Membership Interest accruing on or after the effective date hereof, regardless of the source of those distributions or payments.  Nothing in this Assignment will affect the allocation to Assignor of Profits, Losses and other items of income, gain, loss, deduction or credit allocable to its Membership Interest and attributable to any period before the effective date hereof or any distribution or payments made to Assignor in respect of its Membership Interest before such date.

**SECTION 9.  Successors and Assigns.**  This Assignment shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

**SECTION 10.  Governing Law.**  This Assignment will be governed by the laws of the State of New York, without giving effect to principles of conflict of laws of that State.

**SECTION 11.  Counterpart Execution.**  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.

**SECTION 12.  Non-Merger Provisions.**  Anything in this Assignment to the contrary notwithstanding, it is the express intention of Assignor and Assignee that, in the event that Assignee or any entity affiliated with Assignee is the holder of a mortgage encumbering the real property owned by the Company, this Assignment shall not result in or cause the merger of the fee interest and either the mortgagee's interest in the real property owned by the Company or the existing mortgage encumbering the real property owned by the Company, which will remain a separate and distinct lien on such real property owned by the Company.  [<u>NOTE:  Only in Assignments to Lehman Designees</u>]

**SECTION 13.  Consent and Acknowledgment of Members and Kojaian Management Corporation.**  This Assignment and the effectiveness thereof is conditioned upon the full execution and delivery to Assignee of: (i) the Consent to Assignment by the non-transferring member of the Company substantially in the form attached hereto, and (ii) the Acknowledgment of Kojaian Management Corporation substantially in the form attached hereto.  [NOTE:  Only in Assignments to Lehman Designees]

[Balance of page left intentionally blank]

12595226\V-11

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment, as of the
_____ day of _____, 2009, to be effective as of such date.

Signed:

[Signature block for Assignor]

By:    _____

Its:    _____

"Assignor"

[Signature block for Assignee]

By:    _____

Its:    _____

"Assignee"

(Consent to Assignment on following page)

–57–

<u>Consent to Assignment</u>

        The undersigned, in its own capacity and in its capacity as a Managing Member of Company, on behalf of Company, does hereby (i) acknowledge and consent to the assignment by _____, a_____, to _____, a _____, of a _____% [managing] membership interest in _____ _____, a _____ limited liability company, in accordance with the terms and conditions set forth in the foregoing Assignment, and (ii) waive any and all rights it may have to purchase the Membership Interest as provided in the Operating Agreement.  The undersigned agrees that, to the extent this Assignment violates or would violate any provision of the Operating Agreement enforceable by the undersigned against Assignor, the undersigned hereby waives the necessity of Assignor's compliance with said provisions and the undersigned's right to enforce such provisions, in each case solely with respect to this Assignment.

        Signed:

        [Signature block for Managing Member]

        By:   _____

        Its:   _____

<u>Acknowledgment of Kojaian Management Corporation</u>

        The undersigned, Kojaian Management Corporation, a Michigan corporation ("<u>KMC</u>"), does hereby (i) acknowledge and consent to the assignment by _____, a _____, to _____, a _____, of a _____% managing membership interest in _____ _____, a _____ limited liability company, in accordance with the terms and conditions set forth in the foregoing Assignment, and (ii) confirm that it does not have any outstanding loans to or from the Company, (iii) acknowledge that it shall no longer provide any asset management services to or on behalf of the Company, (iv) confirm that it is not currently owed any fees, expense reimbursements or other sums of money from the Company, (v) waive any and all rights or claims that it may have to receive monies and/or other property which may have heretofore accrued and/or which may now be due or which may hereafter become due to KMC under or pursuant to the Operating Agreement or any asset management agreement, including, but not limited to, any asset management fees or expense reimbursements, together with any and all right to the repayment thereof and any interest or other return thereon [<u>NOTE:  but not commissions per</u>

12595226\V-11

schedule], and (ii) any and all claims of KMC for damages arising out of or for breach of or default under the Operating Agreement or any asset management agreement. [NOTE: Only in Assignments to Lehman Designees.].

Signed:

KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation

Dated: _____, 2009          By: _____

                                            C. Michael Kojaian
                                            Executive Vice President

–59–

## Exhibit 5

Form of Covenant Deed

## COVENANT DEED

THIS INDENTURE, is made this ____ day of _____, 2009, between _____, a _____, whose address is _____ (hereinafter called "Grantor"), and _____, a _____, whose address is _____ (hereinafter called "Grantee").

W I T N E S S E T H :

That Grantor, for and in consideration of One ($1.00) Dollar, to it in hand paid by Grantee, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey to Grantee that certain real property situated in the _____ of _____, County of _____ and State of Michigan, more particularly described in Exhibit A attached hereto and made a part hereof, together with all and singular the rights, tenements, hereditaments, privileges and appurtenances thereunto belonging or in anywise appertaining, including any right, title and interest of Grantor in and to adjacent streets, alleys, easements and rights-of-way, subject to all easements and restrictions, if any, affecting such property (the "Premises"), and all of the estate, right, title, interest, claim or demand whatsoever of Grantor, either in law or in equity, of, in and to the above-described Premises.

Subject to those matters (the "Permitted Exceptions") set forth on Exhibit B attached hereto and made a part hereof.

**[Anything in this Deed to the contrary notwithstanding, it is the express intention of Grantor and Grantee that, in the event that Grantee or any entity affiliated with Grantee is the holder of a mortgage encumbering the Premises, this Deed shall not result in or cause the merger of the fee interest and either the mortgagee's interest in the Premises or the existing mortgage encumbering the Premises, which will remain a separate and distinct lien on the Premises.]**

[NOTE:  **THIS PARAGRAPH IS TO BE INSERTED FOR ONLY UNPLATTED PROPERTY**:  Grantor grants to Grantee the right to make all allowable divisions under the land division act, Act No. 288 of the Public Acts of 1967, as amended.  This property may be located within the vicinity of farmland or a farm operation.  Generally accepted agricultural and management practices which may generate noise, dust, odors and other associated conditions may be used and are protected by the Michigan right to farm act.]

–60–

TO HAVE AND TO HOLD the Premises unto Grantee forever, and Grantor does hereby covenant and agree with Grantee that Grantor has not heretofore done, committed or wittingly or willingly suffered to be done or committed any act, matter or thing whatsoever whereby the Premises are or shall be charged or encumbered in title, estate or otherwise howsoever.

IN WITNESS WHEREOF, Grantor has executed this Covenant Deed as of the day and year first above written.

Signed:

[Signature block for Grantor]

By: _____

Its: _____

STATE OF _____    )
                             ) ss.
COUNTY OF _____    )

The foregoing instrument was acknowledged before me this ___ day of _____, 2009, by _____, the _____ of _____, a _____, on behalf of said _____.

_____

Notary Public, County of _____, State of _____
My Comm. Expires: _____

INSTRUMENT DRAFTED BY:

William G. Barris, Esq.
Barris, Sott, Denn & Driker, P.L.L.C.
211 West Fort Street
Fifteenth Floor
Detroit, Michigan 48226-3281

WHEN RECORDED RETURN TO:

Linda D. White, Esq.

12595226\V-11

SONNENSCHEIN NATH & ROSENTHAL LLP
233. S. Wacker Drive
Suite 7800
Chicago, Illinois 60606

Exhibit A

Legal Description of Real Estate

−63−

Exhibit B

Schedule of Permitted Exceptions

**Exhibit 6**

List of Schedule A Joint Ventures

1.     Alpha Drive Development Associates, L.L.C.
2.     Alpha Drive Development Associates-North, L.L.C.
3.     Hamlin Development Associates Limited Partnership
4.     K/LB Twelve Mile Associates, L.L.C.
5.     Maple Stephenson Development Associates, L.L.C.
6.     New Van Buren Industrial Investors, L.L.C.
7.     New West Michigan II Industrial Investors, L.L.C.
8.     Northville Technology Park Associates, L.L.C.
9.     One Woodward Avenue Associates Limited Partnership
10.    Shelby Industrial Investors, L.L.C.
11.    Shelby Industrial Investors-II, L.L.C.
12.    Shelby III Industrial Investors, L.L.C.
13.    Shelby IV Industrial Investors, L.L.C.
14.    Venoy Wick Development Associates, L.L.C.

12595226\V-11

**Exhibit 7**

<u>List of Schedule B Joint Ventures</u>

1.   900 Tower Drive Associates, L.L.C.
2.   2100 Woodward Associates, L.L.C.
3.   Farmington Hills Corporate Investors-II, L.L.C.
4.   Farmington Hills V Corporate Investors, L.L.C.
5.   K/LB Mineral Holdings, L.L.C.
6.   SMC Investors, L.L.C.
7.   SMC Mezzanine Associates, L.L.C.
8.   Troy Corporate Center Associates, L.L.C.
9.   Van Buren Business Park Associates, L.L.C.
10.  Van Buren Industrial Investors, L.L.C.

12595226\V-11

## **Exhibit 8**

List of Schedule D Joint Ventures

1.    Farmington Hills Corporate Investors, L.L.C.
2.    Farmington Hills IV Corporate Investors, L.L.C.
3.    K/LB Bloomfield Associates, L.L.C.
4.    Milford Road West Development Associates, L.L.C.
5.    K/LB Funding, L.L.C.

**Exhibit 9**

Form of Assignment of Ground Lease

## ASSIGNMENT AND ASSUMPTION OF GROUND LEASES

     **THIS ASSIGNMENT AND ASSUMPTION OF GROUND LEASES** (this "Assignment")**,** dated as of the ___th day of _____, 2009, by and between **ONE WOODWARD AVENUE ASSOCIATES LIMITED PARTNERSHIP,** a Michigan limited partnership, whose address is 39400 Woodward Avenue, Suite 250, Bloomfield Hills, Michigan  48304 (hereinafter a called "Assignor") and _____, a _____, whose address is _____ (together with its successors and assigns hereinafter collectively called "Assignee").

     In consideration of Ten Dollars ($10.00) lawful money of the United States and other valuable consideration paid by Assignee, the receipt of which is hereby acknowledged by Assignor, Assignor assigns and transfers to Assignee, its successors and assigns, all of Assignor's right, title and interest in, to and under and, subject to the terms of this Assignment, Assignee accepts and assumes, all of Assignor's right, title and interest in, to and under:

     As to Parcel B (legally described on Schedule A)

     The Lease by Lawrence E. Burch, Joan E. Thuma (surviving spouse of John J. Thuma), Maureen Young, Anne E. Bricker, Judith M. Torres, Nancy G. Griffith, Katherine J. Gohsman, Edwina L. Molloseau, Timothy Grant LaVere and Richard Frederick LaVere, Ulysses Grant Burch II and Marilyn G. Burch, Zondra Taylor, Gerald Grant Matthews, Marilyn Joyce Dock, Jill R. Thuma and Brett D. dated April 12, 1916 and recorded April 12, 1916 in Liber 1057, Page 333; and assigned by unrecorded letter agreement dated January 6, 1959; and amended by Amendment to Lease dated March 3, 1959 and recorded March 9, 1959 in Liber 13890, Page 398; and assigned by Assignment of Lease recorded March 27, 1935 in Liber 4370, Page 250; and amended by Option to Renew Lease dated January 6, 1959 and recorded January 20, 1959 in Liber 13854, Page 150; and assigned by Assignments of Lease recorded February 11, 1959 in Liber 13870, Page 929, recorded October 4, 1960 in Liber 14311, Page 787; and recorded October 13, 1960 in Liber 14318, Page 802; and assigned by Assignment of Option dated October 13, 1960 and recorded October 13, 1960 in Liber 14318, Page 806; and assigned by Assignment of Lease dated as of July 2, 1979 and recorded in Book 20580, Page 632; and assigned by Assignment of Lease dated December 1, 1981 and recorded in Liber 21297, Page 201; and assigned by Assignment of Option to Renew Lease and Agreement dated December 1, 1981 and recorded in Liber 21297, Page 179 and re-recorded in Liber 21297, Page 190; and amended by unrecorded Amendment to Lease dated March 1, 1982; and assigned by Assignment and Assumption Agreement dated February 8, 1985 and recorded in Liber 22281, Page 186; and amended by unrecorded Amendment to Lease dated October 1, 1991; and assigned to One Woodward Avenue Associates Limited Partnership by Assignment and Assumption of Ground Lease dated May 27, 1997 and recorded June 30, 1997 in Liber 29621, Page 20 (collectively, the "Parcel B Lease") with respect to a tract of land at One Woodward Avenue in Detroit, Michigan.

<u>As to Parcel C</u> (legally described on Schedule A)

The Lease by the City of Detroit dated December 30, 1959 and recorded December 31, 1959 in Liber 14122, Page 758; and assigned by Assignment of Lease recorded October 4, 1960 in Liber 14311, Page 790, and recorded October 13, 1960 in Liber 14318, Page 798; and assigned by Assignment of Lease dated as of July 2, 1979 and recorded in Book 20580, Page 632; and assigned by Assignment of Lease dated December 1, 1981 and recorded in Liber 21297, Page 209; and assigned by Assignment of Option to Lease and Agreement dated December 1, 1981 and recorded in Liber 21297, Page 179 and re-recorded in Liber 21297, Page 190; and assigned by Assignment and Assumption Agreement dated February 8, 1985 and recorded in Liber 22281, Page 186; and assigned by Assignment and Assumption of Ground Lease dated May 27, 1997 and recorded June 30, 1997 in Liber 29621, Page 20 to Lessee (collectively, the "<u>Parcel C Lease</u>") with respect to a tract of land located at One Woodward Avenue in Detroit, Michigan.

The Parcel B Lease and the Parcel C Lease are herein collectively referred to as the "<u>Ground Leases</u>". Terms which are used but not expressly defined herein shall have the meanings set forth in the Ground Leases.

Assignor represents and warrants to Assignee, which representations and warranties shall survive delivery hereof for a term of two (2) years, that:

A.     It is the sole tenant under the Ground Leases and has not previously assigned the Ground Leases to any person.

B.     The Ground Leases are free and clear of (i) all lawful claims and demands of all persons claiming through the Assignor, and (ii) to the best of the knowledge of Assignor, all other claims.

C.     Each of the Ground Leases is in full force and effect and Assignor is not currently in default under any the Ground Lease, and Assignor has no knowledge of the occurrence of any event which presently or after notice or the passage of time or both will allow the respective landlord to terminate the Ground Leases.

D.     Except as set forth above, the Ground Leases have not been amended, modified, supplemented, assigned or terminated in any manner whatsoever.

Subject to the representations and warranties set forth in this Assignment, by execution of this Assignment, Assignee (x) assumes and agrees to perform all of the covenants, agreements and obligations under the Ground Leases binding on Assignor (such covenants, agreements and obligations being herein collectively referred to as the "<u>Ground Lease Obligations</u>"), as such Ground Lease Obligations shall arise or accrue from and after the date of this Assignment and (y) agrees to indemnify, hold harmless and defend Assignor from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Ground Lease Obligations that are attributable to the period of time from and after the date of this Assignment. Assignor agrees to indemnify, hold harmless and defend Assignee from and

against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Ground Lease Obligations that are attributable to the period of time prior to the date of this Assignment.

This Assignment shall inure to the benefit of, and be binding upon, Assignor and Assignee, and their respective successors and assigns.

This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.

**IN WITNESS WHEREOF,** the Assignor and Assignee have caused this instrument to be executed by the persons thereunto duly authorized as of the date first above written.

**ONE WOODWARD AVENUE ASSOCIATES LIMITED PARTNERSHIP.,** a Michigan limited liability partnership

By:    Woodward Jefferson, Inc., a Michigan corporation, its general partner

By:_____
Name: C. Michael Kojaian
Its: Executive Vice President

STATE OF _____ )

                                 ) ss.

COUNTY OF _____)

        The foregoing instrument was acknowledged before me this _____ day of _____, _____, by _____, the _____ of _____, a _____, on behalf of said corporation.

_____
Notary Public

My Commission Expires:_____

INSTRUMENT DRAFTED BY:

William G. Barris, Esq.
Barris, Sott, Denn & Driker, P.L.L.C.
211 West Fort Street
Fifteenth Floor
Detroit, Michigan 48226-3281

WHEN RECORDED RETURN TO:

Linda D. White, Esq.
SONNENSCHEIN NATH & ROSENTHAL LLP
233. S. Wacker Drive
Suite 7800
Chicago, Illinois 60606

Schedule A

Land in the City of Detroit, County of Wayne, State of Michigan, described as:

**Parcel B:**

Lot 4, Section 2, Governor and Judges plan, further described as Nos. 151, 153, and 155 Jefferson Avenue, situated on the northeast corner of Jefferson Avenue and Griswold Street, in the City of Detroit, Wayne County, Michigan.

Ward 2, Item 1910-5
Commonly known as One Woodward Avenue

**Parcel C:** Lot 1; the Easterly 20 feet of Lot 2 and alley adjacent thereto; the Easterly 70 feet of lot 64 and alley adjacent thereto; the Easterly 70 feet of the Southerly 40 feet of Lot 63; a strip of land in Woodward Avenue 12 feet in width and 190 feet in length, lying along and abutting the Easterly line of Lots 1, 64 and the Southerly 40 feet of lot 63; a strip of land in Jefferson Avenue 27 feet in width and 228 feet in length, lying along and abutting the Southerly line of Lots 1 through 4, as extended Easterly 12 feet and as extended Westerly 16 feet; a strip of land in Griswold Street 16 feet in width and 41 feet in length lying along and abutting the Westerly line of the Southerly 41 feet of Lot 4; all according to the Plat of Governor and Judges Plan, Section 2, City of Detroit, Wayne County, Michigan as recorded in Liber 34, Page 549 Deeds, Wayne County Records, more particularly described as follows: beginning at the intersection of the Easterly line of Griswold Street, 90 feet wide, and Northerly line of Jefferson Avenue 210 feet wide, thence along the Northerly line of said Jefferson AvAe, North 59 degrees 54 minutes East, 130.00 feet recorded, 130.45 feet measured; thence along the Westerly line of Woodward Avenue, as widened to a width of 190 feet, North 30 degrees 09 minutes West, 190.00 feet recorded, 190.57 feet measured, thence along the Southerly line of Lamed Street, as widened to a width of 60 feet, North 59 degrees 52 minutes 10 seconds East, 82.00 feet recorded and measured; thence along a line parallel with the Westerly line of said Woodward Avenue, South 30 degrees 09 minutes East, 217.00 feet recorded, 217.62 feet measured; thence along a line parallel with the Northerly line of said Jefferson Avenue, South 59 degrees 54 minutes West, 228.00 feet recorded, 228.45 feet measured, thence North 30 degrees 06 minutes West, 68.00 feet recorded and measured; thence North 59 degrees 54 minutes East, 16.00 feet recorded and measured, thence along the Easterly line of said Griswold Street South 30 degrees 06 minutes East, 41.00 feet recorded and measured to the point of beginning, Excepting and Reserving, however, the surface and upper 4-1/2 feet of said lands to the City, its successor and assigns.

