1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.



            Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS INC.



            Debtor.

- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            June 24, 2009

            10:15 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Debtors' Motion for Authorization to (i) Assume

3    Unexpired Lease of Nonresidential Real Property; and (ii)

4    Assume and Assign Unexpired Leases of Real Property

5

6    HEARING re Debtors' Motion to Restructure Certain Loans with

7    Broadway Partners Fund Manager, LLC, et. al.

8

9    HEARING re Motion of Unclaimed Property Recovery Service, Inc.

10   for Compelling Payment of Unclaimed Funds by the New York State

11   Comptroller

12

13   HEARING re Motion Authorizing Discovery from Barclays Capital,

14   Inc.

15

16   HEARING re Motion of Kalaimoku-Kuhio Development Corp for (i)an

17   Order Compelling Payment of Post-Petition Rent and Charges and

18   (ii)Granting Relief from the Automatic Stay

19

20   HEARING re Debtors Motion for Establishment of the Deadline for

21   Filing Proofs of Claim, Approval of the Form and Manner of

22   Notice Thereof, and Approval of the Proof of Claim Form

23

24

25

3

1

2    ADVERSARY PROCEEDING:

3

4    HEARING re Deutsche Bank AG v. Lehman Brothers Holdings Inc.

5    Motion for Summary Judgment

6

7    SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

8

9    HEARING re Trustee's Application for an Order Pursuant to

10   Section 365(d)(1) of the Bankruptcy Code Further Extending the

11   Time Within Which the Trustee may Assume or Reject Executory

12   Contracts and Certain Unexpired Leases

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  RICHARD W. SLACK, ESQ.

9         LORI R. FIFE, ESQ.

10        SHAI Y. WAISMAN, ESQ.

11

12   HUGHES HUBBARD & REED LLP

13        Attorneys for James W. Giddens, SIPC Trustee

14        One Battery Park Plaza

15        New York, NY 10004

16

17   BY:  JEFFREY S. MARGOLIN, ESQ.

18        DAVID WILTENBURG, ESQ.

19        JAMES B. KOBAK, JR.

20

21

22

23

24

25

5

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         One Chase Manhattan Plaza

5         New York, NY 10005

6

7    BY:   DENNIS C. O'DONELL, ESQ.

8         EVAN R. FLECK, ESQ.

9         DENNIS F. DUNNE, ESQ.

10

11   UNITED STATES DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street

14        21st Floor

15        New York, NY 10004

16

17   BY:   ANDREW D. VELEZ-RIVERA, ESQ.

18

19

20

21

22

23

24

25

6

1

2   ALLEN & OVERY LLP

3        Attorneys for ISDA

4        1221 Avenue of the Americas

5        New York, NY 10020

6

7   BY:   JOSHUA D. COHN, ESQ.

8

9        JOHN KIBLER, ESQ.

10

11  ALSTON & BIRD LLP

12       Attorneys for Bank of America, N.A. in its Capacity as

13       Trustee of Certain Trust Agreements

14       90 Park Avenue

15       New York, NY 10016

16

17  BY:   JOHN SPEARS, ESQ.

18

19

20

21

22

23

24

25

7

```
 1

 2    ALSTON & BIRD LLP

 3          Attorneys for Bank of America, N.A. in its Capacity as

 4          Trustee of Certain Trust Agreements

 5          One Atlantic Center

 6          1201 West Peachtree Street

 7          Atlanta, GA 30309

 8

 9    BY:   WILLIAM S. SUGDEN, ESQ.

10          (TELEPHONICALLY)

11

12    BINGHAM MCCUTCHEN LLP

13          Attorneys for Deutsche Bank; Harbinger Funds; Putman

14          Investments; State Street Bank; and UBS

15          399 Park Avenue

16          New York, NY 10022

17

18    BY:   JOSHUA DORCHAK, ESQ.

19

20

21

22

23

24

25
```

8

1

2   BLANK ROME LLP

3        Attorneys for 600 Partners Co, LP;

4        The Chrysler Building

5        405 Lexington Avenue

6        New York, NY 10174

7

8   BY:  ANDREW B. ECKSTEIN, ESQ.

9

10   BOIES, SCHILLER & FLEXNER LLP

11        Attorneys for Barclays

12        5301 Wisconsin Avenue, N.W.

13        Washington, DC 20015

14

15   BY:  HAMISH P.M. HUME, ESQ.

16

17   CADWALADER, WICKERSHAM & TAFT LLP

18        Attorneys for Morgan Stanley

19        1201 F. Street, N.W.

20        Washington, DC 20004

21

22   BY:  MARK C. ELLENBERG, ESQ.

23        HOWARD HAWKINS, ESQ.

24

25

9

1

2    CHAPMAN & CUTLER LLP

3        Attorneys for US Bank, N.A.

4        111 West Monroe Street

5        Chicago, IL 60603

6

7    BY:  FRANKLIN H. TOP, III, ESQ.

8        JAMES HEISER, ESQ.

9        (TELEPHONICALLY)

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12       Attorneys for Barclays Capital Inc.

13       One Liberty Plaza

14       New York, NY 10006

15

16   BY:  LINDSEE P. GRANFIELD, ESQ.

17       CARMINE D. BOCCUZZI, ESQ.

18

19   CLEARY GOTTLIEB STEEN & HAMILTON LLP

20       Attorneys for Goldman Sachs & Co.

21       One Liberty Plaza

22       New York, NY 10006

23

24   BY:  CARMINE D. BOCCUZZI, ESQ.

25

10

1

2   CLIFFORD CHANCE US LLP

3       Attorneys for Calyon

4       31 West 52nd Street

5       New York, NY 10019

6

7   BY:  ANDREW BROZMAN, ESQ.

8

9   COVINGTON & BURLING LLP

10      Attorneys for Wilmington Trust Company

11      The New York Times Building

12      620 Eighth Avenue

13      New York, NY 10019

14

15  BY:  AMANDA R. RABOY, ESQ.

16      SUSAN JOHNSTON, ESQ.

17

18  CRAVATH, SWAINE & MOORE LLP

19      Attorneys for Credit Suisse

20      Worldwide Plaza

21      625 Eight Avenue

22      New York, NY 10019

23

24  BY:  RICHARD LEVIN, ESQ.

25

11

1

2    DLA PIPER US LLP

3          Attorneys for Banco Bank, et al.

4          1251 Avenue of the Americas

5          New York, NY 10020

6

7    BY:  WILLIAM M. GOLDMAN, ESQ.

8

9    DEBEVOISE & PLIMPTON LLP

10         Attorneys for Juice Energy, Inc.

11         919 Third Avenue

12         New York, NY 10022

13

14   BY:  JESSICA R. SIMONOFF, ESQ.

15

16   DEWEY & LEBOEUF LLP

17         Attorneys for Royal Bank of Scotland and Affiliates

18         1301 Avenue of the Americas

19         New York, NY 10019

20

21   BY:  IRENA M. GOLDSTEIN, ESQ.

22

23

24

25

12

1

2    ENTWISTLE & CAPPUCCI

3         Attorneys for New York State Comptroller Thomas DiNapoli

4         280 Park Avenue

5         26th Floor West

6         New York, NY 10017

7

8    BY:  JOSHUA K. PORTER, ESQ.

9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP

11        Attorneys for HWA 555 Owners, LLC

12        One New York Plaza

13        New York, NY 10004

14

15   BY:  JANICE MAC AVOY, ESQ.

16

17   GOODWIN PROCTER LLP

18        Attorneys for Evergreen Solar, Inc.

19        The New York Times Building

20        620 Eighth Avenue

21        New York, NY 10018

22

23   BY:  STEPHEN M. WOLPERT, ESQ.

24

25

13

1

2   HAYNES AND BOONE, LLP

3         Attorneys for Steve G. Holder Trust, et al.

4         1221 Avenue of the Americas

5         26th Floor

6         New York, NY 10020

7

8   BY:   JASON A. NAGI, ESQ.

9

10  HOGAN & HARTSON LLP

11        Attorneys for Westernbank Puerto Rico

12        875 Third Avenue

13        New York, NY 10022

14

15  BY:   DAVID DUNN, ESQ.

16

17  HOLLAND & KNIGHT LLP

18        Attorneys for Kantats Co. Ltd.; Teachers' Retirement

19        System of Illinois; Singapore Airlines Ltd.

20        195 Broadway

21        24th Floor

22        New York, NY 10007

23

24  BY:   BARBRA R. PARLIN, ESQ.

25

14

1

2    JENNER & BLOCK, LLC

3         Attorneys for the Examiner

4         One IBM Plaza

5         Chicago, IL 60611

6

7    BY:  ROBERT BYMAN, ESQ.

8

9    JONES DAY

10        Special counsel to LBHI

11        222 East 41st Street

12        New York, NY 10017

13

14   BY:  WILLIAM J. HINE, ESQ.

15        ROBERT W. GAFFEY, ESQ.

16

17   KATTEN MUCHIN ROSENMAN LLP

18        Attorneys for Federal Home Loan Bank, et al.

19        575 Madison Avenue

20        New York, NY 10022

21

22   BY:  MERRITT A. PARDINI, ESQ.

23        JEFF J. FRIEDMAN, ESQ.

24

25

15

1

2    KAYE SCHOLER LLP

3          Attorneys for Wells Fargo Bank N.A. and Affiliates

4          425 Park Avenue

5          New York, NY 10022

6

7    BY:   MADLYN G. PRIMOFF, ESQ.

8          LAUREN ATTARD, ESQ.

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for Bank of New York Mellon as Indenture Trustee

12         1177 Avenue of the Americas

13         New York, NY 10036

14

15   BY:   SARAH SCHINDLER-WILLIAMS, ESQ.

16

17   LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.

18         Attorneys for Kalaikoku-Kuhio Dev., Movant

19         10250 Constellation Boulevard

20         Suite 1700

21         Los Angeles, CA 90067

22

23   BY:   DAVID L. NEALE, ESQ.

24

25

16

1

2    LINLATERS LLP

3        Attorneys for the Joint Administrators of LBIE

4        1345 Avenue of the Americas

5        New York, NY 10105

6

7    BY:  MARTIN N. FLICS, ESQ.

8        MARY K. WARREN, ESQ.

9

10   LOEB & LOEB LLP

11       Attorneys for Thomas Cook AG

12       345 Park Avenue

13       New York, NY 10154

14

15   BY:  DANIEL B. BESIKOF, ESQ.

16

17   MCCARTER & ENGLISH, LLP

18       Attorneys for Occidental

19       Renaissance Centre

20       405 N. King Street

21       8th Floor

22       Wilmington, DE 19801

23

24   BY:  DAVID M. SILVER, ESQ.

25

17

```
 1
 2   MCGUIREWOODS LLP
 3        Attorneys for Toronto Dominion Bank
 4        1345 Avenue of the Americas
 5        Seventh Floor
 6        New York, NY 10105
 7
 8   BY:  SHAWN R. FOX, ESQ.
 9
10   MCGUIREWOODS LLP
11        Attorneys for Toronto Dominion Bank
12        One James Center
13        901 East Cary Street
14        Richmond, VA 23219
15
16   BY:  DION W. HAYES, ESQ.
17        (TELEPHONICALLY)
18
19   NIXON PEABODY LLP
20        Attorneys for Deutsche Bank Net Trust Co. as Indenture
21        Trustee
22        437 Madison Avenue
23        New York, NY 10022
24
25   BY:  ROBERT N.H. CHRISTMAS, ESQ.
```

18

1

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3         Attorneys for Citigroup, et al.

4         1205 Avenue of the Americas

5         New York, NY 10019

6

7    BY:   CLAUDIA L. HAMMERMAN, ESQ.

8          STEPHEN J. SHIMSHAK, ESQ.

9

10

11   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

12        Special Counsel to the Creditors' Committee

13        51 Madison Avenue

14        22nd Floor

15        New York, NY 10010

16

17   BY:   JAMES C. TECCE, ESQ.

18

19   REED SMITH LLP

20        Attorneys for Bank of New York Corporate Trustee Services

21        and Bank of New York Mellon

22        599 Lexington Avenue

23        New York, NY 10022

24

25   BY:   MICHAEL J. VENDITTO, ESQ.

19

```
 1

 2   SALANS

 3        Attorneys for Svenska HandelsBanken AB

 4        Rockefeller Center

 5        620 Fifth Avenue

 6        New York, NY 10020

 7

 8   BY:  CLAUDE D. MONTGOMERY, ESQ.

 9

10   SEWARD & KISSEL LLP

11        Attorneys for Global Thematic Opportunities Fund LP

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:  JUSTIN L. SHEARER, ESQ.

16

17   SHEARMAN & STERLING LLP

18        Attorneys for Bank of America and its Affiliates

19        599 Lexington Avenue

20        New York, NY 10022

21

22   BY:  NED S. SCHEDEK, ESQ.

23

24

25
```

20

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for Black Rock Financial Management, Inc.

4         Four Times Square

5         New York, NY 10036

6

7    BY:  ANDREW M. THAU, ESQ.

8

9    STROOCK & STROOCK & LAVAN LLP

10        Attorneys for Mizvhu Investors Securities, Derivative

11        Claimants

12        180 Maiden Lane

13        New York, NY 10038

14

15   BY:  LAWRENCE M. HANDELSMAN, ESQ.

16        CLAUDE G. SZYFER, ESQ.

17

18   TROUTMAN SANDERS LLP

19        Attorneys for RWG Supply & Trading; New South Federal

20        Savings Bank; Electrabel A.V./S.A.

21        The Chrysler Building

22        405 Lexington Avenue

23        New York, NY 10174

24

25   BY:  PAUL H. DEUTCH, ESQ.

21

1

2    WACHTELL, LIPTON, ROSEN & KATZ

3         Attorneys for JPMorgan Chase Bank

4         51 West 52nd Street

5         New York, NY 10019

6

7    BY:  HAROLD S. NOVIKOFF, ESQ.

8

9    WHITE & CASE LLP

10        Attorneys for Deutsche Sparkessen und Giroverband

11        1155 Avenue of the Americas

12        New York, NY 10036

13

14   BY:  RICHARD GRAHAM, ESQ.

15

16   BAKER & HOSTETLER LLP

17        Linn Energy, LLC; Deer Park Road Corporation

18        1050 Connecticut Avenue, N.W.

19        Washington, DC 20036

20

21   BY:  DONALD WORKMAN, ESQ.

22        (TELEPHONICALLY)

23

24

25

22

1

2    GALLAGHER & KENNEDY, P.A.

3         Attorneys for Venture Associates, LLC

4         2572 Camelback Road

5         Suite 1100

6         Phoenix, AZ  85016

7

8    BY:  LINDSI M. WEBER, ESQ.

9         (TELEPHONICALLY)

10

11   STEPTOE & JOHNSON LLP

12        Attorneys for Korea Investment & Securities Co. and the

13        Friend Ferth Specialty Co.

14        2121 Avenue of the Stars

15        Suite 2800

16        Los Angeles, CA 90067

17

18   BY:  KATHERINE C. PIPER, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

23

1

2    STUTMAN, TREISTER & GLATT PC

3         Attorneys for the TPG-Austin Portfolio Holdings LLC

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:  JEFFREY H. DAVIDSON, ESQ.

9         MARINA FINERMAN, ESQ.

10        ISAAC PACHULSKI, ESQ.

11        (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

24

P R O C E E D I N G S

1

2    THE COURT:  Please be seated.  Good morning.

3    MS. FIFE:  Good morning, Your Honor.  Lori Fife, Weil

4    Gotshal & Manges on behalf of Lehman Brothers and its

5    affiliated debtors.  This morning, Your Honor, we have a full

6    courtroom and a crowded agenda.

7    THE COURT:  I think full is an understatement.  I am

8    a little concerned just about health and safety issues when a

9    courtroom is quite as packed as this one is.  And for those who

10   are standing near the door, unless you truly expect to be

11   coming to the podium and speaking, there's a more comfortable

12   place to be one flight up in Judge Beatty's courtroom which has

13   full audio.  If you're just here to audit, you'll be a lot more

14   comfortable upstairs and everybody else in the courtroom will

15   be more comfortable for those who, in an exercise of civility

16   and good judgment choose to leave.  So I'm going to take about

17   three minutes to give people an opportunity to leave who don't

18   really need to be here.  And you know who you are.  If no one

19   leaves, I will expect that you're somebody who actually has a

20   reason to come to the podium.  And if it's just to say me, too

21   or I reserve rights, you should be upstairs, too.

22   (Pause)

23   THE COURT:  Okay.

24   MS. FIFE:  Also, Your Honor, we've been asked if LBI

25   could proceed before LBHI because I'm told they have a very

25

1    short calendar and that may also free up some of the people to

2    leave earlier, if that's okay.

3            THE COURT:  That's fine.  We can start with LBI.

4            MS. FIFE:  Okay.  Thank you, Your Honor.  David

5    Wiltenburg, Hughes Hubbard & Reed for the trustee in the SIPA

6    proceeding.  And I appreciate the willingness of counsel and

7    the Court to vary the calendar.  This morning, as with

8    adjournments, we have only uncontested matter.  It appears as

9    item 8 at page 10 of the agenda.  And it is the trustee's

10   application for an order further extending the time to assume

11   or reject executory contracts pursuant to Section 365 of the

12   Bankruptcy Code.

13           There was one objection received that has been

14   resolved by means of rejection of the contract in question.  So

15   the application this morning is unopposed.

16           Your Honor, as before, the trustee's staff continues

17   to work through the significant project of evaluating executory

18   contracts and contracts continue to be identified that have

19   value either to LBI or to the Holding Company estate.  As I

20   say, that process is continuing and we are as we work through

21   rejecting and assuming as appropriate.  And accordingly, we

22   would request approval of a further extension of the trustee's

23   time to assume or reject.

24           THE COURT:  There's no objection?  It's approved as

25   uncontested.

26

1      MR. WILTENBURG:  Thank you, Your Honor.  And with

2  that, if I may be excused?

3      THE COURT:  You may be.  That frees up one spot.

4      MR. WILTENBURG:  Thank you, Your Honor.

5      MS. FIFE:  Okay.

6      THE COURT:  And before Ms. Fife starts, we have any

7  number of people who are participating through CourtCall.  I

8  believe most of the people on the line are just listening.  To

9  the extent that anybody has a BlackBerry near their

10 speakerphone, please either shut it off or move it away.  Also,

11 to the extent that you have an open line, please mute it

12 because we're getting feedback in the courtroom.

13     Please proceed, Ms. Fife.

14     MS. FIFE:  Thank you, Your Honor.  The first matter

15 on the agenda is the debtors' motion for authorization to

16 assume an unexpired lease and to assume and assign an unexpired

17 lease.  The assumption was already heard and granted with

18 respect to 85 10th Avenue.  With respect to the assumption and

19 assignment, this relates to a lease at 600 Madison.  The

20 debtors are seeking to assume and assume that lease to

21 Neuberger Berman.  The landlord had asked for additional

22 information with respect to adequate assurance.  We have

23 provided that information to the landlord.  And as a result,

24 the landlord has consented to the assumption and assignment.  I

25 believe that the landlord, who is represented here in court

1    today, would like to look at the revised order which we have

2    provided or will provide to the landlord.  So we need to get

3    him the revised order.  But we expect to do that shortly and

4    then submit the revised order to Your Honor by the end of

5    today.

6            THE COURT:  So but for that detail, there are no

7    issues, is that right?  Mr. Eckstein, do you want to identify

8    yourself for the record?

9            MR. ECKSTEIN:  Yes, Your Honor.  Andrew Eckstein,

10   counsel for 600 Partners Co, LP.  That is a correct

11   representation.  There was a little confusion as to who the

12   assignee was given that Neuberger Berman was in a state of flux

13   having had its assets sold and the like.  We've asked for

14   adequate assurance, took a couple of months to get it.  We now

15   know that Neuberger Berman is known as LB Hercules Holdings LLC

16   but we did receive a letter from Lehman's CFO identifying that

17   it has the financial ability to perform and we're, therefore,

18   satisfied.  Just would like to see the order.

19           THE COURT:  Okay.  Fine.  Thank you.

20           MR. ECKSTEIN:  Thank you, Your Honor.

21           MS. FIFE:  Neuberger changed its name in connection

22   with the sale from LBHI.  The next matter on the calendar is

23   the debtors' motion to restructure certain loans with Broadway

24   Partners Fund Manager.  This was a loan by LBHI to Broadway

25   Partners in approximately the amount of 450 million dollars.

28

1    The loan consists of actually two loans, one a bridge A

2    mezzanine loan of 320 million dollars, the other a bridge B

3    mezzanine loan of 137 million dollars.  In light of the

4    distressed commercial real estate market that affects these

5    properties, LBHI is seeking to restructure them.  And we have

6    agreed to forbear from exercising our rights with respect to

7    these loans until June 2012.  We're also agreeing to actually

8    take control of these properties.  And we are seeking to make a

9    capital contribution of twenty million dollars in connection

10   with this restructuring.

11        There were no objections to this motion.  The

12   proposed order, however, has been modified to make it clear

13   that LBHI cannot reject its obligations under the agreement so

14   that the obligations will survive any confirmation of a plan

15   and also that the order does not affect any of the rights of

16   any of the senior lenders, the lenders that are senior to these

17   mezzanine loans.

18        As there are no objections, we would ask the Court to

19   approve the debtors' motion.  I believe the creditors'

20   committee would like to make a statement in support of our

21   motion as well, Your Honor.

22        THE COURT:  All right.

23        MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

24   Tweed Hadley & McCloy on behalf of the creditors' committee.

25   As with all significant real estate transactions, the

29

1    committee's real estate subcommittee evaluated this proposed

2    transaction, spent several weeks, actually, doing diligence on

3    it with the debtors' professionals and, for reasons we need not

4    go into detail here, believe that it is in the best interest of

5    the debtors' estates to proceed with the proposed transaction.

6         THE COURT:  Okay.  I accept that representation.  I

7    took a look at the term sheet which is attached to the motion.

8    It appears to be a complex transaction.  It's not obvious to me

9    from having reviewed it exactly what's going on.  And I suspect

10   that's probably true for other people who saw this motion and,

11   as a result, there are no objections because nobody understood

12   it.

13        MS. FIFE:  Oh, well, I'm not sure that's good.

14        THE COURT:  I'm only slightly exaggerating.  But as I

15   understand it, there are mezzanine pieces.  There are

16   underlying properties being divided into different pools of --

17        MS. FIFE:  Pools, right.

18        THE COURT:  -- 1, 2 and 3.  I thought twenty million

19   dollars was being advanced by Broadway entities for the benefit

20   of Lehman and that Lehman was going to receive twenty million

21   dollars.  But I may have --

22        MS. FIFE:  No.  You're right.  I was incorrect, Your

23   Honor.

24        THE COURT:  All right.  I'm glad I brought that up

25   then because that's actually the correct way the money moved.

30

1          MS. FIFE:  Yes.  You're right.

2          THE COURT:  And I accept that this is a good

3   transaction and I am comforted by the independent diligence of

4   the creditors' committee.  It's approved.

5          MS. FIFE:  Thank you, Your Honor.  The next motion on

6   the calendar is a motion of Unclaimed Property Recovery

7   Services Inc.  This motion was actually heard at the June 3rd

8   hearing.  The Court denied the motion.  There is a consensual

9   order that we have agreed to with the Unclaimed Property

10  Recovery Services Inc.  And that order denies the motion with

11  respect to the Chapter 11 debtors' estates or their nondebtor

12  affiliates provided that the denial is without prejudice to any

13  relief that the UPRS is seeking with respect to LBI and any of

14  the trustee's objections thereto.  With that, we have a

15  consensual order and we would ask the Court to approve that

16  order.

17         THE COURT:  It's approved.

18         MS. FIFE:  Thank you, Your Honor.  The next motion on

19  the calendar is the debtors' motion authorizing discovery from

20  Barclays Capital.  Yeah.  I was going to say.  This is a motion

21  that's being handled by Jones Day.  But before we get to that,

22  if possible, I'm just going to go out of order.  There is an

23  adversary proceeding which is listed on page 10, B7, Deutsche

24  Bank v. Lehman Brothers.  And this was a motion for summary

25  judgment.  The matter has been settled and the parties will be

31

1   presenting an order incorporating the terms of the settlement.

2   So this is going to be settled.

3           THE COURT:  Is there a statement to be made by the

4   parties?

5           MR. DORCHAK:  Good morning, Your Honor.  Joshua

6   Dorchak from Bingham McCutchen on behalf of Deutsche Bank in

7   this matter.  Thank you for giving us a slot today on a busy

8   calendar, Your Honor.  My clients -- since the summary judgment

9   motion's been pending and ready for hearing for a while now,

10  our clients just wanted to make sure that we put on the record,

11  once and for all, that there was a settlement agreed to in

12  principal.  The debtors' are going to return the funds that

13  were mistakenly transferred with any accruals thereon.  And

14  we're going to finish up the stipulation and get it to Your

15  Honor as soon as possible.

16          THE COURT:  Fine.

17          MR. DORCHAK:  Thank you.

18          MR. GAFFEY:  Good morning, Your Honor.  I'm Robert

19  Gaffey from Jones Day.  We're special counsel to Lehman

20  Brothers Holdings Inc. in connection with the Barclays matter.

21  And I'm here on the debtors' motion to authorize discovery from

22  Barclays Capital.

23          Your Honor, I'll be brief and only summarize what I

24  think we've shown in our papers which is that the discovery

25  sought by the estate is focused, is necessary and is well

32

1    within the ambit of Rule 2004.

2         As we noted in our papers, shortly after the

3    transaction, Barclays announced that it had shown a gain of

4    approximately 4.2 billion dollars on the acquisition of Lehman.

5    And since that time, certain, we think, fairly significant

6    discrepancies in connection with the sales transaction have

7    presented themselves and warrant further examination.  They

8    fall into essentially three, possibly four, different

9    categories.  The three categories are the accrual for

10   compensation which found its way into the asset purchase

11   agreement in Section 9.1C which, in that agreement, Barclays

12   agreed to pay in the aggregate.

13        The second issue is the amount estimated for the

14   Court at the approval hearing with respect to cure amounts that

15   Barclays would assume which was estimated for the Court at 1.5

16   billion dollars.

17        The third issue has to do with a transaction that was

18   front and center before the Court at the approval hearing.  It

19   was going on at the same time.  And that is a repurchase

20   agreement between Barclays and Lehman that took place on

21   September 18, 2008 where the Court was informed that Barclays

22   would essentially be stepping into the shoes of the Fed to take

23   over certain overnight financing to finance the debtor pending

24   closing of the asset purchase agreement.

25        And the fourth issue which sort of overrides all of

33

1    this, Your Honor, is that the debtor needs discovery concerning

2    the negotiations of these various matters in the transaction.

3          Now, one important reason that the debtor needs to do

4    this by way of discovery is it has no access to really any of

5    the former Lehman employees who were involved in the

6    negotiations, who were involved in putting these numbers

7    together. And a large number of them worked for Barclays at

8    this point and, therefore, they're unavailable for interview,

9    they're unavailable for access and, therefore, discovery is

10   necessary for us to question people about these issues.

11         The discrepancies that we have pointed out in our

12   papers, let me briefly review what those are. With respect to

13   the compensation accrual, which was put at two billion dollars,

14   and was recorded in a certain financial schedule to which the

15   APA specifically refers, that financial schedule -- it's

16   annexed as Exhibit A to our motion. Barclays -- the Court was

17   told and the board of LBHI understood that Barclays would

18   assume that two billion dollar liability for bonuses to be paid

19   to the transferred Lehman employees. The asset purchase

20   agreement in Section 9.1C says that they shall do it and

21   they'll do it in the aggregate.

22         Barclays has, at least as far as we've been able to

23   tell, it appears that either the accrual was too high in which

24   case it could well be that the consideration Barclays gave in

25   the transaction was overstated, or Barclays had not met its

34

1    obligation under the APA to pay the full two billion dollars.

2    And it's an issue we've been trying to track down with Barclays

3    since Alvarez & Marsal -- Bryan Marsal, the chief restructuring

4    officer of LBHI, wrote to Barclays and asked how much have you

5    paid.  We've not been able to determine that amount.  Now,

6    obviously, that's information solely available to Barclays.

7           The reason that that's important is the accruals that

8    we'll put together, the two billion dollar accrual for

9    compensation, and, at least according to the financial

10   schedule, the 2.25 billion dollar accrual for a cure which, by

11   the next morning, was being put at 1.5 billion were critical

12   components of the consideration that Barclays paid in the deal.

13   They paid 250 million cash.  They undertook up to four and a

14   quarter billion dollar liabilities.  And if these liabilities

15   were not properly calculated or, worse, simply pulled out of

16   thin air, and I'm not saying that was done -- I'm saying we

17   need discovery to find that out -- then the consideration that

18   Barclays paid in the transaction may have been significantly

19   lower than it should have been.

20          Now where does the repurchase agreement come into

21   this?  The repurchase agreement, Your Honor, is an important

22   part of the investigation that we're conducting right now

23   because it appears, at least from some e-mail that we have been

24   able to recover so far, that the repurchase agreement may have

25   been used as a mechanism to move, essentially, fifty billion

35

1    dollars to Barclays worth of assets in return for forty-five

2    billion dollars.  It was supposed to be overnight financing

3    secured for forty-five million dollars, secured by fifty

4    billion dollars in collateral.  In the event and in amendments

5    that were made over the weekend after the sale was approved,

6    that repo was canceled.  The fifty billions went to Barclays.

7    And as we've said in our papers, it appears that that may have

8    been a mechanism to give Barclays an undisclosed discount in

9    the sales transaction.  And, in particular, I'm referring to

10   Exhibit 9 to our papers.  And it's an e-mail from Girard Riley,

11   then at Lehman, to Ian Lowitt, then Lehman's CFO, and Michael

12   Gelband, another senior Lehman executive.  And what it said in

13   part was "Defaulting on the repo could be the best as a

14   discount could be taken from the haircut."  And at the end of

15   that e-mail, I think, is what is a very important sentence with

16   respect to our application:  "Would we rather have that be in

17   the sale price tomorrow?"

18        Now, as we've outlined in our papers, Your Honor, if

19   it turns out that the repo was used as a mechanism to give a

20   five billion dollar discount to Barclays, that raises

21   disclosure issues and it raises fairness, equivalence and other

22   issues that need to be examined by the estate.

23        Now we've had no choice but to pursue this by way of

24   an application under Rule 2004 because our attempts to resolve

25   this cooperatively with Barclays have, unfortunately, been

36

1    unsuccessful to date.  We've met with their counsel.  They're

2    not willing to provide to us all of the documents that we've

3    asked for.  And we've laid out the documents that we need in

4    Exhibit F to our papers.

5         They have, in their reply, said that they may be

6    willing to give us some information that's been given to the

7    creditors' committee and some information that, by

8    happenstance, also has been given to the examiner.  And I'm

9    happy to get that to the extent it overlaps with the request

10   that we've made.  But I think we need to proceed by way of an

11   order, Your Honor, in order to move expeditiously and to ensure

12   the estate gets the information necessary to pursue these

13   discrepancies and to determine whether or not, and I emphasize

14   both sides of that, whether or not the estate has claims that

15   it should assert or other means by which it should revisit the

16   sale order.

17        That, Your Honor, is essentially a summary of our

18   position in the papers.  I'm happy to rest on our papers unless

19   Your Honor has any questions.

20        THE COURT:  I have a couple of questions.  To what

21   extent is the discovery that you seek comparable to the

22   discovery that is being undertaken by the examiner in

23   connection with the examiner's pursuit of his undertakings to

24   develop a report which, among other things, is to touch upon

25   the Barclays sale.

37

1          MR. GAFFEY:  The short answer to that, Your Honor, is

2     I don't know because I don't know what the examiner has asked.

3     I don't know what the examiner's particular requests are

4     although I do understand there's some overlap.  I know the

5     examiner is looking at the Barclays transaction as well.  I

6     would suggest, though, that it's appropriate for the debtor to

7     look independently at that issue because there may be a

8     different end result and may form a different conclusion about

9     what claims it has an obligation to bring or to decide not to

10    bring.

11          To the extent Your Honor might be concerned about

12    burden or duplicativeness or overlap here, we have offered to

13    Barclays and would be happy to deal with the examiner, to make

14    sure they don't have to produce things twice.  For example, I

15    understand that Barclays may recently have made a production to

16    the examiner although I don't know what's in it because the

17    examiner is bound by a confidentiality order which doesn't

18    allow the examiner to share with the estate what it received.

19          It would seem to me, at least as a first step toward

20    giving us the 2004 discovery that we want, Barclays can either

21    go through what it's already produced to the examiner and pull

22    out that which is responsive to what I've asked us or give it

23    to us and let us do that job.  But that's the way to deal with

24    the efficiency and the burden point that Barclays has raised.

25    I would add -- I would say the same thing with respect to

38

1    requests made by the creditors' committee.

2              THE COURT:  Okay.  And I have, I guess, a more

3    fundamental question which is where can this lead.  Let's just

4    assume for the sake of discussion that you conduct court-

5    authorized 2004 discovery obtained information and discover a

6    smoking gun or some other piece of information that gives you

7    reason to think that Barclays ended up with too good a deal

8    during that week we all remember.  Those of us who participated

9    remember it well.  But the order approving that transaction was

10   affirmed at the district court level by Judge Cote and was

11   ultimately final by virtue of the disposition of the Second

12   Circuit of the appeal.  The appeal is now dismissed.  And so, I

13   have a final sale order and so do you.  So let's just assume

14   you find something that gives you reason to question whether or

15   not Barclays got too good a deal.  Then what?

16             MR. GAFFEY:  I think the answer to that, Your Honor,

17   is with respect to the sale order itself, I think I still have

18   an opportunity although it may not be the mechanism that's

19   required here to come back under Rule 60, Rule 9024 on grounds

20   of either mistake -- for example, if the smoking gun Your Honor

21   refers to shows, as some of our documents appear to indicate,

22   that the two billion dollars was actually the firm wide accrual

23   for comp, not the North American operations.  Let's take that

24   as purely a hypothetical.  I think I have an opportunity to

25   come back under Rule 60 and revisit the sale order at that

39

1    point on the grounds of mistake.

2          Should a smoking gun indicate grounds of

3    misrepresentation or fraud, I also have that opportunity.  And

4    Rule 60 also allows the Court to give relief from the order for

5    any other reason that justifies relief.

6          Now, with respect to the first two components there,

7    the debtor has a year to do it.  That doesn't apply to the

8    third.  But it does apply to the first two which goes to the

9    need for expedition and efficiency on the discovery we seek.

10   But I think I can come back, I could come back conceivably and

11   ask the Court to revisit the sale order under Rule 60 as

12   Barclays, by the way, has done twice.

13         I think we're not restricted to Rule 60 relief,

14   however.  There could be claims.  There could be claims to be

15   asserted against Barclays.  For example, and this is just by

16   way of example, and, again, Your Honor, I emphasize subject to

17   what discovery we get and what facts we see.  There could be

18   the imposition of a constructive trust over assets that were

19   given to Barclays that were meant for a particular purpose and

20   not used for such.  There could be a claim for conversion on

21   the same grounds.  If a tangible fund was given to Barclays in

22   the transaction, again, for an annotated earmarked purpose and

23   it's not used for that purpose, I think, under New York State

24   law, a conversion claim could lie.

25         There could be breach of fiduciary duty claims.  One

40

1    of the things we've raised in our papers is that some of the

2    discovery we seek goes to compensation offers made to and

3    compensation subsequently paid to former Lehman executives who

4    were near or in the negotiations to determine whether or not

5    they abided by their duties to the corporation or whether they

6    gave away points they shouldn't have given away concerned more

7    about their own financial wherewithal.

8           Again, Your Honor, I emphasize we are just looking at

9    what the possibilities could be and what the early indications

10   are.  But I think if I have a breach of fiduciary duty claim, I

11   could look to Barclays for an aiding and abetting claim.  I

12   think -- in other words, Your Honor, I don't think the sale

13   order, with respect to independent claims that could be

14   assertive in a complaint is the be all and the end all of that.

15   I think there may a breach of contract claim under the asset

16   purchase agreement.

17          Now, Barclays have said in their opposition that they

18   have no obligation to pay two billion dollars.  That's just not

19   what the contract says.  The contract is mandatory.  The

20   contract says they shall pay it.

21          So it's a fair question, Your Honor, most absolutely,

22   and it's one that I gave a lot of thought to as we proceeded

23   down the Rule 2004 path.  Again, at the risk of repetitive, I

24   don't want what I'm saying today to be an announcement that we

25   have such claims.  I want it to be an announcement that we need

41

1    to take discovery to make a responsible determination as to

2    whether (a) the estate has them and (b) should proceed with

3    those claims.

4              THE COURT:  All right.  Thank you.

5              MR. GAFFEY:  Thank you, Your Honor.

6              THE COURT:  I see people coming from two sides.  Are

7    you -- do you represent different parties?

8              MR. HUME:  Yes, Your Honor.

9              MR. DUNN:  Yes.

10             THE COURT:  And who do you represent?

11             MR. DUNN:  Westernbank.

12             THE COURT:  And you represent Barclays?

13             MR. HUME:  Correct, Your Honor.

14             THE COURT:  I think Barclays might be the key person

15   to hear from right now.

16             MR. HUME:  Thank you, Your Honor.  Hamish Hume from

17   Boies, Schiller & Flexner.  I'm here with our managing partner,

18   Jonathan Schiller.  I'll be handling the argument today, Your

19   Honor.

20             Your Honor, in paragraph 1 of their reply, LBHI

21   disclaims that they are undertaking a wholesale attack on the

22   sale order or trying to retrade the deal.  I think in the

23   answer you were just given, Your Honor, respectfully, you see

24   that that isn't, in fact, what this discovery is intended to

25   do.  This Court found that the sale was undertaken in the best

42

1    interest of the estate, that fair consideration was provided,

2    that Barclays made the highest and best offer, paragraphs (i),

3    (k) and (l) of your sale order.  In their brief, they say they

4    want discovery as to whether there was adequate consideration,

5    whether there was good faith and whether or not there were

6    conflicts of interest that prevented the transaction from being

7    conducted at arms' length.  They want discovery precisely into

8    the issues this Court has already determined and ruled upon by

9    saying that it was a good faith transaction, it was conducted

10   at arms' length and Barclays did make the highest and best bid.

11   The Court should not allow it.

12          THE COURT:  What if they made a huge mistake because

13   of the pressure of time?

14          MR. HUME:  Your Honor --

15          THE COURT:  It's possible that I make mistakes, you

16   know.

17          MR. HUME:  Your Honor, they've given you no reason,

18   none whatsoever, to believe that there might be any kind of

19   mistake.  There are two things they keep pointing to.  Bonus

20   and cure are completely mischaracterized and do not come close

21   to showing the basis of this kind of wholesale attack.

22          The bonus payments?  First of all, we're going to

23   provide the information showing how much we paid in bonuses.

24   We think they should see what we've provided and then see

25   whether they have anything to say about it.  There is an

43

1    obligation to pay accrued bonuses.  Barclays complied with that

2    obligation.  No one has said otherwise.  If we hadn't complied,

3    you would have heard about it.  We complied.  We paid

4    significant amounts in those bonuses and in all of the other

5    compensation.  The schedule refers to a comp number of 2.0, two

6    billion.  It is obviously an estimate.  Every single time

7    anyone came before this Court in those days leading up to the

8    closing and referred to the bonus number or the cure payment

9    number, they used the word "estimate", "approximately",

10   "potential exposure".  These were not presented to Your Honor

11   as this is the consideration.  No one ever said that.  The

12   agreement itself in Section 3.1 of the APA defines

13   consideration as the cash paid, over a billion dollars for the

14   real estate, 250 million in cash, which ended up being

15   deposited with the DTCC and the assumed liabilities which were

16   defined as the liabilities of operating the business going

17   forward.  And I can assure you, Your Honor, those liabilities

18   have been assumed.  The payment of 10,000 employees, their

19   compensation on a going forward basis, the contractual

20   counterparty payments.  The business is operating.  The

21   liabilities have been assumed.  The consideration has been

22   provided.

23          THE COURT:  I hear you.  But you're not really going

24   to the issue of discovery as much as what you're telling me is

25   the good faith of your client in the transaction.  This is a

44

1    very unusual procedural setting we find ourselves in.  I can't

2    recall another instance of a transaction of this magnitude

3    being questioned in this manner nine months after the

4    transaction was approved by highly motivated special counsel

5    because it's obvious that Weil Gotshal can't do this.  And what

6    I'm being told, it's not that there's anything out there that

7    Barclays needs to be concerned about so much as we just have

8    some concerns on behalf of the estate based upon some

9    representations that have been made publicly by Barclays

10   concerning what appears to be a two billion dollar benefit,

11   accounting benefit, associated with the acquisition in a 2008

12   Barclays earnings report.  I looked at that.

13          I don't think that anybody at Jones Day is saying

14   that there are claims.  In fact, counsel was very clear in

15   saying I'm not saying there are claims.  All he's saying is we

16   want an opportunity to investigate whether there might be

17   claims.  What's wrong with that?

18          MR. HUME:  Your Honor, it's a question of what's

19   justified in light of that representation and how much they've

20   shown as to what those potential claims may be.  Remember, Your

21   Honor -- I mean, the issue before the Court, we submit, is, is

22   the full scope of what they request even remotely justified?

23   We have argued that none of it is justified.  But we've already

24   offered to produce the information showing how much was paid in

25   bonus, the information showing how much was paid in cure

45

1    payments.  They say that they need more than that.  And the

2    argument they made in their papers and to you today was we

3    don't have access to the Lehman people.  And they want to

4    understand how the estimates came about to the extent there may

5    be a discrepancy between the estimate and the actual number

6    paid.  That has nothing to do with the twenty document requests

7    they asked for which, I think, should fairly be understood by

8    the Court to be every single document having anything to do

9    with Lehman at Barclays.  Anything.  It covers everything

10   including every single compensation agreement, bonus paid to

11   any of those 10,000 employees.  They want it all.  Every e-

12   mail, every negotiation with any mid-level manager who might be

13   important to a business.  Hey, why did you send him?  How did

14   you keep him at Lehman?  How did you prevent him to go to

15   another firm?  They want it all.  It's exceptionally broad,

16   it's hugely intrusive and it's not justified.  If they want the

17   aggregate number, fine.  We'll give it to them.  If they think

18   there's a basis to come back for more, we'll talk about it but

19   we don't think there is.  If they need to speak to a couple of

20   Lehman employees, we can arrange that.  We were offering to

21   arrange those things when they ran to court.  We do need a

22   protective order.  We think that this bonus information is

23   confidential.

24       But their thesis in their reply brief is that

25   something's amiss because the estimates generated by their

46

1    client originally, or Weil Gotshal's client before the

2    transaction, those estimates seem off in light of what was

3    actually paid.  That's the thesis of why they think there's

4    something to investigate.

5         Their reply brief demonstrates they have all the

6    documents from Lehman Brothers from before the deal.  They

7    don't need Barclays' documents.  There's no need for any

8    document discovery to explore what they're saying they want to

9    explore.  They may need to speak to the people involved who

10   generated those estimates.  We don't think there's any basis

11   for it.  I want to be clear about that.  But, at most, that

12   would be what we think they could argue they may be justified

13   to.

14        And, Your Honor, all of this talk that they have in

15   their brief and today again about confusion on the repo,

16   respectfully submitted, it's just simply not credible.  The

17   Weil Gotshal lawyers were involved in the repo.  They submitted

18   to Your Honor the schedule of securities that were in the

19   collateral that were going to be transferred to Barclays in the

20   repo.  It was not a gratuitous transfer of five billion

21   dollars.  It was a repo in which there was collateral declining

22   by the day precipitously in value that we took in exchange for

23   forty-five billion dollars in cash which they call mere

24   interday financing.  It was not mere; it was not interday.

25   Forty-five billion dollars in cash that Barclays fronted and

47

1    didn't get back.  They got collateral in the form of securities

2    that were plummeting in value.  And then it didn't even get all

3    those.  And as Your Honor knows, had to come to this Court for

4    a settlement in which it didn't receive the full amount that it

5    was supposed to.  And the Federal Reserve, through Shari

6    Leventhal's affidavit, told the Court that she had evaluated

7    the whole thing and thought it was a fair settlement.

8          None of this is news to the Court.  None of this is

9    confusing or should be a source of confusion or allegations

10   that there is --

11         THE COURT:  It's not news but it is confusing.  And I

12   think that one of the problems -- I'm just giving you a very

13   candid appraisal.  In talking about something that's this

14   massive from the perspective of looking back at it nine months

15   later is that I know from having sat here during that week that

16   it was an extraordinary time in the history of global finance.

17   And things were happening very, very quickly.  Very skillful

18   lawyers and businesspeople put together an extraordinary

19   transaction in virtually no time.  And it's conceivable that

20   mistakes were made.  As has been pointed out by special counsel

21   for the debtors and as you know, Barclays itself sought 60(b)

22   relief on two separate occasions having to do with contracts

23   listed on the list for assumption and the Amex Barclays

24   litigation continues, although I believe it to be close to

25   resolution.

48

1          So the notion that there may have been either a

2     misunderstanding or even an innocent misrepresentation as

3     opposed to a willful one is entirely possible.  Where it leads

4     is another question.  And whether the discovery which is being

5     currently sought is well geared to the objectives of getting to

6     the truth remains to be seen.  But we will get to the truth.

7          MR. HUME:  Your Honor, we understand that and we want

8     to cooperate with that and we are cooperating with that.  And

9     we have multiple parties with whom we are speaking, you may

10    hear from the creditors' committee in a moment, the examiner's

11    present to a question Your Honor asked counsel for LBHI, how

12    much of the discovery sought is covered by what the examiner is

13    looking at.

14          On this point on the repo, I would like to draw the

15    Court's attention to the third bullet point on page 4 of the

16    Court's January, I think, 18th order authorizing the examiner

17    which specifically says one topic for the examiner is the

18    transactions and transfers including but not limited to the

19    pledging or granting of collateral security interest among the

20    debtors pre-Chapter 11 lenders and financial participants

21    including JPMorgan, Bank of America, the Federal Reserve Bank

22    of New York.  The repo is clearly covered by that topic is

23    something the examiner is looking at.

24          We have produced documents, e-mails, spreadsheets,

25    what was exchanged in those tumultuous days, we produced them.

49

1    We'll continue to produce them for the examiner.  We've

2    scheduled interviews and we've offered to make all of that

3    available to LBHI in a coordinated process.

4         So there should be no question that, in terms of

5    unraveling all of that complexity, we are cooperating and we

6    can make available what we're giving the examiner and the

7    creditors' committee to LBHI.

8         The creditors' committee may wish to speak.  They

9    chimed in on this motion.  Our one point on that, which may

10   save a rebuttal, we met with them in February.  We've provided

11   them documents.  We talked through all of these discrepancies

12   in the numbers they raise in their papers.  We haven't heard

13   back since.

14        THE COURT:  Let me just cut through your argument, if

15   I may, and I understand your position.  Is it your position

16   that there should be no order entered authorizing 2004

17   discovery and instead you should simply be permitted to go

18   about the business of providing informal discovery as you've

19   been doing in the past?  Is that your position?

20        MR. HUME:  Your Honor, we think --

21        THE COURT:  Because I think that's what I heard you

22   say.

23        MR. HUME:  That is our position, Your Honor.  And we

24   think, at a minimum, Your Honor could stay the motion pending

25   our production of the documents we've offered to produce.

50

1    Because we don't think there's any need to order production of

2    anything in excess of that.  So yes, that is our position.

3            THE COURT:  All right.  Let me hear from the

4    creditors' committee.  I know there are others who wish to be

5    heard and then I'll give counsel for LBHI an opportunity for

6    further comment.

7            MR. DUNNE:  Your Honor, may I be heard briefly?

8            THE COURT:  Yes, of course.

9            MR. DUNNE:  It's Dennis Dunne from Milbank Tweed

10   Hadley & McCloy on behalf of the committee.  The reason I asked

11   for permission is we're actually not representing the committee

12   in this matter.  I'm going to turn it over to my co-counsel,

13   James Tecce in thirty seconds to address the merits.

14           I rose to address one purely factual issue relating

15   to something we are representing the committee with respect to,

16   which is the examiner.  Your Honor had some comments about the

17   scope of the examiner's charge.  And we recently were in

18   discussions with the examiner so I was literally looking at the

19   order yesterday.  And what it actually says is that -- your

20   order charged the examiner with investigating the transfer of

21   assets from LBHI affiliates, other than LBI, to Barclays.  And

22   so the vast bulk of the purchase by Barclays were securities

23   and other assets from LBI.  You may remember that the genesis

24   of that was Mr. Bienenstock's concern that his client, which

25   was a nondebtor at this time, may have had assets that were

51

1    swept up in some broad language that was given to the examiner

2    to take a look at.  But they carved out LBI, which my

3    understanding relates to the bulk of what we're talking about

4    today with respect to 2004.  And I just wanted to put that --

5            THE COURT:  Thanks for that clarification.

6            MR. DUNNE:  -- on the record.  I'll turn the podium

7    over to my co-counsel.

8            MR. TECCE:  Good morning, Your Honor.  James Tecce of

9    Quinn Emmanuel on behalf of the official committee.  Your

10   Honor, we filed a joinder in support of the 2004 motion because

11   from our perspective it arrives at a propitious time that is

12   coincident with our own investigation at a point that we've

13   reached in our own investigation that suggests that we do need

14   additional information from Barclays.

15           If the Court will remember, we first raised this

16   issue in December of 2008 in the context of a settlement that

17   had been reached between the SIPA trustee, Barclays and

18   JPMorgan Chase.  And we had identified certain issues that were

19   raised in a factual affidavit that was submitted in connection

20   with that affidavit that we viewed as being inconsistent or

21   worthy of further investigation from our perspective and the

22   sale transaction as we were reviewing the sale transaction,

23   that order proving that settlement was entered on the 22nd of

24   December, Your Honor.  And I think what's important, because

25   the charge has been made that we've really done nothing to

52

1    follow up with Barclays, just to -- very briefly, and I will be

2    brief Your Honor -- chronicle what we have done with respect to

3    Barclays and what the status of our investigation is with

4    respect to Barclays.

5         The Court admonished, on the 22nd of December, that

6    the parties should work cooperatively to obtain information,

7    specifically the committee to obtain information from Barclays

8    with respect to its questions concerning the sale transaction.

9    And we were very conscious of the Court's remarks.  We did not

10   want it to devolve to motion practice so we worked as hard as

11   we could to work cooperatively with Barclays to get the

12   information that we wanted to conduct our investigation.

13        So the order was entered on that settlement and that

14   issue was raised at a hearing on the 22nd of December, Your

15   Honor.  On the 26th of December, four days later, we sent

16   Barclays our first request, if you will, an informal request

17   for information.  The parties had a short meet and confer

18   session in January to discuss that letter.  There was a meeting

19   on the 3rd of February that is referenced in Barclays' papers.

20   I disagree with Barclay's characterization of that meeting.  It

21   was not the Rosetta stone that answered all of the committee's

22   questions.  We actually emerged from that meeting with

23   additional questions.  And to that end, seven days later, we

24   sent a revised document request or a revised request of

25   information that reflected the questions that we had from that

53

1    meeting in February.

2             Barclays ultimately did produce documents to us in

3    response to those requests on the 20th of March, that's

4    correct.  But when the documents were delivered to us they were

5    in a format that made it almost impossible to decipher them.

6    So a period of negotiation with Barclays started as to the

7    format in which the documents would be produced to us.

8             And it wasn't until the 28th of May -- the documents

9    consist of a number of schedules because, as Your Honor will

10   recall from the sale transactions, securities -- a number of

11   securities were transferred.  As they were presented to us, it

12   was difficult for us to decipher them.  During the period of

13   April we actually reached out to Barclays and worked with them,

14   asking them to provide the documents to us electronically and

15   they wouldn't agree to that initially.  So we worked with them

16   through different ways to get the documents that would avoid

17   them having to produce them electronically.  Ultimately, they

18   did produce them electronically to us on the 28th of May, three

19   weeks ago.

20            So to say that we haven't followed up with them about

21   the schedules, is really unfair to the extent that number one,

22   they were just produced to us in a way that we can decipher on

23   the 28th of May.  And two, we're still reviewing those

24   schedules.

25            But where we are in our investigation, Your Honor, is

54

1    I think we've reached a point where we have additional

2    questions on the basis of the documents that we've received.

3    And the best way for us to proceed is probably what we really

4    need are depositions of certain individuals.  We may have some

5    discrete discovery requests but we would like to take

6    depositions.  And in an effort to be efficient and an effort to

7    avoid duplications, we're asking to join in the debtor's 2004

8    motion.  They've asked for depositions.  They have asked for

9    documents but they have asked for depositions and we would like

10   to attend those depositions and propound questions.

11        We could have filed our own 2004 motion, Your Honor,

12   at any time.  But we didn't do that because going back, at

13   least to April, the debtors served discovery on Barclays and

14   requested depositions.  And we think that the most efficient

15   and non-duplicative way for us to proceed is to proceed through

16   the Rule 2004 motion.

17        Just one other point, Your Honor.  Your Honor asked

18   where does this all go?  What is the remedy at?  Mr. Gaffey

19   discussed some of the issues that the parties were considering

20   and I provide the same caveat that we don't know that there's a

21   claim yet.  But I just would note that to the extent that

22   assets were transferred that were not authorized by the sale

23   order, that it may give rise to 549 post-petition transactions

24   that were not authorized by the Court.  So that's just one

25   other area that we're investigating.  We don't know that it

55

1    gives rise to a claim.  I provide that same caveat but just to

2    answer Your Honor's question.

3             THE COURT:  Okay.  Recognizing that there are caveats

4    throughout the courtroom at this moment, is the committee

5    investigating the same subject matter that the debtor intends

6    to investigate assuming the 2004 request that's before me is

7    approved or are you focusing on different subjects?

8             MR. TECCE:  Well, that's a fair question Your Honor.

9    I think that we are -- from our perspective we're examining the

10   sale order, the assets transferred and the liabilities assume

11   and whether or not the transaction that's consummated is

12   consistent with the transaction that was represented to the

13   Court and to the committee.

14            THE COURT:  Sounds like it's the same thing.

15            MR. TECCE:  There are similarities, Your Honor, but I

16   think that we can work with them to avoid the duplication of

17   effort.  Already this process is reflected by that to the

18   extent that the debtors have filed their 2004 motion.  To the

19   extent that we have additional questions of Barclays, we have

20   not filed a 2004 motion yet because there's one on file already

21   and we've already avoided the duplication of two 2004 motions.

22            I think the reply that Barclays filed telegraphs what

23   their answer will be when we ask them for additional

24   information.  And that's that we've given you everything you

25   need to know.  They said in their reply that the committee

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

56

1    shouldn't have any additional questions because we met with the

2    committee and we answered all their questions and they have no

3    basis to be confused.

4         I think to the extent that we -- if the Court denies

5    the debtor's motion and we go to Barclays and we ask them for

6    additional information, we may be tasked with having to file

7    our own 2004 motion because we'll be met with the answer you

8    have everything you need, go to the Court and prepare a 2004.

9         So we've already avoided that duplication already.

10   The debtor's have filed their motion.  We can certainly

11   coordinate with them in the conduct of depositions as to what

12   questions and areas we think are important to focus upon.  And

13   that coordination has been working to avoid duplication so far

14   already.

15        THE COURT:  Okay.

16        MR. TECCE:  Unless Your Honor has any questions, that

17   concludes my presentation.

18        THE COURT:  I don't.

19     (Pause)

20        MR. DUNN:  Your Honor, my name is David Dunn.  I

21   represent Westernbank of Puerto Rico.  I'll be very brief.

22        My client has 145 million dollar claim arising from a

23   repurchase contract for approximately 450 million.  The assets

24   that were to be repurchased were involved in the repo that is

25   being investigated here.  And we have issues and concerns about

57

1     those transactions; what the classifications were of assets

2     that were transferred; what the consideration was that was paid

3     and how that repo transaction came to be a sale transaction in

4     the period immediately after the time Your Honor --

5          THE COURT:  I'm familiar with this theme.  It has

6     been raised at multiple times early in the bankruptcy case.

7          MR. DUNN:  And the point is that all of this

8     discovery is being taken under confidentiality orders.  We're

9     happy to participate but we need this information.  We are

10    likely to wind up in a dispute over the status of repurchase

11    transaction participants, as Your Honor is aware.  And as long

12    as this is going forward, given the stake of our claim, we just

13    ask for the opportunity to be able to participate and have

14    access.

15         THE COURT:  Absolutely not.  This is something that

16    was fully vetted during the first probably four months of the

17    bankruptcy case when we had -- I don't have the number off the

18    top of my head -- something like thirty-plus separate requests

19    for 2004 examinations brought by parties similarly situated to

20    your client, all seeking information concerning what happened

21    in respect of particular transactions.  None of that 2004

22    discovery has been authorized.  All of it has been subsumed

23    under the investigation which is being conducted currently by

24    the examiner.  And to the extent it's not subsumed under that

25    examination, it's subsumed under the examination being

58

1   conducted by the committee.

2          So while I appreciate your remarks, you're not

3   getting any relief from me today, nor are you getting any

4   comfort from me in terms of your reserved rights.  They are

5   what they are and they're the same as everybody else's reserved

6   right.

7          MR. DUNN:  Your Honor, I'm not looking to get --

8          THE COURT:  Then why are you talking to me?

9          MR. DUNN:  I was trying to explain what it was I was

10  asking.

11         THE COURT:  But I'm trying to understand what

12  position are you asserting that is different from the positions

13  that have been expressed throughout this case and that have

14  been put to one side, appropriately?

15         MR. DUNN:  I'm not looking for discovery about my

16  specific transaction.  I'm looking for the generic

17  categorization discovery of what was transferred and how it was

18  allocated, which I understand is already going to be the

19  subject of this examination.  And because this examination has

20  already been initiated, I think my client has an interest and a

21  standing and a right to participate in that.  I'm not talking

22  about what happened to my securities.  I'm talking about the

23  categorization of securities and the division of consideration

24  between, for example, LBHI and LBI.  What made up the

25  transaction, the stock that was in that repo?  Not did it

59

1   include my stock, I know it included my securities.  But what

2   were the components and how was the consideration allocated?

3        It is my understanding that is already what LBHI is

4   seeking to inquire about and obtain.  I think I have an

5   interest in that because it's going to affect the pool from

6   which my client ultimately is going to be entitled to recover.

7        I don't want to ask about my securities, I want to

8   ask generally about the categorization, the valuation and the

9   consideration that was paid and how it was allocated.  Those

10  are the issues I'm interested in that where level one step

11  above what Your Honor has previously rejected.

12       I think as long as that information is going to be

13  provided, we're willing to sign on to a confidentiality

14  agreement.  We have a very serious stake here.  This is

15  critical to my client's interests and I think we ought to be

16  entitled to participate at that level.  I'm not talking about

17  what happened to my particular securities, which is what I

18  understand Your Honor has previously rejected.

19       THE COURT:  There's absolutely no reason for you to

20  separately participate in discovery that's being initiated, if

21  allowed, by the debtor to revisit a transaction if that

22  transaction is revisited and produces information that

23  ultimately needs to the articulation of causes of action.

24  There'll be plenty of opportunities for you and others in the

25  same position to understand what's going on.  This is, as I

60

1    have said from the outset, to be a transparent process but it

2    is also to be an orderly and efficient one.  And there's no

3    efficiency associated with having particular parties jump on

4    the bandwagon of discovery.  That bandwagon has been moved to

5    the side and will remain as a side issue until such time as the

6    examiner finishes his investigation and produces a report and

7    the committee finishes its investigation.

8            To the extent that you have questions that the

9    committee can answer, I'm sure the committee will be

10   cooperative in responding to any reasonable request that you

11   have.  To the extent that after this process has run its

12   course, there is still unanswered questions.  No parties in

13   interest, including those of your client, will be adversely

14   affected.  You'll have an opportunity to pursue your separate

15   interests either in separate litigation or in separate

16   permitted discovery.  But nothing's happening today.

17           MR. DUNN:  Okay, Your Honor.  Thank you.

18           MR. BYMAN:  Your Honor, may I approach on behalf of

19   the examiner?

20           THE COURT:  Yes, please.  I'd like to hear what the

21   examiner's position is.

22       (Pause)

23           MR. BYMAN:  Good morning, Your Honor.  Robert Byman

24   on behalf of the examiner.  We actually did not file anything

25   and don't take a position on this motion because we don't think

61

1    it's appropriate for us to have one.  But want to make sure

2    that the Court is aware, as I'm sure you had anticipated, that

3    each of the areas that had been discussed that people want to

4    take discovery on are things that we are looking into.  We are

5    looking into every one of those factual issues, whether or not

6    we report on them is something that I'm not in a position to

7    say yet because we are still agnostics -- we are still the

8    perfect jury that hasn't tried to form a conclusion.  But we

9    are looking into each of those issues.  We have already

10   interviewed a number of former LBHI people who are now at

11   Barclays.

12          I would like to simply state for the record that

13   while the course of production of witness interviews and

14   documentation from Barclays hasn't been as fast as I would have

15   liked it.  I'm also not as tall as I would have liked to have

16   become.  We have gotten cooperation from Barclays.  We've

17   gotten everything we've asked for.  We've never gotten a no.

18   So we expect to be able to comment on all of these issues.

19          By the same token, we haven't taken a position on

20   this because, as Jones Day points out to you, they have a

21   deadline that doesn't apply to us.  If they're looking at one-

22   year deadline under Rule 60, we can't assure them that we'll be

23   able to answer their questions by then.  So I think that's

24   something that they have to take up with you but I don't want

25   anybody in this room to think that we're not looking into all

62

1    of these issues.

2        THE COURT:  And indeed from what I read in the Ernst

3    & Young papers, November 2009 continues to be the target date

4    for your report or do you wish to revise that date?

5        MR. BYMAN:  It is our target.  But I will tell you

6    that we expect to talk to you sometime in August when we have a

7    better understanding of what our target is.  It's becoming less

8    and less likely that that's possible because of unanticipated

9    delays in production of documents, being able to interview

10   witnesses as quickly as we thought.

11       THE COURT:  So you're telling me it's not going to be

12   November, it'll be some time later than that.

13       MR. BYMAN:  I suspect it will, Your Honor.

14       THE COURT:  All right.

15       MR. DUNN:  Your Honor, just a follow up to this, and

16   today is not the day for this but I suspect we're going to be

17   back in front of you on the scope issue.  As Your Honor knows

18   we spent hours and hours carefully calibrating the scope to

19   avoid duplication of efforts and the cost that would go into

20   duplicating those efforts.  And what I just heard is that

21   they're exceeding the scope as the order is currently drafted

22   and I suspect that we'll be back in front of Your Honor on an

23   appropriate motion.

24       THE COURT:  I think that's probably a good idea that

25   it be brought sooner rather than later.

63

1          MR. DUNN:  I agree, Your Honor.

2          MR. KOBAK:  Good morning, Your Honor.  James Kobak on

3     behalf of the SIPA trustee.  Your Honor, I'll be very brief.

4     My purpose for rising now is because we submitted a statement.

5     We think the issues that are being pursued here are relevant to

6     things that we need to look into for various purposes,

7     including disputes we have with Barclays and the report that we

8     need to prepare.  And I think, consistent with the way we've

9     been dealing with some of the other parties in their

10    investigations, all that we would ask is whatever Your Honor

11    order we be permitted to attend depositions, to receive copies

12    of documents and so forth.  I think in the long run that will

13    avoid a lot of duplication of effort by us and I would think by

14    Barclays.  I don't know if Barclays is willing to agree to that

15    voluntarily or not.  But if they're not and if Your Honor does

16    order some production and some discovery, we would hope that we

17    would be permitted to participate in that way rather than

18    having to reduplicate the effort ourselves.

19         THE COURT:  Understood.

20         MR. KOBAK:  Thank you.

21         MS. SCHINDLER-WILLIAMS:  Good morning, Your Honor.

22    Sara Schindler-Williams of Kramer Levin on behalf of the Bank

23    of New York Mellon as indentured trustee for the Main Street

24    bonds.  I would just like to highlight a few points, although

25    I'm not -- I understand Your Honor's concerns about the

64

1   duplication and the efforts of individual creditors coming in.

2   But the indentured trustee is an unusual position of being the

3   creditor of a debtor that was -- of an entity that was not a

4   debtor at the time of the sale and whose assets, therefore, if

5   they were wrongfully transferred to Barclays would not have

6   done so subject -- would have done so subject to any claims of

7   the indentured trustee.

8          THE COURT:  I remember specifically denying a motion

9   brought by your client requesting 2004 relief.  It must have

10  been six months ago.

11         MS. SCHINDLER-WILLIAMS:  Yes, Your Honor.  That's

12  right.  It was on January 14th and you did give us -- you

13  denied it without prejudice given the pending investigation to

14  the creditors' committee and the examiner.  But we just would

15  feel that the current filings of the debtors and the committee

16  highlight that the same concerns of the indentured trustee's

17  own motion that excess assets may have been transferred to the

18  estate in error.  And that to the extent discovery is uncovered

19  by the parties that is relevant to the indentured trustee's own

20  discovery requests, now filed November 2008, we would like to

21  share in that.

22         THE COURT:  I understand the request.

23         MS. SCHINDLER-WILLIAMS:  Thank you.

24         MR. GAFFEY:  Robert Gaffey again, Your Honor, for --

25         THE COURT:  Your motion certainly has opened a

1    Pandora's Box, hasn't it?

2         MR. GAFFEY:  It appears to have, Your Honor, but for

3    good reason.  I rise just briefly, Your Honor to address a few

4    points that Barclays has raised.  One is, respectfully Your

5    Honor, I think at this point we really do need to proceed under

6    order from the Court.  As I said, Barclays has, several times,

7    said they would produce.  I still haven't seen what they gave

8    the creditors' committee.  I can't get it from the creditors'

9    committee because they've got them tied up in a confidentiality

10   agreement.  And if it were produced back in March in whatever

11   form it was produced to Quinn Emmanuel and then later in

12   electronic form, if Barclays wanted to resolve these issues

13   they would have turned that over to me by now.

14        I think an order will have a good, cleansing effect

15   on how everyone proceeds here.  I have no interest in taking

16   any more deposition then I need.  If an interview makes sense,

17   we'll do that.  But I think it makes sense, especially giving

18   the debtor's timing issues here, to proceed by order rather

19   than by promises of cooperation.  Inevitably, I think Your

20   Honor, we will be back, if that's the basis on which we

21   proceed.

22        Secondly, Your Honor, to the extent there has been a

23   suggestion that we, the debtor, are merely curious about the

24   fact that Barclays declared that gain, it's hardly that.  I

25   think we've made the showing in our papers and let me just say

66

1    out loud, we have some serious concerns about the discrepancies

2    that have arisen here.  If there's a 1.5 billion dollar

3    estimate for cure amounts to be spent by Barclays as part of

4    the consideration paid.  And if, as it appears, no more than

5    200 million and probably less then that has been spent, that's

6    a big difference that needs to be investigated.

7            If a two billion dollar compensation amount was

8    estimated and put in as a firm number in the agreement and if

9    as it appears, from best we can tell, probably no more than 700

10   million was spent. That's a huge discrepancy that needs to be

11   pursued.

12           And the repurchase agreement, Your Honor, is a

13   serious, serious matter.  If, as these e-mails indicate, it was

14   used to give an undisclosed discount, that's beyond mere

15   curiosity.  That's an issue that we, the debtor, have an

16   obligation to pin down.

17           Lastly, Your Honor, ask for a moment on the issue of

18   confidentiality.  One of the things we noted in our papers is

19   I've been asking since first meeting in an attempt to resolve

20   this with Barclays' counsel, for them to propose a

21   confidentiality agreement that they could agree to.  And I did

22   that to try and avoid the, sort of, half-need negotiation of

23   this paragraph and that paragraph.  I did not hear back from

24   them.  Finally on June 16th I sent a draft and Monday afternoon

25   I had a counterproposal.  I think we're going to be able to

67

1    work that out but I just wanted to, sort of, put a marker down

2    that one issue that will be important to us.

3            And I think that goes to the efficiency point that

4    you've heard the debtor address and the creditors' committee

5    address and the SIPA trustee address, is we need to be able to

6    share amongst those three constituencies what Barclays

7    produces.  It will do no good if Barclays is able to put us, by

8    dint of separate confidentiality agreements, in different

9    silos.  That's a recipe for duplicative discovery.  So we may

10   be back to Your Honor, I hope we're not but we may be back to

11   Your Honor asking that a confidentiality order on those terms

12   be entered.

13           THE COURT:  All right.

14           MR. GAFFEY:  Thank you, Your Honor.

15           THE COURT:  Is there anyone else who wishes to be

16   heard at this point?

17           MR. WAISMAN: Your Honor, purely procedural point.

18   This protective order point is a little ironic.  That's the

19   only reason they haven't received what we've offered.  They

20   sent us a protective order completely different from the one we

21   have with the examiner.  We want to harmonize the protective

22   orders.  They changed the designations up so we'd have to

23   redesignate everything.

24           So if we get a protective order we can proceed.

25   We've cooperated with everyone, just as you've heard with the

68

1    examiner.  These spreadsheets the creditors' committee couldn't

2    open, we've now sent them to them in native format so they

3    could actually alter them, which is highly unusual, to overcome

4    that formatting issue.  So we have cooperated fully, we will

5    continue to do so.

6          THE COURT:  Appreciate that representation of a

7    willingness to be fully cooperative in this effort to discover

8    the truth.  I'm going to grant the motion brought by debtors'

9    special counsel for authority to take discovery under

10   Bankruptcy Rule 2004.

11         I am concerned, however, about some of the things

12   I've heard this morning that suggest that this really may be a

13   revisiting of some of the issues that I had thought had been

14   put to rest, at least pending the completion of the examiner's

15   report relating to the needed individual creditors to know more

16   than they currently know about the status of collateral or know

17   more than they think they currently know about how the sale

18   transaction with Barclays impacted their rights.

19         As to the discovery that might be initiated by

20   individual creditors, I reiterate points I've made in the past

21   that this is not the time for particularized discovery.

22   Instead, discovery for the benefit of all parties in interest

23   concerning fundamental transactions should be conducted by, as

24   the case may be, the examiner, the creditors' committee, the

25   SIPA trustee and now the debtor in possession itself.

69

1          But I am troubled, as I have been in the past, about

2     duplication of effort and inefficiencies associated with doing

3     multiple times what can be most efficiently done once.  And so

4     as was the case at the time of the appointment of the examiner,

5     and my direction that parties in interest meet and confer for

6     purposes of developing a workable, informal protocol to

7     coordinate the efforts to uncover the truth.

8          I believe that a similar meet and confer session

9     would be appropriate in respect of the 2004 discovery to be

10    initiated by the debtor by reason of this new order.  I believe

11    that it would be entirely appropriate for the SIPA trustee to

12    be a participant, particularly because as has already been

13    noted on the record today, the LBI assets represent a

14    significant percentage of what was transferred pursuant to the

15    sale order.  And I also think it important that the creditors'

16    committee, which has sought to join in the 2004 discovery,

17    coordinate its efforts with the efforts of special counsel for

18    LBHI.

19         To the extent that there is overlap with what the

20    examiner is already doing, the examiner's counsel should also

21    be part of this process.  And to the extent that existing

22    confidentiality agreements and restrictions need to be modified

23    in order to permit the sharing of information with other

24    parties who would agree to be bound by comparable

25    confidentiality restrictions if appropriate, that would be a

70

1    way to avoid having to produce, again, material that has

2    already been produced once before.

3            I suggest that that effort at coordination take place

4    as a priority item between today's date and the date of the

5    next omnibus hearing.  And if there is a need for either a

6    status report or guidance from the Court concerning any issues

7    of disagreement that may arise, there'll be an opportunity for

8    discussion on the record at that time.

9            I'll entertain an appropriate order.  We'll move on

10   to the next --

11           MR. HUME:  I beg your pardon --

12           THE COURT:  Did you have an order in there?

13           MR. GAFFEY:  Well, I did Your Honor, but it does

14   not -- it's the form of order -- excuse me, Your Honor.  It's

15   the form of order that we proposed as an exhibit to our papers.

16   It does not address the meet and confer requirement Your Honor

17   just described but I think we all understand it.

18           THE COURT:  I think everybody understands what I've

19   just said.  And you can make a slight adjustment to the order

20   that you have prepared by incorporating into the order the

21   statements that I've made just now.

22           MR. GAFFEY:  We will do that and we'll submit it when

23   that's finished, Your Honor.  Thank you.

24           THE COURT:  Okay.

25           MR. GAFFEY:  May I be excused, Your Honor?

71

1           THE COURT:  Yes.  If there are people who feel that

2      it's a good time to leave because this matter has been

3      addressed, people can leave.  We'll take a -- just two minutes

4      of quiet time; I'm not moving.

5           (Pause)

6           MR. WAISMAN:  Good morning, Your Honor.  Shai

7      Waisman, Weil Gotshal & Manges --

8           THE COURT:  Good morning.

9           MR. WAISMAN:  -- for the debtors.  Two remaining

10     items on the agenda.  The first one being listed as agenda item

11     number 5 on page 4 of the agenda that was filed this morning,

12     the motion of -- I'm going to botch this -- Kalaimoku-Kuhio

13     Development Corp.  I understand --

14          THE COURT:  I don't think you did that right.

15          MR. WAISMAN:  I'm certain I did not and I apologize

16     to any that are offended.  And I'll gladly take instruction on

17     how to pronounce that appropriately.  I understand counsel to

18     the movant is either in the room or standing right behind me.

19          THE COURT:  Why don't you pronounce it?

20          MR. NEALE:  Good morning, Your Honor.  David Neale of

21     Levene, Neale, Bender, Rankin & Brill.  I believe it's

22     Kalaimoku-Kuhio Development Corporation.

23          MR. WAISMAN:  Not even close.

24          MR. NEALE:  One of the hazards of working in Los

25     Angeles, you do have to learn a little Hawaiian, Your Honor.  I

72

1   don't think that there's anything particularly controversial or

2   groundbreaking from the legal standpoint about our motion.  We

3   are simply seeking compliance with the requirements of Section

4   365(d)(3).  The debtor has been in bankruptcy now for in excess

5   of sixty days.  There has been no post-petition rent paid to my

6   client.  The evidence before the Court suggests that the debtor

7   is incapable of making any rent payments.  There is only,

8   approximately 150,000 dollars or so in the debtors' bank

9   account.  The building is nearly empty, soon to be entirely

10  empty.  We understand that Nike Town, which is the last

11  remaining tenant in the building, is on its way out.  So we are

12  sort of at a loss to understand what the debtor is up to with

13  this property, what the debtor intends to do with this

14  property.

15          THE COURT:  They say they're selling it.

16          MR. NEALE:  Well, they said they might be selling it,

17  Your Honor.

18          THE COURT:  They said they're trying to sell it.

19          MR. NEALE:  Well, they've been trying to sell it for

20  months and months, Your Honor.  They've been trying to sell it

21  since before the bankruptcy case was filed.  They asked for a

22  continuance without giving any sort of information about what

23  kind of deal they're pursuing, who the buyer might be, whether

24  there is a buyer, whether there's a series of bidders.  We

25  don't know anything about what's happening with this property

73

1    from the debtor's perspective.  The only thing we know, Your

2    Honor, is that at this point my client is financing this

3    estate.  At this point it's over 600,000 dollars and in about a

4    week or so it's going to be 800,000 dollars.  We have about

5    400,000 dollars that's owing from a prepetition period.  So at

6    this point my client is an involuntary lender to this estate in

7    excess of a million dollars.

8           Simply saying that we're trying to sell the property,

9    I don't think, excuses compliance with the mandatory language

10   of Section 365(d)(3).  It does say in (d)(3) that the debtor

11   shall or the trustee shall comply with the terms of the lease

12   within sixty days following the petition date.  As I read the

13   debtors' response, it was some sort of an equitable plea to the

14   Court to say please don't make us comply with the Bankruptcy

15   Code because there might be an upside here.

16          Well, if that were true there'd never be relief under

17   Section 365(d)(3) because presumably with properties there

18   generally might be an upside somewhere down the road.  We don't

19   know whether it could be six months down the road, a year down

20   the road or, you know, two years down the road.

21          THE COURT:  Well, there are different consequences

22   that flow from a failure to make a required payment under 365

23   (d)(3).  Sometimes it can become grounds for a motion to

24   dismiss a case.  Sometimes it can become grounds for a motion

25   to convert a case.  Sometimes it can become a basis for

1   financing.  Sometimes it can become the basis for an adequate

2   protection claim which is secured.  But it isn't necessarily

3   grounds for relief from the automatic stay.

4            MR. NEALE:  I understand that, Your Honor.  As our

5   motion is phrased in the alternative, I mean, the basic

6   objective of my client is to get paid.  There's really no

7   mystery to that.  We've asked for relief from the automatic

8   stay in order to affect what Hawaii law allows to occur in the

9   event of a continued default under this lease.  The issue that

10  we have is that there are these outstanding defaults.  The

11  motion, in the first instance, seeks an order compelling the

12  payment of the outstanding post-petition rent.  Failing that,

13  I'm not sure what the debtor is proposing to us because the

14  debtor can't provide adequate protection of our interest under

15  the lease.

16           THE COURT:  What if the order that you seek said that

17  you'll be paid the rent that you're owed at the time that the

18  building is sold.  And if the building isn't sold within a

19  reasonable period of time, you can come back in court.

20           MR. NEALE:  Well, Your Honor, that opens all kinds of

21  issues about what a reasonable time is.

22           THE COURT:  Let's just say, for the sake of

23  discussion, it's six months.

24           MR. NEALE:  Well, Your Honor, then my client has

25  financed this property.  My client has its own financing

75

1    obligations.  This is a property that itself is financed by my

2    client.  And to the extent we're not receiving rent; we're

3    being put in a financial bind with our lenders.  My client

4    never entered into this lease with the expectation of extending

5    two or three million dollars worth of credit to this tenant.

6         The issue that we have is if the debtor came in today

7    and said, Your Honor we have a sale that we've negotiated to a

8    five star company who can provide adequate assurance of future

9    performance, it's not a special purpose entity that's not

10   capitalized.  It's a real tenant who can takeover our space and

11   takeover the lease obligations, I would agree with Your Honor

12   that that would be a perfectly suitable outcome.  And we

13   probably would have agreed to allow that to occur.  In fact,

14   there were discussions prior to the hearing today about ways in

15   which we could resolve this motion that would involve a sale of

16   the property.

17        Unfortunately, there's no one here.  There's no one

18   here with a check saying we're ready to buy the property.

19   There's no one on the horizon that's been identified with a

20   check that's ready to buy the property.

21        THE COURT:  In that sense, this is almost a classic

22   single-asset real estate case that's residing within a very

23   large global bankruptcy.

24        MR. NEALE:  That's correct, Your Honor.  That's

25   correct.  It's a single-asset real estate case with a property

76

1    that generates little or no rental income; where the tenant is

2    unable to pay the landlord the rent; where there's only 150,000

3    dollars of cash in the bank which would not even be sufficient

4    to cure the post-petition defaults.  It's not even enough to

5    pay one month's rent.  So the question, Your Honor, is what

6    would my client be required to do under those circumstances?

7    We've moved to compel payment of the rent.  We've moved for

8    relief from the automatic stay.  We've moved to compel

9    assumption or rejection of the lease.  Those, to us, are the

10   three most legitimate approaches to dealing with the situation.

11        So if the Court would compel the payment of rent,

12   that may be a somewhat meaningless act if the debtor doesn't

13   have the cash to do that.  We've moved for relief from stay

14   because if they can't pay the rent we'd like to have our

15   remedies.  And finally, we've asked that the Court compel them

16   to assume or reject because some time has passed in this case,

17   time has passed prior to the bankruptcy petition being filed

18   where the debtor was marketing the property for sale but no

19   sale was identified.  And so we want an outside date.  We want

20   to know when our problems come to an end with this tenant.  We

21   don't think that's unreasonable under the circumstances.

22        If the facts were different, if we had something

23   concrete we might be singing a different tune.  But as we sit

24   here today, Your Honor, we don't see how there's really any

25   alternative.

1          THE COURT:  Okay.

2          MR. NEALE:  Thank you, Your Honor.

3          MR. WAISMAN:  Your Honor, Shai Waisman again for LB

4     2080, the debtor in question in this dispute.  First of all,

5     just to correct some statements that were made at the beginning

6     of counsel's presentation, there is no evidence in the record,

7     there are statements of counsel as to the status of the

8     property.  What the papers make clear is that the debtor, LB

9     2080, has invested over forty-five million dollars in this

10    property.  Given the state of real estate the world over,

11    that's not likely to be dollar for dollar value.  But the

12    debtor does believe that there is value to be had in a sale of

13    the ground lease and that that value inures to the benefit of

14    all creditors, not just the landlord.

15         What has become evident to the debtor, in the course

16    of trying to work with the landlord through this situation, and

17    the parties have spent a great deal of time trying to come to

18    an amicable resolution and avoid a hearing today, is that

19    ultimately it appears the landlord very much would like the

20    building with the improvement and the forty-five million

21    dollars expended by LB 2080.  And by way of its motion, and

22    many of the statements made today, it's not willing to and it's

23    not going to accept, and we'll get to the issue of the buyer

24    and the status of the sale in just a moment, but is not going

25    to accept any proposed purchaser here and is going to try as

78

1      hard as possible to block any assumption of assign and sale of

2      the lease in order to effect a forfeiture on the debtor to the

3      detriment of all creditors and end up with the building.

4            And point in fact, the history of the property is

5      that LB 2080 or Lehman was originally the lender on the

6      property.  The original owner defaulted and LB -- the loan was

7      transferred to this special purpose entity, LB 2080 which

8      foreclosed and now owns the property.  So the current tenant is

9      an SPE and that, of course, will go to if and when we come

10     forward with a motion to assume, assign and sell.

11           The debtors have told counsel for the objector, in

12     detail, the steps they have taken to market and sell the

13     property, have explained that they are in negotiations with one

14     particular proposed purchaser.  And in fact, very late last

15     night, New York time, still early Hawaii time, the debtors

16     received a signed -- an executed purchase agreement by a

17     proposed purchaser who would pay three million dollars for an

18     assignment of the lease.

19           There is one open issue and the debtors will either

20     be countersigning or working to resolve that issue to see if

21     they can countersign and have a fully executed purchase

22     agreement for the assumption, assignment and sale of the lease

23     to the proposed purchaser.  We will, of course, provide the

24     objector with any and all information necessary on adequate

25     assurance.  And if we can't resolve that issue we will be back

79

1    before Your Honor.  But the effect of lifting the automatic

2    stay, which is not warranted under the cases, would be to

3    affect a horrible forfeiture when we have in hand an ability

4    not just to pay the landlord everything he's owed and provide a

5    continuing cash stream in accordance with the original existing

6    lease that he negotiated but an opportunity to provide a

7    meaningful  creditor -- a meaningful distribution to the

8    creditors of the estate.

9          Seeing as that's -- those are the facts and that's

10   where we are given the timing of this hearing, we would simply

11   request, as we did in the papers, that the matter be adjourned

12   until the next omnibus date.  And we did, in fact, make that

13   request of the objector for a one-time adjournment which

14   certainly is an accommodation that most provide and they were

15   not willing to.  So we would ask the Court to adjourn the

16   matter to the next omnibus date to see if we can reach a

17   conclusion on the sale for the benefit of the estate and all of

18   its creditors.

19         THE COURT:  Okay.  This is what I'm going to do here.

20   This is not a situation that calls for relief from the

21   automatic stay, in my view.  But it is a situation in which the

22   moving party has made a prime facie case of entitlement to

23   post-petition rent which is mandatory under 365(d)(3); it's not

24   optional.  And as I suggested in my comments to movant's

25   counsel earlier there are a variety of consequences that flow

1   from an inability or failure of a debtor in possession to

2   comply with the requirements of the Bankruptcy Code and this is

3   such a requirement.

4        However, this is a balancing process in which I

5   accept the representations of debtor's counsel that there is in

6   fact a transaction in prospect which reasonably could be

7   developed to the point of being acceptable between now and July

8   15th, the next omnibus hearing date.  And I say the 15th.  I'm

9   not sure if that's the date or if it's some other date in July.

10   Is it the 15th or 16th?

11        MR. WAISMAN:  The 15th, Your Honor.  The 15th,

12   correct.

13        THE COURT:  I'm going to grant you request for an

14   adjournment but I'm going to note, for purposes of what happens

15   between now and then, that there needs to be a means developed

16   to satisfy the landlord's claim either consensually as a result

17   of the landlord's consent to a transaction which will result in

18   payment or the debtor's going to have to come up with a means

19   to fund that payment.  This is not the only situation in which

20   a special purpose entity in which Lehman had an interest was

21   short of cash and needed funding and some of them aren't

22   special purpose entities.  So I'll let you finesse this for one

23   hearing more but that's it.

24        MR. WAISMAN:  Thank you, Your Honor.

25        MR. NEALE:   Could I ask?  There is cash that's

81

1    available in the bank account right now.  I'm wondering if the

2    Court might fashion an order that requires at least some of

3    that cash to be paid to my client by the end of this month in

4    partial satisfaction.

5             THE COURT:  No.  An adjournment means an adjournment.

6    It means that relief is not being afforded until July 15.  And

7    I've given you some helpful remarks already in terms of some

8    leverage as against the debtor.  Why don't you use that and sit

9    down?

10            MR. NEALE:  You have, Your Honor.  I just -- my

11   client made sure that I had to ask.

12            THE COURT:  Okay.  Well, you've asked and I've

13   rejected it.

14            MR. NEALE:  Thank you, Your Honor.  May I be excused,

15   Your Honor?

16            THE COURT:  You may be excused.

17       (Pause)

18            MR. WAISMAN:  Shai Waisman, again Your Honor, for the

19   debtors.  The final matter on the calendar is the debtors'

20   motion pursuant to Section 502(b)(9) of the Bankruptcy Code and

21   Bankruptcy Rule 3003(c)(3) for establishment of the deadline

22   for filing proofs of claim, approval of the form and manner of

23   notice thereof and approval of the proof of claim form.

24            As is evident, Your Honor, the overwhelming majority

25   of creditors and claims or for the overwhelming majority of

82

1    creditors and claims at question in these cases, the debtors

2    have proposed what are ordinary bar date procedures.  For one

3    category of claims, the debtors seek to implement procedures

4    that are not ordinary and those relate to derivatives.

5            As claims based on derivative contracts, and we've

6    heard a lot about the derivatives in these cases so far and

7    likely more to come, as those claims are by no means ordinary

8    the typical procedures for filing proofs of claim simply are

9    not appropriate.

10           This Court well knows that the relief the debtors

11   seek is far from unprecedented.  The debtors simply ask that

12   the procedures be modified as to one narrow category of claims

13   to adjust to the context of these totally extraordinary and

14   unprecedented cases and the issues, in accordance with

15   applicable law and precedent.

16           To pick up on Your Honor's comment, I think it was

17   the attorney from Western Bank, the court, the debtors; the

18   creditors' committee have worked very hard over these past nine

19   months to affect orderly and efficient administration of these

20   Chapter 11 cases.  The procedures proposed, in particular as it

21   relates to derivatives, are simply consistent with the aim that

22   all parties have worked towards, which is the orderly and

23   efficient administration of these cases.  And absent a grant of

24   the relief requested, as it relates to derivative

25   questionnaires, we all fear the result.

1       Just generally, Your Honor, the debtors seek to

2  establish September 1, 2009 at 5 p.m. New York time as the last

3  date and time for each person or entity to file a proof of

4  claim.  Bankruptcy Rule 3003(c)(3) provides that the Court

5  shall fix a time within which proofs of claim must be filed in

6  a Chapter 11 case pursuant to Section 501 of the Bankruptcy

7  Code.

8       The debtors, Your Honor may have noticed, filed their

9  original schedules on several dates in March 2009, exception as

10  to one late debtor, actually LB 2080 which subsequently filed

11  its schedules.  And those original schedules were amended about

12  two weeks ago, slightly less then that, on June 15th.

13       As creditors in these cases had ample time to review

14  the debtor's schedules or will by the time the bar date comes,

15  it is now appropriate to establish a bar date in these cases.

16  The debtors believe that the proposed procedures for filing

17  proofs of claim will provide ample opportunity to prepare and

18  file proofs of claim and are fair and reasonable under these

19  particular circumstances.

20       Importantly, the debtors anticipate that hundreds of

21  thousands of claims will be filed against their estates.  The

22  claims are expected to include claims from creditors with

23  breach of contract claims, tort claims, claims based upon

24  loans, claims based upon bond issuances, wage claims and likely

25  nearly every other form of claim asserted in a typical Chapter

84

1    11 case.  All of the debtors and all of their creditors would

2    benefit from an efficient claims process.

3          A claims process that provides the debtors with the

4    basic information to understand and begin to analyze claims and

5    does not result in unnecessary and wasteful claims, discovery,

6    litigation and significant delays in distributions to creditors

7    as a result of the claims resolution process.  Such a fair and

8    reasonable claims process is precisely what has been proposed

9    in these cases.

10         Your Honor, the bar date motion of procedures, in

11   particular the derivatives questionnaire in its original form,

12   all were prepared over a period of well over a month by the

13   debtors working closely with their advisors and with the

14   assistance of the legal and financial advisors to the official

15   committee of unsecured creditors in these Chapter 11 cases.

16   Subsequently, the bar date motion was filed and served, and I

17   believe that occurred on May 26, 2009.

18         In addition to service of the bar date, numerous

19   publications ran stories about the proposed bar date order.

20   Several law firms sent bulletins to all of their clients

21   regarding the proposed procedures.  And a number of banks,

22   indentured trustees and others published or otherwise

23   disseminated descriptions, notices, about the bar date

24   procedures.

25         In fact, Your Honor, the LBI administrator published

1   notice of the bar date on its website and included on its

2   website a number of documents purporting to be guarantees

3   issued by the debtors with respect to LBIE claims, which

4   documents the LBIE administrator made available to anybody

5   visiting the website to download.

6        I highlight this because these guarantees and similar

7   guarantees, in particular, were obtained by parties subsequent

8   to or other than in connection with the original transaction

9   may become an important issue in the claims process.  As

10  further evidence of how widespread notice has been provided, we

11  can take notice of a full courtroom, overflow courtrooms and, I

12  believe, several participants on the telephone today.

13       The original hearing on this bar date motion, as Your

14  Honor knows, was scheduled for June 17, 2009.  As I'm sure Your

15  Honor and chambers is well aware, the debtors received a number

16  of formal responses in opposition to the bar date motion before

17  and after the original deadline and also received numerous

18  informal responses and have been in informal conversations with

19  numerous creditors over the last several weeks.

20       The objections raised a number of issues that

21  included allegations of counsel as to factual matters,

22  particularly as it relates to derivatives and derivative

23  termination procedures.

24       In order to properly evaluate the formal, informal

25  objections, to talk to counterparties debtors adjourned the

86

1    June 17th hearing to today.  We spent that time, since the

2    17th, engaged in conversations with counterparties regarding

3    the issues they raised and carefully considered each and every

4    objection, both from a legal perspective and operationally as

5    it would play out in the bar date process and how it would

6    affect the administration of these cases.  And throughout, the

7    aim has been the implementation of a reasonable process, fair

8    and reasonable to the debtors and all parties.

9           As a result, and as has been reflected on the docket,

10   the debtors made numerous modifications to the bar date order,

11   the bar date notice, the claim form and the derivatives

12   questionnaire.  As I mentioned, those modifications were

13   reflected in the reply which the debtors filed and served

14   yesterday together with an affidavit of Gary Mandelblatt (ph.)

15   a managing director of Lehman Brothers Holdings, Inc., which,

16   pursuant to the Court's instruction, was noticed to all parties

17   in a notice of evidentiary hearing that was filed and served on

18   June 22nd.

19          In addition, through the comments received and

20   informal communications had, the debtors have executed three

21   stipulations that they will hand up to the Court.  Those

22   stipulations resolve particular concerns with respect to the

23   bar date and those stipulations are entered into with the

24   Internal Revenue Service, JPMorgan Chase and PIMCO (ph.)

25   resolving most of their disputes although some of their

87

1    concerns, outside of what was invited in the stipulation, were

2    memorialized in additional objections that those parties filed.

3         Since the reply was filed yesterday at noon, in

4    discussions with the creditors' committee the debtors have made

5    a number of additional modifications to the bar date order and

6    the attachments thereto.  A complete black line of where we are

7    right now on all of those documents, as compared to what we

8    originally filed, I believe, was delivered to chambers.  We

9    have another copy to hand up if Your Honor would like.  And was

10   made available at the commencement of the hearing to all of the

11   parties in the courtroom today.

12        So, with that I think it makes sense to quickly run

13   through the modifications that have been made to the bar date

14   order since the original motion so that we can illustrate where

15   we stand at this moment.

16             THE COURT:  Okay.

17             MR. WAISMAN:  Does Your Honor have a copy or would

18   you like me to hand one up?

19             THE COURT:  I have a lot of material up here.  I'm

20   not sure what, in particular, I may be missing.

21             MR. WAISMAN:  If I could approach, Your Honor, I --

22             THE COURT:  Please.  Thank you.

23             MR. ELLENBERG:  Your Honor, may I be heard for a

24   minute?

25             THE COURT:  Before we -- before going through this

88

1    form of order?

2         MR. ELLENBERG:  Yes, Your Honor, because I'm confused

3    procedurally as to where we are.  I understand a request has

4    been made.  By the way, Your Honor, for the record, Mark

5    Ellenberg on behalf of Morgan Stanley.  A request has been made

6    for an evidentiary hearing.  At least two parties have asked

7    that that be adjourned because there's lack of adequate notice.

8    We're --

9         THE COURT:  Multiple parties have --

10        MR. ELLENBERG:  -- we're one of them.

11        THE COURT:  Multiple parties have objected, and I --

12        MR. ELLENBERG:  If this is going to be an evidentiary

13   hearing, then I wonder if we're going to hear evidence or we're

14   just hearing argument.  I'm just confused about where we are.

15        THE COURT:  Well, I think you're probably not alone

16   in being a little lost as to precisely where we are.  I think

17   all that's happening at this moment, and I'm going to give --

18   why don't you sit down in front of the bar; that way you'll be

19   able to pop up again and it'll be convenient for you.

20        I think that all that's happening at this moment is

21   that Mr. Waisman is reviewing certain changes to the procedures

22   that have been developed in discussions with the creditors'

23   committee since the filing midday yesterday of the global

24   response to the various objections and the declaration in

25   support of the relief being sought today.  Nothing is happening

89

1    yet to deal with the question of what kind of hearing we're

2    having or whether or not we're even going to proceed with an

3    evidentiary hearing today.  I'm just getting a status report.

4            MR. ELLENBERG:  Thank you, Your Honor.

5            THE COURT:  That's all that's happening right now.

6    Do I misunderstand what's going on, Mr. Waisman, or do you have

7    more in mind?

8            MR. WAISMAN:  Maybe slightly.  I have a little bit

9    more in mind, which is, I was going to take the Court through

10   the order and all of the changes that have been made in

11   response to the objections in consultation with parties and, at

12   the request of the creditors' committee, from the moment we

13   first filed the motion, not limited to the four issues that

14   were reflected from yesterday's accommodation.

15           THE COURT:  Fine.  You're going to update me and all

16   other parties in interest as to what we're dealing with today,

17   which may be different from what parties thought they were

18   objecting to when the objection deadline came --

19           MR. WAISMAN:  That is --

20           THE COURT:  -- do I understand this correctly?

21           MR. WAISMAN:  That is correct, Your Honor.

22           THE COURT:  Fine.

23           MR. WAISMAN:  Okay.

24           THE COURT:  So let's just view this, as I said, as a

25   status report in which everybody will be updated as to

90

1    precisely what we're dealing with today.

2         MR. WAISMAN:  Your Honor, on the blackline that I've

3    handed up to the Court, as well as the blackline that was

4    handed out to the parties before the commencement of the

5    hearing, the first change appears on page 2.  And there we have

6    a -- we pushed back the bar date for one week to accommodate

7    the fact that this hearing is now one week later.  And we do,

8    in fact, want to make sure we provide parties-in-interest with

9    at least sixty days' notice of the bar date, ultimately.

10        The next change would appear on page 4 of the

11   blackline.  And this is the carve-out as to entities that do

12   not have to file proofs of claim.  Paragraph G there was

13   modified just to add (i) and (ii) to make clear who this

14   applies to.

15        Paragraph (h) was a modification made at the request

16   of Wilmington Trust as indentured trustee, and to make clear

17   that the reason we have a master list of securities is that we

18   have been in discussions with several indentured trustees who

19   have represented to us that they intend to file proofs of claim

20   on behalf of an entire issuance and, therefore, there's no

21   reason for individual holders to file what would essentially

22   be, at that point, duplicative claims.

23        And to the extent we've been in those conversations

24   and we have proper representations that those proofs of claim

25   will indeed be filed, we've implemented a process that will

91

1    avoid, hopefully avoid, probably hundreds of thousands, if not

2    millions, of proofs of claim.

3         I turn to page 5.  The modifications on page 5,

4    again, relate back to the master list of securities and go to a

5    number of the comments made in objections that people would

6    like a more formalized process by which they have to submit

7    inquiries as to whether their security is or can be listed on

8    the master list of securities and that the debtors have a

9    deadline by which they have to reply to folks so that they

10   indeed know whether or not they have to file a proof of claim.

11   And we set out here a clear process with deadlines and

12   ultimately a date by which the master list of securities, as

13   posted, is final, and no changes will be made.  So people do

14   know when they have to, if they have to, file proofs of claim

15   or they're exempt.

16        In addition, and this is one of the new changes, the

17   first Ordered paragraph subsequent to the larger one on page 5,

18   at the request of the creditors' committee we've inserted an

19   ordered paragraph here that the master list of securities, in

20   its initial form, will be published by no later than tomorrow

21   at noon.  In fact, we've represented that we'll endeavor to

22   file it today, but certainly by no later than noon tomorrow so

23   that people can start reviewing it and start submitting their

24   questions.  In response to a number of objections, we've made

25   clear that any security listed on the master list of securities

92

1    is not a derivative contract and therefore does not have to

2    comply with the derivative procedures; and the final ordered

3    paragraph that a holder of a security that is guarantied by a

4    debtor must file a claim against that debtor, again, just

5    clarifying and consistent with the Bankruptcy Code.

6            On page 6, we've made clear that proofs of claim must

7    denominate claims in U.S. dollars.  And then in the next

8    addition, at the bottom of that page, in response to many, many

9    of the objections that we include a more precise definition of

10   derivative contract, we have revised the definition, included

11   it here.  And this is a definition we've come to in our

12   conversations with many of the objectors.

13           I will note that it's almost impossible to get

14   unanimity of views on this issue, but this definition is one

15   that the debtors believe clearly reflects what are derivative

16   contracts and seems to meet the concerns of many of the

17   parties.

18           There was one additional modification made last night

19   at the request of the creditors' committee, and that's in

20   romanette -- not romanette -- V in the parentheticals towards

21   the end of that paragraph.  And that's to insert a repurchase

22   agreement, that a repurchase agreement would be included in the

23   definition of a derivative contract.

24           Page 7, quite important here.  The changes on page 7

25   relate to the counterparties to derivative contracts and the

93

1    procedures they must follow in filing their claims.  And an

2    important, and hopefully very helpful, modification here and

3    one made at the request of many of the parties, which is, we

4    understand the procedures and that this information needs to be

5    submitted, but sixty days it not enough and we need additional

6    time.  The compromise there is the debtors will have a bar date

7    that will be subject to this Court's approval, a date, a fixed

8    date, hopefully September 1st, by which all parties must file

9    proofs of claim unless otherwise exempted, and that would

10   include counterparties on derivative contracts.

11          However, here, the debtors have given derivative

12   counterparties an additional thirty days to upload their

13   information onto the specialized Web site for derivative

14   contracts and, therefore, folks will not have to -- while

15   they'll have to submit their proof of claim by September 1st,

16   will not have to complete the questionnaire and upload it

17   until -- or will have to submit it and upload it before October

18   1st.  So a total of, really, ninety days' worth of notice to

19   comply with the procedures for derivative counterparties.

20          Page 8, modifications there, clarifying language that

21   if you have a claim against a debtor based on a guaranty of a

22   derivative contract that was not issued by a debtor, you do in

23   fact have to complete both the guaranty questionnaire and the

24   derivative questionnaire, but of course you have the

25   additional -- you're afforded the additional thirty days to

94

1    complete the derivative questionnaire.

2         On page 9, in order to accommodate the numerous

3    international protocols and the general cooperative nature

4    among the various administrators, the debtors do require that

5    such administrators file proofs of claim by September 1st, but

6    they will not need to complete the derivative questionnaire.

7    And those administrators will continue to work through the

8    protocol process in providing information to the debtors and

9    quantifying those claims.

10        The next paragraph, inserted paragraph, on page 9,

11   the claims process we're all familiar with involves a claims

12   agent that has a publicly attestable Web site where one's

13   proofs of claim are submitted; they're available on the Web

14   site to any member of the public.  The general proof of claim

15   Web site here maintained by Epiq Systems will not be any

16   different.  Proofs of claim that are filed need to be, as part

17   of the Court's records, publicly available.  But due to many of

18   the concerns received from counterparties as to the derivative

19   questionnaire specifically, the derivative questionnaire will

20   be a separate Web site.  And as parties upload information, it

21   will not be viewable or accessible other than by the party

22   making the submission and by the debtors and the creditors'

23   committee.  So no party will be able to go onto the derivative

24   questionnaire Web site and view the submissions information of

25   another party.

95

1          The next paragraph was a point raised in a couple of

2    objections, and which was a good point, and this is to reflect

3    that, under the Bankruptcy Rules and applicable precedent,

4    parties do have an opportunity to amend proofs of claim.  And

5    the process should be no different with respect to the

6    derivative questionnaire, which will be part of the

7    questionnaire.

8          So the modification here is to reflect that parties

9    will make their, and must make their, initial submission by

10   October 1st in compliance with the bar date order but will have

11   an opportunity subsequently to amend and supplement the

12   information.  As additional information becomes available to

13   them or they become aware of additional or other information,

14   they will have the opportunity to amend, all consistent with

15   the provisions of the Code and precedent, and subject to the

16   parties' rights to argue whether or not the amendments are in

17   fact appropriate amendments or assertions of new claims, or

18   whatever the kind of lines of demarcation are in the case law.

19         Again, on bottom on page 9, just clarifying the

20   derivative questionnaire deadline.

21         Page 10, in the middle, again, along with the

22   additional thirty days to submit the derivative questionnaire

23   and a number of modifications to the derivative questionnaire

24   itself, one of the more important points raised by

25   counterparties in a typical bar date order, and as per the

96

1    proposed form of bar date order that this Court has adopted as

2    its proposed form, the order makes clear that parties that do

3    no comply with the bar date order are subject to having their

4    claim expunged, barred for noncompliance.

5            A number of counterparties here objected on the

6    grounds that, by the addition of the derivatives questionnaire

7    and the requirement to comply, in fact the debtors were

8    employing some form of gotcha and were going to object to

9    derivative claims and seek to expunge them, in whole, based

10   solely upon the failure to submit a document.  And first and

11   foremost, I think Your Honor understands the manner in which

12   the debtors and their counsel have been proceeding in these

13   cases.  The debtors do not seek to play a game of Gotcha on

14   anybody.  The counterparties are required to comply with Your

15   Honor's bar date order, once it's entered, and as to whatever

16   it says.  And the debtors will exercise good faith in reviewing

17   submissions and determining whether parties made an effort to

18   comply with Your Honor's order, as they do in every case.

19           And the ultimate arbiter of whether or not --

20   assuming, for some reason, the debtors decide to become -- take

21   an aggressive position on claims submitted, the ultimate

22   arbiter of whether or not a party attempted to comply will be

23   Your Honor.  And the debtors have a lot of credibility to lose

24   before this Court in bringing objections when parties have made

25   an effort, a real effort, to comply and seeking to expunge

97

1    claims on technical grounds.

2          We, of course, would not be doing that.  But in order

3    to assuage concerns and in language that's not found in any

4    other bar date order, at least one that I've seen, we have

5    inserted language here to make clear that we will not seek to

6    expunge claims so long as a creditor substantially -- a

7    derivative creditor or a creditor on a derivative contract,

8    substantially and in good faith, complies with the procedures

9    proposed by the order.

10         Again, there will ultimately be an order, and

11   whatever it says folks will have to comply.  To the extent it

12   contains a derivative questionnaire, we have represented to

13   parties in our conversations, now on the record, and as a

14   concession and to make sure that this concern is properly

15   addressed.  We've inserted this language so that no one should

16   have a concern that we are going to be somehow arbitrary and

17   seek to effect a forfeiture on a party for failure to not be in

18   compliance on technical reasons.

19         THE COURT:  I don't have a concern based on this

20   language that you're going to be arbitrary, but, candidly, I

21   have some concern as to whether or not this isn't just an open-

22   ended invitation to endless litigation over whether or not

23   there is or is not substantial good-faith compliance with the

24   procedures.  And I don't know how one objectively determines

25   that a failure to comply fits the exception.  I'm a little

98

1    concerned that it's a desirable saving paragraph but that it

2    may have unintended horrible consequences in terms of case

3    administration.

4         MR. WAISMAN:  Your Honor, the debtors could not agree

5    more and really didn't think this was necessary and thought

6    that what should suffice is the debtors' representation and the

7    fact that the judge, the Court, will ultimately be the arbiter

8    of whether folks complied.  But in an effort to assuage the

9    continuing concerns, this was what was proposed.  And, of

10   course, in the theme of no good deed, a number of objections

11   have been filed, suggesting that the language proposed, as Your

12   Honor points out, is vague and will lead to additional concerns

13   as to what is substantial and good-faith compliance.

14        Your Honor, again, our effort to streamline the

15   process and avoid needless discussion of this issue on the

16   record, although I suspect, as the Court points out, that

17   parties will not be satisfied, and of course the debtors share

18   the Court's concern that this is actually, if not an open door

19   to do other (sic) than comply to the best of one's ability in

20   accordance with a Court order, to at least argue later on as to

21   what this language means.  And we, of course, leave it to Your

22   Honor's direction on that point.

23        THE COURT:  If it were up to me, I'd cross it out.

24   But, of course, it is up to me, isn't it?

25        MR. WAISMAN:  It is.  It is.  It is.  On page 10,

99

1    just a technical change given the week's delay in hearing this

2    matter.  We have revised the date by which we will serve the

3    bar date notice from June 24th to July 1st.

4          Page 12, a change that was necessitated by a number

5    of the objections that pointed out, you know, inartful

6    language, probably, on our part.  And the language now comports

7    with the provisions of the Bankruptcy Code, that only parties

8    authorized by the Bankruptcy Code and the Bankruptcy Rules can

9    submit proofs of claim, and parties cannot submit proofs of

10   claim if they are not so authorized by the holder of such

11   claim.

12         The deletion in the middle -- the next two changes,

13   really, are at the request of the creditors' committee.  As

14   Your Honor may be aware, there's a motion to dismiss the

15   Chapter 11 case of PAMI Statler Arms LLC that was pending

16   before this Court.  The deletion is to make clear, at the

17   committee's request, that the bar date be permitted to run so

18   that there's a quantification of the claims against PAMI

19   Statler and only thereafter will the case be dismissed, if

20   appropriate.

21         And, finally, the insertion in -- at the request of

22   the creditors' committee, the debtors have agreed that, from

23   this moment forward through the bar date, any modification

24   provided to a -- or relief from the procedures approved by the

25   Court with respect to the bar date that the debtors enter into

1    or agree to with a creditor will only be done at the consent of

2    the creditors' committee.  And, of course, that's agreeable to

3    us.

4         Those were the only changes to the order itself.  The

5    modifications to the proof-of-claim form are made to reflect

6    the changes in the order.

7         The next set of modifications to be discussed,

8    really, are on Exhibit C and D, which are the derivative

9    questionnaire and the guaranty questionnaire.

10        And to the extent parties are noticing strange kind

11   of pagination and margining on the proof of claim, it's solely

12   due to the blackline, and it will not look like that.

13        Your Honor, picking up with Exhibit C, derivative

14   questionnaire, the additional language at the top of the

15   derivative questionnaire is there to reflect that this is a

16   submission in connection with, and as part of, a proof of

17   claim, and mirrors the language that is found in every proof-

18   of-claim form.

19        From there, page 2 at the top, Your Honor, the

20   debtors are parties to derivative contracts that were or have

21   been terminated since the commencement date.  And there are a

22   number of derivative contracts that in fact have not been

23   terminated.  The deletion at the top there is make clear that

24   parties to derivative contracts that have not been terminated

25   need to file a proof of claim for their contingent unliquidated

1    claim but do not need to comply with the various other

2    provisions of the derivative questionnaire as to calculation of

3    their termination claim and delivery of termination notices.

4    Obviously, those wouldn't apply in those circumstances.

5            Question 4(a), the changes there really, I think, go

6    to the heart of the overwhelming number of objections that were

7    made as to the questionnaire.  First, as to confirmations, the

8    debtors heard from a number of parties that they really are

9    bothered by the request to provide confirmations.  The debtors

10   consulted with their operational personnel and others and

11   concluded that they could in fact live without the

12   confirmations.  And that has been struck.

13           And, of course, all of these changes are subject to

14   the fact that this is the information the debtors need to form

15   their baseline analysis of claims and subject to the regular

16   claims resolution process, which could include discovery and

17   litigation where the debtors reserve all rights to seek any and

18   all information, including the information that they've

19   eliminated from the derivative questionnaire.

20           So, confirmations have been eliminated.  And then the

21   debtors tighten the language at the end of that paragraph.  It

22   previously had said "and other documents related to the

23   transactions", which, we agree, was probably much more vague

24   and broad than intended and now seeks "agreements", again,

25   other than confirmations to make clear and not give anybody

102

1    unnecessary concern, "evidencing the transactions"; again, the

2    documents relating -- the very documents that form the

3    contractual relationship between the parties.

4          In 4(b), termination notice, the second sentence has

5    been completely struck, relating to conditions to be satisfied,

6    evidence of the conditions to be satisfied.  And the debtors

7    clarified that they don't in fact need the original termination

8    notice, because in some instances I'm not sure anyone knows

9    where those are, but at least a copy of the termination notice

10   provided.

11         4(c), again, a copy of a valuation statement and

12   just, really, clarifying language.

13         In 4(d), specific transaction-level information that

14   is needed, fixing a typo and making clear what we were

15   referring to with the submission being in Excel.

16         4(e), the changes in 4(e), I think throughout, are

17   really meant to conform to industry standards and the need to

18   provide reference market-maker quotations.  The, kind of,

19   narrative request at the very end there has been completely

20   struck, requesting a description of the methodology used to

21   determine the valuation and how the quotations played into the

22   valuation itself.

23         Again, the balance, which kind of runs through the

24   rest of page 3, just clarifying that we are looking for, kind

25   of, the industry standard reference market-maker quotations, as

1    set forth in ISDA.

2           In 4(f), replacement transaction.  To the extent a

3    party went out and replaced the transaction, we do need those

4    confirmations to illustrate that those replacement transactions

5    did in fact take place.  But we've eliminated the request for

6    external communications and will rely on the contracts and

7    agreements themselves.

8           4(g), eliminating the request for supporting

9    documentation as to unpaid amounts.

10          And 4(h), eliminating some of the requests there as

11   to additional information and clarifying Microsoft Excel.

12          Those are the changes to the derivative

13   questionnaire.  And with those changes, we've gotten down to,

14   kind of, where we believe to be a fair and reasonable request

15   that would enable the debtors to kind of begin to form a

16   baseline understanding of the claims and, from there, decide

17   what actions to take next.

18          Finally, Your Honor, and very quickly, Exhibit D, the

19   guaranty questionnaire, again, the addition of the language at

20   the top, making clear it's being submitted in connection with a

21   proof of claim.

22          And, finally, there was a question number 8, which

23   was initially inserted at the request -- surprisingly, at the

24   request of a number of the objectors, or some of the informal

25   comments we received, but also at the request of the creditors'

1    committee, and that was a certification from parties that they

2    in fact relied on the guaranty for which they're submitting the

3    claim in connection or at the time of the underlying

4    transaction with the nondebtor entity, going back to the early

5    discussion of the LBIE situation.

6         Given that this was inserted after the initial draft

7    was circulated, the creditors' committee had some concern that

8    perhaps it was too late and that the debtors should endeavor to

9    verify the reliance subsequent to the submission of guaranties.

10   It may be obvious, it may not be obvious, and more questions

11   may need to be asked, but their view was that this is not the

12   time given how far down the road we were.  And, as a result, we

13   removed question number 8 last night and no longer have a

14   requirement that folks certify in a specific question that they

15   relied upon the guaranty.  Of course, it would be the debtors'

16   view that any submission in connection with a proof of claim

17   submitted under penalty of perjury is done with the utmost

18   veracity and folks would submit guaranties only to the extent

19   that they relied upon them in the underlying transaction.

20        So those modifications are the ones that were made

21   and reflected in the filing on the docket yesterday and further

22   reflected in the distributions today here in court.

23        From there, it may be useful to walk through the

24   objection chart attached to the reply to illustrate how the

25   changes we've just run through relate back to the objections

105

 1    raised.

 2          THE COURT:  That may be helpful, but I think Mr.

 3    Ellenberg has raised, not only on behalf of his own client but

 4    on behalf of a number of other similarly situated parties, a

 5    fundamental question as to where we're going today.  And I

 6    think it's entirely appropriate for you to continue your

 7    presentation that ties in the chart to the objections and which

 8    demonstrates how you've attempted to satisfy the objections,

 9    but it's pretty clear that anybody who is following the case

10    closely has probably had a chance to at least take a look at

11    the attachment and see whether or not their particular

12    objection has been satisfied, and if it hasn't been I'll hear

13    from them.

14          So I think we'll get to that.  I'm not suggesting we

15    shouldn't go there, but I think it's important as a threshold

16    matter, particularly because we're getting close to a time when

17    at least I like to eat lunch, that we understand where we're

18    going today and whether or not we are moving forward with an

19    evidentiary hearing, whether or not issues relating to the

20    evidentiary record are going to be heard another day as a

21    result of objections to the timing and requests for

22    adjournment.  And it seems to me that that's an important issue

23    for us to address.

24          MR. WAISMAN:  Your Honor, the debtors are moving

25    forward with their motion to have this Court approve the bar

1    date procedures that have been proposed.  The motion was filed;

2    due notice was provided.  Parties had every opportunity to

3    object; many of them did object.  Given the lengthy opportunity

4    to object, not one of them elected to submit any evidence in

5    connection with their objection.

6         Solely in response to the numerous assertions of

7    counsel made in pleadings, the debtors submitted a declaration

8    on a very narrow issue:  the procedures -- the background as to

9    derivatives in this case and the procedures for terminating

10   derivative contracts in this case.  It is a very narrow issue

11   and submitted solely in reply to the objections.  Entirely

12   appropriate.

13        The declaration has now been in the hands of the

14   objectors for nearly a day.  They have -- the witness is --

15        THE COURT:  That wasn't intended to be a laugh line,

16   I suspect.

17        MR. WAISMAN:  In the context of these cases where

18   folks filed objections up to the objection deadline, well

19   through the objection deadline and pretty much every day and

20   every hour past that objection deadline to this point in time,

21   including well into last night, it actually wasn't meant to

22   generate the laughter that it did because, quite seriously, as

23   Your Honor points out, people are laser-focused on this case;

24   they're focused on this issue.  They had enough time to sit

25   back, consider their objections and their requests, to draft

1   them, to get their clients' consent and to submit them, at

2   which time I presume they had plenty of time to review the

3   declaration on a very narrow issue and decide whether or not

4   they wanted to question the witness on any of those issues.

5          The witness is here.  The witness is available for

6   cross-examination.  We would rest on the declaration, although

7   we are prepared to proffer the witness's testimony.  And it is

8   part and parcel of our motion.  And the debtors would seek to

9   go forward on the procedure as proposed and have this Court

10   rule on the motion.

11          THE COURT:  Okay.  Let me make a couple of comments

12   in reference to where we are procedurally and then allow other

13   parties to be heard, who may wish to be heard.  Ordinarily, the

14   first hearing in a contested matter, under the Local Rules, is

15   not an evidentiary hearing.  And on Friday I received word from

16   chambers that the debtor was requesting that this be an

17   evidentiary hearing so that the declaration that you've just

18   referenced and any examination of the declaration could be part

19   of today's hearing.

20          I was off-site at the time that that request was made

21   and, through my clerk, confirmed that I would permit today's

22   hearing to be an evidentiary hearing provided that notice was

23   given to the world, and most particularly to every party who

24   had objected.  That notice generated yet another flurry of

25   objections, not just to the substance of what's being requested

1    today but to the procedure.

2         I'm concerned, as I have been throughout this case,

3    about the most basic question of due process:  that parties

4    have, under the circumstances of the case, a full and fair

5    opportunity to present their positions and to be heard and, in

6    terms of my role, that I'm fully informed relative to what it

7    is that I need to decide.

8         The contested matter that relates to the approval of

9    the bar date order has generated more objections than, I think,

10    anything in this case since the original sale hearing.  I

11    haven't done the math, but my review of the record demonstrates

12    that, both in terms of substantive objections, procedural

13    objections, me-too objections, reservation-of-right objections,

14    amicus objections, that this particular ordinarily

15    uncontroversial aspect of the case is quite obviously very

16    controversial.

17         So one of the initial questions that I have,

18    particularly since, Mr. Waisman, you urged that a plain-vanilla

19    matter be adjourned to July 15th rather than be heard today:

20    What is the genuine urgency that everybody be forced to have an

21    evidentiary hearing today when we have another spillover Lehman

22    hearing date on the 29th to accommodate the Aurora funding

23    request?  And we have another omnibus hearing on July 15th.

24    And even though my schedule is, as many know, increasingly

25    tight, I have the ability to specially schedule evidentiary

1    hearings, and I have throughout this case.

2         So that's a long wind-up to get you to answer the

3    question:  Why now?

4         MR. WAISMAN:  Your Honor, I understand, and have

5    heard since the first week and into some very late hours, the

6    Court's concern as to due process.  And it is an issue that

7    comes up often in the bankruptcy context.  And many litigators

8    are often astounded when they sit through bankruptcy hearings.

9    In the context of this bar date motion where the local rules of

10   this Court already provide that no notice of a bar date motion

11   need be provided and that a bar date motion can be submitted,

12   upon the consent of the creditors' committee, directly to

13   chambers and approved by the judge, we've provided more than

14   that.

15        The motion was filed.  It was served on the entirety

16   of the master service list.  It has received much publicity.

17   And the original date for the hearing, the 17th, was adjourned

18   for an additional week to try and advance the ball.  So, from

19   our perspective, folks have had more than ample notice, more

20   notice than is required by the rules of this Court, by the

21   bankruptcy rules or by the Bankruptcy Code.

22        The sole issue is the submission of a declaration on

23   a very narrow issue.  First of all, we would think that we

24   could proceed without the declaration because the facts and

25   circumstances of these cases illustrate why the proposed

110

1    procedures as to one narrow type of claim are appropriate and

2    necessary.

3         But that aside, the declaration is submitted in

4    response to the objections that were filed, objections that --

5    objectors that had every opportunity to submit their own

6    declarations, their own evidence, elected not to, instead made

7    assertions of counsel as to factual matters.  And the debtors

8    offer a declaration on those narrow points.

9         The declaration is not -- cannot serve as the reason

10   to delay the implementation of a bar date and the continued

11   forward progress of these cases.  And, I submit, Your Honor

12   very well knows the manner in which things happen in these

13   cases.  Any delay as to a declaration which ultimately likely

14   isn't necessary but, if it is, is submitted in response and is

15   very narrow, will lead to full-blown discovery on a bar date

16   motion, which wouldn't be appropriate, but there's no doubt

17   that that's where this will end up.

18        THE COURT:  Let me break in and just mention that, in

19   effect, we define away the problem by talking about this as if

20   it's just a bar date motion.  The evidentiary problem, I think,

21   is that the premise underlying the debtors', in my view,

22   reasonable request that there be some extraordinary procedures

23   applicable to proofs of claim relating to derivatives

24   nonetheless, as they used to say on Perry Mason, assumes a fact

25   not in evidence.  It assumes that, in fact, the procedures that

1    you have cobbled together, I'm confident with the utmost of

2    good faith, and having called upon a tremendous amount of

3    skillful and knowledgeable people, in fact represent the right

4    approach under the circumstances.

5           The fact that there are so many objections that have

6    been generated by this process can lead to a number of possible

7    conclusions on my part, and I'm not going to assume the

8    motivation of the parties who have objected.  I assume that

9    parties object in good faith because they're concerned that the

10   procedures that are being proposed are either inappropriate,

11   contrary to law, require a level of effort that's not required

12   under applicable rules, changes the burden.

13          And so it seems to me that the evidentiary issue that

14   we're talking about is not quite as narrowly drawn as you've

15   just articulated.  I actually think that in order for me to

16   give you the order that you want, and I recognize that a

17   tremendous amount of work has gone into adjusting the form of

18   relief to accommodate objections, you also need to demonstrate

19   that extraordinary provisions are appropriate in the case of

20   derivatives and guaranty claims.  I'm confident you're right.

21   The problem is, as with most people in the room, I was trained

22   as a lawyer.  I didn't spend any of my adult life on Wall

23   Street.  I know what a derivative is, I think.

24          MR. WAISMAN:  You're ahead of me.

25          THE COURT:  But in terms of the actual work

112

1    associated with the six-step derivatives unwind processes

2    described in the affidavit, and whether or not six steps as

3    opposed to four steps as opposed to ten steps may be the right

4    approach, I don't have good answers.  Additionally, what I

5    don't know, because there's no evidence on it, and maybe

6    there's no need for evidence on it, is the burden, if any,

7    which is being imposed on counterparties in having to comply

8    with this questionnaire.

9         And since I've already indicated that I understand

10   the philosophy that underlies that saving paragraph that you

11   stuck into the order, I think the saving paragraph about

12   substantial compliance is an invitation to gaming the system,

13   and I don't like it.  Any procedures that we adopt will be

14   strictly enforced.  There'll be no slippery slopes so that the

15   procedures that I want to adopt are the procedures that

16   everybody will comply with.  But in order to develop those

17   procedures, I need to be assured that they're right and

18   appropriate and that they balance, under the circumstances of

19   this case, the relative burden.

20        I'm fully comfortable that under 105 and other

21   applicable provisions, given the unique circumstances of this

22   case, I have the authority to adopt specific procedures

23   relative to derivatives and guaranty claims and to deviate from

24   the standard proof-of-claim form.  That's not the issue.  The

25   issue is making sure that we do it right and that the right

113

1    input has been put into the mix.  I recognize that there has

2    been dialogue with the creditors' committee, that, no doubt,

3    you've had dialogue with various aggressive objectors, and that

4    the ultimate order may in fact be, under the circumstances, if

5    not perfect, close to workable.

6          I have questions whether we can get where we want to

7    get today because the record that I want to have established is

8    more than just the declaration on the six-step process.  I want

9    a record in which the debtor proves up the extraordinary nature

10   of the derivatives claims, the million transactions, the ten

11   thousand counterparties, the extraordinary burden on the estate

12   if procedures specially crafted to deal with the problem are

13   not adopted.

14         The nature of the derivative transactions that we're

15   talking about here, what's involved conventionally in

16   determining breakage associated with such transactions?  What

17   are the varying approaches to value?  What are the varying

18   approaches to claims articulation?  What proof is ordinarily

19   required in connection with presenting such claims?  What

20   happens in a nonbankruptcy setting when parties in the market

21   are involved in swap termination or derivative termination or

22   whatever may be the terminated contract?  I suspect that it may

23   be possible to analogize, from the free market approach, how

24   parties actually value these things when a party is out of the

25   money and exposed to a claim.  But I also expect that there may

114

1   be differences when parties are alive and functioning and have

2   multiple transactions.  So you can give a little on one in the

3   hope of getting one on another.

4          Here we're talking about dead Lehman Brothers.  This

5   is your one-time shot to maximize your recovery.  And it raises

6   questions in my mind as to how counterparties are going to

7   approach this process.  I want to know what Lehman's people

8   think about that process and how it can be most efficiently

9   managed, because we're not just talking about a questionnaire;

10  we're talking about the biggest administrative headache in this

11  case.  And for that reason, I want to make sure that when I

12  approve the procedures I don't, nine months from now, have a

13  hearing like I had today on the sale hearing in which somebody

14  says we didn't think of something we should have thought of.

15         So I'm not suggesting for a moment that a tremendous

16  amount of topflight work hasn't gone into where we are right

17  now.  I want a record that allows me to comfortably approve

18  those procedures.  And I don't think we're going to get it

19  today if all we're doing is cross-examining the witness whose

20  declaration I have.  Now, it could happen, and if everybody

21  consents to it we can do it at 2 o'clock, but that means that

22  the parties who have sought an adjournment of today's hearing

23  will all waive their objections.  And I'm prepared to have an

24  evidentiary hearing at 2.  I'll be here all afternoon.  But I'm

25  also prepared to do it another day when everybody who's

115

1    involved in this process can give some thought not only to

2    things I've said pretty much off the top of my head but also to

3    things that maybe I didn't think of, and maybe to the things

4    that I did wrong, so that we actually have a record relating to

5    proof of claim procedures as it relates to the derivative and

6    guaranty claims that supports the entry of an order that

7    provides for some extraordinary requirements which I view as

8    appropriate in concept but I need to be assured are appropriate

9    in application.

10             MR. WAISMAN:  Based upon Your Honor's comments, it's

11   clear Your Honor understands many of the issues that the

12   parties have struggled with and that have been of concern to

13   the debtors but not necessarily aired in connection with the

14   original presentation, and that's very much appreciated.

15   Perhaps the best way to proceed would be to adjourn to 2

16   o'clock, give the debtors an opportunity to consider the

17   Court's comments --

18             MS. GRANFIELD:  Can we just have a --

19             MR. WAISMAN:  Can I consult for a moment?

20             THE COURT:  Do you want to confer?

21        (Pause)

22             THE COURT:  So what came out of that huddle?

23             MR. WAISMAN:  That I'm overruled as to the request to

24   an adjournment to 2:00.  The recommendation here, Your Honor,

25   would be, to the extent Your Honor's offer of the 29th is open,

1  to adjourn the bar date motion to the 29th and give parties an

2  opportunity to review the blackline to come back in discussion

3  with the debtor as to any remaining points and issues and to be

4  prepared on the 29th to go forward with an evidentiary hearing,

5  at which parties will have an opportunity to examine the

6  witness, should they choose to do so.

7          But it's very important that it be clear that between

8  now and the 29th this is not an invitation for discovery, that

9  there is a narrow -- perhaps not as narrow as I articulated but

10  a narrow issue, and the witness will be available -- will be

11  testifying as to that issue.  If we have discovery, it

12  obviously should not be more than the deposition of the witness

13  proposed.  But given the reality of the seventy-eight

14  objections embodying the issues articulated by probably well

15  over a hundred parties, I don't think a deposition really makes

16  sense.  I think people will have additional time to prepare

17  their examination of the witness, and we should proceed on the

18  29th with an evidentiary hearing.

19          THE COURT:  Comments from -- it looks like there are

20  a number of parties who wish to be heard, and this is the time

21  to hear them.

22          MR. DUNNE:  Your Honor, for the record, Dennis Dunne,

23  Milbank, Tweed, Hadley & McCloy, on behalf of the official

24  creditors' committee.  We are in support of a limited

25  adjournment on this matter.  I'd like to just make two

117

1    representations, one's a clarification.

2         Mr. Waisman alluded to procedures whereby under

3    certain circumstances no notice of a bar date motion need be

4    provided if the committee is in accord with that procedure.  We

5    refuse to consent to that convention here because of the

6    complexity and some of the extraordinary provisions.  And I

7    just want that to be clear.

8         The second is, while there has been a tremendous

9    amount of collaboration between the debtors and the creditors'

10   committee on the form of order and language insertions, at the

11   end of the day, the debtors did not garner the committee's

12   support to the current form of order.  And it has to do with

13   the savings clause which Your Honor struck.  We had issues with

14   it as well, but a different fix than striking it.  We can

15   reserve that, and hopefully we'll be on board with the revised

16   form of order by Monday.  But I wanted Your Honor to know that

17   we still had one remaining issue that went to the heart of one

18   of the committee's concerns.

19        THE COURT:  I want to be clear on something.  I

20   didn't strike that paragraph.

21        MR. DUNNE:  Good to hear.

22        THE COURT:  It's not an order.  It's just a proposed

23   order.  And what I pointed out was that I believed that the

24   philosophy providing flexibility to parties who don't comply,

25   while admirable, is, I think, a fool's errand.  I think that

118

1    what we need are procedures that will be rigidly and strictly

2    applied; procedures that will be known to everybody, and you

3    either comply or take the consequences of failing to comply.

4    Complete proof of claim transparency.  You file it and you

5    comply, or you're out of luck.

6            MR. DUNNE:  And, Your Honor, we agree with that.  We

7    were looking for a different bright-line fix.  But we can

8    revisit that on --

9            THE COURT:  And by the way, I'm not trying to

10   negotiate the right outcome, here.  I'm telling you that I

11   think, in my broad view of this, procedures that are not

12   absolute, are not procedures.

13           MR. DUNNE:  Thank you, Your Honor.

14           MS. GRANFIELD:  I'm sorry, I'm grabbing the podium

15   from Mr. Ellenberg.  Lindsee Granfield of Cleary, Gottlieb,

16   Steen & Hamilton LLP on behalf of Barclays Capital Inc. and

17   Barclays Bank PLC and their affiliates on this objection.

18           I obviously heard Your Honor's comments.  With

19   respect to a proposal to simply adjourn the hearing to the

20   29th, which I didn't get out my calendar, whether that's next

21   Monday or Tuesday --

22           THE COURT:  It's Monday.

23           MS. GRANFIELD:  -- next Monday, a few things.  It's

24   not just the proposed witness, to the extent we're having some

25   full-blown evidentiary hearing.  It obviously, as Your Honor

119

1    indicated, partly goes to the burden on the objectors with

2    respect to the proposed procedures.  And there's seventy-five

3    of them or eighty or them, and don't know -- have no idea

4    standing here right now, how many of them would be proposing to

5    bring a witness to talk about the --

6        THE COURT:  I suspect none of them, because in the

7    end -- and I don't mean to break in -- this is not intended to

8    be an unmanageable hearing.  It's intended to be a hearing in

9    which real information is provided to me that I can use to make

10   smart decisions.  It's not about posturing; it's not about

11   gamesmanship.

12        MS. GRANFIELD:  Bearing in mind --

13        THE COURT:  It's about understanding fully the nature

14   of the derivatives market so that reasonable procedures can be

15   applied to all, and everyone should be able, not with

16   witnesses, but with bright lawyers who are diligent, figuring

17   out a way that works.  The objections in the real world should

18   wither away if people do their work properly.

19        MS. GRANFIELD:  I agree, Your Honor.  And I've been

20   trying to be in dialogue for a while about what would work

21   here, and not turn into an unmanageable process.  But to the

22   extent that Your Honor's asking for an evidentiary hearing --

23   or you're not asking for it -- to the extent there has to be

24   one --

25        THE COURT:  The debtors asked for one, and I simply

120

1   said sure.  If you're going to have it, make it be the hearing

2   I need.

3           MS. GRANFIELD:  Sure.  But it's not just going to be

4   a monologue by the debtors' witness as to what his view of the

5   derivative market is and what usually happens when derivative

6   claims are being resolved, as they have been in a number of

7   cases that have had a lot of derivatives without a

8   questionnaire tied to the proof of claim.

9           Now, so let me split up into two things.  Because I

10  think one is, what are we doing if we're going evidentiary

11  hearing-wise?  But I actually have a different suggestion which

12  might do away with the need for that.  On the evidentiary

13  hearing, I guess, my proposal would be that there be

14  discussion, because there are a lot of parties.  I don't speak

15  for anybody else.  Many of them joined in an objection that we

16  wrote -- not all of them.  Many of them wrote their own.  But I

17  don't speak for any of them.

18          And therefore, in consultation, debtors, creditors'

19  committee, I think there would have to be discussion about what

20  discovery does anybody want.  Maybe no one will want discovery.

21  That's going to have to be a question.  How many witnesses?  Do

22  people want to have witnesses?  Is there a date to determine

23  whether you're going to have a witness or not?  And if there

24  isn't other resolution that would make an evidentiary hearing

25  not necessary, to come back on the 29th, and if there's still

121

1   disputes about how the evidentiary hearing is going to work,

2   bring them to you; or if there's agreement about it, tell you

3   what's going to happen and what people propose.

4           With respect to a suggestion as to how to try to

5   bridge the gap, the concerns, I think, of at least my

6   objectors, go to things about the questionnaire, which is not

7   gamesmanship, it's not trying to do anything other than say,

8   for a party that's got tens of thousands of derivative trades

9   because Barclays is a big financial institution that had lots

10  of dealing with Lehman that had nothing to do with the sale in

11  September, that an institution like Barclays and many other of

12  the institutions who are objectors that also have potentially

13  hundreds of thousands.  And so the debtor talking about two

14  percent of the people, well, I think if you added up all the

15  trades of the people who objected, I think you're going to get

16  way into the percentage of their trades, that there are real

17  issues about the gargantuan effort that would be involved in

18  doing what that questionnaire asked people to do.

19          So that, ultimately, if it has to be tried, would be

20  part of what would be put before you.  And the consequences,

21  Your Honor has said, procedures are going to be the procedures,

22  and at least on the -- if this is tied to the bar date order,

23  it's going to be the procedures for everybody.  Of course,

24  we've already heard there are three, maybe, special

25  stipulations that those procedures wouldn't apply to if they

122

1    were ever ordered.  So they're not going to apply to everybody.

2         But if we are going to have procedures, what the

3    suggestion was, is you don't have to tie them to the bar date

4    order.  I mean, if the outcome that the debtor, the creditors'

5    committee, and other people would like is to have -- to be able

6    to send out a notice of bar date order and get a bar date in

7    the middle of September, October, right now, that could happen;

8    because as I think all the objectors said, no one is objecting

9    to the setting of a bar date.  And if the bar date, as Your

10   Honor had said, had been a plain vanilla bar date order, then

11   it would have been done, potentially without notice and that

12   would have been it.

13        One, the Court, parties, the other alternative, in

14   terms of setting up procedures that all parties could try to

15   get behind in terms of having an efficient and streamlined way

16   to resolve derivative claims, is to have procedures that we

17   would work on right now, so they could be entered definitely

18   before whatever bar date is set, whatever regular bar date is

19   set, to be able to say these are the procedures that are going

20   to apply.  And you know, part of the controversy is what's the

21   definition of derivative claims or having a definition that's

22   going to cause a lot of confusion; that, in fact, if you're

23   talking about procedures to resolve claims, you can allow the

24   debtor to decide when people are going into those procedures,

25   who's going into those procedures, so that you could cut out a

123

1    lot of what people are very concerned about in terms of saying,

2    if you don't comply, your bar date's going to be disallowed

3    because you didn't do this gargantuan thing in the space of a

4    couple of months.

5              Those procedures, though, when you're talking about

6    resolving claims, would need -- they're usually a two-way

7    street, not a one-way street.  Because both parties, both sides

8    need the information to try to get to resolution, and

9    resolution that's not going to require trials in front of this

10   Court as to the resolution of derivative claims, and to not

11   have derivative claims simply disallowed because we're not

12   going with whatever standard.  We too thought the standard

13   didn't really work, because we agree with Your Honor, it would

14   just create a lot of litigation about was the standard met.

15             We don't think these procedures should be attached to

16   the bar date.  The bar date could go forward and all claims

17   could be filed.  They've got a lot of work to do on things that

18   aren't derivative claims.  But then, have the parties -- we

19   could use the same two-week period that people were talking

20   about in terms of adjournment, potentially, to try to come up

21   with procedures that all people could seek to get behind and

22   obviously have Your Honor order them.  And it would be, you've

23   got to comply with the procedures.  You've got to comply with

24   the procedures.

25             Just like any bar date order, people might be able to

124

1     come back and say this or that about any procedure, just like

2     they would if they're getting to the end and they say, oh

3     there's some real issue about extending the bar date.  But that

4     is what the suggestion had been, to try to carve out all of

5     this in terms of attaching it to a bar date order that, in

6     general, as to the general bar date, nobody has a problem with.

7            I know this is just a suggestion.  And obviously it

8     wasn't taken up by the debtors, and they determined to plow

9     through, and rather than have procedures that would definitely

10    be ordered and have to be complied with by everybody, have a

11    questionnaire that obviously a large group of creditors have

12    real concerns with.  So I guess it's two different proposals.

13           If we're going the, you know, we're going to have

14    discovery, we're going to have a full evidentiary hearing,

15    people are obviously not going to try to be presenting

16    information to Your Honor that doesn't make sense or is just

17    gamesmanship.  But we'll go to what are the real burdens, not

18    only that the debtor fears, but that the claimants fear.  And

19    if it's a contested evidentiary hearing, people have the right

20    to discovery.  People have to determine what they're doing.

21    But there is a way to not have this be tied to the bar date,

22    upset the bar date, make the bar date be extended for a long

23    time.

24           THE COURT:  I hear your point, Ms. Granfield.  It's

25    not your motion.  It's a nice suggestion.  Obviously it wasn't

125

1    picked up.  And I'm not even sure it's a good suggestion.  It's

2    obvious to me that linking the questionnaire to the bar date

3    means that it's coercive is someone fails to file the

4    questionnaire.  If someone files a proof of claim and is

5    delinquent in following up with a questionnaire or with

6    required further submissions, the claim is still alive.

7    There's simply been some excusable, perhaps, default.  That's

8    not going to work in this Court.

9           We're going to have an up or down on claims.  Whether

10   or not there needs to be some timing relief or extension for

11   cause shown for certain parties who are truly burdened and can

12   show the burden, we can deal with that on a case-by-case basis.

13   What we're going to deal with is the motion that's been

14   presented.  And the motion that's been presented is for a bar

15   date that includes, as to derivatives and guarantee claims,

16   certain extra added attractions.  And what we're really dealing

17   with is the form of those extras in trying to balance the need

18   of the debtor with the burden on those who have to comply.  I

19   think I've heard enough from you.

20          MS. GRANFIELD:  Thank you.

21          THE COURT:  Thank you.  You started this, Mr.

22   Ellenberg.

23          MR. ELLENBERG:  If the Court please, Mark Ellenberg,

24   Cadwalader, Wickersham & Taft on behalf of Morgan Stanley.  I'm

25   sorry to have started it, Your Honor.  Perhaps I can finish it.

1   I do understand that it's late.  Just a couple of things.  And

2   I understand, Your Honor, that this is a procedural opportunity

3   for me to speak, not a substantive one, and I will not argue

4   the merits.

5          However, the Court identified the Perry Mason

6   question as whether it has been demonstrated that extraordinary

7   measures are appropriate with respect to derivatives contracts.

8   And I fully agree that that is a very relevant question for an

9   evidentiary hearing.  But I think there's a second one, Your

10  Honor, and that's whether the measures that the debtors are

11  actually offering are the right ones.

12         I don't think there's much disagreement about the

13  fact that they have a problem.  I think the question is whether

14  what they've proposed is really the solution to the problem.

15  Morgan Stanley is a very active trader with Lehman and others,

16  and this is not about gamesmanship.  This is about having to do

17  substantial additional work that would not normally be done in

18  a nonbankruptcy termination context, and which is totally

19  unnecessary and will be costly and will distract people who are

20  otherwise doing productive things at Morgan Stanley.  And

21  that's why, as Your Honor observed, there have been so many

22  objections, because it's just unreasonable.

23         Now, Your Honor correctly identified the need for due

24  process, which obviously is the basis of our concern about

25  timing.  And certainly an adjournment till Monday is better

1    than no adjournment.  I would think that consistent with

2    notions of due process that if we're having an evidentiary

3    hearing, that would mean that objectors could put on evidence

4    if they so chose.  Indeed, one of the problems we had with

5    today is a witness that we might well put on was unavailable to

6    day and would be available on Monday.  I would like to have the

7    ability to put on a witness if I see a need to do that.

8            And I would normally think that an evidentiary

9    hearing would include the ability to have notice of who was

10   going to be a witness and the ability to have discovery.  Now,

11   most of all, rules need to be symmetrical.  So if we're not

12   going to have discovery, or even perhaps notice of the debtors'

13   witnesses, then certainly the same would be true of us.  But I

14   would think that normally there would be notice and there would

15   an opportunity for discovery.  But most of all, I would like to

16   reserve the right to put on a witness if I feel it's

17   appropriate.

18           THE COURT:  Your right is reserved.

19           MR. ELLENBERG:  Thank you.

20           MR. SHIMSHAK:  Good afternoon, Your Honor.  Steve

21   Shimshak, Paul Weiss, for Citi.  We are a derivatives counter

22   party as well.  We've objected to the procedures, but I'm not

23   going to comment about that.  That portion of the discussion is

24   separate.  It seems that we're going in the direct of an

25   evidentiary hearing in the near term.

128

1          I wanted to mention another feature of our objection

2     which is a source of concern, and that is the issues

3     surrounding guaranteed obligations by LBHI that do not relate,

4     necessarily, to derivative products.  We are the nominee

5     custodian for over 38,000 individuals around the world who

6     bought, on a retail level, Lehman paper that was issued by its

7     Dutch subsidiary, and had the benefit of an LBHI guarantee.

8     And we believe that there are serious issues of both fact and

9     substance on the fairness of the mechanisms concerning

10    guarantee claims that are inherent in the bar date procedures

11    that the debtor has proposed.

12          So if we are going to have an evidentiary hearing, as

13    the gentleman who proceeded me made clear, we would like the

14    opportunity to present testimony on that score and to develop

15    that aspect of the infirmities of the bar date as well.  Thank

16    you, Your Honor.

17          THE COURT:  Okay.

18          MR. BROZMAN:  Good afternoon.  Andrew Brozman,

19    Clifford Chance for Calyon, Your Honor.  I am going to just

20    raise one additional point.  I don't think the Court got an

21    answer to its question of what's the rush.  I heard a lot of

22    explanations of what they've been doing and a lot of excuses

23    for giving people enough time to have discussions.  But

24    unfortunately, those discussions didn't bear fruit.

25          And I suggest that if we are going to provide the

129

1   Court with a record upon which it should rule, and I agree that

2   it should be an appropriate record, I don't understand why we

3   are going forward on June 29th.  I think that there is no

4   apparent rush to this process.  If anybody wants to rush, it

5   should be the people who are awaiting their funds.  I don't

6   believe that we would be dilatory or do anything other than

7   proceed with alacrity here.

8          But if we are going to observe the minimum

9   requirements of due process, and given the fact that there is

10  no apparent need for a date today, tomorrow or the next day, I

11  suggest that if we're going to do this:  number 1, we pick a

12  reasonable date to provide opportunity both to have further

13  discussions based upon the new revised order;  number 2, to

14  understand what it is; and number 3, if there is going to be

15  some deviation from the normal contested matter process, in

16  terms of limiting or restricting discovery, I think at least we

17  should be entitled to a new and full-blown witness statement,

18  so we have some concept of what it is that the witness is going

19  to base his testimony upon.  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. HANDELSMAN:  Good afternoon, Your Honor.

22  Lawrence Handelsman, Stroock & Stroock & Lavan.  I'll be very

23  brief.  I rise only because I'm not sure whether this is a list

24  of those who are reserving their rights to put in evidence.  I

25  --

130

1          THE COURT:  I don't think --

2          MR. HANDELSMAN:  -- an exclusive list.  That was my

3    concern.

4          THE COURT:  -- it's neither exclusive nor a list.

5          MR. HANDELSMAN:  Well, just briefly.  I also

6    represent a record holder of the Euro medium-term notes that

7    Mr. Shimshak referred to.  I do not intend to put on evidence -

8    - a witness, I should say, since my client's in Japan.  I

9    would, and I hope we can work something out with the debtor

10   where we can put in a sample document upon consent.  And that's

11   all we would have to put into the record in order to make the

12   arguments we think you ought to hear.

13         THE COURT:  Okay.

14         MR. SZYFER:  Your Honor, Claude Szyfer, also from

15   Stroock & Stroock & Lavan, but I represent twenty-three

16   derivative claimants.  And I simply rise to echo what Mr.

17   Brozman said, simply because I have clients in Finland, in

18   Germany, in Japan, and I don't see the rush and see why we need

19   to proceed on the 29th.  And I'm not saying that I would be

20   able to get clients if I wanted to put them on from such far

21   flung places as Finland and Japan.

22         THE COURT:  Looks like those wishing to be on the

23   list have finished their comments.  There probably is no reason

24   for the 29th as opposed to any other day, except there is

25   something to be said for convenience and the fact that it's

131

1    another Lehman day.  It's a day that was set aside for purposes

2    of dealing with an emergency motion to fund Aurora Bank, and I

3    believe that a hearing is set for 2:00 in the afternoon on the

4    29th.  2:00 seems too late to start proceedings with respect to

5    the derivative and guarantee claim issues, and I would propose

6    that we hold the date on the 29th; start at 10 a.m. that day.

7    Consistent with Mr. Brozman's remarks, however, it isn't

8    necessarily so that every witness who may need to show up will

9    be available that day.  It isn't necessarily so that we will

10   complete the record that day.

11        Oh.  I have another case on at 10 a.m. on Monday.  I

12   can't do it at 10 a.m. on Monday.  It's another Weil Gotshal

13   case.

14        MR. WAISMAN:  We'll adjourn it.

15        THE COURT:  No, it's extended stay.  We can't do it

16   at 10; it has to be at 2.  I have a confirmation hearing on the

17   30th.  Regrettably, this is just a busy time.  And consistent

18   with Mr. Brozman's request for additional time, if I look later

19   in the month of July, it doesn't get much better.  So I think

20   that we should stay at 2:00 on the 29th, recognizing that we

21   might go late.  But that's not an invitation to go late.

22        As far as the process, however.  In the best of all

23   worlds, we would not be involved in a contest over something

24   that should be transactionally easy to understand.  There

25   should be no issue of fact in dispute as to what's involved in

132

1   proving up a derivative claim.  It may be that it varies from

2   derivative to derivative, a swaption may be different from a

3   foreign exchange contract.  But I suspect there's some

4   overlapping Wall Street approach to this sort of process.  So I

5   doubt that if a witness from Morgan Stanley gets on the stand

6   and talks about the process, that somebody from some other

7   securities firm is going to say well, that's not how we do it,

8   we do it differently; or if it's done differently, it's not

9   going to be materially differently.

10          So, in the interest of efficiency, let's not create a

11   structure that's completely unnecessary.  One of the procedural

12   problems that we have here is that there are lots and lots of

13   objectors, and they tend to cluster around certain common

14   themes.  One theme is the theme raised by Ms. Granfield on

15   behalf of her client, which is not only is this burdensome,

16   it's simply inappropriate to shift the burden on us.

17          The debtors' theme is, this is unprecedented.  And

18   it's simply going to be impossible for this claim process to be

19   anything other than my worst nightmare, unless we have

20   procedures in place applicable to all parties who have claims

21   of this type; which procedures are not necessarily typical, but

22   which are nonetheless appropriate under the circumstances.

23          All I'm trying to get the parties to do is to agree

24   that some set of procedures does make sense here, and to see if

25   you can develop a consensus approach to what those procedures

133

1    are.  To the extent you can't, obviously, I'll decide.  Ms.

2    Granfield mentioned something which resonated with me, because

3    it's on my personal wish list.  My wish list would be that an

4    ad hoc committee of counterparty representatives were to form

5    without portfolio, because no one's going to authorize you to

6    do anything.  But to the extent that you've been active and you

7    represent a major counterparty, you should have an interest for

8    your client to protect, and that you could be, in effect, an

9    information source for the debtor.

10          The debtor could sit with this self-anointed group --

11   because I'm not going to appoint you.  And you can spend some

12   time in somebody's conference room talking about the issues the

13   way an unbiased committee might talk about the issues.  I'm not

14   talking about litigation, I'm talking about designing a

15   solution, recognizing that the solution you design doesn't bind

16   anybody, but might be a recommendation to be made to the Court

17   on Monday.  I'm not directing that, but I'm suggesting that.

18   And I think that you might find that you don't have as many

19   disagreements as you think you do.

20          To the extent that there are major problems that

21   don't go away, I'll see you at 2 o'clock, and the first witness

22   will be the debtors'.  And we'll probably take the afternoon

23   with that witness, but that's without prejudice to anybody

24   else's witness.  Additionally, in terms of streamlining the

25   process, to the extent that there are aspects of the

134

1    derivatives and guarantee claim process from the perspective of

2    counterparties that are of common concern, it might be useful

3    if you could coalesce around a particular authority:  someone

4    from a trade association, someone from a particular

5    organization that would be an acceptable witness for all.  So

6    that instead of having a dozen witnesses saying the same thing,

7    maybe we could have one witness saying what a dozen other

8    people would say.

9            My goal is to get to a good result, not to create a

10   monstrosity.  That should be everybody's goal.  Is there

11   anything more before we break for our late lunch?

12           MR. WAISMAN:  Your Honor, just a point of

13   clarification on the proposed procedures.  Given that the

14   debtors' witness is known and has submitted a declaration

15   which -- to clarify the procedures, Your Honor, the debtors'

16   witness is known, has submitted a declaration.  Everyone has

17   it.  We may need to supplement it to meet some of the concerns

18   or questions Your Honor has --

19           THE COURT:  Right.

20           MR. WAISMAN:  -- but we would expect that any witness

21   that a party is going to present at the hearing on Monday, that

22   the debtors' be advised of the identity of the witness and be

23   presented with a declaration as to that witness' testimony so

24   that it is an equal playing field and that it be done in a time

25   frame that enables the debtors to analyze the submission to the

135

1    same extent that parties have the declaration and have had an

2    opportunity to review the debtors' declaration.

3            THE COURT:  It's a reasonable request, although I

4    suspect, given the hour of the day and the number of parties

5    involved and the need for people to figure out who their

6    witnesses may be, that all I can suggest is that you receive

7    the best notice that parties can give you; recognizing that you

8    may not know until Friday afternoon or maybe even by e-mail

9    over the weekend, when somebody is available to testify.

10           We don't have a lot of time to dedicate to this.  I'd

11   like to be really clear on something.  I don't think this is a

12   situation in which we are dealing with disputed issues of fact.

13   I think this is a situation in which the parties should be able

14   to, to a very large extent, stipulate as to what the facts are.

15   And part of what I'm looking for is evidence as to the

16   appropriateness of the procedures that have been cobbled

17   together here, and as to the burden on counterparties

18   associated with compliance with these procedures.

19           Some burden is to be expected.  The question is

20   whether or not it's unreasonable under the circumstances.  And

21   the ultimate standard, I think, is what happens in the market.

22           MR. WAISMAN:  Just one final clarification.  And I

23   appreciate that parties will provide notice of the identity of

24   their witnesses as soon as possible, hopefully on Friday, and

25   if later because of circumstances determine, obviously as soon

136

1    as possible, including any declaration; and that neither the

2    debtors' witness nor any other party's witness is subject to

3    deposition over the next few days.  We will all be heard by

4    Your Honor on Monday.

5             THE COURT:  We'll see you at 2:00 on Monday.

6             MR. WAISMAN:  Thank you, Your Honor.

7         (Whereupon these proceedings were concluded at 1:26 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

137

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Trustee's application for an order further | 25 | 24 |
| extending time to assume or reject executory | | |
| contracts pursuant to Section 365 of the | | |
| Bankruptcy Code granted | | |
| | | |
| Debtors' motion for authorization to assume | 27 | 19 |
| an unexpired lease and to assume and assign | | |
| an unexpired lease | | |
| | | |
| Debtors' motion to restructure certain loans | 30 | 4 |
| with Broadway Partners Fund Manager | | |
| Motion of Unclaimed Property Recovery Service, | 30 | 17 |
| Inc. for compelling payment of unclaimed funds | | |
| by the New York State comptroller approved | | |
| | | |
| Debtors' motion to authorize discovery from | 68 | 8 |
| Barclays Capital granted | | |

138

I N D E X, cont'd


R U L I N G S

DESCRIPTION                                    PAGE    LINE

Debtors' request for adjournment of            80      13

Kalaimoku-Kuhio Development Corp.'s motion for

order compelling payment of post-petition rent

granting relief from automatic stay granted and

adjourned to next omnibus hearing date

139

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a

true and accurate record of the proceedings.

_____

LISA BAR-LEIB

AAERT Certified Electronic Transcriber (CET**D-486)


Also transcribed by:  Pnina Eilberg

                      Clara Rubin

                      Penina Wolicki


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  June 25, 2009