WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
:
**In re**                                            :    **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,    :    **08-13555 (JMP)**
:
               **Debtors.**                         :    **(Jointly Administered)**
:
:
---------------------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF GARY H. MANDELBLATT**
**IN SUPPORT OF DEBTORS' MOTION PURSUANT**
**TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 3003(c)(3) FOR ESTABLISHMENT OF THE DEADLINE FOR FILING**
**PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER OF NOTICE**
**THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM**

Pursuant to 28 U.S.C. § 1746, I, Gary H. Mandelblatt, declare:

1. I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to the truth of the matters set forth herein.

2. This is a supplement to my Declaration dated June 23, 2009 in response to particular areas of inquiry raised by the Court on June 24, 2009. I serve as one of the senior managers who played a significant role in developing the six-step process to unwind and value the Derivative Transactions. The process we developed has been fully

implemented since February 2009. To give a sense of the time consuming and complex nature of the task at hand, in the almost five months that the team has been working full time using this six-step process we have approved (internally) approximately 500 Derivative Contracts for settlement. The primary contributor to the fact that we have approved only 500 Derivative Contracts since February is the actual physical time that it takes our staff to ask and obtain the counterparties' information. The information we have been requesting to date is the same information requested in connection with the Bar Date Motion, that, if received would facilitate the ability of the Debtors to assess the valuation of the Transactions.

What is a Derivative Transaction?

3. A derivative transaction is a transaction where the value is derived from an underlying market factor, security, index, portfolio of securities or portfolio of assets. In other words, the value of a derivative transaction is derived from the value of something else. A derivative can be derived from anything that is observable. Traditional derivatives are based upon the value of interest rates, bond prices, equity prices, FX rates, commodity prices, and mortgage backed securities. As derivatives technology (i.e. modeling capabilities) have increased, derivative transactions evolved to be derived from pools of securities, indexes and virtually any observable variable – including the weather.

Parties' Valuations and Exchange of Information in the Ordinary Course

4. On a daily basis, in the normal course of business outside of bankruptcy, counterparties must input information on their derivative transactions in their propriety systems in order to value them internally. In order to do this, they have to input the transaction detail for the transaction, using the transaction characteristics applicable to

specific products and types of transactions, such as those requested in question 4(d) of the Derivative Questionnaire: trade id, electronic trade reference id, trade type, product, trade date, reference obligation or reference entity, factored and original contract notional amount, quantity/unit of measure, currency, price or strike price, buy/sell, call or put, cap or floor, location, effective date, maturity date, termination date, and value.  In my experience, counterparties usually record significantly more characteristics of each transaction, but the items we have requested in question 4(d) are some of the basic identifiers for transactions used by many counterparties.

5.   Once the counterparties have identified the transactions, the counterparties will then value the transaction, typically using their own proprietary models.  In normal ordinary course business environments (non-bankruptcy) valuation calculations are performed by financial institutions on a daily basis for books and records and in order to ensure that the credit exposures (net of posted collateral) are not greater than the credit limits set by the credit department.  The credit department of a financial institution must continually quantify its current exposure to any given counterparty.  The credit department typically sets a limit on the amount of credit exposure it will take with respect to a counterparty.  The margin department, which calculates the amount of a counterparty's excess exposure over the credit limits, uses the same counterparty transaction representation and values to determine the margin that has to be posted or received with the counterparty.  Thus, the margin and credit departments of any financial institution must have a continual understanding of the value of their transactions with any counterparty.

6.  If there are large differences between the parties as to the valuation of their transactions and estimates of collateral requirements, then the parties undergo a standard, consensual reconciliation process. This process includes the exchange of the key transaction characteristics in order to reconcile the transactions and compare values. If errors are found, then they are corrected, and if the valuations are correct, then collateral is posted or returned.

7.  As part of the ongoing reconciliation process prior to bankruptcy, Lehman and the financial institution counterparties would regularly exchange key transaction characteristics and their own valuation for each transaction, thereby assisting the parties in identifying value differences. Such information was exchanged routinely in Microsoft Excel (or a Microsoft Excel adaptable format) and without objection in the normal course.

8.  Counterparties with a small number of derivative transactions with Lehman were reconciled only on an *ad hoc* basis when there were questions regarding the valuation of the portfolio. With respect to counterparties with a large number of transactions with Lehman, reconciliation and the exchange of key transaction characteristics and internal values, happened regularly and on demand. The exchange of information included information regarding key transaction characteristics (requested under 4(d)) including trade id, electronic trade reference id, trade type, product, trade date, reference obligation, contract notional amount, currency, strike price, buy/sell, call or put, effective date, maturity date and value.

Reconciliation and Valuation in Lehman's Bankruptcy

9.  Upon termination of the Transactions with Lehman, in bankruptcy, we need to perform a complete reconciliation of *all* counterparties' Transactions to value their portfolio and assess their claims.  We need to reconcile the Transactions in the same manner as prior to the bankruptcy—through the gathering of transaction detail and the identifying trade characteristics listed in question 4(d) of the Derivatives Questionnaire.  Unlike the ongoing process prior to bankruptcy, which allows some flexibility in the reconciliation because of credit limits, the credit limits here are effectively set to zero (0) (meaning we need to fully reconcile the portfolio).

10.  Counterparties are required to provide valuation statements, but if we do not receive them, we request that the counterparties provide them (as described more fully in my declaration).  Because the valuation of any derivative transaction involves projecting the expected cash flows over the life of the contract and discounting the cash flows back to the present value, it is imperative that the Debtors know *when* the Transaction was terminated and valued.  As I explained in my declaration, it is standard industry practice, and required by the ISDA Master Agreement, that a counterparty provide the termination notice in writing, in person or by courier, or by certified or registered mail.  The values of the Transactions varied widely depending upon the date and time of valuation; a few hours or a one or two day difference could lead to very different valuations for the estate.  The days following September 15, and Lehman's bankruptcy filing, were among the most volatile the markets have ever experienced.  We, therefore, need to know the exact day and time of valuation.  Also, in the valuation statement the counterparty needs to specify which methodology (such as market

quotation, loss, or close-out) was utilized in the valuation, together with supporting data such as market quotes (identity of Reference Market-makers and date) and reasonable detail substantiating the valuation.

The Counterparties' Burden is Minimal

11.     Counterparties, in conducting their own calculations of the Transactions with Lehman upon termination, have at a minimum the information requested in the derivatives questionnaire. They either have it as a result of regular (periodic or daily) valuation or as a means of conducting their own valuation upon termination. It should, therefore, not be overly burdensome for counterparties to provide this information to the Debtors. Nothing we have asked for would be information they do not have if they have calculated their claim according to industry standards. In fact, they could not calculate their claim without this information. If we do not get the requested information, we cannot evaluate the basis for their calculations. With every day that passes, it becomes more difficult for the counterparty (and us) to recreate the claim and value of the Transaction upon the date that the Transaction was terminated. This is because involved personnel leave, files get lost, and historical data on the markets and Transaction information is deleted from the systems.

Without this Information Reorganization Would be Difficult

12.     Until now, we have largely shouldered the burden of collecting the information and reconciling the claims. This is true despite the fact that section 6(d) of the ISDA Master Agreement specifically requires the counterparties to provide the valuation statements and evidence of their calculations and methodologies. If my department and the Debtors do not receive evidence of delivery of the termination notice,

the valuation statement, the trade detail, and information about the type of methodology used in the calculations, the process of reconciling and resolving the claims will be significantly delayed and the cost to unwind the derivatives portfolio will increase dramatically.

13.  Because Lehman had over a million Transactions to reconcile and 10,000 counterparties with whom to negotiate, all of the reconciliation, valuation and transfer of information needs to occur extremely efficiently. Accordingly, we implemented the six-step unwind process, described in my Declaration, to maximize efficiency to unwind the derivative Transactions. There is no magic to the six-step process we have developed. Other institutions may have developed a process in four steps or ten steps, but the essence of the project is likely very similar. The tasks in the six-step process need to be completed whether they are bunched into any number of "steps". In our six-step process, to date, we have asked counterparties for the basic information requested in the derivatives questionnaire. Based upon the information we have and have received to date, we have reconciled and have entered into final settlements (internally approved) for about 500 Derivative Contracts.

14.  This process would be much more efficient, move faster than it has in the past, and save the estate significant costs, time and other expense, were we to get the information requested in the questionnaire from the counterparties when they file their proofs of claim. Having this information, even if some portion of it has already been provided, all together in a central electronic location will improve the efficiency of the reconciliation and resolution of Derivative Transactions. This in turn, will help reduce expenses and minimize unnecessary costs to the Debtors' estates. Because

counterparties have to use this information in the calculation of their claim, and it is the fundamental support for their claim, it only makes sense from an efficiency standpoint that they provide it to us with the derivative questionnaire.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of June, 2009.

 s/ Gary H. Mandelblatt
Gary H. Mandelblatt