WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                                :
In re                                                           :   Chapter 11 Case No.
                                                                :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,     :   08-13555 (JMP)
                                                                :
                                    Debtors.           :   (Jointly Administered)
                                                                :
                                                                :
---------------------------------------------------------------x

**DECLARATION OF GREGORY F. EICKBUSH**
**IN SUPPORT OF DEBTORS' MOTION PURSUANT**
**TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 3003(c)(3) FOR ESTABLISHMENT OF THE DEADLINE FOR FILING**
**PROOFS OF CLAIM, APPROVAL OF THE FORM AND MANNER OF NOTICE**
<u>**THEREOF AND APPROVAL OF THE PROOF OF CLAIM FORM**</u>

Pursuant to 28 U.S.C. § 1746, I, Gregory F. Eickbush, declare:

1.      I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to truth of the matters set forth herein.

2.      I am a Managing Director for LBHI and head of the team that interfaces with counterparties of LBHI in the settlement and unwinding of the Debtors' derivatives portfolio. In my role, I manage seventy people who are responsible for engaging with

counterparties and coming to a final settlement of each Transaction in the form of a net receivable or payable to the Debtors' estates.

3.  Following Lehman's Chapter 11 filing in September 2008, and as a result of the sale of certain of the Debtors' assets to Barclay, I became an employee of Barclays Capital. For the six months following, until February 2009, I managed operational support pursuant to the Transitional Services Agreement between Lehman and Barclays. I built and managed a process to mark-to-market over 800,000 Transactions as of the counterparties' respective declared termination dates. In March 1, 2009, I returned to Lehman.

4.  Prior to Lehman's chapter 11 filing, I served as Senior Vice President and head of Fixed Income Operations at Lehman Brothers from June 2008 to September 2008. I was responsible for capturing all trades (correctly booking the trades in our systems following execution) and producing daily risk and profit and loss calculations. I oversaw 450 employees in that role. Before that time, I served as the Chief Operating Officer of Lehman's Global Rates, Global FX, and LATAM (Latin American) businesses. I oversaw the day-to-day management of the business, including directing all support groups, such as technology, operations, human resources, compliance, legal and credit.

5.  Prior to April 2006, I was a Business Manager at Deutsche Bank (from 2004 to 2006) overseeing the day-to-day management of the U.S. interest rate products. In 2004, I served as the Chief Operating Officer for Deutsche Securities Inc. From July 1997 to December 2003, I served as the Chief Operating Officer for Global Markets at Deutsche Securities Limited in Tokyo, Japan. I managed the implementation of various

strategies to build one of the top Fixed Income houses in Japan. From May 1995 to July 1997, I worked at Price Waterhouse Consulting as a Manager, for the Financial Services Industry Practice Group in New York and Tokyo, Japan. I have had almost 15 years of experience in the financial markets and, specifically, in the fixed income industry.

6. I am a graduate of Brigham Young University, and hold a bachelors degree in Japanese. I also received a Masters in Business Administration from Columbia University.

7. In my current position at LBHI, I oversee the specific procedure by which the Counterparty Team gathers information to close out Transactions through the six-step unwind process. The Counterparty Team consists of ninety individuals divided into four divisions—according to type of counterparty: (1) big banks (institutions that had over 2,000 Transactions with Lehman); (2) special purpose vehicles; (3) internal counterparties (such as LBI, LBIE); and (4) general counterparties (anything not in (1)-(3)). Each of us, the counterparty interactors, is assigned specific counterparty accounts. Our role is to reach out to counterparties to reconcile the Debtors' derivative Transactions and settle them to reach an agreed-upon net receivable to or payable from the Debtors' estates. I am specifically in charge of the general counterparty division (number 4 above), the largest division, consisting of seventy individuals.

8. The actual procedure that we follow when contacting a counterparty is to first, review Lehman's own documentation of the Transactions with the counterparty. This requires a review of the governing agreements (such as ISDA Master Agreements, schedules, and credit support annexes). Second, we determine if we received a termination notice, which is the document that the counterparty would have sent us if

they terminated a set of Transactions, or a Derivative Contract. The termination notice designates the early termination date of the Transactions. Third, we determine if the counterparty sent, and we have received, a valuation statement, which sets forth the counterparties' calculation of the valuation of the Transactions, and provides detail such as market quotations for replacement Transactions. Finally, we review our own valuation of the Transaction marked-to-market as of September 12, 2008—prior to the bankruptcy.

9. Once the basic facts of the relationship are ascertained, we will attempt to engage the counterparty through direct communication via phone and/or email. Generally, the first communication to the counterparty is to introduce ourselves, and clarify our role as the contact person for reconciling the Transactions and the counterparties' claim. Next, we need to be certain that we have the correct contact information for the counterparty and understand with whom we should interface.

10. Then, we verify our records with those of the counterparty. We confirm that we have the correct governing documents. We verify the date of the delivery of the termination notice and request any evidence of delivery, if our records indicate that we received the notice on a different date than the date the counterparty claims it was delivered. If we have not received a valuation statement, we ask that the counterparty provide it to us.

11. Then, in order to actually verify the valuation and ultimately agree upon a settlement amount, we must confirm that our records and the counterparties' records reflect the same population of transactions. We ask that the counterparty provide us with certain identifying characteristics of the transactions (such as trade id, electronic trade id,

trade type, product, trade date, reference obligation or reference entity, factored and original notional amount, quantity/unit of measure, currency, price or strike price, buy/sell, call or put, cap or floor, location, effective date, maturity date, valuation date and value) in connection with providing us with the valuation statement, so that we can confirm that we view the same population of Transactions. If a counterparty has not determined the value of the Transactions, we ask that they go ahead and send us the transaction data (the key characteristics of the Transactions) so that we may begin the reconciliation process on our side—a process that may take some time. To date, in accordance with industry practice, counterparties have readily provided us with the requested Transaction detail in Microsoft Excel format.

12.   We cannot undertake to settle a counterparty's portfolio unless we have the trade detail to reconcile the Transaction populations. I have seen many situations to date in this process where counterparties have double counted Transactions, omitted Transactions, or omitted collateral. This is irrespective of the size of the portfolio, or the size of the counterparty. The ease of reconciliations is directly correlated to the quality of data from the counterparty—if the data is accurate and clearly organized, the reconciliation process is completed more quickly. Once we have the Transaction detail, this process of Transaction reconciliation is undertaken by my team and, unless we need additional data (such as confirmations) to clarify any discrepancies, the counterparty is no longer directly involved the reconciliation process.

13.   Once we have completed reconciliation of Transactions we can evaluate the valuation statement for information about the methodology of valuation, agree as to any missed payments, agree as to the application of posted collateral, and the applicable

interest rate to the Transaction. The valuation statement, which is required under an ISDA Master Agreement, must provide the calculations of the value of the Transactions, any quotes for replacement Transactions, and detail regarding the methodology used to value the Transactions.

14. The information we are requesting, copies of the termination notices and proof of its delivery, the trade detail, and the valuation statement including the explanation as to methodology, should not be burdensome for counterparties to collect. Prior to bankruptcy, and in the ordinary course of business, most counterparties mark-to-market their derivatives portfolio every day. The trade detail data that we are requesting from the counterparties is regularly provided between counterparties in the ordinary course for collateral posting disputes, which arise daily. This is a consensual process that institutions undertake with respect to one another on a regular basis and in the ordinary course to determine collateral sufficiency. If the parties decide to terminate their Transactions or novate their transactions to another counterparty, in a non-bankruptcy situation, they go through the same process of reconciling the Transactions, agreeing a trade/termination date and time, and agree their valuation of the Transactions as of that date and time. These are the same methods and data that are being used here, in the bankruptcy context.

15. Nine months have passed since the Debtors' bankruptcy filing. Counterparties have already begun to tell me that although they have the Transaction detail, finding the correct contact to explain the valuation of their Lehman portfolio is becoming increasingly difficult as people move to other jobs in the ordinary course. The data is often archived off of live systems and is being manually preserved by a small

number of people at any given firm.  I am concerned that the more time that passes before we get this information the more difficult it will be to obtain.  In other words, the longer the time allowed for the submission of trade detail data, and the valuation statements, the greater the burden on the estate as well as on the counterparties.  It is in the interest of the counterparties and the estates to submit the requested information necessary to reconcile each portfolio in the most expeditious manner possible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of June, 2009.

/s/ Gregory F. Eickbush
Gregory F. Eickbush