WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                    :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------x

## DECLARATION OF SHAI Y. WAISMAN
## IN SUPPORT OF ORDER  PURSUANT TO
## SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND
## FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004(h) AND 9019
## AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE
## CERTAIN LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET AL.

        **SHAI Y. WAISMAN**, being duly sworn, hereby declares pursuant to section

1746 of title 28 of the United States Code:

        1.      I am an attorney admitted to practice before this Court and a member of

Weil, Gotshal & Manges LLP, attorneys for Lehman Brothers Holdings Inc. ("LBHI") and its

affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession.

        2.      On June 3, 2009, LBHI filed the Motion Pursuant to Sections 105 and 363

of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Authorizing Lehman

Brothers Holdings Inc. to Restructure Certain Loans with Broadway Partners Fund Manager,

LLC, et al. [Docket No. 3773] (the "Motion").

3.      No objections to the Motion were interposed, and the Motion was approved by the Court at the June 24, 2009 omnibus hearing (the "Hearing").  At that time, LBHI presented the Court with a proposed form of order incorporating certain modifications made after the Motion had been filed.  That order has not yet been entered on the Court's docket.

4.      As more particularly described in the Motion, in 2007, LBHI loaned in excess of $459 million to entities affiliated with Broadway Partners Fund Manager, LLC (the "Broadway Entities") in connection with their acquisition of indirect ownership interests in various office properties located in Massachusetts, New York, Virginia and California (the "BIII Portfolio Properties").  In addition to these loans (the "Bridge Mezzanine Loans"), various third parties loaned additional amounts, secured by mortgages, on and indirect ownership interests in the BIII Portfolio Properties.  The proceeds of these third party loans were also used to fund the Broadway Entities' acquisition of the BIII Portfolio Properties.  In light of the highly distressed state of the commercial real estate markets and related challenges confronting the BIII Portfolio Properties, LBHI and the Broadway Entities entered into the term sheet attached as Exhibit A to the Motion to restructure the Bridge Mezzanine Loans (the "Restructuring").  As part of the Restructuring, the Broadway Funds (as defined in the Motion) will contribute up to $17 million of capital (the "Capital Contribution") to pay down the Bridge Mezzanine Loans and to provide needed capital for the BIII Portfolio Properties.  The Debtors believe that the Restructuring will maximize the value of the Bridge Mezzanine Loans and, thus, is in the best interest of LBHI, its estates and its creditors.

5.      The Motion did not request, and the proposed order submitted to the Court did not provide for, relief from 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which provides that an "order authorizing the use, sale, or lease of

property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

6.     I am submitting this declaration in support of a revised proposed order in the form attached hereto as Exhibit 1 (the "Revised Order").  A blackline comparison of the Revised Order and the proposed order presented to the Court at the Hearing is attached hereto as Exhibit 2.  LBHI requests that the Court enter the Revised Order, granting the relief requested in the Motion, effective immediately by providing that the 10-day stay under Rule 6004(h) is inapplicable.

7.     A waiver of the ten-day stay imposed pursuant to Bankruptcy Rule 6004 is necessary for LBHI to maximize the value of the Bridge Mezzanine Loans.  The Bridge Mezzanine Loans are secured by the BIII Portfolio Properties.  Because of this, the value of the Bridge Mezzanine Loans increases as the value of the BIII Portfolio Properties increases. Capital investments made in the BIII Portfolio Properties will increase their value; however, the Broadway Entities need a source of liquidity to provide for the capital needs of the BIII Portfolio Properties.  The Capital Contribution will provide such needed liquidity.  In order for the Broadway Funds to obtain the funds for the Capital Contribution, the Broadway Funds' investors are requiring that the Restructuring be complete by July 2, 2009.  As a result, if the order approving the Restructuring is stayed until the expiration of ten days after entry of the order, the funds needed to provide for the capital needs of the BIII Portfolio Properties may no longer be available.

8.     On the other hand, if the Revised Order is entered and the ten-day stay pursuant to Bankruptcy Rule 6004(h) is waived, LBHI and the Broadway Entities can complete

the Restructuring and increase the value of the BIII Portfolio Properties for the benefit of the

Debtors, their estates and their creditors.

         9.      Accordingly, LBHI requests that the Court enter the Revised Order, which

incorporates a waiver from Bankruptcy Rule 6004(h), but is in all other respects similar to the

order submitted to the Court at the Hearing.


Dated:    June 29, 2009
        New York, New York


           /s/ Shai Y. Waisman
           Shai Y. Waisman

           WEIL, GOTSHAL & MANGES LLP
           767 Fifth Avenue
           New York, New York 10153
           Telephone: (212) 310-8000
           Facsimile: (212) 310-8007

           Attorneys for Debtors
           and Debtors in Possession

## Exhibit 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
                                                          :

In re                                        :       Chapter 11 Case No.
                                             :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :    **08-13555 (JMP)**
                                             :

                         **Debtors.**       :      **(Jointly Administered)**
                                             :
                                             :
---------------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105 AND 363
OF THE BANKRUPTCY CODE AND FEDERAL
RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING
LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE CERTAIN
LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET. AL.**

Upon the motion, dated June 4, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to

sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for

authorization and approval of LBHI's restructuring of certain loans with Broadway

Partners Fund Manager, LLC (the "Settlement") substantially consistent with the

agreement and term sheet (together, the "Term Sheet") annexed hereto as Exhibit A; and

upon the Declaration of Shai Y. Waisman, dated June 26, 2009 (the "Declaration"),

attesting to the necessity for a waiver of the ten-day stay pursuant to Bankruptcy Rule

6004(h); and the Court having jurisdiction to consider the Motion and the relief requested

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in
the Motion.

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance

with the procedures set forth in the amended order entered February 13, 2009 governing

case management and administrative procedures [Docket No. 2837] to (i) the United

States Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv)

the Internal Revenue Service; (v) the United States Attorney for the Southern District of

New York; (vi) counsel to Broadway Partners; and (vii) all parties who have requested

notice in these chapter 11 cases, and it appearing that no other or further notice need be

provided; and the Court having found and determined that the relief sought in the Motion

and the Declaration is in the best interests of the Debtors, their estates and creditors, and

all parties in interest and that the legal and factual bases set forth in the Motion and the

Declaration establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefore, it hereby is:

ORDERED that the relief requested in the Motion is granted; and it is

further

ORDERED that, pursuant to sections 105 and 363(b) of the Bankruptcy

Code and Bankruptcy Rule 9019, the Term Sheet and the Settlement are hereby

approved, in all respects; and it is further

ORDERED that LBHI is hereby authorized to enter into the transactions contemplated by and in substantial accordance with the Term Sheet and Settlement and to consummate all of the transactions contemplated thereby; and it is further

ORDERED that LBHI is hereby authorized to perform each and every term of the Settlement in accordance with its terms and this Order; and it is further

ORDERED that the obligations of LBHI under the Term Sheet and Settlement, including without limitation, all related transaction documents, shall, to the extent not otherwise provided for in the Term Sheet and related transaction documents, survive confirmation of any plan in the LBHI bankruptcy case and shall not be discharged under section 1141 of the Bankruptcy Code and no plan shall be confirmed in the LBHI bankruptcy case that is inconsistent with this order; and it is further

ORDERED that LBHI is authorized to execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to accomplish the foregoing; and it is further

ORDERED that notwithstanding anything to the contrary in the Term Sheet, the Settlement or related transaction documents, nothing in any of the foregoing or this Order shall prejudice, affect or be deemed a waiver of the rights or benefits of any mortgage or mezzanine lender senior to Lehman in respect of the BIII Portfolio Properties under any mortgage or mezzanine loan documents and applicable intercreditor agreements, including without limitation, any and all consent rights with respect to these transactions and such mortgage or mezzanine loan documents and applicable intercreditor

agreements shall not be modified or amended in any way by the terms of this Order, the

Term Sheet or the Settlement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order and any disputes that may arise in the future with respect to the Settlement and the

Term Sheet; and it is further

ORDERED that the stay imposed pursuant to Bankruptcy Rule 6004(h)

hereby is waived and this Order shall be effective immediately upon its entry.

Dated: June __, 2009
        New York, New York


_____

UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Term Sheet**

**EXECUTION VERSION**

## AGREEMENT

THIS AGREEMENT (this "**Agreement**") dated as of May 29, 2009 is made by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (together with its successors and assigns, "**Lender**"), **THE PARTIES LISTED ON SCHEDULE I ANNEXED HERETO** (collectively, the "**Bridge A Mezzanine Borrower**"), **THE PARTIES LISTED ON SCHEDULE II ANNEXED HERETO** (collectively, the "**Bridge B Mezzanine Borrower**" and together with the Bridge A Mezzanine Borrower, collectively, the "**Borrowers**"), **BROADWAY PARTNERS FUND MANAGER, LLC**, a Delaware limited liability company ("**Fund Manager**"), **BROADWAY PARTNERS REAL ESTATE FUND III, L.P.**, a Delaware limited partnership ("**Broadway Real Estate Fund**"), **BROADWAY PARTNERS PARALLEL FUND P III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund P**"), **BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund B**" and together with Broadway Real Estate Fund and Broadway Parallel Fund P, the "**Broadway Funds**"), **BROADWAY B3 EQUITY LP**, a Delaware limited partnership (the "**Partnership**"), **BROADWAY FUND MANAGER SUB, LLC**, a Delaware limited liability company ("**Broadway Manager Sub**"), **BROADWAY PARTNERS FUND GP III, L.P.**, a Delaware limited partnership ("**GP III**"), **BROADWAY PARTNERS FUND GP II, L.P.**, a Delaware limited partnership ("**GP II**"), and **SCOTT LAWLOR**, an individual ("**Lawlor**" and together with the Broadway Funds, the Fund Manager, GP III and GP II, each a "**Guarantor**" and collectively, the "**Guarantors**"). The Guarantors, the Partnership, Broadway Manager Sub, Bridge A Mezzanine Borrower and Bridge B Mezzanine Borrower are sometimes referred to collectively as the "**Borrower Parties.**"

## W I T N E S S E T H:

**WHEREAS**, the Bridge A Mezzanine Borrower and Lender are parties to that certain Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 15, 2008 (collectively, the "**Bridge A Mezz Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge A Mezzanine Borrower in the principal amount of $321,984,921.90 (the "**Bridge A Mezz Loan**");

**WHEREAS**, the Bridge A Mezz Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge A Mezz Loan Agreement), which Loan Documents for the purposes of this Agreement are hereinafter referred to as the "**Bridge A Mezz Loan Documents;**"

**WHEREAS**, the Bridge B Mezzanine Borrower and Lender are parties to that certain Bridge Mezzanine Loan Agreement, dated as of August 15, 2007, effective July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Bridge Mezzanine Loan Agreement, dated as of July 15, 2008

(collectively, the "**Bridge B Mezzanine Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge B Mezzanine Borrower in the principal amount of $137,627,670.32 (the "**Bridge B Mezzanine Loan**" and together with the Bridge A Mezz Loan, collectively, the "**Mezzanine Loans**");

WHEREAS, the Bridge B Mezzanine Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge B Mezzanine Loan Agreement), which Loan Documents for the purpose of this Agreement are hereinafter referred to as the "**Bridge B Mezzanine Loan Documents**" and together with the Bridge A Mezz Loan Documents, the "**Mezzanine Loan Documents;**"

**WHEREAS**, the Mezzanine Loans matured on May 11, 2009;

**WHEREAS**, the Borrower Parties desire to enter into the transaction in accordance with the terms set forth herein;

**NOW, THEREFORE**, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Borrower Parties hereby covenant, agree, represent and warrant as follows:

1.    **Modification to Mezzanine Loans**.  Each Borrower Party hereby covenants and agrees that it will restructure the Mezzanine Loans substantially in accordance with the terms and provisions of that certain term sheet attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") and will take all necessary action and deliver all necessary documents to consummate the Transaction (as defined below) on or before June 26, 2009.  Simultaneously with the execution hereof, the Broadway Funds shall transfer to Lender the West Monroe deposit in cash which amount shall be held by Lender and either (i) be applied to the Broadway Funds payment obligation described in the "Broadway Payments" section of the Term Sheet if the transaction contemplated by the Term Sheet (the "**Transaction**") closes on or before June 26, 2009 (or such later date approved by Lender in writing in its sole discretion) or (ii) retained by Lender as a fee as Lender's sole and only remedy if the Transaction fails to close for any reason whatsoever (including as a result of Lender's unwillingness, in Lender's sole discretion, to close the Transaction) on or before the date specified in clause (i) above (but without prejudice to Lenders' rights under the Mezzanine Loan Documents which shall survive execution of this Agreement and any termination of this Agreement and if this Agreement fails to close for any reason on or before the date specified in clause (i) above, the Mezz Loan Documents shall continue in full force and effect and all parties shall have all of their respective rights and obligations thereunder just as if this Agreement had not been executed (except that the provisions of Paragraphs 2 and 3 hereof shall remain in effect)).  Consummation of the Transaction is also subject to the closing conditions specified in the Term Sheet or waiver thereof by Lender.  The Borrower Parties hereby agree that in no event shall they have any claims or exercise any remedies against Lender for any failure to consummate the Transaction and the Borrower Parties each hereby waive any and all claims they may have against Lender, whether for breach of contract, tort or otherwise, with respect to Lender's failure to close the Transaction for any reason whatsoever. In no event shall the Borrower Parties have any claim or cause of action against Lender if the Transaction fails to close for any reason, including any claim for breach of any duty of good faith or fair dealing.

2

2.    **No Defenses, Counterclaims or Offsets**. Each Borrower Party for itself and its respective heirs, executors, administrators and successors and assigns, and by its execution hereof (i) hereby acknowledges, admits and agrees that, as of the date hereof, there are no objections, claims, defenses, counterclaims or offsets relating to their obligations under or in respect of the Mezzanine Loans, the Mezzanine Loan Documents, any Event of Default or to the enforcement or exercise by Lender of any of its rights, powers or remedies under or in respect of the Mezzanine Loan Documents, at law or in equity, and (ii) hereby irrevocably waives, relinquishes and releases any and all such objections, claims, defenses, counterclaims or offsets, that may now or hereafter exist, including without limitation, any and all such objections, claims, defenses, counterclaims or offsets whether known or unknown, foreseeable or unforeseeable.

3.    **Consent and Reaffirmation**. Each Borrower Party hereby confirms and ratifies its respective obligations under the Mezzanine Loan Documents to which it is a party and consents to the terms of this Agreement and the transactions contemplated herein. Nothing contained in this Agreement or any of the Mezzanine Loan Documents or any of the transactions contemplated herein or thereby shall constitute, and there has not otherwise occurred, any waiver, release or limitation of any obligation of any Borrower Party relating to or otherwise connected to the Mezzanine Loan Documents to which it is a party. Nothing herein is intended to, nor shall it, constitute, nor has there otherwise occurred, a novation of the indebtedness evidenced by the Mezzanine Loan Documents.

4.    **WAIVER OF JURY TRIAL**. THE BORROWER PARTIES AND LENDER SHALL NOT SEEK A JURY TRIAL IN ANY ACTION BASED UPON OR ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE MEZZANINE LOANS OR ANY OF THE MEZZANINE LOAN DOCUMENTS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER PARTY AND LENDER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ANY AND ALL RIGHTS TO ANY SUCH JURY TRIAL AND AGREES THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH BORROWER PARTY, LENDER AND THEIR RESPECTIVE COUNSEL, AND SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.

5.    **Counterparts**. This Agreement may be executed by facsimile or pdf signatures, and in any number of identical counterparts, each of which shall be deemed to be an original, and all of which shall collectively constitute a single agreement, fully binding upon and enforceable against the parties hereto.

6.    **Governing Law**. This Agreement shall be governed by New York law, without regard to the principles of conflicts of law.

7.    **Expenses**. The Borrowers or the Broadway Funds shall pay promptly upon demand, whether or not the Transaction closes, all reasonable costs and expenses of Lender in connection with this Agreement and the transactions contemplated hereby, including without limitation, the reasonable fees and disbursements of Lender's counsel.

8.    **Confidentiality**.  The terms and conditions of this Agreement, including the terms and conditions set forth in the Term Sheet, are confidential and may not be disclosed by Borrower Parties to third parties other than Borrower Parties' attorneys and accountants, except as may otherwise be required by applicable law.

9.    **Modification; Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any Mezzanine Loan Document, or any consent to any departure therefrom, shall be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

10.    **Time; Construction; Exhibits and Schedules; Bankruptcy Court Approval**.  Time is of the essence of each provision of this Agreement.  All references to the singular or plural number or masculine, feminine or neuter gender shall, as the context requires, include all others.  All references to sections, paragraphs and exhibits are to this Agreement unless otherwise specifically noted.  The use of words "hereof", "hereunder", "herein" or words of similar import shall refer to this entire Agreement and not to any particular section, paragraph or portion of this Agreement unless otherwise specifically noted.  All schedules and exhibits attached hereto are by this reference made a part of this Agreement for all purposes.  This Agreement is fully binding on all parties hereto.  Lender's obligations under this Agreement are subject to the approval of the Bankruptcy Court of the Southern District of New York .

[Signatures appear on the following pages]

4

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

<b>BRIDGE A MEZZANINE BORROWER:</b>

**BROADWAY WALL JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:   Jonathon K. Yormak
    Title:    Authorized Signatory

<b>[SIGNATURES CONTINUE ON FOLLOWING PAGE]</b>

**BROADWAY HUNTINGTON JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:     Jonathon K. Yormak
    Title:     Authorized Signatory

**BROADWAY LEGATO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:     Jonathon K. Yormak
    Title:     Authorized Signatory

**BROADWAY WILSHIRE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:     Jonathon K. Yormak
    Title:     Authorized Signatory

**BROADWAY STATE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:     Jonathon K. Yormak
    Title:     Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY BCCC JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
      Name:   Jonathon K. Yormak
      Title:   Authorized Signatory

**BROADWAY BEALE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
      Name:   Jonathon K. Yormak
      Title:   Authorized Signatory

**BROADWAY SANSOME JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
      Name:   Jonathon K. Yormak
      Title:   Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BRIDGE B MEZZANINE BORROWER:**

**BROADWAY WALL JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yormak
     Title:   Authorized Signatory

**BROADWAY GREENSBORO JUNIOR TWO MEZZ
LLC,** a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yormak
     Title:   Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR
TWO MEZZ LLC,** a Delaware limited liability
company

By: _____
     Name:  Jonathon K. Yormak
     Title:   Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR TWO
MEZZ LLC,** a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yormak
     Title:   Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY HUNTINGTON JUNIOR TWO MEZZ LLC**, a Delaware limited liability company


By: _____

    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory


**BROADWAY LEGATO JUNIOR TWO MEZZ LLC**, a Delaware limited liability company


By: _____

    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory


**BROADWAY WILSHIRE JUNIOR TWO MEZZ LLC**, a Delaware limited liability company


By: _____

    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory


**BROADWAY STATE JUNIOR TWO MEZZ LLC**, a Delaware limited liability company


By: _____

    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory


[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY BCCC JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yorman
     Title:  Authorized Signatory

**BROADWAY BEALE JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
     Name:  Jonathon K. Yorman
     Title:  Authorized Signatory

**BROADWAY SANSOME JUNIOR TWO MEZZ
LLC,** Delaware limited liability company

By: _____
     Name:  Jonathon K. Yo
     Title:  Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**LENDER:**


**LEHMAN BROTHERS HOLDINGS INC.**, a
Delaware corporation as Debtor and Debtor in
Possession in its chapter 11 case in the United States
Bankruptcy Court for the Southern District of New
York, Case No. 08-13555 (JMP)

By: _____
Name:          Jeffrey Fitts
Title:          Authorized Signatory


**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**FUND MANAGER:**

**BROADWAY PARTNERS FUND MANAGER, LLC,**
a Delaware limited liability company

By: _____
       Name:  Jonathon K. Yormak
       Title:   Authorized Signatory

**BROADWAY REAL ESTATE FUND:**

**BROADWAY PARTNERS REAL ESTATE FUND
III, L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
        Delaware limited liability company, its
        general partner

        By: _____
           Name:  Jonathon K. Yormak
           Title:  Authorized Signatory

**BROADWAY PARALLEL FUND P:**

**BROADWAY PARTNERS PARALLEL FUND P III,
L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

    By:  Broadway Partners Fund GP III, LLC, a
        Delaware limited liability company, its
        general partner

        By: _____
           Name:  Jonathon K. Yormak
           Title:  Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY PARALLEL FUND B:**

**BROADWAY PARTNERS PARALLEL FUND B III,
L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware
       limited partnership, its general partner

      By:  Broadway Partners Fund GP III, LLC, a
          Delaware limited liability company, its
          general partner

          By: _____
              Name:
              Title: Jonathon K. Yormak
                   Authorized Signatory

**PARTNERSHIP:**

**BROADWAY B3 EQUITY LP**, a Delaware limited
partnership

By:  Broadway Fund Manager Sub LLC., a Delaware
      limited liability company, its general partner

      By: _____
        Name:
        Title: Jonathon K. Yormak
             Authorized Signatory

**BROADWAY MANAGER SUB:**

**BROADWAY FUND MANAGER SUB LLC,**
a Delaware limited liability company

By: _____
  Name:
  Title:  Jonathon K. Yormak
        Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**GP III:**

**BROADWAY PARTNERS FUND GP III, L.P.**, a
Delaware limited partnership

By:  Broadway Partners Fund GP III, LLC., a Delaware
limited liability company, its general partner

By:_____
Name:  Jonathon K. Yormak
Title:  Authorized Signatory

**GP II:**

**BROADWAY PARTNERS FUND GP II, L.P.**, a
Delaware limited partnership

By:  Broadway Partners Fund GP II, LLC., a Delaware
limited liability company, its general partner

By:_____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**LAWLOR:**

**SCOTT LAWLOR**, an individual

_____

**LAWLOR**:

**SCOTT LAWLOR**, an individual

<u>**Exhibit A**</u>

**Term Sheet**

        This Term Sheet is Exhibit A to that certain Agreement (the "**Agreement**"), dated as of May 29, 2009, among Lehman Brothers Holdings Inc. and the Borrower Parties.  The obligations of the parties to the Agreement with respect to the Transaction (as defined in the Agreement) are subject in all respects to the terms and conditions of the Agreement.  In the event of any conflict between the terms of this Exhibit A and the Agreement, the terms of the Agreement shall prevail. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

| | |
|---|---|
| ***General Purpose:*** | The final maturity date of each Mezzanine Loan is May 11, 2009. The Borrowers were unable to repay the Mezzanine Loans on the final maturity date and desire to enter into a restructuring of the obligations in lieu of Lender exercising its remedies under the Mezzanine Loan Documents.  The primary purpose of this transaction is to: (a) provide for additional funding for the BIII Portfolio Properties (defined below), (b) restructure the obligations under the Mezzanine Loans and (c) comply with the requirements of the BIII Portfolio Properties mortgage and senior mezzanine loan documents and the applicable intercreditor agreements.  In consideration of the cooperation of the Borrower Parties in effectuating an orderly transition of control and the investment of certain additional funds as specified herein, Borrower Parties will receive certain benefits as specified herein. |
| ***Properties:*** | The "**BIII Portfolio Properties**" consist of (i) Bay Colony Corporate Center, Waltham, Massachusetts ("**Bay Colony**"), (ii) 116 Huntington Street, Boston, Massachusetts ("**116 Huntington**"), (iii) 120 Howard Street, San Francisco, California ("**120 Howard**"), (iv) 100 California Street, San Francisco, California ("**100 Cal**"), (v) One Sansome, San Francisco, California ("**One Sansome**"), (vi) 50 Beale Street, San Francisco, California ("**50 Beale**"), (vii) 1000 Wilshire Boulevard, Los Angeles, California ("**1000 Wilshire**"), (viii) 100 Wall Street, New York, New York ("**100 Wall**"), (ix) Greensboro Drive, McClean, Virginia ("**Greensboro**") and (x) One Fair Oaks, Fairfax, Virginia ("**One Fair Oaks**").  The "**Pool 1 Properties**" consist of 100 Cal, 1000 Wilshire, 116 Huntington, 50 Beale and One Fair Oaks.  The "**Pool 2 Properties**" consist of Greensboro and One Sansome.  The "**Pool 3 Properties**" consist of 120 Howard, Bay Colony and 100 Wall. |
| ***Restructuring of Mezzanine Loans*** | At closing, a restructuring of the Mezzanine Loans shall be effected as follows: |

14998975.36

- The Bridge A Mezz Loan shall be split into 2 separate mezzanine loans. The "**Bridge A Pool 1 Mezz Loan**" will have an initial principal balance of $198,568,579 and will be indirectly secured by the Pool 1 Properties and the "**Bridge A Pool 2 Mezz Loan**" will have an initial principal balance of $103,302,916 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge A Mezz Loan as of May 12, 2009 of $304,871,494 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $3,000,000 allocated to the Pool 3 Properties.

- The Bridge B Mezz Loan shall be split into 2 separate mezzanine loans. After giving effect to the foreclosure of $20,000,000 described below, the "**Bridge B Pool 1 Mezz Loan**" will have an initial principal balance of $58,824,267 and will be indirectly secured by the Pool 1 Properties and the "**Bridge B Pool 2 Mezz Loan**" will have an initial principal balance of $ 60,240,775 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge B Mezz Loan as of May 12, 2009 of $141,065,042 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $2,000,000 allocated to the Pool 3 Properties.

- Lender and the Borrowers will engage in (and the other Borrower Parties will not object to or interfere with) a consensual partial strict foreclosure under the UCC or, at Lender's option, an assignment in lieu of foreclosure, pursuant to which the Lender, as holder of the Bridge B Mezzanine Loan, will foreclose out $20,000,000 of the Bridge B Mezz Loan and obtain the managing member interests described in "JV Interests" below as being those to be held by Lender, and all existing obligations of the Borrower Parties with respect to the Bridge B Mezzanine Loan shall, except as otherwise contemplated hereby, survive. The documents evidencing such foreclosure or assignment shall be satisfactory to Lender. Notwithstanding the foregoing, there will be no public auction, general solicitation or marketing

2

associated with the partial strict foreclosure unless (i) a party with a right under the UCC to object to the strict foreclosure contemplated hereby objects and strict foreclosure is not an available remedy or (ii) the Transaction does not close within the time periods contemplated hereunder. Borrower Parties agree and acknowledge that this Term Sheet is subject to the approval of the Bankruptcy Court of the Southern District of New York and as such will become public record.

- At Lender's option, after the closing of the Transaction, the Bridge A Pool 1 Mezz Loan, the Bridge A Pool 2 Mezz Loan, the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan may be split into separate cross-collateralized, cross defaulted loans, one loan for each of the Pool 1 Properties and Pool 2 Properties. Each Borrower in each pool will enter into a cross indemnity agreement with each other Borrower in the same pool, in form satisfactory to Lender whereby each Borrower will agree to reimburse each other Borrower for any amount paid on the reimbursing Borrower's behalf.

***Pool 3 Properties:***   Notwithstanding anything contained herein to the contrary, at any time specified by Lender, either before or after the closing of the Transaction, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III will take such actions with respect to the Pool 3 Properties as specified by Lender, including, without limitation, agreeing to deliver after the closing of the Transaction an assignment or deed in lieu to Lender or to the senior lenders or otherwise take such action as may be necessary to relinquish after the closing of the Transaction any interest in the Pool 3 Properties to Lender or to the senior lenders or any other person. Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III, at no cost to Lender, will reasonably cooperate with Lender to effectuate such transfers in the manner directed by Lender (including, without limitation, to minimize any potential transfer tax liability), which cooperation may include, without limitation, Broadway Funds remaining an owner of certain equity in the Pool 3 Properties; provided, however, that Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III shall not be required to do anything that would cause material adverse income tax or transfer tax consequences to either the Broadway Funds (or their direct or indirect partners) or their respective subsidiaries. In no event shall any capital contributed or committed by Broadway Funds be expended by Lender on the Pool 3 Properties without the approval of the Broadway Funds. The Pool 3 Properties will continue to serve as indirect security for the

3

Mezzanine Loans until the closing of the Transaction. At the closing of the Transaction, the Pool 3 Properties shall, at Lender's option, (i) serve as indirect security for the Bridge A Pool 2 Mezz Loan and/or the Bridge B Pool 2 Mezz Loan and only a nominal amount of the Bridge A Pool 2 Mezz Loan ($3,000,000) and/or the Bridge B Pool 2 Mezz Loan ($2,000,000) shall be allocated to the Pool 3 Properties, as determined by Lender in Lender's sole discretion, (ii) serve as indirect security for a "Pool 3 Mezzanine Loan" which will have a nominal loan amount ($5,000,000) and in which Broadway Funds will have no interests or (iii) subject to the foregoing provisions of this paragraph, as otherwise determined by Lender.

***Broadway Payments:***

- The Broadway Funds will provide at least $26,000,000 in cash at closing consisting of (i) $6,000,000 of new money from sources outside the BIII Portfolio Properties, (ii) (x) the remaining proceeds from the Sansome deposit ($4,000,000), which Sansome deposit remaining proceeds the parties hereto acknowledge and agree have been previously provided to Lender, and (y) the remaining proceeds from the Monroe escrow ($10,000,000), (iii) the final, negotiated amount of the 1000 Wilshire deposit, less reasonable third party out-of-pocket costs and (iv) the amounts required by the second to last bullet point in this section, which are estimated to be $3,000,000 (inclusive of Borrower's reasonable third-party out-of-pocket costs incurred in connection with the Transaction).

- At closing, $20,000,000 of the $26,000,000 cash provided by the Broadway Funds, will be applied to pay down the Mezzanine Loans.

- $3,000,000 of the $26,000,000 cash provided by the Broadway Funds will be held by Lender and used to provide liquidity for capital needs (see "Tranche A (Pool 2)" below).

- The Broadway Funds will also commit to provide an additional Tranche A callable capital commitment for each of Pool 1 and Pool 2 of $14,000,000 in the aggregate, $2,000,000 of which will be solely for Pool 1 and $12,000,000 of which will be solely for Pool 2 of new money from sources outside the BIII Portfolio Properties (which new money shall be callable by Lender, subject to the terms and conditions of this Term Sheet, at any time that

4

Lender determines that such additional funds are necessary to provide liquidity for capital needs and restructuring). Prior to closing, Broadway Funds must provide documentation reasonably satisfactory to Lender evidencing that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder. To the extent that Broadway Funds do not satisfy the provisions of the foregoing sentence, the terms described on Schedule IV attached hereto will be deemed incorporated herein.

- At closing, the Broadway Funds shall pay all reasonable third party out-of-pocket fees and expenses incurred by Lender in connection with the transactions contemplated hereby (including, without limitation, attorneys fees). The Broadway Funds shall also be responsible for (A) any transfer taxes associated with the Pool 1 and Pool 2 Properties but not the Pool 3 Properties and (B) all amounts owing directly or indirectly by Borrowers or their subsidiaries that own a direct or indirect interest in the BIII Portfolio Properties to any party except for (i) any amounts set forth on Schedule III attached hereto, (ii) any and all trade payables incurred in the ordinary course of owning and operating the BIII Portfolio Properties which are not 30 or more days past due, (iii) any other ordinary course liabilities and/or expenses that individually are less than $20,000 and in the aggregate do not exceed $200,000 and (iv) amounts due to the senior lenders under the mortgage and mezzanine loans.

- Except with respect to 120 Howard to the extent funds are not available from the working capital reserve account or are otherwise provided by the Broadway Funds, the Broadway Funds shall pay any and all shortfalls in the debt service payments due and payable under the senior loans on the June 2009 payment date under such loans, which payments may be made, in part, from funds then on deposit, if any, in the working capital reserve account. Provided such payment is made, Lender shall provide the Broadway Funds with a credit at the closing of the Transaction against the Bridge A Mezz Loan Tranche A (Pool 2) commitment of the Broadway Funds discussed below in the amount of such shortfall payment amount.

5

**Bridge A Pool 1 Mezz Loan Tranching:** The Bridge A Pool 1 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 1) will be a senior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche B (Pool 1) will be a junior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche C (Pool 1) will be the junior most participation interest in the Bridge A Pool 1 Mezz Loan. The named "lender" for the Bridge A Pool 1 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 1 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1)) and (y) such amendment does not reduce the interest rate payable on Tranche A (Pool 1). Subject to the pay off and/or replacement of Tranche A (Pool 1) described in the last sentence of the "Tranche A (Pool 1)" section below, the Broadway Funds will be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they

6

are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 1 Mezz Loan. The Bridge A Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge A Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 1) and then to Tranche B (Pool 1) and then to Tranche C (Pool 1), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*Tranche A (Pool 1):*    Tranche A (Pool 1) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $20,000,000 (the "**Tranche A (Pool 1) Maximum Principal Amount**") which will consist of:

(A) (i) $5,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00) and (iii) $3,000,000 allocated to Broadway Funds (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 1) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $2,000,000) callable by Lender and both committed and contributed by Broadway Funds as contemplated in "Broadway Payments" above and (ii) the amount of cash contributed by Lender or any party designated by Lender in connection with any capital call.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 1 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its

7

sole and absolute discretion. Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. To the extent any additional capital is actually provided by either Broadway Funds or Lender or any party designated by Lender, such party's Tranche A (Pool 1) interest shall be increased by the amount of such additional capital so provided, and such party's Tranche C (Pool 1) interest shall be correspondingly decreased by such amount. The Broadway Funds shall have 15 business days following a call by Lender to provide any additional advances called by Lender (up to $2,000,000). If the Broadway Funds fail to provide such cash within 15 business days of the date called then (i) (a) Broadway Funds participation interest in Tranche A (Pool 1) will be reduced by $1.00 for every $1.00 Broadway Funds fail to fund, and for every $1.00 that Broadway Funds' Tranche A (Pool 1) interest is reduced, Broadway Funds' Tranche C (Pool 1) interest shall be deemed to be increased, and (b) if Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution (such that such party's Tranche A (Pool 1) interest shall be increased by 125% of the amount provided and Broadway Funds' Tranche C (Pool 1) interest shall be decreased by 125% of the amount provided); provided, however, that the foregoing clause (a) shall only apply to the $2,000,000 committed capital obligation of Broadway Funds and shall not apply to any capital called after the entire $2,000,000 has been funded by Broadway Funds, (ii) Lender with 15 days prior notice may terminate any management agreement or other affiliate agreement related to any Pool 1 Property with any affiliate of Broadway Funds, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), and (iv) Lender may exercise all rights and remedies against the Broadway Funds.

After the $2,000,000 is funded, Lender may make additional capital calls (up to $10,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 1) to the outstanding balance of Tranche A (Pool 1) on the date of the capital call) of any capital calls. If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 1) equal to 125% of its actual cash contribution and (ii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice

may terminate the management agreement and any other affiliate agreement related to the Pool 1 Property for which the capital call was intended to be used.

The Tranche A (Pool 1) Maximum Principal Amount will be included in the outstanding amount of the Bridge A Pool 1 Mezz Loan. To the extent that any portion of the Tranche A (Pool 1) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 1) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 1) will be deducted from the Tranche A (Pool 1) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 1) proceeds will not be needed. All payments on Tranche A (Pool 1) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded or deemed to be funded from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 1) advances. Interest on Tranche A (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 1) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 1) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 1) is at an equal or lower interest rate.

**Tranche B (Pool 1):**    Tranche B (Pool 1) will be in the principal amount of $70,000,000. Lender will be entitled to receive 75% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche B (Pool 1). All distributions on Tranche B (Pool 1) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 1) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 1). Tranche B (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) have been paid.

**Tranche C (Pool 1):**    Tranche C (Pool 1) will be in the principal amount of $108,568,579 (as may be increased or decreased by any portions of Tranche A (Pool 1) added to or reduced from Tranche C (Pool 1) as described in "Tranche A (Pool 1)" above). Lender will be entitled to receive 60% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche C (Pool 1), as such percentages may be adjusted as discussed in the Section

9

entitled "Tranche A (Pool 1)" above. All distributions on Tranche C (Pool 1) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 1) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 1) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 1). Tranche C (Pool 1) shall only be paid after any amounts due on Tranche A (Pool 1) and Tranche B (Pool 1) have been paid.

**_Bridge A Pool 2 Mezz Loan Tranching:_**    The Bridge A Pool 2 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 2) will be a senior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche B (Pool 2) will be a junior participation interest in the Bridge A Pool 2 Mezz Loan. Tranche C (Pool 2) will be the junior most participation interest in the Bridge A Pool 2 Mezz Loan. The named "lender" for the Bridge A Pool 2 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 2) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2)) and (z) such amendment does not reduce the interest rate payable on Tranche A (Pool 2). Subject to the payoff and/or replacement of Broadway Funds' interest in Tranche A (Pool 2) described in the last sentence of the "Tranche A (Pool 2)" section below, the Broadway Funds will

10

be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they are afforded in the participation agreement first discussed in this paragraph above.  Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 2 Mezz Loan. The Bridge A Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender.  On the sale or refinance of a Pool 2 Property, the Bridge A Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 2) and then to Tranche B (Pool 2) and then to Tranche C (Pool 2), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes).  Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

***Tranche A (Pool 2):***    Tranche A (Pool 2) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $49,000,000 (the "**Tranche A (Pool 2) Maximum Principal Amount**") which will consist of:

(A) (i) $4,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00), (iii) $3,000,000 of the initial new money (which shall be used exclusively to pay debt service shortfalls and up to $250,000 of capital needs on the Pool 2 Properties as determined by Lender) as contemplated in "Broadway Payments" above (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 2) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $42,000,000) callable by

11

Lender. The first $12,000,000 of Tranche A (Pool 2) capital calls are committed solely by Broadway Funds and shall be contributed solely by Broadway Funds as contemplated in "Broadway Payments" above. Any portion of the $3,000,000 described in clause (A)(iii) above that is not used for the purposes set forth therein shall be refunded to the Broadway Funds after the disposition of the last remaining Pool 2 Property.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 2 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its sole and absolute discretion. Lender shall have the right, but not the obligation, to provide its ratable share (based on its share of Tranche A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the date of the capital call) of any capital calls. All capital calls shall specify the Pool 2 Property for which the funds called will be used. Any call against the $12,000,000 committed by the Broadway Funds must be based on costs contemplated by an Approved Budget (as defined below), or if outside an Approved Budget, made in good faith for the benefit of the Pool 2 Properties and/or in connection with any restructuring of any senior debt. To the extent any additional capital is actually provided by either Broadway Funds or Lender or any party designated by Lender, such party's Tranche A (Pool 2) interest shall be increased by the amount of such additional capital so provided, and such party's Tranche C (Pool 2) interest shall be correspondingly decreased by such amount. If the Broadway Funds fail to provide any portion of its $12,000,000 capital commitment in cash within 15 business days of the date called, then (i) (a) if the call was based on costs contemplated by an Approved Budget, or (b) if the call was based on costs contemplated outside an Approved Budget and Lender or any party designated by Lender actually provides the capital called, then, in either case (i)(a) or (i)(b), (A) Broadway Funds participation interest in Tranche A (Pool 2) will be reduced by $1.00 for every $1.00 Broadway Funds fail to fund, and for every $1.00 that Broadway Funds' Tranche A (Pool 2) interest is reduced, Broadway Funds' Tranche C (Pool 2) interest shall be deemed to be increased, and (B) if Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 2) equal to 125% of its actual cash contribution (such that such party's Tranche A (Pool 2) interest shall be increased by 125% of the amount provided and Broadway Funds' Tranche C (Pool 2) interest shall be decreased by 125% of the amount provided), (ii) Lender with 15 days prior notice may terminate the

12

management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used, (iii) Broadway Funds will lose its preemptive right to maintain its percentage interest in Tranche A (Pool 2), Tranche B (Pool 2) and Tranche C (Pool 2) in connection with any increase in the size of Tranche A (Pool 2), Tranche B (Pool 2) or Tranche C (Pool 2), (iv) Broadway Funds shall automatically lose their ROFO rights (described below) and Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (v) Lender may exercise all rights and remedies against the Broadway Funds.

After the $12,000,000 is funded, Lender may make additional capital calls (up to $30,000,000) and each party shall have the obligation to provide its ratable share (based on its share of Tranche A (Pool 2) to the outstanding balance of Tranche A (Pool 2) on the date of the capital call) of any capital calls.  If any party fails to provide its ratable portion of any capital call in cash within 15 business days of the date called then (i) if Broadway Funds or Lender or any party designated by Lender provides such cash then the party providing such cash will receive an interest in Tranche A (Pool 2) equal to 125% of its actual cash contribution, (ii)  if Broadway Funds fail to make such capital contribution, Broadway Funds shall automatically lose their Pool 2 Rights (defined below) with respect to the Pool 2 Property for which the capital call was intended to be used and (iii) if Broadway Funds fail to make such capital contribution, Lender with 15 days prior notice may terminate the management agreement and any other affiliate agreement related to the Pool 2 Property for which the capital call was intended to be used.

The Tranche A (Pool 2) Maximum Principal Amount will be included in the  outstanding amount of the Bridge A Pool 2 Mezz Loan.  To the extent that any portion of the Tranche A (Pool 2) Maximum Principal Amount is not funded or deemed funded, the difference between the Tranche A (Pool 2) Maximum Principal Amount and the actual principal amount of Tranche A (Pool 2) will be deducted from the Tranche A (Pool 2) Maximum Principal Amount and added to Tranche C (Pool 1) at such time as Lender determines in its sole discretion that additional Tranche A (Pool 2) proceeds will not be needed.

All payments on Tranche A (Pool 2) will be distributed on a pari passu and pro rata basis based on the relative principal amounts funded (or in the case of Lender's initial $4,000,000 deemed to be funded) from time to time by each of Lender, the Broadway Funds and any other provider of Tranche A (Pool 2) advances.  Interest on Tranche A (Pool 2) shall accrue at a rate of 14% per annum.  Lender,

13

at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. Tranche A (Pool 2) may be paid off, in whole or in part, at any time at Lender's option at par plus accrued interest in cash or replaced with a replacement Tranche A (Pool 2) participation at any time at the discretion of Lender at par plus accrued interest provided that the replacement Tranche A (Pool 2) is at an equal or lower interest rate.

*Tranche B (Pool 2):*    Tranche B (Pool 2) will be in the principal amount of $31,000,000. Lender will be entitled to receive 60% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 40% of the distributions on Tranche B (Pool 2). All distributions on Tranche B (Pool 2) will be distributed on a pari passu and pro rata basis. Tranche B (Pool 2) shall bear interest at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche B (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche B (Pool 2). Tranche B (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) have been paid.

*Tranche C (Pool 2):*    Tranche C (Pool 2) will be in the principal amount of $23,302,916 (as may be increased or decreased by any portions of Tranche A (Pool 2) added to or reduced from Tranche C (Pool 2) as described in "Tranche A (Pool 2)" above). Each of Lender and Broadway Funds will be entitled to receive 50% of the distributions on Tranche C (Pool 2), as such percentages may be adjusted as discussed in the Section entitled "Tranche A (Pool 2)" above. All distributions on Tranche C (Pool 2) will be distributed on a pari passu and pro rata basis. Interest on Tranche C (Pool 2) shall accrue at a rate of 14% per annum. Lender, at its sole option, may require that interest be paid currently or may allow interest to accrue and capitalize. All of the principal balance of Tranche C (Pool 2) shall be paid before any interest or accrued capitalized interest is paid on Tranche C (Pool 2). Tranche C (Pool 2) shall only be paid after any amounts due on Tranche A (Pool 2) and Tranche B (Pool 2) have been paid. Notwithstanding anything to the contrary contained herein, if at anytime Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan would otherwise exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan and Broadway Funds are not qualified transferees under the applicable intercreditor agreements, then a portion of Broadway Funds interest in Tranche C will be automatically allocated to Lender such that Broadway Funds participation interests in the Bridge A Pool 2 Mezz Loan shall not exceed 49% of the total participation interests in the Bridge A Pool 2 Mezz Loan.

14

**Bridge B Pool 1 Mezz Loan:** The named "lender" for the Bridge B Pool 1 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 1 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 1 Mezz Loan, i.e., the participation shall be totally "silent." Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 1 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 1 Mezz Loan. Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 1 Mezz Loan. The Bridge B Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge B Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 1 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

**Bridge B Pool 2 Mezz Loan:** The named "lender" for the Bridge B Pool 2 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a 49% pari passu participation interest in the Bridge B Pool 2 Mezz Loan (pursuant to a participation agreement in form satisfactory to Lender and Broadway Funds) but shall not

15

have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge B Pool 2 Mezz Loan, i.e., the participation shall be totally "silent." Such participation may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with any sale or other transfer by Lender of its interest (in part or in whole) in the Bridge B Pool 2 Mezz Loan, Lender may amend such participation without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender and (y) such amendment does not reduce the interest rate payable on the Bridge B Pool 2 Mezz Loan. Lender will agree to forbear from exercising remedies with respect to the Bridge B Pool 2 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge B Pool 2 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge B Pool 2 Mezz Loan. The Bridge B Pool 2 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 2 Property, the Bridge B Pool 2 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance after the payment in full of the Bridge A Pool 2 Mezz Loan, unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 2 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*JV Interests:*    The common equity interests in the applicable Bridge A Mezz Loan Borrowers (each such entity, a "JV") and Bridge B Mezz Loan Borrowers will be held directly or indirectly by Broadway Funds. The managing member interests in the applicable Bridge A Mezz Loan Borrowers will be held by Lender. Such managing member interests will not be allocated any profits and losses, and will not be entitled to any distributions or any capital accounts. The parties agree that solely for tax purposes the managing member will not be treated as partner of the JV, and in connection therewith, appropriate provisions will be added to the organizational documents of the JVs to protect Broadway Funds and Lender in the event the JVs were treated contrary to the parties intent as partnerships, including,

16

without limitation, that in such event, no partnership elections would be made without the consent of Broadway Funds and Lender. Notwithstanding the foregoing, the intended tax treatment of the JVs as described above shall in no manner whatsoever affect the rights of Lender as managing set member of the JVs as otherwise set forth in this Term Sheet. The equity interests will not accrue preferred return and no payments or distributions will be made on account of equity interests until after the related Bridge A Pool 1 Mezz Loan, Bridge B Pool 1 Mezz Loan, Bridge A Pool 2 Mezz Loan or Bridge B Pool 2 Mezz Loan is paid in full. Future transfers including at the BP REIT (as defined below) and Broadway Funds level will be prohibited to the extent necessary to prevent any controlling interest transfer tax from being imposed; provided, however, that (1) the existing transfer rights of the limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof shall not be limited in any manner; (2) transfers of interests in the equity held by Broadway Funds or their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) between or among the Broadway Funds and their wholly owned subsidiaries (so long as they remain at all times wholly owned by the Broadway Funds) shall not be limited in any manner; and (3) redemption of preferred shareholders of BP REITs that does not involve any changes to the preferred terms shall not be prohibited. For all purposes of this Term Sheet, the Partnership and each of the BP REITs shall be treated as wholly owned subsidiaries of the Broadway Funds. Notwithstanding the foregoing to the contrary, no transfer or redemption shall be permitted to the extent any such transfer or redemption would result in an event of default under any senior loan. The Borrowers and the Broadway Funds shall at closing provide indemnities and guarantees satisfactory to Lender to cover, among other things, (A) any transfer tax liability caused by any activity prior to closing and any post-closing transfers of the direct or indirect interests in the BIII Portfolio Properties (other than the Pool 3 Properties) by any person other than Lender (including, without limitation, transfers by limited partners in the Broadway Funds pursuant to the governing fund documents of the Broadway Funds as of the date hereof or any other transfers or redemptions described above) and (B) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred. There shall be no limits on Lender's ability to transfer its interests in any JV and in no event shall Lender be responsible for any associated transfer tax. **"BP REITs"** means the real estate investment trusts that are as of the date hereof the 100% owners of the equity interests in the Bridge B Mezzanine Borrowers.

No direct or indirect transfers of Broadway Funds' interest in the

participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers (except for transfers between or among the Broadway Funds and their wholly owned subsidiaries (so long as (i) they remain at all times wholly owned by the Broadway Funds, (ii) any such transfer would not result in an event of default under any senior loan, (iii) the transferee (but not with respect to any transfer between or among the Broadway Funds and their wholly owned subsidiaries) will be subject to the ROFR rights described below and (iv) Lender is given 5 business days prior written notice of any such transfer)), shall be permitted without the prior written consent of Lender in its sole and absolute discretion, except that, subject to Lender's right of first refusal described in this paragraph below, any such transfers may occur without Lender's prior written consent solely in connection with the liquidation of the Broadway Funds on or after February 6, 2018 (or February 6, 2016 or February 6, 2017, as the case may be, if, after the good faith use of commercially reasonable efforts, the managing member of the Broadway Funds is unable to obtain the applicable one year extension to the term of the Broadway Funds). Lender will have a right of first refusal ("**ROFR**") to purchase any of Broadway Funds' interest in the participation agreements described above with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrowers, in any such case, prior to a sale thereof to a third party. Prior to causing any such sale, Broadway Funds shall provide written notice to Lender of its intent to sell any interest in the participation agreements with respect to the Mezzanine Loans, or in the JVs or in the Bridge B Mezzanine Borrower, as applicable (the "**ROFR Notice**"), which ROFR Notice shall include the name and address of the prospective purchaser, the purchase price and all other economic and material non-economic terms of the proposed sale transaction, and shall offer to sell such interest to Lender on the same terms and conditions. Lender will have the right for 20 days after the date of the ROFR Notice to notify Broadway Funds in writing of its election to acquire such interest on the same terms and conditions set forth in the ROFR Notice (the "**ROFR Acceptance Notice**") for cash. If Lender sends such ROFR Acceptance Notice, the closing of such purchase by Lender shall occur within 45 days after the date of such ROFR Acceptance Notice. If Lender does not deliver an ROFR Acceptance Notice to Broadway Funds within 20 days after the date of the ROFR Notice, or if Lender rejects the terms and conditions of the ROFR Notice in writing to Broadway Funds within 20 days after the date of the ROFR Notice, then, in either case, Broadway Funds may cause the sale of such interest in such participation agreements, in the JVs, or in the Bridge B Mezzanine Borrowers, as the case may be, to the purchaser identified in the ROFR Notice for a price that is equal to or greater

18

than 96% of the purchase price set forth in the ROFR Notice and otherwise on the same economic and material non-economic terms specified therein for a period of 6 months after the date of the ROFR Notice. If the applicable interest is not sold within said 6 months, the foregoing process shall be repeated for any subsequent offer to purchase such interest. Within 5 days of the date of an ROFR Acceptance Notice, Lender shall deposit in escrow with Broadway Funds an amount equal to 10% of the purchase price. If Lender fails to provide such deposit or close in accordance with the ROFR Acceptance Notice, Broadway Funds shall have the right to retain the deposit as liquidated damages and Lender's ROFR rights will terminate solely with respect to the interest subject to such ROFR Acceptance Notice.

Subject to the last two sentences appearing in the third bullet point in the Section above entitled "Restructuring of the Mezzanine Loans," Lender's managing member equity interest in the JV will be acquired consensually via strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure. The Borrowers shall consent to (and the other Borrower Parties shall not object to or interfere with) this foreclosure or assignment in lieu of foreclosure. To accomplish this, at Lender's option, the Bridge B Mezz Loan may be transferred to a Lender owned single purpose entity and the Bridge B Mezz Loan will be consensually foreclosed upon in part via a strict foreclosure under the UCC or, at Lender's option, via an assignment in lieu of foreclosure such that each Lender owned SPE will become the owner of 100% of the managing member interests of each JV. The common equity interests in the JV entities will remain with the applicable Broadway Funds controlled Bridge B Mezz Borrower and remain pledged to Lender as collateral for the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan.

The organizational documents of each JV entity will be amended and restated as directed by Lender such that the Lender (or its designee) shall be the sole managing member (the "**Managing Member**") of such entity and will have full right and authority to take all actions on behalf of the JV and will control the JV. The Managing Member shall have the right to amend the organizational documents of the JV Entities without the consent of the applicable Broadway non-managing member except that if any such amendment would have a material adverse effect on such Broadway member's interest in any such JV Entity and such material adverse effect would be materially disproportionate to the material adverse effect on the Managing Member's interest in such JV Entity, then the prior written consent of such Broadway member to such amendment shall be required to be obtained by Managing Member. In this regard, the Managing Member will have all powers and rights possessed by a general

19

partner of a partnership under Delaware law.    To the extent that Tranche A (Pool 1) is not sufficient to satisfy all capital needs of the Pool 1 Properties or Tranche A (Pool 2) is not sufficient to satisfy the capital needs of the Pool 2 Properties, Managing Member may at its option and in its discretion call capital from the common members of the JV.  Appropriate remedies for failure to fund capital calls will be set forth in the JV documents.

The Broadway Fund's only rights will be (i) to receive allocations of profits and loss and distributions as set forth herein, (ii) to prepare and propose, in its capacity as property manager, the budget for the Pool 1 Properties which budget shall be subject to the approval of the Managing Member, and to have non-binding consultation rights with respect to (x) any changes made to the Pool 1 Properties budget and (y) negotiations between Managing Member and the senior lenders with respect to the Pool 1 Properties, (iii) to prepare and propose, in its capacity as property manager, the budget for the Pool 2 Properties which budget shall be subject to the reasonable approval of the Managing Member and the Broadway Funds, and to have non-binding consultation rights with respect to negotiations between Managing Member and the senior lenders with respect to the Pool 2 Properties (clause (iii) is referred to as the **"Pool 2 Rights"**).  The budget for the Pool 2 Properties approved by Lender and the Broadway Funds as described in the immediately preceding sentence shall be referred to herein as the "Approved Budget".  Lender and the Managing Member shall, to the maximum extent permitted by law, have no fiduciary duties to the Borrower Parties or any JV.

The tax accountants for the JVs, the owners of the BIII Portfolio Properties and the Bridge B Mezzanine Borrower shall be any of (1) Anchin Block & Anchin, (2) The Cornerstone Group / Schonbraun Group or (3) PWC, the current accountants of the Broadway Funds, and any change in such accountants shall be subject to the prior written approval of Lender.

**Purchase Option:**        Lender shall have a purchase option to purchase on a property-by-property basis up to 49% of the equity interests in each Bridge B Mezzanine Borrower held by Broadway Partners or its affiliates, successors or assigns.  The purchase option shall be exercisable with respect to any such Bridge B Mezzanine Borrower in connection with or following the repayment of that portion of the Bridge A Mezz Loan allocable to the property owned indirectly by such Bridge B Mezzanine Borrower, and the organizational documents governing the Bridge B Mezzanine Borrowers shall be amended prior to the closing of the Transaction to provide that if such option is exercised, then Lender will automatically and without further action have the same managing member rights set forth above for the JV entities.

20

The Broadway Funds (or Lender as their attorney-in-fact for such purpose) shall execute any documents reasonably requested by Lender to evidence the foregoing, although no such documents shall be necessary. The total exercise price of the purchase option with respect to all of the Bridge B Mezzanine Borrowers shall be $1,000,000, and the exercise price with respect to each individual Bridge B Mezzanine Borrower shall be such Bridge B Mezzanine Borrower's pro-rata share of the Bridge A Mezz Loan based on the allocated loan amount for the property owned by such Bridge B Mezzanine Borrower under the Bridge A Mezz Loan as of the closing date of the Transaction. Lender shall be responsible for the payment of any transfer tax liability caused by (i.e., would not have occurred but for) Lender's exercise of the purchase option. In connection with the exercise of any purchase option, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III agree to reasonably cooperate with Lender in an effort to minimize any potential transfer tax liability.

**Property Management:**     Broadway Funds will continue to manage the BIII Portfolio Properties. Such management shall be pursuant to a contract satisfactory to Lender with a term not to exceed two years and a management fee to be agreed upon but not to exceed the lesser of (i) the current management fee and (ii) 2%. To the extent any fees payable to the manager either pursuant to leases or otherwise exceed the management fee, such excess shall be split 50-50 between Broadway Funds and Lender. Any such management agreement shall be terminable (i) in connection with the sale of the applicable property, (ii) for cause as defined in the management agreement and (iii) as described in Tranche A (Pool 1) and Tranche A (Pool 2) above. All leasing activities would be done through third party leasing agents satisfactory to Lender and, with respect to any Pool 2 Property, Broadway Funds. Broadway Funds shall have no management rights with respect to properties not listed in the first sentence of this paragraph. Nothing contained herein shall limit the ability of Lender to appoint a property or asset manager to advise Lender and assist Lender in exercising its rights with respect to the BIII Portfolio Properties. Notwithstanding anything to the contrary contained herein, Lender with 15 days prior notice may, in its sole and absolute discretion, terminate the management agreement and any other affiliate agreement related to any Pool 3 Property and 1000 Wilshire.

**Senior Loan Guaranties**     Except as expressly set forth in the next section below, all guaranties related to any senior debt and the Mezzanine Loans will stay in place; however Lender will indemnify Broadway Funds for any losses actually incurred by Broadway Funds because of a breach of a non-recourse carve-out caused solely by the actions of Lender following

21

the closing of the Transaction and Broadway Funds will indemnify Lender for (1) any losses actually incurred by Lender or its affiliates caused solely by the actions of Broadway Funds or its affiliates following the closing of the Transaction and (2) any other out-of-pocket losses incurred by Lender arising from any action alleging that an improper transfer, foreclosure or assignment in lieu thereof has occurred.  Any successor (or its parent if such entity is a single purpose entity) to Lender's managing member interest in any JV must assume Lender's indemnification obligations described above and Lender will be released from such indemnification obligations simultaneously with such assumption.

***Existing Broadway Fund, Fund Manager, Lawlor Guaranties, Capital Call Agreement, Capital Services and Financing Agreement and Omnibus Agreement***

At the closing of the Transaction, Lender shall terminate the following guaranties and deliver releases of the obligors thereunder: (1) that certain Amended and Restated Guaranty of Recourse Obligations (Lawlor) dated as of March 19, 2008 made by Scott Lawlor, (2) that certain Amended and Restated Guaranty of Payment (Fund Guaranty) dated as of March 19, 2008 made by Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund B III, L.P., and Broadway Partners Parallel Fund P III, L.P., (3) that certain Amended and Restated Guaranty of Payment (GP Guaranty) dated as of March 19, 2008 made by Broadway Partners Fund Manager, LLC, Broadway Partners Fund GP III, L.P., and Broadway Partners Fund GP II, L.P., (4) that certain Amended and Restated Capital Call Agreement dated as of March 19, 2008 by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP and Lehman Brothers Holdings Inc. (it being acknowledged and agreed, however, with respect to such Amended and Restated Capital Call Agreement, the additional reporting requirements set forth in Section 3.02 thereof shall be incorporated into the documents evidencing the Transaction), (5) that certain Amended and Restated Capital Services and Financing Agreement, dated as of March 19, 2008, by and among Broadway Fund Manager Sub, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc. and (6) that certain Omnibus Agreement, made as of March 19, 2008, by and among Broadway Partners Fund Manager, LLC, Broadway Partners Real Estate Fund III, L.P., Broadway Partners Parallel Fund P III, L.P., Broadway Partners Parallel Fund B III, L.P., Broadway B3 Equity LP, and Lehman Brothers Holdings Inc.

***Existing Guaranties of Recourse Obligations of***

The existing Guaranty of Recourse Obligations of Borrower for each of the Mezzanine Loans shall be reaffirmed by the guarantor

22

**Borrower Under
Mezzanine Loans**

thereunder as remaining in full force and effect as part of the Transaction, and shall be expanded to include the following matters as additional recourse carve-outs: (1) the bankruptcy of any Borrower Party or any Broadway Fund that is not initiated by or approved in writing by Lender, and (2) any interference, frustration, hindrance or delay by any Borrower Party or any Broadway Fund in connection with the exercise by Lender of its rights and remedies as managing member of the JVs and/or its rights and remedies under the participation agreements for the Mezzanine Loans, provided that a good faith claim for breach of an express (but not implied) contractual obligation contained in the participation agreements and/or JV agreements shall not constitute interference. Notwithstanding the foregoing, with respect to clause (1) above, other than with respect to a bankruptcy filing by Bridge B Mezzanine Borrower or any subsidiary thereof, recourse shall only be triggered if and to the extent such bankruptcy filing (a) is a default under any of the senior debt documents, (b) causes substantive consolidation with the Bridge B Mezzanine Borrower or any of its subsidiaries, (c) causes any interference with the cash management arrangements or cash flow related to the Mezzanine Loans or (d) causes any loss to Lender under the Mezzanine Loans. If and to the extent any of the recourse carve-out matters occur (including the additional matters above), the parties acknowledge and agree that Lender shall have the immediate right to (1) estimate its damages suffered as a result of the occurrence of any such recourse carve-out matter, and (2) offset such damage amount, it its discretion, against any and all participation interests in the Mezzanine Loans then held by the Broadway Funds.

**ROFO:**

Broadway Funds will have a right of first offer ("**ROFO**") to purchase any of the remaining BIII Portfolio Properties prior to a sale to a third party. Prior to causing the sale of any remaining BIII Portfolio Property, the Managing Member shall provide written notice of its intent to offer to sell any such remaining BIII Portfolio Property to Broadway Funds (the "**ROFO Notice**"). Broadway Funds will have the right for 20 days after the date of the ROFO Notice to submit a written offer to the JV to acquire the applicable BIII Portfolio Property (the "**Purchase Offer**") for cash. The Purchase Offer shall set forth all of the material terms of the proposed purchase, including the purchase price. If Managing Member desires to accept the Purchase Offer on behalf of the JV, it shall send a written notice (the "**Acceptance Notice**") to Broadway Funds within 15 days after the date of the Purchase Offer. The closing of such purchase shall occur within 45 days after such Acceptance Notice. If Managing Member does not deliver an Acceptance Notice within 15 days after the date of the Purchase

23

Offer, or if an offer is submitted but is not accepted by Managing Member of the applicable JV, then Managing Member on behalf of the JV may cause the sale of such BIII Portfolio Property on behalf of the JV to any party for a price that is equal to or greater than 95% of the purchase price set forth in the Purchase Offer for a period of 9 months after the Purchase Offer. If the applicable BIII Portfolio Property is not sold within said 9 months, the foregoing process shall be repeated for any subsequent offer to sell such BIII Portfolio Property. The ROFO granted to Broadway Funds is personal to Broadway Funds and can not be assigned or transferred without the prior written consent of Managing Member.

Within 5 days of its receipt of an Acceptance Notice, Broadway Funds shall deposit in escrow with Managing Member an amount equal to 10% of the purchase price. If Broadway Funds fails to provide such deposit or close in accordance with the applicable Purchase Order, Managing Member shall have the right to retain the deposit as liquidated damages and Broadway Funds' ROFO rights will terminate with respect to all BIII Portfolio Properties.

| | |
|---|---|
| ***Closing Conditions:*** | Notwithstanding anything to the contrary contained in the Agreement or this Term Sheet, Lender shall not be obligated to close the Transaction without satisfying the following conditions precedent: (1) Lender's internal approval process, including approval by Alvarez & Marsal, (2) Lender's completion of satisfactory due diligence, (3) the entering into of acceptable Transaction documents, all in form reasonably acceptable to Lender, (4) title searches and endorsements reasonably acceptable to Lender, (5) opinion letters reasonably acceptable to Lender, (6) (a) with respect to the Pool 1 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 1 Properties acceptable to Lender and (b) with respect to the Pool 2 Properties, delivery by Broadway Funds, as property manager, and receipt by Lender, of an updated budget for the period through and including June 30, 2010 for all the Pool 2 Properties acceptable to Lender and Broadway Funds, (7) receipt by Lender of an updated business plan for the period through and including June 30, 2010 for all of the Properties acceptable to Lender, (8) the consent of the holder of the senior debt to the extent required under any intercreditor agreement, and (9) all necessary approvals in connection with Lender's bankruptcy case, including, without limitation, the approval of the Bankruptcy Court of the Southern District of New York (which Court approval shall include any indemnification obligations of Lender pursuant to the Transaction). |

24

| | |
|---|---|
| ***Costs and Expenses:*** | The Borrowers or the Broadway Funds shall pay, whether or not the Transaction closes, all reasonable out-of-pocket costs and expenses in connection with the Transaction, including without limitation, the reasonable fees and disbursements of Lender's counsel. |
| ***Expense Deposit:*** | $400,000 will be provided by Broadway Funds to Lender along with a countersigned copy of the Agreement. This will be applied to the expenses but may not constitute the entirety of the expenses. |
| ***Miscellaneous:*** | This Term Sheet, as well as Transaction generally, shall be governed by the laws of the State of New York. |
| ***Closing Date:*** | Closing shall occur on or prior to June 26, 2009 or such later date approved by Lender in its sole and absolute discretion. Time is of the essence. |
| ***Assignment:*** | The right by Broadway Funds to receive the participations in the Mezzanine Loans can be assigned by Broadway Funds to wholly owned subsidiaries of the Broadway Funds (so long as they remain wholly owned subsidiaries of the Broadway Funds at all times) in such proportions as may be determined by the Broadway Funds in their sole discretion. |

## SCHEDULE I

## BRIDGE A MEZZANINE BORROWER[1]

| |
|---|
| Broadway Wall Junior Mezz LLC |
| Broadway Greensboro Junior Mezz LLC |
| Broadway Howard Street Junior Mezz LLC |
| Broadway Huntington Junior Mezz LLC |
| Broadway Legato Junior Mezz LLC |
| Broadway Wilshire Junior Mezz LLC |
| Broadway California Street Junior Mezz LLC |
| Broadway State Junior Mezz LLC |
| Broadway BCCC Junior Mezz LLC |
| Broadway Beale Junior Mezz LLC |
| Broadway Sansome Junior Mezz LLC |

---

[1] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

14998975.36

## SCHEDULE II

## BRIDGE B MEZZANINE BORROWER[2]

| |
|---|
| Broadway Wall Junior Two Mezz LLC |
| Broadway Greensboro Junior Two Mezz LLC |
| Broadway Howard Street Junior Two Mezz LLC |
| Broadway Huntington Junior Two Mezz LLC |
| Broadway Legato Junior Two Mezz LLC |
| Broadway Wilshire Junior Two Mezz LLC |
| Broadway California Street Junior Two Mezz LLC |
| Broadway State Junior Two Mezz LLC |
| Broadway BCCC Junior Two Mezz LLC |
| Broadway Beale Junior Two Mezz LLC |
| Broadway Sansome Junior Two Mezz LLC |

---

[2] Each a Delaware limited liability company, each having its principal place of business at c/o Broadway Partners, 375 Park Avenue, Suite 2107, New York, New York 10152

## SCHEDULE III

## ACCOUNTS PAYABLE NOT TO BE SATISFIED PRIOR TO CLOSE

TO BE SATISFACTORY TO LENDER AND COMPLETED BY BORROWER PARTIES

## SCHEDULE IV

To the extent that prior to closing Broadway Funds have not provided documentation reasonably satisfactory to Lender that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder, the terms described below will apply:

- Lender will be entitled to receive 90% of the distributions on Tranche B (Pool 1) and Broadway Funds will be entitled to receive 10% of the distributions on Tranche B (Pool 1).

- Lender will be entitled to receive 80% of the distributions on Tranche C (Pool 1) and Broadway Funds will be entitled to receive 20% of the distributions on Tranche C (Pool 1).

- Lender will be entitled to receive 85% of the distributions on Tranche B (Pool 2) and Broadway Funds will be entitled to receive 15% of the distributions on Tranche B (Pool 2).

- Lender will be entitled to receive 75% of the distributions on Tranche C (Pool 2) and Broadway Funds will be entitled to receive 25% of the distributions on Tranche C (Pool 2).

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 1) ($2,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 1) and Tranche C (Pool 1) shall be reduced to 0%.

- If Broadway Funds fails to fund within the required time periods set forth in the Term Sheet all or any part of its committed capital of Tranche A (Pool 2) ($12,000,000), then in addition to all other remedies set forth in the Term Sheet, Broadway Funds percentage of distributions in Tranche B (Pool 2) and Tranche C (Pool 2) shall be reduced to 0%.

- At any time after the Lockout Period, Lender may, on 15 days prior written notice to Broadway Funds, terminate any management agreement or other affiliate agreement related to any Pool 2 Property. "Lockout Period" means the number of months after the date the Transaction closes that Lender estimates that no capital calls will be needed as a result of Broadway Funds initial capital contributions on such closing date.

2

## **Exhibit 2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                          :
In re                                     :      Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :      08-13555 (JMP)
                                          :
                 Debtors.                 :      (Jointly Administered)
                                          :
                                          :
-------------------------------------------------------------------x
```

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO RESTRUCTURE CERTAIN LOANS WITH BROADWAY PARTNERS FUND MANAGER, LLC, ET. AL.

Upon the motion, dated June 4, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors in possession (collectively, the "Debtors" and, together with

their non-debtor affiliates, "Lehman"), pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for authorization and approval of

LBHI's restructuring of certain loans with Broadway Partners Fund Manager, LLC (the

"Settlement") substantially consistent with the agreement and term sheet (together, the

"Term Sheet") annexed hereto as Exhibit A; and upon the Declaration of Shai Y.

Waisman, dated June 26, 2009 (the "Declaration"), attesting to the necessity for a waiver

of the ten-day stay pursuant to Bankruptcy Rule 6004(h); and the Court having

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated

July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set

forth in the amended order entered February 13, 2009 governing case management and

administrative procedures [Docket No. 2837] to (i) the United States Trustee for the

Southern District of New York; (ii) the attorneys for the Official Committee of

Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal

Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) counsel to Broadway Partners; and (vii) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and

the Court having found and determined that the relief sought in the Motion and the

Declaration is in the best interests of the Debtors, their estates and creditors, and all

parties in interest and that the legal and factual bases set forth in the Motion and the

Declaration establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefore, it hereby is:

ORDERED that the relief requested in the Motion is granted; and it is

further

ORDERED that, pursuant to sections 105 and  363(b) of the Bankruptcy

Code and Bankruptcy Rule 9019, the Term Sheet and the Settlement are hereby

approved, in all respects; and it is further

ORDERED that LBHI is hereby authorized to enter into the transactions contemplated by and in substantial accordance with the Term Sheet and Settlement and to consummate all of the transactions contemplated thereby; and it is further

ORDERED that LBHI is hereby authorized to perform each and every term of the Settlement in accordance with its terms and this Order; and it is further

ORDERED that the obligations of LBHI under the Term Sheet and Settlement, including without limitation, all related transaction documents, shall, to the extent not otherwise provided for in the Term Sheet and related transaction documents, survive confirmation of any plan in the LBHI bankruptcy case and shall not be discharged under section 1141 of the Bankruptcy Code and no plan shall be confirmed in the LBHI bankruptcy case that is inconsistent with this order; and it is further

ORDERED that LBHI is authorized to execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to accomplish the foregoing; and it is further

ORDERED that notwithstanding anything to the contrary in the Term Sheet, the Settlement or related transaction documents, nothing in any of the foregoing or this Order shall prejudice, affect or be deemed a waiver of the rights or benefits of any mortgage or mezzanine lender senior to Lehman in respect of the BIII Portfolio Properties under any mortgage or mezzanine loan documents and applicable intercreditor agreements, including without limitation, any and all consent rights with respect to these transactions and such mortgage or mezzanine loan documents and applicable intercreditor

agreements shall not be modified or amended in any way by the terms of this Order, the

Term Sheet or the Settlement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order and any disputes that may arise in the future with respect to the Settlement and the

Term Sheet; and it is further

ORDERED that the stay imposed pursuant to Bankruptcy Rule 6004(h)

hereby is waived and this Order shall be effective immediately upon its entry.


Dated: June __, 2009
         New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

Document comparison by Workshare Professional on Sunday, June 28, 2009 12:34:57 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://USDMS/US_ACTIVE/43084362/1 |
| Description | #43084362v1<US_ACTIVE> - Revised Broadway III Order |
| Document 2 ID | interwovenSite://USDMS/US_ACTIVE/43084362/3 |
| Description | #43084362v3<US_ACTIVE> - Revised Broadway III Order |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 9 |
| Deletions | 3 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 12 |