**EXPEDITED HEARING REQUESTED**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                              :
In re                                         :     Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :     08-13555 (JMP)
                                              :
                              Debtors.        :     (Jointly Administered)
                                              :
-----------------------------------------------------------------x
```

### MOTION OF LB 2080 KALAKAUA OWNERS LLC PURSUANT TO BANKRUPTCY CODE SECTIONS 363 AND 365 AND BANKRUPTCY RULES 6004 AND 6006 FOR APPROVAL (i) TO SELL CERTAIN REAL AND PERSONAL PROPERTY LOCATED IN HONOLULU, HAWAII, (ii) TO REJECT OR ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (iii) RELATED RELIEF

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

LB 2080 Kalakaua Owners LLC, as debtor and debtor in possession ("LB 2080"),

files this Motion and respectfully represents:

#### Background

1.      Commencing on September 15, 2008, and periodically thereafter, Lehman

Brothers Holdings Inc. ("LBHI," together with its affiliated debtors in the above-captioned

chapter 11 cases, the "Debtors," and collectively with their non-debtor affiliates, "Lehman") and

certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11

of the United States Code (the "Bankruptcy Code").  On April 23, 2009, LB 2080, a wholly-owned, indirect subsidiary of LBHI, commenced its chapter 11 case.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

## Jurisdiction

3.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

4.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

5.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**Preliminary Statement**

6.        On June 25, 2009, LB 2080 entered into an agreement pursuant to which

LB 2080 will assume, assign and sell a commercial building and a land lease and land sublease

for the land upon which such commercial building is situated (as defined more fully below, the

"Plaza Property") to BW VCM Kalakaua, LLC (the "Purchaser"), an unaffiliated, third-party

purchaser.  The prompt sale of the Plaza Property presents the best opportunity to maximize the

value of LB 2080's assets for the benefit of all stakeholders – including those prepetition and

postpetition creditors whose claims may be satisfied in connection with the assumption and

assignment of their executory contracts and unexpired leases.  Absent a prompt sale of the Plaza

Property, LB 2080 may be left without an ability to satisfy its mounting costs.  Accordingly, LB

2080 seeks approval on an expedited basis to assume, assign and sell the Plaza Property.[1]

**The Plaza Property**

7.        In 1997, LBHI loaned King Kalakaua Owners ("KKO") $45 million (the

"Loan") to finance the development and construction of a commercial property located at 2080

Kalakaua Avenue, Honolulu, Hawaii, commonly known as King Kalakaua Plaza.  KKO

defaulted on its obligations under the Loan.  LB 2080, an affiliate of LBHI, commenced

foreclosure proceedings on the Loan and, pursuant to that certain Commissioner's Quitclaim

Assignment of Lease and Sublease, dated as of November 8, 2006, LB 2080 obtained its interest

in and to, among other things, (i) the leasehold estate created by that certain Ground Lease and

Sublease, dated October 6, 1995, by and between the predecessor-in-interest of Kalaimoku-

Kuhio Development Corp. ("Kalaimoku") and KKO (f/k/a Consolidated Amusement Company,

---

[1] LB 2080 described to the Court its ongoing efforts to sell the Plaza Property and its negotiations with the Purchaser
at the June 24, 2009 omnibus hearing.

Limited) (as amended by that certain Amended and Restated Ground Lease, dated as of July 1, 2003, the "Ground Lease"); (ii) the subleasehold estate created by that certain Ground Lease and Sublease, dated October 6, 1995, by and between the predecessor-in-interest of Kalaimoku and KKO (f/k/a Consolidated Amusement Company, Limited) (as amended by that certain Amended and Restated Sublease, dated as of July 1, 2003, the "Ground Sublease"); (iii) the Supplemental Payment Agreement, dated as of July 1, 2003, by and between Oceanfront Hawaii Inc. ("Oceanfront") and KKO (the "Supplemental Payment Agreement" and with the Ground Lease and Ground Sublease, the "Ground Leases"), by and between Kalaimoku and KKO; and (iv) all structures, improvements and fixtures located on the land subject to the Ground Lease and Ground Sublease, including, but not limited to, a four story retail building with two levels of basement parking of approximately 77,000 square feet  ((the "Building" and together with the Ground Leases, the "Plaza Property").

8.      Nike Retail Services, Inc. ("Nike") is currently a tenant at the Building, pursuant to that certain Lease, dated as of August 7, 1995, between Nike and Kalakaua Associates International, Inc. (as amended, the "Nike Lease").  LB 2080 is also obligated to provide parking spaces to HSH 2100 LLC (the "Parking Licensee"), the owner of an adjacent premises, located at 2100 Kalakaua Avenue, Honolulu, Hawaii, under that certain recorded Declaration of Covenants, dated November 30, 2004 and recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. 3213811, noted on Transfer Certificate of Title Nos. 509,502, 492,843, and 726,302 (the "Declaration").

9.      The rents generated by LB 2080 from the Plaza Property have been insufficient to cover LB 2080's monthly costs for the Ground Leases.  Due to the mounting costs associated with the Plaza Property, LB 2080 was compelled to commence its chapter 11 case.

**LB 2080's Prepetition and Postpetition Marketing of the Plaza Property**

10.    On November 24, 2008, LB 2080 requested proposals from two real estate brokers, Colliers Monroe Freelander and CB Richard Ellis ("CBRE"), to market the Plaza Property to prospective purchasers. After careful consideration of both potential brokers, LB 2080 selected CBRE, an experienced multinational commercial real estate brokerage firm, to market the Plaza Property. On February 23, 2009, LB 2080 and CBRE executed that certain Exclusive Listing Agreement (the "Listing Agreement"). Pursuant to the Listing Agreement, LB 2080 agreed to pay CBRE a commission of the greater of $100,000 and three percent of the gross sales price of up to $10 million for the Plaza Property.

11.    Upon execution of the Listing Agreement, CBRE began actively marketing the Plaza Property. Despite contacting over 700 people and businesses through the use of fliers to targeted entities, website listings, electronic mailings and other means, LB 2080 received only three offers for the Plaza Property. The first, originally for $3 million, was subsequently reduced by the prospective purchaser to $1 million and ultimately withdrawn. A second offer was contingent upon the concurrent sale of an adjacent property owned by a non-Debtor, indirect subsidiary of LBHI. The Debtors believe that such offer for both properties was less than the value of the non-Debtor's property alone. The potential purchaser declined to bifurcate its offer for the two properties. The third offer came from the Purchaser on April 21, 2009, but, despite LB 2080's best efforts, a definitive sales contract (the "Sales Contract") was not finalized until June 25, 2009. A copy of the Sales Contract is attached hereto as Exhibit A.

## The Sales Contract

12.    The principal terms of the Sales Contract are as follows:[2]

| | |
|---|---|
| **Purchase Price** | The Purchaser shall purchase the Property (as defined below) for $3,000,000 (the "Purchase Price"). |
| **Deposit** | A deposit of $450,000 shall be held in escrow until closing (the "Deposit").  The Deposit and any interest accrued thereon while held by the escrow agent is non-refundable unless (i) LB 2080 defaults in the performance of its obligations under the Sales Contract and the Purchaser elects to terminate the Sales Contract or (ii) the Bankruptcy Court does not approve the proposed transaction prior July 13, 2009 and either LB 2080 or the Purchaser elects to terminate. |
| **Assets to be Sold** | The assets to be sold are the Plaza Property, together with (i) all property rights, appurtenances, construction documents and rights, intangibles and personalty ,and (ii) LB 2080's interest in the Nike Lease, all as more particularly described in the Sales Contract (collectively, the "Property"). |
| **Conditions to Closing** | The Purchaser shall receive an owner's policy of title insurance in the amount of the Purchase Price, insuring Purchaser as the leasehold owner of the Property, and showing title to the Property vested in the Purchaser.<br><br>If the Purchaser obtains a Phase I environmental report (the "Phase I Report"), such report may not disclose the presence of hazardous substances (i) that were not previously disclosed to the Purchaser during due diligence and (ii) which would require more than $500,000 to be remediated.  If the Phase I Report indicates the presence of hazardous substances that would cost between $250,000 and $500,000 to be remediated, LB 2080 may elect to give the Purchaser a credit against the Purchase Price equal to the amount of remediation; otherwise, the Purchaser may terminate (the "Phase I Condition"). |
| **Closing** | Closing of the Sales Contract will occur on July 14, 2009 if the Court if the Sales Contract is approved by the Court by July 13, 2009 at 5:00 p.m. (prevailing Eastern Time).  Otherwise, closing |

---

[2] This summary is qualified in its entirety by reference to the provisions of the Sales Contract and any documents annexed thereto.  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Sales Contract.

of the Sales Contract will occur on the sixth business day after the receipt of Court approval.

| | |
|---|---|
| **Assumption and Assignment** | Purchaser agrees to assume all of LB 2080's obligations under the Declaration, the Nike Lease, and the Ground Leases. |
| | LB 2080 will seek relief from the Court approving the assumption and assignment of the Ground Leases, the Nike Lease and the Declaration. The Purchaser will promptly take such actions as are reasonably requested by the Seller to assist providing adequate assurance to the counterparties to such leases or agreements. |
| | It is a condition to the Purchaser's obligation to consummate the Proposed Sale that the Court approve of the assumption and assignment of the Ground Leases to the Purchaser. |
| **Termination of Contracts** | Effective as of the Closing Date, LB 2080 shall terminate any existing management, leasing agreement and/or service, supply or maintenance contracts for or affecting the Property (collectively, the "Rejected Contracts"). |
| **Termination** | The Sales Contract may be terminated (i) by mutual agreement of LB 2080 and the Purchaser (the "Parties"); (ii) upon occurrence of the Phase I Condition; or (iii) by either Party (a) in the event of a material breach or default by the other Party or (b) if Court approval of the sale is not obtained by July 13, 2009 at 5:00 p.m. (prevailing Eastern Time) |
| **Limitation of Liability** | Except as otherwise noted in the Sales Contract, the Property is being conveyed in "as is" condition. |
| **Transaction Costs and Expenses** | Except as otherwise set forth in the Sales Contract, the Parties shall bear their own transaction costs and expenses, including, without limitation, any brokers' commission and/or attorneys' fees. Section 6.3 sets forth the allocation of certain closing costs. |
| | LB 2080 is solely responsible for the commission fees of CBRE. Based on a purchase price of $3 million CBRE may be entitled to a commission fee of $100,000 and reimbursement of expenses of up to $17,500 under the Listing Agreement upon the closing of the Sales Contract.[3] |

---

[3] Any fees owed by LB 2080 to CBRE will be paid to CBRE only upon this Court's approval of LB 2080's retention of CBRE.

**Relief Requested**

13.       To maximize the value of LB 2080's estate, LB 2080 seeks, pursuant to

sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006,

authorization to (i) assume, assign and sell the Property, including the assumption and

assignment of the Ground Leases, the Nike Lease, and the Declaration, to the Purchaser pursuant

to the Sales Contract or to a party that submits a higher or better offer, (ii) reject the Rejected

Contracts listed on Exhibit B hereto, and (iii) pay the fees owed to CBRE in connection with the

sale of the Property upon the Court's approval of LB 2080's retention of CBRE.  LB 2080

further requests that such order be effective immediately and waive the 10-day stay pursuant to

Bankruptcy Rules 6004(h) and 6006(d).

**The Relief Requested is Warranted and in the Best Interests of LB 2080 and its Estate**

**A.      Sale of the Property**

14.       Ample authority exists for approval of the relief requested.  Section 363 of

the Bankruptcy Code provides, in relevant part, that a debtor "after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate."  11

U.S.C. § 363(b)(1).

15.       Courts in the Second Circuit and others, in applying this section, have

required that the sale or disposition of a debtor's assets be based upon the sound business

judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a

judge determining a § 363(b) application must find from the evidence presented a good business

reason to grant such application); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel*

*Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  It is generally understood that "[w]here the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid

business justification exists, there is a strong presumption that "the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)

(quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d

Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed

exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.

1984)).  Once a court is satisfied that there is a sound business justification for the proposed sale,

the court must then determine whether (i) the debtor has provided interested parties with

adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is

proceeding in good faith.  *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997);

*accord In re Delaware and Hudson Ry. Co.*, 124 B.R. at 166; *In re Decora Indus., Inc.*, Case No.

00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

16.     LB 2080's decision to sell the Property is an exercise of sound business

judgment.  LB 2080 acquired the Property solely as a result of a foreclosure of the Loan.  The

Debtors have no employees or operations at the Plaza Property.  As described above, the income

generated by the Property is insufficient to cover the Property's current monthly operating costs.

LB 2080 has carefully evaluated the benefits and burdens of maintaining the Property and, upon

a due and proper exercise of its business judgment, has determined that the Property represents a

drain on its estates and resources.  A prompt sale of the Property will stem monthly losses

incurred by LB 2080 with respect to the Property, provide for the assignment of obligations

under, among others, the Ground Leases and the Declaration, and may allow LB 2080 to use the

Purchase Price of $3 million to satisfy administrative expenses and, to the extent applicable, LB

2080's prepetition creditors.

17. LB 2080 has requested that the hearing to consider the relief requested

herein be scheduled on expedited notice in order to maximize the benefit of the proposed

transaction. Nonetheless, given the circumstances, LB 2080 will have provided interested parties

with adequate and reasonable notice of the transaction. Given the current depressed market for

commercial real property in Hawaii, the fact that the Property is encumbered by the Ground

Leases, and the extensive prepetition and postpetition marketing of the Property and negotiation

of the Sales Contract, LB 2080 maintains that the consideration for the transaction, including the

Purchase Price and the Purchaser's assumption of certain going-forward liabilities, is fair and

reasonable. Further, as described below, the Purchaser is proceeding in good faith. The

proposed sale, therefore, should be approved.

**B.      Private Sale Subject to Higher or Better Offers**

18. Bankruptcy Rule 6004(f)(1) permits private sales by a debtor. FED. R.

BANKR. P. 6004(f)(1). Courts, including this Court, often allow a chapter 11 debtor to sell assets

outside the ordinary course of business by private sale when the debtors demonstrate that the sale

is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re Lehman*

*Brothers Holdings Inc.*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Dec. 18, 2008), *In re*

*Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Feb. 24,

2009), *In re Lehman Brothers Holdings Inc.*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.

Jan. 28, 2009); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.),* 233 B.R. 619 (D.P.R.

1999); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998); *In re Wieboldt Stores, Inc.*,

92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

19.     LB 2080's decision to pursue a private sale is supported by the exigent circumstances of its chapter 11 case and the fact that LB 2080 has fully explored potential sales of the Property.  The time and efforts associated with marketing the Property for sale at a public auction would needlessly duplicate the previous efforts made by LB 2080 and CBRE and would likely exceed any benefit of a public sale to LB 2080, its estate or its creditors.

20.     Nonetheless, consistent with LB 2080's fiduciary duties to ensure the greatest return to creditors and its estate and with the Debtors' practice in certain other private sales conducted in their chapter 11 cases, the proposed sale remains subject to a higher or better offer.  Upon the filing of this Motion, LB 2080 will provide notice of the proposed sale to each of the parties that expressed an interest in the Property within the past year and certain other logical or likely bidders determined by CBRE.  LB 2080 will also cause notice of the Motion and the Motion to be published on the Debtors' court-approved claims and noticing agent's website: www.lehman-docket.com.

21.     **Any party interested in submitting a higher or better offer for the Property must submit** (i) an offer in the form of the Sales Contract, and (ii) a Deposit in the amount included in the offer.  A higher or better offer must be submitted to and **received by** LB 2080 Kalakaua Owners LLC, c/o Lehman Brothers Holdings Inc., 1271 Avenue of the Americas, 46th Floor, New York, New York, 10019, Attn: Brian Gross, with a copy to Weil Gotshal & Manges, LLP, 767 Fifth Avenue, New York, New York, 10153, Attn:  Shai Y. Waisman, Esq., attorneys for the Debtors, by no later than June 23, 2009 at 12:00 noon (Prevailing Eastern

Standard Time).  LB 2080 retains the right to determine, in its sole discretion, the highest or

other best bid, and to reject any bid.

22.    Subjecting the proposed transaction to higher or better offers will ensure

that the consideration to be paid by the Purchaser or by a party who submits a higher or better

offer that is ultimately accepted by LB 2080 (i) will represent the highest or best offer for the

Property; (ii) will be fair and reasonable; (iii) may provide for a greater recovery for LB 2080's

creditors than would be provided by any other practical, available alternative; and (iv) will

constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and

non-bankruptcy law.

**C.**      **Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

23.    In the interest of attracting the best offers, the sale of the Property should

be free and clear of any and all liens, claims, encumbrances and other interests in accordance

with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other

interests attaching to the proceeds of the sale.  Pursuant to section 363(f) of the Bankruptcy

Code, a debtor may sell property of its estate "free and clear of any interest in such property of

an entity other than the estate" if applicable nonbankruptcy law permits sale of such property

free and clear of such interest, if such entity consents, if such interest is a lien and the price at

which such property is to be sold is greater than the aggregate value of all liens on such property,

if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or

equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1) –

(5).

24.    LB 2080 is not aware of any party secured by the Property.  Nevertheless,

with respect to any party asserting a lien, claim, encumbrance or other interest against the

Property, LB 2080 anticipates that it will be able to satisfy one or more of the conditions set forth

in section 363(f). Thus the sale of the Property free and clear of liens, claims, encumbrances and

other interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### D.    Protections as a Good Faith Purchaser

25.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from the debtor notwithstanding that the sale conducted under

section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]
> … does not affect the validity of a sale … to an entity that purchased … such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9

(S.D.N.Y. 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147). *See also*

*Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides

that good faith transfers of property will not be affected by the reversal or modification on appeal

of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re*

*Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m),

good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay

pending appeal").

26.    The sale of the Property is the result of arm's length, good faith

negotiations with the Purchaser. *See In re Gucci*, 126 F.3d 380 (2d Cir. 1997) (a good faith

purchaser is shown by integrity of his conduct during the course of the sale proceedings); *In re*

*Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998) (a determination of bad faith must be based

on untoward conduct by the purchaser, such as fraud or collusion) (citing *Gucci*, 126 F.3d 380);

*Community Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985) (a good faith

purchaser is one that has not engaged in conduct involving fraud or collusion nor has sought to

take grossly unfair advantage of other bidders).  The Purchaser has not, in connection with the

proposed transaction, engaged in any conduct that constitutes a lack of good faith.  Neither the

Purchaser nor any of its affiliates or insiders is associated with the Debtors in any way.

Accordingly, the Purchaser is entitled to the protections of section 363(m) of the Bankruptcy

Code.  In the event a higher or better offer is ultimately accepted by LB 2080, LB 2080 intends

to request a finding that such bidder is similarly a good-faith purchaser entitled to the protections

of section 363(m) of the Bankruptcy Code.

**E.      Assumption and Assignment of Ground Leases, Nike Lease and Declaration and Rejection of the Rejected Contracts**

          27.      Section 365 of the Bankruptcy Code allows a debtor to maximize the

value of its estate by assuming executory contracts or unexpired leases that benefit the estate and

by rejecting those that do not.  11 U.S.C. § 365(a); *see COR Route 5 Co., LLC v. The Penn*

*Traffic Co. (In re The Penn Traffic Co.)*, 524 F.3d 373, 382 (2d Cir. 2008).  To facilitate and

effect the sale of its assets, LB 2080 seeks authority to assume and assign the Ground Leases, the

Nike Lease, and the Declaration (collectively, the "Assigned Agreements").  LB 2080 further

seeks authority to reject the Rejected Contracts, as set forth in Exhibit B attached hereto. which

are not wanted by the Purchaser and not needed by LB 2080.

28.    Section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(f)(2).

29.    LB 2080 submits that there are no defaults under the Nike Lease or the Declaration.  To the extent that defaults are found to exist under the Nike Lease or the Declaration, LB 2080 will take appropriate steps to promptly cure such defaults prior to or upon the Closing.  Certain outstanding rent and related obligations are outstanding in respect of the Ground Leases.  LB 2080 estimates that such amounts aggregate no more than approximately $1,154,187.15, assuming closing of the Sales Contract on July 14, 2009.  If the Closing occurs after July 14, 2009, such amounts may increase by up to $17,398.36 per each additional day.  LB 2080 will pay Kalaimoku any outstanding amounts owing under the Ground Leases pursuant to section 365(b)(1) of the Bankruptcy Code concurrently with the Closing and the assumption and assignment of the Ground Leases.  Accordingly, the Debtors will satisfy the "cure" requirement of section 365(b)(1) of the Bankruptcy Code with respect to its and assumption and assignment of the Assigned Agreements.  LB 2080 requests that the Court fix the cure amount for each of the Assigned Agreements in the amounts set forth on Exhibit C hereto. In the event of any dispute relating to any cure amount, LB 2080 shall escrow such funds in a manner approved by the Court for payment pending resolution of such dispute.

30.    The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (*quoting Cinicola*, 248 F.3d at 120 n. 10). *See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon*

*Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single

solution will satisfy every case, the required assurance will fall considerably short of an absolute

guarantee of performance."). Among other things, adequate assurance may be given by

demonstrating the assignee's financial health and experience in managing the type of enterprise

or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

(adequate assurance of future performance is present when prospective assignee of a lease from

debtor has financial resources and has expressed a willingness to devote sufficient funding to

business in order to give it strong likelihood of succeeding; chief determinant of adequate

assurance is whether rent will be paid). *See also In re Vitanza*, Case No. No. 98-19611 (DWS),

1998 WL 808629, at *26 (Bankr. E.D. Pa. 1998) ("The test is not one of guaranty but simply

whether it appears that the rent will be paid and other lease obligations met.").

31.     On the closing date of the Sales Contract, the Purchaser is expected to

have sufficient working capital to operate the Property and the resources to satisfy the

obligations required under the Assigned Agreements. Prior to the hearing of this Motion, LB

2080 and the Purchaser shall provide the counterparties to the Assigned Agreements with further

information regarding the capitalization of the Purchaser upon the closing date of the Sales

Contract and the Purchaser's ability to manage the Property. Based upon the foregoing, LB 2080

submits that the counterparties to the Assigned Agreements, to the extent required, have received

"adequate assurance of future performance" within the meaning of section 365(f)(2) of the

Bankruptcy Code. In the event that a higher or better offer is accepted by LB 2080, LB 2080

intends to request a finding based upon the record to be made at the hearing on this Motion that

any party who submits such bidder will be able to perform all obligations required under the

Assigned Agreements, and accordingly, that adequate assurance of future performance has been

provided to the counterparties to the Assigned Agreements.

           32.      Courts defer to a debtor's business judgment in rejecting an executory

contract or unexpired lease, and upon finding that a debtor has exercised its sound business

judgment, approve the rejection under section 365(a) of the Bankruptcy Code. *See Bildisco &*

*Bildisco*, 465 U.S. at 523 (recognizing the "business judgment" standard used to approve

rejection of executory contracts and unexpired leases); *Nostas Assocs. v. Costich (In re Klein*

*Sleep Products, Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996) (recognizing the "business judgment"

standard used to approve rejection of executory contracts); *In re Minges*, 602 F.2d 38, 42-43 (2d

Cir. 1979) (holding that the "business judgment" test is appropriate for determining when an

executory contract can be rejected); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y.

1994) (approving rejection of license by debtor because such rejection satisfied the "business

judgment" test); *In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (stating that a

debtor may assume or reject an unexpired lease under section 365(a) in the exercise of its

"business judgment").

           33.      LB 2080 has reviewed the Rejected Contracts and determined that the they

no longer have value or utility. The Rejected Contracts are a cash drain on LB 2080's estate and

provide no corresponding benefit. In addition, LB 2080's termination of the Rejected Contracts

is an obligation under the Sales Contract. Accordingly, in accordance with section 365(a) of the

Bankruptcy Code, LB 2080 seeks to reject the Rejected Contracts, effective as of the closing of

the proposed sale. LB 2080 requests that the Court direct that any claim for damages arising as a

result of the rejection of the Rejected Contracts be filed in accordance with any order of the

Court fixing the deadline and the process by which to file proofs of claims in LB 2080's chapter

11 case.

**F.      Relief Under Bankruptcy Rules 6004(h) and 6006(d)**

34.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale,

or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless

the court orders otherwise." FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d) similarly

provides that an "order authorizing the [debtor] to assign an executory contract or unexpired

lease under § 365(f) is stayed until the expiration of 10 days after the entry of the order, unless

the court orders otherwise." FED. R. BANKR. P. 6006(d).  LB 2080 seeks as prompt a closing as

possible to avoid additional administrative expenses.  Additionally, the Purchaser has the right to

terminate the Sales Contract if, by July 13, 2009 at 5:00 p.m. (prevailing Eastern Time), the

Court has not entered a final order waiving any applicable 10-day stay approving the sale of the

Property.  If such an order is entered by July 13, 2009, the Purchaser will be required to close the

transaction on July 14, 2009.  In light of the foregoing, LB 2080 requests that any order

approving the sale of the Property be effective immediately by providing that the 10-day stays

are inapplicable.  Absent a waiver of the stay extant under the Bankruptcy Rules, the Purchaser

will not be obligated to consummate the transaction on July 14, 2009 and will have the right to

terminate the Sales Contract, potentially depriving LB 2080 and its estate of the benefits of the

transaction.

### Notice

35.      No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in the amended

order entered on February 13, 2009 governing case management and administrative procedures

for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) counsel to the

Purchaser; (vii) the counterparties listed on Exhibit B and Exhibit C hereto; (viii) all parties who

may assert a interest in the Property; and (ix) all parties who have requested notice in these

chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

36.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: June 29, 2009
         New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession