**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450
   Eric A. Schaffer
   Michael J. Venditto
   David M. Schlecker

*Attorneys for BNY Corporate Trustee Services, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., et al. | Case No. 08-13555 (JMP) |
|         Debtors. | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | Adv. Proc. No. 09-01242 (JMP) |
|         Plaintiff, | *Related to Docket No. 1* |
| - against - | **DECLARATION OF SANJAY JOBANPUTRA IN SUPPORT OF MOTION FOR DISMISSAL OF COMPLAINT OR OTHER RELIEF** |
| BNY CORPORATE TRUSTEE SERVICES LIMITED, | |
|         Defendant. | |

     **SANJAY JOBANPUTRA** declares the following to be true and correct under penalty of perjury:

     1.    I am an officer of BNY Corporate Trustee Services Limited ("BNY"), the defendant in this adversary proceeding. BNY is a company organized under the laws of England, with its principal place of business in London.

     2.    I am knowledgeable of the facts set forth herein insofar as they pertain to BNY's role as trustee and custodian under certain deeds of trust relating to synthetic portfolio notes

issued under the Dante Finance PLC Multi-Issuer Secured Obligation Programme ("Dante

Programme").

**The Dante Programme**

3.      The Dante Programme was structured and arranged by Lehman Brothers

International (Europe) ("LBIE"), an entity incorporated under the laws of England with its

principal place of business in London.  I understand that LBIE is now in administration, a form

of insolvency procedure available under English law.

4.      I am responsible for overseeing BNY's performance of its duties in connection

with the Dante Programme in circumstances where defaults have now occurred under that

Programme.  I have access to and have reviewed the relevant agreements and documentation

underlying the Dante Programme.   Accordingly, I am familiar with its structure and the

obligations of the parties in relation to the Dante Programme.

5.      BNY's duties as trustee under the Dante Programme are set forth in a Principal

Trust Deed, dated as of October 10, 2002, between Dante Finance Public Limited Company and

BNY,  then known as J.P. Morgan Corporate Trustee Services Limited,[1] as subsequently

amended and restated on a number of occasions (the "Principal Trust Deed").

---

[1]      The Bank of New York Mellon (formerly known as The Bank of New York) ("BNYM") acquired the
worldwide corporate trust business division of JP Morgan Chase Bank, N.A.  As part of this process, BNYM
acquired all the issued share capital of J.P. Morgan Corporate Trustee Services Limited (the trustee originally
named in the Principal Trust Deed), and subsequently changed the name of that company to BNY Corporate Trustee
Services Limited, the Defendant in this proceeding.  A copy of the Order is attached hereto as Exhibit "1." In
relation to the rights and obligations of the custodian, by an order of the High Court of Justice, Chancery Division,
dated April 3, 2007 (the "Order"), BNYM through its London Branch acceded to all of the English law obligations
of JP Morgan Chase Bank, N.A., London Branch, as it related to the Business.  The effective date of the Order was
May 19, 2007.  BNY Securities Services (Ireland) Ltd. is an Irish incorporated entity based in Dublin which
assumed the duties of Irish Paying Agent from JP Morgan Bank (Ireland) plc.

US_ACTIVE-101803017.7 6/22/09 1:53 PM

**The Saphir Notes**

6.    Saphir Finance Public Limited Company ("Saphir") is an Irish company that was

organized by LBIE for the purpose of acting as an issuer under the Dante Programme.  Saphir

acceded to the Principal Trust Deed by a Deed of Accession dated April 9, 2003, as subsequently

amended and restated on January 30, 2004 (the "Accession Deed"), thereby establishing its

participation in the Dante Programme for the issuance of secured notes from time to time.

7.    This litigation involves two series of Australian Dollar ("AUD") notes

(collectively, the "Saphir Notes") issued by Saphir under the Dante Programme:

    (a)  Series 2004-11 AUD 75,000,000 Synthetic Portfolio Notes due 2011
    (b)  Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes due 2011

8.    The Saphir Notes were administered by Lehman in Japan, where BNY's main

contact was Junko Sakaguchi.

**The Saphir Assets**

9.    The obligations of Saphir under the Saphir Notes were secured by assets (in each

case, the "Saphir Assets") charged in favour of BNY pursuant to:  (a) the Supplemental Trust

Deed and Drawdown Agreement for Series 2004-11 Notes, dated December 10, 2004 (the

"Series 2004-11 Supp. Deed"); and (b) the Supplemental Trust Deed and Drawdown Agreement

for Series 2006-5 Notes, dated March 17, 2006 (the "Series 2006-5 Supp. Deed" and, together

with the Series 2004-11 Supp. Deed, the "Supp. Deeds").  Each of the Supp. Deeds cross-refers

to, and incorporates the terms of, the then-most-current version of the Principal Trust Deed.

10.    Different assets secured repayment of each of the two series of Saphir Notes.

11.    The Series 2004-11 Saphir Notes are secured by AUD 75,000,000 of Australia

and New Zealand Banking Group MTN Floating Rate Notes Due 12/2011 (ISIN Code No.

XS0208078732), which are held by BNY through Clearstream.

12.     The Series 2006-5 Saphir Notes are secured by AUD 50,000,000 of Royal Bank of Scotland PLC Floating Rate Notes Due 03/2016 (ISIN Code No. XS0247983058), which are held by BNY through Euroclear.  For both series, BNY also holds cash in AUD cash accounts, through National Australia Bank, a major Australian bank.

13.     The Saphir Assets are administered by BNY in London in accordance with the terms of the Principal Trust Deed and other transaction documents.

**Beneficial Ownership of the Saphir Notes**

14.     Both series of the Saphir Notes are held through a clearing system.

15.     The Saphir 2004-11 Notes were issued originally into Clearstream[2] on December 10, 2004.

16.     The Saphir 2006-5 Notes were issued originally into the Austraclear System[3] on March 17, 2006; however, on March 25, 2009, due to non-payment of the notes since September 2008, Austraclear required that these notes be removed from the Austraclear System and they were then transferred to National Nominees.

17.     Although either the clearing systems or a depositary for the clearing systems were the registered owners of the Saphir Notes, the beneficial owner was another Lehman-sponsored investment vehicle, Mahogany Capital Limited ("Mahogany").  Mahogany pledged each of the Saphir Notes as security for its obligations to its investors.

---

[2]     Clearstream International, one of the two principal clearing houses operating in the European financial marketplace, has its principal office in Luxembourg.

[3]     Austraclear Ltd. operates the Austraclear System to facilitate the matching, clearing and settlement of securities transactions in the Australian financial market.

US_ACTIVE-101803017.7 6/22/09 1:53 PM

18.    Perpetual Trustee Company Limited ("Perpetual"), an Australian company, acted as the trustee for the investors in Mahogany; however, the custodian for the Saphir Notes was JP Morgan Chase Bank, N.A., London Branch.[4]

19.    As a consequence of a default on the Mahogany Notes, on or about April 29, 2009, Perpetual took steps to enforce the rights of Mahogany's investors in the Saphir Notes. On May 8, 2009, ownership of the Saphir Notes was transferred to Perpetual. As a consequence, Perpetual, as trustee for Mahogany's investors, is both the registered and beneficial holder of the Saphir notes.

20.    Thereafter, Perpetual directed BNY to give effect to the so-called "Noteholder Priority" provisions in § 6.2(iii) of the Principal Trust Deed.

**The Action in the High Court of Justice**

21.    BNY declined to follow the instruction because Perpetual refused to indemnify BNY against potential claims if Lehman Brothers Special Financing Inc. ("LBSF")[5] sought to give effect to the "Swap Counterparty Priority" provisions in § 6.2(i) of the Principal Trust Deed.

22.    Thereafter, on May 13, 2009, Perpetual commenced an action against BNY in the High Court of Justice in London. "*Perpetual Trustee Company Limited, Claimant, against BNY Corporate Trustee Services Limited, Defendant*" High Court of Justice, Chancery Division, Claim No. HC09C01612 (the "English Action").

23.    In the English Action, Perpetual seeks a judgment directing BNY to enforce the security over the Mortgaged Property and further declaring that BNY is obliged to make

---

[4]    BNY succeeded to the obligations of the custody agent, and became the custodian of the Saphir Notes, as part of the acquisition described in more detail in note 1, *supra*.

[5]    LBSF is the counterparty to a swap agreement that is part of the Saphir Assets that were delivered to BNY by Saphir to secure its obligations under the Saphir Notes.

US_ACTIVE-101803017.7 6/22/09 1:53 PM

distributions in accordance with the Noteholder Priority. Perpetual also contends that Perpetual

is not obligated to indemnify BNY for any liability that BNY may incur in the event that it

distributes the proceeds in accordance with Noteholder Priority.

24. On May 20, 2009, LBSF moved to intervene in the English Action and

simultaneously requested a stay of that action pending adjudication of the above-captioned

adversary proceeding, which was filed later that same day.

25. LBSF's motion to intervene in the English Action was not contested by either

Perpetual or BNY and was granted by the English court on May 21, 2009.

26. The English court has entered a scheduling order to consider LBSF's motion to

stay the English Action pending resolution of the instant adversary proceeding. LBSF's

evidence in support of its stay motion was submitted to the court on June 11, 2009. Responsive

evidence both as to LBSF's stay application and Perpetual's underlying claim are due on June

25, 2009. A hearing to consider the merits of both LBSF's stay motion and Perpetual's claim is

scheduled for a ten-day window commencing on July 6, 2009.

**Conclusion**

27. I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information and belief.


Executed in London, England
this 22nd day of June, 2009       *s/Sanjay Jobanputra*
                     SANJAY JOBANPUTRA

US_ACTIVE-101803017.7 6/22/09 1:53 PM

# EXHIBIT 1

No. 1231 of 2007

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

The Honourable Mr Justice David Richards

Dated 3 April 2007



IN THE MATTER OF

JPMORGAN CHASE BANK, N.A.

- and -

IN THE MATTER OF

THE BANK OF NEW YORK

- and -                                    **Applicants**

IN THE MATTER OF

THE FINANCIAL SERVICES AND MARKETS ACT 2000

---

**ORDER**

---

**UPON THE APPLICATION** of the above named JPMorgan Chase Bank N.A. (the
"**Transferor**") whose registered office in the United Kingdom is situate at 125 London Wall,
London EC2Y 5AJ and The Bank of New York (the "**Transferee**") whose registered office
in the United Kingdom is situate at One Canada Square, London E14 5AL (together the
"**Applicants**") as named in the Claim Form issued on 19 February 2007 in the above matters
seeking, *inter alia*, the sanction by the Court to a banking business transfer scheme (the
"**Scheme**") pursuant to Part VII of the Financial Services and Markets Act 2000 (the "**Act**").

**UPON HEARING** Counsel for the Transferor and Transferee

**AND UPON READING** the said Claim Form, including the Scheme and the evidence

**AND UPON IT APPEARING THAT** JPMorgan Trustee and Depository Company Limited
("**MTDL**") consents to the transfer to the Transferee of the rights and obligations as note

trustee, security trustee, collateral agent and security agent as described hererin to the Transferee

**THIS COURT HEREBY** sanctions the Scheme as set out in the Schedule hereto

**AND IT IS ORDERED** pursuant to Sections 111(1) of the Act (using the definitions contained in the Scheme) in accordance with and subject to the terms of the Scheme:

1.  The Business shall be transferred to and be vested in the Transferee as a going concern in accordance with the Scheme;

2.  At the Effective Time, the Transferee shall acquire the Business from the Transferor, such that:

2.1  on and with effect from the Effective Time, the Transferred Assets shall by this Order and without further act or instrument be transferred to, and legal and beneficial title in respect of the Transferred Assets shall vest in, the Transferee, subject to all Liens affecting such assets; and

2.2  on and with effect from the Effective Time, the Transferred Liabilities shall by this Order and without further act or instrument be transferred to, and shall become liabilities of, the Transferee and shall cease to be liabilities of the Transferor.

2.3  on and with effect from the Subsequent Transfer Date applicable thereto, each Residual Asset shall, by this Order and without further act or instrument be transferred to, and legal title (the beneficial title having transferred on the Transfer Date pursuant to the creation of the trust described in Clause 2.6 below) in respect of such Residual Assets shall vest in, the Transferee (subject to all Liens affecting such assets).

2.4  on and with effect from the Subsequent Transfer Date applicable thereto, each Residual Liability shall, by this Order and without further act or instrument be transferred to, and shall become a liability of, the Transferee and shall cease to be a liability of the Transferor.

2.5  as further provided by the definition of "Residual Asset", the transfer of the role of trustee from the Transferor to the Transferee (irrespective of the law governing the trust document), will be delayed under this Order (without prejudice to the transfer of any other role related to such transaction which does not require any further steps to be taken) unless and until any further steps that are required under any foreign law are taken with respect to the transfer of such a role and any related trust asset held by a trustee on trust for its beneficiaries; at which time, such role and the related trust asset will transfer simultaneously.

2.6  the Transferor will, from the Transfer Date until the Subsequent Transfer Date applicable thereto, hold any Residual Asset together with any proceeds of sale, income or other accrual or return arising in respect thereof, on trust for the Transferee absolutely (save to the extent that (i) the creation of such trust would itself fall within the scope of paragraph (a) of the definition of Residual Asset, or would be outside the

jurisdiction of the Court as specified in paragraph (b) thereof or that such Residual Asset is a Contract or is reliant upon, or connected with, a Contract the terms of which would become in whole or part unenforceable or invalid by virtue of the creation of such trust or (ii) the creation of such trust would cause a breach of, or default under, any Contract to which the Transferor is party or would give rise to any right of acceleration of any obligation or any right of termination pursuant to any such Contract or (iii) cannot be created for any other reason) and will retain any Residual Liability (without prejudice to any other arrangements between the Transferor and the Transferee in relation to the same) provided that nothing in this paragraph shall require the Transferor to act contrary to its obligations under any Contract to which the Transferor is party and which is a Residual Asset, all of which obligations shall prevail over the trust hereby created.

2.7    the Transferor shall be subject to the Transferee's reasonable directions in respect of any Residual Asset until all of the Residual Assets are transferred to or otherwise vested in the Transferee, or are disposed of, as so provided in any Contract (whereupon the Transferor shall hold the proceeds thereof provided under such Contract) and the Transferee shall have authority to act as the attorney of the Transferor in respect of the Residual Assets for all purposes.

2.8    In the event of any payment being made to or right or benefit being conferred upon or accruing to the Transferor in respect of any of the Transferred Assets after, as appropriate, the Transfer Date or the Subsequent Transfer Date therefor, the Transferor shall hold such sums on trust and shall, as soon as is reasonably practicable after its receipt pay over the amount of such payment or transfer or assign such right or benefit to or in accordance with the directions of the Transferee.

2.9    the Transferor and the Transferee shall each take all such reasonable steps and do all such reasonable things (including the execution and delivery of any documents) as may be necessary or desirable to give effect to this Order including without limitation to effect the transfer to the Transferee of the Business (including the Transferred Assets and the Transferred Liabilities and the Residual Assets and the Residual Liabilities) in accordance with this Clause 2, save to the extent that the Transferee notifies the Transferor that it shall not require such steps to be taken.

2.10   if any Business Asset is governed by the law of any country or territory outside the United Kingdom, the Transferor shall provide all reasonable assistance to the Transferee for securing the transfer to the Transferee of such Business Asset to ensure that it is fully effective under the law of that country or territory.

3.    The transfer and vesting of any Business Asset or Business Liability shall not:

3.1    invalidate or discharge any contract, security or other thing; or

3.2    require further registration in respect of any security or other instrument (including instruments creating or acknowledging indebtedness) registered in the United Kingdom; or

3.3    constitute a breach of, or default under, or require compliance with any notice or consent provision or require any obligation to be performed sooner or later than would have otherwise been the case under, any contract or instrument to which the Transferor is a party or is bound; or

3.4    allow any party to a contract to which the Transferor is a party to terminate that contract when he would not otherwise have been able to terminate it; or

3.5    entitle any party to any contract to which the Transferor is a party to vary the terms of that contact when that party would not otherwise have been able to vary those terms or confer a right or benefit on it which it would not otherwise have had; or

3.6    save as otherwise provided herein, confer any greater or lesser rights or benefits, or impose any greater or lesser obligations, on any party to any contract to which the Transferor is a party when that greater or lesser obligation would not otherwise have been imposed.

4.    On and with effect from the Transfer Date (or a Subsequent Transfer Date, as the case may be) in respect of each relevant Contract which is a Business Asset:

4.1    each of the Transferee and the relevant Person (as defined in the Scheme) who is either (i) the contractual counterparty (a **"Counterparty"**) or (ii) has third party rights or equitable rights (each, a **"Third Party"**) in respect of a relevant Contract shall become entitled to the same rights under or pursuant to such Contract as were available to, or against, each of the Transferor, the Counterparty or any Third Party, immediately prior to the Transfer Date (or a Subsequent Transfer Date, as the case may be), and accordingly such rights that were available to, or against, each of the Counterparty and any Third Party as against the Transferor prior to the Transfer Date (or any Subsequent Transfer Date as applicable), shall no longer be available and shall have been transferred to the Transferee;

4.2    in relation to each relevant Contract under which interest or other sums attributable or referable thereto and relating to a period since the Effective Time that continue to be payable:

4.2.1    the Transferee shall, on and with effect from the Transfer Date, account to the relevant persons whom such interest or other sums are payable for such interest or other sums;

4.2.2    the person or persons from whom such interest or other sums are due and payable shall, on and with effect from the Transfer Date, account to the Transferee for such interest or other sums; and

4.2.3    the Transferor shall, on and with effect from the Transfer Date, account to the Transferee for any further or additional interest or other sums attributable or referable thereto to the extent that the same are received by the Transferor;

4.3    each reference in such Contract to an account of the Transferor with another Person, or to an account of another Person with the Transferor, whether it is a trust account, an account subject to a security interest or for any other purposes, shall be read as being or including a reference to an account of the Transferee with such other Person, or of such other Person with the Transferee, which is subject to the same conditions and incidents as applied thereto immediately prior to the Transfer Date and such account (including the account number, if applicable) shall be deemed for all purposes to be a single continuing account, provided that nothing herein shall affect any right of any Person to such Contract pursuant to its terms to vary the conditions or incidents subject to which any such account is kept;

4.4    This Clause 4 shall be without prejudice to the general application of the provisions of this Order to Transferred Assets that are not Contracts.

5.    Any instruction or authority in force on the Transfer Date (including, without limitation, any instruction given to a bank by its customer in any form) and providing for the payment of any sum under or in respect of any of the Contracts to or by the Transferor shall, from and after the Transfer Date (or a Subsequent Transfer Date, as the case may be), take effect as if it had provided for and authorised such payment to or by the Transferee.

6.    If on or after the Transfer Date (or a Subsequent Transfer Date, as the case may be) there are judicial, quasi-judicial, administrative or arbitration proceedings (whether implemented, pending, threatened or otherwise) by or against the Transferor in connection with the Business, the Transferred Assets or the Transferred Liabilities or the Residual Assets or Residual Liabilities as applicable, the same shall be continued by or against the Transferee and the Transferee shall be entitled to all defences, counterclaims and rights of set-off that would have been available to the Transferor in relation to the Business, the Transferred Assets and the Transferred Liabilities.

7.    On and with effect from the Transfer Date (or in the case of any Residual Asset or Residual Liability, a Subsequent Transfer Date), any reference in any Contract or other document or instrument relating to or referring to the Business to:

7.1    the Transferor, shall be construed as and to take effect as a reference to the Transferee in respect of the Business and references to the Transferor's contact details shall be read as being references to the Transferee's contact details;

7.2    directors, officers, representatives or employees or to any director, officer, representative or employee employed or engaged by the Transferor, shall be construed as and to take effect as a reference to the directors, officers, representatives or employees of the Transferee or to such director, officer, representative or employee of the Transferee as the Transferee may nominate for that purpose; and

7.3    a rate, charge, tariff or scale of fees or to terms or conditions published, determined, ascertained, varied or amended from time to time by the Transferor shall afford to the Transferee the same right under such contract, other document or instrument as the

Transferor had to publish, determine, ascertain, vary or amend such rates, charges, tariffs, scales of fees, terms or conditions published, determined, or ascertained;

8. All books and other documents that would, before the Transfer Date, have been evidence in respect of any matter for or against the Transferor at the Transfer Date, shall be admissible in evidence in respect of the same matter for or against the Transferee after the Transfer Date. In this Clause, **"documents"** has the same meaning as in section 10 of the Civil Evidence Act 1968.

9. On and from the Transfer Date the Bankers' Books Evidence Act 1879 shall apply to any books of the Transferor transferred to, and vested in, the Transferee by virtue of this Order, and to entries made in those books before the Transfer Date, as if such books were the books of the Transferee.

10. For the purposes of section 4 of the Bankers' Books Evidence Act 1879, books so transferred to, and vested in the Transferee shall be deemed to have been the ordinary books of the Transferee at the time of the making of any entry therein which purports to have been made before the Transfer Date, and any such entry shall be deemed to have been made in the usual and ordinary course of business.

11. In this Order, **"books"** shall be construed in accordance with section 9(2) of the Bankers' Books Evidence Act 1879.

12. Without prejudice to the generality of the foregoing provisions, the following provisions shall have effect in relation to the Business, or any part thereof and for these purposes the **"Relevant Date"** means the Transfer Date or any Subsequent Transfer Date as applicable:

12.1 any existing instruction, order, direction, mandate, power of attorney, authority, undertaking or consent given to or by the Transferor in respect of the Business (whether in writing or not and whether or not in relation to an account) shall have effect, on and from the Relevant Date, as if given to or, as the case may be, by the Transferee;

12.2 in respect of the Business, any negotiable instrument or order for payment of money drawn on or by, or given to, or accepted or endorsed by, the Transferor, or payable at any place of business of the Transferor, whether so drawn, given, accepted, endorsed or payable before, on or after the Relevant Date, shall have the same effect on and from the Relevant Date, as if it had been drawn on or by, or given to, or accepted or endorsed by the Transferee, or (as the case may be) as if the place of business at which it is payable were a place of business of the Transferee;

12.3 the custody of tangible Active Account Records, and electronic copies of certain Active Account Records and certain Non-Active Account Records that are Electronic Records, shall pass to the Transferee at and with effect from the Relevant Date, and the rights and obligations of the Transferor under any contract of bailment relating to such Records shall on that day become rights and obligations of the Transferee save to the extent that Transferor will retain Active Account Records that are cancelled bonds and

related documentation if such Active Account Records are commingled with Non-Active Records.

13.    In this Clause, terms shall be construed in accordance with the definitions in the Data Protection Act 1998. With effect from the Transfer Date or Subsequent Transfer Date, as applicable:

13.1    in respect of all personal data comprised in the Business in respect of which the Transferor was the data controller immediately before the Transfer Date or Subsequent Transfer Date, as applicable (the **"Transferred Personal Data"**), the Transferee shall become the data controller;

13.2    any information made available to, or consent obtained or request or other notice received from, any data subject by or on behalf of the Transferor in respect of the Transferred Personal Data will be deemed to have been made available, obtained or received by the Transferee; and

13.3    any reference to the Transferor in any such information, consent, request or other notice will be deemed to include a reference to the Transferee.

## AND IT IS FURTHER ORDERED

(1)    that in accordance with section 112(1)(d) of the Act, that the rights and obligations of MTDL in its capacity as, note trustee, security trustee, collateral agent and security agent howsoever described under Corporate Trust Agreements which form part of the Business, together with associated assets falling within the definition of Business Assets (but excluding for this purpose the items referred to under paragraphs (a), (f) and (g) of that definition) and associated liabilities falling within the definition of Business Liabilities but excluding for this purpose the items referred to under paragraphs (a) and (c) of that definition), are transferred to the Transferee at and from the Relevant Date. For the purposes of this paragraph of this Order, the Scheme and the definitions in it shall be read as if the business, rights and obligations of MTDL were part of the business, rights and obligations of the Transferor or the London Branch of the Transferor or the sections and divisions of the Transferor mentioned in the Scheme as the context requires;

(2)    that in accordance with Section 112(10) of the Act, the Transferor will within 10 days from the date of this Order or such longer period as the Financial Services Authority may allow, deposit two office copies of this Order with the Financial Services Authority;

(3)    that there shall be liberty for the Transferor and Transferee to apply:

(a)    for such further Orders as may be expedient or necessary for the purposes set out in Section 112 of the Act; and

(b)    generally.

31

**IN THE HIGH COURT OF JUSTICE**                    No. 1231 of 2007
**CHANCERY DIVISION**

IN THE MATTER OF

**JPMORGAN CHASE BANK, N.A.**

- and -

IN THE MATTER OF

**THE BANK OF NEW YORK**

- and -

IN THE MATTER OF

**THE FINANCIAL SERVICES AND MARKETS ACT 2000**

---

**THE SCHEME**

---

Pursuant to Part VII of the Financial Services
and Markets Act 2000 for the transfer to
The Bank of New York
of part of the banking and corporate trust and agency business of
JPMorgan Chase Bank, N.A.

32

1.    **INTERPRETATION**

1.1    In this Scheme, unless the context otherwise requires, the following words and phrases
       have the following meanings:

       **"Act"** means the Financial Services and Markets Act 2000 together with the rules and
       regulations implemented pursuant thereto.

       **"Active Account Records"** means, in relation to the Business, all Records other than
       the Non-Active Account Records.

       **"Affiliate"** shall mean, with respect to any Person, any other Person that directly, or
       through one or more intermediaries, controls or is controlled by or is under common
       control with such Person.   For purposes of this definition, the term "control"
       (including, with correlative meanings, the terms "controlled by" and "under common
       control with"), as used with respect to any Person, shall mean the possession, direct or
       indirect, of the power to direct or cause the direction of the management and policies
       of such Person, directly or indirectly, whether through the ownership of voting
       securities, by contract or otherwise.

       **"Business"** shall mean the following businesses, in each case as conducted by the
       Transferor in the United Kingdom through its London Branch or by or through any
       predecessor to the Transferor's London Branch as of the Relevant Date:

       (a)     providing banking and corporate trust and agency services (including the
               acceptance of deposits) in relation to the transactions listed in Schedule 1
               (*London CD book of business*), as amended from time to time in accordance
               with any agreement between the Transferor and Transferee for corporate,
               municipal, governmental agency and other issuers of debt and asset-backed
               securities, mortgage-backed securities, collateralised debt obligation, trust
               preferred securities, commercial paper issuing and paying agent services for
               issuers of conventional and asset-backed commercial paper, project finance,
               eurobonds, warrants, repackagings, conduits, structured investment vehicles
               (SIV) and other securities under various indentures, agreements and
               resolutions, including providing investment execution, document custody,
               master servicing, common and specialised depositary, bond analytics, debt
               defeasance and other escrow services in conjunction with acting in a capacity
               otherwise included in this definition, and other related services, all as
               provided in a Corporate Trust Capacity as currently conducted in conventional
               debt, structured finance and collateralised debt structures of the Collateralised
               Debt Obligation (CDO) sections of the Worldwide Securities Services business
               of the Transferor;

       (b)     serving as a loan agency, collateral agent and other specialty agencies arising
               in a Corporate Trust Capacity as currently conducted by the Asset Servicing
               Division of the Worldwide Securities Services business of the Transferor; and

33

(c)      providing in a Corporate Trust Capacity commercial paper and certificates of
deposit issuing and paying agency services for issuers of commercial paper
and certificates of deposit in Europe, as currently conducted by the Worldwide
Securities Services business of the Transferor;

provided, however, that "Business" shall not include any Excluded Business.

**"Business Assets"** means in relation to the Business, all of the right, title and interest
of the Transferor in, to and under all of the assets, properties, rights, Contracts and
claims of the Transferor, wherever located, whether tangible or intangible, real,
personal or mixed, in each case, primarily related to the Business, but excluding the
Excluded Assets, including by way of example and not limitation, all of the following
assets, properties, rights, Contracts and claims of the Transferor (other than any of the
following to the extent it is an Excluded Asset):

(a)      the furniture, fixtures, equipment, materials and supplies owned by the
Transferor and located at the premises where the Business is conducted;

(b)      all Corporate Trust Agreements;

(c)      all Records;

(d)      other than with respect to Non-Active Accounts, any and all rights of the
Transferor that by their terms are transferable and that arise under or pursuant
to warranties, representations, indemnifications, reimbursement agreements,
covenants (including payment covenants to pay), letters of credit, insurance
policies to the extent held for the benefit of the Transferor in connection with
the Business or guarantees in favour of the Transferor, made by or for the
benefit of the Transferor or their respective customers, issuers or holders of
Securities, predecessors in interest, suppliers, vendors or Affiliates of any of
the foregoing, to the extent relating to the other Business Assets or the
Business Liabilities, in either case with respect to the period from the
Effective Time;

(e)      all of the Transferor's interest in the Custodial Assets (other than Custodial
Assets held in trust for Non-Active Accounts) and Security (including
Claims);

(f)      all customer based intangibles relating to the Business, including without
limitation, any Core Deposit Intangibles relating to the Business; and

(g)      the Intellectual Property owned by the Transferor but only to the extent used
by the Business.

**"Business Liabilities"** means the following liabilities and obligations set forth below,
other than any Excluded Liabilities:

(a)      all deposit liabilities of the Transferor that are attributable solely to the
Business;

34

(b)    all liabilities and obligations of the Transferor under or relating to each of the Corporate Trust Agreements;

(c)    all liabilities and obligations of the Transferor for Stale Cheques presented to BNY following the transfer of the cash related to such Stale Cheques as separately agreed between the Transferor and Transferee;

(d)    all liabilities and obligations relating to the payment, safekeeping, use of or application of payments received related to the Custodial Assets pursuant to the Corporate Trust Agreements; and

(e)    other than the Excluded Liabilities, all other liabilities and obligations relating in any manner to or arising out of the Business, the Business Assets or the other Business Liabilities, of whatever kind or nature primary or secondary, direct or indirect, known or unknown, accrued or unaccrued, absolute or contingent, contractual or tortious or otherwise.

**"Claim"** has the meaning given to it in the definition of "Security" herein.

**"Contracts"** shall mean any written agreement, contract, deed, instrument, arrangement, bond note, commitment, franchise, indemnity, indenture, Trust Document, instrument, lease or licence, together with any exhibits, schedules or documents executed or delivered in connection therewith (including any modifications, amendments, restatements or other supplements thereto).

**"Core Deposit Intangibles"** means the premiums paid by the Transferor to acquire the core deposits listed as intangible assets pursuant to the PAA.

**"Corporate Trust Agreements"** means all indenture, trust, pooling and servicing, Private Label, paying agency, collateral or disbursing agency, securities (whether bond, note, debenture or other) registrar, transfer agency, document custody, and all other fiduciary and agency contracts, indentures primarily related to the Business, including all accounts of the Business that are active as of the Effective Time but excluding any Non-Active Accounts regardless of whether the Transferor continues to have any obligations with respect thereto.

**"Corporate Trust Capacity"** shall mean acting in a trustee, registrar, agency, custodial or other similar capacity under a Corporate Trust Agreement, and any rights or duties arising from, or the provision of any services in connection with any such capacities including those capacities performed in relation to the various transactions described in Schedule 1 (*London CD book of business*), subject to any error identified by the Transferor and the Transferee.

**"Counterparty"** has the meaning given in Clause 5 (*Specific Provisions in respect of Contracts*).

**"Court"** means the High Court of Justice in England and Wales.

35

"**Custodial Assets**" shall mean the cash (on hand or held in bank accounts (in the capacity of banker) or money market funds pursuant to or in connection with a Corporate Trust Agreement), funds (including securities repurchase agreements, time deposits and other deposits and other investments in which funds might be invested on a short-term basis), mortgages, Liens (together with mortgage or Lien collateral), guarantees, tangible and intangible assets, receivables, securities, instruments, uniform commercial code (UCC) financing statements, letters of credit and other property of any type or description (including insurance policies covering principal, premium and interest payments and indemnification in respect of lost, stolen or mutilated securities, property held as collateral or security and letters of credit, notes of obligors, bond insurance policies, securities, derivatives, guaranteed investment contracts, and other credit enhancement documents) held by the Transferor as agent or fiduciary pursuant to a Corporate Trust Agreement except the following:

(a)     cash subject to Escheatment as of the Effective Time relating to the Business; and

(b)     cash to the extent relating to the Business covering outstanding cheques for registered and bearer principal and interest on accounts administered by the Transferor issued less than six months prior to the Effective Time.

"**Effective Time**" means the time specified in Clause 9 (*Transfer Date*) at which the Business transfers on the Transfer Date.

"**Electronic Records**" means, in relation to the Business, all Records that are maintained by Transferor solely in electronic form.

"**Escheatment**" means the legal transfer of unclaimed or abandoned property to a governmental authority under any applicable abandoned property, escheat or similar laws.

"**Excluded Assets**" means all assets which are not Business Assets, including:

(a)     all leases, subleases, licences or other contracts pursuant to which the Transferor leases, subleases or licences real property;

(b)     all works of art;

(c)     all cash, cash equivalents or similar cash items of the Transferor (other than the Custodial Assets), except as agreed in accordance with the PAA;

(d)     all corporate franchises, stock record books, minute books, tax returns, and any stationery, office supplies, business forms, manuals or similar property bearing the Transferor's trademarks, trade names, service marks, logos or similar corporate identification;

(e)     all tax refunds or credits or claims therefor to which the Transferor is entitled to as separately agreed by the Transferor and Transferee;

56

(f)     any insurance policy and proceeds covering any Excluded Asset or any Excluded Liability;

(g)     subject to clause (f) of the definition of "Business Assets" any rights of the Transferor under the Corporate Trust Agreements or any of the other Business Assets, including any rights to fees and reimbursements under such agreements and any rights to assert any claims of privilege or other position in any legal proceeding with respect thereto or otherwise, relating to the conduct of the Business prior to the Effective Time;

(h)     any security deposits or other amounts deposited with any governmental authority in connection with the qualification, certification, licensing or permission of the Transferor in connection with the conduct of the business of the Transferor, including the Business;

(i)     all assets related to the Transferor's employee benefit arrangements;

(j)     all Intellectual Property and IT Assets (including, without limitation, technology servers (the computer hardware with the attached communication and storage devices), computer software, systems or programs, or computer software agreements) of the Transferor, including any rights (ownership, licensed or otherwise) to use the mark "JPM" and any other trademarks, service marks, brand names, Internet domain names, logos, trade dress, trade names, corporate names and other indicia of origin, and any derivatives of the foregoing, and all registrations and applications for registration of any of the foregoing, and all goodwill associated with and symbolised by the foregoing;

(k)     all books, records and other data that cannot, without unreasonable effort or expense, be separated from books and records maintained by the Transferor in connection with businesses other than the Business or to the extent that such books, records and other data relate to Excluded Assets, Excluded Liabilities or employees of the Transferor and all personnel files and records;

(l)     all receivables, including all written off receivables agreed in accordance with the PAA;

(m)     any other assets that the Transferor and Transferee agree are Excluded Assets.

"**Excluded Business**" means any business carried on by JPMorgan Chase Bank N.A., other than the Business, including for the avoidance of doubt, land trusts, insurance trusts, re-insurance trusts, acting as escrow agent in any capacity whatsoever (other than acting in a capacity set forth in paragraph (a) of the definition of "Business"), the depositary receipt business (including providing depositary, transfer agent/registrar, issuance and cancellation, corporate action and dividend services on behalf of non-U.S. issuers and operating any depositary receipt cross-book and depositary receipt pre-release programme), the asset servicing and back-up servicing business, the fund of funds collateral business, commercial paper issued by municipalities and proprietary conduits, bankruptcy and settlement services business, providing any depositary,

clearance, securities and cash collateral management, derivatives, custodial, fiduciary, agency, fund servicing and administration, fund of funds accounting and custody (other than document custody), middle and back office and accounting services for CDO portfolio and fund managers or loan or asset servicing or processing or similar services, or performing similar activities, in connection with any line of business conducted in the United Kingdom outside of the Business and the divisions of the Transferor conducting that Business.

**"Excluded Liabilities"** means the following liabilities and obligations:

(a)    any liability or obligation of the Transferor of any nature whatsoever, whether accrued, absolute, contingent or otherwise, asserted or unasserted, known or unknown, not primarily related to the Business;

(b)    any liability or obligation of the Transferor of any nature whatsoever, whether accrued, absolute, contingent or otherwise, asserted or unasserted, known or unknown, to the extent relating to or arising from or in connection with any Excluded Asset;

(c)    any liability or obligation of the Transferor of any nature whatsoever, whether accrued, absolute, contingent or otherwise, asserted or unasserted, known or unknown, to the extent existing at the time of, or arising out of or relating to (i) acts, events or omissions to act that occurred prior to 1 October 2006 or in connection with the conduct by the Transferor of the Business prior to 1 October 2006, whether in violation of any applicable law, Contracts or fiduciary duties or otherwise; or (ii) any Existing Out-of-Balance Condition as of 1 October 2006;

(d)    any liability or obligation of the Transferor for taxes that are the responsibility of the Transferor as separately agreed by the Transferor and Transferee;

(e)    any compensation and benefit liability to employees of the Business with respect to services provided prior to 1 October 2006 and any liabilities under any employee benefit plans and employment agreements incurred prior to 1 October 2006;

(f)    any liability or obligation for retiree medical and life insurance benefits for employees of the Business prior to 1 October 2006;

(g)    any other liabilities that the Transferor and Transferee agree are Excluded Liabilities.

**"Existing Out-of-Balance Condition"** shall mean, in relation to the Business, as of a specified date and with respect to any appointment of the Transferor to act in a Corporate Trust Capacity, a situation where, as of such date, (i) the amount legally owing or collectible with respect to Securities outstanding or realised in connection with the appointment as reflected in the records of the Business differs from the amount of funds, collateral or trust assets held by the Business, or differs from the amount of

58

the issuer's or obligor's legal obligation to the Business under the applicable Corporate Trust Agreement for payments due with respect to such Securities, excluding funds transferred to any governmental authority pursuant to any abandoned property law, (ii) an excess or duplicate payment or overdraft payment has been made with respect to Securities issued in connection with such appointment that has not been recovered, or (iii) Custodial Asset or cash balances for an appointment of the Transferor to act in a Corporate Trust Capacity reflected in the related records delivered to the Transferee differs from the fund held for payment of securities due or to become due for such appointment.

"FSA" means the Financial Services Authority.

"FSA Handbook" means the FSA Handbook of rules and guidance issued by the FSA from time to time made pursuant to the Act.

"Global Transaction" means the commercial arrangement entered into pursuant to the purchase and assumption agreement dated 7 April 2006 (the "PAA") between JPMorgan Chase & Co. ("JPMorgan Chase") and The Bank of New York Company, Inc., in which JPMorgan Chase agreed, *inter alia*, to transfer part of its global corporate trust and agency business (the "Purchased Corporate Trust Business") carried on by various group subsidiaries (together, the "JPMorgan Group") and The Bank of New York Company, Inc. agreed, *inter alia*, to acquire (or to procure that its subsidiaries acquire) the Purchased Corporate Trust Business.

"Intellectual Property" shall mean all intellectual property rights or other similar proprietary rights owned or held for use under licence, including such rights in and to:

(a)        trademarks;

(b)        service marks;

(c)        copyrights and copyrightable works (including software);

(d)        patents;

(e)        invention disclosures, discoveries and improvements, whether or not patentable;

(f)        trade secrets;

(g)        rights to limit the use or disclosure of confidential information by any Person;

(h)        internet domain names;

(i)        registrations of, and applications to register, any of the foregoing with any governmental authority and any renewals or extensions thereof; and

(j)        the goodwill associated with each of the foregoing.

39

**"IT Assets"** shall mean computers, computer software, firmware, middleware, servers, workstations, routers, hubs, data communication lines, all other information technology equipment and all associated documentation, in each case primarily related to the Business.

**"JPMCB, London Branch"** means the London branch of the Transferor whose registered address is at 125 London Wall, London EC2Y 5AJ.

**"Lien"** shall mean, with respect to any property, any mortgage, deed of trust, easement, declaration, restriction, pledge, hypothecation, assignment, deposit arrangement, option, equity interest, encumbrance, lien (statutory or other), preference, participation interest, priority or other security arrangement or preferential arrangement of any kind or nature whatsoever relating to that property, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code (UCC) or comparable law of any jurisdiction to evidence any of the foregoing; provided, however that any lien deemed to be created by this Scheme shall not be deemed to constitute a Lien.

**"Non-Active Account Records"** means Records relating to Non-Active Accounts.

**"Non-Active Accounts"** means all accounts (and agreements for such accounts) of the Business that, on or prior to the Effective Time, have been fully called or matured and for which all cash has been distributed or escheated and the Corporate Trust Agreement for such account has been terminated.

**"Person"** shall be construed broadly and shall mean an individual, corporation, partnership, limited liability company, joint venture, trust or other entity or organisation or a governmental authority (or any department, agency or political subdivision).

**"Private Label"** means an arrangement pursuant to which an institution who is contractually obliged to undertake certain obligations, out-sources such obligations to a third party.

**"Records"** means other than with respect to Non-Active Accounts, all books, records and other data to the extent relating to the Business, including all files, customer and supplier lists, mailing lists, accounting records, documentation or records relating to the Business or the administration of the Corporate Trust Agreements catalogues, printed materials and all technical and other data relating to the Business, other than (i) corporate minute books and, except for United States Internal Revenue Service Forms W-8 and W-9 and similar tax forms provided to the Transferor by customers of the Business, income tax records of the Transferor, (ii) personnel files and records and (iii) books and records to the extent relating to accounts that terminated prior to the Effective Time and are no longer on the systems of the Transferor;

**"Relevant Date"** has the meaning ascribed thereto in Clause 11 (*Additional Provisions in relation to the Business*).

40

**"Residual Assets"** means all or any part of a Business Asset which:

(a)     the Court has declined to order the transfer to the Transferee at the Effective Time under Section 112(2) of the Act;

(b)     in respect of which its transfer pursuant to an order of the Court (i) is not recognised by the laws of the jurisdiction in which the property is situated or (ii) will not be recognised or be effective or be capable of enforcement without further steps being taken;

(c)     does not for legal, practical, regulatory or other reasons transfer or vest in the Transferee on the Transfer Date;

(d)     is a Contract or a Custodial Asset, or is reliant upon, or connected with, or dependent on, a Contract or a Custodial Asset which would become, in whole or in part, unenforceable or invalid were this Scheme to transfer or purport to transfer, without more, such Contract or Custodial Asset to the Transferee;

(e)     any other interest of the Transferor in any Business Asset which the Transferor and the Transferee shall determine prior to the Transfer Date is more conveniently to be transferred pursuant to this Scheme at a later time;

(f)     without prejudice to the generality of the foregoing, is a Lien or any asset (whether or not a Contract and/or Custodial Asset) subject to a Lien the transfer of which pursuant to an order of the Court either

    (i)     in the case of a Lien,

        (aa) will not be recognised by the laws of the jurisdiction either (x) pursuant to which such Lien was created or (y) of the *lex situs* of some or all of the assets subject to such Lien; or

        (bb) will not be recognised or be fully effective or fully capable of enforcement,

        without, in the case of either (aa) or (bb) above, further steps being taken including, if applicable in relation to the laws of a particular jurisdiction, the operational transfer from the Transferor to the Transferee (whether in the capacity of agent and/or fiduciary (including as trustee or custodian)) of any asset subject to any such Lien; or

    (ii)     in the case of any asset subject to a Lien,

        (aa) the transfer of the Lien to which it is so subject will not be so recognised, fully effective or fully capable of enforcement without such further steps being taken, including such operational transfer; or

        (bb) the transfer of such asset would cause the Lien to which it is subject not to be so recognised, fully effective or fully capable of enforcement,

and, for the avoidance of doubt, any such asset subject to a Lien in the case of (i) above and the Lien over any such asset in the case of (ii) above shall be a Residual Asset;

(g)    without prejudice to the generality of the foregoing, is a trusteeship pursuant to which any trust asset which is a Residual Asset is held and the role of trustee (irrespective of the law governing the trust document) shall be a Residual Asset and will not transfer pursuant to the order of the Court unless and until all such Residual Assets so held cease to be Residual Assets, and no Residual Asset so held or such trusteeship shall cease to be a Residual Asset until all such Residual Assets so held and such trusteeship transfer; or

(h)    any proceeds of sale or income or other accrual or return, whether or not in the form of cash, earned or received from time to time after the Transfer Date in respect of any Business Asset referred to in (a) to (g) above.

"**Residual Liability**" means all or any part of a Business Liability which:

(a)    is attributable to or connected with a Residual Asset and arises at any time before a Subsequent Transfer Date applicable to such Residual Asset;

(b)    the Court has declined to order the transfer to the Transferee under Section 112(2) of the Act or is outside the jurisdiction of the Court;

(c)    in respect of which its transfer pursuant to an order of the Court (i) is not recognised by the laws of the jurisdiction in which the property is situated or (ii) will not be recognised or be effective or be capable of enforcement without further steps being taken;

(d)    is a Contract or a Custodial Asset, or is reliant upon, or connected with, or dependent on, a Contract or a Custodial Asset which would become, in whole or in part, unenforceable or invalid were this Scheme to transfer or purport to transfer, without more, such Contract or Custodial Asset to the Transferee;

(e)    does not for legal, practical, regulatory or other reasons transfer or vest in the Transferee on the Transfer Date;

(f)    without prejudice to the generality of the foregoing, is a Lien or any asset (whether or not a Contract and/or Custodial Asset) subject to a Lien the transfer of which pursuant to an order of the Court either

(i)    in the case of a Lien,

(aa) will not be recognised by the laws of the jurisdiction either (x) pursuant to which such Lien was created or (y) of the *lex situs* of some or all of the assets subject to such Lien; or

(bb) will not be recognised or be fully effective or fully capable of enforcement,

42

without, in the case of either (aa) or (bb) above, further steps being taken including, if applicable in relation to the laws of a particular jurisdiction, the operational transfer from the Transferor to the Transferee (whether in the capacity of agent and/or fiduciary (including as trustee or custodian)) of any asset subject to any such Lien; or

(ii)    in the case of any asset subject to a Lien,

(aa) the transfer of the Lien to which it is so subject will not be so recognised, fully effective or fully capable of enforcement without such further steps being taken, including such operational transfer; or

(bb) the transfer of such asset would cause the Lien to which it is subject not to be so recognised, fully effective or fully capable of enforcement,

and, for the avoidance of doubt, any such asset subject to a Lien in the case of (i) above and the Lien over any such asset in the case of (ii) above shall be a Residual Liability;

(g)    without prejudice to the generality of the foregoing, is a trusteeship pursuant to which any trust asset which is a Residual Liability is held and the role of trustee (irrespective of the law governing the trust document) shall be a Residual Liability and will not transfer pursuant to the order of the Court unless and until all such Residual Liabilities so held cease to be Residual Liabilities, and no Residual Liability so held or such trusteeship shall cease to be a Residual Liability until all such Residual Liabilities so held and such trusteeship transfer; or

(h)    any Business Liability which the Transferor and the Transferee shall determine prior to the Transfer Date is more conveniently to be transferred pursuant to this Scheme at a later time.

"**Scheme**" means this Scheme in its present form or with any modification thereof or addition thereto or condition approved or imposed by the Court.

"**Securities**" shall mean any pass-through certificates, asset-backed certificates, participation certificates, bonds, collateralised mortgage obligations, collateralised debt obligations, revenue certificates, custody receipts, trust receipts, notes, debentures or other instruments evidencing a right to monetary distributions or payments which were issued in connection with an appointment of the Transferor to act in a Corporate Trust Capacity pursuant to any Corporate Trust Agreement (whether or not such instrument is referred to as a "security" or as some other kind of instrument (such as a mortgage participation) under such Corporate Trust Agreement).

"**Security**" means any Lien granted to the Transferor in the capacity of security trustee or pledgee to secure the repayment of a debt (the "**Claim**").

43

"**Stale Cheques**" means, in relation to the Business, the cheques described in exception (b) to the definition of "Custodial Assets" that have not been presented for payment as of the date the Transferor shall have transferred the cash covering such cheques, pursuant to the terms as separately agreed between the parties, and funds which have not been escheated to a government authority pursuant to applicable law.

"**Subsequent Transfer Date**" means, in relation to any Residual Asset or Residual Liability, each date after the Transfer Date on which any impediment (being one or more of the matters referred to in paragraphs (a)-(h) of the definition of Residual Asset or Residual Liability, as the case may be) to the transfer of such Residual Asset or Residual Liability shall have been removed so that such Residual Asset or Residual Liability is transferred to the Transferee.

"**Transfer Date**" means the date upon which the Transferred Assets and Transferred Liabilities shall be transferred in accordance with Clause 9 (*Transfer Date*).

"**Transferee**" means The Bank of New York, a New York state-chartered bank (with registered number FC005522) having a branch with its registered office at One Canada Square, London E14 5AL.

"**Transferor**" means JPMorgan Chase Bank, National Association, with its head office in Ohio (with registered number FC004891) having a branch with its registered office at 125 London Wall, London EC2Y 5AJ.

"**Transferred Assets**" means all Business Assets other than the Residual Assets (unless and until they transfer on a Subsequent Transfer Date).

"**Transferred Liabilities**" means the Business Liabilities other than the Residual Liabilities (unless and until they transfer on a Subsequent Transfer Date).

"**Trust Documents**" means any document creating a trust or other fiduciary arrangement and (unless the context requires otherwise) includes any deed or other document executed in accordance with the provisions of such deed or document expressed to be supplemental to such deed or document, as applicable.

1.2     In this Scheme

1.2.1     "**property**" includes property, assets, rights (including contingent rights as to the repayment of tax), benefits and powers of every description (whether present or future, actual or contingent) and for the avoidance of doubt includes rights under the Contracts and any interest in any of the foregoing.

1.2.2     "**liabilities**" includes obligations and duties of every description (whether present or future, actual or contingent);

1.2.3     "**transfer**" includes "**assign**" or "**assignation**" or "**assignment**" or "**dispose**" or "**disposal**" or "**convey**" or "**conveyance**" as the case may be; and

44

1.2.4  the expressions "**subsidiary**", "**subsidiary undertaking**" and "**holding company**" shall have the meaning given in the Companies Act 1985.

1.3  Any reference in this Scheme to an enactment, a statutory provision or any subordinate legislation shall be deemed to include a reference to that enactment, statutory provision or subordinate legislation as amended, replaced or re-enacted from time to time and to any instrument or order made from time to time under such enactment, statutory provision or subordinated legislation.

1.4  Any reference to the singular shall include the plural and vice versa. Any reference to the masculine shall include a reference to the feminine and vice versa.

1.5  Any reference to a Clause is a reference to a Clause of this Scheme.

1.6  Any reference to "**including**" shall be construed as including without importing any limitation thereto.

2.  **INTRODUCTION**

2.1  The Transferor and the Transferee are authorised persons who are not United Kingdom authorised persons.  The Transferor and Transferee have permission from the FSA pursuant to Part IV of the Act to accept deposits.

2.2  The Business includes the accepting of deposits.

2.3  Some of the Business is subject to regulation by the FSA under the Financial Services and Markets Act 2000, namely accepting deposits (as defined in paragraph 5 of The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 (the "RAO")) and the safeguarding and administering of investments (as defined in paragraph 40 of the RAO) and, in certain circumstances, particularly where the Transferor's duties include the exercise of discretion upon default by an issuer, managing investments (as defined in paragraph 37 of the RAO).  All other aspects of the Business are not specifically subject to regulation by the FSA, although both the Transferor and the Transferee are subject to supervision by the FSA in respect of matters relating to the prudential operation of their business in the UK, for example through compliance with regulations relating to systems, controls and regulatory capital.

2.4  It is proposed that the Business be transferred from the Transferor to the Transferee, which will carry on the Business in the United Kingdom.

3.  **TRANSFER OF THE BUSINESS**

3.1  The Business shall be transferred to and be vested in the Transferee as a going concern in accordance with this Scheme.

45

3.2    At the Effective Time, the Transferee shall acquire the Business from the Transferor in accordance with this Scheme, such that:

3.2.1    on and with effect from the Effective Time, the Transferred Assets shall by this Scheme and without further act or instrument be transferred to, and legal and beneficial title in respect of the Transferred Assets shall vest in, the Transferee, subject to all Liens affecting such assets; and

3.2.2    on and with effect from the Effective Time, the Transferred Liabilities shall by this Scheme and without further act or instrument be transferred to, and shall become liabilities of, the Transferee and shall cease to be liabilities of the Transferor.

3.3    On and with effect from the applicable Subsequent Transfer Date, each Residual Asset shall, subject to Clauses 3.6 and 3.9 below, by this Scheme and without further act or instrument be transferred to, and legal title (the beneficial title having transferred on the Transfer Date pursuant to the creation of the trust described in Clause 3.6 below) in respect of such Residual Assets shall vest in, the Transferee (subject to all Liens affecting such assets).

3.4    On and with effect from the applicable Subsequent Transfer Date, each Residual Liability shall, subject to Clause 3.6 below, by this Scheme and without further act or instrument be transferred to, and shall become a liability of, the Transferee and shall cease to be a liability of the Transferor.

3.5    As further provided by the definition of "Residual Asset", the transfer of the role of trustee from the Transferor to the Transferee (irrespective of the law governing the trust document), will be delayed under the Order (without prejudice to the transfer of any other role related to such transaction which does not require any further steps to be taken) unless and until any further steps that are required under the laws of a particular jurisdiction are taken with respect to the transfer of any related trust asset held by a trustee on trust for its beneficiaries; at which time, such role and the related trust asset will transfer simultaneously.

3.6    The Transferor will, from the Transfer Date until the Subsequent Transfer Date applicable thereto, hold any Residual Asset together with any proceeds of sale, income or other accrual or return arising in respect thereof, on trust for the Transferee absolutely (save to the extent that (i) the creation of such trust would itself fall within the scope of paragraph (a) of the definition of Residual Asset, or would be outside the jurisdiction of the Court as specified in paragraph (b) thereof or that such Residual Asset is a Contract or is reliant upon, or connected with, a Contract the terms of which would become in whole or part unenforceable or invalid by virtue of the creation of such trust or (ii) the creation of such trust would cause a breach of, or default under, any Contract to which the Transferor is party or would give rise to any right of acceleration of any obligation or any right of termination pursuant to any such Contract or (iii) cannot be created for any other reason) and will retain any Residual Liability (without prejudice to any other arrangements between the Transferor and the

Transferee in relation to the same) provided that nothing in this paragraph shall require the Transferor to act contrary to its obligations under any Contract to which the Transferor is party and which is a Residual Asset, all of which obligations shall prevail over the trust hereby created.

3.7    The Transferor shall be subject to the Transferee's reasonable directions in respect of any Residual Assets until all of the Residual Assets are transferred to or otherwise vested in the Transferee, or are disposed of, as so provided in any Contract (whereupon the Transferor shall hold the proceeds thereof as provided under such Contract) and the Transferee shall have authority to act as the attorney of the Transferor in respect of the Residual Assets for all purposes.

3.8    In the event of any payment being made to or right or benefit being conferred upon or accruing to the Transferor in respect of any of the Transferred Assets after, as appropriate, the Transfer Date or the Subsequent Transfer Date therefor, the Transferor shall hold such sums on trust and shall, as soon as is reasonably practicable after its receipt pay over the amount of such payment or transfer or assign such right or benefit to or in accordance with the directions of the Transferee.

3.9    The Transferor and the Transferee shall each take all such reasonable steps and do all such reasonable things (including the execution and delivery of any documents) as may be necessary or desirable to give effect to this Scheme including without limitation to effect the transfer to the Transferee of the Business (including the Transferred Assets and the Transferred Liabilities and the Residual Assets and the Residual Liabilities) in accordance with this Clause 3, save to the extent that the Transferee notifies the Transferor that it shall not require such steps to be taken.

3.10   If any Business Asset is governed by the law of any country or territory outside the United Kingdom, the Transferor shall provide all reasonable assistance to the Transferee for securing the transfer to the Transferee of such Business Asset to ensure that it is fully effective under the law of that country or territory.

4.     **CONSEQUENCES OF VESTING**

4.1    The transfer and vesting of any Business Asset or Business Liability shall not:

4.1.1    invalidate or discharge any contract, security or other thing; or

4.1.2    require further registration in respect of any security or other instrument (including instruments creating or acknowledging indebtedness) registered in the United Kingdom; or

4.1.3    constitute a breach of, or default under, or require compliance with any notice or consent provision or require any obligation to be performed sooner or later than would have otherwise been the case under, any contract or instrument to which the Transferor is a party or is bound; or

47

4.1.4    allow any party to a contract to which the Transferor is a party to terminate that contract when he would not otherwise have been able to terminate it; or

4.1.5    entitle any party to any contract to which the Transferor is a party to vary the terms of that contact when that party would not otherwise have been able to vary those terms or confer a right or benefit on it which it' would not otherwise have had; or

4.1.6    save as otherwise provided herein, confer any greater or lesser rights or benefits, or impose any greater or lesser obligations, on any party to any contract to which the Transferor is a party when that greater or lesser obligation would not otherwise have been imposed.

## 5.    SPECIFIC PROVISIONS IN RESPECT OF CONTRACTS

5.1    On and with effect from the Transfer Date (or a Subsequent Transfer Date, as the case may be) in respect of each relevant Contract which is a Business Asset:

5.1.1    each of the Transferee and the relevant Person who is either (i) the contractual counterparty (a **"Counterparty"**) or (ii) has third party rights or equitable rights (each, a **"Third Party"**) in respect of a relevant Contract shall become entitled to the same rights under or pursuant to such Contract as were available to, or against, each of the Transferor, the Counterparty or any Third Party, immediately prior to the Transfer Date (or a Subsequent Transfer Date, as the case may be), and accordingly such rights that were available to, or against, each of the Counterparty and any Third Party as against the Transferor prior to the Transfer Date (or Subsequent Transfer Date as applicable) shall no longer by available and shall have been transferred to the Transferee;

5.1.2    in relation to each relevant Contract under which interest or other sums attributable or referable thereto and relating to a period since the Effective Time that continue to be payable:

(a)    the Transferee shall, on and with effect from the Transfer Date, account to the relevant persons whom such interest or other sums are payable for such interest or other sums;

(b)    the person or persons from whom such interest or other sums are due and payable shall, on and with effect from the Transfer Date, account to the Transferee for such interest or other sums; and

(c)    the Transferor shall, on and with effect from the Transfer Date, account to the Transferee for any further or additional interest or other sums attributable or referable thereto to the extent that the same are received by the Transferor;

5.1.3    each reference in such Contract to an account of the Transferor with another Person, or to an account of another Person with the Transferor, whether it is a trust account, an account subject to a security interest or for any other purposes, shall be read as being or including a reference to an account of the Transferee with such other Person, or of such other Person with the Transferee, which is subject to the same conditions and incidents as applied thereto immediately prior to the Transfer Date and such account (including the account number, if applicable) shall be deemed for all purposes to be a single continuing account, provided that nothing herein shall affect any right of any Person to such Contract pursuant to its terms to vary the conditions or incidents subject to which any such account is kept.

5.2    This Clause 5 shall be without prejudice to the general application of the provisions of this Scheme to Transferred Assets that are not Contracts.

6.    **MANDATES**

Any instruction or authority in force on the Transfer Date (including, without limitation, any instruction given to a bank by its customer in any form) and providing for the payment of any sum under or in respect of any of the Contracts to or by the Transferor shall, from and after the Transfer Date (or a Subsequent Transfer Date, as the case may be), take effect as if it had provided for and authorised such payment to or by the Transferee.

7.    **CONDUCT OF PROCEEDINGS**

7.1    If on or after the Transfer Date (or a Subsequent Transfer Date, as the case may be) there are judicial, quasi-judicial, administrative or arbitration proceedings (whether implemented, pending, threatened or otherwise) by or against the Transferor in connection with the Business, the Transferred Assets or the Transferred Liabilities, the same shall be continued by or against the Transferee and the Transferee shall be entitled to all defences, counterclaims and rights of set-off that would have been available to the Transferor in relation to the Business, the Transferred Assets and the Transferred Liabilities save to the extent that, for the avoidance of doubt, the Transferor shall retain liability for any such judicial, quasi-judicial, administrative or arbitration proceedings (whether implemented, pending, threatened or otherwise) arising out of the Transferor's conduct with respect to the Business, the Transferred Assets or the Transferred Liabilities prior to 1 October 2006, and shall continue to defend those proceedings in its own name.

7.2    If on or after a Subsequent Transfer Date, there are any judicial, quasi-judicial administrative or arbitration proceedings (whether implemented, pending, threatened or otherwise) by or against the Transferor in connection with the Residual Assets or Residual Liabilities, the same shall be continued by or against the Transferee and the Transferee shall be entitled to all defences, claims, counterclaims and rights of set-off that would have been available to the Transferor in relation to such Residual Assets or Residual Liabilities.

49

8.    **REFERENCES**

8.1    On and with effect from the Transfer Date (or in the case of any Residual Asset or Residual Liability, a Subsequent Transfer Date), any reference in any Contract or other document or instrument relating to or referring to the Business to:

    8.1.1    the Transferor, shall be construed as and to take effect as a reference to the Transferee in respect of the Business and references to the Transferor's contact details shall be read as being references to the Transferee's contact details;

    8.1.2    directors, officers, representatives or employees or to any director, officer, representative or employee employed or engaged by the Transferor, shall be construed as and to take effect as a reference to the directors, officers, representatives or employees of the Transferee or to such director, officer, representative or employee of the Transferee as the Transferee may nominate for that purpose; and

    8.1.3    a rate, charge, tariff or scale of fees or to terms or conditions published, determined, ascertained, varied or amended from time to time by the Transferor shall afford to the Transferee the same right under such contract, other document or instrument as the Transferor had to publish, determine, ascertain, vary or amend such rates, charges, tariffs, scales of fees, terms or conditions published, determined, or ascertained.

9.    **TRANSFER DATE**

9.1    This Scheme shall become effective and the Effective Time shall occur at 00.01am Greenwich Mean Time on Saturday 19 May 2007 subject to the Court having made an order under Section 111 of the Act sanctioning this Scheme.

9.2    The Transferor and the Transferee may resolve that the Effective Time may take effect on such later date as they shall determine. If this Scheme does not take effect before Sunday 18 November 2007, or such later date as the Court may allow upon the application of the Transferor and the Transferee, it shall lapse.

10.    **EVIDENCE: BOOKS AND DOCUMENTS**

10.1    All books and other documents that would, before the Transfer Date, have been evidence in respect of any matter for or against the Transferor at the Transfer Date, shall be admissible in evidence in respect of the same matter for or against the Transferee after the Transfer Date. In this Clause **"documents"** has the same meaning as in section 10 of the Civil Evidence Act 1968.

10.2    On and from the Transfer Date the Bankers' Books Evidence Act 1879 shall apply to any books of the Transferor transferred to, and vested in, the Transferee by virtue of this Scheme, and to entries made in those books before the Transfer Date, as if such books were the books of the Transferee.

50

10.3   For the purposes of section 4 of the Bankers' Books Evidence Act 1879, books so transferred to, and vested in the Transferee shall be deemed to have been the ordinary books of the Transferee at the time of the making of any entry therein which purports to have been made before the Transfer Date, and any such entry shall be deemed to have been made in the usual and ordinary course of business.

10.4   In this Clause 10 **"books"** shall be construed in accordance with section 9(2) of the Bankers' Books Evidence Act 1879.

## 11.   ADDITIONAL PROVISIONS IN RELATION TO THE BUSINESS

11.1   Without prejudice to the generality of the foregoing provisions, the following provisions shall have effect in relation to the Business, or any part thereof and for these purposes the **"Relevant Date"** means the Transfer Date except in the case of any Residual Asset or Residual Liability in which case it means a Subsequent Transfer Date:

11.1.1   any existing instruction, order, direction, mandate, power of attorney, authority, undertaking or consent given to or by the Transferor in respect of the Business (whether in writing or not and whether or not in relation to an account) shall have effect, on and from the Relevant Date, as if given to or, as the case may be, by the Transferee;

11.1.2   in respect of the Business, any negotiable instrument or order for payment of money drawn on or by, or given to, or accepted or endorsed by, the Transferor, or payable at any place of business of the Transferor, whether so drawn, given, accepted, endorsed or payable before, on or after the Relevant Date, shall have the same effect on and from the Relevant Date, as if it had been drawn on or by, or given to, or accepted or endorsed by the Transferee, or (as the case may be) as if the place of business at which it is payable were a place of business of the Transferee; and

11.1.3   the custody of tangible Active Account Records, and electronic copies of certain Active Account Records and certain Non-Active Account Records that are Electronic Records, shall pass to the Transferee at and with effect from the Relevant Date, and the rights and obligations of the Transferor under any contract of bailment relating to such Records shall on that day become rights and obligations of the Transferee save to the extent that Transferor will retain Active Account Records that are cancelled bonds and related documentation if such Active Account Records are commingled with Non-Active Records.

## 12.   DATA PROTECTION

12.1   In this Clause, terms shall be construed in accordance with the definitions in the Data Protection Act 1998.  With effect from the Transfer Date or Subsequent Transfer Date, as applicable;

51

12.1.1    in respect of all personal data comprised in the Business in respect of which the Transferor was the data controller immediately before the Transfer Date or Subsequent Transfer Date, as applicable (the **"Transferred Personal Data"**), the Transferee shall become the data controller;

12.1.2    any information made available to, or consent obtained or request or other notice received from, any data subject by or on behalf of the Transferor in respect of the Transferred Personal Data will be deemed to have been made available, obtained or received by the Transferee; and

12.1.3    any reference to the Transferor in any such information, consent, request or other notice will be deemed to include a reference to the Transferee.

### 13.    MODIFICATION

13.1    The Transferee may consent for and on behalf of the parties herein and all other persons concerned to make any modification of or addition to this Scheme that the Transferor accepts and which, prior to its sanction of this Scheme, the Court may approve or impose.

13.2    The Transferee may also consent for and on behalf of the parties to this Scheme and all other persons concerned to any modification of or addition to this Scheme which is of a minor or technical nature or to correct a manifest error, after sanction of this Scheme by the Court, which the FSA may approve following a review of the modification thereof or addition thereto.

13.3    In relation to any modification to or addition to this Scheme to be made after its sanction by the Court which is not within Clause 13.2 above, the Transferee shall be at liberty to apply to the Court for consent to amend its terms, provided that it any case, the FSA has been notified of the proposed modification or addition and has the right to be heard at any hearing of the Court at which such application is considered.

13.4    Any such sanction or approval may be given on the basis of such further conditions or provisions affecting this Scheme as the FSA may see fit to impose.

### 14.    THIRD PARTY RIGHTS

A person who is not a party to this Scheme has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce the terms of this Scheme.

### 15.    GOVERNING LAW

This Scheme shall be governed by and construed in accordance with English law.

Dated                          2007

25

## SCHEDULE 1
### LONDON CD BOOK OF BUSINESS



Schedule 1
London Book of Business
13 February 2007

53

**IN THE HIGH COURT OF JUSTICE**                              No. 1231 of 2007

**CHANCERY DIVISION**


IN THE MATTER OF

JPMORGAN CHASE BANK, N.A.

- and -

IN THE MATTER OF

THE BANK OF NEW YORK

- and -

IN THE MATTER OF

THE FINANCIAL SERVICES AND MARKETS ACT 2000


---

THE SCHEME

---

No. 1231 of 2007

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>CHANCERY DIVISION</u>
<u>COMPANIES COURT</u>

The Honourable Mr Justice David Richards


IN THE MATTER OF

JPMORGAN CHASE BANK, N.A.

and

IN THE MATTER OF

THE BANK OF NEW YORK

and

IN THE MATTER OF

THE FINANCIAL SERVICES AND

MARKETS ACT 2000

---

ORDER

---

Linklaters
One Silk Street
London EC2Y 8HQ
Tel:  (0)20 7456 2000
Fax:  (0)20 7456 2222

<u>Solicitors for the First Applicant</u>


Clifford Chance LLP
10 Upper Bank Street
London E14 5JJ
Tel:  (0)20 7006 1000
Fax:  (0)20 7006 5555
Ref: Yankee/Park: 70-40029903

<u>Solicitors for the Second Applicant</u>

**IN THE HIGH COURT OF JUSTICE**          No. 1231 of 2007

**CHANCERY DIVISION**

IN THE MATTER OF

**JPMORGAN CHASE BANK, N.A.**

- and -

IN THE MATTER OF

**THE BANK OF NEW YORK**

- and -

IN THE MATTER OF

**THE FINANCIAL SERVICES AND MARKETS ACT 2000**

---

**THE SCHEME**

---