## Exhibit A

**Sales Contract**

.

# SALES CONTRACT

by and between

## LB 2080 KALAKAUA OWNERS LLC

as Seller

and

## BW VCM KALAKAUA, LLC

as Purchaser

June 25, 2009

<u>SALES CONTRACT</u>

THIS SALES CONTRACT (this "**Agreement**") is made as of the Effective Date (as defined in Section 11.3, below) by and between **LB 2080 Kalakaua Owners LLC**, a Delaware limited liability company ("**Seller**"), and BW VCM Kalakaua, LLC, a Nevada limited liability company ("**Purchaser**").

<u>W I T N E S S E T H :</u>

WHEREAS, Seller is a debtor in possession under title 11, of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on April 23, 2009, in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, Seller's chapter 11 case is being jointly administered for procedural purposes with the chapter 11 case of certain of its affiliates in the case captioned *In re Lehman Brothers Holdings Inc. et al.* (Case No. 08-13555 (JMP) (the "**Bankruptcy Case**");

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, pursuant to Sections 363(b)(1) and 365(f) of the Bankruptcy Code, the Property (as such term is defined in Section 1.2 below) on the terms and conditions hereinafter set forth;

WHEREAS, Seller obtained its right, title and interest in and to the right, title and interest of King Kalakaua Owners, a Hawaii general partnership ("**KKO**") in the Property (as defined in Section 1.2 below) pursuant to that certain Commissioner's Quitclaim Assignment of Lease and Sublease dated as of November 8, 2006;

NOW, THEREFORE,  in consideration of the mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**I.**
**<u>Definitions; Sale and Purchase; Property</u>**

1.1     <u>Reserved</u>.

1.2     <u>Sale and Purchase</u>.  Seller agrees to sell, assign and convey unto Purchaser, and Purchaser agrees to purchase, assume and accept from Seller, for the price and subject to the terms, covenants, conditions and provisions herein set forth, the following (collectively, the "**Property**"):

(a)     all right, title and interest of the Seller in the following, subject to Permitted Encumbrances (collectively, the "**Real Property**"): (i) the leasehold estate created by that certain Amended and Restated Ground Lease dated as of July 1, 2003 (the "**Ground Lease**") by and between Kalaimoku-Kuhio Development Corp., a Hawaii corporation (the "**Ground Lessor/Sublessor**"), as landlord, and KKO, as tenant, a short form of which was filed with the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. 2980702 and noted on Transfer Certificate of Title No. 492,843, demising the

land more particularly described on **Exhibit "A"** attached hereto and incorporated herein by this reference (the "**Leasehold Land**"); (ii) the subleasehold estate created by that certain Amended and Restated Sublease dated as of July 1, 2003 (the "**Ground Sublease**") by and between the Ground Lessor/Sublessor, as sublessor, and KKO, as subtenant, a short form of which was filed in said Office as Land Court Document No. 2980701 and noted on Transfer Certificate of Title No. 509,502, demising a subleasehold interest in the land more particularly described on **Exhibit "B"** attached hereto and incorporated herein by this reference (the "**Subleasehold Land**" and together with the Leasehold Land, the "**Land**"); and (iii) all structures, improvements and fixtures located on the Land (collectively, the "**Improvements**"), including, but not limited to, the four-story commercial building with two levels of basement parking (the "**Building**");

(b)    all right, title and interest, if any, of Seller, in and to any land lying in the bed of any street, road or access way, opened or proposed, in front of, at a side of or adjoining the Land ("**Property Rights**");

(c)    All right, title and interest of Seller in and to all easements in or upon the Land and all other rights and appurtenances belonging or in any way pertaining thereto, if any ("**Appurtenances**");

(d)    If and to the extent assignable and to the extent of Seller's interest therein, if any:

(i)    all plans, drawings, guaranties, warranties and indemnifications, if any, received from architects, design consultants, suppliers, contractors, engineers, materialmen, subcontractors or other parties arising out of, or in connection with, the installation, construction or maintenance of the items described in Sections 1.2(a) through 1.2(f) (collectively, the "**Construction Documents and Rights**");

(ii)    all licenses, permits, certificates of occupancy and franchises issued by any federal, state, county or municipal authority, or other party, and all trade names, trademarks, service marks, copyrights or other intellectual property rights (including, without limitation, rights to use the name King Kalakaua Plaza), relating to the use, maintenance or operation of the items described in Sections 1.2(a) through 1.2(f) running to or in favor of Seller or pertaining to the items described in Sections 1.2(a) through 1.2(f) (collectively, the "**Intangibles**") provided, however, that Purchaser agrees that it shall assume the obligations to furnish parking to the licensee under that certain recorded Declaration of Covenants dated November 30, 2004 (the "**Declaration**"), pursuant to section 365(f) of the Bankruptcy Code and Transaction Approval (as such term is defined in Section 3.4(a));

(e)    All furniture, carpeting, draperies, appliances, building supplies, equipment, machinery, inventory, and other items of personal property owned by Seller and presently affixed or attached to, placed or situated upon the items described in Sections 1.2(a) through 1.2(f), and used primarily in connection with the ownership, operation and occupancy of the items described in Sections 1.2(a) through 1.2(f) (collectively, "**Personalty**"), including, without limitation, two (2) Koa wood outrigger canoes, and specifically excluding (i) any items of personal property owned or leased (by parties other than Seller) by lawful tenants, occupants and licensees of the items described in Sections 1.2(a) through 1.2(f) (collectively, "**Tenants**") under Leases (as defined below), and (ii) any items of personal property owned by third parties and leased to Seller; and

(f)      Seller's, lessor's and landlord's right, title and interest in, to and under any and all rents, leases, occupancy agreements and licenses (including, without limitation, an assignment of any and all legal or equitable claims for damages, injunctive relief or other remedies or rights, if any, but not including any right to collect Delinquent Rent (as such term is defined in Section 6.2(c)(iv) of this Agreement) to use space (collectively, "**Leases**") now affecting the Real Property. The only Lease in effect for the Real Property as of the Effective Date hereof is the Nike Lease, as such term is defined in Section 3.3(a) of this Agreement.

1.3      Reserved.

1.4      Contracts. Seller shall, at its sole cost and expense, terminate any existing management, leasing agreement and/or service, supply or maintenance contracts for or affecting the Property (collectively, "**Contracts**") on the Closing Date.

## II.
## Consideration

2.1      Purchase Price. The purchase price ("**Purchase Price**") to be paid by Purchaser to Seller for the sale and conveyance of the Property shall be THREE MILLION AND NO/100 DOLLARS ($3,000,000.00), which shall be payable in United States currency to Seller at the closing of the transaction contemplated hereby ("**Closing**") by wire transfer to Seller or its designee on the Closing Date (as defined in Section 6.1, below). This Agreement is not subject to any financing contingency. Any financing, if any, Purchaser elects to obtain for the purchase of the Property hereunder shall be Purchaser's sole responsibility and at Purchaser's sole expense; Seller shall have no obligation to assist or provide any financing in connection therewith.

2.2      Earnest Money.

(a)      On or before June 29, 2009 at 2:00 p.m. (Phoenix time), Purchaser shall deposit with TITLE GUARANTY ESCROW SERVICES, INC. (the "**Escrow Agent**"), 235 Queen Street, 1st Floor, Honolulu, Hawaii 96813, Attention: Ms. Barbara Paulo (telephone number (808) 521-0209; email address at bpaulo@tghawaii.com), by wire transfer of immediately available federal funds, the amount of FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00) (the "**Deposit**"). As used herein, the term "**Earnest Money**" shall mean the Deposit plus any interest accrued thereon while held by the Escrow Agent. The Earnest Money shall be non-refundable unless this Agreement is terminated pursuant to the provisions set forth in Sections 3.4(a), 5.2 or 6.1 below, or as otherwise expressly provided herein.

(b)      The Escrow Agent shall instruct Purchaser to wire the Deposit into an interest-bearing account. Such account shall have no penalty for early withdrawal, and Purchaser accepts all risks with regard to the account. The Earnest Money shall be held and delivered by the Escrow Agent as hereinafter provided. All interest earned shall be reported to the Internal Revenue Service as income of Purchaser unless this Agreement is terminated and the Earnest Money is paid to Seller pursuant hereto, in which case such interest shall be reported as income to Seller. Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent for such purpose.

(c)    The Earnest Money shall be paid to Seller by wire transfer of immediately available federal funds on the Closing Date.  The balance of the Purchase Price, as adjusted by the prorations and credits specified herein, less the Earnest Money, shall be paid to Seller by wire transfer of immediately available federal funds on the Closing Date.

## III.
## Review and Consent

3.1    <u>Review</u>.  Purchaser acknowledges that Purchaser and its authorized agents and representatives have had reasonable access to the Property to inspect and conduct such tests, investigations and analyses reasonably required by Purchaser prior to Purchaser's execution of this Agreement  In addition, Purchaser acknowledges that, prior to Purchaser's execution of this Agreement: (a) Seller has furnished to Purchaser and Purchaser's authorized agents and representatives non-public, confidential or proprietary information relating to the Property, pursuant to the terms, covenants and conditions of a separate Confidentiality and Right of Entry letter agreement made between Purchaser and Seller; (b) Seller has allowed Purchaser and Purchaser's authorized agents or representatives to inspect and make copies at its own expense of books, records, files and related items relating to the maintenance of the Property and non-confidential documentation and other items in Seller's files, to the extent Seller is authorized to disclose such items; and (c) Purchaser has obtained a current title report (the "**Title Report**") with respect to the Real Property from First American Title Insurance Company (the "**Title Company**"), together with complete copies of all exception documents referenced in the Title Report (all documents relating to the foregoing clauses (a) through (c) are herein collectively called the "**Documents**").  Purchaser acknowledges that many of the Documents were prepared by third parties other than Seller, and in most instances, were prepared prior to Seller's ownership of the Property.  Purchaser has conducted an independent review and analysis of the Documents and the Property prior to Purchaser's execution of this Agreement and acknowledges that it would not have executed this Agreement if it did not approve of or accept any matter arising under the Documents or relating to the Property.  As used in this Agreement, the term "**Permitted Encumbrances**" shall mean (A) matters caused by the actions of Purchaser; (B) all matters either shown on the Survey or listed as an encumbrances in Exhibit A to Exhibit "E" attached hereto, or any additional exceptions listed in the title commitment to be issued by the Title Company, provided they are reasonably acceptable to Purchaser; (C) rights of tenants under Leases; and (D) zoning, platting, subdivision, building and other municipal codes, ordinances, rules and regulations affecting the Property.

3.2    <u>No Representation or Warranty by Seller</u>.  Purchaser hereby acknowledges that Seller acquired the Property pursuant to a commissioner's quitclaim assignment of the Ground Lease and Ground Sublease through judicial foreclosure, that many of the Documents were obtained from or provided by the defendant in the foreclosure action, and, except as provided in Section 9.1, that Seller has not made and does not make any warranty or representation regarding the truth, accuracy or completeness of the Documents or the source(s) thereof.  Except as set forth in Section 9.1, Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Documents and (without limiting the effect of the representations and warranties set forth in Section 9.1) provided the Documents solely as an accommodation to Purchaser.

3.3    Third Party Cooperation; Estoppel Certificates.

(a)    Purchaser acknowledges that, as of the Effective Date, the sole tenant under a Lease, demising space within the Property is tenant Nike Retail Services, Inc. ("**Nike**") pursuant to Lease dated August 7, 1995 by and between Kalakaua Associates International Inc. and Nike, as amended by First Amendment to Lease Agreement dated June 12, 1997 by and between KKO and Nike and Second Amendment to Lease Agreement dated June 22, 1997 by and between KKO and Nike (the "**Nike Lease**"). Seller will use commercially reasonable efforts to obtain a tenant estoppel certificate from Nike (the "**Nike Estoppel**"), acknowledging that the Nike Lease constitutes the entire agreement between the parties thereto and advising whether any default exists on the part of the Seller under the Nike Lease, but Purchaser understands and acknowledges that Seller does not guaranty that Nike will agree to provide the Nike Estoppel in any particular form, in a timely manner, or at all. Seller shall not be deemed to be in default under this Agreement and Purchaser shall have no right to terminate or cancel this Agreement if, despite Seller's commercially reasonable efforts, Nike fails to issue the Nike Estoppel to Purchaser or if any estoppel provided by Nike discloses any matters not satisfactory to Purchaser.

(b)    Seller shall permit Purchaser to contact Nike regarding the Nike Lease and to enter into discussions with Nike regarding the Nike Lease and possible amendments thereto, provided, however, that (A) neither the amount of rent payable to the landlord under the Nike Lease nor Nike's waiver or consent to Purchaser's use of space at the Property pursuant to an existing co-tenancy provision in the Nike Lease shall be a condition precedent to Closing; and (B) Seller shall not be bound by any arrangement or amendments concerning the Nike Lease that may be made between Purchaser and Nike, such arrangements and amendments to become effective only after Closing. Purchaser understands and acknowledges that Seller is not an affiliate of Nike, and therefore cannot guaranty that Nike will be amenable to any discussions regarding the Nike Lease or to any arrangement or amendment thereto. Purchaser's failure to obtain any arrangement or amendment to the Nike Lease from Nike shall not entitle Purchaser to terminate or cancel this Agreement.

(c)    Seller shall use commercially reasonable efforts to obtain estoppel certificates from (i) the Ground Lessor/Sublessor; (ii) Oceanfront Hawaii, Inc., a Hawaii corporation ("**OH**"), the fee owner and master lessor of the Subleasehold Land; and (iii) HSH 2100 LLC ("**HSH**"), the licensee under the Declarations of Covenants dated March 30, 2004 by and between KKO as Licensor, and HSH as Licensee, recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. 3213811 (the "**Declaration of Covenants**"). In the case of the Ground Lessor/Ground Sublessor, Seller shall request that Ground Lessor/Ground Sublessor issue an estoppel acknowledging that the Ground Lease and Ground Sublease are in full force and effect, constitute the agreement between the parties thereto and advising whether any default exists on the part of Seller under the Ground Lease or Ground Sublease. In the case of OH, Seller shall request that OH issue an estoppel acknowledging that the ground lease for the Subleased Land is in full force and effect, constitutes the agreement between the parties thereto and advising whether any default exists under such ground lease. In the case of HSH, Seller shall request that HSH issue an estoppel acknowledging that the Declaration of Covenants is in full force and effect, constitutes the entire agreement between the parties thereto and advising whether any default exists on the part of Seller under the Declaration of Covenants. Purchaser understands and acknowledges that Seller does not guaranty that Ground Lessor/Ground Sublessor, OH or HSH will agree to provide the requested

estoppels in any particular form, in a timely manner, or at all. Seller shall not be deemed to be in default under this Agreement and Purchaser shall have no right to terminate or cancel this Agreement if, despite Seller's commercially reasonable efforts, Ground Lessor/Ground Sublessor, OH or HSH fails to issue the requested estoppels to Purchaser or if any estoppel provided by Ground Lessor/Ground Sublessor, OH or HSH discloses any matters not satisfactory to Purchaser.

(d)    For the purposes of Section 3.3, "**commercially reasonable efforts**" shall mean that Seller shall contact the party from whom an estoppel is sought to obtain same and will follow up on the request by telephone or email as Seller deems appropriate provided Seller shall not be required to expend any money or to commence litigation or take any other action to obtain any estoppel.

3.4    Bankruptcy Court Approval; Submission to Jurisdiction; Dispute Resolution.

(a)    Purchaser and Seller agree that the Closing is subject to an order of the Bankruptcy Court authorizing Seller to consummate the transactions contemplated hereby and approving the provisions of this Agreement, including the assumption and assignment (free and clear of pre-closing liabilities or defaults and without the necessity of any consents) of the Leases, the Ground Lease, the Ground Sublease, and the Declaration of Covenants, to Purchaser pursuant to the terms hereof ("**Transaction Approval**"). The Bankruptcy Court order granting Transaction Approval shall be in a form reasonably acceptable to Purchaser, include a finding that Purchaser is a good faith purchaser under the Bankruptcy Code, and be binding upon the Groundlessor/Sublessor, Nike and any other party to a lease or contract being assigned to Purchaser. Purchaser and Seller agree that this Agreement shall be of no force or effect with respect to the Seller until Transaction Approval is granted by the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Transaction Approval, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes including, but not limited to, providing necessary assurances of performance by Purchaser under this Agreement and adequate assurance of future performance by Purchaser under the Ground Leases, the Ground Sublease, the Leases, and the Declaration of Covenants. Purchaser shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Property hereunder. In the event Transaction Approval shall be appealed and in the event Seller elects to defend such appeal, Purchaser shall promptly take such actions as are reasonably requested by Seller to assist in defending an appeal. If the Bankruptcy Court denies Seller's request for Transaction Approval or if Transaction Approval is not obtained by the day prior to the Closing Deadline (as such term is defined in Section 6.1 below), Seller and Purchaser shall each have the right to terminate this Agreement at any time thereafter by giving written notice to the other party, whereupon all of the provisions of this Agreement shall terminate. In addition, Seller shall have the additional right to terminate this Agreement if Seller is required by order of the Bankruptcy Court or stipulation to make any payment under the Ground Lease or the Ground Sublease prior to its receipt of the Purchase Price from Purchaser and, if as a result of failure to make such payment, the Ground Lease or Ground Sublease would be terminated prior to Closing. Upon any termination pursuant to this Section 3.4(a), neither Seller nor Purchaser shall have any further obligation or liability to the other hereunder. Upon the terminating party's delivery to the other of such notice of termination, Escrow Agent is hereby irrevocably instructed, and shall have the unconditional right, to return the Earnest Money to Purchaser. Further, in the event the Bankruptcy Court does

not allow for a private sale of the Property and subjects the disposition of the Property to a bid or auction process, and Purchaser is not the successful bidder at any such bid or auction in a purchase price not to exceed the amount of the Purchase Price, then this Agreement shall automatically be terminated and of no further force and effect and Escrow Agent shall immediately release and refund to Purchaser the Earnest Money.

(b)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit all claims and disputes to mediation and arbitration with Dispute Prevention and Resolution ("**DPR**") in Honolulu, Hawaii, for the resolution of any such claim or dispute, as more particularly described below. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such venue or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    <u>Mediation</u>

(1)    Except as provided in Section 3.4(b), any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

(2)    The parties shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with Commercial Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with DPR in Honolulu, Hawaii. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

(3)    The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in Honolulu, Hawaii, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

(d)    <u>Arbitration</u>

(1)    Except as provided in Section 3.4(b), any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to arbitration. Prior

to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Section 3.4(c) above.

(2)    Claims, disputes and other matters in question between the parties that are not resolved by mediation within twenty (20) business days following the appointment of a mediator shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be conducted by an independent third party arbitrator with at least fifteen (15) years experience as a commercial or real estate attorney or judge and otherwise in accordance with the Commercial Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with DPR. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(3)    If the parties are unable to mutually agree upon an arbitrator within 10 business days of one party's demand for arbitration, then each party shall each appoint one arbitrator satisfying the foregoing qualifications within 5 days of the expiration of such 10-day period. Thereafter, each party's arbitrator shall then appoint a third arbitrator satisfying the foregoing qualifications within 30 days of their appointment. A hearing will be held by such third arbitrator at DPR Honolulu, Hawaii, within ten (10) business days after the appointment of the third arbitrator (or as soon as practical thereafter as the arbitrator is available), at which each party shall be present and to which the parties may bring counsel. The arbitrator may impose any rules that the arbitrator deems reasonable or necessary consistent with the provisions of this Section. The arbitrator shall permit each party to provide a written and oral statement as to their position. As to each matter presented to the arbitrator for a decision, the arbitrator shall choose either Purchaser's position or Seller's position and may not choose a compromise or other position. The arbitrator shall make a decision within five (5) days after completion of the arbitration or as promptly as possible thereafter. The decision of the arbitrator shall be final and non-appealable and may be enforced by a court of competent jurisdiction.

(4)    Each party acknowledges that there is a benefit to all parties in having disputes resolved as expeditiously as possible and that there is a need for a streamlined method of resolving disputes as described in this Section 3.4(d) so that work is not unduly delayed. If a party fails to appear at a properly noticed hearing, then the arbitrator shall still make a decision based on the evidence submitted. The non-prevailing party shall pay the fees and costs of the arbitrator and if there are multiple decisions made at the arbitration hearing, the arbitrator shall allocate the fees and costs to the non-prevailing party(ies).

3.5    Property Conveyed "AS IS".

(a)    Disclaimer of Representations and Warranties By Seller. Except for the representations and warranties set forth in this Agreement and the warranty of title set forth in the Assignment of Ground Lease/Sublease (as hereinafter defined), but notwithstanding anything contained herein to the contrary contained herein, it is understood and agreed that neither Seller, nor any agent, employee, officer, director, attorney, broker, contractor, representative or property manager of Seller have made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, statutory, oral or written, past, present or future, with respect to the Property, including, but not limited to,

warranties, representations or guaranties as to any of the following matters, whether patent or latent: (i) matters of title, (ii) environmental matters relating to the Property or any portion thereof, (iii) geological conditions, including, without limitation, subsidence, subsurface conditions, water table, underground water reservoirs, limitations regarding the withdrawal of water and earthquake faults and the resulting damage of past and/or future earthquakes, (iv) whether, and to the extent to which the Property or any portion thereof is affected by any stream (surface or underground), body of water, flood prone area, flood plain, floodway or special flood hazard, (v) drainage, (vi) soil conditions, including the existence of instability, past soil repairs, soil additions or conditions of soil fill, or susceptibility to landslides, or the sufficiency of any undershoring, (vii) zoning to which the Property or any portion thereof may be subject, (viii) the availability of any utilities to the Property or any portion thereof including, without limitation, water, sewage, gas and electric, (ix) usages of adjoining Property, (x) access to the Property or any portion thereof, (xi) the value, compliance with the plans and specifications, size, location, age, use, design, quality, description, habitability, suitability, structural integrity, operation, or physical or financial condition of the Property or any portion thereof, including, without limitation, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities or the electrical, mechanical, HVAC, plumbing, sewage or utility systems, facilities or appliances at the Property, if any, or any income, expenses, charges, liens, encumbrances, rights or claims on or affecting or pertaining to the Property or any part thereof, (xii) the presence of Hazardous Substances (hereinafter defined) in or on, under or in the vicinity of the Property, (xiii) the condition or use of the Property or compliance of the Property with any or all past, present or future federal, state or local ordinances, rules, regulations or laws, building, fire or zoning ordinances, codes or other similar laws, including, without limitation, the Americans with Disabilities Act, or any other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability or standards of conduct concerning access and accommodation for disabled persons, (xiv) the existence or non-existence of underground storage tanks, (xv) any other matter affecting the stability or integrity of the Property, (xvi) the potential for further development of the Property, (xvii) the existence of land use, zoning or building entitlements affecting the Property, or (xviii) the habitability, merchantability, or suitability of the Property or fitness of the Property for any particular purpose (Purchaser affirming that Purchaser has not relied on Seller's, or any of its agents' employees', officers', directors', attorneys', brokers', contractors', representatives' or property managers' skill or judgment to select or furnish the Property for any particular purpose, and that Seller makes no warranty that the Property is fit for any particular purpose); provided the foregoing shall not impair the effect of any representations or warranties set forth herein or the warranty of title set forth in the Assignment of Ground Lease/Sublease.

      (b)   Sale "As-Is; Where-Is". Purchaser has not relied upon and will not rely upon, either directly or indirectly, any representation or warranty of Seller or any of its respective agents, employees, officers, directors, attorneys, brokers, contractors, representatives or property managers and acknowledges that no such representations have been made, except for the representations and warranties set forth in this Agreement. Purchaser represents that it is a knowledgeable, experienced and sophisticated purchaser of real estate and that it is relying solely on its own expertise and that of Purchaser's consultants in purchasing the Property. Purchaser has conducted such inspections and investigations of the Property as Purchaser deemed necessary, including, but not limited to, the physical and environmental conditions thereof, and is relying upon the same. Upon closing, Purchaser shall assume the risk that adverse matters, including, but not limited to, adverse physical and environmental conditions, may not have been revealed by Purchaser's inspections and investigations. Purchaser acknowledges and agrees that

upon Closing, Seller shall sell and convey to Purchaser and Purchaser shall accept the Property AS IS, WHERE IS, and WITH ALL FAULTS; provided the foregoing shall not impair the effect of any representations or warranties set forth in this Agreement. Purchaser further acknowledges and agrees that there are no oral agreements, warranties or representations, collateral to or affecting the Property by Seller, any agent of Seller or any third party. The terms and conditions of this Section 3.5 shall expressly survive the Closing, not merge with the provisions of any closing documents and shall be incorporated into the certificate required to be delivered as one of the closing documents. Seller is not liable or bound in any manner by any oral or written statements, representations, or information pertaining to the Property furnished by any real estate broker, agent, employee, servant or other person, unless the same is specifically set forth or referred to herein. Purchaser acknowledges that the Purchase Price reflects the "as is" nature of this sale and any faults, liabilities, defects or other adverse matters that may be associated with the Property; provided the foregoing shall not impair the effect of any representations or warranties set forth in this Agreement. Purchaser has fully reviewed the disclaimers and waivers set forth in this Agreement with its counsel and understands the significance and effect thereof.

(c) <u>Hazardous Substances Defined</u>. For purposes hereof, "**<u>Hazardous Substances</u>**" means any hazardous, toxic or dangerous waste, substance or material, pollutant or contaminant, as defined for purposes of the Comprehensive Environmental Response, Compensation and Liability Act Of 1980 (42 U.S.C. Sections 9601 <u>et seq</u>.), as amended ("**<u>CERCLA</u>**"), or the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 <u>et seq</u>.), as amended ("**<u>RCRA</u>**"), or any other federal, state or local law, ordinance, rule or regulation applicable to the Property, or any substance which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous, or any substance which contains gasoline, diesel fuel or other petroleum hydrocarbons, polychlorinated biphenyls (pcbs), radon gas, urea formaldehyde, asbestos, lead or electromagnetic waves. Without limitation of the other provisions of this Section 3.5, except as provided in Section 9.1, Purchaser acknowledges to and agrees with Seller that Seller has not, does not and will not make any representation or warranty with regard to compliance with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements, including, but not limited to, those pertaining to the handling, generating, treating, storing or disposing of any hazardous substances, including CERCLA and RCRA. Except as provided in Section 9.1, but without otherwise limiting the foregoing, Seller does not make and has not made and specifically disclaims any representation or warranty regarding the presence or absence of any Hazardous Substances at, on, under or about the Property or the compliance or non-compliance of the Property with CERCLA or RCRA, the Federal Water Pollution Control Act, the Federal Environmental Pesticides Act, the Clean Water Act, the Clean Air Act, any federal, state or local so-called "Superfund" or "Superlien" statute, or any other statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability or standards of conduct concerning any Hazardous Substances (collectively, the "**<u>Hazardous Substance Laws</u>**"). The disclaimer set forth herein shall not be affected or limited in any way by any investigation conducted by Seller or any contractor, agent or employee of Seller, or delivery by Seller to Purchaser of copies of any environmental study or report prepared by any environmental testing firm on behalf or at the direction of Seller, Purchaser or any other party. Seller has not conducted any independent investigation or verification of the contents of any such study or report, and makes no representation or warranty with respect to the accuracy or completeness of the information contained therein.

## IV.
## Survey and Environmental Assessment Report

4.1    Survey.  Upon its execution of this Agreement, Purchaser shall order and use commercially reasonable efforts to obtain an ALTA Urban Survey of the Land and Improvements (the "**Survey**") and a current Phase I environmental assessment report (the "**Phase I Report**"), in an efficient and timely manner at Purchaser's sole cost.  Purchaser shall deliver copies of the Survey and the Phase I Report to Seller immediately following Purchaser's receipt thereof.

## V.
## Remedies

5.1    Seller's Remedies.  In the event Purchaser shall default in the performance of any of its obligations hereunder and thereafter fails to cure the same within five (5) days following receipt of written notice from Seller (however, no such cure period shall serve to extend the date upon which the Deposit is due or the Closing Date), Seller shall be entitled, as its sole and exclusive remedy, to terminate this Agreement and recover the Earnest Money as liquidated damages for such default, and not as a penalty or forfeiture, in satisfaction of claims against Purchaser hereunder.  In such case, Seller shall be free to offer the Property for sale to third parties, and Purchaser and Seller shall have no further obligations hereunder.  Seller and Purchaser agree that it would be impracticable and extremely difficult to fix the actual damages suffered by Seller as a result of Purchaser's failure to complete the purchase of the Property pursuant to this Agreement.  Notwithstanding the foregoing, in the event Purchaser fails to make the Deposit as required pursuant to Section 2.2(a), Seller's sole and exclusive remedy shall be to terminate this Agreement, in which case Purchaser and Seller shall have no further obligations hereunder.  The parties further agree that under the circumstances existing as of the date hereof, the liquidated damages provided for in this Section 5.1 represent a reasonable estimate of the damages which Seller would incur as a result of such failure.

5.2    Purchaser's Remedies.  Subject to Transaction Approval, in the event Seller shall default in the performance of any of its obligations hereunder, Purchaser shall be entitled to elect, as its sole remedy, to either terminate the Agreement and be returned the Earnest Money in full, or enforce specific performance of the obligations of Seller hereunder, including (without limitation) Seller's obligation to deliver the closing documents at Closing, as specified in Section 6.2(a), below.  Notwithstanding anything herein to the contrary, Purchaser shall be deemed to have elected to terminate this Agreement if Purchaser fails to deliver to Seller written notice of its intent to file a claim or assert a cause of action for specific performance against Seller on or before twenty (20) days following the scheduled Closing Date or, having given such notice, fails to file a lawsuit asserting said claim or cause of action in the Bankruptcy Court within forty-five (45) days following the Closing Date.  Purchaser's remedies shall be limited to those described in Sections 5.2, 5.3 and 5.4, and Purchaser hereby expressly waives and relinquishes any and all rights to pursue any other remedy at law or in equity.  SUBJECT TO TRANSACTION APPROVAL, IN NO EVENT SHALL SELLER OR ANY OFFICER, DIRECTOR, SHAREHOLDER, MEMBER, PARTNER, EMPLOYEE OR AGENT OF SELLER HAVE ANY LIABILITY, BEYOND ITS INTEREST IN THE PROPERTY AND THE PROCEEDS THEREOF, FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE

PROPERTY, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE.

5.3    <u>Attorneys' Fees</u>. Should either Purchaser or Seller employ attorneys to enforce any of the terms and provisions hereof, or to protect any right, title or interest created or evidenced hereby, or otherwise in connection with claims by one party against the other arising from the operation of this Agreement, each party shall pay its own attorneys' fees and expenses in connection therewith.

5.4    <u>Disposition of Earnest Money</u>.

Purchaser and Seller agree that, in addition to the provisions pertaining to the disposition of the Earnest Money set forth in Section 5.1 and Section 5.2, above, and elsewhere in this Agreement:

(a)    At and subject to the Closing, the Earnest Money shall be delivered by Escrow Agent to Seller, and shall be credited against the Purchase Price; and

(b)    In the event that this Agreement is terminated in accordance with Sections 3.4, 5.2, 6.1 or as otherwise expressly provided herein, then the Earnest Money shall be immediately returned to Purchaser, Seller shall be free to offer the Property for sale to third parties, and Purchaser and Seller shall have no further obligations hereunder.

# VI.
# Closing

6.1    <u>Closing Date</u>. Unless otherwise agreed by Seller and Purchaser or extended in accordance with the terms hereof, and provided that the Bankruptcy Court has granted Transaction Approval on or before 5:00 p.m. New York Time on July 13, 2009, the Closing shall be consummated by 5:00 p.m. Hawaii Time on July 14, 2009; provided, however, if the Bankruptcy Court has not granted Transaction Approval by 5:00 p.m. New York Time on July 13, 2009, then each of Seller and Purchaser shall have the unilateral right to terminate this Agreement by delivering written notice of such termination to the other party and Escrow Agent on or before 5 p.m. New York Time on July 14, 2009; further provided, that if neither party exercises its termination right as described above, then Closing shall occur (x) commencing at 8:01 a.m. Hawaii Time on the sixth (6th) business day after the date Purchaser receives written notice from Seller and a copy of the Bankruptcy Court's order granting Transaction Approval and the Transaction Approval provides that the ten (10) day stay imposed under Bankruptcy Rule 6004(h) is waived and that the Transaction Approval is effective immediately, or (y) the first business day that is eleven (11) days after Transaction Approval is obtained if the Transaction Approval does not provide that the ten (10) day stay imposed under Bankruptcy Rule 6004(h) is waived, provided that the Transaction Approval is not stayed (the "**Scheduled Closing Date**"); further provided, however, that, as more fully described in Section 3.4(a) of this Agreement, in no event shall Closing occur after August 14, 2009 (the "**Closing Deadline**"). Settlement may be conducted through escrow so long as settlement and Closing are completed by the date of the Closing Deadline. The date on which the Closing actually occurs is referred to herein as the "**Closing Date**." Seller and Purchaser contemplate that the Transaction Approval will be granted during the week commencing June 29, 2009, or as soon thereafter as the parties may be heard by

the Bankruptcy Court. Notwithstanding the foregoing, the obligation of Purchaser to consummate the transactions contemplated hereunder is conditioned upon the following:

(a)    Representations and Warranties. Seller's representations and warranties contained herein shall be true and correct in all material respects as of the Effective Date and the Closing Date.

(b)    Actions, Suits, etc. As of the Closing Date, except for the Bankruptcy Case (including any pleadings filed in the Bankruptcy Case), there shall exist no pending actions, suits, arbitrations, claims, attachments or other proceedings that could adversely affect the operation or value of the Property or Seller's ability to perform its obligations under this Agreement.

(c)    Obligations Performed. As of the Closing Date, Seller shall have performed all of its material obligations and tendered to Purchaser or Escrow Agent all items contemplated to be tendered by Seller under this Agreement.

(d)    Title Policy. The Title Company shall issue or be committed to issue to Purchaser an ALTA owner's policy of title insurance ("**Title Policy**") in the total amount of the Purchase Price, insuring Purchaser as the leasehold owner of the Property, and showing title to the Property vested in Purchaser subject only to the Permitted Encumbrances.

(e)    Survey. In the event that Purchaser obtains the Survey prior to the Closing Date, such Survey shall not show any matters ("**Previously Unknown Survey Matters**") affecting the Real Property that were not shown on or disclosed in the Title Report, the Title Commitment and/or any documents (including but not limited to any survey) made available to Purchaser and its authorized agents and representatives prior to Purchaser's execution of this Agreement and such Previously Unknown Survey Matters could reasonably be expected to have a material adverse effect on Purchaser's ability to utilize the Real Property in a manner consistent with its current use.

(f)    Phase I. In the event that Purchaser obtains the Phase I Report prior to the Closing Date, such Phase I Report shall not disclose the presence of Hazardous Substances in violation of Hazardous Substance Laws ("**Previously Unknown Hazard Substances**") on the Real Property that were not previously disclosed in any documents (including but not limited to any previous phase I reports or other reports) made available to Purchaser and its authorized agents and representatives prior to Purchaser's execution of this Agreement and the remediation of such Previously Unknown Hazardous Substances would reasonably be expected to exceed $250,000.

If any condition listed in this Section 6.1 is not satisfied on or before the applicable time period stated in this Section 6.1, then Purchaser may, at its election, terminate this Agreement and promptly recover the Earnest Money by delivering written notice thereof to Seller, in which case, neither Seller nor Purchaser shall have any obligations hereunder; provided, if Purchaser elects to terminate pursuant to Section 6.1(f) and the cost for remediation of such Previously Unknown Hazardous Substances would reasonably be expected not to exceed $500,000, Seller may elect to give Purchaser a credit against the Purchase Price for the difference between the reasonably expected cost of remediation (not to exceed $500,000) of such Previously Unknown Hazardous Substances and $250,000 and, in such event, Purchaser shall not be permitted to terminate.

6.2    <u>Closing Matters.</u>

(a)    <u>Seller's Deliveries.</u>    At Closing, Seller shall deliver the following documents and instruments:

(i)    to the extent available and in Seller's possession or control originals of all Leases;

(ii)    possession of the Property, subject only to any rights of parties pursuant to any Permitted Encumbrances, including the parties with rights under the Nike Lease and the Declaration of Covenants;

(iii)    an executed and acknowledged assignment of Ground Lease and Ground Sublease conveying the Real Property subject only to the Permitted Encumbrances, in the form attached hereto as **Exhibit "E"** and incorporated herein (the "**Assignment of Ground Lease/Sublease**").    The legal description to be attached to the Assignment of Ground Lease/Sublease shall be the legal descriptions attached to this Agreement as **Exhibit "A"** and **Exhibit "B"**.    Seller shall assign the Assignment of Ground Lease/Sublease to Purchaser at Closing, and Purchaser shall assume all liability thereunder accruing from and after the Closing. Purchaser hereby agrees (which agreement shall survive the Closing) to indemnify, defend, and hold Seller free and harmless from any loss, injury, liability, damage, claim, lien, cost or expense, including attorneys' fees and costs, arising out of any claims related to such Ground Lease and/or Ground Sublease from and after the Closing Date, but only to the extent arising out of and during Purchaser's ownership of the Property;

(iv)    an executed and acknowledged assignment of Declaration of Covenants in the form attached hereto as **Exhibit "C"** (the "**Assignment of Declaration of Covenants**").    Seller shall assign the Assignment of Declaration of Covenants to Purchaser at Closing, and Purchaser shall assume all liability thereunder accruing from and after the Closing. Purchaser hereby agrees (which agreement shall survive the Closing) to indemnify, defend, and hold Seller free and harmless from any loss, injury, liability, damage, claim, lien, cost or expense, including attorneys' fees and costs, arising out of any claims related to such Declaration of Covenants from and after the Closing Date, but only to the extent arising out of and during Purchaser's ownership of the Property;

(v)    a duly executed and acknowledged bill of sale, assignment and assumption in the form attached hereto as **Exhibit "F"** and incorporated herein ("**Bill of Sale, Assignment and Assumption**") assigning Seller's, lessor's and the landlord's interest in the Leases, the Construction Documents and Rights, the Intangibles, and conveying the Personalty without warranty.    Seller shall assign the Declaration of Covenants to Purchaser at Closing, and Purchaser shall assume all liability thereunder accruing from and after the Closing. Purchaser hereby agrees (which agreement shall survive the Closing) to indemnify, defend, and hold Seller free and harmless from any loss, injury, liability, damage, claim, lien, cost or expense, including attorneys' fees and costs, arising out of any claims related to such Leases from and after the Closing Date but only to the extent arising during Purchaser's ownership of the Property;

(vi)    certificates of Seller respecting the "non-foreign" status of Seller in the form set forth in **Exhibit "G"** attached hereto and incorporated herein;

(vii)    certificate of resident status in form and substance required by law certifying Seller is a "resident person" as such term is used in H.R.S Section 235-68;

(viii)    a closing statement prepared by Escrow Agent and acceptable to Purchaser (the "**Closing Statement**") and approved by Seller in writing;

(ix)    an owner's title affidavit, in form reasonably acceptable to Seller and the Title Company;

(x)    a certificate or agreement, restating and incorporating the provisions of Section 3.5, above;

(xi)    such documents as may be reasonably required by Purchaser or the Escrow Agent, authorizing Seller to consummate the sale of the Property in accordance with this Agreement and designating those persons authorized to execute and deliver all necessary documents at Closing and a certificate of good standing for the Seller issued by the Department of Commerce and Consumer Affairs of the State of Hawaii not more than thirty (30) days before the Closing Date;

(xii)    notices to tenants in form and substance reasonably acceptable to Seller and Purchaser, notifying tenants of the transfer of title and containing such other information as the parties may agree; and

(xiii)    termination agreement(s) or other evidence of the termination of all management and/or leasing agreements affecting the Property.

(b)    Purchaser's Deliveries.    At Closing, Purchaser shall deliver the following documents and instruments:

(i)    the remaining funds for the Purchase Price to Escrow Agent for delivery to Seller at Closing;

(ii)    such other documents as may be reasonably required by Seller or Escrow Agent, authorizing Purchaser to consummate the purchase of the Property in accordance with this Agreement and designating those persons authorized to execute and deliver all of the documents listed in Section 6.2(b) of this Agreement and, if this Agreement is assigned to an entity pursuant to Section 11.2 of this Agreement, a certificate of authority/good standing for the Purchaser issued by the appropriate governmental authority with jurisdiction to issue such certificate not more than thirty (30) days before the Closing Date;

(iii)    a duly executed and acknowledged Assignment of Ground Lease and Ground Sublease;

(iv)    a duly executed and acknowledged Assignment of Declaration;

(v)    a duly executed and acknowledged Bill of Sale, Assignment and Assumption;

(vi)    a Closing Statement; and

(vii)    a certificate or agreement, restating and incorporating the provisions of Section 3.5, above; notices to tenants in form and substance reasonably acceptable to Seller and Purchaser, notifying tenants of the transfer of title and containing such other information as the parties may agree.

(c)    Prorations.

(i)    At Closing, the following items shall be prorated as of 12:01 a.m. of the Closing Date: rents; fees and assessments; prepaid expenses and obligations under Contracts; accrued expenses; real property taxes ("**Real Property Taxes**") for the year of Closing; water and other utility charges; and all other items of income and expense with respect to the Property.

(ii)    If the Real Property Taxes for the year of Closing are not known, taxes shall be prorated based on the current year's valuation or assessment and the last known millage rate; however, if the actual taxes for the year of Closing are more or less than the amount prorated, then, when the actual amount is known, such taxes shall be reprorated to reflect the actual amount of taxes due for the year in which the Closing occurs, and the party thereto having not paid its full share of such taxes shall remit the shortfall to the other party within thirty (30) days after its receipt of notice thereof together with the tax bills or other reasonable evidence of the actual amount. If the amount of any other items to be prorated is not then ascertainable, the proration thereof shall be on the basis of the most recent ascertainable data, subject to reproration and the payment of any shortfalls after the actual amounts become known, in the same manner as provided for Real Property Taxes. Seller shall pay any installments of special tax assessments (excluding regular ad valorem real estate taxes) regardless of when due, with respect to the Property. To the extent that the lessor under the Nike Lease has overcollected from Nike for Real Property Taxes or other pass-through expenses to Nike under the Nike Lease (as a result of a tax contest, overestimation or otherwise), Seller and Purchaser shall do a final reconciliation at the end of the fiscal year(s) provided in the Nike Lease. In such event, and at the time of such reconciliation, Seller shall remit to Purchaser the amount of any such overpayment actually received by Seller during Seller's ownership of the Property.

(iii)    Purchaser shall make reasonable efforts to effectuate the transfer of all utilities for the Property to its name as of the Closing Date, and where necessary, post deposits with the utility companies. Purchaser and Seller shall further ensure that all utility meters for the Property are read as of the Closing Date. Seller shall pay all utilities arising from periods up to and including the Closing Date (except to the extent required to be paid by tenants) and all utilities for the Property thereafter shall be paid by Purchaser (except to the extent required to be paid by tenants). Seller shall be entitled to recover any and all deposits held by any utility company for the Property as of the date of Closing. To the extent Purchaser fails to provide, where required, deposits to any such utility company(s) so as to prevent the timely release of Seller's deposit(s) by the utility company(s) on the Closing Date, the amount of such deposit(s) for the Property shall be credited to Seller and the Purchase Price shall be adjusted accordingly. In such event, the deposit(s) will be assigned to Purchaser who shall have rights to have the deposit(s) released to it upon satisfaction of the conditions imposed by the utility company.

(iv)    Except for rents collected by Seller for the payment of Delinquent Rents (as more particularly described below), Seller shall deliver to the Purchaser any rents paid

to the Seller by Nike subsequent to the Closing Date. No proration shall be made for rents (including base rent, percentage rent, additional rent, tenant's share of operating expenses and real estate taxes or any other sum due under an applicable lease) delinquent as of the Closing Date (hereinafter called the "**Delinquent Rents**") and which shall be scheduled by Seller, as of the Closing Date, on Exhibit "C" to the Bill of Sale, Assignment and Assumption and Seller shall be entitled to receive all such Delinquent Rents as provided hereinbelow. Except as set forth below, all rent collected on or after the Closing Date by Purchaser shall be allocated in the following order of priority: (a) first, to the rent most recently becoming due and retained by or paid by Purchaser, (b) second to all other rent first becoming due after the Closing Date and retained by or paid to Purchaser, and (c) third, to Delinquent Rents and paid to Seller. Notwithstanding the foregoing, (a) any payments received by Purchaser after the Closing Date from either Nike or former tenant Banana Republic, LLC ("**Banana Republic**") that are designated as, or clearly are intended to apply to, Delinquent Rents shall be promptly paid by Purchaser to Seller regardless of any other sums that may be owed by such tenant, and (b) Seller shall be entitled to retain payments of Delinquent Rent received by Seller after the Closing Date, to the extent such Delinquent Rents remain outstanding; however, Seller shall promptly pay to Purchaser any payments received by Seller after the Closing Date that are designated as, or that clearly are intended to apply to, sums due from Nike for periods after the Closing Date. Purchaser acknowledges that Seller claims Delinquent Rents are owed to Seller from Banana Republic and Nike and Seller shall retain the right after Closing to attempt to collect any Delinquent Rents from Banana Republic and Nike for any period prior to Closing until paid in full, and Purchaser further acknowledges and agrees (which agreement shall survive the Closing) that Purchaser will not take any action or make any agreement with Nike that purports to reduce or release Nike from its obligation to pay sums owed to the Seller for periods prior to the Closing without prior approval from the Seller and, if applicable, the Bankruptcy Court.

(d)     Purchaser's Assumption. Purchaser agrees to: (i) assume and perform all of the covenants of Seller and Seller's predecessor in title pursuant to the Leases, the Ground Lease, the Ground Sublease and the Declaration of Covenants assumed or required to be assumed by Purchaser, which are performable subsequent to the Closing; and (ii) to the extent Purchaser collects Delinquent Rent it shall be deemed on behalf of Seller and it shall deliver all such sums collected, if and as payable to Seller in accordance with the allocation of rent priority set forth in Section 6.2(c)(iv).

(e)     Survival Provisions. The agreements set forth in subparagraphs (c) and (d) of this Section 6.2 shall survive the Closing and be enforceable until fully performed.

6.3     Closing Costs. Any escrow fee charged by the Escrow Agent shall be paid by Purchaser. Any inspections required by the Title Company shall be paid by Purchaser. Seller shall pay any conveyance taxes payable in connection with the delivery of the Assignment of Ground Lease/Sublease and for the cost of the Title Policy. Purchaser shall pay all costs for the Title Report, any extended coverage for the Title Policy and any and all endorsements to the Title Policy. Purchaser shall pay all fees for the recording of the Assignment of Ground Lease/Sublease, and all other closing costs of any nature and costs of any inspections or tests it authorizes or conducts. Except as otherwise provided in Sections 3.4 and 5.3, each party shall be responsible for the payment of its own attorneys' fees.

6.4     Delivery of Books and Records. After the Closing, Seller shall reasonably cooperate with Purchaser in delivering such books, records, Lease files, and other materials

relating to the Property in Seller's or its property manager's possession which have not previously been delivered to Purchaser.

6.5    Real Estate Commissions.    Seller shall pay a real estate commission to CB Richard Ellis, Inc. ("**Seller's Broker**") at Closing in accordance with that certain Exclusive Listing Agreement, dated as of February 5, 2009, by and between Seller and Seller's Broker, subject to approval by the Bankruptcy Court and Seller's retention of Seller's Broker pursuant to section 327(a) of the Bankruptcy Code.    Subject to Closing, Purchaser shall pay a real estate commission to NAI Chaney Brooks ("**Purchaser's Broker**") in an amount agreed upon by written agreement between Purchaser and Purchaser's Broker upon Closing.    In no event and under no circumstances shall either party be obligated to pay any brokerage commission to the other party's broker.    Other than as stated in the previous sentence, Seller and Purchaser each represent and warrant to the other that no real estate brokerage commission is payable to any person or entity in connection with the transaction contemplated hereby, and each agrees to and does hereby indemnify and hold the other harmless against the payment of any commission to any person or entity claiming by, through or under Seller or Purchaser, as applicable.    This indemnification shall extend to any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and litigation costs) arising as a result of such claims and shall survive the Closing.    This Agreement is not a "commission agreement" under any applicable law, and may not be filed for record for any purpose.

## VII.
## Condemnation

7.1    Condemnation.    If, prior to Closing, any governmental authority or other entity having condemnation authority shall institute an eminent domain proceeding or take any steps preliminary thereto (including the giving of any direct or indirect notice of intent to institute such proceedings) with regard to a Material Portion (hereinafter defined) of any of the Real Property and the same is not dismissed with prejudice on or before five (5) days prior to Closing, Purchaser shall be entitled, as its sole remedy, to terminate this Agreement upon written notice to Seller (a) within ten (10) days following notice by Seller to Purchaser of such condemnation, or (b) on the Closing Date, whichever occurs first.    In the event Purchaser does not provide such written notice to terminate this Agreement pursuant to the preceding sentence, Purchaser shall be conclusively deemed to have elected to terminate this Agreement as a result thereof.    For purposes of this Section 7.1, a "**Material Portion**" shall mean that portion of the Property which, if taken or condemned, would (i) eliminate access to any portion of the Property to which access is available as of the date of this Agreement; (ii) cause any non-compliance with any applicable law, ordinance, rule or regulation of any federal, state or local authority or governmental agency having jurisdiction over the Real Property, or any portion thereof; or (iii) materially adversely impair the use of the Property for the purpose for which it is presently being operated; or (iv) cause a default under or give rise to the right of any Tenant to terminate its Lease. Notwithstanding anything to the contrary herein, if any eminent domain proceeding is instituted (or notice of which shall be given) solely for the taking of any subsurface rights for utility easements or for any right-of-way easement, and the surface may, after such taking, be used in substantially the same manner as though such rights had not been taken, Purchaser shall not be entitled to terminate this Agreement as to any part of the Real Property, but any award resulting there from shall be the exclusive property of Purchaser upon Closing.    In the event Purchaser elects to terminate this Agreement under this Section 7.1, the Earnest Money shall be returned to Purchaser, and neither party to this Agreement shall thereafter have any further rights or

obligations hereunder. If Purchaser waives the right to terminate this Agreement as a result of such a condemnation, despite such condemnation, Seller and Purchaser shall close this Agreement in accordance with the terms hereof with no reduction in the Purchase Price, and Seller shall assign to Purchaser at Closing all of Seller's right, title and interest in and to all proceeds resulting or to result from said condemnation.

## VIII.
## Casualty

8.1    Casualty Loss Notice. If, prior to the Closing, any of the Improvements shall be damaged by fire or other casualty (collectively, "**Casualty**"), Seller shall promptly deliver to Purchaser written notice ("**Casualty Loss Notice**") of such Casualty.

8.2    Material Loss. For the purposes of this Section 8.2, "**Material Damage**" shall mean damage to the Improvements of such nature that  the cost of restoring the same to their condition prior to the Casualty will exceed $250,000.00; (b) the damage cannot be substantially repaired within sixty (60) days; (c) causes any non-compliance with any legal requirements with respect to the Property; (d) eliminates access to any portion of the Property; or (e) would cause a default under any lease or give rise to the right of any Tenant thereunder to terminate the Lease, whether or not (in any such case) such damage is covered by insurance. If the Improvements have sustained Material Damage by a Casualty, Seller or Purchaser may, at its option, terminate this Agreement by delivering written notice to the other party within ten (10) days after delivery of the Casualty Loss Notice, and neither party hereto shall have any further rights or obligations hereunder. Failure of Seller or Purchaser to deliver written notice of termination within said ten (10) day period shall be conclusively deemed to be an election not to terminate this Agreement. In the event Seller or Purchaser elects to terminate this Agreement under this Section 8.2, the Earnest Money shall be returned to Purchaser, and thereafter neither party to this Agreement shall thereafter have any further rights or obligations hereunder. In the event this Agreement is not terminated pursuant to the provisions of this Section 8.2, then, at the option of Seller, (a) Seller shall repair the Improvements to substantially their condition prior to such damage, or (b) Seller shall deliver to Purchaser an amount equal to the insurance proceeds paid or payable as a result of such casualty, plus the amount of any applicable deductible up to, but not in excess of, the Purchase Price.

8.3    Non-Material Loss. In the event the damage to the Improvements following a Casualty does not constitute Material Damage, the rights and obligations of the parties shall not be affected thereby and, at the option of Seller, (a) Seller shall repair the Improvements to substantially their condition prior to such damage, or (b) Seller shall deliver to Purchaser an amount equal to the insurance proceeds paid or payable as a result of such casualty, plus the amount of any applicable deductible.

8.4    Determination of Cost of Restoration. In the event of a Casualty, the parties shall attempt to agree, on or before the expiration of ten (10) days after the date of delivery of the Casualty Loss Notice, to agree on the estimated cost or estimated completion time of restoration for all purposes of this Article IX. In the event that the parties are unable to so agree on or before the expiration such ten (10) day period, then, Purchaser and Seller agree that they shall appoint a third party contractor or other expert reasonably acceptable to both parties to determine the cost and estimated completion time of such restoration, in which case, the determination of such third party contractor or expert (to be rendered in not more than ten (10) business days)

shall be binding upon both parties. If the casualty damage is Material Damage as a result of factors other than the cost of or time to repair such damage, Purchaser may unilaterally terminate this Agreement as provided in Section 8.2 without the need for any further inquiry or agreement with Seller.

8.5     Delay in Completion of Repairs. If Seller has elected to repair and if the repairs cannot be completed by the scheduled Closing Date, at the option of Seller, and following notice to Purchaser of Seller's exercise of such option on or before Closing, Closing shall be postponed until five (5) business days following substantial completion of the repairs notwithstanding anything in Section 6.1 of this Agreement to the contrary; however, notwithstanding anything herein to the contrary, if such repairs have not been completed within 45 days of the casualty damage, then Purchaser may terminate this Agreement upon notice thereof to Seller and neither party shall have any further rights or obligations hereunder.

8.6     Postponement of Closing. If, as a result of a Casualty, any determination, election or agreement required by the terms of this Article VIII is not made by the Closing Date, the Closing Date shall be extended until five (5) days after said determination, election or agreement is made by Purchaser, subject to such further extension as may be allowed by the terms of this Article VIII and notwithstanding anything in Section 6.1 of this Agreement to the contrary; provided, however, if said determination, election or agreement has not been made within five (5) days following the originally scheduled Closing Date, this Agreement shall automatically terminate and neither party shall have any further rights or obligations hereunder and the Earnest Money shall be returned to Purchaser.

## IX.

## Representations and Warranties

9.1     Seller's Representations and Warranties. Seller hereby represents and warrants to Purchaser that, as of the date hereof and as of the Closing Date:

(a)     Compliance. To Seller's Knowledge, Seller has received no notice of any alleged violation of any codes, ordinances, laws, rules, regulations or private restrictions; to Seller's Knowledge, Seller has received no notice from any insurance company of any defects or any inadequacies in connection with the Property or the operation of same.

(b)     Leases. To Seller's Knowledge, there are no Leases in existence on the Effective Date other than the Nike Lease.

(c)     Condemnation; Special Assessments. Seller has not received notice of nor does it have Knowledge of any actual or threatened condemnation proceeding or special assessment with regard to the Property.

(d)     Litigation. To Seller's Knowledge, except for the Bankruptcy Case (and any pleadings filed), there is no litigation pending with respect to the Property initiated by Seller or, to Seller's Knowledge, any previous owner or tenant of the Property, and (ii) to Seller's Knowledge, there is no litigation (including governmental proceedings) pending against the Property or against Seller relating to the Property.

(e)    <u>Other Contracts</u>. To Seller's Knowledge, Seller is not a party to, subject to or bound by any agreement or other document or any judgment, order, law or decree, which would prevent or be violated by any of the items set forth below; and, other than the Transaction Approval required from the Bankruptcy Court, no approval, order, authorization or consent of any governmental authority or any other person or entity, which has not been obtained, is required for or will arise out of any of the items set forth below:

(i)    the execution, delivery and performance of this Agreement and any other agreements, obligations and instruments referred to in or contemplated by this Agreement; or

(ii)    the deeding, conveyancing, assignment or other transfer to Purchaser of the Property in accordance with this Agreement.

(f)    <u>Hazardous Substances</u>.   Seller represents and warrants that, to Seller's Knowledge, there has been no notice received by Seller, and no claim, proceeding or litigation brought or pending against Seller or the Property nor any settlements reached by or with any party or parties alleging the presence, disposal, or release, or threatened release of any Hazardous Substances on, from, or under any of the Property, or alleging any violation of Hazardous Substance Laws relating to the Property.   Seller has received no notice from any federal, state, county or municipal authority as to the existence of any such Hazardous Substance at the Property or as to any other environmental problem or Hazardous Substance issues in any way related to the Property.   Seller has never stored or dumped hazardous wastes or materials on the Property and has never used the Property as a landfill.   Seller has no Knowledge of any such use of the Property by others.   Seller's knowledge of the condition of the Property is limited to Seller's Knowledge and by that certain Phase 1 Environmental Site Assessment Report, dated July 28, 1998, prepared by Clayton Environmental Consultants for Honu Group Inc./Lehman Brothers, Inc., a copy of which was provided to Purchaser prior to the date of this Agreement.

(g)    <u>Seller Authority</u>.  Upon Transaction Approval from the Bankruptcy Court, Seller shall have the legal power, right and authority to enter into this Agreement and the closing documents required to be executed by Seller under this Agreement, and to consummate the transaction contemplated hereby.   Except for the Transaction Approval required from the Bankruptcy Court, no other consent of any  creditor, investor, judicial or administrative body, or authority is required.

(h)    <u>Seller is Not a Foreign Person</u>.  Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, as amended, or a "nonresident person" as that term is used in Section 235-68 of the Hawaii Revised Statutes, as amended, and the regulations relating thereto.

For all purposes of this Section 9.1, "**Knowledge**" shall be deemed to refer to the current actual knowledge, without any duty of inquiry or investigation, of Deborah L. Spencer, who is the asset manager at Trimont Real Estate Investors, Inc., the asset manager of the Property of Seller (but not the property manager), and Troy Fujino, the principal person responsible for the Property as an employee of CB Richard Ellis, the property manager for the Property, each of whom are the persons most likely to have awareness of the matters addressed in this Section 9.1. Each and all of the warranties and representations by Seller herein shall terminate for all purposes at the Closing Date and shall not survive the Closing.

9.2     Purchaser's Representations and Warranties.  Purchaser hereby represents and warrants to Seller that Purchaser has the legal power, right and authority to enter into this Agreement and the closing documents required to be executed by Purchaser under this Agreement, and to consummate the transaction contemplated hereby.  No consent of any creditor, investor, judicial or administrative body, or authority is required.

## X.

## Covenants of Seller

10.1     Existing Operations.  Seller shall, through and including the Closing and at Seller's sole cost and expense, (a) keep all existing insurance policies affecting the Property in full force and effect and, in any event, obtain and maintain a commercially reasonable policy of "all risk" hazard insurance on the Improvements on a full replacement cost basis, (b) keep in full force and effect and/or renew all licenses and permits, if any, currently in effect and necessary for the operation of the Property, and (c) continue to operate, manage and maintain the Property (including mechanical equipment of every kind used in the operation thereof) in such condition so that the Property shall be in the same condition on the Closing as on the date hereof, damage by casualty, condemnation and reasonable wear and tear excepted.

10.2     Leases.  Seller will not hereafter extend or otherwise modify or amend in any material respect any of the terms, covenants or conditions of the Leases, the Ground Lease or the Ground Sublease or enter into new Leases.  At Purchaser's request and at Purchaser's sole expense, so long as none of Purchaser's leasing activities interfere with Nike in any way, Seller shall use commercially reasonable efforts to cooperate with Purchaser in connection with Purchaser's efforts to secure new tenants for the Property pending closing and will execute consents to letters of intent or new Leases in such forms as determined by Purchaser so long as such letters of intent or new Leases expressly provide that they shall not be binding until a date after the Closing and that same shall automatically terminate in the event that this Agreement terminates.

10.3     Contracts; Agreements.  Seller will not, without the prior written consent of Purchaser, extend, renew, modify in any material respect or replace any agreements that pertain in any manner to the Property or enter into new Contracts or other agreements affecting the Property except as provided in Section 10.1, in each case if any such agreement would create a lien on the Property or be required to be assumed by Purchaser, or otherwise constitute an obligation of Purchaser.

10.4     Additional Liens.  Seller will not, without the prior written consent of Purchaser, or except as otherwise permitted herein, convey any interest in the Property, and Seller will not subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights-of-way or similar matters after the date of this Agreement, or enter into any agreement granting to any person any right with respect to the Property, in each case, which will not be eliminated prior to the Closing.

10.5     Alterations.  Seller will not make any material alterations to the Property except with the prior written consent of Purchaser, said consent not to be unreasonably withheld or delayed, and Seller will not take or permit any action that would affect the zoning, access, utility availability or other condition of the Property or any portion thereof.

10.6    Invoices.  Seller has paid or, subject to any proration required under this Agreement, will pay in full, prior to the Closing, all bills and invoices that are received by Seller prior to the Closing and applicable to Seller's period of ownership of the Property for goods, materials and services of any kind relating to the Property.  Seller will pay, promptly upon receipt of invoices, utility charges relating to Seller's period of ownership of the Property which Seller is obligated to pay.  Such obligation shall survive the Closing.

# XI.
## Miscellaneous

11.1    Entire Agreement.  This Agreement contains the entire agreement of the parties hereto.  There are no other agreements, oral or written, and this Agreement can be amended only by written agreement signed by the parties hereto.

11.2    Agreement Binding on Parties.  This Agreement, and the terms, covenants, and conditions herein contained, shall inure to the benefit of and be binding upon the heirs, personal representatives, successors, and assigns of each of the parties hereto.  Except as otherwise provided in the next sentence of this Section 11.2, Purchaser shall not have the right to assign its rights under this Agreement, or any interest hereunder, except with the prior written consent of Seller, which consent may be given or withheld in Seller's sole discretion.  Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement upon the satisfaction of all of the following conditions: (i) the assignee of Purchaser shall be an entity controlling, controlled by, or under common control with Purchaser, and shall assume all of the obligations of Purchaser under this Agreement, (ii) all of the Earnest Money must have been delivered in accordance with Section 2.2, (iii) Purchaser shall remain primarily liable for the performance of Purchaser's obligations, and (iv) a copy of the fully executed written assignment and assumption agreement shall be delivered to Seller prior to Closing.

11.3    Effective Date.  The Effective Date of this Agreement shall be the date on which the Escrow Agent acknowledges (by execution of the Joinder by Escrow Agent) its receipt of a copy of this Agreement executed by both Seller and Purchaser and receipt of the Deposit.

11.4    Notice.  Any notice, communication, request, reply or advice (collectively, "**Notice**") provided for or permitted by this Agreement to be made or accepted by either party must be in writing.  Notice may, unless otherwise provided herein, be given or served by (i) depositing the same in the United States mail, postage paid, certified, and addressed to the party to be notified, with return receipt requested, (ii) by delivering the same to such party, or an agent of such party, in person or by commercial courier, (iii) by facsimile, evidenced by confirmed receipt, or by depositing the same into custody of a nationally recognized overnight delivery service such as Federal Express Corporation or Airborne Express, or (iv) transmitting by email (but only if promptly followed by transmittal in another manner permitted by this Section 11.4).  Notice deposited in the mail in the manner hereinabove described shall be effective on the third (3rd) business day after such deposit.  Notice given in any other manner shall be effective only if and when received by the party to be notified between the hours of 8:00 A.M. and 5:00 P.M. at the place of receipt of any business day with delivery made after such hours to be deemed received the following business day.  For the purposes of notice, the addresses of the parties shall, until changed as hereinafter provided, be as follows:

| | |
|---|---|
| Seller: | LB 2080 Kalakaua Owners LLC<br>c/o Trimont Real Estate Advisors, Inc.<br>2 Park Plaza, Suite 850<br>Irvine, California 92614-8515<br>Attention: Deborah Spencer<br>Fax No.: (949) 955-1252<br>Email address: dspencer@trimontrea.com |
| with a copy to: | Shai Y. Waisman, Esq.<br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Fax No: (212) 310-8007<br>Email address: shai.waisman@weil.com |
| and with a copy to: | Janel Yoshimoto, Esq.<br>Chun Rair & Yoshimoto LLP<br>1000 Bishop Street, Suite 1000<br>Honolulu, HI 96813<br>Fax No: (808) 531-8466<br>Email address: jyoshimoto@chunrair.com |
| Purchaser: | BW VCM Kalakaua, LLC<br>c/o Venture Associates, LLC<br>5705 N. Scottsdale Road, Suite D-110<br>Scottsdale, Arizona 85250<br>Attention: Kurt J. Peterson, President<br>Fax No: (480) 682-4517<br>Email address: kurt@venturecapgroup.com |
| with a copy to: | Bill Wyland Holdings, Inc.<br>59-430 Makana Rd.<br>Haleiwa, Hawaii 96712<br>Attention: Bill Wyland<br>Fax No: 808-356-1953<br>Email address: mail@billwyland.com |
| and with a copy to: | Scott W. Settle, Esq.<br>Yamamoto & Settle, LLLC<br>700 Bishop Street, Suite 200<br>Honolulu, HI 96813<br>Fax No: (808) 526-4735<br>Email address: ssettle@yshawaii.com |

The parties hereto shall have the right from time to time to change their respective addresses, and each shall have the right to specify as its address any other address within the United States of America by at least five (5) days written notice to the other party.

11.5   <u>Time of the Essence</u>.   Time is of the essence in all things pertaining to the performance of this Agreement.

11.6   <u>Place of Performance</u>.   This Agreement is made and shall be performable in City and County of Honolulu, State of Hawaii, and shall be construed in accordance with the laws of the State of Hawaii.

11.7   <u>Escrow Agent</u>.   Escrow Agent hereby accepts its designation as Escrow Agent hereunder and agrees to hold and disburse the Earnest Money as herein provided. Escrow Agent shall not be liable for any acts taken in good faith, and which are not negligent or a default hereunder, and Escrow Agent may, in its sole discretion, rely upon the oral or written notices, communications, orders or instructions given by Purchaser or Seller. In the event of a dispute between Purchaser and Seller under this Agreement sufficient in the discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender into the registry or custody of the Bankruptcy Court all money or property in its hands under the terms of this Agreement, together with such legal proceedings as it deems appropriate, and thereupon to be discharged from all further duties under this Agreement. Any such legal action may be brought in the Bankruptcy Court. Seller and Purchaser hereby agree to indemnify and hold harmless Escrow Agent against any and all losses, claims, damages, liabilities and expenses, including, without limitation, reasonable costs of investigation and counsel fees and disbursements which may be imposed upon Escrow Agent or incurred by it in connection with its acceptance of this appointment as Escrow Agent hereunder or the performance of its duties hereunder, including, without limitation, any litigation arising from this Agreement or involving the subject matter hereof; provided, however, that if Escrow Agent shall be found to be in default or negligent with respect to this Agreement, then, in such event, Escrow Agent shall bear all such losses, claims, damages and expenses; and provided further that neither Seller nor Purchaser shall have any liability to Escrow Agent under this indemnity provision for any cost of litigation incurred by Escrow Agent, including, without limitation, attorneys' fees, arising or caused solely by the conduct of the other party which results in a dispute solely between the other party and Escrow Agent.

11.8   <u>Section Headings</u>.   The section headings contained in this Agreement are for convenience only and shall in no way enlarge or limit the scope or meaning of the various and several sections hereof.

11.9   <u>Obligations</u>.   Except as expressly set forth in this Agreement, the terms, conditions, obligations and rights set forth herein shall be deemed terminated at the time of Closing, and will merge into the various documents executed and delivered at the time of Closing.

11.10   <u>Business Days</u>.   In the event that any date or any period provided for in this Agreement shall end on a Saturday, Sunday or legal holiday in the State of Hawaii, the applicable date or period shall be extended to the first business day following such Saturday, Sunday or legal holiday.

11.11   <u>Authority of Purchaser</u>.   Purchaser represents and warrants that Purchaser has full right, power and authority to enter into this Agreement and, at Closing, will have full right, power and authority to consummate the sale provided for herein.

11.12 <u>Authority of Seller</u>.    Seller represents and warrants that upon issuance of Transaction Approval from the Bankruptcy Court, Seller has full right, power and authority to enter into this Agreement and, at Closing, will have full right, power and authority to consummate the sale provided for herein.

11.13 <u>No Recordation</u>.    Without the prior written consent of Seller, there shall be no recordation of either this Agreement or any memorandum hereof, or any affidavit pertaining hereto, and any such recordation of this Agreement or memorandum hereto, by Purchaser without the prior written consent of Seller shall constitute a default hereunder by Purchaser, whereupon this Agreement shall, at the option of Seller, terminate and be of no further force and effect.  Upon termination all Earnest Money shall be immediately delivered to Seller, whereupon the parties shall have no further duties or obligations one to the other.

11.14 <u>Multiple Counterparts</u>.    This Agreement may be executed in multiple counterparts (each of which is to be deemed original for all purposes).

11.15 <u>Severability</u>.    If any provision of this Agreement or application to any party or circumstance shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized officers to execute and deliver this Agreement under seal as of the Effective Date.

DATE: _____June 25_____, 2009          **SELLER**:

**LB 2080 KALAKAUA OWNERS LLC**, as
Debtor and Debtor in Possession
in Chapter 11 Case No. 08-13555 (JMP)
(Jointly Administered) in the United States
Bankruptcy Court for the Southern District of
New York

By: PAMI LLC,
a Delaware limited liability company
Its Managing Member

By:_____
        Name: Jeffrey Fitts
        Title: Authorized Signatory

The execution hereof by Purchaser shall constitute an offer by Purchaser to Seller to purchase the Property on the terms and conditions herein stated, which must be accepted by Seller on or before 5:00 P.M. on the day which is five (5) business days after the date of execution and delivery by Purchaser, by the execution hereof by Seller. If Purchaser's offer is not timely accepted, this Agreement shall be thereafter null and void.

DATE: _____, 2009          **PURCHASER**:

**BW VCM KALAKAUA, LLC**, a Nevada
limited liability company

By:      Venture Associates, LLC, an Arizona
         limited liability company
         Its Manager

         By:      _____
         Name:_____
         Its _____

2128200v4/20693-0001

-27-

**IN WITNESS WHEREOF,** the parties hereto have caused their duly authorized officers to execute and deliver this Agreement under seal as of the Effective Date.

DATE: _____, 2009          **SELLER:**

                                                 **LB 2080 KALAKAUA OWNERS LLC,** as
Debtor and Debtor in Possession
in Chapter 11 Case No. 08-13555 (JMP)
(Jointly Administered) in the United States
Bankruptcy Court for the Southern District of
New York

By: PAMI LLC,
a Delaware limited liability company
Its Managing Member

                    By:_____
                         Name: _____
                         Title: Authorized Signatory

The execution hereof by Purchaser shall constitute an offer by Purchaser to Seller to purchase the Property on the terms and conditions herein stated, which must be accepted by Seller on or before 5:00 P.M. on the day which is five (5) business days after the date of execution and delivery by Purchaser, by the execution hereof by Seller. If Purchaser's offer is not timely accepted, this Agreement shall be thereafter null and void.

DATE: 6/25, 2009          **PURCHASER:**

                                                 **BW VCM KALAKAUA, LLC,** a Nevada
limited liability company

By:    Venture Associates, LLC, an Arizona
        limited liability company
        Its Manager

        By: _____
        Name: Lawrence G. Malanfant
        Its ___Managing Member_____

## JOINDER BY ESCROW AGENT

Title Guaranty Escrow Services, Inc. referred to in this Agreement as the "Escrow Agent" hereby acknowledges that it received this Agreement executed by Seller and Purchaser on the 25th day of June, 2009, and accepts the obligations of the Escrow Agent as set forth herein. Escrow Agent shall acknowledge receipt of the Earnest Money to Seller on the date that it is received by Escrow Agent. The Escrow Agent hereby agrees to hold and distribute the Earnest Money in accordance with the terms and provisions of this Agreement.

By: _____

Name: BARBARA PAULO
Title: ASSISTANT VICE PRESIDENT

Address: 235 QUEEN ST
1ST FLR
HONOLULU HI   96813

## JOINDER BY SELLER'S BROKER

The undersigned Seller's Broker joins herein to evidence such Seller's Broker's agreement to the provisions of Section 6.5.  The undersigned Seller's Broker represents to Seller and Purchaser that such Seller's Broker (i) knows of no other brokers, salespersons or other parties entitled to any compensation for brokerage services arising out of this transaction other than those whose names appear in this Agreement, (ii) has not made any of the representations or warranties specifically disclaimed by Seller in Section 3.5, and (iii) is a duly licensed Real Estate Broker and is currently permitted to conduct business in the State of Hawaii and be paid a real estate commission.  The Seller's Broker acknowledges that payment of the commissions to Seller's Broker is governed by a separate agreement with Seller, subject to approval of the Bankruptcy Court and Seller's retention of Seller's Broker pursuant to section 327(a) of the Bankruptcy Code.  In the event the Bankruptcy Court grants Transaction Approval and approves Seller's retention of Seller's Broker pursuant to section 327(a) of the Bankruptcy Code, Seller's Broker agrees to deliver a receipt at the Closing for the commissions payable in connection with this transaction, a release stating that no other fees or commissions are due to Seller's Broker from Seller or Purchaser and a broker's lien waiver in form and substance sufficient to permit the Title Company to delete any broker's lien exception, if any.   Seller's Broker further acknowledges that it is entitled to a commission only as, if and when the transaction contemplated hereby actually closes.

**SELLER'S BROKER:**

CB Richard Ellis

By: _____

DATE:   June 25, 2009

Name: Philip D. Voorhees
Title: Senior Vice President

Notice Address: 3501 Jamboree Road
Suite 100
Newport Beach, CA 92660

## JOINDER BY PURCHASER'S BROKER

The undersigned Purchaser's Broker joins herein to evidence such Purchaser's Broker's agreement to the provisions of Section 6.5. The undersigned Purchaser's Broker represents to Seller and Purchaser that such Purchaser's Broker (i) knows of no other brokers, salespersons or other parties entitled to any compensation for brokerage services arising out of this transaction other than those whose names appear in this Agreement, and (ii) is a duly licensed Real Estate Broker and is currently permitted to conduct business in the State of Hawaii and be paid a real estate commission. The Purchaser's Broker acknowledges that payment of the commissions to Purchaser's Broker shall be payable from Purchaser only and is as described in Section 6.5. Purchaser's Broker agrees to deliver a receipt at the Closing for the commissions payable in connection with this transaction, a release stating that no other fees or commissions are due to Purchaser's Broker from Seller or Purchaser and a broker's lien waiver in form and substance sufficient to permit the Title Company to delete any broker's lien exception, if any.

**PURCHASER'S BROKER:**

_NAI ChaneyBrooks_

By: _____

DATE: _6 / 26_____, 2009

Name: _DAVID R. JURBALA SR. (B)_

Title: _Principal Broker_

Notice Address: _1100 ALAKEA St._
_7th Fl._
_Honolulu, HI 96813_

## **EXHIBITS**

| | | |
|---|---|---|
| A | - | Legal Description – Leasehold Land |
| B | - | Legal Description – Subleasehold Land |
| C | - | Form of Assignment and Assumption of Declaration of Covenants |
| D | - | Reserved |
| E | - | Form of Assignment of Ground Lease/Sublease |
| F | | Form of Bill of Sale, Assignment and Assumption |
| G | - | Certificate of Non-Foreign Status |

## EXHIBIT "A"

## LEGAL DESCRIPTION – LEASEHOLD LAND

All of the leasehold estate and interest created by the Amended and Restated Short Form Ground Lease particularly described as follows:

"Landlord":    Kalaimoku-Kuhio Development Corp., a Hawaii corporation
"Tenant":    King Kalakaua Owners, a Hawaii general partnership
Dated:    July 1, 2003
Filed as Land Court Document No. 2980702

Term:    "1.    The preliminary term of the Ground Lease commenced on October 6, 1995, and ended on March 11, 1996 (the "Interim Term Commencement Date").

2.    The interim term of the Ground Lease commenced on the Interim Term Commencement Date and ended at midnight on the day immediately preceding April 1, 1996.

3.    The primary term of the Ground Lease commenced on April 1, 1996 (the "Primary Term Commencement Date") and shall end (unless such term is extended or sooner terminated as provided in the Ground Lease) at midnight on the day immediately preceding the fiftieth (50th) anniversary of the Primary Term Commencement Date."

Note:    The foregoing instrument is a short form to give evidence of that certain unrecorded Amended and Restated Ground Lease dated July 1, 2003 by and between said Landlord and said Tenant, as amended. The Tenant's interest in and to said Amended and Restated Ground Lease was assigned to LB 2080 Kalakaua Owners LLC, a Delaware limited liability company, by Commissioner's Quitclaim Assignment of Lease and Sublease dated November 8, 2006, recorded as Land Court Document No. 3510687.

The Amended and Restated Short Form Ground Lease demises the following:

All of that certain parcel of land situate at Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

Lot 203, area 38,861 square feet, as shown on Map 82, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 537 of August Ahrens, Limited and John Francis Bowler.

Being all of the premises described in and covered by Transfer of Certificate of Title No. 492,843, issued to Kalaimoku-Kuhio Development Corp., a Hawaii corporation.

## EXHIBIT "B"

## LEGAL DESCRIPTION – SUBLEASEHOLD LAND

All of the leasehold estate and interest created by the Amended and Restated Short Form Sublease particularly described as follows:

"Sublessor":   Kalaimoku-Kuhio Development Corp., a Hawaii corporation
"Subtenant":   King Kalakaua Owners, a Hawaii general partnership
Dated:          July 1, 2003
Filed as Land Court Document No. 2980701

Term:          "1. The preliminary term of the Ground Sublease commenced on February 8, 1996, and ended on March 11, 1996 (the "Interim Term Commencement Date").

2. An interim term of the Ground Sublease commenced on the Interim Term Commencement Date and ended at midnight on the day immediately preceding April 1, 1996.

3. The primary term of the Ground Sublease commenced on April 1, 1996 (the "Primary Term Commencement Date") and shall end (unless such term is extended or sooner terminated as provided in the Ground Sublease) at midnight on the day immediately preceding the fiftieth (50th) anniversary of the Primary Term Commencement Date."

Note:   The foregoing instrument is a short form to give evidence of that certain unrecorded Amended and Restated Sublease dated July 1, 2003 by and between said Sublessor and said Subtenant, as amended. The subtenant's interest in and to said Amended and Restated Sublease was assigned to LB 2080 Kalakaua Owners LLC, a Delaware limited liability company, by Commissioner's Quitclaim Assignment of Lease and Sublease dated November 8, 2006, recorded as Land Court Document No. 3510687.

The Amended and Restated Short Form Sublease demises the following:

All of that certain parcel of land situate at Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

Lot 201, area 6,711 square feet, as shown on Map 81, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 537 of August Ahrens, Limited and John Francis Bowler.

Being all of the premises described in and covered by Transfer of Certificate of Title No. 509,502, issued to Oceanfront Hawaii, Inc., a Hawaii corporation.

## EXHIBIT "C"

## FORM OF ASSIGNMENT AND ASSUMPTION OF DECLARATIONS OF COVENANTS

| LAND COURT SYSTEM | REGULAR SYSTEM |

AFTER RECORDATION, RETURN BY MAIL ❑ OR PICKUP ❑ :

TYPE OF DOCUMENT:                                              (TOTAL PAGES: _____ )
    ASSIGNMENT AND ASSUMPTION OF DECLARATION OF COVENANTS

PARTIES TO DOCUMENT:
    ASSIGNEE:  BW VCM KALAKAUA, LLC, a Nevada limited liability company
    ASSIGNOR: LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company

TAX MAP KEY FOR PROPERTY:  (1) 2-6-016: 023 and 026; (1) 2-6-018: 010: CPR 0001 through
                0014

## ASSIGNMENT AND ASSUMPTION OF DECLARATION OF COVENANTS

THIS ASSIGNMENT AND ASSUMPTION OF DECLARATION OF COVENANTS (this "**Assignment**") is made as of _____, 2009, by and between LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company ("**Assignor**"), and BW VCM KALAKAUA, LLC, a Nevada limited liability company ("**Assignee**") in connection with and pursuant to the terms of that certain Sales Contract dated as of _____, 2009, between Assignor, as seller, and Assignee,

as purchaser (the "**Sales Contract**"). All capitalized terms not otherwise defined herein shall have the definitions set forth in the Sales Contract.

RECITALS:

A. Assignor is the current licensor and HSH 2100 LLC, a Delaware liability company is the current licensee (the "**Licensee**") under that certain Declaration of Covenants dated November 30, 2004, and recorded in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. 3213811, noted on Transfer Certificate of Title Nos. 509,502, 492,843, and 726,302 (the "**Declaration**"), which pertains to, among other things, a license from Assignor to Licensee of ninety-two (92) unreserved parking spaces located within the Real Property for use of the Licensee and Licensee's tenants, customers, occupants, guests, invitees and/or employees of the 2100 Project (as such term is defined and used in the Declaration).

B. Pursuant to the terms and conditions of the Sales Contract and **[describe Sale Order]**, Assignor is to assign and Assignee is to assume of all Assignor's right, title and interest under the Declaration concurrently with Assignee's acquisition of the Property.

ASSIGNMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignment. Assignor hereby absolutely assigns, transfers, conveys, and sets over unto Assignee, without any representation or warranties of any kind, except as is expressly provided for in the Sales Contract, all of Assignor's right, title and interest in, to an under the Declaration.

2.    Assumption. Assignee hereby accepts the foregoing assignment and hereby assumes and agrees to be bound by the terms and conditions of the Declaration and agrees to assume, perform and discharge, as and when due, all of the agreements and obligations of the licensor thereunder arising and/or accruing after the date of this Assignment.

3.    Further Instruments. Assignor hereby covenants that it will, at any time and from time to time upon written request therefor, execute and deliver to Assignee, its successors and assigns, any new or confirmatory instruments and take such further acts as Assignee may reasonably request to fully evidence the assignment contained herein and to enable Assignee, its successors and assigns to fully realize the rights and interests assigned hereby.

4.    Binding Effect. The provisions of this Assignment shall be binding upon, and shall inure to the benefit of, the estates, heirs, devisees, personal representatives, successors, successors-in-trust and assigns of Assignor and Assignee, respectively.

5.    Governing Law. This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with the laws of the State of Hawaii.

6.   <u>Counterparts</u>.   The parties hereto agree that this instrument may be executed in counterparts, each of which shall be deemed an original, and said counterparts shall together constitute one and the same agreement, binding all of the parties hereto, notwithstanding all of the parties are not signatory to the original or same counterparts.   For all purposes, including, without limitation, recordation and delivery of this instrument, duplicate unexecuted and unacknowledged pages of the counterparts may be discarded and the remaining pages assembled as one document.

<u>**ASSIGNOR:**</u>

LB 2080 KALAKAUA OWNERS LLC,
a Delaware limited liability company

By:     PAMI LLC, a Delaware limited liability company
        Its Managing Member

        By: _____
        Name: _____
        Title:  Authorized Signatory

<u>**ASSIGNEE:**</u>

BW VCM KALAKAUA, LLC, a Nevada limited liability company

        By:     Venture Associates, LLC, an Arizona limited
                liability company
                Its Manager

                By: _____
                Name:_____
                Its _____

**EXHIBIT "D"**

**RESERVED**

## EXHIBIT "E"

## FORM OF ASSIGNMENT OF GROUND LEASE/SUBLEASE

| LAND COURT SYSTEM | REGULAR SYSTEM |

AFTER RECORDATION, RETURN BY MAIL ❑ OR PICKUP ❑ :

---

TYPE OF DOCUMENT:                                    (TOTAL PAGES: _____ )
    ASSIGNMENT OF GROUND LEASE AND GROUND SUBLEASE

---

PARTIES TO DOCUMENT:
    ASSIGNOR:    LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company
    ASSIGNEE:    BW VCM KALAKAUA, LLC, a Nevada limited liability company

---

TAX MAP KEY FOR PROPERTY: (1) 2-6-016-023 AND 026

---

## ASSIGNMENT OF GROUND LEASE AND GROUND SUBLEASE

THIS INDENTURE, made as of _____, 2009, by and between LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company, hereinafter called "**Assignor**", and BW VCM KALAKAUA, LLC, a Nevada limited liability company, whose address is _____, hereinafter called the "**Assignee**";

WITNESSETH:

Pursuant to **[describe order authorizing sale]** (the "**Sale Order**"), the Assignor does hereby sell, assign, transfer, set over and deliver unto the Assignee, its successors and assigns, all of the right, title and interest of the Assignor in, to and under the leasehold estate and interest created by that certain Amended and Restated Ground Lease and Amended and Restated Sublease (collectively, the "**Leases**"), as both are more particularly described in Exhibit A attached hereto and made a part hereof, subject to the encumbrances, exceptions, reservations and other matters of record, and including those noted in said Exhibit A, if any.

TOGETHER WITH, all of the estate, right, title and interest of the Assignor in and to the land thereby demised (the "**Land**"), and in and to all structures, improvements and fixtures situated on or built on or used, occupied and enjoyed in connection with the Land (the "**Improvements**") and also together with all rights, easements, privileges and appurtenances thereunto belonging or appertaining or held or enjoyed in connection with the Leases or the Land, and also together with the landlord's interest under all tenant leases of all or portions of the Improvements.

TO HAVE AND TO HOLD the same unto the Assignee, its successors and assigns for the rest, residue and remainder of the term of the Lease subject, however, to the payment of the rents reserved by the Leases and subject also to the observance and performance by the Assignee of all of the covenants and conditions contained in the Leases which, according to the terms and provisions thereof, are or ought to be observed and performed by the Lessee therein named from and after the date of this assignment.

AND, in consideration of the foregoing, the Assignee hereby covenants and agrees to and with the Assignor and to and with the landlord and sublessor under the Leases that the Assignee will pay all rents reserved by the Leases as and when the same become due and payable, and will also faithfully observe and perform all of the covenants and conditions therein contained and on the part of the tenant or subtenant therein named to be observed and performed and will at all times hereafter indemnify and save harmless the Assignor against any nonpayment of said rents and any non-observance and nonperformance of said covenants and conditions.

The Assignee confirms and agrees that the Assignee has conducted its own inspection, investigation and analysis of the Property, as such term is defined and used in the Sales Contract dated _____, 2009, between the Assignor and _____ (the "**Sales Contract**"), and that the Assignee is purchasing the Property "AS IS, WHERE IS" AND "WITH ALL FAULTS" AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE ASSIGNOR, except as specifically set forth in the Sales Contract.

THE ASSIGNEE HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, CONSTRUCTION DEFCTS, ADVERSE PHYSICAL, ENVIRONMENTAL, HAZARDOUS MATERIALS, ENDANGERED SPECIES, ZONING, ACCESS OR WATER COURSE ISSUES OR CONDITIONS, MAY NOT HAVE BEEN REVEALED BY THE ASSIGNEE'S INVESTIGATIONS.  The Assignee, for itself and its successors and assigns and every person or entity claiming by or through the Assignee, hereby releases the Assignor, and Assignor's members, affiliates, subsidiaries, parent companies, agents,

employees and other representatives, from and waives any and all liability, claims, demands, damages and costs (including attorneys' fees and expenses) of any and every kind or character, known or unknown, for, arising out of, or attributable to, any latent or patent issue or condition at the Property, including without limitation, claims, liabilities and contribution rights relating to the presence, discovery or removal of any hazardous materials in, at, about or under the Property or for, connected with or arising out of any federal, state or local governmental authority, including, without limitation, asbestos or asbestos containing material, the group of compounds known as polychlorinated biphenyls, flammable explosives, oil, petroleum or any refined petroleum product. It is the intention of the Assignee and the Assignor that the foregoing release shall be effective with respect to all matters past and present, known and unknown, suspected and unsuspected.  The Assignee realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses that are presently unknown, unanticipated, and unsuspected, and the Assignee further agrees that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that the Assignee nevertheless hereby intends to release, discharge and acquit the Assignor and the Assignor's members, affiliates, subsidiaries, parent companies, agents, employees and other representatives from any such unknown losses, damages, liabilities, costs and expenses.

The rights and obligations of the Assignor and the Assignee shall be binding upon and inure to the benefit of their respective estates, heirs, devisees, personal representatives, successors, successors-in-trust and permitted assigns.

AND IT IS HEREBY MUTUALLY AGREED that the terms "Assignor", "Assignee", "landlord", "sublessor", "tenant" and "subtenant" as used herein, or any pronouns used in place thereof, shall mean and include the masculine or feminine, the singular or plural number, and individuals, firms or corporations, and their and each of their respective estates, heirs, devisees, personal representative, successors, successors-in-trust and permitted assigns, according to the context hereof, and that the covenants of any two or more persons herein shall be joint and several. The term "Leases" herein shall mean and include said Amended and Restated Ground Lease and said Amended and Restated Sublease and any amendments thereof.

IN WITNESS WHEREOF, the undersigned have executed these presents as of the day and year first above written.

**ASSIGNOR:**

LB 2080 KALAKAUA OWNERS LLC,
a Delaware limited liability company

By: PAMI LLC,
    a Delaware limited liability company
    Its Managing Member

    By: _____
        Name: _____
        Title:  Authorized Signatory

**ASSIGNEE:**

BW VCM KALAKAUA, LLC, a Nevada limited liability company

By:    Venture Associates, LLC, an Arizona
      limited liability company
      Its Manager

      By: _____
      Name:_____
      Its _____

STATE OF _____           )
                                                      )    SS.
COUNTY OF _____     )

On this the _____ day of _____, 2009, before me personally appeared

_____ ❑personally known to me **-OR-** ❑proved to me on

the basis of satisfactory evidence who, being by me duly sworn or affirmed, did say that such person

executed the foregoing instrument as the free act and deed of such person, and if applicable in the

capacities shown, having been duly authorized to execute such instrument in such capacities.


_____
Printed Name: _____
Notary Public, State of _____
My commission expires: _____
(Official Stamp or Seal)

STATE OF HAWAII        )

                              )   SS.

CITY AND COUNTY OF HONOLULU    )

On this the _____ day of _____, 2009, before me personally appeared

BILL WYLAND ❑personally known to me **-OR-** ❑proved to me on the basis of satisfactory

evidence who, being by me duly sworn or affirmed, did say that such person executed the foregoing

instrument as the free act and deed of such person, and if applicable in the capacities shown, having

been duly authorized to execute such instrument in such capacities.

_____

Printed Name: _____
Notary Public, State of Hawaii

My commission expires: _____

(Official Stamp or Seal)

Doc. Date:_____     # of Pages:_____

Notary Name:_____     Circuit:_____

Doc: Description:_____

_____   (Official Stamp or Seal)
Notary Signature                       Date:_____

## EXHIBIT A

-FIRST:-  (TMK:  (1) 2-6-016-023)

A leasehold estate created by that certain amended and restated SHORT FORM GROUND LEASE dated as of July 1, 2003, made by and between KALAIMOKU-KUHIO DEVELOPMENT CORP., a Hawaii corporation, "Landlord", and KING KALAKAUA OWNERS, a Hawaii general partnership, "Tenant", filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii on August 21, 2003 as Land Court Document No. 2980702, as consented to by Bear, Stearns Funding, Inc. pursuant to an unrecorded consent made as of July 1, 2003.

The interest of the "Tenant" is now held by LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company, by COMMISSIONER'S QUITCLAIM ASSIGNMENT OF LEASE AND SUBLEASE filed in said Office on November 8, 2008 as Land Court Document No. 3510687.

Leasing and demising the following property:

All of that certain parcel of land situate at Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

Lot 203, area 38,861 square feet, as shown on map 82, filed in said Office with Land Court Application No. 537 of August Ahrens, Limited and John Francis Bowler.

Being a portion of the premises described in and covered by Transfer Certificate of Title No. 492,843 issued to KALAIMOKU-KUHIO DEVELOPMENT CORP., a Hawaii corporation.

-SECOND:-  (TMK:  (1) 2-6-016-026)

A leasehold estate created by that certain AMENDED AND RESTATED SHORT FORM GROUND SUBLEASE dated as of July 1, 2003, made by and between KALAIMOKU-KUHIO DEVELOPMENT CORP., a Hawaii corporation, "Landlord", and KING KALAKAUA OWNERS, a Hawaii general partnership, "Tenant", filed in said Office on August 21, 2003 as Land Court Document No. 2980701, as consented to by Bear, Stearns Funding, Inc. pursuant to an unrecorded consent made as of July 1, 2003.

Said Sublease was amended by MEMORANDUM OF SUPPLEMENTAL PAYMENT AGREEMENT relating to an AMENDED AND RESTATED GROUND LEASE, dated August 21, 2003, filed in said Office on September 26, 2003 as Land Court Document No. 3000041.

The interest of the "Tenant" is now held by LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company, by COMMISSIONER'S QUITCLAIM ASSIGNMENT OF

LEASE AND SUBLEASE filed in said Office on November 8, 2008 as Land Court Document No. 3510687.

Leasing and demising the following property:

All of that certain parcel of land situate at Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, described as follows:

Lot 201, area 6,711 square feet, as shown on Map 81, filed in said Office with Land Court Application No. 537 of August Ahrens, Limited and John Francis Bowler.

Being all of the premises described in and covered by Transfer Certificate of Title No. 509,502 issued to OCEANFRONT HAWAII, INC., a Hawaii corporation

DEED dated February 20, 1998, filed in said Office as Land Court Document No. 2454657.

SUBJECT, HOWEVER, to the following:

1.  Title to all mineral and metallic mines reserved to the State of Hawaii.

2.  AS TO FIRST (LOT 203):

a.  A GRANT OF EASEMENT for sanitary sewer purposes, in favor of City and County of Honolulu, filed in said Office as Land Court Document No. 415612.

b.  Easement 23 for pedestrian purposes, shown on Map No. 82 filed with Land Court Application No. 537, as set forth by Land Court Order No. 127949, filed in said Office on June 5, 1997.

c.  A GRANT OF EASEMENT for pedestrian purposes, over and across foregoing Easement 23, in favor of CITY AND COUNTY OF HONOLULU, filed in said Office on February 19, 1999 as Land Court Document No. 2522491.

3.  AS TO SECOND (LOT 201):

a.  Easement 22 for pedestrian purposes, shown on Map No. 81 filed with Land Court Application No. 537, as set forth by Land Court Order No. 127948, recorded June 5, 1997.

b.  AMENDED AND RESTATED SHORT FORM OH GROUND LEASE dated as of July 1, 2003, executed by OCEANFRONT HAWAII, INC., a Hawaii corporation, as "Landlord", and KALAIMOKU-KUHIO DEVELOPMENT CORP., a Hawaii corporation, as "Tenant", filed in said Office on August 21, 2003 as Land Court Document No. 2980700.

Said Lease was amended by MEMORANDUM OF SUPPLEMENTAL PAYMENT AGREEMENT RELATING TO AN AMENDED AND RESTATED GROUND

LEASE, dated August 21, 2003, filed in said Office on September 26, 2003 as Land Court Document No. 3000041.

c. A Grant of Easement for pedestrian purposes, over and across Easement 22, in favor of City and County of Honolulu, filed in said Office on February 19, 1999 as Land Court Document No. 2522490.

4. Any failure of Assignee to comply with the terms, provisions and conditions of the Unrecorded Ground Lease and Sublease referred to above.

5. MEMORANDUM OF LEASE executed by KING KALAKAUA OWNERS, a Hawaii general partnership, as Lessor, and NIKE RETAIL SERVICES, INC., an Oregon corporation, as Lessee, for a term of 15 years with options to renew, filed in said Office as Land Court Document No. 2419039. Leasing and demising portions of the building known as the "King Kalakaua Plaza", affecting Lots 201 and 203.

6. The terms and provisions contained in NON-DISTURBANCE AND ATTORNMENT AGREEMENT made by and between 2080 CORPORATION, "Master Landlord", Kalaimoku-Kuhio Development Corp., "Landlord", King Kalakaua Owners, "Tenant", and NIKE RETAIL SERVICES, INC., "Subtenant", filed in said Office as Land Court Document No. 2419040.

7. The terms and provisions contained in the NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made by and between KALAIMOKU-KUHIO DEVELOPMENT CORP., "Landlord", KING KALAKAUA OWNERS, "Tenant", and NIKE RETAIL SERVICES, INC., "Subtenant", filed in said Office as Land Court Document No. 2419041.

8. Intentionally deleted.

9. The terms and provisions contained in the AGREEMENT FOR ISSUANCE OF CONDITIONAL USE PERMIT UNDER SECTION 4.40-21 OF THE LAND USE ORDINANCE (LUO) filed in said Office on February 18, 1998 as Land Court Document No. 2438500.

10. Intentionally deleted.

11. Intentionally deleted.

12. Terms, provisions, reservations, covenants, conditions and restrictions, but deleting any of the aforementioned indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes or Chapter 515 of the Hawaii Revised Statutes, as contained in the DECLARATION OF COVENANTS filed in said Office on January 4, 2005 as Land Court Document No. 3213811.

13.  Intentionally deleted.

14.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by public report.

15.  Intentionally deleted.

16. Intentionally deleted.

## EXHIBIT "F"

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION is made the ___ day of _____, 2009, by and between LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company ("**Assignor**"), and _____, a _____("**Assignee**").

## W I T N E S S E T H:

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    Assignor hereby sells, transfers, assigns and conveys to Assignee, the following:

(a)    All furniture, carpeting, draperies, appliances, building supplies, equipment, machinery, inventory, and other items of personal property owned by Assignor and presently affixed or attached to, placed or situated upon and used in connection with, the ownership, operation and occupancy of that certain leasehold and subleasehold land and improvements located in the City and County of Honolulu, State of Hawaii, as more particularly described in **Exhibits "A" and "B"** attached hereto and made a part hereof ("**Real Property**"), but excluding (i) any items of personal property owned or leased (by parties other than Assignor) by lawful tenants, occupant and licensees of the Real Property, and (ii) any items of personal property owned by third parties and leased to Assignor.

(b)    Assignor's, as lessor and landlord, right, title and interest in and to any and all rents, leases, occupancy agreements and licenses to use space (collectively, the "**Leases**") now affecting the Real Property, together with any and all legal or equitable claims for damages, injunctive relief or other remedies or rights thereunder, but not including the right to collect any Delinquent Rents (as described on **Exhibit "C"** attached hereto. A Schedule of the Leases presently in effect for the Real Property and a Schedule of Delinquent Rents is attached to this Agreement as **Exhibit "C"** and incorporated herein.

(c)    If and to the extent assignable, all licenses, permits, certificates of occupancy and franchises issued by any federal, state, county or municipal authority, or other party, and all trade names, trademarks, service marks, copyrights or other intellectual property rights (including, without limitation, rights to use the name King Kalakaua Plaza), relating to the use, maintenance or operation of the Real Property running to or in favor of Assignor or pertaining to the items described in Section 1 or the Real Property (collectively, the "**Intangibles**").

(e)     All other items of Property described in the Agreement (defined below) to the extent not conveyed and assigned by Assignor to Assignee under a separate instrument.

2.    This Bill of Sale, Assignment and Assumption is given pursuant to that certain Agreement of Sale and Purchase (the "**Agreement**") dated as of June ___, 2009, between Assignor and Assignee, providing for, among other things, the conveyance of the Personalty, the Leases, and the Intangibles.

3.    As set forth in Section 3.5 of the Agreement, which is hereby incorporated by reference as if herein set out in full, the property conveyed hereunder is conveyed by Assignor and accepted by Assignee **AS IS, WHERE IS, AND WITHOUT ANY WARRANTIES OF WHATSOEVER NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF ASSIGNOR AND ASSIGNEE EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE OR BY ANY DESCRIPTION OF THE PROPERTY CONVEYED HEREUNDER, OR BY ANY SAMPLE OR MODEL THEREOF, AND ALL OTHER WARRANTIES WHATSOEVER CONTAINED IN OR CREATED BY THE UNIFORM COMMERCIAL CODE.**

4.    Assignee hereby accepts the assignment of the Personalty, the Leases, and the Intangibles and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations thereunder from and after the date hereof.

5.    Assignee agrees to indemnify and hold harmless Assignor from any cost, liability, damage or expense (including attorneys' fees) arising out of or relating to Assignee's failure to perform any of the foregoing obligations arising from and accruing on or after the date hereof, but only to the extent arising during Assignee's ownership of the Property.

6.    This Bill of Sale, Assignment and Assumption may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties hereto have executed this Bill of Sale Assignment and Assumption under seal as of the date first above written.

**ASSIGNOR:**

LB 2080 KALAKAUA OWNERS LLC, a
Delaware limited liability company

By:  PAMI LLC, a
Delaware limited liability company
Its Managing Member

By:_____
Name: _____
Title:  Authorized Signatory

**ASSIGNEE:**

BW VCM KALAKAUA, LLC, a Nevada limited
liability company

By:    Venture Associates, LLC, an Arizona
limited liability company
Its Manager

By: _____
Name:_____
Its _____

**EXHIBIT "A" TO EXHIBIT "F"**

**<u>LEGAL DESCRIPTION – LEASEHOLD PROPERTY</u>**

**EXHIBIT "B" TO EXHIBIT "F"**

**LEGAL DESCRIPTION – SUBLEASEHOLD PROPERTY**

**EXHIBIT "C" TO EXHIBIT "F"**

**<u>SCHEDULE OF LEASES AND CONTRACTS</u>**

## EXHIBIT "G"

## CERTIFICATION OF NON-FOREIGN STATUS

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee, BW VCM KALAKAUA, LLC, a Nevada limited liability company ("Transferee"), that withholding tax is not required upon the disposition of a U.S. real property interest by LB 2080 KALAKAUA OWNERS LLC, a Delaware limited liability company ("Property Owner"), the undersigned, as the beneficial owner of Property Owner ("Transferor"), hereby certifies to Transferee the following on behalf of Property Owner and Transferor:

1.      Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations promulgated pursuant thereto);

2.      Transferor is not a disregarded entity as defined in Section 1.1555-2(b)(2)(iii);

2.      Transferor's United States Employer Identification Number is: _____; and

3.      Transferor's     office     address     is     _____, Attention: _____.

Transferor understands that this Certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this Certification and, to the best of my knowledge and belief, it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

EXECUTED this _____ day of _____, 2009, at _____, _____.

_____

By:_____
Name: _____
Title: Authorized Signatory

STATE OF HAWAII                 )
                                               )     SS.

CITY AND COUNTY OF HONOLULU    )

On this the _____ day of _____, 2009, before me personally appeared

_____ ❑personally known to me -OR- ❑proved to me on

the basis of satisfactory evidence who, being by me duly sworn or affirmed, did say that such person

executed the foregoing instrument as the free act and deed of such person, and if applicable in the

capacities shown, having been duly authorized to execute such instrument in such capacities.

                                               _____

                                               Printed Name: _____

                                               Notary Public, State of Hawaii

                                               My commission expires: _____

                                                       (Official Stamp or Seal)

Doc. Date: _____ # Pages: _____

Notary Name: _____ _____ Circuit

Doc. Description: _____

_____

_____      (Official Stamp or Seal)

Notary Signature                              Date

NOTARY CERTIFICATION (at time of notarization)