**EXECUTION VERSION**

## AGREEMENT

THIS AGREEMENT (this "**Agreement**") dated as of May 29, 2009 is made by and among **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation (together with its successors and assigns, "**Lender**"), **THE PARTIES LISTED ON SCHEDULE I ANNEXED HERETO** (collectively, the "**Bridge A Mezzanine Borrower**"), **THE PARTIES LISTED ON SCHEDULE II ANNEXED HERETO** (collectively, the "**Bridge B Mezzanine Borrower**" and together with the Bridge A Mezzanine Borrower, collectively, the "**Borrowers**"), **BROADWAY PARTNERS FUND MANAGER, LLC**, a Delaware limited liability company ("**Fund Manager**"), **BROADWAY PARTNERS REAL ESTATE FUND III, L.P.**, a Delaware limited partnership ("**Broadway Real Estate Fund**"), **BROADWAY PARTNERS PARALLEL FUND P III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund P**"), **BROADWAY PARTNERS PARALLEL FUND B III, L.P.**, a Delaware limited partnership ("**Broadway Parallel Fund B**" and together with Broadway Real Estate Fund and Broadway Parallel Fund P, the "**Broadway Funds**"), **BROADWAY B3 EQUITY LP**, a Delaware limited partnership (the "**Partnership**"), **BROADWAY FUND MANAGER SUB, LLC**, a Delaware limited liability company ("**Broadway Manager Sub**"), **BROADWAY PARTNERS FUND GP III, L.P.**, a Delaware limited partnership ("**GP III**"), **BROADWAY PARTNERS FUND GP II, L.P.**, a Delaware limited partnership ("**GP II**"), and **SCOTT LAWLOR**, an individual ("**Lawlor**" and together with the Broadway Funds, the Fund Manager, GP III and GP II, each a "**Guarantor**" and collectively, the "**Guarantors**"). The Guarantors, the Partnership, Broadway Manager Sub, Bridge A Mezzanine Borrower and Bridge B Mezzanine Borrower are sometimes referred to collectively as the "**Borrower Parties.**"

## W I T N E S S E T H:

WHEREAS, the Bridge A Mezzanine Borrower and Lender are parties to that certain Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Amended and Restated Junior Mezzanine Loan Agreement, dated as of July 15, 2008 (collectively, the "**Bridge A Mezz Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge A Mezzanine Borrower in the principal amount of $321,984,921.90 (the "**Bridge A Mezz Loan**");

WHEREAS, the Bridge A Mezz Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge A Mezz Loan Agreement), which Loan Documents for the purposes of this Agreement are hereinafter referred to as the "**Bridge A Mezz Loan Documents;**"

WHEREAS, the Bridge B Mezzanine Borrower and Lender are parties to that certain Bridge Mezzanine Loan Agreement, dated as of August 15, 2007, effective July 10, 2007, as amended by that certain Agreement, dated as of March 19, 2008, as further amended by that certain Second Amendment to Bridge Mezzanine Loan Agreement, dated as of July 15, 2008

(collectively, the "**Bridge B Mezzanine Loan Agreement**"), pursuant to which Lender made a mezzanine loan to Bridge B Mezzanine Borrower in the principal amount of $137,627,670.32 (the "**Bridge B Mezzanine Loan**" and together with the Bridge A Mezz Loan, collectively, the "**Mezzanine Loans**");

WHEREAS, the Bridge B Mezzanine Loan is evidenced and secured by the "Loan Documents" (as defined in the Bridge B Mezzanine Loan Agreement), which Loan Documents for the purpose of this Agreement are hereinafter referred to as the "**Bridge B Mezzanine Loan Documents**" and together with the Bridge A Mezz Loan Documents, the "**Mezzanine Loan Documents;**"

**WHEREAS**, the Mezzanine Loans matured on May 11, 2009;

**WHEREAS**, the Borrower Parties desire to enter into the transaction in accordance with the terms set forth herein;

**NOW, THEREFORE**, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Borrower Parties hereby covenant, agree, represent and warrant as follows:

1.    **Modification to Mezzanine Loans**.  Each Borrower Party hereby covenants and agrees that it will restructure the Mezzanine Loans substantially in accordance with the terms and provisions of that certain term sheet attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") and will take all necessary action and deliver all necessary documents to consummate the Transaction (as defined below) on or before June 26, 2009.  Simultaneously with the execution hereof, the Broadway Funds shall transfer to Lender the West Monroe deposit in cash which amount shall be held by Lender and either (i) be applied to the Broadway Funds payment obligation described in the "Broadway Payments" section of the Term Sheet if the transaction contemplated by the Term Sheet (the "**Transaction**") closes on or before June 26, 2009 (or such later date approved by Lender in writing in its sole discretion) or (ii) retained by Lender as a fee as Lender's sole and only remedy if the Transaction fails to close for any reason whatsoever (including as a result of Lender's unwillingness, in Lender's sole discretion, to close the Transaction) on or before the date specified in clause (i) above (but without prejudice to Lenders' rights under the Mezzanine Loan Documents which shall survive execution of this Agreement and any termination of this Agreement and if this Agreement fails to close for any reason on or before the date specified in clause (i) above, the Mezz Loan Documents shall continue in full force and effect and all parties shall have all of their respective rights and obligations thereunder just as if this Agreement had not been executed (except that the provisions of Paragraphs 2 and 3 hereof shall remain in effect)).  Consummation of the Transaction is also subject to the closing conditions specified in the Term Sheet or waiver thereof by Lender.  The Borrower Parties hereby agree that in no event shall they have any claims or exercise any remedies against Lender for any failure to consummate the Transaction and the Borrower Parties each hereby waive any and all claims they may have against Lender, whether for breach of contract, tort or otherwise, with respect to Lender's failure to close the Transaction for any reason whatsoever. In no event shall the Borrower Parties have any claim or cause of action against Lender if the Transaction fails to close for any reason, including any claim for breach of any duty of good faith or fair dealing.

2

2.  **No Defenses, Counterclaims or Offsets**.  Each Borrower Party for itself and its respective heirs, executors, administrators and successors and assigns, and by its execution hereof (i) hereby acknowledges, admits and agrees that, as of the date hereof, there are no objections, claims, defenses, counterclaims or offsets relating to their obligations under or in respect of the Mezzanine Loans, the Mezzanine Loan Documents, any Event of Default or to the enforcement or exercise by Lender of any of its rights, powers or remedies under or in respect of the Mezzanine Loan Documents, at law or in equity, and (ii) hereby irrevocably waives, relinquishes and releases any and all such objections, claims, defenses, counterclaims or offsets, that may now or hereafter exist, including without limitation, any and all such objections, claims, defenses, counterclaims or offsets whether known or unknown, foreseeable or unforeseeable.

3.  **Consent and Reaffirmation**.  Each Borrower Party hereby confirms and ratifies its respective obligations under the Mezzanine Loan Documents to which it is a party and consents to the terms of this Agreement and the transactions contemplated herein.  Nothing contained in this Agreement or any of the Mezzanine Loan Documents or any of the transactions contemplated herein or thereby shall constitute, and there has not otherwise occurred, any waiver, release or limitation of any obligation of any Borrower Party relating to or otherwise connected to the Mezzanine Loan Documents to which it is a party.  Nothing herein is intended to, nor shall it, constitute, nor has there otherwise occurred, a novation of the indebtedness evidenced by the Mezzanine Loan Documents.

4.  **WAIVER OF JURY TRIAL**.  THE BORROWER PARTIES AND LENDER SHALL NOT SEEK A JURY TRIAL IN ANY ACTION BASED UPON OR ARISING OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT, THE MEZZANINE LOANS OR ANY OF THE MEZZANINE LOAN DOCUMENTS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER PARTY AND LENDER HEREBY IRREVOCABLY AND EXPRESSLY WAIVES ANY AND ALL RIGHTS TO ANY SUCH JURY TRIAL AND AGREES THAT NO SUCH ACTION WITH RESPECT TO WHICH A JURY TRIAL HAS BEEN WAIVED SHALL BE SOUGHT TO BE CONSOLIDATED WITH ANY OTHER ACTION WITH RESPECT TO WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH BORROWER PARTY, LENDER AND THEIR RESPECTIVE COUNSEL, AND SHALL NOT BE SUBJECT TO ANY EXCEPTIONS.

5.  **Counterparts**.  This Agreement may be executed by facsimile or pdf signatures, and in any number of identical counterparts, each of which shall be deemed to be an original, and all of which shall collectively constitute a single agreement, fully binding upon and enforceable against the parties hereto.

6.  **Governing Law**.  This Agreement shall be governed by New York law, without regard to the principles of conflicts of law.

7.  **Expenses**.  The Borrowers or the Broadway Funds shall pay promptly upon demand, whether or not the Transaction closes, all reasonable costs and expenses of Lender in connection with this Agreement and the transactions contemplated hereby, including without limitation, the reasonable fees and disbursements of Lender's counsel.

8.    **Confidentiality**.  The terms and conditions of this Agreement, including the terms and conditions set forth in the Term Sheet, are confidential and may not be disclosed by Borrower Parties to third parties other than Borrower Parties' attorneys and accountants, except as may otherwise be required by applicable law.

9.    **Modification; Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any Mezzanine Loan Document, or any consent to any departure therefrom, shall be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.

10.    **Time; Construction; Exhibits and Schedules; Bankruptcy Court Approval**.  Time is of the essence of each provision of this Agreement.  All references to the singular or plural number or masculine, feminine or neuter gender shall, as the context requires, include all others.  All references to sections, paragraphs and exhibits are to this Agreement unless otherwise specifically noted.  The use of words "hereof", "hereunder", "herein" or words of similar import shall refer to this entire Agreement and not to any particular section, paragraph or portion of this Agreement unless otherwise specifically noted.  All schedules and exhibits attached hereto are by this reference made a part of this Agreement for all purposes.  This Agreement is fully binding on all parties hereto.  Lender's obligations under this Agreement are subject to the approval of the Bankruptcy Court of the Southern District of New York .

[Signatures appear on the following pages]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BRIDGE A MEZZANINE BORROWER:**

**BROADWAY WALL JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY GREENSBORO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR MEZZ LLC,** a Delaware limited liability company

By: _____
    Name:  Jonathon K. Yormak
    Title:   Authorized Signatory

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**BROADWAY HUNTINGTON JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY LEGATO JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY WILSHIRE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY STATE JUNIOR MEZZ LLC,**
a Delaware limited liability company

By: _____
    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BROADWAY BCCC JUNIOR MEZZ LLC,**
a Delaware limited liability company


By: _____

        Name:    Jonathon K. Yormak
        Title:    Authorized Signatory


**BROADWAY BEALE JUNIOR MEZZ LLC,**
a Delaware limited liability company


By: _____

        Name:    Jonathon K. Yormak
        Title:    Authorized Signatory


**BROADWAY SANSOME JUNIOR MEZZ LLC,**
a Delaware limited liability company


By: _____

        Name:    Jonathon K. Yormak
        Title:    Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**BRIDGE B MEZZANINE BORROWER:**

**BROADWAY WALL JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____

    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY GREENSBORO JUNIOR TWO MEZZ
LLC,** a Delaware limited liability company

By: _____

    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY CALIFORNIA STREET JUNIOR
TWO MEZZ LLC,** a Delaware limited liability
company

By: _____

    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

**BROADWAY HOWARD STREET JUNIOR TWO
MEZZ LLC,** a Delaware limited liability company

By: _____

    Name:    Jonathon K. Yormak
    Title:    Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY HUNTINGTON JUNIOR TWO MEZZ
LLC**, a Delaware limited liability company

By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

**BROADWAY LEGATO JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____

Name:
Title:    Jonathon K. Yormak
Authorized Signatory

**BROADWAY WILSHIRE JUNIOR TWO MEZZ
LLC**, a Delaware limited liability company

By: _____

Name:
Title:    Jonathon K. Yormak
Authorized Signatory

**BROADWAY STATE JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____

Name:    Jonathon K. Yormak
Title:    Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY BCCC JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
Name: Jonathon K. Yorman
Title: Authorized Signatory

**BROADWAY BEALE JUNIOR TWO MEZZ LLC,**
a Delaware limited liability company

By: _____
Name: Jonathon K. Yorman
Title: Authorized Signatory

**BROADWAY SANSOME JUNIOR TWO MEZZ
LLC,** Delaware limited liability company

By: _____
Name: Jonathon K. Yo
Title: Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** a
Delaware corporation as Debtor and Debtor in
Possession in its chapter 11 case in the United States
Bankruptcy Court for the Southern District of New
York, Case No. 08-13555 (JMP)

By: _____

Name:              Jeffrey Fitts
Title:              Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**FUND MANAGER:**

**BROADWAY PARTNERS FUND MANAGER, LLC,**
a Delaware limited liability company

By: _____

Name:    Jonathon K. Yormak

Title:    Authorized Signatory

**BROADWAY REAL ESTATE FUND:**

**BROADWAY PARTNERS REAL ESTATE FUND
III, L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

By:  Broadway Partners Fund GP III, LLC, a
Delaware limited liability company, its
general partner

By: _____

Name:  Jonathon K. Yormak

Title:  Authorized Signatory

**BROADWAY PARALLEL FUND P:**

**BROADWAY PARTNERS PARALLEL FUND P III,
L.P.,** a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a
Delaware limited partnership, its general partner

By:  Broadway Partners Fund GP III, LLC, a
Delaware limited liability company, its
general partner

By: _____

Name: Jonathon K. Yormak

Title: Authorized Signatory

[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]

**BROADWAY PARALLEL FUND B:**

**BROADWAY PARTNERS PARALLEL FUND B III,
L.P.**, a Delaware limited partnership

By:  Broadway Partners Fund GP III, L.P., a Delaware
limited partnership, its general partner

By:  Broadway Partners Fund GP III, LLC, a
Delaware limited liability company, its
general partner

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**PARTNERSHIP:**

**BROADWAY B3 EQUITY LP**, a Delaware limited
partnership

By:  Broadway Fund Manager Sub LLC., a Delaware
limited liability company, its general partner

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**BROADWAY MANAGER SUB:**

**BROADWAY FUND MANAGER SUB LLC,**
a Delaware limited liability company

By: _____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**[SIGNATURES CONTINUE ON THE FOLLOWING PAGE]**

**GP III:**

**BROADWAY PARTNERS FUND GP III, L.P.**, a
Delaware limited partnership

By:  Broadway Partners Fund GP III, LLC., a Delaware
limited liability company, its general partner

By:_____
Name:  Jonathon K. Yormak
Title:  Authorized Signatory

**GP II:**

**BROADWAY PARTNERS FUND GP II, L.P.**, a
Delaware limited partnership

By:  Broadway Partners Fund GP II, LLC., a Delaware
limited liability company, its general partner

By:_____
Name:
Title:  Jonathon K. Yormak
Authorized Signatory

**LAWLOR:**

**SCOTT LAWLOR**, an individual

_____

**LAWLOR**:

**SCOTT LAWLOR**, an individual

## Exhibit A

## Term Sheet

This Term Sheet is Exhibit A to that certain Agreement (the "**Agreement**"), dated as of May 29, 2009, among Lehman Brothers Holdings Inc. and the Borrower Parties. The obligations of the parties to the Agreement with respect to the Transaction (as defined in the Agreement) are subject in all respects to the terms and conditions of the Agreement. In the event of any conflict between the terms of this Exhibit A and the Agreement, the terms of the Agreement shall prevail. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

| | |
|---|---|
| ***General Purpose:*** | The final maturity date of each Mezzanine Loan is May 11, 2009. The Borrowers were unable to repay the Mezzanine Loans on the final maturity date and desire to enter into a restructuring of the obligations in lieu of Lender exercising its remedies under the Mezzanine Loan Documents. The primary purpose of this transaction is to: (a) provide for additional funding for the BIII Portfolio Properties (defined below), (b) restructure the obligations under the Mezzanine Loans and (c) comply with the requirements of the BIII Portfolio Properties mortgage and senior mezzanine loan documents and the applicable intercreditor agreements. In consideration of the cooperation of the Borrower Parties in effectuating an orderly transition of control and the investment of certain additional funds as specified herein, Borrower Parties will receive certain benefits as specified herein. |
| ***Properties:*** | The "**BIII Portfolio Properties**" consist of (i) Bay Colony Corporate Center, Waltham, Massachusetts ("**Bay Colony**"), (ii) 116 Huntington Street, Boston, Massachusetts ("**116 Huntington**"), (iii) 120 Howard Street, San Francisco, California ("**120 Howard**"), (iv) 100 California Street, San Francisco, California ("**100 Cal**"), (v) One Sansome, San Francisco, California ("**One Sansome**"), (vi) 50 Beale Street, San Francisco, California ("**50 Beale**"), (vii) 1000 Wilshire Boulevard, Los Angeles, California ("**1000 Wilshire**"), (viii) 100 Wall Street, New York, New York ("**100 Wall**"), (ix) Greensboro Drive, McClean, Virginia ("**Greensboro**") and (x) One Fair Oaks, Fairfax, Virginia ("**One Fair Oaks**"). The "**Pool 1 Properties**" consist of 100 Cal, 1000 Wilshire, 116 Huntington, 50 Beale and One Fair Oaks. The "**Pool 2 Properties**" consist of Greensboro and One Sansome. The "**Pool 3 Properties**" consist of 120 Howard, Bay Colony and 100 Wall. |
| ***Restructuring of Mezzanine Loans*** | At closing, a restructuring of the Mezzanine Loans shall be effected as follows: |

- The Bridge A Mezz Loan shall be split into 2 separate mezzanine loans. The "**Bridge A Pool 1 Mezz Loan**" will have an initial principal balance of $198,568,579 and will be indirectly secured by the Pool 1 Properties and the "**Bridge A Pool 2 Mezz Loan**" will have an initial principal balance of $103,302,916 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge A Mezz Loan as of May 12, 2009 of $304,871,494 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $3,000,000 allocated to the Pool 3 Properties.

- The Bridge B Mezz Loan shall be split into 2 separate mezzanine loans. After giving effect to the foreclosure of $20,000,000 described below, the "**Bridge B Pool 1 Mezz Loan**" will have an initial principal balance of $58,824,267 and will be indirectly secured by the Pool 1 Properties and the "**Bridge B Pool 2 Mezz Loan**" will have an initial principal balance of $ 60,240,775 and will be indirectly secured by the Pool 2 Properties. The allocated loan amounts for each property shall be as determined by Lender in its sole discretion. The balances listed above are based on the outstanding Bridge B Mezz Loan as of May 12, 2009 of $141,065,042 and such numbers and any other numbers herein derived therefrom will be adjusted at closing to reflect the outstanding balances as of closing. Such numbers currently exclude $2,000,000 allocated to the Pool 3 Properties.

- Lender and the Borrowers will engage in (and the other Borrower Parties will not object to or interfere with) a consensual partial strict foreclosure under the UCC or, at Lender's option, an assignment in lieu of foreclosure, pursuant to which the Lender, as holder of the Bridge B Mezzanine Loan, will foreclose out $20,000,000 of the Bridge B Mezz Loan and obtain the managing member interests described in "JV Interests" below as being those to be held by Lender, and all existing obligations of the Borrower Parties with respect to the Bridge B Mezzanine Loan shall, except as otherwise contemplated hereby, survive. The documents evidencing such foreclosure or assignment shall be satisfactory to Lender. Notwithstanding the foregoing, there will be no public auction, general solicitation or marketing

2

associated with the partial strict foreclosure unless (i) a party with a right under the UCC to object to the strict foreclosure contemplated hereby objects and strict foreclosure is not an available remedy or (ii) the Transaction does not close within the time periods contemplated hereunder. Borrower Parties agree and acknowledge that this Term Sheet is subject to the approval of the Bankruptcy Court of the Southern District of New York and as such will become public record.

- At Lender's option, after the closing of the Transaction, the Bridge A Pool 1 Mezz Loan, the Bridge A Pool 2 Mezz Loan, the Bridge B Pool 1 Mezz Loan and the Bridge B Pool 2 Mezz Loan may be split into separate cross-collateralized, cross defaulted loans, one loan for each of the Pool 1 Properties and Pool 2 Properties. Each Borrower in each pool will enter into a cross indemnity agreement with each other Borrower in the same pool, in form satisfactory to Lender whereby each Borrower will agree to reimburse each other Borrower for any amount paid on the reimbursing Borrower's behalf.

***Pool 3 Properties:***    Notwithstanding anything contained herein to the contrary, at any time specified by Lender, either before or after the closing of the Transaction, Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III will take such actions with respect to the Pool 3 Properties as specified by Lender, including, without limitation, agreeing to deliver after the closing of the Transaction an assignment or deed in lieu to Lender or to the senior lenders or otherwise take such action as may be necessary to relinquish after the closing of the Transaction any interest in the Pool 3 Properties to Lender or to the senior lenders or any other person. Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III, at no cost to Lender, will reasonably cooperate with Lender to effectuate such transfers in the manner directed by Lender (including, without limitation, to minimize any potential transfer tax liability), which cooperation may include, without limitation, Broadway Funds remaining an owner of certain equity in the Pool 3 Properties; provided, however, that Borrowers, Fund Manager, Broadway Funds, Partnership, Broadway Manager Sub and GP III shall not be required to do anything that would cause material adverse income tax or transfer tax consequences to either the Broadway Funds (or their direct or indirect partners) or their respective subsidiaries. In no event shall any capital contributed or committed by Broadway Funds be expended by Lender on the Pool 3 Properties without the approval of the Broadway Funds. The Pool 3 Properties will continue to serve as indirect security for the

3

Mezzanine Loans until the closing of the Transaction. At the closing of the Transaction, the Pool 3 Properties shall, at Lender's option, (i) serve as indirect security for the Bridge A Pool 2 Mezz Loan and/or the Bridge B Pool 2 Mezz Loan and only a nominal amount of the Bridge A Pool 2 Mezz Loan ($3,000,000) and/or the Bridge B Pool 2 Mezz Loan ($2,000,000) shall be allocated to the Pool 3 Properties, as determined by Lender in Lender's sole discretion, (ii) serve as indirect security for a "Pool 3 Mezzanine Loan" which will have a nominal loan amount ($5,000,000) and in which Broadway Funds will have no interests or (iii) subject to the foregoing provisions of this paragraph, as otherwise determined by Lender.

***Broadway Payments:***

- The Broadway Funds will provide at least $26,000,000 in cash at closing consisting of (i) $6,000,000 of new money from sources outside the BIII Portfolio Properties, (ii) (x) the remaining proceeds from the Sansome deposit ($4,000,000), which Sansome deposit remaining proceeds the parties hereto acknowledge and agree have been previously provided to Lender, and (y) the remaining proceeds from the Monroe escrow ($10,000,000), (iii) the final, negotiated amount of the 1000 Wilshire deposit, less reasonable third party out-of-pocket costs and (iv) the amounts required by the second to last bullet point in this section, which are estimated to be $3,000,000 (inclusive of Borrower's reasonable third-party out-of-pocket costs incurred in connection with the Transaction).

- At closing, $20,000,000 of the $26,000,000 cash provided by the Broadway Funds, will be applied to pay down the Mezzanine Loans.

- $3,000,000 of the $26,000,000 cash provided by the Broadway Funds will be held by Lender and used to provide liquidity for capital needs (see "Tranche A (Pool 2)" below).

- The Broadway Funds will also commit to provide an additional Tranche A callable capital commitment for each of Pool 1 and Pool 2 of $14,000,000 in the aggregate, $2,000,000 of which will be solely for Pool 1 and $12,000,000 of which will be solely for Pool 2 of new money from sources outside the BIII Portfolio Properties (which new money shall be callable by Lender, subject to the terms and conditions of this Term Sheet, at any time that

4

Lender determines that such additional funds are necessary to provide liquidity for capital needs and restructuring). Prior to closing, Broadway Funds must provide documentation reasonably satisfactory to Lender evidencing that $14,000,000 of capital commitments (i) exist, (ii) are callable by Fund Manager in its sole and absolute discretion and (iii) can not be used for any purpose except to fund the $14,000,000 of capital commitments required hereunder. To the extent that Broadway Funds do not satisfy the provisions of the foregoing sentence, the terms described on Schedule IV attached hereto will be deemed incorporated herein.

- At closing, the Broadway Funds shall pay all reasonable third party out-of-pocket fees and expenses incurred by Lender in connection with the transactions contemplated hereby (including, without limitation, attorneys fees). The Broadway Funds shall also be responsible for (A) any transfer taxes associated with the Pool 1 and Pool 2 Properties but not the Pool 3 Properties and (B) all amounts owing directly or indirectly by Borrowers or their subsidiaries that own a direct or indirect interest in the BIII Portfolio Properties to any party except for (i) any amounts set forth on Schedule III attached hereto, (ii) any and all trade payables incurred in the ordinary course of owning and operating the BIII Portfolio Properties which are not 30 or more days past due, (iii) any other ordinary course liabilities and/or expenses that individually are less than $20,000 and in the aggregate do not exceed $200,000 and (iv) amounts due to the senior lenders under the mortgage and mezzanine loans.

- Except with respect to 120 Howard to the extent funds are not available from the working capital reserve account or are otherwise provided by the Broadway Funds, the Broadway Funds shall pay any and all shortfalls in the debt service payments due and payable under the senior loans on the June 2009 payment date under such loans, which payments may be made, in part, from funds then on deposit, if any, in the working capital reserve account. Provided such payment is made, Lender shall provide the Broadway Funds with a credit at the closing of the Transaction against the Bridge A Mezz Loan Tranche A (Pool 2) commitment of the Broadway Funds discussed below in the amount of such shortfall payment amount.

5

| | |
|---|---|
| *Bridge A Pool 1 Mezz*<br>*Loan Tranching:* | The Bridge A Pool 1 Mezz Loan will be participated into 3 tranches. Tranche A (Pool 1) will be a senior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche B (Pool 1) will be a junior participation interest in the Bridge A Pool 1 Mezz Loan. Tranche C (Pool 1) will be the junior most participation interest in the Bridge A Pool 1 Mezz Loan. The named "lender" for the Bridge A Pool 1 Mezz Loan shall be Lender. In consideration of the Broadway Funds' provision of capital and other consideration contemplated hereby, the Broadway Funds shall have a participation interest in Tranche A (Pool 1), Tranche B (Pool 1)  and Tranche C (Pool 1) to receive a pro rata share (as described below) of payments received and distributed by Lender on Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1) (pursuant to participation agreements in form satisfactory to Lender and Broadway Funds) but shall not have any other rights or ability to vote, approve decisions, call for advances, exercise remedies or vote claims or otherwise take any action or make any decision or prevent Lender from doing so with respect to the Bridge A Pool 1 Mezz Loan, i.e., the participation shall be totally "silent." Such participations may not be amended in any manner that would be adverse to the Broadway Funds without the prior written consent of the Broadway Funds, except that in connection with either any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) or any sale or other transfer by Lender of its interest (in part or in whole) in Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1), Lender may amend such participations without the consent of the Broadway Funds so long as (x) the adverse effect on the Broadway Funds resulting from such amendment is not materially disproportionate to the adverse effect on Lender (it being specifically understood and agreed that any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1) will not be deemed to have an adverse effect on Broadway Funds since Broadway Funds will have a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1)) and (y) such amendment does not reduce the interest rate payable on Tranche A (Pool 1).  Subject to the pay off and/or replacement of Tranche A (Pool 1) described in the last sentence of the "Tranche A (Pool 1)" section below, the Broadway Funds will be granted a pre-emptive right to maintain its percentage interest in Tranche A (Pool 1), Tranche B (Pool 1) and Tranche C (Pool 1)  in connection with any increase in the size of Tranche A (Pool 1), Tranche B (Pool 1) or Tranche C (Pool 1); provided, however, that the terms of the participation agreement with any party providing additional financing shall be as reasonably determined by Lender; provided, however, that if Broadway Funds are a party to such participation agreement, then Broadway Funds shall be afforded therein the same protections governing amendments thereto as they |

6

are afforded in the participation agreement first discussed in this paragraph above. Lender will agree to forbear from exercising remedies with respect to the Bridge A Pool 1 Mezz Loan until June 11, 2012; provided, however, that (1) Lender shall have the right at any time in its discretion to recharacterize such forbearance as an extension of the term of the Bridge A Pool 1 Mezz Loan and (2) no Event of Default other than a maturity default occurs under the Bridge A Pool 1 Mezz Loan. The Bridge A Pool 1 Mezz Loan shall be prepayable at any time as determined by Lender. On the sale or refinance of a Pool 1 Property, the Bridge A Pool 1 Mezz Loan shall be repaid to the extent of available proceeds from such sale or refinance first to Tranche A (Pool 1) and then to Tranche B (Pool 1) and then to Tranche C (Pool 1), unless Lender elects to reserve all or any portion of such proceeds, in Lender's sole discretion (it being agreed that following the sale or other disposition of the last remaining Pool 1 Property that Lender will distribute all proceeds in excess of those Lender determines should be retained for legal, contractual or other prudent purposes). Lender shall, to the maximum extent permitted by law, have no fiduciary or other duties to the Borrower Parties except to the extent specifically provided for herein.

*Tranche A (Pool 1):*

Tranche A (Pool 1) will have a maximum principal balance (exclusive of any accrued or capitalized interest or any dilution factor) of $20,000,000 (the "**Tranche A (Pool 1) Maximum Principal Amount**") which will consist of:

(A) (i) $5,000,000 allocated to Lender, (ii) the amount of cash contributed by Lender in connection with the Transaction (which amount shall be determined by Lender in its sole discretion and which may be $0.00) and (iii) $3,000,000 allocated to Broadway Funds (clauses (i), (ii) and (iii) are collectively referred to as the "**Tranche A (Pool 1) Initial Principal Balance**"); and

(B) (i) the amount of new money (up to $2,000,000) callable by Lender and both committed and contributed by Broadway Funds as contemplated in "Broadway Payments" above and (ii) the amount of cash contributed by Lender or any party designated by Lender in connection with any capital call.

Lender shall have the right, but not the obligation, to call for additional capital as and when determined by the Lender, in its sole and absolute discretion and it is the intention of Lender to utilize cash flow from the Pool 1 Properties prior to making any such calls, provided, that in all events Lender, in its sole and absolute discretion may use any cash flow to pay down the Mezzanine Loans or reserve all or any portion of such cash flow as it deems appropriate, in its

7