# EXHIBIT C

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of September 21, 2006

### LEHMAN BROTHERS          and          OCCIDENTAL ENERGY
### COMMODITY SERVICES INC.                    MARKETING, INC.

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

   (i)    in the same currency; and

   (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

   (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

      (1)    promptly notify the other party ("Y") of such requirement;

      (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

      (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

      (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

         (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

         (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

2    ISDA® 1992

(ii)    *Liability*. If: —

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that: —

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    ·*Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4. ·    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under · subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)    any other documents specified in the Schedule or any Confirmation; and

   (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to ·which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

. (e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4                                                    **ISDA® 1992**

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    ·*Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    · *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default*:

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;·

(v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.     Early Termination

(a)     *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   .   *Right to Terminate Following Termination Event.*

(i)     *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)     *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate.* If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

<center>9</center>

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    Contractual Currency

(a)    *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

11                    ISDA® 1992

**9.**    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)  ·    *Counterparts and Confirmations.*

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into·as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.**    Offices; Multibranch Parties ·

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.**    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

:(i)    if in writing and delivered in person or by courier, on the date it is delivered;

..'(ii)    if sent by telex, on the date the recipient's answerback is received;

.:(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

'; (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

:(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

:(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.    **Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14                                    **ISDA® 1992**

**"Defaulting Party"** has the meaning specified in Section 6(a).

**"Early Termination Date"** means the date determined in accordance with Section 6(a) or 6(b)(iv).

**"Event of Default"** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

**"Illegality"** has the meaning specified in Section 5(b).

**"Indemnifiable Tax"** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

**"law"** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and **"lawful"** and **"unlawful"** will be construed accordingly.

**"Local Business Day"** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

**"Loss"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

**"Market Quotation"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

<center>15</center>

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meanings specified in the Schedule.

16

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17                                                                 ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS COMMODITY SERVICES INC. *(Name of Party)* | OCCIDENTAL ENERGY MARKETING, INC. *(Name of Party)* |
|---|---|
| By: _____ | By: _____ |
| Name: | Name: Ronald K. Takeuchi |
| Title: Zdenka S. Griswold Authorized Signatory | Title: President |
| Date: | Date: |

18

(Multicurrency-Cross Border)

<div align="center">

**SCHEDULE**
to the
**Master Agreement**
dated as of September 21, 2006
between
**LEHMAN BROTHERS COMMODITY SERVICES INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**OCCIDENTAL ENERGY MARKETING, INC.** ("Party B"),
a corporation organized under the laws of
the State of Delaware

</div>

**Part 1: Termination Provisions**

In this Agreement:

(a)     **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Special Financing, Inc., Lehman Brothers Finance SA, Lehman Brothers Commercial Corporation |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Occidental Power Services Inc., Occidental Petroleum Corporation |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     **"Specified Transaction"** will have the meaning specified below.

"Specified Transaction" means (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse purchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward or spot purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be

made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 150 million and (ii) two percent (2%) of the Stockholders' Equity of Party B or any Credit Support Provider of Party B, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B.

(e)     The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)     **"Termination Currency"** means United States Dollars ("USD").

(h)     **Additional Termination Events** will not apply.

(h)     **Additional Event of Default:**

**Adequate Assurance of Performance:** A party (the "Demanding Party") may demand that the other party (the "Posting Party") provide the Demanding Party with Adequate Assurance of Performance if the Demanding Party has reasonable grounds for insecurity concerning the Posting Party's ability to perform any of its obligations under this Agreement. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount and for the term reasonably acceptable to the Demanding Party, including, but not limited to, cash collateral, a standby irrevocable letter of credit issued by a bank reasonably acceptable to the Demanding Party, a prepayment, or other security reasonably acceptable to the Demanding Party. The Posting Party shall provide the Adequate Assurance of Performance within two (2) Business Days of demand by the Demanding Party.

The amount of Adequate Assurance of Performance to be provided shall be determined by the Demanding Party in a commercially reasonable manner.

If the Posting Party fails to provide Adequate Assurance of Performance, as determined by the Demanding Party in a commercially reasonable manner, within two (2) Business Days of demand by the Demanding Party, the Demanding Party may withhold or suspend its obligations under this Agreement and under any Transaction until it receives the Adequate Assurance of Performance from the Posting Party.

**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of <u>Section 3(f)</u> of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of Delaware.

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Provider, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | As soon as practicable upon request (but in the case of Party B, only if such financial statements are not available on "EDGAR" or its home page on the world wide web at http://www.oxy.com). | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Provider, prepared in accordance with generally accepted accounting principles consistently applied. | As soon as practicable upon request (but in the case of Party B, only if such financial statements are not available on "EDGAR" or its home page on the world wide web at http://www.oxy.com). | Yes |

22

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

## Part 4: Miscellaneous

(a)   **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to **Party A**:

Address:     Lehman Brothers Commodity Services Inc.
c/o Lehman Brothers Inc.
Transaction Management Group
Corporate Advisory Division
745 Seventh Avenue
New York, NY 10019

Attention:       Documentation Manager
Telephone No.:   (212) 526-7187
Facsimile No.:   (212) 526-7672

For all purposes.

Address for notices or communications to **Party B**:

Address:     Occidental Power Services, Inc.
5 Greenway Plaza, Suite 110
Houston, TX 77046-0504

Attention:       Gail Rudloff
Telephone No.:   (713) 215-7084
Facsimile No.:   (713) 350-4802
For all purposes.

With a copy to:

Attention:       Andrea Kunkel, Managing Counsel
Telephone No.:   (713) 215-7673
Facsimile No.:   (713) 215-7593

In regards to any Failure to Make Payment under the Agreement, with a copy to:

Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, California 90024

Attention:  Assistant Treasurer
Fax:        (310) 443-6694

(b)   **Process Agent.** For the purpose of Section 13(c) of this Agreement:

<div style="margin-left:2em">

Party A appoints as its Process Agent:     Not applicable.

Party B appoints as its Process Agent:     Not applicable.

</div>

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

        Party A is not a Multibranch Party.

        Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction; provided, however, if an Event of Default has occurred and is continuing with respect to Party A, the Calculation Agent shall be Party B (or any designated third party mutually agreed to by the parties) until such time as Party A is no longer a Defaulting Party. In the event a calculation or determination is disputed by the party that is not a Calculation Agent, the parties shall first endeavor to resolve such dispute. If the parties are unable to resolve such dispute within a commercially reasonable time, the parties shall mutually select a dealer in the applicable commodity to act as Calculation Agent with respect to the issue in dispute.

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

        In the case of **Party A:**

        Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule. Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

        In the case of **Party B:**

        Guarantee of Party B's obligations hereunder in the form annexed hereto as Exhibit B to this Schedule. Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

(g)    **Credit Support Provider.**

        Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

        Credit Support Provider means in relation to Party B:    Occidental Petroleum Corporation

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions, unless specified in the relevant Confirmation..

(j)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5: Other Provisions**

<u>Miscellaneous:</u>

(a)   **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

   (g)   *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

   (j)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

   (k)   *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)   **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

   (f)   *Set-off.*

   (i)   In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

   (ii)   If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

   (iii)   This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(c)   **Transfer.** For the purposes of Section 7, the following phrase "which consent shall not be unreasonably withheld" shall be inserted on the third line thereof, after the word "party," and before the word "except". In addition,, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be otherwise identical to the guarantee then in effect of the obligations of the transferor.

(d)   **Notices.** Section 12(a) is hereby amended by inserting the words "or 13(c)" between the number "6" and the word "may" in the second line thereof. For the purposes of subsections (iii) and (v) of Section 12(a), the

date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(e)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(f)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(g)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(h)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(i)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "second".

(j)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(k)    **Recording of Conversations.** Each party (i) consents to the recording of telephone conversations between the trading and marketing personnel of the parties in connection with this Agreement or any potential Transaction, and (ii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

(l)    **LIMITATION OF LIABILITY.** FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE), LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE; PROVIDED HOWEVER, THAT NOTHING IN THIS PROVISION SHALL EFFECT THE ENFORCEABILITY OF SECTION 6(E) OF THIS AGREEMENT. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT

THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS AND NOT A PENALTY.

(m)   **Statute of Frauds.** The parties agree not to contest, or to enter any defense concerning the validity or enforceability of any Transaction on the grounds that the documentation for such Transaction fails to comply with the requirements of any jurisdiction's (of whatever country, province, or state) statute of frauds or any other statute, regulation or judicial decision that agreements be written or signed.

(n)   **Procedures for Entering Into Transactions.** Any Transaction may be effectuated by a telephone conversation with the offer and acceptance constituting an agreement of the parties. Any such Transaction shall be considered a "writing" and to have been "signed". The parties shall be legally bound by each such Transaction from the time they agree to its terms. Any tape recording of the telephone conversation effectuating a Transaction shall be considered an "original" document evidencing such Transaction.

For each Transaction entered into hereunder, Party A shall promptly send to Party B a Confirmation via facsimile transmission, email or any other means mutually agreed upon between the parties.. Party B agrees to respond to such Confirmation within three (3) Business Days, either confirming agreement thereto or requesting a correction of any error(s) contained therein. Failure by Party B to respond within such period shall not affect the validity or enforceability of such Transactions.

(o)   **Further Representations.** With respect to commodity swap, cap, floor, collar and option transactions (for purposes of this Schedule Part 5(m), "Commodity Transactions"), each party represents to the other (which representations will be deemed to be repeated on each date on which a Commodity Transaction is entered into) that:

(i)     it has entered into this Agreement and each Commodity Transaction in conjunction with its line of business (which may include financial intermediation services) or the financing of its business;

(ii)    the material terms of this Agreement and each Commodity Transaction have been and will be individually tailored and negotiated;

(iii)   it is a producer, processor, or commercial user of, or a merchant handling, the commodity which is the subject of any Commodity Transaction, or the products or by-products thereof, and that it is entering into any such Commodity Transaction solely for purposes related to its business as such; and

(iv)    it is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction and any other documentation relating to this Agreement that is required by the Agreement to deliver as principal and not as agent or in any other capacity, fiduciary or otherwise.

(p)   **Reference Market-makers.** The definition of "Reference Market-makers" in Section 14 is hereby amended by deleting clause (b) thereof.

(q)   **Counterparts.** The Parties hereto agree that this Schedule and Master Agreement may be executed in counterparts, and each party may rely on a facsimile copy of the other party's execution as evidence of its agreement to the terms contained in the Schedule and the Master Agreement, respectively.

(r)   **Confidentiality.** The contents of any Transaction arising under this Agreement and all other documents relating to this Agreement, and any information made available by one party or its Credit Support Provider to the other party or its Credit Support Provider with respect to this Agreement is confidential and shall not be disclosed to any third party (nor shall any public announcement relating to this Agreement be made by either party), except for such information (i) as may become generally available to the public, (ii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, ruling, or accounting disclosure rule or standard, (iii) as may be obtained from a non-confidential source that disclosed such information in a manner that did not violate its obligations to the other party or its Credit Support Provider in making such disclosure, or (iv) as may be furnished to that party's Affiliates, or its auditors, attorneys, or advisors which are required to keep the information that is disclosed in confidence. Notwithstanding the foregoing, a party

27

may disclose any one or more of the commercial terms of a Transaction (other than the name of the other party unless otherwise agreed to in writing by the parties) to any industry price source for the purpose of aggregating and reporting such information in the form of a published energy price index.

**Part 7: Additional Terms for Commodity Transactions**

(a)     **Definitions.**  This Agreement and each Transaction are subject to the 2000 ISDA Definitions (the "2000 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2000 Definitions and the 2005 Definitions, the 2005 Definitions will prevail.  In the event of any inconsistency between the provisions of this Part of the Schedule and the provisions of any other Part of the Schedule the application of which is limited to any class of Transactions (as defined in the Commodity Definitions) including, without limitation, NBP Transactions, GTMA Transactions and ZBT Transactions, that other Part shall prevail with respect to such class of Transactions.  In the event of any inconsistency between the provisions of this Master Agreement (including the Schedule) and the Definitions, this Master Agreement (including the Schedule) will prevail. In the event of any inconsistency between the provisions of a Confirmation and this Master Agreement (including the Schedule) or the Definitions, the Confirmation will prevail for the purpose of such Transaction.

(b)     **Disruption Fallback.** The definition of "Fallback Reference Dealers" shall be deleted in its entirety and replaced with the following: "Fallback Reference Dealers means that: the Relevant Price will be determined and calculated as set forth in the definition "Commodity-Reference Dealers" (provided that, if the basis that the Specified Price for a Transaction is determined on an hourly basis, all references to Pricing Date shall be read as Pricing Hour) except that each party shall select, in good faith, a price quote from at least two (2) independent, impartial and unaffiliated Reference Dealers in the relevant market which satisfy all the criteria that a party applies generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event, and shall obtain such quotes within six (6) Business Days of the Market Disruption Event. The Relevant Price shall be the arithmetic mean of the prices so obtained, and such calculation shall be binding and conclusive absent manifest error even if one party was able to obtain only one quote or no quotes within the time provided. However, if the parties have not obtained at least two (2) prices in total on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, the next applicable Disruption Fallback will apply to the Transaction."

Subject to the change in Part 7(b) above, Section 7.5(d)(i) of the 2005 Definitions shall be applicable to all Transactions unless specified in a confirmation.

(c)     **Rounding.**  Section 9 of the Commodity Definitions is deleted in its entirety and the following is substituted therefore:

"**Section 9.**  For purposes of preparing any calculations referred to in the Commodity Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Dollar Amounts: | rounded to the nearest cent." |

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

|  |  |
|---|---|
| **LEHMAN BROTHERS**<br>**COMMODITY SERVICES INC.**<br>*(Name of Party)* | **OCCIDENTAL ENERGY MARKETING, INC.**<br>*(Name of Party)* |

By: _____

Name:

Title:  Zdenka S. Griswold

Date:  Authorized Signatory

By: _____

Name:   Ronald K. Takeuchi

Title:   President

Date:

# LEHMAN BROTHERS

### EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and OCCIDENTAL ENERGY MARKETING, INC.. ("Party B") have entered into a ISDA Master Agreement (including any Schedules thereto) dated as of, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)      Guarantor hereby unconditionally guarantees to Party B the due and punctual payment (within five (5) business days of written demand by Party B to Party A)of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement including payment for costs and expenses arising out of Party B's enforcement of this guarantee. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection. Party B shall not be required to take any proceedings or exhaust its remedies against Party A prior to the exercise of its rights and remedies against the Guarantor.

(c)      Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but in each case only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)      This Guarantee is a continuing guarantee and shall remain in full force and effect until a date five (5) business days after receipt by Party B of such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)      Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

1

# LEHMAN BROTHERS

    (g)    Guarantor hereby acknowledges that any modification of the Agreement shall not affect the liability of Guarantor with respect thereto.  Guarantor hereby waives (i) notice of acceptance, notice of entry into the Agreement, any Transaction and any modification thereof, notice of extension of time for payment, promptness, diligence, presentment, demand of payment, protest, notice of protest, order notice of adverse facts, notice of any defaults or disputes and, except as set forth in paragraph (a) hereof, notice for demand of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

    (h)    Any notice, request or demand provided for in this Guarantee will be in writing and will be deemed properly given if delivered in person, telecopied or by certified or registered mail, return receipt requested, prepaid to the other at the following addresses:

        Occidental Energy Marketing, Inc.
        5 Greenway Plaza, Suite 110
        Houston, TX  77046

        Attention:  Credit Manager
        Fax:     (713) 350-4802

    If to the Guarantor, to:

                Lehman Brothers Holdings, Inc.
                Attention: Corporate Counsel
                1301 Avenue of the Americas, 5th Floor
                New York, New York 10019

    With a copy to:

                Lehman Brothers Commodity Services Inc.
                c/o Lehman Brothers Inc.,
                Corporate Advisory Division
                Attention: Transaction Management Group
                745 Seventh Avenue
                New York, New York 10019 USA

    (i)    This Guarantee shall not be affected by the taking of any checks, notes or other obligations, secured or unsecured, in any amount, purportedly in payment of the whole or any part of any indebtedness owed by Party A to Party B until such payment by the Guarantor clears.

    (j)    Guarantor's liability hereunder shall not be impaired or discharged by reason of any reorganization, insolvency or bankruptcy law modifying Party B's rights and remedies against Party A with regard to any obligation or liability of Party A to Party B under the Agreement.

    (k)    Guarantor represents and warrants, as of the date hereof, that this Guarantee has been duly authorized, executed and delivered by Guarantor.

    (l)    This Guarantee shall not be assigned or modified without the written consent of each of Guarantor and Party B.

    This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. Guarantor and Party B, by accepting this Guarantee, submit to the non-exclusive jurisdiction of the Court of the State of New York and the United

<div align="center">2</div>

# LEHMAN BROTHERS

States District Court of the Southern District of New York. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

3

<u>EXHIBIT B to Schedule</u>

GUARANTY

LEHMAN BROTHERS COMMODITY SERVICES INC., (the "Guaranteed Entity"), and OCCIDENTAL ENERGY SERVICES, INC. ("OEMI"), a Delaware corporation and an indirect wholly-owned subsidiary of OCCIDENTAL PETROLEUM CORPORATION, a Delaware corporation ("Occidental"), have entered into or agreed to enter into (i) an International Swaps and Derivatives Association, Inc. Master Agreement (including the Schedule(s) and subsequent confirmations thereto) providing for certain financial transactions, including, but not limited to, financial instruments, such as swaps and options, related to or derived from the price of crude oil, natural gas and/or electricity and/or (ii) contracts for the purchase, sale, exchange, transportation or storage of crude oil, natural gas, natural gas liquids, condensate and/or electricity (collectively, the "Agreements").

In consideration thereof, and as an inducement for the extension of credit by the Guaranteed Entity to OEMI pursuant to the Agreements, Occidental hereby unconditionally guarantees the Guaranteed Entity, its permitted successors and assigns pursuant to this agreement (this "Guaranty"), the prompt payment (within three (3)) business days of written demand by the Guaranteed Entity to Occidental) of any and all amounts that are or may hereafter become due and payable from OEMI to the Guaranteed Entity by reason of the Agreements, including, but not limited to, payment for damages, losses, costs and expenses arising out of any failure by OEMI to fully perform the Agreements, as well as any indebtedness under the Agreements (regardless of whether such indebtedness be in the form of book accounts, promissory notes, trade acceptances, checks, drafts, or other evidence of indebtedness, together with interest, if any, at the rate specified therein), up to the aggregate amount owed to the Guaranteed Entity, but in no event in excess of fifty million U.S. Dollars ($50,000,000); provided, however, that, notwithstanding the foregoing, such payment obligations of Occidental shall not include any obligation to pay any consequential, lost profits, indirect, punitive or exemplary damages of any kind whatsoever. Occidental further promises to pay any such amounts due the Guaranteed Entity pursuant to this Guaranty without deduction for any claim or set-off or counterclaim, except as may be provided expressly in the Agreements. This Guaranty shall be a guaranty of payment, and not of collection, and the Guaranteed Entity shall not be required to take any proceedings or exhaust its remedies against OEMI prior to the exercise of its rights and remedies against Occidental, as guarantor.

This Guaranty is a continuing guaranty and shall remain in full force and effect until the earlier of (i) September 21, 2011, or (ii) a date ten (10) days after receipt by the Guaranteed Entity of written notice of revocation from Occidental.

Any revocation hereunder shall be only with respect to payment obligations incurred for transactions entered into by OEMI pursuant to the Agreements after the effective date of such revocation.

Occidental hereby acknowledges that any modification of the Agreements shall not affect the liability of Occidental with respect thereto. Except as provided above with respect to the requirement of notice from the Guaranteed Entity to Occidental of a payment demand, Occidental hereby waives, to the extent permitted by law, the requirements of the giving of any notice, including, but not limited to, the following:

a. Notice of the acceptance of this Guaranty by the Guaranteed Entity;

b. Notice of the entry into any Agreements between OEMI and the Guaranteed Entity and of any modifications thereto;

c. Notice of any extension of time for the payment of any sums due and payable to the Guaranteed Entity under the Agreements;

d. With respect to any notice or evidence of indebtedness received by the Guaranteed Entity from OEMI, notice of presentment, notice of adverse facts, demand for payment, protest or notice of protest; and

e. Notice of any defaults by or disputes with OEMI.

Any notice, request or demand provided for in this Guaranty will be in writing and will be deemed properly given if delivered in person, telecopied or by certified or registered mail, return receipt requested, prepaid to the other at the following addresses:

Occidental Petroleum Corporation
10889 Wilshire Boulevard
Los Angeles, California 90024

Attention: Assistant Treasurer
Fax:        (310) 443-6694

Lehman Brothers Commodity Services Inc.
c/o Lehman Brothers Inc.,
Corporate Advisory Division
Attention: Transaction Management Group
745 Seventh Avenue
New York, New York 10019 USA

This Guaranty shall not be affected by the taking of any checks, notes or other obligations, secured or unsecured, in any amount, purportedly in payment of the whole or any part of any indebtedness owed by OEMI to the Guaranteed Entity or by reason of any extension of time given to, or any indulgences shown to, OEMI by the Guaranteed Entity, or by the making, execution and delivery of any oral or written agreement or agreements affecting such indebtedness. Occidental's liability hereunder shall not be impaired or discharged by reason of any reorganization, insolvency or bankruptcy law modifying the Guaranteed Entity's rights and remedies against OEMI with regard to any obligation or liability of OEMI to the Guaranteed Entity under the Agreements.

Occidental represents and warrants, as of the date hereof, that this Guaranty has been duly authorized, executed and delivered by Occidental.

This Guaranty shall not be assigned or modified without the written consent of each of Occidental and the Guaranteed Entity. This Guaranty shall not be relied upon, or enforced, by any person other than Occidental and the Guaranteed Entity.

This Guaranty shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law rules thereof. Occidental and the Guaranteed Entity, by accepting this Guaranty, submit to the non-exclusive jurisdiction of the Courts of the State of New York and the United States District Court of the Southern District of New York.

IN WITNESS WHEREOF, Occidental has caused this Guaranty to be executed this 21st day of September 2006.

OCCIDENTAL PETROLEUM CORPORATION

By: _____

Name: _____

OEMI – 0827M                    Title: _____

- 3 -



*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

dated as of  September 21, 2006

**between**

| LEHMAN BROTHERS | OCCIDENTAL ENERGY |
|---|---|
| **COMMODITY SERVICES INC.** | **MARKETING, INC.** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)      *Definitions and Inconsistency*.  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor*.  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.  Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder.  Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

(d)   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

                                        ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.*  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

**ISDA®1994**

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a). in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

ISDA®1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA®1994

**Paragraph 12. Definitions**
As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

<div align="center">8</div>

<div align="right">ISDA®1994</div>

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

> (i) Eligible Collateral or Posted Collateral that is:
>
> > (A) Cash, the amount thereof; and
> >
> > (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;
>
> (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and
>
> (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of September 21, 2006 between
**LEHMAN BROTHERS COMMODITY SERVICES INC.**
(hereinafter referred to as "Party A")
and
**OCCIDENTAL ENERGY MARKETING, INC.**
(hereinafter referred to as "Party B")

**Paragraph 13. Elections and Variables**

(a)   **Security Interest for "Obligations".**  The term **"Obligations"** as used in this Annex includes the following additional obligations: None.

(b)   **Credit Support Obligations.**

   (i)   **Delivery Amount, Return Amount and Credit Support Amount**

      (1)   **"Delivery Amount"** has the meaning specified in Paragraph 3(a).

      (2)   **"Return Amount"** has the meaning specified in Paragraph 3(b).

      (3)   **"Credit Support Amount"** has the meaning specified in Paragraph 3(b).

   (ii)   **Eligible Collateral.**  The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (1) Cash, in the form of U.S. Dollars. | [X] | [X] | 100% |
| (2) Such other Eligible Collateral as may be agreed between the parties. | [X] | [X] | As agreed between the parties. |

   (iii)   **Other Eligible Support.**  The following items will qualify as **"Other Eligible Support"** for the party specified:   The following item will qualify as *"Other Eligible Support"* for Party A and for Party B: a "Letter of Credit"(as defined in Paragraph 13 (i) (v) "Additional Definitions").  See Paragraph 13(i) for further provisions regarding letters of credit.  The Valuation Percentage shall be 100% of the Value of the Other Eligible Support unless (i) a Letter of Credit Default shall apply with respect to such Letter of Credit, or (ii) twenty (20) or fewer Business Days remain prior to the expiration of such Letter of Credit, in either of which case the Valuation Percentage shall be zero (0).  Additionally, if the Value of such Other Posted Support exceeds one hundred and fifty million U.S. Dollars ($150,000,000) ("Letter of Credit Cap"), the Valuation Percentage shall be zero for all amounts of Other Posted Support in excess of the Letter of Credit Cap.

   (iv)   **Thresholds.**

      (1)   **"Independent Amount"** shall mean zero.

      (2)   **"Rated Debt"** means, with respect to Party A, the long-term senior unsecured debt (or any successor rating) of Lehman Brothers Holdings Inc., and with respect to Party B, the long-term senior unsecured debt (or any successor rating) of its Credit Support Provider, which is rated by Moody's Investors Service, Inc. (or any successor rating agency) ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. (or any successor rating agency) ("S&P").

11

(3)  **"Threshold"** means, with respect to Pledgor, the amount corresponding to the rating of the Rated Debt of such Pledgor as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any issue of Rated Debt, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, or Credit Event Upon Merger has occurred and is continuing, then the Threshold with respect to the Defaulting Party or Affected Party shall be zero and (II) if such Pledgor's Credit Support Provider ceases to be rated by either Moody's or S&P or ceases to have Rated Debt, then the Threshold with respect to Pledgor shall be zero:

| S&P's Rating | Moody's Rating | Threshold | Minimum Transfer Amount |
|---|---|---|---|
| AAA | Aaa | $100,000,000 | $50,000 |
| AA+ | Aa1 | $100,000,000 | $50,000 |
| AA | Aa2 | $100,000,000 | $50,000 |
| AA- | Aa3 | $100,000,000 | $50,000 |
| A+ | A1 | $100,000,000 | $50,000 |
| A | A2 | $100,000,000 | $50,000 |
| A- | A3 | $100,000,000 | $50,000 |
| BBB+ | Baa1 | $100,000,000 | $50,000 |
| BBB | Baa2 | $50,000,000 | $50,000 |
| BBB- | Baa3 | $20,000,000 | $50,000 |
| BB+ | Ba1 | ----0---- | $50,000 |
| BB | Ba2 | ----0---- | $50,000 |
| BB- | Ba3 | ----0---- | $50,000 |
| below BB- or if Pledgor ceases to have Rated Debt. | below Baa3 or if Pledgor ceases to have Rated Debt. | ----0---- | $50,000 |

(4)  **"Minimum Transfer Amount"** means, with respect to a party, the amount corresponding to the rating of the Rated Debt of Pledgor as set forth in the table above; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that (A) if an Event of Default or a Credit Event Upon Merger, with respect to Pledgor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Pledgor in the case of Party B or the Pledgor's Credit Support Provider in the case of Party A ceases to be rated by either Moody's or S&P or ceases to have Rated Debt, then the Minimum Transfer Amount with respect to Pledgor shall be zero.

(5)  **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD100,000.

(c)  **Valuation and Timing.**

(i)  **"Valuation Agent"** means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6 (d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable. In addition the Valuation Agent shall be the Secured Party for purposes of calculating Value in connection with substitutions pursuant to Paragraph 4(d).

(ii)  **"Valuation Date"** means any New York Business Day.

(iii)    "**Valuation Time**" means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    "**Notification Time**" means 10:00 a.m., New York time, on a Local Business Day.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.**  For purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event.  For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party if the Termination Event occurs with respect to that party):

|  | Party A | Party B |
|---|---|---|
| Illegality |  |  |
| Tax Event |  |  |
| Tax Event Upon Merger |  |  |
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule (if any). |  |  |

(e)    **Substitution.**

(i)    "**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

(ii)    **Consent.**  The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    **Dispute Resolution**

(i)    "**Resolution Time**" means the close of business, New York time, on the Local Business Day on which notice is given that gives rise to a dispute.

(ii)    **Value.**  For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support shall be (i) the face value of cash collateral and (ii) for collateral other than Cash shall be calculated as follows:

*"Value"* with respect to Other Eligible Support and Other Posted Support means the undrawn portion of any Letter of Credit maintained by the Pledgor (or its Credit Support Provider) for the benefit of the Secured Party, multiplied by the valuation percentage.

(iii)    **Alternative.**  Paragraph 5 will apply.

(g)    **Holding and Using Posted Collateral.**

(i)    **Eligibility to Hold Posted Collateral; Custodians.**

(1)    Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(A)    No Event of Default or Material Adverse Change has occurred and is continuing with respect to Party A.

(B)    The Custodian, if any, is a Qualified Institution.

(C)    Posted Collateral may be held only in the United States of America and must be held at all times in a Collateral Account.

Initially, the Custodian for Party A is: Not applicable.

(2)    Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

(A)    No Event of Default or Material Adverse Change has occurred and is continuing with respect to Party B.

(B)    The Custodian, if any, is a Qualified Institution.

(C)    Posted Collateral may be held only in the United States of America and must be held at all times in a Collateral Account.

Initially, the Custodian for Party B is: Not applicable.

(ii)    **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    **Distributions and Interest Amount.**

(i)    **Interest Rate.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month. A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred.

(iii)    **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s).** Not applicable.

(j)    **"Other Eligible Support and Other Posted Support."**

(i)    *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:

(A)    For purposes of Paragraph 3(a), delivery of the Letter of Credit by the Pledgor or issuer of the Letter of Credit to the Secured Party at the address of the Secured Party specified in the Notices Sections of this Agreement, together with evidence of the authority, incumbency and specimen signature of each person authorized to execute the Letter of Credit or any amendment on behalf of the issuer, or delivery of an executed amendment to such Letter of Credit (extending the term or increasing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Letter of Credit to the Secured Party at address of the Secured Party specified in the Notices Section of this Agreement; and

(B)    For purposes of Paragraph 3(b), by the return of an outstanding Letter of Credit by the Secured Party to the Pledgor, at the address of the Pledgor specified in the Notices Section of this Agreement, or delivery of an executed amendment to the Letter of Credit in form and substance acceptable to the Secured Party (reducing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Letter of Credit to the Secured Party at the Secured Party's address specified in the Notices Section of this Agreement. If a Transfer is to be effected by a reduction in the amount of an outstanding Letter of Credit previously issued for the benefit of the Secured Party, the Secured Party shall not unreasonably withhold its consent to a commensurate reduction in the amount of such Letter of Credit and shall take such action as is reasonably necessary to effectuate such reduction.

(ii)    *Letter of Credit Provisions.* Other Eligible Support and Other Posted Support provided in the form of a Letter of Credit shall be subject to the following provisions.

(A)    Each Letter of Credit shall be provided in accordance with the provisions of this Annex and shall be maintained for the benefit of the Secured Party. The Pledgor shall (i) renew or cause the renewal of each outstanding Letter of Credit on a timely basis as provided in the relevant Letter of Credit, (ii) if the bank that issued an outstanding Letter of Credit has indicated its intent not to renew such Letter of Credit, provide a substitute Letter of Credit or Eligible Collateral, in each case at least twenty (20) Local Business Days prior to the expiration of the outstanding Letter of Credit, and (iii) if a bank issuing a Letter of Credit shall fail to honor the Secured Party's properly documented request to draw on an outstanding Letter of Credit, provide for the benefit of the Secured Party (x) a substitute Letter of Credit that is issued by a bank acceptable to the Secured Party, other than the bank failing to honor the outstanding Letter of Credit, or (y) Eligible Collateral, in each case within one (1) Local Business Day after the Pledgor receives notice of such refusal, provided that, as a result of the Pledgor's failure to perform in accordance with (i), (ii), or (iii) above, the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount.

(B)    As one method of providing Eligible Credit Support, the Pledgor may increase the amount of an outstanding Letter of Credit or establish one or more additional Letters of Credit.

(C)    A Letter of Credit shall provide that the Secured Party may draw upon the Letter of Credit in an amount (up to the face amount for which the Letter of Credit has been issued) that is equal to all amounts that are due and owing from the Pledgor but have not been paid to the Secured Party within the time allowed for such payments under this Agreement (including any related notice of grace period or both). A Letter of Credit shall provide that a drawing be made on the Letter of Credit upon submission to the bank issuing the Letter of Credit of one or more certificates specifying the amounts due and owing to the Secured Party in accordance with the specific requirements of the Letter of Credit.

(D)    If the Pledgor shall fail to renew, substitute, or sufficiently increase the amount of an outstanding Letter of Credit (as the case may be), or establish one or more additional Letters of Credit, or otherwise provide sufficient Eligible Credit Support and if the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount as a result of such failure, then the Secured Party may draw on the entire, undrawn portion of any outstanding Letter of Credit. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(E)    If a party's Credit Support Provider shall furnish a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the option of such Credit Support Provider be reduced by the amount of any Letter of Credit established by such party (but only for such time as such party's Letter of Credit shall be in effect). In the event a party shall be required to furnish a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the option of such party be reduced by the amount of any Letter of Credit established by such party's Credit Support Provider (but only for such time as such Credit Support Provider's Letter of Credit shall be in effect).

(F)    All Cash proceeds received from by the Secured Party from drawing upon any Letter of Credit shall be deemed Posted Collateral as security for the Pledgor's Obligations to the Secured Party and the Secured Party shall have all the rights and remedies set forth in this Annex with respect to such proceeds. Notwithstanding the Secured Party's receipt of Cash proceeds from drawing upon any Letter of Credit hereunder, the Pledgor shall remain liable for any failure to Transfer sufficient Eligible Credit Support or for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(G)    Notwithstanding Paragraph 10, in all cases, the costs and expenses (including but not limited to the reasonable costs, expenses, and external attorneys' fees of the Secured Party) of establishing, renewing, substituting, canceling, increasing and reducing the amount of (as the case may be) one or more Letters of Credit shall be borne by the Pledgor. Notwithstanding any other provision of this Annex, the occurrence of any Letter of Credit Default shall constitute an Event of Default under Section 5(a)(iii) of the Agreement.

*(iv)    Certain Rights and Remedies.*

(A)    *Secured Party's Rights and Remedies.*  For purposes of Paragraph 8(a)(ii), the Secured Party may draw on the entire undrawn portion of any outstanding Letter of Credit. Cash proceeds received from drawing upon the Letter of Credit shall be deemed Posted Collateral and shall either be (i) applied against all amounts then due and owing from the Pledgor but not yet paid to the Secured Party or (ii) maintained in accordance with the Annex. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(B)    *Pledgor's Rights and Remedies.*  For purposes of Paragraph 8(b)(ii), (i) the Secured Party will be obligated immediately to Transfer any Letter of Credit to the Pledgor and (ii) the Pledgor may do any one or more of the following: (x) to the extent that the Letter of Credit is not Transferred to the Pledgor as required pursuant to (i) above, set-off any amounts payable by the Pledgor with respect to any Obligations against any such Letter of Credit held by the Secured Party and, to the extent its rights to set-off are not exercised, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral and the Value of any Letter of Credit held by the Secured Party, until any such Posted Collateral and such Letter of Credit is Transferred to the Pledgor; and (y) exercise rights and remedies available to the Pledgor under the terms of the Letter of Credit.

*(v)*    *Additional Definitions.*  As used in this Annex:

*"Credit Rating"* shall mean, with respect to a party or entity on any date of determination, the respective rating then assigned to its unsecured and senior long-term debt (not supported by third party credit enhancement) by S&P, Moody's or the specified rating agency.

*"Letter of Credit"* shall mean an irrevocable, standby letter of credit, issued by a major U.S. commercial bank or a foreign bank with a U.S. branch office with a Credit Rating or at least "A-" by S&P or "A3" by Moody's, in the form set forth in Schedule 1 hereto, with such changes to the terms in that form as the issuing bank may require and as may be acceptable to the party in whose favor the letter of credit is issued.

*"Letter of Credit Default"* shall mean with respect to an outstanding Letter of Credit, the occurrence of any of the following events: (i) the issuer of such Letter of Credit shall fail to maintain a Credit Rating of at least "A-" by S&P or "A3" by Moody's; (ii) the issuer of the Letter of Credit shall fail to comply with or perform its obligations under such Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period; (iii) the issuer of such Letter of Credit shall disaffirm, disclaim, repudiate or reject, in whole or in part, or challenge the validity of, such Letter of Credit; (iv) such Letter of Credit shall expire or terminate, or shall fail or cease to be in full force and effect at any time during the term of this Agreement, in any such case without replacement or (v) any event analogous to an event specified in Section 5(a)(vii) of this Agreement shall occur with respect to the issuer of such Letter of Credit or (vi) the issuer of the Letter of Credit shall fail to cause the renewal or replacement of such Letter of Credit to the Secured Party at the address specified in the Agreement at least thirty (30) days prior to the expiration of such Letter of Credit; provided, however, that no Letter of Credit Default shall occur in any event with respect to a Letter of Credit after the time such Letter of Credit is required to be cancelled or returned to the Pledgor in accordance with the terms of this Annex.

"Material Adverse Change" with respect to a party means (i) the downgrading by S&P, Moody's or Fitch of any then assigned Credit Rating of such party or its Credit Support Provider such that such applicable rating is below "BBB-", or its equivalent, by S&P; or below "Baa3", or its equivalent by Moody's; or below "BBB-", or its equivalent by Fitch; or (ii) the occurrence of one or more events which, in the reasonable judgment of the other party, constitutes a material adverse effect on the creditworthiness, financial responsibility or ability of such party or its Credit Support Provider, as applicable, to perform its obligations in connection herewith.

*"Moody's"* shall mean Moody's Investors Service, Inc. or its successor.

*"Qualified Institution"* shall mean a U.S. office of a commercial bank or trust company (which is not an Affiliate of a party to this Agreement) organized under the laws of the United States (or any

state or a political subdivision thereof) having a long term debt rating or deposit rating of at least (i) "A3" from Moody's or (ii) "A-" from S&P having assets of at least USD $1 billion.

"*S&P*" shall mean the Standard & Poor's Rating Services (a division of McGraw-Hill, Inc.) or its successor.

(k)    **Demands and Notices.**  All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l)    **Addresses for Transfers.**  As agreed between the parties from time to time.

(m)    **Other Provisions**.

   (i)    **Local Business Day.**  For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| **LEHMAN BROTHERS COMMODITY SERVICES INC.** | **OCCIDENTAL ENERGY MARKETING, INC.** |
|---|---|
| *Party A* | *Party B* |
| By: _____ | By: _____ |
| Name:  Zdenka S. Griswold | Name:  Ronald K. Takeuchi |
| Title:  Authorized Signatory | Title:  President |
| Date: | Date: |

# LEHMAN BROTHERS

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and OCCIDENTAL ENERGY MARKETING, INC.. ("Party B") have entered into a ISDA Master Agreement (including any Schedules thereto) dated as of September 21, 2006, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment (within five (5) business days of written demand by Party B to Party A) of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement including payment for costs and expenses arising out of Party B's enforcement of this guarantee. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection. Party B shall not be required to take any proceedings or exhaust its remedies against Party A prior to the exercise of its rights and remedies against the Guarantor.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but in each case only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee is a continuing guarantee and shall remain in full force and effect until a date five (5) business days after receipt by Party B of such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

1

# LEHMAN BROTHERS

(g)    Guarantor hereby acknowledges that any modification of the Agreement shall not affect the liability of Guarantor with respect thereto.  Guarantor hereby waives (i) notice of acceptance, notice of entry into the Agreement, any Transaction and any modification thereof, notice of extension of time for payment, promptness, diligence, presentment, demand of payment, protest, notice of protest, order notice of adverse facts, notice of any defaults or disputes and, except as set forth in paragraph (a) hereof, notice for demand of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(h)    Any notice, request or demand provided for in this Guarantee will be in writing and will be deemed properly given if delivered in person, telecopied or by certified or registered mail, return receipt requested, prepaid to the other at the following addresses:

Occidental Energy Marketing, Inc.
5 Greenway Plaza, Suite 110
Houston, TX   77046

Attention:  Credit Manager
Fax:        (713) 350-4802

If to the Guarantor, to:

> Lehman Brothers Holdings, Inc.
> Attention: Corporate Counsel
> 1301 Avenue of the Americas, 5th Floor
> New York, New York 10019

With a copy to:

> Lehman Brothers Commodity Services Inc.
> c/o Lehman Brothers Inc.,
> Corporate Advisory Division
> Attention: Transaction Management Group
> 745 Seventh Avenue
> New York, New York 10019 USA

(i)    This Guarantee shall not be affected by the taking of any checks, notes or other obligations, secured or unsecured, in any amount, purportedly in payment of the whole or any part of any indebtedness owed by Party A to Party B until such payment by the Guarantor clears.

(j)    Guarantor's liability hereunder shall not be impaired or discharged by reason of any reorganization, insolvency or bankruptcy law modifying Party B's rights and remedies against Party A with regard to any obligation or liability of Party A to Party B under the Agreement.

(k)    Guarantor represents and warrants, as of the date hereof, that this Guarantee has been duly authorized, executed and delivered by Guarantor.

(l)    This Guarantee shall not be assigned or modified without the written consent of each of Guarantor and Party B.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. Guarantor and Party B, by accepting this Guarantee, submit to the non-exclusive jurisdiction of the Court of the State of New York and the United

2

# LEHMAN BROTHERS

States District Court of the Southern District of New York. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS, INC.

By:

Name:   James J. Killerlane III

Title:   Vice President

Date:   September 21, 2006

3

**Exhibit A**

RESOLVED, that this Corporation (a) be and hereby is authorized to enter into: commodity transactions, including, without limitation, commodity swap transactions; commodity option transactions; commodity spot and forward transactions; energy derivative transactions; gas, oil, power and coal transactions; and any other commodity transactions, whether cash or physically settled; weather derivatives transactions; rate swap transactions; swap option transactions; basis swap transactions; credit derivative transactions; forward rate transactions; index options and index swap transactions; interest rate option transactions; foreign exchange transactions; non-deliverable forward transactions; interest rate cap, floor, corridor and collar transactions; currency swap transactions; cross-currency swap transactions; currency spot and forward transactions; interest rate spread-lock transactions; interest rate-lock transactions; currency option transactions; credit spread transactions; futures transactions; any other similar transactions (including options with respect to any of these transactions) howsoever designated; and any combination of these transactions (each a "Transaction" and, collectively, "Transactions"), and (b) may enter Transactions on terms satisfactory to the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, and engage in such other acts and things as may be advisable or necessary to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that this Corporation may enter into any transactions, perform any services and enter into any agreements necessary or incidental to acting as a commodity or derivatives dealer, merchant, market-maker or power marketer, including, without limitation, transmitting, scheduling, bidding, offering, trading or otherwise purchasing, selling, delivering or receiving energy, capacity, congestion management and any ancillary services and related products and services in independent system operator or regional transmission organization markets and power pools or transmission owner or operator control areas, including obtaining financial guarantees and letters of credit or providing collateral to secure payment obligations incurred in such markets, pools or areas by the Company and any of its affiliates that are members, participants or users therein, and the payment of any applicable pro rata share of defaults of third party members, participants or users therein (each a "Pool Transaction" and, collectively, "Pool Transactions"); and

FURTHER RESOLVED, that each of the President, any Managing Director, any Senior Vice President, any Vice President and the Treasurer of this Corporation be and hereby is authorized to execute, in the name of and on behalf of the Corporation, any form of document or agreement with respect to any Transactions or Pool Transactions and to do such other acts and things as may be advisable or necessary to carry out and perform, on the part of this Corporation, any such agreement, or in order to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that any and all prior actions taken, and any and all Transactions or Pool Transactions entered into, on behalf of this Corporation by the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, prior to the date of this resolution be and hereby are ratified; and

FURTHER RESOLVED, that any one of the President, any Managing Director and the Treasurer (each such officer, an "Authorized Officer") shall have the authority to designate and/or terminate the designation of those individuals who can, in the name of and on behalf of the

Corporation, enter into Transactions or Pool Transactions or execute any form of document or agreement in connection therewith; and

**FURTHER RESOLVED,** that the Corporation hereby adopts any form of resolution which an Authorized Officer shall approve as necessary, appropriate or desirable in order to carry out the purpose and intent of the preceding resolutions and directs that the Secretary or an Assistant Secretary file a copy of each form of resolution so approved in the appropriate Minute Book of the Corporation.

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), does hereby certify that attached hereto as Exhibit A is a true, correct and complete copy of resolutions duly adopted by the Board of Directors of the Corporation, which resolutions are in full force and effect as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of December, 2005.

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____
     Aaron Guth
     Assistant Secretary

## CERTIFICATE OF INCUMBENCY AND SIGNATURE

I, Jin Lee, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the title in the Corporation indicated opposite her name on the date hereof and that the signature appearing opposite her name is a genuine signature of such person.

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Zdenka Griswold | Senior Vice President | *[signature]* |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Corporation as of this _6_ day of _February_ , 2006.

[SEAL]

Name: Jin Lee
Title: Assistant Secretary

648017.2

## AMENDMENT AGREEMENT

AMENDMENT AGREEMENT (the "Amendment") dated as of May 21, 2007 between LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and OCCIDENTAL ENERGY MARKETING, INC. ("Party B").

### WITNESSETH

WHEREAS, Party A and Party B have entered into an ISDA Master Agreement dated as of September 21, 2006 (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1. **Certain Definitions.** Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2. **Amendments.**

2a. The Schedule to the Master Agreement is hereby amended by adding the following as Part 8:

"Part 8 ("Gas Annex") Physically Settled Gas Transactions.

(a)   **Physical Gas Transactions under this Agreement; Credit Support Documents**

(i)   *Physical Gas Transactions under this Agreement.* The provisions of this Gas Annex shall apply solely to transactions between the parties for the purchase or sale of physical Gas with delivery points in North America on a Firm or Interruptible basis on a spot or forward basis or as an option to purchase or sell Gas (collectively, "Gas Transactions"). All Gas Transactions will be deemed to have been entered into in accordance with the terms of this Agreement and shall be Transactions for all purposes of this Agreement. A subsequent agreement between the parties to settle a Gas Transaction without involving a physical delivery of Gas shall not affect such Gas Transaction's status as a Gas Transaction under this Gas Annex. In the event of any inconsistency among or between the other provisions of this Agreement and this Gas Annex, this Gas Annex will govern with respect to Gas Transactions. In the event of any inconsistency between the Confirmation for a Gas Transaction and this Gas Annex, the Confirmation will govern with respect to such Gas Transaction, except as provided in clause (a)(ii) with respect to Outstanding Gas Transactions.

(ii)   *Applicability to Outstanding Gas Transactions.* Gas Transactions executed by the parties prior to the effectiveness of this Gas Annex and selected under clause (l)(1) ("Outstanding Gas Transactions") shall be Transactions and shall be subject to the terms and conditions of this Agreement upon effectiveness of this Gas Annex, unless otherwise agreed in writing by the parties with respect to one or more specific Outstanding Gas Transactions. All confirmations evidencing such Outstanding Gas Transactions shall constitute "Confirmations" within the meaning of this Agreement that supplement, form part of and are subject to this Agreement. If any confirmation issued or entered into with respect to one or more Outstanding Gas Transactions pursuant to the terms of a master agreement or in a form that contains provisions that are not directly related to the commercial terms of the Transaction and that are inconsistent with or duplicative of the terms and conditions of this Agreement (such master agreement or the portion of such Confirmation containing such non-commercial terms being referred to herein as the "Prior Master Agreement"), then, notwithstanding any provision of this Agreement to the contrary, the terms of the Schedule and the pre-printed form of this Agreement shall automatically supersede such Prior Master Agreement effective upon the effectiveness of this Gas Annex.

(iii)   *Credit Support Documents.* If elected under clause (l) as being applicable:

1

(A) *Outstanding Gas Credit Support*. The parties agree that to the extent any collateral, margin, security or other similar form of credit support (such credit support, excluding guarantees, being referred to herein as "Outstanding Gas Credit Support") is held by a party in connection with the obligations of the other party under Outstanding Gas Transactions, such Outstanding Gas Credit Support shall be deemed to have been delivered in respect of the obligations of the other party under and in connection with this Agreement.

The parties further agree that with respect to any Outstanding Gas Credit Support that (x) if the parties have entered into a Credit Support Document in connection with this Agreement that governs the provision of collateral, margin, security or other similar form of credit support (such Credit Support Document, an "Existing ISDA Credit Support Document") then the Outstanding Gas Credit Support shall be deemed to constitute credit support provided under such Existing ISDA Credit Support Document and such Existing ISDA Credit Support Document shall automatically supersede any agreement between the parties pursuant to which the Outstanding Gas Credit Support was provided (the "Outstanding Gas Credit Support Document") effective as of the date agreed by the parties and (y) if the parties have not entered into an Existing ISDA Credit Support Document, then the Outstanding Gas Credit Support Document constitutes a Credit Support Document with respect to the party that provided such credit support.

(B)    *Amendments/Guaranties*. The parties agree that they will enter into such amendments to any Outstanding Gas Credit Support Document as may be necessary to give effect to the terms of this clause (a)(iii). To the extent that a guaranty was delivered in connection with a party's obligations under Outstanding Gas Transactions or a Prior Master Agreement, that party represents and warrants that any amendments necessary to ensure that the guaranty would extend to Transactions subject to this Agreement have been made prior to the effectiveness of this Gas Annex and agrees (x) that such guaranty constitutes a Credit Support Document with respect to the obligations of such party and (y) the guarantor under such guaranty constitutes a Credit Support Provider with respect to the obligations of such party.

**(b)    Performance Obligation**

(i)    Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular Gas Transaction in accordance with the terms of this Gas Annex. Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a Gas Transaction.

(ii)    The remedy for the breach of a Firm obligation by a party shall be determined pursuant to the option below that the parties select in clause (l)(3):

Option A.    *Cover Standard*: The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s); multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s); multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the performing party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s). Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex. The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

Option B        *Spot Price Standard*: The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price. Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex. The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

(iii)        Notwithstanding clause (b)(ii) of this Gas Annex, the parties may agree to Alternative Damages in a Confirmation executed in writing by both parties.

(c)        Transportation, Nominations and Imbalances

(i)        Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

(ii)        The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). Each party shall give the other party timely prior notice, sufficient to meet the requirements of all Transporter(s) involved in the Gas Transaction, of the quantities of Gas to be delivered and purchased each Day. Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

(iii)        The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges. If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges. If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller. If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer. "Unpaid Amounts" as defined in Section 14 of this Agreement shall include unpaid Imbalance Charges, if any.

(d)        Quality and Measurement

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter. The unit of quantity measurement for purposes of Gas Transactions shall be one MMBtu dry. Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

(e)        Taxes

The Taxes payable by a party shall be determined pursuant to the option below that the parties select in clause (f)(4):

Option A: *Buyer Pays At and After Delivery Point*: Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

3

Option B: *Seller Pays Before and At Delivery Point.* Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

(f)     **Billing, Payment and Audit**

(i)     Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged. If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas. The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

(ii)    Buyer shall remit the amount due under clause (f)(i) of this Gas Annex, in immediately available funds to the account specified from time to time by Seller, on or before the Payment Date elected in clause (l)(5) of this Gas Annex. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this clause (f)(ii).

(iii)   In the event payments become due pursuant to clauses (b)(ii) or (b)(iii) of this Gas Annex, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated. Payment from the nonperforming party will be due five Local Business Days after receipt of invoice.

(iv)    If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this clause (f).

(v)     A party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Gas Annex. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to Gas Transactions under this Gas Annex. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery. All retroactive adjustments under clause (f) of this Gas Annex shall be paid in full by the party owing payment within 30 Days of notice and substantiation of such inaccuracy.

(g)     **Title, Warranty and Indemnity**

(i)     Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

(ii)    Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS CLAUSE (g)(ii), ALL OTHER WARRANTIES WITH RESPECT TO GAS, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(iii)   Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of

4

title, personal injury or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

(iv)    Notwithstanding the other provisions of this clause (g) of this Gas Annex, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of clause (d) of this Gas Annex.

**(h)    Force Majeure**

(i)    Except with regard to a party's obligation to make payment(s) due under clause (f) of this Gas Annex, Section 6-(e) of this Agreement and Imbalance Charges under clause (c)(iii) of this Gas Annex, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in clause (h)(ii) of this Gas Annex.

(ii)    Force Majeure shall include, but not be limited to, the following: (A) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (B) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (C) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (D) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars; and (E) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

(iii)    Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (A) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (B) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (C) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Agreement; (D) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in clause (h)(ii) of this Gas Annex; (E) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in clause (h)(ii) of this Gas Annex. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

(iv)    Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

(v)    The party whose performance is prevented by Force Majeure must provide notice to the other party. Initial notice may be given orally; however, written notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

If the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, Section 5(b)(ii) of this Agreement shall not apply to any Gas Transaction.

**(i)    Limitation of Liability**

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND

EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A GAS TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

(j)     Certain Amendments to this Agreement for Gas Transactions

    (i)     Section 5(a)(i). With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(i) of this Agreement and, if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, the words "or the first Local Delivery Day in the case of any such delivery" and ", in each case," in the third and fourth lines of Section 5(a)(i) of this Agreement, are hereby deleted.

    (ii)    Section 5(a)(ii). With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(ii) are hereby deleted and the words "or to deliver or receive Gas, the exclusive remedy for which is provided in clause (b)(ii) of the Gas Annex to the Schedule" are hereby added at the end of the parenthetical of Section 5(a)(ii) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement form or Section 5(a)(ii)(1) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form.

    (iii)   Section 5(a)(v). With respect to all Gas Transactions, (A) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement, the parenthetical "(other than by failing to make a delivery)" is inserted after the word "defaults" in clause (1) of Section 5(a)(v) and the words "or delivery" in clause (2) of Section 5(a)(v) of this Agreement are deleted; and (B) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement, the words "(including any delivery due on the last delivery or exchange date of) a Specified Transaction or" in clause (3) of Section 5(a)(v) of this Agreement are deleted.

(k)     Definitions. For purposes of this Gas Annex, the following definitions apply:

    (i)     "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

    (ii)    "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

    (iii)   "Buyer" shall mean the party receiving Gas under a Gas Transaction.

    (iv)    "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a Gas Transaction.

    (v)     "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a Gas Transaction.

    (vi)    "Cover Standard" shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Gas Annex, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available) or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by the nonperforming party; the

6

immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

(vii)    "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

(viii)    "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a Gas Transaction.

(ix)    "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a Gas Transaction.

(x)    "EFP" shall mean, when used in a Confirmation of a Gas Transaction, the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts. EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the U.S. Commodity Exchange Act (7 U.S. Code 1, as amended).

(xi)    "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during a Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in clause (o)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

(xii)    "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

(xiii)    "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

(xiv)    "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in clause (o)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

(xv)    "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

(xvi)    "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

(xvii)    "Payment Date" shall mean the payment date for Gas Transactions under this Gas Annex, as specified in clause (l)(5) of this Gas Annex.

(xviii)    "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

(xix)    "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

(xx)    "Seller" means the party delivering Gas under a Gas Transaction.

(xxi)    "Spot Price" as referred to in clause (b)(ii) of this Gas Annex shall mean the price published as the Spot Price Index for the relevant Day; provided, if there is no single price published as the Spot Price Index for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices. If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

(xxii)    "Spot Price Index" shall mean, with respect to a Gas Transaction, unless otherwise specified in the Confirmation for that Transaction, the "Daily Midpoint" price set forth in Gas Daily (published by Platts), or any successor publication, in the column "Daily Price Survey" under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day or, if an alternative index or price is specified in clause (l)(6) below, such alternative index or price.

(xxiii)    "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular Gas Transaction.

7

(l)    **Elective Provisions**

1.    **(a)(ii) – Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

X    Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

___ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

___ Option C:  None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

2.    **(a)(iii) – Outstanding Gas Credit Support.**
X    Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).  If not checked, not applicable.

3.    **(b)(ii) – Performance Obligation (remedy for breach of Firm obligation)**

X    Option A:  Cover Standard

___ Option B:  Spot Price Standard

If neither option is selected, Option A shall apply.

4.    **(e) – Taxes**

X    Option A: Buyer Pays At and After Delivery Point

___    Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

5.    **(f)(ii) – Payment Date**

X    Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Power Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.  (k)(xxii) – **Alternative to Spot Price Index.**  The parties have selected the following alternative index as the Spot Price Index: _____.  If no index is specified, the Spot Price Index specified in clause (l)(xxi) applies.

(m)    **Notices for Gas Transactions**

| PARTY A: Lehman Brothers Commodity Services Inc. | PARTY B: Occidental Energy Marketing, Inc. |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: Energy Operations<br>Phone:   212-526-9941 | Attn:    Marketing Accounting<br><br>Phone:   713-215-7061 |
| Facsimile: 646-834-4615 | Facsimile: 713-215-7488 |
| **Nominations:** | **Nominations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:<br>Nominations<br>Phone:<br>212-528-0703<br>Facsimile:<br>646-834-4951 | Attn:    Shawnette Sonnier<br><br>Phone:   713-215-7153<br><br>Facsimile: 713-985-1616 |
| **Confirmations:** | **Confirmations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:<br>Energy Operations<br>Phone:   212-526-9941 | Attn:    Confirmations, Natural Gas Marketing<br><br>Phone: |
| Facsimile: 646-834-4615 | Facsimile: 713-985-1601 |
| **Option Exercise:** | **Option Exercise:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: [TBD] | Attn:    Clint Stockman |
| Phone: | Phone:   713-215-7176 |
| Facsimile: | Facsimile: 713-215-7486 |
| ☒Wire Transfer – or – ☐ACH (check one box):<br>Bank:JP Morgan Chase Bank | ☐Wire Transfer – or – ☐ACH (check one box):<br>Bank: JP Morgan Chase Bank, New York, NY |

9

08-13555-mg    Doc 4238-3    Filed 06/29/09    Entered 06/29/09 20:13:26    Exhibit C
Pg 70 of 73

ABA: 021000021
Account: 66-647517
Other Details: SLHIUS3X Ref bnf/energy

ABA: 021000021
Account: 323-010709
Other Details: Account of OEMI

(n)     **Other Provisions/Modifications to this Gas Annex.**

   (i)     Amendments to clause (f): Billing, Payment and Audit

     (A)     Clause (f)(i) is amended by adding the following at the end thereof:
"The premium amount for the purchase of an option shall be paid within two (2) Business Days of the Gas Transaction trade date."

     (B)     Clause (f)(v) is amended by deleting the words "two years" in the penultimate sentence and replacing them with the words "one year."

     (C)     Clause (f)(i) is amended by adding the following after the last sentence thereof:

"All invoices shall be provided by Seller to Buyer and shall be on Seller's letterhead that contains the name of the entity that is a party to this Agreement. Each month, at least three (3) days prior to the Payment date, the parties shall confer with each other by any reasonable means (e.g., telephone, facsimile or electronic data transmission) to compare and confirm invoice amounts and total net amounts owed to each other."

   (ii)     Amendments to clause (h) Force Majeure; Clause (h) is amended by adding the following as subsection (vii):
"Notwithstanding any other provisions of this Agreement to the contrary, with regard to references to "Imbalance Charges", it is understood and agreed that upon receiving Notice of Force Majeure, the party not claiming Force Majeure shall adjust nominations with its Transporter(s) to account for any change in quantities to be delivered or received. Such nomination change shall be made as soon as practicable after receipt of Notice of such event of Force Majeure, but not later than the next Business Day thereafter."

   (iii)     Amendments to Clause (j): Certain Amendments to this Agreement for Gas Transactions

Clause (j) is amended by adding the following new provisions at the end thereof:

"(iv) *Section 2(a)(iii).* Section 2(a)(iii) is amended by adding the following phrase at the end of clause (1), immediately before the last comma of such phrase:

"(provided, however, that in relation to any Transaction that is a Gas Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than 20 Business Days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i)".

   (iv)     *Section 6(e)(i).* Section 6(c)(i) of this Agreement is hereby amended by adding the following phrase at the end:

"(it being understood, that to the extent in the reasonable opinion of the Non-defaulting Party or the Non-Affected Party, as the case may be, any of the Terminated Transactions that are Gas Transactions may not be liquidated and terminated under applicable law on the Early Termination Date, then such Terminated Transactions shall be liquidated and terminated as soon as thereafter as is reasonably practicable)."

   (v)     Amendments to clause (k): Definitions; Clause (k)(vi) is amended by striking the parenthetical expression in clause (i).

(vi)    Insertion of Additional clause. The following shall be added as a new clause (o) to this Gas Annex and shall apply to all Gas Transactions hereunder:

"(o)    FERC Standard of Review; Certain Covenants and Waivers.

To the extent, if any, that a Gas Transaction does not qualify as a "first sale" as defined by the Natural Gas Act and §§ 2 and 601 of the Natural Gas Policy Act, each party irrevocably waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change in the rate(s), charges, classifications, terms or conditions of this Gas Annex, any Gas Transaction hereunder or any other agreements entered into in connection with this Agreement (collectively, the "Covered Agreements"). By this provision, each party expressly waives its right to seek or support: (i) an order from the U.S. Federal Energy Regulatory Commission ("FERC") finding that the market-based rate(s), charges, classifications, terms or conditions agreed to by the parties under the Covered Agreements are unjust and unreasonable; or (ii) any refund with respect thereto. Each party agrees not to make or support such a filing or request, and that these covenants and waivers shall be binding notwithstanding any regulatory or market changes that may occur hereafter. Absent the agreement of all parties to the proposed change, the standard of review for changes to any section of the Covered Agreements proposed by a party (to the extent that any waiver as set forth in this Section (f)(vii) is unenforceable or ineffective as to such party), a non-party or FERC acting _sua sponte_, shall be the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956) (the "Mobile-Sierra" doctrine)."

3.    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4.    Each of the parties hereby represents and warrants that:

(a)    the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)    the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.    This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written.

LEHMAN BROTHERS COMMODITY
SERVICES INC.

OCCIDENTAL ENERGY MARKETING, INC.

*Party A*

*Party B*

By: _____

By: _____

Name: KIANGA M. ELLIS

Name: Ronald K. Takeuchi

Title: VICE PRESIDENT

Title: President

Date: 5/30/07

Date: May 23, 2007

12

## Occidental Energy Marketing, Inc.
### SIGNATURE REVIEW RECORD

*PLEASE REVIEW AS SOON AS POSSIBLE*

| Party: | Customer Name |
|---|---|
| Agreement Type: | *Lee Array b.* *4/20/06 I30#* |
| Agreement Number: | *N/b* |

| Seq No. | Date Routed | No. of Originals | Signature Req'd | Initials Req'd | Route only to those with sequence number by their names | Initial and Date Out |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | Marketing-SVP- *Aurora R. Thomas* | |
| | | | | | Marketing-VP- | |
| | | | | | Credit - *Eric Lawson* | *9/ 6/04/07* |
| | | | | | Legal - *Mark Martin Ward* | *9/6 5/25/07* |
| | | | | | Trader - *Tim Curran* | |
| | | | | | Accounting - | |
| | | | | | Trade Control - | |

COMMENTS: *Lawson does not agree Aurora to listen Texts* *A has agreed to become new Thomas is N30SS* *Lawson I To Aurora for Signature*

BELOW INFORMATION TO BE FILLED OUT FOR **CONTRACTS AND AMENDMENTS**