# EXHIBIT E

# 28th Annual
# Ernest E. Smith
# Oil, Gas & Mineral Law Institute

## How To Use The ISDA Master Agreement

March 22, 2002
Westin Oaks Hotel
Houston

**Paul E. Vrana**
**Craig R. Enochs**
**Fundi A. Mwamba**

**Jackson Walker L.L.P.**
**1100 Louisiana Street, Suite 4200**
**Houston, Texas 77002**
**713-752-4200**

**Sponsored by The University Of Texas School Of Law**

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1
II.   DERIVATIVES ...................................................................................................... 1
III.  A BRIEF OVERVIEW OF THE ISDA ................................................................. 3
IV.   DEVELOPMENT OF ISDA .................................................................................. 5
V.    NEED FOR THE MASTER AGREEMENT IN TODAY'S OTC MARKETS ................. 6
VI.   MASTER AGREEMENT AND RELATED DOCUMENTS ARCHITECTURE ............ 7
VII.  SUMMARY OF WHAT CONTRACT DOES ..................................................... 12
VIII. ELECTIONS UNDER AGREEMENT ................................................................ 15
IX.   PRACTICAL CONSIDERATIONS ................................................................... 17
X.    CONCLUSION .................................................................................................... 18

I.    INTRODUCTION

As energy transactions have become more sophisticated, over-the-counter ("OTC") derivatives have emerged as valuable tools to limit the risk and optimize the value of these transactions.    Despite a common perception of derivatives as a new and untested financial product, anecdotes of derivatives transactions date back to ancient Greece, where Aristotle wrote about a philosopher named Thales using derivatives to corner the olive press market and reap a large financial windfall.[1]    The advantage parties to OTC derivative transactions today enjoy over Thales is their ability to use the International Swaps and Derivatives Association, Inc. ("ISDA")[2] Master Agreement ("Master Agreement") to identify, monitor and manage the risks associated with OTC derivative transactions.

This article (i) provides a basic background on derivatives; (ii) provides an overview of the Master Agreement; (iii) recounts a brief history of the ISDA and Master Agreement; (iv) explains the advantages gained by using the Master Agreement and the ISDA Credit Support Annex to the Master Agreement ("Annex") for OTC derivative transactions; (v) describes the contract architecture of the Master Agreement; and (vi) addresses practical considerations associated with successfully negotiating a Master Agreement.

II.    DERIVATIVES

Despite the ancient roots of derivatives, what constitutes a derivative is still unclear to most people today.    Derivatives are financial instruments that derive their value from underlying product but do not invlolve the purchase, sale or exchange of that product.[3]    Risk factors may include: (i) the price of a bond, commodity, currency, or share; (ii) a yield or rate of interest; (iii) an index of prices or yields; (iv) weather data such as inches of rainfall or heating-degree-days; or (v) insurance data such as claims paid for a natural disaster.[4]    Participants in the energy industry can use derivatives to address a wide range of their financial and risk management needs.    For example, a natural gas producer may wish to reduce downward price risk by locking in a minimum price he will receive for his natural gas.    One way to accomplish this goal is by the purchase of a financial put option, giving the producer the right to be paid if the price of natural gas falls below the put option strike price.    The cost of the derivative would depend in part upon the difference between the minimum price sought and the price for natural gas at the time the derivative was purchased.

Derivatives differ from standard commodity transactions in that they usually settle on a financial rather than physical basis.    Although derivatives reference commodity quantities in valuing the derivatives, derivatives are usually settled by the payment by one party to the other and not by the physical delivery of the underlying commodity.    In the example of the natural gas producer in the previous paragraph, the financial put option would not give him the right to sell natural gas to his counterparty, but rather would entitle him to be paid by the counterparty the amount by which the put option strike price exceeds the market price of natural gas.    Therefore, while the producer still must sell and deliver the physical natural gas to purchasers at a market price, he will also receive from the seller of the put option payment in the amount by which the market price for natural gas at the time the natural gas is sold is less than the put option strike price.

Rather than being traded on an exchange, OTC derivatives are privately negotiated transactions between parties. Eligibility to participate in an OTC derivative transaction is governed by the Commodity Exchange Act[5] and is generally restricted to a class of persons and entities with sufficiently sizable assets and/or presumed sophistication to understand and manage the risks associated with derivatives.[6]

Many types of derivatives exist, and while it is beyond the scope of this paper to discuss the vast array of derivatives in detail, a brief discussion of the two most common energy-related derivatives follows:

### 1. Options

Options contracts give the option holder the right, but not the obligation, to exercise the contract at a predetermined price during a specific period of time.[7] Options may be the option to sell, called a "put option," or the option to buy, called a "call option."[8] Options can be used for hedging as well as for speculative purposes. The producer discussed earlier who purchased the put option to create a minimum price for the natural gas he sold was using the option as a hedge, reducing his risk to market declines in natural gas, while an investor purchasing a call option in the hopes the natural gas market will rise is using his option to speculate on the market. Options can be sold through organized exchanges, or they can be negotiated and sold on the OTC market. American-style options may be exercised at any time before the option expires, while European options may only be exercised on the date they expire.[9]

The issuer of the option makes money by charging the purchaser a fee (usually a percentage of the face value of the underlying asset) to secure the option. If prices remain stable, option writers make only the original fee they collected, known as the "premium," on the transaction. If prices are volatile, however, option writers may suffer losses far greater than the value of the premium received. For example, assume that an option writer sells a financially-settled call option to a counterparty giving the counterparty the right to payment if natural gas prices exceed a specified strike price. Once the option writer has collected the premium, it will not be entitled to any further payments under the transaction. However, the option writer's liability is virtually unlimited as its obligations under the transaction are determined by the difference between the strike price and the current market price of natural gas at the time the transaction is settled.

### 2. Swaps

Swaps are privately negotiated OTC derivatives that are not traded on organized exchanges. In a swap transaction, two parties agree to exchange a series of payments based on different instruments.[10] Upon settlement, the payment obligations are netted, and the party owing the net amount pays the other. Swaps are generally used for hedging to alter a party's exposure to market volatility. An example of a swap would involve Party A, the holder of a fixed-price natural gas position, entering into a swap with Party B, the holder of an index-price natural gas position. Party A, seeking to participate in the natural gas market price volatility, would agree to pay Party B the fixed price of natural gas and in exchange would be paid a market-sensitive index price by Party B, who would enter into the transaction with the goal of reducing its risk exposure to price volatility. If the index price rises above the fixed price, Party

B will be obligated to pay Party A the difference between the two prices. On the other hand, if the index price falls below the fixed price, Party A would be obligated to pay Party B the difference between the two prices.

III.    A BRIEF OVERVIEW OF THE ISDA

The Master Agreement has the following characteristics:

1.    The Master Agreement is designed to govern OTC financial transactions. The Master Agreement does not contain provisions relating to the physical delivery of any energy commodity or the purchase or sale of exchange-traded securities. Any sale for exchange-traded securities should be made using a registered broker, and any transaction for the purchase and sale of physical commodities should be made pursuant to an agreement with provisions relating to issues such as title transfer, transportation, metering and delivery points. The Master Agreement should only be used to document transactions that are settled on a financial basis.

2.    Two versions of the Master Agreement may be used. The Master Agreement has two versions, the Local Currency-Single Jurisdiction version and the Multicurrency-Cross Border version. The existence of two versions permit parties to elect a version that may be used internationally and with multiple currencies or a form that omits any terms, such as multi-jurisdictional tax provisions, not applicable to transactions in a single jurisdiction. Participants in energy-related OTC derivative transactions most commonly use the Multicurrency-Cross Border version.

3.    The Master Agreement contains an optional Credit Support Annex. The Annex is optional but is widely used in most Master Agreements for energy-related OTC derivative transactions. The Annex contains extensive provisions concerning the posting and return of collateral, the types of collateral that may be used, and the treatment of collateral by the secured party.

4.    The Master Agreement has extensive supporting documentation. ISDA has produced a wide array of supporting materials for the Master Agreement, including definitions and user's guides. This documentation is designed to prevent disputes and to facilitate the consistent use and interpretation of the Master Agreement. These materials are produced by ISDA and are regularly updated to reflect the most recent regulatory or market changes.

5.    The Master Agreement is designed to control multiple transactions. The Master Agreement sets forth all of the general terms and conditions necessary to properly allocate the risks of the transactions between the parties but does not contain any commercial terms specific to a particular transaction. Once the Master Agreement is executed, the parties can enter into numerous transactions by agreeing to the material commercial terms over the telephone as evidenced by a written confirmation without any need to revisit the underlying terms contained in the Master Agreement.

3

6.    <u>The Master Agreement is the basis for other energy-related contracts.</u>  Many of the standard form agreements now in use in the energy industry can trace many of their provisions and their treatment of certain issues to the Master Agreement. Terms originally developed for the Master Agreement are commonly found in other contracts unrelated to OTC derivatives, such as the GISB Base Contract for Short-Term Sale and Purchase of natural Gas and the EEI Master Power Purchase & Sale Agreement.

7.    <u>The Master Agreement is widely used by a variety of counterparties.</u>  Although it is often viewed as a tool for banks and financial companies, the Master Agreement is widely used by a wide variety of counterparties. Producers, energy traders, and large end users all utilize the Master Agreement and OTC derivatives to reduce their energy commodity risk, while investors including banks and insurance companies may use the Master Agreement to reduce risks in their portfolios or to speculate on movements in the energy markets. The Master Agreement is in no way limited in its use or restricted to a small population of users.

8.    <u>The Master Agreement provides significant credit protection to its users.</u>  The Master Agreement provides several mechanisms to help reduce parties' credit risk to each other including: (i) the right to terminate and liquidate all of the transactions under the agreement when a default occurs; (ii) the right to set-off obligations owing between the parties; (iii) the right to withhold payment after the occurrence of an event of default; (iv) the right to demand collateral from the counterparty under certain conditions; and (v) the ability to monitor and adjust the exchange of collateral as frequently and as specifically as the parties desire.

9.    <u>The Master Agreement reduces legal risk.</u>  The Master Agreement significantly diminishes three legal risks parties assume when they enter into OTC derivative transactions. First, it improves the enforceability of oral transactions so parties can enter into transactions by phone rather than waiting to exchange executed written confirmations. Second, it contains numerous representations to ensure that both parties abide by all regulatory requirements related to the OTC derivative transactions and that neither party will violate federal law or incur unanticipated tax obligations by virtue of entering into OTC derivative transactions with the other party. Third, the Master Agreement's credit provisions reduce the risk resulting from an OTC derivative counterparty's entering bankruptcy and the expense and effort a party must expend to work through any such proceeding.

10.    <u>The Master Agreement reduces contract risk.</u>  The Master Agreement reduces contract risk by reducing variance of the contract terms across a party's contracts with all counterparties and between counterparties and affiliates. The Master Agreement achieves this both by its own standardized terms and a party's use of a consistent Schedule and Annex for all of its Master Agreements. The burden of tracking the contractual terms of thousands of transactions is eased considerably

4

by the ability to ensure consistent terms are used in all of a party's Master Agreements.

11.    <u>The Master Agreement reduces the parties' liquidity risk.</u> Liquidity risk is the risk that a party may not be able to enter into or terminate a needed transaction. By having a Master Agreement and the early termination and liquidation and set-off rights it contains, parties significantly reduce their liquidity risk. The Master Agreement also increases the number of transactions parties can enter into due to their ability to net credit exposure, thereby increasing the liquidity of the OTC derivative market as a whole.

12.    <u>The Master Agreement facilitates the documentation process.</u> By standardizing the terms of OTC derivative transactions, the Master Agreement enables parties to engage in more transactions while requiring less time and expense to put the transactions in place. This increase in efficiency moves parties' resources away from administrative functions to be deployed in other areas that may lead to increased revenues.

## IV.   DEVELOPMENT OF ISDA

The need for a standard swap agreement arose prior to the deregulation of the United States energy markets.[11] Individual interest rate and currency swap dealers developed different contracts with different terms and conditions.[12] Negotiating these contracts often consumed a great deal of time and money. The result was the formation of the International Swap Dealers Association in 1984.[13]

ISDA is a trade association composed of dealers and market participants engaged in transactions in the OTC derivative markets. ISDA was created to encourage the prudent and efficient development of the OTC derivative markets by: (i) promoting practices conducive to the efficient conduct of the business; (ii) promoting the development of sound risk management practices; (iii) fostering high standards of commercial conduct; (iv) advancing international public understanding of the business; (v) educating members and others on legislative, regulatory, legal, accounting, tax, operational, technological and other issues affecting them; and (vi) creating a forum for the analysis and discussion of and representing the common interest of its members on these issues and developments.[14] In addition, ISDA produces standard form documentation for privately negotiated derivative contracts with terms specifically tailored to the specific needs of the parties. The result has been the development of the Master Agreement and the Annex.

ISDA initially consisted of 11 members whose goal was to develop standard definitions for terms typically found in swap agreements.[15] The Swaps Code, introduced in 1985 and updated in 1986, consisted of standard definitions, representations and warranties, events of default, and remedies.[16]

In 1987, ISDA produced three documents: (i) a standard form master agreement for U.S. dollar interest-rate swaps; (ii) a standard form master agreement for multi-currency interest-rate

and currency swaps (collectively known as the "1987 ISDA Master Agreement"); and (iii) the interest rate and currency definitions.[17]

The 1990s resulted in major document production by ISDA, including (i) a revised version of the Swaps Code, known as the 1991 ISDA Definitions, drafted and replaced later by the 2000 ISDA Definitions; (ii) a revision to the 1987 Master Agreement resulting in the 1992 Master Agreement; (iii) the User's Guide to the 1992 Master Agreement, drafted in 1993, explaining in detail each section of the 1992 Master Agreement; (iv) the Commodities Derivatives Definitions, drafted in 1993 and supplemented in 2000; and (v) the Annex, providing for collateral documentation, finalized in 1994, followed by its User's Guide in 1995.[18]

Membership in ISDA comprises approximately 555 member organizations from 41 different countries, 210 of which are Primary Members (dealer firms) consisting of banks, securities companies and large corporations. There are 182 Associate Members (service providers) consisting of professional firms and corporations, and Subscribers such as end-users make up the remaining 163 members.[19] To promote the OTC derivatives industry, ISDA holds international conferences, providing the most recent information and training in such areas as documentation, collateral and risk management.[20] In addition, ISDA regularly appears before legislative and regulatory bodies to advocate issues on behalf of its members.[21]

## V.   NEED FOR THE MASTER AGREEMENT IN TODAY'S OTC MARKETS

As energy markets began to deregulate and a market for energy-based derivatives began to emerge, large energy trading and marketing firms began using the Master Agreement to document derivative transactions.

The Master Agreement documents the overall terms of the relationship between the parties, providing for payment provisions, representations and warranties, and provisions for early termination, while the Annex governs the pledging and management of collateral to secure a party's payment obligations.

The Master Agreement is considered a "master" contract because of its function in allowing the parties to transact multiple transactions in the future using the terms in the same master contract. The Master Agreement is quite lengthy, and the negotiation process can be burdensome, but once a Master Agreement is signed, the documentation of future transactions between parties is reduced to a brief confirmation of the material terms of the transaction. The confirmation automatically becomes part of and is governed by the general terms established in the Master Agreement. Parties may exchange numerous confirmations over time, resulting in dozens or hundreds of transactions between them. Without a master contract, the parties would be required to enter into numerous voluminous contracts and exchange hundreds of payments. The Master Agreement can reduce transaction costs, however, by reducing the contractual requirements for each transaction to a single-page confirmation and by permitting the netting of payments between the parties, resulting in one payment being made. Usage of the Master Agreement increases the efficiency of OTC transactions and thereby increases the profitability of the transaction for both sides. The Master Agreement also aids in reducing disputes by providing extensive resources defining its terms and explaining the intent of the contract, thereby preventing disputes from beginning as well as providing a neutral resource to interpret standard

contractual terms. Finally, the Master Agreement greatly aids in risk and credit management for the parties. As a result of all of these advantages, most energy marketing and trading companies require that all OTC derivative transactions be conducted using a Master Agreement.

## VI.    MASTER AGREEMENT AND RELATED DOCUMENTS ARCHITECTURE

### A.    Master Agreement

The Master Agreement is structured to provide the framework around which the rest of the ISDA documentation is built. The preprinted Master Agreement is never altered except to insert the names of the parties, but is customized through use of the Schedule to the Master Agreement ("Schedule"), a document containing elections, additions and amendments to the Master Agreement. While comprehensive guides exist for detailed discussion of the Master Agreement and Annex,[22] this paper is intended to describe some of the issues with which every user of the Master Agreement should be familiar.

There are two versions of the Master Agreement, the local version for transactions between parties located in the same jurisdiction who are transacting in only one currency, and the multicurrency version for use when parties are located in different jurisdictions transacting in different currencies. Despite this distinction, the multicurrency version is often used even when transactions are in the same jurisdiction and payment will be in the same currency in order to include the more comprehensive provisions contained in the multicurrency version. The provisions included in the multicurrency version but not in the local currency version concern issues such as taxes, currency of payment, the use of multiple offices to enter into transactions, and the designation of an agent for service of process.

As previously discussed,[23] the Master Agreement does not contain any terms specific to a transaction, such as price, quantity or the identity of the buyer and seller, but rather leaves the negotiation and documentation of those terms to a separately executed confirmation. The confirmation establishes the parameters of performance. However, these obligations are limited by the condition that a party is not obligated to make any payment or deliver or return any collateral if an Event of Default has occurred or is occurring or an Early Termination Date has occurred.[24] This illustrates one advantage of the Master Agreement, namely that its drafters considered many undesirable scenarios that could occur, such as an obligation to pay a counterparty who is in default, and drafted the provisions of the Master Agreement to prevent these undesirable scenarios from arising.

The Master Agreement is designed so that counterparties may engage in an infinite number of transactions in any month without requiring the negotiation of anything other than the material terms of performance of each individual transaction. While this saves a tremendous amount of backoffice and legal time, this still burdens the risk management and accounting departments with the responsibility and inherent risk of tracking and settling all the various transactions. To address this concern, the Master Agreement permits the netting of payments due under the same transaction so that only a single amount is exchanged between the parties, rather than numerous payments involving the same transaction. This increases the efficiency of the accounting process by reducing the number of individual payments that must be made and tracked and saves the parties expenses incurred in every payment such as wire transfer fees. To

7

further facilitate settling transactions and reduce costs, most counterparties agree to net all amounts due on a single day regardless of whether amounts are due under a single or multiple transactions. It is important to note that this netting right is different from the legal right of set-off discussed later.[25] Netting is an accounting convenience utilized on an ongoing basis between parties while set-off is used as a final settlement of accounts that extinguishes the mutual debts owed between the parties in exchange for a new, net amount due. The parties are incentivized to pay in a timely manner by the imposition of interest on any amounts paid after the due date.

Due to the limited types of entities that may participate in OTC derivative transactions, it is important for the parties to verify that each has the proper authorizations to participate in the transactions. The ISDA contains a series of representations that address the internal and external authorizations a party must have to participate in OTC derivative transactions. These include but are not limited to representations that: (i) a party is duly organized and in good standing; (ii) it has the power to enter into the agreement; (iii) the entering into of a Master Agreement would not violate any law, provision of its organizational documents or any court order or judgment; (iv) no events of default, potential events of default or termination events have occurred or are continuing or would occur upon the execution of a Master Agreement; (v) no lawsuit has been filed against the party that could affect the validity, legality or enforceability of the Master Agreement; (vi) and all information provided to the other party in connection with the Master Agreement will be accurate. It is common for parties to supplement these representations with additional representations in the Schedule, often addressing in greater detail the eligibility of the parties to engage in OTC derivative transactions and the arms-length relationship of the parties in any OTC derivative transaction. In recognition that circumstances may change after the execution of the Master Agreement, the Master Agreement requires that these representations be made at the time the Master Agreement is executed and are deemed repeated at the time any transaction is entered into.

The netting and set-off rights parties are given in the Master Agreement cause parties to calculate their financial exposure under OTC transactions on a net basis, *i.e.*, a party calculates the difference between what it owes a counterparty under a Master Agreement and what the counterparty owes it under the same agreement. These calculations are made on a mark-to-market basis to reflect the current market position of each transaction. In support of these practices, the United States Bankruptcy Code exempts participants in OTC derivative transactions from the automatic stay provisions of the Bankruptcy Code and permits them to set-off obligations owed between the creditor and the bankrupt party even during the pendency of a bankruptcy stay order.[26] While this provides a creditor some relief from a counterparty's bankruptcy by permitting the set-off of obligations due and owing, it does not provide relief from the exposure to future positions that have not yet become due and owing. In recognition of this problem, the Master Agreement contains provisions permitting a creditor party to terminate and liquidate transactions upon a counterparty's bankruptcy or other default under the Master Agreement.

The Master Agreement provides the parties two means by which the Master Agreement and all transactions thereunder may be terminated upon the occurrence of specified events. The first is the occurrence of an Event of Default, which permits a party to terminate the Master Agreement and liquidate all transactions if the other party is affected by an Event of Default. In contrast, Termination Events may affect both parties, are usually the result of the actions of

8

third-parties, and may provide the affected party a grace period to cure the Termination Event before the other party may terminate and liquidate the Master Agreement.[27]

Some examples of Events of Default include: (i) a party's failure to make payment or deliver collateral after receiving notice of such failure; (ii) a failure of or default under credit support provided to the other party; (iii) any misrepresentation; (iv) a default under a financial obligation to a third party; and (v) bankruptcy. Termination Events include: (i) a change in a law making performance under the Master Agreement illegal; (ii) a merger that impairs the credit of the resulting entity; (iii) a merger that causes a party to pay increased taxes; or (iv) a change in tax laws or procedures that increases a party's taxes. The parties may provide for elect Additional Events of Default or Additional Termination Events in the Schedule.

The party responsible for or to whom an Event of Default applies is called the Defaulting Party and the other party is called the Non-defaulting Party. If an Event of Default occurs and is continuing, the Non-defaulting Party may, at its option, declare an Early Termination Date.

When a Termination Event occurs, the party affected by the Termination Event is designated the Affected Party. If a Termination Event affects both parties, both parties are designated Affected Parties. An Affected Party is obligated to promptly notify the other party in detail of the occurrence of the Termination Event when it discovers that the Termination Event has occurred. Certain Termination Events require the parties to negotiate to permit the Affected Party to transfer its obligations to a different office or affiliate if doing so will cure the Termination Event.[28] Other Termination Events that affect both parties require the parties to employ reasonable efforts to attempt to negotiate to cure the Termination Event.[29]

If an Event of Default or Termination Event is cured prior to a party's delivery of notice of an Early Termination Date to the other party, the right to declare an Early Termination Date is extinguished. If the Event of Default or Termination Event is not cured, an Early Termination Date may be declared. Once notice of an Early Termination Date is given, the early termination process is allowed to run its course even if the Event of Default or Termination Event ceases to exist before the Early Termination Date. Further, once notice of the Early Termination Date has been given, no further payments or deliveries of collateral related to the transactions to be terminated on the Early Termination Date are required even though the Master Agreement is not terminated until the Early Termination Date.

Upon the occurrence of the Early Termination Date, all transactions under a particular Master Agreement, as well as the Master Agreement itself, are terminated and liquidated at market values as of the Early Termination Date into a Settlement Amount. Two important elections shape the liquidated value of the transactions.

The first election is which of two methods to use in calculating the Settlement Amount. The First Method permits payment of a Settlement Amount only to the Non-defaulting or Non-affected Party; if the Non-defaulting Party or Non-affected Party would otherwise owe a settlement amount to the Defaulting Party or Affected Party, any such amount is deemed to be zero. The premise behind this method is that a party who defaults under the contract should not receive a benefit in the form of a Settlement Amount as a result of the default. The Second Method permits either party to receive a Settlement Amount, pursuant to the rationale that a

9

Defaulting Party should be entitled to the benefit of its contractual bargain so long as the Non-defaulting Party is kept whole.

The second election the parties make related to the Settlement Amount is whether to use the Market Quotations or Loss method to value the liquidated transactions. The Market Quotations method uses the valuations of the liquidated transactions from various participants in the relevant OTC derivative market to calculate the Settlement Amount. The Loss valuation method measures the Non-defaulting/Non-affected Party's economic loss due to the early termination, including the cost to unwind any related hedges.

Regardless of the method chosen, any amounts payable with respect to the early termination and liquidation of transactions are subject to any set-off provisions agreed to by the parties. These set-off provisions vary in their scope,[30] but they permit the Non-defaulting party to elect whether to employ set-off and at a minimum allow the Non-defaulting Party to set-off any Settlement Amount it would owe to the Defaulting Party against any amounts the Defaulting Party owes to the Non-defaulting Party under the Master Agreement. This set-off right is valuable for several reasons: (1) it extinguishes the underlying debts and gains and replaces them with a single net amount, greatly aiding in the management of the aggregated amount between the parties and reducing the Non-defaulting Party's risk exposure;[31] and (2) if the Defaulting Party is embroiled in bankruptcy proceedings, it reduces the amount and number of claims in the bankruptcy proceeding and can increase the Non-defaulting Party's cash liquidity related to those claims.

The Master Agreement restricts assignment rights to ensure the parties can control the identity of their respective counterparty. The assignment clause in the Master Agreement prohibits transfers without consent unless: (i) the transfer is made in conjunction with a merger, consolidation, or other business event where all or substantially all of the assets of the transferor have been transferred to the other entity; or (ii) the transfer is an assignment of amounts owed by the other party pursuant to an Early Termination.

The Master Agreement contains a set of boilerplate miscellaneous provisions intended to address issues in advance to prevent the issues from being the subject of a dispute between the parties at a later date. These provisions include an entirety clause,[32] a modification restriction,[33] a statement that all remedies are cumulative,[34] a counterparts provision,[35] a waiver restriction,[36] and a headings limitation.[37]

Should a party incur any costs or expenses in enforcing its rights under the Master Agreement against the other party, Section 11 provides for the recovery of those costs from the other party. While some states, such as Texas, may offer similar rights,[38] this provision is particularly useful in both providing a broader right to recovery than most states offer and in eliminating any need to research the treatment of this issue by the particular jurisdiction whose law is chosen to govern the Master Agreement.

While the parties are free to elect the law of any jurisdiction to govern the Master Agreement, the most commonly chosen jurisdiction by energy trading and marketing counterparties is New York. New York has a long history of addressing complex business issues in its statutes and for tackling complex business issues in the financial and commodities

industries. The foundation for this is the New York General Obligations Statute[39] whereby any person may file suit in a New York State court against a foreign corporation or other non-resident if: (1) the suit arises out of an agreement specifying the use of New York law (and, if the obligation is equal to or greater than $250,000, no relationship to the State of New York need be shown for the election of New York law to be enforceable); and (2) the suit concerns a transaction with an aggregated value of at least $250,000.[40] Parties also usually consent to jurisdiction and venue in New York City, because New York City courts have a reputation for proficiency in complex business litigation, fairness to all parties regardless of their jurisdiction of origin, including foreign parties, and a desire to welcome cases involving participants from jurisdictions outside of New York. The Master Agreement also requires that the parties waive all immunities they may have to being sued or the exercise of any remedy against the party with immunity.[41]

The Master Agreement concludes with a definitions section. Parties to the Master Agreement should be aware that not all definitions are included in Section 14 of the Master Agreement but may be included in the text of the Master Agreement, the Annex, a Schedule, a Paragraph 13, or the separately published Commodity Definitions.[42] It is also noteworthy that terms may have defined meanings even though they are not capitalized in the text of the agreement.

B.    Annex

The Annex is not required by the terms of the Master Agreement, but almost all parties using the Master Agreement also require the use of the Annex. The insistence on using the Annex stems from the fact that the Annex contains the vast majority of the credit terms related to a Master Agreement.

The Annex's mechanism for the requirement to deliver or return collateral is based on whether a party's exposure to the other party exceeds its credit threshold.[43] If it exceeds the threshold, it must deliver collateral to the other party, and if its exposure is less than the threshold, then any collateral it has previously posted must be returned to it. Neither party is obligated to deliver or return collateral unless the amount to be transferred exceeds a minimum transfer amount, and any amount to be transferred is rounded to an agreed amount. If cash is posted as collateral, the Annex provides for the payment of interest on that cash amount each month by the secured party.

The parties may elect conditions restricting a party's right to hold collateral,[44] and if a party fails to meet these requirements, it may still request collateral from the other party but any such collateral must be held by a custodian that meets certain requirements. If a party is not affected by an ongoing Event of Default or Termination Event, then it may freely use, commingle or otherwise dispose of collateral as it sees fit, provided that it must exercise the same standard of care as it would exercise toward its own property. This provision permits a great deal of flexibility in a party's use of another party's collateral, even permitting a secured party to rehypothecate the other party's collateral for the secured party's benefit, and thereby greatly improves the liquidity of collateral posted under the Annex. However, this flexibility also causes the inherent danger that a counterparty might utilize collateral given to it and not be

11

able to return the collateral when required under the Annex. This danger often causes parties to a Master Agreement to strike this provision .

The Annex contains certain representations related to the collateral, including representations that a party has the power to grant a security interest in collateral transferred, it has the right to transfer collateral, the transfer of collateral will create a valid and perfected security interest for the benefit of the party receiving the collateral, and performance under the Annex will not create any security interest in the collateral other than any security interest created by the Annex.

The Annex concludes with a set of definitions, but as previously noted,[45] this is by no means a comprehensive list.

C.    Schedule to the Master Agreement and Paragraph 13 to the Annex

In addition to the Master Agreement and Annex, parties are required to negotiate a Schedule to the Master Agreement ("Schedule") and a Paragraph 13 to the Annex ("Paragraph 13"). The Schedule and Paragraph 13 are used to make all amendments to and customizations of the Master Agreement and Annex, including the elections of the various options presented to the parties in the Master Agreement and Annex and the addition of provisions not contained in the Master Agreement. The Schedule and Paragraph 13 contrast with the Master Agreement and Annex in that while the Master Agreement and Annex are always the same, it is rare for the forms of Schedule and Paragraph 13 of any two parties to be exactly alike. The Schedule and Paragraph 13 are always separately executed from and in addition to the Master Agreement and Annex.

VII.    SUMMARY OF THE OPERATION OF THE MASTER AGREEMENT

The Master Agreement addresses five primary issues inherent to OTC derivative transactions.

A.    Reduces Credit Risk Associated with Financial Transactions

OTC transactions by their nature do not raise many of the concerns associated with physical transactions in the same commodities. For example, issues involving gas transportation or the failure of power generation are irrelevant to an OTC transaction. However, while risk reduction is always beneficial, the elimination of some risks amplifies the importance of the remaining risks. Chief among these risks is the credit risk of counterparties.

At their core, transactions under a Master Agreement are nothing more than a transfer of payments from one party to the other. These are usually made on a net basis, with each party owing money to the other under various multiple transactions, and the amounts owed are typically quite large, with energy trading and marketing companies often exchanging tens or hundreds of millions of dollars each month under Master Agreements with various counterparties. If this mutual cash flow is disrupted by the failure of one party to pay its obligations, the effect can be damaging, as a net obligation or receivable an entity anticipated being due in a month will suddenly turn into a larger exposure upon the other party's failure to pay. For example, assume that Party A owes Party B $25 million in a month under a Master

Agreement, and Party B owes Party A $50 million in the same month. Party A would normally expect a net receivable of $25 million from Party B for this month. If the parties do not net obligations and Party A makes its payment to Party B not knowing Party B will not make its corresponding payment, Party A will lose $50 million as a result of paying $25 million to Party B and never receiving the $50 million from Party B.

The Master Agreement addresses this issue by creating a sophisticated collateral and security system that functions to protect the parties while creating as flexible a mechanism for doing so as the parties desire. The Master Agreement permits the parties to select any kind of collateral they desire, although typically cash, third-party guaranties and letters of credit are used. The parties set individual thresholds for each other beyond which collateral must be provided to reflect the individual evaluation each party may have of the creditworthiness of another.[46] The parties also elect how frequently the credit exposure each party has to the other must be monitored and how frequently and in which amounts collateral must be delivered and returned. The existence of these variables results in Master Agreements resembling snowflakes, where they are all identifiable as Master Agreements but no two are exactly alike. However, in doing so the Master Agreement provides the parties powerful and individualized tools to manage their credit exposure according to their own individual credit policies and risk tolerances. No other standardized energy trading and marketing contract addresses this issue as comprehensively as does the Master Agreement, and in so doing the Master Agreement, when managed in a diligent manner, is usually considered to provide parties the lowest credit risk of any standardized agreement.

B.     Provides a Right to Terminate Upon the Occurrence of Certain Events

OTC derivatives carry a substantial risk of forward exposure, *i.e.*, the risk that their value will change drastically as the market moves up or down over time. This risk is minimized by the performance obligations of the other party, in particular by the payment of amounts owed and the posting of additional collateral when necessary. However, when a party cannot rely on the other party's performance, the market risk dramatically increases, and most parties will prefer to exit their market positions rather than accept this risk. Most contracts do not permit a party to terminate its obligations subsequent to an adverse occurrence with sufficient ease to allow a party to quickly address its increased market risk. In response to this, the Master Agreement provides for two different means by which the Master Agreement and the Transactions thereunder may quickly be terminated and the OTC positions unwound.

As previously discussed,[47] parties may be able to terminate and liquidate a Master Agreement and/or some or all of the Transactions upon the occurrence of an Event of Default or Termination Event. This right provides parties the advantage of the certainty that they can exit Transactions with minimal market risk if certain events occur, and the likelihood and extent of any legal challenge to such action is reduced by the express inclusion of such right in the Master Agreement. The recent events surrounding Enron evidenced the tremendous impact the flexibility of the Master Agreement has on the overall efficiency of the OTC markets. Enron was the largest[48] trader in natural gas and power derivatives prior to its bankruptcy filing. Contrary to the predictions of many market observers and despite this significant market position, Enron's default under its OTC derivative transactions caused at most a minor ripple in the marketplace, with little material impact on either short-term or long-term pricing.

Counterparties were able to invoke the early termination provisions of the Master Agreement to quickly segregate the Enron obligations, isolate them from the remainder of their trading book, quantify and affix their value and continue in business. If parties had been required to negotiate release from their contracts with Enron or terminated the contracts with the risk that Enron might file suit for such action, the marketplace could very well have ground to a halt upon the demise of such a major market participant. Instead, the market continued functioning without any discernible impairment.

### C.    Provides Method for Liquidation

The other facet of the early termination provisions that give them so much power is the means by which parties are able to swiftly and objectively calculate the value of the terminated transactions, thus permitting them to exit their positions without concern that the method by which their damages were measured might be challenged by a legal proceeding. The costs incurred by the terminating party are addressed as well, leaving few issues for dispute other than the proper market numbers to use to value the terminated transactions. As shown by the Enron bankruptcy, companies were rewarded in the marketplace when they were able to quickly quantify their exposure to Enron with certainty. This certainty could be seriously misplaced if not for the valuation provisions of the early termination provisions.

### D.    Provides Right to Require Margin in Certain Circumstances

The right to demand and the obligation to deliver collateral are often hotly contested in contracts. Many contracts do not specifically discuss collateral, and many rely upon the UCC[49] fallback provisions to enforce their collateral rights. The UCC is inapplicable to many contracts,[50] however, and even when it does apply its rights to demand collateral are couched in vague, ambiguous terms that lend themselves to challenge by the party from which collateral is demanded.[51] Once collateral is transferred under the UCC, it is up to the parties to determine how the collateral is valued, how frequently it is valued, what the secured party may do with the collateral and what rights the party providing collateral has to the return of the collateral. The Master Agreement resolves all of these issues in advance by specifically addressing the rights of the parties to collateral and requiring the parties to detail what collateral policies will apply and how they will be applied. By resolving these issues in advance, parties are provided better credit certainty, reduced credit risk, a reduced likelihood for disputes concerning the posting and treatment of collateral and lower transaction costs.

### E.    Rights to Set-off

As discussed previously, a party's exposure to a counterparty can depend greatly on whether the obligations between the parties can be set-off against each other.[52] Although some set-off rights exist in the United States Bankruptcy Code[53] and at common law[54], these rights typically do not provide the extent of set-off OTC derivative counterparties require. The Master Agreement fills this gap by reserving all set-off rights the parties may otherwise have[55] and by adding express set-off rights for the Non-defaulting Party upon the termination and liquidation of the Master Agreement.[56] These set-off rights provide the parties to a transaction assurance that any exposure they might suffer due to the early termination and liquidation of the Master Agreement will be netted against obligations they owe to the other party and any collateral held

by the parties. With these assurances in hand, the parties are able to offer greater credit leverage than they otherwise would.

VIII.   ELECTIONS UNDER AGREEMENT

Every Master Agreement presents the parties with certain standard elections. While this paper is not intended to comprehensively address every contractual option available under the Master Agreement, this section highlights and summarizes the most common elections.

A.   Automatic Early Termination

This option permits the parties to elect to have the Master Agreement and all Transactions automatically terminate upon the occurrence of certain bankruptcy or insolvency events.[57]Th is is desirable in the event the parties have no other means to avoid the automatic stay provisions of the United States Bankruptcy Code and would thereby be prevented from enforcing the early termination and liquidation scheme detailed in Sections 5 and 6 of the Master Agreement. This election is typically not made, however, due to its overlap with provisions of the United States Bankruptcy Code that exclude OTC derivatives from the automatic stay provisions.[58] Further, it is presently unclear whether this provision is enforceable in the United States or Canada. This provision is most useful when the choice of law is a jurisdiction other than the United States or when there is an issue of whether the transactions entered into under the Master Agreement will be excluded from the automatic stay provisions of the United States Bankruptcy Code.

B.   Valuation Methods - Market Quotation Versus Loss

As previously discussed,[59] the parties to a Master Agreement may elect to value terminated transactions using either the Market Quotation or Loss methods. The Market Quotation method essentially averages the valuations given to the terminated transactions by various neutral market participants. This method is generally seen as the more objective method with the lower risk of gaming by the Non-defaulting Party in order to increase the payments owed to it for the terminated transactions. The disadvantages of this method are that it assumes the Non-defaulting Party was able to obtain the market price quoted by the neutral market participants when various factors, including the timing of the liquidation, may have prevented the Non-defaulting Party from obtaining this price, and it does not specifically provide for the recovery of any costs relating to the unwinding of hedges of the terminated transactions. This can lead to the Non-defaulting Party either being undercompensated by the damages or a dispute between the parties as to whether the Non-defaulting Party is entitled to recover its hedge unwinding costs.

The Loss method is an indemnity provision based on the economic loss realized by the Non-defaulting Party as a result of the termination of the Transactions. This method is very subjective as it relies on the self-reporting of the Non-defaulting Party, permits the recovery of such amorphous damages as loss of bargain, and permits the Non-defaulting Party to estimate the value of its losses.[60] Further, the recovery of the cost of unwinding any hedge related to the terminated transactions is specifically provided for when using the Loss method. Master

15

Agreements between energy trading and marketing companies tend to utilize the Market Quotation method in order to inject as much objectivity as possible into the liquidation process.

C.    First Method Versus Second Method

The other variable in valuing liquidated transactions is the use of First Method versus Second Method. First Method permits only the Non-defaulting Party to receive payment for the terminated transactions while the Second Method allows either party to receive payment. The argument for using the First Method is that a defaulting party should not be rewarded for its default. The counter-argument for the Second Method is that contract law envisions both parties receiving the benefit of the contractual bargain, and so long as the Non-defaulting Party is made whole, it is unjust to bestow a windfall on that party as well. The First Method also could wreak havoc on the defaulting party's risk profile when it anticipates a gain from various transactions that is wiped out due to the use of the First Method. Parties will occasionally alter the early termination provisions to permit the Non-defaulting Party to pick and choose which transactions it wishes to terminate. When coupled with the First Method, this creates a tremendous incentive for a party to identify the transactions unfavorable to it, identify a Event of Default or Termination Event as soon as possible, and terminate only the transactions unfavorable to it so that it owes the counterparty nothing under those transactions. Energy trading and marketing companies tend to elect the Second Method.

D.    Set-off

The Master Agreement permits the parties to enforce any set-off rights they may have when the payment amount after early termination is calculated. In general, parties may set-off the obligations owed to one another under a contract without any express right to do so.[61] However, this is typically insufficient for parties to a Master Agreement. Parties often elect in the Schedule to add a set-off provision permitting the set-off of all amounts owed between the parties to a Master Agreement under all contracts between them. This is particularly desirable for energy trading and marketing companies who will typically trade in both the physical and financial sides of one or more commodities and therefore have multiple contracts between counterparties in order to avoid a circumstance where the Non-defaulting or Non-affected Party was required to pay the other party under one agreement with no reasonable expectation of payment by the other party under another agreement.

Some parties add a provision permitting the set-off of obligations owed between affiliates of the parties. This can be useful when sister companies of the parties to a Master Agreement also enter into transactions and the Non-defaulting or Non-affected Party wishes to avoid making payment from one affiliate while the other affiliate fails to receive payment from the other party or its affiliate. An example of this is Party A and Party B entering into a Master Agreement to facilitate OTC derivative transactions while each has an affiliate that has entered into an agreement with the other party's affiliate for entering into physical natural gas transactions.

Despite the potential advantages this type of provision can provide, many companies are not permitted to entangle their obligations with the obligations of affiliates. This issue is particularly acute as deregulation of the energy industry progresses in the United States and more companies are divided into regulated and unregulated subsidiaries that are prohibited from

entering into transactions involving each other. Companies are also more reluctant to agree to cross-affiliate netting provisions as the companies grow in size and complexity and the issue of tracking obligations across all affiliates becomes more and more cumbersome. It is not unusual for an energy marketing and trading company to have more than 150 affiliates, each with their own credit and risk managers. Parent companies of these affiliates are often unwilling to permit a single affiliate to enter into an agreement that would affect other affiliates, possibly without the knowledge of the other affiliates.

On the other hand, as the Enron bankruptcy showed, it is not uncommon for the affiliates of two companies to have numerous contracts and transactions with each other, and it makes more sense to net these obligations on an organizational level than to have some affiliates pay the bankrupt party and have other affiliates file as unsecured creditors of the bankrupt party. Using cross-affiliate netting, the creditor party will likely realize more money in set-off value for amounts owed to it by the debtor party than it would receive as an unsecured creditor. Cross-affiliate netting has the advantage of reducing the amount of time it takes to resolve claims with a bankrupt party, the expense of addressing these claims and the organizational energy and attention that must be devoted to these claims. Utilizing cross-affiliate netting can lead to a much more efficient marketplace and lower transaction costs for the market participants.

IX.    PRACTICAL CONSIDERATIONS

A party considering the use of the Master Agreement should take the following steps to implement the use of the Master Agreement for its transactions.

1.    Purchase the materials. The Master Agreement, definitions, user's guides and other materials are all available for sale from ISDA.[62] These materials are essential to developing policies and documentation related to the Master Agreement.

2.    Develop the forms. Before a party enters into a Master Agreement, it is important that the party first develop its own set of forms and policies which reflect its credit, risk and trading strategies and policies. In addition to generating a document that can be forwarded for others' consideration, the creation of forms will also create a blueprint of policies for a party to follow during ISDA negotiations ensuring the consistent treatment of issues across agreements. The process of creating form documents will also aid a party in identifying issues that may arise during negotiations so that these issues may be considered and solutions generated prior to the negotiation process with a counterparty.

3.    Prepare the supporting documents. Pursuant to Section 4 of the Master Agreement, parties typically require each other to provide the other various documents relating to the corporate authority of each party to enter into OTC derivative transactions under the Master Agreement and the creditworthiness of each party and its guarantor, if any. These documents often take the form of certificates of authority and annual reports and at times may require an opinion of counsel. This can take time, particularly for a party that has not previously

17

entered into OTC derivative transactions and therefore has not required that such authorizations and documentation be put in place.

4.  Coordinate the efforts of personnel.   The Master Agreement requires the contributions of legal, trading, credit, risk management, accounting and tax personnel to generate an entity's customized Master Agreement and to address the issues that arise during the negotiation of a Master Agreement.  This will require the integration of disparate groups and interests, and this integration takes time and careful discussion to determine what policies will best represent a party's interests.[63]

5.  Start early.   All of these steps require an extended time frame for completion. Ample time must be allotted to lay the groundwork prior to entering into Master Agreements or a party risks creating uncertain or inconsistent policies which can increase the risk and workload after transactions commence.

## X.   CONCLUSION

OTC derivatives are extremely valuable tools to more precisely manage risk, increase the efficiency of the marketplace and increase the profits of the parties using them.  However, OTC derivatives carry great risks if improperly used, thus creating issues that could cause the expense and risk of OTC derivatives to outweigh their utility.  By using the Master Agreement properly, parties can reduce this risk and expense to a customized and comfortable level that allows for very efficient transactions.

3052741V8

18

**ENDNOTES**

[1] *10 Myths About Financial Derivatives*, Thomas F. Siems, <u>Cato Policy Analysis No. 283</u>, September 11, 1997 (citing Artistotle, <u>Politics</u>, trans. Benjamin Jowett, vol. 2, <u>The Great Books of the Western World</u>, ed. Robert Maynard Hutchins (Chicago: University of Chicago Press, 1952), book 1, chap. 11, p. 453).

[2] T he name was changed to International Swaps and Derivatives Association in 1993. The association had previously been known as the International Swap Dealers Association.

[3] A lternately, "[d]erivatives are financial instruments that derive their used to hedge risk and speculate on market movements, the value of which depends, at least in part, upon the value and risk factor of a related asset or liability." *Applied Derivatives*, Glossary, February 2002, found at http://www.appliedderivatives.com/glossary/index; and *The Derivatives 'Zine*, Derivatives Dictionary, November 2001, found at http://www.margrabe.com/Dictionary.

[4] *Th e Derivatives 'Zine,s supra* note 3.

[5] 7 U.S.C. § 1, et seq., as amended (West 1999).

[6] *Se e* 7 U.S.C.A. § 1a(12) (West Supp. 2001) (definition of "eligible contract participant").

[7] *Th e Derivatives 'Zine,s supra* note 3.

[8] *Id* .

[9] *App lied Derivative,s supra* note 3.

[10] *The Derivatives 'Zine,s supra* note 3.

[11] Sean M. Flanagan, Student Note, The Rise of a Trade Association: Group Interactions Within the International Swaps and Derivatives Association, 6 Harv. Negotiation L. Rev. 211, 235-236 (2001).

[12] *Id.*

[13] *Id.*

[14] *See* International Swaps and Derivatives Association, Inc., Who we are - Mission, at http://www.isda.org/wwa/index.html (last visited January 26, 2002).

[15] *Flanagan, supra* at 235-236.

[16] *Id.* at 234.

[17] *Id.* at 243-245.

[18] *Id.* at 243-245.

[19] *See* International Swaps and Derivatives Association, Inc., All About Membership, at http://www.isda.org/membership/index.html (last visited January 26, 2002).

[20] *See* International Swaps and Derivatives Association, Inc., Conferences, at http://www.isda.org/conf/index.html (last visited January 26, 2002).

[21] *E.g.*, http://www.isda.org/speeches/pdf/FeinsteinLetter.pdf.

[22] *See* ISDA, User's Guide to the 1992 ISDA Master Agreements (1993) (hereinafter ISDA User Guide); 1991 ISDA Definitions; 1994 ISDA Equity Definitions; ISDA Commodity Definitions.

[23] *See supra* Section V.

[24] International Swap Dealers Association, Inc., Master Agreement §§ 5-6, at 5 (1992) (hereinafter ISDA Master Agreement).

[25] *See* Section VII(E), *infra.*

[26] 11 U.S.C.A. § 362 (West Supp. 2001).

[27] *See infra* Section VII.

[28] *See ISDA Master Agreement, supra* note 6.

[29] *Id.*

[30] *E.g.*, many Master Agreements permit the set-off of amounts owed between the affiliates of the parties to the Master Agreement and/or amounts owed under physical commodity agreements between the parties to the Master Agreement and/or their affiliates.

[31] *E.g.*, If Party A declares an Event of Default due to Party B's default, and Party A owes Party B $30 million under the Master Agreement while Party B owes Party A $50 million under the Master Agreement, Party A risks having to pay Party B while not getting paid in return, an $80 million exposure. However, if set-off is employed, Party B would owe Party A $20 million, resulting in a $20 million exposure for Party A.

19

[32] This provision establishes that no agreements or indications of the intent of the parties exist regarding the subject of the Master Agreement other than those contained in the Master Agreement.

[33] For any modification of the master Agreement to be effective, both parties must sign the written document detailing the modification.

[34] Contracts that contain liquidated damages typically limit recovery to those liquidated damages. However, the Master Agreement in this provision permits the parties to any other remedy available to it, such as injunctive relief or specific performance, and permits the parties to seek such remedies without necessarily terminating the Master Agreement or any Transaction.

[35] As is typical in energy trading and marketing contracts, the Master Agreement permits the parties to exchange duplicate originals of the Agreement and/or signatures via fax with all such duplicates or facsimile copies constituting an original document for purposes of evidencing the contractual agreement of the parties. Further, the Master Agreement establishes that Transactions are binding as soon as they are agreed upon rather than at the time Confirmations are jointly executed, thus permitting a party to rely on an oral agreement and immediately establish other positions based on that oral agreement rather than requiring for the complete execution of the confirmation. It is not uncommon for days or weeks to elapse before a confirmation is fully executed, and without this provision parties would incur significant market risk in that the market could move substantially while the parties were awaiting the execution of confirmations. This provision greatly improves the efficiency of OTC derivative transactions, lowers transaction costs and decreases the likelihood that a counterparty will back out of a transaction on the basis that the transaction was not binding until a Confirmation was fully executed.

[36] In some cases a party's failure to take an action or waiver of a right can be construed by a court as a waiver of all similar rights. This provision rejects this approach in favor of permitting the parties to decline to exercise a right at any time without prejudicing any future rights.

[37] Headings and titles can sometimes be used to interpret the meaning of contractual provisions, but this section of the Master Agreement prevents headings from being used in such manner.

[38] See TEXAS CIV. PRAC. & REM CODE, § 38.001 (VERNON 1997).

[39] N.Y. Gen. Oblig. § 5-1401 (McKinney 1989).

[40] N.Y. Jud. L. 27(b) (McKinney 1989).

[41] This is occasionally a sticking point for quasi-governmental entities, but this issue can usually be separately negotiated in a mutually satisfactory manner and this provision serves the valuable role of identifying this issue for negotiation even if a party refuses to agree to its terms.

[42] 1991 ISDA Definitions; 1994 ISDA Equity Definitions; ISDA Commodity Definitions.

[43] The threshold is calculated using a threshold established by the parties and adding to it any collateral previously posted.

[44] This usually prohibits a party from holding collateral if it is affected by an ongoing Event of Default or Termination Event or fails to meet certain creditworthiness requirements.

[45] See supra Section VI(A).

[46] Parties frequently tie these thresholds to a matrix so the thresholds adjust themselves automatically in relation to changes in a party's credit ratings.

[47] See supra Section VI.

[48] See The Power Marketing Association Online, at http://www.pmaconference.com/topmarketers

[49] See Tex. Bus. Com. Code Ann. § 2.609 (Vernon 1994) (Right to Adequate Assurance of Performance) (The Uniform Commercial Code as set forth in the provisions of the Texas Business and Commerce Code will be hereinafter cited as the "U.C.C.").

[50] U.C.C. § 2-201 (Vernon 1994). The UCC Article 2 only applies to transactions between merchants for the sale of goods.

[51] U.C.C. § 9 et. Seq. (Vernon 1994).

[52] See supra Section VI.

[53] 11 U.S.C.A. § 553 (West Supp. 2001).

[54] See Studley v. Boylston National Bank, 229 U.S. 523, 528 (1913).

[55] See ISDA Master Agreement.

[56] See ISDA User's Guide, at 54.

[57] See ISDA Master Agreement, at 8. Parties often also elect to cause automatic termination to occur if a party's credit rating drops below investment grade.

[58] 11 U.S.C.A. § 362(b) (West Supp. 2001).

[59] See infra Section V.

---

[60] *See ISDA Master Agreemen,* at 15.

[61] *See supra* Section VII(E).

[62] ISDA offers all of its materials for sale at its website, www.isdsa.org.

[63] An example of this is the tension between the trader desiring to enter into OTC derivative transactions, who is incentivized to assume risk to maximize return, and legal counsel, who is incentivized to minimize the risk in the Master Agreement.