**Hearing Date:  July 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  July 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re                                                          :        **Chapter 11 Case No.**
: 
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :        **08-13555 (JMP)**
: 
Debtors.                              :        **(Jointly Administered)**
: 
---------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION FOR AN
### ORDER PURSUANT TO SECTION 365 OF THE
### BANKRUPTCY CODE APPROVING THE ASSUMPTION OF
### OPEN TRADE CONFIRMATIONS WITH THREE BASSO FUNDS

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtor, Lehman Commercial Paper Inc.

("LCPI," and together with LBHI, the "Debtors"), for entry of an order approving the

assumption of open trade confirmations with Basso Credit Opportunities Holding Fund Ltd.,

Basso Fund Ltd., and Basso Multi-Strategy Holding Fund Ltd. (collectively, the "Basso Funds"),

all as more fully described in the motion (the "Motion"), will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **July 15, 2009 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that the Debtors seek to assume the

executory contracts with the Basso Funds listed on the schedule annexed to the Motion as

Exhibit A and that the Basso Funds receiving this motion should locate their names and their

contracts, if any, on Exhibit A annexed thereto.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn: Richard L. Levine, Esq. and Jacqueline Marcus, Esq., attorneys for the Debtors;

(iii) the Office of the United States Trustee for the Southern District of New York (the "U.S.

Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-

Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy

Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck,

Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v)

any person or entity with a particularized interest in the Motion, so as to be received no later than

**July 10, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: June 30, 2009
     New York, New York

                       /s/ Jacqueline Marcus
                       Richard L. Levine
                       Jacqueline Marcus
                       WEIL, GOTSHAL & MANGES LLP
                       767 Fifth Avenue
                       New York, New York 10153
                       Telephone: (212) 310-8000
                       Facsimile: (212) 310-8007

                       Attorneys for Debtors
                       and Debtors in Possession

08-13555-mg    Doc 4249    Filed 06/30/09    Entered 06/30/09 17:47:23    Main Document
Pg 1 of 49
Hearing Date:  July 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline:  July 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
:
**In re**                                                    :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :        **08-13555 (JMP)**
:
**Debtors.**                                    :        **(Jointly Administered)**
:
----------------------------------------------------------------x

## DEBTORS' MOTION FOR AN
## ORDER PURSUANT TO SECTION 365 OF THE
## BANKRUPTCY CODE APPROVING THE ASSUMPTION OF
## OPEN TRADE CONFIRMATIONS WITH THREE BASSO FUNDS

**PLEASE TAKE NOTICE THAT THE DEBTORS SEEK COURT APPROVAL OF
THE ASSUMPTION OF ALL EXECUTORY CONTRACTS WITH BASSO
CREDIT OPPORTUNITIES HOLDING FUND LTD, BASSO FUND LTD, AND
BASSO MULTI-STRATEGY HOLDING FUND LTD (THE "BASSO FUNDS")
LISTED ON THE SCHEDULE ANNEXED HERETO AS EXHIBIT A AND THAT
THE BASSO FUNDS RECEIVING THIS MOTION SHOULD LOCATE THEIR
NAMES AND THEIR CONTRACTS ON EXHIBIT A**.

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtor,

Lehman Commercial Paper Inc. ("LCPI"), as debtors and debtors in possession (together,

the "Debtors" and, collectively with their debtor and non-debtor affiliates, "Lehman"),

file this Motion and respectfully represent:

**Background**

1.      Commencing on September 15, 2008, and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including

LCPI, commenced with this Court voluntary cases under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been

consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Debtors are authorized to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of

unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").

3.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and, by order dated

January 20, 2009, the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

5.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Lehman's Business

6.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman

has been a leader in the global financial markets by serving the financial needs of

corporations, governmental units, institutional clients, and individuals worldwide.  Its

headquarters in New York and regional headquarters in London and Tokyo were

complemented by a network of offices in North America, Europe, the Middle East, Latin

America and the Asia Pacific region.

7.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to these chapter 11 filings is contained in the

Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

Southern District of New York in Support of First-Day Motions and Applications, filed

on September 15, 2008 [Docket No. 2].

## Preliminary Statement

8.      Prior to the Commencement Date, the Debtors were active in the

secondary loan market as purchasers and sellers of both par and distressed commercial

loans.  The Debtors' prepetition secondary loan market trades were reflected in various

oral and written trade confirmations with counterparties (the "Trade Confirmations").

Generally, each Trade Confirmation represented a binding agreement to purchase or sell

positions at an agreed upon price in par or distressed loans, participations in par or

distressed loans, or claims against third parties.  Such transactions were generally

consummated and settled during the several weeks or months following the trade date

upon execution by the Debtors and the respective counterparties of formal transfer

documentation, payment by the purchaser of the applicable purchase price, and

completion of other formalities where necessary.

       9.     As of the Commencement Date, the Debtors had entered into, but had not

yet consummated and settled, hundreds of Trades Confirmations (the "Open Trade

Confirmations").  These included Open Trade Confirmations with each of the Basso

Funds, which are affiliates of Basso Capital Management, L.P. ("Basso Capital," and,

collectively with the Basso Funds, "Basso"), dated June 3, 2008, which reflected

purchases by each of the Basso Funds from LCPI (the "Basso Trades") of debt of

Greektown Holdings, L.L.C. (the "Greektown Debt").  Key details of the Basso Trades

are set forth on the schedule annexed hereto as Exhibit A.

       10.    The Basso Trades are executory contracts subject to assumption under

section 365 of the Bankruptcy Code.  LCPI is not in monetary default under any of the

Basso Trades.

       11.    On November 14, 2008, the Debtors filed the Motion for an Order

Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection

of Open Trade Confirmations [Docket No. 1541] (the "Open Trades Motion").  The Open

Trades Motion sought, *inter alia*, an order approving LCPI's rejection of the Basso

Trades.  The Debtors subsequently filed revised exhibits to the Open Trades Motion, by

which the Debtors sought, *inter alia*, an order approving the assumption of the Basso

Trades. On December 16, 2008, the Court entered the Order Pursuant to Section 365 of

the Bankruptcy Code Approving the Assumption or Rejection of Open Trade

Confirmations [Docket No. 2258] (the "Open Trades Order"), in which, *inter alia*, the

Court approved LCPI's assumption of the Basso Trades.

12.     On May 7, 2009, Basso filed the Motion of Basso Capital Management,

L.P. for Relief Concerning Certain Contracts that Debtor Moved to Reject, Then Sought

to Assume Without Providing Sufficient Notice and an Opportunity to Object (the "Basso

Motion for Relief"), contending, among other things, that Basso did not receive proper

notice of the Open Trades Motion's revised requested relief and arguing, *inter alia*, that

the Court should enter an order approving the rejection of the Basso Trades. The Debtors

timely filed an objection to the Basso Motion for Relief.

13.     On June 29, 2009, the Court entered an order granting in part and denying

in part the Basso Motion for Relief [Docket No. 4231] (the "June 29 Order"). The June

29 Order provides that the Open Trades Order is vacated only to the extent that it

approved assumption of the Basso Trades. The June 29 Order provides that the Basso

Motion for Relief is denied to the extent it sought an order approving rejection of the

Basso Trades. The June 29 Order provides that the Debtors are granted leave to file a

new motion to assume or reject the Basso Trades and states that such motion may be filed

"notwithstanding anything to the contrary" in the Revised Stipulation and Agreed Order

Resolving Motion to Compel [Docket No. 1400] (the "Stipulation"), to the extent the

Stipulation is applicable. Accordingly, the Debtors now file this motion, seeking an order

approving LCPI's assumption of the Basso Trades.

**Relief Requested**

14.     The Debtors respectfully request, pursuant to section 365(a) of the

Bankruptcy Code, Rule 6006 of the Bankruptcy Rules, and Rule 6006-1 of the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules"), an order

approving the assumption of the Basso Trades.

15.     The Debtors also seek a finding in such order that there are no cure

amounts owed with respect to any of the Basso Trades and that the Debtors have

provided Basso adequate assurance of LCPI's future performance thereunder.

16.     In addition, the Debtors seek a provision in such order that Basso shall not

be entitled to assert or take any act to exercise a right to set off any prepetition claim that

it might have against any of the Debtors against any obligation to LCPI with respect to

the Basso Trades.

**The Relief Requested is in the Best Interests
of the Debtors and their Estates and Creditors**

17.     Section 365(a) of the Bankruptcy Code empowers a debtor in possession,

"subject to the court's approval, [to] assume or reject any executory contracts or

unexpired leases of the debtor." 11 U.S.C. § 365(a).  A chapter 11 debtor in possession

"may assume or reject an executory contract . . . at any time before the confirmation of a

plan," unless the court, on the request of any party to such contract, orders otherwise.  11

U.S.C. § 365(d)(2).  In determining whether to approve the assumption or rejection of

executory contracts and leases of the debtor, courts apply the deferential "business

judgment" standard.  *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78

F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion*

*Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993). "More exacting scrutiny would slow

the administration of the debtor's estate and increase its cost, interfere with the

Bankruptcy Code's provision for private control of administration of the estate, and

threaten the court's ability to control a case impartially." *Richmond Leasing Co. v.*

*Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

18.    The Basso Trades are executory contracts subject to assumption under

section 365 because performance, namely transfer of the Greektown Debt by LCPI and

payment of the purchase price by Basso, remains due on both sides. *See Nat'l Labor*

*Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984).

19.    The Debtors believe the relief requested herein – an order approving

assumption of the Basso Trades – reflects a sound exercise of business judgment because

assumption of the Basso Trades will maximize the recovery to be realized by the

Debtors' estates. Specifically, the terms provided in the Basso Trades are more favorable

to LCPI than what is available for the Greektown Debt in today's secondary market. Put

another way, LCPI will realize a greater recovery as a result of assumption of the Basso

Trades than it would through rejection of such trades followed by the sale of the

Greektown Debt on the open market based on current market prices. LCPI's proposed

assumption of the Basso Trades, therefore, reflects the Debtors' exercise of sound

business judgment.

20.    Based upon the foregoing, the Debtors submit that the proposed

assumption of the Basso Trades should be approved as being in the best interests of the

Debtors and their estates and creditors.

**Setoff By Basso of Prepetition Claims Against
Its Obligations Under the Basso Trades Would Be Impermissible**

21.     To the extent that it has prepetition claims against any Debtor, including
LCPI, Basso may not set off such claims against obligations to LCPI under the Basso
Trades.

22.     Section 553 of the Bankruptcy Code preserves in bankruptcy the state law
right of setoff.  11 U.S.C. § 553.  It is well-established that in order for a setoff to be
permissible, there must be mutuality of obligations.  *See* 11 U.S.C. § 553; *In re Shoppers
Paradise, Inc.*, 8 B.R. 271, 277 (Bankr. S.D.N.Y. 1980).  Thus, prepetition obligations
may be set off against prepetition obligations and postpetition obligations—such as the
Basso Trades if assumption is approved by the Court—may be set off against postpetition
obligations.  "Traditionally, there has been no crossover of claims because the debtor and
the debtor-in-possession are two separate and distinct entities which act in different
capacities pre-and post-petition."  *In re Genuity*, 323 B.R. 79, 82 (Bankr. S.D.N.Y. 2005)
(citing *Shopmen's Local 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir.
1975)); *Shoppers Paradise, Inc.*, 8 B.R. at 279.

23.     The burden lies with the party seeking setoff to prove its right to do so
and, thus, to establish the requisite mutuality.  *See Official Comm. of Unsecured
Creditors v. Mfrs. and Traders Trust Co. (In re the Bennett Funding Group, Inc.)*, 212
B.R. 206, 212 (B.A.P. 2d Cir. 1997), *aff'd*, 146 F.3d 136 (2d. Cir. 1998).  Moreover,
mutuality is strictly construed against the party seeking the right of setoff.  *See Bennett
Funding,* 212 B.R. at 212 ("A narrow interpretation of mutuality ensures that setoff is
allowed only in situations in which the equitable considerations are the strongest")

(quoting with approval *In re Ionosphere Clubs, Inc.* 164 B.R. 839, 843 (Bankr. S.D.N.Y. 1994)).

24.    The effect of assumption of the Basso Trades under section 365(a) of the Bankruptcy Code will be to require Basso to perform its obligations on a *postpetition* basis.  Indeed, LCPI's obligation to close the Basso Trades, if assumed, will be treated as postpetition administrative obligations of the LCPI estate.  *See, e.g.*, *Nat'l Labor Relations Bd. v. Bildisco and Bildisco*, 465 U.S. 513 (1984) ("Should the debtor-in-posession elect to assume the executory contract, however, it assumes the contract *cum onere*, and the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate") (citations omitted).  Thus, any purported exercise of a right of setoff of a prepetition claim against the consummation of the Basso Trades would entail the improper setoff of a prepetition unsecured claim owed by a Debtor against Basso's postpetition obligations to LCPI (the purchase price under the Basso Trades).

25.    Consistent with the foregoing, several courts have found that it is impermissible under section 553 to set off prepetition claims against obligations under assumed contracts.  *See, e.g.*, *In re Evatt*, 112 B.R. 405, 415 (Bankr. W.D. Okl. 1989); *In re Walat Farms Inc.*, 69 B.R. 529, 534 (Bankr. E.D. Mich. 1987).  *See also* 4 NORTON BANKR. L. & PRAC. 3d § 73:4 (2008) ("[T]he assumption of a contract postpetition may give rise to a postpetition obligation that is no longer a mutual debt with a prepetition obligation").  *But see In re Gerth*, 991 F.2d 1428, 1432 (8th Cir. 1993) (finding that government could offset its prepetition claim against its obligation to pay the debtor under an assumed contract).

26.     Inasmuch as the requisite mutuality of the proposed setoff is lacking, and
for equitable reasons, the Debtors seek entry of an order providing that no Basso entity
shall be entitled to assert or take any act to exercise a right to set off any prepetition claim
against its obligations to LCPI under the Basso Trades if assumed.

### LCPI Is Not In Default and Thus Neither Cure Nor
### Adequate Assurance of Future Performance is Required

27.     A debtor assuming an executory contract pursuant to section 365(a) of the
Bankruptcy Code is required under section 365(b) to cure and to provide adequate
assurance of future performance only if there has been a default by the debtor.  11
U.S.C. § 365(b).  Here, there has been no default by LCPI with respect to any of the
Basso Trades.  In fact, LCPI's obligations thereunder, consisting chiefly of its obligation
to deliver certain transfer documentation (the "Transfer Certificates") required to effect
the assignment of the Greektown Debt to Basso, are not yet due, and LCPI stands ready,
willing and able to perform.

28.     Specifically, under the Trade Confirmations documenting the Basso
Trades (the "Basso Trade Confirmations"), copies of which are annexed hereto as Exhibit
B, delay in settlement does not constitute a default.  Each of the Basso Trade
Confirmations incorporates the Standard Terms and Conditions for Distressed Trade
Confirmations published by the Loan Syndications and Trading Association, Inc.
published as of December 1, 2006 (the "LSTA Standard Terms"), a copy of which is
annexed hereto as Exhibit C.  Neither the LSTA Standard Terms nor the Basso Trade
Confirmations require that the Basso Trades settle by any date certain.  Rather, the LSTA
Standard Terms provide that the "target" settlement date for trades governed thereunder

is "as soon as practicable after the Trade Date." LSTA Standard Terms, ¶ 1. The LSTA

Standard Terms further provide that "a valid and binding obligation to settle the trade

nevertheless continues to exist" even if the buyer and seller are unable to effect

settlement of the trade as specified in the Trade Confirmation, and requires that delayed

settlement compensation be added to the purchase price on the trade in the event that it

takes longer than 20 days to settle. LSTA Standard Terms, ¶¶ 1, 6. Accordingly, the

LSTA Standard Terms are clear that a trade continues to exist even though it settles

outside of the "target" settlement range, and nothing in the Basso Trade Confirmations

required that the Basso Trades settle by any certain date.

29.     In sum, until LCPI and Basso consensually select a settlement date for the

Basso Trades, performance thereunder is not yet due. To the extent that the LSTA

Standard Terms obligated LCPI to exert "reasonable efforts" to provide required transfer

documentation, *see* LSTA Standard Terms, ¶ 10, LCPI's efforts to settle the Basso

Trades up to and including the Commencement Date were reasonable, as was its

temporary pause in continuing its effort to settle the Basso Trades after that date. There

is thus no default under the Basso Trades, and, consequently, no obligation to cure or to

provide adequate assurance of future performance.

### LCPI Stands Ready to
### Perform Under the Basso Trades

30.     LCPI stands ready to perform its obligations under the Basso Trades.

LCPI's sole remaining obligation thereunder is the completion and delivery to Basso of

the Transfer Certificates in exchange for the purchase price to be paid by Basso. The

present case does not present a situation in which a contractual counterparty is required to

continue to receive performance from its bankrupt counterparty for a lengthy period of time.  Here, LCPI is able to perform fully under the Basso Trades in a single act.  LCPI holds the Greektown Debt that is the subject of the Basso Trades in its inventory and is prepared to promptly deliver the Transfer Certificates upon entry of an order approving the assumption of the Basso Trades and agreement with Basso on a settlement date.  No further assurance of performance is required.

### Notice

31.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) Stroock & Stroock & Lavan, LLP 180 Maiden Lane, New York, New York 10038, Attn: Melvin A. Brosterman, Esq., Harold A. Olsen, Esq., and Dina Kolker, Esq., as agents for Basso; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

32.     The Debtors initially sought to assume the Basso Trades pursuant to the

Open Trades Motion.  As described above, the Court has permitted the Debtors to file a

new motion seeking the Court's approval of LCPI's assumption or rejection of such

trades.  No other request for the relief sought herein has been made by the Debtors to this

or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: June 30, 2009
       New York, New York

                                        /s/ Jacqueline Marcus
                                        Richard L. Levine
                                        Jacqueline Marcus
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

**EXHIBIT A**

**(The Basso Trades)**

| Trade Counterparty | Borrower | Tranche | B/S | Trade Date |
|---|---|---|---|---|
| Basso Credit Opportunities Holding Fund Ltd. | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |
| Basso Fund Ltd | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |
| Basso Multi-Strategy Holding Fund Ltd | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |

**EXHIBIT B**

**(The Basso Trade Confirmations)**

DECEMBER 2006

# LEHMAN COMMERCIAL PAPER INC
## LSTA DISTRESSED TRADE CONFIRMATION

**To:**    **Basso Multi-Strategy Holding Fund Ltd.**
          **Contact: Cristin Caufield**
          **Tel No.: 203-352-6109**
          **Fax.:**
          **Email: ccaufield@bassocapital.com**

**From:**  **Lehman Commercial Paper Inc.**
          **Contact: Tina Wong**          **Confirms:**   **Jenna Yoo**
          **Tel No.:  212-526-2044**       **Tel. No.:**   **212-526-2081**
          **Fax No.:  646-758-4993**       **Fax No.:**    **646-834-1847**
          **Email:   tina.wong@lehman.com**  **Email:**     **jenna.yoo@lehman.com**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | June 3, 2008 |
| **Seller:** | Lehman Commercial Paper Inc.[2] ☒ Principal[3] ☐ Agent |
| **Buyer:** | Basso Multi-Strategy Holding Fund Ltd.[4] ☒ Principal[3] ☐ Agent |
| **Credit Agreement:** | CREDIT AGREEMENT, dated as of December 2, 2005, among GREEKTOWN HOLDINGS, L.L.C. and GREEKTOWN HOLDINGS II, INC., as the Borrowers, VARIOUS FINANCIAL INSTITUTIONS, as the Lenders, KEYBANK NATIONAL ASSOCIATION, as the Existing Issuer, NATIONAL CITY BANK OF THE MIDWEST, as the Replacement Issuer, MERRILL LYNCH, PIERCE, FENNER AND SMITH INCORPORATED, as the Sole Lead Arranger, the Sole Book Runner and the Syndication Agent, MERRILL LYNCH CAPITAL CORPORATION, as the Administrative Agent, and WACHOVIA SECURITIES, NATIONAL CITY BANK OF THE MIDWEST, WELLS FARGO BANK, NATIONAL ASSOCIATION and FIFTH THIRD BANK, as the Co-Documentation Agents. |
| **Borrower:** | GREEKTOWN HOLDINGS, L.L.C.[5] |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

**LSTA EFFECTIVE DECEMBER 2006** Copyright © LSTA 2006. All rights reserved.

2

| | | |
|---|---|---|
| **Form of Purchase:** | If no election is made, "Assignment" applies. | |
| | ☒ Assignment | |
| | ☐ Participation | |
| | ☐ Other: _____ | |

**Purchase Amount/**
**Type of Debt:**

| Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|
| | Term B Loan | T/L B | N/A |

**Purchase Rate:**

**Accrued Interest:**    ☒ Settled Without Accrued Interest

☐ Trades Flat

**Credit Documentation**    ☒ Yes (only applicable if Buyer was not a lender on Trade Date and
**to be provided by Seller:**        made its request on or prior to Trade Date)

☒ No

**LSTA Standard**    ☐ This Transaction shall be subject to the successful completion of the
**Other Terms of Trade:**        purchase by Seller of the Purchase Amount of the Debt to be sold to
Buyer hereunder

☐ This Transaction shall be subject to the successful completion of the
sale by Buyer of the Purchase Amount of the Debt to be purchased
from Seller hereunder

☐ Flip representations shall apply (election is applicable only if Seller is
a Riskless Principal (i.e., the first box above has been checked), the
settlement of the sale of the Purchase Amount of the Debt to Buyer
from Seller occurs no later than one (1) business day after the
settlement of the purchase of the Purchase Amount of the Debt by
Seller from Seller's immediate prior seller(s) and the other criteria
specified in Section 11 of the Standard Terms and Conditions are
met)

**Trade Specific**    ☒ Unless otherwise specified herein, Lehman Commercial Paper Inc.
**Other Terms of Trade:**        shall not be required to pay (in the aggregate) more than one half of one
Agent transfer fee for transactions specified in this or any other
confirmation) allocated by an investment manager or advisor to multiple
funds or accounts. [9]

---

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

3

**Subject to:**          Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jenna Yoo* at the following fax number(s) or e-mail address Jenna.yoo@lehman.com.

If you have any questions, please contact *Jenna Yoo at 212-526-2081.*

**Lehman Commercial Paper Inc**        **Basso Multi-Strategy Holding Fund Ltd.**

By:_____      By:_____

Name:_____    Name:_____
                           Joseph J. Schultz

Title:_____    Title: Chief Operating Officer

Date:_____    Date:_____

DECEMBER 2006

# LEHMAN COMMERCIAL PAPER INC
## LSTA DISTRESSED TRADE CONFIRMATION

### REVISED 9.10.08

To:    **Basso Fund Ltd.**
      **Contact: Cristin Caufield**
      **Tel No.: 203-352-6109**
      **Fax.:**
      **Email: ccaufield@bassocapital.com**

From:  **Lehman Commercial Paper Inc.**
      **Contact: Tina Wong**

| | | | |
|---|---|---|---|
| **Tel No.:** | **212-526-2044** | **Confirms:** | **Jenna Yoo** |
| **Fax No.:** | **646-758-4993** | **Tel. No.:** | **212-526-2081** |
| **Email:** | **tina.wong@lehman.com** | **Fax No.:** | **646-834-1847** |
| | | **Email:** | **jenna.yoo@lehman.com** |

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | June 3, 2008 |
| **Seller:** | Lehman Commercial Paper Inc.[2] ☒ Principal[3] ☐ Agent |
| **Buyer:** | Basso Fund Ltd.[4] .☒ Principal[3] ☐ Agent |
| **Credit Agreement:** | CREDIT AGREEMENT, dated as of December 2, 2005, among GREEKTOWN HOLDINGS, L.L.C. and GREEKTOWN HOLDINGS II, INC., as the Borrowers, VARIOUS FINANCIAL INSTITUTIONS, as the Lenders, KEYBANK NATIONAL ASSOCIATION, as the Existing Issuer, NATIONAL CITY BANK OF THE MIDWEST, as the Replacement Issuer, MERRILL LYNCH, PIERCE, FENNER AND SMITH INCORPORATED, as the Sole Lead Arranger, the Sole Book Runner and the Syndication Agent, MERRILL LYNCH CAPITAL CORPORATION, as the Administrative Agent, and WACHOVIA SECURITIES, NATIONAL CITY BANK OF THE MIDWEST, WELLS FARGO BANK, NATIONAL ASSOCIATION and FIFTH THIRD BANK, as the Co-Documentation Agents. |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

**LSTA EFFECTIVE DECEMBER 2006** Copyright © LSTA 2006. All rights reserved.

2

| | |
|---|---|
| **Borrower:** | GREEKTOWN HOLDINGS, L.L.C.[5] |
| **Form of Purchase:** | If no election is made, "Assignment" applies. |
| | ☒ Assignment |
| | ☐ Participation |
| | ☐ Other: _____ |

| **Purchase Amount/ Type of Debt:** | Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|---|
| | | Term B Loan | T/L B | N/A |

**Purchase Rate:**

| | |
|---|---|
| **Accrued Interest:** | ☒ Settled Without Accrued Interest |
| | ☐ Trades Flat |
| **Credit Documentation to be provided by Seller:** | ☒ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date) |
| | ☐ No |
| **LSTA Standard Other Terms of Trade:** | ☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder |
| | ☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder |
| | ☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria specified in Section 11 of the Standard Terms and Conditions are met) |
| **Trade Specific Other Terms of Trade:** | ☒ Unless otherwise specified herein, Lehman Commercial Paper Inc. shall not be required to pay (in the aggregate) more than one half of one Agent transfer fee for transactions specified in this or any other confirmation) allocated by an investment manager or advisor to multiple funds or accounts. [9] |

---

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from

3

|  | See Rider below (pg 4) |
|---|---|
| **Subject to:** | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jenna Yoo* at the following fax number(s) or e-mail address Jenna.yoo@lehman.com.

If you have any questions, please contact *Jenna Yoo at 212-526-2081.*

**Lehman Commercial Paper Inc**                    **Basso Fund Ltd.**

By:_____            By:_____

Name:_____           Name:_____
                                        Joseph J. Schultz

Title:_____          Title: Chief Operating Officer

Date:_____           Date:_____

(..continued)

the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

4

**Rider 1**

Seller and Buyer agree that Buyer's Representation 5.1(j) in the PSA shall be deleted in its entirety and replaced with the following:

"Either (i) no interest in the Transferred Rights is being acquired by or on behalf of an Entity that is, or at any time while the Transferred Rights are held thereby will be, one or more Benefit Plans or (ii) the funds being used by Buyer to purchase the Transferred Rights are from a fund managed by a Qualified Professional Asset Manager (the "Manager"), within the meaning of Part V of PTE 84-14, the Manager made the investment decision on behalf of Buyer to purchase the Transferred Rights from the Seller as contemplated by this Agreement, and the purchase of the Transferred Rights hereunder satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and the individual making the investment decision to transfer the Transferred Rights on behalf of the Buyer has no actual knowledge (after reasonable inquiry and investigation) that the requirements of subsection (a) of Part I of PTE 84-14 are not satisfied.  Buyer and Basso Capital Management, in its capacity as Manager of Buyer, each represent and warrant to Seller that Seller has not acted and will not act as a fiduciary, as such term is defined in Section 3(21) of ERISA, with respect to the purchase and holding of the Transferred Rights by the Buyer and the exercise of Seller's or Buyer's rights related thereto."

DECEMBER 2006

# LEHMAN COMMERCIAL PAPER INC
## LSTA DISTRESSED TRADE CONFIRMATION

**To:**  **Basso Credit Opportunities Holding Fund Ltd.**
  **Contact: Cristin Caufield**
  **Tel No.: 203-352-6109**
  **Fax.:**
  **Email: ccaufield@bassocapital.com**

**From:**  **Lehman Commercial Paper Inc.**
  **Contact: Tina Wong**       **Confirms:**   **Jenna Yoo**
  **Tel No.:  212-526-2044**    **Tel. No.:**   **212-526-2081**
  **Fax No.:  646-758-4993**    **Fax No.:**    **646-834-1847**
  **Email:    tina.wong@lehman.com**   **Email:**   **jenna.yoo@lehman.com**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below.  Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | June 3, 2008 |
| **Seller:** | Lehman Commercial Paper Inc.[2] ☒ Principal[3] ☐ Agent |
| **Buyer:** | Basso Credit Opportunities Holding Fund Ltd.[4] ☒ Principal[3] ☐ Agent |
| **Credit Agreement:** | CREDIT AGREEMENT, dated as of December 2, 2005, among GREEKTOWN HOLDINGS, L.L.C. and GREEKTOWN HOLDINGS II, INC., as the Borrowers, VARIOUS FINANCIAL INSTITUTIONS, as the Lenders, KEYBANK NATIONAL ASSOCIATION, as the Existing Issuer, NATIONAL CITY BANK OF THE MIDWEST, as the Replacement Issuer, MERRILL LYNCH, PIERCE, FENNER AND SMITH INCORPORATED, as the Sole Lead Arranger, the Sole Book Runner and the Syndication Agent, MERRILL LYNCH CAPITAL CORPORATION, as the Administrative Agent, and WACHOVIA SECURITIES, NATIONAL CITY BANK OF THE MIDWEST, WELLS FARGO BANK, NATIONAL ASSOCIATION and FIFTH THIRD BANK, as the Co-Documentation Agents. |
| **Borrower:** | GREEKTOWN HOLDINGS, L.L.C.[5] |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below.  (See Sections 11 and 19 of the Standard Terms and Conditions.)  It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

**LSTA EFFECTIVE DECEMBER 2006**  Copyright © LSTA 2006. All rights reserved.

2

| **Form of Purchase:** | If no election is made, "Assignment" applies. |
|---|---|

☒ Assignment

☐ Participation

☐ Other: _____

| **Purchase Amount/<br>Type of Debt:** | Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|---|
| | | Term B Loan | T/L B | N/A |

**Purchase Rate:**

**Accrued Interest:**  ☒ Settled Without Accrued Interest

☐ Trades Flat

**Credit Documentation to be provided by Seller:**  ☒ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date)

☒ No

**LSTA Standard Other Terms of Trade:**  ☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder

☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder

☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria specified in Section 11 of the Standard Terms and Conditions are met)

**Trade Specific Other Terms of Trade:**  ☒ Unless otherwise specified herein, Lehman Commercial Paper Inc. shall not be required to pay (in the aggregate) more than one half of one Agent transfer fee for transactions specified in this or any other confirmation) allocated by an investment manager or advisor to multiple funds or accounts. [9]

---

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

3

| Subject to: | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jenna Yoo* at the following fax number(s) or e-mail address Jenna.yoo@lehman.com.

If you have any questions, please contact *Jenna Yoo at 212-526-2081.*

**Lehman Commercial Paper Inc**                    **Basso Credit Opportunities Holding Fund Ltd.**

By:_____

Name:_____

Title:_____

Date:_____

By:_____

Name:_____

Title: Joseph J. Schultz

Date: Chief Operating Officer

**EXHIBIT C**


**(LSTA Standard Terms and Conditions for
Distressed Trade Confirmations)**



### Standard Terms and Conditions for Distressed Trade Confirmations
(Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)

The following are the Standard Terms and Conditions for Distressed Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006. Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Distressed Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections herein, if any, in which such capitalized terms are defined. All references to specific section numbers in Sections 11 and 12 below, "Flip Representations" and "Step-Up Provisions," respectively, relate to the December 2006 version of the LSTA Purchase and Sale Agreement for Distressed Trades and successor provisions thereto. As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1.  **Target Settlement/Settlement Date/Transfer of Debt:** The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder.

    Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

    If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2.  **Purchase Amount/Type of Debt:** The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt," respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit or loans), and (c) a claim amount is fully funded with no further funding obligations (but may be subject to adjustment). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3.  **Permanent Reductions:** The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

4. **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraphs of this Section 4 with regard to a Multi-Currency Commitment or Proceeds (each as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date. For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

With respect to Proceeds, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Proceeds on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of the Debt on the date immediately prior to the Restructuring Date (as defined below) minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Restructuring Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date through the Restructuring Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date minus (e) 100% multiplied by the amount of any cash Proceeds received by Seller from the Restructuring Date through and including the Settlement Date. Subject to the terms of Section 5, "Interest Payments and Fees" below, Buyer shall be entitled to receive all proceeds or other distributions received by Seller with respect to the Proceeds from and after the Restructuring Date, including, without limitation, pursuant to clause (e) above, a credit equal to 100% multiplied by the amount of any cash Proceeds and including a credit equal to 100% multiplied by any Permanent Reductions effected with respect to any Proceeds. If the Debt immediately prior to the Restructuring Date was a Multi-Currency Commitment, then clauses (a) and (b) of the immediately preceding sentence shall be replaced by the following clauses: "(a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans immediately prior to the Restructuring Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount immediately prior to the Restructuring Date in the Master Currency". Notwithstanding any other provision of this paragraph, if the Transaction settles on a "Settled Without Accrued Interest" basis, then any Interest and Accruing

2

Fees paid with respect to any debt instrument included within the Proceeds shall be allocated between Buyer and Seller in accordance with the sixth paragraph of Section 5, "Interest Payments and Fees," below. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

As used herein:

"Restructuring Date" means the effective date of any reorganization, restructuring or conversion with respect to the Debt.

"Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

"Master Currency" means the currency in which the Facility is principally denominated.

"Proceeds" means if, prior to the Settlement Date, the Debt has been reorganized, restructured, converted or otherwise modified, any proceeds or other distributions received by Seller with respect to the Debt pursuant to such reorganization, restructuring, conversion or other modification.

5. **Interest Payments and Fees:** Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents or the Adequate Protection Order (such amounts, "PIK Interest"). Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees and Adequate Protection Payments (as defined below) are allocated: (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Price Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

If "Trades Flat" is specified in the Confirmation, subject to the application of clause (a) of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees and, if applicable, Adequate Protection Payments unpaid as of the Trade Date, whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, shall be for the account of Buyer and, if paid to Seller after the Settlement Date, shall promptly be paid by Seller to Buyer.

If "Settled Without Accrued Interest" is specified in the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller. Buyer shall pay to Seller any

3

such Interest and Accruing Fees promptly upon any receipt thereof by Buyer; so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of the obligor(s) under the Credit Agreement. Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof. The foregoing notwithstanding, if (i) Buyer and Seller agree that the treatment of Interest and Accruing Fees shall be on a "Settled Without Accrued Interest" basis and (ii) the obligor(s) is/are making Adequate Protection Payments in accordance with an Adequate Protection Order (as defined below), then any such Adequate Protection Payments shall, subject to Section 6, "Compensation for Delayed Settlement," below, be allocated on a "Settled Without Accrued Interest" basis as if such Adequate Protection Payments were Interest and Accruing Fees. The parties may elect to have terms contrary to those of the immediately preceding sentence control their Transaction by expressly specifying such contrary terms in the "Trade Specific Other Terms of Trade" section of the Confirmation.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation For Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date. If the obligor(s) thereafter pay(s) the Paid on Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount. If, however, the Paid on Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer. If the obligor(s) fail(s) to pay the Paid on Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date; by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein:

"Adequate Protection Order" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"Adequate Protection Payments" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1] In addition, solely for purposes of determining the Commencement Date (as defined below), Business Day excludes any day on which the New York

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

4

Stock Exchange is closed.[2]  For purposes of determining the LIBO Rate (as defined below) Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

6.  **Compensation for Delayed Settlement**:  If settlement occurs on a Delayed Settlement Date (as defined below), the parties shall pay "delayed compensation" for each day during the Delay Period (as defined below) as follows:

(a)  Buyer shall pay Seller (or if Seller is required to pay Buyer the Purchase Price, Seller shall pay Buyer) on the Delayed Settlement Date an amount equal to interest that would accrue for each day during the Delay Period at the Average LIBO Rate (as defined below) on an amount equal to the Purchase Price calculated as of the Commencement Date according to the applicable method described in Section 4, "Purchase Price Calculation," above (but without adjustment for delayed compensation payable hereunder or any Assignment Fees or Consent to Transfer Fees) substituting the phrase "Commencement Date" for the phrase "Settlement Date" appearing therein (and utilizing the loan and commitment amounts outstanding on the Commencement Date); _provided_ that if the Purchase Price so calculated as of the Delayed Settlement Date has increased or decreased more than 25% from the Purchase Price so calculated as of the Commencement Date, then such payment shall be calculated based on the Purchase Price so calculated on each day during the Delay Period.

(b)  If the applicable trade settles on a "Settled Without Accrued Interest" basis, then Seller shall pay or credit to Buyer on the Delayed Settlement Date (free of any withholding, setoff, recoupment or deduction of any kind) any Interest and Accruing Fees and, if applicable, Adequate Protection Payments accrued (regardless of whether paid or otherwise credited to Seller) with respect to the Purchase Amount and allocable to the Delay Period.  If Borrower fails to pay on or prior to the scheduled due date thereof (taking into account any applicable grace period) in accordance with the Credit Agreement or the Adequate Protection Order, as applicable, any Interest and Accruing Fees or Adequate Protection Payments that were paid or credited to Buyer on the Delayed Settlement Date pursuant to this paragraph (b), then Buyer shall, upon demand by Seller, pay Seller an amount equal to the portion of such Interest and Accruing Fees or Adequate Protection Payments that were not paid to Seller, _plus_ interest that would accrue for each day on such amounts at the Federal Funds Rate (as defined below).  If all or part of such Interest and Accruing Fees and, if applicable, Adequate Protection Payments is paid other than in cash, and the property received cannot be transferred to Buyer, the parties shall mutually agree as soon as practicable on the cash value thereof to be transferred by Seller to Buyer or, if the parties shall mutually agree, on the appropriate participation arrangements in respect thereof.

As used herein:

"Average LIBO Rate" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"Commencement Date" means the date twenty (20) Business Days after the Trade Date.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

---

[2] The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613686.html.

[3] When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "Website"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period. The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

5

"Delay Period" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"Federal Funds Rate" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such day transactions received by the parties from three federal funds brokers of recognized standing selected by the parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day. For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

7. **Breakfunding:** No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8. **Assignment Fees and Consent to Transfer Fees:** Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as is specified in the Credit Agreement and (b) any transfer fee payable to the grantor in connection with the transfer of a participation ("Consent to Transfer Fees") shall be paid by Seller in such amount as is specified in the applicable participation agreement (or, if not so specified, in a reasonable amount requested by the grantor).

9. **Costs and Expenses:** Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction. Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date. Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:** In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) and, unless otherwise specified in the Confirmation, a supplemental purchase and sale agreement substantially similar to the current LSTA form of Purchase and Sale Agreement for Distressed Trades (taking into account related predecessor transfer documents ("Predecessor Transfer Documentation"), if any). In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in distressed loan assets. Any such referenced assignment agreement, supplemental purchase and sale agreement and/or participation agreement is hereinafter referred to as the "Transfer Documentation." Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents obtained, by Seller. Seller shall use reasonable efforts to send Buyer the Confirmation no later than one (1) Business Day after the Trade Date. Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller. Seller shall use reasonable efforts to furnish Buyer drafts of the applicable Transfer Documentation, together with any related Predecessor Transfer Documentation, subject to applicable confidentiality provisions contained in such documents, within six (6) Business Days after the Trade Date.

6

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| By: T + 1 → | By: T + 2 → | By: T + 6 |
|---|---|---|
| Sender delivers Confirmation to Counterparty | Counterparty returns executed Confirmation (or requested changes thereto) to Sender | Sender delivers Predecessor Transfer Documentation and draft Transfer Documentation to Counterparty |

11. **Flip Representations:** Flip representations are appropriate only if Seller is acting as a Riskless Principal (as defined below), and only if the settlement of the purchase of the Debt by Buyer from Seller occurs no later than one (1) Business Day after the settlement of the sale of the Debt to Seller by Seller's immediate prior seller(s) (the "Flip Representation Deadline"). In the event that flip representations are applicable, the Transfer Documentation shall contain representations with respect to title (Section 4.1(d)), outstanding principal amount and commitment (Section 4.1(f)), future funding obligations (Section 4.1(g)) and, if applicable, the proof of claim filing (Section 4.1(v)) that will be limited by assuming the truth and accuracy of the representations and warranties on such matters made to Seller by the immediate prior seller(s). In addition, Seller shall give Buyer a reasonable opportunity to (a) review and comment on Seller's Predecessor Transfer Documentation prior to Seller's execution and delivery thereof and (b) close its purchase from Seller contemporaneously with Seller's upstream purchase. However, if Seller is ready, willing and able to close its sale to Buyer within the Flip Representation Deadline, but is unable to do so because Buyer is unable or unwilling to close at such time, then the Flip Representation Deadline shall be deemed met and flip representations shall apply; provided that, if both Seller and Buyer are willing and able to close Seller's sale to Buyer within the Flip Representation Deadline but are unable to do so because the required consents for Buyer's purchase from Seller have not been obtained within the Flip Representation Deadline despite the exercise by each of Buyer and Seller of commercially reasonable efforts to obtain such consents, then flip representations shall not apply.

12. **Step-Up Provisions:** Seller shall provide to Buyer customary step-up provisions with respect to those prior sellers, if any, that transferred the Debt on par documents on or after such date as is reasonably determined to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation. Such representations, indemnities and other provisions shall reference only such prior sellers that transferred the Debt on a par documentation basis at a time that market convention for transferring such Debt was to use distressed documentation. If step-up provisions apply, the purchase and sale agreement or participation agreement with respect to the Purchase Amount of the Debt shall be modified to include a reference to all appropriate prior sellers in (a) the definition of "Retained Obligations" (Section 1.2), (b) the representations with respect to actual or threatened proceedings (Section 4.1(e)), funding obligation (Section 4.1(g)), acts and omissions (Section 4.1(h)), performance of obligations (Section 4.1(i)), no setoff (Section 4.1(l)), no consents or waivers (Section 4.1(t)) and no execution of other documents (Section 4.1(u)), (c) the disgorgement section of the indemnity provision (Section 6.1(b)) and (d) the distributions section (Section 8.2).

In consulting as to the appropriate date on which market convention shifted from a par documentation basis to a distressed documentation basis, the parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the date on which such market convention shifted or, if results have not been published with respect to the Debt, either party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of the Borrower and either the CUSIP number (if available) or the date

7

of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between Seller and Buyer and have no binding effect.

13. **ERISA Representation:** Unless otherwise specified in the Confirmation, the Transfer Documentation shall not contain the "Alternative ERISA Representation," as referenced in a footnote to Sections 4.1(q) and 5.1(j) of the current LSTA form of Purchase and Sale Agreement for Distressed Trades.

14. **Credit Documents; Confidentiality Agreement:** If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on the Trade Date and (c) Buyer has requested such documents on or prior to the Trade Date, then Seller shall furnish Buyer, or provide access to Buyer, as promptly as practicable following the Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer. If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to the Trade Date. Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

15. **Participations:** Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after the Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

16. **Syndicate Confidential Information:** Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with the Transaction, it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller. If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date. Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction. Subject to the foregoing, if Buyer has requested Seller to provide

8

Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of the Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between the Trade Date and the Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver). Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement. Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

**17. Standstill:** With respect to the Purchase Amount of the Debt, until the Settlement Date or Delayed Settlement Date, as the case may be, Seller shall cease any discussions with other purchasers and shall decline all offers.

**18. Principal/Agency Status:** Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction. If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof. A Buyer or Seller that holds itself out in the Confirmation as a principal is directly liable for the completion of the Transaction. A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to the Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an agent acts on behalf of one or more principals to the Transaction. A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation: (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction. A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law. A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

**19. Bankruptcy Proceedings:** In the case of a bankruptcy proceeding involving any of the obligor(s) under the Credit Agreement, (a) Seller shall use commercially reasonable efforts to provide to Buyer within six (6) Business Days after the Trade Date copies of any Proof(s) of Claim that have been filed in such bankruptcy proceeding relating to the Debt specified in the Confirmation if such Proof(s) of Claim were filed individually by Seller or any immediate prior sellers (and was not filed by the Agent under the Credit Agreement on behalf of the lenders generally) and (b) Buyer shall be responsible for the preparation and filing of any necessary Bankruptcy Rule 3001(e) Notices of Transfer relating to such Proof(s) of Claim.

**20. Nonreliance:** Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation. Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent. Except as otherwise provided in the Confirmation and these

9

Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that that may be material to a decision to enter into the Transaction ("Excluded Information"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

21. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' respective rights and obligations hereunder. Buyer shall be permitted to make any necessary disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), provided that such purchasers shall be subject to substantially the same confidentiality restrictions.

22. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank loans, or any interest therein, on "distressed terms" upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "Statute of Frauds"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

23. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction. In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

24. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and

10

other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

25. **Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

Annex I

**Capitalized Term**                                                                    **Defined In**

Adequate Protection Payments ........................................................................ Section 5

Adequate Protection Order ............................................................................. Section 5

Assignment Fees ........................................................................................... Section 8

Borrower........................................................................................................ Confirmation

Business Day ................................................................................................. Section 5

Buyer............................................................................................................. Confirmation

Commencement Date ..................................................................................... Section 6

Confirmation.................................................................................................. Preamble

Consent to Transfer Fees ............................................................................... Section 8

Credit Agreement .......................................................................................... Confirmation

Credit Documents .......................................................................................... Section 14

Debt................................................................................................................ Section 2

Delayed Settlement Date ............................................................................... Section 6

Delay Period.................................................................................................. Section 6

Excluded Information ..................................................................................... Section 20

Facility .......................................................................................................... Confirmation

Federal Funds Rate ........................................................................................ Section 6

Flip Representation Deadline.......................................................................... Section 11

Interest and Accruing Fees ............................................................................ Section 5

LIBO Rate...................................................................................................... Section 6

LSTA ............................................................................................................. Preamble

Master Currency............................................................................................ Section 4

Multi-Currency Commitment ........................................................................ Section 4

Non-Recurring Fees ...................................................................................... Section 5

Paid on Settlement Date Amount................................................................... Section 5

12

Permanent Reductions...................................................................................................... Section 3

PIK Interest ...................................................................................................................... Section 5

Predecessor Transfer Documentation ........................................................................... Section 10

Purchase Amount............................................................................................................. Section 2

Purchase Price................................................................................................................. Section 4

Purchase Rate ............................................................................................................... Confirmation

Riskless Principal ........................................................................................................... Section 19

Seller .............................................................................................................................. Confirmation

Settlement Date ............................................................................................................... Section 1

Standard Terms and Conditions ..................................................................................... Preamble

Statute of Frauds............................................................................................................. Section 22

Trade Date ..................................................................................................................... Confirmation

Transaction ...................................................................................................................... Preamble

Transfer Documentation.................................................................................................. Section 10

**(Proposed Order)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard L. Levine
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
**In re**                                               :          **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :          **08-13555 (JMP)**
:
**Debtors.**                          :          **(Jointly Administered)**
:
-------------------------------------------------------------------x

## ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OF OPEN TRADE CONFIRMATIONS WITH THREE BASSO FUNDS

Upon the motion, dated June 30, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtor, Lehman Commercial Paper Inc. ("LCPI"), as

debtors and debtors in possession (together, the "Debtors"), pursuant to section 365(a) of title 11

of the United States Code (the "Bankruptcy Code"), Rule 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6006-1 of the Local Bankruptcy

Rules for the Southern District of New York (the "Local Rules") for entry of an order approving

the Debtors' assumption of the Basso Trades,[1] all as more fully described in the Motion; and the

Court having jurisdiction to consider the Motion and the relief requested therein in accordance

---

[1] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges

for the Southern District of New York Any and All Proceedings Under Title 11, dated July 10,

1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the Amended Order Pursuant to Section

105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain

Notice and Case Management Procedures [Docket No. 2837] to (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) Stroock & Stroock & Lavan, LLP 180 Maiden Lane, New York, New York 10038, Attn:

Melvin A. Brosterman, Esq., Harold A. Olsen, Esq., and Dina Kolker, Esq., attorneys for the

Basso Funds; and (vii) all parties who have requested notice in these chapter 11 cases; and it

appearing that no other or further notice need be provided; and a hearing (the "Hearing") having

been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED, pursuant to section 365(a) of the Bankruptcy Code, that the Debtors'

assumption of the Basso Trades set forth on Exhibit A annexed hereto is hereby approved; and it

is further

ORDERED that the Debtors are not required to pay any cure costs to Basso in connection with the Basso Trades; and it is further

ORDERED that the Debtors have demonstrated adequate assurance of future performance of the Basso Trades and that no further showing of adequate assurance is necessary; and it is further

ORDERED that Basso shall not be entitled to assert or take any action to exercise a right to set off any prepetition claim that it might have against any of the Debtors against any obligation payable to LCPI under any one of the Basso Trades; and it is further

ORDERED that the Debtors are authorized to execute and deliver all instruments and documents, and take such other actions as may be necessary or appropriate to implement and effectuate the assumption of the Basso Trades as provided in this Order; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and that the requirements of Bankruptcy Rule 6006(a) and Local Rule 6006-1 are satisfied; and it is further

ORDERED that this Court retains jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: July __, 2009
    New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

**(The Basso Trades)**

| Trade Counterparty | Borrower | Tranche | B/S | Trade Date |
| --- | --- | --- | --- | --- |
| Basso Credit Opportunities Holding Fund Ltd. | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |
| Basso Fund Ltd | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |
| Basso Multi-Strategy Holding Fund Ltd | GREEKTOWN HOLDINGS, L.L.C. | Term B Loan | Sale | 6/3/2008 |