WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
:
In re                                                   :    Chapter 11 Case No.
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                        :
                                    Debtors.            :    **(Jointly Administered)**
                                                        :
                                                        :
------------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION, PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE, REQUESTING SECOND EXTENSION OF EXCLUSIVE PERIODS FOR THE FILING OF AND SOLICITATION OF ACCEPTANCES FOR CHAPTER 11 PLANS

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for an order extending the exclusive periods during which only

the Debtors may file chapter 11 plans and solicit acceptances thereof, all as more fully described

in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy

Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom

601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **July 15,**

**2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Lori R. Fife, Esq. and Shai Y. Waisman, Esq., attorneys for the Debtors; (iii) the

Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"),

33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq.,

Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis,

Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New

York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.,

attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v)

any person or entity with a particularized interest in the Motion, so as to be so filed and received

by no later than **July 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection

Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 1, 2009
       New York, New York

/s/ Lori R. Fife
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                        :

| | |
|---|---|
| **In re** | :    **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | :    **08-13555 (JMP)** |
| | : |
| **Debtors.** | :    **(Jointly Administered)** |
| | : |
| | : |

-------------------------------------------------------------------x

**DEBTORS' MOTION, PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE, REQUESTING SECOND EXTENSION OF EXCLUSIVE PERIODS FOR THE FILING OF AND SOLICITATION OF ACCEPTANCES FOR CHAPTER 11 PLANS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

           Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Preliminary Statement**

           1.     On January 15, 2009, the Court extended the periods during which only the Debtors may propose chapter 11 plans and solicit acceptances thereof through and including

July 13, 2009 and September 16, 2009, respectively.  The extension of the Exclusive Periods

(defined below) was warranted because the Debtors had made substantial progress in the initial

four months of these unprecedented cases and were working in good faith, in cooperation with

their creditors, on maximizing value for their stakeholders.  The Debtors have continued to move

expeditiously towards the formulation of chapter 11 plans, primarily in the recovery of core data

and the development of strategies that are necessary to complete the chapter 11 plan process.

However, due to the sheer size and complexity of these cases, additional time is required to

prepare confirmable chapter 11 plans.  Accordingly, the Debtors are requesting an extension of

their Plan Period (defined below) and Solicitation Period (defined below) through and including

March 15, 2010 and May 17, 2010, respectively.

        2.      During the last six months, the Debtors have successfully transitioned

from the frenetic stage of these cases to a controlled and focused strategy of maximizing

recoveries for their creditors.  In that regard, among other things, the Debtors have: (i) made

substantial progress in the recovery of critical data needed for the administration of their cases;

(ii) filed their schedules of assets and liabilities and statements of financial affairs (the

"Schedules and SOFA's"), which were amended to provide a greater level of accuracy; (iii)

obtained authorization to set a claims bar date of September 22, 2009 (the "Bar Date"); (iv)

negotiated an international protocol with many of the foreign administrators (the "Foreign

Administrators") managing almost *eighty* insolvency proceedings (the "Foreign Proceedings") of

the Debtors' affiliates throughout the world; (v) begun to evaluate billions of dollars of

intercompany claims and transactions; and (vi) established and implemented strategies to

maximize the value of their loan, derivative, real estate and other assets.

3.      Notwithstanding the significant progress the Debtors have made, before confirmable chapter 11 plans can be proposed and negotiated, ongoing analyses and investigations into the Debtors' businesses and assets must be completed.  Extending exclusivity will allow for the completion of these tasks without the distraction and delay that would inevitably result were competing plans to be filed.  While the Debtors desire to complete the chapter 11 plan process as quickly and efficiently as possible, in these circumstances, the requested extension will facilitate, rather than delay, the confirmation of workable plans.  Accordingly, the Motion should be granted.

## Background

4.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

7.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner.

### Jurisdiction

8.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

9.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

10.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### Relief Requested

11.      Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose and file a chapter 11 plan (the "Plan Period").  *See* 11 U.S.C. § 1121(b).  Section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the 120-day Plan Period, it has a period of 180 days after the commencement of the case to obtain acceptance of such plan, during which time competing plans may not be filed (the "Solicitation Period" and together with the Plan Period, the "Exclusive Periods").  *See id.* at § 1121(c)(3).  Pursuant to

section 1121(d) of the Bankruptcy Code, where the initial 120-day and 180-day Exclusive

Periods provided for in the Bankruptcy Code prove to be an unrealistic time frame for proposal

and solicitation of a plan, the Court may extend a debtor's Exclusive Periods for cause.  *See id.* at

§ 1121(d).

          12.      By order dated January 15, 2009 [Docket No. 2549], the Court extended

the Debtors' Plan Period through and including July 13, 2009, and the Solicitation Period

through and including September 16, 2009.  For the reasons set forth in this Motion, the Debtors

hereby request an additional eight-month extension of the Plan Period through and including

March 15, 2010, and the Solicitation Period through and including May 17, 2010.

          13.      In the context of the size and complexity of these chapter 11 cases, the

proposed eight-month extension is justified and more than appropriate.  Given the size of the task

that lies ahead, and the necessary steps to achieve confirmation, which almost certainly will

require an additional eight months, requiring the Debtors to proceed on a piecemeal basis to seek

multiple two or three-month extensions of their Exclusive Periods is not an efficient use of estate

assets.  To the contrary, a single eight-month extension would effect no prejudice to the Debtors'

stakeholders (who retain the right to request a termination of the Exclusive Periods at any time

pursuant to section 1121(d)(1) of the Bankruptcy Code), while providing the Debtors with the

crucial benefits of avoiding the significant time and expenditure of resources in seeking multiple

shorter extensions and possibly avoiding the destabilizing effect of creditors or other

stakeholders filing competing chapter 11 plans.  Accordingly, the relief requested is appropriate

and should be granted.

## The Debtors' Cases Warrant the Extension Requested

14.    Over the last six months, the Debtors have made substantial progress towards the development of chapter 11 plans.  A significant amount of critical data needed for the administration of the estates has been recovered.  The Debtors' Schedules and SOFA's have been filed and subsequently were amended.  A September 22, 2009 Bar Date has been set.  Asset management and claims reconciliation teams were established and have been diligently working.  Exit strategies are being developed.

15.    Derivative Teams.  The Debtors have made considerable progress in designing and implementing strategies to maximize the value of their assets.  To that end, over the last six months, the Debtors have retained over 300 individuals as well as the services of third parties with extensive experience in the derivatives industry.  To maximize their limited resources, the Debtors have established derivatives reconciliation and management teams based upon relevant industry, counterparty and derivative product experience.  By organizing their resources in a focused and strategic manner, the Debtors believe they will be able to expedite the review of core data upon receipt and minimize delay in unwinding their derivative transactions.

16.    As Lehman was the fourth largest investment bank in the United States prior to its demise, the Debtors engaged in derivatives trading with some of the largest counterparties in the world on an enormous scale.  Recognizing that reconciling these trades will require significant time and special attention, the Debtors have constructed "Big Bank" teams with the sole and dedicated purpose of unwinding derivative trades between the Debtors and forty-three of the largest banks in the world.  Dissecting the Debtors' derivative transactions and relationships will require substantial time, review and negotiation.  With the personnel and infrastructure in place, however, and upon receipt of the core information that the Debtors expect

to receive by October 22, 2009 through the Bar Date's derivative questionnaire, the Debtors

believe that they will be able to expedite the settlement of some of their most significant and

complicated assets and generate value that will affect the distributions to be made to creditors

under chapter 11 plans.

17.     The Debtors have also continued to make significant progress in realizing

the value of their derivative contracts.  For example, in many cases, the commencement of the

Debtors' chapter 11 cases constituted events of default upon which many counterparties

purportedly terminated their agreements with the Debtors.  In some cases, the termination

resulted in a net claim in favor of a Debtor – i.e., the Debtors are "in the money."  The Debtors'

derivative teams have been working expeditiously to verify and collect termination payments, in

most cases without the need for litigation, as well as undertaking other measures to capture the

value of their derivative contracts, such as the assumption and assignment of their agreements.

Indeed, to date, the Debtors' efforts have resulted in recovery of over $5 billion for the benefit of

creditors.

18.     <u>Real Estate</u>.  The Debtors have also made substantial progress to develop

and implement the best available course of action for their real estate assets.  As of the

Commencement Date, the Debtors and their affiliates had billions of dollars invested in both the

debt and equity of various commercial and residential real estate projects the world over.  Due to

turmoil in the real estate markets, many of these projects have requested additional infusions of

liquidity or required significant restructurings in order to continue to function and preserve value.

For example, the Debtors provided $230 million in capital to Archstone, the second largest

publicly-traded real estate investment trust in the United States for most of 2007, to preserve in

excess of $5.5 billion in investments.  As a result of the recent turmoil in the real estate market,

Archstone required additional time and liquidity to continue to implement its business plan and repay its lenders, including various Lehman affiliates. To avoid diminished recoveries, the Debtors, along with other third party lenders, negotiated a consensual resolution that provided Archstone the additional liquidity it required, thereby preserving the value of the Debtors' sizeable investment for the benefit of creditors.

19.    Similarly, to preserve the value of a real estate construction loan in excess of $522 million, the Debtors obtained authorization for LBHI's entry into a Mortgage Loan Purchase Agreement. The agreement makes residential loan financing available to purchasers of residential condominiums at Canyon Ranch Living Miami Beach Condominiums so as to increase the likelihood that LBHI's construction loan can be paid off. The Debtors have also negotiated the restructuring of a $459 million loan to Broadway Partners Fund Manager LLC made in connection with the acquisition of various office properties throughout the United States to avoid diminished recoveries that would otherwise result from foreclosure sales under currently depressed market conditions. All of these actions have been instrumental in maximizing recoveries for creditors.

20.    <u>Bank Assets</u>. In similar fashion, the Debtors have preserved the value of their bank assets. In response to the threat of serious regulatory action that could have resulted in a takeover of its domestic banks, LBHI, with the support of the Creditors' Committee, prepared and obtained approval of five motions to preserve the opportunity to realize the value of Aurora Bank FSB f/k/a Lehman Brothers Bank, FSB and Woodlands Commercial Bank f/k/a Lehman Brothers Commercial Bank (together, the "<u>Banks</u>") for the benefit of creditors. Those efforts have required calculated actions and extremely sensitive negotiations with the Banks' regulators, including the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the

Department of Financial Institutions of the State of Utah, to satisfy applicable banking regulations. With the Debtors' assistance, the Banks should be able to continue and their value should inure to their estates and their creditors.

21. <u>Foreign Proceedings</u>. As the Court will recall, in the initial stages of these cases, the Debtors faced considerable difficulty due to the commencement of approximately *eighty* insolvency proceedings of their foreign affiliates. Prior to the commencement of the Debtors' cases and the Foreign Proceedings, Lehman worked in unison operating under a centralized and integrated cash management and financial reporting system. The commencement of the Foreign Proceedings seriously complicated the Debtors' ability to access Lehman's integrated global financial reporting system without which the Debtors could not effectively administer their chapter 11 estates. In addition, as a result of the commencement of the Debtors' cases and the Foreign Proceedings, Lehman's cash management system, which produced hundreds of thousands of transactions a day, was no longer operational; to the contrary, it had to be unraveled. It appeared that cooperation may not be forthcoming and the Debtors were facing years of complex world-wide litigation.

22. Over a period of three months, however, the Debtors have successfully negotiated a Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "<u>Protocol</u>")[1] that is hoped to achieve, through its framework, agreements on common issues of substance and avoid the cost and delay associated with intercompany litigation on such a massive scale. Among other things, the Protocol seeks to promote communication among the Debtors and the Foreign Representatives, the sharing of relevant information, an efficient and transparent claims process, including a consistent and measured approach to intercompany

---

[1] By order dated June 17, 2009 [Docket No. 4020], the Court authorized the Debtors' entry into the Protocol.

claims, and the identification and preservation of Lehman's worldwide assets to maximize value

for all creditors.  Although not all of the Foreign Administrators have agreed to the Protocol,

with a firm understanding of the cooperation that can be reasonably expected from many of the

Foreign Administrators, the Debtors can begin to consider realistic chapter 11 plan proposals.

23.    Bar Date.  To accelerate recoveries to their creditors, the Debtors

requested the setting of the Bar Date at the first possible opportunity.  To expedite the enormity

of the task of reconciling claims against the Debtors, especially claims based on Derivative

Contracts (defined below), the Debtors formulated unprecedented procedures that would enable

them to receive and review claims and supporting documentation with respect to over 1,000,000

trades in a more organized and efficient manner than would be possible under ordinary

circumstances.  Nearly 120 objections were interposed to the Debtors' motion for the entry of a

bar date order.  Without the special Bar Date procedures for derivative contracts, the Debtors

feared that their estates would be mired in needless and costly litigation for many years to come

that would deplete assets, impact recoveries to creditors and delay distributions for extended

periods.  The Debtors ultimately succeeded in obtaining Court approval for their procedures after

engaging the objectors and reaching a remarkable and largely consensual resolution on all issues.

24.    Remaining Challenges.  Notwithstanding the substantial progress the

Debtors have made, the administration of these chapter 11 cases remains a complex and difficult

task.  Intercompany issues, in particular with Lehman Brothers International (Europe) and

Lehman Brothers Inc., add an additional layer of complexity in the administration of these cases.

Moreover, the Debtors have continued to investigate other intercompany matters, including the

existence and scope of intercompany claims, that must be resolved before chapter 11 plans can

be prepared for any of the Debtors.  Overcoming these obstacles has taken, and will continue to require, time.

25.     In addition to intercompany issues, certain other contingencies must be resolved before the Debtors can propose serious chapter 11 plans, such as the passage of the Bar Date and the filing of the Examiner's report.  Although the Debtors were recently successful in setting the Bar Date, this is only the first step in the claims analysis that will lay the critical groundwork for their chapter 11 plans.  Hundreds of thousands of claims, if not more, are expected to be filed.  The enormity of the of the task of collecting, organizing, reviewing and reconciling claims against the Debtors alone demands an extension of the Debtors' Exclusive Periods.  In addition, derivative claims, the complexities of which are universally recognized, will not be submitted until October 22, 2009, the date by which counterparties are required to complete the derivatives questionnaire.  As to most counterparties, the Debtors cannot even begin to evaluate the derivative claims prior to the receipt of essential information that is necessary to value such claims.  On this score alone the requested extensions are justified.

26.     The Debtors have also commenced preference and avoidance analyses, the outcome of which may have a substantial impact on recoveries to creditors and the Debtors' chapter 11 plans.  The potential avoidance issues involve large and complex transactions that will require careful review and consideration.  Extending the Debtors' Exclusive Periods will avoid the distractions posed by competing plans and allow the Debtors to efficiently complete their review and commence necessary actions that will increase recoveries to creditors and distribute the Debtors' assets in a fair and equitable manner.

27.     Finally, the Examiner is currently investigating broad areas and numerous parties, the outcome of which may have a significant affect on chapter 11 plans in these cases.

Practically speaking, the Debtors are not in a position to formulate confirmable chapter 11 plans prior to the filing of the Examiner's report, which is not expected to be completed until at least the end of November 2009 – five months from now. Even after the Examiner's report is filed, the Debtors will need adequate time to review and analyze the Examiner's findings before they can propose meaningful chapter 11 plans. Accordingly, the requested extensions are reasonable and appropriate.

### The Debtors have Demonstrated Cause for an Extension of Exclusivity

28.    The Bankruptcy Code neither defines the term "cause" for purposes of section 1121(d) nor establishes formal criteria for an extension. The legislative history indicates, however, that it is intended to be a flexible standard to balance the competing interests of a debtor and its creditors. *See* H.R. Rep. No. 95-595, at 231-32 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (noting that Congress intended to give bankruptcy courts flexibility to protect a debtor's interests by allowing unimpeded opportunity to negotiate settlement of debts without interference from other parties in interest).

29.    In determining whether cause exists to extend the Exclusive Periods, a court may consider a variety of factors to assess the totality of circumstances in each case. *See In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) (identifying the factors used by courts to determine whether cause exists to extend exclusivity); *In re Dow Corning Corp.*, 208 B.R. 661, 664 (Bankr. E.D. Mich 1997); *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996). Those factors include, without limitation:

> (a) the size and complexity of the debtor's case;
>
> (b) the existence of good-faith progress towards reorganization;
>
> (c) a finding that the debtor is not seeking to extend exclusivity to pressure creditors to accede to the debtor's reorganization demands;

(d) existence of an unresolved contingency; and

(e) the fact that the debtor is paying its bills as they come due.

*See In re McLean Indus., Inc.*, 87 B.R. at 834 (citations omitted); *accord In re Express One Int'l, Inc.*, 194 B.R. at 100 (identifying four of the five above-quoted factors, among others, as relevant in determining whether "cause" exists to extend exclusivity); *In re United Press Int'l, Inc.*, 60 B.R. 265, 269 (Bankr. D.C. 1986) (holding that the debtor showed "cause" to extend its exclusivity period based upon certain of above-quoted factors).

30.    The primary objective of a chapter 11 case is the formulation, confirmation, and consummation of a consensual chapter 11 plan. The Exclusive Periods are intended to afford a debtor a full and fair opportunity to propose a consensual plan and solicit acceptances of such plan without the deterioration and disruption that is likely to be caused by the filing of competing plans by non-debtor parties.

31.    Application of the aforementioned standards to the facts of these chapter 11 cases demonstrates sufficient "cause" to grant the Debtors' requested extension of the Exclusive Periods so that they may have a full and fair opportunity to propose consensual plans and to solicit acceptances.

**The Size and Complexity of These Cases Warrant an Additional Extension**

32.    Both Congress and the courts have recognized the size and complexity of a debtor's case alone may constitute cause for the extension of a debtor's exclusive period to file a plan and the period to solicit acceptances of such a plan. "[I]f an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement." H.R. Rep. No. 95-595, at 232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787. In *In re Texaco Inc.*, the court stated:

The large size of a debtor and the consequent difficulty in

formulating a plan of reorganization for a huge debtor with
a complex financial structure are important factors which
generally constitute cause for extending the exclusivity periods.

*In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987).

33.     Given that these are the largest and most complex cases ever filed, there

can be no contest that the requested extensions are warranted.  Prior to its demise, Lehman was

the fourth largest investment bank in the United States with over 4,000 entities worldwide and

over $600 billion in balance sheet assets and liabilities, respectively.  The Debtors have bank

debt, bond debt, intercompany debt, derivative debt, and guaranty issues that bear on the

workings of any chapter 11 plan.  Before confirmable chapter 11 plans can be proposed, the

Debtors must intimately understand the scope and scale of the claims against their estates to

negotiate practical and fair resolutions with their creditors, which cannot reasonably be expected

to be completed prior to the passage of the Bar Date and the receipt of information pursuant to

the derivative questionnaire.

34.     The monumental task of administering these massive chapter 11 cases is

further complicated by the limited resources with which the Debtors have had to operate.  From

an operating global enterprise with over 25,000 employees, the Debtors' estates are now being

administrated by approximately 700 individuals (inclusive of approximately 200 full-time

professionals at Alvarez & Marsal North America LLC), many of whom were brought on after

the commencement of these chapter 11 cases and have been forced to rapidly familiarize

themselves with the Debtors' businesses.  Not only must these individuals learn Lehman's global

pre-petition business, but they must also understand the thousands of counterparties with whom

Lehman transacted to make informed business decisions.  As an example, prior to the

Commencement Date, the Debtors were among the nation's leading lenders with $46.7 billion of

committed loans outstanding to borrowers of all industries for use in their general business operations.  Since the Commencement Date, among other things, the Debtors have been taking actions as lender, agent and loan participant for over 700 corporate loans, negotiating agreements for the termination of unfunded loans of over $12 billion and transferring various agency roles to other financial institutions.  Each of these transactions and counterparties require independent investigation, review, and action so that informed business decisions can be made to maximize value for creditors.

35.    These cases are not only massive, but they pose some of the most complex problems in history.  As of the Commencement Date, Lehman was party to or guarantor of over 10,000 derivative contracts (the "Derivative Contracts") with an excess of 1,000,000 transactions.  In certain circumstances, the Derivative Contracts may be accorded special treatment under the Bankruptcy Code's "safe harbor" (the "Safe Harbor") provisions.  Many of the Safe Harbor provisions are relatively new to the Bankruptcy Code.  As such, there is little or no relevant case-law to rely upon.  In fact, most of the Safe Harbor provisions have rarely, if ever, been tested by a large chapter 11 case.  Consequently, the Debtors' evaluation of the Derivative Contracts has been particularly demanding, as it involves finding business solutions to legal questions of first impression that will have a significant impact on recoveries to creditors.

36.    Since the Commencement Date, the Debtors and their professionals have devoted substantial resources to assess, without the benefit of direct precedent, the rights and strategic options available to them as they seek to maximize the value of their Derivative Contracts, particularly in light of the unique treatment accorded to these contracts under the Safe Harbor provisions.  On a daily basis, the Debtors are confronted with issues such as the validity

of terminations of Derivative Contracts, counterparty non-performance, and assertions of setoff

rights.  These issues have been raised both informally and formally through the commencement

of adversary proceedings or motions filed against the Debtors, each of which require careful

analysis and attention.  Representative examples of the nature and complexities of these issues

are the *Wong v. HSBC USA, Inc.*, *et. al.* (Adv. Pro. No. 09-1120 (JMP)) and *Lehman Brothers*

*Special Financing Inc. v. BNY Corp. Trustee Serv. Ltd.* (Adv. Pro. No. 09-1242 (JMP)),

adversary proceedings.

       37.    After careful planning, the Debtors have put their affirmative strategies

into action through the recent commencement of adversary proceedings against various

counterparties, such as Ballyrock ABS CDO 2007-1 Ltd., Metropolitan West Asset Management

LLC, Libra CDO Ltd., and BNY Corporate Trustee Services Ltd.  In addition, the Debtors filed a

motion to compel performance of a Derivative Contract against Metavante Corporation, as well

as a motion to reject a Derivative Contract with Jana Master Fund Ltd. pursuant to sections 365

and 562 of the Bankruptcy Code.  Each of these proceedings raises significant legal issues and

are representative of thousands of similar derivative and financial transactions to which the

Debtors are a party.  As a result, the outcome of these proceedings will have far reaching

ramifications on recoveries to creditors and the Debtors' chapter 11 plans.  Given the substantial

risks and enormity of the potential impact on their stakeholders, the Debtors have taken a

deliberate and measured approach with their derivative assets and counterparties, recognizing

that the result could have an impact not only on the particular proceeding at hand, but also on the

thousands of similarly situated transactions.

       38.    As the Court is aware from the litigation surrounding the Bar Date motion,

Derivative Contracts are complex financial instruments and their valuation is not a science.

Recognizing as much, the Court set unique Bar Date procedures for derivative and guarantee claims and extended the time to complete the derivative questionnaire to October 22, 2009. Reviewing and reconciling information that is fundamental to the Debtors' ability to value their Derivative Contracts will require substantial time and effort by the Debtors.  After the derivative and related guarantee claims are filed, the Debtors will need to undertake a complex six-step labor-intensive process to test the validity of the filed claims.  Thus, although the Debtors have taken measures to prepare for the monumental task, it cannot be reasonably expected that the Debtors will be able to complete this process and propose confirmable chapter 11 plans without the requested extensions of their Exclusive Periods.

39.     Given the size and complexity of these cases, additional time is required to complete the chapter 11 plan process and more than justified.

**Substantial Good Faith Progress has Been Demonstrated**

40.     Extension of a debtor's exclusive period to file a plan and the period to solicit acceptances thereto are justified by progress in the resolution of issues facing the debtor's estate.  *See e.g.*, *In re Service Merchandise Co., Inc.*, 256 B.R. 744, 753-54 (Bankr. M.D. Tenn. 2000); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996); *In re McLean Indus. Inc.*, 87 B.R. at 835; *In re Texaco, Inc.*, 76 B.R. at 327.

41.     The Debtors have made substantial progress in addressing major issues confronting their estates by implementing strategies to overcome the unmatched complexities posed by the Debtors' businesses and to continue to preserve and maximize the value of their assets.  As the Court has recognized,

> The…history that we've had in this case for the last, approximately, nine months in which we have been dealing with any number of unprecedented commercial transactions that I believe have never been presented in a bankruptcy court at least to this level of volume

and sophistication.  And somehow, counsel have been able to work
out procedures, whether related to open trades or, in this instance,
as it relates to proofs of claim for derivatives.

*See* Tr. of June 29, 2009 Hr'g, at 36:25 – 37:8.

42.    More specifically, the Debtors have accomplished the following tasks in

their chapter 11 cases:

- obtained approval of and closed major sales under section 363 of the
  Bankruptcy Code, including:

  - the sale of the North American capital markets business to
    Barclays Capital, Inc. ("Barclays") that resulted in recovery to the
    estates of over $1.5 billion and preservation of approximately
    10,000 jobs;

  - the sale of certain assets related to the investment management
    division in exchange for a preferred equity interest with an
    aggregate liquidation preference of $875 million and 49% of
    common stock in a newly formed company;

  - the sale of the Debtors' interest in R3 Capital Management, LLC
    for $500 million in value;

  - the sale of the Debtors' interest in Eagle Energy Partners I L.P. for
    $230 million; and

  - the sale of the estates' interest in Lehman Brothers Merchant
    Banking III, L.P., Lehman Brothers Merchant Banking IV, L.P.
    and Lehman Brothers Merchant Banking IV (Europe), L.P., as well
    as approximately 40 direct investments in various venture capital
    portfolio companies.

- prepared and obtained approval of three motions to take various actions to
  preserve and maximize the value of their derivative assets, including (i)
  the implementation of assumption and assignment procedures for
  Derivative Contracts, (ii) the consensual assumption and assignment of
  various Derivative Contracts, and (iii) authorization to take protective
  measures to hedge against risks to the value of the Debtors' Derivative
  Contracts associated with fluctuations in the marketplace;

- negotiated and obtained approval of a settlement agreement with the
  Pension Benefit Guaranty Corporation ("PBGC") that includes, among
  other things, PBGC's agreement to withdraw all claims and/or liens for the

unfunded benefit liabilities of the pension plan and dismiss the District Court litigation commenced to terminate the pension plan in exchange for a payment of $127,600,000 in respect of pension benefits for over 22,000 current and former Lehman employees and their beneficiaries;

- prepared and obtained approval of five motions for authorization to take various calculated actions with respect to the Banks, all to preserve over $1 billion in value for the benefit of creditors;

- obtained authority for the establishment of procedures to expedite the resolution of, and minimize the costs associated with, approximately $30 billion in unfunded corporate loan commitments;

- negotiated and obtained approval of the international Protocol that will minimize the cost and delay associated with resolving the Debtors' intercompany issues with their foreign affiliates;

- filed their Schedules and SOFA's, which were amended in June 2009; and

- set a September 22, 2009 Bar Date with special procedures for derivative and guarantee claims.

43.    Indeed, as a result of the Debtors' efforts, the aggregate cash balances of the Debtors has gone from approximately $2 billion on the Commencement Date to more than $10 billion as of the date hereof.  The Debtors' progress on these crucial issues justifies the requested extension of the Exclusive Periods.

44.    The substantial progress the Debtors have made is truly remarkable when considered in light of the intense and pressured circumstances under which they have been operating.  Since the Commencement Date, twenty-seven adversary proceedings have been commenced against the Debtors, seeking a range of relief, as well as an action in the District Court commenced by the PBGC to terminate Lehman's pension plan.  Thirty-one motions for relief from the automatic stay, including motions seeking to exercise asserted rights of setoff, have been filed.  Twelve parties filed joinders to eight applications seeking examination of the Debtors pursuant to Bankruptcy Rule 2004.  Eleven proceedings were commenced to compel the

Debtors to assume or reject executory contracts and to provide adequate protection.  Three

motions and three joinders were filed seeking the appointment of additional committees, trustees,

and examiners in these cases.  Four appeals from decisions of this Court have been taken.  In

addition, throughout these cases, the Debtors have been strained under the thousands of inquiries,

requests and assertions by counterparties, creditors, government agencies and other stakeholders.

**The Requested Extension Will be**
**Beneficial to the Administration of the Chapter 11 Cases**

45.    Affording the Debtors a full opportunity to undertake an extensive review

and analysis of their assets and liabilities so that they may develop chapter 11 plans that satisfy

the requirements of the Bankruptcy Code will not harm creditors.  Since the Commencement

Date, the Debtors and their professionals have become familiar with Lehman's assets, liabilities,

corporate structure and businesses.  For another proponent to propose meaningful chapter 11

plans would require the duplication of extensive efforts already expended by the Debtors and

their professionals thereby imposing unnecessary delay and expense onto the Debtors'

stakeholders.  Indeed, given the substantial progress the Debtors have made, exit strategies,

which are being considered in the preliminary stages, will be delayed by distractions created by

competing plans.

46.    Moreover, by no means is the requested extension an attempt to pressure

creditors to accede to the Debtors' demands.  Throughout these cases, regular and open

communication with their creditors has been and remains a fundamental goal of the Debtors.

The Debtors have made every effort to keep creditors apprised and informed of all

developments, including constant communication with the Creditors' Committee and its

professionals on issues ranging from day-to-day administration to long term strategy.  More

specifically, the Debtors, with the assistance of their professionals, have taken the following

actions to apprise creditors of all developments in these cases to the greatest extent possible:

- published notice of the section 341 meeting of creditors in The Wall Street Journal Global, The New York Times and International Herald Tribune;

- held a section 341 meeting of creditors lasting approximately three hours on January 29, 2009 that was attended by approximately 250 parties at which the Debtors gave a formal presentation of the status of the cases, including, among other things, information regarding the Debtors' cash balances, reports on the Debtors' assets, and an overview of the personnel and infrastructure in place to maximize creditor recoveries;[2]

- prepared and publicly filed twenty-seven current reports on form 8-K with the Securities Exchange Commission available at no cost on EDGAR;

- held seven formal case conferences, reports, and presentations before the Court and parties in interest at omnibus hearings on issues such as general case status, the international Protocol and other matters;

- conducted individual creditor meetings with the Harbinger Funds, the Newport Funds, DE Shaw, Elliot Associates, Russell Investments, Promontory Asset Finance, and Bank of America to accommodate requests for information as to particular issues;

- Conducted at least *twenty-two* separate telephonic presentations with individual creditors, such as: Longacre LLC, Davidson Kempner Capital Management LLC, Perry Capital, Goldman, Sachs & Co., Oaktree Capital Management, L.P., Silverpoint Capital, Constellation Capital, Aurelius Capital Management, L.P., JPMorgan Securities Inc., King Street Capital Management, L.P., Bingham Strategic Advisors, LLC, Strategic Value Partners, LLC, Fortress Investment Group LLC, Anchorage Capital, Deutsche Bank Securities, Inc., Bank of America Securities LLC – Special Situations, Centerbridge Partners L.P., CPMG, 3G Capital, Inc., Owl Creek Asset Management, L.P., Carval Investors UK Ltd., and Baupost Group;

- filed monthly operating reports through April 2009 with the Court;

- published lehman-docket.com, which provides direct and free access to all pleadings filed in these cases, information on filing a proof of claim,

---

[2] The section 341 meeting of creditors has been continued to July 8, 2009 to allow for another opportunity to provide a formal presentation to creditors.

important deadlines, a listing of all chapter 11 Debtors and their petitions, copies of the presentations made to the Court and at the section 341 meeting as well as other important documents, contact information for the estates' professionals broken down by areas of responsibility, and other pertinent information;

- conducted monthly meetings with the Creditors' Committee and its professionals to provide formal progress reports as well as weekly sub-committee meetings to allow the Creditors' Committee to raise questions and concerns so that the Creditors' Committee can effectively carry out its oversight role and fiduciary duties in these cases;

- coordinated routinely with the U.S. Trustee to ensure compliance with the Bankruptcy Code, the Bankruptcy Rules, Local Rules and the U.S. Trustee Guidelines on all matters; and

- responded to hundreds, if not thousands, of informal inquiries related to the status of these cases, prepetition activities of the Debtors, and specific contract counterparty demands, including by way of a Lehman Hotline (212-310-8040) and an email address for the submission of questions at Lehmanteam@weil.com.

**Substantial Contingencies Remain;**
**The Debtors Have Been Paying Bills as They Become Due**

47.     Notwithstanding the substantial progress the Debtors have accomplished to date, certain crucial contingencies must be resolved before confirmable chapter 11 plans can be proposed.  The Court recently fixed a September 22, 2009 Bar Date with an extension through October 22, 2009 for counterparties to complete the derivative questionnaire.[3]  Passage of the Bar Date and review of the filed claims is a minimum requirement to the Debtors' ability to propose confirmable chapter 11 plans.  Given the magnitude and unparalleled complexity of claims that are expected to be filed, the Debtors will need sufficient time to review, test and reconcile such claims.  Needless to say, claims review and assessment will not be a simple task and cannot reasonably be expected to be completed prior to the expiration of the extended

---

[3] The Bar Date has been set for November 2, 2009 with respect to a certain set of notes issued by LBHI or any of the Debtors' affiliates and sold to holders outside of the United States, generally referred to as the "Lehman Non-U.S. Retail Notes," and any guarantees issued in connection therewith.

Exclusive Periods requested by this Motion, even at the exceptional pace the Debtors have been

progressing through their chapter 11 cases.  Because it would be impossible to appropriately

analyze the scope of the Debtors' liabilities and confirm chapter 11 plans prior to the ability to

review the claims filed against the Debtors' estates, the requested extensions should be granted.

48.    Moreover, the Examiner is still in the midst of his investigation and has

recently stated that his report is not expected to be completed until the end of November 2009

and likely will take longer.  *See* Tr. of June 24, 2009 Hr'g, at 62:11-13.  Without question, the

Examiner's findings and conclusions will play an integral part of the chapter 11 plan process.

The Examiner has been charged with a broad-sweeping task of investigating, among other

things:

- intercompany claims, including whether any of LBHI's chapter 11 affiliates may have an administrative expense claim resulting from LBHI's cash sweeps from September 15, 2008 through the date that such applicable LBHI affiliate commenced its chapter 11 case;

- the transactions and transfers, including the pledging of collateral, between the Debtors and their prechapter 11 lenders and financial participants, such as JPMorgan Chase, Citigroup, Inc., Bank of America and the Federal Reserve Bank of New York;

- intercompany accounts and transfers among LBHI and its direct and indirect subsidiaries during the 30-day period preceding the commencement of the chapter 11 cases by each Debtor;

- the existence of intercompany or insider preferences and possible voidable transfers or incurrences of debt under the Bankruptcy Code or other applicable law;

- whether assets of LBHI's affiliates (other than LBI) were transferred to Barclays pursuant to the Barclays asset purchase agreement; and

- the transfer of capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc.

49.     All of these issues go to the heart of any chapter 11 plans that the Debtors may propose.  As a result, until the Examiner's report is filed, which, as explained, is not expected for another five months at the earliest, and reviewed by the Debtors, the Creditors' Committee, and the Debtors' stakeholders, the Debtors cannot realistically begin to prepare chapter 11 plans.  Accordingly, the requested extensions are not only reasonable, but necessary.

50.     In general, since the commencement of these cases, the Debtors have been paying their bills as they become due.  As a result, no party in interest will be harmed by the extensions.

51.     Similar extensions of exclusivity have been granted by this Court in cases of comparable size and complexity both prior and subsequent to the enactment of the BAPCPA. *See In re Dana Corp.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y.) (granting initial extension of six months and second extension of eight months for total 18-month maximum exclusive period under BAPCPA) [Docket Nos. 1584 and 4398]; *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y.) (granting initial extension of eight months and subsequent extension of six months for total 18-month maximum exclusive period under BAPCPA) [Docket Nos. 1216 and 3223]; *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (JMP) (Bankr. S.D.N.Y.) (debtors granted exclusivity for maximum eighteen-month period under BAPCPA) [Docket Nos. 572, 1149, 1501, 1548, 1570 and 1666]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y.) (debtors granted exclusivity for maximum eighteen-month period under BAPCPA) [Docket Nos. 434, 727 and 853]; *see also In re WorldCom Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y.) (debtors' retained exclusivity for approximately 14 months); *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y.) (debtors retained exclusivity for approximately 15 months); *In re Global Crossing, Inc.*, Case No. 02-40188 (REG) (Bankr.

S.D.N.Y.) (debtors retained exclusivity for approximately 17 months); *In re R.H. Macy & Co.*, Case No. 92-B-40477 (BRL) (Bankr. S.D.N.Y.) (debtors retained exclusivity for over three years).

### Conclusion

52.     The Exclusive Periods should be extended to afford the Debtors a full and fair opportunity to negotiate, propose and seek acceptance of consensual chapter 11 plans.  For the reasons set forth herein, the requested extension of the Exclusive Periods is warranted and appropriate.  Therefore, the Motion should be granted.

### Notice

53.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

54.     The Debtors previously requested the Court to extend the Exclusive Periods.  By order dated January 15, 2009 [Docket No. 2549], the Court extended the Plan Period through and including July 13, 2009 and the Solicitation Period through and including September 16, 2009.  For the reasons explained, cause exists to justify a further extension of the Debtors' Exclusive Periods without prejudice to the Debtors' ability to request further extensions.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated:  July 1, 2009
      New York, New York

          /s/ Lori R. Fife
          Harvey R. Miller
          Lori R. Fife
          Shai Y. Waisman

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone: (212) 310-8000
          Facsimile: (212) 310-8007

          Attorneys for Debtors
          and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                              :
In re                                         :    Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :    08-13555 (JMP)
                                              :
                Debtors.                      :    (Jointly Administered)
                                              :
                                              :
----------------------------------------------------------------x
```

### ORDER GRANTING DEBTORS' MOTION, PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE, REQUESTING SECOND EXTENSION OF EXCLUSIVE PERIODS FOR THE FILING OF AND SOLICITATION OF ACCEPTANCES FOR CHAPTER 11 PLANS

Upon the motion, dated July 1, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to section 1121(d) of title 11 of the United States Code

(the "Bankruptcy Code"), for an order further extending the exclusive periods during which the

Debtors may file chapter 11 plans (the "Plan Period") and solicit acceptances thereof (the

"Solicitation Period," and together with the Plan Period, the "Exclusive Periods"), all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order

M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the amended order entered February 13, 2009 governing case management and administrative

procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New

York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities

and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for

the Southern District of New York; and (vi) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing

having been held to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their estates

and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, each of the

Debtors' exclusive Plan Period is extended through and including March 15, 2010; and it is

further

ORDERED that, pursuant to section 1121(d) of the Bankruptcy Code, each of the

Debtors' exclusive Solicitation Period is extended through and including May 17, 2010; and it is

further

ORDERED that the extension of the Exclusive Periods granted herein is without

prejudice to any party in interest's rights, pursuant to section 1121(d) of the Bankruptcy Code, to

move to reduce or increase the Debtors' Exclusive Periods; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: July __, 2009
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE