1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


          Debtors.

- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          June 29, 2009

          2:06 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re LBHI's Motion for Authorization to Make a Capital

3    Contribution to Aurora Bank

4    FSB

5

6    HEARING re Debtors' Motion for Establishment of the Deadline

7    for Filing Proofs of Claim, Approval of the Form and Manner of

8    Notice Thereof and Approval of the Proof of Claim Form

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2      A P P E A R A N C E S :

3      WEIL, GOTSHAL & MANGES LLP

4            Attorneys for Debtors

5            767 Fifth Avenue

6            New York, NY 10153

7

8      BY:  RICHARD W. SLACK, ESQ.

9            LORI R. FIFE, ESQ.

10           SHAI Y. WAISMAN, ESQ.

11           RICHARD P. KRASNOW, ESQ.

12

13     HUGHES HUBBARD & REED LLP

14           Attorneys for James W. Giddens, SIPC Trustee

15           One Battery Park Plaza

16           New York, NY 10004

17

18     BY:  JEFFREY S. MARGOLIN, ESQ.

19

20

21

22

23

24

25

4

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         One Chase Manhattan Plaza

5         New York, NY 10005

6

7    BY:   DENNIS C. O'DONELL, ESQ.

8          EVAN R. FLECK, ESQ.

9

10   ALLEN & OVERY LLP

11        Attorneys for ISDA; Banca Akros S.p.A.; Mediolanum Vita,

12         S.p.A.; Banca Monte dei Paschi di Siena, S.p.A.; Banca

13         Popolare di Milano Societa Cooperativa a r.l.; and Banco

14         Popolare Societa Cooperativa

15        1221 Avenue of the Americas

16        New York, NY 10020

17

18   BY:   JOSHUA D. COHN, ESQ.

19         JOHN KIBLER, ESQ.

20

21

22

23

24

25

5

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for Deutsche Bank; Harbinger Funds; Putman

4          Investments, LLC; State Street Bank and Trust Company;

5          and UBS AG; Harbinger Capital Partners Special Situations

6          Fund, L.P. and Harbinger Capital Partners Master Fund I,

7          Ltd. (f/k/a Harbert Distressed Investment Master Fund

8          Ltd.)

9         399 Park Avenue

10        New York, NY 10022

11

12   BY:  JOSHUA DORCHAK, ESQ.

13

14   CADWALADER, WICKERSHAM & TAFT LLP

15        Attorneys for Morgan Stanley

16        One World Financial Center

17        New York, NY 10281

18

19   BY:  ELLEN M. HALSTEAD, ESQ.

20

21

22

23

24

25

6

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3        Attorneys for Morgan Stanley

4        1201 F. Street, N.W.

5        Washington, DC 20004

6

7    BY:  MARK C. ELLENBERG, ESQ.

8

9    CHAPMAN & CUTLER LLP

10       Attorneys for US Bank, N.A.

11       111 West Monroe Street

12       Chicago, IL 60603

13

14   BY:  FRANKLIN H. TOP, III, ESQ.

15

16

17

18

19

20

21

22

23

24

25

7

```
 1

 2     CLEARY GOTTLIEB STEEN & HAMILTON LLP

 3          Attorneys for Barclays Capital Inc.; Barclays Bank PLC and

 4           their affiliates; D. E. Shaw Composite Portfolios,

 5           L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., and their

 6           affiliates; Abu Dhabi Investment Authority; Banco Bilbao

 7           Vizcaya Argentaria, S.A.; Deutsche Postbank AG; PB

 8           Capital Corporation; Wachovia Bank, N.A. and its

 9           affiliates; Evergreen Investment Management Company, LLC,

10           acting as agent for various funds; AB Svensk

11           Exportkredit; Autonomy Capital Research LLP, Autonomy

12           Master Fund Limited and Autonomy Rochevera One Limited

13          One Liberty Plaza

14          New York, NY 10006

15

16     BY:  LINDSEE GRANFIELD, ESQ.

17          ZOE SEGAL-REICHLIN, ESQ.

18

19     CLIFFORD CHANCE US LLP

20          Attorneys for Calyon

21          31 West 52nd Street

22          New York, NY 10019

23

24     BY:  ANDREW BROZMAN, ESQ.

25          JENNIFER C. DEMARCO, ESQ.
```

8

1

2      COVINGTON & BURLING LLP

3            Attorneys for Wilmington Trust Company

4            The New York Times Building

5            620 Eighth Avenue

6            New York, NY 10019

7

8      BY:   AMANDA R. RABOY, ESQ.

9            SUSAN POWER JOHNSTON, ESQ.

10

11     CRAVATH, SWAINE & MOORE LLP

12           Attorneys for Credit Suisse

13           Worldwide Plaza

14           625 Eight Avenue

15           New York, NY 10019

16

17     BY:   RICHARD LEVIN, ESQ.

18

19     DLA PIPER US LLP

20           Attorneys for Banco Banif, et al.

21           1251 Avenue of the Americas

22           New York, NY 10020

23

24     BY:   WILLIAM M. GOLDMAN, ESQ.

25

9

1

2      DEBEVOISE & PLIMPTON LLP

3            Attorneys for Juice Energy, Inc.; Carlyle Credit Partners

4            Master Fund; Carlyle High Yield Partners IX, Ltd.; Carlyle

5            Loan Investment Ltd.; Ross Financial Corporation

6            919 Third Avenue

7            New York, NY 10022

8

9      BY:  JESSICA R. SIMONOFF, ESQ.

10

11     DEWEY & LEBOEUF LLP

12            Attorneys for Royal Bank of Scotland and Affiliates

13            1301 Avenue of the Americas

14            New York, NY 10019

15

16     BY:  IRENA M. GOLDSTEIN, ESQ.

17

18     HAYNES AND BOONE, LLP

19            Attorneys for Steve G. Holder Living Trust, et al.

20            1221 Avenue of the Americas

21            26th Floor

22            New York, NY 10020

23

24     BY:  JASON A. NAGI, ESQ.

25

10

1

2   HOLLAND & KNIGHT LLP

3        Attorneys for Kantatsu Co. Ltd.; Teachers' Retirement

4         System of Illinois; Singapore Airlines Ltd.

5        195 Broadway

6        24th Floor

7        New York, NY 10007

8

9   BY:   BARBRA R. PARLIN, ESQ.

10

11   HUNTON & WILLIAMS LLP

12        Attorneys for E*TRADE Bank

13        200 Park Avenue

14        53rd Floor

15        New York, NY 10166

16

17   BY:   PETER S. PARTEE, ESQ.

18        SCOTT H. BERNSTEIN, ESQ.

19

20

21

22

23

24

25

                                                                11

 1

 2    HUNTON & WILLIAMS LLP

 3          Attorneys for E*TRADE Bank

 4          Riverfront Plaza, East Tower

 5          951 East Byrd Street

 6          Richmond, Virginia 23219

 7

 8    BY:  J.R. SMITH, ESQ.

 9

10    KATTEN MUCHIN ROSENMAN LLP

11          Attorneys for Federal Home Loan Bank of New York, et al.

12          575 Madison Avenue

13          New York, NY 10022

14

15    BY:  JEFF J. FRIEDMAN, ESQ.

16

17    KAYE SCHOLER LLP

18          Attorneys for Wells Fargo & Company and Wells Fargo Bank,

19           National Association; Galliard Capital Management, Inc.;

20           Banco Popular Español, S.A. and Popular Gestión

21           S.G.I.I.C., S.A., acting as agent for various funds

22          425 Park Avenue

23          New York, NY 10022

24

25    BY:  MADLYN G. PRIMOFF, ESQ.

12

```
 1
 2    KRAMER LEVIN NAFTALIS & FRANKEL LLP
 3          Attorneys for Bank of New York Mellon as Indenture Trustee
 4          1177 Avenue of the Americas
 5          New York, NY 10036
 6
 7    BY:  DANIEL M. EGGERMAN, ESQ.
 8
 9    MAYER BROWN LLP
10          Attorneys for Societe Generale
11          1675 Broadway
12          New York, NY 10019
13
14    BY:  BRIAN TRUST, ESQ.
15
16    MCCARTER & ENGLISH, LLP
17          Attorneys for Occidental Energy Marketing, Inc., et al.
18          Renaissance Centre
19          405 N. King Street
20          8th Floor
21          Wilmington, DE 19801
22
23    BY:  DAVID M. SILVER, ESQ.
24
25
```

13

1

2    NIXON PEABODY LLP

3         Attorneys for Deutsche Bank Trust Company Americas and

4          Deutsche Bank National Trust as Trustee

5         100 Summer Street

6         Boston, MA 02110

7

8    BY:  RICHARD C. PEDONE, ESQ.

9

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11        Attorneys for Citigroup, et al.

12        1205 Avenue of the Americas

13        New York, NY 10019

14

15   BY:  STEPHEN J. SHIMSHAK, ESQ.

16        CLAUDIA L. HAMMERMAN, ESQ.

17

18   REED SMITH LLP

19        Attorneys for BNY Corporate Trustee Services; Bank of New

20         York Mellon; Intesa Sanpaolo S.p.A.

21        599 Lexington Avenue

22        New York, NY 10022

23

24   BY:  MICHAEL J. VENDITTO, ESQ.

25        JOHN L. SCOTT, ESQ.

14

1

2   SALANS

3        Attorneys for Svenska Handelsbanken AB

4        Rockefeller Center

5        620 Fifth Avenue

6        New York, NY 10020

7

8   BY:  CLAUDE D. MONTGOMERY, ESQ.

9

10   SHEARMAN & STERLING LLP

11        Attorneys for Bank of America, N.A.; Merrill Lynch & Co.,

12         Inc. and Their, Respective Affiliates

13        599 Lexington Avenue

14        New York, NY 10022

15

16   BY:  NED S. SCHODEK, ESQ.

17

18   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

19        Attorneys for Silver Point Capital Fund, L.P., et al.

20        Four Times Square

21        New York, NY 10036

22

23   BY:  ANDREW M. THAU, ESQ.

24

25

15

1

2    STROOCK & STROOCK & LAVAN LLP

3         Attorneys for Mizuho Investors Securities, Inc.,

4          Derivative Claimants

5         180 Maiden Lane

6         New York, NY 10038

7

8    BY:  LAWRENCE M. HANDELSMAN, ESQ.

9         JEREMY S. ROSOF, ESQ.

10        SHERRY MILLMAN, ESQ.

11        MELVIN A. BROSTERMAN, ESQ.

12

13   SUTHERLAND ASBILL & BRENNAN LLP

14        Counsel for US AgBank, FCB; Aviva Italia Holding S.p.A.,

15         Aviva S.p.A.; Aviva Vita S.p.A., Aviva Life S.p.A., Aviva

16         Italia S.p.A.; Aviva Assicurazioni S.p.A. and Aviva

17         Previdenza S.p.A.

18        1275 Pennsylvania Avenue, NW

19        Washington, DC 20004

20

21   BY:  MARK D. SHERRILL, ESQ.

22        (TELEPHONICALLY)

23

24

25

16

```
 1

 2    TROUTMAN SANDERS LLP

 3          Attorneys for RWG Supply & Trading; New South Federal

 4           Savings Bank; Electrabel n.v./s.a; New South Federal

 5           Savings Bank, F.S.B.

 6          The Chrysler Building

 7          405 Lexington Avenue

 8          New York, NY 10174

 9

10    BY:  PAUL H. DEUTCH, ESQ.

11

12    WACHTELL, LIPTON, ROSEN & KATZ

13          Attorneys for JPMorgan Chase Bank

14          51 West 52nd Street

15          New York, NY 10019

16

17    BY:  HAROLD S. NOVIKOFF, ESQ.

18

19    WHITE & CASE LLP

20          Attorneys for Deutsche Sparkessen und Giroverband; Korea

21           Development Bank

22          1155 Avenue of the Americas

23          New York, NY 10036

24

25    BY:  LYDIA EMILY LIN, ESQ.
```

17

1

2    WILMER CUTLER PICKERING HALE AND DORR LLP

3         Attorneys for Taconic Capital Partners 1.5 L.P. and

4          Taconic Opportunity Fund L.P.

5         399 Park Avenue

6         31st Floor

7         New York, NY 10022

8

9    BY:   JAMES H. MILLAR, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1                P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Mr. Krasnow?

3          MR. KRASNOW:  Good afternoon, Your Honor.  Richard

4    Krasnow, Weil Gotshal & Manges LLP, for the Chapter 11 debtors.

5    Your Honor, if we can turn to the first item on the agenda --

6    and that relates to the debtors' motion and supplemental motion

7    seeking authority to make a further capital contribution to

8    Aurora Bank of up to fifty million dollars.

9          Your Honor, the motion and supplemental motion were

10   duly noticed.  There have been no responses whatsoever with

11   respect to these requests although we've been advised by the

12   creditors' committee that they do support it.

13         In light of that, Your Honor, and in light of the

14   rather full afternoon that the Court has on the other matter, I

15   would suggest that we would simply refer to our motion and

16   supplemental motion and, for the reasons indicated therein,

17   request that the Court grant the relief that's sought.

18         THE COURT:  I'm prepared to do that.  I would just

19   like to hear from the creditors' committee regarding their

20   analysis of the situation.

21         MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

22   Tweed Hadley & McCloy on behalf of the creditors' committee.

23   Your Honor, we do support this request as we have supported the

24   four or five prior requests with respect to the banks.  The

25   committee, based on the limited information it has and with

19

1    full acknowledgment of risks that may exist here, believe that

2    this is the best possible course for the debtors to pursue with

3    respect to the banks.  The stated purpose and its purpose, we

4    concur of this application is to permit the bank or LBB Aurora

5    to continue to pursue seeking permission from the regulators to

6    begin to issue CDs again.  And we believe that is the best

7    possible outcome or best possible course for LBB to pursue.  It

8    would basically allow them to help themselves get back on a

9    firm potential footing.  And we believe that this application

10   will facilitate that and we hope that the regulators in whose

11   hands that decision rests will concur and everyone's conclusion

12   here that this makes sense for both the creditors of these

13   estates and the depositors of these banks.

14        THE COURT:  Fine.  It's an unopposed motion and the

15   creditors' committee endorses it recognizing that nothing in

16   life is certain including the funding of this bank.  And so,

17   the motion's approved.

18        MR. KRASNOW:  Your Honor, the funding must be made by

19   no later than tomorrow.  I do have the disk and if I may

20   approach --

21        THE COURT:  You may approach.

22        MR. KRASNOW:  Thank you, Your Honor.

23        THE COURT:  Anyone who's here simply on the Aurora

24   matter who would like to leave may leave.

25        MR. KRASNOW:  Thank you, Your Honor.

20

1           MR. WAISMAN:  Good afternoon, Your Honor.  Shai

2    Waisman, Weil Gotshal & Manges.  The second and only other item

3    on the agenda today is the debtors' adjourned motion to

4    establish a bar date in these cases.  This hearing was

5    commenced on Wednesday of last week and adjourned to this

6    afternoon.  I think, as noted in some of the papers that were

7    filed, significant progress has been made.  We are in the midst

8    of discussions with a few remaining parties and I think

9    everyone would benefit from a brief recess, perhaps fifteen

10   minutes, and we can apprise Chambers of where we stand at that

11   point.

12           THE COURT:  Let's make it twenty minutes.  That will

13   get us to 2:30 as a witching hour.  And good luck in resolving

14   what you can resolve.

15           MR. WAISMAN:  Thank you, Your Honor.

16           THE COURT:  We're adjourned till then.

17       (Recess from 2:10 p.m. until 2:36 p.m.)

18           THE COURT:  Be seated, please.  I have no idea what

19   you want.

20           MR. COHN:  My name is Josh Cohn of Allen & Overy on

21   behalf of the International Swaps and Derivatives Association.

22   We've had an amicus brief pending on motion for two weeks and

23   I'd love to get it out of the way.

24           THE COURT:  Mr. Waisman, do you have any problem with

25   this visitor from the trade association?

21

1        MR. WAISMAN:  I do not, Your Honor.

2        THE COURT:  Why don't you come forward?

3        MR. COHN:  Thank you.  Thank you, Your Honor.  We

4    don't understand the articulation of debtors' counsel's

5    objection to our brief.  Our brief is filed with the Court

6    subject to a reservation with respect to standing.  We would

7    like to resolve the standing of the International Swaps and

8    Derivatives Association with respect to the brief.

9        I can go forward or perhaps Mr. Waisman would like to

10   voice the objection.

11       THE COURT:  I'm not sure what the agenda looks like

12   for this afternoon and I'm going to be relying on debtors'

13   counsel to determine the order of play so we can make this as

14   efficient as possible.  Mr. Waisman, is this something that we

15   can address now or would you prefer to deal with it another

16   time?

17       MR. WAISMAN:  Your Honor, I'm happy to address it

18   now.  As we've said for some time, we have no opposition to the

19   filing of the motion with reservation of all the debtors'

20   rights as to who and what is said in the brief.

21       THE COURT:  Let me tell you.  I read the brief.

22       MR. COHN:  Thank you.

23       THE COURT:  So to the extent that the purpose of

24   having filed it was to have somebody like me read it, you've

25   already accomplished that objective.

22

1          In terms of your standing to appear and be heard

2     during argument in reference to unresolved questions on the

3     treatment of derivatives this afternoon, I gather there's a

4     continuing standing objection which may or may not be pressed

5     depending upon where we are in the process and whether you're a

6     friend of foe.

7          MR. COHN:  And actually, at this juncture, we have

8     nothing to say with respect to what goes on in the remainder of

9     this afternoon.  The International Swaps & Derivatives

10    Association has not had an opportunity to canvass its

11    membership for a consensus position.  Our brief was really

12    directed towards the bar date order that is being withdrawn.

13    And I'm simply here to make sure that the reply -- that our

14    brief is actually in the record.  I tried to engage Mr. Waisman

15    last week and over the weekend to find out exactly what his

16    remaining objection might be and was unable to find out.

17         So, if in fact the brief is in the record of the

18    proceedings then I'm done, Your Honor.

19         THE COURT:  I'm not sure that it's in the record.

20    But I don't know that it matters that it be in the record

21    unless it matters to you.  Let's find out.

22         MR. WAISMAN:  Just one clarifying point.  There was a

23    statement --

24         THE COURT:  You haven't withdrawn the --

25         MR. WAISMAN:  I haven't withdrawn the bar date

23

 1    motion.

 2              THE COURT:  I know you haven't withdrawn it.

 3              MR. WAISMAN:  And as Your Honor noted, the brief is

 4    on file for what it's worth.  And we reserve the right to the

 5    extent they take a position with respect to a particular

 6    objection or issue to assert all of our rights and responses.

 7    And I'm hoping we can agree that that's the way forward and

 8    move on with the agenda.

 9              THE COURT:  Okay.  We're in a zone of ambiguity.  Is

10    that okay with you?

11              MR. COHN:  I'd appreciate clarification.  If you

12    wouldn't mind, Your Honor, industry associations commonly

13    appear as amicus.  I'm not sure what the nature of the

14    obstruction is here.  The International Swaps & Derivatives

15    Association publishes the ISDA master agreement and we

16    submitted our brief with respect to how we think the ISDA

17    master agreement interfaces potentially with the bankruptcy

18    court and the bankruptcy court's rules and procedures.

19              We believe that under Section 105(a) and under

20    Bankruptcy Rule 9029(b), you have ample authority simply to say

21    within your discretion that the brief is filed.  And we're

22    perfectly happy to leave any other participation in this

23    proceeding to whatever objections Mr. Waisman cares to make.

24              THE COURT:  Well, if it's important to you for the

25    brief to be filed, I can tell you that it's attached to a

24

1    motion requesting leave to file --

2          MR. COHN:  Yes, it is.

3          THE COURT:  -- an amicus brief.  And because I read

4    the brief that was attached to the motion, it's better than

5    filed; it's actually read which is about -- which is more than

6    you can say for a lot of things that are filed.

7          So, to that extent, I'd declare victory and leave.

8          MR. COHN:  Well, I think I probably should take your

9    advice on that, Your Honor.  So thank you very much.

10         THE COURT:  Okay.

11         MR. WAISMAN:  Okay.  Try that again, Your Honor.

12   Good afternoon.  Shai Waisman, Weil Gotshal & Manges, again for

13   the record on behalf of the debtors.  Your Honor, the only

14   remaining matter on the agenda is the debtors' motion to

15   establish a bar date.  The motion appears at docket 3654 and

16   was filed on May 26th.  It was originally scheduled to be heard

17   by the Court on June 17th and adjourned by the debtors to June

18   24th which was last Wednesday.  We had a hearing before Your

19   Honor and adjourned the matter to 2 p.m. this afternoon.

20         Your Honor gave some very helpful comments on the

21   record of the hearing and one of the suggestions that Your

22   Honor made, all of the parties, I think, took up which was the

23   formation of an ad hoc group of creditors to gather, discuss

24   their issues with the proposed bar date motion and interface

25   with the debtors.  And in fact, immediately following the

25

1    conclusion of the hearing, a group was formed.  The group met,

2    I believe, on June 25th on their own and interacted at some

3    point during that meeting with the advisors to the creditors'

4    committee.

5         The very next day, commencing at 10 a.m., the debtors

6    hosted the ad hoc group and the creditors' committee and the

7    offices of the debtors' counsel.  There were over thirty

8    parties represented at that meeting by over forty counsel, many

9    of which are here today.  I think the meeting can be accurately

10   described as a free, open, honest dialogue as to the burdens to

11   the various parties as a result of the proposed procedures as

12   well as the benefits to the estate from the proposed

13   procedures.  And in an exchange that lasted almost till 10:00

14   that night with all the parties essentially still in the room,

15   the parties were able to conclude an agreement as to the form

16   of a bar date order, the form of a questionnaire, derivative

17   questionnaire, and the form of a guarantee questionnaire that,

18   in substance, no one in the room found objectionable.  I

19   described it in a pleading this morning as unanimity but, of

20   course, it was subject to final documentation and that final

21   documentation subject to everyone in the room confirming with

22   their clients that they had appropriate sign off.

23        We did file a statement this morning and the

24   statement was followed by an amended statement to clarify that

25   for those in the room, there was unanimity as to the proposed

26

1   bar date order, the proposed procedures, but that it did not,

2   by any means, resolve all of the objections.  And the debtors,

3   in fact, promised those in the room that identities would not

4   be disclosed so that there could be a fair dialogue among

5   everybody and that everybody would reserve rights.

6           As we stand here today, I think there is one party

7   who has advised us they would like to speak to a narrow issue

8   on the derivative procedures.  And aside from that, there are

9   two remaining issues but issues that were not taken up in any

10  way by the ad hoc group, those relating to the European medium

11  term notes and, I think, another issue related to certain SIVs

12  and objections or claims they may have -- SPVs.  I'm sorry,

13  they're not SIVs.

14          We did, with our statement, file a blackline of the

15  entire package, the order and the questionnaires comparing what

16  was distributed in court on Wednesday with where we are today.

17  And that blackline was handed out as well to everyone in the

18  courtroom at the commencement of this hearing.  Not sure if

19  Your Honor received a copy.  We did have a set delivered to

20  chambers.  I do have additional copies if Your Honor would like

21  a copy of the blackline bar date order.

22          THE COURT:  I've looked at a variety of papers in

23  preparation for today's hearing so I'm absolutely clear that

24  we're talking about the same blackline.  It probably would be

25  just as well if you handed one up.

27

1          MR. WAISMAN:  If I can approach?

2          THE COURT:  Please.  Thanks.

3          MR. WAISMAN:  Your Honor, rather than take everyone

4    through another boring monologue of mine as I did on Wednesday,

5    I can highlight some of the more substantive modifications made

6    and then address a few other points on the record before we

7    move to any open issues.  And what's embodied in what Your

8    Honor holds again is the product of the meeting on Friday and

9    comments, additional clarifying and some substantive comments,

10   that were received by the debtors and largely accepted over

11   this past Saturday, Sunday and this morning as well.

12          The revisions to the bar date include a bar date for

13   proofs of claim of September 22nd, 2009.  In a departure from

14   the last iteration, derivative questionnaires and guarantee

15   questionnaires are now due on the same day and that date is

16   October 22nd, 2009.  The mailing of notices of the bar date and

17   the proofs of claim will occur no later than July 8th.  In

18   fact, the debtors believe they may be able to effect the

19   mailing earlier, but given the holiday weekend that we are now

20   running up against, we needed to leave a little bit additional

21   time for the mailing to occur.

22          All in, Your Honor, that's approximately just under

23   eighty days from mailing to bar date and 106 days to

24   questionnaire deadline.

25          The significant changes, the most significant

28

1    changes, were made, obviously, to the derivative questionnaire.

2    I'm not sure it's a good exercise again for me to go line by

3    line through the questionnaire.  But the blackline does

4    highlight the changes.  And, again, this reflects the work of

5    the ad hoc group, the debtors and the creditors' committee

6    which played an integral part both before, during and after the

7    meeting on Friday to ensure that there was a consensus among

8    the parties and served as a good mediator.

9         THE COURT:  May I just ask a question about the ad

10   hoc committee?  You commented earlier that there was, in

11   effect, a no name's basis for certain aspects of this process

12   to preserve the independence of client positions.  Are the

13   members of the ad hoc committee a secret or can I know them?

14   And are they, in fact, reasonably representative of the

15   interest being generally represented in the room?

16        MR. WAISMAN:  Your Honor, good question.  First, I

17   will note that I learned the hard way at the meeting we had

18   that they do not like to be called a committee.  They are an ad

19   hoc group.

20        THE COURT:  Of course.  We're in 2019 land.

21        MR. WAISMAN:  I did make a representation just so no

22   one would feel like their rights would be prejudiced by

23   participating in the meeting and contributing.  And everyone

24   really did contribute and I think everyone was somewhat

25   inspired by what we were able to achieve that day.  I did

29

1    promise those groups that I would not disclose the client

2    representations.  They are here in the room.

3            THE COURT:  Okay.

4            MR. WAISMAN:  It is the debtors' belief that it was a

5    fair cross-section including derivative claimants and guarantee

6    claimants.  But I would leave it to those members to step up

7    and identify themselves if they'd like to do so or comfortable

8    doing so and if the Court would --

9            THE COURT:  I'm not trying to force anybody to

10   disclose what they would prefer to keep private at this moment.

11   I'm simply trying to understand the composition of the

12   committee, the number of members and to get some assurance that

13   at least in the view of those who have been part of the process

14   that it's a fairly representative group.

15           MR. WAISMAN:  Again, I will say that over thirty

16   institutions were represented in the room, a few on the phone

17   and these were all groups that had objected initially to the

18   bar date.  They were represented by over forty counsel.  And we

19   do believe them to be fairly representative.  I'll also say

20   that since we circulated the blacklines on Saturday and subject

21   to revisions, we have heard back from many of them confirming

22   that their clients had signed off on the form.  And I do think

23   that I can fairly represent that it is the recommendation of

24   that group.  But I am concerned by my assurances to the group

25   that -- I personally would not disclose identities.

30

1          I'm happy to take a break if others want to --

2          THE COURT:  No.  That's okay.  I'm just recognizing

3    how unusual this is because in, I guess, basic bankruptcy

4    courses, everybody knows that bankruptcy is a fish bowl and

5    that it's supposed to be incredibly transparent.  And the theme

6    of this bankruptcy case starting in the second week of the

7    case, not the first, was the transparency was the order of the

8    day.  So this is an opaque ad hoc group, something which I

9    think is not necessarily in the best interest of what I believe

10   to be an important theme of this bankruptcy case.

11         So at some point during the afternoon hearing, I'd

12   like the parties who have been part of this process to take

13   ownership of it.

14         MR. WAISMAN:  Understood, Your Honor.  They will

15   certainly have an opportunity in a moment to step up.  I can

16   also canvass them individually and get their consent.  But we

17   did think it was an important component to being able to have a

18   fair open exchange on Friday.  And I think the results reflect

19   that hopefully it helped the process along.

20         THE COURT:  I'm confident that it did and I'm very

21   pleased that this informal process of meeting and conferring

22   and reaching certain accommodations has produced something

23   which may reflect a consensus position.

24         I'm not making too much of this point other than to

25   say that I am somewhat troubled by the fact that it's not, at

31

1    this point, public and I think that it should be, in part,

2    because to the extent that we are going to reach a conclusion

3    today that produces an order, I'd like very much to have a

4    record that's available to parties who are not represented so

5    that there's a clear understanding as to how we got here.  But

6    let's proceed.

7           MR. WAISMAN:  Okay.  And the only other point I can

8    make is after canvassing the group and comparing them to our

9    records, we do believe that over fifty percent of all

10   derivative transactions -- over fifty percent -- were

11   represented in that room.  So that is a significant group.

12          With that, unless Your Honor has any questions as to

13   the form of order and any particular modifications made to the

14   order, I did also represent that I would make a few quick

15   statements on the record, the first one being that -- obviously

16   a big component of the proposed procedures is a website where

17   information will be submitted and downloaded.  Recognizing that

18   the website is not up and running at this very moment, we

19   agreed with the members of the ad hoc group that we would form,

20   essentially, a focus group with a few representatives that

21   would, prior to unveiling the website, would work with the

22   debtors and their professionals to kind of preview the website,

23   raise any questions and really make sure that it is as easy and

24   as functional to use as is possible.  And we hope to do that

25   later this week beginning of next week.

32

1        There's also been a request that we make clear on the

2    record that nothing in the bar date order is meant to affect

3    the safe harbor provisions of the Bankruptcy Code and, of

4    course, that is not the debtors' intention.

5        There have been a number of questions as to who can

6    file a proof of claim and the questionnaires.  And as the bar

7    date order makes clear and any bar date order makes clear and

8    the law is clear, it is a holder of a claim or their authorized

9    representative.  There is nothing in any of those documents

10   that modifies the law on that point.

11       We do have a continuing request for, essentially,

12   cure periods and notices.  We addressed that briefly at the

13   hearing last Wednesday.  The provision that Your Honor referred

14   to as perhaps a fool's errand has been struck.  But we will say

15   on the record that to the extent people do make a good faith

16   effort to comply, no one is seeking to play a game of gotcha

17   and call them out for not submitting a specific document.  And

18   there will be a cooperative good faith process where the

19   debtors endeavor to contact people that attempted in good faith

20   to comply to resolve issues before they're brought to the

21   Court's attention.

22       With that, I think we've, subject to confirmation,

23   largely resolved all the objections to the bar date order.  I

24   note there is one party that would like to address the Court on

25   a narrow issue.  And perhaps we should do that first and then

33

1   we can turn to the two remaining issues being the SPV and the

2   EMTN issue.  But happy to proceed how ever Your Honor would

3   like.

4           THE COURT:  Let's deal with the narrow issue.

5           MR. DORCHAK:  Good afternoon, Your Honor.  Joshua

6   Dorchak, Bingham McCutchen, on behalf of Deutsche Bank AG.

7   Deutsche Bank filed a fairly lengthy objection to the

8   procedures motion, Your Honor, which has now shrunk down to a

9   very limited objection on two points neither of which are part

10  of a philosophical difference of opinion.  And, in fact,

11  Deutsche Bank was a member of the ad hoc committee and did

12  participate over the last few days and is pleased with the

13  progress that was made.

14          These are practical points, which is not to discount

15  them, practical but important points that didn't get resolved

16  in the course of those discussions.  And the two background

17  points that you -- I'd like to tell you are, number one, that

18  Deutsche Bank is a counterparty to various debtors on

19  derivatives contracts with one hundred thousand or underlying

20  trades.  And that means that Deutsche Bank is especially

21  sensitive to the burdens of responding to the procedures.

22          The second important fact is that Deutsche Bank has

23  been negotiating with the debtors post-petition voluntarily to

24  resolve all of the open derivatives issues.  And in the course

25  of doing so has provided a great deal of information.  In fact,

34

1    I believe they've provided everything that's covered by 4A, B,

2    C and D on the derivatives questionnaire already and that

3    information's been worked with, assessed and, in many cases,

4    signed off on with agreement on both sides.

5           With that background, Your Honor, the two things that

6    the proposed orders don't do that Deutsche Bank would like to

7    have them do would be, number one, relieve a counterparty who

8    has already provided information to the debtors from providing

9    it again.  Number two, to permit a counterparty to provide

10   information to the debtors on DVD as opposed to uploading it to

11   the proposed website, which, as Mr. Waisman just said, no one

12   has yet seen in operation.

13          The last of the points, Your Honor, my client,

14   Deutsche Bank, has a very legitimate concern that they're going

15   to have to put one or more employees to work all day all summer

16   inputting details about one hundred thousand trades, one by

17   one, uploading onto a website even though the debtors already

18   have this information and have already signed off on it in many

19   cases.  These are two practical forms of relief that Deutsche

20   Bank would like to seek in part because there are so many

21   trades at issue.  And we'd respectfully request that Your Honor

22   consider those proposed modifications.

23          THE COURT:  I will consider them.

24          MR. DORCHAK:  Thank you.

25          MR. PEDONE:  Your Honor, Richard Pedone with Nixon

35

1    Peabody on behalf of Deutsche Bank as indenture trustee and

2    supplemental interest trust.

3            THE COURT:  This is a different arm of Deutsche Bank?

4            MR. PEDONE:  It is, Your Honor, and this form, also

5    through Nixon Peabody, filed an objection to the motion.  And

6    we, too, participated in the ad hoc committee and appreciate

7    the progress that was made.

8            We have one narrow issue that is unresolved and that

9    is as trustee, Deutsche may be forced following and event of

10   default or otherwise to file proofs of claim or a manager who

11   has primary responsibility would have initially terminated or

12   taken other action.  It may be beyond the trustee's ability to

13   actually get possession of the documents and all of the

14   information needed to comply with the procedures.  We will

15   undertake a good faith effort to put all the information in but

16   there may be circumstances where it simply proves impossible to

17   do at this time.  And so, we had hoped that there would be a

18   form of good faith compliance exception of the procedures which

19   was removed.

20           We've given the debtors some specific language to try

21   to resolve the issue for trustees and our situation and that

22   was unacceptable.  So we'd, on that point, continue our

23   objection, Your Honor.  Thank you.

24           THE COURT:  Okay.  Well, it was this pen that removed

25   it.

36

1           MR. PEDONE:  I understand.  Thank you.

2           THE COURT:  But let me be clear as to what I was

3   concerned about and it may be that there's a way around your

4   concern.  I was conscious of the fact that we were creating in

5   a relatively abbreviated period of time a model that is

6   intended to be a somewhat more elaborate version of proof of

7   claim practice as it applies to derivatives and guarantee

8   claims in the Lehman case.  The good cause for doing that being

9   that given the complexity of the transactions and the need to

10  address a great volume of transactions of similar sorts that

11  something as loose as good faith compliance was an exception

12  that would swallow the rule.  That was my concern.  That

13  remains my concern.

14          It was my belief, and I said this fairly emphatically

15  last week, that we needed to come up with a pretty much no-

16  exceptions design that would apply to everybody in which

17  everybody would get clear and conspicuous notice of the

18  obligation to perform and would be acting at their peril should

19  they fail to perform fully and faithfully.  That having been

20  said, if there is a legitimate provable problem that a party is

21  having while engaged in a good faith effort to comply, I have a

22  feeling that parties will be able to stipulate to some relief

23  geared to the particular circumstance.  But I'm not going to

24  design that now nor do I think it appropriate to design it now.

25          The premise on which this is based is the history

37

1    that we've had in this case for the last, approximately, nine

2    months in which we have been dealing with any number of

3    unprecedented commercial transactions that I believe have never

4    before been presented in a bankruptcy court at least to this

5    level of volume and sophistication.  And somehow, counsel have

6    been able to work out procedures, whether related to open

7    trades or, in this instance, as it relates to proofs of claim

8    for derivatives.  And I think that it's going to be possible to

9    deal with particular problems all of which I can't presently

10   foresee as they arise.  But meanwhile, the world should know

11   that there's a potential cliff that they're going to walk over

12   on September 22nd and again on October 22nd.  And it's going to

13   be a long way down.

14        MR. PEDONE:  Your Honor, I fully understand the

15   Court's position.  We will work with the debtor as best we can.

16   But in light of the fact that see potential impossibilities, I

17   do need to continue with that limited part of our objection to

18   the procedures.

19        THE COURT:  That's fine.

20        MR. PEDONE:  Thank you.

21        THE COURT:  And my philosophy here is that there

22   should be flexibility to deal with the particular problems of

23   someone that's trying to comply in good faith.

24        MR. PEDONE:  Thank you.

25        MR. THAU:  Your Honor, Andrew Thau of Skadden Arps on

38

1    behalf of Silver Point Capital Fund and Silver Point Capital

2    Offshore Fund.  We just wanted to confirm a couple clarifying

3    comments we had with debtors' counsel that the beneficial

4    holders of the Euro Medium Term Notes can file proofs of claim

5    and that nothing in the bar date order is intended to limit the

6    ability of assignees to assert assigned claims beyond

7    Bankruptcy Code and the bankruptcy rules limitations.

8            MR. WAISMAN:  Your Honor, Shai Waisman again.  I

9    think three points to address very quickly in maybe reverse

10   order.  As to Silver Points' statement, I believe both of the

11   statements comply with the Bankruptcy Code, the rules and the

12   law.  And the bar date order does not change parties' rights to

13   file claims.

14           Two Deutsche Bank issues.  Deutsche Bank -- I'm

15   sorry.  Attorney for Silver Point would like to say something

16   further on that point.

17           MR. THAU:  At the request of debtors' counsel, I just

18   wanted to confirm that Silver Point participated in the

19   meetings on Thursday and Friday and it was a productive

20   process.

21           THE COURT:  Thank you.  We're getting creeping

22   transparency.

23           MR. WAISMAN:  I'm happy to let others step up and

24   interrupt me for the same statement.

25           Deutsche Bank first issued -- Your Honor, the issue

39

1    as to information provided during the course of these cases in

2    all sorts of conversations, discussions with the debtors was

3    the subject of discussion on Friday.  I think the burdens to

4    both sides have to be weighed and they have been considered by

5    the debtors.  The derivative procedures substantially reduce

6    the burdens on all of the counterparties in submitting

7    information.  But the benefit of having the website in a

8    centralized process for the submission of all the information

9    and a centralized location and formatting of all the

10   information will help the claims process and the forward

11   progression of these cases immeasurably.  And that has to be

12   weighed against if -- and assuming with our argument that it's

13   correct, and I'm not sure that it is, but that somebody has to

14   sit and plug in all the information, it would be no different

15   than the burden on the debtors if the debtors were to accept

16   paper copies and the debtors would need to input all the

17   information to create this centralized catalogue of these

18   highly complex claims.

19         So on balance, and there's no question there are

20   burdens, but on balance, I think we strike the fair balance in

21   the proposed order.  And the requirement to submit the

22   information on the website, given the numerous objections, I'm

23   not sure is being pressed because of the reduced burdens that

24   the new procedures provide for and the submission of the

25   information is an important one for the debtors on the website

40

1    is an important one for the debtors.

2           And as to the second point raised by Deutsche Bank,

3    Your Honor is absolutely right.  To put language in the order

4    would be the exception to swallow the rule here.  Of course, my

5    representation last week and again today is that we will work

6    in good faith with any party that has particularized issues and

7    problems and fashion a way to make this process as smooth as

8    possible and not require the Court's intervention.  And I think

9    that should suffice.

10          I also have authorization to represent that Calyon

11   and Pimco participated in Friday's meeting the result of which

12   is the modified procedures.  I believe I also have Barclays

13   authorization to represent that they participated as well.

14          THE COURT:  Good.  One point raised by counsel for

15   Deutsche Bank that does concern me a little bit is this.  I

16   gather that there are parties in different stages of

17   information sharing.  And based upon one of the declarations

18   that I read, I believe that there are only 500 trades in total

19   that have gotten to the point of being fully reconciled at this

20   juncture which is a very small percentage of the total.  I

21   haven't done the math but it's point zero something.

22          And to the extent that Deutsche Bank has been

23   exceptionally forthcoming -- I don't know if that's true or

24   not.  I'm just hearing counsel say we gave at the office, in

25   effect, and provided a lot of information and have been working

41

1    with great diligence to help provide information which is of

2    the exact same sort as that which is requested by the

3    questionnaire, it raises a question of duplication of effort

4    which has been brought up.  Is it the debtors' position that

5    even if duplication of effort is what's required that it's

6    appropriate here so that all parties to derivative trades are,

7    in effect, in the same place in terms of the work they need to

8    do and in terms of the website where the work product is to

9    ultimately reside?

10           MR. WAISMAN:  Your Honor, that is the debtors'

11   position in the process.  And I'm not -- I'm far from an expert

12   in the process.  But in the process, if you properly terminated

13   a derivative contract, you submitted some information.  And the

14   spectrum from terminating and submitting some to others who

15   either in cooperation or on their own submitted additional

16   information while an issue in terms of duplication, does not in

17   the debtors' estimation resolve the fact that this procedure is

18   the only way for the debtors to actually have a firm deadline

19   where all the information is collected in a centralized

20   location where it's not in one party's hands and someone else's

21   hands or the debtors aren't even sure where it is but somebody

22   says they provided it -- there are all sorts of gray as to what

23   may have been provided and what may not have been provided.

24   And just like any other bar date in any other case where a

25   party may have sent in a request for payment with a copy of a

42

1    contract, when the bar date comes, people do need to submit

2    that claim again.  And necessarily, there is duplication in the

3    process.  There is burden in the process.  There's no argument

4    with that but what we've tried to do here is create a process

5    that minimizes that effort.  And one thing I should point that

6    in addition to having sort of a focus group just sit and

7    observe the website, one of the things we will undertake is an

8    effort to make that website easy to manipulate and populate as

9    is possible so that, we hope, no one has to spend the summer

10   typing in each and every data field, that perhaps there is

11   information, tables that can be downloaded onto systems that

12   will automatically populate information and that can then be

13   uploaded.  We promised the counterparties that we will do our

14   best to make sure that it will be as easy to function and

15   populate as is possible.  But will there be duplication?  There

16   always is duplication.  We've tried to minimize the burden

17   though and the balance here we think is fair and reasonable.

18           THE COURT:  Okay.  As to the --

19           MR. DORCHAK:  If -- could --

20           THE COURT:  Oh, do you wish to say more on this?

21           MR. DORCHAK:  Very quickly, Your Honor.  You'll like

22   the second one better than the first one.  The first one is to

23   follow up on that.  Deutsche Bank didn't simply throw some

24   documents at these debtors.  They've been working for a long

25   time now.  They provided all the specific trade specific

43

1    information with valuations for a hundred thousand trades on

2    DVD.  If the debtors' counsel consulted with the debtors they

3    would be able to confirm that.  So we're not talking about

4    Deutsche Bank trying to get away with throwing some documents

5    at the debtors and saying they're special.  Just for the

6    record.

7            The second thing, I don't -- well, sorry.  Another

8    half of the first thing, the DVD submissions have been working

9    fine in the course of the negotiations so far and I don't

10   understand the need to have everything uploaded as opposed to

11   uploaded in DVD.  Deutsche Bank would be happy to work with the

12   debtors to ensure that the website is user friendly.  So we're

13   not -- we're happy to cooperate.  But we're looking at a

14   wishful thinking situation on the user friendly nature of the

15   website.

16           And the second thing, Your Honor, I can confirm that

17   my other clients, UBS AG and their affiliates, State Street

18   Bank and Trust Company and Putnam Investments LLC participated

19   in the ad hoc group negotiations.

20           THE COURT:  Thank you.

21           MR. DORCHAK:  Thank you.

22           THE COURT:  As to this narrow continuing objection,

23   we're getting in a zone that's really not legal; it's

24   practical.  And for reasons similar to the comments made

25   earlier in connection with stipulations to accommodate good

44

1    faith compliance on an ad hoc basis, it seems to me that we are

2    dealing with Deutsche Bank's risks.  Deutsche Bank participated

3    in the process, is participating in this hearing and knows that

4    the philosophy which underlies the development of a uniform set

5    of procedures to apply to the filing and proving of derivative

6    claims is something that really is not intended to have a lot

7    of exceptions.  Indeed, it's intended to be a no-exception

8    approach to dealing with proofs of claim.

9          To the extent that Deutsche Bank may be able, through

10    persuasion, to convince debtors' counsel or Alvarez & Marsal or

11    whoever they may be dealing with that the DVDs previously

12    submitted contain information that can be easily transferred to

13    the website and that it's best done by Lehman personnel because

14    they have control of the information already and some

15    appropriate stipulation to that effect is developed.  I'm

16    indifferent as to that.

17          I do think, however, that it is really inappropriate

18    for one counterparty, regardless of the number of trades

19    involved, to be taking the position that substantial compliance

20    means, in effect, exoneration from having to be bound by the

21    very same procedures that apply to everybody else.

22          So at least in terms of my reaction to this argument,

23    it is that this request for a narrow special exception is

24    denied with the same basic overlay as applied to my earlier

25    remarks, namely, that we're dealing with extraordinarily

45

1    sophisticated institutions that are dealing in a market that is

2    well known to them although, generally, unknown to most human

3    beings.  And to the extent that there is a way to demonstrate

4    that the functional equivalent of developing an information

5    base to allow for ready reconciliation can be accomplished by

6    means of data previously submitted or any other form of data

7    transfer previously submitted and the debtors find that

8    acceptable, I suppose that they can, if they choose to,

9    stipulate away the protections of the order which I'm about to

10   enter today.

11          But in terms of the integrity of the order and the

12   proof of claim process, I consider it unwise to cobble together

13   exceptions now.  And I refuse to do it.

14          MR. WAISMAN:  Your Honor, I think with those issues

15   resolved, we are down to two particular issues proceeding with

16   a bar date, the first one relating to the EMTN program and the

17   process by which claims will be asserted on account of the EMTN

18   program; and secondly, the SPV issue, which I'm told Your Honor

19   is familiar with, and others will address.

20          On EMTN, my partner, Lori Fife would like to address

21   the Court as to the EMTN and SPV.

22          THE COURT:  I don't think there's ever been a case in

23   the history of the world that has had this many terms that are

24   just initials.  It's incredible.

25          MR. WAISMAN:  I agree.

46

1          MR. FLECK:  Good afternoon, Your Honor.  Evan Fleck

2     of Milbank Tweed Hadley & McCloy.  If I may, Your Honor, we

3     would like to advise the Court with respect to the committee's

4     thinking and ultimate decision to support the derivative

5     questionnaire aspect.  And I guess that takes us one step back.

6     But we did want to provide that information to the Court.

7          THE COURT:  I assume the committee also participated

8     in the marathon sessions at Weil Gotshal last week.

9          MR. FLECK:  Yes, Your Honor.  The committee's

10    representatives participated, the counsel to the committee as

11    well as the financial advisors.

12          The concept of the derivative questionnaire that

13    would go along with the proof of claim procedures was shared

14    with the committee very early on in the process.  And as was

15    reflected in the debtors' pleadings in connection with the bar

16    date, the committee's advisors worked closely with the debtors

17    to help to develop and comment on those procedures.  As the

18    Court is aware, there is a derivative subcommittee of the

19    committee that directly considers and consents to derivative

20    transaction settlements with respect to both claims and in the

21    money positions.  That's pursuant to this Court's order that

22    was entered in mid-December.

23          The derivative subcommittee, in particular, spent a

24    lot of time reviewing the procedures that were set forth in the

25    original draft and the iterations thereafter of the derivative

47

1    questionnaire and asked very probing questions of the

2    committee's advisors with respect to what was necessary and

3    appropriate in the context of these cases.  And as we indicated

4    at the hearing last week, while the committee was very far

5    along in the process and recognized the need for special

6    procedures for derivatives in these cases, we weren't quite

7    there yet.

8         And I'm very pleased to report to the Court that

9    through the process that took place on -- starting on Thursday

10   when the committee's advisors met with the ad hoc group

11   derivative counterparties by phone through the process on

12   Friday and then over the weekend when the committee met

13   yesterday in an extended session to consider these procedures.

14   The committee is fully in support of the revised version of the

15   procedures because it's comfortable that it represents the

16   appropriate balancing of what is needed in order to move

17   through the derivative book in an appropriate fashion and also

18   in consideration of the burdens on the parties that are

19   directly affected by the procedures.

20        And I think -- would also like to comment that the

21   process that took place on Friday, in particular, was an

22   extremely healthy process.  We'd like to thank the Court for

23   the suggestion of it.  The parties absolutely worked in good

24   faith and in honest dialogue with respect to what was needed,

25   what was possible and appropriate for these cases.  And in

48

1   light of that process, and in light of the result of that

2   process, which is before the Court for approval, as I

3   indicated, the committee is in full support of the revised

4   procedures with respect to derivative contracts.

5           THE COURT:  Okay.  Thank you.

6           MR. SHERRILL (TELEPHONICALLY):  Good evening, Your

7   Honor.  May I be heard?

8           THE COURT:  You better identify yourself.

9           MR. SHERRILL:  Of course.  This is Mark Sherrill of

10  Sutherland Asbill & Brennan.  I represent US AgBank FCB and

11  Aviva entities.  Before we move on to the two narrower issues,

12  I'd like to voice an objection or a couple of objections on

13  these matters in a more general sense.  Neither US AgBank nor

14  Aviva participated in the ad hoc group.  And I would disagree

15  with counsel's statement that all objections have been

16  resolved.  I would prefer to have our objection ruled upon.

17          Our concerns are based primarily on the imbalance of

18  information that will be shared under these procedures.  I'm

19  not aware of anything that allows for the claimants to gain

20  access to the debtors' data which, if the concern voiced by the

21  Court is reconciliation of claims, it would seem that that

22  would be the most efficient process as far as them being a

23  universal sharing mechanism.

24          Under the procedures, as I understand them, there

25  would be an ability for the debtors to review data before

49

1    claims objections have been filed and propose their claim in

2    the amount that's approximately equal to that on the debtors'

3    books and records but where the methodology is different

4    somehow.   In ordinary circumstances, no claim objection would

5    be, too.   But here, because of the amount of data that's being

6    shared and other information, that might lead to a claim

7    objection.   Similarly, after a claim objection is filed, the

8    debtors will have full understanding of the strengths and

9    weaknesses of the claimant's case while the claimant has no

10   understanding of the debtors.   Yet, there would be possible

11   discovery under Rule 2004 but I suspect that that would be

12   heavily opposed.

13        From a broader view, the result is litigation

14   advantages for the debtors that, in effect, lead to the trading

15   counterparties that were in the money, those that made good

16   trades with Lehman, to settle in a discount because of the

17   taxable advantage that the debtors will have and ultimately

18   subsidize the other unsecured creditors in this case.

19        I would finally add that I think just about everyone

20   recognizes that this is extraordinary relief that the debtors

21   seek.   I believe the Court used the same word last week.   And I

22   don't see that the debtors have established an extraordinary

23   basis for that relief sought.   The basis for the relief boils

24   down to the fact that there are a lot of derivatives contracts

25   that are very complex.   Obviously, that's true, but to some

50

1   extent, it must be the case that the debtors assume that risk

2   by entering into this type of business.  The debtors have an

3   army of professionals that can work to liquidate these

4   derivatives contracts where the creditors and the claimants do

5   not have such resources.

6        For those reasons, US AgBank and Aviva would oppose

7   the entry of any party that requires the completion of

8   questionnaires.  We feel that there -- may result in an

9   impermissible shifting of burdens.  And to the extent

10  modifications have been raised in the questionnaires in this

11  stage while the result of admirable efforts are ultimately

12  irrelevant from a legal perspective.  Thank you.

13       THE COURT:  I see someone interested in speaking.

14       MR. NOVIKOFF:  Not to that objection.  It's a related

15  matter, Your Honor.

16       THE COURT:  Why don't you come forward?  Mr.

17  Novikoff, how are you?

18       MR. NOVIKOFF:  I'm very well, Your Honor.  Harold

19  Novikoff, Wachtell Lipton Rosen & Katz, on behalf of JPMorgan

20  Chase Bank.  Your Honor, we actually appreciate the efforts of

21  the ad hoc group and congratulate them on getting a much better

22  product than before that started.  However, we were not a part

23  of that group.  That is because as is referred to in the order,

24  we did negotiate in advance with the debtor a stipulation which

25  has been submitted to Your Honor, I believe, before the last

51

1    hearing on this matter to deal with the fact that JPMorgan has

2    in the area of 75,000 derivatives trades with various of the

3    Lehman debtors as well as other Lehman affiliates.  We have

4    made a very high priority trying to get those resolved with the

5    debtor, have given a tremendous amount of information,

6    including electronic sharing of information so that the

7    databases for that can be filled and that is -- they've been

8    almost fully reconciled at this point.  And we've had our

9    traders meeting with their team who is reconciling and looking

10   at valuations to go forward with that process.

11        We have entered into a stipulation with the debtor

12   which has been given to Your Honor, the deal with the mass of

13   information that we've given to allow that to be used and to

14   continue sharing information in that way.  And we intend to

15   continue working with the debtor to try to reconcile and

16   hopefully agree on the amount of the claims as soon as we

17   reasonably can.

18        I would ask Your Honor to sign on to that stipulation

19   contemporaneously with the bar date order if and when you enter

20   it.

21        THE COURT:  I'm familiar with the stipulation and

22   looked at it last week and decided to put it to one side until

23   after we concluded other matters relating to the derivatives

24   proof of claim procedures.  Not that I had any hesitation in

25   approving that separate stipulation but it seemed to me that it

52

1    was appropriate to have it determined at the more or less

2    contemporaneous moment.  That's the reason for the delay.

3            MR. NOVIKOFF:  We agree with that, Your Honor.  It is

4    something that should entry of the order --

5            THE COURT:  I'm glad I made the right call on that

6    one at least.

7            MR. NOVIKOFF:  Yeah.  So certainly, we'd make sure

8    they're consistent with each other but we wanted to draw your

9    attention to the fact and it is something that we are looking

10   for.

11           THE COURT:  Okay.  Thank you.

12           MR. NOVIKOFF:  Thank you, Your Honor.

13           MR. ELLENBERG:  Can I come up?

14           THE COURT:  Yes.

15           MR. ELLENBERG:  Your Honor, Mark Ellenberg,

16   Cadwalader Wickersham & Taft on behalf of Morgan Stanley.

17   Perhaps, Your Honor, and particularly in light of the objection

18   that was voiced, it might be a good time to demystify somewhat

19   the ad hoc group process that went on here.  Let me try to do

20   that.

21           Shortly after the hearing concluded last week, a

22   number of people -- a number of objectors gathered in the

23   courtroom and agreed to have a meeting the following morning at

24   Cadwalader.  We attempted to give very wide notice of that

25   meeting.  Anyone who expressed an interested in coming was

53

1    permitted to come.  Nobody was intentionally excluded from that

2    group.  We even invited Mr. Novikoff.  And --

3         THE COURT:  He declined because he already had a

4    stipulation.

5         MR. ELLENBERG:  Yes, he did, Your Honor.  So we

6    intended to get as wide a cross-section of objectors as we

7    could.  And we did meet for most of the day at Cadwalader and

8    then the following day at Weil.  And amazingly, given the

9    number of parties that were involved, we did reach an end

10   product that everyone could live with.

11        I think, Your Honor, the confidentiality concerns may

12   be two-fold.  The first is that, as Your Honor noted at the

13   hearing last week, this ad hoc group is somewhat without

14   portfolio.  We don't have fiduciary duties to anyone beyond our

15   group and, indeed, we don't even have fiduciary duties to each

16   other.  And so, we didn't want any patina of committeeness to

17   be lent to the process, I believe.

18        And the other thing is that I'm not sure that any

19   member of the group wanted to be thought of as endorsing the

20   end product here.  We're not happy with the questionnaire.  As

21   the Deutsche Bank objection just made clear, there's things

22   about it that various members of the group aren't completely

23   happy with.  But we do think it got to a point where it was no

24   longer worthy of continued objections.  And we appreciate the

25   flexibility that the debtor demonstrated in getting us to that

54

1    point and we also tried to be flexible.  And at the end of the

2    day, as Your Honor observed, this was largely a pragmatic

3    exercise and we got to what we thought was a pragmatically

4    workable solution.  And so, that's where we ended up.  And if

5    other members want to come forward and say they participated,

6    that's great, but I think it is clearly fair to say that it was

7    a very wide cross-section of the trading community.  It was

8    dealers, it was non-dealers.  It was domestic, it was foreign.

9    And as I believe the debtors said, clearly more than fifty

10    percent of the trades were represented in that group.  Thank

11    you.

12         THE COURT:  Thank you very much.  That's helpful.

13    I'd also like to make what I hope is a helpful comment.  When I

14    proposed last week that a group of representatives of

15    counterparties to derivative contracts organize, it was as much

16    a wish as it was a direction.  It wasn't really a direction at

17    all.  It was my hope that the process that when involved in

18    could be a largely consensual one in which the positions of

19    counterparties could be openly expressed to the debtors in an

20    environment of give and take.  And based upon the reports that

21    have been made this afternoon, it seems that's exactly what

22    occurred.  And I'm gratified that happened.

23         However, I don't assume that any party that

24    participated in the process assumed any duties to any third

25    party.  I recognize that the process was completely informal.

55

1   And to the extent that it turned out to be representative,

2   that's a happy accident.  This was a coalition of the willing.

3   It wasn't anything more than that.  And to the extent that

4   there resulted from the process a set of procedures that

5   counterparties, at least those represented, could endorse, that

6   gives the Court added comfort that third parties who weren't in

7   the room should be able to deal with those very same procedures

8   in a businesslike way.

9        So I'm making that comment to make it clear that I

10  don't assume that any member of the committee has assumed any

11  responsibility to anyone.

12       MR. WAISMAN:  Your Honor, Shai Waisman again.

13  Perhaps for just a quick moment addressing the objection raised

14  by -- on the phone by US AgBank and Aviva, Your Honor, this

15  point was actually addressed in our original reply to all of

16  the objections.  The objector here would actually have us

17  believe that terminating and ISDA outside of court, a

18  bankruptcy process requires the free exchange of a great deal

19  of information about the trades.  But once a company falls into

20  Chapter 11, the termination of the ISDA with the overlay of

21  bankruptcy means that all you need is a proof of claim with no

22  supporting documentation and at that point, the onus is on the

23  debtor to actually initiate litigation to get the information

24  that it would otherwise be able to get without litigation.

25  That, of course, is not the law and certainly not appropriate.

56

1          In this Chapter 11 case, we have proposed these

2     procedures which have been now largely endorsed.  And far from

3     the suggestion of counsel on the phone, these procedures would

4     enable the debtors in a streamlined fashion obtain much of the

5     information required by ISDA and, indeed, a little bit more

6     than ISDA requires which our friends at ISDA, in their own

7     brief, recognized is appropriate in a Chapter 11 case.

8          For those reasons and everything else that's on the

9     record today, I would ask the Court to overrule the objection.

10          THE COURT:  Let me inquire if there's anyone else I

11    haven't heard from, either on the telephone line or in the

12    courtroom, that has an objection to press at this time.

13          UNIDENTIFIED SPEAKER:  Your Honor, there's a whole

14    EMTN objection which has been unresolved and has to be heard.

15          THE COURT:  That's a separate

16          UNIDENTIFIED SPEAKER:  Right.

17          THE COURT:  That's a separate matter.  And I'll be

18    getting to EMTN shortly -- next I'll be getting to it.  I just

19    wanted to make sure that in terms of the more general

20    objections that have just been articulated over the telephone

21    by counsel for US AgBank and Aviva which, in effect, reopened

22    the category of broad objections that have been largely closed

23    as a result of the amendments to the proposed order and

24    procedures.  I just want to see if there are any other

25    objectors in the same category to be heard from.

57

1          MR. VENDITTO:  Your Honor, Michael Venditto from Reed

2     Smith on behalf of Bank of New York Corporate Trustee Services.

3     We filed an objection with respect to both the Euro mid-term

4     notes as well as the derivative procedure process.  Our

5     objection is solely related to a particular synthetic portfolio

6     program known as the Dante program which, unfortunately, Your

7     Honor is probably more familiar with than you would like to be.

8     And it has to do at this point, since there's been substantial

9     modifications made to the derivative procedure with respect to

10    the timing and the bifurcation or propriety of having two

11    separate bar dates, both the general proof of claim filing bar

12    date which is proposed for a date in September as well as a

13    later bar date for the filing of the additional materials which

14    we believe, particularly with respect to the Dante program,

15    presents particular hurdles.  And I believe Ms. Fife has

16    indicated that that objection will be discussed later in the

17    hearing.

18          MS. FIFE:  Can do it now.

19          THE COURT:  I don't know when it's going to be

20    discussed but you're discussing it now.  Can we just deal with

21    it now?

22          MR. VENDITTO:  Certainly, Your Honor.  As Your Honor

23    is aware, there is an entire program which has been

24    euphemistically referred to as Dante in which Bank of New York

25    is functioning as trustee under deeds of trust that were issued

58

1    by the debtors English subsidiary, Lehman Brothers

2    International Europe.  Pursuant to that program, the debtors

3    set up approximately 180 special purpose vehicles.  Those

4    special purchase vehicles issued notes to investors around the

5    world primarily in Europe, Australia and Asia, and then entered

6    into derivatives contracts with Lehman Brothers Special Finance

7    which were guarantied by Lehman Brother Holdings.

8            As a result, the creditor, in particular, is a

9    special purpose entity which was originally organized by the

10   debtors but which is now essentially defunct.  The real parties

11   in interest would be the purchasers of the notes who are

12   scattered around the world who would have to give direction to

13   the trustee under the terms of the deed of trust which is

14   governed by peculiarities of British law.

15           As a result, Your Honor, we think that the process

16   that's -- timing of the process set forth in the proposed bar

17   order is unworkable with respect to our obligations to those

18   holders.  We believe that there will be approximately several

19   thousand of these noteholders scattered around the world.  The

20   only way the Bank of New York has to communicate with those

21   noteholders is through several of the European clearing systems

22   since the notes are held in the names of depositories.  The

23   ultimate beneficial holders, who are the only parties who could

24   give direction with respect to the filing of a proof of claim,

25   are unknown to us as well as to the debtor.  Because of the

59

1    mechanics of having to communicate to these technically known

2    but unidentified holders, through the clearing systems, we

3    believe that the process, which would now be essentially

4    eighty-five days, is unworkable for a couple of reasons.

5           First is the fact of getting the notice out through

6    the clearing systems, then the individual noteholders would

7    have to convene a noteholders meeting at which a vote is given

8    to give direction to the bank with respect to the filing of a

9    proof of claim whether it should be filed or not.  Some of

10   these derivative contracts have, in fact, been terminated.

11   Some have not and they're still open.  So the question of what

12   to do with those contracts is also something that would have to

13   be taken up by these noteholders.

14          Adding to that complexity is the fact that many of

15   these special purpose vehicles sold the notes to other special

16   purpose vehicles.  So this process has to be replicated two or

17   three times.  Under the terms of the governing documents, the

18   period for convening a meeting of the noteholders varies from

19   twenty-five to thirty-five days.  As a consequence, it's almost

20   unworkable in situations where there are multiple layers of

21   SPVs to get the requisite authority within the eighty-five days

22   contemplated by the initial bar date.

23          Then, of course, there is the additional problem of

24   obtaining the documentation necessary to complete the

25   questionnaire.  We believe that since our function as a

60

1    representative of these known but unidentified noteholders is

2    totally dependent on the instruction we receive and the fact

3    that we're dependent on receiving that direction that there's

4    no reason to have two separate dates.  We would not be in a

5    position to file a proof of claim without having all of the

6    information necessary which Lehman says itself needs in order

7    to evaluate the claim.

8            Therefore, I'm not certain that there's any real

9    benefit to the first September bar date.  The real value as far

10   as the estate is concerned and as far as we're concerned would

11   be the compliance deadline for the derivative questionnaire.

12           We therefore would recommend that the Court set a

13   procedure with only one date and adopt the later date which is

14   the date on which all of the substantive and supporting

15   documentation necessary to support the proof of claim is

16   available.

17           Setting an earlier bar date only creates an

18   additional layer of complexity and additional potential trip

19   wire for some of these noteholders who may miss it.  And

20   really, the benefit, since it has to do with the submission of

21   the questionnaire and the supporting materials, is the

22   effective bar date is in October.  So we recommend that the

23   Court set one bar date and adopt the October bar date, Your

24   Honor.

25           THE COURT:  Okay.  Before I let you go, I want to

61

1    understand something about the way this functions and what your

2    real interest is.  Is Bank of New York the party that would, in

3    the ordinary course, be filing a proof of claim in any event?

4        MR. VENDITTO:  No, Your Honor.  In the ordinary

5    course, it should be filed by the Lehman SPV.  But the SPVs

6    have defaulted under the terms of the documents as a result of

7    the filings by the debtors as well as by LBIE in England.

8    Consequently, the obligation to take enforcement action has to

9    be determined under the terms of the trust documents because

10   the derivative contracts have been pledged as collateral for

11   the underlying obligations of those SPVs to the noteholders.

12   So, essentially, the noteholders would be taking action only as

13   secured parties.

14       THE COURT:  All right.  So are you just here as a

15   friend of the unknown or are you here to protect your client as

16   against potential liability for failing to act or acting

17   without authority?

18       MR. VENDITTO:  Both, Your Honor.  We have an interest

19   in ensuring that there's a process here that results in the

20   filing of proof of claims by parties who are entitled to file

21   those proofs of claim.  I think that the provisions of the bar

22   order, as they've been hashed and rehashed here, have raised an

23   issue as to ensuring that the party who actually files the

24   proof of claim is legally entitled to do so.

25       As it stands now, here, now and today, we do not have

62

1   the requisite authority to file the proof of claim.  Our

2   obligation on behalf of these unknown noteholders would be to

3   ensure that they receive adequate notice, timely notice of what

4   their obligations are and afford them the opportunity to give

5   us direction.

6        THE COURT:  Have you done anything up to this point

7   to try to organize or notify or advise -- you don't need the

8   bar date to know that the bar date's coming.  And you don't

9   need a weatherman to know that it's going to be storming in the

10  fall.

11       MR. VENDITTO:  Your Honor, we have provided periodic

12  notices to the -- through the clearing systems to the

13  noteholders with respect to key developments in the bankruptcy

14  case.  Not knowing exactly what the terms of the bar date order

15  would provide or what the deadlines would be, what the process

16  and procedures would be, we have not given specific notice to

17  the noteholders with respect to the elements of the bar date.

18       THE COURT:  Okay.  I understand your concern.  Thank

19  you.

20       MR. VENDITTO:  Thank you, Your Honor.

21       THE COURT:  It looks as if we've ended up skipping

22  EMTN and we're down at SPV so we'll just deal with SPV.  And

23  then we'll go back to US AgBank and Aviva.

24       MR. SLACK:  Your Honor, Richard Slack from Weil

25  Gotshal for the debtors.  A couple of observations.  First off,

63

1    as we understand it, the trustee here in this program had to go

2    out, as a factual matter -- I think they had said that there

3    were some contracts that had been terminated and some that had

4    not.  So they needed initially to go out and get direction at

5    the very beginning to terminate the transaction which is what

6    has triggered the potential filing of the proof of claim.  In

7    other words, with the termination, they would be taking the

8    position that they are owed money.  Having terminated the

9    transactions and gotten the direction to do so, there's very

10   little question under the documents.  Or put it differently, I

11   haven't seen anything in the filings by the trustee to indicate

12   that doing the ministerial acts that follow from the

13   termination, such as filing a valuation statement and filing a

14   proof of claim, can't be done.  In other words, I would say

15   that there's nothing in the record whatsoever at this point,

16   Your Honor, that suggests that there isn't adequate authority

17   to file the proof of claims and that there's really no reason

18   here for any delay.

19        The other point, Your Honor, which I think is an

20   important one, is there's been nine months since the events

21   that I believe they're saying were the cause of the

22   terminations or possible terminations.  And I think you hit it

23   on the nose that once they had the direction to terminate, this

24   was a necessary step.  In other words, at some point, they knew

25   once they terminated and filed and put into place a valuation

64

1    statement that they would have to file a proof of claim at some

2    point at some bar date.  And so, it is at least a mystery why

3    it has taken this long, if it's at all needed, once they have

4    the ability to terminate.

5           The third point, just looking at the papers, Your

6    Honor, is that there's nothing in the papers that suggests that

7    they can do in 120 days what they're going to be given eighty

8    days to do.  In other words, why is the extra forty days

9    necessary?  There's absolutely no indication in any papers that

10   were filed by the trustee that they can't do what they need to

11   do in the eighty days even if they've done it.

12          Now, with respect to part of what I heard, it seems

13   to me that the trustee could file, the issuer could file, some

14   kind of a protective proof of claim that resolves the issue.

15   So I think that's another issue that I'm not sure I understand

16   why they need, after getting the direction to terminate, to

17   file some kind of a protective proof of claim at the bar date.

18          So with that, Your Honor, I don't think there's any

19   evidence in the record as to why we need an extra forty days.

20   And what's going to happen in that forty days that couldn't

21   happen in the eighty before it?

22          THE COURT:  Anything more on Dante?  Okay.  Let me

23   return to the more general objection that was articulated by

24   counsel for U.S. AgBank and Aviva, and then I'll comment on

25   Dante.

65

1            I believe that the general objection that was raised

2      on behalf of U.S. AgBank and Aviva is comparable to objections

3      that were filed during the lead-up to last week's initial

4      hearing on the subject.

5            There were any number of written objections presented

6      by counterparties to derivative transactions that raised

7      questions as to the fairness and reasonableness of compelling a

8      counterparty as part of the proof of claim process to provide

9      the information which is requested in the questionnaire.

10           During the hearing last week I made it clear that

11     while I wasn't necessarily convinced that every piece of

12     information in the questionnaire was the right piece of

13     information because as I've noted, I don't know how to

14     terminate a derivative.  But it was clear today and I

15     referenced my general power under Section 105 of the Bankruptcy

16     Code that some specialized claim process was necessarily in

17     this case in order to avoid complete administrative meltdown.

18           I believe that the consensual resolution of virtually

19     every other objection to the notion of a questionnaire speaks

20     loudly to the reasonableness of having some kind of process in

21     place to deliver information to the debtors enabling the

22     debtors, at least initially, to begin to reconcile the

23     derivatives positions in the derivatives book at Lehmans.

24           Absent such a process and procedure I, frankly, don't

25     know how we would get through this case during the remaining

66

1    years of my term as a bankruptcy judge.  And while I say that

2    only half facetiously, I have another ten years left.

3         I remember Bryan Marsal making a presentation in

4    December of last year, in which he stated with the benefit of a

5    PowerPoint presentation his hope, indeed, his expectation that

6    these bankruptcy cases could come to conclusion within perhaps

7    two years.  And no one is a fair predictor of the future.  But

8    absent the adoption of workable procedures to deal with the

9    approximately million derivative transactions, and the

10   significant exposure that these transactions represent to the

11   debtors' estates, the process of claims reconciliation simply

12   will not take place in an orderly way.

13        Although, it's not part of today's formal record, I

14   noted on a docket of the case two supplemental declarations

15   that were filed over the weekend.  One was a supplemental

16   declaration of Gary H. Mandelblatt in support of the debtors'

17   motion, and the other is a declaration of Gregory F. Eickbush.

18   Both of these documents provide answers to some of the

19   questions that I raised last week, and provide further support

20   to the notion that this is an extraordinary situation, one that

21   request procedures that are well crafted to the task at hand.

22        While I heard the various statements that were made

23   by counsel who participated in the ad hoc group process last

24   week, noting that the result was not perfection, but it was

25   improvement, I am satisfied that based upon the representations

1    made, the procedures that are now before me represent a fair

2    balancing of the burdens and benefits as between the debtors'

3    estates on the one hand, and the counter parties to these

4    transactions on the other.  And as a result, at least as it

5    relates to the objection articulated over the telephone on

6    behalf of U.S. AgBank and Aviva, I overrule those objections.

7         To the extent those objections may have had some

8    merit before this process began to fully evolve, what has

9    resulted from the consensual process of last week, I believe

10    moots those objections.  And in any event, under the

11    circumstances of this case, imposing certain additional burdens

12    on claimants associated with questionnaires, both as it relates

13    to derivatives and guaranteed claims, represents a necessary

14    attribute of administering a case of this magnitude and

15    complexity.

16         Now I think we should deal with the SPV question.

17    I'm sensitive to the argument that was made by counsel for Bank

18    of New York concerning the difficulty in getting direction from

19    a group of noteholders who have been described by known but

20    unidentified.  I'm not quite sure what that means.  But what I

21    gather by that description counsel means to say that this is a

22    group that's very hard to corral, and perhaps even hard to

23    communicate with.  That's a problem for the trustee.  But it

24    shouldn't be a problem for the estate.  Eighty plus days of

25    time to identify the group and gain direction from the group

68

1   seems adequate, particularly given electronic communication the

2   ability to publish notice.  The fact that there are clearing

3   houses principally in Europe, I believe, involved in this

4   transaction, and it may be that this is a circumstance to try

5   to gain some help from our friends at LBIE, but it shouldn't be

6   a problem for this estate.  It's rather a practical problem

7   that arises on account of how these particular notes were

8   originally distributed, through the SPV system.  The trustee

9   will simply have to take appropriate action to avoid liability.

10  And I assume that the Bank of New York will do so.  So the

11  extent that that constitutes an objection of the procedures,

12  that objection is overruled.

13          Let's go on to EMTN now.

14          MS. FIFE:  Thank you, Your Honor.  For the record,

15  Lori Fife from Weil Gotshal & Manges on behalf of the debtors.

16  Before we deal with the EMTN, I was asked to advise you that

17  Royal Bank of Scotland and it's affiliates, including ABM Ambro

18  and Sempra participated in the marathon session on Friday.

19          THE COURT:  Thank you.

20          MS. FIFE:  So the EMTN program -- you probably, Your

21  Honor, have seen a number of objections, in fact, we filed a

22  reply this morning.  I'm sorry for the lateness of the reply.

23          But during the time that we were working with the

24  derivative group we were also trying to resolve the objections

25  with respect to the EMTN program.  In fact, the creditors'

69

1    committee was really taking the laboring war with Citibank and

2    some of the other parties in an effort to try to resolve the

3    objections.

4            The EMTN program is a program that was financed by

5    LBHI and a Lehman Brothers Treasury BV and Lehman Brothers

6    Bankhaus AG, but the notes are issued by primarily -- and this

7    is really summary high level because these are extremely -- I

8    mean, derivatives are complex, these notes are really, really

9    complex.  And I don't pretend to understand them fully.  So at

10   a very high level, I'm generalizing.  The notes were issued by

11   Lehman Brothers Treasury BV for the most part and Lehman

12   Brothers Bankhaus AG and other non-debtor entities and,

13   purportedly, guarantied by LBHI.

14           And they were issued in these European countries with

15   no indentured trustee, under fiscal agent note.  And Bank of

16   New York is the holder of a global note and the fiscal agent,

17   but is agent on behalf of the issuer, but doesn't really act on

18   behalf of the holders.  There is no party that acts on behalf

19   of the holders.  That is how it is done apparently in Europe.

20   That's how these notes and many other corporate notes are

21   issued.  So as a result there are -- there's no entity who has

22   authority to act on -- there may not be any entity who has

23   authority to act for these holders.  There may.  As to some,

24   perhaps the account number, the street name holder might have

25   authority.  But, for instance, in Germany we know for a fact

70

1    the account holders don't have authority, only the beneficial

2    holders have authority.

3         There are more than 4,000 series of these structured

4    notes.  These notes, themselves, are based on derivative

5    transactions.  So the underlying security is a derivative

6    transaction that's based on an index.  The actual note could be

7    worth zero based on an index.  It could be worth some money.

8    It could be accelerated.  It could have some money.  I mean, it

9    could be contingent right now.  There are a lot of issues that

10   are undecided at this point in time.

11        We originally took the position that these notes are

12   not appropriate to put on the master securities list because

13   they're not issued by the debtors, and, therefore, they don't

14   belong on the list.  And, also, we can't identify the

15   documents, we don't have a lot of the documents, and we also

16   don't acknowledge the liability.  So we didn't want to list

17   them on our schedules.  We want to preserve the ability to

18   object to the validity of those claims.

19        However, we did recognize the predicament that these

20   holders in these foreign countries, many of whom are moms and

21   pops.  I have been convinced after many conversations over the

22   weekend that these notes were actually sold at the retail

23   level.  I mean, some of these notes were sold in denominations

24   I'm told of a hundred pounds, even.  So we're talking about

25   small denominations.  And they did go down to the retail level.

71

1    So the problem is how do these people have the ability to file

2    proofs of claims?  We don't know who to provide notice to.  And

3    the only party who really knows is these account holders, the

4    street name holders.  And the street name parties, some of whom

5    have objected, like Citibank and Banco Popular, they don't

6    have, necessarily, the responsibly to provide notice to their

7    beneficial holders like an indentured trustee would have that

8    responsibility, or, frankly, like a Merrill Lynch, or an

9    investment banking firm here would have an obligation to notify

10   its customers.

11        So we were in -- we've had numerous conference calls

12   subject to Your Honor, and this is contrary to the theme of

13   today, so I will preface that.  However, I do believe that the

14   circumstances with respect to these parties are in a very

15   different than the parties who we have been talking about thus

16   far this afternoon.  That we in consultation with the

17   creditors' committee and Bank of New York, and the other

18   parties that are represented here today, I think there are a

19   number of account holders who are represented.

20        Citibank and Banco Popular were very active in

21   negotiating, have reached a settlement of which I will describe

22   for the Court now.  What we think is appropriate is that we

23   would modify the proof of claim form.  And it would be tailored

24   such that the holders of these structured notes under the EMT

25   program would have a -- well, there would be a list and it

72

1    would be identified by KESP and ICIN number.  And that list

2    would be developed by the debtors, the committee, and certain

3    representatives, interested parties, within five business days.

4    And if we can't resolve that list then the Court would help us

5    resolve it.  And what we would attach that list of securities

6    and the proof of claim form would have that list with a box.

7    And a party who holds one of these securities would have to

8    just check the box to indicate the security on which it's

9    submitting this guaranteed claim against LBHI.

10         And we would print the instructions to these holders

11   in other language.  We haven't agree on the languages -- not

12   every single language, but we tried to cover as many languages

13   as appropriate.  And the notices would have to, of course, be

14   acceptable to Euro Clear and Clear Stream, because they would

15   be sending out the notice.

16         The holders of these notes would not be required to

17   complete the guarantee questionnaire or to submit any

18   documentation.  Most of these holders don't actually have any

19   documentation.  The account holder or the street name holder

20   actually holds the document.  And so we won't require them to

21   do that.  And the account holders or the street name holders,

22   and the beneficial holders, either one, can file a proof of

23   claim.  And the debtors will waive our right to object on the

24   grounds that any such claim was not filed by the authorized

25   representative.  In other words, we're going to give up our

73

1    right to say that somebody wasn't authorized, which is,

2    obviously, very important to the account holders.

3            But whoever, ultimately, files the proof of claim

4    then has responsibility for that claim.  So if Citibank

5    determines that it is going to file claims on behalf of XYZ

6    holder, then it has responsibility for the objections and for

7    prosecuting the claim going forward.  And we'll be dealing with

8    that claim.  If the beneficial holders file the claim then they

9    would have the responsibility.  And other than not objecting

10   with respect to authorization, we reserve our right to object

11   to the claims on any other grounds.

12           We have agreed that because of the language barriers

13   that the parties can file their claims as contingent or

14   unliquidated, which you can do anyway, that's the law.  Or they

15   can write, "I don't know the amount of my claim."  And we're

16   not going to just deem that as a not valid claim.  I mean,

17   we'll take that into consideration.  But, of course, we're

18   reserving our right to object to the amount of the claim.

19           And then the debtors are going to provide the bar

20   date notice to Euro Clear and Clear Stream and the

21   representatives of the U.S. -- the non-U.S. Lehman estates, so,

22   BV and Bankhaus and the other non-debtors.  And they will then

23   actually provide the notices to the beneficial holders, which

24   will happen five days after we will agree on the KESP and ISIN

25   numbers.  And holders -- we have agreed that holders would --

74

1    or we're proposing that holders would have to November 1st to

2    file their proofs of claims.

3          And that is the resolution that we have reached, Your

4    Honor.  And we think that in light of the facts and unusual

5    circumstances that we face here, we think that this is the

6    right balance.  It requires parties to file proofs of claims,

7    but it gives those parties a little bit additional time and

8    recognizes the burdens that they have.

9          THE COURT:  All right.  Is there anyone here on

10   behalf of the EMTN notes, or the parties that might have to

11   file claims on behalf of the noteholders who wishes to be heard

12   with respect to Ms. Fife's rendition of the terms of the

13   settlement?  It seems that invitation has prompted a very long

14   line.

15         MR. SHIMSHAK:  Good afternoon, Your Honor.  Steve

16   Shimshak, Paul Weiss, for Citigroup.  First, I wanted to

17   mention that we were a member of the coalition of the

18   willing --

19         THE COURT:  Good.

20         MR. SHIMSHAK:  -- in the negotiations this week and

21   on the derivative questionnaire.

22         Second, I wanted to confirm that Ms. Fife has

23   accurately presented the understanding, the agreement in

24   principle that we reached.  And I, too, want to thank the

25   creditors' committee in their role in bridging what started out

75

1    as being a very broad gap, but we managed to come up with a

2    program that we think is fair and equitable under the

3    extraordinary circumstances involving these retail holders all

4    around the world.

5          I think that the final scope of the program, the term

6    EMTN, in some ways is shorthanded.  It covers a great deal of

7    the holders.  There are some other programs -- the schedule, I

8    think is going to be the final deteriment of the programs that

9    are within this.  But the process is going to be the same for

10   participants in other debt raising programs of Lehman.

11         Finally, Your Honor, because we reached an agreement

12   in principle on our objection, we would propose that if we

13   are -- if this is going to be acceptable, and I know there has

14   to be further hearings, but at some point, I would appreciate

15   an indication of the Court as to how you intend to proceed

16   because we do have two witnesses here.  And if we're not going

17   to go forward because the Court feels it's sensible for us to

18   go forward and to finalize this arrangement, we do have to work

19   out language and, obviously, the devils and the details.  But I

20   would not want to hold the witnesses here in the courtroom

21   unduly until the end of the hearing.

22         THE COURT:  Well, from my perspective, there's no

23   need to call witnesses as to a matter that has been settled.

24   And the only question is whether or not you have doubt as to

25   the settlement.

76

1              MR. SHIMSHAK:  These are our witnesses.  I have the

2       level of comfort.

3              THE COURT:  Then you can release them.

4              MR. SHIMSHAK:  Then I can release them.  Thank you,

5       Your Honor.

6              THE COURT:  Mr. Handelsman?

7              MR. HANDELSMAN:  Good afternoon, Your Honor.

8       Lawrence Handelsman, Stroock & Stroock & Lavan.  I'm counsel

9       for Mizuho Investors Securities.

10             We filed an objection with respect to these EMTN

11      notes, and raised exactly the issues that have been addressed.

12      And proposed more or less this solution as one or two possible

13      solutions.  We were not part of the conversation, although we

14      tried, that led to this solution.  And, of course, we haven't

15      and I don't believe anyone's seen any documents because they're

16      not prepared in terms of modifications to the order to reflect

17      this.  So if the order is -- proposed order is revised to

18      accurately -- and I expect it will be, reflect Ms. Fife's

19      recitation, we'll be satisfied.  But, of course, we need to see

20      the language before we can say anything.

21             THE COURT:  Okay.  Subject to documentation, you're

22      on board, however?  He didn't say, so I assume that means yes.

23             MR. HANDELSMAN:  Oh, I'm sorry, Your Honor.  Yes.

24      But we would like to -- we were not permitted the opportunity

25      to participate in conversations, we would at least be permitted

77

1    the opportunity to see the language before it's finalized and

2    presented.

3              THE COURT:  Absolutely.  That's what I meant by

4    "subject to documentation".

5              MR. FRIEDMAN:  Good afternoon, Your Honor.  Jeff

6    Friedman, counsel for the Royal Bank of Canada, Federal Home

7    Loan Bank of New York, credit structured asset management with

8    respect to certain hedge funds that they manage.

9              Your Honor, I just really want to say two things.

10   First, we were part of the ad hoc group that participated

11   Friday in terms of transparency.  And, secondly, I'd just like

12   a clarification based on this schedule.  I have clients,

13   actually other clients, that have these medium term notes.

14   They're not quite mom and pop, but they're also not JPMorgan.

15             And I just want to clarify to the extent that they're

16   particular KESP and ISIN numbers don't make the proof of claim

17   form.  And I don't know whether my clients would want me to

18   participate and try to develop that form for them.  Are those

19   people going to have to fill out guarantee questionnaires, or

20   are those people -- obviously, they could file a proof of claim

21   saying this is my bond and I'm the beneficial holder, but will

22   they have to go through the guarantee questionnaire process, or

23   are they going to be excluded and just have to file paper

24   proofs of claim with whatever supporting documentation would

25   support their claim based on the note?

78

1          THE COURT:  Ms. Fife?

2          MS. FIFE:  If their notes are not part of this EMTN

3     program, then they will have to file a guarantee questionnaire.

4     But if they are part, then they don't.

5          MR. FRIEDMAN:  Whether the ISIN number is listed or

6     not?

7          MS. FIFE:  Yes.

8          MR. FRIEDMAN:  In order to be part of the program

9     does the note have to be listed, or does it just have to look

10    like one of the agreements?

11         MS. FIFE:  It has to be listed.

12         MS. SEGAL-REICHLIN:  Good afternoon, Your Honor.  Zoe

13    Segal-Reichlin, from Cleary Gottlieb Stein & Hamilton on behalf

14    of Banco Bilbao Vizcaya Argentaria.  We were a party to the

15    conversations and can confirm, as Citi's counsel did, that Ms.

16    Fife accurately represented our agreement.

17         I just want to make two points of clarification for

18    the record.   The first of which is it was actually Banco

19    Bilbao Vizcaya Argentaria and not Banco Popular that was part

20    of that discussion.  As well as Mr. Shimshak noted that the

21    issuances that were under agency agreements were not just the

22    EMTN program, it was other programs as well, which we can also

23    confirm.  The notes in question are also not just structured

24    notes, they're also fixed rate notes and floating notes.

25         THE COURT:  All right.  So if I understand that

79

1    clarification, I'm just trying to follow this, the EMTN

2    program, which is really the principal focus that we've been

3    talking about relates to certain structured notes that are

4    largely in the hands of retail investors all over the globe.

5         Your clarification point is to note that there are

6    other notes that were represented in the discussions that did

7    not have the benefit of an indentured trustee structure.  And

8    it's as to these notes that don't have a home that there'll be

9    the same opportunity to get on the list, is that right?

10        MS. SEGAL-REICHLIN:  That's correct.  And my

11   understanding from the debtors is that there's no disagreement

12   on that point.  But we've been using EMTN as shorthand because

13   it is the largest issuance.

14        THE COURT:  So what we're doing is we're expanding,

15   for purposes of today's discussion, the defined term "EMTN" to

16   include a whole bunch of other notes that aren't actually EMTN

17   notes?

18        MS. SEGAL-REICHLIN:  Correct.

19        THE COURT:  Okay.

20        MR. GOLDMAN:  Good afternoon, Your Honor.  William

21   Goldman, DLA Piper on behalf of Banco Banif and a number of

22   other Spanish and Austria banks.

23        Just to clarify, as used in our objection, the EMTN

24   program is a particular program that Lehman Brothers --

25   actually, Lehman Brothers Holdings Inc. established.  It was a

80

1   one hundred million dollar program of which about thirty

2   billion dollars were sold to hundreds -- what I gather, is now

3   about a hundred thousand individuals outside of the United

4   States.  There are other programs that Lehman had -- I don't

5   represent anyone in connection with those -- which also sold

6   outside the United States.  But there is one particular

7   program, with a particular offering circular with what, at

8   least, in our objection we were referring to as the EMTN

9   program or the Euro EMTN program.

10          In any event, we have no problem with the settlement

11   as been proposed, it's consistent with what our objection was

12   about.  As with Mr. Handelsman, would like to be included in

13   the draft of the documentation.  And assuming it all goes the

14   way it should go, and it's been represented, and I expect it

15   would be, we have no problem with the settlement.

16          THE COURT:  Fine.  Thank you.

17          MR. KIBLER:  Your Honor, John Kibler from Allen &

18   Overy.  We represent Banca Akros and a number of other Italian

19   banks.

20          Similar to the other objectants we objected to the

21   imposition of the obligations on guaranteed claimants.  We

22   heard the proposed settlement and agree wholeheartedly, subject

23   to documentation.  And hope that we just get a copy of it.

24          THE COURT:  Fine.  Thank you.

25          MR. EGGERMANN:  Good afternoon, Your Honor.  Daniel

81

1    Eggermann from Kramer Levin Naftalis & Frankel.  I'm not here

2    on behalf of a noteholder, I'm here on behalf of Rutger

3    Schimmel Penek (ph.), who is the court appointed trustee in the

4    Netherlands for Lehman Brothers Treasury Co BV.  One of the

5    issuers under the EMTN program.

6         Your Honor, we did not file an objection.  We

7    perceive this issue as one between our noteholders and LBHI

8    under the guarantee.  And we were not directly involved with

9    the negotiations, although we spoke a little bit with Citibank

10   over the weekend -- or Citigroup, rather.  And we indicated

11   that in the spirit of the cross border protocol we are happy to

12   help coordinate the notice process in Europe through the

13   European clearing systems, provided that our involvement does

14   not result in any additional liability to he trustee or any

15   additional costs to the trustee.  But we expect the details of

16   that coordination will be worked out between the trustee and

17   LBHI.

18        And one other point I'd like to note.  There's been

19   some talk with respect to the EMTN program and the other notes,

20   other than the EMTN program.  The LBT issues notes under four

21   programs, one of them was the EMTN program, the other three

22   were called the Swiss program, the Italian program, and the

23   German program.  And it's my hope and the trustee's hope that

24   those programs all get treated similarly.

25        THE COURT:  Well, I hear the hope, but let me just

82

1  understand what he proposal is that's before me.  Is that

2  something which is acceptable to the estate, or is that a shift

3  in position.  Do you want to confer briefly?

4       MS. FIFE:  One moment.

5   (Pause)

6       MS. FIFE:  Your Honor, nobody has raised this issue

7  from these other programs, so we haven't discussed it with

8  them.  And I suppose if somebody comes forward and requests to

9  be added to the list we could consider it.  But right now we're

10 really concerned with the EMTN program.

11      THE COURT:  Here's part of the confusion that I now

12 have.  It's a shame when at 4:30 in the afternoon things are

13 starting to move sideways.

14      MS. FIFE:  Right.

15      THE COURT:  But when counsel for -- and I hope I

16 pronounce this right, Banco Bilbao, stood up it was for point

17 of clarification that I interpreted, and she agreed with my

18 interpretation, meant that when we use the term EMTN to

19 describe the kinds of notes that could find their way by

20 agreement on to the securities list, which would exempt a

21 holder from having to file a guarantee questionnaire, the

22 answer was yes, it's a broad definition that includes similarly

23 situated noteholders.  What I'm hearing counsel for the

24 Netherlands' Trustee say is that this may be a broader universe

25 of potential holders than had been originally contemplated,

83

1    because it involves different programs; the Swiss, the Italian

2    and the German programs, in addition to the EMTN program.

3         I have no idea how extensive those programs are, what

4    notes were sold, or whether or not they are, in fact, similarly

5    situated in a sense of being retail holders, predominately, as

6    opposed to sophisticated holders.  If they're sophisticated

7    holders, they're not entitled to any benefit.  No offense to

8    sophisticated holders, but they can take care of themselves.

9    And the reason you put together this exception to the rule, is

10   because we're dealing with widely dispersed individuals who

11   purchased small denomination notes that were issued under the

12   EMT program.

13        So is there, is there not an understanding that we

14   have a broad universe of noteholders to populate this new

15   class?  Or is that something to be discussed?

16        MS. FIFE:  I need a minute, Your Honor.

17        (Pause)

18        MS. FIFE:  We've been advised, Your Honor, that what

19   counsel to Banco Bilbao -- I believe I have it correct -- was

20   referring to the German program and the Italian program.  And

21   we've also been advised that the EMTN program represents ninety

22   percent of the notes that were issued by Lehman Brothers

23   Treasury BV.  So we're talking about a very small additional

24   amount of notes.  And they were issued to the same retail

25   holders.  So given that information, we believe it's

84

1    appropriate to add them to the exception to the bar date, and

2    cover them in this settlement proposal.

3            THE COURT:  All right.

4            MS. FIFE:  Thank you.

5            MR. EGGERMANN:  Just for clarification, that includes

6    the Swiss program?

7            MS. FIFE:  Oh, yes.  Swiss, German and Italian.

8    Thank you.

9            MR. EGGERMANN:  Thank you, Your Honor.

10           THE COURT:  Is there anyone else who wishes to speak

11   to this settlement.

12           MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed

13   Hadley & McCloy on behalf of the committee.  It's probably

14   appropriate that we speak in support of this proposal because

15   it's something that, frankly, the committee brought the parties

16   together on.

17           In recognition of the fact that this is a very unique

18   circumstances within the context of these cases, where there's

19   not an indentured trustee, and given the body of holders and

20   potential claimants on account of the guarantees, the committee

21   recognized the unique issues here and directed its counsel to

22   try to bridge the gap and reach this solution.

23           In that regard, the committee was also conscious of

24   the fact of not bridging the gap or going too far on account of

25   these particular holders, because there are procedures that

85

1    apply in these cases and we're comfortable that the procedure,

2    or the process, and the settlement that's been described to the

3    Court as modified in light of the comments that were made is an

4    appropriate one and satisfies the concerns that were raised by

5    the parties, including the committee.  And we support it for

6    those reasons.

7              THE COURT:  Fine, thank you.  Since there's a

8    settlement, it seems that I now resolved I think every

9    outstanding issue that relates to the proposed order.  Is that

10   correct?

11             MR. WAISMAN:  Your Honor, that is the debtors'

12   understanding.  So I think perhaps the only order of business,

13   perhaps, is the way forward to implement everything you heard

14   about today.

15             THE COURT:  I think there's a little bit of a

16   drafting exercise which needs to take place, at least as it

17   relates to the EMTN settlement.

18             MR. WAISMAN:  That's right, Your Honor.  So, perhaps,

19   if we can have the bar date order and its exhibits as modified

20   by the record of the hearing today so ordered, the parties can

21   retreat to draft language to resolve the EMTN and friends

22   issue.  It would be our hope that we would have a final version

23   of the bar date order packaged to chambers tomorrow.  I would

24   think latest Wednesday.  And if we're able to accomplish it on

25   that timetable we would accomplish a mailing of the bar date

86

1   notice and proofs of claim by next Wednesday, if that all meets

2   the Court's approval.

3                THE COURT:  That's fine.  I've reviewed the form of

4   order as it has evolved, including reading it, I think, both

5   this morning and over the weekend.  I think I've seen multiple

6   versions of it.  And I'm satisfied that the parties have made

7   substantial progress that the consensual resolution of

8   disagreements as mediated by the ad hoc group of counterparties

9   and the ad hoc group of EMTN noteholders and friends,

10  represents a very significant achievement in this case and,

11  frankly, is a testament to the high quality of lawyering that

12  has been present in this courtroom from the beginning of this

13  case, not only on behalf of the debtor but on behalf of all

14  parties in interest who have actively participated.  This is an

15  extraordinary complex undertaking.  Unprecedented, actually, in

16  the history of global finance.  And to the extent you get this

17  right the first time, that's an achievement which is probably

18  mostly to be chalked off to good luck.

19                And to the extent that there turns out to be some

20  problems along the way I won't be surprised and I hope we can

21  address them.  But I compliment all counsel who have produced

22  this, and I'm sure you'll continue your good work in developing

23  the next generation of this evolving document.

24                Is there more for this afternoon?

25                MR. WAISMAN:  Just an expression of gratitude to the

87

1    Court and chambers for accommodating all the issues that have

2    arisen.  And on behalf of the debtors and their professionals,

3    thank you to all of the parties that were involved in all of

4    the groups in the assistance in making this possible.

5            And, finally, just a reminder that there are three

6    stipulations that relate to the bar date order and process that

7    have been submitted to chambers.

8            THE COURT:  We'll find them and try to enter them at

9    the same time.

10           MR. WAISMAN:  Thank you, Your Honor.

11           THE COURT:  Thank you.  We're adjourned.

12       (Whereupon these proceedings were concluded at 4:37 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

88

I N D E X


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| LBHI's motion for authorization to make capital | 19 | 17 |
| contribution to Aurora Bank FSB approved | | |
| Limited objection of Deutsche Bank Trust Company | 44 | 24 |
| Americas and Deutsche Bank National Trust Company | | |
| to debtors' motion for establishment of proofs of | | |
| claim bar date overruled | | |
| Objection of US AgBank, FCB to debtors' motion | 67 | 6 |
| for establishment of proofs of claim bar date | | |
| overruled | | |
| Objection of BNY Corporate Trustee Services | 68 | 12 |
| Limited to debtors' motion for establishment | | |
| of proofs of claim bar date overruled | | |
| Bar date order and its exhibits as modified | 86 | 3 |
| on the record so ordered | | |

89

1

2                    C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     LISA BAR-LEIB

9     AAERT Certified Electronic Transcriber (CET**D-486)

10

11    Also transcribed by:  Esther Accardi

12

13    Veritext LLC

14    200 Old Country Road

15    Suite 580

16    Mineola, NY 11501

17

18    Date:  June 30, 2009

19

20

21

22

23

24

25