WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
**In re**                                          :          **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :          **08-13555 (JMP)**
:
                              **Debtors.**        :          **(Jointly Administered)**
:
:
-------------------------------------------------------------------x

**NOTICE OF SUPPLEMENT TO DEBTORS' MOTION PURSUANT
TO SECTIONS 365(A) AND 562(A) OF THE BANKRUPTCY CODE FOR
AUTHORIZATION TO REJECT EXECUTORY CONTRACT BETWEEN
LEHMAN BROTHERS SPECIAL FINANCING INC. AND JANA MASTER FUND, LTD.**

PLEASE TAKE NOTICE that Lehman Brothers Special Financing Inc. and its

affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors-in-possession,

hereby supplement the motion, dated June 30, 2009 (the "Motion"), pursuant to sections 365(a)

and 562(a) of title 11 of the United States Code and Rules 6006 and 9014 of the Federal Rules of

Bankruptcy Procedure, for authorization to reject an executory contract between LBSF and Jana

Master Fund, Ltd. **[Docket No. 4240]** by filing the annexed agreement referred to in the Motion

as Exhibit A.

Dated: July 7, 2009
       New York, New York

                                   /s/ Robert J. Lemons
                                   Lori R. Fife
                                   Robert J. Lemons

                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone:    (212) 310-8000
                                   Facsimile:    (212) 310-8007

                                   Attorneys for Debtors
                                   and Debtors in Possession

**(Agreement)**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of March 14, 2007

## LEHMAN BROTHERS SPECIAL    and    JANA MASTER FUND, LTD.
## FINANCING INC.

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**        **JANA MASTER FUND, LTD.**

*(Name of Party)*                                  *(Name of Party)*

By: _____                        By: _____

Name: _____                        Name: Benjamin Hoter

Title: Allyson M. Carine                           Title: Authorized Signatory
       Authorized Signatory

Date: _____                        Date: 3/15/07

**(Multicurrency-Cross Border)**

**SCHEDULE**
to the
**Master Agreement**
dated as of March 14, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of the State of Delaware
and
**JANA MASTER FUND, LTD.** ("Party B")
an exempted company organized under the laws of
the Cayman Islands

**Part 1: Termination Provisions**

In this Agreement:

(a)     **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Special Financing Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Finance S.A., Lehman Brothers Commodity Services Inc. and Lehman Brothers OTC Derivatives Inc. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement; provided, however, that an Event of Default under Section 5(v)(1) and (2) shall not occur if (i) the default referred to in Section 5(v)(1) and (2) is a failure to pay or deliver caused solely by error or omission of an administrative or operational nature; and (ii) funds, securities or property were available to such party, Credit Support Provider of such party or any applicable Specified Entity of such party, as the case may be, to enable it to make the relevant payment or delivery when due; and (iii) such relevant payment or delivery is made within one local Business Days of receipt of written notice from an interested party of such failure to pay; and (iv) the party defaulting under Section 5(v)(1) and (2) provides the other party with such additional information as the other party shall have requested in writing in order to satisfy the other party that such failure occurred solely as a result of the reasons described under (i)-(iii) above.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B; provided, however, that the phrase ", or becoming capable at such time of being declared," is hereby deleted.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million and (ii) three percent (3%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 20 million and (ii) three percent (3%) of the aggregate Net Asset Value of Party B in the case of Party B (or its equivalent in any other currency).

19

For the purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The **"Credit Event Upon Merger"** provisions of <u>Section 5(b)(iv)</u> will apply to Party A and Party B; *provided*, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Lehman Brothers Holdings Inc., as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors Services, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services ("S&P").

(e)     The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will not apply to Party A and will not apply to Party B.

(f)     **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)     **"Termination Currency"** means United States Dollars ("USD")

(h)     **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:-

  (i)     **Material Amendment.** Any Operative Document (as hereinafter defined) or constitutional document (including, without limitation, investment policies or guidelines) of Party B is amended or modified in a manner which, in the reasonable judgment of Party A, may have a materially adverse effect on Party A under this Agreement or any Transaction hereunder or on the ability or authority of Party B to perform its obligations under this Agreement or any Transaction hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

  (ii)    **Change in Management or Control.** (A) The Investment Manager or General Partner merges or consolidates with, or sells or otherwise transfers its advisory business or all or a material portion of its assets to, any individual or entity and such individual or entity is not reasonably acceptable to Party A; (B) an event listed in <u>Section 5(a)(vii)</u> occurs with respect to the Investment Manager or the General Partner; or (C) the Investment Manager or the General Partner has any of its registrations, authorizations, licenses or memberships with any federal or state governmental or regulatory authority revoked, suspended, terminated, limited or qualified. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

  (iii)   **Change of Investment Manager.** Investment Manager ceases to be the investment manager to Party B and a replacement reasonably acceptable to Party A is not appointed promptly thereafter. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

  (iv)    **Decline in Net Asset Value.** On any day during the term hereof, Party A determines that Party B (A) has failed to maintain a Net Asset Value in an amount equal to the greater of (x) USD 2,000,000,000 and (y) 60 percent of Party B's highest historical year-end Net Asset Value within the last three years as reflected in Party B's audited financial statements at any time after the execution date of this Agreement, or (B) has experienced a decline in its Net Asset Value during any one-month period preceding such date, of 20 percent or more (excluding redemptions and withdrawals), or (C) has experienced a decline in its Net Asset Value during any three-month period preceding such date, of 30 percent or more, or (D) has experienced a decline in its Net Asset Value during any twelve-month period preceding such date, of 40 percent or more. For the avoidance of doubt, Party A may use the NAV Statement or any other financial performance or Net Asset Value information provided by Party B pursuant to Part 3(b) or Part 5(c)(iii) hereof in making a determination hereunder. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

Party B acknowledges and agrees that the Net Asset Value trigger in clause (y) above may increase from time to time as a result of an increase in Party B's year-end Net Asset Value level but that such trigger amount shall not in any event decrease once reset.

(v)    **Failure to Deliver Financial Statements.** Party B fails to deliver or provide its audited annual financial statements, its unaudited quarterly financial statements, its NAV Statement within the timeframe specified in Part 3(b) hereof, or its verbal estimate of its Net Asset Value and performance pursuant to Part 5(c)(iii) hereof. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vi)   **Key Person.** One or more of the following occurs with respect to Barry Rosenstein and Gary Claar and one of the three additional Key Persons (as defined in Part 5 hereof): (A) an Incompetency Event; (B) death or incarceration; or (C) the Key Person ceases to exercise, or a person who is not a Key Person exercises, either directly or indirectly, a significant influence over the management of Party B. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(vii)  **Prohibited Transaction.** Either party reasonably determines, and provides to the other party in writing the basis of its determination, that this Agreement and/or any Transaction contemplated hereunder constitutes, or may constitute, a "prohibited transaction" under ERISA or Section 4975 of the Code and that no exemption from the "prohibited transaction" provisions of ERISA or from Section 4975 of the Code is available with respect to this Agreement and/or such Transaction. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(viii) **Plan Assets.** At any time during the term of this Agreement, "benefit plan investors" (within the meaning of U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101 (the "Plan Asset Regulation")) hold twenty-five percent (25%) or more of the value of any class equity interest in Party B as determined in accordance with the Plan Asset Regulation. For the purposes of the foregoing Termination Event, Party B shall be the Affected Party.

21

**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of <u>Section 3(f)</u> of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is an exempted company duly organized and validly existing under the laws of the Cayman Islands.

(c)     **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of the Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A, Party B and Investment Manager | An incumbency certificate with respect to the signatories of this Agreement and the Credit Support Document(s), (if any). | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the resolutions or other actions of (i) in the case of Party A, the board of directors of Party A, and (ii) in the case of Party B, its General Partner, certified by a secretary or assistant secretary of the relevant entity, pursuant to which such party is authorized to enter into this Agreement, the relevant Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | The earlier of (i) within 90 days after fiscal year-end and (ii) upon request. | Yes, but solely with respect to audited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B, prepared in accordance with generally accepted accounting principles consistently applied. | The earlier of (i) within 45 days after fiscal quarter-end and (ii) upon request. | Yes, but solely with respect to unaudited financial statements, the phrase "true, accurate and complete in every material respect" in Section 3(d) shall be deleted and the phrase "a fair presentation, in all material respects, of the financial condition of the relevant person" inserted in lieu thereof. |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of the Schedule. | Upon execution of this Agreement. | No |

23

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Promptly after execution of this Agreement. | No |
| Party B | Monthly statement which includes the Net Asset Value of Party B and the performance of Party B for the preceding month ("NAV Statement"). | Within 5 days after each month-end. | Yes |
| Party B | Operative Documents specified in Part 5(o) hereof. | Upon execution of this Agreement. | Yes |

**Part 4: Miscellaneous**

(a)    **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to Party A:

| | |
|---|---|
| Address: | Lehman Brothers Special Financing Inc. |
| | c/o Lehman Brothers Inc. |
| | Corporate Advisory Division |
| | Transaction Management Group |
| | 745 Seventh Avenue |
| | New York, NY 10019 |

| | |
|---|---|
| Attention: | Documentation Manager |
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |

For all purposes.

Address for notices or communications to Party B:

| | |
|---|---|
| Address: | JANA MASTER FUND, LTD. |
| | c/o JANA Partners LLC |
| | 200 Park Avenue, Suite 3300 |
| | New York, New York 10166 |

| | |
|---|---|
| Attention: | Charles Penner |
| Telephone No.: | 212-692-7645 |
| Facsimile No.: | 212-692-7965 |

For all purposes.

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:    Not applicable

Party B appoints as its Process Agent:     JANA Partners LLC
200 Park Avenue, Suite 3300
New York, New York 10166

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

**Calculation Agent.** The Calculation Agent is Party A; provided, however, where Party B disputes any determination, calculation or estimate, then (i) the relevant party shall pay the amount or make the delivery, if any, that is not in dispute in a timely manner and (ii) the parties shall promptly appoint an independent third party that would qualify as a Reference Market-maker (a "Substitute Calculation Agent") to resolve the dispute the determination of which shall be final and binding absent manifest error.  Party B agrees to immediately notify Party A if it disputes any of Party's A's calculations.

**Credit Support Document.**

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of Party B, the Credit Support Annex which supplements, forms part of, and is subject to this Agreement.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    Not applicable.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement; provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Jurisdiction.** <u>Section 13(b)</u> is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

(a)  **Representations.**  Section 3 of this Agreement is hereby amended by adding the following additional subsections:

   (g)  *No Reliance.*  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

   (h)  *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

   (i)  *Status of Parties.*  The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

   (j)  *No Agency.*  It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

   (k)  *Eligible Contract Participant.*  It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)  **Additional Representations of Party B.**  Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until termination of this Agreement) that:

   (i)  **Reliance on the Investment Manager.**  Pursuant to the Trading Authorization, Party B has granted the Investment Manager full discretionary power and authority to make investment decisions for, in the name of, and on behalf of, Party B, including without limitation the power and authority to enter into Transactions as the agent for Party B and to advise and direct Party B to enter into this Agreement and Transactions and to execute and deliver Confirmations in connection therewith. In connection with Party B's entering into this Agreement and any Transactions hereunder, Party A will be entitled to rely conclusively upon any request, instruction, certificate, opinion, or other document which Party A reasonably believes to be genuinely furnished to Party A by an employee or agent of the Investment Manager in connection with this Agreement and the Transactions as though such request, instruction, certificate, opinion, or other document were given directly by Party B, until such time that Party B affirmatively, and upon written notice to Party A, revokes, terminates, or modifies the Trading Authorization.

   (ii)  **No Plan Assets.**  The assets of Party B do not and will not constitute "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

(c)  **Additional Obligations of Party B.**  Party B agrees with Party A (so long as Party A or Party B has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party) that:

   (i)  **Obligations Relating to Representations.**  It will not take any action during the term of this Agreement that may render any of the representations and warranties in this Agreement (including this Schedule) untrue, incorrect or incomplete, and, if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B will immediately give written notice thereof to Party A.

(ii)     **Notice of Certain Events.** It will provide Party A, promptly upon becoming aware of the same, with written notice of: (A) any proposed action, change, or modification to any Operative Document or any other action to be voted on in respect of Party B, in each case that may cause a Termination Event or Event of Default; (B) any pending or threatened litigation, action, claim, or proceeding that may adversely affect the ability of Party B to perform its obligations under this Agreement or any Transaction; or (C) the Investment Manager's impending resignation or termination as investment adviser to Party B, or any other facts or developments that may adversely affect the status of Party B or the Investment Manager with respect to this Agreement.

(iii)    **Net Asset Value.** It will provide Party A, promptly upon request (and in no event more than two local Business Days after such request), with a verbal estimate of its Net Asset Value and performance.

(d)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)     *Set-off.*

(i)     In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)   If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This provision shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(e)    **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(f)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(g)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(h)    **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(i)    **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(j)    **No Violation or Conflict.** Section 3(a)(iii) is hereby amended by inserting the words "or investment policies, or guidelines, procedures, or restrictions" immediately following the words "documents".

(k)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "second".

(l)    **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(m)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(n)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(o)    **Additional Definitions.** Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Code**" means Internal Revenue Code of 1986, as amended, or any successor statute.

"**ERISA**" means Employee Retirement Income Security Act of 1974, as amended, or any successor statute.

"**General Partner**" means JANA Capital LLC, a Delaware limited liability company, the sole general partner of Party B.

"**Incompetency Event**" means the declaration by a court of competent jurisdiction that a Key Person is incompetent due to a physical, mental or emotional condition resulting from injury, sickness, disease or other cause.

"**Investment Manager**" means JANA Partners, LLC, a Delaware limited liability company

"**Key Person**" means each of (1) Barry Rosenstein, (2) Gary Claar, (3) Marc Lehmann (4) Kevin Lynch and (5) Ben Hoyer.

"**Net Asset Value**" of Party B shall be equal to the gross assets of Party B less the aggregate amount of all liabilities of Party B (including all absolute and contingent liabilities of any kind) and shall be determined in accordance with generally accepted accounting principles in the country in which Party B is organized and on a basis consistent with prior periods.

"**Operative Documents**" means the Confidential Memorandum dated as of January 2006 of JANA Partners, L.P, the Memorandum and Articles of Association of JANA Master Fund Ltd. dated as of August 29, 2002, the Confidential Memorandum of JANA Partners Qualified L.P. dated as of January 2007, the Memorandum & Articles of Association of JANA Offshore Partners, Ltd. dated as of January 1, 2006, the Confidential Memorandum of JANA Offshore Partners, Ltd. dated as of January 2007, the Fourth Amended and Restated Limited Partnership Agreement of JANA Partners, L.P. dated as of January 1, 2006, the Certificate of Incorporation of Party B dated as of August 7, 2002, the Trading Authorization and other constitutional documents, investment policies, procedures, restrictions, or guidelines and the then-current disclosure document of Party B and the Investment Manager (if different from Trading Authorization).

"**Trading Authorization**" means the Investment Management Agreement dated as of September 1, 2002 and the Investment Management Agreement dated as of January 1, 2006, between Jana Offshore Partners, Ltd. and the Investment Manager between Party B and the Investment Manager authorizing the Investment Manager to act on behalf of Party B.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)    <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

    Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

    **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions.** Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i)     <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

    Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall

automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii)    Netting, Discharge and Termination with Respect to Currency Option Transactions.    The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies.** In the event of any conflict between:

(i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**
*Party A*

By: _____
Name:
Title:
Date:    Allyson M. Carine
         Authorized Signatory

**JANA MASTER FUND, LTD.**
*Party B*

By: _____
Name:
Title:
Date:

# LEHMAN BROTHERS

### EXHIBIT A to Schedule

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and JANA MASTER FUND, LTD. ("Party B") have entered into a Master Agreement dated as of March 14, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)     This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

1

# LEHMAN BROTHERS

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

EXHIBIT B to Schedule

[Form of Opinion of Counsel for Party B]

[Date]

LEHMAN BROTHERS SPECIAL FINANCING INC.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019 USA

Ladies and Gentlemen:

I have acted as counsel to JANA MASTER FUND, LTD., a [cp jurisdiction] corporation ("Party B"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of [date] between Party B and LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Master Agreement, certificates and statements of public officials and officers of Party B and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.      Party B is a [entity type] duly incorporated, validly existing and in good standing under the laws of the State of [cp jurisdiction].

2.      The execution, delivery and performance of the Master Agreement, by or on behalf of Party B, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.      The Master Agreement, has been duly executed and delivered by Party B and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

4.      To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any U.S. federal or state governmental authority is required in connection with the execution, delivery and performance of the Master Agreement by Party B.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.      My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of [licensed State] and render no opinion on the laws of any jurisdiction other than the laws of the State of [cp jurisdiction], the federal laws of the United States of America and the General Corporation Law of the State of [cp jurisdiction].

C.     My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.     This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party B, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party B, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement.

E.     I have assumed with your permission (i) the genuineness of all signatures by each party other than Party B, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party B.

Very truly yours,



**International Swaps and Derivatives Association, Inc.**

# CREDIT SUPPORT ANNEX

to the Schedule to the

**Master Agreement**

dated as of March 14, 2007

between

| | |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **JANA MASTER FUND, LTD.** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

### Paragraph 1. Interpretation

(a)     *Definitions and Inconsistency*.  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex.  In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor*.  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

### Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder.  Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of March 14, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.**
(hereinafter referred to as "Party A")
and
**JANA MASTER FUND, LTD.**
(hereinafter referred to as "Party B")

**Paragraph 13. Elections and Variables**

(a)    **Security Interest for "Obligations".**  The term **"Obligations"** as used in this Annex includes the following additional obligations: None.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a)

        (2)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (3)    **"Credit Support Amount"** means, for any Valuation Date (A) the Secured Party's Exposure for that Valuation Date plus (B) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (C) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Pledgor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    **Eligible Collateral.**  The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (1) Cash, in the form of U.S. Dollars. | [X] | [X] | 100% |
| (2) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of not more than one year. | [X] | [X] | 99% |
| (3) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than one year but not more than ten years. | [X] | [X] | 98% |
| (4) Negotiable debt obligations issued by the U.S. Treasury Department having a maturity at issuance of more than ten years. | [X] | [X] | 97% |
| (5) Such other Eligible Collateral as may be agreed between the parties. | [X] | [X] | As agreed between the parties. |

    (iii)    **Other Eligible Support.**  The following items will qualify as **"Other Eligible Support"** for the party specified: Not applicable.

    (iv)    **Thresholds.**

        (1)    **"Independent Amount"** shall mean an amount, if any, as set forth in a Confirmation with respect to Party B.

        (2)    **"Threshold"** means, with respect to Party A, USD zero.

**"Threshold"** means, with respect to Party B, USD zero.

(3)     **"Minimum Transfer Amount"** means, with respect to a party, USD 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that, if an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or Affected Party shall be zero.

(4)     **Rounding.** The Delivery Amount and the Return Amount shall be rounded up and down respectively to the nearest integral multiple of USD 1,000.

(c)    **Valuation and Timing.**

(i)     **"Valuation Agent"** means Party A.

(ii)    **"Valuation Date"** means any Local Business Day.

(iii)   **"Valuation Time"** means the close of business in New York on a Local Business Day provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    **"Notification Time"** means 3:00 p.m., New York time, on a Local Business Day.[Lehman is reviewing your request for an earlier time]

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** For purposes of Paragraph 8(a), each Termination Event will constitute a Specified Condition with respect to Pledgor, if Pledgor fails to pay when due any amount payable by it in connection with an Early Termination Date designated in connection with that Termination Event. For all other purposes of this Annex, each Termination Event specified below with respect to a party will be a "Specified Condition" for that party (that party being the Affected Party if the Termination Event occurs with respect to that party):

|                                                                     | Party A |     |
| ------------------------------------------------------------------- | ------- | --- |
| Illegality                                                          |         |     |
| Tax Event                                                           |         |     |
| Tax Event Upon Merger                                               |         |     |
| Credit Event Upon Merger                                            | [X]     | [X] |
| Additional Termination Event(s) as specified in                     | [X]     | [X] |
| Part 1(h) of the Schedule (if any).                                 |         |     |

(e)    **Substitution.**

(i)     **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii)

(ii)    **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    **Dispute Resolution**

(i)     **"Resolution Time"** means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii)    **Value.** For the purpose of Paragraph 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Eligible Collateral in the form of securities listed in Paragraph 13(b)(ii) (referred to herein as "Collateral Obligations") the sum of (1) (x) the bid price quoted on such date by a mutually acceptable principal market maker for such Collateral Obligations, or (y) if no such quotation is available from a principal market maker for such date, such bid price as of the day, next preceding such date, on which such quotation was available, in either case multiplied by the applicable Valuation Percentage, plus (2) the accrued interest on such Collateral Obligations (except to the extent Transferred to a party pursuant to any applicable section of this Agreement or included in the applicable price referred to in (1) of this clause) as of such date.

(iii)   **Alternative.** Paragraph 5 will apply.

(g)    **Holding and Using Posted Collateral**

(i)     **Eligibility to Hold Posted Collateral; Custodians.**

(1)     Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

      (A)    Party A is not a Defaulting Party.

      (B)    The Custodian, if any, is a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party A is: Not applicable

(2)    Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

      (A)    Party B is not a Defaulting Party.

      (B)    The Custodian, if any, is a bank or trust company located in the State of New York having total assets of at least USD 1 billion.

Initially, the Custodian for Party B is: Not applicable

(ii)    **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A and Party B

(h)    **Distributions and Interest Amount.**

    (i)    **Interest Rate.** The Interest Rate will be the Federal Funds Rate. "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

    (ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor on the first Local Business Day of each calendar month. A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred.

    (iii)    **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s).** Not applicable.

(j)    **"Other Eligible Support and Other Posted Support."**

    (i)    **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

    (ii)    **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k)    **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l)    **Addresses for Transfers.** As agreed between the parties from time to time.

(m)    **Other Provisions.**

    (i)    **Local Business Day.** For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

    (ii)    **No offset.** The following subparagraph (c) is hereby added to Paragraph 3 of this Annex:

      (c)    ***No offset.*** On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 3(a) or (ii) each party is required to make a transfer under Paragraph 3(b), then the amounts of those obligations will not offset each other.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

LEHMAN BROTHERS SPECIAL FINANCING INC.

*Party A*

By:

Name:
Title:    Allyson M. Carine
          Authorized Signatory

Date:

JANA MASTER FUND, LTD.

*Party B*

By:

Name: Benjamin Hoyer
Title: Authorized Signatory
Date: 3/15/07

14

## FIRST AMENDMENT AGREEMENT

**FIRST AMENDMENT AGREEMENT** (the "Amendment") dated as of August 1, 2007 - between **LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A") and **JANA MASTER FUND, LTD.** ("Party B").

### WITNESSETH

WHEREAS, Party A and Party B have entered into an ISDA Master Agreement dated as of March 14, 2007 (the "Master Agreement") and

WHEREAS, Party A and Party B wish to amend the Master Agreement and to have the Master Agreement, as amended herein, govern the rights and obligations of Party A and Party B with respect to each and every Transaction which is (a) outstanding on the date hereof, and (b) entered into on or after the date hereof,

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Party A and Party B hereby acknowledge and agree as follows:

1.     <u>Certain Definitions.</u> Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or pursuant to the Master Agreement.

2.     <u>Amendments.</u> The Master Agreement is hereby amended, as of the date hereof, by adding the following to the Schedule immediately after Part 6(e) thereof:

### "Part 7: Additional Terms for Commodity Transactions

(a)     Definitions. This Agreement and each Transaction are subject to the 2000 ISDA Definitions (the "2000 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2000 Definitions and the 2005 Definitions, the 2005 Definitions will prevail. In the event of any inconsistency between the provisions of this Master Agreement (including the Schedule) and the Definitions, this Master Agreement (including the Schedule) will prevail. In the event of any inconsistency between the provisions of a Confirmation and this Master Agreement (including the Schedule) or the Definitions, the Confirmation will prevail for the purpose of such Transaction.

(b)     Rounding. Section 9 of the 2005 Definitions is deleted in its entirety and the following is substituted therefore:

"Section 9. For purposes of preparing any calculations referred to in the 2005 Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Currency Amounts: | rounded to the lowest unit of such Currency."" |

3.    Except as specifically amended hereby, all of the terms and conditions of the Master Agreement shall continue to be in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4.    Each of the parties hereby represents and warrants that:

(a)    the representation and warranties contained in the Master Agreement are true on and as of the date hereof as if made by the party on and as of said date, and

(b)    the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms.

5.    This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

6.    This Amendment shall be construed in accordance with and be governed by the laws of the State of New York (without reference to choice of law doctrine).

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the day and year first above written.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*Party A*

By: _____

Name:

Title:    Allyson M. Carine
          Authorized Signatory

Date:

**JANA MASTER FUND, LTD.**

*Party B*

By: _____

Name: Benjamin Hoyer

Title: Partner, JANA Partners LLC, as Investment Manager

Date: 8/1/07