**Hearing Date and Time: July 15, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: July 10, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000
Martin J. Bienenstock, Esq.
Philip M. Abelson, Esq.

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Gerard Uzzi, Esq.
Lisa Thompson, Esq.

*Attorneys for the Ad Hoc Group*
*of Lehman Brothers Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

|  |  |  |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** | : | **08-13555 (JMP)** |
| *et al.* | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

-------------------------------------------------------- x

|  |  |
|---|---|
| **LEHMAN BROTHERS HOLDINGS INC.,** | : |
| *et al.* | : |
| **Movants,** | : |
| | : |
| -  **against -** | : |
| | : |
| **AD HOC GROUP OF LEHMAN** | : |
| **BROTHERS CREDITORS,** | : |
| | : |
| **Respondent.** | : |

-------------------------------------------------------- x

**OBJECTION OF AD HOC GROUP OF LEHMAN BROTHERS CREDITORS TO**
**DEBTORS' MOTION PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY**
**CODE REQUESTING SECOND EXTENSION OF EXCLUSIVE PERIODS FOR THE**
**FILING OF AND SOLICITATION OF ACCEPTANCES FOR CHAPTER 11 PLANS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      The Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group")[1] submits

this objection (the "Objection") to Debtors' Motion Pursuant to Section 1121(d) of the

Bankruptcy Code, Requesting Second Extension of Exclusive Periods for the Filing of and

Solicitation of Acceptances for Chapter 11 Plans (the "Motion") and respectfully represents:

## PRELIMINARY STATEMENT

      1.    An A+.  At the hearing on January 14, 2009, this Court articulated its

aspiration that these chapter 11 cases should be administered at an A+ level.[2]  The instant

exclusivity Motion is a defining moment for the Debtors' $45 billion enterprise.  The end of

exclusivity enabling confirmation of a plan preferred by creditors[3] in a transparent process that is

fair and appears fair would carry out the fundamental purpose of this corporate enterprise (even

in bankruptcy), namely value maximization.  "The prime objective of the Bankruptcy Act

remains the simple one of getting creditors paid …."[4]  Here, however, as shown mathematically

below, neither the managers of the enterprise, nor the Debtors' advisors, nor the incumbent board

of directors, nor the equity holders are economically motivated to create value for the enterprise.

In contrast, the true stakeholders -- the creditors -- are effectively disfranchised and impaired

---

[1]     The Ad Hoc Group is comprised of Elliott Management Corporation, King Street Capital Management, L.P. and Paulson & Co. Inc.  Together with their affiliates, the Group holds claims against the Debtors, including claims directly against LBHI totaling approximately $13 billion.  The Group has been active, directly or indirectly, in the chapter 11 cases since nearly their inception with the goal of pursuing an efficient and meaningful resolution of these cases.

[2]     Hearing Tr., Jan. 14, 2009, vol. 1, at p. 94 ("[W]hat I want to accomplish here is not something which merely gets the job done, but something that gets an A plus.").

[3]     Congress expressly provided for a court to consider the plan preferred by creditors in Bankruptcy Code section 1129(c).

[4]     *Grayson-Robinson Stores, Inc. v. Secs. Exch. Comm'n*, 320 F.2d 940, 949 (2d Cir. 1963) (Friendly, C.J.).

because the only incentive in place, through no fault of management, is to stretch out the length of these chapter 11 cases while thwarting stakeholder control.  These cases require a plan that allows creditors immediately to control their destinies and maximize recoveries for themselves.

2. <u>No Cause Exists to Delay Stakeholder Control and Best Practice Governance.</u>  The Debtors seek the extraordinary relief of exclusivity in a liquidating case.  One more month is too long, let alone eight months, because giving the Debtors the exclusive right to propose a plan defies Congressional intent and Bankruptcy Code section 1129(c) providing that the Court should consider the creditors' preference for which plan they want.  Exclusivity deprives creditors of any preference.  Significantly, the Debtors allege cause to extend exclusivity without articulating the purpose exclusivity serves in these liquidating chapter 11 cases.  In a liquidation such as this, Congress made clear that it recognizes that creditors should determine their destinies.  Pursuant to Bankruptcy Code section 702(a), Congress legislated that creditors (not the debtors' shareholders and directors) elect chapter 7 trustees.  This is logical because creditors are the real parties in interest in liquidation cases.  Here, the Debtors admit they are liquidating, but seek to prevent creditors from taking control.   Clearly, the standard for extending exclusivity in a liquidating chapter 11 case must take Congressional intent and common sense into account.

3. What "cause" do the Debtors' offer to extend their exclusive dominion over the creditors' assets:  the reasons propounded in *rehabilitation* cases regarding (a) the alleged "destabilizing" effect of having the competing plans Congress expressly provided for in section 1129(c) with the court being guided by the creditors' preference, (b) the progress made in the cases while the real stakeholders are not in control, and (c) a list of alleged contingencies the

Debtors imply must be dealt with before a plan can be proposed by them when, in fact, the contingencies are conditions precedent to certain cash distributions, but not to plan confirmation.

4.      The Debtors fail to explain how or why any of their listed contingencies *actually* prevent a plan from being proposed now by the real stakeholders or why it would take the stakeholders eight months or any significant time to propose a plan.  They cannot.  The Debtors are in wind-down mode and are (and will continue to be) liquidating their assets over time in a process that may take years.  Thus, any plan that will be proposed (by any proponent) will be a chapter 11 liquidating plan.  The real issue is whether the real parties in interest can control business decisions to maximize distributions to creditors, or whether the Debtors will make most all the key business decisions affecting the real stakeholders before a chapter 11 plan is belatedly effective.

5.      <u>The Debtors Comprise a $45 Billion Enterprise and Should be Governed by Best Practices of Corporate America.</u>  The Debtors estimate they operate approximately $45 billion of assets,[5] and comprise one of the largest businesses in the world.  Fundamental principles of corporate governance and management dictate that a corporate entity's primary goal should be maximizing value for the benefit of the stakeholders of the enterprise. The time for stakeholder rights is now, when decisions on how and when to distribute over $12 billion in cash (held by the Debtors as of June 30, 2009) and how and when to monetize other assets by the Debtors' own estimates in excess of $33 billion will materially affect creditor recoveries.  Put simply, delaying the chapter 11 plan process leaves these estates controlled by old shareholders having no pecuniary interest in the enterprise, and not by the real parties in interest.  Extending

---

[5]      *See* note 23, *infra*.

exclusivity insulates the business from the stakeholders impacted by its operations. The transition of control to the real stakeholders while governance can still make a difference is what is at issue here. Moreover, in the estates' hands, the current $12 billion of cash earns miniscule returns due to today's historically low interest rates, whereas the prompt confirmation of a plan by itself helps creditors in many ways. First, a plan will reduce uncertainty. Second, it will eliminate an obstacle to the eventual distribution of cash and/or securities or certificates to creditors, all of which can be monetized to enable creditors to earn superior returns to the estates' acutely limited interest revenue.

6.      The Debtors' Motion to extend exclusivity should be denied because no cause exists to deprive stakeholders of control, best practice governance, and a chapter 11 plan they formulate to administer their $45 billion business enterprise.

## BACKGROUND

7.      On September 15, 2008 and periodically thereafter, LBHI and certain of its direct and indirect subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are jointly administered under the above-captioned case number.

8.      On December 29, 2008, the Debtors filed their first application pursuant to section 1121(d) of the Bankruptcy Code for an order extending the exclusive period during which the Debtors may file chapter 11 plans (the "Plan Period") through July 13, 2009 and the period during which the Debtors may solicit acceptances thereof (the "Solicitation Period") through September 16, 2009, which application was granted by order dated January 15, 2009.

9.      On July 1, 2009, the Debtors filed the Motion for an extension of the Plan Period and Solicitation Period (collectively, the "Exclusive Periods") to March 15, 2010 and May 17, 2010, respectively.

4

**ARGUMENT**

## I.    THE DEBTORS FAIL TO DEMONSTRATE "CAUSE" FOR EXTENDING EXCLUSIVITY

10.    <u>What Valid Purpose Does Exclusivity Serve In These Cases?</u>    Cause to extend exclusivity cannot be determined based on platitudes or in a vacuum.    First, the reason for exclusivity must be identified.    Normally, exclusivity promotes reorganization by preventing a senior or secured creditor from proposing a liquidation plan that pays in full the senior creditor, but does not maximize value for other creditors or preserve jobs.    Here, there is no reorganization, no senior creditor, and no jobs to preserve.    We are in a liquidation.[6]    Therefore, exclusivity serves *no* valid purpose.    Proof of that proposition is the Debtors' Motion.    The only purpose it identifies is the avoidance of competing plans.    We respectfully submit that in section 1129(c) of the Bankruptcy Code, Congress expressly provided for competing plans and for the plan preferred by creditors to prevail.    The U.S. Supreme Court ruled terminating exclusivity may foster market value testing in *Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 457-58 (1999) (Souter, J.).    As a matter of law, avoiding use of a statute (section 1129(c)) cannot be cause to extend exclusivity.

---

[6]    Just this week, in an interview with CNBC, Bryan P. Marsal, the Debtors' Chief Restructuring Officer, Chief Executive Officer and head of the firm Alvarez & Marsal, explained, "[S]ignificant progress is being made but it's a liquidation.    It's a wind-down of an operation.    When we got in there initially it was, it was clear there was no rehab, no fix or reconstruction of Lehman.    It was going to be a wind down, collection of the assets, and then to figure out … who we owed money to …."    *The Unwinding of Lehman Brothers* (CNBC Video broadcast Jul. 6, 2009), http://www.cnbc.com/id/15840232?video=1172874235&play=1; *see also* Vinee Tong, *Lehman Predicts Bankruptcy Exit Within Two Years*, Associated Press, January 14, 2009 ("Restructuring expert Bryan Marsal, who replaced Lehman's longtime chief executive Richard Fuld at the end of 2008, told a bankruptcy judge that liquidators could finish their work of winding down Lehman within 18 to 24 months.").

11.    The Debtors bear the burden of proving that an extension of exclusivity is warranted under the circumstances.[7]  The Debtors fail to offer any compelling reason to thwart stakeholders.  They allege, but fail to explain the significance of (a) the size and complexity of the cases; (b) their good-faith progress in managing assets; (c) not seeking to extend exclusivity to pressure creditors to accept the Debtors' demands; (d) the existence of unresolved contingencies; and (e) their paying their bills as they come due.  The Debtors attempt to justify their requested extension of exclusivity by demonstrating that they have satisfied each of these factors.

## A.    A Confirmable Chapter 11 Liquidation Plan Can Be Proposed

12.    The Debtors are indisputably in wind-down mode and the only plan that will be proposed in these cases is a chapter 11 liquidation plan having flexibility to treat each asset in an optimal manner based on risk profiles and objectives set by stakeholders.

13.    The Debtors confuse distributions with confirmation.  The Debtors' Motion focuses entirely on issues arguably necessary to resolve before certain distributions commence.  Unwinding the Derivative Transactions, preserving and liquidating Real Estate assets, awaiting a Bar Date, settling Intercompany Claims and pursuing avoidance actions, are all plan consummation issues and a plan can be structured to provide mechanisms for dealing with each of them.  None must be fully accomplished before a plan can be proposed and, indeed, with the exception of the Bar Date, *none* is likely to be completed before the Debtors' requested eight month extension period expires.

---

[7]    *See In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("[t]he party who seeks the extension or the reduction of the exclusivity period has the burden of establishing cause").

**B.      Terminating Exclusivity and Allowing Creditors to Propose a Plan Will
Benefit, Not Destabilize, These Cases**

14.      As support for the Motion, the Debtors assert the refrain regarding the
"destabilizing" effect competing plans will have on the estates.[8]   The Debtors never explain
exactly what will be destabilized.  In some rehabilitating chapter 11 cases, competing plans could
have a destabilizing effect on the Debtors' businesses, sending mixed messages to the Debtors'
vendors, suppliers, and customers.  As the Debtors are so quick to remind us, however, these are
not typical chapter 11 cases.  There is no ongoing business operation to disrupt here, no new
business being generated and no chance for reorganization.  The Debtors are essentially a large
investment fund whose positions are being liquidated.[9]

15.      The Debtors presume that terminating exclusivity will lead to chaos and
wasted resources.  However, there is nothing inherently bad or destabilizing in having competing
plans proposed (or, for that matter, having creditors, rather than debtors, propose a plan in the
first instance).  Indeed, the Bankruptcy Code expressly contemplates the prospect of multiple
plans and creditor-proposed plans.  First, section 1121(c) expressly provides that *any* party in
interest may propose a plan.  Second, section 1129(c) contemplates the possibility that more than
one confirmable plan can be proposed, and guides the bankruptcy court to consider the

---

[8]      Motion at ¶ 13.

[9]      Moreover, it is pointless to suggest that this Court, which handled the sale of much of the Debtors' business
in a record five days, would be unable to control these cases should parties in interest propose competing plans.  In
recent weeks, the court in *In re Asarco LLC, et al.*, Case No. 05-21207 (Bankr. S.D. Tex.), modified exclusivity to
allow creditors to vote on three competing plans, the court in *In re Pliant Corp. et al.*, Case No. 09-10443 (Bankr. D.
Del.), terminated exclusivity to allow creditors to propose competing plans, and the court in *Hawaiian Telcom
Communications Inc.* terminated exclusivity, despite the debtors' assertion that, "[a]llowing the exclusive periods to
expire could derail the debtors' efforts to bring these cases to a successful conclusion as quickly as possible and
would likely result in increased administrative costs."  Brief of Hawaiian Telcom Commc'ns Inc. et al. at 12-13, *In
re Hawaiian Telcom Commc'ns Inc. et al.*, Case No. 08-02005 (LK) (Bankr. D. Hawaii Jun. 3, 2009).

preferences of creditors[10] in determining which plan to confirm.  Finally, by limiting exclusivity

to a statutory maximum of eighteen months,[11] the Bankruptcy Code invites parties in interest to

propose competing plans.

16.    The Debtors contend they are not using exclusivity to impose their

"reorganization demands" on creditors.[12]  But, that is exactly what they are doing.  The Debtors'

demands are to control monetization of the $45 billion enterprise, before creditors can take

control.  That is the only purpose being served by exclusivity, and it is not any meritorious

purpose Congress had in mind.

### C.    None of the Alleged Unresolved Contingencies Listed in the Debtors' Motion Justifies an Extension of Exclusivity

17.    In support of their Motion, the Debtors identify a number of factors they

contend demonstrate that "substantial progress" has been made towards the development of

chapter 11 plans for each of the Debtors.[13]  Despite this progress, the Debtors now insist that

various unresolved contingencies remain before they can even consider formulating a plan.  On

analysis, however, each item the Debtors list as a condition precedent to a plan, is at most a

condition precedent to some cash distributions, not to  chapter 11 plan confirmation.

---

[10]    Under any proponent's chapter 11 plan, shareholders will be deemed to reject.  Therefore, their preference is immaterial here.

[11]    It bears noting that the eighteen month cap on exclusivity is a radical departure from the previous rule, permitting bankruptcy courts to order extensions of exclusivity indefinitely, no doubt signaling Congress's view that debtors' ability to maintain exclusive control over their cases must be carefully circumscribed so as to avoid any undue prejudice to creditors.  These cases cry out for such discipline where a liquidating chapter 11 plan will be proposed and confirmed (and distributions commenced) before the cases can be fully administered.

[12]    Motion at ¶¶ 29(c) & 46.

[13]    Motion at ¶ 14.

1.        **Derivative Transactions**

18.      The Debtors cite their substantial effort to unwind the Derivative Transactions as support for their entitlement to an extension of the Exclusive Periods.[14] Undoubtedly, however, the process of unwinding the Derivative Transactions will continue after the Debtors' eight month extension would expire.  Thus, any party in interest (including the Debtors) will have an opportunity to propose a plan regardless of whether the Debtors have completed the Derivative Transaction reconciliation process.  In addition, the Debtors merely declare, but never explain, why the Derivative Transactions need to be fully (or even partially) completed prior to a plan being proposed.  This plan, as with all other chapter 11 plans, will provide mechanisms similar to a typical disputed claims reserve whereby, as the individual transactions are unwound, the resulting assets (if the Debtor counterparty is a net creditor) or claims (if the Debtor counterparty is a net debtor) are either distributed to creditors in a subsequent distribution or added to the total allowed claims entitled to a distribution under the plan.

19.      A plan with these characteristics can be proposed without having to wait for the Debtors to complete the Derivative Transactions reconciliation process.  The key to resolving derivative claims is to tee up the few recurring legal issues that create the dominant disputes.  Once those are decided, resolutions can be negotiated with most claimants.

---

[14]        Motion at ¶ 15.

**2.      Real Estate**

20.      The Debtors also cite their progress developing a course of action for the disposition and maintenance of their real estate assets.[15]  Again, the Debtors do not explain why the real estate issues need to be resolved before a plan can be proposed.  That's because they do not have to be.  In fact, the real stakeholders should be allowed to make the decisions affecting those major assets after a plan is confirmed.  The Debtors note that many of their real estate projects have needed cash infusions and are likely to continue to need further infusions in the future.  Financing is one of many issues the reorganized debtors will handle.  It certainly does not have to delay plan confirmation.  The Debtors' insistence to the contrary is telling.  The Debtors' position evidences their intent to make all business decisions necessary for distributions and to keep the real stakeholders at bay until then.  That intent is consistent with desiring to elongate the cases, but inconsistent with good governance and creditor-stakeholders' rights.  Under a confirmed plan, a creditor elected board will make the ultimate determination whether to continue financing these projects.

**3.      Bank Assets**

21.      The Debtors also cite their efforts to preserve their bank assets,[16] but do not address why this step has either made a plan more likely or prevented a plan from being proposed.  If value is later realized from the Debtors' efforts, then it will be distributed through the subsequent distribution mechanisms in the plan.

---

[15]      Motion at ¶ 18.

[16]      Motion at ¶ 20.

### 4.      Foreign Proceedings and Intercompany Claims

22.      The Debtors next cite the difficulty of reconciling the numerous foreign insolvency proceedings filed by the Debtors' foreign affiliates and the numerous intercompany claims among the Debtors' debtor and non-debtor affiliates.[17]   Intercompany claims by and against foreign or domestic affiliates can be dealt with in the plan through the normal claims resolution procedures or through other means.   Enron had no problem dealing with similar claims resolution issues.   The Debtors never explain why such claims cannot be dealt with under the plan like all other claims.

### 5.      Bar Date

23.      The Debtors also reference the need for the bar date to pass prior to formulating a plan.[18]   We know the claims are large in amount.   After the bar date, we will have more proof that the claims are large in amount.   That does not change the prospect of plan confirmation.

### 6.      Avoidance Actions

24.      The Debtors cite their continued analyses of potential avoidance actions as a ground for an extension of exclusivity,[19] but avoidance actions are routinely reserved for post-emergence litigation and thus are not an obstacle to proposing, confirming, or making distributions under a plan.   To the extent avoidance actions are prosecuted and liquidated after the Debtors emerge from bankruptcy, the resulting recoveries can be distributed to creditors through a subsequent distribution mechanism in the plan.

---

[17]      Motion at ¶¶ 21 & 24.

[18]      Motion at ¶ 23.

[19]      Motion at ¶ 26.

### 7.    Examiner Report

25.    The Debtors want plan proposals to await the Examiner's report, but fail to explain why the report is needed for a plan other than to say that its necessity is "without question."[20]   To the extent the Examiner identifies promising causes of action, they can be prosecuted post-confirmation.   To the extent the Examiner identifies claims, the claims resolution process will move faster.   None of it, however, is a condition precedent to plan confirmation.

### D.    Neither The Complexity of Administering These Chapter 11 Cases Nor the Debtors' Good Faith Justifies a Further Extension of Exclusivity

26.    These cases are definitely large and indisputably complex, but the end-game is not.  Under every scenario, these cases will end in a liquidation plan that distributes cash and assets to the creditors.  The Debtors indicate they will need to engage in a "six-step labor-intensive process" to resolve derivative contracts before a plan can be proposed[21] -- no explanation of how long this process will take or whether it will be completed within the Exclusive Period.  Most likely, the process will not be completed before the expiration of the Exclusive Periods and it does not need to be.

27.    Finally, the Debtors string-cite a handful of cases filed after BAPCPA, wherein exclusivity was extended to the statutory maximum.[22]  What the Debtors fail to mention, however, is that each of those cases was a reorganization case and none involved a liquidating debtor that would implement a cash-based waterfall plan.

---

[20]      Motion at ¶ 48.

[21]      Motion at ¶ 38.

[22]      Motion at ¶ 51.

## II.    THE DEBTORS' CURRENT GOVERNANCE DOES NOT SERVE CREDITORS' INTERESTS AND ONLY ELONGATES THESE CASES

28.    Together, the 19 debtors comprising these jointly administered chapter 11 cases are one of the largest business enterprises in the world, controlling over $45 billion in assets.[23]    Successful American business enterprises do not structure its management and corporate governance in the mode of a chapter 11 process with multiple parties in interest weighing in on every issue.    Indeed, the current incentive structure actually *impedes* stakeholders' ability to maximize recovery and control expenses because it encourages lengthening the cases.[24]

### A.    Neither the Debtors Nor Their Shareholders, Directors or Advisors are Economically Motivated to Emerge from Bankruptcy Promptly or to Maximize Creditor Recovery

#### 1.    The Shareholders are Out of the Money and Have No Incentive to Monitor the Enterprise's Directors or Maximize Value for the Enterprise

29.    Given the size of the Debtors' liabilities, the Debtors' shareholders have no hope of achieving any recovery on their investments from these estates.    Thus, unlike an ordinary enterprise, the Debtors' shareholders lack incentive to demand disclosure and monitor the performance of the company's directors and officers, for they can no longer benefit from

---

[23]    *See* Jeffrey McCracken and Alex Frangos, *Lehman Considers Spinoff of Remnants*, Wall St. J., May 14, 2009, at C1 (reporting figures supplied by Alvarez & Marsal).

[24]    The National Association of Corporate Directors ("NACD") -- a non-profit membership organization dedicated to serving the corporate governance needs of companies and individual directors, widely recognized as an authoritative voice on corporate governance policies and practices -- published a paper in 2008 laying out ten "Key Agreed Principles" for strong corporate governance.    They are:  (i) board responsibility; (ii) transparency; (iii) director competence and commitment; (iv) accountability and objectivity; (v) independent board leadership; (vi) integrity, ethics and responsibility; (vii) attention to information, agenda and strategy; (viii) protection against board entrenchment; (ix) shareholder input in director selection; and (x) shareholder communications.  "Key Agreed Principles to Strengthen Corporate Governance in U.S. Publicly Traded Companies," National Association of Corporate Directors 2008 (hereafter, the "Principles"), *available at* http://www.nacdonline.org/.  As set forth in more detail below, virtually every one of these guideposts of good corporate governance is lacking in the Debtors' present operating structure.

maximizing such value. And, indeed, the shareholders have taken no action to install new board members. Shareholders have no reason to care. The Delaware Supreme Court, renowned for its governance expertise, recognizes that when shareholders are out of the money, creditors must be granted rights to protect the enterprise because shareholder control is no longer effective.[25]

### 2. The Board of Directors Has No Incentive to Maximize Returns for Creditors

30. Essentially the same board that (a) oversaw the Debtors' demise, (b) witnessed additional billions in losses due to the chapter 11 filing before derivatives were sold,[26] and (c) presided over the rapid transfer of its U.S. investment banking business to Barclays for $250 million[27] -- which the Debtors negotiated and closed, but are now investigating -- remains at the helm.[28] These directors have no future with any reorganized Lehman entity, for there will be no reorganized entity. Even if they were independent and not connected with the events leading up to the commencement of these cases,[29] there is no incentive, economic or otherwise,

---

[25] *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("It is well settled that directors owe fiduciary duties to the corporation. When a corporation is *solvent*, those duties may be enforced by its shareholders, who have standing to bring *derivative* actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value. When a corporation is *insolvent*, however, its creditors take the place of the shareholders as the residual beneficiaries of any increase in value.") (footnotes omitted) (emphasis in original).

[26] Notably, Mr. Marsal, publicly questioned the judgment in failing properly to prepare the company for a bankruptcy filing. The three-month study conducted by Alvarez & Marsal following the commencement of these chapter 11 cases estimates the board's hasty filing to have cost the company (*i.e.*, the creditors) some $50-75 billion in lost asset value as a result of failing to conduct an orderly wind down of the company's derivative portfolio, among other things. Jeffrey McCracken, *Lehman's Chaotic Bankruptcy Filing Destroyed Billions in Value*, Wall St. J., Dec. 23, 2008, at A10.

[27] Motion of Debtor and Debtor in Possession for an Order, Pursuant to Fed. R. Bankr. P. 2004, Authorizing Discovery from Barclays Capital, Inc., dated May 18, 2009, at ¶ 16 [Docket No. 3596].

[28] Each of the nine directors presently serving on the board of LBHI have been fixtures on LBHI's board for years or decades prepetition.

[29] The bankruptcy filing before off-loading derivatives cost the firm an estimated $50-75 billion. "It was an unconscionable waste of value," said Marsal. McCracken, *supra* note 26 at A10. In an interview given by Mr. Marsal to Spiegel International Online on March 13, 2009, he elaborated on the board's utter failure to prepare the

*continued on the following page …*

14

for them to fashion a plan for the company to emerge swiftly from bankruptcy or to maximize value for creditors.[30]

### 3. The Debtors Currently are Managed by Outside Advisors Not Economically Motivated to Steer the Enterprise Toward a Swift Emergence from Chapter 11 or to Maximize Returns for Creditors

31. As the Debtors have repeatedly reminded their creditors and this Court, the Debtors lost most of their staff, including substantially all their senior management, as part of the Barclays sale. While the two primary outside advisors -- Alvarez & Marsal and the Debtors' attorneys – stepped into that breach with little notice and even less time to prepare, we are at a different cross roads in this case. We do not ask the Court to question any of their judgment, but to consider only whether there is cause to prevent the real stakeholders from proposing a plan to maximize their recovery, especially in light of the current economic incentives that motivate delay, as shown below.

### a. A&M

32. At present, Bryan P. Marsal, supported by his firm, Alvarez & Marsal ("A&M"), functions as the Debtors' Chief Executive Officer. According to the Motion,

---

*continued from preceding page ...*

enterprise for a bankruptcy filing: "I received a call from the board of directors of Lehman Brothers. This was at 10:30 at night on September 14th, and they asked me: Would I take on responsibility for the wind-down of Lehman? … I said yes. And my question to them was: How much planning has gone into this bankruptcy? Their response was: This phone call is the first planning we have done." Frank Hornig, *The Global Banking Community Had a Heart Attack*, Spiegel Online International, Mar. 13, 2009, http://www.spiegel.de/international/business/0,1518,613196,00.html.

[30] Although the business of the enterprise has radically changed in the last nine months, the composition of the board of directors has not. The serving board members should have experience relevant to the current business enterprise -- *i.e.*, a bankrupt entity in the process of winding down its affairs and liquidating assets. "[T]he board should reflect a mix of diverse experiences and skill sets relevant to the business and governance of the company, each board must determine for itself, and review periodically, what those experiences and skill sets are and what the appropriate mix should be as the company faces different challenges over time." Principles at 9. Ordinarily, shareholders would be incentivized to install qualified directors when those in service no longer have the requisite expertise to direct the business. That this has not happened and there is no reason to believe it will happen, is emblematic of the absence of good governance here.

approximately 200 A&M employees are employed full time at the Debtors.  A&M has billed in excess of $115 million in hourly fees,[31] which compensation will be in addition to certain so-called "incentive" fees capped at 25% of the hourly fees: an "Asset Management Incentive Fee" of 17.5 basis points of all unsecured distributions greater than $15 billion and a "Claims Management Incentive Fee" in an amount to be determined at the conclusion of the case.[32]

33.     In a nutshell, the problem is that A&M's Asset Management Incentive Fee is already greater than 25% of its hourly fees.  Therefore, the only incentive A&M has is to elongate the cases so its hourly fees become large enough to pay the full incentive fee.  The math is as follows:  A&M has estimated that the real estate property value held by LBHI *alone* exceeds $20 billion and a conservative estimate of the return from spinning off LBHI's remaining assets would yield $45 billion,[33] inclusive of approximately $12 billion in net cash from these assets since the commencement of these chapter 11 cases.[34]  Assuming A&M's own estimates are correct, A&M would be entitled to 17.5 basis points of $30 billion -- or $52.5 million.  But, $52.5 million is much greater than the cap on its aggregate bonus which is currently 25% of the $115 million it has billed.

---

[31]     *See* Exhibit C at p. 8.

[32]     Second Supplemental Declaration of Bryan P. Marsal in Support of Debtors Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Final Order Authorizing the Debtors to (A) Retain Alvarez & Marsal North America, LLC to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and (B) to Appoint the Chief Restructuring Officer *Nunc Pro Tunc* to the Commencement Date, dated November 17, 2008 [Docket No. 1559].

[33]     The $45 billion figure reportedly represents a precipitous drop in value -- approximately 50% -- as a result of the fallout following the commencement of these cases.  McCracken & Frangos, *supra* note 23, at C1.  The assets were estimated to be worth approximately $400 billion at non-distressed prices, likely enough to pay every creditor of the Debtors in full.  *Id.*

[34]     The Debtors credit themselves with increasing cash reserves from $2 billion on the Commencement Date to more than $10 billion.  Motion at ¶ 43.

34.    That fact has turned the so-called "incentive" fee structure on its head. Rather than incentivizing A&M to promote an expeditious confirmation and to maximize returns for creditors, because A&M's "incentive" fees are capped at 25% of the firm's total billings, the only way A&M can fully earn the $52.5 million bonus it is otherwise contractually entitled to (or any additional bonus money) would be to stretch out the case until its fees crest $210 million or more.[35]    The stakeholders' problem, however, is that increasing the $45 billion does A&M *no good*.  A&M only benefits if the cases last long enough to bill $210 million.

**B.    Transparency Has Not Been Accomplished**

35.    Transparency is one of the fundamental principles of good corporate governance and the theme set by this Court.[36]  When the Debtors were actively in business, they publicly disclosed massive amounts of information about all material assets and liabilities, but do not do so now.[37]  Meanwhile, the Debtors have failed to provide basic information under a governing structure  designed to produce a quick plan confirmation process that will limit the drain of unnecessary administrative expenses.

36.    To show they have disseminated to creditors meaningful information in these cases, the Debtors cite ten instances in which they have communicated with creditors.  Six

---

[35]    As noted, in the first nine and a half months of these cases alone, A&M has billed over $115 million in professional fees [Docket No. 4288].  Allowed to proceed at present rates, A&M's total fees will approach $218 million (exclusive of "incentive" fees) by the end of the eight month extension to exclusivity proposed by the Debtors.

[36]    Hearing Tr., June 29, 2009, at p. 30 ("[T]he theme of this bankruptcy case starting in the second week of the case, not the first, was the transparency was the order of the day."); *see also* Principles at 8 ("Governance structures and practices should be transparent -- and transparency is more important than strictly following any particular set of best practice recommendations.").

[37]    Prebankruptcy, when the Debtors were not in default of their obligations, the Debtors' provided massive amounts of information in its public reporting.  Now that the Debtors are in default however, the flow of information is negligible.  *Compare* LBHI Form 10-K for fiscal year ended November 30, 2007 (Exhibit A hereto) *with* LBHI's Notice of Late Filing Form NT 10-K for fiscal year ended November 30, 2008 (Exhibit B hereto).

of the ten are required by the Bankruptcy Code or are common in chapter 11 cases. For instance, the Debtors cite their publication of the notice of the 341 meeting in newspapers as an example of their full disclosure. The publication notice of a meeting the Debtors are required to hold is not an example of disclosure. Similarly, filing Form 8-K disclosures and monthly operating reports are not cause to extend exclusivity. They are required by law. Finally, providing the docket on a public website is commonplace among large chapter 11 debtors. That the Debtors resort to trumpeting compliance with law and a public website highlights a lack of any substantive cause to extend exclusivity.

37.    Most importantly, the Debtors do not mention the substance of their disclosures. A look at their monthly operating reports poignantly shows why. Attached as Exhibit C is the Debtors' monthly operating report for May and June 2009 [Docket No. 4288]. The title, "Monthly Operating Report," suggests there would be an operating report. Not so. The "Monthly Operating Report" for LBHI for June 2009 is *one line* on page six of Exhibit C. It shows beginning cash of $2.666 billion, receipts of $688 million, transfers of $188 million, disbursements of $602 million, foreign exchange fluctuation of $6 million, and ending cash of $2.939 billion. LBHI is a huge company. Its one line skeletal operating report provides virtually no insights as to its operations. To compound the lack of disclosure, LBHI filed a new Form 8-K dated July 8, 2009 (Exhibit D hereto), consistent with its prior Forms 8-K, not providing any additional data, but rather advising creditors: "The Registrant cautions investors and potential investors not to place undue reliance upon the information contained in the Monthly Operating Report, as it was not prepared for the purpose of providing the basis for an investment decision relating to any of the securities of any of the Debtors, or any other affiliate of the Registrant …." Yet the only information in the Monthly Operating Report was a single line item containing a

cash balance.  Similarly, information provided at the Debtors' recent section 341 meeting was meager in substance.  Thus, the Debtors' allegations about their public disclosure exalt form over substance.  Creditors are receiving far less information than the Debtors provided prepetition.

38.  <u>Meaningful Expense Reduction Can Only Occur under a Confirmed Plan.</u> Successful corporate America is run by putting enterprises in the hands of management rationally incentivized to maximize returns, which management is overseen by the real stakeholders.  Extending exclusivity only extends the existing chapter 11 process which in these cases is the most expensive in history.

**C.    The Status Quo Is Contrary to Creditors Interests and Refutes any Further Extension of the Debtors' Exclusivity**

39.  All this points ineluctably to one conclusion:  The creditors -- the true parties in interest -- must have the ability to implement governance and motivations that benefit the stakeholders.  The stakeholders want to decide their own destinies, maximize estate values and begin distributions at the earliest possible point.  All the actions the Debtors describe in their Motion may be accomplished, but none must be completed before a plan may be proposed and few or none are likely to be completed when the Debtors' requested eight-month extension period runs out.  Congressional intent that creditors control insolvent, liquidating debtors should be implemented.  Only a creditors' plan will enable the real parties in interest to control their destinies.

40.  <u>The Bottom Line.</u>  When all is said and done, one proposition emerges. Exclusivity's *sole* impact in these cases is to prevent stakeholders from implementing best business practices and best corporate governance.  That is not cause to extend exclusivity.  It is the reverse.

19

## CONCLUSION

WHEREFORE for all the foregoing reasons, the Ad Hoc Group respectfully requests that this Court deny the Motion and grant it such other and further relief as is just and proper.

Dated: New York, New York
      July 10, 2009

DEWEY & LEBOEUF LLP

/s/ Martin J. Bienenstock
Martin J. Bienenstock, Esq.
Philip M. Abelson, Esq.
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

-and-

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi, Esq.
Lisa Thompson, Esq.

*Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors*