WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                            :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

-------------------------------------------------------------------x

### DEBTORS' OBJECTION TO THE MOTION OF DNB NOR BANK ASA FOR ALLOWANCE AND PAYMENT OF A SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIM AND ALLOWING SETOFF OF SUCH CLAIM

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), as and for their objection (the "Objection") to the motion of DnB Nor Bank ASA (the "Bank"), dated June 19, 2009 (Docket No. 4054) (the "Motion"), for allowance and payment of superpriority administrative expense claim pursuant to 11 U.S.C. §§ 503(b) and 507(b), and allowing setoff of such claim, respectfully represent:

**Preliminary Statement**

1.      The Bank is seeking, for the first time, an entitlement to adequate protection on the basis of its unsubstantiated assertion that it has an allowed administrative expense claim with respect to cash collateral over which the Bank obtained possession and control almost six months ago.  The Bank's current request arises from currency fluctuations between the Norwegian krone and the United States dollar of funds in an LBHI account located at the Bank, as to which the Bank, pursuant to a motion filed on September 30, 2008, sought stay relief to exercise its purported setoff right against the entire amount in the account without regard to whether all of the funds in the account were actually deposited prior to the commencement of LBHI's chapter 11 case.

2.      The Motion should be denied because in its original stay relief motion, the Bank never actually presented a request to the Court for adequate protection.  Instead, the prayer for relief in its stay relief motion was made as an alternative to its request for stay relief _and_ conditioned upon the Court not granting the Bank stay relief.  But the Bank was granted stay relief, thus mooting the alternative and conditional relief sought.  Notwithstanding that the request for adequate protection was only to be triggered if stay relief was denied, LBHI on November 5, 2008 permitted, with this Court's approval, the Bank to convert the funds in the bank account during the pendency of the stay relief litigation, so as to mitigate the allege currency risks.  The Bank, however, failed or refused to timely convert the funds and subsequently agreed that it would assume the risk resulting from its inaction.  The Bank now has the audacity to belatedly request that the Debtors' creditors should bear the cost of pre-November 5, 2008 currency risks that the Bank by its own conduct has demonstrated it is otherwise prepared to absorb.

3.      As set forth below, the Bank's request to receive superpriority treatment with respect to an administrative expense claim is legally and factually deficient.  The Bank cannot demonstrate, as it must, that it has or is entitled to an administrative expense claim.  For the reasons discussed herein, the Motion should be denied and the Court should direct the Bank to promptly return the remaining funds in the account as to which this Court previously held that the Bank had no entitlement.

## Background

4.      Commencing on September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

5.      At the close of business on September 15, 2008, after the commencement of LBHI's chapter 11 case, there was at least 106,178,587 Norwegian Krone ("NOK") deposited in an account in the name of LBHI (the "'268 Account") located at the Bank.  *See* Exhibit A to the Stipulation and Order [Docket No. 2605] (the "Stipulation and Order").[1]  At the close of business on September 12, 2008, however, the total amount deposited in the '268 Account was approximately 1,221,285 NOK.  *Id.*

6.      After the Commencement Date, the Bank imposed an administrative freeze on the '268 Account, thereby restricting LBHI's access to and right to use all of the funds deposited in such account.  *See* Setoff Motion, ¶ 7.

---

[1] The Stipulation and Order memorialized the undisputed facts with respect to the Setoff Motion (as defined in paragraph 7) and provided for the modification of the automatic stay for the limited purpose of permitting the Bank to setoff its claim against the portion of the Undisputed Funds (as defined in paragraph 12) that were deposited in the '268 Account prior to the Commencement Date.

7.      On September 30, 2008, the Bank filed a motion styled as "Motion for

Entry of (i) an Order Pursuant to 11 U.S.C. § 362(d) and Fed. R. Bankr. P. 4001 Granting Relief

from the Automatic Stay to Effect Setoff or, in the Alternative, (ii) an Order Pursuant to 11

U.S.C. §§ 361 and 506(a) Requiring the Debtors to Provide Adequate Protection" [Docket No.

465] (the "Setoff Motion").

8.      As formulated and presented to the Court in the Setoff Motion, the Bank

moved the Court as follows:

> In accordance with section 362(d) of the Bankruptcy Code and Bankruptcy Rule
> 4001, DnB seeks an order from this Court lifting the automatic stay to permit
> DnB to exercise its right to offset its claims against the funds contained in the
> Account. Alternatively, in the event that the Court determines not to modify the
> automatic stay, DnB seeks adequate protection of its interest in the Cash
> Collateral pursuant to sections 361 and 506(a)(1) of the Bankruptcy Code.

Setoff Motion, ¶ 10 (emphasis supplied).

9.      On November 3, 2008, the Debtors filed an objection to the Setoff Motion

[Docket No. 1334 (as amended by Docket No. 1342)] (the "Initial Objection"), and the Official

Unsecured Creditors' Committee (the "Committee") filed a joinder to the Initial Objection

[Docket No. 1336].  In the Setoff Motion, the Bank asserted, without any evidentiary support,

that the funds in the '268 Account were deposited prior to the commencement of LBHI's chapter

11 case.  Setoff Motion, ¶ 4.  In response, the Debtors argued the account balances on September

12, 2008 and September 15, 2008 gave them reason to believe that not all of the funds in the

'268 Account were deposited prior to the Commencement Date.  Initial Objection, ¶¶  11-15.

10.      At the first scheduled hearing on the Setoff Motion on November 5, 2008,

the Debtors and the Bank agreed to adjourn the motion to December 3, 2009 while the Bank

produced documents that supported it was entitled to relief pursuant to section 553 of the

Bankruptcy Code.  While the Bank's request for adequate protection was framed in the

alternative <u>and</u> conditioned upon the Court not modifying the automatic stay, LBHI nevertheless

permitted the Bank to convert the funds in the '268 Account from NOK to United Stats dollars

("<u>USD</u>").  At the November 5, 2008 hearing, the Bank stated on the record that

> we've reached an agreement also on adequate protection, as Mr. Miller said, that
> my client can convert the krona account to U.S. dollars at its discretion in order to
> protect it against currency fluctuations.  And we're fine with that being just a
> memorialization on the record, Your Honor.  But if Your Honor would prefer a
> written order on that, we would be happy to submit a written order also.

November 5, 2008 Transcript, 44:2-8.[2]

11.     Notwithstanding its ability to convert the funds in the '268 Account, the

Bank failed or refused to timely convert the NOK to USD.  In their supplemental objection to the

Setoff Motion, the Debtors took issue with the Bank's failure to timely convert the funds.  ¶ 17,

[Docket No. 1988] (the "<u>Supplemental Objection</u>").  At the December 3, 2008 hearing on the

Setoff Motion, the Bank agreed that "it would take the risk from November 5th forward with

respect to any diminution that occur [sic]."  December 3, 2008 Transcript, 39:17-22.[3]  As of the

date hereof, the Debtors are unaware when, if at all, the Bank converted the funds.

12.     After the Bank and the Debtors completed their diligence, the Debtors

determined that NOK 99,113,236.36 (the "<u>Undisputed Amount</u>") had been deposited in and

credited to the '268 Account approximately 90 minutes before the commencement of LBHI's

chapter 11 case, but that the NOR 7,065,351.56 (the "<u>Disputed Amount</u>") had been deposited

and credited to the '268 Account after the filing of LBHI's petition.  As a result, the Debtors

acknowledged that the Court should grant the Setoff Motion, in part, to permit the Bank to setoff

against the Undisputed Amount against the Bank's claim that was deemed a valid claim in

---

[2] The relevant portion of the November 5, 2008 Transcript is annexed hereto as Exhibit A.

[3] The relevant portion of the December 3, 2008 Transcript is annexed hereto as Exhibit B.

amount no less than the Undisputed Amount.  The Debtors requested, however, that the Bank

should be directed to transfer to LBHI the Disputed Amount and any other funds remaining in

the '268 Account upon LBHI's direction.  Supplemental Objection, ¶ 16.

13.     Subsequently, the Debtors, the Committee, and the Bank entered the

Stipulation and Order that (i) set forth the undisputed facts relating to the setoff request and

(ii) agreed to modify the automatic stay for the limited purpose of permitting the Bank to setoff

its claim against the Undisputed Amount.  The Stipulation and Order was entered by the Court

on January 22, 2009.  The Debtors hereby incorporate by reference the terms of the Stipulation

and Order.

14.     The Stipulation and Order provides that it "was without prejudice to (a)

any <u>assertion</u> by the Bank that it is entitled to . . . adequate protection in respect of the

Undisputed Amount . . ."  Stipulation and Order, ¶ 16 (emphasis supplied).  The Stipulation and

Order did not, however, create, preserve, or revive any right to an administrative expense claim

nor did the Stipulation and Order toll the Bank's time to make a request for such a claim.

15.     On June 1, 2009, the Court issued its memorandum and decision denying

the Bank's request to setoff its claims against the Disputed Amount.  *In re Lehman Brothers*

*Holdings Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009).

## Adequate Protection Is Determined As Of The Date The Request Is Made

16.     The case law is clear that a creditor is not entitled to adequate protection

until it makes a request to the Court for such relief.  *In re Best Products Co., Inc.*, 138 B.R. 155,

158 (Bankr. S.D.N.Y. 1992) (holding that adequate protection is measured from the time the

request is made to the court, not as of the petition date).  The Bank relies exclusively on

*Travelers Life and Annuity Co. v. Ritz-Carlton of D.C., Inc.*, (*In re Ritz-Carlton of D.C., Inc.*), 98

B.R. 170, 173 (S.D.N.Y. 1989) for the proposition that adequate protection should be determined

as of the petition date without regard to the time the creditor actually makes the request.[4]

17.    In *Best Products*, this Court held that

> it is unclear how the *Ritz-Carlton* court determined that the "general rule" is that a
> secured creditor's position as of the petition date rather than the motion date
> controls for adequate protection <u>with so much authority supporting a contrary
> finding</u>.

*Best Products*, 138 B.R. at 158 (emphasis supplied) (citing *Ahlers v. Norwest Bank*, 794 F.2d

388, 395 n.6 (8th Cir. 1986) *rev'd on other grounds*, 485 U.S. 197 (1998); *Grundy Nat'l Bank v.*

*Tandem Mining Corp.*, 754 F.2d 1436, 1441 (4th Cir. 1985); *In re Adams*, 2 B.R. 313, 314

(Bankr. M.D. Fla. 1980); *In re Advisory Information and Mgt. Systems, Inc.*, 50 B.R. 627, 629

(Bankr. M.D. Tenn. 1985); *In re Briggs Trans. Co.*, 47 B.R. 6, 8 (Bankr. D. Minn. 1984)).

18.    Since that time, the majority of courts cite to *Best Products* in support of

the proposition that adequate protection is measured from date the request is made to the court.

*In re Continental Airlines, Inc.*, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992) (citing *Best*

*Products* and holding that adequate protection is determined as the date the request is made to

the court); *In re Waverly Textile Processing Inc.*, 214 B.R. 476, 479 (Bankr. E.D. Va. 1997)

(same).

19.    To the extent that the holding in *Ritz-Carlton* has any vitality today, the

Debtors argue that it only applies in the limited context in which a secured creditor's interest in

the collateral deteriorates as a result of the accumulation of tax liens between the petition date

and the date the creditor makes its request for adequate protection.  *Ritz-Carlton*, 98 B.R. at 173.

---

[4] In the Motion, the Bank asserts for the first time that it is entitled to a superpriority administrative
expense claim in the amount of $2,411,681.83.  Motion, ¶ 15.  This calculation presumes that such claim
is valid and calculated as of the Commencement Date.  If the Bank had actually made a request to the
Court on the date the Setoff Motion was filed, then, assuming, *arguendo* without conceding that it has a
valid claim, the proper calculation would result in a claim in the amount of $2,005,792.

Because the '268 Account was not subject to the accumulation of tax liens, the holding in *Ritz-Carlton* has no application to the Motion.

20.     In the case at bar, the first request to the Court for adequate protection and an administrative expense claim occurred when the Bank filed the Motion on June 19, 2009, not the Setoff Motion.  Indeed, the Bank has acknowledged this in the Motion.  Motion, ¶ 26.  As noted above, by the Setoff Motion the Bank expressly sought stay relief and never made a request to the Court for adequate protection because the prayer for relief in the Setoff Motion was made in the alternative and conditioned upon the Court not modifying the automatic stay. As a result, the Bank's alternative relief was never presented to the Court because the stay relief was eventually granted as to the Undisputed Amount.  For the Bank to argue otherwise is to engage in a revisionist attempt almost ten months after it was filed to reformulate the Setoff Motion so that it now reads in the manner the Bank wishes it had been presented and plead to the Court.  This Court should not continence such conduct.

21.     Notwithstanding the Bank's limited request to the Court, LBHI nevertheless permitted the Bank's conversion of the funds in the '268 Account.  In the word's of the Bank's attorney represented on the record that "we've reached an agreement on adequate protection" from that date forward.  November 5, 2008 Transcript, 44:1-8.  Yet notwithstanding its purported concern about currency risks, the Bank failed to mitigate its damage claim and timely convert the funds.  December 3, 2008 Transcript, 39:21-22.  The Bank's apparent feigned claims regarding such risk that were alluded to over eight months ago now form the very basis for the relief requested in Motion.

22.     Indeed, the Bank's failure or refusal to convert the funds on November 5, 2008 seriously challenges the credibility of any assertion by the Bank that it actually would have converted the funds had it been permitted such an opportunity at an earlier date.

23.     As noted above, it is still not clear whether the Bank has ever converted the funds in the '268 Account and its failure to convert the funds has prejudiced LBHI's estate and its creditors.  Accordingly, the Debtors reserve their rights to object to the Bank's deficiency claim based upon, *inter alia*, the Bank's failure to covert the funds on November 5, 2008.

24.     For these reasons, the Motion should be denied and the Court should direct the Bank to turnover all of the funds remaining in the '268 Account.

### DnB Has Not Met its Burden
### That It Is Entitle To A Superpriority Administrative Expense Claim

25.     The Bank's request for a superpriority administrative expense claim also fails for the following reasons.  The Bank cannot show that the conversion was ultimately inadequate because the Bank (i) assumed the collateral risk after November 5, 2008, (ii) is not entitled to any relief prior to November 5, 2008 since is request was conditioned upon the automatic stay not being modified, and (iii) cannot demonstrate that it holds or is entitled to a claim that has been allowed pursuant to section 503(b)(1)(A).

26.     Section 507(b) of the Bankruptcy Code provides that

> [i]f the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

27.     As provided by section 507(b), it is the creditor's burden to establish that (i) adequate protection was provided and it was ultimately inadequate, (ii) it has an allowable administrative expense claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code, and (iii) such administrative expense claim arose as a result of either section 362, 363, or 364(d) of the Bankruptcy Code. *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865 (4th Cir. 1994). A failure to establish any of the foregoing elements, results in denial of a request for a superpriority administrative expense claim. *Id.*

28.     As discussed above, the Bank cannot demonstrate that LBHI's consent to convert the funds was inadequate because it cannot show that it was entitled to any relief prior to this time.  The Bank cannot deny that its request for adequate protection was presented to the Court in the alternative and conditioned upon the Court's determination not to modify the automatic stay.  More importantly, the Bank cannot use its current Motion to request relief that was conditioned upon an event that never occurred, *i.e.*, the denial of its stay relief motion.  As a result, its request for a superpriority administrative expense claim must be denied.

29.     In addition, the Bank cannot demonstrate that it holds or is entitled to a claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code.  Section 503(b)(1)(A) of the Bankruptcy Code defines an administrative expenses as "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A); *Trustees of the Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986).  An expense is entitled to administrative priority (i) if it arises out of a transaction between the debtor-in-possession and creditor and (ii) only to the extent that the consideration provided by the creditor actually benefited the operation of the debtor's business.  *Id.*  Congress enacted the administrative expense provision to induce creditors to continue their business relationship with the debtor for

the purpose of facilitating the rehabilitation of a debtor's business "for the benefit of all the

estate's creditors." *Id.* (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir. 1976)).

30.      The purpose of an administrative expense claim is to prevent the unjust

enrichment of a debtor's estate, not compensate a creditor for its loss. *In re Enron Corp.*, 279

B.R. 695, 705 (Bankr. S.D.N.Y. 2002) (citing *R.H. Macy & Co., Inc.*, 170 B.R. 69, 78 (Bankr.

S.D.N.Y. 1994)).  As a result, the court's determination turns on the actual benefit the estate

gained, not the loss incurred by the creditor. *Enron*, 279 B.R. at 705 (citing *In re CIS Corp.*, 142

B.R. 640, 642 (Bankr. S.D.N.Y. 1992)).  Congress's use of the words "actual" and "necessary"

in section 503(b)(1)(A) requires that (i) the estate receive a "real benefit" from the transaction,

not a potential benefit and (ii) the debtor actually used the creditor's property, not have the mere

option to use the property. *Enron*, 279 B.R. at 705-06.

31.      It is the creditor's burden to establish that it is entitled to an administrative

expense claim, which "should only be granted under extraordinary circumstances, to wit, when

the parties seeking priority have sustained their burden of demonstrating that their services are

actual and necessary to preserve the estate. *In re Drexel Burnham Lambert Group Inc.*, 134 B.R.

482, 489 (Bankr. S.D.N.Y. 1991) (quoting *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr.

E.D.N.Y. 1988).

32.      The Bank relies on three inapposite cases for the proposition that mere

opposition by a debtor to a lift stay motion shows that the collateral must be necessary and

beneficial to the estate.  Motion, ¶¶ 19-20 (citing *Bonapfel v. Nalley Mortor Trucks* (*In re Carpet

Center Leasing Co., Inc.*), 991 F.2d 682, 687 (11th Cir. 1993); *In re McGill*, 78 B.R. 777, 780

(Bankr. D.S.C. 1986); *In re Mutschler*, 45 B.R. 494, 496 (Bankr. D.N.D. 1984)).

33.     In the foregoing decisions, the debtors entered into adequate protection agreements that required them to make adequate protection payments in exchange for using tractors and other farm equipment to operate their businesses.  In each case, the debtors actually used the secured creditors' property, which was not only necessary for the operation of the businesses but also provided a concrete benefit to the debtors' respective estates.

34.     In this case, LBHI opposed the Setoff Motion because the Bank failed provide any factual support that it was entitled to setoff its claim against the full amount in the '268 Account.  Given the account balances on the business day prior to the Commencement Date and on the Commencement Date, LBHI had reason to believe that not all of the funds were deposited prior to the Commencement Date and not subject to setoff.  Moreover, the Banks' conclusory and self-serving statements in the Setoff Motion did not constitute cause for stay modification.  Given these facts, the Debtors had a fiduciary obligation to determine whether some or all of the funds in the '268 Account were eligible for setoff.  The due diligence demonstrated, as this Court eventually held, that the Disputed Amount was deposited and credited after the commencement of LBHI's chapter 11 case.

35.     Any delay associated with the setoff request was not the result of the Debtors but caused by the Bank's Setoff Motion that was both legally and factually deficient.  After it was determined which funds were credited to '268 Account before the filing, LBHI promptly agreed that the stay should be modified accordingly.  In this regard, LBHI's estate and creditors did not receive any benefit when the Court permitted the Bank to setoff its claim.  The relief granted was for the sole benefit of the Bank and assuming LBHI received any benefit, it was with respect to the Disputed Amount, and, as this Court held, the Bank was not entitled to relief with respect to such funds.

36.     Unlike the cases that it relies upon, the Bank did not consent to LBHI's use of the funds in the '268 Account.  On the contrary, the Bank placed an administrative freeze upon the '268 Account immediately after LBHI commenced its chapter 11 case.  In addition, LBHI did not seek the Court's authorization to use the funds in the '268 Account and its opposition to the Setoff Motion does not demonstrate that LBHI benefited by it in any manner especially when the Bank was ultimately permitted to recover the funds to setoff its claim.  Thus, the administrative freeze not only prevented LBHI from using the funds but it also deprived LBHI from benefiting from these funds in any manner.

37.     In addition, the Bank does not cite to or even acknowledge that a creditor's entitlement to an administrative expense claim is dependent upon "the actual benefit to the estate not the loss sustained by a creditor."  *Enron*, 279 B.R. at 705 (emphasis supplied).  The Bank asserts without any support that the change in value as a result of the currency fluctuations (which occurred prior to the time any request for adequate protection was made) automatically entitles it to an administrative expense claim, which fails to show that it is entitled to an administrative expense claim.  The Bank has not provided any evidence to support that that administrative freeze and its other actions benefited LBHI's business operation of was "for the benefit of all the estate's creditors."  *McFarlin's, Inc.*, 789 F.2d at 101.

38.    For the reasons stated herein, the Motion is singularly devoid of merit and should be denied.  Additionally,  and given that the Bank has no right or other legal entitlement to retain property of LBHI's estate, it should be directed by the Court to return any and all funds in '268 Account  that it has wrongfully refused to turnover.

WHEREFORE the Debtors respectfully request that the Court deny the Motion, direct the Bank to turnover any and all funds in the '268 Account, an grant the Debtors such other and further relief as may be just.

Dated:  July 10, 2009
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **EXHIBIT A**

**(November 5, 2008 Transcript)**

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555

5    - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS, INC., et al.

9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                November 5, 2008

19                10:02 AM

20

21    B E F O R E:

22    HON. JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

```
 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4          Attorneys for Debtors

 5          767 Fifth Avenue

 6          New York, NY 10153

 7

 8    BY:   HARVEY R. MILLER, ESQ.

 9          SHAI WAISMAN, ESQ.

10          LORI R. FIFE, ESQ.

11          RICHARD P. KRASNOW, ESQ.

12          ALFREDO R. PEREZ, ESQ.

13          JOHN W. LUCAS, ESQ.

14          JACQUELINE MARCUS, ESQ.

15          RONIT J. BERKOVICH, ESQ.

16          DIANE HARVEY, ESQ.

17

18

19

20

21

22

23

24

25
```

```
 1

 2    WESTLB AG, NEW YORK BRANCH

 3         Attorneys for WestLB AG, New York Branch

 4         1211 Avenue of the Americas

 5         New York, NY 10002

 6

 7    BY:   PETER MARCHETTI, ESQ.

 8

 9    WHITE & CASE LLP

10         Attorneys for DNB NOR Bank ASA

11         1155 Avenue of the Americas

12         New York, NY 10036

13

14    BY:   GERARD UZZI, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

LEHMAN BROTHERS HOLDINGS INC., et al.

1   action settlements of a certified class action entitled

2   "Austin, et al, v. Chisick".  The parties have agreed to put

3   that over for November 18th, Your Honor.

4           THE COURT:  There's also a number on there carried --

5           MR. MILLER:  I'm sorry?

6           THE COURT:  Number 42 on the next page.

7           MR. MILLER:  I'm sorry, Your Honor.  That is the

8   debtors' motion, Your Honor, to pay pre-petition excise and

9   withholding taxes.  We have agreed -- there's an objection

10  filed, Your Honor, by the Walt Disney Company.  We've agreed to

11  discuss that with the Walt Disney Company and bring it back on

12  November 18th.

13          THE COURT:  Fine.

14          MR. MILLER:  We can go to the contested matters, Your

15  Honor, which relate to Lehman Brothers Inc., et al. and then go

16  to LBI, Lehman Brothers Inc., if that's --

17          THE COURT:  Fine.

18          MR. MILLER:  -- agreeable to Your Honor.

19          THE COURT:  That's agreeable.

20          MR. MILLER:  Okay.  The first contested matter, Your

21  Honor, is the motion of DNB Bank ASA for stay relief or, in the

22  alternative, an order requiring the debtors to provide adequate

23  protection.  This relates, Your Honor, to a deposit of

24  approximately 18.5 million dollars.  It's actually in Swedish

25  krona, Your Honor.  And the moving party would like to have the

LEHMAN BROTHERS HOLDINGS INC., et al.

1    stay lifted.  We are in negotiations, Your Honor, to try and

2    resolve this matter.  The debtors are agreeable to the

3    conversion of the krona into U.S. dollars to protect it against

4    deterioration in value.  The parties have agreed that there

5    should be final hearing on December 3.  In the interim, there

6    would be expedited discovery to see if this matter can be

7    resolved and then bring it forward to December 3 which I think

8    is an omnibus hearing date, if I recall correctly, Your Honor,

9    if it can't be resolved prior to that date.  I don't know if

10   counsel is here --

11          MR. UZZI:  Your Honor, pardon me, Gerard Uzzi of

12   White & Case on behalf of DNB NOR Bank.  That, for the most

13   part, accurately reflects our agreement, Your Honor, with one,

14   I think, nuance.  The next omnibus hearing date is November

15   14th --

16          THE COURT:  November 18th.

17          MR. UZZI:  18th, I'm sorry, 18th.  I think both

18   parties want to work toward getting to a final hearing if we

19   need a contested hearing, an evidentiary hearing by the 18th.

20   We're using the 3rd as a fallback in the event that we can't

21   get it done by the 18th.  But our hope would be that we resolve

22   this consensually by the 18th, that the parties are ready to go

23   forward on the 18th.  If we haven't otherwise resolved it

24   consensually, then we will want to go forward on the 18th as a

25   final hearing.

LEHMAN BROTHERS HOLDINGS INC., et al.

1        THE COURT:  I don't think you mean the 18th.  Maybe I

2    misunderstood you.  I thought that this was being put off to a

3    possible hearing on the 3rd.  What happens on the 18th?

4        MR. UZZI:  It's really being put off, Your Honor, to

5    the 18th but there's a recognition that my client's in Norway,

6    the debtors may want to take some discovery.  And if we're

7    unable to resolve the matter consensually, either on the merits

8    or with respect to providing discovery so that the parties are

9    ready to go forward on the 18th, we've agreed that we would

10   then adjourn it to the 3rd.  But it no event would we adjourn

11   it later than the 3rd so that we would have the final hearing

12   on the 3rd.

13       THE COURT:  All right.  Well, here's my take-away

14   from this.

15       MR. UZZI:  Yes.

16       THE COURT:  If you have a consensual resolution, it

17   can be approved on the 18th.  Otherwise, there will be a

18   hearing on the 3rd.  But since you don't control the calendar,

19   you can't tell me that that's the last permissible date.  It

20   will be ultimately up to me when this happens.

21       MR. UZZI:  Understood, Your Honor.

22       THE COURT:  Okay.

23       MR. UZZI:  And I didn't mean to imply otherwise.  I

24   just meant the agreement between the parties.

25       THE COURT:  Okay.  I understand the agreement.  Okay.

LEHMAN BROTHERS HOLDINGS INC., et al.

1        MR. UZZI:  And then just, Your Honor, the -- we are -

2   - we've reached an agreement also on adequate protection, as

3   Mr. Miller said, that my client can convert the krona account

4   to U.S. dollars at its discretion in order to protect it

5   against currency fluctuations.  And we're fine with that being

6   just a memorialization on the record, Your Honor.  But if Your

7   Honor would prefer a written order on that, we would be happy

8   to submit a written order also.

9        THE COURT:  Well, it's up to you as to how much

10  protection you want as you convert kronas into dollars.  I

11  assume with the consent of Mr. Miller on behalf of the estate

12  and with your stating the intention to do it as a form of

13  adequate protection, I'm confident that you're free to proceed

14  without further documentation.  But if, for your own

15  protection, you want that documentation, go right ahead and

16  produce it.

17       MR. UZZI:  No, that's fine, Your Honor.  We just want

18  to make sure the Court was aware.

19       THE COURT:  I understand.  Thank you.

20       MR. UZZI:  Thank you.  May I be excused, Your Honor?

21       THE COURT:  You may.

22       MR. UZZI:  Thank you.

23       MR. MILLER:  I just want to make clear, Your Honor,

24  to get to a resolution on November 18th depends upon expedited

25  discovery.  And as counsel pointed out, because the moving

LEHMAN BROTHERS HOLDINGS INC., et al.

1    party is in Sweden, there may be some delay.  That's why we did

2    that backup.

3            MR. UZZI:  We're fine with expedited discovery.

4            THE COURT:  Is it Norway or is it Sweden?

5            MR. UZZI:  It's Norway, Your Honor.

6            MR. MILLER:  I'm sorry.  Scandinavia, Your Honor.

7            THE COURT:  Okay.  Fine.

8            MR. MILLER:  And in one election and the dollar

9    suddenly became a solid currency.  Your Honor, the next matter

10   is the cash management order.  Mr. Perez will handle that.

11           MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.

12   Your Honor, there's a footnote on the G-IV sale motion that I

13   neglected to tell Mr. Miller.  And that is there's a footnote 8

14   in the supplemental motion that talks about rights and

15   obligations being assigned.  And that is a little incorrect.

16   The purchaser -- Pegasus is obligated to pay the money.  They

17   will then assign the right to take the liberty of the contract

18   but they're not assigning the obligation to pay.  And I just --

19   I told the creditors' committee I would put it on the record

20   and I just wanted to make sure that that was on the record.

21           THE COURT:  Okay.  Fine.

22           MR. PEREZ:  Thank you, Your Honor.

23           THE COURT:  Now we'll proceed with what you stood up

24   to talk about.

25           MR. PEREZ:  I apologize.

# EXHIBIT B

**(December 3, 2008 Transcript)**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP)

Adv. Pro. No. 08-01610 (FHLB of Pittsburgh v. LBSF and

                    JPMorgan Chase Bank, N.A.)

- - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

        Debtors.

- - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

        Debtor.

- - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                December 3, 2008

                10:00 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

4

1

2       A P P E A R A N C E S :

3       WEIL, GOTSHAL & MANGES LLP

4            Attorneys for Debtors

5            767 Fifth Avenue

6            New York, NY 10153

7

8       BY:  SHAI WAISMAN, ESQ.

9            JOHN W.LUCAS, ESQ.

10           RICHARD P. KRASNOW, ESQ.

11           DIANE HARVEY, ESQ.

12

13      HUGHES HUBBARD & REED LLP

14           Attorneys for James W. Giddens, SIPC Trustee

15           One Battery Park Plaza

16           New York, NY 10004

17

18      BY:  CHRISTOPHER K. KIPLOK, ESQ.

19

20

21

22

23

24

25

8

1

2     SEWARD & KISSEL LLP

3         One Battery Park Plaza

4         New York, NY 10004

5

6     BY:  JUSTIN L. SHEARER, ESQ.

7

8     STEVENS & LEE P.C.

9         Attorneys for Royal Bank America

10        485 Madison Avenue

11        20th Floor

12        New York, NY 10022

13

14    BY:  CONSTANTINE POURAKIS, ESQ.

15

16    WHITE & CASE LLP

17        Attorneys for DnB Nor Bank ASA

18        1155 Avenue of the Americas

19        New York, NY 10036

20

21    BY:  PHILIP JOHN NICHOLS, ESQ.

22        J. CHRISTOPHER SHORE, ESQ.

23

24

25

35

1    wrote something on it and issued an opinion, a brief one.  And

2    as a result, that's not on the calendar any longer.

3            MR. KIPLOK:  That's correct.  Thank you, Judge.

4            THE COURT:  Thank you.

5            MR. WAISMAN:  The only remaining item on the

6    calendar, Your Honor is --

7            THE COURT:  Thank you.

8            MR. WAISMAN:  -- the motion of --

9            THE COURT:  I'm not a claimant.

10           MR. WAISMAN:  Make sure you get it in on time.  DnB

11   Nor Bank motion for relief from stay from setoff.  And that'll

12   be handled by my colleague, John Lucas.

13           MR. LUCAS:  Good morning, Your Honor.  Mr. Shore of

14   White & Case, counsel to DnB, will present the stipulated facts

15   that we've agreed to that will provide for the legal argument

16   to follow.

17           MR. SHORE:  But first I'll drop my papers.

18           THE COURT:  I just have a question.  You said

19   stipulated facts.  Will there be any disputed facts?  Is the

20   answer no?

21           MR. SHORE:  No, there will not.

22           THE COURT:  Okay.  So there will be no witnesses, no

23   cross-examination, none of the fun stuff?

24           MR. SHORE:  Good morning, Your Honor.  For the

25   record, Chris Shore from White & Case on behalf of DnB Nor.

36

1       We're here on a motion to lift stay or get adequate protection

2       with respect to deposits on account at DnB.  I'll go through

3       briefly some of this which was before Your Honor before.  All

4       this concerns a twenty-five million dollar credit agreement

5       with LBHI and DnB Nor and an LBHI account which currently

6       contains about 106 million Norwegian kronas.  A demand by the

7       bank was made to allow setoff on September 17th, two days after

8       the filing, and the motion was filed on September 30th.

9       Oppositions were filed by the debtors and joined by the

10      official committee and the ad hoc noteholders.  And in those

11      pleadings, the debtors and the joining parties objected to any

12      setoff at all.  The preliminary hearing was before Your Honor

13      on November 5th.  And then the parties exchanged informal

14      discovery and had discussions to narrow the issues.  And we

15      have substantially narrowed the issues which, I think, are set

16      forth in the debtors' supplemental objection which was filed

17      yesterday.  There appears to be agreement that the stay may be

18      lifted to allow the bank to offset 99.26 million kronas of the

19      collateral against the loan with a deficiency to be filed for

20      the remainder.

21              The debtors have also requested that we turn over the

22      remaining kronas on the theory that they were not mutual with

23      the pre-petition debt.  We do have a dispute over whether or

24      not a turnover needs to be made although I understand that the

25      debtors are not seeking an order from this Court today which

37

1    would require a turnover of the seven million kronas because we

2    have a dispute as to whether or not the debtors have a post-

3    petition adequate protection obligation with respect to the

4    entire amount of the collateral which we're going to reserve

5    for another day.  And the amount of that adequate protection

6    claim would depend upon what is the dispute which is up today

7    which is a dispute over seven million dollars of kronas that

8    were moved from one Lehman account to an LBHI account on or

9    about the petition date.

10          So the narrow issue today relates to two deposit

11    transfer requests that were made by wire as to which we've

12    stipulated some facts.

13          I think for the purpose of today's hearing, the

14    debtors are agreeing that the bank has a valid pre-petition

15    claim against LBHI of at least 106 million kronas to be

16    converted into a U.S. dollar claim as required by whatever

17    applicable conversion would be.  All money -- all that 106

18    million kronas, which include the seven million, at all times

19    was held at DnB but in separate accounts for separate entities.

20    So the money never was wired anywhere.  There were just -- we

21    have overlapping issues of requests to transfer deposits and

22    make book entries within the bank as to those kronas.

23          Lehman Brother Commercial Corporation, LBCC, wired a

24    deposit transfer instruction, a true and correct copy of which

25    is going to be Hearing Exhibit 5.  We've agreed on an exhibit

38

1    binder which I can hand up to Your Honor.  But that was sent on

2    September 12th at 5:03 p.m. for a transfer of 6.865 -- well,

3    why don't I read it out -- 6,865,351.56 Norwegian kronas from

4    its account, LBCC, to the -- what we've been calling the 268

5    account at LBHI.

6            LBCC also sent wire instructions, a true and correct

7    copy of which will be Hearing Exhibit 6, on September 12th at

8    5:06 p.m. CEST for a transfer of 200,000 Norwegian kronas from

9    its account at DnB Nor to the 268 account of LBHI.

10           The book entries, which effectuate that transfer of

11   accounts, weren't made until the 15th, the date of the filing

12   at 12:54 p.m. CEST, which is 6:54 a.m. Eastern Daylight Time.

13   So the actual book entries to transfer from the LBCC account to

14   the LBHI account were made post-petition.

15           So the narrow issue for the Court to address is what

16   is the effect of that series of facts.  Was the seven million

17   kronas, the 6.8 plus the 200,000, a pre-petition obligation of

18   DnB to LBHI or was it a post-petition obligation?  And to the

19   extent it is a post-petition obligation, again, they've made a

20   demand for turnover.  We accept that but we would claim an

21   adequate protection payment for any diminution in the value of

22   the collateral between the petition date and the -- well,

23   November 5th on an issue that was previously addressed with the

24   Court.

25           THE COURT:  What's happening with respect to the

39

1    issue of the delay in converting the kronas to cash following

2    the last hearing?  I understood from the papers that the debtor

3    was reserving rights that your client had acted at its peril or

4    unreasonably in failing to immediately convert the kronas to

5    dollars as part of the adequate protection remedy that had been

6    talked about on the record.  And is that part of the

7    stipulation now or is that still out there as a reserved claim

8    today?

9            MR. SHORE:  That would be a reserved issue.  Again,

10   the way I think we've agreed it would proceed is the ninety-

11   nine would be offset and deficiency would exist.  The seven

12   million will either be offset or won't be offset depending upon

13   the mutuality issue.  And in either event, when the deficiency

14   claim is filed, a portion of that deficiency claim will be

15   claimed as adequate protection as a post-petition obligation

16   entitled to a post-petition priority.  And then the issue will

17   come up.  I will tell you that when the adequate protection

18   motion is filed, we would only seek adequate protection from

19   the petition date when we were stayed from exercising the

20   setoff in converting it to dollars then up to November 5th.

21   And the bank would take the risk from November 5th forward with

22   respect to any diminution that occur.

23            THE COURT:  Were there any currency hedges or other

24   arrangements that the bank entered into to protect against the

25   exchange risk?

40

1          MR. SHORE:  Not that I'm aware of.

2          THE COURT:  All right.

3          MR. SHORE:  So, as I said, I think the --

4          MR. LUCAS:  Can I interrupt just one second?

5          THE COURT:  Sure.

6          MR. LUCAS:  Your Honor, just to clarify that the

7   amount that we're agreeing to as to the ninety-nine, Mr. Shore

8   earlier said it was 99.26.  Just for a clarity of the record,

9   it's actually 99,113,236 kronas.  Just slightly less than his

10  figure didn't take into account to the post-petition debits and

11  withdrawals that occurred in the account on 9/15.

12         MR. SHORE:  That's right.  So we added a narrow issue

13  for the Court and one that there doesn't appear to be any law

14  on which is --

15         THE COURT:  Well, I guess there will be soon.

16         MR. SHORE:  Yes, there will.  Which is in the

17  instance where the only thing that needs to be done post-

18  petition is effectuate a book entry within the payor bank.

19  It's our position that sufficiently enough pre-petition

20  activity occurred to crystallize the obligation.  That

21  constitutes a pre-petition obligation of the bank.  To be

22  clear, it's our position that the -- and you'll see in Exhibits

23  5 and 6 that they provided a value date of the petition date.

24  Both the 6.8 million dollar trans -- or krona transfer and the

25  200,000 krona transfer provided for a value date of the 15th

41

1    but that -- well, I think there are two issues with respect to

2    that.  One, that would not have prevented the bank from

3    actually effectuating the transfer earlier.  It would just mean

4    that they ran credit risk.  So, for example, if they

5    transferred the 6.8 million krona from the LBCC to the LBHI

6    account on that Friday and LBHI then withdrew the funds, they

7    were subject to a reversal claim by LBCC up to the 15th.  That

8    doesn't mean they were prohibited from following the transfer.

9    It would just mean that in the event that the money was

10   withdrawn and the request was made back, the bank would have to

11   make good on sending the deposit back to the LBCC.

12            THE COURT:  I have a question for you.

13            MR. SHORE:  Sure.

14            THE COURT:  It seems to me obvious, although it's not

15   part of your stipulation, that everything that your client did

16   in Europe in connection with these fund transfers and

17   bookkeeping entries took place without regard to the bankruptcy

18   filing in the United States, namely, it's my impression -- I

19   don't know if it's relevant but it's my impression that what

20   the bank did, it did completely without regard to the risk that

21   Lehman Brothers might be a Chapter 11 debtor on Monday morning

22   in New York.

23            MR. SHORE:  That --

24            THE COURT:  Is that true?

25            MR. SHORE:  That is my understanding.

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

42

1           THE COURT:  Then I'm not understanding your argument

2    about credit risk because I'm assuming that everything that was

3    done was done in the ordinary course of the bank and the way

4    that the bank would ordinarily do it.

5           MR. SHORE:  Yes.

6           THE COURT:  Isn't that right?

7           MR. SHORE:  Yes.

8           THE COURT:  Okay.

9           MR. SHORE:  But the question of what the bank is

10   doing in the ordinary course versus what the bank is entitled

11   to do is often times the distinction between whether something

12   is done pre-petition or post-petition.  And in this instance,

13   the only defining event -- so let's assume we get past the

14   credit risk issue, that they weren't going to, in the ordinary

15   course, credit on the date that the deposit transfer request

16   was done that Friday and instead would wait till the value date

17   of the 15th.  The bank would be entitled on the value date

18   prior to the petition to effectuate the book entry.  So you've

19   still got a position where the only distinction between whether

20   this is a pre-petition credit or a post-petition credit of the

21   debtors, in that instance subject to offset against the pre-

22   petition claim, is the manual book entry that --

23           THE COURT:  Is this manual?

24           MR. SHORE:  Well, no.  Sorry.  The electronic book

25   entry --

43

1            THE COURT:  I have this image of somebody with a

2      quill pen and a very, very big ledger.

3            MR. SHORE:  I still think they would need to type it

4      using their fingers.  So I would think that that distinction --

5      we don't have any case law guiding the Court on this.  I think

6      that the check cashing cases are different because you've got

7      value transfers between banks.  We're talking about a minute

8      entry.  Let's go -- decide manual or anything else -- minute

9      entry which is going to affect the obligations or the printouts

10     that occur with respect to the two accounts.  I think when you

11     get into that situation, the only issue is what could LBCC have

12     done up to the time that the credit was actually made, five

13     hours after the petition occurred.

14            The only thing they could have done is sought a

15     reversal of that but in the cases that talk about pre-petition

16     and post-petition, including your tax case, the DOUSA case from

17     2006, the mere fact that there's some contingency left to

18     that --

19            THE COURT:  You are the first person to cite that

20     case to me.

21            MR. SHORE:  The mere contingency of the obligation,

22     the fact that things have to be done post-petition, doesn't

23     necessarily make it a pre-petition claim -- or a post-petition

24     claim.  The only thing that'd have to be done here is the book

25     entry.  In that instance, it doesn't seem to make a

44

1    distinction -- I mean, could there be a more contin -- or a

2    less ministerial act to create what is a contingent pre-

3    petition claim which is offsettable into the fully matured

4    seven million dollar -- seven million krona deposit.  So we

5    think in that instance, it's highly formalistic to say that the

6    delay from 12:01 in Norway on the 15th to credit that account

7    to twelve hours later which overlapped the petition date is

8    sufficient to create a divergence between a pre and post-

9    petition claim.

10            THE COURT:  I assume that this is something that you

11    and your colleagues have researched as thoroughly as your

12    associates could do it.

13            MR. SHORE:  I believe that's so.

14            THE COURT:  And is it your settled view that there is

15    no applicable case authority that governs the situation?

16            MR. SHORE:  Not that I'm aware of.

17            THE COURT:  Okay.  I'll accept that.  And I assume

18    that that's also true for the debtors and I'm going to ask them

19    the same question.  Is there value to the fair adjudication of

20    this process beyond today's argument and the submission of

21    whatever agreed exhibits you've put together to further

22    briefing this on the subject of policy issues and any other

23    analogous jurisprudence that may exist here or in foreign

24    countries?

25            MR. SHORE:  I think that the question of further

45

1    briefing is always one directed at Your Honor.  If Your Honor

2    would be more comfortable with that, we'd be --

3              THE COURT:  No.  I'm asking you.

4              MR. SHORE:  No.  And I -- well, look, ask a lawyer

5    whether it's valuable to write more, I think the answer is

6    always yes.  I certainly don't want to be in a position of

7    burdening Your Honor.  I think if we kept it to short

8    submissions and even letter briefs, that would be helpful for

9    cutting down.  I think we have, as I said, in narrowing the

10   issues from a 106 million krona issue down to a seven million

11   krona issue, we've been able to focus more narrowly on the

12   facts and circumstances surrounding this.

13             THE COURT:  So you're telling me that the briefing

14   should be limited to the amount which is in dispute.  So it

15   should be brief.

16             MR. SHORE:  Well, but not only that.  I'm saying

17   that, you know, given where we are now in the debtors' early

18   response to the motion, they have not briefed us at all.  I

19   think it may be useful but I certainly don't want to do it if

20   Your Honor doesn't.  I could see that we would exchange short,

21   maybe three-page letter briefs, simultaneously.  But I think it

22   would have to be on that issue which is given the stipulated

23   facts and everything else, does the fact that the book entry

24   was not made until after post-petition effect whether or not

25   it's a pre or post-petition debt.  And quite frankly, I think

46

1    even on that narrow issue -- and I don't mean to question

2    anybody's research on this.  I'm sure we could find some

3    analogies on what an intracreditor action -- you know, what

4    effect that has on a -- whether a debt is pre or post-petition.

5            So while I'm comfortable that the issue of what

6    happens with a deposit request that is made and interbank

7    movement or intrabank movement has been done, I'm betting we

8    can find some stuff on what happens in an analogous situation

9    where a creditor has different accounts with different

10   counterparties and there is an accounting entry that's made.

11           THE COURT:  Okay.  Thank you.

12           MR. LUCAS:  Good morning, Your Honor.  John Lucas,

13   Weil Gotshal, for Lehman.  And just to address your last point

14   about future briefing, with the facts that we're stipulating

15   today here, we're comfortable with relying on our pleadings and

16   what was implied to the Court.  However, if the Court does

17   decide it would like further briefing, we request that the

18   briefing would be submitted simultaneously.

19           THE COURT:  I'll take that request into consideration

20   when we conclude today's argument.

21           MR. LUCAS:  Your Honor, I mean, we think the issue

22   today here is pretty clear, that Section 553 of the Bankruptcy

23   Code preserves a creditor's right to setoff provided that both

24   claims arose prior to the petition date.  In this regard,

25   there's no dispute that the evidence and the proffered

47

1    testimony demonstrate that as of LBI's petition date as of 1:45

2    on September 15th, 2008 that no more than approximately ninety-

3    nine million krona were available and credited to LBHI's

4    account and that with respect to the wiring instructions that

5    were directed from LBCC to be transferred to LBHI, as Exhibits

6    5 and 6 show, the wiring instructions while directed on 9/12 at

7    approximately 5:03 p.m., which I believe is Greenwich Mean

8    Time, provide that the LBC account is not to be debited until

9    9/15 and that the LBHI account is not to be debited until

10    9/15 -- I mean, credited until 9/15.

11            And, Your Honor, if -- I'm assuming that we've

12    admitted all the exhibit lists, in particular, transaction log,

13    which was Exhibit A to the debtors' supplemental objection.

14    The transaction log makes it crystal clear that LBHI's account

15    was not credited with the funds from the LBCC account until

16    12:54 p.m. local Norway time which is approximately five hours

17    after the petition date.  And no one's disputing those facts.

18    We think that the case law is clear and that, for instance,

19    Your Honor, In re Kleather at 208 B.R. 406 at page 415,

20    Southern District of Ohio, stands for the proposition, I think,

21    is well accepted by all that post-petition deposits are

22    ineligible for setoff against a pre-petition claim.  And that's

23    exactly what we have here.

24            DnB's motion failed to cite and nor, as we requested

25    earlier, the debtors have been able to find any case law that

1    supports a proposition that a creditor is able to setoff

2    against a pre-petition claim, against a post-petition deposit

3    merely because the wiring instructions, which eventually caused

4    those deposits to be credited to the account post-petition were

5    directed at the pre-petition period.  We found none, Your

6    Honor.

7            And, Your Honor, I mean, based on the evidence which

8    we've agreed to on the record, the debtors respectfully request

9    the Court to deny the motion in part insofar it seeks a setoff

10   against the entire approximate amount of 106,000 krona and

11   grant the motion in part by lifting the automatic stay for the

12   limited purpose of permitting DnB to setoff against the

13   approximate ninety-nine million krona.

14           And unless Your Honor has any other questions --

15           THE COURT:  I have one question that occurs to me.

16   Your adversaries seem to be focused on the fact that the

17   transfer in question is occurring within the bank as a pure

18   accounting matter as opposed to an interbank transfer in which

19   a wire transfer is made from bank A to bank B and hasn't yet

20   been received by bank B.  Does the debtor acknowledge that

21   that's even an issue or is it your position that it makes no

22   difference whether or not we're talking about an interbank

23   transfer or an intrabank transfer?

24           MR. LUCAS:  We think it makes no difference.  There

25   are two separate accounts.  The transfer was to occur from one

49

```
1     separate entity, that is LBCC, to a separate account that was

2     held by LBHI.  Two separate debtors, two separate entities.

3     And it's because of that the obligations were mutual.

4            THE COURT:  And I'm not sure that it's relevant but

5     I'm sort of interested in knowing the answer to this.  Do you

6     know why these transfers were being requested on the Friday

7     before the weekend when Lehman was going through all of its

8     well publicized troubles?

9            MR. LUCAS:  No, I don't, Your Honor.

10           THE COURT:  Okay.  Thank you.  Is there anything

11    more?

12           MR. SHORE:  If I could address two issues.  To the

13    extent that Your Honor is going to reserve or seek further

14    briefing on the seven million dollar (sic) issue, it seems

15    prudent that we --

16           THE COURT:  Seven million krona.

17           MR. SHORE:  Krona, right.

18           THE COURT:  I think that the --

19           MR. SHORE:  It seems prudent that we ---

20           THE COURT:  -- exchange rate is about fourteen cents?

21           MR. SHORE:  It seems prudent that we bifurcate it to

22    some extent and allow the stay to be lifted with respect to

23    ninety-nine so all parties can avoid any issue with respect to

24    currency fluctuation.  Make that setoff and leave the

25    remainder.
```

50

1          THE COURT:  Well, I'm going to make the following

2     suggesting but I'm going to, I think, also hear from the

3     creditors' committee to the extent the committee wants to weigh

4     in on this.  I believe that the relief that you're describing

5     should be the subject of the so-ordered stipulation.  And if

6     you can't agree on a stipulation, I'm not granting any relief

7     today.  This is to, frankly, minute a question in terms of the

8     numbers that we're talking about and even the record that we

9     have developed this morning with Mr. Lucas' interjection

10    suggests that there's just too much of a zone of possible

11    disagreement if I were to so order something on the basis of an

12    oral record.  But I encourage the parties, if they've actually

13    reached substantial agreement, concerning most of this dispute

14    to try to reduce it to a relatively straightforward writing and

15    then submit it to chambers and I can so order that.

16          As to the balance of what's being debated here, I'm

17    going to hear from the creditors' committee before commenting

18    further on any supplemental briefing that might be necessary.

19          MR. DUNNE:  Good morning, Your Honor.  For the

20    record, Dennis Dunne from Milbank, Tweed, Hadley & McCloy on

21    behalf of the official creditors' committee.  I'm only going to

22    make three points and I'll be brief, though at the outset, I

23    will say I think that additional briefing would be helpful

24    here.  One of the points -- and I think Mr. Shore, frankly, has

25    done a good job of characterizing the facts to appear as if the

51

1    bank was somehow in the process of making the transfer.  And I

2    think Your Honor's allusion to a bank clerk with a large quill

3    and a giant general ledger was how I was hearing it as well but

4    just simply isn't the fact.  It is an electronic transfer and

5    it's kind of binary.  Either you've made it or you haven't.

6    And it's not disputed that at the time of the LBHI filing that

7    this money was not, in fact, with LBCC.  That's not disputed.

8            What the argument is, and this is why the briefing

9    may be appropriate, the argument at its core could have broad

10   applications in the case.  It's that the instructions

11   themselves may be enough to effectuate something.  It may be

12   enough to effectuate the transfer from one account to another.

13   Does that work just one way?  Does it work just between Lehman

14   entities?  I mean, think of the broadest example of that.  What

15   if -- and I'm sure there are countless examples of this --

16   there were Lehman customers who instructed Lehman to remove

17   their money from Lehman accounts in the week leading up to the

18   filing?  But we know that that did not occur in innumerable

19   cases.  At what point is there enough with instructions and

20   other ministerial acts to make something that we all agree

21   hasn't happened to somehow have happened?  And I want to make

22   sure we don't begin to kick up chalk on the line with all what

23   I think is relatively clear law on those aspects.

24           So I think Mr. Shore recognized that and Your Honor,

25   again, picked up on it because then he kind of brings it back

52

1    to say well, there must be some difference when it's an

2    intrabank transfer between accounts.  I, frankly, don't know of

3    any law that makes that distinction between interbanks or

4    intrabank.  And I think that additional briefing on those

5    topics can kind of drive home those points.  So I would suggest

6    that we do that.  And with that, Your Honor, that's all I

7    really had to add to the other arguments.

8              THE COURT:  Thank you.  Mr. Lucas?

9              MR. LUCAS:  Just to be clear that we've admitted all

10   the exhibits that --

11             MR. SHORE:  We will provide Your Honor with a binder.

12   We need to remove some --

13             THE COURT:  They're --

14             MR. LUCAS:  I can hand up everything, Your Honor.

15             THE COURT:  -- deemed admitted although I haven't

16   seen them.

17             MR. SHORE:  Right.

18             THE COURT:  I assume that the parties will have a

19   stipulation as to the authenticity and admissibility of

20   everything in the binder that's ultimately submitted to me.

21             MR. LUCAS:  Absolutely.

22             MR. SHORE:  We'll do that, yes.

23   (DnB Nor Bank Hearing Exhibit 5, wire instruction on 9/12/08 at

24   5:03 p.m. transferring 6,865,351.56 Norwegian kronas from LBCC

25   account to LBHI, was hereby marked for identification and

53

1    received into evidence as of this date.)

2    (Dnb Nor Bank Hearing Exhibit 6, wire instruction on 9/12/08 at

3    5:06 p.m. transferring 200,000 kronas from DnB Nor Bank account

4    to LBHI, was hereby marked for identification and received into

5    evidence as of this date.)

6            THE COURT:  Okay.  This is a very interesting but

7    very narrow question although the comments made by Mr. Dunne

8    resonate with me and suggest that while it is a narrow question

9    as it relates to this particular transaction, it's a question

10   the resolution of which may have broad potential consequences

11   within this case.  I am mindful of the fact, for example, that

12   routinely in the SIPA proceeding, in particular, I have so

13   ordered what must be fifteen or twenty -- I'm not sure what the

14   total number is -- stipulations relating to the correcting of

15   errors made in the deposit of funds in different accounts of

16   Lehman entities and third parties during the period at or about

17   the commencement date of this case involving, in some

18   instances, hundreds of millions of dollars.  The parties in

19   those examples recognized that mistakes were made, that funds

20   had been misapplied to particular accounts and, by virtue of

21   the stipulations entered into, in effect, reversed those

22   entries to set the record straight.

23           I think that supplemental briefing of a limited

24   nature is sensible.  I accept Mr. Lucas' suggestion that it

25   happen on a common date.  I'm not mandating when that has to

54

1    happen but I suggest that it be part of the stipulation that I

2    have referenced so that in addition to providing for that

3    relief which the parties have agreed to, which I will so order,

4    that there also be a reference to the procedures applicable to

5    the disputed question and that you can pick a date that works

6    for you and that also is sufficiently tight in terms of timing

7    that I can resolve this question while everything that has been

8    presented in oral argument is very fresh in my mind.

9          I have some thoughts on this which I'm going to keep

10   to myself for the time being because I'm very interested in

11   seeing what people have to write on this subject.

12         It occurs to me, and I'm just going to mention this,

13   that you may want to look at some nonbankruptcy authority.  And

14   I will likely be influenced, to the extent you're able to

15   present information on this subject, as to the practices of

16   large financial institutions when it comes to intrabank

17   transfers which happen every minute of every day twenty-four

18   hours a day.  My working premise is that accounting matters

19   generally and particularly in this case and that it matters

20   what account funds are deposited in, not just for purposes of

21   Section 553 of the Bankruptcy Code but for purposes of orderly

22   international commerce.  Therefore, cast your net widely and

23   see if you can find some analogous authority that will be

24   helpful.

25         As to page limits, I'm not going to impose any but

55

1   suggest that the parties reach some kind of understanding as to

2   what a fair effort is given the amount which is in dispute.

3   But this is not really, at this juncture, about the amount in

4   dispute between these parties as much as it is getting to the

5   right result for this case and for other cases like it.

6         Is there anything more on this?

7         MR. LUCAS:  Considering that you've keyed on the

8   importance of this issue, we suggest, contrary to what I

9   suggested earlier, that perhaps it would be best worked out if

10  this was done with responsive pleadings.

11        THE COURT:  Oh, you've changed your mind?  I hear

12  what you're saying but I'm -- in effect, the card has been

13  played.  There will be simultaneous submissions and only one

14  set of submissions and no further argument.  It may be an

15  important issue but it has been presented in the context of

16  what is a fairly circumscribed dispute.  And I'm not writing a

17  law review article.  I'm deciding this dispute in the context

18  in which it has been presented.

19        Now, is there anything more?

20        MR. WAISMAN:  Your Honor, nothing further on the

21  calendar today.  Obviously, there is a lengthy calendar for

22  December 16th.  We will endeavor to post updates to the docket

23  as, hopefully, many of those things are either adjourned or

24  resolved.  The only other matter would be handing up the

25  proposed orders for today's matters.