**Hearing Date: July 14, 2009 at 2:00 p.m. (Prevailing Eastern Time)**

| | |
|---|---|
| WHITE & CASE LLP | DEWEY & LEBOEUF LLP |
| 1155 Avenue of the Americas | 1301 Avenue of the Americas |
| New York, New York 10036-2787 | New York, New York 10019-6092 |
| Telephone: (212) 819-8200 | Telephone: (212) 259-8000 |
| Facsimile: (212) 354-8113 | Facsimile: (212) 259-6333 |
| Gerard Uzzi (GU – 2297) | Martin Bienenstock |
| J. Christopher Shore (JS – 6031) | |
| Lisa Thompson (LT – 5176) | |

Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
In re                                                       :    Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                                            :
                              Debtors.                 :    Jointly Administered
---------------------------------------------------------------x

**STATEMENT OF AD HOC GROUP OF
LEHMAN BROTHERS CREDITORS IN SUPPORT
OF DEBTORS' MOTION, PURSUANT TO SECTIONS 105(a), 362 AND
365 OF THE BANKRUPTCY CODE, TO COMPEL PERFORMANCE OF
METAVANTE CORPORATION'S OBLIGATIONS UNDER AN EXECUTORY
<u>CONTRACT AND TO ENFORCE THE AUTOMATIC STAY</u>**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors, through its undersigned counsel, hereby files this statement in support of the Motion of Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), together with Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced chapter 11 cases (collectively, the "<u>Debtors</u>") for Order Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code Compelling the Performance of Metavante Corporation's Obligations Under an Executory Contract and Enforcing the Automatic Stay (the "<u>Motion</u>"). In support of the Motion, the Ad Hoc Group of Lehman Brothers Creditors joins in the arguments made in the Motion and in the Statement of Official Committee of Unsecured

Creditors of Lehman Brothers Holdings Inc., et al. (the "Committee") and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Ad Hoc Group of Lehman Brothers Creditors (the "Group") is comprised of Elliott Management Corporation, King Street Capital Management, L.P. and Paulson & Co. Inc., which, together with their affiliates, hold claims against the Debtors, including claims directly against LBHI totaling approximately $13.1 billion. The Group has been active, directly or indirectly, in the chapter 11 cases since nearly their inception with the goal of pursuing an efficient and meaningful resolution of these cases.

2. There are two estates which are in privity with Metavante: LBSF, pursuant to the Agreement, and LBHI, pursuant to the Guarantee, attached as Exhibit A to Schedule to the Agreement, and dated as of November 20, 2007 (the "Guarantee"), guaranteeing LBSF's obligation to Metavante under the Agreement.[1] Although the Guarantee has been ignored in papers filed to date, the existence of the Guarantee is critical to the analysis.

3. As set forth below, both the Agreement and the Guarantee are "swap agreements" within the meaning of section 101(53B) of the Bankruptcy Code. Yet, what Metevante has done, without Court approval, is "suspend" its obligations under the Agreement solely based upon the financial condition of LBHI and the commencement of LBHI's chapter 11 case. That self-help suspension is not an act entitled to safe harbor protections (which cover a narrow set of actions with respect to a swap agreement), nor is it an act permitted under New York common law. More critically, by suspending due to LBHI's financial condition, Metavante squarely violates section 365(e)(1)(A) and (B) which prohibit exactly that type of ipso facto modification of

---

[1] Capitalized terms not otherwise defined herein are defined in the Motion.

LBHI's guaranty rights and obligations under the Guarantee as well as the rights and obligations of LBSF under the Agreement.

4.  Ultimately, there is nothing in the Bankruptcy Code, the common law or the agreements themselves that permits Metavante's granting to itself a free option under the Agreement, to suspend when the contract is out of the money and accept performance when it is in the money (and when LBHI's obligation under the Guarantee would spring back into existence). The Court should grant the Motion in its entirety.

## ARGUMENT

### I. "SUSPENSION" OF A CONTRACT OBLIGATION IS NOT PROTECTED BY THE BANKRUPTCY CODE'S SAFE HARBOR PROVISIONS

5.  On November 20, 2007, LBSF and Metavante entered into a standard interest rate swap agreement (the "Agreement"). Under the Agreement, LBSF agreed to make quarterly payments based on a floating interest rate with an initial notional value of $600,000,000 and Metavante agreed to make payments on the same dates based on a fixed interest rate on the same notional amount. In addition, under the Guarantee, LBHI committed to unconditionally guarantee LBSF's punctual payment of all amounts due in connection with each transaction under the Agreement. LBHI's role, as guarantor of LBSF, was allegedly critical to Metavante's decision to enter into the Agreement. (Opp. ¶ 2) (Metavante chose LBSF as its swap counterparty because "of its ability to meet the institutional needs and requirements for a transaction of this magnitude, and because of its inducement to offer [LBHI] as the Credit Support Provider.")

6.  The parties to the Agreement performed their obligations through August 1, 2008. In November 2008, however, Metavante failed to make the net payment required of it. Metavante similarly failed to make payments in February and May of 2009. (Mot. ¶ 20.)

Metavante currently owes LBSF $6,640,138.01, exclusive of interest. (Id.) Metavante claims that LBHI's bankruptcy filing on September 15, 2008, and LBSF's filing on October 3, 2008, were events of default that triggered the failure of a condition to Metavante's obligations, and permitted Metavante to suspend performance, without terminating the Agreement. (Opp. ¶ 17.) Metavante argues that it cannot be compelled to pay because the absence of a default is a condition precedent to its performance pursuant to section 2(a)(iii) of the Agreement, and that its contractual rights are not abrogated by the Bankruptcy Code.

7. As its core argument for refusing to pay amounts under the Agreement, Metavante asserts that sections 560 and 561 (together, the "Safe Harbor Provisions") of the Bankruptcy Code prevent this Court from enforcing the automatic stay or otherwise ordering its compliance. (Opp. ¶ 25.) In essence, it argues that so long as the Agreement is of the kind described in the Safe Harbor Provisions, the Court is divested of jurisdiction to address the contractual relationship between the parties. Such an assertion is contrary to a plain reading of the Bankruptcy Code as well as the intent of Congress.

8. The Safe Harbor Provisions neither operate as an abstention nor provide immunity to a non-debtor counterparty to a swap agreement. Rather, the Safe Harbor Provisions protect only a party's contractual right to "cause the liquidation, termination, or acceleration" of a swap agreement, "or to offset or net out" the party's position. 11 U.S.C. § 560. Thus, if the counterparty is not seeking to cause the liquidation, termination, acceleration or netting of the agreement, the Safe Harbor Provisions simply do not apply. Id. See also In re Enron Corp., 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004). To take advantage of the Safe Harbor Provisions, the counterparty must elect to exercise its protected rights within a reasonable period of time following the bankruptcy filing. In re Enron Corp., No. 01-16034 (AJG), 2005 WL 3874285, *4

(Bankr. S.D.N.Y. Oct. 5, 2005) ("To avail itself of the 'safe harbor' provisions of the Bankruptcy Code, however, . . . the election to terminate must be made fairly contemporaneously with the bankruptcy filing.").

9. Contrary to Metavante's arguments, the Safe Harbor Provisions do not vitiate the bankruptcy filing or restore the parties to their contractual prepetition positions. Rather, they serve to create certainty and finality and to insure that the swap obligations continue after the bankruptcy filing "only by mutual consent of both the non-debtor swap participant and the trustee." H.R. Rep. No. 101-484, at 6 (1990), reprinted in 1990 U.S.C.C.A.N. 233, 228. The rationale for the enactment of such Safe Harbor Provisions is that "[t]he immediate termination for default and the netting provisions are critical aspects of swap transactions and are necessary for the protection of all parties in light of the potential for rapid changes in the financial markets." S. Rep. No. 101-285 (1990), 1990 WL 259288 (emphasis added).

10. Metavante's expansive reading of the Safe Harbor Provisions which equates "suspension" of payments with the Code's permissible "netting" of same under a swap agreement must not be countenanced. The Safe Harbor Provisions must be construed narrowly. See generally H.R. Rep. No. 101-484 (1990), reprinted in 1990 U.S.C.C.A.N. 233 (discussing section 560 as an exception to the other provisions of the Bankruptcy Code). Had Congress intended to safe harbor all acts taken *in anticipation* of a counterparty's right to cause the liquidation, termination, or acceleration of a swap agreement, section 560 of the Bankruptcy Code would have been drafted accordingly. It wasn't and the language of the Safe Harbor Provisions is clear. Moreover, this Court has made it clear that for a counterparty to avail itself of a Safe Harbor Provision, the election to terminate must be made fairly contemporaneously with the bankruptcy filing. In re Enron Corp., 2005 WL 3874285, at *4. If a counterparty may

not preserve the right to terminate a swap agreement later, then it certainly cannot take actions now intended to create a right to net out payment amounts at a later date.

11. Here, assuming that "suspension" is a viable contractual right (and it is not for reasons discussed infra at III), the Safe Harbor Provisions offer no immunity for Metavante's chosen course of conduct. By not seeking to terminate the contract within a reasonable period of time following the bankruptcy filing, nothing in the Code prevents this Court from enforcing the Code, the agreements themselves and the common law. In other words, since Metavante did not timely elect to terminate the Agreement, in many respects, the Agreement is just an ordinary executory contract subject to this Court's ultimate jurisdiction to, among other things: (i) permit LBSF to assume or reject the Agreement; (ii) fix the amount of any claim arising from the rejection thereof; or (iii) compel Metavante to perform under the Agreement. See In re Enron Corp., 2005 WL 3874285, at *4.

## II. SECTION 2(A)(III) IS AN UNENFORCEABLE IPSO FACTO CLAUSE WITH RESPECT TO LBHI'S BANKRUPTCY FILING

12. Metavante next argues that, whether or not suspension of payment under the Agreement was a safe harbor event, LBHI's bankruptcy filing was an independent event of default that, under the Agreement itself, allowed it to cease performing. (Opp. ¶ 10.) Metavante relies on section 2(a)(iii)(1) of the Agreement, which states that the obligation to make each payment or delivery "is subject to (1) the condition precedent that no Event of Default or Potential event of Default with respect to the other party has occurred and is continuing . . . ." (Mot. Ex. 1, Agreement § 2(a)(iii)(1).) Metavante asserts that this clause does not operate as an unenforceable ipso facto clause because the Event of Default was LHBI's bankruptcy filing, an event prepetition to LBSF's filing. (Opp. ¶ 17.)

13. Section 365(e)(1), provides, in part:

[A]n executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, . . . solely because of a provision in such contract or lease that is conditioned on –

(A) the insolvency or financial condition of the debtor at any time before the closing of the case; [or]

(B) the commencement of a case under this title . . . .

11 U.S.C. § 365(e)(1). This is exactly what Metavante is doing with respect to both the Agreement and the Guarantee.[2] Section 2(a)(iii)(1) of the Agreement constitutes an unenforceable ipso facto provision under 365(e)(1)(A) with respect to LBSF and 365(e)(1)(B) with respect to LBHI.

14. Metavante asserts that LBHI's bankruptcy filing was a default precisely because it affected LBSF's financial condition, by "depriv[ing] Metavante of an ineffective counterparty." (Opp. ¶ 13.) In making this argument, Metavante concedes that it was LBSF's "financial condition [that triggered] an independent default under the Metavante Swap Agreement." (Id.) The sole purpose of the Guarantee and the existence of LBHI as a Credit Support Provider is to protect against the financial condition of LBSF. Absent concerns about the financial condition of LBSF, LBHI's guarantee is irrelevant. Therefore, it is clear that section 2(a)(iii)(1) constitutes an unenforceable ipso facto provision as to LBSF.

15. Accordingly, the Agreement encompasses both the ISDA Master Agreement as well as the Schedule, and the Guarantee appended to the Schedule as Exhibit A. In addition, the Schedule itself defines LBHI as the Credit Support Provider and references the Guarantee as the

---

[2] If Metavante is arguing that it had a non-bankruptcy related reason to declare a default (see e.g., Opp. ¶ 12), taking its enforcement action out of Section 365(e)(1) altogether, then the Safe Harbor Provisions simply do not apply. Absent the exceptions in the Safe Harbor Provisions, Metavante must first seek relief from the automatic stay before it can enforce its contractual rights against the Debtors. In re Enron Corp., 306 B.R. at 474 (state court action not excepted from automatic stay because section 560 did not apply).

Credit Support Document. The reliance on LBHI's bankruptcy to suspend payments under the Agreement, is, in fact, a modification of the rights and obligations of LBHI under the Guarantee in direct violation of section 365(e)(1)(B) of the Bankruptcy Code. 11 U.S.C. § 365(e)(1)(B).

**III.     METAVANTE'S DELAY IN SETTING AN EARLY TERMINATION DATE CONSTITUTES A WAIVER OF ITS ELECTION OF REMEDIES AND NECESSITATES THE PROVISION OF ADEQUATE ASSURANCE**

    **A.     Metavante Must Make An Election Of Remedies**

16.     As indicated above, Metavante is seeking to grant to itself a free option under the Agreement, to suspend payment when the Agreement is out of the money, but to retain protection for future interest rate shifts in its favor. That course of conduct is not permitted under New York law. Clearly, if there is a default, Metavante does not have to perform. But that is not license to withhold termination. Following a default under New York law, the non-breaching party must elect either to cease performance under the contract and seek damages or continue to perform. In re Randall's Island Family Golf Ctrs., Inc., 261 B.R. 96, 101 (Bankr. S.D.N.Y. 2001) (discussing election of remedies for non-breaching party under New York law). See also Romacorp, Inc. v. TR Acquisition Corp., No. 93 Civ. 5394, 1993 WL 497969, *13 (S.D.N.Y. Dec. 1, 1993) ("It is an elementary rule of contract law that one cannot repudiate a contract and at the same time retain the consideration or any part thereof received under the contract."); 14 LORD, WILLISTON ON CONTRACTS § 43:15 (4th ed.) ("the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, . . . insists that the defaulting party continue to render future performance").

17.     If the non-breaching party's conduct evinces an intention to continue the parties' contractual relationship after the default, that party waives its right to assert the breach and its own obligations under the agreement remain in full force. See e.g., Casita, LP v. Maplewood

Equity Partners (Off-Shore) Ltd., No. 603525/05, 2007 WL 4294741, *7 (Sup. Ct. N.Y. County Dec. 7, 2007) (non-defaulting party was required to continue with payment obligations after failing to terminate contract following breach by counterparty).

18. A provision in a contract that allows a party the option of terminating the contract must be construed as requiring the non-defaulting party to make such an election within a reasonable period of time. Curnan v. Delaware & O.R. Co., 138 N.Y. 480, 489 (1893) ("The right reserved [in the contract], to suspend or delay the work, is to be reasonably construed. [Defendant] could not abandon the enterprise or delay it for an indefinite and unreasonable time, and still refuse to pay the plaintiff."). See also Romacorp, Inc., 1993 WL 497969, at *12 (quoting McDonald's Corp. v. Robert A. Makin, Inc., 653 F. Supp. 401, 403 (W.D.N.Y. 1986)) ("[I]t is against the law as well as sound morals to permit a party to a contract to repudiate the contract or his obligation under it, and at the same time retain the consideration that he has received.").

19. Conversely, there is nothing inequitable about LBSF's position. LBSF's position does not leave Metavante without options. It may move to compel LBSF to assume or reject within a reasonable period of time and it may seek to avail itself of the Safe Harbor Provisions by causing the termination, liquidation, or netting of the Agreement. In re Enron Corp., 349 B.R. 96, 103 (Bankr. S.D.N.Y. 2006) (Safe Harbor Provisions permit counterparty to terminate and net or set-off its position).

20. Moreover, Metavante's alleged insecurity with respect to the financial condition of LBSF and LBHI is illusory. (See Opp. ¶ 7.) If the Agreement is assumed, Metavante will have an administrative expense claim for the amounts due under the Agreement, if any, to the extent LBSF fails to make the required payments as Metavante fears. 11 U.S.C. §§ 365, 503.

Conversely, if the Agreement is rejected, Metavante will have an unsecured rejection damage claim as of the earlier of the rejection date or termination date. 11 U.S.C. § 562(a). Thus, Metavante's concerns regarding the financial condition of LBSF and LBHI as such condition relates to the Agreement are without merit.

### B.     Metavante Should Be Required To Provide Adequate Assurance

21.    If Metavante is nevertheless permitted to continue to sit on its hands, it must be compelled on equitable grounds to provide adequate assurance that it will eventually be able to perform under the Agreement's termination provisions, just as LBSF would be required to do should it seek to assume the Agreement under section 365(b)(1)(C) of the Bankruptcy Code.

22.    The purpose of the adequate assurance requirement when the debtor assumes a contract, and the reason why Metavante should be equitably compelled to do so here, is because "an essential element of any contract is performance, . . . and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain." In re Metromedia Fiber Network, Inc., 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005) (quoting 2 NORTON BANKR. L. & PRAC. 2d § 39:31). New York law approves the use of the doctrine when a party has reasonable grounds for insecurity regarding the counterparty's ability to perform. Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 465 (1998) (answering in the affirmative a certified question from the Second Circuit as to whether the U.C.C. doctrine should apply to common law cases).

23.    LBSF, LBHI and their constituent creditors, including the Group, have several reasons for insecurity regarding Metavante's ability to pay when the Agreement ultimately is terminated. Metavante's impending merger with Fidelity National Information Services, may impair LBSF's rights under the Agreement. See Metavante Press Release, attached to SEC Form

8-K dated April 1, 2009 (attached hereto as Exhibit A). In addition, given the current market turmoil, and broad consensus that the market will not recover for quite some time, it is highly likely that LBSF will remain "in the money" under the Agreement through to the expiration date. Accordingly, by the time the Agreement expires in 2012, Metavante's payment obligation may be significantly higher than it is now.

WHEREFORE, for the foregoing reasons, the Group requests that the Court grant the relief set forth in the Motion, or in the alternative, require Metavante to provide adequate assurance of its ability to perform in the future.

Dated: July 10, 2009
      New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU - 2297)
J. Christopher Shore (JS – 6031)
Lisa Thompson (LT – 5176)

By: /s/ J. Christopher Shore
    J. Christopher Shore

- And -

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: (212) 259-8000
Facsimile: (212) 259-6333
Martin Bienenstock

ATTORNEYS FOR THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS