WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                      :
**In re**                             :         **Chapter 11 Case No.**
                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :    **08-13555 (JMP)**
                                      :
                     **Debtors.**     :         **(Jointly Administered)**
-------------------------------------------------------------------x

## DEBTORS' REPLY IN SUPPORT OF MOTION TO COMPEL PERFORMANCE OF METAVANTE CORPORATION'S OBLIGATIONS UNDER EXECUTORY CONTRACT AND TO ENFORCE AUTOMATIC STAY

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in

possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

the above-referenced chapter 11 cases, the "Debtors" and, collectively with their non-debtor

affiliates, "Lehman"), files this reply in response to the Objection of Metavante Corporation

("Metavante") to Debtors' Motion to Compel Performance of Obligations Under an Executory

Contract and To Enforce the Automatic Stay ("Objection") and in support of such Motion

("Motion"), and respectfully states:

## PRELIMINARY STATEMENT

1.     The Motion seeks to require Metavante to perform under an executory contract while the Debtors decide whether to assume or reject the agreement.  Although the type of agreement at issue – a swap agreement – may be complicated, the principles underlying the Motion are not:  Metavante, as a counterparty to an executory contract, must continue to perform under the contract notwithstanding any defaults thereunder while LBSF, as a chapter 11 debtor, determines whether to assume or reject the contract.

2.     Metavante does not dispute that it has failed to perform under the agreement at issue (the "Agreement"),[1] and it does not dispute that when the Motion was filed, Metavante owed LBSF $6,640,138.01 plus default interest.  Instead, Metavante seeks to take advantage of LBSF's chapter 11 case by attempting to use the Bankruptcy Code's Safe Harbor Provisions offensively to allow it to refuse to honor its obligations under the Agreement.

3.     Metavante's overarching contention is that the Safe Harbor Provisions – principally sections 560 and 561 of the Bankruptcy Code – allow it to take as much time as it likes to decide whether and when to terminate the Agreement as a result of changes in the financial markets.  This wildly expansive reading of the Safe Harbor Provisions is at odds with both applicable case law and the legislative history.

4.     The Safe Harbor Provisions were instituted to permit timely termination of a swap agreement to limit a non-defaulting party's exposure to market movements.  But nothing in the Safe Harbor Provisions or applicable case law indicates that the Safe Harbor Provisions were designed to allow a counterparty to exploit a debtor's bankruptcy case to evade the counterparty's obligations.  To the contrary, applicable case law makes clear that the Safe Harbor

---

[1] Terms defined in the Motion shall have the same meaning in this reply.

Provisions should be construed narrowly to permit only the liquidation, termination, or acceleration of a derivative contract and to offset or net out termination values or payment amounts under a swap agreement, and not to apply to either (x) other contractual rights that are ancillary or incidental to clauses giving rise to such rights or (y) terminations for reasons other than a debtor's bankruptcy case or financial condition (such as a movement in markets favorable to the non-defaulting party).

5.      In fact, enforcement of the Agreement against Metavante is entirely consistent with the Safe Harbor Provisions and the other provisions of the Bankruptcy Code. Despite Metavante's complaint that it was "deprived of an effective counterparty" when LBHI and LBSF filed for bankruptcy, Metavante still had a counterparty – LBSF as a debtor in possession – to a live contract.  If Metavante wanted to obtain certainty by exiting the contractual relationship on account of LBHI's and LBSF's chapter 11 cases, the Safe Harbor Provisions would have permitted Metavante immediately to terminate the Agreement and enter into a replacement swap transaction at the same time in order to replicate its position.  Instead, Metavante chose not to terminate the Agreement, hoping for a turn in the markets that would lower or eliminate its termination payment to LBSF.

6.      Despite Metavante's unsupported suggestion otherwise, the numerous cases requiring non-debtor counterparties to continue performance while a debtor decides whether to assume or reject an executory contract are as applicable to a swap agreement as they are to any other executory contract.

7.      Metavante makes two additional flawed arguments to attempt to justify its refusal to honor its contractual obligations.  First, Metavante seeks to delay its performance under the Agreement while it goes on an evidentiary fishing expedition by asserting "on

information and belief" that Debtors are also in default under certain unspecified indebtedness that allegedly may have created a cross default under the Agreement.  But this argument is flawed for at least four reasons:  (1) applicable case law requires a counterparty to an executory contract to continue performance, regardless of any defaults, while a debtor determines whether to assume or reject the contract; (2) Metavante could not have relied on these other purported cross defaults to refuse performance under the Agreement because, as the Objection makes clear, it is not even aware of any actual default in any other agreement that implicates the cross-default provisions; (3) the cross-default provision is unenforceable under applicable case law because it undermines LBSF's ability to assume and assign the Agreement; and (4) the cross-default provision is unenforceable under section 365(e)(1) of the Bankruptcy Code as a provision modifying a debtor's rights due to its financial condition.

8.      Second, Metavante argues that the Agreement is a financial accommodation contract to which section 365(e)(1) does not apply.  But there is nothing about the Agreement that establishes a typical creditor-debtor relationship in which a financial accommodation is being extended to the debtor, and Metavante cites no authority that derivative contracts should be treated as financial accommodations.

## ARGUMENT

### I.      Enforcement of the Agreement Does Not Deprive Metavante of Rights Protected by the Safe Harbor Provisions

9.      In its Objection, Metavante argues that it will be deprived of rights protected by the Safe Harbor Provisions if it is compelled to perform under the Agreement.  This argument is flawed because the relevant portions of the Safe Harbor Provisions protect only the rights to terminate, accelerate, or liquidate a swap agreement due to a debtor's financial

condition or chapter 11 case and to offset or net out termination values or payment amounts

under a swap agreement. *See* 11 U.S.C. §§ 365(e), 560.

10.     For instance, in *In re Enron*, 306 B.R. 465, 471 (Bankr. S.D.N.Y. 2004)

(Gonzalez, J.), a counterparty unsuccessfully urged the court to accept that section 560 and the

other Safe Harbor Provisions permit the counterparty to exercise any right that it might have

under the swap agreement or common law.  Relying on the legislative history behind section

560, the court disagreed with the counterparty's broad reading of the Safe Harbor Provisions'

purpose:

> In enacting section 560, Congress sought to protect financial markets from
> the volatility associated with delaying the final and prompt resolution of
> swap agreements.  See H.R. Rep. No. 101-484, at 2 (1990), U.S. Code
> Cong. & Admin. News 1990, pp. 223, 224 ("U.S. bankruptcy law has long
> accorded special treatment to transactions involving financial markets, to
> minimize volatility.  Because financial markets can change significantly in
> a manner of days, or even hours, a non-bankrupt party to ongoing
> securities transactions and other financial transactions could face heavy
> losses unless the transactions are resolved promptly and with finality.")

*Id.* at 472.

11.     The *Enron* court applied the Safe Harbor Provisions in light of Congress's

policy considerations and held that the commencement of a state court declaratory judgment

action regarding the validity of a swap agreement was not safe harbored and was subject to the

automatic stay because the counterparty was "not in fact attempting to terminate the Swap

Agreement for any of the reasons set forth in section 365(e)(1)." *Id.* at 474.  The Court based

its decision on the literal and plain meaning of the Bankruptcy Code that the Safe Harbor

Provisions do not protect all rights that a counterparty might have under a swap agreement. *Id.*

at 471.  Thus, the court recognized that section 560 does not permit the counterparty to

terminate for any reason, but only for those reasons expressly set forth under the Bankruptcy

Code. *Id.* at 473.

12.     Similarly, in *Calpine Energy Servs. v. Reliant Energy Elec. Solutions* (*In re Calpine Corp.*), No. 05-60200 (BRL), ADV. 08-1251 (BRL), 2009 WL 1578282, *1 (Bankr. S.D.N.Y. May 7, 2009) (Lifland, J.), this Court recently rejected a suit by a counterparty to enforce a clause in a terminated safe harbored swap agreement that required Calpine to dispute a termination payment calculation within two days of receipt.  Even though the contract had been terminated and the clause in question governed the parties' rights upon the termination, the Court held that the counterparty's enforcement of the clause was not protected by the Safe Harbor Provisions because the Safe Harbor Provision in question "clearly limits its reach to only those clauses that trigger termination upon the occurrence of a condition specified in section 365(e)(1) of the Code."  *Id.* at *7.  The Court held that:

> However, by its terms, section 556 of the Code is limited to enforcing only those terms that trigger termination upon the occurrence of one of the three specified conditions listed in section 365(e)(1) of the Code…. Accordingly, contractual rights that are merely ancillary or incidental to an ipso facto clause are not enforceable under section 556 of the Code.

*Id.* at *6.

13.     *Enron* and *Calpine* both make clear that a party's enforcement of a clause in a safe harbored contract is not protected by the Safe Harbor Provisions unless the contract is being terminated as a result of a condition of the kind described in section 365(e)(1) and the clause triggers the termination.  Applying this reasoning, the Safe Harbor Provisions cannot protect Metavante's enforcement of clauses in the Agreement that may otherwise excuse Metavante's obligation to perform.  First, like the counterparty in *Enron*, Metavante seeks to invoke the Safe Harbor Provisions outside the context of an actual termination of the Agreement.  Second, like the counterparty in *Calpine*, Metavante seeks to invoke a clause that

does not actually trigger termination.  Instead, Metavante is seeking to hide behind the Safe

Harbor Provisions in an effort to *avoid* terminating or performing under the Agreement.

14.     Metavante also vaguely claims that its "set-off rights" would be impaired

if it were compelled to perform under the Agreement.  Objection at ¶ 26.  But Metavante does

not currently have any rights to set off or net out any termination values or payment rights

because it has chosen not to terminate the Agreement.  Only when Metavante terminates the

Agreement will it have any such rights to enforce set off under the Safe Harbor Provisions.  11

U.S.C. § 560; *see also Pub. Serv. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In

re Pub. Serv. Co. of New Hampshire)*, 884 F.2d 11, 15 (1st Cir. 1989) (holding that a creditor to

an executory contract may not withhold performance in anticipation of enforcing its right to set

off when the agreement remains in effect and has not been rejected by the debtor).

15.     Finally, although not directly at issue here because Metavante is not

attempting to terminate the Agreement, Metavante similarly misreads the Bankruptcy Code and

ignores applicable case law when it insists that it can "ride the market" and terminate the

Agreement at any time under the Safe Harbor Provisions.  The plain language of the Safe Harbor

Provisions only permits a termination "because of a condition of the kind specified in section

365(e)(1)," which include the insolvency or financial condition of the debtor and the

commencement of a bankruptcy case.  *See, e.g.,* 11 U.S.C. §§ 560, 561; *see also Calpine*, 2009

WL 1578282, at *6 (noting that section 556 – a Safe Harbor Provision – is limited to enforcing

only those terms that trigger termination upon the occurrence of one of the three specified

conditions listed in section 365(e)(1)).  Courts considering this limitation have held that a

counterparty who waits to terminate a safe harbored contract for a reason other than the

commencement of a debtor's chapter 11 case may not terminate the contract under the Safe

Harbor Provisions.  *See, e.g., In re Enron Corp.*, No. 01 B 16034 (AJG), 2005 WL 3874285, *4

(Bankr. S.D.N.Y. Oct. 5, 2005) (Gonzalez, J.) (recognizing that a counterparty's use of the Safe

Harbor Provisions "must be made fairly contemporaneously with the bankruptcy filing" and the

failure to make such election renders the contract "just another ordinary executory contract.")

("*Enron II*"); *In re Amcor Funding Corp.*, 117 B.R. 549, 551, 553 (Bankr. D. Ariz. 1990)

(holding that the automatic stay would remain in full force and effect to stay a counterparty's

liquidation of a securities contract, where the counterparty clearly sought to do so "to ease its

own bankrupt condition, at the expense of the [debtor's] estate").

       16.    Termination of the Agreement more than nine months after the

commencement of LBSF's chapter 11 case due to changes in the markets would not be a

termination permitted by *Enron II* or *Amcor* and is not what Congress intended when enacting

the Safe Harbor Provisions.  Instead, Congress enacted the Safe Harbor Provisions to maintain

liquidity in the financial markets by allowing for the "*prompt* closing out or liquidation of

[counterparties'] open accounts" upon the commencement of the debtor's bankruptcy case.  H.R.

REP. NO. 97-420, at 1 (1982) (emphasis added).  When Congress further broadened the

bankruptcy protections afforded to certain contracts in 1990, the rationale was that "[t]he

*immediate* termination for default and the netting provisions are critical aspects of swap

transactions and are necessary for the protection of all parties in light of the potential for rapid

changes in the financial markets."  S. REP. NO. 101-285, at 1 (1990) (emphasis added).  S*ee*

*generally* Scott Tucker, *Interest Rate Swaps and the 1990 Amendments to the United States*

*Bankruptcy Code:  A Measure of Certainty Within Swap Market Contracts,* 1991 UTAH L. REV.

581 (1991) (discussing Congress's intent in adding the Safe Harbor Provisions to address the

uncertainties that would arise when a party to a swap agreement commenced a case under the

Bankruptcy Code).[2]

## II.     Metavante's Reliance on LBHI's Bankruptcy to Avoid Performance Is Impermissible Under the Bankruptcy Code

17.     In its Objection, Metavante argues that LBHI's bankruptcy was an Event

of Default under the Agreement that provided Metavante the right to withhold performance.

Objection at ¶ 10.  However, Metavante may not rely on such an ipso facto provision to avoid

performance.  The Bankruptcy Code is clear that once LBSF filed for bankruptcy, its rights to

receive performance under the Agreement may not be modified because of a provision in an

executory contract that is conditioned on "the commencement of *a case* under this title."  11

U.S.C. § 365(e)(1)(B) (emphasis added).  This language must be contrasted with the words used

by Congress earlier in the same provision.  When Congress intended to refer to the filing by the

Debtor it used the words "the case."  *See id.* 365(e)(1) ("any right or obligation under such

contract or lease may not be terminated or modified, at any time after commencement of *the case*

solely because of a provision in such contract or lease….") (emphasis added).

18.     The plain words of the Bankruptcy Code thus make it clear that the

contractual provision relied on by Metavante is an unenforceable ipso facto clause regardless of

whether it modifies LBSF's rights based on its own bankruptcy *or* the bankruptcy of LBHI.

---

[2] Metavante cites *In re Mirant Corp., et al.*, 314 B.R. 347, 352 n. 10 (Bankr. N.D. Tex. 2004) for the proposition that  "Congress sought to preserve the full termination rights of a party under a swap agreement as those rights would have existed under the terms of the agreement outside bankruptcy" in enacting sections 560 and 561.  Objection at ¶ 34.  In *Mirant*, the debtor was seeking an order that the counterparty had violated the automatic stay by terminating a swap agreement seven weeks after the filing of the debtor's bankruptcy.  *Id.* at 350.  The *Mirant* court did not address the issue here of whether a party can wait and terminate at any time without performing under the contract in the interim.  Instead, the *Mirant* court made a limited ruling that an interim order of the court had provided the counterparty with the ability not to terminate immediately and to continue performing without waiving the benefits of the Safe Harbor Provisions.  As such, *Mirant* is inapposite to Metavante's position here.

III.    **Metavante Cannot Use the Cross-Default Provision of the Agreement as a Reason Not to Perform**

A.    **Metavante Cannot Withhold Performance Due to Alleged Breaches of the Agreement While LBSF Decides Whether to Assume or Reject**

19.    Metavante argues that, under New York contract law, a failure of a condition precedent excuses Metavante's obligation to perform.  Objection at ¶¶ 15-22.  This argument misses the mark.  As stated in the Motion, while LBSF is determining whether to assume or reject the Agreement, the Bankruptcy Code trumps any state law excuse of performance due to a default under the Agreement.  Motion at ¶¶ 27-29.  Additionally, as discussed in the Motion and below, the defaults alleged by Metavante to excuse its performance are unenforceable under the Bankruptcy Code.

20.    Metavante relies primarily on *In re Lucre, Inc.*, 339 B.R. 648 (Bankr. W.D. Mich. 2006), in support of the proposition that a debtor cannot compel a counterparty to perform an executory contract absent assumption and cure of any existing prepetition defaults. *See* Objection at ¶ 18.  In *Lucre*, the court permitted a counterparty to withhold performance of an executory contract because the debtor was in prepetition arrearage of approximately $1.3 million.  *See id.* at 652, 660.   The holding in *Lucre* should not be given any weight.  Contrary to *Lucre*, nearly all other courts to have considered this issue have held that a counterparty must perform an executory contract pending the debtor's decision to assume or reject the agreement, notwithstanding a debtor's prepetition default.  For example, in *Cont'l Energy Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. Co. (In re Cont'l Energy Assocs. Ltd. P'ship)*, 178 B.R. 405 (Bankr. M.D. Pa. 1995), the court compelled a counterparty to continue to supply natural gas to the debtor until such time as the debtor assumed or rejected the contract.  *Id.* at 408.  There, just

as in *Lucre*, the debtor was in prepetition arrearage in excess of $15 million. *Id.* at 407. The court reasoned that if the counterparty was permitted to withhold performance, then:

> Not only does this saddle an ailing company with an additional burden which it is unlikely to overcome, it pressures the Debtor to surrender the "breathing space" normally allowed to it to consider the assumption or rejection of the contract. As a matter of its very existence, the Debtor is influenced to immediately assume the contract with all of its administrative burdens.

*Id.* at 408.[3]

21.     Even if, *arguendo*, LBSF was in prepetition default of the Agreement, the Court should decline to adopt the holding of *Lucre* because, in addition to deviating from the majority of cases, it does not reflect sound policy. Indeed, *Lucre* recognizes that it deviates from other courts, but offers no discussion of the contrary case law other than in a footnote that unsuccessfully attempts to distinguish *Interstate Gas Supply v. Wheeling Pittsburgh Steel Corp.* (*In re Pittsburgh-Canfield Corp.*), 283 B.R. 231 (Bankr. N.D. Ohio 2002), one of many cases holding that a  counterparty can be compelled to perform an executory contract pending assumption or rejection by the debtor. *Lucre* attempts to distinguish *Pittsburgh-Canfield* on the basis that *Pittsburgh-Canfield* did not involve a circumstance where the debtor was in prepetition default. *Lucre,* 339 B.R. at 660, n. 12. But the *Lucre* court was wrong. In *Pittsburgh-Canfield,* "it [was] undisputed that, as of [the petition date], the [debtor] had not paid the [counterparty] for October and early November gas sales." *Pittsburgh-Canfield,* 283 B.R. at 235. In fact, *despite the debtor's prepetition default*, the court held that the counterparty was liable for the debtor's

---

[3] *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *McLean Indus. Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989); *Pub. Serv. Co. of New Hampshire v. New Hampshire Elec. Coop., Inc. (In re Public Ser. Co. of New Hampshire)*, 884 F.2d 11, 14 (1st Cir. 1989); *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1078-79 (3d Cir. 1992); *see also* Motion at ¶¶ 24-25.

"cover" damages because of its failure to perform the agreement postpetition until such agreement was rejected by the debtor.  *Id.* at 238-40.

22.     A debtor's ability to compel postpetition performance of an executory contract is so critical to the rehabilitation process that it has been held that even a counterparty that ceased prepetition performance of an agreement in accordance with its state law contractual rights was required to resume performance once the debtor filed for bankruptcy.  *See In re Pacific Gas & Elec. Co.*, 2004 U.S. Dist. LEXIS 22023, at *16-18 (N.D. Cal. Sept. 30, 2004). Similarly, the bankruptcy court for the District of Delaware recently held that a counterparty could be compelled to perform despite the debtor's prepetition payment default of approximately $3.4 million.  *See Broadstripe, LLC v. Nat'l Cable Television Coop. (In re Broadstripe, LLC)*, 402 B.R. 646, 650, 656 ¶¶ 18, 78 (Bankr. D. Del. 2009), *stayed pending appeal,* 2009 U.S. Dist. LEXIS 25690 (D. Del. Mar. 25, 2009); *see also Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage. Co., Inc. (In re Whitcomb & Keller Mortgage. Co., Inc.)*, 715 F.2d 375, 376 (7th Cir. 1983) (affirming bankruptcy court's issuance of preliminary injunction prohibiting counterparty from ceasing to provide services to debtor despite alleged prepetition indebtedness of $12,954.63 owed to counterparty).

**B.     Metavante Could Not Rely on a Cross Default to Refuse Performance Because It Is Not Aware of Any**

23.     Metavante argues that LBSF or LBHI, prior to LBSF's bankruptcy, *may have* defaulted under other agreements or instruments relating to LBSF's or LBHI's "Specified Indebtedness" (defined broadly to include any borrowed money), either individually or collectively, above a "Threshold Amount" of the lesser of (i) USD100 million or (ii) two percent

(2%) of the Stockholders' Equity of LBHI,[4] which resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable. *See* Master Agreement at p. 6; Objection at ¶¶ 11-12. Therefore, Metavante asserts – upon information and belief – that it is not required to make any payments that otherwise would have been owed to LBSF under the Agreement because an Event of Default – a "Cross Default" – has occurred. Objection at ¶¶ 13-14. Metavante, however, obviously has no knowledge of any such default and it therefore could not have been the basis for its refusal to make payments to LBSF.

24.    Indeed, the Objection does not set out the basis for Metavante's supposed "information and belief" that such a default occurred and the Objection presents no evidence of such a cross default. Instead, Metavante seeks to delay its continued performance by requesting discovery into all of the Debtors' prepetition indebtedness and presumably on every possible default under all of the Debtors' agreements. As explained above and below, Metavante's argument should be rejected as a matter of law because the cross-default provision on which Metavante relies does not excuse Metavante's performance pending assumption or rejection of the Agreement by LBSF and is unenforceable under the Bankruptcy Code in any event. Any discovery, therefore, is improper and unnecessary. Indeed, allowing Metavante not to perform while it takes far-reaching and time-consuming discovery would set a precedent that would make it extremely difficult, if not impossible, for the Debtors to enforce their rights under any derivative contract.

---

[4] "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied. *See* Master Agreement at p. 20.

C.    **The Cross-Default Provision Is Unenforceable Because It
Undermines LBSF's Ability to Assume the Agreement**

25.    In an attempt to avoid the clear application of 11 U.S.C. § 365(e)(1)(B),
which invalidates Metavante's attempt to withhold performance based on the bankruptcy filings
of LBSF and LBHI, Metavante contends without any basis whatsoever that it also is relying upon
unspecified prepetition events.  Those prepetition events are supposedly that LBSF or LBHI
might have had defaults to parties under other agreements or instruments related to "Specified
Indebtedness" in an amount above the Threshold Amount resulting in such debt becoming, or
becoming capable at such time of being declared, due and payable – an alleged cross default
under the Agreement.

26.    Cross-default provisions, however, such as the one relied upon by
Metavante, are "inherently suspect" under the Bankruptcy Code because they undermine the
debtor's ability to assume contracts under section 365 of the Bankruptcy Code.  *See EBG
Midtown South Corp. v. Mclaren/Hart Envtl. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139
B.R. 585, 597 (S.D.N.Y. 1992), *aff'd* 993 F.2d 300 (2d Cir 1993); *In re Adelphia Bus. Solutions,
Inc.*, 322 B.R. 51, 62 (Bankr. S.D.N.Y. 2005) (Gerber, J.) (citing *Kopel v. Campanile (In re
Kopel)*, 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999)).  Numerous courts have held under section
365(f) of the Bankruptcy Code that "cross-default provisions are unenforceable in bankruptcy
where they would restrict the debtor's ability to fully utilize the provisions of section 365 with
respect to an executory contract or unexpired lease." *In re Convenience USA, Inc.*, 2002 WL
230772, at *7 (Bankr. M.D.N.C. Feb. 12, 2002) (citing *Sanshoe*, 139 B.R. at 597); *Kopel*, 232
B.R. at 64 ("Although, by its terms, section 365(f) applies to invalidate provisions restricting
assignment, rather than assumption…the section is relevant to the assumption inquiry because
365(f)(2)(A) requires assumption as a predicate to assignment of a contract"); *Braniff, Inc. v.*

14

*GPA Group PLC* (*In re Braniff, Inc.*), 118 B.R. 819, 845 (Bankr. M.D. Fla. 1989)); *see Papago Parago Partners, LLC v. Three-Five Sys., Inc.* (*Papago Parago Partners, LLC v. Three Five Sys., Inc.*), 2007 WL 1958733, at *5 (D. Ariz. July 2, 2007) (citing *In re Convenience USA*).

27.    For this reason, bankruptcy courts will enforce a cross-default provision only if the two agreements are so interdependent as to be "necessary" or "essential" or "fundamental" elements of the same transaction.  *See Adelphia*, 322 B.R. at 63 (citing *Kopel*, 232 B.R. at 67, 67 n.8, 69).  In contrast, where the two agreements are unrelated and the cross-default would prevent the debtor from effectively assuming its executory contracts, courts will not enforce the cross-default provision.  *See id.* (citing *Sanshoe*, 139 B.R. at 596) (declining to enforce cross-default provisions where "the different leases [were] contracts for separate spaces. They [did] not have the same subject matter or purpose, and one agreement [was] not the subsidiary of the other.")).

28.    By enforcing cross-default provisions only if the agreements are closely connected, this so-called "cross-default rule" prevents, among other things, a counterparty to a debtor's executory contract from requiring a debtor to pay all of its other creditors before it is permitted to assume a valuable executory contract.  The bankruptcy court in *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n* (*In re UAL Corp*) explained this rationale:

> For example, a particular supplier of goods to the debtor might provide that its supply contract would terminate upon the debtor's breach of any similar agreement with other specified suppliers. Such a "pay all" requirement could effectively serve as a proxy for the debtor's insolvency, and, in bankruptcy, it would require the debtor to pay the pre-petition claims of the specified suppliers as a condition for assumption, a daunting undertaking given the rule of equality of distribution recognized and enforced in *Kmart*. However, the cross-default rule addresses this problem by preventing a debtor from being required to perform contracts substantially unrelated to the one sought to be assumed.

346 B.R. 456, 471 n.13 (Bankr. N.D. Ill. 2006).

29.     The cross-default rule most typically arises in cases in which the debtor seeks to assume a contract and the counterparty to that contract alleges that in order to assume that contract the debtor must first cure "cross defaults" in other contracts.  *See, e.g., Sanshoe*, 139 B.R. at 597; *Kopel*, 232 B.R. at 59.  As noted above, unless the cross-defaulted contracts are fundamentally part of the same transaction, courts refuse to enforce such cross-default provisions.  If a cross-default provision cannot prevent assumption of a contract by a debtor, then a counterparty certainly cannot invoke a cross-default provision to stop performing while the debtor decides whether or not to assume or reject.  Any other result would render the Debtors' ability to assume a contract illusory.

30.     The cross-default provision relied on by Metavante cannot pass scrutiny. Metavante's assertion of a cross default undoubtedly is based on alleged defaults in unrelated transactions with unrelated parties.  Indeed, the fact that Metavante seeks discovery to determine whether there even was a default under other agreements demonstrates that Metavante is claiming that potential cross defaults occurred based upon defaults in separate agreements governing different subject matter from the Agreement.

31.     Moreover, Metavante's assertion of a cross default would improperly frustrate LBSF from assuming its executory contract with Metavante.  Under Metavante's interpretation, Metavante would only be required to perform if LBSF and LBHI performed, or cured defaults, under other unrelated agreements, thus eliminating the cross defaults.  But Metavante's position prevents LBSF from being able to choose which executory contracts it wants to assume or reject, thereby frustrating the purpose of section 365.  *See In re UAL*, 346 B.R. at 471 n.13 (stating that cross-default rule "prevent[s] a debtor from being required to

perform contracts substantially unrelated to the one sought to be assumed"). Thus, the cross-default provision should not be enforced.

### D. The Cross-Default Provision Relied Upon by Metavante Is an Unenforceable Ipso Facto Provision

32. Additionally, the cross-default provision relied on by Metavante is unenforceable because it is itself an impermissible ipso facto clause under section § 365(e)(1)(A) of the Bankruptcy Code. In an attempt to avoid the clear application of 11 U.S.C. § 365(e)(1)(B), which invalidates Metavante's attempt to withhold performance based on the bankruptcy filings of LBSF and LBHI, Metavante contends without any basis whatsoever that it also is relying upon unspecified prepetition events. Those prepetition events are supposedly that LBSF or LBHI might have had defaults under other "Specified Indebtedness" to parties under other agreements in an amount above the Threshold Amount. Thus, Metavante is relying upon the financial condition of the Debtors, *i.e.*, LBSF or LBHI had defaulted on other indebtedness over the Threshold Amount – to withhold performance. Metavante recognizes as much by stating that Metavante could withhold performance "if the *financial condition* of LBSF or its Credit Support Provider (LBHI) deteriorated to the point that an existing lender to either LBSF or LBHI could accelerate its debt . . . ." Objection at ¶ 13.

33. Such a provision, however, may not be enforced under section 365(e)(1)(A) of the Bankruptcy Code, which states that a provision that would modify a debtor's rights based on the "*insolvency or financial condition of the debtor*" is unenforceable. Several courts have held similar cross-default provisions to be unenforceable because they were invalid ipso facto provisions. *See In re Sambo's Restaurants Inc.*, 24 B.R. 755, 757 (Bankr. C.D. Cal. 1982) ("The cross-default provisions operate as financial condition clauses. The inability to perform under one lease is indicative of SRI's financial problems."); *Papago Parago,* 2007 WL

1958733 at *5 ("A default provision triggered by inability to perform under a lease is a default provision triggered by a party's financial problems.").  Metavante provides no support for the proposition that these cross-default provisions are anything other than unenforceable "financial condition" clauses that may not be used to withhold performance from LBSF.

### IV.    The Agreement Is an Executory Contract Subject to Assumption or Rejection and Is *Not* a Financial Accommodation Contract

34.    In its Objection, Metavante asserts that the Agreement is a contract of "financial accommodation" that is unassumable by LBSF and exempted from section 365(e)(1) of the Bankruptcy Code based on the language of section 365(e)(2)(B).[5]  Thus, upon an Event of Default, Metavante asserts that it has the right to suspend performance under section (2)(a)(iii) of the Agreement because section 365(e)(1) does not apply to contracts of financial accommodation, and, therefore, section (2)(a)(iii) is not an unenforceable ipso facto provision. *See* Objection at ¶¶ 36-39.

35.    Specifically, Metavante argues that the "essence of a swap transaction such as this one is the extension of credit by each party to the other party" because at times one party will be "in the money" and one party will be "out of the money."  Objection at ¶ 37.  This argument is nonsensical.  While the Bankruptcy Code does not define "financial accommodation," courts that have construed the term uniformly conclude that it does not refer to "all contracts that involve the extension of credit; rather it applies to contracts to make loans and other traditional kinds of debt financing arrangements." *Citizens and S. Nat'l Bank v. Thomas B.*

---

[5] Section 365(e)(2)(B) of the Bankruptcy Code states that section 365(e)(1) does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if…such contract is a contract to make a loan, or extend other debt financing or financial accommodations, *to or for the benefit of the debtor*, or to issue a security of the debtor."  11 U.S.C. ¶ 365(e)(2)(B) (emphasis added).

*Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.),* 969 F.2d 1013, 1018-19 (11th Cir.

1992); *see also In re Emerald Forest Const., Inc.*, 226 B.R. 659, 664 (Bankr. D. Mont. 1998)

(stating that courts strictly construe the terms "loan," "debt financing" and "financial

accommodation" narrowly).

36.      A swap agreement is *not* an agreement to make a loan, but instead is a

complex financial instrument pursuant to which each of the parties agrees to deliver certain

things (which could be cash in different currencies, securities, or goods) to the other party at

certain times. *See Thomas B. Hamilton Co.*, 969 F.2d at 1020 (noting that purpose of credit card

merchant agreement was not to provide financing but to "establish a relationship that will permit

[the Debtor] to accept the use of credit cards instead of cash in the course of its business and

permit [the merchant bank] to purchase the sales drafts arising from the resulting credit card

transactions").

37.      In explaining the nature of interest rate swap agreements in *Thrifty Oil Co.*

*v. Bank of America Nat. Trust and Sav. Ass'n*, 322 F.3d 1039, 1048 (9th Cir. 2003), the court

stated:

> A fundamental characteristic of an interest rate swap is that the
> counterparties never actually loan or advance the notional amount.
> The swap involves an exchange of periodic payments calculated by
> reference to interest rates and a hypothetical notional amount.
> Payments made under an interest rate swap cannot possibly
> compensate for the delay and risk associated with borrowed money
> because no loan has taken place between the counterparties.

38.      Of course, if a swap agreement were a financial accommodation contract

just because certain parties were owed money at various times, then virtually all executory

contracts would be financial accommodation contracts, thereby gutting section 365.  Moreover,

Metavante's broad reading of what constitutes a financial accommodation contract would render

significant portions of the Safe Harbor Provisions superfluous.  If swap agreements were financial accommodation contracts so that ipso facto clauses under such contracts were enforceable, then Congress would not have needed to enact provisions of the Bankruptcy Code protecting swap counterparties' rights to terminate swap agreements pursuant to ipso facto clauses.

39.     Metavante further argues that LBHI's position as a "Credit Support Provider" of LBSF makes the Agreement a financial accommodation contract within the meaning of section 365(e)(2).  Objection at ¶ 39.  This argument is contrary to common sense, as Metavante is arguing that any contract that is guaranteed by another party is a financial accommodation contract.  If this argument were correct, countless contracts would be excluded from being assumed, in contravention of the important goals of section 365.  Moreover, the guarantee by LBHI is not a contract to make a loan, or extend other debt financing or financial accommodations, *to or for the benefit of the debtor*, as required by section 365(e)(2)(B).  11 U.S.C. § 365(e)(2)(B).  Here, Metavante is the party benefiting from LBHI's guarantee.  As such, Metavante's argument fails.

40.     Under no circumstance can the Agreement be regarded as an extension of a loan or credit that falls under section 365(e)(2)(B).  The Agreement is an executory contract that is not exempt from section 365(e)(1), and Metavante's suspension of its performance pursuant to section (2)(a)(iii) of the Agreement is prohibited by the Bankruptcy Code.

## **CONCLUSION**

For the reasons set forth in the Motion and this Reply, the Debtors respectfully request that this Court grant the relief requested in the Motion.


Dated: July 13, 2009
      New York,  New York


<div style="margin-left:40%">

/s/ Robert J. Lemons
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor and
Debtor In Possession

</div>