Hearing Date: July 14, 2009 at 2:00 p.m. (Prevailing Eastern Time)

Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

and

David S. Cohen (*pro hac vice*)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586


Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 Case |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | No. 08-13555 (JMP) |
| Debtors. | : | (Jointly Administered) |

**JOINDER OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN DEBTORS' REPLY IN SUPPORT OF MOTION TO COMPEL PERFORMANCE OF METAVANTE CORPORATION'S OBLIGATIONS UNDER EXECUTORY CONTRACT AND TO ENFORCE AUTOMATIC STAY**

The Official Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc., et al. (collectively, the "Debtors") join (the "Joinder") in the Debtors' Reply in Support of Motion to Compel Performance of Metavante Corporation's Obligations Under Executory Contract and to Enforce Automatic Stay ("Debtor's Reply"). In support of its Joinder, the Committee respectfully states as follows:

## THE COMMITTEE'S JOINDER

1.      Reduced to its essence, Metavante's argument is that "[t]he non-defaulting party is not required to terminate its swap within any fixed or specified period of time, but is instead permitted to wait as long as it deems appropriate to permit the market to recover." (Metavante Objection at 11; see id. at 13 ("The right to elect to terminate – or not to terminate – the swap at any time prior to maturity is an essential and critical right of a non-defaulting party. . . . . If Metavante defers its termination and the markets turn so that Metavante is 'in the money,' Metavante must have the right under section 560 to minimize the loss resulting from the Debtors' defaults . . . .").)

2.      It is hard to see how one could construe the Safe Harbor Provisions[1] as granting a swap participant an unlimited option to terminate, much less an option that permits a swap participant, whenever it chooses, to deprive a debtor of the debtor's "in the money" position.  But this is exactly what Metavante argues.  Metavante's argument, however, is contradicted by (a) the plain language of the termination provisions of the Safe Harbor Provisions, (b) the case law construing them, and (c) the relevant legislative history.

3.      Sections 560 and 561 of the Bankruptcy Code allow a swap participant to exercise a contractual right to terminate a swap agreement based upon a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code – in this instance, pursuant to section 365(e)(1)(B), "the commencement of a case under [the Bankruptcy Code]."  11 U.S.C. § 365(e)(1)(B).  This termination right, however, must be promptly exercised, or it will be lost. The reason is that, by their plain terms, the Safe Harbor Provisions protect only the right of a swap participant to terminate a swap agreement based upon a condition of the kind specified in

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meaning set forth the Committee's Statement in Support, which the Committee filed on June 15, 2009 (Docket No. 3958).

2

section 365(e)(1); they do not protect the right of a swap participant to terminate a swap agreement based upon both (i) a condition of the kind specified in section 365(e)(1) and (ii) some other condition, event, or occurrence, such as, to paraphrase Metavante's argument on this point, a "recovery" or "turn" in the markets that improves a swap participant's position with respect to its debtor-counterparty.  A party that does not promptly terminate a swap agreement based on the commencement of a case under the Bankruptcy Code, but instead waits – as Metavante candidly confesses that it has done and continues to do – for a recovery or turn in the market that improves its position, has taken itself outside the ambit of the Safe Harbor Provisions.

    4.  The case law supports this conclusion.  See, e.g., In re Enron Corp., 2005 WL 3874285, at *4  (Bankr. S.D.N.Y. 2005) [hereinafter "Enron II"] (a non-defaulting party "must opt for the early termination of the swap agreement based upon one of the reasons enumerated in section 365(e)(1) of the Bankruptcy Code . . . fairly contemporaneously with the bankruptcy filing"); In re Enron Corp., 306 B.R. 465, 473-74 (Bankr. S.D.N.Y. 2004) (explaining that section 560 "does not provide a swap participant an unqualified right to terminate a swap agreement," and holding that section 560 is inapplicable where a counterparty is not, in fact, terminating as a result of a condition of the kind specified in section 365(e)(1)); In re Amcor Funding Corp., 117 B.R. 549, 551 (D. Ariz. 1990) (holding that counterparty's action was not protected by the Safe Harbor Provisions, and noting that, although the commencement of the subject debtor's bankruptcy case was a condition of the kind specified in section 365(e)(1), it had been a year since the commencement of that case).

    5.  The legislative history of the Safe Harbor Provisions also supports this construction of the termination right provided by the Safe Harbor Provisions.  The termination right granted to swap participants in the Safe Harbor Provisions was based on the concern that a

3

swap participant could be exposed to market risk if (a) its counterparty became a debtor in a case under the Bankruptcy Code and (b) the automatic stay (i) prevented the swap participant from terminating the swap agreement, and thereby (ii) forced the swap participant to be subjected to the risks of being a party to an open swap agreement with the debtor, including the risk that the debtor would "play the market" against the swap participant by assuming or rejecting the swap agreement depending on how the market moved after the commencement of the debtor's bankruptcy case.  See, e.g., The American Bankruptcy Institute Survey:  Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Judiciary Comm., 100th Cong. 665 (1988) [hereinafter "1988 Hearing"] (statement of Richard F. Kezer, Public Securities Association) ("avoid inequitable decisions by a trustee in bankruptcy to assume favorable swap transactions while rejecting unfavorable transactions"), 679 (statement of International Swap Dealers Association) ("The nondefaulting party could face substantial market exposure if the automatic stay barred it from terminating all outstanding transactions and forced it to hold open all transactions with the debtor, particularly in a volatile market."), 681 ("Any delay in obtaining authority to terminate outstanding transactions . . . would create unreasonable risks for the nondefaulting party. . . .  The possibility that the automatic stay could prevent such termination – possibly for weeks or months – creates a threat of a substantial increase in the nondefaulting party's potential exposure to the debtor and generally complicates any effort to hedge that exposure."), 682 (noting the costs and risks to a nondefaulting party arising from "the uncertainty as to whether the transaction will be assumed"), 692 (statement of New York Clearing House) (purpose of section 560 "is . . . to give assurance that the contractual right to terminate open transactions . . . will not be subject to inequitable or delayed decisions to assume favorable transactions or reject unfavorable ones"); 135 Cong. Rec. S1414 - 17 (daily ed. Feb. 9, 1989)

4

(statement of Sen. DeConcini) ("[C]ounterparties could be faced with substantial losses if forced to await a bankruptcy court decision on assumption or rejection of [swap agreements]"); <u>Interest Swap: Hearing Before the Subomm. on Courts and Administrative Practice of the Senate Judiciary Comm.</u> 101st Cong. 8 (1989) [hereinafter "1989 Hearing"] (statement of Sen. Grassley) (noting "the risk that an outstanding swap transaction would be held open during the bankruptcy, despite contractual provisions for its termination"), 12 (testimony of Mark C. Brickell, International Swap Dealers Association) ("The nondefaulting party could face substantial market exposure if the automatic stay barred if from terminating all outstanding transactions and forced it to hold open those transactions with the debtor, particularly in a volatile market."), 15 (statement of Mark C. Brickell) ("Without [section 560], the counterparty would be required to remain exposed to interest or currency rate fluctuations without knowing if the debtor will assume or reject the agreement."), 54 (testimony of John J. Jerome) (noting "the possibility that a debtor with a swap can gamble, can play the market by delaying affirmance"), 56 (statement of John J. Jerome) ("[A] debtor may in effect be permitted an open-ended option not contemplated by the original agreement."), 69 (testimony of William J. Perlstein) ("to say to a swap dealer that they have to keep the swap open while the debtor decides whether to assume or reject imposes mammoth risks on the dealer"), 94, 98 (statement of John J. Jerome) (citing "the possibilities of unfair prejudice to a nondebtor resulting from . . . delay by a debtor in deciding whether to assume or reject a swap transaction or agreement," and stating that "[p]ermitting such delay, in effect, gives the debtor an option on a swap. This may result in a windfall to the debtor and force the nondebtor counterparty to suffer the consequences."); <u>Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing Before the Subcomm. On Economic and Commercial Law of the House Judiciary Comm.</u>, 101st Cong. 15-16, 17, 20, 28, 30-32, 34, 35-36

5

(1990) (testimony and statement of Mark C. Brickell) [hereinafter "1990 Hearing"].  As summarized by one witness at a Congressional hearing:

> If the market has turned favorable to the debtor, the trustee says fine, I will assume it.  If the market has turned unfavorable, the trustee says I will reject it.  In that time period, the [swap participant] has no idea whether it is going to be assumed or rejected, and you are basically just encouraging the trustee to play the market with the creditor's money.

Id. at 83 (testimony of William J. Perlstein).

    6.  Accordingly, the Congressional intent was that, to invoke the protections of the Safe Harbor Provisions, a swap participant would exercise its termination right immediately or promptly after the commencement of a bankruptcy case.  See, e.g., H.R. Rep. No. 109-31, pt. 1, at 111 (2005), reprinted in  2005 U.S.C.C.A.N. 88, 193,  2005 WL 832198 ("For the purposes of Bankruptcy Code sections 555, 556, 559, 560, and 561, it is intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate or accelerate . . . swap agreements . . . with the bankrupt or insolvent party.").  *Swap Agreements and Forward Contracts*, S. Rep. No. 101-285, at 3-4 (1990) ("immediate termination for default"; "immediate termination of outstanding transactions"; "prompt termination of the agreement"; "immediate termination and netting"); 1988 Hearing at 681 (statement of International Swap Dealers Association) ("[A] prudent counterparty would immediately terminate all transactions with a debtor so as to fix its exposure and would simultaneously enter into separate transactions to hedge that exposure."), 684 ("immediate action"); 1989 Hearing at 26 (statement of Mark C. Brickell) ("[A] prudent counterparty would immediately terminate all transactions with a debtor so as to fix its exposure . . . ."), 29 ("immediate action"), 37 (statement of Paul Allan Schott, Office of the Comptroller of the Currency) ("immediate liquidation of a swap agreement when one party went into default"),

6

48 (statement of Federal Reserve Staff) ("give immediate effect to the termination provisions of the swap agreement upon the commencement of a case under the Code"), 132 (statement of Don Comer) ("ability to immediately terminate"); 1990 Hearing at 31 (statement of Mark C. Brickell and William J. Pearlson) ("Following a default, and absent a stay, a prudent counterparty would immediately terminate all [swap] transactions with a debtor . . . .").

7. Metavante's assertion that it may terminate the Swap Agreement whenever it sees fit contravenes the above-cited authority and Congressional intent. Metavante does not have the right to "play the market" by delaying the termination until a time that is better for it and worse for the Debtors. The Swap Agreement is now like any other executory contract, where Metavante must perform until the Debtors assume or reject. See Enron II, 2005 WL 3874285, at *4. Accordingly, the Debtors' Motion should be granted and Metavante should be compelled to perform under the Swap Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Creditors' Committee respectfully requests that the Court grant the relief requested in the Debtors' Motion.

Dated: New York, New York
July 13, 2009

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By: /s/ Dennis F. Dunne
Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck

1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

David S. Cohen (*pro hac vice*)

1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.