Hearing Date:  July 15, 2009 at 10:00 a.m. (New York Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
**In re**                          :       **Chapter 11 Case No.**
                                     :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :       **08-13555 (JMP)**
                                       :
                    **Debtors.**        :       **(Jointly Administered)**
-------------------------------------------------------------------x

**DEBTORS' REPLY TO OBJECTION TO DEBTORS' MOTION**
**PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

         Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced

chapter 11 cases reply to the objection filed by the "Ad Hoc Group of Lehman Brothers

Creditors" (the "Hedge Fund Committee") to the Debtors' Motion, Pursuant to Section 1121(d)

of the Bankruptcy Code, Requesting Second Extension of Exclusive Periods for the Filing and

Solicitation of Acceptances for Chapter 11 Plans (the "Motion")[1], and respectfully represent:

**I.**
**Introduction**

         1.    Elliott Management Corporation, King Street Capital Management LP and

Paulson & Company Inc., as a purported "group of Lehman Brothers creditors," hold, with their

---

[1] Capitalized terms used but not defined shall have the meanings ascribed to them in the Motion.

affiliates, claims against the Debtors, including claims directly against LBHI, totaling

approximately $13 billion, and object to the Debtors' motion pursuant to section 1121(d) of the

Bankruptcy Code (the "Objection").  The Objection is made in the perspective of the following

indisputable facts that apply to the Motion.

a.    The chapter 11 cases of the Debtors constitute the largest and most complex chapter 11 cases in the history of the United States.

b.    The financial collapse of the Lehman enterprise resulted in consequences to the financial markets and the global economy which have not yet been fully determined.

c.    The Lehman enterprise was a global business.  The commencement of these chapter 11 cases and the onset of administration proceedings under the insolvency laws of the United Kingdom for Lehman Brothers Inc. (Europe) ("LBIE") resulted in a complete breakdown in the financial reporting systems of the Lehman enterprise which has caused substantial difficulties in recreating the financial transactions involving the Lehman entities.

d.    Since the Commencement Date, there have been over 80 foreign insolvency proceedings initiated involving segments or units of the Lehman enterprise.

e.    A protocol among the receivers and other fiduciaries appointed in the major foreign insolvency proceedings and the chapter 11 Debtors was formally approved by the Court on June 17, 2009.  The major foreign insolvency proceeding, the UK administration proceedings involving LBIE, remains outside of the approved protocol and the ability to freely access and receive information from the LBIE administrators continues to remain problematic.

f.    The full extent of the respective assets and liabilities, including potential causes of action and claims that may be asserted on behalf of each Debtor, is still not yet determined.

g.    The status, extent and allowability of inter-company claims as between LBHI, its debtor affiliates and the non-debtor Lehman entities, has not yet been determined.

h.    On September 16, 2008, the Unites States Trustee appointed a statutory committee of unsecured creditors (the "Official Committee").  The Official Committee is represented by professionals, including two forensic advisory firms.  They have closely monitored the administration of these chapter 11 cases.  The Official Committee has consented to the extension of the Exclusive Periods as set forth in its Statement, dated July 14, 2009.

i.    A multitude of investigations are being pursued as to the acts, conduct and affairs of the Debtors and their affiliates, including those being pursued by the Official

Committee, the United States Attorneys for the Southern and Eastern Districts of New York and the District of New Jersey, and state enforcement agencies.

j.      At the request of The Walt Disney Company, represented by one of the co-attorneys for the Hedge Fund Committee, and with the consent of the Debtors, on January 16, 2009, Anton Valukas, Esq., the Managing Partner of the law firm of Jenner & Block, was appointed as Examiner in these chapter 11 cases under an extremely broad charter to add to the transparency of the administration of these chapter 11 cases. The Examiner originally contemplated that his investigation would be completed within nine months from the date of appointment, based upon his estimation of the scope of the discovery and analysis that would be required. More recently, the Examiner has indicated that additional time would be required, inasmuch as the volume of documents that need to be produced and examined exceeded his estimation by almost ten-fold.

k.      Administration of the chapter 11 cases and of the non-debtor affiliates is under the direct charge of Mr. Bryan Marsal, a senior member of Alvarez & Marsal ("A&M"), who was appointed as Chief Restructuring Officer of LBHI contemporaneously with the commencement of the LBHI chapter 11 case on September 15, 2008, and who was thereafter appointed as Chief Executive Officer on January 1, 2009. A&M has assisted Mr. Marsal as financial advisor and as restructuring experts and staff.

l.      As a result of the approval of the emergency sale of LBHI's North American capital markets business to Barclays Capital Inc. on September 20, 2008, essentially all of the North American employees of the Lehman enterprise (approximately 10,000 individuals) became employees of Barclays Capital Inc. upon the closing of the sale transaction. As a result, to initiate, develop and progress the administration, A&M had to use over 200 of its employees for the administration of the Debtors' cases. All of the foregoing exacerbated the complexities of the business and transactions that have to be reviewed and evaluated in order to determine the critical information that may be used to develop and formulate proposed chapter 11 plans for the Debtors.

m.      Mr. Marsal, as CEO of the Debtors, is a fiduciary under applicable principles of both bankruptcy and general corporate law. It is his duty, as it is the duty of the boards of directors of the Debtors and their non-debtor affiliates, to act in the best interests of the Debtors and, as a consequence thereof, the residual claimants, and not merely distressed debt traders.

n.      Lehman Brothers, Inc. ("LBI"), the broker/dealer affiliate of LBHI is being administered under the provisions of the Securities Investor Protection Act. James W. Giddens, Esq. is the duly-appointed SIPA Trustee. The full extent of the transactions between the Debtors and LBI have not yet been fully determined and will require a substantial amount of time to resolve.

o.      At the direction of the Court, there has been and continues to be complete transparency in the administration of the Debtors' chapter 11 cases. An extensive internet series of websites has been created that may be accessed by parties in

interest.  Mr. Marsal and A&M have appeared in Court on several occasions to provide reports on the status of the administration of the chapter 11 cases and as to particular matters, as well as at meetings pursuant to section 341 of the Bankruptcy Code.  They have extended themselves and have responded to the fullest extent possible to all inquiries made of them and, wherever practicable, have met with persons asserting claims against the Debtors and seeking information as to the Debtors and the administration of the chapter 11 cases, including the representatives of the Hedge Fund Committee and its professionals.

p.    All claims against these Debtors are not due to be filed until November 1, 2009, and it is anticipated that well over 1,000,000 claims may be asserted, including a large number of highly complex claims based upon derivative transactions.  All claims will require careful analysis and many will require discovery and litigation.

2.    Notwithstanding the acknowledged size and extreme complexity of the affairs of the Debtors, the Hedge Fund Committee insists that the Debtors' exclusive periods to propose a chapter 11 plan and to thereafter solicit acceptances should not be extended and that, in its view of the best corporate and governance practices, the Hedge Fund Committee and other creditors should be allowed to file chapter 11 plans.  The Hedge Fund Committee contends:

a.    The administration of the chapter 11 cases lacks transparency;

b.    A confirmable plan can be filed despite the dearth of critical information that a hypothetical investor would need to make an informed judgment to accept or reject such a plan;

c.    The integrity of Mr. Marsal, A&M and the incumbent boards of directors of the Debtors must be questioned as, allegedly, they are only concerned with extending the administration of these chapter 11 cases so that they may continue to earn large and unjustified fees.

3.    These three contentions are wholly devoid of any substance other than the Hedge Fund Committee's ipse dixit that they know better and that asserted fundamental principles of corporate governance require the Court to allow them to take "control" of the Debtors and, perhaps, to transfer the substantial assets of the Debtors outside of the jurisdiction and oversight of the Bankruptcy Court.  The objective is a simple scheme to enable speculators

to use the Debtors' assets and data to sate their own appetite for profits. This is the very motivation that contributed to the demise of the Debtors.

4.    The Objection is singularly devoid of merit and should be overruled. Further, neither the co-attorneys representing the Hedge Fund Committee nor the Hedge Fund Committee itself has complied with the requirements of Rule 2019 of the Federal Rules of Bankruptcy Procedure. Resultantly, the Objection should be disregarded.

5.    The Official Committee, the representative of all creditors of the Debtors, not only the distressed debt traders motivated by opportunities to reap large profits, supports the Debtors' request for an eight-month extension of the exclusive period to file chapter 11 plans. The Bank of New York Mellon Trust Company, N.A., which had filed a Limited Objection to the Debtors' extension request, has withdrawn that Limited Objection.

## II.
## The Hedge Fund Committee and Its Attorneys
## Failed To Comply with Bankruptcy Rule 2019[2]

6.    Bankruptcy Rule 2019(b) states, in relevant part, that the Court may, "on its own initiative," (i) "refuse to permit" an entity or committee "to be heard further or intervene in the case" and (ii) "hold invalid any authority, acceptance, rejection, or objection given, procured, or received by an entity or committee who has not complied with [Bankruptcy Rule 2019]." FED. R. BANKR. P. 2019(b). Bankruptcy Rule 2019 is a disclosure provision that requires every entity representing more than one creditor to file a verified statement setting forth certain information, including:

(1) the name and address of the creditor or equity security holder;

---

[2] The Debtors reserve all rights to challenge the lack, or adequacy, of all verified statements filed by professionals, ad hoc groups and unofficial committees in these cases.

(2) the nature and amount of the claim or interest and the time of acquisition
thereof unless it is alleged to have been acquired more than one year prior to the
filing of the petition;
(3) a recital of the pertinent facts and circumstances in connection with the
employment of the entity … and, in the case of a committee, the name or names
of the entity or entities at whose instance, directly or indirectly, the employment
was arranged or the committee was organized or agreed to act; and
(4) … the amounts of claims or interests owned by the entity, the members of the
committee, … the times when acquired, the amounts paid therefor, and any sales
or other disposition thereof.

The statement shall include a copy of the instrument, if any, whereby the entity,
committee, or indenture trustee is empowered to act on behalf of creditors or
equity security holders.  A supplemental statement shall be filed promptly, setting
forth any material changes in the facts contained in the statement filed pursuant to
this [Bankruptcy Rule 2019(a)].

FED. R. BANKR. P. 2019(a) (emphasis added).  The disclosure requirement is important, as
opposed to a ministerial act, because, "[b]y appearing as a 'committee,'" the members of an ad
hoc or unofficial committee "purport to speak for a group and implicitly ask the court and other
parties to give their positions a degree of credibility appropriate to a unified group with large
holdings."  In re Northwest Airlines Corp., 363 B.R. 701, 703 (Bankr. S.D.N.Y. 2007) (emphasis
added).

7.     Bankruptcy Rule 2019 applies to every entity and provides no exceptions to
its application except in the case of committees appointed under section 1102 or 1114 of the
Bankruptcy Code.  See FED. R. BANKR. P. 2019; Northwest, 363 B.R. at 702-04 (holding that
where "an ad hoc committee has appeared as such, the committee is required to provide the
information plainly required by Rule 2019 on behalf of each of its members…. The Rule is long-
standing, and there is no basis for failure to apply it as written."); In re North Bay General Hosp.,
Inc., 404 B.R. 443, 455-56, 461-63 (Bankr. S.D. Tex. 2009) (holding that a committee's proof of
claim would be disallowed on account of committee's failure to comply with Bankruptcy Rule
2019); City of Lafayette v. P.A.C. First Ltd. P'ship (In re Okla. P.A.C. First Ltd. P'ship), 122

B.R. 387, 389-392 (Bankr. D. Ariz. 1990) ("The Code contemplates that there will be unofficial committees. Any such unofficial committee must comply with Rule 2019 by its terms…").

8.    The requirements of Bankruptcy Rule 2019(a) are <u>mandatory</u>. Fed. R. Bankr. P. 2019(a) (using the word "shall," rather than "may," to command compliance). If the plain language of a statute is unambiguous, there is generally no need to look to administrative interpretations or to legislative history. <u>Magic Rests., Inc. v. Bowie Produce Co. Inc.</u> (<u>In re Magic Rests., Inc.</u>), 205 F.3d 108, 114 (3d Cir. 2000); <u>see also</u> <u>Patterson v. Shumate</u>, 504 US. 753, 761 (1992); <u>Toibb v. Radloff</u>, 501 US. 157, 162 (1991). The term "shall" generally is "mandatory and leaves no room for the exercise of discretion by the trial court." <u>Barbieri v. RAJ Acquisition Corp.</u> (<u>In re Barbieri</u>), 199 F.3d 616, 619 (2d Cir. 1999) (holding that the Bankruptcy Code is mandatory where statute provides that the court "shall" dismiss Chapter 13 case on request of the debtor at any time). Failure to comply with the requirements of Bankruptcy Rule 2019 is illegal.

9.    The Hedge Fund Committee has filed no statement pursuant to Bankruptcy Rule 2019. Apparently, it is now relying upon a self-determined declaration that it is a "group," rather than a "committee," a distinction without a difference, and one not observed in prior meetings with Mr. Marsal and the Debtors, when the Hedge Fund Committee identified itself as an "ad hoc committee." Patently, the Hedge Fund Committee members do not wish to disclose the information required by Bankruptcy Rule 2019.

10.    The Hedge Fund Group is represented by two law firms. (<u>See</u> Notice of Appearance and Request for Service of Papers, dated May 12, 2009 [Docket No. 3552] ("[T]he law firms of White & Case LLP and Dewey & LeBoeuf LLP hereby appear on behalf of the Ad Hoc Group of Lehman Brothers Creditors.").) Neither has complied with Bankruptcy Rule 2019.

White & Case LLP filed a verified statement on behalf of its firm listing the Hedge Fund

Committee, along with other unrelated entities, as clients, but the statement fails to contain

information sufficient to satisfy the provisions of Bankruptcy Rule 2019(a).  (See Verified

Statement of White & Case LLP Pursuant to Bankruptcy Rule 2019(a), dated June 15, 2009

[Docket No. 3953].)  Dewey & LeBoeuf LLP has not filed any statement under Bankruptcy Rule

2019 listing the members of the Hedge Fund Committee.

    11. As a result of the failures to comply with Bankruptcy Rule 2019, neither the

Court nor any party in interest in these cases knows, for example, when the committee members

acquired their claims, what they paid for their claims when they were acquired, and when they

organized and agreed to act in concert.  Did they purchase all of their claims against the Debtors

postpetition?  While it may not defeat a claimant's position, it may be relevant to know if the

claims were acquired at a deep discount.  As to the Motion at bar, the Hedge Fund Committee is

the sole objector, in stark contrast to the Official Committee and the vast array of other claimants

who do not oppose an extension of the Exclusive Periods.  The Hedge Fund Committee's failure

to provide the requisite disclosure under Bankruptcy Rule 2019 places the Court in a position

that it is unable to consider potentially relevant facts.  Cf. In re Adelphia Commc'ns Corp., 352

B.R. 578, 590 (Bankr. S.D.N.Y. 2006) (finding "[c]ertain practical considerations, or other

considerations in the interests of justice," should be  considered as relevant by the court deciding

whether to terminate a debtor's exclusivity).  Accordingly, the Court should exercise its

discretion under Bankruptcy Rule 2019(b) to disregard the Objection and further refuse to permit

the Hedge Fund Committee or its professionals to be heard further or intervene in these cases

until the Court finds that they have complied with the requirements of Bankruptcy Rule 2019(a).

**III.**
**Cause Exists To Grant The Debtors' Motion**

12.    It is hornbook law that size and complexity of chapter 11 cases establishes

cause for the extension of exclusivity periods under section 1121 of the Bankruptcy Code.  E.g.,

Adelphia, 352 B.R. at 587 (holding that "the size and complexity of the case favors preservation

of the Debtors' exclusivity"); In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y.

1987) (holding that "exclusivity should be extended because the case is "complex and requires

considerable further study before a plan of reorganization could be proposed and intelligently

communicated to creditors for their acceptance").  See Exhibit A attached hereto (collecting

large and complex cases and noting extensions of exclusivity).  The instant chapter 11 cases are

the largest in United States bankruptcy history and the Court has already commented that it

"involves a level of complexity, that probably goes beyond that of almost any other case [the

Court] can identify."  (Hr'g Tr., May 13, 2009, at 20:3-4.)  Moreover, as the Court has

previously noted, the first four months of these chapter 11 cases were devoted to dealing with

crisis and emergencies to protect the Debtors' assets.  Indeed, the lack of the necessity to respond

to emergency situations was recognized by the attorneys for The Walt Disney Company who

agreed to defer the motion for the appointment of the Examiner until the emergency phase of the

chapter 11 cases had abated.  Thus, it is really only six months that a level of stability has been

achieved in the administration of the chapter 11 cases.

13.    It is further irrefutable that this Court and others "typically rely on" a number

of other factors established by caselaw when determining a debtor' motion to extend

exclusivity.[3]  See Adelphia, 352 B.R. at 587.  See also In re Lexington Precision Corp., Case No.

---

[3] The nine factors that courts "typically rely on" are:

    (a) the size and complexity of the case;

08-11153 (MG) (Bankr. S.D.N.Y. July 31, 2008) (Order Granting Motion Pursuant to Section

1121(d) to Extend Debtors' Exclusivity) (recognizing that not all of the factors may be

applicable, but finding these factors "provide the necessary framework in considering the relief

requested") [Docket No. 289]; In re Lionel L.L.C., No. 04-17324, 2007 WL 2261539, at *6

(Bankr. S.D.N.Y. Aug. 3, 2007) (applying the nine factor in making its determination); McLean,

87 B.R. at 834-35 (same); In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich.

1997) (same).  And, as set forth fully in the Motion, an application of the facts in this case to

these factors militates an extension of the Debtors' Exclusive Periods.

        14.   Nonetheless, the Hedge Fund Committee suggests that the Court disregard

the long-standing factor analysis as "platitudes … in a vacuum."  (Id. ¶ 10.)  It proposed, in the

alternative, that (i) "exclusivity serves no valid purpose" in a liquidation (id.), (ii) Bankruptcy

Code section 1129(c) trumps Bankruptcy Code section 1121 (id. at ¶¶ 10, 15), and (iii) a

confirmable chapter 11 plan can be proposed now, without destabilizing the Debtors' cases (id.

§ I.A., I.B.).  The Hedge Fund Committee is in denial.  It persists in being oblivious to the

obvious.  Indeed, the argument is precisely the same argument made by one of the same

attorneys in the Adelphia case and soundly rejected.

### A.    The Determinative Factors in Consideration of Exclusivity Extensions Are Not Mere "Platitudes"

---

(b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
(c) the existence of good faith progress toward reorganization;
(d) the fact that the debtor is paying its bills as they become due;
(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;
(f) whether the debtor has made progress in negotiations with its creditors;
(g) the amount of time which has elapsed in the case;
(h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
(i) whether an unresolved contingency exists.

15.    Adelphia was another large liquidating chapter 11 case.  A group claiming to hold Adelphia bonds moved to terminate Adelphia's exclusivity periods.  352 B.R. at 582. Bankruptcy Judge Gerber stated: "I don't agree with the [bondholders'] suggestion that the factors set forth in the caselaw for exclusivity termination determination are 'platitudes.'"  Id. Judge Gerber stated that, while the bondholder group

> characterizes the enumerated factors as 'platitudes' (implying that these are less than worthy of being considered), [the Court] can't agree.  They're objective factors which courts historically have considered in making determinations of this character, as a means of ensuring that at least these factors are considered.

Id. at 587.  The Court in Adelphia made clear that these factors "can't be ignored."  Id.  The decision in Adephia should be given deference by this Court in the interest of judicial consistency and stare decisis in the Southern District of New York.

### B.    The Right to Exclusivity Exists Equally in Liquidating Chapter 11 Cases

16.    When Congress enacted the Bankruptcy Code, liquidation was contemplated as a proper application of chapter 11.  11 U.S.C. § 1129(a)(11) (contemplating "liquidation … proposed in the plan"); Florida Dep't of Rev. v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2331 n.2 (2008) (recognizing that "Chapter 11 expressly contemplates liquidation"); Ionosphere Clubs, Inc. v. Shugrue (In re Ionosphere Clubs, Inc.), 184 B.R. 648, 654 (S.D.N.Y. 1995) ("Reorganization encompasses rehabilitation and may include liquidation.") (collecting cases).

17.    The Hedge Fund Committee proclaims, without any authority, that "exclusivity serves no valid purpose."  The Hedge Fund Committee argues:

> Normally, exclusivity promotes reorganization by preventing a senior or secured creditor from proposing a liquidation plan that pays in full the senior creditor, but does not maximize the value for other creditors or preserve jobs.

(Resp. ¶ 10 (emphasis in original).)  It ignores the need to protect the interests of all claimants and not just bondholders and distressed debt speculators.

18.    In what appears to be a cut and paste of the foregoing argument, in <u>Adelphia</u>, counsel to the Hedge Fund Committee argued:

> On the issue of exclusivity, to wrap up, we're aware of the platitudes, size and complexity of the case, for instance.  The platitudes don't cover the purpose of exclusivity.
>
> Its first and foremost purpose is to promote reorganization and prevent a senior or secured creditor from proposing a liquidation plan that would pay it off in full while not maximizing proceeds for others.  That, of course, is moot here because the company has been sold.  We're talking about allocating sale proceeds.  So there really is little purpose to be served – I mean, the main purpose of exclusivity is now moot in this case, and there's going to be no reorganized debtor.

<u>Adelphia</u> Hr'g Tr. 125:14-126:1, Sept. 11, 2006 (M. Bienenstock).  These arguments were rejected in <u>Adelphia</u> and should be rejected here.  <u>See</u>  <u>Adephia</u>, 352 B.R. at 587, 590 (finding, <u>inter alia</u>, the case was of "unprecedented complexity and overwhelming size" and denied the motion to terminate exclusivity).  The Hedge Fund Committee cites no chapter 11 decision holding that a debtor seeking to distribute assets under a plan of liquidation may not invoke the statutory entitlements under section 1121(d) of the Bankruptcy Code, but there are many liquidating chapter 11 cases in which the liquidating debtor was granted extensions of the exclusivity periods to enable it to promulgate a liquidating chapter 11 plan.  The following examples are illustrative, not exhaustive:

- ▪    In <u>In re Ames Department Stores, Inc.</u>, Case No. 01-42217 (REG) (Bankr. S.D.N.Y.), the Court extended the Plan Period 3 years and 6 months and extended the Solicitation Period 8 years and 2 months;[4]

- ▪    In <u>In re Enron Corp.</u>, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y.), the Court extended the Plan Period 1 year and 6 months and extended the Solicitation Period over 2 years and 8 months;[5]

---

[4] <u>See</u> Exhibit B.

[5] <u>See</u> <u>id.</u>

-   In <u>In re Adelphia Communications</u>, Case No. 02-41729 (REG) (Bankr. S.D.N.Y.), the Court extended the Exclusive Periods 1 year and 10 months;[6] and

-   In <u>In re TL Administration Corporation</u>, Case No. 03-15564 (CB, RDD) (Bankr. S.D.N.Y.), the Court extended the Exclusive Periods 1 year and 6 months.[7]

-   In <u>In re Westpoint Stevens Inc.</u>, Case No. 03-13532 (Bankr. S.D.N.Y.), the Court extended the Plan Period 1 year and 6 months and extended the Solicitation Period 1 year and 9 months;[8]

-   In <u>In re Bethlehem Steel Corp.</u>, Case No. 01-15288 (BRL) (Bankr. S.D.N.Y.), the Court extended the Plan Period 21 months.[9]

**C.**   <u>**Section 1129(c) Does Not Trump Section 1121**</u>

19.   Section 1121 of the Bankruptcy Code identifies who may file a chapter 11 plan and when they may do so. <u>See</u> 11 U.S.C. § 1121 (listing "[w]ho may file a plan" and defining the debtor's exclusive periods). Section 1129 of the Bankruptcy Code addresses confirmation of a plan, assuming the plan is first filed properly. <u>Id.</u> § 1129(a)(1) (stating the bankruptcy court shall confirm a plan only if the plan complies with the applicable provisions of the Bankruptcy Code). Section 1129(c), in particular, provides that a bankruptcy court "may confirm only one plan." <u>Id.</u> § 1129(c). In the event (i) more than one plan is filed properly and (ii) each of the plans satisfies all of the requirements for confirmation, then section 1129(c) further provides that "the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm." <u>Id.</u>

20.   Sections 1121 and 1129 are not in conflict. Nonetheless, the Hedge Fund Committee asks the Court to imagine that they are – and to hold that section 1129(c) trumps

---

[6] <u>See</u> <u>id.</u>

[7] <u>See</u> <u>id.</u>

[8] <u>See</u> <u>id.</u>

[9] <u>See</u> <u>id.</u>

section 1121 and, therefore, that a debtor can never have exclusivity.  <u>Without a single cited</u> <u>authority</u>, the Hedge Fund Committee asserts that "giving the Debtors the exclusive right to propose a plan defies Congressional intent and Bankruptcy Code section 1129(c) providing that the Court should consider the creditors' preference for which plan they want."  (Resp. ¶ 2.) Taking the faulty logic to its conclusion, any period of "[e]xclusivity deprives creditors of any preference."  (<u>Id.</u>  <u>Cf.</u> <u>id.</u> at ¶ 5 (suggesting restriction imposed by Bankruptcy Code section 345 on a debtor's ability to invest is cause to terminate exclusivity).)  Again, <u>without any foundation</u>, the Hedge Fund Committee claims that, "[i]n a liquidation such as this, Congress made clear that it recognizes that creditors should determine their destinies," a statement made of whole cloth. (<u>Id.</u> at ¶ 2 (suggesting, mistakenly, that a creditor's ability to elect a chapter 7 trustee pursuant to Bankruptcy Code 702(a) has applicability to the present chapter 11 cases).  The citation to <u>Grayson-Robinson Stores, Inc. v. Secs. Exch. Comm'n,</u> 320 F.2d 940 (2d Cir. 1963), similarly is inapposite.  The <u>Grayson-Robinson</u> case concerned statutory consideration as to whether the former Bankruptcy Act mandated the use of chapter X of that Act for corporations that issued public debt.  The Second Circuit ruled that in the negative and decided that the guiding principle of law was the needs of the debtors.  It did not decide that the preferences of creditors controlled.)

21.    In the only case in which an argument analogous to the one espoused by the Hedge Fund Committee was raised, the bankruptcy court, in a case of first impression, construing the new statutory language applicable to small business reorganizations, determined that, while a creditor may file and solicit approval for a competing plan under Bankruptcy Code section 1121(e) after expiration of the 100 day exclusive period, there is no unqualified, unlimited right to do so on the same accelerated track extended to a debtor's plan.  <u>See</u> <u>In re</u>

Aspen Limousine Servs., Inc., d/b/a Vans to Vail, Inc., 193 B.R. 325, 332 (D. Colo. 1996).  The

bankruptcy court gave the debtor "a 'first opportunity'" to get its plan confirmed and denied, on

an interim basis, a creditor's motion for immediate conditional approval of its disclosure

statement.  See id. at 333.  On appeal, the creditor argued that the "bankruptcy court's conduct

'stripped [creditors] of their statutory right under Section 1129(c) to chose [sic] between

competing plans.'"  Id.  (internal citations omitted).  The United States District Court for the

District of Colorado affirmed the bankruptcy court decision and found "[t]his argument is

specious."  Id.  The district court found "[t]he creditors' right to choose under § 1129(c) is

triggered only when the requirements of § 1129(a) and (b) 'are met with respect to more than one

plan.' [The creditor's] plan never got to that stage."  Id.  The Aspen decision is consistent with

other authority addressing Bankruptcy Code section 1129(c), which decided that the "preferences

of creditors is reflected in the voting results."  E.g., In re Greate Bay Hotel & Casino, Inc., 251

B.R. 213, 245 (Bankr. D.N.J. 2000).  The Hedge Fund Committee's red herring Objection should

be overruled.

> **D.    The Hedge Fund Committee's Demand for Control
> of the Debtors Imperils the Interests of Other Claimants**

22.    The Hedge Fund Committee confuses that "the Bankruptcy Code invites

parties in interest to propose competing plans" only approximately five months after achieving a

level of stabilization ten months into a debtor's chapter 11 case from the fact that the Bankruptcy

Code allows "exclusivity [for] a statutory maximum of eighteen months."  (Resp. at ¶ 15.)

Again, the contention represents nothing more than the Hedge Fund Committee's ipse dixit.  The

Hedge Fund Committee has made the instant motion a fight for control of the Debtors' chapter

11 cases.  It is manifest that the Hedge Funds want to take control of the Debtors' boards of

directors and access all of the information that will enhance their positions and direct the

administration of the chapter 11 cases to satisfy their objectives.

23.    The chapter 11 cases are still overcoming the devastating consequences of

the tsunami that overwhelmed Lehman.  At this juncture, it is unknown what will be nature,

scope and substance of the chapter 11 plans for the Debtors and all the legal issues that will have

to be resolved, including, without limitation, substantive consolidation.  But the Debtors are not

as presumptuous as the Hedge Fund Committee is to conclude that they can define the contours

of 19 separate chapter 11 plans only 10 months (and in some cases less) into history's largest

chapter 11 cases.  The Debtors will continue to work in complete cooperation with the Official

Committee, to analyze the economics and maximize the potential benefit to stakeholders in the

various Debtors.  In the meantime, the Debtors continue to benefit from the protections and

benefits afforded by the Bankruptcy Code, including pursuing sales of assets that could not be

sold outside of the chapter 11 context,[10] and consideration of the value of assuming or rejecting

executory contracts and unexpired leases.[11]  Some Debtors may propose liquidating plans.

Others may be able to realize greater value through a form of reorganization or other means,

---

[10]  E.g., Order Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other
Interests, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, September 20, 2008
[Docket No. 258]; Order Authorizing Lehman Brothers Holdings, Inc. to (A) Enter into a Partnership Interest
Purchase Agreement, (B) Compromise and Release a Portion of an Intercompany Loan, and (c) Assign the
Remainder of Such Intercompany Loan to Purchasers, October 17, 2009 [Docket No. 1126]; Order Authorizing and
Approving Debtors' Sale of Purchased Assets and the Assumption and Assignment of Executory Contracts and
Unexpired Leases in Connection with the Sale of Lehman Brothers Investment Management Division, December
22, 2008 [Docket No. 2350]; Amended Order Pursuant to Section 105 and 363 of the Bankruptcy Code, Federal
Rules of Bankruptcy Procedure 2002, 6004, 9014 and Rules 2004-1, 9006-1 and 9014-1 of the Local Bankruptcy
Rules Approving the Sale of Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase Agreement, December 23,
2008 [Docket 2362]; Order Approving the Sale of Debtors' Aircraft Pursuant to an Aircraft Sale and Purchase
Agreement and Payment of Related Fees, March 25, 2009 [Docket No. 3219]; Motion of LB 2080 Kalakaua Owners
LLC Pursuant to Bankruptcy Code Sections 363 and 365 and Bankruptcy Rules 6004 and 6006 for Approval (i) to
Sell Certain Real and Personal Property Located in Honolulu, Hawaii, (ii) to Reject or Assume and Assign
Executory Contracts and Unexpired Leases in Connection Therewith, and (iii) Related relief, June 29, 2009 [Docket
No. 4212].

[11]  E.g., Order Pursuant to Section 365(d)(4) of the Bankruptcy Code Extending the Time to Assume or Reject
Unexpired Leases of Nonresidential Real Property, January 15, 2009 [Docket No. 2548].

such as dismissal, without the expense of a chapter 11 plan process.[12]  At this early stage of these

cases, it is uncertain and too early to determine which results would be the best and most feasible

course to pursue.

      24.    The Hedge Fund Committee concedes that the Debtors' businesses

"comprise one of the largest businesses in the world" (Resp. ¶ 5) and that "[t]hese cases are

definitely large and indisputably complex," but fails to explain why the formulation of

liquidating chapter 11 plans is not.  (Id. at ¶ 26)  Notably, the Hedge Fund Committee overlooks

the fact that some of the most complex chapter 11 plans confirmed by this Court have been plans

of liquidation.  E.g., In re Enron, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. July 15, 2004)

(order confirming liquidating chapter 11 plans) [Docket No. 19759]; In re Adelphia Commc'ns

Corp., 368 B.R. 140 (Bankr. S.D.N.Y. 2007) (memorandum decision confirming liquidating

chapter 11 plans (274 pages)).  The Hedge Fund Committee's assertion that, at present, a party is

able to propose, confirm and consummate a single, simple plan to liquidate all of the Debtors'

assets in a "cash-based waterfall plan" and establish a mechanism to satisfy all claims is a blatant

and nonsensical refusal to acknowledge the reality of the complexities and issues that need to be

resolved in these chapter 11 cases.  (Resp. ¶ 27.)

      25.    The Hedge Fund Committee's altruistic "bottom line" that exclusivity is

preventing the Debtors from implementing "best business practices and best corporate

governance" is pure nonsense.  (Id. at ¶ 40.)  Terminating or allowing exclusivity to expire for

the purposes of expediting or facilitating the chapter 11 process must be supported by evidence,

---

[12] See Motion of Debtors Seeking Entry of an Order Pursuant to Section 1112(b) of the Bankruptcy Code
Dismissing Chapter 11 Case of PAMI Statler Arms LLC, Case No. 08-13664 [Docket No. 3650].  Cf., Order
Dismissing the Bankruptcy Case of Fundo de Investimento Multimercado Credito Privado Navigator No Exterior,
Case No. 08-13903 [Docket No. 2913]; Order Dismissing Chapter 11 Case of Lehman Brothers Finance AG a/k/a
Lehman Brothers SA, Case No. 08-13887 [Docket No. 3076].

not "expressions of counsel of matters of experience." <u>Official Unsecured Creditors' Comm. v.</u>

<u>Eagle Picher Indus., Inc.</u> (<u>In re Eagle Picher Indus., Inc.</u>), 176 B.R. 143, 147 (Bankr. S.D. Ohio

1994) (recognizing this consideration is a "judgment call" and sharing the view of other courts

that termination of exclusivity would undermine the prospects for a prompt resolution of the

chapter 11 cases).

E.    **These Cases Have Been Marked By**
      **the Debtors' Goals of Transparency and Cooperation**

26.    Adequacy of the Debtors' disclosure has been recurring theme in these cases.

From the beginning, Court has recognized the Debtors' goal for transparency, acknowledging

> [t]he fact that there are more Web sites than I can count on the fingers of one hand
> confirms to me that reasonable efforts are underway to provide the public, which
> has a need to know, as much information as can be provided in a timely way.

(Hr'g Tr., Nov. 20, 2008 at 42:25, 43:1-3.)  And until now, all concerns regarding this issue have

been resolved.  For example, after the Debtors' January 14, 2009, "State of the Estate" address to

the Court, the attorney for another informal group of creditors, which had objected to the

Debtors' second request for an extension of time to file their Schedules and SOFAS (<u>see</u>

Objections of Harbinger and Informal Noteholder Group [Docket Nos. 2472, 2515]), said

> the filings today, which are made public by Mr. Marsal and the report by Alvarez
> go a long way.  In fact, borrowing the term of this global case, perhaps it's a
> universal case.  As I recall that first step on the moon, "it was one giant leap
> forward," and I think the filing today is one giant leap forward in terms of
> information available for transparency in this case.

(Hr'g Tr., Jan. 14, 2009 at 93:19-25.)  The only subsequent challenges to the adequacy of the

Debtors' disclosures were filed by one member of the Hedge Fund Committee.  (<u>See</u> Elliott

Objections [Docket Nos. 2759, 2991].)  The objections focused on creditor oversight and public

disclosure regarding the Debtors' proposal to enter into certain hedging transactions and were

withdrawn (<u>see</u> Notice of Withdrawal of Elliott Objections [Docket No. 3034]), after the

Debtors, in response to the objections and in cooperation with the Official Committee, amended their proposed order to include a role for the Official Committee and certain public disclosure milestones.  (See Order Authorizing Debtors to Grant First Priority Liens in Cash Collateral in Connection with Certain Hedging Transactions [Docket No. 3047]).  The Debtors have complied with their duties and have disclosed to the public the number and aggregate value of their various hedging transactions (See Notice of Hedging Transactions Debtors Have Entered [Docket No. 3722].)  The Debtors and their professionals continue to communicate regularly and work closely with the United States Trustee, who, notably, did not oppose the Motion.[13]

27.   This is important - the information the Hedge Fund Committee seeks does not pertain to the administration of the Debtors' cases.  Rather, it admits that it seeks information to assist the Hedge Fund Committee to value and trade claims against and related to the Debtors. The Debtors, of course, take no issue with the proper trading of claims consistent with applicable law.  The Debtors' sole focus is the administration of the chapter 11 cases and the maximization of values.  As such, it would be inconsistent to expend the estates' limited resources analyzing, preparing, disseminating and clarifying information for the sole benefit of the claims-trading market.

## IV.
## Bankruptcy Code Protections Serve the Interests of All Stakeholders

### A.     The Hedge Fund Committee's Assertions of Breaches
### of Fiduciary Duty By Alvarez & Marsal Are Spurious

28.   Notwithstanding the facts, and with nothing more than a passing reference to the governing jurisprudence, the Hedge Fund Committee accuses the Debtors' Court-approved financial advisors, and Mr. Marsal as Chief Executive Officer, in particular, of being motivated

---

[13] The Debtors have filed four (4) Monthly Operating Reports (see Docket Nos. 3358, 3622, 3916, 4288) and 19 amended Schedules (see Docket Nos. 3918, 3920-21, 3924-27, 3930, 3932-34, 3936-39, 3941, 3943, 3945-46).

by personal "economic incentives" to "delay" the administration of these chapter 11 cases and

the filing of chapter 11 plans.  (Resp. ¶ 31; accord id. ¶¶ 31-34.)  The accusations have no basis

whatsoever.  The Hedge Fund Committee accusation, once again, is pure hyperbole.  In these

large chapter 11 cases, which are followed by constant media attention and heightened judicial

scrutiny and supervision by the Office of the United States Trustee, the Hedge Fund

Committee's arguments are manifestly spurious.

        29.    The Hedge Fund Committee appears to have conjured this specious

argument from the existence of a Court-approved incentive fee arrangement for A&M  that is

capped as a percentage of hourly fees.  The Court has recognized the efforts of Mr. Marsal and

the A&M team "in the midst of a truly heroic effort to marshal the data, work across boarders

with other parties who are working in parallel proceedings and working with Barclays in an

effort to develop the transparency that … is his goal."  (Hr'g Tr., Oct. 16, 2008 at 92:8-12.)

Essentially no creditor has been denied an audience with Mr. Marsal or his professionals.  The

Court found that A&M had

> the requisite experience and expertise to supplement the debtors' diminished
> resources at a time when there was a tremendous need for expertise to deal with
> the derivatives needing to be unwound.  … And I think it's worth noting that this
> has been presented and vetted to the point that the creditors' committee filed more
> or less simultaneously with the application [a] statement of support and at this
> hearing, which is well-populated, has produced not a single comment in
> opposition….  And I consider that to be an achievement worth, at least, noting.

(Hr'g Tr., Nov. 20, 2008 at 33:3-15.)  The Court observed that the Debtors are "seeking to

maximize value and by the activities of the creditors' committee working in cooperation with the

debtor and working for their constituency, also seeking to maximize value."  (Hr'g Tr., Oct. 16,

2008 at 101:11-14.)  The efforts of Mr. Marsal and his professionals have resulted in an

administration of these cases that is not beset by extensive litigation or controversy.  The

Debtors' approach to case management has fostered compromise and settlement and have

enabled the Debtors to move forward without greater expense.

> ### B.     The Debtors and Their Directors Have Discharged Their Fiduciary Duties

>> 30.   It has been said that

> [o]ne of the most unexceptionable statements made about management of a debtor
> in possession is that it is a fiduciary.[14]  The United States Supreme Court ruled in
> Commodity Futures Trading Commission v. Weintraub, [471 U.S. 343 (1985)]
> that "the willingness of courts to leave debtors in possession 'is premised upon an
> assurance that the officers and managing employees can be depended upon to
> carry out the fiduciary responsibilities of a trustee.'"

Martin J. Bienenstock, Conflicts Between Management and the Debtor In Possession's Fiduciary

Duties, 61 U. Cin. L. Rev. 543, 543 (1992) (some internal citations omitted) (footnote in

original).

> It is well settled outside bankruptcy law that management and boards of directors
> have fiduciary duties to inform themselves, prior to making a business decision,
> of all material information reasonably available to them and to act with requisite
> care to maximize value for shareholders (or creditors if the corporation is
> insolvent).  There is no reason why such principles would be ineffective in a
> chapter 11 case.  They are contrary neither to any provision of chapter 11, nor to
> any federal policy to be served by it, and therefore should not be preempted.

---

[14] The most fundamental component of a fiduciary is its obligation to act in the best interests of someone or
something other than the fiduciary. Black's Law Dictionary defines "fiduciary" as follows:

> The term is derived from the Roman law, and means (as a noun) a person holding the character of
> a trustee, or a character analogous to that of a trustee, in respect to the trust and confidence
> involved in it and the scrupulous good faith and candor which it requires. A person having duty,
> created by his undertaking, to act primarily for another's benefit in matters connected with such
> undertaking. As an adjective it means of the nature of a trust; having the characteristics of a trust;
> analogous to a trust; relating to or founded upon a trust or confidence.

Black's Law Dictionary 563 (6th ed. 1990)(Emphasis added). In the context of chapter 11, the formulation of the
debtor in possession's fiduciary duties is complex because the debtor in possession must act on behalf of numerous
other parties having conflicting interests, such as creditors holding secured claims, senior unsecured claims, and
junior unsecured claims, in addition to, shareholders, customers, and the public interest, in some situations. To
determine a debtor in possession's fiduciary duties is at least as complex as simultaneously solving multiple
equations for as many variables as there are different categories of parties in interest. (Emphasis added.)

Id. at 562 (emphasis added). No statutory federal law formulates the fiduciary duties of an

insolvent company's management and directors. State laws and jurisprudence governing the

conduct of officers and directors remain effective, except to the extent preempted by federal law.

Id. at 551 ("It would be preposterous to argue . . . that an officer or director of a debtor in

possession is free to murder an officer of a debtor in possession, to usurp a business opportunity

of the debtor in possession, or to commit some other breach of fiduciary duty, simply because

there is no federal rule to the contrary.)

      31.    LBHI and fourteen of the other Debtors are incorporated under the laws of

the State of Delaware. Under Delaware law, "[i]t is well settled that directors owe fiduciary

duties to the corporation." N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930

A.2d 92, 101 (Del. 2007). Even where the corporation is insolvent, directors owe no direct

fiduciary duties to the company's creditors. Id. at 103. The Supreme Court of Delaware clearly

stated that direct duties to creditors would "create uncertainty for directors who have a fiduciary

duty to exercise their business judgment in the best interest of the insolvent corporation . . . and

would create a conflict between those directors' duty to maximize the value of the insolvent

corporation for the benefit of all those having an interest in it." Id. Directors of insolvent

corporations must retain the freedom to "engage in vigorous, good faith negotiations with

individual creditors for the benefit of the corporation." Id.

      32.    Gheewalla does not support the Hedge Fund Committee's theory that

"creditors must be granted rights to protect the enterprise" in this case. (Id. ¶ 29.) One need not

be an expert in corporate governance to know that Gheewalla clarifies that the Debtors' directors

owe no direct fiduciary duties to the companies' creditors. 930 A.2d at 103. Insolvency merely

provides a creditor – outside the chapter 11 context – derivative standing to bring an action on

behalf of the company.  Id.  Within the chapter 11 context, however, causes of action are property of a debtor's estate and cannot be commenced by a third party without the debtor's consent or approval of a bankruptcy court.  E.g., In re Commodore Inter'l Ltd., 262 F.3d 96, 99-100 (2d Cir. 2001); In re STN Enter., 779 F.2d 901, 904-05 (2d Cir. 1985); cf. In re Smart World Tech., LLC, 423 F.3d 166, 182-83 (2d Cir. 2005).  Any assertion that there is "Congressional intent [for] creditors [to] control insolvent, liquidating debtors" is utterly without support.  (Resp. ¶ 39.)  The Hedge Fund Committee is not entitled to "implement governance and motivations." (Id.)  Neither Gheewalla, nor any case cited by the Dissident Committee, nor the Bankruptcy Code, authorizes a "creditor in possession" in a chapter 11 case.

33.    The Hedge Fund Committee asserts that neither the Debtors nor their directors or advisors are motivated to emerge from bankruptcy promptly or to maximize creditor recovery.  (Resp. § II.A.)  Such bald assertions completely ignore law and fact.  The Hedge Fund Committee disregards the significance of the fact that there are 19 Debtors in these jointly-administered cases.  (Resp. ¶ 28.)  While the shares of LBHI are publicly held, LBHI itself is the direct shareholder of six (6) of the Debtors and the indirect shareholder of the remaining thirteen (13) Debtors.  At this point in the administration of these cases, prior to the Bar Date and valuation and analysis of their assets and liabilities, the Debtors have not concluded, as the Hedge Fund Committee apparently has, that there is "no hope of achieving any recovery" from the equity of their subsidiaries.

34.    Following the Commencement Date, LBHI changed and replaced, and caused to be changed and replaced, the directors and officers of each of the Debtors, as well as many of their numerous non-debtor affiliates.  As controlling shareholders, the Debtors have access to disclosure regarding, closely monitor, and indeed direct the performance of their

subsidiaries.  As the ultimate parent company, LBHI will directly benefit from maximizing the

value of its subsidiary affiliates.  The Debtors' directors and officers are aware of their duties to

the corporation to exercise their business judgment in the Debtors' best interests.  <u>Gheewalla</u>,

930 A.2d at 100, 103.

35.   It is of no consequence, even if it were true, that "[t]hese directors have no

future with any reorganized Lehman entity" (Resp. ¶ 30), because "Delaware corporate law

provides for a separation of control and ownership." <u>Gheewalla</u>, 930 A.2d at 101 ("The directors

of Delaware corporations have 'the legal responsibility to manage the business of a corporation

for the benefit of'" the beneficiaries of the corporation's growth and increased value.).  LBHI's

board of directors has met monthly since the Commencement Date.  Boards of LBHI's Debtor

and non-Debtor affiliates have also met postpetition.  The boards have considered and voted on

material transactions and decisions made by the respective companies.  The Debtors and their

affiliates continue to comply with corporate formalities.  The Debtors' various boards,

shareholders and management have properly exercised their fiduciary duties throughout these

chapter 11 cases.  The Hedge Fund Committee has offered no evidence to the contrary.

### III.  <u>Conclusion</u>

36.   The Debtors in these large and complex chapter 11 cases are seeking an

extension of the Exclusive Periods predicated upon incontrovertible facts and well-established

legal authority.  Indeed, it would be unprecedented, particularly in this District, and completely

antithetical to the intent and purposes of section 1121 of the Bankruptcy Code to terminate

exclusivity at this junction.  The requested extension requested is more than warranted as these

cases, because of the complexities that are self-evident as to the assets, liabilities, claims and

legal issues that must be determined and to provide the opportunity to commence substantive

plan negotiations as to any of the Debtors.  There has not been a realistic opportunity to do so

with less than six months since the emergency phase of the chapter 11 administration subsided.

The understanding reached among the Debtors and the Official Committee, as set forth in the

Statement of the Official Committee, establishes the right balance to achieve and maintain the

goals of transparency, due process, and efficiency in the administration of these cases.

       37.   Unsubstantiated assertions are not substitutes for undisputed facts and sound

reasoning.  Unfounded allegations cannot mask the misguided strategy of the Hedge Fund

Committee to negate the provisions of chapter 11 in an attempt to gain control of the Debtors,

access their data and to achieve the Hedge Fund Committee's parochial objectives to the

detriment of all other economic stakeholders.  The Objection should be overruled.

       Wherefore the Debtors request that the Objection be disregarded under

Bankruptcy Rule 2019 or, in the alternative, overruled and the Debtors' Motion be granted,

together with such other and further relief to the Debtors as is just.

Dated:  July 14, 2009
      New York, New York

                /s/ Harvey R. Miller
                Harvey R. Miller
                Lori R. Fife
                Shai Y. Waisman

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Attorneys for Debtors
                and Debtors in Possession

## <u>EXHIBIT A</u>

### <u>Large and Complex Cases In Which Extensions of Exclusivity Were Granted</u>

| Case and Date Filed | Total Time Granted |
|---|---|
| In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y. 2001) (AJG) | Filing period extended 1 year and 6 months. Solicitation period extended over 2 years and 8 months. |
| In re Adelphia Communications, Case No. 02-41729 (Bankr. S.D.N.Y. 2002) (REG) | Filing and solicitation period extended 1 year and 10 months. |
| In re Bethlehem Steel, Case No. 01-15288 (Bankr. S.D.N.Y. 2001) (BRL) | Filing period extended approximately 1 year and 9 months. |
| In re Loral Space & Communications, Case No. 03-41710 (Bankr. S.D.N.Y. 2003) (RDD) | Filing period extended approximately 9 months. Solicitation period extended 1 year and 2 months. |
| In re Calpine, Case No. 05-60200 (Bankr. S.D.N.Y. 2005) (BRL) | Filing period extended approximately 1 years and six months. |
| In re Global Crossing Ltd., Case No. 02-40188 (Bankr. S.D.N.Y. 2002) (REG) | Exclusive period extended approximately 2 years. |
| In re WorldCom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. 2002) (AJG) | Exclusive period extended approximately 1 year and 2 months. |

## EXHIBIT B

## Liquidating Cases in Which Extensions of Exclusivity Were Granted

| Case and Date Filed | Orders granting extension | Total time granted |
|---|---|---|
| *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. Dec. 2, 2001) (AJG) | • Order entered April 24, 2002 [Doc. No. 3302] (granting all debtors except Enron North America Corp. ("*ENA*") initial extension of filing period to Oct. 1, 2002, and solicitation period to Nov. 29, 2002; and to ENA initial extension of filing period to Aug. 31, 2002, and solicitation period to Oct. 30, 2002)<br><br>• Order entered Sept. 26, 2002 [Doc. No. 6728] (granting to ENA additional extension of filing period to Nov. 30, 2002, and solicitation period to Jan 29, 2003)<br><br>• Order entered Oct. 31, 2002 [Doc. No. 7562] (granting all debtors except ENA additional extension of filing period to Jan 31, 2003, and solicitation period to March 31, 2003)<br><br>• Order entered Dec. 12, 2002 [Doc. No. 8361] (granting ENA additional extension of filing period to Jan 31, 2003, and solicitation period to March 31, 2003)<br><br>• Order entered Feb. 20, 2003 [Doc. No. 9319] (granting all debtors except ENA additional extension of filing period to April 30, 2003, and solicitation period to June 30, 2003)<br><br>• Order entered May 13, 2003 [Doc. No. 10671] (granting all debtors except ENA additional extension of filing period to June 30, 2003, and solicitation period to Nov. 29, 2003)<br><br>• Order entered June 30, 2003 [Doc. No. 11509] (granting all debtors additional extension of filing period to July 11, 2003)<br><br>• Order entered Jan. 8, 2004 [Doc. No. 15264] (granting all debtors additional extension of solicitation period to April 30, 2004)<br><br>• Order entered May 6, 2004 [Doc. No. 18245] (granting all debtors additional extensions of solicitation period to July 31, 2004)<br><br>• Order entered August 26, 2004 [Doc. No. 20557] (granting all debtors additional extension of solicitation period through thirtieth (30th) day following conclusion of all appeals from confirmation order dated July 15, 2004. | Filing period extended 1 year and 6 months.<br><br>Solicitation period extended over 2 years and 8 months. |
| *In re Adelphia Communications*, Case No. 02-41729 (Bankr. S.D.N.Y. June 25, 2002) (REG) | • Order entered Oct. 25, 2002 [Doc. No. 949] (granting initial extension of filing period to Feb. 21, 2003, and solicitation period to April 21, 2003)<br><br>• Order entered March 20, 2003 [Doc. No. 1532] (granting additional extension of filing period to June 30, 2003, and solicitation period to Aug. 21, 2003) | Filing and solicitation period extended 1 year and 10 months. |

|  |  |  |
|---|---|---|
|  | • Order entered June 26, 2003 [Doc. No. 1832] (granting additional extension of filing period to Oct. 20, 2003, and solicitation period Dec. 22, 2003)<br><br>• Order entered Nov. 11, 2003 [Doc. No. 2954] (granting additional extension of filing period to Feb. 17, 2004, and solicitation period to April 20, 2004)<br><br>• Order entered Dec. 15, 2006 [Doc. No. 12805] (denying motion to terminate exclusivity) |  |
| *In re Ames Department Stores, Inc.*, Case No. 01-42217 (Bankr. S.D.N.Y. Aug. 20, 2001) (REG) | • Order entered Dec. 18, 2001 [Doc. No. 600] (granting initial extension of filing period to May 31, 2002, and solicitation period to July 30, 2002)<br><br>• Order entered May 23, 2002 [Doc. No. 945] (granting additional extension of filing period to Feb. 28, 2003, and solicitation period to April 29, 2003)<br><br>• Order entered Feb. 25, 2003 [Doc. No. 1885] (granting additional extension of filing period to Aug. 29, 2003, and solicitation period to Oct. 28, 2003)<br><br>• Order entered Aug. 19, 2003 [Doc. No. 2285] (granting additional extension of filing period to Feb. 27, 2004, and solicitation period to April 27, 2004)<br><br>• Order entered Feb. 25, 2004 [Doc. No. 2552] (granting additional extension of filing period to Aug. 27, 2004, and solicitation period to Oct. 26, 2004)<br><br>• Order entered Sept. 30, 2004 [Doc. No. 2669] (granting additional extension of filing period to Feb. 28, 2005, and solicitation period to April 29, 2005)<br><br>• Order entered Oct. 18, 2007 [Doc. No. 3240] (granting additional extension of solicitation period to April 25, 2008)<br><br>• Order entered April 23, 2008 [Doc. No. 3282] (granting additional extension of solicitation period to Oct. 23, 2008)<br><br>• Order entered Oct. 14, 2008 [Doc. No. 3361] (granting additional extension of solicitation period to April 23, 2009)<br><br>• Order entered April 15, 2009 [Doc. No. 3408] (granting additional extension of solicitation period to Oct. 29, 2009) | Filing period extended 3 years and 6 months.<br><br>Solicitation period extended 8 years and 2 months. |
| *In re TL Administration Corporation*, Case No. 03-15564 (Bankr. S.D.N.Y. August 4, 2003) (CB) | • Order entered Jan. 7, 2004 [Doc. No. 370] (granting initial extension of filing period to Apr. 2, 2004, and solicitation period to May 31, 2004)<br><br>• Order entered Mar. 26, 2004 [Doc. No. 432] (granting additional extension of filing period to Jun. 1, 2004, and solicitation period to Jul. 30, 2004) | Filing and solicitation periods extended 1 year and 6 months. |

| | | |
|---|---|---|
| | • Order entered May 19, 2004 [Doc. No. 478] (granting additional extension of filing period to Dec. 1, 2004, and solicitation period January 31, 2005)<br><br>• Order entered Nov. 17, 2004 [Doc. No. 600] (granting additional extension of filing period to Mar. 31, 2005, and solicitation period to May 2, 2005)<br><br>• Order entered Mar. 23, 2005 [Doc. No. 701] (granting additional extension of filing period to Jun. 30, 2005, and solicitation period to Aug. 29, 2005) | |
| *In re Westpoint Stevens Inc.*, Case No. 03-13532 (Bankr. S.D.N.Y. June 1, 2003) (RDD) | • Bridge Order entered Sept. 23, 2003 [Doc. No. 294] (granting initial extension of filing and solicitation period to date of entry of final order)<br><br>• Order entered Oct. 23, 2003 [Doc. No. 344] (granting extension of filing period to Jan. 31, 2004, and solicitation period to Mar. 31, 2004)<br><br>• Bridge Order entered Mar. 26, 2004 [Doc. No. 495] (granting extension of filing and solicitation period to date of entry of final order)<br><br>• Order entered Apr. 22, 2004 [Doc. No. 530] (granting extension of filing period to Jul. 29, 2004, and solicitation period to Sept. 27, 2004)<br><br>• Bridge Order entered Jul. 26, 2004 [Doc. No. 612] (granting extension of filing and solicitation periods to date of entry of final order)<br><br>• Order entered Jul. 30, 2004 [Doc. No. 635] (granting extension of filing period to Oct. 1, 2004, and solicitation period to Nov. 30, 2004)<br><br>• Order entered Sept. 28, 2004 [Doc. No. 679] (granting extension of filing period to Dec. 1, 2004, and solicitation period to Jan. 30, 2005)<br><br>• Bridge Order entered Nov. 29, 2004 [Doc. No. 760] (granting extension of filing and solicitation period to date of entry of final order)<br><br>• Order entered Dec. 3, 2004 [Doc. No. 770] (granting extension of filing period to Jan. 20, 2005, and solicitation period to Mar. 21, 2005)<br><br>• Bridge Order entered Mar. 16, 2005 [Doc. No. 843] (granting extension of filing and solicitation period to date of entry of final order)<br><br>• Order entered Apr. 7, 2005 [Doc. No. 896] (granting extension of solicitation period to Aug. 31, 2005) | Filing period extended 1 year and 6 months.<br><br>Solicitation period extended 1 year and 9 months. |

| | | |
|---|---|---|
| | • Order entered Aug. 29, 2005 [Doc. No. 1210] (granting extension of solicitation period until the Court has entered an order determining the debtors' request for dismissal.) | |
| *In re Bethlehem Steel*, Case No. 01-15288 (Bankr. S.D.N.Y. 2001) (BRL) | • Order entered Jan. 30, 2003 [Doc. No. 948] (granting extension of filing period) | Filing period extended 1 year and 10 months. |