1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS INC.,


              Debtor.

- - - - - - - - - - - - - - - - - - - -x

           U.S. Bankruptcy Court

           One Bowling Green

           New York, New York


           July 14, 2009

           2:05 p.m.


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE


MOTION of Debtors to Compel Performance of Metavante

Corporation's Obligations Under an Executory Contract and to

Enforce the Automatic Stay

2

```
 1    A P P E A R A N C E S :

 2    WEIL GOTSHAL & MANGES, LLP

 3         Attorneys for Debtors

 4         767 Fifth Avenue

 5         New York, New York 10153

 6

 7    BY:   RICHARD W. SLACK, ESQ.

 8          ROBERT LEMONS, ESQ.

 9

10

11    WHYTE HIRSCHBOECK DUDEK, S.C.

12         Attorneys for Metavante Corporation

13         555 East Wells Street

14         Milwaukee, Wisconsin 53202

15

16    BY:   BRUCE G. ARNOLD, ESQ.

17          DARYL L. DIESING, ESQ.

18

19

20    WHITE & CASE, LLP

21         Attorneys for Ad Hoc Group of Creditors

22         1155 Avenue of the Americas

23         New York, New York 10036

24

25    BY:   J. CHRISTOPHER SHORE, ESQ.
```

3

1    A P P E A R A N C E S : (continued)

2    MILBANK TWEED HADLEY & MCCLOY, LLP

3         Attorneys for Official Committee of Unsecured Creditors

4         One Chase Manhattan Plaza

5         New York, New York 10005

6

7    BY:   WILBUR FOSTER, ESQ.

8         DENNIS C. O'DONNELL, ESQ.

9

10

11   HUGHES HUBBARD & REED, LLP

12        Attorneys for SIPA Trustee

13        One Battery Park Plaza

14        New York, New York 10004

15

16   BY:   JAMES W. GIDDENS, ESQ.

17        JEFFREY S. MARGOLIN, ESQ.

18

19

20

21

22

23

24

25

4

P R O C E E D I N G S

1          THE COURT:  Be seated.

2          MR. SLACK:  Good afternoon, Your Honor.  Richard Slack

3     from Weil Gotshal & Manges, LLP for the debtors.  And I'm here

4     with my partner Rob Lemons.

5          The debtors are bringing this motion to compel

6     performance by Metavante based on an interest rate swap that

7     Metavante entered into with LBSF.  And the idea here is we'd

8     like Metavante to perform on that contract while LBSF

9     determines whether to assume or reject the agreement.

10          The relevant background facts are really not in

11     dispute.  I know that Metavante's counsel and Metavante has

12     filed a paper that says that they'd like discovery.  I'll get

13     to that.  But the issues that they want discovery on really are

14     not relevant.  And the relevant facts here are truly not in

15     dispute.

16          THE COURT:  May I stop you for one second?

17          MR. SLACK:  Yes.

18          THE COURT:  Just at it relates to discovery.  And this

19     is a contested matter and parties are entitled to discovery.

20     At leastd ordinarily they're entitled to discovery.  Has any

21     discovery been taken here informally or formally?

22          MR. SLACK:  There hasn't been any discovery

23     propounded, and there hasn't been any discovery taken.

24          THE COURT:  By eithe rparty?

5

1        MR. SLACK:  By either party.

2        THE COURT:  Okay.

3        MR. SLACK:  Your Honor, Metavante and LBSF entered

4  into an interest rate swap in 2007.  LBHI acts as the credit

5  support provider under that agreement.  Generally under the

6  agreement LBSF agreed to make quarterly payments based on a

7  floating interest rate on a notional amount of 600 million

8  dollars.  That 600 million doesn't actually get sent to either

9  party, it's just a notional amount.  And Metavante agreed to

10  make quarterly interest payments based on a fixed interest

11  rate.  And so what that means, Your Honor, is that if the

12  interest rates were low then LBSF would get the better of this

13  because they'd be paying less quarterly.

14      Now, the way this works is that even though both

15  parties have obligations to pay quarterly the agreement only

16  requires the person who actually has more to pay to pay.  So

17  the net obligor has to make a payment, and that's the way it

18  works quarterly.  Even though both parties actually have the

19  obligation to make these payments.

20      Three's also no dispute, Your Honor, that from May 1,

21  2008 until August 1, 2008 the parties performed.  Both parties

22  performed under the agreement.

23      Now, after LBSF and LBHI filed for bankruptcy

24  Metavante stopped performing.  And there's no dispute that up

25  until the time that Metavante stopped performing, and, in fact,

6

1    until today, because of the interest rate that exists right

2    now, LBSF is in the money.  All of the payments that were

3    missed during this period were payments where Metavante owed

4    money to LBSF because the interest rates were low.  In total,

5    there were three payments; these quarterly payments that were

6    missed.  And the amounts that Metavante owed under these three

7    payments, and they're listed separately in our papers.  But the

8    amounts that Metavante owes is approximately 6.6 million, plus

9    default interest, which is contractually required under the

10   agreement between the parties.

11        THE COURT:  How much is the default interest?

12        MR. SLACK:  I will get you the amount of the default

13   interest.  It actually goes up until today.  So we had a number

14   in our papers, it's obviously not up to date.

15        THE COURT:  There's a per diem rate?

16        MR. SLACK:  It's a big amount, do you have that from

17   our papers what the default interest is there?  I'll get it for

18   you before --

19        THE COURT:  It's not critical I was just interested.

20   In the event that the swap agreement should be terminated at

21   some point between quarterly payments is there a true-up at

22   that point, or is the payment only quarterly?

23        MR. SLACK:  You have the quarterly and then you true-

24   up for the termination payment.

25        THE COURT:  So the termination -- if by chance the

7

1   agreement is terminated say next week which doesn't correspond

2   with the end of the quarter there would be a true-up at that

3   point?

4        MR. SLACK:  I assume that you would -- I don't know if

5   true-up is the right word.  The quarterly --

6        THE COURT:  I'm sure it's not the right word, it's

7   just the word I use.

8        MR. SLACK:  Obviously, the quarterly payments would

9   still be due and you'd have to then make the termination

10  payments as well.  So both would be due.  Obviously at

11  termination both payments would be due.  You'd have the

12  quarterly payments which would be past due, plus default

13  interest.  Plus you would have the termination payment.

14       THE COURT:  And are there projections as to what would

15  have to happen to interest rates over time in order for the

16  payment which is due to the debtors to become zero?  In other

17  words, at what point could you project a change in interest

18  rates if you were playing the market?

19       MR. SLACK:  I don't know whether it's possible to make

20  that kind of a projection or not.

21       THE COURT:  I take it that projection hasn't been

22  done?

23       MR. SLACK:  Certainly, I haven't seen it, Your Honor.

24  So after the filing of the bankruptcy of LBSF and LBHI

25  Metavante chose not to terminate the swap agreement pursuant to

1    the safe harbor provisions of the Bankruptcy Code.  And while

2    it's not entirely in their papers, it certainly is suggested

3    that the reason they didn't do that was because they would have

4    owed LBSF millions of dollars.  And what they wanted to do, I

5    think by their own admission in their papers, is they wanted to

6    hold off terminating until the market switched and they

7    wouldn't owe money to LBSF under a termination payment.  And I

8    think they're pretty expressive about that in their papers.

9          As Your Honor knows from the bar date motion and many

10   other motions, the derivative area here could be very complex.

11   But I think this motion rests on principles that are not so

12   complicated.  From our position there really are two main

13   principles that this motion rests on.  The first is that the

14   swap agreement with Metavante is an executory contract.  Under

15   the swap agreement, both LBSF and Metavante, have continuing

16   obligations.  In other words, these quarterly payments need to

17   continue to be made and with the net obligor, as I said, making

18   the payments.  So at any particular time depending on the

19   interest rate changes that could possibly take place, one or

20   both parties in the future might have to perform.

21         I don't think there's much dispute that based on the

22   fact that both of these parties have continuing obligations

23   that this is an executory contract.

24         Now, in its opposition Metavante says that in their

25   view this isn't a garden variety executory contract.  And I

9

1    confess I don't know exactly what they mean by that.  But under

2    the law there doesn't seem --

3         THE COURT:  Probably they mean a contract that isn't

4    governed by one of the safe harbor provisions.

5         MR. SLACK:  Well, if that's what they mean, Your

6    Honor, we will obviously get to that.  But what I was --

7         THE COURT:  That's what I took it to mean.

8         MR. SLACK:  I would pose, Your Honor, that whether a

9    swap agreement is an executory contract is one that's been

10   decided by other courts.  For example, in the Enron bankruptcy

11   Judge Gonzalez wrote, "Although, after netting out the payment

12   obligations only a single payment would be made in any

13   particular month.  Nevertheless, under the swap agreement the

14   parties had mutual performance obligations.  Each party was

15   obligated to make a payment each month based on an agreed upon

16   formula.  ENA was obligated to make payment based on a fixed

17   amount, and Penoco (ph.) was obligated to make payment based on

18   a floating amount.  As there were mutual obligations under the

19   swap agreement it was an executory contract."

20        THE COURT:  There's no doubt in my mind that a swap

21   agreement is an executory contract.  And that's not an issue

22   which I consider we need to spend any time on today.

23        MR. SLACK:  Okay.  The second issue, Your Honor, that

24   we think that -- the second principle, Your Honor, that we

25   think is important here is that a non-debtor counterparty must

10

1      perform obligations under an executory contract while the

2      debtor decides whether to assume or reject.  Indeed, it's

3      really undisputed that an executory contract is enforceable by

4      the debtor but not against the debtor.  And there's a recent

5      decision by the District of Delaware in Broadstripe, and, of

6      course, a lot of courts have followed the Bildisco rule by the

7      Supreme Court.  And so, thus, where we have an executory

8      contract the non-debtor must perform while the debtor decides

9      whether to assume or reject.  And those are merely the basic

10     principles that our motion rests on.

11          Metavante raises four arguments to try to avoid

12     performing under the agreement, and I'll try to take each one.

13          First, Your Honor, Metavante contends that the

14     bankruptcy filings of LBSF and LBHI are events of default under

15     Section 2(a)(3) of the agreement between the parties.  There's

16     a master, so it's 2(a)(3) under the master.  And that that

17     excuses their performance here.  This argument, Your Honor,

18     fails because the alleged defaults are unenforceable ipso facto

19     clause is under 365(e)(1) of the Bankruptcy Code.

20          Now, 365(e)(1)(B) provides, "That an executory

21     contract of the debtor cannot be terminated or modified solely

22     because of the commencement of a case under this title."

23     That's the wording.  Here, both LBSF and LBHI, filed cases

24     under this title.  And, therefore, their bankruptcies cannot be

25     used to modify or terminate any right under the agreement here.

11

1    And I would point out, Your Honor, that the use of the language

2    (a) takes under this title I would suggest isn't accidental.

3    Earlier in the same provision the code reads when it's

4    referring to the bankruptcy of the debtor it says "the case"

5    not "a case."  And I think in today's world where you have so

6    many of the bankruptcies involving corporate affiliates I think

7    the code actually anticipates exactly the issue we have here,

8    where they didn't want related corporate affiliates going into

9    bankruptcy and somebody claiming that a bankruptcy filing under

10   this chapter would trigger a default that wasn't an ipso facto

11   default.

12          Now, Your Honor, Metavante also contends -- I think

13   the second argument they make, is that Metavante also contends

14   that its nonperformance is protected by the safe harbor.  And

15   it's argument here I think, frankly, is a brazen one.  Because

16   they say that safe harbor protects not just its right to

17   terminate promptly but its ability to essentially wait to

18   terminate.  And there's a very big distinction between those

19   two things.

20          Now, Metavante's papers, I think, again, they're very

21   open about it.  They say what they would like to do, what they

22   think they can do, what they think they have a right to do is

23   have a default, have a bankruptcy.  And let's say this contract

24   is about an eighteen months contract, but let's say the

25   contract was a four-year contract, that they could wait the

12

1    four years and pick the very best time for them to terminate so

2    that they would no longer owe LBSF money.

3          Now, Metavante cites no authority for this proposed

4    right, and it's inconsistent with, both the case law and the

5    legislative history of the safe harbor provisions.

6          First, Your Honor, there are two cases which I think

7    are pretty close to on-point as to the nature of the safe

8    harbor provisions.  The Enron case and the Calpine case, both

9    are cited in oour papers.  Both are recent.  The Calpine case

10   was decided in May so it's very recent.  But they make it clear

11   that the safe harbor provisions do not extend to ancillary

12   matters that they only allow you to do those things that are

13   enumerated in the statute, which is terminate, liquidate,

14   accelerate.  And so other matters such as waiting here, now the

15   cases don't deal with that, they deal with other matters,

16   simply are not safe harbor.

17         And, Your Honor, the legislative history I think here

18   is even more crystal clear.  The legislative history of the

19   safe harbor provisions make it clear that termination was

20   anticipated to occur promptly.  To avoid a party trying to gain

21   the system.  And what's remarkable is if you read the

22   provisions of the legislative history, and I'll point Your

23   Honor to a couple of them, but there's some in our papers and

24   there's some in some of the ancillary papers filed by the

25   committee.  The fact is is that it tries to guard against

13

1    exactly what Metavante is doing here, which is trying to play

2    the market.

3        Now, the Enron court that we talked about earlier also

4    dealt with the legislative history.  And what the Enron court

5    said about the legislative history in this regarding was, "In

6    enacting Section 560 Congress sought to protect financial

7    markets from the volatility associated with delaying the final

8    and prompt resolution of a swap agreement."  It then cites to

9    the legislative history which it quotes as follows:  "U.S.

10   Bankruptcy law has long accorded special treatment to

11   transactions involving financial markets to minimize

12   volatility.  Because financial markets can change significantly

13   in a matter days or even hours, a non-bankruptcy party to an

14   ongoing securities transaction and other financial

15   transactions, could face heavy losses unless the transactions

16   are resolved promptly and with finality."  Similarly, Your

17   honor, when Congress adopted the safe harbor provisions in the

18   1990s the legislative history said that the rationale was that,

19   "The immediate termination for default and the netting

20   provisions are critical aspects of swap transaction and are

21   necessary for the protection of all parties in light of the

22   potential for rapid changes in the financial markets."

23       What Metavante's tried to do here is exactly the

24   opposite, Your Honor.  What they've tried to do is use the safe

25   harbor as a sword, essentially, against the debtor.  Because

1    right now the debtor is owed money under the swap agreement.

2    What they're saying is they can do exactly the opposite from

3    terminating immediately or promptly.  That they can wait it out

4    and play the market.

5        At one point, about what I think Metavante did here

6    that's important and puts it in context.  Metavante had

7    recourse.  After they say that there was a default based on the

8    bankruptcies, they could have at that time under the safe

9    harbor terminated.  And what they could have done at that time

10   was put in a replacement swap.

11       THE COURT:  They did that, they didn't terminate but

12   they put in a replacement swap.

13       MR. SLACK:  That's exactly right, they doubled down.

14   What they did was they doubled down on their exposure here,

15   rather than terminating and replicating.  Because that's what

16   the safe harbor actually permits.  We would not be here today

17   if they actually did what the safe harbor suggests that they

18   should do.  Metavante made a decision, they made a choice not

19   to terminate the swap and play the market.  And it must live

20   with that choice.

21       Indeed, although it's not the precise issue today

22   there are at least two courts that we cite in our reply that

23   had said that the safe harbor does not allow termination based

24   on a bankruptcy filing -- or should say only allows it based on

25   a bankruptcy filing and not for other reasons such as a turn in

15

1    the market.

2          The point is that Metavante's conduct is not only not

3    protected by the safe harbor, it's election not to terminate

4    has foreclosed resort to the safe harbor.

5          THE COURT:  But let's revisit what you just said,

6    because I want to understand more about this point.  Is it the

7    debtors' position that there is a clock that runs on 560 and

8    other safe harbor provisions, and that at some point right

9    under that provision are lost, either under a doctrine of

10   waiver, or laches, or some other kind of equitable doctrine?

11   Is that your position?

12         MR. SLACK:  Yeah.  I don't think it's the -- I don't

13   think it's the issue today, but I will tell Your Honor we do

14   believe that.  In other words, we think that there is an

15   obligation on behalf of the counterparties here that if they're

16   going to terminate, they have to terminate because of the

17   bankruptcy.  And that means terminating as the legislative

18   history says promptly or immediately.  And if they wait because

19   of a turn in the market, then I think the way it comes into the

20   statute, actually, Your Honor, is that they're not terminating

21   by reason of the enumerated features in the Bankruptcy Code, in

22   the safe harbor, they're terminating for other reasons.

23         And so, Your Honor, we do believe -- again, I don't

24   think it's the precise issue today, but we do believe that a

25   counterparty must terminate promptly or immediately and on the

16

1   basis of the bankruptcy itself, and not some other reason in

2   order to get the benefit of the safe harbor.

3        THE COURT:  So your position would be they would need

4   to come in and potentially get relief from the automatic stay

5   in order to terminate in the future?

6        MR. SLACK:  Right.  They would --

7        THE COURT:  Or don't you take a position on that?

8        MR. SLACK:  You're right, Your Honor.  We would take

9   the position that if they tried to terminate that that

10  termination would be invalid because it's -- or at least

11  without getting permission from Your Honor because it would not

12  be safe harbor.

13       THE COURT:  What would be your position if today,

14  because of the way the argument is going, counsel for Metavante

15  were to jump up and instead of arguing the merits say we hereby

16  terminate, could they do that?

17       MR. SLACK:  Your Honor, I don't believe they could do

18  that.  I think they've waited too long.  Again, it's not the

19  issue today.  But I don't believe that they would be able to

20  terminate today.  I think they had their opportunity to

21  terminate, I don't think they took it, and I think they have to

22  live with that decision.

23       THE COURT:  Okay.

24       MR. SLACK:  Your Honor, the next argument that

25  Metavante makes is that there are certain cross default

17

1    provisions.  And they say they believe on information and

2    believe that these cross default provisions have been triggered

3    in the agreement.  Now, there is a cross default provision and

4    the master is the agreement.  And it provides, in short -- and

5    it's one of those provisions that you have to go to the

6    definitions and do a little cross reference.  But, essentially,

7    it says that if LBSF and LBHI have defaulted with respect to

8    any obligations with respect to borrowed money, so on any of

9    the obligations that they have where they borrowed money, which

10   could be quite a few, and those defaults reach a threshold

11   amount of -- I think it's 100 million or two percent of LBHI's

12   equity value, then there's a cross default to the swap with

13   Metavante.  That's essentially what that cross default

14   provision says.  And Metavante contends, though they haven't

15   propounded in any discovery, they contend that they need to

16   take discovery concerning every such obligation of LBSF and

17   LBHI.  So every obligation for borrowed money to find out if

18   there are defaults that add up to the threshold amount.  And

19   Metavante in their papers, at least, and I assume we'll hear it

20   in their argument, asserts that this hearing should be

21   postponed until the discovery takes place.

22        We contend, Your Honor, that the cross default issue

23   is a red herring.  Because whether or not there is a cross

24   default is simply not relevant on this motion as a matter of

25   law for a couple of reasons.  I'll actually want to go through

18

1   some of the reasons in more detail, but let me just lay them

2   out for you.  Because I think if you have them in your mind

3   when we go through them it may help.

4        The first reason is is that the case law is that

5   Metavante has to perform notwithstanding default, whether

6   they're pre-petition or post-petition.  In other words, the

7   existence of a pre-petition default is irrelevant whereas here

8   Metavante did not actually terminate.  In other words, it might

9   be a different situation if there had been a pre-petition

10  default and Metavante terminated.  But by not terminating the

11  agreement remains in effect, and the case law is clear that

12  Metavante therefore must perform whether or not there are

13  defaults.

14       THE COURT:  You're talking about the gap period here

15  between September 15th and October 3rd?  Is that the period

16  that they could have terminated the agreement?  In fact,

17  terminated on account of the filing by LBHI and do that before

18  the filing by the present counterparty?

19       MR. SLACK:  That's right, Your Honor.  In other words,

20  for this argument had they terminated before we would have a

21  different set of facts than we do today.

22       The second, Your Honor, is that Metavante really

23  shouldn't be able to rely on a pre-petition default that they

24  say they don't even know exists; meaning the cross default

25  here.  In other words, they say they need discovery as to

19

1    whether there's a cross default.

2         THE COURT:  I may have misled you as to what I said.

3    We're not talking about the default associated with the filing

4    by LBHI which would be the default of the guarantor, but you're

5    talking about other unrelated defaults.

6         MR. SLACK:  That's right.  I'm talking now, Your

7    Honor, about the cross default.  With respect to you question,

8    as I understood it, if they would have had a default by LBHI

9    before the bankruptcy of LBSF and terminated beforehand, I

10   think we would still be in a different situation, my answer's

11   still the same, we'd be in a different factual situation than

12   we are today.

13        THE COURT:  It doesn't matter the agreement still

14   hasn't been terminated, so we're not in that zone anyway.

15        MR. SLACK:  That's right, Your Honor.

16        Your Honor, the third reason that the cross default

17   argument doesn't work is that cross default provision are

18   generally not enforceable under what some courts have called

19   the cross default rule.  If the cross defaulting agreements are

20   not fundamentally part of the same agreement, if the agreements

21   are not intertwined.

22        And, lastly, Your Honor, the cross default provisions

23   here are, themselves, evidence of LBSF's financial condition

24   and the problems with it.  And, therefore, are not valid under

25   the ipso facto -- are invalid ipso facto clauses as well.

20

1        So those are the four reasons.  And I'd like to take

2    some time to talk about a couple of them.

3        THE COURT:  Okay.

4        MR. SLACK:  With respect to the first, and that is, it

5    just doesn't matter if there's been a default.  Even if there's

6    been a pre-petition default courts have almost uniformly held

7    that a non-debtor must continue to perform in this interim

8    period while a debtor decides to assume or reject a contract.

9    An example.  Recently the District of Delaware in the

10   Broadstripe bankruptcy held that, "A contract is not deemed

11   terminated and no longer executory simply because the debtor

12   has defaulted or breached the contract before the commencement

13   of a bankruptcy."  Similarly, and I think you know this is a

14   more extreme situation than we have here.  In the Pacific Gas &

15   Electric case from the Northern District of California, the

16   non-debtor had actually stopped performing because of pre-

17   petition breaches prior to the bankruptcy didn't terminate, but

18   stopped performing.  And what the court said is that once the

19   bankruptcy was filed that because of this right of the debtor

20   to assume or reject that the counterparty actually had to start

21   performing, had to resume performing under the contract.

22        Now, there are a number --

23        THE COURT:  Excuse me one second.  Is there any

24   distinction that they've drawn between -- I'm going to call it

25   a near breach that constitutes a default under the agreement,

21

1   and a material breach that goes to the essence of performance?

2        MR. SLACK:  Well, I think it -- you know, breaches are

3   breaches.

4        THE COURT:  Breaches are breaches, but some are

5   material.

6        MR. SLACK:  Well, I think the courts here in these

7   cases were all dealing with what were alleged to be material

8   breaches.  In Broadstripe they weren't getting paid.  I think

9   it was a significant amount of money that hadn't been paid

10  under the contract.  With Pacific Gas & Electric they'd stop

11  performing because they believed that the breaches were

12  material.  So at least with respect to the cases that we've

13  seen, and the cases we cite in our papers, I think the breaches

14  are along the same lines we're talking about here.

15        For example, the other three cases we had, the

16  Continental Energy case from the Middle District of

17  Pennsylvania, I think the arrears was like fifteen million that

18  hadn't been paid.  The Pittsburgh-Canfield case from the

19  Northern District of Ohio said that the debtor hadn't

20  performed.  The Whitcomb & Keller mortgage case from the

21  Seventh Circuit, I think, again, was owing -- in that case it

22  was an amount of money that was not as significant, maybe

23  12,000.  But for that contract maybe it was significant.

24        But we cite a number of cases where this principle

25  exists.  Which is that if you have a breach the non-debtor has

22

1    to perform during this interim period.  And I just cited five,

2    there's more in our papers.  Metavante cites to one case in

3    their opposition, so there is a case.  The Luker case from the

4    District of Michigan.  And it holds that a debtor cannot assume

5    a contract that was in breach pre-petition.  In reaching that

6    conclusion Luker court interestingly enough recognized that it

7    was alone on an island.  In a couple of places it says it

8    disagrees with all the other cases that are out there.  And

9    since the Luker case, which was three years ago, at least from

10   our looking, no cases adopted it and no cases followed.  So,

11   both before and after, it appears that the Luker case is on its

12   own.

13        Now, the policy reason for the courts that we cite,

14   that is that pre-petition breach isn't relevant and that the

15   non-debtor has to perform, the policy reason for that rule is a

16   sound one.  Courts have said that allowing the debtor the time

17   to decide without having to worry about whether a contract is

18   being performed or not is an important one to give the debtor

19   breathing room.  And that's especially true I think you're

20   dealing with a rule again for executory contracts.  In some

21   circumstances it could make ultimately assuming and assign the

22   contract difficult or impossible.

23        Also, Your Honor, we've talked about this.  The fact

24   that the counterparty did, in fact, terminate.  If there's a

25   pre-petition breach that the counterparty views as being

23

1    material then it should have terminated.  So what the courts

2    have, essentially, said and it makes some sense, is that where

3    they have decided, the counterparties made a decision not to

4    terminate and you have a pre-petition breach, the contract

5    still exists.  And so the counterparty, the non-debtor has to

6    live with their decision not to terminate pre-bankruptcy.

7            Now, the other thing, Your Honor, is that the whole

8    idea of allowing Metavante to avoid its obligation here while

9    it takes discovery of every indebtedness that LBHI and LBSF

10   have, would essentially set a precedent that would make it

11   impossible for this debtor to ever enforce any of its

12   contracts.  And there are I think somewhere in the nature of

13   about 100 to 200 contracts where this issue may -- I say may be

14   involved.

15           THE COURT:  Just so I understand the universe of

16   contracts you're referring to, are you talking about interest

17   rate swap agreements, or are you talking about other kinds of

18   contracts that are subject to safe harbor provisions?

19           MR. SLACK:  I'm talking about derivatives.  My

20   understanding is this is derivatives in general.  So I don't

21   know that they're all interest rates swaps, they could be other

22   kinds of derivatives.

23           THE COURT:  I'm just trying to understand what kind of

24   contracts we're referring to when you say 100 to 200?

25           MR. SLACK:  that's in the derivative portfolio but I

24

1    don't know how it breaks out between interest rate swaps or

2    other kinds of derivatives.

3            THE COURT:  All right.

4        (Pause)

5            MR. SLACK:  I've just been told that it's the

6    unterminated derivative contract.  So it's 100 to 200

7    unterminated derivative contract where this issue could apply.

8            Moreover, Your Honor, the cross default provisions are

9    invalid under what I called earlier the cross default rule,

10   which some courts have terminated the cross default rule.  And

11   the cross default rule provides where a contract has a cross

12   default provision, that provision will be invalid under 365(f)

13   of the bankruptcy code unless the contracts are so

14   fundamentally intertwined that they're essentially one and the

15   same.

16           Now, the rationale behind using 365(f) is that

17   assumption is a predicate to assignment.  And, thus, a cross

18   default provision that would be used ultimately to thwart a

19   debtor's right to assume and assign is invalid.  Indeed, absent

20   this kind of a rule a non-debtor could do precisely what

21   Metavante seeks to do here, argue that certain other cross

22   defaults prevent the debtor from assuming its contract.  And

23   that it either has to go and cure those defaults or it can't

24   assume and assign.

25           Now, in our papers we cite to three -- we cite to a

25

1    number of cases, but we cite to three in this district, each of

2    which invalidated cross default provisions based on 365(f) that

3    would have disturbed the right of a debtor to assume and assign

4    an executory contract.  These cases include the Sansui decision

5    where the District Court wrote on this issue and then it was

6    appealed to the Second Circuit and the Second Circuit affirmed.

7    So I would tell the Court the Second Circuit did not write on

8    this issue, it just affirmed the decision and it wrote on other

9    issues.

10         The Eastern District Court in Koppel also wrote on the

11   issue and it says, "Although by its terms Section 365(f)

12   applies to invalidate provisions restricting assignment, rather

13   than assumption, this section is relevant to the assumption

14   inquiry because 365(f)(2)(A) requires assumption as a predicate

15   to assignment of a contract.

16         Adelphia, Judge Gerber ruled very similarly in another

17   case that we cite in our reply.

18         The last reason that the cross default provision, Your

19   Honor, is not an impediment to our motion is that it is, in

20   itself, an ipso facto clause.  Because if you think about what

21   the cross default provision is saying, it's saying that the

22   debtor here was in such poor financial condition that it was

23   defaulting on its indebtedness, it's borrowed money, up to as

24   certain level.  In our reply brief, Your Honor, we cite a

25   couple of cases that have invalidated cross default provisions

26

1    as ipso facto clause exactly on this basis.  Meaning, that when

2    you look at the reason for the cross default, which is what's

3    alleged here, which is a default in indebtedness, that it's

4    based on essentially the financial condition of the debtor.

5         Your Honor, the last argument that Metavante makes is

6    that the agreement is not a financial accommodation, or that it

7    is a financial accommodation contract that cannot be assumed

8    because it is not an executory contract.

9         Your Honor, as you probably are well aware, the

10   Bankruptcy Code doesn't define financial accommodation, but

11   courts have construed the two uniformly to really be talking

12   about actual loans or the kinds of traditional debt financing.

13   I'm not going to spend a lot of time here because I think, Your

14   Honor, it's pretty clear that a swap is not a financial

15   accommodation, but I would like to I think read from the

16   Thrifty Royal case from the Ninth Circuit, which said, "A

17   fundamental characteristic of an interest rate swap is that the

18   counterparties never actually loan or advance the notional

19   amount.  The swap involves an exchange of periodic payments

20   calculated by reference to interest rates in a hypothetical

21   notional amount.  Payments made under an interest rate swap

22   cannot possibly compensate for the delay and risk associated

23   with borrowed money because no loan has taken place between the

24   counterparties."

25        Your Honor, the one point I'd like to make on

27

1    conclusion is to reinforce that Metavante was not without an

2    option here under the safe harbor.  What it did instead of

3    taking its option under the safe harbor was essentially playing

4    the market.  It did not want to make a payment to LBSF on

5    termination.

6         And so I would say to Your Honor that the idea of

7    using the safe harbor provisions offensively is what we're

8    saying Metavante can't do.  We would urge you to grant the

9    motion to compel.

10        THE COURT:  All right, thank you.  I think what makes

11   sense given the fact that there are parties that have, in

12   effect, joined in the debtors' motion, would be to hear from

13   everybody who is a proponent of this relief at the same time,

14   and then we'll hear from Metavante's counsel.  So I think we

15   have the committee and the ad hoc group of creditors.

16        MR. FOSTER:  Good afternoon, Your Honor.  Wilbur

17   Foster of Milbank Tweed Hadley & McCloy on behalf of the

18   Official Committee of Unsecured Creditors.

19        I'm not going to recanvass all the issue and points

20   that Mr. Slack handled so well, I do want to speak, though, to

21   one point which you raised with Mr. Slack.  And in a way it's

22   really at the heart of Metavante's argument that propelling

23   Metavante to perform its obligations under this contract is

24   against bankruptcy rights that they have.  That argument, in

25   essence, that by requiring Metavante to perform the obligations

28

1    under the unterminated swap agreement, that would undercut an

2    absolute right that they have, and they're not shy about this,

3    an absolute right that they have to terminate that swap

4    agreement at any time before the maturity of the swap.  So

5    requiring the payment before termination undercuts their right

6    to terminate under Section 560 and 561.  They're similar, so

7    I'll just refer to 560.  And they are very blunt about that.

8         They say on page 11 of their objection, "The non-

9    defaulting party is not required to terminate its swap within

10   any fixed or specified period of time.  But is instead

11   permitted to wait as long as it deems appropriate to permit the

12   market to recover."  Recover, of course, for their benefit not

13   the debtors.  Similarly, on page 13, they state without

14   equivocation.  And I quote, "The right to elect to terminate or

15   not to terminate the swap at anytime prior to maturity, is an

16   essential and critical right of a non-defaulting party."  If

17   Metavante defers its termination then the markets turn so that

18   Metavante is "in the money" Metavante must have the right under

19   Section 560 to minimize the loss resulting from the debtors'

20   defaults.  That is the right that they say -- the Bankruptcy

21   Code right that they say -- the absolute right under the

22   Bankruptcy Code that they have that they say will be undercut

23   or violated by requiring them to perform during the interim.

24   And as we stated in our response in support of the debtors'

25   motion in our joinder, that key argument of theirs is

29

1    inconsistent with three things.

2         First, it's inconsistent with the plain language of

3    Section 560, which says they have a contractual right -- can

4    exercise a contractual right to cause termination based upon an

5    event of the kind described in Section 365(e)(1).  Not based on

6    such a defense and something else such as the recovery of the

7    market.  You know, a movement in the money to let Metavante.

8    That is not protected.

9         So I join Mr. Slack in his response to your question

10   when you ask is there a temporal restriction under Section 560?

11   The answer is yes.  In the sense that a party who does not

12   terminate promptly upon learning of an event of the kind

13   described in Section 365(e)(1) that authorizes termination is

14   necessarily and by their own admission here as a matter of fact

15   that terminating or waiting to terminate because of some other

16   reason.  That's not what Section 560 permits.  That's the plain

17   language.

18        On top of that, however, there's also the case law

19   that is to the similar effect, that in case there's any concern

20   that giving the plain language in that case law, in effect, we

21   argue they should have, is inconsistent -- plainly inconsistent

22   with the intention that Congress had drafted Section 560.  We

23   don't think he could get there, but even if one tried to argue

24   that.  But let's just say the history of the safe harbor is

25   just the swap agreement of safe harbor is alone and there are a

30

1    number of others on which they're built that are to the same

2    effect makes it very clear that what 560 would aim to do was to

3    prevent a counterparty from being forced to hold open a

4    position while a debtor decided whether to assume or reject the

5    contract.  And in our response we quote some of this, not all

6    of this, but certainly plenty of legislative history to this

7    effect.

8         For example, it was designed to prevent against the

9    possibility of, "The possibility that a debtor with a swap can

10   gamble.  Can play the market by delaying affirmants."  Without

11   this protect, "A debtor may, in effect, be permitted an open-

12   ended option not contemplated by the original agreement."  It

13   talks about the danger possibilities.  "The possibilities of

14   unfair prejudice to a non-debtor resulting from, delayed by a

15   debtor in deciding whether to assume or reject a swap

16   transaction or agreement."  And stating that, "Permitting such

17   delay, in effect, gives a debtor an option on a swap."  And one

18   last statement in legislative history, all in the 1990

19   amendments.  One person put it this way describing the dilemma

20   that the non-debtor faces.  "If the market has turned favorable

21   to the debtor the trustee says fine, I will assume it.  If the

22   market has turned unfavorable, the trustee says I will reject

23   it."  In that time period the swap participants has no idea

24   whether it's going to be assumed or rejected, and you are

25   basically just encouraging the trustee to play the market with

1    the creditors' money.

2         Section 560 was put in the Bankruptcy Code to

3    eliminate that option on behalf of the debtor.  To eliminate

4    the debtors' ability to hold the counterparty at bay and to sit

5    back and play -- to have an option.  To sit back and play with

6    the creditors' money and to assume if the market moves in the

7    debtors' favor and to reject if it moves against the debtor.

8    That's why as again, and I won't quote all these sections in

9    our joinder, the clear Congressional intent and understanding

10   was that a prudent counterparty, and that's exactly the word

11   that was used in the legislative history a number of times.  A

12   prudent counterparty would terminate promptly upon the

13   occurrence of a bankruptcy.  Your Honor, Section 365(e)(1)

14   event.

15        THE COURT:  Mr. Foster, I agree with you completely.

16   That's what the legislative history seems to suggest.  But it

17   doesn't say that it's impermissible for -- it may turn out to

18   be because I may find that.

19        MR. FOSTER:  Understood.

20        THE COURT:  But it doesn't say it's impermissible to

21   do what Metavante has done.  Nor is there any express time

22   limit built into 560.  Nor is there any express time limit set

23   forth in any of the legislative history.  It rather assumes

24   that market participants will act prudently and that the most

25   prudent thing for a market participant to do in dealing with an

32

1    insolvent counterparty is to terminate, settle and move on.

2    Isn't that right, or did I miss something?

3         MR. FOSTER:  No, that is correct.  But it is -- the

4    language of 560 and the evil it was designed to be remedied

5    support the conclusion that we're arguing for.  Because the

6    bottom line is there's no indication that Congress was

7    intending to take away this option from the debtor to pay with

8    the creditor's money and just take it and hand it over to the

9    creditor and say okay, well, now you can play.  This swap

10   agreement is in the money on the petition date, no sweat.

11   Unusual market conditions, October/September 2008.  Just wait.

12   Just wait a while and then when the market moves in your favor

13   you can terminate.  So I agree with you there's no express time

14   limit in 560, there's no express time limit in the legislative

15   history.  But the clear purpose and intent is that this was put

16   in there to prevent a counterparty from getting hung up and

17   letting the debtor play the market against them.  There is no

18   intention to let the counterparty to do that to the debtor.

19        THE COURT:  But I guess the question that I still has

20   is did it remove from the counterparty, the non-debtor

21   counterparty, the optionality that Metavante claims that it

22   has?  In other words, since it wasn't nailed down Metavante

23   says I can pick it up and run with it.  I think that's what

24   their position seems to be.

25        MR. FOSTER:  That is their position and we disagree

33

1   with that.  The point was to eliminate an option from the

2   debtor -- an option that existed only because without 560 the

3   counterparty will be an ordinary executory contract claim.

4   Because as Your Honor noted a swap agreement is an executory

5   contract.  And it was to take that optionality away from the

6   debtor, it was not designed to hand the optionality over to the

7   counterparty.  And just as a matter of bankruptcy policy, if

8   there's something wrong with the debtor playing the market and

9   thereby playing with a creditors' money, as stated in

10  legislative history it should be at least deeply wrong for a

11  counterparty to play the market to the detriment of the debtor

12  and the creditors of the estate.  If the counterparty wants not

13  to be hung up by the automatic stay and the assumption and

14  rejection power, which is what Congress was concerned about in

15  passing 560 they have a way out of that, they terminate.  If

16  they don't terminate they are in executory contract land.

17  There's no clear expression of intent to give a counterparty

18  this open-ended option.  And just -- and it should be at least

19  as harmful and evil, if not more so, for a counterparty to be

20  viewed as having the right to play around with the debtors'

21  money, just as it was for the debtor to be able to play around

22  with the counterparties money.

23          THE COURT:  Thank you.

24          MR. FOSTER:  Thank you, Your Honor.

25          MR. SHORE:  Good afternoon, Your Honor.  Chris Shore

1    from White & Case for the ad hoc committee of LBHI bondholders.

2         The committee at this point collectively holds about

3    thirteen billion dollars of debt at LBHI.  We filed a statement

4    in support of the debtors' motion.  And I for just a second

5    will explain why.  We understand that the structure here is a

6    common one that's going to come up in the context of these 100

7    or 200 other contracts.  Where a Lehman subsidiary entered into

8    a contract and then LBHI either provided a guarantee or agreed

9    to act as a credit support party.

10        Our concern here is that with respect to the out of

11   the money contracts, LBHI viewed from the perspective of

12   Lehman, LBHI potentially faces a guarantee exposure.  But with

13   respect to the in the money contracts, as this one is, if

14   Metavante prevails and is permitted to suspend or terminate,

15   LBHI is left with an asymmetry.  So it's paying mother out on

16   out of the money contracts, and not taking any money in at the

17   subsidiary level with respect to the in the money contracts.

18        I'm not going to repeat any of the arguments, but

19   focus on two key questions.  One is in the context of this

20   agreement and the other agreements can LBHI's bankruptcy

21   support a suspension or termination of the contracts.  And,

22   two, to focus on Your Honor's time limit question and where

23   does that come from.

24        560 presents, from our perspective, a two-part

25   analysis.  It allows the liquidation, termination or

35

1    acceleration of one or more swap agreements because of a

2    condition of the kind specified in 365(e)(1).  So the first

3    question the Court has to ask is is the reason for termination

4    because of a 365(e)(1) condition.  That is that gets into that

5    issue of a case or the case or is this based upon the financial

6    condition of the debtors.  We've set our position forth in the

7    papers.  Mr. Slack ably handled that so I don't want to go over

8    that.

9         But the analysis differs depending on where you come

10   out on that.  If you determine that the reason for termination,

11   the LBHI filing, is not a 365(e)(1) issue, either A or B, then

12   you have to go into the Bildisco analysis.  That is it's for

13   some other reason, there's no safe harbor with respect to that.

14   In the stub period or the breathing spell referred to in the

15   cases, they have to perform notwithstanding the condition until

16   the debtors assumes or rejects.  If the debtor assumes they'll

17   get adequate assurance and future performance in a cure.  If

18   the debtor rejects they will have a claim for the pre-petition

19   breach and they will have potentially a claim for reasonable

20   value, which would be an administrative claim.  That's just

21   Bildisco as applied.

22        The remedy if they don't like that situation is to

23   petition the Court to force the debtors to assume or reject the

24   contract in a shorter period of time.  The only thing that 560

25   is protecting is their right under the contract to terminate

36

1    because of the financial condition of the debtor or the filing.

2         So getting to the -- if it's a 365(e)(1)(A) issue, is

3    suspension -- there are two questions there I think.  First of

4    all, is suspension a safe harbor event?  And here's our problem

5    with it.  They have a free option or Metavante wants a fee

6    option.  If the contract remains out of the money, they don't

7    want to pay and want to backload it all, whether that --

8    whether they're credit worthy enough to pay that at a later

9    date is an unanswered question.  But if it switches in their

10   favor, which it may or may not ever do, they want to accept

11   performance.

12        But suspension of payments is not a safe harbor event.

13   It covers any act to cause the liquidation termination or

14   acceleration of the contract.  They're doing the opposite.

15   They want to preserve the contract.  They don't want to cause

16   anything.  They want to keep the contract in place and just not

17   perform.

18        Second, we agree with the committee that the

19   legislative history makes clear -- in fact, I think the

20   legislative history says that they should immediately

21   terminate, and that we've cited in our papers.

22        But here's the new point that I wanted to raise and I

23   can end.  560 does not expand the contractual rights of the

24   parties.  This is a New York law governed contract; the swap

25   agreement is.  We've set forth in our papers a very expansive

37

1    view of what the parties' rights are in a default setting that

2    was set forth by Judge Bernstein in Randall's Island.

3    Metavante has in the instance of where this breach occurs an

4    option, it can terminate or it can accept performance and go

5    forward.  For the last ten months Metavante has been accepting

6    the benefits of the contract.  They've made it very clear that

7    to the extent that the interest rates went in their favor they

8    would be taking the benefits of the contract.  They would be

9    demanding payment.  You cannot accept the benefits of the hedge

10   that sits there and still not perform under the contract.  They

11   have to elect.  And they had to elect a long time ago because

12   each quarterly period they've been operating on the basis that

13   the hedge is in effect.  So from an LBHI perspective they

14   either have to terminate now the termination which would get

15   rid of the guarantee exposure, which is now zero because this

16   is an in the money contract.  Or they have to continue making

17   the payments.  But once they -- as Judge Bernstein sets out,

18   once they accept the benefits of the contract he clock has

19   stopped.  They can no longer elect not to perform under the

20   contract.  So whether that ended at the end of the first month

21   or the end of the first quarter, the clock stopped a long time

22   ago.  So they either have to perform -- and it's not just a

23   question of whether they can terminate, I think they can't

24   terminate now; 560 would not allow them to terminate now.  But

25   it would give the debtors the option to terminate which would

1    lead to a debtor-settled termination payment which would be a

2    big boom in that case to the LBSF estate.

3        THE COURT:  I think it's now Metavante's turn.

4        MR. ARNOLD:  Thank you, Your Honor.  May it please the

5    Court.  My name is Bruce Arnold, I'm with the firm of Whyte

6    Hirschbeock Dudek in Milwaukee, Wisconsin.  With me today is my

7    colleague Daryl Diesing, and also Kirk Larsen who is the

8    treasurer and vice-president of investor relations for

9    Metavante.

10       Thank you, Your Honor, for the opportunity to appear

11   pro hac vice before you today.  And to argue this case at first

12   impression on an important question, it's not accidental that

13   there are I think as many people in the courtroom today as

14   there are, given the significance of this matter.

15       A little bit about Metavante, if you will allow me,

16   Your Honor.

17       THE COURT:  Sure.

18       MR. ARNOLD:  Metavante is a highly successful payment

19   technologies firm providing services to approximately 8,000

20   financial services and businesses worldwide.  Metavante just

21   concluded a very successful first quarter in which it reported

22   426 million dollars of revenue and increased its profits.

23   Metavante has 274 million dollars in cash on its balance sheet.

24       THE COURT:  Sounds to me like it can well afford to

25   write the check that you may be asked to write before the end

39

1   of the day today.

2          MR. ARNOLD:  That is exactly my point.  Metavante is

3   also the counterparty right now to a very significant

4   transaction with Fidelity which, if approved, will result in

5   the creation of a company that will produce five billion

6   dollars in revenue.

7          THE COURT:  Is the non-payment of this amount an item

8   that has been scheduled in connection with this transaction

9   you've just referred to?  That is, is this a material item

10  which, if paid, would affect your transaction?

11         MR. ARNOLD:  It is not, Your Honor.

12         THE COURT:  Good.

13         MR. ARNOLD:  Because of the implications of FASB 133,

14  which I'm happy to get into in greater detail.  But this is no

15  longer an effective hedge transaction, and how Metavante

16  accounts for its obligations to LBSF and to the rehedge are

17  governed by financial accounting standards statement number

18  133.

19         THE COURT:  I'm asking a slightly different question.

20  My question is whether or not the payment which has been

21  demanded by the debtors in this motion constitutes an item

22  which would trigger some adjustment?

23         MR. ARNOLD:  It does not, Your Honor.

24         THE COURT:  But to be fair to state that it has been

25  disclosed in some detail to Fidelity and its counsel.  The firm

40

1    of Skadden Arps here in New York.  There's no question that

2    this matter is on everybody's radar screen; Metavante's,

3    Fidelity's and, of course, Lehman.

4         THE COURT:  All right.

5         MR. ARNOLD:  The debtors' motion brings some very

6    important questions to the Court, the answers to which may have

7    profound effects, not just on these parties, but on the entire

8    derivatives marketplace.

9         To prevail on their motion, and I appreciate the

10   candor expressed by my colleagues representing the debtors, the

11   committee and the ad hoc group, would essentially ask this

12   Court to impose a deadline on Metavante's right to terminate

13   the swap agreement with LBSF arising out of the pre-petition

14   defaults triggered by Holdings filing and by the breach of the

15   cross default provisions.

16        It would ask you, secondly, Your Honor, to rewrite the

17   1992 master agreement to eliminate the condition precedent

18   language to payment after an event of default.  This now well

19   understood Section 2(a)(iii).

20        And, importantly, it would ask this Court to unwind

21   and integrated agreement between Metavante and its lenders and

22   LBSF and LBHI, so that LBHI's guarantee is no longer part of

23   the underlying transaction.

24        Let's take it in parts.  I'll ask rhetorically first

25   should this Court impose a deadline on Metavante or any other

41

1    non-defaulting party to terminate?  To answer this question we

2    ask you, Your Honor, respectfully to consider the two primary

3    sources of guidance available to the Court and the parties.

4    The plain meaning of the statute and the unambiguous language

5    of the 1992 ISDA agreement.

6          To frame this response and provide some perspective

7    for how Section 560 came into existence, a little bit of

8    history.  The International Swap and Derivatives Association

9    was formed in 1985 by ten members.  Today it has over 600

10   members.  In 1985 and 1986 ISDA published the first two swap

11   codes to govern U.S. interest rates swap agreements.  And by

12   1992 ISDA successfully created the first interest rate and

13   currency exchange agreement, frequently called the master

14   agreement, which is still used today and is the one used here.

15         The use of this master agreement has been wildly

16   successful.  The architecture created by the ISDA agreement

17   has, essentially, standardized the market and created a common

18   language, a common economic language, for these transactions.

19   The 2002 version makes some tweaks to the hard work done for

20   the 1992 ISDA, but they're not relevant here.

21         So what does the agreement that these parties sign

22   provide?  Well, it begins with the absolute right to suspend

23   regularly scheduled payments under Section 2(a)(iii) as well as

24   any obligation to post additional collateral under the credit

25   support annex in the event of default.  Metavante does not have

42

1    collateral support, but it does have an obligation to pay

2    unless that right is suspended by virtue of a default.  It has

3    the right, Your Honor, but not the obligation to designate an

4    early termination date by not more than twenty days notice of

5    the defaulting parties.

6        THE COURT:  Let me ask you a question, I don't mean to

7    intrude on your prepared remarks.  But I find it a curiosity

8    that by your own acknowledgement replaced this particular

9    derivatives position, in effect, to hedge it out with another

10   counterparty undisclosed in your papers.  I'm not sure when

11   that happened.  At the time that you did that, why didn't you

12   simply terminate the agreement?  Was it simply to avoid the out

13   of the money from your perspective payment that would be due to

14   your counterparty and perform in accordance with the agreement?

15       MR. ARNOLD:  Metavante's view is that at that point in

16   time it had an ineffective hedge, and that it had no further

17   obligations to Lehman as a result of the pre-petition

18   agreement.

19       THE COURT:  There are a lot of people who disagree

20   with you, you realize that?

21       MR. ARNOLD:  I do.

22       THE COURT:  You're standing alone against a very heavy

23   bench to your immediate right.

24       MR. ARNOLD:  And I will not shy from the suggestions

25   that have been made here today, that Metavante has bluntly held

43

 1    out the right to terminate when and if and whether it chooses

 2    to do so.

 3         THE COURT:  That's an extraordinary bold, brash and

 4    audacious position you've taken.

 5         MR. ARNOLD:  It's --

 6         THE COURT:  Which is not apparently supported by any

 7    law or authority, other than your brief.

 8         MR. ARNOLD:  Neither position is supported by any law

 9    or authority, and that's why, Your Honor, you are in a unique

10    position to issue a decision of extraordinary magnitude in the

11    derivatives marketplace.

12         The ISDA agreement is unambiguous on its face.

13    Section 9(d) says quite bluntly, "That the option to leave the

14    agreement in place or to seek specific performance is

15    completely up to the non-defaulting counterparty."  As the one

16    and only court to consider this issue held, and I acknowledge

17    it was the Supreme Court of New South Wales, it's not binding

18    here, not even persuasive, may be interesting.  The parties in

19    the context that we have here before you today, Your Honor,

20    essentially are allowed to do one of three things.  They can

21    terminate the swap agreement.  If you're the debtor you can

22    reject the swap agreement.  Or if you're Metavante you can

23    allow the swap agreement to conclude until it's end, February

24    1, 2012, at which point in time the so-called closeout

25    provisions set forth in Section 6 of the ISDA master agreement

44

1    decide the internal rights and remedies of the parties, if any,

2    at that point in time.

3         It is not so astounding to suggest that the non-

4    defaulting party has the right to do exactly what Metavante is

5    doing here.  Because it's what the Bankruptcy Code, itself, has

6    in mind.

7         The Bankruptcy Code of the legislative history that

8    has been discussed at some length here, I think is actually

9    supportive of Metavante's position.  Let's be blunt.  This

10   statute and the amendments to it were crafted by the Lehmans of

11   this world.  And it is marvelously designed to allow dealers

12   like Lehman to immediately terminate swap agreements.  And this

13   makes eminent sense from the dealer's perspective, where

14   they're looking at a whole panoply of swap agreements with

15   their debtor counterparty.  What Congress and the parties who

16   lobbied hard to get the safe harbor positions didn't do, is

17   they didn't go one step further and create an amendment to the

18   Bankruptcy Code to require that these actions take place within

19   a given period of time.  To our reckoning only one important

20   lobby has succeeded in that respect, and that's the lobby of

21   landlords in the United States, where Section 365 clearly does

22   set limitations with respect to the assumption or rejection of

23   leases in non-residential real property.

24        In fact, the 2005 amendments creating Section 362 of

25   the Bankruptcy -- excuse me, 562 of the Bankruptcy Code, give

45

1    voice to the very argument that we're talking about here, Your

2    Honor.   What does 562 do?   It governs the timing of and

3    procedures for damage measurements if a trustee -- that is the

4    debtor, rejects a swap agreement.   Or if a swap participant

5    terminates.   And so what is that deadline?   562 teaches that

6    that deadline for doing the Section 562 true-up is the earlier

7    of the date of such rejection or the date or dates of such

8    termination.

9        The only critical literature on this point is actually

10   found in Colliers where the authors note that, in the unique --

11   and they acknowledge it.   "In the unusual case in which the

12   counterparty to a protected transaction is either not a

13   protected counterparty," that's not us, "is a protected

14   counterparty but does not exercise its contractual rights,"

15   that is Metavante, "or has no protected contractual right to

16   terminate the protected transaction, the debtor may reject the

17   protected transaction."

18       So when they decided to overrule Enron and no longer

19   make it a requirement that you seek relief from the automatic

20   to setoff and perfect your rights they had yet another

21   opportunity to set a timeframe in which the non-debtor

22   counterparty to an interest rate swap agreement must choose to

23   terminate or not.

24       And far from establishing such a deadline, they went

25   the other direction.   They said when you get around to

46

1    terminating or rejecting, the measurement date for damages is

2    the earlier of those two to occur, whenever it occurs.  And

3    from that perspective, Your Honor, I think the interplay

4    between the ISDA agreement and the Bankruptcy Code really

5    perfectly explains the rationale behind the motion to assume

6    and assign, a matter which as to Metavante is still up for

7    consideration on September 16th.  Metavante is one of the

8    objecting parties whose objection to the assignment and

9    assumption motion has not yet been resolved.

10         Lehman told us, Your Honor, that it had 930,000

11   derivative contracts as of the petition date.  About 30,000 of

12   which had not yet been -- it still remained open as of the date

13   of the filing.  In some of these contracts Lehman was clearly

14   in the money.  And I acknowledge they were in the money as of

15   the date of the filing with respect to Metavante.  But Lehman

16   couldn't collect its receivables because the counterparties,

17   for example, Metavante, but not solely Metavante, chose not pay

18   the resets because of the pre-petition defaults.  The timing of

19   this bankruptcy, whether by choice or by accident --

20         THE COURT:  It was not by choice, let me assure you of

21   that.

22         MR. ARNOLD:  Then by accident, or by happenstance, or

23   by the critical nature of the filing and the weekend of

24   September 15th leading up to the filing, the fact remains that

25   Holdings went in first, creating an event of default with

47

 1     respect to LBSF and all the other, at that point in time, non-

 2     debtor counterparties.  So to get around the hurdle that the

 3     non-debtor counterparties had the right not to pay the resets

 4     based upon the Section 2(a)(iii) condition precedent language,

 5     Lehman brilliantly proposed to assume and assign these

 6     derivative contracts, cure any monetary defaults, and then

 7     assign these contracts to third parties.  So that Lehman could

 8     harvest the value of those contracts through a bidding process

 9     in which third parties would bid for the right to, for example,

10     get the Metavante agreement.

11          Metavante, like about 100 other counterparties,

12     objected to this motion.  And although the hearing's been

13     adjourned a few times at Lehman's request, I think we should

14     see what's going on here today for what it is.  This is in part

15     an end around on the motion to assume or assign,

16     notwithstanding the fact that the plain language of the ISDA

17     does not permit the assumption and assignment.

18          THE COURT:  But we're not arguing that today.  The

19     only thing we're really arguing is why you shouldn't be

20     compelled today to perform your part of the bargain, while you

21     continue to play the market.  Because, fundamentally, what's

22     going on here is an asymmetry in which you're proposing that

23     you should have till sometime in 2012 to terminate this

24     agreement at a time when it's opportune to your client, while

25     paying not a cent except counsel fees.  That's not exactly a

48

1   fair deal, is it?  What makes that a fair deal?

2           MR. ARNOLD:  The contract.

3           THE COURT:  Wrong.  As you point out, except for going

4   offshore to find some kind of case that you think may arguably

5   support your position, you're standing alone with no authority,

6   none.  Bankruptcy law squarely is against you.  And you can't

7   rely on the Luker case.  I've red it, I understand it, it's not

8   binding authority anywhere except, perhaps, in Michigan.  And I

9   doubt it's binding authority there either.

10          MR. ARNOLD:  Well, let's examine the cases that they

11  cite, Your Honor, and put it against the backdrop of whether

12  the kind of default which has occurred here, excuses

13  Metavante's performance.

14          You were on to it before when you talked about the

15  difference between material and immaterial breaches.  Even the

16  cases cited by the debtor here in support of the argument that

17  a non-debtor counterparty can be compelled to perform while the

18  debtor sits back and decides whether to reject, acknowledge the

19  significance of a pre-petition default which remains uncured.

20          Judge Bushman's excellent analysis as well as the Law

21  Review article that he wrote on this topic says that McLean and

22  it's progeny should not viewed as saying that all pre-petition

23  defaults are excused.  Instead, what Judge Bushman said in that

24  case, and has said in the other two cases cited in the McLean

25  case is, "NLA makes no allegation that McLean had previously

1    breached the agreement or that it had been prejudiced by

2    McLean's performance under the agreement."

3        Similarly, in Fayline (ph.), the court makes a point

4    of noting that, "There had not been a pre-petition default

5    under the contract by Fayline."

6        Similarly, in Chattergay (ph.), the Court noted, "This

7    action is distinguishable from cases where the party seeking

8    reimbursement in attorney's fees was permitted to recover."  In

9    those cases the debtor was in default under the terms of the

10    contract or lease for reasons other than the mere filing of the

11    bankruptcy petition.

12        More than that, Your Honor, look at the gravamen of

13    the cases and the style of the case that they cite, they're

14    all, in a sense, critical vendor doctrine cases.  A topic near

15    and dear to my heart because in the Seventh Circuit, that

16    doctrine after K-Mart has questionable validity.  So look at

17    the cases cited by the debtor here.  They ask whether a non-

18    debtor counterparty should still be compelled to provide gas,

19    oil, fuel, marketing services, or some other essential good and

20    service which the non-debtor party declined to continue

21    providing.

22        THE COURT:  This is a contract about cash.  It's cash

23    which is either due or owing.  It's the most vital fuel in any

24    bankruptcy.  And you're proposing not to provide the cash but

25    to enjoy the benefits of the transaction that your client could

50

1    have terminated months ago.  Doesn't it strike you as unfair,

2    because it strikes me as unfair?  You should be able, on behalf

3    of your client, to hedge this and ride the market.  That seems

4    totally wrong to me.

5            MR. ARNOLD:  But we're not riding the market --

6            THE COURT:  I am completely telegraphing to you that

7    you are arguing from an extremely weak position.

8            MR. ARNOLD:  And if your ruling is that a non-debtor

9    counterparty may not enforce Section 2(a)(iii) of the swap

10   agreement --

11           THE COURT:  Didn't say that.  We are not dealing with

12   that section of the swap agreement.  Indeed, what I view as

13   particularly material here is that you and apparently your

14   client, a well-informed and sophisticated participant in the

15   market, decided to play this game for all its worth by not

16   terminating the contract.  You clearly had the right to do it

17   under 560.  I mean, you've got the legislative history, you've

18   got all kinds of history of the provision, you understand what

19   it's for, you knew you had the right to do it, but you opted

20   not to, that's extraordinary.  Your hands are a little unclean.

21   You're in a court of equity and you're seeking a case of first

22   impression in United States Bankruptcy Court.  Tough argument

23   for you.

24           MR. ARNOLD:  I think actually the unfairness is on the

25   other side.  And here's why.

51

1          THE COURT:  Why didn't you terminate?

2          MR. ARNOLD:  Why don't they reject.

3          THE COURT:  Why didn't you terminate on day 5?

4          MR. ARNOLD:  Because we rehedged.

5          THE COURT:  Because you figured you owed money to do

6    so and you didn't want to be in that position, so you're

7    hedging your own position.

8          MR. ARNOLD:  We had no confidence in the debtors'

9    ability to honor its obligations under the swap agreement and

10   LBSF agreement.  And we no longer had a credit support

11   provider.

12         THE COURT:  So you could have terminated and replace.

13   Instead you just replaced and didn't terminate.

14         MR. ARNOLD:  That's true.  But remember, Your Honor,

15   what happened here is the essence of a swap agreement was taken

16   away from us.  The debtors are, essentially, asking you to

17   order us to pay disputed amounts.  And, by the way, we dispute

18   that any amount is currently owing.  In light of all the monies

19   we've had to pay to rehedge, the professional fees we've

20   incurred and so forth.  And that can be resolved in the context

21   of an evidentiary hearing if that's the Court's pleasure, or in

22   some other fashion.

23         THE COURT:  Almost ten months have gone by here and

24   nobody has brought this to my attention until you're now

25   responding to my comments to you.  You're now on the wrong end

52

1    of a motion to compel.

2         MR. ARNOLD:  They brought the motion to compel, but

3    what they succinctly and neatly avoided telling the Court is

4    that forcing Metavante to pay takes away our contractual rights

5    of setoff, netting and the termination rights we have.  There's

6    no question that Metavante has the ability to pay.  Should this

7    contract go to its end and there's a determination at that

8    point in time that the due to is due from Metavante to Lehman.

9         If what this is about, Your Honor, is Lehman's desire

10   to harvest what they think is a current accounts receivable,

11   then they should simply reject.  And I will tell you, Your

12   Honor, the reason why I think the equities are not so clearly

13   against Metavante in these circumstances is because it is the

14   debtor, not Metavante, that is playing the market.  This debtor

15   wants the Court to order the payment of these reset amounts.

16   And the nanosecond after a trillion dollars worth of money is

17   going into our economy causes a huge interest rate spike,

18   they'll reject, leaving Metavante with an unsecured claim for

19   the amounts due based upon the rejection under Section 562 of

20   the Bankruptcy Code.  That's what this is about.

21        THE COURT:  I'm not sure that's what it's about.

22   Because you had the ability to exercise all of the rights that

23   Section 560 gave participants just like you to terminate and

24   eliminate all risks.  Had you terminated this would be over.

25   We wouldn't be here.  We wouldn't be talking about these

53

1    theoretical issues of great interest.

2         MR. ARNOLD:  I cannot disagree with that, Your Honor.

3    The history that we had before you is that the agreement has

4    not been terminated --

5         THE COURT:  Because your client no doubt made its own

6    independent judgment as to what was in its best economic

7    interest, which was to not terminate and hope the markets might

8    move and to make the kinds of arguments you're now making.  In

9    effect, you're playing the market ten months later.

10        MR. ARNOLD:  Which is a right that that the non-debtor

11   counterparty has granted, both by statute and by contract.

12        THE COURT:  Absolutely untrue.  I don't see a single

13   place where anybody in your position is granted the right to

14   play the market, except at its own risk.

15        MR. ARNOLD:  If that's the Court's ruling --

16        THE COURT:  No, that's just my comment about what you

17   said.  Where is it written -- where is it written that you have

18   the right to do what you're proclaiming you have the right to

19   do?

20        MR. ARNOLD:  It's in Section 9 of the ISDA swap -- of

21   the basic ISDA agreement.

22        THE COURT:  Where is it in here?  That's the

23   Bankruptcy Code I just demonstratively showed you.

24        MR. ARNOLD:  Congress' silence on the point is

25   deafening.  We have a Congress that completely understands

54

1    when, if or how to create limitations for the exercise of

2    rights in the face of executory contracts.  It speaks volumes

3    that even after they overruled Enron in 2005 they still didn't

4    establish a time limit.  All they created was a new count

5    damage measurement calculus in Section 562.

6         THE COURT:  Fine.  And without a time limit you'll be

7    bound by issues of waiver and laches and legislative history.

8         MR. ARNOLD:  Which is a risk that Metavante takes,

9    isn't it?  If Metavante, to borrow from your phraseology early

10   on in this hearing, in light of your comments today and perhaps

11   some of the signals that you've sent to the parties and

12   counsel, if Metavante chooses to terminate you've already heard

13   what's going to happen.  If prior to the evidentiary hearing on

14   this contested matter or any discovery that takes place with

15   respect to the pre-petition defaults that occurred here,

16   Metavante does choose to terminate, like Baylor University and

17   a couple of dozen others who have not yet terminated, if

18   Metavante chooses not to terminate, you've already heard what

19   the next pleading is going to be.  The debtors will file a

20   motion saying that Metavante did not have the right to

21   terminate, and that you should find that Metavante either

22   waived the right to terminate or is estopped to assert it.

23   That's exactly what they've said today.  They want cake and eat

24   it too.  They want to preclude Metavante from terminating and

25   they want to hold out the right to reject when and if and

55

1    whenever they choose to do so.

2         THE COURT:  Well, when sophisticated parties choose to

3    play in the corners of statutes that are not very well lit,

4    they play at their own risk.

5         MR. ARNOLD:  I wish two things.  I wish Congress had

6    been clearer with respect to the implementation of the so-

7    called safe harbor swaps.  And, frankly, I wish that our client

8    had terminated as of sometime in October because it would have

9    obviated the necessity of this hearing.  But it did not.  And

10   it's failure to do so whether you question the business

11   judgment behind that, cannot be impugned from the standpoint of

12   saying that they did not have a contractual right to do so or a

13   statutory right to wait.

14        You might accuse them of making a bad business

15   decision, but it's unfair for the parties to say that Metavante

16   is gaming the system.  They might have made the mistake, and if

17   my making a mistake of not terminating earlier, this Court then

18   takes away the right to terminate, that's for this Court to

19   decide.

20        THE COURT:  Well, that's a different question.

21        MR. ARNOLD:  It is.

22        THE COURT:  I think that the question of whether you

23   have the right to terminate is truly not before me today.  One

24   think is sure at one point you absolutely had the right to

25   terminate.  Whether you ever lost that right because of the

56

1    passage of time remains to be determined.  The more potent

2    question is whether or not you have the right to run this game

3    out to 2012 and not pay amounts that are otherwise due and

4    owing on a quarterly basis to the estate.  That's where I think

5    you need to pay to play.  And you're choosing to not pay and

6    play at the same time.  That's a problem.  And I think that's

7    where your hands are just a little soiled.

8              MR. ARNOLD:  I really only have one response to that.

9    The whole concept of pay to play builds off of a foundation

10   that there's continuing consideration flowing back and forth.

11   It's why this whole concept of the election of remedies here is

12   a complete non-starter.  It has absolutely no applicability

13   here.

14         Intrinsic in your comment that Metavante should not be

15   permitted to sit back and then choose to terminate when it

16   chooses, is a predicate that it is still benefiting from the

17   underlying contractual relationship with the debtors, and it is

18   not.  It is an ineffective hedge at the cost of millions of

19   dollars that Metavante rehedged.  And Metavante's fundamental

20   rights, these rights of netting and setoff and so forth would,

21   effectively, be taken away if the Court ordered Metavante to

22   pay to preserve those rights later on when hypothetically the

23   debtor then rejects the contract leaving Metavante with nothing

24   more than an unsecured claim.

25         That's why I was intrigued by the debtors' references

57

1    to the sort of -- I call them critical vendor cases, the cases

2    involving the obligation to continue providing services where

3    it was really important; it was gas, it was electricity --

4    excuse me, not electricity, marketing services and so forth.

5    What I found compelling about those cases was that the courts

6    worked hard to fashion some kind of a concept of adequate

7    protection.

8          My friend, Bill Rochelle argued the case involving --

9    the case in Pennsylvania where ultimately National Gas was, in

10    fact, compelled to continue supplying.  But the court found a

11    way to protect National Gas from the inability of the debtor to

12    pay because it didn't force them to extend it on open account

13    post-petition and leave them with merely a post-petition

14    administrative expense claim.  Remember, this contract has not

15    yet been assumed.

16          So inside the dialogue we're having right now about

17    the fundamental fairness and the suggestion that Metavante has

18    unclean hands, there's perhaps an opening to talk about this in

19    the context of adequate protection.  What would adequately

20    protect Metavante's interest in preserving the fundamental deal

21    and it's rights under the swap agreement, and the debtors'

22    desire to be paid, at least at a point in time when it believes

23    it's in the money.  Remember we dispute that because of the

24    various offsets that Metavante has already incurred by virtue

25    of the debtors' defaults -- pre-petition defaults.

58

1        And as we thought creatively about what that adequate

2   protection might mean, we talked about escrow agreements, we

3   talked about a variety of things that might address the

4   situation, I'll tell you what the only sensible answers we came

5   up with, Your Honor, and that's for the parties to agree

6   consensually to permit this contract to be assumed and

7   assigned.  Notwithstanding the objections that Metavante and

8   100 other counterparties raised with respect to the fundamental

9   predicate of whether this can be assumed and assigned, there's

10  an opportunity for this to be resolved if Metavante and some

11  third party agrees to enter into a forward contract for the

12  period of time that Metavante did not rehedge for.  Metavante

13  only rehedged for a period of the four-year term that the

14  underlying swap agreement governed.  It went all the way out to

15  February 2012.  Metavante didn't rehedge that far out.  So

16  there's still that gap period between the expiration of the

17  rehedge and the expiration of the original swap agreement.

18       And inside of that dialogue, candidly, is the

19  opportunity to settle this matter.  That's the only creative

20  solution that we've been able to come up with to resolve what

21  is, otherwise, a tough question.  I accept that you've told us,

22  and you've told Metavante today, that the position it's

23  articulating is hard position in a court of equity, I accept

24  that.  Our pleadings did not mince words, we didn't hide the

25  ball with respect to what we believe are the fundamental rights

59

1   of a non-defaulting counterparty as Mr. Shore and others took

2   pains to quote, again, what we said.  We haven't tried to hide

3   what this is about.  There's some pretty important questions

4   here.

5       THE COURT:  Okay.  Well, I think I understand your

6   position.

7       MR. ARNOLD:  One last question.  I know that this is,

8   perhaps, not as important to the overall resolution of this

9   thing, but having gone to Michigan Law School and studied under

10  Professor Wright, it did bother me that the argument was made

11  that the LBHI filing was part of the ipso facto clause because

12  of the use of a phrase "a case."  For the record, the

13  background there, according to Professor Wright, finds its

14  history in the Bankruptcy Act and the report of the Commission

15  on Bankruptcy Laws in the United States.  And the codification

16  of actually a Second Circuit case called Queens Boulevard, the

17  Commission on the Bankruptcy Laws in the United States

18  encouraged Congress to put the ipso facto provisions in Chapter

19  3 of the Bankruptcy Code, not Chapter 11.  So that the ipso

20  facto provisions would apply to all cases filed under the

21  Bankruptcy Code; both Chapter 7 cases and Chapter 11 cases.  So

22  the suggestion that LBHI's filing a case did not trigger a pre-

23  petition default in favor of Metavante has absolutely no

24  support in the legislative history or otherwise.  It is not

25  accidental that the debtor cited not case for that proposition

60

1  because there are none, because it's wrong.  It's an incorrect

2  construction of the statute.  Thank you, Your Honor.

3        THE COURT:  Okay.  Is there anything more on this?

4        MR. SLACK:  Your Honor, I wanted to just let the Court

5  know that the interest number that you asked for before in our

6  papers, at the time of filing, was 359,215.37.

7        And unless Your Honor has questions for me, I have

8  nothing further.

9        THE COURT:  Okay.  I'm not going to decide this from

10  the bench.  Although, I suspect that I've been fairly

11  transparent in some of my views on this.  To the extent that

12  the parties have found this a cathartic experience to argue

13  somewhat esoteric issues involving safe harbor provisions and

14  rights under Section 365 of the Bankruptcy Code, that's find.

15  I found it an interesting argument.  But I'm intrigued by some

16  of the comments made by Mr. Arnold toward the end of his

17  presentation suggesting that the parties might profitably

18  confer about ways to find a business solution to this.  That

19  may not be possible, I'm assuming it's improbable given the

20  fact that we've gotten to this point.  Suggesting some fairly

21  rigid positions of the parties, at least up to this point.

22        My candid belief is that it is extraordinarily

23  difficult for a party in Metavante's position to not perform

24  while at the same time boldly asserting that it has a right to,

25  in effect, hold onto the position for years hoping to derive

61

1   some benefits in movements in the credit markets, or interest

2   markets.

3          I'm not going to grant this motion today, but I'm

4   going to take it under advisement.  I would suggest that this

5   matter be calendared for one of our omnibus hearings in

6   September for purposes of a status conference, and for purposes

7   of either a bench ruling at that time, or a status report on

8   any progress the parties may have made in attempting to resolve

9   this on their own.  I also reserve the right to decide this by

10  opinion before that date.

11         We're adjourned until tomorrow at 10 a.m.  And I have

12  a very long calendar to prepare for.

13         MR. SLACK:  Thank you, Your Honor.

14      (Proceedings concluded at 3:36 p.m.)

15

16

17

18

19

20

21

22

23

24

25

62

C E R T I F I C A T I O N

I, Esther Accardi, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

ESTHER ACCARDI (CET**D-485)

AAERT Certified Electronic Transcriber

Veritext LLC

200 Old Country Road

Suite 580

Mineola, New York 11501

Date: July 15, 2009