1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP) and 08-01420(JMP)(SIPA)

Adv. Case Nos. 09-01241, 09-01261, 09-01242, 09-01120,

09-01130.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

        Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

        Debtor.

- - - - - - - - - - - - - - - - - - - -x

LEHMAN BROTHERS SPECIAL FINANCING INC.,

           Plaintiff,

      -against-

HARRIER FINANCE LTD.,

           Defendant.

- - - - - - - - - - - - - - - - - - - -x

(cont'd. on next page)

2

1

2    - - - - - - - - - - - - - - - - - - - -x

3    LEHMAN BROTHERS SPECIAL FINANCING INC. and

4    LEHMAN BROTHERS HOLDINGS, INC.,

5                        Plaintiff,

6            -against-

7    AMERICAN FAMILY LIFE ASSURANCE COMPANY OF

8    COLUMBUS, et al.,

9                        Defendants.

10   - - - - - - - - - - - - - - - - - - - -x

11   LEHMAN BROTHERS SPECIAL FINANCING INC.,

12                        Plaintiff,

13           -against-

14   BNY CORPORATED TRUSTEE SERVICES LIMITED,

15                    Defendant.

16   - - - - - - - - - - - - - - - - - - - -x

17   WONG, et al.,

18                        Plaintiffs,

19           -against-

20   LEHMAN BROTHERS SPECIAL FINANCING INC.,

21                    Defendants.

22   - - - - - - - - - - - - - - - - - - - -x

23   (cont'd. on next page)

24

25

3

1

2      - - - - - - - - - - - - - - - - - - -x

3      OLIVIA BAM,

4                          Plaintiff,

5             -against-

6      BARCLAYS CAPITAL INC.,

7                          Defendant.

8      - - - - - - - - - - - - - - - - - - -x

9

10

11

12

13

14                     U.S. Bankruptcy Court

15                     One Bowling Green

16                     New York, New York

17

18                     July 15, 2009

19                     10:03 a.m.

20

21      B E F O R E:

22      HON. JAMES M. PECK

23      U.S. BANKRUPTCY JUDGE

24

25      OMNIBUS HEARING

4

1

2     HEARING re Debtors' Motion for Authorization and Approval of

3     Settlement Agreement with Kojaian Affiliates [Docket No. 4160]

4

5     HEARING re Motion of Kalaimoku-Kuhio Development Corp. for an

6     Order Compelling Payment of Post-Petition Rent and Charges and

7     Relief from the Automatic Stay [Docket No. 3768]

8

9     HEARING re Motion of DnB Nor Bank ASA for Allowance and Payment

10    of Administrative Expense Claim and Allowing Setoff of Such

11    Claim [Docket No. 4054]

12

13    HEARING re Motion of Levine Leichtman Capital Partners Deep

14    Value Fund, L.P. for an Order Compelling Debtors' Performance

15    [Docket No. 4059]

16

17    HEARING re Motion of Official Committee of Unsecured Creditors

18    to Direct the Examiner to Comply with Court's Order Directing

19    Appointment of an Examiner [Docket No. 4262]

20

21    HEARING re Debtors' Motion Requesting Second Extension of

22    Exclusive Periods for the Filing of and Solicitation of

23    Acceptances for Chapter 11 Plans [Docket No. 4253]

24

25

5

1

2    RE: ADV. CASE NO. 09-01241:

3    HEARING re Pre-Trial Conference/Motion Granting Authority to

4    Intervene as Plaintiff

5

6    RE: ADV. CASE NO. 09-01261:

7    Pre-Trial Conference

8

9    RE: ADV. CASE NO. 09-01242:

10   Pre-Trial Conference/Motions to Intervene

11

12   RE: ADV. CASE NO. 09-01120:

13   HEARING re Pre-Trial Conference/Motion to Stay Discovery

14

15   RE: ADV. CASE NO. 09-01130:

16   HEARING re Motion to Dismiss Adversary Proceeding

17

18

19

20

21

22

23   Transcribed by:  Ellen Kolman

24                    Clara Rubin

25                    Pnina Eilberg

6

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES, LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          SHAI Y. WAISMAN, ESQ.

10         JOHN W. LUCAS, ESQ.

11         RICHARD L. LEVINE, ESQ.

12         GARRETT A. FAIL, ESQ.

13         SCARLETT E. COLLINGS, ESQ.

14         RALPH I. MILLER, ESQ.

15         RICHARD W. SLACK, ESQ.

16

17

18   ALLEN & OVERY, LLP

19         Attorneys for Kojaian Affiliates

20         1221 Avenue of the Americas

21         New York, NY 10020

22

23   BY:   KEN COLEMAN, ESQ.

24

25

7

1

2      CAHILL GORDON & REINDEL LLP

3            Attorneys for Wong Foreign Defendants

4            Eighty Pine Street

5            New York, NY 10005

6

7      BY:   HOWARD (PETER) G. SLOANE, ESQ.

8

9      COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

10           Attorneys for Wong Movants

11           655 West Broadway

12           Suite 1900

13           San Diego, CA 92101

14

15     BY:   RAY MANDLEKAR, ESQ.

16           PATRICK W. DANIELS, ESQ.

17

18     COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP

19           Attorneys for Wong Movants

20           100 Pine Street

21           Suite 2600

22           San Francisco, CA 94111

23

24     BY:   JASON C. DAVIS, ESQ.

25

8

1

2    DEWEY & LEBOEUF, LLP

3          Attorneys for Elliot Associates, King Street Capital

4          Management, Paulson & Co., Inc.

5          1301 Avenue of the Americas

6          New York, NY 10019

7

8    BY:   MARTIN J. BIENENSTOCK, ESQ.

9

10   GENOVESE JOBLOVE & BATTISTA P.A.

11         Attorneys for Wong Movants

12         200 East Broward Boulevard, Suite 1110

13         Fort Lauderdale, FL 33301

14

15   BY:   ROBERT F. ELGIDELY, ESQ.

16

17   GENOVESE JOBLOVE & BATTISTA P.A.

18         Attorneys for Wong Movants

19         Bank of America Tower

20         100 Southeast Second Street

21         44th Floor

22         Miami, FL 33131

23

24   BY:   W. BARRY BLUM, ESQ.

25

9

1

2    HUGHES HUBBARD & REED, LLP

3           Attorneys for the SIPA Trustee

4           One Battery Park Plaza

5           New York, NY 10004

6

7    BY:   KENNETH E. LEE, ESQ.

8          JEFFREY S. MARGOLIN, ESQ.

9          SARAH LOOMIS CAVE, ESQ.

10

11   JENNER & BLOCK LLP

12          Attorneys for the Examiner

13          330 N. Wabash Avenue

14          Chicago, IL 60611

15

16   BY:   ROBERT L. BYMAN, ESQ.

17

18   KRAMER LEVIN NAFTALIS & FRANKEL, LLP

19          Attorneys for The Bank of New York Mellon as Indentured

20           Trustee, Main Street Bonds

21          1177 Avenue of the Americas

22          New York, NY 10036

23

24   BY:   AMY D. CATON, ESQ.

25

10

1    LEVENE, NEALE, BENDER, RANKIN & BRILL, LLP

2         Attorneys for Movant, Kalaimoku-Kuhio Development

3          Corporation

4         10250 Constellation Boulevard, Suite 1700

5         Los Angeles, CA 90067

6

7    BY:   DAVID L. NEALE, ESQ.

8

9    MILBANK, TWEED, HADLEY & MCCLOY, LLP

10         Attorneys for the Official Committee of

11          Unsecured Creditors

12         One Chase Manhattan Plaza

13         New York, NY 10005

14

15   BY:   DENNIS C. O'DONNELL, ESQ.

16         DENNIS F. DUNNE, ESQ.

17

18   MILBANK, TWEED, HADLEY & MCCLOY, LLP

19         Attorneys for the Official Committee of Unsecured

20          Creditors

21         International Square Building

22         1850 K Street, NW

23         Washington, DC 20006

24

25   BY:   DAVID S. COHEN, ESQ.

11

1

2   MORRISON FOERSTER

3        Attorneys for Levine Leichtman Capital Partners Deep

4         Value Fund, LP

5        1290 Avenue of the Americas

6        New York, NY 10104

7

8   BY:   BRETT H. MILLER, ESQ.

9

10  REED SMITH LLP

11       Attorneys for BNY Corporate Trustee Services

12       355 South Grand Avenue

13       Suite 290

14       Los Angeles, CA 90077

15

16  BY:   ERIC C. SCHAFFER, ESQ.

17

18  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

19       Attorneys for AFLAC

20       One Rodney Square

21       Wilmington, DE 19899

22

23  BY:   ROBERT A. WEBER, ESQ.

24       ANTHONY W. CLARK, ESQ (TELEPHONICALLY)

25

12

```
 1

 2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 3         Attorneys for AFLAC

 4         Four Times Square

 5         New York, NY 10036

 6

 7    BY:   SALLY MCDONALD HENRY, ESQ.

 8

 9

10    SULLIVAN & CROMWELL LLP

11         Attorneys for Defendant Barclays Capital Inc.

12         125 Broad Street

13         New York, NY 10004

14

15    BY:   ROBINSON B. LACY, ESQ.

16         THEODORE O. ROGERS, JR., ESQ.

17

18

19    VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.

20         Attorneys for Plaintiff Olivia Bam

21         1501 Broadway

22         Suite 800

23         New York, NY 10036

24

25    BY:   VALDI LICUL, ESQ.
```

13

```
 1

 2    WHITE & CASE, LLP

 3          Attorneys for DnB NOR Bank ASA and Ad Hoc Group of

 4           Creditors

 5          1155 Avenue of the Americas

 6          New York, NY 10036

 7

 8    BY:   J. CHRISTOPHER SHORE, ESQ.

 9          LISA THOMPSON, ESQ.

10

11    U.S. DEPARTMENT OF JUSTICE

12          Office of the United States Trustee

13          33 Whitehall Street, Suite 2100

14          New York, NY 10004

15

16    BY:   LINDA A. RIFFKIN, AUST

17

18    TELEPHONIC APPEARANCES:

19    CHAPMAN & CUTLER LLP

20          Attorneys for Creditor, US Bank, N.A.

21          111 West Monroe Street

22          Chicago, IL 60603

23

24    BY:   JAMES HEISER, ESQ. (TELEPHONICALLY)

25          FRANKLIN H. TOP, III, ESQ. (TELEPHONICALLY)
```

14

1

2    GALLAGHER & KENNEDY, P.A.

3         Attorneys for Venture Associates, LLC

4         2572 Camelback Road

5         Suite 1100

6         Phoenix, AZ 85016

7

8    BY:   LINDSI M. WEBER, ESQ. (TELEPHONICALLY)

9

10   LEVINE LEICHTMAN CAPITAL PARTNERS

11        Interested Party

12        335 North Maple Drive

13        Suite 130

14        Beverly Hills, CA 90210

15

16   BY:     JASON D. SCHAUER (TELEPHONICALLY)

17

18   STUTMAN, TREISTER & GLATT PC

19        Interested Party

20        1901 Avenue of the Stars

21        12th Floor

22        Los Angeles, CA 90067

23

24   BY:   JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

25

15

1

2   STUTMAN, TREISTER & GLATT PC

3         Attorneys for Creditor, Perry Capital

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8   BY:   MARINA FINEMAN, ESQ. (TELEPHONICALLY)

9

10  CREDIT SUISSE FIRST BOSTON

11        Interest Party

12

13  BY:   ANDREW REBAK (TELEPHONICALLY)

14

15

16

17

18

19

20

21

22

23

24

25

16

P R O C E E D I N G S

THE COURT:  Please be seated.

MR. H. MILLER:  Good morning, Your Honor.  Harvey

Miller, Weil Gotshal & Manges on behalf of the debtors.  Today

is an auspicious date, Your Honor.  It's exactly ten months ago

today that we all began this epic journey into the demise of

Lehman and where it is going.  I'm sure as Your Honor will

recall the first four of the five months was the period of a

series of emergencies as the debtors strived to preserve and

protect the assets of these estates.  By my count, Your Honor,

I think this is the eighteenth omnibus hearing and we have

today one uncontested matter, five contested matters, five

adversary proceedings and a combination of fourteen adjourned

adversary proceedings and contested matters.  And with Your

Honor's permission, Mr. Waisman will lead off on the agenda.

THE COURT:  That's fine.  Thank you.

MR. H. MILLER:  Thank you.

MR. WAISMAN:  Good morning, Your Honor.  Shai Waisman,

Weil Gotshal Manges on behalf of Lehman Brothers Holdings,

Inc., debtors.  As Mr. Miller mentioned, the first matter on

the agenda this morning, the revised agenda, which was filed

early this morning on the Court's docket, is the debtors'

motion for authorization and approval of a settlement agreement

with the Kojaian Affiliates.

Your Honor, the original motion was filed at docket

17

1    4160.  Objections were due July 10th.  No objections were

2    received.  In essence, Your Honor, this was a joint venture

3    project between the debtors and Kojaian and certain affiliates

4    in the Detroit, Michigan area.  The result here of several

5    disputes is essentially an amicable divorce with each of the

6    parties walking away with certain properties, certain payments

7    and releases.  As I indicated, Your Honor, no objections were

8    filed.  I'm happy to answer any questions Your Honor may have.

9         I do note that since the filing of the motion and the

10   proposed order, the order was modified.  Just to clarify for

11   one of the original parties, JPMorgan, here that certain

12   language in the order didn't affect a release of any of their

13   interests.  So I do have a blackline and clean order to hand up

14   to the Court.

15        THE COURT:  Why don't you approach with that and I'll

16   take a look at the blackline.  Thank you.

17        (Pause)

18        THE COURT:  Looks fine.  Does anybody wish to be heard

19   on this?

20        MR. COLEMAN:  Ken Coleman, Your Honor, on behalf of

21   the Kojaian Affiliates.  I just wanted to confirm that wording

22   just to make sure that that was the wording that our clients

23   had agreed on for the change in the order.  Because -- just one

24   moment, Your Honor.

25        THE COURT:  Take a look.

18

1        MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank,

2   Tweed, Hadley & McCloy on behalf of the committee just weighing

3   in as we have in the past with respect to these complex real

4   estate settlements.  We have looked at this closely.  We have

5   looked at what the debtors are keeping, what they're giving up

6   and the releases they're getting.  And based on a review, we're

7   satisfied that it's a transaction that makes sense for the

8   estate in its current form.

9        THE COURT:  That comforting, thank you.

10       MR. COLEMAN:  Your Honor, thank you for the time.

11  That language is acceptable to us.

12       THE COURT:  Fine.  It's approved.

13       MR. WAISMAN:  With that, Your Honor, we move onto the

14  contested portion of the LBHI agenda.  First matter on the

15  contested calendar is the motion of -- and I'll try it again,

16  Kalilocho-Kohunio (sic) --

17       THE COURT:  I don't think you did it right that time,

18  either.

19       MR. WAISMAN:  Certainly wrong again.  And I believe

20  the movant is here.

21       MR. NEALE:  Good morning, Your Honor, David Neale,

22  Leven, Neale, Bender, Rankin & Brill on behalf of Kalaimoku-

23  Kuhio Development.

24       Your Honor, we're back from our hearing on June 24th

25  and unfortunately not a lot has happened to change the status

19

1    quo.

2            THE COURT:  Well, I think a lot has happened, but

3    maybe we're back to a place similar to where we were last time.

4            MR. NEALE:  I think that's right, Your Honor.  There

5    was a sale motion that was filed.  It was subsequently

6    adjourned to August 5th.  We learned from the buyer yesterday

7    that the sale agreement had been terminated.  We had learned

8    prior to that that the deposit that was required under the sale

9    agreement by the end of June had not been made.  So we're here

10   today, essentially, in the same place we were.  Except now,

11   another month's worth of rent has come due.  So at this point

12   the post-petition default amount is up to 800,000 dollars.

13   It's, obviously, going to increase August 1st.  We've heard

14   from the debtor that they're evaluating options, that they're

15   considering alternatives and so on and so forth.  But as we

16   discussed last time, Your Honor, the concern my client has is

17   that you can consider alternatives indefinitely and my client

18   has now become the largest involuntary lender to this debtor

19   having extended over 800,000 dollars worth of post-petition

20   credit.

21           At this point, Your Honor, as we discussed last time,

22   Section 365(b)(3) stated in a mandatory that the debtor shall

23   timely perform its obligations.  Mr. Waisman conceded that

24   point in his declaration in support of the motion for an order

25   shortening time or an order to show cause why the hearing on

20

1   the sale motion cannot be accelerated and conceded that the

2   obligations are about a million two as of July 14th or cure

3   about 850,000 of that is post-petition.  At this point, Your

4   Honor, my understanding is that the debtor has adjourned the

5   sale here until August 5th.  I would anticipate that they're

6   going to get up before Your Honor and say, let us have another

7   crack at this and let us have until August 5th to try to figure

8   this out.  At the last hearing, Your Honor was pretty clear

9   about saying that either come back with an agreement with the

10  landlord about the payment to post-petition rent or explain to

11  me how it is you're going to pay this post-petition rent.

12  Well, there's no motion to approve DIP financing, there's been

13  no advance by any of the other debtors to this estate.  There's

14  no payment that's been made.  When we were last here, there was

15  about 150,000 dollars of cash in the bank.  I don't even think

16  there's that anymore.  If there is, that's all there is.  So

17  again, my client's in a position of standing before Your Honor

18  having requested relief which is still on hold even though

19  365(b)(3) requires the debtor perform by sixty-days into the

20  case.

21        So again, we just ask that the Court, at this point,

22  grant our motion.  If the debtor has a transaction that it

23  wants to propose to us after the motion has been granted, we're

24  open to considering all issues.  But at this point, the

25  post-petition rent really should be paid.

21

1        THE COURT:  Okay.  We'll let me find out --

2        MR. O'DONNELL:  Thank you, Your Honor.

3        THE COURT:  -- the debtors' positions on this.

4        MR. WAISMAN:  Your Honor, as --

5        THE COURT:  Did he predict what you were going to say?

6        MR. WAISMAN:  I think there's a little bit more to

7   that and that's certainly not our request as to their request

8   to put this out to --

9        THE COURT:  Someone who is on the phone should mute

10  the phone.  In fact, everybody who's on the phone should mute

11  the phone.  We heard you in the courtroom.  Mr. Waisman, please

12  proceed.

13       MR. WAISMAN:  Their request to put off to August is

14  not accurate.  Last we were before Your Honor we did have a

15  asset purchase agreement signed by a purchaser.  We executed it

16  immediately after the hearing.  The purchaser was required to

17  provide a deposit.  The purchaser asked for more time.  And for

18  the benefit of the estate and all of its stakeholders we

19  provided more time.  The hearing for Monday was put off to

20  today and on Monday we received the supplement that the

21  landlord's attorneys filed indicating in quite some detail the

22  wherewithal, alleged wherewithal, of the purchaser to

23  consummate the deal.  That isn't information that we provided

24  and subsequent to receiving this supplement that was filed in

25  the docket, the purchaser in fact sent over a notice of

22

1   termination which we received late yesterday afternoon.  This

2   is not an enviable situation, but the debtor is striving to do

3   the best by its estate and all stakeholders.  There are other

4   parties that have expressed an interest.  We would like to

5   quickly circle back with them.  See if there's somebody who's

6   willing to step into the shoes of this purchaser and quickly

7   consummate a deal.  Otherwise I agree; we really have no

8   alternative but presumably to reject the lease.

9           In terms of the landlord position as an administrative

10  creditor, either we will come forward with a purchaser which

11  will satisfy their claims, and hopefully all claims of

12  administrative creditors in the Kalakaua estate or will be left

13  with a number of administrative creditors, including the

14  landlord but not exclusively the landlord, and it certainly

15  would be inappropriate, from the estate's perspective, to

16  prefer the landlord over the other administrative creditors.

17  And at that point, we could determine what the next steps would

18  be, what the assets of the estate are and how to proceed with

19  its most valuable asset, which is the building.

20          THE COURT:  Isn't that the only asset really?

21          MR. WAISMAN:  There are other contracts.  There is a

22  tenant in place that has, I believe there is some --

23          THE COURT:  But this is single asset real estate in

24  all -- for all practical purposes, correct?

25          MR. WAISMAN:  I think that's accurate.

23

1          THE COURT:  One of the concerns I have here, Mr.

2     Waisman, is to this case and it's a mundane case that's caught

3     up in an extraordinary bankruptcy.  It's a case with limited

4     liquidity accruing administrative claims, a landlord

5     aggressively pressing the motion for payment and it's the sort

6     of situation which if it weren't arising in a packed courtroom

7     might lead to somebody filing a motion to dismiss, even the

8     debtor, or some Hail Mary pass towards financing our sale,

9     which is what we seem to be doing.  And I'm frankly a little

10    concerned about the potential -- administrative insolvency in

11    this case, raising some serious questions for this morning.  Is

12    there any plan to fund from sources outside this debtor for

13    payments that are due and owing to the landlord?

14         MR. WAISMAN:  Other than locating a purchaser to take

15    on the liabilities, no, there is not.

16         THE COURT:  I'm inclined to grant the landlord's

17    motion unless there is something more than a general

18    representation of interest in the property.  Because last time

19    we adjourned this to today, with the understanding which proved

20    to be true, that there was a real fish on the hook; well, that

21    fish got away.  And just because there may be some other fish

22    out there, may not be a sufficient reason to defer this.  I'd

23    like to hear if there is some substantive reason to think that

24    putting this over to August 5 would lead to a different

25    outcome.

24

1        MR. WAISMAN:  Your Honor, the debtors have had since

2   about 4 yesterday afternoon to react to the notice of

3   termination.  It's not as though the debtors knew that the

4   purchaser was walking away last week and have been evaluating

5   their options since then and contacting other interested

6   parties.  I think it would be in the estate's best interest if

7   the debtors had a minimal amount of time to see if this

8   purchaser has any remaining interest or is truly walking away.

9   There hasn't even been an opportunity to call the purchaser.

10  And for us and the broker to turn back to the other parties

11  that have contacted us up until last week because this did

12  receive local press, to see if there's a transaction.  And

13  debtor is not looking to delay this into eternity.  We agree

14  there should be a finite deadline on when we have to make our

15  determination, but I think it's reasonable.  We've had no time

16  to react to the termination of the asset purchase agreement or

17  to see if there's another transaction that would benefit the

18  estate.  Understanding the landlord is going to take every

19  advantage of this termination in an attempt to not only demand

20  rent payments but to seek a blanket carte blanche modification

21  of estate to pursue remedies that aren't even specified.  We

22  can address that when and if the time is right, but I think the

23  debtor should be afforded a brief window here to react, review

24  its alternatives, speak to the landlord, speak to the purchaser

25  and determine how to proceed with the case.

25

1        MR. NEALE:  Your Honor, may I respond?

2        THE COURT:  Sure.

3        MR. NEALE:  Your Honor, the purchaser failed to make

4   the deposit in late June.  It's now the middle of July.

5   There's certainly been an opportunity to discuss the situation

6   with the purchaser.  In addition, we had understood from the

7   debtor and the purchaser that there were discussions that were

8   ongoing between the debtor and the purchaser between the time

9   that the deposit was not made and today's hearing.  In fact,

10  the hearing on Monday was adjourned so that there could be

11  contemplation of additional overbids to the extent that the

12  debtor was talking to other parties and wanted to see if there

13  were other opportunities out there.

14       Essentially, the debtor is asking for more time as

15  every debtor would ask for more time if he could live in

16  bankruptcy rent free.  That's basically what the debtor is

17  suggesting here.  That we take another month to have the debtor

18  consider its options and evaluate its alternatives.  That's

19  exactly what we heard last time we were here; a roundup of a

20  signed purchase agreement.  That purchase fell apart.  They've

21  had the opportunity to explore these alternatives.  They've had

22  the opportunity to solicit overbids.  At this point, by August,

23  my client's claim will be a million five.  They have a purchase

24  agreement of three million dollars that has now fallen apart.

25  Presumably, the next bid is going to be even lower than that.

26

1          THE COURT:  Well, I wouldn't want to say that in an

2    open courtroom.

3          MR. NEALE:  Your Honor, we would love to see it be for

4    as much as possible, but we haven't seen any bids be made on

5    this property.

6          THE COURT:  Presumably the market will be whatever the

7    market is for an asset of this sort, but I wouldn't presume

8    that it's going down.

9          MR. NEALE:  Your Honor, it will be what it will be if

10   it will be.

11         THE COURT:  It will be what it will be.

12         MR. NEALE:  If it will be.  That's really the question

13   here, Your Honor.  The plea for more time was basically the

14   same plea the debtor made last time we were here.  If the Court

15   is inclined to give more time, which hopefully it is not

16   because of the mandatory language of 365(b)(3) that, at a

17   minimum, the debtor be required immediately to pay the amounts

18   due.  The Court last time inquired, "Are there other entities

19   that are going to advance funds to this entity so that the rent

20   can be paid?"  The answer then was the same answer as you

21   received today.  No it is not.

22         THE COURT:  I'll tell you what I'm inclined to do and

23   I'm sympathetic both to the position being expressed by the

24   landlord and also to the debtors' plight.

25         I'm prepared to grant your motion in part and to put a

27

1     time trigger on it.  In fact, a delayed fuse.  And it's August

2     1.  I'm going to order that the debtor in this case pay the

3     rent which is due pursuant to the lease by August 1.  Failing

4     that, you can have stay relief.  That, in effect, gives the

5     debtor the fifteen day window to either come up with financing

6     if it wishes to in effect play the optionality of holding onto

7     the property for sale or lose rights under applicable Hawaiian

8     state law.

9              MR. NEALE:  Thank you, Your Honor.  We'll prepare an

10    order and submit it to the Court.

11             THE COURT:  That's fine.

12             MR. NEALE:  Thank you.

13             MR. WAISMAN:  Thank you, Your Honor.  Item 3 on the

14    agenda this morning is the matter of DnB NOR Bank.  It's DnB's

15    motion.  For the debtors my colleague, John Lucas will be

16    arguing.

17             THE COURT:  Okay.

18             MR. LUCAS:  Good morning, Your Honor.  John Lucas,

19    Weil Gotshal for the debtors.  I believe Mr. Shore will be

20    arguing for DnB.

21             MR. SHORE:  Good morning, Your Honor.

22             THE COURT:  Good morning.

23             MR. SHORE:  Chris Shore from White & Case for DnB NOR

24    Bank.  Let me start with two apologies.  First, this is a

25    relatively small matter in a packed courtroom.  Having heard

28

1    what Your Honor said yesterday about preparing for the hearing,

2    I had asked to take it off but the debtors wanted to move

3    forward today.

4         My second apology is, once again, I seem to have found

5    an issue as to which there isn't a whole lot of case law on.  I

6    think some of it, some of the presentation, is basic principles

7    but there is an issue at the end as to which I don't think

8    there are any cases or any writing on, so it may take a little

9    more time to deal with that esoteric issue.  I presume the

10   Court's familiar with the underlying facts of the deposits and

11   the various deposits.

12        THE COURT:  I'm very familiar with this dispute.

13        MR. SHORE:  Okay.  The issue today is with respect to

14   the ninety-nine million dollar kroner deposit account which was

15   in -- which is a pre-petition debt which was offset against the

16   pre-petition debt.  Whether after the offset there's an

17   additional adequate protection payment that is due for the

18   diminution in the value of that collateral between the petition

19   date and the date of November 5th when adequate protection was

20   provided in the form of allowing DnB NOR to convert the

21   currency into U.S. Dollars.

22        THE COURT:  My recollection is that your partner, Mr.

23   Uzzi, was present in court when this issue first came up.  And

24   my best recollection, and the transcript will speak for itself

25   on this, is that there was a right to convert kroner to dollars

29

1   with the debtors' consent that I believed to be prospective as

2   of that point.   Now, is there an open issue of fact as to

3   whether or not it was intended to be prospective or not or is

4   that something that your client concedes?

5        MR. SHORE:   My client concedes that any currency

6   fluctuation after November 5th was on its own account.   That

7   is, it waited for an opportune moment to convert that currency

8   and converted the currency and as discussed with the Court on

9   December 3rd, which is the first hearing I came in on, we made

10  that clear at that point as well, but did say that there was an

11  open issue -- going to be an open issue to be resolved with

12  respect to what happened in the period from the petition date

13  to November 5th and that reservation of rights was memorialized

14  in the stipulation and order which Your Honor signed which

15  dealt with two issues; the evidentiary presentation on the

16  smaller kroner account and the authorization for the actual

17  offset of the ninety-nine million dollars.

18       So the basic facts, I don't think, are in dispute

19  here.   From the petition date to -- well, on the petition date,

20  there was ninety-nine million kroner on deposit.   Two days

21  after the filing, DnB NOR sent a letter to the debtors saying

22  we want -- we want to offset this.   We want to offset it now

23  subject to a reservation of rights.   We want to avoid issues of

24  fluctuation and said "If you can't do that, we'll file a motion

25  for lifting stay or in the alternative to seek adequate

30

1    protection."  The debtors didn't respond.  No problem there;

2    obviously they're busy.  But on September 30th that motion was

3    filed.

4              THE COURT:  Obviously are busy, it was September of

5    2008.

6              MR. SHORE:  No question, no question.  I just -- the

7    point being is that the debtors were given the choice two days

8    into the case to exercise their right to either lift the

9    stay --

10             THE COURT:  You have to be kidding in making this

11   argument.  At September 17th the case is two days old.  We're

12   talking about the day before the procedures hearing in the

13   Barclays sale.  The financial markets worldwide are reacting in

14   panic and you're suggesting -- are you actually suggesting

15   this, that there's an adequate protection right because you

16   sent a letter?

17             MR. SHORE:  There is -- the Best Products case which

18   is set forth, Judge Lifland sets out very clearly, and it's

19   actually been written upon by a number of people in the

20   courtroom, the problem of when to start accruing the adequate

21   protection payment.  I don't think there's a dispute here that

22   adequate protection is due.  There are numerous cases out

23   there, coming out of chambers --

24             THE COURT:  This is a dispute what adequate protection

25   is to.

31

1          MR. SHORE:  Well --

2          THE COURT:  I read the committee's papers which

3     suggest you don't even have a claim.

4          MR. SHORE:  Let me -- let me revise that or state that

5     more clearly.  The -- a secured creditor is entitled to

6     adequate protection for the diminution of its collateral while

7     the stay is pending.  The question that comes up in the cases

8     is when does the right of payment accrue and how do you

9     calculate that?  And there is a split as to whether it just

10    runs from the petition date until the time the stay is lifted

11    and the issue that arises and the concern that people have

12    raised, including Judge Lifland, is that a secured creditor

13    would gain the system.  That they wait until confirmation and

14    at that point raise the issue of the diminution and the

15    collateral and seek to throw additional administrative claims

16    on the estate at an inopportune moment.  What Judge Lifland

17    said was, "No, the right to accrue the obligation to pay the

18    adequate protection comes when the debtor is given the choice."

19    And in that case the debtor was given the choice with the

20    filing of the motion.

21          So technically, if one is focusing on that choice

22    argument, it is two days into the case.  I'm not faulting the

23    debtors for not responding but that's when the right to payment

24    starts accruing.

25          THE COURT:  Well, there are two dates in September.

32

1    One is September 17th when you send a letter; the other is

2    September 30 when you file a motion.

3              MR. SHORE:  Right.

4              THE COURT:  Are you saying that your sending of a

5    letter is a trigger event for purposes of your adequate

6    protection claim?

7              MR. SHORE:  Yes.

8              THE COURT:  And is your adequate protection claim

9    purely based upon foreign currency exchange risk?

10             MR. SHORE:  Yes.

11             THE COURT:  Okay.

12             MR. SHORE:  And the reason I make the distinction is

13   there is about -- and we have some differences in calculation;

14   there is about a two or three hundred thousand dollar swing

15   between the period of the sending of the letter and the filing

16   of the motion.  But the issue that the debtors raise and that

17   the committee raise -- well, first of all, the debtors raise an

18   issue that the committee doesn't raise, which is that the -- we

19   have no right to adequate protection on the motion filing date

20   because it was an alternative request.  That is, we said, "Lift

21   the stay or provide adequate protection".  I don't think that's

22   a proper reading of Best Products.  Best Products is if you

23   give them a choice, they have to then choose.  The debtors did

24   not consent on September 30th to allow the offset and it was

25   later determined that DnB NOR had a right of offset at that

33

1    time.  DnB warned them of the currency fluctuations and offered

2    to offset subject to reversal at a later date.  I don't think

3    there was ever any question as to whether DnB NOR was

4    creditworthy enough to deal with the issue if it was determined

5    that it was a post-petition -- if it was a post-petition

6    deposit which was the potential issue at that point.  Remember,

7    we separated out the seven million kroner from --

8             THE COURT:  I remember and I decided in a memoranda

9    decision which I'm sure you've read.

10            MR. SHORE:  We've read and we appreciate it.  It is a

11   now a final order so everything that's in there is law of the

12   case in connection with this motion as well.  And we certainly

13   appreciate the debtors need to investigate.  And they said they

14   needed to investigate and we're not faulting the professionals.

15   But the debtors bore the risk of loss between the time that

16   they were given the option and the time that they gave us the

17   right to offset.  And fundamentally, that's the issue.  Who

18   bears the risk of loss of the value of the collateral between

19   the time that the request is made and the time that the relief

20   is granted?  And if you want to look at it from a big picture

21   item, the code is full of sections which make clear the

22   congressional intent that a secured creditor is, to the fullest

23   extent possible, not to be affected by the bankruptcy.

24            THE COURT:  Is there any law, because I'm just not

25   familiar with it, that equates adequate protection and foreign

34

1    currency exchange risk?

2         MR. SHORE:  No.  I've not seen any cases, and it came

3    up in the context of dealing with the other motion as well,

4    that deal with what happens to the value of the collateral.

5    There are cases out there where commodities, where you can see

6    the fluctuation more clearly than you can with, for example, a

7    non residential real estate parcel.

8         THE COURT:  I have a hard time; I'm just giving you my

9    state of mind on this, equating foreign currency exchange risk,

10   which is inherent in banking, which is what your client does,

11   with diminution in value of collateral.  In effect, if you have

12   a collateral account that includes dollars or yen or sterling,

13   whatever it may be, that's the collateral.  It's worth what

14   it's worth in the market.  And unless you're involved in

15   currency swap arrangements, it's inherent in the collateral

16   you're holding.  I'm, frankly, perturbed by something that

17   nobody has really raised which is the entitlement as a matter

18   of law to adequate protection with respect to currency that a

19   bank holds.

20        MR. SHORE:  The problem --

21        THE COURT:  It's own deposit accounts.

22        MR. SHORE:  -- right.  The problem we have, and we

23   wouldn't have a problem if we could denominate our claim in

24   kroner, but the code won't allow us to denominate the claim in

25   kroner.  So you can have a very liquid asset which has market

35

```
1    prices published all the time, gold, but you still have to

2    convert it into U.S. dollars.  It can be converted quickly, it

3    can be converted almost instantaneously, but it has to be

4    converted.  And that's the problem you have.  The code is

5    what's causing the problem because it requires --

6         THE COURT:  I'm not sure I agree with that.  Because

7    in international transactions routinely, daily, every hour,

8    every minute, parties deal with this risk all the time with

9    currency swaps.  That's what they do.

10        MR. SHORE:  But there is --

11        THE COURT:  Or they assume the risk.

12        MR. SHORE:  Well, that's the issue.  The question is

13   who assumes the risk in this instance, right?  Do you put the

14   risk on the secured creditor who can't do anything because the

15   stay is in effect, or do you put it on the debtor who could

16   consent to lifting the stay?  At that point, the bank has an

17   open position in kroner and doesn't know whether it's going

18   to --- is a position that it can't hedge because it doesn't

19   know whether at the end of the day it's going to be handed

20   ninety-nine million kroner or it's going to be handed in

21   adequate protection payment.  The debtor is the one, once the

22   choice is put to it, that can control whether or not it's going

23   to consent to allow the stay to be lifted or it's going to

24   enforce the stay and take on an adequate protection obligation

25   with respect to currency risk.
```

36

1          So I agree the question is allocation of risk, I just

2    think that the code, which is built around protecting the

3    secured creditors from risk, is going to put that onus on the

4    debtors.

5          Now, this is going to be an odd case, obviously,

6    because you're not going to have a situation normally where

7    you've got a large amount of currency, which we have here, such

8    that it makes it worth litigating, you had a material

9    devaluation in currency over a short period of time, and you

10   had a secured creditor who is then out in front of it saying we

11   want to do this.  We want access to this account now and we

12   want you to lift the stay to do that.

13         So that's, I think at the end of the day, an

14   allocating risk; it's not creating an adverse precedent, at

15   least in the currency fund or otherwise, that says that the

16   burden is on the debtor or the risk is on the debtor of the

17   devaluation of the collateral, whether it's gold, currency,

18   real property, during that period in which it's deliberating

19   over the choice that's been put to it.  Either give the secured

20   creditor the collateral or keep it and maintain your adequate

21   protection obligations.

22         Once we get past that, that there is a right to

23   adequate protection, we get to what I think the committee's

24   response is, which is, you may have a right to adequate

25   protection, but you're not entitled to any priority for it.

37

1   And that's the 507(b) argument and where we could really get

2   caught in the weeds for a while.

3        I think that, first of all, they've overlooked one

4   fact.  We still have the seven million kroner account, which is

5   a -- now Your Honor has ruled a post-petition obligation.  To

6   the extent that there is an obligation to pay adequate

7   protection for the currency devaluation, it is a secured claim

8   to the amount of that deposit.  And I don't think anybody could

9   really argue that.  We've now determined it's a post-petition

10  obligation to pay adequate protection if there is one and a

11  post-petition deposit obligation.  So of the two and a half

12  million sought, about a million would be a secured claim.

13       The difficult issue is in 507(b) and just what

14  Congress was doing there.  507(b) covers a failure of adequate

15  protection.  What happens when adequate protection, which was

16  given, is not enough to compensate the secured creditor for the

17  loss, and that's another instance in which Congress has evinced

18  it's intent, driven largely by constitutional concerns, that

19  the secured creditor to the fullest extent possible not be

20  harmed by the imposition of -- in specifically 362.  And I

21  think the argument that the committee's making is focusing on

22  the language in 507(b) which says that "Such creditor", and it

23  may be worth pulling out here -- 507(b) gives a second priority

24  ahead of all other second priority claims to an adequate -- for

25  adequate protection to the extent, quote, "Such creditor has a

38

1   claim allowable under subsection (a)(2) of this section arising

2   from the stay of an action against such property under Section

3   362."  And (a)(2) is a 503(b) claim.

4        503(b), the provision which would be applicable, is

5   the actual necessary costs of administering the estate.  And

6   the argument that the committee is making is that although we

7   might have a claim for adequate protection, they're not

8   conceding that, but if to the extent we have a claim for

9   adequate protection, it's just not entitled a priority; it's

10   part of your pre-petition deficiency claim and it's actually

11   duplicative of the pre-petition deficiency claim.  Because the

12   deposit account, that ninety-nine million dollars did not

13   benefit the estate.  And I think -- I think that's the argument

14   that they're making.

15        Now, they don't cite any authority.  There are no

16   cases.  We've looked.  There's just nothing out there which

17   deals with the issue of where a secured creditor has an

18   adequate protection claim but can't demonstrate actual

19   necessary -- the actual necessary expense obligation for 503(b)

20   that there's no priority to it.  But I do have a couple of

21   responses to that.

22        First of all, we have cited to the cases that say that

23   where the debtor has enforced the stay, which they did here,

24   that it is presumed that the property that they were not giving

25   over was benefitting the estate.  Now, I recognize they're

39

1      foreign cases but there is authority on our side that says that

2      it's just presumed, the debtor would not be fighting the

3      automatic stay unless it was bent to keep the property unless

4      the property was benefiting the estate.  And here, the debtor

5      elected to hold the cash while it was doing its investigation,

6      as it says, but that's a cost of doing business.  But I think

7      where it gets really difficult, is I think this just raises

8      that whole Reading issue of what happens with respect to a

9      post-petition act of the debtors?

10          The adequate protection payment is a post-petition

11     obligation of the debtors.  The debtors are essentially saying

12     even though as a post-petition obligation, you can't show that

13     we benefitted you at all.  That is DnB provided any benefit to

14     the estate, any more than the people who were injured in

15     Reading by the fire; they didn't benefit the estate, but the

16     Supreme Court came out very clearly and said, no.  The

17     privilege of operating in Chapter 11 requires that your post-

18     petition obligation be paid as administrative expenses.  They

19     are benefitting the estate.

20          And so you've got this statute, 507(b), which requires

21     a secured creditor to show actual use for an adequate

22     protection payment, but the Supreme Court saying that it's

23     presumed.  If it's a post-petition obligation, it is actual and

24     necessary.  But I think you can harmonize it by going back to

25     these demand cases.

40

1      If you've got -- there is an obligation to pay

2  adequate protection for the diminution and the value of the

3  collateral, but the obligation for the debtor to pay that, does

4  not arise until the demand is made, until they're given the

5  choice.  At that point, the debtor is using the code to

6  prevent -- electing to use the code to prevent the secured

7  creditor from taking the collateral.  And in the instance in

8  which they are electing to do that, that is the benefit to the

9  estate.  It may be at the end of the day that all the benefit

10  was that they got to exercise their fiduciary duties and

11  determine whether or not we were a legitimate creditor and

12  whether it is a pre-petition or post-petition claim, but that's

13  the post-petition benefit.  They cited -- the only case that

14  even comes close to that is the Enron case, that gas capacity

15  pipeline, but that's a totally different issue.  That's a,

16  first of all, an unsecured creditor, but it's also a

17  pre-petition obligation.  We talked a little bit yesterday

18  about the DESCO and that weird GAAP period, that's what that

19  case is.  Which is somebody on a pre-petition contract coming

20  forward with arguing that even though it's a pre-petition

21  contract, it's got a post-petition obligation.

22      The obligation to pay adequate protection which

23  accrues at the time that the demand is made is a post-petition

24  obligation that is entitled to the second priority.  So once

25  you get past there is an adequate protection, of the claim, and

41

1    this is what we -- a million dollars of that is secured, we've

2    asked for the authorization to offset and there's no objection

3    to the offset to the extent that there is an obligation to pay

4    adequate protection.  So a million of that would be subject to

5    offset and the remainder, whether calculated from the petition

6    date, the date of the letter going out, or the date of the

7    motion, is entitled to a second priority.  And if you don't

8    have any questions, I'll sit down and hear what the others have

9    to say.

10         THE COURT:  Let's hear what everybody else has to say

11   about this.

12         MR. LUCAS:  Your Honor, John Lucas, Weil Gotshal for

13   the debtors.  Your Honor, we believe that the case law is clear

14   here and that when the bank filed its setoff motion that moved

15   the Court for stay relief to setoff its claim against the

16   funds.  And LBHI initially opposed the motion because the bank

17   failed to carry its burden, as it must, to show that it was

18   setting off pre-petition claims against pre-petition claims

19   between DnB and LBHI and it failed to do that and that's why we

20   opposed it.

21         And notably, Your Honor, the bank's motion expressly

22   stated that as an alternative that it sought adequate

23   protection and only if the Court denied its request for stay

24   relief and that never occurred, Your Honor.  Nevertheless, at

25   the November 5th hearing, LBHI agreed that the bank convert the

1    funds in the account to kroner to U.S. dollars.  The bank,

2    nonetheless, failed to timely convert the funds.  And, Your

3    Honor, it was only after we complained at the December 3rd

4    hearing that DnB agreed that it would take the risk from

5    November 5th forward.  We don't believe that was its intention

6    until it didn't exercise its rights that were provided at the

7    November 5th hearing.

8         By the bank's current motion, it now asks the Court to

9    provide it with this super priority administrative expense

10   claim pursuant to Section 507(b) as a result of currency

11   fluctuations from the petition date through November 5th, even

12   though the bank never made a request to this Court for adequate

13   protection for this period, and the bank expressly conditioned

14   any request upon the Court modifying the automatic stay.

15        Your Honor, the bank is essentially asking the Court

16   to provide it with adequate protection with respect to a period

17   of time that proceeds the date any request was made.  The law

18   is clear in this circuit and others that a secured creditor is

19   not entitled to adequate protection until the request is made,

20   and in this case, the bank cannot reformulate and change the

21   relief it actually requested in its setoff motion.  And we

22   think that the Best Products decision supports this result.

23        In addition, Your Honor, the motion fails for other

24   reasons.  As the committee also pointed out in its objection,

25   in order to be entitled to a super priority administrative

1    expense claim, you must satisfy three elements.  You must show

2    that you are granted out of protection and that ultimately

3    failed.  That the creditor has an allowable admin claim under

4    503(b)(1).  And that such claims arose as a result of, in this

5    case, Section 362.  The bank cannot satisfy these elements.

6          First, it's unclear how the bank can say that the

7    right to convert the funds was inadequate.  When it was given

8    such right, it failed to do so and it didn't so until a month a

9    half later.  The bank made knowledge of this December 3rd

10   hearing, which we've already discussed.

11         Second, this Court has not granted, and the bank has

12   not demonstrated that it's entitled to an admin claim under

13   503(b).  The bank fails in this regard because it cannot point

14   to any consideration that it provided to LBHI that actually

15   benefitted the estate.  As we know, that administrative expense

16   claims were provided to prevent the estate from being unjust

17   and rigid -- unjustly enriched at the expense of the secured

18   creditor.

19         As this Court held in the Enron decision that's cited

20   in the debtors' objection, "An entitlement to an administrative

21   expense claim cannot be sustained on the purported loss on the

22   creditor but only on the actual benefit of the estate."

23         And the bank here, as it's relying on the three

24   foreign cases that it cites in its motion, in those cases each

25   of the debtors entered into adequate protection agreements with

44

1    a secured creditor and it was required to make adequate

2    protection payments.  And in each of those situations, the

3    debtor was in possession and was able to use the equipment that

4    actually provided a concrete benefit to the estate.  Here, that

5    didn't occur.  The funds were not used by LBHI because the bank

6    immediately froze the funds after the petitions were filed in

7    LBHI's case.  LBHI never sought to use the funds, it didn't

8    seek the bank's consent and it did not file the motion pursuant

9    to 363(c)(2) to seek Your Honor's authorization to use the

10   funds.  The funds remain there today and we've never had access

11   to them although Mr. Shore said earlier on -- in our argument

12   that we had possession of them while we were deliberating and

13   figuring out which was pre- and which was post-; that's not the

14   case.

15        Any delay associated with the bank setoff motion was

16   caused by the bank's plan to satisfy its burden under Section

17   553.  Once the banks applied this information, LBHI promptly

18   agreed to consent to the setoff.  Your Honor, in the end, the

19   bank is not entitled to a super priority administrative expense

20   claim, because the adequate protec -- if it had the adequate

21   protection, it was more than sufficient and it cannot

22   demonstrate that it has an administrative expense claim under

23   503(b).

24        And one other point to respond to a point that you

25   brought up, Your Honor, is that -- about whether or not a

45

1    creditor is entitled for adequate protection for the foreign

2    currency that it holds.

3         The debtors are the ones that had a claim against DnB

4    in foreign currency, because the deposit, the account, is in

5    Norwegian kroner and they owe us the money.  However, DnB's

6    claim is in U.S. dollars with respect to a separate credit

7    agreement.  And so we agree with Your Honor when Your Honor

8    says that they're not entitled to adequate protection, the

9    money in the account is what it's worth.  And unless Your Honor

10   has any further questions, we believe that the motion should be

11   denied.

12        THE COURT:  Okay.  Thank you.

13        MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

14   Tweed Hadley and McCloy on behalf of the committee.  I don't

15   think -- I can be very brief here, Your Honor, because I think

16   Mr. Lucas covered his both own arguments and ours very well and

17   I think you've read our papers.  Just two points to sum it up.

18        Number one, in terms of whether adequate protection

19   was properly requested here, we don't think it was and the

20   right to not accrue is a result.  They had the opportunity to

21   do so on a number of occasions.  They contend that a letter did

22   it but post -- subsequent to the letter, they had other

23   opportunities to crystallize that request and that request was

24   not properly made.

25        And secondly, we think the dispositive point is that

46

1    as to the use of the cash, it was never used.  It say there and

2    the administrative freeze was never -- the debtors never sought

3    to undue the administrative freeze, so there was no use of the

4    credit cash and there could be no detriment to the estate or

5    any use for which the debtors had to compensate the creditor

6    here.  Unless the Court has any further questions, that's all

7    we have to say.

8            THE COURT:  I don't have any other questions.  Mr.

9    Shore, do you have anything more?

10           MR. SHORE:  Just three quick points.  First, the focus

11   here has to be on, seems to me if they're going to rely on Best

12   Products, when were they given a choice?  They were given the

13   choice.  It was not lift the stay to some extended period in

14   the future or pay in the adequate protection, it was I want the

15   money now subject to any kind of demand at a later date.  So

16   the demand -- they're trying to convert the demand for the

17   payment of the money and to pay me sometime in the future and

18   if you -- or give it to me some time in the future and if you

19   don't give it to me at some time in the future, pay me adequate

20   protection now.  The demand was give me the money now.

21   That's -- that was the demand so if you're not going to give me

22   the money now, give me the adequate protection now.

23           Second, there was a suggestion there that it was our

24   delay in establishing the right, the payment, or right to

25   offset.  The first information -- the first request we got for

47

1    information from Lehman was in the week prior to the November

2    5th hearing.  So this was not an instance in which the motion

3    was filed, the debtor came to us immediately and said, oh,

4    we've got serious questions with respect to this or that.  The

5    delay there was in the debtors' requesting information.

6    Ultimately, the motion was correct with respect to the ninety-

7    nine million.  The allegations that DnB NOR made with respect

8    to it being an offsettable amount were correct.  So again, on

9    the risk there, the bank couldn't have done anything more than

10   make a valid application and respond to the debtors' request,

11   which it did.

12        With respect to the benefit, I just don't hear the

13   debtors' dealing with Reading or its progeny.  If it's a post-

14   petition obligation, it's presumed to be actual and necessary.

15   You cannot take the position that I burned the building down

16   and I injured other people but those injuries that other people

17   suffered didn't benefit the estate.  It's presumed to benefit

18   the estate.  If they incurred an obligation to pay adequate

19   protection, it's presumed that it's actual and necessary.  It's

20   not the burden of the party to show that the debtor got a

21   benefit because otherwise that takes 507(b) out.  There isn't a

22   situation which is going to be a failure of adequate protection

23   unless the debtor did something, unless the collateral was

24   devalued.  So I think that to try to turn 507(b) into every

25   secured creditor needs to come forward and show actual benefit,

48

1    I think misreads the statute.

2            MR. LUCAS:  May I, Your Honor?

3            THE COURT:  Sure, briefly.

4            MR. LUCAS:  There are no presumptions under 503 of the

5    bankruptcy code.  You have to prove the benefit.  It's not

6    assumed on account of the creditor's loss. And here, Your

7    Honor, there's no buildings burned or anything, it's money that

8    sits in the account that DnB is controlling and has been

9    holding and frozen from LBHI's access since the petition date.

10           THE COURT:  Okay.  Well, this is a fairly esoteric

11   argument before a packed courtroom of people who may or may not

12   be interested in it.  I'm going to reserve judgment on this.

13   In part because I want to give some more thought to the

14   question that I raised but that others really didn't raise in

15   their papers which is whether there is an entitlement to

16   adequate protection in respect of currency exchange risk.  And

17   I'm going to invite the parties to submit letter briefs in

18   reference to that issue.  I bring this issue to everybody's

19   attention in part because it occurred to me and I think it's a

20   real issue.  I don't know to what extent in the global cases

21   involving Lehman Brothers there may be others similar kinds of

22   claims that could be made or whether or not the DnB NOR example

23   is purely a one-off situation.  But I would like to know what

24   the parties think of that question and believe that it makes

25   some sense for counsel for the committee, the debtor and DnB

49

1    NOR to meet and confer about a schedule that makes sense for

2    submitting those letter briefs.  Mr. Lucas?

3        MR. LUCAS:  And since this is the committee's -- I'm

4    sorry, the bank's motion, we presume that the bank will submit

5    its brief first and the debtors will respond.

6        THE COURT:  I'm making no presumption about anything.

7    I just would like the parties to meet at some point; can be on

8    the telephone and just work out some sort of rational timetable

9    for submitting very brief presentations on this subject.  I

10   don't think it needs to be elaborate.  And I'll decide after I

11   receive those presentations whether I'm simply going to provide

12   a bench ruling or whether or not I'll issue a rather short

13   additional memoranda decision relating to this dispute.  And

14   we'll work out a timetable for that with counsel.

15       I believe that for holding purposes, we should

16   probably relist this for, perhaps, the September 23rd hearing

17   date.

18       MR. LUCAS:  Your Honor, I believe the hearing in

19   September, I believe, is September 16th or at least for omnibus

20   purposes.

21       THE COURT:  Okay.  Then it's September 16th.

22       MR. LUCAS:  So we will make that annotation on the

23   next agenda or file a notice with the bank.

24       THE COURT:  Okay.  Fine.

25       MR. LUCAS:  Thank you, Your Honor.  The next matter on

50

1       the agenda is the Levine Leichtman motion.  And my colleague,

2       Richard Levine, will be handling that from Weil Gotshal.

3       Movant's counsel is here.

4               THE COURT:  Mr. Miller, good morning.

5               MR. B. MILLER:  Good morning, Your Honor.  Brett

6       Miller, Morrison Foster on behalf of Levine Leichtman Capital

7       Partners Deep Value Fund LP.  We're here on a motion compelling

8       the debtors' performance on their open trades order or on the

9       alternative, compelling payment as an administrative expense.

10              The facts, as set forth in the pleadings, are not in

11      dispute.  In the commercial paper is in breach of an assumed

12      trade confirmation with my client.  Unfortunately, Lehman

13      Brothers, Inc. is holding the securities which need to be

14      transferred to my client to complete the trade.  June 15th was

15      the deadline for performance under the agreement.  That time

16      period has passed.  There have been numerous discussions back

17      and forth between the parties, primarily between my firm and

18      Weil Gotshal.  We have not had direct conversations with Lehman

19      Brothers, Inc. because we don't have any privity with them.

20      The burden is essentially on Lehman Commercial to get the

21      securities from Lehman Brothers, Inc. and they have not been

22      forthcoming.

23              We thought we had a deal prior to filing a motion.  It

24      was supposed to be a three-way conference call set up; it was

25      cancelled.  We've not heard anything since from the Lehman

51

1    Brothers, Inc. side and we were left with no alternative but to

2    file the motion seeking to compel the debtors to go to Lehman

3    Brothers, Inc. to get the securities that are owed to my client

4    or as an alternative for my client to go into the open market

5    to purchase the securities at issue which are thinly traded as

6    is noted in the pleadings.

7         THE COURT:  Do you have any notion whatsoever as to

8    what the securities are worth?

9         MR. B. MILLER:  Essentially, they arguably have no

10   value.  It's a tagalong of post-confirmation bank debt trade

11   where securities were thrown in.  They're thinly traded.  It's

12   just my client feels that they're there --

13        THE COURT:  So these are hope certificates?

14        MR. B. MILLER:  Yes.

15        THE COURT:  So we're fighting over hope certificates?

16        MR. B. MILLER:  I think the basis is that we're

17   fighting over something that is due to us, that has clearly

18   within reach and at this point we need the SIPA trustee to just

19   turn them over.  They're holding them as a conduit.  They've

20   acknowledged that.  They need to be turned over to Lehman

21   Commercial to be turned over to my client so that Lehman

22   Commercial is not in breach of the agreement.

23        THE COURT:  I understand.  Now, is LBI here and

24   represented with respect to this issue?  I didn't see any

25   papers filed by LBI.  LBI has been mentioned repeatedly in the

52

1    papers.

2         MR. LEE:  Yes, Your Honor. Ken Lee, Hughes Hubbard for

3    the SIPA Trustee.  We're not a party to this particular lawsuit

4    and no relief was sought against us so we did not file papers

5    but I'm happy to address the Court's question.

6         THE COURT:  Can you turn over these securities?  That

7    makes this whole thing go away.

8         MR. LEE:  It would, Your Honor.  Under SIPA, if they

9    were customer named securities we would be able to do that.

10   We're not, however, talking about customer named securities.

11   They're not in the name of LCPI or Levine Leichtman.  They're

12   in the name of LBI.  Therefore, they are arguably part of the

13   fund of customer property against which the debtor has filed a

14   proof of claim.  And therefore, there is a claim's process

15   where the claim has to be determined and at the end of that

16   process, if it's an allowable claim, they would receive their

17   pro rata share based on net equity.  So, but if --

18        THE COURT:  I understand your position, although

19   there's something extraordinarily inefficient about a process

20   in which not only do we have a packed courtroom of people who

21   are billing time listening to this, but we have lawyers who

22   have spent time and effort writing papers, an individual person

23   who's sitting on the bench, that's me, who has spent time

24   reading these papers.  Mr. Miller confirms what I did not know,

25   which is, these are securities of perhaps inconsequential value

53

1   or they may be of some value in the future but they're

2   virtually impossible to value.  And so we're spending real time

3   and real money fighting over something that's purely

4   theoretical.  Am I right?

5        MR. LEE:  Your Honor, to -- yes, you are right and to

6   that end, that is why when we were approached by the debtor

7   some time ago to see if we could work out an agreement so that

8   we wouldn't all be sitting here filing papers, we have

9   endeavored to engage in conversations.  And I believe that

10  there were discussions relating to the fact that there would be

11  an acknowledgement and a stipulation on all sides that there

12  was no real value to the securities and that pursuant to that

13  we might be able to work out an accommodation.  And the SIPA

14  trustee is still interested if the other parties are interested

15  in trying to work that out.  But my understanding is that on

16  the last go around, we were not able to reach an agreement on

17  all sides so that we could accommodate the request --

18       THE COURT:  What's the sticking point?

19       MR. LEE:  -- in a manner consistent with the statute.

20       THE COURT:  What's the sticking point?

21       MR. LEE:  I believe that we were trying to enter into

22  a stipulation about the fact that the securities had no value

23  and my understanding was that that was not something that could

24  be stipulated to by LCPI.  But if I'm wrong then we can

25  continue this discussion out of court.

54

1        THE COURT:  Well, if it's a discussion that can take

2   place in a conference room instead of a courtroom, that's

3   probably an advantage.  Let me hear from LCPI's counsel.

4        MR. LEVINE:  Thank you, Your Honor.  Richard Levine

5   from Weil Gotshal.  I think in terms of the actual motion, I

6   mean obviously it's really frustrating, these securities just

7   kind of caught up in a technicality and it's obviously

8   frustrating to everyone that they just can't be turned over and

9   just dealt with and move on, particularly when they are of

10  virtually no value, so the possibility of it ultimately being

11  held back by the trustee seems unlikely.  But I think in terms

12  from the prospective of the movant, they have shown no injury

13  or even likelihood of injury from delay.  These are not

14  securities that are actively traded.  They have not suggested

15  they're going to go out there and try to sell them in the short

16  term.  In fact, they probably couldn't.  There's no

17  distributions coming in on them that they're losing out on.

18        THE COURT:  Yeah, but they're part of a debt trade.

19        MR. LEVINE:  I understand, but there's no injury to

20  them by waiting a little longer while the SIPA process was --

21        THE COURT:  Well, I suppose the injury is that they

22  have -- they paid for something and they didn't get everything

23  that they paid for.

24        MR. LEVINE:  I understand.  But it's still the intent

25  of the debtors to satisfy the trade.  To complete, obviously, a

55

1    significant portion of the consideration that was supposed to

2    be transferred was transferred and it's only these as Your

3    Honor has deemed them "hope securities" which are held out.

4    And a further delay of a month, two months, three months, is

5    not going to cause them any injury.  It's not like these

6    securities have any real value in the short term where

7    ultimately it is going to cause any damage to them.  Whether

8    they got them on June 15th, which they should have, but because

9    of the realities of the situation, the impracticability because

10   of the SIPA proceeding they didn't get, and that waiting until

11   August or September, there's no harm to them for the wait.  Is

12   it something that they were legally entitled to?  Absolutely.

13   Is there a reason why this Court should order anything which

14   negatively impacts the estate as a result of that?  I think the

15   answer is, no.  Obviously, what everyone hopes is that a three-

16   way agreement can be reached and this can be resolved in the

17   near term.  But other than that, I don't see any reason why the

18   movant should get any particular relief here at the moment.

19        Obviously, at the end of the day if there is an issue,

20   if the SIPA trustee will not turn these certificates over, then

21   we're at a different place.  And then there is real damage.

22   Now, how you measure that damage is questionable because these

23   things are hope certificates.  But at this point, there's no

24   damage and no injury.

25        THE COURT:  I'll hear Mr. Miller.

1          MR. B. MILLER:  Your Honor, it was a month or two

2    months and an agreement would be in sight it would be one

3    thing, but I would ask the SIPA trustee's counsel, I mean he

4    just asked explained it has to go through the entire

5    proceeding; are we talking many months, are we talking years to

6    possibly figure this out?  And what if it takes seven months,

7    eight months, ten months and these things do become valuable?

8    Then my client will be the one who's harmed because if they got

9    it today when it doesn't have any value, it's fine with the

10   parties.  But if in ten months the securities take off and I

11   feel that something happens, then we're harmed.  And then we're

12   back in before Your Honor with an administrative claim seeking

13   damages when it can all be remedied today by compelling the

14   debtor here to enter into the stipulation which was proposed

15   which is to turn over the securities because they have no

16   value.  It was just admitted on the record, essentially, by

17   Lehman Commercial.

18          THE COURT:  Now, are these securities directly related

19   to the underlying borrower Plastech?

20          MR. LEVINE:  Yes.

21          THE COURT:  And is Plastech a public or private

22   company at this point?

23          MR. LEVINE:  I believe, yes, I believe it liquidated

24   in Delaware.  Chapter 11.  It was a bank debt trade that --

25          THE COURT:  It was a bank debt trade but what's the

57

1    underly -- who's the underlying obligor at this point?  Is it

2    Plastech?  I'm trying to figure out what this is all about.

3    Why are we here fighting about something that may have no value

4    and that may be a waste of our time, collectively?

5           MR. LEVINE:  It is my understanding, Your Honor, that

6    as part of the bankruptcy, a portion of the debt was converted

7    into equity, securities and a new entity.

8           THE COURT:  In a new entity?

9           MR. LEVINE:  Yes.

10          THE COURT:  A new entity unrelated to Plastech or a

11   successor to Plastech?

12          MR. LEVINE:  It is my understanding it is a successor

13   to Plastech.

14          THE COURT:  And is that entity currently engaged in

15   business?

16          MR. LEVINE:  I don't know about that, Your Honor.

17          THE COURT:  And is it a public company or a private

18   company?

19          MR. LEVINE:  I don't know that either, Your Honor.

20          MR. B. MILLER:  I don't believe it is a public company

21   because I was advised by my client these are thinly traded and

22   it would be --

23          THE COURT:  Thinly traded means that they are only

24   traded privately by parties who decide after getting cards,

25   okay, I'll satisfy my obligation by giving you these

58

1   certificates that may be worthless?

2         MR. B. MILLER:  Correct.

3         THE COURT:  Okay.  That's the market?

4         MR. LEVINE:  These are securities issued by someone

5   called JCIM, of which as I understand is a successor entity to

6   the original debtor.

7         THE COURT:  Okay.

8         MR. LEVINE:  And so the -- a portion of the original

9   debt was paid off and a portion of it was converted into equity

10  into this new entity and obviously the hope is that some day it

11  will have value.

12        THE COURT:  I'm sure.  Maybe it will have value some

13  day and I make no comment one way or the other as to what the

14  value of these securities may be today or in the future, but I

15  think that this is an extraordinary waste of resources.  I'm

16  shocked actually that everybody has spent this much time and

17  effort at a highly sophisticated level dealing with something

18  that is notionally of uncertain to inconsequential value.

19  Something's wrong here.

20        That's not to say that a party to a debt trade is not

21  entitled to the completion of that trade in accordance with its

22  terms and there was, as I understand it here, a date by which

23  the consideration was supposed to have been transferred and it

24  didn't happen.  And that's a real problem.

25        MR. LEVINE:  That's true, Your Honor.

59

1          THE COURT:  And if we were talking about something

2     that involved significant measurable value, it would be a much

3     bigger problem.  So I think that there's a principle underlying

4     this that should be respected.

5          I'm going to defer the entry of any lawyer for thirty

6     days, but I'm inclined to grant the motion.  During the next

7     thirty-day period, recognizing that people in the summertime

8     have vacations, I'm going to direct that a responsible party on

9     behalf of the trustee and representatives of the debtor and the

10    moving party meet and confer and resolve this.  This is just

11    lunacy.  There has to be a placeholder that somebody can put in

12    place for the securities to be transferred.  There can be an

13    indemnity claim over as against somebody's ability to prove the

14    value of this.  This is not intended to affect the rights of

15    parties who are looking at the SIPA proceeding.  This is an

16    inconsequential piece of paper we're talking about that doesn't

17    have measurable present value.  And I'm not going to direct the

18    trustee to do something the trustee does not believe to be

19    appropriate in the administration of the LBI liquidation.  But

20    positions have to be taken that make sense.  And this position

21    simply makes no sense.  The securities should be turned over

22    and there should be an ability to reach an agreement to do

23    something that simple.  Transactional lawyers do this all the

24    time and this is maybe something that a couple of transactional

25    lawyers can figure out how to solve.  Debt trades including

60

1    carried securities take place routinely and this one should

2    close routinely and not take up any more Court time.

3         I'll consider this again at the September 16th omnibus

4    hearing and hopefully it will be off calendar because it has

5    been resolved by then.

6         MR. LEVINE:  Thank you, Your Honor.

7         MR. B. MILLER:  Thank you, Your Honor.

8         MR. DUNNE:  Good morning, Your Honor.  I think the

9    next agenda item is ours.  For the record, Dennis Dunne of

10   Milbank Tweed Hadley McCloy on behalf of the Official Creditors

11   Committee.  The committee moved on July 1st for an order

12   directing the examiner to comply with the limits of the mandate

13   as set out in Your Honor's January 16th order.  We received two

14   objections to that motion.  One from the examiner, which I

15   submit helps telescope the issues and which we will address

16   first.  The second objection was filed by the Walt Disney

17   Company as I submit is of an entirely different character and I

18   will address some of their invective and digressions into other

19   matters at the end of my remarks.

20        But by way of background, at the June 24th omnibus

21   hearing, a colloquy occurred on the record between myself and

22   Mr. Byman, counsel for the examiner, in connection with the

23   Rule 2004 motion seeking discovery of Barclays.  The examiner

24   took the position that they were investigating every aspect of

25   the sale transaction.  I pointed out that the enabling order

61

1    expressly excluded claims relating to the transfer of assets

2    from LBI or LBHI.  Now, that was done on the ground not that

3    they should not be investigated, but that that ground was

4    already sufficiently covered because you had the SIPA trustee

5    doing a report on precisely the transfer of those assets out of

6    the LBI estate to Barclays as well as the debtor and the

7    committee investigating potential causes of action.

8        After that colloquy, Your Honor invited us to tee up

9    this motion sooner rather than later so that we could get

10   clarification if there was a continuing disagreement over it.

11   And --

12       THE COURT:  I'd like to be clear on something.  I

13   didn't invite you to file a motion.  I invited the parties to

14   resolve any disagreements that might exist concerning scope.

15       MR. DUNNE:  And failing that, we had to come back in

16   front of Your Honor on this point.  And it's really in that

17   spirit, Your Honor.  We're just seeking Your Honor's guidance

18   on this.  We can read the order.  We've had discussions with

19   the examiner.  And let me just telescope it because I think it

20   boils down to a relatively small item.

21       The -- in our discussions with the examiner, he has

22   said that they don't intend to formally report on items that

23   were carved out.  And I believe they were drawing a distinction

24   between investigation and formally reporting on, and so that

25   they could investigate all aspects of the Barclays' transaction

62

1    but they wouldn't formally report on it.  And if that's as far

2    as went, we probably wouldn't be here in front of Your Honor

3    today, but they continued by saying, well, if they found things

4    that might signify claims or otherwise be noteworthy, they're

5    going to include that in the report, whether that's formally

6    reporting on them or not.  And that may be what Your Honor

7    intended.  It may not be.  I don't -- the committee doesn't

8    believe it's what the order said and if you read it that

9    broadly it swallows the exception.  The committee's

10   interpretation of the order is that Your Honor carefully heard

11   and weighed all the various concerns.  And given the fact that

12   you had the SIPA trustee, the debtors and the committee already

13   investigating this there was no reason for the fourth party,

14   the examiner, to plow the same ground.

15          There's another item that the examiner comes up with

16   and you'll hear about shortly, is the difference between direct

17   claims and derivative claims.  And I'll say at the outset that

18   this kind of made my head spin a little bit.  Because the way

19   the committee views it is giving the enabling order, the

20   examiner should see were there or were there not any assets

21   transferred from an LBHI affiliate other than LBI.  If yes,

22   continue the investigation and see whether there were colorable

23   claims arising therefrom.  If not, duty discharged, mandate

24   complied with, SIPA report will deal with the balance.  And

25   again, if we had agreement on that, we wouldn't be here today.

63

1        What the examiner says in response is, but there might

2   be a derivative claim.  And by that the examiner means let's

3   assume that one of the LBHI affiliates has an intercompany

4   claim against LBI.  That intercompany claim might be worth less

5   if LBI improperly transferred assets to Barclays.  And so they

6   can piggyback on that intercompany claim and investigate the

7   entire propriety of the LBI asset sale transferred to Barclays.

8   We, again, believe that that swallows the parenthetic where we

9   expressly carved out the assets transferred from LBI.  And so

10  we would ask Your Honor to enforce the order as drafted, or

11  give direction to expand it.

12       At the end of the day, it was Your Honor that -- we're

13  seeking Your Honor's guidance on this, but I think it helps all

14  the parties to just be clear about it at this point while we

15  still have months and months before we actually see the report

16  from the examiner.

17       Which brings me to the Walt Disney Company's objection

18  and I'll be brief here, because I think a lot of this stems

19  from the fact that they were not in court on June 24th, unaware

20  of the context of the motion, but let me try and I'll just try

21  dispassionately to address some of their comments.

22       They suggest that we're motivated by some

23  anti-transparency concerns to hide findings of the examiner.

24  That couldn't be farther from the truth.  We're -- we have

25  three parties already investigating it.  Every aspect of that

1    transaction will be investigated and made public either through

2    the SIPA report or in some type of litigation.  As you'll see

3    in the next motion, Your Honor, in exclusivity, the committee

4    was very concerned about transparency and settled out their

5    concerns about an extended exclusivity request by compelling

6    the debtors to make more disclosures four months from now in

7    connection with the second half of that extension.

8           And taken to a logical extreme, the Walt Disney

9    Company's argument is that even in the face of what we think is

10   pretty clear language in the order, if there is some -- there's

11   a floating transparency goal that allows you to flout an order

12   of the court if you think it furthers transparency.  We don't

13   buy that.  We think that Your Honor waived the balance of

14   transparency, duplication of effort and costs in setting the

15   language as it did.  They also cast dispersions on the

16   committee and implied that we must be near or in settlement

17   discussions with Barclays that would somehow favor LBHI and we

18   don't want that to see the light of day and therefore there

19   should be another committee.  That again, makes my head spin.

20   It's baseless, it's spurious; if they want to make a motion for

21   another committee, actually I think you have to go back to the

22   U.S. Trustee again, but if they wanted avail themselves of

23   those rights, they're free to do that.  That's not before Your

24   Honor today.

25           I can go on and address the others.  I will not at

65

1    this point, Your Honor.  I will cede my time for any rebuttal

2    if anybody continues to raise these issues.  Of course, if Your

3    Honor has any questions, I'll address them.  Otherwise I'll sit

4    down.

5           THE COURT:  Okay.  Thank you.  Well, let me hear from

6    the examiner.

7           MR. BYMAN:  Good morning, Your Honor.  Robert Byman on

8    behalf of the examiner.  I hope it is clear to Your Honor that

9    we have no interest in doing anything that you didn't ask us to

10   do, nor do we have any interest in not doing things that you

11   did ask us to do.  So if we've gotten Your Honor's order wrong

12   this is a good time to tell us, and we will happily comply.

13          Unfortunately, we did not have the discussions that

14   Mr. Dunne alluded to before this motion was filed.  This motion

15   might have looked a little different had we done that.  The

16   discussions came afterwards.  And we didn't have the

17   discussions with Mr. Dunne.  I, personally, spoke with

18   Mr. Fleck and with Mr. O'Donnell, and I think maybe something

19   got lost in the translation.  And Mr. O'Donnell may have his

20   own recollection of what we said, but my recollection is that

21   we assured the creditors' committee that we are not looking

22   into any possible claims by LBI or LBHI.  We understand that

23   those are carved out.  We are, however, looking into claims

24   that affiliates of LBI might have as a result of the sale.  And

25   that comes directly from the bullet point at page 4 of the

1   examiner that directs the examiner to look into whether

2   consequences to any LBI affiliate, as a result of the

3   consummation of the transaction, created colorable causes of

4   action that inured to the benefit of the creditors of such

5   subsidiary or affiliate.

6           In order to do that, Your Honor, we have to understand

7   pretty much everything about the transaction.  We can't do it

8   in the vacuum of saying this looks fair or not fair without

9   understanding the transaction.  And that's all I told

10  Mr. O'Donnell we were doing.  I also told him, I assured him,

11  that we were not planning to make gratuitous comments about

12  findings of fact that did not apply to any of the conclusions

13  we are going to draw.  I don't recall, frankly, if I mentioned

14  1106 to him, but we're mindful of 1106, which requires that if

15  we stumble across something in the course of our investigation

16  that suggests incompetence or malfeasance or fraud on behalf of

17  somebody that leads to a cause of action we're required to

18  comment on it.

19          So we will comment on things that we think Your Honor

20  has asked us to do.  We will comments on things that the

21  Bankruptcy Code requires us to do.  And we will go no further.

22  Does Your Honor have any questions of us?

23          THE COURT:  I actually don't.  I read your written

24  response, and I'm hearing your oral presentation.  I don't

25  think there's a problem here, based upon what I understand to

67

1    be your interpretation of your mandate, because your

2    interpretation is consistent with my understanding of what you

3    would be doing in order to fulfill the objectives of the order.

4    I believe that it was Walt Disney Company that used the

5    metaphor that we're really dealing with two sides of the same

6    coin.  It's impossible, really, to understand what may have

7    been transferred in respect of affiliates without understanding

8    the transaction itself.

9         Now, that having been said, it's also true that I

10    think I have been fairly consistent in my comments regarding

11    the avoidance of unnecessary duplication of effort, and it was

12    really in that spirit that I suggested that there be a meet and

13    confer session in connection with the examiner's work protocol,

14    which I understand took place, and I understand that people are

15    mostly not getting in each other's way.  I suppose that,

16    consistent with some other papers that I've seen from

17    Mr. Bienenstock, that there may be some concerns about the

18    overall efficiency of the case at this point.  But that's not

19    before me right now.  It will be soon.

20         As it relates to the motion of the creditors'

21    committee, and I can hear from Mr. Bienenstock on this as well,

22    but I probably don't need to.  I've very comfortable, based

23    upon what I've read from counsel for the examiner, that what

24    the examiner is doing is appropriate and fully consistent with

25    what I expected the examiner should be doing.

68

1          If there's some particular example, however, of

2    parties getting in each other's way to the point that there is

3    a potential for conflict or inconsistent outcomes, or the

4    potential for diminishing the value of any identified causes of

5    action because things are stated publicly that turn out to be

6    inconsistent with conclusions reached by others who are

7    conducted an examination on their own that may overlap with the

8    examination being conducted by the examiner, I can understand

9    that potential concern.  But that's not before me today.

10          MR. BYMAN:  Thank you, Your Honor.  And I probably

11   should have said what I know you have surmised, that we are

12   working to make sure that we eliminate duplication every step

13   of the way.

14          THE COURT:  I expected you to say that, and I'm sure

15   that's true.

16          MR. BYMAN:  I should have said it on my own until you

17   prompted me.  Thank you.

18          THE COURT:  Mr. Bienenstock, I've sort of given you a

19   cue not to speak, but if you wish to say something you're

20   welcome to.

21          MR. BIENENSTOCK:  I'll take the cue, Your Honor.

22          THE COURT:  Fine.  That works for me.  So the motion

23   of the committee is appreciated but denied.

24          MR. MILLER:  Your Honor, Harvey Miller on behalf of

25   the debtors, once again, Your Honor.  The debtors have moved,

69

1    Your Honor, pursuant to Section 1121(d), for a second extension

2    of the exclusivity periods.  I will attempt to be brief, Your

3    Honor.  Pursuant to Section 1121(d) of the Bankruptcy Code

4    extensions of the exclusivity periods may be granted for cause.

5         The debtors have requested that the exclusive period

6    for the filing of Chapter 11 plans be extended for a period of

7    eight months.  The official creditors' committee, as per its

8    statement filed on July 14th, 2009, supports the debtors'

9    motions as set forth in that statement based upon the agreement

10   of the debtors to provide additional reports and updates to the

11   creditors' committee.  The Bank of New York Mellon Trust, as

12   indenture trustee, filed an objection to the debtors' motion

13   that the extension be less than that requested by the debtors.

14   I am advised by the attorney that the attorneys for the Bank of

15   New York Mellon Trust are present in Court today and will

16   inform the Court that the objection is withdrawn on the same

17   basis as set forth in the official committee's statement.

18        As a result, Your Honor, there is only one objection

19   to the debtors' motion.  An objection was filed on or about

20   July 10, 2009 on behalf of what has been self-characterized as

21   an ad hoc group of Lehman Brothers creditors, comprised of

22   Elliott Management Corporation, King Street Capital Management,

23   L.P. and Paulson & Co. Inc. who, together with their

24   affiliates, allege to hold claims against the debtors,

25   including directly against Lehman Brothers Holdings Inc.,

70

1   totaling approximately 13 billion dollars.  Although the so-

2   called group refers to itself under that characterization, the

3   debtors submit that the group is nothing more than an ad hoc

4   committee of hedge funds that may have purchased distressed

5   obligations of one or more of the Lehman debtors.

6           In the debtors' reply to the objection the group is

7   referred to as the hedge fund committee.  That committee's

8   objection, Your Honor, is the only objection, as I said, to the

9   requested extensions.  The hedge fund committee concedes that

10  at issue is the control of the administration of these Chapter

11  11 cases.  It contends one, that the administration of the

12  Chapter 11 cases lack transparency.  Two, a confirmable plan

13  can be filed despite the dearth of critical information as to

14  the debtors and their estates that a hypothetical investor

15  would need to make an informed judgment to accept or reject a

16  proposed plan.  And, three, the integrity of Mr. Marsal, the

17  CEO of Lehman Brothers Holdings Inc.  Alvarez & Marsal is the

18  financial advisors, and the incumbent boards of directors of

19  the debtors must be questioned.  Allegedly, they are only

20  concerned with extending the administration of these Chapter 11

21  cases so that they may continue to earn large and unjustified

22  fees.

23          The contention of this committee, Your Honor, the

24  contentions are totally without substance or merit.  The hedge

25  fund committee asked the Court to accept its ipse dixit that it

71

1    knows better than anybody else as to what should be done in the

2    administration of these debtors' cases.  The hedge fund

3    committee misconstrues the provisions of the Bankruptcy Code

4    and refers to a single comment from a Second Circuit decision

5    in In re Grayson-Robinson Stores, Inc. as signifying the

6    decisional principle applicable to the debtors' motion.

7         I hate to say it, Your Honor, but the Grayson-Robinson

8    case was the third case in my career that I ever argued in a

9    District Court, and I am thoroughly familiar with the case.

10   That case involved an issue as to whether the Bankruptcy Act in

11   effect in those days required a company with public debt to use

12   the processes in Chapter 10 reorganizations versus Chapter 11.

13   And what was ultimately decided in that case, Your Honor, is

14   there was no mandatory requirement to use Chapter 10, and what

15   was the decisional principle was the needs to be served by the

16   particular debtor.  The statement that Mr. Bienenstock refers

17   to, Your Honor, was pure dicta.  And I think I happen to have

18   written that statement at the time in my brief.

19        In addition, Your Honor, it completely ignores the

20   Second Circuit's recent decision in Smart World Technologies,

21   which said that Congress determined, in connection with Chapter

22   11, that the control, in effect, the control of the

23   administration of the estate is placed in the debtor and the

24   debtor in possession.

25        We believe, Your Honor, that cause has been

1    established in connection with this motion and as we have set

2    forth in the omnibus reply to the objection, Your Honor, at

3    pages 2, 3 and 4.   Undisputed facts.

4            A) The Chapter 11 cases of the debtors constitute the

5    largest and most complex Chapter 11 cases in the history of the

6    United States.

7            B) The financial collapse of the Lehman enterprise

8    resulted in consequences to the financial markets and the

9    global economy which have not yet been fully determined.

10           C) The Lehman enterprise was a global business.   The

11   commencement of these Chapter 11 cases and the onset of

12   administration proceedings under the insolvency laws of the

13   United Kingdom for Lehman Brothers Inc. (Europe), otherwise

14   known as LBIE, resulted in a complete breakdown in the

15   financial reporting systems of the Lehman enterprise which has

16   caused substantial difficulties in recreating the financial

17   transactions involving the Lehman entities.

18           D) Since the commencement date there have been over

19   eighty foreign insolvency proceedings initiated involving

20   segments or units of the Lehman Enterprise.

21           E) A protocol among the receivers and other

22   fiduciaries appointed in the major foreign insolvency

23   proceedings and the Chapter 11 debtors was formally approved by

24   the Court on June 17, 2009.   The major foreign insolvency

25   proceeding, the U.K. administration proceedings involving LBIE,

73

1  remains outside of the approved protocol and the ability to

2  freely access and receive information from LBIE administrators

3  continues to be problematic.

4      F) The full extent of the respective assets and

5  liabilities of the debtors, including potential causes of

6  action and claims that may be asserted on behalf of each

7  debtor, is still not yet determined.

8      G) The status, extent and allowability of the

9  intercompany claims as between LBHI, its debtor affiliates and

10  the non-debtor Lehman entities, have not yet been determined.

11      H) On September 16, 2008, the United States Trustee

12  appointed a statutory committee of unsecured creditors.  The

13  official committee is represented by professionals, including

14  two forensic advisory firms.  They have closely monitored the

15  administration of these Chapter 11 cases.  The official

16  committee has consented to the extension of the exclusive

17  periods as set forth in its statement, dated July 14, 2009.

18      I) A multitude of investigations are being pursued as

19  to the acts, conduct and affairs of the debtors and their

20  affiliates, including those being pursued by the official

21  committee, The United States Attorneys for the Southern and

22  Eastern Districts of New York and the District of New Jersey,

23  and state enforcement agencies.

24      J) At the request of the Walt Disney Company,

25  represented by the co-attorneys for the hedge fund committee,

1    and with the consent of the debtors, on January 16, 2009

2    Anton Valukas, Esq., the Managing Partner of the law firm of

3    Jenner & Block, was appointed as examiner in these Chapter 11

4    cases under an extremely broad charter to add to the

5    transparency of the administration of these cases.  The

6    examiner originally contemplated that his investigation would

7    be completed within nine months from the date of appointment,

8    based upon his estimation of the scope of discovery and

9    analysis that would be required.  More recently the examiner

10   has indicated that additional time would be required, inasmuch

11   as the volume of documents that need to be produced and

12   examined exceeded his estimation by almost tenfold.  He

13   estimated a million documents, and he's going to be looking at

14   10 million documents, Your Honor.

15        K) Administration of these Chapter 11 cases and of the

16   non-debtor affiliates is under the direct charge of

17   Mr. Bryan Marsal, a senior member of Alvarez & Marsal, who was

18   appointed as the Chief Restructuring Officer of LBHI soon after

19   the commencement of the Chapter 11 cases on September 15, 2008,

20   and who was thereafter appointed Chief Executive Officer on

21   January 1, 2009.  Alvarez & Marsal has assisted Mr. Marsal as

22   financial advisor and as restructuring experts and staff.

23       L) As the result of the approval of the emergency sale of

24   LBH's North American capital markets business to Barclays

25   Capital Inc. on September 20, 2008, essentially all of the

75

1    North American employees of the Lehman enterprise,

2    approximately 10,000 individuals, became employees of Barclays

3    Capital Inc. upon the closing of the sale transaction.  As a

4    result, to initiate, develop and progress the administration of

5    the debtors' cases, Mr. Marsal & Alvarez & Marsal had to use

6    over 200 of its employees for the administration of the

7    debtors' cases.  All of the foregoing exacerbated the

8    complexities of the business and transactions that have to be

9    reviewed and evaluated in order to determine the critical

10   information that may be used to develop and formulate proposed

11   Chapter 11 plans for the debtors.

12        M) Mr. Marsal, as CEO of the debtors, is a fiduciary

13   under applicable principles of both bankruptcy and general

14   corporate law.  It is his duty, as it is the duty of the boards

15   of directors of the debtors and their non-debtor affiliates, to

16   act in the best interests of the debtors and, as a consequence

17   thereof, the residual claimants, and not merely distressed debt

18   traders.

19    N) Lehman Brothers, Inc., the broker/dealer affiliate of

20   LBHI, is being administered under the provisions of the

21   Securities Investor Protection Act.  James W. Giddens, Esq. is

22   the duly-appointed SIPA Trustee.  The full extent of the

23   transactions between the debtors and LBI have not yet been

24   fully determined and will require a substantial amount of time

25   to resolve.

1        O) At the direction of the Court, there has been and

2    continues to be complete transparency in the administration of

3    the debtors' Chapter 11 cases.  An extensive Internet series of

4    websites has been created that may be accessed by parties in

5    interest.  Mr. Marsal and A&M have appeared in Court on several

6    occasions to provide reports on the status of the

7    administration of the Chapter 11 cases and as to particular

8    matters, as well as at meetings pursuant to Section 341 of the

9    Bankruptcy Code.  They have extended themselves and have

10   responded to the fullest extent possible to all inquiries made

11   of them and, wherever practicable, have met with persons

12   asserting claims against the debtors and seeking information as

13   to the debtors and the administration of the Chapter 11 cases,

14   including the representatives of the hedge fund committee and

15   its professionals.

16       P) All claims against these debtors are not due to be

17   filed until November 1, 2009, and it is anticipated that well

18   over one million claims may be asserted, including a large

19   number of highly complex claims based upon derivative

20   transactions, all of which will require careful analysis and

21   may well require discovery and litigation.

22        Consistent with the applicable authorities on this

23   under Section 1121, and the granting of extensions of the

24   exclusive period, Your Honor, we believe that cause has been

25   demonstrated in these very complex and large cases that would

1    warrant the extension which has been requested.  We would also

2    note, Your Honor, that neither the attorneys for this hedge

3    fund committee nor the committee itself have complied with

4    Bankruptcy Rule 2019.

5         Last evening, I believe, a 2019 statement was filed on

6    behalf of Dewey & LeBoeuf LLP as cocounsel to this so-called ad

7    hoc group of Lehman Brothers creditors.  I would submit to Your

8    Honor that the statement is not compliant with 2019, and the

9    statement of White & Case, likewise, is not compliant with

10   2019, and consistent with the Bankruptcy Rule Your Honor may

11   disregard the objection which has been interposed by them, or

12   disregard it and it is not a factor in this case.

13        The objector says their consideration of the debtors'

14   motion and the determinative factors relating to exclusivity

15   extensions are, and the factors that are generally applied by

16   Courts, are mere platitudes.  I would point out to Your Honor

17   that the precise same argument was made by Mr. Bienenstock in

18   the Adelphia Communications court case before

19   Bankruptcy Judge Gerber, and Judge Gerber, in response to that

20   accusation when Mr. Bienenstock was representing the ACC

21   Bondholder Group, also a group rather than a committee, in his

22   characterization.  Judge Gerber said "While the ACC

23   Bondholder's Group characterizes the enumerated factors as

24   "platitudes" (implying that these are less than worthy of being

25   considered), I can't agree.  They're objective factors which

78

1    courts historically have considered in making determinations of

2    this character, as a means of ensuring that at least these

3    factors are considered."

4         These factors, which historically, Your Honor, have

5    been utilized by Courts in determining extensions of

6    exclusivity are the factors that have been applied.  The

7    argument is made, Your Honor, that this is a liquidation case,

8    and, therefore, it is different than the ordinary Chapter 11

9    case.  There's nothing in the Bankruptcy Code, Your Honor,

10   which distinguishes between an ongoing debtors' business and a

11   liquidation.  In fact, there are usually many more problems in

12   a liquidation case, because of the need to resolve the claims

13   in order to get to a position in which you can determine what

14   type of plans might be used.

15        In addition, Your Honor, there is no foregone

16   conclusion that every single debtor in this case is going to be

17   subjected to a plan of liquidation.  It may very well be that

18   one or more of these subsidiaries will have a plan of

19   reorganization.  It may have an ongoing business of some type.

20   And there may very well be, Your Honor, as we go on in the next

21   eight months to a conception, there may be a business coming

22   out of these Chapter 11 cases in which an entity will be formed

23   that may be engaged in the business of providing services in

24   similar situations in the future that may have significant

25   value.

79

1          The options are all open, Your Honor.  And Your Honor

2     has to take into account, as I said before, the first four, or

3     maybe even five months of this case, was operation stability.

4     Trying to establish a normalcy in the administration of the

5     estate.  And that did not occur, and it was recognized even by

6     the Walt Disney Company.  The original motion requesting the

7     appointment of an examiner was made in October of 2008.  It was

8     agreed upon the parties that it would not be appropriate to

9     appoint an examiner at that point in time because we didn't

10    have books and records.  We didn't have any stabilized estate.

11    And so the motions were put off, Your Honor, until January,

12    when at least some degree of normalcy had been achieved.  And

13    it was at that point in time that the parties moved forward

14    with the appointment of the examiner.

15         So, basically, Your Honor, there's only been five,

16    maybe six, months of what you might call a period of normalcy,

17    in which people can start thinking about which direction are

18    these estates going to go in.  And in a Chapter 11 context of

19    the size of these cases and the complexities which these cases

20    present in trying to unravel the transactions, and Your Honor

21    has seen some of this in the derivative litigation, to say that

22    these estates are now ripe for termination of exclusivity and

23    multiple, one, two or three, plans of reorganization filed is

24    totally inappropriate, Your Honor.  It would be disadvantageous

25    to the estates.  It would create moments of uncertainty.  Not

80

1    moments.  Hours and days of uncertainty for the staff as to

2    where they are going.  It would be a negative impact on these

3    estates, Your Honor.

4         To ask for eight months, in the context of what we are

5    talking about, Your Honor, is not an extended -- extension.  I

6    shouldn't say -- is not an extension of exclusivity periods

7    which is beyond the pale.  And, with all due deference to the

8    objector, Your Honor, there has been transparency in this

9    estate.  There has never been a time when Mr. Marsal has

10   declined to meet with any person who has requested an interview

11   or a meeting to discuss their claims.  And that includes this

12   committee, and before this committee the Walt Disney Company.

13        The door has always been open, and the administration

14   of the estate has been vigorously pursued by the official

15   committee.  There are meetings every single week, and nobody,

16   Your Honor, out of all of the creditors in this estate, and

17   we're talking about potentially more than a million creditors,

18   is objecting to this extension of exclusivity.

19        So I would submit to Your Honor one, the contention

20   that there is no transparency in this estate is totally

21   erroneous.  It's just not true, Your Honor.  Second, that these

22   estates are ready for the proposal of plans of reorganizations,

23   similarly, is not true.  There is no way that a disclosure

24   statement could be prepared that would give to creditors the

25   information that an investor could use to make an informed

81

1    judgment as to whether to accept or reject a plan.  Finally,

2    the attack upon the integrity of Mr. Marsal, Alvarez & Marsal

3    and the incumbent boards of directors, that they are motivated

4    in their self-interest is totally spurious and without any

5    foundation whatsoever, and not one shred of evidence.

6            These estates, Your Honor, have not reached the period

7    of plan formulation.  There are ongoing discussions every

8    single week as to which direction to take these estates and how

9    to collect the assets and how to build financial statements

10   that can be relied upon.  That's what's going on in this

11   process.  And to take the position, Your Honor, that this is

12   just an ordinary liquidation and you can file a plan with a

13   waterfall, from my perspective, Your Honor, is ludicrous.  It

14   just isn't so.

15           It's contended that Section 1129(c) trumps Section

16   1121.  There is absolutely no authority for that at all, Your

17   Honor.  A Court, in construing the Bankruptcy Code, has to do

18   it holistically.  And it has to harmonize the provisions of the

19   Bankruptcy Code.  Section 1121 was put in there for precisely

20   the kind of situations which we find ourselves today, where we

21   have a large, complex series of cases that have not yet moved

22   to the status of plan formulation.

23           In court with us today, Your Honor, is Mr. Marsal, who

24   is prepared to testify in support of the application, the

25   motion for the extension of exclusivity, and is here ready for

82

1    cross-examination, Your Honor.  I would proffer his direct

2    testimony with Your Honor's permission.

3         MR. BIENENSTOCK:  Objection, Your Honor.

4         THE COURT:  Mr. Bienenstock, your objection to the

5    proffer, you simply want him called as a live witness --

6         MR. BIENENSTOCK:  No.

7         THE COURT: -- or are you objecting to the fact that

8    evidence is being put forth?

9         MR. BIENENSTOCK:  The latter, Your Honor.  If that's

10   what they want to do, we'd like to take his deposition, bring

11   our own rebuttal witness, and have an evidentiary hearing.  The

12   Local Rules, as we understand them, require that if they were

13   going to pull a stunt like this they were supposed to get the

14   Court's leave so that we could do all the things to make these

15   examinations efficient for everyone, including the Judge.  Not

16   to call a witness out of the blue, and the cross-examination

17   would be, basically, discovery and take many hours.

18        THE COURT:  Mr. Miller, what's your reaction to that?

19        MR. MILLER:  My answer to that, Your Honor, is we have

20   to establish cause.  It was our motion.  He objected to the

21   motion.  He should have been prepared today to respond to

22   anything that we did consistent with the motion, Your Honor.

23        THE COURT:  Well, it occurs to me, and I'm perfectly

24   prepared to move forward with an evidentiary hearing today,

25   given the extraordinary circumstances, but I don't really think

1    this is an evidentiary matter.  My take on this is that

2    substantially all of the grounds asserted in support of the

3    debtors' motion to extend exclusivity are matters that are not

4    controverted.  I don't believe that this is really a case at

5    this moment, a contested matter at this moment, that requires

6    evidence.  It's a pure legal question.  Unless, and this was

7    certainly something that the ad hoc group of creditors could

8    have done, unless there was a desire to take discovery prior to

9    this in reference to some of the allegations of lack of

10   transparency and the role of the board of directors, in

11   particular, in managing the debtors' affairs at this point.

12          So I think I'm going to cut this off in this manner.

13   I believe that this is appropriately a matter for legal

14   argument.  I am prepared to take judicial notice, as is my

15   right, of everything that has gone on in the case and that is

16   in the docket of the case, and I believe that that provides a

17   sufficient record on the basis of which both you, on the

18   debtors' behalf, can argue in support of an extension of

19   exclusivity, and Mr. Bienenstock, if he's the principal

20   objector, can argue against the extension.  And I don't believe

21   that we need evidence.

22          MR. MILLER:  In that light, Your Honor, I will

23   withdraw the request to put Mr. Marsal on the stand, and we

24   will stand on our papers.

25          THE COURT:  Okay.

84

1          MR. MILLER:  Thank you, Your Honor.

2          MR. DUNNE:  Your Honor, may I be heard before we get

3     to the objector?

4          THE COURT:  Sure.

5          MR. DUNNE:  As Mr. Miller said, the committee supports

6     the extension with the conditions we negotiated.  At one level

7     an eight month extension is extraordinary, and the committee

8     considered the arguments advanced by the ad hoc committee, and

9     to some degree we agree with, and we've always fostered that,

10    you know, the paramount objective of creditor involvement and

11    leadership in the case, and we think we've accomplished that.

12    Similarly, we expect that the committee will be in the

13    forefront of negotiating any plan and that that plan should be

14    crafted with the debtors to garner broad creditor support.

15          Right now this case looks like a modified liquidation.

16    But, as Mr. Miller said, they haven't foreclosed any options,

17    and there may be operations that are ongoing post-emergence.

18          That being said, the reality of the case is obvious.

19    No one could file a plan right now.  This is the largest case

20    ever to file.  Indeed, the bar date is months away.

21    Recognizing that reality the committee negotiated for

22    additional disclosures in the hope of achieving even greater

23    transparency.

24          And there's one clarification I have to make to Mr.

25    Miller's remarks at this juncture.  I believe Mr. Miller said

85

1    that we insisted on additional disclosures be made to the

2    official committee.  It's not just to the official committee.

3    Those disclosures that will be made four months from now will

4    be made publicly to the Court, will be filed publicly, and any

5    party in interest will have the right to see them.

6         I do have to comment on the ad hoc committee's

7    objection.  We've worked with the ad hoc committee on a number

8    of fronts to date.  We've had good faith discussions with them.

9    We've found many of the paths that we've contemplated with them

10   to be constructive.  But I have to have one comment, and this

11   goes to both sides of the house right now.  I think that there

12   are a number of assertions and allegations in the pleadings

13   that are needlessly inflammatory.  A number of them, as

14   Mr. Miller had said, are baseless, and I think that they're a

15   bit of a sideshow for today.  And I'll include in that the Rule

16   2019 comments, where I think Your Honor is aware that the case

17   law is divergent on whether additional disclosures would be

18   required.  We're not sure that they would be in this case, but

19   that can be teed up separately.

20        I think that the only thing in front of Your Honor

21   right now is whether or not exclusivity should be extended on

22   the terms outlined by Mr. Miller, and the committee, with the

23   conditions we negotiated, wholeheartedly endorses that

24   extension.

25        THE COURT:  Okay.  Thank you for that.

86

1    Mr. Bienenstock, I think it's your turn.  As far as limiting

2    your ability to participate in today's hearing on account of

3    claim deficiencies in the 2019 disclosure recently made, I have

4    not reviewed that disclosure, and I have reviewed your papers.

5    So I know your argument, and I have, in the past, heard from

6    your ad hoc committee of creditors.  I will decline to call

7    this an ad hoc committee of hedge funds, to the extent that

8    that carries with it any connotation that may be negative.  And

9    I have heard from cocounsel for the committee as recently as

10   yesterday afternoon.  Mr. Shore, who was arguing on behalf of

11   DnB NOR this morning, was here yesterday afternoon for a

12   separate hearing relating to the Lehman case.

13            MR. SPEAKER:  Metavante.

14            THE COURT:  Yes.  Metavante.  And this has been a long

15   Lehman week, even though it's only Wednesday morning.  And I

16   did hear from the ad hoc group in connection with the Metavante

17   matter.  I did permit argument, and I believe that an alleged

18   13.5 billion dollars in creditor claims commonly represented

19   should be heard from.  But, obviously, compliance with 2019

20   issues also must be satisfied.  I'm not going to make any

21   judgments today with regard to that issue.  And to the extent

22   that becomes an issue in the future we'll address it on some

23   other day.  So I'll hear from you now.

24            MR. BIENENSTOCK:  Thank you, Your Honor.  Good

25   morning.  Martin J. Bienenstock of Dewey & Lebouf for the ad

87

1    hoc group of Lehman Brother creditors.  I will try my best to

2    take into account Your Honor's comments of having read the

3    pleadings, which I know from experience occurs.  I do have some

4    remarks I must make, however, because, obviously, the debtor

5    filed a twenty-five page, approximately, reply yesterday, and

6    that needs to be responded to.

7            THE COURT:  I read that as well.

8            MR. BIENENSTOCK:  Well, that was the debtors', so I

9    want to respond.

10           THE COURT:  Yes, I read yours and I read theirs.

11           MR. BIENENSTOCK:  I'm sure.  I'm sure.  So I --

12           THE COURT:  So I'm familiar with the purple prose on

13   both sides.

14           MR. BIENENSTOCK:  Right.  There were things there that

15   were also repeated this morning that need to be responded to.

16   In respect of 2019, Your Honor, given all the remarks, I'll

17   simply say there is a big issue.  We agree with the committee.

18   We highlighted the issue in the statement we did file, and in

19   view of Your Honor's comments, while I had prepared an argument

20   on that, unless Your Honor wants to hear it more later I'll

21   defer that for when it's teed up.

22           THE COURT:  I really don't want to convert the

23   important argument on exclusivity into a discussion of Rule

24   2019 issues, particularly since the Rule is being modified as

25   we speak and we're dealing with today's iteration of the rule.

88

1    But you should all know that at some point within the useful

2    working lives of the people you represent their disclosure

3    applications will likely be significantly greater.  Why don't

4    you proceed without dealing with the 2019 issues now?

5            MR. BIENENSTOCK:  Okay.  Your Honor, the ad hoc group

6    is grateful to the committee for making progress on

7    transparency and recognizing in its response the claims and

8    issues that the group raised.  In the group's view, strongly

9    held view, a report four months in the future, with an

10   extension of exclusivity for eight months and the concomitant

11   transfer of the burden of proof on exclusivity from the debtor

12   to any creditor who during those eight months would want to

13   shorten it, is wrong, unacceptable, bad for the estates and bad

14   for creditors.  And that's why we're still here now.

15           Great things can happen in these cases if the Court

16   does not extend exclusivity.  First, the real stakeholders, all

17   the creditors, can have a voice and a choice.  It's axiomatic,

18   it's obvious, it's indisputable, that when a debtor negotiates

19   with the benefit of exclusivity a Chapter 11 plan, everyone

20   negotiating with the debtor knows that they can't file any

21   counterplan, any competing plan.  So you're prone to take less.

22   A level playing field is when everyone can file a plan.  That

23   makes the negotiations real.

24           But, more importantly, whether the distributions to

25   creditors are all in cash, which we, frankly, think will not be

89

1    the case, or it's a combination of cash and some type of

2    security or certificates in various entities.  The entities

3    will range from litigation trusts to, perhaps, real estate REIT

4    or other type of portfolio that isn't wound down that may have

5    some viable properties, to something having to do with the

6    derivative operation.  There will be distributions of cash and

7    some types of securities in the plan that's ultimately

8    confirmed in this case.

9           And when we say it's simple, we mean it's simple.  We

10   mean it can be done now, for the following reason.  This is not

11   a case where putting together a reorganization plan means you

12   need a deal with the union, the IRS, the EPA and a bunch of

13   secured lenders and a new financer.  That is complicated.  That

14   takes time.  That must happen before you can maintain going

15   concern value of an ongoing business.

16          This is the opposite.  We don't have a union.  We

17   don't have a financer to worry about.  We have different types

18   of assets.  Some monetized.  We're told now 12.2 billion in

19   cash.  Others derivatives, real estate assets, loans, possibly

20   REO, whatever.  And claims against foreign entities.

21          We know now that the unsecured claim holders in each

22   debtor will share pro rate what comes out of that debtor.

23   There's no need to treat one type of class differently.  People

24   you're going to keep doing business with get one thing.  Trade

25   creditors get another.  That's not the issue here.  Everyone's

90

1    going to get their pro rata share.  Will there be issues as to

2    intercompany claims?  Of course.  Just like other claims that

3    won't be resolved.  And when they are resolved, whether

4    allowed, allowed in part, partly subordinated, totally

5    disallowed, re-characterized as equity, the denominator will

6    come better into focus.

7        When Enron's plan and disclosure statement went out

8    the disclosure statement, to the extent it had to, projected

9    roughly twenty cent returns plus or minus.  Happily, many

10   creditors are receiving eighty-five to a hundred cents.  Why?

11   Because in the year since confirmation many claims were

12   disallowed, many affirmative litigations were successful, some

13   of the ongoing businesses were sold for more than was

14   anticipated.  It was a happy event.  Did creditors, when they

15   were voting, care that the twenty percent estimate may go up or

16   down?  No.  They knew they were all getting the same.  Whatever

17   it is, it is.

18       Another way of looking at it, Judge, here, is all of

19   the things Lehman mentioned in its pleadings and a few minutes

20   ago, very few are going to be finished when the eighteen month

21   bell rings in this case, which, I think, is in March of 2010.

22   Very few.  And it's not even knowable today which will be

23   finished and which not.  And, to take an example, the item that

24   they keep talking about, joined by the committee, as an

25   absolute, an absolute bar to a plan proposal now, it's not a

91

1    bar at all.  A bar date.  Mr. Miller referred to November.  The

2    bar date is September 22.  There's a subsequent November date

3    for questionnaire answers.  But let's see how this plays,

4    because I want Your Honor to have an understanding of what can

5    happen if Your Honor doesn't extend exclusivity.  A plan can be

6    proposed, let's say, in the next few weeks, next month.  A

7    disclosure statement will likely occur, say, sometime in

8    September, latest October, but in that neighborhood.  Obviously

9    all current creditors on schedules can be given actual notice

10   by e-mail and other mail.  And the rest of the world, it's

11   going to be online and in the newspapers.  So there will be a

12   disclosure statement hearing sometime in September or October,

13   and by the time the plan goes out the proofs of claim will have

14   been filed, to the extent there are any names that come in that

15   are not on the debtors' schedules.  So that's not a bar at all.

16   Because one thing is for sure, which we pointed out in our

17   objection.  The bar date doesn't tell us the allowed amount of

18   claims.  It doesn't give us the denominator.  It just confirms

19   what we already know.  There are a lot of claims out there,

20   large in amount.  So we'll have more evidence that they are

21   large in amount and large in number when they come in.  But

22   it's certainly not a bar to sending out a plan.

23        And the expense, Your Honor, is key.  And it's very

24   important that we recognize what are the opportunities in this

25   case to make a major impact on expense of administration.

1       Notwithstanding the comments from Mr. Miller about our attacks,

2       and his use and his pleadings and in argument of our allegation

3       of unjustified expense, I don't think Mr. Miller or anyone in

4       this courtroom can find the words unjustified expense or words

5       to that effect anywhere in our pleadings.

6            What we pointed out has many facets, but what's

7       important for today is the Chapter 11 process is a dual work

8       stream process.  For every business decision, the debtor and

9       its array of professionals sits down with the committee and its

10      array of professionals -- and notwithstanding that the debtor

11      basically has the edge in that discussion because, as it says

12      in every one of its motions under 363 and 365, its business

13      judgment should prevail -- there is this discussion, hopefully,

14      we think, about all these major decisions with the dual sets of

15      professionals.

16           That's not the way corporate America works.  The

17      successful corporations in America don't have their sets of

18      professionals sit down for every decision with another set of

19      professionals.  That's occasion for the reasons we all know in

20      Chapter 11, but that's a major, major expense.  When a plan is

21      confirmed, the debtor can have directors selected by the real

22      stakeholders.  It can have management, perhaps including some

23      of current management.  That's left to be decided, and

24      hopefully the subject of discussions.  But it will have one

25      management, one set of professionals, and we will cut these

93

1      expenses in half.  That's a major saving, given the level of

2      expenses in these cases.

3           And again, we have not criticized the level.  We don't

4      know enough to criticize the level.  But we do know from their

5      monthly operating reports which we attached to our objection, I

6      think the A&M billed something like 115 million in nine months

7      or something close, and the lawyers more than 55 million.  We

8      haven't criticized it, as I said, we don't know enough to

9      criticize it.  And since I come from one of the firms, I would

10     just as soon assume that it's all valid.  But it's large, and

11     it's larger when you consider a lot of the time is not simply

12     spent getting ready to do the business transaction, it's

13     getting ready to sit with the committee and make all kinds of

14     presentations and then have their professionals pore through

15     it.

16          All that expense, or at least a very substantial

17     chunk, gets eliminated if we make this into a successful

18     reorganized American corporation.  And whether that corporation

19     goes on in life forever or liquidates, successful American

20     corporate management and governance is helpful to all

21     creditors.  That's what Your Honor can do today by not

22     extending exclusivity; make that date come sooner for the

23     benefit of all creditors.

24          THE COURT:  Let me stop you for a second, Mr.

25     Bienenstock --

1          MR. BIENENSTOCK:  Yes.

2          THE COURT:  -- because it's a nice rhetorical

3    flourish, but I don't understand how this happens.  The

4    examiner is still in the midst of conducting an

5    investigation -- we talked about it earlier -- on behalf of the

6    Walt Disney company.  You even submitted papers in respect of

7    it.  And I asked you to hold your remarks.  And I'm not going

8    to reopen that discussion now, I'm simply identifying that as a

9    point in time earlier in today's hearing.

10          I know from the hearing that we had in June that the

11    examiner's timetable for completing his report has been

12    elongated -- to use a term that I read in your papers -- not

13    because there's a desire on his part or on the part of his

14    partners to generate more administrative expenses that they can

15    put in their pocket, but because the task at hand is, by

16    anybody's estimate, enormous.

17          How is it conceivable that any plan of reorganization

18    that one might draw on the back of an envelope could be

19    properly disclosed to global creditors prior to the completion

20    of the examiner's report testing all manner of issues in this

21    case, including the Barclays sale, which we just talked about

22    within the last two hours.

23          I don't understand -- I understand the goal:  cut

24    expenses, increase transparency, have real stakeholders have a

25    role in managing the process.  I understand all of these

95

1    platitudes, because they are platitudes, the very same argument

2    you make about the standards I'm supposed to apply in dealing

3    with exclusivity,  but the term actually applies to your

4    argument.

5         Your argument is not based upon anything that feels

6    like reality to me.  It seems to be predicated on impatience,

7    impatience with a process that done professionally, necessarily

8    will take time.  How on earth could anybody develop a

9    confirmable plan before the examiner's report is done?  How

10   could anybody develop a confirmable plan before the bar date?

11   How can anybody develop a confirmable plan without fully

12   understanding the value of the assets that underlie what you've

13   described as a forty plus billion dollar business?  Well, okay,

14   that's the basket, that's a broad valuation we could apply to

15   the basket, but what's in it?  And without being able to

16   disclose what's in it, how can anybody make an informed

17   judgment with respect to whatever this liquidation plan looks

18   like?

19        Additionally -- and I think you know this --

20        MR. BIENENSTOCK:  I hope you'll let me answer, Your

21   Honor.

22        THE COURT:  I'm not quite done.

23        MR. BIENENSTOCK:  Okay.

24        THE COURT:  Additionally -- and I'm sure you know

25   this -- in the ordinary course of trying to fight exclusivity,

96

1    parties-in-interest could say we want an opportunity to file a

2    plan.  They attach the plan to their pleading.  They attach at

3    least a term sheet.  They describe something that's different

4    from what might otherwise be in front of the Court if we had

5    simply the debtors' plan pursuant to exclusivity.

6         You say nothing about that.  And while you talk in

7    your hypothetical about "the plan" that might in some dream

8    emerge in September, the contents of that plan nowhere have

9    been described, including in your argument.  So what are we

10   really talking about?  Is this just about impatience or do you

11   represent a claim group that has a cognizable, confirmable

12   alternative plan?

13        MR. BIENENSTOCK:  Your Honor, I'm glad you brought it

14   to the point.  We can file a cognizable, confirmable plan in

15   the near term.  And I'll tell you why it's not attached and

16   I'll answer your other contentions.  And by the way, if your

17   other contentions are correct, then I think what you've just

18   foreshadowed to the world is there won't be a plan for many

19   years.

20        Taking the examiner report as an example.  The

21   examiner's report is going to give one man's fact findings and

22   opinions on some issues.  Some people will agree with him, some

23   people will disagree, some people will sue based on what he

24   says.  And that litigation will go on for years.

25        So Judge, if you think the examiner's report is some

97

1    type of -- the day of its filing is some type of triggering

2    event, liberating event, now we can have a plan, I suggest

3    you're very mistaken.  What is it is it's going to be a man's

4    opinion of what claims can likely be successful if litigated

5    and what claims may not be successful.  He'll probably be right

6    in many instances, in some instances he'll be wrong.  It will

7    take years.

8         All the plan has to do, Your Honor, is reserve to the

9    reorganized debtors the rights to bring the estate's causes of

10   action, whether they're identified in the examiner's plan or

11   whether they're not identified, because as Mr. Dunne pointed

12   out earlier, the examiner's scope is not universal.  It's not

13   finding all causes of actions of all the estates.  So there are

14   other parties who never file reports.

15        Your Honor, how are we going to deal with that?

16   Mr. Dunne doesn't have a date to file a report.  The debtor

17   never has to file a report.  Is Your Honor saying that we can

18   never have a plan, because we never know when their reports

19   will come?  Of course not.

20        THE COURT:  I think maybe you're overstating what I'm

21   stating, and I'm not sure it's helpful.  My point -- and let me

22   be clear -- is that there's a lot that's still happening that

23   in the ordinary course of a well managed case should happen to

24   the point of conclusion in order to provide reasonable

25   disclosure.

98

1          There's a different issue which I think you're

2     pressing.  When Congress amended the provisions of 1121 in the

3     2005 amendments to limit the discretion of a bankruptcy court

4     judge to extend exclusivity more than eighteen months from the

5     filing date, I rather expect that Congress wasn't thinking

6     about the Lehman Brothers Holdings bankruptcy case.  And

7     circumstances in bankruptcy have changed dramatically since

8     then, as have circumstances in the economy.  I won't get into

9     the question of whether or not I think that is or is not a

10    useful provision in mega-bankruptcy cases, because it may not

11    be in terms of its practical application, but it's the law I

12    need to apply.

13          I'm also aware that in the ordinary course of

14    bankruptcy cases since 2005, instead of the problem that was

15    supposedly fixed by the eighteen-month cap on exclusivity

16    extensions, we have a different problem: cases that go on too

17    fast a track, cases in which lenders pre-filing prevent a

18    variety of milestones that have to be met that are incredibly

19    unrealistic.  That's the impatience of the marketplace,

20    perhaps.  And I believe that at some level what you're arguing

21    is the impatience of the marketplace too --

22          MR. BIENENSTOCK:  No, that's not --

23          THE COURT:  -- because in reality, I believe that

24    eighteen months may turn out to be a very difficult time within

25    which the debtor will be able to file a plan or anybody will be

99

 1   able to file a plan that is accompanied by the kind of

 2   disclosure that one would expect a reasonably informed creditor

 3   or investor would have to see in order to vote on that plan.

 4           And here's really the point I'm making.  Are you

 5   simply today, in effect, accelerating to today the date that

 6   might be in March of 2010 when exclusivity will have expired as

 7   a matter of law anyway, by saying that there's a futility

 8   factor here?  Because that's one way that I can read your

 9   argument.  One way that I can read your argument is that we

10   should just get on with the business of ignoring exclusivity

11   because exclusivity's not going to matter anyway.  But you

12   haven't quite made that argument.

13           MR. BIENENSTOCK:  Well --

14           THE COURT:  Do you want to make that argument?

15           MR. BIENENSTOCK:  Yes, Your Honor, because the point

16   is -- the point is that all of these things that we're talking

17   about are not going to be finished by March of 2010.  And I

18   guarantee you, Your Honor, the debtor will propose a plan.  So

19   when I say I want to make that argument, I want to make it to

20   prove to Your Honor that all of these impediments -- and I'm

21   going to go back over Your Honor's list -- that all of these

22   impediments to a plan are not impediments to a plan today.  And

23   Your Honor can say platitudes, and maybe I'll fall on my face,

24   but I hope when I'm finished Your Honor will realize these are

25   no platitudes.

1          Now, Your Honor seems to be concerned with disclosure.

2     And I think, if I'm inferring the right message, it's

3     disclosure so creditors know well, the claim amount is really

4     approximately not 800 trillion, it's 200 -- or billion, and the

5     approximate asset amount is something and the return is maybe

6     23 cents, 17 cents, something like that.  If I'm close to right

7     I hope -- my point, Your Honor, is that's not -- that's not the

8     disclosure any creditor needs.  Why not?  Because they're going

9     to get what they're going to get, and as long as the plan says

10    all unsecured claim holders against each individual debtor

11    share equally, why would someone vote no?

12         Let's say they come out with a plan and say we're

13    going to give you fifteen cents.  What does voting no get me?

14    Presumably the fifteen cents is going to be everything that's

15    there.  If I vote no, it doesn't mean I'll get twenty.  So why

16    is that -- the numerator and the denominator -- why is that

17    necessary for someone to know?  We'll tell them the best

18    information we have at the time.

19         As I explained in Enron, we were off on the low side.

20    We guesstimated 20 cents; it's 85 to 100 in most cases.  No

21    one's complaining.  And if it had been less than twenty, we

22    have plenty of caveats that if claims came in higher, etcetera,

23    if the market fell apart and we sold assets for less, it would

24    be lower.  But we had overwhelming acceptance because all the

25    creditors knew we're getting what there is, in the best form

1    that people know how to give it to us: partly cash, partly

2    certificates and different types of litigation trusts or real

3    estate businesses.  That's all someone needs for disclosure,

4    Your Honor, to know you're being treated equally with everyone

5    else.  But you're going to have a streamlined company,

6    excellent managers, excellent directors, it's going to get off

7    the ground, you're going to eliminate this dual expense track.

8          And Your Honor, I have to admit, I don't know how you

9    can call those platitudes.  These are tangible real things that

10   will happen.  It is a legal fact.  You confirm, you don't have

11   committee.  You don't have a committee, you don't have the

12   committee's professionals.  You no longer have to have a

13   debating society on every business decision.  That is a hard

14   and fast saving.  That's no platitude.

15         What's a platitude?  A platitude is the debtor saying

16   size and complexity.  Yeah, there are lots of assets.  Yeah,

17   there are lots of debtors around the world.  Enron is still

18   dealing with foreign debtors all over the world.  Nothing winds

19   down too quickly, as Your Honor knows, especially in

20   liquidations.  But the claims against the foreign debtors in

21   insolvency, ultimately there will be a distribution one day;

22   it'll be sent pro rata to creditors.

23         I started with my example about the IRS, the union,

24   the secured lender and the financer to make the point that size

25   and complexity has meaning, it's not a platitude, when you can

102

1    identify the steps you have to do --  Union, EPA, secured

2    financing, etcetera, trade creditors -- to survive as a going

3    concern.  That is not a platitude.  That is real.  It's

4    tangible.

5         We can understand you have to go through all those

6    steps.  The words "size and complexity" here, just because

7    there are a lot of assets, we know nothing's going to hold up

8    confirmation if we tell creditors you're going to get your pro

9    rata amount of what's there, and our assessment of what's there

10   now is X or a range of X to Y.  That's what I mean by

11   platitude.  It can be big but yet the plan is simple.

12        And why didn't we attach a plan?  I'm glad Your Honor

13   mentioned that.  Two reasons.  First, we didn't think that to

14   have exclusivity terminated, our plan -- that this hearing has

15   to turn into a confirmation hearing.  The debtor is not going

16   to preview its plan with the Court before it files it.  We

17   didn't think we should have to do that.

18        Having said that, I would have liked to, and let me

19   tell you why we didn't.  This is not being taken as impatience.

20   It's not being taken lightly.  If there's one thing that even

21   Mr. Miller would agree about hedge funds is they want to make

22   money, not spend it stupidly or frivolously.  They're not here

23   to propose a plan that you'll blast out of the water because

24   you think it's a fantasy.  They only want to propose a plan

25   that they think Your Honor will confirm, and it'll have to be a

1   responsible plan and not just, as the debtor says, for some

2   hedge funds to sate their appetites for profits.  If this plan

3   isn't great for all creditors with a lot of support, it's not

4   being confirmed.  We get it, Judge.

5         So the notion that we're here to do something

6   frivolous is ridiculous -- or that it's a platitude is

7   ridiculous.  The reason why we didn't propose a plan, it takes

8   some time and expense to go through the schedules that have

9   been filed thus far, some of which are still being amended.  It

10  takes some time and expense to gather up the expertise you need

11  to make sure you're doing it right.  Some serious expense,

12  which we are willing to spend, but not if after we spend it we

13  come into this Court and Your Honor says oh, your objectives

14  are platitudinal, get lost.

15        THE COURT:  I --

16        MR. BIENENSTOCK:  That's not --

17        THE COURT:  Let me break in, only because I think

18  you're starting to now not only demean Mr. Miller but you're

19  starting to demean me.

20        MR. BIENENSTOCK:  Well, I apologize.

21        THE COURT:  And I think that's where I'm going to draw

22  the line.  What I said, and what I believe in your rhetorical

23  excitement you're distorting, is that many of the things that

24  you say in your papers and that you've said in your remarks

25  this morning, are in fact platitudes -- references to corporate

104

1    America.  This isn't a political campaign.  This is a really

2    large, indisputably complex, and incredibly important

3    bankruptcy case.  Rhetoric has its place, but let's deal with

4    reality.

5         If you actually had the ability to propose a

6    confirmable plan, or if you actually had the outline of a

7    confirmable plan with the information presently available to

8    you, you'd be saying more about it than just it's expensive to

9    do and we didn't do the work to comb the schedules.  Let's not

10   minimize the really hard job that's associated with developing

11   a confirmable plan in this case in the name of procedural

12   advantage.

13        If, as, and when you, or anyone else for that matter,

14   is representing a party-in-interest with enough skin in the

15   game to be able to develop an alternative plan, you know full

16   well that motion can be filed to terminate exclusivity.  And

17   Mr. Miller did just that in the Rockefeller Center bankruptcy

18   case -- I can't tell you how many years ago -- and lost.  That

19   doesn't mean that at the right time such a motion can't be

20   brought successfully in the right case.  Whether this is the

21   right case at any time between now and March of 2010, I don't

22   know.  But I'll tell you that today is hardly the right time,

23   on the basis of broad generalizations, to suggest that the

24   debtors shouldn't be allowed any opportunity to continue to

25   maintain the exclusive right to propose a plan which is granted

105

1    under 1121.

2          And you also have a stiff adversary in the official

3    committee of unsecured creditors that has filed a statement in

4    support of the debtors' plan.  So at a certain level,

5    Mr. Bienenstock, you are representing, however we deem it, a

6    rump group of self-selected creditors that has chosen

7    sophisticated counsel to try to achieve an objective.  Now, if

8    that objective is today's record, so be it.  If the objective

9    is to say we need more transparency, that may be a different

10   motion.  If the objective is to say we should minimize

11   administrative expenses in this case, I wholeheartedly agree.

12   But I'm not sure an exclusivity objection is the means to those

13   ends.

14          MR. BIENENSTOCK:  Well, Your Honor, there's more to

15   our motion.  And Your Honor clearly has the belief that we

16   can't propose a plan that's confirmable and responsible.

17   First, I hope Your Honor accepts the notion that we know if

18   it's not a responsible plan it won't get to first base.  So

19   that's the only type of plan we're talking about proposing.

20   And it does take work to put together the people and the plan,

21   and the expertise shouldn't be minimized, Your Honor.

22          And there's another phenomena going on here, Your

23   Honor.  These claims in this case trade for relatively little.

24   A point was made, there's no one supporting us.  Well, none of

25   the creditors on the outside are supporting the extension.  The

106

1    committee is.  But they're here and they're paid from the

2    estate to take a position on everything.

3         The message that we're here and others are not, I ask

4    Your Honor not to interpret that we're some group looking for a

5    special advantage.  We are a group that bought up enough debt

6    to have a stake, and it's worthwhile to try to increase the

7    returns that will come out of this case.  That's why we are

8    here, and we realize that we do that for everybody, not just

9    for us.  But it still takes a lot more money to put it all

10   together.  And if we're going to put it all together and

11   someone is going to have ideas that well, you don't have a bar

12   date yet, you don't have an examiner report yet, you don't get

13   to first base -- as I said, my clients are business people.

14   They don't want to spend money frivolously.

15        But I think that I've given Your Honor -- I mean, it's

16   a plan that treats every claim holder of one debtor the same.

17   And that is going to be the plan here.  The plans will differ

18   and maybe one will say there will be a litigation trust and a

19   real estate trust, and another will say just a litigation

20   trust, but whatever the currency is, it's all going to be

21   distributed pro rata, and it's not -- and inter-company claims

22   can be determined before confirmation, at confirmation, or

23   afterwards.  Hundreds of billions of claims are going to be

24   determined after confirmation no matter whose plan it is.

25        So Your Honor, the notion that there's not a real plan

1   possible, this is a liquidation, we're talking about pro rata

2   distribution to the creditors of each debtors' estate.  All the

3   bankruptcy lawyers in this room know what that plan is.  They

4   could probably write the term sheet now.  I'm not saying

5   anything people don't know.  But obviously we want to do it

6   responsibly from a tax viewpoint, from an accounting viewpoint,

7   from a management director viewpoint.  We'd like to do it

8   responsibly and that is going to cost some money.  I don't

9   think we should be faulted for not having done that already,

10  but it is what it is.

11        I want to go on to discuss the other points of our

12  motion which I think are important.

13        THE COURT:  Okay.  And I'm just going to note that

14  it's 12:30.  At least for me, this is a warm courtroom.  People

15  are standing.  At some point, we're going to break for lunch

16  and we're going to deal with the adversary proceeding portion

17  of today's agenda after a lunch break.

18        I'm only pausing to make the following observation.

19  To the extent that there are people in the room who are here on

20  account of the adversary proceeding docket and they wish to

21  leave, I will not be bothered by -- I'll stay where I am and

22  people can just exit who might not want to watch this

23  particular argument to conclusion.  And that will be a fine

24  thing if they wish to go and come back at 2 o'clock.

25        MR. BIENENSTOCK:  Thank you, Your Honor.

108

1          THE COURT:  Let's just pause for one moment while

2      certain people are going to head for the hallway.

3          (Pause)

4          UNIDENTIFIED SPEAKER:  Your Honor, can we get some

5      estimation on how long Mr. Bienenstock expects to go on?

6          THE COURT:  I was about to ask that, because it goes

7      to the question of whether we take a lunch break that involves

8      this contested matter as well.  And given the way the

9      elevator's functioning here, it's probably just as well that

10     people leave in stages.

11         (Pause)

12         Mr. Bienenstock, about how long do you think you're

13     going to be?  And I'm assuming that Mr. Miller and/or the

14     committee may have some further observations as well.

15         MR. BIENENSTOCK:  My best guess is forty-five minutes.

16         THE COURT:  Well, if you're going to be forty-five

17     minutes, I think that we should take a lunch break.  And maybe

18     during the lunch break you can think of ways of making it

19     shorter.  That's not to say that I won't be happy to hear you

20     for the full forty-five minutes.  But I really do understand

21     your argument, but I'm not going to in any way limit your

22     ability to make it.  Let's take a break until 2 o'clock.

23         MR. BIENENSTOCK:  2 o'clock?

24         THE COURT:  2 o'clock.  We're adjourned.

25         (Recess from 12:33 p.m. to 2:02 p.m.)

109

1          THE COURT:  Be seated, please.

2          Mr. Bienenstock.

3          MR. BIENENSTOCK:  Good afternoon, Your Honor.  I'm

4    Martin Bienenstock of Dewey & LeBoeuf for the ad hoc Lehman

5    Brother creditor group.  I'm going to do my best on time.  Your

6    Honor, to start, I want to mention some undisputed facts in the

7    record and then some facts for which there's no evidence in the

8    record.  The undisputed facts I'd like to call the Court's

9    attention to are all from our objection to exclusivity, so I'll

10   just cite the paragraph number.

11         Paragraph 5 that the estate has twelve billion dollars

12   in cash that earns miniscule return, in fact Mr. Marsal at the

13   July 8 341 meeting himself acknowledged the pitiful return on

14   the money because of today's interest rates.

15         Paragraph 14, LBHI provides no example of a

16   destabilizing effect that competing plans would have in this

17   case.

18         Paragraph 18, derivative transactions will continue

19   after the debtors' requested eight-month extension would

20   expire.

21         Paragraph 28, the debtors comprise a forty-five

22   billion enterprise.  These are all things that the debtors'

23   reply did not dispute at all.

24         Paragraph 29, the debtors' shareholders have no hope

25   of any recovery from these estates.  They've no incentive to

110

1    monitor directors and officers.

2         Paragraphs 32 and 33, this was our mathematical

3    showing that the A&M asset management bonus now exceeds the

4    amount that could be paid because it's capped by the amount of

5    fees, twenty-percent of fees, and if there were confirmation

6    now the bonus would be larger than twenty-five percent.

7         Paragraph 37, that the operating report in May and

8    June for LBHI was literally the one line that we quoted -- or

9    summarized in our objection.

10        Paragraph 38, that meaningful expense reduction can

11   only occur under a confirmed plan.

12        Now, there's no evidence in the record to show the

13   following:  how a creditors' plan would imperil other

14   creditors; that there's a need to resolve intercompany claims

15   before confirmation.  In fact, as I explained earlier, we all

16   know that in all large cases there are going to be many very

17   large claims by and against estates that won't be resolved till

18   after confirmation.

19        There's no evidence in the record showing we need an

20   examiner report before there can be confirmation.  In fact, the

21   committee's investigation, the debtors, the examiners, they'll

22   all lead to potential claims; some will be brought, some won't,

23   some will succeed, some won't.  We won't know that for years to

24   come.

25        There's no evidence in the record showing a need for

1    foreign proceeding resolution to confirm.  As we know from

2    other large cases with foreign proceedings, these things take

3    time.  These estates' claims against them will be resolved over

4    time.  Hopefully some money will come back.

5         And on that subject, Your Honor, since I think Your

6    Honor asked me as part of the colloquy this morning, I think --

7    Your Honor was wondering if we were asking for this for some

8    other reason than wanting to file a plan.  The answer to that

9    is no.  But in terms of what could happen in terms of

10   transparency, information, moving the process along, well, the

11   debtor could be given dates to report on things it says stand

12   in the way of confirmation:  intercompany claims analysis --

13   and I mean report to all creditors, not just the committee --

14   intercompany claims analysis, foreign proceedings, substantive

15   consolidation.  Since the eight-month (sic), if it's granted,

16   will take them, I think, right up to the eighteenth month,

17   which the limit -- clearly the debtor's going to have a plan in

18   process before the eighteenth month passes.  So it would be

19   useful if they made reports on these things to all creditors in

20   the next month by month by month.

21        Again, I want to emphasize that, for the reasons I've

22   already gone over, and I don't want to take the time to repeat

23   them, we don't think any of these stand in the way of

24   confirming a plan now, but they do.  My concern is the Court

25   does or might.  So there must be progress on this.  Let them

1    make reports to creditors so we see how these things are being

2    resolved so we can get to confirmation.

3         Also, on that subject, since I mentioned the eight

4    months, obviously that we want no extension.  The biggest

5    problem with the eight-month is that anyone who wants to

6    propose a plan in between would have the burden of proof to

7    shorten exclusivity.  For that reason, we think that either the

8    extension should not be eight months, or the Court, if it's

9    going to give it, should say if someone comes in to shorten it,

10   the burden of proof remains on the debtor to show why it should

11   continue with that point.

12        I want to talk about the fiduciary point for a minute.

13   The debtors' reply, I think kindly, I'm not sure, but cites an

14   article I wrote in 1985 about fiduciary duties in bankruptcy

15   cases.  And essentially, you know, I can't take credit.  The

16   articles cites to commodity futures trading commissions, a

17   Supreme Court decision and the definition of fiduciary in

18   Black's Law Dictionary, and other sources.  Basically a

19   fiduciary is simply a person who's supposed to act in someone

20   else's best interest.  It's not a person with a halo or angelic

21   or special.  It's someone who's supposed to act other than in

22   that person's own interest.

23        And from what I read in the debtors' reply, they're

24   saying, well, that's the answer, Mr. Marsal is a fiduciary, so

25   what are you worried about?  And from my perspective, from my

113

1   client's perspective, that's not the answer; that defines the

2   problem.  And what I mean specifically is this:  If -- when

3   someone is supposed to act in someone else's best interests,

4   it's relevant to know what pressures are on that Court to act

5   in someone else's best interests or in that person's own best

6   interests.  If you're simply hired to do a job for someone

7   else, there are no counterforces.

8            In this situation, we went through the mathematics of

9   the asset management bonus not to criticize Mr. Marsal, and

10  there's no criticism in our pleading; not to say fees are

11  unjustified, the debtor made that up; but simply to show a

12  counterforce that has occurred in this case.  The full bonus

13  cannot be earned without the fees of 115 million expanding to

14  nearly twice that.

15           THE COURT:  Well, Mr. Bienenstock, the way I read your

16  papers, you suggested that because there was an economic

17  incentive associated with prolonging the number of hours spent,

18  that, in effect, this particular fiduciary had a reason to keep

19  this process going as long as possible to make the most on the

20  twenty-five percent.  That's how I read your papers.

21           MR. BIENENSTOCK:  Well, mathematically --

22           THE COURT:  Did I read them correctly?

23           MR. BIENENSTOCK:  -- that's -- we showed that as a

24  mathematical truism.

25           THE COURT:  So it's possible for someone reading those

114

1    papers to think that perhaps you're suggesting that a human

2    being who is also a fiduciary might be tempted to prolong the

3    process.  That seemed to be the suggestion of your papers.

4         MR. BIENENSTOCK:  Right.  We were showing the

5    counterforces on a fiduciary that happens to exist in this

6    case.

7         THE COURT:  But that's not to suggest that just

8    because that's mathematically true that's what motivates a

9    person who is truly fulfilling fiduciary duties, because the

10   economic incentive wouldn't be a true counterbalance to doing

11   the right job.

12        MR. BIENENSTOCK:  We agree a hundred percent with

13   that.

14        THE COURT:  Fine.  At least we agree on that.

15        MR. BIENENSTOCK:  Okay.  There's also no evidence in

16   the record to support the debtors' contention in its reply at

17   paragraph 3.  It says, quote, "The objective is a simple scheme

18   to enable speculators to use the Debtors' assets and data to

19   sate their own appetite for profits.  This is the very

20   motivation that contributed to the demise of the Debtors," end

21   of quote.  Total whole cloth, Your Honor, there's nothing, no

22   evidence that they offer in any part of this record, that shows

23   that the objective is to enable the speculators, that they're

24   calling my clients, to get any special advantage.  Do they want

25   to make money on their claims?  Like everyone else, of course

115

1    they do.  They want to maximize their recovery.  But is there

2    some particularly negative wrongful part of this?  No.  And

3    they have no evidence, but they make it up.

4         And they make it up again in their reply at 17, where

5    they say my clients ignore the need to protect interests of all

6    claimants and not just bondholders and distressed debt

7    investors.  I don't want to repeat the whole morning, but I did

8    mention that we fully understand that when exclusivity ends we

9    have to propose a plan that Your Honor likes, that wants (sic)

10   to confirm.  Other creditors are going to have to support it.

11   It's going to have to be fair.  It's going to have to maximize

12   value.

13        So the notion that we're trying to do something that

14   just benefits the clients who are spending the money to try to

15   improve the process is simply totally without evidence in this

16   entire record.

17        At paragraph 22 of the reply, they contend that the

18   group's demand for control imperils other creditors.  They say,

19   quoted, "It's manifest that the hedge funds want to take

20   control of the Debtors' boards of directors and access all of

21   the information that will enhance their positions and direct

22   the administration of the Chapter 11 cases to satisfy their

23   objectives."  Again, no evidence for that statement whatsoever.

24   The plan we would propose, of necessity, would have to have

25   great directors rallied around by the people voting on the

116

1    plan.  That's how you get people to support it.  And the notion

2    that the debtor has converted our pleading into some evil

3    request for relief designed to benefit only a few creditors is

4    telling about the debtor, Your Honor.  Why is the debtor making

5    that up?  There's no evidence and they cite no evidence for

6    their statements.  Why is it doing that as opposed to saying we

7    think there are the following obstacles to a plan, intercompany

8    claims, Your Honor, here's how we're doing -- here's what we're

9    doing to resolve those obstacles?  That is not coming forward.

10   But the animus, the venom, based on no evidence, that comes

11   through loud and clear.

12        A few things from the argument this morning, Your

13   Honor.  Mr. Miller cited Smart World after having said that

14   Grayson-Robinson has nothing to do here; might have been dicta,

15   but I think the Second Circuit's dicta that the purpose of

16   dicta -- that the purpose of bankruptcy is to get creditors

17   paid is as valid when they said it then as now.  And the fact

18   that they said it in the context of a Chapter X/XI contest is

19   of no moment.

20        But Smart World certainly doesn't support what Lehman

21   is claiming.  In Smart World, a creditor purported to settle an

22   estate cause of action when the bankruptcy court approved the

23   settlement.  And the Second Circuit said, until you're given

24   authority to do it by the bankruptcy court, you can't settle a

25   cause of action.  In no way does Smart World support the notion

117

1    that exclusivity should be extended to maintain the debtor in

2    control.  There's no presumption.  Congress knew how to grant

3    the presumption when it wanted to; it starts the debtor off

4    with 120 days.  But there's certainly no presumption now, and

5    Smart World doesn't get them to where they want to be.

6            THE COURT:  Well, I'm going to disagree with you on

7    this one.  I don't think that that was the purpose for which

8    Smart World was cited by the debtors.  It wasn't about

9    exclusivity as much as it was the reasonableness of the debtor-

10   in-possession being the principal party to propose, because it

11   is the debtor-in-possession that is truly in control of the

12   case.  Creditors have an opportunity to participate actively,

13   as your standing here demonstrates, as the creditors'

14   committee's role in the case demonstrates, as the role of

15   individual creditors throughout this bankruptcy case

16   demonstrates.  But absent converting your motion into a motion

17   for appointment of a trustee, which I don't think you want, but

18   you certainly could bring such a motion if you wished, it is

19   the debtor-in-possession that is entitled to an exclusive

20   period absent good cause being shown by you for not extending

21   the exclusive period.  And I believe that based upon my review

22   of the initial motion and the reply papers just filed the other

23   day that the debtor has presented ample good cause for

24   extending exclusivity under the extraordinary circumstances of

25   the case.  I understand you disagree, and you have a right to

118

1    do that, and that's what we're here to talk about, but at least

2    as it relates to Smart World, and I'm quite familiar with the

3    case, it was the creditors' committee that was seeking to take

4    control of that case without apparent authority, and the Second

5    Circuit chastised the committee for doing that and, frankly,

6    chastised the bankruptcy court for permitting it.  And I

7    understand the case and I understand why you're making the

8    point you're making, but I'm just disagreeing with your gloss

9    on it.

10              MR. BIENENSTOCK:  Okay, I don't think any -- I'll move

11   on.

12              THE COURT:  Good idea.

13              MR. BIENENSTOCK:  Adelphia, Your Honor, it's

14   interesting that the debtor cites Adelphia because I'm really

15   happy for this Court to look at the big picture of Adelphia.

16   Towards the end of the case, when the debtor had a plan

17   pending, as they point out in their pleadings, I was

18   representing a group that wanted to terminate exclusivity and

19   file a creditors' plan.  And the judge denied us that right.

20              And then we went to confirmation and plan was

21   confirmed, over my client's objection.  And we pointed out many

22   illegal parts of that plan -- we believe they were illegal; the

23   bankruptcy judge obviously did not -- and said there would be

24   no stay pending appeal because he didn't think there were even

25   issues that, I guess, could be arguable.

119

1          Well, it went up to the district court, and District

2     Judge Scheindlin found five grounds on which the confirmation

3     order could be reversed.  And when -- if Your Honor reads her

4     decision -- you probably have at some point -- when you read

5     the decision, although the final words are phrased in the words

6     of the statute, I think a strong possibility, a reasonable

7     possibility, of reversal, when you read the district court's

8     analysis of the issues it's real clear how forcefully the

9     district court felt there should be reversal.  But the stay

10    that the Court granted was conditioned on a 1.2 billion dollar

11    bond which was in excess of what our clients had in stake in

12    that contest.

13         So the bottom line is, a plan with probably five

14    illegalities in it was confirmed and consummated.  Had there

15    been competing plans in front of the bankruptcy court, I think

16    the chances of that happening would have been a lot less.  But

17    after so many years in bankruptcy with only one plan on the

18    table, that's what happened.

19         We don't think that's a great example to cite.  I

20    understand the debtors cited it to show that we argued there

21    that when you say things like size and complexity are

22    platitudes, and I said them, and the Court obviously did not

23    grant our objection to exclusivity, it said, well, that's

24    support for Your Honor not agreeing with our agreement that the

25    size and complexity is a platitude.

1        But I just want to leave that subject with this.  It's

2    not that the standard is a platitude, that the law is wrong.

3    It's that when the law says size and complexity, it doesn't

4    mean that you just have to show billions of assets and lots of

5    issues.  You have to show why the size and the complexity

6    stands in the way of confirmation or formulating a confirmable

7    plan.  That's what we contend is missing here.  There can

8    easily be a plan that's confirmable.

9        When they propose a plan, we're not going to have all

10   the answers.  It's not going to be possible to tell creditors

11   in a disclosure statement reliably what they will receive.  But

12   if they know they're getting the same as everyone else and that

13   debtor, and they like the structure and the way the business is

14   going to be run going forward, that's all you can ask for; why

15   not vote for it?  There's nothing better available.

16       So we think that it's not that the standards are

17   platitudes and shouldn't be followed; it's that the debtor

18   hasn't put any evidence in this record, and we think there is

19   none to put in, why those factors that it cites really do stand

20   in the way of confirming a plan now.

21       And, you know, I guess that's just a point of

22   certainly disagreement with me and the Adelphia decision and

23   possibly this Court, but that's our analysis of it.

24       To close, Your Honor, I want to make a few points very

25   clear.  My clients came to court today to get permission to

121

1   propose a plan which they would propose in the near term, and

2   for no other reason.  If that can't be, I've put on the table

3   things that we think the Court can order for the debtor to do;

4   so there will be no excuses in the future why a plan can't be

5   proposed, and that is, give the creditors' reports on

6   intercompany claims, foreign proceedings, substantive

7   consolidation analyses, taxes, anything else they contend would

8   be an obstacle to confirmation.

9        The one-line operating statement for LBHI and for each

10  of the other debtors, it's not compliant with Local Rules and

11  it's unacceptable.  And we pointed out that when the debtors

12  talk about transparency, they list what they filed, the

13  meetings they've attended.  When you go to what they filed,

14  starting with the operating report, one line for a company that

15  had -- they say had 600, I think, 89 million in revenue in one

16  month.  One line:  beginning cash, cash in, cash out, foreign

17  currency exchange, ending cash.  That totally undermines the

18  notion of transparency.  That's not disclosure.  That's not

19  being transparent.  That's really telling creditors virtually

20  nothing.  And then on the same day they filed that, they file

21  an 8-K and they trump it, their filings of 8-Ks in their

22  request to extend exclusivity.  And then when you go to look at

23  the 8-Ks, what do they say?  We attach it to our pleading.

24  They say don't rely on that operating report, that one-liner,

25  because we didn't apply GAAP, it's not audited, this, that and

122

1    the other.

2         That's not -- in substance, that's not transparency.

3    That's not to say A&M isn't working hard and all the rest.  But

4    it is to say that, from a creditors' point of view,

5    sophisticated creditors who know how to read numbers, the

6    information being furnished is so scant and superficial,

7    doesn't move the ball along and it doesn't comply with the

8    Local Rules.

9         And if the Court is going to extend exclusivity but

10   perhaps take some steps or orders to move the case along

11   towards more transparency, et cetera, certainly filing complete

12   operating statements, we submit, should be right up there.

13        So I guess to summarize where we have to leave this

14   is, for the reasons mentioned, we don't think they've shown any

15   cause, especially when you consider there's no harm

16   demonstrated why a competing plan submitted now would be

17   harmful.  Frankly, we think it would be phenomenal because it

18   would immediately kindle all kinds of discussions to get

19   constructive things done rapidly.  But if exclusivity is going

20   to be extended, we ask for the shortest possible time; for the

21   burden of proof to remain on the debtor if someone comes in to

22   shorten it; for the debtor to provide its creditors' reports on

23   substantive consolidation, intercompany claims, foreign

24   proceedings, taxes and anything else it thinks might be an

25   obstacle to a plan.

123

1          And, finally, I just want to assure the judge, Your

2     Honor, that we came here today to get permission to file a plan

3     that would be supported and trumpeted and benefit all the

4     creditors.  Nothing we did would only redound to our benefit,

5     because we don't think for one second the Court would allow

6     that to happen.  Why waste our time proposing a plan that only

7     helps us or gives us an unfair advantage compared to everyone

8     else?  It was never in our minds.  We don't think it would be a

9     total waste of time and money.  We came here to do something

10    that would benefit us and all other creditors equally.  And I

11    hope Your Honor accepts and appreciates that, even if Your

12    Honor concludes that we shouldn't be able to propose a plan in

13    the near term.

14          THE COURT:  Okay, thank you.

15          MR. BIENENSTOCK:  Thanks.

16          THE COURT:  Mr. Miller, do you have some remarks?

17          MR. HARVEY MILLER:  Harvey Miller for the debtors.

18    Your Honor, I will try to be brief.  Mr. Bienenstock ended by

19    saying that the monthly operating reports are basically one

20    line.  I have the monthly operating report, Your Honor, for May

21    and June of 2009.  It's eight pages, including a substance of

22    financial information.  That's number one.

23          Number two, on July 8, just a few days -- a week ago,

24    there was a 341 meeting, which was attended by

25    Mr. Bienenstock's clients.  The meeting took over two hours.

124

1    And a report was given, Your Honor, which I'm holding in my

2    hand, consisting -- well, the pages, unfortunately -- here they

3    are -- of twenty-two pages of detailed financial information,

4    and questions were answered during the entire two hours.  And

5    not one person in that meeting, and it was attended, I think,

6    by over 200 people, Your Honor, including Mr. Bienenstock's

7    clients, not one person raised an issue about transparency; not

8    one person raised an issue about reporting; not one, including

9    his clients, Your Honor.  So this issue about transparency is a

10   red herring.

11        And just the other day, Your Honor, we signed a

12   confident -- the estate signed a confidentiality agreement with

13   White & Case so that they would have complete access to the

14   reports which are given to the creditors' committee.  Their

15   confidentiality agreement is the same confidentiality agreement

16   that Harbinger signed to get access to the reports that were

17   given to the creditors' committee.

18        So as I say, Your Honor, transparency is a red

19   herring.  And for Mr. Bienenstock to stand her, Your Honor, and

20   say that he has not attacked the integrity of the professionals

21   and the fiduciaries working on this estate I find incredulous.

22   He says in paragraph 34 of his objection, "The only way A&M can

23   fully earn 52.4" -- I'm sorry -- "52.5 million dollars bonus it

24   is otherwise contractually entitled to, or any additional bonus

25   money, would be to stretch out the case until its fees crest at

125

1    210 million dollars or more.  The stakeholders' problem,

2    however, is that increasing the forty-five billion dollars does

3    A&M no good.  A&M only benefits if the cases last long enough

4    to build 210 million dollars."  Now, if the implication of that

5    sentence, Your Honor, is that -- is not that they're trying to

6    drag this case out, then I don't know what the implication is,

7    Your Honor.

8          I think Your Honor put your finger right on the

9    problem here.  This is impatience of the market.  These are

10   traders.  They are anxious to trade in these claims.  And Mr.

11   Bienenstock stands here, Your Honor, and he says oh, we don't

12   have to worry, this plan will be very simple, it'll say fifteen

13   cents on the dollar, everybody'll be happy with it.  But what

14   he forgets is there'll be trading in those claims.  The

15   recipients of this fifteen cents, or this proposed fifteen

16   cents, won't know what the real value is.  But distressed debt

17   traders will come in immediately and trade.

18         Now, take the Enron situation where they said twenty

19   cents was what will ultimately be the dividend.

20   Mr. Bienenstock reports it was seventy cents.  Somebody was

21   trading in those claims as soon as the plan was proposed and as

22   soon as it was confirmed.  And the poor creditor, who is not

23   involved in the inner circles of these cases, he doesn't know,

24   or she doesn't know, what's happening.  And this is exactly the

25   problem that Judge Beatty had in the Revere Copper and Brass

1    case and the trading of claims where she imposed the rule that

2    you have to tell the seller what's going on in the case and

3    what the true value of these claims is.  No, I would submit to

4    Your Honor that there was an attempt here to take advantage of

5    people who don't know what the claims are going to be worth.

6           Your Honor said that there has been ample cause

7    demonstrated by the debtors, and we agree with that, Your

8    Honor.  In addition, Your Honor, it was Mr. Bienenstock who

9    moved for the appointment of an examiner.  And he said it was

10   very important in that motion to ascertain what are the

11   intercompany claims that we -- we can't go forward in this case

12   until we know what the intercompany claims are, till we know

13   what are the values of these estates.  And now suddenly, Your

14   Honor, the examiner is going to be only one man's opinion.  And

15   there are going to be a lot of erroneous conclusions by the

16   examiner.  Well, then I have to ask Your Honor why did they

17   move for an examiner, what was the point of having an examiner,

18   if it's only going to be one man's opinion?

19          And we're not submitting to Your Honor that it's

20   absolutely necessary to have the examiner's report to have a

21   plan.  We are going to hit the eighteen-month's deadline.  And

22   as Your Honor pointed out, in the 2005 amendments, clearly

23   Congress did not have in mind mega cases.  And we're putting

24   aside the whole 2005 amendments, questionable in terms of

25   bankruptcy practice and bankruptcy jurisprudence.

1          But you can't dismiss the fact that the examiner was

2     appointed here with probably, Your Honor, the broadest charter

3     I've ever seen an examiner have.  And it was done for the

4     purpose of having more transparency in this estate than in any

5     other estate.  And that's what has been the goal from day one,

6     from the days that Bryan Marsal stood here and made lengthy

7     reports to Your Honor.  And there is no hesitation about making

8     reports.

9          Mr. Bienenstock talks about cutting expenses, but here

10    we have been sitting here, Your Honor, almost a half a day on

11    this particular motion, which, as Your Honor pointed out, the

12    facts are indisputable.  Ample cause has been shown in

13    connection with extending exclusivity in these cases.  And

14    there will be efforts, and we may not be at a position, Your

15    Honor, in eighteen months where we have claims.  But if Your

16    Honor remembers, in January, I think it was, of 2009, Mr.

17    Marsal, and this is no secret, stood before Your Honor and he

18    said it's going to take eighteen to twenty-four months to come

19    up with the solution -- hopefully the solutions in this case.

20    And it hasn't varied from that from that day to day.  And all

21    the creditors were aware of that, Your Honor.

22          And we have a, I have to tell Your Honor, a proactive

23    creditors' committee, proactive financial advisors on that

24    committee, who are doing the job that they are delegated to do

25    under the Bankruptcy Code.

128

1          So there isn't a transparency problem, Your Honor.

2     And Your Honor has been very clear on making it a mandate in

3     this case that there be transparency.  There isn't selfish

4     incentives and motives on the part of the fiduciaries or the

5     professionals, Your Honor.  And the argument about best

6     business practices, as Your Honor pointed out, have nothing to

7     do with the administration of this estate.  These fiduciaries

8     that are administering these estates have the obligation, and

9     they recognize the obligation every day, that their duties are

10    to the entire universe of the parties-in-interest in this case.

11    And that's what they're working for, and that's what the

12    creditors' committee is working for, and that's why there's

13    complete cooperation, Your Honor, with the examiner.

14          These investigations that are underway are going to

15    play into which of these estates may be solvent.  It may be

16    that LCPI is solvent.  It may be that LBSF is solvent.  Until

17    those facts get more firm, there cannot be, Your Honor, a

18    proposal of a plan of reorganization.  Just to say to creditors

19    oh, it's very simple, you'll get at least ten cents, so just

20    vote for this plan; that's not a plan of reorganization.  There

21    is no way of giving them the information they can make an

22    informed judgment.  Yes, they may want to turn that down

23    because they think if the estate goes longer we'll get a firmer

24    view of what are the assets and what are the recoveries.  And

25    that's what we intend to do.

129

1          So, Your Honor -- and I also would point out, Your

2     Honor, in the Enron case the period to file a plan was extended

3     for a year and six months.  The solicitation period was

4     extended for two years and eight months.  The Adelphia case,

5     which Mr. -- which we all have alluded to in this situation,

6     just in connection with what Mr. Bienenstock said about the

7     appeal, yes, on Judge Scheindlin's initial first opinion she

8     pointed out that there were four or five potential errors and a

9     probability of success on appeal, and she set the bond a

10    billion-two.

11         Mr. Bienenstock doesn't tell you that later there were

12    serious negotiations about reducing the bond to below 1.2

13    billion dollars.  In fact, when it went to the Court of

14    Appeals, Judge Newman kept saying to Mr. Bienenstock what are

15    your clients prepared to do, what bond would they be willing to

16    put up.  And Mr. Bienenstock never came up with more than ten

17    million dollars, Your Honor.

18         And, finally, Judge Newman said okay, the Second

19    Circuit doesn't have jurisdiction, I'm sending it back to Judge

20    Scheindlin.  And it went back to Scheindlin, and there were

21    further negotiations about the size of the bond.  And these

22    bondholders that Mr. Bienenstock represented, we're not going

23    above ten million dollars.  And if you read the second opinion

24    by Judge Scheindlin, the criticism she levels at the appealing

25    bondholders and accuses them of gamesmanship, that they were

130

1   using the appeal process to get leverage in negotiating a

2   change in the plan in their recoveries, that, Your Honor, is a

3   factor in that case.

4           So the fact that there was a potential defect in Judge

5   Gerber's ruling has nothing to do with whether exclusivity

6   should be granted in these cases.  But the facts are not as

7   Mr. Bienenstock proposed them.

8           What this objection is about, Your Honor, is control,

9   is control of the administration by a small group of creditors

10  that have different objectives than expressed by the official

11  committee and other parties-in-interest.  And in that context,

12  Your Honor, the debtors' motion to extend exclusivity for the

13  eight-month period should be granted.  Thank you, Your Honor.

14          MR. DUNNE:  Your Honor, I'll be brief.  I don't have

15  more than minute or two of comments.  And I really rise to

16  address one of Mr. Bienenstock's broadsides against the

17  committee and its professionals.  Whether he got carried away

18  in a flight of rhetorical fancy or not doesn't really matter.

19  His comments with respect to the committee were inexcusable.

20  He argued that the position of the official creditors'

21  committee should be discounted because we are paid by the

22  estate.  The insinuation that we represent our pocketbooks and

23  he represents the creditors generally is absurd and deplorable.

24  I expected better from my esteemed colleague.

25          But let me just contrast our role and his.  The

131

1    committee owe its fiduciary duties to all of the unsecured

2    creditors, Your Honor; his group does not.  The members of the

3    creditors' committee have duties of confidentiality; the

4    members of his group do not.  The members of the creditors'

5    committee have reviewed all public and non-public information;

6    his group has not.  The committee has faithfully and selflessly

7    discharged its duties.  We've spent countless hours with the

8    debtors trying to maximize the value of this estate.  We've

9    analyzed the motion to extend exclusivity and support it.

10           Even on its own terms, the aspersion fails.  We are

11   not beholden to the debtors for the payment of our fees.  The

12   Court, Your Honor, will approve allowance of the fees, and

13   there is an independent fee committee for exactly that process.

14   We're the professionals trying to line their pockets.  They

15   would not only be breaching their duties and besmirching their

16   reputations and characters, they would be objecting to motions,

17   not considering them in good faith.  They would be seeking to

18   litigate, not seeking and obtaining settlements.  They would be

19   looking to get on a soapbox to filibuster and grandstand in a

20   chaotic attempt to shorten to ten months the exclusive periods

21   in the largest case ever to file.  The committee has no desire

22   to get on such a soapbox, but even if it did there's already

23   someone there.  We have nothing further to add, Your Honor.

24           THE COURT:  Thank you, Mr. --

25           MR. BIENENSTOCK:  I must -- two quick comments.

132

1          THE COURT:  Okay.  I mean, let's try to keep away from

2     personal accusations if we can.

3          MR. BIENENSTOCK:  Counsel for the committee totally,

4     and probably by accident, hopefully, misstated what we said.

5     The point I made is, when the debtors is no one is supporting

6     us to let exclusivity end, I said no one is supporting them

7     either.  This is a case where claims trade very little.  It's

8     not in most people's interests to spend the money.  When it

9     comes to the committee, they're not spending their own money.

10    It wasn't an insult; it was just a fact:  They are not

11    constrained by the expense because it's not their money.  It's

12    a fact.

13         In respect of Judge Scheindlin, Your Honor, Mr. Miller

14    doesn't tell Your Honor -- I don't know if he knows or not, but

15    he certainly knows some facts -- that when we went back to

16    Judge Scheindlin, she would not reduce the bond to a level that

17    was my client's, even, upside.

18         THE COURT:  Whatever happened before Judge Scheindlin

19    is a matter of --

20         MR. BIENENSTOCK:  Okay, but it was --

21         THE COURT:  -- interest perhaps to those who were

22    involved in the Adelphia case but of no interest to me --

23         MR. BIENENSTOCK:  Good.

24         THE COURT:  -- and certainly of no relevance to

25    today's motion.

133

1          MR. BIENENSTOCK:  Good.  It was -- I needed to

2    respond, and it was not that the bondholders did anything bad

3    or had a bad motive.  They were being asked to post a bond more

4    than their upside could be.  And that's the only reason why

5    they didn't post.

6          THE COURT:  Okay.

7          Well, this was hotly contested motion, wasn't it?  Not

8    just in the rhetoric but in the stridency of the papers that

9    were filed.  And I believe that, based upon my review of the

10   papers filed by the ad hoc committee, that at a certain level

11   the reaction is a direct result of a fair reading of the prose.

12   I believe that Mr. Bienenstock, who is a sophisticated and

13   experienced lawyer, knows that there are consequences that flow

14   from filing papers of the sort that he filed on behalf of his

15   group.  He certainly had the right to say what he said, but the

16   fact that we ended up having a fairly heated argument during

17   today's omnibus calendar, I think, was foreseeable.  It was

18   also foreseeable that Mr. Miller and his team would file reply

19   papers defending the integrity of all of the professionals who

20   are working on the debtors' behalf to move forward this plan

21   process.

22         There has been a lot said, both in papers and in

23   rhetoric today, about platitudes.  That's perhaps an

24   unfortunate choice of words.  But it is, in fact, what was

25   written about in the context of the Adelphia case, which we

1    have now made several references to.  The only meaningful

2    reference, however, is the reference to the decision of Judge

3    Gerber to extend exclusivity in that case.

4        The Adelphia case was, by my reckoning, a very

5    complicated case involving significant intercompany claims and

6    different constituencies.  With all respect to the Adelphia

7    case, it pales in comparison to this one.  All kinds of

8    hyperbole gets tossed around the courtroom about the size and

9    complexity of the Lehman case.  It becomes almost trite to say

10   that this is the largest and most complex bankruptcy in

11   history.  But let's face it, it really is.  And the complexity

12   is at a level that the Court sees only at the surface.  As I

13   have said in earlier hearings, it is obvious to me, based upon

14   what I see going on in the docket, that that is merely a

15   reflection of all that is going on that isn't docketed, all of

16   the activity that is required on the part of those currently

17   working for Lehman Brothers and for the creditors' committee

18   and all the professionals, to unravel what is perhaps the most

19   complicated financial disaster in recorded history.

20       Without getting into the specifics of that work, it is

21   apparent to the Court that that work is ongoing and that we are

22   not anywhere near the end of the beginning.  This is a process

23   that may well go beyond the eight-month period that we're now

24   talking about to extend exclusivity.  That's all the time that

25   Congress has allowed a debtor-in-possession, and it applies

135

1    whether or not we're talking about a retailer, an automobile

2    company or the fourth largest investment bank on the planet.

3    It's a one-size-fits-all provision that doesn't necessarily fit

4    all circumstances well, but it's what I must apply.

5            That comment might be particularly appropriate if made

6    in March of 2010, but it's July of 2009 and I deal with a

7    contested matter regarding the future of a plan process in a

8    case in which it is obvious that the plan process is on

9    everybody's radar screen, but it will take considerable time

10   and effort to move beyond concepts to term sheets, to

11   proposals, to negotiated terms and conditions, based upon facts

12   not surmised as to what the facts might be.

13           The fact-gathering and analytical process is still

14   ongoing.  That is apparent not only from the transcript that

15   will be read after today's hearing but from the transcripts of

16   every other one of the omnibus hearings that have taken place

17   since September 2008.  Transparency, the sharing of

18   information, cooperation, investigation, these are the

19   hallmarks of this bankruptcy case up to this point.  But it

20   will take, I believe, in fairness, more time to be thoughtful

21   about what a plan should look like that will truly maximize the

22   returns of all creditors.

23           And I agree with Mr. Bienenstock, the business of

24   bankruptcy is about returning dollars to creditors or, if

25   they're in Norway, krones to creditors.  But it takes a lot of

136

1    thought and attention to develop a plan in a setting this

2    complex that is truly better than a mere liquidation.

3    Otherwise, if I take Mr. Bienenstock's argument at face value,

4    if this is really so simplistic, maybe we toss away all the

5    costs and expenses that are here and we have some trustee come

6    in with a single professional doing whatever has to be done to

7    maximize value.  But my best guess is that Mr. Bienenstock and

8    a chorus of others would get up and say don't do that, that

9    would be an extraordinarily stupid thing to do.  And I think it

10   would be.

11        I don't want to get into what I believe are the

12   motivations of the parties who have been litigating here on

13   this question it, frankly, doesn't matter.  I take at face

14   value what everybody has said.  I also believe that I think

15   there is some value to the process in having debated this

16   question today.  At a certain level, I think that it puts the

17   debtors and their professionals on notice that the ad hoc

18   group, as it's presently composed, or as it may be composed in

19   the future, or some other group that may form with different

20   participants that have significant enough economic interests to

21   hire expensive lawyers, will be looking over the shoulders of

22   the professionals who represent the debtor-in-possession, and

23   the professionals who represent the creditors' committee, and

24   the professionals who represent the examiner, and everybody

25   else who is being paid ultimately out of the estates' assets.

1    That's a healthy thing, and that's part of transparency.  But

2    in terms of the fundamental question which is before the Court

3    today, it seems to me clear and almost beyond reasonable debate

4    that the debtors should be entitled, to the fullest extent of

5    the law, to as much time as they need to develop their best

6    plan, their view of the plan of reorganization that most

7    appropriately addresses the complexities of this unique set of

8    circumstances.  And exclusivity was designed, in part, to give

9    debtors that privilege, unless it's being abused, and there's

10   absolutely nothing in this record to suggest that the privilege

11   has been abused in any respect.

12         Under the circumstances, I grant the motion as

13   supported by the creditors' committee and, in effect, as

14   modified by the creditors' committee's position, to extend

15   exclusivity for eight months with the understanding that at the

16   midpoint, roughly four months from now, there will be a full

17   report provided by Bryan Marsal, and such other individuals as

18   may be appropriate to come into court to make that

19   presentation, concerning the progress that is being made in

20   developing a plan; I'm assuming that will be a well-attended

21   hearing and we'll have over full capacity for that day.

22         Let's go on to the next item.

23         MR. HARVEY MILLER:  Thank you, Your Honor.  Your

24   Honor, would it be possible to get a five-minute recess?

25         THE COURT:  Excuse me?

138

1          MR. HARVEY MILLER:  Would it be possible to get a

2     five-minute recess?

3          THE COURT:  Absolutely, and I think it's a good idea.

4     Let's take a ten-minute break till 3 o'clock.

5          MR. HARVEY MILLER:  Thank you, Your Honor.

6          THE COURT:  We're adjourned.

7     (Recess from 2:52 p.m. until 3:07 p.m.)

8          THE COURT:  Be seated, please.  Good afternoon.

9          MS. COLLINGS:  Good afternoon, Your Honor.  Scarlett

10     Collings on behalf of Lehman Brothers Special Financing.

11     Rather than have a master or mistress of ceremonies as we walk

12     through some of the adversaries, I thought we might just pass

13     the baton from one to the other, if that's acceptable?

14          THE COURT:  Perfectly acceptable.

15          MS. COLLINGS:  Thank you, Your Honor.  The first

16     matter this afternoon is the Lehman Brothers Special Financing

17     versus Harrier Finance.  I think there are two items on today's

18     agenda under the Harrier adversary proceeding.  There's the

19     committee's motion to intervene, which I understand is

20     unopposed, and the pretrial.  With respect to -- and I don't --

21     others can address the committee's motion to intervene, but I

22     do think that there was no opposition filed vis-a-vis that

23     intervention mention.

24          With respect to the pretrial, Your Honor, currently

25     set for hearing August 5th is the motion to dismiss of AFLAC in

1    this case.  And just to give the Court some brief background on

2    how we've progressed, LBSF filed the complaint May 20th; motion

3    to dismiss was filed June 22nd.  LBSF's opposition brief,

4    opposition of the motion to dismiss, is due next week; we're

5    preparing to file accordingly.  We anticipate we'll have good

6    arguments and good discussions on August 5th.  However, today

7    we have been approached by counsel for some of the other

8    defendants in these derivative adversary proceedings that are

9    also on the docket today about trying to have a call this

10   Friday to further coordinate, if possible, some these

11   derivative adversary proceedings that may have overlapping

12   issues.  While there may be overlapping issues among the cases,

13   they are still unique.

14        And so we, from LBSF's perspective, we've committed to

15   trying to have a global call, if you will, on Friday to work

16   out some of those coordination issues.  Because of that, I'm

17   not sure that the current schedule will remain intact.  If it

18   does, then we will see you on the 5th for argument and we will

19   file our papers next week.  If the takeaway from the call is

20   that there's some type of alternative coordination or

21   scheduling that makes sense, then we'll notify the Court

22   accordingly.

23        THE COURT:  Okay.  And this is also a good opportunity

24   for me to make a completely general comment, because that last

25   comment I viewed as a general comment that applied to a variety

140

1    of pending adversaries, and this has to do with what I am

2    increasingly seeing as a burden on my resources as it relates

3    to the adversary proceedings.  And a suggestion that we have a

4    chambers conference -- well, we can certainly talk about some

5    of this on the record -- about perhaps changing the format for

6    dealing with adversary proceedings as part of the omnibus

7    hearing, I have noted that.  And I'm not sure which month this

8    happens, but Lehman omnibus hearing dates are moving from once

9    every three weeks to once a month.

10          MS. COLLINGS:  Yes, sir.

11          THE COURT:  We started out at the beginning of the

12   case with twice a month.  Today's hearing follows a hearing

13   that took place yesterday afternoon at 2 o'clock in the

14   Metavante matter and a hearing that was adjourned, that was

15   originally set for Monday, in connection with a real property

16   sale.  So that if you look at it from the Court's perspective,

17   this is a week in which, although it didn't happen, Monday was

18   reserved for a Lehman hearing, Tuesday afternoon in fact was a

19   Lehman hearing, and it took a while and it ate deeply into my

20   own preparation time for today's hearing.  Additionally, based

21   upon the nature of the case, there are matters that are on the

22   provisional agenda that end up getting adjourned, but we never

23   really know which one it's going to be or when it's going to

24   happen.

25          And I will tell, in effect, the Weil Gotshal side of

1   the room that I found this week very burdensome.  And it made

2   me come to the conclusion that we need to do something

3   particularly about the adversary proceedings.  I just received

4   more notebooks in connection with this omnibus hearing as it

5   relates to the pleadings in all the adversary proceedings and

6   the various pleadings in the contested matters that we've heard

7   already that it's really a lot for one person to digest for one

8   day in which everybody's got a specialist out there in the

9   courtroom to represent a particular issue in the case but

10  there's only one brain sitting up here that needs to comprehend

11  all the stuff that's going on, and I'm finding it a little

12  challenging.

13          It seems to me that one of the ways that we could

14  profitably discuss some adjustments would be for the adversary

15  proceedings either to only be at 2 o'clock on an omnibus

16  hearing date so that people who are here only for the adversary

17  proceedings don't have to sit through an entire morning of

18  matters that don't concern them, or, alternatively, for there

19  to be a separate day each month reserved for adversary

20  proceedings in the Lehman case, because the adversary

21  proceedings, at least it seems to me, tend to involve different

22  sets of lawyers and, at least at this stage, involve motions to

23  dismiss, motions to intervene, motions for summary judgment,

24  motions to stay discovery, whatever may be the procedural

25  matters that are coming up, but they are of great interest to

142

1    the parties who are litigating them but not necessarily of

2    general interest.

3         So I'm going to suggest that -- this is kind of a long

4    way of saying it -- that I think we need to consider an

5    appropriate way to better manage this calendar.  And I

6    recognize that what happened this week is probably

7    aberrational, and I don't know what's going to happen in

8    August, I don't know what's going to happen in September, but I

9    have a very strong sense that there are some very big issues

10   that are being pushed out for ultimate hearing and

11   determination, and I don't think that those issues are best

12   heard on an omnibus hearing date.

13        MS. COLLINGS:  I understand, Your Honor, and we will

14   confer and try to suggest a more manageable, human schedule

15   for --

16        THE COURT:  For everybody.

17        MS. COLLINGS:  -- handling the adversary proceedings,

18   for everyone, absolutely.

19        With respect to the Harrier action there, Your Honor,

20   right now we have a clear path for the briefing schedule and

21   for the hearing, but we will try to confer on Friday with

22   counsel that are involved in a number of these adversary

23   proceedings and see if there's a resolution on further

24   scheduling that can be reached, and we'll report back.

25        THE COURT:  Fine.  That's great.  And my suggestion,

143

1    for what it's worth, and it's not anything other than a

2    suggestion, is that having a separate day for the adversaries

3    may make sense.

4        MS. COLLINGS:  Absolutely, Your Honor.  Thank you.

5        The next item up -- the next -- I'm sorry, the UCC,

6    Your Honor.

7        MR. COHEN:  Good afternoon, Your Honor.  David Cohen

8    with Milbank, Tweed, Hadley & McCloy, here on behalf of the

9    committee.  As Ms. Collings alluded to, there was a motion to

10   intervene filed by the committee; no objection was filed on

11   Monday.  We filed a certificate of no objection that was

12   circulated to the parties with the proposed order.

13       THE COURT:  Welcome to the case; you're in it.

14       MR. COHEN:  Thank you.  And further to Your Honor's

15   comments just now about generally scheduling, the debtors and I

16   have had conversations about trying to work in that protocol

17   and we've been working with some of the defendants in the

18   adversary proceedings to come up with a more humane schedule

19   for the Court.  So I think we'll continue those conversations

20   and hopefully be able to present a proposal to the Court.

21       THE COURT:  That makes sense to me.  Thank you for

22   your efforts.

23       MR. COHEN:  Thank you.

24       MR. RALPH MILLER:  Good afternoon, Your Honor.  Ralph

25   Miller here on behalf of Lehman Brothers Holdings, Inc. and

1    Lehman Brothers Special Financing.  I believe the next item up

2    is LBSF and LBHI against American Family Life Assurance Company

3    of Columbus, case number 09-1261, which we commonly call the

4    AFLAC case since that's the primary name of the defendant in

5    the adversary proceeding.

6         This is closely related, Your Honor, to the next

7    adversary proceeding that is up:  Lehman Brothers Special

8    Financing v. BNY Corporate Trustee Services.  The two parties

9    in Lehman Brothers Special Financing and BNY Corporate Trustee

10   Services are also parties to the AFLAC case, Your Honor.  And

11   the central legal issue is very much the same in those two

12   proceedings.

13        And a point that I need to begin to make, as the Court

14   may recall when we were together before, there is a proceeding

15   in London brought by a party known as Perpetual Trust.  And the

16   judge in London has under advisement the issue of whether he

17   will grant some time for those matters to be resolved, the

18   bankruptcy law issues in these cases, before he renders a final

19   ruling in London on some questions.

20        THE COURT:  Let me ask you a question about that,

21   because when I saw a reference I think it was in the Bank of

22   New York's papers to the hearing that took place July 7, 8 and

23   9, I think --

24        MR. RALPH MILLER:  Yes, Your Honor.

25        THE COURT:  -- in London.  It wasn't clear to me what

145

1   kind of hearing that was.  Was that full evidentiary hearing?

2   Was that a legal argument on a dispositive motion?  What was

3   that?  Who was the judge?  What happened?  Does it relate to

4   anything that I'm dealing with here?  Is this a situation that

5   calls for court-to-court communication?  Those are my

6   questions.

7        MR. RALPH MILLER:  Well, first of all, I'm not sure I

8   know that name of the judge, but perhaps we can determine that.

9   My understanding was, and others can -- I was not there

10   personally, Your Honor, so this has been reported to me.  It

11   was -- a submission of evidence was made.  One of the issues

12   before that Court was the request of Lehman Brothers Special

13   Financing, Inc. for a stay of that proceeding.  We understand

14   that the plaintiff in that case, the Perpetual Trustee entity,

15   has asked that there be a part ruling on at least the English

16   law issues.  We understand there has been no decision by the

17   Court.  I believe that July 28th is projected to be a decision

18   date by that Court, and that will deal with both the stay

19   question as well as perhaps -- or perhaps not dealing with

20   issues of English law.

21        My understanding is that that Court was not asked to

22   rule directly on questions of U.S. bankruptcy law; the question

23   was whether it was going to care, in effect, or whether it was

24   relevant to wait for some ruling by this Court.

25        We have no idea how that's going to go, but we're

146

1    optimistic.  And it is the request of Lehman Brothers Special

2    Financing that at least some time be granted for this Court to

3    proceed and consider this ipso facto issue.  And for that

4    reason, we want to maintain a reasonably expedited schedule.

5         As I mentioned before, our understanding is that there

6    is a summer recess for the London court.  So that essentially

7    it's not a question of getting this done in July or August, for

8    example; it's more a question of coming back to this issue

9    promptly in the fall rather than letting it slip off to next

10   year, for example.

11        THE COURT:  So I'm confused.  What happens on July

12   28th?

13        MR. RALPH MILLER:  Well, one of two things -- or one

14   of several things, Your Honor.  The Court, first of all, may

15   rule under English law on whether there is any English legal

16   reason why the request of Perpetual Trust to enforce the

17   documents as written should not go forward.  It may or may not

18   rule on that.

19        That's not going to have a direct impact on what's

20   happening here because the question of how the English law

21   applies to those documents is not before the Court in any of

22   these proceedings.  Essentially, no one's asked this Court to

23   rule on the English law aspects of that.

24        We have asked this Court to look at a clause which

25   adjusts the priority of payments based on the bankruptcy of, in

147

1     some cases, LBHI, and in some cases LBSF.  In these cases, it

2     is LBSF, that clause, whether that's an ipso facto clause, and

3     the scope of the safe harbor, especially Section 560.  We

4     understand, and that's been presented to the English court, for

5     example.

6          The summary judgment that was filed here was

7     presented.  There was a declaration that was presented by

8     Ms. Fife, actually, and others to explain how the U.S.

9     bankruptcy procedure viewed that.  And we understand that a

10    number of interesting questions were asked by the judge, and he

11    seemed to be engaged in trying to understand how that might

12    proceed.

13         We believe that one of the outcomes, and certainly

14    what LBSF hopes will be the outcome, is that at least that

15    issue will not be decided and there will be no final ruling

16    from the English court before it goes into the summer recess on

17    actually directing anybody to pay money or do anything, and

18    that that would allow time for this issue to be presented to

19    this Court in an orderly fashion.  And there is, of course, a

20    summary issue now pending in the second adversary proceeding

21    that's going to be up, the adversary proceeding with just the

22    Bank of -- BNY Corporate Trustee services now.

23         And we're going to propose in this proceeding, Your

24    Honor, that we have cross motions for summary judgment, and I

25    believe that that's going to be acceptable to the parties here.

148

1          I see Mr. Schaffer is waiting.

2          Do you want to provide some more guidance on the

3     issue?

4          MR. SCHAFFER:  Your Honor, Eric Schaffer, Reed Smith,

5     on behalf of BNY Corporate Trustee Services.  Just to fill in a

6     little bit for Mr. Miller, there was a proceeding.  There were

7     three full days on July 7th, 8th, and 9th in the High Court of

8     Justice before the Chancellor, Lord Justice Morritt, and there

9     were a number of issues there.  The plaintiffs in the cases

10    there initially were the Perpetual Trustee Company Ltd., which

11    sued the trustee, BNY Corporate Trustee Services.  There also

12    was a second action initiated by Belmont Park Investments, also

13    against the trustee.  Lehman Brothers Special Financing did

14    intervene in both actions.

15         In the course of the proceedings, the plaintiffs are

16    noteholders who claim not to be subject to the jurisdiction of

17    this Court, and they are looking for a decision, as I

18    understand it, that under English law they take priority.  The

19    trustee is looking for a decision that supports its position

20    with regard to direction and indemnification.

21         I understand Lehman's position, and while I certainly

22    defer to Mr. Miller, I understand it to be looking for a stay

23    of the English proceeding while this Court might go forward; or

24    alternatively, I believe, from my initial review of the

25    transcript, that they propose a number of bases on which the

1    English court might come to the same decision that they are

2    advocating here.

3          In terms of the timing, I believe that the Lord

4    Chancellor anticipates having a decision on some of the pending

5    issues before the end of this month.  And with that, I may have

6    exhausted my knowledge of what happened in court there.

7          THE COURT:  Okay.  That's helpful, though.  Thank you.

8          MR. RALPH MILLER:  Your Honor, I began with that,

9    because I want to make it clear that we want to accommodate the

10   desires of the English court to move forward.  On the other

11   hand, these are important issues.  They require complete

12   consideration, and we don't believe that it's necessary to do

13   these in a way that will not give the Court or the parties

14   ample time to submit them.

15         One of the issues that we have had discussions about

16   is the fact that there may be some benefit to consolidating a

17   hearing on some of these summary judgments that present the

18   same issues.  We're flexible on that.  And one of the things

19   we're going to do is have a conference call, as Ms. Collings

20   said, try to arrange a conference call with other parties.

21         In full disclosure to the Court, some of these same

22   issues overlap a case where the parties are, as far as we know,

23   not all here, and that is the so-called Ballyrock proceeding.

24   That has additional issues in it; it's in the Venn diagram.

25   The circles are not the same.  That has some ineffective

1    termination issue in it, for example, that are not present in

2    some of these other cases.  It's a little more complicated

3    case.  It's an interpleader, as the Court may recall.

4         So what we would suggest at this point for the

5    pretrial, and we can have others express their view, is we

6    would like to ask the Court's permission to file summary

7    judgment in the AFLAC case.  It will look very much like the

8    summary judgment that's already been filed in the second

9    adversary proceeding on the list, which we call the Saphir

10   case.  And we understand that AFLAC, and perhaps BNY, wish

11   to file summary judgment also in that case.  So we would

12   have -- and we propose a simultaneous briefing schedule, yet to

13   be resolved.  And the primary issue on trying to resolve is to

14   try to consult with parties in the Ballyrock case to see if we

15   can coordinate that.

16        Now, in Ballyrock, there is a motion to dismiss that,

17   which is scheduled for hearing on August the 5th.  We don't

18   believe that there is a necessary conflict between a motion to

19   dismiss and summary judgments.  They're not dealing with the

20   same standard.  And it's not at all clear to us how a ruling on

21   a motion to dismiss might prejudice any of the parties in the

22   AFLAC case or in the so-called Saphir case, the second case.

23   But in any event, we understand that perhaps AFLAC has a desire

24   to try to delay a consideration of that motion to dismiss so

25   that it will not move forward more rapidly.  We're happy to

151

1    talk about that.

2         And I think as far as the interests of the estate are

3    concerned, our primary concern at this point is getting an

4    orderly resolution of these issues, with full briefing, and

5    also accommodating the desire of the Chancellor in London to

6    move forward expeditiously on the issue so it doesn't bog down.

7         THE COURT:  Those seem to be very desirable goals.

8    Are there any issues that I need to know from other parties

9    about --

10        MR. RALPH MILLER:  Well, let me let others speak to

11   this.

12        THE COURT:  -- achieving this goal?

13        MR. RALPH MILLER:  And, of course, the official

14   creditors' committee we'd like to have express its views, and

15   the other parties.

16        THE COURT:  Okay.

17        MR. COHEN:  Your Honor, David Cohen again, with

18   Milbank Tweed.  In the AFLAC adversary, we had filed on Monday,

19   at docket 21, a stipulation of intervention.  So we're just

20   awaiting the Court's ruling on that.  But with respect to the

21   more substantive issues --

22        THE COURT:  With stipulation, you're in.

23        MR. COHEN:  Thank you --

24        THE COURT:  Assume you're in.

25        MR. COHEN:  Thank you very much.  I'm two for two

152

today.

THE COURT:  What are you going to do when you're in?
Are you just going to -- are you going to be watching and
participating, or can I expect papers to be filed on the
merits?

MR. COHEN:  We're going to expect -- what we would
hope to see is papers filed on the merits, working closely with
the debtors, because I think our interests are aligned there.
And to the extent that there are arguments that we think should
be made that the debtors aren't making, we will be additive.
But in no way do we intend to duplicate the debtors' efforts
and expect the debtors will be taking the leading role here.

THE COURT:  That makes very good sense.

MR. COHEN:  With respect to scheduling and summary
judgment, as Mr. Miller alluded to, there have been discussions
about aligning summary judgment in this case and the next case
that we'll consider, which is the Perpetual one.

THE COURT:  Just so we're clear.  When you say "this
case and the next case", I just -- we should identify what
those cases are.

MR. COHEN:  Certainly.  This case being AFLAC, which
is item 8 on the agenda, the next case being the Perpetual
case, the case which has the companion case in England; so,
items 8 and 9.  There have been discussions this morning about
aligning summary judgment briefing and hearings.  And I think

153

1    the committee is amenable to making sure that we do that in as

2    an efficient way as possible.

3         THE COURT:  I take it, while the parties are different

4    and the transactions are different, the legal issues are, for

5    all practical purposes, overlapping?

6         MR. COHEN:  Certain of them are.  And to the extent

7    that those certain ones are, we think they should be dealt with

8    together.  And then, as Mr. Miller mentioned, there are other

9    transactions like Ballyrock that may have other issues outside

10   the scope.  But we think, rather than the Court hearing the

11   same case and the same legal issue three weeks in a row or

12   three months in a row, if we come up with one day for

13   adversaries --

14        THE COURT:  Maybe by the time I hear it the third time

15   I'll finally get it.

16        MR. COHEN:  Exactly.  But we also think, just for

17   efficiency, to get everybody here to be heard on that issue, it

18   makes sense to align the scheduling.  And we're working with

19   everybody to make sure that happens.

20        THE COURT:  I think that actually is a desirable goal,

21   and I'm glad you're working toward it.

22        MR. COHEN:  Thank you.

23        MS. HENRY:  Good afternoon, Your Honor.  Sally Henry,

24   Skadden, Arps, Slate, Meagher & Flom, LLP, on behalf of

25   American Family Life Assurance Company of Columbus, or AFLAC,

154

1    as it's known on TV and here.

2          I've heard three themes today from the Court:  One is

3    efficiency; the other is unnecessary duplication of effort; and

4    the other is a recognition of the magnitude of these issues.

5    And I think what you've been hearing from everyone here is that

6    we want to help you and all of us to be efficient; we want to

7    help you and all of us to avoid duplication of effort; and we

8    want to make sure that, given the magnitude of these issues,

9    given the fact that for the first time in some of these

10   structured finance products that are all over the world and the

11   billions of dollars -- I know Lehman, I understood, sold tens

12   of millions of these -- dollars' worth of these products, that

13   the issues under 362(b)(17) and 560 will be looked at in a

14   logical way.

15         I recognize the interest in moving things along

16   because of what's going on in Perpetual, but I would point out

17   to the Court that this whole discussion that you heard about

18   Perpetual isn't the AFLAC case.  And I'm pointing that out

19   because it shows how these cases are all -- which is the one

20   that's up on the calendar now -- the cases are all intertwined.

21         So what we proposed is that all the parties -- and

22   it's not just Ballyrock; I understand that there are 560 and

23   365(b)(17) issues also possibly raised in Harrier, and others

24   of them -- get together on the phone on Friday and try to work

25   out something so you are not hit with one after the other,

155

1    where all the parties have a chance to make sure that you, when

2    you make your decision, have everyone's thoughts before you and

3    you're not whipsawed with one thing one day, one thing the

4    other day, extra issues about law of the case, or that type of

5    thing.  So we can do it as efficiently as possible.  And that's

6    our goal.

7         We're going to meet on Friday; hopefully we'll all

8    come to a resolution.  We've done a lot of work in the halls

9    today and in the breaks and made some progress on that.  And we

10   will report back to the Court.  If we have issues, we'll

11   contact the Court -- the clerk to see if we could have the

12   conference you mentioned earlier, Your Honor, because we think

13   these are real important issues, and it's also -- they're real

14   big issues, and we could have a mess on our hands if we didn't

15   make it rational.

16        THE COURT:  Well, I appreciate what you're saying, and

17   I certainly laud the cooperation that appears to be going on

18   among counsel.  One question I have, and maybe it's too soon to

19   comment on this, is it reasonable for me to anticipate that, as

20   a result of the conference that is taking place on Friday among

21   interested counsel, that there may be an adjustment in the

22   schedule applicable to hearing motions to dismiss and motions

23   for summary judgment in these various cases, particularly those

24   that are listed for August 5?

25        MS. HENRY:  There is some possibility with respect to

156

1    that.  At this point in my discussions, I haven't seen any

2    interest in that from the Ballyrock people.  But there are the

3    Harrier people.  We have to investigate to see if there's

4    overlap.  If there is, we'll let you know just as soon as

5    possible.  We want to get these issues resolved and make it as

6    easy for you as possible.

7             THE COURT:  I appreciate that.  It's not about

8    anything other than my schedule that I'm asking this question.

9             MS. HENRY:  Yes.

10            THE COURT:  And it's not that it's an issue for the

11   Lehman Brothers case.  But I have a very active trial schedule

12   over the next few weeks, and for that reason I don't have a lot

13   of days that are not currently committed to something between

14   now and August 5.

15            MS. HENRY:  Right.

16            THE COURT:  For that reason, if it turned out that the

17   parties wanted to pick another day that wasn't August 5, I

18   would be most pleased.

19            MS. HENRY:  So would we, Your Honor, frankly, but we

20   felt it would be fair to talk with everyone else.  What we

21   would like to do, what we'd like to see, is a slight movement

22   so that everybody can get together, so that you can have

23   everything together.  And from what I've heard about the other

24   case, Perpetual, it seems that would work.  That's what we will

25   be proposing from our point of view on the call Friday.

157

1          THE COURT:  Okay.

2          MS. HENRY:  And we hope that we can get people to

3    agree.  We don't want to have to litigate law of the case or

4    ask you to reconsider something that wasn't before you the

5    first go-around.

6          THE COURT:  Well, hopefully you'll have a productive

7    meeting on Friday.

8          MS. HENRY:  Thank you very much, Your Honor.

9          MR. SCHAFFER:  Your Honor, Eric Schaffer for the

10   trustee.  With regard to the AFLAC adversary proceeding, we

11   concur with everything that was just said by AFLAC's counsel.

12   The next case, as we seem to be merging the two, the Perpetual

13   litigation, is really on a different track.  That's the one

14   where we filed a motion to dismiss because Perpetual's not

15   here.  We are not prepared to go forward with summary judgment

16   on that for the obvious reason that we still have pending a

17   motion to dismiss.

18          That has been scheduled before the Court for August 5.

19   I don't know that I care whether it goes forward then or at a

20   later date, but I do want to make clear that we have not agreed

21   to proceed with summary judgment in a case where we have

22   pending a motion to dismiss.

23          THE COURT:  Okay.

24          MR. LACEY:  Your Honor, may I address this?

25          MR. MILLER:  Is that about this proceeding?

158

1            MR. LACEY:  It's about Ballyrock.

2            MR. MILLER:  Oh, good.  Thank you.

3            MR. LACEY:  Your Honor, Robinson Lacey, Sullivan &

4    Cromwell.  I represent Barclays, which is the largest

5    noteholder in Ballyrock.  You will recall that I've been trying

6    to get that motion to dismiss teed up and heard for quite --

7    for months now.  And I'm just standing up so that we don't get,

8    sort of, run over by the herd here.

9            As briefed in the motion to dismiss, the two central

10   issues in Ballyrock are whether the termination of the swap was

11   prohibited by a provision unique to the Ballyrock indenture --

12   unique at least in that it does not appear to turn up in any of

13   the papers in these other deals -- and whether the resulting --

14   whether the subordination of the swap termination payment under

15   the indenture is unenforceable as a forfeiture under New York

16   law, it being an indenture that provides that it's governed by

17   New York law.  The papers for these deals are English law

18   papers governed by English law, and that's why you have an

19   English judge working on the English law issues concerning the

20   enforceability of that provision.  So as we see it, there is

21   very, very little overlap.

22           The other issue is that -- the other point is that

23   Ballyrock's termination occurred before LBSF went into

24   bankruptcy, so there's no 362 or safe harbor issue in the case;

25   I gather there is in these other proceedings.

159

1          So to the extent we're drawn into these discussions on

2     Friday, our view will be that the efficient thing to do is to

3     proceed with the Ballyrock motion, which presents separate and

4     discrete issues, do that on time.  If we could schedule it for

5     2 instead of the omnibus hearing on the 5th, that would be

6     great, but I do think we should try and get that out of the

7     way.

8          THE COURT:  Thank you.

9          MR. RALPH MILLER:  Your Honor, Ralph Miller again.  I

10    just wanted to clarify to make sure I was understanding the

11    Court.  When you said you would favor some change from August

12    the 5th, I gather you're not talking about moving it earlier,

13    Your Honor.

14         THE COURT:  You got it correct.

15         MR. RALPH MILLER:  I just wanted to make sure I was

16    hearing that correctly, Your Honor.

17         THE COURT:  And by the way, I'm not advocating that

18    anything be moved.

19         THE COURT:  I'm simply noting --

20         MR. RALPH MILLER:  Well --

21         THE COURT:  I'm simply noting that the luck of the

22    draw has given me a particularly rich summer of work, and I

23    have a very, very full trial calendar over the next few weeks.

24    I'm perfectly prepared to meet all the current schedule dates

25    including August 5.  I was simply noting that if by chance it

160

1    turned out that there was some movement later in August, that

2    would actually benefit me in the sense of having more time to

3    deal freshly with these issues.  But I'm perfectly prepared to

4    deal with the schedule that we already have.

5         MR. RALPH MILLER:  Well -- and, Your Honor, certainly

6    one of the things that the estate is always concerned with is

7    whether there is some imminent danger of injury to the

8    interests of the estate by delay.  And in all of these

9    proceedings, as we understand the facts, wherever the money is,

10   it is either gone or it's safely somewhere probably invested in

11   interest.  So some time delay is not directly impacting the

12   estate in an adverse way, and we certainly want to accommodate

13   the Court's calendar as best we can.

14        This is, I think, perhaps a good segue if we might

15   talk about some housekeeping matters with regard to the matter

16   that we keep talking about as the next matter, number 9:

17   Lehman Brothers Special Financing versus BNY Corporate Trustee

18   Services, case number 09-01242.  And if I might, shall we move

19   to that?  I believe we're ready to go to that, unless someone

20   else wants to be heard on this other matter.

21        On that, Your Honor, we have a housekeeping proposal.

22   There are three items up in that proceeding today:  There is a

23   pretrial scheduled and there are two motions to intervene.  One

24   of the motions to intervene is by the unsecured creditors'

25   committee and is supported by the debtor and Plaintiff LBSF.

1    We think it's simple and straightforward.  We think the motions

2    to intervene do impact the pretrial, and much of what we would

3    say in the pretrial has already been said because it's a part

4    of this coordinated group.

5         But the other motion to intervene which has been filed

6    by plaintiffs in the Wong adversary proceeding, case number

7    09-01120, presents a threshold timing issue that the Court may

8    want to consider as a matter of docket control.  And then we

9    are certainly prepared to argue that motion to intervene if you

10   would like to proceed.

11        The defendant in that adversary proceeding, BNY

12   Corporate Trustee Services, has requested that both of these

13   motions to intervene should be deferred until after its motion

14   to dismiss.  Now, it's motion to dismiss, to be clear, is not

15   primarily on the merits but has to do with this question of

16   whether there's an indispensable party, Perpetual Trust.

17        We have agreed on a briefing schedule and, as you

18   know, that's set for August the 5th.  The plaintiff, LBSF,

19   believes that both of these motions to intervene are right;

20   particularly the motion of the official unsecured creditors'

21   committee, we think, should be granted promptly for their

22   participation.

23        And we also think that the facts are not going to

24   change any with regard to the Wong motion.  We don't think that

25   those parties are part of this group where there are

162

1    overlapping issues that require their participation.  They're

2    not parties to the contracts in issue in this adversary

3    proceeding or the prior proceeding we were talking about, the

4    AFLAC proceeding.  They're separated from any party in this

5    proceeding by an intervening party, as we can explain if we go

6    into this.  We think that -- which is called Pacific Finance.

7    And we think those facts will not change.

8           So, as far as we are concerned, there's no reason not

9    to go forward with that.  However, if the Court, as a matter of

10   docket control, would like to defer that intervention motion

11   for a later hearing, there's also no prejudice to the estate in

12   doing so.  So we're actually neutral on whether you go ahead

13   and hear that motion to intervene today or would like to defer

14   it to some later time.  It will take a little time to present,

15   but we're prepared to move through it promptly.  And so if the

16   Court wants to, it may wish to consider whether it wants to go

17   forward on that motion.  Or do you wish to have us just go into

18   that motion?  And I think perhaps BNY Corporate Trustee

19   Services would like to be heard on its request to defer that.

20          THE COURT:  Okay.  I'm neutral too, other than the

21   fact that it's late in the afternoon.

22          MR. RALPH MILLER:  Right.

23          THE COURT:  I'm prepared to deal with the motions to

24   intervene now, but before dealing with them I'd like to hear

25   from counsel for BNY who's asking that I not hear them.

163

1          MR. RALPH MILLER:  That's what I was suggesting, Your

2     Honor, is perhaps this threshold issue made sense to consider

3     first.

4          THE COURT:  I'm prepared to hear it.  And

5     Mr. Schaffer may be very persuasive, given that it's a quarter

6     to 4.

7          MR. SCHAFFER:  Well, if nothing else, I'll be briefer.

8     Your Honor, you understand we filed a response and not an

9     objection.  Our response -- I won't detail it -- it notes that

10    the real party-in-interest here is Perpetual.  They're not

11    here.  We have a motion to dismiss pending.  The concern --

12         THE COURT:  May I ask you a question about Perpetual?

13         MR. SCHAFFER:  Yes.

14         THE COURT:  To the extent you can share this and have

15    had any contact with their representatives, directly or

16    indirectly, do I understand correctly that Perpetual is

17    unwilling, for any purpose, to submit to the jurisdiction of

18    the bankruptcy court for purposes of allowing all parties to be

19    present for a complete adjudication of that legal issue?

20         MR. SCHAFFER:  That is my understanding.

21         THE COURT:  And has any stated reason been given,

22    other than they just think they're better off in the U.K.?

23         MR. SCHAFFER:  I think that's a correct assessment.

24         THE COURT:  Okay.

25         MR. SCHAFFER:  Your Honor, we're not here on the

164

1    motion to dismiss.  We appreciate particularly that the

2    committee has a special status under the Code.  That said, if

3    Perpetual can be joined, if it will come in, we think that it's

4    appropriate to give them an opportunity to respond to

5    intervention motions.  If they cannot be joined and they are an

6    indispensable party, the motion to dismiss is granted,

7    intervention becomes moot.

8           We really don't want to be second-guessed by

9    Perpetual, and I think you've heard us state that theme before.

10   And it's with that in mind that we think that any decision on

11   the intervention motions should be deferred until we have had

12   an opportunity to argue, get a decision on the motion to

13   dismiss.  Your Honor, that is the basis for our objection.

14          I do have a few additional comments that relate to the

15   debtors' opposition to intervention by the Wong plaintiffs.

16   Without going into great detail there, the last of their

17   arguments is that the trustee is fully capable of representing

18   the Wong plaintiffs in the -- what I'm calling the Perpetual

19   litigation.  We are not Wong's trustee; we don't owe them an

20   obligation.  Indeed, we don't owe anyone an obligation without

21   direction and indemnification.  We don't have that from

22   Perpetual, which is our holder.  So I simply want to correct

23   any misstatement or anything that may be related to our motion

24   to dismiss as far as the debtors' response to the Wong

25   intervention motion is concerned.

165

1          THE COURT:  I've heard what you've said, although I

2     have no idea if it's true that your client owes no duty absent

3     direction and indemnification.  It may be, given that we had a

4     whole conversation this morning about fiduciary duties, that

5     those duties exist.  If that's your legal position that's fine,

6     but I'm not going to allow it to be part of the record as if my

7     silence means that it's true.

8          MR. SCHAFFER:  No, and Your Honor, I'm really not

9     trying to get into the issues that will be before the Court on

10    the 5th or whenever we argue the motion to dismiss.  I simply

11    did not want to remain silent with regard to any statements by

12    the debtor that might suggest we have some affirmative

13    obligation to appear on behalf of Perpetual, something that we

14    have denied.

15         THE COURT:  Okay.  I understand that's your position

16    as it relates to the timing of the motions to intervene,

17    because I understand your principal argument to be that you

18    believe more time should be allowed to give Perpetual an

19    opportunity to appear and be heard as to whether or not the

20    intervention should be granted as being the principal reason

21    for deferring consideration.  And inasmuch as you've said that

22    Perpetual has already indicated, directly or indirectly, that

23    they have no intention of appearing, they have opted out of the

24    chance to come out, one way or the other, as to the

25    interventions.  And I see no reason to delay giving them

166

1    consideration today.

2        MR. SCHAFFER:  I understand.

3        THE COURT:  So your motion to defer this is denied.

4        MR. COHEN:  Your Honor, on the merits of the

5    committee's motion to intervene, I think Mr. Schaffer

6    recognized that the committee stands in a special position.  We

7    have a statutory right recognized by the Second Circuit in

8    Caldor to be heard on any issue in this case including --

9        THE COURT:  I recognize it too.  Your motion to

10    intervene is granted.

11        MR. COHEN:  Thank you, Your Honor.

12        MR. DAVIS:  Your Honor, Jason Davis of Coughlin Stoia

13    on behalf of the Wong plaintiffs in adversary proceeding

14    09-01120.  We've moved to intervene in this case.  I know it's

15    late in the day and there's been a lot discussed today, so I

16    appreciate the opportunity to be heard.  I do want to say that

17    if there's a critical gating issue, we'd like to participate in

18    the discussions.

19        I heard that some of the overlapping issues that may

20    affect our client's interests may be discussed on Friday.  We'd

21    like to participate in that.  Of course, Your Honor may decide

22    that's unnecessary if the motion to intervene you don't find

23    very persuasive.  With that, I'd like to present our --

24        THE COURT:  That's a bad way to start an argument.

25        MR. DAVIS:  With that, I'd like to present our motion

1       to intervene, if it's okay with Your Honor.

2                THE COURT:  Sure.  Why don't you proceed with it.

3                MR. DAVIS:  Okay.  So just a little bit of background.

4       The clients we represent are basically retail investors in Hong

5       Kong primarily.  There are approximately 30,000 people in the

6       group we seek to represent.  We currently represent only seven

7       named individuals.  We've heard a lot of talk about a number of

8       structured creditor products that are at issue in some of these

9       other cases, and Mr. Schaffer of BNY made a point to say they

10      do not owe us, my clients, any responsibilities, fiduciary

11      responsibilities, presumably because we didn't purchase notes

12      directly from them.

13                And that goes to one of the important matters in this

14      case, and that is, what are our interests relative to the notes

15      that are at issue in the Perpetual matter?  And in the

16      Perpetual matter you basically have notes called Saphir notes.

17      And the Saphir notes were issued under a multi-issuer

18      obligation program.  To put that into the context of what we

19      might see in the United States, you basically have a shelf

20      document.  You have a shelf document that explains the basic

21      terms of the program, includes some of the important terms of

22      every single note that's issued off of that program, and then

23      you have a series of separate issuances where specific pieces

24      of debt are issued.  In our case, the Saphir bonds that we have

25      an interest in are held in an intermediary trust; it's a trust

1    run by HSBC.

2        Now, HSBC sold mini-bonds to our client; they're

3    called Lehman mini-bonds, and they're issued by a separate

4    issuer called Pacific Finance.  The critical point from our

5    perspective is that, under the terms of the trust documents,

6    the supplemental trust deeds that constitute the terms of our

7    notes that we own -- we have a security interest in the Saphir

8    notes, and that schedule interest gives us a right to intervene

9    under Rule 24.

10        And the reasons that we explain in our paper is, under

11   Rule 24(a)(1), we have a right to intervene, a mandatory right

12   to intervene where permitted by federal statute.  And from our

13   perspective, Bankruptcy Code 1109(b) is applicable here where

14   there's a right to be heard in any adversary proceeding under

15   Caldor.  The response by LBSF is, well, that only applies to

16   parties-in-interest.  And they cite case law that says, well,

17   to be a party-in-interest you have to be a creditor of the

18   estate.

19        And our response to that, Your Honor, is, well, we are

20   a creditor of the estate because we have a security interest in

21   property they're claiming belongs to them.  And under well-

22   settled principles of what is a creditor defined in Comcoach, a

23   case cited by LBSF, we believe that we are a creditor, because

24   they're basically looking at one of the assets we have a clear

25   property interest in, namely a security interest, and,

169

1    secondly, a beneficial interest, because the assets are held in

2    trust for our benefit.  And that alone gives us the right to

3    intervene under 24(a)(1).

4         Secondly, we think we have a right to intervene under

5    24(a)(2).  And I won't go through the timeliness element

6    because that's not disputed; I'll let LBSF speak to that if

7    they think we're untimely.  The second point, we say we have an

8    interest in this property that is protectable and allows us to

9    intervene under Rule 24(a)(2).  Specifically, in our papers we

10   reference the fact that LBSF essentially concedes that at a

11   minimum we have a security interest in these notes and at a

12   minimum we have a beneficial interest in these notes given the

13   fact that our clients are beneficiaries of the trust in which

14   these notes are held.

15        The point about the financing of these notes, Your

16   Honor, is each one of these Saphir notes has a specific par

17   value, a face value.  In the case of the documents -- the few

18   documents we've been able to get from LBSF -- the par value of

19   a Saphir bond that's held in trust by HSBC in which we have a

20   security interest is identical to the par value of the note

21   that we held legal and beneficial ownership interests in.

22   So, essentially the value of whatever is in this Saphir note

23   ultimately equates to whatever the value is in this mini-bond

24   note that we hold, with one important exception which I'll

25   address toward the end.

1    All of this basically means that if LBSF is

2  accessible -- and basically, from our perspective, Judge,

3  rewriting the terms of the contracts that they agreed to in

4  Saphir, to reverse the waterfall or reverse the payment

5  priority, and they're able to persuade the Court this is an

6  ipso facto clause, despite the fact that it's not just the

7  reversal of the priorities that's at issue but how the parties

8  intended to calculate termination payments.  And that's a

9  really critical point that I haven't heard mentioned yet.

10    Specifically, under the terms of the notes, of the

11  Saphir notes, what happens is, when LBSF has a credit default

12  event, basically the way that you measure the value of what

13  needs to be transferred to them versus what needs to be

14  transferred to the Saphir noteholder -- and yes, it's held for

15  us in trust -- is determined with respect to very specific

16  provisions that say when it's an event of default that's their

17  fault, that they caused -- one hundred percent of the value

18  that's locked up in those notes needs to be paid first to

19  noteholders -- I misspeak -- first to BNY Corporate Trustee

20  Services; they get their fees.

21    But the real parties-in-interest, of course, are the

22  people who invested in these bonds.  And right after BNY, the

23  people who get paid are us.  But that's just payment priority,

24  Judge.  Termination payment determines what the quantum of that

25  payment is.  And that's in a separate provision, and I haven't

1    heard anybody speak to that yet.

2         We think that's a critical issue that we share with

3    what's occurring in the Perpetual matter.  Why?  Well, this

4    goes to how does this affect our interest from a practical

5    perspective?  From a practical perspective, returning to the

6    first point I made, what we're looking at here, Judge, is

7    essentially a shelf takedown program.

8         So the principal document that's the backbone for all

9    of the Saphir documents is called a principal trust deed.  And

10   the terms in the Perpetual principal trust deed are

11   substantially identical to the terms in our principal trust

12   deed.  Why?  Because it was the same one over time that was

13   amended from time to time from the people who did the

14   transactions to suit whatever differences or whatever changes

15   in law they wanted to make.  What did not change, Your Honor,

16   was the definition of noteholder priority.  What did not

17   change, from our perspective, was how you calculate termination

18   payments under each one of those individual notes.

19        Now, LBSF, in their papers, make much of the fact that

20   we've said in our pleadings, Your Honor, that all of these

21   notes are virtually identical.  And I concede to LBSF that we

22   haven't seen every single one of these documents.  In our

23   pleadings we've made good-faith allegations that are based on

24   our belief that every single one of these bonds contains the

25   exact same provision.

172

1          And one might ask, well, how could you make that

2     allegation?  And we would respond by pointing to notices that

3     have gone out from HSBC that attached notices from BNY that

4     basically say the payments -- the termination payments on all

5     of these bonds are being held up because of an issue in U.S.

6     bankruptcy court by Lehman.  What is that issue?  All you've

7     heard today, Judge, is, ipso facto, safe harbor.  It's the

8     identical issue that applies to us.

9          What differences do we have with the Perpetual matter?

10    Perpetual matter, as we understand it, is a trustee, represents

11    sophisticated investors.  We represent people who are safety

12    deposit investors.  They go into their bank, their retail

13    depositors, and they basically see advertisements, Your Honor,

14    for synthetic CDOs, and it's not even just a synthetic CDO with

15    all the people in this room trying to explain exactly what that

16    means.  On top of that, part of the product that they purchased

17    involved a separate first-to-default swap basket.  Basically

18    all that is, Judge, is an insurance -- it's an insurance asset.

19    I'll skip that part and focus on the Saphir note again since

20    it's getting late in the day.

21          THE COURT:  No, no, it's not that.  I'm trying to

22    understand.  What you're describing is something that seems

23    awfully remote from the nexus of this litigation.  This is a

24    litigation between counterparties, and you're not a

25    counterparty.  How are you affected by it?

173

1        MR. DAVIS:  Well, we're directly affected, Your Honor,

2   because --

3        THE COURT:  Well, explain that.  I mean, you're

4   describing a class of retail customers of, I guess, some

5   broker-dealers in Hong Kong that sold the so-called mini-bonds,

6   and you're describing what even to sophisticated listeners is a

7   fairly exotic product.  I don't know how they ended up buying

8   it or what the disclosures were, but that's in front of me at

9   the moment.

10        MR. DAVIS:  It's not, Your Honor, and I agree.  What's

11   in front of the Court, and the issues that we want to intervene

12   on, are specifically noteholder priority, termination payments

13   and whether there are other reasons for the event of default --

14        THE COURT:  What would you --

15        MR. DAVIS:  -- of LBSF.

16        THE COURT:  What would you say or do that wouldn't be

17   said or done by other parties of the litigation?

18        MR. DAVIS:  Well, essentially, Your Honor, our clients

19   bought these notes under different circumstances, and the Court

20   said that's not before Your Honor and I'll move on from that.

21        Separately, however, our understanding is that our

22   notes were triggered -- the termination payments, if you will,

23   under our notes were triggered at different times; it's not the

24   exact time, Your Honor.  And there are some provisions -- we

25   can't say, obviously because we haven't seen every single one

174

1    of the documents, but there are some provisions that may have

2    been triggered before the debtor filed for bankruptcy.

3        For example, one of the events of default of the swap

4    counterparty, LBSF, is if the parent company ceases to meet its

5    obligations to essentially guarantee the transactions.  And the

6    question that we have is whether the downgrading of LBHI's

7    credit rating triggered a termination payment pre-petition.

8    Post-petition, what's going to be different is the timing of

9    these notices.

10       And the timing is absolutely critical.  Why?  Because

11   payments also are critical.  So if payments were due, Your

12   Honor, before termination notices were sent out, and the

13   failure to make those payments caused an event of default under

14   our bonds, that would be different from what would be before

15   the Court with respect to the other bonds, and it could very

16   well affect whether ipso facto would apply at all.

17       And so what we don't want to have happen, Your Honor,

18   is have an ipso facto argument, you know, black and white,

19   plain-vanilla BNY arguing the case on behalf of the

20   overwhelming majority of beneficial owners in these assets and

21   we don't get the opportunity to be heard on whether there are

22   other reasons why the bonds defaulted, other reasons why there

23   was an event of default.

24       Separately, what LBSF would say, and it is to some

25   degree -- is true, is that our clients didn't acquire the exact

1    Saphir bonds that are at issue in Perpetual.  But the problem,

2    Your Honor, and the reason why as a practical matter the

3    Court's decision is going to affect our client's interests, is

4    because LBSF has threatened to sue for damages if BNY doesn't

5    respect the automatic stay allegation that it's alleged.

6         So as a practical matter, what that means, Your Honor,

7    is our bonds can't be redeemed, haven't been redeemed, aren't

8    making interest payments, my clients don't have their

9    principal, my clients don't have their interest payments.  And

10   we believe that as a practical matter their interests are going

11   to be affected by whatever the Court says.  Every single dollar

12   that goes to LBSF, at a minimum, a percentage of that dollar

13   will not go to our clients.

14        And to the Court's specific question that this is a

15   matter between counterparties, what I would say is we have a

16   specific security interest in the Saphir bonds that

17   collateralize our mini-bonds.  We have a specific beneficial

18   interest in the bonds that collateralize our mini-bonds.  And

19   we believe, under bankruptcy provisions and Comcoach that LBSF

20   cites in their papers, and under Ohio v. Kovacs which basically

21   says if you have a claim against property that the debtor

22   claims it has an interest in, you're a creditor.  And we think

23   for that reason we should have the right to intervene, both

24   under 24(a)(1) and 24(a)(2).

25        The last point I think I haven't covered already, Your

1    Honor, is we don't think BNY is an adequate rep.  We don't have

2    anything bad to say about them, except for the fact that it's

3    not their money that's at risk.  And secondly, they also,

4    merely as a consequence of contracts and obligations they

5    entered into with the debtors before petition, they also are

6    fiduciaries to senior bondholders in this litigation, share

7    that with Citibank to the extent, I think, 138 billion dollars,

8    and underneath that have sole fiduciary obligations to sub-debt

9    and junior debt to the tune of 17 billion dollars.

10        I think the principal focus for BNY is to avoid

11    inconsistent judgments and essentially avoid reaching resolve

12    where they are forced to pay out the corpus of the funds

13    supporting the Saphir notes and risk a determination that they

14    paid it out wrongly at some future date.  That's one of the

15    reasons why we think we're not adequately represented by BNY.

16        The last reason, Your Honor, is because we read their

17    papers and their motion to dismiss, and we understand that

18    there's a question of whether a necessary party needs to be

19    joined here.  And they basically say look, it's true, we're not

20    the real stakeholders here.  And counsel will say, well, look,

21    you're one step removed from this program.  And always in

22    response to that we say, well, we have a security interest,

23    it's in the terms of the documents governing our notes.  It's a

24    question of law as to whether we have a protectable property

25    right in those notes when LBSF points at those documents and

1    says hey, Court, we want you to interpret and read the terms of

2    these provisions in our favor, and essentially write out one of

3    the most critical provisions in these documents.

4         I'll tie it up quickly, Your Honor, because I know

5    that there's a lot remaining on the Court's schedule.  But I

6    also just would like to say that, under permissive intervention

7    24(a)(2), we think we do share a common question of law in

8    fact.  It's a difficult balance that the courts go through when

9    they say, on the one hand, you have to have a common question

10   of law in fact, but it's not -- as the Court asked, what

11   additional questions would you raise and bring in this matter.

12   We don't think, as LBSF suggests, that we would radically alter

13   the nature of the questions before the Court.

14        Ultimately, it's one hundred percent within the

15   Court's discretion to determine what pleading goes on file on

16   behalf of our clients if we were permitted to intervene.  If

17   their claims are too broad or should be dealt with in another

18   forum, we're open to obviously obeying the Court's orders on

19   that and open to talking to LBSF about that.

20        The last point I would make, Your Honor, is our

21   client's interest in this covers eighty percent of the bonds

22   that were issued under the Dante program.  To put that into

23   perspective, the 70 million dollars that LBSF says they're in

24   the money in because ipso facto applies is 3.5 percent of the

25   value of the notes that were issued.  Our clients have security

1    interests, contract rights to 80 percent, 1.5 billion dollars

2    of notes that were issued under this program.

3            I think, from a practical perspective, Judge, it makes

4    sense under 24(a)(2) to permit us to intervene if for no other

5    reason than to have finality over this issue.  There are

6    competing interests here.  The creditors' committee certainly

7    would want, I would assume, a resolution in their favor, in all

8    of the creditors' favor, which would be to our detriment,

9    naturally.  We, of course, would like a resolution that's in

10   our favor that goes to our client's benefit, and we'd like it

11   sooner rather than later.  We allege in our pleadings, and we

12   have good-faith basis for believing that the overwhelming

13   majority of our clients are retirees.  That doesn't mean the

14   bonds are not governed by the terms of the bonds.  So the

15   process by which they acquired the bonds, none of that needs to

16   be part of this.

17           And I guess, as a last point, certainty and speed, I

18   think, would be of great benefit both to our clients and

19   ultimately to the estate, and we certainly will attempt to

20   enforce our client's rights elsewhere.  We thought it was

21   appropriate and right to bring these claims in Your Honor's

22   court because it's so intimately connected to the bankruptcy

23   estate.  And with that, unless the Court has any additional

24   questions, I turn over the podium to LBSF.

25           THE COURT:  Okay.  Thank you.

179

1          MR. RALPH MILLER:  Your Honor, for the record, Ralph

2     Miller again.  The Wong plaintiffs don't meet any of the tests

3     for mandatory intervention, and they shouldn't be allowed to

4     intervene as a matter of discretion because they have virtually

5     no connection with this adversary proceeding.

6          I know the hour is late.  I want to make two points

7     quickly.  First, I want to try to clarify confusion about the

8     facts, and I think the best way to do that is with some

9     diagrams.  And then I want to talk about --

10          THE COURT:  You may approach with that.

11          MR. RALPH MILLER:  -- controlling Second Circuit

12     authority which explains why this relationship, which is

13     frankly best described as a creditor of a creditor of a debtor,

14     does not create the necessary nexus to bring these parties in.

15          We have copies of these.  May I approach, Your Honor,

16     and take out our larger copy so I can point to that?

17          THE COURT:  Sure.

18     (Pause)

19          MR. RALPH MILLER:  Your Honor, we passed up two copies

20     of these; these were included in our responsive papers.  I

21     think the one to start with is the simpler one which represents

22     the adversary proceeding that we are now having a hearing on

23     and in which the Wong plaintiffs tried to intervene.

24          This is the Perpetual -- what's sometimes called the

25     Perpetual Trust case.  And as the Court can see -- and this, by

180

1   the way, I think, is essentially undisputed in this case -- we

2   do have documents that have been filed in the Wong case that I

3   can cite to the Court that explain the more complicated

4   diagram.  Perpetual Trustee was the sole noteholder.  It bought

5   notes that are not notes that had anything directly to do with

6   the Wong plaintiffs.  It bought notes called the 2006-5 and

7   2004-11 notes, and money from that was put into Saphir Finance

8   PLC.

9         There is a swap with LBSF.  This is the swap in which

10   there is a question of ipso facto and whether the subordination

11   of the swap counterparty, LBSF, which was otherwise in the

12   money and but for its bankruptcy would have great value,

13   whether that is a valid provision or it's invalidated by the

14   ipso facto clause.  In turn, that money was used to purchase

15   some notes that were issued by other entities, and that's

16   collateral that is held.  The Wong plaintiffs have no interest

17   in that collateral either.  They're completely separated from

18   this transaction.

19         The second diagram shows where the Wong plaintiffs

20   actually are.

21         Can you get the other diagram?

22         And the best way to do that, I think, Your Honor --

23       (Pause)

24         MR. RALPH MILLER:  This is just to explain.  The Wong

25   plaintiffs bought what they call retail notes, and those are on

1    the top of this picture, Your Honor.  Those were sold in Hong

2    Kong.  Those notes, Your Honor, have nothing directly to do

3    with Saphir.  They were bought from an entity called Pacific

4    Finance.  The Pacific Finance principal trustee is -- well,

5    it's in the record, and there is a swap involving LBSF.  It

6    does not contain this subordination or waterfall issue because,

7    it simply says, that doesn't apply.

8            So I want to make it clear that this first swap does

9    not contain the ipso facto issue that we've been talking about.

10   The trustee there is HSBC.  That was the point that Mr. Fleck

11   made earlier is that his client is not the trustee there.  This

12   document provides that only Pacific Finance can enforce rights

13   of the trust and the trustee.

14           These parties are actually investors -- that's all

15   they are -- in Pacific Finance.  They bought investments, that

16   we'll call notes, that they basically purchased those notes.

17   That's who the Wong plaintiffs are.  Pacific Finance has

18   nothing to do with the present adversary proceeding.  Pacific

19   Finance bought different Saphir notes from the same entity,

20   Saphir PLC, a different series issued at a different time.  And

21   the trustee related to those notes is BNY Corporate Trustee

22   Services.

23           There is a swap there.  This swap has some of the same

24   characteristics legally as the swap that is involved in this

25   adversary proceeding.  It's a different swap; it's different

182

1    documents.  They're not identical, but there is a possible

2    precedential affect if we recognize that.

3         Then there are notes issued by a different entity.

4    And this whole transaction is separated so there is no direct

5    interest at all in any of the swaps or any of the notes.  The

6    point that is being made by the Wong plaintiffs, and I want to

7    be candid with the Court about how -- we kept hearing the

8    phrase "as a practical matter" -- I'll go back to the recording

9    system, Your Honor.  "As a practical matter", they said, they

10   might be influenced.  What he means, I believe, is if the Court

11   finds that the ipso facto argument is good, as certainly LBSF

12   believes it is, and if that becomes precedent, and if that is

13   extended to different contracts that have similar provisions,

14   then less money may be available in this transaction and

15   ultimately flow down to them when they try to collect from

16   another entity.  And in other words, they are saying that they

17   hope to get money from somebody who may not have the money left

18   because they may have to pay it to LBSF first.

19        That's why I say that literally what we have is if you

20   say that LBSF is the party here, that's what's at issue here.

21   They are a creditor of Pacific Finance, which is a creditor of

22   Saphir Finance, that is a debtor that may owe money to LBSF.

23   And they're saying if Saphir Finance has to pay the money to

24   LBSF, under precedents that are going to be set, not because

25   it's going to be binding on them in this case, then Saphir may

183

1   not have enough money to pay the party it owes money to which

2   would pay money that they say they ought to get down here.

3   There is another issue of how this swap may interact that has

4   nothing to do with the present case.

5          So there is actually a Second Circuit case that's

6   strikingly on point here, Your Honor, and controlling, and I'm

7   sure you're familiar with it.  This came out of the Refco

8   Chapter 11, Krys v. the Official Committee of Creditors, 505

9   F.3d 109 (2d Cir. 2007).  It was dealing with a party-in-

10  interest concept, as you may know, and it had to do with

11  investors in a Cayman Islands investment company that had made

12  a settlement with a debtor and had paid a lot of money in the

13  settlement.  The analogy here is if we win and this money flows

14  over here and -- however, it would be much more direct; it

15  would be as if they were investors in this entity.  They are

16  actually several levels removed.

17         And what the Second Circuit concluded, based on its

18  Comcoach case and others, is that an investor in an entity that

19  may owe money to a debtor is not a proper party for a

20  bankruptcy proceeding and should not have rights in that case

21  to object to the settlement.  And I wanted to point out two

22  quotes from that, and this is at page 118, I believe, of the

23  reported decision.

24         The Second Circuit said, "We hold, therefore, that

25  investors are not a 'party-in-interest' within the meaning of

184

1    Section 1109(b) of the Bankruptcy Code and affirm the District

2    Court's holding that the bankruptcy court did not abuse its

3    discretion by proving a settlement without ruling on the merits

4    of the investor's objection, allowing them to intervene or

5    affording them an opportunity for discovery."

6         And then, very significantly, a little later the

7    Second Circuit said, "Bankruptcy court is a forum where

8    creditors and debtors can settle their disputes with each

9    other.  Any internal dispute between a creditor and that

10   creditor's investors belongs elsewhere."  And Your Honor, that

11   is essentially what we have here.

12        There is another point; I want to deal with the

13   principal trust deed very quickly.  As was described, the

14   principal trust deed is a shelf document and it's essentially

15   adopted with supplemental instruments.  It's in the record and

16   we'd ask the Court to take judicial notice of it.  It's in the

17   Wong adversary proceeding, which is adversary proceeding number

18   09-01120.  It's attached to the declaration of Richard Slack,

19   who's sitting here; it happens to be Exhibit A.  And if you

20   flip over to page 3 of Exhibit A, it has a reference to the

21   Contracts (Rights of Third Parties) Act of 1999.  And it says,

22   "a person who is not a party to this principal trust deed has

23   no rights under the Contracts (Rights of Third Parties) Act

24   1999 to enforce any term of this agreement except and to the

25   extent, if any, that this principal trust deed expressly

1        provides for such Act to apply to any of its terms."

2             And so, Your Honor, in essence, this is like a

3        derivative shareholder action.  The rights, if any, of the Wong

4        plaintiffs to get something from Saphir have to be asserted by

5        this entity.  It would be like shareholders of a corporation

6        trying to sue directly in the name of the corporation; they'd

7        have to go through some sort of a derivative procedure.  And

8        they haven't done that.

9             And I'd also point out that they say that they

10       represent these 30,000 people.  This has a very large

11       assumption in it, which is that a class action is certified on

12       behalf of those people in their proceeding.  But in any event,

13       even if that happened, even if they had a class, that class

14       would not be able to act for Pacific Finance, which has nothing

15       to do with this case.

16            So Your Honor, for those reasons, we believe that

17       there is neither a right to intervene and that they should not

18       be allowed to intervene, and we think the addition of these

19       parties to this case will add unnecessary complexity.

20            Now, they will have the right to assert their position

21       in the Wong proceeding, which conveniently is the next one up

22       on the docket, Your Honor, for a pretrial conference.  And

23       that's where we believe they should be.  And for those reasons,

24       Lehman Brothers Special Financing and LBHI respectfully

25       request -- actually, Lehman Brothers Special Financing is the

186

1   only plaintiff here -- respectfully requests that the motion to

2   intervene be denied.

3           I'd be happy to answer any questions, Your Honor.

4           THE COURT:  No, it was a very clear presentation of a

5   complex subject.

6           MR. RALPH MILLER:  Thank you, Your Honor.

7           MR. DAVIS:  Your Honor, if I may, a couple of points.

8   First, on the chart I would just say this isn't evidence of

9   course.  This is a --

10          THE COURT:  It's a demonstrative.

11          MR. DAVIS:  -- it's a demonstrative, LBSF's.

12          THE COURT:  This isn't an evidentiary hearing; it's

13  just an argument.

14          MR. DAVIS:  It's an interpretation of some of the

15  documents that they think support their client's interest.  I

16  would just point the Court to this line right here which says

17  purchase of collateral to support obligations to LBSF and the

18  Nabon Series N (ph.) noteholders.

19          THE COURT:  You should go to the microphone, though.

20          MR. DAVIS:  Sorry.  The special purpose vehicle,

21  Pacific Finance, had one purpose, one purpose alone; that was

22  to buy Saphir bonds and sell them to the mini-bond holders.

23          THE COURT:  But the issue here is really how indirect,

24  in relative terms, the interests of your client base seem to be

25  relative to the Saphir/LBSF counterparty dispute, which is the

187

1   core of this litigation.  I mentioned that, during your

2   presentation even before we heard from Mr. Miller, this is

3   really a litigation between counterparties.  I understand that

4   there may be some indirect potentially adverse financial

5   consequence, but it's indirect, at least that's how I see it.

6   Can you tell me how I'm missing the point on this?

7          MR. DAVIS:  I wouldn't suggest for a minute that

8   you're missing the point.  It's obvious I haven't done a good

9   job explaining.

10          THE COURT:  No, you've done a fine job.

11          MR. DAVIS:  Well, Mr. Miller --

12          THE COURT:  You've made it clear that you represent a

13   class of retail investors in a mini-bond structure that perhaps

14   has a billion-five of moms-and-pops in Hong Kong and elsewhere

15   offshore that bought into some investments they probably never

16   should have bought into, but it's not my job to determine the

17   suitability of investments.  At this point, my job is to figure

18   out whether or not your group is so situated that they actually

19   have a meaningful interest to protect in this particular

20   litigation, and I'm having a hard time seeing that.

21          MR. DAVIS:  I understand, and I appreciate the

22   opportunity to clarify.  Number one, I would just say, to the

23   extent there are any issues whatsoever of suitability, it

24   doesn't need to be litigated.  The Court controls whatever

25   pleading that we put on file in this adversary proceeding.

188

1          The second point, and perhaps the most critical point

2     I'd like to leave the Court with, is that the mini-bonds, the

3     assets that our clients bought, fine, they weren't hedge funds;

4     fine, they weren't AFLAC; but they own these bonds, Your Honor

5     and they're governed by the terms of the supplemental trust

6     deed, which hasn't been spoken to yet.

7          Mr. Miller spoke an English law opinion governing the

8     rights of third parties and that helps make it look like we're

9     even more distant.  But, basically, the supplemental trust deed

10    isn't a bond, and that supplemental trust deed says

11    specifically that the noteholders' mini-bonds are secured by

12    the Saphir bonds.  That interest is sufficient to protect under

13    24(a)(2) from our perspective if for no other reason than by

14    operation of 102(2) of the Bankruptcy Code which says, when you

15    have a claim, a claim is broadly defined and a claim includes

16    security interest under applicable precedent.  And the reason

17    that our interests have been involved here is because LBSF has

18    come forward and said -- made a claim to our security interest.

19         So the point I would just like to make as strongly and

20    as clearly as I can is that our bonds are constituted by the

21    supplemental trust deed.  And a reading of the supplemental

22    trust deed specifically says that we have a security interest

23    in these bonds, number one; and number two, we have recourse to

24    these bonds; and number three, that the bonds do not limit the

25    rights of the noteholders to take action in any court.

189

1          Now there's an interesting footnote that is cited in

2    their papers.

3          THE COURT:  May I stop you for one second?

4          MR. DAVIS:  Yes, Your Honor.

5          THE COURT:  When you say we have a security interest

6    in the bonds, is that the individual holders of the mini-bonds

7    issued at the retail level have such interests or is that

8    Pacific Finance, in some representative capacity, has that

9    interest and you claim through Pacific Finance?

10         MR. DAVIS:  Well, the question that the Court posed is

11   answered based on the reading of the documents.  Reading of the

12   documents, from our perspective, leads to the conclusion that

13   Pacific Finance put all of its interest and whatever it owned

14   into the trust of which we are the trust beneficiaries.  And it

15   signed a supplemental trust deed that does contain some

16   complexity, because --

17         THE COURT:  So your certificate -- I mean, to put this

18   in a different form, you're certificate holders in an entity

19   that in turn put assets into a trust which holds the asset that

20   you claim an interest in indirectly.  Do I have it correctly so

21   far?

22         MR. DAVIS:  I certainly would not dispute with --

23   that's not our position, Your Honor.  Our position is --

24         THE COURT:  I want to know your position --

25         MR. DAVIS:  Yes.

190

1          THE COURT:  -- because I'm trying to understand.

2          MR. DAVIS:  The perspective --

3          THE COURT:  I'm trying to understand.  This also goes

4    to some of the standing issues that are going to be considered,

5    not today, in the motion to dismiss the HSBC matter as it

6    relates to LBSF on a standing basis.  So I'm familiar generally

7    with these issues but I'm not trying to determine anything that

8    relates to those issues today; simply trying to understand, for

9    purposes of the position you're now asserting in an unrelated

10   litigation in which you seek to participate in on behalf of

11   this not yet certified class of holders of mini-bonds, how they

12   claim an interest in the underlying counterparty dispute, which

13   is what this present litigation is about with BNY.

14         MR. DAVIS:  Yes, Your Honor, if I may.  One point that

15   Mr. Miller made is we're a creditor of a creditor of a

16   creditor, and I think that Your Honor was speaking to that

17   point.  The other point that I would make in addition to that,

18   though, is we're also trust beneficiaries, and the Saphir notes

19   are held in trust for our benefit.  And the last question the

20   Court posed is what do those bonds in trust for you have to do

21   with this perpetual dispute that you're trying to intervene in?

22   And I would just direct the Court to Exhibit A of our reply

23   which basically sets forth a side-by-side comparison of

24   condition 44 which addresses the value of the termination

25   payments that occur upon an event of default triggered by LBSF.

191

1   They're identical.  There's a lot of similarity here.

2          THE COURT:  Okay.

3          MR. MILLER:  Might I have a --

4          THE COURT:  Mr. Miller has indicated he will be very

5   brief at this moment.

6          MR. RALPH MILLER:  I have, Your Honor.  The one key

7   point that I want to make is that they're not the same notes

8   issued by Saphir regardless of what interest he might have in

9   them.  They're different numbered notes.  If you'd just look on

10  the diagrams, these are --

11         THE COURT:  Same warning to you, Mr. Miller.  As you

12  move away from the microphone, the transcript becomes of

13  questionable value --

14         MR. MILLER:  If I may move this, Your Honor.

15         THE COURT:  Sure.

16         MR. MILLER:  -- so I can --

17         THE COURT:  I don't really need to see it at all.  I

18  have a chart on my bench.

19         MR. MILLER:  Well, Your Honor, as shown here, and this

20  is only an illustrative transaction because there are seventy-

21  nine tranches in the mini-bonds group that they talked about,

22  these have certain numbers attached to these notes, like Saphir

23  2004-1, excluding 2008-6 notes, and if you look over on the

24  ones that are involved in the present adversary proceeding,

25  they're 2006-5 and 2004-11.  They're not the same notes;

192

1    they're different notes.  So the idea that they have some kind

2    of security interest, they can't get security interest.  This

3    would be like saying that an accountholder in Bank of America

4    with one account has a security interest in some other account,

5    holder's account, because we're going to talk about what the

6    accountholders' agreement means in a lawsuit.

7           It's certainly true that an outcome of some kind on

8    how accountholder agreements work might have some effect on all

9    the accountholders, but that doesn't mean that one

10   accountholder has an interest in a different account.  And so

11   the security interest thing is really, I think, a confusion.

12          Thank you, Your Honor.

13          THE COURT:  I'm satisfied, based upon what I've heard,

14   recognizing that none of this is evidence but simply legal

15   argument, that the Wong plaintiffs, in their capacity as

16   holders of mini-bonds with an indirect interest in the legal

17   determination to be made as between LBSF and BNY as trustee,

18   have failed to demonstrate a sufficient connection to this

19   dispute to warrant intervention under Rule 24 of the Federal

20   Rules.

21          I find that the position asserted is sympathetic in

22   the sense that we're dealing with a class of investors that

23   bought into a vehicle that provided them with little obvious

24   control, but this isn't the mechanism to gain that control.

25   This is a complex dispute, as it is, and as I understand the

193

1    pleadings.  At least to this point, it's a dispute that is

2    almost purely legal in nature and, at least from the

3    perspective of LBSF, has been presented as a matter that can be

4    decided by the Court as a matter of law in a motion for summary

5    judgment.

6          To the extent that that is true, this is not a

7    situation in which the credibility of witnesses or the

8    passionate arguments of counsel should make that much of a

9    difference.  This is a dispute in which the Court, exercising

10   hopefully some intelligence, and after careful deliberation,

11   will be exercising judgment as to the proper significance of

12   certain Bankruptcy Code provisions in the context of a

13   particular transaction.  For that reason, I have some question

14   as to whether, even if we weren't dealing with a creditor of a

15   creditor of a creditor, that this is a case in which

16   intervention would be appropriate.  This is not the bankruptcy

17   case itself; this is an adversary proceeding.  It's an

18   adversary proceeding between the debtor, LBSF and its

19   counterparty.  The creditors' committee has been granted leave

20   to intervene just today, given the special status of the

21   committee as a party that represents the interest of all

22   creditors generally.

23          I'll entertain an appropriate order denying the motion

24   to intervene brought on behalf of the Wong plaintiffs.

25          MR. RALPH MILLER:  Your Honor, if we may, we will

194

1    submit that order shortly.  Thank you.

2          THE COURT:  That's fine.

3      (Pause)

4          MR. SLACK:  Your Honor, the next adversary proceeding

5    is in fact the Wong adversary proceeding.  And we have both a

6    pretrial conference on today and also the motion to stay

7    discovery which Your Honor alluded to earlier.

8          Your Honor, I apologize but it's Richard Slack from

9    Weil Gotshal for the debtor.

10          THE COURT:  You don't have to apologize for being

11    Mr. Slack.

12          MR. SLACK:  Thank you.

13          THE COURT:  Nothing you can do about that.

14          MR. SLACK:  So what I would suggest, Your Honor, is, I

15    think from the standpoint of a pretrial conference, we actually

16    have a schedule in place.  We have -- that's for the motions to

17    dismiss that are pending; those are scheduled to be heard,

18    actually, on fairly short order in September.  So that's just a

19    couple of months away.

20          And I would like to move to our motion, Your Honor,

21    which is to stay discovery pending the determination by the

22    Court of those motions to dismiss.

23          THE COURT:  Okay.  I'd like to say, and it's not just

24    because it's late but because I've actually spent some time

25    thinking about the Wong case, that before people start talking

1  this is what bankruptcy judges in California sometimes refer to

2  as a tentative ruling, I'm going to give -- in effect I'm going

3  to shift the burden.

4       I believe that a stay of discovery is appropriate in

5  this case based upon my review of the dispositive motions that

6  have been filed, but I do not mean to suggest that I have come

7  to any conclusion, whatsoever, as to whether the dispositive

8  motion should be granted.  I think that they raised some very

9  strong arguments and, on the basis of those arguments, consider

10 that the taking of what could turn out to be quite burdensome

11 discovery, pending hearings that could resolve the case, would

12 be a waste of resources.

13      And because of the time involved in getting from today

14 to the hearing on the motion to dismiss is relatively short,

15 and because I've seen that HSBC has filed its own motions to

16 dismiss, two of them I might add, one that was filed as

17 recently as, I think, yesterday, which have been listed for

18 hearing on September 23rd, if I remember correctly, that the

19 delay between today and the end of September is relatively

20 inconsequential in the life of complex commercial litigation,

21 whereas the burden associated with taking discovery pending

22 that dispositive motion is immediate and irreversible.

23      So, under the circumstances, I'm inclined to grant the

24 motion to stay discovery even before you say the first word.

25 But I'd like to turn it over to counsel for the Wong plaintiffs

196

1    to convince me otherwise.  This doesn't mean that I'm

2    absolutely certain; it just means that that's where I'm clearly

3    heading.

4         MR. SLACK:  Okay.  Your Honor, I've had the pleasure

5    of practicing in California Bankruptcy Court and I'm going to

6    sit down.

7         THE COURT:  Very smart.

8         MR. MANDELKAR:  Good afternoon, Your Honor.  Ray

9    Mandelkar from Coughlin Stoia for the plaintiffs.  Please

10   excuse my sniffles; I have a bit of a sinus infection.

11        With regard to the motion to stay, I understand the

12   Court's position that it doesn't think discovery should go

13   forward or the Court is inclined to grant the motion.  However,

14   I'm sensitive to the Court's comments about the burden and the

15   volume of the briefing, so I don't intend to insist to be heard

16   about it if the Court's really made up its mind.

17        We're pursuing discovery because we think it's the

18   right thing to do for our clients, but we understand if the

19   Court doesn't want to go there because the motion to dismiss is

20   coming up soon.  We understand that.

21        I think -- I couldn't hear quite well back there but I

22   think the Court said it was not interested in hearing the

23   standing arguments in detail today.  I think that's what the

24   Court said.

25        THE COURT:  I don't want to hear the standing

197

1    arguments at all today.

2         MR. MANDELKAR:  Okay.

3         THE COURT:  What I was saying was that I recognize

4    that the motion to stay discovery was notionally connected to

5    the motion to dismiss and that standing argument.  I was not

6    making a determination with respect to that.  I wasn't

7    expecting to hear argument on the merits as to that.

8         But I obviously have given at least some attention to

9    those arguments in order to recognize that they are what appear

10   to be strong arguments.  That doesn't necessarily mean they're

11   winning arguments.  And because I think that they are strong

12   arguments, it makes good sense to stay discovery for the

13   reasons that I said earlier in my comments before you stood to

14   take the podium.

15        MR. MANDELKAR:  Okay, Your Honor.  Well, where I was

16   going with that is, like I heard, the Court didn't seem to want

17   to hear a lot about standing today, so I'm not going to talk

18   about standing today.

19        THE COURT:  That's fine.  And you can have a complete

20   reservation of rights to say everything you want to say about

21   standing when we're actually hearing the motion to dismiss.

22        MR. MANDELKAR:  Sure.  I just want to make one comment

23   real quick, Your Honor, is that we firmly believe that we do

24   have standing.  And I believe it was Mr. Miller who made a

25   variety of comments in discussing the intervention motion,

198

1    which, I think the Court commented, would have some overlap

2    with standing.  And I just want to assure the Court that we

3    have responses for all of those arguments and we're confident

4    the Court will find that we do have standing when in fact it

5    does rule on the motion to dismiss.

6         Thank you, Your Honor.

7         THE COURT:  Fine.  Are we now down to Olivia Bam?

8         MR. SLOANE:  Your Honor, if I may just briefly be

9    heard.  I'm Howard G. Sloane from Cahill Gordon.  We represent

10   several of the HSBC entities as well as certain of the

11   individuals, otherwise known as the foreign defendants in Wong.

12        THE COURT:  Okay, in Wong, I just wanted to make

13   clear --

14        MR. SLOANE:  Yes.

15        THE COURT:  -- for purposes of the record that, when

16   you stood up after I said Olivia Bam, that you are talking

17   about HSBC and Wong.

18        MR. SLOANE:  I did that, Judge.  I've been sitting on

19   a hard bench and now it's a soft chair, so I was a little slow

20   in getting up.

21        But in any event, I just wanted to clarify one thing,

22   Your Honor, and comment on one point you made early.  You asked

23   early on whether it would make sense for there to be some

24   coordination/discussion with the Court, particularly in the

25   U.K.  We think that's a good idea actually.  There's been a

1    fair amount of discussion here about what went on in the U.K.;

2    we're not a party to that proceeding.  But I think for -- it

3    makes good practical sense, and it is in accordance with

4    practice, that a phone call would be appropriate.  We'd be

5    happy to provide you with the name of the judge in the U.K. to

6    coordinate with, at least to know what is going to happen in

7    July on that.

8          THE COURT:  It's an interesting proposal, and given

9    some of the history in this case I think, unless there is an

10    established protocol for court-to-court communication, I'm

11    concerned that it might be viewed as overstepping the bounds of

12    reasonable diplomacy for me to reach out to the judge who's

13    handling this in the High Court.  It's a particularly sensitive

14    subject in the context of the Lehman bankruptcy case generally

15    because of certain issues that have arisen, mentioned during

16    this morning's hearing, about the relationship that exists

17    between the U.K. administrators and other parties-in-interest

18    in global Lehman bankruptcy cases relating to the multinational

19    protocol which has been subscribed to by a variety of trustees

20    and foreign representatives and administrators but not by the

21    U.K. administrators.  And I recognize this is a separate and

22    distinct litigation, but I think it would be, at least in my

23    view, unduly sensitive for me to reach out to a justice of the

24    High Court without knowing that it will be a welcome

25    initiative.

200

1      MR. SLOANE:  Fair enough, Your Honor.  One other point

2  I just wanted to clarify, you mentioned two motions by HSBC.

3  The first motion that was filed was filed only because the time

4  to file it as to the one HSBC defendant that had been served,

5  it needed to be filed at that time.  The other HSBC

6  "entities" -- which we can argue about later whether they are,

7  in fact -- had not been served at that point -- so we filed a

8  timely motion pursuant to a stipulation reached with all

9  counsel about the scheduling and counsel.

10      Weil Gotshal, is absolutely right:  We have a

11  schedule; it's going to be on September 23rd, as Your Honor

12  knows.  So that's why there are two motions.

13      THE COURT:  Okay.  Thank you for that.

14   (Pause)

15      THE COURT:  If parties who are not involved in or

16  interested in the Olivia Bam vs. Barclays matter wish to

17  depart, you're free to do so.  Let's take about a two-minute

18  pause.

19      MR. LUCAS:  Okay.

20   (Pause)

21      THE COURT:  It's been a long day, hasn't it?

22      MR. LUCAS:  Yes, it has Your Honor, but instructive.

23  Your Honor, if we could just have a schedule, we might be able

24  to keep the core people in the courtroom.

25      THE COURT:  Is it possible to move more people out of

1    the courtroom; is that what you're suggesting?

2         MR. LUCAS:  That's what I'm trying to do.

3         THE COURT:  Okay.

4         MR. LUCAS:  Your Honor, we realize -- this is John

5    Lucas, Weil Gotshal, Your Honor.  We realize that it's been a

6    very long day, and prior to today's hearing we had contacted

7    chambers and requested a chambers conference on some specific

8    matters with the committee and the debtors.

9         THE COURT:  We're not going to do that today.

10        MR. LUCAS:  That's what we want to know, Your Honor.

11   Thank you very much.

12        THE COURT:  We're not going to do that unless we

13   finish the argument in Bam v. Barclays in the next fifteen

14   minutes.

15        MR. ROGERS:  For the defendant/movant, I've got about

16   five minutes, Your Honor.  But of course I don't know about the

17   plaintiff.

18        MR. LICUL:  Your Honor, for the plaintiff, I think we

19   have about the same.

20        MR. ROGERS:  So it's conceivable.

21        THE COURT:  How long is this conference likely to be?

22        UNIDENTIFIED SPEAKER:  Fifteen minutes, Your Honor.

23        MS. HENRY:  But whatever Your Honor would like.

24        THE COURT:  Now, how many people are involved in this

25   conference, and --

202

1            MS. HENRY:  The debtors and the committee.

2            THE COURT:  We'll do it just because people have been

3       waiting for purposes of having the conference.  However, note

4       that I'll probably need some coffee before going into the

5       conference.

6            MR. ROGERS:  Your Honor, Theodore Rogers from Sullivan

7       and Cromwell for Defendant Barclays Capital Inc., which is

8       moving to dismiss this adversary proceeding.  This is a

9       proceeding brought by a former Lehman employee who is seeking

10      to have Barclays pay a guarantee that Lehman made to her in its

11      contract of employment with her last March.

12           THE COURT:  I'm going to stop you right now because

13      there's something that has been bothering me about both this

14      case and the Coreth matter.

15           MR. ROGERS:  Yes, Your Honor.

16           THE COURT:  And I'm not suggesting that it does

17      anything to affect your motion to dismiss or what we're going

18      to be talking about today.  But between the time of oral

19      argument in connection with the Coreth matter and the

20      scheduling of oral argument in this matter, a hearing was held,

21      I believe, on June 24 and special counsel for LBHI, Jones Day,

22      sought and obtained the right to pursue certain 2004 discovery

23      from Barclays having to do with, among other subjects, Barclays

24      conduct in respect of employees and the assumption of employee

25      liabilities and the payment of those liabilities pursuant to

203

1    the asset purchase agreement.

2            It is unclear to me to what extent any of the

3    discovery that may be currently underway relating to that

4    general topic may have any impact, whatsoever, with respect to

5    either the Coreth matter or this matter.  And so even before

6    you argue this, I want you to know that I am probably not going

7    to decide it right away.

8            MR. ROGERS:  All right.

9            THE COURT:  In fact, I have stopped working on the

10   decision that relates to Coreth -- I'm letting you know that

11   because, as I recall, you argued that --

12           MR. ROGERS:  Yes indeed, Your Honor.

13           THE COURT:  -- in part, because I am concerned about

14   what, if anything, may come out of that discovery that impacts

15   my deliberations as to the treatment of employees.  Now, I

16   recognize that there are a whole host of particular legal

17   arguments that you have raised as it relates to the assumption

18   of particular employment agreements and that the investigation

19   that's being conducted may be much more general in nature and

20   not go to the question of individual agreements.  But I'm

21   nonetheless concerned about being asked to decide in a vacuum

22   matters that may later become a subject of public interest in

23   the bankruptcy case itself.  So now you have it.  That's my

24   point.

25           MR. ROGERS:  I understand, Your Honor.

204

1          THE COURT:  My point is, feel free to argue it,

2     recognizing that I'm not going to decide this so quickly.

3          MR. ROGERS:  Okay.  Understood, Your Honor.  The

4     reason we're making the motion to dismiss though, of course, is

5     because we believe that, similar to other motions to dismiss,

6     there is no basis as a matter of law for these claims,

7     accepting the allegations as true, except for contrary

8     documentary evidence.

9          So our position would be that legally whatever goes on

10    in other discovery about other employees and other situations

11    or even other claims, that the claims made in this complaint

12    are legally meritless.

13         And I will go quite quickly, Your Honor, in light of

14    what we said earlier.  A very brief review of the facts with

15    respect to Ms. Bam.  As Your Honor noted, the Coreth case is

16    quite similar.  The amounts at issue are much larger in Coreth

17    at 19.6 million dollars was the amount of that guarantee,

18    payable in Lehman stock as well as cash.

19         Here, Ms. Bam, in March 2008, signed a contract of

20    employment with Lehman Brothers to become a vice president in

21    its fixed income sales area.  Her contract provided for a bonus

22    payable in 2009 for her work in 2008 worth 185,000 dollars in

23    stock and cash.  Then, of course, the bankruptcy came and the

24    purchase agreement between Barclays and Lehman dated September

25    16 was entered into.

205

1          The relevant provisions, from our point of view, are

2     section 2.4(d) where Barclays excluded liability for Lehman

3     employment contracts or equity claims, referring only to, then,

4     9.1(b) which is the general provision where Barclays agreed

5     with Lehman that it would make severance payments and benefits

6     available to those who Barclays took on and fired before the

7     end of the year; no less favorable than Lehman's severance

8     plans or agreements.  And, again, that was part of the two-

9     party agreement -- actually three; I mean the two Lehman

10    entities and Barclays.

11         And then most significantly, we believe, for this

12    motion, 13.9 of the purchase agreement provided that there

13    would be no rights for third parties to claim benefits under

14    that contract, the negating provision.  And as we've noted

15    before, this provision had particular application here given

16    the extremely short time period that the two parties, the

17    parties on either side, had to enter into this agreement.  They

18    didn't have time to consider the possibility of third-party

19    claims or the like.

20         After that agreement, Ms. Bam was offered at-will

21    employment by Barclays pursuant to an e-mail, which is written,

22    and it's an exhibit to the motion papers.  The only payment

23    term Barclays offered her was salary, and she was offered

24    employment pursuant to Barclays' policies.  So there was no

25    mention of the Lehman bonus, no undertaking of the Lehman

1   bonus.

2        In November 2008, Barclays terminated Ms. Bam.  As the

3   complain recites, Barclays offered her severance of

4   approximately 50,000 dollars, which she turned down, and we are

5   here.  If Barclays had waited until 2009, it would not have had

6   any obligation under the purchase agreement to offer her any

7   severance; because it let her go, it offered the 50,000

8   dollars.

9        There are three sources of claims in the complaint

10  here, and, Your Honor, we submit that as a matter of law they

11  cannot go forward.  One source of claims is the purchase

12  agreement itself between Barclays and Lehman.  But the no-

13  third-party beneficiary clause, the negating provision, we

14  submit, is a matter of New York law which we briefed at great

15  length here as well as in the Coreth provision, provides that

16  Ms. Bam has no right to make a claim under that agreement.

17       The second source, potentially, is a claim under her

18  contract with Lehman Brothers, and Ms. Bam claims that Barclays

19  assumed that contract.  But there was no motion under Section

20  365 of the Bankruptcy Code as required to assume Ms. Bam's

21  contract.  There's no mention of Ms. Bam's contract.  The cases

22  that plaintiff cites are cases where -- and we had this same

23  colloquy in the Coreth proceeding and then some later letter

24  briefing about this -- where in a bankruptcy setting there was

25  express assumption, express reference to a contract which then

207

1   was -- there was a sale order and the contract was assumed.

2   There's no reference whatsoever to Ms. Bam and no right for

3   her, we submit, to try to charge Barclays with liability under

4   her contract with Lehman Brothers, which was not assumed.

5        The third source recited in the complaint is Barclays'

6   employment arrangement with Ms. Bam herself.  And as I noted

7   earlier, Barclays' e-mail, written offer of at-will employment

8   to her, similar to that made to other Lehman employees, was

9   simply that at-will employment, fixed salary, no other

10  guarantees of any bonus or provision for them, and that she

11  would be an employee pursuant to Barclays' policies and under

12  established New York law; among others, International Paper v.

13  Saween (ph.).  There's no claim as a matter of law.

14       The last claim, I think it's almost an undisputed

15  matter of labor law.  There's a claim under the New York labor

16  law that there would be no claim unless one had a contractual

17  right to compensation that could rise to the level of a wage.

18  Then one could argue that the labor law might require some

19  payment of the wage.  But I think it's undisputed, if there's

20  no right to wage, then there's no claim under the labor law.

21       And I'll sit down, Your Honor, unless there are any

22  questions, and reserve --

23       THE COURT:  No, you're benefitted by the fact that I

24  heard much the same argument in connection with Coreth.  So

25  I -- and it was at greater length in Coreth.

208

1          MR. ROGERS:  All right.

2          MR. LICUL:  Good afternoon, Your Honor.  Valdi Licul,

3   Vladeck Waldman Elias & Engelhard, for Ms. Bam.  The question

4   Your Honor posed at the onset was -- or questioned here is what

5   impact the discovery may have that's been ordered in this case,

6   not in this case but in the --

7          THE COURT:  In the bankruptcy case.

8          MR. LICUL:  -- bankruptcy case.  And I think it's very

9   important because it may define exactly what it is that

10  Barclays agreed to pay as severance.

11         Barclays doesn't dispute that it owes Ms. Bam

12  severance.  The dispute here is about whether or not this

13  185,000 dollar payment is severance and that the discovery,

14  which may show what it paid to other folks and what its

15  practices were, may define exactly what severance is here.  For

16  example, in this case, which is similar to the Coreth case,

17  Barclays offered Ms. Bam ten percent of her guaranteed minimum,

18  which suggests that there was some acknowledgement there that

19  they were, in fact, obligated to pay her severance.  What they

20  did with respect to other folks may also inform the Court's

21  judgment and the party's judgment on this.

22         With respect to the 185,000 dollar payment, it's our

23  position that it has all the hallmarks of a severance payment.

24  It's not denominated as severance payment but it's not payment

25  for work she has done because she left prior to the time it

209

1   would have been paid.  It's not an inducement to stay longer

2   because she had been fired.  In fact, the agreement itself, the

3   purchase agreement, doesn't define what severance is but it has

4   all the hallmarks of severance.  It is an amount to be paid by

5   the employer to the employee upon the termination of employment

6   through no fault of the employee.

7       Had Ms. Bam left, she would have forfeited her

8   severance.  Had she engaged in misconduct and been fired for

9   cause, she also would have forfeited her severance.  However,

10  the reason this payment came into being, her vested right came

11  as a result of being fired as a part of a reduction in force.

12      THE COURT:  Let me break in and ask you something

13  which certainly came up in the context of Coreth; and as far as

14  I can tell, these cases are very similar in terms of the legal

15  issues that are being presented on the Barclays motion to

16  dismiss.  The issue that was heavily vetted during oral

17  argument in that separate adversary proceeding focused, as I

18  recall, principally on the fact that the contract in question

19  was not expressly assumed by Barclays under the sale

20  transaction.  And so the dilemma for someone who represents a

21  plaintiff such as your client is that you have a sale order

22  which purports to exclude all rights for third parties to claim

23  third-party beneficiary rights and you have a scheduled list of

24  contracts to be assumed by contract.

25      In the case of Coreth, because the damages associated

210

1    with the contract were so material, I was able to ask a whole

2    bunch of questions about, well, how can you take the position

3    that a 19.6 million dollar severance claim wasn't specifically

4    identified to be assumed; and if it wasn't assumed, how can you

5    take the position that it somehow picked up under the sale

6    order.  Your case is a little different in the sense that,

7    while it's still quite a lot of money for Ms. Bam, I'm sure

8    it's a significant sum; it's not a shocking sum.

9         What's your position on the issue of assumption and

10   assignment of the contract?  It wasn't assumed and assigned, so

11   how can Barclays have liability under it?

12        MR. LICUL:  I don't know, Your Honor.  They were

13   conceding that it wasn't assumed and assigned.  I think the

14   contract followed the same path as the Lehman severance plans

15   or agreements.  They are incorporated within that language.

16   What the language of the purchase agreement says is that

17   Barclays will pay, and Barclays doesn't dispute this, will make

18   severance payments pursuant to Lehman's severance plans, not a

19   single plan but plans, or other agreements covering such

20   employees, which suggests individual employment agreements.

21        And I think in that context the Lehman severance plan

22   gets in as an assumed liability, which Barclays does not

23   dispute, as well as everything else.  And I don't recall that

24   there was any express motion to have the Lehman severance plan

25   assumed -- assigned and assumed either.  But there's no dispute

1    that Barclays actually has to pay under that plan.  So I think

2    it's part of the same category of assumption that was

3    consummated at the time of the purchase agreement.

4            It would make no sense for Barclays to argue, and I

5    think they do this a little bit in piecemeal, that just, sort

6    of, trot out 365 in one context but ignore it in another

7    context, to say yes, we owe severance.  We didn't attach a

8    severance plan, by the way, to the asset purchase agreement; it

9    wasn't expressly the subject of a separate motion.  But we

10   admit that we owe that money but not perhaps severance

11   provision in an individual employment agreement, which is what

12   we're saying this is.

13           The language of Section 9.1(b), under which Barclays

14   agreed to pay this amount, is very broad in terms of the rights

15   it confers.  It specifically starts off with a statement that

16   says this is not intended to limit the rights of employees.

17   And what it says is that Barclays will make payments no less

18   favorable than what the transferred employee would receive

19   under a Lehman severance plan or other agreement.  That's

20   extraordinarily broad language, and it certainly encompasses a

21   severance provision in an individual employment agreement.

22           What Barclays' position does is it turns that language

23   on its head.  Rather than providing Ms. Bam with no less than

24   she would have received had she been fired by Lehman, that's

25   exactly what they are trying to do.  If Ms. Bam had been fired

212

1    by Lehman Brothers as part of a reduction in force, I don't

2    think there is any question she would have been entitled to the

3    185,000 dollar guarantee.  She was fired without cause.  She's

4    entitled to that payment as severance.  It wasn't an earned

5    payment inasmuch as she didn't work through the end of January.

6         There's also the problem with 365, that what Barclays

7    is trying to do here is slice up the employment relationship

8    into its components.  We will assume liability for severance.

9    We will assume liability.  We will take her on as an employee,

10   we will pay her a salary and we will give her the same benefits

11   she received.  But we don't want to pay the 185,000 dollars.

12   And one of the things that 365 does not permit is this sort of

13   picking and choosing within the individual contract as to what

14   Barclays, in this case, which is the purchaser, wants to accept

15   and what it doesn't want to accept.  It hired Ms. Bam, same

16   salary, same position, and I think that it's then bound by the

17   same terms that she had with Lehman.

18        An alternative argument here, Your Honor, is that

19   there is a separate two-party agreement here between Barclays

20   and Ms. Bam.  She was given an offer of employment by e-mail;

21   that employment offer does not contain all the material terms.

22   The only way to define what those terms are is to go back and

23   look at her offer with Lehman.  It doesn't state what her

24   salary would be.  It doesn't even have her position.  The only

25   way that her engagement with Barclays, and prior with Lehman,

213

1    can be defined is by looking at both of these documents in

2    tandem.  It's part of the same transaction, her employment as a

3    fixed-income salesperson.

4         And I will make one last point, which is, the at-will

5    doctrine here is a red herring.  All the at-will doctrine says

6    is that an employer may fire an employee for good/bad reason or

7    no reason at all.  It says nothing about what they owe to the

8    employee if they get fired.  Ms. Bam was an at-will employee of

9    Lehman.  They could have fired her whenever they liked, but

10   they contracted away their right not to pay her severance.  And

11   in this case they said the trigger here was if we're going to

12   fire you without cause we will make this payment to you.  And

13   that is an obligation that Barclays assumed expressly, under

14   the agreement, as a successor to Lehman in this transaction.

15        THE COURT:  Okay.  Thank you.

16        Do you want to comment?

17        MR. ROGERS:  Yes.  Just briefly, Your Honor.  First of

18   all, the Lehman severance plan actually distinguishes bonus

19   guarantees from severance; it's Exhibit D to the moving papers.

20   It says that you're not entitled to severance if you have a

21   bonus guarantee.  Barclays offered Bam a severance in

22   accordance with Lehman's severance plan.

23        And, by the way, I know that Mr. Licul didn't do it

24   intentionally, but the language was a little bit garbled.  The

25   language of Section 9 says "provides for payment of severance

214

1  payments and benefits no less than Lehman severance plans or

2  agreements", not "no less than severance plans or other

3  agreements".  The language is Lehman Severance Plans, Lehman

4  severance agreements will be done, will be paid.  But a bonus

5  guarantee, as the severance plan explicitly states, is a

6  different animal than severance.

7        Severance is what was offered, and substantial

8  severance was offered.  And it was much more than the plan

9  would have provided just for the timing piece.  The severance

10  plan provides that you get a certain amount of money, a certain

11  number of weeks per year of service; plus the company can offer

12  more if it wants.  And Lehman -- the 50,000 dollars is way more

13  than it needed to do for two months' service.

14        In terms of picking and choosing, Lehman -- the

15  purchase agreement doesn't really assume the Lehman severance

16  plan.  It's an agreement by Barclays with Lehman to make that

17  offer to these employees who it's going to fire before year-

18  end.

19        And in terms of the argument that we can't pick and

20  choose, I'm not quite sure what is meant there.  Counsel

21  acknowledges that under 365 there would have to be an

22  assumption of the entire contract.  Even under their theory,

23  Barclays did not assume her Lehman contract.  Barclays offered

24  at-will Barclays employment at the same salary, no other money

25  terms, and then, as an employee in accordance with Barclays'

215

1   plans, the at-will doctrine is directly applicable here.

2        As the cases we cite say, when you're an at-will

3   employee, you're subject to your current employer's policies;

4   you're free to leave, but you're subject to your current

5   employer's policies.  And Barclays' offer to her was come join

6   us at Barclays, we'll pay you your salary, you're now our

7   employee, we'll set what you're position is going to be, we may

8   fire you but you don't have a Lehman bonus guarantee.

9        Thank you, Your Honor.

10       MR. LICUL:  Your Honor, just thirty seconds.  In terms

11   of the Lehman severance plan, the Lehman severance plan

12   actually, as it operates, offers the employee the greater of a

13   calculation under a particular severance formula or the

14   guarantee.  So it actually incorporates the guarantee, or,

15   rather, a guarantee is incorporated into the severance plan as

16   it --

17       MR. ROGERS:  Just say the language.  And it is Exhibit

18   D to the moving declaration:  "Further, an employee is not

19   eligible to receive such payments", meaning severance payments,

20   "if the employee will receive further payments pursuant to a

21   compensation agreement/compensation guarantee."

22       THE COURT:  Okay.

23       MR. ROGERS:  Thank you.

24       THE COURT:  I'm going to follow through on my opening

25   remark.  No offense, but I'm going to sit on this for a little

216

1   bit.

2           MR. ROGERS:  Understood, Your Honor.

3           THE COURT:  And I'm also going to give the parties an

4   opportunity, if they wish, to comment in a supplemental letter

5   submission, and I'm going to just give you a time to do it only

6   so that I know when the time has run that you're not doing

7   it -- this isn't a strong suggestion that it be done; it's just

8   that I'm interested in your perspectives on it -- between now

9   and, say, two weeks from today at 5:05.

10          I'm interested in knowing what, if any, position the

11  plaintiff takes and Barclays takes as to the applicability of

12  the 2004 discovery, which is currently being conducted by

13  special counsel for Lehman.  If everybody agrees that it's

14  completely irrelevant, I will expedite my decision and ignore

15  whatever happens there.  If everybody agrees that it's

16  completely relevant, I'll wait.  If there's a split, I'll wait,

17  assuming that I'm persuaded by the party who says that I should

18  wait, that I should wait.  Okay?

19          IN UNISON:  Thank you, Your Honor.

20          THE COURT:  We're adjourned.

21      (Proceedings concluded at 5:06 PM)

22

23

24

25

217

1

2                                    I N D E X

3

4                                    RULINGS

5    DESCRIPTION                                    PAGE      LINE

6    Motion for authorization and approval of       18        12

7    settlement agreement with Kojaian Affiliates

8    approved

9    Motion by Kalaimoku-Kuhio Development for       26        25

10   payment of post-petition rent granted,

11   with conditions

12   Committee's motion to direct the examiner       68        23

13   to comply with Court's Order directing

14   appointment of an examiner denied

15   Debtors' motion requesting second extension    137        12

16   of exclusive periods for the filing of and

17   solicitation of acceptances for Chapter 11

18   plans granted

19   Committee's motion to intervene granted        166         3

20   BNY's motion to defer denied                   166        10

21   Motion to intervene brought on behalf of       193        23

22   Wong plaintiffs denied

23

24

25

218

1

2                        C E R T I F I C A T I O N

3

4        I, Ellen S. Kolman, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        ELLEN S. KOLMAN

9

10       Also transcribed by:      Clara Rubin (CET**D-491)

11                                 Pnina Eilberg (CET**D-488)

12

13       Veritext LLC

14       200 Old Country Road

15       Suite 580

16       Mineola, NY 11501

17

18       Date:  July 16, 2009

19

20

21

22

23

24

25