**<u>EXHIBIT B</u>**

# LEHMAN BROTHERS

### Transaction

| | |
|---|---|
| Date: | 27 April, 2007 |
| To: | Consolidated Container Company LLC |
| | Attention:    Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | Transaction Management Group |
| | Facsimile:    (+1) 646-885-9551 (United States of America) |
| | Telephone:    212-526-9570 (Louis P. Bardos) |

Ref. Numbers:  Risk ID: 1504389L / Effort ID: N1348532 / Global Deal ID: 3022624

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consolidated Container Company LLC ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation,

enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 26 April, 2007 |
| Effective Date: | 30 April, 2007 |
| Termination Date: | 30 April, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 440,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 30th calendar day of each January, April, July, and October, from and including 30 July, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 30th calendar day of each January, April, July, and October, from and including 30 July, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.91625% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:** London; New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

Risk ID: 1504389L / Effort ID: 1348532 / Global Deal ID: 3022624

| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

**(I) Additional Termination Event:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events)

(a) Party B fails to execute and deliver to Party A the Agreement within the first 60 calendar days following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(b) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the First-Lien Term Loan Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Credit Documents without the prior written consent of Party A (unless the release of such Collateral from the Liens does not require any written consent, amendment or waiver by any of the other First-Lien Term Loan Secured Parties), (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Credit Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Credit Documents without the prior written consent of Party A (in either case under this clause (3), unless the release of such Credit Support Provider from its guarantee obligation does not require any written consent, amendment or waiver by any of the other First – Lien Term Loan Secured Parties), (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Transaction and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Credit Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Transaction or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Transaction and the relevant Credit Support Documents cease to constitute the First-Lien Term Loan Obligations of the Credit Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Credit Documents. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(c) **Change of Control.** A Change of Control has occurred. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**(II) Other Provisions:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions)

(a)   The **"Cross Default"** provisions of Section 5(a)(vi) of the ISDA Form will apply.

**"Threshold Amount"** means the lesser of (i) USD 100 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and USD 20 million, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

**(b)**   The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) of the ISDA Form will apply to Party A and Party B; provided, that the term "materially weaker" means, with respect to Party A, that Holdings or the resulting, surviving or transferee entity of Holdings fails to maintain a long-term senior, unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. and BBB- from Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc.

**(c) Representations:**   Section 3 of the ISDA Form is hereby amended by adding the following additional subsection:

Eligible Contract Participant. It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

**(d) Waiver of Trial By Jury.**   Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder.

**(e)   Additional Representations of Party B.**   Party B represents to Party A in accordance with Section 3 of the ISDA Form (which representations will be deemed to be repeated by Party B at all times until the termination of this Transaction) that:

(1)   **Portfolio Management.**   This Transaction has been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B.

(2)   **Compliance with Laws.**   Neither the execution, delivery or performance by Party B of this Transaction nor the compliance by Party B with the terms and provisions hereof will contravene any provision of applicable laws, statutes, rules or regulations affecting Party B, this Transaction, or the performance of Party B's obligations hereunder.

(3)   **Constitutional Documents.**   Neither the execution, delivery or performance by Party B of this Transaction nor the compliance by Party B with the terms and provisions hereof will violate any provision of its constitutional documents and the Transaction contemplated hereunder is and will be an authorized and permitted Transaction.

(4)   **Contractual Obligations.**   This Transaction is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Transaction does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof.

(5)     **Credit Support Documents.** The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(6)     **Credit Support Providers.** Neither the execution, delivery or performance of any Credit Support Document by any Credit Support Provider that is a party to such Credit Support Document nor the compliance by any Credit Support Provider with the terms and provisions of such Credit Support Document does (i) contravene any law applicable to such Credit Support Provider, (ii) violate any provision of the constitutional documents of such Credit Support Provider, (iii) contravene any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) violate or conflict with any Contractual Obligation of such Credit Support Provider or result in any breach of or constitute a default in respect thereof.

(7)     **Secured Hedging Agreement.** (i) Party A is one of the First-Lien Term Loan Secured Parties, (ii) this Transaction is a Secured Hedging Agreement, (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Transaction and the relevant Credit Support Documents constitute the First-Lien Term Loan Obligations of each such Credit Party and rank pari passu with and equal in right and priority of payment with the Loans under the Credit Documents and (iv) Party B has, prior to or on the Trade Date, notified each Collateral Agent that this Transaction is a Secured Hedging Agreement and is to be equally and ratably secured with the First-Lien Term Loan Obligations.

**Additional Definitions**

"**Change of Control**" shall have the meaning assigned to such term in the Credit Agreement.

"**Collateral**" shall have the meaning assigned to such term in the Credit Documents.

"**Collateral Agent**" shall have the meaning assigned to such term in the First Lien Intercreditor Agreement.

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Credit Documents).

"**Credit Agreement**" means the First Lien Term Loan Credit Agreement, dated as of March 28, 2007 (as amended, supplemented, waived or otherwise modified from time to time), among Consolidated Container Holdings LLC, Consolidated Container Company LLC, various Lenders, and Deutsche Bank Trust Company Americas, as Administrative Agent, as the same exists on the date of execution of this Transaction and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A or an affiliate of Party A then a party to the Credit Agreement, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Credit Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Credit Party**" shall have the meaning assigned to such term in the Credit Agreement.

"**First Lien Intercreditor Agreement**" means the Intercreditor Agreement dated as of March 28, 2007 among Consolidated Container Holdings LLC, Consolidated Container Company LLC, the other Grantors from time to time party thereto, Deutsche Bank Trust Company Americas, as Collateral Agent under the ABL Credit Agreement, and Deutsche Bank Trust Company Americas, as Collateral Agent under the Credit Agreement.

"**First-Lien Term Loan Obligations**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**First-Lien Term Loan Secured Parties**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**Guarantors**" shall have the meaning assigned to such term in the Credit Agreement.

"**Intercreditor Agreements**" means collectively, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

"**Lenders**" shall have the meaning assigned to such term in the Credit Agreement.

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Second Lien Intercreditor Agreement**" means the Intercreditor Agreement dated as of March 28, 2007 among Consolidated Container Holdings LLC, Consolidated Container Company LLC, Deutsche Bank Trust Company Americas, as Collateral Agent under the ABL Credit Agreement, Deutsche Bank Trust Company Americas, as Collateral Agent under the Credit Agreement and Deutsche Bank Trust Company Americas, as Collateral Agent under the Second-Lien Term Loan Credit Agreement.

"**Secured Creditors**" shall have the meaning assigned to such term in the Security Documents.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Secured Hedging Agreement**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

**Credit Support Documents:** each of the Credit Documents.

**Credit Support Provider:** each of the Guarantors party to the Credit Documents.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                    Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**          **Consolidated Container Company LLC**

By: _Anatoly Kozlov_
Name:  Anatoly Kozlov
Title:   Authorized Signatory

                                                    By: _R.P. Schring_
                                                    Name:  Richard P. Sefring
                                                    Title:   CFO

Risk ID: 1504389L / Effort ID: 1348532 / Global Deal ID: 3022624

# LEHMAN BROTHERS

### -Revised- Transaction

| | |
|---|---|
| Date: | 25 June, 2007 |
| To: | Consolidated Container Company LLC |
| | Attention:    Documentation Unit |
| From: | Lehman Brothers Special Financing Inc. |
| | Transaction Management Group |
| | Facsimile:    (+1) 646-885-9551 (United States of America) |
| | Telephone:    212-526-9570 (Louis P. Bardos) |

Ref. Numbers: Risk ID: 1504389L / Effort ID: N1442466 / Global Deal ID: 3022624

**This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

---

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and Consolidated Container Company LLC ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below.

This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form"), with such modifications as you and we will in good faith agree. Upon the execution by you and us of such an agreement, this Confirmation shall supplement, form a part of, and be subject to that agreement (the "Agreement"). All provisions contained or incorporated by reference in the Agreement, upon its execution, will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents confirming transactions entered into between us and referring to the ISDA Form, shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement in such form (but without any Schedule) on the Trade Date of this Transaction. In the event of any inconsistency between the provisions of that agreement, or the Agreement, when executed, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional

advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 26 April, 2007 |
| Effective Date: | 30 April, 2007 |
| Termination Date: | 30 April, 2010, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 440,000,000.00 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The 30th calendar day of each January, April, July, and October, from and including 30 July, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The 30th calendar day of each January, April, July, and October, from and including 30 July, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.91625% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Business Days:** London; New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |

Risk ID: 1504389L / Effort ID: 1442466 / Global Deal ID: 3022624

| | |
|---|---|
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |
| Transfer: | Notwithstanding Section 7 of the Agreement, Party A may assign its rights and obligations under this Transaction, in whole and not in part, to any Affiliate of Lehman Brothers Holdings Inc. ("Holdings") effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Governing Law: | The laws of the State of New York (without reference to choice of law doctrine); provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |
| Termination Currency: | USD; provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over this election. |

**(I) Additional Termination Event:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these Additional Termination Events)

**(a)** Party B fails to execute and deliver to Party A the Agreement within the first **75 calendar days** following the Trade Date. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**(b)** **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the First-Lien Term Loan Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Credit Documents without the prior written consent of Party A (unless the release of such Collateral from the Liens does not require any written consent, amendment or waiver by any of the other First-Lien Term Loan Secured Parties), (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Credit Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Credit Documents without the prior written consent of Party A (in either case under this clause (3), unless the release of such Credit Support Provider from its guarantee obligation does not require any written consent, amendment or waiver by any of the other First – Lien Term Loan Secured Parties), (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Transaction and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Credit Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Transaction or the Credit Support Documents as unsecured indebtedness, <u>or</u> (6) the obligations and liabilities of Party B and its Credit Support Providers under this Transaction and the relevant Credit Support Documents cease to constitute the First-Lien Term Loan Obligations of the Credit Parties and cease to

Risk ID: 1504389L / Effort ID: **1442466** / Global Deal ID: 3022624

rank pari passu with and equal in right and priority of payment with the Loans under the Credit Documents. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(c)  **Change of Control.**  A Change of Control has occurred.  For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

(II) **Other Provisions:** (provided, however, any provision to the contrary in the Agreement, when executed, shall take precedence over these provisions)

(a)  The **"Cross Default"** provisions of <u>Section 5(a)(vi)</u> of the ISDA Form will apply.

**"Threshold Amount"** means the lesser of (i) USD 100 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and USD 20 million, in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

(b)  The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) of the ISDA Form will apply to Party A and Party B; provided, that the term "materially weaker" means, with respect to Party A, that Holdings or the resulting, surviving or transferee entity of Holdings fails to maintain a long-term senior, unsecured debt rating of at least Baa3 as determined by Moody's Investors Service, Inc. and BBB- from Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies Inc.

(c) Representations: Section 3 of the ISDA Form is hereby amended by adding the following additional subsection:

<u>Eligible Contract Participant.</u> It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

(d) **Waiver of Trial By Jury.**  Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Transaction hereunder.

(e)  **Additional Representations of Party B.**  Party B represents to Party A in accordance with <u>Section 3</u> of the ISDA Form (which representations will be deemed to be repeated by Party B at all times until the termination of this Transaction) that:

(1)  **Portfolio Management.**  This Transaction has been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B.

(2)  **Compliance with Laws.**  Neither the execution, delivery or performance by Party B of this Transaction nor the compliance by Party B with the terms and provisions hereof will contravene any provision of applicable laws, statutes, rules or regulations affecting Party B, this Transaction, or the performance of Party B's obligations hereunder.

(3)  **Constitutional Documents.**  Neither the execution, delivery or performance by Party B of this Transaction nor the compliance by Party B with the terms and provisions hereof

will violate any provision of its constitutional documents and the Transaction contemplated hereunder is and will be an authorized and permitted Transaction.

(4)   **Contractual Obligations.**  This Transaction is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Transaction does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof.

(5)   **Credit Support Documents.**  The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(6)   **Credit Support Providers.**  Neither the execution, delivery or performance of any Credit Support Document by any Credit Support Provider that is a party to such Credit Support Document nor the compliance by any Credit Support Provider with the terms and provisions of such Credit Support Document does (i) contravene any law applicable to such Credit Support Provider, (ii) violate any provision of the constitutional documents of such Credit Support Provider, (iii) contravene any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) violate or conflict with any Contractual Obligation of such Credit Support Provider or result in any breach of or constitute a default in respect thereof.

(7)   **Secured Hedging Agreement.**   (i) Party A is one of the First-Lien Term Loan Secured Parties, (ii) this Transaction is a Secured Hedging Agreement, (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Transaction and the relevant Credit Support Documents constitute the First-Lien Term Loan Obligations of each such Credit Party and rank pari passu with and equal in right and priority of payment with the Loans under the Credit Documents and (iv) Party B has, prior to or on the Trade Date, notified each Collateral Agent that this Transaction is a Secured Hedging Agreement and is to be equally and ratably secured with the First-Lien Term Loan Obligations.

## Additional Definitions

"**Change of Control**" shall have the meaning assigned to such term in the Credit Agreement.

"**Collateral**" shall have the meaning assigned to such term in the Credit Documents.

"**Collateral Agent**" shall have the meaning assigned to such term in the First Lien Intercreditor Agreement.

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Credit Documents).

"**Credit Agreement**" means the First Lien Term Loan Credit Agreement, dated as of March 28, 2007 (as amended, supplemented, waived or otherwise modified from time to time), among Consolidated Container Holdings LLC, Consolidated Container Company LLC, various Lenders, and Deutsche Bank Trust Company Americas, as Administrative Agent, as the same exists on the date of execution of this Transaction and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A or an affiliate of Party A then a party to the Credit Agreement, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Credit Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Credit Party**" shall have the meaning assigned to such term in the Credit Agreement.

"**First Lien Intercreditor Agreement**" means the Intercreditor Agreement dated as of March 28, 2007 among Consolidated Container Holdings LLC, Consolidated Container Company LLC, the other Grantors from time to time party thereto, Deutsche Bank Trust Company Americas, as Collateral Agent under the ABL Credit Agreement, and Deutsche Bank Trust Company Americas, as Collateral Agent under the Credit Agreement.

"**First-Lien Term Loan Obligations**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**First-Lien Term Loan Secured Parties**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**Guarantors**" shall have the meaning assigned to such term in the Credit Agreement.

"**Intercreditor Agreements**" means collectively, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

"**Lenders**" shall have the meaning assigned to such term in the Credit Agreement.

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Second Lien Intercreditor Agreement**" means the Intercreditor Agreement dated as of March 28, 2007 among Consolidated Container Holdings LLC, Consolidated Container Company LLC, Deutsche Bank Trust Company Americas, as Collateral Agent under the ABL Credit Agreement, Deutsche Bank Trust Company Americas, as Collateral Agent under the Credit Agreement and Deutsche Bank Trust Company Americas, as Collateral Agent under the Second-Lien Term Loan Credit Agreement.

"**Secured Creditors**" shall have the meaning assigned to such term in the Security Documents.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Secured Hedging Agreement**" shall have the meaning assigned to such term in the Intercreditor Agreements.

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

**Credit Support Documents:** each of the Credit Documents.

**Credit Support Provider:** each of the Guarantors party to the Credit Documents.

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (+1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                                  Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**        **Consolidated Container Company LLC**

By:  _Anatoly Kozlov_
Name: Anatoly Kozlov
Title:  Authorized Signatory

                                                  By:  _RP Sehring_
                                                  Name:  Richard P. Sehring
                                                  Title:  CFO

Risk ID: 1504389L / Effort ID: **1442466** / Global Deal ID: 3022624

# **EXHIBIT C**

08/30/2007    13:31                                                        NO.321    P01

# LEHMAN BROTHERS

### Transaction

Date:        30 August, 2007

To:          **CONSOLIDATED CONTAINER COMPANY LLC**
             Attention:        Documentation Unit

From:        Lehman Brothers Special Financing Inc.
             Confirmations Group
             Facsimile:        (1) 646-885-9551 (United States of America)
             Telephone:        212 526-1791 {Leila Arjune}

Ref. Numbers:  Risk ID: 1631173L / Effort ID: N1583443 / Global Deal ID: 3315971

Dear Sir or Madam:

The purpose of this communication (this "Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between Lehman Brothers Special Financing Inc. ("Party A") and **CONSOLIDATED CONTAINER COMPANY LLC** ("Party B") on the Trade Date specified below. This Confirmation constitutes a "Confirmation" as referred to in the Agreement specified below. **This Confirmation supersedes and replaces in its entirety any other confirmation referencing the Transaction to which this Confirmation relates.**

This Confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement dated as of 26 April, 2007, as amended and supplemented from time to time, between Party A and Party B (the "Swap Agreement"). All provisions contained in or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The terms of the particular Transaction to which this Confirmation relates are as follows:

**General Terms:**

| | |
|---|---|
| Trade Date: | 28 August, 2007 |
| Effective Date: | 31 August, 2007 |
| Termination Date: | 31 August, 2009, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Notional Amount: | USD 100,000,000.00 |

**Fixed Amounts:**

| | |
|---|---|
| Fixed Amount Payer: | Party B |
| Fixed Amount Payer Payment Dates: | The last calendar day of each February, May, August, and November, from and including 30 November, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate: | 4.88% per annum |
| Fixed Rate Day Count Fraction: | Actual/360 |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | Party A |
| Floating Amount Payer Payment Dates: | The last calendar day of each February, May, August, and November, from and including 30 November, 2007 to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | 3 months |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/360 |
| Reset Dates: | The first day of each Calculation Period |

**Business Days:**     London and New York

**Miscellaneous:**

| | |
|---|---|
| Calculation Agent: | Party A |
| Office: | For the purposes of this Transaction, Party A is not a Multibranch Party, and the Office of Party B is its Head Office. |

08/30/2007    13:31                                                              NO.321    P03

Please confirm your agreement with the foregoing by executing this Confirmation and returning such Confirmation, in its entirety, to us at facsimile number (1) 646-885-9551 (United States of America), Attention: Confirmations Group.

Yours sincerely,                          Accepted and agreed to:

**Lehman Brothers Special Financing Inc.**      **CONSOLIDATED CONTAINER COMPANY LLC**

Anatoly Kozlov

Lehman Brothers Special Financing Inc.

By: _____
Name: Richard P. Sehring
Title: CFO

# **EXHIBIT D**



**Consolidated Container Company**

Corporate Headquarters
3101 Towercreek Parkway
Suite 300
Atlanta, Georgia 30339

December 4, 2008

TO:    Lehman Brothers Special Financing, Inc.
       c/o Lehman Brothers Inc.
       Corporate Advisory Division
       Transaction Management Group
       745 Seventh Avenue
       New York, NY 10019
       Attn: Documentation Manager

RECEIVED DEC 0 5 2008

Hand

042607 CONS

CC:    Weil, Gotshal & Manges
       767 Fifth Avenue
       New York, NY 10153
       Attn: Harvey Miller, Esq.

       Curtis, Mallet-Prevost, Colt & Mosle LLP
       101 Park Avenue
       New York, NY 10178
       Attn:    Steven Reisman, Esq.
                Lynn P. Harrison III, Esq.

**Re:    Notice of Event of Default and Designation of Early Termination Date**

Reference is made to the ISDA 1992 Master Agreement ("Master Agreement"), dated as of April 26, 2007, between Lehman Brothers Special Financing, Inc. ("Defaulting Party") and Consolidated Container Company LLC ("Non-Defaulting Party"). All capitalized terms used herein and not otherwise defined shall have the respective meanings provided in the Master Agreement.

Please be advised that Non-Defaulting Party has suffered Events of Default under Section 5(a)(vii)(4) of the Master Agreement due to the fact that the Defaulting Party and Lehman Brothers Holdings Inc., Credit Support Provider for the Defaulting Party, have both filed for bankruptcy protection. As such, Non-Defaulting Party is hereby designating December 5, 2008, as the Early Termination Date in respect of all Transactions under the Master Agreement, including without limitation the Transactions evidenced by the confirmations dated April 27, 2007 and August 30, 2007.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Transactions.

Sincerely,

**CONSOLIDATED CONTAINER COMPANY LLC**

By: _R.P. Sehring_

Name: Richard P. Sehring
Title:  Chief Financial Officer

Telephone  678-742-4600                                        Fax  678-742-4750

## EXHIBIT E



## Consolidated Container Company

3101 Towercreek Pkwy
Suite 300
Atlanta, GA 30339
Tel: (678) 742-4600
Fax: (678) 742-4758

December 23, 2008

RECEIVED DEC 2 9 2008
HAND

Master III 042607CCNS

TO:    Lehman Brothers Special Financing, Inc.
      c/o Lehman Brothers Inc.
      Corporate Advisory Division
      Transaction Management Group
      745 Seventh Avenue
      New York, NY 10019
      Attn: Documentation Manager

CC:    Weil, Gotshal & Manges
      767 Fifth Avenue
      New York, NY 10153
      Attn: Harvey Miller, Esq.

      Curtis, Mallet-Prevost, Colt & Mosle LLP
      101 Park Avenue
      New York, NY 10178

Attn:    Steven Reisman, Esq.
      Lynn P. Harrison III, Esq.

Re:    Notice of Termination Amount Due

    Reference is made to (i) the 1992 ISDA Master Agreement (the "Master Agreement") dated as of April 26, 2007 between Lehman Brothers Special Financing Inc. ("Lehman") and Consolidated Container Company LLC (the "Company"), and (ii) the letter dated December 4, 2008 from the Company to Lehman, a copy of which is attached, whereby the undersigned terminated all outstanding Transactions between Lehman and the Company under the Master Agreement (the "Termination Notice"). The Early Termination Date with respect to the Transactions was designated as December 5, 2008. Terms used but not defined herein are used as defined in the Master Agreement.

    This letter is being provided pursuant to Section 6(d)(i) of the Master Agreement. As of the Early Termination Date, the amount payable to Lehman by the Company under Section 6(e) of the Master Agreement is $2,535,523.75 (the "Termination Amount"). The Company's calculation of the Termination Amount is described below.

    The Company is required under its first-lien and second-lien term credit facilities to maintain interest rate protection with a total notional amount equal to at least 40% of the outstanding principal amount of such debt. All assets of the Company are pledged under the Company's two term credit facilities and its revolving credit facility, which are the Company's only sources of funding. When the Company terminated its swaps after Lehman's default, the

Lehman Brothers Special Financing, Inc.
Weil, Gotshal & Manges
Curtis, Mallet-Prevost, Colt & Mosle LLP
Page 2

Company had to obtain alternative interest rate protection to comply with its credit facilities. Otherwise, the Company risked default under all three credit facilities, with a resulting exercise by the lenders of rights against all assets of the Company. Interest rate protection was obtained in the form of an interest rate cap and came at an incremental cost to the Company.

In accordance with the definition of "Loss" which states: "A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets," the Company sought bids for replacement swaps, including from its agent bank, Deutsche Bank Trust Company Americas. The Company did not receive any bids which the Company believed in good faith were executable or represented realistic replacements for the Lehman swaps. Either dealers were not willing to give quotes on replacement swaps or the quotes received were non-committal and with conditions. Deutsche Bank was not willing to assume or provide an actual bid on the swaps at any price. Further, because all its assets are pledged to its various credit facilities, the Company was not in a position to pledge collateral to a new swap provider unless the lenders approved or the swap provider also became a lender under one of the facilities and could share in collateral under that facility at a level satisfactory to the new swap provider, thus limiting the universe of potential swap counterparties.

In lieu of a replacement swap, the Company purchased an interest rate cap. In light of the current financing markets, any other approach to addressing the interest rate protection requirement, such as amendment to the credit facilities or waiver of the requirement, would have come, in the Company's view, at a significant cost in terms of amendment fees, rate increases, stricter covenants, lower liquidity, or other limitations or conditions, if an amendment or waiver could be obtained at any price. We note that the Company's first and second lien debt is trading at substantial discounts, an indication of the challenging circumstances under which the Company would be seeking such an amendment or waiver.

While the Company believes its determination of amounts owed has been done in accordance with the Master Agreement and would withstand challenge, the Company is aware that Lehman, as debtor-in-possession, could decide to raise questions regarding its determination, as might any debtor-in-possession or bankruptcy trustee. To cover that contingency, the Company has included in its determination a deduction of $150,000.00 as a setoff for legal and other expenses incurred in working through any challenge or question from Lehman, as permitted under the Loss methodology and Section 6(f) of the Master Agreement. The Company is prepared to turn over the contingent amount upon assurance from Lehman that the Termination Amount it has calculated is acceptable and upon receipt of a satisfactory release.

Lehman Brothers Special Financing, Inc.
Weil, Gotshal & Manges
Curtis, Mallet-Prevost, Colt & Mosle LLP
Page 3

The Termination Amount was determined as follows.

| | | |
|---|---|---:|
| | Company amounts scheduled to be paid since 9/15/08 | $2,907,072.22 |
| plus | | |
| | Interest on scheduled payments: | 11,248.53 |
| less | | |
| | Outstanding Lehman amounts: | --- |
| less | | |
| | Cost of interest rate cap: | 160,000.00 |
| less | | |
| | Company expenses: | 72,797.00 |
| less | | |
| | Contingent expenses: | 150,000.00 |
| | Termination Amount | $2,535,523.75 |

We will be delivering a total of $2,540,411.40 (such total is equal to the Termination Amount plus interest in the amount of $4,887.65 accrued since the Early Termination Date). Funds will be wired to account number 066143543 in the name of Lehman Brothers Special Financing Inc. at JPMorgan Chase, the same account to which previous payments under the Master Agreement have been made.

Sincerely,

CONSOLIDATED CONTAINER COMPANY LLC

By: _R.P. Sehling_

Name: Richard P. Sehling
Title: Chief Financial Officer



## Consolidated Container Company

Corporate Headquarters
3101 Towercreek Parkway
Suite 300
Atlanta, Georgia 30339

December 4, 2008

TO:    Lehman Brothers Special Financing, Inc.
       c/o Lehman Brothers Inc.
       Corporate Advisory Division
       Transaction Management Group
       745 Seventh Avenue
       New York, NY 10019
       Attn: Documentation Manager

CC:    Weil, Gotshal & Manges
       767 Fifth Avenue
       New York, NY 10153
       Attn: Harvey Miller, Esq.

       Curtis, Mallet-Prevost, Colt & Mosle LLP
       101 Park Avenue
       New York, NY 10178
       Attn:   Steven Reisman, Esq.
              Lynn P. Harrison III, Esq.

Re:    **Notice of Event of Default and Designation of Early Termination Date**

    Reference is made to the ISDA 1992 Master Agreement ("Master Agreement"), dated as of April 26, 2007, between Lehman Brothers Special Financing, Inc. ("Defaulting Party") and Consolidated Container Company LLC ("Non-Defaulting Party"). All capitalized terms used herein and not otherwise defined shall have the respective meanings provided in the Master Agreement.

    Please be advised that Non-Defaulting Party has suffered Events of Default under Section 5(a)(vii)(4) of the Master Agreement due to the fact that the Defaulting Party and Lehman Brothers Holdings Inc., Credit Support Provider for the Defaulting Party, have both filed for bankruptcy protection. As such, Non-Defaulting Party is hereby designating December 5, 2008, as the Early Termination Date in respect of all Transactions under the Master Agreement, including without limitation the Transactions evidenced by the confirmations dated April 27, 2007 and August 30, 2007.

    Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Transactions.

                 Sincerely,

                 **CONSOLIDATED CONTAINER COMPANY LLC**

                 By: _R.P. Sehring_
                 Name: Richard P. Sehring
                 Title:  Chief Financial Officer

# **EXHIBIT F**

# LEHMAN BROTHERS

**BY OVERNIGHT COURIER**

December 30, 2008

Consolidated Container Company
3101 Towercreek Pkwy
Suite 300
Atlanta, Georgia  30339
      Attn:  Richard P. Sehring, Chief Financial Officer

           **Re:**    **In re Lehman Brothers Holdings Inc., *et al.*, Chapter 11
                 Case No. 08-13555 (JMP) (jointly administered)**

Ladies and Gentlemen:

I am the head of the Derivatives Legal team for Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, including Lehman Brothers Special Financing, Inc. ("LBSF") (collectively, the "Debtors").  Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  LBSF commenced its voluntary chapter 11 case on October 3, 2008.

Reference is hereby made to your correspondence dated December 23, 2008 (the "Valuation Letter"; terms used and not otherwise defined herein shall have the meanings ascribed thereto in the Valuation Letter) indicating a Termination Amount payable to LBSF under the Master Agreement in the amount of $2,535,523.75.  We are respectfully unable to agree the Termination Amount for the reasons set forth in greater detail below but would welcome the opportunity to discuss a more appropriate valuation in order to avoid more costly dispute resolution alternatives.  Additionally, to the extent you have not yet transferred the Termination Amount as indicated in the Valuation Letter, kindly utilize the updated settlement instructions enclosed herewith.

Although we will ultimately require additional detail around such items in the Valuation Letter as the interest rates that were applied to the Termination Amount and the "Company amounts", the "Company expenses" item and evidence of the "Cost of interest rate cap," clearly the most problematic aspect of the Termination Amount is that it neglects to take into account the significant market value in favor of LBSF represented by the Transactions under the Master Agreement.  More specifically, and although LBSF does not dispute Consolidated Container's right to act reasonably in re-establishing hedges and incorporating associated costs into the "Loss" calculation, provided they are so incorporated "without duplication," "Loss" primarily requires that the determining party "reasonably determine[] in good faith…its total losses and costs (**or gain…**) in relation to this Agreement"(emphasis not in original). Consolidated Container has surely experienced such a gain by virtue of being relieved of its obligations under Transactions that were in-the-money to LBSF.  Moreover, while we can appreciate that market quotations are not in all circumstances available, we must note that "Loss" is also utilized when the parties have elected "Market Quotation" to govern the measure of damages but quotations are not available.  Clearly, the unavailability of quotations in the market does not mean that market values in favor of the defaulting party are ignored.

As mentioned above, we would very much welcome the ability to discuss the matters contained in this letter with you.  Feel free to contact me (212-526-7186; locke.mcmurray@lehman.com) or Steve Simonte (646-333-6022; steven.simonte@lehman.com).

Very truly yours,

Locke R. McMurray

cc:    Steven Simonte

To: Counterparties to Lehman Brothers Holdings Inc. Entities Listed Below

From: David Coles

Date: November 6, 2008

RE: Lehman Brothers Settlement Account Change – IMMEDIATE ACTION REQUIRED

Effective immediately (Thursday, November 6, 2008), please change the beneficiary wire information on derivative transactions. All funds should be sent to the new accounts listed with Citibank below. There are additional foreign currency settlement accounts on the second page. Your prompt attention and implementation by COB Friday, November 7, 2008 will be greatly appreciated. **Please make sure to include your entities name as the counterparty in the Reference field of the wire transfer, list what Lehman entity you are remitting funds to, and briefly describe what the transaction relates to.**

To the extent any funds are transferred to a Lehman entity in satisfaction of an amount that has been calculated by a counterparty, kindly be advised that unless otherwise specifically agreed Lehman is not able at this time to verify such calculations and must reserve its right to request further funds if its calculations later show a greater amount due, and also reserves any other rights that it may have under applicable law.

If you have any questions, please reach out to your Lehman/Barclays contact. Thank you for your prompt attention.

---

Citibank USD Bank Accounts
ABA #: 021-000-089
SWIFT Code: CITIUS33

Citibank N.A. New York
388 Greenwich Street
New York, NY 10013

---

| Legal Entity | Currency | Account Number | Account Name |
|---|---|---|---|
| Lehman Brothers Holdings Inc | USD | 3078-4686 | Lehman Brothers Holdings Inc – DIP – Cash Concentration |
| Lehman Brothers Special Financing Inc | USD | 3078-4731 | Lehman Brothers Special Financing Inc. - DIP |
| Lehman Brothers Financial Products Inc | USD | 3078-4758 | Lehman Brothers Financial Products Inc - DIP |
| Lehman Brothers Derivative Products Inc | USD | 3078-4766 | Lehman Brothers Derivative Products Inc -DIP |
| Lehman Brothers OTC Derivatives Inc | USD | 3078-4774 | Lehman Brothers OTC Derivatives Inc -DIP |
| Lehman Brothers Commercial Corporation | USD | 3078-4782 | Lehman Brothers Commercial Corp -DIP |
| Lehman Brothers Commodity Services Inc | USD | 3078-4803 | Lehman Brothers Commodity Services Inc -DIP |
| Lehman Commercial Paper Inc | USD | 3078-4723 | Lehman Commercial Paper Inc – DIP – Operating AC |

Citibank FX Bank Accounts
SWIFT Code: CITIGB2L

Citibank N.A. London
25 Canada Square
Canary Wharf
Citigroup Centre 2
London, England E14 5LB

| Legal Entity | Currency | Account Number | Account Name |
|---|---|---|---|
| Lehman Commercial Paper Inc | EUR | 001-2136694 | Lehman Bros Comm Paper Inc - DIP |
| | GBP | 001-2154560 | Lehman Bros Comm Paper Inc - DIP |
| | JPY | 001-2154552 | Lehman Bros Comm Paper Inc - DIP |
| | CAD | 001-2154544 | Lehman Bros Comm Paper Inc - DIP |
| Lehman Brothers Special Financing Inc | EUR | 001-2136325 | Lehman Bros Spec Fin Inc - DIP |
| | GBP | 001-2136368 | Lehman Bros Spec Fin Inc - DIP |
| | JPY | 001-2136341 | Lehman Bros Spec Fin Inc - DIP |
| | CAD | 001-2136333 | Lehman Bros Spec Fin Inc - DIP |
| Lehman Brothers Holdings Inc (UK Branch) | EUR | 001-2136384 | LBHI (UK Branch) - DIP |
| | GBP | 001-2136422 | LBHI (UK Branch) - DIP |
| | JPY | 001-2136414 | LBHI (UK Branch) - DIP |
| | CAD | 001-2136406 | LBHI (UK Branch) - DIP |

By: DJ Coles

Name: David Coles

Title:

Chief Financial Officer, Co-Treasurer, Controller and Executive Vice President:
Lehman Brothers Holdings, Inc.
Chief Financial Officer, Treasurer and Controller:
Lehman Brothers Financial Products, Inc.
Lehman Brothers Special Financing Inc.
Lehman Brothers Derivative Products Inc.
Lehman Brothers Commodity Services, Inc.
Lehman Brothers OTC Derivatives Inc.
Lehman Brothers Commercial Paper Inc.
Lehman Brothers Commercial Corporation

## EXHIBIT G

# LEHMAN BROTHERS

April 15, 2009

BY OVERNIGHT COURIER

Consolidated Container Company LLC
3101 Towercreek Parkway
Suite 300
Atlanta, GA 30339
Attention:    Chief Financial Officer

Dear Sir or Madam:

I am a member of the Derivatives Legal team for Lehman Brothers Holdings Inc. ("Holdings") and its affiliated debtors, including Lehman Brothers Special Financing Inc. ("Lehman" and, together with Holdings, the "Debtors"). On September 15, 2008 and periodically thereafter, Holdings and certain of its subsidiaries commenced with the United States Bankruptcy Court for the Southern District of New York voluntary cases under chapter 11 of title 11 of the United States Code. Lehman commenced its voluntary chapter 11 case on October 3, 2008.

Reference is made to (i) the 1992 ISDA Master Agreement (Multicurrency-Cross Border), dated as of April 26, 2007 (as amended, supplemented or modified, and including all schedules, annexes and exhibits thereto, and all confirmations exchanged pursuant to Transactions entered into in connection therewith, the "Master Agreement"), between Lehman and Consolidated Container Company LLC ("Counterparty"), (ii) the Notice of Event of Default and Designation of Early Termination Date, dated December 4, 2008, from Counterparty to Lehman declaring an Event of Default and designating an Early Termination Date (the "Notice of Termination"), (iii) the Notice of Termination Amount Due, dated December 23, 2008, from Counterparty to Lehman regarding the calculations pursuant to Section 6 of the Master Agreement and including a calculation of the Termination Amount (the "Calculation Statement") and (iv) the letter, dated December 30, 2008, from Lehman to Counterparty disputing certain statements in the Calculation Statement (the "Dispute Letter"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Agreement or, if not defined in the Master Agreement, in the 1992 ISDA Master Agreement (Multicurrency-Cross Border) published by the International Swaps and Derivatives Association, Inc.

Lehman is in the process of reviewing the Notice of Termination and the Calculation Statement and, further to the Dispute Letter, wishes to consolidate its requests for information relative to those communications by means of this letter. Accordingly, Lehman is seeking the following information:

April 15, 2009
Page 2

     1.    <u>Valuation Methodology and Quotations with respect to Terminated Transactions</u>.

(a) Please provide a narrative description of the methodology used to determine the valuations of Terminated Transactions, including how quotations, if any, were utilized and all other inputs, assumptions, values and applicable parameters.

(b) Please provide documentation to support any and all requests by or on behalf of Counterparty for quotations from Reference Market-makers or other persons concerning or otherwise related to the Terminated Transactions (including specifying to whom and when such requests were made, the form of request that was made, in what manner the Reference Market-makers responded and the nature of any follow-up requests).

     2.    <u>Unpaid Amounts</u>. Please specify any Unpaid Amounts included in Counterparty's calculations of any amounts due with respect to Terminated Transactions.

     3.    <u>Replacement Transactions</u>. Please provide documentation evidencing any transactions executed in order to replace any Terminated Transactions, including specifying any cash (or other consideration) paid or received by or to any person to replace the Terminated Transactions, the name of each entity that effectuated a replacement and when any such transactions were effected.

     4.    <u>Communications related to Market Quotations, Unpaid Amounts and/or Replacement Transactions</u>. Please provide all internal and external communications (including all transaction confirmations, other documents, e-mails, text messages, screen-shots, voice recordings, Bloomberg or other electronic texts, tapes, quotations requested and/or received or any other writings or information) evidencing or concerning the requests, responses, follow-up requests, determinations (including methodology used in such determinations), Unpaid Amounts and replacement transactions referred to in items 1, 2 and 3 above.

     5.    <u>Persons involved with respect to valuations and/or replacement transactions</u>. Please provide the names, contact information (including telephone numbers, facsimile numbers and e-mail addresses) and description of the roles of each person (whether such person is inside or outside your organization, including any financial advisors, companies, entities or other persons consulted in connection with any Terminated Transactions) who was involved in the valuation of any Terminated Transactions or in the replacement of any Terminated Transactions.

     6.    <u>Fees and expenses</u>. Please provide supporting documents and/or other information related to all fees, expenses or other ancillary items incurred by Counterparty with respect to Terminated Transactions.

     7.    <u>Financial/Accounting Entries</u>. Please provide any profit, loss, valuation or other financial or accounting entries made on Counterparty's books and records as a result of

April 15, 2009
Page 3

the termination of each Terminated Transaction, and all supporting documents or other information related to the determination of such amounts.

8.    <u>Market information</u>.  Please provide the historical bid/offer spread and midpoint (or estimate) for each Terminated Transaction as of the close of business for each day from and including September 12, 2008 to and including the Early Termination Date designated by Counterparty for each Terminated Transaction.  Please provide Counterparty's internal valuation models and external sources (<u>e.g.</u> screen shots from Bloomberg or other financial services) evidencing these amounts.

9.    <u>Documentation of Terminated Transactions</u>.  Please provide copies of all master agreements, other agreements, confirmations and other documents related to Terminated Transactions, including with respect to rebooking of Terminated Transactions.

Please forward the information requested herein as soon as possible, and in any case no later than May 1, 2009.  Please note that if you do not provide the requested information described above, Lehman may pursue legal avenues to obtain such information from you.  This letter in no way constitutes an admission or acknowledgment by Lehman that the Terminated Transactions were actually terminated or were terminated properly, that the amount set forth in the Calculation Statement has been accurately calculated or is due or owing by Lehman, or that such amount accrues interest.

The foregoing information requests are without waiver of or prejudice to any and all of the rights and remedies of Lehman in connection with the above transactions, including under each applicable ISDA Master Agreement and with respect to your purported termination and valuation calculation and under any applicable law.

Please contact me at (646) 333-9836 or <u>david.downie@lehman.com</u> with any questions related to the foregoing.

Very truly yours,

/s/ David C. Downie

David C. Downie

cc: General Counsel / Consolidated Container Company LLC

# EXHIBIT H



# Consolidated Container Company

Corporate Headquarters
3101 Towercreek Parkway
Suite 300
Atlanta, Georgia 30339

June 8, 2009

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Holdings Inc.
1271 Sixth Avenue, 40th Floor
New York, New York 10020
Attn:   Derivatives Legal

**RECEIVED** JUN 0 9 2009
*Hand*

Re:   Request for Information related to Calculation of Termination Amount

Dear Sirs,

We have reviewed David Downie's letter of April 15, 2009 and our counsel has had discussions with Kevin Chichester related to the information requests set forth in such letter. We incorporate by reference the definitions and statements made in our letters of December 4 and 23, 2008 respectively.

With respect to Lehman's request for information related to the Company's calculation of the Termination Amount, we are not willing to incur the substantial time and expense required to engage in the litigation style discovery requested in Mr. Downie's April 15, 2009 letter. Mr. Chichester emphasized to our counsel in their call of April 27 that Lehman principally was interested in the factual basis for the Company's statement in its letter of December 23 that "… the Company sought bids for replacement swaps, including from an affiliate of its agent bank, Deutsche Bank Securities Inc. The Company did not receive any bids which the Company believed in good faith were executable or represented realistic replacements for the Lehman swaps."

We are willing to disclose the following in response to Lehman's information request. Following the Lehman bankruptcy and corresponding default under the Master Agreement, the Company engaged PMC Treasury Inc. ("PMC") to solicit bids in an effort to replace the Lehman swaps on terms identical to those with Lehman. Accordingly, PMC solicited bids on behalf of the Company from various financial institutions seeking quotations of relevant rates or prices to replace the Lehman swaps. The Company received four responses to this inquiry. Of those responses, the Company received one response that was disregarded for a variety of reasons, including a clear conflict of interest and the conditional nature of the bid. The qualified responses were not accompanied with specific prices since the counterparties stated verbally or in writing to the Company's representative, PMC, that they were not willing to pay any price to execute a replacement swap at that time and under the conditions then existing in the financial markets. As a result, the Company concluded in good faith that, based on the market data it received, there was no value associated with the Lehman swaps and calculated the Termination Amount accordingly.

The Company remains willing to discuss a reasonable compromise of this dispute. It does not desire litigation, although it is prepared to litigate if it is unable to reach a reasonable resolution with Lehman. The Company is also willing to consider mutually employing a professional mediator to help aid in the process of reaching a reasonable compromise to our dispute.

Please call me if you would like to explore further the idea of mediating our differences.

Sincerely,

**CONSOLIDATED CONTAINER COMPANY LLC**

By: _R. Sehring_

Name: Richard P. Sehring
Title:   Chief Financial Officer

Telephone  678-742-4600                                   Fax  678-742-4750

# Exhibit I

# EXHIBIT I

## SCHEDULE OF DOCUMENTS TO BE PRODUCED

### DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below.

1.      "Concerning" shall have the meaning set forth in Southern District of New York Local Civil Rule 26.3(c)(7).

2.      "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and includes, without limitation, reports, correspondence, minutes, emails, instant messages, spreadsheets, memoranda, notes and all other writings, Bloomberg screenshots, drawings, graphs, charts, photographs, sound recordings and electronic or computerized data compilations from which information can be obtained and/or translated, if necessary, through electronic detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of this term. The word "including" means including, but not limited to.

3.      The terms "Debtor," "Debtors," "LBHI" or "LBSF" shall mean Lehman Brothers Holdings, Inc. or Lehman Brothers Special Financing, Inc.

4.      "Consolidated," "You," and "Your" shall mean Consolidated Container Company LLC and any person acting on its behalf or under its control, including any of its agents, subsidiaries, affiliates, predecessors, successors, or representatives.

5.      The terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of this request all documents which might otherwise be considered to be outside of that scope.

6.      The word "each" shall mean both "each" and "every", and the word "every" shall mean both "each" and "every," as appropriate in order to bring within the scope of this Request documents which might otherwise be beyond its scope.

7.      The term "Master Agreement" shall mean the 1992 ISDA Master Agreement and the schedule thereto, entered into by Consolidated and LBSF as of April 26, 2007.

8.      The term "Replacement Transactions" shall mean transactions entered into by Consolidated to replace the Terminated Transactions, including an interest rate cap.

9.      The term "Terminated Transactions" means the transactions terminated by Consolidated in its December 4, 2008 letter to LBSF.

10.     The term "Termination Date" means December 5, 2008.

11.     The term "Unpaid Amounts" shall mean the amounts that Consolidated was scheduled to pay to LBSF on or prior to the Termination Date but which it failed to pay.

12.     The term "Valuation Letter" shall mean the letter from Consolidated, dated December 23, 2008.

## <u>GENERAL INSTRUCTIONS</u>

The following General Instructions apply to each request set forth herein.

1.      Each request seeks production of each Document, in its entirety, without abbreviation or expurgation, and all drafts and non-identical copies of each Document.

2.      If any Document requested herein was formerly in Your possession, custody or control (or that of Your Representative) and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

3.      If any Document requested herein is withheld on the basis of any claim of privilege, You are requested to submit, in lieu of any such Document, a written statement (a) identifying the person(s) who prepared or authored the Document, and, if applicable, the person(s) to whom the Document was sent or shown, (b) specifying the date on which the Document was prepared or transmitted, (c) describing the nature of the Document (e.g., letter, telegram, etc.), (d) stating briefly why the Document is claimed to be privileged or to constitute work product, and (e) identifying the paragraph of this request to which the Document relates.

4.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, those portions of the Document subject to the

claim of privilege shall be deleted or redacted from the Document, the instructions in the preceding paragraph shall be applicable, and the rest of the Document shall be produced.

5.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in this request.  The method for production of each category is to be identified at the time of production.  Documents are to be produced in full and unexpurgated form.

6.      Each page of each document should be numbered consecutively. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

7.      Documents attached to each other (physically or via electronic mail) should not be separated.

8.      In producing the requested documents, even though the requests are directed to "you," furnish all documents which are available to you, including documents in the possession of any of your officers, directors, employees, agents, attorneys, investigators, accountants or consultants and not merely such documents in your possession.

9.      The requests which follow are to be regarded as continuing, and Consolidated is requested to provide by the way of supplementary compliance herewith, such additional documents as Consolidated may hereafter obtain, which will augment the documents now produced in response to the requests below.  Such additional documents are to be produced at the offices of Weil, Gotshal & Manges LLP promptly after receipt thereof.

10.     The documents are to be produced for examination at the office of

the Debtors' bankruptcy counsel, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New

York, New York  10153 (Attention:  Lori R. Fife, Richard W. Slack and Robert J.

Lemons), by 10:00 a.m. (New York time) on August 25, 2009.

11.     At a future date, the Debtors may request the production of

additional documents based on information revealed during this document request.

12.     At a future date, the Debtors may request to depose additional

individuals based on information revealed during this document request.

### RELEVANT TIME PERIOD

Unless otherwise stated, the relevant time period for each of the following

requests is from and including the Termination Date through the present.

### REQUESTS FOR PRODUCTION

REQUEST NO. 1

All documents concerning any valuation of the Terminated Transactions,

including, but not limited to, the valuation contained in the Valuation Letter.

REQUEST NO. 2

All documents containing or reflecting a description, in whole or in part,

of the methodology used by Consolidated to determine the value of the Terminated

Transactions, including any documents describing how quotations, if any, were utilized,

and documents reflecting requests by or on behalf of Consolidated for quotations from

leading dealers or any other persons.

REQUEST NO. 3

All documents concerning any Unpaid Amounts, including accrued

interest thereon, included in Consolidated's calculations of any amounts due with respect

to the Terminated Transactions.

REQUEST NO. 4

All documents concerning any Replacement Transaction, including, but

not limited to, documents concerning (i) any consideration paid or received in connection

with a Replacement Transaction, (ii) the names of any entity which effectuated a

replacement, and (iii) when any such transaction was effected.

REQUEST NO. 5

All documents concerning any communications between and among, or on

behalf of, Consolidated and any third party, including Consolidated's representatives,

advisors, agents, accountants, and counsel related to quotations from leading dealers,

Loss, Unpaid Amounts, and/or Replacement Transactions in connection with the

Terminated Transactions.

REQUEST NO. 6

Documents sufficient to identify all persons who were involved in the

valuation of any Terminated Transactions or in the replacement of any Terminated

Transactions and their roles in connection therewith.

REQUEST NO. 7

All documents concerning fees, expenses, or other ancillary items incurred

or expected to be incurred by Consolidated with respect to the Terminated Transactions.

REQUEST NO. 8

All documents sufficient to identify any financial or accounting entries made on Consolidated's books and records as a result of the termination of each Terminated Transaction, and all supporting documents or other information related to the determination of such amounts.

REQUEST NO. 9

Documents sufficient to identify the historical bid/offer spread and mid-point (or estimate) for each Terminated Transaction as of the close of business for each day from and including September 12, 2008 to and including the Termination Date, and Consolidated's internal valuation models and external sources evidencing these amounts.

REQUEST NO. 10

Documents sufficient to identify all master agreements, other agreements, confirmations and other documents constituting the Agreement between the parties in connection with the Terminated Transactions.