# **EXHIBIT D**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of **January 16, 1997**

## LEHMAN BROTHERS
## SPECIAL FINANCING INC.      and      **FIRSTBANK OF PUERTO RICO**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions

Accordingly, the parties agree as follows:--

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

1992 by International Swap Dealers Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**LEHMAN BROTHERS**
**SPECIAL FINANCING INC.**
*(Name of Party)*

By: _____

Name:
Title:    **Bruce M. Witherell**
Date:    **Managing Director**

**FIRSTBANK OF PUERTO RICO**
*(Name of Party)*

By: _____

Name:  Luis M. Cabrera
Title:    Senior Vice President
Date:    July 15, 1997

**(Multicurrency-Cross Border)**

**SCHEDULE**
**to the**
**Master Agreement**
dated as of **January 16, 1997,**
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under
the laws of
the State of Delaware
and
**FIRSTBANK OF PUERTO RICO** ("Party B")
a commercial bank organized under the laws of
Puerto Rico

# Part 1: Termination Provisions

In this Agreement:-

(a)     **"Specified Entity"** means in relation to Party A for the purpose of:-

   Section 5(a)(v),          Not applicable.

   Section 5(a)(vi),         Not applicable.

   Section 5(a)(vii),        Not applicable.

   Section 5(b)(iv),         Not applicable.

   and in relation to Party B for the purpose of:-

   Section 5(a)(v),          Not applicable.

   Section 5(a)(vi),         Not applicable.

   Section 5(a)(vii),        Not applicable.

   Section 5(b)(iv),         Not applicable.

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

   The following provisions apply:-

   **"Specified Indebtedness"** will have the meaning specified in Section 14.

   **"Threshold Amount"** means the lesser of (i) $40 million or (ii) two percent (2%)

of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Holdings"), in the case of Party A and Holdings (or its equivalent in any other currency), and the lesser of (i) $40 million or (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

(d) The **"Credit Event Upon Merger"** provisions of <u>Section 5(b)(iv)</u> will apply to Party A and Party B.

(e) The **"Automatic Early Termination"** provisions of <u>Section 6(a)</u> will <u>not</u> apply to either Party A or Party B.

(f) **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Market Quotation and the Second Method will apply.

(g) **"Termination Currency"** means United States Dollars ("USD").

(h) **Additional Termination Event** will apply.   The following shall constitute Additional Termination Events:-

    (i) Party B fails to maintain a Long-term Bank Deposits rating of at least Baa3 as determined by Moody's Investors Service Inc.

    For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

    (ii) A breach by Party B of the FIRREA Provisions set forth under Part 5(a) of this Schedule.

    For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

## Part 2: Tax Representations

(a)     **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> and <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction of the agreement of the other party contained in Section <u>4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, <u>provided</u> that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> by reason of material prejudice to its legal or commercial position

(b)     **Payee Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the state of Delaware and Party B represents that it is a bank duly organized and validly existing under the laws of Puerto Rico.

## Part 3: Agreement to Deliver Documents

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
| --- | --- | --- |
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |

(b)    Other documents to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
| --- | --- | --- | --- |
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement | Yes |
| Party A and Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party A substantially in the form of Exhibit D to this Schedule. | Promptly after execution of this Agreement | Yes |
| Party B | A copy of the annual report of the party (and any Credit Support Provider) containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A copy of the unaudited financial statements of the party (and any Credit Support Provider) for its most recent fiscal quarter and prepared in accordance with generally accepted accounting practices consistently applied. | Upon execution of this Agreement and thereafter upon request. | Yes |
| Party B | A certified copy of the resolution or resolutions (the "Authorizing Resolution") of the board of directors or loan committee of Party B, certified by a secretary, or an assistant secretary of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction entered into under this Agreement. | Upon execution of this Agreement (unless an Authorizing Resolution has previously been furnished by Party B to Party A) and, with respect to each Transaction not covered by a previously-furnished Authorizing Resolution, within five (5) Business Days of the Trade Date. | Yes |

## Part 4:  Miscellaneous

(a)    **Addresses for Notices.**  For the purpose of <u>Section 12(a)</u>:-

Address for notices or communications to Party A:-

Address:          Lehman Brothers Inc.
                  Derivative Finance Department
                  3 World Financial Center, 12th Floor
                  New York, New York 10285-1200

                  <u>Attention:</u>          Documentation Manager

Telephone No.:    (212) 526-1877

Facsimile No.:    (212) 528-7097

                          For all purposes.

Address for notices or communications to Party B:-

Address:          FirstBank of Puerto Rico
                  Treasury and Investment Department
                  1519 Ponce de León, Stop 23
                  San Juan, PR 00908

                  <u>Attention:</u>          Operations Manager

Telephone No.:    787-729-8111

Facsimile No.:    787-724-5965

                          For all purposes.

(b)    **Process Agent.**  For the purpose of <u>Section 13(c)</u>, will <u>not</u> apply to either Party A or Party B.

(c)    **Offices.**  The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.**  For the purpose of <u>Section 10(c)</u> of this Agreement:-

Party A is not a Multibranch Party.

Party B **[Please advice.]**

(e)    **Calculation Agent.**  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    **Credit Support Document.**  Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection

with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:-

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B of this Schedule.

In the case of Party B, the Credit Support Annex.

(g) **Credit Support Provider.**

Credit Support Provider means in relation to Party A, Holdings.

Credit Support Provider means in relation to Party B, not applicable.

(h) **Governing Law.**   This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i) **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of Subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions (in each case starting from the date of this Agreement).

(k) **"Affiliate"** will have the meaning specified in Section 14 of this Agreement.

## Part 5:  Other Provisions

**FIRREA Provisions:**

(a)   **Maintenance of Records.**  Party B agrees to maintain in its official books and records: (i) a copy of the confirmation for each Transaction, for so long as such Transaction remains outstanding; and (ii) a copy of the Agreement and the Authorizing Resolution, for so long as any Transaction under the Agreement remains outstanding.

(b)   **Authorizing Resolution Representation.**   Party B makes the following representation to Party A, which representation will be deemed repeated at the times set forth in <u>Section 3</u> of the Agreement: An Authorizing Resolution, as defined in Part 3 of this Schedule, is in full force and effect.

(c)   **Qualified Financial Contract.**  Party A and Party B agree that each Transaction and the Agreement are a "swap agreement" and a "qualified financial contract" and that the Agreement is a "master agreement", for purposes of Section 11(e)(8) of the Federal Deposit Insurance Act or any successor provisions.

(d)   Party B agrees that this Agreement, any Credit Support Document to which it is a party, each Confirmation, and any other documentation relating to this Agreement to which it is a party or that it is required to deliver will be executed and delivered by a duly appointed or elected and authorized officer of Party B of the level of vice-president or higher.

(e)   Party A and Party B each represent that it will engage in "financial contracts" as a counterparty on "both sides of one or more financial markets" as set forth in 12 C.F.R. Section 231.3 of Regulation EE issued by the Board of Governors of the Federal Reserve System.

**Miscellaneous:**

(f)   **Country of Domicile.**  The country of domicile of Party A and Party B is the United States of America.

(g)   **Confirmation.**  Each Confirmation supplements, forms part of, and will be read and construed as one with, this Agreement.  A form of Confirmation is set forth as Exhibit A hereto.

(h)   **Tax Forms** means any form or document that may be required or reasonably requested in order to allow the other party to make a payment under the Transaction without any deduction or withholding for an account of any Tax or with such deduction or withholding at a reduced rate.

(i)   **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at

par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(j)     **Transfer.**  Section 7 of the Agreement is hereby modified by inserting the following after the word "party" but before the comma in the third line thereof:

", provided, however, that such consent shall not be unreasonably withheld"

(k)     For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

(l)     **Trial By Jury.**  Each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction.

(m)    **Accuracy of Specified Information.**  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(n)     **Definitions.**  This Agreement, each Confirmation, and each Transaction are subject to the 1991 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. as amended, supplemented, updated, restated, and superseded from time to time (the "Definitions"), and will be governed in all respects by the Definitions (except that references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions").  The Definitions as so modified, are incorporated by reference in, and made part of, this Agreement and each Confirmation as if set forth in full in this Agreement and such Confirmations.  Subject to Section 1(b), in the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.  Also, subject to Section 1(b), in the event of any inconsistency between the provisions of any Confirmation and this Agreement, or the Definitions, such Confirmation will prevail for the purpose of the relevant Transaction.

(o)     **Representations.**  Section 3 is hereby amended by adding the following additional Subsections:

    (g)     **No Agency.**  It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

    (h)     **Eligible Swap Participant.**  It is an "eligible swap participant" as defined in the Part 35 Regulations of the U.S. Commodity Futures Trading Commission.

(i)    **No Reliance.**  Party B acknowledges and agrees that (i) Party A is acting solely in the capacity of an arm's length contractual counterparty, with respect to this Agreement and any Transaction hereunder and (ii) Party A is not acting as a financial advisor or fiduciary of Party B (or in any similar capacity) with respect to this Agreement and any Transaction hereunder regardless of whether Party A provides Party B with market information or its views. Party B represents to Party A (which representation shall be deemed to be repeated by Party B on each date on which Transaction is entered into) that it understands the risks of the Transactions it enters and any legal, regulatory, tax, accounting and economic consequences arising therefrom and that its decision to enter into each Transaction has been based solely on the independent evaluation of Party B and its representatives in light of Party B's financial capabilities and objectives.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.


**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*(Name of Party)*

By: _____

Name:    **Bruce M. Witherell**
Title:    **Managing Director**
Date:

**FIRSTBANK OF PUERTO RICO**
*(Name of Party)*

By: _____

Name:    Luis M. Cabrera
Title:    Senior Vice President
Date:    July 15, 1997

<u>EXHIBIT A to Schedule</u>

**Form of Confirmation**

Date.

To:          FirstBank of Puerto Rico

             Telephone
             Telecopier.

From:        Lehman Brothers Special Financing Inc.

**Subject:**   **Swap Transaction** (Ref: S__ _-__ )

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Swap Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") (guaranteed by Lehman Brothers Holdings Inc. ("Holdings")) and FirstBank of Puerto Rico ("Party B"). This communication constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

This confirmation supplements, forms part of, and is subject to, the Master Agreement, which the parties have entered into, dated January 16, 1997, between Party A and Party B (the "Swap Agreement"). All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represent that entering into the Swap Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party, and it has reached its own conclusions about the Swap Transaction, and any legal, regulatory, tax, accounting or economic consequences arising from the Swap Transaction, and has concluded that the Swap Transaction is suitable in light of its own evaluation of the Swap Transaction and its own financial capabilities and sophistication.

This Confirmation incorporates the definitions and provisions contained in the 1991 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"). In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern. The Definitions shall apply to this Confirmation even if the Swap Agreement between the parties incorporate the provisions of the 1985 or 1986 editions of the ISDA Code of Standard Wording, Assumptions and Provisions for Swaps.

The terms of the particular Swap Transaction to which this Confirmation relates are as follows:

| | |
|---|---|
| Party A: | LEHMAN BROTHERS SPECIAL FINANCING INC. |
| Party B: | FIRSTBANK OF PUERTO RICO |

[Notional Amount:]

Trade Date:

Effective Date:

Termination Date:

[Initial Exchange:

Initial Exchange Date:

Party A Initial Exchange Amount:
Party B Initial Exchange Amount:

Final Exchange:

Final Exchange Date:

Party A Final Exchange Amount:

Party B Final Exchange Amount:]

FIXED AMOUNTS:

Fixed Rate Payer:                              [Party A/B]

[Fixed Rate Payer
Currency Amount:]

Fixed Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]:          [          ], subject to adjustment in accordance with the [Following/Modified Following/Preceding] Business Day convention, with respect to a _____ Banking Day and a _____ Banking Day [with No Adjustment of Period End Dates]

[Fixed Amount:]

Fixed Rate:

Fixed Rate Day

Count Fraction:

FLOATING AMOUNTS:

Floating Rate Payer:                        [Party B/A]

[Floating Rate Payer
Currency Amount:]

Floating Rate Payer Payment          [          ], subject to adjustment in
Dates [or, Period End Dates, if       accordance        with        the
Delayed    Payment    or    Early     [Following/Modified
Payment applies]:                     Following/Preceding] Business Day
                                      convention,  with  respect  to  a
                                      _____  Banking  Day
                                      and  a  _____  Banking
                                      Day [with No Adjustment of Period
                                      End Dates]

Floating Rate for initial
Calculation Period:

Floating Rate Option:

Designated Maturity:

Floating Rate Spread:                 [plus/minus]    % p.a.

Floating Rate Day
Count Fraction:

Reset Dates:

[Rate Cut-off Dates:]

[Method of Averaging:                 Unweighted/Weighted Average Rate]

Compounding:                          Applicable/Inapplicable

[Compounding Dates:]

**Calculation Agent:**

**Offices:**                          Party A is not a Multibranch Party

                                      Party B is not a Multibranch Party

                                      (The Office of Party B is its ____ Branch)

**Other Provisions:**

**Payment instructions for
Party A in _____:**

**Payment instructions for
Party B in _____:**

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transaction by signing in the space provided below and sending a copy of the executed Confirmation by telecopier (212-528-6927) to the Client Services Group, Lehman Brothers Special Financing Inc.

It has been a pleasure working with you on this transaction and we look forward to working with you again in the future.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Name:_____

Title:_____

Confirmed as of the
date first written:

FIRSTBANK OF PUERTO RICO

By:_____

Name:_____

Title:_____



# ISDA®

*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

## to the Schedule to the
## Master Agreement

dated as of **January 16, 1997**

between

**LEHMAN BROTHERS
SPECIAL FINANCING INC.**
*"Party A"*

and

**FIRSTBANK OF PUERTO RICO**
*"Party B"*

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)    *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)    *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    **Delivery Amount.** Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the **"Delivery Amount"** applicable to the Pledgor for any Valuation Date will equal the amount by which:

　　　(i) the Credit Support Amount

　　　exceeds

　　　(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    **Return Amount.** Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the **"Return Amount"** applicable to the Secured Party for any Valuation Date will equal the amount by which:

　　　(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

　　　exceeds

　　　(ii) the Credit Support Amount.

**"Credit Support Amount"** means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; provided, however, that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    **Conditions Precedent.** Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

　　　(i)  no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

　　　(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    **Transfer Timing.** Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    **Calculations.** All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA® 1994

(d)    *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

## Paragraph 5. Dispute Resolution

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3

**ISDA® 1994**

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA® 1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)     *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

5

(b)     *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i) the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)     *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)     *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**ISDA® 1994**

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA® 1994

**Paragraph 12. Definitions**

As used in this Annex:

**"*Cash*"** means the lawful currency of the United States of America.

**"*Credit Support Amount*"** has the meaning specified in Paragraph 3.

**"*Custodian*"** has the meaning specified in Paragraphs 6(b)(i) and 13.

**"*Delivery Amount*"** has the meaning specified in Paragraph 3(a).

**"*Disputing Party*"** has the meaning specified in Paragraph 5.

**"*Distributions*"** means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

**"*Eligible Collateral*"** means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

**"*Eligible Credit Support*"** means Eligible Collateral and Other Eligible Support.

**"*Exposure*"** means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

**"*Independent Amount*"** means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

**"*Interest Amount*"** means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

    (x) the amount of that Cash on that day; multiplied by

    (y) the Interest Rate in effect for that day; divided by

    (z) 360.

**"*Interest Period*"** means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

**"*Interest Rate*"** means the rate specified in Paragraph 13.

**"*Local Business Day*"**, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA® 1994

"*Minimum Transfer Amount*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Notification Time*" has the meaning specified in Paragraph 13.

"*Obligations*" means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

"*Other Eligible Support*" means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

"*Other Posted Support*" means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

"*Pledgor*" means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

"*Posted Collateral*" means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

"*Posted Credit Support*" means Posted Collateral and Other Posted Support.

"*Recalculation Date*" means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

"*Resolution Time*" has the meaning specified in Paragraph 13.

"*Return Amount*" has the meaning specified in Paragraph 3(b).

"*Secured Party*" means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

"*Specified Condition*" means, with respect to a party, any event specified as such for that party in Paragraph 13.

"*Substitute Credit Support*" has the meaning specified in Paragraph 4(d)(i).

"*Substitution Date*" has the meaning specified in Paragraph 4(d)(ii).

"*Threshold*" means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

"*Transfer*" means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

> (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

> (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

> (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

> (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

"*Valuation Agent*" has the meaning specified in Paragraph 13.

"*Valuation Date*" means each date specified in or otherwise determined pursuant to Paragraph 13.

"*Valuation Percentage*" means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

"*Valuation Time*" has the meaning specified in Paragraph 13.

"*Value*" means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

  (i) Eligible Collateral or Posted Collateral that is:

   (A) Cash, the amount thereof; and

   (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any.

  (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

  (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

## CREDIT SUPPORT ANNEX
Elections and Variables

Dated as of
**January 16, 1997**

between
**Lehman Brothers Special Financing Inc. ("Party A")**

and
**FirstBank of Puerto Rico ("Party B")**

# Paragraph 13.  Elections and Variables

(a)    Security Interest for "Obligations".  The term "Obligations" as used in this Annex includes the following additional obligations:

With respect to Party A and Party B:  Not applicable.

(b)    **Credit Support Obligations.**

    (i)    Delivery Amount, Return Amount and Credit Support Amount

        (A)    **"Delivery Amount"** has the meaning specified in Paragraph 3(a).

        (B)    **"Return Amount"** has the meaning specified in Paragraph 3(b).

        (C)    **"Credit Support Amount"** means, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to Pledgor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    **Eligible Collateral.**    The following items will qualify as **"Eligible Collateral"** for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A)    Cash, in the form of U.S. Dollars | [X] | [X] | 100% |
| (B)    negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than one year. ("Treasury Bills") | [X] | [X] | 100% |

| | Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|---|
| (C) | negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than one year but not more than ten years ("Treasury Notes") | [X] | [X] | 100% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than ten years. ("Treasury Bonds") | [X] | [X] | 100% |
| (E) | Other negotiable debt obligations issued by the Federal National Mortgage Association, the Government National Mortgage Corporation the Federal Home Loan Mortgage Corporation, provided, however, that such securities may not be (a) multi-class or multi-branch securities or (b) paying interest or principal only ("Agency Securities") | [X] | [X] | 100% |

(iii)    **Other Eligible Support**.  The following items will qualify as **"Other Eligible Support"** for the party specified:  Not applicable.

(iv)    **Thresholds.**

    (A)    **"Independent Amount"** shall mean an amount, if any, as set forth in a confirmation with respect to both Party A and Party B.

    (B)    **"Threshold"** means, with respect to both Party A and Party B, USD$0 (zero).

    (C)    **"Minimum Transfer Amount"** means, with respect to a party, USD$250,000; provided, that if an Event of Default has occurred and is continuing with respect to the Pledgor, the Minimum Transfer Amount shall be USD$0 zero.

    (D)    **"Rounding"**.  The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD$1,000.

(c)    **Valuation and Timing.**

(i)    **"Valuation Agent"** means Party A.

(ii)    **"Valuation Date"** means the first and fifteenth calendar day of each calendar month or, if such day does not fall on a Local Business Day, then the next following day that is a Local Business Day plus any two (2) additional Local Business Days during each month selected by a party hereto.

(iii)    **"Valuation Time"** means 1:00 p.m., New York time (or earlier in the day if the markets relevant to such determination end business earlier on such

11

day); _provided_ that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

    (iv)    **"Notification Time"** means by 3:00 p.m., New York time, on a Local Business Day.

(d)    **Conditions Precedent and Secured Party's Rights and Remedies.** The following Termination Event(s) will be a "Specified Condition" for the party specified (that party being the Affected party if the Termination Event occurs with respect to that party):

| Event | Party A | Party B |
| --- | --- | --- |
| Illegality | [ ] | [ ] |
| Tax Event | [ ] | [ ] |
| Tax Event Upon Merger | [ ] | [ ] |
| Credit Event Upon Merger | [X] | [X] |

(e)    **Substitution**

    (i)    **"Substitution Date"** has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here:  Not later than two (2) Local Business Days following the Secured Party's receipt of Substitute Credit Support.

    (ii)    **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    **Dispute Resolution**

    (i)    **"Resolution Time"** means 1:00 p.m. New York time on the fifth Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 5.

    (ii)    **"Value."** For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

        With respect to any Treasury Bills, Treasury Notes, Treasury Bonds or Agency Securities (referred to herein as "Government Obligations") the sum of (I) (x) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day, next preceding such date, on which such quotations were available, plus (II) the accrued interest on such Government Obligations (except to the extent Transferred to a party pursuant to this Agreement or included in the applicable price referred to in (I) of this Clause) as of such date.

    (iii)    **Alternative.** Not Applicable.

(g)    **Holding and Using Posted Collateral.**

(i)    **Eligibility to Hold Posted Collateral; Custodians.**

Party A and or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(1)    Party A  Party A is not a Defaulting Party.

(2)    The Custodian, if any, is either (a) a wholly owned, direct or indirect, subsidiary of Lehman Brothers Holdings Inc. or (b) bank or trust company located in the State of New York having total assets of at least $100,000,000.

Initially, the Custodian for Party A is:  Not applicable.

Party B and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(1)    Party B is not a Defaulting Party.

(2)    The Custodian, if any, is a bank or trust company located in the State of New York having total assets of at least $100,000,000.

Initially, the Custodian for Party B is :  Not applicable.

(ii)    **"Use of Posted Collateral"** The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    **Distributions and Interest Amount.**

(i)    **"Interest Rate."** The Interest Rate will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii)    **"Transfer of Interest Amount."** The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii)    **"Alternative to Interest Amount."** Not applicable.

(i)    **Additional Representation(s).** Not applicable.

(j)    **Other Eligible Support and Other Posted Support.**

(i)    **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(ii)    **"Transfer"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k)   **Demands and Notices.**  All demands, specifications and notices made by a party
to this Annex will be made pursuant to the Notices Section of this Agreement.

(l)   **Addresses for Transfers.**

Party A.

(i)   In the case of cash, by wire transfer of immediately available funds for
credit to a bank account of Party A to be designated in Party A's demand
for the Delivery Amount or Return Amount, as applicable.

(ii)  In the case of securities or obligations that can be paid or delivered by
book-entry on the records of U.S. Federal Reserve Banks, delivery to
Chase, for credit to the account of Lehman Brothers Inc., as agent for Party
A   (in   telegraphic   abbreviation,   CHASE   NYC/LEHMAN,
ABA #021000021).

Party B:

[Indicate delivery instructions]

(m)   **Other Provisions.**

(i)   **Additions to Paragraph 3.**  The following subparagraph (c) is hereby
added to Paragraph 3 of this Annex:

(c)   **No offset.**  On any Valuation Date, if both parties are required to
Transfer an Independent Amount under Paragraph 3(a) then the
amounts of those obligations will not offset each other.

EXHIBIT B to Schedule

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and FIRSTBANK OF PUERTO RICO ("Party B") have entered into a Master Agreement dated as of January 16, 1997, (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any

payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)  The Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination.  Termination of this Guarantee shall not affect Guarantor's liability hereunder as obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(f)  Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor

(g)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 200 Vesey Street, 28th Floor, New York, New York  10285 USA (Facsimile No. (212) 526-1467) with a copy to Lehman Brothers Special Financing Inc., Attention: Documentation Manager at 3 World Financial Center, 12th Floor, New York, New York 10285-1200  (Facsimile No. (212) 528-7097).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.


LEHMAN BROTHERS HOLDINGS INC.

By: _____    _____

Title: _____    _____