COSTELL & CORNELIUS LAW CORPORATION
1299 Ocean Avenue, Suite 400
Santa Monica, California 90401
Telephone: (310) 458-5959
Facsimile: (310) 458-7959
Jeffrey Lee Costell, Esq.

Attorneys for Easton Investments II

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **08-13555 (JMP)** |
| | **(Jointly Administered)** |
| **Debtors.** | |

---------------------------------------------------------

# OPPOSITION OF EASTON INVESTMENTS II, A CALIFORNIA LIMITED PARTNERSHIP TO DEBTORS' MOTION FOR AUTHORIZATION TO IMPLEMENT ALTERNATIVE DISPUTE RESOLUTION

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

**I.      SUMMARY OF CLAIM**

On or about April 13, 2006, Easton Investments II, a California Limited Partnership ("Creditor") and Lehman Brothers Special Financing, Inc. (the "Debtor") entered into that certain Rate Cap Agreement (BMA). A true and correct copy of the Rate Cap Agreement is attached hereto

as Exhibit "A" (the "Agreement").  The Creditor was required to obtain the Agreement under the terms of its $20,800,000.00 bond financing agreements (the "Bond Financing") with Federal Home Loan Mortgage Corporation ("Freddie Mac").  The Creditor was under an express, mandatory obligation by virtue of its loan agreements with Freddie Mac to maintain at all times a qualifying "hedge" to protect both Freddie Mac and the Creditor against the variable interest rate risk inherent in the Bond Financing.  Freddie Mac required that the Agreement have certain terms including, but not limited to, termination and default provisions, damage quantification provisions and procedures upon the default or termination of the Agreement for the qualification of replacement agreements and the providers thereof.

Creditor has fully performed all duties and obligations under the Agreement, other than those duties which have been excused or waived as a result of the Debtor's breach of the Agreement.

On or about October 8, 2008, Debtor became unable to perform under the Agreement due to its bankruptcy filing and terminated and breached the Agreement as a result of the same (the "Termination").

Shortly after October 8, 2008, Freddie Mac became aware of the Debtor's bankruptcy filing and the Termination and immediately contacted the Creditor and demanded that the Creditor obtain a replacement for the terminated Agreement and obtain a replacement for the same.

On or about October 17, 2008, the Creditor gave written notice to the Debtor that it was compelled also to terminate the Agreement under Sections 10 through 13 because of the Debtor's inability to perform its duties thereunder and that the Debtor was liable for damages under the Agreement on account of the same.  On or about October 17, 2008, Freddie Mac consented to the termination of the Agreement.

In connection with fixing and liquidating the damages causes by the Debtor's breach of the Agreement and the termination of the same, the Creditor engaged Swap Financial Group to price the cost for purchasing interest rate cap protection equivalent to the rate cap protection provided by the Debtor under the Agreement. On or about October 17, 2008, Swap Financial Group transmitted a Term Sheet to Creditor that indicated that the cost to acquire the replacement cap rate protection was approximately $101,000.

On or about October 17, 2008, the Creditor transmitted a letter to the Debtor notifying the Debtor that the Creditor had, in accordance with the Agreement, obtained a quote for replacement rate cap protection and that the Creditor had suffered other incidental and consequential damages and incurred recoverable fees and costs as a result of the Debtor's breach of the Agreement and the termination of the same.

A summary of the Creditor's damages is as follows:

| | |
|---|---|
| Market Quotation from Swap Financial Group: | $101,000.00 |
| Creditor's Accrued Attorneys Fees and Costs: | $20,000.00 |
| Freddie Mac Outside Attorneys Fees and Cost: | $2,500.00 |
| Swap Financial Group Consulting Fees: | $750.00 |
| TOTAL CLAIM: | $124,250.00 |

The foregoing claims are not exhaustive. Accounting, legal and other investigations are ongoing and may reveal additional amounts owed to the Creditor. The creditor filed a proof of claim previously but will be refiling it in accordance with the new deadline and procedures for derivative claims.

II.   ARGUMENT

The Court should deny Debtors' Motion for Authorization to Implement Alternative Dispute Resolution Procedures because 1) the parties never agreed to any form of Alternative Dispute Resolution; 2) forcing Creditor to submit to mediation, and its associated costs, in New York is Detrimental to the aims of this court and highly prejudicial to Creditor; 3) the proposed ADR Procedure is procedurally biased in favor of Debtor.

A.   **The Parties Did Not Agree to Any Form of Alterative Dispute Resolution.**

Dispute resolution by arbitration is and must be consensual. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *McAllister Bros. v. A & S Transp. Co.*, (1980) 621 F.2d 519, 522, *quoting United Steel workers v. Warrior and Gulf Navigation Co.*, (1960) 363 U.S. 574. New York law is to the same effect. "[P]arties to a commercial transaction 'will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit commitment neither party may be compelled to arbitrate.'" *Matter of Marlene Industries Corp. v. Carnac Textiles, Inc.* (1978) 45 N.Y.2d 327, 333, quoting *Matter of Acting Supt. of Schools of Liverpool Cent. School Dist.[United Liverpool Faculty Assn.]* (1977) 42 N.Y.2d 509, 512.

///

///

///

///

///

The ADR procedure proposed by the Debtor is analogous to arbitration in that it sets forth an extra-judicial dispute resolution procedure that neither party specified or agreed to at the outset of their Agreement. The Agreement between the parties contains absolutely no reference to a mandatory or elective Alterative Dispute Resolution procedure. The parties did not agree to any ADR procedure, and Creditor certainly did not agree to be bound to any obligation requiring it to travel to New York to participate in ADR.

**B.     Forcing Creditor to Submit to Mediation in New York is Detrimental to the Aims of the Court and is Highly Prejudicial to Creditor.**

Bankruptcy courts have authority to manage and determine the rights of creditors and debtors, and bankruptcy courts have invalidated even contractual arbitration agreements when the court finds it would substantially interfere with the rights of a party. While state and federal courts generally respect arbitration clauses, in bankruptcy litigation, however, there is often less deference to arbitration clauses. *See Phillips v Congelton, L.L.C. (In re White Mountain Mining Company, L.L.C.)* (4th Cir 2005) 403 F3d 164. In *White Mountain*, the Fourth Circuit affirmed the bankruptcy court's refusal to honor an arbitration clause. The court found that ordering arbitration of the dispute would have substantially interfered with the debtor's efforts to reorganize. The court held that the "very purpose of bankruptcy is to modify the rights of debtors and creditors," and "Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts." *See also McDonald v Cash N Advance, Inc. (In re Lucas)* (2004) 312 B.R. 407*; Home Express v Alamo Group, LLC (In re Home Express)* (1998) 226 B.R. 657, 659 (motion to arbitrate denied, "bankruptcy policy must hold sway over the policies of the Federal Arbitration Act as to disputes involving [11 USC] §327 through 330"). "Arbitration is inconsistent with centralized decision-making

because permitting an arbitrator to decide a core issue would make debtor-creditor rights "contingent upon an arbitrator's ruling" rather than the ruling of the bankruptcy judge assigned to hear the debtor's case." *In re White Mountain Mining, supra* 403 F.3d at 164, 169.

Similar to in *White Mountain*, mediation is inconsistent with centralized decision-making because permitting a mediator to influence or decide a core issue would make debtor-creditor rights contingent upon a mediator's determination rather than the ruling of the bankruptcy judge assigned to hear the debtor's case. Analogous to to in *White Mountain*, this Court should deny Debtors' request for the imposition of ADR procedures because forcing Creditor to expend the resources and time to travel across the United States to New York to participate in such a proceeding would undoubtedly substantially interfere with Creditor's efforts to obtain relief, and the moneys expended in such an effort would potentially cancel out any amount Creditor might have recovered from its Claim. Forcing Creditor to mediate this dispute would prejudice Creditor, and Debtor should not be allowed to foist draconian ADR procedures on Creditor when Creditor was never notified, never agreed, and indeed, did not contemplate at the outset of the Agreement any such ADR proceedings.

## C. The Proposed ADR Procedure is Procedurally biased towards Debtor and against Creditor

The ADR Procedure proposed by Debtor is highly biased in favor of Debtor. Debtor should not be allowed to seek from this court an order catering to Debtor's convenience and needs–Debtor is the party owing vast amounts of money to all creditors in this action, and Creditor and other creditors are entitled to a resolution process that is fair and not unnecessarily burdensome.

The Motion (Paragraph 23-31) does not make clear who is to pay for the mediation and since Creditor never agreed contractually to mediation and cannot be compelled under the applicable law,

if the Court is to grant the Debtor's Motion, the Debtor should be required to pay for all mediation costs and expenses.

The Motion seeks at Paragraph 28 to require parties to travel to New York in person to participate in the mediation. Again, Creditor never agreed to mediation and should not be compelled to pay for counsel and principals to travel to New York to attend a mediation. The parties should be entitled to appear telephonically at any mediation ordered by the Court or the parties should be entitled to appear through local counsel with the principals available by phone as necessary. To require derivative contract holders to travel to New York in person to attend a mediation is a needless expense and would put an undue burden on parties to derivative contracts who have less than $150,000 in dispute. The procedure proposed by the Debtor will actually result in legitimate creditors loosing their claims if they do not participate in the mediation and/or being overly burdened where there is no clear analysis at this stage as to what percentage on the dollar they will receive.

The Motion at Paragraph 29 seeks to authorize the Court to, among other things, terminate the creditors claim if they do not participate in the ADR Procedure. This is extremely heavy handed. Creditor and it appears many other parties never agreed to mediation or any ADR procedures and the Debtor not only seeks to institute an onerous and costly mediation process, it seeks to eliminate a creditor's claim in they fail to participate in the mediation or if they do not "cooperate in good faith." The draconian nature of this remedy where Creditor never agreed to mediation is completely unwarranted. If a party does not participate in the ADR process, the Court should consider only ordering a party to pay the mediation fee and the Debtor's fees and costs, but to actually eliminate a claim where a party never initially agreed to mediation is unwarranted and would act as an improper forfeiture where parties never were required to mediate in the first place. Thus, to the extent the

Court authorizes the ADR Procedures, the Court should limit any sanctions for failed to participate or to cooperate in good faith to the payment of the mediators fees and costs and the Debtor's fees and costs.

Dated: July 30, 2009
Santa Monica, California

/s/ Jeffrey Lee Costell
Jeffrey Lee Costell, Esq.
COSTELL & CORNELIUS LAW CORPORATION
1299 Ocean Avenue, Suite 400
Santa Monica, California 90401
Telephone: (310) 458-5959
Facsimile: (310) 458-7959

Attorneys for Easton Investments II