**REED SMITH LLP**                                     Hearing Date: August 5, 2009
  Andrea Pincus, Esq.
599 Lexington Avenue
New York, NY  10022
Tel:  212-521-5400
Fax:  212-521-5450
   apincus@reedsmith.com
   mvenditto@reedsmith.com

*Counsel to the University of Pittsburgh – Of the Commonwealth System of Higher Education*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                         :
In re                                                    :    Chapter 11
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al*.,  :    Case No. 08-13555 (JMP)
                                                         :    (Jointly Administered)
                                          Debtors.   :
                                                         :    Refers to Dkt. No. 4453
---------------------------------------------------------------x

**LIMITED OBJECTION OF THE UNIVERSITY OF PITTSBURGH
TO DEBTORS' MOTION PURSUANT TO SECTION 105(A)
OF THE BANKRUPTCY CODE AND GENERAL ORDER M-143 FOR
AUTHORIZATION TO IMPLEMENT ALTERNATIVE DISPUTE
RESOLUTION PROCEDURES FOR AFFIRMATIVE CLAIMS OF DEBTORS UNDER
<u>DERIVATIVE CONTRACTS</u>**

The University of Pittsburgh – Of the Commonwealth System of Higher Education (the "University") hereby makes this limited objection ("Limited Objection") to the Debtors' Motion ("ADR Motion")(Dkt. No. 4453) for an Order Pursuant to Section 105 of the Bankruptcy Code and General Order M-143 For Authorization To Implement Alternative Dispute Resolution Procedures For Affirmative Claims Of Debtors Under Derivative Contracts.   In support of its Limited Objection, the University respectfully represents as follows:

1.    On September 15, 2008 and periodically thereafter (the "Petition Date"), the Debtors commenced their respective Chapter 11 Cases.  The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. Each of the Debtors has been authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2. On July 20, 2009, Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors") filed the ADR Motion, seeking entry of an order authorizing Debtors to implement certain alternative dispute resolution procedures ("Derivatives ADR Procedures") to resolve "affirmative claims" -- in other words, disputed monetary claims the Debtors believe they may have against certain counterparties to derivatives contracts.

3. The University and Lehman Brothers Special Financing, Inc. ("LBSF" and a "Debtor") entered into a certain ISDA Master Agreement dated as of August 3, 2000 (the ISDA Master Agreement, the Schedule to the ISDA Master Agreement and all Exhibits thereto, as amended, are collectively referred to herein as the "Pittsburgh Master Agreement").

4. The University was party to interest rate swap transactions entered into pursuant to the Pittsburgh Master Agreement, which interest rate swap transactions are discussed further below. As a result of the Debtors' default under the Pittsburgh Master Agreement caused by their respective bankruptcy filings, the swap transactions were terminated by the University effective December 5, 2008. The University determined that a payment was due to LBSF as a result of such termination ("Early Termination Payment") and calculated the Early Termination Payment due pursuant to the terms of the Pittsburgh Master Agreement. The University promptly paid the same to LBSF by wire transfer on December 19, 2008. Debtor, LBSF, received the payment and Debtors have neither objected to nor otherwise disputed the Early Termination Payment.

5. The University submits that the ADR Motion should not apply to the Early Termination Payment as it has been fully paid without any subsequent objection or dispute by the Debtors and further that LBSF should be estopped from now disputing the amount of the Early Termination Payment. The University thus objects to the ADR Motion to the extent

Debtors now intend to seek to implement the Derivatives ADR Procedures in connection with the fully paid and undisputed Early Termination Payment. In addition, the University objects to the specific Derivatives ADR Procedures because they (a) fail to provide reasonable notice for response to the Debtors' demand, to a demand for Settlement Conference, and to the date and time of proposed mediation; (b) improperly provide for sanctions never contemplated by the underlying derivatives contract or otherwise agreed to by the parties; and (c) fail to provide alternative locations to New York for in person mediation or telephonic or videoconference participation by non-debtor counterparties, thereby imposing on the University undue burden and costs not otherwise authorized under the terms and conditions of the Pittsburgh Master Agreement.

**Background**

6.  The University is a non-sectarian, coeducational, state-related, research university. The University derives its corporate existence under the laws of the Commonwealth of Pennsylvania (the "Commonwealth") by reason of an act of the State Legislature of the Commonwealth establishing an "Academy or Public School in the town of Pittsburgh" on February 28, 1787 and from the act of February 18, 1819 incorporating the "Western University of Pennsylvania." On July 11, 1908, the name was changed to "University of Pittsburgh" by order of the Court of Common Pleas of Allegheny County. On July 28, 1966, the Pennsylvania State Legislature enacted the "University of Pittsburgh-Commonwealth Act" which changed the name of the University to "University of Pittsburgh – Of the Commonwealth System of Higher Education" and established the University as an instrumentality of the Commonwealth to serve as a state-related institution of the Commonwealth System of Higher Education. The Commonwealth appoints twelve (12) members of the University's fifty-one (51) member Board of Trustees, and all of the Commonwealth Trustees are among the thirty-six (36) voting members of the University's Board of Trustees.

7. The University's primary campus is located in Pittsburgh, Pennsylvania, and the University has four other campuses located in western Pennsylvania.

8. Each interest rate swap entered into pursuant to the Pittsburgh Master Agreement was memorialized by a separate confirmation (collectively, the "Confirmations") and together with the Pittsburgh Master Agreement constituted one integrated agreement.

9. With respect to each of the Confirmations, LBSF was identified as "Party A," also known as the floating rate payer, and LBHI was the Credit Support Provider (or guarantor) of all of LBSF's obligations under the Pittsburgh Master Agreement including without limitation any payments related to the interest swaps or the termination of the same.

10. The Pittsburgh Master Agreement was entered into by the University in order to effect interest rate hedges in connection with the issuance of its $200,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, consisting of $100,000,000 Series A of 2000 Bonds (the "2000A Bonds"), $50,000,000 Series B of 2000 (the "2000B Bonds'), and $50,000,000 Series C of 2000 Bonds (the "2000C Bonds"). The 2000A Bonds, 2000B Bonds and the 2000C Bonds are collectively referred to herein as the "2000 Bonds"). Within each series there are multiple maturity dates for the 2000 Bonds, and there were a total of eleven (11) different maturity dates applicable to the 2000 Bonds.

11. At the time of the issuance of the 2000 Bonds, Lehman Brothers Inc. ("Lehman") served as one of three underwriters for the University's 2000 Bonds. In addition, Lehman was also selected to serve as the University's remarketing agent for the 2000B and 2000C Bonds.

12. In order to hedge the interest rate risk associated with the 2000 Bonds, the University entered into interest rate swaps with notional amounts and expiration dates based on the principal amount and underlying maturity dates of the 2000 Bonds. In certain instances, the floating rate to be paid by LBSF as the floating rate payer was determined based on the actual bond rate applicable to the hedged bonds, and the related Confirmations also provided for alternative floating rate calculations in the event that Lehman was replaced or terminated by the

University as remarketing agent or if the University elected to change the interest rates mode applicable to the 2000 Bonds.

13. Subsequent to the issuance of the 2000 Bonds, the University also issued (i) $60,500,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, Series A of 2002 (the "2002A Bonds"), (ii) $29,500,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, Series B of 2002 (the "2002B Bonds") (the 2002A Bonds and 2002B are collectively referred to herein as the "2002 Bonds"), (iii) $150,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project Bonds, comprised of $75,000,000 Series A of 2005 (the "2005A Bonds"), $45,000,000 Series B of 2005 (the "2005B Bonds"), and $30,000,000 Series C of 2005 (the "2005C Bonds") (the 2005A Bonds, 2005B Bonds and the 2005C Bonds are collectively referred to herein as the "2005 Bonds") and (iv) $255,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, comprised of $150,379,000 Series A of 2007 (the "2007A Bonds") and $104,621,000 Series B of 2007 (the "2007B Bonds") (the 2007A Bonds and the 2007B Bonds are collectively referred to herein as the "2007 Bonds"). The 2000 Bonds, the 2002 Bonds, the 2005 Bonds and the 2007 Bonds are collectively referred to herein as the "Bonds."

14. All of the Bonds were variable rate demand obligations with essentially the same terms as the 2000 Bonds. Similarly to the 2000 Bonds, the University entered into corresponding interest rate swaps to hedge the variable rate interest risk associated with each maturity of its outstanding Bonds. In total, there were more than 50 separate interest rate swaps in effect, with maturities ranging from less than two (2) to more than thirty (30) years.

15. On December 5, 2008, following the commencement of the LBHI and LBSF bankruptcy cases, the University delivered a Notice of Early Termination to LBSF and thereby terminated all interest rate swaps entered into under the Pittsburgh Master Agreement pursuant to

- 5 -

Section 5(a)(vii) thereof, effective as of the date of the Notice.  A copy of the Notice of Early Termination, indicating receipt by LBSF on December 5, 2008, is annexed hereto as <u>Exhibit A</u>.

16. On December 19, 2008, the University delivered to LBSF a written statement pursuant to Section 6(d) of the Pittsburgh Master Agreement, setting forth the University's calculation of payments due LBSF as a result of the designation of the Early Termination Date ("Early Termination Payment"), and enclosed documentation supporting the calculations. A redacted copy of the Statement of Calculation Payments Due (without the supporting documentation) is annexed hereto as <u>Exhibit B</u>.

17. The University wired the full amount of the Early Termination Payment to LBSF on December 19, 2008.

18. Thereafter, on or about March 26, 2009, Mr. Jason Rizzo, acting on behalf of the Debtors, requested certain information regarding the date of delivery of the Notice of Early Termination.  A copy of such Notice, as accepted and acknowledged by an officer of the Debtors on December 5, 2008, was sent to Mr. Rizzo on March 27, 2009.  In addition, on or about April 27, 2009, Mr. Rizzo made an additional inquiry relating to the details of any replacement swap transactions entered into by the University and information provided to swap bidders in connection with the quotes obtained and used to calculate the amount of the Early Termination Payment due to LBSF and paid by the University.  The University responded to Mr. Rizzo's request for additional information on or about May 20, 2009, which response explained that (a) the University's interest rate swaps with LBSF were originally entered into in order to hedge a portion of the University's variable rate bond portfolio, (b) in light of numerous market events including the LBSF bankruptcy, the University pursued a restructuring plan for its entire bond portfolio, (c) the University entered into new hedges with respect to its restructured bond portfolio and that such hedges are materially different from the terminated LBSF swaps and were not replacement hedges comparable to the terminated LBSF swaps.

19. Debtors have not challenged the amount of the payment or the validity of the underlying calculations, and other than the specific inquiries identified in paragraph 18 above,

from the Debtors four months ago, Debtors have not communicated with the University in any way concerning the Early Termination Payment.

### The Motion

20.  On July 20, 2009, Debtors filed the ADR Motion, seeking to establish certain streamlined procedures in lieu of litigation in order to resolve disputes with respect to claims Debtors may have in connection with derivatives contracts that -- according the Debtors -- are, or would be, "in the money" to Debtors upon termination by the non-debtor counterparty. ADR Motion ¶12.

21.  Debtors estimate there are more than 250 such contracts, which they define as "Derivative Contracts with Recovery Potential," but they fail to identify any specific contracts or counterparties in connection with the ADR Motion. ADR Motion ¶13.

22.  Debtors seek an order from this Court mandating participation in the proposed Derivatives ADR Procedures by each counterparty served with notice of the Debtors' affirmative claim against it, and requiring each such counterparty to (a) serve answers and responses to Debtors' proposed settlement, (b) engage in settlement discussion, (c) participate in any mediation in good faith, (d) follow directions of the mediator, and (e) follow such procedures as are approved by the Court. ADR Motion ¶16.

23.  The Debtors expressly except any requirement to settle or compromise any dispute through the proposed Derivatives ADR Procedures. Id.

24.  Debtors propose that derivatives counterparties must respond in writing within 20 calendar days of receipt of the Debtors' Derivatives ADR Package containing notice of Debtors' affirmative claim (the "Derivatives ADR Notice"). Failure to respond timely would subject the derivative counterparty to a host of sanctions including entry of a judgment in the amount demanded in the Derivatives ADR Notice. ADR Motion ¶¶19-20.

25.  Debtors propose through the ADR Motion a step by step process starting with a "Notice/Response Stage" in which either party may demand a settlement conference on 5

calendar days notice, must respond to such demand on 2 days notice, and must commit to a date no later than 5 days from such response or else proceed to the "Mediation Stage" before a single Court-appointed mediator. Further, Debtors propose that all mediations will take place in New York unless Debtors agree in their sole discretion to other locations and, that all parties must include a business principal with settlement authority and must appear in person. ADR Motion ¶¶21-28.

26. The ADR Motion does not provide for any reimbursement of travel costs or other expenses incurred by the derivative counterparty in connection with travel to and appearance in New York for such mandatory mediation but instead provides (a) that each party will be responsible for their own counsel fees and costs and (b) the party affirmatively requesting mediation will be solely responsible for the fees and expenses of the mediator.

27. Finally, a derivative counterparty may be deemed to have waived a right to a jury trial such as may exist, in the event a derivative counterparty is determined to "affirmatively choose" the Mediation Stage proposed by Debtors.

**Limited Objection**

28. The University understands that discussions between the parties directly and informally or under the auspices of a mediator may be an efficient way -- outside of full-blown litigation -- to attempt to address potential disputes that may arise in connection with unresolved claims of the Debtors for monies that may be owed but not yet paid to Debtors by derivative counterparties on account of "in the money" contracts.

29. The University, however, objects first and foremost to the application of such procedures to its termination of transactions under the Pittsburgh Master Agreement and the University's Early Termination Payment which has been paid in full, and received and accepted by Debtors over seven months ago without complaint or dispute by Debtors despite ample time and resources for Debtors to pursue the same directly and informally with the University.

Debtors therefore should be estopped from now first initiating a process that would without doubt cause the University to incur unnecessary costs in defence of its termination and calculations through the multi-staged process proposed by the Debtors, a process never contemplated by the parties nor made part of the Pittsburgh Master Agreement.

30.     Importantly, Congress enacted the so called "safe harbor" provisions of the Bankruptcy Code in recognition of the strong public policy of protecting American financial markets and institutions from the ripple effects resulting from a bankruptcy filing by a major player in the financial markets.[1]  As new financial instruments have been developed, Congress has recognized the need to amend certain aspects of the Bankruptcy Code in order to continue to provide the necessary certainty in complex financial transactions,[2] and to assure counterparties that they will be able to terminate these agreements and exercise contractual liquidation and netting rights if a party to the agreement files for bankruptcy relief.[3]

31.     Importantly, through the 2005 amendments to the Bankruptcy Code, Section 561 of the Bankruptcy Code was added in its entirety as a further clarification of the scope of safe harbor protections afforded non-debtor parties to master netting agreements, and further underscores the Court's inability to use its powers under Section 105 to curtail temporally or otherwise modify such rights.   Section 561 (a) provides, in relevant part:

> … the exercise of any contractual  right … to cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation or acceleration of one or more) --
>
> (5) swap agreements; or
>
> (6) master netting agreements.

---

[1] 135 Cong. Rec. S1414 (daily ed. Feb. 9, 1989).

[2] Id. at S1416.

[3] Id. at S1417.

> shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceedings under this title.

11 USC §561(a) (emphasis added).

32. To the extent Debtors rely on the Court's powers under section 105(a) effectively to rewrite contract terms and abrogate the safe harbor protections with respect to the Pittsburgh Master Agreement, and rewrite the terms of the underlying interest rate swaps under the guise of the proffered ADR procedures, Debtors seek to frustrate the very protections and certainty that Congress put in place.

33. For example, the ADR Motion provides no deadline by which parties will be notified by Debtors of the existence of a dispute and hence no mechanism to provide certainly and closure for derivative counterparties which, like the University, have acted in good faith to terminate their transactions, calculated payment due the Debtors and promptly made such payment. Absent such a deadline for notice, counterparties remain at risk for prolonged uncertainly in virtual perpetuity and the ADR Motion should be modified to address and require such a notice deadline or else denied.

34. In addition, to the extent that Debtors may seek to impose the Derivatives ADR Procedures on the University, the notice provisions for analyzing and responding to a Derivatives ADR Notice and even more limited time to respond to a request for Settlement Conference are inadequate, commercially unreasonable in light of the complexity and volume of the underlying transactions, and impracticable. The Derivatives ADR Procedures also allow for Debtors to seek sanctions which, in the case of the University, were never agreed to or even contemplated under the operative derivatives contract (i.e., the Pittsburgh Master Agreement and Confirmations).

35. The University's bond portfolio was and remains massive and complex, and its risk management system equally intricate. The internal procedures for this state-related, not-for profit institution to analyze and address the Debtors' potential claims and related exposure would require more than the allotted 20 calendar days. Failure to respond timely would give rise to

sanctions including a default judgment. These sanctions were never contemplated by the counterparties in connection with the Pittsburgh Master Agreement or Confirmations and present untenable and unfair risks and penalties for the University. As proposed by Debtors, these procedures will deny the University due process and a sufficient opportunity to be heard, and thus should be denied or modified by extending sufficiently the notice periods.

36. Similarly, the proposed notice provisions for the Mediation Stage are equally insufficient, especially as they may require written submissions and in person participation of the parties to a degree tantamount to what is would be required for litigation and trial.

37. Due process requires that the Court provide "notice reasonably calculated, under all the circumstances, to apprise interested parties" of proceedings and afford them an opportunity to present their objections. See, Jones v. Flowers, 547 U.S. 220, 226 (2006)(quoting Mullane v. Central Hanover Bank & Trust Co., 339 U. S. 306, 314 (1950). The limited number of calendar days for notice of the dispute pertaining to the termination of Pittsburgh Master Agreement, involving hundred of millions of dollars of financial exposure is simply inadequate. Logistically, the procedures the Debtors envision occurring in these short periods are unworkable and should be rejected.

38. In addition, the University objects to the requirements that mediation be conducted in person, in New York, with the in person participation of a business person with settlement authority. Such requirements create for the derivative counterparty, such as the University, who maintains no physical location or operations in the State of New York, an undue burden upon and significant economic cost for travel and related expenses. While Debtors proffer that they may agree to alternative locations for mediation, they not only have no obligation to do so, but affirmatively seek to retain the sole discretion to determine where the mandated mediation will take place. ADR Motion ¶26. Notably, the ADR Motion proposes that mediation be mandated and costs presumably imposed on the counterparty -- regardless of a request for mediation by the noticed counterparty -- in the event that (a) the Debtors reject any counteroffer that might be presented during the "Notice/Response Stage," (b) the parties are not

- 11 -

able to agree on a time and date for a Settlement Conference, or (c) the parties are unable to resolve the Derivatives ADR Dispute during the "Notice/Response Stage." ADR Motion ¶¶20-21, 23. Further, in the event the derivative counterparty affirmatively requests mediation to resolve the Debtors' claim following the mandated participation in the initial stage of the proposed procedures, Debtors would have the Court impose on the derivative counterparty full responsibility for the entirety of the mediator's costs and expenses.

39. The University submits that the imposition of travel and mediation fee costs on the counterparty, and the requirement of travel as may be necessitated for in-person participation in New York, are patently unfair and unnecessary. The costs associated with the mandated Mediation Stage unfairly and improperly penalize counterparties for failure to settle during the initial and mandated Notice/Response Stage. Such costs should instead either be borne by the estate or, with respect to travel costs, be minimized through the option of mediation by telephonic or video conferencing.

40. In the absence of such modifications to the Derivatives ADR Procedures as proposed by this Limited Objection, the ADR Motion should be denied and the Debtors' attempt to rewrite the derivatives contracts to include dispute resolution procedures, penalties, and costs should be rejected.

**Reservation Of Rights**

41. The University reserves its rights to assert such other and further objections as may be warranted including, but not limited to, objections to any proposed modifications by the Debtors following the objections deadline for the ADR Motion.

## Conclusion

WHEREFORE, University of Pittsburgh respectfully objects to the ADR Motion and requests that the Court grant this Limited Objection and with respect to the University deny the relief requested or condition any Order on (a) extension of the notice periods for the Notice/Response Stage, Notice of Settlement Conference, and Mediation Stage, (b) authority for telephonic and/or video-conference participation in mediation, (c) payment by the Debtors' estates of reasonable expenses of mediation related to travel, (d) costs and expenses of the mediator to be borne by the Debtors' estates, (e) a deadline by which all notices of affirmative claims by the Debtors must be delivered to derivative counterparties so as to be received by such counterparties and further barring such actions as may be initiated by Debtors by notice beyond the deadline, and (f) provide such other and further relief as may be warranted.

Dated: New York, New York
July 31, 2009

        Respectfully submitted,

        REED SMITH LLP

    By: /s/ Andrea Pincus
        Andrea Pincus
        599 Lexington Avenue
        New York, NY 10022
        Tel: 212-521-5400
        Fax: 212-521-5450

        *Counsel to the University of Pittsburgh – Of the Commonwealth System of Higher Education*

**TO**:

Weil, Gotshal & Manges LLP
  Attention: Lori R. Fife
         Robert J. Lemons
767 Fifth Avenue
New York, New York 10153

Curtis, Mallet-Prevost, Colt & Mosle LLP
  Attention:  Steven J. Reisman
         L. P. Harrison 3rd
101 Park Avenue
New York, New York 10178

Office of the United States Trustee
  Attention: Andy Velez-Rivera
         Paul Schwartzberg
         Brian Masumoto
         Linda Riffkin
         Tracy Hope Davis
33 Whitehall Street, 21st Floor
New York, New York 10004

Milbank, Tweed, Hadley & McCloy LLP
  Attention: Dennis F. Dunne
         Dennis O'Donnell
         Evan Fleck, Esq.
One Chase Manhattan Plaza
New York, New York 10005