**Hearing Date and Time:**   **August 5, 2009 at 10:00 a.m.**
**Objection Date and Time:**   **July 31, 2009 at 4:00 p.m.**

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Gerald C. Bender
Steven A. Rosenstein

Attorneys for Oceania Cruises Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------------x
                                          )
In re                                     )      Chapter 11
                                          )
LEHMAN BROTHERS HOLDINGS INC., et al.,    )      Case No. 08-13555 (JMP)
                                          )
              Debtors.                    )      (Jointly Administered)
                                          )
------------------------------------------------------------------------x
```

**OBJECTION OF OCEANIA CRUISES INC. TO DEBTORS' MOTION
PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND
GENERAL ORDER M-143 FOR AUTHORIZATION TO IMPLEMENT
ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR
AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVE CONTRACTS**

Oceania Cruises Inc. ("OCI"), by and through its undersigned counsel, hereby

submits its objection to Lehman Brothers Holdings Inc.'s and its affiliated debtors' (individually,

a "Debtor" and, collectively, the "Debtors") motion pursuant to Section 105(a) of the Bankruptcy

Code and General Order M-143 for authorization to implement alternative dispute resolution

procedures for affirmative claims of Debtors under derivative contracts ("Debtors' ADR

Motion").

## **Preliminary Statement**

1.      Apparently frustrated with the limitations of their contractual and legal

rights, and thus their inability to terminate early and "monetize" so-called "in the money"

derivatives contracts, Debtors seek relief from this Court to sidestep OCI's rights under its

derivatives contract and applicable bankruptcy law to force OCI into an inappropriate and

needless mediation process.  Because no actual dispute and thus no basis for mediation exists

between the parties, the Court should deny Debtors' ADR Motion or, in the alternative, order

that any relief granted for Debtors' ADR Motion does not apply to OCI and its Derivatives

Agreement (as further described below).

2.      Specifically, OCI and one of the Debtors are parties to a Derivatives

Agreement, to which such Debtor, and not OCI, is in breach.  Because such Debtor is in breach

of the Derivatives Agreement, OCI has the contractual right to either terminate or continue under

the Derivatives Agreement subject to the terms and conditions set forth therein.  Debtors, on the

other hand, have no right to force an early termination of the Derivatives Agreement.  Further, no

payments are currently due by OCI under the plain terms of the Derivatives Agreement.

3.      Thus, there is simply no dispute between the parties – OCI is not in breach

of the Derivatives Agreement, and Debtors are not currently entitled to any payments.    The

earliest scheduled termination or expiration date for any transaction pursuant to the Derivatives

Agreement is September 30, 2010.  And while the Derivatives Agreement may be "in the

money" for Debtors now, it may be less "in the money" or even "out of the money" by the time

of termination or expiration of any transaction under the Derivatives Agreement.  In any event,

because the earliest scheduled termination or expiration is more than a year away, there is no

financial or legal dispute between the parties today that would suggest the need for resolution

through mediation.  The parties must abide by the legal and enforceable rights that they have

mutually agreed to, rights that Debtors know well enough as leading derivatives dealers in the "over-the-counter" derivatives market, and which they have in the past enforced, or chosen not to enforce as is their right, against defaulting counterparties.

4.    Nonetheless, without any legal basis to do so, Debtors seek to have the Court order OCI to participate in an expensive and time-consuming mediation process that jeopardizes OCI's rights and possibly would include sanctions if OCI fails to satisfy Debtors' unilaterally-created mediation process.  Debtors assert that Section 105 and General Order M-143 provide a basis for the Court to approve their mediation scheme, but neither does so.  It is black-letter law that Section 105 does not create substantive rights that are not otherwise available under other authority, and Debtors do not cite any other statutory provisions as a basis for their mediation request.  General Order M-143 merely authorizes and provides procedures for mediation of adversary proceedings, contested matters, and disputes – it does not create disputes or assume that disputes exist.  Because there is no adversary proceeding, contested matter, or dispute here, General Order M-143 is irrelevant.

5.    As Debtors admit, they have already received several Court orders allowing them ways to "monetize" their interests in derivatives contracts.  Moreover, they have the right to negotiate for a resolution through ordinary business negotiations, outside of any Court-ordered process, and it has been publicly reported that Debtors have attempted to sell their "in-the-money" derivative transactions, subject to counterparty consent and the Orders of this Court.  In fact, OCI and Debtors have engaged in various business discussions regarding the terms of the Derivatives Agreement and other financial agreements between them during the course of these cases without any Court order requiring them to do so.  Apparently unsatisfied with the options that exist, options that are widely recognized as the standard, effective and fair

means of monetizing a party's derivatives agreements, Debtors now seek to force mediation –

based on their own breach of the Derivatives Agreement – to try to compel the non-defaulting

party, OCI, into surrendering its rights.  In fact, Debtors' attempt to force mediation is merely a

thinly-veiled attempt to force OCI and similarly-situated counterparties to prematurely settle

open derivatives contracts despite the fact that they have no legal or contractual right to do so.

Indeed, it is apparent that Debtors hope to use the Court-ordered imposition of a cumbersome

and costly mediation process, and the normal give-and-take of mediation, to gain an unjust

advantage and to force a better result for the Debtors through an early termination outside the

terms of Derivatives Agreement and applicable law.  This would be unprecedented and

inconsistent with the treatment of these contracts under the Bankruptcy Code.

### OCI's Derivatives Agreement

6.      OCI and Debtor Lehman Brothers Special Financing Inc. ("LBSF") are

parties to an International Swaps and Derivatives Association ("ISDA") Agreement

("Derivatives Agreement"), which includes schedules to the ISDA Agreement and transactions

under it (each a "Confirmation").[1]  The Derivatives Agreement provides that a bankruptcy filing

(such as Debtors' filing) constitutes an Event of Default.  (Derivatives Agreement § 5(a)(viii).)

When an Event of Default occurs, the non-defaulting party has the right to terminate the

Derivatives Agreement with notice, but it is not required to do so.  (*Id.* § 6(a).)  OCI has not

terminated the Derivatives Agreement.  The Derivatives Agreement does not grant the defaulting

party the right to terminate early based on its own default.  (*Id.*)

7.      Under the Derivatives Agreement, no payments are currently due, and the

earliest any scheduled termination or expiration payment will be due is September 30, 2010.

Thus, OCI is not obligated to make any termination or expiration payments to Debtors until at

---

[1] The Derivatives Agreement, except for the Confirmations thereto, is attached hereto as Exhibit 1.

least that time.[2]  Moreover, although OCI is "out of the money" as of today, it is possible that

that OCI may be less "out of the money" or even "in the money" as of the scheduled termination

or expiration dates in the Derivatives Agreements' Confirmations.  At the very least, the amount

due will undoubtedly be different than it would be if due today.

8.     The importance of scheduled termination and expiration dates is made

clear when viewed against the context in which derivatives transactions arise.  Financial

institutions and other companies often enter into derivative transactions as part of broader

financial transactions to hedge certain risks.  Many financial institutions enter into "back to

back" derivative transactions or other loans or transactions whereby the financial institution will

take opposite positions in the same transaction with different counterparties or hedge the risk in

the securities, commodities, or other markets, thus allowing the financial institution to manage

their risk with respect to such derivative transactions.   Likewise, many manufacturers and

operating companies use derivatives transactions in a similar fashion to manage their risk from

financing of operations and investments.  Therefore, for many derivatives contracts, the timing of

scheduled termination or expiration payments may be indelibly linked to the timing of amounts

due for other financial transactions.  Forcing a non-defaulting company into an early termination

of a derivatives contract may therefore lead to financial difficulties for many companies,

including defaults under other agreements and potentially bankruptcy.

9.     OCI, a world-renowned cruise line, is a perfect example of this risk.  It is

an operating company, not simply a financial speculator or hedge fund.  OCI, in fact, entered into

the Derivatives Agreement and related Confirmations to guard against currency and interest rate

risks for its business operations and investments.  For example, the Derivatives Agreement and

---

[2] If any interim payments would otherwise be required under the Derivatives Agreement, OCI's obligation to make such payments is suspended under the Derivatives Agreement due to Debtors' continuing breach and for so long as they remain in breach.  (Derivatives Agreement § 2(a)(iii).)

the foreign currency Confirmations thereto were executed to facilitate the purchase and financing

of two new cruise ships upon their delivery to OCI.  As the purchase price of the cruise ships is

in Euros and the related committed financing is denominated in Dollars, the foreign currency

swaps were entered into with Debtor LBSF to minimize currency fluctuation risk and to facilitate

OCI's payments upon delivery of the ships.  The Confirmations' scheduled termination or

expiration dates are therefore not meaningless or mere speculation, but instead tied to the

delivery of the cruise ships.  To ask OCI to pay any amounts under the Derivatives Agreement

and the related Confirmations more than a year ahead of time because of Debtors' breach would

not only be unjust and violate the letter and the spirit of the Derivatives Agreement, but would

also undermine OCI's operations and business plans.  Indeed, in the event OCI became obligated

to settle the foreign currency swaps early, OCI would not have access to the cruise ship financing,

which is designed to fund the settlement of the foreign currency swaps, at such time.

### The Bankruptcy Code Protects Derivative Counterparties' Contractual Rights

10.     The Bankruptcy Code specifically protects the contractual rights of

counterparties to derivatives and swaps agreements such as OCI's rights under the Derivatives

Agreement.   Section 362(b)(17) provides that the filing of a bankruptcy petition:

> does not operate as a stay . . . of the exercise by a swap participant
> or financial participant of any contractual right . . . under any
> security agreement or arrangement or other credit enhancement
> forming a part of or related to any swap agreement, or of any
> contractual right . . . to offset or net out any termination value,
> payment amount, or other transfer obligation arising under or in
> connection with 1 or more such agreements, including any master
> agreement for such agreements.

See also 11 U.S.C. § 560.  These provisions were provided by Congress as "safe harbors from

the destabilizing effects of bankruptcy proceedings for parties to specified commodities and

financial contracts in order to protect financial markets."  Hutson v. E.I. du Pont de Nemours &

*Co. (In re Nat'l Gas Distribs., LLC)*, 556 F.3d 247, 252 (4th Cir. 2009); *see also In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) ("Section 560 of the Bankruptcy Code provides an exception to the non-enforceability of ipso facto clauses in connection with swap agreements in a bankruptcy case.  Section 560 preserves the rights of a non-defaulting counterparty to a swap agreement to terminate the contract based upon, among other things, the filing of a bankruptcy petition."); *In re Bd. of Dirs. of Compania Gen. de Combustibles S.A.*, 269 B.R. 104, 112 (Bankr. S.D.N.Y. 2001) (same).

11.    Thus, OCI is entitled – but not obligated – to terminate the Derivatives Agreement and maintains the ability to exercise its other contractual rights under it.  On the other hand, Debtors have no right to seek an early termination, whether under the Bankruptcy Code or the Derivatives Agreement.

12.    At bottom, the bankruptcy provisions allow non-defaulting derivatives' counterparties to exercise their agreed-upon contractual rights.  If derivatives' counterparties were forced to mediate over the rights they clearly have or as to rights that Debtors do not have, those bankruptcy provisions would be infringed and potentially rendered meaningless.

### There Is No Legal Basis for Debtors' ADR Motion

13.    The fundamental flaw in Debtors' ADR Motion is that there is no actual "dispute" to mediate.  Thus, Debtors seek to force OCI to spend its time and money on a mandatory mediation process – with the risk of sanctions if OCI fails to participate "in good faith" – over Debtors' apparent disappointment that it either has to wait for the termination or expiration dates in the Derivatives Agreement's Confirmations that Debtors originally agreed to or appropriately sell or transfer the Derivatives Agreement to a third party, subject to the Derivatives Agreement or the Orders of the Court as applicable, for an amount that presumably represents the inherent risk in such an agreement.

14.    Notably, the only legal authorities that Debtors attempt to rely on are Bankruptcy Code Section 105(a) and General Order M-143.   Neither provides a basis for Debtors' ADR Motion nor for the Court to force parties that are not in any dispute with Debtors into participating in Debtors' mediation scheme.

15.    It is black-letter law that Section 105(a) does not create substantive rights. *See In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (holding that Section 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity" (internal quotation marks omitted)); *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 751 (2d Cir. 1992) ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); *In re General Motors Corp.*, No. 09-50026, 2009 WL 1959233, at *39 (S.D.N.Y. July 5, 2009) ("[E]ven with the presence of section 105(a), bankruptcy judges are not free to do whatever feels right.").

16.    Thus, Debtors' ADR Motion is fatally flawed because the only Bankruptcy Code provision Debtors even attempt to rely on is Section 105(a).  As the Court of Appeals wrote in *In re Dairy Mart Convenience Stores*, "[b]ecause no provision of the Bankruptcy Code may be successfully invoked in this case, section 105(a) affords [Debtors] no independent relief."  351 F.3d at 92; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Any power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." (internal quotation marks omitted)).  As the District Court for the Southern District of New York has explained,

> [S]ection 105(a) does not provide bankruptcy courts with a roving
> writ, much less a free hand.  The authority bestowed thereunder

> may be invoked only if, and to the extent that, the equitable
> remedy dispensed by the court is necessary to preserve an
> identifiable right conferred elsewhere in the Bankruptcy Code.

*In re WestPoint Stevens, Inc.*, 333 B.R. 30, 54 (S.D.N.Y. 2005) (internal quotation marks

omitted)).  Section 105(a) therefore does not provide a basis for Debtors' ADR Motion.

17.    Nor does General Order M-143 support Debtors' ADR Motion.  General

Order M-143 merely establishes rules for the mediation of matters, and expressly specifies that

the types of matters included are adversary proceedings, contested matters, or other disputes.

(*See* General Order M-143, § 1.3 ("Unless otherwise ordered by the presiding judge, any

adversary proceeding, contested matter or other dispute may be referred by the court to

mediation").)  There is no adversary proceeding, contested matter, or dispute between Debtors

and OCI.  And no dispute exists because, as explained above, OCI is not in breach of the

Derivatives Agreement and is not currently obligated to make any payments to Debtors.  General

Order M-143 does not create disputes or assume that disputes exist.  Because no actual dispute

exists between the parties, General Order M-143 provides no basis for Debtors' ADR Motion.

*Cf., Smith v. Frank*, 923 F.2d 139, 141-42 (9th Cir. 1991) ("[L]ocal rules should not be construed

as affecting the jurisdiction of the district court, but instead should merely regulate the practice

within the court.").

18.    Further, the cases Debtors cite which apply General Order M-143 do not

support the relief they seek here because they involve this Court's adoption of mediation

procedures for ***filed adversary proceedings***.  *See In re Ames Department Stores, Inc., et al.*, Case

No. 01-42217 (REG) (Bankr. S.D.N.Y. June 25, 2007) [Docket No. 3195] (ordering mediation

for numerous listed preference actions); *In re Enron Corp., et al.*, Case No. 01-16034 (ALG)

(Bankr. S.D.N.Y. Mar. 20, 2003) [Docket No. 9862] (ordering mediation procedures for the 25

listed adversary proceedings and adversary proceedings of the same nature filed in the future)

*and* (Mar. 4, 2003) [Docket No. 9533] (same).  Debtors' parenthetical citations for those decisions even note that critical difference.  (*See* Debtors' ADR Motion ¶ 38.)  Unlike the *Enron* and *Ames Department Stores* cases, Debtors seek to bind parties that are not part of any adversary proceedings to Court-ordered mediation.  Clearly, cases involving parties already embroiled in pending adversary proceedings do not speak to the issues presented here.

19.    It is clear that Debtors seek to engage in their proposed mediation process in the hope of elevating negotiations into a proceeding requiring the intervention of a mediator, who might then be inclined to pressure OCI into accepting an "equitable" resolution or, alternatively, face sanctions.  It is not a mediator's role to determine whether a dispute exists in the first place, but instead to seek to reach resolution of an actual dispute.  Here, Debtors wish to institute a Court-ordered mediation process in the hopes of manipulating the process for their advantage.

20.    It is understandable that Debtors desire to "monetize" their "in the money" derivatives contracts in the most profitable way for the benefit of Debtors' estate.  But that does not justify requiring OCI to submit to timely and expensive Court-ordered mediation.  Debtors can sell their derivatives contracts or simply engage in negotiations with the contracts' counterparties for early termination.  In fact, the parties have engaged in various business discussions regarding the terms of the Derivatives Agreement and other financial agreements between them during the course of these cases without any Court order requiring them to do so.

**Debtors' ADR Motion Seeks to Create Landmines for OCI**

21.    Debtors' ADR Motion would force OCI to engage in costly and time-consuming mediation over a non-dispute, while also subjecting OCI to the risks of sanctions, default judgments, and other remedies if it does not participate to the satisfaction of Debtors or an appointed mediator.  As Debtors admit, its proposed ADR procedures would require parties

such as OCI to "(i) serve and answer in response to the proposed settlement set forth in a

Derivative ADR Package, (ii) engage in settlement discussions, (iii) participate in any mediation

in good faith, (iv) follow the directions of the mediator, and (v) follow the Derivative ADR

Procedures approved by this Court."  (Debtors' ADR Motion ¶ 16.)

22.    Specifically, if Debtors' ADR Motion is granted, OCI potentially must:

- Submit an explanation if it chooses to decline Debtors' initial offer. (*See id.* ¶ 19.)  If OCI failed to respond, Debtors could file for "(a) sanctions, (b) entry of a judgment for recovery of the amounts sought in the Derivative ADR Notice, or (c) immediate entry into the mediation stage." (*Id.* ¶ 20.)

- Respond within two calendar days to a request for a "Settlement Conference," agree to a conference date within five days of Debtors' proposal, and then appear for an approximately one-hour conference.  (*Id.* ¶¶ 21-22.)  If OCI fails to respond, it will be forced into the "Mediation Stage."  (*Id.* ¶ 21.)

- Appear in person at a mediation, for which a mediator "will have the broadest possible discretion" and briefing may be directed.  (*Id.* ¶¶ 25; *see also id.* ¶ 26 ("The addition or elimination of mediation locations will be within the sole discretion of the Debtors.").)

- Risk Court sanctions for failing to follow Debtors' imposed procedures. (*Id.* ¶ 29 ("Sanctions as they relate to Derivatives Counterparties may include but are not limited to (a) attorneys' fees, (b) fees and costs of the Mediator, or (c) an award of the Derivatives ADR Dispute up to the amount specified in the Debtor's Derivatives ADR Notice.").)

- Pay its own counsel fees and other costs of the mediation.  (*Id.* ¶ 30.)

- Potentially be forced to reveal legal or financial positions directly to Debtors or the Credit Committee through the Debtors proffered mediation process, including service of briefing on those parties.  (*Id.* ¶¶ 27, 32.)

23.    Not only would this process be expensive and time-consuming for OCI

and other counterparties, it would be similarly expensive and time-consuming for the estate,

including through Debtors' counsel's fees, mediator fees, and other costs.  In a case with an

actual legal dispute, one can understand how a mediation process might be appropriate and result

in a savings over the costs of protracted litigation.  But there is no actual legal dispute here.

Although the bare allegation that the proposed ADR procedures would save money for the estate

cannot alone justify their implementation, it nonetheless appears much more likely that Debtors'

proposed ADR procedures would actually cause the estate to waste significant amounts of

money and time.

### Debtors Already Have the Ability to Fairly "Monetize" Their Interests

24.    Debtors have already received several Court orders enabling them to have

the ability to "monetize" their interests in derivatives agreements, but while also respecting

counterparties' contractual and legal rights.  Apparently unsatisfied with those measures, Debtors

now seek to force mediation, essentially opening the door to using its own breach of the

Derivatives Agreement as a basis for it to try to force the non-defaulting party, OCI, into

surrendering its rights.

25.    As Debtors noted, they have already received three orders to help them

"monetize" their interests in derivatives contracts.  (*See* Debtors' ADR Motion ¶¶ 10-11.)  First,

on December 16, 2008, the Court granted Debtors' November 13, 2008 motion, as revised,

seeking to establish procedures to assign derivative contracts and to settle terminated derivative

contracts.  (12/16/08 Order [Docket 2257].)  Among other things, the December 16, 2008 Order

allows Debtors to assign numerous derivative contracts without the respective counterparty's

prior approval.  (12/16/08 Order at 3.)  Under this Order, counterparties are afforded an

opportunity to object; but if such objection is not resolved consensually, then Debtors may move

to assign a derivatives contract over a counterparty's objection.  (12/16/08 Order at 4-6.)

Notably, Debtors had initially sought far broader relief, including the virtually unfettered right to

assign derivatives contracts and impair counterparties' contractual rights, leaving counterparties

with little assurance of the potential assignee's creditworthiness.  (*See generally* 11/13/08

Motion and Proposed Order.)  After numerous objections were filed by counterparties, however, Debtors retrenched and sought more reasonable relief.  (12/15/08 Notice of Amended Order [Docket 2239].)  Nevertheless, the December 16, 2008 Order that was ultimately entered by the Court still gave Debtors wide-ranging ability to sell many of its derivatives positions to third parties.  (12/16/08 Order at 3-8.)

26.    Second, on January 28, 2009, the Court granted Debtors' January 16, 2009 motion (1/16/09 Motion [Docket 2561]) to assume and assign certain other derivatives contracts where such assumption and assignment was either with the consent of the applicable counterparty or in accordance with the terms of the applicable derivatives contract.  (1/28/09 Order [Docket No. 2667].)  This allowed Debtors to "monetize" even more interests.  Again, numerous objections were filed in response to Debtors' January 16, 2009 motion, forcing Debtors' to submit an Amended Order that better protected the counterparties' rights under their respective derivatives contracts.  (*See generally* 1/23/09 Amended Motion [Docket 2635].)

27.    Third, on March 11, 2009, the Court granted Debtors' January 28, 2009 motion (1/28/09 Motion [Docket 2682]) to enter into a diverse range of trading or hedging transactions with certain broker dealers to hedge against the loss of their interests in derivatives contracts by granting first priority liens in cash collateral posted in connection therewith. (3/11/09 Order at 2 [Docket No. 3047].)  As with the two previous orders, the March 11, 2009 Order reflected a scaled-back version of Debtors' initial Proposed Order after numerous objections were filed by various counterparties and the Creditors' Committee raising concerns about the vague and open-ended nature of Debtors' hedging transactions.  In response, Debtors submitted a revised Proposed Order which included additional protocols aimed at addressing some of the objections.  (3/10/09 Debtors' Reply [Docket 3031].)

28.     The record of this case demonstrates two things.  First, Debtors already have the means to "monetize" their interests in derivatives contracts.  The fact that Debtors apparently cannot sell them for what they would like does not justify Debtors' present attempt to force OCI and other counterparties to mediate.  Second, Debtors are attempting to ignore OCI's and other counterparties' contractual and legal rights and to manipulate them into surrendering rights and paying a ransom to avoid a time-consuming, expensive, and risky – yet wholly unnecessary – mediation process.

WHEREFORE, for the reasons set forth herein, OCI respectfully requests that the Court deny Debtors' ADR Motion in all respects or, in the alternative, order that any relief granted for Debtors' ADR Motion does not apply to OCI and its Derivatives Agreement.

Dated: New York, New York
       July 31, 2009

/s/ Gerald C. Bender
Gerald C. Bender
Steven A. Rosenstein

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:     (212) 326-2000
Facsimile:     (212) 326-2061

*Attorneys for Oceania Cruises Inc.*