**(Multicurrency-Cross Border)**

**SCHEDULE**
to the
**Master Agreement**
dated as of December 19, 2006
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**OCEANIA CRUISES, INC.** ("Party B"),
a corporation organized under the laws of
Delaware

**Part 1: Termination Provisions**

In this Agreement:-

(a) **"Specified Entity"** means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Finance, S.A.<br>Lehman Brothers Commercial Corporation<br>Lehman Brothers Commodity Services Inc.<br>Lehman Brothers OTC Derivatives Inc. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b) **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c) The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:-

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 100 million or (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and USD 3 million in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d) The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party A, that Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be, fails to maintain a long-term senior unsecured debt rating of at least Baa3 as determined by Moody's Investors

Service, Inc. ("Moody's") and BBB- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e) The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f) **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g) **"Termination Currency"** means USD.

(h) **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:

(i) **Party A as a Secured Party.** At any time (1) Party A ceases to be one of the Secured Parties, (2) all or substantially all of the Collateral is released from the Liens of the relevant Loan Documents without the prior written consent of Party A, (3) (A) the liabilities of any Credit Support Provider of Party B in respect of its guarantee obligations under the relevant Loan Documents are limited without the prior written consent of Party A or (B) any Credit Support Provider of Party B is released from its guarantee obligations under the relevant Loan Documents without the prior written consent of Party A, (4) the obligations or liabilities of Party B or any of its Credit Support Providers under this Agreement and the Credit Support Documents are deemed subordinate to or junior in right or priority of payment to any of the Loans under the Loan Documents, (5) Party B or any of its Credit Support Providers takes any action that may render its obligations or liabilities under this Agreement or the Credit Support Documents as unsecured indebtedness, or (6) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents cease to constitute the Obligations of the Loan Parties and cease to rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents For the purpose of the foregoing Termination Event, Party B shall be the Affected Party .

(ii) **Financial Covenants.** At any time Party B fails to comply with any of the terms and provisions as set forth in the following sections or any section(s) substituting for such section(s), as the case may be, of the Credit Agreement as the same exists on the Trade Date and without regard to any amendment, modification, addition, or waiver thereof; (1) Section 6.10 (b) Maximum Interest Expense Coverage Ratio; (2) Section 6.10 (a) Maximum Leverage Ratio; and (3) Section 6.10 (c) Limitation on Capital Expenditures. For the purpose of the foregoing Termination Event, Party B shall be the Affected Party.

**Part 2: Tax Representations**

(a) **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b) **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of Delaware.

(c) **Tax Representations in Confirmations.** For purposes of Sections 2(d)(i)(4) and 3(f), any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a) Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered |
|---|---|---|
| Party A and Party B | Forms and/or documents described in Section 4(a)(iii) of the Agreement. | Upon reasonable demand by the other party. |

(b) Other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Within 120 days of each fiscal year end. | Yes |

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Providers, prepared in accordance with generally accepted accounting principles consistently applied. | Within 45 days of the end of each of the first three fiscal quarters. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit B to this Schedule. | Upon execution of this Agreement | No |
| Party B | Compliance Certificate, as of the end of the fiscal quarter or fiscal year of Party B, certified by a Financial Officer, attesting (1) that no condition or event has occurred with respect to Party B which would constitute an Event of Default, a Potential Event of Default or a Termination Event under this Agreement and (2) that Party B is in compliance with every financial covenant in the Credit Agreement. The Compliance Certificate shall set forth reasonably detailed calculations evidencing Party B's compliance with such financial covenants. | Simultaneously with the annual and quarterly financial statements referred to above. | Yes |
| Party B | An executed copy of the Credit Agreement and the Security Documents, certified by a secretary or assistant secretary of Party B. | Upon execution of this Agreement or upon request | No |

**Part 4: Miscellaneous**

(a)

Address for notices or communications to **Party A:**

Address: Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Divsion
Transaction Management Group
745 Seventh Avenue
New York, NY 10019

Attention: Documentation Manager

| | |
|---|---|
| Telephone No.: | (212) 526-7187 |
| Facsimile No.: | (212) 526-7672 |
| | For all purposes. |

Address for notices or communications to **Party B**:

| | |
|---|---|
| Address: | 8300 N.W. 33rd Street<br>Suite 308<br>Miami, Florida 33122<br>USA |
| Attention: | Mr. Luis San Miguel, CFO<br>Senior Vice President |
| Telephone No.: | (305) 514-2255 |
| Facsimile No.: | (305) 392-2582 |
| | For all purposes. |

(b) **Process Agent.** For the purpose of Section 13(c) of this Agreement:

| | |
|---|---|
| Party A appoints as its Process Agent: | Not applicable. |
| Party B appoints as its Process Agent: | Gema M. Piñon, Esq.<br>Vice President & Corporate Counsel<br>8300 N.W. 33rd Street, Suite 308<br>Miami, FL 33122 |

(c) **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(d) **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e) **Calculation Agent.** The Calculation Agent is Party A.

(f) **Credit Support Document.**

In the case of **Party A**:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B**:

Each of the Loan Documents.

(g) **Credit Support Provider.**

Credit Support Provider means in relation to Party A: Holdings

Credit Support Provider means in relation to Party B: Other than Party B, each of the Loan Parties party to the Loan Documents.

(h) **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.).

(i) **Jurisdiction.** Section 13(b) is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

(j) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transaction.

(k) **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5: Other Provisions**

(a) **General Conditions.** Section 2(a)(iii) is hereby amended by (X) inserting in the third line thereof after the words "and is continuing, (2)" and before the words "the condition precedent" the following phrase "the condition precedent that no Additional Termination Event has occurred and is continuing with respect to which the other party is an Affected Party and with respect to which all outstanding Transactions are Affected Transactions, (3)" and (Y) delete the symbol "(3)" before the words "each other applicable condition" and substitute the symbol "(4)" in lieu thereof.

(b) **Accuracy of Specified Information.** Section 3(d) is hereby amended by inserting in the third line thereof after the words "in every material respect" and before the period the phrase "or, in the case of audited or unaudited financial statements, a fair presentation, in all material respects, of the financial condition of the relevant person."

(c) **No Violation or Conflict Representation.** Section 3(a)(iii) is hereby amended by inserting in the second line thereof after the words "constitutional documents" and before the words ", any order or judgment" the phrase "(including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions)."

(d) **Representations.** Section 3 is hereby amended by adding the following subsections after subsection (f) thereof:

(g) **No Agency.** It is entering into this Agreement, any Credit Support Document to which it is a party, and each Transaction, and any other documentation relating to this Agreement or any Transaction, as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(h) **Eligible Contract Participant.** It is an "eligible contract participant" as that term is defined in the Commodity Exchange Act, as amended.

(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into each Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(j) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(k) **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) **Additional Representations of Party B.** Party B represents to Party A in accordance with Section 3 of the Agreement (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

(1) **Portfolio Management.** This Agreement and each Transaction have been, and will be, entered into not for the purpose of speculation but solely in connection with portfolio management, asset, risk, and liability management and hedging activities of Party B.

(2) **Compliance with Laws.** It is in compliance, in all respects, with all applicable laws, rules, regulations, interpretations, guidelines, procedures, and policies of applicable regulatory authorities affecting Party B, this Agreement, the Transactions, or the performance of Party B's obligations hereunder.

(3) **Constitutional Documents.** Party B is in compliance, in all respects, with each and every provision in its constitutional documents (including, but not limited to any and all resolutions, investment policies, guidelines, procedures or restrictions) and each Transaction contemplated hereunder is and will be an authorized and permitted transaction thereunder.

(4) **Contractual Obligations.** This Agreement (and each Transaction hereunder) is entered into by Party B in accordance with and as permitted by the Contractual Obligations of Party B, and this Agreement (and each Transaction hereunder) does not and will not violate or conflict with any Contractual Obligation of Party B nor result in any breach of or constitute a default in respect thereof.

(5) **Credit Support Documents.** The Credit Support Documents of Party B were duly executed and delivered by each of its Credit Support Providers and the obligations under each Credit Support Document constitute the legal, valid and binding obligations of each Credit Support Provider that is a party to such Credit Support Document, enforceable in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(6) **Credit Support Providers.** The execution, delivery and performance of each Credit Support Document by each Credit Support Provider that is a party to such Credit Support Document do not violate or conflict with (i) any law applicable to such Credit Support Provider, (ii) any provision of the constitutional documents of such Credit Support Provider, (iii) any order or judgment of any court or other agency applicable to such Credit Support Provider, or (iv) any Contractual Obligation of such Credit Support Provider nor result in any breach of or constitute a default in respect thereof.

(7) **Hedging Agreement.** (i) Party A is one of the Secured Parties, (ii) this Agreement (and each Transaction entered into thereunder) is a Hedging Agreement and (iii) the obligations and liabilities of Party B and its Credit Support Providers under this Agreement and the relevant Credit Support Documents constitute the Obligations of the Loan Parties and rank pari passu with and equal in right and priority of payment with the Loans under the Loan Documents.

(f) **Additional Obligations of Party B.** Party B agrees with Party A (so long as each of Party A and Party B has or may have any obligation under this Agreement) that:

(1) **Representations.** Party B will not take any action that may render any of the representations and warranties in this Agreement untrue, incorrect or incomplete, and if any event or condition should occur that would render any such representations and warranties untrue, incorrect or incomplete, then Party B shall promptly give written notice thereof to Party A.

(g) **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f) ***Set-off.***

(i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii) For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii) If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv) This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(h) **Transfer**. Notwithstanding anything to the contrary in Section 7 of the Agreement, Party A may assign its rights and obligations under the Agreement, in whole or in part, (1) to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor, or (2) to any entity with the same or higher long term senior unsecured debt rating (as determined by S&P or Moody's) as Holdings at the time of such transfer.

(i) **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(j) **Service of Process.** The third sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(k) **Outstanding Specified Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(l) **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(m) **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(n) **Default Under Specified Transaction.** Section 5(a)(v) is hereby amended to read as follows:

(v) ***Default Under Specified Transaction.*** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1) defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early

termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3) defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(o) **Escrow Payments**. If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(p) **Severability**. If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(q) **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction. Promptly upon the request by a party, the other party will provide a copy of such recording to the party making the request.

(r) **Additional Definitions.** Section 14 is hereby amended by adding the following definitions in their appropriate alphabetical order:

"**Collateral**" shall have the meaning assigned to such term in the Security Documents.

"**Contractual Obligation**" means with respect to Party B and each of its Credit Support Providers, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound (including, but not limited to, the Loan Documents).

"**Credit Agreement**" means the Credit Agreement, dated as of November 13, 2006 (as amended, supplemented, waived or otherwise modified from time to time), by and among Party B, INSIGNIA VESSEL ACQUISITION, LLC, REGATTA ACQUISITION, LLC, the Lenders and other entities from time to time party thereto, UBS AG, STAMFORD BRANCH,as administrative agent and collateral agent, as the same exists on the date of execution of this Agreement and without regard to (1) any termination or cancellation thereof, whether by reason of payment of all indebtedness incurred thereunder or otherwise, or (2) unless consented to in writing by Party A, any amendment, modification, addition, waiver or consent thereto or thereof.

"**Financial Officer**" shall have the meaning assigned to such term in the Credit Agreement.

"**Hedging Agreement**" shall have the meaning assigned to such term in the Credit Agreement.

"**Holdings**" means Lehman Brothers Holdings Inc.

"**Lien**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loans**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Loan Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Moody's**" means Moody's Investor Services, Inc.

"**Obligations**" shall have the meaning assigned to such term in the Security Documents.

"**Person**" shall have the meaning assigned to such term in the Credit Agreement.

"**S&P**" means Standard & Poor's Ratings Services.

"**Secured Parties**" shall have the meaning assigned to such term in the Credit Agreement.

"**Security Documents**" shall have the meaning assigned to such term in the Credit Agreement.

"**Stockholders' Equity**" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

"**USD**" means United States Dollars.

**Part 6: Additional Terms for FX Transactions and Currency Options**

(a) **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i) Incorporation of 1998 FX and Currency Option Definitions. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii) Amendment of 1998 FX and Currency Option Definitions. The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

**Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b) **Confirmations**. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c) **Netting and Related Provisions**. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

(i) Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii) Netting, Discharge and Termination with Respect to Currency Option Transactions. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d) **Inconsistencies.** In the event of any conflict between:

(i) the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii) the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii) the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e) **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and OCEANIA CRUISES, INC. ("Party B") have entered into a Master Agreement dated as of December 19, 2006, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a) Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b) Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c) Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d) This Guarantee shall remain in full force and effect until the first to occur of (i) receipt by Party B of a written notice of termination from Guarantor or (ii) none of the obligations of Party A remain outstanding. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e) Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f) Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: ______________________________
Name:
Title:
Date:

EXHIBIT B to Schedule

[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

I have acted as counsel to OCEANIA CRUISES INC., a Delaware corporation ("Party B") and each of the Credit Support Providers of Party B (as specified in Part 4 of the Schedule to the Master Agreement) as of the date hereof and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of February __, 2007 between Party B and LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and the Credit Support Documents of Party B.

In connection with this opinion, I have examined, or have had examined on my behalf, executed copies of (1) the Master Agreement, (2) the Credit Support Documents of Party B, (3) the Credit Agreement, (4) certificates and statements of public officials and officers of each of Party B and its Credit Support Providers, and (5) such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion. All capitalized terms used but not defined in this opinion shall have the meanings assigned thereto in the Master Agreement.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party B and its Credit Support Providers is a __________ duly organized, validly existing and in good standing under the laws of the State of __________.

2. The execution, delivery and performance of [(i)] in the case of Party B, the Master Agreement by or on behalf of Party B, [and (ii) in the case of each Credit Support Provider of Party B,] each Credit Support Document to which it is a party by or on behalf of such Credit Support Provider, are within its powers, have been duly authorized by all necessary actions and do not (X) contravene any provision of its constitutional documents and (Y) contravene or result in any breach of or constitute a default under any Contractual Obligation of Party B and said Credit Support Provider, as the case may be.

3. Each of the Master Agreement and the Credit Support Documents of Party B has been duly executed and delivered by each of Party B and its Credit Support Providers, as the case may be, and constitutes a legal, valid and binding obligation, enforceable against each of Party B and its Credit Support Providers, as the case may be, in accordance with its terms.

4. (X) Party A is one of the [Secured Parties], (Y) the Master Agreement (and each Transaction entered into thereunder) is a [Swap Agreement] and (Z) the obligations and liabilities of Party B and its Credit Support Providers under the Master Agreement and the relevant Credit Support Documents constitute the [Obligations] of the [Loan Parties] and rank pari passu with and equal in right and priority of payment with the Loans under the [Loan Documents].

5. To the best of my knowledge, no consent, authorization, license or approval of or registration or declaration with, any U.S. federal or state governmental authority is required

in connection with the execution, delivery and performance of the Master Agreement and the Credit Support Documents of Party B by Party B or any of its Credit Support Providers, as the case may be.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A. My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B. I am a member of the Bar of the State of ___________ and render no opinion on the laws of any jurisdiction other than the laws of the State of ___________ and the federal laws of the United States of America and the General Corporation Law of the State of Delaware.

C. My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D. This letter is rendered to you in connection with the Master Agreement and the Credit Support Documents of Party B and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party B, except that you may furnish copies hereof (i) to your attorneys and independent auditors, (ii) to any United States, state or local authority having jurisdiction over you or your Credit Support Provider, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Credit Support Documents.

E. I have assumed with your permission (i) the genuineness of all signatures by each party other than Party B and its Credit Support Providers, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement and the Credit Support Documents by each party other than Party B and its Credit Support Providers.

Very truly yours,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

*Party A*

By:
Name:
Title:
Date:

Allyson M. Carine
Authorized Signatory

**OCEANIA CRUISES, INC.**

*Party B*

By:
Name: Luis San Miguel, as
Title: Chief Financial Officer
Date: 2/26/07