# EXHIBIT A

[PMI Agreement]

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of January 30, 2007

**LEHMAN BROTHERS**     and     **FPL ENERGY POWER**
**COMMODITY SERVICES INC.**            **MARKETING, INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.     **Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

           (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

           (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

    ISDA® 1992

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)      any other documents specified in the Schedule or any Confirmation; and

   (iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)     *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)     *Credit Support Default.*

(1)     Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)     the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)     the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)     *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)     *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)     *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption.* The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If :—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)  If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and, except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

ISDA® 1992

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

### 12.    Notices

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv) if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

### 13.    Governing Law and Jurisdiction

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15                                                ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

<table>
<tr><td align="center">LEHMAN BROTHERS<br>COMMODITY SERVICES INC.<br>*(Name of Party)*</td><td align="center">FPL ENERGY POWER MARKETING, INC.<br><br>*(Name of Party)*</td></tr>
<tr><td>By: _____<br>Name:<br>Title:<br>Date:    Allyson M. Carine<br>        Authorized Signatory</td><td>By: _____<br>Name:<br>Title:<br>Date:</td></tr>
</table>



LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of January 30, 2007
between
**LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A"),**
a corporation organized under the laws of
the State of Delaware
and
**FPL ENERGY POWER MARKETING, INC. ("Party B"),**
a corporation organized under the laws of
Florida

**Part 1: Termination Provisions**

In this Agreement:

(a)    **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Commercial Corporation, Lehman Brothers Finance SA, Lehman Brothers Special Financing Inc. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)    **"Specified Transaction"** will have the meaning specified below.

"Specified Transaction" means (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse purchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward or spot purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or

19

measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c) The "Breach of Agreement" provisions in Section 5(a)(ii), shall be amended by deleting the following words in the parenthetical: "or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)".

(d) The "Credit Support Default" provisions in Section 5(a)(iii)(3), shall be amended by inserting at the end of the clause, immediately before the semicolon, the following parenthetical: "(or any such action is taken by any person or entity appointed or empowered to operate it or act on its behalf)".

(e) The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and Party B, however Section 5(a)(vi) shall be amended by deleting the words "or becoming capable at such time of being declared," in the seventh line thereof and is further amended by adding, "provided, however, that notwithstanding the foregoing, an Event of Default shall not occur with respect to either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay or deliver referred to in (2) is a failure to pay or deliver caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

The following provisions apply:

"Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement.

"Threshold Amount" means the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and the lesser of (i) USD 50 million and (ii) two percent (2%) of the Stockholders' Equity of Party B, in the case of Party B (or its equivalent in any other currency).

For purposes hereof, "Stockholders' Equity" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(f) The "Credit Event Upon Merger" provisions of Section 5(b)(iv) will apply to Party A and Party B, amended as follows:

"'Credit Event Upon Merger' shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In such case the Affected Party shall be the party with respect to which, or with respect to whose Credit Support Provider or Specified Entity of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

Any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

(g) The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B.

20

(h)     **Payments on Early Termination.** For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(i)     **"Termination Currency"** means United States Dollars ("USD").

(j)     **Additional Termination Events** will not apply.

(k)     **"Additional Event of Default"** shall apply to both Party A and Party B and is defined as the following:

Adequate Assurance of Performance: A party (the "Demanding Party") may demand that the other party (the "Posting Party") provide the Demanding Party with Adequate Assurance of Performance if at any time (i) the Posting Party's Credit Support Provider has a Credit Rating below either BBB- as determined by S&P or Baa3 by Moody's and (ii) the Demanding Party has reasonable grounds for insecurity concerning the Posting Party's ability to perform any of its obligations under this Agreement. Notwithstanding the foregoing, if Party A's reasonable grounds for insecurity concerning Party B's ability to perform is based upon amendment or revocation of the that certain Guarantee dated as of October 14, 1998 between FPL Group, Inc. and FPL Group Capital Inc, then the Credit Rating of Party B's Credit Support Provider will be irrelevant for purposes of determining whether Party A has the right to demand Adequate Assurance of Performance in accordance with the preceding sentence. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount and for the term reasonably acceptable to the Demanding Party, including, but not limited to, cash collateral, a standby irrevocable letter of credit issued by a bank reasonably acceptable to the Demanding Party, a prepayment, or other security reasonably acceptable to the Demanding Party.   The Posting Party shall provide the Adequate Assurance of Performance within two (2) Business Day of demand by the Demanding Party.

Upon making a demand for Adequate Assurance of Performance the Demanding Party may withhold or suspend its obligations under this Agreement and under any Transaction until it receives the Adequate Assurance of Performance from the Posting Party.

**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of <u>Section 3(e)</u> of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under <u>Sections 2(e)</u>, <u>6(d)(ii)</u> or <u>6(e)</u> of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to <u>Section 3(f)</u> of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to <u>Section 4(a)(i)</u> or <u>4(a)(iii)</u> of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in <u>Section 4(d)</u> of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under <u>Section 4(a)(iii)</u> of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of <u>Section 3(f)</u> of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a corporation duly organized and validly existing under the laws of Florida.

(c)     **Tax Representations in Confirmations.** For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

21

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority and genuine signature of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, FPL Group, Inc., containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied , if such financial statements are not available on the SEC "EDGAR" website or such party's internet home page. | Upon request. | Yes |

LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, FPL Group, Inc., prepared in accordance with generally accepted accounting principles consistently applied , if such financial statements are not available on the SEC "EDGAR" website or such party's internet home page. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

**Part 4: Miscellaneous**

(a)  **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to Party A:

Address:     Lehman Brothers Commodity Services Inc.
             c/o Lehman Brothers Inc.
             Transaction Management Group
             Corporate Advisory Division
             745 Seventh Avenue
             New York, NY 10019

Attention:          Documentation Manager
Telephone No.:      (212) 526-7187
Facsimile No.:      (212) 526-7672

             For all purposes.

Address for notices or communications to Party B:
For all purposes other than notice purposes described below:
Address:     FPL Energy Power Marketing, Inc.,
             700 Universe Blvd.,
             Juno Beach, Florida 33408

Attention:          Contracts/Legal
Facsimile No.:      (561) 625-7567

(b)  **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

Party A appoints as its Process Agent:          Not applicable.

23

Party B appoints as its Process Agent:          Not applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A unless otherwise specified in a Confirmation to the relevant Transaction or unless an Event of Default in respect of Party A has occurred and is then continuing in which case the Calculation Agent shall be Party B or a recognized dealer designated in good faith by Party B to be the Calculation Agent.

(f)    **Credit Support Document.**

In the case of **Party A:**

Guarantee of Party A's obligations hereunder made by Party A's Credit Support Provider and dated June 28, 2006 (as the same may be renewed or amended from time to time)
Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

In the case of **Party B:**

Guarantee of Party B's obligations hereunder made by Party B's Credit Support Provider and dated June 26, 2006 (as the same may be renewed or amended from time to time)
Credit Support Annex annexed hereto which supplements, forms part of, and is subject to, this Agreement.

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:       Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:       FPL Group Capital, Inc. and FPL Group Inc.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions and netting pursuant to Section 2(c) will apply across all Transactions under this Agreement.

(j)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement, <u>provided, however,</u> that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

(k)    **Jurisdiction.** <u>Section 13(b)</u> is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.

**Part 5: Other Provisions**

<u>Miscellaneous:</u>

(a)    **Representations.** <u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

(g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based

24

upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)    *Default Under Specified Transaction.* Section 5(a)(v) is hereby amended to read as follows:

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least two Local Business Days);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(c)    Set-off. Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)    *Set-off.*

(i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement

25

with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)   If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(d)    **Transfer.** Notwithstanding anything to the contrary in <u>Section 7</u> of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor.

(e)    **Notices.** For the purposes of <u>subsections (iii)</u> and <u>(v)</u> of <u>Section 12(a)</u>, the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)    **Service of Process.** The penultimate sentence of <u>Section 13(c)</u> shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(g)    **WAIVER OF TRIAL BY JURY.** INSOFAR AS IS PERMITTED BY LAW, EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION, AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS AGREEMENT AND EACH TRANSACTION HEREUNDER.

(h)    **Accuracy of Specified Information.** <u>Section 3(d)</u> is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person in accordance with U.S. generally accepted accounting principles consistently applied."

(i)    **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "second".

(j)    **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

26

(k)    **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction.

(l)    **LIMITATION OF LIABILITY.** FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

(n)    **Statute of Frauds.** The parties agree not to contest, or to enter any defense concerning the validity or enforceability of any Transaction on the grounds that the documentation for such Transaction fails to comply with the requirements of any jurisdiction's (of whatever country, province, or state) statute of frauds or any other statute, regulation or judicial decision that agreements be written or signed.

(o)    **Confirmation of a Transaction.** The parties hereby amend Section 9(e)(ii) by adding the following sentences at the end thereof: "Promptly after the Trade Date of a Transaction, Party A will send to Party B a Confirmation. Party B will promptly thereafter confirm the accuracy of, or request the correction of, such Confirmation. If Party B fails to accept or dispute the Confirmation in the manner set forth above within two (2) Local Business Days after it was effectively sent to Party B, the Confirmation shall be deemed to correctly reflect the parties' agreement on the terms of the Transaction referred to therein, absent manifest error. If Party A fails after a commercially reasonable period to send a Confirmation to Party B after the Trade Date of a Transaction, then Party B may send a Confirmation for such Transaction to Party A, which Confirmation will be deemed to correctly reflect the parties' agreement on the terms of Transaction referred to therein, absent manifest error, if Party A fails to accept or dispute such Confirmation within two (2) Local Business Days after it was effectively sent to Party A. If any dispute shall arise as to whether an error exists in a Confirmation, the parties shall in good faith make reasonable efforts to resolve the dispute. The requirement of this Section and elsewhere in this Agreement that the parties exchange Confirmations shall for all purposes be deemed satisfied by a Confirmation sent and an acknowledgment deemed given as provided herein. Notwithstanding anything in the foregoing to the contrary, if a Confirmation contains provisions purporting to modify the general terms and conditions of this Master Agreement (e.g. Events of Default, representations and warranties, set-off, etc.) in addition to provisions setting forth the commercial terms for the Transaction documented by such Confirmation (e.g., the notional volume, Fixed Price, Floating Price, etc.), no such Confirmation shall be deemed to effectively modify such general terms and conditions of this Master Agreement (with respect to the applicable Transaction or otherwise) unless it has been duly executed by both Parties hereto.

(p)    **Reference Market-Makers.** The definition of "Reference Market-makers" in Section 14 of this Agreement is hereby amended by: (i) deleting "(a)" from the second line thereof, (ii) deleting in the fourth line thereof after the word "credit" the words "and (b) to the extent practicable, from among such dealers having an office in the same city" and (iii) replacing such words with the words "or to enter into transactions similar in nature to Transactions."

27

(q)  **Applicable Rate.** The definition of "Applicable Rate" in Section 14 of this Agreement is hereby amended by adding to the end of Subsection (b) of the definition after the word "Rate" the following provision: "provided, however, that if the payee is a Defaulting Party for purposes of Section 6(e), then the rate shall be the Non-default Rate."

### Part 6: Additional Terms for Commodity Transactions

(a)  **Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (the "2000 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2000 Definitions and the 2005 Definitions, the 2005 Definitions will prevail. In the event of any inconsistency between the provisions of this Master Agreement (including the Schedule) and the Definitions, this Master Agreement (including the Schedule) will prevail. In the event of any inconsistency between the provisions of a Confirmation and this Master Agreement (including the Schedule) or the Definitions, the Confirmation will prevail for the purpose of such Transaction.

(b)  **Disruption Fallback.** The definition of "Fallback Reference Dealers" shall be deleted in its entirety and replaced with the following: "Fallback Reference Dealers means that: the Relevant Price will be determined and calculated as set forth in the definition "Commodity-Reference Dealers" (provided that, if the basis that the Specified Price for a Transaction is determined on an hourly basis, all references to Pricing Date shall be read as Pricing Hour) except that each party shall select, in good faith, a price quote from at least two (2) independent, impartial and unaffiliated Reference Dealers in the relevant market which satisfy all the criteria that a party applies generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event, and shall obtain such quotes within six (6) Business Days of the Market Disruption Event. The Relevant Price shall be the arithmetic mean of the prices so obtained, and such calculation shall be binding and conclusive absent manifest error even if one party was able to obtain only one quote or no quotes within the time provided. However, if the parties have not obtained at least two (2) prices in total on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, the next applicable Disruption Fallback will apply to the Transaction."

Subject to the change in Part 7(b) above, Section 7.5(d)(i) of the 2005 Definitions shall be applicable to all Transactions unless specified in a confirmation.

(c)  **Rounding.** Section 9 of the Commodity Definitions is deleted in its entirety and the following is substituted therefore:

"**Section 9.** For purposes of preparing any calculations referred to in the Commodity Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Dollar Amounts: | rounded to the nearest cent." |

LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

| LEHMAN BROTHERS<br>COMMODITY SERVICES INC.<br>*(Name of Party)* | FPL ENERGY POWER MARKETING, INC.<br>*(Name of Party)* |

By: _____

Name:

Title:

Date:    Allyson M. Carine
         Authorized Signatory

By: _____

Name:

Title:

Date:



LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

# ISDA®

*International Swaps and Derivatives Association, Inc.*

# CREDIT SUPPORT ANNEX

to the Schedule to the

Master Agreement

dated as of January 30, 2007

between

| | |
|---|---|
| **LEHMAN BROTHERS COMMODITY SERVICES INC.** | **FPL ENERGY POWER MARKETING, INC.** |
| *Party A* | *Party B* |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1. Interpretation**

(a)     *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)      *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13).  Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i)      the Credit Support Amount

exceeds

(ii)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)      *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13).  Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)      *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i)      no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii)     no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)      *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)      *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time.  The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA® 1994

(d)    *Substitutions.*

(i)  Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii)  subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i)  In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A)  utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B)  calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C)  utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii)  In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

3                    **ISDA® 1994**

**Paragraph 6. Holding and Using Posted Collateral**

(a)      *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property.   Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)      *Eligibility to Hold Posted Collateral; Custodians.*

(i)   *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party.  Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian.  The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii)  *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii)  *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)      *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i)   sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii)  register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)      *Distributions and Interest Amount.*

(i)   *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA® 1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(I) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition wit respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA® 1994

(b)    *Pledgor's Rights and Remedies.*  If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

> (i)    the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

> (ii)    the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

> (iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

> (iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

>> (A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

>> (B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.*  The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.*  When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

Paragraph 9. Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date en which it, as the Pledgor, Transfers Eligible Collateral) that:

> (i)    it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

> (ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

> (iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

> (iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

6                                ISDA® 1994

**Paragraph 10. Expenses**

(a)    *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)    *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)    *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)    *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)    *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

ISDA® 1994

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

  (x) the amount of that Cash on that day; multiplied by

  (y) the Interest Rate in effect for that day; divided by

  (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

ISDA® 1994

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in th form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5, *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A)  Cash, the amount thereof; and

        (B)  a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii)  Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii)  Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA® 1994

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of January 30, 2007 between
**LEHMAN BROTHERS COMMODITY SERVICES INC**
(hereinafter referred to as "Party A")
and
**FPL ENERGY POWER MARKETING, INC.**
(hereinafter referred to as "Party B")

**Paragraph 13.  Elections and Variables**

(a)    **Security Interest for "Obligations".**  The term **"Obligations"** as used in this Annex includes the following additional obligations:

With respect to Party A:    None

With respect to Party B:    None

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    "Delivery Amount" has the meaning specified in Paragraph 3(a).

        (2)    "Return Amount" has the meaning specified in Paragraph 3(b).

        (3)    "Credit Support Amount" has the meaning specified in Paragraph 3

    (ii)    **Eligible Collateral.**  The following items will qualify as "Eligible Collateral" for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (1) Cash, in the form of U.S. Dollars. | [X] | [X] | 100% |
| (2) Such other Eligible Collateral as may be agreed between the parties. | [X] | [X] | As agreed between the parties. |

    (iii)    **Other Eligible Support.**  The following items will qualify as "Other Eligible Support" for the party specified:

| | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| Letter of Credit (as defined in Paragraph 13(j)). | [X] | [X] | 100% of the Value of the undrawn portion of the Letter of Credit unless (i) a Letter of Credit Default shall apply with respect to such Letter of Credit, or (ii) twenty (20) or fewer Local Business Days remain prior to the expiration of such Letter of Credit, in either of which cases the Valuation Percentage shall be zero.    Additionally, if the Value of such Other Posted Support exceeds two hundred fifty million U.S. Dollars ($250,000,000) ("Letter of Credit Cap"), the Valuation Percentage shall be zero for all amounts of Other Posted Support in excess of the Letter of Credit Cap. |

11

(iv)    **Thresholds.**

(1)    **"Independent Amount"** shall mean with respect to Party A, not applicable, and with respect to Party B, not applicable.

(2)    **"Threshold"** means, with respect to Pledgor, or its Credit Support Provider, as the case may be, the lower of the following: (i) 90% of the amount of any dollar limit contained in a guaranty provided by the Party's Credit Support Provider or (ii) the amount corresponding to the Credit Rating of such entity as set forth in the table below, provided that (A) if Moody's and S&P have assigned ratings at different levels for any Credit Rating, the lower of such ratings shall be used for purposes hereof and (B) if (I) an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to the Defaulting Party or Affected Party shall be zero and (II) such entity ceases to be rated by either Moody's or S&P or ceases to have a Credit Rating, then the Threshold with respect to Pledgor shall be zero:

| S&P's Rating | Moody's Rating | Threshold | Minimum Transfer Amount |
|---|---|---|---|
| AAA | Aaa | $45,000,000 | $250,000 |
| AA+ | Aa1 | $45,000,000 | $250,000 |
| AA | Aa2 | $45,000,000 | $250,000 |
| AA- | Aa3 | $45,000,000 | $250,000 |
| A+ | A1 | $45,000,000 | $250,000 |
| A | A2 | $40,000,000 | $250,000 |
| A- | A3 | $35,000,000 | $250,000 |
| BBB+ | Baa1 | $25,000,000 | $250,000 |
| BBB | Baa2 | $20,000,000 | $250,000 |
| BBB- | Baa3 | $5,000,000 | $250,000 |
| below BBB- or if Pledgor ceases to have a Credit Rating | below Baa3 or if Pledgor ceases to have a Credit Rating | ----0---- | $250,000 |

(3)    **"Minimum Transfer Amount"** means, with respect to a party, USD the amount corresponding to the Credit Rating of such entity as set forth in the table above; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that (A) if an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Pledgor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Pledgor, or its Credit Support Provider, as the case may be, ceases to be rated by either Moody's or S&P or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Pledgor shall be zero.

(4)    **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of USD250,000.

(c)    **Valuation and Timing.**

(i)    **"Valuation Agent"** means for the purpose of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for the purposes of Paragraphs 4(d) and 6(d), the Secured Party; provided, however, that in all cases, if an Event of Default or Potential Event of Default or Specified Condition has occurred and is continuing with respect to the party designated as the Valuation

Agent, then in such case, and for so long as the Event of Default or Potential Event of Default or Specified Condition continues, the other party shall be the Valuation Agent.

.(ii)   "**Valuation Date**" means any Local Business Day.

(iii)   "**Valuation Time**" means the close of business in New York on a Local Business Day provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)   "**Notification Time**" means 3:00 p.m., New York time, on a Local Business Day.

(d)   **Conditions Precedent and Secured Party's Rights and Remedies.** The following Termination Events will be a "Specified Condition" for the party specified (that party being the Affected Party if the Termination Event occurs with respect to that party):

| | Party A | Party B |
|---|---|---|
| Illegality | [X] | [X] |
| Tax Event | [X] | [X] |
| Tax Event Upon Merger | [X] | [X] |
| Credit Event Upon Merger | [X] | [X] |
| Additional Termination Event(s) as specified in Part 1(h) of the Schedule (if any). | [X] | [X] |

(e)   **Substitution.**

(i)   "**Substitution Date**" has the meaning specified in Paragraph 4(d)(ii).

(ii)   **Consent.** The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)   **Dispute Resolution**

(i)   "**Resolution Time**" means 1:00 p.m., New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute.

(ii)   **Alternative.** Paragraph 5 will apply.

(g)   **Holding and Using Posted Collateral.**

(i)   **Eligibility to Hold Posted Collateral; Custodians.**

(1)   Party A and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

(A)   Party A is not a Defaulting Party and Party A's Credit Support Provider has a Credit Rating from each of S&P and Moody's and the lowest Credit Rating for Party A's Credit Support Provider is "BBB-" with a stable or positive outlook or higher by S&P or "Baa3" with a stable or positive outlook or higher by Moody's. For the avoidance of doubt and without modification to the foregoing, Party A will not be entitled to hold Posted Collateral in the event Party A's Credit Support Provider has a Credit Rating of "BBB-" with a negative outlook in the case of S&P or "Baa3" with a negative outlook in the case of Moody's notwithstanding the absence of any rating change other than the assigning of a negative outlook to an existing Credit Rating.

(B)   Posted Collateral may be held only in the following jurisdictions: Any jurisdiction within the United States.

(C)   The Custodian is a Qualified Institution (as defined in Paragraph 13(g)(ii)).

Initially, the Custodian for Party A is: Not applicable.

(2)   Party B and/or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

13

(A)    Party B is not a Defaulting Party and Party B's Credit Support Provider has a Credit Rating from each of S&P and Moody's and the lowest Credit Rating for Party B's Credit Support Provider is "BBB-" with a stable or positive outlook or higher by S&P or "Baa3" with a stable or positive outlook or higher by Moody's.   For the avoidance of doubt and without modification to the foregoing, Party B will not be entitled to hold Posted Collateral in the event Party B's Credit Support Provider has a Credit Rating of "BBB-" with a negative outlook in the case of S&P or "Baa3" with a negative outlook in the case of Moody's notwithstanding the absence of any rating change other than the assigning of a negative outlook to an existing Credit Rating.

(B)    Posted Collateral may be held only in the following jurisdictions:   Any jurisdiction within the United States.

(C)    The Custodian is a Qualified Institution (as defined in Paragraph 13(g)(ii)).

Initially, the Custodian for Party B is:  Not applicable.

(ii)    **Use of Posted Collateral.** The provisions of Paragraph 6(c) will apply to Party A and Party B; provided, however, that if a party or its Custodian is not eligible to hold Posted Collateral pursuant to Paragraph 13(g)(i), then:

(1)    the Secured Party will not be entitled to use the Posted Collateral as provided in Paragraph 6(c) for so long as either the Secured Party or its Custodian, if any, remain a Downgraded Party or a Downgraded Custodian, respectively; and

(2)    the Downgraded Party shall be required to deliver (or cause the Downgraded Custodian to deliver, as applicable) not later than the close of business on the second Local Business Day following such Downgrade Event all Posted Collateral in its possession or held on its behalf to a Qualified Institution, to a segregated, safekeeping or custody account ("Collateral Account") within such Qualified Institution with the title of the Collateral Account indicating that the property contained therein is being held as Posted Collateral for the ownership of the Pledgor, subject to the security interest of the Secured Party.  The Qualified Institution shall serve as Custodian with respect to the Posted Collateral in the Collateral Account, and the Secured Party shall cause it to hold such Posted Collateral in accordance with the terms of this Annex.  With respect to a Downgraded Custodian that is acting as Custodian for a Secured Party that is not itself a Downgraded Party, such Secured Party may cause such Downgraded Custodian to transfer all Posted Collateral held by such Downgraded Custodian to the Secured Party, to be held in accordance with the terms of this Annex.

(iii)    For the purposes of Section 5(a)(iii) of this Agreement, failure by a party or its Custodian to comply with any of the obligations under this Paragraph 13(g) will constitute an Event of Default with respect to such party if the failure continues for two (2) Local Business Days after notice of failure is given to that party.

(h)    **Distributions and Interest Amount.**

(i)    **Interest Rate.** The Interest Rate will be the Federal Funds Rate.  "Federal Funds Rate" means the rate per annum equal to the overnight Federal Funds Rate for each day Cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Secured Party to the Pledgor no later than the third Local Business Day of each calendar month.  A Transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Secured Party from the Pledgor of confirmation of the Interest Amount to be Transferred.

(iii)    **Alternative to Interest Amount.** Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s).** Not applicable

14

(j)     "Other Eligible Support and Other Posted Support."

(i)     "Value" with respect to Other Eligible Support and Other Posted Support means the stated amount (undrawn portion) of any Letter of Credit maintained by the Pledgor (or its Credit Support Provider) for the benefit of the Secured Party multiplied by the applicable Valuation Percentage.

(ii)     "Transfer" with respect to Other Eligible Support and Other Posted Support means:

(A)     For purposes of Paragraph 3(a), delivery of the Letter of Credit by the Pledgor or issuer of the Letter of Credit to the Secured Party at the address of the Secured Party specified in the Notices Section of this Agreement, or delivery of an executed amendment to such Letter of Credit (extending the term or increasing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Letter of Credit to the Secured Party at address of the Secured Party specified in the Notices Section of this Agreement; and

(B)     For purposes of Paragraph 3(b), by the return of an outstanding Letter of Credit by the Secured Party to the Pledgor, at the address of the Pledgor specified in the Notices Section of this Agreement, or delivery of an executed amendment to the Letter of Credit in form and substance acceptable to the Secured Party (reducing the amount available to the Secured Party thereunder) by the Pledgor or the issuer of the Letter of Credit to the Secured Party at the Secured Party's address specified in the Notices Section of this Agreement. If a Transfer is to be effected by a reduction in the amount of an outstanding Letter of Credit previously issued for the benefit of the Secured Party, the Secured Party shall not unreasonably withhold its consent to a commensurate reduction in the amount of such Letter of Credit and shall take such action as is reasonably necessary to effectuate such reduction.

(iii)     Letter of Credit Provisions.  Other Eligible Support and Other Posted Support provided in the form of a Letter of Credit shall be subject to the following provisions.

(A)     Each Letter of Credit shall be provided in accordance with the provisions of this Annex and shall be maintained for the benefit of the Secured Party.

(B)     As one method of providing Eligible Credit Support, the Pledgor may increase the amount of an outstanding Letter of Credit or establish one or more additional Letters of Credit.

(C)     A Letter of Credit shall provide that the Secured Party may draw upon the Letter of Credit in an amount (up to the face amount for which the Letter of Credit has been issued) that is equal to all amounts that are due and owing from the Pledgor but have not been paid to the Secured Party within the time allowed for such payments under this Agreement (including any related notice of grace period or both). A Letter of Credit shall provide that a drawing be made on the Letter of Credit upon submission to the bank issuing the Letter of Credit of one or more certificates specifying the amounts due and owing to the Secured Party in accordance with the specific requirements of the Letter of Credit.

(D)     If the Pledgor fails to renew, substitute, or sufficiently increase the amount of an outstanding Letter of Credit (as the case may be), or establish one or more additional Letters of Credit, or otherwise provide sufficient Eligible Credit Support and if the Delivery Amount applicable to the Pledgor equals or exceeds the Pledgor's Minimum Transfer Amount as a result of such failure, then the Secured Party may draw on the entire, undrawn portion of any outstanding Letter of Credit. Further, Secured Party may draw on the entire, undrawn portion of any outstanding Letter of Credit upon or at any time after (1) the occurrence of an Event of Default with respect to the Pledgor, or (2) the occurrence or deemed occurrence of an Early Termination Date as a result of a Termination Event and the failure of Pledgor to make all payments due and owing to Secured Party in accordance with the terms of this Agreement. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(E)     If a party's Credit Support Provider furnishes a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the option of such Credit Support Provider be reduced by the amount of any other Letter of Credit established by such party (but only for such time as such party's Letter of Credit shall be in effect). In the event a party is required to furnish a Letter of Credit hereunder, the amount otherwise required under such Letter of Credit may at the

15

option of such party be reduced by the amount of any other Letter of Credit established by such party's Credit Support Provider (but only for such time as such Credit Support Provider's Letter of Credit shall be in effect).

(F)    All Cash proceeds received from by the Secured Party from drawing upon any Letter of Credit shall be deemed Posted Collateral as security for the Pledgor's Obligations to the Secured Party and the Secured Party shall have all the rights and remedies set forth in this Annex with respect to such proceeds. Notwithstanding the Secured Party's receipt of Cash proceeds from drawing upon any Letter of Credit hereunder, the Pledgor shall remain liable for any failure to Transfer sufficient Eligible Credit Support or for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(G)    Upon the occurrence of a Letter of Credit Default, the Pledgor agrees to deliver a substitute Letter of Credit or other Eligible Credit Support to the Secured Party in an amount at least equal to that of the Letter of Credit to be replaced on or before three (3) Local Business Day after written demand by the Secured Party.    Failure of the Pledgor to comply with this Paragraph 13(j)(iii)(G) will constitute an Event of Default with respect to Pledgor for all purposes of the Agreement.

Notwithstanding Paragraph 10, in all cases, the costs and expenses (including but not limited to the reasonable costs, expenses, and external attorneys' fees of the Secured Party) of establishing, renewing, substituting, canceling, increasing and reducing the amount of (as the case may be) one or more Letters of Credit shall be borne by the Pledgor. Notwithstanding any other provision of this Annex, any Letter of Credit Default that is not cured by the Pledgor in accordance with the terms herein shall constitute an Event of Default under Section 5(a)(iii) of the Agreement.

(iv)    *Certain Rights and Remedies.*

(A)    Secured Party's Rights and Remedies. For purposes of Paragraph 8(a)(ii), the Secured Party may draw on the entire undrawn portion of any outstanding Letter of Credit. Cash proceeds received from drawing upon the Letter of Credit shall be deemed Posted Collateral and shall either be (i) applied against all amounts then due and owing from the Pledgor but not yet paid to the Secured Party or (ii) maintained in accordance with the Annex. The Pledgor shall remain liable for any amounts due and owing to the Secured Party and remaining unpaid after the application of the amounts so drawn by the Secured Party.

(B)    Pledgor's Rights and Remedies. For purposes of Paragraph 8(b)(ii), (i) the Secured Party will be obligated immediately to Transfer any Letter of Credit to the Pledgor and (ii) the Pledgor may do any one or more of the following: (x) to the extent that the Letter of Credit is not Transferred to the Pledgor as required pursuant to (i) above, set-off any amounts payable by the Pledgor with respect to any Obligations against any such Letter of Credit held by the Secured Party and, to the extent its rights to set-off are not exercised, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral and the Value of any Letter of Credit held by the Secured Party, until any such Posted Collateral and such Letter of Credit is Transferred to the Pledgor; and (y) exercise rights and remedies available to the Pledgor under the terms of the Letter of Credit.

(v)    *Additional Definitions.* As used in this Annex:

"Credit Rating" means, with respect to any entity on any date of determination, the respective rating then assigned to its unsecured senior long-term debt or deposit obligations (not supported by third party credit enhancement), by S&P, Moody's or such other rating agency or agencies as are specified; and if no rating is assigned to such entity's unsecured, senior long-term debt or deposit obligations by such rating agency, the general corporate credit rating or long-term issuer rating, as applicable, assigned by such rating agency to such entity. The standing guaranty of FPL Group, Inc. in favor of Party B's Credit Support Provider shall not be considered to constitute "third party credit enhancement" for purposes of this definition.

"Downgrade Event" shall have the meaning set forth under the Schedule to the Master Agreement.

"**Letter of Credit**" shall mean an irrevocable, transferable, standby letter of credit, issued by a major U.S. commercial bank or a foreign bank with a U.S. branch office with a Credit Rating or at least "A-" by S&P or "A3" by Moody's, in the form attached as Schedule 1 hereto.

"**Letter of Credit Default**" shall mean with respect to an outstanding Letter of Credit, the occurrence of any of the following events: (i) the issuer of such Letter of Credit fails to maintain a Credit Rating of at least "A-" by S&P or "A3" by Moody's; (ii) the issuer of the Letter of Credit fails to comply with or perform its obligations under such Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period; (iii) the issuer of such Letter of Credit disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenge the validity of, such Letter of Credit; (iv) such Letter of Credit expires or terminates, or fails or ceases to be in full force and effect at any time during the term of this Agreement, in any such case without replacement  or (v) any event analogous to an event specified in Section 5(a)(vii) of this Agreement occurs with respect to the issuer of such Letter of Credit; provided, however, that no Letter of Credit Default shall occur in any event with respect to a Letter of Credit after the time such Letter of Credit is required to be cancelled or returned to the Pledgor in accordance with the terms of this Annex.

"**Moody's**" shall mean Moody's Investors Service, Inc. or its successor.

"**Qualified Institution**" means a commercial bank or trust company organized under the laws of the United States or a political subdivision thereof, having assets of at least $10 billion and a Credit Rating of at least "A-" from S&P or "A3" from Moody's.

"**Relevant Rating Agencies**" means "Moody's" and "S&P".

"**S&P**" shall mean the Standard & Poor's Rating Group (a division of McGraw-Hill, Inc.) or its successor

(k)     **Demands and Notices.**  All demands, specifications and notices made by a party to this Annex will be made pursuant to Section 12 (Notices) of this Agreement unless otherwise notified from time to time.

(l)     **Addresses for Transfers.**  As agreed between the parties from time to time.

(m)    **Other Provisions.**

(i)     **Local Business Day.**  For purposes of effecting a Transfer pursuant to this Annex, "Local Business Day" shall mean a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in both the jurisdiction of the party obligated to make such Transfer and the place, if different, where the relevant Eligible Collateral or Posted Collateral subject to such Transfer, is located.

(ii)    **Amendment to Paragraph 7(i).**  Paragraph 7(i) is amended by adding the words "Eligible Collateral" in the first line with the words "Eligible Credit Support" and the words "Posted Collateral" in the second line with the words "Posted Credit Support".

(iii)   **Amendment to Paragraph 8(a)(iii).**  Paragraph 8(a)(iii) is amended by replacing each use of the words "Posted Collateral" with the words "Posted Credit Support".

(iv)    **Amendment to Paragraph 8(b)(iii).**  Paragraph 8(b)(iii) is amended by replacing the words "Posted Collateral" with the words "Posted Credit Support".

(v)     **Amendment to Paragraph 8(b)(iv).**  Paragraph 8(b)(iv) is amended by replacing each use of the words "Posted Collateral" with the words "Posted Credit Support".

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| LEHMAN BROTHERS COMMODITY SERVICES INC. | FPL ENERGY POWER MARKETING, INC. |
|---|---|
| *Party A* | *Party B* |

By: _____

Name:

Title:      Allyson M. Carine

Date:       Authorized Signatory

By: _____

Name:

Title:

Date:

SCHEDULE 1    Form of Letter of Credit



## SCHEDULE 1

## IRREVOCABLE NON-TRANSFERABLE STANDBY LETTER OF CREDIT FORMAT
### DATE OF ISSUANCE: _____

[Address]

Re: Credit No._____

We hereby establish our Irrevocable Non-Transferable Standby Letter of Credit in your favor for the account of _____ (the "Account Party"), for the aggregate amount not exceeding _____ United States Dollars ($_____), available to you at sight upon demand at our counters in New York on or before the expiration hereof against presentation to us of the following statement, dated and signed by a representative of the Beneficiary:

"An Event of Default (as defined in the Master Agreement dated as of _____ between Beneficiary and Account Party, as the same may have been amended (the "Master Agreement")) has occurred and is continuing with respect to Account Party under the Master Agreement."; or

"An Early Termination Date (as defined in the Master Agreement dated as of _____ between Beneficiary and Account Party, as the same may have been amended (the "Master Agreement") has occurred as a result of a Termination Event (as defined in the Master Agreement) and the Account Party has failed to make all payments due and owing to Beneficiary in accordance with the terms of the Master Agreement."

The amount which may be drawn by you under this Letter of Credit shall be automatically reduced by the amount of any drawings paid through the Issuing Bank referencing this Letter of Credit No. _____. Partial drawings are permitted hereunder.

This Letter of Credit shall expire _____ (_____) days from the date of issuance, but shall automatically extend without amendment for additional _____ (_____)-day periods from such expiration date and from subsequent expiration dates, if you, as Beneficiary, and the Account Party have not received due notice of our intention not to renew ninety (90) days prior to any such expiration date.

We hereby agree with you that documents drawn under and in compliance with the terms of this Letter of Credit shall be duly honored upon presentation as specified.

With respect to Article 13(b) of the UCP, the Issuing Bank shall have a reasonable amount of time, not to exceed three (3) banking days following the date of its receipt of documents from the Beneficiary, to examine the documents and determine whether to take up or refuse the documents and to inform the Beneficiary thereof accordingly.

This Letter of Credit shall be governed by the Uniform Customs and Practice for Documentary Credits, 1993 Revision, International Chamber of Commerce Publication No. 500 (the "UCP"), except to the extent that the terms hereof are inconsistent with the provisions of the UCP, including but not limited to Articles 13(b) and 17 of the UCP, in which case the terms of this Letter of Credit shall govern. As to matters not covered by the UCP and to the extent not inconsistent with the UCP or the terms hereof, this Letter of Credit shall be governed by and construed in accordance with the law of the State of New York, including Article 5 of the Uniform Commercial Code as in effect in that State.

In the event of an Act of God, riot, civil commotion, insurrection, war or any other cause beyond our control that interrupts our business (collectively, an "Interruption Event") and causes the place for presentation of this Letter of Credit to be closed for business on the last day for presentation, the expiry date of this Letter of Credit will be automatically extended without amendment to a date thirty (30) calendar days after the place for presentation reopens for business.

This Letter of Credit is not assignable or transferable. Any purported transfer or any purported assignment shall be void and of no force or effect.

## SCHEDULE 1

This Letter of Credit may not be amended, changed or modified without the express written consent of the Beneficiary, the Issuing Bank and the Account Party.

All charges related to this Letter of Credit are for the Account Party's account. Failure of the Account Party to pay any such amounts shall not affect your rights to make drawings under this Letter of Credit.

[BANK SIGNATURE]

## CERTIFICATE OF INCUMBENCY AND SIGNATURE

I, Jin Lee, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the title in the Corporation indicated opposite her name on the date hereof and that the signature appearing opposite her name is a genuine signature of such person.

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Allyson Caring | Vice President | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Corporation as of this ___ day of _____, 2006.

[SEAL]

Name: Jin Lee
Title: Assistant Secretary

646017.2

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), does hereby certify that attached hereto as Exhibit A is a true, correct and complete copy of resolutions duly adopted by the Board of Directors of the Corporation, which resolutions are in full force and effect as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of December, 2005.

LEHMAN BROTHERS COMMODITY
SERVICES INC.

By: _____
Aaron Guth
Assistant Secretary

Exhibit A

RESOLVED, that this Corporation (a) be and hereby is authorized to enter into commodity transactions, including, without limitation, commodity swap transactions, commodity option transactions, commodity spot and forward transactions, energy derivative transactions, gas, oil, power and coal transactions, and any other commodity transactions, whether cash or physically settled, weather derivatives transactions, rate swap transactions, swap option transactions, basis swap transactions, credit derivative transactions, forward rate transactions, index options and index swap transactions, interest rate option transactions, foreign exchange transactions, non-deliverable forward transactions, interest rate cap, floor, corridor and collar transactions, currency swap transactions, cross-currency swap transactions, currency spot and forward transactions, interest rate spread-lock transactions, interest rate-lock transactions, currency option transactions, credit spread transactions, futures transactions, any other similar transactions (including options with respect to any of these transactions) howsoever designated and any combination of these transactions (each a "Transaction" and, collectively, "Transactions"), and (b) may enter Transactions on terms satisfactory to the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, and engage in such other acts and things as may be advisable or necessary to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that this Corporation may enter into any transactions, perform any services and enter into any agreements necessary or incidental to acting as a commodity or derivatives dealer, merchant, market-maker or power marketer, including, without limitation, transmitting, scheduling, bidding, offering, trading or otherwise purchasing, selling, delivering or receiving energy, capacity, congestion management and any ancillary services and related products and services in independent system operator or regional transmission organization markets and power pools or transmission owner or operator control areas, including obtaining financial guarantees and letters of credit or providing collateral to secure payment obligations incurred in such markets, pools or areas by the Company and any of its affiliates that are members, participants or users therein, and the payment of any applicable pro rata share of defaults of third party members, participants or users therein (each a "Pool Transaction" and, collectively, "Pool Transactions"); and

FURTHER RESOLVED, that each of the President, any Managing Director, any Senior Vice President, any Vice President and the Treasurer of this Corporation be and hereby is authorized to execute, in the name of and on behalf of the Corporation, any form of document or agreement with respect to any Transactions or Pool Transactions and to do such other acts and things as may be advisable or necessary to carry out and perform, on the part of this Corporation, any such agreement, or in order to carry out and effect the full intent and purpose of this resolution; and

FURTHER RESOLVED, that any and all prior actions taken, and any and all Transactions or Pool Transactions entered into, on behalf of this Corporation by the President, any Managing Director, any Senior Vice President, any Vice President or the Treasurer of this Corporation, prior to the date of this resolution be and hereby are ratified; and

FURTHER RESOLVED, that any one of the President, any Managing Director and the Treasurer (each such officer, an "Authorized Officer") shall have the authority to designate and/or terminate the designation of those individuals who can, in the name of and on behalf of the

Corporation, enter into Transactions or Pool Transactions or execute any form of document or agreement in connection therewith; and

FURTHER RESOLVED, that the Corporation hereby adopts any form of resolution which an Authorized Officer shall approve as necessary, appropriate or desirable in order to carry out the purpose and intent of the preceding resolutions and directs that the Secretary or an Assistant Secretary file a copy of each form of resolution so approved in the appropriate Minute Book of the Corporation.

**AMENDMENT**

dated as of May 22, 2007

**TO ISDA® MASTER AGREEMENT**

dated as of January 30, 2007

between

## FPL Energy Power Marketing, Inc.    and    Lehman Brothers Commodity Services Inc.

FPL Energy Power Marketing, Inc and Lehman Brothers Commodity Services Inc. (the "parties") have previously entered into that certain ISDA Master Agreement, dated as of January 30, 2007 (the "Agreement"), as it may have been hitherto amended or varied and which Agreement includes the Schedule and all Confirmations exchanged between the parties confirming the Transactions (or Swap Transactions) thereunder (the "Agreement"). For good and valuable consideration, receipt of which is acknowledged, the parties have now agreed to amend the Agreement by this Amendment (this "Amendment").

Accordingly, the parties agree as follows:--

1.    **Amendment of the Agreement**

The parties hereby agree that the Attachment A, attached hereto, incorporating the ISDA North American Power Annex, Sub-Annex F of the 2005 Commodity Definitions, (the "Power Annex") with such elections, changes and modifications contained therein shall be inserted into the Schedule to the Agreement as a new Part 7.

As used in the Agreement (including any Confirmation relating thereto), as amended by this Amendment, the terms "ISDA Master Agreement", "this Master Agreement", "Agreement", "this Agreement", "herein", "hereinafter", "hereof", "hereto" and other words of similar import shall mean the Agreement as amended hereby, unless the context otherwise specifically requires.

2.    **Representations**

Each party represents to the other party that all representations contained in the Agreement (including all representations set forth in the Annex) are true and accurate as of the date of this Amendment and that such representations are deemed to be given or repeated by each party, as the case may be, on the date of this Amendment.

3.    **Miscellaneous**

(a) **Definitions.** Capitalized terms used in this Amendment and not otherwise defined herein shall have the meanings specified for such terms in the Agreement.

(b) **Entire Agreement.** This Amendment constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

1

(c) **Counterparts.** This Amendment may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(d) **Headings.** The headings used in this Amendment are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Amendment.

(e) **Governing Law.** This Amendment will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

IN WITNESS WHEREOF the parties have executed this Amendment on the respective dates specified below with effect from the date specified on the first page of this Amendment.

| FPL Energy Power Marketing, Inc. | and | Lehman Brothers Commodity Services Inc. |
|---|---|---|
| (Name of Party) | | (Name of Party) |

By: _Mark Nausto_                       By: _SC L.C_

Name: _Mark Nausto_                    Name: _ICLANGA M. ELLIS_

Title: _President_                          Title: _VICE PRESIDENT_

Date: _5/30/07_                            Date: _6/6/07_

LEGAL
F80

2

**Attachment A**

**to the Amendment**
**dated as of May 22, 2007**
**to ISDA Master Agreement**
**dated as of January 30, 2007**
**between**
**FPL Energy Power Marketing, Inc. and Lehman Brothers Commodity Services Inc.**

**Part 7: ISDA North American Power Annex**

(a)    <u>Form of ISDA North American Power Annex</u>. The parties hereby agree that the text of the body (paragraphs (a) to (jj)) of the pre-printed form of ISDA North American Power Annex, Sub-Annex F of the 2005 Commodity Definitions as published and copyrighted by the International Swaps and Derivatives Association, Inc. (the "Power Annex") is incorporated by reference into Part 7 of this Schedule without change or modification, other than such elections, changes and modifications expressly provided for below.

The Commodity Definitions and the provisions of Part 6 are incorporated in the Power Annex for all purposes. All terms used in this Part 7 that are not otherwise defined shall have the meanings given to them in the Power Annex.

(b)    Part 7(a)(i) of the Power Annex is amended by adding the following as the last sentence thereto:

"In the event of any inconsistency between a fully executed or deemed accepted Confirmation for a Power Transaction and this Part 8, such Confirmation will govern with respect to such Power Transaction, except as provided in Part 8(a)(ii) with respect to Outstanding Power Transactions."

(c)    Part 8(b)(ii) of the Power Annex is amended by inserting at the end thereof the following:

"Product deliveries shall be Scheduled in accordance with the then-current applicable tariffs, protocols, operating procedures and Scheduling practices for the relevant region and system operator."

(d)    Part 8(d) of the Power Annex is amended by adding the following subclause to the end thereof:

"(v)    For purposes of determining a Floating Price for any day, if the price published or announced on a given day and used or to be used to determine a relevant price is subsequently corrected and the correction is published or announced by the person responsible for that publication or announcement, either Party may notify the other Party of (i) that correction and (ii) the amount (if any) that is payable as a result of that correction. If a Party gives notice that an amount is so payable, the Party that originally either received or retained such amount will, not later than three (3) Business Days after the effectiveness of that notice, pay, subject to any applicable conditions precedent, to the other Party that amount, together with interest at the Default Rate for the period from and including the day on which payment originally was (or was not) made to but excluding the day of payment of the refund or payment resulting from that correction; provided, however, that any correction made pursuant to this subclause (v) shall only be permitted if notice is provided on or prior to 60 days of the date on which payment originally was (or was not) made."

(e)    <u>Indemnity</u>. Part 8(g)(ii) of the Power Annex is amended by inserting the following: "except to the extent attributable to the indemnitee party's gross negligence, willful misconduct or bad faith" at the end of the first sentence.

3

(f)   (i)   <u>FERC Standard of Review</u>. Subsection (D) to the provision of Part 8(h)(iii) of the Power Annex is hereby deleted and replaced with the following new subsection (D):

>   (D)   The Parties agree that in the event that any portion of this Part 7(h)(iii) is determined to be invalid, illegal or unenforceable for any reason, the provisions of Part 7(h)(iii)(A) shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law."

(ii)   <u>Standard of Review for ERCOT Transactions</u>. Part 8(h) of the Power Annex is amended by the addition of the following:

<u>FERC Standard of Review; Mobile-Sierra Waiver</u>.

>   (a)   Each Party irrevocably waives its rights, including its rights under §§ 205-206 of the Federal Power Act, unilaterally to seek or support a change in the rate(s), charges, classifications, terms or conditions of this Agreement or any other agreements entered into in connection with this Agreement or any Transaction thereunder, including any credit, security, margin, guaranty or similar agreement (collectively with this Agreement, the "Covered Agreements"). By this provision, each Party expressly waives its right to seek or support: (i) an order from FERC finding that the market-based rate(s), charges, classifications, terms or conditions agreed to by the Parties in the Covered Agreements are unjust and unreasonable; or (ii) any refund with respect thereto. Each Party agrees not to make or support such a filing or request, and that these covenants and waivers shall be binding notwithstanding any regulatory or market changes that may occur hereafter.

>   (b)   Absent the agreement of all Parties to the proposed change, the standard of review for changes to any section of any Covered Agreement proposed by a Party (to the extent that any waiver in Section (a) above is unenforceable or ineffective as to such Party), a non-party or FERC acting <u>sua sponte</u>, shall be the "public interest" standard of review set forth in <u>United Gas Pipe Line Co. v. Mobile Gas Service Corp.</u>, 350 U.S. 332 (1956) and <u>Federal Power Commission v. Sierra Pacific Power Co.</u>, 350 U.S. 348 (1956) (the "Mobile-Sierra" doctrine).

(g)   (i)   Events of Default. Part 8(i)(ii)(B) of the Power Annex is amended to delete the words "Section [5(a)(ii)][5(a)(ii)(1)]" and replace them with the words "Section 5(a)(ii)".

(ii)   Part 8(i)(iv) of the Power Annex is further amended by adding the following to the end of the definition of "Product":

>   "If the parties agree to a service level/product defined by reference to a different agreement (e.g., the ERCOT Agreement, the MAPP Restated Agreement, the Western Systems Power Pool Agreement, the PJM Operating Agreement) for a particular Transaction, then, unless the Parties expressly state and agree that all the terms and conditions of such other agreement will apply, such reference to a service level/product shall be as defined by such other agreement, including, if applicable, the regional reliability requirements and guidelines as well as the specific excuses for performance, Force Majeure, Uncontrollable Forces or other such excuses applicable to such other agreement, to the extent inconsistent with the terms of this Agreement, and only to the extent necessary for the purpose of defining the service level/product, but all other terms and conditions of this Agreement remain applicable.."

4

     (iii)    <u>Schedule P Additional Provision</u>.  The following provision is hereby added to Schedule P:

"The Parties agree that, notwithstanding the final sentence of Section 32.8 of the Western Systems Power Pool Agreement (Rate Schedule FERC No.6, as published by the Western Systems Power Pool effective February 1, 2005, as may be amended or supplemented or superseded from time to time, the "WSPPA") or any Confirmation issued by a party referencing the WSPPA, any physical electric capacity or energy transaction or any other product related thereto, including any transaction referencing a product defined in Schedule P of the pre-printed EEI Master Power Purchase & Sale Agreement (Version 2.1 modified 4/25/00, published by the Edison Electric Institute and National Energy Marketers Association, as may be amended by this Agreement) or defined by reference to a different agreement (e.g., the ERCOT Agreement, the MAPP Restated Agreement), shall, unless expressly agreed in writing or via a recorded oral agreement by the Parties otherwise, be Transactions that form part of, are governed by and subject to this Agreement.

     (iv)    The following new definition is added to Part 8(i)(iv) of the Power Annex:

"Claims" means all third party claims or actions, threatened or filed and, whether groundless, false, fraudulent or otherwise, that directly or indirectly relate to the subject matter of an indemnity, and the resulting losses, damages, expenses, attorneys' fees and court costs, whether incurred by settlement or otherwise, and whether such claims or actions are threatened or filed prior to or after the termination of this Agreement.

     (v)    Part 8(i)(iv) of the Power Annex ("Replacement Price") shall be further amended by (i) adding the phrase "for delivery" immediately before the phrase "at the Delivery Point" in the second line and (ii) deleting the phrase "at Buyer's option" from the fifth line and replacing it with the following: "absent a purchase".

     (vi)    Part 8(i)(iv) of the Power Annex ("Sales Price") shall be further amended by deleting the phrase "at Seller's option" from the fifth line and replacing it with the following: "absent a sale".

  (h)    Part 8(j) of the Power Annex, Elective Provisions of Part 8 is superseded by the following:

"(j) **Elective Provisions**

1.    (a)(ii) ☒ Applicability of Part 8 to Outstanding Power Transactions.  If not checked, not applicable.

2.    (a)(iii) ☒ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions.  If not checked, not applicable.

3.    (c) ☒ Accelerated Payment Damages.  If not checked, not applicable.

4.    (d)(ii):  Timeliness of Payment

       ☐    Option A

       ☒    Option B

If neither is checked, Option B shall be deemed to apply.

5.    (h)(i):  Wholesale Power Tariffs

☒ Party A Electric Tariff.

Dated:
Docket Number: .

☒ Party B Electric Tariff.  FERC Electric Tariff Schedule No. 1
Dated: October 1, 1998
Docket Number: ER98-3566-000

If not checked, not applicable.

6.    (h)(ii) ☒ Applicability of Severability provision.  If not checked, not applicable.

7.    (h)(iii) ☒ Applicability of FERC Standard of Review and Certain Covenants and Waivers.  If not checked, not applicable."

(i)        **Bankruptcy Matters -** With respect to all Power Transactions:

(A).  Each Party acknowledges and agrees that (i) Power Transaction(s) constitute "forward contracts" within the meaning of title 11 of the United States Code (the "**Bankruptcy Code**"); (ii) each of Party A and Party B is a "forward contract merchant" within the meaning of the Bankruptcy Code with respect to any Transactions that constitute "forward contracts"; (iii) all payments made or to be made by one Party to the other Party pursuant to this Agreement constitute "settlement payments" within the meaning of the Bankruptcy Code; (iv) all transfers of Credit Support by one Party to the other Party under this Agreement constitute "margin payments" within the meaning of the Bankruptcy Code; and (v) each Party's rights under Section 6, "Early Termination", of this Agreement constitutes a "contractual right to liquidate" the Transactions within the meaning of the Bankruptcy Code.

(B).  Each party acknowledges and agrees that, for purposes of this Agreement, neither party may benefit from or be subject to the provisions of Section 366 of the Bankruptcy Code.

(j)        **Disputes and Adjustment of Invoices.**  With respect to all Transactions entered into under this Agreement, a Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice, rendered under this Agreement or adjust any invoice for any arithmetic or computational error within twelve (12) months of the date the invoice, or adjustment to an invoice, was rendered.  In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due, with notice of the objection given to the other Party.  Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment.  Payment of the disputed amount shall not be required until the dispute is resolved.  Upon resolution of the dispute, any required payment shall be made within two (2) Local Business Days of such resolution along with interest accrued at the Default Rate from and including the due date  to but excluding the date paid.  Inadvertent overpayments shall be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with interest  accrued at the Default Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the Party receiving such overpayment.  Any dispute with respect to an  invoice is waived unless the other Party is notified in accordance with this Part 5(r) within twelve (12) months after the invoice is rendered or

6

any specific adjustment to the invoice is made. If an invoice is not rendered within twelve (12) months after the close of the month during which performance of a Transaction occurred, the right to payment for such performance is waived.

(k)     Part 7(d)(iii) is amended by deleting the words "receipt of an invoice from the option seller" and replacing them with "the transaction date":

(l)     Part 7(d)(iv) is amended by replacing "may, by agreement of the parties," with the word "will".

(m)     Part 7(i)(ii) (A) and (B) are hereby deleted and replaced with the following:

"(A)    *Section 5(a)(i)*. With respect to all Power Transactions, the following are hereby deleted: (1) the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(i) of this Agreement; and (2) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, the words "or the first Local Delivery Day in the case of any such delivery" and ", in each case," in the third and fourth lines of Section 5(a)(i).

(B)    *Section 5(a)(ii)*. With respect to all Power Transactions, (1) the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(ii) are hereby deleted; (2) the words "or to deliver or receive Product, the exclusive remedy for which is provided in clause (c)(i) and (c)(ii) of Part [X] of the Schedule" are hereby added at the end of the parenthetical of Section 5(a)(ii) (if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement form) or Section 5(a)(ii)(1) (if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form)."

7