KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE 68102-2186
Tel: (402) 346-6000
Facsimile: (402) 346-1148
Bruce A. Wilson, Esq. (BAW 7206)
Jeremy S. Williams, Esq. (JSW 2424)
bruce.wilson@kutakrock.com
jeremy.williams@kutakrock.com

*Attorneys for the Nebraska Investment Finance Authority*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**LEHMAN BROTHERS HOLDINGS INC., et al.,**<br><br>Debtors. | **Chapter 11**<br><br>**Case No. 08-13555 (JMP)**<br><br>**(Jointly Administered)** |

**OBJECTION OF THE NEBRASKA INVESTMENT FINANCE AUTHORITY
TO DEBTORS' MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY
CODE AND GENERAL ORDER M-143 FOR AUTHORIZATION TO IMPLEMENT
ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR AFFIRMATIVE
CLAIMS OF DEBTORS UNDER DERIVATIVE CONTRACTS**

The Nebraska Investment Finance Authority ("NIFA"), a body politic and independent instrumentality of the State of Nebraska organized and existing under the laws of the State of Nebraska, hereby objects to the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternate Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivative Contracts [D.I. #4453] (the "Motion") and in support thereof states as follows:

4820-5930-5476.4

**Background**

1. NIFA, a body politic and corporate, is an independent instrumentality exercising essential public functions organized and existing under the laws of the State of Nebraska. *See* Nebraska Investment Finance Authority Act, Neb. Rev. Stat. § 58-201 et seq. (Reissue 2004), as amended. NIFA is a government unit as defined under Section 101(27) of the Bankruptcy Code.

2. NIFA files this Objection for the limited purpose of objecting to the Debtors' Motion to the extent the Motion purports to or would apply to NIFA or the NIFA Swap Agreements (as defined below). By filing this Objection, NIFA does not waive any right or remedy under applicable state or federal law, including without limitation jurisdiction to order the requested relief against NIFA or the NIFA Swap Agreements.

3. Lehman Brothers Financial Products Inc. ("LBFP") and NIFA were parties to an ISDA Master Agreement and Schedule to the Master Agreement, each dated as of November 1, 2000, together with the following related Confirmations (collectively, the "LBFP Swap Agreements"):

    (i)   Confirmation relating thereto dated as of November 1, 2000 and a trade date of November 1, 2000, with respect to NIFA's Single Family Housing Revenue Bonds, 2000 Series F;

    (ii)  Confirmation relating thereto dated as of April 3, 2001 and a trade date of March 14, 2001, with respect to NIFA's Single Family Housing Revenue Bonds, 2001 Series B;

    (iii) Confirmation relating thereto dated as of November 27, 2001 and a trade date of October 16, 2001, with respect to NIFA's Single Family Housing Revenue Bonds, 2001 Series E;

    (iv)  Confirmation relating thereto dated as of March 19, 2002 and a trade date of February 5, 2002, with respect to NIFA's Single Family Housing Revenue Bonds, 2002 Series B;

  (v) Confirmation relating thereto dated as of August 8, 2002 and a trade date of July 23, 2002, with respect to NIFA's Single Family Housing Revenue Bonds, 2002 Series E;

  (vi) Confirmation relating thereto dated as of June 10, 2003 and a trade date of April 30, 2003, with respect to NIFA's Single Family Housing Revenue Bonds, 2003 Series B;

  (vii) Confirmation relating thereto dated as of October 9, 2003 and a trade date of September 3, 2003, with respect to NIFA's Single Family Housing Revenue Bonds, 2003 Series E; and

  (viii) Confirmation relating thereto dated as of January 29, 2004 and a trade date of January 7, 2004, with respect to NIFA's Single Family Housing Revenue Bonds, 2004 Series B.

4. Lehman Brothers Derivative Products Inc. ("LBDP") and NIFA were parties to an ISDA Master Agreement and Schedule to the Master Agreement, each dated as of March 9, 2004, pursuant to which various transactions were entered into and thereafter terminated as described below (collectively, the "LBDP Swap Agreements", together with the LBFP Swap Agreements, the "NIFA Swap Agreements").

5. On September 15, 2008, LBFP's and LBDP's parent or affiliate, Lehman Brothers Holdings Inc. ("Holdings"), filed a petition for relief under Chapter 11 of 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code"). On October 3, 2008, LBDP filed its own petition for relief under Chapter 11 of the Bankruptcy Code. On October 5, 2008, LBFP filed its own petition for relief under Chapter 11 of the Bankruptcy Code. The Chapter 11 cases of Holdings, LBFP and LBDP, debtors and debtors in possession, together with the Chapter 11 cases of certain affiliates of Holdings, LBFP and LBDP, are currently jointly administered under Case No. 08-13555 (the "Bankruptcy Cases"), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

6. Shortly following the filing of LBFP's bankruptcy case, each LBFP Swap Agreement was terminated on November 25, 2008 in accordance with the Early Termination Date terms thereof pursuant to a notice to LBFP from NIFA dated November 25, 2008.

7. NIFA delivered to LBFP on December 23, 2008, a Settlement Notice setting forth, in accordance with the terms of the LBFP Swap Agreements, the amounts due and payable to NIFA and LBFP as of the Early Termination Date.

8. A Notice of Trigger Event dated September 16, 2008 was sent by LBDP to NIFA with respect to the LBDP Swap Agreements, notifying NIFA that, pursuant to the terms of the LBDP Swap Agreements, a Trigger Event had occurred and that LBDP was establishing an Early Termination Date of September 23, 2008 with respect to the LBDP Swap Agreements.

9. Pursuant to a letter from LBDP to NIFA dated September 25, 2008, LBDP set forth the Termination Amount calculated by LBDP ($8,567,540.90) owed by NIFA to LBDP. In connection with the termination of the LBDP Swap Agreements, NIFA paid $8,567,540.90 to LBDP on September 30, 2008.

**The Debtors' Motion**

10. As described in the Motion, the Debtors seek to create an expedited and extra-judicial process (the "Procedures") through which the Debtors may implement alternate dispute resolution procedures to mediate and attempt to settle claims owing to a Debtor under terminated and open Derivative Contracts (as defined in the Motion). If approved by the Bankruptcy Court, the Procedures would permit the Debtors to compel counterparties to Derivative Contracts ("Counterparties") to engage in mediation proceedings concerning the settlement of amounts, if any, purportedly owed to the Debtors under such Derivative Contracts.

4820-5930-5476.4

11. As more fully set forth below, (i) General Order M-143 does not provide a basis for the requested relief against NIFA, (ii) the Debtors' Procedures fail to satisfy due process requirements and fundamental fairness considerations and (iii) Section 105(a) of the Bankruptcy Code does not provide a basis for the requested relief against NIFA. Accordingly, the Debtors Motion must be denied as to NIFA.

**Objections**

**A. General Order M-143 Does Not Provide a Basis for the Requested Relief Against NIFA. Thus, the Motion and Requested Relief Should Not Apply to NIFA or the NIFA Swap Agreements.**

12. General Order M-143 does not provide a basis on which to grant the relief requested in the Motion respecting NIFA or the NIFA Swap Agreements. Therefore, the Debtors' Motion must be denied as to NIFA and the NIFA Swap Agreements.

13. As expressly set forth in General Order M-143, a court mediation program is established by the Bankruptcy Court "for matters not involving a governmental unit". *See* first paragraph of General Order M-143. NIFA is a governmental unit. Given that the Bankruptcy Court in General Order M-143 expressly excluded governmental units from the mediation program established thereunder, the Debtors should not be permitted to compel, and the Bankruptcy Court should not enter an order compelling, NIFA to participate in an involuntary and entirely extra-judicial mediation program as requested by the Motion or otherwise under Section 105(a) or General Order M-143.

**B. The Proposed Procedures are Contrary to Procedural and Substantive Due Process Rights and Issues of Fundamental Fairness.**

14. To the extent that the Motion is deemed to, or argued to, apply to NIFA or the NIFA Swap Agreements, NIFA further asserts that the Motion must be denied because the

mediation Procedures proposed by the Debtors in the Motion fail under procedural and substantive due process requirements and principles of fundamental fairness.

15. NIFA asserts that the Procedures as proposed in the Debtors' Motion fail under, among other things, procedural and substantive due process requirements and principles of fundamental fairness in at least the following respects:

16. <u>Judicial Proceedings, Process and Rights</u>. As noted in the Motion, at paragraph 13, the Debtors seek to use the Procedures to recover amounts, if any, owed to Debtors under Derivative Contracts "whether or not an actual lawsuit or adversary proceeding has been commenced". This approach creates at least three problematic issues. First, to the extent there is no case pending before the Bankruptcy Court concerning a Derivative Contract, there is no case for which the Bankruptcy Court may order mediation. The Debtors are attempting to compel extra-judicial settlement conferences without a case pending and thus without a case to mediate or settle. Second, the Procedures cannot be a substitute for judicial proceedings, processes and rights. Instead of effectively operating as a substitute for judicial proceedings, processes and rights, the Procedures should apply, if at all, only to (and not in lieu of) cases that are currently or in the future <u>actually commenced and pending</u> before the Bankruptcy Court. Otherwise, the Procedures would serve as an improper substitute for judicial proceedings and delay, and potentially deprive, Counterparties of their fundamental and substantive rights to due process and to have their day in court. Notably, the mediation procedures authorized by the orders in *In re Enron* and *In re Ames Department Stores, Inc.*, on which the Debtors rely for the relief requested in their Motion (*see* Motion at paragraph 38), applied to, and not in lieu of, cases that were pending at the time such order was entered or that would be filed in the future. Indeed, the orders in *In re Enron* and *In re Ames Department Stores, Inc.* did not even stay all proceedings

and formal discovery in all instances in the pending cases subject to such orders. Third, the Procedures would improperly permit the Bankruptcy Court to effectively enter a default judgment in the amount of the Debtors' purported claim, as a sanction against a Counterparty, without any showing or evidentiary hearing respecting the factual or legal basis of the Debtors' purported claim.

17. <u>Fundamentally Flawed Process.</u> The Procedures effectively keep Counterparties in the dark while the Debtors and the Creditors' Committee (as defined in the Motion) will be aware of important considerations in prior mediations and mediation outcomes. Under the Procedures, Counterparties to Derivative Contracts will be at an extreme and fundamentally unfair disadvantage because all mediations will be held before a single mediator, common issues applicable to Derivative Contracts will be presented, only the Debtors and the Creditors' Committee will be permitted to participate in all mediation proceedings and all such proceedings must be held confidential. Consequently, the Debtors and the Creditors' Committee (and only the Debtors and the Creditors' Committee) will be in a position to know in advance of each mediation all important considerations in, and the outcome of, all prior mediations. Indeed, the Debtors state in their Motion, at paragraph 12, that "[m]any common issues exist with respect to the Debtors' Derivative Contracts with Recovery Potential". Yet, unlike litigated proceedings in court which are public (and respecting which interested third parties may monitor and in appropriate circumstances actively participate), the Procedures authorize exclusively secret proceedings and have the effect of keeping Counterparties completely in the dark. Given the common issues that the Debtors acknowledge will be presented, the Debtors and the Creditors' Committee will likely know the outcome of many future mediations even before they are commenced. Accordingly, the Procedures are heavily skewed in favor of the Debtors and

against Counterparties, are fundamentally flawed and unfair and present each Counterparty with an extreme and insurmountable disadvantage. Contrary to the Procedures, the mediation procedures under the orders in *In re Enron*, on which the Debtors rely for the relief requested in the Motion (*see* Motion at paragraph 38), provided the mediator with discretion in connection with the common issues shared in the pending cases over "the grouping of [the] Trading Cases" at issue.

18. <u>Mandatory Mediation</u>. By definition, mediation is a voluntary procedure, as opposed to binding arbitration. While a court may have the power to order parties to mediate in appropriate instances, the mediation Procedures should be proper and should also include an "opt out" procedure whereby a Counterparty is permitted to make a showing to the Bankruptcy Court that, for any good faith reason, such Counterparty should not be required to participate in the involuntary mediation Procedures. Further, any order approving the Motion should reflect that any party attempting to "opt out" of the Procedures will not be subject to sanctions solely for attempting to exercise its opt out rights.

19. <u>Unrealistic Response Periods</u>. The Procedures contain several unrealistic response periods, including a requirement that Counterparties file a written response within twenty (20) calendar days of receipt of the Debtors' initial demand and, in one instance, submit a response to the Debtors within two (2) calendar days. While the Debtors note the "complex nature of the Derivative Contracts" (*see* Motion at paragraph 12), the Debtors nevertheless propose to give Counterparties unrealistic response periods under the Procedures.

20. <u>Sanctions</u>. The Debtors' request for sanctions, especially in the context of the ill-defined and vague requirements for "good faith" participation and the nature of responsive information or data that is required from Counterparties, improperly skews the Procedures in

4820-5930-5476.4

favor of Debtors and against Counterparties. While General Order M-143 may permit sanctions, neither the orders in *In re Enron* nor the order in *In re Ames Department Stores, Inc.*, on which the Debtors rely for the relief requested in their Motion (*see* Motion at paragraph 38), compelled mediation under threat of sanction. Moreover, NIFA contends that it would not be permissible for the Bankruptcy Court to impose sanctions on a governmental unit such as NIFA based on, among other things, Section 106 of the Bankruptcy Code and the exclusion of governmental units from General Order M-143.

21. <u>Lack of Counter-demand</u>. The proposed procedures do not appear to contemplate a counter-demand by a Counterparty for monetary relief against the Debtors. To the extent that a Counterparty may in fact have claims for monetary relief against the Debtors, the Procedures and order should clearly indicate that a counter-demand against the Debtors is an acceptable response to a notice for mediation from the Debtors.

22. <u>Settlement Conference</u>. Given that the mediation proceeding that is the primary subject of the Procedures is designed to compel settlement discussions, the telephonic settlement conference as proposed by the Debtors' Procedures is unnecessary. The requirement for a telephonic settlement conference is nothing more than a "trip wire" that provides the Debtors with the ability to assert that a Counterparty is failing to act in good faith. In addition, as proposed by the Procedures, the proposed telephonic settlement conference would permit the Debtors to skip the "Notice/Response Stage" of the Procedures entirely, again to the disadvantage of the Counterparties.

23. <u>Selection of Mediator</u>. Typically, the parties concerned with a mediation process will agree upon the selection of the mediator, and the court becomes involved in the selection process only upon the parties' failure to agree on such selection. The Procedures and

proposed order, however, provide that the Bankruptcy Court will select the single mediator, and only if such mediator is unable or unwilling to serve would the parties be given a voice in the selection of an alternate mediator. The Procedures and the order should be modified to provide the parties with an opportunity to agree upon the selection of a mediator, and that the Bankruptcy Court would become involved in the selection process only if the parties are unable to agree upon the selection. Even then, however, there should be a process wherein parties can propose mediators to the Bankruptcy Court for consideration.

24. <u>Location of Mediation</u>. As proposed, all mediations would occur in New York or otherwise at the discretion of the Debtors. The Procedures should instead provide for mutual agreement of the parties on the location of the applicable mediation and involvement by the Bankruptcy Court only if the parties fail to so agree.

25. <u>Confidential Mediation Briefs</u>. The Procedures and proposed order require the parties to submit a written mediation brief, copies of which must be served upon all parties to the mediation in addition to the Creditors' Committee. The parties should be provided with the opportunity to submit briefs confidentially to the mediator without service of the briefs to the other parties, as the parties will almost certainly be more open about their respective positions if briefs can be submitted confidentially to the mediator without service of the briefs upon the adverse parties.

26. <u>Certification of Issues to the Bankruptcy Court</u>. The approach in the Procedures, and that would be permitted by the proposed order, of allowing the mediator to "certify specific legal issues to the court for decision" is problematic and further violates due process. For example, the Procedures do not contain any provision for any party's involvement or even briefing on an issue certified to the Bankruptcy Court. Thus, the mediator could certify a

4820-5930-5476.4

legal issue to the Bankruptcy Court, without notice to the parties involved in the mediation process, and secure a ruling that has the effect of a partial summary judgment order on such issue without any actual action being filed by a party to the dispute. Allowing a party or a mediator to request a court ruling on a specific issue prior to suit being filed clearly violates due process.

27. <u>Withdrawal of Reference</u>. Any order granting the Motion must preserve the right of Counterparties to file a motion to withdraw the reference of its case.

28. Through the Procedures, the Debtors effectively set into motion, under threat of sanctions, an extra-judicial proceeding that is heavily skewed in favor of the Debtors and against Counterparties and that deprives the Counterparties of fundamental due process. The Procedures effectively constitute a de facto implementation of the Debtors' preferred outcome respecting Derivative Contracts.

29. As stated by the United States Supreme Court in *Mullane, Special Guardian v. Central Hanover Bank & Trust Co.*:

> [a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information and *it must afford a reasonable time* for those interested to make their appearance. But when notice is a person's due, process which is a mere gesture is not due process.

*Mullane, Special Guardian v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-315 (1950). Under the guidance articulated in *Mullane* or by any measure, the Procedures must be deemed patently unreasonable.

30. The Debtors point to "substantially similar" orders of this Bankruptcy Court as a basis for requesting the Bankruptcy Court to approve the proposed Procedures. *See* Motion at paragraph 38. However, as described above, the procedures in the orders cited by the Debtors

from *In re Enron* and *In re Ames Department Stores, Inc.* are substantively distinguishable from the Debtors' requested Procedures. Although the *In re Enron* and *In re Ames Department Stores, Inc.* orders involved mediation procedures, a review of those orders clearly reflects that the mediation procedures approved in those orders, and the context in which such procedures were approved, were not "substantially similar" to the Procedures. While NIFA distinguishes such orders as precedent for the proposed Procedures in this case, NIFA does not agree to the substance of the *In re Enron* and *In re Ames Department Stores, Inc.* orders in this case.

31. The Debtors' Procedures do not satisfy the basic requirements of due process articulated in *Mullane*. Accordingly, the Debtors' Motion must be denied.

**C.  Section 105(a) of the Bankruptcy Code Does Not Provide a Basis for the Requested Relief.  The Relief That the Debtors Seek Pursuant to Section 105 of the Bankruptcy Code Cannot Be Granted as it is Contrary to and Modifies the Substantive Rights of the Counterparties.**

32. Unlike the procedures approved by the *In re Enron* and *In re Ames Department Stores, Inc.* orders, the authority that the Debtors seek by their Motion is not merely procedural in nature. As discussed above, the Procedures are contrary to and violate the substantive due process rights of Counterparties and fail under principles of fundamental fairness. Through their Motion, the Debtors seek to alter substantive legal rights as provided to Counterparties under applicable state and federal law.

33. Although the exigencies of the Debtors' circumstances may be significant, Section 105 of the Bankruptcy Code, under which the Debtors seek their relief, does not allow the Bankruptcy Court to mandate settlement procedures out of whole cloth or override explicit mandates of other sections of the Bankruptcy Code or mandates of other state or federal statutes. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988); *In re Barbieri*, 199 F.3d 616, 620-12 (2d Cir. 1999); *In re Rashid*, 97 B.R. 610, 615 (W.D. Okla. 1989). As frequently stated

and followed by bankruptcy, district and courts of appeal, Section 105 of the Bankruptcy Code does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity. *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

34. The Debtors not only seek to unilaterally usurp NIFA's legal rights, but also to impose on NIFA a one-sided, Debtor-friendly mediation procedure that is largely created out of whole cloth.

35. Because the Debtors Procedures are not authorized under General Order M-143 or Section 105 of the Bankruptcy Code and are inconsistent with and seek to modify substantive rights of NIFA, the Debtors' Motion must be denied as it relates to NIFA and the NIFA Swap Agreements.

[remainder of page intentionally left blank]

WHEREFORE, for the reasons set forth herein, NIFA objects to the Motion and requests that the Bankruptcy Court:

1. enter an order denying the Debtors' Motion as it relates to NIFA and the NIFA Swap Agreements; and

2. grant NIFA such other and further relief to which it may be entitled.

Dated: Omaha, Nebraska
July 31, 2009

                        Respectfully submitted,

                        KUTAK ROCK LLP

                        By: */s/ Bruce A. Wilson*
                            Bruce A. Wilson, Esq. (BAW 7206)
                            Jeremy S. Williams, Esq. (JSW 2424)
                            Kutak Rock LLP
                            1650 Farnam Street
                            Omaha, NE 68102-2186
                            Tel: (402) 346-6000
                            Facsimile: (402) 346-1148

                        *Attorneys for the Nebraska Investment Finance Authority*

4820-5930-5476.4