Hearing Date and Time: August 5, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: July 31, 2009 at 4:00 p.m. (Prevailing Eastern Time)

STROOCK & STROOCK & LAVAN LLP
Claude G. Szyfer
Francis C. Healy
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Attorneys for Derivative Counterparties*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x
In re                                                         :    Chapter 11
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                  :    Case No. 08-13555 (JMP)
                                                              :
                                           Debtors.           :    (Jointly Administered)
                                                              :
------------------------------------------------------------- x

**OMNIBUS OBJECTION OF DERIVATIVE COUNTERPARTIES TO DEBTORS'
MOTION PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE
AND GENERAL ORDER M-143 FOR AUTHORIZATION TO IMPLEMENT
ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR
<u>AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVE CONTRACTS</u>**

Nineteen derivative counterparties, as parties to terminated Derivative Contracts (the

"Derivative Counterparties")[1] entered into pre-petition with certain of the Debtors, by their

undersigned attorneys, hereby file this objection (the "Objection") to the motion (the "Motion")[2]

---

[1] The Derivative Counterparties consist of the following: CEDAR DKR Holding Fund Ltd.; DKR IBEX Holding Fund Ltd.; DKR Soundshore Oasis Holding Fund Ltd.; DZ BANK AG Deutsche Zentral-Genossenschaftsbank, Frankfurt am Main; Hess Corporation; Hess Energy Power and Gas Company (UK) Limited; Hess Energy Trading Company, LLC; Magnetar Capital Master Fund, Ltd.; Magnetar Constellation Master Fund, Ltd.; Magnetar Constellation Fund II, Ltd.; Magnetar Constellation Master Fund III, Ltd.; Magnetar Structured Credit Fund, L.P.; Mizuho Capital Markets Corp.; Mizuho Corporate Bank, Ltd., as Holder of Derivative Claims; Mizuho Alternative Investments LLC; Nordea Bank Finland Plc; Nordea Bank AB (Publ); Pulsar Re, Ltd.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

of Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated debtors in the above captioned chapter 11 cases (collectively, the "Debtors") seeking an order implementing alternative dispute resolution procedures for "affirmative claims of the Debtors regarding derivative contracts." In support of this Objection, Derivative Counterparties respectfully represent as follows:

## PRELIMINARY STATEMENT

1.  For the second time this summer, Debtors propose the implementation of procedures which would deprive Derivative Counterparties of critical protections set forth by the United States Bankruptcy Code (the "Code") and put Derivative Counterparties at a distinct disadvantage with respect to the mediation of amounts owed under Derivative Contracts. The Debtors' original proposed Bar Date and Proof of Claim procedures engendered the filing of over 75 objections from Derivative Counterparties with claims against the estate, and had to be scaled back significantly through spirited negotiations. The Debtors now seek to hamstring Derivative Counterparties—selected unilaterally by the Debtors—through the implementation of Alternative Dispute Resolution Procedures (the "Proposed ADR Procedures") that confer upon the Debtors significant strategic and procedural advantages; completely tilt the mediation playing field against Derivative Counterparties; and create loopholes through which the Debtors can continue the mediation process <u>ad infinitum</u>, and materially impede the ability of Derivative Counterparties from availing themselves of the conventional chapter 11 claim procedures.

2.  Specifically, the Proposed ADR Procedures provide Debtors with significant information advantages which deprive the Derivative Counterparties of the ability to fairly face off with the Debtors in the mediation. Under the Proposed ADR Procedures, the Debtors unilaterally select which Derivative Counterparties will participate in the process—which could easily include those Derivative Counterparties who believe they are <u>creditors of the Debtors</u>. Those "creditor" Derivative Counterparties are required to upload mountains of information for

2

Debtors through the Proof of Claim/Derivatives Questionnaire process, but will not have received equivalent transaction information from the Debtors prior to the mediation. Indeed, the Proposed ADR Procedures do not explicitly state which transaction information, if any, the Debtors will produce to a Derivative Counterparty in the ADR Package or prior to the mediation. In addition, many Derivative Counterparties have already provided the Debtors with transaction information because in the Termination Statements[3] provided to Debtors stated that they owed amounts to the Debtors. Those Derivative Counterparties have yet to receive equivalent information from Debtors, and will also be at a similar information disadvantage.

3. Additionally, the Proposed Order (the "Proposed Order") contemplates the selection of "one mediator who will hear and preside over all mediations hereunder." (Motion, ¶ 23). The selection of just one mediator, however, will afford the Debtors with unfair "experience" advantages, which can be easily mitigated by the selection of a potential pool of mediators to hear and preside over the mediations. Moreover, the selection of only one mediator will needlessly delay matters that the Debtors profess to want to expedite.

4. Furthermore, the Proposed ADR Procedures also contain no explicit mechanism to terminate the mediation, allowing the parties to proceed through to the conventional chapter 11 claims administration process. The lack of an explicit termination provision leaves Derivative Counterparties in a procedural limbo, unable to avail themselves of the chapter 11 claims procedures notwithstanding the fact that the parties may be at a settlement impasse.

5. The motion contains the following additional infirmities: (i) the Debtors never demonstrate why a Derivative Counterparty's right to a jury trial should be affected in any way by participation in the Proposed ADR Procedures; (ii) the certification of legal issues will only

---

[3] Statements provided by the non-defaulting party after the termination pursuant to Section 6(d) of an ISDA Master Agreement.

3

slow the mediation process down, and is unfair to Derivative Counterparties that do not participate in the certification process; (iii) the Proposed ADR Procedures are ambiguous as to who bears the reasonable costs and fees of the mediator; and (iv) the Proposed ADR Procedures are ambiguous as to whether counsel for a Derivative Counterparty may participate in the initial "telephonic settlement conference" required by the Proposed ADR Procedures.

6. While seeking to "reduce[] the cost associated with enforcing the Debtors' affirmative claims under the Derivative Contract with Recovery Potential, preserving the value available under such contracts, and promoting judicial efficiency" are all admirable goals, the Proposed ADR Procedures severely disadvantage Derivative Counterparties unfairly. (Motion, ¶ 12). It is respectfully requested that this Court deny the Motion seeking to implement the Proposed ADR Procedures as set forth in the Proposed Order.

## SUMMARY OF THE PROPOSED ADR PROCEDURES

### The "Notice/Response Stage"

7. Pursuant to the Proposed ADR Procedures, the Debtors will unilaterally "designate a dispute (a 'Derivatives ADR Dispute') as to any Derivative Contract with Recovery Potential" by serving a copy of the Proposed Order, and providing the Derivative Counterparty with "a notice (a "Derivatives ADR Notice") containing sufficient information regarding the Debtors' affirmative claim and its demand for settlement (together with Derivative ADR Notice, a "Derivatives ADR Package"). The Proposed Order allows notice to or service upon the "Derivative Counterparty, the Derivative Counterparty's counsel, legal guardian, estate representative, or other representative." (Proposed Order, § 3).

8. After service of the Derivatives ADR Package on a Derivatives Counterparty, "compliance with the ADR Procedures in this Order is mandatory" and each party must then serve the required responses, set forth further below, participate in any mediation "and otherwise

4

comply with the Derivatives ADR Procedures …" (Proposed Order, § 5).  Specifically, in the Derivatives ADR Notice, the Debtors will provide "a notice containing sufficient information regarding the Derivatives ADR Dispute to make the Derivatives Counterparty aware of the nature of the Debtor's affirmative claim and of its demand for settlement . . . including an amount of monetary recovery Debtor(s) would accept in full settlement and compromise . . ." (Proposed Order, § 8(a)).  The Proposed Order, however, is bereft of any specific transaction information or calculations that the Debtors are required to provide a Derivatives Counterparty, except for a settlement amount.  According to the Proposed ADR Procedures, the Derivatives Counterparty must then respond to Debtors "in writing through a 'Statement of Position' within twenty (20) calendar days from" receipt of the ADR Notice.  Should a Derivatives Counterparty reject the Debtor's settlement offer, the Derivatives Counterparty must respond to the Notice and "must include a brief explanation in the Response" of its reasons for the denial.  (Id.).

9.  After receipt of the Derivatives Counterparty's Response, Debtors then have four different options:  (i) modify its demand, (ii) respond to any counteroffer, (iii) provide additional information in support of its demands in the Derivatives ADR Dispute, or (iv) reject any counter-offer "in which case the Derivatives ADR Dispute will automatically proceed to the Mediation Stage."  (Proposed Order, § 8).

**The "Mediation Stage"**

10.  Once in mediation, the parties will schedule sessions with the mediator, possibly exchange mediation briefs (due five (5) days prior to the initial Mediation Date), and must appear with a "business principal who has settlement authority." (Proposed Order, § 10).  The Debtors propose that all mediations shall be "confidential" and that "Rule 408 of the Federal Rules shall apply to all aspects of the Derivatives ADR Procedures, including Settlement

5

Conferences and [the] Mediation Stage."  (Id., § 13).

11.     Furthermore, Section 14 of the Proposed Order states that "to the extent a Derivatives Counterparty affirmatively chooses the mediation option set forth herein, participation in the [Proposed] ADR Procedures shall not waive any right to a jury trial that might otherwise exist."  (Proposed Order, § 14).  In addition, the Debtors propose that each party to the mediation shall bear its own counsel fees and other costs related to the mediation, but that the reasonable costs and fees charged by the Mediator, shall be paid by "the party who requests the Mediation . . ." (Id., § 15).

12.     Finally, the Debtors propose that the mediator(s) will have the "broadest discretion as provided under the Standing Order [M-143] including the discretion to certify specific legal issues to the Court for decision." (Motion, § 25).

## ARGUMENT
## THE PROPOSED ADR PROCEDURES SHOULD BE REJECTED

13.     While Derivative Counterparties do not object to the implementation of alternative dispute resolution procedures, the Proposed ADR Procedures set forth in both the Motion and the Proposed Order place the Derivative Counterparties and other Counterparties at a severe informational and procedural disadvantage.  As set forth in the Proposed Order, the Proposed ADR Procedures should be rejected, or at least modified in accordance with this Objection.

**I.    The Proposed ADR Procedures Confer Upon the Debtors A Significant Information Advantage**

14.     The Proposed ADR Procedures create critical, asymmetrical information advantages in favor of the Debtors in the mediation—the Debtors will have nearly all the relevant information as to how a Derivatives Counterparty valued the terminated transactions at

6

issue, while the Derivative Counterparty will have none.  During the course of the mediation, a Derivatives Counterparty will be severely hamstrung because the Debtors will have all of the transaction information that a Derivatives Counterparty might have uploaded pursuant to the Derivatives Questionnaire for Derivative Proofs of Claims—where the Derivative Counterparty believes it is a <u>creditor</u> of the Debtors—but the Debtors will not have provided equivalent information to the Derivative Counterparty for purposes of the mediation.  Derivative Counterparties will be mediating with two arms tied behind their backs.  This Court cannot countenance such an unbalanced result.

15.   To illustrate, assume that a Derivative Counterparty files a Proof of Claim and a Derivative Questionnaire asserting that it is owed net $5,000,000.00 by the Debtors under the terminated Derivatives Contract:  the Counterparty holds $15 million in collateral from the Debtors, and states that the total Termination Amount owed by the Debtors is $20,000,000.00.  The Debtors, however, believe that they owe just $10,000,000.00 total pursuant to the terminated transactions, and that Debtors are entitled, after setoff, to a return of $5,000,000.00 from the Derivative Counterparty.

a) **The Debtors Provide an ADR Package to the "Creditor" Derivative Counterparty and Do Not Provide The Derivatives Counterparty with Equivalent Transaction Information**:   Pursuant to the Proposed ADR Procedures, Debtors can unilaterally decide to provide an ADR Package to the "creditor" Derivative Counterparty described above.  According to the Proof of Claim and Derivative Questionnaire, this Derivative Counterparty is required to provide the Debtors a mountain of information relating to its calculations of the amounts owed, including a spreadsheet for each terminated transaction (which may contain some or

7

most of the following information: the electronic trade reference i.d., trade type, product, trade date, reference obligation or entity, original contract notional amount, quantity/unit of measure, currency, price or strike price, buy/sell, call/put, cap/floor, effective date, and maturity date), a description of the methodology utilized by that Derivative Counterparty to calculate the amounts owed, documents and other information relating to any market quotations that Derivative Counterparty may have obtained as part of the termination process and the other information required under the Derivatives Questionnaire. Under the Proposed ADR Procedures, however, the Debtors are required simply to provide a "Derivatives ADR Notice" which contains just "sufficient information regarding" the Debtors' affirmative claim and its demand for settlement. (Motion, ¶ 15). Nothing in the Proposed Order requires the Debtor to provide any other specific transaction information to the Derivative Counterparty.

b) **Derivative Counterparty is Required to Provide Additional Information, While the Debtors are not Required to Provide Any Additional Information:** Indeed, during the "Notice/Response" stage of the mediation, after receipt of the ADR Package, a Derivative Counterparty is required to then provide additional information to the Debtors: an explanation setting forth its reasons for denying the Debtors' settlement offer. The Debtors then "may . . . provide additional information supporting the demand made in the Derivatives ADR Notice . . ." (Proposed Order, § 8(d)). The more likely scenario, however, is that the Debtors will "reject any counteroffer in which case the Derivatives ADR Dispute will automatically proceed to the Mediation Stage." (Id. (emphasis added)).

8

c)  **Derivative Counterparty "Automatically" Proceeds to Mediation Without Having Equivalent Information from the Debtors:** While a Derivatives Counterparty will "automatically" proceed to a mediation in which it has provided the Debtors with a mountain of information, the Debtors will only be required to provide "sufficient information regarding the Debtors' affirmative claim and its demand for settlement." (Proposed Order, § 8(a)). Thus, while the Debtors will know specific information regarding each terminated transaction, including the transaction terms and the termination amount derived by the Derivative Counterparty, the Proposed Order does not require the Debtors to provide to Derivative Counterparty equivalent information. While the Debtors will have all of the information relating to market quotations obtained by the Derivative Counterparty, the Proposed Order fails to direct the Debtors to provide Derivative Counterparty the same type of information relating to market quotations. The Proposed ADR Procedures leave the Derivative Counterparty having to mediate with both arms tied behind its back, lacking the equivalent transaction information from the Debtors.

16. Even more troubling is the fact that the same Derivative Counterparty who correctly determines it is a <u>creditor</u> of the Debtors, and protected by the conventional proof of claim process now finds itself embroiled in a mediation process that is stacked against it, and in which it is at a stark information disadvantage.

17. In addition, many Derivative Counterparties who owe the Debtors amounts pursuant to terminated transactions face the same information disadvantages, notwithstanding the fact that these Counterparties will not utilize the Derivatives Questionnaire to upload transaction information. Many of these Derivative Counterparties have already started to supply Debtors

9

with much of the same terminated transaction information required under the Derivatives Questionnaire, but have not been provided with any equivalent information from Debtors, notwithstanding requests to be given that information. Because the Proposed ADR Procedures do not contemplate the production of any specific transaction information by the Debtors, these Derivative Counterparties face the same informational disadvantages in the mediation stage.

18. The Debtors themselves admit that the burden to provide the equivalent information uploaded by Derivative Counterparties pursuant to the Derivatives Questionnaire is not heavy. As made clear by the Proposed ADR Procedures, the Debtors will be submitting a settlement offer, which includes their calculation of the amounts they claim are owed pursuant to the terminated transactions. Accordingly, the Debtors presumably have in their own records similar transaction information readily available, and in a form that can be produced with minimal effort. Indeed, in the Declaration of Gary H. Mandelblatt, dated June 23, 2009 ("Mandelblatt Declaration"), submitted in support of the Debtors' Bar Date Motion, Mr. Mandelblatt made clear that the Debtors could readily produce transaction information for each counterparty. (Exhibit A, Mandelblatt Declaration, dated June 23, 2009, ¶ 28 ("Counterparties are supposed to deliver this information upon termination of the Derivative Contracts. If requested, we would be able to pull this information for a defaulting party in a matter of hours.").
Thus, burden to the Debtors should not be an issue.

19. Accordingly, the Proposed ADR Procedures must be rejected, or in the alternative, the Debtors should be required to provide to the Derivative Counterparty the equivalent transaction information provided by a Derivative Counterparty pursuant to the Derivatives Questionnaire at the time they serve the ADR Package.[4]

---

[4] Given the Debtors' statements in the Mandelblatt Declaration, it is respectfully submitted that the Debtors should also be required to provide equivalent transaction information to all counterparties who provide transaction

## II. Utilizing One Mediator To Conduct Over 250 Mediations Will Unduly Delay the Process and Also Provide the Debtors with Unfair Advantages

20.     The Debtors propose the appointment of one mediator to preside over all of the potential mediations contemplated by the ADR Procedures. Utilizing only one mediator to conduct all of the mediations—which the Debtors admit could surpass 250—provides the Debtors with significant advantages and is likely to cause unnecessary delay in the mediation process. Derivative Counterparties propose that instead of one mediator, the Court enter an order which would include a pool of mediators, comprised of United States Magistrate Judges from the Southern District of New York and/or professional mediators from organizations like JAMS, who are experienced mediators and likely knowledgeable about derivative contracts.

21.     In their Motion, the Debtors state affirmatively "that there are approximately two hundred fifty (250) Derivative Counterparties (which number surely will increase) to Derivative Contracts with recovery potential" which the Debtors seek to involve in the Proposed ADR Procedures. (Motion, ¶ 16 (emphasis added)). Over 250 mediations is a daunting number for any one mediator, let alone a single mediator who may also have a full docket of cases, such as a sitting Bankruptcy Judge. Simple scheduling of mediation sessions will be incredibly difficult, and scheduling conflicts between various Derivative Counterparties seeking to mediate with Debtors on the same day, are guaranteed. Should the single mediator selected be a Bankruptcy Judge, who is especially busy during these difficult economic times, scheduling conflicts are also a certainty. Since such mediations could last numerous sessions[5], having just one mediator

---

information pursuant to the Derivatives Questionnaire. Presumably, many of these proofs of claims will likely be subject to some form of mediation as well in order to expedite the resolution of those claims.

[5] Some of the Derivative Counterparty portfolios number in the tens of thousands of derivative transactions with the Debtors. In addition, the derivative portfolios may include numerous different types of derivatives, such as plain vanilla swaps, options, swaptions, foreign exchange transactions, interest rate swaps, credit default swaps, and more complicated structured derivative transactions. A portfolio could contain hundreds, if not thousands of each type of

11

ensures that the entire mediation process will take years to conclude.

22. Next, having all of the mediations conducted by one mediator affords the Debtors a decided "experience" or "home-court" advantage. After the first few mediations, the Debtors will already have an excellent sense as to which arguments the mediator finds more compelling, know the specific types of information or facts the mediator seeks to discover during the course of the mediation, and for which questions the mediator most seeks answers. Although it is true that the Debtors' participation in every mediation provides them and their counsel with a certain advantage over the Derivative Counterparties, that advantage is mitigated significantly by having numerous different mediators involved in the process, rather than just one mediator.

23. Moreover, the Debtors' accumulated knowledge about the mediator's tendencies, information requests, as well as even the mediator's methods for conducting the mediation, will make the mediator potentially less effective in the mediation process. After just a few mediations, Debtors will know as much about the mediator's techniques and style as the mediator herself. Given that the success of a mediator often depends on the mediator's ability to identify potential weaknesses in a party's legal or factual positions, if the Debtors know ahead of time exactly which "pressure point" the mediator may focus upon, it severely limits the potential effectiveness of the mediator. Moreover, having to conduct over 250 mediations regarding Derivative Contracts could easily lead to mediator burnout.

24. Accordingly, Derivative Counterparties propose the creation of a list of mediators, which could include both sitting United States Magistrate Judges from the Southern District of Manhattan, as well as professional mediators from organizations like JAMS. Such a list would include at least 10-15 potential mediators from which both the Debtors and the respective

---

derivative transaction, each requiring a mediation session to resolve. Accordingly, many mediations will likely involve numerous sessions with the mediator.

Derivative Counterparty could choose. Both Magistrate Judges and professional mediators are expert in the settlement/mediation process, and also have experience mediating disputes involving complex financial instruments, such as derivative contracts. By having a pool of as many as 10-15 potential mediators, many of the problems identified here will be mitigated or negated completely. The scheduling issues and delays endemic to utilizing just one mediator will be assuaged significantly, and the mediation process will be expedited. More important, the decided "experience" or "home court" advantages that utilizing one mediator would create will be curtailed immeasurably.

### III. Certification Of Legal Issues To The Court Should Not Be Part Of The Proposed ADR Procedures

25. In the Motion, the Debtors propose that the "mediator will have the broadest possible discretion as provided under the Standing Order including the discretion to certify specific legal issues to the Court for decision." (Motion, ¶ 25). Given the significant number of mediations that are contemplated under the Proposed ADR Procedures, and the private nature of each mediation, Derivative Counterparties are concerned that certain legal issues may be certified to the Court without their knowledge or participation. The result may be the creation of "law of the case" binding on Derivative Counterparties, notwithstanding the fact that they have not participated in the briefing and argument of critical legal issues. This problem is compounded by the apparent inability of a Derivative Counterparty to appeal any decisions relating to certified issues until after the end of the mediation, and then after the end of any subsequent adversary proceeding/contested matter relating to the dispute over the amount owed. Indeed, other Derivative Counterparties who did not participate in the briefing and argument relating to the certified issue will have absolutely no right of appeal concerning the decision on the certified issue(s). This result is simply unfair to the "absent" Derivative Counterparties.

13

26. In addition, the certification of legal issues to the Court defeats much of the efficiency and economy of judicial resources contemplated by mediation. As Debtors themselves recognize, "prolonged litigation will slow the administration of these cases," and that a critical facet of mediation involves "reduc[ing] the costs associated with the reconciliation and collection of the Debtors' affirmative claims under their Derivative Contracts." (Motion, at ¶¶ 36-37). The certification of legal issues by the mediator to the Court, however, risks bringing that mediation to a grinding halt. If the certification process is utilized frequently by the mediator(s), many of the efficiencies that Debtors identify in their Motion will be eliminated.

27. Thus, the Proposed ADR Procedures should be rejected, or, in the alternative, modified to delete the provision allowing for certification of legal issues by the mediator for resolution by the Court.

## IV. The Proposed ADR Procedures Contain No Time Limit Or Procedures By Which To Terminate the Mediation

28. Absent from the Proposed ADR Procedures (and the Proposed Order) is any provision relating to how a Derivative Counterparty or Debtors can terminate a mediation, should the parties fail to reach an agreement on the amounts due between them.[6] While the Proposed ADR Procedures require "**Mandatory Participation**" and parties will "automatically proceed to the Mediation Stage" should <u>Debtors</u> reject the settlement counteroffer from the Derivatives Counterparty (Motion, at ¶¶ 16, 20), the Proposed ADR Procedures provide no mechanism by which a Derivative Counterparty can terminate the mediation after the parties have had numerous sessions with a mediator, and reached an unbridgeable impasse. The result is a procedural limbo for a Derivative Counterparty who seeks to avail themselves of the chapter 11

---

[6] This problem is particular problematic for a "creditor" Derivative Counterparty, who has been embroiled in the mediation process, and cannot proceed with the resolution of its Proof of Claim.

14

claims resolution procedures set forth in the Code, but cannot because Debtors may seek to continue the mediation.

29. The Proposed Order states that the Proposed ADR Procedures are "not intended and shall not be utilized as a substitute for chapter 11 claims procedures." (Proposed Order, ¶ 6). This pronouncement has a decidedly hollow ring to it, since the Proposed Order contains no termination mechanism, and the Derivative Counterparty has no ability to terminate a stalled mediation.

30. The absence of any procedure to end the mediation process or to cap the length of the mediation process is exacerbated by the fact that based on the terms of ISDA Master Agreements, and other Master Agreements, interest on the amounts owed continues to run from the date of termination until the date of payment of the Termination Amount. Without the ability to end the mediation process, and proceed to the chapter 11 claims procedures, a Derivative Counterparty may find itself expensively accruing interest on the amount it owes the Debtors.

31. Thus, it is respectfully requested that the Proposed ADR Procedures be rejected because of the absence of a termination provision. In the alternative, Derivative Counterparties propose a 180-calendar-day cap on the length of any mediation that begins to run from the date that the Mediation Stage commences. Clearly, 180-calendar days should provide the Debtors and a Derivative Counterparty with sufficient time to schedule and appear at numerous mediation sessions, engage in meaningful good faith discussions to resolve any dispute, but not unduly delay proceedings for both the estate, Debtors and Derivative Counterparties.[7] After the 180-calendar-day period ends, unless the Debtors and Derivative Counterparties agree otherwise, the mediation will automatically terminate, and the parties proceed to the chapter 11 claims

---

[7] It is ironic that Debtors rely upon Standing Order M-143, which specifically includes Section 3.5, "Termination of Mediation," which occurs "[u]pon receipt of the Mediator's final report." (Exhibit B, § 3.5).

15

process. Of course, should the parties to the mediation reach an unbridgeable impasse prior to the end of the 180-calendar-day period, either party should have the right to request to the Mediator that the mediation should be terminated.

V. **A Derivative Counterparty's Right To A Jury Trial Should Not Be Limited By The Proposed ADR Procedures**

32. Section 14 of the Proposed Order contains a provision misleadingly entitled "Jury Trials Unaffected." While the title seems to imply that a Derivative Counterparty's right to a jury trial is unaffected by the Proposed ADR Procedures, the opposite is true—should the Derivative Counterparty "affirmatively choose[] the mediation option set forth herein" that Derivative Counterparty might inexplicably waive its right to a jury trial. Specifically, Section 14 states:

> 14. Jury Trials Unaffected. Except to the extent a Derivatives Counterparty affirmatively chooses the mediation option set forth herein, participation in the Derivatives ADR Procedures shall not waive any right to a jury trial that might otherwise exist.

33. The Debtors' Motion, however, is conspicuously silent as to why this should be the case. Indeed, the Motion is bereft as to any explanation as to why a Derivative Counterparty should lose its right to a jury trial because it participated in an alternative dispute resolution process thrust upon it by the Debtors, and may have been the party that selected a procedure which the Debtors themselves recognize is efficient, cost saving and expeditious. The right to a jury trial, which a Derivative Counterparty explicitly preserved in its Master Agreement with the Debtors, should be unaffected by any of the provisions of the Proposed ADR Procedures.

VI. **The Debtors Should Be Required To Pay The Fees For The Mediators**

34. The Proposed Order contains an ambiguous provision stating that the "party who requests the Mediation shall pay the reasonable fees and costs charged by the Mediator." (Proposed Order, § 15). Since the Debtors can "reject any counteroffer" made by a Derivatives

16

Counterparty during the "Notice/Response Stage" of the Proposed ADR Procedures, "in which case the <u>Derivatives ADR Dispute will automatically proceed to the Mediation Stage</u>" (<u>id.</u>), it is unclear who will bear the "reasonable fees and costs charged by the Mediator." Does the Debtors' rejection constitutes the "request" for mediation? The Proposed ADR Procedures provide absolutely no guidance to answer this question.

35. Moreover, to the extent that the Debtors are the champion of this Motion seeking an order that compels Derivative Counterparties to participate in mediation, it is respectfully submitted that the Debtors should then be solely responsible for the reasonable costs and fees of the mediator(s). A Derivative Counterparty may find itself the recipient of an unwanted dinner invitation, and then get stuck with the check.

**VII.    The Telephonic Conference Appears To Improperly Prohibit The Participation Of Counsel For The Derivatives Counterparty**

36. The Proposed ADR Procedures contemplate an initial telephonic settlement conference, however, the Motion proposes that the settlement conference include "the Debtors and its representatives" and the "Derivatives Counterparty and its representatives," while the Proposed Order is silent as to who may participate. Since the Proposed Order distinguishes between a party's "representatives" and a party's "counsel" (see, Proposed Order, § 3 (notice to "Derivatives Counterparty, the Derivative's Counterparty's counsel, legal guardian, estate representative, or other representative")), it is unclear as to whether Debtors seek to have a Derivatives Counterparty appear for the first telephonic settlement conference without counsel present. This is troubling. For foreign Derivative Counterparties who are unfamiliar with U.S. mediation and U.S. civil procedures, the absence of counsel will engender reticence and concern over the sharing of information. The protections of Rule 408 of the Federal Rules of Evidence will be of little comfort, as foreign Derivative Counterparties, unfamiliar with the bounds of what

17

constitutes "settlement discussions," will be hesitant to provide information. Accordingly, the Debtors should be required to clarify that counsel for Derivative Counterparties is welcome to participate in the initial telephonic settlement conference.

## **CONCLUSION**

37.      For all of the reasons set forth above, Derivative Counterparties respectfully request that this Court enter an order denying the Motion, and granting such other and further relief as may be just and proper.

Dated: New York, New York
       July 31, 2009

**STROOCK & STROOCK & LAVAN LLP**

By: /s/ Claude G. Szyfer
    Claude G. Szyfer
    Francis C. Healy
180 Maiden Lane
New York, New York 10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for Derivative Counterparties*