Hearing Date and Time: August 5, 2009 at 10:00 a.m.
Objection Date and Time: July 31, 2009 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
Facsimile: (312) 701-2361
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br><br>LEHMAN BROTHERS HOLDINGS INC., ET AL.,<br><br>          Debtors. | CHAPTER 11 CASE NO. 08-13555 (JMP)<br><br>(Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE TO THE DEBTORS' MOTION PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND GENERAL ORDER M-143 FOR AUTHORIZATION TO IMPLEMENT ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR AFFIRMATIVE CLAIMS OF DEBTORS UNDER DERIVATIVE CONTRACTS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

     NOW COMES U.S. Bank National Association, not individually but as Trustee under a variety of trusts ("*U.S. Bank*" or the "*Trustee*"), by and through its counsel, Chapman and Cutler LLP, to object to the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-143 for Authorization to Implement Alternative Dispute Resolution

2659785.01.04.doc

Procedures for Affirmative Claims of Debtors Under Derivative Contracts (the "*Motion*" and U.S. Bank's objection thereto, the "*Objection*"). In support of its Objection, U.S. Bank states as follows:

**SUMMARY OF OBJECTIONS**

1. U.S. Bank serves as Trustee, Owner Trustee, Indenture Trustee and/or Administrative Agent for a large number of transactions involving one or more of the Debtors. With no monetary interest in the transaction itself (with the exception of fees, costs and expenses in connection with its service under the relative documents), U.S. Bank relies upon directions, instructions, indemnities and funding (to the extent that funds in a trust are insufficient to cover the fees, costs and expenses of the Trustee in taking action under the relevant agreement) from the beneficial holders of the interests in the trusts with respect to actions it takes in connection with such trusts. Many of these transactions involve derivative contracts, some of which are complicated and complex credit default swaps. The Trustee has a number of objections to the Motion which include:

  *A.* *Threshold Issues*. The existence of threshold issues, particularly with respect to credit default swaps issued in connection with CDO and CLO transactions, which until fully and finally resolved, make mediation costly and unlikely to result in a resolution; in such cases mediation should be purely voluntary. These include, but are not limited to, issues such as whether certain provisions in a derivatives contract constitute an unenforceable penalty under applicable law and whether the subordination of a termination payment in accordance with the terms of the derivatives contract and other documents is enforceable, as has been alleged by the Debtors.

  *B.* *Identification of "In the Money Swaps"*. The Debtors should be required to identify all of the derivative transactions they currently believe are 'In the Money" and therefore

subject to these procedures so that Counterparties may reach out to the Debtors to attempt to settle in advance of any ADR proceedings, and to put Counterparties on Notice that their transaction might be subject to these ADR procedures.

  C. *Derivatives ADR Notice*. The Counterparty to the relevant derivatives contract should likewise have the ability to initiate whatever alternative dispute resolution process is ordered by this Court by submitting a Derivatives ADR Notice of its own.

  D. *Transactions Involving Trustees*. In transactions involving Trustees, the Derivatives ADR Notice be delivered to the Trustee whether or not such Trustee is a formal counterparty to the derivatives contract. Also, the timing of the proposed response to the Derivatives ADR Notice is insufficient to enable the Trustee to attempt to reach the beneficiaries of the Trust in an effort to provide any meaningful response to the Derivatives ADR Notice. Further, given the significant number of derivative contracts the Trustee is involved in, any mediation process should be coordinated in a manner to make the process efficient for both the Trustee and the Debtors.

  E. *Reply to the Response to the Derivatives ADR Notice*. While requiring a Response from the Counterparty with the potential imposition of harsh penalties if a Response is not timely provided, there is no requirement that the Debtors submit a Reply to the Response of a Counterparty.

  F. *Timing of Settlement Conference*. The timing of a settlement conference must provide sufficient time to enable the Trustee to determine if there are any holders of beneficial interests interested in participating and/or obtain input, instructions and/or funding from any holders as to their respective positions on settlement.

G. *Assignment of the Mediator*. The parties to the Derivative Contract ought to be able to select a mutually agreeable mediator; in the event of a failure to agree, a mediator from a pool of mediators selected by their Court should be selected.

H. *Attendance by a Principal with Settlement Authority*. While the Trustee will abide by any mediation order entered by this Court by sending an authorized representative of the Trustee, because the Trustee may be unable to identify a majority of holders of interests in a transaction or unable to convince a holder to participate, the Trustee may be unable to obtain settlement authority.

I. *Confidentiality*. The confidentiality provisions need to be amended for Trustees to enable the Trustee to share information, statements and arguments with its beneficiaries who have the right to direct and instruct the Trustee, and who may fund the Trustee's efforts.

2. U.S. Bank has been working with the Debtors to resolve issues in the more than 800 transactions between U.S. Bank and the Debtors, many of which involve Derivative Contracts. U.S. Bank believes it has developed an effective process to address issues with the Debtors. It is the expectation of U.S. Bank that this dialogue and cooperation will continue. If U.S. Bank and the Debtors are unable to resolve issues relating to a particular Derivative Contract, that matter will be brought to the attention of this Court. As such, U.S. Bank does not believe any mediation process is necessary with respect to Derivative Contracts in transactions involving U.S. Bank and the Debtors. Any process relating to Trustees ought to be purely voluntary.

**BACKGROUND**

3.  U.S. Bank National Association serves as Trustee (or some other similar capacity) in over *eight hundred* transactions involving the Debtors in these proceedings. These transactions are generally sophisticated transactions in which the Debtors or an affiliate of the Debtors have multiple roles and responsibilities. These transactions include securitization transactions in which U.S. Bank serves as custodian or collateral agent; other securitization transactions in which U.S. Bank serves as Trustee; Collateralized Loan Obligations and Collateralized Bond Obligations for which U.S. Bank serves as Trustee (some of which involve complicated credit default swaps); and corporate and municipal debt transactions pursuant to which U.S. Bank serves as a Trustee. Many of these transactions, in some way, include derivative contracts. Some of these transactions are described below:

*Collateralized Debt Obligations.*

4.  In these transactions loans and notes of third parties are sold to the Issuer who finances such purchase through the issuance of Notes and Certificates. The loans and notes provide the return of interest and principal on the Notes or Certificates in accordance with the terms of a waterfall. Some or all of the notes "owned" by the Issuer or Trust are "synthetic" taking the form of a credit default swap with the Issuer as a counterparty. The Issuer, a special purpose entity, may also be a counterparty to other swap transactions, including but not limited coupon swap agreements, interest rate swaps or total return swaps, with one of the Debtors a counterparty thereto. The Trustee for the Notes issued by the Issuer either has a security interest in the swaps or has certain rights to act on behalf of the Issuer.

5.  A Credit Default Swap Agreement is a form of insurance against certain Credit Events occurring with respect to a designated portfolio of unrelated notes or indebtedness, including high yield debt. The "Credit Events" typically are bankruptcy of the "reference entity"

(the obligation for which the "insurance" is being offered), failure to pay, restructuring or certain defaults related to any such high yield debt. In some transactions with mortgage backed securities serving as the reference portfolio these Credit Events include writedowns with respect to the relevant security.

6. If a Credit Event occurs, the Issuer is required to pay the Debtor counterparty (through one of a number of different mechanisms) the amount of the loss on the indebtedness subject to the Credit Event. The Issuer funds any obligations it may have to the Debtor counterparty from funds it receives through the issuance of notes. The notes are issued pursuant to an Indenture between the Issuer and U.S. Bank as Trustee. There are usually several tranches of notes that are issued under the Indenture, with varying priorities and rights to payment.

7. In exchange for taking on the risk of Credit Events, the Issuer receives periodic payments from the Debtor. The Issuer uses these payments to make payments of interest on any issued notes, or to pay commitment fees to those who have made a commitment to purchase notes. In some cases the Debtors failure to make these periodic payments has rendered the Issuer (generally, a nominal "shell" type entity) unable to make payments on the notes, creating an Event of Default under the Indenture and changing, perhaps permanently, the relative rights of holders of different tranches of notes under the Indenture.

8. In a coupon swap, a Debtor, for a fee, often took on the risk of the failure of a transaction to pay interest on a certain tranche of securities issued in the transaction.

9. The swaps were almost invariably guaranteed by Lehman Brothers Holdings Inc. ("LBHI"), who served as the Credit Support Party under the terms of the swap. The filing of LBHI's bankruptcy petition generally constitutes an Event of Default under the terms of the swap enabling the swap to be terminated in accordance with the terms thereof. The swap also

contained provisions with respect to any termination payment that might be due and the priority of the termination payment, generally by reference to the relevant transactional documents.

10. As a result, although it may not be a counterparty to the Derivative Contract, the Trustee and the noteholders have a huge interest in what happens to the contract as a result of these bankruptcy proceedings.

*Securitization Transactions.*

11. U.S. Bank serves as Trustee for a large number of Lehman sponsored mortgage backed securitization transactions. In these transactions a special purpose entity or trust issues various tranches of certificates to fund its purchase of mortgage loans from a Lehman related entity. Some of the tranches are supported by swap agreements, some of which have the applicable special purpose entity or trust and the Debtor as counterparties. In some cases these are interest rate swaps; in other cases these swaps take on the risk of non-payment of certain amounts due and owing a particular tranche of certificates. Of course, the special purpose entity or the trust may have no real interest in the swap arrangement, rather it is the Trustee and the affected tranches of certificateholders that have the real economic interest in connection with the swap agreement.

**CERTAIN THRESHOLD ISSUES SHOULD BE FINALLY DETERMINED PRIOR TO REQUIRING MEDIATION**

12. In order for the mediation process to be meaningful, certain issues must be finally determined with respect to certain swaps. In the case of credit default swaps and the documentation relating thereto, the Debtors have raised certain threshold legal issues with respect to the contractual terms thereof, including but not limited to, whether a swap was properly terminated, whether certain provisions of the swap constitute unenforceable penalties under New York law, or whether certain documentary provisions constitute unenforceable *ipso facto* provisions under New York law (the Debtors arguments are diametrically opposed to the

disclosures made to purchasers of these securities at the time)[1]. For example, the Indenture with respect to the White Marlin transaction provides:

> (B) On each Payment Date and upon acceleration following an Event of Default, Principal Proceeds shall be applied in the following order of priority:
>
> (i) first, to pay the Credit Swap Counterparty any Cash Settlement Amounts owed by the Issuer (if any) under the Credit Swap Agreement on the Scheduled Termination Date, second, on or after the Maturity Date, to make a deposit of the Maturity Date Amount into the Maturity Date Account (to the extent Principal Proceeds are not sufficient to make deposits into the maturity Date Account, such deposits will be made in accordance with Section 10.4(j)) and third, unless the Credit Swap Counterparty is the sole affected party or a party causing the Event of default (the "defaulting party"), to pay any termination payments owed to Credit Swap Counterparty;
>
> \* \* \* \*
>
> [Thereafter to make up any Administrative Expenses, Fees and Expenses, certain management fees, and payments of interest on

---

[1] These arguments are set forth in the following adversary proceedings, and given the stakes it is likely any determination by this Court with respect to these issues will be appealed by the losing party:

A. Lehman Brothers Special Financing Inc. v. Ballyrock ABS CDO 2007-1 Limited et al., Adv. Proc. No. 09-01032 pending in the United States Bankruptcy Court for the Southern District of New York.

B. Lehman Brothers Holdings Inc., et al., v. Libra CDO Limited et al., Adv. Proc. No. 09-01177 pending in the United States Bankruptcy Court for the Southern District of New York.

C. Libra CDO Limited et al., v. Lehman Brothers Special Financing Inc., et al., Adv. Proc. No. 09-01178 pending in the United States Bankruptcy Court for the Southern District of New York.

D. Lehman Brothers Special Financing Inc. v. Harrier Finance Limited aka Rathgar Capital Co., Adv. Proc. No. 09-01241 pending in the United States Bankruptcy Court for the Southern District of New York.

E. Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited, Adv. Proc. No. 09-01242 pending in the United States Bankruptcy Court for the Southern District of New York.

F. Lehman Brothers Special Financing Inc. et al., v. American Family Assurance Company of Columbus, Adv. Proc. No., 09-01261 pending in the United States Bankruptcy Court for the Southern District of New York.

> the Notes, certain other payments, then payments of principal on the Notes]
>
> * * * *
>
> (xiv)  first, to the payment of the amounts specified in subclause (xv) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder; and second, to the payment of any termination payments to the Credit Swap Counterparty if it is the sole affected party or a Defaulting Party; . . .

Indenture (the "Indenture") by and between White Marlin CDO 2007-1, Ltd., as Issuer, and White Marlin CDO 2007-1, Corp., as Co-Issuer and U.S. Bank National Association, as Trustee dated as of June 22, 2007, Section 11.1(B), p. 173-176.  This priority of payments is likewise reflected by reference in the Schedule to the Master Agreement which expressly provides:

> If an early Termination Date is designated hereunder, market Quotation and Second Method shall be used to calculate any termination payment owing by either party in respect of such early Termination date.  If an Early Termination Date is designated and any termination payment is owed by Party B, such termination payment shall be paid on the first Payment Date on or after the Early Termination Date in accordance with the Priority of Payments set forth in the Indenture.

Schedule, Part 1(c), p. 1.  Therefore the priority of the payment of any termination payment due LBSF is incorporated into and therefore an integral part of the Swap Agreement and the business arrangement of the parties.

       13.    Without prejudging the Debtor's position on these provisions, it is likely the Debtors would likewise challenge this provision on grounds similar to those set forth in the adversary proceedings listed in footnote 1.  Given the amounts that would be available in the relevant trusts to (a) pay administrative fees and expenses, (b) make payments on the Notes and (c) make termination payments on the swap, it is highly unlikely that there will be sufficient funds to make a full payment on both the Notes and any termination payment determined to be

due. The effectiveness of the payment waterfall in the circumstances of a default by the Lehman counterparty (by virtue of LBHI's voluntary petition) may mean a large swing in the amount of the payment to discharge any termination payment due the Debtors in the event the Debtors prevail on their arguments and the amounts due the Noteholders. Given this potentially huge difference in value, it is uncertain whether the Trustee would be able to obtain direction from a requisite number of holders willing to compromise these issues to be able to meaningfully participate in court mandated mediation, particularly in light of *Drexel Burnham Lambert Products Corporation v. Midland Bank PLC*, 1992 U.S. Dist LEXIS 21223 (S.D.N.Y. 1992), and the recent decision of the English High Court of Justice, Chancery Division styled *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Services LTD., et al.*, Case No. HC09C01612, both of which upheld contractual provisions which either (a) denied a termination payment to a defaulting party in its entirety as a result of a default or (b) provide for the payment of any termination payment due a defaulting party after payments to the Noteholders. These threshold type issues ought to be decided by the Bankruptcy Court, and thereafter any appellate court prior to parties going through the expense of mediation.

### THE DEBTORS SHOULD DISCLOSE A LIST OF DERIVATIVE CONTRACTS THEY BELIEVE ARE IN THE MONEY.

14. The Trustee believes it would be helpful if the Debtors filed a nonbinding list of derivative contracts they believe are in the money. First, the filing of the "list" could serve as the initiation of the "dispute" which appears to be required to invoke the provision of the General Order[2]. Providing a list would be fair to the counterparties by providing them notice that their contract is the subject of the mediation procedures, and may facilitate a resolution prior to

---

[2] Paragraph 1.3 of the General Order provides "unless otherwise ordered by the presiding judge, any adversary proceeding, contested matter or other dispute may be referred by the court to mediation".

initiating any of the proposed procedures, thereby conserving resources. A list of derivative contracts which the Debtors believe are "in the money" would eliminate any surprise on the parts of counterparties with respect the receipt of a Derivatives ADR Notice, and would enable counterparties to examine the documentation relevant to a swap with knowledge of the Debtors' position. Particularly in the case of a Trustee, who would seek direction and instruction of the beneficiaries in the transaction with respect to the swap, this advance knowledge and review would enable the Trustee to attempt to obtain the beneficiaries directions and instructions with respect to the swap at issue and potentially engage in settlement discussions without the need for the proposed procedures. In some transactions the certificates are held in "street name", and the Trustee does not know the identity of all of the beneficial holders. The lead time the list would help provide might enable the Trustee to provide adequate notice to holders of the Debtors' position and attempt to identify appropriate decision makers.

### ALL PARTIES SHOULD HAVE THE RIGHT TO INITIATE ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

15.     While it is not clear in either the Motion or the proposed Order, it appears that only the Debtors may initiate the process of invoking the ADR procedures by sending a Derivatives ADR Notice. Section 8a. on page 5 of the proposed Order provides:

> Derivatives ADR Notice. Debtors shall serve upon a Derivatives Counterparty a notice containing sufficient information regarding the Derivatives ADR Dispute to make the Derivatives Counterparty aware of the nature of Debtor's affirmative claim and of its demand for settlement . . .

This process should be open to all parties under terms of equally applicable terms and conditions. There is no good or just reason for the Debtors to obtain any leverage in connection with these disputes by virtue of their being the sole party to initiate the ADR procedures.

### THE RELEVANT TRUSTEE SHOULD RECEIVE COPIES OF ALL DERIVATIVE ADR NOTICES

16. The nominal counterparty to many of the swaps relating to trusts is often either the Issuer or a special purpose vehicle. The Trustee, however, often has a security interest in the swap agreements in particular transactions or the right to make decisions with respect thereto. For example a typical Granting Clause in a trust agreement or Indenture might provide:

> The Issuer hereby Grants to the Trustee, for the benefit of the Secured parties, all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, all accounts, general intangibles, payment intangibles, securities accounts, chattel paper, instruments, investment property, money (as such terms are defined in the UCC), and any and all other property of any type or nature owned by it, including but not limited to:

\* \* \* \* \*

> (b) the Credit Swaps and the Issuer's rights thereunder, and all payments made or to be made thereon or with respect thereto and any collateral granted to the Issuer thereunder;

\* \* \* \* \*

Series Indenture dated as of September 20, 2005 among Blue Point CDO SPC for the account of Series 2005-2 Segregated Portfolio, Blue Point CDO Series 2005-2 LLC and U.S. Bank National association, as Trustee, Granting Clauses, p. 1. While the credit default swaps in the Blue Point 2005-2 transaction are in the name of the Issuer, the Trustee has a security interest therein. As a result, it is imperative for the Trustee and its designated counsel to receive copies of all of the Derivative ADR Notices involving trusts so that the Trustee may confirm which party has the right to take action with respect to a particular swap. The Trustee and its bona fide interests in the relevant swap should not be subject to the penalties contemplated by the Order without actually receiving the relevant Derivative ADR Notice.

**THE TIMEFRAMES FOR ACTIONS REQUIRED BY DERIVATIVES COUNTERPARTIES SHOULD BE ADJUSTED TO TAKE INTO CONSIDERATION THE NEED OF THE TRUSTEE TO COMMUNICATE WITH ITS BENEFICIARIES**

17.  The timing of various events provided for in the Order are not sufficient for the Trustee in order to make the Notice, Settlement and Mediation processes meaningful. As is typical in most Indentures, holders of a certain amount of securities have the right to direct and instruct the Trustee with respect to actions to be taken under the Indenture. For example the Series Indenture for the Barton Springs CDO Series 2005-1 transaction provides:

> The Majority of the holders of the Notes shall have the right to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or exercising any trust, right, remedy or power conferred on the Trustee . . .

subject to certain terms and conditions. Series Indenture dated as of April 20, 2005 among Barton Springs CDO SPC for the account of the Series 2005-1 Segregated Portfolio, Barton Springs CDO Series 2005-1 LLC and U.S. Bank National Association, as Trustee, Section 6(d), p. 46. The Trustee needs sufficient time to identify holders and provide sufficient information to obtain holder directions. The Trustee can only be certain of the registered holder of a particular note, and in many cases that holder is the Depository Trust Company ("DTC"). The Trustee relies upon beneficial holders identifying themselves. Often this requires that the Trustee send a notice through DTC and the relevant DTC Participants and brokers to the ultimate holder. This process takes time.

18.  As a result, in order for the mediation process to be meaningful, the Trustee believes it needs more than 20 calendar days to prepare a meaningful response to a Derivative ADR Notice and suggests that 45 calendar days be the limit for Trustees. Likewise it needs more than 5 calendar days to notify holders of settlement conferences and believes 30 days is appropriate.

**THE MEDIATION ORDER SHOULD LIMIT THE NUMBER OF MEDIATIONS A GIVEN COUNTERPARTY/TRUSTEE IS SUBJECT TO OR OTHERWISE PROVIDE SAFEGUARDS FOR MAKING THE PROCESS AS EFFICIENT AS POSSIBLE**

19.     The purpose of the Motion is purportedly to provide an efficient approach to the resolution of issues relating to certain derivative contracts in which a Debtor is "in the money". The need for the procedures is purportedly based on the large number of derivative contracts at issue. The procedures, however, provide no mechanism for insuring that the procedures are efficient from the perspective of counterparties and Trustees. There are no limits on the ability of Debtors to issue Derivative ADR Notices to initiate these processes; the Debtors could theoretically burden those entities that are counterparties on multiple swaps with seriatim Derivative ADR Notices, making the counterparties subject to multiple notices with differing time frames. The procedures ought to be as efficient as possible for the counterparties as well, and limits ought to be placed on the number of any such notices that are outstanding at any given time, or some alternative method put into place to make the process as efficient as possible from the perspective of the counterparties. It would appear that Lehman might raise similar legal and factual issues with respect to many of the transactions.

**THE DEBTORS SHOULD BE REQUIRED TO PROVIDE A REPLY TO ANY RESPONSE TO A DERIVATIVE ADR NOTICE**

20.     While the procedures require the recipient of a Derivatives ADR Notice to prepare a Response within a set period or suffer certain potentially severe penalties, there is no requirement that the debtors prepare and serve a Reply. The Debtors ought to be required to provide a Reply subject to the same penalties as a counterparty.

**THE PARTIES OUGHT TO BE ABLE TO SELECT A MEDIATOR; BARRING AN AGREEMENT ON THE IDENTITY OF THE MEDIATOR, A MEDIATOR OUGHT TO BE ASSIGNED RANDOMLY FROM A POOL**

21.    While the mediation is not binding, parties are required to participate in the mediation in good faith and may be subject to "instructions or directions" from the mediator. As such, the derivative counterparties ought to be able to seek the agreement with the Debtors on a mutually acceptable mediator, and barring that, a mediator be assigned randomly from a pool. The current procedures mandate that there be one mediator assigned for all of the disputes which are the subject of these procedures. Given the sheer numbers of disputes that might be the subject of these procedures, it is likely that one mediator will not be sufficient for this task. Further, the Debtors will gain an unfair advantage over other counterparties if for no other reason but by knowing the methods of the mediator. Further, to be effective, the procedures ought to be designed to assure the assignment of an impartial neutral - ideally one selected by the parties to the mediation, but if not, at least one selected at random from a pool of mediators selected by the Court.

**THE MEDIATION PROCEDURES NEED TO BE MODIFIED FOR TRUSTEE'S TO PROVIDE THAT A DULY AUTHORIZED OFFICER OF THE TRUSTEE WILL ATTEND A MEDIATION SESSION**

22.    As presently drafted the mediation procedures require that the counterparty bring a principal with settlement authority to the mediation sessions. This requirement is untenable as it relates to Trustees. As noted above certain holders of the Notes have the right to direct and instruct (with an appropriate indemnity and funding) the Trustee with respect to certain actions the Trustee might take under the relevant agreement. There also may be limitations on what a Trustee may compromise under the terms of an Indenture without the support of a requisite number of holders. For the reasons set forth above, it may be difficult to identify an appropriate

- 15 -

holder or group of holders to provide these instructions[3]. As a result it is impossible for a Trustee to guarantee that it will have "settlement authority" if and when it is required to attend a mediation. Should this Court adopt mediation procedures, the Trustee will be able to have a duly authorized officer of the Trustee attend the mediation and participate to the full extent possible under the terms of its agreements. Because of the Trustee's limitations to obtain settlement authority from its beneficiaries, any procedures for mediation ought to be purely voluntary with respect to Trustees.

### THE CONFIDENTIALITY PROVISIONS OF THE PROCEDURES MUST ENABLE THE TRUSTEE TO COMMUNICATE ALL OF THE FACTS AND POSITIONS OF THE MEDIATOR AND THE DEBTORS TO BE DIVULGED TO BENEFICIARIES

23. The proposed Order picks up the provisions of Section 5.0 of the General Order with respect to the confidentiality of the statements made during the mediation. While the Trustee agrees that all of these statements should be subject to Federal Rules of Evidence 408, Section 5 of the General Order goes beyond using such information in court to precluding divulging such information to "any third party". In order for any mediation process to be effective, the Trustee must be able to divulge all proposals, statements and positions of both the Debtor and the mediator to its beneficiaries. The beneficiaries should be able to have all of this information available it in connection with any decision to direct and instruct the Trustee in connection with decisions relating to the "dispute". Without the ability to pass this information on to beneficiaries, the Trustee will not be able to meaningfully participate in any mediation process.

---

[3] There may, in fact, be bona fide issues as to which group of holders has the right to provide direction.

WHEREFORE U.S. Bank National Association, as Trustee respectfully requests that this Court deny the relief requested in the Motion as it related to the Trustee, or, alternatively, modify terms of the Order in accordance with this Objection.

          Respectfully submitted,

          U.S. BANK NATIONAL ASSOCIATION, not individually but as Trustee

          /s/ Ann Acker

By: _____
          One of Its Attorneys

James E. Spiotto
Ann Acker
Franklin H. Top, III
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois  60603
(312) 845-3000