SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000

Attorneys for Barclays Bank PLC and Long Island International Limited

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., et al.,

          Debtors

-----------------------------------------------------------------x

Chapter 11 Case No.
08-13555 (JMP)

**OBJECTION OF BARCLAYS BANK PLC AND LONG ISLAND
INTERNATIONAL LIMITED TO DEBTORS' MOTION TO
IMPLEMENT ALTERNATIVE DISPUTE RESOLUTION PROCEDURES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Barclays Bank PLC and Long Island International Limited submit this objection to the Motion of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors") for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors under Derivative Contracts (the "ADR Motion").

**BACKGROUND**

        1.    Barclays Bank PLC and Long Island International Limited ("Barclays") own notes ("Notes") issued by a number of special purpose entities created by the Debtors ("CDOs") that are parties to Derivative Contracts with one or more of the Debtors.  For a number of these CDOs, (1) Barclays owns the majority of the controlling class of Notes and (2) any resolution of disputes concerning the amounts and priority of payment for termination payments under the Derivative Contracts will have a material impact on the value of the Notes held by Barclays.  In

addition, Barclays Bank PLC is also a direct party to a number of Derivative Contracts with certain of the Debtors.

2.    One of the CDOs in which Barclays holds Notes is Ballyrock ABS CDO 2007-1 Limited ("Ballyrock"), in which Barclays owns roughly $93 million of Senior Notes. As the Court is aware, Ballyrock is the subject of a pending adversary proceeding in which a motion to dismiss is scheduled to be heard on September 17, 2009, and Barclays is playing an active role in that proceeding and motion.

3.    Other CDOs in which Barclays owns Notes have received letters from the Debtors' counsel indicating that disputes are likely to arise concerning the termination of Derivative Contracts between the CDOs and the Debtors and the priority of payment applicable to the resulting termination payments.

4.    Barclays is not opposed to mediation, but the rigid procedures proposed in the ADR Motion unjustifiably depart from the sound mediation procedures prescribed in General Order M-143 (the "General Order"). The procedures set forth in the General Order are cooperative in nature, providing, for example, all the parties to a mediation with the right to "agree upon a mediator" before the Court intervenes to appoint a mediator, to consult with the mediator regarding "a reasonable time and place" for the mediation conference, and to move "to withdraw a matter from mediation." General Order §§ 2.2, 3.0, and 3.6. It may be appropriate to supplement the provisions of the General Order to deal with the Debtors' Derivative Contact disputes, but to broadly supersede the General Order is likely to result in procedures that turn out to be unfair and impractical, for reasons including those discussed below.

5.    *Avoidance of Disruptive Demands for Arbitration*. Paragraph 1.1 of the General Order provides that any motion by a party in interest to assign a matter to mediation "must be

2

filed promptly after filing the initial document in the matter." The Debtor's Proposed Order, in contrast, appears to permit the Debtors to designate any dispute concerning a Derivative Contract for mediation at any time. The Debtors should not be allowed to initiate mediation at a time when it is likely to cause delay in, or distraction from, a pending adversary proceeding or contested matter. They should be required to institute any mediation before the parties have devoted substantial time and expenses to litigating the dispute, as provided in the existing General Order.

6. ***Certification of Legal Issues***. Paragraph 10(b) of the Proposed Order contains an inconspicuous provision giving a mediator "discretion to certify specific legal issues to the court for decision." The provision is antithetical to both the proper functioning of a mediation and the established procedures for deciding properly presented legal issues. On the one hand, the point of mediation is to achieve a prompt resolution of a specific dispute by negotiation. The proposed certification procedure would mean that a matter was resolved by the Court rather than negotiation, and would produce substantial delay while the issue was presented to and decided by the Court. On the other hand, the proposed certification procedure is not subject to any of the established procedures that govern this Court's adjudication of legal disputes. Mediation under the Debtor's proposed procedures apparently may occur before any adversary proceeding or contested matter has been initiated. The mediator might therefore certify legal issues prior to any exchange of pleadings or motion papers to establish a context and factual predicate for the legal dispute. Indeed, the proposed procedures apparently would allow the mediator to certify abstract questions of law, not tied to any particular dispute, and with no assurance that the issue arises in a case or controversy within the constitutional limits of the Court's jurisdiction. Finally, the

3

proposed procedures do not outline anything corresponding to the normal notice, briefing, and argument procedures designed to ensure that issues are fairly presented for decision.

7. ***Initiation, Time, and Place.*** The General Order provides that the Court "may order assignment of a matter to mediation upon its own motion, or upon a motion by any party in interest," or stipulation of the parties, thus providing any party to an adversary proceeding equal ability to initiate mediation. General Order §§ 1.1, 1.2. The mediator, who is chosen by the parties unless they fail to agree, *id*. § 2.2, then "shall fix a reasonable time and place" for the mediation conference after consultation with the parties. *Id*. § 3.1. By contrast, the Debtors' proposal provides the Debtors with ultimate control over the initiation and timing of mediation procedures by placing the "Notice/Response Stage" completely within the Debtors' discretion. Specifically, the Debtors' proposal appears to provide the Debtors with the discretion to "designate a dispute . . . as to any Derivative Contract . . . by serving (i) a copy of an order approving this Motion . . . and (ii) a notice." ADR Motion ¶ 15. The Debtors would thus control when such notice is given, ADR Motion ¶ 15, which will in turn determine when mediation can begin. ADR Motion ¶¶ 19-20 Finally, the Debtors propose to give themselves full control over the location of mediation, as their proposal states that "the addition or elimination of mediation locations will be within the sole discretion of the Debtors." ADR Motion ¶ 26.

8. ***Insufficient Time For Notice/Response Stage.*** The General Order provides for flexibility in determining deadlines for the mediation process, after consultation with all parties. Specifically, the General Order calls for the mediator to "fix a reasonable time and place for the initial mediation conference" after "consultation with all attorneys . . . subject to the mediation." General Order § 3.1. After the conference, the mediator has the "authority to establish the time for all mediation activities, including private meetings . . . and the submission of relevant

4

documents." General Order § 3.1. The flexibility of the General Order allows the mediator to consider the complexity and specific fact patterns of the dispute in determining the pace of the mediation from the very beginning.

9. Under the Debtors' proposed procedures, by contrast, upon service with a "Derivatives ADR Package," the counterparties would have only "twenty (20) calendar days to respond in writing its position with respect to Debtors' demand," under penalty of sanctions. ADR Motion ¶¶ 19-20. The Debtors' proposal would impose deadlines, without the input of the counterparties, that may provide insufficient time for the counterparties to respond to Debtor's claims given the complexity of the instruments giving rise to these claims, and the numerous disputes as to law and fact relating to these claims.

10. ***The Debtors' Proposed Sanctions.*** The General Order does not prescribe specific sanctions, saying only that "[t]he mediator shall report any willful failure to attend or participate in good faith" to the court, and "[s]uch failure may result in the imposition of sanctions by the court." General Order § 3.2. In their motion, the Debtors propose inappropriate and punitive sanctions that would undermine the voluntary and consensual nature of mediation. For failure to timely respond to a "Derivatives ADR Package" or failure to mediate, the Debtors propose sanctions that "may include but are not limited to . . . (c) an award of the Derivatives ADR Dispute up to the amount specified in the Debtors' Derivatives ADR Notice." ADR Motion ¶ 29. Such an award is effectively a grant of judgment, which "is a harsh remedy to be utilized only in extreme situations." *Cody* v. *Mello*, 59 F.3d 13, 15 (2d Cir. 1995) (internal quotation marks omitted); *see also Negron* v. *Woodhull Hosp.*, 173 F. App'x 77, 79 (2d. Cir. 2006) (grant of judgment is an improper sanction for failure to mediate in good faith). The Debtors' assertion that the procedures proposed in their Motion "will help develop a productive, consensual

5

resolution process," ADR Motion ¶ 37, is belied by their proposal for coercive and unnecessarily punitive sanctions. Such draconian sanctions are especially inappropriate given the strict confidentiality requirements of the mediation process, which could inhibit the ability of any party to mount an effective defense to a claim that it was not participating in the mediation in good faith.

11. ***Selection of Mutually Agreeable Mediator.*** Under the General Order, "The parties will ordinarily choose a mediator from the Register for appointment by the Court," and the Court will appoint a mediator of its choosing only "[i]f the parties cannot agree upon a mediator within seven (7) days of assignment to mediation." General Order § 2.2 (A). The Debtors, however, provide no role for the counterparties in choosing the mediator, and only permit input from the counterparties in the appointment of an alternate mediator. Motion ¶¶ 23-24. If the Court does not permit counterparties to participate in the selection of a mediator, it should choose the mediators at random from a list of mediators suggested by the parties, similar to the process this Court has employed in the past. *See, e.g.*, *In re Ames Department Stores, Inc., et al.*, Case No. 01-42217 (REG) (Bankr. S.D.N.Y. June 25, 2007) [Docket No. 3195] (selecting four mediators from a list).

12. ***The Court Should Allow For Multiple Mediators.*** The Debtors argue that "the Court should select one mediator who will hear and preside over all mediations hereunder." ADR Motion ¶ 23. In the past, however, this Court has authorized the use of multiple mediators. *See, e.g.*, *In re Ames Department Stores, Inc., et al.*, Case No. 01-42217 (REG) (Bankr. S.D.N.Y. June 25, 2007) [Docket No. 3195] (appointing four mediators for disputes between the debtor and sixty counterparties). The appointment of more than one mediator is especially important in this case given that "[t]he Derivative Contracts are complex agreements" and given the

6

complicated legal and factual issues surrounding the disputes, including "the appropriateness of setoff, termination, valuation, computation of termination payments, and notice in the chapter 11 context." ADR Motion ¶ 35. The Debtors also state that "there are approximately two hundred fifty (250) Derivative Counterparties (which number surely will increase)." ADR Motion ¶¶ 13. Appointing only one mediator is likely to slow the mediation process, compromising the efficiency and cost-reduction that are the chief benefits of mediation.

13. ***Opportunity for the Noteholders to Participate***.  Any special procedures for disputes relating to the Debtors' Derivative Contracts should provide for notice to and an opportunity for participation by the Trustee and Noteholders in connection with any dispute with a CDO. The CDO itself may have no economic interest in the outcome of a dispute concerning its Derivative Contracts, because the dispute will only affect how the value of the CDO's assets are allocated between the Debtors, the Noteholders, and potentially other creditors of the CDO. In contrast, the Trustee of a CDO generally is responsible for protecting the CDO's assets, including its Derivative Contacts, for the benefit of all the CDOs creditors, while the Noteholders are likely to have the greatest economic interest in disputing the Debtors' claims against the CDO. Although the Noteholders and Trustee should be permitted to rely on the CDO to represent their interests if they choose to do so, and therefore should not be required to participate in a mediation, they should have a full opportunity to do so. Yet, nothing in the Debtors' proposed order ensures that they have such an opportunity, and the confidentiality provisions in paragraph 13 appear to preclude their participation.

**WHEREFORE**, Barclays Bank PLC and Long Island International Limited respectfully request that the Court deny the Alternative Dispute Resolution Procedures Motion or otherwise modify the relief requested therein as per this opposition and grant such other and further relief as it deems just and proper.

Dated: New York, New York
July 31, 2009

SULLIVAN & CROMWELL LLP

/s/ Robinson B. Lacy
Robinson B. Lacy (RL-8282)
Penny Shane (PS-0185)
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000

Attorneys for Barclays Bank PLC and
Long Island International Limited