WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | |
|---|---|
| **In re** : | **Chapter 11 Case No.** |
| : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* : | **08-13555 (JMP)** |
| : | |
| **Debtors.** : | **(Jointly Administered)** |

------------------------------------------------------------------x

**DEBTORS' REPLY TO LIMITED OBJECTION TO LBHI'S MOTION,**
**PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 6004, FOR AUTHORIZATION TO ENTER INTO**
**(I) AN AMENDED REPURCHASE AGREEMENT WITH AURORA BANK, FSB**
**AND (II) A FINANCING FACILITY WITH AURORA LOAN SERVICES, LLC**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

   Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced

chapter 11 cases (collectively, the "Debtors") reply to the limited objection (the "Objection") of

Elliot Management Corporation (the "Hedge Funds") to LBHI's Motion, Pursuant to Sections

105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004, for Authorization to Enter

Into (I) an Amended Repurchase Agreement with Aurora Bank, FSB (the "Bank" or "FSB") and

(II) a Financing Facility with Aurora Loan Services LLC ("Aurora") (the "Motion")[1], and

respectfully state:

---

[1] Capitalized terms used but not defined shall have the meanings ascribed to them in the Motion.

# I.
## Introduction

1.      The Objection is nothing more than another attempt by a disgruntled member of an ad hoc committee of hedge funds[2] to exert control over these cases and substitute its uninhibited judgment for the business judgment of the fiduciaries of the Debtors.  The Objection is devoid of merit.  The Objection, without any foundation, asserts that the Debtors' investment of additional moneys into the Bank, which the Creditors' Committee fully supports, is not justified.  The Hedge Funds, who owe no fiduciary obligations other than to their individual investors, fail to consider, as the Debtors and the Creditors' Committee must, the risks and losses to the Debtors and all of their creditors from the failures of FSB and its affiliate Woodlands Commercial Bank ("Woodlands," when referred to with FSB, the "Banks").  On February 4, 2009, when the OTS issued the PCA,[3] LBHI was faced with a choice:  allow the Banks to fail and litigate with the Regulators over a potential claim under section 365(o) of the Bankruptcy Code or support the Bank's capital and preserve the opportunity to recover the significant value of the Banks for all creditors.  After completing an exhaustive review with its professionals, the Banks' management, and the Creditors' Committee and its professionals, LBHI made the decision, with the full support of the Creditors' Committee, to preserve such opportunity.  That decision has resulted in five orders entered after notice that have authorized, but not directed, LBHI to take appropriate actions to support the Banks' capital and avoid a

---

[2] Elliot Management Corporation is a member of the hedge fund committee (the "Hedge Fund Committee") comprised of at least Elliot Management Corporation, King Street Capital Management LP and Paulson & Company Inc., that filed an objection, through the same counsel Dewey & LeBoeuf LLP, to the Debtors' motion to extend exclusivity.  *See* Objection of Ad Hoc Group of Lehman Brothers Creditors to Debtors' Motion Requesting Second Extension of Exclusivity [Docket No. 4318].

[3] On February 4, 2009, in response to the diminished capital position reported on the Bank's December 31, 2008 Thrift Financial Report, the OTS issued a Prompt Corrective Action directive (the "PCA").  The PCA imposes restrictions on the Bank's business and requires the Bank to submit a capital restoration plan.

seizure of the Banks by the Regulators. The Objection is the first challenge to the collective judgment of the Debtors and the Creditors' Committee as previously approved by the Court.

2.     Without ever having attempted to contact the Debtors or their professionals to request information concerning the Banks, the Hedge Funds complain that LBHI has failed to supply creditors with pertinent information to make an informed judgment. Objection ¶ 10. Contrary to the Hedge Funds' unsubstantiated assertions, the Debtors have made every attempt to provide the necessary information available under the circumstances[4] to the fiduciaries of all general unsecured creditors of the Debtors. Specifically:

- as indicated in the Creditors' Committee's statement in support of the Motion, since the outset of these cases, the Debtors have worked in close consultation with the Creditors' Committee regarding the strategy for the Banks and their capitalization and prospects;

- the Debtors hold regular meetings and conferences with the members of the Creditors' Committee's Bank sub-committee to ensure that the Creditors' Committee is aware of, and has meaningful input regarding, all developments concerning the Banks on a real-time basis;

- the Debtors offered a detailed oral and written presentation at the February 17, 2009 hearing,[5] through their chief executive officer, Mr. Bryan Marsal, explaining the situation of the Banks and the basis for LBHI's determination to attempt to preserve the opportunity to realize the significant equity value of the Banks, including the risks associated with the Banks' failure;

- the Debtors have offered the testimony of their officers on three separate occasions in connection with motions to approve various actions to the support the Bank's capital, all subject to cross-examination;

- the Debtors have filed five comprehensive motions (even in circumstances where they believed they had authority to enter into the contemplated transactions either in the ordinary course of their business or pursuant to the

---

[4] As explained in further detail in paragraph 3 of this Reply and footnote 7, the Debtors are prohibited by law (punishable by criminal sanctions) from disclosing the substance of LBHI and/or the Bank's dealings with the Regulators.

[5] A copy of the transcript of the hearing held on February 17, 2009 is attached hereto at Exhibit "A."

cash management order) in an effort to inform parties in interest of developments concerning the Banks; and

- the Debtors provided access to all creditors of information concerning the Banks at the section 341 meetings of creditors held on January 29, 2009 and July 8, 2009 with an opportunity for direct inquiries to the Debtors' professionals.[6]

3.        The Hedge Funds fail to recognize, or, more appropriately, choose to ignore, that the Debtors have been engaged in extremely delicate discussions concerning the overall strategy for the Banks for more than eight months and are prohibited in most instances by regulatory restrictions from publicly disclosing LBHI's and/or the Bank's dealings with the Regulators.[7]  In addition to the regulatory limitations imposed on the Debtors, as a practical matter, if the Debtors were to disclose all of the details of their strategy (as the Objection demands), it would cripple any ability the Debtors have to deal effectively with the Bank.  The Debtors have invested substantial capital and time in their discussions with the Regulators.  Those discussions are at a sensitive stage.  The Debtors are in a position to continue their discussions with the Regulators and put into action a plan to recover the value of the Bank.

4.        LBHI has always recognized and fully disclosed that the preservation of the Banks would require a substantial long-term financial commitment that is dependent upon the Bank's changing balance sheet, its liquidity position, the general economy and the political

---

[6] After the July 8, 2009 creditors meeting, the Debtors received and responded to inquiries from Paulson & Company Inc., a member of the Hedge Fund Committee.

[7] *See e.g.,* 12 C.F.R § 510.5 (Bank institution's directors, officers or employees may not disclose unpublished Office of Thrift Supervision information, including records created or obtained in connection with the OTS's performance of its responsibilities, such as records concerning supervision, regulation and examination of savings associations, their holding companies, and records compiled in connection with the OTS's enforcement responsibilities); 12 C.F.R §§ 309.5(g)(8) and 309.6 (imposing similar FDIC restrictions); 18 U.S.C. § 641 (any person who discloses or uses non-public information except as expressly permitted to as ordered by a federal court may be subject to underline criminal penalties).  Copies of these regulations are attached at Exhibit "B" for the Court's convenience.

considerations of the Regulators.  The discussions with the Regulators have developed to a stage

that the end is reasonably in sight.  Indeed, LBHI's assistance has enabled the Bank to be "well-

capitalized" for two consecutive quarters.  If the Bank is unable to satisfy its upcoming Deposit

Obligations, however, the risk of a Regulator directed receivership and resultant loss of any

value to LBHI approximating $575 million in equity in the Bank is a real probability.  Similarly,

if Aurora is unable to satisfy its advancing obligations under its servicing agreements,

termination of the servicing agreements could result leading to a significant loss of servicing

revenue.  These consequences would be a horrible result for LBHI given all that has been

achieved to date and will result in the loss of the significant investments pursuant to the prior

orders of the Court.

5.    Although the Hedge Funds complain that the requirements of the

Bankruptcy Code must be literally enforced, they have not complied with some of the most basic

and fundamental disclosure obligations imposed by Bankruptcy Rule 2019.  Without a compliant

2019 statement (unlike the 2019 statement filed by counsel to the Hedge Fund Committee),[8]

parties in interest and the Court have no way to know the monetary claims of the objectors or to

gauge their true motivation.  The Hedge Funds should be directed to comply with Bankruptcy

Rule 2019.  Absent such compliance, the Court should exercise its discretion and disregard the

limited Objection.  Alternatively, the Objection should be overruled on the merits.

## II.
## The Debtors' Actions to Support the
## Bank Are Supported by Good Business Judgment

6.    When considering a transaction outside the ordinary course of business,

Second Circuit precedent requires that such transaction be based upon the sound business

---

[8] On July 14, 2009 Dewey & Leboeuf LLP filed a statement that fails to comply with Bankruptcy Rule
2019.  *See* Docket No. 4393.

judgment of the debtor.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*
722 F.2d 1063, 1070 (2d Cir. 1983).  It is generally understood that "[w]here the debtor
articulates a <u>reasonable basis</u> for its business decisions (as distinct from a decision made
arbitrarily or capriciously), courts will generally not entertain objections to the debtor's
conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (emphasis
added).  "Courts are loathe to interfere with corporate decisions absent a showing of bad-faith,
self-interest or gross negligence."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y.
1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  If a valid business justification exists, there is
a strong presumption that "the directors of a corporation acted on an informed basis, in good
faith and in the honest belief that the action taken was in the best interests of the company."  *Id.*
(quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).  The burden of rebutting this
presumption falls to parties <u>opposing</u> the proposed exercise of a debtor's business judgment.  *Id.*
(citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

7.    The Hedge Funds demand that the Court deny the Motion unless LBHI
can offer a "compelling rationale" to take the proposed actions.  *See* Objection at 6 (Conclusion).
<u>That is not the law</u>.  The Debtors have satisfied their burden by offering reasonable and
articulated business reasons in support of their business decision.  The Creditors' Committee
concurs.  As a result, it is the Hedge Funds that carry the burden to prove that the Debtors'
business decision is defective.  To carry their burden, the Hedge Funds must offer facts and
admissible evidence.  Conclusory allegations and speculation as to possible alternatives relied
upon in the Objection do not suffice. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("The
burden is on the party challenging the decision to establish <u>facts</u> rebutting the presumption.")
(emphasis added).

8.      The business justifications in support of the Motion cannot be seriously questioned.  LBHI's equity interest in the Bank, which was recently reported at approximately $575 million, is an extremely valuable asset of LBHI.  Moreover, the Bank is a profitable operating enterprise that can inure to the benefit of all holders of allowed claims if the appointment of a receiver and failure of the Banks are avoided.  The Bank has a large valuable loan portfolio that consists of loan receivables totaling approximately $1.9 billion, including approximately $1.2 billion in mortgage loans, $190 million in consumer loans and $417 million in other loans (predominantly student loans).  In addition, through the servicing business of Aurora, the Bank operates the eleventh largest residential mortgage loan servicing operation in the U.S. that collects servicing fees on a monthly basis of approximately $28 million.

9.      The Bank's capital challenges have not been caused by its business model, profitability or management, but rather are caused primarily by one factor completely out of the Bank and LBHI's control, i.e., the effect of fair value accounting.  Fair value accounting or "FAS 159" was adopted by the Bank in 2007 in order to be consistent with the business practices of LBHI and its subsidiaries.  The Bank's election of FAS 159, unfortunately, is irreversible and requires that the Bank mark the value of its assets at the projected price that it would receive if it sold its assets in an orderly transaction between market participants at the measurement date.  The effect of fair value accounting on the Bank's assets and liabilities, thus far, has been devastating because of the recessionary market conditions that occurred and continued post September 15, 2008.  Notwithstanding the fact that the Bank's business remains consistent with the period prior to the commencement of LBHI's chapter 11 case, under currently depressed market conditions, FAS 159 paints an artificially distorted view of the Bank's capital, which has resulted in regulatory restrictions imposed on the Bank's operations.  The application of FAS

159 puts the Bank in a minority of financial institutions with similar assets and liabilities.

Indeed, if the Bank were to apply "amortized cost" or "realizable value" to its assets and

liabilities, as the majority of other financial institutions do, the Bank would be capitalized well in

excess of where it appears to be now under the OTS's regulations. Accordingly, there is real

value in the Bank that requires time to realize.

10.    The Hedge Funds demand to know "How acute is the risk the Bank will be

seized regardless of the new investment?" Objection ¶ 9. If the Bank is unable to meet its

Deposit Obligations and the FDIC is forced to expend its insurance funds to satisfy the Bank's

obligations, based upon LBHI's extensive experience with the Regulators and consultation with

the Bank's independent management, LBHI believes that the Bank would be at serious risk of

seizure. Indeed, already in 2009, the FDIC has seized and closed 68 banks.[9] Additionally, if the

Bank is unable to satisfy its Deposit Obligations, LBHI will have lost all credibility with the

OTS, and any hope that the OTS would approve a business plan for the Bank would be

destroyed.

11.    Allowing a failure of the Bank and appointment of a receiver would not

only deprive LBHI of a valuable asset, but it would also expose the Debtors to guarantee claims

and a potentially significant claim under section 365(o) of the Bankruptcy Code that would

precipitate significant litigation and attendant costs. Pursuant to section 365(o) of the

Bankruptcy Code, if (a) there is a commitment by a debtor to maintain the capital of an insured

depository institution and (b) there is a deficiency in capital existing on the date of the petition,

then the debtor may be compelled to immediately cure the capital deficiency or convert to a case

under chapter 7 and treat the claim as a priority claim under section 507(a)(9) of the Bankruptcy

---

[9] Associated Press, *F.D.I.C. Moves to Close Failed Banks in 4 States*, N.Y. Times, Aug. 1, 2009, at B2 ("The 68 bank failures nationwide this year compare with 25 last year and 3 in 2007").

Code.  *See* 11 U.S.C. § 365(o); *Resolution Trust Corp. v. Firstcorp Inc. (In re Firstcorp Inc.)*,

973 F.2d 243 (4th Cir. 1992).  Although LBHI believes it has valid and sustainable defenses to a

section 365(o) claim, if one were asserted, there is very limited existing dispositive authority as

to the potential issues.  The results of litigation are never certain.  If the Regulators successfully

prosecute the section 365(o) claim, it will have to be paid ahead of all allowed general unsecured

claims.

12.    The appointment of a receiver for FSB might also cause LBHI to lose the

value of and its prior investments in Woodlands pursuant to a cross-liability statute.  *See* 12

U.S.C. § 1815(e)(1)(A) ("Any insured depository institution shall be liable for any loss incurred

by the [FDIC]…in connection with – (i) the default of a commonly controlled insured depository

institution; or (ii) any assistance provided by the [FDIC] to any commonly controlled depository

institution in danger of default.").  If FSB is allowed to fail, there is a possibility that the

deficiencies covered by the FDIC on FSB will be imposed onto Woodlands, which would

thereby expose Woodlands' capital levels and risk a receivership of Woodlands.  The recently

reported value of LBHI's equity interest in Woodlands is approximately $625 million.  In sum,

the appointment of a receiver and failure of the Banks could cause LBHI to suffer between $1.2

billion (reasonable best case) and $3.6 billion (reasonable worst case) in losses.  The potential

harm to all general unsecured creditors is obvious.  Since September 2008, LBHI's actions have

improved the equity of both Banks by over $900 million.

13.    The Debtors have taken a series of actions to preserve the value of the

Banks, including: (i) LBHI's entry into two settlement agreements with Aurora that transferred

to the Bank and Aurora ownership of approximately $99 million in excess servicing fees; (ii)

capital contributions of $9.838 million on February 27, 2009, $15 million on March 31, 2009,

and $50 million on June 30, 2009; (iii) the transfer of master servicing rights to the Bank and

Aurora valued at approximately $226 million; (iv) the termination of certain loan commitments

totaling $1.357 billion; (v) LBHI's entry into the master repurchase agreement that made $325

million in financing available to the Bank; and (vi) a $200 million cash contribution to

Woodlands.  All of these actions previously taken to preserve value will have been wasted if the

Banks are allowed to be seized by the Regulators.

14.    Preservation of LBHI's valuable interest in the Bank is warranted.  The

Bank is a valuable asset that can inure to the benefit of creditors if given the time to allow market

conditions to recover and the impact of "fair value" accounting to subside as the financial

markets continue to improve and the recession recedes.  As stated, the risks associated with a

failure of the Banks could have a severe impact on creditor recoveries.  Similarly, Aurora's

servicing rights are valuable assets of the estate.  Accordingly, it is necessary for LBHI to

provide sufficient financing (i) to the Bank to ensure that it will be able to satisfy its upcoming

Deposit Obligations and ward off any further regulatory sanctions, and (ii) to Aurora to allow it

to satisfy its impending obligations under its servicing agreements to prevent their termination

and the loss of servicing revenue.

### III.
### LBHI's Cash is Adequately Protected by the
### Amended Repurchase Agreement and Financing Facility

15.    The challenges to the Amended Repurchase Agreement and Financing

Facility asserted in the Objection are without merit.  Prior to the regulatory restrictions imposed

on its business, the Bank primarily financed its operations through the issuance of FDIC-insured

brokered certificates of deposit.  During August 2009, approximately $550 million of the Bank's

repayment obligations of its brokered certificates of deposit will become due.  Ordinarily, the

Bank would have "rolled over" its obligations by issuing new certificates of deposit. However, because the Bank lacks access to the brokered certificate of deposit market under the current regulatory restrictions, it has agreed with LBHI for alternative sources of financing through the Amended Repurchase Agreement and the Financing Facility. The Financing Facility will also help Aurora fulfill its impending obligations, which have been increasing as a result of rising delinquencies from the troubled economy and housing market.

16.     Generally, the Amended Repurchase Agreement provides that LBHI will purchase a portfolio of the Bank's eligible residential mortgage loans for a purchase price of 75% of the value of the loans in exchange for the Bank's agreement to repurchase those loans for the purchase price paid by LBHI plus an applicable spread. The aggregate outstanding purchase price may not exceed $450 million, an increase of $125 million over the amount authorized by the current repurchase agreement. The amendment also adds commercial mortgage loans as assets eligible for sale under the Amended Repurchase Agreement. Additionally, LBHI has agreed to finance Aurora's monthly Advance Receivables in exchange for interest at LIBOR + 5% and a first priority perfected security interest in the Advance Receivables to be held by LBHI. The maximum loan balance may not exceed $500 million. The Amended Repurchase Agreement and the Financing Facility should provide the Bank and Aurora access to sufficient liquidity that may be needed to satisfy their upcoming Deposit Obligations and Advance Obligations. At the same time, LBHI will be fully secured. The total value of the eligible collateral will provide a suitable margin of safety for repayment of the advances. The loan to value ratio has been thoroughly reviewed by the Creditors' Committee and its professionals and found to be satisfactory to protect the interest of LBHI and its creditors.

17.     The Amended Repurchase Agreement is on substantially similar terms as the repurchase agreement previously approved by this Court.  Contrary to the Hedge Funds' contentions, none of the prior motions requesting similar relief with respect to the Banks, including the repurchase agreement, have been "rubber stamped" by the Court.  *See* Objection ¶ 8.  Each of the Motions was and continues to be supported by good business judgment and uncontroverted evidence that supported the relief requested.

18.     The Hedge Funds fail to offer any credible evidence that the Amended Repurchase Agreement and the Financing Facility would be harmful to LBHI and the general unsecured creditors of the Debtors.  Under the Amended Repurchase Agreement and the Financing Facility, LBHI's cash will be protected by a first priority fully perfected lien in the Purchased Mortgage Loans and Advance Receivables, respectively.  Additionally, the Amended Repurchase Agreement requires margin maintenance payments and the Financing Facility requires a 2% reserve account that will further safeguard LBHI's investment.  The Amended Repurchase Agreement and Financing Facility provide the Debtors with greater security than under the existing cash management order and will allow LBHI to realize a return of six to seven times greater than investment of its cash in other sources, such as securities backed by the United States.

19.     The Objection suggests, again without any basis, that the Amended Repurchase Agreement is on less secure terms than the Repurchase Agreement and therefore should not be approved.  The Objection contends that the Amended Repurchase Agreement is too risky because in comparison to the current repurchase agreement the advance rate has increased from 50% to 75% and the Margin Account Maintenance requirements have been reduced from 200% of the outstanding value of Purchased Loans to 133%.  Essentially, the

Objection contends that the Debtors should have to provide greater justification to enter into the Amended Repurchase Agreement because they are going from a "highly oversecured" position to an "adequately oversecured" position.  Notwithstanding the change in the terms, the loans are secured.  Also, since the entry into the repurchase agreement, the Debtors are more confident as to the extent of the risks associated with the underlying mortgage portfolio.  The Debtors are comfortable that the modifications in the Amended Repurchase Agreement, which are necessary to address the Bank's and Aurora's current liquidity needs, do not expose LBHI to unacceptable risks.

20.    The Objection offers no credible challenge to the Financing Facility.  It cannot.  The Debtors have satisfied their fiduciary duties. They are making a sound investment of cash, and have taken adequate steps to protect their advances.  Also lost on the Hedge Funds are the benefits associated with offering the financing through LBHI, the ultimate 100% parent of the Bank.  If the Bank were to secure financing from a third party, all interest, cost and expenses expended in connection with such transaction would reduce the Bank's capital and thereby proportionally reduce the value of LBHI's equity interest.  If the interest expenses are paid to LBHI, however, essentially, LBHI is receiving the value in respect of its equity interest in the Bank.  That is, each dollar out of the Bank's capital, which has a corresponding reduction on the Bank's equity, is a dollar into LBHI's pocket instead of a third-party.

21.    In response to the questions posed in paragraph 9 of the Objection, the Debtors state:

- What is the schedule of the Bank's deposit obligations beyond the $940 million that comes due between July and December?

  Response:  In 2010, $937 million will become due on the Bank's brokered certificates of deposit.  The maturity of certificates of deposit's ("CDs") is a liquidity issue, not a capital issue.  LBHI and the Bank believe that the

proposed financing and the Bank's intent to resume normal business operations through the issuance of brokered certificates of deposit, if authorized by the Regulators, should sufficiently address the Bank's liquidity needs through 2010. However, should the ability to issue brokered CD's remain elusive, the financing that will be available to the Bank from the proposed facilities with LBHI and the Bank's intention to issue retail deposits (from which the Bank is not currently prohibited and is actively considering), should be sufficient to satisfy the Bank's liquidity needs through 2010.

- What additional future capital investments may be required?

  Response: Currently, the Bank is "well-capitalized." It is critical to LBHI's long-term strategy for the Bank that the Bank remain "well-capitalized." Unfortunately, however, the effect of fair value accounting is difficult to predict as the Bank's capital is necessarily driven by fluctuations in market conditions. Moreover, LBHI is currently in discussions with the Regulators regarding a plan for the Bank and has requested concessions from the Regulators. As a result, future capital injections may be required, but are difficult to predict. Additionally, on January 6, 2009, the Bank filed a claim against LBHI with respect to a master forward agreement, dated January 1, 2008, between LBHI and the Bank. LBHI is currently considering resolution of the Bank's proof of claim that may require additional contributions.

- How acute is the risk the Bank will be seized regardless of the new investment?

  Response: As indicated above, LBHI believes that if the Bank is unable to fully satisfy its Deposit Obligations, there is a high risk that the Bank will be seized. With the additional source of capital that will be made available to the Bank to satisfy its upcoming Deposit Obligations in full, however, the risk of a receiver is significantly reduced because the proposed financing will enable the Bank to demonstrate that it should be able to satisfy Deposit Obligations through at least 2010.

- Why did LBHI's prior motions to preserve the Bank not highlight the potential need for material additional contributions?

  Response: The precise manner or amount of support has been difficult, if not impossible, to predict because the Bank's needs have always been a moving target as a result of fair value accounting as well as (in respect of advances required under the servicing agreements) the well-known problems in the economy and housing market. The Objection is factually incorrect, however, in as much as it suggests that the Debtors have misled creditors. LBHI has fully disclosed that restoration of the Bank's capital

would be a long-term financial commitment that could require further investments.[10]

- Why must LBHI risk its funds if funds can be borrowed by the Bank on market terms?

  Response:  It is puzzling that the Hedge Funds would criticize LBHI for entering into transactions on market terms that are on a first-priority fully secured basis and will yield a healthy return on LBHI's investment that is six to seven times greater than other available alternatives.  In addition to these benefits to the estate from the transactions, there are practical reasons why LBHI is making the financing available.  There are grave consequences to LBHI if a receiver is appointed for the Bank.  Not only will the Bank's failure to satisfy its Deposit Obligations set off a chain of events that will result in the likely loss of both FSB and Woodlands, but the Debtors will have no choice but to engage in a litigation and attendant expense with the Regulators over any claim asserted under section 365(o) of the Bankruptcy Code.  Also, as explained above, by extending the facility directly to the Bank, LBHI will be collecting interest and other payments.  Accordingly, LBHI has an incentive to ensure that the Bank has sufficient liquidity to satisfy its Deposit Obligations.

- What efforts has LBHI or the Bank made to obtain third-party financing and with what results?

  Response:  LBHI and the Bank have explored other sources of financing, but given the stigma of LBHI's bankruptcy and the restrictions on the Bank's operations, the Bank's attempts to obtain third-party financing from other sources have been unsuccessful.  Moreover, the financing is a bridge to more permanent sources of funds, among them, the ability to issue brokered certificates of deposit, if authorized, retail deposits, and a third party advance facility.

- Why is LBHI requesting authority on less secure terms than it loaned previous money?

---

[10] *See* LBHI's Motion to Increase the Capital Level of Lehman Brothers Bank, FSB, at 8, n. 5 [Docket No. 2800] ("LBHI anticipates that it will need to provide additional support to the Bank in order for the Bank to reach a capital level that will permit the Bank to operate in a manner that will allow LBHI to realize the full value of its equity interest in the Bank"); LBHI's Motion For Authorization to Invest Capital and to Perform Certain Related Actions to Support the Capital Level of the Bank ¶ 21 [Docket No. 3193] ("even if not required to sustain the Bank's capital at the adequacy level, LBHI may, with the consent of the Creditors' Committee, make the balance of the Capital Contribution in connection with implementation of a strategic plan for the Bank so as to help restore the Bank to a "well capitalized" status").

Response: Although the terms of the repurchase agreement have changed, the financing is still secured and a 75% advance rate is very conservative. As explained above, LBHI is less concerned about the risks associated with the underlying mortgage portfolio of the Amended Repurchase Agreement. The modifications are necessary in light of the Bank and Aurora's current liquidity needs. The investment of LBHI's cash pursuant to the Amended Repurchase Agreement is still on a fully secured first priority basis with added protections of a cash margin maintenance account. Additionally, the Financing Facility is secured by very safe collateral, which is nonetheless substantially discounted in the borrowing base calculation. Also, the terms of the transactions further protect LBHI. Each transaction under the Amended Repurchase Agreement has a maximum term of 14 days and renewal or "rolling" requires mutual agreement. The Financing Facility has a term of six months renewable at the option of LBHI, and is intended to be a bridge to a long term facility from a third-party.

- What will be the enforceability of LBHI's security interests if the Bank is seized?

  Response: As explained in the Motion, LBHI has considered the risks associated with a recovery of its investment pursuant to the Amended Repurchase Agreement in the event the Bank is seized, and believes that the exercise of its remedies would not be prohibited or otherwise stayed by applicable law. See 12 U.S.C. § 1821(e)(8)(A), which provides certain "safe harbor" type protections to qualified transactions entered into prior to the appointment of a receiver. With respect to the Financing Facility, as indicated in the Motion, LBHI has been successful in enhancing the structure of the transaction to establish a special purpose entity that will purchase Aurora's Advance Receivables against which LBHI will hold a first priority security interest. Accordingly, the assets securing the repayment of LBHI's cash will be held separately from the Bank's assets and should not be subject to seizure.

- What are the minimum credit quality criteria for eligible collateral under the Amended Repurchase Agreement? Will there be lower advance rates for lower-quality collateral?

  Response: Only performing loans are eligible under the agreement. LBHI is only lending at 75% of the marked value of the underlying of the assets, which marks will be provided by LBHI. A 75% advance rate is conservative and, together with LBHI's security interest, should adequately protect LBHI's interest.

- What is the risk of repayment associated with the Advance Receivables?

<u>Response</u>:  The Advance Receivables are reimbursed on a first-priority basis from collections on the related loans, or if they prove to be unrecoverable from that source, on a first priority basis from collections received by the related trust generally.  The advance facility will follow general market conventions to protect the facility by requiring collateral discount and other risk mitigating measures consistent with market practices.  In addition, the facility will be over collateralized by pledging all advances governed by eligible securities trusts whether or not the facility recognizes collateral credit for such advances.  As a result, LBHI believes the risk of repayment associated with the Advance Receivables is low.

- What is the 'cash conversion cycle' for assets of this type?

  <u>Response</u>:  Generally speaking advances are recouped from liquidation proceeds, paid-in-full proceeds, modification or as a delinquent loan becomes current.  In today's environment, it is reasonable to expect that advances will be recovered from either liquidation proceeds or modification.  Liquidation can take a few forms, such as real estate owned ("<u>REO</u>") sales, third party sale at foreclosure, or short sale.  An REO sale is likely to require the longest time of the available liquidation options for recovery of the advance funds.  In general, an average REO timeframe from first delinquency to REO sale will take about a year and one-half.  This time frame may be dependent on the state, contesting of the foreclosure, moratoriums and other factors.  The other forms of recovery would conclude earlier than the REO timeframes.  Because the advance receivables now outstanding and to be pledged to LBHI relate to all phases in the recovery cycle, they will produce a constant stream of cash flow.

- What is the perceived likelihood that the Bank will be allowed to issue brokered certificates of deposit if LBHI risks more money?

  <u>Response</u>:  This question goes to the central subject of LBHI's discussions with the Regulators.  It is impossible for LBHI to predict the outcome with any certainty.  However, if the Bank fails to satisfy its Deposit Obligations, the Bank may be seized, and the discussed consequences would unfold.

- What benefits will LBHI receive if the FDIC allows the Bank to issue brokered certificates of deposit?  Would LBHI be able to rescind the deal or force the Bank to issue brokered CDs to pay back LBHI?

  <u>Response</u>:  To answer the compound questions, as explained in the Motion, prior to the restrictions imposed on its business, the Bank would primarily finance its operations through the issuance of brokered certificates of deposit.  If the FDIC were to issue a waiver to allow the

Bank to issue brokered certificates of deposit, the Bank's liquidity problems would be resolved.  In addition, if the Bank is permitted to call or refinance existing certificates of deposit with new brokered deposits, it has the potential of improving its net interest margin given the current market interest rates.  That would be extraordinarily beneficial to LBHI because the Bank would no longer need to rely upon capital support from LBHI to conduct its operations and preserve its value.  At that point, there is no need to rescind the transactions with LBHI because the Bank will have access to cheaper sources of funds and access to liquidity that can be used to satisfy LBHI to the extent any outstanding  financing remains.

- What is LBHI's exit strategy?

  <u>Response</u>:  See below.

## IV.
## The Business Plan

22.    LBHI is currently considering a number of alternatives to best realize the value of its equity interests in both Banks.  Those include a potential sale of the Bank and/or Aurora to a third party, a transfer of the Bank as an operating and profitable enterprise to a trust for the benefit of creditors, a spin-off of the Bank, an orderly wind-down of the Bank to pay off deposits as loans mature and recovery of LBHI's equity or even a liquidation of the Bank's assets under normal market conditions.  All of these possibilities will need to be further developed and reviewed with the Creditors' Committee, but will be futile if the Bank is unable to satisfy its Deposit Obligations.  The goal for the Banks has always been to restore the capital to a sufficient level that will enable them to independently operate their businesses.  Once the Banks' operations are stabilized and the regulatory restrictions are lifted, LBHI can then pursue the best course of action to realize the value of the Banks.

23.    The Objection further demands, without justification, that LBHI provide financial disclosure on the Bank's operations beyond its publicly available call reports.  *See* Objection ¶ 10.  The level of information that the Objection would require is unwarranted.  The

Bank has no independent disclosure obligations under the Bankruptcy Code.  The level of information publicly available through the Bank's Thrift Financial Reports is comparable to publicly available information with respect to public corporations.  The Hedge Funds offer no reason for why they should be entitled to non-public insider information concerning the Bank.

24.     LBHI believes that it has crafted a careful balance between the confidentiality restrictions imposed as a consequence of dealing with the Regulators and its fiduciary duties to creditors by sharing information with the Creditors' Committee subject to existing confidentiality agreements.  Thus, the interests of creditors are represented.  Indeed, the comments of counsel to the Creditors' Committee in response to the Hedge Fund Committee's objection to the Debtors' motion to extend exclusivity are equally applicable here:

> But let me just contrast our role and [Mr. Bienenstock's].  The committee owes its fiduciary duties to all of the unsecured creditors, Your Honor, his group does not.  The members of the creditors' committee have duties of confidentiality; the members of his group do not.  The members of the creditors' committee have reviewed all public and non-public information; his group has not.  The committee has faithfully and selflessly discharged its duties.  We've spent countless hours with the debtors trying to maximize the value of this estate.

*See* Tr. of July 15, 2009 Hr'g at 130:25 – 131:8.

## V.
### The Hedge Funds Should be
### Compelled to Comply with Rule 2019

25.     Bankruptcy Rule 2019(b) states, in relevant part, that the Court may, "on its own initiative," (i) "refuse to permit" an entity or committee "to be heard further or intervene in the case" and (ii) "hold invalid any authority, acceptance, rejection, or objection given, procured, or received by an entity or committee who has not complied with [Bankruptcy Rule 2019]."  Fed. R. Bankr. P. 2019(b).  Bankruptcy Rule 2019 is a disclosure provision that requires

every entity representing more than one creditor to file a verified statement setting forth certain

information, including:

> (1) the name and address of the creditor or equity security holder;
> (2) the nature and amount of the claim or interest and the time of acquisition thereof unless it is alleged to have been acquired more than one year prior to the filing of the petition;
> (3) a recital of the pertinent facts and circumstances in connection with the employment of the entity … and, in the case of a committee, the name or names of the entity or entities at whose instance, directly or indirectly, the employment was arranged or the committee was organized or agreed to act; and
> (4) … the amounts of claims or interests owned by the entity, the members of the committee, … the times when acquired, the amounts paid therefor, and any sales or other disposition thereof.
> The statement shall include a copy of the instrument, if any, whereby the entity, committee, or indenture trustee is empowered to act on behalf of creditors or equity security holders.  A supplemental statement shall be filed promptly, setting forth any material changes in the facts contained in the statement filed pursuant to this [Bankruptcy Rule 2019(a)].

Fed. R. Bankr. P. 2019(a) (emphasis added).  The disclosure requirement is important, as

opposed to a ministerial act, because, "[b]y appearing as a 'committee,'" the members of an ad

hoc or unofficial committee "purport to speak for a group and implicitly ask the court and other

parties to give their positions a degree of credibility appropriate to a unified group with large

holdings."  *In re Northwest Airlines Corp.*, 363 B.R. 701, 703 (Bankr. S.D.N.Y. 2007) (emphasis

added).

26.   Bankruptcy Rule 2019 applies to every entity and provides no exceptions to

its application except in the case of committees appointed under section 1102 or 1114 of the

Bankruptcy Code.  *See* Fed. R. Bankr. P. 2019; *Northwest*, 363 B.R. at 702-04 (holding that

where "an ad hoc committee has appeared as such, the committee is required to provide the

information plainly required by Rule 2019 on behalf of each of its members…. The Rule is long-

standing, and there is no basis for failure to apply it as written."); *In re North Bay General Hosp.,*

*Inc.*, 404 B.R. 443, 455-56, 461-63 (Bankr. S.D. Tex. 2009) (holding that a committee's proof of

claim would be disallowed on account of committee's failure to comply with Bankruptcy Rule 2019); *City of Lafayatte v. P.A.C. First Ltd. P'ship (In re Okla. P.A.C. First Ltd. P'ship)*, 122 B.R. 387, 389-392 (Bankr. D. Ariz. 1990) ("The Code contemplates that there will be unofficial committees.  Any such unofficial committee must comply with Rule 2019 by its terms…").

27.    The  requirements of Bankruptcy Rule 2019(a) are <u>mandatory</u>.  Fed. R. Bankr. P. 2019(a) (using the word "shall," rather than "may," to command compliance).  If the plain language of a statute is unambiguous, there is generally no need to look to administrative interpretations or to legislative history.  *Magic Rests., Inc. v. Bowie Produce Co. Inc. (In re Magic Rests., Inc.)*, 205 F.3d 108, 114 (3d Cir. 2000); *see also Patterson v. Shumate*, 504 US. 753, 761 (1992); *Toibb v. Radloff*, 501 US. 157, 162 (1991).  The term "shall" generally is "mandatory and leaves no room for the exercise of discretion by the trial court." *Barbieri v. RAJ Acquisition Corp. (In re Barbieri)*, 199 F.3d 616, 619 (2d Cir. 1999) (holding that the Bankruptcy Code is mandatory where statute provides that the court "shall" dismiss Chapter 13 case on request of the debtor at any time).  Failure to comply with the requirements of Bankruptcy Rule 2019 is illegal.

28.    Although the Hedge Funds go to great lengths to style the Objection as having been filed by one creditor – Elliot Management Corporation – the objection is made on behalf of five (possibly related) entities:  Elliot Associates, L.P., Elliot International, L.P, The Liverpool Limited Partnership, Springfield Associates LLC and Kensington International Limited.  *See* Objection at 1 (Introduction).  Moreover, Elliot Management Corporation is a member of a Hedge Fund Committee comprised of at least Elliot Management Corporation, King Street Capital Management LP and Paulson & Company Inc.  *See* Objection of Ad Hoc Group of Lehman Brothers Creditors to Debtors' Motion for Extension of Exclusivity [Docket No. 4318].

The Hedge Funds have not filed a Rule 2019 Statement that complies with the rule.

Accordingly, there is no way for the Court and parties in interest to know when the Hedge Funds

and other members of the Hedge Fund Committee acquired their claims, what they paid, and

when and under what circumstances they organized.  Rather, the Hedge Funds ask the Court to

take them at their word that "Elliot holds public debt of LBHI, open trade positions with LCPI, is

a party to derivatives contracts with LBCS and LBSF, and as a result, is a substantial creditor of

such debtors."  Objection ¶ 2.  The Hedge Funds should be compelled to disclose their interest in

these cases.

## VI.
## <u>Conclusion</u>

29.    The Objection is without merit.  The interests of all creditors requires the

continued actions to preserve and protect LBHI's valuable interest in the Bank as recognized by

the Creditors' Committee.  The Objection should be overruled.

WHEREFORE the Debtors respectfully request that the Objection be disregarded

under Bankruptcy Rule 2019 or, in the alternative, overruled and the Motion be granted, together

with such other and further relief as the Court deems just and proper.

Dated:  August 4, 2009
      New York, New York


          /s/ Alfredo R. Pérez_____
          Alfredo R. Pérez

          WEIL, GOTSHAL & MANGES LLP
          700 Louisiana, Suite 1600
          Houston, Texas 77002
          Telephone: (713) 546-5000
          Facsimile: (713) 224-9511

          Attorneys for Debtors
          and Debtors in Possession

<u>**Exhibit "A"**</u>

**(February 17, 2009 Hearing Transcript)**

```
1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555 (JMP)

5

6    - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    LEHMAN BROTHERS HOLDINGS, INC., et al.

10

11                Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15                United States Bankruptcy Court

16                One Bowling Green

17                New York, New York

18

19                February 17, 2009

20                10:02 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25
```

```
 1

 2    Hearing Re LBHI's Motion, Pursuant to Sections 105(a) and 363

 3    of the Bankruptcy Code, for Authorization to Fund a Capital

 4    Contribution to Woodlands Commercial Bank

 5

 6    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 363

 7    of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, for

 8    Authorization to Increase the Capital Level of Lehman Brothers

 9    Bank, FSB through (i)the Settlement of Pending Disputes; and

10    (ii)a Direct Capital Contribution of up to $15 Million

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib
```

```
 1

 2    A P P E A R A N C E S :

 3    WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Debtors

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8    BY:  ALFREDO R. PEREZ, ESQ.

 9

10    HUGHES HUBBARD & REED LLP

11         Attorneys for James W. Giddens, SIPC Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15    BY:  JAMES B. KOBAK, JR., ESQ.

16

17    MILBANK, TWEED, HADLEY & MCCLOY LLP

18         Attorneys for the Official Committee of Unsecured

19          Creditors

20         One Chase Manhattan Plaza

21         New York, NY 10005

22

23    BY:  DENNIS C. O'DONNELL, ESQ.

24         EVAN R. FLECK, ESQ.

25
```

```
 1

 2    ARNOLD & PORTER LLP

 3          Attorneys for Woodlands Commercial Bank

 4          399 Park Avenue

 5          New York, NY 10022

 6

 7    BY:  MICHAEL J. CANNING, ESQ.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

LEHMAN BROTHERS HOLDINGS INC., et al.

 1                    P R O C E E D I N G S

 2          THE COURT:  Please be seated.  Mr. Perez?

 3          MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

 4   on behalf of the debtors.  First, I want to thank you for

 5   hearing this on short notice and on a regular Lehman day.  This

 6   is an important motion for the debtor.

 7          We're here, Your Honor, on two motions, LBHI's motion

 8   to fund a capital contribution to Woodlands Commercial Bank and

 9   then LBHI's motion to increase the capital level of Lehman Bank

10   FSB through a settlement of some pending disputes and an

11   additional direct contribution of up to fifteen million

12   dollars.

13          Your Honor, the creditors' committee filed a

14   statement in support of the motion.  I don't know if the

15   Court's had an opportunity to see that.  I have an extra copy

16   if --

17          THE COURT:  I read it.

18          MR. PEREZ:  Thank you, Your Honor.  Your Honor, we

19   have not received any objections to the relief requested.

20   These motions have been the subject of extensive discussion

21   with many, many, many different parties in interest.  We were

22   obviously -- to the extent that there had been an objection, we

23   were prepared to make an evidentiary showing.  And even though

24   we don't have an objection, Your Honor, Mr. Marsal is here and

25   he has prepared a presentation to the Court so that the Court

LEHMAN BROTHERS HOLDINGS INC., et al.

1    understands the importance of the situation and why the debtor

2    is making this business decision to go forward and try to save

3    these two assets.

4           THE COURT:  That's fine.  And candidly, even in the

5    absence of objection, this is the sort of thing that is so

6    significant that I'm delighted that Mr. Marsal is here and can

7    provide a record in support of the relief requested.  And I'm

8    pleased that, in effect, one of the questions I had has been

9    answered which was how are you going to prove this.  And you're

10   ready to do that.

11          MR. PEREZ:  We are ready, Your Honor.  We can

12   certainly do it as -- take his statements in the form of a

13   proffer.  If the Court likes to create an evidentiary record,

14   we can certainly do that.

15          THE COURT:  Well, Mr. Marsal has addressed the Court

16   before without proffers and without being sworn as a witness.

17   And I accept his statements as the functional equivalent of

18   testimony that he would give from the stand if sworn.  And this

19   can be presented in any way that the debtor prefers.

20          MR. PEREZ:  Your Honor, we have prepared a dec for

21   the Court and we --

22          THE COURT:  I've already read it.

23          MR. PEREZ:  Thank you, Your Honor.  We did not

24   present it beforehand.  Just wanted to have it available here

25   for anybody -- and we have extra copies.  But if Mr. Marsal

LEHMAN BROTHERS HOLDINGS INC., et al.

1    could address the Court, that would be great.

2            THE COURT:  Fine.  Mr. Marsal?

3            MR. MARSAL:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. MARSAL:  Your Honor, I'll try and walk you

6    through this as quickly as I'm sure you would want to see it.

7    What we'd just like to make sure you understand on the bank

8    platform front -- again, this is Brian Marsal.  I'm the chief

9    executive officer of Lehman Brothers.

10           On page 1 of the presentation, Your Honor, it's an

11   organization chart which outlines the banks, the funding

12   vehicles which Lehman Brothers Holdings, through its wholly

13   owned subsidiary, Lehman Brothers Bank Corp., own.  The one on

14   the left, the Utah Bank was in support of the commercial

15   banking operations.  The Thrift was in support of the mortgage

16   banking operations residential.  That's the subject of today's

17   hearing -- of this aspect of the hearing.

18           THE COURT:  What's the box on the right?

19           MR. MARSAL:  The box on the right are two other

20   smaller banks that they had -- they were in the process of

21   selling, Your Honor.  And those were related to the commercial

22   side of the house.  But they're very small and really have no

23   issues today as far as we know.

24           THE COURT:  Okay.

25           MR. MARSAL:  Turning to page 2 of the presentation,

LEHMAN BROTHERS HOLDINGS INC., et al.

1    we're going to cover the Utah Bank.  We lay out some of the

2    essential issues.  The assets of this bank are 5.4 billion, the

3    liabilities, approximately five billion, resulting in an

4    equity -- a realizable equity value of 433 million.  This is

5    being done on a mark-to-market basis which means that the value

6    has been really written down significantly.  We believe that on

7    a hold to maturity basis, there's significantly more equity

8    here.  And we don't see why a hold to maturity would not be

9    relevant as opposed to the -- well, we've taken the more

10   conservative and appropriate accounting policy of marking-to-

11   market which is the 433.

12           On the right, you see the capital levels.  That

13   brings us to a capital level of 5.4 percent.  Eight percent is

14   required by the FDIC.  In order to meet the minimum

15   requirement, a 200 million dollar capital infusion is

16   necessary.

17           Just to focus on the footnotes for a second, the 433

18   million dollars is after a write-down of the muni bonds

19   purchased from Lehman Brothers Inc. for 534 million dollars.

20   And we'll discuss that in more detail as to how that got --

21   that got messed up here.  In terms of the other footnotes, the

22   eight percent is the capital adequacy level established by the

23   FDIC.  And LBHI -- so the footnote C so you -- read this

24   confusing footnote.  We received a PCA, which means a --

25   basically, a notice that we're in serious breach or potential

LEHMAN BROTHERS HOLDINGS INC., et al.

1    default deficiency situation.  When this gets issued as part of

2    any financial plan, the holding company would have to guaranty

3    five percent of whatever the asset base is.  So five percent of

4    the asset base would be 272 million dollars.  We just wanted to

5    put the FDIC on notice that this 200 million dollars we're

6    putting in is part of that 272 million dollars to not make any

7    mistake.  We don't want to be double counted, in other words.

8          Moving on to -- and we hope not to have to put the

9    seventy-two million dollars up, by the way.  But it will be

10   part of any capital plan.  We'll have to guaranty the 272.

11         Going to the next page, how did we get into this fix?

12   The Utah Bank paid cash -- on the Friday before the filing, it

13   paid 534 million dollars worth of cash to LBI.  We surmise, we

14   have not been able to verify this, but what we believe is that

15   there was a major move to mobilize cash within the corporation

16   given what was happening to the liquidity that was being taken

17   by the various clearing banks in the week prior to the

18   proceeding.  To generate that cash, LBI went into the Utah

19   Bank, sold them 534 million dollars worth of munis that they

20   had in inventory, securities that they had in inventory

21   which -- and 534 million was transferred from the Utah Bank to

22   LBI.  LBI was instructed by the Utah Bank to take that money

23   and segregate those munis into a custodial account for the

24   benefit of the Utah Bank.  That was ignored by the LBI in its

25   processing of -- in those days there was utter chaos taking

LEHMAN BROTHERS HOLDINGS INC., et al.

1    place during the 12th and the 15th.  That was ignored and, in

2    fact, the munis were co-mingled.  Rather than the munis being

3    placed in a custodial box for the benefit of Utah, they were

4    placed in the general box -- incorrectly in the general box.

5            On the 19th, JPMorgan seized all securities that were

6    in the general box adding it to their collateral base for the

7    protection of the various clearing risks that they had.

8    Immediately thereafter, a SIPA proceeding was commenced on LBI

9    so the 534 million has sort of been in limbo.

10           In November, we took the problem to the SIPA trustee

11   to explain to the SIPA trustee that the Utah Bank -- if we did

12   not receive this 534 million dollars, we were going to find

13   ourselves in serious trouble with the FDIC.  SIPA trustee

14   responded that they will investigate the matter.

15           In January, the Utah Bank -- actually, we filed a

16   claim with the SIPA trustee -- we went to the FDIC and asked

17   the FDIC if they would please file a formal complaint which

18   would, we think from a statutory standpoint, would have

19   superseded the automatic stay and thus we would have gotten the

20   534.  The FDIC chose not to sue another agency so we're sort of

21   left in a -- as the pickle in the middle, if you will, between

22   two agencies who will not -- one agency who comes to us but

23   will -- the FDIC but will not go to SIPA and demand the 534

24   million dollars.

25           We filed a our accounting report on the Utah Bank

LEHMAN BROTHERS HOLDINGS INC., et al.

1    with the FDIC and the FDIC said you have to write that -- the

2    accountant said you have to write that 534 off until SIPA sends

3    you the cash.  And thus, we find ourselves failing the eight

4    percent capital adequacy test down into the five plus percent

5    range.  The FDIC has notified us that unless we get that up

6    into the eight percent range as of February 20th that they

7    would -- we should expect that they will seize the bank.

8             Moving on, what we propose, Your Honor --

9             THE COURT:  Can I stop you just for one second,

10   please?

11            MR. MARSAL:  Yes.  Yes.

12            THE COURT:  This is all happening on an expedited

13   schedule.  I just want to confirm whether or not the FDIC is

14   represented in court today.  Apparently not.  So I accept your

15   representation that, in fact, February 20th represents a real

16   draconian deadline and that there's no opportunity for further

17   extension of that deadline.  And its seizure represents a

18   material risk absent the relief that's being sought.

19            Additionally, I would note that you made a number of

20   statements of LBHI's legal position concerning this matter.  I

21   also understand that some litigation is at least a possibility

22   if the matter is not resolved.  To the extent that you've made

23   those statements and there's anyone who wishes to cross-

24   examine, I'm just going to state this is not the time for that.

25   And I assume that anything that you've said which is subject to

LEHMAN BROTHERS HOLDINGS INC., et al.

1    further clarification or contradiction will be available for

2    such good faith litigation at the appropriate time in the

3    future.  And just because nobody is questioning you now does

4    not mean that I am absolutely determining what you've said to

5    be true.  I know that you believe it to be true.  But I also

6    understand that this is a very complicated matter.  So I just

7    wanted to make that clear.

8         MR. MARSAL:  Thank you.  In terms of the Utah Bank's

9    solution, Your Honor, what we propose to do is to infuse 200

10   million dollars basically in a participation -- by purchasing a

11   participation in the muni obligation.  So that if and when that

12   muni obligation gets satisfied, what would happen is the first

13   200 million dollars to come back would come back to the estate

14   assuming the eight percent capital level is being maintained.

15   To the extent that that is not maintained, we could not pull

16   the money out of that.  We couldn't find ourselves into a

17   default or inadequacy position by virtue of doing it.

18        We believe this will satisfy the FDIC in terms of the

19   Utah -- in permitting the Utah Bank to continue to operate.  In

20   order to operate at a higher level, in order to begin to try

21   and match -- to try to issue CDs and try and match the runoff

22   of the liabilities with the runoff of the assets, we have to

23   get it to a ten percent capital adequacy level.  We're working

24   on a capital plan to figure out how we do that.  And we'll be

25   back to the court probably with a solution down the road but

LEHMAN BROTHERS HOLDINGS INC., et al.

1   it's not the emergency that today is.  But we'll be working

2   with the FDIC to figure out how we can best match the liability

3   runoff with the asset runoff so we can liquidate this estate in

4   a sensible way.

5        In other actions which are being taken, we continue

6   to reduce the unfunded which reduces the risk to the FDIC.  I

7   think that they're pleased with that runoff.  We have some

8   ideas on how we can expedite that but I think that process

9   continues.

10        I've covered the long term plan.  If we go to the

11  next page, moving to the next bank, which is the Thrift, this,

12  again, was in support of our mortgage banking and servicing

13  operations.  The Thrift has 6.5 billion in assets, six billion

14  of liabilities, roughly a half a billion in equity.  There's

15  less mark-to-market opportunity here, Your Honor, but -- there

16  is a small amount but this is probably closer to real value,

17  460 -- or half a billion dollars is closer to the real value

18  here.  The value on the Utah Bank, again, is probably

19  understated by as much as a half billion dollars.

20        The actual capital in this bank is 5.9 million --

21  excuse me, 5.9 percent.  This, too, is required -- the FDIC

22  requires eight percent.  We'll need 185 million to be infused

23  in order to meet the capital adequacy test.  The office of the

24  Thrift has issued a directive for us to restore this capital.

25  We have, in this case, until the 28th of February to find a

LEHMAN BROTHERS HOLDINGS INC., et al.

1    solution.  We've submitted a plan to solve this problem.  We

2    think this plan will prove to be acceptable to them.  And a

3    failure to reach an agreement with them will result in, we

4    believe, a seizure of the bank.  And the banks are cross-

5    defaulted to one another.  So the seizure of the Thrift would

6    result in the seizure of Utah.

7            The solution, which is on page 8, is to put in 185

8    million in capital but very little of it being cash.  First of

9    all, the Thrift owes Holdings ninety-three million dollars

10   related to the profits on servicing rights.  And again, not to

11   be controversial because, in fairness, I think some of the

12   Thrift people might argue until we get matters straightened

13   out, we're not accepting that this is a real liability or not.

14   But we believe it's a liability and, in fact, it's on the

15   Thrift's books for ninety-three million dollars.  So what we're

16   proposing to do is to take the ninety-three million and simply

17   convert that payable, with all the controversy surrounding it,

18   into capital.  The capital would be, again, -- it would be

19   Holdings capital being converted into Thrift equity.

20           In addition, we would contribute eighty-nine million

21   of servicing rights which are owned by Holdings but which are

22   really tied very closely to the Thrift.  And in the event that

23   the Thrift were seized, it would be a difficult realization on

24   the eighty-nine million dollars.  So we think that's a -- and

25   also a reasonable give-up in terms of a capital infusion.  In

LEHMAN BROTHERS HOLDINGS INC., et al.

1    order to top it off, we would need somewhere between three to

2    fifteen million dollars of additional cash in order to get up

3    to the 185 million dollar level.  It's a little -- the reason

4    it's a range is because some of these values may shift around

5    but that gives us a pretty good -- that gives us enough room to

6    deal with just about anything.

7           Again, here, with the Thrift, we need to develop a

8    long term capital plan.  It would be our objective to get up --

9    get beyond the ten percent threshold and figure out a game plan

10   by which we could match the liquidation of the asset book with

11   the liabilities.  Again, we just believe that we'll do a better

12   job on a liquidation than the FDIC will in both of these

13   properties.  But the intention, Your Honor, at this stage, the

14   intention is to have an orderly liquidation of the portfolio, a

15   repayment of a hundred percent of the liabilities to the

16   various parties and the estate would derive the residual

17   equity.

18          In terms of page 9 -- lays out the economics of this.

19   To the extent that there would be an FDIC -- if we look at the

20   top column -- I mean, if you look at the horizontal, you have

21   Utah Bank, Thrift and Total.  Down the vertical axis, we see

22   Assets, Holdings Equity, the proceeds that we would realize, we

23   believe, from our managing it versus the FDIC's managing it and

24   this is not -- this is just, I think, again, we would manage it

25   over a longer term.  They would manage it in a more immediate

LEHMAN BROTHERS HOLDINGS INC., et al.

1   way which would result in a discount and we think an

2   unnecessary discount.  What we've assumed here is that we would

3   realize basically a hundred percent on the mark-to-market

4   values.  The FDIC, we're assuming, would realize seventy

5   percent of mark-to-market values thus resulting in a deficiency

6   claim on the Utah Bank, hypothetical deficiency claim of

7   somewhere between of approximately 1.2 billion for Utah, 1.5

8   billion for the Thrift for a total of 2.7 billion in

9   hypothetical deficiency claims.

10          Turning the page, what's a deficiency claim?  What's

11   the relevance of this deficiency claim?  We believe that the

12   deficiency claim could be characterized one of two ways, either

13   an unsecured deficiency claim which would be added to the

14   Holdings' deficiency which would be added to the Holdings'

15   unsecured claim pool.  Or, it could be traded as a priority

16   claim under statute.  Now that will be a subject, hopefully,

17   that we can avoid but that is a potential litigation down the

18   road as well as to what the treatment of this claim would be.

19   What we attempted to do is not to argue it out here but rather

20   to lay out what best case and worst case would be for the

21   estate.  Best case for the estate would be for this claim to be

22   treated as a deficiency claim at applying a value of ten cents

23   on the dollar to that deficiency claim.  This would result in a

24   cost to the estate of 1.2 billion dollars.

25          THE COURT:  Now, for purposes of this illustration --

LEHMAN BROTHERS HOLDINGS INC., et al.

1        MR. MARSAL:  Yes.

2        THE COURT:  -- I assume that the ten percent is just

3    that, for purposes of the illustration --

4        MR. MARSAL:  Just that.

5        THE COURT:  -- and is in no way predictive of what

6    unsecured claims may ultimately fetch in this case.

7        MR. MARSAL:  Correct, Your Honor, and I should have

8    said that.  This is just -- we had to have an illus -- we had

9    to have a number.  So we chose a number that was basically the

10   last trading that we -- sort of a weighted average of the

11   trades that seemed to be happening in today's market.

12       THE COURT:  Okay.

13       MR. MARSAL:  The right-hand column, worse case would

14   be for a priority claim treatment which would be a hundred

15   cents on the dollar.  And under that circumstance, in addition

16   to losing the equity that we have in the two properties, we

17   would have to pay the full deficiency claim of 2.7 billion, a

18   hundred cents on the dollar.  That would result in a 3.6

19   billion dollar loss to the estate.  So it is a huge matter to

20   the estate.  And, I mean, one of the things that it's very

21   important from my standpoint and from the estate's standpoint

22   that we get this -- that we really get this SIPA -- SIPA to

23   focus on the legitimacy of this 534 million dollars muni claim.

24   I mean, to the extent that we have that 534 million dollars, I

25   think we satisfy our capital adequacy test and it means, as you

LEHMAN BROTHERS HOLDINGS INC., et al.

1   can see, potentially a three billion dollar avoidance to the

2   estate, of a potential loss and recovery value.

3         This final summary on page 11, it just lays out where

4   we are.  We think that, again, that the deficiency claim is a

5   reasonable estimate on an unsecured basis of the deficiency

6   claim would be a 1.2 billion dollar loss to the estate.  The

7   900 million of equity plus the deficiency claim totals 1.2.

8   Worse case, we think it'll be a 3.6 billion dollar cost to the

9   estate.  Now, this is opposed to our plan which is to have an

10  orderly liquidation by the estate where we think at least 900

11  million dollars will be realized.  As I indicated, we think 900

12  million is on the low side.  We think it's closer to 1.4

13  billion dollars as opposed to 900 million.  And we would avoid

14  any payment of potential deficiency claims.

15        Last but not least, what we have to recognize is that

16  this is really an investment that's being made that would be

17  recovered as part of this liquidation.  So it's an investment

18  that's being made but we should recover it all.  To the extent

19  that we are wrong, then, in fact, this is not an investment but

20  it is a prepayment against the claim.  So either way, we are --

21  I think either way, the decision is the right decision, that

22  that's initially confusing.  We make it what --

23        THE COURT:  I understand.

24        MR. MARSAL:  Okay.

25        THE COURT:  I understand what you've said.

LEHMAN BROTHERS HOLDINGS INC., et al.

1          MR. MARSAL:  Okay.

2          THE COURT:  I do have a question, though.

3          MR. MARSAL:  Yes.

4          THE COURT:  You carefully described in your

5  presentation that you believed that the arrangements that you

6  have outlined will be acceptable to the FDIC.  Do you have any

7  reasonable assurance at this point that they will be accepted?

8  Because there's one concern that I have and it may be that I'm

9  seeing an issue that doesn't exist and that you've already

10  taken into account which is the cross-default aspect of this.

11  I mean, it seems to me that it's at least conceivable that you

12  might go through the steps of saving Utah only to have a

13  problem with Thrift and for the Thrift problem to cross-default

14  to Utah so that the exercise has turned out to be an exercise

15  in futility.  Accordingly, what I'm concerned about is this.

16  To what extent, as you stand here now, are you reasonably

17  confident that the arrangements that you're now describing

18  will, in fact, secure both of these institutions from potential

19  adverse consequences courtesy of the regulators?

20          MR. MARSAL:  The answer to that, Your Honor, the FDIC

21  has been extremely cooperative, very straightforward, and has

22  told us you keep this at an eight percent level, we will give

23  you time.  If it falls below, all bets are off, things

24  deteriorate.  As long as you keep it at an eight percent level,

25  we will permit you to continue with the orderly liquidation of

LEHMAN BROTHERS HOLDINGS INC., et al.

1    the assets.  To the extent that you were to get it up to ten

2    percent and show us an adequate capital plan for the

3    liquidation, we would even consider the reissuance of CDs to

4    help you do this matching.

5         The FDIC, which insures both institutions, is very

6    cooperative.  The difficulty we have is -- the OTS has -- they

7    have been a little circumspect.  And one agency isn't told what

8    to do by the other agency, as you might not be surprised.  So

9    the OTS, they march to their own drummer.  And so, we are

10   trying to pin the OTS down as to whether or not this is an

11   unacceptable arrangement with them.  We believe it will prove

12   to be.  Our concern is -- I think, if Your Honor is asking the

13   question do we put the money in without a clear sign-off from

14   the OTS, my answer would be yes, even if it's a little bit of

15   a, let's say, squirrelly sign-off or a circumspect sign-off on

16   the OTS because I think there's very little down side.  And

17   I -- but I also think that it's very difficult for the OTS with

18   an eight percent capital adequacy in today's market to grab

19   this institution without a hue and cry (echo/gap in audio) if

20   this thing is actually adequately capitalized.  So I would hope

21   that they would look at it that way.  But there's no telling,

22   on the FDIC front, I have a high confidence level.  On the OTS

23   front, I think our confidence level is high -- I mean, is above

24   average but it's not certain.

25         THE COURT:  Okay.  So there's some risk here.

LEHMAN BROTHERS HOLDINGS INC., et al.

1              MR. MARSAL:  Yes.  Yes, Your Honor.

2              THE COURT:  All right.  Thank you.

3              MR. MARSAL:  That's it.

4              THE COURT:  That was a very helpful presentation.

5     There are no objections but I just want to be assured that

6     there is no one else who may have some questions about the

7     presentation that was just made.  I realize that this is

8     unusual.  It's not testimony --

9              MR. PEREZ:  Right.

10             THE COURT:  -- it was a presentation.  I don't hear

11    any -- well, wait a minute.  We have counsel for --

12             MR. KOBAK:  I'm here, Your Honor, for the SIPA

13    trustee.  I have not really questions but a couple of comments

14    I'd like to make at the appropriate time.

15             THE COURT:  Well, this is probably the appropriate

16    time.

17             MR. KOBAK:  Good.  Thank you.

18             THE COURT:  I'm just guessing that it has something

19    to do with some of the things Mr. Marsal said about the

20    municipal securities that seem to have been lost in the

21    process.

22             MR. KOBAK:  That's correct, Your Honor.  James Kobak,

23    Hughes Hubbard & Reed on behalf of the SIPA trustee.  Your

24    Honor, I just wanted to make it very clear.  I think Mr. Marsal

25    sometimes leaves the impression that the trustee isn't focusing

LEHMAN BROTHERS HOLDINGS INC., et al.

1   a lot of attention on this claim or looking at it very

2   expeditiously.

3           THE COURT:  I think he would just like you to look at

4   it as expeditiously --

5           MR. KOBAK:  Yes.

6           THE COURT:  -- as possible.

7           MR. KOBAK:  Well, we are doing that.  We do have some

8   questions about the transaction.  In order to be a customer

9   claim, it has to have been done in the ordinary course of

10  business.  In our view of some of the evidence, it looks like

11  the parties, and that includes the bank, were scrambling around

12  like crazy to find a way to set up a segregated account in

13  time.  They couldn't do it so they permitted this money to be

14  deposited in the Chase account as Your Honor has already heard.

15          We've asked the bank for documents.  There's been a

16  little delay in getting those documents.  We're in the process

17  of reviewing them now.  We do take this very seriously.  Of

18  course, we have a lot of other claimants who come in and say

19  that their business -- and if it's hedge funds, their investors

20  are going to lose their life savings as well.  It is a 500

21  million dollar claim.  The people that instigated this was the

22  treasurer of LBI who is also a member of the board of the bank.

23  So we do think this is something that we have to examine very

24  carefully.  We haven't made any determination yet.  We've told

25  all the parties, including Mr. Marsal and his counsel, that we

LEHMAN BROTHERS HOLDINGS INC., et al.

1    do intend to try to reach our determination as soon as we've

2    got the documents and as soon as possible.

3           So I just wanted to make that very clear that there

4    is a little bit more to the issue here and that we are acting

5    as expeditiously as possible.  Thank you, Your Honor.

6           THE COURT:  I understand.  That's a helpful

7    clarification of your position.  Mr. Perez?

8           MR. PEREZ:  Yes, Your Honor.  Your Honor, I do have

9    two exhibits that I'd like to present to the Court.  Exhibit

10   number 1 is the order to cease and desist issued by the Federal

11   Deposit Insurance Corporation against the Utah Bank.  And in

12   paragraph 1, Your Honor, it says "On or before February 20, the

13   insured institution shall, in a manner acceptable to the

14   regional director of the New York regional office of the FDIC,

15   obtain sufficient capital to meet and maintain the adequately

16   capitalized level for all capital measures."

17          And then a similar document issued by the office of

18   Thrift Supervision, dated February 4th, which would be Exhibit

19   number 2, and in that circumstance it indicates the February

20   28th date to maintain the adequate capital for the Thrift, the

21   FSB.

22          THE COURT:  And you would like these two documents to

23   be deemed part of the record?

24          MR. PEREZ:  Yes, Your Honor.

25          THE COURT:  Is there any objection to my seeing these

LEHMAN BROTHERS HOLDINGS INC., et al.

1    documents?  Fine.  You may hand them up.

2          MR. PEREZ:  Thank you.

3          THE COURT:  It doesn't matter.  You can go either

4    way.  Thanks.

5          MR. PEREZ:  Thank you, Your Honor.  Your Honor, just

6    one last point and perhaps a little bit extraneous.  But to the

7    extent that there's -- there were issues about the municipal

8    bond, Your Honor.  The Utah Bank had, in fact, had an approved

9    business plan with the FDIC which allowed it to purchase and

10   sell municipal bonds and hold them for investment.  And, in

11   fact, earlier in the month of September, LBHI had injected

12   several hundred million dollars of capital into the Utah Bank

13   for the purpose of allowing them to execute on their new

14   business plan.  So we believe it was in the ordinary course of

15   business, Your Honor.

16          I have nothing further to say.

17          THE COURT:  Okay.  Well, all self-serving statements

18   are accepted in that spirit.  I recognize that everybody has

19   chartered some territory for further exploration down the road.

20   But none of that is really part of today's hearing.

21          MR. PEREZ:  It isn't, Your Honor.  And, Your Honor,

22   on the basis of the record, we would request that the Court

23   enter the two orders and approve the compromise.

24          THE COURT:  Let me just find out if the creditors'

25   committee wishes to be heard in connection with this.  I know

LEHMAN BROTHERS HOLDINGS INC., et al.

1   that a statement was filed yesterday on behalf of the

2   committee.

3          MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

4   Tweed Hadley & McCloy on behalf of the creditors' committee.

5   Yes, Your Honor, we did file a brief statement in support.  And

6   as indicated in there, on balance, we believe that making this

7   investment makes sense.  It was not an easy decision for the

8   committee to make.  However, our advisors have been

9   significantly involved in the process from the beginning.  And

10  looking at all of the pros and cons and some of the issues that

11  you yourself raised, we think that there is potentially value

12  in these banks.  And letting them be seized at this point in

13  time would not ultimately redown to the benefit of all

14  creditors.

15         So again, on balance under all the circumstances with

16  things we can't predict, we think it makes sense to grant these

17  two motions.

18         THE COURT:  All right.  Thank you.  Is there anyone

19  else who wishes to be heard at this point?  Apparently not.

20  I've reviewed the two emergency motions that are being heard

21  today.  And I have considered the statement filed yesterday by

22  the official committee of unsecured creditors in support of

23  these motions.  Additionally, I have reviewed the written

24  presentation prepared by Alvarez & Marsal which has been

25  referenced by Mr. Marsal in his statement made to the Court.

LEHMAN BROTHERS HOLDINGS INC., et al.

1    And I am satisfied that there are sound business reasons that

2    support this action, the proposed action being to make

3    investments in what we've called Utah, meaning Woodlands

4    Commercial Bank, and Thrift, meaning Lehman Brothers Bank FSB.

5    My understanding is that the measures being adopted to assure

6    capital adequacy at this difficult time include, in addition to

7    capital infusions, various means to limit the exposure of these

8    institutions to unfunded obligations to fund loans to third

9    parties.  As a consequence, the overall combination of both

10   capital infusion and reduction of liability is to improve the

11   capital levels of each institution.

12        Mr. Marsal did not reference in his presentation

13   anything about the fair value accounting or at least I don't

14   remember hearing it.  The papers that I have read, however,

15   filed in support of this motion do reference the impact of fair

16   value accounting on the capital adequacy of both institutions.

17        Notwithstanding the fact that there are acknowledged

18   risks associated with moving forward with these transactions,

19   the presentation that has been made makes it abundantly clear

20   that the risk to the estate in not taking these measures now

21   before February 20th or February 28th, depending on the

22   institution, could result in seizure of these institutions and

23   a significant material adverse impact to the investment of LBHI

24   made indirectly in these institutions and, more critically,

25   could result in a very material deficiency claim at the LBHI

LEHMAN BROTHERS HOLDINGS INC., et al.

1   level measured somewhere between 1.2 billion dollars and 3.6

2   billion dollars.  Those are significant numbers.  And the

3   avoidance of such an obviously adverse outcome represents cause

4   for the proposed rescue of these two institutions.

5          Additionally, there is the potential, by virtue of

6   adopting these measures, of preserving LBHI's equity

7   investments in these two institutions so that, on an overall

8   basis, there is no doubt that I have that a presentation has

9   been made with no objection on the record, that this represents

10  an appropriate exercise of business judgment, not without some

11  risk, but certainly an appropriate exercise of business

12  judgment.  For that reason, I'm prepared to approve both

13  motions in the form submitted.  I note that one of them, I

14  think it's the motion in connection with the rescue of the Utah

15  institution has a supplement and a somewhat modified proposed

16  form of order.  I have read the supplement and the proposed

17  order and I'm satisfied that, as amended, the relief requested

18  is sensible and I will approve it.

19         MR. PEREZ:  Thank you, Your Honor.

20         THE COURT:  Is there anything more for today?

21         MR. PEREZ:  Not for us, Your Honor.

22         THE COURT:  Very well.  We're adjourned.  Thank you.

23         MR. PEREZ:  Thank you very much.

24      (Whereupon these proceedings were concluded at 10:39 a.m.)

25

1

2                                    I N D E X

3

4                              R U L I N G S

5   DESCRIPTION                                           PAGE      LINE

6   LBHI's motion to fund a capital contribution to      27        18

7   Woodlands Commercial Bank approved

8

9   LBHI's motion to increase capital level of           27        18

10  Lehman Bank FSB and an additional contribution

11  of up to fifteen million dollars approved

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                    C E R T I F I C A T I O N

 3

 4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

 5    true and accurate record of the proceedings.

 6

 7    _____

 8    LISA BAR-LEIB

 9

10    Veritext LLC

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date:  February 18, 2009

16

17

18

19

20

21

22

23

24

25
```

## Exhibit "B"

**(Confidentiality Regulations)**

Westlaw.

12 C.F.R. § 4.37                                                                                                Page 1

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
    Title 12. Banks and Banking
        Chapter I. Comptroller of the Currency, Department of the Treasury
            Part 4. Organization and Functions, Availability and Release of Information, Contracting Outreach Program, Post-Employment Restrictions for Senior Examiners (Refs & Annos)
                Subpart C. Release of Non-Public OCC Information

→ **§ 4.37 Persons and entities with access to OCC information; prohibition on dissemination.**

(a) Current and former OCC employees or agents--

(1) Generally. Except as authorized by this subpart or otherwise by the OCC, no current or former OCC employee or agent may, in any manner, disclose or permit the disclosure of any non-public OCC information to anyone other than an employee or agent of the Comptroller for use in the performance of OCC duties.

(2) Duty of person served. Any current or former OCC employee or agent subpoenaed or otherwise requested to provide information covered by this subpart must immediately notify the OCC as provided in this paragraph. The OCC may intervene, attempt to have the compulsory process withdrawn, and register appropriate objections when a current or former OCC employee or agent receives a subpoena and the subpoena requires the current or former employee or agent to appear or produce OCC information. If necessary, the current or former employee or agent must appear as required and respectfully decline to produce the information sought, citing this subpart as authority and United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951). The cur-

rent or former OCC employee or agent must immediately notify the OCC if subpoenaed or otherwise asked for non-public OCC information:

(i) In a civil action, by notifying the Director of the OCC's Litigation Division at the Washington office; or

(ii) In a criminal action, by notifying the appropriate district counsel for current and former district employees or agents; or the Director of the OCC's Enforcement and Compliance Division at the Washington office, for current and former Washington employees or agents.

(b) Non-OCC employees or entities--

(1) Generally.

(i) Without OCC approval, no person, national bank, or other entity, including one in lawful possession of non-public OCC information under paragraph (b)(2) of this section, may disclose information covered by this subpart in any manner, except:

(A) After the requester has sought the information from the OCC pursuant to the procedures set forth in this subpart; and

(B) As ordered by a Federal court in a judicial proceeding in which the OCC has had the opportunity to appear and oppose discovery.

(ii) Any person who discloses or uses non-public OCC information except as expressly permitted by the Comptroller of the Currency or as ordered by a Federal court, under paragraph (b)(1)(i) of this section, may be subject to the penalties provided in 18 U.S.C. 641.

(2) Exception for national banks. When neces-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sary or appropriate for bank business purposes, a national bank or holding company, or any director, officer, or employee thereof, may disclose non-public OCC information, including information contained in, or related to, OCC reports of examination, to a person or organization officially connected with the bank as officer, director, employee, attorney, auditor, or independent auditor. A national bank or holding company or a director, officer, or employee thereof may also release non-public OCC information to a consultant under this paragraph if the consultant is under a written contract to provide services to the bank and the consultant has a written agreement with the bank in which the consultant:

(i) States its awareness of, and agreement to abide by, the prohibition on the dissemination of non-public OCC information contained in paragraph (b)(1) of this section; and

(ii) Agrees not to use the non-public OCC information for any purpose other than as provided under its contract to provide services to the bank.

(3) Duty of person or entity served. Any person, national bank, or other entity served with a request, subpoena, order, motion to compel, or other judicial or administrative process to provide non-public OCC information shall:

(i) Immediately notify the Director of the OCC's Litigation Division at the Washington, DC office and inform the Director of all relevant facts, including the documents and information requested, so that the OCC may intervene in the judicial or administrative action if appropriate;

(ii) Inform the requester of the substance of these rules and, in particular, of the obligation to follow the request procedures in §§ 4.33 and 4.34; and

(iii) At the appropriate time, inform the court or tribunal that issued the process of the substance of these rules.

(4) Actions of the OCC following notice of ser-

vice. Following receipt of notice pursuant to paragraph (b)(3) of this section, the OCC may direct the requester to comply with §§ 4.33 and 4.34, intervene in the judicial or administrative action, attempt to have the compulsory process withdrawn, or register other appropriate objections.

(5) Return of records. The OCC may require any person in possession of OCC records to return the records to the OCC.

(c) Disclosure to government agencies. When not prohibited by law, the Comptroller may make available to the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and, in the Comptroller's sole discretion, to certain other government agencies of the United States and foreign governments, state agencies with authority to investigate violations of criminal law, and state bank regulatory agencies, a copy of a report of examination, testimony, or other non-public OCC information for their use, when necessary, in the performance of their official duties. All non-public OCC information made available pursuant to this paragraph is OCC property, and the OCC may condition its use on appropriate confidentiality protections, including the mechanisms identified in § 4.37.

(d) Intention of OCC not to waive rights. The possession by any of the entities or individuals described in paragraphs (a), (b), and (c) of this section of non-public OCC information does not constitute a waiver by the OCC of its right to control, or impose limitations on, the subsequent use and dissemination of the information.

[63 FR 62929, Nov. 10, 1998; 64 FR 29216, 29217, June 1, 1999]

SOURCE: 60 FR 57322, Nov. 15, 1995; 62 FR 6452, Feb. 12, 1997; 63 FR 46120, Aug. 28, 1998; 63 FR 62929, Nov. 10, 1998; 70 FR 69636, 69637, Nov. 17, 2005; 73 FR 22236, April 24, 2008, unless otherwise noted.

AUTHORITY: 12 U.S.C. 93a. Subpart A also issued under 5 U.S.C. 552. Subpart B also issued under 5

12 C.F.R. § 4.37                                                        Page 3

U.S.C. 552; E.O. 12600 (3 CFR 1987 Comp., p. 235).
Subpart C also issued under 5 U.S.C. 301, 552; 12
U.S.C. 161, 481, 482, 484(a), 1442, 1817(a)(2) and
(3), 1818(u) and (v), 1820(d)(6), 1920(k), 1821(c),
1821(o), 1821(t), 1831m, 1831p-1, 1831o, 1867,
1951 et seq., 2601 et seq., 2801 et seq., 2901 et seq.,
3101 et seq., 3401 et seq.; 15 U.S.C. 77uu(b),
78q(c)(3); 18 U.S.C. 641, 1905, 1906; 29 U.S.C.
1204; 31 U.S.C. 9701; 42 U.S.C. 3601; 44 U.S.C.
3506, 3510. Subpart D also issued under 12 U.S.C.
1833e.

12 C. F. R. § 4.37, 12 CFR § 4.37

Current through July 23, 2009; 74 FR 36402

© 2009 Thomson Reuters
END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

12 C.F.R. § 510.5                                                                                    Page 1

☞

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    ◄▤ Chapter V. Office of Thrift Supervision, De-
    partment of the Treasury (Refs & Annos)
      ◄▤ Part 510. Miscellaneous Organizational
      Regulations (Refs & Annos)

      ➔ § 510.5 Release of unpublished OTS
      information.

(a) Scope.

(1) This section applies to requests by the public
for unpublished OTS information, such as re-
quests for records or testimony from parties to
lawsuits in which the OTS is not a party.

(2) Unpublished OTS information includes re-
cords created or obtained in connection with the
OTS's performance of its responsibilities, such as
records concerning supervision, regulation, and
examination of savings associations, their hold-
ing companies, and affiliates, and records com-
piled in connection with the OTS's enforcement
responsibilities. Unpublished OTS information
also includes information that current and former
employees, officers, and agents obtained in their
official capacities. Examples of unpublished in-
formation include:

(i) Information in the memory of a current or
former employee, officer, or agent of the OTS
(or the Federal Home Loan Bank Board, the
predecessor agency of the OTS), by testimony or
informal interview, that was acquired in the
course of performing official duties or because of
the employee's, officer's or agent's official status;

(ii) Reports of examination, supervisory corre-
spondence, internal agency memoranda and in-
vestigatory files compiled in connection with an

investigation, whether such records are in the
possession of the OTS or some other individual
or entity; and

(iii) Unpublished OTS records obtained by or in
the possession of third parties, including other
government agencies.

(3) This section does not apply to:

(i) Requests for records or testimony in proceed-
ings in which the OTS is a party;

(ii) Requests for information by other govern-
ment agencies, except when specifically pro-
vided; and

(iii) Requests for records that are required to be
disclosed under the Freedom of Information Act,
see 5 U.S.C. 552, and 31 CFR 1.1-1.6.

(b) Purpose. The purposes of this section are:

(1) To afford an orderly mechanism for the OTS
to expeditiously process requests for unpublished
OTS information and, where appropriate, for the
OTS to assert evidentiary privileges in litigation;

(2) To balance the need for confidentiality of un-
published OTS information with the private
party's interest in obtaining disclosure of that in-
formation;

(3) To ensure that the time of OTS employees is
utilized in the most efficient manner consistent
with the OTS's statutory mission;

(4) To prevent undue burdens on the OTS;

(5) To limit the expenditure of the OTS's funds
for private purposes; and

(6) To maintain the impartiality of the OTS
among private litigants.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(c) Procedure--

(1) Requests for records and testimony in general. A request for unpublished OTS information must be in writing, furnish the caption of the lawsuit if the request arises in the course of litigation, and support the requester's claim that the information sought is highly relevant to the purpose for which it is sought. In demonstrating that the information is highly relevant, the requester must explain in detail how the requested OTS information relates to the issues in the case or the matter.

(i) For requests arising in lawsuits, the submission also must include:

(A) A copy of the complaint or equivalent document in the case and any other pleadings necessary to show relevance;

(B) A description of any prior decisions or pending motions in the case that may bear on the asserted relevance of the information being sought from the OTS; and

(C) The names, addresses and phone numbers of counsel to all other parties in the case.

(ii) In all instances, in addition to demonstrating that the information sought is highly relevant to the purpose for which it is sought, the requester must:

(A) Demonstrate that the information sought is not available from any other source; and

(B) Demonstrate that the need for the information clearly outweighs the need to maintain the confidentiality of the OTS information and the burden on the OTS to produce the information.

(iii) If a request seeks a response in fewer than 30 days, it must include an explanation of why the requester was unable to submit the request

earlier and why expediting the request is required.

(2) Additional provisions relating to requests for records. In addition to the requirements of paragraph (c)(1) of this section, the provisions in paragraphs (c)(2)(i) and (c)(2)(ii) of this section apply to requests for disclosure of records.

(i) A request for records must list the categories of records sought and describe the specific information sought, including the relevant time period.

(ii) When the OTS believes that another person has a claim of privilege regarding the information in the records and the records are in the possession or control of that person, such as reports prepared by a savings association's attorneys that are shared with the OTS, the OTS may respond to the request by authorizing that person to release the records pursuant to an appropriate confidentiality order rather than by the OTS releasing the records directly to the requesting party. This will enable the person possessing or controlling the records to argue any issues of privilege to the appropriate court.

(3) Additional provisions relating to requests for testimony from OTS employees. In addition to the requirements of paragraph (c)(1) of this section, the provisions in paragraphs (c)(3)(i) through (c)(3)(iv) of this section apply to requests that current or former OTS employees be authorized to give testimony.

(i) The request must specifically describe the substance of the testimony sought and show a compelling need for the testimony. A showing of compelling need should include a demonstration that the requested information is not available from any other source, such as the books and records of other persons or entities, OTS records that have been or might be released, or the testimony of other non-OTS persons, including retained experts.

(ii) OTS employees will not be authorized to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

provide expert or opinion testimony for private parties.

(iii) The OTS expects litigants to anticipate their need for OTS testimony in sufficient time to request and obtain that testimony in deposition form. A request for testimony at a trial or hearing may not be granted unless the requester shows that properly developed deposition testimony could not be used or would not be adequate at the trial or hearing.

(iv) The OTS shall specify the scope of any authorized testimony and may take steps to ensure that the scope of testimony taken adheres to the scope authorized. Parties to the case who did not join in the request and who wish to question the witness beyond the authorized scope should request expanded authorization pursuant to this regulation. The OTS will attempt to render decisions on such requests in an expedited manner.

(4) Information available to savings associations, holding companies, state and Federal agencies and requesters.

(i) The regular report of examination of a savings association, savings and loan holding company, or other affiliate of a savings association is made available by the appropriate Regional Office to the entity examined.

(ii) A subsidiary savings association of a savings and loan holding company may reproduce and furnish a copy of its report of examination and related supervisory correspondence of the savings association to its parent holding company(ies) without prior approval of the OTS. A savings and loan holding company may reproduce and furnish a copy of its report of examination and related supervisory correspondence to another affiliated savings and loan holding company that controls the same savings association or its subsidiary savings association(s) without prior approval of the OTS. This paragraph does not require such disclosure by a parent savings and loan holding company or subsidiary savings association.

(iii) Reports of examination and other information relating to state-chartered savings associations and affiliates are made available, upon request, by the OTS to the state governmental authority having general supervision of such state-chartered savings associations.

(iv) Reports of examination and other information may be made available by the OTS to other agencies of the United States, a state agency, or to the Federal Home Loan Banks, for use where necessary in the performance of their official duties.

(v) All reports or other information made available to savings associations, holding companies, affiliates, other governmental agencies or requesters shall remain the property of the OTS and, except as permitted by this section or otherwise by the Director or his delegate, no person, company, agency, or authority to whom the information is made available, or any officer, director, employee or agent thereof, shall disclose any such information except published statistical material that would not disclose the identity of any individual or corporation.

(5) Where to submit requests. In all matters covered by this section, notification of the issuance of subpoenas or compulsory process and requests for records or testimony covered by this section must be sent to the OTS at 1700 G Street NW., Washington, DC 20552, to the attention of the Corporate Secretary, and should be labelled "Request for Release of Unpublished Information Under Section 510.5." Requesters may furnish copies of the request or subpoenas simultaneously to the appropriate OTS Regional Office, but the furnishing of such copies does not constitute service on the OTS.

(d) Consideration of requests--

(1) In general. The OTS will generally process requests in the order in which they are received. The OTS will endeavor to respond to requests within 30 days, but this may vary depending on

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the scope and precision of the request. The OTS will weigh requests for processing in less than 30 days against the burden to the OTS of expedited processing and the unfairness to other parties whose pending requests may be delayed.

(2) Consultation with requester. The OTS may consult with the requester to:

(i) Refine and limit the scope of the request so as to reduce the burden and expense on the OTS; or

(ii) Obtain additional information necessary for the OTS to make an informed determination on the request. To the extent necessary to reach an informed determination on the request, the OTS may inquire into the circumstances of the underlying matter and rely on sources of information beyond the requester, including other interested parties.

(3) Final determinations. Final determinations on requests will be made by the Director or his delegate. All such determinations are the sole discretion of the Director or his delegate. Requesters will be notified in writing of the disposition of the request.

(4) Denial of requests.

(i) The OTS may deny requests for records or testimony that seek information that the OTS deems to be:

    (A) Not highly relevant;

    (B) Privileged;

    (C) Available from other sources; or

    (D) Information that should not be disclosed for reasons that warrant restriction of discovery under the Federal Rules of Civil Procedure (28 U.S.C. appendix).

(ii) The OTS may also deny a records or testimony request when it considers production of

the information to be overly burdensome or contrary to the public interest, or where OTS determines that the need for the information does not clearly outweigh the need to maintain the confidentiality of the information, or where the requester seeks testimony and has not shown a compelling need for the testimony.

(5) Confidentiality Orders and Agreements. As is set forth in paragraph (f) of this section, the OTS may condition release of information on the entry by the relevant tribunal of an order satisfactory to the OTS or, in a non-litigated matter, the execution of a confidentiality agreement that limits access of third parties to the unpublished OTS information. It shall be the duty of the requesting party to obtain such an order or to execute a confidentiality agreement.

(e) Parties with access to OTS information; restriction on dissemination--

(1) Current and former employees. Except as authorized by this section or as otherwise authorized by the Director or his delegate, no current or former employee, officer or agent of the OTS or a predecessor agency shall disclose or permit the disclosure of any unpublished information of the OTS to anyone (other than an employee, officer or agent of the OTS properly entitled to such information for the performance of their official duties), whether by giving out or furnishing such information or a copy thereof or by allowing any person to inspect, examine, or copy such information or copy thereof, or otherwise.

(2) Duty of person served. If any person, whether or not a current or former employee, officer or agent of the OTS, has information of the OTS that may not be disclosed under the regulations of the OTS or other applicable law, and in connection therewith is served with a subpoena, order, or other process requiring personal attendance as a witness or production of records or information in any proceeding, that person shall promptly advise the OTS of such service or request for information. Upon such notice the OTS will take appropriate action to advise the court or tribunal that issued the process and the attorney

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

for the party at whose instance the process was issued, if known, of the substance of this section. Such notice to the OTS shall be made by contacting the Litigation Division, Office of Chief Counsel, Office of Thrift Supervision, 1700 G Street NW., Washington, DC 20552. As provided in paragraph (e)(3) of this section, a person so served with process may not disclose OTS information without OTS authorization. To obtain OTS authorization, a request must be sent to the OTS in Washington, DC, in accordance with paragraph (c) of this section.

(3) Appearance by person served. Except as the OTS has authorized disclosure of the relevant information, or except as authorized by law, any person who has information of the OTS that may not be disclosed under this section and is required to respond to a subpoena or other legal process shall attend at the time and place therein mentioned and respectfully decline to produce such records or give any testimony with respect thereto, basing such refusal on this part. If, notwithstanding, the court or other body orders the disclosure of such records or the giving of such testimony, the person having such information of the OTS shall continue respectfully to decline to produce such information and shall promptly advise the Litigation Division of the Chief Counsel's Office, Office of Thrift Supervision. Upon such notice the OTS will take appropriate action to advise the court or tribunal which issued the order, of the substance of this section.

(4) Non-waiver of privilege. The possession by any entity or individual described in paragraph (c)(4) of this section of OTS records covered by this section shall not waive any privilege of the OTS or the OTS's right to supervise the further dissemination of these records.

(f) Orders and agreements protecting the confidentiality of unpublished OTS information--

(1) Records. Unless otherwise permitted by the OTS, release of records authorized pursuant to this section will be conditioned by the OTS upon entry of an acceptable protective order by the court or administrative tribunal presiding in the particular case, or, in non-litigated matters, upon execution of an acceptable confidentiality agreement. In cases where protective orders have already been entered, the OTS reserves the right to condition approval for release of information upon the inclusion of additional or amended provisions.

(2) Testimony. The OTS may condition its authorization of deposition testimony on an agreement of the parties that the transcript of the testimony will be kept under seal, or will be made available only to the parties, the court and the jury, except to the extent that the OTS may allow use of the transcript in related litigation. The party who requested the testimony shall, at its expense, furnish to the OTS a copy of the transcript of testimony of the OTS employee or former employee.

(g) Limitation of burden on the OTS in connection with released records--

(1) Authentication for use as evidence. The OTS will authenticate released records to facilitate their use as evidence. Requesters who require authenticated records should request certified copies at least 30 days prior to the date they will be needed. The request should be sent to the OTS Public Disclosure Branch and shall identify the records, giving the office or record depository where they are located (if known) and include copies of the records and payment of the certification fee.

(2) Responsibility of litigants to share released records. The party who has sought and obtained OTS records has the responsibility of:

(i) Notifying other parties to the case of the release and, after entry of a protective order, providing copies of the records to the other parties who are subject to the protective order; and

(ii) Retrieving any records from the court's file as soon as the records are no longer required by the court and returning them to the OTS. Where a party may be involved in related litigation, the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

OTS may, upon a request made to it pursuant to this section, authorize such party to transfer the records for use in that related case.

(h) Fees--

(1) Fees for records searches, copying and certifications. Requesters shall be charged fees in accordance with Treasury Department regulations, 31 CFR 1.7. With certain exceptions, the regulations in 31 CFR 1.7 provide for recovery of the full direct costs of searching, reviewing, certifying and duplicating the records sought. An estimate of the statement of charges will be sent to requesters, and fees shall be remitted by check payable to the OTS prior to release of the requested records. Where it deems appropriate, the OTS may contract with commercial copying concerns to copy the records, with the cost billed to the requester.

(2) Witness fees and allowances.

(i) Litigants whose requests for testimony of current OTS employees are approved shall, upon completion of the testimonial appearance, promptly tender a check payable to the OTS for witness fees and allowances in accordance with 28 U.S.C. 1821.

(ii) All litigants whose requests for testimony of former OTS employees are approved, shall also promptly tender witness fees and allowances to the witness in accordance with 28 U.S.C. 1821.

[55 FR 7695, March 5, 1990; 60 FR 28031, May 30, 1995]

SOURCE: 54 FR 49456, Nov. 30, 1989; 59 FR 18475, April 19, 1994; 60 FR 28031, May 30, 1995; 60 FR 66715, Dec. 26, 1995; 60 FR 66716, Dec. 26, 1995; 61 FR 575, Jan. 8, 1996; 61 FR 56119, Oct. 31, 1996, unless otherwise noted.

AUTHORITY: 12 U.S.C. 1462a, 1463, 1464; Pub.L. 101-410, 104 Stat. 890; Pub.L. 104-134, 110 Stat. 1321-358.

12 C. F. R. § 510.5, 12 CFR § 510.5

Current through July 23, 2009; 74 FR 36402

© 2009 Thomson Reuters
END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

12 C.F.R. § 309.5                                                                                    Page 1

**C**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    Chapter III. Federal Deposit Insurance Corporation (Refs & Annos)
      ⁿ⧉ Subchapter A. Procedure and Rules of Practice
        ⁿ⧉ Part 309. Disclosure of Information (Refs & Annos)

    → **§ 309.5 Procedures for requesting records.**

(a) Definitions. For purposes of this section:

(1) Commercial use request means a request from or on behalf of a requester who seeks records for a use or purpose that furthers the commercial, trade, or profit interests of the requester or the person on whose behalf the request is made. In determining whether a request falls within this category, the FDIC will determine the use to which a requester will put the records requested and seek additional information as it deems necessary.

(2) Direct costs means those expenditures the FDIC actually incurs in searching for, duplicating, and, in the case of commercial requesters, reviewing records in response to a request for records.

(3) Duplication means the process of making a copy of a record necessary to respond to a request for records or for inspection of original records that contain exempt material or that cannot otherwise be directly inspected. Such copies can take the form of paper copy, microfilm, audio-visual records, or machine readable records (e.g., magnetic tape or computer disk).

(4) Educational institution means a preschool, a

public or private elementary or secondary school, an institution of undergraduate or graduate higher education, an institution of professional education, and an institution of vocational education, which operates a program or programs of scholarly research.

(5) Noncommercial scientific institution means an institution that is not operated on a commercial basis as that term is defined in paragraph (a)(1) of this section, and which is operated solely for the purpose of conducting scientific research, the results of which are not intended to promote any particular product or industry.

(6) Representative of the news media means any person primarily engaged in gathering news for, or a free-lance journalist who can demonstrate a reasonable expectation of having his or her work product published or broadcast by, an entity that is organized and operated to publish or broadcast news to the public. The term news means information that is about current events or that would be of current interest to the general public.

(7) Review means the process of examining records located in response to a request for records to determine whether any portion of any record is permitted to be withheld as exempt information. It includes processing any record for disclosure, e.g., doing all that is necessary to excise them or otherwise prepare them for release.

(8) Search includes all time spent looking for material that is responsive to a request, including page-by-page or line-by-line identification of material within records. Searches may be done manually and/or by computer using existing programming.

(b) Making a request for records.

(1) The request shall be submitted in writing to the Freedom of Information Act/Privacy Act Group ("FOIA/PA Group"), Legal Division:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(i) By completing the online request form located on the FDIC's World Wide Web page, found at: http://www.fdic.gov;

(ii) By facsimile clearly marked Freedom of Information Act Request to the FOIA/PA Group: (202) 736-0547; or

(iii) By sending a letter to: Legal Division, FDIC, ATTN: FOIA/PA Group, 550 17th Street, NW., Washington, DC 20429.

(2) The request shall contain the following information:

(i) The name and address of the requester, an electronic mail address, if available, and the telephone number at which the requester may be reached during normal business hours;

(ii) Whether the requester is an educational institution, noncommercial scientific institution, or news media representative;

(iii) A statement agreeing to pay the applicable fees, or a statement identifying a maximum fee that is acceptable to the requester, or a request for a waiver or reduction of fees that satisfies paragraph (f)(1)(x) of this section; and

(iv) The preferred form and format of any responsive information requested, if other than paper copies.

(3) A request for identifiable records shall reasonably describe the records in a way that enables the FDIC's staff to identify and produce the records with reasonable effort and without unduly burdening or significantly interfering with any of the FDIC's operations.

(c) Defective requests. The FDIC need not accept or process a request that does not reasonably describe the records requested or that does not otherwise comply with the requirements of this part. The FDIC may return a defective request, specifying the deficiency. The requester may submit a corrected request, which will be treated as a new request.

(d) Processing requests--

(1) Receipt of requests. Upon receipt of any request that satisfies paragraph (b) of this section, the FOIA/PA Group, Legal Division shall assign the request to the appropriate processing track pursuant to this section. The date of receipt for any request, including one that is addressed incorrectly or that is referred by another agency, is the date the FOIA/PA Group actually receives the request.

(2) Multitrack processing.

(i) The FDIC provides different levels of processing for categories of requests under this part. Requests for records that are readily identifiable by the FOIA/PA Group, and that have already been cleared for public release may qualify for fast-track processing. All other requests shall be handled under normal processing procedures, unless expedited processing has been granted pursuant to paragraph (d)(3) of this section.

(ii) The FDIC will make the determination whether a request qualifies for fast-track processing. A requester may contact the FOIA/PA Group to learn whether a particular request has been assigned to fast-track processing. If the request has not qualified for fast-track processing, the requester will be given an opportunity to refine the request in order to qualify for fast-track processing. Changes made to requests to obtain faster processing must be in writing.

(3) Expedited processing.

(i) Where a person requesting expedited access to records has demonstrated a compelling need for the records, or where the FDIC has determined to expedite the response, the FDIC shall process the request as soon as practicable. To show a compelling need for expedited processing, the requester shall provide a statement demonstrating that:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(A) The failure to obtain the records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(B) The requester can establish that they are primarily engaged in information dissemination as their main professional occupation or activity, and there is urgency to inform the public of the government activity involved in the request; and

(C) The requester's statement must be certified to be true and correct to the best of the person's knowledge and belief and explain in detail the basis for requesting expedited processing.

(ii) The formality of the certification required to obtain expedited treatment may be waived by the FDIC as a matter of administrative discretion.

(4) A requester seeking expedited processing will be notified whether expedited processing has been granted within ten (10) working days of the receipt of the request. If the request for expedited processing is denied, the requester may file an appeal pursuant to the procedures set forth in paragraph (h) of this section, and the FDIC shall respond to the appeal within ten (10) working days after receipt of the appeal.

(5) Priority of responses. Consistent with sound administrative process the FDIC processes requests in the order they are received in the separate processing tracks. However, in the agency's discretion, or upon a court order in a matter to which the FDIC is a party, a particular request may be processed out of turn.

(6) Notification.

(i) The time for response to requests will be twenty (20) working days except:

(A) In the case of expedited treatment under paragraph (d)(3) of this section;

(B) Where the running of such time is suspended for the calculation of a cost estimate for the requester if the FDIC determines that the processing of the request may exceed the requester's maximum fee provision or if the charges are likely to exceed $250 as provided for in paragraph (f)(1)(v) of this section;

(C) Where the running of such time is suspended for the payment of fees pursuant to the paragraphs (d)(6)(i)(B) and (f)(1) of this section; or

(D) In unusual circumstances, as defined in 5 U.S.C. 552(a)(6)(B) and further described in paragraph (d)(6)(iii) of this section.

(ii) In unusual circumstances as referred to in paragraph (d)(6)(i)(D) of this section, the time limit may be extended for a period of:

(A) Ten (10) working days as provided by written notice to the requester, setting forth the reasons for the extension and the date on which a determination is expected to be dispatched; or

(B) Such alternative time period as agreed to by the requester or as reasonably determined by the FDIC when the FDIC notifies the requester that the request cannot be processed in the specified time limit.

(iii) Unusual circumstances may arise when:

(A) The records are in facilities, such as field offices or storage centers, that are not located at the FDIC's Washington office;

(B) The records requested are voluminous or are not in close proximity to one another; or

(C) There is a need to consult with another agency or among two or more components of the FDIC having a substantial interest in the determination.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(7) Response to request. In response to a request that satisfies the requirements of paragraph (b) of this section, a search shall be conducted of records maintained by the FDIC in existence on the date of receipt of the request, and a review made of any responsive information located. The FDIC shall notify the requester of:

(i) The FDIC's determination of the request;

(ii) The reasons for the determination;

(iii) If the response is a denial of an initial request or if any information is withheld, the FDIC will advise the requester in writing:

(A) If the denial is in part or in whole;

(B) The name and title of each person responsible for the denial (when other than the person signing the notification);

(C) The exemptions relied on for the denial; and

(D) The right of the requester to appeal the denial to the FDIC's General Counsel within 30 business days following receipt of the notification, as specified in paragraph (h) of this section.

(e) Providing responsive records.

(1) Copies of requested records shall be sent to the requester by regular U.S. mail to the address indicated in the request, unless the requester elects to take delivery of the documents at the FDIC or makes other acceptable arrangements, or the FDIC deems it appropriate to send the documents by another means.

(2) The FDIC shall provide a copy of the record in any form or format requested if the record is readily reproducible by the FDIC in that form or format, but the FDIC need not provide more than one copy of any record to a requester.

(3) By arrangement with the requester, the FDIC may elect to send the responsive records electronically if a substantial portion of the request is in electronic format. If the information requested is made pursuant to the Privacy Act of 1974, 5 U.S.C. 552a, it will not be sent by electronic means unless reasonable security measures can be provided.

(f) Fees--

(1) General rules.

(i) Persons requesting records of the FDIC shall be charged for the direct costs of search, duplication, and review as set forth in paragraphs (f)(2) and (f)(3) of this section, unless such costs are less than the FDIC's cost of processing the requester's remittance.

(ii) Requesters will be charged for search and review costs even if responsive records are not located or, if located, are determined to be exempt from disclosure.

(iii) Multiple requests seeking similar or related records from the same requester or group of requesters will be aggregated for the purposes of this section.

(iv) If the FDIC determines that the estimated costs of search, duplication, or review of requested records will exceed the dollar amount specified in the request, or if no dollar amount is specified, the FDIC will advise the requester of the estimated costs (if greater than the FDIC's cost of processing the requester's remittance). The requester must agree in writing to pay the costs of search, duplication, and review prior to the FDIC initiating any records search.

(v) If the FDIC estimates that its search, duplication, and review costs will exceed $250.00, the requester must pay an amount equal to 20 percent of the estimated costs prior to the FDIC initiating any records search.

(vi) The FDIC shall ordinarily collect all appli-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

cable fees under the final invoice before releasing copies of requested records to the requester.

(vii) The FDIC may require any requester who has previously failed to pay the charges under this section within 30 calendar days of mailing of the invoice to pay in advance the total estimated costs of search, duplication, and review. The FDIC may also require a requester who has any charges outstanding in excess of 30 calendar days following mailing of the invoice to pay the full amount due, or demonstrate that the fee has been paid in full, prior to the FDIC initiating any additional records search.

(viii) The FDIC may begin assessing interest charges on unpaid bills on the 31st day following the day on which the invoice was sent. Interest will be at the rate prescribed in section 3717 of title 31 of the United States Code and will accrue from the date of the invoice.

(ix) The time limit for the FDIC to respond to a request will not begin to run until the FDIC has received the requester's written agreement under paragraph (f)(1)(iv) of this section, and advance payment under paragraph (f)(1)(v) or (vii) of this section, or payment of outstanding charges under paragraph (f)(1)(vii) or (viii) of this section.

(x) As part of the initial request, a requester may ask that the FDIC waive or reduce fees if disclosure of the records is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester. Determinations as to a waiver or reduction of fees will be made by the FOIA/PA Group, Legal Division (or designee) and the requester will be notified in writing of his/her determination. A determination not to grant a request for a waiver or reduction of fees under this paragraph may be appealed to the FDIC's General Counsel (or designee) pursuant to the procedure set forth in paragraph (h) of this section.

(2) Chargeable fees by category of requester.

(i) Commercial use requesters shall be charged search, duplication and review costs.

(ii) Educational institutions, non-commercial scientific institutions and news media representatives shall be charged duplication costs, except for the first 100 pages.

(iii) Requesters not described in paragraph (f)(2)(i) or (ii) of this section shall be charged the full reasonable direct cost of search and duplication, except for the first two hours of search time and first 100 pages of duplication.

(3) Fee schedule. The dollar amount of fees which the FDIC may charge to records requesters will be established by the Chief Financial Officer of the FDIC (or designee). The FDIC may charge fees that recoup the full allowable direct costs it incurs. Fees are subject to change as costs change.

(i) Manual searches for records. The FDIC will charge for manual searches for records at the basic rate of pay of the employee making the search plus 16 percent to cover employee benefit costs. Where a single class of personnel (e.g., all clerical, all professional, or all executive) is used exclusively, the FDIC, at its discretion, may establish and charge an average rate for the range of grades typically involved.

(ii) Computer searches for records. The fee for searches of computerized records is the actual direct cost of the search, including computer time, computer runs, and the operator's time apportioned to the search. The fee for a computer printout is the actual cost. The fees for computer supplies are the actual costs. The FDIC may, at its discretion, establish and charge a fee for computer searches based upon a reasonable FDIC-wide average rate for central processing unit operating costs and the operator's basic rate of pay plus 16 percent to cover employee benefit costs.

(iii) Duplication of records.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. § 309.5                                                                                           Page 6

(A) The per-page fee for paper copy repro-
duction of documents is the average FDIC-
wide cost based upon the reasonable direct
costs of making such copies.

(B) For other methods of reproduction or
duplication, the FDIC will charge the actual
direct costs of reproducing or duplicating the
documents.

(iv) Review of records. The FDIC will charge
commercial use requesters for the review of re-
cords at the time of processing the initial request
to determine whether they are exempt from man-
datory disclosure at the basic rate of pay of the
employee making the search plus 16 percent to
cover employee benefit costs. Where a single
class of personnel (e.g., all clerical, all profes-
sional, or all executive) is used exclusively, the
FDIC, at its discretion, may establish and charge
an average rate for the range of grades typically
involved. The FDIC will not charge at the ad-
ministrative appeal level for review of an exemp-
tion already applied. When records or portions of
records are withheld in full under an exemption
which is subsequently determined not to apply,
the FDIC may charge for a subsequent review to
determine the applicability of other exemptions
not previously considered.

(v) Other services. Complying with requests for
special services, other than a readily produced
electronic form or format, is at the FDIC's dis-
cretion. The FDIC may recover the full costs of
providing such services to the requester.

(4) Publication of fee schedule and effective date
of changes.

(i) The fee schedule is made available on the
FDIC's World Wide Web page, found at
http://www.fdic.gov.

(ii) The fee schedule will be set forth in the "No-
tice of Federal Deposit Insurance Corporation
Records Fees" issued in December of each year
or in such "Interim Notice of Federal Deposit In-
surance Corporation Records Fees" as may be is-

sued. Copies of such notices may be obtained at
no charge from the FOIA/PA Group, Legal Divi-
sion, 550 17th Street NW., Washington, DC
20429, and are available on the FDIC's World
Wide Web page as noted in paragraph (f)(4)(i) of
this section.

(iii) The fees implemented in the December or
Interim Notice will be effective 30 days after is-
suance.

(5) Use of contractors. The FDIC may contract
with independent contractors to locate, repro-
duce, and/or disseminate records; provided,
however, that the FDIC has determined that the
ultimate cost to the requester will be no greater
than it would be if the FDIC performed these
tasks itself. In no case will the FDIC contract out
responsibilities which the Freedom of Informa-
tion Act (FOIA) (5 U.S.C. 552) provides that the
FDIC alone may discharge, such as determining
the applicability of an exemption or whether to
waive or reduce fees.

(g) Exempt information. A request for records may
be denied if the requested record contains informa-
tion which falls into one or more of the following
categories. [FN1] If the requested record contains
both exempt and nonexempt information, the nonex-
empt portions which may reasonably be segregated
from the exempt portions will be released to the re-
quester. If redaction is necessary, the FDIC will, to
the extent technically feasible, indicate the amount of
material deleted at the place in the record where such
deletion is made unless that indication in and of itself
will jeopardize the purpose for the redaction. The
categories of exempt records are as follows:

  ¹ Classification of a record as exempt from
  disclosure under the provisions of this para-
  graph (g) shall not be construed as authority
  to withhold the record if it is otherwise sub-
  ject to disclosure under the Privacy Act of
  1974 (5 U.S.C. 552a) or other federal stat-
  ute, any applicable regulation of FDIC or
  any other federal agency having jurisdiction
  thereof, or any directive or order of any
  court of competent jurisdiction.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(1) Records that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order;

(2) Records related solely to the internal personnel rules and practices of the FDIC;

(3) Records specifically exempted from disclosure by statute, provided that such statute:

(i) Requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) Establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(4) Trade secrets and commercial or financial information obtained from a person that is privileged or confidential;

(5) Interagency or intra-agency memoranda or letters that would not be available by law to a private party in litigation with the FDIC;

(6) Personnel, medical, and similar files (including financial files) the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) Records compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records:

(i) Could reasonably be expected to interfere with enforcement proceedings;

(ii) Would deprive a person of a right to a fair trial or an impartial adjudication;

(iii) Could reasonably be expected to constitute an unwarranted invasion of personal privacy;

(iv) Could reasonably be expected to disclose the

identity of a confidential source, including a state, local, or foreign agency or authority or any private institution which furnished records on a confidential basis;

(v) Would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or

(vi) Could reasonably be expected to endanger the life or physical safety of any individual;

(8) Records that are contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of the FDIC or any agency responsible for the regulation or supervision of financial institutions; or

(9) Geological and geophysical information and data, including maps, concerning wells.

(h) Appeals.

(1) Appeals should be addressed to the FOIA/PA Group, Legal Division, FDIC, 550 17th Street, NW., Washington, DC 20429.

(2) A person whose initial request for records under this section, or whose request for a waiver of fees under paragraph (f)(1)(x) of this section, has been denied, either in part or in whole, has the right to appeal the denial to the FDIC's General Counsel (or designee) within 30 business days after receipt of notification of the denial. Appeals of denials of initial requests or for a waiver of fees must be in writing and include any additional information relevant to consideration of the appeal.

(3) Except in the case of an appeal for expedited treatment under paragraph (d)(3) of this section, the FDIC will notify the appellant in writing within 20 business days after receipt of the appeal and will state:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(i) Whether it is granted or denied in whole or in part;

(ii) The name and title of each person responsible for the denial (if other than the person signing the notification);

(iii) The exemptions relied upon for the denial in the case of initial requests for records; and

(iv) The right to judicial review of the denial under the FOIA.

(4) If a requester is appealing for denial of expedited treatment, the FDIC will notify the appellant within 10 business days after receipt of the appeal of the FDIC's disposition.

(5) Complete payment of any outstanding fee invoice will be required before an appeal is processed.

(i) Records of another agency. If a requested record is the property of another federal agency or department, and that agency or department, either in writing or by regulation, expressly retains ownership of such record, upon receipt of a request for the record the FDIC will promptly inform the requester of this ownership and immediately shall forward the request to the proprietary agency or department either for processing in accordance with the latter's regulations or for guidance with respect to disposition.

[63 FR 16404, April 3, 1998; 67 FR 71071, Nov. 29, 2002]

SOURCE: 60 FR 61465, Nov. 30, 1995, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552; 12 U.S.C. 1819 "Seventh" and "Tenth."

12 C. F. R. § 309.5, 12 CFR § 309.5

Current through July 23, 2009; 74 FR 36402

© 2009 Thomson Reuters

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective: January 14, 2008**

Code of Federal Regulations Currentness
  Title 12. Banks and Banking
    Chapter III. Federal Deposit Insurance Corporation (Refs & Annos)
      Subchapter A. Procedure and Rules of Practice
        Part 309. Disclosure of Information (Refs & Annos)

      → **§ 309.6 Disclosure of exempt records.**

(a) Disclosure prohibited. Except as provided in paragraph (b) of this section or by 12 CFR part 310 [FN2], no person shall disclose or permit the disclosure of any exempt records, or information contained therein, to any persons other than those officers, directors, employees, or agents of the Corporation who have a need for such records in the performance of their official duties. In any instance in which any person has possession, custody or control of FDIC exempt records or information contained therein, all copies of such records shall remain the property of the Corporation and under no circumstances shall any person, entity or agency disclose or make public in any manner the exempt records or information without written authorization from the Director of the Corporation's Division having primary authority over the records or information as provided in this section.

    [2] The procedures for disclosing records under the Privacy Act are separately set forth in 12 CFR part 310.

(b) Disclosure authorized. Exempt records or information of the Corporation may be disclosed only in accordance with the conditions and requirements set forth in this paragraph (b). Requests for discretionary disclosure of exempt records or information pursuant to this paragraph (b) may be submitted directly to the Division having primary authority over the exempt records or information or to the FOIA/PA Group for

forwarding to the appropriate Division having primary authority over the records sought. Such administrative request must clearly state that it seeks discretionary disclosure of exempt records, clearly identify the records sought, provide sufficient information for the Corporation to evaluate whether there is good cause for disclosure, and meet all other conditions set forth in paragraph (b)(1) through (10) of this section. Information regarding the appropriate FDIC Division having primary authority over a particular record or records may be obtained from the FOIA/PA Group. Authority to disclose or authorize disclosure of exempt records of the Corporation is delegated as follows:

  (1) Disclosure to depository institutions. The Director of the Corporation's Division having primary authority over the exempt records, or designee, may disclose to any director or authorized officer, employee or agent of any depository institution, information contained in, or copies of, exempt records pertaining to that depository institution.

  (2) Disclosure to state banking agencies. The Director of the Corporation's Division having primary authority over the exempt records, or designee, may in his or her discretion and for good cause, disclose to any authorized officer or employee of any state banking or securities department or agency, copies of any exempt records to the extent the records pertain to a state-chartered depository institution supervised by the agency or authority, or where the exempt records are requested in writing for a legitimate depository institution supervisory or regulatory purpose.

  (3) Disclosure to federal financial institutions supervisory agencies and certain other agencies. The Director of the Corporation's Division having primary authority over the exempt records, or designee, may in his or her discretion and for good cause, disclose to any authorized officer or employee of any federal financial institution supervisory agency including the Comptroller of the Currency, the Board of Governors of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Federal Reserve System, the Office of Thrift Supervision, the Securities and Exchange Commission, the National Credit Union Administration, or any other agency included in section 1101(7) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401 et. seq.) (RFPA), any exempt records for a legitimate depository institution supervisory or regulatory purpose. The Director, or designee, may in his or her discretion and for good cause, disclose exempt records, including customer financial records, to certain other federal agencies as referenced in section 1113 of the RFPA for the purposes and to the extent permitted therein, or to any foreign bank regulatory or supervisory authority as provided, and to the extent permitted, by section 206 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (12 U.S.C. 3109). Finally, the Director, or designee, may in his or her discretion and for good cause, disclose reports of examination or other confidential supervisory information concerning any depository institution or other entity examined by the Corporation under authority of Federal law to: any other Federal or State agency or authority with supervisory or regulatory authority over the depository institution or other entity; any officer, director, or receiver of such depository institution or entity; and any other person that the Corporation determines to be appropriate.

(4) Disclosure to prosecuting or investigatory agencies or authorities.

(i) Reports of Apparent Crime pertaining to suspected violations of law, which may contain customer financial records, may be disclosed to federal or state prosecuting or investigatory authorities without giving notice to the customer, as permitted in the relevant exceptions of the RFPA.

(ii) The Director of the Corporation's Division having primary authority over the exempt records, or designee, may disclose to the proper federal or state prosecuting or investigatory authorities, or to any authorized officer or employee of such authority, copies of exempt records pertaining to irregularities discovered in depository institutions which are believed to constitute violations of any federal or state civil or criminal law, or unsafe or unsound banking practices, provided that customer financial records may be disclosed without giving notice to the customer, only as permitted by the relevant exceptions of the RFPA. Unless such disclosure is initiated by the FDIC, customer financial records shall be disclosed only in response to a written request which:

(A) Is signed by an authorized official of the agency making the request;

(B) Identifies the record or records to which access is requested; and

(C) Gives the reasons for the request.

(iii) When notice to the customer is required to be given under the RFPA, the Director of the Corporation's Division having primary authority over the exempt records, or designee, may disclose customer financial records to any federal or state prosecuting or investigatory agency or authority, provided that:

(A) The General Counsel, or designee, has determined that disclosure is authorized or required by law; or

(B) Disclosure is pursuant to a written request that indicates the information is relevant to a legitimate law enforcement inquiry within the jurisdiction of the requesting agency and:

(1) The Director of the Corporation's Division having primary authority over the exempt records, or designee, certifies pursuant to section 1112(a) [FN3] of the RFPA that the records are believed relevant to a legitimate law enforcement inquiry within the jurisdiction of the receiving agency; and

[3] The form of certification generally is as follows. Additional information may be

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

added:

Pursuant to section 1112(a) of the Right to Financial Privacy Act of 1978 (12 U.S.C. 3412), I, ___ [name and appropriate title] hereby certify that the financial records described below were transferred to (agency or department) in the belief that they were relevant to a legitimate law enforcement inquiry, within the jurisdiction of the receiving agency.

    (2) A copy of such certification and the notice required by section 1112(b) [FN4] of the RFPA is sent within fourteen days of the disclosure to the customer whose records are disclosed. [FN5]

    [4] The form of notice generally is as follows. Additional information may be added:

Dear Mr./Ms. ___:

Copies of, or information contained in, your financial records lawfully in the possession of the Federal Deposit Insurance Corporation have been furnished to (agency or department) pursuant to the Right to Financial Privacy Act of 1978 for the following purpose: ___. If you believe that this transfer has not been made to further a legitimate law enforcement inquiry, you may have legal rights under the Right to Financial Privacy Act of 1978 or the Privacy Act of 1974.

    [5] Whenever the Corporation is subject to a court-ordered delay of the customer notice, the notice shall be sent immediately upon the expiration of the court-ordered delay.

(5) Disclosure to servicers and serviced institutions. The Director of the Corporation's Division having primary authority over the exempt records, or designee, may disclose copies of any exempt record related to a bank data center, a depository institution service corporation or any other data center that provides data processing or related services to an insured institution (hereinafter referred to as "data center") to:

(i) The examined data center;

(ii) Any insured institution that receives data processing or related services from the examined data center;

(iii) Any state agency or authority which exercises general supervision over an institution serviced by the examined data center; and

(iv) Any federal financial institution supervisory agency which exercises general supervision over an institution serviced by the examined data center. The federal supervisory agency may disclose any such examination report received from the Corporation to an insured institution over which it exercises general supervision and which is serviced by the examined data center.

(6) Disclosure to third parties.

(i) Except as otherwise provided in paragraphs (c) (1) through (5) of this section, the Director of the Corporation's Division having primary authority over the exempt records, or designee, may in his or her discretion and for good cause, disclose copies of any exempt records to any third party where requested to do so in writing. Any such written request shall:

    (A) Specify, with reasonable particularity, the record or records to which access is requested; and

    (B) Give the reasons for the request.

(ii) Either prior to or at the time of any disclosure, the Director or designee shall require such terms and conditions as he deems necessary to protect the confidential nature of the record, the financial integrity of any depository institution to which the record relates, and the legitimate privacy interests of any individual named in such records.

(7) Authorization for disclosure by depository institutions or other third parties.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(i) The Director of the Corporation's Division having primary authority over the exempt records, or designee, may, in his or her discretion and for good cause, authorize any director, officer, employee, or agent of a depository institution to disclose copies of any exempt record in his custody to anyone who is not a director, officer or employee of the depository institution. Such authorization must be in response to a written request from the party seeking the record or from management of the depository institution to which the report or record pertains. Any such request shall specify, with reasonable particularity, the record sought, the party's interest therein, and the party's relationship to the depository institution to which the record relates.

(ii) The Director of the Corporation's Division having primary authority over the exempt records, or designee, may, in his or her discretion and for good cause, authorize any third party, including a federal or state agency, that has received a copy of a Corporation exempt record, to disclose such exempt record to another party or agency. Such authorization must be in response to a written request from the party that has custody of the copy of the exempt record. Any such request shall specify the record sought to be disclosed and the reasons why disclosure is necessary.

(iii) Any subsidiary depository institution of a bank holding company or a savings and loan holding company may reproduce and furnish a copy of any report of examination of the subsidiary depository institution to the parent holding company without prior approval of the Director of the Division having primary authority over the exempt records and any depository institution may reproduce and furnish a copy of any report of examination of the disclosing depository institution to a majority shareholder if the following conditions are met:

(A) The parent holding company or shareholder owns in excess of 50% of the voting stock of the depository institution or subsidiary depository institution;

(B) The board of directors of the depository institution or subsidiary depository institution at least annually by resolution authorizes the reproduction and furnishing of reports of examination (the resolution shall specifically name the shareholder or parent holding company, state the address to which the reports are to be sent, and indicate that all reports furnished pursuant to the resolution remain the property of the Federal Deposit Insurance Corporation and are not to be disclosed or made public in any manner without the prior written approval of the Director of the Corporation's Division having primary authority over the exempt records as provided in paragraph (b) of this section;

(C) A copy of the resolution authorizing disclosure of the reports is sent to the shareholder or parent holding company; and

(D) The minutes of the board of directors of the depository institution or subsidiary depository institution for the meeting immediately following disclosure of a report state:

(1) That disclosure was made;

(2) The date of the report which was disclosed;

(3) To whom the report was sent; and

(4) The date the report was disclosed.

(iv) With respect to any disclosure that is authorized under this paragraph (b)(7), the Director of the Corporation's Division having primary authority over the exempt records, or designee, shall only permit disclosure of records upon determining that good cause exists. If the exempt record contains information derived from depository institution customer financial records, disclosure is to be authorized only upon the condition that the requesting party and the party releasing the records comply with any applicable provision of the RFPA. Before authorizing the disclosure, the Director (or designee) may re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

quire that both the party having custody of a copy of a Corporation exempt record and the party seeking access to the record agree to such limitations as the Director (or designee) deems necessary to protect the confidential nature of the record, the financial integrity of any depository institution to which the record relates and the legitimate privacy interests of any persons named in such record.

(8) Disclosure by General Counsel.

(i) The Corporation's General Counsel, or designee, may disclose or authorize the disclosure of any exempt record in response to a valid judicial subpoena, court order, or other legal process, and authorize any current or former officer, director, employee, agent of the Corporation, or third party, to appear and testify regarding an exempt record or any information obtained in the performance of such person's official duties, at any administrative or judicial hearing or proceeding where such person has been served with a valid subpoena, court order, or other legal process requiring him or her to testify. The General Counsel shall consider the relevancy of such exempt records or testimony to the litigation, and the interests of justice, in determining whether to disclose such records or testimony. Third parties seeking disclosure of exempt records or testimony in litigation to which the FDIC is not a party shall submit a request for discretionary disclosure directly to the General Counsel. [FN6] Such request shall specify the information sought with reasonable particularity and shall be accompanied by a statement with supporting documentation showing in detail the relevance of such exempt information to the litigation, justifying good cause for disclosure, and a commitment to be bound by a protective order. Failure to exhaust such administrative request prior to service of a subpoena or other legal process may, in the General Counsel's discretion, serve as a basis for objection to such subpoena or legal process. Customer financial records may not be disclosed to any federal agency that is not a federal financial supervisory agency pursuant to this paragraph unless notice to the customer and certification as required by the RFPA have been given except

where disclosure is subject to the relevant exceptions set forth in the RFPA.

[FN6] This administrative requirement does not apply to subpoenas, court orders or other legal process issued for records of depository institutions held by the FDIC as Receiver or Conservator. Subpoenas, court orders or other legal process issued for such records will be processed in accordance with State and Federal law, regulations, rules and privileges applicable to FDIC as Receiver or Conservator.

(ii) The General Counsel, or designee, may in his or her discretion and for good cause, disclose or authorize disclosure of any exempt record or testimony by a current or former officer, director, employee, agent of the Corporation, or third party, sought in connection with any civil or criminal hearing, proceeding or investigation without the service of a judicial subpoena, or other legal process requiring such disclosure or testimony, if he or she determines that the records or testimony are relevant to the hearing, proceeding or investigation and that disclosure is in the best interests of justice and not otherwise prohibited by Federal statute. Customer financial records shall not be disclosed to any federal agency pursuant to this paragraph that is not a federal financial supervisory agency, unless the records are sought under the Federal Rules of Civil Procedure (28 U.S.C. appendix) or the Federal Rules of Criminal Procedure (18 U.S.C. appendix) or comparable rules of other courts and in connection with litigation to which the receiving federal agency, employee, officer, director, or agent, and the customer are parties, or disclosure is otherwise subject to the relevant exceptions in the RFPA. Where the General Counsel or designee authorizes a current or former officer, director, employee or agent of the Corporation to testify or disclose exempt records pursuant to this paragraph (b)(8), he or she may, in his or her discretion, limit the authorization to so much of the record or testimony as is relevant to the issues at such hearing, proceeding or investigation, and he or she shall give authorization only upon fulfillment of such conditions as he or

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12 C.F.R. § 309.6                                                                    Page 6

she deems necessary and practicable to protect the confidential nature of such records or testimony.

(9) Authorization for disclosure by the Chairman of the Corporation's Board of Directors. Except where expressly prohibited by law, the Chairman of the Corporation's Board of Directors may in his or her discretion, authorize the disclosure of any Corporation records. Except where disclosure is required by law, the Chairman may direct any current or former officer, director, employee or agent of the Corporation to refuse to disclose any record or to give testimony if the Chairman determines, in his or her discretion, that refusal to permit such disclosure is in the public interest.

(10) Limitations on disclosure. All steps practicable shall be taken to protect the confidentiality of exempt records and information. Any disclosure permitted by paragraph (b) of this section is discretionary and nothing in paragraph (b) of this section shall be construed as requiring the disclosure of information. Further, nothing in paragraph (b) of this section shall be construed as restricting, in any manner, the authority of the Board of Directors, the Chairman of the Board of Directors, the Director of the Corporation's Division having primary authority over the exempt records, the Corporation's General Counsel, or their designees, or any other Corporation Division or Office head, in their discretion and in light of the facts and circumstances attendant in any given case, to require conditions upon and to limit the form, manner, and extent of any disclosure permitted by this section. Wherever practicable, disclosure of exempt records shall be made pursuant to a protective order and redacted to exclude all irrelevant or non-responsive exempt information.

[63 FR 16408, April 3, 1998; 67 FR 71071, Nov. 29, 2002; 73 FR 2146, Jan. 14, 2008; 73 FR 55433, Sept. 25, 2008]

SOURCE: 60 FR 61465, Nov. 30, 1995, unless otherwise noted.

AUTHORITY: 5 U.S.C. 552; 12 U.S.C. 1819 "Sev-

enth" and "Tenth."

12 C. F. R. § 309.6, 12 CFR § 309.6

Current through July 23, 2009; 74 FR 36402

© 2009 Thomson Reuters
END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

☞

**Effective: July 15, 2004**

United States Code Annotated Currentness
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 31. Embezzlement and Theft (Refs & Annos)
            ➜ **§ 641. Public money, property or records**

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted--

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.