Hearing Date and Time: August 5, 2009 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                  :

**In re**                                  :        **Chapter 11 Case No.**
                                                  :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :        **08-13555 (JMP)**
                                                  :

                         **Debtors.**       :        **(Jointly Administered)**
                                                  :
                                                  :
-------------------------------------------------------------------x

### NOTICE OF EXHIBITS TO LBHI'S MOTION, PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004, FOR AUTHORIZATION TO ENTER INTO (I) AN AMENDED REPURCHASE AGREEMENT WITH AURORA BANK FSB AND (II) A FINANCING FACILITY WITH AURORA LOAN SERVICES, LLC

**PLEASE TAKE NOTICE** that on July 16, 2009, LBHI filed its Motion, pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for authorization, but not direction, to enter into (i) an amended master repurchase agreement (the "Amended Repurchase Agreement") with its indirect wholly owned non-debtor subsidiary, Aurora Bank FSB (the "Bank") and (ii) a secured bridge financing facility with the Bank's wholly owned subsidiary, Aurora Loan Services, LLC (the "Financing Facility"), all as more fully described in the Motion.

**PLEASE TAKE FURTHER NOTICE** that attached hereto at Exhibit A is a draft of the Amended Repurchase Agreement.

**PLEASE TAKE FURTHER NOTICE** that attached hereto at <u>Exhibit B</u> is a

draft of the Financing Facility.

Dated:  August 4, 2009
       New York, New York

<div style="margin-left:40%">

/s/ Alfredo R. Perez
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

</div>

## **Exhibit A**

**(Amended Repurchase Agreement)**

EXECUTION COPY

July 31, 2009

Aurora Bank FSB
1271 Avenue of the Americas
New York, NY 10020
Attention: Chief Financial Officer
Fax: 646-758-4245

With a copy to:

Aurora Bank FSB
15305 Dallas Parkway, Suite 300
Addison, TX 75001
Attention: Interim General Counsel
Fax: 972-455-2874

## AMENDMENT NO. 1 TO MASTER REPURCHASE AGREEMENT

This agreement (this "Amendment"), dated as of July 31, 2009, is made between Lehman Brothers Holdings Inc. ("Buyer") and Aurora Bank FSB, f/k/a Lehman Brothers Bank FSB ("Seller").

WHEREAS, Buyer and Seller are parties to a Master Repurchase Agreement, dated as of March 16, 2009 (as amended, modified or supplemented from time to time, the "Agreement"); and

WHEREAS, Buyer and Seller wish to amend the Agreement as herein provided.

NOW THEREFORE, in consideration of the mutual agreements herein contained, Buyer and Seller hereby agree as follows:

1.    Amendments to the Agreement

  (a)    Section 2 of the Agreement is hereby amended by replacing the definition of "Eligible Mortgage Loan" in its entirety with the following:

  "Eligible Mortgage Loan" shall mean a First Lien Mortgage Loan that is either (a)(i) a residential Mortgage Loan insured or guaranteed by the Federal Housing Administration or the U.S. Department of Veterans Affairs, (ii) an other Alt-A residential Mortgage Loan or (iii) a reverse mortgage loan, and in each case was included in the loan tape most recently provided to and approved by Buyer, or (b) any other mortgage loan approved in writing by Buyer in its sole discretion including, in each case, all their related files, rights, intangibles, escrows, claims and accounts, which, in the case of either clause (a) or clause (b) above, complies with the representations and warranties set forth on Schedule 1 to

this Agreement, or (c) any commercial mortgage loan approved in writing by Buyer in its sole discretion including all its related files, rights, intangibles, escrows, claims and accounts, which complies with the representations and warranties set forth on Schedule 2 to this Agreement.

(b)     Section 2 of the Agreement is hereby amended by replacing the definition of "Facility Fee" in its entirety with the following:

"Facility Fee" shall mean $375,000 per month paid monthly over the term of this Agreement.

(c)     Section 2 of the Agreement is hereby amended by replacing the definition of "Maximum Purchase Price" in its entirety with the following:

"Maximum Purchase Price" shall mean Four Hundred Fifty Million Dollars ($450,000,000).

(d)     Section 2 of the Agreement is hereby amended by replacing the definition of "Mortgage Loan" in its entirety with the following:

"Mortgage Loan" shall mean any loan evidenced by a Mortgage Note and secured by a Mortgage encumbering Mortgaged Property consisting of a single family residence or a commercial property, and owned by Seller prior to the Transactions.

(e)     Section 2 of the Agreement is hereby amended by replacing the definition of "Purchase Price Percentage" in its entirety with the following:

"Purchase Price Percentage" shall mean seventy-five percent (75%).

(f)     Section 2 of the Agreement is hereby amended by replacing the definition of "Repurchase Price" in its entirety with the following:

"Repurchase Price" shall mean the price at which Purchased Mortgage Loans are to be transferred from Buyer or its designee to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price, overdue Facility Fee and the unpaid Price Differential as of the date of such determination.

(g)     Section 2 of the Agreement is hereby amended by replacing the definition of "Termination Date" in its entirety with the following:

"Termination Date" shall mean December 31, 2009, as may be extended by mutual agreement between Buyer and Seller.

(h)        Section 3(d)(i) of the Agreement is hereby amended by replacing it in its entirety with the following:

"Seller shall repurchase Purchased Mortgage Loans on the date specified in the Transaction Request, which shall be not later than fourteen (14) days following the date of the relevant Transaction, unless Buyer agrees to an extension of the Repurchase Date, and Seller may repurchase Purchased Mortgage Loans without penalty or premium on an earlier date, subject to the notice requirement below. The Repurchase Price payable for the repurchase of any such Purchased Mortgage Loan shall be reduced as provided in Section 5(d). If Seller intends to make such a repurchase before the Repurchase Date, Seller shall notify Buyer of its intent no later than 11:00 a.m. on the Business Day prior to the date of such early repurchase, designating the Purchased Mortgage Loans to be repurchased. If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, and, on receipt, such amount shall be applied to the Repurchase Price for the designated Purchased Mortgage Loans."

(i)        Section 10(f) of the Agreement is hereby amended by inserting the following after the words "each Purchased Mortgage Loan" in the first sentence thereof:

"that is a residential mortgage loan and the representations and warranties set forth on Schedule 2 attached hereto with respect to each Purchased Mortgage Loan that is a commercial mortgage loan, in either case,".

(j)        Section 11 of the Agreement is hereby amended by inserting the following at the end thereof:

"(q) Facility Fee. Seller shall pay the Facility Fee on the last Business Day of each month."

(k)        Section 12(b) of the Agreement is hereby amended by inserting the following after the words "Schedule 1" in the sixth line thereof:

"or Schedule 2, as applicable,".

(l)        Section 23 of the Agreement is hereby amended by replacing Seller's "Address for Notices" with the following:

"If to Seller:        Aurora Bank FSB
                     1271 Avenue of the Americas
                     New York, NY 10020
                     Attention:  Karen Tankersley, Chief Legal Officer
                     Fax:  646-758-4245"

(m)    Schedule 1 to the Agreement is hereby amended by inserting:

(i) the word "RESIDENTIAL" after the word "RE:" and before the words "MORTGAGE LOANS"; and

(ii) the words "that is a residential mortgage loan" after the words "with respect to each Mortgage Loan" in the lead-in sentence thereof.

(n)    The Agreement is hereby amended by inserting Schedule 2, attached hereto as Appendix A, after Schedule 1 to the Agreement.

2.    <u>Miscellaneous</u>

(i)    Except as specifically amended hereby, the Agreement shall continue in full force and effect in accordance with the provisions hereof on the date hereof and nothing herein contained shall be construed as a waiver or modification of any existing rights and obligations under the Agreement, except as such rights and obligations are expressly modified hereby.

(ii)    From and after the effectiveness of this Amendment, all references in the Agreement to "this Agreement" (or words or phrases of a similar meaning) shall be deemed to be references to the Agreement, as amended hereby.

(iii)    This Amendment shall be construed in accordance the laws of the State of New York without giving effect to the conflict of law principles thereof.

(iv)    This Amendment may be executed in two counterparts, each of which shall constitute an original, but both of which, when taken together, shall constitute one instrument.

(v)    No amendment, modification or waiver in respect of this Amendment will be effective unless in writing and executed by each of Buyer and Seller.

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be executed by its officers duly authorized and empowered with effect from the date first written above.

| **LEHMAN BROTHERS HOLDINGS INC.** | **AURORA BANK FSB** |
|---|---|
| By: _____ <br>    Name: <br>    Title: | By: _____ <br>    Name: <br>    Title: |

**APPENDIX A**

**SCHEDULE 2**

**REPRESENTATIONS AND WARRANTIES RE:
COMMERCIAL MORTGAGE LOANS**

Seller represents and warrants to Buyer, with respect to each Mortgage Loan that is a commercial mortgage loan, that as of the Purchase Date for the purchase of any Purchased Mortgage Loans by Buyer from Seller:

(a)    The information set forth in the Mortgage Loan Schedule is complete, true and correct;

(b)    each related Mortgage Note and Mortgage are not subject to an assignment or pledge, and, except in the case of the Continental Bayside SR Bridge Mortgage Loan and a portion of the Project Murphy SR Mortgage Loan in which Seller holds participations, Seller has good title to, and is the sole owner of, each Mortgage Loan;

(c)    Seller has full right and the authority to sell, assign and transfer such Mortgage Loan;

(d)    Seller is transferring such Mortgage Loan free and clear of any and all liens, pledges, charges or security interests of any nature encumbering such Mortgage Loan;

(e)    each related Mortgage Note, Mortgage and assignment of leases and rents (if any) executed in connection with such Mortgage Loan is the legal, valid and binding obligation of the related Mortgagor, enforceable in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally, or by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(f)    each related assignment of leases and rents, if any, creates a valid, first priority collateral assignment of, or a valid first priority security interest in, certain rights under the related leases, subject only to a license granted to the related Mortgagor to exercise certain rights and to perform certain obligations of the lessor under such leases, including the right to operate the related Mortgaged Property; no person other than the related Mortgagor owns any interest in any payments due under such leases that is superior to or of equal priority with the lender's interest therein;

(g)    (x) such Mortgage Loan has not been waived, modified, altered, satisfied, canceled, subordinated or rescinded and, each related Mortgaged Property has not been released from the lien of the related Mortgage in any manner which materially interferes

with the security intended to be provided by such Mortgage and (y) the Mortgagor has not been released from any material obligation under the Mortgage Loan;

(h)      each related Mortgage is a valid and enforceable first priority lien on the related Mortgaged Property and such Mortgaged Property (subject to the matters discussed in clause (i) below) is free and clear of any mechanics' and materialmen's liens which are prior to or equal with the lien of the related Mortgage;

(i)      the lien of each related Mortgage is insured by an ALTA lender's title insurance policy (or a binding commitment therefor for which the premium has been paid), or for a Mortgaged Property in a state where an ALTA policy is not widely available, a policy in a form in general use in such state insuring the lender, its successors and assigns, as to a valid, first priority lien on the related Mortgaged Property in the original principal amount of such Mortgage Loan as set forth in the Mortgage Loan Schedule after all advances of principal, subject only to (x) the lien of current real property taxes, ground rents, water charges, sewer rents and assessments not yet due and payable, and (y) covenants, conditions and restrictions, rights of way, easements and other matters of public record, none of which, individually or in the aggregate, materially interferes with the current use of the Mortgaged Property or the security intended to be provided by such Mortgage or with the Mortgagor's ability to pay its obligations when they become due or the value of the Mortgaged Property, neither of which, individually or in the aggregate, materially interferes with the security intended to be provided by such Mortgage or with the Mortgagor's ability to pay its obligations when they become due or the value of the Mortgaged Property; the Mortgage Loan lender or its successors or assigns is the sole named insured of such policy; such policy is in full force and effect upon the consummation of the transactions contemplated by this Agreement; no claims have been made under such policy by Seller and Seller has no actual knowledge of any matter which would impair or diminish the coverage of such policy;

(j)      the proceeds of such Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder and Seller covenants that Seller will not make any future advances under the Mortgage Loan to the related Mortgagor except for the Tesoro Resorts Mortgage Loan; neither Seller nor its affiliates have applied any proceeds of any Mortgage Loan to any principal or interest payments due thereon, or paid any such proceeds to any taxing authority on behalf of the Mortgagor;

(k)      to the actual knowledge of Seller, there is no proceeding pending for a total or partial condemnation of the related Mortgaged Property that materially and negatively affects the value thereof, and to the actual knowledge of Seller such Mortgaged Property is free of material damage;

(l)      such Mortgage Loan does not have a shared appreciation feature or other contingent interest feature;

(m)      such Mortgage Loan does not have a negative amortization or deferred interest feature;

(n)      such Mortgage Loan is a whole loan or a portion of a syndicated loan and no other party holds a participation interest in the Mortgage Loan;

(o)    (x) the per annum rate at which interest accrues on the principal amount of such Mortgage Loan (exclusive of any default interest, prepayment premiums or equity participation) complied as of the date of origination with, or is exempt from, applicable state or federal laws, regulations and other requirements pertaining to usury; any and all other requirements of any federal, state or local laws applicable to such Mortgage Loan have been complied with as of the date of origination of such Mortgage Loan or (y) Seller has received an opinion to such effect;

(p)      no fraudulent acts were committed by Seller or the Mortgagor during the origination process of such Mortgage Loan;

(q)      all taxes and governmental assessments that prior to the Purchase Date became due and owing in respect of each related Mortgaged Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established;

(r)      all the funds that are required to have been deposited and remain in escrow pursuant to the Mortgage Loan are in the possession, or under the control, of Seller or its agent and there are no deficiencies in connection therewith;

(s)      to the extent required under applicable law, as of the Purchase Date, Seller is authorized to transact and do business in the jurisdiction in which each related Mortgaged Property is located at all times;

(t)      to the actual knowledge of Seller, all insurance required under the Mortgage for such Mortgage Loan is in full force and effect with respect to the related Mortgaged Property;

(u)      there is no event of default or event of acceleration existing under any related Mortgage or any related Mortgage Note and Seller has no actual knowledge of any substantial and material event or circumstance with respect to which the expiration of an applicable default grace period is imminent;

(v)      such Mortgage Loan has not been for 30 or more days delinquent since origination and as of the Purchase Date was not 30 or more days delinquent;

(w)      each related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including realization by judicial or, if applicable, non-judicial foreclosure;

(x)      one or more environmental site assessments or updates were performed with respect to each Mortgaged Property approximately within fourteen months prior to the origination of the Mortgage Loan and Seller, having made no independent inquiry other than to perform the assessments referenced herein, has no knowledge of any material and adverse environmental condition or circumstance affecting such Mortgaged

8

Property that was not disclosed in the related reports; the related Mortgagor has covenanted to comply with all applicable laws;

(y)    as of the Purchase Date, no Mortgagor is a debtor in any outstanding proceeding pursuant to the federal Bankruptcy Code;

(z)    if the related Mortgage is in the form of a deed of trust, a duly qualified trustee serves thereunder and no fees or expenses are or will become payable to the trustee under the deed of trust;

(aa)    each Mortgaged Property is required, pursuant to the related Mortgage or other loan document, to be insured by a fire and extended perils insurance policy providing coverage against loss or damage sustained by reason of fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles and smoke, and, to the extent required as of the date of origination by the originator of such Mortgage Loan consistent with its normal commercial mortgage lending practices, against other risks insured against by persons operating like properties in the locality of the Mortgaged Property in an amount not less than the lesser of the principal balance of the related Mortgage Loan and the replacement cost of the Mortgaged Property.  In addition, each Mortgaged Property is either (x) not located in a flood hazard area (as defined by the Federal Insurance Administration) or (y) is covered by flood hazard insurance. Each such fire and extended perils and flood hazard insurance policy contains a standard mortgagee clause that names the mortgagee as an additional insured and that requires prior notice to the holder of the Mortgage of termination or cancellation, and no such notice has been received, including any notice of nonpayment of premiums, that has not been cured. Each Mortgage obligates the related Mortgagor to maintain such insurance and, upon such Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from such Mortgagor.  Each Mortgage provides that casualty insurance proceeds will be applied either to the restoration or repair of the related Mortgaged Property or to the reduction of the principal amount of the Mortgage Loan;

(bb)    to the actual knowledge of Seller, with respect to each Mortgage Loan, all material licenses, permits and authorizations then required for use of a Mortgaged Property had been obtained and were valid and in full force and effect as of the origination date of such Mortgage Loan;

(cc)    if any Mortgaged Property is subject to any leases, the Mortgagor is the owner and holder of the landlord's interest under such leases, and the related Mortgage or assignment of rents, if any, provides that upon an event of default, the mortgagee may seek the appointment of a receiver for rents, or provides that the mortgagee may either collect rents directly or direct tenants to make payments directly to the mortgagee; and

(dd)    no Mortgage Loan requires the mortgagee to release any portion of the Mortgaged Property from the lien of the related Mortgage except upon payment in full of the Mortgage Loan, and each of which permits partial releases of Mortgaged Properties upon the payment of a specified release price with respect to each Mortgaged Property.

EXECUTION COPY

# MASTER REPURCHASE AGREEMENT

**between**

**LEHMAN BROTHERS HOLDINGS INC.,**
**a Delaware corporation, as Buyer**

**and**

**LEHMAN BROTHERS BANK, FSB,**
**a federal savings bank, as Seller**

**Dated as of March 16, 2009**

# TABLE OF CONTENTS

**Page**

Section 1.     Applicability ...................................................................... 1

Section 2.     Definitions............................................................................ 1

Section 3.     Initiation; Termination ...................................................... 12

Section 4.     Margin Amount Maintenance ........................................... 16

Section 5.     Periodic Advance Repurchase Payments; Income............. 16

Section 6.     Requirements of Law ......................................................... 17

Section 7.     Taxes ................................................................................. 18

Section 8.     Security Interest; Buyer's Appointment as Attorney-In-Fact ............ 18

Section 9.     Payment, Transfer and Custody ......................................... 20

Section 10.    Representations .................................................................. 21

Section 11.    Covenants ......................................................................... 24

Section 12.    Events of Default .............................................................. 27

Section 13.    Remedies ........................................................................... 29

Section 14.    Indemnification and Expenses; Recourse .......................... 31

Section 15.    Servicing ........................................................................... 31

Section 16.    Due Diligence ................................................................... 32

Section 17.    Assignability ..................................................................... 33

Section 18.    Transfer and Maintenance of Register ............................... 34

Section 19.    Hypothecation or Pledge of Purchased Mortgage Loans.... 34

Section 20.    Tax Treatment ................................................................... 34

Section 21.    Set-Off............................................................................... 35

Section 22.    Terminability...................................................................... 35

Section 23.    Notices and Other Communications .................................. 35

Section 24.    Entire Agreement; Severability; Single Agreement ........... 36

Section 25.    Governing Law .................................................................. 37

Section 26.    Submission to Jurisdiction; Waivers.................................. 37

Section 27.    No Waivers, Etc ................................................................ 38

Section 28.    Confidentiality .................................................................. 38

Section 29.    Intent ................................................................................. 39

i

## TABLE OF CONTENTS
### (continued)

Page

Section 30.    Disclosure Relating to Certain Federal Protections ............................................. 39

Section 31.    Acknowledgement of Anti-Predatory Lending Policies ..................................... 40

Section 32.    Miscellaneous ..................................................................................................... 40

Section 33.    General Interpretive Principles ............................................................................ 40

EXHIBIT A:    PURCHASE PRICE PERCENTAGES ............................................................. 43

EXHIBIT B:    FORM OF TRANSACTION REQUEST ........................................................... 44

EXHIBIT C:    MASTER SERVICER ACKNOWLEDGEMENT LETTER ............................ 48

SCHEDULE 1 .................................................................................................................... 52

# MASTER REPURCHASE AGREEMENT

This is a MASTER REPURCHASE AGREEMENT dated as of March 16, 2009 between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Buyer"), and LEHMAN BROTHERS BANK, FSB, a federal savings bank ("Seller").

## Section 1.    Applicability

From time to time, the parties hereto may enter into transactions in which Seller agrees to sell to Buyer certain Eligible Mortgage Loans (as defined below) in exchange for an amount paid by Buyer, with a simultaneous agreement by Seller to re-purchase from Buyer and agreement by Buyer to sell to Seller such Eligible Mortgage Loans at a date certain in exchange for an amount paid by Seller.   As more fully described herein, each such transaction shall be referred to as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement.

## Section 2.    Definitions

As used herein, the following terms shall have the following meanings (all terms defined in this Section 2 or in other provisions of this Agreement in the singular to have the same meanings when used in the plural and vice versa):

"1934 Act" shall have the meaning set forth in Section 30 hereof.

"Accepted Servicing Practices" shall mean, with respect to any Mortgage Loan, those mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

"Additional Purchased Mortgage Loans" shall have the meaning specified in Section 4.

"Affiliate" shall mean with respect to any Person, any "affiliate" of such Person, as such term is defined in the Bankruptcy Code; provided, however, that with respect to Seller, it shall mean any of Seller's Subsidiaries other than BNC Mortgage, LLC.

"Agreement" shall mean this Master Repurchase Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Appraised Value" shall mean the value set forth in an appraisal made in connection with the origination of the related Mortgage Loan as the value of the Mortgaged Property.

"Assignment and Acceptance" shall have the meaning set forth in Section 17 hereof.

"Assignment of Mortgage" shall have the meaning set forth in the related Custodial Agreement of the applicable Custodian with respect to each Mortgage Loan.

"Asset Value" shall mean with respect to each Mortgage Loan, as of any date of determination, the product of (i) the Purchase Price Percentage and (ii) the lesser of (a) the Market Value of such Mortgage Loan and (b) the outstanding principal balance of such Mortgage Loan.   Without limiting the generality of the foregoing, Seller acknowledges that the Asset Value may be reduced to zero by Buyer if:

(a)       such Mortgage Loan ceases to be an Eligible Mortgage Loan;

(b)       Seller breached with respect to such Purchased Mortgage Loan a representation or warranty made by Seller in the Facility Documents;

(c)       the Purchased Mortgage Loan has been released from the possession of the applicable Custodian;

(d)       when the Market Value for such Purchased Mortgage Loan is added to the Market Value for all other Purchased Mortgage Loans, the Market Value for all Purchased Mortgage Loans with respect to which Seller has delivered a lost note affidavit in lieu of an original Mortgage Note exceeds 3% of the aggregate Market Value for all Purchased Mortgage Loans;

(e)       the Mortgage Loan is 30 or more days delinquent.

"Bankruptcy Code" shall mean the United States Bankruptcy Code of 1978, as amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

"Business Day" shall mean a day other than (i) a Saturday or Sunday, (ii) any day on which banking institutions are authorized or required by law, executive order or governmental decree to be closed in the State of New York or (iii) any day on which the New York Stock Exchange is closed.

"Buyer" shall have the meaning provided in the heading hereof.

"Capital Lease Obligations" shall mean, for any Person, all obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) Property to the extent such obligations are required to be classified and accounted for as a capital lease on a balance sheet of such Person under GAAP, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP.

"Change of Control" shall mean:

(a)        any transaction or event as a result of which Lehman Brothers Holdings Inc. ceases to own directly or indirectly all of the capital stock and other beneficial interests of Seller; or

(b)        the sale, transfer, or other disposition of all or substantially all of Seller's assets (excluding any such action taken in connection with any whole loan sale or securitization transaction); or

(c)        the consummation of a merger or consolidation of Seller with or into another entity or any other corporate reorganization (in one transaction or in a series of transactions).

"Chapter 11 Case" shall mean collectively the cases that Buyer and certain of its direct and indirect Subsidiaries commenced with the Bankruptcy Court by in each case filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 15, 2008 and periodically thereafter.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Confidential Terms" shall have the meaning set forth in Section 28 hereof.

"Costs" shall have the meaning set forth in Section 14(a) hereof.

"Custodial Agreement" shall mean with respect to each Mortgage Loan the related LBHI Custodial Agreement and the related LBB Custodial Agreement, in either case, of the applicable Custodian, as the same may be amended from time to time.

"Custodian" shall mean (1) U.S. Bank National Association, (2) Deutsche Bank National Trust Company, (3) Bank of America, N.A., as successor by merger to LaSalle National Bank, and (4) Wells Fargo Bank, N.A., or any successor to any of the foregoing under the related Custodial Agreement.

"Default" shall mean an Event of Default or an event that with notice or lapse of time or both would become an Event of Default.

"Defaulting Party" shall mean either party that fails to honor any payment obligation under this Agreement or any Transaction hereunder.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Due Date" shall mean the day of the month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

"Due Diligence Review" shall mean the performance by Buyer of any or all of the reviews permitted under Section 16 hereof with respect to any or all of the Mortgage Loans, as desired by Buyer from time to time.

3

"Effective Date" shall mean the date upon which the conditions precedent set forth in Section 3(a) shall have been satisfied.

"Electronic Tracking Agreement" shall mean that certain Electronic Tracking Agreement dated as of the date hereof, among Buyer, Seller, MERS and MERSCORP, Inc., a Delaware corporation, as the same may be amended from time to time.

"Eligible Mortgage Loan" shall mean a First Lien Mortgage Loan that is either (a)(i) a residential Mortgage Loan insured or guaranteed by the Federal Housing Administration or the U.S. Department of Veterans Affairs, (ii) an other Alt-A residential Mortgage Loan or (iii) a reverse mortgage loan, and in each case was included in the loan tape with a cut-off date of January 30, 2009 provided to Buyer, and (b) any other mortgage loan approved in writing by Buyer in its sole discretion including, in each case, all their related files, rights, intangibles, escrows, claims and accounts, which, in either case, complies with the representations and warranties set forth on Schedule 1 to this Agreement.

"Escrow Payments" shall mean, with respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other document.

"Event of Default" shall have the meaning specified in Section 12 hereof.

"Excluded Taxes" shall have the meaning specified in Section 7(e) hereof.

"Facility Documents" shall mean this Agreement, the Custodial Agreements, the Electronic Tracking Agreement, the Master Servicer Acknowledgement Letter and, in each case, any other documents executed and delivered in connection therewith.

"Facility Fee" shall mean the product of the Maximum Purchase Price and fifty (50) basis points (0.5%), paid ratably on a monthly basis over the term of this Agreement.

"Fannie Mae" shall mean Fannie Mae, or any successor thereto.

"FDIA" shall have the meaning set forth in Section 29 hereof.

"FDICIA" shall have the meaning set forth in Section 29 hereof.

"First Lien Mortgage Loan" shall mean a Mortgage Loan secured by a first Lien on the related Mortgaged Property.

"First Payment Default" shall mean, with respect to a Mortgage Loan, the failure of the Mortgagor to make the first Monthly Payment due under such Mortgage Loan on or before its scheduled Due Date.

4

"Fitch" shall mean Fitch Ratings, Inc., or any successor thereto.

"Freddie Mac" shall mean Freddie Mac, or any successor thereto.

"GAAP" shall mean generally accepted accounting principles in the United States of America, applied on a consistent basis and applied to both classification of items and amounts, and shall include, without limitation, the official interpretations thereof by the Financial Accounting Standards Board, its predecessors and successors.

"Governmental Authority" shall mean any nation or government, any state, county, municipality or other political subdivision thereof or any governmental body, agency, authority, department or commission (including, without limitation, any taxing authority) or any instrumentality or officer of any of the foregoing (including, without limitation, any court or tribunal) exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation, partnership or other entity directly or indirectly owned by or controlled by the foregoing.

"High Cost Mortgage Loan" shall mean a Mortgage Loan classified as (a) a "high cost" loan under the Home Ownership and Equity Protection Act of 1994 or (b) a "high cost," "threshold," "covered," or "predatory" loan under any other applicable state, federal or local law (or a similarly classified loan using different terminology under a law, regulation or ordinance imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees).

"Income" shall mean, with respect to any Mortgage Loan at any time, any principal thereof then payable and all interest, dividends or other distributions payable thereon. Except following the occurrence and during the continuation of an Event of Default, all Income may be retained by Seller.

"Increased Cost Certificate" shall have the meaning set forth in Section 6(a) hereof.

"Indebtedness" shall mean, with respect to any Person, (a) obligations created, issued or incurred by such Person for borrowed money (whether by loan, the issuance and sale of debt securities or the sale of Property to another Person subject to an understanding or agreement, contingent or otherwise, to repurchase such Property from such Person); (b) obligations of such Person to pay the deferred purchase or acquisition price of Property or services, other than trade accounts payable (other than for borrowed money) arising, and accrued expenses incurred, in the ordinary course of business, so long as such trade accounts payable are payable within 90 days of the date the respective goods are delivered or the respective services are rendered; (c) Indebtedness of others secured by a Lien on the Property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; (d) obligations (contingent or otherwise) of such Person in respect of letters of credit or similar instruments issued or accepted by banks and other financial institutions for the account of such Person; (e) Capital Lease Obligations of such Person; (f) obligations of such Person under repurchase agreements, sale/buy-back agreements or like arrangements; (g) Indebtedness of others guaranteed by such

Person; (h) all obligations of such Person incurred in connection with the acquisition or carrying of fixed assets by such Person; and (i) Indebtedness of general partnerships of which such Person is a general partner.

"Indemnified Party" shall have the meaning set forth in Section 14(a) hereof.

"Insolvency Event" shall mean, for any Person:

(a)     that such Person shall discontinue or abandon operation of its business; or

(b)     that such Person shall fail generally to, or admit in writing its inability to, pay its debts as they become due; or

(c)     a proceeding shall have been instituted in a court having jurisdiction seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable bankruptcy, insolvency, liquidation, reorganization or other similar law now or hereafter in effect, or a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official shall have been appointed for such Person, or for any substantial part of its property, or for the winding-up or liquidation of its affairs; or

(d)     the commencement by such Person of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or such Person's consent to the entry of an order for relief in an involuntary case under any such Law, or consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its property, or any general assignment for the benefit of creditors; or

(e)     that such Person shall become insolvent; or

(f)     if such Person or its Affiliate is a corporation, such Person or its Affiliate shall take any corporate action in furtherance of, or the action of which would result in any of the actions set forth in the preceding clause (a), (b), (c), (d) or (e).

"LBB Custodial Agreement" shall mean any of: (1) the Amended and Restated Flow Custodial Agreement dated as of November 1, 2006 between Seller and U.S. Bank National Association; (2) the Custodial Agreement dated as of March 15, 2000 between Seller and Deutsche Bank National Trust Company, f.k.a Bankers Trust Company of California, N.A.; (3) the Custodial Agreement dated as of July 13, 1999 between Seller and Bank of America, N.A., as successor by merger to LaSalle National Bank; and (4) the Custody Agreement dated as of April 1, 2000 between Seller and Wells Fargo Bank, N.A., as successor by merger to Northwest Bank Minnesota, N.A., as the same may be amended from time to time.

"LBHI Custodial Agreement" shall mean any of: (1) the Amended and Restated Flow Custodial Agreement dated as of November 1, 2006 between Lehman Capital, a division of Buyer, and U.S. Bank National Association; (2) the Custodial Agreement dated as of March 30,

1995 between Lehman Capital, a division of Buyer, and Deutsche Bank National Trust Company, f.k.a Bankers Trust Company of California, N.A.; (3) the Custodial Agreement dated as of December 2, 1998 between Lehman Capital, a division of Buyer, and Bank of America, N.A., as successor by merger to LaSalle National Bank; and (4) the Custody Agreement dated as of March 1, 1996 between Lehman Capital, a division of Buyer, and Wells Fargo Bank, N.A., as successor by merger to Northwest Bank Minnesota, N.A., as the same may be amended from time to time.

"LIBOR Rate" shall mean, with respect to each day a Transaction is outstanding, the rate per annum equal to the rate appearing at page 5 of the Telerate Screen as one-month LIBOR on such date (and if such date is not a Business Day, the LIBOR Rate in effect on the Business Day immediately preceding such date), and if such rate shall not be so quoted, the rate per annum at which Buyer or its Affiliate is offered Dollar deposits at or about 10:00 a.m., New York City time, on such date, by prime banks in the interbank eurodollar market where the eurodollar and foreign currency exchange operations in respect of its Transactions are then being conducted for delivery on such day for a period of one month and in an amount comparable to the amount of the Transactions outstanding on such day.

"Lien" shall mean any lien, claim, charge, restriction, pledge, security interest, mortgage, deed of trust or other encumbrance.

"LTV" shall mean with respect to any Mortgage Loan, the ratio of the original outstanding principal amount of the Mortgage Loan to the lesser of (a) the Appraised Value of the Mortgaged Property at origination or (b) if the Mortgaged Property was purchased within 12 months of the origination of the Mortgage Loan, the purchase price of the Mortgaged Property.

"Margin Call" shall have the meaning specified in Section 4.

"Margin Deficit" shall have the meaning specified in Section 4.

"Market Value" shall mean, as of any date with respect to any Purchased Mortgage Loan, the price at which such Mortgage Loan could readily be sold as determined by Buyer in its sole discretion on a weekly basis.    The Market Value of an Eligible Mortgage Loan shall initially be determined by the Pricing Agent, such determinations to be made on at least a monthly basis with respect to the entire portfolio of Eligible Mortgage Loans at the time owned by Seller (but shall be so determined as of any other date but not more than once weekly if requested by Buyer), but shall be subject to adjustment by Buyer (i) to such value as shall be determined by Buyer and reflected in documentation with respect to all of such portfolio to be provided by Buyer and accepted by Seller at the time Seller agrees to effectuate a Transaction and (ii) thereafter, but not sooner than one week after a Transaction is effectuated, as reflected in documentation with respect to all of such portfolio to be provided by Seller to Buyer.    (For the avoidance of doubt, such prohibition on further adjustment in the Pricing Agent's valuation of Eligible Mortgage Loans shall apply both with respect to the Purchased Loans subject to a Transaction and all other Eligible Mortgage Loans owned by Seller).    To assist Buyer in determining if an adjustment to

7

the Pricing Agent's valuation is appropriate, Servicer shall provide such information with respect to the Mortgage Loans as Buyer may reasonably request.

"Master Servicer" shall mean Aurora Loan Services LLC.

"Material Adverse Effect" shall mean a material adverse effect on (a) the ability of Seller to perform its obligations under any of the Facility Documents to which it is a party, (b) the validity or enforceability of any of the Facility Documents, (c) the rights and remedies of Buyer under any of the Facility Documents, or (d) the Asset Value of the Purchased Mortgage Loans, taken as a whole.

"Maximum Purchase Price" shall mean Three Hundred Twenty-Five Million Dollars ($325,000,000).

"MERS" shall mean Mortgage Electronic Registration Systems, Inc., a Delaware corporation, or any successor thereto.

"MERS System" shall mean the system of recording transfers of mortgages electronically maintained by MERS.

"Monthly Payment" shall mean the scheduled monthly payment of principal and interest on a Mortgage Loan.

"Moody's" shall mean Moody's Investor's Service, Inc. or any successors thereto.

"Mortgage" shall mean each mortgage, assignment of rents, security agreement and fixture filing, or deed of trust, assignment of rents, security agreement and fixture filing, deed to secure debt, assignment of rents, security agreement and fixture filing, or similar instrument creating and evidencing a first lien on real property and other property and rights incidental thereto.

"Mortgage File" shall mean the mortgage loan documents in the possession or under the control of the applicable Custodian.

"Mortgage Interest Rate" shall mean the rate of interest borne on a Mortgage Loan from time to time in accordance with the terms of the related Mortgage Note.

"Mortgage Loan" shall mean any loan evidenced by a Mortgage Note and secured by a Mortgage encumbering Mortgaged Property consisting of a single family residence and owned by Seller prior to the Transactions.

"Mortgage Loan Schedule" shall mean with respect to any Transaction as of any date, a mortgage loan schedule in the form of a computer tape or other computer medium generated by Seller and delivered to Buyer and the applicable Custodian, which provides information relating to the Purchased Mortgage Loans in a format acceptable to Buyer.

"Mortgage Loan Schedule and Exception Report" shall mean the mortgage loan schedules and exception reports of the applicable Custodian with respect to each Mortgage Loan.

"Mortgage Note" shall mean the promissory note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

"Mortgaged Property" shall mean the real property securing repayment of the debt evidenced by a Mortgage Note.

"Mortgagor" shall mean the obligor or obligors on a Mortgage Note, including any Person who has assumed or guaranteed the obligations of the obligor thereunder.

"Nondefaulting Party" shall mean the party other than the Defaulting Party.

"Obligations" shall mean any amounts due and payable by Seller to Buyer in connection with any Transaction hereunder, together with interest thereon (including interest which would be payable as post-petition interest in connection with any bankruptcy or similar proceeding) and all other amounts, fees or expenses which are payable hereunder or under any of the Facility Documents.

"OFAC" shall have the meaning set forth in Section 10(q) hereof.

"P&I Accounts" shall have the meaning set forth in Section 11(n) hereof

"Payment Date" shall mean the Repurchase Date.

"Periodic Advance Repurchase Payment" shall have the meaning specified in Section 5(a).

"Person" shall mean any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof).

"PMI Policy" shall mean a policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

"Post-Default Rate" shall mean a rate equal to the sum of (a) the Pricing Rate plus (b) two percent (2.00%).

"Price Differential" shall mean, with respect to any Transaction hereunder as of any date, the aggregate amount obtained by daily application of the Pricing Rate (or, during the continuation of an Event of Default, by daily application of the Post-Default Rate) for such Transaction to the Purchase Price for such Transaction on a 360-day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the Repurchase Date .

9

"Pricing Agent" shall mean Pentalpha Group, LLC or an Affiliate thereof.

"Pricing Rate" shall mean a rate per annum equal to the sum of (a) the LIBOR Rate plus (b) the Pricing Spread.

"Pricing Spread" shall mean 600 basis points (6%).

"Prohibited Person" shall have the meaning set forth in Section 10(y) hereof.

"Property" shall mean any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Purchase Date" shall mean the date on which Purchased Mortgage Loans are transferred by Seller to Buyer or its designee.

"Purchase Price" shall mean, on the Purchase Date, the price at which each Purchased Mortgage Loan is transferred by Seller to Buyer, which shall equal the Purchase Price Percentage multiplied by the lesser of (i) the Market Value of such Purchased Mortgage Loan and (ii) the unpaid principal balance of such Purchased Mortgage Loan.

"Purchase Price Percentage" shall mean such percentage points as set forth on Exhibit A attached hereto.

"Purchased Mortgage Loans" shall mean the Mortgage Loans sold by Seller to Buyer in a Transaction, and any Additional Purchased Mortgage Loans as evidenced by a Mortgage Loan Schedule and Exception Report delivered by Seller to Buyer and/or a Trust Receipt.

"Qualified Insurer" shall mean a mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business.

"Rating Agency" shall mean any of S&P, Moody's or Fitch.

"Records" shall mean all instruments, agreements and other books, records, and reports and data generated by other media for the storage of information maintained by Seller or any other person or entity with respect to a Purchased Mortgage Loan.   Records shall include the Mortgage Notes, any Mortgages, the Mortgage Files, the credit files related to the Purchased Mortgage Loan and any other instruments necessary to document or service a Mortgage Loan.

"Register" shall have the meaning set forth in Section 18 hereof.

"Regulations T, U and X" shall mean Regulations T, U and X of the Board of Governors of the Federal Reserve System (or any successor), as the same may be modified and supplemented and in effect from time to time.

"REO Property" shall mean a Mortgaged Property acquired through foreclosure or by deed in lieu of foreclosure.

"Repurchase Assets" shall have the meaning provided in Section 8 hereof.

"Repurchase Date" shall mean the date on which Seller is to repurchase the Purchased Mortgage Loans subject to a Transaction from Buyer as specified in the related Transaction Request and subject to Section 3(d), or if not so specified, on a date requested pursuant to Section 3(d) or on the Termination Date, including any date determined by application of the provisions of Sections 3 or 13 and upon any Change of Control.

"Repurchase Price" shall mean the price at which Purchased Mortgage Loans are to be transferred from Buyer or its designee to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the unpaid Price Differential as of the date of such determination.

"Requirement of Law" shall mean as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule, regulation, procedure or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"S&P" shall mean Standard & Poor's Ratings Services, or any successor thereto.

"SEC" shall have the meaning set forth in Section 30 hereof.

"Section 4402" shall mean Section 4402 of Title 12 of the United States Code.

"Section 7 Certificate" shall have the meaning set forth in Section 7(e) hereof.

"Seller" shall have the meaning provided in the heading hereof.

"Servicer" shall mean collectively Master Servicer and other primary servicers, each hired by Seller (at its own expense) and with the prior written consent of Buyer.

"Master Servicer Acknowledgement Letter" shall have the meaning set forth in Section 13 hereof.

"SIPA" shall have the meaning set forth in Section 30 hereof.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership or other entity of which at least a majority of the securities or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other persons performing similar functions of such corporation, partnership or other entity (irrespective of whether or not at the time securities or other ownership interests of any other class or classes of such corporation, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by

such Person or one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person.

"Tangible Net Worth" shall mean, for any Person as of a particular date, (a) all amounts which would be included under capital on a balance sheet of such Person at such date, determined in accordance with GAAP, less (b) (i) amounts owing to such Person from its Affiliates, or from officers, employees, shareholders or other Persons similarly affiliated with such Person, (ii) intangible assets and (iii) deferred tax charge.

"Taxes" shall have the meaning set forth in Section 7(a) hereof.

"Termination Date" shall mean the date which is 180 days from the date hereof which shall be September 12, 2009, as may be extended by mutual agreement between Buyer and Seller.

"Transaction" shall have the meaning specified in Section 1.

"Transaction Request" shall mean a request from Seller to Buyer to enter into a Transaction.

"Trust Receipt" shall have the meaning set forth in the related Custodial Agreement of the applicable Custodian with respect to each Mortgage Loan, except that in the case of the Custodial Agreements with Bank of America, N.A., as successor to LaSalle National Bank, such term shall mean the Initial Certification specified therein.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non perfection of the security interest in any Repurchase Assets or the continuation, renewal or enforcement thereof is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non perfection.

<div align="center">

### Section 3.       Initiation; Termination

</div>

(a)       _Conditions Precedent to Initial Transaction_.   Buyer's agreement to enter into the initial Transaction hereunder is subject to the satisfaction, immediately prior to or concurrently with the making of such Transaction, of the condition precedent that Buyer shall have received from Seller the Facility Fee and any fees and expenses payable hereunder, and all of the following documents, each of which shall be reasonably satisfactory to Buyer and its counsel in form and substance:

(i)       The following Facility Documents delivered to Buyer:

(A)    Repurchase Agreement.  This Agreement, duly executed by the parties thereto;

(B)    Custodial Agreements.  The LBHI Custodial Agreements, duly executed by the parties thereto;

(C)    Electronic Tracking Agreement.    The Electronic Tracking Agreement entered into, duly executed and delivered by the parties thereto; and

(D)    Master Servicer Acknowledgement Letter.  A fully executed Master Servicer Acknowledgement Letter in the form attached hereto as Exhibit C.

(ii)    Organizational Documents.  A certificate of corporate existence of Seller delivered to Buyer prior to the Effective Date (or if unavailable, as soon as available thereafter) and certified copies of the charter and by-laws (or equivalent documents) of Seller and of all corporate or other authority for Seller with respect to the execution, delivery and performance of the Facility Documents and each other document to be delivered by Seller from time to time in connection herewith.

(iii)    Security Interest.  Evidence that all other actions necessary or, in the opinion of Buyer, desirable to perfect and protect Buyer's interest in the Purchased Mortgage Loans and other Repurchase Assets have been taken, including, without limitation, UCC searches and duly authorized and filed Uniform Commercial Code financing statements on Form UCC-1.

(iv)    Approvals.  True and correct copies of the written approvals by the Office of Thrift Supervision of the transactions contemplated hereby.

(v)    Other Documents.  Such other documents as Buyer may reasonably request, in form and substance reasonably acceptable to Buyer.

(b)    Conditions Precedent to all Transactions.  Upon satisfaction of the conditions set forth in this Section 3(b), Buyer shall enter into a Transaction with Seller.  Buyer's obligation to enter into each Transaction (including the initial Transaction) is subject to the satisfaction of the following further conditions precedent, both immediately prior to entering into such Transaction and also after giving effect thereto and to the intended use thereof:

(i)    Due Diligence Review.  Without limiting the generality of Section 16 hereof, Buyer shall have completed, to its satisfaction, its due diligence review of the related Mortgage Loans and Seller.

(ii)    No Default.  No Default shall have occurred and be continuing under the Facility Documents.

13

(iii)    Representations and Warranties.    Both immediately prior to the Transaction and also after giving effect thereto and to the intended use thereof, the representations and warranties made by Seller in Section 10 hereof, shall be true, correct and complete on and as of such Purchase Date in all material respects with the same force and effect as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

(iv)    Maximum Purchase Price.    After giving effect to the requested Transaction, the aggregate outstanding Purchase Price for all Purchased Mortgage Loans subject to then outstanding Transactions under this Agreement shall not exceed the Maximum Purchase Price.

(v)    No Margin Deficit.    After giving effect to the requested Transaction, the Asset Value of all Purchased Mortgage Loans exceeds the aggregate Purchase Price for such Transactions.

(vi)    Transaction Request.    On or prior to 10:00 a.m. (New York Time) on the Business Day immediately prior to the applicable Purchase Date, Seller shall have delivered to Buyer (a) a Transaction Request, and (b) a Mortgage Loan Schedule.

(vii)    Trust Receipt and Mortgage Loan Schedule and Exception Report. Buyer or its designee shall have received from the applicable Custodian on or before the day of a Transaction the related Trust Receipt and Mortgage Loan Schedule and Exception Report (which shall not list any material exceptions) under the related LBHI Custodial Agreement in form and substance satisfactory to Buyer and duly executed.

(viii)    Seller, Buyer and the banks at which the P&I Accounts are located shall have entered into a control agreement in a form reasonably satisfactory to Buyer.

Each Transaction Request delivered by Seller shall constitute a certification by Seller that all the conditions set forth in clauses (i) through (viii) of this Section 3(b) have been satisfied (both as of the date of such notice or request and as of Purchase Date).

(c)    Initiation.

(i)    Seller shall deliver a Transaction Request to Buyer on or prior to the date and time set forth in Section 3(b)(vi) prior to entering into any Transaction, substantially in the form attached as Exhibit B hereto.  The Transaction Request shall specify any additional terms or conditions of the Transaction agreed to by Seller and Buyer and not inconsistent with this Agreement.    Each Transaction Request, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Transaction Request relates, and Buyer's disbursement and Seller's acceptance of the related proceeds shall constitute Buyer's and Seller' agreement to the terms of such Transaction Request.  It is the intention of the parties that each Transaction Request shall not be separate from this Agreement but shall be made a part of this Agreement.  In the event

14

that any terms or conditions of any Transaction Request are inconsistent, or in direct conflict, with this Agreement, the terms of this Agreement shall prevail; provided that the Transaction Request and this Agreement shall be construed to be cumulative to the extent possible.  Such Transaction Request shall include a Mortgage Loan Schedule with respect to the Mortgage Loans to be sold in such requested Transaction.

        (ii)     The Repurchase Date for each Transaction shall not be later than the Termination Date.

        (iii)     Subject to the terms and conditions of this Agreement, during such period Seller may sell to Buyer, repurchase from Buyer and resell to Buyer Eligible Mortgage Loans hereunder.

        (iv)     Subject to the provisions of this Section 3, the Purchase Price shall then be made available to Seller by Buyer transferring, via wire transfer, in the aggregate amount of such Purchase Price in immediately available funds.

     (d)    <u>Repurchase</u>.

        (i)     Seller shall repurchase Purchased Mortgage Loans not later than four (4) Business Days following the date of the relevant Transaction, unless Buyer agrees to an extension of the Repurchase Date, and Seller may repurchase Purchased Mortgage Loans without penalty or premium on an earlier date.  The Repurchase Price payable for the repurchase of any such Purchased Mortgage Loan shall be reduced as provided in Section 5(d). If Seller intends to make such a repurchase before the Repurchase Date, Seller shall give one (1) Business Day's prior written notice thereof to Buyer, designating the Purchased Mortgage Loans to be repurchased.  If such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, and, on receipt, such amount shall be applied to the Repurchase Price for the designated Purchased Mortgage Loans.

        (ii)     On the Repurchase Date, termination of the Transaction will be effected by reassignment to Seller or their designee of the Purchased Mortgage Loans (and any Income in respect thereof received by Buyer not previously credited or transferred to, or applied to the Obligations of Seller pursuant to Section 5), free and clear of any security interest, lien, encumbrance or other restrictions created by Buyer, against the simultaneous transfer of the Repurchase Price to an account of Buyer.  Such obligation to repurchase exists without regard to any prior or intervening liquidation or foreclosure with respect to any Purchased Mortgage Loan (but liquidation or foreclosure proceeds received by Buyer shall be applied to reduce the Repurchase Price for such Purchased Mortgage Loan on each Payment Date except as otherwise provided herein).  Seller is obligated to obtain the Mortgage Files from the applicable Custodian or Buyer or its designee at Seller's expense on the Repurchase Date.

### Section 4.    <u>Margin Amount Maintenance</u>

(a)    Buyer shall determine the Asset Value of the Purchased Mortgage Loans at such intervals as Buyer may choose; provided, however, that such intervals may not be more often than weekly.

(b)    If at any time seven (7) days or more after a Purchase Date, upon a calculation of the Asset Value of the Purchased Mortgage Loans subject to all Transactions after taking into account any adjustment made in accordance with the definition of Market Value herein, the aggregate Asset Value of all such Purchased Mortgage Loans is less than 100% of the aggregate outstanding Purchase Price for all Purchased Mortgage Loans subject to then outstanding Transactions under this Agreement (a "Margin Deficit"), then Buyer may, by notice to Seller (as such notice is more particularly set forth below, a "Margin Call"), require Seller to transfer to Buyer or its designee cash or Eligible Mortgage Loans (or other assets reasonably acceptable to Buyer in its sole discretion) ("Additional Purchased Mortgage Loans") so that the aggregate Asset Value of the Purchased Mortgage Loans, including any such cash or Additional Purchased Mortgage Loans, will thereupon equal or exceed 100% of the aggregate Purchase Price for all Transactions.   In the event Buyer delivers a Margin Call to Seller on any Business Day, Seller shall be required to transfer cash or Additional Purchased Mortgage Loans no later than 5 p.m. (New York City time) on the following Business Day.

(c)    Buyer's election, in its sole and absolute discretion, not to make a Margin Call at any time there is a Margin Deficit shall not in any way limit or impair its right to make a Margin Call at any time a Margin Deficit exists.

(d)    Any cash transferred to Buyer pursuant to Section 4(b) above shall be credited against the Repurchase Price of the related Transactions.

### Section 5.    <u>Periodic Advance Repurchase Payments; Income</u>

(a)    Notwithstanding that Buyer and Seller intend that the Transactions hereunder be sales to Buyer of the Purchased Mortgage Loans for all purposes except accounting and tax purposes, Seller shall pay to Buyer the accreted value of the Price Differential (less any amount of such Price Differential previously paid by Seller to Buyer) plus the amount of any unpaid Margin Deficit (each such payment, a "Periodic Advance Repurchase Payment") on each Payment Date.   Notwithstanding the preceding sentence, if Seller fails to make all or part of the Periodic Advance Repurchase Payment on any Payment Date, the Pricing Rate shall be equal to the Post-Default Rate until the Periodic Advance Repurchase Payment is received in full by Buyer.

(b)    If Seller shall fail to pay in full any accrued Periodic Advance Repurchase Payment, Repurchase Price or any other amount due and payable to Buyer under the Facility Documents (whether on the Repurchase Date, Termination Date, by acceleration or otherwise), interest shall accrue on such amount at a rate equal to the Post-Default Rate for the period from

16

and including the due date thereof to but excluding the date the same is paid in full.  Default interest payable hereunder shall accrue daily and shall be payable upon such accrual.

(c)      For so long as no Event of Default has occurred, (i) Buyer hereby grants Seller a license to directly receive all Income paid or distributed on or in respect of the Repurchase Assets; (ii) all Income constituting principal or unscheduled prepayments in respect of a Repurchase Asset that is received by Buyer, shall be retained by Buyer and shall be applied by Buyer to reduce the Repurchase Price of such Repurchase Asset; and (iii) all other Income received by Buyer shall be remitted to Seller.

(d)      The license granted under Section 5(c) above shall automatically terminate upon the occurrence of an Event of Default without further act or instrument.   Any and all Income in respect of Repurchase Assets received by Seller following the termination of such license (which shall automatically occur following the occurrence of an Event of Default) shall be paid by Seller to Buyer and shall be applied by Buyer to reduce the amounts that comprise the Obligations in any manner that it shall elect.   Until so paid by Seller to Buyer, all Income received by Seller shall be held by Seller in trust for Buyer, segregated from other funds of Seller, and shall forthwith upon receipt by Seller be turned over to Buyer in the exact form received by Seller (duly endorsed by Seller to Buyer, if required).

(e)      Buyer shall offset against the Repurchase Price of each such Transaction all Income and Periodic Advance Repurchase Payments actually received by Buyer, excluding any default interest.

## Section 6.      Requirements of Law

(a)      If any Requirement of Law (other than with respect to any amendment made to Buyer's certificate of incorporation and by laws or other organizational or governing documents) or any change in the interpretation or application thereof or compliance by Buyer with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)      shall subject Buyer to any Tax or increased Tax of any kind whatsoever with respect to this Agreement or any Transaction or change the basis of taxation of payments to Buyer in respect thereof;

(ii)      shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, or other extensions of credit by, or any other acquisition of funds by, any office of Buyer which is not otherwise included in the determination of the LIBOR Rate hereunder;

(iii)      shall impose on Buyer any other condition;

and the result of any of the foregoing is to increase the cost to Buyer, by an amount which Buyer deems to be material, of entering, continuing or maintaining any Transaction or to reduce any amount due or owing hereunder in respect thereof, then, in any such case, upon Seller' receipt from Buyer of a certificate that sets forth in reasonable detail the good faith calculation of the additional amount or amounts as will compensate Buyer for such increased cost or reduced amount receivable and basis therefor (an "Increased Cost Certificate"), Seller shall promptly to pay Buyer such additional amount or amounts as set forth in the Increased Cost Certificate.

(b)    If Buyer shall have determined that the adoption of or any change in any Requirement of Law (other than with respect to any amendment made to Buyer's certificate of incorporation and by laws or other organizational or governing documents) regarding capital adequacy or in the interpretation or application thereof or compliance by Buyer or any corporation controlling Buyer with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Buyer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which Buyer or such corporation could have achieved but for such adoption, change or compliance (taking into consideration Buyer's or such corporation's policies with respect to capital adequacy) by an amount deemed by Buyer to be material, then from time to time, upon Seller' receipt of an Increased Cost Certificate, Seller shall promptly pay to Buyer such additional amount or amounts as set forth in the Increased Cost Certificate.

(c)    If Buyer becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify Seller of the event by reason of which it has become so entitled. An Increased Cost Certificate as to any additional amounts payable pursuant to this Section submitted by Buyer to Seller shall be conclusive in the absence of manifest error.

## Section 7.    <u>Taxes</u>

Seller hereby agrees to pay any present or future stamp, recording, documentary, excise, property or value-added taxes, or similar taxes, charges or levies that arise from any payment made under or in respect of this Agreement or any other Facility Document or from the execution, delivery or registration of, any performance under, or otherwise with respect to, this Agreement or any other Facility Document.

## Section 8.    <u>Security Interest; Buyer's Appointment as Attorney-In-Fact</u>

(a)    <u>Security Interest</u>.  Although the parties intend that all Transactions hereunder be sales and purchases (other than for accounting and tax purposes) and not loans, in the event any such Transactions are deemed to be loans, Seller hereby pledges to Buyer as security for the performance by Seller of the Obligations and hereby grants, assigns and pledges to Buyer a fully perfected first priority security interest in the Purchased Mortgage Loans, the Records, and all servicing rights owned by Seller, if any, related to the Purchased Mortgage Loans, the Facility Documents (to the extent such Facility Documents and Seller' right thereunder relate to the

Purchased Mortgage Loans), any Property relating to any Purchased Mortgage Loan or the related Mortgaged Property, all insurance policies and insurance proceeds relating to any Purchased Mortgage Loan or the related Mortgaged Property, including but not limited to any payments or proceeds under any related primary insurance or hazard insurance, any Income relating to any Purchased Mortgage Loan and any contract rights, accounts (including any interest of Seller in escrow accounts) and any other payments, rights to payment (including payments of interest or finance charges) and general intangibles to the extent that the foregoing relates to any Purchased Mortgage Loan and any other assets relating to the Purchased Mortgage Loans (including, without limitation, any other accounts) or any interest in the Purchased Mortgage Loans, and any proceeds (including the related securitization proceeds) and distributions and any other property, rights, title or interests as are specified on a Trust Receipt and Mortgage Loan Schedule and Exception Report with respect to any of the foregoing, in all instances, whether now owned or hereafter acquired, now existing or hereafter created (collectively, the "Repurchase Assets").   Seller hereby authorizes Buyer to file such financing statement or statements relating to the Repurchase Assets as Buyer, at its option, may deem appropriate, which shall be in form and substance reasonably acceptable to Seller; provided that Seller shall give comments, if any, on the draft of such statement within three (3) Business Days of receiving such draft.   Seller shall pay the filing costs for any financing statement or statements prepared pursuant to this Section 8.

(b)      Buyer's Appointment as Attorney in Fact.   Seller hereby irrevocably constitutes and appoints Buyer and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Seller and in the name of Seller or in its own name, from time to time in Buyer's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be reasonably necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, Seller hereby gives Buyer the power and right, on behalf of Seller, without assent by, but with notice to, Seller, if an Event of Default shall have occurred and be continuing, to do the following:

(i)      in the name of Seller, or in its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due with respect to any other Repurchase Assets and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Buyer for the purpose of collecting any and all such moneys due with respect to any other Repurchase Assets whenever payable;

(ii)      to pay or discharge taxes and Liens levied or placed on or threatened against the Repurchase Assets;

(iii)      (A) to direct any party liable for any payment under any Repurchase Assets to make payment of any and all moneys due or to become due thereunder directly to Buyer or as Buyer shall direct; (B) to ask or demand for, collect, receive payment of and receipt

19

for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Repurchase Assets; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with any Repurchase Assets; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Repurchase Assets or any proceeds thereof and to enforce any other right in respect of any Repurchase Assets; (E) to defend any suit, action or proceeding brought against Seller with respect to any Repurchase Assets; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as Buyer may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any Repurchase Assets as fully and completely as though Buyer were the absolute owner thereof for all purposes, and to do, at Buyer's option and Seller' expense, at any time, and from time to time, all acts and things which Buyer deems necessary to protect, preserve or realize upon the Repurchase Assets and Buyer's Liens thereon and to effect the intent of this Agreement, all as fully and effectively as Seller might do.

Seller hereby ratify all that said attorneys shall lawfully do or cause to be done by virtue hereof.   This power of attorney is a power coupled with an interest and shall be irrevocable.

Seller also authorize Buyer, if an Event of Default shall have occurred, from time to time, to execute, in connection with any sale provided for in Section 13 hereof, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Repurchase Assets.

The powers conferred on Buyer hereunder are solely to protect Buyer's interests in the Repurchase Assets and shall not impose any duty upon it to exercise any such powers.   Buyer shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to Seller for any act or failure to act hereunder, except for its or their own gross negligence or willful misconduct.

<div align="center">

**Section 9.**      **Payment, Transfer and Custody**

</div>

(a)      Unless otherwise mutually agreed in writing, all transfers of funds to be made by Seller hereunder shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to Buyer at the following account maintained by Buyer: Account No. 3078-4686, for the account of Lehman Brothers Holdings Inc.; Reference: Lehman Brothers Bank, FSP Warehouse, Citibank, ABA No. 021-000-089 on the date on which such payment shall become due.   Seller acknowledges that it has no rights of withdrawal from the foregoing account.

(b)      On the Purchase Date for each Transaction, ownership of the Purchased Mortgage Loans shall be transferred to Buyer or its designee against the simultaneous transfer of the Purchase Price to the following account of Seller (or as otherwise directed in writing by Seller): Account No. 124700002613, for the account of Lehman Brothers Bank, FSB, Delaware Retail

Clearing, Lehman Brothers Bank FSB, ABA No. 231170136, Attn: Delaware Retail Clearing. With respect to the Purchased Mortgage Loans being sold by Seller on a Purchase Date, Seller hereby sells, transfers, conveys and assigns to Buyer or its designee without recourse, but subject to the terms of this Agreement, all their respective right, title and interest in and to the Purchased Mortgage Loans together with all right, title and interest in and to the proceeds of any related Repurchase Assets.

## Section 10.    <u>Representations</u>

Seller represents and warrants to Buyer that as any Purchase Date and as of the date of this Agreement:

(a)    <u>Acting as Principal</u>.  Seller will engage in such Transactions as principal (or, if agreed in writing in advance of any Transaction by the other party hereto, as agent for a disclosed principal).

(b)    <u>No Broker</u>.  Seller has not dealt with any broker, investment banker, agent, or other person, except for Buyer, who may be entitled to any commission or compensation in connection with the sale of Purchased Mortgage Loans pursuant to this Agreement.

(c)    <u>Organization, Etc</u>.  Seller is a federal savings bank duly organized, validly existing and in good standing under the laws of the United States.  Seller (a) has all requisite corporate or other power, and has all governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a Material Adverse Effect; (b) is qualified to do business and is in good standing in all other jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify would not be reasonably likely (either individually or in the aggregate) to have a Material Adverse Effect; and (c) has full power and authority to execute, deliver and perform its obligations under the Facility Documents.

(d)    <u>Authorization, Compliance, Etc</u>.   The execution and delivery of, and the performance by Seller of its obligations under, the Facility Documents to which it is a party (a) are within Seller's powers, (b) have been duly authorized by all requisite action, (c) do not violate any provision of applicable law, rule or regulation, or any order, writ, injunction or decree of any court or other Governmental Authority, or its organizational documents, (d) do not violate any indenture, agreement, document or instrument to which Seller is a party, or by which any of it or any of its Properties, any of the Repurchase Assets is bound or to which any of them is subject and (e) are not in conflict with, do not result in a breach of, or constitute (with due notice or lapse of time or both) a default under, or except as may be provided by any Facility Document, result in the creation or imposition of any Lien upon any of the Property of Seller pursuant to, any such indenture, agreement, document or instrument.  Except as contemplated pursuant to Section 3(a) hereof, Seller is not required to obtain any consent, approval or authorization from, or to file any declaration or statement with, any Governmental Authority in

21

connection with or as a condition to the consummation of the Transactions contemplated herein and the execution, delivery or performance of the Facility Documents to which it is a party.

(e)    <u>Litigation</u>.    There are no actions, suits, arbitrations, investigations (including, without limitation, any of the foregoing which are to Seller's knowledge pending or threatened) or other legal or arbitrable proceedings affecting Seller or affecting any of the Repurchase Assets before any Governmental Authority which (i) questions or challenges the validity or enforceability of the Facility Documents or any action to be taken in connection with the transactions contemplated hereby, (ii) makes a claim or claims in an aggregate amount greater than $5,000,000, or (iii) individually or in the aggregate, if adversely determined, would have a Material Adverse Effect.

(f)    <u>Purchased Mortgage Loans</u>.    Seller makes the representations and warranties set forth on Schedule 1 attached hereto with respect to each Purchased Mortgage Loan purchased on such Purchase Date.   The provisions of this Agreement are effective to either constitute a sale of Repurchase Assets to Buyer or to create in favor of Buyer a valid security interest in all right, title and interest of Seller in, to and under the Repurchase Assets.

(g)    <u>Chief Executive Office/Jurisdiction of Organization</u>.    On the Effective Date, Seller's chief executive offices is, and has been, located at 1271 Avenue of the Americas, New York, NY 10020.   Seller's jurisdiction of organization is the United States of America.

(h)    <u>Enforceability</u>.    This Agreement and all of the other Facility Documents executed and delivered by Seller in connection herewith are legal, valid and binding obligations of Seller and are enforceable against Seller in accordance with their terms except as such enforceability may be limited by (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors rights generally and (ii) general principles of equity.

(i)    <u>Ability to Perform</u>.    Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in the Facility Documents to which it is a party on its part to be performed.

(j)    <u>No Default</u>.    No Default has occurred and is continuing.

(k)    <u>Tangible Net Worth</u>.    Seller's Tangible Net Worth is greater than Five Hundred Million Dollars ($500,000,000).

(l)    <u>Accurate and Complete Disclosure</u>.    The information, reports, financial statements, exhibits and schedules furnished in writing by Seller to Buyer in connection with the negotiation, preparation or delivery of this Agreement and the other Facility Documents or included herein or therein or delivered pursuant hereto or thereto, when taken as a whole, do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements herein or therein, in light of the circumstances under which they were made, not misleading.   All written information furnished after the date hereof by or on behalf of Seller to

22

Buyer in connection with this Agreement and the other Facility Documents and the transactions contemplated hereby and thereby including without limitation, the information set forth in the related Mortgage Loan Schedule, will be true, complete and accurate in every material respect, or (in the case of projections) based on reasonable estimates, on the date as of which such information is stated or certified.   There is no fact known to Seller, after due inquiry, that could reasonably be expected to have a Material Adverse Effect that has not been disclosed herein, in the other Facility Documents or in a report, financial statement, exhibit, schedule, disclosure letter or other writing furnished to Buyer for use in connection with the transactions contemplated hereby or thereby.

(m)    Margin Regulations.    The use of all funds acquired by Seller under this Agreement will not conflict with or contravene any of Regulations T, U or X.

(n)    Investment Company.    Seller is not an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(o)    Solvency.    As of the date hereof and immediately after giving effect to each Transaction, the fair value of the assets of Seller is greater than the fair value of the liabilities (including, without limitation, contingent liabilities if and to the extent required to be recorded as a liability on the financial statements of Seller in accordance with GAAP) of such Person and Seller is solvent, and after giving effect to the transactions contemplated by this Agreement and the other Facility Documents, will not be rendered insolvent or left with an unreasonably small amount of capital with which to conduct its business and perform its obligations.   Seller does not intend to incur, nor does it believe that it has incurred, debts beyond its ability to pay such debts as they mature.   Seller is not contemplating the commencement of an insolvency, bankruptcy, liquidation, or consolidation proceeding or the appointment of a receiver, liquidator, conservator, trustee, or similar official in respect of itself or any of its property.

(p)    No Reliance.    Seller has made its own independent decisions to enter into the Facility Documents and each Transaction and as to whether such Transaction is appropriate and proper for it based upon its own judgment and upon advice from such advisors (including without limitation, legal counsel and accountants) as it has deemed necessary.   Seller is not relying upon any advice from Buyer as to any aspect of the Transactions, including without limitation, the legal, accounting or tax treatment of such Transactions.

(q)    No Prohibited Persons.    Neither Seller nor any of its Affiliates, officers, directors, partners or members, is a Person (or to Seller' knowledge, owned or controlled by a Person): (i) that is listed in the Annex to, or is otherwise subject to the provisions of Executive Order 13224 issued on September 24, 2001 ("EO13224"); (ii) whose name appears on the United States Treasury Department's Office of Foreign Assets Control ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, http:www.treas.gov/ofac/t11sdn.pdf); (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in EO13224; or (iv) who is otherwise affiliated with any

23

Person listed above (any and all Persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person").

## Section 11.   <u>Covenants</u>

On and as of the date of this Agreement and each Purchase Date and at all times until this Agreement is no longer in force, Seller covenant as follows:

(a)   <u>Preservation of Existence; Compliance with Law</u>.   Seller shall, except to the extent a failure to do so would not reasonably be expected to have a Material Adverse Effect:

(i)   Preserve and maintain its legal existence and all of its material rights, privileges, licenses and franchises necessary for the operation of its business;

(ii)   Comply with the requirements of all applicable laws, rules, regulations and orders, whether now in effect or hereafter enacted or promulgated by any applicable Governmental Authority (including, without limitation, all environmental laws);

(iii)   Maintain all licenses, permits or other approvals necessary for such Person to conduct its business and to perform its obligations under the Facility Documents, and shall conduct its business strictly in accordance with applicable law;

(iv)   Keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied; and

(v)   Permit representatives of Buyer, upon reasonable notice (unless an Event of Default shall have occurred and is continuing, in which case, no prior notice shall be required), during normal business hours, to examine, copy and make extracts from its books and records, to inspect any of its Properties, and to discuss its business and affairs with its officers, all to the extent reasonably requested by Buyer.

(b)   <u>Notice of Proceedings or Adverse Change</u>.   Seller shall give notice to Buyer immediately after any knowledge of:

(i)   the occurrence of any Default;

(ii)   any (a) default or event of default under any Indebtedness of Seller that is greater than $5,000,000 individually or in the aggregate or (b) litigation, investigation, regulatory action or proceeding that is pending or threatened by or against Seller in any federal or state court or before any Governmental Authority which, if not cured or if adversely determined, would reasonably be expected to have a Material Adverse Effect or constitute a Default, and (c) any Material Adverse Effect with respect to Seller;

(iii)   any litigation or proceeding that is pending or threatened against (a) Seller in which the amount involved exceeds $5,000,000 and is not covered by insurance, in which

24

injunctive or similar relief is sought, or which, would reasonably be expected to have a Material Adverse Effect and (b) any litigation or proceeding that is pending or threatened in connection with any of the Repurchase Assets, which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(iv)    and, as soon as reasonably possible, notice of any of the following events:

(A)    any material change in accounting policies or financial reporting practices of Seller;

(B)    promptly upon receipt of notice or knowledge of any Lien or security interest (other than security interests created hereby or under any other Facility Document) on, or claim asserted against, any of the Repurchase Assets; and

(C)    any other event, circumstance or condition that has resulted, or has a possibility of resulting, in a Material Adverse Effect.

(c)    Financial Statements.    Seller shall furnish to Buyer a copy of its (a) consolidated balance sheet for the most recently ended fiscal year and the related consolidated statements of income and retained earnings and of cash flows for Seller for such fiscal year, not later than April 30 of each calendar year, setting forth in each case in comparative form the figures for the previous year, with the unqualified opinion thereon of Ernst & Young and (b) consolidated balance sheet for the quarterly fiscal period(s) of Seller ended [   ], setting forth in comparative form the figures for the previous year.    All such financial statements shall be complete and correct and fairly present, in all material respects, the consolidated financial condition of Seller and the consolidated results of its operations as at such dates and for such fiscal periods, all in accordance with GAAP applied on a consistent basis.

(d)    Financial Reporting.    Seller shall maintain a system of accounting established and administered in accordance with GAAP, and furnish to Buyer promptly, from time to time, such other information regarding the business affairs, operations and financial condition of Seller as Buyer may reasonably request.

(e)    Visitation and Inspection Rights.    Seller shall permit Buyer to inspect, and take all other reasonable actions permitted under Section 16 hereof.

(f)    Reimbursement of Expenses.    Seller shall promptly reimburse Buyer for all expenses as the same are incurred by Buyer as required by Section 14(b) hereof.

(g)    Further Assurances.    Seller shall execute and deliver to Buyer all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that Buyer may reasonably request, in order to effectuate the transactions contemplated by this Agreement and the Facility Documents or, without limiting any of the foregoing, to grant, preserve, protect and perfect the validity and first-priority of the security interests created or intended to be created hereby.    Seller shall do all

things necessary to preserve the Repurchase Assets so that they remain subject to a first priority perfected security interest hereunder. Without limiting the foregoing, Seller will comply with all rules, regulations, and other laws of any Governmental Authority and cause the Repurchase Assets to comply with all applicable rules, regulations and other laws.

(h)     True and Correct Information.    All information, reports, exhibits, schedules, financial statements or certificates of Seller or any of its Affiliates or any of their officers furnished to Buyer hereunder and during Buyer's diligence of Seller are and will be true and complete and do not omit to disclose any material facts necessary to make the statements therein or therein, in light of the circumstances in which they are made, not misleading. All required financial statements, information and reports delivered by Seller to Buyer pursuant to the Facility Documents shall be prepared in accordance with GAAP, or in the case of SEC filings, the appropriate SEC accounting requirements.

(i)     No Adverse Selection.    Seller shall not select Eligible Mortgage Loans to be sold to Buyer as Purchased Mortgage Loans using any type of adverse selection or other selection criteria which would adversely affect Buyer.

(j)     Books and Records.    Seller shall, to the extent practicable, maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing the Repurchase Assets in the event of the destruction of the originals thereof), and keep and maintain or obtain, as and when required, all documents, books, records and other information reasonably necessary or advisable for the collection of all Repurchase Assets.

(k)     Disposition of Assets; Liens.    Seller shall not create, incur, assume or suffer to exist any Lien of any nature whatsoever on any of the Repurchase Assets, whether real, personal or mixed, now or hereafter owned, other than the Liens created in connection with the transactions contemplated by this Agreement; nor shall Seller cause any of the Purchased Mortgage Loans to be sold, pledged, assigned or transferred.

(l)     Guarantees.    Seller shall not create, incur, assume or suffer to exist any guarantees, except to the extent reflected in Seller's financial statements or notes thereto.

(m)     Servicing Tape.    Seller shall provide (or cause Master Servicer to provide) to Buyer on the 20th day of each month a computer readable file containing servicing information, including without limitation, a Mortgage Loan Schedule, details of Income, remittance monies, collection performance, delinquencies, expected dispositions and sales, and such other fields specified by Buyer from time to time, on a Repurchase Asset by Repurchase Asset basis and in the aggregate, with respect to the Repurchase Assets serviced hereunder by Master Servicer.

(n)     Servicing of Purchased Mortgage Loans.    Seller shall cause Master Servicer to hold or cause to be held all funds collected with respect to the Mortgage Loans in segregated trust accounts established in the name of Master Servicer in trust for Seller (the "P&I Accounts"). Seller hereby grants Buyer a first priority security interest in the P&I Accounts to secure the

26

repurchase obligations of Seller to Buyer hereunder.   Upon the termination of this Agreement and the repurchase of the Purchased Mortgage Loans by Seller from Buyer, such security interest of Buyer in the P&I Accounts shall be released.   Upon Buyer's request, Seller shall provide reasonably promptly to Buyer a letter addressed to and agreed to by Master Servicer, in form and substance reasonably satisfactory to Buyer, advising Master Servicer of such matters as Buyer may reasonably request.   If Seller should discover that, for any reason whatsoever, Servicer or an entity responsible to Servicer or Seller by contract for managing or servicing any such Mortgage Loan has failed to perform fully Seller's obligations under the Facility Documents with respect to the servicing of the Purchased Mortgage Loans or any of the obligations of such entities with respect to the Purchased Mortgage Loans, Seller shall promptly notify Buyer and shall replace the relevant servicer by no later than 45 days from such notification.   Within 30 days of the date hereof Seller shall make such changes to its operations as necessary such that no funds other than proceeds and other amounts related to the Mortgage Loans are deposited in the P&I Accounts.

(o)    Preservation of the Purchased Mortgage Loans.   Seller shall do all things necessary to preserve each Purchased Mortgage Loan so that it remains subject to a first priority perfected security interest hereunder.   Without limiting the foregoing, Seller shall comply with all rules, regulations and other laws of any Governmental Authority applicable to Seller relating to the Purchased Mortgage Loans and cause the Purchased Mortgage Loans to comply with all applicable rules, regulations and other laws.   Seller shall fully perform or cause to be performed when due all of its obligations (including funding obligations with respect to reverse mortgage loans) under any Purchased Mortgage Loan or the Facility Documents and acknowledges and agrees that Buyer shall have no obligation to perform any obligations under any Purchased Mortgage Loan (including funding obligations with respect to reverse mortgage loans).

(p)    Lien Release.   On or before March 26, 2009, Seller shall cause the Federal Home Loan Bank of Pittsburgh to execute a release of any liens on the Eligible Mortgage Loans. Seller has no outstanding obligations to the Federal Home Loan Bank of Pittsburgh and will not incur any such obligation until such release is obtained.

## Section 12.    Events of Default

If any of the following events (each an "Event of Default") occurs and continues for three (3) Business Days, Seller and Buyer shall have the rights set forth in Section 13, as applicable:

(a)    Payment Default.   Seller shall default in (i) the payment of any Periodic Advance Payment, Repurchase Price or Price Differential with respect to any Transaction when due (whether at stated maturity, upon acceleration or at mandatory or optional prepayment); or (ii) the payment of any other Obligations, when the same shall become due and payable, whether at the due date thereof, or by acceleration or otherwise; or

(b)    Representation and Warranty Breach.   Any representation, warranty or certification made or deemed made herein or in any other Facility Document by Seller or any certificate furnished to Buyer pursuant to the provisions hereof or thereof or any information

with respect to the Mortgage Loans furnished in writing by or on behalf of Seller shall prove to have been untrue or misleading in any material respect as of the time made or furnished (other than the representations and warranties set forth on Schedule 1 unless Seller fails to pay the Repurchase Price for the related Mortgage Loan(s) within one (1) Business Day of notice or actual knowledge thereof); or

(c)    Immediate Covenant Default.    Seller's failure to perform, comply with or observe any term, covenant or agreement applicable to Seller contained in any of Sections 11(a), (k), (m), (n) or (o); or

(d)    Additional Covenant Defaults.    Seller shall fail to observe or perform any other covenant or agreement contained in this Agreement (and not identified in clause (c) of this Section 12) or any other Facility Document, and if such default shall be capable of being remedied, and such failure to observe or perform shall continue unremedied for a period of three (3) Business Days; or

(e)    Judgments.    A judgment or judgments for the payment of money in excess of $5,000,000 in the aggregate shall be rendered against Seller or any of its Affiliates by one or more courts, administrative tribunals or other bodies having jurisdiction and the same shall not be satisfied, discharged (or provision shall not be made for such discharge) or bonded, or a stay of execution thereof shall not be procured, within 30 days from the date of entry thereof, and such Person(s) shall not, within said period of 30 days, or such longer period during which execution of the same shall have been stayed or bonded, appeal therefrom and cause the execution thereof to be stayed during such appeal; or

(f)    Cross-Default.    Seller or any of its Affiliates shall be in default under any Indebtedness or any other contract to which it is a party (other than a failure after September 15, 2008 to fund loan commitments), which default involves Indebtedness or an obligation in excess of $5,000,000; or

(g)    Insolvency Event.    An Insolvency Event shall have occurred with respect to Seller; or

(h)    Enforceability.    For any reason, any Facility Document at any time shall not be in full force and effect in all material respects or shall not be enforceable in all material respects in accordance with its respective terms, or any Lien granted pursuant thereto shall fail to be perfected and of first priority, or any Person (other than Buyer) shall contest the validity, enforceability, perfection or priority of any Lien granted pursuant thereto, or any party thereto (other than Buyer) shall seek to disaffirm, terminate, limit or reduce its obligations hereunder; or

(i)    Liens.    Seller shall grant, or suffer to exist, any Lien on any Repurchase Asset (except any Lien in favor of Buyer); or at least one of the following fails to be true (A) the Repurchase Assets shall not have been sold to Buyer, or (B) the Liens contemplated hereby shall cease or fail to be first priority perfected Liens on any Repurchase Assets in favor of Buyer or shall be Liens in favor of any Person other than Buyer.

28

## Section 13.    <u>Remedies</u>

(a)    If an Event of Default occurs, the following rights and remedies are available to Buyer; provided, that an Event of Default shall be deemed to be continuing unless expressly waived by Buyer in writing.

(i)    At the option of Buyer, exercised by prior written notice to Seller (which option shall be deemed to have been exercised, even if no notice is given, immediately upon the occurrence of an Insolvency Event of Seller), the Repurchase Date for each Transaction hereunder, if it has not already occurred, shall be deemed immediately to occur.  Buyer shall (except upon the occurrence of an Insolvency Event of Seller) give prior written notice to Seller of the exercise of such option as promptly as practicable.

(ii)    If Buyer exercises or is deemed to have exercised the option referred to in subsection (a)(i) of this Section,

(A)    Seller' obligations in such Transactions to repurchase all Purchased Mortgage Loans, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subsection (a)(i) of this Section, (1) shall thereupon become immediately due and payable and (2) all Income received by Buyer after such exercise or deemed exercise shall be retained by Buyer and applied to reduce the amounts that comprise the Obligations in any manner that it shall elect; and

(B)    to the extent permitted by applicable law, the Repurchase Price with respect to each such Transaction shall be increased by the aggregate amount obtained by daily application of, on a 360-day per year basis for the actual number of days during the period from and including the date of the exercise or deemed exercise of such option to but excluding the date of payment of the Repurchase Price as so increased, (x) the Post-Default Rate in effect following an Event of Default to (y) the Repurchase Price for such Transaction as of the Repurchase Date as determined pursuant to subsection (a)(i) of this Section (decreased as of any day by (i) any amounts actually in the possession of Buyer pursuant to clause (C) of this subsection, and (ii) any proceeds from the sale of Purchased Mortgage Loans applied to the Repurchase Price pursuant to subsection (a)(iv) of this Section.

(iii)    Upon the occurrence of an Event of Default, Buyer shall have the right (such right having been expressly acknowledged and agreed to by Master Servicer in a letter dated March 16, 2009 attached hereto as Exhibit C) to obtain physical possession of all files of Seller relating to the Purchased Mortgage Loans and the Repurchase Assets and all documents relating to the Purchased Mortgage Loans which are then or may thereafter come into the possession of Seller or any third party acting for Seller (including, without limitation, Servicer) and Seller shall deliver to Buyer such assignments as Buyer shall request.  Buyer shall be entitled to specific performance of all agreements of Seller contained in the Facility Documents.

(iv)    At any time on the third (3rd) Business Day following notice to Seller (which notice may be the notice given under subsection (a)(i) of this Section), in the event Seller

29

has not repurchased all Purchased Mortgage Loans, Buyer may (A) immediately sell, without demand or further notice of any kind, at a public or private sale and at such price or prices as Buyer may deem satisfactory any or all Purchased Mortgage Loans and the Repurchase Assets subject to a such Transactions hereunder and apply the proceeds thereof to the Obligations in any manner that it shall elect or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Mortgage Loans, to give Seller credit for such Purchased Mortgage Loans and the Repurchase Assets in an amount equal to the Market Value of the Purchased Mortgage Loans against the Obligations in any manner that it shall elect; in either case provided that Buyer shall be in compliance with all applicable Requirements of Law.  The proceeds of any disposition of Purchased Mortgage Loans and the Repurchase Assets shall be applied as determined by Buyer in its sole discretion.

(v)    Seller shall be liable to Buyer for (i) the amount of all reasonable legal or other expenses (including, without limitation, all costs and expenses of Buyer in connection with the enforcement of this Agreement or any other agreement evidencing a Transaction, whether in action, suit or litigation or bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally, further including, without limitation, the reasonable fees and expenses of counsel (including the costs of internal counsel of Buyer) incurred in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(vi)    Buyer shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

(b)    Buyer may exercise one or more of the remedies available hereunder immediately upon the occurrence of an Event of Default and at any time thereafter.  All rights and remedies arising under this Agreement are cumulative and not exclusive of any other rights or remedies which Buyer may have.

(c)    Buyer may enforce its rights and remedies hereunder without prior judicial process or hearing, and Seller hereby expressly waives any defenses Seller might otherwise have to require Buyer to enforce its rights by judicial process.  Seller also waive any defense (other than a defense of payment or performance) Seller might otherwise have arising from the use of nonjudicial process, enforcement and sale of all or any portion of the Repurchase Assets, or from any other election of remedies.  Seller recognize that nonjudicial remedies are consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's length.

(d)    To the extent permitted by applicable law, Seller shall be liable to Buyer for interest on any amounts owing by Seller hereunder, from the date Seller becomes liable for such amounts hereunder until such amounts are (i) paid in full by Seller or (ii) satisfied in full by the

exercise of Buyer's rights hereunder.   Interest on any sum payable by the Seller to Buyer under this paragraph shall be at a rate equal to the Post-Default Rate.

## Section 14.    <u>Indemnification and Expenses; Recourse</u>

(a)     Seller agrees to hold Buyer, and its Affiliates and their respective direct and indirect partners, shareholders, members, officers, directors, employees, agents and advisors (each an "Indemnified Party") harmless from and indemnify any Indemnified Party against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, "Costs"), relating to or arising out of this Agreement, any other Facility Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, any other Facility Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.   Without limiting the generality of the foregoing, Seller agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Costs with respect to all Mortgage Loans relating to or arising out of any taxes incurred or assessed in connection with the ownership of the Mortgage Loans, that, in each case, results from anything other than the Indemnified Party's gross negligence or willful misconduct.   In any suit, proceeding or action brought by an Indemnified Party in connection with any Mortgage Loan for any sum owing thereunder, or to enforce any provisions of any Mortgage Loan, Seller will save, indemnify and hold such Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by Seller of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from Seller.   Seller also agrees to reimburse an Indemnified Party as and when billed by such Indemnified Party for all the Indemnified Party's costs and expenses incurred in connection with the enforcement or the preservation of Buyer's rights under this Agreement, any other Facility Document or any transaction contemplated hereby or thereby, including without limitation the reasonable fees and disbursements of its outside counsel.

(b)     Seller agrees to pay as and when billed by Buyer all reasonable costs and expenses of Buyer (including reasonable counsel's fees) in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, any other Facility Document, or any other documents required for a Transaction.

(c)     Seller hereby acknowledge that the Obligations are recourse obligations of Seller.

## Section 15.    <u>Servicing</u>

(a)     Seller, on Buyer's behalf, shall service or cause to be serviced the Purchased Mortgage Loans consistent with the degree of skill and care that Seller customarily requires with respect to Mortgage Loans owned or managed by it and in accordance with Accepted Servicing Practices.   Master Servicer shall (i) comply with all applicable Requirements of Law, (ii)

31

maintain all state and federal licenses necessary for it to perform its servicing responsibilities hereunder and (iii) not impair the rights of Buyer in any Mortgage Loans or any payment thereunder.  Buyer may terminate the servicing of any Mortgage Loan with the then existing Master Servicer in accordance with Section 15(c) hereof.

(b)     Seller shall cause Master Servicer to hold or cause to be held all funds collected on behalf of Seller with respect to any Purchased Mortgage Loans in the P&I Accounts, and shall apply the same for the purposes for which such funds were collected.

(c)     Upon the occurrence of an Event of Default, Buyer shall have the right, but not the obligation, to immediately terminate Seller's right to service the Purchased Mortgage Loans without payment of any penalty or termination fee and Seller shall transfer or cause Master Servicer to transfer to Buyer all funds in the P&I Accounts.  Seller shall cooperate in transferring the servicing of the Purchased Mortgage Loans to a successor servicer appointed by Buyer in its sole discretion.

(d)     If Seller should discover that, for any reason whatsoever, any Person responsible to Seller by contract for managing or servicing any such Purchased Mortgage Loan has failed to perform fully Seller's obligations under the Facility Documents or any of the obligations of such entities with respect to the Purchased Mortgage Loans, Seller shall promptly notify Buyer.

(e)     Seller shall cause Master Servicer to permit Buyer from time to time to inspect Master Servicer's servicing facilities, as the case may be, for the purpose of satisfying Buyer that Master Servicer has the ability to service the Purchased Mortgage Loans as provided in this Agreement.

## Section 16.    Due Diligence

(a)     Seller acknowledges that Buyer has the right to perform continuing due diligence reviews with respect to the Mortgage Loans and Seller for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and Seller agrees that upon reasonable prior notice to Seller unless an Event of Default shall have occurred, in which case no notice is required, Buyer or its authorized representatives will be permitted during normal business hours to examine, inspect, and make copies and extracts of, the Mortgage Files and any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession or under the control of Master Servicer, Seller and/or the applicable Custodian.  Seller also shall make available to Buyer a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Mortgage Files and the Mortgage Loans.  Without limiting the generality of the foregoing, Seller acknowledges that Buyer may purchase Mortgage Loans from Seller based solely upon the information provided by Seller to Buyer in the Mortgage Loan Schedule and the representations, warranties and covenants contained herein, and that Buyer, at its option, has the right at any time to conduct a partial or complete due diligence review on some or all of the Mortgage Loans purchased in a Transaction, including, without limitation, ordering broker's price opinions, new credit reports and new appraisals on the related Mortgaged Properties and otherwise re-generating the information used

32

to originate such Mortgage Loan.  Buyer may underwrite such Mortgage Loans itself or engage a mutually agreed upon third party underwriter to perform such underwriting.  Seller agrees to cooperate with Buyer and any third party underwriter in connection with such underwriting, including, but not limited to, providing Buyer and any third party underwriter with access to any and all documents, records, agreements, instruments or information relating to such Mortgage Loans in the possession, or under the control, of Seller.

## Section 17.    **Assignability**

(a)    The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by Seller without the prior written consent of Buyer.  Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.  Nothing in this Agreement express or implied, shall give to any Person, other than the parties to this Agreement and their successors hereunder, any benefit of any legal or equitable right, power, remedy or claim under this Agreement.  Subject to the following sentence, Buyer may from time to time assign all or a portion of its rights and obligations under this Agreement and the Facility Documents pursuant to an executed assignment and acceptance by Buyer and assignee ("Assignment and Acceptance"), specifying the percentage or portion of such rights and obligations assigned.  Notwithstanding the preceding sentence, if such assignment is to a Person that is not an Affiliate of Buyer and no Default shall have occurred and be continuing, any such assignment shall be subject to the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned.  Upon such assignment, (a) such assignee shall be a party hereto and to each Facility Document to the extent of the percentage or portion set forth in the Assignment and Acceptance, and shall succeed to the applicable rights and obligations of Buyer hereunder, and (b) Buyer shall, to the extent that such rights and obligations have been so assigned by it be released from its obligations hereunder and under the Facility Documents.  Unless otherwise stated in the Assignment and Acceptance, Seller shall continue to take directions solely from Buyer unless otherwise notified by Buyer in writing.  Buyer may distribute to any prospective assignee any document or other information delivered to Buyer by Seller.

(b)    Buyer may sell participations to one or more Persons in or to all or a portion of its rights and obligations under this Agreement; provided, however, that (i) Buyer's obligations under this Agreement shall remain unchanged, (ii) Buyer shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) Seller shall continue to deal solely and directly with Buyer in connection with Buyer's rights and obligations under this Agreement and the other Facility Documents except as provided in Section 7.

(c)    Buyer may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 17, disclose to the assignee or participant or proposed assignee or participant, as the case may be, any information relating to Seller, or any of its Subsidiaries or to any aspect of the Transactions that has been furnished to Buyer by or on behalf of Seller or any of its Subsidiaries; provided that such assignee or participant agrees in writing to hold such information subject to the confidentiality provisions of this Agreement.

33

(d)      In the event Buyer assigns all or a portion of its rights and obligations under this Agreement, the parties hereto agree to negotiate in good faith an amendment to this Agreement to add agency provisions similar to those included in repurchase agreements for similar syndicated repurchase facilities.

## Section 18.      Transfer and Maintenance of Register

(a)      Subject to acceptance and recording thereof pursuant to paragraph (b) of this Section 18, from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of Buyer under this Agreement. Any assignment or transfer by Buyer of rights or obligations under this Agreement that does not comply with this Section 18 shall be treated for purposes of this Agreement as a sale by such Buyer of a participation in such rights and obligations in accordance with Section 18(b) hereof.

(b)      Seller shall maintain a register (the "Register") on which it will record Buyer's rights hereunder, and each Assignment and Acceptance and participation. The Register shall include the names and addresses of Buyer (including all assignees, successors and participants) and the percentage or portion of such rights and obligations assigned. Failure to make any such recordation, or any error in such recordation shall not affect Seller's obligations in respect of such rights. If Buyer sells a participation in its rights hereunder, it shall provide Seller, or maintain as agent of Seller, the information described in this paragraph and permit Seller to review such information as reasonably needed for Seller to comply with its obligations under this Agreement or under any applicable Requirement of Law.

## Section 19.      Hypothecation or Pledge of Purchased Mortgage Loans

Title to all Purchased Mortgage Loans and Repurchase Assets shall pass to Buyer and Buyer shall have free and unrestricted use of all Purchased Mortgage Loans, subject to Seller's right to repurchase the Purchased Mortgage Loans as set forth herein. Nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Mortgage Loans or otherwise pledging, repledging, transferring, hypothecating, or rehypothecating the Purchased Mortgage Loans. Nothing contained in this Agreement shall obligate Buyer to segregate any Purchased Mortgage Loans delivered to Buyer by Seller.

## Section 20.      Tax Treatment

Each party to this Agreement acknowledges that it is its intent for purposes of U.S. federal, state and local income and franchise taxes, to treat each Transaction as indebtedness of Seller that is secured by the Purchased Mortgage Loans and that the Purchased Mortgage Loans are owned by Seller in the absence of a Default by Seller. All parties to this Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

## Section 21.    <u>Set-Off</u>

In addition to any rights and remedies of Buyer hereunder and by law, Buyer shall have the right, without prior notice to Seller, any such notice being expressly waived by Seller to the extent permitted by applicable law, upon any amount becoming due and payable by Seller hereunder (whether at the stated maturity, by acceleration or otherwise) to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Buyer and/or any of its Affiliates to or for the credit or the account of Seller or any of its Affiliates.   Buyer agrees promptly to notify Seller after any such set-off and application made by Buyer; provided that the failure to give such notice shall not affect the validity of such set-off and application.   For the avoidance of doubt, neither Seller nor Buyer shall have any right to set off any amounts due under this Agreement against any amounts due under another contract that is not a Facility Document and each of Buyer and Seller hereby waives any such right to set-off to which it may be entitled or subject under such other contract, applicable law or otherwise.

## Section 22.    <u>Terminability</u>

Seller acknowledges that:

(a)    each representation and warranty made or deemed to be made by entering into a Transaction, herein or pursuant hereto shall survive the making of such representation and warranty, notwithstanding the payment of the Repurchase Price with respect thereto or the termination of any of the Facility Documents;

(b)    Buyer shall not be deemed to have waived any Default that may arise because any representation or warranty shall have proved to be false or misleading, notwithstanding that Buyer may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time the Transaction was made; and

(c)    the covenants contained in this Agreement, including without limitation, the obligations of Seller under Section 14 hereof, shall survive the termination of this Agreement.

## Section 23.    <u>Notices and Other Communications</u>

Except as otherwise expressly permitted by this Agreement, all notices, requests and other communications provided for herein (including without limitation any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including without limitation by telecopy) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof or thereof); or, as to any party, at such other address as shall be designated by such party in a written notice to each other party. Except as otherwise provided in this Agreement and except for notices given under Section 3 (which shall be effective only on receipt), all such communications shall be deemed to have been

duly given when transmitted by telecopy or personally delivered or, in the case of a notice sent by mail or courier, upon receipt or refusal, in each case given or addressed as aforesaid.

Address for Notices:

If to Seller:          Lehman Brothers Bank, FSB
                       1271 Avenue of the Americas
                       New York, NY 10020
                       Attention:   Chief Financial Officer
                       Fax:   646-758-4245

with a copy to:        Lehman Brothers Bank, FSB
                       15305 Dallas Parkway, Suite 300
                       Addison, TX 75001
                       Attention:   Interim General Counsel
                       Fax:   972-455-2874

If to Buyer:           Lehman Brothers Holdings Inc.
                       1271 Avenue of the Americas
                       New York, NY 10020
                       Attention:   Douglas J. Lambert
                       Fax:   646-346-8239

**Section 24.      Entire Agreement; Severability; Single Agreement**

This Agreement, together with the Facility Documents, constitute the entire understanding between Buyer and Seller with respect to the subject matter they cover and shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions involving Purchased Mortgage Loans.  By acceptance of this Agreement, Buyer and Seller acknowledge that they have not made, and are not relying upon, any statements, representations, promises or undertakings not contained in this Agreement.

Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

Seller acknowledges that Buyer has entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that all Transactions hereunder constitute a single business and contractual relationship and that each has been entered into in consideration of the other Transactions.  Accordingly, Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that Buyer shall be entitled to set off claims and apply property held by it in respect of any Transaction against obligations owing to it in respect of any other Transaction hereunder; (iii) that payments, deliveries, and other transfers made by Seller in respect of any Transaction shall

36

be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries, and other transfers may be applied against each other and netted and (iv) to promptly provide notice to the other after any such set-off or application.

## Section 25.    Governing Law

THIS REPURCHASE AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

## Section 26.    Submission to Jurisdiction; Waivers

SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(i)    SUBMITS, FOR SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, WITHOUT LIMITING SELLER'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, TO ENFORCE THE TERMS OF THIS AGREEMENT AND THE OTHER FACILITY DOCUMENTS AND TO DECIDE ANY CLAIMS OR DISPUTES WHICH MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT AND THE OTHER FACILITY DOCUMENTS, ANY BREACH OR DEFAULT HEREUNDER OR THEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND CONSENTS THAT ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND CONSENTS TO AND SUBMITS TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT IF THE CHAPTER 11 CASE HAS CLOSED, SELLER AGREES TO IRREVOCABLY AND UNCONDITIONALLY SUBMIT, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE FEDERAL COURT OF THE UNITED STATES OF AMERICA, SITTING IN THE SOUTHERN DISTRICT OF NEW YORK OR, IF NO SUCH FEDERAL COURT HAS PROPER JURISDICTION, ANY NEW YORK STATE COURT LOCATED IN THE BOROUGH OF MANHATTAN, NEW YORK, NEW YORK, AND ANY APPELLATE COURT FROM WHICH APPEAL OF ANY JUDGMENT OR ORDER THEREOF AMY BE TAKEN, IN ANY ACTIONS ARISING OUT OF OR RELATION TO THIS AGREEMENT AND ANY TRANSACTIONS CONTEMPLATED HEREBY AND FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RELATING THERETO;

(ii)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION BROUGHT IN SUCH COURTS, AND THE DEFENSE OF AN INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTES AND AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LAW;

(iii)    AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO ITS ADDRESS SET FORTH UNDER ITS SIGNATURE BELOW OR AT SUCH OTHER ADDRESS OF WHICH THE BUYER SHALL HAVE BEEN NOTIFIED;

(iv)    AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION; AND

(v)    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS REPURCHASE AGREEMENT, ANY OTHER FACILITY DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

### Section 27.    No Waivers, Etc.

No failure on the part of Buyer to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Facility Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Facility Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.   The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

### Section 28.    Confidentiality

Buyer and Seller hereby acknowledge and agree that all information provided by one party to any other regarding the terms set forth in any of the Facility Documents or the Transactions contemplated thereby (the "Confidential Terms") shall be kept confidential and shall not be divulged to any party without the prior written consent of such other party except to the extent that (i) it is necessary to do so in working with legal counsel, auditors, taxing authorities or other governmental agencies or regulatory bodies or in order to comply with any applicable federal or state laws, (ii) any of the Confidential Terms are in the public domain other than due to a breach of this covenant, or (iii) in the event of an Event of Default Buyer determines such information to be necessary or desirable to disclose in connection with the marketing and sales of the Purchased Mortgage Loans or otherwise to enforce or exercise Buyer's rights hereunder.   Notwithstanding the foregoing or anything to the contrary contained herein or in any other Facility Document, the parties hereto may disclose to any and all Persons, without limitation of any kind, the federal, state and local tax treatment of the Transactions, any fact relevant to understanding the federal, state and local tax treatment of the Transactions, and all materials of any kind (including opinions or other tax analyses) relating to such federal, state and local tax treatment and that may be relevant to understanding such tax treatment; provided that Seller may not disclose the name of or identifying information with respect to Buyer or any

pricing terms (including, without limitation, the Pricing Rate, and Purchase Price) or other nonpublic business or financial information that is unrelated to the federal, state and local tax treatment of the Transactions and is not relevant to understanding the federal, state and local tax treatment of the Transactions, without the prior written consent of Buyer.   The provisions set forth in this Section 28 shall survive the termination of this Agreement.

## Section 29.   <u>Intent</u>

(a)     The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Mortgage Loans subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b)     It is understood that either party's right to liquidate Mortgage Loans delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Section 13 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c)     The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d)     It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

(e)     This Agreement is intended to be a "repurchase agreement" and a "securities contract," within the meaning of Section 555 and Section 559 under the Bankruptcy Code.

## Section 30.   <u>Disclosure Relating to Certain Federal Protections</u>

The parties acknowledge that they have been advised that:

(a)     in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 14 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b)        in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c)        in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

### Section 31.    **Acknowledgement of Anti-Predatory Lending Policies**

Seller acknowledges that it has been informed that Buyer has in place internal policies and procedures that expressly prohibit its purchase of any High Cost Mortgage Loan.

### Section 32.    **Miscellaneous**

(a)        Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.

(b)        Captions.  The captions and headings appearing herein are for included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

(c)        Acknowledgment.  Seller hereby acknowledges that:

(i)        it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Facility Documents;

(ii)        Buyer has no fiduciary relationship to Seller; and

(iii)        no joint venture exists between Buyer and Seller.

(d)        Documents Mutually Drafted.  Seller and Buyer agree that this Agreement each other Facility Document prepared in connection with the Transactions set forth herein have been mutually drafted and negotiated by each party, and consequently such documents shall not be construed against either party as the drafter thereof.

### Section 33.    **General Interpretive Principles**

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration; and

(g)    all times specified herein or in any other Facility Document (unless expressly specified otherwise) are local times in New York, New York unless otherwise stated.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date written on the first page hereof.

BUYER:

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation


By: _____
　　Name:
　　Title:

SELLER:

LEHMAN BROTHERS BANK, FSB,
a federal savings bank


By: _____
　　Name:
　　Title:

## EXHIBIT A:    PURCHASE PRICE PERCENTAGES

50%

## <u>EXHIBIT B:    FORM OF TRANSACTION REQUEST</u>

[DATE]

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020
Attention:   Douglas J. Lambert
Fax:   646-346-8239

## TRANSACTION REQUEST

Confirmation No.:_____

Ladies and Gentlemen:

Reference is made to that certain Master Repurchase Agreement (the "Agreement") dated as of March 16, 2009, between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Buyer" or "you"), and LEHMAN BROTHERS BANK, FSB, a federal savings bank ("Seller", "we" or "us").   Capitalized terms used but not defined herein shall have the meanings ascribed thereto in or by reference to the Agreement.

This letter is a request for you to purchase from us the Eligible Mortgage Loans listed on Appendix I hereto pursuant to the Agreement as follows:

Requested Purchase Date:   [            ]

Eligible Mortgage Loans requested to be Purchased: See Appendix I hereto.

Purchase Price:   $[            ]

Pricing Rate:   LIBOR Rate + 600 basis points (6%)

Repurchase Date:   [            ]

Repurchase Price:   $[            ]   less   any   Income   and   Periodic   Advance Repurchase Payments actually received by Buyer plus any accrued and unpaid default interest.

Names and addresses for communications:

Buyer:
        Lehman Brothers Holdings Inc.
        1271 Avenue of the Americas
        New York, NY 10020
        Attention:   Douglas J. Lambert
        Fax:   646-346-8239

45

Seller:

    Lehman Brothers Bank, FSB
    1271 Avenue of the Americas
    New York, NY 10020
    Attention:   Chief Financial Officer
    Fax:   646-758-4245

    with a copy to:

    Lehman Brothers Bank, FSB
    15305 Dallas Parkway, Suite 300
    Addison, TX 75001
    Attention:   Interim General Counsel
    Fax:   972-455-2874

        This Transaction Request constitutes a certification by Seller that all the conditions set forth in clauses (i) through (ix) of Section 3(b) of the Agreement have been satisfied.

Very truly yours,

LEHMAN BROTHERS BANK, FSB,
as Seller

By:   _____
Name:
Title:

APPENDIX I

**EXHIBIT C:    MASTER SERVICER ACKNOWLEDGEMENT LETTER**

Aurora Loan Services LLC
10350 Park Meadows Drive
Littleton, CO 80124
Attn:   [                    ]
Fax:   [                    ]

March 16, 2009

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020
Attention:   Douglas J. Lambert
Fax:   [                    ]

Re:    Acknowledgement Letter

Ladies and Gentlemen:

Reference is made to that certain Master Repurchase Agreement (the "Agreement") dated as of March 16, 2009, between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("Buyer"), and LEHMAN BROTHERS BANK, FSB, a federal savings bank ("Seller"). Capitalized terms used but not defined herein shall have the meanings ascribed thereto in or by reference to the Agreement.

1. Acknowledgement. Aurora Loan Services LLC ("Aurora") hereby acknowledges receipt of notice that Seller has transferred or pledged to Buyer certain mortgage loans which are master serviced by Aurora for Seller. Furthermore, Aurora hereby acknowledges and agrees that, following written notice from Buyer to Aurora that an Event of Default has occurred under the Agreement, (i) Buyer shall have the right to obtain physical possession of all files of Seller relating to the Purchased Mortgage Loans and the Repurchase Assets and all documents relating to the Purchased Mortgage Loans (collectively, the "Servicing Records") which are then or may thereafter come into the possession of Aurora, (ii) promptly upon Buyer's request and subject to Aurora's obligations under applicable Requirements of Law, Aurora shall deliver to Buyer or its designee at Buyer's expense the Servicing Records which are then or may thereafter come into the possession of Aurora, and (iii) promptly upon Buyer's request, Aurora shall authorize each loan-level servicer of a Purchased Mortgage Loan to follow Buyer's direction with respect to the delivery of the Servicing Records which are then or may thereafter come into the possession of such loan-level servicer; provided that, for the avoidance of doubt, Aurora shall have no liability to Buyer or any third party for any loan-level servicer's failure to follow Buyer's direction

2. Reliance. Notwithstanding any contrary information which may be delivered to Aurora by Seller, Aurora may conclusively rely on any information or notice of the termination of Seller as servicer delivered by Buyer, and Seller shall indemnify and hold Aurora

49

harmless for any and all claims asserted against it for any actions taken in good faith by Aurora in connection with the delivery of such information or notice.

3. <u>GOVERNING LAW, ETC</u>.   THIS ACKNOWLEDGEMENT LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS, AND MAY BE AMENDED ONLY IN A WRITING EXECUTED BY ALL THE PARTIES HERETO.

AURORA WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS ACKNOWLEDGEMENT LETTER IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY IT OR BUYER AGAINST THE OTHER, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

4. <u>Miscellaneous</u>.   Delivery of an executed signature page to this acknowledgement letter by facsimile transmission shall be effective as delivery of an original of this acknowledgement letter.   The headings and titles of the paragraphs above are for convenience only and have no substantive meaning herein.

*[SIGNATURE PAGES FOLLOW]*

Very truly yours,

Acknowledged and Agreed to as of the date
first written above:
AURORA LOAN SERVICES LLC


By:_____
Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.


By:_____
Name:
Title:
LEHMAN BROTHERS BANK, FSB


By:_____
Name:
Title:

## SCHEDULE 1

## REPRESENTATIONS AND WARRANTIES RE: MORTGAGE LOANS

Seller represents and warrants to Buyer, with respect to each Mortgage Loan, that as of the Purchase Date for the purchase of any Purchased Mortgage Loans by Buyer from Seller:

(a)     <u>Mortgage Loans as Described</u>.    The information set forth in the Mortgage Loan Schedule is complete, true and correct;

(b)     <u>Payments Current</u>.    No payment required under the Mortgage Loan is 30 days or more delinquent;

(c)     <u>No Outstanding Charges</u>.    There are no defaults in complying with the terms of the Mortgage, and all taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable. No Seller has advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Mortgage Loan, except for interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage Loan proceeds, whichever is earlier, to the day which precedes by one month the Due Date of the first installment of principal and interest;

(d)     <u>Original Terms Unmodified</u>.    The terms of the Mortgage Note and Mortgage have not been impaired, waived, altered or modified in any respect, from the date of origination except by a written instrument which has been recorded, if necessary to protect the interests of Buyer, and which has been delivered to the applicable Custodian or to such other Person as Buyer shall designate in writing, and the terms of which are reflected in the Mortgage Loan Schedule. The substance of any such waiver, alteration or modification has been approved by the issuer of any related PMI Policy and the title insurer, if any, to the extent required by the policy, and its terms are reflected on the Mortgage Loan Schedule, if applicable. No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement, approved by the issuer of any related PMI Policy and the issuer of the title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File delivered to the applicable Custodian or to such other Person as Buyer shall designate in writing and the terms of which are reflected in the Mortgage Loan Schedule;

(e)     <u>No Defenses</u>.    The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including without limitation the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto, and no Mortgagor was a debtor in any state or federal bankruptcy or insolvency proceeding at, or subsequent to, the time the Mortgage Loan was originated;

(f)    <u>Hazard Insurance</u>.    Pursuant to the terms of the Mortgage, all buildings or other improvements upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are provided for in the Fannie Mae Guides or by Freddie Mac. If required by the National Flood Insurance Act of 1968, as amended, each Mortgage Loan is covered by a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration as in effect which policy conforms to Fannie Mae and Freddie Mac. All individual insurance policies contain a standard mortgagee clause naming the applicable Seller and its successors and assigns as mortgagee, and all premiums thereon have been paid and such policies may not be reduced, terminated or cancelled without 30 days' prior written notice to the mortgagee. The Mortgage obligates the Mortgagor thereunder to maintain the hazard insurance policy at the Mortgagor's cost and expense, and on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at such Mortgagor's cost and expense, and to seek reimbursement therefor from the Mortgagor. Where required by state law or regulation, the Mortgagor has been given an opportunity to choose the carrier of the required hazard insurance, provided the policy is not a "master" or "blanket" hazard insurance policy covering a condominium, or any hazard insurance policy covering the common facilities of a planned unit development. The hazard insurance policy is the valid and binding obligation of the insurer, is in full force and effect, and will be in full force and effect and inure to the benefit of Buyer upon the consummation of the transactions contemplated by this Agreement. No Seller has engaged in, and has no knowledge of the Mortgagor's or any servicer's having engaged in, any act or omission which would impair the coverage of any such policy, the benefits of the endorsement provided for herein, or the validity and binding effect of such policy, including, without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by Seller;

(g)    <u>Compliance with Applicable Laws</u>.    Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity and disclosure laws or unfair and deceptive practices laws applicable to the Mortgage Loan have been complied with, the consummation of the transactions contemplated hereby will not involve the violation of any such laws or regulations, and Seller shall maintain in its possession, available for Buyer's inspection, and shall deliver to Buyer upon demand, evidence of compliance with all such requirements;

(h)    <u>No Satisfaction of Mortgage</u>.    The Mortgage has not been satisfied, canceled, subordinated or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission. The relevant Seller has not waived the performance by the Mortgagor of any action, if the Mortgagor's failure to perform such action would cause the Mortgage Loan to be in default, nor has Seller waived any default resulting from any action or inaction by the Mortgagor;

(i)    <u>Location and Type of Mortgaged Property</u>.    The Mortgaged Property is a fee simple property located in the state identified in the Mortgage Loan Schedule except that with respect to real property located in jurisdictions in which the use of leasehold estates for residential properties is a widely-accepted practice, the Mortgaged Property may be a leasehold

53

estate and consists of a single parcel of real property with a detached single family residence erected thereon, or an individual residential condominium unit in a low-rise condominium project, or an individual unit in a planned unit development and that no residence or dwelling is (i) a mobile home or (ii) a manufactured home, provided, however, that any condominium unit or planned unit development shall not fall within any of the "Ineligible Projects" of part VIII, Section 102 of the Fannie Mae Selling Guide. The Mortgaged Property is not raw land;

(j)    Valid First Lien.    Each Mortgage is a valid and subsisting first lien of record on a single parcel of real estate constituting the Mortgaged Property, including all buildings and improvements on the Mortgaged Property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time, subject in all cases to the exceptions to title set forth in the title insurance policy with respect to the related Mortgage Loan, which exceptions are generally acceptable to prudent mortgage lending companies, and such other exceptions to which similar properties are commonly subject and which do not individually, or in the aggregate, materially and adversely affect the benefits of the security intended to be provided by such Mortgage. The lien of the Mortgage is subject only to:

(i)    the lien of current real property taxes and assessments not yet due and payable;

(ii)    covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording acceptable to prudent mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and (a) specifically referred to or otherwise considered in the appraisal made for the originator of the Mortgage Loan or (b) which do not adversely affect the Appraised Value of the Mortgaged Property set forth in such appraisal; and

(iii) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.

Any security agreement, chattel mortgage or equivalent document related to and delivered in connection with the Mortgage Loan establishes and creates a valid, subsisting, enforceable and perfected first lien and first priority security interest with respect to each First Lien Mortgage Loan on the property described therein and Seller has full right to sell and assign the same to Buyer. The Mortgaged Property was not, as of the date of origination of the Mortgage Loan, subject to a mortgage, deed of trust, deed to secure debt or other security instrument creating a lien subordinate to the lien of the Mortgage;

(k)    Validity of Mortgage Documents.    The Mortgage Note and the Mortgage and any other agreement executed and delivered by a Mortgagor in connection with a Mortgage Loan are genuine, and each is the legal, valid and binding obligation of the maker thereof enforceable in accordance with its terms. All parties to the Mortgage Note, the Mortgage and any other such related agreement had legal capacity to enter into the Mortgage Loan and to execute and deliver the Mortgage Note, the Mortgage and any such agreement, and the Mortgage Note, the Mortgage and any other such related agreement have been duly and properly executed by other such related

parties. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of any Person, including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination or servicing of the Mortgage Loan. The relevant Seller has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein;

(l)    <u>Full Disbursement of Proceeds</u>.    The Mortgage Loan has been closed and (other than a reverse mortgage loan) the proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m)    <u>Ownership</u>.    The relevant Seller is the sole owner of record and holder of the Mortgage Loan and the indebtedness evidenced by each Mortgage Note and upon the sale of the Mortgage Loans to Buyer, Seller will retain the Mortgage Files or any part thereof with respect thereto not delivered to the applicable Custodian, Buyer or Buyer's designee, in trust only for the purpose of servicing and supervising the servicing of each Mortgage Loan. The Mortgage Loan is not assigned or pledged, and Seller has good, indefeasible and marketable title thereto, and has full right to transfer and sell the Mortgage Loan to Buyer free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest, and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan pursuant to this Agreement and following the sale of each Mortgage Loan, Buyer will own such Mortgage Loan free and clear of any encumbrance, equity, participation interest, lien, pledge, charge, claim or security interest. The relevant Seller intends to relinquish all rights to possess, control and monitor the Mortgage Loan;

(n)    <u>Doing Business</u>.    All parties which have had any interest in the Mortgage Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (1) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (2) either (i) organized under the laws of such state, or (ii) qualified to do business in such state, or (iii) a federal savings and loan association, a savings bank or a national bank having a principal office in such state, or (3) not doing business in such state;

(o)    <u>LTV, PMI Policy</u>.    No Mortgage Loan has an LTV greater than 100%. The LTV of the Mortgage Loan either is not more than 80% or the excess over 75% of the Appraised Value is and will be insured as to payment defaults by a PMI Policy until the LTV of such Mortgage Loan is reduced to 80%. All provisions of such PMI Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. No action, inaction, or event has occurred and no state of facts exists that has, or will result in the exclusion from, denial of, or defense to coverage;

55

(p)    Title Insurance.    The Mortgage Loan is covered by an ALTA lender's title insurance policy, or with respect to any Mortgage Loan for which the related Mortgaged Property is located in California a CLTA lender's title insurance policy, or other generally acceptable form of policy or insurance acceptable to Fannie Mae or Freddie Mac and each such title insurance policy is issued by a title insurer acceptable to Fannie Mae or Freddie Mac and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the applicable Seller, its successors and assigns, as to the first priority lien (with respect to First Lien Mortgage Loans) of the Mortgage in the original principal amount of the Mortgage Loan, subject only to the exceptions contained in clauses (1), (2), (3) and (4) of paragraph (j) of this Schedule 1, and in the case of Adjustable Rate Mortgage Loans, against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage providing for adjustment to the Mortgage Interest Rate and Monthly Payment. Where required by state law or regulation, the Mortgagor has been given the opportunity to choose the carrier of the required mortgage title insurance. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The title policy does not contain any special exceptions (other than the standard exclusions) for zoning and uses and has been marked to delete the standard survey exception or to replace the standard survey exception with a specific survey reading. The relevant Seller, its successor and assigns, are the sole insureds of such lender's title insurance policy, and such lender's title insurance policy is valid and remains in full force and effect and will be in force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy, including without limitation, no unlawful fee, commission, kickback or other unlawful compensation or value of any kind has been or will be received, retained or realized by any attorney, firm or other person or entity, and no such unlawful items have been received, retained or realized by Seller;

(q)    No Defaults.    Other than payments due but not yet 30 days or more delinquent, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration, and Seller nor any of its Affiliates nor any of their respective predecessors, have waived any default, breach, violation or event which would permit acceleration;

(r)    No Mechanics' Liens.    There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such liens) affecting the related Mortgaged Property which are or may be liens prior to, or equal or coordinate with, the lien of the related Mortgage;

(s)    Location of Improvements; No Encroachments.    All improvements which were considered in determining the Appraised Value of the Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property. No improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation;

56

(t)    Origination; Payment Terms.    The Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or other similar institution which is supervised and examined by a federal or state authority. The documents, instruments and agreements submitted for loan underwriting were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading. No Mortgage Loan contains terms or provisions which would result in negative amortization. Except with respect to reverse mortgage loans, principal payments on the Mortgage Loan commenced no more than sixty days after funds were disbursed in connection with the Mortgage Loan. The Mortgage Interest Rate as well as the Lifetime Rate Cap and the Periodic Cap are as set forth on the Mortgage Loan Schedule. Except with respect to reverse mortgage loans, the Mortgage Note is payable in [equal monthly] installments of principal and interest, which installments of interest, with respect to Adjustable Rate Mortgage Loans, are subject to change due to the adjustments to the Mortgage Interest Rate on each Interest Rate Adjustment Date, with interest calculated and payable in arrears, sufficient to amortize the Mortgage Loan fully by the stated maturity date, over an original term of not more than thirty years from commencement of amortization. Unless otherwise specified and except with respect to reverse mortgage loans, the Mortgage Loan is payable on the first day of each month. There are no Convertible Mortgage Loans which contain a provision allowing the Mortgagor to convert the Mortgage Note from an adjustable interest rate Mortgage Note to a fixed interest rate Mortgage Note;

(u)    Customary Provisions.    The Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure. Upon default by a Mortgagor on a Mortgage Loan and foreclosure on, or trustee's sale of, the Mortgaged Property pursuant to the proper procedures, the holder of the Mortgage Loan will be able to deliver good and merchantable title to the Mortgaged Property. There is no homestead or other exemption available to a Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage, subject to applicable federal and state laws and judicial precedent with respect to bankruptcy and right of redemption or similar law;

(v)    Conformance with Agency Document Guidelines.    The Mortgage Note and Mortgage are on forms acceptable to Freddie Mac or Fannie Mae and Seller has not made any representations to a Mortgagor that are inconsistent with the mortgage instruments used;

(w)    Occupancy of the Mortgaged Property.    The Mortgaged Property is lawfully occupied under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities;

(x)     No Additional Collateral.   The Mortgage Note is not and has not been secured by any collateral except the lien of the corresponding Mortgage and the security interest of any applicable security agreement or chattel mortgage referred to in clause (j) above;

(y)     Deeds of Trust.   In the event the Mortgage constitutes a deed of trust, a trustee, authorized and duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Buyer to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(z)     (aa)     Delivery of Mortgage Documents.   The Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered under the related Custodial Agreement for each Mortgage Loan have been delivered to the applicable Custodian. The relevant Seller is in possession of a complete, true and accurate Mortgage File, except for such documents the originals of which have been delivered to the applicable Custodian;

(bb)     Condominiums/Planned Unit Developments.   If the Mortgaged Property is a condominium unit or a planned unit development (other than a de minimis planned unit development) such condominium or planned unit development project is (i) acceptable to Fannie Mae or Freddie Mac or (ii) located in a condominium or planned unit development project which has received project approval from Fannie Mae or Freddie Mac. The representations and warranties required by Fannie Mae with respect to such condominium or planned unit development have been satisfied and remain true and correct;

(cc)     Transfer of Mortgage Loans.   The Assignment of Mortgage with respect to each Mortgage Loan is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by Seller are not subject to the bulk transfer, bulk sale or similar statutory provisions in effect in any applicable jurisdiction (including, without limitation, Article 6 of the Uniform Commercial Code);

(dd)     Due-On-Sale.   With respect to each Fixed Rate Mortgage Loan, the Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder, and to the best of Seller's knowledge, such provision is enforceable;

(ee)     No Buydown Provisions; No Graduated Payments or Contingent Interests.   The Mortgage Loan does not contain provisions pursuant to which Monthly Payments are paid or partially paid with funds deposited in any separate account established by Seller, the Mortgagor, or anyone on behalf of the Mortgagor, or paid by any source other than the Mortgagor nor does it contain any other similar provisions which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature;

(ff)     Consolidation of Future Advances.   Any future advances made to the Mortgagor prior to the Purchase Date have been consolidated with the outstanding principal amount secured

58

by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien priority by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to Fannie Mae and Freddie Mac. Except with respect to reverse mortgage loans, the consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(gg)    <u>Mortgaged Property Undamaged; No Condemnation Proceedings</u>.    There is no proceeding pending or threatened for the total or partial condemnation of the Mortgaged Property. The Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, windstorm, flood, tornado or other casualty so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended and each Mortgaged Property is in good repair;

(hh)    <u>Collection Practices; Escrow Deposits; Interest Rate Adjustments</u>.    The origination, servicing and collection practices used by Seller with respect to the Mortgage Loan have been in all respects in compliance with Accepted Servicing Practices, applicable laws and regulations, and have been in all respects legal and proper and prudent in the mortgage origination and servicing business. With respect to escrow deposits and Escrow Payments, all such payments are in the possession of, or under the control of, Seller and there exist no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. All Escrow Payments have been collected in full compliance with state and federal law and the provisions of the related Mortgage Note and Mortgage. An escrow of funds is not prohibited by applicable law and has been established in an amount sufficient to pay for every item that remains unpaid and has been assessed but is not yet due and payable. No escrow deposits or Escrow Payments or other charges or payments due Seller have been capitalized under the Mortgage or the Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage and Mortgage Note on the related Interest Rate Adjustment Date. If, pursuant to the terms of the Mortgage Note, another index was selected for determining the Mortgage Interest Rate, the same index was used with respect to each Mortgage Note which required a new index to be selected, and such selection did not conflict with the terms of the related Mortgage Note. The relevant Seller executed and delivered any and all notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and the Monthly Payment adjustments. Any interest required to be paid pursuant to state, federal and local law has been properly paid and credited;

(ii)    <u>No Violation of Environmental Laws</u>.    The Mortgaged Property is free from any and all toxic or hazardous substances and there exists no violation of any local, state or federal environmental law, rule or regulation. There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgaged Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(jj)    Servicemembers Civil Relief Act of 2003.    The Mortgagor has not notified Seller, and Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act of 2003;

(kk)    Appraisal.    The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by a qualified appraiser, duly appointed by Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 and the regulations promulgated thereunder, all as in effect on the date the Mortgage Loan was originated;

(ll)    Disclosure Materials.    The Mortgagor has executed a statement to the effect that the Mortgagor has received all disclosure materials required by, and Seller has complied with, all applicable law with respect to the making of the Mortgage Loans. Seller shall maintain such statement in the Mortgage File;

(mm)    Construction or Rehabilitation of Mortgaged Property.    No Mortgage Loan was made in connection with the construction or rehabilitation of a Mortgaged Property or facilitating the trade-in or exchange of a Mortgaged Property;

(nn)    Value of Mortgaged Property.    No Seller has knowledge of any circumstances existing that could reasonably be expected to adversely affect the value or the marketability of any Mortgaged Property or Mortgage Loan or to cause the Mortgage Loans to prepay during any period materially faster or slower than similar mortgage loans held by Seller generally secured by properties in the same geographic area as the related Mortgaged Property;

(oo)    No Defense to Insurance Coverage.    Seller has caused or will cause to be performed any and all acts required to preserve the rights and remedies of Buyer in any insurance policies applicable to the Mortgage Loans including, without limitation, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of Buyer. No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the Purchase Date (whether or not known to Seller on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any applicable, special hazard insurance policy, PMI Policy or bankruptcy bond (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence, or fraud of Seller, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(pp)    Escrow Analysis.    With respect to each Mortgage, Seller has within the last twelve months (unless such Mortgage was originated within such twelve-month period) analyzed the required Escrow Payments for each Mortgage and adjusted the amount of such payments so that, assuming all required payments are timely made, any deficiency will be eliminated on or before the first anniversary of such analysis, or any overage will be refunded to the Mortgagor, in accordance with RESPA and any other applicable law;

(qq)    Prior Servicing.    Each Mortgage Loan has been serviced in all material respects in strict compliance with Accepted Servicing Practices;

(rr)    Credit Information.    As to each consumer report (as defined in the Fair Credit Reporting Act, Public Law 91-508) or other credit information furnished by Seller to Buyer, that Seller has full right and authority and is not precluded by law or contract from furnishing such information to Buyer and Buyer is not precluded from furnishing the same to any subsequent or prospective purchaser of such Mortgage. The relevant Seller shall hold Buyer harmless from any and all damages, losses, costs and expenses (including attorney's fees) arising from disclosure of credit information in connection with Buyer's secondary marketing operations and the purchase and sale of mortgages or Servicing Rights thereto;

(ss)    Leaseholds.    If the Mortgage Loan is secured by a long-term residential lease, (1) the lessor under the lease holds a fee simple interest in the land; (2) the terms of such lease expressly permit the mortgaging of the leasehold estate, the assignment of the lease without the lessor's consent and the acquisition by the holder of the Mortgage of the rights of the lessee upon foreclosure or assignment in lieu of foreclosure or provide the holder of the Mortgage with substantially similar protections; (3) the terms of such lease do not (a) allow the termination thereof upon the lessee's default without the holder of the Mortgage being entitled to receive written notice of, and opportunity to cure, such default, (b) allow the termination of the lease in the event of damage or destruction as long as the Mortgage is in existence, (c) prohibit the holder of the Mortgage from being insured (or receiving proceeds of insurance) under the hazard insurance policy or policies relating to the Mortgaged Property or (d) permit any increase in rent other than pre-established increases set forth in the lease; (4) the original term of such lease is not less than 15 years; (5) the term of such lease does not terminate earlier than five years after the maturity date of the Mortgage Note; and (6) the Mortgaged Property is located in a jurisdiction in which the use of leasehold estates in transferring ownership in residential properties is a widely accepted practice;

(tt)    Prepayment Penalty.    Each Mortgage Loan is subject to a Prepayment Penalty as provided in the related Mortgage Note unless otherwise as set forth on the Mortgage Loan Schedule hereof, and no Mortgage Loan has a Prepayment Penalty period in excess of five years;

(uu)    Predatory Lending Regulations; High Cost Loans; No Inclusion of Insurance. No Mortgage Loan (i) is subject to Section 226.32 of Regulation Z or any similar state law (relating to high interest rate credit/lending transactions), (ii) includes any single premium credit life or accident and health insurance or disability insurance or (iii) is a High Cost Mortgage Loan;

(vv)    <u>Georgia Fair Lending Act</u>.    No Mortgage Loan that was originated on or after October 1, 2002 and before March 7, 2003 is secured by property located in the State of Georgia. There is no Mortgage Loan that was originated on or after March 7, 2003 that is a "high cost home loan" as defined under the Georgia Fair Lending Act;

(ww)    <u>Single-premium Credit Life Insurance Policy</u>.    In connection with the origination of any Mortgage Loan, no proceeds from any Mortgage Loan were used to finance a single-premium credit life insurance policy;

(xx)    <u>Tax Service Contract; Flood Certification Contract</u>.    Each Mortgage Loan is covered by a paid in full, life of loan, tax service contract and a paid in full, life of loan, flood certification contract and each of these contracts is assignable to Buyer;

(yy)    <u>Qualified Mortgage</u>.    The Mortgage Loan is a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code;

(zz)    <u>Regarding the Mortgagor</u>.    The Mortgagor is one or more natural persons;

(aaa)    <u>Origination</u>.    No predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor, were employed in the origination of the Mortgage Loan;

(bbb)    <u>Recordation</u>.    Each original Mortgage was recorded and, except for those Mortgage Loans subject to the MERS identification system, all subsequent assignments of the original Mortgage (other than the assignment to Buyer) have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of Seller, or is in the process of being recorded;

(ccc)    <u>Compliance with Anti-Money Laundering Laws</u>.    Seller has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws;

(ddd)    <u>Servicer Approval</u>.    Seller has not caused the Mortgage Loans to be serviced by any servicer other than an existing servicer expressly approved in writing by Buyer, which approval shall be deemed granted by Buyer with respect to such existing servicer with the execution of this Agreement;

(eee)    <u>FICO Scores of the Mortgagor</u>.    The weighted average of the date-of-origination FICO scores of the Mortgagors is not less than 700; and

(fff)    <u>Primary Residence of the Mortgagor</u>.    With respect to at least 75% of unpaid principal balance of the Mortgage Loans, the Mortgaged Property is occupied and used by the Mortgagor as the Mortgagor's primary residence.

For purposes of this Schedule 1 and the representations and warranties set forth herein, a breach of a representation or warranty shall be deemed to have been cured with respect to a Mortgage Loan if and when Seller has taken or caused to be taken action such that the event, circumstance or condition that gave rise to such breach no longer affects such Mortgage Loan. With respect to those representations and warranties which are made to the best of Seller's knowledge, if it is discovered by Seller or Buyer that the substance of such representation and warranty is inaccurate, notwithstanding Seller's lack of knowledge with respect to the substance of such representation and warranty, such inaccuracy shall be deemed a breach of the applicable representation and warranty.

## Exhibit B

**(Financing Facility)**

WGM DRAFT 8/03/09

# RECEIVABLES PURCHASE AND CONTRIBUTION AGREEMENT

Aurora Loan Services LLC,
as Seller

Aurora Advance Receivables I LLC,
as Company

August [     ], 2009

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS.................................................................................... 1

    Section 1.01.    Certain Defined Terms.................................................. 1

    Section 1.02.    Other Definitional Provisions .................................... 4

ARTICLE II       SALE OF RECEIVABLES; CLOSING;
ACKNOWLEDGEMENT AND CONSENT .................................... 5

    Section 2.02.    Closing ......................................................................... 7

    Section 2.03.    Seller's Acknowledgment and Consent to Assignment........... 7

ARTICLE III      CONDITIONS PRECEDENT TO CLOSING ................................... 8

    Section 3.01.    Closing Subject to Conditions Precedent................................. 8

ARTICLE IV       RESERVED................................................................................... 9

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF THE
COMPANY...................................................................................... 9

    Section 5.01.    Representations and Warranties................................. 9

ARTICLE VI       REPRESENTATIONS AND WARRANTIES OF THE
SELLER ...................................................................................... 12

    Section 6.01.    Representations and Warranties............................. 12

    Section 6.02.    Repurchase Upon Breach....................................... 18

    Section 6.03.    Breach Receivables................................................ 18

ARTICLE VII      INTENTION OF THE PARTIES; SECURITY INTEREST ............ 18

    Section 7.01.    Intention of the Parties........................................... 18

    Section 7.02.    Security Interest ..................................................... 19

ARTICLE VIII     COVENANTS OF THE SELLER.................................................... 20

    Section 8.01.    Information .............................................................. 20

    Section 8.02.    Reserved.................................................................. 21

    Section 8.03.    Access to Information .............................................. 21

    Section 8.04.    Ownership and Security Interests; Further Assurances ......... 21

    Section 8.05.    Covenants................................................................ 21

    Section 8.06.    Amendments ........................................................... 21

    Section 8.07.    Assignment of Rights.............................................. 22

ARTICLE IX       ADDITIONAL COVENANTS ....................................................... 22

i

# TABLE OF CONTENTS
## (continued)

Page

Section 9.01.        Legal Conditions to Closing ................................................. 22

Section 9.02.        Expenses ................................................................................. 22

Section 9.03.        Mutual Obligations ................................................................ 22

Section 9.04.        Reserved.................................................................................. 22

Section 9.05.        Servicing Standards ............................................................... 22

Section 9.06.        Transfer of Servicing ............................................................ 23

Section 9.07.        Bankruptcy ............................................................................. 23

Section 9.08.        Legal Existence ...................................................................... 24

Section 9.09.        Compliance With Laws........................................................... 24

Section 9.10.        Taxes ...................................................................................... 24

Section 9.11.        No Liens, Etc ......................................................................... 24

Section 9.12.        Amendments to Servicing Agreements .................................. 24

Section 9.13.        No Netting or Offsetting ........................................................ 25

Section 9.14.        Books and Records ................................................................ 25

Section 9.15.        Verification Agent .................................................................. 25

Section 9.16.        Exclusive................................................................................ 25

Section 9.17.        Recovery ................................................................................ 25

Section 9.18.        Merger.................................................................................... 26

Section 9.19.        Use of Proceeds...................................................................... 26

Section 9.20.        Rights Under Eligible Servicing Agreements........................ 26

ARTICLE X        INDEMNIFICATION........................................................... 26

Section 10.01.        Indemnification ..................................................................... 26

ARTICLE XI        MISCELLANEOUS ............................................................. 28

Section 11.01.        Amendments ......................................................................... 29

Section 11.02.        Notices .................................................................................. 29

Section 11.03.        No Waiver; Remedies ........................................................... 29

Section 11.04.        Binding Effect; Assignability ................................................ 29

Section 11.05.        GOVERNING LAW; JURISDICTION ................................ 29

Section 11.06.        Execution in Counterparts..................................................... 30

# TABLE OF CONTENTS
## (continued)

Page

Section 11.07.      Survival .................................................................................. 30

Section 11.08.      Third Party Beneficiary ........................................................... 30

Section 11.09.      General ................................................................................... 30

Section 11.10.      LIMITATION OF DAMAGES ............................................. 31

Section 11.11.      WAIVER OF JURY TRIAL .................................................. 31

SCHEDULE I        INFORMATION FOR NOTICES ………………..Sch-I-1

SCHEDULE II       AMENDMENTS TO SERVICING AGREEMENTS Sch-II-1

EXHIBIT A         COPY OF INITIAL SALE DATE REPORT FOR INITIAL RECEIVABLES …………………………. A-1

EXHIBIT B         FUNDING NOTICE ………………………………….. B-1

EXHIBIT C         FORM OF BILL OF SALE …………………………... C-1

EXHIBIT D         SCHEDULE I REPORT ……………………………… D-1

EXHIBIT E         SCHEDULE II REPORT ……………………………E-1

RECEIVABLES PURCHASE AND CONTRIBUTION AGREEMENT, dated as of August 5, 2009 (the "Receivables Purchase and Contribution Agreement" or this "Agreement"), among Aurora Advance Receivables I LLC (the "Company") and AURORA LOAN SERVICES LLC (the "Seller" or the "Servicer").

ARTICLE I

DEFINITIONS

Section 1.01.   Certain Defined Terms. Capitalized terms used herein without definition shall have the meanings set forth in the Receivables Loan Agreement. Additionally, the following terms shall have the following meanings:

"Additional Receivables": With respect to each Sale Date after the Initial Sale Date, the Receivables sold or contributed by the Seller to the Company on such Sale Date and pledged by the Company, as borrower (the "Borrower") to the to the Lender under the Receivables Loan Agreement.

"Advance Reimbursement Amounts": Amounts paid to or retained by the Servicer in its capacity as agent for the Securitization Trust, including amounts withdrawn from the related Custodial Account (as defined in the applicable Servicing Agreement), as reimbursement of any Advance or Servicing Advance pursuant to the applicable Servicing Agreement.

"Aggregate Receivables": All Initial Receivables and all Additional Receivables.

"Cash Purchase Price" means, with respect to the Receivables conveyed on a Sale Date, the cash consideration paid by the Company for such Receivables on such Sale Date.

"Closing" shall have the meaning set forth in Section 2.02.

"Contribution" shall have the meaning set forth in Section 2.01(b).

"Delinquency Ratio": With respect to any Securitization Trust and any date, a ratio, expressed as a percentage, the numerator of which is the unpaid principal balance of Mortgage Loans 60 days or more Delinquent, and the denominator of which is the unpaid principal balance of all Mortgage Loans.

"Delinquent" means that a payment on a Mortgage Loan is past due thirty (30) days or more. The period of delinquency is based upon the number of days that payments are contractually due (assuming, for this purpose, that each month has exactly thirty (30) days) and each such period shall be expressed as a multiple of thirty (30).

"Eligible Securitization Trust" shall mean a Securitization Trust satisfying the following criteria:

(a)      It shall have been approved by the Lender, in its sole discretion no later than five business days prior to the related Sale Date;

(b)      It shall satisfy the representations and warranties set forth in the Transaction Documents;

(c)      On or prior to the Closing Date, the Servicer shall have delivered a notice to the Securitization Trustee informing it of the Servicer's intent to convey the Aggregate Receivables to the Company in connection with entering into an advance facility;

(d)      It shall not require the Servicer to make nonrecoverable Advances;

(e)      It shall require reimbursement of all Servicer Advances in connection with a "cleanup" call or other redemption of the related Securitization Trust;

(f)      It shall not require the Servicer to invoice the Securitization Trustee, Master Servicer or any other party for reimbursement of the Servicer Advances; and

(g)      no Securitization Termination Event has occurred with respect to such Securitization Trust.

"FIFO" means First-In First-Out.

"Governmental Actions" means any and all consents, approvals, permits, orders, authorizations, waivers, exceptions, variances, exemptions or licenses of, or registrations, declarations or filings with, any Governmental Authority required under any Governmental Rules.

"Governmental Authority" means the United States of America, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and having jurisdiction over the applicable Person.

"Governmental Rules" means any and all laws, statutes, codes, rules, regulations, ordinances, orders, writs, decrees and injunctions, of any Governmental Authority and any and all legally binding conditions, standards, prohibitions, requirements and judgments of any Governmental Authority.

"Indemnified Party" as defined in Section 10.01(b).

"Initial Receivables" means the Receivables sold or contributed by the Seller to the Company on the Initial Sale Date pursuant to this Agreement and pledged by the Company, as Borrower, to the Lender.

"Initial Sale Date" means the first date on which Receivables are sold or contributed by the Seller to the Company pursuant to this Agreement.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, lien, pledge, charge, security interest, hypothecation, option or encumbrance of any kind in respect of such asset or (b) the interest of a vendor or lessor under any conditional sale agreement, financing lease or other title retention agreement relating to such asset.

"<u>Material Adverse Effect</u>" means, with respect to any Person, a material adverse effect to (i) the business, operations or financial condition of (A) such Person or (B) such Person and its Affiliates taken as a whole or (ii) the validity or enforceability of this Agreement or any of the other Transaction Documents or the rights or remedies of the other parties to the Transaction Documents hereunder or thereunder or (iii) the ability of such Person to perform its obligations under this Agreement or (iv) the enforceability or recoverability of any of the Aggregate Receivables.

"<u>Performing Modified Loans with Capitalized Advances</u>" Any Mortgage Loan (i) the terms of which are modified, for among other reasons, to capitalize outstanding Advances and/or Servicing Advances into the unpaid principal balance of such Mortgage Loan payable in equal monthly installments over the remaining term of such Mortgage Loan and (ii) which is not 60 or more days Delinquent with regards to the modification agreement governing such Mortgage Loans as of any date of determination.

"<u>Purchase Price</u>" means, for any Receivables and the related Sale Date, the aggregate amount of the Receivables conveyed on such Sale Date, payable in cash and membership interests of the Company in accordance with the terms of this Agreement.

"<u>Purchased Receivables</u>" means, for any Receivables and the related Sale Date, Receivables sold in consideration for the Cash Purchase Price.

"<u>Receivable Balance</u>": As of any date of determination and with respect to a Receivable, the outstanding unreimbursed amount of such Receivable.

"<u>Receivables Loan Agreement</u>" means the Receivables Loan Agreement, dated as of [      ], 2009, between the Company, as Borrower, Lehman Brothers Holdings, Inc. (the "<u>Lender</u>") and Aurora, as collection agent.

"<u>Receivables Related Collateral</u>" has the meaning set forth in Section 7.01.

"<u>Relevant UCC</u>" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"<u>Repurchase Price</u>" has the meaning set forth in Section 6.02.

"<u>Sale Date</u>" means any date on which Receivables are sold or contributed by the Seller to the Company pursuant to this Agreement.

"<u>Securitization Termination Event</u>" With respect to any Securitization Trust, any of the following conditions or events:

(a)        the (i) giving or receiving of notice of termination or resignation of the Servicer (to the extent that the related Servicing Agreement does not provide for reimbursement of outstanding Servicer Advances upon termination or on a FIFO basis, (ii) the occurrence of the effective date of any termination or resignation of the Servicer (to the extent that the related Servicing Agreement does not provide for reimbursement of outstanding Servicer Advances upon termination or on a FIFO basis), (iii) receipt by the Servicer of notice of an  event of default by the Servicer under any Servicing Agreement that is not cured or waived within the time periods specified in the related Servicing Agreement, or (iv) threatened termination of the Servicer by the related Securitization Trustee in writing related to any default existing for 30 or more days by the Servicer under the related Servicing Agreement;

(b)        the aggregate unpaid principal balance of the related Mortgage Loans is less than $5,000,000;

(c)        the Delinquency Ratio with respect to such Securitization Trust exceeds 55%;

(d)        the Advance Ratio exceeds 25%; or

(e)        a change in advance reimbursement mechanics of any Securitization Trust in a manner adverse to the Servicer.

"Securitization Trustee": Each trustee appointed under a Servicing Agreement in connection with a Securitization Trust.

"True-Up Date" means the day in each calendar week (and which must occur weekly), in which the Seller and the Company perform the "true-up" mechanisms provided for in Section 2.01 hereof.

"True-Up Period" means, for any True-Up Date, the period from and including the end of the prior True-Up Period (or, with respect to the first True-Up Date, the period beginning on the close of business as of the end of the second Business day prior to the Notice of Borrowing related to the Initial Sale Date) through the end of the second Business Day prior to such True-Up Date.

"Verification Agent" shall mean RiskSpan, Inc.

Section 1.02.   Other Definitional Provisions.

(a)        All terms defined in this Agreement shall have the meanings defined herein when used in any certificate or other document made or delivered pursuant hereto unless  otherwise defined therein.

(b)        As used herein and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in Section 1.01, and accounting terms partially defined in Section 1.01 to the extent not defined, shall have the respective

meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms herein are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained herein shall control.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, subsection, Schedule and Exhibit references contained in this Agreement are references to Sections, subsections, Schedules and Exhibits in or to this Agreement unless otherwise specified.

Section 1.03     Construction. Notwithstanding any other provisions of the Transaction Documents or the Servicing Agreements, for purposes of determining the length of time an Advance is outstanding, any Advance shall be considered outstanding notwithstanding the reimbursement thereof from collections on loans other than those on which the related Advances were made (except for reimbursements for nonrecoverable Advances), prior to the liquidation of such loan in full.

ARTICLE II

SALE OF RECEIVABLES; CLOSING; ACKNOWLEDGEMENT AND CONSENT.

Section 2.01. Sale of Receivables.

(a)     Reserved.

(b)     On the Initial Sale Date, the Seller shall sell or contribute to the Company and the Company shall acquire from the Seller, in accordance with the procedures and subject to the terms and conditions set forth herein, the Initial Receivables described in the Initial Sale Date Report attached as Exhibit A hereto. On each subsequent date on which Additional Receivables arise, the Seller automatically without further act by the Company shall sell or contribute to the Company and the Company shall acquire from the Seller, in accordance with the procedures and subject to the terms and conditions set forth herein and in the Receivables Loan Agreement, Additional Receivables representing the contractual rights to be reimbursed for all of the Servicer Advances with respect to the Securitization Trusts made on such date. On the Initial Sale Date and each True-Up Date, as consideration for conveyance of the Initial Receivables to the Company on the Initial Sale Date or the Additional Receivables during the related True-Up Period, respectively, the Company shall pay to the Seller consideration equal to the Cash Purchase Price for the Purchased Receivables in an amount no greater than the amount of funds available to the Company therefor on such Sale Date under the terms of the Receivables Loan Agreement. The Seller shall also make a capital contribution of Receivables (the "Contribution") to the Company in an amount equal to the excess of the balance of all Receivables conveyed on such date over the balance of the Purchased Receivables. For purposes of clarification, the general ledger of the Seller and the Company will be updated to reflect each immediate conveyance on each True-Up Date for the related

True-Up Period. The Aggregate Receivables at any time of determination shall consist of the Initial Receivables and the Additional Receivables sold or contributed to the Company prior to such time of determination.

(c)     Reserved.

(d)     On the Initial Sale Date, the Seller shall deliver to the Company, with copies to the Collection Agent and the Lender, the Funding Notice and a bill of sale, in substantially the forms annexed as Exhibits B and C hereto, respectively, for the Initial Receivables. On each True-Up Date, the Seller shall deliver to the Company, with copies to the Collection Agent and the Lender, the Funding Notice and a bill of sale, in substantially the forms annexed as Exhibits B and C hereto, respectively, with respect to the Additional Receivables sold or contributed during the period covered by such bill of sale, but the failure to do so shall not affect the validity of the sale described in Section 2.01(b).

(e)     The Seller shall take such action reasonably requested by the Company (including from the Lender, as designee or assignee), from time to time hereafter, that may be necessary or appropriate to ensure that the Company and its assigns have an enforceable ownership interest in the documents, books, records and other information relating to the Receivables purchased from the Seller hereunder.

(f)     In connection with the transfers of Receivables hereunder, the Collection Agent hereby grants to each of the Company and the Lender a non- exclusive license to use, without royalty or payment of any kind, all software used by the Collection Agent to account for the Receivables, to the extent necessary to administer the Receivables, whether such software is owned by the Collection Agent or is owned by others and used by the Seller under license agreements with respect thereto (but solely to the extent that Collection Agent is permitted thereunder to grant any such license); provided, that should the consent of any licensor of the Seller to such grant of the license described herein be required, the Seller hereby agrees upon the request of the Company or the Lender to use its commercially reasonable efforts to obtain the consent of such third-party licensor. The parties hereto acknowledge and agree that any such access may be limited by the Seller's compliance with applicable privacy and information security laws and regulations, that the Seller shall not be required to take or allow the Company or Lender to take any action that would cause the Seller to fail to comply with any such laws and regulations and that any parties receiving such access may be subject to further confidentiality provisions relating to access under privacy and information security laws and regulations. The Collection Agent agrees, subject to this paragraph (f), that the Lender and the Verification Agent shall have access to the Collection Agent's systems and software on the Collection Agent's premises. To the extent the Company or the Lender (each, a "Recipient") are granted access to the mortgage servicing platform ("MSP") licensed by the Collection Agent from Lender Processing Services, Inc. (together with its affiliates, "LPS"), the Company and the Lender hereby agree as follows:

(i)      Recipient acknowledges that Collection Agent is providing access to the MSP licensed by Collection Agent from LPS which access is limited by the agreement(s) between LPS and the Seller (the "LPS Agreement").

(ii)      Recipient further acknowledges that any and all LPS products and services, including but not limited to, documentation and any information which pertains to LPS' processes or business operations and other such confidential information of LPS provided to Collection Agent, and in turn provided to Recipient, as well as any third party software licensed by LPS (regardless of the manner or the media in which such provision or disclosure is made) is either (i) the sole and exclusive property of LPS or (ii) licensed by LPS from third parties (collectively, the "LPS Intellectual Property").

(iii)      Recipient acknowledges that the LPS Intellectual Property constitutes the valuable, proprietary products and trade secrets of LPS or such third parties, as applicable, embodying substantial creative efforts, ideas and expressions and are copyrighted under United States law and treaty provisions. Recipient shall ensure that any use by it of the LPS Intellectual Property (or any other third party software or other Intellectual Property provided by Collection Agent) shall be in accordance with the terms and conditions of the applicable third party licenses.

Subject to the foregoing, the license granted hereby shall be irrevocable and shall terminate when the Loan Balance is paid in full. The Seller shall take such action requested by the Company, the Lender and/or any of their assignees, from time to time hereafter, that may be necessary or appropriate to ensure that the Company and its assigns have an enforceable ownership interest in the Records relating to the Receivables purchased from the Seller hereunder and an enforceable right to the extent available under the LPS Agreement (whether by license or sublicense or otherwise) to use all of the computer software used to account for the Receivables and/or to recreate such Records.

Section 2.02.   Closing. The closing (the "Closing") of the execution of this Agreement, upon and concurrent with the closing under the Receivables Loan Agreement, shall take place at [      ] at the offices of [          ] on [        ], 2009 (the "Effective Date"), or if the conditions precedent to closing set forth in Article III of this Agreement shall not have been satisfied or waived by such date, as soon as practicable after such conditions shall have been satisfied or waived, or at such other time, date and place as the parties shall agree upon.

Section 2.03.   Seller's Acknowledgment and Consent to Assignment. Seller hereby acknowledges that the Company has collaterally assigned to the Lender, the rights of the Company under this Agreement, including, without limitation, the right to enforce the obligations of the Seller hereunder. The Seller hereby consents to such assignment by

the Company, and, agrees to remit the Repurchase Price in respect of any repurchased Receivable directly to the Collection Account as provided for in Section 6.02 hereof. The Seller acknowledges that the Lender shall be a third party beneficiary in respect of the representations, warranties, covenants, rights and benefits arising hereunder that are so assigned by the Company. The Seller hereby authorizes the Company, on behalf of the Seller, to execute and deliver such documents or certificates as may be necessary in order to enforce its rights to or collect under the Receivables.

ARTICLE III

CONDITIONS PRECEDENT TO CLOSING.

Section 3.01.  Closing Subject to Conditions Precedent. The Closing is subject to the satisfaction at the time of the Closing of the following conditions (any or all of which may be waived by the Lender in its sole discretion):

(a)    Performance by the Seller and the Company. All the terms, covenants, agreements and conditions of the Transaction Documents to be complied with and performed by the Seller and the Company on or before the Effective Date shall have been complied with and performed in all material respects.

(b)    Representations and Warranties. Each of the representations and warranties of the Seller and the Company made in the Transaction Documents shall be true and correct in all material respects as of the Effective Date (except to the extent they expressly relate to an earlier or later time).

(c)    Officer's Certificate. The Lender shall have received in form and substance reasonably satisfactory to the Lender and its counsel an Officer's Certificate from the Seller and the Company, dated the Effective Date, each certifying to the satisfaction of the conditions set forth in the preceding paragraphs (a) and (b).

(d)    Opinions of Counsel to the Seller and the Company. Counsel to the Seller and the Company shall have delivered to the Lender favorable opinions and reliance letters as to matters described in Article VIII of the Receivables Loan Agreement, dated as of the date of the Effective Date and reasonably satisfactory in form and substance to the Agent and its counsel.

(e)    Filings and Recordations. Within ten (10) days from the Effective Date, the Lender shall have received evidence reasonably satisfactory to the Lender of the completion of all recordings, registrations and filings as may be necessary or, in the reasonable opinion of the Lender, desirable to perfect or evidence the assignment by the Seller to the Company of the Seller's ownership interest in the Aggregate Receivables and the proceeds thereof and the collateral assignment by the Company to the Lender of the Seller's ownership interest in the Aggregate Receivables and the proceeds thereof. Within ten (10) day from the Effective Date, the Lender shall have received evidence reasonably satisfactory to the Lender of the completion of all recordings, registrations,

and filings as may be necessary or, in the reasonable opinion of the Lender, desirable to perfect or evidence the grant of a first priority perfected security interest in the Company's ownership interest in the Aggregate Receivables, in favor of the Lender.

(f)      Documents. The Lender shall have received a duly executed counterpart of this Agreement (in a form acceptable to the Lender), each of the other Transaction Documents and each and every document or certification delivered by the Seller and the Company in connection with this Agreement or any other Transaction Document, and each such document shall be in full force and effect.

(g)      Actions or Proceedings. No action, suit, proceeding or investigation by or before any Governmental Authority shall have been instituted to restrain or prohibit the consummation of, or to invalidate, any of the transactions contemplated by the Transaction Documents and the documents related thereto in any material respect.

(h)      Approvals and Consents. All Governmental Actions of all Governmental Authorities required to consummate the transactions contemplated by the Transaction Documents and the documents related thereto shall have been obtained or made.

(i)      Fees and Expenses. The fees and expenses payable by the Seller pursuant to Section 9.02 hereof and any other Transaction Document shall have been paid.

(j)      Other Documents. The Seller and the Company shall have furnished to the Lender such other opinions, information, certificates and documents as the Lender may reasonably request.

(k)      Verification Agent. The Seller shall have agreed to pay the Verification Agent fees arising pursuant to the Verification Agent Letter.

If any condition specified in this Section 3.01 shall not have been fulfilled when and as required to be fulfilled, this Agreement may be terminated by the Company by notice to the Seller at any time at or prior to the Closing Date, and the Company shall incur no liability as a result of such termination.

ARTICLE IV

RESERVED.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 5.01.   Representations and Warranties. The Company hereby makes the following representations and warranties on which the Seller is relying in executing this Agreement. The representations are made as of the execution and delivery of this Agreement, and as of each date of conveyance of any Additional Receivables. Such

representations and warranties shall survive the sale and/or contribution of any Aggregate Receivables to the Company and are as follows:

(a)    Organization. The Company is a limited liability company duly formed and validly existing in good standing under the laws of the State of Delaware and is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect with respect to the Company.

(b)    Power and Authority. The Company has all requisite limited liability company power and authority and has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being conducted and to execute and deliver and perform its obligations under this Agreement and any other Transaction Document to which it is a party and, except to the extent not necessary in order to execute and deliver and perform its obligations under this Agreement and any other Transaction Document to which it is a party, to own its assets and carry on its business as now being conducted.

(c)    Authorization of Transaction. All appropriate and necessary limited liability company action has been taken by the Company to authorize the execution and delivery of this Agreement and all other Transaction Documents to which it is a party, and to authorize the performance and observance of the terms hereof and thereof.

(d)    Agreement Binding. This Agreement and each of the other Transaction Documents to which the Company is a party constitute the legal, valid and binding obligation of the Company, enforceable in accordance with their terms except as may be limited by laws governing insolvency or creditors' rights or by rules of equity. The execution, delivery and performance by the Company of this Agreement and the other Transaction Documents to which the Company is a party will not violate any provision of law, regulation, order or other governmental directive, or conflict with, constitute a default under, or result in the breach of any provision of any material agreement, ordinance, decree, bond, indenture, order or judgment to which the Company is a party or by which it or its properties is or are bound.

(e)    Compliance with Law. The Company is conducting its business and operations in compliance with all applicable laws, regulations, ordinances and directives of governmental authorities, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect with respect to the Company. The Company has filed all tax returns required to be filed and has paid all taxes in respect of the ownership of its assets or the conduct of its operations prior to the date after which penalties attach for failure to pay, except to the extent that the payment or amount of such taxes is being contested in good faith by it in appropriate proceedings and adequate reserves have been provided for the payment thereof.

(f)     Consents. All licenses, consents and approvals required from and all registrations and filings required to be made by the Company with any governmental or other public body or authority for the making and performance by the Company of this Agreement and the other Transaction Documents to which it is a party have been obtained and are in effect.

(g)     Litigation. There is no action, suit or proceeding at law or in equity by or before any court, governmental agency or authority or arbitral tribunal now pending or, to the knowledge of the Company, threatened against or affecting it which have a reasonable possibility of being determined adversely in a manner or amount that would have a Material Adverse Effect with respect to the Company.

(h)     Other Obligations. The Company is not in default in the performance, observance or fulfillment of any obligation, covenant or condition in any agreement or instrument to which it is a party or by which it is bound the result of which should reasonably be expected to have a Material Adverse Effect with respect to the Company.

(i)     1940 Act. The Company is not an "investment company" or a company "controlled" by an investment company within the meaning of the 1940 Act.

(j)     Solvency. The Company, both prior to and after giving effect to each sale and/or contribution of Aggregate Receivables on the Initial Sale Date or on any Sale Date thereafter (i) is not, and will not be, "insolvent" (as such term is defined in § 101(32)(A) of the Bankruptcy Code), (ii) is, and will be, able to pay its debts as they become due, and (iii) does not have unreasonably small capital for the transaction contemplated in the Transaction Documents.

(k)     Full Disclosure. No document, certificate or report furnished by or on behalf of the Company, in writing, pursuant to this Agreement, any other Transaction Document or in connection with the transactions contemplated hereby or thereby contains or will contain when furnished any untrue statement of a material fact. There are no facts relating to and known by the Company, which when taken as a whole, materially adversely affect the financial condition or assets or business of the Company, or which should reasonably be expected to impair the ability of the Company to perform its obligations under this Agreement or any other Transaction Document, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Company pursuant hereto or thereto. All books, records and documents delivered in connection with the Transaction Documents are and will be true, correct and complete.

(l)     ERISA. All Plans maintained by the Company or any of its Affiliates are in substantial compliance with all applicable laws (including ERISA).

(m)     Fair Consideration. The Seller is receiving fair consideration and reasonably equivalent value in exchange for the sale or contribution of the Aggregate Receivables under this Agreement.

(n)    <u>Bulk Transfers</u>. No sale, contribution, transfer, assignment or conveyance of Aggregate Receivables by the Seller to the Company contemplated by this Agreement will be subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(o)    <u>Name</u>. The legal name of the Company is as set forth in this Agreement and the Company does not have any trade names, fictitious names, assumed names or "doing business" names.

(p)    <u>Organizational Information</u>. The Company's Federal Tax ID Number is as follows: 27-0607071.

(q)    <u>Chief Executive Office</u>. On the date of this Agreement, the Company's chief executive office and principal place of business is located at 10350 Park Meadows Drive, Littleton, CO 80124.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF THE SELLER

Section 6.01.   <u>Representations and Warranties</u>. The Seller hereby makes the following representations and warranties on which the Company is relying in accepting the Aggregate Receivables and executing this Agreement. The representations are made as of the execution and delivery of this Agreement, as of each date of conveyance of any Additional Receivables and as of each Release Date (except with respect to representations and warranties relating to any Receivables, which are made solely as of the date such Receivables are conveyed from the Seller to the Company). Such representations and warranties shall survive the sale and/or contribution of any Aggregate Receivables to the Company and are as follows:

(a)    <u>Organization</u>. The Seller is a limited liability company duly formed and validly existing in good standing under the laws of the state of Delaware and is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect with respect to the Seller.

(b)    <u>Power and Authority</u>. The Seller has all requisite limited liability company power and authority and has all material governmental licenses, authorizations, consents and approvals necessary to execute and deliver and perform its obligations under this Agreement and any other Transaction Document to which it is a party and, except to the extent not necessary in order to execute and deliver and perform its obligations under this Agreement and any other Transaction Document to which it is a party, to own its assets and carry on its business as now being conducted.

(c)     <u>Authorization of Transaction</u>. All appropriate and necessary limited liability company action has been taken by the Seller to authorize the execution and delivery of this Agreement and all other Transaction Documents to which it is a party, and to authorize the performance and observance of the terms hereof and thereof.

(d)     <u>Agreement Binding</u>. This Agreement and each of the other Transaction Documents to which the Seller is a party constitute the legal, valid and binding obligation of the Seller enforceable in accordance with their terms except as may be limited by laws governing insolvency or creditors' rights or by rules of equity. The execution, delivery and performance by the Seller of this Agreement and the other Transaction Documents to which the Seller is a party will not violate any provision of law, regulation, order or other governmental directive, or conflict with, constitute a default under, or result in the breach of any provision of any agreement, ordinance, decree, bond, indenture, order or judgment to which the Seller is a party or by which it or its properties is or are bound.

(e)     <u>Compliance with Law</u>. The Seller is conducting its business and operations in compliance with all applicable laws, regulations, ordinances and directives of governmental authorities, except where the failure to comply would not reasonably be expected to have a Material Adverse Effect with respect to Seller. The Seller has filed all tax returns required to be filed and has paid all taxes in respect of the ownership of its assets or the conduct of its operations prior to the date after which penalties attach for failure to pay, except to the extent that the payment or amount of such taxes is being contested in good faith by it in appropriate proceedings and adequate reserves have been provided for the payment thereof.

(f)     <u>Consents</u>. All licenses, consents and approvals required from and all registrations and filings required to be made by the Seller with any governmental or other public body or authority for the making and performance by the Seller of this Agreement and the other Transaction Documents to which it is a party have been obtained and are in effect.

(g)     <u>Litigation</u>. Except as previously disclosed to the Company, there is no action, suit or proceeding at law or in equity by or before any court, governmental agency or authority or arbitral tribunal now pending or, to the knowledge of the Seller, threatened against or affecting it which have a reasonable possibility of being determined adversely in a manner or amount that would reasonably be expected to have a Material Adverse Effect with respect to Seller.

(h)     <u>Other Obligations</u>. The Seller is not in default in the performance, observance or fulfillment of any obligation, covenant or condition in any agreement or instrument to which it is a party or by which it is bound the result of which should reasonably be expected to have a Material Adverse Effect with respect to Seller.

(i)     <u>1940 Act</u>. The Seller is not an "<u>investment company</u>" or a company "<u>controlled</u>" by an investment company within the meaning of the 1940 Act.

(j)      Solvency. The Seller, both prior to and after giving effect to each sale and/or contribution of Aggregate Receivables on the Initial Sale Date or on any Sale Date thereafter (i) is not, and will not be, "insolvent" (as such term is defined in § 101(32)(A) of the Bankruptcy Code), (ii) is, and will be, able to pay its debts as they become due, and (iii) does not have unreasonably small capital for the business in which it is engaged or for any business or transaction in which it is about to engage.

(k)      Full Disclosure. No document, certificate or report furnished by or on behalf of the Seller, in writing, pursuant to this Agreement, any other Transaction Document or in connection with the transactions contemplated hereby or thereby contains or will contain when furnished any untrue statement of a material fact. Except as previously disclosed in writing to the Company and the Lender, there are no facts relating to and known by the Seller, which when taken as a whole, materially adversely affect the financial condition or assets or business of the Seller, or which should reasonably be expected to impair the ability of the Seller to perform its obligations under this Agreement or any other Transaction  Document or Servicing Agreement, which have not been disclosed herein or in the certificates and other documents furnished by or on behalf of the Seller pursuant hereto or thereto. All books, records and documents delivered in connection with the Transaction Documents are and will be true, correct and complete.

(l)      ERISA. All Plans maintained by the Seller or any of its Affiliates are in substantial compliance with all applicable laws (including ERISA).

(m)      Fair Consideration. The Seller is receiving fair consideration and reasonably equivalent value in exchange for the sale and/or contribution of the Aggregate Receivables to the Borrower under this Agreement.

(n)      Bulk Transfers. No sale, contribution, transfer, assignment or conveyance of Aggregate Receivables by the Seller to the Company contemplated by this Agreement will be subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

(o)      Name. The legal name of the Seller is as set forth in this Agreement and the Seller does not have any trade names, fictitious names, assumed names or "doing business" names.

(p)      Organizational Information. The Seller's Federal Tax ID Number is as follows: 13-3947742.

(q)      Chief Executive Office. On the date of this Agreement, Seller's chief executive office and principal place of business is located at 10350 Park Meadows Drive, Littleton, CO 80124.

(r)      Reserved.

(s)    Reimbursement Amounts. The Seller has not waived or forgiven any obligation of a Mortgagor to repay any Servicer Advance in any manner that would prevent reimbursement thereof from the related custodial account.

(t)    Aggregate Receivables.

(i)    Each Initial Receivable and Additional Receivable is payable in United States dollars and has been created pursuant to and in accordance with the terms of the related Servicing Agreement, in accordance with the Seller's customary procedures with respect to the applicable Securitization Trust and in the ordinary course of business of the Seller.

(ii)    The sale and/or contribution to the Company of the rights to reimbursement for the Servicer Advances under each Securitization Trust, and the assignment thereof to the Lender, does not violate the terms of the related Servicing Agreement or any other document or agreements to which the Seller is a party or to which its assets or properties are subject.

(iii)    No Receivable has been sold, transferred, assigned or pledged by the Seller to any Person other than the Company. Immediately prior to the transfer and assignment herein contemplated, the Seller was the sole owner with respect to each such Receivable, and had the right to transfer and sell such Receivable, free and clear of all Liens and rights of others except as provided under applicable law; immediately upon the transfer and assignment thereof, the Company shall own all of such interest in and to such Receivable, free and clear of all Liens and rights of others except as provided under applicable law.

(iv)    As of the date of conveyance thereof, the Seller has not taken any action that, or failed to take any action the omission of which, would materially impair the rights of the Company with respect to any such Receivable.

(v)    As of the date of conveyance thereof, no such Receivable has been identified by the Seller or reported to the Seller as having resulted from fraud perpetrated by any Person with respect to such Receivable.

(vi)    All filings (including UCC filings) necessary in any jurisdiction to perfect the transfers and assignments herein contemplated, and solely in the event the transfer contemplated hereby were to be recharacterized as a pledge rather than an absolute sale, to perfect the Company's security  interest in the

Aggregate Receivables that is prior to any other interest held or to be held by any other Person (except the Lender) have been made or will be made in accordance with the terms of this Agreement.

(vii)    No Receivable is secured by "real property" or "fixtures" or evidenced by an "instrument" as such quoted terms are used for purposes of creating and perfecting a security interest under the Relevant UCC.

(viii)    Each such Receivable is the legal, valid and binding obligation of the related Securitization Trust and is enforceable in accordance with its terms. There is no valid and enforceable offset, defense or counterclaim to the obligation of the related Securitization Trust to make payment of any such Receivable except as provided under applicable law.

(ix)    Each such Receivable is entitled to be paid, has not been repaid in whole or been compromised, adjusted (except by partial payment), extended, satisfied, subordinated, rescinded, amended or modified, and is not subject to compromise, adjustment, extension, satisfaction, subordination, rescission, set-off, counterclaim, defense, amendment or modification by the Seller (except to the extent that any of the above arise in connection with the modification of the related Mortgage Loan made in accordance with the terms of the related Servicing Agreement).

(x)    As of the date of conveyance thereof, such Receivables do not include amounts payable as a result of accounting or other errors, or the failure to deposit funds or the misapplication of funds by the Servicer.

(xi)    As of the date of conveyance thereof, no such Receivable has been identified by the Seller as a nonrecoverable Advance for which reimbursement has not been sought from the Securitization Trust in accordance with the related Servicing Agreement.

(xii)    The Initial Receivables represent all of the rights to be reimbursed for all Servicer Advances with respect to the Securitization Trusts as of the Initial Sale Date. The Seller has not sold, assigned, transferred or conveyed, without the Lender's consent, any Servicer Advance with respect to such Securitization Trusts to any Person other than the Company. The Additional Receivables conveyed on any Sale Date constitute all of the Servicer Advances with respect to the Securitization Trusts not previously sold or contributed to the Company hereunder, except for Receivables repurchased by the Seller pursuant to Section 6.02.

(xiii)   If such Advance becomes a nonrecoverable Advance after the Initial Sale Date or any subsequent Sale Date, the related Servicing Agreement provides for the reimbursement of such Servicer Advance from the general collections of the Securitization Trust prior to any payments to related Securitization Trust certificateholders.

(xiv)   Each Servicing Agreement is in full force and effect and, other than as set forth in Schedule II, has not been amended or modified, and no party thereto, to the knowledge of the Seller, is in default thereunder.

(xv)   As of the date of conveyance thereof, no Receivable is an obligation of a Securitization Trust for which a Securitization Termination Event has occurred and is continuing.

(xvi)   The principal amount of any Additional Receivable relating to a Servicing Advance or Loan-Level Advance, when added to the aggregate outstanding principal amount of all Receivables relating to Servicing Advances and Loan- Level Advances under the related Securitization Trust, does not cause the weighted average months outstanding with respect to all such Receivables to exceed 16 months.

(xvii)   Each Receivable has not been repaid or reimbursed to the Seller or any other Person.

(xviii)  Each Receivable was made by the Seller pursuant to the Servicer Advance Guidelines.

(xix)   Each Receivable is deemed recoverable when made.

(xx)   Each Receivable is recoverable solely from collections on, or arising out of, the Mortgage Loans and other assets subject to the related Eligible Servicing Agreement and does not otherwise constitute a claim for reimbursement from any Person.

(xxi)   Reserved.

(xxii)  Reserved.

(xxiii)  Reserved.

(xxiv)  No Receivable is on account of Servicing Advances made for fees charged with respect to demand letters.

(u)     Eligible Securitization. Each Securitization Trust to which the Initial and Additional Receivables relate is an Eligible Securitization Trust.

Section 6.02.   Repurchase Upon Breach. The Company or the Seller, as the case may be, shall inform the Company or the Seller, as applicable, promptly (but in no event later than two (2) Business Days following such discovery), in writing, upon the discovery of any material breach of the Seller's or Company's representations and warranties hereunder. If the Seller breaches any such representation or warranty pertaining to a Receivable (including the representations under Sections 5.01(a)(iv) and 6.01(a)(iv)), unless such material breach shall have been cured within thirty (30) days after the earlier to occur of the discovery of such breach by the Seller or receipt of written notice of such breach to the Seller or waived by the Lender, the Seller shall (if the Company demands the same at its option or if the Company is directed to demand the same by the Lender) repurchase such Receivable from the Company at a price equal to the outstanding Receivable Balance of such Receivable as of the date of repurchase (the "Repurchase Price"). The Seller shall pay any Repurchase Price by deposit into the Collection Account. In the event that the Company receives collections in respect of Receivables repurchased by the Seller, it shall hold such collections in trust and shall return them to the Seller on receipt of reasonable evidence of the Seller's right thereto.

Section 6.03.   Breach Receivables. If the Seller is aware than any Receivable to be sold under the Receivables Purchase and Contribution Agreement would be sold on a Sale Date in breach of any representations or warranties contained in Section 6.01(s), 6.01(t) or 6.01(u) of the Receivables Purchase and Contribution Agreement, the Seller shall give the Company and the Lender notice of such applicable representations or warranties on or prior to the related Sale Date. The Seller shall be deemed not to have made those representations or warranties for purposes of this Agreement but shall, for all purposes of this Agreement, be subject to the remedies provided thereunder had such representations been made on the related Sale Date.

ARTICLE VII

INTENTION OF THE PARTIES; SECURITY INTEREST.

Section 7.01.   Intention of the Parties. It is the intention of the parties hereto that each transfer and assignment contemplated by this Agreement shall constitute an absolute sale or contribution, or a combination thereof, of the related Receivables from the Seller to the Company and that the related Receivables shall not be part of the Seller's estate or otherwise be considered property of the Seller in the event of the bankruptcy, receivership, insolvency, liquidation, conservatorship or similar proceeding relating to the Seller or any of its property. Except as set forth below, it is not intended that any amounts available for reimbursement of Receivables be deemed to have been pledged by the Seller to the Company to secure a debt or other obligation of the Seller. In the event that (A) the transfers of Receivables by the Seller are deemed by a court or applicable regulatory, administrative or other governmental body contrary to the express intent of the parties to constitute pledges rather than sales or contributions, or a combination

thereof, of the Receivables, or (B) if amounts available now or in the future for reimbursement of any Receivables are held to be property of the Seller or loans to the Company, or (C) if for any reason this Agreement is held or deemed to be a financing or some other similar arrangement or agreement, then: (i) this Agreement is and shall be a security agreement within the meaning of Articles 8 and 9 of the Relevant UCC; (ii) the Company shall be treated as having a first priority, perfected security interest in and to, and lien on, the Receivables transferred and assigned to the Company hereunder; (iii) the agreement of the Seller and the Company hereunder to sell, assign, convey and transfer the Receivables shall be a grant by the Seller to the Company of, and the Seller does hereby grant to the Company, a security interest in all of the Seller's property and right (including the power to convey title thereto), title, and interest, whether now owned or hereafter acquired, in and to the Aggregate Receivables, together with (A) all amounts payable now or in the future by or with respect to the Receivables and (B) any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all such amounts from time to time held or invested in accounts maintained by or on behalf of the Seller, by or on behalf of the Securitization Trusts, whether in the form of cash, instruments, securities or other property (the "Receivables Related Collateral"). The possession by the Company or its agent of notes and such other goods, money, documents or such other items of property as constitute instruments, money, negotiable documents or chattel paper, in each case, which constitute any of the items described in the foregoing sentence, or proceeds thereof, shall be "possession by the secured party," or possession by a purchaser or a person designated by such secured party, for purposes of perfecting the security interest pursuant to the Relevant UCC of any applicable jurisdiction; and notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of any such holder for the purpose of perfecting such security interest under applicable law.

Section 7.02.   Security Interest.

(a)        The Seller shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in (i) any of the Aggregate Receivables, (ii) the amounts reimbursable now or in the future by or with respect to the Securitization Trusts in respect of any of the Aggregate Receivables or (iii) the other property described above, such security interest would be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement. The Seller shall execute such documents and instruments as the Company may reasonably request from time to time in order to effectuate the foregoing and shall return to the Company the executed copy of such documents and instruments. Without limiting the generality of the foregoing, the Company shall forward for filing, or shall cause to be forwarded for filing, at the expense of the Seller, all filings necessary to maintain the effectiveness of any original filings

necessary under the Relevant UCC to perfect the Company's security interest described above, including without limitation (x) UCC continuation statements, and (y) such other statements as may be occasioned by (1) any change of name of the Seller or the Company or (2) any change of location of the jurisdiction of organization of the Seller (such preparation and filing shall be at the expense of the Seller).

(b)    Reserved.

## ARTICLE VIII

## COVENANTS OF THE SELLER

Section 8.01.   Information. The Seller, in its capacity as the Collection Agent, shall furnish to the Company and the Lender:

(a)    such information (including financial information), documents, records or reports with respect to the Aggregate Receivables, the Securitization Trusts, and the Seller as the Company or the Lender may from time to time reasonably request;

(b)    prompt notice of any Event of Termination, Incipient Event of Termination, Event of Default, Incipient Event of Default or Securitization Termination Event, or any event known to the Seller which, with the passage of time or the giving of notice or both, would become a Securitization Termination Event;

(c)    prompt written notice of a change in name, or address of the jurisdiction of organization of the Seller;

(d)    prompt notice of the occurrence of any event of default by the Servicer under any Servicing Agreement without regard to whether such event of default has been cured;

(e)    Reserved;

(f)    Reserved;

(g)    a Schedule I Report and Schedule II Report, in the form of Exhibits D and E, respectively, attached hereto, monthly to the Lender;

(h)    promptly, and in any event within ten (10) days after the occurrence thereof, written notice of (i) any legal action brought in any jurisdiction against the Seller in which the plaintiff is seeking a judgment for the payment of money in excess of $50,000,000.00 or any legal action brought in any jurisdiction against the Company, (ii) any final judgment or judgments held against the Seller for the payment of money in excess of $15,000,000.00 in the aggregate or any final judgment for the payment of money against the Company, (iii) any other events that could reasonably be likely to have a Material Adverse Effect with respect to the Seller or the Company (iv) any claim for liability brought in any jurisdiction against the Seller or the Company relating to ERISA,

or any contribution failure with respect to any "defined benefit plan" (as defined in ERISA) sufficient to give rise to a lien under Section 302(f) of ERISA, and (v) the creation or assertion of any Lien on the Aggregate Receivables; and

(i)    Reserved.

Section 8.02.    Reserved.

Section 8.03.    Access to Information. The Seller shall, at any time and from time to time during regular business hours, or at such other reasonable times upon reasonable notice to the Seller, permit the Company or the Lender, or their agents or representatives, at the Seller's expense:

(a)    to examine all books, records and documents (including computer tapes and disks) in the possession or under the control of the Seller relating to the Receivables or the Transaction Documents as may be requested;

(b)    to visit the offices and property of the Seller for the purpose of examining such materials described in clause (a) above; and (c) to conduct verification procedures alongside the Verification Agent, including access to the appropriate servicing personnel of the Seller.

Section 8.04.    Ownership and Security Interests; Further Assurances. The Seller will take all action necessary to maintain the Lender's security interest in the Receivables. The parties hereto agree to take any and all acts and to execute any and all further instruments reasonably necessary to more fully effect the purposes of this Agreement.

Section 8.05.    Covenants. The Seller shall duly observe and perform each of its covenants set forth in each of the Transaction Documents to which it is a party. The Seller in its capacity as Servicer shall duly observe and perform each of its covenants set forth in each Servicing Agreement. The Seller shall, promptly upon making its determination that a Servicer Advance is a nonrecoverable Advance, seek reimbursement for that advance in accordance with the related Servicing Agreement.

The Seller hereby covenants that except for the sales and contributions hereunder, the Seller will not sell, pledge, assign or transfer to any other Person, or grant, create, incur, assume or suffer to exist any lien on, any Receivable, or any interest therein; and the Seller will defend the right, title and interest of the Company, in, to and under the Receivables, against all claims of third parties claiming through or under the Seller.

Section 8.06.    Amendments. The Seller shall not make, or permit any Person to make, any amendment, modification or change to, or provide any waiver under any Transaction Document to which the Seller is a party without the prior written consent of the Lender. Any such amendment, modification or waiver without such consent shall be void ab initio.

Section 8.07.   <u>Assignment of Rights</u>. Either (i) while an Event of Termination has occurred and is continuing or (ii) in the absence of an Event of Termination but only for the limited purpose of effecting buybacks for defective Receivables, the Seller and the Company hereby constitute and irrevocably appoint the Lender, as the Receivable Seller's and the Company's true and lawful agent and attorney-in-fact, with the power to the full extent permitted by law, to exercise with respect to the Receivables conveyed under this Receivables Purchase and Contribution Agreement, all the rights, powers and remedies of an owner. The power of attorney granted pursuant to this Receivables Purchase and Contribution Agreement and all authority hereby conferred are granted and conferred solely to protect the Lender's interests in the Receivables and shall not impose any duty upon the Lender to exercise any power. The Seller and the Company shall execute any documentation, including, without limitation, any powers of attorney and/or irrevocable proxies, requested by the Lender to effectuate such assignment. The foregoing grant and assignment are powers coupled with an interest and are irrevocable.

<div align="center">ARTICLE IX</div>

<div align="center">ADDITIONAL COVENANTS</div>

Section 9.01.   <u>Legal Conditions to Closing</u>. The parties hereto will take all reasonable action necessary to obtain (and will cooperate with one another in taking such action to obtain) any consent, authorization, permit, license, franchise, order or approval of, or any exemption by, any Governmental Authority or any other Person, required to be obtained or made by it in connection with any of the transactions contemplated by this Agreement.

Section 9.02.   <u>Expenses</u>.

(a)      The Seller covenants to pay as and when billed by the Verification Agent all of the fees, out-of-pocket costs and expenses and other amounts payable to the Verification Agent in accordance with the Verification Agent Agreement.

Section 9.03.   <u>Mutual Obligations</u>. On and after the Closing, each party hereto will do, execute and perform all such other acts, deeds and documents as one or more other parties may from time to time reasonably require in order to carry out the intent of this Agreement.

Section 9.04.   <u>Reserved</u>.

Section 9.05.   <u>Servicing Standards</u>. At all times, the Servicer shall, unless otherwise consented to by the Lender:

(i)      continue to make Servicer Advances and seek reimbursement, including reimbursement of Servicer Advances deemed nonrecoverable Advances by the Servicer, in accordance with the related Servicing Agreement;

(ii)     apply the Advance Reimbursement Amount on a FIFO basis; provided, that reimbursements in respect of Advances will be applied solely to Advances and reimbursements in respect of Servicing Advances will be applied solely to Servicing Advances;

(iii)    in its capacity as the Collection Agent, identify on its systems the Company as the owner of each Advance and Servicing Advance and that such Advance and Servicing Advance have been pledged to the Lender;

(iv)    in its capacity as the Collection Agent, maintain systems and operating procedures necessary to comply with all the terms of the Transaction Documents;

(v)     in its capacity as the Collection Agent, reasonably cooperate with the Verification Agent in its duties set forth in the Transaction Documents; and

(vi)    make all Servicer Advances within the period required under the related Servicing Agreement.

Section 9.06.  Transfer of Servicing. The Seller covenants that it shall not transfer its rights as Servicer under the Servicing Agreement for any Securitization Trust or cause, permit or suffer its rights as Servicer under any such Servicing Agreement to be terminated; provided, however, that the Seller may transfer its rights as Servicer under the Servicing Agreement for any Securitization Trust or cause its rights as Servicer under any such Servicing Agreement to be terminated if (i) in the event that upon the occurrence of such transfer or termination the Company shall prepay the Aggregate Loans in accordance with Section 2.7 of the Receivables Loan Agreement or the successor servicer under such Servicing Agreement shall cause all Receivables under such Servicing Agreement to be paid in full on or before the applicable date of transfer, (ii) if the Servicer is reimbursed in full for the Servicer Advances under such Servicing Agreement prior to such termination or transfer, or (iii) otherwise with the consent of the Lender. In the event the Seller shall cause, permit or suffer its rights as Servicer under any such Servicing Agreement to be transferred or terminated, (x) the Company shall have the option to prepay the Aggregate Loans, without penalty or premium, in accordance with Section 2.7 of the Receivables Loan Agreement, and (y) with respect to the covenant set forth above, the Seller shall indemnify the Company and its successors and assigns for any losses associated with any breach of the covenant pursuant to the Indemnity Agreement. If the Company shall prepay the Aggregate Loans pursuant to this Section 9.06, the Seller shall deposit an amount equal to the Aggregate Loans into the Collection Account. The Company shall indemnify the Lender for any losses associated with any breach of this covenant pursuant to the Indemnity Agreement.

Section 9.07.  Bankruptcy. The Seller shall not take any action in any capacity to file any bankruptcy, reorganization or insolvency proceedings against the Company, or

cause the Company to commence any reorganization, bankruptcy or insolvency proceedings under any applicable state or federal law, including without limitation any readjustment of debt, or marshaling of assets or liabilities or similar proceedings. The Seller is not transferring and will not transfer any of the Receivables with intent to hinder, delay or defraud any Person.

Section 9.08. <u>Legal Existence</u>. The Seller shall do or cause to be done all things necessary on its part to preserve and keep in full force and effect its existence as a limited liability company, and to maintain its licenses, approvals, registrations or qualifications in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such licenses, approvals, registrations or qualifications; except for failures to maintain any such licenses, approvals, registrations or qualifications which, individually or in the aggregate, would not have a Material Adverse Effect with respect to the Seller.

Section 9.09. <u>Compliance With Laws</u>. The Seller shall comply with all laws, rules and regulations and orders of any governmental authority applicable to the Seller, except where the failure to comply would not have a Material Adverse Effect with respect to the Seller.

Section 9.10. <u>Taxes</u>. The Seller shall pay and discharge all taxes, assessments and governmental charges or levies imposed upon the Seller, or upon such party's income and profits, or upon any of such party's property or any part thereof, before the same shall become in default; provided, that the Seller shall not be required to pay and discharge any such tax, assessment, charge or levy so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Seller  shall have set aside on its books adequate reserves with respect to any such tax, assessment, charge or levy so contested, or so long as the failure to pay any such tax, assessment, charge or levy would not, individually or in the aggregate, have a Material Adverse Effect with respect to the Seller.

Section 9.11. <u>No Liens, Etc. Against Receivables and Trust Property</u>. The Seller, in its capacity as the Collection Agent, and the Company hereby covenants and agrees not to create or suffer to exist (by operation of law or otherwise) any Lien upon or with respect to any of the Aggregate Receivables or any of its interest therein, if any, or upon or with respect to any of its interest in any Account, or assign any right to receive income in respect thereof, except for the Lien created by the Receivables Loan Agreement. Each of the Seller and the Company shall immediately notify the Lender of the existence of any Lien on any of the Aggregate Receivables and shall defend the right, title and interest of the Company and the Lender in, to and under the Aggregate Receivables, against all claims of third parties.

Section 9.12. <u>Amendments to Servicing Agreements</u>. The Seller, in its capacity as Servicer under the Servicing Agreements with respect to the Securitization Trusts, hereby covenants and agrees not to amend or agree to the amendment of any of the Servicing Agreements that has a material adverse impact on the collectibility (timing or

otherwise) of the Receivables, without the prior written consent of the Lender, except as expressly required by the Transaction Documents.

Section 9.13.    No Netting or Offsetting. The Seller, in its capacity as the Servicer, shall make all Servicer Advances out of its own funds without the utilization of any netting or offsetting of amounts in any account of the Securitization Trust, except as permitted under the Servicing Agreements with respect to amounts paid ahead by Obligors (or such substantially similar term as is used in each such Servicing Agreement). The Seller shall repay any amounts borrowed with respect to amounts paid ahead by Obligors (or such substantially similar term as is used in each such Servicing Agreement) pursuant to the terms and provisions of the Servicing Agreements.

Section 9.14.    Books and Records. The Seller, in its capacity as the Servicer, shall maintain accounts and records as to each Receivable accurately and in sufficient detail to permit the reader thereof to know at any time the status of such Receivable, including payments and recoveries made and payments owing (and the nature of each, if applicable). The Seller shall maintain its computer records so that, from and after the time of the granting of the security interest under the Indenture on the Receivables to the Indenture Trustee, the Seller's master computer records (including any back-up archives) that refer to any Receivables indicate clearly the interest of the Company in such Receivables and that the Receivable is owned by the Company and pledged to the Lender.

Section 9.15.    Verification Agent. The Seller, in its capacity as the Collection Agent, shall cooperate with the Verification Agent and shall allow the Verification Agent access to its books, records, computer system and employees during ordinary business hours upon reasonable notice and, shall allow the Verification Agent to review all collections and to make copies of any books, records and documents requested by the Verification Agent, as necessary to carry out the provisions of the Transaction Documents.

Section 9.16.    Exclusive. The Initial Receivables to be sold and/or contributed to the Company on the Initial Sale Date shall consist of the right to reimbursement for all of the Servicer Advances outstanding with respect to the Securitization Trusts as of the Initial Sale Date. Until the Loans and other obligations have been paid in full, the Seller shall not sell, assign, transfer, pledge or convey any Receivable with respect to the Securitization Trusts to any Person other than the Company. The Additional Receivables sold and/or contributed on each Borrowing Date shall consist of the right to reimbursement for all of the Servicer Advances with respect to the Securitization Trusts not previously sold and contributed to the Company hereunder (other than Receivables repurchased by the Seller pursuant to Section 6.02).

Section 9.17.    Recovery. The Seller, in its capacity as the Collection Agent, shall diligently endeavor to collect reimbursement of Aggregate Receivables.

Section 9.18.   Merger. Without the prior written consent of the Lender, the Seller shall not enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation, wind up or dissolution).

Section 9.19.   Use of Proceeds. The Seller shall utilize the proceeds of each purchase of Initial Receivables and Additional Receivables to make Servicer Advances to the extent necessary to ensure the full funding thereof.

Section 9.20.   Rights Under Eligible Servicing Agreements. In connection with each Eligible Servicing Agreement relating to the Pool Receivables, the Company shall direct, instruct, or request the Seller to take any lawful action in connection with enforcement of its rights thereunder, as instructed by the Lender.

ARTICLE X

INDEMNIFICATION

Section 10.01. Indemnification.

(a)      Without limiting any other rights that an Indemnified Party may have hereunder or under applicable law, the Seller hereby agrees to indemnify each Indemnified Party (as defined below) from and against any and all Indemnified Amounts (as defined below) which may be imposed on, incurred by or asserted against an Indemnified Party in any way arising out of or relating to any breach of the Seller's obligations under this Agreement or any other Transaction Document, or the ownership of the Aggregate Receivables or in respect of any Aggregate Receivables, excluding, however, Indemnified Amounts to the extent resulting from gross negligence or willful misconduct on the part of such Indemnified Party or any other Indemnified Party.

(b)      Without limiting or being limited by the foregoing, the Seller shall pay on demand to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from:

(i)      a breach of any representation or warranty made by the Seller under or in connection with this Agreement;

(ii)      the failure by the Seller or the Servicer to comply with any term, provision or covenant contained in this Agreement, or any agreement executed by it in connection with this Agreement or with any applicable law, rule or regulation with respect to any Aggregate Receivable, or the nonconformity of any Aggregate Receivable with any such applicable law, rule or regulation; or

(iii)      the failure to vest and maintain vested in the Company, or to transfer, to the Company, ownership of the Aggregate Receivables,

together with all collections in respect thereof, free and clear of any adverse claim (except as permitted hereunder), whether existing at the time of the transfer of such Aggregate Receivable or at any time thereafter or the failure to vest and maintain vested in the Lender the perfection of the security interest in the in the Aggregate Receivables free and clear of any adverse claim (except as permitted hereunder), whether existing at the  time of the transfer of such Aggregate Receivable or at any time thereafter.

(c)    Any Indemnified Amounts subject to the indemnification provisions of this Section 10.01 shall be paid to the Indemnified Party within twenty (20) Business Days following demand therefor. "Indemnified Party" means the Company and its officers, employees, directors and successors or assigns. "Indemnified Amounts" means any and all claims, losses, liabilities, obligations, damages, penalties, actions, judgments, suits, and related reasonable costs and reasonable expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements (subject to the following paragraph), incurred by an Indemnified Party.

(d)    Promptly after an Indemnified Party shall have been served with the summons or other first legal process or shall have received written notice of the threat of a claim in respect of which an indemnity may be claimed against the Seller under this Section 10.01, the Indemnified Party shall notify the Seller in writing of the service of such summons, other legal process or written notice, giving information therein as to the nature and basis of the claim, and providing a copy thereof; provided, however, that failure so to notify the Seller shall not relieve the Seller from any liability which it may have hereunder or otherwise except to the extent that the Seller is prejudiced by such failure so to notify the Seller. The Seller will be entitled, at its own expense, to participate in the defense of any such claim or action and to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Party, unless the defendants in any such action include both the Indemnified Party and the Seller, and the Indemnified Party (upon the advice of counsel) shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Seller, or one or more Indemnified Parties, and which in the reasonable opinion of such counsel are sufficient to create a conflict of interest for the same counsel to represent both the Seller and such Indemnified Party. Each Indemnified Party shall cooperate with the Seller in the defense of any such action or claim. The Seller shall not, without the prior written consent of the Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Party is or could have been a party and indemnity could have been sought hereunder by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such proceeding or threatened proceeding.

(e)    Without limiting any other rights that a Lender Indemnified Party may have hereunder or under applicable law, the Company hereby agrees to indemnify each Lender Indemnified Party (as defined below) from and against any and all Lender

Indemnified Amounts (as defined below) which may be imposed on, incurred by or asserted against a Lender Indemnified Party in any way arising out of or relating to any breach of the Seller's obligations under this Agreement or any other Transaction Documents, or the ownership of the Aggregate Receivables or in respect of any Aggregate Receivables, excluding, however, Lender Indemnified Amounts to the extent resulting from gross negligence or willful misconduct on the part of such Lender Indemnified Party or any other Lender Indemnified Party. The Company shall pay on demand to each Lender Indemnified Party any and all amounts necessary to indemnify such Lender Indemnified Party from and against any and all Lender Indemnified Amounts relating to or resulting from:

> (i)      a breach of any representation or warranty made by the Seller under or in connection with this Agreement;

> (ii)      the failure by the Seller or the Servicer to comply with any term, provision or covenant contained in this Agreement, or any agreement executed by it in connection with this Agreement or with any applicable law, rule or regulation with respect to any Aggregate Receivable, or the nonconformity of any Aggregate Receivable with any such applicable law, rule or regulation; or

> (iii)      the failure to vest and maintain vested in the Company, or to transfer, to the Company, ownership of the Aggregate Receivables, together with all collections in respect thereof, free and clear of any adverse claim (except as permitted hereunder), whether existing at the time of the transfer of such Aggregate Receivable or at any time thereafter or the failure to vest and maintain vested in the Lender the perfection of the security interest in the Aggregate Receivables free and clear of any adverse claim (except as permitted hereunder), whether existing at the time of the transfer of such Aggregate Receivables or at any time thereafter.

Any Lender Indemnified Amounts subject to the indemnification provisions of this Section 10.01(e) shall be paid to the Indemnified Party within ten (10) Business Days following demand therefore. "Lender Indemnified Party" means the Lender and its officers, employees, directors and successors or assigns. "Lender Indemnified Amounts" means any and all claims, losses, liabilities, obligations, damages, penalties, actions, judgments, suits and related reasonable costs and reasonable expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements incurred by an Indemnified Party.

ARTICLE XI

MISCELLANEOUS

Section 11.01. <u>Amendments</u>. No amendment or waiver of any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by all of the parties hereto and consented to in writing by the Lender, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 11.02. <u>Notices</u>. All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including telecopies) and mailed or e-mailed, telecopied (with a copy delivered by overnight courier) or delivered, as to each party hereto, at its address as set forth in Schedule I hereto or at such other address as shall be designated by such party in a written notice to the other parties hereto. All such notices and communications shall be deemed effective upon receipt thereof, and in the case of telecopies, when receipt is confirmed by telephone.

Section 11.03. <u>No Waiver; Remedies</u>. No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 11.04. <u>Binding Effect; Assignability</u>.

(a)     This Agreement shall be binding upon and inure to the benefit of the Seller and the Company and their respective permitted successors and assigns; provided, however, that the Seller shall not have any right to assign its respective rights hereunder or interest herein (by operation of law or otherwise) without the prior written consent of the Lender.

(b)     This Agreement shall create and constitute the continuing obligation of the parties hereto in accordance with its terms, and shall remain in full force and effect until such time as the Indenture has terminated.

Section 11.05. . <u>GOVERNING LAW; JURISDICTION</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND ANY APPELLATE COURT HAVING JURISDICTION TO REVIEW THE JUDGMENTS THEREOF. EACH OF THE PARTIES HEREBY WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER IN ANY OF THE AFOREMENTIONED COURTS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

Section 11.06. . Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

Section 11.07. Survival. All representations, warranties, covenants, guaranties and indemnifications contained in this Agreement and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the sale, transfer or repayment of the Aggregate Receivables.

Section 11.08. Third Party Beneficiary. The Seller and the Company acknowledge and agree that the Lender is an intended third party beneficiary of this Agreement.

Section 11.09. General.

(a)    No course of dealing and no delay or failure of the Company (or the Lender as its assignee) in exercising any right, power or privilege under this Agreement shall affect any other or future exercise thereof or the exercise of any other right, power or privilege; nor shall any single or partial exercise of any such right, power or privilege or any abandonment or discontinuance of steps to enforce such a right, power or privilege preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies of the Company (and the Lender as its assignee) under this Agreement are cumulative and not exclusive of any rights or remedies which the Company would otherwise have.

(b)    The obligations of the Seller under this Agreement shall be absolute and unconditional and shall remain in full force and effect without regard to, and shall not be released, discharged or in any way affected by (a) any exercise or nonexercise of any right, remedy, power or privilege under or in respect of this Agreement or applicable law, including, without limitation, any failure to set-off or release in whole or in part by the Company of any balance of any deposit account or credit on its books in favor of the Company or any waiver, consent, extension, indulgence or other action or inaction in respect of any thereof, or (b) any other act or thing or omission or delay to do any other act or thing which would operate as a discharge of the Company as a matter of law.

(c)    This Agreement (and the other documents referenced in or contemplated hereby) sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and supersedes all prior understandings and agreements, whether written or oral with respect to the subject matter hereof and thereof.

(d)    Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or nonauthorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

Section 11.10. <u>LIMITATION OF DAMAGES</u>.

NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PARTIES AGREE THAT NO PARTY SHALL BE LIABLE TO ANY OTHER FOR ANY SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND STRICT LIABILITY) OR ANY OTHER LEGAL OR EQUITABLE PRINCIPLES; PROVIDED THAT, THE FOREGOING PROVISION SHALL NOT LIMIT OR RELIEVE ANY PARTY OF ANY OBLIGATION UNDER THIS AGREEMENT TO INDEMNIFY ANY OTHER PARTY AGAINST ANY DAMAGES IMPOSED (INCLUDING SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES) UPON SUCH PARTY BY A FINAL ORDER OF ANY COURT OF COMPETENT JURISDICTION IN CONNECTION WITH ANY LEGAL ACTION BROUGHT AGAINST SUCH PARTY BY ANY THIRD PARTY.

Section 11.11. <u>WAIVER OF JURY TRIAL</u>.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, THE PURCHASES OR THE ACTIONS OF ANY PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF OR THEREOF.

IN WITNESS WHEREOF, the parties hereto have caused this RECEIVABLES PURCHASE AND CONTRIBUTION AGREEMENT to be executed by their duly authorized representatives on the date first written above.

**Aurora Loan Services LLC,**

**as Seller**


By: _____

Name: _____

Title: _____


**Aurora Advance Receivables I LLC,**

**as Company**


By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this RECEIVABLES PURCHASE AND CONTRIBUTION AGREEMENT to be executed by their duly authorized representatives on the date first written above.

**Aurora Loan Services LLC,**

**as Seller**


By: _____

Name: _____

Title: _____


**Aurora Advance Receivables I LLC,**

**as Company**


By: _____

Name: _____

Title: _____

**SCHEDULE I**

**INFORMATION FOR NOTICES**

1.      if to the Company:

> Aurora Advance Receivables I LLC
>
> 10350 Park Meadows Drive
>
> Littleton, CO 80124
>
> Attn: Robert Leist, AARILLC Financing
>
> Fax: 720-945-5720
>
>
> With a copy to:
>
> Aurora Advance Receivables I LLC
>
> 10350 Park Meadows Drive
>
> Littleton, CO 80124
>
> Attn: Todd Whittemore, AARILLC Financing
>
> Fax: 720-945-3123

2.      if to the Seller:

> Aurora Loan Services LLC
>
> 2617 College Park
>
> Scottsbluff, NE 69361
>
> Attn: Leo C. Trautman, Jr., AARILLC Financing
>
> Fax: 308-220-2982
>
>
> With a copy to:
>
> Aurora Loan Services LLC
>
> 10350 Park Meadows Drive
>
> Littleton, CO 80124

Attn: James L. Greene, AARILLC Financing

Fax: 303-728-7666

**SCHEDULE II**

**AMENDMENTS TO SERVICING AGREEMENTS**

| Deal Name | Amendment Name | Amendment Date |
|---|---|---|
| RALI 2005-QO1 | Amendment No. 1 Amending the Series Supplement | 11/15/2005 |
| RALI 2005-QO1 | Amendment No. 2 Amending the Series Supplement | 12/30/2005 |
| RALI 2005-QO4 | Amendment No. 1 Amending the Series Supplement | 6/5/2006 |
| RALI 2006-QH1 | Amendment No. 2 to Series Supplement | 3/19/2007 |
| RALI 2006-QH1 | Amendment No. 1 to Series Supplement | 1/2/2007 |
| RALI 2006-QO8 | Amendment No. 1 Amending the Pooling and Servicing Agreement | 2/28/2007 |
| RALI 2006-QO9 | Amendment No. 1 Amending the Pooling and Servicing Agreement | 2/12/2007 |
| RALI 2007-QH8 | Amendment No. 1 to Series Supplement | 11/1/2008 |
| RALI 2007-QH9 | Amendment No. 1 to Series Supplement | 11/1/2008 |
| RALI 2007-QO5 | Amendment No. 1 to Pooling and Servicing Agreement | 9/28/2007 |

**EXHIBIT A**

**COPY OF INITIAL SALE DATE REPORT**
**FOR**
**INITIAL RECEIVABLES**

Copy of Initial Sale Date Report For Initial Receivables

| INV# | Deal Name | Initial Advances Sold | Initial Servicing Advances Sold | Total Initial Servicer Advances Sold |
|------|-----------|----------------------|--------------------------------|--------------------------------------|
| C01 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-3 | | | |
| C06 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-9XS | | | |
| C16 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-5 | | | |
| C22 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-S2 | | | |
| C24 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-7 | | | |
| C25 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-12H | | | |
| C29 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-6 | | | |
| C30 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-8 | | | |
| C35 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-6 | | | |
| C44 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-10 | | | |
| C45 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-11 | | | |
| C47 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-12 | | | |
| C48 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-13 | | | |
| C49 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-8 | | | |
| C55 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-SC1 | | | |
| C59 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-S3 | | | |
| C61 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-18H | | | |
| C63 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-14 | | | |
| C64 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-15 | | | |
| C69 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-10 | | | |
| C71 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-16 | | | |
| C72 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-17 | | | |
| C79 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-S4 | | | |
| C80 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-18 | | | |
| C87 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-23XS | | | |
| C88 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-11 | | | |
| C89 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-19 | | | |
| C90 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-20 | | | |
| C91 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-1 | | | |
| C93 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-2XS | | | |
| C94 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-3XS | | | |
| C97 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-1 | | | |
| C98 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-2 | | | |
| E06 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-2 | | | |
| E08 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-4XS | | | |
| E09 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-S1 | | | |
| E10 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-4 | | | |
| E11 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-5 | | | |
| E12 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-6XS | | | |
| E19 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-3 | | | |
| E21 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-7XS | | | |
| E22 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-4 | | | |
| E23 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-7 | | | |
| E24 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-8XS | | | |
| E26 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-6 | | | |
| E27 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-S2 | | | |
| E28 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-GEL2 | | | |
| E31 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-5 | | | |
| E32 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-11 | | | |
| E36 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-9XS | | | |
| E37 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-10 | | | |
| E41 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-10 | | | |
| E42 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-12 | | | |
| E47 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-6 | | | |
| E48 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-1 | | | |
| E49 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-14 | | | |
| E52 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-15 | | | |
| E58 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-GEL3 | | | |
| E61 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-7 | | | |
| E63 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-15 | | | |
| E67 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-17 | | | |
| E68 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-2 | | | |
| E73 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-HE3 | | | |
| E74 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-16 | | | |
| E76 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-18 | | | |
| E77 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-3 | | | |
| E87 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-GEL4 | | | |
| E89 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-SC1 | | | |
| E90 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-20 | | | |
| E92 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-4 | | | |
| E93 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-8 | | | |
| E94 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2005-17 | | | |
| E96 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2005-9 | | | |
| E97 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2005-1 | | | |
| E99 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-6 | | | |
| F01 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-21 | | | |
| F04 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2005-2 | | | |
| F06 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-8 | | | |
| F07 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-22 | | | |
| F12 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2005-3 | | | |
| F14 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2005-10 | | | |
| F15 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2005-23 | | | |
| F21 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-GEL1 | | | |

Copy of Initial Sale Date Report For Initial Receivables

| | |
|---|---|
| F23 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-1 |
| F25 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-1 |
| F26 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-1 |
| F28 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-3H |
| F30 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-3 |
| F31 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-2 |
| F32 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-2 |
| F33 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-2 |
| F35 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-5 |
| F38 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-3 |
| F41 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-GEL2 |
| F43 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-4 |
| F44 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-7 |
| F45 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-4 |
| F47 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-8 |
| F48 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-5 |
| F53 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2006-4 |
| F54 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-9 |
| F55 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-10N |
| F56 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-6 |
| F60 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-11 |
| F61 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-7 |
| F63 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-12 |
| F65 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-S3 |
| F66 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-5 |
| F67 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-13 |
| F68 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-8 |
| F71 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-RF3 |
| F72 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-6 |
| F73 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-15 |
| F74 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-9 |
| F75 | BNC Mortgage Loan Trust 2006-1 Mortgage Pass-Through Certificates, Series 2006-1 |
| F76 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-GEL4 |
| F78 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-7 |
| F79 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-17 |
| F80 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-10 |
| F83 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2006-S4 |
| F85 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-8 |
| F86 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-19 |
| F87 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-11 |
| F90 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-20 |
| F91 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2006-12 |
| F94 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2006-9 |
| F95 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC1 |
| F96 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-GEL1 |
| F98 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-1 |
| F99 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-1 |
| H01 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-1 |
| H03 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC2 |
| H04 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-3 |
| H05 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-2 |
| H06 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-2 |
| H08 | GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR1 |
| H10 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-5 |
| H11 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-3 |
| H12 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-3 |
| H15 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-GEL2 |
| H17 | GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR2 |
| H18 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-4 |
| H19 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-6 |
| H30 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC3 |
| H32 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-4 |
| H38 | GreenPoint Mortgage Funding Trust Mortgage Pass-Through Certificates, Series 2007-AR3 |
| H39 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-5 |
| H41 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-7N |
| H42 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-8H |
| H43 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-9 |
| H44 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-5 |
| H48 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-11 |
| H49 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-12N |
| H50 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-10H |
| H51 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-6 |
| H52 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-6 |
| H53 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-7 |
| H55 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-15N |
| H56 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-14H |
| H57 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-10 |
| H58 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-7 |
| H60 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-8 |
| H61 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-16N |
| H62 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-17H |
| H63 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-8 |
| H65 | SASCO MORTGAGE LOAN TRUST 2007-RNP1 MORTGAGE-BACKED NOTES |
| H66 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-10 |
| H68 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-9 |
| H69 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-18N |
| H70 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007- |

**Copy of Initial Sale Date Report For Initial Receivables**

| | |
|---|---|
| H76 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-20N |
| H77 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2007-11 |
| H82 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2007-BC4 |
| H86 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-14N |
| H87 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2008-2 |
| H92 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO5 |
| H93 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO4 |
| H94 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO3 |
| H95 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO2 |
| H96 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO1 |
| H97 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH9 |
| H98 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH8 |
| H99 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH7 |
| J01 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH6 |
| J02 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH5 |
| J03 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH4 |
| J04 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH3 |
| J05 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH2 |
| J06 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QH1 |
| J07 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO9 |
| J08 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO8 |
| J09 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO7 |
| J10 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO6 |
| J11 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO5 |
| J12 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO4 |
| J13 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO3 |
| J14 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO2 |
| J15 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO10 |
| J16 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QO1 |
| J17 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2006-QH1 |
| J18 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO5 |
| J19 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO4 |
| J20 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO3 |
| J21 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO2 |
| J22 | Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2005-QO1 |
| J23 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-4N |
| J24 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2007-2N |
| J25 | Structured Asset Securities Corporation Lehman XS Trust Mortgage Pass-Through Certificates, Series 2006-18N |
| J29 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2008-1 |
| J40 | RESIDENTIAL LOAN TRUST 2008-AH1 MORTGAGE-BACKED NOTES, SERIES 2008-AH1 |
| J45 | RESIDENTIAL LOAN TRUST 2008-2 MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2008-2 |
| J47 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2008-2 |
| J49 | Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2008-6 |
| L63 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-33H |
| L75 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-S2 |
| L78 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-37A |
| L84 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2003-40A |
| L87 | Structured Asset Investment Loan Trust Mortgage Pass-Through Certificates, Series 2004-1 |
| L89 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-1 |
| L90 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2004-2AC |
| L97 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-2 |
| L98 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-4 |
| L99 | Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates, Series 2004-3AC |
| M75 | Structured Asset Securities Corporation Mortgage Pass-Through Certificates, Series 2001-15A |

**EXHIBIT B**

**FUNDING NOTICE**

*[insert date]*

| | |
|---|---|
| Aurora Advance Receivables I LLC<br>10350 Park Meadows Drive<br>Littleton, CO 80124<br>Attn: Robert Leist, AARILLC Financing<br>Fax: 720-945-5720 | Aurora Loan Services LLC<br>2617 College Park<br>Scottsbluff, NE 69361<br>Attn: Leo C. Trautman, Jr., AARILLC Financing<br>Fax: 308-220-2982 |
| Aurora Advance Receivables I LLC<br>10350 Park Meadows Drive<br>Littleton, CO 80124<br>Attn: Todd Whittemore, AARILLC Financing<br>Fax: 720-945-3123 | Aurora Loan Services LLC<br>10350 Park Meadows Drive<br>Littleton, CO 80124<br>Attn: James L. Greene, AARILLC Financing<br>Fax: 303-728-7666 |

　　　　Re: Receivables Purchase and Contribution Agreement, dated as of August [ ], 2009; Funding Notice

　　　　Pursuant to Section 2.01 of the Receivables Purchase and Contribution Agreement, dated as of August [  ], 2009 (the "Receivables Purchase and Contribution Agreement"), between Aurora Loan Services LLC (the "Seller") and Aurora Advance Receivables I LLC (the "Company"), the undersigned hereby notifies you that the Receivables listed on Exhibit A hereto, in the amount of $[_____], have been sold or contributed to the Company [on the Initial Sale Date] [since the most recent True-Up Date].

　　　　The Seller (i) in its capacity as Collection Agent, also hereby certifies that the borrowing conditions contained in Article VIII of the Receivables Loan Agreement, dated as of August [  ], 2009 between the Company (as the Borrower), the Seller (as the Collection Agent) and Lehman Brothers Holdings Inc. have been met, as applicable, and (ii) also hereby certifies that the representations and warranties contained in Section 6 of the Receivables Purchase and Contribution Agreement are true and correct as of the date hereof.

　　　　　　　　[Signature Page Follows]

Very truly yours,

AURORA LOAN SERVICES LLC

By: _____
Name:_____
Title: _____




AURORA ADVANCE
RECEIVABLES I LLC

By: _____
Name: _____
Title: _____

**Exhibit C**

**FORM OF BILL OF SALE**

Aurora Loan Services LLC (the "Seller") hereby absolutely sells to Aurora Advance Receivables I LLC (the "Company"), without recourse, except as set forth in the Receivables Purchase and Contribution Agreement:

A.  All right, title and interest in and to the Receivables identified in the Schedule attached hereto as Exhibit A; and

B.  All principal, interest and other proceeds of any kind received with respect to such Receivables, including but not limited to proceeds derived from the conversion, voluntary or involuntary, of any of such assets into cash or other liquidated property.

The ownership of the Receivables is vested in the Company and the ownership of all records and documents with respect to the related Receivables prepared by or which come into the possession of the Seller shall immediately vest in the Company and shall be retained and maintained, in trust, by the Seller at the will of the Company in such custodial capacity only. The sale of the Receivables shall be reflected as a sale on the Seller's business records.

This Bill of Sale is made pursuant to, and is subject to the terms and conditions of, that certain Receivables Purchase and Contribution Agreement dated as of August [   ], 2009, between Aurora Loan Services LLC, as seller and Aurora Advance Receivables I LLC, as company (the "Agreement"). The Seller confirms to the Company that the representations and warranties set forth in Article 6 of the Agreement are true and correct as if made on the date hereof (except to the extent that they expressly relate to an earlier or later date).

Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

DATED: _____

<div style="margin-left:50%">

AURORA LOAN SERVICES LLC

By: _____
Name: _____
Title: _____


AURORA ADVANCE
RECEIVABLES I LLC

By: _____
Name: _____
Title: _____

</div>

WGM DRAFT 8/03/09

**EXHIBIT D**

**SCHEDULE I REPORT**

**SCHEDULE I - LOAN LEVEL SECURITIZATION TRUSTS SERVICER ADVANCES**

| Investor | Name | Initial Funding Date | Remittance Date | Original Balance | UPB as of MM/DD/YY | Factor (UPB/Original Balance) | Advances MM/DD/YY | Servicing Advances MM/DD/YY | Total Servicer Advances MM/DD/YY | Servicer Advances Already Sold/Contributed to | Total Servicer Advances / UPB | UPB - OTS Current as of MM/DD/YY | UPB - OTS 30+ Delinquent as of MM/DD/YY | UPB - OTS 60+ Delinquent as of MM/DD/YY | Percent OTS 30+ Delinquent UPB | Percent OTS 60+ Delinquent UPB | Total Advances / UPB Current | Total Advances / UPB OTS 30+ Delinquent | Total Advances / UPB OTS 60+ Delinquent | Escrow Advance | Corporate Advance | Servicing Advances | Servicer Advance Percent of Second Liens | UPB <$5M | Delinquent Percent >55% | Total Servicer Advances / UPB >25% | Total Servicer Advances / UPB >25% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | Securitization Termination Events | | | |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |

**EXHIBIT E**

**SCHEDULE II REPORT**

**SCHEDULE II - POOL LEVEL SECURITIZATION TRUSTS SERVICER ADVANCES**

| Investor | Name | Initial Funding Date | Remittance Date | Original Balance | UPB as of MM/DD/YY | Factor (UPB/Original Balance) | Advances MM/DD/YY | Servicing Advances MM/DD/YY | Total Servicer Advances MM/DD/YY | Servicer Advances Already Sold/Contributed to AARLLC | Total Servicer Advances / UPB | UPB - OTS Current as of MM/DD/YY | UPB - OTS 30+ Delinquent as of MM/DD/YY | UPB - OTS 60+ Delinquent as of MM/DD/YY | Percent OTS 30+ Delinquent UPB | Percent OTS 60+ Delinquent UPB | Total Advances / UPB Current | Total Advances / UPB OTS 30+ Delinquent | Total Advances / UPB OTS 60+ Delinquent | Escrow Advance | Corporate Advance | Servicing Advances | Servicer Advance Percent of Second Liens | Securitization Termination Events | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | UPB <$5M | Delinquent Percent >55% | Total Servicer Advances / UPB >25% | Total Servicer Advances / UPB >25% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |
| XXX | XXX | 01/00/00 | 01/00/00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | $0.00 | #DIV/0! | $0.00 | $0.00 | $0.00 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! | $0.00 | $0.00 | $0.00 | 0.00% | Yes | 0.00% | 0.00% | 0.00% |

WGM DRAFT 8/03/09

# RECEIVABLES LOAN AGREEMENT

Aurora Advance Receivables I LLC,
as Borrower

Aurora Loan Services LLC,
as Collection Agent

Lehman Brothers Holdings Inc.,
as Lender

August [     ], 2009

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS.................................................................. 1

　　　　Section 1.1        Definitions........................................................... 1

ARTICLE II        AMOUNT AND TERMS OF THE LOANS.................................... 18

　　　　Section 2.1        Agreement to Lend ................................................. 18

　　　　Section 2.2        Reserved.............................................................. 18

　　　　Section 2.3        Manner of Borrowing ............................................ 18

　　　　Section 2.4        Notes .................................................................. 20

　　　　Section 2.5        Interest and Fees .................................................. 20

　　　　Section 2.6        Repayment of the Loans ......................................... 20

　　　　Section 2.7        Optional Prepayments ........................................... 20

　　　　Section 2.8        Distribution of Collections...................................... 21

　　　　Section 2.9         Reserved............................................................. 21

　　　　Section 2.10        Recovery of Payments ......................................... 21

　　　　Section 2.11        Reserved............................................................ 21

　　　　Section 2.12        Increased Costs, etc............................................. 22

　　　　Section 2.13        Reserved............................................................ 22

　　　　Section 2.14        Increased Capital Costs......................................... 22

　　　　Section 2.15        Taxes ................................................................ 22

　　　　Section 2.16        Maximum Interest................................................ 24

ARTICLE III        PLEDGE; GRANT OF SECURITY INTEREST............................ 25

　　　　Section 3.1        Pledge................................................................. 25

　　　　Section 3.2        Notification to Trustee/Owner ................................ 26

　　　　Section 3.3        Further Assurances................................................ 26

　　　　Section 3.4        Assignment of Rights............................................. 26

　　　　Section 3.5        Change of Name; Jurisdiction of Organization .................... 27

ARTICLE IV        REPRESENTATIONS AND WARRANTIES OF THE
　　　　　　　　　BORROWER.................................................................. 27

　　　　Section 4.1        Organization......................................................... 27

　　　　Section 4.2        Power and Authority .............................................. 27

　　　　Section 4.3        Authorization ...................................................... 27

i

# TABLE OF CONTENTS
## (continued)

Page

Section 4.4    Agreement Binding ................................................................ 28

Section 4.5    Compliance with Law ........................................................... 28

Section 4.6    Consents ................................................................................ 28

Section 4.7    Litigation ............................................................................... 28

Section 4.8    Margin Regulations ............................................................... 28

Section 4.9    Investment Company Act ...................................................... 28

Section 4.10    Chief Executive Office; Location of Records ...................... 29

Section 4.11    Accuracy of Information ....................................................... 29

Section 4.12    ERISA .................................................................................. 29

Section 4.13    Perfection ............................................................................. 29

Section 4.14    Eligibility ............................................................................. 30

Section 4.15    Use of Proceeds .................................................................... 30

Section 4.16    Indebtedness ......................................................................... 30

Section 4.17    Legal Name, etc .................................................................... 30

Section 4.18    Solvent ................................................................................. 30

Section 4.19    Subsidiaries .......................................................................... 30

Section 4.20    Event of Default ................................................................... 30

Section 4.21    Event of Termination ............................................................ 30

Section 4.22    Fair Consideration ................................................................ 30

Section 4.23    Limited Business .................................................................. 30

Section 4.24    Ownership ............................................................................ 31

Section 4.25    Receivables Purchase and Contribution Agreement ............. 31

Section 4.26    Aggregate Receivables .......................................................... 31

ARTICLE V     REPRESENTATIONS AND WARRANTIES OF THE
COLLECTION AGENT ........................................................... 31

Section 5.1    Organization .......................................................................... 31

Section 5.2    Power and Authority ............................................................. 31

Section 5.3    Authorization ........................................................................ 31

Section 5.4    Agreement Binding ............................................................... 32

Section 5.5    Compliance with Law ........................................................... 32

ii

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| Section 5.6 | Consents | 32 |
| Section 5.7 | Litigation | 32 |
| Section 5.8 | Chief Executive Office; Location of Records | 32 |
| Section 5.9 | Accuracy of Information | 33 |
| Section 5.10 | Perfection | 33 |
| Section 5.11 | Event of Default | 33 |
| Section 5.12 | Event of Termination | 34 |
| ARTICLE VI | COVENANTS OF THE BORROWER AND THE COLLECTION AGENT | 34 |
| Section 6.1 | Financial Statements | 34 |
| Section 6.2 | Other Business and Financial Information | 35 |
| Section 6.3 | Corporate Existence; Agency Status | 36 |
| Section 6.4 | Keeping of Records and Books of Account | 36 |
| Section 6.5 | Separate Corporate Existence | 37 |
| Section 6.6 | Merger | 39 |
| Section 6.7 | True Sale | 39 |
| Section 6.8 | Receivables Purchase and Contribution Agreement | 39 |
| Section 6.9 | Borrower Organizational Documents | 39 |
| Section 6.10 | RESERVED | 40 |
| Section 6.11 | Collections | 40 |
| Section 6.12 | Compliance with Laws, Taxes, etc | 40 |
| Section 6.13 | Insurance | 40 |
| Section 6.14 | Restricted Payments | 40 |
| Section 6.15 | RESERVED | 40 |
| Section 6.16 | Audits | 40 |
| Section 6.17 | Indebtedness | 41 |
| Section 6.18 | Adverse Claims | 41 |
| Section 6.19 | RESERVED | 41 |
| Section 6.20 | RESERVED | 41 |
| Section 6.21 | Further Assurances | 41 |

# TABLE OF CONTENTS
### (continued)

**Page**

Section 6.22 Rights under Eligible Servicing Agreements .......................... 41

Section 6.23 Extension or Amendment of Pool Receivables ..................... 41

Section 6.24 Change in Business ................................................................. 41

Section 6.25 RESERVED ........................................................................... 41

Section 6.26 ERISA .................................................................................... 42

ARTICLE VII RESERVED ................................................................................. 42

ARTICLE VIII CONDITIONS PRECEDENT ........................................................ 42

Section 8.1 Conditions Precedent to the Initial Borrowing ...................... 42

Section 8.2 Conditions Precedent to each Borrowing (including the initial Borrowing) .................................................................. 43

ARTICLE IX EVENT OF DEFAULT ................................................................. 44

Section 9.1 Event of Default ..................................................................... 44

Section 9.2 Acceleration ........................................................................... 45

Section 9.3 Remedies upon Event of Default ........................................... 45

Section 9.4 Lender's Appointment as Attorney-in-Fact ........................... 47

ARTICLE X EVENT OF TERMINATION .......................................................... 47

Section 10.1 Event of Termination ............................................................. 47

Section 10.2 Effect of Event of Termination .............................................. 49

ARTICLE XI RESERVED ................................................................................. 49

ARTICLE XII COLLECTION AGENT ................................................................. 49

Section 12.1 Designation of Collection Agent ........................................... 49

Section 12.2 Duties of Collection Agent .................................................... 49

Section 12.3 Certain Rights of the Lender ................................................. 50

Section 12.4 Rights and Remedies ............................................................. 51

Section 12.5 Indemnities by the Collection Agent ..................................... 51

Section 12.6 Collection Agent Default ....................................................... 52

Section 12.7 Investment of Collection Account ......................................... 52

ARTICLE XIII MISCELLANEOUS ..................................................................... 53

Section 13.1 Indemnification ..................................................................... 53

Section 13.2 Expenses ............................................................................... 53

iv

# TABLE OF CONTENTS
## (continued)

Page

| Section 13.3 | Set-off | 54 |
|---|---|---|
| Section 13.4 | Waiver of Notices, etc. | 54 |
| Section 13.5 | Waiver; Cumulative Rights | 54 |
| Section 13.6 | Binding Effect | 54 |
| Section 13.7 | GOVERNING LAW, ETC.; WAIVER OF TRIAL BY JURY | 54 |
| Section 13.8 | Notice | 55 |
| Section 13.9 | Amendments, Waivers, etc | 57 |
| Section 13.10 | Assignments, Participations | 57 |
| Section 13.11 | Successors and Assigns | 59 |
| Section 13.12 | Survival | 60 |
| Section 13.13 | Severability | 60 |
| Section 13.14 | Construction | 60 |
| Section 13.15 | Confidentiality | 60 |
| Section 13.16 | Counterparts; Effectiveness | 61 |
| Section 13.17 | Entire Agreement | 61 |
| SCHEDULE I | AUTHORIZED PERSONS | I-1 |
| EXHIBIT A | FORM OF ASSIGNMENT AND ACCEPTANCE | A-1 |
| EXHIBIT B | FORM OF BORROWING BASE CERTIFICATE | B-1 |
| EXHIBIT C | RESERVED | C-1 |
| EXHIBIT D | FORM OF NOTICE OF BORROWING | D-1 |
| EXHIBIT E | FORM OF NOTE | E-1 |
| EXHIBIT F | FORM OF COLLATERAL INFORMATION REPORT | F-1 |

## RECEIVABLES LOAN AGREEMENT

RECEIVABLES LOAN AGREEMENT, dated as of August [  ], 2009, by and between Aurora Advance Receivables I LLC, a limited liability company, as borrower (the "Borrower"), Aurora Loan Services LLC, a limited liability company, as collection agent (the "Collection Agent"), and Lehman Brothers Holdings Inc., as lender (the "Lender").

### R E C I T A L S

WHEREAS, the Seller (as defined herein), as the master servicer or servicer of certain pools of Mortgage Loans, is obligated to make Servicer Advances with respect to such Mortgage Loans pursuant to the related Servicing Agreements;

WHEREAS, the Seller desires to sell and contribute such Servicer Advances to the Borrower pursuant to the Receivables Purchase and Contribution Agreement;

WHEREAS, in order to fund the purchase of such Receivables, the Borrower desires to obtain Loans from the Lender subject to the terms and conditions set forth herein; and

WHEREAS, the Lender is willing, subject to the terms and conditions set forth herein, to make Loans to the Borrower for the purchase of Receivables from the Seller;

NOW THEREFORE in consideration of the premises and mutual agreements contained herein, the adequacy and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1 Definitions.  Capitalized terms used herein without definition shall have the meanings set forth in the Receivables Purchase and Contribution Agreement. Additionally, the following terms shall have the following meanings:

"Advance" shall mean an Advance or a Monthly Advance, defined in the related Servicing Agreement.

"Advance Ratio": With respect to any Securitization Trust and any date, a ratio, expressed as a percentage, the numerator of which is the aggregate outstanding Receivables Balance of the Pool Receivables relating to such Securitization Trust, and the denominator of which is the aggregate outstanding principal balance of Current-Paying Mortgage Loans owned by such Securitization Trust.

"Affiliate" shall mean, as to any Person, each other Person that directly, or indirectly through one or more intermediaries, owns or controls, is controlled by or under common control with, such Person or is a director or officer of such Person.  For

purposes of this definition, with respect to any Person "control" shall mean (i) the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, or (ii) the beneficial ownership of securities or other ownership interests of such Person having 10% or more of the combined voting power of the then outstanding securities or other ownership interests of such Person ordinarily (and apart from rights accruing under special circumstances) having the right to vote in the election of directors or other governing body of such Person.

"Agreement" shall mean this Receivables Loan Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Aggregate Loans" shall mean, as of any date of determination, the aggregate principal amount of all Loans outstanding hereunder as of such date.

"Amortization Period" shall mean that period beginning at the earliest to occur of (i) an Event of Termination in connection with which the Lender has delivered notice to the Borrower declaring the Commitments hereunder terminated in accordance with Section 10.2 hereof and (ii) the Termination Date and ending upon the payment in full in cash of the Aggregate Loans, accrued interest thereon and all other outstanding Obligations.

"Approved Fund" shall mean, with respect to the Lender, any trust, limited or general partnership, limited liability company, corporation or other limited purpose entity that invests in loans (a "Fund") and is formed by the Lender or one of its Affiliates or, if the Lender is a Fund, that is managed or advised by the same investment advisor of the Lender or by an Affiliate of such investment advisor or is managed or advised by a Lender or an Affiliate of the Lender.

"Assignment and Acceptance" shall mean an Assignment and Acceptance entered into between a Lender and an Eligible Assignee and accepted by the Borrower in substantially the form of Exhibit A.

"Aurora" shall mean Aurora Loan Services LLC

"Authorized Persons" shall mean the persons listed on Schedule 1 attached hereto, as the same may be updated from time to time.

"Available Release Amount" means, as of any date of determination, an amount equal to the aggregate amount on deposit in the Collection Account on such date, so long as no Borrowing Base Deficiency will occur after giving effect to such Release.

"Bank" shall mean Aurora Bank FSB.

"Bankruptcy Event" shall be deemed to have occurred with respect to a Person if either:

(a)    a case or other proceeding shall be commenced, without the application or consent of such Person, in any court, seeking the liquidation, reorganization, debt arrangement, dissolution, winding up, or composition or readjustment of debts of such Person, the appointment of a trustee, receiver, custodian, liquidator, assignee, sequestration or the like for such Person or all or substantially all of its assets, or any similar action with respect to such Person under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, and such case or proceeding shall continue undismissed, or unstayed and in effect, for a period of sixty (60) consecutive days or an order for relief in respect of such Person shall be entered in an involuntary case under the federal bankruptcy laws or other similar laws now or hereafter in effect; or

(b)    such Person shall commence a voluntary case or other proceeding under any applicable bankruptcy, insolvency, reorganization, debt arrangement, dissolution or other similar law now or hereafter in effect, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestration (or other similar official) for such Person or for any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall fail to, or admit in writing its inability to, pay its debts generally as they become due, or, if a corporation or similar entity, its board of directors shall vote to implement any of the foregoing.

"Base Rate" shall mean the Federal Funds Rate plus 5.0% per annum, as adjusted to conform to changes as of the opening of business on the date of any such change in the Federal Funds Rate.

"Borrower" shall mean Aurora Advance Receivables I LLC, a limited liability company, and any successor thereto.

"Borrowing" means each extension of credit made by the Lender by way of Loans pursuant to a Notice of Borrowing, including, without limitation, Special Advance Funding.

"Borrowing Base" shall mean, as of any time of determination, the sum of (a) the product of (i) of the aggregate outstanding balance of all Eligible Receivables that are Receivables pledged hereunder and (ii) the applicable Discount Factor, (b) cash in respect of Eligible Receivables held by the Borrower or the Collection Agent (which is subsequently remitted in accordance with the terms of this Agreement to the Collection Account) and (c) the product of (i) the outstanding balance of all Receivables that are not Eligible Receivables and (ii) the applicable Ineligible Receivables Factor. "Ineligible Receivables Factor shall be 30%; provided, however, that in the Lender's sole discretion, the Lender may assign a Receivables Factor of 0% to any Ineligible Receivable.

"Borrowing Base Certificate" shall mean a certificate in substantially the form attached hereto as Exhibit B.

"Borrowing Base Coverage Requirement" shall mean the requirement that as of the close of business on the second Business Day before the Delivery of a Notice of Borrowing or a Notice of Release, the Borrowing Base shall be greater than or equal to the outstanding aggregate principal amount of all Loans on such date, after giving effect to the Loans or a Release, as applicable (but not to other activity after such second Business Day) to be made on the related Borrowing Date or Release Date, as applicable.

"Borrowing Base Deficiency" means on any date of determination the amount by which (a) the outstanding aggregate principal amount of all Loans on such date exceeds (b) the Borrowing Base on such date.

"Borrowing Date" shall have the meaning set forth in Section 2.3(b) hereof.

"Business Day" shall mean (i) any day other than a Saturday or Sunday, a legal holiday or a day on which commercial banks in New York, New York are required by law to be closed and (ii) in respect of any determination relevant to One-Month LIBOR, any such day that is also a day on which tradings are conducted in the London interbank Eurodollar market.

"Cash Equivalents" shall mean (a) direct obligations of, or obligations fully guaranteed by, (i) the United States of America, or (ii) any agency or instrumentality of the United States of America, the obligations of which are backed by the full faith and credit of the United States of America, (b) federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as at the time of such investment or contractual commitment providing for such investment the commercial paper or other short-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is a subsidiary of a holding company, the commercial paper or other short-term debt obligations of such holding company) are rated "P-l" by Moody's and "A-1" by S&P, and the long-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is a subsidiary of a holding company, the long-term debt obligations of such holding company) are rated at least "Aa2" by Moody's and "AA" by S&P; and (c) any other demand, money market or time deposit account or obligation, or interest-bearing or other security or investment, acceptable to the Lender.

"Change of Control" means that (i) with respect to the Borrower, at any time Aurora shall own less than 100% of all equity interests of the Borrower and (ii) with respect to the Bank and Aurora, Lehman Brothers Holdings Inc. shall own directly or indirectly less than a 100% of all equity interest of the Bank or Aurora.

"Closing Date" shall mean August 5, 2009.

"Collateral" shall have the meaning set forth in Section 3.1 hereof.

"Collateral Information Report" shall mean a report in substantially the form attached hereto as Exhibit F, which shall include, without limitation, (1) aggregate Servicer Advances drawn, outstanding and paid, (2) Collections for the related Collection Period and (3) in digital form, certain servicing portfolio statistics for analytic purposes as reasonably requested by Lender.

"Collection Account" shall mean that certain segregated trust account established at the Collection Account Bank, for the purpose of holding all Collections and any other Proceeds of the Receivables Property.

"Collection Account Bank" shall mean the bank holding the Collection Account, which initially shall be U.S. Bank, National Association.

"Collection Agent" means at any time the Person then authorized pursuant to Section 12.1 to administer and collect the Pool Receivables, in its capacity as Collection Agent, which initially will be Aurora.

"Collection Agent Default" shall have the meaning set forth in Section 12.6 hereof.

"Collection Agent Fee" shall mean with respect to any Payment Date, a fee payable to the Collection Agent on each Payment Date pursuant to Section 2.8 equal to the greater of (a) $500 and (b) the product of (i) 0.01% per annum multiplied by; (ii) the aggregate outstanding balance of the Pool Receivables as of the first day of the related Collection Period.

"Collection Period" shall mean, with respect to each Payment Date, the prior calendar month.

"Collections" shall mean all payments received and collected on the Pool Receivables and all other Proceeds relating to the Pool Receivables and the related Receivables Property including, without limitation, the amount of the "Repurchase Price" (under and as defined in the Receivables Purchase and Contribution Agreement) received by the Borrower pursuant to Section 6.02 of the Receivables Purchase and Contribution Agreement.

"Commitment" shall mean, for the lender, the Maximum Facility Amount, as the same shall be reduced by the aggregate principal amount of loans previously made by the lender, and as the same may be reduced, increased or adjusted from time to time pursuant to the terms of this Agreement.

"Commitment Fee" shall have the meaning set forth in Section 2.5(c) hereof.

"<u>Control Account Agreement</u>" shall mean that certain Control Account Agreement dated as of [        ] between the Borrower, the Lender and the Collection Account Bank.

"<u>Corporate Advance</u>": Any Servicing Advance made by the Servicer pursuant to the terms and provisions of a Servicing Agreement to inspect, protect, preserve or repair the underlying properties that secure related Mortgage Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purpose, including, but not limited to, necessary legal fees and costs expended or incurred by the Servicer in connection with foreclosure, bankruptcy, eviction or litigation actions with or involving the obligors on such related Mortgage Loans, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by any such related Mortgage Loan on such underlying property, and to dispose of such underlying properties taken through foreclosure or by deed in lieu thereof or other similar action which are reported by the Servicer in the Collateral Information Report.

"<u>Corporate Advance Ratio</u>": With respect to any Securitization Trust and any date, a ratio, expressed as a percentage, the numerator of which is the aggregate outstanding Receivables Balance of the Pool Receivables relating to Corporate Advances arising in such Securitization Trust, and the denominator of which is the aggregate outstanding Receivables Balance of the Aggregate Receivables relating to such Securitization Trust.

"<u>Current-Paying Mortgage Loan</u>": As of any date of determination, a Mortgage Loan with respect to which no payment is more than 30 days Delinquent.

"<u>Delinquent</u>" means that a payment on a Mortgage Loan is past due thirty (30) days or more. The period of delinquency is based upon the number of days that payments are contractually due (assuming, for this purpose, that each month has exactly thirty (30) days) and each such period shall be expressed as a multiple of thirty (30).

"<u>Discount Factor</u>": (i) With respect to Pool-Level Advances, 75%, (ii) with respect to Loan-Level Advances, 70%, and (iii) with respect to Servicing Advances, 70%; provided, however, that, if a Discount Factor Reduction Event shall have occurred and be continuing with respect to a related Securitization Trust, each percentage set forth in clauses (i) through (iii) with respect to any such Receivables immediately above shall be decreased by the applicable Discount Factor Reduction Percentage. If a Securitization Termination Event has occurred, notwithstanding the foregoing, the Discount Factor applicable to all related Receivables shall be 50%.

"<u>Discount Factor Reduction Event</u>":  With respect to any Securitization Trust, any of the following conditions or events: (a) the Weighted Average Liquidation Period with respect to such Securitization Trust exceeds fifteen (15) months; (b) the Weighted Average Months Outstanding with respect to such Securitization Trust exceeds (i) fifteen

(15) months or (ii) nineteen (19) months; (c) the Advance Ratio with respect to such Securitization Trust exceeds 20%; and (d) the Corporate Advance Ratio with respect to such Securitization Trust exceeds (i) 50%, (ii) 60%, (iii) 70%, or (iv) 80%.

"Discount Factor Reduction Percentage": (i) With respect to the Discount Factor Reduction Event set forth in clause (a) of the definition thereof, 5.00%; (ii) with respect to the Discount Factor Reduction Event set forth in clause (b)(i) of the definition thereof, 4.00%; (iii) with respect to the Discount Factor Reduction Event set forth in clause (b)(ii) of the definition thereof, 8.00%; (iv) with respect to the Discount Factor Reduction Event set forth in clause (c) of the definition thereof, 2.00%; (v) with respect to the Discount Factor Reduction Event set forth in clause (d)(i) of the definition thereof, 1.00%; (vi) with respect to the Discount Factor Reduction Event set forth in clause (d)(ii) of the definition thereof, 2.00%; (vii) with respect to the Discount Factor Reduction Event set forth in clause (d)(iii) of the definition thereof, 3.00%; and (viii) with respect to the Discount Factor Reduction Event set forth in clause (d)(iv) of the definition thereof, 4.00%.

"Eligible Assignee" shall mean (i) a commercial bank or financial institution organized under the laws of the United States or any state thereof and having total assets in excess of $1,000,000,000, (ii) a commercial bank or financial institution organized under the laws of any other country that is a member of the Organization for Economic Cooperation and Development or any successor thereto (the "OECD") or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such commercial bank or financial institution is acting through a branch or agency located in the United States, in the country under the laws of which it is organized or in another country that is also a member of the OECD, (iii) the central bank of any country that is a member of the OECD, (iv) a finance company, insurance company or other financial institution or fund that is engaged in making, purchasing or otherwise investing in loans in the ordinary course of its business and having total assets in excess of $500,000,000, (v) any existing Lender or Affiliate of an existing Lender or (vi) any other Person approved by the Lender and the Borrower, which approval shall not be unreasonably withheld.

"Eligible Receivable" shall mean a Receivable satisfying the criteria set forth in Section 6.01(s), 6.01(t) and 6.01(u) of the Receivables Purchase and Contribution Agreement. No Receivable sold by the Seller to the Company in breach of any of the representations or warranties contained in Section 6.01(s), 6.01(t) and 6.01(u) of the Receivables Purchase and Contribution Agreement shall be an Eligible Receivable unless such breach has been cured in accordance with Section 6.02 of the Receivables Purchase and Contribution Agreement. No Receivable shall be an Eligible Receivable if:

(a)    when sold by the Seller to the Company, it exceeds, together will all other Servicer Advances with respect to the related Mortgage Loan, fifty (50) % of the most recent BPO or appraisal, if any, of related mortgaged property;

(b)      it is outstanding fifteen (15) months past sixty (60) days after Delinquency of the related Mortgage Loan, if no foreclosure or bankruptcy proceeding has begun with respect to the related Mortgage Loan or the mortgage borrower, as applicable. No such Receivable shall be an Eligible Receivable if it is outstanding fifteen (15) months from the date on which a foreclosure or bankruptcy proceeding began. Further, no such Receivable shall be an Eligible Receivable if it is outstanding eight (8) months after the related trust obtained marketable title to the related mortgaged property as an REO property;

(c)      it relates to a mortgaged property or REO property with known environmental issues;

(d)      the principal amount of such Receivable, when added to the aggregate outstanding principal amount of all Receivables under the related Securitization Trust previously sold or contributed to the Company, would cause the aggregate outstanding principal amount of all such Receivables to exceed 15% of the aggregate outstanding principal amount of all Receivables;

(e)      it relates to a Servicing Advance relating to a Mortgage Loan secured by a second or more junior lien on the related mortgaged property and the outstanding principal amount of that Receivable, when added to the aggregate outstanding principal amount of all Receivables relating to Servicing Advances that relate to Mortgage Loans secured by second or more junior liens on the respective mortgaged properties would cause the aggregate principal amount of all Receivables relating to Servicing Advances secured by second or more junior liens on mortgaged properties to exceed 5% of the aggregate principal amount of all Receivables relating to Servicing Advances;

(f)      it relates to a Performing Modified Loan with Capitalized Advances, and the principal amount of any such Receivable, when added to the aggregate outstanding principal amount of all Receivables relating to Performing Modified Loans with Capitalized Advances under the related Securitization Trust would cause such Receivables to exceed the lesser of (A) 10% of Aggregate Loans and (B) $20,000,000.

"Eligible Servicing Agreement" means, as of any date of determination, a Servicing Agreement:

(a)      which has been reviewed and approved by the Lender in their sole and absolute discretion, within five (5) Business Days of a request for approval from the Borrower;

(b)      which is in full force and effect and under which no event of default, termination event or similar event shall have occurred and be continuing;

(c)      to the extent Aurora was the Master Servicer as of the related Borrowing Date, Aurora has not resigned or been terminated as master servicer thereunder; and

(d)      with respect to which all Receivables arising thereunder are free and clear of Liens in favor of any Person, other than Liens created pursuant to the Transaction Documents.

Each Eligible Servicing Agreement shall be set forth on <u>Exhibit [  ]</u>, as amended, supplemented or otherwise modified from time to time for Servicing Agreements approved by the Lender.

"<u>ERISA</u>" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Affiliate</u>" shall mean any person (including any trade or business, whether or not incorporated) that would be deemed to be under "common control" with, or a member of the same "controlled group" as, Security National Master Holding Company, LLC or any of its Subsidiaries, within the meaning of Sections 4I4(b), (c), (m) or (0) of the Internal Revenue Code or Section 4001 of ERISA.

"<u>Event of Default</u>" shall have the meaning set forth in <u>Section 9.1</u> hereof.

"<u>Event of Termination</u>" shall have the meaning set forth in <u>Section 10.1</u> hereof.

"<u>Facility Rate</u>" shall mean One-Month LIBOR <u>plus</u> 5.00% per annum; provided that (i) if the Lender shall have notified the Borrower that a LIBOR Disruption Event has occurred, the "<u>Facility Rate</u>" shall be the Base Rate, and  (ii) during the continuation of an Event of Default (that has not been waived) the Facility Rate will be the otherwise applicable rate plus 2.00%.

"<u>Federal Funds Rate</u>" shall mean, for any period, a fluctuating per annum interest rate (rounded upwards, if necessary, to the nearest 1/100 of one percentage point) equal for each day during such period to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Lender from three federal funds brokers of recognized standing selected by the Lender.

"<u>Final Maturity Date</u>" means 6 months after the commencement of the Amortization Period.

"<u>Fitch</u>" shall mean Fitch Ratings (or its successors in interest).

"<u>Governmental Authority</u>" shall mean any nation, government, or State, or any political subdivision thereof, or any court, stock exchange, entity or agency exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Highest Lawful Rate" shall have the meaning set forth in Section 2.16 hereof.

"Incipient Event of Default" shall mean an event that but for notice or lapse of time or both would constitute an Event of Default, that has not otherwise been waived by the Lender.

"Incipient Event of Termination" shall mean an event that but for notice or lapse of time or both would constitute an Event of Termination, that has not otherwise been waived by the Lender.

"Indebtedness" shall mean, with respect to any Person (without duplication), (i) all indebtedness and obligations of such Person for borrowed money or in respect of loans or advances of any kind, (ii) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments, (iii) all reimbursement obligations of such Person with respect to surety bonds, letters of credit and bankers' acceptances that are accrued and payable, (iv) all non-contingent obligations of such Person to pay the deferred purchase price of property or services (other than ordinary course trade payables), (v) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (vi) all obligations of such Person as lessee under capital leases to the extent that such obligations are required, in accordance with GAAP, to be recorded on the balance sheet of such Person, (vii) all obligations and liabilities of such Person incurred in connection with any transaction or series of transactions providing for the financing of assets through one or more securitizations or in connection with, or pursuant to, any synthetic lease or similar off-balance sheet financing, (viii) all contingent obligations of such Person in respect of indebtedness of others, and (ix) all indebtedness referred to in clauses (i) through (viii) above (A) of any partnership or unincorporated joint venture in which such Person is a general partner or joint venturer to the extent such Person is liable thereof, or (B) secured by any Lien on any property or asset owned or held by such Person regardless of whether the indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of such Person.

"Indemnity Agreement" means that certain Indemnity and Pledge Agreement, dated as of the date hereof, between the Seller and the Company.

"Independent Manager" means a natural person approved in writing by the Lender, provided that the initial Independent Manager, Jill Russo, is acceptable to the Lender, who (A) shall not have been at the time of such Person's appointment, and may not have been at any time during the preceding five (5) years and shall not be as long as such Person is an Independent Manager of the Borrower (1) a director, member, officer, manager, partner, shareholder or employee of the members of the Borrower or any of its directors, members, partners, subsidiaries, shareholders or Affiliates other than the Borrower and Affiliates that constitute special purpose entities (collectively, the "Independent Parties"), (2) a supplier to any of the Independent Parties, (3) a person controlling or under common control with any directors, members, partners, shareholder or supplier of any of the Independent Parties or (4) a member of the immediate family of

any director, member, partner, shareholder, officer, manager, employee or supplier of the Independent Parties, and (B) has prior experience as an independent director for a corporation or limited liability company whose charter documents required the unanimous consent of all independent directors thereof before such corporation or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable federal or state law relating to bankruptcy.

"Initial Reserve Account Deposit": an amount equal to 2% of the Maximum Facility Amount.

"Interest Period" means with respect to any Loan:

(a)    the period commencing on the date of the initial funding of such Loan and ending on the last day of the month of such funding; and

(b)    thereafter, each calendar month;

provided, however, that if any Interest Period for any Loan that commences before the Termination Date would otherwise end on a date occurring after such Termination Date, such Interest Period shall end on such Termination Date and the duration of each such Interest Period that commences on or after the Termination Date, if any, shall be of such duration as shall be selected by Lender.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

"Lender" shall mean Lehman Brothers Holdings Inc.

"Lending Office" shall mean, with respect to the Lender, the office of the Lender located at 1271 Avenue of the Americas, New York, NY 10020 or designated as its "Lending Office" in an Assignment and Acceptance, or such other office as may be otherwise designated in writing from time to time by the Lender to the Borrower. Such office may be a domestic or foreign branch or Affiliate of the Lender.

"LIBOR Disruption Event" means, with respect to any Interest Period, any of the following: (a) a determination by the Lender that it would be contrary to law or to the directive of any central bank or other governmental authority (whether or not having the force of law) to obtain dollars in the London interbank market to make, fund or maintain its portion of the Aggregate Loans during such Interest Period, (b) the failure of the sources listed in the definition of "One-Month LIBOR" to publish a London interbank offered rate as of 11 :00 a.m. on the second Business Day prior to the first day of such Interest Period, (c) a determination by the Lender that the rate at which deposits of United States dollars are being offered in the London interbank market does not accurately reflect the cost to the Lender of making, funding or maintaining its portion of the

Aggregate Loans for such Interest Period or (d) the inability of the Lender, because of market events not under the control of the Lender, to obtain United States dollars in the London interbank market to make, fund or maintain its portion of the Aggregate Loans for such Interest Period.

"<u>Lien</u>" shall mean any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of such property, whether such interest is based on the common law, statute or contract, and including, but not limited to, the security interest, security title or lien arising from a security agreement, mortgage, deed of trust, deed to secure debt, encumbrance or pledge for security purposes.

"<u>Loan</u>" shall mean each extension of funds to the Borrower by the Lender pursuant to <u>Article II</u> of this Agreement.

"<u>Loan-Level Advance</u>": Servicing Advances which are permitted to be reimbursed by a withdrawal from the related custodial account prior to remittance to the related master servicer upon a determination that all amounts that it expects to recover on behalf of the related Securitization Trusts from on or account of such Mortgage Loan have been recovered.

"<u>Loan-Level Securitization Trusts</u>": Each Securitization Trust for which the underlying Servicer Advances are Loan-Level Advances, which shall initially be listed on Schedule II hereto.

"<u>Master Servicer</u>" shall mean Aurora, in its capacity as master servicer under the Eligible Servicing Agreements and any successor master servicer appointed thereunder or any other master servicers under the Eligible Servicing Agreements.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, operations, properties, prospects or condition (financial or otherwise) of the Borrower, the Collection Agent, the Bank or the Seller, as applicable in the context used, or (b) the validity or enforceability of this Agreement or any of the other Transaction Documents or the rights or remedies of the Lender hereunder or thereunder or (c) the ability of the Borrower, the Collection Agent, the Bank or the Seller, as applicable in the context used, to perform its obligations under this or any of the other Transaction Document.

"<u>Maximum Facility Amount</u>" shall mean $500,000,000; provided, however, that the Borrower, in its sole discretion, shall have the right to permanently reduce the Maximum Facility Amount to the extent, as of any date of determination, of the excess of the Maximum Facility Amount over the Aggregate Loans.

"<u>Moody's</u>" means Moody's Investors Service, Inc. (or its successors in interest).

"<u>Mortgage</u>" shall mean a mortgage, deed of trust or other instrument on real property consisting of residential properties.

"Mortgage Loan" shall mean a loan evidenced by a Mortgage Note and the related Mortgage.

"Mortgage Note" shall mean a promissory note or other evidence of indebtedness which is secured by a Mortgage.

"Multiemployer Plan" shall mean any "multiemployer plan" within the meaning of Section 400 I(a)(3) of ERISA to which the Borrower or any ERISA Affiliate makes, is making or is obligated to make contributions or has made or been obligated to make contributions.

"Non-Use Fee" shall mean with respect to each Payment Date, a fee payable by the Borrower to the Lender in an amount equal to (a) the product of (i) 0.25% per annum and (ii) the average amount of the excess (if any) on each day during the prior calendar month of the Maximum Facility Amount over the Aggregate Loans for each such day.

"Note" and "Notes" shall have the meanings set forth in Section 2.4(a) hereof.

"Notice of Borrowing" shall have the meaning set forth in Section 2.3(a) hereof.

"Obligations" shall mean (i) the unpaid principal of, and interest (including interest accruing at the then applicable rate provided in this Agreement after the maturity of the Loans and interest accruing at the then applicable rate provided in this Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceedings, relating to the Borrower whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other obligations and liabilities of every nature of the Borrower from time to time owing to the Lender whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), which may arise under, out of, or in connection with, this Agreement or any other Transaction Document or under any other document made, delivered or given in connection with any of the foregoing, in each case whether on account of principal, interest, fees, indemnities, costs, expenses or otherwise (including all reasonable fees and disbursements of counsel to the Lender) that are required to be paid by the Borrower pursuant to the terms of this Agreement or any other Transaction Document.

"One-Month LIBOR" shall mean, as of any date of determination related to an Interest Period, the London interbank offered rate for one month United States dollar deposits for such Interest Period, and in an amount comparable to the amount of the Loans to be outstanding on the first day of the related Interest Period.

"OTS" shall mean the Office of Thrift Supervision or any successor agency.

"<u>Owner</u>" shall mean any owner, other than a Trustee, or in the case of a subservicing agreement, any named servicer, of any Mortgage Loan that is serviced or subserviced by the Seller pursuant to a Servicing Agreement.

"<u>Payment Date</u>" shall mean the seventh (7th) day of each month or if such day is not a Business Day, the Business Day immediately following such seventh (7th) day, commencing in September 2009.

"<u>Person</u>" shall mean an individual, partnership, limited liability company, corporation, statutory trust, joint venture or other entity of whatever nature.

"<u>Plan</u>" shall mean any "employee pension benefit plan" within the meaning of Section 3(2) of ERlSA that is subject to the provisions of Title IV of ERISA (other than a Multiemployer Plan) and to which the Borrower or any ERISA Affiliate may have any liability.

"<u>Pool-Level Advance</u>": Advances which are permitted to be paid or reimbursed from funds held in the collection account for future distribution.

"<u>Pool Receivables</u>" shall mean, as of any date of determination, the Receivables sold or contributed to the Borrower by the Seller pursuant to the Receivables Purchase and Contribution Agreement.

"<u>Proceeds</u>" shall mean all "proceeds" as defined in Section 9-102(64) of the UCC and, in any event, shall include without limitation, all collections, distributions or other income or receipts from or in respect of the Pool Receivables.

"<u>Rating Agencies</u>" mean Moody's or S&P, or such other nationally recognized statistical rating organizations as may be designated by the Lender.

"<u>Receivable</u>" shall mean the right to reimbursement from any Servicing Agreement for a Servicer Advance not theretofore reimbursed and all rights of the Servicer or Master Servicer, as applicable, to enforce payment of such obligation under the related Servicing Agreement.

"<u>Receivable Balance</u>": As of any date of determination and with respect to a Receivable, the outstanding unreimbursed amount of such Receivable.

"<u>Receivables Property</u>" shall mean all Pool Receivables, all Collections and all Related Rights with respect thereto.

"<u>Receivables Purchase and Contribution Agreement</u>" shall mean that certain Receivables Purchase and Contribution Agreement, dated as of the date hereof, between the Seller, as seller, and the Borrower, as purchaser.

"Records" means all documents, books, records and other information (including, without limitation, computer programs, tapes, disks, punch cards, data processing software and related property and rights) maintained with respect to Receivables Property.

"Related Rights" shall mean with respect to any Pool Receivable (a) all rights of the Seller under the related Eligible Servicing Agreement with respect to reimbursement of the related Servicer Advances and (b) access to all Records of the Borrower, the Seller and the Collection Agent related to such Eligible Servicing Agreements, related Servicer Advances and Pool Receivables; provided, that such access shall be subject to applicable law prohibiting the disclosure of information regarding mortgagors with respect to the Mortgage Loans relating to such Eligible Servicing Agreement.

"Release" shall have the meaning set forth in Section 2.3(c) hereof.

"Required Reserve Amount": With respect to any Payment Date, an amount equal to 2% of the Maximum Facility Amount.

"Reserve Account" shall mean that certain segregated trust account established at the Reserve Account Bank, for the purpose of holding all the Initial Reserve Account Deposit and the Reserve Fund Reimbursement Amount.

"Reserve Account Agreement" shall mean that certain Control Account Agreement dated as of [    ] between the Borrower, the Lender and the Reserve Account Bank.

"Reserve Account Bank" shall mean the bank holding the Reserve Account, which initially shall be U. S. Bank, National Association.

"Reserve Fund Reimbursement Amount": With respect to any Payment Date, the excess of the Required Reserve Amount over the amount then on deposit in the Reserve Account.

"Responsible Officer" shall mean the chief executive officer, the president or any executive or senior vice president of the Borrower, the Seller or the Collection Agent, as applicable.

"Restricted Payments" shall mean with respect to any Person, collectively, all dividends or other distributions of any nature (cash, securities, assets or otherwise), and all payments, by virtue of redemption or otherwise, on any class of equity securities (including, without limitation, warrants, options or rights therefor) issued by such Person, whether such securities are now or may hereafter be authorized or outstanding and any distribution in respect of any of the foregoing, whether directly or indirectly.

"Rolling Three Month Reimbursement Percentage": The percentage equivalent of a fraction, the numerator of which is the aggregate Advance Reimbursement Amounts

with respect to the applicable Servicing Advances and applicable Loan Level Advances deposited to the Reimbursement Account during the prior three related Collection Periods and the denominator of which is the aggregate Receivables Balance with respect to Servicing Advances and Loan Level Advances outstanding as of the beginning of the first related Collection Period.

"Rolling Three Month Reimbursement Percentage Threshold": for the month of January, 17%; for the month of February, 17%; for the month of March, 20%; for the month of April, 20%; for the month of May, 23%; for the month of June, 26%; for the month of July, 26%; for the month of August, 26%; for the month of September, 26%; for the month of October, 23%; for the month of November, 20%; and for the month of December, 17%.

"Securitization Trust": Each real estate mortgage investment conduit within the meaning of Section 860A-860G of the Code or other mortgage-backed securities issuance described on Schedule II hereto, as such schedules may be amended from time to time, and additional real estate mortgage investment conduits and other mortgage-backed securities issuances subsequently approved in writing by the Lender in its sole discretion (in each case, within two (2) Business Days of request from the Borrower or such shorter time as may be reasonably necessary in connection with the remedy of a Borrowing Base Deficiency), and collectively referred to herein as the "Securitization Trusts."

"Seller" shall mean Aurora and any successor thereto.

"S&P" shall mean Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"Servicer Advance Guidelines" means, for any Servicer Advance, the terms of the Servicing Agreement related thereto.

"Servicer Advances" shall mean those Advances and Servicing Advances made by the Seller in its capacity as master servicer or servicer pursuant to a Servicing Agreement and related to Pool Receivables.

"Servicing Advances" shall have the meaning described in the related Eligible Servicing Agreement.

"Servicing Agreement" shall mean any servicing agreement, pooling and servicing agreement, subservicing agreement, trust agreement or other similar agreement pursuant to which the Seller has agreed to master service or service the corresponding Mortgage Loans in a Securitization Trust.

"Subsidiary" shall mean, with respect to any Person, any corporation or other Person of which more than 50% of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors, board of managers or other governing body of such Person, is at the time, directly or indirectly, owned or controlled by such

Person and one or more of its other Subsidiaries or a combination thereof (irrespective of whether, at the time, securities of any other class or classes of any such corporation or other Person shall or might have voting power by reason of the happening of any contingency).

"Termination Date" shall mean the earlier of (i) six (6) months after the Closing Date (or, at the sole option of the Lender so long as no Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination has occurred and is continuing (and has not otherwise been waived), twelve (12) months after the Closing Date); and (ii) repayment in full of the Obligations of the Borrower under this Agreement in connection with a refinancing in full of the facility.

"Transaction Documents" shall mean and include this Agreement, the Notes, the Receivables Purchase and Contribution Agreement, the Control Account Agreement, the Reserve Account Agreement, the Indemnity Agreement and all other documents and instruments executed and delivered in connection herewith or therewith.

"Trustee" shall mean any trustee under a Servicing Agreement.

"UCC" shall mean the Uniform Commercial Code from time to time in effect in the State of New York or other applicable jurisdictions.

"Verification Agent" shall mean RiskSpan, Inc.

"Weighted Average Liquidation Period" : As of any date of determination, with respect to all Servicing Advances, the Receivables of which were owned by the Borrower and repaid in full during the preceding month, the average of the number of Collection Periods (defined as, with respect to any date of determination, the calendar month immediately preceding the month of such date of determination) (expressed in months and weighted by the aggregate Receivables Balance of all such Servicing Advances) from the respective dates such Servicing Advances arose to the dates that such Servicing Advances were repaid in full, whether as the result of liquidation or otherwise.

"Weighted Average Months Outstanding": As of any date of determination, with respect to all Servicing Advances, the Receivables of which are owned by the Borrower, the average of the number of Collection Periods (defined as, with respect to any date of determination, the calendar month immediately preceding the month of such date of determination) (expressed in months and weighted by the aggregate Receivables Balance of all such Servicing Advances) from the respective dates such Servicing Advances arose to such date of determination.

Section 1.2   Construction. Notwithstanding any other provisions of the Transaction Documents or the Servicing Agreements, for purposes of determining the length of time an Advance is outstanding, any Advance shall be considered outstanding notwithstanding the reimbursement thereof from collections on loans other than those on

which the related Advances were made (except for reimbursements for nonrecoverable Advances), prior to the liquidation of such loan in full.

## ARTICLE II
## AMOUNT AND TERMS OF THE LOANS

Section 2.1    Agreement to Lend.    Subject to the terms and conditions of this Agreement and the satisfaction of the conditions precedent set forth in Article VIII hereof, and provided that no Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination shall have occurred and be continuing hereunder (without waiver thereof), the Lender agrees, from time to time during the period commencing on the date hereof and ending on the Termination Date, to make loans (each a "Loan" and, collectively, the "Loans") to the Borrower, which Loans (a) may be repaid and reborrowed in accordance with this Agreement, (b) shall not exceed the Commitment of the Lender at such time and (c) shall not exceed for the Lender at any time outstanding the lesser of (i) the Maximum Facility Amount at such time and (ii) the Borrowing Base at such time.  The amount of each Loan requested by the Borrower pursuant to a Notice of Borrowing shall be at least $250,000.

Section 2.2    Reserved.

Section 2.3    Manner of Borrowing.

(a)    To request a Borrowing, the Borrower shall notify the Lender by delivering a Notice of Borrowing substantially in the form of Exhibit D hereto (a "Notice of Borrowing") not later than 1:00 p.m. Eastern Time two (2) Business Days prior to the date of such requested Borrowing (or in the case of a Release, not later than the Business Day immediately preceding the Release Date (a "Notice of Release")).  Each Notice of Borrowing and Notice of Release shall be executed by an Authorized Person.  In addition, the Borrower or the Seller shall forward to the Lender, to the extent not previously provided, a copy of the related Servicing Agreement or Servicing Agreements and such other documents reasonably requested by the Lender in order for the Lender to determine that each such Servicing Agreement is an Eligible Servicing Agreement. Notwithstanding anything to the contrary contained herein, the Lender shall not have any obligation to make a Loan hereunder if the Receivables proposed as collateral for such Loan are not, in the Lenders' judgment, Eligible Receivables originated under an Eligible Servicing Agreement.

(b)    In connection with each Notice of Borrowing, on the borrowing date specified in such Notice of Borrowing ("Borrowing Date"), the Lender will disburse to the Borrower in immediately available funds, the amount of the Loan to be made by the Lender.

(c)    On any Business Day during the period commencing on the date hereof and ending on the Termination Date, provided that no Event of Default, Incipient Event

of Default, Event of Termination or Incipient Event of Termination shall have occurred (without waiver thereof) and be continuing, in lieu of requesting a Borrowing under Section 2.3(a) of this Agreement, the Borrower may notify the Lender in writing that the Borrower intends to utilize funds then on deposit in the Collection Account for the sole purpose of purchasing additional Receivables pursuant to the Receivables Purchase and Contribution Agreement (each such release of funds, a "Release") in an aggregate amount not to exceed the Available Release Amount on such date. The Borrower shall notify the Lender in writing of each request for a Release hereunder by delivery of Notice of Release not later than 1 PM Eastern Time on the Business Day prior to each Borrowing Date or Release date certifying that no Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination has occurred and is continuing or would result from such Release or borrowing. Subject to the terms and conditions set forth herein, the Borrower shall disburse the amount of the requested Release out of funds then on deposit in the Collection Account by wire transfer of immediately available funds on the date of the requested Release. The Borrower may use such funds to purchase Receivables under the Receivables Purchase and Contribution Agreement or to allow any of its members to withdraw any part of its capital contribution or its capital account or to receive any distribution of capital in accordance with the Borrower's limited liability company agreement.

(d)    In lieu of requesting a Borrowing under Section 2.3(a) of this Agreement, the Borrower may seek a "Special Advance Funding." A Special Advance Funding may be requested by the Borrower once a month, provided that no Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination shall have occurred and be continuing (without waiver thereof). The "Special Advance Funding Date" shall mean the Business Day prior to the first Business Day in the related month on which the Collection Agent, as Servicer, is required to deposit Advances in the related custodial account under any Servicing Agreement. The Borrower may request, and the Lender will fund, such Special Advance Funding as follows: (i) no later than the second Business Day prior to the Special Advance Funding Date, the Collection Agent shall provide the Borrower and the Lender with the estimated amount of Receivables in respect of Advances that will be made and be conveyed to the Borrower under the Receivables Purchase and Contribution Agreement for the related month (the "Special Advance Funding Notice"), based on information available to the Collection Agent as of the end of the day two Business Days prior to the date of delivery of the Special Advance Funding Notice and (ii) such Special Advance Funding shall be funded by the Lender no later than 1 P.M. Eastern Time on the Special Advance Funding Date.

(e)    Not later than 1 PM Eastern Time on the Business Day prior to each Borrowing Date or Release Date, the Borrower shall deliver a Borrowing Base Certificate updated to include the Receivables to be purchased with the proceeds of such Borrowing or Release, demonstrating that no Borrowing Base Deficiency would exist after giving effect to the related Borrowing or Release.

Section 2.4      Notes.

(a)      The Borrower's obligation to repay any and all Loans made by the Lender and interest thereon shall be evidenced by a promissory note of the Borrower payable to the order of the Lender, substantially in the form of Exhibit E hereto (as amended, supplemented or otherwise modified from time to time, each a "Note" and, collectively, the "Notes") in a maximum principal amount equal to the Lender's Commitment.

(b)      The date and amount of each Loan made by the Lender and the date and amount of each payment of principal made by the Borrower shall be evidenced by entries made by the Lender in its books and records kept by it in the normal course of its business; provided, however, that the failure of the Lender to make any such recordation or provide any such information, or any error therein, shall not affect the Borrower's Obligations, including its obligation to repay the Aggregate Loans outstanding pursuant to this Agreement and the Notes.

Section 2.5      Interest and Fees.

(a)      The Borrower agrees to pay the Lender interest on the unpaid principal amount of each Loan from and including the date such Loan is extended to but not including the date on which the Loan is paid in full.  Interest shall accrue on an adjustable monthly basis at a per annum rate equal to the Facility Rate.  The Facility Rate for each Interest Period shall be determined on the Business Day prior to the first day of such Interest Period.  Accrued interest shall be payable in arrears on each Payment Date and on the date of repayment in full or in part of the applicable Loan.

(b)      All interest payable hereunder shall be computed on the basis of a 360-day year for the actual days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

(c)      The Borrower shall pay to the Lender a commitment fee (the "Commitment Fee") equal to the product of (i) 0.50%, and (ii) the Maximum Facility Amount on or prior to the initial Borrowing Date; provided, however, that if the Termination Date is extended beyond the initial six (6) month period, the Borrower shall pay to the Lender an additional Commitment Fee equal to the product of (i) 0.50%, and (ii) the Maximum Facility Amount on the date of the extension.

Section 2.6      Repayment of the Loans.     The Borrower shall prepay the Aggregate Loans in accordance with Section 2.8 hereof.

Section 2.7      Optional Prepayments.  The Borrower may at any time, prepay the Aggregate Loans in whole or in part, without premium in accordance with the priority of payments set forth in Section 2.8 hereof, together with accrued interest to, but excluding, the date of such prepayment on the amount prepaid and any amounts due under Section 2.13 hereof. The Borrower shall notify the Lender of such prepayment no later than 1:00 PM Denver Time on the Business Day prior to the date thereof.

Section 2.8     Distribution of Collections.

On each Payment Date, the Collection Agent shall allocate and distribute all funds then on deposit in the Collection Account in the following order of priority:

(a)     first, to the Lender, an amount equal to (i) all accrued interest on the Loans and (ii) any Non-Use Fee due on such date;

(b)     second, to the Lender, (i) if the Termination Date shall not have occurred or an Event of Default or Incipient Event of Default shall not then exist or shall have been waived, an amount equal to the Borrowing Base Deficiency, if any, and (ii) if the Termination Date shall have occurred or an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination shall then exist (that has not been waived and for which the Lender shall have given notice of the declaration of the immediate payment of all amounts payable hereunder in accordance with Section 9.2 hereof), an amount equal to the Aggregate Loans;

(c)     third, to the payment of all other Obligations then due and payable at such time by the Borrower pursuant to this Agreement or any other Transaction Document;

(d)     fourth, to the payment of any voluntary prepayments by the Borrower pursuant to Section 2.7 hereof;

(e)     fifth, to the Collection Agent, the Collection Agent Fee;

(f)     sixth, prior to the Amortization Period if so instructed by the Lender, to the Reserve Account, the Reserve Fund Reimbursement Amount for such Payment Date, if applicable;

(g)     seventh, to the payment of any other expenses incurred by the Borrower in connection with the Transaction Documents; and

(h)     eighth, any remaining amounts shall be paid to the Borrower.

Section 2.9     Reserved.

Section 2.10     Recovery of Payments.

The Borrower agrees that to the extent the Borrower makes a payment or payments to or for the account of the Lender which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy, insolvency or similar state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the Obligation intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been received.

Section 2.11     Reserved.

Section 2.12    <u>Increased Costs, etc.</u>  The Borrower agrees to reimburse the Lender for any increase in the cost to the Lender of, or any reduction in the amount of any sum receivable by the Lender with respect to, making, continuing or maintaining (or of its obligation to make, continue or maintain) any Loans.  The Lender shall promptly notify the Borrower in writing of the occurrence of any such event, such notice to state, in reasonable detail, the reasons therefor and the additional amount required fully to compensate the Lender for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrower directly to the Lender within five (5) days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.  The Borrower will not be responsible for paying any amounts pursuant to this <u>Section 2.12</u> accruing more than one hundred eighty (180) days prior to the receipt by the Borrower of the notice referred to in the preceding sentence.

Section 2.13    <u>Reserved</u>.

Section 2.14    <u>Increased Capital Costs</u>.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any court, central bank, regulator or other governmental authority affects or would affect the amount of capital required or expected to be maintained by the Lender or any Person controlling the Lender, and the Lender determines (in its sale and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of its Commitment or the Loans made by the Lender is reduced to a level below that which the Lender or such controlling Person could have achieved but for the occurrence of any such circumstance, then, in any such case upon notice from time to time by the Lender to the Borrower, the Borrower shall immediately pay directly to the Lender additional amounts sufficient to compensate the Lender or such controlling Person for such reduction in rate of return.  A statement of the Lender as to any such additional amount or amounts (including calculations thereof in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on the Borrower.   In determining such amount, the Lender may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

Section 2.15    <u>Taxes</u>.

(a)      All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and additions to tax) with respect thereto imposed by any governmental authority thereof or therein, excluding income taxes, branch profits taxes, franchise taxes or any other tax imposed on the net income by the United States, a state or a foreign jurisdiction under the laws of which the Lender is organized or of its applicable lending office, or any political subdivision thereof (collectively, "<u>Non-Excluded Taxes</u>"), all of which shall be paid by the Borrower for its own account not later than the date when due.  If the Borrower is required by law or regulation to deduct or withhold any

Non-Excluded Taxes from or in respect of any amount payable hereunder, it shall: (1) make such deduction or withholding; (2) pay the amount so deducted or withheld to the appropriate governmental authority not later than the date when due; (3) deliver to Lender, promptly, original tax receipts and other evidence satisfactory to Lender of the payment when due of the full amount of such Non-Excluded Taxes; and (4) pay to the Lender such additional amounts as may be necessary so that such Lender receive, free and clear of all Non-Excluded Taxes, a net amount equal to the amount it would have received under this Agreement, as if no such deduction or withholding had been made.

(b)     In addition, the Borrower agrees to pay to the relevant governmental authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes, transfer taxes and similar fees) imposed by the United States or any taxing authority thereof or therein that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement ("Other Taxes").

(c)     The Borrower agrees to indemnify the Lender for the full amount of Non-Excluded Taxes (including additional amounts with respect thereto) and Other Taxes, and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, provided that the Lender shall have provided the Borrower with evidence, reasonably satisfactory to the Borrower, of payment of Non-Excluded Taxes or Other Taxes, as the case may be.

(d)     Any Lender or a Lender's assignee that is not incorporated under the laws of the United States, any State thereof, or the District of Columbia (a "Foreign Lender") shall provide the Borrower with properly completed United States Internal Revenue Service ("IRS") Form W-8BEN or W-8ECI or any successor form prescribed by the IRS, certifying that such Foreign Lender is entitled to benefits under an income tax treaty to which the United States is a party which reduces the rate of withholding tax on payments of interest to zero or certifying that the income receivable pursuant to this Agreement is effectively connected with the conduct of a trade or business in the United States on or prior to the date upon which each such Foreign Lender becomes a Lender. Each Foreign Lender will resubmit the appropriate form on the earliest of (A) the third anniversary of the prior submission or (B) on or before the expiration of thirty (30) days after there is a "change in circumstances" with respect to such Foreign Lender as defined in Treas. Reg. Section 1.1441(e)(4)(ii)D). For any period with respect to which a Foreign Lender has failed to provide the Borrowers with the appropriate form or other relevant document pursuant to this Section 3.03(d) (unless such failure is due to a change in treaty, law, or regulation occurring subsequent to the date on which a form originally was required to be provided), such Foreign Lender shall not be entitled to any "gross-up" of Non-Excluded Taxes or indemnification under Section 3.03(c) with respect to Non-Excluded Taxes imposed by the United States; provided, however, that should a Foreign Lender, which is otherwise exempt from a withholding tax, become subject to Non-Excluded Taxes because of its failure to deliver a form required hereunder, the Borrower shall take such

steps as such Foreign Lender shall reasonably request to assist such Foreign Lender to recover such Non-Excluded Taxes.

(e)    Without prejudice to the survival or any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this Section 2.15 shall survive the termination of this Agreement. Nothing contained in this Section 2.15 shall require the Lender to make available any of its tax returns or other information that it deems to be confidential or proprietary.

Section 2.16    Maximum Interest.    It is the intention of the parties hereto to conform strictly to applicable usury laws and, anything herein to the contrary notwithstanding, the obligations of the Borrower to the Lender under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of law applicable to the Lender limiting rates of interest which may be charged or collected by the Lender. Accordingly, if the transactions contemplated hereby would be usurious under applicable law (including the Federal and state laws of the United States of America, or of any other jurisdiction whose laws may be mandatorily applicable) with respect to a Lender then, in that event, notwithstanding anything to the contrary in this Agreement, it is agreed as follows:

(i)    the provisions of this Section 2.16 shall govern and control;

(ii)    the aggregate of all consideration which constitutes interest under applicable federal, state and local law that is contracted for, charged or received under this Agreement, or under any of the other Transaction Documents or otherwise in connection with this Agreement by the Lender shall under no circumstances exceed the maximum amount of interest allowed by applicable law (such maximum lawful interest rate, if any, with respect to the Lender herein called the "Highest Lawful Rate"), and any excess shall be credited to the Borrower by the Lender (or, if such consideration shall have been paid in full, such excess promptly refunded to the Borrower);

(iii)    all sums paid, or agreed to be paid, to the Lender for the use, forbearance and detention of the Indebtedness of the Borrower to the Lender hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such Indebtedness until payment in full so that the actual rate of interest is uniform throughout the full term thereof; and

(iv)    if at any time the interest provided pursuant to Section 2.5 together with any other fees payable pursuant to this Agreement and deemed interest under applicable law, exceeds that amount which would have accrued at the Highest Lawful Rate, the amount of interest and any such fees to accrue to the Lender pursuant to this Agreement shall be limited, notwithstanding anything to the contrary in this Agreement to that amount which would have accrued at the

Highest Lawful Rate, but any subsequent reductions, as applicable, shall not reduce the interest to accrue to the Lender pursuant to this Agreement below the Highest Lawful Rate until the total amount of interest accrued pursuant to this Agreement and such fees deemed to be interest equals the amount of interest which would have accrued to the Lender if a varying rate per annum equal to the interest provided pursuant to Section 2.5 had at all times been in effect, plus the amount of fees which would have been received but for the effect of this Section 2.16.

Section 2.17    Reserve Account. On or prior to the initial Borrowing Date, the Borrower shall cause the Initial Reserve Account Deposit to be deposited into the Reserve Account.

If, on any Payment Date, the available funds for such Payment Date are insufficient to pay the amounts required to be paid pursuant to clauses (a) through (e) of Section 2.8 and on any Payment Date following the Termination Date, the available funds are insufficient to pay the principal amount of the Loan on such date, the Collection Agent shall withdraw the amount of such shortfall from the Reserve Account and deposit the same into the Collection Account to be applied to the payment of such items.

## ARTICLE III
## PLEDGE; GRANT OF SECURITY INTEREST

Section 3.1    Pledge.  The Borrower hereby pledges and grants to the Lender, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations, a security interest in and assignment of all of the Borrower's rights, title and interest in and to the following property and interests in property, whether now owned or existing or hereafter arising or acquired and wheresoever located and whether the same comprise accounts, instruments, securities, chattel paper or general intangibles (as each such term is defined in the UCC) (the "Collateral"):

(a)    all of the Borrower's right, title and interest in and to (but not any of the obligations, liabilities or indemnifications of the Borrower under) the Receivables Property;

(b)    all of the Borrower's right, title and interest in and to the Receivables Purchase and Contribution Agreement, including, without limitation, to enforce the obligations of the Borrower thereunder with respect to the Pool Receivables;

(c)    all of the Borrower's right, title and interest in and to the Indemnity Agreement;

(d)    the Collection Account and any other account into which Collections or the Proceeds of the Pool Receivables may be deposited (except for any account established by and subject to the terms of the related Servicing Agreement), and all

monies, "securities," "instruments," "accounts," "general intangibles," "chattel paper," "financial assets," "investment property" (the terms in quotations are defined in the UCC) and other property on deposit or credited to the Collection Account from time to time; and all funds on deposit and all investments made with the funds in the Collection Account or any such other account;

(e)    all right, title and interest of the Borrower as assignee of the Seller to the contractual rights to payment on the Pool Receivables under each Eligible Servicing Agreement and all related documents, instruments and agreements pursuant to which the Seller acquired, or acquired an interest in, any of the Pool Receivables;

(f)    true and correct copies of all books, records and documents relating to the Pool Receivables in any medium, including without limitation paper, tapes, disks and other electronic media;

(g)    all other assets of the Borrower; and

(h)    all Proceeds of the foregoing.

Section 3.2    <u>Notification to Trustee/Owner</u>.    Prior to the pledge of any Pool Receivable hereunder, the Collection Agent shall have notified the Trustee or Owner, as the case may be, of this credit facility providing for the sale and financing of the Receivable and related Servicer Advance hereunder.

Section 3.3    <u>Further Assurances</u>.    The Borrower shall take any and all action reasonably required by the Lender, so that the Lender has a valid, first priority, perfected security interest in the Collateral, including executing financing statements, assigning or endorsing Collateral to the Lender, and delivering Collateral to the Lender.

Section 3.4    <u>Assignment of Rights</u>.    The Borrower hereby acknowledges that all of its right, title and interest in, to and under the Receivables Purchase and Contribution Agreement and the Indemnity Agreement constitute part of the Collateral and that the Lender shall have the sole right (as between the Lender and the Borrower) to enforce the Borrower's rights and remedies under the Receivables Purchase and Contribution Agreement and the Indemnity Agreement, to receive all amounts payable by the Seller thereunder or in connection therewith, to consent to all amendments, modifications or waivers thereof, and to direct, instruct or request any action thereunder, but in each case without any obligation on the part of the Lender to perform any of the obligations of the Borrower thereunder.    The Lender shall have the exclusive right to direct enforcement by the Borrower of its rights and remedies under the Receivables Purchase and Contribution Agreement and the Indemnity Agreement.    The Borrower hereby confirms and agrees that the Lender shall have, following the automatic occurrence or declaration of an Event of Default pursuant to <u>Section 9.1</u> of this Agreement, the sole right to enforce the Borrower's rights and remedies under the Receivables Purchase and Contribution Agreement and the Indemnity Agreement for the benefit of the Lender, but without any obligation on the part of the Lender or any of its respective Affiliates, to perform any of

the obligations of the Borrower under the Receivables Purchase and Contribution Agreement and the Indemnity Agreement.  The Borrower further confirms and agrees that the rights, powers and authorities provided under this Section 3.4 shall terminate upon the date on which all Obligations have been paid in full; provided, however, that the rights of the Lender with respect to rights and remedies in connection with any indemnity and any breach of any representation, warranty or covenant made by the Seller pursuant to Receivables Purchase and Contribution Agreement and the Indemnity Agreement, which rights and remedies survive the termination of the Receivables Purchase and Contribution Agreement and the Indemnity Agreement, shall be continuing and survive any termination of this assignment. The Borrower hereby authorizes the Lender, and gives the Lender its irrevocable power of attorney (which authorization is coupled with an interest), in the name of the Borrower or otherwise, to execute, deliver, file and record any UCC financing statement, continuation statement and to take any other action necessary or appropriate under the UCC to further perfect the security interests created hereby.

Section 3.5    Change of Name; Jurisdiction of Organization.  The Borrower will not change its name, identity, jurisdiction of organization or limited liability structure unless it shall have given the Lender at least thirty (30) days' (or such shorter period to which the Lender may consent in writing) prior written notice thereof and shall have taken all action necessary or reasonably requested by the Lender to amend its existing UCC financing statements and continuation statements so that they are not misleading and to file additional UCC financing statements in all applicable jurisdictions to perfect the security interests of the Lender in all of the Collateral.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

The Borrower hereby represents and warrants to the Lender as of the date of this Agreement, each Release Date and each Borrowing Date as follows:

Section 4.1    Organization.  The Borrower is a limited liability company duly formed and validly existing in good standing under the laws of the State of Delaware and is duly qualified to do business and is in good standing in each jurisdiction in which such qualification is necessary.

Section 4.2    Power and Authority.  The Borrower has all requisite limited liability company power and authority and has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being conducted and to execute and deliver and perform its obligations under the Transaction Documents.

Section 4.3    Authorization.  All appropriate and necessary limited liability company action has been taken by the Borrower to authorize the execution and delivery of this Agreement and each other Transaction Document to which the Borrower's a party, and to authorize its performance and observance of the terms hereof and thereof.

Section 4.4    <u>Agreement Binding</u>.  This Agreement and each other Transaction Document to which the Borrower is a party each constitutes the legal, valid and binding obligation of the Borrower enforceable in accordance with its terms except as may be limited by laws governing insolvency or creditors' rights or by rules of equity.  The execution, delivery and performance by the Borrower of this Agreement and each other Transaction Document to which the Borrower is a party will not violate any provision of the Borrower's organizational documents or any law, regulation, order or other governmental directive, or conflict with, constitute a default under, or result in the breach of any provision of any material agreement, ordinance, decree, bond, indenture, order or judgment to which the Borrower is a party or by which it or its properties is or are bound.

Section 4.5    <u>Compliance with Law</u>.  The Borrower is conducting its business and operations in compliance with all applicable laws, regulations, ordinances and directives of governmental authorities, other than such laws, regulations, ordinances or directives the failure to comply with which would not be reasonably likely to have a Material Adverse Effect.  The Borrower has filed all tax returns required to be filed and has paid all taxes in respect of the ownership of its assets or the conduct of its operations prior to the date after which penalties attach for failure to pay except (a) to the extent that the payment of such taxes is being contested in good faith by it in appropriate proceedings and adequate reserves have been provided for the payment thereof, or (b) with respect to such returns and/or taxes which are not material in either nature or amount such that any failure to file such returns or pay such taxes would not reasonably be expected to have a Material Adverse Effect.

Section 4.6    <u>Consents</u>.  All licenses, consents and approvals required from and all registrations and filings required to be made with any governmental or other public body or authority for the making and performance by the Borrower of this Agreement and the other Transaction Documents have been obtained (or, in the case of UCC-1 financing statements, filed in accordance with the Transaction Documents) and are in effect.

Section 4.7    <u>Litigation</u>.  There is no action, suit or proceeding at law or in equity by or before any court, governmental agency or authority or arbitral tribunal now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower that is reasonably likely to be adversely determined and, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

Section 4.8    <u>Margin Regulations</u>.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Loans, directly or indirectly, will be used for a purpose that violates, or would be inconsistent with, Regulations T, U and X promulgated by the Federal Reserve Board from time to time.

Section 4.9    <u>Investment Company Act</u>.  The Borrower is not an "investment company" or a company "controlled" by an investment company within the meaning of the Investment Company Act of 1940, as amended.

Section 4.10   <u>Chief Executive Office; Location of Records</u>.  The chief executive office of the Borrower, and the place where the Records of the Borrower are maintained, is located at the address for notices set forth in <u>Section 12.8</u> for the Borrower, or such other location in the United States as has been communicated to the Lender from time to time pursuant to <u>Section 12.8</u>.

Section 4.11   <u>Accuracy of Information</u>.  No representation or warranty made by or on behalf of the Borrower contained herein and no information (written or oral), certificate, financial statement or report furnished by or at the direction on behalf of the Borrower in connection herewith, contains an untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein contained, in light of the circumstances under which they were made, not misleading.

Section 4.12   <u>ERISA</u>.  The Borrower is in compliance in all material respects with ERISA and has not incurred and does not expect to incur any material liabilities (except for premium payments arising in the ordinary course of business) to the Pension Benefit Guaranty Corporation (or any successor thereto) under ERISA.

Section 4.13   <u>Perfection</u>.

(a)   Upon execution and the Borrower obtaining rights in the Collateral, this Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Receivables Property and the other Collateral in favor of the Lender, which is enforceable against creditors of and purchasers from the Borrower, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, now or hereafter in effect, and by general principles of equity (whether considered in a suit at law or in equity). Upon (x) attachment and (y) the filing of the financing statements described in <u>clause (d)</u> below, the security interest in favor of the Lender in the Collateral will be prior to all other Liens (other than Liens contemplated by the Transaction Documents);

(b)   The Receivables constitute "payment intangibles" within the meaning of Section 9-102(a)(61) of the applicable UCC;

(c)   Immediately prior to the pledge of the Collateral pursuant to this Agreement, the Borrower owns and has good and marketable title to the Receivables Property, free and clear of any Lien, claim or encumbrance of any Person, other than as contemplated by the Transaction Documents or applicable law;

(d)   The Borrower has caused or will have caused, within ten days of the date hereof, the filing of all appropriate UCC financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted by the Borrower to the Lender under this Agreement in the Collateral;

(e)   Other than the security interest granted to the Lender pursuant to this Agreement, the Borrower has not pledged, assigned, sold, granted a security interest in or

otherwise conveyed any of the Collateral. The Borrower has not authorized the filing of and is not aware of any financing statements against the Borrower that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Lender hereunder.

Section 4.14    Eligibility. Each Pool Receivable represented by the Borrower to be an Eligible Receivable in any report, certificate, notice or statement hereunder or included in the Borrowing Base satisfies the requirements of the definition of an Eligible Receivable set forth herein.

Section 4.15    Use of Proceeds. The Borrower will use the proceeds of the Loans only to purchase Receivables pursuant to the Receivables Purchase and Contribution Agreement or for such other purposes as expressly permitted under the Transaction Documents.

Section 4.16    Indebtedness. The Borrower has no Indebtedness, other than Indebtedness incurred under (or contemplated by) the terms of this Agreement and the other Transaction Documents.

Section 4.17    Legal Name, etc. The Borrower's legal name is as set forth in this Agreement; the Borrower has not changed its jurisdiction of formation or its name since its formation; and the Borrower does not have trade names, fictitious names, assumed names or "doing business as" names.

Section 4.18    Solvent. The Borrower is solvent and will not become insolvent after giving effect to the transactions contemplated hereby; the Borrower is paying its debts as they become due; and the Borrower, after giving effect to the transactions contemplated hereby, will have adequate capital to conduct its business.

Section 4.19    Subsidiaries. The Borrower has no Subsidiaries.

Section 4.20    Event of Default. No Event of Default or Incipient Event of Default has occurred and is continuing (which has not previously been identified to the Lender in writing).

Section 4.21    Event of Termination. No Event of Termination or Incipient Event of Termination has occurred and is continuing (which has not previously been identified to the Lender in writing).

Section 4.22    Fair Consideration. The Borrower has given fair consideration and reasonably equivalent value in exchange for the Pool Receivables sold or contributed to the Borrower by the Seller under the Receivables Purchase and Contribution Agreement.

Section 4.23    Limited Business. Since its formation, the Borrower has conducted no business other than the purchase of the Receivables Property from the Seller pursuant to the Receivables Purchase and Contribution Agreement, the granting of

a security interest in the Collateral under this Agreement, the execution and delivery of the Transaction Documents to which it is a party, and such other activities as are incidental to the foregoing. The Transaction Documents are the only agreements to which the Borrower is a party. The Borrower does not own or hold, directly or indirectly, any capital stock or equity security of, or any equity interest in, any Person.

Section 4.24    Ownership.    All of the outstanding membership interests of the Borrower are directly or indirectly owned of record by Aurora and all such membership interests are fully paid and nonassessable.

Section 4.25    Receivables Purchase and Contribution Agreement.    The Receivables Purchase and Contribution Agreement is the only agreement pursuant to which the Borrower purchases or acquires the Receivables Property and the Receivables Purchase and Contribution Agreement is in full force and effect.

Section 4.26    Aggregate Receivables.    The Borrower hereby repeats the representations and warranties made by the Seller in Section 6.01(r) through (u) of the Receivables Purchase and Contribution Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE COLLECTION AGENT

The Collection Agent hereby represents and warrants to the Lender as of the date of this Agreement, each Release Date and on each Borrowing Date as follows:

Section 5.1    Organization.    The Collection Agent is a limited liability company duly formed and validly existing in good standing under the laws of the State of Delaware and is duly qualified to do business and is in good standing in each other State in which such qualification is necessary in order to conduct business of the type conducted by the Collection Agent, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 5.2    Power and Authority.    The Collection Agent has all requisite limited liability company power and authority and has all material governmental licenses, authorizations, consents and approvals necessary to own its assets and carry on its business as now being conducted and to execute and deliver and perform its obligations as Collection Agent under the Transaction Documents to which the Collection Agent is a party.

Section 5.3    Authorization.    All appropriate and necessary limited liability company action has been taken by the Collection Agent to authorize the execution and delivery of this Agreement and each other Transaction Document to which the Collection Agent is a party, and to authorize the performance and observance of the terms hereof and thereof.

Section 5.4    Agreement Binding.  This Agreement and each other Transaction Document to which the Collection Agent is a party each constitutes the legal, valid and binding obligation of the Collection Agent, enforceable in accordance with its terms except as may be limited by laws governing insolvency or creditors' rights or by rules of equity.   The execution, delivery and performance by the Collection Agent of this Agreement and each other Transaction Document to which the Collection Agent is a party will not violate any provision of the Collection Agent's organizational documents or any law, regulation, order or other governmental directive, or conflict with, constitute a default under, or result in the breach of any provision of any material agreement, ordinance, decree, bond, indenture, order or judgment to which the Collection Agent is a party or by which it or its properties is or are bound.

Section 5.5    Compliance with Law.  The Collection Agent is conducting its business and operations in compliance with all applicable laws, regulations, ordinances and directives of governmental authorities, other than such laws, regulations, ordinances or directives the failure to comply with which would not be reasonably likely to have a Material Adverse Effect.  The Collection Agent has filed all tax returns required to be filed and has paid all taxes in respect of the ownership of its assets or the conduct of its operations prior to the date after which penalties attach for failure to pay except (a) to the extent that the payment of such taxes is being contested in good faith by it in appropriate proceedings and adequate reserves have been provided for the payment thereof, or (b) with respect to such returns and/or taxes which are not material in either nature or amount such that any failure to file such returns or pay such taxes would not reasonably be expected to have n Material Adverse Effect.

Section 5.6    Consents.  All licenses, consents and approvals required from and all registrations and filings required to be made with any governmental or other public body or authority for the making and performance by the Collection Agent of this Agreement and the other Transaction Documents have been obtained and are in effect, except where the failure to obtain such licenses, consents and approvals would not reasonably be expected to have a Material Adverse Effect.

Section 5.7    Litigation.  There is no action, suit or proceeding at law or in equity by or before any court, governmental agency or authority or arbitral tribunal now pending or, to the knowledge of the Collection Agent, threatened against or affecting the Collection Agent which has not been previously disclosed to the Lender in writing or is reasonably likely to be adversely determined and, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

Section 5.8    Chief Executive Office; Location of Records.  The chief executive office of the Collection Agent and the place where the Records of the Collection are maintained is located at the address for notices set forth in Section 12.8 for the Collection Agent, or such other location in the United States as has been communicated to the Lender from time to time pursuant to Section 12.8.

Section 5.9    <u>Accuracy of Information</u>.  No representation or warranty made by or on behalf of the Collection Agent contained herein and no information (written or oral), certificate, financial statement or report furnished by or at the direction on behalf of the Collection Agent in connection herewith, contains an untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein contained, in light of the circumstances under which they were made, not misleading.

Section 5.10    <u>Perfection</u>.

(a)    Upon execution and the Borrower obtaining rights in the Collateral, this Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Receivables Property and the other Collateral in favor of the Lender, which is enforceable against creditors of and purchasers from the Borrower, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws, now or hereafter in effect, and by general principles of equity (whether considered in a suit at law or in equity).  Upon (x) attachment and (y) the filing of the financing statements described in <u>clause (d)</u> below, the security interest in favor of the Lender in the Collateral will be prior to all other Liens (other than Liens contemplated by the Transaction Documents);

(b)    The Receivables constitute "payment intangibles" within the meaning of Section 9-102(a)(61) of the applicable UCC;

(c)    Immediately prior to the pledge of the Collateral pursuant to this Agreement, the Borrower owns and has good and marketable title to the Receivables Property, free and clear of any Lien, claim or encumbrance of any Person, other than as contemplated by the Transaction Documents;

(d)    The Borrower has caused or will have caused, within ten days of the date hereof, the filing of all appropriate UCC financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest granted by the Borrower to the Lender, under this Agreement in the Collateral;

(e)    Other than the security interest granted to the Lender, pursuant to this Agreement, the Borrower has not pledged, assigned, sold, granted a security interest in or otherwise conveyed any of the Collateral.  The Borrower has not authorized the filing of and is not aware of any financing statements against the Borrower that include a description of collateral covering the Collateral other than any financing statement relating to the security interest granted to the Lender, hereunder.

Section 5.11    <u>Event of Default</u>.  No Event of Default or Incipient Event of Default has occurred and is continuing (that has not previously been identified to the Lender in writing).

Section 5.12  <u>Event of Termination</u>.  No Event of Termination, Incipient Event of Termination or Collection Agent Default has occurred and is continuing (that has not previously been identified to the Lender in writing).

## ARTICLE VI
## COVENANTS OF THE BORROWER AND THE COLLECTION AGENT

Each of the Borrower and the Collection Agent severally and jointly hereby covenants to the Lender that, until the payment in full and final performance of all Obligations under the Transaction Documents, it shall perform the following obligations:

Section 6.1  <u>Financial Statements</u>.  The Collection Agent and the Borrower will deliver to the Lender:

(a)  Within forty-five (45) days after the end of each calendar quarter (other than the last calendar quarter of the fiscal year), the consolidated Thrift Financial Report that is filed with the OTS that include the Collection Agent and its Subsidiaries (including the Borrower);

(b)  As soon as available and in any event within one hundred-twenty (120) days after the end of each fiscal year, beginning with the fiscal year ending December 31, 2009 (i) an audited consolidated balance sheet that include the Collection Agent and its Subsidiaries (including the Borrower) as of the end of such fiscal year and audited consolidated statements of operations, cash flows and members' equity that include the Collection Agent and its Subsidiaries (including the Borrower) for the fiscal year then ended, including the notes thereto, in each case setting forth comparative figures as of the end of and for the preceding fiscal year, all in reasonable detail and certified by the independent certified public accounting firm retained by the Collection Agent, the Borrower or the Bank, or another independent certified public accounting firm of recognized national standing reasonably acceptable to the Lender, together with a report thereon by such accountants that (x) is not qualified as to going concern or scope of audit and to the effect that such financial statements present fairly in all material respects the consolidated financial condition and results of operations that include the Collection Agent and its Subsidiaries (including the Borrower), as the case may be, as of the dates and for the periods indicated in accordance with GAAP applied on a basis consistent with that of the preceding year or containing disclosure of the effect on the financial condition or results of operations of any change in the application of accounting principles and practices during such year, and (y) based on and in connection with their examination of the financial statements that include the Collection Agent and its Subsidiaries (including the Borrower), as the case may be, does not contain any qualifying statement based upon the occurrence or existence of any Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination, or a statement specifying the nature and period of existence of any such Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination disclosed by their audit; <u>provided</u>, <u>however</u>, that such accountants shall not be liable by reason of the failure to obtain knowledge of any Event of Default, Incipient Event of Default, Event of Termination or

Incipient Event of Termination that would not be disclosed or revealed in the course of their audit examination, and (ii) an unaudited consolidating balance sheet that include the Collection Agent and its Subsidiaries (including the Borrower) as of the end of such fiscal year and unaudited consolidating statements of income that include the Collection Agent and its Subsidiaries (including the Borrower) for the fiscal year then ended, all in reasonable detail.

Section 6.2    <u>Other Business and Financial Information</u>.  The Collection Agent or the Borrower, as applicable, will deliver to the Lender:

(a)    Concurrently with each delivery of the financial statements described in <u>Section 6.1(b)</u>, a certificate of the chief executive officer of the Collection Agent (i) certifying as to whether an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, and (ii) stating whether any change in GAAP or in the application thereof has occurred since the end of the prior fiscal year, and if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(b)    Promptly upon the sending, filing or receipt thereof, copies of (i) all regular, periodic and special reports, registration statements that the Collection Agent or the Bank shall render to or file with the OTS, the Federal Deposit Insurance Corporation or any other federal authority and (ii) all press releases and other statements made available generally by the Collection Agent or any of its Subsidiaries to the public concerning material developments in the business of the Collection Agent or any of its Subsidiaries;

(c)    Promptly upon (and in any event within one (1) Business Day after) any Responsible Officer of the Collection Agent or the Borrower obtaining knowledge thereof, written notice of any of the following:

(i)    the occurrence of any Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination, together with a written statement of a Responsible Officer of the Collection Agent or the Borrower specifying the nature of such Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination, the period of existence thereof and the action that the Collection Agent or the Borrower has taken and proposes to take with respect thereto;

(ii)    the institution or threatened institution of any action, suit, or proceeding against or affecting the Collection Agent or any of its Subsidiaries, that could, if adversely determined, be reasonably expected, individually or in the aggregate, to have a Material Adverse Effect, and any material development in any litigation or other proceeding previously reported pursuant to this subsection;

(iii)    the occurrence of any event that would be reasonably likely to create liability to the Pension Benefit Guaranty Corporation (or any successor thereto) under ERISA;

(iv)    the occurrence of any default under, or any proposed or threatened termination or cancellation of, any Servicing Agreement or other contract or agreement to which Aurora is a party, the termination or cancellation of which other contract or agreement could be reasonably expected to have a Material Adverse Effect;

(v)    any termination or removal or any threatened termination or removal of Aurora as master servicer or servicer under any Eligible Servicing Agreement or any allegation by a party to the related Securitization Trust of the material breach by Aurora of any obligation in a Servicing Agreement;

(vi)    the occurrence of any Collection Agent Default; and

(vii)    any other matter or event that has, or would be reasonably likely to have, a Material Adverse Effect, together with a written statement of a Responsible Officer of the Collection Agent or the Borrower setting forth the nature and period of existence thereof and the action that the Collection Agent or the Borrower has taken and proposes to take with respect thereto.

(d)    On each Borrowing Date and on any date reasonably requested by the Lender, a Borrowing Base Certificate; and

(e)    Such other information (including non-financial information) as the Lender may from time to time reasonably request with respect to the Collection Agent or its Subsidiaries.

Section 6.3    <u>Corporate Existence; Agency Status</u>.    Each of the Borrower and the Collection Agent will (a) observe all procedures and comply with all of the terms set forth in its respective organizational documents, (b) maintain its existence in good standing under the laws of the jurisdiction of its formation and (c) preserve its qualification to carry on its business and operations in each jurisdiction in which the character of the properties owned or leased by it or the business conducted by it makes such qualification necessary and the failure to be in good standing would preclude the Borrower or the Collection Agent, as applicable, from enforcing its rights with respect to any material assets or expose the Borrower or the Collection Agent, as applicable, to any material liability.

Section 6.4    <u>Keeping of Records and Books of Account</u>.    Each of the Borrower and the Collection Agent will keep books and records that accurately reflect all of its business affairs and transactions and keep and maintain all Records and other information reasonably necessary or advisable related to the Receivables Property.

Section 6.5   Separate Corporate Existence.   The Borrower hereby acknowledges that the Lender is entering into the transactions contemplated by this Agreement and the other Transaction Documents in reliance upon the Borrower's identity as a legal entity separate from the Seller, the Bank and any other Subsidiaries of the Bank (each, an "Aurora Party").   Therefore, from and after the date hereof, the Borrower shall take all reasonable steps specifically required by this Agreement to continue the Borrower's identity as a separate legal entity and to make it apparent to third Persons that the Borrower is an entity with assets and liabilities distinct from those of any Aurora Party and any other Person, and is not a division of the any Aurora Party or any other Person.   Without limiting the generality of the foregoing and in addition to and consistent with the covenants set forth herein, the Borrower shall take such actions as shall be required in order that:

(a)     The Borrower will be a limited purpose entity whose primary activities are restricted in its organizational documents to purchasing Receivables, borrowing funds to finance such purchase and conducting such other activities as it deems necessary or appropriate to carry out its primary activities. The Borrower shall have at least one Independent Manager at all times;

(b)     (i) The Borrower shall not approve, or take any other action to cause the filing of a voluntary bankruptcy petition with respect to the Borrower unless the Independent Manager shall approve the taking of such action in writing prior to the taking of such action, and (ii) the Borrower shall not amend or permit the amendment of any provision of the Borrower's organizational documents without the prior written consent of the Lender;

(c)     Any employee, consultant or agent of the Borrower will be compensated from funds of the Borrower.   The Borrower will engage no agents, other than the Collection Agent, for the Receivables Property without the consent of the Lender. The Collection Agent will be fully compensated for its services to the Borrower by payment of the Collection Agent Fee pursuant to Section 2.8;

(d)     To the extent, if any, that the Borrower and any Aurora Party share items of expenses such as legal, auditing and other professional services, such expenses will be allocated to the extent practical on the basis of actual use or the value of services rendered; it being understood that the Seller will pay or cause payment of all expenses relating to the preparation, negotiation and execution of the Transaction Documents;

(e)     The Borrower's operating expenses will not be paid by any Aurora Party or any other Affiliate thereof except as permitted under the terms of this Agreement;

(f)     The Borrower will have its own separate stationery;

(g)     The Borrower's books and records will be maintained separately from those of any Aurora Party and any other Affiliate thereof, except to the extent held in connection with the duties and obligations of the Collection Agent pursuant to the

Transaction Documents or Aurora as a master servicer or servicer under any Servicing Agreement;

(h)    All audited financial statements of any Aurora Party or any Affiliate thereof that are consolidated to include the Borrower will contain detailed notes clearly stating that (A) all of the Borrower's assets are owned by Borrower, and (B) the Borrower is a separate entity with creditors who have received ownership and/or security interests in the Borrower's assets;

(i)    The Borrower's assets will be maintained in a manner that facilitates their identification and segregation from those of any Aurora Party or any Affiliate thereof;

(j)    The Borrower will strictly observe corporate formalities in its dealings with any Aurora Party or any Affiliate thereof, and, other than any limited and temporary commingling permitted under the Transaction Documents, funds or other assets of the Borrower will not be commingled with those of any Aurora Party or any Affiliate thereof. The Borrower shall not maintain joint bank accounts or other depository accounts to which any Aurora Party or any Affiliate thereof has independent access, other than pursuant to the Transaction Documents. None of the Borrower's funds will at any time be pooled with any funds of any Aurora Party of any Affiliate thereof, except to the extent held by Aurora in its servicing and/or master servicing clearing account or the custodial accounts for any Securitization Trust;

(k)    The Borrower shall pay to any Aurora Party (or any Affiliate thereof) the marginal increase (or, in the absence of such increase, the market amount of its portion of) the premium payable with respect to any insurance policy that covers the Borrower and any Aurora Party (or any Affiliate thereof), but the Borrower shall not, directly or indirectly, be named or enter into an agreement to be named,· as a direct or contingent beneficiary or loss payee, under any such insurance policy, with respect to any amounts payable due to occurrences or events related to any Aurora Party (or any Affiliate thereof);

(l)    The Borrower will maintain arm's-length relationships with any Aurora Party (and any Affiliate thereof). The Borrower will not enter into any transaction with any Aurora Party or any Affiliate thereof, other than (a) transactions in the ordinary course of business on terms no less favorable to the Borrower than those that would be obtained in an arm's-length transaction and (b) as otherwise permitted under its limited liability company agreement;

(m)    Except as contemplated in the Transaction Documents, neither the Borrower nor Aurora will be or will hold itself out to be responsible for the debts of the other or the decisions or actions respecting the daily business and affairs of the other; and

(n)    The Borrower will operate its business and perform its obligations hereunder and under the other Transaction Documents in a manner consistent with the

factual assumptions described in the legal opinion of Lowenstein Sandler PC delivered to the Lender pursuant to Section 8.1(vi) hereof.

(o)    The Borrower will maintain a sufficient number of employees or engage independent agents, in each case to the extent reasonably required in light of its contemplated business operations;

(p)    The Borrower will not guarantee, become obligated or pay for the debts of any other entity or person;

(q)    The Borrower will not hold out its credit as being available to satisfy the obligations of any other person or entity;

(r)    The Borrower will not pledge its assets for the benefit of any other party (except the pledges set forth in this Agreement);

(s)    The Borrower will hold itself out as a separate entity;

(t)    The Borrower will correct any known misunderstanding regarding its separate identity; and

(u)    The Borrower will maintain adequate capital in light of its contemplated business operations.

Section 6.6    Merger.  The Borrower will not merge or consolidate with, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired), or acquire all or substantially all of the assets or capital stock or other ownership interest of any Person.

The Borrower will not dissolve or liquidate in whole or in part, except as provided herein (it being understood that the payment or repurchase of Receivables does not constitute a partial liquidation within the meaning of this provision).

Section 6.7    True Sale.  The Borrower will treat the transactions contemplated by the Receivables Purchase and Contribution Agreement as a sale or contribution of Receivables by the Seller, as the case may be, to the Borrower, for accounting purposes.

Section 6.8    Receivables Purchase and Contribution Agreement.  The Borrower will not amend, modify, waive or terminate any terms or conditions of the Receivables Purchase and Contribution Agreement (including, without limitation, any eligibility criteria thereunder) without the written consent of the Lender, and shall perform its obligations thereunder.

Section 6.9    Borrower Organizational Documents.  The Borrower will not amend, modify or otherwise make any change to its certificate of formation or limited liability company agreement without the prior written consent of the Lender.

Section 6.10    RESERVED

Section 6.11    Collections.  If the Borrower or the Collection Agent receive any Collections, the Borrower or the Collection Agent, as applicable, will remit such Collections to the Collection Account within one (1) Business Day of the Borrower's or the Collection Agent's receipt of good funds thereof.

Section 6.12    Compliance with Laws, Taxes, etc.  Each of the Borrower and the Collection Agent will comply with all applicable laws, rules, regulations and orders (including without limitation Regulations T, U and X of the Board of Governors of the Federal Reserve System), other than such laws, rules, regulations or order the failure to comply with which would not be reasonably likely to have a Material Adverse Effect, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith by appropriate proceedings and for which any reserves required by GAAP have been established.

Section 6.13    Insurance.  The Collection Agent will maintain in full force and effect (a) an adequate errors and omissions insurance policy, (b) such other insurance coverage, by financially sound and respectable insurers, on all properties of a character usually insured by organizations engaged in the same or similar business against loss or damage of a kind customarily insured against by such organizations, and (c) a mortgage banker's blanket bond insurance policy in at least the amount customarily maintained by organizations engaged in the same or similar business and under similar circumstances as the Collection Agent.

Section 6.14    Restricted Payments.  Following the occurrence and during the continuance of an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination (in each case, that has not been waived), the Borrower will not make any Restricted Payments.

Section 6.15    RESERVED.

Section 6.16    Audits.  Each of the Borrower and the Collection Agent shall, from time to time during normal business hours and with reasonable prior notice at the request of the Lender, permit, to the extent permitted by applicable law, (a) the Lender or its respective agents and representatives to review the Borrower's or the Collection Agent's books and records with respect to the Collateral, and all Records and other documents related thereto, at the Borrower's or the Collection Agent's expense, as applicable; provided, however, that such expenses payable by the Borrower or the Collection Agent, as the case may be, shall be limited to the reasonable out-of-pocket travel expenses. Without limiting the foregoing, each of the Borrower and the Collection Agent shall permit, during normal business hours and with reasonable prior notice at the request of the Lender (but not more than quarterly except during the continuance of an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination that has not been waived) certified public accountants or other auditors

chosen to the Lender to review the Borrower's or the Collection Agent's books and records with respect to the Collateral, and all Records and other documents related thereto, at the Borrower's or the Collection Agent's expense, as applicable.

Section 6.17    Indebtedness.    Borrower shall not create, incur, assume, suffer to exist or permit to exist or otherwise become or be liable in respect of any Indebtedness except:  (i) Indebtedness and liabilities incurred pursuant to the Transaction Documents and (ii) Indebtedness incurred by Borrower for the purpose of prepaying the Loans and all other Obligations in full; provided, that with respect to clause (ii), the Loans and all other Obligations hereunder shall be paid in full concurrently with such incurrence.

Section 6.18    Adverse Claims.    Neither the Borrower nor the Collection Agent shall (i) sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Lien (other than pursuant to the Transaction Documents) upon or with respect to, any Receivables Property, any Collections or any other Collateral, or upon or with respect to any account to which any Collections are sent, or assign any right to receive income in respect thereof or (ii) create or suffer to exist any Lien (other than pursuant to the Transaction Documents) upon or with respect to any of the Borrower's assets.

Section 6.19    RESERVED.

Section 6.20    RESERVED.

Section 6.21    Further Assurances.    Each of the Borrower and the Collection Agent will take all such further actions and execute all such further documents and instruments as the Lender may at any time reasonably determine in its sole discretion to be necessary or advisable to further carry out and consummate the transactions contemplated by the Transaction Documents and to perfect or protect the Liens granted to the Lender, under any Transaction Document.

Section 6.22    Rights under Eligible Servicing Agreements.    In connection with each Eligible Servicing Agreement relating to the Pool Receivables, the Borrower shall direct, instruct, or request the Seller to take any lawful action, in connection with enforcement of its rights thereunder, as instructed by the Lender.

Section 6.23    Extension or Amendment of Pool Receivables.    Except in accordance with the Servicer Advance Guidelines or as otherwise required under applicable law, the Collection Agent shall not compromise, extend or adjust payments on any Pool Receivables.

Section 6.24    Change in Business.    The Borrower shall not make any material change in the character of its business.

Section 6.25    RESERVED.

Section 6.26   ERISA.   The Borrower shall not (I) engage in any nonexempt transaction prohibited under Section 406 of ERISA (if not related to the Receivables Property) which is reasonably likely to result in material liability to the Borrower; (2) permit to exist any accumulated funding deficiency, as defined in Section 302(a) of ERISA and Section 412(a) of the Internal Revenue Code, or material funding deficiency with respect to any Plan other than a Multiemployer Plan; (3) fail to make any payments to any Multiemployer Plan that the Borrower or any ERISA Affiliate may be required to make under the agreement relating to such Multiemployer Plan or any law pertaining thereto, the failure of which is reasonably likely to result in material liability to the Borrower; (4) terminate any Plan so as to result in any liability to the Borrower; or (5) permit to exist any occurrence of any reportable event described in Title IV of ERISA with respect to which notice is not waived under Pension Benefit Guaranty Corporation regulations which represents a material risk of a material liability of the Borrower or any ERISA Affiliate under ERISA or the Internal Revenue Code.

## ARTICLE VII
## RESERVED

## ARTICLE VIII
## CONDITIONS PRECEDENT

Section 8.1   Conditions Precedent to the Initial Borrowing.   The obligations of the Lender to fund any Borrowing hereunder are subject to the receipt by the Lender, in form and substance satisfactory to the Lender, of the following:

(i)     Good standing certificates for the Borrower and the Collection Agent issued as of a recent date acceptable to the Lender by (a) the Secretary of State of the jurisdiction of such Person's organization and (b) the Secretary of State of the jurisdiction where such Person's chief executive office and principal place of business are located;

(ii)     A certificate of the Secretary, an Assistant Secretary or Manager of each of the Borrower and the Collection Agent certifying (a) its organizational documents, (b) resolutions authorizing or ratifying the execution, delivery and performance of the Transaction Documents and (c) the names of its officer or officers authorized to sign this Agreement and the Transaction Documents to which it is a party;

(iii)     Written search reports provided by a search service acceptable to the Lender, listing all effective financing statements that name the Borrower, as debtor or assignor, and that are filed in the jurisdictions in which such Person is located under the applicable UCC, and tax and judgment lien search reports satisfactory to the Lender showing no evidence of such lien filed against Borrower or Aurora;

(iv)    Financing statements on Form UCC-l (a) naming Aurora, as debtor/seller, and the Borrower, as buyer/assignor, and Lender, as secured party/assignee, and describing the Receivables Property, as collateral, to be filed in each jurisdiction in which it is necessary to file to perfect a security interest in such Receivables Property and (b) naming the Borrower, as debtor, and the Lender, as secured party, and describing the Collateral, as collateral, to be filed in each jurisdiction in which it is necessary to file to perfect a security interest in such Collateral;

(v)    Duly executed and delivered counterparts of this Agreement and all other Transaction Documents, documents, agreements and instruments contemplated thereby;

(vi)    Favorable opinions of counsel to the Borrower and Aurora in form and substance reasonably acceptable to the Lender and as to such corporate, lien perfection and priority, bankruptcy, affiliate transaction and other matters as the Lender may request;

(vii)    Such other documents, certificates or financial or other information as the Lender may reasonably request;

(viii)    The written non-objection of the transactions contemplated hereby by the OTS.

Section 8.2    <u>Conditions Precedent to each Borrowing (including the initial Borrowing)</u>.  In addition to each of the conditions precedent set forth in <u>Section 8.1</u> being met, the obligations of the Lender to fund each Loan hereunder shall be subject to the following conditions:

(i)    There shall not have occurred and be continuing any Event of Default, Incipient Event of Default, Event of Termination, Incipient Event of Termination or Collection Agent Default, in each case that has not been waived, and the Borrower shall be in compliance in all material respects with all of its respective covenants and obligations under the Transaction Documents;

(ii)    The Lender shall have received the Notice of Borrowing described in Section 2.3 and a Borrowing Base Certificate taking into account the Borrowing;

(iii)    The Collection Agent shall have notified the Trustee or Owner under the related Eligible Servicing Agreement of this credit facility providing for the sale and financing of the Receivable and related Servicer Advance in accordance with <u>Section 3.2</u> hereof;

(iv)    Taking into account the amount of the requested Loan, (a) no Borrowing Base Deficiency shall exist and (b) the Aggregate Loans outstanding shall not exceed the Maximum Facility Amount;

(v)    The Lender shall have completed satisfactory due diligence review of the related Receivables; and

(vi)    All representations and warranties of the Borrower and the Collection Agent hereunder shall be true and correct in all material respects.

Each request for a Borrowing by the Borrower hereunder shall constitute a certification by the Borrower that the conditions set forth in this Section 8.2 have been satisfied (both as of the date of such notice, request or confirmation and as of the date of such Borrowing).

## ARTICLE IX
## EVENT OF DEFAULT

Section 9.1    Event of Default.  Each of the following events and occurrences shall constitute an Event of Default under this Agreement:

(i)    The Borrower shall fail to make payment to the Lender of (a) interest due on any Payment Date, the principal balance of the Loan on the Final Maturity Date or any amount that the Borrower is obligated to pay under Section 2.8 of this Agreement on any Payment Date and such failure shall have continued unremedied for two (2) Business Days or (b) any other amount payable by it hereunder or under any other Transaction Document and such default shall have continued unremedied for three (3) Business Days;

(ii)    any other failure by the Borrower, the Seller or the Servicer to make (or cause to be made) any payment, transfer or deposit, or deliver (or cause to be delivered) to the Lender any proceeds or payment required to be so delivered under the terms of this Agreement or any other Transaction Documents and such default shall have continued unremedied for three (3) Business Days;

(iii)    Any representation, warranty, or certification made or deemed made by the Borrower or the Collection Agent herein or by the Borrower, or the Collection Agent in any other Transaction Document or any certificate furnished to the Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished, and which remains unremedied for thirty (30) days from the date of notice thereof;

(iv)    Any material breach of any covenant made or deemed made by the Borrower or the Collection Agent herein or by the Borrower, or the Collection Agent in any other Transaction Document or any certificate furnished to the

Lender pursuant to the provisions thereof, shall prove to have been false or misleading in any material respect as of the time made or furnished, and which remains unremedied for thirty (30) days from the date of notice thereof;

(v)    The occurrence of any Bankruptcy Event with respect to the Bank, the Collection Agent or any of the Collection Agent's subsidiaries including the Borrower;

(vi)    The Bank, the Servicer or the Borrower becomes insolvent or admits in writing to its inability to pay its debts as they mature;

(vii)    Any failure to comply with the Borrowing Base Coverage Requirement that remains unremedied for two (2) consecutive Business Days;

(ix)    A court of competent jurisdiction shall have entered a final judgment in excess of $50,000 with respect to the Borrower or in excess of $15,000,000 with respect to Aurora; and

(x)    The occurrence of a Change of Control with respect to the Borrower.

Section 9.2    <u>Acceleration</u>.  If not cured within the cure period provided within the relevant provision, then upon the continuance of such Event of Default, the Lender may, by notice to the Borrower (which notice shall be deemed given automatically upon the occurrence of an Event of Default referred to in paragraph (i)(a), (v) or (vi), (A) declare the Commitments of the Lender hereunder to be terminated, whereupon those obligations shall terminate, and (B) declare immediately due and payable all amounts payable hereunder and under each Note by the Borrower that would otherwise be due after the date specified in the notice (or the date such notice is deemed given), whereupon all those amounts shall become immediately due and payable, all without further diligence, presentment, demand of payment, protest or notice of any kind, all of which are expressly waived by the Borrower.

Section 9.3    <u>Remedies upon Event of Default</u>.  If an Event of Default shall have occurred and be continuing, to the extent in compliance with applicable law:

(a)    At any time at the Lender may apply all or any part of the funds on deposit in the Collection Account and other Proceeds of the Collateral in payment of the Obligations in the following order of priority:

FIRST, to the payment of all reasonable costs and expenses then due and owing to the Lender pursuant to the terms of this Agreement, the Notes or any other Transaction Document, including, without limitation, all court costs and the reasonable costs or expenses incurred in connection with the exercise by the Lender of any right or remedy under this Agreement, the Notes or any other Transaction Document;

SECOND, to the satisfaction of all other Obligations; and

THIRD, any excess to the Borrower or to whomsoever may be lawfully entitled to receive the same.

(b)      The Lender may exercise, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, and at law or in equity, all rights and remedies of a secured party under the UCC.  Without limiting the generality of the foregoing, to the extent permitted by law, the Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived to the extent permitted by law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the Borrower, which right or equity is hereby waived and released.  The Lender shall apply any Proceeds from time to time held by it and the proceeds of any such collection, recovery, receipt, appropriation, realization or sale, in the order of priority specified in Section 9.3(a) hereof, and only after such application and after the payment by the Lender of any other amount required by any provision of law need the Lender account for any surplus and remit such amount to the Borrower.  To the extent permitted by applicable law, the Borrower waives all claims, damages and demands it may acquire against the Lender arising out of the exercise by them of any rights hereunder, other than any such claims, damages and demands that may arise from its gross negligence or willful misconduct.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, to the extent permitted by law such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.  The Borrower shall remain liable for any deficiency if the proceeds of any sale or other disposition of Collateral are insufficient to pay the Obligations and the fees and expenses of any attorneys employed by the Lender to collect such deficiency.

(c)      The Borrower recognizes that the Lender may be unable to effect a public sale of any or all of its interest in connection with its right to the Collateral, and may be compelled to resort to one or more private sales thereof.  The Borrower acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that

any such private sale shall be deemed to have been made in a commercially reasonable manner.

(d)    The Lender shall have the right to notify any Person obligated on any Collateral of the rights of the Lender hereunder, to enter into any extension, settlement or compromise agreement relating to or affecting the Collateral, receive payment or performance of any insurance claims, claims for breach of warranty or any other claims concerning the Collateral, all without liability (other than for its gross negligence, bad faith or willful misconduct) except to account for property actually received by it, but the Lender shall have no duty to the Borrower to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

Section 9.4    Lender's Appointment as Attorney-in-Fact.

(a)    The Borrower hereby constitutes and appoints the Lender and any officer or agent of the Lender, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of the Borrower and in the name of the Borrower or in the Lender's own name, from time to time in the Lender's discretion, for the purpose of carrying out the terms of this Agreement or any other Transaction Document, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, to the extent permitted by law, including, without limitation, any financing statements, endorsements, assignments or other instruments of transfer.

(b)    The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done pursuant to the power of attorney granted hereunder.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

## ARTICLE X
## EVENT OF TERMINATION

Section 10.1    Event of Termination.    Each of the following events and occurrences shall constitute an Event of Termination under this Agreement:

(i)    The occurrence of an Event of Default;

(ii)    the Rolling Three Month Reimbursement Percentage is less than the Rolling Three Month Reimbursement Percentage Threshold;

(iii)    a failure to comply with Servicing Agreements that has a material adverse impact on the collectability (timing or otherwise) of any of the Servicer Advances as determined by the Lender;

(iv)     the Verification Agent is terminated or resigns prior to the assumption of the Verification Agent's duties by a successor verification agent and a replacement verification agent is not appointed within 30 days from the date of the termination or resignation of the Verification Agent;

(v)      Servicer sells Eligible Receivables to the Borrower that are in material breach of any representation or warranty set forth in the Receivables Purchase and Contribution Agreement, which are not remedied in accordance with the terms of the Receivables Purchase and Contribution Agreement;

(vi)     the Seller fails to sell and/or contribute all Additional Receivables relating to Securitization Trusts on at least a monthly basis during the term of this Agreement to the extent any Additional Receivables arise during the related monthly period;

(vii)    the sale or transfer by the Servicer of Servicer Advances of any Securitization Trust to any Person other than the Borrower other than pursuant to the terms and provision of the Transaction Documents;

(viii)   The Servicer's primary servicing rating is either withdrawn by S&P or Fitch or rated below either of the following categories: "Average" by S&P or "RPS3-" by Fitch. (which withdrawal or downgrade is not undertaken because of the financial health of any corporate parent or affiliate);

(ix)     Failure to satisfy the Reserve Account Requirement;

(x)      The Servicer fails to amend the related Servicing Agreement, in a form reasonably acceptable to the Lender and within ninety (90) days following the date on which any Eligible Receivable under the related Servicing Agreement is first transferred to the Borrower and pledged to the Lender (for avoidance of doubt, the transfer date with respect to Receivables related to the Servicing Agreements listed on Exhibit A to the Receivables Purchase and Contribution Agreement shall be the Initial Sale Date), to provide for: (i) the Servicer entering into an advance facility; and (ii) Servicer Advance reimbursement amounts being paid on a FIFO basis;

(xi)     The Borrower shall cease or otherwise fail to have good and valid title to the Collateral;

(xii)    The Liens contemplated hereby shall cease to be first priority perfected Liens on the Collateral in favor of the Lender (except to the extent caused by the Lender or any of its employees or agents);

(xiii)    The occurrence of the Termination Date;

(xiv)    Any other event shall occur which, in the sole good faith discretion of the Lender, has had a Material Adverse Effect;

(xv)    The occurrence of a Change of Control with respect to the Servicer or the Bank; and

(xvi)    The occurrence of a Collection Agent Default.

Section 10.2    <u>Effect of Event of Termination</u>.  If not cured within the cure period provided within the relevant provision, then upon the continuance of such Event of Termination, the Lender may, by notice to the Borrower declare the Commitments of the Lender hereunder to be terminated, whereupon those obligations shall terminate and the Amortization Period shall begin.

<div align="center">

**ARTICLE XI**
**RESERVED**

**ARTICLE XII**
**COLLECTION AGENT**

</div>

Section 12.1    <u>Designation of Collection Agent</u>.  The servicing, administration and collection of the Pool Receivables shall be conducted by the Collection Agent.  Until the Lender gives notice to Aurora of the designation of a new Collection Agent (which notice may only be given following the occurrence of a Collection Agent Default) Aurora is hereby designated as, and hereby agrees to perform the duties and obligations of, the Collection Agent pursuant to the terms hereof.  The Lender at any time during the existence of a Collection Agent Default may designate as Collection Agent any Person (including itself) to succeed Aurora or any successor Collection Agent, if such Person shall consent and agree to the terms hereof.  The Collection Agent may with the prior consent of the Lender, subcontract with any other Person or Person for the servicing, administration or collection or all or any portion of the Pool Receivables.

Section 12.2    <u>Duties of Collection Agent</u>.

(a)    The Collection Agent shall take or cause to be taken all such actions as may be necessary or advisable to collect each Pool Receivable from time to time, all in accordance with the Servicer Advance Guidelines and applicable laws, rules and regulations, with reasonable care and diligence and in accordance with the applicable Eligible Servicing Agreement.  The Lender hereby appoints the Collection Agent as agent for itself to enforce its respective rights and interests in the Pool Receivables, the

Related Rights and the related Eligible Servicing Agreements.  In performing its duties as Collection Agent, the Collection Agent shall exercise the same care and apply the same policies as it would exercise and apply if it owned such Pool Receivables and shall act in the best interests of the Borrower and the Lender.

(b)    With respect to each Servicer Advance related to a Pool Receivable, the Collection Agent will, on a monthly basis, provide to the Lender (i) no later than the twenty-fourth (24th ) day of the month, the Collateral Information Report as of the close of business on the last day of the related Collection Period; and (ii) such other information as the Lender shall reasonably request.

(c)    The Collection Agent shall deposit in the Collection Account on a daily basis, within one (1) Business Day of receipt of good funds, all Collections.

(d)    The Collection Agent shall hold in trust for the Borrower and the Lender, in accordance with their respective interests, all Records.  The Collection Agent shall cause the master data processing records of the Seller evidencing the Pool Receivables to be marked to indicate that the Pool Receivables have been sold in accordance with the Receivables Purchase and Contribution Agreement.

(e)    The Collection Agent shall, as soon as practicable following deposit in the Collection Account, if ever, turnover to the Seller or other appropriate Person any cash collections or other cash proceeds received with respect to receivables not constituting Pool Receivables.

(f)    The Collection Agent shall maintain, protect and preserve the Liens of the Lender hereunder in the Collateral.

Section 12.3    Certain Rights of the Lender.

At any time during the existence of an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination (that has not been waived):

(a)    The Lender may direct the Trustees and Owners under the Eligible Servicing Agreements that all payments or distributions in respect of Servicer Advances thereunder are to be made directly to the Lender or its designee.

(b)    At the Lender's request and at the Borrower's expense, the Borrower and the Collection Agent shall (A) assemble all Records and shall make the same available to the Lender at a place selected by the Lender or its designee, and (B) segregate all cash, checks and other instruments received by it from time to time constituting Collections of Pool Receivables in a manner acceptable to the Lender and, promptly upon receipt, remit all such cash, checks and instruments, duly endorsed or with duly executed instruments of transfer, to the Lender or its designee.

(c)    The Borrower authorizes the Lender to take any and all steps in the Borrower's name and on behalf of the Borrower that are necessary or desirable, in the determination of the Lender, to collect amounts due under the Pool Receivables, including without limitation, enforcing the Receivables Purchase and Contribution Agreement and the Eligible Servicing Agreements.

Section 12.4    <u>Rights and Remedies</u>.  If the Collection Agent fails to perform any of its obligations under this Agreement, the Lender may (but shall not be required to) itself perform, or cause performance of, such obligations; and the Lender's reasonable costs and expenses incurred in connection therewith shall be payable by the Collection Agent.

Section 12.5    <u>Indemnities by the Collection Agent</u>.  The Collection Agent hereby agrees to hold the Lender and each of its Affiliates, officers, directors, agents and employees (each an "<u>Indemnified Party</u>") harmless from and indemnify against any and all claims, losses and liabilities, obligations, damages, penalties, actions, judgments, suits, costs, expenses (including reasonable attorneys' fees), advances or disbursements of any kind or nature whatsoever (all of the foregoing being collectively referred to as "Indemnified Amounts") arising out of or resulting from any of the following (excluding, however, (a) Indemnified Amounts to the extent resulting from gross negligence, bad faith or willful misconduct on the part of such Indemnified Party or another Indemnified Party acting in connection with the Transaction Documents, (b) recourse for uncollectible receivables; (c) any income taxes or any other tax or fee measured by income incurred by such Indemnified Party arising out of or as a result of this Agreement or the other Transaction Documents) or (d) any such Indemnified Party's role (other than its role under the Transaction Documents) in connection with any Securitization Trust:

(i)    any representation or warranty or statement made or deemed made by the Collection Agent under or in connection with this Agreement or the other Transaction Documents which shall have been incorrect in any material respect when made;

(ii)    the failure by the Collection Agent to comply with any applicable law, rule or regulation with respect to any Pool Receivable or related Eligible Servicing Agreement;

(iii)    any failure of the Collection Agent to perform its duties or obligations in accordance with the provisions of this Agreement or the other Transaction Documents;

(iv)    the commingling of Collections of Pool Receivables at any time by the Collection Agent with other funds; and

(v)    any action or omission by the Collection Agent reducing or impairing the rights of the Lender with respect to any Pool Receivable or the value of any Pool Receivable.

The Collection Agent hereby agrees to hold the Borrower, its successors and assigns (the "Borrower Indemnified Parties") harmless from and indemnify them against any and all Indemnified Amounts arising out of or resulting from any of the following (excluding, however, (a) Indemnified Amounts to the extent resulting from gross negligence, bad faith or willful misconduct on the part of the Borrower Indemnified Parties or another Indemnified Party acting in connection with the Transaction Documents, (b) recourse for uncollectible receivables or (c) any income taxes or any other tax or fee measured by income incurred by Borrower Indemnified Parties arising out of or as a result of this Agreement or the other Transaction Documents):

(i)     any claim brought by any Person other than Borrower Indemnified Parties or another Indemnified Party arising from any activity by the Collection Agent in servicing, administering or collecting any Pool Receivable.

Section 12.6   Collection Agent Default.   Each of the following events and occurrences shall constitute a Collection Agent Default under this Agreement:

(a)     The Collection Agent shall fail to make any deposit or required payment the Collection Agent is obligated to make under this Agreement or any other Transaction Document; or

(b)     The Collection Agent shall fail to perform or observe any provision or covenant of this Agreement or any other Transaction Document, within 10 days following the earlier of (a) a Responsible Officer of the Collection Agent having knowledge of such failure to perform or observe or (b) written notice thereof from the Lender; or

(c)     Any representation, warranty or certification made or deemed made by the Collection Agent herein or in any other Transaction Document or any certificate furnished to the Lender pursuant to the provisions or thereof shall prove to have been false or misleading in any material respect as of the time made or furnished; or

(d)     The occurrence of a Bankruptcy Event with respect to the Collection Agent; or

(e)     The Collection Agent becomes insolvent or admits in writing to its inability to pay its debts as they mature; or

(f)     Any event shall occur which, in the sole and good faith discretion of the Lender, has had a Material Adverse Effect.

Section 12.7   Investment of Collection Account.

(a)     Investments.   All or a portion of the amounts in the Collection Account may be invested and reinvested by the Borrower in one or more Cash Equivalents.  The taxpayer identification number associated with the Collection Account shall be that of the

Borrower and the Borrower shall report for federal, state and local income tax purposes, the income, if any, received on such investments. The Lender shall not be liable for any loss incurred in connection with any investment of funds on deposit in the Collection Account, except for losses in respect of investments in any instrument  issued or guaranteed by the Lender.

(b)    Maturity of Investments.   No investment of any amount held in the Collection Account shall mature later than the earlier of (i) the Business Day immediately preceding the Payment Date which is scheduled to occur immediately following the date of investment and (ii) one week from the date of investment.

## ARTICLE XIII
## MISCELLANEOUS

Section 13.1   Indemnification.   The Borrower agrees to hold each Indemnified Party harmless from and indemnify each Indemnified Party against all Indemnified Amounts relating to or arising out of this Agreement, the Notes, any other Transaction Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, any other Transaction Document or any transaction contemplated hereby or thereby (including, without limitation, in connection with any claim brought by any Person other than an Indemnified Party arising from any activity by the Collection Agent in servicing, administering or collecting any Pool Receivable), that, in each case, results from anything other than such Indemnified Party's  or any other Indemnified party's gross negligence, bad faith or willful misconduct.   In any suit, proceeding or action brought by the Lender for any sum owing in connection with any Pool Receivable or the related Servicer Advance, or to enforce any provisions thereof, the Borrower will save, indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by the Borrower of any obligation thereunder or arising out of any other agreement. Indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrower.   The Borrower also agrees to reimburse the Lender as and when billed by the Lender for all the Lender's costs and expenses incurred in connection with the enforcement or the preservation of the Lender's rights under this Agreement, the Notes, any other Transaction Document or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel (including all reasonable fees and disbursements incurred in any action or proceeding between the Borrower and the Lender or between the Lender and any third party relating hereto).   The Borrower hereby acknowledges that, notwithstanding the fact that the Notes are secured by the Collateral, the obligation of the Borrower under each Note is a recourse obligation of the Borrower.

Section 13.2   Expenses.   The Borrower agrees to pay as and when billed by the Verification Agent all of the fees, out-of-pocket costs and expenses and other amounts payable to the Verification Agent.

Section 13.3    Set-off.  In addition to any rights and remedies of the Lender provided by this Agreement and by law, the Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all property and deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, Indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender thereof to or for the credit or the account of the Borrower.  The Lender may set-off cash, the proceeds of the liquidation of any Collateral and all other sums or obligations owed by the Lender to the Borrower against all of the Borrower's obligations to the Lender, whether under this Agreement or under any other agreement between the parties or between the Borrower and any affiliate of the Lender, or otherwise, whether or not such obligations are then due, without prejudice to the Lender's right to recover any deficiency.  The Lender agrees promptly to notify the Borrower after any such set-off and application made by the Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Section 13.4    Waiver of Notices, etc.  The Borrower hereby expressly waives promptness, diligence, notice of acceptance and any other notice with respect to any of its Obligations hereunder or under the Notes, and any requirement that the Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto or exhaust any right or take any action against the Borrower or any other person or entity or any collateral, and all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations hereunder or under the Notes.

Section 13.5    Waiver; Cumulative Rights.  No failure on the part of the Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under this Agreement or the Notes shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement or the Notes preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

Section 13.6    Binding Effect.  This Agreement shall be binding upon and shall be enforceable by the parties hereto and their respective successors and permitted assigns.

Section 13.7    GOVERNING LAW, ETC.; WAIVER OF TRIAL BY JURY.

(a)    THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.  EACH PARTY HERETO HEREBY SUBMITS TO THE NONEXCLUSIVE PERSONAL JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF

ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.8    <u>Notice</u>.    Any notice hereunder shall be in writing and shall be personally delivered, transmitted by overnight delivery, by facsimile, telegram, electronic mail or cable to the parties as follows:

|  |  |
|---|---|
| <u>To Lender:</u> | Lehman Brothers Holdings Inc. |
|  | 1271 Avenue of the Americas |
|  | New York, NY 10020 |
|  | Attn: Michelle Rosolinsky |
|  | Fax: 646-758-5015 |
| <u>With a copy to:</u> | Lehman Brothers Holdings Inc. |
|  | 1271 Avenue of the Americas |
|  | New York, NY 10020 |
|  | Attn: Yvonne Lin-Lu |
|  | Fax: 212-299-0202 |
| <u>To Borrower:</u> | Aurora Advance Receivables I LLC |
|  | 10350 Park Meadows Drive |
|  | Littleton, CO 80124 |

Attn: Robert Leist, AARILLC Financing

Fax: 720-945-5720

With a copy to:                Aurora Advance Receivables I LLC

10350 Park Meadows Drive

Littleton, CO 80124

Attn: Todd Whittemore, AARILLC Financing

Fax: 720-945-3123


To the Collection Agent:       Aurora Loan Services LLC
2617 College Park
Scottsbluff, NE 69361
Attn: Leo C. Trautman, Jr., AARILLC Financing
Fax: 308-220-2982

With a copy to:                Aurora Loan Services LLC
10350 Park Meadows Drive
Littleton, CO 80124
Attn: James L. Greene, AARILLC Financing
Fax: 303-728-7666


To Seller:                     Aurora Loan Services LLC

10350 Park Meadows Drive

Littleton, CO 80124

Attn: Leo C. Trautman, Jr., AARILLC Financing

Fax: 308-220-2982

With a copy to:                Aurora Loan Services LLC

10350 Park Meadows Drive

Littleton, CO 80124

Attn: James L. Greene, AARILLC Financing

Fax: 303-728-7666

All notices and other communications shall be deemed to have been duly given on the date of receipt if delivered personally or by first class mail; the date two (2) Business Days after posting if transmitted by overnight delivery; or in the case of a facsimile, telegram or cable, at the time receipt is confirmed.  Any party hereto may change its address for purposes hereof by written notice to the other.

Section 13.9    <u>Amendments, Waivers, etc.</u>  No amendment, modification, waiver or discharge or termination of, or consent to any departure by the Borrower from, any provision of this Agreement or any other Transaction Document, shall be effective unless in a writing signed by the Lender, and then the same shall be effective only in the specific instance and for the specific purpose for which given. No amendment or modification of any provision of this Agreement or any other Transaction Document shall be effective unless in a writing signed by the Lender and the Borrower (and, to the extent adversely affected thereby, the Collection Agent), and then the same shall be effective only in the specific instance and for the specific purpose for which given.

Section 13.10    <u>Assignments, Participations</u>.

(a)    The Lender may assign to one or more other Eligible Assignees (each, an "<u>Assignee</u>") all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its Commitments, the outstanding Loans made by it and the Note or Notes held by it; provided, however, that (i) any such assignment (other than an assignment to a Lender, an Affiliate of a Lender or an Approved Fund of a Lender) shall not be made without the prior written consent of the Lender, and the Borrower (to be evidenced by its counter execution of the relevant Assignment and Acceptance), which consent shall not be unreasonably withheld (provided that the Borrower's consent shall not be required in the event an Event of Default, Incipient Event of Default, Event of Termination or Incipient Event of Termination shall have occurred and be continuing), (ii) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund of a Lender, no such assignment shall be in an aggregate principal amount (determined as of the date of the Assignment and Acceptance with respect to such assignment) less than $1,000,000 (or, if less, the full amount of the assigning Lender's outstanding Loans) provided, that, a series of assignments by the Lender, its Affiliates and its Approved Funds on or about the same day to several Assignees that are Affiliates of each other or are related as Approved Funds shall be deemed to be one assignment, and (iii) the parties to each such assignment will execute and deliver to the Lender, for its acceptance and recording in the Register, an Assignment and Acceptance, together with any Note or Notes subject to such assignment.  Upon such execution, delivery, acceptance and recording of the Assignment and Acceptance, from

and after the effective date specified therein, which effective date shall be at least five Business Days after the execution thereof (unless the Lender shall otherwise agree), (A) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall have the rights and obligations of the assigning Lender hereunder with respect thereto and (B) the assigning Lender shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (other than rights under the provisions of this Agreement and the other Transaction Documents relating to indemnification or payment of fees, costs and expenses, to the extent such rights relate to the time prior to the effective date of such Assignment and Acceptance) and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of such assigning Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto).    The terms and provisions of each Assignment and Acceptance shall, upon the effectiveness thereof, be incorporated into and made a part of this Agreement, and the covenants, agreements and obligations of the Lender set forth therein shall be deemed made to and for the benefit of the Lender and the other parties hereto as if set forth at length herein.

(b)    The Lender will maintain at its address for notices referred to herein a copy of each Assignment and Acceptance delivered to and accepted by it and a register for the recordation of the name and address of the Lender and the Commitment of, and principal amount of the Loans owing to, the Lender from time to time (the "Register"). The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Lender may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and the Lender at any reasonable time and from time to time upon reasonable prior notice.

(c)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee and, if required, counter executed by the Borrower, together with the Note or Notes subject to such assignment and the processing fee referred to in subsection (a) above, the Lender will (i) accept such Assignment and Acceptance, (ii) on the effective date thereof, record the information contained therein in the Register and (iii) give notice thereof to the Borrower and the Lender. Within five (5) Business Days after its receipt of such notice, the Borrower, at its own expense, will execute and deliver to the Lender, in exchange for the surrendered Note or Notes, a new Note or Notes to the order of the Assignee (and, if the assigning Lender has retained any portion of its rights and obligations hereunder, to the order of assigning Lender), prepared in accordance with the applicable provisions of Section 2.4 as necessary) to reflect, after giving effect to the assignment, the Commitments of the Assignee and (to the extent of any retained interests) the assigning Lender, dated the date of the replaced Note or Notes and otherwise in substantially the form of Exhibit A. The Lender will return canceled Notes to the Borrower.

(d)    The Lender may, without the consent of the Borrower, sell to one or more other Persons (each, a "Participant") participations in any portion comprising less than all of its rights and obligations under this Agreement (including, without limitation, a portion of its Commitments, the outstanding Loans made by it and the Note or Notes held by it; provided, however, that (i) the Lender's obligations under this Agreement shall remain unchanged and the Lender shall remain solely responsible for the performance of such obligations, (ii) no Lender shall sell any participation that, when taken together with all other participations, if any, sold by the Lender, covers all of the Lender's rights and obligations under this Agreement, (iii) the Borrower and the Lender shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement, and no Lender shall permit any Participant to have any voting rights or any right to control the vote of the Lender with respect to any amendment, modification, waiver, consent or other action hereunder any other Transaction Document (except as to actions that would (x) reduce or forgive the principal amount of any Loan, reduce the rate of or forgive any interest thereon, or reduce or forgive any fees or other Obligations, (y) extend the Termination Date, or any other date fixed for the payment of any principal of or interest on any Loan, any fees or any other Obligations, or (z) increase or extend any Commitment of the Lender), and (iv) no Participant shall have any rights under this Agreement or any of the other Transaction Documents, each Participant's rights against the granting Lender in respect of any participation to be those set forth in the participation agreement, and all amounts payable by the Borrower hereunder shall be determined as if the Lender had not granted such participation.

(e)    Nothing in this Agreement shall be construed to prohibit the Lender from pledging or assigning all or any portion of its rights and interest hereunder or under any Note to (i) any Federal Reserve Bank as security for borrowings there from; or (ii) in the case of any portion of the Loans that is held by a Fund, to the trustee under the indenture to which such Fund is a party in support of its obligations to the trustee for the benefit of the applicable trust beneficiaries; provided, however, (x) that no such pledge or assignment shall release a Lender from any of its obligations hereunder and (y) in the case of the preceding clause (ii), such trustee shall have no voting rights with respect to its interest in the Loans.

(f)    The Lender or Participant may, in connection with any assignment, participation or pledge or proposed assignment, participation or pledge pursuant to this Section 12.10 disclose to the Assignee, Participant or pledgee or proposed Assignee, Participant or pledgee any in formation relating to the Borrower and its Affiliates furnished to it by or on behalf of any other party hereto, provided that such Assignee, Participant or pledgee or proposed Assignee, Participant or pledgee agrees in writing to keep such information confidential to the same extent required of the Lender under this Agreement.

Section 13.11 Successors and Assigns.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto, and all references herein to any party shall be deemed to include its successors and assigns; provided, however, that (i) the Borrower shall not sell, assign or

transfer any of its rights, interests, duties or obligations under this Agreement without the prior written consent of the Lender and (ii) any Assignees and Participants shall have such rights and obligations with respect to this Agreement and the other Transaction Documents as are provided for under and pursuant to the provisions of <u>Section 12.10</u>.

Section 13.12  <u>Survival</u>.  All representations, warranties and agreements made by or on behalf of the Collection Agent or the Borrower in this Agreement and in the other Transaction Documents shall survive the execution and delivery hereof or thereof, the making and repayment of the Loans.  In addition, notwithstanding anything herein or under applicable law to the contrary, the provisions of this Agreement and the other Transaction Documents relating to indemnification or payment of fees, costs and expenses, shall survive the payment in full of all Loans, the termination of the Commitments, and any termination of this Agreement or any of the other Transaction Documents.

Section 13.13  <u>Severability</u>.  To the extent any provision of this Agreement is prohibited by or invalid under the applicable law of any jurisdiction, such provision shall be ineffective only the extent of such prohibition or invalidity and only in such jurisdiction, without prohibiting or invalidating such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

Section 13.14  <u>Construction</u>.  The headings of the various articles, sections and subsections of this Agreement have been inserted for convenience only and shall not in any way affect the meaning or construction of any of the provisions hereof.  Except as otherwise expressly provided herein and in the other Transaction Documents, in the event of any inconsistency or conflict between any provision of this Agreement and any provision of any of the other Transaction Documents, the provision of this Agreement shall control.

Section 13.15  <u>Confidentiality</u>.

(a)     The Lender hereby agrees to keep confidential, pursuant to its customary procedures for handling confidential information of a similar nature and in accordance with safe and sound banking practices, all nonpublic information provided to it by or on behalf of the Collection Agent, the Seller, the Borrower or any of its Affiliates in connection with this Agreement or any other Transaction Document; provided, however, that the Lender may disclose such information (i) to its directors, employees and agents and to its auditors, counsel and other professional advisors, (ii) at the demand or request of any bank regulatory authority, court or other Governmental Authority having or asserting jurisdiction over the Lender, as may be required pursuant to subpoena or other legal process, or otherwise in order to comply with any applicable law, (iii) in connection with any proceeding to enforce its rights hereunder, under any other Transaction Document or in any other litigation or proceeding in connection with the Transaction Documents to the extent such disclosure is not in violation of applicable laws, (iv) to the extent the same has become publicly available other than as a result of a breach of this Agreement and (v) pursuant to and in accordance with the provisions of Section 12.10(f).

(b)    Notwithstanding anything to the contrary in Section 12.15(a) or otherwise in the Transaction Documents, the information subject to any confidentiality requirement shall not include, and the Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Lender relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transactions as well as other information, this sentence shall only apply to such portions of the document or similar items that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

Section 13.16  Counterparts; Effectiveness.  This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by the Lender and the Borrower of written or telephonic notification of such execution and authorization of delivery thereof.

Section 13.17  Entire Agreement.  THIS AGREEMENT AND THE OTHER DOCUMENTS AND INSTRUMENTS EXECUTED AND DELIVERED IN CONNECTION HEREWITH (A) EMBODY THE ENTIRE AGREEMENT AND UNDERSTANDING BETWEEN THE PARTIES HERETO AND THERETO RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, (B) SUPERSEDE ANY AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS OF SUCH PERSONS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF, AND (C) MAY NOT BE AMENDED, SUPPLEMENTED, CONTRADICTED OR OTHERWISE MODIFIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have caused this RECEIVABLES LOAN AGREEMENT to be executed by their duly authorized representatives on the date first written above.

**Lehman Brothers Holdings Inc.,**
**as Lender**

By: _____
Name:_____
Title:_____

**Aurora Advance Receivables I LLC,**
**as Borrower**

By:_____
Name:_____
Title:_____

**Aurora Loan Services LLC,**
**as Collection Agent**

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this RECEIVABLES LOAN AGREEMENT to be executed by their duly authorized representatives on the date first written above.

**Lehman Brothers Holdings Inc.,
as Lender**

By:_____
Name:_____
Title:_____


**Aurora Advance Receivables I LLC,
as Borrower**

By:_____
Name:_____
Title:_____


**Aurora Loan Services LLC,
as Collection Agent**

By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this RECEIVABLES LOAN AGREEMENT to be executed by their duly authorized representatives on the date first written above.

**Lehman Brothers Holdings Inc.,**
**as Lender**

By:_____
Name:_____
Title:_____


**Aurora Advance Receivables I LLC,**
**as Borrower**

By:_____
Name:_____
Title:_____


**Aurora Loan Services LLC,**
**as Collection Agent**

By:_____
Name:_____
Title:_____

**SCHEDULE I**
**AUTHORIZED PERSONS**

| <u>Name</u>: | <u>Title</u>: |
| --- | --- |
| Robert Leist | Manager |
| E. Todd Whittemore | Manager |
| Karen Tankersley | Secretary |
| Aida Sarmast | Assistant Secretary and Vice President |
| Lee Trautman | President |
| Keith McDonald | Senior Vice President |
| R. Peter Karr | Vice President |
| Dianna Cohoon | Vice President |
| James L. Greene | Vice President |

**EXHIBIT A**
**FORM OF ASSIGNMENT AND ACCEPTANCE**

**THIS ASSIGNMENT AND ACCEPTANCE** (this "Assignment and Acceptance") is made this __ day of _____, by and between _____ (the "Assignor") and _____ (the "Assignee"). Reference is made to the Receivables Loan Agreement, dated as of [        ], 2009 (as amended, modified or supplemented from time to time, the "Receivables Loan Agreement"), among Aurora Advance Receivables I LLC, a Delaware limited liability company, as borrower (the "Borrower"), Aurora Loan Services LLC, a Delaware limited liability company, as collection agent (the "Collection Agent"), and Lehman Brothers Holdings Inc., as lender (the "Lender"). Unless otherwise defined herein, capitalized terms used herein without definition shall have the meanings given to them in the Receivables Loan Agreement.

The Assignor and the Assignee hereby agree as follows:

1.    Assignment and Assumption. Subject to the terms and conditions hereof, the Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, without recourse to the Assignor and, except as expressly provided herein, without representation or warranty by the Assignor, the interest or interests as of the Effective Date (as hereinafter defined) in and to all of the Assignor's rights and obligations under the Receivables Loan Agreement and the other Transaction Documents (in its capacity as a Lender thereunder) with respect to the Commitments and Loans represented by the percentage interest or interests specified under the heading "Assigned Share" in Item 4 of Annex I (each such assigned interest, an "Assigned Share"), including, without limitation, the relevant Assigned Share of all rights and obligations of the Assignor with respect to its Commitment (unless terminated), Note and Loans.

2.    The Assignor. The Assignor (i) represents and warrants that it is the legal and beneficial owner of each interest being assigned by it hereunder, that each such interest is free and clear of any adverse claim, and that as of the date hereof the amount of its Commitments and outstanding Loans with regard to which an interest is being assigned hereunder is as set forth in Item 4 of Annex I, (ii) except as set forth in clause (i) above, makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Receivables Loan Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Receivables Loan Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto, and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or any of its Affiliates or the performance or observance by the Borrower or any of its Affiliates of any of their respective obligations under the Receivables Loan Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto.

3.      <u>The Assignee</u>.  The Assignee (i) represents and warrants that it is legally authorized to enter into this Assignment and Acceptance, (ii) confirms that it has received a copy of the Receivables Loan Agreement, together with copies of the financial statements most recently required to have been delivered under Section 6.1 of the Receivables Loan Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance, (iii) agrees that it will, independently and without reliance upon the Assignor, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Receivables Loan Agreement, (iv) confirms that it is an Eligible Assignee, and (v) agrees that it will perform in accordance with their respective terms all of the obligations that by the terms of the Receivables Loan Agreement are required to be performed by it as a Lender.

4.      <u>Effective Date</u>.    Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, an executed original hereof, together with all attachments hereto, shall be delivered to the Borrower.  The effective date of this Assignment and Acceptance (the "<u>Effective Date</u>") shall be the later of (i) the date of acceptance hereof by the Assignor and the Borrower as evidenced solely by their signature hereto or (ii) the date, if any, designated as the Effective Date in <u>Item 5</u> of <u>Annex I</u> (which date shall be not less than five (5) Business Days after the date of execution hereof by the Assignor and the Assignee).  As of the Effective Date, (y) the Assignee shall be a party to the Receivables Loan Agreement and, to the extent provided in this Assignment and Acceptance, shall have the rights and obligations of a Lender thereunder and under the other Transaction Documents, and (z) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights (other than rights under the provisions of the Receivables Loan Agreement and the other Transaction Documents relating to indemnification or payment of fees, costs and expenses, to the extent such rights relate to the time prior to the Effective Date) and be released from its obligations under the Receivables Loan Agreement and the other Transaction Documents.

5.      <u>Payments; Settlement</u>.  On or prior to the Effective Date, in consideration of the sale and assignment provided for herein and as a condition to the effectiveness of this Assignment and Acceptance, the Assignee will pay to the Assignor an amount (to be confirmed between the Assignor and the Assignee) that represents the Assigned Share of the principal amount of the Loans made by the Assignor and outstanding on the Effective Date (together, if and to the extent the Assignor and the Assignee so elect, with the Assigned Share of any related accrued but unpaid interest, fees and other amounts).  From and after the Effective Date, Borrower will make all payments required to be made by it under the Receivables Loan Agreement in respect of each interest assigned hereunder (including, without limitation, all payments of principal, interest and fees in respect of the Assigned Share of the Assignor's Commitments and Loans assigned hereunder) directly to the Assignee.  The Assignor and the Assignee shall be responsible for making between themselves all appropriate adjustments in payments due under the

Receivables Loan Agreement in respect of the period prior to the Effective Date.  All payments required to be made hereunder or in connection herewith shall be made in Dollars by wire transfer of immediately available funds to the appropriate party at its address for payments designated in <u>Annex 1</u>.

      6.    <u>Governing Law</u>.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the laws of the State of New York.

      7.    <u>Entire Agreement</u>.  This Assignment and Acceptance, together with the Receivables Loan Agreement and the other Transaction Documents, embody the entire agreement and understanding between the parties hereto and supersede all prior agreements and understandings of the parties, verbal or written, relating to the subject matter hereof.

      8.    <u>Successors and Assigns</u>.  This Assignment and Acceptance shall be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

      9.    <u>Counterparts</u>.  This Assignment and Acceptance may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[signatures on following page]

**IN WITNESS WHEREOF**, the parties have caused this Assignment and Acceptance to be executed by their duly authorized officers as of the date first above written.

**ASSIGNOR:**

By:_____

Name:_____

Title:_____

**ASSIGNEE:**

By:_____

Name:_____

Title:_____

Consented and agreed to this _____ day of _____, 200__:

**AURORA ADVANCE RECEIVABLES I LLC**

By:        _____

Name:    _____

Title:      _____

<u>ANNEX I</u>

1. Borrower:  Aurora Advance Receivables I LLC

2. Name and Date of Receivables Loan Agreement:

   Receivables Loan Agreement, dated as of [        ], 2009, among Aurora Advance Receivables I LLC, as borrower, Aurora Loan Services LLC, as collection agent, and Lehman Brothers Holdings, Inc., as lender.

3. Date of Assignment and Acceptance:  _____, 200__.

4. Amounts:

| | Aggregate for Assignor | Assigned Share | Amount of Assigned Share | Aggregate for Assignor (after assignment) |
|---|---|---|---|---|
| (a) Loan Commitment | $500,000,000 | ____% | $_____ | $_____ |
| (b) Loans | $_____ | | $_____ | $_____ |

5. Effective Date:  _____, 200__.

6. Addresses for Payments:

   Assignor:            _____
                        _____
                        _____
                        Attention:_____
                        Telephone:_____
                        Telecopy:_____
                        Reference:_____

   Assignee:            _____
                        _____
                        _____
                        Attention:_____
                        Telephone:_____
                        Telecopy:_____
                        Reference:_____

7.      Addresses for Notices:

      Assignor:                               _____

                                           _____

                                           _____

Attention:_____

Telephone:_____

Telecopy:_____

      Assignee:

Attention:_____

Telephone:_____

Telecopy:_____

8.      Lending Office of Assignee:

Attention:_____

Telephone:_____

Telecopy:_____

**EXHIBIT B**
**FORM OF BORROWING BASE CERTIFICATE**

# FORM OF BORROWING BASE CERTIFICATE

**as per Exhibit B to the Receivables Loan Agreement**

# FORM OF BORROWING BASE CERTIFICATE
## As of _____, 20YY

**I.**  **AURORA ADVANCE RECEIVABLES I LLC Receivables Information (per collateral information summary)**

|  | **Advances** | | **Servicing Advances** | | **Total Servicer Advances** | |
|---|---|---|---|---|---|---|
| Beginning Balance | $ | - | $ | - | $ | - |
| (+) New Receivables | $ | - | $ | - | $ | - |
| (-) Collections | $ | - | $ | - | $ | - |
| (-) Recon Items | $ | - | $ | - | $ | - |
| Current Balance | $ | - | $ | - | $ | - |

**II.**  **Borrowing Base Value (per collateral information summary)**

|  | | | | | | |
|---|---|---|---|---|---|---|
|  | $ | - | $ | - | $ | - |
| (+) Collection Account Balance (including deposits in transit) | $ | - | $ | - | $ | - |
| (-) Antcipated Release Funds | $ | - | $ | - | $ | - |
| Total Available Borrowing Capacity | $ | - | $ | - | $ | - |

**III.**  **Aggregate Loans**

|  | | | | | | |
|---|---|---|---|---|---|---|
| Previous Balance | $ | - | $ | - | $ | - |
| (-) Repayments applied | $ | - | $ | - | $ | - |
| Outstanding Balance | $ | - | $ | - | $ | - |
| (+) Current Notice of Borrowing request or Special Advance request | $ | - | $ | - | $ | - |
| Anticpated Total Outstanding Balance | $ | - | $ | - | $ | - |

**IV.**  **Lower of Maximum Facility Amount or Total Available Borrowing Capacity**     $ _____ -

**V.**  **Remaining Facilty Amount after anticipated Borrowing &/or Release**     $ _____ -

The undersigned authorized person hereby represents and warrants that this report is a true and accurate accounting of the True Up Period Date

By: _____

Name: _____

Title: _____

Page 1 of 1

**EXHIBIT C**
**RESERVED**

**EXHIBIT D**
**FORM OF NOTICE OF BORROWING**

**Aurora Advance Receivables I LLC**
**10350 Park Meadows Drive**
**Littleton, CO 80124**
**Attn: Robert Leist, AARILLC Financing**
**Fax: 720-945-5720**

**NOTICE OF BORROWING**

[Date]

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020
Attn: Michelle Rosolinsky
Fax: 646-758-5015

Notice of Borrowing No.: _____

Ladies/Gentlemen:

Reference is hereby made to the Receivables Loan Agreement, dated as of [ ], 2009 (as amended, supplemented or otherwise modified, the "Loan Agreement") between Aurora Advance Receivables I LLC ("Borrower") and Lehman Brothers Holdings Inc. ("Lender"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Loan Agreement.

In accordance with Section 2.3(a) of the Loan Agreement, the undersigned Borrower hereby requests that you, the Lender, make Loans to us in an aggregate principal amount of $_____ (the "Proposed Borrowing") on [day of week], [month] [day], 200__ (the "Borrowing Date").

The Borrower hereby certifies that the following statements are true on and as of the date hereof and will be true on and as of the Borrowing Date:

(a)     Each of the representations and warranties of Borrower contained in Article IV of the Loan Agreement and in the other Transaction Documents is and will be true and correct in all material respects on and as of each such date, with the same effect as if made on and as of each such date, both immediately before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom (except to the extent any such representation or warranty is expressly stated to have been made as of a specific date, in which case such representation or warranty shall be true and correct in all material respects as of such date);

(b)      No Event of Default, Incipient Event of Default, Event of Termination, Incipient Event of Termination or Collection Agent Default has occurred and is continuing or would result from the Proposed Borrowing or from the application of the proceeds therefrom; and

(c)      After giving effect to the Proposed Borrowing, the aggregate principal amount of Loans outstanding will not exceed the lesser of (i) the Maximum Facility Amount and (ii) the Borrowing Base as of such Borrowing Date.

[Signature Page Follows]

AURORA ADVANCE RECEIVABLES I LLC

By:  _____

Name:  _____

Title:  _____

**EXHIBIT E**
**FORM OF NOTE**

$_____                                                      _____, 20__
                                                                      New York, New York


FOR VALUE RECEIVED, AURORA ADVANCE RECEIVABLES I LLC, a limited liability company (the "Borrower"), hereby promises to pay to the order of LEHMAN BROTHERS HOLDINGS INC. (the "Lender"), at the offices of the Lender located at 1271 Avenue of the Americas, New York, NY 10020 (or at such other place or places as the Lender may designate), at the times and in the manner provided in the Receivables Loan Agreement, dated as of _____, 20__ (as amended, modified or supplemented from time to time, the "Receivables Loan Agreement"), among the Borrower, Aurora Loan Services LLC and the Lender, the principal sum of _____ ($_____), or such lesser amount as may constitute the unpaid principal amount of the Loans made by the Lender to the Borrower, under the terms and conditions of this promissory note (this "Note") and the Receivables Loan Agreement. The defined terms in the Receivables Loan Agreement are used herein with the same meaning. The Borrower also promises to pay interest on the aggregate unpaid principal amount of this Note at the rates applicable thereto from time to time as provided in the Receivables Loan Agreement.

All of the terms, conditions and covenants of the Receivables Loan Agreement are expressly made a part of this Note by reference in the same manner and with the same effect as if set forth herein at length, and any holder of this Note is entitled to the benefits of and remedies provided in the Receivables Loan Agreement and the other Transaction Documents. Reference is made to the Receivables Loan Agreement for provisions relating to the interest rate, maturity, payment, prepayment and acceleration of this Note.

In the event of an acceleration of the maturity of this Note, this Note shall become immediately due and payable, without presentation, demand, protest or notice of any kind, all of which are hereby waived by the Borrower.

In the event this Note is not paid when due at any stated or accelerated maturity, the Borrower agrees to pay, in addition to the principal and interest, all costs of collection, including reasonable attorneys' fees.

This Note shall be governed by and construed in accordance with the laws of the State of New York. The Borrower hereby submits to the nonexclusive jurisdiction and venue of the federal and state courts located in New York, New York, although the Lender shall not be limited to bringing an action in such courts.

(signature on following page)

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed by its duly authorized officer as of the day and year first above written.

AURORA ADVANCE RECEIVABLES I LLC

By: _____

Name: _____

Title: _____

**EXHIBIT F**
**FORM OF COLLATERAL INFORMATION REPORT**

F-1

| | | | | | Securitization Termination Event | | | | RLA Ineligible | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Item | Deal | Advances | Servicing Advances | Total Servicer Advances | Securitization Trust UPB x $5 mil | Securitization Trust Advance Delinquency Ratio > 50% | Securitization Trust Advance Ratio > 25% | Remaining Servicer Advances | Mortgage Loans with Servicer Advances > 50% of BPO | Servicer Advances more than 15 months past OTS 60 day Delinquent | Servicer Advances more than 15 months past OTS 90 day Delinquent | Servicer Advances more than 15 months past FC or BK Start Date | Servicer Advances outstanding more than 8 months after Good & Marketable Title to REO | Property with known Environmental issues | Securitization Trust Total Servicer Advances > 15% of Total Servicer Advances | 2nd Lien Servicing Advances > 5% of Total Servicing Advances | Performing Modified Loans with Capitalized Advances that have Servicer Advances in a Securitization Trust > lesser of A) 10% of Aggregate Loans or B) $20 mil | Total RLA Ineligible Servicer Advances | Eligible Servicing Advances | Eligible Servicer Advances | At 75% Advance Funding Factor | At 70% Advance Funding Factor | At 70%Servicing Advance Funding Factor | Securitization Trust WALP > months | Securitization Trust WAMO - 15 months | Securitization Trust WAMO - 19 months | Securitization Trust Advance Ratio > 20% | Securitization Trust Corp Adv Ratio > 50% | Securitization Trust Corp Adv Ratio > 60% | Securitization Trust Corp Adv Ratio > 70% | Securitization Trust Corp Adv Ratio > 80% | Borrowing Base $ from Eligible Receivables | Borrowing Base $ from Ineligible Receivables @ 30% | Total Borrowing Base excluding Collection Account |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 2 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 3 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 4 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 5 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 6 | XXXXXXX | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Total | | | | | | | | | | | | | | | | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

WGM DRAFT 8/03/09

INDEMNITY AND PLEDGE

THIS INDEMNITY AND PLEDGE, dated as of August [  ], 2009 (as amended, modified or supplemented from time to time in accordance with its terms, this "Indemnity"), is issued by Aurora Loan Services LLC, a Delaware limited liability company (the "Indemnifying Party", the "Pledgor" or "Aurora", as applicable) for the benefit of Aurora Advance Receivables I LLC (the "Indemnified Party") and by the Indemnified Party for the benefit of Lehman Brothers Holdings Inc. (the "Lender").

PRELIMINARY STATEMENTS:

(1)     Aurora and the Indemnified Party, as borrower (the "Borrower") entered into a Receivables Purchase and Contribution Agreement, dated as of August [  ], 2009 (the "Receivables Purchase and Contribution Agreement"), pursuant to which Aurora will sell and/or contribute certain of its rights to reimbursement for Advances and Servicing Advances in respect of, and as such terms are defined in, the Servicing Agreements identified on Exhibit A of the Receivables Purchase and Contribution Agreement and additional Servicing Agreements as agreed from time to time (the "Receivables") to the Borrower.

(2)     The Borrower and the Lender entered into a Receivables Loan Agreement, dated August [   ], 2009 (the "Receivables Loan Agreement") pursuant to which the Lender will make Loans (the "Loans") to the Borrower, which loans will be secured by the Receivables (the transactions contemplated by the Receivables Purchase and Contribution Agreement and the Receivables Loan Agreement are referred to herein as the "Transactions").

(3)     Aurora covenanted in Section 9.06 of the Receivables Purchase and Contribution Agreement (the "Applicable Provision") not to transfer its rights as Servicer under the Servicing Agreement for any Securitization Trust or cause, permit or suffer its rights as Servicer under any such Servicing Agreement to be terminated unless, upon the occurrence of such transfer or termination, (i) the Borrower repays the Aggregate Loans in accordance with Section 2.7 of the Receivables Loan Agreement or the successor servicer under such Servicing Agreement shall cause all Receivables under such Servicing Agreement to be paid in full on or before the applicable date of transfer, (ii) Aurora is reimbursed in full for Advances and Servicing Advances under the Servicing Agreement prior to termination or transfer or (iii) otherwise with the consent of the Lender.

NOW, THEREFORE, in order to induce the Borrower to purchase the Receivables under the Receivables Purchase and Contribution Agreement and to induce the Lender to enter into the Receivables Loan Agreement, the receipt and sufficiency of consideration with respect thereto is hereby acknowledged, Aurora, as the Indemnifying Party and as the Pledgor, hereby agrees as follows:

SECTION 1.   Definitions.  Capitalized terms used in this Indemnity, unless otherwise defined herein, shall have the meaning set forth in the Receivables Purchase and Contribution Agreement and the Receivables Loan Agreement.

SECTION 2.     <u>Indemnity</u>.

(a)     In the event that Aurora causes, permits or suffers its rights as Servicer under any Servicing Agreement to be transferred or terminated (including as a result of resignation) in contravention of the covenants set forth in Section 9.06 of the Receivables Purchase and Contribution Agreement, the Indemnifying Party hereby irrevocably, absolutely and unconditionally agrees to indemnify the Indemnified Party from and against any and all losses, liabilities, obligations, damages, penalties, actions, judgments, suits, and related reasonable costs and reasonable expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements, incurred by the Indemnified Party (the "<u>Indemnified Amounts</u>") resulting from the Transactions and the Indemnifying Party shall pay on demand to the Indemnified Party any and all amounts necessary to carry out such indemnity within [20 (twenty) business days] following demand therefor.

(b)     In the event that Aurora causes, permits or suffers its rights as Servicer under any Servicing Agreement to be transferred or terminated (including as a result of resignation) in contravention of the covenants set forth in Section 9.06 of the Receivables Purchase and Contribution Agreement, the Borrower hereby irrevocably, absolutely and unconditionally agrees to indemnify the Lender from and against any and all losses, liabilities, obligations, damages, penalties, actions, judgments, suits, and related reasonable costs and reasonable expenses of any nature whatsoever, including reasonable attorneys' fees and disbursements, incurred by the Lender (the "<u>Lender Indemnified Amounts</u>") resulting from the Transactions and the Borrower shall pay on demand to the Lender any and all amounts necessary to carry out such indemnity within [20 (twenty) business days] following demand therefor.

(c)     An "<u>Event of Default</u>" under this Indemnity shall have occurred and be continuing in the event that the Indemnifying Party or the Borrower, as applicable, fails to timely pay all Indemnified Amounts and Lender Indemnified Amounts, as applicable, in accordance with the terms and provisions of this Indemnity.

SECTION 3.     <u>Pledge of Servicing Rights</u>.

(a)     As Pledged Collateral security for the prompt payment in full when due of the Indemnified Amounts and solely to secure such obligation, Pledgor hereby pledges, assigns and hypothecates to the Indemnified Party, and hereby grants to the Indemnified Party, a lien on and first priority security interest in, all of the Pledgor's rights (but none of the obligations) as Servicer under the Servicing Agreements, whether now owned by the Pledgor or hereafter acquired and whether now existing or hereafter coming into existence (all being collectively referred to herein as the "<u>Pledged Collateral</u>"), including, but not limited to: (i) all accrued and unpaid servicing fees, late charges and ancillary income (as such terms or terms of substantially similar import are defined in each applicable Servicing Agreement); (ii) all other payments, moneys or amounts due and payable to Pledgor or received for or in connection with servicing the Mortgage Loans, including without limitation, any servicing fees; (iii) all payments, moneys or amounts due and payable to Pledgor or received in connection with the sale, assignment, transfer or other disposition of servicing rights under any Servicing Agreement on a voluntary or

involuntary basis; and (iv) all rights, powers and privileges incident to any of the foregoing.

(b)    The Pledgor shall not (i) change the location of its chief executive office/chief place of business from 10350 Park Meadows Drive, Littleton CO 80124, (ii) change its name, identity or corporate structure (or the equivalent) or change the location where it maintains its records with respect to the Pledged Collateral, or (iii) reincorporate or reorganize under the laws of another jurisdiction unless it shall have given the Indemnified Party at least 30 days prior written notice thereof and shall have delivered to the Indemnified Party all Uniform Commercial Code financing statements and amendments thereto as the Indemnified Party shall request and taken all other actions deemed necessary by the Indemnified Party to continue its perfected status in the Pledged Collateral with the same or better priority.

(c)    The Pledgor hereby irrevocably constitutes and appoints the Indemnified Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Pledgor and in the name of the Pledgor or in its own name, from time to time in the Indemnified Party's discretion, for the purpose of carrying out the terms of this Indemnity, including without limitation, protecting, preserving and realizing upon the Pledged Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Indemnity, including without limitation, to protect, preserve and realize upon the Pledged Collateral, and, without limiting the generality of the foregoing, the Pledgor hereby gives the Indemnified Party the power and right, on behalf of the Pledgor, without assent by, but with notice to, the Pledgor, if an Event of Default shall have occurred and be continuing, to do the following:

(i)    in the name of the Pledgor or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any mortgage insurance or with respect to any other Pledged Collateral and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Indemnified Party for the purpose of collecting any and all such moneys due under any such mortgage insurance or with respect to any other Pledged Collateral whenever payable;

(ii)    to pay or discharge taxes and liens levied or placed on or threatened against the Pledged Collateral; and

(iii)    (A) to direct any party liable for any payment under any Pledged Collateral to make payment of any and all moneys due or to become due thereunder directly to the Indemnified Party or as the Indemnified Party shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Pledged Collateral; (C) to sign and endorse any invoices, assignments, verifications,

notices and other documents in connection with any of the Pledged Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Pledged Collateral or any part thereof and to enforce any other right in respect of any Pledged Collateral; (E) to defend any suit, action or proceeding brought against the Pledgor with respect to any Pledged Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Indemnified Party may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Pledged Collateral as fully and completely as though the Indemnified Party were the absolute owner thereof for all purposes, and to do, at the Indemnified Party's option and the Pledgor's expense, at any time, or from time to time, all acts and things which the Indemnified Party deems necessary to protect, preserve or realize upon the Pledged Collateral and the Indemnified Party's Liens thereon and to effect the intent of this Indemnity, all as fully and effectively as the Pledgor might do.

The Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

(d)    If the Pledgor fails to perform or comply with any of its material agreements contained in the Transaction Documents or the Servicing Agreements and the Indemnified Party may itself perform or comply, or otherwise cause such performance or compliance, the reasonable out-of-pocket expenses of the Indemnified Party incurred in connection with such performance or compliance, together with interest thereon at a rate per annum equal to the Facility Rate during the Amortization Period (the "Default Rate"), shall be payable by the Pledgor to the Indemnified Party on demand and shall constitute Indemnified Amounts.

(e)    If an Event of Default shall occur and be continuing, (a) all proceeds of Pledged Collateral received by the Pledgor consisting of cash, checks and other near-cash items shall be held by the Pledgor in trust for the Indemnified Party, segregated from other funds of the Pledgor, and shall forthwith upon receipt by the Pledgor be turned over to the Indemnified Party in the exact form received by the Pledgor (duly endorsed by the Pledgor to the Indemnified Party, if required) and (b) any and all such proceeds received by the Indemnified Party will be applied by the Indemnified Party against, the Indemnified Amounts (whether matured or unmatured), such application to be in such order as the Indemnified Party shall elect.  Any balance of such proceeds remaining after the Indemnified Amounts shall have been paid in full and this Indemnity shall have been terminated shall be promptly paid over to the Pledgor or to whomsoever may be lawfully entitled to receive the same.

(f)    If an Event of Default shall occur and be continuing, the Indemnified Party may exercise, in addition to all other rights and remedies granted to it in this Indemnity and in any other instrument or agreement securing, evidencing or relating to the Indemnified Amounts, all rights and remedies of a secured party under the Uniform

Commercial Code, at law and in equity. Without limiting the generality of the foregoing, the Indemnified Party without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Pledgor or any other Person (all and each of which demands, defenses, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith (i) terminate the Pledgor as servicer with respect to any or all of the Securitization Trusts and sell, assign and/or transfer the servicing rights to successor servicers in accordance with the Servicing Agreements and (ii) otherwise collect, receive, appropriate, foreclose and realize upon the Pledged Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Pledged Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels or as an entirety at public or private sale or sales, at any exchange, broker's board or office of the Indemnified Party or elsewhere upon such terms and conditions and at prices that are consistent with the prevailing market for similar Pledged Collateral as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Indemnified Party shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Pledged Collateral so sold, free of any right or equity of redemption in the Pledgor, which right or equity is hereby waived or released. The Pledgor further agrees, at the Indemnified Party's request, to assemble the Pledged Collateral and make it available to the Indemnified Party at places which the Indemnified Party shall reasonably select, whether at the Pledgor's premises or elsewhere. The Indemnified Party shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Pledged Collateral or in any way relating to the Pledged Collateral or the rights of the Indemnified Party hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Liabilities, in such order as the Indemnified Party may elect, and only after such application and after the payment by the Indemnified Party of any other amount required or permitted by any provision of law, including, without limitation, Section 9-504(1)(c) of the Uniform Commercial Code, need the Indemnified Party account for the surplus, if any, to the Pledgor. To the extent permitted by applicable law, the Pledgor waives all claims, damages and demands it may acquire against the Indemnified Party arising out of the exercise by the Indemnified Party of any of its rights hereunder, other than those claims, damages and demands arising from the gross negligence or willful misconduct of the Indemnified Party. If any notice of a proposed sale or other disposition of Pledged Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition. The Pledgor shall remain liable for any deficiency (plus accrued interest thereon at a rate per annum equal to Default Rate) if the proceeds of any sale or other disposition of the Pledged Collateral are insufficient to pay the Indemnified Amounts and the reasonable fees and disbursements incurred by the Indemnified Party, including reasonable fees and expenses of any attorneys employed by the Indemnified Party to collect such deficiency. Because the Pledgor recognizes that it may not be

possible to purchase or sell all of the Pledged Collateral on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Pledged Collateral may not be liquid, the Pledgor agrees that liquidation of the Pledged Collateral does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner.  Accordingly, the Indemnified Party may elect, in its sole discretion, the time and manner of liquidating any Pledged Collateral and nothing contained herein shall (A) obligate the Indemnified Party to liquidate any Pledged Collateral on the occurrence of an Event of Default or to liquidate all Pledged Collateral in the same manner or on the same Business Day or (B) constitute a waiver of any of the Indemnified Party's rights or remedies.

(g)    The Indemnified Party's duty with respect to the custody, safekeeping and physical preservation of the Pledged Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Indemnified Party deals with similar property for its own account.  Neither the Indemnified Party nor any of its directors, officers or employees shall be liable for failure to demand, collect or realize upon all or any part of the Pledged Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of the Pledgor or otherwise.

(h)    All authorizations and agencies herein contained with respect to the Pledged Collateral are irrevocable and powers coupled with an interest.

(i)    Upon termination of this Indemnity and satisfaction of all Indemnified Amounts, the Indemnified Party shall release its security interest in any remaining Pledged Collateral; provided, that if any payment, or any part thereof, of any of the Liabilities is rescinded or must otherwise be restored or returned by the Indemnified Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Pledgor or any of its Affiliates, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or a trustee or similar officer for the Pledgor or any of its Affiliates or any substantial part of its or their Property, or otherwise, this Indemnity, all rights hereunder and the Liabilities created hereby shall continue to be effective, or be reinstated, until such payments have been made.

SECTION 4.    Pledge of the Borrower's rights under the Indemnity.

(a)    As security for the prompt payment in full when due of Lender Indemnified Amounts and solely to secure such obligation, the Borrower hereby pledges, assigns and hypothecates to the Lender, and hereby grants to the Indemnified Party, a lien on and first priority security interest in all of the Borrower's rights (but none of the obligations) as Indemnified Party under this Indemnity, including, but not limited to the right to be indemnified for the Indemnified Amounts in case Aurora breaches the covenant contained in Section 9.06 of the Receivables Purchase and Contribution Agreement (the "Borrower Pledged Collateral").

(b)       The Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in the Lender's discretion, for the purpose of carrying out the terms of this Indemnity, including without limitation, protecting, preserving and realizing upon the Borrower Pledged Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Indemnity, including without limitation, to protect, preserve and realize upon the Borrower Pledged Collateral, and, without limiting the generality of the foregoing, the Borrower hereby gives the Lender the power and right, on behalf of the Borrower, without assent by, but with notice to, the Borrower, to do the following:

(i)       in the name of the Borrower or its own name, or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due to the Borrower under this Indemnity and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due to the Borrower under this Indemnity whenever payable; and

(ii)       (A) to direct any party liable for any payment under the Borrower Pledged Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (B) to ask or demand for, collect, receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of the Borrower Pledged Collateral; (C) to sign and endorse any invoices, assignments, verifications, notices and other documents in connection with the Borrower Pledged Collateral; (D) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Borrower Pledged Collateral or any part thereof and to enforce any other right in respect of the Borrower Pledged Collateral; (E) to defend any suit, action or proceeding brought against the Borrower with respect to the Borrower Pledged Collateral; (F) to settle, compromise or adjust any suit, action or proceeding described in clause (E) above and, in connection therewith, to give such discharges or releases as the Lender Party may deem appropriate; and (G) generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with the Borrower Pledged Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and the Borrower's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Borrower Pledged Collateral and the Lender's Liens thereon and to effect the intent of this Indemnity, all as fully and effectively as the Borrower might do.

The Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  This power of attorney is a power coupled with an interest and shall be irrevocable.

(c) If Aurora fails to perform or comply with any of its material agreements contained in the Transaction Documents or the Servicing Agreements and the Lender may itself perform or comply, or otherwise cause such performance or compliance, the reasonable out-of-pocket

expenses of the Lender incurred in connection with such performance or compliance, together with interest thereon at a rate per annum equal to the Facility Rate during the Amortization Period (the "Default Rate"), shall be payable by the Borrower to the Lender on demand and shall constitute Lender Indemnified Amounts.

(d)    If an Event of Default shall occur and be continuing, (a) all proceeds of the Borrower Pledged Collateral received by the Borrower consisting of cash, checks and other near-cash items shall be held by the Borrower in trust for the Lender, segregated from other funds of the Borrower, and shall forthwith upon receipt by the Borrower be turned over to the Lender in the exact form received by the Borrower (duly endorsed by the Borrower to the Lender, if required) and (b) any and all such proceeds received by the Lender will be applied by the Lender against, the Lender Indemnified Amounts (whether matured or unmatured), such application to be in such order as the Lender shall elect.  Any balance of such proceeds remaining after the Lender Indemnified Amounts shall have been paid in full and this Indemnity shall have been terminated shall be promptly paid over to the Borrower or to whomsoever may be lawfully entitled to receive the same.

(e)    If an Event of Default shall occur and be continuing, the Lender may exercise, in addition to all other rights and remedies granted to it in this Indemnity and in any other instrument or agreement securing, evidencing or relating to the Lender Indemnified Amounts, all rights and remedies of a secured party under the Uniform Commercial Code, at law and in equity.  Without limiting the generality of the foregoing, the Indemnified Party without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Borrower or any other Person (all and each of which demands, defenses, presentments, protests, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate, foreclose and realize upon the Borrower Pledged Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Borrower Pledged Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels or as an entirety at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions and at prices that are consistent with the prevailing market for similar Borrower Pledged Collateral as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Borrower Pledged Collateral so sold, free of any right or equity of redemption in the Borrower, which right or equity is hereby waived or released.  The Borrower further agrees, at the Lender's request, to assemble the Borrower Pledged Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Borrower's premises or elsewhere.  The Lender shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Borrower Pledged Collateral or in any way relating to the Borrower Pledged Collateral or the rights of the Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the

Liabilities, in such order as the Lender may elect, and only after such application and after the payment by the Lender of any other amount required or permitted by any provision of law, including, without limitation, Section 9-504(1)(c) of the Uniform Commercial Code, need the Lender account for the surplus, if any, to the Borrower.  To the extent permitted by applicable law, the Borrower waives all claims, damages and demands it may acquire against the Lender arising out of the exercise by the Lender of any of its rights hereunder, other than those claims, damages and demands arising from the gross negligence or willful misconduct of the Lender.  If any notice of a proposed sale or other disposition of Borrower Pledged Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.  The Borrower shall remain liable for any deficiency (plus accrued interest thereon at a rate per annum equal to Default Rate) if the proceeds of any sale or other disposition of the Borrower Pledged Collateral are insufficient to pay the Lender Indemnified Amounts and the reasonable fees and disbursements incurred by the Lender, including reasonable fees and expenses of any attorneys employed by the Lender to collect such deficiency.  Because the Borrower recognizes that it may not be possible to purchase or sell all of the Borrower Pledged Collateral on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Borrower Pledged Collateral may not be liquid, the Borrower agrees that liquidation of the Borrower Pledged Collateral does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner.  Accordingly, the Lender may elect, in its sole discretion, the time and manner of liquidating the Borrower Pledged Collateral and nothing contained herein shall (A) obligate the Lender to liquidate the Borrower Pledged Collateral on the occurrence of an Event of Default or (B) constitute a waiver of any of the Lender's rights or remedies.

(f)    The Lender's duty with respect to the custody, safekeeping and physical preservation of the Borrower Pledged Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Lender deals with similar property for its own account.  Neither the Lender nor any of its directors, officers or employees shall be liable for failure to demand, collect or realize upon all or any part of the Borrower Pledged Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Borrower Pledged Collateral upon the request of the Borrower or otherwise.

(g)    All authorizations and agencies herein contained with respect to the Borrower Pledged Collateral are irrevocable and powers coupled with an interest.

(i)    Upon termination of this Indemnity and satisfaction of all Lender Indemnified Amounts, the Lender shall release its security interest in any remaining Borrower Pledged Collateral.

SECTION 5.    Continuing Indemnity.  This Indemnity shall in all respects be a continuing, absolute and unconditional indemnity, and shall remain in full force and effect (notwithstanding, without limitation, that at any time or from time to time all Indemnified Amounts and all Lender Indemnified Amounts may have been paid in full), subject to discontinuance only upon payment and performance in full of: (i) all

Aggregate Loans, (ii) all Indemnified Amounts and all Lender Indemnified Amounts; and (iii) any and all reasonable expenses paid or incurred by the Indemnified Party or the Lender, as applicable, in endeavoring to collect the Indemnified Amounts and Lender Indemnified Amounts, as applicable, and in enforcing this Indemnity; and all of the agreements and obligations under this Indemnity shall remain fully in effect until all such obligations and expenses finally shall have been paid in full.

SECTION 6.   <u>Rescission</u>.   The Indemnifying Party and the Lender, as applicable, further agree that, if at any time all or any part of any payment theretofore applied by the Indemnified Party or the Lender, as applicable, to any of the Indemnified Amounts or Lender Indemnified Amounts, as applicable, is or must be rescinded or returned by the Indemnified Party or Lender, as applicable, for any reason whatsoever, such Indemnified Amounts or Lender Indemnified Amounts, as applicable, shall, for the purposes of this Indemnity, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Indemnified Party or the Lender, as applicable, and this Indemnity shall continue to be effective or be reinstated, as the case may be, as to such Indemnified Amounts or Lender Indemnified Amounts, as applicable, all as though such application by the Indemnified Party or the Lender, as applicable, had not been made.

SECTION 7.   <u>Certain Actions</u>.   The Indemnified Party or the Lender, as applicable, may, from time to time at its sole discretion and without notice to the Indemnifying Party or the Borrower, as applicable, take any or all of the following actions without affecting the obligations of the Indemnifying Party, the Pledgor or the Borrower hereunder: (a) in addition to the lien set forth in Section 3 and 4 hereof, retain or obtain a lien upon any property to secure any of the Indemnified Amounts or Lender Indemnified Amounts or any obligation hereunder; (b) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the Pledgor and the Borrower, with respect to any of the Indemnified Amounts or Lender Indemnified Amounts or any obligation hereunder; (c) extend or renew for one or more periods (regardless of whether longer than the original period), alter or exchange any of the Loans, or release or compromise any obligation of the Indemnifying Party or the Borrower hereunder or any obligation of any nature of any other obligor with respect to any of the Loans; (d) release or fail to perfect its lien upon, or impair, surrender, release or permit any substitution or exchange for, all or any part of any property securing the Loans or any obligation hereunder, or extend or renew for one or more periods (regardless of whether longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property; and (e) resort to the Indemnifying Party or the Borrower, as applicable, for payment of any of the Indemnified Amounts or Lender Indemnified Amounts, as applicable, regardless of whether the Indemnified Party or the Lender, as applicable, shall have resorted to any property securing any of the Indemnified Amounts or Lender Indemnified Amounts, as applicable, or any obligation hereunder or shall have proceeded against any other obligor primarily or

secondarily obligated with respect to any of the Indemnified Amounts or Lender Indemnified Amounts.

SECTION 8.    <u>Subrogation</u>.  Any amounts received by the Indemnified Party from whatsoever source on account of the Indemnified Amounts, may be applied by it toward the payment of such of the Indemnified Amounts, and in such order of application, as the Indemnified Party may from time to time elect.  Until one year and one day after payment of the full amount of all Indemnified Amounts, the performance of all of the Indemnifying Party's  obligations hereunder and the termination of this Indemnity, no payment made by or for the account of the Indemnifying Party pursuant to this Indemnity shall entitle the Indemnifying Party  by subrogation, indemnity or otherwise to any payment by the Borrower or from or out of any property of the Borrower, and the Indemnifying Party shall not exercise any right or remedy against the Borrower or any property of the Borrower by reason of any performance by the Indemnifying Party of this Indemnity.  If any amount shall be paid to the Indemnifying Party on account of such subrogation rights at any time when all of the Indemnified Amounts shall not have been paid in full, such amount shall be held in trust for the benefit of the Indemnified Party and shall forthwith be paid to the Indemnified Party to be credited and applied upon the Indemnified Amounts, whether matured or unmatured, in accordance with the terms of this Indemnity.

SECTION 9.    <u>Waiver; Waiver of Defenses</u>.  The Indemnifying Party and the Borrower hereby expressly waive: (a) notice of the Indemnified Party's and the Lender's acceptance of this Indemnity; (b) notice of the existence or creation or non-payment of all or any of the Indemnified Amounts and Lender Indemnified Amounts; (c) presentment, demand, notice of dishonor, protest, and all other notices whatsoever (provided that nothing contained in this clause (c) shall affect any obligations to give notice or make demand as set forth in the Receivables Purchase and Contribution Agreement); and (d) all diligence in collection or protection or realization upon the Indemnified Amounts and Lender Indemnified Amounts, any obligation hereunder, or any security for or guaranty of any of the foregoing.  To the fullest extent permitted by applicable law, the Indemnifying Party and the Borrower, as applicable, agrees not to assert, and hereby waives for the benefit of the Indemnified Party and the Lender, as applicable, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud or fraud in the inducement), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to the Indemnifying Party and the Borrower, as applicable, to avoid payment of their obligations under this Indemnity in accordance with the express provisions of this Indemnity.

SECTION 10.    <u>Unconditional Nature of Indemnity.</u>        Notwithstanding anything herein to the contrary, no provision of this Indemnity shall require the Indemnifying Party and the Borrower, as applicable, to pay, perform or discharge any Indemnified Amounts and Lender Indemnified Amounts, as applicable, prior to the time such Indemnified Amounts and Lender Indemnified Amounts are due and

payable.  No delay on the Indemnified Party's or the Lender's part in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Indemnified Party or the Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Indemnity be binding upon the Indemnified Party or the Lender except as expressly set forth in a writing duly signed by the Indemnified Party or the Lender.  The Indemnified Party and the Lender may in all events pursue its rights under this Indemnity prior to or simultaneously with pursuing its various rights referred to in the "Transaction Documents" (as defined in the Receivables Loan Agreement), as the Indemnified Party and the Lender may determine.  No action of the Indemnified Party and the Lender permitted hereunder shall in any way affect or impair the Indemnified Party's and the Lender's rights or the Indemnifying Party's and the Borrower's obligations under this Indemnity.  The obligations of the Indemnifying Party and the Borrower are unlimited in amount (but not greater than the Indemnified Amounts or Lender Indemnified Amounts, as applicable, plus costs and expenses payable hereunder) and shall be continuing and irrevocable, absolute and unconditional, primary, original and immediate and not contingent and shall remain in full force and effect without regard to and not be released, discharged or in any way affected by any circumstance or condition (other than by payment in full of Aggregate Loans, Indemnified Amounts and Lender Indemnified Amounts) including, without limitation, the occurrence of any one or more of the following:

(i)     any lack of validity or enforceability of any of the Aggregate Loans, Indemnified Amounts and Lender Indemnified Amounts under the Transaction Documents, any provision thereof, or any other agreement or instrument relating thereto or the absence of any action to enforce the same;

(ii)     any failure, omission, delay or lack on the part of the Indemnified Party or the Lender to enforce, assert or exercise any right, power, privilege or remedy conferred on the Indemnified Party or the Lender in the Transaction Documents or this Indemnity, or the inability of the Indemnified Party or the Lender to enforce any provision of the Transaction Documents for any reason, or any other act or omission on the part of the Indemnified Party or the Lender; provided, that the foregoing shall not apply to applicable statutes of limitation;

(iii)     any change in the time, manner or place of performance or of payment, or in any other term of, all or any of the Aggregate Loans, Indemnified Amounts and Lender Indemnified Amounts, or any other modification, supplement, amendment or waiver of or any consent to departure from the terms and conditions of the Transaction Documents;

(iv)     any taking, exchange, release or non-perfection of the Pledged Collateral or Borrower Pledged Collateral or any collateral or security, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Indemnified Amounts or the Lender Indemnified Amounts or the acceptance of any security therefor;

(v)    Reserved;

(vi)    Reserved;

(vii)    the recovery of any judgment against any Person or any action to enforce the same;

(viii)    any failure or delay in the enforcement of the Indemnified Amounts and Lender Indemnified Amounts of any Person under the Transaction Documents or any provision thereof; *provided*, that the foregoing shall not apply to applicable statutes of limitation;

(ix)    any set-off, counterclaim, deduction, defense, abatement, suspension, deferment, diminution, recoupment, limitation or termination available with respect to any Indemnified Amounts and Lender Indemnified Amounts and, to the extent permitted by applicable law, irrespective of any other circumstances that might otherwise limit recourse by or against the Indemnifying Party, the Borrower or any other Person;

(x)    the obtaining, the amendment or the release of or consent to any departure from the primary or secondary obligation of any other Person, in addition to the Indemnifying Party or the Borrower, with respect to any Indemnified Amounts or Lender Indemnified Amounts;

(xi)    any compromise, alteration, amendment, modification, extension, renewal, release or other change, or waiver, consent or other action, or delay or omission or failure to act, in respect of any of the terms, covenants or conditions of the Transaction Documents, any Indemnified Amounts or any Lender Indemnified Amounts or any other agreement or any related document referred to therein, or any assignment or transfer of any thereof;

(xii)    any manner of application of the Pledged Collateral or Borrower Pledged Collateral, as applicable, or any other collateral, or proceeds thereof, to all or any of the Indemnified Amounts or Lender Indemnified Amounts, as applicable, or any manner of sale or other disposition of the Pledged Collateral or Borrower Pledged Collateral, as applicable, or any other collateral for all or any of the Indemnified Amounts or Lender Indemnified Amounts, or any furnishing or acceptance of additional collateral or any release of any existing securities;

(xiii)    Reserved;

(xiv)    to the fullest extent permitted by applicable law, any other circumstance which might otherwise constitute a defense available to, or a discharge of; a guarantor or surety with respect to any Indemnified Amounts or Lender Indemnified Amounts;

(xv)    any default, failure or delay, whether as a result of actual or alleged force majeure, commercial impracticability or otherwise, in the performance of the Indemnified

Amounts or Lender Indemnified Amounts, or by any other act or circumstances which may or might in any manner or to any extent vary the risk of the Indemnifying Party or the Borrower, or which would otherwise operate as a discharge of the Indemnifying Party or the Borrower;

(xvi)    the existence of any other obligation of the Indemnifying Party or the Borrower, or any limitation thereof, in the Transaction Documents;

(xvii)   any regulatory change or other governmental action (whether or not adverse) or other change in applicable law; or

(xviii)  the partial payment or performance of the Indemnified Amounts or Lender Indemnified Amounts (whether as a result of the exercise of any right, remedy, power or privilege or otherwise) or the invalidity of any payment for any reason whatsoever.

Should any money due or owing under this Indemnity not be recoverable from the Indemnifying Party or the Borrower, as applicable, due to any of the matters specified in clauses (i) through (xviii) above or for any other reason, then, in any such case, such money shall nevertheless be recoverable from the Indemnifying Party or the Borrower, as applicable, as though the Indemnifying Party or the Borrower, as applicable, were principal debtor or obligor in respect thereof and not merely an indemnitor and shall be paid by the Indemnifying Party or the Borrower, as applicable, forthwith.

SECTION 11.    Reserved.

SECTION 12.    Representations and Warranties.    The Indemnifying Party represents and warrants as follows:

(a)    Organization and Good Standing.    It has been duly organized and validly exists as a limited liability company in good standing under the laws of its state of incorporation, with requisite power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted.

(b)    Due Qualification.    It is duly licensed, qualified and authorized to do business and is in good standing in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such license or qualification except for failures to be so qualified which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on (a) the business, operations, properties or condition (financial or otherwise) of such Indemnifying Party or (b) the validity or enforceability of this Indemnity, the Transaction Documents or the rights or remedies of the Indemnified Party hereunder or thereunder or (c) the ability of such Indemnifying Party to perform its obligations under this Indemnity or (d) the enforceability or recoverability of any of the Assets.

(c)    Power and Authority; Due Authorization.    It has (i) all necessary limited liability company power, authority and legal right to execute, deliver and perform its

obligations under this Indemnity and (ii) duly authorized by all necessary limited liability company action such execution, delivery and performance of this Indemnity.

(d)  Binding Obligations.  This Indemnity constitutes the legal, valid and binding obligation of such Indemnity, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(e)  No Violation.  The execution, delivery and performance of this Indemnity will not (i) conflict with, or result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under (A) the limited liability company agreement of the Indemnifying Party or (B) any indenture, lease, loan agreement, asset purchase agreement, mortgage, deed of trust, or other agreement or instrument to which the Indemnifying Party is a party or by which it or its property is bound, (ii) result in or require the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, lease, loan agreement, asset purchase agreement, mortgage, deed of trust, or other agreement or instrument or (iii) violate any law or any order, rule, regulation applicable to the Indemnifying Party of any court or of any federal, state or foreign regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Indemnifying Party or any of its properties.

(f)  Solvency.  The execution, delivery and performance by the Indemnifying Party of this Indemnity will not render such Indemnifying Party insolvent, nor is it being made in contemplation of the Indemnifying Party's insolvency; the Indemnifying Party does not, in its reasonable judgment, have unreasonably small capital for conducting its business as presently contemplated by it.

(g)  Reserved.

(h)  Prohibition of Fundamental Changes.  The Indemnifying Party shall not liquidate, wind up or dissolve itself (or suffer any liquidation, winding up or dissolution), or sell all or substantially all of its assets.

(i)  Pledged Collateral; Pledged Collateral Security.

(ii)  The Pledgor owns the exclusive servicing rights with respect to each Securitization Trust pursuant to the relevant Servicing Agreement.

(iii)  The Pledgor has not assigned, pledged, or otherwise conveyed or encumbered any of the Pledged Collateral to any other Person, and immediately prior to the pledge of any such Pledged Collateral to the Indemnified Party and the Lender, the Pledgor was the sole holder of such Pledged Collateral free and clear of all liens.

(iv)    The provisions of this Indemnity are effective to create in favor of the Indemnified Party and the Lender a valid security interest in all right, title and interest of the Pledgor in, to and under the Pledged Collateral.

(v)    Upon execution of this Indemnity, the filing of financing statements on Form UCC-1 naming the Indemnified Party as "<u>Secured Party</u>" and the Pledgor as "<u>Debtor</u>", and describing the Pledged Collateral, in the State of Delaware, the Indemnified Party and the Lender shall have a fully perfected first priority security interest in all of the Pledged Collateral.

SECTION 13.    <u>Successors and Assigns; Amendment</u>

(a)    This Indemnity shall be binding upon the Indemnifying Party and the Borrower and upon the Indemnifying Party's and the Borrower's successors and assigns and all references herein to the Indemnity shall be deemed to include any successor or successors whether immediate or remote, to such Indemnifying Party and the Borrower. The Indemnifying Party and the Borrower, as applicable, shall not assign any of its obligations hereunder without the prior written consent of the Indemnified Party and the Lender, as applicable.

(b)    This Indemnity shall inure to the benefit of the Indemnified Party and the Lender, as applicable, and its successors and assigns and all references herein to the Indemnified Party and the Lender, as applicable, shall be deemed to include any successors and assigns of the Indemnified Party and the Lender, as applicable (whether or not reference in a particular provision is made to such successors and assigns).

(c)    No amendment or waiver of any provision of this Indemnity, and no consent to any departure by the Indemnifying Party and the Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by the Indemnifying Party, the Indemnified Party, the Borrower and the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 14.    <u>GOVERNING LAW</u>.    THIS INDEMNITY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, BUT OTHERWISE WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES AND SHALL CONSTITUTE A SECURITY AGREEMENT WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE.    Wherever possible each provision of this Indemnity shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Indemnity shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Indemnity.

SECTION 15.  <u>Consent to Jurisdiction</u>. Waiver of Jury Trial.    The Indemnified Party and the Lender may enforce any claim arising out of this Indemnity in any state or federal court having subject matter jurisdiction and located in New York, New York and with respect to any such claim, the Indemnifying Party and the Borrower hereby irrevocably submit to the jurisdiction of such courts.  The Indemnifying Party and the Borrower irrevocably consents to the service of process out of said courts by mailing a copy thereof, by registered mail, postage prepaid, to the Indemnifying Party and the Borrower, and agree that such service, to the fullest extent permitted by law, (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall be taken and held to be valid personal service upon and personal delivery to it.    Nothing herein contained shall preclude the Indemnified Party and the Lender from bringing an action or proceeding in respect hereof in any other country, state or place having jurisdiction over such action.  The Indemnifying Party and the Borrower irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in such a court located in New York, New York and any claim that any such suit, action or proceeding brought in such court has been brought in an inconvenient forum.    THE INDEMNIFYING PARTY AND THE BORROWER HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS INDEMNITY OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS INDEMNITY, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

SECTION 16.  <u>Notices</u>.  All notices, demands or requests given pursuant to this Indemnity shall be in writing, sent by overnight courier service or by facsimile or hand delivery to the following addresses:

To Indemnifying Party:                    [                              ]

To the Indemnified Party:                 [                ]

To the Lender                             [                      ]

Notice shall be effective and deemed received (a) one (1) day after being delivered to the courier service, if sent by courier, (b) upon receipt of confirmation of transmission, if sent by telecopy, or (c) when delivered, if delivered by hand.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, this Indemnity has been executed and delivered by the Indemnifying Party's and the Borrower's duly authorized officer as of the date first written above.

**AURORA LOAN SERVICES LLC**

By:_____
Name:
Title:

**AURORA ADVANCE RECEIVABLES I LLC**

By:_____
Name:
Title:

**ACKNOWLEDGED AND ACCEPTED:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
Name:
Title:

IN WITNESS WHEREOF, this Indemnity has been executed and delivered by the Indemnifying Party's and the Borrower's duly authorized officer as of the date first written above.

**AURORA LOAN SERVICES LLC**

By:_____

Name:

Title:

**AURORA ADVANCE RECEIVABLES I LLC**

By:_____

Name:

Title:

**ACKNOWLEDGED AND ACCEPTED:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:

IN WITNESS WHEREOF, this Indemnity has been executed and delivered by the Indemnifying Party's and the Borrower's duly authorized officer as of the date first written above.

**AURORA LOAN SERVICES LLC**

By:_____
Name:
Title:

**AURORA ADVANCE RECEIVABLES I LLC**

By:_____
Name:
Title:

**ACKNOWLEDGED AND ACCEPTED:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
Name:
Title: