WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                                                  :
In re                                                             :   Chapter 11 Case No.
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., et al.,                            :   08-13555 (JMP)
                                                                  :
                         Debtors.                                 :   (Jointly Administered)
                                                                  :
                                                                  :
------------------------------------------------------------------x
```

**DECLARATION OF DOUGLAS LAMBERT IN SUPPORT OF LBHI'S MOTION, PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004, FOR AUTHORIZATION TO ENTER INTO (I) AN AMENDED REPURCHASE AGREEMENT WITH AURORA BANK, FSB AND (II) A FINANCING FACILITY WITH AURORA LOAN SERVICES, LLC**

Pursuant to 28 U.S.C. § 1746, I, Douglas Lambert, declare:

1.  I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to the truth of the matters set forth herein.

2.  I am a Managing Director with Alvarez and Marsal. I was assigned to the Lehman matter on October 1, 2008. My areas of responsibility are managing the combined bank book and the bank platform assets of Lehman Brothers Holdings Inc. ("LBHI," together with its chapter 11 affiliates, the "Debtors"), in particular, dealing with issues related to Aurora Bank FSB (the "Bank" or "FSB") and Woodlands Commercial Bank ("Woodlands," together with FSB, the "Banks").

3.  In that role, I have been intimately involved with the Bank's affairs since approximately October 1, 2008. Since that time, I have independently reviewed and been advised of the Bank's business, its operations, records, financial statements, and data. I have also been in constant communication with the Bank's management, the Office of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Corporation (the "FDIC, together with the OTS, the "Regulators"), the Creditors' Committee and each of their respective counsel and professionals on behalf of the Debtors. I have been the primary individual involved in discussions with the Regulators and the Bank on behalf of the Debtors.

4.  I have been advised by my attorneys, the Regulators and the Bank's management, among others, that LBHI's dealings with the Regulators with respect to the Bank are strictly confidential and, if disclosed, could result in criminal sanctions. To satisfy its fiduciary duties, however, LBHI has maintained an open dialogue with the official committee of general unsecured creditors appointed in these cases (the "Creditors' Committee") regarding the Banks subject to appropriate confidentiality agreements. As such, information concerning the Bank has been shared with the Creditors' Committee and its professionals on a real-time basis, and the Creditors' Committee has had meaningful input regarding LBHI's strategy for the Bank. LBHI will continue to work with the Creditors' Committee to ensure that the interests of all unsecured creditors are represented and protected. All of LBHI's five prior motions to take various actions to support the Banks have been based upon consultation with and the support of the Creditors' Committee.

The Prompt Corrective Action directive

5.  In response to the diminished capital level reported in the Bank's December 31, 2008 Thrift Financial Report (the "TFR"), on February 4, 2009, the OTS issued a Prompt

Corrective Action directive (the "PCA") imposing significant restrictions on the Bank's operations, including, among other things, prohibiting the Bank from issuing certificates of deposit as well as restrictions on issuing new loans and conducting new business without the approval of the OTS.

6. Prior to the issuance of the PCA, the Bank would primarily finance its operations through the issuance of brokered certificates of deposit. The PCA remains in effect until it is terminated by the OTS. In response to the immediate concerns raised by the PCA, including a potential seizure of the Bank, LBHI sought authority to restore the Bank's capital level. After receiving such authority from the Court in February, 2009, LBHI consummated a settlement agreement with Aurora Loan Services LLC, pursuant to which LBHI contributed approximately $185 million in value and $9.838 million in cash to the Bank's capital.

7. LBHI always recognized and disclosed that a resolution of the Banks would be a long-term financial commitment that would develop over time primarily because the Banks capital levels are tied to market conditions as a result of fair value accounting. LBHI believes it has been candid that there are risks associated with its investments in the Banks, but this course of action far outweighs the alternative to allow the Banks to fail.

The Capital Support Actions

8. On March 31, 2009, there was a possibility that the Bank's capital level could have dropped below an 8% total risk-based capital ratio or the bank's capital divided by its risk-weighted assets (including hypothetical loans which may result from unfunded loan commitments to borrowers) considered to be "adequate" under the applicable regulations. To sustain the Bank's capital adequacy and avoid adverse regulatory restriction, in March, 2009,

LBHI and its affiliated chapter 11 Debtor, Lehman Commercial Paper Inc., filed the capital support motion seeking authority to take various actions to support the Bank's capital level.

9. The capital support motion also requested that LBHI be authorized, subject to the consent of the Creditors' Committee, to take the capital support actions to implement the Bank's business strategy, including to achieve a "well-capitalized" status, even if such actions were not required to achieve an 8% capital adequacy level. A 10% total risk-based capital ratio is a minimum requirement to be "well-capitalized" under the applicable regulations, although the Regulators may require a higher ratio to allow the Bank to resume normal business operations, including the ability of the Bank to raise funds in the brokered certificate of deposit market.

10. Pursuant to approved authority, virtually all of the capital support actions were consummated on March 31, 2009, with the approval and consent of the Creditors' Committee, to not only satisfy the 8% capital adequacy mark, but also to allow the Bank to achieve a 10% "well-capitalized" status on March 31, 2009, to support the Bank's ability to carry out its business strategy including plans to access the market for brokered certificates of deposit. Specifically, pursuant to the order granting the authority requested in the capital support motion, the Debtors: (i) assigned to Aurora Loan Services LLC ("Aurora") a portfolio of LBHI's unencumbered mortgage servicing rights of approximately $216 million; (ii) consummated a settlement agreement with Aurora that transferred ownership of approximately $6-7 million in disputed funds; (iii) contributed $15 million in cash to the Bank; and (iv) terminated unfunded loan commitments of $1.375 billion.

11. On March 31, 2009, the Bank attained a 10.4% total-risk based capital ratio.

The June 31, 2009 Capital Contribution

12. On April 28, 2009, the Bank, with LBHI's support, submitted a three-year business plan (the "Business Plan") for approval by the OTS. The Business Plan is premised on the Bank maintaining a "well-capitalized" status and, based on such status, pursuing a strategy under which, among other things, the Bank recommences certain lending operations and financing its business through the issuance of brokered certificates of deposit. The terms of the Business Plan are currently under discussion with the OTS and will need to be modified based upon further discussions with the Regulators.

13. Alternatively, to assist the Bank with its current liquidity needs, the FDIC could issue a waiver to allow the Bank to issue brokered certificates of deposit while the PCA remains in effect. Such waiver has been requested by the Bank, but has not yet been determined by the FDIC.

14. Despite the improvement to the Bank's financial condition over the last several months, there was a possibility that due to the effect of "fair value" accounting, the Bank could have fallen somewhat below the 10% risk-based capital ratio that is considered to be "well-capitalized" on its June 30, 2009 Thrift Financial Report. LBHI believed that would have been inconsistent with the Business Plan as submitted to the OTS and such failure could have caused the Regulators to decline to authorize the Bank to begin issuing brokered certificates of deposit, including on an interim basis.

15. Accordingly, with the support of the Creditors' Committee, LBHI requested and obtained authority to contribute up to $50 million in cash into the Bank to the extent such contribution was determined to be necessary for the Bank to maintain a "well-capitalized" status. On June 30, 2009, LBHI contributed $50 million to the Bank to further support the Bank's

capital and preserve the opportunity to preserve and realize the value of LBHI's equity interest in the Bank amounting to hundreds of millions of dollars.

The Current Need for the Financing Facilities

16.     Prior to the issuance of the PCA, the Bank historically funded its operations through the issuance of brokered certificates of deposit. In the two-and-a-half years ending on June 30, 2009, the Bank issued approximately $5 billion of brokered certificates of deposit and funded maturities of approximately $12.8 billion during that period. This has left the Bank with a balance of approximately $4.2 billion in brokered certificates of deposit as of June 30, 2009. During August 2009, approximately $550 million of the Bank's repayment obligations on its brokered certificates of deposit will become due (the "Deposit Obligations"). Prior to the regulatory restrictions imposed on the Bank's operations, the Bank would ordinarily "rollover" or issue new certificates of deposit to finance its Deposit Obligations. However, because the Bank currently lacks access to the brokered certificate of deposit market under the restrictions imposed by the PCA, it must make alternative arrangements for financing in the event that the FDIC does not issue a timely waiver.

17.     In addition to the Bank's Deposit Obligations, Aurora, the Bank's loan servicing arm, has heavy cash demands to satisfy its advance obligations. More specifically, in connection with its mortgage servicing business, Aurora is a party to various mortgage servicing agreements, pursuant to which Aurora has agreed under certain conditions to advance monthly payments of principal and interest due on residential mortgages that Aurora services for the benefit of Aurora's counterparties (the "Advance Obligations"). The advances are typically made prior to Aurora's receipt of monthly mortgage payments from delinquent borrowers, thereby creating a receivable for the benefit of Aurora (the "Advance Receivables"). Because

the Bank lacked access to the funding sources that it would normally rely upon to finance its mortgage servicing business and because the credit crisis and housing downturn drove delinquencies to unprecedented levels, there was a concern that Aurora would be in default of its monthly Advance Obligations, and, therefore, was risking precipitous actions by Aurora's counterparties that could threaten the value of the Bank and cause the Regulators to impose further restrictions on the Bank's operations. To avoid such adverse consequences, LBHI determined to enter into the repurchase agreement with the Bank to provide the Bank the temporary liquidity that the Bank needed to finance Aurora's Advance Obligations. Aurora's Advance Obligations continue to impose heavy mid-month cash demands on Aurora and the Bank.

18.     If the Bank is unable to meet all of its Deposit Obligations, LBHI and the Bank's management believe that the OTS will not approve an amended Business Plan, but instead the Regulators may impose further restrictions on the Bank's operations, including a possible seizure of the Bank and the appointment of a receiver. Similarly, if there is a risk of loss to the Bank of the considerable servicing revenue generated by Aurora, the Regulators may further restrict the Bank's activities.

<u>Consequences of Seizure</u>

19.     If the Bank is subject to seizure and a receiver is appointed, LBHI would lose an extremely valuable asset. On its June 30, 3009 TFR, the value of LBHI's equity interest in the Bank was reported at approximately $575 million. Moreover, having conducted its due diligence, LBHI believes that the Bank can be a profitable enterprise that can inure to the benefit of all creditors if preserved. LBHI believes that the challenges faced by the Bank have been largely due to the effect of fair value accounting or "FAS 159." The Bank's election of FAS 159

is irreversible and requires that the Bank mark the value of its assets at the price that would be received to sell assets in an orderly transaction between market participants at the measurement date.  The effect of fair value accounting on the Bank's assets and liabilities has been devastating.  In LBHI's judgment, FAS 159 paints an artificially distorted view of the Bank's capital under the currently depressed market conditions.  LBHI believes that significant value can be realized from a preservation of the Bank.

20.     As reported on its June 30, 2009 Thrift Financial Report, the Bank has a large loan portfolio that consists of loan receivables totaling approximately $1.9 billion, including approximately $1.2 billion in mortgage loans, $190 million in consumer loans and $417 million in other loans (predominantly student loans).  In addition, through Aurora, the Bank operates the eleventh largest residential mortgage loan servicing operation in the U.S. that collects servicing fees on a monthly basis of approximately $28 million.

21.     Allowing a seizure of the Bank and appointment of a receiver could also expose the Debtors to guarantee claims and a potentially significant claim under section 365(o) of the Bankruptcy Code, that, if successful, could have a devastating negative impact on general unsecured creditor recoveries.  Additionally, the appointment of a receiver for FSB might also cause LBHI to lose the value of and its prior investments in Woodlands pursuant to a cross-liability statute.  The value of LBHI's equity interest in Woodlands was recently reported at $625 million, inclusive of a $200 million cash investment made by LBHI on February 20, 2009. LBHI has considered, with the advice of its attorneys and business professionals, the risks associated with a claim asserted by the Regulators under section 365(o) and the statutory cross-liability provision. A reasonable projection of the cost to the Debtors from the appointment of a receiver and the successful assertion of a 365(o) claim and the resultant loss of the equity value

from a failure of the Banks ranges between approximately $1.2 billion (reasonable best case) and $3.6 billion (reasonable worst case).

22. After independently weighing the risks associated with a failure of the Banks and the benefits of preserving the Banks, LBHI determined, with the consultation and support of the Creditors' Committee, that the preservation of the Banks is in the best interests of all creditors.

Financing Facilities

23. To enable the Bank and Aurora to satisfy their Deposit Obligations and Advance Obligations in full, LBHI has determined (i) to amend the master repurchase agreement with the Bank approved by this Court on March 13, 2009 to provide the Bank with up to $450 million in liquidity (the "Amended Repurchase Agreement") and (ii) to enter into a bridge financing facility with the Bank's wholly owned loan servicing subsidiary, Aurora, pursuant to which LBHI will provide Aurora with up to $500 million in short-term secured financing (the "Financing Facility").

24. Generally, the Amended Repurchase Agreement provides that LBHI will purchase a portfolio of the Bank's eligible mortgage and commercial loans for a purchase price of 75% of the value of the loans determined by LBHI (an increase from 50% under the repurchase agreement) in exchange for the Bank's agreement to repurchase those loans for the purchase price paid by LBHI plus an applicable spread of LIBOR + 6%. The aggregate outstanding purchase price may not exceed $450 million, an increase of $125 million authorized by the current repurchase agreement. Additionally, LBHI and the Bank have agreed to include, at the option of LBHI, commercial real estate loans in the repurchase transactions. The current repurchase agreement only contemplates the purchase and sale of residential mortgage loans.

25.   Notwithstanding the modifications to the terms of the agreement that are necessary to accommodate the Bank and Aurora's current cash needs, LBHI believes that the cash advances to be made under the Amended Repurchase Agreement do not expose the estate to unacceptable risk because:

a.   The Amended Repurchase Agreement is on substantially the same terms as the repurchase agreement previously approved by this Court. Under the current repurchase agreement, LBHI has made a total of $805 million in advances to date that were paid back in accordance with the agreement.

b.   Although the advance rate has increased to 75% of the value of a purchased loan, only performing loans are eligible under the agreement and LBHI has retained the right to independently value the underlying loans so as to ensure that the value that is being ascribed to the loans is acceptable to LBHI and appropriately discounted for current market risks. Moreover, 75% is a conservative advance rate.

c.   LBHI continues to hold a first priority perfected security interest in the purchased loans. Also, if the value of LBHI's collateral ever falls below the 133% outstanding amount due under the Amended Repurchase Agreement, LBHI can require the Bank to post cash or transfer additional assets. Thus, LBHI's investment should be fully secured.

d.   As market conditions for residential mortgages recover, LBHI believes, based on its familiarity with the underlying assets, that the risk to the estate associated with the collateral is significantly reduced and an increase to a 75% advance rate is appropriate under the circumstances.

e.   The Amended Repurchase Agreement is intended to be a bridge to a long-term facility with a third party. Also, each transaction under the Amended Repurchase Agreement has a maximum term of 14 days and renewal or "rolling" requires mutual agreement of the parties. The limited term of the Amended Repurchase Agreement will help protect LBHI's exposure and minimize the risk of its investment.

f.   Even in the event a receiver is appointed for the Bank, LBHI believes it has taken adequate measures to structure the transaction so that LBHI should be entitled to "safe harbor" protections to immediately recover its collateral.

26.   In sum, the risks associated with a failure of the Bank and its related consequences far outweigh any risk associated with the modifications to the Amended

Repurchase Agreement. LBHI is confident that it has taken appropriate measures to protect its cash advances.

27. Further, LBHI and Aurora have negotiated an agreement to finance Aurora's Advance Receivables. Generally, pursuant to the Financing Facility, LBHI will issue a revolving loan facility to Aurora in exchange for interest at LIBOR + 5% and a first priority perfected security interest in the Advance Receivables to be held by LBHI. The Financing Facility does not expose LBHI to unacceptable risk because:

a. Through negotiations, LBHI has successfully enhanced the structure of the transaction to further protect its cash advances: ownership of the Advance Receivables will be transferred to a special purpose entity that will issue notes to LBHI for amounts outstanding under the revolving Facility.

b. Similar to the Amended Repurchase Agreement, the Financing Facility is intended to be a short-term bridge to a long-term facility with a third party. Additionally, LBHI has successfully negotiated a further enhancement to the transaction. The term of the Financing Facility is 180 days now to be extended at the option of LBHI, not Aurora.

c. Having become familiar with Aurora's business, LBHI is comfortable that the risk associated with repayment of the Advance Receivables is low. The Advance Receivables are reimbursed on a first-priority basis from collections on the related loans, and, if they prove to be unrecoverable, on a first priority basis from collections received by the related trust generally. The advance facility will follow general market conventions to protect the facility by requiring an appropriate collateral discount and other risk mitigating measures consistent with market practices.

d. Ownership of the Advance Receivables will be transferred to an SPV; thus, in the event of a failure of the Bank or Aurora, LBHI believes its collateral will be adequately protected because the assets of the trust will not be property of Aurora.

e. The Financing Facility requires the Bank to post a 2% reserve account that will further safeguard LBHI's cash investment.

f. The Financing Facility is secured by very safe collateral, which is substantially discounted in the borrowing base calculation.

28.   LBHI also believes that there are economic benefits associated with the transactions. Under both the Amended Repurchase Agreement and the Financing Facility, LBHI will earn a return on its cash investment that is approximately six to seven times greater than that available from alternative sources under current market conditions, such as U.S. securities. Also, LBHI believes it is more beneficial to extend the financing to the Bank because it will be collecting interest and other payments that, if paid to a third party, would reduce the value of LBHI's equity interest. Both of these transactions were negotiated at arm's-length and with the advice of counsel and financial professionals for LBHI and the Bank. LBHI believes it has satisfied its fiduciary duties, is making a good investment of its cash, and has taken adequate steps to protect its advances.

29.   The funds made available under the Amended Repurchase Agreement and the Financing Facility will ensure that the Bank can satisfy is Deposit Obligations and Aurora is able to satisfy its Advance Obligations. LBHI believes that the access to liquidity provided to the Bank through the Amended Repurchase Agreement and Financing Facility should be sufficient to allow the Bank to satisfy its Deposit Obligations through 2010.

The Business Plan

30.   LBHI is currently considering a number of alternatives to best realize the value of its equity interests in both Banks. The options include a potential sale of the Bank and/or Aurora to a third party, a transfer of the Bank as an operating and profitable enterprise to a trust for the benefit of creditors, a spin-off of the Bank, an orderly wind-down of the Bank to pay off deposits as loans mature and pull out LBHI's equity or even a liquidation of the Bank's assets under normal market conditions. The ultimate strategy for the Banks will be selected with the

consultation of the Creditors' Committee. In order to implement any of these strategies, however, LBHI must take the proposed actions to preserve the Bank.

31. It is critical to obtain approval of a Business Plan from the OTS. To do so, the Bank must be able to satisfy its Deposit Obligations. To avoid risks to the Bank's enterprise value, Aurora must timely satisfy its Advance Obligations. If the Bank or Aurora cannot satisfy their respective obligations, based upon my experience with the Regulators, it will be extremely difficult, if not impossible, to convince the OTS that the restrictions on the Bank's operations should be lifted and that it should be authorized to resume normal business operations. Accordingly, LBHI's entry into the Amended Repurchase Agreement and the Financing Facility are appropriate and necessary, as recognized by the Creditors' Committee and its professionals, to ensure that the significant value of the Banks is preserved for the benefit of all of the Debtors' creditors.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

        Executed on this 4th day of August, 2009.

                                        /s/ Douglas Lambert
                                        Douglas Lambert