# **Exhibit A**

**(Interim Agreement)**

EXECUTION COPY

## CITADEL SOLUTIONS LLC
## CONSULTING AGREEMENT

THIS AGREEMENT ("**Agreement**") is effective as of June 1, 2009 by and between Citadel Solutions LLC, a Delaware limited liability company (the "**Administrator**"), and Lehman Brothers Holdings Inc., a Delaware corporation ("**Client**"). (Client and Administrator hereinafter sometimes are referred to, individually, as a "**Party**" and, collectively, as "**Parties**").

### RECITALS

*WHEREAS* Client commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") (Case No. 08-13555) (the "**Bankruptcy Case**"). Client is authorized to operate its businesses and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

*WHEREAS* Client desires to engage Administrator and Administrator desires to be engaged by Client to commence the process of implementation as defined in the attached Schedule I (the "**Services**") and certain other services as may be requested by Client from time to time pursuant to a Statement of Work referencing this Agreement (the "**Additional Services**") in advance of the potential execution of a Master Services Agreement ("**MSA**") between Administrator and Client.

*NOW, THEREFORE*, in consideration of the foregoing premises and the mutual agreements contained herein, it is agreed between the Parties as follows:

1. Consulting Relationship. Client hereby engages Administrator and Administrator hereby accepts such engagement as an independent contractor to provide the Services and, if applicable, the Additional Services. Administrator shall confer fully, freely and regularly with Client in the performance of Administrator's duties and responsibilities, provided, however, that Administrator shall have exclusive control over its employees and agents hereunder and shall independently manage and control its activities subject only to the terms of this Agreement. Administrator will delegate the performance of certain of the Services to its affiliates and to outsourcing partners outside the United States of America and will be solely responsible for the Services provided by its affiliates and delegates. For the avoidance of doubt, no Administrator affiliate other than Administrator is incurring any liability hereunder to Client or any of its affiliates in connection with the performance of the Services except as expressly provided in the Non-Disclosure Agreement dated March 26, 2009, as amended (the "**Non-Disclosure Agreement**"). Administrator agrees that all services to be performed under this Agreement will be performed in a good and workmanlike fashion and will comply with industry standards.

2. <u>Limitations</u>. Nothing in or under this agreement shall be construed to create an obligation on either party to enter into any further agreement with respect to the Services or otherwise, including but not limited to the MSA; nor shall anything in this agreement be construed to constitute any agreement to exclusivity with respect to the Services.

3. <u>Term:</u> The term will commence on the date set forth above and will continue until terminated according to the terms hereof or upon the execution of a MSA by the Parties. Either Party may terminate Administrator's engagement (or any relationship under a particular Statement of Work) at any time upon providing the other Party with 30 days written notice.

4. <u>Fees:</u> Immediately after the effective date of this Agreement, the fees set forth on the attached <u>Schedule II</u> will begin to accrue (the "**Consulting Fee**"), in addition to any other amount that may be due and payable to Administrator pursuant to this Agreement (including any Statement of Work attached hereto). Client shall pay any amounts due within thirty (30) days after receipt of Administrator's invoice, which shall be delivered to Client on a monthly basis. The Parties agree that any amounts actually paid by Client under this Agreement shall be fully credited against any fees due under the MSA for the period prior to the execution of the MSA (*i.e.*, no fees for work performed will be payable twice), in the event the parties do enter into such an agreement.

5. <u>Expenses.</u> In addition to all fees payable to Administrator for Services, Client shall also reimburse Administrator for its reasonable (*i.e.*, in accordance with the Alvarez & Marsal travel and expense policy) related travel, lodging and meal expenses, provided that (A) the travel in question is approved by Jeffrey Donaldson or such other person designated by Client and (B) Administrator shall submit reasonable documentation for particular expenses to Client following Client's request therefor. Any Administrator expenses for which Administrator seeks reimbursement, other than the travel, lodging and meal expenses described in this <u>Section 5</u>, shall also be subject to Client's prior written approval.

6. <u>Reports.</u> Administrator agrees to keep Client advised as to Administrator's progress in performing the Services and shall prepare bi-weekly written reports with respect to such progress, which shall include the number of hours accumulated for each individual working on the Services and a description of the work performed. Client may review Administrator's records to determine the accuracy of the charges hereunder. If an audit reveals that Client has overpaid Administrator as a result of an inaccuracy in Administrator's time tracking report or invoice, Administrator will refund to Client the overpayment plus interest on the overpayment at the lesser of fifteen percent or the maximum rate allowed by law. Furthermore, if an audit reveals that Client has overpaid Administrator by more than ten percent in any month as a result of an inaccuracy in Administrator's time tracking report or invoice, Administrator will reimburse Client's reasonable cost of the audit. Any payment by Administrator of the cost of an audit and any refund by Administrator of an overpayment and interest will be without prejudice to any other remedies that Client may have under this Agreement or at law or in equity.

7. Proprietary Rights.

(a) Any Records created pursuant to or in connection with this Agreement and delivered or to be delivered to Client by Administrator shall be Client's sole and exclusive property. The Parties agree that all Records are intended by the Parties to constitute a "work made for hire" as defined in Section 101 of the U.S. Copyright Act for purposes of United States copyright laws and the law of any other country in which the Services are to be performed. If all or any of the Services Work Product are not considered a "work made for hire", Administrator agrees to assign and hereby does assign to Client all right, title and interest in and to the Records. "**Records**" means descriptions of requirements, workflow maps, results of data discovery (identification of potential quality or contextual issues and proposed treatment in a system to system mapping exercise by asset/sub-asset class) and the financial records and supporting documentation that Administrator prepares and receives in connection with Client's monthly close package (*i.e.*, bank reconciliation report, interest and dividend accrual worksheets, shareholder equity reconciliation if applicable, allocation schedule, cash activity reports, trade positions daily report, realized gain and loss report, cash flow statements and the month end checklist) during the term of this Agreement.

(b) Any intellectual property of any kind, work product, materials, software or technology in which Administrator or its affiliate is the owner of all rights, which pre-existed the commencement date of the Services and any modifications or improvements thereto, know-how, materials, or other items developed in the course of performing Services that are not Records ("**Administrator Work Product**") shall be and remain Administrator's sole and exclusive property. To the extent any such Administrator Work Product is incorporated into any Records delivered or required to be delivered to Client pursuant to or in connection with the Services and is not excisable with minimal effort, Administrator hereby grants Client a perpetual, irrevocable, non-exclusive right and license to use such Administrator Work Product or other material in connection with such Records for their own uses.

(c) Administrator represents and warrants that it has the right, power and authority to convey the ownership and rights to all Records granted to Client as set forth herein and that all individuals and subcontractors performing Services hereunder shall assign all of their right, title and interest in and to the Records to Administrator.

8. Confidentiality. The Parties agree that the terms of the Non-Disclosure Agreement are incorporated herein and made a part of this Agreement by this reference.

9. Customer Data

(a)  Ownership of Client Data. As used in this Agreement, the term "**Client Data**" is defined as all information and data, whether or not "Lehman Sensitive Information" as

3

defined in the Confidentiality Agreement, received, used or stored by Administrator (including its employees and/or subcontractors) from Client or on its behalf in connection with the Services, and any information and data derived from such information and data. Administrator agrees that, as between Administrator and Client, all Client Data is the exclusive property of Client and Administrator hereby waives any interest, title, lien or right to any such Client Data.

(b)  Use of Client Data. Client grants to Administrator a limited, non-exclusive, non-transferable, license and/or sublicense, as applicable, during the term of this agreement to use the Client Data solely for the purpose of, and only to the extent necessary for, Administrator to perform the Services in accordance with this Agreement and any applicable Statement of Work. Client Data may not be (a) used by Administrator other than in connection with providing the Services, including in connection with any other agreements or relationships between Client and Administrator; (b) disclosed, sold, assigned, leased, or otherwise provided by Administrator to third parties except that Client Data may be made available to employees of Citadel Investment Group LLC as expressly provided in (and subject to) the Non-Disclosure Agreement and to employees of Sapient Corporation who have a need to know such information provided that (i) Sapient Corporation has agreed in writing to be bound by the Non-Disclosure Agreement with respect to such Client Data (subject to the limitations on liability provided in Section 10 below) and (ii) Administrator shall be liable with respect to any breach of such agreement by Sapient Corporation; or (c) commercially (or otherwise) exploited by or on behalf of Administrator.

(c)  Return of Client Data. At any time at the request and option of Client and in the event of termination or expiration of the Agreement (or any part thereof) or any applicable Statement of Work, Administrator agrees to promptly: (a) return to Client the Client Data (or any requested portion thereof); or (b) destroy or permanently erase (on all forms of recordation) the Client Data and, if requested by Client, acknowledge in writing that all such Client Data has been destroyed or permanently erased, provided that, other than in connection with a termination or expiration of this Agreement, Administrator shall be relieved of any obligations dependent upon any Client Data with respect to which Client has requested return or destruction following the date that such Client Data has been returned or destroyed by Administrator. Notwithstanding the foregoing, Administrator may retain copies of the Client Data to the extent required to comply with applicable legal and regulatory requirements or which temporarily reside on Administrator system back-ups, provided, however, that Client Data will remain subject to the terms and conditions of the Agreement.

(d)  Exceptions. Notwithstanding anything to the contrary contained in the Agreement, the rights and obligations set forth in this Article will not be modified or amended without approval in writing by legal counsel for Client and then the effect of such amendment or modification will apply only as set forth in writing in the specific Statement of Work.

4

10. <u>Limitation of Liability</u>. Neither Party shall be liable for any speculative, exemplary, punitive or (except with respect to breaches of <u>Section 9(b)</u> or <u>(c)</u>), indirect or consequential damages relating to arising from any alleged breach of this Agreement; provided further that in no event shall the aggregate of all liabilities for damages relating to, or arising from any actual or alleged breach of, this Agreement exceed the aggregate amount of fees received by Administrator pursuant to this Agreement, except to the extent such liability arises from Client's or Administrator's (as the case may be) grossly negligent or willful misconduct.

11. <u>Binding Agreement</u>. The Agreement shall be binding upon Administrator and its respective heirs, successors, personal representatives and assigns, and shall be binding upon Client and its respective heirs, successors, personal representatives and assigns upon the Bankruptcy Court's approval of the Agreement.

12. <u>Governing Law. Governing Law; Submission to Jurisdiction</u>.

(a) This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction.

(b) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12</u> hereof; <u>provided, however,</u> that if Client's Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

(c) Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

5

Each of the Parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.</u>

13. <u>Notices.</u> All notices for which provision is made in this Agreement shall be given in writing either by actual delivery of the notice to the party entitled to the notice or by mailing the notice by registered or certified mail, return receipt requested, in which case the notice shall be deemed to be given on the date following the postmarked date of its mailing. If a notice is so mailed, it shall be addressed as follows: (a) if to Client, to its then principal office; and (b) if to Administrator, to its principal office or business address, as disclosed in Client's engagement records. Any party hereto may change the address to which each such notice shall be so mailed by giving written notice to the other party hereto of such new address.

14. <u>Independent Contractor.</u> The Parties are and shall be independent contractors to one another, and nothing herein shall be deemed to cause this Agreement to create an agency, partnership, or joint venture between the Parties. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between Client and Administrator or any employee or agent of Administrator.

15. <u>Survival.</u> The provisions of Sections 6, 7, 8, 9, 10, 12 and 13 hereof, together with all applicable definitions, Schedules, Statements of Work (or portions thereof) necessary to the interpretation and/or operation of such provisions, shall survive any termination of this Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

CLIENT:

Lehman Brothers Holdings Inc.

By: _____
Its: _____
Date: _____

ADMINISTRATOR:

Citadel Solutions LLC

By: _/s/_____
Name: ~~John Buckley~~ Michael R. Weiner
Its: ~~President~~ General Counsel
Date: 8/5/09

**Client Training / Go-Live:** Administrator will provide Client training and coordinate with account management and shared services in preparation for going live.

1) Web Portal Training
2) Trade/Activity Uploads via the Portal
3) Viewing/Using Reports via the Portal
4) Review Final Implementation Checklist with Account Management and Shared Services
5) Live Portfolio go-live

Terminated but not settled Portfolio

1) Post terminated transactions and cash required for settlements
2) Other processing to be agreed through service level agreement

**Services may also consist of:**

- **Analysis:** Identifying development requirements for client customizations to enable processing of trades from Client's Trade Management/Booking system to Administrator.
- **Message format and Data standard validation:** Together with, and contingent upon, significant input from Client and Client's relevant vendors, Administrator will validate and drive for standardization to market conformance of trade data to be transmitted from Client's relevant vendor system to Administrator.
- **Improving the processing architecture:** Development of processors and customizing code (i) for client-specific requirements and (ii) to effect operational improvements in the straight through processing of trades from Client to Administrator.
- **Client On-boarding:** Executing System Tests and Regression Tests for the products to be supported by the custom connectivity solution developed hereunder. This will involve certifying Client for all asset types as agreed by Client and Administrator.
- **Defect Tracking with development team at the vendors** - Recording and follow-up

For purposes of clarity, the terms of the Confidentiality Agreement shall apply to the Additional Services.

ACCEPTED:
Lehman Brothers Holdings Inc.
By: _____
Name: Willie Gord
Title: SVP
Date: 8/5/05

Citadel Solutions LLC
By: _____
Name: _____
Title: _____
Date: _____

8

Schedule I
Statement of Work #1 Dated as of June 1, 2009
To the Consulting Agreement between Citadel Solutions LLC and
Lehman Brothers Holdings Inc.
Dated as of June 1, 2009 (the "Consulting Agreement")

Client hereby requests that Administrator perform certain Services as set forth in this Statement of Work. Capitalized terms not otherwise defined herein shall have the meaning set forth in the Consulting Agreement.

**Discovery:** Administrator will perform the necessary due diligence to learn about Client's business and gather required information for setup.

1) Request relevant documentation
2) Request Technical Architecture Detail – all systems and applications to support business
3) Gain understanding of current services provided by A&M and Lehman Estate
4) Services provide by current providers – ex. Barclays, Aurora, Numerix
5) Request counterparty information
6) Request portfolio and accounting information
7) Agree upon Legal entity and account structure
8) Agree Service Level Agreement – including delivery mechanism

**Configuration:** Administrator will set up Client's structure across all systems and establish relationships/connections with Client's counterparties/provider

1) Legal Entity Setup
2) Account and Executing Broker Setup
3) Web Portal Setup
4) Great Plains Mapping Setup
5) Reporting Setup
6) Security Master Setup
7) Swap Template Setup
8) Test Upstream/Downstream Connections

**Conversion:** For conversion clients, Administrator will load portfolio, as-of the agreed upon date.

Live Portfolio

1) Open Tax Lots loaded for Portfolio
2) All missed Month-to-Date Activity loaded.

7

**Client Training / Go-Live:** Administrator will provide Client training and coordinate with account management and shared services in preparation for going live.

1) Web Portal Training
2) Trade/Activity Uploads via the Portal
3) Viewing/Using Reports via the Portal
4) Review Final Implementation Checklist with Account Management and Shared Services
5) Live Portfolio go-live

Terminated but not settled Portfolio

1) Post terminated transactions and cash required for settlements
2) Other processing to be agreed through service level agreement

**Services may also consist of:**

- **Analysis:** Identifying development requirements for client customizations to enable processing of trades from Client's Trade Management/Booking system to Administrator.
- **Message format and Data standard validation:** Together with, and contingent upon, significant input from Client and Client's relevant vendors, Administrator will validate and drive for standardization to market conformance of trade data to be transmitted from Client's relevant vendor system to Administrator.
- **Improving the processing architecture:** Development of processors and customizing code (i) for client-specific requirements and (ii) to effect operational improvements in the straight through processing of trades from Client to Administrator.
- **Client On-boarding:** Executing System Tests and Regression Tests for the products to be supported by the custom connectivity solution developed hereunder. This will involve certifying Client for all asset types as agreed by Client and Administrator.
- **Defect Tracking with development team at the vendors** - Recording and follow-up

For purposes of clarity, the terms of the Confidentiality Agreement shall apply to the Additional Services.

**ACCEPTED:**

| Lehman Brothers Holdings Inc. | Citadel Solutions LLC |
|---|---|
| By: _____ | By: _____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |

Schedule II
Fees

| Levels | Citadel & Sapient Hourly Rates |
|---|---|
| Managing Director | 750 |
| Director | 550 |
| Senior Manager | 400 |
| Manager | 300 |
| Staff | 225 |

These levels are intended as descriptive of an individual's experience level and may not reflect an individual's actual corporate title

9