JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Aviva Warter Sisitsky
Sarah E. Lieber
Benjamin Rosenblum

Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
-----------------------------------------------------------------x
```

**NOTICE OF MOTION OF DEBTOR AND DEBTOR IN POSSESSION,
PURSUANT TO SECTIONS 105(a), 362 AND 365 OF THE BANKRUPTCY CODE,
TO COMPEL PERFORMANCE BY AIG CDS, INC. OF ITS OBLIGATIONS UNDER
AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

PLEASE TAKE NOTICE that a hearing on the annexed motion of Lehman

Brothers Special Financing Inc., as debtor and debtor in possession (together, with Lehman

Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, the

"Debtors"), to compel performance of AIG CDS, Inc.'s obligations under an executory contract

and to enforce the automatic stay (the "Motion"), all as more fully described in the Motion, will

be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United

States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling

Green, New York, New York 10004 (the "Bankruptcy Court"), on **October 14, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Jones Day, 222 East 41st Street, New York, New York  10017 (Attn: Jayant W. Tambe, Aviva Warter Sisitsky, Sarah E. Lieber and Benjamin Rosenblum) and Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Richard P. Krasnow, Lori R. Fife, Shai Y. Waisman, and Jacqueline Marcus), attorneys for the Debtor; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck) and Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010 (Attn: Susheel Kirpalani), attorneys for the official committee of unsecured creditors appointed in these cases; (v) Willkie Farr & Gallagher LLP, 787 Seventh Ave, New

York, New York 10019 (Attn: Marc Abrams and Shelley C. Chapman) attorneys for AIG CDS,

Inc., and (vi) AIG CDS, Inc. c/o AIG Global Investment Corp, 70 Pine Street, 13th Floor, New

York, New York, 10270, so as to be received no later than October 1, 2009 at 4:00 p.m.

(Prevailing Eastern Time) (the "Objection Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

       **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  New York, New York
       August 7, 2009

Respectfully submitted,

 _/s/ Jayant W. Tambe_____
Jayant W. Tambe
Aviva Warter Sisitsky
Sarah E. Lieber
Benjamin Rosenblum
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

ATTORNEYS FOR DEBTOR AND DEBTOR
IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Jayant W. Tambe
Aviva Warter Sisitsky
Sarah E. Lieber
Benjamin Rosenblum

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re:                                                          :        Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :        Case No. 08-13555 (JMP)
:
Debtors.                                      :        (Jointly Administered)
:
-------------------------------------------------------------x

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION PURSUANT TO
SECTIONS 105(A), 362 AND 365 OF THE BANKRUPTCY CODE,
TO COMPEL PERFORMANCE BY AIG CDS, INC. OF ITS OBLIGATIONS UNDER
AN EXECUTORY CONTRACT AND TO ENFORCE THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), as debtor and debtor in

possession (together with Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

the above-referenced chapter 11 cases, the "Debtors"), files this motion for an Order pursuant to

sections 105(a), 362 and 365 of the Bankruptcy Code, 11 U.S.C. §§101-1532 (the "Bankruptcy

Code") compelling AIG CDS, Inc. ("AIG") to perform its obligations under an executory

contract, namely the ISDA Master Agreement, dated as of July 14, 2004 (the "Master

Agreement" and together with the Schedule and various Confirmation entered into thereunder, the "Swap Agreement") between it and LBSF, and to enforce the automatic stay.  In support of this motion, LBSF respectfully states:

## Preliminary Statement

1.      This motion seeks redress for the failure by AIG to perform its contractual obligations to pay settlement amounts due in connection with the occurrence of credit events under certain credit derivative transactions (the "Credit Derivative Transactions") entered into between AIG and LBSF under the Swap Agreement.  The sole basis that AIG is expected to rely upon to excuse its failure to make the required payments is the bankruptcy filings of LBSF and its credit support provider, LBHI.

2.      On the relevant petition dates and at all times thereafter, the Credit Derivative Transactions have had a significant market value in favor of LBSF.  During the past nine months, AIG has elected not to exercise its right to terminate the Swap Agreement.  AIG has further seen fit during such period to take no action whatsoever with respect to the Swap Agreement, including making any payments that have become due in such period.

3.      It was only when LBSF sought performance by AIG under the Swap Agreement with respect to certain Credit Derivative Transactions in which credit events had occurred that LBSF learned that AIG intended to enjoy the benefits of the Swap Agreement, but avoid having to "pay to play."[1]

---

[1] This Court noted at the July 14, 2009 hearing on the Motion by Debtors to Compel Performance Of Metavante Corporation's Obligations Under An Executory Contract And To Enforce The Automatic Stay that "[t]he more potent question is whether or not you [Metavante Corporation] have the right to run this game out to 2012 and not pay amounts that are otherwise due and owing . . . to the estate.  That's where I think you need to pay to play. And you're choosing to not pay and play at the same time.  That's a problem.  And I think that's where your hands are just a little soiled."  (Tr. 56:1-56:7).  The relevant pages of the July 14, 2009 transcript are attached hereto as Exhibit ("Ex.") 1.

4.      In direct contravention of the specific provisions of the Bankruptcy Code, AIG is attempting to improperly exploit the chapter 11 filings of LBHI and LBSF in order to avoid its unequivocal obligation to make the payments.  AIG can be expected to argue that the chapter 11 filings of LBHI and LBSF are purported Events of Default under the Swap Agreement, which allow AIG to avoid the payments owed to LBSF until the market value of the Swap Agreement shifts back in AIG's favor.  However, AIG's refusal to meet its performance obligations under the Swap Agreement on that basis flies in the face of section 365(e)(1) of the Bankruptcy Code, which expressly prohibits parties (such as AIG) from suspending their performance obligations solely on account of the bankruptcy filings of its counterparties.

5.      Indeed, nothing in the Bankruptcy Code, the common law or the Swap Agreement itself grants AIG the right to suspend its performance obligations until the market value of the Swap Agreement erodes to the point where it shifts in AIG's favor.  To the contrary, the automatic stay and section 365 of the Bankruptcy Code provide that under these circumstances, AIG is required to perform under the contract.  Accordingly, this Court should compel AIG to comply with its contractual obligations under the Swap Agreement, namely to pay LBSF $9,130,706.00, the physical settlement amounts due in connection with the settlement of credit events under certain Credit Derivative Transactions, accept delivery of the bonds purchased by LBSF in compliance with its obligations under the Swap Agreement to effectuate such settlement, and pay LBSF accrued default interest.[2]

---

[2]    AIG was required to settle the Credit Derivative Transactions on July 28, 2009.  They failed to do so.  As of the date of this filing, LBSF still holds the bonds and expressly reserves its rights to sell the bonds in order to mitigate losses or market risk prior to the adjudication of the motion, and to seek money damages from AIG in respect of any losses and expenses realized in connection with such sale.  In that event, LBSF will submit an amended proposed order to include the additional relief.

## Background

6.      On September 15, 2008, and periodically thereafter, LBHI, the credit support provider under the Swap Agreement, and certain of its subsidiaries including LBSF, commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  On October 3, 2008, LBSF filed its voluntary petition under chapter 11 of the Bankruptcy Code, and this Court consolidated the Debtors' chapter 11 cases for procedural purposes and is jointly administering them pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## Jurisdiction And Venue

7.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The Swap Agreement

9.      This motion concerns the right of LBSF to enforce the provisions of the Swap Agreement so that the estate of LBSF may realize substantial amounts currently owed to it in connection with certain Credit Derivatives Transactions under the Swap Agreement.  Only the key facts that are relevant for the resolution of this motion are set forth below.

A.    **The Mechanics Of The Credit Derivative Transactions
Under The Swap Agreement**

10.    In July 2004, LBSF and AIG entered into the Swap Agreement,[3] which governs approximately one hundred and twenty five (125) separate Credit Derivative Transactions.

11.    Credit derivative transactions involve contracts that afford protection against the risk of a default of a particular entity, known as the "reference entity".  The buyer of credit protection in a credit derivative transaction makes periodic fixed payments to the seller of the credit protection until the end of the term of the credit derivative transaction or until a "credit event" occurs.[4]  The "credit events" for a credit derivative transaction are set forth in the related swap agreement, and usually include the bankruptcy of the related reference entity or a failure by such reference entity to pay debt service on particular debt obligations specified in the swap agreement.

12.    Upon the occurrence of a "credit event" in respect of any credit derivative transaction, if the protection buyer satisfies certain "conditions to settlement," the protection buyer will be required to deliver debt obligations to the protection seller, in exchange for the protection seller paying to the protection buyer an amount equal to the outstanding principal amount of such debt obligations.  A credit protection buyer is required to deliver three notices to the credit protection seller in order to satisfy the "conditions to settlement:" (i) a credit event

---

[3]  Capitalized terms used in this motion have the meaning ascribed to them herein or in the Master Agreement.  With respect to any particular Credit Derivative Transaction, the parties' contract was comprised of the Master Agreement, Schedule and a Confirmation.  (*See* Master Agreement Section 1 at 1, Ex. 2.)  A unique Confirmation documented each Credit Derivative Transaction (*See* Confirmations, Ex. 3.)  The Swap Agreement is governed by New York law.  (*See* Schedule to the Master Agreement at Part 4(h), Ex. 2.)

[4]  Reference Entity and Credit Event are defined in the ISDA 2003 Credit Derivatives Definitions (the "Credit Derivatives Definitions") at Sections 2.1 and 4.1, respectively.  The relevant pages of the Credit Derivatives Definitions are attached hereto as Ex. 4.  The Credit Derivative Definitions are incorporated by reference in their entirety into the Confirmations under the Swap Agreement; *see also*, Hull, John C., *Options, Futures, and other Derivatives*, at 526-28 (7th ed. 2008).

notice, (ii) a notice of publicly available information (such notice, together with the credit event

notice, the "CEN"), and (iii) a notice of physical settlement (the "NOPS" and, together with the

CEN, the "Notices").

13.    Ninety-seven (97) of the one hundred and twenty five (125) Credit

Derivative Transactions between LBSF and AIG are transactions in which LBSF bought credit

protection from AIG, and the remaining twenty-eight (28) Credit Derivative Transactions are

transactions in which LBSF sold credit protection to AIG.[5]

14.    On the petition date and each date thereafter, the Credit Derivative

Transactions under the Swap Agreement have had a market value substantially in favor of LBSF.

**B.    AIG Elected Not To Terminate The Swap Agreement
On Account Of LBHI's And LBSF's Bankruptcy Filing**

15.    Section 5(a)(vii) of the Swap Agreement expressly provides that the filing

of a chapter 11 proceeding by any Credit Support Provider under the Swap Agreement

constitutes an Event of Default under the Swap Agreement.  Accordingly, the chapter 11

proceeding of LBHI (the Credit Support Provider for LBSF under the Swap Agreement) resulted

in the occurrence of an Event of Default under the Swap Agreement, which entitled AIG to

terminate the Swap Agreement.

16.    AIG also had the right to terminate the Swap Agreement upon the filing of

a chapter 11 proceeding by LBSF, on October 3, 2008, pursuant to Section 5(a)(vii) of the

Master Agreement and section 560 of the Bankruptcy Code.

17.    AIG has been on notice of the chapter 11 proceedings commenced by

LBHI and LBSF since their respective filings on September 15, 2008 and October 3, 2008.  AIG

---

[5]    Twelve (12) of the one hundred and twenty five (125) Credit Derivative Transactions under which LBSF
was the credit protection buyer have matured as of June 30, 2009.

has elected during this entire period not to terminate the Swap Agreement on account of such filings.

### C.   Credit Events Pertaining To Separate Reference Entities And Debtors' Contractual Right To Settlement

18.   In the eight Credit Derivative Transactions at issue here, credit events have occurred with respect to six separate reference entities:  General Motors Corporation ("GM"), Washington Mutual, Inc. ("WaMu"), Abitibi-Consolidated Inc. ("Abitibi"), Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"), all of which suffered bankruptcies, and Station Casinos, Inc. ("Station Casinos"), which defaulted in respect of the payment of certain of its debt obligations (the above identified reference entities are referred to herein, collectively, as the "Reference Entities"). LBSF is the protection buyer under four Credit Derivative Transactions referencing Abitibi, WaMu, GM and Station Casinos, respectively.  LBSF is the protection seller under four Credit Derivative Transactions, each referencing Fannie Mae, Freddie Mac and WaMu.

19.   The credit events that occurred with respect to the Reference Entities entitled the parties to settle the eight Credit Derivative Transactions under the Swap Agreement.[6]

20.   Accordingly, on June 29, 2009, in compliance with the strict terms of the Swap Agreement, LBSF delivered the CENs to AIG and thereafter purchased the debt obligations (the "Deliverable Obligations") that LBSF is required to deliver to AIG in order to physically settle the credit events and receive the credit protection payments.  In the CENs, LBSF indicated its intention to net the fixed payment amounts owed by it to AIG, as it is entitled

---

[6]   Lehman has taken the necessary steps to settle the four Credit Derivative Transactions with respect to which it is the credit protection buyer.  Section 4 ("Floating Payments") of the Confirmations for the Credit Derivative Transactions with respect to which LBSF is the credit protection seller, provides that either the buyer or seller of the credit protection has the right to deliver a credit event notice and trigger a credit event.  (*See, e.g.,* Confirmation at Ex. 3, A-4.)

to do both under Section 2(c) of the Swap Agreement and under section 362 of the Bankruptcy Code.[7]

21.    LBSF spent approximately $5 million of assets of the LBSF estate to purchase the Deliverable Obligations of the Reference Entities under the Credit Derivative Transactions with respect to which credit events have occurred.

22.    On July 23, 2009, LBSF delivered the NOPS to AIG. The NOPS specified that, on the settlement date, AIG would be required to pay to LBSF $12,500,000, representing the aggregate physical settlement amount for the four credit events with respect to which LBSF is the protection buyer, less $3,369,294.00, representing the net fixed amount owed by LBSF to AIG in respect of all transactions under the Swap Agreement, for a total amount owed to LBSF of $9,130,706.00. Under the terms of the Swap Agreement, AIG was obligated to make its credit event payment to LBSF no later than July 28, 2009.

23.    AIG has yet to deliver a NOPS with respect to the Credit Derivative Transactions under which AIG is the protection buyer.[8]

---

[7] The Bankruptcy Code permits a non-debtor counterparty to "offset or net out" certain amounts under the swap agreement:

> The filing of a petition . . . does not operate as a stay . . . of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) *to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements*, including any master agreement for such agreements.

11 U.S.C.A. § 362(b)(17) (emphasis added); *see also* the Netting provision in Section 2(c) of the Master Agreement, Ex. 2.

[8] Once LBSF triggered the credit events on the four Credit Derivative Transactions with respect to which AIG is the credit protection buyer, AIG was required under the Swap Agreement to deliver a notice of physical settlement to Lehman within 30 calendar days thereafter, or AIG would lose the benefit of the protection it purchased from LBSF. Such 30 calendar day window has passed, and AIG has elected to do nothing. Thus, AIG is no longer entitled to settle the four Credit Derivative Transactions with respect to which AIG is the credit protection buyer. (See Section 3.4 of the Credit Derivatives Definitions, which states, in relevant part, "...If an effective Notice of Physical Settlement is not delivered by Buyer on or before the thirtieth calendar day after the Event

24.    On July 24, 2009, LBSF reached out to the portfolio manager for AIG's credit default swaps, to inquire as to whether AIG intended to meet its obligations under the Swap Agreement, and forwarded, by e-mail, yet another copy of the CENs and NOPS.  AIG advised LBSF that such documents would be forwarded to AIG's legal counsel.

25.    Again, on July 28, 2009, the date the settlement payments were required to be paid, LBSF contacted AIG to inquire into whether AIG would perform its obligations under the Swap Agreement by accepting delivery of the relevant bonds purchased by LBSF for physical settlement, in exchange for payment by AIG to LBSF of the Physical Settlement Amounts.  AIG informed LBSF that AIG would not be accepting any delivery of bonds and would not perform its obligations — he said, "there would be no settlement today."  AIG gave no indication as to whether AIG intended in the future to perform its obligations under the Credit Derivative Transactions.

26.    Although AIG was entitled to terminate the Swap Agreement under the applicable provisions of the Bankruptcy Code, it chose not to avail itself of that remedy as termination would mean that AIG would have to pay the market value of the Swap Agreement to LBSF, which is a substantial sum valued by LBSF to be approximately $50 million.

27.    To circumvent this result, AIG appears to have taken the position that it is entitled to unilaterally avoid its obligation to pay settlement amounts in respect of certain of the Credit Derivative Transactions until the maturity of the transaction or until the market value of the contract shifts over time in its favor.

---

(continued…)

Determination Date (subject to adjustment in accordance with the specified Business Day Convention), such thirtieth calendar day shall be the Termination Date."

28.     Such action by AIG has no basis in fact or law and this Court should grant

the motion in its entirety compelling AIG to comply with the Swap Agreement as written and the

applicable sections of Bankruptcy Code which mandate that AIG perform its obligations under

the Swap Agreement, including payment of accruing default interest.

29.     LBSF has expended approximately $5 million dollars of assets of the

LBSF estate in attempting to comply with the terms of the Swap Agreement and is subject to

continuing market risk so long as AIG fails to perform its obligations under the Swap Agreement.

**Relief Requested**

30.     By this motion, LBSF seeks an order directing AIG to comply with and

perform its obligations under the Swap Agreement, and to enforce the automatic stay.

**Basis For Relief Requested**

**A.     The Agreement Is An Executory Contract That Can Be Enforced By LBSF**

31.     The Swap Agreement is an "executory contract" pursuant to section 365

of the Bankruptcy Code because material performance — *i.e.*, periodic and floating amount

payment obligations — remains due by both LBSF and AIG.  *See In re Enron Corp.*, Case No.

01 B 16034 (AJG), 2005 WL 3874285, at *4, n.11 (Bankr. S.D.N.Y. Oct. 5, 2005) (rejecting

non-debtor's argument that the parties' swap agreement was not an executory contract, because

despite the netting out of payment obligations, each party was still obligated under the swap

agreement to make a payment to the other); *see also*, *Shoppers World Cmty. Ctr. v. Bradlees*

*Stores, Inc. (In re Bradlees Stores Inc.)*, Case No. 01-CV-3934 (SAS), 2001 WL 1112308, at *6-

10 (S.D.N.Y. Sept. 20, 2001) (discussing in depth the various tests for whether a contract is an

executory contract under section 365 of the Bankruptcy Code.).

32.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract [. . . ] of the debtor." 11 U.S.C. § 365(a); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 518 (1984); *In re Lavigne*, 114 F.3d 379, 386 (2d Cir. 1997). "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor - in - possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993).

33.    A counterparty to an executory contract must perform its obligations under the contract while the debtor determines whether to assume or reject such agreement. The United States Supreme Court has held that an unassumed executory contract is not enforceable against a debtor. *See Bildisco*, 465 U.S. at 531. On the other hand, an unassumed executory contract, while not enforceable against the debtor, is still enforceable by the debtor against the counterparty. *See e.g., McLean Indus., Inc. v. Medical Laboratory Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ("a debtor-in-possession's ability to continue to perform and to compel performance with respect to assumable executory contracts is usually the life blood of its reorganization."); *Public Ser. Co. of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Ser. Co. of New Hampshire)*, 884 F.2d 11, 14 (1st Cir. 1989) ("Ordinarily, the debtor need not commit itself to assumption or rejection of such a contract until a reorganization plan is confirmed. In the meantime, the executory contract remains in effect and creditors are bound to honor it.") (citation omitted); *In re PublicData-Link Sys. Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 378-79 (7th Cir. 1983) (affirming bankruptcy court's entry of a restraining order that prohibited non-debtor counterparty from ceasing to provide essential

services to the debtor pending debtor's determination to assume or reject agreement and notwithstanding debtor's pre-petition arrearage).

34.    Indeed, even if LBSF was in default under the Swap Agreement, which it is not,[9] AIG is required to perform its obligations because the contract remains enforceable by, but not against, the debtor in possession.  *See*, *e.g.*, *U.S. v. Dewey Freight Sys., Inc.*, 31 F.3d 620, 624 (8th Cir. 1994); *see also In re Feyline Presents, Inc.*, 81 B.R. 623, 626-27 (Bankr. D. Colo. 1988) (holding that a non-debtor could not unilaterally enforce contractual right prior to debtor's decision to assume or reject, notwithstanding counterparty's contention that debtor was unable to perform its obligations under the contract).  The United States Court of Appeals for the Second Circuit has recognized that section 365 of the Bankruptcy Code "provide[s] a means whereby a debtor can force others to continue to do business with it when the bankruptcy filing might otherwise make them reluctant to do so."  *Chateaugay Corp. v. LTV Steel Co. (In re Chateaugay)*, 10 F.3d 944, 954-55 (2d Cir. 1993) (internal citations and quotations omitted).

35.    Accordingly, regardless of any defaults by LBSF, AIG must continue to perform all of its obligations under the Swap Agreement.

**B.    AIG Cannot Suspend Its Performance Under The Swap Agreement On The Basis Of The Bankruptcies Of LBSF And LBHI**

36.    It appears that the sole basis upon which AIG has suspended payment to LBSF under the Swap Agreement, is the chapter 11 filings of LBHI, the credit support provider, and LBSF on September 15, 2008 and October 3, 2008, respectively, which AIG may argue constitute Events of Default.

---

[9]  The Settlement Amounts owed by AIG to LBSF are net of any periodic payments owed under the Swap Agreement by LBSF to AIG.

37.    AIG's anticipated reliance upon Section 2(a)(iii) and 5(a)(vii) of the Master Agreement as an excuse for its failure to perform its obligations under the Swap Agreement violates the Bankruptcy Code's well settled *ipso facto* prohibitions and the automatic stay.

38.    *Ipso facto* clauses are provisions in executory contracts that automatically terminate the contract or modify a contractual right solely because of the insolvency or financial condition of the debtor, the commencement of a bankruptcy case, or the appointment of a bankruptcy trustee, receiver or custodian.  11 U.S.C.A. § 365(e)(1); *see also In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004) ("Ipso facto clauses are generally unenforceable . . . because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets."  (Internal quotations and citations omitted)).

39.    *Ipso facto* clauses are void and unenforceable pursuant to section 365(e)(1) of the Bankruptcy code because the automatic termination or modification of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets.  *See Summit Inv. and Dev. Corp. v. LeRoux (In re LeRoux)*, 69 F.3d 608, 610 (1st Cir. 1995).  Most courts have interpreted section 365(e)(1) to broadly "abrogate[] the power of *ipso facto* clauses" such that "[n]o default may occur pursuant to an *ipso facto* clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."  *In re Chateaugay Corp.*, 1993 WL 159969, *4 (Bankr. S.D.N.Y. 1993); *In re Child World, Inc.*, 161 B.R. 349, 354 (Bankr. S.D.N.Y. 1993).

40.    Thus, the Bankruptcy Code typically renders *ipso facto* clauses void and unenforceable because they run contrary to its goal of encouraging continued dealing with the debtor so that the debtor has a fair opportunity to reorganize its affairs.  *See e.g.*, *Summit Inv.*

13

*And Dev. Corp. v. LeRoux*, 69 F.3d at 610 (finding that *ipso facto* clauses are void because

automatic termination or modification of a debtor's contractual rights deters the debtor's

rehabilitation and causes a forfeiture of the debtor's assets.)

      41.    Here, the only Event of Default(s) upon which AIG is expected to rely on

is Section 2(a)(iii)'s right to refuse payments due and owing to LBSF is that stemming from

LBSF or LBHI's bankruptcy filings.  This application of Section 2(a)(iii) — a quintessential *ipso*

*facto* clause automatically modifying the contractual rights of LBSF as a result of bankruptcy —

is in clear contravention to the Code's *ipso facto* bar and is void and unenforceable as a matter of

law.

      42.    Further, the Bankruptcy Code's automatic stay prohibits creditors such as

AIG from, among other things, undertaking "any act to obtain possession of property of the

estate or of property from the estate or to exercise control over property of the estate."  11

U.S.C.A. § 362(a)(3).  "The automatic stay is one of the fundamental debtor protections provided

by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors . . . . It permits

the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial

pressures that drove him into bankruptcy."  11 U.S.C.A. § 362, Revision Notes and Legislative

Reports.

      43.    AIG's failure to make the payments owed to LBSF is an impermissible

"exercise of control over property of the estate" in violation of Section 362(a)(3), exposing AIG

to contempt of Court.  *See e.g.*, *In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003)

("Courts have consistently held that contract rights are property of the estate, and that therefore

those rights are protected by the automatic stay.") (citations and internal quotations omitted); *In*

*re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830, 846-47 and n. 21 (Bankr. S.D.N.Y. 1990)

("a freeze of payments to a debtor-in-possession or trustee may not be unilaterally ordered by a creditor without court approval, at least in cases not involving bank deposits."); *see also*, *In re Baltimore Marin Indus.*, 476 F.3d 238, 240 (4th Cir. 2007) ("Amounts owed to the debtor under existing contracts are included within the estate.").

44.    Nor can AIG shoe-horn its refusal to pay the Settlement Amounts into the Bankruptcy Code's swap safe harbor provisions.  *See* 11 U.S.C.A. §§ 362(b)(6), (7), (17); 546(e), (f), (g); 555, 556, 560 and 561 (collectively the "Safe Harbor Provisions").  A plain reading of these provisions (and the legislative history surrounding the safe harbors) makes clear that the safe harbors carve out only very narrow exceptions to the general rule that *ipso facto* clauses are void.  *See U.S. v. Ron Pair Enter. Inc.*, 489 U.S. 235, 242 (1993) ("The plain meaning of legislation should be conclusive, except in the rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (citations omitted)).

45.    The Safe Harbor Provisions neither operate as an abstention nor provide immunity to a non-debtor counterparty to a swap agreement.  Rather, the Safe Harbor Provisions protect only a party's contractual right to "cause the liquidation, termination, or acceleration" of a swap agreement, "or to offset or net out" the party's position.  11 U.S.C. §560.  Thus, if the counterparty is not seeking to cause the liquidation, termination, acceleration or netting of the agreement, the Safe Harbor Provisions simply do not apply.  *Id.  See also, In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004).  Specifically, the only rights of a swap counterparty that are exempted from Code's *ipso facto* prohibitions (and the automatic stay) are the counterparty's rights to "cause the liquidation, termination, or acceleration" of one or more swap

15

agreements because of a condition of the kind specified in section 365(e)(1).[10] AIG has elected

none of these options. Its unilateral exercise of purported *ipso facto* rights to "suspend

payments" under Section 2(a)(iii) falls outside the scope of the Code's Safe Harbor Provisions

and is void as a matter of law.

        46.    AIG simply has no excuse for refusing to perform under the Swap

Agreement, and should be compelled to do so.

### C.    LBSF Is Entitled To An Order Compelling AIG's Performance And Enforcement Of The Automatic Stay

        47.    This Court has the authority to compel AIG to perform its obligations

under its executory contract with LBSF. 11 U. S. C. §105. For example, in *In re Ernie Haire*

*Ford,* 403 B.R. 750, 759 (Bankr. M.D. Fla. 2009), a Bankruptcy Court granted a debtor's motion

to compel performance when the debtor's counterparties improperly terminated their contracts

based on the commencement of the debtor's bankruptcy case. *Id.* at 760. The Court reasoned

that "[w]hile [the parties'] agreements are in full force and effect, the parties are bound by their

terms and must continue to operate under the agreements in good faith." *Id.* at 761.

        48.    LBSF's right to receive the payments under the Swap Agreement is

property of the estate. *See, e.g., In re Enron Corp.*, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003)

("Courts have consistently held that contract rights are property of the estate, and that therefore

those rights are protected by the automatic stay.") (citations and internal quotations omitted); *In*

*re Baltimore Marine Indus.*, 476 F.3d 238, 240 (4th Cir. 2007) ("Amounts owed to the debtor

under existing contracts are included within the estate."); *In re Ernie Haire Ford*, 403 B.R. at

---

[10] Section 365(e)(1) of the Bankruptcy Code enumerates the three specific conditions as "(1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2) the commencement of a bankruptcy case under this title; or (3) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."

760 ("[Debtor's] rights under these executory contracts are property of he bankruptcy estate, and, therefore, exercising a terminable-at-will provision is not permitted without relief from stay.")

49.    AIG's attempts to exercise control over such property of the estate by failing to make the payments under the Swap Agreement violates the automatic stay.  *See In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("By refusing to perform its obligations under the Member Agreement, [the defendant] is interfering with Broadstripe's property rights under the member Agreement and acting in violation of the automatic stay.")[11]

### Notice

50.    No trustee has been appointed in these chapter 11 cases.  The Debtor has served notice of this motion in accordance with the procedures set forth in the order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] of (i) the U.S. Trustee; (ii) counsel for the Creditor's Committee; (iii) the Securities and Exchange Commission (iv) the Internal Revenue Service; (v) counsel for AIG; and all parties who have requested notice in these chapter 11 cases.  The Debtor submits that no other or further notice need be provided.

51.    No previous request for the relief sought herein has been made to this or any other Court.

---

[11] LBSF reserves the right to seek at a later date sanctions for AIG's knowing violation of the automatic stay.

WHEREFORE, the Debtor respectfully requests that the Court (a) enter an order granting

the relief requested herein and as set forth in the proposed order submitted herewith and (b) such

other and further relief to the Debtor as the Court may deem just and proper.

Dated:    New York, New York                    Respectfully submitted,
          August 7, 2009


                                         _/s/ Jayant W. Tambe_____
                                         Jayant W. Tambe
                                         Aviva Warter Sisitsky
                                         Sarah E. Lieber
                                         Benjamin Rosenblum
                                         JONES DAY
                                         222 East 41st Street
                                         New York, New York  10017
                                         Telephone:  (212) 326-3939
                                         Facsimile:  (212) 755-7306

                                         ATTORNEYS FOR DEBTOR AND DEBTOR
                                         IN POSSESSION