## CROSS MARGINING AND NETTING AGREEMENT

CROSS MARGINING AND NETTING AGREEMENT dated as of April 19, 2006 by and among Prudential Global Funding LLC (formerly Prudential Global Funding, Inc.) ("Pru Global"), Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers Finance S.A. ("LBF" and, together with LBSF, the "Lehman Brothers Entities" and each, a "Lehman Brothers Entity").

### WITNESSETH:

WHEREAS, Pru Global and LBF have entered into a 1992 ISDA Master Agreement and 1994 ISDA Credit Support Annex, each dated as of March 11, 1997 (collectively, as such agreement and annex may be amended, supplemented or modified (other than as supplemented herein), and including terms and conditions incorporated by reference therein and confirmation of transactions thereunder, the "LBF Agreement");

WHEREAS, it is a condition precedent to the execution and delivery of a certain 1992 ISDA Master Agreement and 1994 ISDA Credit Support Annex, each dated as of the date hereof, between Pru Global and LBSF (collectively, as such agreement and annex may be amended, supplemented or modified (other than as supplemented herein), and including terms and conditions incorporated by reference therein and confirmations of transactions thereunder, the "LBSF Agreement" and, together with the LBF Agreement, the "Swap Agreements"), that Pru Global and LBSF execute and deliver this Agreement; and

WHEREAS, LBSF and LBF desire to enter into this Agreement for their mutual benefit and to reduce their collective risk in respect of Pru Global and Pru Global desires to enter into this Agreement to reduce its operational expense in respect of the Swap Agreements.

NOW, THEREFORE, in consideration of the foregoing premises and for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Definitions.  Each capitalized term used herein and not otherwise defined herein has the meaning set forth below following such term.

"Aggregate Out-of-the-Money Amount" means (i) with respect to the Lehman Brothers Entities, the sum of the Out-of-the-Money Amounts for LBSF as to the LBSF Agreement and the sum of the Out-of-the-Money Amounts for LBF as to the LBF Agreement, and (ii) with respect to Pru Global, the sum of the Out-of-the-Money Amounts for Pru Global under each of the Swap Agreements.

"Bankruptcy Code" means the U.S. Bankruptcy Code as amended.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City are authorized to be closed.

"Collateral" has the meaning provided in Section 6(b) hereof.

"Counterparty Termination Amount" means, with respect to each Swap Agreement, the termination amount required to be delivered by Pru Global to the Lehman Brothers Entity that is party to such Swap Agreement (which includes the return of any securities or other collateral held by Pru Global to secure the Lehman Brothers Entity's obligations under such Swap Agreement), as determined pursuant to Section 4(a) of this Agreement.

"Defaulting Party" means Pru Global if a Termination Event has occurred with respect to Pru Global, or the Lehman Brothers Entity party to the relevant Swap Agreement if a Termination Event has occurred with respect to such Lehman Brothers Entity.

"Early Termination Date" means, with respect to each Swap Agreement, the meaning provided in such Swap Agreement for such term, as modified by Section 3 of this Agreement.

"Lehman Brothers Termination Amount" means, with respect to each Swap Agreement, the termination amount required to be delivered to Pru Global by the Lehman Brothers Entity that is party to such Swap Agreement (which includes the return of any securities or other collateral held by Lehman Brothers to secure Pru Global's obligations to the Lehman Brothers Entity under such Swap Agreement), as determined pursuant to paragraph 4(a) of this Agreement.

"Moody's" means Moody's Investor Services Inc.

"Net Aggregate Out-of-the-Money Amount" means (i) with respect to the Lehman Brothers Entities, the amount by which the sum of the Aggregate Out-of-the-Money Amounts for each of LBSF (if any) and LBF (if any) exceeds the Aggregate Out-of-the-Money Amount for Pru Global and (ii) with respect to Pru Global, the amount by which Pru Global's Aggregate Out-of-the-Money Amount exceeds the sum of the Aggregate Out-of-the-Money Amounts for each of LBSF (if any) and LBF (if any).

"Non-Defaulting Party" means the Lehman Brothers Entities if a Termination Event has occurred with respect to Pru Global, or Pru Global if a Termination Event has occurred with respect to one or both of the Lehman Brothers Entities.

"Out-of-the-Money Amount" means, with respect to either Swap Agreement, on any date of determination and without regard to the value of any Posted Collateral or Collateral pledged hereunder, the sum of (i) amounts due and owing by Pru Global, LBSF or LBF, as the case may be, but remaining unpaid as of such date, and (ii) the amount that would be payable by such party (to the extent not included in clause (i) hereof) if such Swap Agreement were to be terminated or declared payable as of such date, as measured in accordance with the terms of the Swap Agreement, if applicable, or in accordance with the determination method, which determination method shall be selected and executed in good faith and in a commercially reasonable manner, of the party making such determination.

"Posted Collateral" means, with respect to the LBSF Agreement, the "Posted Collateral" as defined therein, and, with respect to the LBF Agreement, the "Posted Collateral" as defined therein.

2

[New York #1444607 v2]

"S&P" means Standard & Poor's Corporation.

"Termination Event" means the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of Pru Global or a Lehman Brothers Entity, or any guarantor of, or similar credit support provider of or with respect to, Pru Global or a Lehman Brothers Entity under a Swap Agreement, which has resulted in one or more obligations under a Swap Agreement becoming, or becoming capable at such time of being declared, due and payable, before it or they would otherwise have been due and payable pursuant to the terms of such Swap Agreement or this Agreement; (2) a default by Pru Global or a Lehman Brothers Entity, or any guarantor of, or similar credit support provider of or with respect to, Pru Global or a Lehman Brothers Entity in making one or more payments on the due date thereof under a Swap Agreement; or (3) a designation pursuant to Section 3 or 9(c) of this Agreement.

"Transaction" means a transaction between Pru Global and a Lehman Brothers Entity that is governed by a Swap Agreement.

"UCC" means the New York Uniform Commercial Code as in effect from time to time.

"Unsecured Exposure Limit" means, with respect to Pru Global, the amount in U.S. Dollars corresponding to the lowest rating of the long-term unsecured debt of Prudential Funding LLC (formerly Prudential Funding Corporation) rated by both Moody's and S&P as set forth in the table below; and, with respect to the Lehman Brothers Entities, the amount in U.S. Dollars corresponding to the lowest rating of the long-term unsecured debt of Lehman Brothers Holdings, Inc. rated by both Moody's and S&P; provided, however, that if Moody's and S&P have assigned ratings at different levels with respect to the applicable long-term unsecured debt, the lower of such ratings shall be used for the purposes hereof.

[New York #1444607 v2]

| Moody's Rating | S&P Rating | Limit |
|---|---|---|
| Aaa | AAA | $75million |
| Aa1 | AA+ | $50 million |
| Aa2 | AA | $35 million |
| Aa3 | AA- | $25 million |
| A1 | A+ | $20 million |
| A2 | A | $15 million |
| A3 | A- | $10 million |
| Baa1 | BBB+ | $5 million |
| Baa2 | BBB | $2.5 million |
| Baa3 and below | BBB- and below | —0— |

"U.S. Dollar Equivalent" of an amount as of any date means (1) in respect of an amount denominated in U.S. Dollars, such amount and (ii) in respect of any amount dominated in a currency, including a composite currency such as ECU, other than U.S. Dollars ("Other Currency"), the amount expressed in U.S. Dollars, as determined by Lehman Brothers, that would be required to purchase such amount of such Other Currency as of such date with U.S. Dollars at the rate equal to the spot exchange rate of a foreign exchange agent (selected in good faith by Lehman Brothers at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) or such later time as Lehman Brothers in its discretion shall determine.

2.      Collateral Requirements.

(a)      Any party hereto may on any Business Day determine the Out-of-the-Money Amount of Pru Global, LBSF and LBF for each Swap Agreement and the Net Aggregate Out-of-the-Money Amount of each of Pru Global and the Lehman Brothers Entities. If the Net Aggregate Out-of-the-Money Amount of Pru Global exceeds the sum of the Unsecured Exposure Limit and the value of any Posted Collateral deposited with the Lehman Brothers Entities by an amount of not less than $250,000, then Pru Global shall deliver to the Lehman Brothers Entities, within two Business Days of the Lehman Brothers Entities' demand therefor, Posted Collateral of a value not less than such excess. If the Net Aggregate Out-of-the-Money Amount of the Lehman Brothers Entities exceeds the sum of the Unsecured Exposure Limit and the value of any Posted Collateral deposited with Pru Global by an amount not of less than $250,000, then LBSF and LBF shall each deliver to Pru Global, within two Business Days of Pru Global's demand therefor, Posted Collateral of an aggregate value not less than such excess. The parties hereto specifically intend that all Posted Collateral posted as contemplated by this Section 2(a) (or returned pursuant to Section 2(b) below) shall be deemed to be posted or returned in respect of the specific Out-of-the-Money Amounts for the relevant Swap Agreement. The parties hereto further authorize each party receiving Posted Collateral as contemplated by this Section 2(a) to apply such Posted Collateral to individual Out-of-the-Money Amounts in a manner consistent with the minimization of regulatory capital costs and economic risks in connection with the Swap Agreements and the impact on such receiving party of an insolvency or bankruptcy of the other parties hereto (including without limitation, application of any safe harbor provisions for financial contracts under the Bankruptcy Code or other applicable insolvency laws).

4

(b)    If, on any Business Day, the value of Posted Collateral held by Pru Global or the Lehman Brothers Entities, as applicable (the "Receiving Party"), exceeds the aggregate amount of Posted Collateral required pursuant to the Swap Agreements and this Agreement by an amount not less than $250,000 and no Termination Event has occurred and is continuing with respect to the other party or parties, as applicable, then the Receiving Party, within two Business Days following demand therefor, shall return such excess Posted Collateral.

3.    Cross Default.    Notwithstanding anything to the contrary in either of the Swap Agreements, in the event that an Early Termination Date has been designated under one Swap Agreement, or such Swap Agreement has been terminated automatically in accordance with its terms, based in either case on the occurrence of a Termination Event, then the Non-Defaulting Party shall have the right, in its sole discretion, to designate an Early Termination Date under the other Agreement.    Such designation shall be made by notice given in accordance with Section 10(a) hereof.

4.    Netting and Set-off.

(a)    *Calculation of Lehman Brothers Termination Amounts and Pru Global Termination Amounts.*    With respect to each Swap Agreement, the Non-Defaulting Party shall determine the Pru Global Termination Amount or Lehman Brothers Termination Amount, as applicable, by calculating the termination amount in accordance with such Swap Agreement. If the obligations with respect to one or more Transactions have not matured, terminated, liquidated, or been accelerated, then the Non-Defaulting Party shall nonetheless follow the procedures set forth in this Section 4, except that the Non-Defaulting Party shall in good faith estimate the termination amount as of the date of determination in respect of such Transaction(s).

(b)    *Netting and Set-off.*

(i)    Notwithstanding anything to the contrary in either of the Swap Agreements, if (x) a Termination Event occurs and (y) there exists both a Lehman Brothers Termination Amount under one Swap Agreement and a Pru Global Termination Amount under the other Agreement (in each case, regardless of whether the obligations under the Swap Agreements have then matured, terminated, liquidated, or been accelerated), then, at the option of the Non-Defaulting Party, such Lehman Brothers Termination Amount and such Pru Global Termination Amount shall be set off against each other and the obligations under each Swap Agreement shall be deemed discharged and satisfied in all respects to the extent they are so set off. The Non-Defaulting Party shall provide notice to the Defaulting Party of any reduction and set-off pursuant to this Section 4(b)(i) in accordance with Section 10(a) hereof.

(ii)    To the extent that a Lehman Brothers Termination Amount and a Pru Global Termination Amount are set off against each other pursuant to Section 4(b)(i) which are the result of an estimate pursuant to the last sentence of Section 4(a), then the Non-Defaulting Party shall account to the Defaulting Party promptly after any estimated amount is actually ascertained.

(iii)    If the exercise of any right to reduce and set off pursuant to Section 4(b)(i) hereof shall be avoided or set aside by a court or shall be restrained, stayed or enjoined under

5

applicable law, then the obligations in respect thereof shall be reinstated, or in the event of restraint, stay or injunction, preserved in the amounts as of the date of restraint, stay or injunction between the applicable Lehman Brothers Entities, on the one hand, and Pru Global, on the other, until such time as such restraint or injunction shall no longer prohibit exercise of such right.

(c)     *Subrogation.* The Lehman Brothers Entity with respect to which a Pru Global Termination Amount was set off and reduced pursuant to Section 4(b)(i) (and with respect to which the obligations under the relevant Swap Agreement have been deemed discharged and satisfied) by application of a Lehman Brothers Termination Amount under the other Swap Agreement (the "Other Swap Agreement") shall be subrogated to the rights of Pru Global under the Other Swap Agreement against the Lehman Brothers Entity which is party to the Other Swap Agreement to the extent of any such reduction and set-off.

5.     Converting to U.S. Dollars.  For purposes of Sections 2 and 4 hereof, all Out-of-the-Money Amounts, Lehman Brothers Termination Amounts and Pru Global Termination Amounts in currencies other than U.S. Dollars shall be converted into and expressed in their U.S. Dollar Equivalents.

6.     Security Agreement.

(a)     *Grant of Security.*

(i)     LBSF hereby grants to Pru Global a security interest in and to (i) all of LBSF's rights under the LBSF Agreement, including without limitation LBSF's rights to payments due thereunder and to the return of collateral as contemplated therein, and (ii) all Posted Collateral as to which LBSF is the Pledgor (as defined in the LBSF Agreement) under the LBSF Agreement, as collateral security for (x) the performance by LBSF of its obligations under this Agreement, and (y) the performance by LBF of its obligations under the LBF Agreement.

(ii)     LBF hereby grants to Pru Global a security interest in and to (i) all of LBF's rights under the LBF Agreement, including without limitation LBF's rights to payments due thereunder and to the return of collateral as contemplated therein, and (ii) all Posted Collateral as to which LBF is the Pledgor (as defined in the LBF Agreement) under the LBF Agreement, as collateral security for (x) the performance by LBF of its obligations under this Agreement, and (y) the performance by LBSF of its obligations under the LBSF Agreement.

(iii)     Pru Global hereby grants to each Lehman Brothers Entity, individually and collectively, a security interest in and to (i) all of Pru Global's rights under the Swap Agreements, including without limitation Pru Global's rights to payments due thereunder and to the return of collateral as contemplated therein, and (ii) to the extent necessary to effectuate the foregoing, all Posted Collateral as to which Pru Global is the Pledgor (as defined in the relevant Swap Agreement) under either Swap Agreement, as collateral security for the performance by Pru Global of its obligations to each of the Lehman Brothers Entities under the Swap Agreements (which security interest in such Posted Collateral shall be subordinate only to the security interest, if any, in favor of a Lehman Brothers Entity with respect to particular amounts of such Posted Collateral under or in respect of the Swap Agreement to which such Lehman Brothers Entity is a party).

6

(iv)    For the purpose of perfecting each Lehman Brothers Entity's security interest in Posted Collateral as to which Pru Global is the Pledgor (as defined in each such Swap Agreement) under the Swap Agreement to which such Lehman Brothers Entity is not a party, the parties hereto understand, intend and acknowledge that each Lehman Brothers Entity: (i) shall act on behalf of such other Lehman Brothers Entity as agent, collateral agent, bailee, entitlement holder and/or securities intermediary (and/or such other similar capacity as may be necessary to perfect such security interest) with respect to such Posted Collateral, (ii) has received notice of the other Lehman Brothers Entity's security interest in such Posted Collateral, and (iii) shall, to the extent it is a securities intermediary or bank with respect to any Posted Collateral comply with any entitlement orders or other instructions or directions originated by such other Lehman Brothers Entity with respect to the Collateral without any further consent of Pru Global. Each Lehman Brothers Entity and Pru Global agree that all Collateral credited to any securities account maintained on the books of any Lehman Brothers Entity shall be treated as a financial asset for purposes of the UCC. For purposes of Articles 8 and 9 of the UCC, to the extent that Pru Global has any right to originate entitlement orders or other instructions or directions with respect to any Collateral or any commodity contracts, Pru Global shall no longer have any such right upon the occurrence of a Termination Event as to which Pru Global is the Defaulting Party.

(v)    Pru Global hereby irrevocably grants each Lehman Brothers Entity a power of attorney, with full authority to act in the place and stead of Pru Global, under a power coupled with an interest, and in the name of Pru Global or otherwise, from time to time in such Lehman Brothers Entity's discretion to take any action and to execute any instrument which such Lehman Brothers Entity may deem necessary or advisable to accomplish the purposes of this Agreement or to effectuate each grant of a security interest and assignment by way of security under Section 6(a) herein. Each Lehman Brothers Entity is authorized, without limitation, to prepare and file UCC financing statements, whether initial filings, amendments or continuations, with respect to the Collateral.

(b)    *Covenants Regarding Collateral.*  So long as this Agreement is in effect, each party hereto covenants as follows with respect to the collateral pledged by it in Section 6(a) hereof (the "Collateral"):  (i) such party shall defend such Collateral against the claims and demands of all other parties; (ii) such party shall keep such Collateral free from all security interests or other encumbrances except the security interests or other encumbrances created by this Agreement or either Swap Agreement or otherwise permitted under the Swap Agreements; (iii) shall notify the other parties hereto, promptly in accordance with Section 10(a) hereof, of any change in form; (iv) shall execute and deliver such financing statements, assignments, and other instruments and documents and do such other things relating to the Collateral as may reasonably be requested by the party or parties hereto to whom it has granted a security interest in Collateral for the purpose of obtaining the full benefit of this Agreement and the rights and powers granted hereunder, and shall pay all reasonable costs of UCC searches and filing financing statements, assignments, and other documents in all public offices reasonably requested by such party or parties hereto; and (v) except to the extent a Swap Agreement provides otherwise, shall pay all taxes, assessments, and other charges of every nature which may be imposed, levied, or assessed against or with respect to the Collateral.

(c)    *Exercise of Rights Against Collateral; Application of Proceeds.*

7

[New York #1444607 v2]

      (i)     Notwithstanding anything to the contrary in either of the Swap Agreements, in the event of the occurrence of a Termination Event, then to the extent permitted by applicable law, the Non-Defaulting Party may:

      (I)     take any action to effect the collection of amounts owing to the Defaulting Party with respect to any Collateral, including any remedies available in respect of any security for such amounts; and

      (II)     without prior written notice to or demand upon the Defaulting Party, liquidate all or any part of the Collateral in a commercially reasonable manner with the proceeds of such liquidation constituting additional Collateral hereunder.

      (ii)     Proceeds of any sale or other disposition of all or any part of the Collateral shall be applied, in the following order:

first, to the payment of the reasonable costs and expenses (including without limitation attorneys' fees and disbursements) incurred by the Non-Defaulting Party in collecting or liquidating any Collateral, or in otherwise enforcing any of the rights hereunder;

second, to the payment of all obligations secured by such Collateral until such amounts have been paid in full; and

finally, to the payment to the Defaulting Party or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds together with any unsold Collateral.

      (iii)     If the proceeds of sale or other disposition of the Collateral are insufficient to pay in full all expenses and other amounts described in clauses first and second above, then (i) the Non-Defaulting Party shall determine to which of such expenses or other amounts, as the case may be, such proceeds shall be applied (taking into account the priority therefor), and (ii) the Defaulting Party shall remain liable to the Non-Defaulting Party for any deficiency.

      (d)    *No Counterclaim.*  The rights against the Collateral as provided hereunder shall be absolute and subject to no counterclaim, set-off, deduction or defense, except as contemplated in this Agreement and the Swap Agreements.

8

[New York #1444607 v2]

7.      Non-Exclusive. Except to the extent expressly provided herein, the terms and provisions set forth in this Agreement are not exclusive and nothing herein shall prevent any party hereto from exercising any right such party may have under either Swap Agreement, applicable law or otherwise to cause the termination, liquidation or acceleration of either Swap Agreement or exercising any right under any security arrangement relating to either Swap Agreement, any right to net or set off payments which may arise under either Swap Agreement, under applicable law or otherwise or any other right or remedy of such party.

8.      Representations and Warranties. Each party hereto represents and warrants, and shall be deemed to represent and warrant as of the time it enters into any Transaction and as of the time it delivers or pledges any Collateral hereunder, to each of the other parties hereto as follows:

        (a)     it has full power and authority to execute and deliver this Agreement and each Swap Agreement to which it is a party and to perform and observe the provisions hereof and thereof and to enter into and perform each Transaction, except as performance may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

        (b)     the execution, delivery and performance of this Agreement and each Swap Agreement to which it is a party have been, and each Transaction either has been or will be prior to entering into such Transaction, duly authorized by all necessary corporate action and do not and will not contravene any requirement of law, such party's charter or by-laws or any transactional restriction or agreement binding on or affecting such party or its assets;

        (c)     this Agreement and each Swap Agreement to which it is a party has been duly and properly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party enforceable in accordance with its terms, except as the enforcement of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights, and general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

        (d)     it is presently solvent and able to pay, and is paying, its debts as they come due, and anticipates that it will continue to be able to pay its debts as they come due for the foreseeable future;

        (e)     the security interest granted by such party in Section 6(a) hereof is a valid, perfected and enforceable security interest in, and lien on, the Collateral that is, or expressed to be, pledged by such party as contemplated by this Agreement and the Swap Agreements;

        (f)     such party has the right (or, in the case of after-acquired Collateral, at the time such party delivers or pledges such Collateral, will have the right) to pledge the Collateral as set forth in Section 6(a) hereof; and

        (g)     except for security interests or encumbrances created by this Agreement and the Swap Agreements, no person has (or, in the case of after-acquired Collateral, at the time such

[New York #1444607 v2]

party delivers or pledges such Collateral, will have) any right, title, claim or interest (by way of lien, mortgage, pledge, charge, security interest or other encumbrance, or otherwise) in, against, or to the Collateral pledged by such party.

(h)    Pru Global's exact legal name, type of organization and jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Pru Global), its place of business, or if it has more than one place of business, its chief place of business and chief executive office, at the date of this Agreement and for the four months immediately preceding the date of this Agreement are as set forth in Schedule I.

9.    Further Assurances.

(a)    Pru Global covenants and agrees that if either Moody's or S&P assigns a rating to the long-term unsecured debt of Prudential Funding LLC which is less than the rating assigned by such rating agency on the date hereof, the Lehman Brothers Entities may demand further assurances of performance, including without limitation the delivery of additional collateral and/or the execution and delivery of additional undertakings.

(b)    Each of the Lehman Brothers Entities covenants and agrees that if either Moody's or S&P assigns a rating to the long-term unsecured debt of Lehman Brothers Holdings Inc. which is less than the rating assigned by such rating agency on the date hereof, Pru Global may demand further assurances of performance, including without limitation the delivery of additional collateral and/or the execution and delivery of additional undertakings.

(c)    Failure to provide further assurances as contemplated by this Section 9 within ten business days following demand therefor shall constitute a Termination Event.

10.    Miscellaneous.

(a)    *Notices.* Unless otherwise specified, all notices and other communications to be given to a party hereunder shall be given to the address, telex (if confirmed by the appropriate answer back), fax [[(confirmed if requested)]] or telephone number and to the individual or department specified with respect to such party below or such other address, telex, fax or telephone number as such party may hereafter specify for the purpose of notice given in accordance with this paragraph. Unless otherwise specified, any notice, instruction or other communication, shall be effective upon receipt if given in accordance with this paragraph.

If to a Lehman Brothers Entity, to:

Lehman Brothers Special Financing Inc.
Address: 3 World Financial Center, 7th Floor,
New York, NY 10285
Phone: 212-526-7158
Fax: 212-528-6815
Attention: Oliver Rochester

With a copy to:

10

[New York #1444607 v2]

Lehman Brothers Finance, S.A.
Talstrasse 82
Zurich CH-8021
Switzerland
Phone: +41 44 287 8826
Fax: +41 44 287 8828
Attention: Legal Department

If to Pru Global, to:

Prudential Global Funding LLC
Address: Two Gateway Center, 5th Floor
Newark, New Jersey 07102
Phone: 973-802-8677
Fax: 973-802-9177
Attention: Collateral/Operations Department

(b)    *Entire Agreement.* This Agreement shall constitute the entire and exclusive understanding and agreement by the parties with respect to the matters addressed herein. Each Swap Agreement shall remain in full force and effect and shall not be affected by this Agreement except to the extent provided herein. To the extent that there is any conflict between the terms and provisions of this Agreement and either Swap Agreement, the terms and provisions of this Agreement shall be controlling.

(c)    *Headings and Subheadings.* The headings and subheadings of this Agreement are for convenience of reference only and shall not affect the meaning or construction of any provision hereof.

(d)    *Governing Law and Severability.* THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid or unenforceable under such laws, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability without otherwise affecting the validity or enforceability of such provision or the remaining provisions of this Agreement.

(e)    *Jurisdiction.* With respect to any suit, action, claim, or proceedings relating to this Agreement (collectively, "Proceedings"), each party irrevocably:

(i)    submits to the jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in The City of New York; and

(ii)   waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum, and further

11

[New York #1444607 v2]

waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party.

(f)     *Waiver of Trial by Jury.*  Each party hereby irrevocably waives any and all right to trial by jury in any proceeding arising out of or relating to this Agreement or any Transaction.

(g)     *Counterparts.*  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

(h)     *Amendments; Waivers.*  No amendment, modification, supplement or waiver in respect of this Agreement will be effective unless in writing and signed by the party against whom enforcement is sought.  No failure or delay by any party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

(i)     *Intent.*  Each of the parties understands, intends and agrees that this Agreement is a "supplement" to each of the Swap Agreements within the meaning of Section 101 (53B) of the Bankruptcy Code, and that margin posted and amounts payable hereunder are "termination

[New York #1444607 v2]

values or payment amounts arising under or in connection with" the Swap Agreements within the meaning of Section 560 of the Bankruptcy Code.

IN WITNESS WHEREOF, the parties have signed this Cross Margining and Netting Agreement as of the date stated above.

**PRUDENTIAL GLOBAL FUNDING LLC**

By:

Name:

Title:       Gary F. Neubeck
             President

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:       Miki Herrick

Title:      Vice President

**LEHMAN BROTHERS FINANCE S.A.**

By:

Name:       Nadia Casanova

Title:      Authorised Signatory

By:

Name:       Barbara Grob

Title:      Authorised Signatory

13

[New York #1444607 v2]

## SCHEDULE I

Pru Global's exact legal name, type of organization, jurisdiction of organization (together with the organizational identification number, if any issued by such jurisdiction to Pru Global), place of business, or if it has more than one place of business, its chief place of business and chief executive office, are as of the date of this Agreement and for the four preceding months:


Prudential Global Funding LLC
Delaware limited liability company
Taxpayer ID: 33-1106788
Place of business: Gateway Center II, Newark, NJ