**<u>EXHIBIT C</u>**

*0 3300 7 PINN*



*hand*
RECEIVED OCT 2 4 2008

**October 23, 2008**

## VIA OVERNIGHT DELIVERY WITH SIGNATURE RECEIPT REQUESTED

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019
Attention:          Documentation Manager
Telephone No.:     (212) 526-7187
Facsimile No.:     (212) 526-7672

Lehman Brothers Holdings Inc.
Attention: Corporate Counsel
399 Park Avenue, 11th Floor
New York, NY 10022

## VIA OVERNIGHT DELIVERY WITH SIGNATURE RECEIPT REQUESTED and
**EMAIL TO:** allyson.carine@barclayscapital.com

Allyson Carine
Barclays Capital
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
allyson.carine@barclayscapital.com
212 526 7187 (t)
646 758 4124 (f)

## VIA OVERNIGHT DELIVERY

Debra A. Cash
Senior Director
Alvarez & Marsal Business Consulting LLC
700 Louisiana Street, Suite 900
Houston, TX 77002
Direct: 713.547.3754
Mobile: 281.798.9990
Fax:  713.547.3601
www.alvarezandmarsal.com

**Re:**    <u>**1992 ISDA Master Agreement ("Master Agreement") dated as of May 31, 2007 between Lehman Brothers Special Financing Inc. ("Defaulting Party) and Pinnacle Foods Finance LLC ("Non-Defaulting Party") -- Notice of Termination of All Transactions**</u>

Ladies and Gentlemen:

This letter (this "**Notice**") shall serve as notice pursuant to <u>Section 12</u> of the Master Agreement of the Non-Defaulting Party's election to terminate all Transactions under the above-referenced Master Agreement, which incorporates under its terms (without limitation) that certain Credit Support Document known as that certain "Guarantee by Lehman Brothers Holdings Inc." ("**Credit Support Provider**") in favor of the Non-Defaulting Party, and all annexes and exhibits thereto, as amended, supplemented or otherwise modified and in effect on the date hereof and all Confirmations evidencing Transactions governed thereby. Capitalized terms appearing in this Notice and not otherwise defined shall have the meanings assigned to them in the Master Agreement.

The Non-Defaulting Party's election to terminate all Transactions is by reason of the Events of Default that have occurred with respect to the Defaulting Party and its Credit Support Provider pursuant to <u>Section 5(a)(vii)(4)</u> of the Master Agreement in light of the voluntary Chapter 11 filing of the Defaulting Party and its Credit Support Provider. In accordance with <u>Section 6(a)</u> of the Master Agreement, the Non-Defaulting Party hereby designates <u>October 24, 2008</u> (which date is not more than twenty (20) days from the date of effectiveness of this Notice) as the Early Termination Date in respect of all outstanding Transactions under the Master Agreement. The Non-Defaulting Party will provide its statement of netted calculations of any amounts payable or receivable with respect to all Transactions under the Master Agreement, in accordance with <u>Sections 6(d)</u>, <u>6(e)</u> and <u>11</u> of the Master Agreement, on or as soon as reasonably practicable following the occurrence of the Early Termination Date.

For your reference, attached as **Exhibit "A"** is a schedule of the Defaulting Party's Transaction reference numbers for each Transaction under the Master Agreement. We are providing this to you to ease the Defaulting Party's process of booking terminations for these Transactions, and to ensure that both of our records are accurate. We would appreciate your prompt attention to booking these Terminations.

To the extent that the Defaulting Party may owe a net amount to the Non-Defaulting Party and is not in a position to immediately pay the Non-Defaulting Party the amount calculated by the Non-Defaulting Party upon the Non-Defaulting Party's presentment of such calculation statement, we would greatly appreciate a prompt response from the Defaulting Party concerning its intentions.

Please note that the Non-Defaulting Party reserves all rights at law and equity with respect to such payment including, without limitation, the right to charge any interest that may be permitted under the terms of the Master Agreement, if any amounts owing are not paid promptly. Further, the Non-Defaulting Party hereby reserves the right to exercise from time to time any additional rights, powers, privileges and/or remedies the Non-Defaulting Party has and/or to

which the Non-Defaulting Party is entitled under the Master Agreement or under any other agreement between the parties, or otherwise. In addition to the aforementioned Event(s) of Default, other Events of Default, Potential Events of Default and/or Termination Events may have occurred under the Agreement, and may occur from time to time after the date hereof, and this Notice does not constitute a waiver of any right, power or privilege that the Non-Defaulting Party is entitled to exercise as a result of any such other Events of Default, Potential Events of Default and/or Termination Events or otherwise.

Nothing in this Notice shall be deemed to constitute a waiver of any default, Event of Default or similar event not specified herein, and the Non-Defaulting Party hereby reserves all other rights and remedies that it may have under the Master Agreement, any other agreement between the parties or their affiliates and applicable law. In addition, any acceptance by the Non-Defaulting Party or its affiliates to performance by the defaulting Party or its affiliates or any delay in exercising any remedies the Non-Defaulting Party may have shall not constitute a waiver or forbearance of any rights or remedies the Non-Defaulting Party may have.

Please be advised that no verbal communication from or on behalf of the Non-Defaulting Party or its affiliates or agents shall constitute any agreement, commitment, or evidence of any assurance or intention of the Non-Defaulting Party or its affiliates with respect of the subject matter hereof. Any agreement, commitment, assurance or intention of the Non-Defaulting Party shall be effective only if in writing and duly executed on behalf of the Non-Defaulting Party or such affiliate.

Thank you for your time and attention devoted to this matter. We wish you the best in setting your affairs in order.

Sincerely yours,

Lynne Misericordia
Pinnacle Foods Finance LLC
Senior Vice President & Treasurer

## Exhibit "A"

## List of All Transactions under the Master Agreement

1487007L – Interest Rate Swap
1487027L/1487029L – Interest Rate Collar

8939443 – CAD Call Option
8939442 – CAD Put Option

8939444 – CAD Call Option
8939437 – Cad Put Option

8939446 – CAD Call Option
8939445 – CAD Put Option

KTX1840596  Natural Gas SWAP
KTX1875298  Natural Gas SWAP
KTX1902483  Natural Gas SWAP

## EXHIBIT D

033009 PINN

RECEIVED OCT 3 0 2008
fax



## Assumptions

On September 15, 2008, an Event of Default under Section 5(a)(vii)(4) of the ISDA Agreement dated as of May 31, 2007 (the "ISDA"), as supplemented by the Schedule to the Master Agreement (the "Schedule") and Confirmation dated April 25, 2007 (the "Confirmation"; together with the ISDA and Schedule, the "Lehman Agreement") between Lehman Brothers Special Financing Inc. (as Party A) and the Pinnacle Foods Finance LLC (as Party B) occurred with respect to Party A based upon the filing of a Chapter 11 bankruptcy petition by Lehman Brothers Holdings Inc., the Credit Support Provider. In accordance with Section 6(a) of the Lehman Agreement, Party B had the right designate an Early Termination Date with respect to that ISDA Agreement based upon such Event of Default. Pursuant to a notice of termination dated October 23, 2008, Party B designated October 24, 2008 as the Early Termination Date.

## Payments due under Confirmation

Party A produced what is known as a short-form Confirmation to document the economic and other terms of the interest rate swap and collar between Party A and Party B. The Lehman Agreement states that Second Method and Market Quotation apply for the purposes of Section 6 of the ISDA Form and the Termination Currency is USD.

Party B may determine its payment on Early Termination by reference to quotations of relevant rates or prices from three or more leading dealers in the relevant markets. Pursuant to the Definitions in Section 14 ISDA form, in the cases where Party B was able to obtain exactly three quotations, the Market Quotation for payment upon Early Termination is the remaining quotation after disregarding the highest and lowest quotation. In the case where Party B was able to obtain more than three quotations, the Market Quotation for payment upon Early Termination is the arithmetic mean of the remaining quotations after disregarding the highest and lowest quotation.

The payment due by Party B in respect to the Early Termination Date specified under Section 6 of the ISDA is (USD 17,516,249.84) as reduced by legal fees and out-of-pocket expenses pursuant to the provisions of Section 11 of the Lehman Agreement.

A Reference Market-marker is not defined in the Lehman Agreement. Based on the standard ISDA definition, one may interpret a Reference Market-maker to mean a leading dealer in the relevant market selected by Party B in good faith from among dealers of the highest credit standing which satisfy all criteria that Party B applies generally in deciding whether to offer or to make an extension of credit.

Party B solicited quotations detailed in Chatham's Transaction Summary from ten leading dealers in the interest rate swap market. The three dealers that were responsive and evaluated the terms of the interest rate swap and collar were:

- Goldman Sachs
- Barclays
- Wachovia

Each of these entities should be considered a Reference Market-marker because, among other factors i) these are leading dealers of high credit quality in the interest rate swap market, ii) Party B selected these dealers in good faith.

Of the ten dealers Party B solicited, three provided quotations.   By market convention, the dealers provided quotations on the basis of settlement two business days after acceptance: Oct 28, 2008.

The results of the quotations for the interest rate swap were (Bank would pay):

| Bank | Quote |
| --- | --- |
| Barclays | $21,135,000 |
| Wachovia Bank, N.A. | $12,530,000 |
| Goldman Sachs | $12,417,000 |

Pursuant to the Definitions in Section 14 ISDA form, the termination value of the interest rate swap is $12,530.000.00 after disregarding the highest and lowest quotation.

The results of the quotations for the interest rate collar were (Bank would pay):

| Bank | Quote |
| --- | --- |
| Barclays | $6,841,000 |
| Wachovia Bank, N.A. | $4,500,000 |
| Goldman Sachs | $2,750,000 |

Pursuant to the Definitions in Section 14 ISDA form, the termination value of the interest rate collar is $4.500,000.00 after disregarding the highest and lowest quotation.

The results of the quotations for CAD FX collars were (Bank would receive):

| Bank | Quote |
| --- | --- |
| Wachovia Bank, N.A. | $630,283 |
| Goldman Sachs | $628,700 |
| Barclays | $618,400 |

Pursuant to the Definitions in Section 14 ISDA form, the termination value of the CAD FX collars is ($628,700) after disregarding the highest and lowest quotation.

The results of the quotations for Natural Gas were (Bank would pay):

| Bank | Quote |
| --- | --- |
| Barclays | $1,373,205.04 |
| Goldman Sachs | $1,329,487.67 |
| Deutsche Bank | $1,298,592.00 |
| Wachovia Bank, N.A. | $1,249,674.44 |

Pursuant to the Definitions in Section 14 ISDA form, the termination value of the Natural Gas swaps is $1,314,039.84 after disregarding the highest and lowest quotations and averaging the remaining.

**Section 11 Expenses**

As specified in Section 11 of the Lehman Agreement, Party A (the Defaulting Party) will, on demand, indemnify and hold harmless Party B for and against all reasonable out-of-pocket expenses, including legal fees, incurred by Party B by reason of the enforcement and protection of its rights under the Lehman Agreement or by reason of the early termination of the swap and collar governed by the Lehman Agreement. In accordance with the provisions of Section 11, Party B has incurred legal fees equal to USD 40,000. In addition to legal fees, because Chatham provided services solely for the purpose of assisting with the termination of the Lehman Agreement (including the determination of any payments due with respect to this Early Termination Date), Chatham's fees in the amount of USD 159,060 are reasonable out-of-pocket expenses as defined in Section 11 for which Party A will indemnify Party B upon demand. As such, the total amount of USD 199,060 representing legal fees and fees incurred by Party B shall be deducted from the payment due to Party A.


**Payment due to Party A by Party B in respect to this Early Termination Date**

Payment on early termination in accordance with Section 6(e):

| | |
|---|---|
| Interest Rate Swap Termination | USD 12,530,000.00 |
| Interest Rate Collar Termination | USD 4,500,000.00 |
| CAD FX Collars Termination | USD (628,700.00) |
| Natural Gas Swaps Termination | USD 1,314,039.84 |
| Total Termination Value | USD 17,715,339.84 |

Expenses in accordance with Section 11:

USD 199,060

Net amount:

USD 17,516,276.84

**<u>EXHIBIT E</u>**

# LEHMAN BROTHERS

<u>**VIA OVERNIGHT COURIER**</u>

April 17, 2009

Pinnacle Foods Finance LLC
1 Old Bloomfield Avenue
Mountain Lakes
NJ 07046
Attn:   Lynne Misericordia, Senior Vice President & Treasurer

Ladies and Gentlemen:

Reference is made to: (i) the 1992 ISDA Master Agreement/Multicurrency-Cross Border dated as of May 31, 2007 (as amended, supplemented or modified, and including all schedules, annexes and exhibits thereto, and all confirmations exchanged pursuant to Transactions entered into in connection therewith, the "<u>Master Agreement</u>") between Lehman Brothers Special Financing Inc. ("<u>Lehman</u>") and Pinnacle Foods Finance LLC ("<u>Counterparty</u>"), (ii) the Notice of Termination of all Transactions, dated October 23, 2008, from Counterparty to Lehman (the "<u>Early Termination Notice</u>"), and (iii) the letter dated October 24, 2008, from Counterparty to Lehman containing a calculation statement for payment on early termination of the Master Agreement (the "<u>Calculation Statement</u>"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Agreement or, if not defined in the Master Agreement, in the 1992 ISDA Master Agreement (Multicurrency-Cross Border) published by the International Swaps and Derivatives Association, Inc.

Lehman is in the process of reviewing the Early Termination Notice and the Calculation Statement and wishes to consolidate its requests for information relative to those communications by means of this letter. Accordingly, Lehman is seeking the following information:

    1.  <u>Valuation Methodology and Quotations with respect to Terminated Transactions</u>.

    (a) Please provide a narrative description of the methodology used to determine the valuations of Terminated Transactions, including how quotations, if any, were utilized and all other inputs, assumptions, values and applicable parameters.

    (b) Please provide documentation to support any and all requests by or on behalf of Counterparty for quotations from Reference Market-makers or other persons concerning or otherwise related to the Terminated Transactions (including specifying to whom and when such requests were made, the form of request that was made, in what manner the Reference Market-makers responded and the nature of any follow-up requests).

    2.  <u>Unpaid Amounts</u>.  Please specify any Unpaid Amounts included in Counterparty's calculations of any amounts due with respect to Terminated Transactions.

    3.  <u>Replacement Transactions</u>. Please provide documentation evidencing any transactions executed in order to replace any Terminated Transactions, including specifying any cash (or other consideration) paid or received by or to any person to replace the Terminated Transactions, the name of each entity that effectuated a replacement and when any such transactions were effected.

4.    Communications related to Market Quotations, Unpaid Amounts and/or Replacement Transactions. Please provide all internal and external communications (including all transaction confirmations, other documents, e-mails, text messages, screen-shots, voice recordings, Bloomberg or other electronic texts, tapes, quotations requested and/or received or any other writings or information) evidencing or concerning the requests, responses, follow-up requests, determinations (including methodology used in such determinations), Unpaid Amounts and replacement transactions referred to in items 1, 2 and 3 above.

5.    Persons involved with respect to valuations and/or replacement transactions. Please provide the names, contact information (including telephone numbers, facsimile numbers and e-mail addresses) and description of the roles of each person (whether such person is inside or outside your organization, including any financial advisors, companies, entities or other persons consulted in connection with any Terminated Transactions) who was involved in the valuation of any Terminated Transactions or in the replacement of any Terminated Transactions. Please provide all communications (including all documents, e-mails, text messages, screen-shots, voice recordings, tapes, quotations requested and/or received or any other writings or information) with, between and/or within any financial advisors, companies, entities or other persons outside your organization consulted with respect to valuation or replacement of any Terminated Transactions.

6.    Fees and expenses. Please provide supporting documents and/or other information related to all fees, expenses or other ancillary items incurred by Counterparty with respect to Terminated Transactions.

7.    Financial/Accounting Entries. Please provide any profit, loss, valuation or other financial or accounting entries made on Counterparty's books and records as a result of the termination of each Terminated Transaction, and all supporting documents or other information related to the determination of such amounts.

8.    Market information. Please provide the historical bid/offer spread and midpoint (or estimate) for each Terminated Transaction as of the close of business for each day from and including September 12, 2008 to and including the Early Termination Date designated by Counterparty for each Terminated Transaction. Please provide Counterparty's internal valuation models and external sources (e.g. screen shots from Bloomberg or other financial services) evidencing these amounts.

9.    Documentation of Terminated Transactions. Please provide copies of all master agreements, other agreements, confirmations and other documents related to Terminated Transactions, including with respect to rebooking of Terminated Transactions.

Please forward the information requested herein as soon as possible, and in any case no later than May 8, 2009. Please note that if you do not provide the requested information described above, Lehman may pursue legal avenues to obtain such information from you. This letter in no way constitutes an admission or acknowledgment by Lehman that the Terminated Transactions were actually terminated or were terminated properly, that the amount set forth in the Calculation Statement has been accurately calculated or is due or owing by Lehman, or that such amount accrues interest.

The foregoing information requests are without waiver of or prejudice to any and all of the rights and remedies of Lehman in connection with the above transactions, including under each applicable ISDA Master Agreement and with respect to your purported termination and valuation calculation and under any applicable law.

2

Please contact Andrew Yare on 646-333-9493 or ayare@lehman.com with any questions related to the foregoing.

Very truly yours,

Locke R. McMurray

**<u>EXHIBIT F</u>**



<u>**VIA COURIER DELIVERY WITH RECEIPT REQUESTED**</u>

Lehman Brothers Special Financing Inc.
1271 Sixth Avenue, 43rd Floor
New York, New York 10020
Attention:    Andrew Yare
         Locke R. McMurray

May 1, 2009

Ladies and Gentlemen:

Reference is made to: (i) the Confirmations, with trade dates of April 5, 2007 (swap Transaction and collar Transaction), April 25, 2007 (three call Transactions and three put Transactions), July 9, 2008 (gas Transaction), July 17, 2008 (gas Transaction), July 22, 2008 (gas Transaction) and September 3, 2008 (gas Transaction) (collectively, the "<u>Confirmation</u>") evidencing various interest rate, foreign currency and commodity transactions between Lehman Brothers Special Financing Inc. ("<u>Lehman</u>") and Pinnacle Foods Finance LLC ("<u>Pinnacle</u>"), (ii) the ISDA Master Agreement, dated as of May 31, 2007 between Lehman and Pinnacle (the "<u>Master Agreement</u>"), (iii) the Notice of Termination of Transactions, dated October 23, 2008, from Pinnacle to Lehman (the "<u>Early Termination Notice</u>") in respect of the Transactions described above, (iv) the document sent on October 28, 2008 by Pinnacle to Lehman containing a calculation statement for payment on early termination of such Transactions (the "<u>Calculation Statement</u>"), (v) the email correspondence between Lynne Misericordia of Pinnacle and Kevin Chichester of Lehman, dated February 13, 2009, containing various market quotations previously obtained by Pinnacle in the determination of the amount payable in respect of the terminated Transactions (the "<u>Supporting Quotations</u>"), (vi) the email correspondence between Lynne Misericordia of Pinnacle and Kevin Chichester of Lehman, dated March 19, 2009 and March 20, 2009, containing information on the breakdown of termination payments previously made by Pinnacle to Lehman among the terminated Transactions (the "<u>Breakdown</u>"), and (vii) the letter, dated April 17, 2009, from Lehman to Pinnacle seeking certain information from Pinnacle in connection with the Early Termination Notice and the Calculation Statement (the "<u>Information Request</u>"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Confirmation or the Master Agreement, as applicable.

As required under Section 6(d)(i) of the Master Agreement, Pinnacle (as the Non-defaulting Party) calculated the amounts payable upon occurrence of the Early Termination Date with respect to the Transactions described above and provided to Lehman the Calculation

2

Statement (and subsequently provided at Lehman's request the Supporting Quotations and the Breakdown), which amounts were paid to Lehman in accordance with the terms of the Master Agreement. The Calculation Statement, as well as the Supporting Quotations and the Breakdown, shows, in reasonable detail, the method of calculation of the amounts payable under Section 6(e) of the Master Agreement, the recognized Reference Market-makers that were approached in order to obtain quotations, the responses received from such Reference Market-makers as well as Unpaid Amounts included in the calculation and out-of-pocket and legal expenses incurred by Pinnacle by reason of the early termination of such Transactions as a result of the Chapter 11 voluntary bankruptcy petition by Lehman.

With regard to the information sought in the Information Request, we would like to kindly refer you to the Calculation Statement and the quotations from Reference Market-makers attached thereto, as well as the information in the Supporting Quotations and the Breakdown, all of which include information responsive to several of the items listed in the Information Request. While we intend to fully cooperate with Lehman in its review of the Early Termination Notice, the Calculation Statement, the Supporting Quotations and the Breakdown, we do not see any requirement under the Master Agreement or the Confirmation to provide additional information that goes beyond what we have provided to date. We further do not consider the broad scope of the Information Request customary or justified in connection with the early termination of Transactions by the Non-defaulting Party.

We are available to discuss the Information Request or any individual items contained therein with you in greater detail.

Very truly yours,

PINNACLE FOODS FINANCE LLC

By:     Kelley Maggs
Title:  Senior Vice President and General Counsel

cc:     Lynne Misericordia
        Jay Ptashek, Simpson Thacher & Bartlett

**EXHIBIT G**

# EXHIBIT G

## SCHEDULE OF DOCUMENTS TO BE PRODUCED

### DEFINITIONS

The terms used herein shall have the meanings ascribed to them in the definitions set forth below.

1.      "Concerning" shall have the meaning set forth in Southern District of New York Local Civil Rule 26.3(c)(7).

2.      "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), and includes, without limitation, reports, correspondence, minutes, emails, instant messages, spreadsheets, memoranda, notes and all other writings, Bloomberg screenshots, drawings, graphs, charts, photographs, sound recordings and electronic or computerized data compilations from which information can be obtained and/or translated, if necessary, through electronic detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of this term. The word "including" means including, but not limited to.

3.      The terms "Debtor," "Debtors," "LBHI" or "LBSF" shall mean Lehman Brothers Holdings, Inc. or Lehman Brothers Special Financing, Inc.

4.      "Pinnacle," "You," and "Your" shall mean Pinnacle Foods Finance LLC and any person acting on its behalf or under its control, including any of its agents, subsidiaries, affiliates, predecessors, successors, or representatives.

5.      The terms "and" and "or" shall be construed both disjunctively and conjunctively so as to bring within the scope of this request all documents which might otherwise be considered to be outside of that scope.

6.      The word "each" shall mean both "each" and "every", and the word "every" shall mean both "each" and "every," as appropriate in order to bring within the scope of this Request documents which might otherwise be beyond its scope.

7.      The term "Market Quotation" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

8.      The term "Master Agreement" shall mean the 1992 ISDA Master Agreement and the schedule thereto, entered into by Pinnacle and LBSF as of May 31, 2007.

9.      The term "Reference Market-makers" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

10.     The term "Replacement Transaction" shall mean any transaction entered into by Pinnacle to replace the Terminated Transaction.

11.     The term "Terminated Transactions" means the transactions terminated by Pinnacle in its October 23, 2008 letter to LBSF.

12.     The term "Termination Date" means October 24, 2008.

13.     The term "Unpaid Amounts" shall have the meaning ascribed to it in Section 14 of the Master Agreement.

14.     The term "Valuation Letter" shall mean the letter from Pinnacle, dated on or about October 30, 2008.

## GENERAL INSTRUCTIONS

The following General Instructions apply to each request set forth herein.

1.      Each request seeks production of each Document, in its entirety, without abbreviation or expurgation, and all drafts and non-identical copies of each Document.

2.      If any Document requested herein was formerly in Your possession, custody or control (or that of Your Representative) and has been lost or destroyed or otherwise disposed of, You are requested to submit in lieu of any such Document a written statement (a) describing in detail the nature of the Document and its contents, (b) identifying the person(s) who prepared or authored the Document and, if applicable, the person(s) to whom the Document was sent, (c) specifying the date on which the Document was prepared or transmitted and (d) specifying the date on which the Document was lost or destroyed and, if destroyed, the conditions of and reasons for such destruction and the person(s) requesting and performing the destruction.

3.      If any Document requested herein is withheld on the basis of any claim of privilege, You are requested to submit, in lieu of any such Document, a written statement (a) identifying the person(s) who prepared or authored the Document, and, if applicable, the person(s) to whom the Document was sent or shown, (b) specifying the date on which the Document was prepared or transmitted, (c) describing the nature of the Document (e.g., letter, telegram, etc.), (d) stating briefly why the Document is claimed to be privileged or to constitute work product, and (e) identifying the paragraph of this request to which the Document relates.

4.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, those portions of the Document subject to the claim of privilege shall be deleted or redacted from the Document, the instructions in the preceding paragraph shall be applicable, and the rest of the Document shall be produced.

5.      All Documents are to be produced as kept in the usual course of business or are to be organized and labeled to correspond with the categories in this request.  The method for production of each category is to be identified at the time of production.  Documents are to be produced in full and unexpurgated form.

6.      Each page of each document should be numbered consecutively. A request for a document shall be deemed to include a request for any and all file folders within which the document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the document in addition to the document itself.

7.      Documents attached to each other (physically or via electronic mail) should not be separated.

8.      In producing the requested documents, even though the requests are directed to "you," furnish all documents which are available to you, including documents in the possession of any of your officers, directors, employees, agents, attorneys, investigators, accountants or consultants and not merely such documents in your possession.

9.      The requests which follow are to be regarded as continuing, and Pinnacle is requested to provide by the way of supplementary compliance herewith, such additional documents as Pinnacle may hereafter obtain, which will augment the documents now produced in response to the requests below.  Such additional documents

are to be produced at the offices of Weil, Gotshal & Manges LLP promptly after receipt

thereof.

10.    At a future date, the Debtors may request the production of

additional documents based on information revealed during this document request.

11.    At a future date, the Debtors may request to depose additional

individuals based on information revealed during this document request.

### RELEVANT TIME PERIOD

Unless otherwise stated, the relevant time period for each of the following

requests is from and including the Termination Date through the present.

### REQUESTS FOR PRODUCTION

REQUEST NO. 1

All documents concerning any valuation of the Terminated Transactions,

including, but not limited to, the valuation contained in the Valuation Letter.

REQUEST NO. 2

All documents containing or reflecting a description, in whole or in part,

of the methodology used by Pinnacle to determine the value of the Terminated

Transactions, including any documents describing how quotations, if any, were utilized.

REQUEST NO. 3

All documents reflecting requests by or on behalf of Pinnacle for

quotations from Reference Market-makers or any other persons, and all responses from

Reference Market-makers and any other persons thereto.

REQUEST NO. 4

All documents concerning any Unpaid Amounts, including accrued

interest thereon, due with respect to the Terminated Transactions.

REQUEST NO. 5

All documents concerning any Replacement Transaction, including, but

not limited to, documents concerning (i) any consideration paid or received in connection

with a Replacement Transaction, (ii) the names of any entity which effectuated a

replacement, and (iii) when any such transaction was effected.

REQUEST NO. 6

All documents concerning any communications between and among, or on

behalf of, Pinnacle and any third party, including Pinnacle's representatives, advisors,

agents, accountants, and counsel related to Market Quotations from Reference Market-

makers, Unpaid Amounts, and/or Replacement Transactions in connection with the

Terminated Transactions.

REQUEST NO. 7

Documents sufficient to identify all persons who were involved in the

valuation of any Terminated Transactions or in the replacement of any Terminated

Transactions and their roles in connection therewith.

REQUEST NO. 8

All documents concerning fees, expenses, interest, or other ancillary items

incurred by Pinnacle with respect to the Terminated Transactions.

REQUEST NO. 9

All documents sufficient to identify any financial or accounting entries

made on Pinnacle's books and records as a result of the termination of each Terminated

Transaction, and all supporting documents or other information related to the determination of such amounts.

REQUEST NO. 10

Documents sufficient to identify the historical bid/offer spread and mid-point (or estimate) for each Terminated Transaction as of the close of business for each day from and including September 12, 2008 to and including the Termination Date, and Pinnacle's internal valuation models and external sources evidencing these amounts.

REQUEST NO. 11

Documents sufficient to identify all master agreements, other agreements, confirmations and other documents constituting the Agreement between the parties in connection with the Terminated Transactions.