# Linklaters

Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone (+1) 212 903 9000
Facsimile (+1) 212 903 9100
Direct Line (+1) 212 903 9031
mary.warren@linklaters.com

Honorable James M. Peck
United States Bankruptcy Court for the
Southern District of New York
615-3 Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004

**By Hand**

May 13, 2009

### Re: Lehman Brothers International (Europe) (in administration) and Lehman Brothers Limited (in administration)

Dear Judge Peck:

1. We represent the joint administrators (the "**Administrators**") of Lehman Brothers International (Europe) ("**LBIE**") and Lehman Brothers Limited ("**LBL**"). As Your Honor is aware, our clients are officers of the High Court of Justice for England and Wales (the "**High Court**") and were appointed on September 15, 2008 to manage the affairs, business and property of LBIE and LBL (and the other English companies over which they were appointed) toward achievement of the purpose of administration, which in the present case is essentially achieving a better result for creditors than would be effected on a winding up (*i.e.* a liquidation).

2. At the Lehman Brothers Holdings Inc. ("**LBHI**") omnibus hearing held on April 7, 2009, Mr Krasnow from Weil Gotshal & Manges LLP and Mr Ehrmann from Alvarez & Marsal Holdings, LLC ("**Alvarez & Marsal**") made a series of statements suggesting that the Administrators' decision not to sign a global protocol devised by Alvarez & Marsal (the "**Alvarez & Marsal Protocol**") was obstructive. The Administrators understand Alvarez & Marsal to consider the Alvarez & Marsal Protocol to be an attempt to bring together a multi-lateral protocol for the numerous insolvent members of the Lehman Group (the "**Insolvent Lehman Affiliates**"). Your Honor will recollect that a degree of criticism of the Administrators was expressed and that you requested that the Administrators attend a conference call to explain their position.

This communication is confidential and may be privileged or otherwise protected by work product immunity.

Linklaters LLP is a multinational limited liability partnership registered in England and Wales with registered number OC326345 including solicitors of the Supreme Court of England and Wales, members of the New York Bar and foreign legal consultants in New York. It is a law firm regulated by the Solicitors Regulation Authority. The term partner in relation to Linklaters LLP is used to refer to a member of Linklaters LLP or an employee or consultant of Linklaters LLP or any of its affiliated firms or entities with equivalent standing and qualifications. A list of the names of the members of Linklaters LLP together with a list of those non-members who are designated as partners and their professional qualifications is open to inspection at its registered office, One Silk Street, London EC2Y 8HQ, England or on www.linklaters.com.

Please refer to www.linklaters.com/regulation for important information on our regulatory position.

Linklaters

3. The Administrators were extremely concerned that, in the course of that hearing, the representatives of LBHI made a number of assertions that were factually incorrect and that mischaracterized the position of the Administrators. For example, LBHI understated the extent of the Administrators' co-operation to date and the importance of the transition services agreement between LBIE and LBHI signed in November 2008.

4. To enable them time to take advice and to determine how best to proceed, the Administrators declined the invitation to attend the conference call and applied for directions to the Honourable Mr Justice Blackburne in the High Court, which is the court with supervisory jurisdiction over the Administrators.

5. On May 13, 2009, Mr Justice Blackburne considered evidence from the Administrators, and submissions made on their behalf by Counsel, *inter alia*, outlining their dealings with LBHI representatives and others in relation to the Alvarez & Marsal Protocol. The evidence and submissions described the Administrators' involvement in the U.S. proceedings, explained their disinclination to enter into the Alvarez & Marsal Protocol, and set out the reasons underpinning the strategy they have adopted in this regard. Having considered that evidence and having heard the submissions made on behalf of the Administrators, Mr Justice Blackburne authorized Linklaters on behalf of the Administrators to send this letter to Your Honor to respond to Your Honor's request for an explanation as to why the Administrators do not propose to enter into the Alvarez & Marsal Protocol.

6. Having reviewed the transcripts of the omnibus hearings when the proposals put forward by Alvarez & Marsal for a global protocol were discussed, the Administrators understand that Your Honor's view was that *"it would be desirable to come up with . . . something that is a global protocol to minimize dissonance as between and among the pending cases thereby maximizing coordination and ultimately recoveries for all"* (Omnibus Hr'g Tr. 56, Jan. 14, 2009.); further that *"[w]hen Lehman was an operating global enterprise, command and control . . . resided in the New York office . . . [so] . . . at some level, command and control should continue to reside in the New York office and that the concepts of Chapter 15 and the model law contemplate a main proceeding in situations involving multiple international insolvencies"* (Omnibus Hr'g Tr. 67-68, Jan. 14, 2009.); and further that *"at a minimum, that there should be some effort to coordinate the claims process."* (Omnibus Hr'g Tr. 69, Jan. 14, 2009.) Your Honor also indicated that the aims of the Alvarez & Marsal Protocol *"appear to be reasonable, appropriate, desirable and necessary aims."* (Omnibus Hr'g Tr. 37, Feb. 11, 2009.)

7. The Administrators share the view that co-operation with other insolvency office holders appointed to Insolvent Lehman Affiliates is desirable. It is something that they have been making strenuous efforts to achieve and those efforts have in large part been successful. They are also of the view, however, that so far as English insolvency law is concerned, there are some very substantial limitations on the Administrators' freedom of maneuver. The Administrators are bound to treat each insolvent entity as a separate legal entity and any framework that seeks to achieve a different outcome by creating or seeking to create a global estate comprising many Insolvent Lehman Affiliates in different jurisdictions would

Linklaters

not be permitted. It is important, moreover, that where an Insolvent Lehman Affiliate is a creditor of LBIE (or LBL), it is not treated in a manner that is materially different from that accorded to other creditors, for example by virtue of the special asset preservation or asset realization clauses in the Alvarez & Marsal Protocol. While the Alvarez & Marsal Protocol recognizes that any policy of co-operation cannot displace or interfere with the duties and obligations of the office holder entrusted with administering the Insolvent Lehman Affiliate, by placing additional burdens and expectations not contemplated by national laws on the office holders, the Alvarez & Marsal Protocol complicates the very process it seeks to streamline.

8. Since their appointment, in carrying out their functions in accordance with their usual professional standards, the Administrators have accorded significant importance to co-operating with the Insolvent Lehman Affiliates. The LBHI/LBIE Transition Services Agreement (the "**LBHI/LBIE TSA**") is one important example. It was entered into with LBHI on November 14, 2008, having been negotiated at a time when the Administrators were under enormous pressures resulting from taking control of LBIE, stabilizing its business, dealing with employees, entering into a substantial transaction with Nomura, interfacing with regulators, maintaining communication with clients of LBIE, preparing for a significant High Court application at the beginning of October 2008 and then preparing for the initial statutory meeting of LBIE's creditors. A particular reason that the LBHI/LBIE TSA is a significant example of the Administrators' commitment to information sharing is that, since LBHI's sale of assets to Barclays Capital Inc. ("**Barclays Capital**") in September 2008, as approved by this Court, LBIE/LBL are now the companies in the Lehman Group which find themselves in possession of a major part of the electronic data to which LBHI seeks access.

9. The Administrators have also had extensive dealings with a number of Insolvent Lehman Affiliates which, for completeness, are briefly summarized in Exhibit 1. Ensuring that there has been a high level of information flow has been of paramount importance to the Administrators, as is demonstrated by the array of information that is available on the section of the PwC website dedicated to the Lehman Brothers administrations and the Progress Report submitted to LBIE's creditors on April 14, 2009 in accordance with the English Insolvency Rules (a copy of which is enclosed with this letter at Exhibit 2). The Administrators have made this information available to all of LBIE's creditors, including LBHI and other Insolvent Lehman Affiliates. As Your Honor may recall, the Administrators filed much of this material with the Court on February 10, 2009, to provide Your Honor with some insight into progress in the LBIE administration.

10. The Administrators have prioritized two key issues in their dealings with LBHI and the other Insolvent Lehman Affiliates:

   a. the dependency of Insolvent Lehman Affiliates on the electronic data that was originally held by LBHI and LBIE but is now held by LBIE/LBL and Barclays Capital Inc. following the sale transaction with Barclays Capital approved by Your Honor in September 2008; and

Linklaters

      b.  the complexity of the intercompany accounting arrangements which arose as a consequence both of LBHI having been treated as the "banker" to the Lehman Group prior to its collapse and the substantial financial trading that was undertaken among Lehman Group companies.

11. Procedures designed to resolve (to the greatest extent possible) the way in which these issues impact upon the insolvency procedures to which the Insolvent Lehman Affiliates are subject are well developed, as is in part evidenced by:

      a.  the LBHI/LBIE TSA approved by Your Honor;

      b.  a draft intercompany balance memorandum of understanding (the "**Intercompany Balance MoU**") (a copy of which is attached at Exhibit 3), which the Administrators intend to discuss with Alvarez & Marsal and the other Insolvent Lehman Affiliates with a view to achieving consensus in dealing with intercompany claims; and

      c.  agreements reached in relation to claim filing procedures with Lehman Brothers, Inc. and Lehman Brothers Japan.

Consequently, important issues in the Alvarez & Marsal Protocol, such as co-operation, communication, access to information and an intercompany claims procedure, are already being appropriately addressed.

12. There has never been any question in the Administrators' minds as to the merit, and benefits to be gained for LBIE and the other companies under the control of the Administrators, of achieving a high level of co-operation with the other Insolvent Lehman Affiliates, in order to address the inevitable issues that arise in a group insolvency context. The challenge has been to identify how best to address those issues as a practical matter in the extraordinarily complex circumstances of this case.

13. The Administrators differ from Alvarez & Marsal as to what is the best way of seeking to ensure co-operation so as to resolve, so far as possible, the difficulties that arise among the Insolvent Lehman Affiliates and as a result of the unravelling of the Affiliates' operations that were linked pre-administration. The Alvarez & Marsal Protocol, while laudable in its general high-level objectives, is not, so far as the Administrators are concerned, the best way for them to seek to deal with these issues and may conflict both with the strategy already adopted by the Administrators (including the agreements they have entered into) and with their duties and obligations as a matter of English law. It would additionally involve the Administrators (a) diverting resources that are critically needed to pursue the other objectives of the administration and (b) incurring unnecessary costs. The Administrators are also mindful that there is no precedent, and no jurisdiction as a matter of English law that would provide, for different legal entities that were formerly part of a group, but which are now subject to separate insolvency proceedings under different laws in different jurisdictions, becoming subject to a single process or protocol.

14. As we have previously explained in our submissions to the Court, the Administrators have adopted a strategy of pragmatism by entering into arrangements with a range of Insolvent

Linklaters

Lehman Affiliates, thereby directly addressing specific issues that have arisen. The Administrators have sought to address each problem on its own merits and find a solution aimed directly at resolving the specific issue. This has led to a series of bespoke solutions to the problems that have arisen, often bilateral and complex in nature. Bespoke protocols and agreements are capable of resolving issues, by providing for specific problems which are encountered and specific co-operation that is needed, in a way that an "aspirational" and non-binding multilateral protocol is not capable of doing.

15. The experience of the Administrators over the eight months in which they have been in office is that their preferred method of securing co-operation is working satisfactorily. They have pursued this strategy as an alternative to developing an overarching protocol as they believe their approach is more likely to meet their commercial objectives and is consistent with the proper discharge of their duties under English law. The Administrators believe that entering into the Alvarez & Marsal Protocol (a) will not assist them in managing the affairs and property of the Insolvent Lehman Affiliates under their control; (b) risks elevating expectations as to what may be achievable without paying sufficient regard to the limitations imposed by national laws; and (c) gives insufficient recognition to the fact that the cross-border issues in the Lehman insolvencies relate to the affairs of separate legal entities rather than the affairs of a single legal entity subject to an insolvency procedure in more than one jurisdiction.

16. The Administrators do not take the view that the Alvarez & Marsal Protocol would enable them to "*minimize the costs and maximize recoveries for all creditors of the Proceedings*" (Draft 3 Protocol at page 2) nor that it is necessarily consistent with their obligations to the creditors of the Insolvent Lehman Affiliates under their control for them to be seeking to maximize recoveries "*for all of the Debtors' creditors*". (Draft 3 Protocol at page 3). On the contrary, even though LBHI has redrafted the Protocol since the April 7, 2009 omnibus hearing to make it non-binding, agreeing to the Protocol, in the view of the Administrators, could lead to the Administrators' feeling obliged, or being expected by others, to take steps that would increase the costs of administering the estates of the Insolvent Lehman Affiliates under their control and which might not be (and are not necessarily intended to be) for the benefit of the creditors of those estates.

17. While it is plainly a worthy objective that, where possible and consistent with the interests of the creditors of the Insolvent Lehman Affiliates under their control, the Administrators take steps which assist the office holders of other Insolvent Lehman Affiliates, it is only where possible and where consistent with their existing statutory duties that they should do so. The Administrators' view, therefore, is that to enter into the Alvarez & Marsal Protocol would not be in the best interests of the creditors of LBIE or LBL and could give rise to unnecessary costs and the potential for conflicts. By way of explanation, we have selected a number of the provisions of the Alvarez & Marsal Protocol that present these problems for the Administrators and explain the Administrators' reasoning in Exhibit 4 to this letter.

18. The Administrators emphasize that their disinclination to engage in the negotiation of the Alvarez & Marsal Protocol should not be construed as a rejection of, or disinterest in, the

Linklaters

principles of co-operation, which will be integral to the successful conduct of the insolvency proceedings for the Insolvent Lehman Affiliates across the world, nor should their conduct properly be regarded as obstructive or motivated by parochial interests. The Administrators' sole concern, which they understand is one that is shared by a number of office holders appointed in relation to other Insolvent Lehman Affiliates, is that the Alvarez & Marsal Protocol is not an appropriate means for achieving that end.

Very truly yours,

Mary K. Warren

cc: Richard Krasnow, Weil Gotshal & Manges LLP