# Lehman Brothers International (Europe)
# In Administration

Joint Administrators' progress report for the period
15 September 2008 to 14 March 2009

14 April 2009

# Contents

| | | |
|---|---|---|
| Section 1 | Purpose of the Joint Administrators' progress report | 2 |
| Section 2 | Executive summary | 4 |
| Section 3 | Background information | 8 |
| Section 4 | The LBIE Operating Model | 12 |
| 4.1 | Operating Model | 14 |
| 4.2 | Operations ("COO") | 17 |
| Section 5 | Activities | 20 |
| 5.1 | House Positions | 22 |
| 5.2 | Counterparties | 25 |
| 5.3 | Trust Property | 30 |
| 5.3.1 | Proposed Client Asset Scheme of Arrangement | 34 |
| 5.4 | Treasury | 36 |
| 5.5 | Reporting | 38 |
| Section 6 | Cross Functional Workstreams | 40 |
| 6.1 | Custodians | 42 |
| 6.2 | Failed Trades | 44 |
| 6.3 | Corporate Events | 46 |
| 6.4 | Terminations and Valuations | 48 |
| 6.5 | Derivative Exchanges | 50 |
| 6.6 | Financing | 51 |
| 6.7 | Overseas Branches | 53 |
| 6.8 | Affiliate company relationships | 55 |
| Section 7 | Functions | 58 |
| 7.1 | Information Technology | 60 |
| 7.2 | Regulatory and Compliance | 64 |
| 7.3 | Infrastructure and Property | 66 |
| 7.4 | Human Resources | 68 |
| 7.5 | Tax | 69 |
| Section 8 | Statutory and other information | 72 |
| 8.1 | Statement of Affairs | 75 |
| 8.2 | Administrators' Remuneration | 76 |
| Section 9 | Receipts and payments to 14 March 2009 | 80 |
| Appendix 1 | LBIE contact details | 88 |
| Appendix 2 | News releases and information | 90 |

# Section 1

# Purpose of the Joint Administrators' progress report

## Introduction

This report has been prepared by the Joint Administrators (the "Administrators") of Lehman Brothers International (Europe) ("LBIE" or the "Company") under Rule 2.47(3)(a) of the Insolvency Rules 1986 (the "Rules").

Creditors were notified of the Administrators' Proposals for Achieving the Purpose of the Administration on 28 October 2008. These were approved with modification at a meeting of creditors held on 14 November 2008. Creditors have been provided with access to the presentation that was given at that meeting. Copies of this report and other announcements by the Administrators are available at www.pwc.co.uk.

This report provides details of the work undertaken and the progress made during the first six months to 14 March 2009. Particular emphasis has been placed on developments since the meeting of creditors on 14 November 2008.

## Objective of the Administration

The Administrators are pursuing the objective of achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets, including all cash, securities and in-the-money derivative positions on a managed basis;

- Mitigate as far as is possible and agree in principle the claims of all stakeholders and counterparties; and

- Manage Client Assets and Client Monies, assess the claims to such assets and return all Trust Property to their rightful owners on a systematic basis.

## Creditors' Committee

Your Creditors' Committee (the "Committee") was elected at the meeting of creditors and its members are:

- Lehman Brothers Holdings Inc;

- Ramius Credit Opportunities Master Fund Limited;

- GLG European Long/Short Fund;

- Legal and General Pensions Limited; and

- Oceanwood Global Opportunities Master Fund.

The Administrators meet with the Committee regularly, either in person or by conference call. To date three formal full day meetings of the Committee have taken place. Summary minutes of these meetings have been placed on the LBIE Client Information and Claims website at https://dm.pwc.com/LBIEClient. In addition, seven telephone meetings have taken place and three further full day meetings have been held to develop the outline of a Scheme of Arrangement in order to deal with Client Assets.

The meetings with your Committee provide the Administrators with the opportunity to review progress and activities in detail and to consult on critical issues. The Committee has been active in its dealings with the Administrators and has provided constructive support. We wish to express our thanks for the significant time they have committed to date.

## Future Reports

The Administrators' next formal progress report to creditors will be in six months time.

Signed:

**SA Pearson**
Joint Administrator
Lehman Brothers International (Europe)

# Section 2

# Executive summary

## Objective

The objective of the Administration is to achieve a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration).

## Progress to date

Considerable progress has been made in meeting this objective.  In particular:

- LBIE's equities business was sold to Nomura Holdings Inc ("Nomura"). Over 2,400 jobs were preserved and related employee claims against the estate were mitigated;

- Control has been asserted over the assets of the Company and its clients, including over $35.5bn in securities;

- $8.7bn has been recovered to date and is held as cash on deposit or investments;

- An interim mechanism for the return of assets has been implemented. $12.2bn (46%) of Client Assets (as defined in Section 5.3) have been returned or released to 14 March 2009;

- Policies have been formed for handling the estimated 839,000 pending and failed trades, including deleting many from exchanges;

- We have identified and valued the majority of LBIE's estimated 130,000 over-the-counter ("OTC") derivative contracts;

- A new operating model has been designed and implemented. This has already been effective in ensuring the systematic realisation of value for creditors;

- Revised employee reward and retention processes have been implemented for the retained 360 employees. These focus activities and reward on the objectives of the Administration;

- Extensive communication has been provided to the estimated 22,000 current and historic counterparties with LBIE and to the market generally. Over 25 news releases have been posted on our website. (See Appendix 2);

- We have negotiated agreements with certain Lehman affiliates to govern the provision of services between LBIE and those companies, post-Administration, and other agreements to reconcile claims between companies.  We continue to negotiate agreements with other affiliates, tailored to the specific circumstances of LBIE's relationship with them;

- A mechanism for the systematic return of Client Assets has been identified, shared with the High Court, the Committee, key industry groups and the market. Its practical feasibility is being tested;

- The IT environment, critical to the protection and recovery of value from the estate, has been stabilised. Annual IT costs have been reduced by over $200m per annum; and

- The exit from overseas branches has been largely concluded, realising over $150m to date.

Specific progress in these and other areas is discussed in more detail in the balance of this report.

## Financial position at 15 September 2008

The directors have provided a draft Statement of Affairs at 15 September 2008. This financial information is unaudited and is stated before provisions for losses post 15 September 2008. Based upon this draft Statement of Affairs:

- The book value of LBIE's gross assets (i.e. grossed up for collateral and Client Assets) was $628.6bn;

- The book value of gross liabilities was $611.8bn;

- After counterparty and cross product netting and eliminating amounts relating to Trust Property this reduces to assets of $49.5bn and liabilities of $32.6bn ("Adjusted Assets and Liabilities");

- The resulting net equity at 15 September 2008, was estimated as $16.9bn; and

- Some $6.7bn was reported as payable to Lehman Brothers Holdings Inc. ("LBHI"), the ultimate holding company. $7.3bn was reported as receivable from Lehman Brothers Inc ("LBI"), LBIE's sister broker-dealer.

Included in the gross balances are:

- Segregated assets (cash and securities) and related liabilities of $24.9bn to third parties;

- Financing receivables (including intercompany) of $493.1bn and related liabilities of $486.4bn; and

- Inventory (depot securities) of $37.1bn, of which $23.0bn is identified as segregated for clients. A further $3.1bn of inventory was held in safe custody for clients and $5.0bn relating to affiliates.

As illustrated above, the nature of LBIE's business is such that considerable collateral was posted by and received from counterparties. This collateral has been reflected based upon book values at 15 September 2008.

## Issues impacting recovery

LBIE's draft Statement of Affairs indicates net equity at 15 September 2008, of $16.9bn. Whilst this appears to be a significant equity cushion when compared to Adjusted Assets and Liabilities, it represents just 1.3% of the gross book value of market positions at 15 September 2008 and an even smaller proportion of nominal outstanding positions.

LBIE's business has historically managed to control Value at Risk ("VaR"), however a number of events could result in LBIE suffering material losses, including:

- Significant movements in global securities and derivatives markets since 15 September 2008;

- Unilateral termination of positions by market counterparties, leaving LBIE unhedged in various products and markets;

- An inability by LBIE to terminate certain of its open market positions and close-out for value;

- Default valuation rules which favour the non-defaulting party resulting in an adverse effect on carrying values of both assets and liabilities;

- Asserted set-off by market counterparties above levels reflected in the books of LBIE;

- An inability to quantify and hedge residual market exposures;

- Hedges provided to LBIE by its affiliates, now themselves in insolvency; and

- Significant other unsecured intercompany receivables now in insolvency.

As such, we believe that there is a high probability that these factors will have eliminated the reported $16.9bn equity cushion and as such there is likely to be a shortfall to unsecured creditors.

## Dividend Prospects

Due to the early stage of the Administration and, in particular, the limited visibility we currently have on the value of claims against the estate and the recoverable value of the assets of LBIE we are unable to provide any form of dividend estimate to creditors or give any illustration of the timing of any such dividend at present. We will of course, provide further clarity on this as the case progresses.

## Other sources of recovery

LBIE is an unlimited liability company and in due course creditors are likely to have access to LBIE's shareholders for any shortfall. However, LBIE's shareholders are themselves insolvent and we are unable to determine whether any material recoveries will arise from this source.

Many of LBIE's market counterparties have the benefit of guarantees from the ultimate holding company, LBHI. Creditors are encouraged to lodge any guarantee claims they may have directly with LBHI. Further information is available at www.lehmanbrothersestate.com.

In addition, certain of LBIE's market counterparties may have a claim against Customer Asset Protection Company ("CAPCO"), a provider of insurance cover to certain clients, for any shortfall they may suffer and these creditors are encouraged to communicate directly with CAPCO. Further information is available at www.capcoexcess.com.

## Cash position at 14 March 2009

To 14 March 2009, the Administrators have recovered cash and bonds totalling $8.7bn, comprising $5.7bn in House positions and $3.0bn in potential client positions. Net cash balances (including investments of $0.7bn) at 14 March 2009, totalled $7.4bn.

Payments for costs, taxes and expenses to date total $0.5bn. In addition, $0.8bn has been returned in cash to clients. More details are set out in Section 9.

Assets potentially subject to trust claims are held in separate accounts and not co-mingled with House accounts.

All funds on hand are prudently invested, either held with the Bank of England, invested in institutions which are AA-rated or above, subject to defined market capitalisation parameters and credit default swap spreads, or invested in short-dated AAA rated government securities.

## Trust Property Asset Claimants

Creditors with Client Asset claims are covered in detail in Section 5.3 of this report. We are sensitive to the consequences of returning Trust Property Assets and have committed extensive resources to this activity.

During October 2008, a formal process to commence the return of assets to clients was announced. A structured process for dealing with client claims has been implemented and there have been extensive dealings with many of the c.2,000 account holders.

An initial prioritisation of clients has been agreed and over 100 hardship cases have been considered and responded to.

To date Trust Property Asset returns total $12.2bn (assets and cash $11.5bn, release of claims to collateral held by third parties $0.7bn). We have to date returned material assets to client claimants by value, but a limited amount by number.

During March 2009, we outlined a potential mechanism for the orderly return of assets using a Scheme of Arrangement under the Companies Act 2006. The practical viability and application of the Scheme of Arrangement is under assessment and we are working with the Committee to progress it. This is discussed further in Section 5.3.1.

## Creditors' claims

Creditors should continue to submit their claims to the Administrators electronically via the LBIE Client Information and Claims website. At this early stage limited resources are being deployed to formally agreeing creditors' unsecured claims, but a comprehensive framework is being implemented to receive, value and monitor such claims for subsequent admission for dividend.

No bar date has been established yet for claims.

The LBIE Information and Claims website is only accessible by a unique user ID and password. All creditors and counterparties were provided with access details in our letter accompanying the Administrators' Proposals for Achieving the Purpose of the Administration dated 28 October 2008. If you are unsure of your access details, please follow the email link at www.pwc.co.uk.

Updates from the Administrators and certain information regarding the LBIE Administration are regularly posted. (See Appendix 2).

## Future strategy and actions

The Administration of LBIE is exceptionally complex. Actions to date have established a comprehensive framework for the systematic run-off of positions and processing of claims.

Over the coming months, the Administrators intend to explore the alternative mechanisms for distributing realisations to unsecured creditors. We caution, however, that it is likely to be some time before a dividend is paid to unsecured creditors.

The Administrators would like to formally acknowledge the invaluable ongoing contribution being made by the LBIE management and staff in working as an integral part of the LBIE Administration team. The circumstances of the insolvency of LBIE and its impact on them, their friends and families have been very significant. Despite this they have demonstrated a high degree of professionalism and commitment to ensure the impact on LBIE's creditors is minimised.

# Section 3

# Background information

## Background information

Investment banking was at the core of the business of the global Lehman Brothers Group of companies (the "Lehman Group"). Until its collapse, the Lehman Group was one of the four biggest investment banks in the United States. It provided financial services to corporations, governments and municipalities, institutional clients and high net worth individuals. The business activities of the Lehman Group were organised in three segments, namely: capital markets, investment banking and investment management. Those segments included businesses in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

The Lehman Group's headquarters were in New York, with regional headquarters in London and Tokyo and many offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region.

The ultimate parent company of the Lehman Group is LBHI, which is incorporated in the United States.

## Events immediately preceding the Administrators' appointment

The Lehman Group operated in a market that depends heavily on investor and market confidence. In the period immediately prior to its insolvency, there was an escalating loss of confidence in the Lehman Group, as evidenced by a significant deterioration in LBHI's share price on the New York Stock Exchange of almost 80 per cent during the week from Friday 5 September 2008 to Friday 12 September 2008.

On Tuesday 9 September 2008, the share price fell 45 per cent following reports that negotiations with the Korean Development Bank, regarding a potential major investment in the Lehman Group, had been put on hold.

The following day, the Lehman Group announced a third quarter loss of $3.9bn.

At the same time, the Lehman Group announced plans

to sell a majority stake in its investment management business and to spin-off the majority of its commercial real estate assets into a new, separate public company. These measures failed to restore investor confidence and the share price fell a further 7 per cent on Wednesday 10 September 2008.

Following the close of business that day, Moody's Investors Service, one of the main credit rating agencies, announced that, in the absence of a purchaser for the Lehman Group or its business by Monday 15 September 2008, it intended to downgrade the Lehman Group's credit rating.

Various steps were taken in an attempt to resolve the Lehman Group's situation. We understand that weekend discussions were held in New York with potential investors and purchasers of the Lehman Group's business (or part thereof).

During the afternoon of 14 September 2008, we met with the directors of LBIE in order to consider what steps should be taken in the event that the New York discussions to save the Lehman Group were to fail.

LBHI managed substantially all of the material cash resources of the Lehman Group centrally. A continuing failure of LBHI to settle obligations on behalf of LBIE at any point in time would result in the insolvency of LBIE, as it would be unable to meet its liabilities as they fell due. On 14 September 2008, the directors of LBIE sought assurances from LBHI that payments due to be made on 15 September 2008 on its behalf would in fact be made by LBHI. The directors also planned how to react in the event that these assurances could no longer be given by LBHI.

At approximately 12.30 am on 15 September 2008, LBIE was informed by LBHI that it would no longer be in a position to make payments to or for LBIE and other Lehman Group companies and that it was preparing to file for Chapter 11 bankruptcy protection in the US.

Overnight, preparations were made by the directors, employees and advisers for a number of the Lehman Group companies in the UK to seek the protection

of an administration order and the directors of those companies, including LBIE, met and resolved to place those companies into Administration (collectively "the Lehman Administration Companies").

At 7.56 am, on 15 September 2008, Administration orders were made in respect of each of the Lehman Administration Companies. Having been appointed as administrators, the Administrators and their teams immediately assumed responsibility for LBIE's affairs and began to pursue the purpose of the appointment.

Later on 15 September 2008, LBHI announced that it had filed for Chapter 11 bankruptcy protection in the US. At the same time, LBIE's fellow affiliate, Lehman Brothers Inc ("LBI") was supported by the USA financial authorities, for a further five days, LBI finally entered Securities Investor Protection Act ("SIPA") trusteeship on 19 September 2008, whereupon a significant part of its prime brokerage activities, including a material quantity of Client Assets and obligations, was transferred to Barclays Capital Inc ("BarCap") and others. LBIE has major claims against LBI, but for Client Assets and cash, and for apparently unsecured amounts.

## Business Activities

LBIE was LBHI's main European broker-dealer. It provided investment banking services to clients (including corporate customers, institutions, governments, hedge funds and private clients) on a global basis.

LBIE was a global market maker in certain major equity and fixed income products. As part of its market-making activities it was a member of all principal securities and commodities exchanges across Europe and many others across the world.

LBIE had trading, research, structuring and distribution capabilities in equity and fixed income products and used a client-flow business model, which was based on the principal focus of facilitating client transactions in all major global capital markets products and services. LBIE generated client-flow revenues from a full range of clients by:

- Advising on and structuring transactions specifically suited to meet client needs;

- Serving as a market-maker and / or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to adjust their portfolios and risks across different market cycles;

- Originating loans for distribution to clients in the securitisation or principals market; and

- Acting as an underwriter to clients.

LBIE maintained inventory positions of varying amounts across a broad range of financial instruments and took proprietary trading and principal investment positions.

LBIE's Capital Markets division carried out primarily institutional client-flow activities, including secondary trading, financing, origination and securitisation, prime brokerage and research activities in fixed income and equity products. These products included a wide range of cash, derivative, secured financing and structured instruments and investments. LBIE was a leading global market-maker in numerous equity and fixed income products, European equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage and asset-backed securities, preferred stock, municipal securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products.

LBIE was one of the largest market participants in terms of pan-European listed equities trading volume and maintained a major presence in over-the-counter stocks, large capitalisation stocks, warrants, convertible debentures and preferred issues.

The secured financing business managed equity and fixed income matched book activities, supplied secured financing to institutional clients and provided secured funding for their own book inventory of equity and fixed income products. LBIE also served as an agent, market-maker and / or intermediary in the global marketplace, including making available securities and other financial instruments and products to clients to adjust their portfolios and risks across different market cycles, enabling clients to buy or sell large positions of securities through block trades and originating loans for distribution to clients through securitisations and / or syndications.

## Corporate Functions

LBIE and all other companies in the Lehman Group were supported by a number of corporate support functions, including: Operations, Information Technology, Treasury, Finance, Risk, Compliance, Legal, Regulatory and Human Resources.

These were organised and managed on a global basis with regional or local management providing the appropriate local input. The main role of each function is outlined below.

The corporate functions provided support to LBIE's businesses through the processing of securities transactions arising from multiple business units across a multitude of systems, across multiple geographies. It also included receipt, identification and delivery of funds and securities, safeguarding of clients' securities, risk management, and compliance with regulatory and legal requirements.

Included in corporate functions are technology infrastructure and systems maintenance, information security, business continuity planning, treasury operations, financial reporting and business unit financial support, tax planning and compliance, internal audit, expense management, and other support functions. Records relating to the status of transactions (including unsettled, terminated and failed trades) and the physical location of assets by sub-custodian were managed, reconciled and reported by the corporate functions.

LBIE's businesses and operations relied on the secure processing, storage and transmission of confidential and other information. Substantial investment has historically been made in systems, processing capability and technology to manage and record execution and clearing and risk management. The businesses were highly dependent on the ability to process, on a daily basis, a large number of often complex transactions across numerous and diverse markets in many currencies. Consequently, LBIE relied (and continues to rely) heavily on IT systems for financial, accounting, business and settlement systems as well as interfaces to third parties such as banks, custodians and settlement entities / clearing houses.

Extensive protective measures are required for LBIE's computer systems, internet sites, software and networks to protect against vulnerabilities to unauthorised access, computer viruses, denial of service attacks or other events that could have a security or business impact.

These systems and business infrastructure are inextricably linked to the same facilities utilised by other companies in the Lehman Group, and important geographic locations for the maintenance and support of these are both London and New York.

The Administrators only have control over certain parts of the London located facilities. Various other Lehman Group companies, actively through their respective representatives, claim title to certain intellectual property rights in competition with LBIE. This has required the development and implementation of operating protocols and service agreements to ensure LBIE's continued access to data, applications and systems and to govern the basis on which the infrastructure use will be shared and funded going forward.

# Section 4

# The LBIE Operating Model

# Section 4.1 Operating Model

## Background

In our report to creditors of 28 October 2008, we identified that the control and management of the Administration was to be managed in three phases:

**Phase I – Control and Assimilation**

- We asserted control over the Company, its business processes and personnel.  We identified key roles and individuals and set the primary objectives to meet the purpose of the Administration;

**Phase II – Systemisation**

- The LBIE Operating Model was assessed and restructured to reorganise LBIE's activities to meet the objectives of realising assets, controlling and managing the return of trust property and to agreeing creditors' claims. The current LBIE Operating Model has established a flexible and efficient operating structure through which to support these objectives; and

**Phase III – Run Off**

- The process of running off the balance sheet of LBIE is now well underway, being implemented through the LBIE Operating Model. This phase of the project will ensure the systematic realisation of assets, return of Trust Property and agreement of creditors' claims.

At this early stage we have not determined the mechanism for distributing assets to unsecured creditors; this will be assessed over coming months and will form Phase IV of the process - Distribution.

## The LBIE Operating Model

Set out below is an illustration of the LBIE Operating Model. Each element is discussed in detail in the identified section.

| Joint Administrators | | | | | |
|---|---|---|---|---|---|
| **ACTIVITIES** | | | | | |
| House Positions *Section 5.1* | Counterparties *Section 5.2* | Trust Property *Section 5.3* | Treasury *Section 5.4* | Reporting *Section 5.5* | |
| **CROSS FUNCTIONAL WORKSTREAMS** | | | | | **COO** Section 4.2 |
| Custodians | *Section 6.1* | | | | |
| Failed Trades | *Section 6.2* | | | | |
| Corporate Events | *Section 6.3* | | | | |
| Terminations and Valuations | *Section 6.4* | | | | |
| Derivative Exchanges | *Section 6.5* | | | | |
| Financing | *Section 6.6* | | | | |
| **FUNCTIONS** | | | | | |
| Information Technology | Regulatory & Compliance | Infrastructure & Property | Human Resources | Tax & In-house legal | |

As noted above, the LBIE Operating Model has been restructured to meet the objectives of the Administration. To enable creditors to better understand this, we set out below a description of the Operating Model. This report then provides an update on the various activities of the teams managing each aspect of the Operating Model.

### Operations ("Chief Operating Officers" or "COO")

**COO** are responsible for managing the operations of the organisation, allocating resources and supporting the **Activities, Cross Functional Workstreams** and **Functions**.

### Activities

The Operating Model has five **Activities**:

- **House Positions** – the primary objective is the realisation of House positions (securities and open derivatives). See section 5.1;

- **Counterparties** – the primary objective is to settle outstanding positions (collect receivables and agree claims) with market counterparties, including street counterparties, Lehman affiliates and to deal with prime brokerage clients which are debtors of LBIE. See section 5.2;

- **Trust Property** – the primary objective is the identification of clients asserting claims to Client Assets (and Client Monies) in LBIE's custody prior to Administration and to manage the return of these assets. See section 5.3;

- **Treasury** – the primary objective is to ensure all accounts held by LBIE with cash balances at the date of Administration are collected and to manage the funds realised in the Administration. See section 5.4; and

- **Reporting** – this Activity coordinates the production and distribution of management information and information for reporting to the Committee and the creditors generally. See section 5.5.

## Cross Functional Workstreams

Six **Cross Functional Workstreams** provide support to the Activities in meeting their objectives:

- **Custodians** – responsible for gaining control of and reconciling all assets in LBIE's extensive custodian network;

- **Failed Trades** – responsible for establishing the manner in which failed and pending trades are to be dealt with in the 80 markets in which LBIE operated;

- **Corporate Events** – responsible for ensuring that all corporate actions, coupons and dividends relating to securities held by LBIE (both House and client) are collected and ultimately accounted for;

- **Terminations & Valuations** – responsible for coordinating the collation of all termination notices and statements received and undertaking valuations to support the settlement and close out of counterparty positions;

- **Derivative Exchanges** – responsible for all dealings with the various derivative exchanges, including recovering posted collateral and reviewing the close out of House and client positions; and

- **Financing** – responsible for managing the process of collecting sums relating to excess collateral posted with the Street on LBIE's very extensive financing activities.

Each of the Activities and Cross Functional Workstreams has specific objectives, which have in turn been cascaded through the remaining LBIE employees and Administrators' staff.

## Functions

Supporting the work of the Activities and Cross Functional Workstreams are several **Functions**. Some of the LBIE Functions are provided by Lehman Brothers Limited ("LBL") in its capacity as the service company for the UK Lehman Group entities and recharged to LBIE:

- **Information Technology** – managing the transitional and ongoing IT needs;

- **Regulatory & Compliance** – ensuring ongoing compliance with FSA and other regulatory requirements and handling investigations;

- **Infrastructure & Property** – managing LBIE's physical premises in London and elsewhere;

- **Human Resources** – handling all matters relating to the retention, reward and restructuring of the employee base; and

- **Tax and In-house Legal** – dealing with all ongoing tax matters, including corporation tax and withholding tax and in-house legal matters.

Four other traditional back-office functions: Finance, Operations, In-house Legal and Risk, have been incorporated directly into the Activities and Cross Functional Workstreams.

## Coordination

Each of the Activities, Cross Functional Workstreams and Functions has its own specific objectives; at all times they work together as a unit to achieve the aims of the Administration. These are coordinated by the Joint Chief Operating Officers, who report into the Administrators. Mr Tom Bolland, a senior Lehman Executive, leads this team.

Each of the Activities, Cross Functional Workstreams and Functions comprise of integrated teams of LBIE and the Administrators' staff ensuring the knowledge and experience of the LBIE management and staff are an integral part of the process. All staff act under the supervision of the Administrators. This balances the cost effectiveness of the run off with the management of risk.

We have now completed a relocation of the remaining 360 LBIE staff and have consolidated the bulk of the operations to place the Activities, Cross Functional Workstreams and Functions teams into contiguous working areas.

## Resourcing

The Operating Model has been designed to allow staff to move fluidly between Activities and Cross Functional Workstreams as required by work demands. Resourcing is reviewed weekly by the COOs to ensure efficient staffing and optimal utilisation of resources. We have an active recruitment programme to replace employees who have resigned at various times and to increase capacity in specific areas, as needed.

As part of our ongoing management of people, retained staff members have individual goals and objectives which are aligned with the goals of the Activities, Cross Functional Workstreams and Functions they support. Performance against these objectives is regularly monitored (and reported to your Committee) and reward for the LBIE staff is linked to progress. In summary, the LBIE Operating Model has been designed to ensure that the objectives of the Administration are met in a coordinated, focused and cost effective manner. The Operating Model is now well established and the benefits of this reorganisation are increasingly apparent.

# Section 4.2 Operations ("COO")

## Background

Immediately following Administration the priority was to stabilise the operations of LBIE. The existing operating and management model was preserved, subject to the supervision of the Administrators. This provided an immediate risk management infrastructure and enabled the Administrators to gain knowledge and to assert control over LBIE's activities.

As discussed in Section 4.1 the Operating Model was subject to review and during late 2008, a revised Operating Model was designed to meet the objectives of the Administration. The model was formally implemented in January 2009.

LBIE is overseen on a daily basis by the COOs, who are responsible for managing the operations of the organisation to effect the aims of the Administration. The COOs report directly to the Administrators.

At the time of the Administration LBIE occupied approximately 571,000 sq ft at 25 Bank Street, London, its European head office, with some 5,000 staff employed in its operations.

The IT architecture involved over 2,000 applications to support LBIE's global operations.

## Objectives

The objectives of the COO function are:

- Effect control across the organisation and prioritise activities against key objectives;

- Allocate resources across the organisation and manage headcount via selective recruitment;

- Manage Functions that support the Cross Functional Workstreams and Activities; and

- Monitor and manage costs.

## Progress to date

Identifying the key resource, applications and processes needed to support the Administration was the key objective prior to 2009, and has resulted in a consolidation of activities to London.

Approximately 360 LBIE employees have been retained, led by partners and staff from the Administrators' team. The revised team now occupies approximately 137,000sq. ft.

**Effecting control and prioritising work – implementing the Operating Model**

The LBIE Operating Model is focused on driving the Administration objectives to:

- Realise all assets;

- Mitigate and agree claims; and

- Manage and return Trust Property (as defined in Section 5.3).

The COOs ensure that the processes are stable but dynamic such that as workflow volumes shift between areas and that change can be implemented smoothly, with minimal disruption.

The COOs act as a key point of contact for the Administrators to ensure the interface between the Activities and Cross Functional Workstreams is effective. This includes prioritisation of tasks enabling the Activities to deliver on their agreed targets and that targets are appropriately managed at the Cross Functional Workstream level. They manage this through Cross Functional Workstream target setting and monitoring, directing Cross Functional Workstreams to priority activities and redistributing resource to meet priority needs.

In terms of prioritisation, on a quarterly basis each Activity and Cross Functional Workstream submits detailed objectives and tasks, which are reviewed by the COOs to agree priority activities. In addition, the objectives and associated tasks are mapped between Activity and Cross Functional Workstreams to enable capacity issues to be identified and addressed.

Key Performance Indicators have been defined and are monitored by the COOs to measure progress and identify where resource reallocations are needed.

**Allocating resources – creating the resource model**

The COOs are focused on maintaining a skilled, highly utilised and cost efficient team. They use a resource headcount model to formally manage identification of staffing requirements, resource allocation, prioritisation and conflict resolution. This model provides a systematic way to optimise staff utilisation and support the preparation of forecasts.

Resource reports are distributed weekly with budget versus actual assessments performed on a monthly basis.

## Key Processes

**Controlling Management Information ("MI"), managing costs and reporting**

MI is prepared regularly – the Activities report bi-weekly and the Cross Functional Workstreams and Functions report weekly. The MI is used to monitor progress, manage costs and as a basis for all reporting internally as well as externally. It is the primary measure against which the COOs manage the activities of

the Administration, hold Activity, Cross Functional Workstream and Functions leaders accountable and ensure the Activities, Cross Functional Workstreams and Functions are properly integrated.

### Transitional Service Arrangements ("TSA")

The global nature of the legacy Lehman Group and the centralised nature of transaction processing arrangements have resulted in LBIE losing access to key systems and data.  In effect, control of the data and systems sits outside the immediate control of LBIE.

Agreements have been implemented with other Lehman entities and third parties, on a bilateral basis to minimise the impact on the run off of the LBIE balance sheet.  In addition, LBIE and LBL are continuing to work with Lehman affiliates and their insolvency officeholders to provide support and assistance to them in gaining access to data and systems where this is not prejudicial to the interests of LBIE's creditors.

The COOs manage the coordination of such service provision and in particular manage the resourcing conflict which arises from these actions.

### Managing Functions

The COOs manage the corporate Functions which support the entire Operating Model. These include: Human Resources, Information Technology, Infrastructure & Property, Regulatory & Compliance and Tax. In this capacity the COOs ensure:

- The consistent provision of support to the Activities and Cross Functional Workstreams;

- The adequacy of the resource to ensure ongoing compliance with relevant regulations and laws;

- Accountability against team targets; and

- Existence of a stable and effective infrastructure (both physical infrastructure and IT).

### Capacity issues

The COOs also proactively identify potential operating issues around resources, technology and business continuity as well as react to specific issues. In these instances, they serve as a liaison managing through these issues with the Function providing the service, the Activity and Cross Functional Workstream leads and the Administrators.

### Issues and challenges

Given the complexity of the business of LBIE prior to Administration the nature of the activities undertaken by the Activities themselves are inherently complex. This requires appropriately skilled individuals to undertake such activities and the support from Cross Functional Workstreams and Functions is critical.

The inter-dependencies across each Activity, Cross Functional Workstream and Function are considerable. The appropriate prioritisation of Activities and the need for a dynamic process results in a highly complex matrix of tasks that need to be controlled.

# Section 5

# Activities

Lehman Brothers International (Europe) - In Administration

# Section 5.1 House Positions

## Introduction

The primary objective is the realisation of House positions (securities and open derivatives) for optimal value.

The activity of the House Positions team is divided across three streams: Securities, live OTC and exchange traded derivatives ("ETD"). The overall objective across these three streams has been to maximise the value to the creditors through an orderly resolution of open house positions.

We have made significant progress in meeting this objective, despite initially being constrained by frozen custody accounts, the need for extensive diligence to identify House Positions (as distinct from client positions) and the complexity of live derivative contracts. This progress has been achieved under very difficult market conditions. Key progress to date includes:

- $1.8bn realised from the sale of House cash securities (bonds and shares across 80 markets);

- $1.0bn realised from the negotiated novation or termination of various OTC contracts;

- $738m of excess collateral released to counterparties following the settlement of their outstanding obligations to LBIE; and

- Risk positions on derivative exchanges closed out enabling the return of $2.3bn of LBIE's cash and collateral.

## SECURITIES

### Objective

Our objective is to liquidate House securities positions in an expedient and orderly manner once the appropriate due diligence checks have been completed to ensure that Client Assets are not sold.

### Strategy

Our strategy is to limit the market risk remaining within LBIE while realising the best value for these assets in markets which continue to be challenging. High quality fixed income assets (primarily highly rated, short term, government debt) are being retained within LBIE's investment portfolio, pending realisation and distribution to the unsecured creditors in due course. Certain positions, typically structured fixed income securities may be held to maturity or until greater liquidity returns to the markets to optimise their realised value.

Once our diligence procedures are complete, a liquidation strategy is determined for material security holdings and execution initiated following a formal trade approval process.

## Progress to date

As at 14 March 2009, some $1.6bn has been realised from securities, being $593m from the sale of equities (788 trades over 311 positions) and the realisation or transfer to the Treasury portfolio of $1.2bn fixed income securities (101 positions).

The other key accomplishments to date include:

- Sustaining an ability to execute transactions in the markets by retaining a core front office team and implementing a support framework with a third party;

- Engaging third party brokers, securing terms for best execution;

- Establishing stand-alone global settlements capabilities that were lost on the insolvency of LBHI and on the Administration of LBIE;

- The sale of House positions requires the prior reconciliation of the asset ownership records by the in-house finance team, securing the release of assets from custodians and separating House from Client Assets. To enable the early realisation of assets we have implemented processes which should eliminate the risk of disposing of Client Assets; and

- As of 14 March 2009, we had liquidated 78% in value terms of those positions that have been confirmed as House positions. Certain positions lent to clients have been recalled and disposed of. We have prioritised higher value positions to reduce the market risk of the house book.

### Key processes

In conjunction with the Custodians Cross Functional Workstream (see Section 6.1), the majority of House positions in both open and closed LBIE custodians have been identified. Regular management information is prepared and presented to the COO, Administrators, the LBIE management team and the Creditors' Committee to enable close monitoring of the effectiveness of the activities. These reports detail progress across all activities, relating to the movement of House assets to our new global custodian, the status of the assets (House vs. Client) and the liquidation and settlement.

### Issues and challenges

To date, the main challenges have been:

- The majority of positions held by LBIE are illiquid – being in thinly traded securities. LBIE had an active financing business prior to Administration such that the majority of high value liquid securities were lent into the market for cash, thus residual positions are less liquid and more complex to realise;

- The Administrators place a high level of importance on the protection of Client Assets. We have therefore implemented a robust due diligence process to ensure that we only sell House positions. To complete these procedures we have had to implement a revised management infrastructure, including obtaining information from various custodians and affiliates which was not previously required. This has been time consuming but is now operating in a systematic and automated manner enabling us to segregate higher volumes of assets in a shorter timeframe; and

- Realising illiquid positions in the current, difficult market conditions. Working with the LBIE front office teams we continue to develop individual strategies to realise illiquid assets on a case-by-case basis. Given that the Administration is likely to continue for some time these illiquid positions will only be realised if a suitably acceptable bid is procured.

## LIVE OTC DERIVATIVE CONTRACTS

### Objective

To identify the live OTC derivative contracts with counterparties which are debtors to the estate and to negotiate the novation or termination of these derivatives.

### Strategy

Our strategy is to reduce the level of uncertainty for LBIE and the client over the value of these contracts and we have worked bilaterally with many counterparties to settle outstanding positions. This process involves undertaking multiple valuations of vanilla and structured derivatives and / or offering them into the market for novation.

A comprehensive valuation capability has been developed as part of this process and we are now leveraging this expertise into other areas of the estate, including supporting the activities of both the Counterparties team and the Trust Property team to value live and terminated derivatives.

### Progress to date

As at 15 September 2008, there were approximately 134,000 OTC derivative contracts between LBIE and its counterparties, of which approximately 1,100 were still live at 14 March 2009; the remainder having been terminated.

The key accomplishments across the OTC population include:

- Successful negotiation of a significant number of novations and terminations of live contracts. Our approach of expediently identifying, valuing and

building a proposition to take to counterparties has resulted in the recovery of over $1.0bn on live contracts to date;

- In a number of instances, these negotiations have resulted in the return of excess collateral held on behalf of LBIE by third parties. We estimate that collateral with a value of $738m has been released, allowing counterparties to use that collateral in their other dealings;

- Over 99% of the OTC derivative contracts have been terminated, allowing their valuation to be undertaken and a final position to be determined with the counterparty;

- The development of our own valuation capability or sourcing valuations from third parties to enable us to value all the live trades on a regular basis. To do this we have negotiated contracts with market data providers to provide the relevant valuation inputs;

- Retention of a core Lehman front office team to assist in the valuation process and to negotiate novations and terminations with counterparties. This was achieved despite the personnel concerned being highly marketable. The success to date is in no small part attributable to the effectiveness of that team; and

- Development and implementation of a software application to identify all existing derivatives, track live contracts, validate incoming valuations on terminated contracts and record progress of all negotiations at a counterparty level.

### Key processes

The key steps to the resolution of live OTC positions are:

- Valuation;

- Identification of counterparties that are net debtors;

- Strategy development and options analysis;

- Negotiation; and

- Legal documentation and settlement.

Live derivatives are valued on a regular basis and these valuations are combined with data on collateral and other positions held by or for LBIE to develop a comprehensive view of the overall financial position between LBIE and the counterparty. Using this information, activities are prioritised.

To date this approach has allowed us to either novate open positions to a replacement financial institution or to reach an agreed termination of the derivative contracts at an agreed termination value. These novations and terminations are documented and funds due to the estate are collected.

## Issues and challenges

The main challenges have been:

- A number of counterparties with live OTC contracts have to date refused to terminate those contracts and have indicated a lack of willingness to agree a close-out or novation of the contract. We will be pursuing all legal remedies available to LBIE against such counterparties;

- Many of the counterparties with whom there remain live contracts have multi-product, multi-Lehman entity relationships with other dependencies and complexities that need to be analysed and understood. Many clients have asserted set-off and we are evaluating the validity of these claims; and

- Determining the complete population of live contracts has been challenging as many counterparties have yet to submit valid termination notices or related valuations.

## EXCHANGE TRADED DERIVATIVES ("ETD")

Working with the Derivative Exchanges Cross Functional Workstream, the House Positions team has successfully closed out all risk positions on global exchanges resulting in the return of $2.3bn of bonds and cash posted as collateral.

Actions in this area are discussed in further detail at Section 6.5 - Derivative Exchanges.

# Section 5.2 Counterparties

## Background

The Counterparties team was formally established in January 2009, to reflect the optimal manner for dealing with the multiplicity of market counterparties. There are estimated to be up to 22,000 counterparties of which some 6,000 had live positions with LBIE at 15 September 2008.

The Counterparties team is structured into four sub-teams, each with distinct responsibilities for specific types of counterparty relationship:

- The "Street" team which manages dealings with Asset Managers, Custodians, Pension Funds, Corporates, Banks and other Non-Banking Financial Institutions;

- The "Intercompany" team which deals with LBIE relationships with many other Lehman Group entities;

- The "Prime Brokerage" team which deals with LBIE Prime Services counterparties who are debtors to the LBIE estate. Prime Brokerage clients who are creditors to the estate are handled by the Trust Property team (as detailed at Section 5.3); and

- The "Agency" team which handles LBIE's multiple roles in various structures and loan facilities arranged by LBIE and other Lehman entities.

Prior to the formalisation of these teams there was no equivalent of the Street team.

Equivalent relationships were managed across the global Lehman organisation or along global product lines by the Equities and Fixed Income business lines.

## Objectives

The Counterparties team's purpose is to manage counterparty relationships in such a way as to provide the greatest opportunity to maximise returns to creditors in the most cost effective timescale. The Activity's key objectives to fulfil this purpose are outlined below. The common objectives of the teams are to:

- Maximise realisations from counterparty receivables; and

- Validate counterparty creditor claims.

## Summary progress to date

Considerable progress has been achieved to date in reaching agreed settlements with counterparties but we note that given the number and complexity of counterparty relationships, the most complex relationships and claims may take some time to conclude.

Key progress to date includes:

- Establishing a comprehensive team to systematically settle positions with market counterparties;

- $1.3bn realised from settling outstanding positions with Street counterparties (including the $1.0bn recovered from OTC derivatives referred to in Section 5.1);

- Filed claims totalling $65.0bn (gross) with 11 Lehman entities. Established an effective dialogue with many insolvency office holders of affiliates;

- Re-established credit risk management systems to monitor credit risk with Street and PB debtors and taken recovery proceedings against a number of clients in breach of terms / limits. Developed an effective interface with the Trust Property process;

- Integrated the Lehman / Administrators' staff in a single team, using the global network of PwC to be represented in all material territories; and

- Implemented a systematic approach for dealing with the multiple agency arrangements to which LBIE was a party.

The remainder of this section summarises the progress made by each of the four teams.

## STREET

### Overview

Dealings with all types of counterparties with all types of relationships were conducted under the original Lehman structure immediately post-Administration. These discussions were typically conducted with those counterparties with single product relationships with LBIE and hence were conducted primarily by the legacy Equities and Fixed Income teams. A dedicated Street team was formed in January 2009. This has provided central coordination for dealings with these parties – a fundamental shift in the manner in which the legacy Lehman business operated.

The Street team's counterparty base comprises approximately 3,500 counterparties. Of this number, up to c.2,000 may have a Trust Asset relationship with LBIE and a further 1,500 have a Financing (i.e. stock loan / borrow / repo / reverse repo) relationship. The management of these Trust and Financing client relationships is being conducted in conjunction with those two respective teams.

In terms of value, per the Company's records, as at 15 September 2008, the total net value to the estate of the Street relationships includes some $8.8bn of in-the-money derivatives and $8.5bn of in the money financing positions.

## Progress to date

Since the formation of the Street team, the primary focus has been on ensuring the organisation is engaging with and settling as many counterparties with net receivables balances to LBIE as possible, regardless of whether the counterparty has a multiple or single product relationship.

This approach has been productive to date generating material asset realisations. At 14 March 2009, cumulative cash collections from the team amounted to $1.3bn.

In addition to the amounts collected, a further $3.5bn is subject to active and ongoing negotiations with c.200 counterparties.

The balance of the counterparties we have yet to have an active negotiation with regarding settlement (c.1,400 counterparties). These counterparties have either not provided valuation statements or have provided valuation statements which require further clarification.

Over 500 counterparties have been contacted to request valuation statements and a further 400 counterparties have been contacted requesting further and better information on statements provided.

## Key processes

To address the challenges faced to date whilst enabling us to meet our key objectives and maintain momentum, the team has adopted a range of strategies.

- The initial focus has been on engaging with those counterparties which the Company's records indicate owe sums to LBIE as of the 15 September 2008; and

- Given the high volume of counterparties, we have sought to stratify and engage with counterparties based on agreed criteria. Clearly these processes are sensitive and are not disclosed in this report.

## Issues and challenges

The challenges facing the Street team in meeting their objectives are numerous and significant. They include:

- Complexity of counterparty balances: Multi-product, multi-fund and multi entity relationships;

- Nature of the counterparty's relationships with LBIE and the Lehman Group, including:

  – Multiple agreements;

  – Complex cross entity netting arrangements and cross default provisions;

  – Uncertainties as to the treatment of a counterparty as agent vs. principal; and

  – Diversity of the underlying derivative contracts.

- Sheer volume of counterparties;

- Valuation challenges;

- Timely availability of information and variable quality of information, especially valuation statements;

- Credit risk; and

- Legal interpretation and consequential litigation risk.

## Major residual challenges

Over the coming weeks and months, there are three key challenges which the Street team are addressing:

- Generating a significant increase in the volume and quality of valuation statements from terminated agreements with counterparties;

- Reviewing the assertions from counterparties claiming cross master or cross entity netting; and

- Timely valuation of a high volume of exotic trade and product trades.

The systematic approach to managing dealings with counterparties should deliver material ongoing recoveries to the estate. Clearly the effectiveness of this team is dependent upon information provided by Street and we will continue to request counterparties provide such information.

# INTERCOMPANY

## Overview

The global nature of the Lehman business with highly integrated, trading and non-trading relationships across the group led to a complex series of intercompany positions being outstanding at the date of Administration. There are over 300 debtor and creditor balances between LBIE and its affiliates representing $10.5bn of receivables and $11.0bn of payables as at 15 September 2008.

In addition, there are very substantial Trust Property claims against other Lehman Group companies, which we are actively pursuing on behalf of LBIE and its clients. Other Lehman Group companies have similar claims against LBIE on behalf of themselves and their clients (See Section 5.3).

## Progress to date

The primary focus at the outset of the Administration was to ensure that LBIE's interests were preserved with other group companies – in particular meeting the early claims filing bar dates, with Lehman Brothers Japan ("LBJ") and LBI. These were filed by their due dates.

The Intercompany team has continued to make significant progress, including:

- Total claims amounting to $65bn (gross) have been filed against 11 group companies and all bar dates have been met. Claims against other group companies continue to be prepared for submission;

- A working protocol has been established with LBI regarding the process for agreeing the Security Investors Protection Corporation ("SIPC") claim (Trust Property claim);

- Local individuals have been appointed in key locations - Japan, Hong Kong, Australia and Korea to represent LBIE's interests in these countries;

- Active dialogue is ongoing with the office holders in Europe, including Switzerland, France, Holland, Luxembourg, Germany and Italy;

- A formal basis of funding the costs associated with a number of affiliates has been established;

- Negotiations have commenced with material Lehman Group companies regarding their role in the Client Asset Scheme of Arrangement (see Section 5.3.1); and

- A secure central repository has been established for storing supporting documentation and evidence for claims.

## Key processes

Significant progress has been made as a result of the intercompany team adopting the following approach:

- A dedicated team is preparing evidence for all intercompany claims;

- A central team is interacting with all relevant overseas insolvency practitioners and office-holders to progress claims, post filing;

- The organisation is being leveraged to assist in the trading elements of the intercompany validation and claims filing;

- Two specialist teams are focusing on non-trading and exceptional items, supported by an experienced advisory group; and

- Documentation has been standardised.

## Issues and challenges

The intercompany relationships are complex, and subject to a multiplicity of legal agreements. They deal with many differing types of activities including financing, swaps, common cash and securities accounts, staff and cost recharges etc. Accordingly, the challenges inherent in filing claims across the world for such are many and include:

- A significant volume of securities and non-securities trading transactions;

- Intercompany positions remain subject to market risk where agreements are still live;

- Uncertainties over asset ownership with affiliates and the risk that these entities seek to assert trust claims; and

- Uncertainty over the precise scope and impact of various intercompany guarantees and assignment agreements, and local set-off rules.

Work is ongoing with Linklaters and our other advisors to address these issues.

# PRIME BROKERAGE ("PB")

## Overview

The primary focus of the PB team is to manage credit risk with debtor PB clients to maximise the realisation of assets for the estate.

## Progress to date

The key achievements of the PB team are:

- Identification of the debtor population and prioritising engagement;

- Implementation of credit risk management disciplines and the active pursuit of accounts at risk;

- Identification and implementation of a robust reconciliation and valuation process; and

- Initiating a programme to fully understand the range of issues associated with rapidly settling a high quantity of two types of counterparty relationship.

## Key processes

The rate of progress has been high as a result of the PB team implementing the following key processes:

- Prioritising engagement based on a range of criteria including: value of receivable, credit worthiness, existing relationships, complexity and termination status relating to all agreements held;

- Leveraging existing processes across the organisation to provide all necessary information to enable robust reconciliation and valuation; and

- Monitoring PB counterparties where credit risk may exist.

## Issues and challenges

The key challenges facing the PB team and the approach adopted to overcome these challenges are set out below:

- Right of set-off- due to the vast range of the legal agreements and underlying products for each PB Debtor relationship, complexity is high. Assessing counterparty's right of set-off across the range of agreements remains a particular challenge with detailed bespoke legal analysis required for each client relationship. A process has been devised to manage this effectively and enable scalability;

- Terminating live PB agreements - many PB agreements remain live extending the time required to reach settlement and recover cash. A series of actions are being implemented which should markedly increase the number of masters terminated;

- Principal vs Agency - many of the PB counterparties entered into Prime related transactions with LBIE via an Agent. As such, agreements in place were held between the Agent and LBIE and not with the underlying funds. Accordingly, the Administration faces challenges in this area; and

- Reliance on administrations in New York and Asia- certain positions are held and controlled within the US and Asia depot structure and are therefore outside the control of LBIE. To date, the relevant data and information required to reconcile this trade population at a counterparty level remains outstanding. Negotiations for data access are ongoing.

# AGENCY TEAM

## Introduction

Prior to the Administration LBIE had been appointed in various agency roles in the vast majority of structured transactions and deals that it had arranged. LBIE performed a number of different roles under these contractual agency agreements, both with external counterparties and other Lehman Group entities. These agency roles include:

- Security agent;

- Facility agent;

- Calculation agent; and

- Balancing agent.

Continuing to perform the role as an agent under these agreements would require a significant diversion of the Administration's resources and would also result in the LBIE estate being exposed to unacceptable performance and litigation risk.

It has been assessed that the other parties involved in the deals where LBIE was the calculation or balancing agents (over 500 structures identified to date), can replace LBIE, without the process requiring any action from LBIE. However, upon request, we have confirmed LBIE's willingness to formally resign from these agency roles, subject to certain conditions.

The principal area of concern arises where LBIE is appointed to the role of security agent where, LBIE continues to hold the rights to pledges of security granted by the borrower, on trust for the lenders and other secured creditors. Managing obligations on these roles is both time consuming and potentially risky.

The level of fees LBIE was entitled to for fulfilling these roles was deminimus and does not cover the costs of discharging the roles.

## Objectives

The key objectives for the Agency Team in the run-off phase are to:

- Establish and communicate a practical policy that enables LBIE to resign from the security agent roles, whilst managing risk and the costs to the Administration;

- Work with the counterparties involved to identify the structures where LBIE was the security agent and agree a prioritisation for resignation; and

- Resign as security agent in a systematic and controlled manner.

## Progress to date

The accomplishments to date include:

- A formal policy addressing all of the agency roles (including security agent) has been developed and implemented;

- A set of procedures and principles for the resignation of LBIE as a security agent (including a cost contribution policy) has been formulated and communicated to counterparties on request;

- Full pro-forma legal documentation has been drafted with input from the major counterparties to streamline the resignation process going forward;

- To date we have resigned from five agency roles and have commenced the process for a further seventeen security agent roles;

- Formal contact with significant counterparties has been held to initiate the identification of the remaining population of agency roles and to prioritise resignations; and

- Responses to counterparties via the Query Management System ("QMS") have been provided on LBIE's position with regards to the different agency roles.

## Issues and challenges

It has been estimated that LBIE was a security agent in over 100 structures which involves a large number of individual pledges over different types of securities including real estate (for example in one particular structure, there are some 5,200 individual real estate properties in eleven different legal jurisdictions, where LBIE holds the pledges of security).

LBIE continues to receive a large volume of requests from various parties involved in these structures who are unable to progress a wide range of basic actions such as: refinancing, making repayments, restructuring the vehicles or selling/leasing secured properties, without the involvement of the security agent.

It has also been assessed that there is a risk of liability (which would rank unsecured) that could arise for the LBIE estate, if LBIE fails to perform its role as security agent or is in error in its performance of that role (e.g. for loss to the lender for non performance or erroneous performance).

## Ongoing actions

We have agreed that LBIE should cease to perform the role of security agent (due to the inherent risk and the significant resources required) and that it should facilitate its resignation and the transfer of the pledges to the new incoming agents.

The resignation process includes the borrower making a cost contribution to compensate the LBIE estate for the redirection of resources and to cover the legal and administration costs incurred in the resignation process. To date borrowers have been willing to make these payments to ease the manner in which their positions are addressed.

Due to the number and complexity of the agency roles, a separate Agency team has been established to ensure the appropriate priority and resources are applied to the resignation process.

## Summary

The resignation process has been formalised and we are working with a large number of counterparties and legal counsel to deal with the many outstanding agency relationships.

# Section 5.3 Trust Property

## Objectives

From the commencement of the Administration there has been very considerable focus on the return of property to which third parties may assert a trust claim. This includes securities in the Company's possession at 15 September 2008, ("Client Assets"), and cash balances managed by LBIE pursuant to the UK Financial Services Authority's Client Money Rules at 15 September 2008, ("Client Money"), – (jointly referred to as "Trust Property").

The Administrators recognise the market issues being faced by Trust Property claimants and are treating the identification and return of Trust Property as an urgent matter. It is a complex and highly technical area.

A large team (comprising in excess of 100 staff of the Administrators, Linklaters and LBIE as well as numerous staff from Nomura) are deployed specifically to deal with the return of Trust Property.

The Activity's key overarching objectives are:

- Identification, protection and return of Client Assets;

- Verification that House assets for disposal are not Client Assets;

- Pooling and return of pre-Administration Client Money; and

- Management and ultimate resolution of post-Administration cash receipts.

## Progress to date

The Trust Property team has a number of key achievements to date, specifically:

- Defined a clear process for the return of assets under a risk mitigating indemnity framework;

- Returned c.$11.5bn out of the estimated $26.1bn Client Assets;

- Implemented a process to reconcile the Client Asset claims (over 1,100 such claims received to date) against records and return unencumbered assets that are not subject to legal or reconciling complexities;

- Submitted claims against LBI, LBJ, Lehman Brothers Bankhaus AG ("Bankhaus") and others for the return of Trust Property to LBIE;

- Automated and streamlined a process for review and approval for the disposal of LBIE's House assets in order to diminish the risk of potentially disposing of co-mingled Client Assets;

- Recovered $0.9bn of the pre-Administration Client Money held in agent banks constituting the pre-Administration Client Money Pool ("the Pool"), and

substantially established the client entitlement to the Pool (subject to pending legal issues); and

- Gained control of approximately $2.1bn of money received post-Administration that is potentially Client Money and commenced a process to allocate these post-Administration receipts to assets and eventually clients.

The Trust Property Activity has met the objectives established in Phases I and II and commenced those in Phase III, specifically:

### Phase I – Control and Assimilation

In Phase I:

- Various reviews were completed of the business lines and products, the IT systems, processes and agreements involved around the creation and management of Trust Property that had existed in LBIE prior to Administration;

- An estimated $26.1bn of Client Assets and $2.1bn of Client Money was identified to be segregated as control over these assets was asserted from various custodians, affiliates, and agent banks in over 80 markets;

- New policies and arrangements for the safeguarding of Client Money and Client Assets were defined and implemented;

- The population of pre-Administration Client Money claimants, and the counterparties that purport to have claims, rights or other interests in Client Assets were circulated. In excess of 1,700 notification letters being sent and followed up on. To date, in excess of 1,100 Trust Property claims have been received, which are in the process of being reconciled to underlying records;

- A bespoke reconciliation system was built allowing the automated reconciliation between client claims, LBIE records and custodian records for Client Assets;

- A dedicated Client Money reconciliations team was formed; and

- A bespoke IT system was built to determine entitlement to Client Money.

### Phase II – Systemisation

In Phase II:

- Procedures to reconcile all data and information were embedded; specifically a process was implemented to undertake three-way reconciliation exercises between counterparty claims, LBIE records and custodian records;

- A process for the allocation of post -Administration receipts to specific asset holdings was launched;

- A process was established for the legal review of agreements to establish counterparty entitlements to Trust Property. To date this review has completed on c.2,100 legal agreements relating to in excess of 1,000 LBIE counterparties;

- A significant number of legal issues that impact upon the validity of the Trust Property claims are being raised with counsel, which may be resolved via the directions of the High Court;

- The Administrators have notified affected clients and the High Court of the intention to explore the feasibility of a Scheme of Arrangement for dealing with Client Assets claims (see below);

- A dedicated client relationship team was formed to interact with counterparties regarding Trust Property. In excess of 3,000 individual queries have been responded to, to date;

- Regular updates and answers to 'Frequently Asked Questions' continue to be provided on-line to inform the market of the issues and progress made; and

- Stakeholders such as regulators and industry bodies (including the Financial Services Authority, Alternative Investment Management Association, and Managed Fund Association) have been presented to and their queries addressed. Wherever possible, the support of stakeholders has been sought to assist in achieving the workstream objectives.

**Phase III – Run-off**

Phase III is currently underway, with the objective of agreeing and implementing a procedure for making distributions of Trust Property to counterparties with valid trust claims.

- A working committee was established in January 2009, to explore a mechanism for the return of assets to Client Assets claimants. A Scheme of Arrangement is currently being assessed;

- The interim processes for the return of unencumbered Client Assets that meet certain conditions has progressed and some 260 account claims received are within the final stages of this process;

- Work has commenced on establishing systems and controls to make an interim distribution of the pre-Administration Client Money Pool, pending the resolution of two material issues which could impact the distribution (see below); and

- An automated process has been developed to review and approve the disposal of LBIE's House assets

in order to diminish the risk of potentially disposing of co-mingled Client Assets. Approximately 40% of equity stock lines and 30% of fixed income have been reviewed, leading to approximately 500 security lines available for House disposal.

## Hardship and Priority process

The Hardship and Priority process is chaired by one of the Administrators and coordinated by a dedicated committee, which was established in accordance with the Court directions application of 7 October 2008, to address special claims that meet specific criteria allowing accelerated return while ensuring that the overriding objective of treating all counterparties fairly is not prejudicial to the interests of a minority.

The Committee periodically meets to review special claims, and makes recommendations to the Administrators who then decide the terms on which resolutions will be reached with individual counterparties or classes of counterparties. Approximately 120 such claims have been received to date.

## Issues and challenges

The identification, securing, reconciliation and return of Trust Property are complex and highly technical areas. The Trust Property Activity has required the support of many of the other Activities and Cross Functional Workstreams within the Administration, which have their own challenges and dependencies (as described in other parts of this report). Set out below are some of the key challenges that the Trust Property Activity is directly overseeing.

# CLIENT MONEY

## Bankhaus

Prior to Administration, $1.0bn of Client Money was deposited for LBIE with Bankhaus a member of the Lehman Brothers Group and a licensed bank, registered in Germany. This deposit represents approximately 50% of the total Pre-Administration Client Money held by LBIE.

Client Monies had been invested with Bankhaus over the preceding year. On 12 November 2008, the German regulator, BaFIN, announced that insolvency proceedings had been commenced in relation to Bankhaus.

A claim on behalf of LBIE clients was filed with the Bankhaus administrators on 3 February 2009, to recover the $1.0bn of Client Money deposited. The initial Bankhaus creditors' meeting was held under German insolvency proceedings on 17 March 2009. There continues to be considerable uncertainty surrounding the treatment of the Client Monies claim and to date the German administrator has been unwilling to confirm

his interpretation of the basis of LBIE's dealings with Bankhaus and hence the status of these monies. The timing and extent of the recovery of the deposit of Client Money with Bankhaus is fundamentally uncertain at this juncture.

## Pre-Administration Client Money Pool Legal Boundary Issues

The precise application of the FSA rules to the circumstances of the LBIE Administration is complex. Investigations are ongoing to confirm total claims to the Pool and whether there may be further competing claims. Details of these issues are not set out in this report to minimise the risk of prejudicing LBIE's client's recoveries from the Pool, but include:

- Futures margins;

- Affiliates entitlements; and

- Impact of depot breaks.

We are in ongoing dialogue with the FSA and intend seeking directions from the High Court in certain areas.

For these reasons it is unlikely that any form of Client Money distribution will be made within the next few months. The aim is to resolve these matters as quickly as possible, ensuring that any distribution of monies is in accordance with the FSA Client Money Rules and applicable legal rulings. In order to facilitate this, the Administrators will ask clients to agree their Client Money position and obtain other administrative information prior to any distribution.

## Assets held by Lehman Brothers affiliates

Prior to Administration, different entities within the Lehman Group routinely acted as depositories or sub-custodians for one another, where commercially convenient. At 15 September 2008, LBIE's House and Client securities were held by a number of affiliates, including LBI, LBJ and Lehman Brothers entities in Hong Kong ("LBHK"). In total over $7.6bn of securities were controlled by these three parties.

LBIE has submitted claims in each of these affiliate estates for the return of Client Assets. The most material claim is against LBI, and this claim was filed on behalf of LBIE itself and its clients by the LBI deadline of 30 January 2009.

LBI is in a US bankruptcy process, under the supervision of a trustee appointed by the US District Court for the Southern District of New York granting the application of the SIPC. The trustee, Mr James Giddens of US law firm Hughes Hubbard & Reed LLP, was appointed on 19 September 2008.

LBJ is subject to a liquidation proceeding in Japan.

Japanese law firm Oh-Ebashi has been appointed to deal with its affairs.

The LBHK entities are in provisional liquidation in Hong Kong. KPMG LLP is dealing with the liquidation, which is subject to the supervision of the Hong Kong authorities.

**LBI**

In the case of US securities the majority of securities traded, received or held by LBIE for its clients and for its own account in the Depository Trust Company ("DTC") were held in a DTC account managed by LBI. According to LBIE's records some $6.6bn of House and Client securities were held by LBI at 15 September 2008.

The Administrators have made progress in their dealings with the LBI Trustee and have obtained access to certain information from LBI's books and records concerning the securities held in the LBI DTC account. In addition, agreement has been reached between the LBI Trustee, SIPC and LBIE (the "Claims Agreement") regarding the filing of such claims and their reconciliation.

The Administrators and the LBI Trustee are now actively working to reconcile clients' holdings subject to the control of the LBI Trustee. This process involves reconciling the securities held by over 1,000 LBIE clients via LBI and access to these securities will be restricted until the LBI Trustee is satisfied with the claims of LBIE and its clients.

A material barrier to obtaining information about LBIE Client Assets in the US resulted from the transfer of LBI's IT systems and databases to BarCap following the sale of certain assets belonging to LBHI and LBI to BarCap. We understand that the LBI Trustee is continuing negotiations to reach a general agreement with BarCap in relation to IT access. In addition, the Administrators are negotiating directly with BarCap, with a view to entering into a TSA on behalf of LBIE, pursuant to which LBIE will secure access to those software systems which it used prior to entering into Administration and which are now under the control of BarCap.

Whilst obtaining information from LBI has been particularly complex, through the Clients Agreement, we have established a protocol for progressing the task.

**Other affiliates**

Negotiations are also ongoing with LBJ and LBHK, which together hold some $1.1bn of House and Client Assets.

The Administrators are in the process of submitting claims to LBHK and have a regular dialogue with the liquidator regarding the mutual return of assets.

Recent meetings with Oh-Ebashi representatives have resulted in obtaining their confirmation that some $1.0bn of LBIE securities are held by LBJ.

Discussions with affiliate company office holders have
extended to the subject of those companies' potential
claims to securities held by LBIE on their (or their clients')
behalf. LBIE, will manage these claims in a similar
manner to claims from third parties.

# Section 5.3.1 Proposed Client Asset Scheme of Arrangement

## Background

The return of Trust Property is a core objective of priority to the Administration and we are anxious to return Trust Property to clients as expeditiously as possible.

The mechanism in place for the return of Client Assets by individual bilateral negotiation is sub-optimal as it a lengthy process and onerous on clients, failing to bring finality to dealings between them and LBIE.

## Key Issues

Before a systematic distribution of Client Assets can be implemented it is necessary to identify and determine the pool of claimants. This objective has been hampered by the following issues:

- We presently face uncertainty over whether the assets we are currently holding may be the subject of competing claims;

- We are aware that the significant number of fails has resulted in shortfalls of certain assets which should have been held for return to clients. In some instances these were accounted for by additional segregation of Client Monies, but in some circumstances this is not the case (some 400 securities);

- The reconciliation exercise currently underway involves all clients providing adequate information and documentation to substantiate their claim – to date less than 60% of client account holders have provided sufficient data to meet our requests;

- There is uncertainty as to whether particular holdings of Client Assets are subject to set-off rights in respect to liabilities of clients to LBIE and / or any of its affiliates (over which we have no control);

- Valuing Client Assets is a complex task, both operationally and legally. There is significant variation in valuation dates which affect clients' rights to Client Assets;

- A significant number of clients have not terminated their agreements. As such the value of their open positions with LBIE fluctuates daily. The aggregate client entitlement to Client Assets varies daily, which in turn impacts the possible shortfall on certain stock lines; and

- The effects of termination are not legally clear in all cases. Again, this issue is likely to impact whether there are stock shortfalls for clients.

The current bilateral approach to distributing Client Assets will take some years. We have identified that the return of Client Assets to clients would be best facilitated

through a Scheme of Arrangement ("Scheme") pursuant to section 895 of the Companies Act 2006.

## Proposed Scheme of Arrangement

Broadly speaking a Scheme is a contractual compromise between LBIE and its affected creditors. The objective of the Scheme is to materially speed up the return of Client Assets to clients through, *inter alia*, the imposition of a bar date for submitting final claims.

A Scheme should be capable of providing the following benefits:

- Achieves finality of the population of Client Assets claims allowing Client Assets to be distributed without the need for indemnity;

- Ensures no future claims arise against LBIE for assets distributed under the Scheme;

- Addresses the issue of any competing claims to stock lines. Defines rules for dealing with asset shortfalls;

- Provides finality of dealings with Client Assets claimants – defines the trust and unsecured claim;

- Allows the controlled termination of open positions; and

- Applies a consistent set of rules for a number of issues, including valuation methodology, allocation of costs and dispute resolution.

If the Scheme is approved by the pre-requisite majorities (see below) all affected creditors will become bound by the terms of the Scheme whether they vote or not.

## Development process

The feasibility and parameters of the proposed Scheme are currently being explored and developed with the assistance of a representative group of clients, a formal working group consisting of members of the Creditors' Committee who are assisting with exploring the elements of the scheme and their application.

We have published information on the website and held open meetings with industry bodies in both the US and UK in early March 2009, to solicit the views of the affected funds industry.

We are taking the views of the working group and industry bodies into consideration and are actively working with our legal advisers to define a feasible Scheme.

The nature and scope of the Scheme being explored is both novel and ambitious. It will likely require compromise by clients and LBIE if it is to be effective. We will continue to take counsel on the various issues from affected clients.

## Timescale

If we and the working group conclude that a well formulated Scheme can be promoted, then we shall revert to the Court in due course to seek sanction to convene the appropriate scheme meeting(s) for all affected creditors.

We hope to hold the Scheme creditors' meeting(s) by the end of September 2009. Prior to any meeting being held, we will provide full disclosure of the proposed terms of the Scheme to all affected creditors.

If this timescale is met, we aim to set a bar date during 2009, with a view to commencing asset distributions in 2010. The High Court, our counsel and external observers have commented that this timescale is ambitious, given the complexity of the issues to be addressed in the Scheme. We will revert to affected creditors with a more specific timeline once the substantive issues in the Scheme are advanced.

## Pre-requisite majorities

All affected creditors with Trust claims against segregated Client Assets will be able to vote and the Scheme will need to be approved by 75% of the value and 50% by number of each class of creditors voting at the meeting. It is presently uncertain as to the number of classes in the Scheme.

Further information on the current status of the Scheme proposal can be found at www.pwc.co.uk.

## Section 5.4 Treasury

### Objectives

The Treasury Activity is responsible for the recovery and management of LBIE's cash, as such the core objectives are:

- The identification and repatriation of cash within the pre-Administration network, followed by the reconciliation and closure of pre-Administration accounts;

- The implementation of efficient processes for the collection, reconciliation and management of post-Administration receipts; and

- The investment of the estate's cash and assets in order to realise greatest return while safeguarding capital.

### Progress

**Cash Operations - structure and efficiency**

Treasury has implemented a full set of operational processes and controls to support the function. This includes cross-activity processes for:

- The management and forecasting of receipts;

- The identification, follow-up and collection of anticipated non-receipts; and

- Account reconciliation and closure.

Key achievements include:

- $7.4bn (net) cash now under the Administrators' control;

- The outstanding cash in the agent network has been classified and projects established to actively pursue recovery in a number of territories;

- Of the 1,517 pre-Administration accounts, 31 have been closed and a further 173 have been instructed for closure;

- Following Administration, the global treasury management systems ceased and reconciliations failed. A project was initiated to address this extensive task and material progress has been made;

- Detailed management information for both external and internal accounts has been established and production is automated; and

- Under the requirements of Administrations, all receipts and payments need to be captured on a gross basis. Since 15 September 2008, over 60,000 cash movements have occurred on the pre-Administration accounts, these movements are in the process of being reconciled and captured within the Administration receipts and payments system; and

- An investment strategy and policy framework was required to support the investment of estate cash. The policy has been implemented and our 'Investment policy' detailed below.

A summary of the cash position of the estate is provided in Section 9.

### Investment policy

At 14 March 2009, LBIE held $7.4bn of cash and investments in accounts under our control, comprising $2.2bn of Client Monies and $5.2bn (cash $4.5bn, bonds $0.7bn) of House funds.

An investment policy for the management and investment of these funds has been established.

The primary objectives of this policy are:

- Meet legal requirements and comply with FSA regulations including suitable Client Money segregation and no set-off arrangements between pre and post-Administration liabilities and between post-Administration liabilities of the various Lehman entities in insolvency proceedings;

- Security of funds and protection of principal. To meet this objective a comprehensive investment risk policy has been established with clear limits on counterparties, instruments, amounts and duration with associated monitoring and management;

- Ensure sufficient liquidity to meet the day-to-day working capital requirements of the Administration and the requirements to meet payments to creditors. The duration of cash assets will be chosen to match the expected duration of liabilities wherever this is possible; and

- To achieve an appropriate yield on surplus cash in line with the investment risk policy, operational constraints, FSA regulations and legal requirements. The yield is benchmarked against relevant indices dependent upon the type of instrument used.

Positions are monitored and managed on a real time basis by the team and reports are provided weekly basis as part of the treasury MI.

Current market conditions are resulting in frequent intra-day balancing of the portfolio within the investment policy. The primary aspects of the Investment policy are:

**Short term investment policy (cash at bank plus money market deposits):**

- Long term credit rating – minimum rating AA- (if on negative watch, the effective rating is reduced one notch to give an effective credit rating);

- 5 year Credit Default Swap ("CDS") spreads must be below defined level;

- An absolute limit on funds that can be placed with any one institution is derived by assigning a maximum proportion of market capitalisation and credit rating;

- Tier 1 capital and P/E ratio for banks are also monitored; and

- A short maximum duration for money market deposits is currently set to allow maximum response to a change in limit.

Medium term investment policy (bonds):

- AAA-stable rated sovereign backed issuances with CDS within acceptable limits and where the markets are sufficiently large and liquid to allow for easy purchase and sale at large volume;

- Currency - USD, GBP and EUR in line with determination of the Committee;

- Duration – investment periods which mean bonds will be held to maturity. In cases where bonds are already held within the Lehman estate they may be transferred to the investment policy with longer maturity dates; and

- Maximum holding limits in any one issue to ensure diversification.

## Issues and challenges

- Negotiation and return of cash assets – a number of cash assets identified within the Statement of Affairs will require extensive negotiation and in some cases are progressing through in difficult jurisdictions. Teams are mobilised and actively pursuing these claims;

- Systems access – the formation of new operational teams with dependencies on applications not under direct control of the Administration has resulted in a back log of systems access and permissions. This has been progressed with the wider IT systems issues; and

- Reconciliation of pre-Administration accounts – around 30% of the pre-Administration LBIE accounts were operationally managed in non-LBIE entities. New service agreements or teams are being established to resolve these issues.

# Section 5.5 Reporting

## Objectives

The Reporting Activity is responsible for the provision of regular internal management information to the Administrators and the management team in the production of information for external use, including reporting to the Committee and creditors in general.

The Reporting Activity also ensure compliance with the Administrators' statutory reporting obligations set out in the Insolvency Act 1986.

In summary, the Reporting Activity aims to:

- Provide the Administrators with information necessary to monitor progress against the defined strategy and to support the management team in leading and controlling the process of the Administration;

- Coordinate the production of MI to support and assist the Activities;

- Assimilate information, prepare published statutory reports and presentations and to convene and conduct periodic meetings with creditors and the Committee;

- Construct and maintain a database for the recording of creditors' claims and for the publication of confidential materials to LBIE creditors;

- Reconcile and track post-Administration activity against LBIE's balance sheet and books and records; and

- Control the updating and maintenance of all LBIE financial books and records to the date of the Administration and thereafter.

## Progress to date

Given the size and complexity of the Administration, a specific Reporting Activity was established to assist the Administrators to monitor and report progress and to aid decision making. This team:

- Designed and implemented an efficient and streamlined MI framework which is aligned to the LBIE Operating Model. This reports on Activity, Cross Functional Workstream and Function performance against measurable objectives and forecasts;

- Established cost management procedures to monitor and report to the LBIE management team and the Administrators a rolling three month budget and workplan for each Activity, Cross Functional Workstream and Function;

- Monitor costs fortnightly; and

- Ensure that the Administrators' statutory reporting

obligations set out in the Insolvency Act 1986 have been met including:

- Convening the creditors' meeting held on 14 November 2008, to consider the Administrators' proposals, which was attended by approximately 700 creditors;

- Established and monitored the LBIE Client Information and Claims website: (https://dm.pwc.com/LBIEClient) to capture unsecured claims, to ensure equitable voting rights for the creditors' meeting. This website, which is accessible only by a unique user ID and password, has subsequently been utilised to post confidential information being made available only to LBIE creditors (see Appendix 2). All creditors and counterparties were provided with access details to the website in the letter accompanying the Administrators' Proposals for Achieving the Purpose of Administration dated 28 October 2008;

- Preparing this report and the related receipts and payments accounts in the prescribed form for filing with Companies House; and

- Providing extensive reports and presentations for the meetings and conference calls with the Committee which detail and discuss progress of the Administration.

## Management of LBIE financial records

**Global close**

As a consequence of the insolvency of LBIE, it was necessary for the accounting systems to be updated and reconciled at a date other than the normal period end. Any close of the accounting records needed to be coordinated globally to ensure a degree of consistency between Lehman Group entities in establishing intercompany positions.

In the days immediately following our appointment as Administrators of LBIE, we initiated discussions with Lehman accounting staff in New York and elsewhere in the world with a view to arranging a global close for the nominal ledgers of the principal operating companies in the Lehman Group, at the mid month point. Such a close was dependent upon access to, and processing by, systems outside the control of the Administrators. LBIE worked closely with those responsible for the other principal group entities in various jurisdictions to agree a cut-off date and define processes to be adopted.

To illustrate the scale of this exercise, LBIE had to process over 200,000 manual journal line ledger transactions, relating to over 1 million underlying trades in order to reflect unposted / unprocessed transactions.

The accounting for a large number of LBIE positions was controlled outside London and the support of and collaboration with those managing the affairs of the other affiliates was essential to update the records. These records now provide the basis for discussion with affiliates, where we are seeking to reconcile balances between LBIE and each affiliate including accounting for post global close revisions and agreement of the relevant claims proving date(s), valuation mechanisms, proprietary interests and set off.

## Reconciliation

A team within the Reporting Activity has undertaken the process of reconciling transactions, balances, stock lines and bank accounts within LBIE's books of account on Lehman systems as at 15 September 2008. The reconciliation exercise is now largely complete, with reconciled data having been made available to all Activities and Cross Functional Workstreams to assist them in carrying out their day-to-day processes.

The updated LBIE records form the basis of a control account to ensure the integrity and completeness of all data utilised and processed since the Administration.

The Reporting team is also developing a database of counterparty data to support the various asset recovery and claims management processes.

# Section 6

# Cross Functional Workstreams

# Section 6.1 Custodians

## Objectives

The key objectives of the Custodians Cross Functional Workstream are to:

- Gain control of the House and client securities inventory held within the global network of master and sub-custodians, including affiliates; and

- Facilitate asset realisations and trust property returns.

To achieve this, the Cross Functional Workstream has:

- Progressed the reconciliation of LBIE internal accounted inventory on its record keeping system to the external records of the real-world custodian statements;

- Set up a new global master custodian which is used to hold all migrated LBIE securities;

- Claimed securities held on LBIE's behalf through the other Lehman Brothers Group entities custodian relationships; and

- Developed controlled operational processes to effect the above.

## Key Achievements

The securities held by LBIE's custodians are now largely under our control. The value of this was $45.2bn at 15 September 2008, of which $37.1bn was included in the balance sheet and $8.1bn held off balance sheet (for clients and affiliates). A further breakdown is as follows:

- $11.5bn have been returned to clients;

- $21.8bn of assets are under our control held within our new global master custodian depots;

- $7.6bn (US $6.6bn, Japan $1.0bn) held by affiliates;

- $2.1bn remain in depots frozen by the custodians;

- Assets with a book value at 15 September 2008, of $1.4bn have been sold realising $1.3bn;

- $0.8bn of securities have been redeemed, with proceeds paid to the cash accounts;

- $4.7bn was seized and realised by custodians to settle liabilities to the custodian. Alternative securities replaced those held at 15 September 2008;

- 71% of assets held through the legacy LBIE custodian network have been transferred to the new global master custodian. The remainder are in the process of being migrated where depot access has been obtained;

- Reconciliations - significant progress has been made in the identification and resolution of breaks on the custodian depot reconciliation. The process is now 95% complete;

- Liquidations - through performing the reconciliations and by communication with the legacy LBIE custodians, the Cross Functional Workstream has received significant information to support the booking of the involuntary liquidations to the underlying accounting systems. These liquidations reflect the involuntary (i.e. done without LBIE's express request) sale of collateral from the House accounts by the custodians to extinguish outstanding settlement liability. These relate to 1,501 lines of stock; and

- A full operating model has been developed, processes designed and levels of automation designed and implemented to facilitate a controlled, efficient and accelerated process.

## Key Processes

A process has been developed to migrate the assets from the c.100 legacy custodians to the single new global custodian. To aid the process the Cross Functional Workstream has developed a processing 'tool kit' to include:

- The new global master custodian workflow;

- Automation on inbound receipt instructions;

- Automation of internal record keeping to reflect the migration; and

- Development of key control and authorisation points.

In addition, the Custodian Cross Functional Workstream supports the activities of the House Positions and Trust Property Activities by:

- Facilitation of House asset realisation through the development of a robust support model to include:

  - Production of MI to identify assets as available for sell authorisations and controls;

  - Trade capture;

  - Broker matching;

  - Settlement;

  - Fails management; and

  - Reconciliation.

- Facilitation of the return of Trust Property assets through the development of a robust returns process.

## Issues and challenges

**Frozen assets**

The release of assets held at seven of the legacy LBIE
custodians will take some time to resolve. This equates
to c. 3,800 lines of stock valued at $2.1bn. The majority
of this exposure resides with North American custodians.

This population can be further split into sub-categories:

* Securities held at LBIE custodians which are closed
  due to either litigation or local regulatory actions; and

* Securities held at LBIE custodians where the
  custodian is additionally a counterparty of LBIE and
  has a multi-product, entity relationship with them.
  These relationships and negotiations are being
  managed through the Counterparty Activity.

**Systems**

The core control and record keeping processes continue
to utilise the legacy Lehman mainframe application.
This application is now controlled by BarCap following
the sale of the Lehman Brothers North American
operations.  The Information Technology team has been
progressive in ensuring limited disruption to the Cross
Functional Workstream and has commenced work on
the longer term solutions around mitigating this risk (see
Section 7.1).

## Section 6.2 Failed Trades

### Objectives

The key objectives of the Failed Trades Cross Functional Workstream are to:

- Recover cash from failed trades with counterparties where a net debtor position exists;

- Agree creditor claims for net creditor failed trade positions; and

- Manage the operational activity with respect to updating LBIE's books and records to reflect the result of net cash settlement of OTC failed trades and the actions taken by exchanges and settlement agents, including affiliates.

To achieve the above objectives the Failed Trades Cross Functional Workstream is working to:

- Establish a complete population of failed trades taking into consideration post-Administration events;

- Understand the legal framework for resolution of failed trades in the various jurisdictions;

- Understand the trading relationship with other Lehman Group entities and the impact of LBIE Administration on failed trades executed with / through these affiliates;

- Define and implement a detailed approach for handling specific categories of failed trades; and

- Implement a controlled and efficient operating model with appropriate levels of automation and authorisation.

In addition, the Cross Functional Workstream supports the activities of Trust Property Activity by validating the failed trades position of LBIE's clients.

### Key Achievements

These include the following:

- Determined the population of failed trades. The population of pending and failed trades is up to 839,000 trades, as opposed to the 140,000 initially estimated from the Company's systems. These contaminate the records of the vast majority of the company's estimated 6,000 live counterparties;

- Responded to over 2,000 queries from counterparties;

- Developed and implemented a mechanism for handling failed trades and facilitated the bilateral cancellation of significant fails;

- Segregated failed trades with or on behalf of Prime Brokerage clients, Trust clients, Street counterparties and other Lehman Group entities;

- Stratified failed trades by type of street counterparty (i.e. counterparties with failed trade-only exposures and those with other product relationships) to enable effective prioritisation of resolving failed trades); and

- Working with exchanges, central counterparties and LBIE's settlement agents who have applied their default rules to close-out LBIE's positions and reflected those actions in LBIE's books and records. For example:

  - Prepared a standard used across all jurisdictions for the deletion of trades from exchanges between LBIE and its counterparties to establish a net settlement position of failed trades;

  - Where net settlement is a claim for the estate, working to obtain cash. Agreeing creditor claims where there is a net payable;

  - As a result of our continued work with Euroclear on 29 December 2008, Euroclear Bank cancelled all pending LBIE settlement instructions in the system; and

  - We have provided supporting documentation required to meet the filing deadlines imposed by the administrators / trustees / provisional liquidators of certain Lehman Group entities. For example, in January 2009, we filed a claim against LBI in relation to approximately 200,000 failed trades.

### Key Processes

A process has been implemented for:

- Prioritisation of counterparties for the settlement of failed trades where the counterparty has other exposures with LBIE;

- Prioritisation of counterparties where the only exposure arises from failed OTC trades;

- Improved communication with the counterparties; and

- Recording the net settlement of failed trades in LBIE's books and records in conjunction with the Custodians Cross Functional Workstream.

**Systems and MI**

Information repositories underpinning the Administration have been developed to provide Activities and Cross Functional Workstreams with a consistent view of failed cash trades by counterparty and entity. In addition, this will support the production of MI and the tracking of realisation of cash or agreed creditors' claims from failed trades.

Counterparties should be aware that LBIE will be working
to quantify and agree financial claims between LBIE
and the relevant party to the failed trades to ensure that
obligations to LBIE are settled and / or claims against
LBIE are recognised.

# Section 6.3 Corporate Events

## Introduction

The Corporate Events team deals with the income processing of coupons, dividends and handling mandatory and voluntary corporate actions, such as the processing of redemption monies or the sale of unpaid rights.

## Objectives

The objectives of the Corporate Events team are to:

- Efficiently update the books and records in relation to corporate actions, dividends and coupons that have occurred since Administration;

- Support the distribution of Client Trust Property Assets; and

- To provide a service to clients in respect of corporate actions until such time as the assets can be returned.

## Progress to date

- On the morning of 15 September 2008, revised Standing Settlement Instructions ("SSIs") were sent to paying agents advising them to no longer remit payments to the pre-Administration LBHI managed accounts;

- To date there have been over 20,000 corporate events for processing, including c.200 redemptions, c.160 other corporate actions and over 19,000 income events (notification or receipt of dividends and interest). Receipts into accounts under our control from corporate events total over $2.2bn;

- Of this $2.1bn has been received into accounts controlled by the Administrators and in relation to Client Assets (of which c$0.8bn has been on transferred to clients);

- c.$217m was received immediately pre-Administration in relation to Client Assets and retained by LBHI. We are pursuing the recovery of these amounts, which may have been pooled with other LBHI accounts pre-Administration;

- A further c.$200m has been received into accounts not in the control of the Administrators – primarily accounts with custodians who have yet to release Client Assets to LBIE;

- Early in the Administration, clear processes were defined for the processing of voluntary corporate actions and details provided to clients via the PwC website;

- Segregating all funds received relating to assets which are potentially Client Assets; and

- Established a proactive corporate actions environment, using Announcement Manager.

## Issues impacting control of Corporate Events

Shortly after the Administration date, the LBIE team responsible for managing corporate events (i.e. those responsible for the processing of corporate events) transferred to Nomura under the business sale arrangements. Provisions were included in the sale terms for ongoing support from Nomura. In practice, LBIE had no IT infrastructure and no direct staff to manage corporate events. Inevitably, following the Administration and the sale, the entire corporate events operations ceased to function.

Considerable resources have been committed to re-establish a team and systems to process the many dividends and coupons and to provide a limited corporate actions service to clients. This team includes resource provided by Nomura.

Processing backlogs as a result of the interruption in processes are significant. This issue is exacerbated by the separation of LBIE systems from those of BarCap and a continuing lack of visibility and control over securities held by LBI and LBJ.

An estimated 10,000 corporate events relating to securities held by affiliates remain unposted at 14 March 2009, as we have yet to receive the data and, more importantly, the related funds.

The UK based corporate events team has also now taken in-house the function that provides detail on upcoming corporate events, which was previously outsourced to Lehman Brothers in Mumbai, as the latter were unwilling to provide ongoing support.

A corporate actions committee was established pursuant to paragraph 3.4 of the Schedule to the order of Mr Justice Blackburne dated 7 October 2008. The committee's role is to "agree a protocol in relation to the implementation of corporate actions that may need to be undertaken in relation to Trust Property, for example the exercise of voting rights, receipt of dividends, rights issues and other pre-emptive offers, that will have an impact on the ultimate value of the Trust Property."

The team has clear plans and actions underway to address the issues resulting from the break in systems and is working with affiliates to agree a programme for dealing with corporate events relating to assets outside our control.

In addition to the events processing functions, there is a significant element of reconciliation work, and provision of information to other business functions, particularly in relation to the ongoing process of returning Client Assets.

## Issues and challenges

- Gain full functional access to the suite of software controlled by BarCap which supports the income processing needs. This should enable the arrears of UK processing to be addressed. At present there are many thousands of unposted entries to address;

- Eliminate dependency on the staff provided by Nomura. This is currently work in progress;

- To maintain some level of client service for corporate actions until the Client Assets can either be returned or be determined to be House assets;

- In respect of corporate events, put a robust system in place to ensure all income properly due to LBIE and its clients is pursued. This has yet to be fully implemented, but the use of Announcement Manager provides the cornerstone of this system; and

- To process the LBIE related transactions held in affiliate companies and secure the release of the underlying cash. This is intrinsically linked to the Trust Property Activity and Custodians Cross Functional Workstream.