# Section 6.4 Terminations and Valuations

## Objectives

The Terminations and Valuations Cross Functional Workstream is core to the LBIE Administration, coordinating the processing of terminations and related valuations. The objectives of the Cross Functional Workstream are to:

- Support the settlement of derivatives and financing positions with counterparties where the counterparty is a net debtor. This includes analysis of terminated positions and the review of valuations;

- Agree claims: through the establishment of a LBIE portfolio view, provision of in-house valuations to reference claims, and reconciliation with counterparties' close-out valuations to ensure they are compliant with the underlying agreements; and

- Support the return of Trust Property: through the identification of Client Assets, counterparties' complete dealings with LBIE and valuation of these positions.

The ability of the organisation to value positions was fundamentally affected by the insolvency of the various Lehman Brothers entities, the sale to BarCap and Nomura and the exceptional nature of the valuation exercise required, both in terms of scale and technicality.

The dismantling of the Lehman Group has resulted in access to systems, personnel and expertise being materially impaired. The underlying infrastructure and technical skills required to assess and value many of the more exotic derivative structures no longer existed in LBIE.

## Progress to date

Against this backdrop the Terminations and Valuations Cross Functional Workstream has been working to:

- Establish the population of Master Agreements. The majority of these Master Agreements covered OTC derivatives, stock loans and repos (currently estimated to be c.11,200 Master Agreements);

- Establish the precise population of derivative positions covered by these Master Agreements (currently estimated to be c.134,000 trades);

- Obtain termination notices from the counterparties for all terminated derivative trades, to establish when the agreement was terminated;

- Obtain and reconcile a valuation statement which shows the settlement amount for all the trades under the Master Agreement. (These documents are prepared and submitted by the non-defaulting counterparty to LBIE);

- Manage the data and reconciliation process by logging and validating any outstanding amounts owed to LBIE and supporting their collection via the Counterparties team;

- Complete the logging and valuation of intercompany reconciliations as required;

- Maintain a list of forecast cash flows and historical resets / events for all OTC derivatives;

- Support the Trust Property Activity team by providing 'fast track' valuations and delivering security prices for determining client net equity positions;

- Support the Counterparties Activity by providing 'fast track' valuations and investigating and resolving House vs. counterparty valuation disputes;

- Support the Failed Trades Cross Functional Workstream by valuing several portfolios of failed securities. The population of failed trades is approximately 839,000; and

- Support the Financing Cross Functional Workstream by providing security price information for large portfolios of trades, facilitating settlement of positions with counterparties - the recovery of net debtors and the determination of net creditors.

## Key processes

Counterparties are prioritised by means of weekly meetings and a 'fast track' process is followed to ensure that the team's effort are focused on achieving maximum return for the Administration.

In parallel with the 'fast track' and priority Counterparties processes, the team is procuring termination notices for all Master Agreements that had live trades as at the 15 September 2008:

- All termination notices are reviewed for legal validity. Where a termination notice has not been received, the House Positions team will follow up;

- A trade level valuation statement is obtained from each counterparty and reconciled to the counterparty valuation statements;

- The Corporate Events team provides an analysis of cash events to assist the valuation team;

- Reconciling differences are addressed;

- The valuations team ensures that all terminations have a house valuation and undertake some price verification; and

- Once reconciled the Counterparty team progress to settlement.

A bespoke Asset Realisation Tool ("ART") has been developed as a single application to support the Administration. This acts as a central point of reference for legal documentation, trade population, House valuations and for the reporting of MI. ART facilitates the production of comprehensive counterparty statements.

## Key Achievements to Date

The Terminations and Valuations process which is core to all activities has been designed and established. To support the process:

- Clear prioritisation mechanisms working with all Cross Functional Workstreams and Activities, and focusing on asset realisation and Client Assets, have been established;

- ART has been developed and implemented, to act as central repository of all derivative trade agreements and house valuations, provide an efficient workflow across the Administration;

- At 14 March 2009, the legal team had received, identified, scanned, logged and verified approximately 7,000 termination, valuation, and ancillary legal notices from counterparties;

- A London based trade reconciliation team has been established to supplement / cover the reconciliation process previously performed by Lehman India. Through the transition, continuity of India service has been ensured via an agreement with Nomura;

- The trade reconciliation team have valued and successfully reconciled over 500 trade populations where a counterparty valuation statement with sufficient information has been received. In addition, the reconciliation of a further 500 trade populations is in progress;

- An escalation workflow for counterparties which have not provided sufficient information has been implemented;

- A shared service framework has been established to address reconciliation and valuation needs for Financing products, on the same basis of activities initially performed for OTC derivatives;

- For fixed income derivatives, the inventory of LBIE clients, derivative agreements and the related trade inventory has been finalised. The trade population has been segmented;

- Pricing policies have been developed to value illiquid securities where no market quote is available; and

- Critical risk and valuation engines are now operational across all fixed income product groups. A process has been established for rebuilding the historical

volatility surfaces and gathering other input required for valuation.

Significant progress has been made in building a scalable process for the valuation of Equity derivatives. This functional capability ceased to exist in-house, but implementing a replacement capability is underway.

## Issues and challenges

Overall, challenges are primarily of scale and complexity in terms of trade volumes and agreeing close-out valuations. Terminations and Valuations is a labour intensive exercise with extensive systems and data reliance. Other key challenges include:

- Establishing the LBIE view of the counterparty positions to reconcile against the close-out valuations relies on an incomplete LBIE infrastructure;

- Comprehensive legal reviews are required to confirm validity of claims and of submitted documents (e.g. termination notices, valuation statements);

- Complex legal issues such as counterparty set-off are currently being addressed;

- In the majority of cases, counterparties have not provided adequate valuation statements;

- The availability of market data has also been an issue. The valuation process requires a large volume of retrospective market data over an extensive time period which was unavailable in many cases;

- Key issues concern obtaining volume of market data over time period in question;

- There are a number of legacy problems with the quality of the underlying trade data; and

- Establishing the portfolios on trades with intercompany entities is complex given the number of systems involved and the existence of auto booking mechanisms.

Processes are in place to address these issues, but they are time-consuming. On balance, the progress made with managing terminations and valuations is satisfactory to date. It will continue to be a major focus in the implementation of counterparty settlement.

# Section 6.5 Derivative Exchanges

## Objectives

The Derivative Exchanges Cross Functional Workstream is responsible for establishing and recovering House and client net equity from clearing houses and brokers. House and client gains and losses on these positions mean that it is now necessary to:

- Validate the House and Client positions as at the point of Administration;

- Reconcile the net cash received or paid to terminated trades;

- Establish the amount of cash owed to or by each client and affiliate; and

- Coordinate with the Client Monies team to ensure Client funds relating to derivatives exchanges are addressed.

## Progress to date

Highlights to date are as follows:

- Cash and collateral recovered relating to House positions is $2.3bn;

- A further $209m remains outstanding, primarily from Korea and Taiwan. Local regulatory authorities have prohibited the return of these funds to date;

- Client money repatriated is $74m. An additional $39m remains still to collect;

- Work on the task of determining client and House entitlement (including affiliates) following liquidation and transfer of positions has commenced. Emphasis has been on the client accounts;

- Data sources have been identified and quality of the information available has been assessed;

- A methodology for determining realised gains and losses has been defined; and

- As at 14 March 2009, we had successfully reconciled 21 of the 39 positions at exchanges and brokers.

## Key Processes

- Accounts, House and Client have been identified and a process is in place for monitoring repatriation of cash resulting from the transfer and liquidation of positions;

- All exchange relationships have been identified. All Client and House positions have been identified and global trade flows between former Lehman entities are understood;

- A reconciliation process for Lehman data to that

provided by clearing house and brokers has been established and reconciliation activity is underway for the 39 exchanges in where there were open positions;

- The process is in place, which can be summarised as:

  - Reconcile LBIE records at the point of Administration to information provided by the exchange for positions and cash;

  - Confirm prices on booked trades correcting as necessary; and

  - Calculate realised gains and losses.

- To the extent possible this process has been automated and IT solutions have been implemented to enable us to convert data into a format that can be readily manipulated.

## Issues and challenges

In determining the reconciliation of position we have encountered the following challenges:

- Information provided by clearing houses and brokers is variable in format, content and completeness;

- Delays are suffered in receiving data;

- Legacy Lehman systems are now operated by BarCap, so access is restricted; and

- The treatment of pre and post-Administration gains and losses on Client positions is subject to ongoing legal review as to how the rules should be interpreted. There remain outstanding questions as to how the pool of segregated money should be apportioned and the extent to which costs should be properly allocated.

# Section 6.6 Financing

## Introduction

In the report to Creditors dated 28 October 2008, Financing transactions were included within Prime Services, as that was where the financing business resided. Due to the size and complexity of the financing business, a separate Financing Cross Functional Workstream was established in order to ensure that appropriate priority, resource and process would be applied to the run off of all financing transactions.

Financing transactions include:

- Repos and Reverse Repos;

- Stock Loans and Borrows; and

- Buy / Sell Backs and Sell / Buy Backs.

Typical market contracts were OSLA, GMSLA, GMRA, GESLA and MEFISLA in addition to French law and German law equivalent agreements.

At 15 September 2008, outstanding collateral posted with third parties on financing transactions was valued at $283.4bn, against collateral received of $278.3bn. Outstanding collateral posted with other Lehman entities on financing transactions was valued at $210.7bn, against collateral received of $208.2bn.

An estimated 211,000 financing transactions require valuation and settlement / admission as unsecured creditors.

The net book receivable with third parties at 15 September 2008, was $8.5bn and net payable $3.3bn. The net receivable from affiliates was $7.9bn and net payable $5.4bn.

Many of the counterparties with whom collateral was posted have other relationships with LBIE and Lehman Group entities, which serves to complicate the process of recovering posted collateral.

## Key Objectives

The three key objectives for the Financing Cross Functional Workstream in the run off phase are:

- Identify all excess collateral;

- Implement appropriate resourcing, processes and systems for realising excess financing assets and agreeing creditor claims; and

- Work with the Trust Property and Counterparties Activities to deliver a composite settlement by counterparty.

## Progress to date

Priority and focus to date has been on realising excess collateral from third party debtors.

Key accomplishments to date include:

- Established a formalised counterparty contact and communication programme to manage the close-out process;

- Formal contact with over 200 financing counterparties to 14 March 2009, equating to 73% of third party debtors;

- Established source data for revaluing 90% of the underlying securities in the Financing population;

- Processes underway for sourcing data for the remaining 10% population, represented by the more illiquid securities; and

- Robust trade reconciliation and revaluation processes are in place.

## Key Financing Processes

Key processes have been designed and implemented to support the Financing Cross Functional Workstream objectives and are set out further below:

- Terminations – following receipt of a counterparty termination the default notice is centrally logged, recorded and reviewed for compliance. The counterparty is obligated to provide a close out statement;

- Internal Systems Reconciliation – a daily reconciliation is undertaken between LBIE financing systems. The reconciliations take into account actions taken by market intermediaries;

- External Reconciliation – a reconciliation of trade populations and close-out statements provided by counterparties to LBIE's books and sourced valuations is performed. Exceptions are logged, actively addressed and followed up;

- Valuation – the Financing Cross Functional Workstream works closely with the Terminations and Valuations Cross Functional Workstream to leverage the valuation resources. Valuations are also being sourced for open (i.e. unterminated) transactions to enable engagement with the market counterparty; and

- Cash Realisation – if a counterparty provides a statement indicating a payable to LBIE an immediate request for payment is submitted. Where LBIE's valuations differ from the counterparty further investigations are undertaken to address the balance.

## Issues and challenges

**Agency vs. Principal relationships**

Many counterparties who entered into financing transactions with LBIE did so as agent for underlying principals. The precise basis of the agents relationship with LBIE differs by counterparty, with both LBIE's and the agent's rights varying. Following LBIE's Administration the various contractual dealings between both the agent and the underlying principal impact the basis of settlement of the outstanding trade.  It is estimated that over 1,200 principals sit behind 53 agents. This creates a need for a multiple number of cross party reconciliations ahead of a final settlement being implemented.

The diversity of arrangements in place require each position to be examined. Given the value at stake for LBIE and the relevant counterparty this is a necessarily time-consuming exercise.

We have designed information requests which request transactional details of all underlying principals and have a record of underlying principals' data.

**Termination of trades**

The process of settling with counterparties depends upon termination of the governing legal agreements for each counterparty. The vast majority of counterparties have terminated their agreements, but a notable proportion remain live. Clearly until there is a close-out date both, LBIE and the market counterparty have continuing market risk.

We have implemented various methods to encourage counterparty terminations. Ultimately those which remain unterminated will need to be closed-out.

**Provision of close-out statements**

Once financing contracts are terminated the counterparty must determine the net amounts owed by or to LBIE. Close-out statements providing details of such calculations enable LBIE to reconcile amounts.

In many cases, either no close-out statement has been received or the form or content of the close-out statement received has been inadequately detailed.

A comprehensive programme has been implemented, including providing guidance, templates and offers of support in valuation to counterparties. LBIE intends to formally pursue settlement with recalcitrant counterparties.

**Set-off**

Many LBIE counterparties transacted multiple products with both LBIE and other Lehman entities. In some instances counterparties have asserted a right of set-off.

In many instances this is not a valid set-off.

The process of examining and pursuing LBIE's rights is time-consuming, but will be systematically addressed.

**Price transparency and liquidity of financing collateral**

Pricing information is an essential prerequisite for the production and reconciliation of close-out statements. The financing business involved many thousands of securities. Whilst the majority of these securities were liquid, a significant proportion have been challenging to price.

To address these pricing issues we have built independent valuation capabilities, including reinstating use of external market data providers and retention of key staff with extensive pricing experience.

## Summary

The Financing business is very extensive and requires considerable time and resources to optimise recoveries and agree unsecured creditors claims. The process has been highly systemised and we are working with market counterparties to work through the many thousands of outstanding positions.

# Section 6.7 Overseas Branches

## Background

At the date of Administration LBIE had branches in
Holland, Germany, Switzerland (Geneva & Zurich),
France, Italy, Dubai, Qatar, Spain, Korea, Sweden &
Israel.

There are many complexities with the branch network.
Each branch has been subject to a controlled local
closure process which has had to address many issues,
including: local employment law, regulatory issues,
assets managed locally, local creditors, property and
facilities, and tax.

Whilst the total recoveries from the branches are not
material to the overall outcome of the estate, effecting a
transition to Nomura (where appropriate) and designing
and implementing a controlled formal programme for the
exit from the local office has been important to preserve
value, limit market impact and minimise claims against
LBIE.

## Objectives

The objectives for LBIE's overseas branches team are as
follows:

- Identify, preserve and realise all available assets from
  the overseas branches. Identify any locally managed
  trust property;

- Assist with the completion of the sale of the
  Investment Banking division and Equity business by
  concluding conditions subsequent to the sale insofar
  as they relate to branches;

- Retain or make redundant remaining staff as
  appropriate; and

- Formally close and wind-up LBIE's overseas
  branches.

## Progress to date

Key accomplishments

- Some $150m has been recovered from our controlled
  programme with branches;

- Over 300 of the 450 branch personnel have been
  transferred to Nomura. We continue to employ 11
  branch staff;

- Operations in all branches have ceased, with each
  branch moving through a formal closure process,
  which in most cases is being supervised by local
  regulators and will be subject to local laws and
  processes. Certain residual activities are underway;

- We are continuing to manage the exit from Korea,
  Spain, France, Italy and Holland. Further value is likely
  be recovered from these sources in due course; and

- Where assistance is provided to other Lehman entities
  we have a mechanism for the recovery of these costs.

## Issues and challenges

In the Administrators' Proposals dated 28 October 2008,
we identified that according to the books of LBIE there
are assets held in Korea, France and Switzerland. We set
out below an update of our progress in realising these
assets and formally closing the branches.

The major outstanding issues are the recovery of funds
from Korea and the formal closure of the other branches.

### Korea

In order to comply with local Korean regulations we are
advised that assets held in the local branch must first be
used to repay the creditors of the Korean branch in full,
prior to any funds being remitted outside Korea. Since
15 September 2008, the Administrators' staff from the
local offices in Seoul have been working with the local
regulator and the branch management in Seoul to:

- Identify and realise all locally held assets;

- Agree the claims of creditors and work with local
  management to settle those claims with locally held
  funds. To date settlements of $104m have been made
  from restricted funds held in Korea to local creditors;

- Applied to the Korean authorities for the closure of the
  branch;

- Transferred the majority of staff to Nomura;

- Clear objectives for remaining staff have been
  set which are aligned with the interests of the
  Administration;

- Plan the formal liquidation of the Korean branch, in
  accordance with local regulations; and

- Oversee an inspection by the local tax authorities.

Current estimates indicate that there will be a remittance
back to LBIE's UK estate on the conclusion of the
liquidation.

The settlement with one of the local counterparty's
claims facilitated the payment of some $50m from a
Korean institution to the UK estate which could have
otherwise been set-off against the payable in Korea.

Current tasks to move towards branch closure in Korea
include:

- Devising a strategy for dealing with amounts identified
  as Client funds;

- Monitoring tax audit, which covers the five years
  through to March 31 2009;

- Negotiating and settling with remaining market counterparties; and

- Disposing of remaining securities, once House title has been confirmed.

We expect the Korean liquidation process to progress during 2009, but at this time cannot provide any further visibility into the quantum and timing of recoveries.

**France**

Approximately €62m has been recovered from France to date. There is a further €10m that could flow back to the UK Administration; however this is subject to the solvency of another Lehman entity.

**Switzerland**

$45m of LBIE's funds continue to be frozen in Switzerland by the local regulator. This is likely to be retained pending resolution of various local issues, including employee claims.

**Saudi Arabia**

LBIE was in the process of opening a branch in Saudi Arabia.  A capital advance of $13m had been sent to Saudi Arabia in order to initiate the process of establishing a local branch. We have successfully recovered this sum from the receiving bank.

**Branch closure**

In order to formally close the branches and determine tax creditors or receivables there are certain steps to conclude in all of the branches which include:

- Identifying and realising assets held in the branches that were not sold to Nomura;

- Completing the transfer of leases from LBIE to either Nomura or a third party and recovering the return of deposits from landlords;

- Capturing the data held with the branches and cleansing data from IT systems. This work is largely complete with only one branch remaining;

- Completing tax returns. There could be repayments due to LBIE in terms of corporate tax refunds and VAT refunds.  This will be quantified once the exercise is complete;

- Recovering various costs from Nomura. Salary recharges have been completed for the majority of costs incurred to date and will be finalised by our Human Resources team; and

- Formally closing the overseas branches and coordinating with the FSA and local regulators in each jurisdiction.

# Section 6.8 Affiliate company relationships

## Background

As already noted elsewhere in this report, Lehman Brothers corporate entities and operating systems across the world had a significant degree of interdependency. The various insolvencies across the world, including the appointment of the UK Administrators and the Chapter 11 Bankruptcy proceedings in the US, have inevitably resulted in many entities, including LBIE, being unable to access data and resources regarding their financial position, business and operations.

LBIE has open positions with some 200 affiliate entities. In addition, prior to its insolvency it acted in various roles for certain other affiliates, ranging from custodian and loan servicer to supporting LBL and other UK entities in accounting and processing transactions. In many instances records for the affiliates were not retained locally.

In Europe the material entities with which LBIE had a relationship included Lehman Brothers Treasury Co BV (Holland), Lehman Brothers (Luxembourg) SA, Lehman Brothers (Luxembourg) Equity Finance SA, Lehman Brothers Finance SA (Switzerland) and Lehman Brothers Bankhaus AG (Germany).

These and other European affiliates were, to a greater or lesser extent, reliant upon accounting and IT systems maintained primarily by Lehman entities in London. Certain affiliates had their own staff located in London or had access to LBL staff in London who, in some instances, also carried out duties for LBIE. The fact that these various companies have become subject to separate local insolvency processes has proven challenging for both the office-holders managing the separate European affiliates and the Administrators of the various UK registered companies.

LBL, the UK based European service company employed the majority of Lehman staff based in the UK (and elsewhere in the LBIE branches) and was the contracting party for key infrastructure arrangements (such as IT and property). LBL seconded most of its staff to carry out duties for other group companies. The majority of these were for the benefit of LBIE but certain of these individuals provided day-to-day transactional and technical support to a number of the European entities. In many instances LBIE acted as calculation agent or arranger for the multiplicity of transactions of its European affiliates.

In addition, certain LBIE staff arranged and managed transactions which were booked by other non-European Lehman entities, including Lehman Brothers Special Financing, Inc. (USA) and Lehman Commercial Paper Inc (USA).

## Progress to date

At the outset of the LBIE Administration we took steps to ensure the position of LBIE and its creditors was best protected and risks to LBIE and the Administrators were minimised. Inevitably, the immediate and pressing creditor issues faced by LBIE staff took priority over the issues faced by the affiliates.

Early in the case it was apparent that LBIE's support would be required by various affiliates and bi-lateral discussions were commenced in late September 2008 with a view to collaborating in areas which would mutually benefit the various estates.

### US affiliates

The initial concern of the UK Administrators (including those of LBIE) was the relationship with LBHI, the ultimate US holding company. LBIE and the other UK affiliates were themselves at least partly dependent upon the US for systems support. This dependency ran both ways, and a Transitional Services Agreement ("TSA") was negotiated by LBL and agreed with LBHI and certain of its affiliates during November 2008, to which LBIE is a signatory.

Since that date considerable support has been provided to LBHI under the TSA on a cost indemnified basis. This has allowed LBHI to further its objectives with the support of both LBL and LBIE and has ensured that various complex risk and conflict issues are managed. Extensive dealings continue with the team managing LBHI, including daily interactions on issues where LBL or LBIE provides support.

To date over $300m has been transferred to LBIE from LBHI in relation to sums paid by LBIE counterparties to legacy bank accounts. Negotiations are continuing for the transfer of a further $100m of similar funds to LBIE.

In April 2009, LBIE entered into a further arrangement with LBHI under which certain London-based staff employed by LBHI's affiliates were seconded to LBIE. Under these arrangements, they will benefit from the use of LBIE's regulatory permissions to arrange transactions on behalf of LBHI affiliates which in turn will facilitate the recovery of value to LBHI's creditors. The FSA is aware of these arrangements and we have put controls in place to enable LBIE to perform these activities in line with prevailing laws, rules and regulations.

In addition, following LBI's sale of certain information systems and data previously managed by LBI to BarCap, the Administrators have worked with the trustee of LBI, the US broker dealer, and BarCap to gain access to key information systems. These discussions are ongoing. We are grateful for the support and assistance provided by both LBI's Trustee and BarCap to date.

## European Affiliates

The UK Administrators, including those managing LBIE, have offered support to various European affiliates in a number of ways. These efforts have included:

- The formation of a dedicated team to manage dealings with affiliates;

- Active dialogue from the inception of the case;

- Meetings in the UK and elsewhere;

- Regular, focused communication to address specific requests of affiliates;

- Specific proposals for the provision of services and support;

- Advice and observations on the manner in which affiliates can address issues common to those faced by LBIE; and

- Discussion on the manner in which claims will be admitted and proved in the various estates, respecting local requirements of the affiliate.

As the LBIE Administrators are primarily responsible to the creditors of the LBIE estate, any provision of services to affiliates is provided on a cost indemnity basis. Furthermore, because LBIE's resources have extreme demands being put upon them by the Company's own creditor community, their availability to provide services to affiliates is very limited. In so far as affiliates are also creditors, of course their requests are being dealt with *pari passu* with the requests of other LBIE creditors.

As the business models of the individual affiliate companies vary widely the service needs are different, tailored agreements are being negotiated with affected affiliates.

## Asian Affiliates

In Asia, the material entities with which LBIE has a relationship include LB Commercial Corporation Asia Limited, LB Asia Holdings Limited ("LBAHL"), LB Securities Asia Limited, LB Asia Capital Company and LBJ ("Asian Affiliates").

LBIE is a member of the Committee of Inspection ("COI") in respect of LBAHL, the holding company for the Hong Kong Lehman entities and the UK Administrators have instructed a local PwC principal to represent LBIE at the periodic COI meetings, and the UK Lehman entities generally in respect of interactions with the Hong Kong office holder.

A number of the Asian Affiliates have similar dependencies to those of European affiliates on fellow Lehman entities, including LBIE and particularly in respect of access to shared IT services.

Together with the Administrators of the other Lehman entities, we have sought to establish constructive bilateral working relationships with the office-holders in Asia to further LBIE's objectives with the Asian Affiliates and vice versa.

Activities in respect of the bilateral working relationships with the office-holders of the Asian Affiliates have included, the following:

- The formation of a dedicated team to manage dealings with those affiliates, in the same way as has been instigated with European Affiliates;

- Engagement with local PwC principals in both Hong Kong and Japan in order to assist the dealings with Asian Affiliates;

- Meetings with the Japanese office holder;

- Meetings with the Hong Kong office holder;

- Introduction of an "issues log" with both the Hong Kong and Japanese office holders to manage in an orderly way the specific requests of those office holders of LBIE and vice versa;

- Discussions with the Japanese office holder in respect of the proposed LBIE Client Assets Scheme of Arrangement;

- Implementation of a protocol for the management of Corporate Events, and an agreement in respect of the intercompany claim between the UK entities, including LBIE and LBJ; and

- Preliminary discussions with the Hong Kong office holder on the above areas.

## Guarantees

According to the draft Statement of Affairs, LBIE was indebted to LBHI for some $6.7bn. The obligations of various Lehman affiliates have been guaranteed by LBHI. The Administrators intend to assert a claim against LBHI for the liabilities of these affiliates to LBIE where LBIE benefits from a guarantee. It is too early to establish the effect of these guarantees and the precise quantum of these claims and related recoveries, if any, at this stage.

The precise quantum of any such claims will not become clear until final claims have been agreed with the other Lehman affiliates whose liabilities have been guaranteed by LBHI. This may take some time to conclude as it will be influenced by local insolvency proceedings, but will ultimately reduce LBIE's liabilities to LBHI and benefit the other unsecured creditors of LBIE. We are developing a claims agreement methodology to expedite the agreement of intercompany claims.

Also, we are aware of an agreement which appears to allow LBIE the right to offset LBI indebtedness owed

to LBIE against amounts owing by LBIE to LBHI. We are investigating the legal effectiveness, if any, of this agreement.

**Other matters**

Creditors may be aware that LBHI is currently promoting a far-reaching multi-lateral agreement between Lehman legal entities requiring entities, inter alia, to provide rights of access and information to each other. At this time the Administrators do not consider it to be in the best interests of LBIE and its creditors to be party to or bound by such a broad arrangement, which could potentially place a very significant burden on LBIE, to the cost of its general body of creditors.  We will continue to manage LBIE's affairs efficiently and effectively, in the interests of its creditors and will continue to provide appropriate levels of professional cooperation with affiliate company office holders dealing with the specific matters which affect LBIE's interface with each of them, in a tailored manner.

In light of the progress made in our bilateral dealings with affiliates over the six months to date, as reflected in TSA's, bilateral arrangements and current dealings with affiliates, we plan to continue following this approach.

# Section 7

# Functions

# Section 7.1 Information Technology

## Objectives

The objective of the Information Technology ("IT") function is to provide LBIE with a secure, stable, cost effective and appropriate technology platform to facilitate the activities and financial objectives of the Administration.

The key tasks involved with this objective are to:

- Refine the technology solution to meet changing requirements over time;

- Minimise and manage the risks represented by dependencies on third parties;

- Manage the service delivery from Nomura and BarCap;

- Manage key contracts with external parties;

- Decommission the legacy technology in an optimal fashion; and

- Capture and store data from the core applications for future use.

## Background on the legacy architecture

Similar to most other large investment banking groups, Lehman Brothers operated a global IT architecture that was independent of legal entity. Application developers and support staff were located in London, New York, Sweden, India and the Far East. Applications tended to be hosted where the developers that had led the development were based. Development of applications was also shared globally with multiple legal entities contributing to development and funding.

The diagram below illustrates the scale of the IT infrastructure in terms of numbers of staff, applications and the servers that hosted the applications.



The complexity of the architecture led to a number of immediate issues for LBIE:

- The IT service needed to ensure the wind down of trading positions in the UK to be provided from different locations and legal entities, including BarCap and Nomura;

- Ownership of the IT infrastructure including the core business applications was not clear and in dispute; and

- Key data that was needed to unwind the trades was co-mingled with other entities data and was located in different global locations

## Progress to date

After the initial actions required in Phase I (set out in our previous report to creditors), our Control and Assimilation Phase focused on securing control of and access to key data, applications and infrastructure. We are now in the Systemisation Phase and are implementing a model to allow us to run IT to support the wind down of the balance sheet.

To achieve this we performed the following:

- Gained a detailed understanding of key systems required – at 15 September 2008, LBIE was dependant upon over 2,000 applications. We analysed the reduced business requirements and settled on 120 critical applications. This allowed us to start retiring redundant applications and to identify specific dependencies on Nomura, BarCap and LBHI;

- Analysed the IT staff for ongoing support – we identified a core number of staff needed to support the IT on an ongoing basis, 60 core staff out of the original 720. Appropriate cost reductions were implemented;

- Implemented an operating model and governance processes for on-going IT support;

- Agreed a TSA with Nomura – this covered IT applications and support that they would provide to us, the infrastructure that we would provide, the related costs (free to LBIE, recharged to Nomura) and defined service levels;

- Agreed TSA with LBHI to allow mutual provision of services;

- Negotiated a draft TSA with BarCap. The TSA is due to be finalised shortly;

- Reviewed contracts for software applications, IT service provision and market data provision, ensuring coverage for necessary services;

- Developed and agreed data governance principles with other entities in Administration, BarCap and Nomura, to control trading data transfer from co-mingled sources to those entities for whom it is relevant; and

- Identified key data that needed to be archived for forensic and legal purposes and implemented a plan.

These focused actions have contributed to a reduction in the cost base for IT for LBIE from some $300m per annum to approximately $70m to $80m per annum.

We now have a secure, stable, cost effective and appropriate technology platform to support Phase III wind down activities.

## Issues and challenges

**Migration to the target IT architecture**

Two of the key tasks to achieve the objective of the IT function are to:

- Refine the technology solution to meet changing wind down requirements over time; and

- Decommission the legacy technology achieving best possible outcome for creditors.

We have performed a considerable amount of analysis to assess the options for the target architecture. We considered three key options:

- **Legacy option** – use existing architecture (fairly complex architecture based in US and Europe) – a number of the applications currently being used are being supported by third parties. The TSAs that allow us access to these applications have a defined end date. In addition, the current infrastructure is reasonably complex and costly with potential for simplification. It was therefore decided that this was not a long term solution;

- **Simplification** – use a rationalised UK-based architecture and eliminate dependencies by recreating applications in the UK. We would also need to take a similar approach for Nomura hosted applications as we neared the end of the TSA; and

- **Outsourcing** – outsource the required application functionality, support and, potentially, some business processes to third party service providers leaving decision making with LBIE. After investigation it was apparent that the complexity of the infrastructure makes wholesale outsourcing not practical or cost-effective.

The strategy for the target IT architecture is a combination of Simplification and Outsourcing. For areas where we can find a suitable third party service provider

we will outsource. This can primarily be achieved for front office valuation applications.

For back office applications where we have not yet identified appropriate third party service providers we intend to migrate a number of the core applications, including the mainframe cash settlement system onto a single application that provides the required functionality.

We are currently running a proof of concept for an application. The application is already licensed to LBIE and the Administrators staff have sufficient IT and operations skills. We will need a small number of other core middle office and back office applications where the core replacement system does not include that functionality.

For forensic and legal data archiving, we will need to retain historical data. We have a solution identified, which will be implemented shortly.

The target date for completion of the implementation of this architecture is the end of March 2010.

**Customisation of tools to support the administration**

Since the business processes that are required to perform the run off differ from the legacy business processes, we have customised legacy applications to provide tools to support our activities. Specifically key tools that have been customised and are being provided for wind down are:

- **Asset Realisation Tool ("ART")** - this provides a single counterparty view that identifies all the exposures to a single counterparty and stores all related counterparty valuations, positions and allows a statement to be prepared, once all data is available;

- **The Trust Property Tool** - this tool facilitates the process to capture data from clients with Trust Property managed by LBIE and segregated Client Money. It interfaces with ART in relation to valuation data;

- **Daily Asset Reporting Tool ("DART")** - this tool provides a front end reporting layer for information that is stored in the mainframe settlement system to provide an easier user interface to view a stock's position from books and records and from the external world depots;

- **Query Management System ("QMS")** – this system tracks all external queries received and tracks response and resolution; and

- **LBIE Client Information and Claims website** – this database allows creditors to enter the exposures to LBIE and their valuations and gain access to confidential communications.

These applications allow the combined LBIE employees and Administrators' staff to systemise their daily activities and have been central to enhancing processing rates.

## Separation of the network

As described above, the legacy IT architecture was global. After the business sales, competing organisations (BarCap and Nomura) were using the same IT architecture and there was risk of disclosure of each other's data.

In January 2009, BarCap advised of its intention to separate the networks between the UK and US. LBIE needs to continue to access to the US applications until the migration to the Target Architecture (see above) has been achieved. To avoid potentially damaging consequences to LBIE a joint working group was formed to manage the separation.

A major project was initiated in January 2009 to perform the following:

- Manage the interaction with BarCap and with Nomura who needed to help support LBIE during the separation;

- Understand the impact of the separation on the wind down processes;

- Identify potential issues in terms of continued access and identify solutions to maintain access;

- Test solutions prior to network separation; and

- Manage the impact over the separation weekend and the following weeks.

Over 110 people from the IT function, other Administration Activities, Cross Functional Workstreams, Functions and Nomura were involved in the project including 4 weekends of testing.

Network separation was achieved successfully on the weekend of 21 February 2009.

## Future priorities for the IT function

Over the next few months, the IT function will be focused on:

- On-going day-to-day support of the IT architecture;

- Continued customisation of tools to support including a tool to track contact with counterparties;

- Management of service from third parties;

- Migration to the Target Architecture:

  – proof of concept with front office valuation providers;

  – Completion of proof of concept with mainframe
    replacement; and

  – Rationalisation of applications.

• Input into the project to move premises by ensuring
  that dependency on the in-house data centre is
  removed.

The accomplishments of the IT team have been critical
to managing the ongoing position and extracting
and analysing data. It is likely to require considerable
resources over the coming months to preserve
functionality and effectiveness.

# Section 7.2 Regulatory and Compliance

## Objectives

The objectives of the Regulatory & Compliance ("R&C") function are to:

- Oversee an orderly and compliant wind-down in line with relevant FSA regulations;

- Maintain adequate compliance infrastructure to mitigate regulatory and reputational risks;

- Proactively manage relationships with regulators, in the UK and other jurisdictions; and

- Address ad-hoc regulatory issues as they arise.

The R&C team combines specialists from the Administrators' staff with existing LBIE regulatory and compliance expertise.

## Progress to date

**Key achievements**

The R&C Function has been designed to be aligned with the Activities and Cross Functional Workstreams. Key accomplishments include:

- Designed and implemented a revised compliance infrastructure;

- Integration throughout the LBIE Administration through designating points of contact for relevant Activities and Cross Functional Workstreams;

- A presence on the trading floor and provide real-time support in the House Positions and Counterparties Activities;

- Compliance policies have been updated and communicated to all LBIE and Administrators' staff;

- Bespoke training has been delivered for staff with a focus on those who are at greatest risk of encountering regulatory matters;

- To support the ongoing obligation to meet Anti-Money Laundering requirements, a process has been developed and implemented to manage the risks in this area. The plan includes:

  – Reviewing historical documentation on all clients who claim money or assets;

  – A process to screen all clients and counterparties prior to the return of any money or assets; and

  – Implementing procedures for engaging with counterparties.

- R&C has maintained a regular liaison with the FSA to ensure that LBIE is responsive to the Regulator's needs in respect of specific regulatory investigations

/ requests for information, enquiries, employee / individuals and the run-off of regulated firms.

**Other achievements**

The focus during the early period of the Administration was on reviewing existing compliance processes and determining how to reduce costs by eliminating redundant processes. The R&C team developed a process for meeting reporting and disclosure requirements and developed standard responses where feasible.

Given the need to access information held in legacy Lehman systems to meet regulatory obligations, R&C has supported the negotiations with other market counterparties, including BarCap, Nomura, LBHI and other affiliates.

These dealings have had to finely balance the need to provide support and assistance to the affected parties with the need to ensure the strict compliance with regulatory guidelines.

The function is now established in Phase III (Run-off) with the focus on managing compliance as a "business-as-usual" activity within the revised context of LBIE in Administration. To ensure regulatory obligations are met in addition to accomplishments highlighted above, the function has been:

- Responding to disclosure requests where there is a mandatory obligation to do so;

- Providing oversight of trading out of large positions to ensure relevant disclosures are made;

- Providing factual regulatory references for former LBIE staff;

- Supporting the Administration in establishing contractual arrangements with Nomura, (e.g. Terms of business with regulated market counterparties); and

- Providing regulatory advice and support on a number of matters including record keeping, client money and asset rules, market abuse, anti-money laundering and implications of specific FSA obligations (e.g. Approved Persons rules).

The R&C team has been working alongside the team responsible for closing the international branches of LBIE to agree a compliant plan of action for the surrendering of branch licenses as appropriate.

## Issues and challenges

R&C will continue to provide services to the Counterparties team and deal with regulatory matters as they emerge.

Some of the activities of R&C have been hampered due to the challenges of accessing LBIE data held in systems controlled by other parties. This is having particular impact on the ability to review client information needed to meet Anti-Money Laundering compliance and the ability to respond in a timely manner to the FSA on specific information requests.

R&C is working with the IT Function to resolve these issues with the relevant parties.

# Section 7.3 Infrastructure and Property

## Background

LBL holds the service (IT and property) and employee contracts that are integral to support the UK based Lehman Brothers companies. Through cost capture and recharge mechanisms, LBL recovers these costs from the various Lehman Brothers companies and subtenants.

LBL holds leases and other contracts for properties, including 25 Bank Street (the current location of the bank in the UK), Broadgate (the previous UK headquarters), data centres, business continuity centres, overflow offices, residential properties, European branches and storage facilities. Over 90% of LBL's costs are recharged to LBIE, consistent with the pre-Administration regime.

From an IT and general operations perspective, there are a large number of suppliers with whom LBL transacts as part of its daily operations.

## Objectives

The objectives of the LBL Infrastructure and Property ("I&P") team are to:

- Process the various suppliers to the UK based Lehman entities, including LBIE;

- Minimise the costs of LBL in dealing with I&P;

- Coordinate the recovery of incurred costs on an appropriate basis from the participating entities; and

- Manage the real estate and occupation of various Lehman Group companies.

## Progress to date

### Cost Recharge Mechanism

Our priority has been to:

- Identify essential services for the ongoing operation of LBIE;

- Review LBL's cost base and minimise the costs levied on LBIE;

- Provide funding to LBL (from the initial loan and subsequently from asset realisations) to enable LBL to continue to provide services to LBIE.  Agree appropriate terms for the provision of such funding;

- Negotiate and participate in the cost sharing agreement with LBL; and

- The Administrators team working within LBL negotiated with many vendors to agree a basis of continued supply. To date no critical services have been interrupted.

## Properties

### London

Negotiations with the Bank Street landlord, Canary Wharf resulted in the sub-letting of approximately one third of the building to a third party. Significant effort has been committed to supporting the tenants of the building as it has materially reduced the occupancy and operating costs of LBL, hence LBIE.

Bank Street has been reorganised to optimise occupancy efficiency. LBL is looking to market the empty space using its agents. If successful this will further reduce LBIE's costs.

Bank Street has now changed from a single tenanted building to a multi-tenanted building. A major focus has been around preparing the 2009 service charge budget for the tenants and considering options around the operation of the amenity areas. Furthermore, given the risks around being the head lessee for a property such as Bank Street, a major focus has been to consider the best management structure to support the running of the building. This process is on going.

There have been numerous savings achieved by reducing the remainder of the contracts with other LBL landlords and service providers, such as the surrender of the lease at Broadgate, and the transition or termination of LBL's contracts with business continuity centres and storage facilities.

### Branches

We are continuing to dispose of and transfer the leasehold interests and fixed assets across the EMEA branches. Property transfers or disposals have now completed in Amsterdam, Frankfurt, Geneva, Kuwait City, Madrid, Munich, Paris, and Stockholm. We are working to transfer the Rome property.  Negotiations are continuing with landlords and third parties in Milan, Dubai, Istanbul and Doha.

### Other vendor management

Immediately upon our appointment, a number of vendors took legal proceedings against LBL for purported breaches of contracts that were in place pre-Administration. These have been managed without disruption to date.

Established processes are now in place for the timely discharge of infrastructure costs incurred.

A major focus has been to ensure the Bank Street property continues to function as required. We have negotiated ongoing arrangements with vendors ranging from the mail room services through to building maintenance, which both reduce costs and preserve our ability to operate.

## Future Strategy

The main priority is to assess the benefits and
practicalities of relocating LBIE to a lower cost location,
whilst minimising the impact on the effectiveness of the
operations. This is a very challenging project, particularly
given the IT infrastructure.

These decisions will be explored in detail with the
Committee over coming months as options and
timescales become clearer.

# Section 7.4 Human Resources

## Objectives

Some 5,500 personnel were deployed in the LBIE operations worldwide at 15 September 2008. The focus of this team was to:

- Rapidly implement retention processes for critical staff;

- Ensure comprehensive and rigorous processes are implemented for the management of the remaining employees;

- Support the downsizing efforts required to match the skills and resources to the ongoing business needs of the Administration; and

- Manage the operation of the residual HR function.

## Progress to date

The position of the remaining employees has been stable for some time, following the effectiveness of the early actions in the Administration. Notable areas of progress are:

- Identified employees who are core to the wind-down and agreed contracts for 2009 for c.360 employees;

- The 2008 retention payment process has been concluded. A robust exercise was implemented to ensure employees were retained and rewarded in an objective performance based process;

- A new Operating Model was developed to restructure existing teams into workstreams that would support asset realisation, return trust property and agreement of claims. A thorough communication strategy was implemented and re-enforced by the 2009 performance management process;

- A rigorous performance management process for 2009 has been implemented which aligns individual performance and reward to the achievement of specific Activity, Cross Functional Workstream and Functional objectives. Written objectives have been agreed with all retained employees;

- Day-to-day HR support for employees has continued;

- All HR related issues are being actively progressed including: pension issues, benefit issues and employee grievances;

- Payment in January 2009 of all bonuses in respect of 2008 performance. Dealing with related tax issues in an optimal manner for the estate;

- Implemented a comprehensive recruitment process to replace any employees who resign during 2009 and / or additional staff needed to optimise the efficiency of the Administration. Some 50 personnel have been

recruited to date. Further recruitment is underway;

- Resolution of residual issues relating to the transfer of staff to Nomura;

- All employee claims received in respect of redundancy, holiday pay, arrears of notice and notice payments have been submitted to the Redundancy Payments Office for payment; and

- The process of accumulating all employee residual claims has also commenced.

All the objectives set out in the Joint Administrators' Proposals for Achieving the Purpose of Administration under Phase I (Control and Assimilation) and Phase II (Systemisation) have been met.

## Key Processes

Two key processes have been introduced that maximise efficiency, control costs and support the achievement of the overall objectives of the Administration:

- Performance Management - all retained employees and all new fixed term contract employees must have documented performance objectives set for 2009; and

- Hiring - where it is identified that additional or replacement resources are required, a rigorous process is undertaken to assess the business justification of the hire and to ensure that the most appropriate and cost effective resource is utilised.

## Issues and challenges

Whilst the position of the employees is currently stable there are a number of ongoing challenges in preserving an effective environment for the remaining employees:

- The Operating Model is fundamentally different to the legacy business and operating framework. This requires continuing support by employees during the transition;

- It is imperative to ensure that employees receive regular communication and details of how their roles form part of the overall Operating Model;

- Challenges will be faced as the changing resourcing needs become apparent as the run off progresses. Taking necessary steps to ensure that appropriate resources are in place at all times to ensure that the business deliverables are not compromised; and

- Retaining, assessing, rewarding and motivating key employees will be crucial to the overall success of the wind down.

We are confident that the framework implemented will allow these issues to be addressed.

# Section 7.5 Tax

## Objectives

The five key objectives of the tax function are as follows:

- Tax strategy - to develop an optimal tax strategy for the Administration;

- Corporation tax repayments - to capture, maximise and preserve losses and obtain a refund of corporation tax;

- Management of transactional matters - management of tax liabilities arising from transactions;

- Tax infrastructure - to develop procedures to ensure that tax risks are managed; and

- Overseas Branches - to develop and implement a tax strategy for each branch.

## Progress to date

- We have set processes in place to prepare and control the preparation of corporation tax returns to ensure that compliance obligations are met as necessary;

- Tax reclaims have been made in relation to overseas withholding taxes suffered by LBIE;

- Agreement has been reached with HM Revenue and Customs ("HMRC") that LBIE holds recognised intermediary status for UK Stamp Duty Reserve Tax purposes, preventing charges to UK Stamp Duty Reserve Tax arising to LBIE in relation to future transfers of UK equities; and

- We have established essential relationships with HMRC and the Enforcement Office and have conducted meetings to discuss key issues such as:

  - Group tax losses and the format and time limits for group relief claims;

  - Clarifying the structure of the Group Payment Arrangement ("GPA") and implications on the GPA and tax recoveries as a consequence of Administration; and

  - Negotiating with HMRC on on-going enquiries to limit the areas of focus to key issues so that costs for the Administration can be minimised.

We continue to maintain close liaison with the tax authorities on these key issues.

- We are in dialogue with HMRC to arrive at a pragmatic solution to tax accounting for specific consequences of the way in which the Financing business operates. With the Corporate Events Cross Functional Workstream, Tax is working to produce the necessary information for HMRC;

- Managing the tax status of new custody accounts for house and client positions at the global custodian and in the migration of securities from former agent network;

- Action is being pursued in Italy to establish LBIE's entitlement to certain reclaims. Overall we are seeking to protect cash reclaims that have already been made and to put LBIE in a position to pursue further recoveries;

- Established relationships and developed a network of advisors in each of the branch territories to ensure tax objectives are met; and

- Submitted tax computations and returns in all branch jurisdictions for periods to 2006 and for material jurisdictions to 2007.

## Key processes

### Tax compliance

A robust and efficient process has been developed for the preparation of corporation tax returns. In addition to ensuring that LBIE satisfies its tax compliance requirements, it is necessary for a large number of corporation tax returns to be filed to realise the value of LBIE tax losses and obtain a refund of corporation tax.

### US tax reporting

Work is well underway to identify LBIE's obligations and to manage its historical and ongoing obligations to the US Internal Revenue Service under the "Qualified Intermediary" regime to which LBIE is subject.

### Manufactured Dividend rules

Manufactured dividends relate to financing transactions to which LBIE was party. There may be a manufactured dividends event which has to be accounted for.

The tax function has researched and identified the optimal position for LBIE in relation to the manner in which it processes real and manufactured dividends. Work is underway with regard to how to tax optimise the required reporting and accounting procedures.

## Issues and challenges

### HMRC relationship

Various tax related aspects will potentially be affected or influenced by HMRC (including, in particular, successfully obtaining a refund of corporation tax using LBIE tax losses).

The tax function has met and spoken regularly with senior inspectors within HMRC to preserve what the existing good working relationship and to reach quick agreement on matters that could potentially deplete the value of the estate or delay the tax reclaim process.

## Availability of accounting information

In order to file corporation tax returns, accounting records of sufficient quality are required to be maintained. The tax team has worked with other Cross Functional Workstreams to ensure the necessary information can be made available for the corporation tax compliance process.

Given the extensive demands on the accounting resources within LBIE and the limited personnel and access to systems, this is a challenging objective.

In addition, there have been many income events (dividend and coupon receipts on LBIE custodian securities) post-Administration. To 14 March 2009, an estimated 10,000 such events have occurred outside the UK in entities not under our control.  Ensuring tax is correctly accounted for on these income events is essential.

## Operational processes

LBIE previously relied on various processes to ensure that it was able to effect various tax filings and record keeping.  There are a number of these processes that are strategically important to the Administration going forward and therefore need to continue post-Administration. Following the sale to Nomura and BarCap, certain operations staff and systems formerly deployed, that were integral to the effective running of these various processes, are, in some instances, no longer available.

In the initial days post-Administration, the Tax function identified the key individuals responsible for key processes and as far as possible ensured that their knowledge was available to enable these processes to continue.

A key challenge will be to ensure that the processes operate in a systematic manner to be able to support the tax position of LBIE going forward.

The major residual challenges include:

- Successfully agreeing and securing the refund of corporation tax;

- Ensuring that unnecessary tax liabilities are not crystallised as a result of transactions undertaken to realise LBIE's assets; and

- Retaining access to data in respect of overseas income pre-Administration and obtaining data in respect of overseas income arising since Administration, which is sufficient to enable tax refund claims to be filed and pursued.

## Branches

We are in the process of negotiating and agreeing final tax positions with the local tax authorities such that expected tax recoveries are possible for LBIE. This will be a particular challenge due to diverse legal requirements in each territory and also the local political and fiscal environments.

We are in regular contact with local tax advisors in each territory to ensure that the elements required to meet this end are identified and that processes are in place for the winding up of the branches from a tax perspective.

## Group Payment Arrangement ("GPA")

GPA aim to reduce the administrative burden of paying tax liabilities in a large group of companies and operate on an accounting period-by-accounting period basis. The Lehman GPA is a corporation tax payment arrangement between many Lehman UK entities and HMRC. GPAs are not drafted with insolvency in mind. Once party to an agreement, a company must abide by the contract for the whole of the accounting period until the GPA is terminated. LBL is the 'Principal Entity' facilitating the Lehman GPA - prior to our appointment GPAs have been established for all Lehman accounting periods up to and including 30 November 2008 year end.

As a general rule, corporation tax liabilities (or other UK tax liabilities) of a GPA participating entity may be assessable on any other member of the GPA. To assess whether a corporation tax under or over-payment has arisen all GPA companies must first submit their tax returns for a period. Only then can an application be made to HMRC recover any tax overpayment.

In summary, the tax issues to address are numerous – we have implemented a framework to ensure these are systematically addressed.

# Section 8

# Statutory and other information

| | |
|---|---|
| Court details for the Administration: | High Court of Justice, Chancery Division, Companies Court - case 7942 of 2008 |
| Full name: | Lehman Brothers International (Europe) |
| Trading name: | Lehman Brothers International (Europe) |
| Registered number: | 02538254 |
| Registered address: | 25 Bank Street, London E14 5LE |
| Company directors: | Mr WT John, Mr PR Sherratt, Mr JM Isaacs, Mr R Magnoni, Mr IM Jameson, Mr AJ Rush, Mr JP Phizackerley, Mr A Wright, Mr D Gibb |
| Company secretary: | Ms M Smith |
| Shareholdings held by the directors and secretary: | None of the directors own shares in LBIE |
| Date of the Administration appointment: | 15 September 2008 |
| Administrators' names and addresses: | AV Lomas, SA Pearson, DY Schwarzmann & MJA Jervis, of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT |
| Appointer's name and address: | High Court of Justice, Chancery Division, Companies Court |
| Objective being pursued by the Administrators: | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| Division of the Administrators' responsibilities: | In relation to paragraph 100(2) Sch.B1 IA86, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Joint Administrators may be done by any or one or more of the persons for the time being holding that office. |
| Proposed end of the Administration: | The Administrators are not yet in a position to determine the most likely exit route from the Administration.  At this stage, the Administrators intend to apply for an extension of the Administration order beyond the initial 12 month statutory period. |
| Estimated dividend for unsecured creditors: | We are unable to provide an estimate at this time due to material uncertainties regarding the quantum of asset recoveries and the level of unsecured creditors' claims. |
| Estimated values of the prescribed part and LBIE's net property: | It is estimated that the value of the prescribed part will be £600,000, which will be met in full.  The estimated value of LBIE's net property is uncertain. |
| Whether and why the Administrators intend to apply to court under Section 176A(5) IA86: | Such an application is considered unlikely. |
| The European Regulation on Insolvency Proceedings (Council Regulation(EC) No. 1346/2000 of 29 May 2000): | The European Regulation on Insolvency Proceedings does not apply to this Administration, as LBIE is an investment undertaking. |

# Section 8.1 Statement of Affairs

The Administrators have granted the directors an extension of time in which to prepare a Statement of Affairs, due to the complexity of the task. Interim submissions have been received from the directors, which have allowed the Administrators to prioritise and focus their activities on asset recovery and claims management.

The Administrators do not believe it is in the interests of creditors to provide an alternative financial analysis at this time as it could potentially provide a misleading view of the recovery prospects for creditors. This report has included various material extracts from the information provided in the draft Statement of Affairs to illustrate the value of the assets for which the Administrators have responsibility and to provide a proxy for the complexity and volumes of the issues to be addressed. As such, extracts are not comprehensive and no reliance should be placed upon them in forming any view of the dividend prospects for unsecured creditors.

At this stage it is not possible to assess the level of claims against LBIE, as claims will ultimately result from the quantification of the impact of events subsequent to the date of insolvency. At this early stage we have not formed a view on the level of claims, but note that gross contractual claims are $611.8bn, before accounting for counterparty and cross product netting and Trust Property claims, with a book value of $579.1bn. Whilst in the draft Statement of Affairs the directors have provided details on the value and identity of creditors at 15 September 2008, according to the books and records at that date, actual claims by creditors will differ materially.

A list of known counterparties is provided on the PwC website (see Appendix 2).

# Section 8.2 Administrators' Remuneration

## Background

This section sets out the process for setting and monitoring the Administrators' remuneration. The Administrators recognise that the costs of the insolvency proceedings will be significant and that it is appropriate in this case to exceed the disclosure standards defined in statute and regulatory guidance.

## Insolvency Rules 1986 ("the Rules")

By way of context, the manner in which Administrators' remuneration is determined and approved is set out in the Rules (2.106 to 2.109).

Pursuant to these rules, on 14 November 2008, the Company's creditors resolved to appoint a Creditors' Committee whose duties include approving the basis and quantum of the Administrators' remuneration.

There are two alternative bases of determining the remuneration under the Rules, either:

- A percentage of the value of the property with which the Administrator has to deal; or

- By reference to the time properly given by the Insolvency Practitioner and his staff in attending to matters arising in the Administration.

The Rules also provide that in arriving at its decision on remuneration the Committee is required to consider the following matters:

- The complexity (or otherwise) of the case;

- Any responsibility of an exceptional kind or degree which falls on the Administrators;

- The effectiveness with which the Administrators appear to be carrying out, or have carried out, their duties; and

- The value and nature of the property which the Administrators have to deal with.

## Statement of Insolvency Practice No.9 ("SIP 9")

In addition to the Rules, SIP 9, issued by the Joint Insolvency Committee provides guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, *inter alia*, Administrators. The purpose of SIP 9 is to:

- Ensure that Administrators are familiar with the statutory provisions relating to office holders' remuneration;

- Set out best practice with regard to the observance of the statutory provisions;

- Set out best practice with regard to the provision of

information to those responsible for the approval of remuneration to enable them to exercise their rights under the insolvency legislation; and

- Set out best practice with regard to the disclosure and drawing of disbursements.

Committee members have each been provided with a copy of SIP 9.

When seeking agreement for remuneration, the Administrators are required to provide sufficient supporting information to enable those responsible for approving their remuneration ("the approving body") to form a judgement as to whether the proposed remuneration is reasonable having regard to all the circumstances of the case. The nature and extent of the supporting information which should be provided will depend upon:

- The nature of the approval being sought;

- The stage during the Administration of the case at which it is being sought; and

- The size and complexity of the case.

## Remuneration review and approval process

In accordance with SIP 9 the Committee has been provided with details of the charge-out rates for all grades of staff which are involved on the case.

As the Administrators' remuneration is based on time costs, the Committee has been provided with an account of the time spent and the charge-out value, together with additional information setting out the approach to the project, the milestones and progress against such milestones. Given the size and complexity of the case these disclosures have been extensive. This additional information which has been provided comprises an extensive explanation of the Administrators' activities, methods and achievements in order to enable the value of the exercise to be understood.

The time analysis provided to the Committee gives details of the work performed and grade of staff, by Activity, Cross Functional Workstream and Function for all two weekly periods post 15 January 2009 (the commencement of the LBIE Operating Model). Prior to January 2009, a similar level of detail was provided using classifications relevant to the pre-existing LBIE structure. In addition, the Committee has been provided with a rolling budget and summary work-plans which forecast costs and identify work to be undertaken for the following 3 month period.

SIP 9 guidance suggests the following areas of activity as a basis for the analysis of time spent:

- Administration and planning

- Investigations

- Realisation of assets

- Trading

- Creditors

- Any other case-specific matters

The analysis that has been provided to the Committee contains 23 subdivisions (including LBL recharges) of time spent.

The following categories are suggested by SIP 9 as a basis for analysis by grade of staff:

- Partner

- Manager

- Other senior professionals

- Assistants and support staff

The Committee has been provided with an analysis of staff allocated between six grades.

SIP 9 also suggests that an explanation of what has been done should include an outline of the nature of the assignment and the Administrator's own initial assessment, including the anticipated return to creditors. To the extent applicable it should also explain:

- Any significant aspects of the case, particularly those that affect the amount of time spent;

- The reasons for subsequent changes in strategy:

- Any comments on any figures in the summary of time being spent accompanying the request the Administrator wishes to make;

- The steps taken to establish the views of creditors, particularly in relation to agreeing the strategy for the assignment, budgeting, time recording, fee drawing or remuneration agreement; and

- Details of how other professionals, including subcontractors, were chosen, how they were contracted to be paid, and what steps have been taken to review their fees.

Each of these matters has been covered in some detail in the discussions we have had with the Committee. The administrative matters referred to in summary in the body of this report have been covered in extensive detail with the Committee and each area of our activities discussed in depth.

The Administrators recognise that the Committee has an unusually difficult task in reviewing and assessing the Administrators' remuneration and have sought to address this by providing significantly more information

and explanation than is required by SIP 9. Further consideration is being given to providing independent support to the Committee in this task.

## Resolutions of the Creditors' Committee

**To pay costs on a "time properly given" basis**

Given the fundamental uncertainties about the value of the property with which the Administrators have to deal, the Committee resolved to use the "time properly given" basis i.e. an hourly billing basis.

**Charge-out rates**

Details of the hourly charge-out rates have been provided to the Committee, together with available market benchmarks. The hourly rates used are the standard rates charged by the Administrators' firm for complex insolvency cases.

**Remuneration approvals to date**

The Committee has authorised the Administrators to draw 75% of their time costs on account in the period between Committee resolutions. At approximately six to eight week intervals, the Committee is requested to consider and approve remuneration.

To date the Committee has approved remuneration of £77,233,373 which comprises 234,578 hours at an average hourly rate of £329. Further details of these costs are set out in the tables on the following page.

The remuneration drawn in the period shown by the Receipts and Payments account in Section 9 is £72.3m. The difference between this and the £77.2m now authorised has subsequently been drawn.

**Relevant references**

In the body of the report to creditors, we have set out in some detail the achievements of the Administrators to date. Aside from the very many complex matters which we have had to address it is important to note that:

- During the period to 14 March 2009, the Administrators have recovered or realised gross cash funds totalling approximately $8.7bn. In addition, the Administrators have succeeded in taking control of securities with a book value of $35.5bn (House and Client combined); and

- Operating costs of the Company have been substantially reduced to a forecast annual run rate of approximately $80m to $90m, a fraction of the previous level. Whilst the historical total payroll costs are not immediately a relevant comparator, over $1.0bn in annual cost savings has been made to date. In addition, property costs have been materially reduced, as have other expenditures.

## Other matters

In accordance with the current operating regime, a certain cash retention is made in respect of Client Assets that we have returned. These retention amounts are in lieu of Administrator and legal advisor costs and may, in due course, be transferred from the relevant Client accounts to the House. If this is the ultimate treatment of these retentions then the costs to be borne by the unsecured creditors will be reduced accordingly. Until that time these amounts will continue to be held on deposit under the Trust account structure.

## Additional analysis of the Administrators' time costs

Due to the complexity and scale of the Administration, there is a high proportion of Partner and senior staff time. The table below provides an analysis of the total hours and cost by grade of staff.

| Global Grade | Hours | £ 000's |
|---|---|---|
| Partner | 18,781 | 11,647 |
| Director | 21,405 | 11,574 |
| Senior Manager | 48,458 | 18,932 |
| Manager | 32,539 | 10,491 |
| Senior Associate | 73,155 | 18,806 |
| Associate | 40,240 | 5,783 |
| **Total** | **234,578** | **77,233** |

The following table provides an analysis of the total hours and costs incurred by the Activity, Cross Functional Workstream and Function.

| LBIE Operating Model | | Hours | £ 000's |
|---|---|---|---|
| COO | Operations | 15,319 | 6,051 |
| Activities | House Positions | 21,974 | 8,643 |
| | Counterparties | 18,525 | 6,027 |
| | Trust Property | 41,937 | 11,456 |
| | Treasury | 23,208 | 7,912 |
| | Reporting | 27,964 | 8,691 |
| Cross Functional Workstreams | Custodians | 3,852 | 1,354 |
| | Failed Trades | 1,254 | 414 |
| | Corporate Events | 828 | 239 |
| | Terminations and Valuations | 4,551 | 1,325 |
| | Derivative Exchanges | 348 | 151 |
| | Financing | 965 | 441 |
| | Branches & Subsidiaries | 19,222 | 6,328 |
| Functions | Tax | 4,539 | 2,292 |
| | Regulatory & Compliance | 5,999 | 1,956 |
| | Other | 3,628 | 1,032 |
| | LBL Recharges | 40,465 | 12,921 |
| **Total** | | **234,578** | **77,233** |

It is likely that current levels of activity will be sustained for some time and we therefore expect that these costs will
continue to accrue at a similar rate over the coming months.

| LBL Recharges | Hours | £ 000's |
|---|---|---|
| Employee Issues | 5,480 | 2,126 |
| Interdependencies | 4,467 | 1,691 |
| IT | 19,967 | 5,635 |
| Litigation | 15 | 10 |
| Media and Communications | 2,757 | 1,121 |
| Property Issues | 7,779 | 2,338 |
| **Total** | **40,465** | **12,921** |

# Section 9

# Receipts and payments to 14 March 2009

# House receipts and payments to 14 March 2009

| | Note | GBP £mil | EUR €mil | USD $mil | Other $mil | Total (USD $ Equivalent at 14 Mar 2009 |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| House | | | | | | |
| Fixed Income | | 9.5 | 844.7 | 63.0 | 5.6 | 1,170.8 |
| Derivative Exchanges | | 273.7 | 893.6 | 12.5 | 21.9 | 1,568.8 |
| Equities | | 68.0 | 317.8 | 53.1 | 35.5 | 593.3 |
| Corporate Events | | 5.8 | 46.9 | 5.7 | 44.4 | 118.7 |
| Counterparties | | 233.9 | 314.0 | 545.7 | 10.8 | 1,288.0 |
| Other | 1 | 3.8 | 92.2 | 60.8 | 14.1 | 199.2 |
| Receipts on behalf of affiliates | 2 | 23.8 | - | 34.1 | - | 67.3 |
| Loan | 3 | - | - | 100.0 | - | 100.0 |
| Interest | | 1.5 | 11.1 | 0.2 | - | 16.6 |
| **Total Receipts for period** | | **620.0** | **2,520.3** | **875.1** | **132.3** | **5,122.7** |
| **Payments** | | | | | | |
| Payroll and employee costs | 4 | (114.8) | (0.6) | (1.4) | - | (162.6) |
| Administrators' remuneration | 5 | (72.3) | - | - | - | (101.0) |
| Loan repayment | 3 | - | - | (100.0) | - | (100.0) |
| Building and occupancy costs | 6 | (34.6) | - | - | - | (48.3) |
| Legal costs | 7 | (33.5) | - | (0.1) | - | (46.9) |
| Loan to LBL | 8 | (17.8) | (2.6) | (14.2) | - | (42.4) |
| Loans to/payments for group companies | 8 | (7.4) | (1.4) | (0.1) | - | (12.2) |
| Other costs | | (0.2) | (0.7) | (5.1) | (0.6) | (6.9) |
| VAT paid | | (18.5) | - | - | - | (25.8) |
| **Total payments for period** | | **(299.1)** | **(5.3)** | **(120.9)** | **(0.6)** | **(546.1)** |
| Inter-currency transfers | | 17.6 | (22.3) | 69.0 | (71.3) | (6.5) |
| **Net position** | | **338.5** | **2,492.7** | **823.2** | **60.4** | **4,570.1** |
| Bank balances | | | | | | |
| Bank of England | | 11.1 | 103.0 | 612.7 | 27.3 | 788.3 |
| Other institutions | | 327.4 | 2,389.7 | 210.5 | 33.1 | 3,781.8 |
| **Total Balance** | | **338.5** | **2,492.7** | **823.2** | **60.4** | **4,570.1** |

In addition to the above balances, Long Term Securities of $664.7m have been secured.

# Client receipts and payments to 14 March 2009

| | GBP £mil | EUR €mil | USD $mil | Other $mil | Total (USD $ Equivalent) at 14 Mar 2009 |
|---|---|---|---|---|---|
| Receipts | | | | | |
| Pre-Administration client monies | - | - | 876.0 | - | 876.0 |
| Redemption proceeds, coupons & dividends & investment income | 102.3 | 397.1 | 1,216.7 | 229.8 | 2,101.4 |
| **Total Receipts for period** | **102.3** | **397.1** | **2,092.7** | **229.8** | **2,977.4** |
| Payments | | | | | |
| Transfers to clients | - | (1.7) | (799.5) | - | (801.7) |
| **Net position** | **102.3** | **395.4** | **1,293.2** | **229.8** | **2,175.7** |
| Bank balances | | | | | |
| Bank of England | 24.4 | 0.3 | 1,249.4 | 129.7 | 1,413.6 |
| Other institutions | 77.9 | 395.1 | 43.8 | 100.1 | 762.1 |
| **Total Balance** | **102.3** | **395.4** | **1,293.2** | **229.8** | **2,175.7** |

## Notes to Receipts and Payments accounts

**General**

In accordance with the Insolvency Act 1986 and Insolvency Rules 1986, the transactions within the LBIE estate are reported to creditors on the basis of cash receipts and payments. These statements in this section reflect transactions in cleared funds in accounts established and controlled by the Administrators.

Separate accounts have been established for handling realisations from House assets and assets which may, in due course, be deemed to be Client Assets.

In addition to these accounts there continue to be movements on accounts operated by or on behalf of LBIE prior to Administration. We continue efforts to assert control over those accounts and progress is set out in Section 5.4.

Accrued income and costs, including taxes, are not reported in the receipts and payments accounts.

For convenience we have aggregated the receipts and payments into a single reporting currency, US Dollars. As detailed in the receipts and payments account realisations are held in a number of currencies and the aggregation is for reporting purposes only.

We have summarised realisations by Activity area within the Administration. In certain instances realisations relate to more than one Activity. House and Counterparty realisations are discussed in Sections 5.1 and 5.2 of this report, respectively.

**1. Other receipts**

Includes recoveries of cash balances from Saudi Arabia and receipts from recharges to Nomura and LBHI.

**2. Receipts on behalf of Affiliates**

Relates to funds LBIE holds on behalf of certain other UK affiliate companies.

**3. Loan and Loan Repayment**

Shortly after our appointment, a loan of USD $100 million was negotiated and drawn to fund the immediate expenses of the Administration, primarily payroll and rent. The loan has been fully repaid.

**4. Payroll and employee costs**

Our activities in the Human Resources area are detailed at Section 7.4. Payments to date relate to the payroll of LBIE staff and include:

- The relevant proportion of payroll and costs of c 5,500 Lehman staff for the month of September 2008;

- Payroll, taxes and national insurance costs including retention bonus for 2008; and

- Ongoing salary and expense payments for retained staff.

**5. Administrators' remuneration**

This reflects payments to the Administrators for remuneration and expenses, in accordance with the framework detailed in the previous section.

**6. Building and occupancy costs**

In accordance with the existing pre-Administration cost recharge regime between LBL and LBIE, this expense represents LBIE's share of occupancy and infrastructure costs for the Bank Street premises.

As set out in Section 7.3, numerous savings have been implemented. We are mitigating costs through tenancy arrangements and generating revenue from the amenity areas at 25 Bank Street, London.

**7. Legal costs**

This includes the costs of retained legal advisers in providing advice in respect of the various complex issues which are being addressed as part of this process.

The Administrators implemented a rigorous review process for all legal costs, which requires each Activity, Cross Functional Workstream and Function leaders to define objectives for any legal advice sought and to manage the provision of advice and review the level of costs. Further disclosures are provided to the Committee.

An in-house legal team has been retained and is increasingly managing the legal issues that we are able to distill for them to handle.

A significant amount of legal costs have necessarily been incurred in dealing with Trust Property, including assets and client monies, as more fully detailed in Section 5.3.

The management and return of Trust Property is a complex and highly technical area, accordingly, we expect legal costs to continue to be extensive.

**8. Loan to LBL and payments on behalf of other Affiliates**

The largest entity in the UK group of Lehman companies was LBIE, which accounted for some 90% of group costs incurred in London. In order to effectively manage these costs LBL, LBIE's affiliate, is the contracting party for administrative and operating costs. LBL has no source of cash other than its recharges to affiliates.

To ensure LBL is able to fund costs and provide essential
support services to LBIE, LBIE has entered into a formal
funding arrangement whereby it advances funding to LBL
on specific terms. These advances bear interest.

Certain other loans have been made to other UK Lehman
entities or payments made on their behalf where this has
been in the interest of LBIE's creditors.

# Appendices

# Appendix 1 - LBIE contact details

## General enquiries

enquiries.lehmanbrothers@uk.pwc.com

## Activities

**House Positions**                    housepositions@lbia-eu.com

**Counterparties**                     counterparties@lbia-eu.com

**Trust Property**                     clientpositionresponses@lbia-eu.com

**Treasury**                           treasury@lbia-eu.com

**Reporting**                          lbiecreditors.lehmanbrothers@uk.pwc.com

## Cross Functional Workstreams

**Custodians**                         custodians@lbia-eu.com

**Failed Trades**                      unsettledtrades@lbia-eu.com

**Corporate Events**                   corporateevents@lbia-eu.com

**Terminations & Valuations**          uk.terminationnoticesqueries@lbia-eu.com

**Derivative Exchanges**               derivativesandexchanges@lbia-eu.com

**Financing**                          financingreplies@lbia-eu.com

# Appendix 2 - News releases and information

## LBIE Client Information and Claims website

The following is a summary of the information the Administrators have made available to LBIE counterparties to keep them apprised of developments in the Administration. These have been made available on the LBIE Client Information and Claims website, https://dm.pwc.com/LBIEClient, which is accessible only by a unique user ID and password. All creditors and counterparties were provided with access details to the website in the letter accompanying the Administrators' Proposals for Achieving the Purpose of Administration dated 28 October 2008. Registration details to access the LBIE Client Information and Claims website can be found on www.pwc.co.uk:

- Presentation to the Creditors' meeting on 14 November 2008

- First meeting of the Creditors' Committee 3 December 2008

- Creditors Update 14 January 2009

- Second meeting of the Creditors' Committee 22 January 2009

- Presentation to members of MFA and AIMA on 3 March 2009 and 5 March 2009

## PwC website

The following is a summary of updates which have been posted on www.pwc.co.uk:

**Trust Property**

- Client money and assets update 10 October 2008

- Client money and assets update 15 October 2008

- Client money and assets update 13 November 2008

- Client money and assets update - SIPA customer claims  20 January 2009

- Client money and assets update 26 February 2009

- Client money and assets update 23 March 2009

- Trust Property FAQ's  25 March 2009

- Impact of Global Trader Europe Limited High Court Judgment  27 March 2009

**Failed Trades**

- Update on OTC cash trades unsettled in CREST 24 September 2008

- Unsettled OTC trades 8 October 2008

- Exchange and clearing house communications 22 October 2008

- Failed trades - Market update 7 November 2008

**General**

- Update video 18 September 2008

- Update 30 September 2008

- Webcast to Lehman Brothers employees 7 October 2008

- Webcast to Lehman Brothers employees 15 October 2008

- Frequently asked questions 24 October 2008

- All known LBIE counterparty addresses- 28 October 2008

- All known LBIE trade creditor addresses- 28 October 2008

- FAQ on Audit Confirmation Letters 3 December 2008



© 2009 PricewaterhouseCoopers LLP. All rights reserved. 'PricewaterhouseCoopers' refers to PricewaterhouseCoopers LLP (a limited liability partnership in the United Kingdom) or, as the context requires, other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.