## Exhibit 4

### The Administrators' comments on the Alvarez & Marsal Protocol

**1**   The Alvarez & Marsal Protocol has seven stated aims:

   **1.1**   Co-ordination;

   **1.2**   Communication;

   **1.3**   Information and data sharing;

   **1.4**   Asset preservation;

   **1.5**   Claims reconciliation;

   **1.6**   Maximise recoveries; and

   **1.7**   Comity.

**2**   Each of these aims is addressed in detail below.

**3**   Paragraph 1.4.1: "***Coordination*** *– To promote international cooperation and the coordination of activities in the Proceedings; and to provide for the orderly, effective, efficient, and timely administration of the various Proceedings in order to reduce their cost and maximize recovery for creditors.*"

   **3.1**   Administrators' comment – Linklaters' letter explains the commitment of the Administrators to co-operate with the Insolvent Lehman Affiliates and provided a summary of the Administrators recent dealings with the insolvency practitioners responsible for those entities. This is exemplified by the LBHI/LBIE TSA and the recent trip of Mr Jervis and a number of the Administrators' team, including representatives from Linklaters, to meet with the trustee of LBJ.

   **3.2**   Section 10 of the Alvarez & Marsal Protocol provides for co-ordination in respect of distribution plans:

   "*10.1 Where applicable and permitted under the law of the Forum in a Proceeding, Official Representatives should endeavor to submit a winding-up plan, plan of reorganization or liquidation, or deed of company arrangement (a "*Plan*") in their respective Proceedings, or to amend a Plan once submitted (to the extent permitted by applicable law) so that each Official Representative's Plan is consistent with Plans filed by other Official Representatives, provided that nothing herein shall require an Official Representative to agree (or shall be deemed to be an agreement), and shall not constitute a waiver of such Official Representative's right to object, to the Plan of another Official Representative.*

   *10.2 Official Representatives should endeavor to coordinate all procedures in connection with their Plans to the extent permitted by applicable law,*

1

> *including, without limitation, all solicitation proceedings relating to their plans.*
>
> *10.3 No provision of this Protocol contemplates that any Official Representative is required to delay filing, prosecuting or consummating a Plan with respect to the estate administered by such Official Representative.*"

3.3  Administrators' comment – the Administrators are responsible for achieving the purposes of the administration for each of the Lehman Administration Companies. The Administrators' objective is to maximise realisations for the creditors of each estate and, in due course, consider the most expedient procedure for affecting a distribution to creditors. Section 10 of the Alvarez & Marsal Protocol proposes the alignment of distribution plans across the estates of the Insolvent Lehman Affiliates by seeking "*consistency*" of plans and co-ordination of all "*procedures*" in connection with those plans. This is an example of the Alvarez & Marsal Protocol treating the Insolvent Lehman Affiliates as forming one global estate and introducing a concept of the collective interest of all creditors of the Lehman Affiliates in Insolvency Procedures. This objective is unlikely to be consistent with the purpose of administration for the Lehman Administration Companies and is not an objective that the Administrators should pursue. It is possible that by focusing on such objectives, the Administrators will increase costs and be distracted from the real purpose of the administrations of the Lehman Administration Companies. If, when the Administrators prepare their distribution plans, it is optimal and complementary to the purpose of the administrations of the Lehman Administration Companies to seek an alignment of interests with other Insolvent Lehman Affiliates then the Administrators will consider this. The Administrators do not consider that this should be an objective that they commit to now. It cannot be right that the Administrators should be required to coordinate procedures if, for example, that delays distributions being made (and presumably all will have to work at the pace of the slowest) or increases the costs of making distributions such that the amounts of the distributions will be reduced.

3.4  Administrators' comment – the Administrators are presently working towards the promulgation of a scheme of arrangement to address the challenging issues regarding the distribution of trust property held by or on behalf of LBIE. The Administrators have not yet commenced their planning in relation to a distribution plan for unsecured creditors. At this juncture the Administrators are unable to accept that it would be appropriate to conclude or agree that a distribution plan for LBIE should be consistent with any planned reorganisation in the US bankruptcy proceedings for LBHI or distribution plans envisaged for any other Insolvent Lehman Affiliate. While the Administrators have no desire to propose a course that would conflict with the plans of the Insolvent Lehman Affiliates, if the appropriate exit route (e.g. for LBIE) did conflict, the Administrators would nevertheless consider it appropriate to act in the best interest of the LBIE and its creditors.

**4** Paragraph 1.4.2: "***Communication*** *– To promote communication among Official Representatives and Committees; and to provide, wherever possible, for direct communication among Tribunals.*"

    **4.1** Communication among Tribunals and among committees is also addressed in Sections 5 and 6:

        "***5. Communication Among Tribunals***

        *5.1 The <u>Guidelines Applicable to Court-to-Court Communication in Cross-Border Cases</u> (the "<u>Guidelines</u>") attached as Schedule "A" hereto, shall, where applicable to the relevant Proceeding and where recognized by the Tribunal of the relevant Proceeding, be incorporated by reference and form part of this Protocol subject to formal adoption of the Guidelines in whatever form by each Tribunal, in whole or in part and with or without modifications (if any). Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.*

        ***6. Communication Among Committees***

        *6.1 To the extent permitted and approved by the respective Committee, non-public information available to the Committee in any Forum may, if relevant to a matter in which another Debtor has an interest, be shared with the Committees of such Debtor, subject to appropriate confidentiality arrangements and all privileges under the applicable rules of evidence or applicable law.*"

    **4.2** Administrators' comment on communication between committees –

        **4.2.1** It is not clear what this provision is designed to achieve. Information disclosed to the LBIE Creditors' Committee will not be disclosed to other Insolvent Lehman Affiliates, except insofar as those companies are also creditors and the information is being transmitted to creditors more generally. Much of what is disclosed is confidential or otherwise sensitive and it would not be appropriate for those discussions to be more widely transmitted or, alternatively, for the Administrators' discussions with the LBIE Creditors' Committee to have to be limited because of the risk of (or desire for) information discussed being shared more widely. It is possible that the approach to creditors' committees in the US is different, which may explain the reason for this proposal. In the case of LBB, LBIE nominated itself as a member of LBB's Creditors' Committee but it failed to secure enough votes to gain a seat.

    **4.3** Administrators' comment on communication between Courts –

        **4.3.1** The Administrators consider that the proposal of there being extensive communication between the different Courts that have jurisdiction over the various global insolvencies is misconceived in light of significant differences in the roles played by the local Courts in the relevant

3

jurisdictions (communication between courts is not a procedure that the Administrators recognise as being customary). Ultimately, the determination of issues in different jurisdictions will be governed by the practice and procedure in each case. The principle of drawing these different proceedings together seems to be aspirational and not reflective of the rights and duties of the insolvency practitioners or the statutory or otherwise mandated role of the tribunal in each jurisdiction. It is not clear what Alvarez & Marsal considers would be the objectives of communications between the Courts with jurisdiction over the Lehman Administration Companies and LBHI, for example. Nevertheless, if an obvious benefit becomes apparent during the course of the administrations the Administrators will support it and report to the Court in relation to the issue or objective that makes it both desirable and pragmatic. Legislating for the eventuality now is unnecessary.

4.3.2   The guidelines referred to in paragraph 5.1 of the Alvarez & Marsal Protocol are described as guidelines applicable to court-to-court communications in cross-border cases and have been developed by the American Law Institute for co-operation in relation to bankruptcies in Canada, Mexico and the US. In the Administrators' experience, guidelines such as these relate to co-operation and communication where one legal entity is subject to insolvency proceedings in different jurisdictions or a requirement for assistance in different jurisdictions. It is not apparent from the International Insolvency Institute Guidelines how, or indeed when, they are intended to become applicable. With respect, it is hard to see what assistance they can provide in the circumstances outlined of this case.

4.3.3   The Administrators will discharge their duties and obligations in accordance with the recognised principles of English law and any directions made by the High Court.

4.4   Communication is also addressed in the notice provision in paragraph 2.1 of the Alvarez & Marsal Protocol:

> "*Official Representatives should provide adequate notice by email to the parties hereto, as well as to any Committees established in the Proceedings, of relevant matters in which those parties have an interest.*"

4.4.1   Administrators' comment – the Administrators do not understand the justification for this notice provision. The only basis upon which a notice should be given to an Insolvent Lehman Affiliate is where that notice is required by the Insolvency Act or the Insolvency Rules, primarily the Administrators would expect this to be where the relevant Insolvent Lehman Affiliate is a creditor of one of the Lehman Administration Companies and entitled to notice of a meeting convened by the Administrators.

  **4.4.2** Administrators' comment – where Insolvent Lehman Affiliates have claims against a Lehman Administration Company, or an interest in information or documents, or such other rights as may cause them to seek a hearing before the Court, these rights should be subject to the provisions of the Insolvency Act 1986 and the Insolvency Rules 1986. Creating obligations over and above those that exist under English law, besides imposing additional costs and burdens on the Lehman Administration Companies, would potentially grant rights to Insolvent Lehman Affiliates that elevate them above other creditors and parties that have an interest in the estate on an entirely general and unnecessary basis. The Administrators do not consider this is justified in the circumstances.

**4.5** A related aspect of the Alvarez & Marsal Protocol is Section 3:

> "*3. Rights of Official Representatives and Creditors to Appear 3.1 Subject to the laws of each Forum, Official Representatives shall have the right to appear in all of the Proceedings, whether before a Tribunal or in statutory meetings convened pursuant to applicable law. If required and available in a particular Forum, an exequatur or similar proceeding may be utilized to implement recognition of the Official Representative.*"

  **4.5.1** Administrators' comment - this deals with the rights of appearance before the High Court. and is an example of the Alvarez & Marsal Protocol adding an additional layer to the usual rights of parties under English law. Principally, creditors will have the right to appear in the administration proceedings for the Lehman Administration Companies. If an Insolvent Lehman Affiliate or its representative wishes to appear, it should make an application in the usual way. It is not for the Administrators to determine in advance of any dispute or issue that arises that all Insolvent Lehman Affiliates and their representatives should have a general right of appearance. If the consent or approval of the Administrators at the appropriate time is required, then exercising their judgement the Administrators would consider the request at that time and act appropriately.

**5** Paragraph 1.4.3: "*Information and Data Sharing* – *To provide for the sharing of relevant information and data among Official Representatives in order to promote effective, efficient, and fair administrations, and to avoid duplication of effort and activities by the parties.*"

 **5.1** Access to information and data is also addressed at some length in Section 4 of the Alvarez & Marsal Protocol.

 **5.2** Administrators' comment – the Insolvent Lehman Affiliates that LBHI would wish to see participate in the Alvarez & Marsal Protocol have a common interest in that there is a significant amount of information and data in which a majority of these companies have an interest that is under the control of the Lehman Administration

5

Companies. The Administrators recognise that terms upon which information and data can be shared between Insolvent Lehman Affiliates need to be agreed, not least because in some circumstances the identification, separation and provision of data is a highly complex issue. The LBHI/LBIE TSA has been agreed with LBHI and negotiations are taking place on a regular basis that will provide for information to be shared with other Insolvency Lehman Affiliates

5.3   However, the Administrators do not believe that it is either prudent or in the interest of creditors of LBIE to commit, even on a basis that is said to be non-binding, to a data-sharing arrangement that incorporates the provisions of Section 4 of the draft Alvarez & Marsal Protocol. If the Administrators have an obligation to provide or share information or release documents, or if it is otherwise in the interest of the Lehman Administration Companies to do so (and they properly can), then by reference to their own assessment of their professional and legal obligations and duties they will provide or share information or release documents as appropriate, subject to agreeing appropriate terms (and where necessary by seeking directions from the High Court). Even leaving aside the problems that exist in relation to co-mingled data and the duties of the Administrators not to breach third-party interests in data, the provisions of Section 4 of the Alvarez & Marsal Protocol are unduly burdensome and ambiguous. For example, it does not limit the rights of Insolvent Lehman Affiliates to instances in which they are creditors of a Lehman Administration Company and it is unclear what law is to apply to determine the debtors' rights and privileges and any duties of confidentiality. Also, the reference in paragraph 4.6.1 of the Alvarez & Marsal Protocol to "*(i) material interest holders of an asset, (ii) restitution of assets and (iii) relevant information that assists such other Official Representative to fulfil its duties*" could be extremely onerous, give rise to a conflict of interest and, most importantly, create an obligation to share information with a third party who is not otherwise entitled to that information under English law.

5.4   The Administrators are already faced with an extremely challenging task in discharging their rights and obligations as administrators of the Lehman Administration Companies. The provisions of the Insolvency Act 1986, the Insolvency Rules 1986 and the various legal principles that govern the obligations of the Administrators are well understood by the Administrators and their advisers. The Administrators consider that to add an additional layer of contractual obligations, even if they are stated to be non-binding from a legal (but not moral) standpoint, would create: (i) an expectation in the minds of third parties that are unlikely to be met; and/or (ii) an unnecessary, undesirable and potentially very significant burden upon the Administrators and their advisers that is not in the interests of the estates of the Lehman Administration Companies and/or simply serves no useful purpose. When dealing with issues of data and information, the Administrators will continue to engage with all Insolvent Lehman Affiliates as they have already done with LBHI in relation to the LBHI/LBIE TSA to agree terms to share information.

**5.5** Paragraph 4.6.3 of the Alvarez & Marsal Protocol extends to the co-ordination in good faith of the investigation of pre-filing activities with the representatives of other Insolvent Lehman Affiliates. This process may be commercially sensitive and confidential. An administrator cannot agree to share information on this basis. As with many of these issues, if there is information that should be shared, and legally can be shared, then the Administrators will exercise their judgment to share it in an appropriate manner. When these various requirements of the Alvarez and Marcel Protocol are tied together, it can be seen how onerous and inappropriate, particularly at this stage of the administrations where there are so many competing demands on the Administrators time, to engage in the negotiation of the provisions of the Alvarez and Marcel Protocol when there are numerous issues the Administrators are disinclined at this juncture to approve.

**6** Paragraph 1.4.4: "***Asset Preservation** – To identify, preserve, and maximize the value of the Debtors' worldwide assets for the collective benefit of all creditors and other interested parties.*"

**6.1** Asset preservation is also addressed in Section 7 of the Alvarez & Marsal Protocol:

*"7.2  If, in the course of a Proceeding, an Official Representative learns or believes that another Debtor could have a material interest in a particular asset whose value and/or recovery is at risk, such Official Representative may notify the Official Representative of the Debtor whose estate includes such asset and, where practicable and consistent with the duties of such Official Representative under applicable laws, the Official Representative of the Debtor whose estate includes such asset should consult with the Official Representative of the Debtor that may have such material interest prior to: (i) the sale, abandonment, or any disposition of such asset; (ii) the termination, suspension, or other transition of any employees managing such asset; or (iii) the commencement of any judicial, or non-judicial, proceeding affecting such asset.*

*7.3  In the event that (a) an Official Representative claims to have a legal or beneficial interest in property which is transferred to, or received by another Debtor, or (b) an Official Representative determines that the estate for which it is responsible has improperly received or is improperly holding property transferred from or owned by another estate, such Official Representatives should cooperate in:*

*7.3.1 Assessing the ownership of such transferred property and provide all relevant information, to the extent not otherwise restricted, allowing each Official Representative to ascertain ownership of the property; and*

*7.3.2 Where ownership of the Property has been established and subject to applicable laws: (i) returning the property to the Official Representative of the Debtor establishing its right to such property;*

7

> *and (ii) refraining (to the extent an Official Representative may do so and subject to applicable laws) from transferring or co-mingling property once another Official Representative establishes ownership of such transferred property."*

> *"7.4 Official Representatives should, to the extent permitted under applicable law and where appropriate, cooperate to maximize the realizable value of assets for which multiple Debtors have an interest. Official Representatives also recognize that in certain cases such as where a Debtor (the "<u>Funding Estate</u>") has an existing interest in an asset which forms part of another Debtor's estate (the "<u>Funded Estate</u>"), the Official Representative of the Funding Estate may wish to provide funding towards the asset held by the Funded Estate in order to preserve and maximize its realizable value. In such event, the Official Representative of the Funded Estate may, subject to applicable laws, allow such funding to be provided on mutually acceptable bilateral terms."*

**6.2**   Administrators' comment on asset preservation –

- 6.2.1 The Administrators do not consider that these provisions governing asset preservation should be approved by them. The affairs of the Lehman Group are extremely complex and investments were made for a wide range of reasons on a cross-border basis. The Administrators do appreciate that circumstances may arise, as discussed in paragraphs 7.2, 7.3 and 7.4 of the Alvarez & Marsal Protocol, where other Insolvent Lehman Affiliates may have an interest in the assets of LBIE or another legal entity controlled by LBIE, either in its capacity as shareholder or a major creditor. In such circumstances, the Administrators will explore with the relevant Insolvent Lehman Affiliate a means of preserving value (see, for example, the assistance provided by the Administrators to Alvarez & Marsal in respect of LB Turkey, discussed in Exhibit 1 to this letter). The Administrators do not consider that the existing drafting is acceptable and will deal with asset preservation on a separate basis with LBHI (and others, as applicable).

- 6.2.2 Paragraph 7.2 of the Alvarez & Marsal Protocol provides scope for conflict as there are many subsidiaries directly or indirectly under the control of the Lehman Administration Companies whose value is currently uncertain. These companies may in due course be sold or liquidated. Some of these subsidiaries are not just subsidiaries of the Lehman Administration Companies but a range of other Insolvent Lehman Affiliates. Some of these hold non-performing loan assets, others real estate investments or joint ventures for various commercial enterprises. In some cases, LBHI and/or other Insolvent Lehman Affiliates are creditors of these entities. The Administrators have a responsibility to generate value for the relevant entity that holds the investment and will discharge that responsibility.

**6.2.3**   The obligations of paragraph 7.2 of the Alvarez & Marsal Protocol are diverse. In some cases the interests of a Lehman Administration Company may conflict with those of another Insolvent Lehman Affiliate. In any event, where the Administrators identify a situation where there is no conflict, although they may correspond with another Insolvent Lehman Affiliate with regard to assets in which both estate have an interest, the Administrators do not wish to undertake an obligation to do so. It is unreasonably onerous and creates a risk that the Administrators may be criticised for not performing a task that they otherwise had no obligation to perform. When viewed in the context of the many responsibilities and tasks that the Administrators are obliged or required to do across the estates of the Lehman Administration Companies, that would not be a sensible exercise of their discretion.

**6.2.4**   The provisions of paragraph 7.3 of the Alvarez & Marsal Protocol have been under discussion between the Administrators and Alvarez & Marsal for some time in relation to funds believed to be the property of LBIE but which were transferred in error to LBHI by counterparties of LBIE post-15 September 2009. the Administrators are already negotiating a settlement of this matter. This provision simply duplicates their current efforts in this regard.

**6.3**   Administrators' comment on asset realisation –

**6.3.1**   The proposition in paragraph 7.4 of the Alvarez & Marsal Protocol that the Administrators should cooperate to maximise the realisable value of assets in respect of which multiple debtors have an interest is an intrusion into the broad discretion which administrators have in the management of the affairs, business and property of the company over which they are appointed. This is another example of the Alvarez & Marsal Protocol apparently seeking to create a global estate comprising of all the Insolvent Lehman Affiliates and their subsidiaries, and seeking to impose a duty upon the Administrators to take steps to do something where there may be no benefit (but possible dis-benefit in terms of the costs involved) to the creditors of the relevant Lehman Administration Company in them so doing.

**6.3.2**   The insolvency practitioners for each Insolvent Lehman Affiliate, as with the Administrators, have responsibilities to deal with the property and creditors of the company over which they are appointed and other interested parties in accordance with their local law. Although co-operation among the Insolvent Lehman Affiliates is appropriate, the view of the Administrators is that an Insolvent Lehman Affiliate should not be accorded treatment by the Administrators that is in any way preferential to the rights of other creditors of LBIE. The realisation of assets is a process particular to each Insolvent Lehman Affiliate; there is no global legal concept that provides for the collective benefit of all creditors of all Lehman entities.

    **6.3.3**    It is the responsibility of the Administrators of the Lehman Administration Companies to maximise the recovery of the assets of those companies for the benefit of their creditors. The Administrators are not required to have any regard to the creditors of other Insolvent Lehman Affiliates. Indeed it is conceivable that the Administrators, when realising the assets of the Lehman Administration Companies, may encounter conflict with other Insolvent Lehman Affiliates that have an interest in another entity. Examples of this have already been experienced by the administrators of Storm Funding Limited. Maximising recoveries for the Lehman Administration Companies and their creditors may require the Administrators to take steps that adversely affect the recoveries in other Insolvent Lehman Affiliates. Equally, to take steps to maximise recoveries in some or all of the other Insolvent Lehman Affiliates might require the Administrators to take steps that adversely effect the recoveries in the Lehman Administration Companies.

**7**    Paragraph 1.4.5: "***Claims Reconciliation*** *– To coordinate an efficient and transparent claims process; and in particular, to provide for a consistent and measured approach to the calculation and adjudication of intercompany claims that avoids unnecessary intercompany litigation.*"

    **7.1**    Claims reconciliation is also addressed at length in Sections 8 and 9 of the Alvarez & Marsal Protocol.

    **7.2**    Administrators' comment – the Insolvent Lehman Affiliates are likely to be substantial creditors or debtors of each other and consequently the process of agreeing claims between Insolvent Lehman Affiliates will have a significant impact upon the eventual plans for the liquidation of the Insolvent Lehman Affiliates. The Administrators have prepared a detailed claims agreement methodology, reflecting an intimate knowledge of the Lehman Group accounting systems, for dealing with the reconciliation of intercompany claims made against the estates for which they are responsible. Each Insolvent Lehman Affiliate will have a procedure for agreeing and adjudicating upon claims pursuant to its local law. Whilst it may not be possible to achieve total uniformity in relation to this process, it is the Administrators' intention to use their own claims methodology as the basis for discussion with all other Insolvent Lehman Affiliates against which they are registering unsecured claims in order to explore whether a consistent approach can be adopted across all relevant estates.

    **7.3**    The claims reconciliation process is the principal issue, alongside data access and sharing, in which all or the majority of the Insolvent Lehman Affiliates have a significant interest. The Administrators have been working on this for many months. The Administrators intend to engage with Alvarez & Marsal and the other Insolvent Lehman Affiliates to agree a methodology for resolving the issues identified in Sections 8 and 9 of the Alvarez & Marsal Protocol and in their own Intercompany Balance MoU, with a view to achieving consensus across the Insolvent Lehman

10

Affiliates. This will by necessity involve the Administrators considering the substantive issues between the Insolvent Lehman Affiliates.

**8** Paragraph 1.4.6: "**Maximize Recoveries** – *To cooperate in marshalling the assets of the Debtors in order to maximize recovery for all of the Debtors' creditors.*"

**8.1** Administrators' comment – the obligations that are proposed are too broad. The Administrators should not commit to obligations that extend beyond the existing obligations they have, principally to creditors, in their capacity as administrators.