**Hearing Date and Time: August 26, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  August 21, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, for entry of an order authorizing certain discovery from Colorado Housing and Finance Authority, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 26, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck,

One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Lori R. Fife, Esq. and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York, 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be received no later than **August 21, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 11, 2009
      New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time: August 26, 2009 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: August 21, 2009 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                 :

| | |
|---|---|
| **In re** : | **Chapter 11 Case No.** |
| : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, : | **08-13555 (JMP)** |
| : | |
| **Debtors.** : | **(Jointly Administered)** |
| : | |
| : | |

-------------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO**
**BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors" and, collectively with their non-debtor affiliates, "Lehman"), hereby move for

entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), authorizing certain discovery from Colorado Housing and

Finance Authority ("Colorado Housing"), and respectfully represent:

## PRELIMINARY STATEMENT

1.     This motion seeks basic and necessary information from a derivative counterparty to allow Lehman Brothers Financial Products Inc. ("LBFP") and Lehman Brothers Special Financing Inc. ("LBSF") to determine whether the valuation of terminated derivative contracts provided by Colorado Housing was proper. Although the Debtors typically seek this information cooperatively in the first instance (and hundreds of counterparties who have terminated and provided valuation statements have provided the Debtors with similar information voluntarily), the counterparty here, Colorado Housing, has refused to provide it.

2.     The background of the agreements with Colorado Housing is straightforward. On various dates, LBFP entered into seventeen swap transactions with Colorado Housing, and LBSF[1] entered into forty-six swap transactions with Colorado Housing, pursuant to four separate ISDA Master Agreements – two of which governed the LBFP transactions, and two of which governed the LBSF transactions. Following the bankruptcies of LBFP and LBSF, Colorado Housing terminated all sixty-three transactions (the "Terminated Transactions").

3.     The agreements between LBFP and Colorado Housing and between LBSF and Colorado Housing provided that Colorado Housing, as the non-defaulting party, would have the ability to control the valuation process and calculate the amounts due to LBFP or LBSF in respect of the Terminated Transactions. Colorado

---

[1] As discussed below, the ISDA Master Agreements between LBSF and Colorado Housing were originally entered into by Lehman Brothers Derivative Products Inc. ("LBDP") and subsequently assigned to LBSF by LBDP on September 16, 2008.

2

Housing determined that with respect to the transactions entered into with LBFP, it was in-the-money at the time of termination, and that therefore, Colorado Housing was owed approximately $9 million by LBFP.  Colorado Housing also determined that it owed LBSF approximately $80 million with respect to the transactions entered into with LBSF.

4.      Typically, the defaulting party will want to confirm that the non-defaulting party reasonably determined in good faith the amount owed after termination, and understand the non-defaulting party's basis for arriving at the termination amounts. It is common for the non-defaulting party to share information and confer in good faith with the defaulting party concerning the calculation of the termination amounts when requested.  Although Colorado Housing has provided LBFP and LBSF with some limited information regarding its calculation of the termination amounts, the materials it provided were neither complete nor sufficient for them to understand and verify Colorado Housing's valuation of the termination amounts.  Despite a detailed request for information, Colorado Housing has refused to share with LBFP and LBSF complete and sufficient information regarding the steps that Colorado Housing took to determine the termination amounts it claims it is owed by LBFP or owes to LBSF, as applicable.

5.      The Debtors have an obligation to their creditors to make sure that their derivative counterparties properly value swap agreements.  The information sought from Colorado Housing is designed to help LBFP and LBSF meet that duty.  Since Colorado Housing has refused to provide information on a voluntary basis, this Motion is necessary.  The Court should therefore grant the Motion authorizing discovery from Colorado Housing pursuant to Bankruptcy Rule 2004.

3

## BACKGROUND

6.      Beginning on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  LBSF commenced its chapter 11 case on October 3, 2008.  LBFP commenced its chapter 11 case on October 5, 2008.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

## JURISDICTION

8.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

## RELIEF REQUESTED

9.      By this Motion, the Debtors request entry of an order pursuant to Bankruptcy Rule 2004:

> a.      directing Colorado Housing to produce responsive, non-privileged documents requested on the attached Exhibit Q hereto for examination by the Debtors; and

4

b.      directing Colorado Housing to designate an individual or individuals with knowledge of the matters described below in paragraph 32 and to produce that individual(s) to be examined by the Debtors under oath on such date and time and at such location as may be designated in writing by the Debtors on not less than 14 days' notice.

## THE TRANSACTIONS

10.      LBFP and Colorado Housing are parties to two separate 1992 ISDA Master Agreements including the schedules thereto (the 1992 ISDA Master Agreements and their respective schedules together, the "Master Agreements"), dated as of March 2, 2000 (the "2000 Agreement") and September 13, 2001 (the "2001 Agreement", and together with the 2000 Agreement, the "LBFP Agreements"), respectively.

11.      LBSF and Colorado Housing are parties to two separate Master Agreements, dated as of December 4, 2002 (the "2002 Agreement") and June 19, 2003 (the "2003 Agreement", and together with the 2002 Agreement, the "LBSF Agreements"), respectively.  The LBSF Agreements were originally entered into between Lehman Brothers Derivative Products Inc. ("LBDP") and Colorado Housing, but were subsequently assigned to LBSF on September 16, 2008.  The LBFP Agreements and the LBSF Agreements (collectively, the "Agreements") provide the basic terms of the parties' contractual relationship and contemplate being supplemented by trade confirmations that provide the economic terms of the specific transactions agreed to by the parties.  (Copies of the Agreements are annexed as Exhibits A-D hereto.)

12.      Pursuant to the terms of the Agreements, Colorado Housing entered into seventeen swap transactions with LBFP (the "LBFP Transactions") and

5

forty-six swap transactions with LBSF (the "<u>LBSF Transactions</u>", and together with the LBFP Transactions, the "<u>Transactions</u>").  The LBFP Transactions are comprised of: (i) seven interest rate swaps under the 2000 Agreement; and (ii) ten interest rate swaps under the 2001 Agreement.  The LBSF Transactions are comprised of: (i) ten interest rate swaps under the 2002 Agreement; and (ii) thirty-six interest rate swaps under the 2003 Agreement.

13.    Section 5(a)(vii) of the LBFP Agreements and the LBSF Agreements provides that the commencement of a bankruptcy case by LBFP and LBSF, respectively, is an event of default.   Following the respective commencement of bankruptcy proceedings by LBFP and LBSF, Colorado Housing terminated the Agreements pursuant to Section 5(a)(vii) and designated the following dates as the early termination dates (each, a "<u>Termination Date</u>"): (i) November 21, 2008 in respect of the 2000 Agreement; (ii) December 4, 2008 in respect of the 2001 Agreement; (iii) December 2, 2008 in respect of the 2002 Agreement; and (iv) December 3, 2008 in respect of the 2003 Agreement.  (Copies of the four letters from Colorado Housing terminating the respective Agreements are annexed as Exhibits E through H hereto.)

14.    Pursuant to each of the Agreements, a termination amount (the "<u>Termination Amount</u>") is calculated whenever transactions under the Agreements are subject to early termination.  Each Agreement specifies that "Second Method" and "Market Quotation" be used to determine which party owes a Termination Amount to the other and how much it owes.  Each Agreement provides in relevant part that if the Second Method and Market Quotation apply

> an amount will be payable equal to (A) the sum of the [s]ettlement
> [a]mount (determined by the [non-defaulting party]) in respect of the
> Terminated Transactions and the Unpaid Amounts owing to the [non-
> defaulting party] less (B) the Unpaid Amounts owing to the [defaulting
> party]. If that amount is a positive number, the [defaulting party] will pay
> it to the [non-defaulting party]; if it is a negative number, the [non-
> defaulting party] will pay the absolute value of that amount to the
> [defaulting party].

See Section 6(e)(i)(3) of each Agreement. Each Agreement defines the Unpaid Amounts

owing to any party as

> the aggregate of … in respect of all Terminated Transactions, the amounts
> that became payable … to such party … on or prior to such [e]arly
> [t]ermination [d]ate and which remain unpaid as at such [e]arly
> [t]ermination [d]ate … together with … interest … from (and including)
> the date such amounts or obligations were or would have been required to
> have been paid or performed to (but excluding) such [e]arly [t]ermination
> [d]ate, at the [a]pplicable [r]ate ….

See Section 12 of each Agreement. Each Agreement further provides in relevant part that

the settlement amount means the sum of the Market Quotations for each Terminated

Transaction. "Market Quotation" is defined in each Agreement as

> an amount determined on the basis of quotations from Reference Market-
> makers. Each quotation will be for an amount, if any, that would be paid
> to [the party making the determination] (expressed as a negative number)
> or by such party (expressed as a positive number) in consideration of an
> agreement between such party … and the quoting Reference Market-
> maker to enter into a transaction (the "Replacement Transaction") that
> would have the effect of preserving for such party the economic
> equivalent of any payment or delivery … that would, but for the
> occurrence of the relevant [e]arly [t]ermination [d]ate, have been required
> after that date ….

See Section 12 of each Agreement. Each Agreement defines Reference Market-makers

as

> four leading dealers in the relevant market selected by the party
> determining a Market Quotation in good faith (a) from among dealers of
> the highest credit standing which satisfy all the criteria that such party

7

applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

<u>See</u> Section 12 of each Agreement.

<u>The LBFP Valuation Letter</u>

15.    Colorado Housing sent LBFP a letter (the "<u>LBFP Valuation Letter</u>"), dated March 5, 2009, pursuant to Section 6(d)(i) of the LBFP Agreements, containing Colorado Housing's determination of the Termination Amounts, both purportedly payable to Colorado Housing, in connection with the LBFP Agreements.  (A copy of the LBFP Valuation Letter is annexed as Exhibit I hereto.)

16.    The LBFP Valuation Letter informed LBFP that based on Colorado Housing's calculations, the Termination Amount with respect to the 2000 Agreement was $4,883,319.31 payable to Colorado Housing.  First, Colorado Housing valued the Terminated Transactions at $4,858,633.82.  Second, it subtracted an Unpaid Amount of $190,896.19 due to LBFP on October 1, 2008 and $1,367.10 of interest accrued thereon, arriving at a sub-total of $4,666,370.53.  Third, Colorado Housing added $51,948.78 of interest accrued on that sub-total from the Termination Date to March 5, 2009.  Lastly, Colorado Housing added asserted termination-related expenses of $165,000.

17.    The LBFP Valuation Letter also informed LBFP that based on Colorado Housing's calculations, the Termination Amount with respect to the 2001 Agreement was $3,884,206.45 payable to Colorado Housing.  First, Colorado Housing valued the Terminated Transactions at $3,658,592.74.  Second, it added $35,613.71 of

interest due from the Termination Date to March 5, 2009. Lastly, Colorado Housing added asserted termination-related expenses in the amount of $190,000.

18.    Colorado Housing explained in the LBFP Valuation Letter that with regard to the 2000 Agreement, it had sought bids from twelve Reference Market-makers, only two of which agreed to provide quotations though "neither of which was actionable." One of those two bids indicated a payable to LBFP in the amount of $15,762,000, while the other a payable to Colorado Housing in the amount of $26,500,000. According to Colorado Housing, because it could not obtain the necessary number of quotations required for the Market Quotation, it had to determine the Termination Amount using "Loss,"[2] which Colorado Housing did by simply averaging the two bids it had received and then reducing it by "the present value of the amount accrued on the transactions from October 1, 2008 to the [Termination Date] of $510,366.18," arriving at a net sum of $4,858,633.82 payable to Colorado Housing. As detailed above, Colorado Housing then deducted an Unpaid Amount owed to LBFP, together with interest accrued thereon, and added interest from the Termination Date to March 5, 2009 and its expenses to arrive at the Termination Amount of $4,883,319.31.

---

[2] Each Agreement defines Loss in relevant part as "an amount that [the non-defaulting party] reasonably determines in good faith to be its total losses and costs (or gain . . .) in connection with . . . [the] [t]erminated [t]ransactions . . . including any loss of bargain, cost of funding, or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining, or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made . . . on or before the relevant [e]arly [t]ermination [d]ate and not made . . . ." See Section 12 of each Agreement.

19.    Colorado Housing further explained in the LBFP Valuation Letter that with regard to the 2001 Agreement, it had sought bids from eight Reference Market-makers, none of which was "willing to provide a quotation to enter into replacement swaps under the terms in the existing agreement with LBFP."  According to Colorado Housing, because it could not obtain any bids, it had to determine the Termination Amount using Loss, which Colorado Housing asserted that it did by "replicating the different methodologies used by each of the two reference market makers that submitted quotations for" the Terminated Transactions entered into under the 2000 Agreement (not the 2001 Agreement).  Colorado Housing stated that "the two methods produce[d] widely different results," one indicating a payable to Colorado Housing in the amount of $33,088,110 and the other a payable to LBFP in the amount of $24,895,655.  Colorado Housing nonetheless determined its Loss to be $4,096,227.50, payable to it, by simply averaging the two results, which was then reduced by "the present value of the amount accrued on the transactions from October 1, 2008 to the [Termination Date] of $437,634.76," producing a net sum of $3,658,592.74.  As detailed above, Colorado Housing then added interest and its expenses to arrive at the Termination Amount of $3,884,206.45.

20.    Colorado Housing did not provide LBFP with any details or any documentation to support its total claim of $355,000 in expenses for the LBFP Agreements.  Moreover, based on the very limited information contained in the LBFP Valuation Letter, it is not clear what methodologies were employed by Colorado Housing in determining the Termination Amounts.

The LBSF Valuation Letters

21.    Colorado Housing sent LBSF two letters, each dated December 18, 2008, one with respect to the 2002 Agreement (the "2002 Valuation Letter") and the other with respect to the 2003 Agreement (the "2003 Valuation Letter", and together with the 2002 Valuation Letter, the "LBSF Valuation Letters"), pursuant to Section 6(d)(i) of the LBSF Agreements. The LBSF Valuation Letters contained Colorado Housing's determination of the Termination Amounts. (Copies of the LBSF Valuation Letters are annexed as Exhibits J and K hereto.)

22.    The 2002 Valuation Letter informed LBSF that based on Colorado Housing's calculations, the Termination Amount with respect to the 2002 Agreement was $18,686,364.88 payable to LBSF. First, Colorado Housing valued the Terminated Transactions under the 2002 Agreement at $18,852,355.70. Second, it added interest in the amount of $24,009.18 due from the Termination Date to the settlement date. Lastly, Colorado Housing subtracted asserted termination-related expenses in the amount of $190,000.

23.    The 2003 Valuation Letter informed LBSF that based on Colorado Housing's calculations, the Termination Amount with respect to the 2003 Agreement was $60,763,665.90 payable to LBSF. First, Colorado Housing valued the Terminated Transactions under the 2003 Agreement at $61,125,819.89. Second, it added interest in the amount of $77,846.01 due from the Termination Date to the settlement date. Lastly, it subtracted asserted termination-related expenses in the amount of $440,000.

24.    In explaining how it determined the Termination Amount with respect to the 2002 Agreement, Colorado Housing explained that it had engaged Bond

11

Logistix LLC ("BLX") to implement the valuation of the Terminated Transactions on behalf of Colorado Housing.  According to Colorado Housing, BLX sought bids from twenty-seven financial institutions for entering into Replacement Transactions, of which it said twenty-two indicated no interest in participating and four withdrew after first indicating "some willingness to consider providing an offer."  The only remaining Reference Market-maker, however, indicated a willingness to enter into new transactions on a negotiated basis with certain material modifications.  Colorado Housing argued that it was unable to "obtain quotations for Replacement Transactions in connection with the Market Quotation payment measure" and as a result used "Loss."  Colorado Housing stated that it entered into Replacement Transactions intended to re-establish its hedging positions, but which "contained substantially less favorable credit/documentation terms than did the Terminated Transactions."  Colorado Housing explained that it determined Loss with respect to each of the Terminated Transactions primarily by "passing through to LBSF the payment that [Colorado Housing] actually realized in connection with the corresponding Replacement Transaction, adjusted for the value of any changes in credit and documentation terms in the new ISDA."

25.    Colorado Housing explained that it had also engaged BLX with respect to the 2003 Agreement to act on its behalf in obtaining quotations.  According to Colorado Housing, BLX sought bids from twenty-seven financial institutions for entering into Replacement Transactions, of which it said twenty-two indicated no interest in participating and three withdrew after first indicating "some willingness to consider providing an offer."  The two remaining Reference Market-makers, however, indicated a willingness to enter into new transactions on a negotiated basis with certain material

12

modifications.  Colorado Housing argued that it was unable to "obtain quotations for

Replacement Transactions in connection with the Market Quotation payment measure"

and as a result used "Loss".  Colorado Housing stated that it entered into Replacement

Transactions that were intended to re-establish its hedging positions, but which

"contained substantially less favorable credit/documentation terms than did the

Terminated Transactions."  Colorado Housing stated that it determined Loss with respect

to each of the Terminated Transactions primarily by "passing through to LBSF the

payment that [Colorado Housing] actually realized in connection with the corresponding

[Replacement Transaction], adjusted for the value of any changes in credit and

documentation terms in the new ISDAs."

      26.    Colorado Housing did not provide LBSF with any details or any

documentation to support its total claim of $630,000[3] in expenses for the LBSF

Agreements.  Moreover, based on the very limited information contained in the LBSF

Valuation Letters, the terms of the Replacement Transactions appear to differ

significantly from the terms of the Terminated Transactions.

      Contacts Between the Debtors and Colorado Housing
      <u>After Receipt of the Valuation Letters</u>

      27.    Since February, 2009, the Debtors have attempted to obtain from

Colorado Housing the information necessary to verify the Termination Amounts.  In

response to written requests by the Debtors, Colorado Housing produced copies of the bid

---

[3] In an e-mail dated March 3, 2009, Colorado Housing informed Lehman that with
respect to the 2002 Agreement, $150,000 was for advisory services and $40,000 was for
legal expenses, and with respect to the 2003 Agreement, $400,000 was for advisory
services and $40,000 was for legal expenses.

solicitation forms which had been sent to Reference Market-makers, and a spreadsheet showing Colorado Housing's mark-to-market valuation of each Terminated Transaction. Colorado Housing also noted that there were certain discrepancies in the trade details between its records and the Debtors' records.

28.    The information provided by Colorado Housing, however, is neither complete nor by itself sufficient to allow the Debtors to understand and verify Colorado Housing's valuations of the Terminated Transactions. Indeed, in requesting that Colorado Housing complete the aforementioned spreadsheet, the Debtors noted on May 26, 2009 in an email (the "May 26, 2009 E-mail") to Colorado Housing that "there may be additional questions and/or requests for further detail" regarding the LBFP Valuation Letter and the LBSF Valuation Letters (collectively, the "Valuation Letters"). (A copy of the May 26, 2009 E-mail is annexed as Exhibit L hereto.)  For example, despite the request by the Debtors, Colorado Housing did not produce any evidence of communications with the Reference Market-makers in which the Reference Market-makers purportedly declined to provide bids for the Terminated Transactions.  The Debtors cannot properly evaluate the Termination Amounts and reach a conclusion as to whether Market Quotation could not be employed without reviewing the specific responses received from the Reference Market-makers.  Moreover, the information Colorado Housing provided so far does not explain the methodologies employed by Colorado Housing in calculating the Termination Amounts or the terms of the actual replacement transactions Colorado Housing entered into nor does it provide any details surrounding the fees and expenses charged in connection with the calculation of the Termination Amounts.

14

29.    Thus, on July 9, 2009, Lehman sent two letters to Colorado Housing (the "July 9, 2009 Letters"), asking Colorado Housing to provide information and documents in eleven specific categories relevant to the determination of the Termination Amounts for the Agreements.  (Copies of the July 9, 2009 Letters are annexed as Exhibits M and N hereto.)

30.    Colorado Housing responded to Lehman in two substantively similar letters, dated July 31, 2009 (the "July 31, 2009 Letters"), and informed Lehman that Colorado Housing would not produce documents requested in the July 9, 2009 Letters. (Copies of the July 31, 2009 Letters are annexed as Exhibits O and P hereto.)

31.    The July 9 Letters were designed to provide the Debtors with the information necessary to verify Colorado Housing's calculation of the Termination Amounts – information which has not been provided.  For example, the Debtors requested, among other things, (i) supporting documents for the specific fees, expenses, and other ancillary items that Colorado Housing had claimed in connection with its termination of the Agreements; (ii) documents supporting the contention by Colorado Housing that it could not employ Market Quotation (such as responses from Reference Market-makers to requests for bids); and (iii) any documentation evidencing any replacement transactions into which Colorado Housing actually entered.  By this Motion, the Debtors seek to obtain these materials.

32.    Additionally, the July 9 Letters asked Colorado Housing to explain and provide specific details regarding certain items discussed in the Valuation Letters – items that the Debtors could not understand or verify based solely upon what was contained in the Valuation Statements.  For example, Colorado Housing stated that in the

15

2003 Valuation Letter that it had eliminated certain Reference Market-makers because

they  did not meet "minimum CHFA Rating Agency criteria."  By this Motion, Debtors

seek to have Colorado Housing produce documents identifying those Reference Market-

makers and documents explaining the criteria used to eliminate them.  Similarly,

Colorado Housing stated in the 2003 Valuation Letter that the Replacement Transactions

which it had entered into had "substantially similar" cash flows to the Terminated

Transactions.  Again, by this Motion, Debtors seek to have Colorado Housing produce

documents concerning the criteria used in deciding what those similar cash flows were in

the context of the Replacement Transactions, and what makes them similar to the cash

flows of the Terminated Transactions.

## THE SCOPE OF INFORMATION REQUESTED

33.     Exhibit Q hereto contains a list of the types of documents that

LBFP and LBSF require from Colorado Housing.  The list includes documents and

information relating to Colorado Housing's determination of the Termination Amounts.

Without limiting the generality of the foregoing, the list includes documents concerning

(as that word is defined in Southern District of New York Local Civil Rule 26.3(c)(7)):

> (i) any valuation of the Terminated Transactions;
>
> (ii) the requests by or on behalf of Colorado Housing for quotations from
> Reference Market-makers or other persons concerning or related to the
> Terminated Transactions;
>
> (iii) unpaid amounts with respect to the Terminated Transactions;
>
> (iv) transactions executed in order to replace any of the Terminated
> Transactions;

16

(v) communications related to quotations, unpaid amounts, and/or

replacement transactions in connection with the Terminated Transactions;

(vi) persons involved with respect to valuations and/or replacement

transactions;

(vii) fees and expenses allegedly incurred by Colorado Housing;

(viii) financial/accounting entries made on Colorado Housing's books and

records as a result of the termination of the Terminated Transactions;

(ix) market information for the Terminated Transactions;

(x) documentation of the Terminated Transactions; and

(xi) any replacement of the Remarketing Agent (as such term is defined in

the applicable Agreement) and any evidence of consents from LBFP or

LBSF, as required under such applicable Agreement.

34.    The general scope of questions to be asked of the individual(s)

designated by Colorado Housing to be examined under oath will relate to the subjects

covered by the requests identified on Exhibit Q hereto and the documents which are

produced in response thereto.

## **ARGUMENT**

35.    Bankruptcy Rule 2004(a) states that on "motion of any party in

interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a).

36.    The scope of an examination sought under Bankruptcy Rule 2004

may relate to "the acts, conduct, or property or to the liabilities and financial condition of

the debtor, or to any matter which may affect the administration of the debtor's estate, or

to the debtor's right to a discharge." See Fed. R. Bankr. P. 2004(b).  Thus, a "party in

17

interest may use Rule 2004 to determine the nature and extent of a bankruptcy estate and

to ascertain whether wrongdoing has occurred." In re Hilsen, 2008 WL 2945996, *4

(Bankr. S.D.N.Y., July 25, 2008) (Peck, J.) (citations omitted); see also In re Recoton

Corp., 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) ("The purpose of a Rule 2004

examination is to assist a party in determining the nature and extent of the bankruptcy

estate, revealing assets, examining transactions, and assessing whether wrongdoing has

occurred."; In re Coffee Cupboard, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The

purpose of a Rule 2004 examination 'is to show the condition of the estate and to enable

the Court to discover its extent and whereabouts, and to come into possession of it, that

the rights of the creditor may be preserved.'") (citing Cameron v. U.S., 231 U.S. 710, 714

(1914).

37.    The granting of a motion under Bankruptcy Rule 2004 is within

the discretion of the Court.  See In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y.

2002) ("As the permissive language of the rule suggests, the Court has the discretion to

grant a request for a 2004 examination . . .") (citations omitted).  Bankruptcy Rule 2004

is "debtor-centric and allows considerable leeway for all manner of so-called fishing

expeditions provided that there is a reasonable nexus to the debtor and the administration

of the debtor's case".  In re Hilsen, 2008 WL 2945996, at *1.  Bankruptcy Rule 2004

requires a court to "balance the competing interests of the parties, weighing the relevance

of and necessity of the information sought by examination."  In re Drexel Burnham

Lambert Group, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

38.    The identification of any assets that are potentially property of

LBFP's and LBSF's estates, and the evaluation of potential claims related to such assets,

is important in ensuring that all available sources of value are located and pursued for the benefit of LBFP's and LBSF's creditors. The amounts that LBFP and LBSF are owed under the Agreements are property of the estates, and thus, it is important that LBFP and LBSF confirm that the counterparty, here Colorado Housing, properly valued the Termination Amounts under the Agreements. The discrete categories of documents and other information sought by LBFP and LBSF in this Motion are targeted to provide them with information needed to evaluate Colorado Housing's valuation and determine whether their estates have a claim against Colorado Housing for additional amounts.

### NO PRIOR REQUEST FOR RELIEF

39.    No prior motion for the relief requested herein has been made to this Court or any other court.

### NOTICE

40.    No trustee has been appointed in these chapter 11 cases. The Debtors, in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837], have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) Colorado Housing, and (vii) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

WHEREFORE, for the reasons stated herein, the Debtors respectfully request that the Court enter an order, pursuant to Bankruptcy Rule 2004, granting the

19

relief requested in this Motion in its entirety and such other and further relief as may be

just and proper.

Dated: August 11, 2009
      New York, New York

                        WEIL, GOTSHAL & MANGES LLP

                   By:  /s/ Richard W. Slack
                        Lori R. Fife
                        Richard W. Slack
                        Robert J. Lemons

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        Attorneys for Debtors
                        and Debtors in Possession

20