# Exhibit B

**(Local Currency-Single Jurisdiction)**                                      Execution Copy

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated as of September 13, 2001

Lehman Brothers Financial Products Inc. and Colorado Housing and Finance Authority have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.        Interpretation**

(a)        *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)        *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)        *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.        Obligations**

(a)        *General Conditions.*

(i)        Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)        Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.
NYA 374111.4

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account*.  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*.  If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts.*  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

(a)      *Basic Representations*.

      (i)      *Status*. It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

      (ii)      *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

      (iii)      *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

      (iv)      *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

      (v)      *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.**      **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information*. It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      ***Maintain Authorizations***.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      ***Comply with Laws***.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.      Events of Default and Termination Events

(a)      ***Events of Default***.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

     (i)      ***Failure to Pay or Deliver***.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

     (ii)      ***Breach of Agreement***.  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

     (iii)      ***Credit Support Default***.

          (1)      Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

          (2)      the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

          (3)      the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

     (iv)      ***Misrepresentation***.  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

4

(v)      **_Default under Specified Transaction_**.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)     **_Cross Default_**.  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    **_Bankruptcy_**.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)      is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)    ***Merger Without Assumption***.    The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)        the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)        the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    ***Termination Events***.    The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)    ***Illegality***.    Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)        to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)        to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    ***Credit Event Upon Merger***.    If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)    ***Additional Termination Event***.    If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)      ***Event of Default and Illegality***.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.      Early Termination

(a)      ***Right to Terminate Following Event of Default***.  If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions.  If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)      ***Right to Terminate Following Termination Event***.

(i)      ***Notice***.  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)      ***Two Affected Parties***.  If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)      ***Right to Terminate.***  If:—

(1)      an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)      an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)      ***Effect of Designation***.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

(i)        If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)        Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement.  The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)        *Calculations*.

(i)        *Statement.*  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid.  In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)        *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)        *Payments on Early Termination.*  If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method."  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply.  The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)        *Events of Default.*  If the Early Termination Date results from an Event of Default:—

(1)        *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

8

(2)      *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)      *Second Method and Market Quotation.*  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)      *Second Method and Loss.*  If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)      **Termination Events.**  If the Early Termination Date results from a Termination Event:—

(1)      *One Affected Party.*  If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)      *Two Affected Parties.*  If there are two Affected Parties:—

(A)      if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)      if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)      **Adjustment for Bankruptcy.**  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)     *Pre-Estimate.*    The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.     Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)     a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)     a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.     Miscellaneous

(a)     *Entire Agreement*.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)     *Amendments*.  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)     *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations*.

(i)     This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)     The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    **No Waiver of Rights.**  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    **Headings.**  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.    Notices

(a)    **Effectiveness.**  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    **Change of Addresses.**  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

## 11.    Governing Law and Jurisdiction

(a)    ***Governing Law.***  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    ***Jurisdiction.***  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    ***Waiver of Immunities.***  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

***"Additional Termination Event"*** has the meaning specified in Section 5(b).

***"Affected Party"*** has the meaning specified in Section 5(b).

***"Affected Transactions"*** means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

***"Affiliate"*** means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

*"Applicable Rate"* means:—

       (a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

       (b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii) on which that amount is payable, the Default Rate;

       (c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

       (d)      in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

**"Scheduled Payment Date"** means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

**"Set-off"** means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

**"Settlement Amount"** means, with respect to a party and any Early Termination Date, the sum of:—

    (a)      the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

    (b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

**"Specified Entity"** has the meaning specified in the Schedule.

**"Specified Indebtedness"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"Specified Transaction"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"Terminated Transactions"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"Termination Event"** means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"Termination Rate"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"Unpaid Amounts"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS FINANCIAL          COLORADO HOUSING AND FINANCE
PRODUCTS INC.                      AUTHORITY


By:_____       By:_____
    Name:                                  Name:
    Title:                                 Title:
    Date:                                  Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYA 374111.4

SCHEDULE
to the
MASTER AGREEMENT
dated as of September 13, 2001
between
LEHMAN BROTHERS FINANCIAL PRODUCTS INC. ("Party A"),
a corporation organized under the laws of the State of Delaware
and
COLORADO HOUSING AND FINANCE AUTHORITY ("Party B"),
a body corporate and political subdivision of the State of Colorado

Part 1.  **Termination Provisions.**

In this Agreement:—

(a)      **"Specified Entity"** means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section (a)(v) (Default under Specified Transaction), | Not Applicable. |
| Section (a)(vi) (Cross Default), | Not Applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not Applicable. |

and in relation to Party B for the purpose of: —

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not Applicable. |
| Section 5(a)(vi) (Cross Default), | Not Applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not Applicable. |

(b)      **"Specified Transaction"** will have the meaning specified in Section 12 of this Agreement.

(c)      The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

**"Specified Indebtedness"** will have the meaning specified in Section 12 of this Agreement; provided that, with respect to Party B, Specified Indebtedness includes only obligations of Party B that are either (1) general obligations of Party B, backed by the full faith and credit of Party B, or (2) obligations issued under the Covered Indenture that are Class I, Class II or Class III Obligations (as defined in the Covered Indenture).

*"Threshold Amount"* means USD 20,000,000 in the case of Party A, and USD 10,000,000 in the case of Party B.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B.

(e)    The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)    *Payments on Early Termination.*   For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)    *Additional Termination Event* will apply.   The following shall constitute Additional Termination Events:—

Party A's counterparty rating (in which case Party A shall be the Affected Party), or the rating of Class I Obligations (as defined in the Covered Indenture) issued under the Covered Indenture (in which case Party B shall be the Affected Party), is suspended, withdrawn or falls below (i) A2 as determined by Moody's Investors Service, Inc., or (ii) A as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or (iii) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties.

(h)    *Events of Default.*

(i) *Bankruptcy.*   Clause (6) of Section 5(a)(vii) of this Agreement is hereby amended to read in its entirety as follows:—

"(6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) in the case of a Government Entity, any Credit Support Provider of such Government Entity or any applicable Specified Entity of such Government Entity, (I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body (a "Commission") with authority to recommend, advise or declare the postponement, rescheduling or revision of the Government Entity's outstanding debt in connection with a declaration of financial emergency or similar state of financial distress with respect to the Government Entity or (II) there shall be enacted by any legislative or regulatory body with competent jurisdiction over it, legislation or regulatory action creating a Commission with such authority;".

(ii) *Merger Without Assumption.*   Section 5(a)(viii) of this Agreement is hereby amended to read in its entirety as follows:—

"(viii) *Merger Without Assumption.*   The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if such party is a Government Entity, an entity such as an organization, board, commission, authority, agency, or body succeeds to the principal functions of, or powers and duties

5

granted to, such party or any Credit Support Provider of such party) and, at the time of such consolidation, amalgamation, merger, transfer or succession:—

> (1) the resulting, surviving, transferee, or successor entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

> (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Agreement."

(i) **Termination Events**.  Section 5(b)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) *Credit Event Upon Merger.*  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if X is a Government Entity, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, X, any Credit Support Provider of X or any Specified Entity of X) and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving, transferee or successor entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party).  For purposes of this Section 5(b)(ii), a party's creditworthiness shall be treated as "materially weaker" only if the credit rating of the resulting, surviving, transfereee or successor entity (or in the case of Party B, the Class I Obligations of Party B) is lower than the credit rating of X immediately prior to such consolidation, amalgamation, merger, asset transfer or succession; or".

(j) In Subsection (b) of Section 6, in the 13th line, "either party in the case of an Illegality" is deleted, and in its place, the following is inserted: "Either party in the case of an Illegality described in clause (ii) of Section 6(b), and the party that is not the Affected Party in the case of any other Illegality".

(k) The last sentence of clause (i) of Section 6(d) is deleted.

(l) The last sentence of the lead-in paragraph of Section 6(e) is amended by adding at the end thereof, following the word "Set-off" the following: "; provided that neither party shall be permitted to effect a Set-off to the extent that such Set-off is not permitted by applicable law."

(m) In clause (ii) of Section 8(e), 2nd line, "(whether orally or otherwise)" is deleted and "in writing" is inserted in its place.

Part 2. **Agreement to Deliver Documents.**

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

NYA 374111.4

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Lehman Brothers Holdings Inc. ("Holdings") in the form of Exhibit B to this Schedule. | Upon substitution of Lehman Brothers Special Financing Inc. ("LBSF") for Party A pursuant to Part 4(j) of this Schedule. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Promptly after execution of this Agreement. | Yes |
| Party B | An opinion of counsel to Party B in the form of Exhibit D to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A copy of the statutory or regulatory authority pursuant to which Party B is authorized to enter into this Agreement and each Transaction. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party A and Party B | An incumbency certificate with respect to the signatory of this Agreement. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit E to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certificate from the Chief Executive Officer or the Chief Financial Officer of Party B, or the equivalent of any thereof, to the effect that any requirements of the statutory or regulatory authority referred to above have been satisfied, substantially in the form of Exhibit F to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | An executed copy of the Covered Indenture. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |

Part 3.        **Miscellaneous.**

5

(a)    ***Addresses for Notices.***  For the purpose of Section 10(a) to this Agreement:—

Address for notices or communications to Party A:—

Address:    3 World Financial Center, 8th Floor, New York, New York 10285
Attention:  Municipal Financial Products – Middle Office
Facsimile No.:  212-526-7372
Telephone No.:  212-526-7133

Address for notices or communications to Party B:—

Address:    1981 Blake Street, Denver, CO 80202
Attention:  Director of Finance
Facsimile No.: 303-294-9773
Telephone No.: 303-297-7346

(b)    ***Calculation Agent***.  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(c)    ***Credit Support Document.***  Details of any Credit Support Document:—

In the case of Party A, Not Applicable, but only from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(j) of this Schedule, the Guarantee of Holdings in the form of Exhibit B to this Schedule.

In the case of Party B, Not Applicable.

(d)    ***Credit Support Provider.***  Credit Support Provider means in relation to Party A: Not Applicable, but only from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(j) of this Schedule, Holdings.  Credit Support Provider means in relation to Party B: Not Applicable.

(e)    ***Governing Law.***  This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine); provided, however, that the power and authority of Party B to enter into this Agreement will be governed by and construed in accordance with the laws of the State of Colorado.

(f)    ***Netting of Payments.***  Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(g)    ***"Affiliate"*** will have the meaning specified in Section 12 of this Agreement.

(h)    ***"Covered Indenture"*** means the 2001 Series AA Indenture, dated as of  September 1, 2001, between Party B and Zions First National Bank, as Trustee, as amended and supplemented in accordance with the terms hereof and thereof..

(i)    ***"Covered Indenture Incorporation Date"*** means the date of this Agreement.

(j)    ***"Government Entity"*** means Party B.

Part 4.  **Other Provisions.**

5

(a)    **Obligations.** Section 2(a)(iii) of this Agreement is hereby amended to read in its entirety as follows:—

"(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, material Potential Event of Default or Incipient Illegality with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

(b)    **Representations.**

(i) The introductory clause of Section 3 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and 3(e), at all times until the termination of this Agreement) that:—".

(ii) Section 3(a)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) **Powers**. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance;".

(iii) Section 3(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b) **Absence of Certain Events**. No Event of Default or material Potential Event of Default or, to its knowledge, Incipient Illegality or Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."

(iv) Section 3 of this Agreement is hereby amended by adding the following subsection "(e)" thereto, which subsection shall only apply to the Government Entity:—

"(e) **Non-Speculation**. This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments and not for purposes of speculation."

(v) Section 3 of this Agreement is hereby amended by adding the following subsection "(f)" thereto:—

"(f) **No Immunity**. It is not entitled to claim immunity on the grounds of sovereignty or other similar grounds other than with respect to claims which lie or could lie in tort with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court in Denver, Colorado, (iii) relief by way of injunction, order for specific performance or for recovery of property, or (iv) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any

5

Proceedings (as defined in Section 11(b)) in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets."

(vi)    Section 3 of this Agreement is hereby amended by adding the following subsection "(g)" thereto:—

"(g)  *Eligible Swap Participant.*  It is an "eligible swap participant" as defined in the Part 35 Regulations of the U.S. Commodity Futures Trading Commission."

(c)    *Agreements.*

(i) The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d), (e) and (f), the Government Entity agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

(ii) Section 4 of this Agreement is hereby amended by adding the following subsections "(d)", "(e)" and "(f)" thereto:—

"(d)  *Compliance with Covered Indenture*.  The Government Entity will observe, perform and fulfill each material provision in the Covered Indenture applicable to such Government Entity in effect on the Covered Indenture Incorporation Date the non-compliance with such material provision would materially adversely affect Party A (as any of those provisions may be amended, supplemented or modified for purposes of this Agreement with the prior written consent of the other party hereto) (the "Incorporated Provisions"), with the effect that such other party hereto will have the benefit of each of the Incorporated Provisions (including without limitation, covenants, right to consent to certain actions subject to consent under the Covered Indenture and delivery of financial statements and other notices and information).  In the event the Covered Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Covered Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Government Entity under this Agreement and any obligations of the Government Entity or any Credit Support Provider of the Government Entity under a Credit Support Document have been fully satisfied.  The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein.  For purposes of this Agreement, the Incorporated Provisions shall be construed as though (i) all references therein to any party making loans, extensions of credit or financial accommodations thereunder or commitments therefor (the "Financings") were to the other party hereto and (ii) to the extent that such Incorporated Provisions are conditioned on or relate to the existence of such Financings or the Government Entity having any obligations in connection therewith, all references to such Financings or obligations were to the obligations of the Government Entity under this Agreement.  Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement.  Any amendment, supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement.

(e)  *Notice of Incipient Illegality*.  If an Incipient Illegality occurs, the Government Entity will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Incipient

5

Illegality and will also give such other information about that Incipient Illegality as the other party may reasonably require.

(f) ***Security and Source of Payment of Party B's Obligations.*** Party B's obligation to make payments on any Payment Date of any Transaction hereunder ("Regularly Scheduled Payments") shall be secured by the Trust Estate (as defined in the Covered Indenture) established under the Covered Indenture on a parity with Class I Bonds (as defined in the Covered Indenture). Party B's obligations to make payments hereunder other than the Regularly Scheduled Payments shall be secured by the general obligation of Party B. This Agreement and all Transactions hereunder shall constitute Derivative Products (as defined in the Covered Indenture) and Party A shall constitute a Reciprocal Payor (as defined in the Covered Indenture) and as such are entitled to all the benefits provided to Derivative Products and Reciprocal Payors thereunder. "

(d) ***Expenses.*** Section 9 is hereby amended by deleting the phrase "indemnify and hold harmless the other party for and against" and substituting therefore the word "pay".

(e) ***Jurisdiction.*** Section 11(b) of this Agreement is hereby deleted in its entirety.—

(f) ***Definitions***. Section 12 of this Agreement is hereby amended to add the following definitions in their appropriate alphabetical order:—

> "***'Covered Indenture'*** has the meaning specified in the Schedule."

> "***'Covered Indenture Incorporation Date'*** has the meaning specified in the Schedule."

> "***'Government Entity'*** has the meaning specified in the Schedule."

> "***'Incipient Illegality'*** means (a) the enactment by any legislative body with competent jurisdiction over a Government Entity of legislation which would render unlawful (i) the performance by such Government Entity of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of a Transaction or the compliance by such Government Entity with any other material provision of this Agreement relating to such Transaction or (ii) the performance by a Government Entity or a Credit Support Provider of such Government Entity of any contingent or other obligation which the Government Entity (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction, (b) any assertion in any proceeding, forum or action by a Government Entity, in respect of such Government Entity to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to a Government Entity or any Credit Support Provider of such Government Entity of any event that constitutes an Illegality."

(g) The definition of "Default Rate" is amended to read as follows: ""Default Rate" means a rate per annum equal to the 6 month USD-LIBOR-BBA rate on the date of the Early Termination date, plus 2% per annum."

(h) In the 3rd line of the definition of "Market Quotation", "will be" is deleted and "will be in writing and" is inserted in its place.

(i) The definition of "Non-Default Rate" is amended to be as follows: ""Non-default Rate" means a rate per annum equal to the six month USD-LIBOR-BBA rate plus 1% as of the date that the sum upon which the Non-Default Rate is computed is due."

NYA 374111.4

(j)     The definition of "Termination Rate" is amended to be as follows: ""Termination Rate" means a rate per annum equal to the six month USD-LIBOR-BBA rate plus 1%, as of the date that the sum upon which the Termination Rate is computed is due."

<u>Miscellaneous</u>:

(k)     Confirmation.  A form of Confirmation is set forth as Exhibit A hereto.

(l)     This Agreement is hereby amended by adding the following Section "13" hereto:—

**"13.     Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

(a) *Non-Reliance*.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction.  It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.  Party A hereby acknowledges that Party A proposed to Party B the Transactions covered by this Agreement, provided that Party B acknowledges that it has sought independent advice to the Transactions and that Party A's preceding acknowledgement does not diminish the foregoing representations contained in this Section 13(a) by Party B.

(b) *Assessment and Understanding*.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction.  It is also capable of assuming, and assumes, the risks of that Transaction.

(c) *Status of Parties*.  The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction."

(m)    *Trial By Jury.*  To the fullest extent permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction.

(n)    *Accuracy of Specified Information.*  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person".

(o)    *Credit Assignment Event.*

(i)     If at any time during the term of this Agreement, the rating of Party B or any Specified Entity of Party B falls below the Assignment Threshold Rating (as defined below) the rights and obligations of Party A under this Agreement and all Transactions hereunder

5

shall automatically, and without any further action by any party, be deemed to have been assigned and delegated to LBSF, effective on the third Business Day following notification by Party A to Party B of such assignment and Party B expressly and irrevocably consents to such assignment and assumption, except that no such assignment and assumption shall occur at any time after the occurrence of any event of default under any master agreement between Party A and LBSF. As of and from the effective date of such assignment, LBSF shall succeed to all rights and obligations of Party A under this Agreement and all Transactions hereunder.

"Assignment Threshold Rating" means (A) with respect to a Moody's Investors Service Inc.: the rating of Party B's Class III Obligations under the Covered Indenture, Baa3, and (B) with respect to a Standard & Poor's Rating Group: the rating of Party B's Class III Obligations under the Covered Indenture, BBB-.

(ii)     Party A represents that it has provided separate consideration to LBSF for the right to assign this Agreement and the Transactions hereunder to LBSF pursuant to clause (i), and Party B shall not owe Party A any termination or other payment upon any such assignment.

(iii)    Notwithstanding clause (i) above, no assignment of any Transaction to LBSF shall occur if, prior to the effective date of the assignment described in such clause (i), Party B notifies Party A that Party B agrees to (A) terminate all Transactions as if a Termination Event has occurred with Party B as the Affected Party or (B) assign all Transactions to a third party on terms acceptable to Party A and Party B.

(iv)     Notwithstanding clauses (i) through (iii) above, no transfer or assignment payment shall be due to or owing from either Party A or Party B other than its obligations under the Transactions.

(v)      Notwithstanding the foregoing, the assignment provisions of this paragraph shall not take effect if, at the time such assignment would be required, Party B shall have satisfied in full all of its payment obligations under Section 2(a) of this Agreement and shall at such time have no future payment obligations, whether absolute or contingent, under such Section.

(p)      *Transfers.*

Section 7 of this Agreement is hereby amended by adding subsection "(c)" and the language following "(c)" thereto;

"Notwithstanding the provisions of this Section 7 of this Agreement, Party B may transfer all of its rights and obligations under any Transaction (the "Transferred Obligation") to another entity (the "Transferee") provided that:

(1)      the credit worthiness of the Transferee is acceptable to Party A;

(2)      at the time of such transfer, no Early Termination Date shall have been designated under this Agreement and no Event of Default, Potential Event of Default or Termination Event shall have occurred and be continuing under the Agreement with respect to Party B;

5

(3)     such transfer will not result in the violation of any law, regulation, rule, judgement, order or other legal limitation or restriction applicable to Party A;

(4)     at the time of such transfer, no event which would constitute a Termination Event, Event of Default or Potential Event of Default with respect to the Transferee if the Transferee were a party to this Agreement shall have occurred;and

(5)     no adverse tax consequences will occur as a result of such transfer;

(6)     such transfer will not result in the violation of Party A's exposure limitations or counterparty eligibility policies; and

(7)     the Tranferee has entered into a Master Agreement and Credit Support Annex with appropriate credit provisions in relation to the Transferee's credit rating."

5

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

By:_____

Title:_____

COLORADO HOUSING AND FINANCE AUTHORITY

By:_____

Title:_____

5

EXHIBIT A to Schedule

Form of Confirmation

[Date]

TRANSACTION

Colorado Housing and Finance Authority
1981 Blake Street
Denver, Colorado 80202

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.	This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of September 13, 2001 (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.	The terms of the particular Transaction to which this Confirmation relates are as follows:—

Party A:                                LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

Party B:                                COLORADO HOUSING AND FINANCE AUTHORITY

[Notional Amount:]

Trade Date:

Effective Date:

Termination Date:

FIXED AMOUNTS:

Fixed Rate Payer:                       [Party A/B]

[Fixed Rate Payer
  Currency Amount:]

EXHIBIT A
Page 4

NYA 374111.4

| | |
|---|---|
| Fixed Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]: | [            ], subject to adjustment in accordance with the [Following/Modified Payment or [Following/Preceding] Business convention, with respect to a _____ Banking Day and a _____ Banking Day [with No Adjustment of Period End Dates] |
| [Fixed Amount:] | |
| Fixed Rate: | |
| Fixed Rate Day Count Fraction: | |
| FLOATING AMOUNTS: | |
| Floating Rate Payer: | [Party B/A] |
| [Floating Rate Payer Currency Amount:] | |
| Floating Rate Payer Payment Dates [or, Period End Dates, if Delayed Payment or Early Payment applies]: | [            ], subject to adjustment in accordance with the [Following/Modified Payment or [Following/Preceding] Business convention, with respect to a _____ Banking Day and a _____ Banking Day [with No Adjustment of Period End Dates] |
| Floating Rate for initial Calculation Period: | |
| Floating Rate Option: | |
| Designated Maturity: | |
| Floating Rate Spread: | [plus/minus]     % p.a. |
| Floating Rate Day Count Fraction: | |
| Reset Dates: | |
| [Rate Cut-off Dates:] | |
| [Method of Averaging: | Unweighted/Weighted Average Rate] |

EXHIBIT A
Page 4

NYA 374111.4

Compounding:                                    Applicable/Inapplicable

[Compounding Dates:]

[Initial Exchange:

Initial Exchange Date:

Party A Initial Exchange Amount:

Party B Initial Exchange Amount:

Final Exchange:

Final Exchange Date:

Party A Final Exchange Amount:

Party B Final Exchange Amount:]

Calculation Agent:

      3.        Account Details

        Payments to Party A

        Account for payments in [first currency]:        [    ]

        Account for payments in [second currency]:    [    ]

        Payments to Party B

        Account for payments in [first currency]:        [    ]

        Account for payments in [second currency]:    [    ]

      4.        Offices

        The Office of Party B for the Transaction is [      .]

      5.      [Broker/Arranger:        ]

EXHIBIT A
Page  4

NYA 374111.4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

By:_____

Name:_____

Title:_____

Confirmed as of the
date first written

COLORADO HOUSING AND FINANCE AUTHORITY

By:_____

Name:_____

Title:_____

EXHIBIT A
Page  4

NYA 374111.4

EXHIBIT B to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and COLORADO HOUSING AND FINANCE AUTHORITY ("Party B") have entered into a Master Agreement dated as of September 13, 2001, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest

EXHIBIT B
Page 2

NYA 374111.4

thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 3 World Financial Center, 24th Floor, New York, New York 10285 (Facsimile No. (212) 526-1466) with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products Middle Office at 3 World Financial Center, 7th Floor, New York, New York 10285 (Facsimile No. (212) 528-6927).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: _____

NYA 374111.4

EXHIBIT C to Schedule

[Form of Opinion of Counsel to
Lehman Brothers Financial Products Inc.]

[Date]

Colorado Housing and Finance Authority
1981 Blake Street
Denver, Colorado 80202

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Financial Products Inc., a Delaware corporation ("Party A") and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of September 13, 2001 between Party A and the Colorado Housing and Finance Authority ("Party B").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, certificates and statements of public officials and officers of Party A and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.      Party A is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

2.      The execution, delivery and performance of the Master Agreement are within Party A's corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.      The Master Agreement has been duly executed and delivered and constitutes a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.      My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

EXHIBIT C
Page 2

C.    My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A, (ii) the authenticity of document submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

EXHIBIT C
Page 2

EXHIBIT D to Schedule

[Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Financial Products Inc.
3 World Financial Center
New York, New York 10285

Ladies and Gentlemen:

We have acted as counsel to the Colorado Housing and Finance Authority, a _____ of the State of Colorado ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of September 13, 2001 between Lehman Brothers Financial Products Inc. ("Party A") and Party B. The Master Agreement is to be supplemented by confirmations of Transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the form of Confirmation attached thereto and such documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1. Party B is a _____ of the State of duly Colorado duly organized and validly existing under the laws of the State of Colorado.

2. Party B is authorized under [specify statutory and/or regulatory authority] to enter into the Master Agreement and to perform its obligations thereunder and under the Confirmation entered into pursuant to and which form a part of the Master Agreement.

3. Party B has taken all necessary action required to be taken to ensure that the Master Agreement and the Confirmation entered into pursuant to and which form a part of the Master Agreement comply in all respects with [specify statutory and/or regulatory authority].

4. The Master Agreement has been duly executed and delivered by Party B and constitutes, and each Confirmation, upon due execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

EXHIBIT D
Page 2

NYA 374111.4

5.      To the best of our knowledge, no consent, authorization, license or approval of, or registration or declaration with, any governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation by Party B.

6.      Party B is subject to suit with respect to its obligations under the Master Agreement and each Confirmation and neither Party B nor any of its properties and assets has any right to immunity from suit or attachment in aid of execution or other legal process on the grounds of sovereignty or otherwise or, to the extent that Party B and any of its properties have any such right to immunity, Party B has effectively waived such right for the purpose of the Master Agreement and the party executing the Master Agreement and each Confirmation on its behalf has the authority to waive such immunity.

7.      [Opinion re: security and source of payment of Party B's obligations, enforceability of Covered Indenture and related bond documents.]

Very truly yours,

EXHIBIT D
Page  2

NYA 374111.4

EXHIBIT E to Schedule

Form of Resolutions

RESOLVED that (i) _____ ("_____") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Agreement (the "Agreement") dated as of _____, between Lehman Brothers Financial Products Inc. ("Lehman") and [Counterparty], in the form previously presented to _____ (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by _____ into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that _____ is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of _____ authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a net basis, i.e., where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of _____ be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of _____ and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of _____ in connection with or related to the matters set forth in or reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of _____.

EXHIBIT E
Page 1

EXHIBIT F to Schedule

Officer's Certificate

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of Colorado Housing and Finance Authority (the "Authority") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of September 13, 2001, between Lehman Brothers Financial Products Inc. ("Lehman") and the Authority that:

(i)     the Authority has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [specify statutory and/or regulatory authority] (the "Statute"), [its charter and/or its by-laws], including

[set forth any actions required by the Statute to be taken];

(ii)     the Authority is entering into the Master Agreement and any Transactions entered into or to be entered into thereunder, for hedging purposes and not for the purpose of speculation; and

(iii)     the Authority meets all the requirements of the Statute not referred to above including:

[set forth any requirements of the Statute not referred to above, such as "the Authority is entering into the Transaction in connection with or incidental to the sale and issuance of bonds"].

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN WITNESS WHEREOF, this Certificate has been executed as of this _____ day of _____, _____.

EXHIBIT F
Page 1