**Hearing Date and Time: August 26, 2009 at 10:00 a.m (Prevailing Eastern Time)**
**Objection Date and Time:  August 21, 2009 at 4:00 p.m (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                                  :
In re                                                             :        **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,       :        **08-13555 (JMP)**
                                                                  :
                                    **Debtors.**        :        **(Jointly Administered)**
                                                                  :
-----------------------------------------------------------------x

## NOTICE OF LBHI'S MOTION PURSUANT TO SECTIONS 105(a) AND 364 OF THE BANKRUPTCY CODE AUTHORIZING LBHI TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL POSTED IN CONNECTION WITH A REVOLVING SURETY BOND FACILITY WITH TRAVELERS

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated August 11, 2009 (the "Motion"), of Lehman Brothers Holdings Inc., pursuant to sections 105(a) and 364 of title 11 of the United States Code for authorization to grant first priority liens in cash collateral posted in connection with LBHI's entry into a surety facility, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 26, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, and shall be filed

with the Bankruptcy Court electronically in accordance with General Order M-242 (which can

be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn:

Alfredo R. Perez, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for

the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004

Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin,

Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase

Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis

O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured

creditors appointed in these cases; and (v) Travelers Casualty and Surety Company of America,

One Tower Square, Bond – 2SHS2, Hartford, Ct 06183, Attn:  Robert L. Scanlon, so as to be so

filed and received no later than **August 21, 2009 at 4:00 p.m. (Prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: August 11, 2009
     New York, New York

/s/ Alfredo R. Perez
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time: August 26, 2009 at 10:00 a.m (Prevailing Eastern Time)**
**Objection Date and Time:  August 21, 2009 at 4:00 p.m (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                  :

**In re**                     :    **Chapter 11 Case No.**
                  :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :    **08-13555 (JMP)**
                  :

           **Debtors.**      :    **(Jointly Administered)**
                  :
-------------------------------------------------------------------x

**LBHI'S MOTION PURSUANT TO SECTIONS 105(a) AND 364**
**OF THE BANKRUPTCY CODE AUTHORIZING LBHI TO ENTER**
**INTO A REVOLVING SURETY BOND FACILITY AGREEMENT AND**
**TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL TO TRAVELERS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), respectfully represent:

**Relief Requested**

        1.     LBHI seeks authorization, pursuant to sections 105(a) and 364(c)(2) of the

title 11 of the United States Code (the "Bankruptcy Code"), to grant first priority liens to

Travelers Casualty and Surety Company of America and its subsidiaries and affiliates

(collectively, "Travelers") in a cash securities account maintained at Morgan Stanley Smith

Barney LLC under the control of Travelers of up to $10 million (the "Cash Collateral").  The

Cash Collateral will be posted in connection with LBHI's entry into a revolving surety bond

facility[1] with Travelers, pursuant to which Travelers will issue surety bonds, as needed, for the

benefit of various Lehman entities.  LBHI believes that, at this time, it will need to deposit only

$2 million in Cash Collateral to satisfy Lehman's current surety bond needs, but anticipates that

it will need access to greater amounts in the future.  As explained below, access to a surety bond

facility is necessary to allow Lehman to conduct its real estate operations and protect its real

estate assets throughout the United States.  Accordingly, the Motion should be granted.

      2.      In accordance with Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the

Southern District of New York, below is a summary of the salient terms of the Surety Bond

Agreement, together with references to the applicable sections of the Surety Bond Agreement: [2]

- **Issuance**.  Travelers may issue surety bonds (the "Bonds") up to an aggregate capacity of $10 million in exchange for the payment of premiums to be paid on a timely basis to Travelers as Bonds become due and, as necessary, the posting of Cash Collateral by LBHI.  Travelers will provide LBHI and its affiliates with new Bonds according to Travelers' normal underwriting practices.

- **Indemnity**.  LBHI shall indemnify Travelers for any Loss[3] that it may incur in connection with the issuance of Bonds pursuant to common law and the GCI, including unpaid premiums, interest, court costs and counsel fees, and any expense incurred or sustained as a result of or in connection with the furnishing of Bonds. See GCI § 2.

---

[1] The surety bond facility consists of a General Contract of Indemnity (the "GCI"), a Master Security Agreement (the "MSA"), and a Control Agreement (the "Control Agreement," together with the GCI and the MSA, the "Surety Bond Agreement").  Copies of each of these documents are attached hereto at Exhibits A, B, and C, respectively.

[2] In the event of a conflict between the summary description and the terms of the Surety Bond Agreement, the latter shall control.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the GCI, MSA or Control Agreement.

- <u>Cash Collateral</u>.  LBHI shall provide Travelers a first priority perfected lien in the Cash Collateral pursuant to section 364(c)(2), which will be held as a deposit in a cash securities account maintained at Morgan Stanley Smith Barney LLC under the control of Travelers as provided in the Control Agreement.  <u>See</u> MSA § 2.

- <u>Affiliate Funding</u>.  The Bonds will be issued with respect to both Debtor and non-Debtor affiliates of LBHI.  LBHI will be responsible for the payment of the premiums and the posting of Cash Collateral with respect to all Bonds issued.  As explained below, LBHI will be reimbursed by the respective Lehman affiliate on whose behalf a Bond is issued for all costs expended by LBHI either immediately in cash or in accordance with the terms of the Cash Management Order (defined below);

- <u>Term</u>.  The Surety Bond Agreement shall remain in full force and effect until terminated.  LBHI may terminate upon written notice to Travelers, which shall be effective thirty (30) days after Travelers' receipt of such notice.  <u>See</u> GCI § 11.

- <u>Events of Default</u>.  The following shall constitute "Events of Default":
    - LBHI fails to make any payment, perform any covenant or otherwise defaults under any Bond or the Surety Bond Agreement;
    - LBHI assigns, attempts to encumber, subjects to further pledge or security interest, sells, transfers or otherwise disposes of any of the Cash Collateral without prior written consent of Travelers;
    - any representation or warranty made by LBHI in the Surety Bond Agreement is false or misleading in any material respect;
    - other than in connection with or with respect to these chapter 11 cases, a receiver, custodian or liquidator is subsequently appointed for LBHI and remains in effect for more than 30 days; or LBHI is subsequently adjudicated bankrupt or insolvent or any property of LBHI is sequestered or a petition for arrangement is subsequently filed by or against LBHI under any bankruptcy and remains in effect for more than 30 days, reorganization, arrangement or insolvency law of any jurisdiction and not dismissed within 30 days of such filing.[4]  <u>See</u> MSA § 11.

- <u>Default Interest</u>.  If a Demand on certain Bonds is made by a third party to Travelers, LBHI shall be responsible for paying the full amount of the Demand at least three business days before such payment is due.  If LBHI fails to make payment, interest shall accrue, commencing on the date Travelers pays the amount of the Demand, at 130% of the prime rate of interest in effect on December 31 of the previous calendar year as published by the Wall Street Journal.  <u>See</u> GCI § 12.

---

[4] It is contemplated that LBHI may continue to require the issuance of Bonds by Travelers pursuant to this Surety Bond Agreement beyond the completion of these jointly administered cases.  Accordingly, LBHI and Travelers agree that this provision is intended to capture subsequent actions by or against LBHI, not any actions taken in connection with these jointly administered cases.

- <u>Automatic Stay</u>.  Travelers is granted relief from the automatic stay, as may be necessary, upon five business days' notice to the Debtors, the Creditors' Committee (defined below) and the Office of the United States Trustee, to cancel any Bond in accordance with the terms of such Bond and the GCI and to draw upon the Cash Collateral in accordance with the MSA and Collateral Agreement; and

- <u>Administrative Expense</u>.  Travelers reserves its right to assert a claim for administrative expense priority pursuant to sections 503 and 507 of the Bankruptcy Code to the extent Travelers' Loss relating to the Surety Bond Agreement is not fully secured.  The Debtors reserve all of their rights to contest the assertion of any claim for administrative expense priority by Travelers.

## **Background**

3.     Commencing on September 15, 2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

5.     On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("<u>SIPA</u>") with respect to Lehman Brothers Inc. ("<u>LBI</u>").  A trustee appointed under SIPA is administering LBI's estate (the "<u>SIPA Trustee</u>"). On January 19, 2009, the U.S. Trustee appointed an examiner (the "<u>Examiner</u>") and on January 20, 2009, the Court approved the U.S. Trustee's appointment of the Examiner.

## Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Lehman's Business

7.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## The Need for Surety Bonds

9.      As of the Commencement Date, Lehman had billions of dollars invested in both the debt and equity of various commercial and residential real estate projects around the world.  In addition, LBHI and its affiliates are lenders to a large number of residential mortgage borrowers throughout the country.  In most states and local jurisdictions, Lehman needs a license to qualify as a lending institution and to be eligible to conduct business, directly or indirectly, as a mortgage broker or mortgage lender (a "Real Estate License").  A common requirement when obtaining or renewing a Real Estate License is that the licensee post a surety bond.  Surety bonds serve to secure the performance of Lehman's lending obligations.  In addition, Lehman may have in place or could in the future be required to post surety bonds to utility companies or for other commercial purposes.

10.     Although Lehman is in compliance with most of their licensing and surety bond posting requirements, some of Lehman's surety bonds and Real Estate Licenses are expired and the remainder will expire in the near future.  If Lehman's Real Estate Licenses expire, Lehman will be unable to take actions in the ordinary course of business to preserve the value of its real estate assets, including the selling or transferring of mortgages for value, and the prosecution of foreclosure actions.  Furthermore, Lehman could be subject to fees and penalties imposed by state or local authorities if it is operating its real estate businesses without the applicable Real Estate License.  Therefore, in order to preserve effectively the value of its real estate assets, Lehman must maintain its prepetition surety bonds, and will also need to post new bonds with various state and local authorities to renew or obtain new Real Estate Licenses. Without the ability to continuously renew its surety bonds, Lehman will be unable to satisfy the licensing requirements, which could result in a loss of value to creditors.

### The Need for A Cash Collateral Maintenance Account

11.     Prior to the commencement of these chapter 11 cases, Lehman was generally able to post surety bonds through an insurance company such as Travelers, based almost entirely on Lehman's creditworthiness and in exchange for the payment of a bond premium fee.  Insurers are no longer willing, however, to extend credit to the Debtors and their affiliates on an unsecured basis.  Rather, they have required the posting of either a cash margin maintenance account over which the insurer will hold first priority liens or the issuance of a letter of credit.  After considering their available options, the Debtors determined that it would be more difficult and more expensive to obtain a letter of credit, which requires an additional level of documentation and additional fee to be paid to the bank posting such letter of credit.

Accordingly, LBHI has determined to enter into the Surety Bond Agreement with Travelers and to post the Cash Collateral.

## **The Surety Bond Agreement**

12.    The terms of the Surety Bond Agreement provide that LBHI will advance to Travelers a surety bond premium fee to issue a surety bond for the benefit of one of its various Debtor and non-Debtor Lehman affiliates.  As security for Lehman's performance of its obligations, LBHI will post Cash Collateral with Travelers based upon the amount of bonds outstanding.  Thus, with every surety bond issued by Travelers, LBHI will post a proportional amount of Cash Collateral.  The maximum amount of Cash Collateral that LBHI will post is $10 million.  It is expected, however, that Lehman's current short-term needs will only require LBHI to post approximately $2 million.

13.    Although LBHI will post Cash Collateral on behalf of its affiliates, LBHI will be reimbursed by the affiliate on whose behalf a bond is issued either through an immediate cash payment or in accordance with the order, approved in these cases, authorizing the Debtors to continue using their existing centralized cash management system [Docket No. 1416] (the "Cash Management Order").  LBHI has agreed to use a single Cash Collateral account to minimize the administrative costs and burdens to the estate of posting separate cash collateral accounts for each Lehman entity.  In addition, a single Cash Collateral account reduces the risk of error by Travelers.  A single Cash Collateral account also provides the Debtors the flexibility to obtain surety bonds if there is an excess of Cash Collateral without the need for additional posting of cash.  The Debtors believe that the Cash Management Order and their diligent internal record keeping practices provide sufficient protection against any inter-company financing issues that might be of concern as a result of the single agreement.  The alternative would be to

negotiate, document, execute and perform a new agreement each and every time that Lehman

requires a surety bond, which would be unnecessarily time consuming and more costly.

Moreover, in many instances, value of many of Lehman's real estate assets is expected to flow up

to LBHI.  Accordingly, not only is there an administrative convenience to having a single

agreement, but LBHI will be able to ensure the preservation of its real estate assets that may be

held by various Lehman entities.

14.     To consummate the Surety Bond Agreement LBHI will execute, subject to

approval of this Motion and the entry of an order authorizing LBHI's entry into the Surety Bond

Agreement and the posting of Cash Collateral, the General Contract of Indemnity, the Master

Security Agreement, and the Control Agreement.  The salient terms of the agreements that will

comprise the Surety Bond Agreement between LBHI and Travelers are described in the

summary in paragraph 2 of this Motion.

### Basis for Relief Requested

15.     Section 364(c) of the Bankruptcy Code provides, among other things, that

if a debtor is unable to obtain unsecured credit allowable as an administrative expense under

section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to incur debt

secured by a lien on property of the estate that is not otherwise subject to a lien.  11 U.S.C.

§ 364(c)(2).  LBHI proposes to grant Travelers a perfected first priority lien in the Cash

Collateral pursuant to section 364(c)(2) of the Bankruptcy Code.  LBHI has tried, but has been

unsuccessful, in obtaining surety bonds on an unsecured basis.  Unless LBHI and its affiliates are

able to post surety bonds, they run the risk of falling out of compliance with the various laws,

rules and regulations of government units that issue Real Estate Licenses, which could restrict

the ability to preserve the value of the Debtors' real estate assets for the benefit of creditors and incur sanctions and/or fines.

16.     In applying discretion under section 364(c)(2), courts grant considerable deference the exercise of a debtors' business judgment, provided that a debtor's business judgment does not run afoul of the provisions of and policies underlying the Bankruptcy Code,. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1089 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."). See also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

17.     LBHI submits that in granting the Cash Collateral it has satisfied its obligations under the business judgment rule.  Surety bonds are a prerequisite to allow the Lehman to take actions that are necessary to preserve the benefit of their real estate and mortgage assets for the benefit of creditors.  The $10 million Cash Collateral is relatively *de minimis* in comparison to value of the real estate assets that LBHI seeks to preserve, and is therefore appropriate.  The Cash Collateral is not subject to any existing liens, the terms of the Surety Bond Agreement are standard in the industry and, in the Debtors' judgment, fair and reasonable.

18.     It is important that Debtor and non-Debtor affiliates of LBHI be in compliance with licensing requirements because in many cases LBHI is a beneficiary of the

transactions of its affiliates as well as their actions to preserve the value of their real estate and related assets.  In addition, by operating under one Cash Collateral account for the entire Lehman enterprise, LBHI will be able to reduce the costs and administrative burdens that would exist if an independent agreement was required every time Lehman requires a surety bond. Accordingly, the transaction costs associated with obtaining surety bonds will be reduced.  The Debtors will ensure that they will reconcile all payments either immediately or consistent with the Cash Management Order and will keep appropriate records of all transfers.

### Notice

19.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the amended order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) Travelers; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

20.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: August 11, 2009
      New York, New York

                       /s/ Alfredo R. Perez
                       Alfredo R. Perez

                       WEIL, GOTSHAL & MANGES LLP
                       700 Louisiana, Suite 1600
                       Houston, Texas 77002
                       Telephone: (713) 546-5000
                       Facsimile: (713) 224-9511

                       Attorneys for Debtors
                       and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                              :
In re                                         :        **Chapter 11 Case No.**
                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :        **08-13555 (JMP)**
                                              :
                        **Debtors.**          :        **(Jointly Administered)**
                                              :
                                              :
----------------------------------------------------------------x

## ORDER GRANTING LBHI'S MOTION PURSUANT TO SECTIONS 105(a) AND 364 OF THE BANKRUPTCY CODE AUTHORIZING LBHI TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL POSTED IN CONNECTION WITH A SURETY BOND AGREEMENT WITH TRAVELERS

Upon the motion, dated August 11, 2009 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105 and 364 of the Bankruptcy Code, for

authorization to grant first priority liens to Travelers Casualty and Surety Company of American

and its subsidiaries and affiliates (collectively, "Travelers") in a cash securities account under the

control of Travelers of up to $10 million (the "Cash Collateral") in connection with a revolving

surety bond facility (the "Surety Bond Agreement"), all as more fully described in the Motion;

and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper

notice of the Motion having been provided in accordance with the procedures set forth in the

amended order entered February 13, 2009 governing case management and administrative

procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New

York (the "U.S. Trustee"); (ii) the attorneys for the Official Creditors' Committee (the

"Creditors' Committee"); (iii) the Securities and Exchange Commission; (iv) the Internal

Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi)

Travelers; and (vii) all parties who have requested notice in these chapter 11 cases, and it

appearing that no other or further notice need be provided; and a hearing having been held to

consider the relief requested in the Motion; and the Court having found and determined that the

relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and

all parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that LBHI is hereby authorized, pursuant to section 364(c)(2) of the

Bankruptcy Code, to enter into, and perform under, the Surety Bond Agreement and to post Cash

Collateral up to $10 million in accordance with the terms of the Surety Bond Agreement; and it

is further

ORDERED that LBHI is authorized to grant Travelers a first priority lien in the

Cash Collateral; and it is further

ORDERED that the Debtors are hereby authorized to execute and deliver all

instruments and documents, and take such other actions, as may be necessary or appropriate to

implement and effectuate the Surety Bond Agreement and the granting of the first priority liens

in the Cash Collateral to Travelers; and it is further

ORDERED, that Travelers is granted relief from the automatic stay, as may be necessary, upon five business days' notice to the Debtors, the Creditors' Committee and the U.S. Trustee, to cancel any Bond in accordance with the terms of such Bond and the Surety Bond Agreement and to draw upon the Cash Collateral in accordance with the terms of the Surety Bond Agreement; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dated: August __, 2009
      New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**(General Contract of Indemnity)**

# General Contract
# Of Indemnity
# (Form BP)

**TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA**
**Hartford, Connecticut  06183**

We, the undersigned, hereinafter referred to, individually and/or collectively, as "Indemnitors," hereby request, have requested and/or will request TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, any of their present or future direct or indirect parent companies, any of the respective present or future direct or indirect affiliates or subsidiaries of such companies and parent companies, and/or any of the aforementioned entities' successors or assigns, hereinafter referred to, individually and/or collectively, as "Company," to execute or procure bonds, undertakings, guarantees, and/or contractual obligations, including renewals and extensions thereof, whether before or after the date of this Agreement, and bonds and undertakings for which Company has obligations as a result of an asset purchase, acquisition, merger or like transaction, hereinafter referred to, individually and/or collectively, as "Bond(s)."  As an inducement therefore we make the following representations of fact, promises and agreements:

**REPRESENTATIONS OF FACT:**

1. In the transaction of business one, some or all of the Indemnitors are required, or may desire to give such Bond(s).

2. Indemnitors have a substantial, material and beneficial interest (a) in the obtaining of Bond(s) by any of the Indemnitors and (b) in the transaction(s) for which any other Indemnitor has applied or will apply to Company for Bond(s) pursuant to this General Contract of Indemnity, hereinafter referred to as "Agreement."  It is understood that the purpose of this Agreement is to induce Company to furnish Bond(s); however, Company is under no obligation to furnish Bond(s) to Indemnitors.

3. Indemnitors have the full power and authority to execute, deliver and perform this Agreement and to carry out the obligations stated herein.  Indemnitors further acknowledge and agree that (a) the execution, delivery and performance of this Agreement by such Indemnitors, (b) the compliance with the terms and provisions hereof, and (c) the carrying out of the obligations contemplated herein, do not, and will not, conflict with and will not result in a breach or violation of any terms, conditions or provisions of the charter documents or bylaws of such Indemnitors, or any law, governmental rule or regulation, or any applicable order, writ, injunction, judgment or decree of any court or governmental authority against Indemnitors, or any other agreement binding upon Indemnitors, or constitute a default thereunder.

**PROMISES AND AGREEMENTS:**  In consideration of the furnishing of any such Bond, the forbearance of cancellation of any existing Bond(s) by Company, the assumption of obligations by Company of any Bond, and for other valuable consideration, Indemnitors hereby jointly and severally promise and agree as follows:

1. To pay all premiums for each Bond, as they fall due, until Company has been provided with competent legal evidence that the Bond has been duly discharged.

2. To indemnify and exonerate Company from and against any and all loss, cost and expense of whatever kind which it may incur or sustain as a result of or in connection with the furnishing of Bond(s), the assumption of obligations by Company of Bond(s), and/or the enforcement of this Agreement, including unpaid premiums, interest, court costs and counsel fees, and any expense incurred or sustained by reason of making any investigation, hereinafter referred to as "Loss."  To this end Indemnitors promise:

   (a) To promptly reimburse Company for all sums paid on account of such Loss and it is agreed that (1) originals or photocopies of claim drafts, or of payment records, kept in the ordinary course of business, including computer printouts, verified by affidavit, shall be prima facie evidence of the fact and amount of such Loss, and (2) Company shall be entitled to reimbursement for any and all disbursements made by it, under the belief that it was liable, or that such disbursement was necessary or expedient.

   (b) To deposit with Company, on demand, the amount of any reserve against such Loss which Company is required, or deems it prudent to establish whether on account of an actual liability or one which is, or may be, asserted against it and whether or not any payment for such Loss has been made.

3. This Agreement shall apply to any and all Bond(s) furnished as follows:

   (a) If Company executes the Bond(s), procures the execution of Bond(s) by other sureties, executes Bond(s) with co-sureties and/or obtains reinsurance;

   (b) For or on behalf of any or all of the following:

      (1) One, some or all of the Indemnitors;

      (2) Any joint venture or other form of common enterprise in which Indemnitors were members at the time the Bond(s) were furnished;

      (3) Any present or future affiliate and/or subsidiary of Indemnitors;

      (4) Any third party at the request of Indemnitors, their subsidiaries and/or affiliates.

4. (a) The validity and effect of this Agreement shall not be impaired by, and Company shall incur no liability on account of, and Indemnitors need not be notified of:

      (1) Company's failure or refusal to furnish Bond(s), including final Bond(s) where Company has furnished a bid Bond;

(2)  Company's consent or failure to consent to changes in the terms and provisions of any Bond, or the obligation or performance secured by any Bond;

(3)  The taking, failing to take, or release of security, collateral, assignment, indemnity agreements and the like, as to any Bond;

(4)  The release by Company, on terms satisfactory to it, of any Indemnitors; or

(5)  Information which may come to the attention of Company which affects or might affect its rights and liabilities or those of any of the Indemnitors.

(b)  The validity and effect of this Agreement shall not be impaired by and Company shall incur no liability on account of the cancellation or termination of any Bond(s).

5.  (a)  Indemnitors shall, within thirty (30) days of receipt of Company's written demand ("Discharge Demand"), procure the full and complete discharge of the Company from any and all Bond(s) by providing competent written evidence of discharge satisfactory to Company, in its sole discretion.  If Indemnitors fail to provide the aforementioned discharge Indemnitors shall, within an additional seven (7) days, provide Company with an irrevocable letter of credit in form, content and by a bank acceptable to Company or a cash collateral deposit to an account under the control of Company.  The letter of credit or cash deposit shall be in an amount equal to the total of all undischarged liability under said Bond(s), which liability shall be determined at the time of the Company's Discharge Demand.  Collateral or letters of credit previously provided to Company may be utilized to establish compliance with this provision.  If the undischarged liability subsequently increases, then it is the Indemnitors' responsibility to ensure continued compliance with this provision at all times.

(b)  Indemnitors waive, to the fullest extent permitted by law, each and every right that they may have to contest this requirement.  Indemnitors stipulate and agree that Company will not have an adequate remedy at law should Indemnitors fail to post said letter of credit or cash and further agree as a result that Company is entitled to specific performance of this provision.  Company's failure to act to enforce its right to specific performance shall not be construed as a waiver of that right, which right may be enforced at any time at the Company's sole discretion.

(c)  Indemnitors further agree that this requirement for a letter of credit or cash collateral deposit shall not limit or be deemed a waiver of the Company's other rights, which it may exercise in its sole discretion, under this Agreement or otherwise to cancel Bond(s), to demand collateral or letters of credit, or to take any other actions Company deems necessary and/or prudent, in its sole discretion, to mitigate actual or potential Loss under any and all Bond(s) written in accordance with this Agreement.  The exercise of such additional rights shall not be contingent upon the Company's enforcement of this provision.

6.  Any letter of credit to be provided to Company shall be sent via overnight delivery to the following address: St. Paul Travelers Bond, Attention: Bond Finance - Collateral Processing, One Tower Square, Hartford, Connecticut 06183.

7.  Indemnitors shall have no rights of indemnity, contribution or right to seek collection of any other outstanding obligation against any other Indemnitors or their property until the obligations of the Indemnitors to Company under this Agreement have been satisfied in full.

8.  Company shall have the right, in its sole discretion, (a) to deem this Agreement breached should any Indemnitor become involved in any agreement or proceeding of liquidation, receivership, bankruptcy (except for or in connection with the Bankruptcy Proceeding, as defined below), insolvency or creditor assignment, whether voluntarily or involuntarily, or should any Indemnitor, if an individual, die, or be convicted of a felony, become a fugitive from justice, or for any reason disappear and cannot immediately be found by Company by use of usual methods, and (b) to adjust, settle, compromise or defend any claim, demand, suit or judgment upon any Bond(s).

9.  If Company has or obtains collateral or letters of credit, Company shall not have any obligation to release collateral or letters of credit or turn over the proceeds thereof until it shall have received a written release in form and substance satisfactory to Company with respect to each and every Bond.  Any collateral or letters of credit provided to Company by any Indemnitor or any third party, or the proceeds thereof, may be applied to any Loss.

10.  Indemnitors also understand and agree that their obligations remain in full force and effect for any Bond(s) issued pursuant to this Agreement, notwithstanding that the entity on whose behalf Bond(s) were issued has been sold, dissolved or whose ownership has been otherwise altered in any way.

11.  This Agreement shall remain in full force and effect until terminated.  Indemnitors may only terminate participation in this Agreement by providing written notice to Company of Indemnitors' intent to terminate.  Such notice shall be addressed to St. Paul Travelers Bond, Attention: Senior Vice President Commercial Surety, One Tower Square, Hartford, Connecticut 06183.  Such notice of termination shall become effective thirty (30) days after Company's receipt of the same.  The obligations and liability of Indemnitors giving such notice shall thereafter be limited to Bond(s) furnished before the effective date of the notice, which liability shall include any Bond(s) which were originally issued prior to the effective date of notice and renewed or otherwise extended subsequent to the notice or effective date of termination.

12.  Whereas, the obligee or beneficiary under certain Bond(s) may make a demand for payment ("Demand") against the Bond(s).  When such Demand is made, Company must pay the amount of the Demand, not to exceed the penal sum of the Bond(s), as well as all necessary fees, within the time period required by the Demand.  Under such Bond(s), Company, with the knowledge and consent of the Indemnitors, has expressly waived all defenses to making such payment.  If the Indemnitors receive notice from Company that a Demand has been made against the Bond(s) by the obligee or beneficiary, Indemnitors will, at least three (3) business days before payment of such Demand is due the obligee, pay Company the full amount of the Demand, which amount shall not exceed the penal sum of the Bond, as well as all necessary fees.  Such payment will be made by wire transfer or

otherwise in immediately available funds to the bank account specified in the notice provided to the Indemnitors by Company. The Indemnitors waive, to the fullest extent permitted by applicable law, each and every right which they may have to contest such payment. Failure to make payment to Company as herein provided shall cause the Indemnitors to be additionally liable for any and all costs and expenses, including attorney's fees, incurred by Company in enforcing this Agreement, together with interest on unpaid amounts due Company. Interest shall accrue, commencing the date Company pays the amount of the Demand, at 130% of the prime rate of interest in effect on December 31 of the previous calendar year as published in the Wall Street Journal. Indemnitors stipulate and agree that the Company will suffer immediate irreparable harm and will have no adequate remedy at law should Indemnitors fail to perform this obligation, and therefore Company shall be entitled to specific performance of this obligation.

13. Indemnitors hereby expressly authorize Company to access credit records and to make such pertinent inquiries as may be necessary from third party sources for underwriting purposes, claim purposes and/or debt collection. To the extent required by law, Company will, upon request, provide notice whether or not a consumer report has been requested by Company, and if so, the name and address of the consumer reporting agency furnishing the report.

14. In the event of a claim or notice of a potential claim, Company shall have the right, at all times, to free access to the books, records, and accounts of the Indemnitors for the purpose of examining the same.

15. Company may furnish copies of any and all statements, agreements, financial statements and any information which it now has or may hereafter obtain concerning Indemnitors, to other persons or companies for the purpose of procuring co-suretyship or reinsurance.

16. A duplicate or facsimile copy or electronic reproduction of the original document shall have the same force and effect as the original.

17. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

18. If any provision or portion of this Agreement shall be unenforceable, this Agreement shall not be void, but shall be construed and enforced with the same effect as though such provision or portion were omitted.

19. This Agreement is in addition to and not in lieu of any other agreements and obligations undertaken in favor of Company, whether now existing or entered into hereafter.

20. The rights and remedies afforded to Company by the terms of this Agreement can only be impaired by a written rider to this Agreement signed by an authorized employee of the Company.

21. Company's failure to act to enforce any or all of its rights under this Agreement shall not be construed as a waiver of these rights.

22. The date of this Agreement shall be the earliest date any Indemnitor executes this Agreement.

23. Special Provisions: **The Indemnitors acknowledge and agree that this Agreement has been entered into with full authority of the United States Bankruptcy Court of the Southern District of New York presiding over the jointly administered chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliated chapter 11 debtors, Case N. 08-13555 (JMP) (the "Bankruptcy Proceeding").**

**WE HAVE READ THIS CONTRACT OF INDEMNITY CAREFULLY. THERE ARE NO SEPARATE AGREEMENTS OR UNDERSTANDINGS WHICH IN ANY WAY LESSEN OUR OBLIGATIONS AS ABOVE SET FORTH. IN TESTIMONY HEREOF, WE THE INDEMNITORS HAVE SET OUR HANDS AND FIXED OUR SEALS AS SET FORTH BELOW.**

## If Indemnitor an Individual, sign below:

Instructions: Signatures of individual Indemnitors must be witnessed. Indemnitors must include their Social Security Number. All signatures must be dated with names printed or typed on the line provided.

| | |
|---|---|
| (Witness Signature)                    (Date) | (Indemnitor Signature)                    (Date) |
| Print or Type Name: | Print or Type Name: |
| | SS#: |

## If Indemnitor a Corporation, Limited Liability Company or Partnership, sign below:

Instructions: If the entity is: 1) a corporation the secretary and an authorized officer should sign on behalf of the corporation, 2) a limited liability company the manager(s) or member(s) should sign on behalf of the LLC, or 3) a partnership the partner(s) should sign on behalf of the partnership. Two signatures are required for all entities and all signatures must be notarized and dated. Please provide the entity's federal tax identification number on the line provided.

Each of the undersigned hereby affirms to Company as follows: I am a duly authorized official of the business entity Indemnitor on whose behalf I am executing this Agreement. In such capacity I am familiar with all of the documents which set forth and establish the rights which govern the affairs, power and authority of such business entity including, to the extent applicable, the certificate or articles of incorporation, bylaws, corporate resolutions and/or partnership, operating or limited liability agreements of such business entity. Having reviewed all such applicable documents and instruments and such other facts as deemed appropriate, I hereby affirm that such

entity has the power and authority to enter into this Agreement and that the individuals executing this Agreement on behalf of such entity are duly authorized to do so.

**Lehman Brothers Holdings Inc.**
_____                                   (Seal)
(Indemnitor Name)                                          (First Signature )

_____                    _____
(Federal Tax ID)                                          (Print or Type Name and Title)                (Date)

                                                                                          (Seal)
                                                          _____
                                                          (Second Signature)

                                                          _____
                                                          (Print or Type Name and Title)                (Date)

ACKNOWLEDGEMENT
STATE OF _____          County of _____

On this _____ day of _____, _____, before me personally appeared _____, known or proven to me to be the _____ of the entity executing the foregoing instrument ("Entity") and _____, known or proven to me to be the _____ of the Entity, and they acknowledged said instrument to be the free and voluntary act and deed of said Entity, for the uses and purposes therein mentioned and on oath stated that the seal affixed is the seal of said Entity and that it was affixed and that they executed said instrument by authority of the Entity.  IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

                                                          _____
                                                          Notary Public residing at _____
                                                          (Commission expires _____)

**Exhibit B**

**(Master Security Agreement)**

**COLLATERALIZED BOND SURETY PROGRAM**
**MASTER PLEDGE AND SECURITY AGREEMENT**

THIS AGREEMENT (this "Master Agreement") entered into between Travelers Casualty and Surety Company of America (the "Secured Party") acting on its own behalf and as agent on behalf of its parents, subsidiaries and affiliates and Pledgor, as identified below, on its own behalf and as agent on behalf of any affiliate or other entity which is a party to the Indemnity Agreements defined below ("Pledgor").  This Master Agreement shall be effective as of the date executed and delivered by Pledgor as evidenced by Pledgor's signature below.

**WITNESSETH:**

**WHEREAS**, Pledgor desires Secured Party to issue or otherwise furnish an instrument or instruments of suretyship, undertakings or guarantees ("Bonds");

**WHEREAS**, Pledgor and its joint and several indemnitors have executed and may from time to time in the future execute General Agreements of Indemnity, General Contracts of Indemnity or Applications for Bonds ("Indemnity Agreements") by which they have agreed or will agree to indemnify and hold harmless Secured Party from any loss, cost or expense as a result of furnishing Bonds;

**WHEREAS**, Secured Party desires to be adequately secured with respect to Pledgor's obligations to Secured Party;

**WHEREAS**, to induce Secured Party to issue or otherwise furnish Bonds, Pledgor has agreed, at Secured Party's request, to enter into this Master Agreement;

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor and Secured Party hereby agree as follows:

1.  Definitions.  As used in this Master Agreement, (a) the term "Obligations" means any and all duties, debts, liabilities and obligations of Pledgor to Secured Party, whether direct or indirect, absolute or contingent, joint or several, or now existing or hereafter arising or incurred including, without limitation, any obligations of Pledgor pursuant to any of the Indemnity Agreements, any Bonds or this Master Agreement and (b) the term "UCC" means the Uniform Commercial Code of the State of New York.  Other terms not defined in this Master Agreement and defined in the UCC shall have the meanings defined in the UCC.  If a term is defined in Article 9 of the UCC and also in another Article of the UCC, the term shall have the meaning defined in Article 9.

2.  Pledge of Collateral.  As security for the payment and performance in full when due of all of the Obligations, Pledgor hereby grants to Secured Party a security interest in all of Pledgor's right, title and interest in the account number beginning with the digits 619-71001-1 maintained with Citigroup Global Markets, Inc. or any successor account or accounts maintained with the same or any successor securities intermediary or depositary or custodial institution or with Secured Party (such account or any such successor account or accounts being referred to as the "Collateral Account"), together with any and all financial assets, cash or other property at any time and from time to time credited or held for credit to the Collateral Account (the Collateral Account and such financial assets, cash and other property being referred to herein, collectively, as the "Collateral").

3.  <u>Term</u>.  The security interest set forth in this Master Agreement shall remain in full force and effect until (a) the payment in full in cash or other performance of all of the Obligations and (b) the release of Secured Party from all liabilities arising under or pursuant to any Bonds as evidenced by releases satisfactory to Secured Party.

4.  <u>Additions to Collateral</u>.  Pledgor may at any time and for any reason deposit or deliver additional assets to the Collateral Account or otherwise pledge and deliver additional collateral to Secured Party.  In addition, if at any time or from time to time hereafter the market value or marketability of the Collateral, as determined by Secured Party, is reduced or impaired by an aggregate amount deemed material by Secured Party, or  if any of the  Collateral is applied to satisfy any outstanding Obligations, then, at the option of Secured Party, Secured Party may require that Pledgor pledge additional collateral acceptable to Secured Party in order to replenish or replace such loss in market value or marketability or the Collateral applied to outstanding Obligations.  In such event, within 30 days after Pledgor's receipt of notice of such request, Pledgor shall deposit or deliver to the Collateral Account or otherwise deliver to Secured Party such additional collateral, in each case in a form acceptable to Secured Party.  Any additional collateral delivered to Secured Party shall be delivered together with such documents, instruments and agreements as Secured Party may request in order for the pledge to attach, be perfected and have first priority and for the Secured Party to be able to enforce the pledge without undue cost or expense.

5.  <u>Representations and Warranties</u>.  Pledgor represents and warrants to Secured Party that as of this Master Agreement's effective date and as of each date on which Pledgor deposits or delivers any additional assets to the Collateral Account or otherwise delivers additional Collateral to Secured Party:

(1) Pledgor has the power to execute, deliver and perform this Master Agreement;

(2) the execution, delivery and performance of this Master Agreement has been authorized by all necessary action on the part of Pledgor;

(3) this Master Agreement has been duly executed and delivered by Pledgor as evidenced (should Secured Party so request) by a certificate of incumbency for the individual executing this Master Agreement and constitutes the legal, valid and binding obligation of Pledgor enforceable in accordance with its terms;

(4) other than Pledgor's security entitlements or other interests in the Collateral, the security interest in favor of Secured Party granted hereby and any security interest or lien in favor of a securities intermediary or depositary or custodial institution subject to a control agreement with Pledgor and Secured Party, there are no adverse claims to the Collateral;

(5) no consent of any third party or any authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is necessary for Pledgor's execution, delivery or performance of this Master Agreement and

(6) for any Collateral credited or held for credit to the Collateral Account or any other securities account or deposit account, Pledgor has investigated and accepts the credit risk of, or other risk of loss attributable to, the securities intermediary or depositary or custodial institution maintaining the account.

6.  <u>Further Assurances</u>.  At any time and from time to time, at the expense of Pledgor, Pledgor will promptly execute and deliver all control agreements and further instruments and documents and take all further action that Secured Party may reasonably request in order for the security interest granted or purported to be granted hereby to attach, be perfected and have first priority and to enable Secured Party to exercise and enforce its rights with respect to any Collateral.  Pledgor shall further execute and deliver all control agreements, instruments and documents and take all further action that Secured Party may request in order to transfer any cash, financial assets or other property credited or held by credit to the Collateral Account to a new account maintained by a new securities intermediary, a depository

institution or custodian or by Secured Party directly.  In the event of such a transfer, the new account shall be the Collateral Account within the meaning of this Master Agreement, without further amendment or other action, and this Master Agreement shall without interruption continue in full force and effect as to the Collateral, after giving effect to the substitution of the new account as the Collateral Account.

7.    <u>Collateral Directly or Indirectly Held</u>.  If any Collateral is or is to be held directly by Secured Party and Secured Party so elects, Secured Party may hold the Collateral in its own name or in the name of any nominee or nominees.  Secured Party's sole duty with respect to the custody, safe keeping and physical preservation of the Collateral in its possession shall be to deal with the Collateral in the same manner as the Secured Party deals with similar property for its own account.  The credit or other risk of loss of any Collateral credited or held for credit to the Collateral Account, or to any other securities account or deposit account, maintained by a securities intermediary or depositary or custodial institution shall be for the account of Pledgor, and Secured Party shall have no responsibility therefor.

8.    <u>Voting Rights, Etc</u>.
    (a) So long as no Event of Default (as defined in Section 11) shall have occurred and be continuing and no notice provided in Section 8(b) has been delivered to Pledgor, Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not prohibited by the terms of this Master Agreement, and Secured Party shall execute and deliver or cause to be executed and delivered to Pledgor all such proxies and other instruments as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to this subsection.  However, following a request therefor by Secured Party, Pledgor shall not exercise or, as the case may be, shall not refrain from exercising any such right if in the determination of Secured Party such action or failure to act would have a material adverse effect on the value of any of the Collateral.  Pledgor shall give Secured Party at least ten days' written notice of the manner in which it intends to exercise or fail to exercise any voting or other consensual right.
    (b) Upon the occurrence and during the continuance of an Event of Default, Secured Party may deliver to Pledgor a notice that Secured Party intends to exercise all voting and other consensual rights with respect to the Collateral.  Upon delivery of such notice to Pledgor, all rights of Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 8(a) shall cease, and all such rights shall thereupon become vested in Secured Party.  Secured Party shall thereupon have the sole right to exercise such voting and other consensual rights.

9.    <u>Secured Party Appointed Attorney-in-Fact</u>.  Pledgor hereby irrevocably appoints Secured Party as Pledgor's attorney-in-fact upon and as of the happening of an Event of Default, with full authority in the place and stead of Pledgor and in the name of Pledgor or otherwise, and with full power of substitution, from time to time in Secured Party's discretion, to take any action and to execute any instrument, document or agreement which Secured Party may deem reasonably necessary or advisable to accomplish the purposes of this Master Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to Pledgor representing any dividend or interest payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same, when and to the extent permitted by this Master Agreement.

10.    <u>Secured Party May Perform</u>.    If Pledgor fails to perform any agreement, obligation or responsibility contained herein, Secured Party may itself perform, or cause performance of, such agreement, obligation or responsibility, and the expenses of Secured Party incurred in connection therewith shall be payable by Pledgor under Section 13.

11.  Events of Default.  The following shall constitute "Events of Default" hereunder:

(a) Pledgor shall fail to make any payment, perform any covenant or otherwise default under any Bond, any Indemnity Agreement, or any other agreement creating or evidencing any of the Obligations;

(b) Pledgor shall assign, attempt to encumber, subject to further pledge or security interest, sell, transfer or otherwise dispose of any of the Collateral without the prior written consent of Secured Party;

(c) Any representation or warranty made by Pledgor in this Master Agreement, in any other agreement creating or evidencing any of the Obligations or in any certificate or other document relating thereto shall be false or misleading in any material respect as of the date on which the representation or warranty is made or is deemed to have been made or repeated;

(d) Except for or in connection with the jointly administered chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliated chapter 11 debtors, Case No.08-13555 (JMP) in the United States Bankruptcy Court of the Southern District of New York (the "Bankruptcy Proceeding"), a receiver, liquidator, custodian or trustee of Pledgor, or of all or any of the property of Pledgor, is subsequently appointed by court order and such order remains in effect for more than thirty (30) days; or an order for relief is subsequently entered with respect to Pledgor or Pledgor is subsequently adjudicated a bankrupt or insolvent, or any of the property of Pledgor is sequestered by court order and such order remains in effect for more than thirty (30) days; or a petition is subsequently filed against Pledgor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, and is not dismissed within thirty (30) days after such filing;

(e) Except for or in connection with the Bankruptcy Proceeding, Pledgor subsequently files a petition in voluntary bankruptcy or seeking relief under any provision of any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, whether now or hereafter in effect, or consents to the filing of any petition against it under any such law or takes any action to effect any of the foregoing.

12.    Remedies.  If any Event of Default shall have occurred and be continuing:

(a) Secured Party may exercise in respect of the Collateral, in addition to any and all other rights and remedies provided for herein or otherwise available under applicable law, all of the rights and remedies of a secured party under the UCC.  Secured Party shall give Pledgor at least five days' notice of the time and place of any public disposition, or of the time after which any private disposition is to be made, unless such notice is not required by the UCC to be given to Pledgor.

(b) Any proceeds of the collection or disposition of any of the Collateral, including non-cash proceeds, may be held by Secured Party as collateral for the Obligations, and any cash proceeds may be applied to the Obligations if Secured Party so elects in such order of application as Secured Party may determine.

(c) Any surplus remaining after payment in full in cash of all Obligations, and the release of Secured Party from all liabilities arising under or pursuant to any Bonds evidenced by releases satisfactory to Secured Party, shall be paid over or otherwise delivered to Pledgor or to whomsoever may be lawfully entitled to receive such surplus.

13. Expenses.  Pledgor will upon demand pay to Secured Party the amount of any and all reasonable expenses, including the reasonable fees and expenses of its counsel and of any experts and agents, which Secured Party may incur in connection with (1) the administration of this Master Agreement, (2) the custody or preservation of any of the Collateral, or (3) the exercise or enforcement of any of the rights of Secured Party hereunder or under any other agreement creating or evidencing any of the Obligations. Any expenses not paid on demand will bear interest, payable on demand and whether before or after judgment, at the highest rate for overdue payments under the agreements creating or evidencing any of the Obligations.

14. <u>Security Interest Absolute</u>.  All rights of Secured Party hereunder, the security interest granted to Secured Party hereunder, and all obligations of Pledgor hereunder shall be absolute and unconditional irrespective of any of the following circumstances, acts, events, or occurrences, and Pledgor expressly consents to the occurrence of any of such events and waives any defense arising therefrom:

(a) any lack of validity or enforceability of any Bond, any Indemnity Agreement  or any other agreement or instrument creating or evidencing any of the Obligations;

(b) any change in the time, manner or place of payment, or in any other term of any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Bond, any Indemnity Agreement or any other agreement or instrument creating or evidencing nay of the Obligations; or

(c) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Pledgor in respect of any of the Obligations or in respect of this Master Agreement.

15. <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Master Agreement nor consent to any departure by Pledgor herefrom shall be effective unless it is in a writing signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

16. <u>No Waiver, Cumulative Remedies</u>.  No failure on the part of Secured Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy by Secured Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

17. <u>Severability</u>.  If any provision of any of this Master Agreement or the application thereof to any party hereto or circumstances shall be invalid or unenforceable to any extent, the remainder of this Master Agreement and the application of such provisions to any other party thereto or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

18. <u>Interpretation</u>.  No provision of this Master Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or dictated such provision.

19. <u>Relation to Other Agreements</u>.  This Master Agreement does not derogate from any rights or remedies in favor of Secured Party under any other agreement creating or evidencing any of the Obligations.  Any Event of Default under this Master Agreement shall constitute a default, howsoever defined, under the other agreement.

20. <u>Jurisdiction</u>.  During the pendency of the Bankruptcy Proceeding, the Bankruptcy Court shall maintain exclusive jurisdiction over all disputes related to this Master Agreement and any Obligations secured hereunder; *provided, however*, that subsequent to the completion of the Bankruptcy Proceeding, (i) any legal action or proceeding with respect to this Master Agreement may be brought in the state or federal courts of the State of New York, all as Secured Party may elect, (ii) in furtherance of the foregoing, Pledgor hereby appoints the Secretary of State of the State of New York as its agent for service of process, and (iii) nothing herein shall affect the right of Secured Party to commence legal proceedings or otherwise proceed against Pledgor in any other jurisdiction or to serve process in any manner permitted or required by law.

21. <u>Governing Law</u>.  This Master Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding any conflict of laws rules that would require the

application of the laws of any other jurisdiction, and shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

22. <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto shall be deemed to have been given or made when personally delivered or deposited in the mail, registered or certified mail, postage prepaid, addressed as follows or to such other address as may be designated hereafter in writing by the respective parties hereto:

Pledgor:  (Name and Address)

Secured Party:
Travelers Casualty and Surety Company of America
Collateral Processing, National Resources
One Tower Square, Bond – 2SHS2
Hartford, CT  06183

Taxpayer ID#_____
Attn:_____

Taxpayer ID#_06-0907370

Any such notice, demand or request shall not be effective until received by the party to whom it is addressed.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, Pledgor has executed this Master Security Agreement as of the date set forth below.


By: _____

Name:
Title:
Date:


    I hereby certify that I am the duly elected and qualified Secretary of the corporation ("Pledgor") that entered into the foregoing agreement (the "Master Agreement") with Travelers; that the officer who executed the Master Agreement on behalf of the Pledgor has been duly elected and qualified as such officer; that the signature above is the genuine signature of such officer; that the Master Agreement was duly executed and delivered by Pledgor; that its execution and delivery were properly authorized by the Board of Directors of  Pledgor; and that the Master Agreement represents a valid and binding obligation of Pledgor.


    _____

Secretary


SEAL



ACCEPTED:

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA


By: _____

Title: _____

Date: _____

**<u>Exhibit C</u>**

**(Control Agreement)**

**\* *Specimen Copy for Review Only* \***

MorganStanley
   SmithBarney

## CONTROL AGREEMENT

Re:          Account No. _____619-XXXXX-XX-164_____

          **Account Holder:  XYZ Company**

          **Secured Party:    Travelers Casualty and Surety Company of America**

          1.  This agreement refers to the above-referenced Account (together with any substitution or replacement thereof, the "Account") custodied by and carried on the books of Citigroup Global Markets Inc. (together with its successors and assigns, the "Securities Intermediary") pursuant to the instructions of the undersigned account holder(s) (jointly and severally if more than one) (the "Account Holder"), to which certain financial assets of the Account Holder are or may be credited. Morgan Stanley Smith Barney LLC (together with its successors and assigns, the "Introducing Broker"), performs certain services as introducing broker in respect of the Account. All terms used herein and defined in the Uniform Commercial Code of the State of New York shall have meanings set forth in the Uniform Commercial Code of the State of New York.

          2. The Account Holder, the Securities Intermediary and the Introducing Broker hereby acknowledge and agree that the Account is a cash securities account and is not a delivery versus payment account, a retirement account, a margin account or an account linked to any credit facility. The Securities Intermediary agrees that all property in the Account at any time shall be treated as a financial asset for purposes of the Uniform Commercial Code in effect in New York as of the date thereof.

          3. The Account Holder and the undersigned Secured Party (the "Secured Party") hereby notify the Securities Intermediary and the Introducing Broker that the Account Holder has granted the Secured Party a security interest in the Account, all financial assets and other items therein, all proceeds thereof and distributions in connection therewith, and income received thereon, and any additions thereto (the "Collateral") pursuant to a Collateralized Bond Surety Program Master Pledge and Security Agreement dated of even date herewith made by the Account Holder in favor of the Secured Party (as amended, supplemented or otherwise modified from time to time, the "Security Agreement").  The Account Holder represents and warrants to the Secured Party, the Securities Intermediary and the Introducing Broker that no person other than the Secured Party, the Securities Intermediary or the Introducing Broker has a security interest in, lien on or adverse claim against the Account or the Collateral therein, and that it will not attempt to grant such a security interest in or lien on the Account or the Collateral therein without the written authorization of the Secured Party, the Securities Intermediary and the Introducing Broker. Each of the Securities

## *Specimen Copy for Review Only*

Intermediary and the Introducing Broker confirms that, as of the date hereof, its personnel generally responsible for maintaining records of liens or security interests with respect to customer securities accounts have no knowledge of any restraint, security interest, lien or other adverse claim in or to the Account or any item therein and represents and warrants that it will not consent to any further or subsequent security interest or lien while the Secured Party's security interest remains in effect; provided that the Securities Intermediary and the Introducing Broker may retain a subordinated lien in connection with any obligations that Account Holder may have incurred or from time to time may incur to the Securities Intermediary or the Introducing Broker.  In addition, each of the Securities Intermediary and the Introducing Broker agrees to promptly notify the Secured Party and the Account Holder in the event it receives any written notice of any lien, encumbrance or adverse claim against the Account or any of the other Collateral.

The Account Holder and Secured Party agree that the Account Holder may only instruct the Securities Intermediary to sell or purchase the types of securities for the benefit of the Account, as set forth in Exhibit "A", attached hereto and incorporated by reference, hereinafter referred to as "Permitted Trading."

4. The Account Holder and Secured Party consent and agree that, other than the instructions set forth in the preceding paragraph, the only instructions that shall be given to the Securities Intermediary in regard to or in connection with the Account shall be given by the Secured Party. The Account Holder shall not instruct the Securities Intermediary to deliver and the Securities Intermediary shall not deliver out any financial assets credited or held for credit to the Account without the prior written consent of the Secured Party, except for securities sold as Permitted Trading and where the proceeds of the sale are credited to the Account.  The Securities Intermediary and the Introducing Broker may act conclusively upon the Secured Party's written instruction and shall have no obligation or duty whatsoever to interpret or investigate the terms provided therein. The Account Holder hereby acknowledges and agrees that the Secured Party's consent to Permitted Trading in no way constitutes a waiver of any of its rights under the Security Agreement and that it is the obligation of the Account Holder to ensure at all times that the type and amount of the Collateral in the Account meets the maintenance requirements contained in the Security Agreement.

Notwithstanding anything herein to the contrary, within a reasonable period of time, not to exceed two business days, following effectiveness pursuant to Paragraph 9 below of a written notice from the Secured Party to the Securities Intermediary substantially in the form of the sample notice attached as Exhibit B hereto (a "Notice of Exclusive Control"), the Account Holder shall have no right to engage in any further Permitted Trading, and the Securities Intermediary shall not accept or honor any instructions or entitlement orders from or on behalf of the Account Holder in respect of the Account (including without limitation any Permitted Trading), in each case without the prior written consent of the Secured Party.

5. The Account Holder hereby authorizes each of the Introducing Broker and the Securities Intermediary to, and they (or one of them) shall, provide the Secured Party with monthly account statements and trade confirmations when issued and shall disclose to the Secured Party such information relative to the Account and the financial assets and credit balances therein as the Secured Party may at any time and from time to time request, and as frequently as Secured Party may require

### *Specimen Copy for Review Only *

to permit it to monitor the Collateral for compliance with the Security Agreement, in each case without any reference to any further authority for, or inquiry as to the justification for, such disclosure.

      6. The Securities Intermediary will comply with all entitlement orders relating to the Account or any financial asset credited thereto originated by the Secured Party without further action or consent by Account Holder or any other person, and will, as frequently as requested in writing by the Secured Party, transfer all available credit balances and financial assets in the Account to such account as may be designated by the Secured Party by wire transfer, depository transfer check, automatic clearing house electronic transfer, or otherwise, as the Secured Party may direct in its sole discretion, and  maintain the Account and all financial assets and other items therein as the Secured Party may direct in writing from time to time (including using its best efforts to place or negotiate orders to sell securities in the Account, including but not limited to sell orders pursuant to stock powers issued in favor of the Securities Intermediary, and transferring the proceeds of sale to the Secured Party in accordance herewith). All entitlement orders, instructions, requests and directions of the Secured Party hereunder shall be delivered in the manner set forth in Paragraph 9 hereof.

      7. Any security interest in or lien on the Account or other Collateral granted to or otherwise obtained by the Securities Intermediary or the Introducing Broker (including, without limitation, by operation of law) shall be junior and subordinate to the security interest and lien of the Secured Party in and on the Account and the Collateral, as defined in this Control Agreement, regardless of the order of perfecting any such security interest or lien, the filing or absence of filing any financing statement or the taking or failure to take any other action. Each of the Securities Intermediary and the Introducing Broker acknowledges the Secured Party's perfected security interest in the Account and the other Collateral as defined in this Control Agreement, and agrees that, except as provided herein, it will not (i) foreclose upon, sell or otherwise dispose of the Account or any such other Collateral, or exercise any bankers' or other lien or right of setoff or similar right in connection with the Account or any such other Collateral, in each case without the prior written consent of the Secured Party or (ii) receive, accept or apply any proceeds of the Account or any such other Collateral to or on account of any indebtedness or obligation of the Account Holder to it, in each case until the Secured Party has released its security interest in the Account and  any such other  Collateral; provided, however, that nothing herein shall limit the right of the Securities Intermediary to debit the Account in payment of the then current commissions associated with the Account, and customary fees related to a trading transaction, due to  the Securities Intermediary or the Introducing Broker , as the case may be, and from time to time to debit the Account in an amount equal to the amount of any deposit that the Securities Intermediary has credited to the Account that is thereafter returned to the Securities Intermediary because of insufficient funds or is otherwise unpaid.  Neither the Securities Intermediary nor the Introducing Broker shall advance margin or other credit against the Account, nor hypothecate any financial assets or other items carried in the Account, without the prior written consent of the Secured Party.  Neither the Securities Intermediary nor the Introducing Broker shall enter into any agreement with any other person or entity related to the Account or any financial asset credited thereto pursuant to which the Securities Intermediary agrees to comply (and the Securities Intermediary shall not comply) with any withdrawal, transfer, payment or redemption instruction, or any other entitlement order or other order, from such person or entity concerning the Account or any financial assets or other items therein, without the prior written consent of the Secured Party, and any such agreement entered into without such consent shall be null and void.

3

## * *Specimen Copy for Review Only* *

8. The Account Holder, the Secured Party and the Introducing Broker each acknowledge and agree that neither the Securities Intermediary nor the Introducing Broker shall be held responsible for (i) any decline in the market value of the Collateral or the failure to notify the Account Holder or the Secured Party thereof or (ii) the failure to take any action with respect to the Collateral, except as expressly provided in this Control Agreement, or as instructed by the Secured Party to the Securities Intermediary in accordance with this Control Agreement, and, except as expressly provided in this Control Agreement, this Control Agreement shall not abridge any rights the Securities Intermediary or the Introducing Broker otherwise may have.  To the extent that any provisions of this Control Agreement conflict with any provisions of the Account Holder's existing client agreements with the Introducing Broker and the Securities Intermediary, the provisions of this Control Agreement shall control.

Except with respect to the obligations and duties expressly provided in this Control Agreement, this Control Agreement shall not impose or create any obligations or duties upon the Securities Intermediary or the Introducing Broker that are greater than or in addition to the usual and customary obligations and duties, if any, of the Securities Intermediary or the Introducing Broker, as applicable, with respect to the Account or the Account Holder.  Except as expressly provided in this Control Agreement, neither the Securities Intermediary nor the Introducing Broker shall have any obligation or duty whatsoever to interpret the terms of any other agreements between the Account Holder and the Secured Party or to determine whether any default exists thereunder.

The Account Holder hereby irrevocably authorizes and instructs each of the Securities Intermediary and the Introducing Broker to perform and comply with the terms of this Control Agreement. The Account Holder hereby indemnifies and holds harmless each of the Securities Intermediary and the Introducing Broker (each, an "Indemnified Party") from and against any and all claims, actions and suits (whether groundless or otherwise), losses, damages, costs, expenses (including reasonable attorney's fees) and liabilities of every nature and character arising out of or related to this Control Agreement or the transactions contemplated hereby or any actions taken or omitted to be taken by the Indemnified Party hereunder, including, without limitation, claims arising out of the Securities Intermediary's permitting or failing to permit the Account Holder or any other party to withdraw funds from the Account other than in strict compliance with the terms of this Control Agreement, except to the extent directly caused by the Indemnified Party's  gross negligence or willful misconduct. The Secured Party shall indemnify and hold harmless the Indemnified Party from and against any and all claims, actions and suits (whether groundless or otherwise), losses, damages, costs, expenses (including reasonable attorney's fees) and liabilities of every nature and character that may result by reason of the Indemnified Party complying with instructions or requests of the Secured Party as permitted or required under this Control Agreement, except to the extent directly caused by the Indemnified Party's gross negligence or willful misconduct.  The foregoing indemnifications shall survive any termination of this Control Agreement.

The Introducing Broker may transmit to the Securities Intermediary, and the Securities Intermediary may act upon, any instrument or other writing (or, in respect of entitlement orders permitted pursuant to Paragraph 9 below to be transmitted by the Secured Party by phone, such oral communication) believed by the Introducing Broker in good faith to be genuine and to have been signed or presented by a person (or, in the case of an oral communication transmitted by phone, to have been originated by the Secured Party and communicated by a person) purporting to be the

4

*** Specimen Copy for Review Only ***

authorized representative of the Secured Party or the Account Holder, as the case may be.  Neither the Securities Intermediary nor the Introducing Broker shall be liable in connection with the performance or non-performance of its duties hereunder, except for its own gross negligence or willful misconduct. The Securities Intermediary's and the Introducing Broker's duties shall be determined only with reference to this Control Agreement and applicable laws, and neither the Securities Intermediary nor the Introducing Broker shall be charged with knowledge of, or any duties or responsibilities in connection with, any other document or agreement. Neither the Securities Intermediary nor the Introducing Broker shall have any liability to any party for any incidental, punitive or consequential damages resulting from any breach by such party of its obligations hereunder.

9. Except as provided below, each notice, request or other communication given to any party hereunder shall be in writing and shall be delivered by hand, mailed by United States registered or certified first class mail, postage prepaid and return receipt requested, via facsimile, via email, or sent by overnight courier, to such party at its address set forth on the signature page hereof or, in each case, to such other address for notices as any of the parties to this Control Agreement shall last have furnished in writing to the other parties hereto in accordance with this paragraph.  Entitlement orders originated by the Secured Party directing the disposition of financial assets held in the Account may also be given by telephone to the personnel responsible for the Account at the Introducing Broker at the telephone number set forth on the signature page hereof; *provided* that the Securities Intermediary shall not be required to act upon any entitlement order directing the transfer of proceeds of such disposition to an account other than the Account absent written notice delivered in the manner provided in the first sentence of this Paragraph 9.  With the exception of facsimile and email transmissions, any such notice or communication described above shall be deemed to have been duly given or made and to have become effective at the time of the receipt thereof by the party to which it is directed at its address specified on the signature page hereof, or when delivery is duly attempted and refused; *provided* that entitlement orders given by telephone pursuant to the second sentence of this Paragraph 9 shall become effective when communicated to the personnel responsible for the Account at the Introducing Broker.  Any notice or communication provided via facsimile or email transmission shall be deemed to have been duly given or made and to have become effective at the time receipt is acknowledged by the recipient, *provided* that any notice or communication provided to the Securities Intermediary via facsimile or email transmission shall be deemed to have been duly given or made and to have become effective at the time of receipt by personnel responsible for the Account at the Introducing Broker and when receipt is acknowledged by such personnel, which shall be within a reasonable period of time.

For the avoidance of doubt, all notices, requests and other communications to the Securities Intermediary hereunder (including without limitation any entitlement order originated by the Secured Party, whether written or oral, or any Notice of Exclusive Control) shall be delivered care of the Introducing Broker, and delivery of any such notice, request or other communication to the Introducing Broker in the manner provided above shall constitute delivery to the Securities Intermediary hereunder.  The Securities Intermediary shall be under no obligation to act upon any communication unless delivered in accordance with this Paragraph 9.

10. This Control Agreement may not be amended or modified without the prior written consent of the Securities Intermediary, the Introducing Broker, the Account Holder and the

*** Specimen Copy for Review Only ***

Secured Party.  This Control Agreement shall continue in full force until delivery of a written notice from the Secured Party to the Securities Intermediary and the Introducing Broker terminating this Control Agreement.  Upon receipt of such notice, all obligations of the Securities Intermediary and the Introducing Broker under this Control Agreement shall cease, including without limitation any and all obligations hereunder with respect to the maintenance of the Account.  Thereafter, the Securities Intermediary may take such steps as the Account Holder may request to vest full control of the Account in the Account Holder.  This Control Agreement may also be terminated by the Securities Intermediary or the Introducing Broker, in each case upon 180 days written notice to the Secured Party and the Account Holder. Upon such notice, the Secured Party shall provide the Securities Intermediary with written instructions regarding the delivery of the Collateral to a successor securities intermediary or depositary or custodial institution acceptable to Secured Party or to Secured Party itself, and upon following such written instructions  the Securities Intermediary and the Introducing Broker shall have no further obligations under this Control Agreement.  All entitlement orders, instructions, requests and directions of the Secured Party hereunder shall be delivered in the manner set forth in Paragraph 9 hereof.

11. No delay or omission on the part of the Secured Party, the Introducing Broker or the Securities Intermediary in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Control Agreement.  No waiver of any right under this Control Agreement shall be effective unless in writing and signed by the Secured Party, the Introducing Broker and the Securities Intermediary, and no waiver on one occasion shall be construed as a bar to or waiver of any such right on any other occasion.

12. This Control Agreement and any waiver or amendment hereto may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. This Control Agreement may be executed and delivered by telecopier or other facsimile transmission all with the same force and effect as if the same were a fully executed and delivered original manual counterpart.

13. This Control Agreement shall be governed by and construed in accordance with the laws of the State of New York  (without giving effect to the conflicts of law principles thereof) and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  Without limiting the generality of the foregoing, in the event the Securities Intermediary ceases to be the clearing broker in respect of the Account and the custodial function in respect of the Account is transferred to the Introducing Broker (a "**Self-Clearing Event**"), all rights and obligations of the Securities Intermediary hereunder shall automatically be transferred and assigned to, and assumed by, Introducing Broker, the Securities Intermediary shall be released from all its obligations under this Control Agreement upon such transfer, assumption and assignment, and this Control Agreement shall continue among the Account Holder, the Secured Party and the Introducing Broker serving in the capacity as Securities Intermediary.  The foregoing constitutes the consent of all parties to such transfer, assignment and assumption upon a Self-Clearing Event.  Upon such Self-Clearing Event, any references herein to rights and obligations of the Introducing Broker and the Securities Intermediary shall be construed so as to account for the fact that both the Introducing Broker and the Securities Intermediary will have become the same party, and all references to the Account shall include any successor custody account on the books of Introducing

**_* Specimen Copy for Review Only *_**

Broker.

14.  If the Account Holder executing this Control Agreement is more than one person, all persons executing this Control Agreement as the Account Holder shall be joint and severally a party to this Control Agreement as Account Holder and have joint and several liability hereunder.

15. This Control Agreement constitutes the entire agreement, and supersedes any prior agreements, of the parties concerning its subject matter.  In the event a provision of this Control Agreement is unenforceable, this agreement shall be construed to the extent possible as if the unenforceable provision were omitted.

[*Remainder of Page Intentionally Left Blank.*]

*** Specimen Copy for Review Only ***

Please indicate your agreement with the foregoing by signing below.


**ACCOUNT HOLDER:  XYZ Company**
                              **Account No. 619-XXXXX-XX-164**


**Signature**_____Date:_____
Authorized Signer:
Title:
Address:


**SECURED PARTY:**

**Signature**_____Date:_____
Authorized Signer:
Title:
Address:   Travelers Casualty and Surety Company of America, One Tower Square,
                Bond -2HS2, Hartford, CT  06183


**SECURITIES INTERMEDIARY:**


By: _____Date:_____
Name:
Title:
Address: c/o Morgan Stanley Smith Barney LLC

**INTRODUCING BROKER:**


By: _____ Date:_____
Name: Gabriel D'Amica, Jr.
Title:   Branch Office Manager
Address:  Morgan Stanley Smith Barney
CityPlace I, 185 Asylum Street, Floor 21,
Hartford, CT  06103
Telephone:  860-275-0773

# EXHIBIT A

## PERMITTED TRADING

Types of securities which Account Holder is permitted to instruct the Securities Intermediary to sell or purchase:

    a.   Money Market Mutual Funds approved for use by the Secured Party and distributed by the Securities Intermediary and/or the Introducing Broker

    b.   U.S. Treasuries with maturities of 5 years or less

    c.   U.S. Government Agency fixed income instruments with maturities of 5 years or less

*\* Specimen Copy for Review Only \**

# EXHIBIT B

**SAMPLE FORM ONLY** – DO <u>NOT</u> COMPLETE UNLESS ACCOUNT HOLDER WILL BE DENIED TRADING PRIVILEGES

### Form of Notice of Exclusive Control

Date: _____, _____

Citigroup Global Markets Inc.
c/o Morgan Stanley Smith Barney LLC
_____
_____
Attn.: _____

Re:    <u>Control Agreement dated [            ]</u>

Ladies and Gentlemen:

Reference is made to the Control Agreement dated _____ (the "Agreement"; capitalized terms used herein shall have the meanings assigned thereto in the Agreement) among you, us, the Introducing Broker and _____ (the "Account Holder").  This letter constitutes a Notice of Exclusive Control under the Agreement.

Effective today and continuing until we shall authorize you in writing to do otherwise, you shall no longer accept or honor any instructions from or on behalf of the Account Holder for Permitted Trading in respect of the Account or any financial assets or credit balances in the Account and, instead, shall only accept and honor our instructions, as further provided in the Agreement.

Very truly yours,

(SECURED PARTY)

# [SAMPLE]

By:_____
  Name:
  Title:

10