**Hearing Date: To Be Determined**
**Objection Deadline: To Be Determined**

DUFF & PHELPS LLC
55 East 52nd Street
New York, New York 10055

300 Headquarters Plaza
East Tower, 12th Floor
Morristown, NJ 07960
Allen M. Pfeiffer

Financial Advisors to the Examiner

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|                                            |   |                          |
| :----------------------------------------- | : | ------------------------ |
| In re                                      | : | Chapter 11               |
|                                            | : |                          |
| LEHMAN BROTHERS HOLDINGS INC., <u>et</u> <u>al</u>., | : | Case No. 08-13555 (JMP)  |
|                                            | : |                          |
| Debtors.                                   | : | (Jointly Administered)   |
-------------------------------------------------------------------x

**FIRST INTERIM FEE APPLICATION OF DUFF & PHELPS LLC, AS FINANCIAL ADVISORS *NUNC PRO TUNC* TO THE EXAMINER, ANTON R. VALUKAS, FOR INTERIM ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM FEBRUARY 6, 2009 THROUGH MAY 31, 2009,**

**FOR SECOND INTERIM APPLICATION PERIOD.**

**SUMMARY SHEET PURSUANT TO UNITED STATES TRUSTEE GUIDELINES
FOR REVIEWING APPLICATIONS FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES FILED UNDER 11 U.S.C. § 330**

| | |
|---|---|
| Name of Applicant: | Duff & Phelps LLC |
| Period for which Compensation and Reimbursement is Sought: | February 6, 2009 through May 31, 2009 |
| Authorized to Provide Professional Services to: | Anton R. Valukas (the "Examiner") |
| Date of Notice of Appointment (Examiner): | January 19, 2009 |
| Date of Retention (Duff & Phelps): | February 25, 2009, *nunc pro tunc* February 6, 2009 |

| | | |
|---|---|---:|
| Amount of Compensation and Expense Reimbursement Sought As Actual, Reasonable and Necessary: | Fees Requested:[1] | $9,434,868.30[2] |
| | Expenses Requested:[3] | $149,258.09 |
| Prior Amounts Requested: | Fees Previously Requested: | $0.00 |
| | Fees Previously Awarded: | $0.00 |
| | Expenses Previously Requested: | $0.00 |
| | Expenses Previously Awarded: | $0.00 |

---

[1] This reflects an agreed 10% reduction in standard hourly rates because of the significant public interest associated with the Examiner's duties and responsibilities. This total also reflects the Duff & Phelps' voluntary reduction of half of non-working travel time, as well as other time that Duff & Phelps has voluntarily written-off and not billed, totaling in excess of $550,000.

[2] This amount reflects an additional $4,413.15 as a result of a mathematical error in the May fee statement totaling $6,966, subject to certain offsets totaling $2,552.85.

[3] This amount represents a reduction in excess of $300,000 of expenses voluntarily written off by Duff & Phelps.

Summary of Time Recorded From February 6, 2009 - May 31, 2009
For Services Provided to the Lehman Examiner

| Professional[1] | Feb-March Rate[2,3,4] | April-May Rate[2,3,4] | Hours | Fees | Discounted Fees |
|---|---|---|---|---|---|
| **Managing Director** | | | | | |
| Jerry Arcy | $805 | $835 | 63.9 | $52,393.50 | $47,154.15 |
| Margaret Daley | $805 | $835 | 410.1 | $336,208.50 | $302,587.65 |
| Bruce Dubinsky | $805 | $835 | 261.3 | $211,533.25 | $190,379.93 |
| Gregory Higgins | $805 | $835 | 58.0 | $48,034.00 | $43,230.60 |
| Thomas Kabler | N/A | $835 | 38.7 | $32,314.50 | $29,083.05 |
| David Larsen | $920 | N/A | 6.0 | $5,520.00 | $4,968.00 |
| Erik Laykin | $805 | $835 | 606.1 | $497,135.50 | $447,421.95 |
| John Levitske | $805 | N/A | 38.3 | $30,791.25 | $27,712.13 |
| Paul Marcus | $805 | $835 | 542.4 | $448,140.00 | $403,326.00 |
| Allen Pfeiffer | $805 | $835 | 849.1 | $695,575.25 | $626,017.73 |
| Joseph Pimbley | $920 | $955 | 652.1 | $612,885.50 | $551,596.95 |
| John Schrader | $920 | $955 | 358.1 | $336,072.25 | $302,465.03 |
| Michael Vitti | $805 | $835 | 684.8 | $562,247.00 | $506,022.30 |
| Adam Warren | $805 | $835 | 384.8 | $315,752.00 | $284,176.80 |
| Philip Wisler | $805 | $835 | 32.1 | $26,503.50 | $23,853.15 |
| **Managing Director Total** | | | **4,985.65** | **$4,211,106.00** | **$3,789,995.40** |
| **Senior Advisor** | | | | | |
| Karen Balmer | $805 | $835 | 276.9 | $230,803.50 | $207,723.15 |
| Roberto Mendoza | $805 | $835 | 9.2 | $7,505.25 | $6,754.73 |
| **Senior Advisor Total** | | | **286.05** | **$238,308.75** | **$214,477.88** |
| **Director** | | | | | |
| Kelly Caputo | $720 | $750 | 209.4 | $153,225.00 | $137,902.50 |
| Jaime D'Almeida | $720 | $750 | 353.8 | $262,989.00 | $236,690.10 |
| TC Fleming | N/A | $750 | 28.2 | $21,150.00 | $19,035.00 |
| Robert Maxim | N/A | $800 | 274.5 | $219,600.00 | $197,640.00 |
| Matthew Petrich | $720 | $750 | 123.0 | $89,490.00 | $80,541.00 |
| Andrew Taddei | N/A | $800 | 152.7 | $122,160.00 | $109,944.00 |
| **Director Total** | | | **1,141.6** | **$868,614.00** | **$781,752.60** |
| **Vice President** | | | | | |
| Aijun Besio | $580 | $595 | 433.9 | $256,534.00 | $230,880.60 |
| Luca Blasi | N/A | $595 | 147.5 | $87,762.50 | $78,986.25 |
| Robert Erlich | $580 | $595 | 597.1 | $351,634.00 | $316,470.60 |
| Erin Fairweather | N/A | $595 | 167.4 | $99,603.00 | $89,642.70 |
| Seth Fliegler | N/A | $595 | 293.9 | $174,870.50 | $157,383.45 |
| Eugene Grinberg | $695 | $725 | 201.0 | $143,064.00 | $128,757.60 |
| William Hrycay | $580 | $595 | 409.8 | $242,847.00 | $218,562.30 |
| Chetan Joshi | $580 | $595 | 499.3 | $293,849.00 | $264,464.10 |
| Zahra Kanji | N/A | $595 | 55.0 | $32,725.00 | $29,452.50 |
| Manasi Kapadia | N/A | $595 | 18.1 | $10,769.50 | $9,692.55 |
| Joe Leiwant | $580 | $595 | 836.2 | $491,684.50 | $442,516.05 |

| Name | | | | | |
|---|---|---|---|---|---|
| Cole Morgan | $580 | $595 | 639.7 | $377,882.50 | $340,094.25 |
| Nicolas Nunez | $580 | $595 | 325.4 | $191,170.50 | $172,053.45 |
| Santiago Rivera | $580 | $595 | 117.1 | $68,993.50 | $62,094.15 |
| Robert Sha | $580 | N/A | 27.7 | $16,066.00 | $14,459.40 |
| Anshul Shekhon | $695 | N/A | 13.5 | $9,382.50 | $8,444.25 |
| Joseph Thompson | N/A | $595 | 110.3 | $65,628.50 | $59,065.65 |
| **Vice President Total** | | | **4,892.8** | **$2,914,466.50** | **$2,623,019.85** |
| **Senior Associate** | | | | | |
| Orie Attas | $435 | $450 | 97.6 | $43,113.75 | $38,802.38 |
| Aya Bellicha | N/A | $450 | 34.4 | $15,480.00 | $13,932.00 |
| Akshay Bhargava | $435 | $450 | 355.3 | $159,204.00 | $143,283.60 |
| Timothy Byhre | $435 | $450 | 243.0 | $108,960.00 | $98,064.00 |
| Ambuj Chaudhary | N/A | $450 | 16.1 | $7,245.00 | $6,520.50 |
| Robert Daly | N/A | $450 | 58.9 | $26,505.00 | $23,854.50 |
| John Duvoisin | N/A | $450 | 228.7 | $102,915.00 | $92,623.50 |
| Daniel Eliades | $435 | $450 | 152.0 | $66,570.00 | $59,913.00 |
| Adam Fleming | N/A | $450 | 231.1 | $103,995.00 | $93,595.50 |
| Seth Fliegler | $435 | N/A | 248.8 | $108,228.00 | $97,405.20 |
| Gregory Irwin | $435 | $450 | 388.0 | $173,274.00 | $155,946.60 |
| Manasi Kapadia | $435 | N/A | 61.8 | $26,861.25 | $24,175.13 |
| Rick Lee | N/A | $450 | 31.0 | $13,950.00 | $12,555.00 |
| Anthony Lu | N/A | $450 | 15.4 | $6,930.00 | $6,237.00 |
| Christopher McShea | N/A | $450 | 159.1 | $71,595.00 | $64,435.50 |
| Mukund Narayanan | N/A | $545 | 128.9 | $70,250.50 | $63,225.45 |
| Barry Oglesby | N/A | $450 | 65.1 | $29,295.00 | $26,365.50 |
| Nicole Patterson | $435 | $450 | 302.0 | $134,161.50 | $120,745.35 |
| Prithvi Ramesh | N/A | $450 | 140.0 | $63,000.00 | $56,700.00 |
| Zain Saeed | $435 | $450 | 288.7 | $129,372.00 | $116,434.80 |
| Joseph Thompson | $435 | N/A | 27.6 | $12,006.00 | $10,805.40 |
| David Welch | $435 | N/A | 46.2 | $20,097.00 | $18,087.30 |
| **Senior Associate Total** | | | **3,319.6** | **$1,493,008.00** | **$1,343,707.20** |
| **Analyst** | | | | | |
| Susan Aveni | N/A | $315 | 191.7 | $60,385.50 | $54,346.95 |
| Ted Berklayd | N/A | $315 | 181.9 | $57,298.50 | $51,568.65 |
| Allison Busse | $305 | $315 | 140.5 | $43,991.75 | $39,592.58 |
| Alex Chalunkal | N/A | $315 | 44.1 | $13,891.50 | $12,502.35 |
| John Duvoisin | $305 | N/A | 107.3 | $32,726.50 | $29,453.85 |
| Benjamin Filton | N/A | $315 | 153.8 | $48,447.00 | $43,602.30 |
| Megan Goering | N/A | $315 | 183.5 | $57,802.50 | $52,022.25 |
| Maryann Gunaratnam | N/A | $315 | 72.9 | $22,963.50 | $20,667.15 |
| Justin Kao | $305 | $315 | 315.2 | $98,189.00 | $88,370.10 |
| Jonathan Lasker | N/A | $315 | 63.7 | $20,065.50 | $18,058.95 |
| Laura Lienemann | N/A | $315 | 33.5 | $10,552.50 | $9,497.25 |
| Ian Lunderskov | N/A | $315 | 241.0 | $75,915.00 | $68,323.50 |

| | | | | | |
|---|---|---|---|---|---|
| Samantha Maresca | $305 | $315 | 323.2 | $101,090.00 | $90,981.00 |
| Brian Mcgrath | N/A | $315 | 313.8 | $98,847.00 | $88,962.30 |
| Ajay Patel | N/A | $315 | 145.8 | $45,927.00 | $41,334.30 |
| Rita Patierno | $305 | $315 | 319.8 | $99,372.00 | $89,434.80 |
| Sarah Wilyamowsky | N/A | $315 | 77.8 | $24,507.00 | $22,056.30 |
| **Analyst Total** | | | **2,909.5** | **$911,971.75** | **$820,774.58** |
| **Grand Total** | | | **17,535.2** | **$10,637,475.00** | **$9,573,727.50** |
| | | | Less: 50% of Non-Working Travel | | ($138,859.20) |
| | | | **Duff & Phelps' Adjusted Fees** | | **$9,434,868.30** |

Notes:

1. The following professionals appear in two categories because they were promoted as of April 1: Seth Fliegler, Joseph Thompson, Manasi Kapadia and John Duvoisin

2. Duff & Phelps increased its standard rates for all professionals as of April 1.

3. "N/A" represents a period where either a professional was not involved in the engagement or Duff & Phelps did not bill for his/her services.

4. The rates displayed in this Exhibit do not reflect Duff & Phelps' 10% voluntary reduction.

**Hearing Date: To Be Determined**
**Objection Deadline: To Be Determined**

DUFF & PHELPS LLC
55 East 52nd Street
New York, New York 10055

300 Headquarters Plaza
East Tower, 12th Floor
Morristown, NJ 07960
Allen M. Pfeiffer

Financial Advisors to the Examiner

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., et al., | : | Case No. 08-13555 (JMP) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------------------x

**FIRST[4] INTERIM FEE APPLICATION OF DUFF & PHELPS, LLC, AS FINANCIAL ADVISORS *NUNC PRO TUNC* TO THE EXAMINER, ANTON R. VALUKAS, FOR INTERIM ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FROM FEBRUARY 6, 2009 THROUGH MAY 31, 2009**

**FOR SECOND INTERIM APPLICATION PERIOD.**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

---

[4] Although this is the Second Interim period for this case, this is the First Interim Fee Application that Duff & Phelps is filing.

Duff & Phelps, LLC[5] ("Duff & Phelps" or the "Applicant"), financial advisors *nunc pro tunc* to the Examiner in the above-captioned matter, Anton R. Valukas (the "Examiner"), in support of its First Interim Application (the "First Interim Application") for allowance of compensation for professional services rendered and reimbursement of expenses incurred from February 6, 2009 through May 31, 2009 (the "Second Application Period"), respectfully represents:

## PRELIMINARY STATEMENT

1.      By this First Interim Application, and pursuant to sections 330 and 331 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Duff & Phelps requests that this Court authorize: (a) interim allowance and payment of reasonable compensation for actual and necessary professional services performed by Duff & Phelps in the aggregate amount of $9,434,868.30[6] for the period of February 6, 2009 through and including May 31, 2009 (the "Compensation Period")[7]; and (b) reimbursement of actual, reasonable and necessary expenses in the aggregate amount of $149,258.09 incurred during the Compensation Period.

2.      This Court has jurisdiction over this First Interim Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[5] On February 25, 2009, Order Authorizing the Examiner to Retain and Employ Duff & Phelps LLC as his Financial Advisors *Nunc Pro Tunc* as of February 6, 2009 ("February 25th Order") was entered by this Court in accordance with the Bankruptcy Rule 2016 and based on the Declaration of Allen M. Pfeiffer dated August 14, 2009.  See Docket No 2924 Exhibits A (Order) and B (AP Decl).  In accordance with the February 25th Order, the Examiner retained Duff & Phelps LLC as financial advisor to assist the Examiner by Duff & Phelps' Letter of Engagement dated February 6, 2009 ("D&P Letter of Engagement").  See Docket No 2825 Exhibit C.

[6] This amount reflects an additional $4,413.15 as a result of a mathematical error in the May fee statement totaling $6,966, subject to certain offsets totaling $2552.85.

[7] The Third Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Monthly Compensation and Reimbursement of Expenses of Professionals entered on June 25, 2009 requires this Application, covering the four month period of February 6, 2009 through and including May 31, 2009, be submitted within 75 days of May 31, 2009 or on or before August 14, 2009.

3.      To aid this Court in its review and analysis, the First Interim Application is set forth in four parts.  Part I provides a brief background of the matter and the Duff & Phelps' retention.  Part II provides an overview of the First Interim Application.  Part III provides a description of the work performed by Duff & Phelps during the Compensation Period, by category, as well as how Duff & Phelps calculated the request for compensation for professional services rendered and reimbursement of expenses.  Finally, Part IV explains why this compensation request should be allowed.

## I.  **BACKGROUND**

4.      On September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries (collectively, the "Debtors") commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

5.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPA Trustee") is administering LBI's estate.

7.      On January 16, 2009, the Court entered an order (the "Examiner Order") directing the appointment of an examiner, pursuant to 11 U.S.C. § 1104(c)(2), to investigate,

*inter alia*, various transfers and transactions by the Debtors and their affiliates, claims that

certain Debtors may have against LBHI, and the events that immediately preceded the

commencement of the LBHI chapter 11 case (collectively, the "Investigation"). Examiner Order

at ¶ 2 [Docket No. 2569]. The Examiner Order also directs the examiner to "perform the duties

specified in sections 1106(a)(3) and (4) of the Bankruptcy Code, except to the extent the Court

orders otherwise." Id. at ¶ 3.

        8.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

Examiner in the chapter 11 cases, subject to Court approval, and filed notice of such

appointment. [Docket No. 2570]. On January 20, 2009, the U.S. Trustee filed an application for

an Order of this Court approving the appointment of Anton R. Valukas as examiner in the

chapter 11 cases. [Docket No. 2571]. On January 20, 2009, this Court entered an order

approving the appointment by the U.S. Trustee of Anton R. Valukas as Examiner in the chapter

11 cases. [Docket No. 2583].

        9.     On February 13, 2009, the Examiner filed an Application to authorize the

Retention and Employment of Duff & Phelps LLC Financial Advisors to the Examiner. [Docket

No. 2825]. On February 25, 2009, this Court entered the Order Authorizing the Examiner to

Retain and Employ Duff & Phelps LLC as his Financial Advisors *nunc pro tunc* as of February

6, 2009 (the "February 25th Order"). [Docket No. 2924]. By Duff & Phelps' Letter of

Engagement dated February 6, 2009, the Examiner retained Duff & Phelps, LLC as financial

advisor to assist the Examiner in accordance with the February 25th Order. See Docket No 2825

Exhibit C.

        10.    A plan of reorganization and disclosure statement has not yet been filed in

these cases. On July 20, 2009, the Court entered an order extending the Debtors' exclusivity

period to file a chapter 11 plan through March 15, 2010, and the period during which the Debtors

may solicit acceptances thereof through May 17, 2010.  [Docket No. 4449].

## II. FIRST INTERIM APPLICATION FOR THE SECOND INTERIM APPLICATION PERIOD

11.     Duff & Phelps has prepared this First Interim Application for the Second

Interim Application Period in accordance with the Administrative Order Re: Guidelines for Fees

and Disbursements for Professionals in Southern District of New York Bankruptcy Cases dated

June 20, 1991 (the "Original SDNY Guidelines"), the Administrative Order Re: Amended

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases dated April 19, 1995 (the "Amended SDNY Guidelines," and collectively the

"Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 promulgated by the

United States Department of Justice dated January 30, 1996 (the "UST Guidelines" and

collectively with the Local Guidelines and UST Guidelines, the "Guidelines"). Pursuant to the

Amended SDNY Guidelines, a certification regarding compliance with such guidelines is

attached hereto as Exhibit A.

12.     On May 26, 2009, the Court entered an Order Appointing a Fee

Committee and Approving a Fee Application Protocol (the "Fee Committee Order") [Docket No.

3651].  On June 25, 2009, the Court entered the Third Amended Order Pursuant to Sections

105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures

for Interim Monthly Compensation and Reimbursement of Expenses of Professionals (the

"Compensation Order") [Docket No. 4165].

13.     On August 3, 2009, the Fee Committee filed its Report Pertaining to the

First Interim Fee Application of All Retained Professionals (the "Fee Committee Report").

[Docket No. 4655]. Based on the Fee Committee's recommendation to add detail to time entry

descriptions, Duff & Phelps augmented certain of its time entry descriptions to comply with the

Fee Committee Report. Duff & Phelps is prepared to provide additional information to the Fee

Committee with respect to any additional comments or questions the Fee Committee may have

respecting disbursements or time entry descriptions.

14.     Duff & Phelps seeks interim allowance herein of reasonable compensation

for actual and necessary financial advisory services rendered to the Examiner during the

Compensation Period, in the aggregate amount of $9,434,868.30 and for reimbursement of

actual, reasonable and necessary expenses incurred during the Compensation Period in

connection with the rendition of such services in the aggregate amount of $149,258.09.

15.     The fees sought by this First Interim Application reflect an aggregate of

17,535.2 hours of professional time spent and recorded in performing services by and for the

Examiner during the Compensation Period. This aggregate amount does not include time that

might be construed as duplicative or otherwise not beneficial to the Examiner's Investigation,

nor does it include time incurred prior to the effective date of Duff & Phelps' retention, which

time was spent preparing for the engagement by, *inter alia*, researching and analyzing

information regarding the proposed scope of the Examiner's Investigation.  In addition, for the

duration of the Application period, we eliminated all time spent by our administrative and

research analyst staff, transitory professionals, and executive management of Duff & Phelps.  We

also eliminated many hours spent in training and many hours spent by our technical, technology

and data team.  The total reduction voluntarily eliminated by Duff & Phelps exceeds $550,000 and 700 hours.

16.    Of the aggregate time expended during the Compensation Period, 5,271.7 recorded hours were expended by managing directors and senior advisors, 1,141.6 recorded hours were expended by directors, 4,892.8 recorded hours were expended by vice presidents, 3,319.6 recorded hours were expended by senior associates, and 2,909.5 recorded hours were expended by analysts.

17.    The fees charged by Duff & Phelps in this matter reflect a voluntary, agreed upon 10% reduction from standard hourly rates because of the significant public interest associated with the Examiner's duties and responsibilities.  The fees are otherwise billed in accordance with Duff & Phelps' procedures in effect during the Compensation Period.

18.    During the Compensation Period, Duff & Phelps hourly billing rates for professionals working on these matters ranged from $120.00 to $955.00 per hour[8] before applying the agreed upon 10% rate reduction, or $108 to $859.50 per hour after applying the reduction.  Allowance of compensation in the amount requested would result in a blended hourly billing rate of approximately $538.05.

19.    Such rates are reasonable based on the customary compensation charged by comparably skilled professionals in comparable non-bankruptcy cases in a competitive national financial advisory services market.

20.    Pursuant to the Guidelines, annexed hereto as Exhibit C is a schedule setting forth all Duff & Phelps professionals who have performed services for the Examiner

---

[8] Duff & Phelps' standard hourly rates set forth in the letter of letter range from $120 to $920 per hour.  Consistent with the engagement letter and the retention application, as of April 1, 2009, Duff & Phelps' standard hourly rates were adjusted, resulting in a range of $125 to $955 per hour.

during the Compensation Period for which Duff & Phelps is seeking reimbursement, the position

in which each such professional is employed or retained by Duff & Phelps, the hourly billing rate

charged for services performed by such professional and the aggregate number of hours

expended in this matter and fees billed therefore.

21.     Pursuant to the UST Guidelines, annexed hereto as Exhibit B is a

summary by project matter of the fees generated by the services performed during the

Compensation Period, and, annexed hereto as Exhibit D for each separate project matter, a list of

each professional providing services on the project matter, a statement of the number of hours

spent and the amount of compensation requested for each professional on the project matter.

22.     Annexed hereto as Exhibit E is a schedule specifying the categories of

expenses for which Duff & Phelps is seeking reimbursement and the total amount for each such

expense category.

23.     Annexed hereto as Exhibit F is detailed list of all expenses for which Duff

& Phelps seeks reimbursement.  This schedule has been adjusted for and does not reflect certain

expenses incurred by Duff & Phelps for which it will not be seeking reimbursement.  During the

Compensation Period, Duff & Phelps has voluntarily capped expenses in certain categories and

did not seek reimbursement for expenses in other categories.  For example, Duff & Phelps has

voluntarily capped hotel expenses at $350 per night which is $150 less than the Fee Examiners'

Committee recommendation to cap hotel rates at $500 per night.  We also reduced the amount

requested for car rides between Manhattan and each of the three major area airports.  Further,

Duff & Phelps is not seeking reimbursement for other expenses that it might be entitled to,

including printing and copying fees, certain meal expenses incurred while working on the

engagement, certain in-city transportation, for example taxi and subway expenses, as well as fees

incurred in the ordinary course of business when booking travel. These expenses voluntarily eliminated by Duff & Phelps total more than $300,000.

24.    Duff & Phelps maintains detailed records of the time spent by all professionals and the expenses incurred by, and in connection with the responsibilities to, the Examiner. Copies of the redacted detailed time records are annexed hereto as Exhibit G. Copies of unredacted versions of these detailed time records have been submitted previously to the Chair of the Fee Committee, under a confidentiality letter agreement, and the Office of the United States Trustee. Duff & Phelps has prepared and submitted redacted versions of the detailed time entries in compliance with Paragraph 5 of the Examiner Order, which states, "Until the Examiner has filed his or her report, neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties...."

25.    All of the services for which interim compensation is sought were rendered to the Examiner solely in furtherance of his duties and functions as Examiner and not on behalf of any individual creditor or other person.

26.    Except for subcontractors hired by Duff & Phelps upon and with approval by the Examiner, Duff & Phelps has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

27.    Duff & Phelps has not shared, nor agreed to share (a) any compensation it has received or may receive with another party or person, other than  subcontractors hired by Duff & Phelps upon and with approval by the Examiner, or (b) any compensation another person or party has received or may receive. No promises have been received by Duff & Phelps as to

14

compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

28.     To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Compensation Period, but were not processed prior to the preparation of this First Interim Application, Duff & Phelps reserves the right to request additional compensation for such services and reimbursement of such expenses in a future application.

### III. SUMMARY OF SERVICES RENDERED

29.     Duff & Phelps' Letter of Engagement, in conjunction with the February 25th Order and the Application, sets forth the terms and conditions of Duff & Phelps' retention to advise and assist the Examiner as requested in his investigation directed by this Court and specified in the Examiner Order. Examiner Order at ¶ 2 [Docket No. 2569].

30.     The Examiner Order requires the Examiner to investigate, *inter alia*:

•     Whether LBCC or any other entity that currently is an LBHI chapter 11 debtor subsidiary or affiliate ("LBHI Affiliate(s)") has any administrative claims against LBHI resulting from LBHI's cash sweeps of cash balances, if any, from September 15, 2008, the commencement date of LBHI's chapter 11 case, through the date that such applicable LBHI affiliate commenced its chapter 11 case (herein referred to as "Task 1");

•     All voluntary and involuntary transfers to, and transactions with, affiliates, insiders and creditors of LBCC or its affiliates, in respect of foreign exchange transactions and other assets that were in the possession or control of LBHI

15

Affiliates at any time commencing on September 15, 2008 through the day that each LBHI Affiliate commenced its chapter 11 case (herein referred to as "Task 2");

- Whether any LBHI Affiliate has colorable claims against LBHI for potentially insider preferences arising under the Bankruptcy Code or state law (herein referred to as "Task 3");

- Whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law (herein referred to as "Task 4");

- Whether there are more colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI chapter 11 case on September 15, 2008 (herein referred to as "Task 5");

- Whether assets of any LBHI Affiliates (other than Lehman Brothers, Inc.) were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court entered September 20, 2008, and whether consequences to any LBHI Affiliate as a result of the consummation of the transaction created colorable causes of action that inure to the benefit of the creditors of such LBHI subsidiary or affiliate (herein referred to as "Task 6");

- The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to: LBI, LBIE, Lehman Brothers Special Finance ("LBSF") and LBCC, during the 30-day period preceding the commencement of the chapter 11 cases by each debtor on September 15, 2008 or thereafter or such longer period as the Examiner deems relevant to the Investigation (herein referred to as "Task 7");

- The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-chapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others (herein referred to as "Task 8");

- The transfer of the capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc. (herein referred to as "Task 9"); and

- The events that occurred from September 4, 2008 through September 15, 2008 or prior thereto that may have resulted in commencement of the LBHI chapter 11 case (herein referred to as "Task 10").

Examiner Order, ¶ 2.

31.     During the Compensation Period, Duff & Phelps performed a wide variety of tasks in connection with the Investigation. To efficiently and effectively address and evaluate the issues before the Examiner, Duff & Phelps professionals formed five functional teams: (1) Financial Engineering; (2) Retrospective Valuation and Solvency; (3) Forensic Accounting and Investigation; (4) Data and Document Management; and (5) Project Management. Further, actions taken by each team are categorized into matter descriptions.

32.     As noted above, Exhibit B is a summary by project matters of the fees generated during the Compensation Period.  The following are descriptions of the project matters and their necessity and benefit to the estate.  The descriptions include a statement of the aggregate number of hours spent and fees charged for each matter after applying the 10% reduction.  The persons providing services on each project matter are listed on Exhibit D.

33.     Duff & Phelps professionals worked together with Jenner & Block teams and consistent with the matters as described in Jenner & Block's Interim Fee Application.  In the detailed time entries, attached hereto as Exhibit G, use of the term "Team" refers to the Jenner teams working along with Duff & Phelps professionals on those matters.  Duff & Phelps professionals assigned to project matter "Intercompany Transfers" principally work with Jenner & Block "Team 2" elements of the investigation. Duff & Phelps professionals assigned to project matters "Governance and Fiduciary Duty", "Analysis of Risk Management" and "Commercial and Residential Real Estate Analysis" principally work with Jenner & Block "Team 3" elements of the investigation. Duff & Phelps professionals assigned to project matter "Bank and Other Third Party Transactions" principally work with Jenner & Block "Team 4" elements of the investigation. Duff & Phelps professionals assigned to project matter "Barclays Transactions" principally work with Jenner & Block "Team 5" elements of the investigation. Duff & Phelps professionals assigned to "Systems Analysis", "Solvency and Capital Adequacy", "Liquidity, Credit, and Other Financial Analysis", "Asset Valuation", "Compensation", and "Witness Interviews" worked across Jenner teams in various elements of the investigation.  Duff & Phelps professionals assigned to "Case Administration & Billing" and "Project Infrastructure" principally work with Jenner & Block "Team 1."  Duff & Phelps professionals assigned to "Cross Team Communications, Planning, and Coordination" and "Data and Document

Management Analysis" also worked across and in support of all Duff & Phelps and Jenner & Block teams.

### A.  Intercompany Transfers

34.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 1, 2, 3, 4, 7 and 9 of the Examiner Order.

35.     During the Compensation Period, professionals who have been assigned to these elements of the Investigation have (a) developed a work plan; (b) reviewed and analyzed extensive background documents regarding intercompany transfers and the Debtors' cash management system; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation; (e) coordinated with our system teams to identify the systems of interest and to determine the best way to retrieve needed data and information; (f) met with current and former Lehman employees to evaluate how the cash management system functioned at Lehman in a normal state and to evaluate how the same functioned at the time of, and immediately following bankruptcy filing; and (g) worked to identify and investigate various transactions at or leading up to the bankruptcy it identify transaction that may be deemed to have occurred outside the ordinary course of business.

36.     During the Compensation Period, Duff & Phelps expended 842.2 hours, at an aggregate charge of $532,991.93, on matters relating to the investigation of intercompany transfers.

B. **Governance and Fiduciary Duty**

37.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 5 and 10 of the Examiner Order.

38.     During the Compensation Period, professional who have been tasked with assisting in these elements of the Investigation have (a) conferred to develop a work plan regarding the evaluation of whether there are colorable claims for breaches of fiduciary duties and the events leading up to the commencement of the LBHI chapter 11 case; (b) reviewed and analyzed extensive background documents and materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

39.     Professionals tasked with this matter also performed extensive research and analysis relating to certain claims which included (a) review of accounting for securitizations, hedging and other strategic transactions for potential breach of fiduciary duty; (b) comparison of valuations for major securitizations, leveraged loans and commercial real estate transactions with internal valuation policies; (c) review of internal and external reporting and disclosures of financial condition, earnings, risk posture and risk management procedures for GAAP, regulatory and internal management purposes; (d) analysis of compliance with CSE requirements with respect to capital adequacy, reporting of financial condition, earnings and risk management processes; and (e) analysis of management's compliance with stated policies and procedures.

40.    During the Compensation Period, Duff & Phelps expended 2,107.7 hours, at an aggregate charge of $1,154,183.85, on matters relating to governance and fiduciary duty.

### C.  Analysis of Risk Management

41.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 5 and 10 of the Examiner Order.

42.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan in connection with the investigation evaluating the risk management function at Lehman leading up to filing; (b) analyzed, extensively documented and sourced relevant information regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

43.    Professionals assigned to this matter performed analyses that included (a) identification and assessment of risk metric usage and limit calculations, including analysis of model changes and rationale for changes to evaluate the issue of potential manipulation; (b) analysis of  independence of risk management function and adherence to its objectives; and (c) identification and review of major risk systems, including gaining access to systems to determine evaluate whether risk management procedures were followed and analysis of documentation within risk systems describing methodology changes.

44.    During the Compensation Period, Duff & Phelps expended 697.3 hours, at an aggregate charge of $318,740.40, on matters relating to analysis of risk management.

21

### D.  **Commercial and Residential Real Estate Analysis**

45.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5 and 10 of the Examiner Order.

46.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan in connection with the investigation of Lehman's commercial and residential real estate exposure and activities; (b) analyzed, extensively documented and sourced relevant information regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

47.    Professionals assigned to this matter performed analyses that included (a) the identification and summary of major commercial real estate transactions including valuations ascribed to those transactions over time; and (b) analysis of  residential real estate activity, including securitizations and related characteristics.

48.    During the Compensation Period, Duff & Phelps expended 1,427.9 hours, at an aggregate charge of $666,714.83, on matters relating to commercial and residential real estate analysis.

### E.  **Bank and other Third-Party Transactions**

49.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 4 and 8 of the Examiner Order.

50.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan; (b) assisted Counsel to the Examiner in researching and understanding collateral issues and the impact of liquidity on those

issues; (c) analyzed, extensively documented and sourced relevant systems regarding these issues; (d) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (e) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

51.    Professionals assigned to this matter analyzed topics with respect to Lehman's dealings with JP Morgan Chase, Citigroup, The Federal Reserve Bank of New York, HSBC, and other third parties. Professionals analyzed (a) relevant third-party and intercompany transaction data regarding the investigation of voidable asset transfers; (b) collateral-related activity leading up to the bankruptcy filing; and (c) the impact of Lehman's liquidity on collateral either demanded by third parties and/or posted by Lehman at the time preceding the bankruptcy.

52.    During the Compensation Period, Duff & Phelps expended 723.9 hours, at an aggregate charge of $499,256.33, on matters relating to bank and other third-party transactions.

## F.  **Barclays Transactions**

53.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Task 6 and 9 of the Examiner Order.

54.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan; (b) analyzed, extensively documented and sourced relevant materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements

of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

55.     Professionals assigned to this matter analyzed securities transferred to Barclays to aid in evaluating the propriety of the transfers, and they also analyzed accounting and allocation of back office costs to the legal entities.

56.     During the Compensation Period, Duff & Phelps expended 298.3 hours, at an aggregate charge of $206,678.48, on matters relating to the Barclays transactions.

## G.  Systems Analysis

57.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to all ten of the Tasks of the Examiner Order.

58.     Professionals tasked with systems analysis facilitated the retrieval of data from the vast number of systems at Lehman/Alvarez and Barclays.  The initial step to execute on this matter was to conduct interviews of appropriate technical and business staff at Lehman/Alvarez and Barclays regarding the systems.  Thereafter, we acted to (a) identify the availability of systems; (b) identify the location of the available systems; (c) determine what information was housed on each system; (d) identify systems that contained data needed by our professionals in the execution of their work; (e) research on and testing of the systems to identify the most efficient and proper method in which to search and retrieve data and information; and (f) assess how to efficiently access the requisite data.

59.     Professionals tasked with systems analysis identified relevant systems from thousands of systems and subsystems available to Lehman/Alvarez and Barclays. Thereafter, if a relevant system was available (as some were decommissioned) and access was granted, Duff & Phelps professionals worked to understand the systems' capabilities, including

the information contained thereon, and they developed querying or other capabilities needed to access and obtain the data in a veracious and efficient manner.  The sophistication of the system, as well as the degree of accessibility granted to the system, dictated the research and work needed to appropriately utilize the systems for the Investigation.

60.    To effectively and efficiently execute on this matter, certain Duff & Phelps professionals have been working at on-site locations at Lehman in New York.

61.    Professionals tasked with systems analysis also developed protocols and facilitated access to various systems identified.  Such protocols included training for professionals utilizing the systems to understand the information available and how to appropriately query, review, retrieve and save data and information.

62.    During the Compensation Period, Duff & Phelps expended 1316.0 hours, at an aggregate charge of $783,704.48, on systems analysis.

**H.  Solvency and Capital Adequacy**

63.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3 and 4 of the Examiner Order.

64.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan for assessment of the solvency and capital adequacy of the debtor entities at different dates; (b) analyzed, extensively documented and sourced relevant materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d)  assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

65.     Professionals assigned to this matter analyzed and performed a solvency analysis on Lehman debtor entities at various dates.  Such analysis included a review of (a) Lehman debtor financial statements for balance sheet solvency, the ability to pay debts and for capital adequacy purposes; and (b) the impact of various findings related to valuation on the solvency of the debtor entities.

66.     During the Compensation Period, Duff & Phelps expended 2,621.5 hours, at an aggregate charge of $1,399,860.00, on matters relating to solvency and capital adequacy.

**I.    Liquidity, Credit and Other Financial Analysis**

67.     Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5, 6, 8 and 10 of the Examiner Order.

68.     During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan for investigation of the liquidity and capital adequacy of the debtor entities at different dates; (b) analyzed, extensively documented and sourced relevant materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d)  assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

69.     Liquidity and other financial analysis included a review of (a) Lehman's funding framework; (b) various measures of liquidity over time, including, liquidity pool, its contents and changes over time; (c) an assessment of Lehman's liquidity stress scenarios; (d) Lehman's disclosure of its liquidity levels to various constituents, including investors, regulatory bodies and credit rating agencies; and (e) assessments of Lehman's creditworthiness through analysts and credit rating agencies.

70.    During the Compensation Period, Duff & Phelps expended 2,568.8 hours, at an aggregate charge of $1,295,622.90, on matters relating to liquidity, credit and other financial analysis.

**J.    Asset Valuation**

71.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 3, 4, 5, 6, 8 and 10 of the Examiner Order.

72.    Execution of this matter required valuation analyses on a wide range of financial instruments at various dates, and the results of such analyses were likely relevant to more than one task of the Investigation.  As such, Duff & Phelps implemented a valuation coordination team ("VCT") comprised of professionals representing each functional team.  The purpose of the VCT is to avoid duplication of effort with regard to valuations and ensure the valuations are performed by the appropriate professionals.  VCT oversees all valuation related activities and is responsible for procuring the necessary data and communicating the results of such valuations to the appropriate teams.

73.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan relating to the analysis of Lehman's valuation procedures, including reviewing and testing internal and external valuations of Lehman Debtor assets at different dates; (b) analyzed, extensively documented and sourced relevant information regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

74.    Professionals assigned to this matter reviewed (a) policies, procedures and monthly reports related to the valuation of assets and the verification of asset marks; (b) third party marks, where available, for reasonableness prior to performing any independent valuations; (c) the classification of assets for FAS 157 purposes; and (d) review of submission to Lehman's independent auditors related to the valuation of marks.  In addition, and as directed by Counsel for the Examiner, Duff & Phelps professionals performed independent valuation of various types of assets, including, but not limited to fixed assets, derivatives, fixed income assets, equity, real estate, high yield instruments and leveraged loans.

75.    During the Compensation Period, Duff & Phelps expended 380.0 hours, at an aggregate charge of $219,234.60, on matters relating to asset valuation.

### K.  Compensation

76.    Duff & Phelps professionals assigned to this matter were primarily charged with the investigation relating to Tasks 2, 5, 7 and 10 of the Examiner Order.

77.    During the Compensation Period, professionals who have been assigned to this element of the Investigation have (a) developed a work plan relating to analysis of compensation issues of various Lehman employees; (b) analyzed background documents and materials regarding these issues; (c) assisted Counsel to the Examiner in the identification of potential witnesses with information regarding these elements of the Investigation; and (d) assisted Counsel to the Examiner in the documentation of these elements of the Investigation.

78.    Professionals assigned to this matter researched the compensation structure at Lehman, including analysis of the impact on compensation resulting from decisions which may have caused various changes to Lehman's capital structure and/or profitability, as

well as various payments of compensation to officers and/or directors at Lehman in the time period leading up to the bankruptcy.

79.    During the Compensation Period, Duff & Phelps expended 229.3 hours, at an aggregate charge of $105,795.90, on matters relating to compensation.

**L.  Witness Interviews**

80.    Time entries in this matter relate to preparing for and conducting witness interviews.

81.    Duff & Phelps professionals assisted Counsel to the Examiner in the preparation of witnesses interviews which included (a) review of a comprehensive amount of documents related to the appropriate subject matter; (b) aid in the formulation of interview questions; and (c) analysis of documents and draft of exhibits used.

82.    Duff & Phelps professionals assisted Counsel to the Examiner in the conduct of witness interviews which included attendance and documentation of certain witness interviews as requested by the Examiner, as well as investigation and research of items raised in interviews including documentation of follow-up responses and questions later used by counsel for the Examiner.

83.    During the Compensation Period, Duff & Phelps expended 399.8 hours, at an aggregate charge of $254,781.45, on matters relating to witness interviews.

**M.  Non-Working Travel**

84.    This matter includes time entries related to non-working travel time spent by Duff & Phelps professionals to participate in internal and external meet and confer sessions with various third-parties and parties in interest as directed by the Examiner and includes travel

for necessary on-site work at Lehman/Alvarez.  When feasible, our professionals minimized the amount of non-working travel by working while travelling.

85.    During the Compensation Period, Duff & Phelps expended 500.6 hours, at an aggregate charge of $277,718.40, on non-working travel time.  Duff & Phelps is seeking compensation only for one-half of non-working travel time in the amount of $138,859.20. Duff & Phelps is voluntarily reducing its bill for the balance.

### N.  Case Administration and Billing

86.    This matter relates to internal case administration and the preparation of monthly fee statements and fee applications, and it included (a) general, internal administrative tasks; (b) timekeeping; and (c) review and preparation of fee applications.

87.    During the Compensation Period, Duff & Phelps expended 463.5 hours, at an aggregate charge of $227,534.18, on case administration and billing matters.

### O.  Project Infrastructure

88.    This matter relates to the preparation of and execution on non-recurring infrastructure establishment tasks, and it includes (a) development of billing system tailored to meet the requirements of the engagement, as well as related instruction; (b) whole disk encryption to aid in compliance with stipulations and confidentiality provisions; (c) review and acknowledgement of confidentiality agreements and stipulations by all Duff & Phelps professionals; and (d) establishment of data, communication, document management and related protocols.

89.    During the Compensation Period, Duff & Phelps professionals worked to develop billing and fee system and related protocols to accurately, confidentially and efficiently

capture the nature of the work performed during the course of the Investigation and to ensure that such time was recorded in compliance with the Guidelines.

90.     During the Compensation Period, Duff & Phelps expended 539.8 hours, at an aggregate charge of $293,874.30, on project infrastructure matters.

**P.  Cross-Team Communications, Planning, and Coordination**

91.     In appointing the Examiner, the Court expressed a strong interest in ensuring that the Investigation avoids replication of efforts and duplication of services.  Due to the breadth of the Investigation, the number of parties and entities involved, the volume of documents and data to be reviewed and analyzed, and the short time frame in which the Examiner has committed to completing the Investigation so as to avoid unnecessary delays in the administration of the chapter 11 cases, Duff & Phelps professionals routinely communicate and coordinate internally regarding the scope of the Investigation, documents and data to request, witnesses to interview, and research to be conducted which is relevant to multiple investigatory subject matters.

92.     This matter includes time entries for such planning and coordination to avoid the duplication of work and to conduct an expedient, yet thorough, Investigation, and contains activities such as (a) analysis of issues that pertain to multiple teams; (b) ensuring team collaboration on analyses that impact multiple teams or matters; (c) ensuring consistency and efficiency in procurement of documents, information and interviews; (d) establishment of communications protocols to avoid duplicative efforts, such as "one-team" communication with Jenner & Block; (e) centralized oversight and management of a consolidated work plan for the Investigation, including related staffing and budgeting issues; and (f) time spent insuring that each task performed is related to one of the tasks of the Examiner.

93.    During the Compensation Period, Duff & Phelps expended 699.8 hours, at an aggregate charge of $440,511.08, on matters relating to cross-team communications, planning, and coordination.

## Q.  Data and Document Management and Analysis

94.    A critical piece of the Examiner's Investigation relates to the collection and processing of a vast volume of documents and information that is in the possession of various parties in interest.  This matter relates to the acquisition, management and review of electronic and tangible documents and information, including (a) understanding, assessing and accessing the available data systems at Alvarez and Lehman (among others); (b) reviewing and executing stipulations and implementing related protocols as required regarding the handling and use of data and documents; (c) technically processing documents for review by Duff & Phelps professionals, including centralized data request function, categorization of data to aid in the dissemination of information to the various teams to avoid duplication of efforts; (d) receiving, processing and responding to data requests from Counsel to the Examiner; (e) management of documents tagged by Counsel for the Examiner as for Duff & Phelps' review; and (f) analyzing and implementing efficient protocols to focus the Examiner's Investigation on relevant data and documents.  To effectively and efficiently execute on this matter, Duff & Phelps certain professionals have been working at on-site locations at Lehman in New York.

95.    During the Compensation Period, Duff & Phelps expended 1,719.1 hours, at an aggregate charge of $896,524.43, on matters relating to data and document management and analysis.

## IV. **DUFF & PHELPS' REQUESTED COMPENSATION SHOULD BE ALLOWED**

96.     The foregoing professional services performed by Duff & Phelps were necessary and appropriate to the Examiner's administration of his duties in the above-referenced chapter 11 cases and were in the best interests of the Examiner, the Debtors' estates, and other parties in interest. Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, or tasks involved.

97.     Duff & Phelps has taken significant efforts to ensure that the professional services were performed with diligence, in an efficient manner, and without duplication of effort. Accordingly, when possible, Duff & Phelps delegated tasks to lower cost professionals or, for discrete matters, to professionals with specialized expertise in the particular task at issue. While that approach may have required intra-office conferences or involved individual professionals who spent only a few hours on the matter at hand, the net result was enhanced cost efficiency.

98.     In preparing this First Interim Application, Duff & Phelps calculated the amount of time spent by each professional in performing actual and necessary advisory services to the Examiner and Counsel to the Examiner in the conduct of the Investigation. That data came directly from computerized records that are kept specifically for this engagement. Individual time entries are maintained on written daily logs and are input directly into the billing system.  All time entries and expenses are uploaded into the billing system, which then produces draft spreadsheets of time and expenses. Duff & Phelps professionals have reviewed and edited the draft spreadsheets for errors prior to their submission.

99.     The rates used in this First Interim Application are the customary and usual rates which Duff & Phelps charges clients on matters of this type, subject to the 10%

reduction in standard hourly rates to which Duff & Phelps has agreed because of the significant

public interest associated with the Examiner's duties and responsibilities. In addition, the

disbursements for which Duff & Phelps seeks reimbursement are the customary and usual

expenses for which the Duff & Phelps seeks reimbursement from their clients. Duff & Phelps

does not charge its clients for facsimiles, postage, duplicating and computerized research

domestic and long distance telephone (other than while traveling), and certain overtime expenses,

and takes those expenses into account in its overhead. The hourly rates applied in this First

Interim Application do not compensate the firm for such expenses.

   100. Section 331 of the Bankruptcy Code provides for interim compensation

of professionals and incorporates the substantive standards of section 330 to govern the Court's

award of such compensation. 11 U.S.C. § 331. Section 330 provides that a court may award a

professional employed under section 327 of the Bankruptcy Code "reasonable compensation

for actual necessary services rendered . . . and reimbursement for actual, necessary expenses."

11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such

compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded to an Examiner, trustee under Chapter 11, or professional person, the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including
>
>  (A) the time spent on such services;
>
>  (B) the rates charged for such services;
>
>  (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
>  (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)     with respect to a professional person, whether the
        person is board certified or otherwise has demonstrated
        skill and experience in the bankruptcy field; and

(F)     whether the compensation is reasonable based on the
        customary compensation charged by comparably
        skilled practitioners in cases other than cases under this
        title.

11 U.S.C. § 330(a)(3).

101.    Duff & Phelps respectfully submits that the services for which it seeks
compensation in this First Interim Application were, at the time rendered, believed to be necessary
and beneficial to the Examiner and the Investigation.  Duff & Phelps further submits that the
compensation requested herein is reasonable in light of the nature, extent, and value of such
services provided to the Examiner and Counsel to the Examiner.  The Examiner has been given the
opportunity to review this application and has approved the requested amount.

102.    The services rendered by Duff & Phelps were consistently performed in a
timely manner commensurate with the complexity, importance and nature of the issues involved.
Duff & Phelps took numerous steps to ensure the services  were rendered in the most efficient,
cost-effective manner.  Such steps include (a) establishing several cross-functional teams, such as
the project management, the data and document management and the valuation coordination
("VCT") teams to minimize overlap of activity among the functional teams; (b) focusing on the
tasks deemed most beneficial to the investigation by taking top-down view of each of the major
issues to readily identify areas that warranted greater scrutiny, and thereafter conferring with the
Examiner and Counsel to the Examiner to again focus on only those tasks/deliverables they direct
continued  focus upon; (c) establishing weekly team leader calls both internally and externally
between Duff & Phelps' team leaders and the respective team leader(s) at Counsel for the
Examiner; (d) leveraging off of work already performed by others, including Counsel to the

Examiner, Alvarez, Barclays, Deloitte, Ernst & Young, Houlihan, Lokey, Howard & Zukin and

Gifford Fong Associates; (e) primarily analyzing data and issues that have not yet been the focus

of other investigations, the results of which we expect has and will continue to benefit other parties;

(f) refraining in all but a select few instances from performing first level review of any document

productions by coordinating efforts with Counsel for the Examiner who have, along with contract

attorneys, performed most first level reviews, and instead, efforts have been focused on reviewing

only those documents which have been flagged either as "Hot" or "for Duff review"; and (g) to the

extent we perform first level review of a document production, junior analyst reviewers

knowledgeable about the needs of each area of the investigation are assigned that can readily

identify relevant documents and communicate such findings with the appropriate teams.

103.    Based upon the foregoing, it is respectfully submitted that approval of the

interim compensation sought herein for the Compensation Period is warranted.

104.    To the extent applicable, Duff & Phelps further requests that the Court

waive for cause shown any Guideline requirement not met by this First Interim Application.

105.    No previous application for the relief sought herein has been made to this

or any other court.

## **CONCLUSION**

WHEREFORE Duff & Phelps respectfully requests: (i) allowance and payment of

compensation for professional services rendered during the Compensation Period in the

amount of $9,434,868.30; and (ii) reimbursement for actual and necessary expenses Duff &

Phelps incurred during the Compensation Period in the amount of $149,258.09; and (iii) that

the Court grant Duff & Phelps such other and further relief as is just.

Dated: August 14, 2009

Respectfully submitted,

DUFF & PHELPS, LLC
By:     Allen M. Pfeiffer
        Managing Director
        DUFF & PHELPS, LLC
        300 Headquarters Plaza
        12th Floor
        Morristown, NJ  07960
        (973) 775-8260