**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
                                              :
In re:                                        :        Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :        08-13555 (JMP)
                                              :
                    Debtors.                  :        (Jointly Administered)
                                              :
------------------------------------------------------------ x
```

**SECOND APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
FEBRUARY 1, 2009 THROUGH AND INCLUDING MAY 31, 2009**

Name of Applicant:                          Milbank, Tweed, Hadley & McCloy LLP

Authorized to Provide
Professional Services to:                   Official Committee of Unsecured Creditors

Date of Retention:                          November 18, 2008 (effective as of September 17,
                                            2008)

Period for which compensation
and reimbursement is sought:                    February 1, 2009 – May 31, 2009

Amount of Compensation
requested:                                      $16,829,521.00

Amount of Expense
Reimbursement requested:                        $1,019,754.61

This is an:    X    interim  _____ final application.

This is the second interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in
these cases.

**SECOND INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2009 - MAY 31, 2009)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|------|----------------------|-----------|-------------|--------------------|
| Paul Aronzon | Financial Restructuring Partner for 19 years; admitted in 1979. | $995 | 112.50 | $111,937.50 |
| Linda Dakin-Grimm | Litigation Partner for 9 years; admitted in 1985. | $995 | 3.30 | $3,283.50 |
| Dennis Dunne | Financial Restructuring Partner for 10 years; admitted in 1991. | $995 | 374.10 | $372,229.50 |
| Michael Hirschfeld | Litigation Partner for 27 years; admitted in 1974. | $995 | 31.50 | $31,342.50 |
| Rainer Magold | Leveraged Finance Partner for 4 years; admitted in 1986. | $995 | 3.30 | $3,283.50 |
| Robert Jay Moore | Financial Restructuring Partner for 12 years; admitted in 1977. | $995 | 20.00 | $19,900.00 |
| Anthony Root | Global Securities Partner for 12 years; admitted in 1983. | $995 | 23.10 | $22,984.50 |
| Richard Sharp | Litigation Partner for 18 years; admitted in 1984. | $995 | 2.50 | $2,487.50 |
| John Walker | Global Finance Partner for 8 years; admitted in 1987. | $995 | 105.70 | $105,171.50 |
| Gary Wigmore | Global Project Finance Partner for 19 years; admitted in 1983. | $995 | 3.00 | $2,985.00 |
| Thomas Arena | Litigation Partner for 8 years; admitted in 1991. | $950 | 25.00 | $23,750.00 |
| Elizabeth Besio Hardin | Global Finance Partner for 12 years; admitted in 1996. | $950 | 53.50 | $50,825.00 |
| Stuart Harray | Global Corporate Partner for 2 years; admitted in 1993. | $950 | 15.50 | $14,725.00 |
| Thomas Janson | Global Corporate Partner for 6 years; admitted in 1982. | $950 | 15.70 | $14,915.00 |
| Dale Ponikvar | Tax Partner for 19 years; admitted in 1981. | $950 | 147.10 | $139,745.00 |
| Peter Benudiz | Global Corporate Partner for 1 year; admitted in 1987. | $925 | 264.50 | $244,662.50 |
| Winthrop Brown | Global Finance Partner for 26 years; admitted in 1975. | $900 | 133.60 | $120,240.00 |
| David Cohen | Litigation Partner for 7 years; admitted in 1994. | $900 | 291.70 | $262,530.00 |

---

[1]    Effective January 1, 2009, Milbank implemented an annual increase in billing rates for all Partners,
Of Counsel, Associates and Paraprofessionals.  The hourly rate listed here reflects this increase.

3

| | | | | |
|---|---|---|---|---|
| Robert Finkel | Global Corporate Partner for 13 years; admitted in 1988. | $900 | 35.20 | $31,680.00 |
| David Lamb | Global Corporate Partner for 19 years; admitted in 1992. | $900 | 105.80 | $95,220.00 |
| Eric Moser | Global Finance Partner for 10 years; admitted in 1991. | $900 | 270.10 | $243,090.00 |
| Langdon Van Nordon | Global Finance Partner for 9 years; admitted in 1992. | $900 | 10.90 | $9,810.00 |
| Andrew Walker | Tax Partner for 6 years; admitted in 1995. | $900 | 35.60 | $32,040.00 |
| Paul Wessel | Tax Partner for 13 years; admitted in 1988. | $900 | 139.70 | $125,730.00 |
| David Perkins | Litigation Partner for 32 years; admitted in 1969. | $885 | 27.70 | $24,514.50 |
| Wilbur Foster | Financial Restructuring Partner for 18 years; admitted in 1982. | $875 | 512.30 | $448,262.50 |
| Crayton Bell | Global Corporate Partner for 6 year; admitted in 1992. | $850 | 7.70 | $6,545.00 |
| Catherine Marsh | Global Project Finance Partner for 4 years; admitted in 1995. | $850 | 10.60 | $9,010.00 |
| David Wolfson | Global Corporate Partner for 5 years; admitted in 1994. | $850 | 115.70 | $98,345.00 |
| Brett Goldblatt | Global Corporate Partner for 4 years; admitted in 1998. | $825 | 13.50 | $11,137.50 |
| James Warbey | Global Finance Partner for 4 years; admitted in 1996. | $825 | 95.90 | $79,117.50 |
| Debra Alligood White | Global Corporate Partner for 3 years; admitted in 1993. | $825 | 23.50 | $19,387.50 |
| Andrew Leblanc | Litigation Partner for 2 years; admitted in 1998. | $800 | 13.60 | $10,880.00 |
| Taisa Markus | Global Securities Partner for 3 years; admitted in 1989. | $800 | 10.20 | $8,160.00 |
| Joshua Zimmerman | Global Securities Partner for 3 years; admitted in 1997. | $800 | 36.20 | $28,960.00 |
| Russell Kestenbaum | Tax Partner for 2 years; admitted in 1999. | $775 | 106.60 | $82,615.00 |
| Abhilash Raval | Financial Restructuring Partner for 1 year; admitted in 2003. | $775 | 7.10 | $5,502.50 |
| Paul Denaro | Global Securities Partner for 1 year; admitted in 2000. | $740 | 234.10 | $173,234.00 |
| Martin Erhardt | Global Corporate Partner for 1 year; admitted in 2000. | $740 | 4.30 | $3,182.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 7 years; admitted in 1984. | $825 | 245.80 | $202,785.00 |

| | | | | |
|---|---|---|---|---|
| Dennis O'Donnell | Financial Restructuring Of Counsel for 2 years; admitted in 1992. | $785 | 1,005.90 | $789,631.50 |
| Robert Winter | Financial Restructuring Associate for 11 years; admitted in 1997. | $710 | 29.30 | $20,803.00 |
| Lisa Brabant | Real Estate Associate for 11 years; admitted in 1999. | $685 | 81.30 | $55,690.50 |
| Cecilio Castillero | Global Finance Associate for 9 years; admitted in 2001. | $685 | 134.40 | $92,064.00 |
| Robert Liubicic | Litigation Associate for 10 years; admitted in 1999. | $685 | 181.40 | $124,259.00 |
| Bradley Edmister | Global Securities Associate for 10 years; admitted in 2000. | $685 | 4.60 | $3,151.00 |
| Stephen Tudway | Litigation Associate for 11 years; admitted in 1998. | $685 | 26.00 | $17,810.00 |
| Fred Neufeld | Financial Restructuring Associate for 18 years; admitted in 1990. | $685 | 2.60 | $1,781.00 |
| Lena Mandel | Senior Attorney; admitted in 1991. | $680 | 251.30 | $170,884.00 |
| Nicholas Bragg | Global Finance Associate for 3 years; admitted in 2007. | $675 | 82.40 | $55,620.00 |
| Evan Fleck | Financial Restructuring Associate for 8 years; admitted in 2002. | $675 | 1,136.90 | $767,407.50 |
| Drew Batkin | Tax Associate for 7 years; admitted in 2003. | $650 | 215.40 | $140,010.00 |
| David Levine | Global Corporate Associate for 7 years; admitted in 2002. | $650 | 39.20 | $25,480.00 |
| Stacey Mesler | Tax Associate for 7 years; admitted in 2003. | $650 | 34.60 | $22,490.00 |
| Aaron Renenger | Litigation Associate for 3 years; admitted in 2002. | $650 | 127.90 | $83,135.00 |
| Adrian Azer | Litigation Associate for 6 years; admitted in 2003. | $625 | 569.20 | $355,750.00 |
| Irene Bogdashevsky | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 302.30 | $188,937.50 |
| James Bulger | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 221.10 | $138,187.50 |
| Jonathan Goldstein | Global Transportation Finance Associate for 6 years; admitted in 2004. | $625 | 35.00 | $21,875.00 |

| | | | | |
|---|---|---|---|---|
| Samuel Khalil | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 7.50 | $4,687.50 |
| Brian Kinney | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 20.90 | $13,062.50 |
| Erika Kuver-Del Duca | Real Estate Associate for 6 years; admitted in 2004. | $625 | 46.10 | $28,812.50 |
| Jihay Kwack | Global Securities for 6 years; admitted in 2004. | $625 | 467.60 | $292,250.00 |
| Daniel Lin | Global Corporate Associate for 6 years; admitted in 2001. | $625 | 2.70 | $1,687.50 |
| Neda Matar | Global Finance Associate for 6 years; admitted in 2004. | $625 | 71.10 | $44,437.50 |
| Samir Parikh | Financial Restructuring Associate for 6 years; admitted in 2004. | $625 | 121.40 | $75,875.00 |
| Linda Robinson | Global Finance Associate for 6 years; admitted in 2007. | $625 | 84.20 | $52,625.00 |
| Brian Stern | Global Corporate Associate for 6 years; admitted in 2003. | $625 | 16.80 | $10,500.00 |
| Ben Clossick Thomson | Litigation Associate for 6 years; admitted in 2001. | $625 | 76.30 | $47,687.50 |
| Kevin Brown | Tax Associate for 2 years; admitted in 2008. | $600 | 108.30 | $64,980.00 |
| Joanne Collett | Financial Restructuring Associate for 5 years; admitted in 2008. | $600 | 304.70 | $182,820.00 |
| Peter Devonshire | Global Finance Associate for 5 years; admitted in 2007. | $600 | 18.30 | $10,980.00 |
| Melissa Gambol | Global Securities Associate for 5 years; admitted in 2007. | $600 | 632.60 | $379,560.00 |
| Ada Liu | Global Project Finance Associate for 5 years; admitted in 2005. | $600 | 26.00 | $15,600.00 |
| Candace Murdock | Global Project Finance Associate for 5 years; admitted in 2007. | $600 | 23.80 | $14,280.00 |
| Peter Newman | Financial Restructuring Associate for 5 years; admitted in 2005. | $600 | 118.10 | $70,860.00 |
| Patricia Janeth Quilizapa | Litigation Associate for 5 years; admitted in 2005. | $600 | 187.90 | $112,740.00 |
| Scott Rozic | Global Securities Associate for 5 years; admitted in 2004. | $600 | 483.40 | $290,040.00 |

| | | | | |
|---|---|---|---|---|
| Maximillian Schneider | Leverage Finance Associate for 3 years; admitted in 2005. | $600 | 15.60 | $9,360.00 |
| Naomi Slavinski | Tax Associate for 5 years; admitted in 2005. | $600 | 29.20 | $17,520.00 |
| Tamieka Spencer Bruce | Litigation Associate for 5 years; admitted in 2008. | $600 | 36.00 | $21,600.00 |
| Leo Vellis | Global Securities Associate for 5 years; admitted in 2008. | $600 | 245.20 | $147,120.00 |
| Melanie Westover | Litigation Associate for 5 years; admitted in 2005. | $600 | 131.80 | $79,080.00 |
| Douglas Barnes | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 15.40 | $8,855.00 |
| Timo Bauer | Leverages Finance Associate for 2 years; admitted in 2007. | $575 | 3.50 | $2,012.50 |
| Jonah Crane | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 227.60 | $130,870.00 |
| Jonathan Spader | Global Finance Associate for 4 years; admitted in 2006. | $575 | 421.00 | $242,075.00 |
| Christopher Fickes | Global Transportation Finance Associate for 4 years; admitted in 2006. | $575 | 9.60 | $5,520.00 |
| Philip Gledson | Global Corporate Associate for 4 years; admitted in 2006. | $575 | 11.00 | $6,325.00 |
| Alexis Hedman | Global Transportation Finance Associate for 4 years; admitted in 2006. | $575 | 125.30 | $72,047.50 |
| Daniel Nauth | Global Securities Associate for 4 years; admitted in 2008. | $575 | 53.80 | $30,935.00 |
| Joseph Teltser | Global Corporate Associate for 4 years; admitted in 2005. | $575 | 14.20 | $8,165.00 |
| John White | Litigation Associate for 4 years; admitted in 2006. | $575 | 60.40 | $34,730.00 |
| Simon Williams | Global Finance Associate for 4 years; admitted in 2008. | $575 | 42.10 | $24,207.50 |
| Nicholas Bassett | Litigation Associate for 3 years; admitted in 2007. | $550 | 538.60 | $296,230.00 |
| Jonathan Brown | Global Finance Associate for 3 years; admitted in 2007. | $550 | 67.30 | $37,015.00 |
| Joyce Chang | Global Project Finance Associate for 3 years; admitted in 2007. | $550 | 20.30 | $11,165.00 |
| Melissa Ann Clark | Global Corporate Associate for 3 year; admitted in 2006. | $550 | 179.90 | $98,945.00 |
| Rachel Fink | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 94.90 | $52,195.00 |

| | | | | |
|---|---|---|---|---|
| Jennie Govey | Financial Restructuring Associate for 3 years; admitted in 2008. | $550 | 57.30 | $31,515.00 |
| Gabrielle Haddad | Global Corporate Associate for 3 years; admitted in 2007. | $550 | 97.90 | $53,845.00 |
| Jeremy Hollembeak | Financial Restructuring Associate for 3 years; admitted in 2007. | $550 | 4.40 | $2,420.00 |
| Bryan Hunkele | Global Finance Associate for 3 years; admitted in 2007. | $550 | 94.00 | $51,700.00 |
| Daniel Gubitz | Global Corporate Associate for 3 years; admitted in 2004. | $550 | | |
| Aluyah Imoisili | Litigation Associate for 3 years; admitted in 2006. | $550 | 37.50 | $20,625.00 |
| Jason Karaffa | Financial Restructuring Group Associate for 3 years; admitted in 2007. | $550 | 171.30 | $94,215.00 |
| Gabriel Mpubani | Global Project Finance Associate for 3 years; admitted in 2006. | $550 | 33.80 | $18,590.00 |
| Richard Owen | Global Corporate Associate for 3 years; admitted in 2006. | $550 | 10.00 | $5,500.00 |
| Jed Schwartz | Litigation Associate for 3 years; admitted in 2007. | $550 | 486.90 | $267,795.00 |
| Stephanie Sklar | Real Estate Associate for 3 years; admitted in 2007. | $550 | 33.20 | $18,260.00 |
| Jeremy Sussman | Financial Restructuring Associate for 3 years; admitted in 2007. | $550 | 193.00 | $106,150.00 |
| Hyosung Tang | Global Finance Associate for 3 years; admitted in 2007. | $550 | 6.00 | $3,300.00 |
| Wendy Williams | Global Securities Associate for 3 years; admitted in 2007. | $550 | 188.80 | $103,840.00 |
| Catherine Yu | Financial Restructuring Associate for 3 years; admitted in 2007. | $550 | 500.60 | $275,330.00 |
| Andrea Al-Attar | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 10.40 | $5,356.00 |
| Husam Badawi | Global Securities Associate for 2 years; admitted in 2008. | $515 | 182.30 | $93,884.50 |
| Constance Beverley | Litigation Associate for 2 years; admitted in 2008. | $515 | 429.10 | $220,986.50 |
| Javier Blanco | Global Project Finance Associate for 2 years; admitted in 2008. | $515 | 7.30 | $3,759.50 |

| | | | | |
|---|---|---|---|---|
| Andrew Butville | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 20.90 | $10,763.50 |
| Gina Ciraldo | Global Finance Associate for 2 years; admitted in 2008. | $515 | 12.30 | $6,334.50 |
| James Doench | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 9.80 | $5,047.00 |
| David Eastlake | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 282.20 | $145,333.00 |
| Alison Fraser | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 22.40 | $11,536.00 |
| Cheryl Isaac | Global Finance Associate for 2 years; admitted in 2008. | $515 | 4.00 | $2,060.00 |
| Sofia Khan | Litigation Associate for 2 years; admitted in 2008. | $515 | 212.10 | $109,231.50 |
| Elena Kilberg | Litigation Associate for 2 years; admitted in 2008. | $515 | 13.10 | $6,746.50 |
| Laura Kilian | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 50.80 | $26,162.00 |
| Michael Lee | Global Securities Associate for 2 years; admitted in 2008. | $515 | 174.60 | $89,919.00 |
| Nicole Leyton | Tax Associate for 2 years; admitted in 2008. | $515 | 165.60 | $85,284.00 |
| Michael Lynch | Global Corporate Associate for 2 years; admitted in 2007. | $515 | 115.30 | $59,379.50 |
| Karen Ma | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 5.90 | $3,038.50 |
| Heather Moore | Global Finance Associate for 2 years; admitted in 2008. | $515 | 50.80 | $26,162.00 |
| Mwanga Mtengule | Global Finance Associate for 2 years; admitted in 2008. | $515 | 68.30 | $35,174.50 |
| Ee-Ing Ong | Global Securities Associate for 2 years; admitted in 2008. | $515 | 4.30 | $2,214.50 |
| Jonathan Petts | Litigation Associate for 2 years; admitted in 2008. | $515 | 9.20 | $4,738.00 |
| Lindsay Pinto | Litigation Associate for 2 years; admitted in 2008. | $515 | 382.80 | $197,142.00 |
| Harsha Rao | Global Finance Associate for 2 years; admitted in 2008. | $515 | 39.50 | $20,342.50 |
| Charles Rubio | Financial Restructuring Associate for 2 years; admitted in 2008. | $515 | 111.80 | $57,577.00 |
| Dean Sattler | Global Corporate Associate for 2 years; admitted in 2008. | $515 | 14.40 | $7,416.00 |

| Mikhel Schecter | Global Finance Associate for 2 years; admitted in 2008. | $515 | 30.30 | $15,604.50 |
|---|---|---|---|---|
| Andrew Sullivan | Global Securities Associate for 2 years; admitted in 2008. | $515 | 366.90 | $188,953.50 |
| Masamichi Yamamoto | Global Finance Associate for 2 years; admitted in 2008. | $515 | 11.60 | $5,974.00 |
| Andrew Young | Financial Restructuring Associate for 2 years; admitted in 2006. | $515 | 582.40 | $299,936.00 |
| Jeeseon Ahn | Global Finance Associate for 1 year; admitted in 2009. | $440 | 295.80 | $130,152.00 |
| Michael Applebaum | Tax Associate for 1 year; admitted in 2009. | $440 | 60.10 | $26,444.00 |
| Kurt Avarell | Tax Associate for 1 year; admitted in 2009. | $440 | 21.70 | $9,548.00 |
| Jennifer Beaudry | Global Securities Associate for 1 year; admitted in 2009.. | $440 | 311.00 | $136,840.00 |
| Adlin Castro | Global Securities Associate for 1 year; admitted in 2009. | $440 | 314.50 | $138,380.00 |
| Andrea Conis | Financial Restructuring Associate for Associate for 1 year; admitted in 2009. | $440 | 538.50 | $236,940.00 |
| Ateesh Chanda | Litigation Associate for 1 year; admitted in 2009. | $440 | 244.30 | $107,492.00 |
| Alecia Chen | Global Finance Associate for 1 year; admitted in 2009. | $440 | 178.00 | $78,320.00 |
| Michael Clarke | Global Finance Associate for 1 year; admitted in 2009. | $440 | 116.30 | $51,172.00 |
| Julie Constantinides | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 23.00 | $10,120.00 |
| Patten Courtnell | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 107.40 | $47,256.00 |
| Erin Culbertson | Litigation Associate for 1 year; admitted in 2009. | $440 | 271.80 | $119,592.00 |
| Kinjal Desai | Tax Associate for 1 year; admitted in 2009. | $440 | 86.70 | $38,148.00 |
| Robert Dickens | Global Finance Associate for 1 year; admitted in 2009. | $440 | 154.10 | $67,804.00 |
| Rachel Dobson | Litigation Associate for 1 year; admitted in 2009. | $440 | 572.80 | $252,032.00 |
| Andrew Everett | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 53.30 | $23,452.00 |
| Melanie Fox | Real Estate Associate for 1 year; admitted in 2009. | $440 | 6.20 | $2,728.00 |
| Caitlin Hawks | Litigation Associate for 1 year; admitted in 2009. | $440 | 58.30 | $25,652.00 |

| Jared Joyce-Schleimer | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 580.30 | $255,332.00 |
| Peter Idziak | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 152.20 | $66,968.00 |
| David Kaye | Global Finance Associate for 1 year; admitted in 2009. | $440 | 63.60 | $27,984.00 |
| Benjamin Keller | Real Estate Associate for 1 year; admitted in 2009. | $440 | 28.70 | $12,628.00 |
| Marianna Kosharovsky | Global Securities Associate for 1 year; admitted in 2009. | $440 | 261.90 | $115,236.00 |
| Karen Kringen | Global Securities Associate for 1 year; admitted in 2009. | $440 | 474.30 | $208,692.00 |
| Alan Lawn | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 513.90 | $226,116.00 |
| Brian Lee | Global Finance Associate for 1 year; admitted in 2009. | $440 | 217.70 | $95,788.00 |
| Roger Lee | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 150.50 | $66,220.00 |
| Ulric Lewen | Global Securities Associate for 1 year; admitted in 2009. | $440 | 436.70 | $192,148.00 |
| Stephanie McAviney | Litigation Associate for 1 year; admitted in 2009. | $440 | 60.60 | $26,664.00 |
| Jan Nishizawa | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 66.70 | $29,348.00 |
| Joshua Radzin | Global Finance Associate for 1 year; admitted in 2009. | $440 | 178.90 | $78,716.00 |
| Brendan Riley | Litigation Associate for 1 year; admitted in 2009. | $440 | 88.90 | $39,116.00 |
| Stephen Rose | Global Securities Associate for 1 year; admitted in 2009. | $440 | 428.80 | $188,672.00 |
| Anne Shutkin | Global Project Finance Associate for 1 year; admitted in 2009. | $440 | 23.90 | $10,516.00 |
| Kashif Siddiqui | Global Corporate Associate for 1 year; admitted in 2009. | $440 | 14.50 | $6,380.00 |
| Matthew Squires | Global Securities Associate for 1 year; admitted in 2009. | $440 | 287.50 | $126,500.00 |
| Jeremy Steckel | Global Securities Associate for 1 year; admitted in 2009. | $440 | 389.80 | $171,512.00 |
| Stephanie Swanson | Global Securities Associate for 1 year; admitted in 2009. | $440 | 428.50 | $188,540.00 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Joseph Wang | Financial Restructuring Associate for 1 year; admitted in 2009. | $440 | 179.00 | $78,760.00 |
| Matthew Brod | Summer Associate | $235 | 12.00 | $2,820.00 |
| Regina Gromen | Summer Associate | $235 | 7.00 | $1,645.00 |
| Adam Heasley | Summer Associate | $235 | 3.00 | $705.00 |
| Diane Henderson | Summer Associate | $235 | 2.20 | $517.00 |
| Broderick Henry | Summer Associate | $235 | 25.90 | $6,086.50 |
| Mark McCrone | Summer Associate | $235 | 6.60 | $1,551.00 |
| Benjamin Sayagh | Summer Associate | $235 | 3.00 | $705.00 |
| Tiffani Simmons | Summer Associate | $235 | 7.40 | $1,739.00 |
| John Yarwood | Summer Associate | $235 | 9.50 | $2,232.50 |
| Monica Alston | Case Manager | $245 | 14.20 | $3,479.00 |
| Oscar Castrillon | Case Manager | $245 | 138.60 | $33,957.00 |
| Kathleen Heinsberg | Case Manager | $245 | 17.40 | $4,263.00 |
| Rena Ceron | Case Manager | $210 | 261.00 | $54,810.00 |
| Richard Cosentino | Legal Assistant | $270 | 321.30 | $86,751.00 |
| Randy Hooks | Legal Assistant | $270 | 236.20 | $63,774.00 |
| Kim Strosser | Legal Assistant | $270 | 278.00 | $75,060.00 |
| Charles Sheehah | Legal Assistant | $260 | 178.50 | $46,410.00 |
| Kenneth Micallef | Legal Assistant | $245 | 4.00 | $980.00 |
| Takamichi Okubo | Legal Assistant | $235 | 7.50 | $1,762.50 |
| Marika Tanaka | Legal Assistant | $235 | 2.20 | $517.00 |
| Dakota Blake | Legal Assistant | $210 | 45.50 | $9,555.00 |
| Ken Forman | Legal Assistant | $210 | 21.80 | $4,578.00 |
| Angel Anderson | Legal Assistant | $185 | 157.30 | $29,100.50 |
| Paul Butters | Legal Assistant | $185 | 141.90 | $26,251.50 |
| Grace Green | Legal Assistant | $185 | 40.50 | $7,492.50 |
| Chris Georgakis | Legal Assistant | $180 | 10.00 | $1,800.00 |
| Ming Lu | Legal Assistant | $180 | 12.40 | $2,232.00 |
| Jonathan Comick | Legal Assistant | $170 | 5.60 | $952.00 |
| Maria Nunez | Legal Assistant | $185 | | |
| Peter Delfausse | Legal Assistant | $170 | 186.20 | $31,654.00 |
| Bryn Fuller | Legal Assistant | $170 | 89.20 | $15,164.00 |
| Benjamin Harris | Legal Assistant | $170 | 7.60 | $1,292.00 |

| | | | | |
|---|---|---|---|---|
| Louisa Kiu | Legal Assistant | $170 | 47.80 | $8,126.00 |
| Elliot Law | Legal Assistant | $170 | 515.10 | $87,567.00 |
| Charmaine Thomas | Legal Assistant | $170 | 292.20 | $49,674.00 |
| Toi Carrion | Legal Assistant | $160 | 73.60 | $11,776.00 |
| Alexander Fishman | Legal Assistant | $160 | 58.90 | $9,424.00 |
| Lorena Lucero | Legal Assistant | $160 | 123.90 | $19,824.00 |
| Icsom jones | Managing Attorney Clerk | $205 | 9.00 | $1,845.00 |
| Jacqueline Brewster | Managing Attorney Clerk | $165 | 80.90 | $13,348.50 |
| Paula Prudenti | Librarian | $215 | 3.10 | $666.50 |
| Matthew Ottenstein | Librarian | $200 | 15.20 | $3,040.00 |
| Megan Scanlon | Librarian | $200 | 9.30 | $1,860.00 |
| Robin Traylor | Librarian | $200 | 19.40 | $3,880.00 |
| Miguel Checo | Litigation Support Specialist | $295 | 107.60 | $31,742.00 |
| Rohan Lee | Litigation Support Specialist | $260 | 426.70 | $110,942.00 |
| Alexander Sacklowski | Litigation Support Specialist | $260 | 19.80 | $5,148.00 |
| Theartis Everett | Litigation Support Specialist | $200 | 72.60 | $14,520.00 |
| Joshua Wallach | File Clerk | $135 | 15.60 | $2,106.00 |
| Maria Smilen | File Clerk | $115 | 4.50 | $517.50 |
| | | | | |
| **Total** | | **$539.00 (blended rate)[2]** | **31,223.40 hours** | **$16,829,521.00[3]** |

---

[2]     The blended rate excluding paraprofessionals is $587.66 per hour.

[3]     As is customary in connection with the preparation of this application, Milbank has reviewed the fees set forth in its Fee Statements, based on this review, the amount requested in the application is $114,120.00 less than the fees set forth in the Fee Statements.

**SECOND INTERIM FEE APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. (FEBRUARY 1, 2009 – MAY 31, 2009)**

| ACTIVITY | HOURS | FEES |
|---|---|---|
| Asset Sales | 226.00 | 128,528.00 |
| Automatic Stay Enforcement | 405.40 | 197,015.50 |
| Claims Analysis and Estimation | 8,683.10 | 4,308,320.50 |
| Committee Administration | 1,026.90 | 610,139.00 |
| Committee Meetings | 683.80 | 480,099.00 |
| Communication with Creditors | 657.40 | 277,795.50 |
| Corporate Matters | 48.80 | 31,540.50 |
| Court Hearings | 255.90 | 124,946.00 |
| Debtor in Possession Meetings | 116.80 | 85,824.50 |
| Derivative Issues | 4,620.40 | 2,793,460.00 |
| DIP and Exit Financing | 16.70 | 3,915.50 |
| Disclosure Statement | .60 | 126.00 |
| Employee Issues | 318.40 | 168,655.50 |
| Executory Contracts | 136.70 | 63,498.50 |
| Fee Application – Other | 330.90 | 170,177.50 |
| File, Docket and Calendar Maintenance | 823.00 | 260,007.00 |
| Insurance Matters | 302.20 | 170,950.00 |
| International Insolvency | 375.30 | 221,080.50 |
| Litigation | 2,739.70 | 1,419,526.00 |
| Pension Issues | 363.20 | 243,271.00 |
| Committee Retention Applications | 327.40 | 175,607.50 |
| Real Estate Matters | 1,395.90 | 947,697.50 |
| Regulatory Issues | 1.70 | 1,097.50 |
| Reorganization Plan | 951.20 | 372,453.00 |
| Reporting Requirements | 33.80 | 22,259.00 |
| Retention of Professionals | 66.20 | 32,104.50 |

| | | |
|---|---:|---:|
| Rule 2004 Examinations | 140.70 | 66,631.50 |
| Substantive Consolidation | 835.80 | 419,875.00 |
| Tax Issues | 671.50 | 447,920.50 |
| Trading Book | 742.70 | 424,551.50 |
| Travel Time | 108.00 | 83,022.50 |
| Voidable Transfers and Other Potential Claims | 40.00 | 18,707.50 |
| German Bank Issues | 53.60 | 32,941.50 |
| Japan Issues | 59.90 | 37,584.50 |
| China Issues | 40.00 | 25,937.50 |
| Intercompany Issue | 280.20 | 155,965.00 |
| SIPC Issues | 319.70 | 168,663.00 |
| Bank Issues | 513.50 | 387,682.50 |
| LBI Sale | 56.90 | 42,723.00 |
| Neuberger Sale | 427.80 | 267,129.00 |
| UK Issues | 264.40 | 180,123.00 |
| Examiner Issues | 46.70 | 34,212.50 |
| Bank Book | 33.30 | 18,683.00 |
| Private Equity Issues | 323.90 | 206,142.50 |
| Cash Management Issues | 3.70 | 1,467.00 |
| Milbank Fee Statements and Applications | 1,353.70 | 499,463.50 |
| | | |
| **Total** | **31,233.40** | **$16,829,521.00** |

SECOND INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & MᶜCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(FEBRUARY 1, 2009 – MAY 31, 2009)

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | 1,511.49 |
| Binding | 842.50 |
| Cab Fares/Local Travel | 39,667.74[1] |
| Computer Database Research | 612,993.66 |
| Document Processing/Overtime | 79,740.50 |
| Document Retrieval | 10,472.44 |
| US Mail | 100.13 |
| Meals | 29,021.24[2] |
| Messenger | 1,658.93 |
| Outside Reproduction | 26,116.08 |
| Photocopies | 174,944.30 |
| Telephone/Telecopy | 13,781.91 |
| Transcripts | 7,901.20 |
| Travel | 21,002.49[3] |
| **TOTAL DISBURSEMENTS** | **$1,019,754.61** |

---

[1] This amount reflects a reduction of $1,251.99 as per the recommended future guidelines contained in the Fee Committee report. Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

[2] This amount reflects a reduction of $6,217.45 as per the recommended future guidelines contained in the Fee Committee report. Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

[3] This amount reflects a reduction of $600.16 as per the recommended future guidelines contained in the Fee Committee report. Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

and

Paul Aronzon
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                                                             :
In re:                                                       :          Chapter 11 Case No.
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :          08-13555 (JMP)
                                                             :
                        Debtors.                             :          (Jointly Administered)
                                                             :
------------------------------------------------------------- x

**SECOND APPLICATION OF MILBANK, TWEED, HADLEY & McCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**FEBRUARY 1, 2009 THROUGH AND INCLUDING MAY 31, 2009**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits its application (the "Application"), pursuant to

sections 330 and 331 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

(as amended, the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "Local Guidelines"), the United States Trustee Guidelines

for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Third

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation And Reimbursement

Of Expenses of Professionals, dated June 25, 2009 (the "Interim Compensation Order"), and the

guidelines contained in the Fee Committee Report Pertaining to the First Interim Fee

Applications for All Retained Professionals, dated August 3, 2009 (the "Fee Committee

Report"), for the allowance of interim compensation for professional services rendered from

February 1, 2009 through and including May 31, 2009 (the "Second Interim Compensation

Period"), and for reimbursement of expenses incurred in connection with such services, and in

support thereof respectfully represents as follows:

**I.**
**INTRODUCTION**

**A.      Background**

1.      Bankruptcy Filing.  On September 15, 2008 (the "Petition Date"), and

periodically thereafter, the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2.  Creditors' Committee.  On September 17, 2008, the United States Trustee appointed the Committee in the Chapter 11 Cases.

3.  SIPA Trustee.  On September 19, 2008, a proceeding ("SIPA Proceeding") was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") and is administering LBI's estate.

4.  Examiner.  The United States Bankruptcy Court for the Southern District of New York approved the appointment of Anton R. Valukas as examiner (the "Examiner") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner dated January 20, 2009.

5.  Fee Committee.  The United States Bankruptcy Court for the Southern District of New York appointed a fee committee (the "Fee Committee") and approved a fee protocol in the Chapter 11 Cases on May 26, 2009.

6.  Jurisdiction.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.  Pursuant to the Local Guidelines, a certification regarding compliance with the Local Guidelines is attached hereto as Exhibit "A."

**B.**     **Retention of Milbank and Billing History**

7.     <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002 Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, As Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17, 2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the Committee in these cases.  The Retention Order, which became a final order on November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee Guidelines, and the local rules and orders of this Court.

8.     <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From September 17, 2008 Through And Including January 31, 2009 (the "<u>First Interim Fee Application</u>").  In the First Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from September 17, 2008 Through And Including January 31, 2009 (the "<u>First Interim Compensation Period</u>") in the total amount of $12,123,376.00[1], and (ii) reimbursement of its actual and necessary expenses incurred during the First Interim Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

---

[1]     Milbank voluntarily reduced its fees for the First Interim Compensation Period by $129,111.00.  However, Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback as per the recommendation of the Fee

Committee.[2]

9.    <u>Application</u>.  Milbank makes this second interim application for approval

and allowance of compensation and reimbursement of expenses pursuant to sections 330 and

331 of the Bankruptcy Code.

10.    In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors seeking interim compensation and reimbursement of

expenses.  During the Second Interim Compensation Period, Milbank submitted the following

fee statements:

(a)    On May 4, 2009, pursuant to the Interim Compensation Order, Milbank served its fifth fee statement for the period from February 1, 2009 through and including February 28, 2009 (the "<u>Fifth Fee Statement</u>").  The Fifth Fee Statement sought (i) an allowance of $3,084,465.00 as compensation for services rendered and (ii) the reimbursement of $202,313.19 in expenses.  As of the date hereof, Milbank has received a total of $2,669,885.19, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Fifth Fee Statement.

(b)    On June 5, 2009, pursuant to the Interim Compensation Order, Milbank served its sixth fee statement for the period from March 1, 2009 through and including March 31, 2009 (the "<u>Sixth Fee Statement</u>").  The Sixth Fee Statement sought (i) an allowance of $4,811,335.00 as compensation for services rendered and (ii) the reimbursement of $317,218.74 in expenses.  As of the date hereof, Milbank has received a total of $4,166,286.74, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Sixth Fee Statement.

(c)    On June 26, 2009, pursuant to the Interim Compensation Order, Milbank filed and served its seventh fee statement for the period from April 1, 2009 through and including April 30, 2009 (the "<u>Seventh Fee Statement</u>").  The Seventh Fee

---

[2]    According to the Fee Committee Report, the Fee Committee recommends that the remaining ten percent be released upon the resolution of issues identified by the Fee Committee in the individual reports submitted to each retained professional (the "<u>Individual Summary Sheet</u>") in these Chapter 11 Cases.  Milbank intends in due course to work through its Individual Summary Sheet with the Fee Committee to resolve all outstanding issues.

Statement sought (i) an allowance of $4,963,845.00 as compensation for services rendered and (ii) the reimbursement of $295,027.48 in expenses.  As of the date hereof, Milbank has received a total of $4,266,103.48, which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred pursuant to the Seventh Fee Statement.

(d)     On July 29, 2009, pursuant to the Interim Compensation Order, Milbank filed and served its eighth fee statement for the period from May 1, 2009 through and including May 31, 2009 (the "Eighth Fee Statement" and, together with the Fifth Fee Statement, Sixth Fee Statement and Seventh Fee Statement, the "Fee Statements").  The Eighth Fee Statement sought (i) an allowance of $4,083,996.00 as compensation for services rendered and (ii) the reimbursement of $213,264.80 in expenses.

11.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

## II.

## APPLICATION

12.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the Second Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Second Interim Compensation Period.

13.     In this Application, Milbank seeks approval of $16,829,521.00[3] for legal services rendered on behalf of the Committee during the Second Interim Compensation Period

---

[3]     The compensation sought by this Application reflects a voluntary reduction of approximately $154,700.25, including, but not limited to, with respect to certain fee issues identified by the Fee Committee.  However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

and $1,019,754.61[4] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $17,849,275.61.  Milbank has taken all possible measures to reduce its fees in these cases given the overall amount of professional fees incurred.

14.    Pursuant to the Interim Compensation Order, Milbank has already received payment of $14,582,737.21 during the Second Interim Compensation Period.  Milbank will seek a total payment of $3,266,539.20 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the Second Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[5]

15.    The fees sought by this Application reflect an aggregate of 31,233.40 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Second Interim Compensation Period, at a blended average hourly rate of $539.00 for both professionals and paraprofessionals.  The blended hourly rate for professionals only is $587.66.

16.    Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

---

[4]    This amount reflects a reduction of certain expenses as per the recommended future guidelines contained in the Fee Committee Report.  Milbank reserves the right to seek reimbursement for the total amount of expenses incurred in connection with its representation of the Committee at a future date.

[5]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements.  Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Second Interim Compensation Period is $122,189.60 less than the sum of fees and expenses set forth in the Fee Statements.  Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

17.     Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Second Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  Except as reduced voluntarily by Milbank, the compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

18.     Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[6]

19.     Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses

---

[6]     Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court;

by project category and detailed descriptions of these expenses, are attached hereto as

Exhibit "C."

## III.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED

20.     To provide an orderly summary of the services rendered on behalf of the

Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, Milbank has

established the following separate project billing categories in connection with these cases:

| | |
|---|---|
| 00100 | Adequate Protection Issues |
| 00200 | Asset Sales |
| 00300 | Automatic Stay Enforcement & Litigation |
| 00400 | Business Plan Review and Analysis |
| 00500 | Change of Control Transactions |
| 00600 | Chapter 7 Issues |
| 00700 | Claims Analysis and Estimation |
| 00800 | Committee Administration |
| 00900 | Committee Meetings |
| 01000 | Communication with Creditors |
| 01100 | Corporate Matters |
| 01200 | Court Hearings |
| 01300 | Customer Contracts & Programs |
| 01400 | Debtor-in-Possession Meetings and Communications |
| 01500 | Derivatives Issues |
| 01600 | DIP and Exit Financing |
| 01700 | Disclosure Statement |
| 01800 | Employee Issues |
| 01900 | Environmental Issues |
| 02000 | Equipment/Personal Property Leases |
| 02100 | Estimation Issues |
| 02200 | Exclusivity Issues |
| 02300 | Executory Contracts |
| 02400 | Fee Applications - Other |
| 02500 | File, Docket & Calendar Maintenance |
| 02600 | Insurance Matters |
| 02700 | International Insolvency Matters |
| 02800 | Litigation |
| 02900 | Pension Issues |

---

(ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

| | |
|---|---|
| 03000 | Committee Retention Applications |
| 03100 | Real Estate Matters |
| 03200 | Regulated Business Asset Sales |
| 03300 | Regulatory Issues |
| 03400 | Reorganization Plan |
| 03500 | Reporting Requirements |
| 03600 | Retention of Professionals |
| 03700 | Rule 2004 Examinations |
| 03800 | SEC Investigations and Securities Litigation |
| 03900 | Secured Transactions |
| 04000 | Substantive Consolidation |
| 04100 | Tax Issues |
| 04200 | Trading Book |
| 04300 | Travel Time |
| 04400 | Trustee Issues |
| 04500 | Utilities Matters |
| 04600 | Vendor Issues |
| 04700 | Voidable Transfers and Other Potential Claims |
| 04800 | German Bank Issues |
| 04900 | Japan Issues |
| 05000 | China Issues |
| 05100 | Intercompany Issues |
| 05200 | SIPC Issues |
| 05300 | Bank Issues |
| 05400 | LBI Sale |
| 05500 | Neuberger Sale |
| 05600 | UK Issues |
| 05700 | Equity Committee |
| 05800 | Examiner Issues |
| 05900 | Bank Book |
| 06000 | Private Equity |
| 06100 | Cash Management |
| 06200 | Milbank Fee Statements and Applications |

21.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that

10

Milbank was heavily involved in the performance of services for the Committee on a daily

basis, including night and weekend work, often under extreme time constraints, to meet the

needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11

Cases has required and continues to require substantial and continuing efforts on the part of the

Committee and its professional advisors, including Milbank, to address the many complex

issues and problems that are presented by these extraordinary and complex cases.

A.    <u>Asset Sales</u>

22.    The Committee and its professionals worked in tandem with the Debtors

and the Debtors' professionals to address the myriad challenges arising during the Second

Interim Compensation Period.  Among these challenges were the evaluation of multiple

complex asset sale transactions.  On behalf of the Committee, Milbank's Employee Benefits,

Financial Restructuring, Global Corporate, Intellectual Property, Tax, Strategic Sourcing and

Technology and other practice groups worked closely with the Committee's financial advisors,

FTI Consulting Inc. ("<u>FTI</u>") and Houlihan Lokey Howard & Zukin Financial Advisors, Inc.

("<u>Houlihan</u>"), to analyze proposed transactions, negotiate for enhanced asset sale values and

terms for the unsecured creditors of each of the Debtors' estates.

23.    Milbank reviewed and analyzed numerous transactions during the Second

Interim Compensation Period, including aircraft sale transactions, a commodities transaction,

and Lehman's interest in certain other assets, as described more fully below.  Milbank worked

to maximize the value of the assets sold by both zealously advocating for the interests of

unsecured creditors of each of the Debtors and working cooperatively with the Debtors to

prevent deterioration in asset value occasioned by delay.  Throughout the Second Interim

Compensation Period, Milbank drafted and disseminated memoranda to the Committee

11

analyzing proposed transactions and providing the Committee with recommended courses of
action.  In addition, Milbank regularly updated the Committee as to the material terms of bids
received and the status of the sale processes through written memoranda, electronic mail and
telephonic meetings.

24.    **LBI**.  In connection with the previously consummated sale of the assets
of LBI (the "LBI Sale") to Barclays Capital, Inc. ("Barclays"), Milbank continued to monitor
performance under the transition services agreement with Barclays (the "Barclays TSA")
originally entered into in September 2008.  Given the interrelatedness of the Debtors'
operations, the effective implementation of the Barclays TSA has been of particular importance
to the Committee and to unsecured creditors generally.  Accordingly, Milbank worked
diligently throughout the Second Interim Compensation Period to continue to monitor and
assess compliance with the Barclays TSA through numerous meetings, telephonic conferences
and correspondence with the Debtors.

25.    **LBT Sale**.  Milbank spent significant time in connection with the sale of
the outstanding shares of stock in LBT Varlik Yonetim Anonim Sirketi ("LBT") to Vector
Holdings s.a.r.l ("Vector") and the associated transfer to Vector of the rights of Lehman
Brothers Bankhaus AG ("Bankhaus") and Lehman Commercial Paper Inc. ("LCPI") to receive
repayments of principal and interest due from LBT under two loan agreements.

26.    With respect to the sale of the outstanding shares of stock of LBT,
Milbank worked in close cooperation with the Debtors' counsel to review and analyze the terms
of the purchase agreement, along with related ancillary documents.  Milbank also spent
significant time conducting due diligence to understand the issues associated with the transfer of
certain intercompany indebtedness.

27.     Milbank also briefed the Loan Book Subcommittee[7] regarding the terms

of the purchase agreement and the potential issues related to the sale of LBT through the

preparation and distribution of memoranda and the participation in meetings of the Loan Book

Subcommittee.

**B.    Automatic Stay Enforcement**

28.     During the Second Interim Compensation Period, Milbank reviewed the

numerous motions filed by parties in interest seeking to lift the automatic stay to enforce

various contractual agreements or otherwise exercise rights against the Debtors' estates.  At the

direction of the Committee, Milbank drafted and filed a supplemental brief in opposition to

DnB Nor Bank ASA's ("DnB") request for authorization to set off a claim against LBHI against

certain funds that were en route to a deposit account that LBHI maintained at DnB.  On May 12,

2009, the Court entered a memorandum decision denying DnB's request on the basis that the

debts that DnB sought to set off were not mutual, as the Committee contended.  Milbank also

drafted and filed, on behalf of the Committee, joinders to the Debtors' objections to the motions

of (i) MidCountry Bank and (ii) WWK Hawaii-Waikapuna, LLC, et al., in which the movants

sought relief from the automatic stay in order to, among other things, pursue state court claims

against certain Debtors and their affiliates.  [Docket Nos. 3400 and 3389]  Additionally,

Milbank conducted research and drafted memoranda regarding the legal viability of certain

setoff theories.

**C.    Claims Analysis**

29.     During the Second Interim Compensation Period, Milbank continued to

develop and refine the database of the Debtors' debt offering documents ("Database") that was

---

[7]      The  Loan Book Subcommittee, which was referred to in the First Interim Fee Application as the Bank

created and developed during the First Interim Compensation Period.  Milbank worked with litigation technology specialists to refine and expand the debt information stored in the Database.  Milbank used the Database to develop and present summary forensic capital structure information to the Committee and its advisors, as well as to answer individual queries from the Committee and the public about specific Lehman debt instruments.  The Database is used by Milbank and other Committee advisors on an ongoing basis to determine and analyze the Debtors' capital structure, establish a basis upon which to determine and validate claim amounts and analyze substantive consolidation, preference and other potential issues.

30.    Milbank also drafted a number of memoranda to the Committee on certain current controversies relating to the Debtors' capital structure, including (i) the treatment of original issue discount in structured notes and contingent payment debt instruments, guarantees of debt issued by Lehman Brothers Treasury Co. B.V. (the "<u>BV</u>") and Lehman Brothers Securities N.V. by LBHI, (ii) English law issues relating to the debt of the BV, (iii) certain provisions of LBHI's subordinated debt, and (iv) issuer substitution.

31.    **<u>Bar Date Motion.</u>**  Additionally, during the Second Interim Compensation Period, Milbank began reviewing and analyzing the myriad issues raised with respect to the Debtors' motion to establish the deadline for filing proofs of claim and establish procedures therefor (the "<u>Bar Date Motion</u>").  At the request of the Committee, Milbank worked with the Debtors and parties in interest to revise the proposed procedures contained in the Bar Date Motion to address concerns raised by the Committee.

---

Book Subcommittee, has subsequently been renamed.

### D.    <u>Committee Administration</u>

32.    Milbank developed an elaborate protocol for the organization and delegation of the massive number of tasks involved in ensuring the Committee is kept aware and apprised of all aspects of these Chapter 11 Cases, including frequent meetings among internal team members and the maintenance of comprehensive rolling task lists, distribution lists, calendar notifications, project calendars and research status lists on a daily basis. Additionally, Milbank has established a system whereby substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient and comprehensive methods of administering the Committee's needs will ensure that the Committee has the logistical tools necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

### E.    <u>Committee Meetings</u>

33.    During the Second Interim Compensation Period, the Committee held weekly telephonic meetings and monthly in-person meetings prior to the monthly in-person meetings with the Debtors' professionals.  Prior to each Committee meeting, and in accordance with the Bylaws Of Official Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc., <u>et al.</u>, Milbank prepared an agenda listing topics for discussion.  Milbank also prepared and distributed related materials on behalf of the Committee's professionals for the Committee members' review.  During the Committee meetings, Milbank discussed with Committee members and their counsel all significant matters arising during the Second Interim Compensation Period, and assisted the Committee in formulating positions with respect to such issues.

34.     Through Committee meetings and conference calls, and numerous other communications with members of the Committee, Milbank has assisted the Committee in (i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates and (ii) making informed decisions regarding the numerous issues that have arisen in these cases.

**F.      Committee Retention Application**

35.     During the Second Interim Compensation Period, Milbank continued to review and update its connections to parties in interest in the Chapter 11 Cases, identify any required disclosures, maintain and manage the internal information walls in place at the firm, and correspond with the Office of the United States Trustee regarding certain issues involving the foregoing.  In connection therewith, Milbank drafted and filed, on February 2, 2009, and May 29, 2009, supplemental affidavits in further support of its retention as counsel for the Committee.  In addition, at the direction of the Committee, Milbank worked with Houlihan and FTI in connection with their required disclosures and the preparation of their supplemental affidavits in further support of their retention as investment banker and financial advisors, respectively, to the Committee.

**G.      Communication with Creditors**

36.     In accordance with the Stipulation and Agreed Order Between the Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information Pursuant to 11 U.S.C §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which the Bankruptcy Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the Committee, continued to develop and maintain an internet-accessed website (the "Committee Website").  The Committee Website contains a significant amount of content produced by Milbank, which is updated frequently and designed to provide information

16

to creditors, including, among other things, (i) general information concerning the Debtors'

chapter 11 cases, including adversary proceedings and the SIPA Proceeding; (ii) highlights of

significant events; (iii) a case calendar; and (iv) answers to frequently asked questions, available

in several foreign languages.  The Committee Website also acts as one means of interaction

between Milbank and the Debtors' creditors.  For example, the Committee Website permits

creditors to register to receive monthly reports and to submit inquiries directly to Milbank, to

which Milbank has worked in collaboration with the Debtors' counsel, as required by the

Creditor Information Protocol, to provide responses.

   37. During the Second Interim Compensation Period, Milbank continued to

expend substantial time developing and maintaining the Committee Website.  In addition,

hundreds of creditors contacted Milbank via the Committee Website and telephonically

concerning the Debtors' Chapter 11 Cases.  In accordance with the Creditor Information

Protocol, Milbank reviewed and responded to all such creditor inquiries.

   38. During the Second Interim Compensation Period, the so-called Ad Hoc

Group of Lehman Brothers Creditors (the "Ad Hoc Group") was formed.[8]  Milbank spent

considerable time working with the Ad Hoc Group to assist in its understanding of the issues in

the Debtors' Chapter 11 Cases.  During the Second Interim Compensation Period, Milbank also

continued, at the Court's direction, to act as an information "liaison" between the Debtors, the

Informal Noteholder Group,[9] the Ad Hoc Group of Creditors, and other creditors and, most

---

[8] The Ad Hoc Group filed a Notice of Appearance and Request for Service of Documents on May 12, 2009 at Docket No. 3552.

[9] The Informal Noteholder Group, as defined in the First Fee Application, which was formed early in these Chapter 11 Cases, continued to operate during the Second Interim Compensation Period, but is now believed to be defunct.  See Notice of Withdrawal of First Amended Verified Statement of Akin Gump Strauss Hauer & Feld LLP Pursuant to Bankruptcy Rule 2019 at Docket No. 4538.

specifically, expended time discussing these cases and a number of pending motions with counsel to the Informal Noteholder Group and the Ad Hoc Group on a nearly daily basis.

**H.**    **Court Hearings**

39.    During the Second Interim Compensation Period, Milbank prepared for and appeared at each of the hearings conducted before this Court, including, among others, (i) numerous regularly scheduled omnibus hearings; (ii) special hearings and case conferences; and (iii) hearings in the SIPA Proceeding.  To prepare for each hearing, among other things, Milbank reviewed and analyzed documents, including correspondence and pleadings, conducted both factual and legal research, and met with numerous parties to work toward the consensual resolution of any objections raised by the Committee or other parties in interest.  Following each hearing, Milbank produced summaries and analyses of the proceedings in order to keep the Committee fully apprised of developments in the Chapter 11 Cases.

**I.**    **Debtor-in-Possession Meetings and Communications**

40.    During the Second Interim Compensation Period, Milbank frequently communicated and exchanged correspondence with the Debtors' counsel regarding, among numerous other issues, case administration, responses to pleadings, the requests for additional official creditors' committees, plan and disclosure issues, and upcoming hearings.  Milbank also prepared for and attended various in-person meetings with the Committee members, the Debtors, and their respective professionals to, among other things, discuss the ongoing administration of and long term strategy for these Chapter 11 Cases.

**J.**    **Derivatives Issues**

41.    As reflected in the First Interim Fee Application, the Committee established a derivatives subcommittee (the "Derivatives Subcommittee") comprised of

Committee members, Milbank attorneys, and the Committee's other professionals.  During the Second Interim Compensation Period, Milbank continued to conduct regular meetings with the Derivatives Subcommittee to address and make recommendations to the full Committee in respect of specific issues concerning the Debtors' portfolio of derivatives positions.  Pursuant to the orders of the Court entered in December and January to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts, absent further Court approval, the Committee must analyze and consent to all derivative transactions before the Debtors can consummate any such transaction.  To that end, Milbank, together with the financial advisors to the Committee, reviewed and advised the Committee on all aspects of each proposed transaction and presented to the Derivatives Subcommittee for consultation.

42.    Specifically, Milbank reviewed and analyzed the Debtors' Motion Pursuant To Sections 105 And 364 Of The Bankruptcy Code Authorizing The Debtors To Grant First Priority Liens In Cash Collateral Posted In Connection With The Hedging Transactions The Debtors Enter Into Through Certain Futures And Prime Brokerage Accounts.  At the request of the Committee, Milbank prepared and filed a statement in response to the Debtors' motion.  [Docket No. 2779].

43.    Additionally, Milbank addressed issues related to and provided recommendations on, derivatives matters, including the highly complex derivatives-related adversary proceedings commenced by the Debtors to recover the Debtors' "in-the-money" positions in various derivatives transactions.  To that end, Milbank provided the Derivatives Subcommittee with numerous memoranda summarizing the issues and recommendations related to the derivative matters.  In this and other connections, substantial attorney time was devoted to analyzing derivatives contracts and other related transaction documents, monitoring and

19

participating actively in the derivatives-related adversary proceedings, communicating with the

Debtors' counsel and the Committee's financial advisors, and developing and evaluating

strategies to monetize complicated derivatives transactions for the benefit of unsecured creditors

of each of the Debtors' estates.

44.     As noted, considerable attention was paid to adversary proceedings, each

of which raised novel issues of law.  In preparation for intervention on behalf of the Committee

in certain of the derivatives-related adversary proceedings, Milbank researched numerous

complex legal issues related to the treatment of derivative contracts under the Bankruptcy Code.

Specifically, substantial attorney time was devoted to researching legal issues of first

impression in the Second Circuit; such research is essential to the development of strategies to

recover amounts due to the Debtors in disputed derivatives transactions for the benefit of

unsecured creditors of each of the Debtors' estates.

## K.    Employee Issues

45.     During the Second Interim Compensation Period, in order to apprise the

Committee of the Debtors' responsibilities in closing its offices, Milbank conducted research

and analysis on the federal Worker Adjustment and Retraining Notification Act (the "WARN

Act") and the state WARN Act equivalents.  In particular, Milbank focused upon applicability

triggers, lender and affiliated company liability, specific federal and state notification

requirements, and exceptions to the notification requirements under the statutes.  Milbank also

tracked proposed amendments to the federal WARN Act and delivered an analysis of the

potential impact of these changes.

**L.**     **Executory Contracts**

46.     During the Second Interim Compensation Period, Milbank reviewed and analyzed pleadings filed with respect to the Debtors' and LBI's executory contracts, including numerous motions by the Debtors and SIPA Trustee to assume or reject particular executory contracts, and objections and responses thereto.  Such review and analysis included legal research regarding the relief sought by such pleadings, analysis of the Debtors' and SIPA Trustee's rights and obligations under the applicable executory contracts, consultation with the Committee's financial advisors regarding the financial implications of the proposed treatment of the subject contracts, correspondence with the Debtors' legal and financial advisors regarding the financial context and implications of the proposed courses of action, and assessment of the potential impact on the Debtors' estates.

47.     Based upon such review and analysis, Milbank prepared memoranda for the Committee summarizing such pleadings, applicable legal issues, corresponding financial consideration, and the potential impact on the Debtors' estates and, where appropriate and requested by the Committee, Milbank prepared responsive pleadings.  To that end, during the Second Interim Compensation Period, Milbank drafted and filed an objection, dated April 20, 2009 [Docket No. 3395], to the Debtors' Motion Pursuant to Sections 105(a), 362 and 365 of the Bankruptcy Code for Authorization to Assume Certain Aircraft Lease Agreements and to Consummate Certain Related Transactions, dated March 25, 2009 [Docket No. 3218] (the "Aircraft Assumption Motion").  In connection with this objection, Milbank performed extensive legal research and prepared for the initial scheduled hearing for the Aircraft Assumption Motion, which has since been adjourned to September 16, 2009 [Docket No. 4278].

**M.**    **Fee Applications – Other**

48.    During the Second Interim Compensation Period, Milbank internally

recorded and reviewed monthly fee statements received from other professionals, in particular,

those of Weil Gotshal & Manges LLP, counsel to the Debtors, pursuant to the Interim

Compensation Order.  Additionally, Milbank researched and analyzed the potential role and

impact of a fee examiner or fee committee for the Debtors' Chapter 11 Cases, and the legal

basis for such appointment, resulting in the appointment of the Fee Committee by the Court on

May 26, 2009 [Docket No. 3651].

49.    **Fee Committee.**  Since early in these Chapter 11 Cases, the Committee

recognized that the amount of professional fees in these cases would require specialized review.

At the request of the Committee, Milbank advocated for the appointment of a fee committee and

participated in a chambers conference during the Second Interim Compensation Period to

discuss such an appointment.  Ultimately, at the direction of the Court, the parties worked

towards a common view of the process for fee examination.  In connection therewith, Milbank

worked with the Debtors and the United States Trustee to draft the protocol and pleadings that

resulted in the appointment of the Fee Committee.

**N.**    **File, Docket & Calendar Maintenance**

50.    During the Second Interim Compensation Period, Milbank maintained

internal filing, record-keeping, docket-monitoring, and calendaring systems to organize and

track (i) pleadings filed in the Chapter 11 Cases, SIPA Proceeding, and related adversary

proceedings, (ii) ongoing projects, and (iii) upcoming deadlines.  On a real-time basis, Milbank

downloaded, consolidated, and organized pleadings in order to ensure efficient access.  Milbank

also monitored the dockets on a real-time basis and summarized and circulated substantive

pleadings to the Lehman team. These summaries enabled Milbank to stay abreast of ongoing developments in these cases, facilitated the assignment of projects, and helped ensure that deadlines were not missed.

51. Additionally, Milbank maintained a comprehensive internal calendar of active matters in these cases. This calendar ensured that Milbank could effectively monitor and update the status of all pending matters, a resource that proved invaluable in responding to inquiries and discussing these matters with the Committee and other parties in interest. Milbank also maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming motions, hearing dates, and other important deadlines.

## O.    **Insurance Matters**

52. During the Second Interim Compensation Period, at the direction of the Committee, Milbank expended considerable time investigating and evaluating the Debtors' request to purchase a two-year tail policy to extend the coverage of their existing director and officer liability insurance policy. To obtain all relevant information regarding the cost, scope, and advisability of such purchase, Milbank participated in numerous conferences and meetings, and exchanged correspondence, with the Debtors' counsel, and ultimately determined not to object to the motion by which the Debtors sought Bankruptcy Court approval to purchase the additional coverage.

## P.    **Intercompany Issues**

53. During the Second Interim Compensation Period, Milbank expended considerable time investigating, on a preliminary basis, intercompany claim issues. Most significantly, at the request of the Committee, Milbank devoted substantial resources to an analysis of general guarantees and their potential impact on creditor recoveries. In this

connection, Milbank drafted a memorandum addressing, among other issues, the fact that

Lehman Brothers International (Europe)'s ("LBIE") administrator, PricewaterhouseCoopers

LLP ("PwC"), has indicated that it intends to assert a claim against LBHI, as a purported

guarantor for certain of its affiliates, for liabilities owed to LBIE by those affiliates.  In drafting

the memorandum, Milbank conducted research on U.S. law regarding the enforcement of

general guarantees and reviewed documents relevant to the existence of a purported LBHI

guarantee.

**Q.**    **International Insolvency Matters**

54.    During the Second Interim Compensation Period, Milbank attorneys and

paraprofessionals across various jurisdictions communicated with each other, Debtors' counsel,

and third party administrators regarding the status of proceedings initiated by or against

Lehman-related entities in countries outside of the U.S., or jurisdictions where Lehman entities

may have assets and/or liabilities, including, without limitation, (i) the United Kingdom;

(ii) Hong Kong; (iii) Japan; (iv) France; (v) the Netherlands; (vi) Switzerland; (vii) Germany;

(viii) Australia; (ix) Singapore; (x) Korea; (xi) the Philippines; (xii) China; (xiii) Cayman

Islands; (xiv) Luxembourg; (xv) Taiwan; and (xvi) Bermuda  (collectively, the "International

Jurisdictions").  Milbank liaised with the Committee and provided updates regarding the

international proceedings.   Milbank also monitored publicly available information for updates

and information regarding foreign proceedings, and complied information regarding procedures

for filing claims in such proceedings for each of the International Jurisdictions.

55.    **Asia Issues**.  As reflected in the First Interim Fee Application, due to the

size and complexity of issues related to insolvency proceedings commenced against the

Debtors' Asian subsidiaries and affiliates in various jurisdictions ("Asia Proceedings"), the

Committee established a subcommittee (the "Asia Subcommittee") composed of Milbank

attorneys, Committee members and the Committee's other professionals to monitor, review and

analyze issues specific to the Asia Proceedings.  The Asia Subcommittee continued to conduct

meetings throughout the Second Interim Compensation Period to address and make

recommendations to the full Committee and frequently liaised with the Debtors' professionals

in Asia and various Asian administrators and regulators to represent the Committee's interests.

The Asia Subcommittee focused on communications with the Debtors' professionals regarding

Project Lavender, the sale of certain real estate assets in Japan.  As of the conclusion of the

Second Interim Compensation Period, Milbank continued to research issues and drafted

memoranda to update the Committee on their progress in other Asia Proceedings.

    56. **German Bank Issues**.  Both Lehman Brothers Capital GmbH ("Lehman

GmbH") and Bankhaus are wholly-owned subsidiaries of LBHI.  On October 6, 2008, an order

was entered commencing the provisional administration of Lehman GmbH.  The Frankfurt

Local Court (*Amtsgericht*) commenced formal insolvency proceedings against Bankhaus on

November 13, 2008, and on April 29, 2009, Bankhaus filed with the Court a petition under

chapter 15 of the Bankruptcy Code.  During the Second Interim Compensation Period,

Milbank's domestic and German offices analyzed numerous issues relating to both Lehman

GmbH and Bankhaus, including general insolvency procedures in a German insolvency

proceeding, recent amendments to German insolvency law providing for subordination, and the

treatment of intercompany claims under German insolvency law.  In addition to the foregoing,

Milbank provided regular updates to the Committee on significant events in the German

proceedings, including the first assembly of Bankhaus's creditors, held on March 17, 2009, and

the Bankhaus administrator's demand for payment from R3 Capital Partners Master, L.P., on

March 23, 2009, under a certain repurchase agreement.

57.    **UK Issues**.  LBIE, the Debtors' principal trading company in the United

Kingdom ("UK"), along with several other British subsidiaries and affiliates of the Debtors,

were placed into insolvency administration (the "Administration") in the UK and the English

High Court appointed Tony Lomas, Steven Pearson, Dan Schwarzmann and Mike Jervis,

partners at PwC, as joint administrators (the "UK Joint Administrators") on September 15,

2008.  During the Second Interim Compensation Period, the primary task of Milbank was to

monitor the Administration of LBIE.  This involved numerous telephone conversations, email

communication and research memoranda, as well as email communication and conversations

with other professional advisers on the process pertaining to the Administration.

58.    In particular, Milbank performed extensive legal research into the

provisions and practical mechanics of the administration process under English law.  Milbank

regularly communicated with UK-based members of FTI and, in addition, Milbank had regular

conversations with members of the London office of Weil, Gotshal & Manges LLP regarding

the status of the Administration.  In addition, Milbank monitored and provided updates and

analyses to the Committee on various issues in connection with the LBIE proceeding including

the EDF Litgation, the LBIE Scheme of Arrangement, the Joint Administrators' First Progress

Report and the Lehman Brothers Asset Management (Europe) Limited disposal.

59.    **Multilateral Protocol.**  Milbank reviewed and commented on the draft

Global Cross-Border Insolvency Protocol (the "Multilateral Protocol") and reviewed the various

arguments advanced by the UK Joint Administrators against it, which were filed with this

Court.  Milbank advised the Committee regarding the extent to which the Joint Administrators

could be compelled to adhere to the Multilateral Protocol.  In connection therewith, Milbank conducted research regarding whether the UNCITRAL Model Law could be used and conducted numerous conference calls and engaged in email communications regarding same. Additionally, Milbank engaged in dialogue with the Debtors and various foreign administrators regarding the details of the Multilateral Protocol.  As of the end of the Second Interim Compensation Period, the Debtor's motion to implement the International Protocol was finalized and filed; Milbank reviewed the Multilateral Protocol motion and analyzed its impact for the Committee.

**R.    Litigation**

60.    During the Second Interim Compensation Period, Milbank conducted research and prepared memoranda regarding the claims and issues raised by a wide range of pending lawsuits impacting the Debtors' estates.  Milbank also conducted multiple teleconferences and meetings, both internally and with the Debtors and their professionals, with regard to the foregoing and provided regular updates to the Committee.

61.    More specifically, with the exception of cases in which the Committee's interests are represented by the Committee's conflicts counsel, Milbank monitored developments in (i) all pending adversary proceedings commenced in this Court; (ii) lawsuits commenced prepetition against the Debtors and pre- and postpetition against non-Debtor affiliates, officers, directors, and related parties; and (iii) litigations raising issues similar to those raised or to be raised in the Chapter 11 cases.  Where appropriate and directed by the Committee, Milbank intervened in such matters on the Committee's behalf.  Finally, in connection with the monitored proceedings, Milbank reviewed and analyzed proposed settlement agreements and advised the Committee regarding the same.

**S.**      **Pension Issues**

62.      During the Second Interim Fee Period, Milbank advised the Committee in connection with settlement negotiations between the Debtors and the Pension Benefit Guaranty Corporation (the "PBGC").  The Committee was an active participant in such negotiations.  On behalf of the Committee, Milbank reviewed, analyzed and revised settlement terms and settlement agreement language proposed by the Debtors and the PBGC.  Milbank also researched and analyzed various provisions of, and cases interpreting, the Employee Retirement Income Security Act of 1974 ("ERISA") and the applicable regulations issued thereunder.  Milbank researched and analyzed provisions of ERISA relating to, among other things, (i) the calculation of a pension plan's unfunded benefit liability and the assumptions that underlie such calculation, and (ii) the calculation of termination premiums and whether such premiums can be discharged in bankruptcy.

63.      In order to assist the Committee in its evaluation of a proposed settlement agreement between the Debtors and the PBGC, Milbank prepared a memorandum for the Committee addressing the foregoing issues and providing a recommendation as to whether the Committee should consent to the material terms of the proposed agreement.  Milbank also prepared the Statement filed by the Committee on May 28, 2009, in support of LBHI's motion for authorization and approval of the settlement agreement it had reached with the PBGC. [Docket No. 3681].  Milbank participated in Committee calls and conducted several meetings via teleconference with the Committee's financial advisors, the PBGC and Debtors to resolve outstanding issues.  A settlement was reached by the Debtors and the PBGC during the Second Interim Compensation Period.

**T.**     **Real Estate Matters**

64.     As reflected in the First Interim Fee Application, due to the size, complexity and potential for exposure of the Debtors' real estate portfolio, the Committee established a real estate subcommittee (the "Real Estate Subcommittee"),  comprised of Committee members, Milbank attorneys, and the Committee's financial advisors, to evaluate the Debtor's extensive real estate portfolio.  The Real Estate Subcommittee held regular meetings throughout the Second Interim Compensation Period to address and make recommendations to the full Committee with regard to issues related to the Debtors' real estate holdings in order to both assess discrete issues, e.g., the SunCal, Starman and Heritage Fields situations, and formulate protocols with the Debtors to attempt to maximize the value of the Debtors' real estate assets.

65.     The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects.  Milbank continued to work closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various funding obligations and to respond to numerous requests from Debtors to restructure debt facilities.  In connection therewith, Milbank continued to review the Debtors' rights, obligations and exposures relative to joint venture partners, borrowers, senior secured lenders, unsecured creditors and other third parties to make an impact analysis of the proposed restructurings or failure to fund capital calls.  Milbank also continued to participate in the consensual resolution of several outstanding real estate-related motions.

U.    **Lehman Bank Platform Issues**

66.    During the Second Interim Compensation Period, Milbank expended considerable time in connection with Lehman Brothers Bank, FSB, a federally-chartered thrift headquartered in Delaware ("LBB") overseen by the Office of Thrift Supervision, and Lehman Brothers Commercial Bank, a Utah industrial bank ("LBCB" and, together with LBB, the "Banks") overseen by the Federal Deposit Insurance Company. Due to a number of factors, capital levels at each of the Banks dropped below levels generally considered adequate by the Banks' respective regulators. As a result, the regulators indicated that, unless LBHI took action to support the capital levels at the Banks, the regulators would seize the Banks and liquidate their respective assets. Because the Committee's financial advisors agreed with the Debtors and their professionals that significant value could be recovered if the Banks' capital and liquidity issues could be successfully addressed, the Committee supported the Debtors' efforts to preserve value at the Banks.

67.    In connection therewith, Milbank actively monitored developing legal and regulatory changes by analyzing legislative proposals and participating in meetings of a related subcommittee (the "Bank Regulatory Subcommittee"). The Bank Regulatory Subcommittee held regular meetings throughout the Second Interim Compensation Period. In connection with the Bank Regulatory Subcommittee, Milbank, working together with the Committee's financial advisors, analyzed various governmental programs, including, among others, the Public-Private Investment Program, with respect to details such as the specific type of assets eligible for the programs, the amount of funding available, and restrictions applicable to participants in the program, in order to assess the Debtors' eligibility to participate in such

programs and the potential impact of such participation on the value of certain of the Debtors'
assets.

68.     During the Second Interim Compensation Period, Milbank also worked
closely and cooperatively with the Debtors and the Debtors' professionals in attempting to
structure solutions to the various issues confronting the Banks, including meeting with the
Banks' regulators to discuss the Banks' alternatives and to negotiate a mutually acceptable
solution to the Banks' regulatory issues.  Milbank also expended significant time, together with
the Committee's other professionals, analyzing the potential value to the Debtors' estates of
making capital infusions into the Banks, including in connection with two motions filed by the
Debtors seeking authority to (i) make a cash infusion into LBB (the "Cash Infusion Motion")
and (ii) enter into a master repurchase agreement with LBB (the "MRA Motion") in order to
improve LBB's capital positions to levels LBB's regulators would find acceptable regulators
would find acceptable.  At the request of the Committee, Milbank prepared and filed the
Statement in support of the Cash Infusion Motion and MRA Motion.  [Docket No. 2842].  The
Cash Infusion Motion and the MRA Motion were approved by the Court on March 13, 2009,
and March 31, 2009, respectively.

**V.     Reorganization Plan**

69.     During the Second Interim Compensation Period, Milbank researched
precedent for reorganization plans, dealing with creditor distribution provisions and creating a
plan precedent database with a concentration on issues that may be relevant to the Debtors'
Chapter 11 Cases.  Milbank further researched issues such as the treatment of guarantors and
setoff in connection with substantive consolidation, and rights to vote of holders of derivatives,
drafting memoranda for the Committee regarding the foregoing.

W.       **Retention of Professionals**

70.      During the Second Interim Compensation Period, Milbank reviewed and

scrutinized the retention applications of professionals, including applications for, among others:

(i) Jones Day, as special counsel to the Debtors; (ii) Duff & Phelps, LLC as Financial Advisors

to the Examiner; (iii) an amendment to the original application of McKee Nelson as special

counsel for the Debtors; and (iv) ordinary course counsel and contract attorneys.  In evaluating

these additional retention applications, Milbank discussed with the Committee, the Committee's

other professionals, and the Debtors, concerns about conflicts of interest, amount of fees, and

scope of employment.

X.       **Rule 2004 Investigations**

71.      During the Second Interim Compensation Period, Milbank analyzed

various Rule 2004 motions filed by interested parties including, among others, Bank of New

York Mellon, 25 Broad, LLC ("25 Broad"), and SunTrust, all of whom sought to obtain

information from one or more of the Debtors.  In response to 25 Broad's Rule 2004 motion,

Milbank prepared and subsequently filed a joinder to the Debtors' objection to 25 Broad's

motion.  [Docket No. 2750].  Milbank prepared this pleading to prevent duplicative requests for

information, which would unnecessarily drain the Debtors' resources and impede upon the

Committee's statutory mandate to investigate the acts, conduct, liabilities and financial

condition of the Debtors.

72.      In an effort to better inform the Committee regarding the scope and

purpose of Rule 2004 discovery, Milbank prepared a comprehensive memorandum

summarizing Rule 2004 and applicable case law interpreting Rule 2004.

**Y.    Substantive Consolidation**

73.    During the Second Interim Compensation Period, Milbank created

comprehensive chart summarizing the federal cases discussing the doctrine of substantive

consolidation and a comprehensive memorandum discussing the factors commonly utilized by

courts when analyzing substantive consolidation.   In preparing these charts, Milbank conducted

in-depth research on all federal cases discussing the doctrine of substantive consolidation.

Milbank, together with the Committee's financial advisors, also continued its analysis of the

potential applicability of the principles articulated in such cases to the facts and circumstances

of the Chapter 11 Cases.

**Z.    Tax Issues**

74.    During the Second Interim Compensation Period, Milbank devoted

substantial time to analyzing and evaluating federal, state, and international tax issues relating

to the Debtors' estates.  In connection therewith, Milbank participated in weekly Committee

calls regarding tax matters, met with the Debtors' tax department and tax counsel, and

reviewed, researched, and analyzed (i) tax issues on the disposition of certain assets (e.g.,

SkyPower, the Debtors' investment management division, and interests in certain real estate

funds); (ii) tax issues surrounding the Banks; (iii) the Debtors' tax exposure and potential refund

claims; (iv) transactions subject to on-going Internal Revenue Service ("IRS") audit of the

Debtors' estate, including foreign tax credit claims (e.g., "Voucher" trade and "stock loan"

transactions) and the Debtors' corporate-owned life insurance deductions; (v) motions and

orders to restrict trading of equity and debt claims of the Debtors; (vi) the Debtors' request for a

ruling from the IRS regarding relative valuation of the Debtors' preferred stock;  (vii) the

impact of receipt of government program funds on use of the Debtors' net operating losses, and

(viii) the potential impact on the Debtors' estate of tax provisions in proposed legislation.  In connection with the above-mentioned IRS audit, Milbank met with the Debtors' tax litigation counsel, McKee Nelson LLP, and prepared a memorandum for the Committee explaining the tax exposure associated with the IRS audit.

75.     At the request of the Committee, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) choice of forum issues associated with the determination of the Debtors' tax liability; (ii) the priority of various tax claims against the Debtors; (iii) tax allocation rules related to Debtors' right to contribution by subsidiaries; (iv) setting off tax penalties with refunds and the allowance of certain refund claims; (v) the status of a controlled foreign corporation when placed in receivership; and (vi) the Debtors' right to interest on tax refunds.  Milbank participated in weekly telephone conferences with the Debtors' tax department and the Debtors' tax counsel to discuss the numerous tax issues that arose in the Debtors' continuous dialogue with the IRS and other taxing authorities and other Debtor tax issues which the Debtors' tax department or tax counsel considered noteworthy.

## AA.    <u>Trading and Loan Book</u>

76.     As reflected in the First Interim Fee Application, the Committee established a subcommittee comprised of Milbank attorneys, Committee members, and the Committee's financial advisors to review matters related to the Debtors' loan book (the "<u>Loan Book Subcommittee</u>").  During the Second Interim Compensation Period, the Loan Book Subcommittee continued to analyze, among numerous other matters related to the Debtors' loan book, the unresolved objections and proposed settlements, ancillary motions, and other residual issues concerning the Debtors' motions, dated November 14, 2008 and December 15, 2008, to assume or reject trade confirmations to purchase or sell interests in loans (the "<u>Open Trades</u>").

77.     In connection with the Open Trades involving Fusion Funding Limited and Fusion Funding Luxembourg, S.A.R.L. (together, "Fusion"), Milbank spent considerable time, among other things, (i) working to resolve the related pleadings filed by GE Corporate Financial Services, Inc. ("GE"), including GE's objection to the Debtors' second motion to assume or reject certain Open Trades, in which the Debtors had requested to assume the Fusion Open Trades, and GE's related motion to lift the automatic stay to terminate the Fusion Open Trades, both dated December 24, 2008, and (ii) analyzing various related transactional documents, including credit facilities, inter-creditor agreements, and purchase agreements, involving, among other parties, Fusion, General Electric Capital Corporation, LCPI and Bankhaus.

78.     Milbank also reviewed and analyzed the legal issues raised in various Open Trades-related motions, including (i) the motions filed by Yarpa Investmenti S.G.R. S.p.A. – RP3 Fund, dated April 3, 2009, and Basso Capital Management, L.P., dated May 7, 2009, seeking relief from the Court's December 16, 2008 order approving the Debtors' first motion to assume or reject certain Open Trades, as well as (ii) the Debtors' motion, dated March 5, 2009, seeking entry of an order enforcing the Court's December 23, 2008 order approving the assumption of Open Trades pursuant to a settlement agreement with DK Acquisition Partners, L.P.

79.     Milbank prepared for and monitored the potential litigation and evidentiary hearings concerning certain Open Trades disputes, including those involving the counterparties Fusion, Blue Mountain Credit Alternatives Master Fund L.P. and Field Point IV S.a.r.l.  Milbank also closely monitored and reviewed the development of the adversary

proceeding brought by LCPI against iStar Financial Inc. (Adv. Proc. No. 09-01060) until its dismissal by stipulation entered on April 6, 2009.

80.     In addition to the foregoing, Milbank participated in the Loan Book Subcommittee and, among other things, (i) reviewed various motions relating to loan book transactions, including the Debtors' motion, dated March 2, 2009, seeking to settle disputes with The Metropolitan Life Insurance Company involving certain note repayment obligations; (ii) worked closely with the Debtors' counsel and advisors, and consulted with creditor constituents, to assist in developing Court-approved procedures to execute transactions related to unfunded commitments and loan restructurings; (iii) conducted research and drafted memoranda analyzing, among other legal issues, the treatment of participations in the U.S. and UK, and loan trading standards, and (iv) analyzed numerous transactional materials, including the security and collateral agreement involving Bankhaus to determine the nature of certain loan interests transferred, and certain credit facilities and participation agreements to identify defaults by the Debtors and potential elevations of participating lenders to replace the Debtors as administrative agents and/or lenders.

81.     Milbank worked closely with the Committee's financial advisors to analyze and present the legal and financial implications of the Debtors' loan book transactions to the Loan Book Subcommittee to facilitate its recommendations of responsive courses of action to the full Committee.  To this end, the Loan Book Subcommittee frequently convened meetings to discuss and formulate such recommendations regarding all outstanding loan book matters.

**BB.     <u>Voidable Transfers and Other Potential Claims</u>**

82.     Milbank has devoted substantial time to researching and evaluating potential claims on behalf of the Debtors' estates, including voidable transfer claims.  In connection therewith, Milbank researched the applicable law and performed factual investigations relying on public material concerning the events leading up to Debtors' filing with this Court of their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and drafted a memorandum with regard to the foregoing.

**CC.   SIPC Issues**

83.     During the Second Interim Compensation Period, Milbank attended meetings with the Debtors regarding SIPA and LBI issues, reviewed various motions, such as those of the Teva Companies and the Texas Education Board, and analyzed the SIPA Trustee Motion and SIPA Trustee Report, drafting brief memoranda as appropriate to keep the Committee fully apprised of potential ramifications to the Debtors' estates.  Further, Milbank evaluated customer property and claims issues, including with respect to repurchase, reverse repurchase, and foreign exchange transactions, and their treatment in prior cases, as well as the status of any potential non-U.S. SIPC registrants, while drafting memoranda to the Committee regarding the foregoing.

**DD.   Examiner Issues**

84.     During the Second Interim Compensation Period, Milbank endeavored to communicate and coordinate with the Examiner in connection with its investigation mandate, which was authorized in connection with its appointment by order dated January 16, 2009, and its preliminary work plan, which was approved by order dated February 17, 2009.  At the direction of the Committee, Milbank prepared a stipulation entered into by the Committee and the Examiner regarding the coordination of information sharing, which was approved by the

Court on February 11, 2009.  [Docket No. 2815].  Milbank also reviewed, summarized, and presented to the Committee (i) a number of similar stipulations between the Examiner and parties in interest in the Chapter 11 Cases, and objections thereto, concerning information sharing and confidentiality, and (ii) various motions or applications from the Examiner seeking (a) subpoena power and production of documents from the Debtors and their officers and employees, which was granted on February 11, 2009; (b) the retention of Duff & Phelps, LLC as financial advisors, which was granted on February 25, 2009; and (c) the retention of certain contract attorneys, which was granted on May 15, 2009.

EE.    **Private Equity**

85.    As reflected in the First Interim Fee Application, the Committee established a private equity subcommittee (the "Private Equity Subcommittee") comprised of Milbank attorneys, Committee members, and the Committee's other professionals.  The Private Equity Subcommittee held regular meetings during the Second Interim Compensation Period to address and make recommendations to the full Committee with regard to specific issues surrounding the Debtors' portfolio of private equity assets and formulated protocols with the Debtors to attempt to maximize the value of such portfolios.  Milbank worked closely with the Debtors, the Debtors' professionals, and the Committee's other professionals in connection with the sale of several lines of business that were part of Lehman's private equity businesses, including the sale of tax credit investments and venture capital funds.

86.    With respect to the sale of membership interests in various renewable energy projects, most notably, White Creek Wind I Holdings, LLC and GTH LLC, Milbank worked closely with Debtors' counsel in reviewing and commenting on several drafts of each purchase agreement and the related disclosure schedules and ancillary agreements.

87.     With respect to the proposed sale of debt and equity interests in
SkyPower, Corp. ("SkyPower") to C6 Canada Energy Holdings Inc. and its subsidiary C6
Canada Energy, Inc., Milbank worked together with the Committee's financial advisors and the
Debtors' counsel to review, analyze, and comment on numerous draft purchase agreements.
Additionally, in connection with the proposed sale of the SkyPower equity interests, Milbank
also reviewed drafts of a purchase agreement for the proposed sale of XLE wind turbines to
Invenergy Wind Canada Acquisition ULC by SkyPower.  Milbank also conducted significant
due diligence to verify structuring issues, and communicated the terms of the transaction to the
Private Equity Subcommittee and the Committee.

88.     With respect to the sale of general partnership interests in Lehman's
venture capital funds to the existing management of the funds, Milbank worked closely with
Debtors' counsel in reviewing and commenting on several drafts of each purchase agreement
and the related ancillary agreements.

89.     **D.E. Shaw Payment Obligation**.  Milbank also expended considerable
time in connection with the twenty percent interest of ARS Holdings II LLC ("ARS Holdings"),
a non-Debtor, wholly-owned, direct subsidiary of LBHI, in D.E. Shaw & Co., L.P. and D.E.
Shaw & Co., L.L.C. ("D.E. Shaw").  ARS Holdings is contractually obligated to make certain
payments to D.E. Shaw in 2009 and 2011, which obligations are guaranteed by LBHI.

90.     Due to several factors, ARS Holdings did not have sufficient cash to
make such capital payment in 2009.  After Milbank, along with the Committee's other
professionals, analyzed the documents related to D.E. Shaw and worked closely with the
Debtors and the Debtors' professionals, the Committee's professionals agreed with the Debtors

and their professionals that significant value may be recovered if ARS Holdings fulfilled its payment obligation to D.E. Shaw.

91.     As a result, the Debtors filed a motion seeking authority to make an intercompany loan to ARS Holdings, to allow ARS Holdings to satisfy its obligation to make such payment to D.E. Shaw.  Milbank expended significant time, together with the Committee's other professionals, analyzing the potential value to the Debtors' estates of making this intercompany loan to ARS Holdings and related capital payment to D.E. Shaw and communicating with the Committee regarding the Committee's position with respect to this motion.

92.     **Other Private Equity Sales**.  In connection with certain other prospective asset sales, Milbank have worked and continue to work closely with the Debtors, the Debtors' professionals, and the Committee's financial advisors, to negotiate the terms and conditions of purchase agreements and related transaction documents with potential purchasers of such assets.

## FF.   **Milbank Fee Statements and Applications**

93.     During the Second Interim Compensation Period, Milbank reviewed Milbank's monthly fee statements for, among other purposes, compliance with the Interim Compensation Order and the Local Guidelines.  Milbank also prepared and served its Fee Statements on all parties required by the Interim Compensation Order and upon the newly formed Fee Committee.

# IV.

## ALLOWANCE OF COMPENSATION

94.     The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  Milbank respectfully

submits that the services rendered to the Committee were performed efficiently, effectively and

economically, and that the results obtained to date have benefited not only the members of the

Committee, but also the unsecured creditors of each of the Debtors' estates.

95.     The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

96.     With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)     the time spent on such services;
>
> (B)     the rates charged for such services;

41

(C)     whether the services were necessary to the administration of, or
beneficial at the time which the service was rendered toward the
completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount
of time commensurate with the complexity, importance, and nature
of the problem, issue, or task addressed;

(E)     with respect to a professional person, whether the person is board
certified or otherwise has demonstrated skill and expertise in the
bankruptcy field; and

(F)     whether the compensation is reasonable based on the customary
compensation charged by comparably skilled practitioners in cases
other than cases under this title.

11 U.S.C. § 330(a)(3).

97.     The congressional policy expressed above provides for adequate
compensation in order to continue to attract qualified and competent professionals to
bankruptcy cases. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994)
("Congress rather clearly intended to provide sufficient economic incentive to lure competent
bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation
marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y.
1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys'
rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

98.     In assessing the "reasonableness" of the fees requested, courts have
looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First
Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[10]   See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First Colonial/Johnson analysis);   In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y 1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King, et al., eds., 15th ed. rev. 2009) (enumerating First Colonial and Johnson as the "leading cases to be considered in determining a reasonable allowance of compensation").   Milbank respectfully submits that the consideration of these so-called Johnson factors should result in this Court's allowance of the full compensation requested.

(A)     The Time and Labor Required.  The Debtors' cases are among the largest, most complex and active bankruptcy cases ever filed.  Accordingly, the professional services rendered by Milbank on behalf of the Committee have required the continuous expenditure of substantial time and effort, under time pressures which sometimes required the performance of services late into the evening and, on a number of occasions, over weekends and holidays.  The services rendered required a high degree of professional competence and expertise in order to be administered with skill and dispatch.

(B)     The Novelty and Difficulty of Questions.  Novel and complex issues have arisen in the course of these chapter 11 cases, and it can be anticipated that other such issues will be encountered.  In these cases, as in many others in which the firm is involved, Milbank's effective advocacy and creative approach to problem solving have helped clarify and resolve difficult issues and will continue to prove beneficial.

(C)     The Skill Requisite to Perform the Legal Services Properly.  Milbank believes that its recognized expertise in the area of financial restructuring, its ability to draw from highly experienced professionals in other areas of its practice such as securities, structured products, asset divestiture, litigation, and regulatory law and its practical approach to the resolution of issues help maximize the distributions to the unsecured creditors of each of the Debtors.

(D)     The Preclusion of Other Employment by Applicant Due to Acceptance of the Case.  Due to the size of Milbank's financial restructuring department and the

---

[10]     The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

firm as a whole, Milbank's representation of the Committee has not precluded the acceptance of new clients. However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)     The Customary Fee.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)     Whether the Fee is Fixed or Contingent.  Milbank charges customary hourly rates for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)     Time Limitations Imposed by Client or Other Circumstances.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)     The Amount Involved and Results Obtained.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of  dollars, in what has been widely described as the largest chapter 11 cases ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)     The Experience, Reputation and Ability of the Attorneys.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

44

(J)     The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)     Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

99.     The total time spent by Milbank attorneys and paraprofessionals during the Second Interim Compensation Period was 31,233.40 hours and has a fair market value of $16,829,521.00.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

**V.**

**EXPENSES**

100.     Milbank has incurred a total of $1,019,754.61 in expenses in connection with representing the Committee during the Second Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

101.     In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-

town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

102.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) twenty cents ($0.20) per page for photocopying; (ii) no charge for incoming facsimiles; (iii) toll charges only for outgoing facsimiles; and (iv) an average of nineteen cents ($0.19) per minute for long distance. Specifically, with respect to phone charges over $100.00, such charges were accrued in connection with conference calls in which the Committee, the Debtors and/or other parties in interest participated.

103.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[11]  Additionally, Milbank has further limited and defined its expenses in accordance with the guidelines set forth in the Fee Committee Report.

104.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

105.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, library, word processing and other staff

---

[11]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

services because such items are not included in the firm's overhead for the purpose of setting the billing rates.

106.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel expenses in excess of coach fares.  Throughout the Second Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

107.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the Office of the United States Trustee, and (d) the members of the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for the Committee during the Second Interim Compensation Period in the amount of $16,829,521.00 and (b) reimbursement of expenses incurred in connection with rendering such services in the aggregate amount of $1,019,754.61, for a total award of $17,849,275.61; (ii) authorizing and directing the Debtors to pay to Milbank $3,266,539.20, which is an amount equal to the difference between (i) this $17,849,275.61 award and (ii) $14,582,737.21, the total of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim Compensation

Order for services rendered and expenses incurred during the Second Interim Compensation

Period; and (iii) granting such further relief as is just and proper.

Dated: New York, New York
       August 14, 2009

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By:   /s/ Dennis F. Dunne
Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

and

Paul Aronzon
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x
                                                  :
In re:                                            :                    Chapter 11 Case No.
                                                  :
LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,     :                    08-13555 (JMP)
                                                  :
                    Debtors.                      :                    (Jointly Administered)
                                                  :
--------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF SECOND APPLICATION OF MILBANK,
TWEED, HADLEY & M<sup>c</sup>CLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>FEBRUARY 1, 2009 THROUGH AND INCLUDING MAY 31, 2009</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 (together, the "<u>Local Guidelines</u>"), and the United States Trustee

Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, adopted on January 30, 1996 (the "<u>U.S. Trustee Guidelines</u>" and,

together with the Local Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of

Unsecured Creditors (the "<u>Committee</u>") of Lehman Brothers Holdings Inc. and its affiliated

debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby certifies

with respect to Milbank's second application for allowance of compensation for services

rendered and for reimbursement of expenses, dated August 14, 2009 (the "<u>Application</u>"), for the

period of February 1, 2009 through and including May 31, 2009 (the "Second Interim

Compensation Period") as follows:

1.    I am the professional designated by Milbank in respect of compliance with

the Guidelines.

2.    I make this certification in support of the Application, for interim

compensation and reimbursement of expenses for the Second Interim Compensation Period, in

accordance with the Local Guidelines.

3.    In respect of section B.1 of the Local Guidelines, I certify that:

a.    I have read the Application.

b.    To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought fall within
the Guidelines.

c.    Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

d.    In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

4.    In respect of section B.2 of the Local Guidelines, I certify that Milbank has

provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

the Application), except that completing reasonable and necessary internal accounting and

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

5.    In respect of section B.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the members of the Fee Committee.

6.    I certify that the Application for interim compensation and reimbursement of

expenses for the Second Interim Compensation Period has been prepared in accordance with the

guidelines furnished in the Fee Committee Report (as defined in the Application).

Dated:        New York, New York
              August 14, 2009

By:   /s/  Dennis F. Dunne
             Dennis F. Dunne

# **EXHIBIT B**

**Time Entry Records**[1]

---

[1]    Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# EXHIBIT C

**Expenses**[1]

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $10,919,138.40 | $1,213,237.60 | $2,402,821.16 | $668,388.72 | $668,388.72 |
| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. [X] | $16,829,521.00 | | | $3,266,539.20[1] | $1,019,754.61 | $1,019,754.61 |

---

[1]    The amount requested on account of fees and expenses incurred by Milbank during the Second Interim Compensation Period was $122,189.60 less than the sum of fees and expenses set forth in the Fee Statements served during the Second Interim Compensation Period.

**FEE SCHEDULE A(1)**