1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555(JMP)

Adv. Case Nos. 09-01262, 09-01115

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

             Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

             Debtor.

- - - - - - - - - - - - - - - - - - - -x

EUROPEAN CREDIT MANAGEMENT LIMITED, et al,

                  Plaintiffs,

        -against-

LEHMAN COMMERCIAL PAPER INC.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - -x

(Cont'd. on next page)

2

1

2      - - - - - - - - - - - - - - - - - - -x

3      MILLENNIUM INTERNATIONAL, LTD.,

4                        Plaintiffs,

5           -against-

6      LEHMAN BROTHERS FINANCE, S.A., et al.

7                        Defendants.

8      - - - - - - - - - - - - - - - - - - -x

9

10

11

12

13

14

15                U.S. Bankruptcy Court

16                One Bowling Green

17                New York, New York

18

19                August 5, 2009

20                2:04 p.m.

21

22     B E F O R E:

23     HON. JAMES M. PECK

24     U.S. BANKRUPTCY JUDGE

25

3

1

2      ADV. CASE NO. 09-01262

3      PRE-TRIAL CONFERENCE IN EUROPEAN CREDIT MANAGEMENT LIMITED, ET

4      AL v. LCPI

5

6      ADV. CASE NO. 09-01115

7      PRE-TRIAL CONFERENCE MILLENNIUM INTERNATIONAL, LTD., v. LEHMAN

8      BROTHERS FINANCE, S.A.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Transcribed by:  Ellen S. Kolman

25

4

1

2    A P P E A R A N C E S :

3    WEIL GOTSHAL & MANGES, LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, New York 10153

7

8    BY:  RICHARD L. LEVINE, ESQ.

9

10

11   KLESTADT & WINTERS, LLP

12        Attorneys for European Credit Management Limited

13        292 Madison Avenue

14        New York, New York 10017

15

16   BY:  JOHN E. JURELLER, JR. ESQ

17        TRACY KLESTADT, ESQ.

18

19

20   ROPES & GRAY, LLP

21        Attorneys for Millennium International Limited

22        One International Place

23        Boston, Massachusetts 02110

24

25   BY:  PETER L. WELSH, ESQ.

5

1

2    GIBSON, DUNN & CRUTCHER, LLP

3        Attorneys for Lehman Brothers Finance

4        200 Park Avenue

5        New York, New York 10166

6

7    BY:  LaSHANN DE ARCY, ESQ.

8

9

10    ALLEN & OVERY, LLP

11        Attorneys for KBC

12        1221 Avenue of the Americas

13        New York, New York 10020

14

15    BY:  PAMELA CHEPIGA, ESQ.

16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

1          THE COURT:  Please be seated.  This is the adversary

2   proceeding phase of the Lehman omnibus day.  The first case on

3   my list is European Credit Management.  Are you all here?

4          MR. LEVINE:  Yes, Your Honor.

5          MR. JURELLER:  Yes, we are, Your Honor.

6          THE COURT:  What's the story?

7          MR. JURELLER:  Want me to start off?  Good afternoon,

8   Your Honor.  John Jureller from Klestadt & Winters and Tracy

9   Klestadt, as well, on behalf of the plaintiffs.  We've reached

10  a stipulation as to the discovery schedule which we have and we

11  can submit to the Court.  I can go over some of the facts of

12  the case, if you'd like.  I'm not sure how you want to proceed.

13         THE COURT:  I've looked at the basic pleadings.  What

14  kind of discovery do you need and how much time are you

15  scheduling for it?

16         MR. JURELLER:  The scheduling is -- goes out a little

17  ways.  It's my understanding through Lehman Brothers that

18  there's a process, and maybe Mr. Levine can actually go forth

19  explain it in more detail, there's a process where it's going

20  to take four to five months just to get some of these documents

21  through LBIE and the United Kingdom.  So we've put out

22  discovery where all documents have to be produced before

23  January 29th.  However, the discovery's going to be --

24         THE COURT:  That's 2010?

7

1        MR. JURELLER:  I'm sorry?

2        THE COURT:  That's 2010.

3        MR. JURELLER:  In 2010, that's correct.  But the

4   discovery is going to be on a rolling basis so that as the

5   documents come in, they're not going to be held by the parties

6   until that date.  They're going to be provided within a

7   reasonable time after they're in receipt.  Now, the whole

8   reason, again, is because of this whole U.K. system, again.

9        THE COURT:  You're going to have to --

10        MR. JURELLER:  I don't know the details on that.

11        THE COURT:  -- you're going to have to explain this

12   to me because it seems like it's an extraordinarily prolonged

13   period for document discovery.

14        MR. LEVINE:  Understood, Your Honor.  The problem is

15   that the IT infrastructure, which holds all the e-mails, is now

16   owned by Nomura.  Access to those e-mails is -- has to go

17   through the European entities under the administration of PwC.

18   And PwC -- I've been working with them indirectly through

19   people in London on several other contested matters and they

20   take four to five months to get us documents back.

21        THE COURT:  Is that because it actually takes that

22   much time or because they prefer to drag their feet on this?

23        MR. LEVINE:  I don't know the answer.  But I suspect

24   it's foot-dragging.  I know that people from Alvarez & Marsal,

25   the financial advisors to the debtors, have had numerous

8

1    meetings with PwC to try to press this issue so far, not

2    without great success.  There have been a lot --

3           THE COURT:  I'm going to give you -- I don't mean to

4    make your lives any more difficult than they already are, but I

5    am actually not inclined to acquiesce in a schedule that's

6    unreasonable because other parties not identified and not

7    subject to the jurisdiction of this Court are, I'm going to use

8    your words picking up my words and I don't know if it's true or

9    not, possibly foot-dragging and creating unnecessary delay that

10   is also adding to the expense and burden on case administration

11   here.

12          So what I'm going to ask you to do is to shorten the

13   time to a more reasonable time and use that as a reason for

14   those parties who are holding the documents to respond by that

15   deadline or show cause why they can't meet that deadline.

16          MR. LEVINE:  Your Honor, that's fine with us.

17          THE COURT:  Does that create a problem for you?

18          MR. LEVINE:  It gives us some more leverage.  We have

19   been using deadlines in other cases to try to pressure them.  I

20   know there was a meeting this week between PwC and Linklaters,

21   their counsel, in response to some of the demands that the

22   debtors here have been putting on them to try to speed things

23   along.  Any leverage you can give us is great.  But if they're

24   not so -- and I know that things --

25          THE COURT:  Obviously, we'll extend the time out if

9

1    you need --

2            MR. LEVINE:  Okay.

3            THE COURT:  -- more time because they're not

4    performing as appropriate.

5            MR. LEVINE:  Okay.  So we will talk about a shorter

6    period of time and then try to use that as leverage to get the

7    documents out of London.

8            THE COURT:  Perhaps it will help -- whether it helps

9    or not.  I'm simply not inclined to put document discovery out

10   to January of 2010 because there's a pattern of delay in

11   getting documents that could, if parties were actually acting

12   in a cooperative way, be produced in a timely fashion.

13           MR. LEVINE:  I hear what you're saying.  I do know

14   that there have been technological problems with Nomura, or at

15   least that's what's being reported back to the debtors from

16   PwC.

17           THE COURT:  That may be true, but it really sounds

18   like excuses to me.

19           MR. LEVINE:  I'm not in a position nor would I want

20   to disagree with that, Your Honor.  I mean I hear what you're

21   saying and my gut is the same as yours.

22           THE COURT:  Okay.  I mean I don't have any evidence

23   to indicate that it's one way or the other on this but I'm not

24   inclined to stretch out document discovery unreasonably for

25   reasons that haven't been fully explained.

10

1          MR. LEVINE:  Okay, Your Honor.

2          MR. JURELLER:  On behalf of the plaintiff, we're

3    obviously more than happy to move more quickly on that.

4          THE COURT:  And I figure you would be.

5          MR. LEVINE:  Okay.  So we'll go back to the drawing

6    board and try something else, Your Honor.

7          THE COURT:  All it really means is that you have less

8    time to get the documents together and perhaps a need to come

9    back for further pretrial to stipulate for an extension for

10   cause show.

11         MR. LEVINE:  Okay.

12         THE COURT:  Is it contemplated that this is a case

13   that will lead to dispositive motions or to trial?

14         MR. LEVINE:  Your Honor, I think that both sides have

15   talked about making some fairly early on motions.  There are

16   some -- counsel and I have been discussing, because it's not

17   clear at this point to counsel exactly what contractual terms

18   apply to each of the six trays at issue.  When that is

19   clarified, and we're hoping we can clarify that informally,

20   there may be motion practice if things can't be agreed to.  We

21   may be making motion for judgment on the pleadings.  I know

22   that counsel for the plaintiffs indicate they may, at some

23   point, be making a motion for preliminary injunctive relief.

24   Again, a lot of that may be able to be avoided by counsel

25   working things out and we're trying to do that.

11

1          And I think at the bottom line, though, that the

2     ultimate issue will be a legal issue.  Whether or not under the

3     English form of participations, which is different than the

4     American form, a holder -- a participant in debt held by a

5     debtor has a right to participate.  The way the debtors view it

6     is that under the American form of contract, the participant

7     has an equitable and legal interest in the underlying debt and

8     therefore the debtors have been granting requests by

9     participants to elevate participations into the primary lender

10    position.  While in the U.K. under the debtors' interpretation

11    of the contractual terms, all a participant has, vis-a-vis the

12    debtor, is a debtor/creditor relationship and therefore once

13    the Chapter 11 was filed, their position was simply as being a

14    creditor of the debtor with respect to the underlying

15    transaction.  So I think that's a legal issue which sooner or

16    later unless there's a resolution, will be presented it to Your

17    Honor and my guess is that it's something that can be presented

18    by summary judgment as opposed to trial.

19          THE COURT:  So do I understand you correctly that

20    after document discovery has been concluded and after parties

21    have met and conferred to narrow the issues that it is likely,

22    or at least you think it is possible, that there'll be a

23    dispositive issue in which the bankruptcy court sitting in New

24    York is going to be asked to interpret English law on the

25    question of the rights of loan participants?  Is that right?

12

1          MR. LEVINE:  That is correct, Your Honor.

2          THE COURT:  It seems a very strange thing to ask me

3    to do but I understand that I've done strange things in this

4    case already.

5          MR. JURELLER:  Your Honor, it may go beyond just

6    English law.  We may not even reach that point.  It may be an

7    English contractual dispute, so if maybe the contract terms --

8    the terms of the contracts just happen to be different under

9    both American and the U.K.

10         THE COURT:  This is an LM ---

11         MR. JURELLER:  We may not even get into U.K. law on

12   that.

13         THE COURT:  -- this is an LMA government agreement?

14         MR. LEVINE:  Yes, Your Honor.

15         THE COURT:  Is there any precedent in any U.S. court

16   interpreting this?  Is there precedent in the U.K. courts

17   interpreting this?

18         MR. LEVINE:  Not to my knowledge, Your Honor.  All

19   I've seen is articles.  There are a number of articles out

20   there which, obviously, don't have any precedential value but

21   there are some writings on this issue than on the distinction

22   between the U.S. and the LMA contracts.  But I'm not aware

23   of --

24         THE COURT:  Would there be expert -- would there be

25   expert witnesses involved on either side in order to assist the

13

1   Court in understanding the nuances of U.K. law versus U.S. law

2   on this subject?

3          MR. LEVINE:  I think that's a very real possibility,

4   Your Honor.  I don't think we're there yet, but I think that's

5   a very real possibility.

6          THE COURT:  All right.  Well, it just occurs to me

7   thinking about this that that would be helpful for the Court.

8          MR. LEVINE:  Understood.

9          THE COURT:  And, obviously, if the experts all agree,

10  I assume you'll settle.

11         MR. LEVINE:  Fair enough, Your Honor.

12         THE COURT:  Okay.  Is there more for today?

13         MR. LEVINE:  Thank you very much.

14         MR. JURELLER:  I think that's it.

15         THE COURT:  All right.  Thank you.

16         MR. LEVINE:  Thank you, Your Honor.

17         THE COURT:  You'll submit a stipulation to so order?

18         MR. LEVINE:  We will.  We'll revise the one that --

19         THE COURT:  You'll revise it and submit it.  Thank

20  you.

21         MR. JURELLER:  Thank you, Your Honor.

22         THE COURT:  Next is Millennium International v.

23  Lehman Brothers Finance, S.A.

24      (Pause)

25         MR. WELSH:  Good morning, Your Honor.  Peter Welsh

14

1   from Ropes & Gray on behalf of Millennium International,

2   another plaintiff.

3           THE COURT:  It's good afternoon.

4           MR. WELSH:  Pardon?

5           THE COURT:  It's good afternoon.

6           MR. WELSH:  Good afternoon, sorry.

7           THE COURT:  That's okay.

8           MR. WELSH:  Your Honor, this is our first appearance

9   before the Court and if it would be helpful, I'd be happy to

10  give a brief overview of the allegations in the adversary

11  complaint and also provide a status on where the case currently

12  stands.

13          THE COURT:  That's fine.

14          MR. WELSH:  The case, Your Honor, involves a swap

15  contract between Millennium International and LBF.  Broadly

16  speaking, the terms of the swap contract involved Lehman

17  provide -- LBF providing 75 million dollars in financing and

18  Millennium International providing 37.5 million dollars in

19  financing.  All of which, the 112.5 million, was invested in

20  the Millennium International fund.  The purpose of the swap was

21  to provide Millennium on its 37.5 million dollar investment

22  with a three times levered return on an investment in the

23  Millennium International fund.  The leverage was provided by

24  LBF in the form of the seventy-five million dollars in

25  financing.  Lehman's return on the seventy-five million dollars

15

1   was in the form of an accreting strike price that represented

2   interest effectively on the seventy-five million dollar loan.

3          To hedge Lehman's exposure on the investment,

4   Millennium issued 112.5 million dollars worth of shares to

5   Lehman to hold in the Millennium International fund as a hedge

6   against their exposure on the leverage portion of the deal.

7          In, approximately, May of 2008, LBF contacted

8   Millennium and asked Millennium's consent to transfer the 112.5

9   million -- 112,500 shares of the Millennium fund over to KBC.

10  At that point, the parties discussed the terms of possibly

11  affecting that transfer.  They went back-and-forth a little

12  bit, never reached agreement on the transfer.  And,

13  importantly, Millennium had the right in its absolute

14  discretion to consent or not consent to the transfer of the

15  shares.

16         In September of 2008, Millennium contacted LBF to

17  inquire about unwinding the swap contract and returning to each

18  of the parties their respective interest in the swap.  At that

19  point, Millennium was informed by representatives of LBF that

20  the shares, the 112,500 shares in the Millennium fund had

21  already been transferred on Millennium's book -- on Lehman's

22  book, sorry, to KBC and that if Millennium were interested in

23  unwinding the trade, they would need to bring KBC into the

24  process.  At which point, KBC was brought into the process and

25  KBC took the position that unless Lehman would formally

16

1   transfer the shares to KBC at that point, they could do and

2   would do nothing to unwind the trade.  They also represented it

3   through Lehman and Lehman represented to Millennium that if

4   Millennium returned -- transferred the shares, rather, to KBC,

5   KBC would affect it, unwind, of the trade.

6         On September 11th, Millennium affected the transfer

7   of shares to KBC.  On September 12th, representatives at LBF

8   effectively went radio silent.  And on September 15th, of

9   course, Lehman Brothers Holdings filed for bankruptcy.

10         We've brought this adversary proceeding against both

11   LBF and against KBC in order to recover only the equity portion

12   of the swap; the original -- really, the current value of the

13   original 37,500,000 that was posted by Millennium as part of

14   the original transaction.

15         The seventy-five million dollars in financing that

16   was originally provided by LBF, Millennium is willing and has

17   always been willing to return to the -- whoever the claimant is

18   on those funds, provided Millennium gets some assurances that

19   it's not going to face claims by one or another of the parties,

20   for example, we're paying the funds to the wrong party and as

21   long as Millennium's claims and defenses in this action are

22   preserved.  And we have been working recently with KBC and LBF

23   on a stipulation to affect the return of the seventy-five

24   million dollars that is not contested in this matter.  And then

25   the focus of the matter is on the remaining equity portion, the

17

1  current value of the 37.5 million that was originally posted by

2  Millennium in the original swap.

3           On that issue, Your Honor, we have recently had

4  discussions among the parties as recently as a meeting last

5  evening and those discussions are proving productive and

6  progressing.  And we're moving as quickly as we can to provide

7  information to LBF and to KBC and discuss certain open issues

8  between the parties to try and reach a resolution as soon as

9  possible assuming it is possible.

10          THE COURT:  Based upon that presentation, are you

11  more in the zone of working toward a consensual business

12  solution to this dispute or are you expecting that there will

13  be a need to litigate the remaining issues involving the

14  thirty-seven and a half million dollars?

15          MR. WELSH:  I would say, Your Honor, it's unclear at

16  this point.  I think the recent discussions have been

17  encouraging.  I think there are factors unrelated to litigating

18  the facts of the case that may affect the possible -- a

19  possible resolution of the case.  And I think our discussions,

20  again, as recently as last evening with representatives of LBF

21  and KBC of the issues that would be the subject of litigation

22  on the case was promising, I think, from our perspective.  I'll

23  let them, certainly, speak for themselves.

24          THE COURT:  Let's -- I'll certainly hear from anybody

25  else who wants to speak to the issue.  This is a pre-trial and

18

1    to the extent that parties can avoid what may turn out in

2    retrospect to be unnecessary legal effort if something can be

3    resolved with the exercise of some creativity and hard work,

4    then maybe we should give creativity and hard work a chance

5    first, but let's find out what others think about that.

6            MR. WELSH:  Thank you, Your Honor.

7            THE COURT:  What's the -- what about LBF's position?

8            MS. DE ARCY:  Good afternoon, Your Honor.  LaShann

9    DeArcy.  I'm with Gibson, Dunn & Crutcher representing LBF.  I

10   believe that Mr. Welsh has properly summed up the facts of the

11   case.  Certainly, there are some discrepancies on some of the

12   issues.  We have been engaged with Millennium for quite some

13   time in discussions and are hopeful that we will be able to

14   come to a business resolution.  There are some outstanding

15   issues that we are working on in terms of an effectual matter

16   which will inform our analysis in terms of whether we can reach

17   a business resolution.  But I think that we are hopeful that we

18   can and it is our, I think, desire to avoid unnecessary

19   protracted litigation.

20           THE COURT:  Let me just ask a very mundane question

21   about jurisdiction and decision-making authority.  LBF is in

22   liquidation --

23           MS. DE ARCY:  In Switzerland.

24           THE COURT:  -- in Switzerland.

25           MS. DE ARCY:  Yes.

19

1          THE COURT:  There is a parallel Chapter 15 case here.

2    The litigation resides within the Chapter 15?  Where's the

3    litigation?

4          MS. DE ARCY:  Yes, we have authority -- if you're

5    asking if we have authority to enter into a settlement here and

6    notwithstanding the proceedings that are ongoing in

7    Switzerland, and the answer to that question is yes.

8          THE COURT:  So who makes the decision to settle --

9    who's the business person who does that, and what, if any,

10   authority is needed from the Court in Switzerland or the

11   administrative office that supervises the case?  If the answer

12   is there's none needed, that's a good answer if that's the

13   right answer.

14         MS. DE ARCY:  Well, PwC, Your Honor, is the

15   liquidator/trustee in Switzerland and it is through PwC that we

16   need to get our business decisions approved.  So it is -- we

17   are not without constraints from PwC, however, we have

18   discussed this issue with PwC; we've been given the authority

19   to move forward with business discussions to resolve this

20   issue, if possible.

21         THE COURT:  Okay.  Fine.  I suppose I should also

22   hear from, is it KPC?

23         MS. CHEPIGA:  Yes, Your Honor.  Pamela Chepiga, Allen

24   & Overy for KBC.  Your Honor, in May of 2008, KBC and Lehman

25   entered into a transaction in which KBC purchased from Lehman

20

1    over a billion dollar basket of hedge fund securities.  We

2    received full title to all of those securities with no cloud on

3    any of that title.  Included in that hedge fund basket, was the

4    Millennium shares at issue here, the 112.5 million as to which

5    we now have ownership of.

6         We put in redemption notices last December for that

7    amount.  And Millennium has refused to pay for that claiming

8    that there was a dispute between Lehman and Millennium on

9    whether or not those shares were properly transferred to us.

10    But we received them as a full faith purchaser for value.  And

11    we are most interested in not being a party to this litigation

12    and getting our payment back.

13         In -- we have been attempting --

14         THE COURT:  When you say, "in getting your payment

15    back", let me --

16         MS. CHEPIGA:  A payment for the shares that we hold

17    in which we had put a redemption notice in for last December.

18         THE COURT:  Okay.  Well, let's step back at least one

19    full pace so I understand something.  Your client acquired a

20    basket, to use your term, of securities.  I presume a

21    miscellaneous basket of securities --

22         MS. CHEPIGA:  Yes, Your Honor.

23         THE COURT:  -- from LBF.

24         MS. CHEPIGA:  Yes.

25         THE COURT:  Was LBF the only party with whom you

21

1    dealt that was a Lehman related entity?

2           MS. CHEPIGA:  Yes.

3           THE COURT:  So that it was -- that was the only

4    counterparty to your transaction?

5           MS. CHEPIGA:  Yes.

6           THE COURT:  And the transaction included, I assume,

7    reps and warranties?

8           MS. CHEPIGA:  Yes.

9           THE COURT:  And I presume that all of the conditions

10   to closing were satisfied and you simply bought whatever it was

11   that Lehman sold in accordance with the terms of that

12   administer agreement or a sale agreement, whatever it was.

13          MS. CHEPIGA:  Yes.

14          THE COURT:  And was there a provision for any

15   modification in the purchase price or any right of recourse as

16   to the seller, LBF, in the event that there turned out to be

17   some condition to the transaction that wasn't satisfied?

18          MS. CHEPIGA:  I'd have to check, Your Honor.  But I

19   think all conditions were satisfied because we did get title on

20   it.  And Millennium agreed to transfer title to KBC.

21          THE COURT:  So from your perspective, and I don't

22   know if this is a disputed issue of fact on the case or not,

23   you take the position that you have succeeded to all of LBF's

24   rights as owner of this basket of collateral, or securities,

25   and that you stand in LBF's shoes relative to Millennium at

22

1    this point.  Is that correct?

2           MS. CHEPIGA:  We believe -- yes, Your Honor, that's

3    correct.

4           THE COURT:  Okay.  So why shouldn't LBF be released

5    from the case?

6           MS. CHEPIGA:  KBC.

7           THE COURT:  No, LBF.  If LBF -- if you now have

8    everything that LBF once had, why is LBF a defendant?  Is there

9    a dispute as to your title and ownership?

10          MS. CHEPIGA:  Millennium disputes our title.  I

11   believe --

12          MR. WELSH:  Your Honor, we have not seen the

13   transaction documents.  That's between KBC and LBF.  We have no

14   idea what they say.

15          THE COURT:  Well, that makes two of us.  Because I

16   have no idea what they say either.  I'm learning about this for

17   the first time right now.  Okay.

18          Do you agree that this is a litigation which can be

19   most efficiently managed by going to settlement negotiations

20   before going into active litigation?

21          MS. CHEPIGA:  Yes, Your Honor.  And in particular,

22   the amount in dispute is 37.5 million at maximum and

23   Millennium's holding 112.5 million and we are most interested

24   and have been most interested in getting at least the

25   uncontested portion paid extremely promptly.  And then we will

23

1    exercise in the spirit of creativity discussions as to the

2    other 37.5 million.  But we do want to proceed with this case

3    and make a motion, if necessary, to force the payment at least

4    of the uncontested portion to us and of the contested portion,

5    perhaps, into Court.  Because we do not think it's right for

6    anyone to be bearing the credit risk of a hedge fund while we

7    have discussions.  And we believe there's no reason for

8    Millennium to continue to hold the money that it is continuing

9    to hold.

10        THE COURT:  Well, I'm not -- are you saying that's

11   your position and that you may be filing some pleadings at some

12   point?  The question I was really addressing was before

13   pleadings were filed whether or not you could profitably

14   continue the discussions that I understand took place last

15   evening?

16        MS. CHEPIGA:  Yes.

17        THE COURT:  And that might be continuing into the

18   future.  So you're prepared to do that, correct?

19        MS. CHEPIGA:  We are.

20        THE COURT:  What would you like to accomplish today

21   other than adjourning this to another date at which point we

22   can see if you've made enough progress to get it settled?

23        MR. WELSH:  I think that would be sufficient for our

24   purposes, Your Honor.

25        THE COURT:  Here's my suggestion.  I looked at the

24

1   calendar and it's August and I recognize that some people go on

2   vacation; I have no idea if people in this case are going on

3   vacation but I think we should give you thirty days to try to

4   get this done.  I don't see any reason to make it longer than

5   that.  It seems, as described, to be a relatively

6   straightforward dispute.  It may include twists and turns that

7   haven't yet been revealed to me.

8           To the extent that there is information which you can

9   share with each other, voluntarily without formal discovery

10  that would facilitate a business understanding, I encourage you

11  to do that and to do that promptly.  And without entering an

12  order on the subject, would suggest that you identify those key

13  documents that would be useful for everybody to share in common

14  to be able to understand what went on and what the rights of

15  the parties might be including areas that might be in dispute.

16          I don't presume to know if this is a large or a small

17  universe of documents, but I'm assuming that it's at least an

18  identified group of documents.  Once that's done, presumably,

19  you can have a meeting confer session with or without a

20  mediator in an effort to bring it to conclusion.  I suggest

21  that you start without a mediator because a mediator will

22  simply slow it down and if you can't reach an agreement, well,

23  maybe then you can consider a mediator.  And I would propose

24  that this put on the -- an adversary docket sometime in the

25  middle of September and I'm not sure what date that is, but you

25

1    can check with either my courtroom deputy or counsel for LBHI

2    who doesn't seem to be involved in this case at all.

3            So those are my suggestions.  Does that seem to work

4    for everybody?

5            MR. WELSH:  It works for us, Your Honor.

6            MS. DE ARCY:  Your Honor, if I may.  It works for us.

7    I just would like to note that we are working diligently and

8    have been to obtain information that we can share with the

9    parties in this case.  We are constrained somewhat by the fact

10   that our client is in Switzerland and some of the documents

11   actually do not rest with PwC with whom we have to operate

12   through.  We will do everything that we can to work on that

13   timetable and will do all that we can to expedite things with

14   our client.  But I wanted to make sure that I mentioned that we

15   have some constraints that may not be present for the other

16   parties involved.

17           THE COURT:  Okay.  Well, I assume that KBC -- I

18   shouldn't assume this, I'll ask, does KBC Financial Products

19   have within its control documents that are relevant to the

20   transaction that could be useful to share with others in order

21   to facilitate a settlement conversation?

22           MS. CHEPIGA:  Yes, Your Honor.  But I actually think

23   the real dispute here is actually not with KBC but between

24   Lehman and Millennium.  We're happy to provide what documents

25   we have, but I'm not sure that those are the critical

26

1    documents.

2         THE COURT:  I don't know that.  I mean you may be

3    absolutely right.  I just know that it's a dispute that

4    involves three parties who are all saying they either want the

5    deal unwound or they want their money or they want to be

6    released or something.  That's what people are usually saying

7    in litigation, so.  I don't have enough before me to know who

8    is right.  That doesn't mean that what you said wasn't correct.

9    I just don't know.

10        MR. WELSH:  I can just speak briefly to that, Your

11   Honor.  The discussions that have been had recently have

12   focused on exchanging information with LBF.  And it's my

13   expectation that if we are able to work out an agreement

14   between Millennium and LBF that KBC would be agnostic, I think,

15   with respect to the case at that point.

16        THE COURT:  Fine.  If that's the situation, I think

17   it makes sense to minimize unnecessary incremental litigation

18   costs pending the termination by the parties of their ability

19   to reach an understanding; either you will or you won't.  And I

20   don't think it should take a lot of time to get to that point.

21   If it proves that it's taking more time to get to that point

22   because of the difficulty in obtaining necessary documents in a

23   timely way, I would suggest that rather than having to come

24   down here, that you adjourn the pretrial perhaps for another

25   twenty or thirty day period.  I don't think this should go out

27

1   for any cause more than, say, a total of sixty days while

2   you're trying to work it out.  In which case, we'll have a

3   pretrial that involves more the setting of schedules for motion

4   practice or discovery or other things that may be required in

5   order to move the case along.

6          MR. WELSH:  Understood, Your Honor.

7          If I could just add one qualification to what I said

8   earlier about the focus of the discussions being as between

9   Millennium and LBF, we would very much like to see the

10  transaction documents for the transaction between LBF and KBC.

11  We would expect we'd be able to receive copies of those

12  transaction documents from LBF.  But to the extent we can't, I

13  think we would like to get copies from KBC to the extent

14  they're available.

15         THE COURT:  I was encouraging that very kind of

16  disclosure but there's nothing formal going on here.  This is

17  just a conversation that we're having about how to move the

18  thing along and hopefully Price will cooperate in the spirit of

19  trying to reach a consensual resolution.

20         MR. WELSH:  Understood, thank you, Your Honor.

21         THE COURT:  Okay.  Is there more for this?

22         MR. WELSH:  One.  Just one collateral issue focused

23  solely on Millennium.  Your Honor, we have not filed our

24  corporate ownership statement for millennium.  We're certainly

25  prepared and want to do that, but the issue that has come up in

28

1   the course of preparing it is that reading Rule 7007.1 of

2   reference to classes of securities, because the Millennium

3   International Limited is a fund, there are numerous, numerous

4   classes of investor securities.  And if you look at -- if you

5   look at the ownership on a class-by-class basis, you trip the

6   ten percent threshold a lot over the course of the pool of

7   owners.  And we're prepared to disclose all of those parties.

8   However, because of confidentiality concerns as between

9   Millennium and its investors, we would request, Your Honor,

10   respectfully, that we'd be able to file it under seal or file

11   it in a way that it's not publicly disclosed if Your Honor is

12   agreeable.

13          THE COURT:  If you want to file a motion for sealing,

14   I'll certainly consider it.  It seems to me that this is one of

15   those things that may make it that much more desirable for you

16   to reach a settlement so you don't have to deal with all this

17   and I would suggest that that be deferred until after you reach

18   your settlement, and hopefully you will.  And if you can't

19   reach a settlement, I'm not so sure I'm going to seal it.

20          MR. WELSH:  Understood.

21          THE COURT:  I'm going to make your life as difficult

22   as possible if you can't settle.

23          MR. WELSH:  That's understood.

24          THE COURT:  Fine.  Okay.

25          MR. WELSH:  Thank you, Your Honor.

29

1            THE COURT:  Fine.  Then we all understand each other.

2   We're adjourned until next time.

3            MR. WELSH:  Thank you.

4            THE COURT:  Thanks.

5        (Proceedings concluded at 2:38 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30

1

2                          C E R T I F I C A T I O N

3

4        I, Ellen S. Kolman, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        Ellen S. Kolman

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  August 6, 2009

16

17

18

19

20

21

22

23

24

25