450 7th Ave | 6th Floor | New York, NY 10123 | Tel 212.643.8800 | Fax 212.643.0005 | www.mside.com

**Morningside** | Translations

County of New York
State of New York

August 21, 2009

To whom it may concern:

This is to certify that the attached translation from Japanese into English is an accurate representation of the documents received by this office. These documents are designated as:

**Title of Document in English**:

*Opinion Brief on the Rehabilitation Plan Proposal*

Marcus Plieninger, Project Manager in this company, certifies that Takashi Maeshiro, who translated these documents, is fluent in Japanese and standard North American English and qualified to translate. He attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

*Marcus Plieninger*
Signature of Marcus Plieninger

Sworn to before me this
August 21, 2009

Notary Public

TSOMYK SNIZHANA
Notary Public State of New York
No. 01TS6202101
Qualified In Kings County
Commission Expires 03/09/20 /3

Innovative Language Solutions Worldwide

2008 (Reh.) No. 208 Filing for commencement of rehabilitation proceedings

Rehabilitation debtor: Sunrise Finance Co., Ltd.

Seal of Civil 20
Council of
Tokyo District
Court by two
judges
July 17, '09

July 17, 2009

Mr. Makoto Tahira, Esq.,

Supervisor,

Civil Division 20 Council

Tokyo District Court

## Opinion Brief on the Rehabilitation Plan Proposal

Rehabilitation Creditor: Patrick Cowley,

Appointed Trustee,

Lehman Brothers Asia Holdings Limited

Attorney and Counselor: Jun'ichi Tobimatsu [Seal]

Attorney and Counselor: Kana Manabe [Seal]

Attorney and Counselor: Kazuhisa Hirose [Seal]

Rehabilitation Creditor: Lehman Brothers Holdings, Inc.

Attorney and Counselor: Shigeaki Momoo [Seal]

Attorney and Counselor: Jun'ya Naito [Seal]

# Table of Contents

SECTION 1: Opinions of LBAH and LBHI ................................................................................. 6

SECTION 2: Allegations of Shinsei Bank and the Structure of This Opinion Brief ...................... 6

  1. Allegations of Shinsei Bank and Their Errors ...................................................................... 7

  2. The Structure of This Opinion Brief ..................................................................................... 8

SECTION 3: Shinsei Bank's Allegations Are Essentially Legislative in Nature, Not Comprising Interpretation of the Current Law ................................................................................................. 9

  1. On the Allegations of Subordinations Based on the Fair and Equitable Principle ................ 10

  2. On the Allegation Regarding the Undercapitalization Taxation System ................................ 12

SECTION 4: Subordination of Some Rehabilitation Credits in a Rehabilitation Plan Can Only Be Allowed in Cases Where Clear Contravention of the Fair and Equitable Principle Is Found ....... 13

  1. On the principle of the liquidation value guarantee ............................................................ 14

  2. If there is an exception to the principle of the liquidation value guarantee, it is to be sought in the principle of loyalty, and is approved only in extremely limited cases ..................................... 14

  3. Recent court cases in which subordination has been affirmed are judgments concerning instances in which clear violations of the principle of loyalty are recognized ............................. 15

  4. The Rehabilitation Plan is unlawful, since it ignores the principle of the liquidation value guarantee ..................................................................................................................................... 16

SECTION 5.  In this case, circumstances in which LBHI and LBAH should be subordinated are completely nonexistent ................................................................................................................ 17

  1.  Outline of the sequence of events concerning the rehabilitation debtor .............................. 17

    (1) Concerning the Lehman Brothers Group .......................................................................... 18

    (2)  Concerning the rehabilitation debtor ................................................................................ 18

    (3) The function of aggregating loans in the Group exercised by the rehabilitation debtor and changes in that function ............................................................................................................. 19

(a). The process by which the rehabilitation debtor aggregated the group's internal financing within the Lehman Brother's Group ................................................................................. 19

(b). The process by which the rehabilitation debtor came to receive loans from external financial institutions ........................................................................................................ 20

(c). The transfer of the control of intra-Group financing to LBHJ ......................................... 21

(4)    Financing by Shinsei Bank ........................................................................................... 23

(a)    Circumstances leading up to financing ........................................................................ 23

(b)    Outline of the Shinsei loan agreement in question, and financing under that agreement
       24

    (1)    The Uncommitted Revolving Credit Facility Agreement of December 25, 2003 and
    the ¥10 billion financing based on that agreement. ...................................................... 24

    (2)    First Revised Agreement dated January 16, 2005 and the additional financing of ¥7.5
    billion based on that agreement .................................................................................. 25

    (3)    Sounding out Shinsei Bank on transfer of loan to LBHJ ................................................ 26

    (4)    Events since July 2007 .............................................................................................. 26

(c)    The financing was conducted based on LBHI's credit ........................................................ 27

(d) Information disclosure by reorganization debtor .................................................................... 28

    (1) Information disclosure prior to original financing ................................................................ 28

    (2) Information disclosure after financing had been initially performed .............................. 30

(5) Allegation for beginning civil rehabilitation proceedings by the reorganized debtors ... 31

2. Opposition to the claims by Shinsei Bank ................................................................................. 32

(1) The claim of Shinsei Bank that the cause of the bankruptcy of the rehabilitated debtor lies
in "the aspect of the rehabilitated debtor being the financing subsidiary in the group" is
entirely wrong. ........................................................................................................................ 33

(2) There is no fact that LBHI "improperly controlled the management" of the rehabilitated
debtor. .................................................................................................................................... 34

3

(a). There is nothing wrong in the fact that LBHI as the ultimate holding company was influencing the management of the rehabilitated debtor. ................................................. 35

(b). We cannot recognize any wrongfulness in the fact that the rehabilitated debtor received financing from LBHI and LBAH. ................................................................................. 35

(c). No injustice is observed in the fact that the rehabilitation debtors provided financing within the group to Lehman Brothers group's affiliated companies. .......................................... 37

(d). Shinsei Bank uses Sophistry by Insisting that the Rehabilitation Debtor's raison d'etre was to Handle Bad Loan Business ........................................................................................ 39

3. There are no such Facts as 'Illegal Exploitation' by LBHI to the Rehabilitation Debtor ..... 40

(1) The claim that the loan from external creditors has been appropriated to bad debt business is against the fact and then cannot be a ground for subjecting to any subordination. ...................... 40

(2) The decrease of short-term loan from LBAH started from July, 2007 has not been caused by the repayment to LBAH. ...................................................................................................... 42

(3) The claim of Shinsei Bank that the resource of profit of the rehabilitation debtor is solely from bad debt business is not correct in an objective sense. ................................................. 43

(4) The profit distribution pursuant to Undisclosed Association Agreement has been disclosed to banking institutions. Therefore, there is no point of issue. ............................................. 45

(5) Banking institutes have acknowledged the profit distribution through dividends and the sharing of personnel expenses/business consignment expenses, which cannot substantially be an issue. .................................................................................................................................. 46

(6) No Such Facts Exists that the Rehabilitation Debtor has been 'Forced to Undertake Losses' ................................................................................................................................................ 47

(a). Advanced Payment of Group's Expenses through LBFJ ....................................... 48

(b). Assertion of Existence that the Loss was Incurred for Protecting Profit by LBCM ....... 49

(1) Transfer of Debts ............................................................................................................. 50

(2) Securing Losses ............................................................................................................... 51

(3) Acquisition of Bad Marketable Securities ...................................................................... 52

4

(c). Execution of Uncollectable Business Loans............................................................... 52

(7) Summary........................................................................................................................ 53

4 The fact that the capital amount of the rehabilitation debtor is small compared to total liabilities shall not provide any grounds for subordination of rehabilitation claims. ................. 53

　(1) Shinsei Bank's assertion that the rehabilitation debtor abused the limited liability system ignores principles of the Companies Act.............................................................................. 54

(2) Shinsei's assertion that a part of borrowings should be considered as capital due to the adoption of thin capitalization rules is obviously misleading. ....................................................... 55

(3) Shinsei's assertion that the rehabilitation debtor voluntarily selected to adopt thin capitalization rules is materially and arbitrary leading. .................................................................. 56

(4) Shinsei's assertion that voluntary adjustment of the rehabilitation debtor based on thin capitalization rules caused in excessive tax obligation is clearly wrong. ................................. 57

(5) Sub-summary ................................................................................................................. 58

5 Outside creditors including Shinsei Bank sufficiently recognized conditions of the rehabilitation debtor and extended their loans to the said debtor based on creditworthiness of LBHI as a result of highly sophisticated credit analysis. From this viewpoint, there is no room for approval of subordination under just and equitable principles. ................................................... 58

6. An allegation to subordinate all claims of "15 rehabilitation creditors of the LB Group" is unreasonable. ...................................................................................................................... 60

(1) It is groundless to demand the subordination of LBHI's claims on the ground that LBHI provided a debt guarantee.......................................................................................................... 60

(2) It is not possible to justify subordination on the ground that "15 rehabilitation creditors of the LB Group" except LBHI are under the control of LBHI............................................................. 61

7. LBAH and LBHI have commenced legal insolvency proceedings, leading to the denial of subordination of rehabilitation claims based on fair and equitable principles............................... 61

SECTION 6. It is impossible to deny voting rights at creditors' meetings in respect of definite rehabilitation claims ............................................................................................................... 63

SECTION 7. Summary.......................................................................................................... 65

Rehabilitation creditor and appointed trustee Lehman Brothers Asia Holdings Limited (hereinafter referred to as "LBAH" regardless of pre- or post-liquidation proceedings) and rehabilitation creditor and appointed trustee Lehman Brothers Holdings, Inc. (hereinafter referred to as "LBHI") hereby brief our following opinions on the Rehabilitation Plan Proposal dated May 15, 2009, submitted by Shinsei Bank, Limited (hereinafter referred to as "Shinsei Bank"), the Application for Modification Permit for the Rehabilitation Plan Proposal dated June 26, 2009 (the rehabilitation plan proposal modified and submitted by Shinsei Bank shall hereinafter be referred to as the "Shinsei Plan Proposal"), and Shinsei's opinion brief dated June 26, 2009 (hereinafter referred to as the "Shinsei Opinion Brief").

## SECTION 1: Opinions of LBAH and LBHI

1. The allegation in the Shinsei Opinion Brief that the rehabilitation credit owned by "the 15 LB group rehabilitation creditors"[1] should be treated as subordinate to other rehabilitation credits is based on incorrect interpretation of law and incorrect acknowledgment and assessment of facts, thereby lacking rational reasoning.

2. The allegation in the Shinsei Opinion Brief that the right of vote at the creditors' meetings should not be allowed lacks legal grounds, and is not permissible.

3. The Shinsei Plan Proposal "contravenes provisions of" (Article 174, Item 2 (i) of the Civil Rehabilitation Act) an Act in that it contravenes the provision that such a plan "shall be equal between rehabilitation creditors" (Article 155, Item 1 of the same Act), as well as contravening the provision that such a plan is contrary to the common interests (the liquidation value indemnification principle) of the rehabilitation creditors (Article 174, Item 2 (iv) of the same Act). Thus, Your Honor's Court may not judge on whether the Shinsei Plan Proposal should be voted at the creditors' meetings (Article 169, Item 1 (iii) of the same Act).

4. Your Honor's Court should swiftly judge that the reorganization plan proposal submitted by the reorganization debtor be voted at a creditors' meeting.

## SECTION 2: Allegations of Shinsei Bank and the Structure of This Opinion Brief

---

[1] The Shinsei Opinion Brief defines these companies, aside from LBAH and LBHI, to include Lehman Brothers Securities, Bluto Real Estate, LLC, Gardenia, LLC, Turbine International, LLC, Marlin International, LLC, Pike International, LLC, Geneer, LLC, Piranha International, LLC, Hisen Building, LLC, Duck Horn, LLC, Yellowtail International, LLC, Japan Investment Partnership, Inc., and Lehman Brothers Real Estate Corporation.

## 1. Allegations of Shinsei Bank and Their Errors

Shinsei Bank alleges that LBHI, LBAH, and the Lehman Brothers Group:

(1)  Controlled the entire management of the rehabilitation debtor "inappropriately,"

(2)  Forced the rehabilitation debtor into the "undercapitalized" situation,

(3)  "Passed" the bankruptcy risk and damage of the borrower on to "external creditors" by going through the rehabilitation debtor when LBAH et al provided loans to Lehman Brothers Group member companies,

(4)  Transferred the profits obtained through business using the bad loans of the rehabilitation debtor to other Lehman Brothers Group member companies, at the same time "coercing" the rehabilitation debtor into receiving the damage of these member companies and "exploiting it unfairly,"

and, as the result of these actions, LBHI's bankruptcy led to the bankruptcy of the rehabilitation debtor, "unfairly" prejudicing the assets for which the rehabilitation debtor was held responsible for external creditors (Item 6 and 7, etc. of the Shinsei Opinion Brief). Shinsei Bank also alleges that the external creditors were not given a chance ton acknowledge the above facts (1) through (4), and that thus they were not expected to be able to express objections on the notified credit of "the 15 LB group rehabilitation creditors." Then, declaring, on the basis of these allegations, that a rehabilitation plan proposal submitted by the rehabilitation debtor that proposes paying dividends corresponding to definite rehabilitation claim amounts would bring on "a substantial imbalance," Shinsei Bank submitted to the Court the Shinsei Plan Proposal, which proposes that this credit be treated as subordinate to other rehabilitation credits. Shinsei Bank says that the legal grounds for the justification of such subordination are "the proviso of Article 155, Item 1 of the Civil Rehabilitation Act, and the fair and equitable principle."

In addition, the Shinsei Opinion Brief also maintains that at the creditors' meeting where the Shinsei Plan Proposal is voted on, the right to vote of "the 15 LB group rehabilitation creditors" should not be allowed. However, their legal grounds are not expressly indicated. Nonetheless, according to Item 10 of the opinion brief submitted to the Court on the same date as the Shinsei Opinion Brief by Professor Jun'ichi Matsushita (hereinafter referred to as the "Matsushita Opinion Brief"), the grounds for denying the right to vote may be sought in "the concept that the liquidation amounts obtained by the rehabilitation plan… and the degree of the right to speak should be proportional," presupposing that the rehabilitation credit owned by "the 15 LB group rehabilitation creditors" will be subordinated."

However, first of all, allegations of Shinsei Bank go beyond the boundaries of the interpretation of the current law to the extent that they are practically requesting the Court for a legislative process. Even if their allegations were acceptable as an interpretation of the current law, they would be infinitely expanding the application range of the fair and equitable principle, using such unclear concepts as "the idea of balance and fairness." This would

still be inappropriate as an interpretation of the law per se. Additionally, the acknowledgment and assessment of the facts on the part of Shinsei Bank described earlier are clearly out of touch with the actual situations, and they are entirely wrong. Therefore, the rational or necessity for subordinating the rehabilitation credit of "the 15 LB group rehabilitation creditors" can neither be found in Shinsei Bank's allegations, nor do any grounds exist for denying the right to vote to these rehabilitation creditors.

Shinsei Bank, in an attempt to avoid as much as possible self-incurred loss brought on by the bankruptcy of the Lehman Brothers Group, to whom it made its own credit decision to provide loans, is creating stories, under wrong interpretation of the law, that warp and dramatize the acknowledgment and assessment of the facts about the Lehman Brothers Group, thereby infringing upon the legally valid rights of "the 15 LB group rehabilitation creditors." LBAH and LBHI, the largest rehabilitation creditors, find it extremely deplorable that the civic rehabilitation proceedings of the rehabilitation creditors are being delayed in vain by these actions of Shinsei Bank.

2. The Structure of This Opinion Brief

This opinion will first discuss that Shinsei Bank's allegations are essentially legislative in nature, and they do not comprise interpretation of the current law. After that, it will brief, as a presupposition for the discussion, that subordination of the rehabilitation credit to other credits in the civic rehabilitation proceedings of this case would only make sense under such a extremely limited condition as where a clear condition of contravention of the fair and equitable principle is found.

Further, this brief will advocate that the acknowledgment and assessment of facts in the above-mentioned (1) through (4), which form the presuppositions for Shinsei Bank's allegations, are a complete misfeasance. It will then explain that, in relation to this case, LBHI and "the 15 LB group rehabilitation creditors" have never engaged in actions that infringe upon the "idea of fairness and balance as per the Civic Rehabilitation Act" or the fair and equitable principle.

This brief will in addition discuss the fact that Shinsei Bank and other financial creditors secured LBHI's debt guarantee when providing loans to rehabilitation creditors, and that they continued with the loans with sufficient understanding of the business contents and management situations of the rehabilitation creditors. This point indicates that there is not rationality or necessity in especially protecting these rehabilitation creditors by subordinating the credit of LBAH and its group companies.

8

As the conclusion, this brief will demonstrate that the Shinsei Plan Proposal, which advocates not paying any dividends to "the 15 LB group rehabilitation creditors," "contravenes provisions of" Article 155, Item 1, and Article 174, Item 2 (i) of the Civil Rehabilitation Act, as well as being contrary to the common interests (the liquidation value indemnification principle) of the rehabilitation creditors (Article 174, Item 2 (iv) of the same Act). As a natural consequence of this argument, denial of the right to vote to "the 15 LB group rehabilitation creditors" at the creditors meetings is illegal.

SECTION 3: Shinsei Bank's Allegations Are Essentially Legislative in Nature, Not Comprising Interpretation of the Current Law

Shinsei Bank alleges that the subordination doctrine based on "the proviso of Article 155, Item 1 of the Civil Rehabilitation Act, and the fair and equitable principle" is categorized as unfair management control, unfair exploitation, and undercapitalization according to theory" (Item 10). As we will discuss later in SECTION 4, however, the proviso of Article 155, Item 1 of the Civil Rehabilitation Act does not allow subordination that violates the liquidation value indemnification principle. As regards to the case in question, therefore, this Article cannot be grounds for subordination. As for subordination based on the fair and equitable principle, some in the academic circles do advocate, in such cases as the above, that the credit of a parent company to one of its child companies should be subordinated in some way, while others argue for a protection system for creditors of child companies. Although legislation has been attempted in the past during the process of modification of the bankruptcy law and during the process of modification of the commercial and corporate laws, it is widely known that either of these efforts proved fruitless. In the background of this situation lies, in addition to issues relating to legislative technicality, the fact that it is difficult to set conditions due to the relationship with other positive laws, as well as political oppositions from the industry and financial fields (in case of the combined corporation system[2]). Thus, this issue has not yet obtained any consensus from the parties possessing huge interest such as the industry and financial fields. Allegations of Shinsei Bank are equal to requesting the Court to engage in legislative actions that failed in the past.

---

[2] See Supplementary Volume of *Commercial Law*, No. 211 *Analysis of Opinions from Various Fields on the Parent-Child System* (Attachment 1), p. 245.

1. On the Allegations of Subordinations Based on the Fair and Equitable Principle

Shinsei Bank alleges that subordination based on "the fair and equitable principle" if there exist such objective circumstances as "unfair management control," "unfair exploitation," or "undercapitalization." It further alleges that the subordination theory states that the relationship between the "controlling company" and "the external subordinate creditor" should be regarded as equal to the relationship between the "stockholder" and the "creditor," and that, therefore, the kinds of risk analyses the "creditor" performed and the things it has learned, or could have learned, have nothing to do with the subordination doctrine (Item 43 and 44, Shinsei Opinion Brief).

However, if, hypothetically, "unfair management control," "unfair exploitation," or "undercapitalization" was allowed and the Court subordinated the credit of the controlling company, the criteria for such subordination would have to apply to all bankruptcy proceedings, and function as a rule for the trustees in the bankruptcy proceedings. It is impossible to do this using abstract concepts advocated by Shinsei Bank, such as "unfair management control," "unfair exploitation," or "undercapitalization." It is evident that these concepts would fail, seeing that modification of the bankruptcy law and combined corporation system were both given up in the legislative process. Shinsei Bank's allegations are requesting the Court to do these impossible things. These allegations leave many problems to be solved. For example, what is "under" in "undercapitalization"? Does "capitalization" refer to "capital" or "share capital"? What does "unfair" mean in "unfair management control" and "unfair exploitation"? What is "exploitation" in "unfair exploitation"? Can "unfair exploitation" exist in the dividends within the retained profit dividend frame allowed by the corporate law? What is "subordination"? How much subordination is appropriate? Can it be said that the Court should solve all these problems on its own without going through legislative proceedings?

Thus, Shinsei Bank's allegations discuss a legislative politics on whether or not the credit of the controlling creditor should be subordinated in such a circumstance as "unfair management control," "unfair exploitation," or "undercapitalization," in the disguise of an interpretation of the current law. These allegations are confusing the legislative politics and law interpretation.

The fair and equitable principle, to begin with, dictates that one act with good faith without falling short of expectations that the other party would reasonably have under the specific given circumstances (*New Annotated Civil Law*, (1) p. 74). In relation to this case, this is a rule that protects reasonable mutual expectations between LBHI, LBAH, and other creditors and rehabilitation creditors, and financial institutions such as Shinsei Bank. It is a "disciplinary" rule between two parties whose interests conflict. For this reason, a rule based on the fair and equitable principle should differ depending on whether the recipient of the profit is a general investor, or a group affiliate company, a financial institution, or another organization that knows, or could know, the internal

10

situations of the rehabilitation debtor. Shinsei Bank's allegation that, in an extreme case, the same rule based on the fair and equitable principle applies to an organization that risks to provide loans while being aware of everything that the rehabilitation debtor is doing, and to an organization that transacts on credit without knowing any facts, ignores the essence of this principle, and cannot comprise an interpretation of the current law.

The fair and equitable principle functions in a relationship between specific parties. There may be cases where one of the parties is not aware of a certain fact about the other party, and this party has expected the other party not to take a certain behavior. When the other party does take this behavior, the other party ends up betraying the trust of the original party. However, if one of the parties are, or could be, aware that the other party takes a certain behavior, or the relationship is not based on mutual trust (the relationship is based on the trust for the parent of the other company, for example), it follows that the other party has not betrayed the trust of the original party. Whether or not one of the parties is, or could be, aware of the other party's behavior is an important point in a rule based on the fair and equitable principle. Banks in Japan are under strict monitoring by the Financial Services Agency based on the "General Monitoring Policy for Main Banks" (hereinafter referred to as the "Monitoring Policy"). Financial and management statuses of the borrowers as well as daily monitoring are required especially for "credit risk management" (Monitoring Policy III-2-3-2). For this reason, debtors are required to provide their correct financial information, and this case is no exception. Therefore, a financial institution that is, or could be, aware of the financial and management statuses of the rehabilitation creditor, in a relationship with a rehabilitation creditor, or a creditor in parent or a group company (say, LBHI and LBAH, for example), should not be allowed to allege at all that the financial and management statuses of the rehabilitation creditor such as those described by Shinsei Bank "contravene the fair and equitable principle." If it were allowed to do so, the principle of self responsibility would be denied, banks' requests for credit risk management would be erased, moral hazard would be brought on to banks, resulting in huge damage for the economy of the entire nation.

While the fair and equitable principle functions in a relationship between specific parties, bankruptcy proceedings require conformed and collective treatment. In order for subordination based on the fair and equitable principle to be allowed, the contravention of the fair and equitable principle by a creditor who owns credit to be subordinated would need to be allowed in relationships with debtors or all other (or at least a majority of) creditors[3]. In that sense, contravention of the fair and equitable principle required under subordination circumstances would have to be a "evident," so to speak, contravention of the fair and equitable principle[4].

---

[3] Even if, in a relationship with an individual debtor, there is a certain behavior violating the fair and equitable principle, it is an issue to be solved through a separate loss and damage claim, and not something that should be solved through general subordination in bankruptcy proceedings.

[4] On this point, Professor Yamamoto says, "In case of a business person who engages in bankruptcy proceedings, this would be when contravention of the fair and equitable principle was evident with almost no objection."

11

Furthermore, except for "the 15 LB group rehabilitation creditors," almost all of the rehabilitation creditors are financial institutions, including Shinsei Bank. Since situations would almost never be found where contravention of the fair and equitable principle occur in relationships with these financial institutions, it is utterly difficult to acknowledge rationality in the credits of "the 15 LB group rehabilitation creditors" being subordinated in a conformed manner in a rehabilitation plan.

2. On the Allegation Regarding the Undercapitalization Taxation System

Shinsei Bank discusses the "undercapitalization taxation system" as it relates to international taxation. As described in SECTION 5 4(2) later on, the undercapitalization taxation system does not at all provide that the "loaned money" to be regarded as "capital." It is no more than a regulation regarding the allowed amounts for expenses. However, even if Shinsei Bank's allegations were made the presuppositions for understanding the undercapitalization taxation system, this system evidently shows, after all, that "law" is needed to treat "loaned money" as if it were "capital."

That is to say that the undercapitalization system was established based on the Act on Special Measures Concerning Taxation, and not enforced based on notices, interpretations, or precedents. If, in a case of undercapitalization, treating the credit of the controlling company as capital were a rule commonly applied without going through legislative proceedings, the same should apply to Japan domestic corporations. But it does not. That is, in a case of undercapitalization, even if there was a request to regard the loaned money of the controlling company the same as capital, legislative proceedings would have to intervene in order to do this, in addition to the fact that clear criteria need to be established in legislation. In fact, under the Japanese undercapitalization taxation system, clear criteria have been established by law.

The reason for the necessity of clear criteria is economic laws secure the "forecastability" of economic activities. Without specific and clear criteria, forecasting the economic activities would not be feasible. Arguments advocated by Shinsei Bank have too many criteria that need to be made clear. It is almost clear that the Court can do all this. If the Court adopted Shinsei Bank's arguments based on all-too-easy, abstract, and general concepts, it is easy to imagine that bankruptcy proceedings would not only become chaotic, but huge criticisms from Japan's financial and industrial circles would also be brought on, leading to a devastating impact on the economic activities.

12

SECTION 4: Subordination of Some Rehabilitation Credits in a Rehabilitation Plan Can Only Be Allowed in Cases Where Clear Contravention of the Fair and Equitable Principle Is Found.

The Shinsei Opinion Brief alleges that the legal grounds for leading to the conclusion that the credits of LBAH and LBHI should be treated subordinately in this case are "the proviso of Article 155, Item 1 of the Civil Rehabilitation Act, and the fair and equitable principle." This proviso allows for a difference in modification of rights if "equity will not be undermined.[5]" However, such differential treatment based on this proviso is allowed only when the liquidation value is guaranteed for all rehabilitation creditors. Subordination without guaranteeing the liquidation value would be possible only under extremely limited circumstances such as where clear contravention of the fair and equitable principle can be found in the creditor involved.

In addition, the rehabilitation proceedings for this case are liquidation proceedings, in which the reimbursed original assets distributed to the creditors through the rehabilitation plan are the liquidated values themselves of the rehabilitation debtors. This means that, in this rehabilitation proceedings, treating some rehabilitation credits less advantageously than others itself would be possible only under extremely limited circumstances such as where clear contravention of the fair and equitable principle can be found. So the presuppositions of such arguments as this one should be reviewed very carefully.

The acknowledgment of presuppositions is discussed specifically and in detail in the opinion brief by Professor Kazuhiko Yamamoto (Attachment 2, hereinafter referred to as the "Yamamoto Opinion Brief"). A few samples will follow.

---

[5] The Shinsei Bank Opinion Brief dated March 5, 2009, quoted the D-Block doctrine of the United States, alleging that subordination should be allowed based on the balance based on this doctrine (page 2 of the same document). The Matsushita Opinion Brief also introduces the D-Block judgment in Footnote 1 of page 2 and Addendum 2 of the same document. This case deals with equal treatment of rehabilitation credits in civic rehabilitation proceedings. The U.S. argument seems to be unrelated (see page 4, Footnote 11 of the Yamamoto Opinion Brief), To add, through accumulation of about 70 years of judgments after the judgment just discussed, the range of subordination has been made narrower and more specified. It is not appropriate to discuss the equity between creditors of this case from the perspective of abstract criteria shown in the judgment discussed above.

1. On the principle of the liquidation value guarantee

The "principle of the liquidation value guarantee" in civil rehabilitation procedures, is the principle that in a rehabilitation plan there is a need for at least an allotted share of the anticipated bankruptcy proceeds be guaranteed to each creditor (Article 174.2.4; also see Article 236). This principle is based on the notion that establishing differences in the rights of various bankruptcy creditors in bankruptcy proceedings is not recognized in the law. The majority view is since that the principle of the liquidation value guarantee holds that there is a need for the individual creditors to be satisfied, even if on the whole a settlement that exceeds the liquidation value is made to creditors, if a settlement that lowers the liquidation value is made to only specific creditors, that might just constitute a violation of the principle of the liquidation value guarantee and thus be tantamount to a situation in which the issue of unconstitutionality arises on the basis of the violation of property rights (the individual settlement standard theory).

Consequently, even though the provisions of Article 155, Clause 1 of the Civil Rehabilitation Law allow for the establishment of differences in changes in the rights among the various rehabilitation creditors in "cases that do not cause harm to equity," this is not intended to approve of exceptions to the principle of the liquidation value guarantee. It merely allows for the establishment of a certain difference only within the scope of guaranteeing the liquidation value to individual rehabilitation creditors.

2. If there is an exception to the principle of the liquidation value guarantee, it is to be sought in the principle of loyalty, and is approved only in extremely limited cases

If such an exception to the principle of the liquidation value guarantee is recognized, it is so, even in cases in which bankruptcy proceedings are initiated, only in extremely limited cases in which discriminatory treatment among creditors is recognized. The reason for this is that bankruptcy assets that become security for the shares of assets to be allotted to the creditors in bankruptcy proceedings constitute precisely the liquidation value of the debtor company itself, and if there is discriminatory treatment with respect to those allotted shares, that discrimination is tantamount to not guaranteeing the liquidation value with respect to some of the bankruptcy creditors. Thus, since in bankruptcy law, there exist no provisions that allow for such discriminatory treatment, in the final analysis, one can only seek a basis for being able to engage in discriminatory treatment of creditors in bankruptcy proceedings in the principle of loyalty.

14

On this point, as the subordination of bankruptcy claims of creditors and claims for damages based on guaranteed debt performance of fully owning parent companies was repudiated in the Supreme Court of Japan's decision of December 21, 1995 (see 1994 (O), No. 683, Matsushita Opinion, p. 2 and the Yamamoto Opinion, p. 7), the Supreme Court of Japan has made its position clear that such treatment that is not determined by law will not be approved.

In addition, the September 1, 1984 decision of the Nagoya High Court (Kanazawa Branch)  (see the Matsushita Opinion, p. 4,  Appendix 3) also held that with respect to claims made to a company requiring reorganization with representative directors, it cannot approve subordination only of administrative liabilities in the reorganization plan.

This, in short, ultimately expresses the position of the courts that administrative liabilities  of representative directors, etc. are matters to be resolved by investigating liability for compensation of individual harms and that it is inappropriate to handle these through subordinated treatment of claims in a rehabilitation plan. Academically, as well, discriminatory treatment based on a violation of the principle of loyalty is generally considered to be restricted to extremely limited cases in which claims to compensation for loss are made by a bankrupt company to a controlling company (See Appendix 4, pp. 126 ff., Tahara Statement and Hanamura Statement).

The thinking of the courts concerning this point is as clearly set out in pp. 6ff. of the Yamamoto Opinion, and similar reasoning can be found in previous writings by Professor Matsushita as well (see Appendix 5, pp. 322-323).

3. Recent court cases in which subordination has been affirmed are judgments concerning instances in which clear violations of the principle of loyalty are recognized

On the one hand, as pointed out in the Matsushita Opinion, in the past, at the level of the lower courts, there have been cases in which unfavorable treatment of bankruptcy claims of some claimants has been approved. However, in the case of the most recent March 6, 1998 judgment of the Fukuyama Branch of the Hiroshima District Court (Matsushita Opinion, p. 3, Appendix 6), this was an instance in which it was recognized that the situation was that a reported creditor judged to be subject to subordination intended to prolong the life of the bankrupt company because of the situation of his own company while acknowledging that the bankruptcy of the bankrupt company was inevitable, and the creditor caused harm by having outside contractors receive promissory notes issued by the bankrupt company.  This was precisely an instance of a case that is equivalent to the aforementioned reported creditor having the intention of harming other creditors, a case in which the poor

15

behavior corresponding to a violation of the principle of loyalty was recognized, in which there was the possibility of making the creditor take responsibility for unlawful behavior towards other creditors.

From the above, we can conclude that the Supreme Court has taken a position that does not approve of exceptions to the principle of the liquidation value guarantee. There are no Supreme Court cases that have approved exceptions on the basis of the violation of the principle of loyalty, and in the lower courts, in those instances in which settlement allotments are permitted to lower the liquidation value, a remarkably limited position has been adopted.

Consequently, in discussing this case, the first issue to be considered carefully is whether such a limited instance in which an exception to the principle of the liquidation value guarantee can be recognized to exist or not. Moreover, as we shall explain in point 4 below, if we base our discussion on a correct understanding of this same principle, it will immediately be evident--without even having to examine all the individual facts of the case one by one--that the rehabilitation plan is unlawful.


4. The Rehabilitation Plan is unlawful, since it ignores the principle of the liquidation value guarantee

A so-called rehabilitation plan in the form of liquidation has been submitted by the rehabilitation debtor, and according to that plan, as a result of the exchange price of the assets of the rehabilitation debtor, the principal amount of the settlement for the various rehabilitation creditors will be approximately JPY 83 billion. This figure is precisely the current liquidation value of the rehabilitation debtor, and as a result of the principle of the liquidation value guarantee, there is a need for the right [of the creditors] to receive allotments from the settlement principal of the approximately JPY 83 billion formed with the liquidation of the rehabilitation debtor that corresponds to the amount of the claims made on the "15 Rehabilitation Creditor Companies of the LB Group" , at a minimum to be guaranteed. This fact is not influenced by the existence of the provisions of Article 155, Clause 1 of the Civil Rehabilitation Law. Even if an exception to the principle of the liquidation value guarantee were approved, that would only be in an instance in which a clear violation of the principle of loyalty by the "15 Rehabilitation Creditor Companies of the LB Group" was acknowledged.

As for the legal opinions, originally in the Matsushita Opinion and the Opinion of Professor Hiroyuki Kansaku (hereinafter, the "Kansaku Opinion" ), as well, consideration or examination of the principle of the liquidation value guarantee was absent--the key words "equity" and "fairness" were heavily used--and we can readily conclude that the rehabilitation plan with content that does not implement full allotment [of assets] to the "15 Rehabilitation Creditor Companies of the LB Group" is lawful. However, one should strictly restrain oneself from facilely engaging in a legal interpretation that constructs new provisions of law on the basis of such a

general, abstract perspective.[6] If we maintain that there is a margin in which the rehabilitation plan can be considered to be legal, it is only in the extremely limited case in which we can recognize that there has been a clear violation of the principle of loyalty in the relationship of the respective "15 Rehabilitation Creditor Companies of the LB Group" and all the creditors (or the majority of the creditors). In this case, the rehabilitation bank has not been able to claim such a fact, nor has there been any substantiation for such a claim.

As noted above, when the courts judge whether to consider the rehabilitation plan in this case, I believe that it should make the proper judgment on the basis of the standpoints of the courts and academic theories concerning the principle of the liquidation value guarantee.

Thus, as we have concretely set forth in point number 4, in the facts of this case, at the outset, we cannot approve of any circumstances in which the rehabilitation claims of the "15 Rehabilitation Creditor Companies of the LB Group" should be treated unfavorably. In addition, even in the hypothesis that some of the arguments made by the rehabilitation bank are factual, the behavior of the "15 Rehabilitation Creditor Companies of the LB Group," which from the outset violated the principle of loyalty, by no means allows us to perceive in them circumstances that would influence equity among the rehabilitation creditors. Consequently, with respect to the issue of subordination [of some debt], which violates the principle of the liquidation value guarantee, from the very outset there is no room for approving of the discriminatory treatment of the rehabilitation credit  of the "15 Rehabilitation Creditor Companies of the LB Group" on the basis of provisions of Article 155, Clause 1 of the Civil Rehabilitation Law.

SECTION 5.  In this case, circumstances in which LBHI and LBAH should be subordinated are completely nonexistent

1.  Outline of the sequence of events concerning the rehabilitation debtor

---

[6] This point is also consistent with the judgment in the December 21, 1995 Supreme Court decision (Tokyo High Court, November 3, 1993・1991(Ne) No. 4596 Bankruptcy Claims Affirmation Koso Appeal Case・Unregistered in collected cases), which held,  "Even with general abstract principles such as the principle of equality, equity, and fairness, one cannot conduct legal interpretation that is equivalent to the construction of new texts of law."

(1) Concerning the Lehman Brothers Group

The Lehman Brothers Group, to which the rehabilitation debtor belongs, is a global investment bank group that has developed businesses that respond to the financial needs of clients throughout the world. The services that it provides span all the various areas of investment bank services, asset management services, real estate investment, and stock and bond trading, and the Group conducts operations in all the areas of North America, Europe, South America, the Middle East, and the Asia Pacific.

In Japan, in 1986, the Lehman Brothers Securities Company established operations in Tokyo (in 2006, it was incorporated), and with that branch as its core, it came to provide a wide range of financial services.

(2) Concerning the rehabilitation debtor

The rehabilitation debtor was established on January 5, 1998 and is an incorporated public company that has been involved in the bad debt business and real estate finance operations. The bad debt business consists of buying and selling bad debt, and the real estate financing business is the business of financing capital required for real estate investments made by the individual companies of the Lehman Brothers Group and their related financing businesses. Furthermore, the content of the business in the articles of incorporation of the rehabilitation debtor is listed as beginning with the money lending business, and including, as well, the business of purchasing credit, and holding, managing, investing, and financing negotiable securities, etc. (see Appendix 7).

In the Lehman Brothers Group in Japan, the real estate investment department (GREG) existed as the department that handled primarily real estate investment, and in the same department, the Group conducted activities that could be classified roughly into (1) the bad debt business, (2) the non-recourse loan business, (3) enterprise acquisitions and stock investments, etc. Thus, with respect to (1) the bad debt business, the rehabilitation debtor was primarily responsible; and (2) for the non-recourse loan business, primarily Lehman Brothers Commercial Mortgage Company, Inc. (hereafter "LBCM" ) was responsible.

There are no employees that belong exclusively to the rehabilitation debtor or to LBCM. The employees of the real estate investment department were employees of Lehman Brothers Real Estate Company, Inc., which is a Group company, and in response to the needs of the various businesses in which the Group was engaged, they conducted the business of the rehabilitation debtor and of LBCM in the form of being transferred to the rehabilitation debtor and to LBCM. Many employees conducted both the businesses of the rehabilitation debtor and that of LBCM, with the proportions of the two businesses they conducted varying depending on the individual. Their conduct of this business took the form of partial transfers to the two entities. In addition, with respect to the company directors, as well, most of them, including Yon Kei Cho, Thomas Pearson, Sakano

18

Hiroyuki, Eric Addinton, et al., served on the boards of directors of both the rehabilitation debtor and LBCM. The salaries or compensation of these transferees was paid out of transfer costs, and as a rule, the rehabilitation debtor and LBCM paid personnel expenses into the transfer costs fund. In addition, the business of general administration, management, and other indirect labor departments were, as required, entrusted to other group companies, and for these business activities that were outsourced as well, the costs associated with these activities were paid by the rehabilitation debtor to the other Group companies.

The shareholder of the rehabilitation debtor was originally the key man corporation called Revival Holdings Limited, but as a result of an internal reorganization of the Lehman Brothers Group on August 31, 2007, the shareholder became the wholly owned subsidiary Lehman Brothers Securities Stock Company, Inc. (hereinafter, "LBJ"), which is a Japanese corporation. In other words, the rehabilitation debtor is indirectly in a relationship in which stock is owned by LBHI, but with LBHA, there was no relationship of direct ownership of capital with companies that belonged to the same group.

(3) The function of aggregating loans in the Group exercised by the rehabilitation debtor and changes in that function

(a). The process by which the rehabilitation debtor aggregated the group's internal financing within the Lehman Brother's Group

Originally, in the Lehman Brothers Group, the capital that the respective Group companies required for expanding in the various countries in the world was not raised on the basis of the credit worthiness of the individual companies, but rather was raised centrally on the basis of the credit worthiness of LBHI, which is the ultimate holding company of the Group as a whole. For this reason, LBHI raised capital primarily from American financial institutions, and its fund raising took the form of lending the capital it raised to the Group companies in the individual countries.

However, with respect to the transfer of funds between Japan and other countries, not only was it procedurally complex, but there were problems such as being subject to regulations based on the Foreign Exchange and Foreign Trade Law, which thus incurred fund raising costs that finally could not be ignored. Thus, with respect to Japan, the individual Group companies did not receive financing separately from LBHI, but rather funds were sent from LBHI to a specific Japanese corporation, and in cases in which any of the Japanese Group companies used LBHI's funds, financing of the individual Group companies was done through that Japanese corporation. On those occasions, restrictions in the laws governing the money lending business were applied even to intra-Group financing, and it was considered prudent that the Japanese corporation through

19

which the funds were passed maintain the records of the money lending business. Thus, in the Lehman Brothers Group in Japan, the rehabilitation debtor, which had the only records of the money lending business at the time, was selected as the corporation to centralize Group lending, and it was arranged that the rehabilitation debtor receive funds from LBHI and in turn finance the various Group companies in Japan with these funds.

On the one hand, the LBHI's Funding Desk, which was located in London was responsible for financing by LBHI, and therefore there was a one-day delay in financing the Group companies in the Asia region.  Finally, the inconvenience of this arrangement was duly noted. In order to eliminate this inconvenience, gradually, in the Asia region, instead of LBHI, LBAH came to perform the function of aggregating the intra-Group financing, and along with this, the financing of the rehabilitation debtor also came to be handled by LBAH as well. Thus, with respect to the intra-Group financing of the Lehman Brothers Group in Japan, the funds followed the route: LBHI→LBAH→the rehabilitation debtor.

Furthermore, although it was perfectly natural at that time when the aggregation of the functions of intra-group financing moved to the rehabilitation debtor, the fact that the Lehman Brothers Group, which already included the rehabilitation debtor, several years later would fall into bankruptcy was something that that was not imagined even by LBHI and LBAH, and it was completely unintentional that such aggregation of financing should cause "harm" to the external creditors of the rehabilitation debtor.  Rather, it was clear from the situation at the time that this system was simply implemented with a view towards optimizing the efficiency of capital management within the group.


(b).  The process by which the rehabilitation debtor came to receive loans from external financial institutions

In parallel with the maintenance of the intra-Group financing system described above, from the perspective of risk management for the Lehman Brothers Group as a whole, the importance of conducting fund raising from a variety of financial institutions in a variety of currencies that had become necessary for the conduct of business came to be recognized. Therefore, instead of LBHI collectively raising funds denominated in US dollars primarily from U.S. financial institutions, gradually a strategy emerged that emphasized the need for the Group companies in the various countries to raise funds in local currencies from local financial institutions as much as possible.

Thus, the various Lehman Brothers Group companies in Japan also found it necessary to have funds primarily in Japanese currency when conducting business, and therefore, while relying on the credit worthiness of LBHI, they endeavored to conduct fund raising of funds denominated in Japanese yen from Japanese domestic financial institutions.  In particular, in Japan, from the perspective of deepening relations between LBJ and

Japanese financial institutions, and expanding business opportunities there, there emerged a policy orientation of receiving financing from Japanese financial institutions through "socializing," or building relationships.

In this context, the rehabilitation debtor received financing from (what was then) Fuji Bank in the year 2000, and afterwards gradually increased its borrowings from Japanese financial institutions. In 2004, when the rehabilitation bank conducted its first financing, the rehabilitation debtor received financing from seven (7) financial institutions, including the rehabilitation bank.

        (c).     The transfer of the control of intra-Group financing to LBHJ

Thus, from the time it was established, the rehabilitation debtor performed the function of aggregating the intra-Group financing of the Lehman Brothers Group in Japan, and thereafter, with the reorganization of the Lehman Brothers Group companies in Japan beginning in the latter half of 2006, after Lehman Brothers Holding Company, Inc. (hereinafter, "LBHJ") was established as a holding company, the strategy of transferring the function of aggregating the group's borrowings to LBHJ was adopted.) 。

In accordance with this policy, beginning in the latter half of the year 2007, when Japan's Lehman Brothers Group received new financing from outside financial institutions, first, LBHJ centrally conducted the borrowing, and then it in turn loaned the funds it raised in this manner to the various Group companies.

At that time, a substantial portion of the rehabilitation debtor's financing of the Group companies was comprised of operational loans to LBCM (approximately JPY 256 billion at the end of June 2007 (A14-8, p. 15), and because this too was transferred to LBHJ, and approximately the same amount of LBAH's short-term loans to the rehabilitation debtor were also transferred to LBHJ, the result was that the amount of the short-term loans to the rehabilitation debtor from LBAH which had virtually consistently increased up to that time, temporarily decreased (the rehabilitation debtor's short term loans decreased from JPY 478.8 billion at the end of June 2007 to JPY 248.3 billion at the end of November of the same year (A14-8, p. 11; 14-9, p. 9). On the other hand, there were short-term loans from LBHJ to LBCM. Such short term loans, which barely existed at all in November 2006, totaled approximately JPY 470.9 billion at the end of November 2007 (Appendix 8, 1 and 2). The rehabilitation bank, in opinions dated March 5, 2009 concerning the point that the amount of operating loans to the rehabilitation debtor from LBAH decreased from July 2007 on, argues that somehow fraudulent recoveries were made, but in fact, operating loans were merely transferred to LBHJ, and it is clear that the rehabilitation bank's claims are completely lacking in foundation in fact.

Thus, the system in which LBHJ was making loans to the Group companies was changing, but LBHJ did not have the loan records, and therefore, at the present, only those loans made to LBHJ's subsidiaries and indirect subsidiaries were transferred to LBHJ, and as a result, the loans to Group companies that do not fall into

that category remain with the rehabilitation debtor. Concretely, among the nineteen (19) companies that are the recipients of operating loans from the rehabilitation debtor at the time the decision was made to begin rehabilitation proceedings (the nineteen companies listed as receiving (asset) operating loans in the list of the rehabilitation debtor' properties dated February 25, 2009), three companies-- Lehman Brothers Finance (Japan) Inc., Tokyo Branch (hereinafter, "LBFJ"), Libertas Residential Loan Company, Inc., L. B. C. Company, Ltd.--were not in the category of subsidiaries or indirect subsidiaries, and thus their loans they were left as operating loans with the rehabilitation debtor.

Furthermore, operating loans from the rehabilitation debtor to the sixteen (16) companies besides the three companies named above, were related to the rehabilitation debtor's real estate finance business (For example, operating loans to the Yosemite Company, Ltd., (hereinafter, "Yosemite")) are operating loans related to the real estate finance business, as indicated in Item 3.6 (b) (1) below.), and the claim that the rehabilitation bank makes that taking these together, they are loans based on the intra-Group financing function of the rehabilitation debtor is contrary to fact.

The fact that part of the loans that were based on the intra-Group financing function of the rehabilitation debtor had remained at the time the decision was made to begin rehabilitation proceedings is indeed based on the facts of the case, but therein there was absolutely no intention of blaming the risk of bankruptcy on the rehabilitation debtor's external creditors.

On the one hand, again with respect to the borrowing, in order to transfer the intra-group financing function that the rehabilitation debtor had performed to LBHJ , the rehabilitation debtor already requested that the existing financial institutions (including the rehabilitation bank) that had conducted the financing of the rehabilitation debtor adopt the principle of shifting the borrower from the rehabilitation debtor to LBHJ. However, the vast majority of the financial institutions, including the rehabilitation bank, in order to respond to the administrative guidance of the Ministry of Finance urging them to increase financing of small and medium enterprises, indicated their disapproval of making LBHJ, with its large scale capital, the new primary debtor, and their inclination was to take it upon themselves to seek to continue financing of rehabilitation debtor, which had a small scale of capital (A44, Supplement, p. 10). In addition, there were also financial institutions that had not been conscious of maintaining a balance for financing small and medium enterprises, but as there were also complexities in the procedures on the side of the financial institutions, the transfer of the financing function to LBHJ barely moved forward.

Thus, finally, in September 2008, when that transfer of function was underway, LBHI in the United States went bankrupt, and the result was that the rehabilitation debtor also filed civil rehabilitation proceedings.

(4)   Financing by Shinsei Bank

(a)   Circumstances leading up to financing

The first contact between Lehman Brothers Group of Japan and Shinsei Bank was in early 2003.   At first, the parties discussed a loan from Shinsei Bank to another company in the group that was not the reorganization debtor.  Subsequently, this loan did not occur because the borrower no longer needed to raise capital.  Shinsei Bank, which wanted to increase its balance of loans to small and medium enterprises in particular, asked whether another loan might be possible, and the parties began to consider a loan to the reorganization debtor.

As recognized by Shinsei Bank (A 44, Appendix p. 1), negotiations concerning the loan contract were handled by the finance division of the Lehman Brothers group, and not by employees of the reorganization debtor.  Therefore, Shinsei Bank fully understood from the beginning that the Finance Division was conducting capital procurement for the Lehman Brothers group, including the reorganization debtor, with the interests of the entire group in mind.

Moreover, at this time, Brian Prince, who was chief executive officer of Shinsei Bank (and currently president of Aozora Bank), was a senior vice-president of Lehman Brothers Securities in New York from May 1993, then from September 1997 through 2000 was head of the Asia Division in the Tokyo branch of Lehman Brothers Securities, and was head of the group's real estate investment division (Attachment 9-1; the real estate investment division was then referred to as the "Principle Transactions Group").   Also, Keith Fujii, who was an executive in the real estate investment division, was then employed by Shinsei Bank.  Both Brian Prince and Keith Fujii even served as directors of the reorganization debtor during 1999 and 2000.  Attachment 9-2).  From these personal ties as well, Shinsei Bank was fully aware of the role and function of the reorganization debtor within the group.

Ultimately, the reorganization debtor was seen as the appropriate company within the Lehman Brothers group to receive financing as the borrower from Shinsei Bank, for such reasons as the fact that the reorganization debtor met the criteria of small to medium enterprise consistent with Shinsei Bank's needs as stated above, and the fact that, from the standpoint of the reorganization debtor, the reorganization debtor had a financing function within the group.

(b)   Outline of the Shinsei loan agreement in question, and financing under that agreement

On December 25, 2003, the reorganization debtor entered into an Uncommitted Revolving Credit Facility Agreement (hereinafter, this agreement and subsequent revised agreements are referred to as "the Shinsei Loan Agreement.") with Shinsei Bank, and on January 8, 2004, borrowed ¥10 billion.

The Shinsei Loan Agreement was entered into after discussions based on Shinsei Bank's initial proposal.  Below are an outline of the Shinsei Loan Agreement and an outline of financing from Shinsei Bank.

(1)   The Uncommitted Revolving Credit Facility Agreement of December 25, 2003 and the ¥10 billion financing based on that agreement.

The following is an outline of the Uncommitted Revolving Credit Facility Agreement of December 25, 2003 (Attachment 10).  Based on this agreement, a ¥10 billion facility was established for the reorganization debtor as of that date, and on January 8, 2004, the reorganization debtor received a ¥10 billion loan from Shinsei Bank.  As stated above, the proposal to lend ¥10 billion to the reorganization debtor was made by Shinsei Bank, and for the Lehman Brothers group as well, the main purpose was to begin business relations with Shinsei Bank, and the loan was not based on a specific need for capital on the part of the reorganization debtor.  For this reason, immediately after receiving the loan from Shinsei Bank, the reorganization debtor applied the ¥10 billion to repayment of a loan from LBHI.

| * | Loan limit | ¥10 billion |
| * | Capital use | To meet the general needs of the borrower for capital. |
| * | Interest | London InterBank Offered Rate (LIBOR) plus 0.35% |
| * | Period | Repayment dates were set according to the time of |

each specific loan; (a) Repayment period within 24 months of each specific loan set by agreement of borrower and Shinsei Bank; (b) "Rollover Option" – every three months from the time of each specific loan, the period was extended for three months unless written notice of intent not to extend time was given; where such notice was given, the repayment date became the last banking transaction day of the prior three-month extension; (c) where grounds for forfeiting the benefit of time had arisen, repayment was due immediately.

\*    New specific loans:        Renewal of the part of the facility not used for specific loans was at the complete discretion of Shinsei Bank, which conducted periodic reviews to decide when renewal was necessary and what terms (interest, margin, costs, and timing of demands for these payments) were necessary.  Also, the Bank could terminate or suspend all or part of the facility without providing any reason to the borrower.

\*    Security:        At the time of conclusion of the Agreement, LBHI gave absolute and unconditional security for the borrower's payment obligations under the Agreement, and was to supply a surety bond in written form that satisfied Shinsei Bank.

\*    Rights of information disclosure:  The borrower was to provide Shinsei Bank the following: (i) annual and quarterly consolidated balance sheets, business reports, and cash flow reports for LBHI and its subsidiaries; (ii)

annual consolidated balance sheets and business reports of the borrower; and (iii) information requested by Shinsei Bank at any time concerning the borrower's business, operations, assets, debts, business results, and prospects.

\*    Necessary documents:                The facility became available for use upon receipt from the borrower by Shinsei Bank of the following documents

(i)    Surety bond

(ii)    Copy of the Agreement

(iii)    Incorporating documents of the borrower, documents related to any changes in the incorporating documents, and the articles of incorporation.

(iv)    Any other documents reasonably requested by the Bank.

(2)    First Revised Agreement dated January 16, 2005 and the additional financing of ¥7.5 billion based on that agreement

The reorganization debtor and Shinsei Bank changed the monetary amount of the Facility to ¥17.5 billion, and changed the interest rate to London InterBank Offered Rate (LIBOR) plus 0.20% (Attachment 11). Based on this, the reorganization debtor received additional financing of ¥7.5 billion on November 21 of that year.

This First Revised Agreement and additional financing of ¥7.5 billion was the result of Shinsei Bank's request, when the reorganization debtor asked for a lower interest rate, that if the interest rate were to be reduced then the Bank would want the loan amount to be increased so that the total amount of Shinsei Bank's interest income would not decrease.  Thus, just as with the initial loan, this loan was not based on specific capital needs of the reorganization debtor.

(3)   Sounding out Shinsei Bank on transfer of loan to LBHJ

From May 2007, until before the Second Revised Agreement of October 24, 2007, the reorganization debtor told Shinsei Bank that the financing function of the reorganization debtor within the group had been transferred to LBHJ, and that they wanted to transfer the reorganization debtor's loan to LBHJ.  In response, Shinsei Bank stated that the loan being received by the reorganization debtor, a small or medium enterprise, was advantageous to Shinsei Bank, and that it did not want to transfer the loan to LBHJ.  (On this point, Shinsei Bank agrees, giving "the fact that the business with SF is approved as business with a small or medium enterprise, and that LBHJ is not within the scope of a small or medium enterprise" as the reason for not transferring the loan to LBHJ (A 44, p. 10).)   This indicates that Shinsei Bank was actively interested in continuing to lend to the low-capitalized reorganization debtor.

Also, the fact that the reorganization debtor explained to Shinsei Bank and others in the middle of 2007 that it was transferring its financing function within the group to LBHJ and asked Shinsei Bank to convert the loan to LBHJ as borrower, is an important fact that shows that the reorganization debtor was not at all hiding its intra-group financing function from financial institutions, and that shows that Shinsei Bank, even though it knew by 2007 at the latest that the reorganization debtor was fulfilling the function of inter-group loan consolidation, did not state any special objection.

(4)   Events since July 2007

Based on the Second Revised Agreement dated October 24, 2007, the reorganization debtor and Shinsei Bank changed the Facility amount to ¥30 billion and changed the interest rate to London InterBank Offered Rate (LIBOR) plus 0.60% (Attachment 12).  Based on this agreement, the reorganization debtor received an additional loan of ¥12.5 billion on the same day.  Also, in May 22, 2008, only 4 months before the collapse of the Lehman Brothers group, based on the Third Revised Agreement, they changed the Facility amount to ¥25 billion and changed the interest rate to London InterBank Offered Rate (LIBOR) plus 1.4% (Attachment 13).  Based on this agreement, the reorganization debtor repaid ¥5 billion to Shinsei Bank on May 28, 2008.

26

Thereafter, the reorganization debtor and Shinsei Bank, based on the Fourth Revised Agreement dated May 26, 2008, they changed the interest rate to London InterBank Offered Rate (LIBOR) plus 3.0% (Attachment 14).

In this way, up until just before the collapse of the Lehman Brothers group, Shinsei Bank used its own judgment in managing the interest and loan balance, paying attention to the rated credit risk of LBHI.

(c)    The financing was conducted based on LBHI's credit

In relation to the loan from Shinsei Bank, special attention should be paid to the fact that Shinsei Bank provided financing based not on the reorganization debtor, but on the credit of LBHI, the surety.

In other words, before the Shinsei Loan Agreement was concluded, while discussing the terms of the Shinsei Loan Agreement, the responsible person in the Finance Division of the Lehman Brothers group told Shinsei Bank that they could not disclose details of the reorganization debtor's business because the reorganization debtor and Shinsei Bank were competitors in the bad loans business, and asked whether Shinsei Bank could still lend to the reorganization debtor. (Shinsei Bank itself recognizes, in A 44, Separate Sheet 1, p. 1, that the Bank was an active player at the time in the bad loans business, and had "adequate information" about the reorganization debtor.)    Shinsei bank responded that "it's fine because we are looking at LBHI's creditworthiness."  In fact, at the time of the initial loan, the only disclosure of the reorganization debtor's finances that Shinsei Bank ultimately asked for was the balance statements for three periods, from November 2000 through the November 2002.   Shinsei Bank asserts that information such as loan amounts, details of large loans, and loan situations was not disclosed even though they asked the reorganization debtor to disclose this information. (Shinsei Opinion Brief, p. 45).  However, the fact is that at least as of the time of the initial loan, there was not such request.  Also, after the loan was made, it appears there were cases in which only limited disclosure could be made in response to Shinsei Bank's requests for information disclosure.  However, that is the result of the circumstances states above, and Shinsei Bank was fully aware of the reorganization debtor's policy on information disclosure, and gave financing after consenting to this policy.    Shinsei Bank asserts that the loan was made under circumstances in which information was not sufficient for risk analysis (Shinsei Opinion Brief, p. 45).  If that is so, they did not have to provide financing, and the fact that Shinsei Bank made the loan even though the Bank itself says that it had insufficient information concerning the reorganization debtor shows that the loan was made based not on the credit of the reorganization debtor but on the credit of LBHI.  According to the Shinsei Loan Agreement, Shinsei Bank had discretion whether or not to make each separate loan, and there were many chances to suspend financing of the reorganization debtor.  In reality, Shinsei Bank continued to make loans without at all regarding information disclosure as a problem.

Also in reality, the importance attached to LBHI's surety is objectively evident from provisions of the Shinsei Loan Agreement, such as: the only security required for a huge loan to the reorganization debtor was the

27

surety of LBHI; for information disclosure, the agreement demanded disclosure of various documents for each quarter concerning LBHI, but for the reorganization debtor, treated as sufficient the disclosure of annual balance sheets and business reports; and a condition for financing was the delivery of a surety bond by LBHI.

Shinsei Bank was not the only lender that required this surety of LBHI as security for loans to the reorganization debtor. Almost all outside financial institutions that lent to the reorganization debtor obtained the surety of LBHI, which is ultimately a special-purpose company within the Lehman Brothers group. Also, for these outside financial institutions, LBHI's surety was the only security for their loans. (Shinsei Bank acknowledges that it made no demand for collateral (A 44, p. 6).

In the background of this attitude of Shinsei Bank and other financial institutions is the fact that the reorganization debtor was a privately held company for which detailed disclosure was not required, while LBHI was a special-purpose company of a worldwide investment banking group that was publicly traded and rated by rating agencies, and thus was required to disclose in detail and in fact had done so. In the first place, it is inconceivable as a normal credit judgment that a huge loan of billions of yen, with an extremely low spread of only 0.35%, would be made, without collateral, based on the credit of a privately held company in the real estate or non-bank business such as the reorganization debtor. These considerations also make it clear that lending by Shinsei Bank (and other outside financial institutions) were made on based on the credit of LBHI in the form of LBHI's surety.

Incidentally, in legal terms, the fact that financing was done based on the credit of LBHI, means that Shinsei bank and the other financial institutions gave financing with the understanding that LBHI's assets were sufficient as obligated property, and means that obligated property from LBHI's assets included loan debentures on money directly loaned to the reorganization debtor by LBHI, but also indirect claims, typically loan debentures of LBAH to the reorganization debtor. Secondly, the fact that financing was done based on the credit of LBHI means that Shinsei Bank and the other financial institutions are unprotected reorganization creditors as a result of the operation of subordination in accordance with the good faith principle. As stated in Part 3 above, the good faith principle is based on specific relations among the parties. Shinsei Bank and the other financial institutions are reorganization creditors allocated the assets of LBHI, included the assets of LBAH, rather than the assets of the reorganization debtor, and they do not have an expectation of subordination of the claims of LBHI and LBAH against the reorganization debtor. If there is no subordination there is no basis for reliance, and they do not have grounds for arguing a violation of the good faith principle, which takes as its standard the protection of reasonable expectations.

(d) Information disclosure by reorganization debtor

(1) Information disclosure prior to original financing

As Shinsei Bank also acknowledges, Shinsei Bank received the settlement documents of the reorganized debtors for the three quarters between the November period of 2000 and the November period of 2002 prior to original financing.

Of course, based on those documents, Shinsei Bank has sufficiently recognized the amount of a capital (10,000,000 yen at the time), the presence of a loan payable from the affiliated company and a loan receivable for the affiliated company, and its amount of money, profit sharing based on the anonymous partnership agreement, the amount of the labor expense, and the like. For example, according to the business report of the November period (the 4th quarter) of 2001, there is not only a section of the amount of money for "the purchased loan receivable investment gains and losses", but also "the affiliated company business loan receivable interest". As for the loan receivable for the affiliated company, it was clearly mentioned that an interest income of, for example, approximately 1,606,740,000 yen in the third quarter and 1,816,640,000 yen in the fourth quarter was received. From such a description, it is determined that the reorganized debtor has offered loans to the group companies. It is also described that approximately 25,800,000,000 yen has been borrowed from LBHI as the major lender (A13-2).

In addition, those business reports describe the situation of the workers, "This company operates business by means of workers who are dispatched from the group company with the support of human resource and the labor expense is accrued based on the invoice from the group company" and it is obvious that the reorganized debtor operates business using dispatched employees from the group company and the payment for the labor expenses are made to the group company.

Also pertaining to the profit shares based upon the anonymous partnership agreement, the gross profit in the term before gain and loss sharing based on the anonymous partnership agreement of approximately 5,976,870,000 yen and the amount of gains and losses of approximately 5,206,590,000 yen is accrued in the profit and loss statement. It is obvious at a glance that approximately 90 % of the profit is allocated according to the anonymous partnership agreement. In addition, pertaining to the profit sharing based on this anonymous partnership agreement, Shinsei Bank itself admitted that the content of the unpaid anonymous partnership dividends which has been accrued in the debt items was explained by the reorganized debtor as it is "the unpaid profit sharing based on the anonymous partnership agreement" (A44, page 3) and there is no dispute about the Shinsei Bank acknowledging this from that time. This profit sharing based on the anonymous partnership agreement has been executed in the November period in 2004 as a final round and was abolished; (from such perspective, profit sharing which was performed after Shinsei Bank executed the financing only once, and the profit sharing by the anonymous partnership has not been executed.) however, any fiscal year of the profit sharing has been described clearly in the profits and losses statement. Shinsei Bank has never recognized this as an issue at all though it has noticed the presence from that time.

29

(2) Information disclosure after financing had been initially performed

With such a process being taken into consideration, it is obvious that the fact such that LBAH or LBHI violates the principle of faith and trust is not acknowledged.

In addition to the information disclosure prior to the financing, the reorganized debtors have performed, based upon the Shinsei loan agreement of the present case, (1) It sent the report which LBHI has submitted to the American Securities and Exchange Commission to Shinsei Bank once in 3 months, such as the LBHI annual and quarterly business report and balance sheet

( However, since the LBH I financial information was available to anyone through the internet, etc. it was not sent in case that no request was made by Shinsei Bank in particular.);  (2) It sent the balance sheet and business report of each business year of the reorganized debtor once a year and, furthermore, (3) It  appropriately responded to questions from Shinsei Bank at the timing the disclosure was performed for Shinsei Bank as long as they were not confidential for the business.

Through such information disclosure from reorganized debtors, Shinsei Bank has acknowledged the financial condition and the like of the debtor.

Particularly, pertaining to the loan receivable from LBHI and LBAH, the reorganized debtors received questions regarding the reasons why a loan was provided by LBAH though the in-group loan were provided only by LBHI until then, after sending the 2005 fiscal report to Shinsei Bank. For this, there was no further questions from Shinsei Bank when the background of the aforementioned 1 (3) was explained that the money flow was determined as LBHI >> LBAH >> Reorganized debtors in order to avoid a loss in time at the time of financing. (Shinsei Bank said it received the explanation and acknowledged this point. It confirmed the reason that the lender was changed from LBHI to LBAH and, regarding the asian currency being provided, it was determined that it would be performed mainly by LBAH. (A 44 page 4)

In addition, since 2006, at the latest, the reorganized debtors orally disclosed the summary of the each amount of the financing and the top 10 companies that were financed in response to the request from the financial institution. Shinsei Bank has acknowledged the information of the parties which were financed including the financing to the reorganized debtor's group company to some extent. However, regarding this also, Shinsei Bank has never acknowledged this as a problem.

Additionally, the reorganized debtors have been asked about these details by Shinsei Bank. When an explanation was given that they were the labor expense and the business consignment expense,

Shinsei Bank, as expected, had not acknowledged it as a problem.  It is a fact, widely known to the financial institutions that were financing, that the employees belonging to the reorganized debtors were not present and that the business of the reorganized debtors has been operated by the employees who belong to the separate group company and consignment service. Shinsei Bank also has never been against payment for this. Shinsei Bank, as for this point, has admitted that "The fact that SF has been operating business by workers who are dispatched from Lehman Group was confirmed by the record in the settlement document and the observation of the current status." (A 44,  Page 5)

Furthermore, as mentioned above, as for the profit sharing based upon the anonymous partnership agreement, which is obvious by the description of the balance sheets and profit and loss statements of the reorganized debtors, Shinsei Bank has never acknowledged this as a problem. This was also true for loans payable to the group companies of the reorganized debtors.  Shinsei Bank claims it understood that "business loans" in the balance sheet pertains to real estate financing business (Shinsei's written opinion on page 45). This "business loan" item also included the loan to the group companies which were not directly related to the real estate business, accompanying the fact that the reorganized debtors has the in-group financing function, in addition to loans accompanying the real estate financing business of the reorganized debtors. However, as mentioned above, when the reorganized debtors examined the refinancing to the LBHJ [sic: LBHI] with Shinsei Bank, the reorganized debtors explained the reason why this in-group financing function was determined to be transferred to LBHJ and examined the refinancing.  It is obvious that Shinsei Bank had acknowledged by mid 2007, at the latest, that the reorganized debtors have operated the in-group financing function and held the credits to the group company; however, Shinsei Bank has never seen it as a problem.

As above, Shinsei Bank has acknowledged the amount of the capital of the reorganized debtors, the loan (and its increase and decrease) from LBHI and LBAH to the reorganized debtors, the information of the parties which were financed including the financing to the group companies of the reorganized debtors, profit sharing based on the anonymous partnership agreement, and the payment for the labor expenses and business consignment expenses through such information disclosure from the reorganized debtors. Then, Shinsei Bank continuously executed additional financing of operation fund until October 29, 2007 based on the said acknowledgement as well as it having never raised those as issues thereafter until the allegation of civil rehabilitation proceedings of the present case. Those facts undisputedly shows that the claim of the recent subordination by Shinsei Bank was trying to unjustly avoid the lending loss of LBHI and reorganized debtors generated as a result of their own credit judgment.


(5) Allegation for beginning civil rehabilitation proceedings by the reorganized debtors

31

Being influenced by the subprime loan problem in the United States, which has been obvious after 2007, and the world-wide falling stock prices caused by that, LBHI's net profit had become a deficit for the first time in the March to May term settlement in 2008 since the [company] is listed in the stock market in 1992 and it has been forecasted to become a deficit in the June to August term settlement in the same year. As a result, LBHI, who has encountered a difficulty in funding, had negotiated with the investors and the major financing institutions in developed countries for increasing capital; however, this has not been achieved. They have requested public assistance in September 12 in the same year; however, the meeting has run into difficulty. In the end, they had applied for a Chapter 11 case at the U.S. Bankruptcy Court Southern District of New York.

Accompanying the application for the Chapter 11 case by LBHI, debt based on the Shinsei loan contract of the present case of the reorganized debtors, and almost all other liabilities, has lost the profit of the term or has reason to end the contract, resulting in that the reorganized debtors faced a situation in which they were unable to continue executing the liabilities without extreme interference in continuation of the business and alleged for beginning civil rehabilitation proceedings to Tokyo Municipal Court on September 16, 2008.

As it has already been publicly known by various news reports, LBHI's Chapter 11 application has been determined as a result of a highly political game played in the United States and it was an incident that Leman Brothers Group including the reorganized debtors have not assumed at all until the last minute. It was thought by the public that Leman Brothers would not come to bankruptcy since Bear Sterns, which is smaller than Leman Brothers, was bailed out.

2. Opposition to the claims by Shinsei Bank

The above is the history of objective facts on this matter, and there we cannot recognize any bit of conditions that might give any impact on the equity among the creditors in the civil rehabilitation procedure, not to mention any act that violates fair and equitable principles. The opinion paper of Shinsei distorts the history of objective facts on this matter, arbitrarily picks up only those facts that are convenient to its claims, and by constructing a story with frequent use of such words as "improper," "exploitation," and "coercion" without any grounds, it makes the "15 creditor companies with restored claims to the LB Group" look as if they took acts lacking equitableness and fairness and tries to bring a self-serving rehabilitation plan proposal to the creditors meeting and its contents are remarkably lacking appropriate-ness.  The opinion papers of Matsushita and Shinsaku are stating that the restored claims owned by the "15 creditor companies with restored claims to the LB Group" should be subordinated on the assumption of these facts asserted by Shinsei Bank, but since the assumed facts have been altered from the objective facts, and arbitrarily dramatized, picked and chosen, it is natural that a

wrong conclusion will be reached. In fact, according to the opinion paper of Yamamoto, which was prepared on the basis of the actual facts, it states a completely opposite conclusion that it is illegal to subordinate the restored claims of the "15 creditor companies with restored claims to the LB Group" in this matter. And, when we observe all the facts in this matter calmly and objectively, it is clear that the conclusion of the opinion paper of Yamamoto is proper.

Below, we will pick up specific points of argument and make our opposition separately with respect to the contents of the claims by the opinion paper of Shinsei and the erroneous contents of the opinion papers of Matsushita and Shinsaku that are supposed to reinforce them.

### (1) The claim of Shinsei Bank that the cause of the bankruptcy of the rehabilitated debtor lies in "the aspect of the rehabilitated debtor being the financing subsidiary in the group" is entirely wrong.

First, Shinsei Bank asserts that the rehabilitated debtor had "two faces" as "a financing subsidiary within the LB Group" and "a business company to manage the businesses with bad loans" and that the former face was "controlled" by LBHI but the latter face was entirely controlled by the rehabilitated debtor itself (the opinion paper of Shinsei, pp 10 ~ 11). And, it summarizes that the cause of the rehabilitated debtor falling into bankruptcy lies in the "aspect of being the financing subsidiary within the LB Group' and not in the business of managing the businesses with bad loans.

However, the cause for the rehabilitated debtor to have filed for a civil rehabilitation procedure is that it lost the benefit of payment terms on its borrowings and liabilities to the outside creditors or had its contracts terminated, in connection with the filing for Chapter 11 protection by LBHI, and it has nothing to do with whether or not the rehabilitated debtor was involved in financing within the group (Attachment 15).

To begin with, LBJ and LBCM have ended up filing for a civil rehabilitation procedure despite the fact that they were not directly involved in financing within the group, and other Japanese affiliates of Lehman Brothers Group are also virtually bankrupt. It is obvious from these facts that the cause of the bankruptcy of the rehabilitated debtor and its financing function within the group cannot be recognized to have any relationship at all.

Furthermore, in this loan agreement of Shinsei, it is clearly stipulated that, if the guarantor (LBHI) et al begin a legal bankruptcy procedure, that the rehabilitated debtor shall naturally lose its benefit of payment terms on its loan liabilities to Shinsei Bank (Attachment 10). Thus, the assertion by Shinsei Bank as if the cause of

bankruptcy were due to the rehabilitated debtor having a financing function within the group is only creation of a story that is convenient to the bank.


(2) There is no fact that LBHI "improperly controlled the management" of the rehabilitated debtor.


Shinsei Bank picked up the fact that it was necessary to have a financing transaction within the Group of Lehman Brothers decided and approved by the group Finance Dept and LBHI, and determined that "the rehabilitated debtor is not involved at all in any financing transactions within the group" and that the rehabilitated debtor did not have any authority to decide on its own financing (The Shinsei opinion paper, Page 12).

In addition, [Shinsei] points out the following facts:

- Regarding the group financing from LBHI and LBAH, the facility agreement on these loans was defined to be recourable;
- There were times when borrowings were made in excess of the borrowing limit;
- There is no Minutes of the meeting of the board of directors in file regarding the borrowing from LBHI;
- In addition, the rehabilitated debtor was using the accounting system for the entire Lehman Brothers Group, and did not have its own system.

Shinsei concluded that "the rehabilitated debtor never had any autonomy on its borrowing acts."

Furthermore, with respect to the group financing that the rehabilitated debtor made to the affiliates of Lehman Brothers Group, Shinsei Bank picked up the facts that the rehabilitated debtor never held a meeting of its board of directors, that the CEO of the rehabilitated debtor never received a detailed report on the financing until 2006, etc. and based on these facts, Shinsei concluded that "the rehabilitated debtor was forced to bear the risk of bankruptcy of other companies of LB Group due to the improper control by the LB Group or LBJ, and it possessed no autonomy at all."

However, as we assert below, these claims by Shinsei Bank are all wrong, and we have trouble to understand why these facts must be considered as reasons to subordinate the restored claims of the "15 creditor companies with restored claims to the LB Group" to begin with. Below, we will discuss in detail.

(a). There is nothing wrong in the fact that LBHI as the ultimate holding company was influencing the management of the rehabilitated debtor.

First, it is an indisputable fact that LBHI indirectly owned 100% of the shares of the rehabilitated debtor, and it is also a fact that the affiliated companies of Lehman Brothers Group in Japan, including the rehabilitated debtor, were operating their business under the control of LBHI, which is ultimately the holding company in the U.S. So, in that sense, it is not wrong to say that the rehabilitated debtor was "controlled" by LBHI.

However, we cannot recognize any logic in the claim of Shinsei Bank that the very fact that the same corporate group is uniformly controlled under the will of the holding company to conduct their business as a unit makes it a foundation for some illegality and impropriety. Such a claim, that there are some illegality and impropriety in the fact that a holding company controls the execution of group financing while considering the general management of its subsidiaries as a whole, comes from a position to deny uniform business management through a holding company, and it is a unique opinion [of Shinsei] that we can hardly accept legally and practically. It may be a different story if there were minority shareholders of the rehabilitated debtor, but LBHI indirectly owns 100% of its shares. So the assertion of Shinsei Bank leads to denial of uniform management of the group itself through a holding company and therefore it is wrong.

In addition, LBAH is a sister company of the rehabilitated debtor and not even indirectly in a relationship of a parent company and a subsidiary. With respect to the other "15 creditor companies with restored claims to the LB Group," there are many that are not directly or indirectly parent companies of the rehabilitated debtor. Nevertheless, it is not clear on what basis [Shinsei] can say that these corporations "controlled" the rehabilitated debtor in the same way as LBHI did. Thus, Shinsei Bank is making a remarkable jump in logic in its assertion.

(b). We cannot recognize any wrongfulness in the fact that the rehabilitated debtor received financing from LBHI and LBAH.

Shinsei Bank concludes that "It is quite clear that the rehabilitated debtor was controlled strongly by LB Group, especially by LBHI" based on the following facts, with respect to the fact that the rehabilitated debtor was receiving group financing from LBHI and LBAH.

(1) Initially, group financing was made without preparation of an agreement, but afterward s contractual arrangements were made by stipulating a recourse enforcement in the facility agreement.

(2) Even after the contract was prepared, financing exceeding the credit line was provided for a certain length of time.

(3) There are no minutes of board meetings where the loan from LBHI was approved, and it is estimated that no decision by the board meetings was made.

(4) The rehabilitation debtor used the accounting system of the entire Lehman Brothers group, and did not have its own original system.

However, the bad debt business of the rehabilitation debtor could be executed only if LBAH and others injected the funds to the rehabilitation debtors. Financing by LBAH and others to the rehabilitation debtors includes no unreasonable points. Even if any formal defects in the proceeding of the financing were found according to the Companies Act, it cannot be assessed that there were substantial disadvantages if there was no fear of occurrence of causes for bankruptcy of the rehabilitation debtors unless the direct and indirect stockholder, Lehman Brothers group's affiliated company considers the point as a problem. It is obvious that, if the rehabilitation debtors attempt to take the proceeding on financing from LBAH and others according to the Companies Act, they could do it with ease. I must say that the assertion of Shinsei Bank that is concerned with the defects in the formal proceeding after all this time is not rational. Actually, the fact remains that the rehabilitation debtors made the decision of approval of the change of the loan from LBAH in terms of the Facility Agreement (51 of A 8 on page 3). It is objectively obvious that the board meetings did approve the loan from LBAH.

It is natural from the point of the effective management of international enterprise groups that the rehabilitation debtors did not have its own original accounting system and used the old accounting system of the Lehman Brothers group. By most definitions, this does not constitute the ground for any illegality or injustice. As Shinsei Bank itself recognized since financing to the rehabilitation debtors was made (attached sheet pages 1 and 2 of A 44), the financial and accounting operations of the rehabilitation debtors were managed integrally in Lehman Brothers group. It is natural to presume that the accounting system was managed integrally in the group and Shinsei Bank did not consider it as problematic until the subordination of this time was affirmed.

In addition to the above, concerning the loan of the rehabilitation debtors from LBAH and others without making any decisions by the board meetings, the rehabilitation debtors asserted, "They should have disapproved of the notified debts of LB group that could recognize this fact (note by quoter:  Decision was not made by the board meetings)."

However, the assertion is obviously incorrect that the rehabilitation debts should not be approved if there were any defects in the in-company proceeding of the rehabilitation debtors concerning the cause of occurrence of the rehabilitation debts.  Even if there is a time or case where the formal decision is not made by the board meeting for preparation of contracts for financing within the group or rehabilitation debtors, it is impossible that the presence of the rehabilitation debts is denied because of the defects if there is no actual possibility that the loan is disapproved by the board meetings and there is no objection from the rehabilitation debtor to obtaining the financing and the modifications to the contract is approved by the board meeting as mentioned above (51 of A 8 on page 3).  In the first place, the Companies Act requests the decision by the board meeting concerning the decision of a certain operation on the basis of the viewpoint of the corporate governance to maximize the stockholder value.  It has no direct relation with the protection of the debtors.

Practically, the rehabilitation debtors also increase the assets on the balance sheet (in addition to increasing the debt) by obtaining financing from LBAH.  (If it is not the case that the interest is collected at an irrational interest rate,) Obtaining the financing within the group itself does not worsen the contents of assets of the rehabilitation debtors.  Consequently, the abstract danger that can result from some defects in the internal proceeding is not practical if financing within the group is obtained like this time.

As mentioned above, there is no need to dwell on the following that the assertion that such a handling of non-approval of the rehabilitation debt related to the financing in the internal proceeding is obligatory to the rehabilitation debtors is totally irrational and unpractical.

      (c). No injustice is observed in the fact that the rehabilitation debtors provided financing within the group to Lehman Brothers group's affiliated companies.

Shinsei Bank concluded that "they had to bear the risk of bankruptcy of other LB group companies" because "it is grossly obvious that the rehabilitation debtors were strongly dominated by LB group, in particular by LBHI" on the grounds of the following facts, concerning financing within the group by the rehabilitation debtors to SPC that belongs to Lehman Brothers group.

(1) There are no minutes of the board meetings concerning loans to SPC, and it is estimated that the decision by the board meetings was not made.  It bleached the obligation of arrangement of the internal management organization.

(2) A person who had been the representative executive of the rehabilitation debtors until 2006 did not receive any specific report when financing in the group was made.

(3) Financing within the group was not managed and collected not by the rehabilitation debtors but by other affiliated companies of Lehman Brothers group.

However, the assertion of Shinsei Bank totally ignores the reasons and history of the Rehabilitation Debtor in providing intra-Group finance to SPC and overestimates the defects in internal procedures under the Corporate Law, which is entirely unrelated to protection of external creditors. To this point, the assertion of Shinsei Bank is totally unacceptable.

First, as shown in 1 (3)-a, the Rehabilitation Debtor was assigned to a role of controlling intra-Group financing in Lehman Brothers Group companies in Japan not because it intended to damage in any way to external creditors of the Rehabilitation Debtor, but just because providing such assignment to the Rehabilitation Debtor was considered not inflicting any regulatory concern; the Rehabilitation Debtor was a licensed money lender in Japan. From this fact, Shinsei Bank's assertion alleging that LBAH and other companies assigned a role of intra-Group financing function to the Rehabilitation Debtor to ultimately damage external creditors of it is just a mere assumption not based on factual evidence.

As shown in b. above, as to omission of resolution at the board of directors and other internal governance problems, the stipulations of Corporate Law regarding internal governance aim at protection of stockholders. Protection of corporate creditors is not directly related to interest protected by law. To this point, in this case, missing of internal governance is totally unrelated to subordinating rehabilitation credits. In practice, directors of

38

the Rehabilitation Debtor recognized very well at that time that their company owed a role of an intra-Group financing function (For example, board of directors of the Rehabilitation Debtor such as Mark N. Gavey, Thomas Pearson and Hiroyuki Sakano were also board members of Libertus Housing Loan Co., Ltd. to which the Rehabilitation Debtor provided loan as an intra-Group financing (Appendix 16), and they knew the role of their company as a recipient of loan as well.) Assuming that intra-Group financing to SPC was escalated to the board of directors of the Rehabilitation Debtor, it is evident that all loan proposals would have been approved. As such even if a defect in internal governance be recognized, it is evident that the intra-Group financing was not executed due to the defect.  To this point, the assertion of Shinsei Bank is totally off the point.

In addition, Shinsei Bank concerns that the Rehabilitation Debtor didn't manage and collect back intra-Group financing by itself.  As Shinsei Bank itself recognized at the date when it provides financing to the Rehabilitation Debtor, all financial and accounting matters related to the Rehabilitation Debtor were outsourced to a Lehman Brothers Group company due to management efficiency. It is crystal clear that the outsourcing wasn't considered as inappropriate from the fact that Shinsei Bank didn't raise it as an issue until the bank demanded subordinating of this case.

(d). Shinsei Bank uses Sophistry by Insisting that the Rehabilitation Debtor's raison d'etre was to Handle Bad Loan Business

While insisting that the Rehabilitation Debtor was totally under the control of the Lehman Brothers Group company for intra-Group financing, Shinsei Bank asserts that bad loan business taken by the Rehabilitation Debtor was 'real' by insisting that the Rehabilitation Debtor was involved in assessment of mortgaged real estates and purchasing, control and collection of bad loans.

It is unclear how Shinsei Bank wants to correlate it to their demand of subordinating rehabilitation credits, but as a matter of course, it is needless to say that the bad loan business was under control and supervision of LBHI and other Group companies in view of consolidated corporate management of Lehman Brothers Group companies. Shinsei Bank picks up that LBHI's commitment committee decided and approved any financial transaction taken by the Group companies, including the Rehabilitation Debtor, as evidence of the lack of decision making authority on the part of the Rehabilitation Debtor for intra-Group financing (Statement of Shinsei Bank P12). However, the Rehabilitation Debtor is required to obtain approval of LBHI's commitment committee for its bad

loan business as well (A 6). To this point, the assertion of Shinsei Bank should be called as significantly ignoring the facts and made for the convenience of itself only. Whether a board of directors should be held or not is, regardless of whether the agenda is related to bad loan business or to intra-Group financing, controlled by the controlling function of Lehman Brothers Group as outsourced by the Rehabilitation Debtor. Similarly, management and collection of bad loans were not done by the Rehabilitation Debtor itself but most of them were outsourced to other companies due to business efficiency purposes.  Shinsei Bank asserts existence of 'reality' only to the bad loan business, possibly for the purpose of contrasting between the actions of the Rehabilitation Debtor relating to intra-Group financing with the bad loan business. However, the corporate management structure of the Rehabilitation Debtor was well recognized by financial creditors including Shinsei Bank. (What Shinsei Bank recognized will be argued later in detail.) As to the intra-Group financing and the bad loan business, the Rehabilitation Debtor conducted 'real' business under the consolidated corporate management system of the Group and this shouldn't be considered in any way as violation of the principle of faith and trust and actually, and, in reality, no financial institutions had concern about it.

### 3. There are no such Facts as 'Illegal Exploitation' by LBHI to the Rehabilitation Debtor

(1) The claim that the loan from external creditors has been appropriated to bad debt business is against the fact and then cannot be a ground for subjecting to any subordination.

Shinsei Bank insists that the trend of increase/decrease has been correlated between (a) the amount of short-term loan from LBAH, etc. and (b) the amount of loan for business purpose to rehabilitation debtor and that it can be deducted that the short-term loan from LBAH, etc. has run out to other group companies as a loan for business purpose and as a contribution to the Undisclosed Association. In addition, it insists that the loan from external banking institute has been appropriated to bad debt business because the (c) long-term loan from external source and (d) the amount of loan credit for purchase come near. (Shinsei's Statement of Position, Page 23)

The claim of Shinsei Bank of the existence of above correlation and closeness is obviously arbitrary in the first place.

In other words, (a) the amount of short-term loan and (b) the amount of loan for business purpose appear to be close by chance when referring only to the balance sheet dated November 30, 2006 and June 30, 2007. According to other balance sheets as at the end of each period, the above 2 points are far from being close to each other. The following table shows a summary of the amounts of above (a) and (b) which were abstracted from the balance sheet of each period.

| Period | End of Period | Subsidiaries' Loans: (a) | Loan for business purpose: (b) |
|--------|---------------|--------------------------|-------------------------------|
| 3rd | November 30 2000 | 25,306 | 28,196 |
| 4th | November 30 2001 | 23,019 | 33,931 |
| 5th | November 30 2002 | 4,570 | 47,059 |
| 6th | November 30 2003 | 64,390 | 99,907 |
| 7th | November 30 2004 | 46,561 | 117,707 |
| 8th | November 30 2005 | 141,825 | 166,464 |
| 9th | November 30 2006 | 249,248 | 265,002 |
| 10th | November 30 2007 | 478,821 | 416,222 |
| 11th | November 30 2007 | 256,587 | 155,005 |
| 12th | November 30 2008 | 229,519 | 121,339 |

According to the above, in the balance sheet of November 30, 2003, for instance, (a) is about 99.9 billion yen whereas (b) is about 64.4 billion yen. In the balance sheet of November 30, 2004, (a) is about 117.7 billion yen, which has increased when compared with the same of the previous year whereas (b) has decreased to about 46.6 billion yen. This indicates that the figures themselves and their fluctuations are not correlated at all. (With respect to the subsequent fluctuations, we cannot find any objective correlation.) It is apparent that Shinsei Bank is insisting in an arbitrary fashion based on the figures in the 2nd year in which the figures were close with each other by chance and has no foundation at all.

In addition, with respect to the closeness between (c) the long-term loan and the amount of (d), by only observing the figures that Shinsei Bank is insisting, (c) is about106.5 billion yen whereas (d) is about 83.6 billion yen, both according to the balance sheet of November 30, 2006, and according to the same of June 30, 2007, (c) is about

86.5 billion yen whereas (d) is about 139.9 billion yen. There are differences of about 22.9 billion yen and about 56.3 billion yen respectively, which cannot be considered to be close with each other at all. (If we should mention other examples, in the balance sheet of November 30, 2004, (c) is about 105.0 billion yen whereas (d) is about 41.4 billion yen, and in the balance sheet of November 30, 2005, (c) is about 101.5 billion yen whereas (d) is about 54.2 billion yen. In each case, the amount of (c) is about two times of the same of (d).)

As explained above, it is obvious we cannot find any corresponding relation among figures. We should admit that the claim made by Shinsei Bank is an apparent distortion.

Even if any correlation among amounts could be found objectively, the logic of Shinsei Bank itself cannot be understood that the rehabilitation credits of LBAH and LBHI should be subordinated consequently. In other words, although the loans from LBAH and LBHI are classified as "Short Term Loans", such loans are in fact continuing for a long period of time, which should be regarded substantially as "Long-Term Loans". Shinsei Bank has been insisting repeatedly that it understood that its own loan would be used for bad loan business of the rehabilitation debtor. However, in the Shinsei's Loan Agreement in this instance, it has been provided for that the use of the fund is "to satisfy the general needs for fund of the borrower". There was no provision therein setting forth that the loan should be limited to bad debt business only (which is the same with the loans of the rehabilitation debtor from other banking institutions). In the first place, the rehabilitation debtor was entirely free to use the fund from external banking institutions for whatever purposes. As a matter of fact, there was no such fact or recognition at all that the rehabilitation debtor has distinguished the uses of the loans based on whether the funding source was its internal group or external banking institution.

Be that as it may, the claim itself of Shinsei Bank is against the fact, and in addition, the logic that the specific loan was appropriated to a specific use has no meaning in the Bank's claim. It is obvious that it can never result in any illegality or injustice.

(2) The decrease of short-term loan from LBAH started from July, 2007 has not been caused by the repayment to LBAH.

In addition, Shinsei Bank claims that the decrease of short-term loan from LBAH by about 200.0 billion yen started from July, 2007 is unreasonable. (Refer to the Statement of Position dated March 5, 2009. However, in the Shinsei Bank's Statement of Position, this claim has not been made clear.) However, the decrease of the short-term loan balance of the rehabilitation debtor from LBAH starting from July, 2007 was caused as a result of transferring the consolidation function of inter-group loans to LBHJ from the rehabilitation debtor, as per foregoing 1 (3) U. (Especially, the decrease by about 200.0 billion yen at that point was caused because the loan to LBCM in almost the same amount was transferred to LBHJ.) LBAH was not able to recover the fund from the rehabilitation debtor. Instead, it is a fact that the fund has been kept loaned to LBHJ. The reason for such transfer was not to enlighten LBAH risk being accompanied by economic recession as Shinsei Bank suggested. Consequently, the claim of Shinsei Bank against this point is only based on guesswork, which is against the fact.


(3) The claim of Shinsei Bank that the resource of profit of the rehabilitation debtor is solely from bad debt business is not correct in an objective sense.


In Page 24 of Statement of Position of Shinsei Bank, it is indicated that about 90% or more of the sales amount of the rehabilitation debtor is loan credit for purchase. The loan interest for business purpose obtainable from the loans to the companies in the group is at a level of 1.6 to 7.9% of the sales amount. The distribution of loss or profit (non-operating profit) according to the Undisclosed Association Agreement is kept at a level of 6.1 – 10.6% of the sales amount. Based on these, it has been concluded that the profit source was the bad debt business in which the rehabilitation debtor itself was engaged.


However, it is necessary to procure any bad debt from a banking institution. Shinsei Bank's claim by discussing the level of profit performance by comparing the loan or contribution which does not need any special purchase with the bad dept business requiring confirmed management and recovery cost in "Sales Amount" has no meaning. If it should compare the profit performance, it must make comparisons based on the profit bases.


The table below is a summary of (i) the profit relating to loan credit for purchase after deducting recovery cost and expenses, etc. from the recovered amount of loan credit from purchase and (ii) the interest from the loan for business purpose and the amount of distribution from the contribution to the Undisclosed Association, both described in the profit and loss statement of the rehabilitation debtor.

43

(Unit: Million yen)

--◆---- Interest from the loan credit for purchase

--■--- Interest from the loan for business purpose and the amount of distribution from the contribution to the Undisclosed Association



As you can understand well from the figures above, the profit from the bad debt business of the rehabilitation debtor fluctuates largely. In the 5th Period, a loss has been recorded in the bad debt business itself. This is because the bad debt business belongs to such type of business which requires an appreciable period until a cash flow is realized after purchase, especially requires a period appreciably varies according to the nature of the debt, economic circumstances, etc. (No. 3 of A 14 "Statement of Operation")

On the other hand, as a profit from the loan to any group company and/or from the contribution to the Undisclosed Association, interest or profit distribution can be obtained at a fixed interval once any loan has been made unless it is not repaid back. Therefore, more stable profit performance can be maintained than any bad debt business. When these two are compared, above interest or profit distribution is more than the profit from bad debt business as you can see in the balance sheets of 5th, 10th, 11th and 12th Periods. (By the way, when calculating the profit relating to above (i) loan debt for purchase, no selling expenses and general and administrative expenses were deducted. However, under an assumption that there would be almost no selling expenses to be paid with respect to any loan amount for business purpose and distribution for the contribution to the Undisclosed Association, the amount of (i) should become smaller one because selling/general and administrative expenses have been deducted.)

44

When we observe the statement of accounts for 3 Periods from the 3rd to 5th Period which Shinsei Bank allegedly insists it was disclosed to it, the total amount of (i) during above Periods was about 7.4 billion yen and the same of (ii) was 5.4 billion yen. We can never admit at all that "The source of profit of the rehabilitation debtor was the bad debt business".

If we total the amount from the 7th Period to the 12th Period after Shinsei Bank gave its first loan, the total amount of (i) was about 28.1 billion yen and the same of (ii) is 26.8 billion yen. The two businesses of the rehabilitation debtor earned profits almost in the same amounts.

As such, it is an objective fact that the rehabilitation debtor carried out bad debt business with large fluctuations whereas it attained a high and firm profit performance through its loans to inter-group companies and contribution to the Undisclosed Association. Shinsei Bank insists that the source of profit of the rehabilitation debtor was the bad debt business in which the rehabilitation debtor itself had been engaged. This is based on a meaningless operation of figures, which could lead to any unreasonable misunderstanding. [7]

(4) The profit distribution pursuant to Undisclosed Association Agreement has been disclosed to banking institutions. Therefore, there is no point of issue.

Shinsei Bank claims that profit distribution made pursuant to the Undisclosed Association Agreement made and entered into between the rehabilitation debtor and Japan Investment Partnership (afterwards, the contractual status of Japan Investment Partnership was transferred to LBJ) has prejudiced the responsible property for external creditors (Shinsei's Statement of Position, Page 25). However, such a profit distribution has been made within the scope of ordinary profit the rehabilitation debtor earned during any relevant Period during the 3rd through 7th Periods based on legal Undisclosed Association Agreement. The grounds for deeming it unreasonable are unknown to us. (The Auditing Firm has issued its comments of audit based on this point.) In

---

[7] In Page 19 of Shinsei Bank's Statement of Position, it is described that "The rehabilitation debtor has made profit distribution of total 28,043,250,000 yen from the profit it earned by its original bad debt business" with respect to the profit distribution pursuant to the Undisclosed Association Agreement. Because the amount of profit from bad debt business during the period the profit distribution has been made pursuant to the Undisclosed Association Agreement was less than the amount above, the claim of Shinsei Bank is objectively not correct.

addition, with respect to the profit distribution between the 3rd through 5th Periods, it was made before the timing Shinsei Bank provided its loan to the rehabilitation debtor as described in the profit and loss statement. Therefore, there is no reason such profit distributions as above should be regarded unreasonable in relation to the loan made by Shinsei Bank.

As described in the "Report of the hearing from the related parties, etc. made on June 6" dated June 10, 2009, the reason why LBJ has become eligible to the profit distribution pursuant to the Undisclosed Association Agreement is that Mr. Yonekura, then representative director of the rehabilitation debtor, is said to have considered that the fact that the rehabilitation debtor was earning a huge amount of profit could be a negative point for its business and requested that "Think out any appropriate measure so that the rehabilitation debtor might not earn excessive profit". As such, the profit distribution to LBJ was made based on the request from the rehabilitation debtor in view of its actual business. According to such facts as above, it would be difficult to judge that the rehabilitation debtor has been exploited by LBHI and/or LBAH,

In addition, it appears that Shinsei Bank is claiming that "Unreasonable exploitation was under way" due to the fact that the amount of distributed profit was larger than the contribution amount of 90 million yen to the Undisclosed Association. Even if the Undisclosed Association had not existed, any distribution of company's property within the range of distributable amount (distributable profit) can be freely made to the shareholders Lehman Brothers Group, according to the Corporate Law (the former Commercial Code). As far as the profit distribution pursuant to the Undisclosed Association Agreement has been made within the range of distributable profit, the claim raised by Shinsei Bank against the Undisclosed Association Agreement is only an expression made in other words that the distribution amount is too large in comparison with the contributed amount to the Undisclosed Association, namely, which is "Thin Capitalization". We are going to make clear that the "Thin Capitalization" cannot be the grounds for the subordination of rehabilitation credits of LBAH and LBHI, as follows;

(5) Banking institutes have acknowledged the profit distribution through dividends and the sharing of personnel expenses/business consignment expenses, which cannot substantially be an issue.

In addition, with respect to the dividends and/or sharing of personnel expenses/business consignment expenses, as referred to in the Pages 25 – 26 of Shinsei's Statement of Position, any dividends from surplus profit

46

(dividends from profit) made within the range of distributable amount (distributable profit) and/or sharing of any personnel expenses/business consignment expenses based on the proper calculation grounds is far from any illegality or injustice. It is unreasonable to be rated as "Exploitation". (Incidentally, no dividend has been paid from the 8th Period.) In addition, as explained in 1 (2) above, the payment of personnel expenses/business consignment expenses was a justifiable payment of the expenses required by the bad debt business and real estate financing business of the rehabilitation debtor. There is no ground that such a payment should be regarded as "Exploitation".

No specific point was mentioned to the above payment made by the rehabilitation debtor in any of its account audits. No point of issue was raised from any tax authority.

Incidentally, Shinsei Bank points out that Lehman Brothers Group has received 802 million yen and 532 million yen as business consignment expenses respectively from L. B. C. Limited Company and Libertus Housing Loan Co., Ltd., who were the loan providers to the rehabilitation debtor. (Shinsei's Statement of Position, Page 26 to 27) However, as explained above, such a justifiable payment of business consignment expenses cannot be regarded as any "Exploitation".

(6) No Such Facts Exists that the Rehabilitation Debtor has been 'Forced to Undertake Losses'

Claiming that Lehman Brothers Group is taking actions to protect their assets against any loss and damage by illegally transferring risk of failure and losses to other outside creditors through the Rehabilitation Debtor in order to retain profit, Shinsei Bank asserts to take various actions, including advanced payment of the Group companies' expenditure through LBFJ, providing loans and transfer of liabilities for retaining profit by LBCM, provision of pledges for collecting debts from LBCM, signing a compensation agreement for protection of credits of LBCM, acquisition of low-grade marketable securities and execution of no-repayable business loans (Statement of Shinsei Bank P27 and after).

Our counterarguments against the above are as shown in the following paragraphs. Even if the Rehabilitation Debtor had been under the liability against other Group companies for individual transactions, there should be observed no unjustness in sharing risks among Group companies for improving their profit. Intentionally picking

47

up individual transactions that could be seen as taking risks of the entire Group by him in a unilateral manner, Shinsei Bank, at a glance, asserts as if the Rehabilitation Debtor always undertook the Group's risks. However, such assertion is a mere assumption without any material evidence. For argument's sake, let's assume that the Rehabilitation Debtor was often under the circumstances of undertaking risks for other Group companies. Even if the financial condition of the Rehabilitation Debtor is deteriorated by such undertaking, there was a natural pre-requisite that necessary loans would be provided to the Rehabilitation Debtor by LBAH, LBHI and other Group companies.  Thinking of the above, it is quite unconceivable that such risk taking was intended to transfer the risk to other external creditors. Shinsei Bank asserts that the Rehabilitation Debtor undertook all losses of the Group companies immediately before an application for civil rehabilitation process was submitted by the Rehabilitation Debtor to make 'an illegal exploitation' by Lehman Brothers Group. However, no one, including Lehman Brothers Group itself even consider collapse of the Group, including the Rehabilitation Debtor. Such recognition hit upon them just several days before actual collapse happened. To this point, it is evident that there was no such 'illegal exploitation' by them.

(a). Advanced Payment of Group's Expenses through LBFJ

Shinsei Bank asserts the existence of 'an illegal exploitation' by claiming that Lehman Brothers Group made an advanced payment of the Group companies' expenses through LBFJ and LBFJ used funds loaned by the Rehabilitation Debtor for this purpose (Statement of Shinsei Bank P28).

As to the advanced payment through LBFJ for the Group companies' expenses, it is a fact that LBFJ, acting as a party of a contract with business partners of Lehman Brothers Group companies, paid expenses on behalf of them including office rent and their employees' house payments. This is just for the sake of rationality that concentration of payment to one source is more economically beneficial than making such payment and signing such contracts individually by Group companies. It is a natural flow that the funds were loaned by the Rehabilitation Debtor, which had an intra-Group financing function. (After the intra-Group financing function was transferred to LBHJ, loans by LBHJ to Group companies were restricted to subsidiaries and grandson companies of LBHJ. As such, it is reasonably presumed that loans to LBFJ, a Delaware corporation, remained in the Rehabilitation Debtor.)

48

Outstanding loans against related companies of LBFJ for the 11th business term (the business term beginning in November 2008) were approx. 28.36129 billion yen and 7.67464 billion yen for LBJ and LBAH respectively (A-20-3). Most of the loans were directed to large companies, core constituents of Lehman Brothers Group and hence, no such loans had been considered as becoming uncollectable. LBFJ didn't even imagine that its loans to such companies would become bad loans. To this point, there are no reasonable justifications that the loan to LBFJ by the Rehabilitation Debtor should be called as 'an illegal exploitation.'

As discussed above, it is a fact that Shinsei Bank hadn't claimed any protest though the Bank recognized that the Rehabilitation Debtor acted as a loan provider function. To this point, it is unthinkable that loans to LBFJ by the Rehabilitation Debtor should be considered evidence of violation of the principle of faith and trust by LBHI and LBAH as 'an illegal exploitation.'

Shinsei Bank also asserts that, based on the fact that LBFJ paid taxes on behalf of Yugen Kaisha Duckhorn, the rehabilitation credit to be paid by the company to the Rehabilitation Debtor should be substantially offset with business loans provided by LBFJ to Duckhorn, and that to that point, the funds should be made as subordinated credit. It is needless to confirm here that such argument cannot be applicable unless a doctrine of disregarding a corporate entity is applied.

(b). Assertion of Existence that the Loss was Incurred for Protecting Profit by LBCM

Shinsei Bank asserts that in order to protect profit of LBCM, the Rehabilitation Debtor was forced to (1) transfer of debts, (2) provide a pledge against losses and (3) acquire bad marketable securities, in order to transfer the risks and losses to the Rehabilitation Debtor (Statement of Shinsei Bank P 27 and after). Our counterarguments against them are as shown in the following paragraphs. As stated above, real estate investment by Lehman Brothers Group was undertaken by its Real Estate Investment Department, and the Rehabilitation Debtor and LBCM were established as companies practically in responsible for promoting the investment. As such, both the Rehabilitation Debtor and LBCM were operated aiming at maximizing profit in a comprehensive manner, under the control of Real Estate Investment Department. Such style of business operation is quite reasonable in view of managing the Group companies and, in itself, there are no illegalities. Under such circumstances, both the Rehabilitation Debtor and LBCM were involved in many business transactions dealt by Real Estate Investment Department of Lehman Brothers Group. It is off the mark for Shinsei Bank to pick up only particular transactions

having a characteristic that the Rehabilitation Debtor provided benefit to LBCM to complain that only the Rehabilitation Debtor undertook losses in a unilateral manner. The fact of the Rehabilitation Debtor and LBCM operated and managed collectively by Real Estate Investment Department of Lehman Brothers Group had been open to public and players involved in real estate investment business, including Shinsei Bank recognized such management and operation style of Lehman Brothers Group very well. (As argued in 1-(4)-a, Mr. Brian Prince, former director of  Real Estate Investment Department of Lehman Brothers Group, was an executive officer of Shinsei Bank, when a loan to Shinsei Bank was examined.)

Consequently, even if the Rehabilitation Debtor took risks and losses of LCBM for a particular project, Shinsei Bank shouldn't claim that such risk and loss taking is unreasonable and that the Rehabilitation Debtor was exploited illegally now in a ex post fact manner, because Shinsei Bank well knew the corporate operation style of the Rehabilitation Debtor. At the minimum, such risk and loss taking shouldn't constitute a violation of the principle of faith and trust.

(1) Transfer of Debts

Shinsei Bank argues that it is highly suspicious that transfer of loans and debts to Toranomon Capital by the Rehabilitation Debtor was made as a process of collecting debts by LBCM and asserts that the transfer of debts is likely to deteriorate the possibility of collecting loan amount back by the Rehabilitator and hence such transaction should be regarded as an illegal exploitation that damages nonexempt property of external creditors (Statement of Shinsei Bank P29 to P30).

However, only the ground of Shinsei Bank's assertion for the suspicious transfer of loans and debts is that a mortgage of LBCM to the real estate in question that Toranomon Capital acquired was cancelled on the same day of acquisition and at the same time, the assertion is largely conjectural.

As to the transfer of debts from Toranomon Capital to Cleathasset, the transfer was made because it (1) allowed repayment of 200 million yen to Cleathasset from Toranomon Capital, (2) set a mortgage to the same real estate and (3) enabled an en block sales of the mortgaged real estate to maximize the possibility of collecting the debt, and other reasons. Such transfer was made after obtaining approval of the supervising members. Due to this, it is

50

crystal clear that the transaction was quite reasonable because it intended to maximize the possibility of collecting debts back rather than ignoring it. Picking up only one point of the possibility of collecting back the credit of LBCM that seems to be an additional reason noted by the Rehabilitation Debtor, Shinsei Bank insists that such transactions were made as if to benefit LBCM, which is an entirely false statement.


(2) Securing Losses


Reasoning that a loss compensation contract was signed by the Rehabilitation Debtor and by LBCM, Shinsei Bank stresses that the Rehabilitation Debtor was forced to take losses for protecting profit of LBCM. At this point, it remains unknown as to why such loss compensation contract was signed, but, the Rehabilitation Debtor hasn't claimed for any loss compensation based on the contract. It is inappropriate to determine that acceptance of loss was forced to the Rehabilitation Debtor, based on such ground.


In addition, Shinsei Bank tries to evidence that the Rehabilitation Debtor was forced to accept losses for the sake of protecting profit of LBCM by pointing out that (i) the Rehabilitation Debtor provided loans to Yosemite amounting to 5.05800 billion yen, (ii) Yosemite loaned 4.9 billion yen to K.K. Clock (hereinafter referred to as Clock) and acquired 145 million yen worth of stocks of Yosemite using the funds, (iii) Clock owned 70% of outstanding stocks of Cleathlife using the funds and (iv) LBCM took the Clock stocks owned by Yosemite as a mortgage for the loan of approx. 5.3 billion yen provided by LBCM to Cleathlife. However, the Rehabilitation Debtor, a creditor against Yosemite didn't take the Clock stocks owned by Yosemite as a mortgage. (According to the structure chart (Appendix 17), LBCM took Cleathlife stocks owned by Clock as a mortgage, not Clock stocks held by Yosemite.)


The transaction, as shown in the structure chart, is only a part of quite complex transactions and the total picture is unknown. Because of this, how risks were actually shared between the Rehabilitation Debtor and LBCM is not clear. (The structure chart doesn't even depict loans by the Rehabilitation Debtor to Yosemite.) As such, the evidence submitted by Shinsei Bank is short of establishing the cases of (i) to (iv) above and the assertion made by Shinsei Bank is groundless.


51

Even though (i) to (iv) above were to be established, as argued previously, the structure could be employed by Real Estate Investment Department of Lehman Brothers Group after various advantages taken into consideration. For any group companies, maximizing profit of the entire group is a normal course of reasonable corporate efforts. It is unreasonable and impossible to establish a proposition that the Rehabilitation Debtor accepted losses for the benefit of LBCM.

### (3) Acquisition of Bad Marketable Securities

Another ground of Shinsei Bank for its assertion that the Rehabilitation Debtor was forced to accept losses for the sake of protecting profit of LBCM is that the Rehabilitation Debtor purchased LJAC bonds totaling 32.3 billion yen from LBCM in March 2008 and 12.31 billion yen worth was sold back to LBCM.

However, the transaction of purchasing LJAC bonds by the Rehabilitation Debtor from LBCM was originally a temporal undertaking aimed at acquiring a so-called true sale statement from a lawyer's office for the LJAC bonds that LBCM intended to sale to its investors.  The bonds were slated to be immediately sold to investors. The reason that a part of them was sold back to LBCM is due to a requirement from investors that they wanted to purchase directly from LBCM an original seller due to a reason of representation and warranties. As such, the Rehabilitation Debtor didn't intend to keep the remaining balance of LJAC bonds at its hand. Hence, this shouldn't be associated with 'forced undertaking of losses' in any manner.

### (c). Execution of Uncollectable Business Loans

Shinsei Bank insists that the Rehabilitation Debtor illegally disposed its funds to Group companies just before the collapse reasoning that business loans to Yosemite, Yugen Kaisha Snow Bird, Yugen Kaisha Algo, Yugen Kaisha Perseus and Yugen Kaisha Virgo were provided at a date close to the date when a rehabilitation process started (Statement of Shinsei Bank P33).

The loans to these companies were provided as a course of a real estate finance business by the Rehabilitation Debtor (for example, loans of 5 billion yen to Yosemite was provided by the Rehabilitation Debtor as shown in

52

the structure chart mentioned above), and are nothing to do with the intra-Group financing function of the Rehabilitation Debtor. All of the loans were provided by the end of November 2007. Considering the fact that the Rehabilitation Debtor didn't have a slight imagination that Lehman Brothers Group would go bankrupt till just before the start of applying for rehabilitation procedure in September 2008, it is evident that the Rehabilitation Debtor didn't intend to accept losses and the assertion made by Shinsei Bank is totally misinterpretation of facts.

(7) Summary

Shinsei Bank insists that total profit transferred amounts to 43 billion yen in its statement. However, the assertion is lack of examination as to legality and reasonability of each flow of funds. To this point, mentioning the amount is meaningless. When an assessment is made to individual flow of funds, the results should clearly reveal that there are no illegality and unreasonableness worth characterizing 'exploitation.'

The 'structure of forced loss acceptance' as insisted by Shinsei Bank is a legal and reasonable corporate behavior for rational operation and management of the Group companies and it is entirely wrong to assess such behavior as 'forced.' Most of the behaviors were within the assumption of financial institutions like Shinsei Bank and hence, the behaviors are not ones like producing an issue of illegality or unreasonableness.

Due to the above arguments made so far, there are not such subjective facts at all that the Rehabilitation Debtor was exploited by LBAH or LBHI. Assuming that transfer of profit and taking losses as insisted by Shinsei Bank in its statement were to be true, it is entirely unreasonable to conclude that due to the assumed facts, the Rehabilitation Debtor managed the company in an inappropriate manner or was forced to take losses.

4 The fact that the capital amount of the rehabilitation debtor is small compared to total liabilities shall not provide any grounds for subordination of rehabilitation claims.

（1）Shinsei Bank's assertion that the rehabilitation debtor abused the limited liability system ignores principles of the Companies Act.

Shinsei Bank asserted that "although the controlling shareholder did not assume business risk inherent to the subordinated company within the reasonable range and it was responsible for obligations as a shareholder with only limited degree when the subordinated company went into bankruptcy …, meanwhile, the controlling shareholder required the same rights as outside creditors as one creditor. It was inconsistent with the philosophy of equity and thus, it was considered to abuse the limited liability system and break just and equitable principles" (P34 of Shinsei's Opinion).

However, Shinsei's assertion is significantly indefinite because its opinion that a parent company should assume affiliate's business risk in the form of capital contribution has no reasonable grounds and in addition, it did not provide the clear definition of "reasonable range" in which it asserted to be assumed.

As the premise of its assertion about abuse of the limited liability system, Shinsei Bank insisted that "demands for subsequent regulations and ex-post protection are increasing as an entity's capital policy is permitted to design more flexibly" based on the abolition of minimum capital regulations provided by the Companies Act enacted in 2005. In addition, Shinsei asserted that "because outside creditors' risk to a subordinated company with thin capitalization emerges in the phase of bankruptcy of the said subordinated company, it is important to provide legal protection measures to outside creditors of the said subordinated company in this phase" (P35 of Shinsei's Opinion).

However, the abolition of minimum capital regulations in accordance with the Companies Act shall be considered as the change in regulations in which the previous view that grounds for limited liability are placed in capital principles is amended to the new view which grounds for limited liability are based on disclosure of a debtor's asset and creditor's self responsibility under such disclosure. That is to say, the lawmaker of the Companies Act stated, ""capital" provided by the former Companies Act did not mean the function to maintain an entity's asset and therefore, it did not emphasize each principle of capital (identification of capital, maintenance and fulfillment of capital and constancy of capital) which could not result in the protection of creditors without the premise of function to maintain an entity's asset. Consequently, previous "capital" may not be considered to play the role for the protection of creditors". The lawmaker also said, "As the law system of Companies Act in Japan leaves security for debt collection practically with monitoring by creditor or special agreement, etc., we might expect to provide the protection of creditors through self-defense of creditors by enhancing disclosure. Therefore, from this perspective, we endeavor to enhance the disclosure system" (The lower of page 42 to the middle of P43 in attached document No. 18). As a result, according to the Companies Act, the protection of creditors should be realized by self efforts of creditors that would have resulted from sufficient

54

disclosure of a debtor and consequently, liberalization of capital policy is not any evidence for the necessity of subsequent regulations or ex-post protection. If certain protection is required, it should be realized by legislation. As mentioned above, both of the corporate and financial sectors do not agree with amendment of regulations related to business combination that prevents from establishing legislation.

Accordingly, Shinsei's assertion was inconsistent with the above view and ignored material amendment of the limited liability system and in addition, it was as if it requested a court to make a law about issues to be resolved by legislation. There are no grounds for Shinsei's assertion that activities of the rehabilitation debtor abused the limited liability system.

(2) Shinsei's assertion that a part of borrowings should be considered as capital due to the adoption of thin capitalization rules is obviously misleading.

Shinsei Bank presumed such understanding that thin capitalization rules are "the system in which interest on borrowing is avoided as tax deductible when the form of fund raising by a foreign controlling shareholder is substantially considered as capital contribution …, despite of borrowings… formally" (P36 of Shinsei's Opinion). Considering the fact that the rehabilitation debtor voluntarily avoided paying interest to LBAH and LBHI under thin capitalization rules over six years from the term ended November 2004, Shinsei asserted that "this fact supports that the rehabilitation debtor fell into thin capitalization from the tax perspective" (Same page as the above).

Such assertion, however, is not based on the accurate understanding regarding thin capitalization rules. Section 1, Article 66-5 of Act on Special Measures Concerning Taxation, which is the underlying provision for thin capitalization rules, provides that "where a domestic corporation pays, in each business year…, interest on liabilities, etc. to a foreign controlling shareholder, etc. or fund provider, etc. that is related to the said domestic corporation, and the average balance of liabilities regarding the liabilities owed, for the relevant business year, to the foreign controlling shareholder, etc. and the fund provider, etc. that are related to the said domestic corporation, exceeds threefold the amount of equity interest held by the foreign controlling shareholder, etc. related to the said domestic corporation for the relevant business year, the amount calculated pursuant to the method specified by a Cabinet Order as such excess in the amount of interest on liabilities, etc. payable by the said domestic corporation to the said foreign controlling shareholder, etc. and fund provider, etc. in the relevant business year shall not be included in the amount of deductible expense in the calculation of the amount of income of the said domestic corporation for the relevant business year." Under provisions by this article, this system only requires to include certain interest payment in income before tax as required by the calculation of

taxable income. Shinsei Bank also stated that "in order to prevent an entity from avoiding taxation by receiving the large amount of borrowings from an overseas affiliate, certain amount of interest payment in which the proportion of capital contribution and the loan amount exceeds certain percentage is not approved as deductible expense" (P36 of Shinsei's Opinion) and it approved this point.

On the contrary, there is no provision that the loan amount corresponding to the percentage of nondeductible interest payment shall be included in capital and moreover, it is obvious that the calculation of taxable income is not necessary for such provision. This point agrees with the fact that the tax rate on such interest revenue belonged to the person who received the nondeductible interest payment and is the rate applicable for interest revenue, not for dividend revenue. In addition, other articles of the said Act and other rules and regulations including Corporation Tax Act have no provision that borrowing corresponding to interest payment subject to adoption of thin capitalization rules shall be considered as capital. If Shinsei's assertion is universally established, thin capitalization rules should be applied to a domestic controlling shareholder, however it is not so.

As a result, Shinsei's assertion that borrowing should be considered as capital based on measures for thin capitalization rules is absolutely lack of argument. That assertion is based on obvious misunderstanding about thin capitalization rules or may be self-centered opinion to assertively lead the conclusion favorable to Shinsei that rehabilitation claims considered as capital should be subordinated. Moreover, the facts that the rehabilitation debtor did not include a part of interest payment in deductible expense only by tax reasons do not provide any evidence that rehabilitation claims of LBAH and LBHI to the rehabilitation debtor become subordinated.

As mentioned in the above 3, thin capitalization rules are provided by the "law", which means that accounting for loans as same as capital is not permitted unless the "law" by itself prescribes it.

(3) Shinsei's assertion that the rehabilitation debtor voluntarily selected to adopt thin capitalization rules is materially and arbitrary leading.

Regarding that the rehabilitation debtor "voluntarily avoided" to include interest payment to LBAH in deductible expense according to thin capitalization rules, Shinsei Bank stated that "the rehabilitation debtor by itself considered more than 90% of LBAH's claims as capital, not as borrowing" (P20 of Shinsei's Opinion) and developed its assertion as if the rehabilitation debtor voluntarily approved its thin capitalization.

However, this voluntary adjustment of the rehabilitation debtor just followed to tax obligation provided by Special Measures Concerning Taxation. If the rehabilitation debtor files tax return in which the said rehabilitation debtor includes interest payment over deductible amount in deductible expense, the tax authority

56

typically denies such inclusion in expenses based on thin capitalization rules and thus, the rehabilitation debtor has no choice other than accounting for such interest as nondeductible.

Accordingly, the assertion in Shinsei's Opinion that voluntary adjustment by the rehabilitation debtor was its voluntary action shall be materially and arbitrary leading.

> (4) Shinsei's assertion that voluntary adjustment of the rehabilitation debtor based on thin capitalization rules caused in excessive tax obligation is clearly wrong.

Shinsei Bank pointed out "permanent difference item" and "temporary difference item" as items different for financial reporting purposes and tax reporting purposes and stated that "reasonable business operation is required to minimize the occurrence of permanent difference item". Shinsei insisted that the rehabilitation debtor accounted for interest on borrowing as nondeductible item according to thin capitalization rules and recorded it as permanent difference item and doing so, "the rehabilitation debtor accounted for funds received from LBAH as borrowing, not as capital although excessive tax obligation incurred" (P20 and P21 of Shinsei's Opinion).

However, if all loan amounts which LBAH provided to the rehabilitation debtor are supposed to be cash contribution by LBAH, the rehabilitation debtor does not pay interest to LBAH and thus, taxable income of the said rehabilitation debtor increases by the amount of such interest payment that causes in larger tax obligation of the said rehabilitation debtor. Such amount is obviously greater than tax obligation under thin capitalization rules.

Consequently, Shinsei's assertion that the rehabilitation debtor caused "excessive tax obligation" as it borrowed from LBAH is obviously wrong. In addition, Shinsei cannot state that "the rehabilitation debtor caused additional tax obligation which would have not paid normally and damaged assets held by the rehabilitation debtor which were responsible assets of outside creditors" (P21 of Shinsei's Opinion). Shinsei's assertion is undoubtedly wrong based on misunderstanding of thin capitalization rules.

Anyway, Shinsei Bank maintained its loans to the rehabilitation debtor with fully understanding of the capital amount of the rehabilitation debtor and the loan amount from LBAH or LBHI from the commencement of extension of loans and thus, it is obvious that this assertion is based on opportunism.

(5) Sub-summary

As mentioned above, the fact that the capital amount of the rehabilitation debtor is small compared to total liabilities (or borrowing) does not prove the fact that the rehabilitation debtor abused the limited liability system. In addition, the rehabilitation debtor accounted for a part of interest on borrowing as nondeductible expense according to thin capitalization rules due to the necessity for the calculation of taxable income, which did not result in any damage to the rehabilitation debtor. As a result, these facts shall not provide any evidence for breach of just and equitable principle by "15 rehabilitation creditors of LB group" including LBHI and LBAH, and also, it is obvious that such facts are not grounds for subordination of rehabilitation claims. Shinsei's assertion against these facts is deemed be based on clear misunderstanding or materially and arbitrarily leading.

In sub-summary of assertion considering thin capitalization, Shinsei Bank stated that risk of no capital in each group company was assumed by Lehman Brothers Group if Lehman Brothers Group directly invested in each group company, not via the rehabilitation debtor and accordingly, outside creditors would not have such risk (P37 of Shinsei's Opinion). However, just to make sure of the fact, the rehabilitation debtor played the role of lending function within the group in Japan due to regulations for registration of money lending business and it is clear that the rehabilitation debtor did not have any intent to damage outside creditors. Therefore, Shinsei's assertion is not reasonable. As this point has discussed in aforementioned 1 (3) A, we believe that we need not dwell on the matter again.

5 Outside creditors including Shinsei Bank sufficiently recognized conditions of the rehabilitation debtor and extended their loans to the said debtor based on creditworthiness of LBHI as a result of highly sophisticated credit analysis. From this viewpoint, there is no room for approval of subordination under just and equitable principles.

As such, facts asserted by Shinsei Bank including "unfair controlling of business", "unjust exploitation" and "thin capitalization" are not recognized, and LBHI and others did not break just and equitable principles in this matter at all as mentioned above.

In addition, outside creditors including Shinsei Bank sufficiently recognized conditions of the rehabilitation debtor and extended their loans to the debtor based on creditworthiness of LBHI as a result of highly sophisticated credit analysis used by financial institutions. From this viewpoint, there is no room for recognition of breach of just and equitable principles.

58

In other words, as aforementioned in 1 (4) D (A), Shinsei Bank received financial statements of the rehabilitation debtor for the past three years before first extension of loan and thus, Shinsei was deemed to fully understand the capital amount of the rehabilitation debtor, existence and the balance of borrowings from affiliates and loans to affiliates and allocation of profit according to anonymous partnership agreement as well as personnel expenses. Although Shinsei Bank insisted that the rehabilitation debtor executed loans to LB group related SPC as financial transaction without notifying Shinsei Bank (P46 of Shinsei's Opinion), as mentioned above, the role of the rehabilitation debtor as a lender within the group was objectively and clearly stated in "Interest on operating loans with affiliates" item in Account of Business for the fourth period which Shinsei Bank received before first extension of loan and Lehman Brothers also did not hide this fact. Moreover, by October 2007 at the latest, in line with transfer of such lending function to LBHJ, Lehman Brothers explained this fact to Shinsei Bank so as to request it to change the loan to LBHJ. Therefore, Shinsei's assertion that it did not know this fact is contradictory to the facts.

The rehabilitation debtor was a company without exclusive employees and wholly managed as one of group companies and such facts were well-known to financial institutions who executed loans. In particular, Shinsei Bank as a competitor of the rehabilitation debtor in the bad loan business accepted such facts as natural (Precisely, the in-charge person of this Shinsei Loan Agreement has been served by staffs belonged to Treasury Department of Lehman Brothers Group, not to the rehabilitation Debtor (Shinsei Bank No. 44)

On the contrary, Shinsei Bank insisted that information necessary to risk analysis was not sufficiently provided it in lending to the rehabilitation debtor (P45 of Shinsei's Opinion). However, if Shinsei Bank truly determined that it did not received sufficient information necessary to risk analysis, it was incredible that the Bank as a sophisticated financial institution extended the enormous amount of loans of \10 billion (and moreover, it often increased loan amount continuously). Such assertion of Shinsei Bank was considered that it intended to distort the facts that its extension of loans was based on creditworthiness of LBHI as a guarantor, not on that of the rehabilitation debtor. If Shinsei Bank, without considering creditworthiness of LBHI, executed dozens of billions of unsecured loans to the rehabilitation debtor only analyzing business conditions of the rehabilitation debtor, it cannot help evaluating that credit analysis of such financial institution had the very material problem.

Furthermore, Shinsei Bank insisted that subordination under just and equitable principles was determined by objective conditions between a controlling corporation and a subordinated company, and subjective conditions related to risk analysis of outside creditors were independent of whether subordination is required (P43 of Shinsei's Opinion). However, determination whether just and equitable principles were broken should be originally considered all of conditions and events comprehensively including specific facts and as a part of these conditions and events, it may be naturally considered risk analysis of outside creditors who would have favorable treatment due to subordination of claims. Regarding this point, Shinsei Bank asserted that the theory of subordination was the theory that the relation between "a controlling corporation" and "outside creditors of a

subordinated company" deems to be the relation between "a shareholder" and "a creditor", and what kind of risk analysis "a creditor" performed was irrelevant to the relation between "a shareholder" and "a creditor" (P44 of Shinsei's Opinion). However, the actual matter is that the relation between "claims" of a controlling corporation and "claims" of outside creditors is permitted to consider as the relation between "stock" and "claims". In examining this matter, it shall be reasonable that what information outside creditors has, including actual conditions of the debtor, the relation between the controlling corporation and the debtor and details of claims of the controlling corporation, is considered comprehensively. Accordingly, Shinsei's assertion was deemed to mistake the theory and irrelevant.

As discussed above, Shinsei Bank sufficiently examined the facts which it now asserted "unfair controlling of business", "unjust exploitation" and "thin capitalization" and based on such facts, it extended loans to the rehabilitation debtor with increasing the loan amount over and over again and also rescheduled interest rates on loans so that it earned interest revenue corresponding risk analysis at that time. This Shinsei Loan Agreement could have terminated any time at every three month subsequent to the initial settlement period. If Shinsei Bank was not satisfied with conditions or disclosure of the rehabilitation debtor, it could have terminated the agreement anytime. Despite of such facts, Shinsei Bank voluntarily continued to execute loans to the rehabilitation debtor based on its credit analysis at that time. Although Shinsei Bank fully understood conditions of the rehabilitation debtor at that time, it now intended to have favorable reimbursement by insisting subordination of claims, which may be quite unfair as a manner of a leading financial institution.

6. An allegation to subordinate all claims of "15 rehabilitation creditors of the LB Group" is unreasonable.

(1) It is groundless to demand the subordination of LBHI's claims on the ground that LBHI provided a debt guarantee.

Regarding LBHI's claims, Shinsei Bank insists that LBHI indicated its intentions to assume a rehabilitation debtor's insolvency risk comprehensively, saying that LBHI guaranteed a rehabilitation debtor's loans from Shinsei Bank. Based on this, Shinsei Bank demands claims that LBHI separately holds against the rehabilitation debtor should be also subordinated (Page 38 on Shinsei Bank's Opinion Brief). However, it is an obvious deviation from a rational intention of the guarantor to demand that when the guarantor guarantees the claims of the principal debtor, claims that the said guarantor separately holds against the principal debtor should be also subordinated. The opinion goes beyond the bounds of common sense, since this kind of thing has never become

an issue in the court or academic society. If such an allegation is accepted, nobody will dare to provide a debt guarantee to a bank.


(2) It is not possible to justify subordination on the ground that "15 rehabilitation creditors of the LB Group" except LBHI are under the control of LBHI.


We have already mentioned that there is no reason to subordinate the rehabilitation claims that LBHI holds against the rehabilitation debtor. There is also no clear legal ground for Shinsei Bank's allegation to subordinate the rehabilitation claims that "15 rehabilitation creditors of the LB Group" except LBHI hold, too, by saying that LBHI controls "15 rehabilitation creditors of the LB Group" through direct or indirect holding of shares in these creditors (infra Page 38 on Shinsei Bank's Opinion Brief). Regarding rehabilitation claims that "10 SPCs" among "15 rehabilitation creditors of the LB Group" hold against the rehabilitation debtor, Shinsei Bank demands these claims should be subordinated on the ground that they are incurred on the cash sweep scheme. We must say that the aim of this allegation is also unknown.

To begin with, the money refunded is a thing that LBHI should have received directly from "10 SPCs" as dividends or residual assets, since the rehabilitation debtor only kept it temporarily for effective utilization of the fund (the debtor performed a financial function within the Group). In that sense, the rehabilitation debtor just kept the money that it did not have any reason to receive only because of the above function, so the debtor did not primarily have any reasons to acquire it. Taking these facts into consideration, there is no substantial reason that the rehabilitation debtor should be released from obligation to pay rehabilitation debts to "10 SPCs." Therefore, we cannot figure out what Shinsei Bank has alleged. Shinsei Bank insists that "10 SPCs" should not be treated differently from LBHI by pointing that these companies had posted little operating income in fiscal year ended November 2008. However, we consider Shinsei Bank should produce evidence to support the intensive necessity for disregarding corporate entity (based on fair and equitable principles) in the first place, since it has brought up a discussion of disregarding independent corporate entity. Thus, their allegation that "10 SPCs" should not be treated differently from LBHI is like putting the cart before the horse.


7. LBAH and LBHI have commenced legal insolvency proceedings, leading to the denial of subordination of rehabilitation claims based on fair and equitable principles.

On page eight (8) of Matsushita's Opinion Brief, it mentions that insolvency of LBHI and LBAH, a controlling company, does not prevent the subordination of insolvency claims of the said controlling companies.

However, the subordination of rehabilitation claims under Shinsei's plan (that ignores the principle of guaranteeing liquidation value) is possible only when based on legal grounds that violate fair and equitable principles. If so, the fact that LBHI and LBAH are insolvent should obviously become a quite important factor to make a decision as to whether to apply fair and equitable principles. This is because it is natural to give consideration to the individual and specific circumstances of IBAH and LBHI, parties interested, since fair and equitable principles are a kind of judgment to decide whether a certain party interested is allowed to exercise its rights. In this case, since LBAH and LBHI have commenced legal insolvency proceedings under the jurisdiction of the courts in Hong Kong and the United States, the rights of a shareholder of these corporations and their influences based on them have virtually diminished. Shinsei Bank alleges that they "conducted unfair exploitations" and "improperly took control of management." Proceedings have been taken to realize assets for creditors of LBAH and LBHI. Therefore, approving the subordination of LBAH and LBHI's rehabilitation claims will not result in asking shareholders and management, who allegedly conducted unfair exploitations and improperly took control of management, to bear reasonable burden, inappropriately damaging the rights of external creditors of LBAH and LBHI.

As previously mentioned, since financial institutions including Shinsei Bank etc. accommodated rehabilitation debtors with a loan under guarantee of LBHI means that LBAH's loan claims against rehabilitation debtors, assets of LBHI, were treated as nonexempt property, reducing nonexempt property by applying fair and equitable principles in relation with such a party must be considered against fair and equitable principles.

Furthermore, insolvency proceedings of the Lehman Brothers Group as well as LBAH and LBHI have been taken throughout the world, but we have not heard any argument in other four major strongholds for the Lehman Brothers Group—the United States, United Kingdom, Singapore and Hong Kong—that claims among the Group should be subordinated except Shinsei Bank's allegation in Japan.  Under such a situation, subordination of LBAH and LBHI's rehabilitation claims in Japan is not appropriate, since it will not only bring an unreasonable and unfair result that other creditors of the rehabilitation debtor obtain a profit at the sacrifice of creditors to LBAH and LBHI, but also undermine international trust in Japan's insolvency proceedings.

In addition, if rehabilitation claims of "15 rehabilitation creditors of the LB Group" against the rehabilitation debtor should be subordinated, claims that the rehabilitation debtor holds against other Lehman Brother Groups should also be subordinated in some cases.  However, since it seems that Shinsei Bank does not expect claims that the rehabilitation debtor holds against other Lehman Brother Groups to be subordinated, we must say that their allegation is too expedient.

62

If a rehabilitation debtor affirms subordination like the above, similar claims and debts should be subordinated in regard to corporations that have taken civil rehabilitation proceedings such as LBHJ, LHJ or LBCM. However, neither LBAH nor LBHI have heard any argument on any corporations under civil rehabilitation that is similar to the one made by Shinsei Bank. Allowing subordination only for a rehabilitation debtor would bring extremely imbalanced results among corporations, even if limited to the Lehman Brothers Group in Japan. Shinsei Bank's Opinion Brief does not provide any answers to these points.

Shinsei's Opinion insists that the refusal by the liquidator for a Lehman Brothers' affiliate in England to sign the Cross Border Insolvency Protocol proposed by LBHI to the (trustee) of an overseas affiliate of the Lehman Brothers Group "clearly shows that the need for protection of external creditors is commonly held" by the said liquidator, but such allegation is really a false recognition of facts.  The liquidator for Lehman Brothers' affiliate in England only insists that conclusion of a bilateral protocol instead of a multilateral protocol is rather flexible and appropriate depending on the circumstances (Attached Material No. 19).  Even the article submitted by Shinsei Bank (Plaintiff's Evidence No. 43) does not support Shinsei's allegation at all, and therefore, Shinsei's allegation on the above-mentioned respect is only a fiction created by perverting facts conveniently.

As mentioned above, the fact of LBHI and LBAH having gone bankrupt is, in respect of this case, a specific fact leading to denial of differentiation with respect to change in rights of these rehabilitation creditors under the principle of faith and trust, and Shinsei's allegation on this point is unreasonable.

SECTION 6. It is impossible to deny voting rights at creditors' meetings in respect of definite rehabilitation claims

Further, Shinsei Bank insists that voting rights at creditors' meetings should not be newly granted to the "15 LB Group rehabilitation creditors".  Shinsei's Opinion does not include any allegation specifically supporting this point, but Matsushita's Opinion insists in page 10 that, if rehabilitation claims are to be subordinated, no exercise of voting rights should be allowed as long as substantial interests of the rehabilitation claims are denied.

As mentioned hereinbefore, in connection with this point, the facts in relation to this case do not show any reason or need for handling of the rehabilitation claims of the "15 LB Group rehabilitation creditors" as subordinated claims, and in this sense, there is no reason to deny voting rights of these rehabilitation creditors.

In addition, it is clearly prescribed that the amount of voting rights exercisable at a creditors' meeting is the "definite amount" in case of a notified creditor who holds definite voting rights (Article 170, Paragraph 2, Item 1

of the Civil Rehabilitation Act).  More specifically, even in case of differentiating change in rights pursuant to the proviso of Article 155, Paragraph 1 of the Civil Rehabilitation Act, exercise of voting rights at a creditors' meeting will be allowed in respect of the definite amount under the said law.  Although Matsushita's Opinion points out as a reason for denying exercise of voting rights a concept of values to the effect that "the amount of repayment receivable under a rehabilitation plan and the amount of a say should be proportionate", we must say that such indication does not have any clear grounds.  For example, some rehabilitation plans practically set a lower repayment rate in respect of creditors holding rehabilitation claims in a certain amount or more, but in such case, never decrease voting rights of those creditors proportionately.

Originally, despite that Shinsei Bank was able to question the claims of LBAH and LBHI in the claim determination procedures in the civil rehabilitation procedures against rehabilitation creditors (Article 102, Paragraph 1 of the Civil Rehabilitation Act), it made no specific objection.  If the "15 LB Group rehabilitation creditors" had made any act against the principle of faith and trust as insisted by Shinsei Bank, it would have been the simplest action for Shinsei Bank to make an objection by insisting that the claims held by the rehabilitation creditors against the rehabilitation debtor may not be approved as valid rehabilitation claims and argue on the validity of the claims.  Professor Matsushita also insisted in an article issued in the past that any subordinated treatment on the grounds of an unfair business management should be made through procedures for a claim action (See page 326 and thereafter in Attached Material No. 5).

In case of having any objection, in claim determination procedures, a petition of objection may be filed eventually after assessment procedures (Article 106, Paragraph 1 of the Civil Rehabilitation Act), which will help secure procedures for the parties concerned in the respect that they may depend on court procedures.  On the other hand, in case of allowing subordination in a rehabilitation plan, any party, if unsatisfied, will immediately protest the decision for approval of the rehabilitation plan (Article 175, Paragraph 1 of the Civil Rehabilitation Act) and argue on the validity of the rehabilitation plan itself.  Then, unlike in the case of a petition of objection, the parties concerned will dispute in determination procedures.  Such method is not only inappropriate from the viewpoint of securing of procedures for the parties concerned but also clearly undesirable as means of remedy in the respect that the decision on subordination of claims of certain creditors will also affect other creditors and the entire rehabilitation procedures.

From the reasons mentioned above, the issue insisted by Shinsei Bank with regard to this case should intrinsically be disputed in claim determination procedures, and not in the rehabilitation plan.  The above-mentioned aspect also prevents us from approving the allegation of Shinsei Bank.

SECTION 7. Summary

As mentioned above, there is no reason or need to restrict exercise of rehabilitation claims of the "15 LB Group rehabilitation creditors" in this case.  Therefore, Shinsei's draft plan describing that it will not substantially repay any claim of the "15 LB Group rehabilitation creditors" not only constitutes "breach of the provision of a law" (Article 174, Paragraph 2, Item 1 of the Civil Rehabilitation Act) in the respect that such description goes against the equality between creditors (Article 155, Paragraph 1 of the same law) but also conflicts with the general interests of rehabilitation creditors (so-called the best interests rule) (Item 4 of the same paragraph).  These aspects clearly prevent you from making a decision to put the plan to a creditors' meeting (Article 169, Paragraph 1, Item 3 of the Civil Rehabilitation Act).

Shinsei Bank, in spite of having granted a loan under the credit of LBHI after collection of adequate information on the status of the rehabilitation debtor, once LBHI went bankrupt, tries to evade the risk, which it should naturally assume as a bank, aiming to collect an unreasonably large amount of debts in the disguise of subordination.  This is an unfair attitude, which should not be taken by a major bank assuming public roles.

Therefore, LBAH and LBHI hereby ask you to make a prompt decision on the proposed rehabilitation plan submitted by the debtor instead of putting Shinsei's draft plan to a creditors' meeting.

Attached Materials

As set forth in the separate list of attached materials

List of Attached Materials

| Number | Name of Materials |
|---|---|
| 1 | "Analysis of Opinions in the Fields Concerned on Laws and Regulations Concerning Parent Companies and Subsidiaries" *Shouji Houmu* Separate Edition No. 211 |
| 2 | Legal opinion dated July 16, 2009 prepared by Professor Kazuhiko Yamamoto |
| 3 | Decision dated September 1, 1984 at Kanazawa Branch of the Nagoya High Court, page 141 of *Hanrei Jihou* No. 1142 |
| 4 | "Basic Structure and Practices of the New Bankruptcy Act – No. 14  Priority of Various Claims (Continued)" by Mami Okino, page 100 of Jurist No. 1312 |
| 5 | "Legal Rules Concerning Bankruptcy of Consolidated Companies (III)" by Junichi Matsushita, page 295 of Houkyo Vol. 110, No. 3 |
| 6 | Decision dated March 6, 1998 at Fukuyama Branch of the Hiroshima District Court, page 112 of *Hanrei Jihou* No. 1660 |
| 7 | Articles of Incorporation of the rehabilitation debtor |
| 8 – 1<br><br>8 – 2 | LBHJ's Balance sheet as of the end of November 2006<br><br>LBHJ's Balance sheet as of the end of November 2007 |
| 9 – 1 | News release by Aozora Bank, Ltd. (Personal history of Mr. Brian Prince) |
| 9 – 2 | Certificate of All Closed Items of the rehabilitation debtor |
| 10 – 1<br><br>10 – 2 | Uncommitted Revolving Credit Facility Agreement dated December 25, 2003 by and between Shinsei Bank and the rehabilitation debtor<br><br>Translation of the above (to be supplemented later) |
| 11 – 1<br><br>11 – 2 | First Amendment to the Uncommitted Revolving Credit Facility Agreement dated November 16, 2005 by and between Shinsei Bank and the rehabilitation debtor<br><br>Translation of the above (to be supplemented later) |
| 12 – 1<br><br>12 – 2 | Second Amendment to the Uncommitted Revolving Credit Facility Agreement dated October 24, 2007 by and between Shinsei Bank and the rehabilitation debtor<br><br>Translation of the above (to be supplemented later) |
| 13 – 1 | Agreement on Repayment and Third Amendment to the Uncommitted Revolving Credit Facility Agreement dated May 22, 2008 by and between Shinsei Bank and the |

| | |
|---|---|
| 13 – 2 | rehabilitation debtor<br><br>Translation of the above (to be supplemented later) |
| 14 – 1<br><br>14 – 2 | Fourth Amendment to the Uncommitted Revolving Credit Facility Agreement dated August 26, 2008 by and between Shinsei Bank and the rehabilitation debtor<br><br>Translation of the above (to be supplemented later) |
| 15 | "Request for Commencement of Rehabilitation Procedures" dated September 16, 2008 |
| 16 – 1<br><br>16 – 2 | All Closed Items of Register dated December 20, 2006 of Libertus Jutaku Loan K.K.<br><br>All Closed Items of Register dated September 17, 2008 of Libertus Jutaku Loan K.K. |
| 17 | Structure chart titled "Clover Structure" (Attached material No. 10 of the Request for Consent (14) by the rehabilitation debtor dated October 21, 2008) |
| 18 | "Protection of Creditors under the Companies Act (First Volume)" by Daisuke Guntani and Tomohiko Iwasaki, page 42 of *Shouji Houmu* No. 1746 |
| 19 – 1<br><br>19 – 2 | Letter from a Lehman Brothers' affiliate in England (Lehman Brothers International (Europe)) to the bankruptcy court of the southern district in the New York State in U.S.A.<br><br>Translation of the above (to be supplemented later) |