Ward 2, Item 1910-5
Commonly known as One Woodward Avenue

## Exhibit 10

Form of Assignment of Promissory Note


LEHMAN BROTHERS HOLDINGS INC., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, whose address is 1271 Avenue of the Americas, Forty-Sixth Floor, New York, New York 10020 ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby assigns, without recourse, representation or warranty, to _____, a _____ ("Assignee"), its entire right, title and interest, as payee, under that certain Promissory Note dated February ___, 2000 in the original principal amount of One Million Two Hundred Eight-Three Thousand ($1,283,000.00) Dollars given by Van Buren Industrial Investors, L.L.C., a Delaware limited liability company, as maker, to Assignor, as amended by First Agreement of Modification of Note dated as of November 30, 2001, as further amended by Second Agreement of Modification of Note dated as of November 20, 2002, as further amended by Third Agreement of Modification of Note dated as of November 30, 2003, as further amended by Fourth Agreement of Modification of Note dated as of November 30, 2004, as further amended by Fifth Agreement of Modification of Note dated as of November 0, 2005, as further amended by Sixth Agreement of Modification of Note dated as of December 31, 2006 and as further amended by Seventh Agreement of Modification of Note dated as of December 31, 2007 (collectively, the "Promissory Note").  Assignor hereby represents and warrants to Assignee that it is the owner of the Promissory Note, free of all liens, claims, security interests and encumbrances whatsoever.  Assignor has, simultaneously with the execution and delivery of this Assignment of Promissory Note, delivered the original Promissory Note to Assignee.


IN WITNESS WHEREOF, the undersigned has executed this Assignment of Promissory Note this ____ day of _____, 2009.


Signed:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
Name:_____
Title:_____


"Assignor"

73

**Exhibit 11**

Form of Assignment of Secured Note and Other Loan Documents


LEHMAN BROTHERS HOLDINGS INC., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, whose address is 1271 Avenue of the Americas, Forty-Sixth Floor, New York, New York 10020 ("Assignor"), for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, hereby assigns, without recourse, representation or warranty, to _____, a _____ ("Assignee"), its entire right, title and interest, as payee and/or lender, under those certain documents more particularly itemized in Exhibit A attached hereto (collectively, the "Loan Documents") which evidence, secure and were executed in conjunction with that certain mezzanine loan from Assignor to Mike Kojaian and C. Michael Kojaian dated December 20, 2005 in the original principal amount of Twenty-Eight Million Fifty-Nine Thousand Six Hundred Seventy-Four ($28,059,674.00) Dollars.  Assignor hereby represents and warrants to Assignee that it is the owner of the Loan Documents, free of all liens, claims, security interests and encumbrances whatsoever.  Assignor has, simultaneously with the execution and delivery of this Assignment of Secured Note and Other Loan Documents, delivered the original Secured Note (as defined in Exhibit A) to Assignee.

IN WITNESS WHEREOF, the undersigned has executed this Assignment of Secured Note and Other Loan Documents this _____ day of _____, 2009.

Signed:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
Name:_____
Title:_____

"Assignor"

74

Exhibit A

Schedule of Loan Documents

1.    Consolidated, Amended and Restated Secured Note dated December 5, 2000 in the original principal amount of Twenty-Eight Million Fifty-Nine Thousand Six Hundred Seventy-Four ($28,059,674.00) Dollars from Mike Kojaian and C. Michael Kojaian, as makers, to Lehman Brothers Holdings Inc., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation, as payee ("Payee") as amended by First Agreement of Modification of Note and Other Loan Documents dated as of December 31, 2001, as further amended by Second Agreement of Modification of Note and Other Loan Documents dated as of December 20, 2002, as further amended by Third Agreement of Modification of Note and Other Loan Documents dated as of December 31, 2003, as further amended by Fourth Agreement of Modification of Note and Other Loan Documents dated as of September 28, 2004, as further amended by Fifth Agreement of Modification of Note and Other Loan Documents dated as of December 31, 2005, as further amended by Sixth Agreement of Modification of Note and Other Loan Documents dated as of December 31, 2006, as further amended by Seventh Agreement of Modification of Note and Other Loan Documents dated as of August 20, 2007 and as further amended by Eighth Agreement of Modification of Note and Other Loan Documents dated as of July 11, 2008 (collectively, the "Secured Note").

2.    Stock Pledge and Security Agreement dated as of December 31, 2003 [as to subparagraphs (a) through (e) below] and Stock Pledge and Security Agreement dated as of October 5, 2007 [as to subparagraph (f) below], the interests of Mike Kojaian and C. Michael Kojaian, respectively, as shareholders, in the following entities:

      (a)    Hamlin Investment Corporation; [NOTE:  This needs to be released prior to Closing.]
      (b)    Kojaian 6700 Development Company-MM, Inc.;
      (c)    2100 Woodward GP, Inc.;
      (d)    Orchards Corporate Center-MM, Inc.;
      (e)    Victor Parkway GP, Inc.; and
      (f)    Kojaian II Industrial Investors-MM, Inc.

3.    Security Agreement dated as of December 31, 2003, the interests of Mike Kojaian, C. Michael Kojaian, Hamlin Investment Corporation [as to subparagraph (b) below] and Woodward Jefferson, Inc. [as to subparagraph (a) below], respectively, in the following entities:

      (a)    One Woodward Avenue Associates Limited Partnership; and [NOTE: This needs to be released prior to Closing.]

(b)    Hamlin Development Associates Limited Partnership.    [NOTE:  This needs to be released prior to Closing.]

4.    Security Agreement dated as of December 31, 2003 [as to subparagraphs (a) through (d) below] and Supplemental Security Agreement dated as of October 5, 2007 [as to subparagraphs (e) and (f) below], the interests of Kojaian 6700 Development Associates, L.L.C. [as to subparagraph (a) below], 2100 Woodward GP, Inc. [as to subparagraph (b) below], Orchards Corporate Center-MM, Inc. [as to subparagraph (c) below] and VPA Associates, L.L.C. [as to subparagraph (d) below], and the interests of Mike Kojaian, C. Michael Kojaian and Kojaian II Industrial Investors-MM, Inc. [as to subparagraph (e) below],  and the interest of Kojaian Industrial Investors, L.L.C. [as to subparagraph (f) below], in the following entities:

(a)    6700 Development Associates, L.L.C.;
(b)    2100 Woodward Associates, L.L.C.;
(c)    OCC Associates, L.L.C.;
(d)    Victor Parkway Associates, L.L.C.;
(e)    Kojaian II Industrial Investors, L.L.C.; and
(f)    New West Michigan II Industrial Investors, L.L.C.    [NOTE:  This needs to be released prior to Closing.]

Together with all financing statements, control agreements, confirmation/registration letters and assignments separate from certificates.

76

**Exhibit 12**

<u>Schedule of Entities in which PAMI has Guaranteed Loans</u>

1.    National City Bank Loan to Van Buren Industrial Investors, L.L.C.
2.    JPMorgan Chase Bank, N.A. Loan to K/LB Funding LLC
3.    JPMorgan Chase Bank, N.A. Loan to K/LB Bloomfield Associates, L.L.C.

**<u>Exhibit 13</u>**

<u>TTERTT Wire Instructions</u>

Wachovia Bank, N.A.
Atlanta, GA
ABA # 061000227
Credit: TriMont Real Estate Advisors, Inc. - Depository Account
Account: 2000044713186
Reference: Equity #863001 - TTERTT Associates, LLC

**Exhibit 14**
Legal Description of Travelers Tower I and Tower II Property

Tract II:
Parcel 1 (East):
Part of the Northeast 1/4 of Section 22, Town 1 North, Range 10 East, City of
Southfield, Oakland County, Michigan, described as: Beginning at a point
distant due North 1060.94 feet and South 87 degrees 00 minutes 00 seconds
West 60.08 feet from the East 1/4 corner of Section 22, Town 1 North, Range 10
East, City of Southfield, Oakland County, Michigan; thence continuing South 87
degrees 00 minutes 00 seconds West, 762.40 feet; thence along the Easterly
line of Central Park Boulevard North 03 degrees 00 minutes 00 seconds West,
288.81 feet; thence 49.74 feet along the arc of a curve to the right, radius
950.00 feet and chord bearing North 01 degree 30 minutes 00 seconds West,
49.73 feet; thence due North 361.20 feet; thence South 89 degrees 55 minutes 4!
seconds East, 777.77 feet; thence along the Westerly line of Evergreen
Road (120 feet wide) due South 658.47 feet to the point of beginning.

Parcel 2 (West):
A parcel of land in the Northeast 1/4 Section 22, Town 1 North, Range 10 East,
City of Southfield, Oakland County, Michigan, described as: Beginning at a
point located distant North 1060.94 feet; thence South 87 degrees 00 minutes 0(
seconds West, 922.48 feet from the East 1/4 corner of Section 22, Town 1
North, Range 10 East, City of Southfield, Oakland County, Michigan, and
proceeding thence South 87 degrees 00 minutes 00 seconds West, 522.61 feet;
thence North 1 degree 15 minutes 36 seconds East, 732.82 feet; thence South 89
degrees 55 minutes 45 seconds East, 489.23 feet; thence South 361.32 feet;
thence 54.98 feet along the arc of a curve to the left and chord bearing South
1 degree 30 minutes 00 seconds East at a Radius of 1050 feet for 54.97 feet;
thence South 3 degrees 00 minutes 00 seconds East, 288.81 feet to the point of
beginning.

Parcel 3 (Elevated Parcel):
Perpetual Easement Estate established by that certain Grant of Easement and
Agreement for Maintenance executed between the City of Southfield and Teachers
Insurance and Annuity Association of America, dated August 11, 1981, recorded
in Liber 8086 on Page 642, Oakland County Records, and re-recorded in Liber
8132 on Page 218, Oakland County Records, said easement being described as an
expanse of space located in the City of Southfield, County of Oakland, State
of Michigan, the center line of which is described as follows: The centerline
of a 150 foot wide expanse of space whose horizontal plane is defined as:
Commencing at the East 1/4 corner of Section 22, Town 1 North, Range 10 East,
City of Southfield, Oakland County, Michigan; thence along the East line of
said Section 22, due North a distance of 1060.94 feet; thence South 87 degrees
00 minutes 00 seconds West, 822.48 feet; thence North 03 degrees 00 minutes 00
seconds West, 288.81 feet; thence along a curve to the right a distance of
49.74 feet, Radius of 950.00 feet, Chord bearing of North 01 degrees 30
minutes 00 seconds West, 49.73 feet; thence due North 72.27 feet to the point
of beginning; thence North 89 degrees 59 minutes 48 seconds West, 100.00 feet

SEE LEGAL CONTINUATION

to the point of ending and whose vertical plane is defined as lying above elevation 692.00 feet from mean sea level as established by the United States Coast and Geodetic Survey, along with a 10 foot wide easement for supporting columns centered on the 100 foot width and running in a North-South direction the full 150.00 foot long length, said easement to run below the plane of 692.00 elevation to sufficient depths to adequately support the structure above.

Parcel 4 (Parking Easement):
Easement for parking established by that certain Declaration of Easement recorded in Liber 8326 on Page 803, Oakland County Records, executed by the Teachers Insurance and Annuity Association of America.

Re:  26533 Evergreen

Tax Item No. 24-22-276-018 and 24-22-277-006, as to Tract II (West, East and Easement Parcel)

## Exhibit 15

## OPTION AGREEMENT

THIS OPTION AGREEMENT (the "Agreement") is made and entered into as of the ___ day of _____, 2009, by TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company ("Seller"), and KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation, on behalf of an entity to be designated ("Purchaser").

W I T N E S S E T H:

## Article 1

## Option

1.1    Option.  Subject to the terms and conditions hereinafter set forth, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller does hereby grant to Purchaser the exclusive option (the "Option") to purchase from Seller:

(a)    those certain tracts or parcels of land situated in the City of Southfield, Oakland County, Michigan, more particularly described on **Exhibit A** attached hereto and made a part hereof, together with all and singular the rights, tenements, hereditaments and appurtenances pertaining to such property, including any right, title and interest of Seller in and to adjacent streets, alleys or rights-of-way, and all development rights, any unpaid award for damages to the property, all rights to subdivide the property, and all minerals, oil, gas, casinghead gasoline and other liquid hydrocarbons in, under and that may be produced from any part of the property (the property described in this Section 1.1(a) being herein referred to collectively as the "Land");

(b)    the improvements on the Land, including those certain office buildings and adjoining parking decks commonly known as Travelers Tower I and Travelers Tower II with street addresses of 26555 Evergreen Road and 26533 Evergreen Road, Southfield, Michigan, respectively (the property described in this Section 1.1(b) being herein referred to as the "Improvements");

(c)    the personal property and fixtures owned by Seller upon the Land or within the Improvements, including specifically, without limitation, heating, ventilation and air conditioning systems and equipment, appliances, furniture, carpeting, draperies and curtains, tools and supplies and other items of personal property (excluding cash) used in connection with the operation of the Land and the Improvements, but specifically excluding any furniture, furnishings, fixtures, business equipment or articles of personal property belonging to tenants occupying the Improvements or otherwise excluded pursuant to any tenant estoppel certificates executed by such tenants in conjunction with the purchase and sale

contemplated hereby (the property described in this <u>Section 1.1(c)</u> being herein referred to collectively as the "Personal Property", regardless of whether such property constitutes personalty or fixtures pursuant to Michigan law);

(d)    all of Seller's right, title and interest in all written agreements pursuant to which any portion of the Land or Improvements is occupied by anyone other than Seller (the property described in this <u>Section 1.1(d)</u> being herein referred to collectively as the "<u>Leases</u>", and all guaranties thereof and security deposits thereunder); and

(e)    all of Seller's right, title and interest, if any, in and to (i) all assignable contracts and agreements relating to the upkeep, repair, maintenance or operation of the Land which will extend beyond the date of the Closing, as such term is defined in <u>Section 4.1</u> hereof (collectively, the "<u>Operating Agreements</u>"); <u>provided</u>, <u>however</u>, that Seller makes no representation or warranty with respect to the assignability of any of the Operating Agreements; (ii) all assignable warranties and guaranties (express or implied) in effect at the Closing and held by Seller in connection with the Improvements; <u>provided</u>, <u>however</u>, that Seller makes no representation or warranty with respect to the existence, availability or assignability of any warranties and/or guaranties, (iii) all of Seller's right to connect with and to utilize any private or public utility facilities serving the Land at the time of Closing, to the extent transferable, (iv) all licenses, permits, certificates of occupancy and governmental approvals with respect to the Land or the Improvements in effect at the time of Closing, to the extent transferable, (v) all development and similar agreements relating to governmental permits or utility services relating to the Land or Improvements in effect at the Closing, to the extent transferable, and (vi) all plans and specifications, if any, in Seller's possession for the Improvements, to the extent transferable (the property described in this Section 1.1(e) being herein referred to collectively as the "<u>Intangibles</u>").

1.2    <u>Memorandum of Option</u>.  Concurrently herewith the parties hereto have executed that certain Memorandum of Option, to be recorded with the Oakland County, Michigan Recorder's Office, which shall serve to publicly memorialize the existence of this Option (the "<u>Memorandum of Option</u>").

1.3    <u>Property Defined</u>.  The Land, the Improvements, the Personal Property, the Leases and the Intangibles are hereinafter sometimes referred to collectively as the "<u>Property</u>."

1.4    <u>Option Term</u>.    The Option may be exercised at any time between the date hereof and 5:00 p.m., Bloomfield Hills, Michigan time, on the three hundred sixty fifth (365th) day following the date of this Agreement (the "<u>Expiration Time</u>"); <u>provided</u>, <u>however</u>, that if the Option would otherwise expire on a day which is a Saturday, Sunday or legal holiday (a "<u>Business Day</u>"), the expiration of the Option shall be extended to 5:00 p.m., Bloomfield Hills, Michigan time, on the next Business Day.  The consideration for the Option is contained in that certain Settlement Agreement dated _____, 2009, by and among the parties identified therein as the Lehman Affiliates (which includes Seller) and the Kojaian Affiliates (which includes Purchaser).

1.5    Exercise of Option.  Purchaser may exercise the Option at any time prior to the Expiration Time by delivery of written notice of such exercise to Seller (the "Election Notice"). Upon the timely delivery of the Election Notice Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, the Property, subject to the terms and conditions hereinafter set forth.  If the Purchaser does not timely elect to exercise the Option by the Expiration Date, time being of the essence, the Option shall be deemed to have expired and shall be of no further effect and, in such an event, the Memorandum of Notice shall be deemed released of record without any required further action.  Without limiting the foregoing, concurrently herewith, the Purchaser has executed that certain Release of Memorandum of Option, which has been deposited with Chicago Title Insurance Company (the "Escrow Agent") pursuant to mutually acceptable joint order escrow instructions, which instructions shall provide that Escrow Agent shall cause the recordation of such Release of Memorandum of Option in the event that the Election Notice is not timely provided as set forth in hereinabove.  Moreover, at the request of Seller or any other party, Purchaser shall execute or cause to be executed any and all documents required to remove the Memorandum of Option from record.

<div align="center">

Article 2

Purchase and Sale

</div>

2.1    Purchase Price.  The total purchase price for the Property is Twenty Million ($20,000,000.00) Dollars (the "Purchase Price").  The Purchase Price shall be paid at Closing in cash, by cashier's check or wire transfer of immediately available federal funds.  The Purchase Price shall be the net consideration to be paid to Seller, and there shall be no prorations or adjustments of taxes, expenses, tenant security deposits or other items of income or expense of or attributable to the Property.

2.2    As Is, Where Is; No Representation or Warranties.  NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT PURCHASER WILL PURCHASE THE PROPERTY "AS IS" AND "WHERE IS", AND WITH ALL FAULTS AND THAT SELLER IS MAKING NO REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, WITH RESPECT TO THE QUALITY, PHYSICAL CONDITION OR VALUE OF THE PROPERTY, THE INCOME OR EXPENSES FROM OR OF THE PROPERTY OR THE COMPLIANCE OF THE PROPERTY WITH APPLICABLE BUILDING OR FIRE CODES OR OTHER LAWS OR REGULATIONS.  PURCHASER AGREES THAT SELLER IS NOT LIABLE OR BOUND BY ANY GUARANTEES, PROMISES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, IF ANY, MADE OR FURNISHED BY ANY FINANCIAL ADVISOR, REAL ESTATE AGENT, BROKER, EMPLOYEE, SERVANT OR OTHER PERSON REPRESENTING OR PURPORTING TO REPRESENT SELLER.

<div align="center">

Article 3

Title and Survey

</div>

<div align="center">

–83–

</div>

3.1     Commitment for Title Insurance.  Seller shall not be responsible for providing a commitment for an owner's policy of title insurance (a "Title Commitment") to Purchaser.  In the event Purchaser wishes to obtain a Title Commitment, Purchaser shall do so at its own cost and expense, including the cost of any policy to be issued pursuant thereto, in sufficient time to permit delivery of a copy thereof and all recorded documents appearing as exceptions in Schedule B thereof to Seller at least five (5) Business Days prior to the Closing.

3.2     Permitted Exceptions.  In the event that Purchaser shall obtain a Title Commitment and deliver a copy thereof to Seller within the time limit provided above, the Property shall be conveyed subject to the matters which are itemized as exceptions in Schedule B thereof, except any then outstanding mortgages on the property (including, but not limited to, any mortgage or mortgages originated or held by Lehman Brothers Holdings Inc., which is an affiliate of Seller) which Seller shall cause to be discharged prior to the delivery of the Deed (hereinafter defined) to Purchaser (the "Permitted Exceptions").

3.3     Survey.  Seller shall not be responsible for providing a survey of the Land and Improvements (a "Survey") to Purchaser.  In the event Purchaser wishes to obtain a Survey, Purchaser shall do so at its own cost and expense.

3.4.    Owner's Policy of Title Insurance.  In the event that Purchaser shall obtain a owner's policy of title insurance (the "Title Policy"), at its sole cost and expense, Seller shall deliver an owner's affidavit in the form required by title company issuing such policy to facilitate the removal of the standard printed exceptions in the Title Policy pertaining to the Property, except that (i) the matters contained in such owner's affidavit or similar documents shall be limited to Seller's knowledge, and (ii) Seller shall not be required to indemnify Title Company pursuant to such owner's affidavit.

<div align="center">Article 4</div>

<div align="center">Closing</div>

4.1     Time and Place.  The closing of the sale of the Property (the "Closing") shall be held at the office of the title company issuing the Title Commitment if ordered by Purchaser or, if Purchaser does not order a Title Commitment, at such place as may be mutually agreed upon by Seller and Purchaser at 10:00 a.m. on such date which is not less than ten (10) days nor more than thirty (30) days following the delivery of the Election Notice as may be specified by Purchaser by not less than five (5) days' prior written notice delivered to Seller (the "Closing Date").  At the Closing, Seller and Purchaser shall perform the obligations set forth in Section 4.2 and Section 4.3, respectively, the performance of which obligations shall be concurrent conditions.

4.2     Seller's Obligations at Closing.  At Closing, Seller shall:

<div align="center">–84–</div>

(a)      deliver to Purchaser a Covenant Deed (the "Deed"), in the form of **Exhibit B** attached hereto and made a part hereof, executed and acknowledged by Seller and in recordable form, conveying the Land and Improvements, subject only to the Permitted Exceptions applicable thereto, together with a Real Estate Transfer Tax Valuation Affidavit in the form of **Exhibit C** attached hereto and made a part hereof;

(b)      join with Purchaser in the execution and delivery of an Assignment Agreement (the "Assignment Agreement"), in the form of **Exhibit D** attached hereto and made a part hereof, with respect to the Leases, Operating Agreements, Personal Property and Intangibles;

(c)      deliver to Purchaser a FIRPTA Affidavit (the "FIRPTA Affidavit"), in the form of **Exhibit E** attached hereto and made a part hereof, duly executed by Seller, stating that Seller is not a "foreign person" as defined in the federal Foreign Investment in Real Property Tax Act of 1980 and 1984 Tax Reform Act, and in the event Seller is unable or unwilling to deliver the FIRPTA Affidavit, in lieu thereof, the funds payable to Seller shall be adjusted in such a manner as to comply with the withholding provisions of such statutes; and

(d)      join with Purchaser in the execution of a Closing Statement;

(e)      deliver to Purchaser possession and occupancy of the Property, subject to the rights of tenants in possession and the Permitted Exceptions;

(f)      deliver to Purchaser all available keys to the Property in Seller's possession; and

(g)      deliver to Purchaser all building plans and specifications, if any, in Seller's possession, originals (or true copies if originals are not available to Seller) of all certificates of occupancy and other licenses, permits, authorizations and approvals issued by governmental authorities in Seller's possession; the original (or a true copy if the original is not available to Seller) of the Leases (and all guaranties thereof) and all of the Operating Agreements; and all manuals, warranties, technical data and other documentation in Seller's possession relating to the building systems, equipment and other fixtures and the Personal Property with respect to the Property.

4.3     Purchaser's Obligations at Closing.  At Closing, Purchaser shall:

(a)      pay to Seller the full amount of the Purchase Price payable to Seller; and

(b)      join Seller in the execution of the instruments described in Sections 4.2(b) and (d) above.

12595226\V-11

4.4    Closing Costs.  All closing costs with respect to the Property shall be borne by the parties, as follows:  Seller shall pay one-half of all closing costs, if any, if the Closing shall occur at a title company.  Purchaser shall pay for (a) any and real estate transfer taxes, documentary stamp taxes or similar taxes that becomes payable by reason of transfer of the Land and Improvements, (b) the cost of the Title Policy, if any, (c) the cost of the Survey, if any, (d) the cost of recording the Deed, and (e) one-half of all closing costs, if any, if the Closing shall occur at a title company.  Each of Seller and Purchaser shall pay the fees and expenses of any counsel representing such party in connection with the transaction contemplated by this Agreement.  All other costs and expenses incident to this transaction and the closing thereof shall be paid by the party incurring same.

## Article 5

## Representations, Warranties and Covenants

5.1    Representation and Warranty of Seller.  Seller hereby represents and warrants to Purchaser that, subject to any required approval (if any is required) by the U.S. Bankruptcy Court, it has the full right, power and authority to sell the Property as provided in this Agreement and to carry out Seller's obligations hereunder, and all requisite actions necessary to authorize Seller to enter into this Agreement and to carry out its obligations hereunder have been taken.

5.2    Representation and Warranty of Purchaser.  Purchaser hereby represents and warrants to Seller that it has the full right, power and authority to purchase the Property as provided in this Agreement and to carry out Purchaser's obligations hereunder, and all requisite actions necessary to authorize Purchaser to enter into this Agreement and to carry out its obligations hereunder have been taken.

5.3    Survival.  The representations and warranties set forth in Section 5.1 and Section 5.2 shall survive the Closing for a period of twelve (12) months.  Any action alleging breach of a representation and warranty must be commenced within the aforesaid twelve (12) month period or all claims for breach of representations and warranties shall be deemed waived.

5.4    Environmental Inspections by Purchaser.  Purchaser may, prior to Closing, inspect the Property for the presence of Hazardous Materials (as defined below) and shall promptly furnish to Seller copies of any reports received by Purchaser in connection with any such inspection, but without any representation or warranty  as to the contents thereof or the ability of Seller to rely on such reports.  Purchaser hereby assumes full responsibility for such inspections, if any.

The term "Hazardous Materials" shall mean any substance, material, waste, gas or particulate matter which is regulated by any local governmental authority, the State of Michigan or the United States of America, including, but not limited to, any material or substance which is (i) defined as a "hazardous waste", "hazardous material", "hazardous substance", "extremely hazardous waste" or "restricted

12595226\V-11

hazardous waste" or words of similar import under any provision of any applicable Environmental Law, (ii) petroleum or petroleum products, (iii) asbestos, (iv) polychlorinated biphenyl, (v) radioactive material, (vi) radon gas, (vii) defined as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. §1251, et seq. (33 U.S.C. §1317), (viii) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. §6901, et seq. (42 U.S.C. §6903), or (ix) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601, et seq. (42 U.S.C. §9601).  The term "Environmental Laws" shall mean all statutes specifically described in the foregoing paragraph and all federal, state and local environmental health and safety statutes, ordinances, codes, rules, regulations, orders and decrees regulating, relating to or imposing liability or standards concerning or in connection with Hazardous Materials.

## Article 6

## Default

6.1    Default by Seller.  In the event that Seller shall fail to consummate this Agreement for any reason after receipt of the Election Notice, except Purchaser's default, Purchaser shall be entitled, as its sole remedy, to enforce specific performance of the obligations of Seller under this Agreement. Except as provided in this Article 6, Purchaser expressly waives its rights to seek damages in the event of default by Seller hereunder.

6.2    Default by Purchaser.  In the event that Purchaser shall timely deliver the Election Notice but shall fail to consummate the purchase of the Property within the time required under this Agreement, except due to Seller's default, the Election Notice so delivered by Purchaser shall be deemed null and void, Purchaser shall no longer have any right to exercise the Option granted in this Agreement and Seller shall have the right to unilaterally record a release of any recorded memorandum of this Agreement.

## Article 7

## Risk of Loss

7.1    Damage or Condemnation.   In the event of loss or damage by casualty or condemnation to the Property, or any portion thereof, if Purchaser shall exercise the Option, Seller shall use its reasonable efforts to complete any necessary repairs prior to Closing or, if Seller shall not have completed all such necessary repairs prior to Closing, Seller shall assign to Purchaser all of Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the Property, to the extent not previously disbursed by the insurer and applied to such repairs, and shall pay or credit to Purchaser, at Closing, the amount of any deductible or co-insurance amount with respect thereto.

12595226\V-11

Article 8

Brokers

8.1    Brokers.  Each party represents and warrants to the other than it has not dealt with any real estate broker or salesperson in connection with the option granted under this Agreement and the purchase and sale contemplated hereby.  Each party agrees to indemnify and hold the other harmless from all loss, damage, costs and expenses (including attorneys' fees) that the other party may suffer as a result of any claim brought by any broker, salesperson or finder with whom such party may have dealt in connection with this transaction.  The provisions of this Section 8.1 shall survive Closing.

Article 9

Miscellaneous

9.1    Assignment.  Purchaser may assign its rights, duties and obligations under this Agreement to an entity to be designated by Purchaser prior to Closing.

9.2    Notices.  Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) expedited delivery service with proof of delivery, (c) United States registered or certified mail, return receipt requested, postage prepaid, or (d) prepaid telegram, telex or telecopy (provided that such telegram, telex or telecopy is confirmed by expedited delivery service or by mail in the manner previously described), sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given either at the time of personal delivery, or, in the case of expedited delivery service or mail, as of the date of the first attempted delivery at the address and in the manner provided herein, or, in the case of telegram, telex or telecopy, upon receipt.  Unless changed in accordance with the preceding sentence, the address for notices given pursuant to this Agreement shall be as follows:

<div style="margin-left: 2em;">

If to Seller:        TTERTT Associates, L.L.C.
                     c/o Lehman Brothers Holdings Inc.
                     1271 Avenue of the Americas
                     Forty-Sixth Floor
                     New York, New York 10020
                     Attn: Mr. Steven Gorey
                     Telecopy No. 212/520-0435

And to:              Lehman Brothers Holdings Inc.
                     1271 Avenue of the Americas
                     Forty-Sixth Floor

</div>

–88–

|                        | New York, New York   10020 |
|------------------------|----------------------------|
|                        | Attn:  Joelle Halperin, Esq. |
|                        | Telecopy No. 646/834-0874 |
| <u>With a copy to:</u> | Sonnenschein Nath & Rosenthal LLP |
|                        | 7800 Sears Tower |
|                        | 233 South Wacker Drive |
|                        | Chicago, Illinois 60606-8950 |
|                        | Attn: Linda D. White, Esq. |
|                        | Telecopy No. 312/876-7934 |
| <u>If to Purchaser:</u> | Kojaian Management Corporation |
|                        | 39400 Woodward Avenue |
|                        | Suite 250 |
|                        | Bloomfield Hills, Michigan   48304-5155 |
|                        | Attn:  Mr. C. Michael Kojaian |
|                        | Telecopy No. 248/644-7620 |
| <u>With a copy to:</u> | Barris, Sott, Denn & Driker, P.L.L.C. |
|                        | 211 West Fort Street |
|                        | Fifteenth Floor |
|                        | Detroit, Michigan   48226-3281 |
|                        | Attn:  William G. Barris, Esq. |
|                        | Telecopy No. 313/983-3321 |

9.3    <u>Modifications</u>.  This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it, in whole or in part, unless such executory agreement is in writing and is signed by all parties against whom enforcement of any waiver, change, modification or discharge is sought.

9.4    <u>Calculation of Time Periods</u>.  Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday nor legal holiday.

9.5    <u>Time of Essence</u>.  Seller and Purchaser agree that time is of the essence of this Agreement.

9.6    <u>Successors and Assigns</u>.  The terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

–89–

9.7    Entire Agreement.  This Agreement, including the exhibits, contains the entire agreement between the parties pertaining to the subject matter hereof and fully supersedes all prior agreements and understandings between the parties pertaining to such subject matter.

9.8    Further Assurances.  Each party agrees that it will, without further consideration, execute and deliver such other documents and take such other actions, whether prior or subsequent to the Closing Date, as may be reasonably requested by any other party to consummate more effectively the purposes or subject matter of this Agreement.

9.9    Attorneys' Fees.  In the event of any controversy, claim or dispute between the parties affecting or relating to the subject matter or performance of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party all of its reasonable expenses, including reasonable attorneys' fees (including in-house or outside counsel) and accountants' fees.

9.10   Counterparts.  This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement.  It shall be necessary to account for only one such counterpart in proving this Agreement.

9.11   Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

9.12   Applicable Law.  THIS AGREEMENT SHALL, IN ALL RESPECTS, BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE SUBSTANTIVE FEDERAL LAWS OF THE UNITED STATES AND THE LAWS OF THE STATE OF MICHIGAN.  PURCHASER AND SELLER HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY STATE COURT SITTING IN OAKLAND COUNTY, MICHIGAN OR U.S. DISTRICT COURT SITTING IN DETROIT, MICHIGAN, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN ANY SUCH STATE OR FEDERAL COURT.  PURCHASER AND SELLER AGREE THAT THE PROVISIONS OF THIS SECTION 12.16 SHALL SURVIVE THE CLOSING.

9.13   No Third Party Beneficiary.  The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party.  Accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.14   Exhibits and Schedules.  The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

| | | |
|---|---|---|
| (a) | Exhibit A | Legal Description of Property |
| (b) | Exhibit B | Form of Covenant Deed |
| (c) | Exhibit C | Form of Real Estate Transfer Tax Valuation Affidavit |
| (d) | Exhibit D | Form of Assignment Agreement |
| (e) | Exhibit E | Form of FIRPTA Affidavit |

–90–

9.15    <u>Captions</u>.  The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any section or any subsection hereof.

9.16    <u>Construction</u>.  The parties acknowledge that the parties and their counsel have each participated in the drafting of this Agreement and have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

[Balance of page left intentionally blank]

–91–

IN WITNESS WHEREOF, the parties hereto have executed this Option Agreement as of the day and year first above written.

Signed:

TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company

By:    LB TTERTT INC., a Delaware corporation, Managing Member

By:    _____

Its:    _____

"Seller"

KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation

By:    _____
          C. Michael Kojaian, Executive Vice President

"Purchaser"

CHILIB1-12595226-V11-LEHMAN KOJAIAN SETTLEMENT AGREEMENT--FINAL EXECUTION DRAFT 6 18 (2).DOC

–92–

**<u>Exhibit A</u>**

<u>Legal Description of Property</u>

12595226\V-11

## Exhibit B

### Form of Covenant Deed

THIS INDENTURE is made this _____ day of _____, 20__, between TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company , whose address is c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, Forty-Sixth Floor, New York, New York 10020 (hereinafter called "Grantor"), and _____, a _____, whose address is 39400 Woodward Avenue, Suite 250, Bloomfield Hills, Michigan 48304 (hereinafter called "Grantee").

W I T N E S S E T H:

That Grantor, for and in consideration of One ($1.00) Dollar and other good and valuable consideration as set forth in a Real Estate Transfer Tax Valuation Affidavit separately filed, to it in hand paid by Grantee, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell and convey to Grantee that certain real property situated in the City of Southfield, County of Oakland and State of Michigan, more particularly described in Exhibit A attached hereto and made a part hereof, together with all and singular the rights, tenements, hereditaments and appurtenances pertaining to such property, including any right, title and interest of Grantor in and to adjacent streets, alleys or rights-of-way, and all development rights, any unpaid award for damages to the property and all rights to subdivide the property, and all minerals, oil, gas, casinghead gasoline and other liquid hydrocarbons in, under and that may be produced from any part of the property (the "Premises"), together with all of the estate, right, title, interest, claim or demand whatsoever of Grantor, either in law or in equity, of, in and to the above-described Premises.

Subject to those matters (the "Permitted Exceptions") set forth on Exhibit B attached hereto and made a part hereof.

TO HAVE AND TO HOLD the Premises unto Grantee forever, and Grantor does hereby covenant and agree with Grantee that Grantor has not heretofore done, committed or wittingly or willingly suffered to be done or committed any act, matter or thing whatsoever whereby the Premises are or shall be charged or encumbered in title, estate or otherwise howsoever, except as otherwise provided in Exhibit B.

12595226\V-11

Grantor further grants to Grantee the right to make all legally feasible division(s) under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967. This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust, odors and other associated conditions may be used and are protected by the Michigan Right-To-Farm Act.

IN WITNESS WHEREOF, Grantor has executed this Covenant Deed this _____ day of _____, 20__.

Signed:

TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company

By:   LB TTERTT INC., a Delaware corporation, Managing Member

By:   _____

Its:   _____

"Grantor"

STATE OF                         )
                                 ) ss.
COUNTY OF                        )

The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by _____, the _____ of LB TTERTT INC., a Delaware corporation, the Managing Member of TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company, on behalf of said corporation and company.

_____

Notary Public, _____ County, __
My Comm. Expires: _____

INSTRUMENT DRAFTED BY AND
  WHEN RECORDED RETURN TO:

William G. Barris, Esq.
BARRIS, SOTT, DENN & DRIKER, P.L.L.C.

12595226\V-11

211 West Fort Street, Fifteenth Floor
Detroit, Michigan   48226-3281

12595226\V-11

Exhibit A

Legal Description of Real Estate

Land situated in the City of Southfield, County of Oakland and State of Michigan, being more particularly described as follows:

12595226\V-11

Exhibit B

Schedule of Permitted Exceptions

12595226\V-11

## Exhibit C

Form of Real Estate Transfer Tax Valuation Affidavit

Michigan Department of Treasury
L-4258 (Rev. 9/94)

## REAL ESTATE TRANSFER TAX VALUATION AFFIDAVIT
*This form is issued under authority of P.A. 134 of 1966 and 330 of 1993 as amended.*

This form must be filed when you choose not to enter the amount paid for real estate on the deed.  It is
required whether the transfer is taxable or not.  It is not necessary when the amount paid is entered on the
deed.  This form must be completed and signed by either the seller or his/her authorized agent.

| 1.  County of Property | 2.  City or Township of Property |
|---|---|
| Oakland | Southfield |

| 3.  Seller's Name and Mailing Address | 4.  Purchaser's Name and Mailing Address |
|---|---|
| TTERTT ASSOCIATES, L.L.C.<br>1271 Avenue of the Americas<br>Forty-Sixth Floor<br>New York, New York 10020 | _____<br>39400 Woodward Avenue<br>Suite 250<br>Bloomfield Hills, Michigan  48304-5155 |

| 5.  Type and Date of Document | 6.  Cash Payment | 7.  Amount of County Tax |
|---|---|---|
| ☐ Land Contract   Date: _____<br>■ Deed            Date: __/___/20__ | $20,000,000.00 | $ 22,000.00 |

| | 8.  Amount of Mortgage/Land Contract | 9.  Amount of State Tax |
|---|---|---|
| | $ -0- | $150,000.00 |

| 10.  If consideration is less than market value, state market value | 11.  Total Consideration (Add lines 6&8) | 12 Total Revenue Stamps |
|---|---|---|
| | $20,000,000.00 | $172,000.00 |

| 13.  Legal Description of Real Estate Transferred |
|---|
| See Exhibit A attached hereto |

–99–

12595226\V-11

*I certify that the information above is true and complete to the best of my knowledge and that the value stated is the full market value of the property.*

| | |
|---|---|
| Seller's Signature | If signer is other than the seller, print name and title |
| TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company<br><br>By:   LB TTERTT INC., a Delaware corporation, Managing Member<br><br>       By:   _____<br><br>       Its:   _____ | |

***Notarization***

| Subscribed and sworn to me: | Notary Public<br>State of Michigan, County of Oakland | on this date<br><br>\_\_/\_\_\_\_\_/20\_\_ | My Commission expires on: |
|---|---|---|---|

−100−

Exhibit A

Legal Description of Property

Land situated in the City of Southfield, County of Oakland and State of Michigan, being more particularly described as follows:

12595226\V-11

## Exhibit D

Form of Assignment Agreement

THIS ASSIGNMENT AGREEMENT (this "Assignment") is made this ___ day of _____, 20__, from TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company , whose address is c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, Forty-Sixth Floor, New York, New York 10020 (hereinafter called "Assignor"), to _____, a _____, whose address is 39400 Woodward Avenue, Suite 250, Bloomfield Hills, Michigan 48304 (hereinafter called "Assignee").

W I T N E S S E T H:

The following is a recital of facts underlying this Assignment:

A.      Concurrently with the execution and delivery of this Assignment, Assignor is conveying to Assignee, by Covenant Deed (the "Deed"), that certain tract of land (the "Land") more particularly described on Exhibit A attached hereto and made a part hereof for all purposes, together with the improvements located thereon (the "Improvements").

B.      Assignor desires to assign, transfer and convey to Assignee, and Assignee desires to obtain, all of Assignor's right, title and interest in and to the Leases, Operating Agreements, Personal Property, Warranties and Intangibles (as hereinafter defined), subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration to Assignor in hand paid by Assignee, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, convey, transfer, set over and deliver to Assignee all of Assignor's right, title and interest in and to the following:

(a)      all written agreements pursuant to which any portion of the Land or Improvements is occupied by anyone other than Assignor (collectively, the "Leases"), including, without limitation, the Leases more particularly described on Exhibit B attached hereto, and Assignor represents that said Leases constitute all of the written leases pursuant to which tenants have the right to occupy any portion of such Land or Improvements and that there are no other agreements, whether written or oral, permitting any person or entity to occupy any portion of such Land or Improvements;

(b)      all tenant security deposit monies held on behalf of tenants at the Property as such tenant security deposits are more particularly scheduled on Exhibit C attached hereto;

–102–

(c)      all of those contracts itemized in Exhibit D attached hereto (collectively, the "Operating Agreements"); provided, however, that Assignor makes no representation or warranty with respect to the assignability of any of the Operating Agreements; and provided, further, that Assignor represents that said Operating Agreements constitute all of the agreements, written or oral, pursuant to which services are provided to the Land and Improvements.

(d)      the personal property and fixtures owned by Assignor upon the Land or within the Improvements, including specifically, without limitation, heating, ventilation and air conditioning systems and equipment, appliances, furniture, carpeting, draperies and curtains, tools and supplies and other items of personal property (excluding cash) used in connection with the operation of the Land and the Improvements (collectively, the "Personal Property");

(e)      all of Assignor's right, title and interest, if any, in and to all warranties and guaranties (express or implied) issued to Assignor in connection with the Improvements or the Personal Property (collectively, the "Warranties"); provided, however, that Assignor makes no representation or warranty with respect to the existence, availability or assignability of any Warranties; and

(f)      all of Assignor's right, title and interest, if any, (i) to connect with and to utilize any private or public utility facilities now or hereafter serving the Land, to the extent transferable, (ii) in and to all licenses, permits, certificates of occupancy and governmental approvals with respect to the Land or the Improvements, and all development and similar agreements relating to governmental permits or utility services relating thereto, to the extent transferable, (iii) in and to the building names and assumed names associated with the Improvements, to the extent transferable, and (iv) in and to all plans and specifications, if any, in Assignor's possession, for the Improvements, to the extent transferable (collectively, the "Intangibles").

All representations, warranties, covenants and agreements of each party hereto contained in this Assignment, or in any exhibit or document delivered pursuant hereto, shall survive the execution and delivery of this Agreement.

Assignee assumes and agrees to perform all of the covenants, agreements and obligations under the Leases and the Operating Agreements binding on Assignor or the Land, the Improvements or the Personal Property (such covenants, agreements and obligations being herein collectively referred to as the "Contractual Obligations"), as such Contractual Obligations shall arise or accrue from and after the date of this Assignment.  Assignee hereby agrees to indemnify, hold harmless and defend Assignor from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Contractual Obligations that are attributable to the period of time from and after the date of this Assignment.

12595226\V-11

Assignor agrees to indemnify, hold harmless and defend Assignee from and against any and all third party obligations, liabilities, costs and claims (including reasonable attorneys' fees) arising as a result of or with respect to any of the Contractual Obligations that are attributable to the period of time prior to the date of this Assignment.

TO HAVE AND TO HOLD the Leases, Operating Agreements, Personal Property, Warranties and Intangibles unto Assignee, its successors and assigns, forever.

This Assignment shall inure to the benefit of, and be binding upon, Assignor and Assignee, and their respective successors and assigns.

This Assignment shall be governed by the laws of the State of New York without regard to its conflict of laws rules.

This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement as of the day and year first above written.

Signed:

TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company

By:     LB TTERTT INC., a Delaware corporation, Managing Member

By:     _____

Its:    _____

"Assignor"

(Signatures continued
 on following page)

−104−

[Signature block of Assignee]

By: _____

Its: _____

"Assignee"

STATE OF _____  )
                      ) ss.
COUNTY OF _____  )

    The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by _____, the _____ of LB TTERTT INC., a Delaware corporation, the Managing Member of TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company, on behalf of said corporation and company.

_____

Notary Public, _____ County, __
My Comm. Expires: _____

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF OAKLAND    )

    The foregoing instrument was acknowledged before me this ___ day of _____, 20__, by _____, the _____ of _____, a _____, on behalf of said _____.

_____

Notary Public, _____ County, MI
My Comm. Expires: _____

−105−

<u>Exhibit A</u>

<u>Legal Description of Real Estate</u>

Land situated in the City of Southfield, County of Oakland and State of Michigan, being more particularly described as follows:

<u>Exhibit B</u>

<u>Schedule of Leases</u>

12595226\V-11

<u>Exhibit C</u>

<u>Tenant Security Deposits Dollars Transferred to Assignee</u>

12595226\V-11

<u>Exhibit D</u>

<u>Schedule of Operating Agreements</u>

12595226\V-11

## **Exhibit E**

### Form of FIRPTA Affidavit


STATE OF _____          )
                                 ) ss.
COUNTY OF _____             )


Section 1445(2)(b)(2) of the Internal Revenue Code of 1986, as amended, provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person or corporation.   To inform _____, a _____ ("Transferee"), that withholding of tax is not required upon the disposition of a United States real property interest by TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company ("Transferor"), which real estate is more particularly described on Exhibit A attached hereto, the undersigned hereby certifies that:

1.     Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.     Transferor's United States taxpayer identification number is _____;

3.     Transferor's office address is c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, Forty-Sixth Floor, New York, New York 10020; and

4.     Transferor is not a "disregarded entity" as defined in IRS Regulation 1.1445-2(b)(2)(iii).


Transferor understands that this Certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

–110–

12595226\V-11

Under penalties of perjury, the undersigned declares that he has examined this Certification and to the best of his knowledge and belief, it is true, correct and complete, and further declares that he has authority to sign this document on behalf of Transferor.

Signed:

TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company

By:    LB TTERTT INC., a Delaware corporation, Managing Member

By:    _____

Its:    _____

Subscribed and sworn to before me
this _____ day of _____, 20___

_____
    Notary Public

−111−

This Certification must be retained by Transferee until "the end of the fifth taxable year following the taxable year in which the transfer takes place".

12595226\V-11

<u>Exhibit A</u>

<u>Legal Description of Real Estate</u>

Land situated in the City of Southfield, County of Oakland and State of Michigan, being more particularly described as follows:

12595226\V-11

## Exhibit 16

Form of Memorandum of Option Agreement

## MEMORANDUM OF OPTION AGREEMENT

THIS MEMORANDUM OF OPTION (the "Memorandum") is made and executed this _____ day of _____, 2009, by and between TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company, whose address is _____ (hereinafter called "TTERTT"), and KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation, whose address is 39400 Woodward Avenue, Suite 250, Bloomfield Hills, Michigan 48304-5155 (hereinafter called "KMC").

W I T N E S S E T H:

The following is a recital of facts underlying this Memorandum:

TTERTT and KMC, on behalf of an entity to be designated by KMC (the "KMC Designee"), heretofore entered into an Agreement pursuant to which TTERTT has granted to KMC the option to purchase (the "Option") certain real estate located in the City of Southfield, Oakland County, Michigan, commonly known as Travelers Tower I and Travelers Tower II more particularly described on Exhibit A attached hereto.

The parties wish to enter into this Memorandum in order to give notice of the existence of the Option and certain of its terms, covenants and conditions.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, it is mutually agreed as follow:

1.      The foregoing recital of facts is incorporated herein by reference and shall be deemed a part of this Memorandum.

2.      The Option may be exercised by the Kojaian Designee at any time between the date hereof and _____, 2010 (the "Option Expiration Date") by delivery of written notice of such exercise to TTERTT.  If the Kojaian Designee does not timely elect to exercise the Option, time being of the essence, the Option shall be deemed to have expired and shall be of no further effect and, in such an event, this Notice shall be deemed released of record without any required further action.  Without limiting the foregoing, at the request of TTERTT or any other party, the Kojaian Designee and KMC shall execute or cause to be executed any and all documents reasonably necessary to evidence the removal of this Memorandum from record.

12595226\V-11

3.      This Memorandum does not set forth all of the materials terms or conditions of the Option.  This Memorandum is not intended to, nor shall it, amend, modify, diminish or affect in any way the Option or the construction or interpretation thereof or any rights or obligations of any party thereto.  The sole purpose of this Memorandum is to give notice of the Option and the duration thereof.

4.      This Memorandum shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.      This Memorandum may be executed in several counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Memorandum of Option Agreement as of the day and year first above written.

Signed:

TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company

By:     LB TTERTT INC., a Delaware corporation, Managing Member

By:     _____

Its:    _____

"TTERTT"

KOJAIAN MANAGEMENT CORPORATION, A Michigan corporation

By:     _____
        C. Michael Kojaian, Executive Vice President

"KMC"

(Acknowledgments contained on following page)

12595226\V-11

STATE OF NEW YORK        }
                         } ss.
COUNTY OF NEW YORK       }


     The foregoing instrument was acknowledged before me this ___ day of _____, 2009, by _____, the _____ of LB TTERTT Inc., a Delaware corporation, the Managing Member of TTERTT ASSOCIATES, L.L.C., a Michigan limited liability company, on behalf of said corporation and company.


                                   _____

                                   Notary Public, _____ County, New York
                                   My Comm. Expires: _____


STATE OF MICHIGAN        }
                         } ss.
COUNTY OF OAKLAND        }


     The foregoing instrument was acknowledged before me this ___ day of _____, 2009, by C. Michael Kojaian, the Executive Vice President of KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation,, on behalf of said corporation.


                                   _____

                                   Notary Public, _____ County, Michigan
                                   My Comm. Expires: _____


INSTRUMENT DRAFTED BY AND
  WHEN RECORDED RETURN TO:

William G. Barris, Esq.
BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
211 West Fort Street
Fifteenth Floor
Detroit, Michigan   48226-3281

**Exhibit A**

<u>Legal Description of Real Estate</u>

Land situated in the City of Southfield, County of Oakland and State of Michigan, and being more particularly described as:

**Exhibit 17**

**NTH Consultants Phase I ESA Reports**
**(Project No. 62-090194-01 through 62-090194-14 inclusive)**

**One Woodward Avenue,** NTH Consultants, ESA Phase I Report, Project # 62-090194-01, dated April 10, 2009.

**New West Michigan Industrial Investors (1210 E. Pontaluna)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-02, dated April 9, 2009.

**New West Michigan Industrial Investors (1218 E. Pontaluna)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-03, dated April 9, 2009.

**Hamlin Development Associates Limited Partnership**, NTH Consultants, ESA Phase I Report, Project # 62-090194-04, dated April 14, 2009.

**Alpha Drive Development Associates  (Alpha Tech Park Property)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-05, dated April 8, 2009.

**Bloomfield Hunt Club Estates,** NTH Consultants, ESA Phase I Report, Project # 62-090194-06, dated April 8, 2009.

**K/LB Twelve Mile (12 Mile Road, Farmington Hills, MI)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-07, dated April 9, 2009.

**New Van Buren Industrial Investors,** NTH Consultants, ESA Phase I Report, Project # 62-090194-08, dated April 15, 2009.

**Lyon Crossing (a/k/a Milford Road West Development Associates)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-09, dated April 8, 2009.

**Maple Stephenson Development Associates**, NTH Consultants, ESA Phase I Report, Project # 62-090194-10, dated April 8, 2009.

**Northville Technology Park**, NTH Consultants, ESA Phase I, Report Project # 62-090194-11, dated April 14, 2009.

**Shelby Industrial Investors**, NTH Consultants, ESA Phase I Report, Project # 62-090194-12, dated April 9, 2009.

**Venoy Wick Development Associates,** NTH Consultants, ESA Phase I Report, Project # 62-090194-13, dated April 14, 2009.

**Farmington Hills Corporate Investors (27555 Farmington Road, Farmington Hills, MI)**, NTH Consultants, ESA Phase I Report, Project # 62-090194-14, dated April 14, 2009.

## Exhibit 18

### List of Schedule A Joint Venture Leases and Occupancy Agreements

**Schedule of Leases**

| Tenant | Building | Date of Lease | Amendments | Security Deposit |
|---|---|---|---|---|
| MPH Logistics, Inc. | 1218 Pontaluna | 09/04/07 | 1st Amendment-11/10/08 | $13,020.83 |
| BPC Acquisition Company d/b/a Bennett Pump Company | 1218 Pontaluna | 04/24/98 | Addendum-04/24/98<br>2nd Amendment-02/14/02<br>3rd Amendment-01/16/03<br>4th Amendment-01/06/05<br>5th Amendment-11/14/05 | $15,364.00 |
| Windtronics, Inc. | 1218 Pontaluna | 03/26/09 | None | $2,000.00 |
| Avon Gear Company | 11968 Investment | 06/28/07 | None | $-0- |
| CBeyond Communications, LLC | Citiplace Center | 03/19/07 | None | $-0- |
| GreenPath, Inc., | Citiplace Center | 01/31/06 | 1st Amendment-07/31/06 | $-0- |
| Quicken Loans Inc. | Citiplace Center | 04/17/07 | Agreement – 01/22/09 | $-0- |
| Entertainment Publications, Inc. | Maple Corporate | 09/24/03 | Letter – 08/06/07 | $-0- |
| Abraham Ayoub | One Woodward | 05/18/89 | 1st Amendment-01/01/96 | $-0- |
| CDM Michigan Inc., | One Woodward | 11/06/87 | 1st Amendment-03/11/88<br>2nd Amendment-09/26/90<br>3rd Amendment-05/01/92<br>4th Amendment-12/16/92<br>5th Amendment-03/18/96<br>Letter – 03/20/97<br>Letter – 06/04/97<br>Letter – 01/08/98<br>6th Amendment-12/11/98<br>7th Amendment-08/14/00<br>8th Amendment-02/06/04<br>Assignment &<br>9th Amendment-05/14/08 | $-0- |
| Comerica Capital Markets, Inc., | One Woodward | 04/06/00 | 1st Amendment-08/28/08 | $-0- |
| Fraser, Trebilcock, Davis & Foster | One Woodward | 09/09/98 | 1st Amendment-12/27/02<br>2nd Amendment-02/06/04<br>3rd Amendment-11/20/07<br>4th Amendment-02/26/09 | $5,700.00 |
| M. Arthur Gensler Jr. & Associates, Inc. | One Woodward | 08/21/97 | 1st Amendment-04/22/99<br>2nd Amendment-06/24/99<br>3rd Amendment-05/28/04<br>4th Amendment-07/23/07<br>5th Amendment-05/27/09 | $-0- |
| Detroit Regional Chamber | One Woodward | 09/25/97 | 1st Amendment-06/15/98<br>Letter – 08/21/98 | $-0- |

| Tenant | Building | Date of Lease | Amendments | Security Deposit |
|---|---|---|---|---|
| | | | 2nd Amendment-10/21/00<br>3rd Amendment-07/29/04 | |
| Grubb & Ellis Management Services, Inc., | One Woodward | Letter – 07/12/07 | None | N/A |
| Kitch Drutchas Wagner Denardis & Valitutti, P.C., | One Woodward | 12/16/04 | None | $-0- |
| MCImetro Access Transmission Services LLC, | One Woodward | 02/24/95 | Letter – 11/18/04 | $-0- |
| Michigan Bell Telephone Company | One Woodward | 08/31/90 | Letter – 10/30/90<br>2nd Amendment-11/01/95<br>3rd Amendment-02/25/00<br>4th Amendment-06/07/05 | $-0- |
| National City Bank | One Woodward | 09/27/05 | None | $-0- |
| PMA Consultants LLC | One Woodward | 08/31/98 | 1st Amendment-02/21/05 | $-0- |
| TCG Detroit | One Woodward | License-10/12/99 | None | $-0- |
| Wilson Young PLC | One Woodward | 01/28/05 | Letter – 07/24/07 | $-0- |
| Kaleidoscope Sports and Entertainment L.L.C., | One Woodward | 12/06/04 | Letter – 04/21/05<br>1st Amendment-05/31/05 | $-0- |
| Agilent Technologies Inc. | 48679 Alpha Drive | 04/17/06 | None | $1,667.00 |
| Toshiba International Corporation | 48679 Alpha Drive | 01/23/07 | None | $-0- |
| Stockton Office Systems, Inc. | 48679 Alpha Drive | 09/30/04 | Letter – 07/21/08 | $-0- |
| Nichia America Corporation | 48561 Alpha Drive | 01/13/06 | None | $-0- |
| Valueoptions Inc., | 48561 Alpha Drive | 03/16/07 | None | $-0- |
| Waste Management of Michigan, Inc., | 48797 Alpha Drive | 03/31/03 | 1st Amendment-03/14/07 | $-0- |

## Exhibit 19

### List of Schedule A Joint Venture Security Deposits

**Schedule of Security Deposits**

| Tenant | Building | Date of Lease | Amendments | Security Deposit |
|---|---|---|---|---|
| MPH Logistics, Inc. | 1218 Pontaluna | 09/04/07 | 1st Amendment-11/10/08 | $13,020.83 |
| BPC Acquisition Company d/b/a Bennett Pump Company | 1218 Pontaluna | 04/24/98 | Addendum-04/24/98<br>2nd Amendment-02/14/02<br>3rd Amendment-01/16/03<br>4th Amendment-01/06/05<br>5th Amendment-11/14/05 | $15,364.00 |
| Windtronics, Inc. | 1218 Pontaluna | 03/26/09 | None | $2,000.00 |
| Avon Gear Company | 11968 Investment | 06/28/07 | None | $-0- |
| CBeyond Communications, LLC | Citiplace Center | 03/19/07 | None | $-0- |
| GreenPath, Inc., | Citiplace Center | 01/31/06 | 1st Amendment-07/31/06 | $-0- |
| Quicken Loans Inc. | Citiplace Center | 04/17/07 | Agreement – 01/22/09 | $-0- |
| Entertainment Publications, Inc. | Maple Corporate | 09/24/03 | Letter – 08/06/07 | $-0- |
| Abraham Ayoub | One Woodward | 05/18/89 | 1st Amendment-01/01/96 | $-0- |
| CDM Michigan Inc., | One Woodward | 11/06/87 | 1st Amendment-03/11/88<br>2nd Amendment-09/26/90<br>3rd Amendment-05/01/92<br>4th Amendment-12/16/92<br>5th Amendment-03/18/96<br>Letter – 03/20/97<br>Letter – 06/04/97<br>Letter – 01/08/98<br>6th Amendment-12/11/98<br>7th Amendment-08/14/00<br>8th Amendment-02/06/04<br>Assignment &<br>9th Amendment-05/14/08 | $-0- |
| Comerica Capital Markets, Inc., | One Woodward | 04/06/00 | 1st Amendment-08/28/08 | $-0- |
| Fraser, Trebilcock, Davis & Foster | One Woodward | 09/09/98 | 1st Amendment-12/27/02<br>2nd Amendment-02/06/04<br>3rd Amendment-11/20/07<br>4th Amendment-02/26/09 | $5,700.00 |
| M. Arthur Gensler Jr. & Associates, Inc. | One Woodward | 08/21/97 | 1st Amendment-04/22/99<br>2nd Amendment-06/24/99<br>3rd Amendment-05/28/04<br>4th Amendment-07/23/07<br>5th Amendment-05/27/09 | $-0- |
| Detroit Regional Chamber | One Woodward | 09/25/97 | 1st Amendment-06/15/98<br>Letter – 08/21/98 | $-0- |

| Tenant | Building | Date of Lease | Amendments | Security Deposit |
|---|---|---|---|---|
| | | | 2nd Amendment-10/21/00<br>3rd Amendment-07/29/04 | |
| Grubb & Ellis Management Services, Inc., | One Woodward | Letter – 07/12/07 | None | N/A |
| Kitch Drutchas Wagner Denardis & Valitutti, P.C., | One Woodward | 12/16/04 | None | $-0- |
| MCImetro Access Transmission Services LLC, | One Woodward | 02/24/95 | Letter – 11/18/04 | $-0- |
| Michigan Bell Telephone Company | One Woodward | 08/31/90 | Letter – 10/30/90<br>2nd Amendment-11/01/95<br>3rd Amendment-02/25/00<br>4th Amendment-06/07/05 | $-0- |
| National City Bank | One Woodward | 09/27/05 | None | $-0- |
| PMA Consultants LLC | One Woodward | 08/31/98 | 1st Amendment-02/21/05 | $-0- |
| TCG Detroit | One Woodward | License-10/12/99 | None | $-0- |
| Wilson Young PLC | One Woodward | 01/28/05 | Letter – 07/24/07 | $-0- |
| Kaleidoscope Sports and Entertainment L.L.C., | One Woodward | 12/06/04 | Letter – 04/21/05<br>1st Amendment-05/31/05 | $-0- |
| Agilent Technologies Inc. | 48679 Alpha Drive | 04/17/06 | None | $1,667.00 |
| Toshiba International Corporation | 48679 Alpha Drive | 01/23/07 | None | $-0- |
| Stockton Office Systems, Inc. | 48679 Alpha Drive | 09/30/04 | Letter – 07/21/08 | $-0- |
| Nichia America Corporation | 48561 Alpha Drive | 01/13/06 | None | $-0- |
| Valueoptions Inc., | 48561 Alpha Drive | 03/16/07 | None | $-0- |
| Waste Management of Michigan, Inc., | 48797 Alpha Drive | 03/31/03 | 1st Amendment-03/14/07 | $-0- |

## Exhibit 20

### List of Schedule A Joint Venture Contracts and Subcontracts



**GRUBB & ELLIS.**
From Insight to Results

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

The page contains a large, low-resolution scanned table of service contracts and blanket purchase orders that is largely illegible.

### Additional Comments:
1. PEST CONTROL = $1.40/sq unit
2. HVAC CONTRACT Cancelled w/ Mechanical - Awarded to Summit - prices are for year 1 only here
3. LAWN MO BLAST-BW MONTH
4.
5. SEALCOATING - STRIPE Painters $187
6. WINDOW - $360/CLEAN
7. FLOWERS - 76 FLATS at fall response
8. BACKFLOW - Assumes there are 15+ ETBNs, there should be at least 3 per building
9. MONTH/SPRING-SUMMER/MONTH
10. BROW $300/5.32 of 8 zay/each
Distribution: O EMS District Office (Quarterly Updates due 3/31, 6/30, 9/30, 12/31)



**Grubb&Ellis**

Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: 1350 Hamlin Road

Property Manager: Tim Dirriglio

Date: June, 2009

| Service Type | Contractor | Contract Term Commencement | Contract Term Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content |
|---|---|---|---|---|---|---|---|---|---|
| Landscaping | DeClark's Landscaping | 05/01/09 | 11/01/09 | $4,965.00 | 04/01/05 | Yes | | Yes | In-house scope of work |
| Elevators | ThyssenKrupp | 07/01/04 | 06/30/09 | $480.00 | 06/01/04 | Yes | | Yes | In-house scope of work |
| Alarm System | Guardian Alarm Co. | 01/01/09 | 12/31/09 | 82.40/mo | 06/01/04 | Yes | 227-09-001 | No | In-house scope of work |
| Roof | Lutz Roofing | 01/01/09 | 12/31/09 | 1000.00/annual | 01/01/07 | Yes | 227-09-022 | No | In-house scope of work |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:



**GRUBB & ELLIS MANAGEMENT SERVICES, INC.**
**SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT**

Property Name: KLB TWELVE MILE ASSOCIATES, LLC

Property Manager: Lisa S. Baldwin

Date: June 1, 2009

| Service Type | Category | Contract Term Commencement | Contract Term Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit & Contact |
|---|---|---|---|---|---|---|---|---|---|
| Window Cleaning | Aztec Specialties | 04/01/09 | 11/30/10 | $6,400.00 | 03/31/09 | YES | SC-KLB09-04 | Yes contractor proposal | Contractor Proposal + in house scope of work |
| Generator R&M | Bridgeway Power-Cummins | 05/01/09 | 04/30/10 | $1,272.40 | 03/31/09 | YES | SC-KLB09-05 | YES | Contractor Proposal + in house scope of work |
| Lot Sweeping | C&J Sweeping | 04/01/09 | 10/31/09 | $695.40 | 02/28/09 | YES | SC-KLB09-03 | YES | Contractor Proposal + in house scope of work |
| Pest Control | Complete Pest | 10/01/07 | 09/30/10 | $2,600.00 | 09/01/07 | YES | SC-KLB07-16 | YES | house scope of work |
| Landscape/Mulch | Customers Outdoor Svcs. | 04/01/08 | 11/30/09 | $14,170.00 | 10/15/08 | YES | SC-KLB09-01 | YES | Contractor Proposal + in house scope of work |
| Interior Plants | Emerald Forest | 10/01/07 | 09/30/09 | $2,130.00 | 09/01/07 | YES | SC-KLB07-19 | YES | house scope of work |
| Elevator | Otis Elevator | 11/01/05 | 10/31/10 | $10,655.48 | 10/01/05 | YES | | YES | Contractor Proposal |
| Janitorial | PIC Maintenance | 09/01/07 | 08/31/10 | .07 per RSF | 08/01/07 | YES | SC-KLB07-14 | YES | Contractor Proposal |
| HVAC | Siemens (Revised) | 01/01/07 | 12/31/09 | $69,500.00 | 12/01/06 | YES | | YES | Contractor Proposal + in house scope of work |
| Fire Alarm | Simplex Grinnell | 04/21/09 | 02/28/10 | $4,206.50 | 03/31/09 | YES | SC-KLB09-02A | YES | house scope of work |
| Carpet Cleaning | Sunshine Surface Care | 10/01/07 | 09/30/10 | $5,700.00 | 09/01/07 | YES | SC-KLB07-17 | YES | contractor proposal + in house scope of work |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:

−125−



**Grubb&Ellis.**

Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: Maple Corporate

Property Manager: Tim Geingas

Date: June, 2008

| Service Type | Contractor | Contract Term Commencement | Contract Term Termination | Contract P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content |
|---|---|---|---|---|---|---|---|---|---|
| Alarm Monitoring | ADT Security Services | 03/01/09 | 02/28/10 | $7,205.00 | No | No | | Yes | Proposal w/rates |
| Interior Plants | Artscape, Inc. | 01/01/09 | 12/31/09 | $3,108.00 | No | No | MC07X08 | No | Proposal w/rates |
| Generator PEMA | Cummins Bridgeway | 06/01/08 | 05/31/09 | $1,100.00 | No | No | MC07B07 | No | Proposal w/rates |
| Carpet Cleaning | Dalton Commercial | 04/01/09 | 03/31/10 | $3,500.00 | No | No | MC07J10 | No | Proposal w/rates |
| Grounds Care | DeClarks Landscaping | 05/01/09 | 10/31/09 | $14,810.00 | Yes | 1/1/2009 | | Yes | Proposal w/rates |
| Snow | DeClarks Landscaping | 11/15/09 | 04/15/10 | $12,500 plus | 07/01/08 | Yes | | Yes | Proposal w/rates |
| HVAC PEMA | Johnson Controls | 01/01/08 | 12/31/09 | $6,600.00 | 11/01/07 | Yes | MC07W04 | No | Proposal w/rates |
| Roof PEMA | Lutz Roofing | 01/01/09 | 12/31/09 | $1,250.00 | No | No | MC07T06 | No | Proposal w/rates |
| Janitorial | New Image Building | 01/01/08 | 12/31/09 | varies | yes | Yes | | No | Proposal w/rates |
| Elevator | Otis Elevator | 05/27/03 | 05/26/12 | $2,850.00 | Yes | Yes | | Yes | Proposal w/rates |
| Exterminator | Rose Pest Solutions | 01/01/09 | 12/31/10 | $690.00 | No | No | MC07U08 | No | Proposal w/rates |
| Fire Alarm Serv. | Siemens | 05/01/09 | 04/30/1110 | $5,100.00 | No | No | MC07K10 | No | Proposal w/rates |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:

−126−



## Grubb&Ellis

### Property Solutions Worldwide

**GRUBB & ELLIS MANAGEMENT SERVICES, INC.**
**SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT**

Property Name: Grand Rapids - Portakuna Locations

Property Manager: Jessika Furlong

Date: June 1, 2009

| Service Type | Contractor | Contract Term | | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Commencement | Termination | | | | | Yes/No | Insert Type Bid, contract no, proposal, engineered | | |
| | | (mo/yr) | (mo/yr) | (Insert Annual Cost) | (mo/yr) | (Yes/No) | Insert P.O. Number | Any modifications or additions into Avail specifications, in-house scope of work, be approved and described below. (etc) | | | |
| HVAC - Lakeshore | Quality Air | 01/21/09 | 12/31/2009 | $3,900.00 | 1/1/2009 | Y | SC175 | Yes | In House scope | 1210 - $1668 | 1218 - $2232 |
| Lawn Care | Evergreen | 04/01/09 | 12/1/2010 | $10,660.00 | 3/5/2009 | Y | SC179 | Yes | In House scope | 1210 - $5380 | 1218 - $5280 |
| Window Cleaning | Fish Window | 3/15/2009 | 12/1/2010 | $518.00 | 3/5/2009 | N | SC180 | Yes | In House scope | 1210 - $174 | 1218 - $344 |
| Parking lot sweeping | Bill's Enterprises | 4/10/2009 | 11/15/2009 | $4,970.00 | 3/9/2009 | Y | SC182 | Yes | In House scope | 1210 - $400 | 1218 - $400 |
| Asphalt repairs | Superior Asphalt | 4/22/2009 | 12/31/2009 | TBD | 4/7/2009 | Y | SC183 | Yes | In House scope | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

**Additional Comments:**

Distribution: GEMS District Office (Semi-Annual Updates due 1/15 & 7/15)

−127−



**GRUBB & ELLIS.**
From Insight to Results

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: (234) NORTHVILLE TECHNOLOGY PARK

Property Manager: Kim Dulak

Date: June 1, 2009

| Building | Account | Service Type | Contractor | Contract Term Commencement | Contract Term Termination | Contract/P.O. Value | Cust Bid Date | Commentary Site | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content | Certificate of Insurance Expiration Date | | | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Gen Liability | Workers Comp | Auto | (Test last performed/conducted) |
| | | | | | | | | | | | | | | | |
| 3200-0002 | PLUMBING-BACKFLOW | GARWOOD | 5/1/2008 | 5/31/2008 | $ 156.00 | APR08 | YES | NTP-SC-009 | PURCHASE ORDER | Contractor's Proposal | | 05/31/09 | 04/31/09 | 05/01/09 | |
| 3200-0003 | GENERAL SUPPLIES | | | | | | | | | | | | | | |
| 3200-0008 | ELECTRIC | | | | | | | | | | | | | | |
| 3200-0009 | IRRIGATION | TRICOUNTY IRRIGATION | 5/1/2008 | 11/1/2008 | $ 620.00 | OCT08 | YES | NTP-SC-007 | PURCHASE ORDER | Contractor's Proposal | | 7/31/2009 | 7/31/2009 | 7/31/2009 | |
| 3200-0009 | LANDSCAPING | CUSTOMERS OUTDOOR SERVICE | 5/1/2008 | 11/1/2009 | $ 25,213.00 | MAR08 | NO | NTP-SC-008 | YES | Contractor's Proposal | | 6/16/2009 | 6/16/2009 | 6/16/2009 | 3/09/09 CANCELLED |
| 3200-0009 | LANDSCAPING | BP CANOY | 4/1/2009 | 11/30/2009 | $ 3,680.00 | MAR09 | YES | NTP-SC-005 | YES | Contractor's Proposal | | 12/31/2009 | 12/31/2009 | 12/31/2009 | |
| 3200-0009 | LANDSCAPING - FLOWERS | CUSTOMERS OUTDOOR SERVICE | 6/1/2008 | 11/1/2009 | $ 370.00 | MAR08 | YES | NTP-SC-009 | PURCHASE ORDER | Contractor's Proposal | | 4/23/2009 | 4/23/2009 | 4/23/2009 | 3/09/09 CANCELLED |
| 3200-0009 | LANDSCAPING - FLOWERS | ON FERTILE GROUND | 6/1/2008 | 6/30/2009 | $ 385.00 | MAY08 | YES | NTP-SC-011 | PURCHASE ORDER | Contractor's Proposal | | 4/23/2010 | N/A | N/A | |

Additional Comments:

Distribution:  GEMS District Office (Quarterly Updates due 3/31, 6/30, 9/30, 12/31)



**Grubb&Ellis.**

Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: One Woodward Avenue
Property Manager: Charles E. Brodeur
Date: June 1,2009

| Service Type | Contractor | Contract Term Commencement | Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content | Certificate of Insurance Expiration Date | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | (months) | (mo/d/yr) | (what Annual Total) | (yy/mm/d) | (Yes/No) | (what P.O. number) | they list / by modification in attendance main be approved and described below | Exet Type be contractor proposal engineered specifications, e-Issue large of work set | Cert GEMS | Workers Comp | Auto |
| Valet Parking | Miller Parking | 09/01/07 | 08/31/09 | $200,000.00 | 08/15/07 | Yes | n/a | Yes | Owners Specifications | 06/01/09 | 06/01/09 | 06/01/09 |
| Elevators | Otis Elevators | 12/01/04 | 12/31/09 | $95,400.00 | 12/01/04 | Yes | n/a | Yes | Contractor Proposal | 04/01/10 | 04/01/10 | 04/01/10 |
| Plant Care | Emerald Forest | Pending | Pending | $5,800.00 | 12/31/05 | Yes | 1968 | Yes | Owners Specifications | 01/01/09 | 01/01/09 | 01/01/09 |
| Janitorial | New Image | 12/31/09 | 12/31/09 | $378,200.00 | 02/01/06 | Yes | n/a | Yes | Owners Specifications | 01/01/10 | 01/01/10 | 01/01/10 |
| Security | Securitas | 05/01/09 | 04/30/10 | $30,000.00 | 05/31/04 | Yes | n/a | Yes | Owners Specifications | | | |
| Waste Removal | Capital Waste | Month to Month | | $25,000.00 | 06/01/04 | Yes | 4080 | Yes | Contractor Proposal | 07/14/09 | 07/14/09 | 07/14/09 |
| Pest Control | Eradico | 09/01/08 | 12/31/09 | $888.00 | 05/01/04 | Yes | 1989 | Yes | Contractor Proposal | 05/01/10 | 05/01/10 | 10/18/08 |
| Marble Floor Care | Griffin Marble | 01/01/09 | 12/31/09 | $11,880.00 | 07/01/05 | Yes | n/a | Yes | Owners Specifications | 09/27/09 | 09/27/09 | 09/27/09 |
| Window Cleaning | Professional Window Clea | 04/01/09 | 12/31/09 | $14,000.00 | 03/01/08 | Yes | n/a | Yes | Owners Specifications | 03/10/10 | 03/10/10 | 03/10/10 |
| HVAC Service | H-O-H Chemical | Month to Month | | $8,000.00 | 03/01/08 | Yes | 4079 | Yes | Owners Specifications | 04/01/10 | 04/01/10 | 04/01/10 |
| Uniforms | Arrow Uniforms | 09/01/06 | 08/31/09 | $2,497.04 | 06/01/06 | Yes | n/a | Yes | Owners Specifications | Pending | | |
| Carpet Cleaning | Dalton Commercial Corp | 01/01/09 | 12/31/09 | $800.00 | 01/02/08 | Yes | n/a | Yes | Owners Specifications | 02/11/10 | 02/11/10 | 02/11/10 |
| Fire Alarm Serv | Fire Alarm Services, Inc. | 01/01/09 | 12/31/09 | $7,650.00 | 01/01/07 | Yes | 3914 | Yes | Owners Specifications | 04/21/09 | 04/21/09 | 04/21/09 |
| Metal Trim Maint | Midwest Signature Building | 01/01/09 | 12/31/09 | $12,204.00 | 12/01/08 | Yes | | Yes | Owners Specifications | 08/06/09 | 08/06/09 | 08/06/09 |

Additional Comments:

First

Distribution: GEMS District Office (Quarterly Updates due 3/31, 6/30, 9/30, 12/31)

−129−



**Grubb&Ellis.**

Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: One Woodward Avenue

Property Manager: Charles E. Brodeur

Date: June 1,2009 Page 1 & 2

| Service Type | Contractor | Contract Term | | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Correct | Certificate of Insurance Expiration Date | | |
| | | Commencement | Termination | | | | | | | Gen Liability | Workers Comp | Auto |
| | | (mm/d/yr) | (mm/d/yr) | (Insert Annual Cost) | (Yr/M/D) | (Yes/No) | (Insert P.O. Number) | (Yes/No) Are modifications or alterations in all specifications in loose script of work. No approval and/or specifications attached. | Insert Yes or no contractors proposal, negotiated specifications in loose script of work attached. | | | |
| Ext. Landscaping | Brickman Torre & Bruglio | Pending | Pending | $4,360.00 | 10/31/06 | Yes | n/a | Yes | Contractor Proposal | 07/01/09 | 07/01/09 | 07/01/09 |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Additional Comments:

Distribution:  GEMS District Office (Quarterly Updates due 3/31, 6/30, 9/30, 12/31)

−130−



Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: Shelby Parkway (Common Area 23 - 24 Mile Road)

Property Manager: Tim Glenske

Date: June, 2009

| Service Type | Contractor | Contract Term Commencement | Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content |
|---|---|---|---|---|---|---|---|---|---|
| Landscaping | Ray's Landscaping | 05/01/07 | 11/01/10 | $24,916.01 | 02/01/06 | Yes | | Yes | In-house scope of work |

Additional Comments:



**Grubb&Ellis.**

Property Solutions Worldwide

GRUBB & ELLIS MANAGEMENT SERVICES, INC.
SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT

Property Name: 51870 Shelby Tech Drive Shelby Investment II

Property Manager: Tim Grimske

Date: June, 2009

| Service Type | Contractor | Contract Term Commencement | Termination | Contract P.O. Value | Last Bid Date | Competitive Bid | Blanket Purchase Order | Standard DEMS Service Contract | Exhibit A Content |
|---|---|---|---|---|---|---|---|---|---|
| Snow Removal | DeClark Landscaping | 11/01/08 | 04/30/10 | 2,760/annually | 09/07/06 | Yes | | Yes | In-house scope of work |
| Landscaping | Ray's Landscaping | 05/01/07 | 11/01/10 | $8,023.86 | 02/01/06 | Yes | | Yes | In-house scope of work |
| HVAC Prev. Main | Johnson Controls/Temp Eng | 01/01/08 | 12/31/09 | $1,980.00 | 10/01/03 | Yes | 244-07-030 | No | In-house scope of work |
| Roof | Lutz Roofing | 01/01/09 | 12/31/09 | 560.00/annual | 01/01/09 | Yes | 244-08-022 | No | In-house scope of work |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:

−132−



## Grubb&Ellis.

Property Solutions Worldwide

**GRUBB & ELLIS MANAGEMENT SERVICES, INC.**
**SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT**

Property Name: 11966 Investment Drive Shelby Investment III (AVON GEAR)

Property Manager: Tim Grimsley

Date: June, 2009

| Service Type | Contractor | Contract Term Commencement | Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content |
|---|---|---|---|---|---|---|---|---|---|
| Snow Removal | DeClark Landscaping | 12/01/08 | 04/30/10 | 3,960/annually | 09/07/06 | Yes | | Yes | In-house scope of work |
| Landscaping | Ray's Landscaping | 05/01/07 | 11/01/10 | $4,589.48 | 02/01/06 | Yes | | Yes | In-house scope of work |
| HVAC Prev. Main. | Bumler Mechanical, Inc. | 12/15/08 | 12/14/09 | 7962.00 annually | 10/01/03 | Yes | | Yes | In-house scope of work |
| Elevator | Schindler Elevator | 01/04/09 | 01/03/12 | 2,412/annually | 12/05/08 | Yes | | Yes | In-house scope of work |
| Roof | Lutz Roofing | 01/01/09 | 12/31/09 | 550.00/annual | 01/01/08 | Yes | 224-08-012 | No | In-house scope of work |
| Alarm Monitoring | Guardian Alarm | 01/01/09 | 12/31/09 | 50.00/mo. | 01/01/08 | Yes | 224-09-005 | No | In-house scope of work |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:

−133−



## Grubb&Ellis.
Property Solutions Worldwide

**GRUBB & ELLIS MANAGEMENT SERVICES, INC.**
**SERVICE CONTRACT & BLANKET PURCHASE ORDER STATUS REPORT**

Property Name: 11969 Shelby Tech Drive Shelby Investment II

Property Manager: Tim Gelngas

Date: June, 2009

| Service Type | Contractor | Contract Term Commencement | Contract Term Termination | Contract/P.O. Value | Last Bid Date | Competitively Bid | Blanket Purchase Order | Standard GEMS Service Contract | Exhibit A Content Work Type |
|---|---|---|---|---|---|---|---|---|---|
| Snow Removal | DeClark Landscaping | 11/01/08 | 04/30/10 | 2,160/annually | 09/07/06 | Yes | | Yes | In-house scope of work |
| Landscaping | Ray's Landscaping | 06/01/07 | 11/01/10 | $4,186.77 | 02/01/06 | Yes | | Yes | In-house scope of work |
| HVAC Prev. Main | Johnson Controls/Temp Eng | 01/01/08 | 12/31/09 | $1,980.00 | 10/01/03 | Yes | 244-07-031 | No | In-house scope of work |
| Roof | Lutz Roofing | 01/01/08 | 12/31/09 | 550.00/annual | 01/01/09 | Yes | 244-08-021 | No | In-house scope of work |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Additional Comments:

−134−

## **Exhibit 21**

List of Schedule A Joint Venture Pending Litigation and Claims

None.

## Exhibit 22

List of Fees and Commissions Due to Grubb & Ellis Management Services, Inc. and KMC

### Schedule of Management Fees due to Grubb & Ellis Management Services, Inc. and Asset Management Fees due to Kojaian Management Corporation under Operating Agreements for Schedule A Joint Ventures

| Property | Total Receipts | Fee % | G&E Managment Fees<br>Total Fee | KMC Asset Mgmt. Fees |
|---|---|---|---|---|
| Alpha Drive Development | $ 212,283.90 | 5 % | $10,614.20 | $ 1,061.42 |
| Shelby III Industrial Investors | 64,730.58 | 5 | 3,236.53 | -0- |
| Hamlin (Vacant) | -0- | 5 | 500.00 | -0- |
| Shelby II (Vacant) | -0- | 5 | 500.00 | -0- |
| One Woodward Avenue Assocs. | 298,629.65 | 4 | 11,945.19 | -0- |
| Maple Stephenson | 136,409.38 | 5 | 6,820.47 | 682.05 |
| K/LB Twelve Mile | 194,526.80 | 5 | 9,726.34 | 972.63 |
| New West Michigan-II Indus. | 37,764.71 | 3 | 1,132.94 | 188.82 |
| New Van Buren (Vacant) | -0- | 0 | -0- | -0- |
| Northville Tech (Vacant) | -0- | 0 | -0- | -0- |
| Venoy Wick (Vacant) | -0- | 0 | -0- | -0- |
| Alpha Drive-North (Vacant) | -0- | 0 | -0- | -0- |
| Shelby Industrial Investors (Vacant) | -0- | 0 | -0- | -0- |
| Shelby IV Industrial Investors (Vacant) | -0- | 0 | -0- | -0- |

Note: Management Fees and Asset Management Fees due under Operating Agreements are due based on prior month's receipts. Above schedule sets forth such Management Fees and Asset Management Fees due for May, 2009.

### Schedule of Leasing Commissions

**June 2, 2009**

| Tenant | Building | Broker | Commission |
|---|---|---|---|
| M. Arthur Gensler Jr. & Associates, Inc. | One Woodward | KMC | $8,865.00 |

## Exhibit 23

Form of Agreement, Mutual Waiver and Release and Covenant Not to Sue

**AGREEMENT, MUTUAL WAIVER AND RELEASE AND COVENANT NOT TO SUE**

THIS AGREEMENT, MUTUAL WAIVER AND RELEASE AND COVENANT NOT TO SUE (the "Agreement"), is made and entered into as of the day of _____, 2009, by and between the parties signatory to this Agreement, signature lines for who or which appear on **Schedule A-1** attached hereto (individually, a "Lehman Party" and, collectively, the "Lehman Parties"), and the parties signatory to this Agreement, signature lines for who or which appear on **Schedule B-1** attached hereto (individually, a "Kojaian Party" and, collectively, the "Kojaian Parties").

W I T N E S S E T H:

The following is a recital of facts underlying this Agreement:

Entities owned, directly or indirectly, by Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI") and/or Property Asset Management, Inc. ("PAMI"), on the one hand, and entities, which are owned, directly or indirectly, by a Kojaian Party, on the other hand, are joint venturers in numerous real estate investment entities (collectively, the "Joint Ventures"). First mortgages (the "LBHI Mortgages") on the properties owned by certain of the Joint Ventures are held by LBHI or by affiliates of LBHI. The properties owned by certain other Joint Ventures are encumbered by mortgages held by third party lenders other than LBHI or its affiliates.

Simultaneously with the execution hereof, various of the Lehman Parties and the Kojaian Parties have executed various documents to sever and terminate all relationships between them with regard to, or arising out of, among other things, the (i) Joint Ventures and the operating agreements governing the operations thereof, and (ii) the LBHI Mortgages. In conjunction therewith, the Lehman Parties and the Kojaian Parties have agreed to execute this Agreement in order to, among other things, document certain mutual and general releases between themselves.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and in consideration of the mutual covenants and releases contained in this Agreement, the Lehman Parties and the Kojaian Parties mutually agree as follows:

1.    The foregoing recital of facts is incorporated herein by reference and shall be deemed a part of this Agreement.

2.    Each Lehman Party, jointly and severally, for and on behalf of itself, and all of its present and former affiliates (including, without limitation, each of those affiliates listed on **Schedule A-2**), and all persons and entities who or which may claim by, through or under any of them, including, but not limited to, all of their respective present and former parents, subsidiaries, affiliates, members (managing or otherwise), partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, and each of their respective present and former parents, subsidiaries, affiliates, members, partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, hereby fully, freely, completely and absolutely waives, relinquishes, releases and forever discharges each Kojaian

–137–

Party and its parents, subsidiaries, affiliates, members, partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, and all successors, heirs, executors, administrators and assigns thereof from any and all Claims. "Claims" means any claims, controversies, actions, causes of action, suits, demands, losses, debts, liens, encumbrances, contracts, agreements, promises, representations and/or warranties (or any breach thereof), torts, damages (whether actual, consequential, exemplary or otherwise), costs, fees, adverse tax consequences, penalties, expenses (including, without limitation, attorneys', paralegals' and appraisers' fees and expenses and costs of litigation, arbitration and/or mediation), monies due on accounts, obligations, judgments or liabilities of any nature whatsoever in law or in equity from the beginning of time to the date of execution and delivery of this Agreement, whether or not known now, heretofore or hereafter, whether anticipated or unanticipated, suspected or claimed, fixed or contingent, whether yet accrued or not and whether damage has yet resulted therefrom or not, arising out of or relating in any manner to any matters, causes or things whatsoever. "Claims" shall likewise include any loss, liability, damage or expenses, including reasonable attorneys', paralegals' and appraisers' fees incurred in defending, responding to or otherwise seeking relief from any Claims. Each Lehman Party further expressly acknowledges, covenants, represents and warrants that the foregoing release is intended to be as broad and inclusive as permitted by law. Notwithstanding anything contained herein to the contrary, nothing shall prevent or preclude a Lehman Party from pursuing an action against any Kojaian Party (i) relating to a breach by such Kojaian Party of any representation or warranty made by such Kojaian Party contained in that certain Settlement Agreement dated _____, 2009 (the "<u>Settlement Agreement</u>"), or otherwise contained in any Assignment Agreement or Assignment of Membership Interest executed and delivered by any such Kojaian Party to a Lehman Party or to any Lehman Designee (as defined in the aforesaid Settlement Agreement), and/or (ii) relating to any indemnity made by a Kojaian Party for the benefit of a Lehman Party that is expressly set forth in the Settlement Agreement or any Assignment Agreement or Assignment of Membership Interest executed and delivered by any Kojaian Party to any Lehman Party or Lehman Designee, and/or (iii) relating to any claims, controversies, actions, causes of action, suits or demands, made by or arising out of (directly or indirectly) Kojaian Holdings, LLC investment(s) in the private equity funds sponsored by LBHI or LBHI affiliates itemized in **<u>Schedule C</u>** attached hereto, and the foregoing itemized in clauses (i) through (iii) are specifically excluded from the definition of "Claims".

3. Each Kojaian Party, jointly and severally, for and on behalf of itself, and all of its present and former affiliates (including, without limitation, each of those affiliates listed on **<u>Schedule B-2</u>**, but specifically excluding Kojaian Holdings, LLC, which has invested in the private equity funds sponsored by LBHI or LBHI affiliates itemized in **<u>Schedule C</u>** attached hereto, if and only to the extent that Kojaian Holdings, LLC has a Claim relating to such private equity funds itemized on **<u>Schedule C</u>**) and all persons and entities who or which may claim by, through or under any of them, including,  but not limited to, all of their respective present and former parents, subsidiaries, affiliates, members (managing or otherwise), partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, and each of their respective present and former parents, subsidiaries, affiliates, members, partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, hereby fully, freely, completely and absolutely waives, relinquishes, releases and forever discharges each Lehman Party and its parents, subsidiaries, affiliates, members, partners, shareholders, principals, officers, directors, agents, employees, legal counsel, successors and assigns, and all successors, heirs, executors, administrators and assigns thereof, from any and all Claims. Each Kojaian Party further expressly acknowledges, covenants, represents and warrants that the foregoing release is intended to be as broad and inclusive as permitted by law. Notwithstanding anything contained herein to the contrary, nothing shall prevent or preclude a Kojaian Party from pursuing an action against any Lehman Party (i) relating to a breach by such Lehman Party of any representation or warranty made by such applicable Lehman Party contained in the Settlement Agreement, or

–138–

otherwise contained in any Assignment Agreement or Assignment of Membership Interest executed and delivered by any such Lehman Party to a Kojaian Party or to any Kojaian Designee (as defined in the aforesaid Settlement Agreement), and/or (ii) relating to any indemnity made by a Lehman Party for the benefit of a Kojaian Party that is expressly set forth in the Settlement Agreement or any Assignment Agreement or Assignment of Membership Interest executed and delivered by any Lehman Party to any Kojaian Party or Kojaian Designee, and the foregoing are specifically excluded from the definition of "Claims".

4.    Without limiting the foregoing in any manner, each party hereto understands and agrees that by executing this Agreement, each of them hereby waives any rights, statutory or otherwise, to any Claims covered by the above releases which such party does not now know or suspect to exist in such party's favor at the time of executing this Agreement.

5.    Each party hereto further covenants and agrees that it will never sue or institute, or cause to be instituted, any proceeding in any court against any other party hereto to charge such other party with any matter covered by the above releases.

6.    Each party represents and warrants to each other party that it has neither made, nor suffered to be made, nor will make any assignment or transfer of any Claims covered by the above releases, or any portion or part thereof, and that it is the sole and absolute legal and equitable owner of all of the foregoing matters, which are hereby released by such party.

7.    Each Kojaian Party to this Agreement further represents and warrants to each of the Lehman Parties that it has full authority to execute this Agreement and the persons executing this Agreement on behalf of each such Kojaian Party have been duly authorized to execute this Agreement on behalf of such Kojaian Party. Moreover, each Kojaian Party executing this Agreement further presents that it is not bound by any agreement, or under any other disability, which would prevent it from doing so.

8.    Each Lehman Party to this Agreement further represents and warrants to each of the Kojaian Parties that it has full authority to execute this Agreement and the persons executing this Agreement on behalf of each such Lehman Party have been duly authorized to execute this Agreement on behalf of such Lehman Party. Moreover, each Lehman Party executing this Agreement further presents that it is not bound by any agreement, or under any other disability, which would prevent it from doing so.

9.    Each party to this Agreement acknowledges to the other party that it has consulted with counsel of its choosing with regard to the advisability and effect of executing and delivering this Agreement.

10.    This Agreement constitutes the entire agreement among the parties with respect to the subjects addressed herein, and supersedes any prior oral or written agreement or understanding among the parties concerning such subjects, except as incorporated herein.

11.    For purposes of this Agreement, the term "affiliates" shall mean, as to the person or entity in question, any person or entity that, directly or indirectly, controls, is controlled by, or is under common control with, the person or entity in question and any successors or assigns of such person or entity; the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity whether through ownership of voting securities, by contract or otherwise.

−139−

12.       EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIPS OF THE PARTIES HERETO BE TRIED BY JURY. THIS WAIVER EXTENDS TO ANY AND ALL RIGHTS TO DEMAND A TRIAL BY JURY ARISING FROM ANY SOURCE, INCLUDING, BUT NOT LIMITED TO, THE CONSTITUTION OF THE UNITED STATES OR ANY STATE THEREIN, COMMON LAW OR ANY APPLICABLE STATUTE OR REGULATIONS. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY. EACH PARTY ACKNOWLEDGES THAT NO OTHER PARTY HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THE SETTLEMENT AGREEMENT, THAT EACH OF THEM HAS ALREADY RELIED ON THIS WAIVER AND THAT EACH OF THEM WILL CONTINUE TO RELAY ON THIS WAIVER IN ANY POTENTIAL FUTURE DEALINGS.

13.       This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one and the same agreement.

14.       Each Lehman Party and each Kojaian Party declare that they have read this Agreement, have been advised of its meaning by counsel and fully understand its terms. Each Lehman Party and each Kojaian Party each further declare that this Agreement contains their entire agreement and understanding as to the release of Claims, that no promise, inducement or agreement not expressed in this Agreement has been made by, between or among them as to the release of such Claims, and that this Agreement may not be modified except by a subsequent writing signed by each Lehman Party and each Kojaian Party.

15.       The interpretation and enforcement of this Agreement will be governed by the laws of the State of New York without regard to its conflict of laws rules. Each Lehman Party and each Kojaian Party irrevocably consent to the jurisdiction of the courts of the State of New York located in New York County and/or the United States District Court for the Southern District of New York with respect to the adjudication of any matters arising under or in connection with this Agreement.  Each Lehman Party and each Kojaian Party expressly submits and consents to the jurisdiction of the aforesaid courts and waives any defense of forum non conveniens.

16.       Except as provided in this Agreement, if any suit or other proceeding is brought for the enforcement or interpretation of this Agreement, or because of any alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover from the other parties reasonable attorneys' fees and other costs incurred in that suit or proceeding, in addition to any other relief to which such party may be entitled.  The "successful or prevailing party" shall be the party that most closely obtains the relief he or it sought in such suit or proceeding, or, if each party prevails on a portion of its claims, he or it shall be entitled to recover in proportion to the extent that each party is the prevailing party, as determined by the court .

17.       This Agreement shall be deemed to have been drafted jointly by each Lehman Party and each Kojaian Party. In the event that any covenant, condition or other provision contained in this Agreement is held to be invalid, void or illegal by any court of competent jurisdiction, the same shall be deemed severable from the remainder of this Agreement and shall in no way affect, impair or invalidate any other covenant, condition or other provision contained in this Agreement, and the remainder of this Agreement shall not be affected thereby and each remaining provision or part hereof shall continue to be valid and effective and shall be enforceable to the fullest extent permitted by law.

−140−

18.     This Agreement shall inure to the benefit of, and be binding upon, each Lehman Party and each Kojaian Party, and their respective successors and assigns.

Schedule A-1

Signature Lines for Lehman Parties

IN WITNESS WHEREOF, the Lehman Parties have executed this Agreement, Mutual Waiver and Release and Covenant Not to Sue as of the day and year first above written

Signed:

LB 900 TOWER DRIVE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:    _____

Its: _____

LB ALPHA TECH INC., a Delaware corporation

By:    _____

Its: _____

LB ALPHA TECH NORTH LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

By:    _____

Its: _____

(Signatures continued on following page)

−142−

LB BLOOMFIELD LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

> By:    _____
>
> Its:    _____

LB BUSINESS PARK LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

> By:    _____
>
> Its:    _____

LB FARMINGTON HILLS LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Sole Member

> By:    _____
>
> Its:    _____

LB FARMINGTON HILLS II LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

> By:    _____
>
> Its:    _____

(Signatures continued on following page)

−143−

LB FARMINGTON HILLS IV LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____


LB FARMINGTON HILLS V LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____


LB MAPLE STEPHENSON LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____


LB MILFORD WEST LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____

(Signatures continued on following page)

−144−

LB NEW VAN BUREN LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member


By:    _____

Its:  _____


LB NORTHVILLE LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member


By:    _____

Its:  _____


LB SHELBY INDUSTRIAL INVESTORS LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member


By:    _____

Its:  _____


LB SHELBY INDUSTRIAL INVESTORS III LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member


By:    _____

Its:  _____


(Signatures continued on following page)

**LB SHELBY INDUSTRIAL INVESTORS IV LLC**, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____

**LB SMC/LIVONIA INC.**, a Delaware corporation

By:  _____

Its:  _____

**LB STONERIDGE LLC**, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____

**LB TWELVE MILE LLC**, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

        By:  _____

        Its:  _____

(Signatures continued on following page)

LB VAN BUREN INC., a Delaware corporation

By: _____

    Its: _____


LB VENOY WICK LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member

    By: _____

        Its: _____


LW-LP, INC., a Delaware corporation

By: _____

    Its: _____


LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:_____
Name:_____
Title:_____

PAMI LLC, a Delaware limited liability company

By: _____

    Its: _____


(Signatures continued on following page)

−147−

PAMI MICHIGAN INC., a Delaware corporation

By: _____

Its: _____


PAMI MICHIGAN MEZZANINE II LLC, a Delaware limited liability company

By:    PAMI LLC, a Delaware limited liability company, Managing Member


By: _____

Its: _____


PROPERTY ASSET MANAGEMENT INC., a Delaware corporation

By: _____

Its: _____

−148−

Schedule A-2

Schedule of Lehman Parties

1.    LB Alpha Tech Inc., a Delaware corporation
2.    LB Alpha Tech North LLC, a Delaware limited liability company
3.    LB Bloomfield LLC, a Delaware limited liability company
4.    LB Business Park LLC, a Delaware limited liability company
5.    LB Farmington Hills LLC, a Delaware limited liability company
6.    LB Farmington Hills II LLC, a Delaware limited liability company
7.    LB Farmington Hills IV LLC, a Delaware limited liability company
8.    LB Farmington Hills V LLC, a Delaware limited liability company
9.    LB Maple Stephenson LLC, a Delaware limited liability company
10.   LB Milford West LLC, a Delaware limited liability company
11.   LB New Van Buren LLC, a Delaware limited liability company
12.   LB Northville LLC, a Delaware limited liability company
13.   LB Shelby Industrial Investors LLC, a Delaware limited liability company
14.   LB Shelby Industrial Investors III LLC, a Delaware limited liability company
15.   LB Shelby Industrial Investors IV LLC, a Delaware limited liability company
16.   LB SMC/Livonia Inc., a Delaware corporation
17.   LB Stoneridge LLC, a Delaware limited liability company
18.   LB 900 Tower Drive LLC, a Delaware limited liability company
19.   LB Twelve Mile LLC, a Delaware limited liability company
20.   LB Van Buren, Inc., a Delaware corporation
21.   LB Venoy Wick LLC, a Delaware limited liability company
22.   Lehman Brothers Holdings Inc., a Delaware corporation
23.   LW-LP, Inc., a Delaware corporation
24.   PAMI LLC, a Delaware limited liability company
25.   PAMI Michigan Mezzanine II LLC, a Delaware limited liability company
26.   PAMI Michigan, Inc., a Delaware corporation
27.   Property Asset Management Inc., a Delaware corporation

Schedule B-1

Signature Lines for Kojaian Parties

IN WITNESS WHEREOF, the Kojaian Parties have executed this Agreement, Mutual Waiver and Release and Covenant Not to Sue as of the day and year first above written

Signed:

2100 WOODWARD GP, INC., a Michigan corporation

By:  _____
        C. Michael Kojaian, Vice President

HAMLIN INVESTMENT CORPORATION, a Michigan corporation

By:  _____
        C. Michael Kojaian, Vice President

KOJAIAN 900 TDA ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN 900 TDA-MM, INC., a Michigan corporation, Manager

       By:  _____
              C. Michael Kojaian, Vice President

KOJAIAN 900 TDA-MM, INC., a Michigan corporation

By:  _____
        C. Michael Kojaian, Vice President

(Signatures continued on following page)

−150−

KOJAIAN ALPHA DRIVE ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN ALPHA DRIVE ASSOCIATES-MM INC., a Michigan corporation, Manager

        By:    _____
                  C. Michael Kojaian, Vice President

KOJAIAN ALPHA DRIVE ASSOCIATES-MM INC., a Michigan corporation

By:    _____
       C. Michael Kojaian, Vice President

KOJAIAN ALPHA DRIVE ASSOCIATES-NORTH, L.L.C., a Michigan limited liability company

By:    KOJAIAN ALPHA DRIVE ASSOCIATES NORTH-MM INC., a Michigan corporation, Manager

        By:    _____
                  C. Michael Kojaian, Vice President

KOJAIAN ALPHA DRIVE ASSOCIATES NORTH-MM INC., a Michigan corporation

By:    _____
       C. Michael Kojaian, Vice President

(Signatures continued on following page)

−151−

KOJAIAN BLOOMFIELD ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

       By:    KOJAIAN VENTURES-MM, INC., a Michigan corporation, Manager

          By:    _____

                C. Michael Kojaian, President

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

       By:    _____

           C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-MM, INC., a Michigan corporation

By:    _____

      C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-II, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-II MM, INC., a Michigan corporation, Manager

       By:    _____

           C. Michael Kojaian, Vice President

(Signatures continued on following page)

–152–

KOJAIAN FARMINGTON HILLS CORPORATE INVESTORS-II MM, INC., a Michigan corporation

By: _____
        C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON-II SPE, INC., a Michigan corporation

By:_____
        C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS IV CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS IV CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

    By: _____
           C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS IV CORPORATE INVESTORS-MM, INC., a Michigan corporation

By:_____
        C. Michael Kojaian, Vice President

KOJAIAN FARMINGTON HILLS V CORPORATE INVESTORS, L.L.C., a Michigan limited liability company

By:    KOJAIAN FARMINGTON HILLS V CORPORATE INVESTORS-MM, INC., a Michigan corporation, Manager

    By: _____
           C. Michael Kojaian, Vice President

(Signatures continued on following page)

−153−

KOJAIAN FARMINGTON HILLS V CORPORATE INVESTORS-MM, INC., a Michigan corporation

By: _____
    C. Michael Kojaian, Vice President

KOJAIAN II INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:    KOJAIAN II INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Operations Manager

    By: _____
        C. Michael Kojaian, Vice President

KOJAIAN II INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By: _____
    C. Michael Kojaian, Vice President

KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation

By: _____
    C. Michael Kojaian, Executive Vice President

KOJAIAN MAPLE STEPHENSON DEVELOPMENT ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

    By:    KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

        By: _____
            C. Michael Kojaian, President

(Signatures continued on following page)

−154−

KOJAIAN MILFORD ROAD WEST DEVELOPMENT
ASSOCIATES, L.L.C., a Michigan limited liability
company

By:    KOJAIAN VENTURES, L.L.C., a Michigan
limited liability company, Managing Member

By:    KOJAIAN VENTURES-MM, INC., a
Michigan corporation, Manager

By:    _____
C. Michael Kojaian, President

KOJAIAN NORTHVILLE TECHNOLOGY PARK
ASSOCIATES, L.L.C., a Michigan limited liability
company

By:    KOJAIAN NORTHVILLE TECHNOLOGY
PARK-MM, INC., a Michigan corporation,
Manager

By:    _____
C. Michael Kojaian, Vice President

KOJAIAN NORTHVILLE TECHNOLOGY PARK-MM,
INC., a Michigan corporation

By:    _____
C. Michael Kojaian, Vice President

KOJAIAN SEVEN CROSSING, L.L.C., a Michigan
limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan
limited liability company, Managing Member

By:    KOJAIAN VENTURES-MM INC., a
Michigan corporation, Manager

By:    _____
C. Michael Kojaian, President

(Signatures continued on following page)

−155−

KOJAIAN SHELBY III INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN SHELBY III INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

By:   _____
C. Michael Kojaian, Vice President

KOJAIAN SHELBY III INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By:   _____
C. Michael Kojaian, Vice President

KOJAIAN SHELBY IV INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:   KOJAIAN SHELBY IV INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

By:   _____
C. Michael Kojaian, Vice President

KOJAIAN SHELBY IV INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By: _____
C. Michael Kojaian, Vice President

KOJAIAN SHELBY INDUSTRIAL INVESTORS-II, L.L.C., a Michigan limited liability company

By:   KOJAIAN SHELBY INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

By:   _____
C. Michael Kojaian, Vice President

(Signatures continued on following page)

−156−

KOJAIAN SHELBY INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By: _____
      C. Michael Kojaian, Vice President

KOJAIAN SMC-SPE, INC., a Michigan corporation

By: _____
      C. Michael Kojaian, President

KOJAIAN TWELVE MILE ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

        By:    KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

            By: _____
                C. Michael Kojaian, President

KOJAIAN VAN BUREN BUSINESS PARK ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Manager

        By:    KOJAIAN VENTURES-MM, INC., a Michigan corporation, Manager

            By: _____
                C. Michael Kojaian, President

(Signatures continued on following page)

−157−

KOJAIAN VENOY WICK DEVELOPMENT ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES, L.L.C., a Michigan limited liability company, Managing Member

        By:    KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

            By:   _____
                    C. Michael Kojaian, President

KOJAIAN VENTURES, L.L.C., a Michigan limited liability company

By:    KOJAIAN VENTURES-MM INC., a Michigan corporation, Manager

        By:_____
            C. Michael Kojaian, President

KOJAIAN VENTURES-MM INC., a Michigan corporation

By:   _____
        C. Michael Kojaian, President

NEW VAN BUREN INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By:   _____
        C. Michael Kojaian, Vice President

NEW VBI INVESTORS, L.L.C., a Michigan limited liability company

By:    NEW VAN BUREN INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

        By:   _____
            C. Michael Kojaian, Vice President

(Signatures continued on following page)

−158−

SHELBY INDUSTRIAL INVESTORS, L.L.C., a Michigan limited liability company

By:    SHELBY INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

        By:    _____
                C. Michael Kojaian, Vice President

SHELBY INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By:

_____
      C. Michael Kojaian, Vice President

SMC MEZZANINE ASSOCIATES, L.L.C., a Michigan limited liability company

By:    KOJAIAN SMC-SPE, INC., a Michigan corporation, Managing Member

        By:    _____
                C. Michael Kojaian, President

TCC ASSOCIATES, L.L.C., Michigan limited liability company

By:    TROY CORPORATE CENTER, INC., a Michigan corporation, Manager

        By:    _____
                C. Michael Kojaian, Vice President

TROY CORPORATE CENTER, INC., a Michigan corporation

By:

_____
      C. Michael Kojaian, Vice President

(Signatures continued on following page)

−159−

VAN BUREN INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation

By: _____
       C. Michael Kojaian, Vice President


VBI INVESTORS, L.L.C., a Michigan limited liability company

By:    VAN BUREN INDUSTRIAL INVESTORS-MM, INC., a Michigan corporation, Manager

      By:  _____
           C. Michael Kojaian, Vice President

VICTOR PARKWAY GP, INC., a Michigan corporation

By: _____
       C. Michael Kojaian, Vice President

VPA ASSOCIATES, L.L.C., a Michigan limited liability company

By:    VICTOR PARKWAY GP, INC., a Michigan corporation, Manager

      By:  _____
           C. Michael Kojaian, Vice President


ONE WOODWARD AVENUE ASSOCIATES LIMITED PARTNERSHIP, a Michigan limited partnership

By:    WOODWARD JEFFERSON, INC., a Michigan corporation, General Partner

      By:  _____
      C. Michael Kojaian, Vice President


(Signatures continued on following page)

−160−

WOODWARD    JEFFERSON,    INC., a    Michigan
corporation

By: _____
       C. Michael Kojaian, Vice President


ONE WOODWARD ACQUISITION, L.L.C., a Michigan
limited liability company

By:     ONE WOODWARD ACQUISITION-MM, INC.,
    a Michigan corporation, its Manager

      By:_____
         C. Michael Kojaian, Vice President


ONE    WOODWARD    ACQUISITION-MM, INC., a
Michigan corporation, its Manager

By:_____
       C. Michael Kojaian, Vice President


_____

MIKE KOJAIAN


_____

C. MICHAEL KOJAIAN

Schedule B-2

Schedule of Kojaian Parties

1.  2100 Woodward GP, Inc., a Michigan corporation
2.  Hamlin Development Associates Limited Partnership, a Michigan limited partnership
3.  Hamlin Investment Corporation, a Michigan corporation
4.  Kojaian 900 TDA Associates, L.L.C., a Michigan limited liability company
5.  Kojaian 900 TDA-MM, Inc., a Michigan corporation
6.  Kojaian Alpha Drive Associates, L.L.C., a Michigan limited liability company
7.  Kojaian Alpha Drive Associates-MM Inc., a Michigan corporation
8.  Kojaian Alpha Drive Associates-North, L.L.C., a Michigan limited liability company
9.  Kojaian Alpha Drive Associates-North-MM Inc., a Michigan corporation
10. Kojaian Bloomfield Associates, L.L.C., a Michigan limited liability company
11. Kojaian Farmington Hills Corporate Investors, L.L.C., a Michigan limited liability company
12. Kojaian Farmington Hills Corporate Investors-MM, Inc., a Michigan corporation
13. Kojaian Farmington Hills Corporate Investors-II, L.L.C., a Michigan limited liability company
14. Kojaian Farmington Hills Corporate Investors-II MM, Inc., a Michigan corporation
15. Kojaian Farmington-II SPE, Inc., a Michigan corporation
16. Kojaian Farmington Hills IV Corporate Investors, L.L.C., a Michigan limited liability company
17. Kojaian Farmington Hills IV Corporate Investors-MM, Inc., a Michigan corporation
18. Kojaian Farmington Hills V Corporate Investors, L.L.C., a Michigan limited liability company
19. Kojaian Farmington Hills V Corporate Investors-MM, Inc., a Michigan corporation
20. Kojaian II Industrial Investors, L.L.C., a Michigan limited liability company
21. Kojaian II Industrial Investors-MM, Inc., a Michigan corporation
22. Kojaian Management Corporation, a Michigan corporation
23. Kojaian Maple Stephenson Development Associates L.L.C., a Michigan limited liability company
24. Kojaian Milford Road West Development Associates, L.L.C., a Michigan limited liability company
25. Kojaian Northville Technology Park Associates, L.L.C., a Michigan limited liability company
26. Kojaian Northville Technology Park-MM Inc., a Michigan corporation
27. Kojaian Seven Crossing, L.L.C., a Michigan limited liability company
28. Kojaian Shelby III Industrial Investors, L.L.C., a Michigan limited liability company
29. Kojaian Shelby III Industrial Investors-MM, Inc., a Michigan corporation
30. Kojaian Shelby IV Industrial Investors, L.L.C., a Michigan limited liability company
31. Kojaian Shelby IV Industrial Investors-MM, Inc., a Michigan corporation
32. Kojaian Shelby Industrial Investors-II, L.L.C., a Michigan limited liability company
33. Kojaian Shelby Industrial Investors-MM, Inc., a Michigan corporation
34. Kojaian SMC-SPE, Inc., a Michigan corporation
35. Kojaian Twelve Mile Associates, L.L.C., a Michigan limited liability company
36. Kojaian Van Buren Business Park Associates, L.L.C., a Michigan limited liability company
37. Kojaian Venoy Wick Development Associates, L.L.C., a Michigan limited liability company
38. Kojaian Ventures, L.L.C., a Michigan limited liability company
39. Kojaian Ventures-MM, Inc., a Michigan corporation
40. New Van Buren Industrial Investors-MM, Inc., a Michigan corporation
41. New VBI Investors, L.L.C., a Michigan limited liability company
42. Shelby Industrial Investors, L.L.C., a Michigan limited liability company
43. Shelby Industrial Investors-MM, Inc., a Michigan corporation

44.     SMC Mezzanine Associates, L.L.C., a Michigan limited liability company
45.     TCC Associates, L.L.C., a Michigan limited liability company
46.     Troy Corporate Center, Inc., a Michigan corporation
47.     Van Buren Industrial Investors-MM, Inc., a Michigan corporation
48.     VBI Investors, L.L.C., a Michigan limited liability company
49.     Victor Parkway GP, Inc., a Michigan corporation
50.     VPA Associates, L.L.C., a Michigan limited liability company
51.     One Woodward Avenue Associates Limited Partnership, a Michigan limited partnership
52.     Woodward Jefferson, Inc., a Michigan corporation
53.     One Woodward Acquisition, L.L.C., a Michigan limited liability company
54.     One Woodward Acquisition-MM, Inc., a Michigan corporation,
55.     Mike Kojaian
56.     C. Michael Kojaian

Schedule C

Schedule of Private Equity Funds

Lehman Brothers Real Estate Partners LP
Lehman Brothers Real Estate Partners II LP
Lehman Brothers Real Estate Partners III LP
Lehman Brothers Merchant Banking Partners II LP
Trilantic Capital Partners III LP (formerly known as Lehman Brothers Merchant Banking Partners III LP)
Trilantic Capital Partners IV LP (formerly known as Lehman Brothers Merchant Banking Partners IV LP)
NB Secondary Opportunities Fund LP (formerly known as Lehman Brothers Secondary Opportunities Fund LP)
NB Co-Investment Partners LP (formerly known as Lehman Brothers Co-Investment Partners LP)
Quintana Energy Partners LP
Lehman Brothers Ventures Partners LP
Lehman Brothers Communications Fund LP

## Exhibit 24

Northville and Cherry Creek Condo Association Defaults and
Outstanding Assessments Due and Payable by Unit Owners

| NORTHVILLE TECHNOLOGY PARK ASSOCIATION | | | | |
|---|---|---|---|---|
| ACCOUNTS RECEIVABLE SUMMARY | | | | |
| AS OF MAY 31, 2009 | | | | |
| | 1/1/2009 BEGINNING | | | ENDING |
| DESCRIPTION | BALANCE | DEBITS | CREDITS | BALANCE |
| ZF | 0.00 | 9,753.81 | 6,558.81 | 3,195.00 |
| COMERICA | 0.00 | 955.89 | 955.89 | 0.00 |
| IAV | 0.00 | 5,128.39 | 5,128.39 | 0.00 |
| DEVELOPER NTP ASSOCIATES | (16,288.92) | 27,580.97 | 2,000.00 | 9,292.05 |
| TOTALS | (16,288.92) | 43,419.06 | 14,643.09 | 12,487.05 |
| | | | | ACCT 1201-0000 |
| UNADJUSTED BALANCE | (16,288.92) | | | |
| UNALLOCATED EXPENSES 2008 | 16,222.54 | | | |
| ADJUSTED ENDING BALANCE PER GL | (66.38) | | | |

| CHERRY CREEK CORPORATE CONDOMINIUM ASSOCIATION | | | | | | |
|---|---|---|---|---|---|---|
| ACCOUNTS RECEIVABLE SUMMARY | | | | | | |
| AS OF MAY 31, 2009 | | | | | | |
| | | 01/01/2009 | | | | |
| Description | Unit# | Beginning Balance | Debits | Credits | Ending Balance | |
| WAL-MART STORES | 1A,2 | 5,280.00 | 14,575.19 | 18,114.17 | 1,741.02 | PD |
| SHELBY HOSPITALITY INVESTMENTS LLC | 1 | - | 1,614.30 | 1,614.30 | - | |
| RARONAH LLC | 3 | - | 1,130.61 | 725.61 | 405.00 | PD |
| HALLE PROPERTIES (DISCOUNT TIRE) | 4 | - | 709.16 | 510.00 | 199.16 | PD |
| PNC (NATIONAL CITY) BANK | 5 | 760.00 | 1,053.88 | 1,438.88 | 375.00 | PD |
| SHELBY IV INDUSTRIAL INVESTORS | 6,7 | - | 4,650.52 | 4,650.52 | - | |
| BANC INDUSTRIES (EAGLE) | 8 | - | 2,707.39 | 2,707.39 | (0.00) | |
| SHELBY INDUSTRIAL INVESTORS II | 25,28 | - | 6,559.77 | 6,559.77 | - | |
| SIGNATURE ASSOCIATES (DELPHI BUILDING) | 26 | - | 2,593.66 | 1,658.66 | 935.00 | — |
| BAER BROTHERS | 27 | - | 4,854.09 | 4,854.09 | - | |
| CHERRY CREEK PROPERTIES LLC | 29 | - | 1,904.41 | 1,904.41 | (0.00) | |
| SHELBY III INDUSTRIAL INVESTORS | 30 | - | 4,350.03 | 4,350.03 | (0.00) | |
| CPD PROPERTIES | 31,32,33 | - | 6,104.43 | 292.31 | 5,812.12 | — |
| SHELBY INDUSTRIAL INVESTORS | 99 | (15,856.85) | 17,501.58 | 3,400.00 | (1,755.27) | |
| | | | | | | |
| TOTALS | | (9,816.85) | 70,309.02 | 52,780.14 | 7,712.03 | |
| | | | | | | |
| | | | | | Acct | |
| UNADJUSTED BALANCE 12/31/2008 | | (9,816.85) | | | 1201-0000 | |
| 2008 EXPENSE RECONCILIATION | | 19,221.82 | | | | |
| ADJUSTED BALANCE 12/31/2008 | | 9,404.97 | | | | |

**Exhibit 25**

**Form of One Woodward Ground Lease Estoppel**

**TENANT ESTOPPEL CERTIFICATE**

Dated: as of June \_\_\_, 2009

To: Lawyers Title Insurance Corporation
   c/o New York Land Services
   630 3rd Avenue, New York, NY 10017
   Attention: Teresa Hill

   Lehman Brothers Holdings Inc.
   1271 Sixth Avenue, 46th Floor
   New York, NY 10020
   Attention: Ms. Joelle Halperin, Esq.

   Reference is made herein to (i) a Lease by Lawrence E. Burch, Joan E. Thuma (surviving spouse of John J. Thuma), Maureen Young, Anne E. Bricker, Judith M. Torres, Nancy G. Griffith, Katherine J. Gohsman, Edwina L. Molloseau, Timothy Grant LaVere and Richard Frederick LaVere, Ulysses Grant Burch II and Marilyn G. Burch, Zondra Taylor, Gerald Grant Matthews, Marilyn Joyce Dock, Jill R. Thuma and Brett D. Thuma (collectively, the "**Parcel B Lessor**") dated April 12, 1916 and recorded April 12, 1916 in Liber 1057, Page 333; and assigned by unrecorded letter agreement dated January 6, 1959; and amended by Amendment to Lease dated March 3, 1959 and recorded March 9, 1959 in Liber 13890, Page 398; and assigned by Assignment of Lease recorded March 27, 1935 in Liber 4370, Page 250; and amended by Option to Renew Lease dated January 6, 1959 and recorded January 20, 1959 in Liber 13854, Page 150; and assigned by Assignments of Lease recorded February 11, 1959 in Liber 13870, Page 929, recorded October 4, 1960 in Liber 14311, Page 787; and recorded October 13, 1960 in Liber 14318, Page 802; and assigned by Assignment of Option dated October 13, 1960 and recorded October 13, 1960 in Liber 14318, Page 806; and assigned by Assignment of Lease dated as of July 2, 1979 and recorded in Book 20580, Page 632; and assigned by Assignment of Lease dated December 1, 1981 and recorded in Liber 21297, Page 201; and assigned by Assignment of Option to Renew Lease and Agreement dated December 1, 1981 and recorded in Liber 21297, Page 179 and re-recorded in Liber 21297, Page 190; and amended by unrecorded Amendment to Lease dated March 1, 1982; and assigned by Assignment and Assumption Agreement dated February 8, 1985 and recorded in Liber 22281, Page 186; and amended by unrecorded Amendment to Lease dated October 1, 1991; and assigned to One Woodward Avenue Associates Limited Partnership ("**Lessee**") by Assignment and Assumption of Ground Lease dated May 27, 1997 and recorded June 30, 1997 in Liber 29621, Page 20 (and as amended from time to time, collectively, the "**Parcel B Lease**") with respect to a commercial building located on a tract of land at One Woodward Avenue in Detroit, Michigan ("**Parcel B**") and (ii) a Lease by the City of Detroit (the "**Parcel C Lessor**") dated December 30, 1959 and recorded

–167–

December 31, 1959 in Liber 14122, Page 758; and assigned by Assignment of Lease recorded October 4, 1960 in Liber 14311, Page 790, and recorded October 13, 1960 in Liber 14318, Page 798; and assigned by Assignment of Lease dated as of July 2, 1979 and recorded in Book 20580, Page 632; and assigned by Assignment of Lease dated December 1, 1981 and recorded in Liber 21297, Page 209; and assigned by Assignment of Option to Lease and Agreement dated December 1, 1981 and recorded in Liber 21297, Page 179 and re-recorded in Liber 21297, Page 190; and assigned by Assignment and Assumption Agreement dated February 8, 1985 and recorded in Liber 22281, Page 186; and assigned by Assignment and Assumption of Ground Lease dated May 27, 1997 and recorded June 30, 1997 in Liber 29621, Page 20 to Lessee (collectively, the "**Parcel C Lease**" and together with the Parcel B Lease, the "**Leases**") with respect to an underground parking garage located on a tract of land located at One Woodward Avenue in Detroit, Michigan ("**Parcel C**" and together with Parcel B, the "**Premises**").

To whomever it may concern:

The undersigned represents, warrants and certifies to addressees, as follows:

1. A true, correct and complete copy of the Parcel B Lease is attached hereto as **Exhibit B**, and the Parcel B Lease has not been amended, modified or supplemented except as set forth therein. The Parcel B Lease is in full force and effect and constitutes the entire agreement between Parcel B Lessor and Lessee with respect to Parcel B of the Premises and the Parcel B Lease. The Parcel B Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

2. A true, correct and complete copy of the Parcel C Lease is attached hereto as **Exhibit C**, and the Parcel C Lease has not been amended, modified or supplemented except as set forth therein. The Parcel C Lease is in full force and effect and constitutes the entire agreement between Parcel C Lessor and Lessee with respect to Parcel C of the Premises and the Parcel C Lease. The Parcel C Lease constitutes the legal, valid and binding obligation of Lessee, enforceable against Lessee in accordance with its terms.

3. As of the date hereof, Lessee is currently in possession of the Premises.

4. The Parcel B Lease expires April 30, 2015. The Parcel B Lease contains six (6) options to renew the Parcel B Lease of twenty-five (25) years each.

5. Annual rent under the Parcel B Lease is currently $60,000. As of the date hereof, all rent and real estate tax amounts due and payable under the Parcel B Lease are paid in full.

6. The Parcel C Lease shall remain in effect so as long as the building on Parcel B or any replacement thereof remains on Parcel B.

−168−

7.      There is no obligation of rent under the Parcel C Lease.  As of the date hereof, all real estate tax amounts due and payable under the Parcel C Lease are currently paid in full.

8.      As of the date of this Certificate, to Lessee's actual knowledge:  (a) neither Lessee nor Parcel B Lessor is in default in keeping, observing or performing any covenant or agreement under the Parcel B Lease and no written notice of default has been received by Lessee or sent to Parcel B Lessor by Lessee, (b) neither Lessee nor Parcel C Lessor is in default in keeping, observing or performing any covenant or agreement under the Parcel C Lease and no written notice of default has been received by Lessee or sent to Parcel C Lessor by Lessee;  and (c) no event has occurred which, with the passage of time or the giving of notice or both, would constitute an event of default by the Lessee under the Leases.

9.      Lessee is not contemplating seeking relief under any insolvency or bankruptcy statutes and there are no actions, whether voluntary or otherwise, pending against Lessee under the bankruptcy or insolvency laws of the United States or any state thereof.

10.      The names and addresses of the Parcel B Lessors and the addresses to which rent payments under the Parcel B Lease are required to be sent are as shown on **Exhibit A** attached hereto.

11.      Lessee agrees that this Certificate may be relied upon by the addressees above. Lessee and the persons executing this Certificate on behalf of Lessee have the power and authority to execute this Certificate.

12.      After Lessee became the tenant under the Parcel C Lease, Lessee notified the Parcel C Lessor that Lessee is the tenant under the Parcel C Lease and provided the Parcel C Lessor with an address at which it is to receive any notice(s) to be sent under the Parcel C Lease; and that the address that the Parcel C Lessor currently has on file is the current mailing address for Lessee for the receipt of notices.

13.      Lessee has the authority to assign the Parcel C Lease without first obtaining consent from the Parcel C Lessor.

14.      Lessee is not aware of any current construction being undertaken by the Parcel C Lessor with respect to those portions of Woodward Avenue, Jefferson Avenue or Griswold Street adjacent to Parcel B, Parcel C and other lands owned by Lessee.

15.      Lessee agrees that this Certificate may be relied upon by the addressees above. Lessee and the persons executing this Certificate on behalf of Lessee have the power and authority to execute this Certificate, and the actual knowledge of the matters above in order to make the representations, warranties and certifications being made in this Certificate on behalf of Lessee.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Certificate to be duly executed and delivered as of the day and year first written above.

**ONE WOODWARD AVENUE ASSOCIATES LIMITED PARTNERSHIP**, a Michigan limited partnership

By:    WOODWARD JEFFERSON, INC., a Michigan
corporation, General Partner


By:    _____
C. Michael Kojaian, Vice President

## EXHIBIT A

Parcel B Lessor Names and Addresses

| | | |
|---|---|---|
| Mrs. Marilyn Burch<br>P.O. Box 96<br>8449 Wildcat Road<br>Jeddo, MI  48032 | Richard F. Lavere<br>604 Fairfield Avenue<br>Elmira, NY  14904 | Timothy G. Lavere<br>617 Keith Court<br>West Branch, MI  48661 |
| Anne E. Bricker<br>12 W. Harrington<br>Croswell, MI  48422 | Lawrence Edwin Burch<br>  Living Trust dated<br>  March 22, 2008<br>10836 E. Surveyor Ct.<br>Gold Canyon, AZ  85218 | Marilyn J. Dock<br>2219 North Forest Trail<br>Dunwoody, GA  30338 |
| Katherine Janet Gohsman, as<br>  Trustee of the Katherine<br>  Janet Gohsman Revocable<br>  Trust Dated 12/29/05<br>7303 East Farmdale Avenue<br>Mesa, AZ  85208 | Nancy G. Griffith<br>1342 Blue Ridge Avenue<br>Belton, SC  29627 | Jerry Matthews<br>P.O. Box 1502<br>Scottsdale, AZ  85252-1502 |
| Edwina L. Molleseau<br>120 Thomas Lane<br>Central, SC  29630 | Zondra Taylor Burns<br>5836 Woodstock Pt.<br>Virginia Beach, VA  23464 | Joan E. Thuma<br>P.O. Box 1837<br>Bigfork, MT  59911 |
| Brett D. Thuma<br>P.O. Box 1837<br>Bigfork, MT 59911 | Jill R. Thuma Privett<br>P.O. Box 1837<br>Bigfork, MT  59911 | Judith M. Torres<br>7153 Lake Street<br>Lexington, MI  48450 |
| Maureen Young<br>323 Jackson Street<br>Croswell, MI  48422 | | |

## EXHIBIT B

## Parcel B Lease

EXHIBIT C

Parcel C Lease

**Exhibit 26**

**Schedule A Joint Venture Real Property Title Proformas**

## ACKNOWLEDGEMENT AND AGREEMENT

Reference is hereby made to that certain Settlement Agreement of even date herewith (the "Settlement Agreement") by and among, Lehman Brothers Holdings, Inc., a Delaware corporation ("LBHI"), and certain other entities affiliated with LBHI, which entities are more particularly listed on Exhibit 1 to the Settlement Agreement (collectively, the "Lehman Affiliates"; the Lehman Affiliates, together with LBHI, are hereinafter collectively called "Lehman"), and certain entities owned or controlled, directly or indirectly, by Mike Kojaian ("MK") and/or C. Michael Kojaian ("CMK") which entities, and not MK or CMK, which entities are more particularly listed on Exhibit 2 to the Settlement Agreement (collectively, the "Kojaian Affiliates"). Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms on the Settlement Agreement.

Each of the undersigned parties hereto (i) hereby agrees that it has reviewed the Settlement Agreement and is familiar and aware of the various transactions, transfers, and conveyances contemplated therein, and (ii) has been represented and advised by legal counsel, certified public accountants and other business advisors of its choice in connection with its evaluation of, and the negotiations relating to, the Settlement Agreement and the transactions provided for therein. Each of LBHI, the Lehman Affiliates, PAMI and the PAMI Affiliates, on the one hand, and MK, CMK, KMC and the Kojaian Affiliates, on the other hand, and such counsel, representatives and advisors have made such factual inquiries and other investigations as they deem appropriate to fully qualify themselves to be able to evaluate the acceptability and fairness of the Settlement Agreement and the transactions provided for herein. Consequently, the terms and provisions of the Settlement Agreement shall be interpreted and construed in accordance with their usual and customary meanings, and the parties hereby expressly waive and disclaim in connection with the interpretation and construction of the Settlement Agreement, any rule of law or procedure requiring otherwise, including, without limitation, any rule of law to the effect that ambiguous or conflicting terms or provisions contained in Settlement Agreement shall be interpreted or construed against the party whose attorney prepared the Settlement Agreement or any earlier draft of the Settlement Agreement. In addition, each such party acknowledges that (i) it has given due consideration to the acceptability and fairness to it of Settlement Agreement and the transactions provided for herein, and (ii) it has given due consideration to the advice of its counsel, accountants and advisors in deciding to approve the Settlement Agreement and execute and deliver this Acknowledgment and Agreement and all documents and instruments to be executed and delivered pursuant to the Settlement Agreement and to consummate the transaction contemplated by the Settlement Agreement. Among other things, each such party evaluated and compared (a) the value of (i) the Schedule A Joint Ventures and (ii) the value of the releases of the PAMI Guaranties, (iii) the value of the Mutual Release, and (iv) all the other benefits and consideration granted and parted with by each of the Kojaian Affiliates, CMK, MK or KMC in favor of Lehman and the Lehman Affiliates pursuant to the Settlement Agreement (collectively, the "Kojaian Value Conveyed"), and (b) the value of (i) the Schedule B Joint Ventures, (ii) the value of the Schedule D Joint Ventures, (iii) the value of the LBHI Mezzanine Loans, (iv) the value of the Mutual Release, and (v) all the other benefits and consideration granted to and obtained by the respective Kojaian Affiliates, CMK, MK and KMC pursuant to the terms of the Settlement Agreement (collectively, the "Kojaian Value Received"), and each of the parties hereto has determined the Kojaian Value Conveyed pursuant to the Settlement Agreement is not greater than the Kojaian Value Received pursuant to the Settlement Agreement, and that the Settlement Agreement and the transactions to be consummated pursuant

hereto are fair and in the best interests of Lehman on the one hand and the Kojaian Affiliates, CMK, MK, and KMC, on the other hand.

Moreover, each of CMK, MK and KMC each hereby represents and warrants to Lehman that (a) it is each fully aware and clearly understands all of the terms and provisions contained in the Settlement Agreement; (b) it is each fully aware and acknowledges that LBHI is not only the current "lender" to the Schedule A Joint Ventures and the Schedule D Joint Ventures, but also is the owner of an indirect interest in many of the Joint Ventures; (c) it is fully aware and acknowledges that LBHI, as lender, may have distinct and divergent interests as lender to the Joint Ventures than it may have as an indirect owner of any Joint Venture, and, as such, may make decisions that are in LBHI's best interests, notwithstanding any consideration to the interests of any of the Joint Ventures, and that the same shall not give rise to any claims against LBHI; (d) it has voluntarily, with full knowledge and without coercion or duress of any kind, entered into the transactions contemplated by the Settlement Agreement and this Acknowledgement and Agreement; and (e) it is not relying on any representation, whether written or oral, express or implied, made by Lehman, other than as set forth in the Settlement Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Acknowledgment and Agreement as of the ___18th___ day of June, 2009.

_____
C. Michael Kojaian

_____
Mike Kojaian

KOJAIAN MANAGEMENT CORPORATION, a Michigan corporation

By: _____
C. Michael Kojaian, Executive Vice President

12596626\V-3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                        :
**In re**                                               :         **Chapter 11 Case No.**
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.***,**        :         **08-13555 (JMP)**
                                                        :
                         **Debtors.**                   :         **(Jointly Administered)**
                                                        :
                                                        :
----------------------------------------------------------------x

<div align="center">

**ORDER PURSUANT TO SECTIONS**
**105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE 6004 AND 9019 FOR <u>AUTHORIZATION</u>**
**<u>AND APPROVAL OF SETTLEMENT AGREEMENT WITH KOJAIAN AFFILIATES</u>**

</div>

Upon the motion, dated June 24, 2009 (the "<u>Motion</u>"),[1] of Lehman Brothers

Holdings Inc. ("<u>LBHI</u>"), and their affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors in possession (collectively, the "<u>Debtors</u>" and, together with their non-debtor

affiliates, "<u>Lehman</u>"), pursuant to sections 105 and 363 of title 11 of the United States Code (the

"<u>Bankruptcy Code</u>") and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>") for approval of the Settlement Agreement, dated June 18, 2009 (the

"<u>Settlement Agreement</u>") between LBHI and certain entities owned or controlled, directly or

indirectly, by Mike Kojaian and/or C. Michael Kojaian (the "<u>Kojaian Affiliates</u>") pursuant to an

agreement substantially consistent with the proposed Settlement Agreement annexed to the

Motion as <u>Exhibit A</u>, as more particularly described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the
Motion.

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the amended order entered February 13, 2009

governing case management and administrative procedures [Docket No. 2837] to (i) the United

States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) counsel to the Kojaian Affiliates; and (vii) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105 and 363(b) of the Bankruptcy Code and

Bankruptcy Rule 9019, the Settlement Agreement is hereby approved and the Debtors are duly

authorized to (i) consummate all of the transactions contemplated thereby, (ii) execute and

deliver such assignments, conveyances, and other documents, and instruments of transfer and to

take such other actions as may be reasonably necessary to consummate the settlement agreement,

and (iii) consent to any amendment, restatement, waiver, supplement or other modification of

any of the documents contemplated under the settlement agreement, it being understood that any

actions described in this paragraph taken by the Debtors or their affiliates may be taken without

the necessity of (x) any further court proceedings or approval or (y) any consent of any third

party, and shall be conclusive and binding in all respects on all parties in interest in these cases;

and it is further

ORDERED, FOUND AND DETERMINED that the Debtors are receiving fair

consideration and reasonably equivalent value in exchange for the transfers made by them under

the Settlement Agreement; and it is further

ORDERED that this Order shall be effective and enforceable immediately upon

entry and its provisions shall be self-executing and shall not be stayed pursuant to Bankruptcy

Rule 6004; and it is further

ORDERED that the stay pursuant to Bankruptcy Rules 6004(h) is hereby waived

and this Order shall be effective immediately upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.


Dated: July ___, 2009
      New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE