WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Richard L. Levine
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
              Debtors.                    :    (Jointly Administered)
                                          :
                                          :
--------------------------------------------------------------------x
```

**NOTICE OF SUPPLEMENTAL EXHIBIT**
**TO DEBTORS' MOTION, AS SUPPLEMENTED, PURSUANT**
**TO SECTIONS 105(a) AND 362 OF THE BANKRUPTCY CODE**
**FOR AN ORDER ENFORCING THE AUTOMATIC STAY AND HOLDING**
**SHINSEI BANK IN CONTEMPT FOR VIOLATING THE AUTOMATIC STAY**

PLEASE TAKE NOTICE that, on August 11, 2009, Lehman Brothers Holdings

Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (together, the

"Debtors") filed a Motion Pursuant To Sections 105(a) and 362 Of The Bankruptcy Code For An

Order Enforcing The Automatic Stay And Holding Shinsei Bank In Contempt For Violating The

Automatic Stay (the "Motion") [Docket No. 4764], and on August 17, 2009, the Debtors filed a

Supplement to the Motion [Docket No. 4836].

PLEASE TAKE FURTHER NOTICE that the Motion was accompanied by the

Declaration of Richard L. Levine [Docket No. 4766]. As stated in Richard L. Levine's

declaration ¶ 5, the a certified English translation of the "Opinion" submitted by Shinsei Bank to the Tokyo District Court and the Supervisor on June 26, 2009 was to be filed supplementaly by the Debtors.

PLEASE TAKE FURTHER NOTICE that, on August 24, 2009, the Debtors filed the annexed Supplemental Declaration of Richard P. Krasnow, attaching a true and complete copy of the certified English translation of the Opinion.

PLEASE TAKE FURTHER NOTICE that a hearing (the "Hearing") to consider the Motion (as supplemented) shall be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 26, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  August 24, 2009
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
Richard L. Levine
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Richard L. Levine
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------- x
                                                                  :
In re                                                             :
                                                                  :    Chapter 11 Case No.
                                                                  :
LEHMAN BROTHERS HOLDINGS INC., et al.,                            :    08-13555 (JMP)
                                                                  :
                                                                  :
                                     Debtors.                     :    (Jointly Administered)
                                                                  :
----------------------------------------------------------------- x
```

## SUPPLEMENTAL DECLARATION OF RICHARD P. KRASNOW

Pursuant to 28 U.S.C. § 1746, Richard P. Krasnow declares as follows:

1.      I am an attorney admitted to practice before this Court and a member of

the law firm of Weil, Gotshal & Manges LLP, attorneys for Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman").

2.      I am submitting this declaration in support of Debtors' Motion Pursuant

To Sections 105(a) And 362 Of The Bankruptcy Code For An Order Enforcing The Automatic

Stay And Holding Shinsei Bank In Contempt For Violating The Automatic Stay (the "Motion"),

as supplemented on August 17, 2009.

3.      Attached hereto as "Exhibit A" is a true and complete copy of the certified

English translation of the "Opinion" submitted by Shinsei Bank to the Tokyo District Court and

the Supervisor on June 26, 2009.

4.      I declare under penalty of perjury that the foregoing is true and correct.


Dated:        New York, NY
              August 24, 2009


                                        /s/ Richard P. Krasnow
                                        Richard P. Krasnow

**EXHIBIT A**



# TRANSPERFECT

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BARCELONA
BERLIN
BOSTON
BRUSSELS
CHARLOTTE
CHICAGO
DALLAS
DENVER
DUBAI
DUBLIN
FRANKFURT
GENEVA
HONG KONG
HOUSTON
IRVINE
LONDON
LOS ANGELES
MIAMI
MILAN
MINNEAPOLIS
MONTREAL
MUNICH
NEW YORK
PARIS
PHILADELPHIA
PHOENIX
PORTLAND
PRAGUE
RESEARCH
TRIANGLE PARK
SAN DIEGO
SAN FRANCISCO
SAN JOSE
SEATTLE
SINGAPORE
STOCKHOLM
STUTTGART
SYDNEY
TOKYO
TORONTO
VANCOUVER
WASHINGTON, DC

City of New York, State of New York, County of New York

I, Livia Cheung, hereby certify that the following is to the best of my knowledge and belief, a true and accurate translation, of the document "Opinion_by_Shinsei_July_26_2009" from Japanese into English.

Livia Cheung

Sworn to before me this
August 21, 2009

Signature, Notary Public

Stephanie Dill
Notary Public, State of New York
No. 01DI6180934
Qualified in NEW YORK County
Commission Expires Jan 22, 2012

Stamp, Notary Public

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016   T 212.689.5555   F 212.689.1059   WWW.TRANSPERFECT.COM

[Translation]

2008 (Rehabilitation) No. 208 Petition for Commencement of Rehabilitation Proceedings

Rehabilitation Debtor:          Sunrise Finance Co., Ltd.

# <u>Opinion</u>

June 26, 2009

To:    The Tokyo District Court, 20th Civil Division

Makoto Tahira Esq., Supervisor and Attorney-at-law

| | |
|---|---|
| Rehabilitation Creditor | Shinsei Bank, Limited |
| Attorney representing the Rehabilitation Creditor | Yoshihiko Okuno *[seal]* |
| Attorney representing the Rehabilitation Creditor | Isomi Suzuki *[seal]* |
| Attorney representing the Rehabilitation Creditor | Toshiyuki Arai *[seal]* |
| Attorney representing the Rehabilitation Creditor | Shinpei Yamamoto *[seal]* |
| Attorney representing the Rehabilitation Creditor | Yasushi Ono *[seal]* |
| Attorney representing the Rehabilitation Creditor | Hiroki Sakuraba *[seal]* |
| Attorney representing the Rehabilitation Creditor | Ryosuke Koike *[seal]* |
| Attorney representing the Rehabilitation Creditor | Mamoru Furushima *[seal]* |

1

# Table of Contents

**I.**   **Summary of this Opinion**

**II.**   **Introduction**
1.   Summary this Case
2.   Necessity of Subordination of Claims Owned by the Lehman Brothers Group as Rehabilitation Creditor
3.   Existence of Court Precedents regarding Subordination based on the Principle of Good Faith
4.   Subordination of Claims is required in accordance with Express Proviso of Article 155, Paragraph 1 of the Civil Rehabilitation Law and the Principle of Good Faith
5.   Conclusion

**III.**   **Mismanagement and Unjust Control of the Rehabilitation Debtor by the Lehman Brothers Group**
1.   Two Roles of Rehabilitation Debtor
   (1)   The Rehabilitation Debtor has not been Involved in Financial Transactions within the Lehman Brothers Group
      a.  The Rehabilitation Debtor is a Subsidiary of LBHI
      b.  The Rehabilitation Debtor had no Independent Discretion regarding Financing
      c.  The Rehabilitation Debtor was not Involved in Borrowing Procedures from the Lehman Brothers Group
      d.  Conclusion
      e.  The Rehabilitation Debtor was not Involved in Lending Procedures to the Lehman Brothers Group
   (2)   The Rehabilitation Debtor was actually Involved in the Nonperforming Loan Business
2.   Unjust and Powerful Control of the Lehman Brothers Group over the Rehabilitation Debtor without Consideration of the Interests of Outside Creditors
   (1)   Execution of Silent Partnership Agreement to Transfer 90% of the Profits Generated by the Rehabilitation Debtor
   (2)   Voluntary Exclusion of Interest on Borrowings from LBAH for Tax Purposes
      a.  Voluntary Exclusion Treatment of Interest on Borrowings from LBAH for Tax Purposes
      b.  Meaning of Voluntary Exclusion of Interest on Borrowings for Tax Purposes
3.   Conclusion

**IV.**   **Unjust Exploitation of the Rehabilitation Debtor by the Lehman Brothers Group**
1.   Financial Flow and Profits Earning Structure of the Rehabilitation Debtor
   (1)   The Rehabilitation Debtor's Balance Sheets Imply Borrowings from Outside Creditors were Applied to the Nonperforming Loan Business
   (2)   The Source of the Profits Generated by the Rehabilitation Debtor is the Nonperforming Loan Business
2.   Unjust Transfer of Profits (Siphoning) by the Lehman Brothers Group
   (1)   Transfer of Profits to the Lehman Brothers Group under the Silent Partnership Agreement
   (2)   Transfer of Profits to the Lehman Brothers Group through Dividends

        (3)     Transfer of Profits to the Lehman Brothers Group through Personnel Costs and Service Fees
        (4)     Direct Transfer of Profits from Borrowers of the Lehman Brothers Group
        (5)     Total Amount of Profits Transferred Reached 43 Billion Yen

3.    Compulsory Assumption of Loss by the Rehabilitation Debtor in order to Retain Profits in the Lehman Brothers Group
        (1)     The Rehabilitation Debtor has been Exploited in order to Retain Profits in the Lehman Brothers Group and Consequently the Interests of Outside Creditors of the Rehabilitation Debtor have been Harmed
        (2)     Payment by LBFJ on behalf of Lehman Brothers Group Companies
        (3)     Grant of Loans and Change of Debtor in order to Retain Profits in LBCM
           a. Change of Debtor Disregarding Feasibility of Claim Collection
           b. Loans Granted by the Rehabilitation Debtor Applied to Repayments to LBCM
           c. Actual Condition of Loans Granted to Toranomon Capital and Change of Debtor of such Loans
        (4)     Provision of Security for the Collection of LBCM's Claims
        (5)     Execution of Security Agreements for the Preservation of LBCM's Claims
        (6)     Acquisition of Securities with Low Credit Rating
        (7)     Granting Non-collectable Loans

4.    Conclusion

## V.    Undercapitalization

1.    Subordination Based on Undercapitalization
2.    Undercapitalization in this Case
3.    Voluntary Exclusion of Deductible Expense under the Thin Capitalization Rule
        (1)     Thin Capitalization Rule
        (2)     Voluntary Exclusion of Deductible Expense by the Rehabilitation Debtor
4.    Conclusion

## VI.    Treatment of Rehabilitation Claims Owned by Rehabilitation Creditors that belong to the Lehman Brothers Group

1.    Treatment of Rehabilitation Claims Owned by LBHI, LBAH and LBJ
2.    Treatment of Rehabilitation Claims Owned by 10 SPCs and JIP
        (1)     The 10 SPCs and JIP were Strongly Controlled by LBHI
        (2)     Rehabilitation Claims Owned by 10 SPCs and JIP should be Subordinated
3.    Treatment of Other Creditors that Belong to the Lehman Brothers Group

## VII. Counterarguments to Assertions of LBHI and LBAH

1.    Assertions of LBAH and LBHI
2.    Assertion that 'the Rehabilitation Debtor is Guaranteed by LBHI'
3.    Assertion that 'Shinsei Bank Should Have Conducted Sufficient Risk Analysis Before Lending'
        (1)     No Connection between Risk Analysis by Outside Creditors and Subordination under the Principle of Good Faith
        (2)     No Disclosure of the Actual Business Status of the Rehabilitation Debtor to Outside Creditors
4.    Assertion that 'Creditors Across the World Should be Treated Equally'
        (1)     Appropriate Response by Lehman Brothers UK
        (2)     Meaning of Bankruptcy of Controlling Company

**VIII. Conclusion**

**Preface**

To date, Shinsei Bank, Limited ("Shinsei Bank") has repeatedly alleged to the effect that the rehabilitation claims of the companies belonging to the Lehman Brothers Group ("LB Group") must be treated as subordinate to the other rehabilitation claims in light of the fair and equal concepts under the Civil Rehabilitation Law.   However, due to the disclosure of information by the Rehabilitation Debtor after a petition for an administration order was filed on May 8, 2009, these allegations were firmly substantiated and numerous important factual relationships indicating the actual situation, to the surprise of the Rehabilitation Debtor, became evident.   We submit this Opinion in order to recap the allegations made to date based on the facts that have been discovered at the present point in time.

## I.   Summary of Opinion

1.   The rehabilitation claims held by Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Asia Holdings Limited ("LBAH"), Lehman Brothers Japan Inc. ("LBJ"), Y.K. Pluto Fudosan, Y.K. Gardenia, Y.K. Tapin International, Y.K. Marin International, Y.K. Pike International, Y.K. Zinia, Y.K. Piranha International, Y.K. Hisen Building, Y.K. Duckhorn, Y.K. Yellowtail International, Japan Investment Partnership Inc. ("JIP") and Lehman Brothers Real Estate Corp., each of which belongs to the LB Group, (collectively, the "15 LB Group Rehabilitation Creditors") should be treated as subordinate to other rehabilitation claims in the proposed rehabilitation plan of Sunrise Finance Co., Ltd. (the "Rehabilitation Debtor"), and the 15 LB Group Rehabilitation Creditors should not be allowed to exercise their voting rights at the creditors' meeting for this case.

2.   The proposed rehabilitation plan submitted by Shinsei Bank that permits the subordination of claims held by the 15 LB Group Rehabilitation Creditors should be referred to a resolution at the creditors' meeting.   The 15 LB Group Rehabilitation Creditors should not be allowed to exercise their voting rights at the meeting where a resolution for the proposed rehabilitation plan is adopted.

3.   The proposed rehabilitation plan of the Rehabilitation Debtor treats the rehabilitation claims held by the 15 LB Group Rehabilitation Creditors and those held by other rehabilitation creditors on a formally equal basis without considering specific circumstances of this case.   The proposed rehabilitation plan submitted by the Rehabilitation Debtor, which does not permit subordination, "contravene[s] provisions of any Act" (Article 174, Paragraph 2, Item 1 of the Civil Rehabilitation Law) and "is contrary to the common interests of the rehabilitation creditors" (Article 174, Paragraph 2, Item 4 of the Civil Rehabilitation Law).   The proposed rehabilitation plan submitted by the Rehabilitation Debtor therefore should not be referred to a resolution at the creditors' meeting (Article 169, Paragraph 1, Item 3 of the Civil Rehabilitation Law). Even if the proposed rehabilitation plan submitted by the Rehabilitation Debtor is referred to a resolution and adopted at the creditors' meeting, the proposed rehabilitation plan should not be confirmed due to an event of disconfirmation of the rehabilitation plan.   If an order were made to approve the rehabilitation plan, it would be possible to make an immediate appeal against that order.

## II.   Introduction

1.    Summary of this Case

This case concerns the exercise of control through instructions or directly by LBHI, a controlling company, over the Rehabilitation Debtor, which belongs to LB Group. Specifically, (i) LBHI unjustly controlled the overall management of the Rehabilitation Debtor including the execution of its business, (ii) LBHI subsequently caused the Rehabilitation Debtor to borrow substantial amounts of money without the approval of the Rehabilitation Debtor's board of directors, which caused the Rehabilitation Debtor to become undercapitalized, (iii) LBHI and other LB Group Companies that are controlled by LBHI such as LBAH provided financing to other LB Group Companies (such as Lehman Brothers Finance Japan Inc. ("LBFJ")) by providing financing to them indirectly through the Rehabilitation Debtor as a financial subsidiary of the group rather than by directly providing loans to other LB Group Companies in order to pass to outside creditors bankruptcy risks and losses incurred by the Rehabilitation Debtor and LB Group Companies that are its borrowers, (iv) the Rehabilitation Debtor was forced to transfer substantially all of the profits generated from the nonperforming loan business (including the nonperforming loan acquisition business and part of the real estate finance [business][partial real estate finance], hereinafter the same) to the LB Group in the name of profit earnings distributions under a Silent Partnership Agreement, dividends, and personnel costs and service fees, (v) the Rehabilitation Debtor was unjustly exploited by being forced to assume losses of LB Group Companies, particularly just before the Rehabilitation Debtor went bankrupt, and (vi) the Rehabilitation Debtor went bankrupt following the bankruptcy of LBHI, the controlling company of the group, which means LBHI unjustly damaged the assets of the Rehabilitation Debtor as nonrecourse assets of creditors other than LB Group Companies.

Since the establishment of the Rehabilitation Debtor until just before the bankruptcy of the Rehabilitation Debtor, the LB Group did as it pleased including causing the Rehabilitation Debtor to be undercapitalized, conducting financing transactions between LB Group Companies, and conducting mismanagement and unjust exploitation of the Rehabilitation Debtor as described above without the approval of the Rehabilitation Debtor's board of directors.   However, Shinsei Bank and other outside creditors did not have any opportunity to sufficiently recognize the structural risks of the Rehabilitation Debtor and protect themselves from these risks, which is apparent from the fact that detailed information was disclosed after Shinsei Bank filed a petition for an administration order on May 8, 2009.

*2.*    Necessity of Subordination of Claims Owned by the LB Group as Rehabilitation Creditor

Thus, the LB Group, the cause of the failure of the Rehabilitation Debtor, maintained unjust control over the Rehabilitation Debtor while the latter was undercapitalized, and, while improperly exploiting the company, despite being unable to fully settle all of the rehabilitation claims, in the course of the rehabilitation proceedings has emphasized a formalistic equality and has received and has received dividends the same as Shinsei Bank and other external creditors, this producing a de facto inequality which by no means can be acceptable in view of the concepts of fairness and equality under the Civil Rehabilitation Act, and which is in violation of Article 155 Section 1 of the Civil Rehabilitation Code, proviso or good faith principle (Civil Code Article 1, Section 2).

Additionally, in this case, the Rehabilitation Debtor was made to borrow large sums from within the LB Group, under instructions by the LBJ Treasury Department or LBHI, without there having been any independent decisions by the Rehabilitation Debtor nor any resolutions by the board of directors of the Rehabilitation Debtor. Normally, as the Rehabilitation Debtor would be obliged to act with fairness and sincerity after the initiation of rehabilitation proceedings (Civil Rehabilitation Code Article 38 Section 2), even though it would have been obligatory to express disapproval of loans from within the LB Group, claims filed by members of the LB Group were accepted at random.  As has become evident through the gradual disclosure of information subsequent to issuance of the administrative order of May 8, 2009, even though external creditors have repeatedly requested the disclosure of information, in the present case the Rehabilitation Debtor has not disclosed any information at all, so that the rehabilitation creditors have been unable to express dissent for which reason even in the case of a posteriori redress for this sort of breach of obligations, on the basis of the principle of good faith, it is necessary to treat as subordinated the claims of the fifteen creditors in the LB Group.

3. Existence of a case law doctrine relating to subordination based on the principle of faith and trust

The principle of faith and trust, by its nature, should be applied in every field, and it is clear that it has been applied in a variety of prior cases relating to subordination of bankruptcy claims (Hiroshima District Fukuyama Branch judgment, March 6, 2008 (case report 1660, page 112), Fukuoka Superior Court decision, December 21, 1981 (case report 1046, page 127), Tokyo Superior Court decision, February 11, 1965 (case collection of Lower Court civil judgments, vol. 16, no. 2, page 240), etc.).

In particular, in Hiroshima District Fukuyama Branch judgment, March 6, 2008 (case report 1660, page 112), it was stated, "'The principle of impartiality (equitability)' is also valid in bankruptcy proceedings in Japan, and even for parties who are formally considered general bankruptcy claimants, there are cases wherein, depending on the relationship with the bankrupt party, the method, degree, etc. of participation in the business operations of the bankrupt party, etc., [these parties] should receive an allocation from the bankruptcy financial institution on an equal footing with general bankruptcy claimants in the bankruptcy proceedings, so the execution of the claim is counter to the principle of faith and trust and cannot be allowed," clearly indicating as a legal principle that even parties who are formally considered general bankruptcy claimants have an obligation to allow subordination based on the principle of faith and trust in bankruptcy proceedings, depending on ① the relationship with the bankrupt party, ② the method, degree, etc. of participation in the business operations of the bankrupt party, etc. The above example of judgment was entered for a bankruptcy proceeding, but, since practical equality between claimants is clearly specified in the rehabilitation plan, the gist thereof is further valid in civil rehabilitation proceedings in which the principle of equitability (impartiality) is active.

4. Subordination of claims is required by clear stipulation in the proviso to Article 155 Paragraph 1 of the Civil Rehabilitation Act and the principle of faith and trust

As explained above, even in bankruptcy law where the subordination of claims by

parties internal to the parent company, etc. is not clearly stipulated, based on personal information, from the standpoint of equitability (impartiality), it is recognized as case law doctrine based on the principle of faith and trust, and it is widely agreed that a similar legal principle exists in the process of deliberations by Bankruptcy Law Sectional Committees of the Bankruptcy Law Subcommittee of the Legislative Council of the Ministry of Justice. The only reason that this is not clearly stated in bankruptcy law is that it is left to interpretation and application based on example judgments, since it is difficult to make personal information a condition based on the violation of the principle of faith and trust from the standpoint of lawmaking technique (Petitioner's Evidence No. 2-1 and *Ko* 2-2).

On this point, according to the statements of committee members, etc. in the above process of deliberation, even in bankruptcy law where this is not clearly stipulated, it is the opinion of the overwhelming majority that the subordination of claims by parties internal to the parent company, etc. should not be handled by means of lawmaking theory, but should be resolved through active interpretation and application by the court based on the legal intention of the proviso to Article 155 Paragraph 1 of the Civil Rehabilitation Act and general provisions on the principle of faith and trust, etc. (*Ko* 2-1 and *Ko* 2-2).

A clear stipulation is present in the proviso to Article 155 Paragraph 1 of the Civil Rehabilitation Act, so handling claims between parent and child companies, claims of controlling stockholders, and claims of former managers and current managers subordinately does not violate equitability, but it is considered that handling these equivalently (to the claims of other rehabilitation claimants) may on the other hand violate equitability (Ryūji SONOO, Hideyuki KOBAYASHI, eds., "Interpretation of the Civil Rehabilitation Act," p. 738– (Hideki MATSUSHIMA) (Koubundou, 2nd ed., 2007) *Ko* 3).

Therefore, the court that is the institution applying the law not only may subordinate the claims of internal parties in civil rehabilitation proceedings, but, under specific individual conditions, must subordinate them, based on the proviso to Article 155 Paragraph 1 of the Civil Rehabilitation Act and the principle of faith and trust (Article 1 Paragraph 2 of the Civil Code), and denying this by stating that it is not clearly stipulated in the Civil Rehabilitation Act not only disregards the proviso to Article 155 Paragraph 1 of the Civil Rehabilitation Act, but also violates the principle of equitability (impartiality) in the Civil Rehabilitation Act.

5.    Conclusion

In the following we discuss in detail the conditions underlying the violation of Article 155 Section 1 of the Civil Rehabilitation Code proviso or good faith principle according to which the claims of the LB Group should be made subordinate, specifically, those parties to be taken as general creditors as identified in the above decision of the court (in this case, companies belonging to the LB Group), as well as ① relationships to the parties in default (in this case, the Rehabilitation Debtor) and ② concerning the manner and extent of intervention in he business management of the failed party (in this case, the Rehabilitation Debtor) because, in theory, [this] would be treated as a matter of unjust control of management, unjust exploitation, and undercapitalization, and primarily in conjunction with these conditions underlying the violation of Article 155

Section 1 of the Civil Rehabilitation Code, in this case treatment of LB Group claims as being formalistically equal to the claims of other external creditors contrarily is conducive to de facto in quality.

### III.   Mismanagement and Unjust Control of the Rehabilitation Debtor by the LB Group

First of all, we will describe how the LB Group, especially LBHI, unjustly controlled the Rehabilitation Debtor.

1.     Two Roles of Rehabilitation Debtor

The Rehabilitation Debtor had two roles; namely, that of a financing company within the LB Group and that of a business company that conducted the nonperforming loan business.

That is to say, the Rehabilitation Debtor on one hand acted as a financing company within the LB Group; however, in this role, the Rehabilitation Debtor was controlled by LBHI, which stood at the top of the LB Group, and, with respect to the determination and execution of financing such as providing loans and managing funds, including lending and investments, the Rehabilitation Debtor did not have any function that a company should normally have such as independent functions including decision-making authority and internal control functions.

On the other hand, the Rehabilitation Debtor also acted as a business company that conducted the nonperforming loan business, which was the core business of the Rehabilitation Debtor, and in this role the Rehabilitation Debtor performed all services by itself, including purchasing, administering, and collecting nonperforming loans.

Among these two roles, the Rehabilitation Debtor went bankrupt because of its role as a financing company within the LB Group and because LBHI filed for Chapter 11 protection, not because of its nonperforming loan business, which the outside creditors relied upon in determining the creditworthiness of the Rehabilitation Debtor.

Therefore, the liability for bankruptcy of the Rehabilitation Debtor lies with the creditors within the LB Group that controlled the Rehabilitation Debtor as a financing subsidiary at their discretion, and no losses arising from the bankruptcy of the Rehabilitation Debtor should be transferred to any outside creditors.

(1)    The Rehabilitation Debtor has not been Involved in Financial Transactions within the LB Group

a.     The Rehabilitation Debtor is a Subsidiary of LBHI

The Rehabilitation Debtor established a Cayman Islands domiciled subsidiary belonging to the LB Group on January 5, 1998, and on the occasion of a reorganization of the LB Group realized August 31, 2007, the company became a fully-owned subsidiary of Lehman Brothers Japan ("LBJ").   The Rehabilitation Debtor is an indirect subsidiary of LBHI which is at the apex of the LB Group (Petitioner's Evidence Nos. 4-1 to

9

4-4).

Further, the largest creditor of the Rehabilitation Debtor, LBAH, is an indirect subsidiary of LBHI, that engages in no business operations whatsoever but was used either LBJ, namely the parent company of the Rehabilitation Debtor, or the Treasury Department of the LB Group as an SPC having the function solely of providing financial services for the LB Group (Petitioner's Evidence No. 5-1, pages 5, 6).

b.    The Rehabilitation Debtor had no Independent Discretion regarding Financing

The LB Group engages in intra-group financial transactions on a global scale, with New York, London and Tokyo as the principal locii of activities. The function allocated to Tokyo as one of the locii was that of the Treasury Department of LB J which was charged with management of funds for the entire LB Group in Asia, including the Rehabilitation Debtor and LBAH (Petitioner's Evidence Nos. 1 [page 2] and 5-1 [page 5]).

At the outset the Treasury Department of LBJ did not have complete authority for procurement of capital and management of funds by the LB Group in the Asian region, as within the LB Group there was, in LBHI, a Commitment Committee, and this Committee would decide and approve financial transactions by companies belonging to the group, including the Rehabilitation Debtor, according to the amounts involved (Petitioner's Evidence Nos. 5-1 [page 27] and 6).

c.    The Rehabilitation Debtor was not Involved in Borrowing Procedures from the LB Group

Within the proceedings of the current rehabilitation, a rehabilitation claim has been filed against the Rehabilitation Debtor by a company belonging to the LB Group, but as stated above, concerning financial transactions within the Group the Rehabilitation Debtor was not involved in any way whatsoever, and in the case of borrowing of a large sum of money the board of directors of the Rehabilitation Debtor did not possess decision-making authority (Petitioner's Evidence Nos. 1 [page 4], 7 and 8)

(A)    The Rehabilitation Debtor was not Involved in Borrowings from LBHI

LBHI has filed a claim against the Rehabilitation Debtor in the amount of 1,376,850,000 yen for "loans of funds for use as other working capital and other claims."

The basis of this is given as the Facility Agreement signed by the Rehabilitation Debtor and LBHI on January 30, 2004, having a borrowing limit of 250,000,000,000 yen (Petitioner's Evidence No. 9; this agreement was backdated from the date of signing by three years so as to be effective from June 5, 2000.  That is, there was no

10

borrowing prior to January 30, 2004, no agreement having been signed).

The execution of this Facility Agreement and each borrowing thereunder was conducted under instruction from the Treasury Department of LBJ or the LB Group, and such execution and borrowings were not approved by a resolution of the board of directors of the Rehabilitation Debtor (Petitioner's Evidence Nos. 1 [page 4], 7 and 8).

Thus, concerning this agreement as well, its preparation was done by the LBJ Treasury Department and Mr. Yonekura as representative of the Rehabilitation Debtor merely signed it without having scrutinizing its content (Petitioner's Evidence No. 5-1, pages 5, 6).

(B)    The Rehabilitation Debtor was not Involved in Borrowings from LBAH

(i) LBAH has filed a claim against the Rehabilitation Debtor in the amount of 229,460,330,000 yen for a loan.

(ii) The basis for this is the Facility Agreement having the initial ceiling for borrowing of 300,000,000,000 yen (as explained below, later increased to 800,000,000,000 yen), entered into by the Rehabilitation Debtor and LABH on February 24, 2005 (Petitioner's Evidence No. 10; this agreement was retroactive to two and a half years prior to the signing, namely to November 1, 2002, and during the period from December 1, 2005 to November 30, 2006 the balance owed by the Rehabilitation Debtor to LBAH exceeded the limit of 300,000,000,000 yen of the Facility Agreement signed February 24, 2005. Petitioner's Evidence Nos. 11 and 12).

The execution of this Facility Agreement and each borrowing thereunder was conducted under instruction from the Treasury Department of LBJ or the LB Group, and such execution and borrowings was not approved by a resolution of the board of directors of the Rehabilitation Debtor (Petitioner's Evidence Nos. 1 [page 4], 7 and 8).

Thus, concerning this agreement as well, its preparation was done by the LBJ Treasury Department and Mr. Yonekura as representative of the Rehabilitation Debtor merely signed it without having scrutinizing its content (Petitioner's Evidence No. 5-1, page 7).

(iii) Regarding this Facility Agreement, the ceiling for borrowing was raised to 500,000,000,000 yen as of November 30, 2006 (Petitioner's Evidence No. 10; this agreement was retroactive to one year prior to signing, namely to December 1, 2005, and during the period from December 1, 2005 to November 30, 2006 the balance owed by the Rehabilitation Debtor to LBAH exceeded the borrowing ceiling of

300,000,000,000 yen of the Facility Agreement dated February 24, 2005. Petitioner's Evidence Nos. 11 and 12).

The execution of this Facility Agreement and each borrowing thereunder was conducted under instruction from the Treasury Department of LBJ or the LB Group, and such execution and borrowings was not approved by a resolution of the board of directors of the Rehabilitation Debtor (Petitioner's Evidence Nos. 1 [page 4] and 5-1 [pages 8 and 9]).

(iv) Subsequently, the agreement amended as of November 30, 2006 was revised, raising the borrowing ceiling to 800,000,000,000 yen as of February 1, 2008 (Petitioner's Evidence No. 10; this agreement was retroactive to ten months prior to signing, namely to April 1, 2007, and during the period from April 1, 2007 to February 1, 2008 the balance owed by the Rehabilitation Debtor to LBAH exceeded the borrowing ceiling of 500,000,000,000 yen of the amended agreement dated November 30, 2006. (Petitioner's Evidence Nos. 11 and 12).

With regard to the signing of this amended agreement, even though the board of directors of the borrower had as of November 20, 2007 the authority to approve it by a resolution, no such board of directors resolution was issued (Petitioner's Evidence Nos. 1 [page 4], 7 and 8).

(C)  No Independent Accounting System Existed in the Rehabilitation Debtor

The Rehabilitation Debtor possessed no independent accounting system and was managed by LBJ or the LB Group Treasury Department within the global network, and it was not possible for the Rehabilitation Debtor to access the global accounting system (Petitioner's Evidence No 5-1 [pages 12 and 13].

(D)  The Rehabilitation Debtor Lacked Independence in Borrowings in the LB Group

Thus, the Rehabilitation Debtor on occasion of borrowing large sums from the LB Group, was impeded from undertaking the practices provided for companies by the Corporation Law for study of the terms and conditions of loans, study of the items in the loan agreement and approval by a resolution of the board of directors (Corporation Law 362:4). Further, no independent accounting system existed at the Rehabilitation Debtor, and the Rehabilitation Debtor did not have access to the accounting system used within the LB Group.

Thus, the Rehabilitation Debtor was clearly in violation of the requirement made of large corporations to have an organization for internal governance (Corporation Law 348:3:4, item 4; 362:4:6, item 5) and the Rehabilitation Debtor had absolutely no independence with

regard to the activities of borrowing funds.

d.    Summary

Thus it is an amazing fact that the Rehabilitation Debtor there were no board of director resolutions concerning the large amounts borrowed from the LB Group and it is abundantly clear that the the Rehabilitation Debtor was strongly controlled by the LB Group, that is to say by LBHI.

Moreover, the fact that large borrowings were made without approval by a resolution of the board of directors was discovered by the Rehabilitation Debtor itself, and inasmuch as it is a fact that is naturally recognized or was enabled to be recognized by LBHI, LBJ, and its SPC, LBAH, the Rehabilitation Debtor, as a party assuming the obligations of fairness and sincerity in the rehabilitation proceedings, at the very least in the course of the proceedings for approval or disapproval of the claim, must refute the claim filed by the LB Group in the knowledge of this fact.

e.    The Rehabilitation Debtor was not Involved in Lending Procedures to the LB Group

The Rehabilitation Debtor had business loans of 123,442,850,000 yen to companies in the LB Group at the time of the decision to commence rehabilitation proceedings (see the Property Value Appraisal Report), but loans from the Rehabilitation Debtor to companies in the LB Group (partly excluding those that belonged to nonperforming loan business; hereinafter the same) were also determined by the Treasury Departments of LBJ or the LB Group, and these loans were not approved by a resolution of the board of directors of the Rehabilitation Debtor.   Further, the Rehabilitation Debtor was not involved in the control or collection of such business loans even though these loans were assets held by the Rehabilitation Debtor (Petitioner's Evidence No. 1, p. 4; Petitioner's Evidence No. 5-1, pp. 10-11).

(A)    Business Loans were made to SPCs that Belonged to the LB Group

The Rehabilitation Debtor lend funds (made business loans) to SPCs in the LB Group, specifically to LBFJ (balance at the time of the start of rehabilitation procedures, 47,422,820,000 yen), to Libertus Jutaku Loan K.K. (balance at the time of the start of rehabilitation procedures, 36,948,060,000 yen), LBC Y.K. (balance at the time of the start of rehabilitation procedures,17,054,390,000 yen), and Y.K. Yosemite ("Yosemite;" (balance at the time of the start of rehabilitation procedures, 5,058,950,000 yen), etc., as loans to companies in the LB Group (Property Value Appraisal Report).

(B)    The Rehabilitation Debtor was not Involved in Providing of Business Loans

In connection with the provision of loans (business loans) to the SPCs

13

of the LB Group, the Rehabilitation Debtor had signed Facility Agreements with the SPCs who were to borrow funds (Petitioner's Evidence Nos. 15 and 16).

Even though these agreements provided for limits for each SPC of from 100,000,000,000 yen to 300,000,000,000 yen, because individual loans were based on signing of a contract or on a contract were made pursuant to instructions from LBJ or the the Treasury Department of the LB Group, there had not been approval by the board of directors of the Rehabilitation Debtor (Petitioner's Evidence Nos. 1 [page 4], 7 and 8).

Mr. Yonekura who was representative of the Rehabilitation Debtor has no involvement at all with business loans, the signing of agreements, or individual loans, and received no reports concerning them (Petitioner's Evidence No. 5-1 [pages 10 and 11]).

(C)   The Rehabilitation Debtor was not Involved in the Administration or Collection of Business Loans

As a matter of course the business loans were assets of the Rehabilitation Debtor. Nevertheless, the Rehabilitation Debtor was not involved in the management and collection of these business loans as all was done by LBJ or the Treasury Department of the LB Group (Petitioner's Evidence No. 5-1 [page 25]..

(D)   The Rehabilitation Debtor also Lacked Independence in Lendings in the LB Group

As stated above, on occasion of lending large sums to SPCs in the LB Group, the Rehabilitation Debtor was impeded from undertaking the practices provided for companies by the Corporation Law for study of the terms and conditions of loans, study of the items in the loan agreement and approval by a resolution of the board of directors (Corporation Law 362:4). Further, the Rehabilitation Debtor was clearly in violation of the requirement made of large corporations to have an organization for internal governance (Corporation Law 348:3:4, item 4; 362:4:6, item 5),

Thus, the Rehabilitation Debtor was improperly controlled by the LB Group or LBJ, was made to bear the risk of default by other LB Group companies, and was totally lacking in independence.

(2)   The Rehabilitation Debtor was actually Involved in the Nonperforming Loan Business

On the other hand, Mr. Yonekura, who was the representative of the Rehabilitation Debtor, together with approximately 16 people at first, actually conducted the assessment of the collateral property, and the purchase, management and collection of the nonperforming loans with respect to the nonperforming loan

14

business.    Thereafter, it states that the nonperforming loan business of the Rehabilitation Debtor steadily grew (Petitioner's Evidence No. 5-1 [page 13]).

In addition, even at the point in time when Shinsei Bank commenced the financing on behalf of the Rehabilitation Debtor, Shinsei Bank received an explanation from the Rehabilitation Debtor to the effect that it was a company that conducted the financing of nonperforming loans and property (Petitioner's Evidence No. 13).

Accordingly, this was the true state of the side of the nonperforming loan business, which was the main business of the Rehabilitation Debtor.

Furthermore, since the Rehabilitation Debtor is a company belonging to the LB Group, even in the nonperforming loan business, the approval of LBHI was necessary with respect to the purchase, etc. of the nonperforming loans above a certain amount (Petitioner's Evidence No. 6), we can say that the situation was one in which LBHI was deeply involved with the management of the Rehabilitation Debtor.

2.    Unjust and Powerful Control of the LB Group over the Rehabilitation Debtor without Consideration of the Interests of Outside Creditors

As explained above, the Rehabilitation Debtor had two roles.    One role was as a company that conducted financing transactions within the LB Group, such as borrowing substantial amounts from the LB Group and lending substantial amounts to companies in the LB Group, and in this role, the Rehabilitation Debtor was controlled by the LB Group without any authority to make decisions or determinations.    The other role of the Rehabilitation Debtor was in the operation of a nonperforming loan business at its own discretion.

Additionally, we will describe significant facts that are an indication of unjust and powerful control of the LB Group over the Rehabilitation Debtor without consideration of the interests of outside creditors.

(1)    Execution of Silent Partnership Agreement to Transfer 90% of the Profits Generated by the Rehabilitation Debtor

The Rehabilitation Debtor executed a Silent Partnership Agreement dated November 20, 1998 (the "Silent Partnership Agreement") with Japan Investment Partnership Inc. ("JIP"), which belonged to the LB Group, under which the Rehabilitation Debtor was an operator and JIP was a silent partner (Petitioner's Evidence No. 17).

Although the Silent Partnership Agreement was executed on November 20, 1998, it was made effective retroactively from March 1, 1998, which was immediately after January 5, 1998 when the Rehabilitation Debtor was incorporated, and the status as the silent partner was transferred to LBJ (to be precise, Lehman Brothers Japan Inc., Tokyo Branch, as the company had not been converted into a stock company at that time), which also belonged to the LB Group, on November 28, 2003 (Petitioner's Evidence No. 17).

15

The Silent Partnership Agreement contained an unreasonable provision under which in exchange for a silent partnership contribution of only 90,000,000 yen, the Rehabilitation Debtor was required to transfer 90% of all profits before tax generated from its businesses to the LB Group, which was the silent partner.   As explained below, among the profits the Rehabilitation Debtor generated from the nonperforming loan business, which was its core business, a total of 28,043,250,000 yen was actually distributed from the Rehabilitation Debtor to the LB Group under the Silent Partnership Agreement (Petitioner's Evidence Nos. 14-1 through 14-5).

As described above, the Rehabilitation Debtor was unjustly and powerfully controlled by the LB Group, and as a result, the assets held by the Rehabilitation Debtor that constituted recourse assets of the outside creditors were harmed.   It is also evident that the interests of the outside creditors were not taken into consideration.

(2)    Voluntary Exclusion of Interest on Borrowings from LBAH for Tax Purposes

    a.    Voluntary Exclusion Treatment of Interest on Borrowings from LBAH for Tax Purposes

        The Rehabilitation Debtor has voluntarily excluded a total amount of 4,425,430,000 yen among the interest on borrowings from LBAH from the Rehabilitation Debtor's deductible expenses since the period ended November 2004 based on the "Special Provisions for Taxation on Interest on Liabilities, etc. Payable to Foreign Controlling Shareholders, etc." under Article 66-5 of the Law on Special Measures Concerning Taxation (otherwise known as the "Thin Capitalization Rule") (Petitioner's Evidence Nos. 14-5 through 14-10; 2,350,000 yen for the business year ended November 2004; 26,460,000 yen for the business year ended November 2005; 410,560,000 yen for the business year ended November 2006; 1,239,950,000 yen for the first half of the business year ended June 2007; 153,051,000 yen for the business year ended November 2007; and 121,560,000 yen for the business year ended November 2008).

        Specifically, in its tax return for three consecutive accounting periods, namely, the first half of the business year ended June 2007, the business year ended November 2007, and the business year ended November 2008, the Rehabilitation Debtor voluntarily treated 90% or more of the balance of its short-term borrowings from LBAH as its own capital, instead of as borrowings, and excluded the interest on its borrowings from LBAH from its deductible expenses (Petitioner's Evidence Nos. 14-5 through 14-10).

    b.    Meaning of Voluntary Exclusion of Interest on Borrowings for Tax Purposes

        This fact is a significant indication that the Rehabilitation Debtor itself accounted for 90% or more of LBAH's loan receivables as its own capital, not as borrowings.   Further, this fact also indicates that the Rehabilitation Debtor was under powerful control of the LB Group.

16

More specifically, there are two different kinds of categories that could cause discrepancies in the treatment for financial accounting purposes and the treatment for tax purposes, such as in this case where the Rehabilitation Debtor excluded the interest on borrowings from LBAH from its deductible expenses.

(i)     Timing [temporary] discrepancy: in this category, the discrepancy caused between the treatments for financial accounting purposes and the treatment for tax purposes will correct itself over time.   For example, the taxable income in this category will temporarily increase because the portion that exceeds the limit of the amount admissible to be included in the amount of deductible expense is excluded for the time being, but an adjustment will be made so that the amount allocated to the expenses for financial accounting purposes and the amount to be included for the tax purposes will eventually become the equivalent, by reducing the taxable income; and

(ii)    Permanent discrepancy: in this category, the discrepancy caused between the treatment for financial accounting purposes and the treatment for tax purposes will never correct itself.   For example, like the limit of the amount admissible to be included in the amount of business entertainment expenses and cash donations, the taxable income in this category can never be adjusted in any of the following accounting periods, such as by reducing the taxable income, once it is excluded from deductible expenses in a certain accounting period.

The exclusion of interest on borrowings from deductible expenses under the taxation rule, known as the Thin Capitalization Rule, falls in the latter category, and is therefore a permanent discrepancy.

In other words, the fact that the Rehabilitation Debtor excluded the interest on its borrowings from LBAH from its deductible expenses means that no adjustment would be made by, for example, reducing the taxable income in any following accounting period, and that the burden of paying tax and outward flows of funds with respect to the excluded amount became permanent.   Accordingly, for the sound operation of a company, a company should minimize the occurrence of events that give rise to permanent discrepancies as much as possible, and companies usually consider how to assume the burden of paying tax in line with this aim.

However, in this case, during the periods ended November 2004 to November 2008, the Rehabilitation Debtor excluded a total of 4,425,430,000 yen of the interest on borrowings from LBAH pursuant to the Thin Capitalization Rule.   Consequently, although the Rehabilitation Debtor suffered an increase in the amount of its taxable income by that amount, and an excessive burden of paying tax and outflow of funds, the Rehabilitation Debtor treated the funds from LBAH as borrowings, not as capital, and further, paid interest to LBAH.

This is a significant indication that (i) the Rehabilitation Debtor was

17

unjustly and powerfully controlled by LB Group, such as forcing it to operate for the purpose of transferring profits to the LB Group, and (ii) there was no consideration of the interests of outside creditors, including Shinsei Bank, such as allowing damage to the Rehabilitation Debtor's assets, which are the recourse assets of the outside creditors, by forcing the Rehabilitation Debtor to assume the burden of paying tax that was otherwise not the responsibility of the Rehabilitation Debtor (CPA Suda's Opinion).

3.    Conclusion

As discussed above, it is plainly evident from the facts that (i) the Rehabilitation Debtor had two roles; namely, that of a financing company in the LB Group by functioning as an intra-group financial exchange company to make substantial amounts of borrowings from the LB Group and to provide significant loans to companies within LB Group, and functioning as such under the LB Group's control, in which the Rehabilitation Debtor had no power to make determination or decisions; and that of a business company that conducted the nonperforming loan business with its own decision-making power (as is explained below, 90% or more of the sales of the Rehabilitation Debtor was derived from the nonperforming loan business), (ii) the Rehabilitation Debtor was under unjust and powerful control of LB Group as the Rehabilitation Debtor executed and performed the Silent Partnership Agreement and excluded the interest on borrowings from LBAH from its deductible expenses, and (iii) the Rehabilitation Debtor was operated in a way that caused damage to the recourse assets of the external creditors and there was no consideration whatsoever of the interests of the outside creditors.

In the first place, as for a financing subsidiary in a group, there is a domino effect whereby if a company in the group goes bankrupt, this will progress to other companies in the group, and the companies in the group will become bankrupt one after another (Professor Kansaku's Opinion).

In this case, the LB Group made the outside creditors bear the risk of bankruptcy of companies in the LB Group other than the Rehabilitation Debtor through the Rehabilitation Debtor, by causing the Rehabilitation Debtor to become extremely undercapitalized and forcing the Rehabilitation Debtor to grant loans to other companies within the LB Group, and moreover, as is described below, the LB Group increased the risk of harming recourse assets of the Rehabilitation Debtor by transferring a substantial amount of profit from the Rehabilitation Debtor to the LB Group under the name of silent partnership profit distributions, personnel expenses, etc. and actually harmed these assets.

As described above, the Rehabilitation Debtor adopted a sort of loss distribution scheme, where it made outside creditors also bear the bankruptcy risk of the Rehabilitation Debtor and the companies in the LB Group and losses arising from such bankruptcy. This type of situation was not seen, for example, in the case of Lehman Brothers Commercial Mortgage K.K. ("LBCM"), which filed a petition for civil rehabilitation proceedings at the same time as the Rehabilitation Debtor (LBCM did not borrow money from financial institutions outside the LB Group, and its bankruptcy risk and losses in the LB Group was not borne by outside creditors), so these facts are unique to the Rehabilitation Debtor.

18

Therefore, it is obvious that the rehabilitation claims of the companies in the LB Group, which unjustly controlled the Rehabilitation Debtor as a financing subsidiary and should therefore be liable for the bankruptcy of the Rehabilitation Debtor, should be subordinated under the principle of good faith.

## IV.    Unjust Exploitation of the Rehabilitation Debtor by the LB Group

The Rehabilitation Debtor has been wrongfully exploited because it has been forced to unjustly transfer to the LB Group a significant amount of profits obtained by the Rehabilitation Debtor and also because the Rehabilitation Debtor has been forced to assume significant losses in order to retain the profits of other companies belonging to the LB Group. The damage caused by this wrongful exploitation to the debtor-owned assets, which should constitute the recourse assets of the outside creditors, is described below.

1.    Financial Flow and Profits Earning Structure of the Rehabilitation Debtor

(1)    The Rehabilitation Debtor's Balance Sheets Imply Borrowings from Outside Creditors were Applied to the Nonperforming Loan Business

In the balance sheet of the Rehabilitation Debtor, most of the short-term loans were the loans from LBAH, and the long-term loans were the loans from external creditors outside the LB Group, beginning with Shinsei Bank.   However, based on the balance sheet of the Rehabilitation Debtor, the Rehabilitation Debtor applied the funds loaned by the LB Group to the loans for SPC, which was mainly controlled by LBHI (business loans as the calculation item), and the loans from external creditors, beginning with Shinsei Bank, were mainly applied for the nonperforming loan business (purchase loan receivables as the calculation item) (Attachment 1).

In other words, in the balance sheets as of November 30, 2006 and June 30, 2007, the amount of the purchase loans receivable (83,600,000,000 yen and 139,900,000,000 yen, respectively) and the amount of the long-term loans, which are external loans (106,500,000,000 yen and 86,500,000,000 yen, respectively), were approximately the same, the amount of the business loans (265,000,000,000 yen and 416,200,000,000 yen) and the amount of the short-term loans borrowed from LBAH (249,200,000,000 yen and 478,800,000,000 yen) were approximately the same.   In addition, if you compare the balance sheets as of November 30, 2006 and June 30, 2007, as a result of the increase of 151,200,000,000 yen in the business loans from 265,000,000,000 yen to 416,200,000,000 yen, there was an increase of 229,500,000,000 yen in the short-term loans from 249,200,000,000 yen to 478,800,000,000 yen (all of which are increases in the loans from LBAH). If you compare the balance sheets as of June 30, 2007 and May 31, 2008, there was a decrease of 276,400,000,000 yen in the business loans from 416,200,000,000 yen to 139,700,000,000 yen (as of June 30, 2007, the amount of the loans to LBCM was 256,200,000,000 yen, but the amount was 0 as of May 31, 2008), and there was a decrease of 224,600,000,000 yen in the short-term loans from 478,800,000,000 yen to 254,200,000,000 yen.   (During the same period, the amount of the decrease in the loans from LBAH was 248,600,000,000 yen; (Petitioner's Evidence No. 14-7 and 8)

(2)    The Source of the Profits Generated by the Rehabilitation Debtor is the Nonperforming Loan Business

The amount of the sales loan receivables is over approximately 90% of the sales of the Rehabilitation Debtor, the interest on the loans obtained from the business lender SPC, which belongs to the LB Group, is at the level of 1.6% − 7.9% of the sales, and the profit distribution amount under the Silent Partnership Investment Agreement remains at the level of 6.1% − 10.6% compared with the sales (Petitioner's Evidence No. 14-7 and 8).

Therefore, the withholding of such profits of the Rehabilitation Debtor is in the nonperforming loan business conducted by the Rehabilitation Debtor itself.

2.    Unjust Transfer of Profits (Siphoning) by the LB Group

(1)    Transfer of Profits to the LB Group under the Silent Partnership Agreement

As described above, the LB Group siphoned from the Rehabilitation Debtor 90% of the profits that the Rehabilitation Debtor obtained from the nonperforming loan business, by forcing the Rehabilitation Debtor to execute a Silent Partnership Agreement with JIP, a LB Group company (the contractual status of JIP was subsequently transferred to LBJ).

In other words, with respect to the profits obtained by the Rehabilitation Debtor through the operation of its nonperforming loan business, the LB Group transferred a total amount of 28,043,250,000 yen (2,371,320,000 yen by the end of the period ended November 1999, 3,165,710,000 yen during the period ended November 2000, 5,206,590,000 yen during period ended November 2001, 398,170,000 yen during the period ended November 2002, 4,977,960,000 yen during the period ended November 2003, and 11,923,500,000 yen during the period ended November 2004), thereby causing damage in the above amount to the recourse assets of the outside creditors (Petitioner's Evidence Nos. 14-1 through 14-5).

[The LB Group] stopped such siphoning of profits under the Silent Partnership Agreement from November 2005, but this was because the auditing firm ordered [the LB Group] to stop doing so, since there was no explanation as to why LBJ, a silent partner, which did not bear any risk, would receive large profit distributions (Petitioner's Evidence No. 5-1, pp. 17 and 18).

Given that (i) the Silent Partnership Agreement was an agreement under which 90% of the profits before tax of the current period generated from all of the businesses of the Rehabilitation Debtor was to be transferred to the LB Group even though the LB Group did not bear any risk for the Rehabilitation Debtor's business by providing silent partnership contributions of only 90 million yen, (ii) with respect to the Rehabilitation Debtor, most borrowings from outside creditors were applied to the nonperforming loan business and, (iii) most of the profits obtained by the Rehabilitation Debtor came from the nonperforming loan business, a structure had been adopted since the incorporation of [the Rehabilitation Debtor] under which none of the assets for the repayment of borrowings from outside creditors would be retained [by the Rehabilitation Debtor].    As even the

20

Rehabilitation Debtor recognized after receiving advice from an auditing firm, it is clear that the execution and the performance of the Silent Partnership Agreement is extremely wrongful exploitation of the Rehabilitation Debtor that has harmed the recourse assets of the outside creditors.

(2)    Transfer of Profits to the LB Group through Dividends

At the very least, the LB Group received from the Rehabilitation Debtor 1,075,000,000 yen as interim dividends and 1,096,000,000 yen as final dividends during the 7th Term (the business year from December 1, 2003 – November 30, 2004), and a final distribution of profits of 3,121,000, 000 yen during the 8th Term (the business year from December 1, 2004 – November 30, 2005), for a total of 5,292,000,000 yen in dividends (Petitioner's Evidence No. 14-5 and 6).

Among these dividends, the 3,121,000, 000 yen received by the LB Group as the distribution of year-end profits for the 8th Term (the business year from December 1, 2004 – November 30, 2005) was paid after the auditor ordered the suspension of the distribution of profits under the Silent Partnership Agreement in this Case, as stated above.  By distributing 90% of the unappropriated retained earnings, only 347,190,000 yen remained as the unappropriated retained earnings of the Rehabilitation Debtor after the distribution of such profits (Petitioner's Evidence No. 14-6).

(3)    Transfer of Profits to the LB Group through Personnel Costs and Service Fees

At the very least, the LB Group received from the Rehabilitation Debtor, as personnel costs and service fees, 1,420,000,000 yen during the 7th Term (the business year from December 1, 2003 – November 30, 2004), 1,473,000,000 yen during the 8th Term (the business year from December 1, 2004 – November 30, 2005), 2,359,000,000 during the 9th Term (the business year from December 1, 2005 – November 30, 2006), 1,510,000,000 yen during the 10th term (the 7-month period in the business year from December 1, 2006 – June 30, 2007), and 1,607,000,000 yen for the 11th Term (the 5-month period in the business year from July 1, 2007 – November 30, 2008), for a total of 8,369,000,000 yen (Petitioner's Evidence No. 14-5 through 9).

(4)    Direct Transfer of Profits from Borrowers of the LB Group

The LB Group has received at least 1,334,000,000 yen (breakdown: 802,000,000 yen from LBC Y.K. and 532,000,000 yen from Libertus Jutaku Loan K.K.) since just the period ended November 2006 as service fees from the borrowers, which naturally belonged to the LB Group, of the Rehabilitation Debtor (Petitioner's Evidence Nos. 18-1 and 18-2 and Petitioner's Evidence Nos. 19-1 and 19-2).

(5)    Total Amount of Profits Transferred Reached 43 Billion Yen

Therefore, the LB Group has received 28,043,250,000 yen as profit distributions (under the Silent Partnership Agreement), 5,292,000,000 yen as dividends, and 8,369,000,000 yen as personnel costs and service fees under the Silent Partnership Agreement, totaling at least 41,704,250,000 yen in transferred profits from the

21

Rehabilitation Debtor.

In addition, given that the LB Group has received at least 1,334,000,000 yen in transferred profits directly from the borrowers, which belong to the LB Group, of the Rehabilitation Debtor, the LB Group has enjoyed profits of at least 43,038,250,000 yen (Attachment 2).

3.   Compulsory Assumption of Loss by the Rehabilitation Debtor in order to Retain Profits in the LB Group

   (1)   The Rehabilitation Debtor has been Exploited in order to Retain Profits in the LB Group and Consequently the Interests of Outside Creditors of the Rehabilitation Debtor have been Harmed

      As explained in detail below, the Rehabilitation Debtor has been unjustly forced to assume the risk and losses of other LB Group Companies in order to retain their interests, even though the Rehabilitation Debtor has outside creditors, and ultimately, those outside creditors of the Rehabilitation Debtor have been forced to assume the bankruptcy risk and losses of other LB Group Companies.

      In particular, LBCM, with respect to which a petition for the commencement of civil rehabilitation proceedings was filed concurrently with the Rehabilitation Debtor, has no borrowings from outside creditors, and LBCM's creditors are limited to the LB Group Companies.   However, as explained below, in order to retain the profits of LBCM, LBCM caused the Rehabilitation Debtor to assume risk and losses on behalf of LBCM by unjustly shifting its obligations to the Rehabilitation Debtor and causing the Rehabilitation Debtor to create security interests against losses and to purchase bad securities.

      Hence, the LB Group has taken measures to protect its own interests so that it would not be harmed, by unjustly causing outside creditors to assume bankruptcy risk and losses through the Rehabilitation Debtor.

   (2)   Payment by LBFJ on behalf of LB Group Companies

      LBFJ was a company that played the role of paying expenses on behalf of LB Group Companies (Petitioner's Evidence No. 26), and most of LBFJ's borrowings (53,187,000,000 yen as of November 30, 2008) are from the Rehabilitation Debtor (47,471,000,000 yen) (Petitioner's Evidence No. 20-3).

      Further, an amount that is almost equivalent to LBFJ's borrowings (52,200,000,000 yen as of November 30, 2008) was applied to external payments of the LB Group such as payments of rent, taxes, and other expenses that should have been paid by LB Group Companies, but the amount of these payments increased without being settled from time to time (Attachment 3, Petitioner's Evidence Nos. 20-1 through 20-3).

      Therefore, at present, the amount of loans that are prospected to be recovered from LBFJ is merely 12,380,000,000 yen (Petitioner's Evidence No. 26).

This is an indication that the Rehabilitation Debtor was forced to assume losses without LB Group Companies paying the funds they should have paid, which can only mean there was wrongful exploitation.

One company on behalf of which LBFJ made payments was Y.K. Duckhorn. Y.K. Duckhorn made claims reports for an amount of 1,031,380,000 yen to the Rehabilitation Debtor, but during the period ended November 2008, just before the bankruptcy of the Rehabilitation Debtor, LBFJ paid 793,000,000 yen to Y.K. Duckhorn as tax payment funds, and this amount was covered by loans from the Rehabilitation Debtor to LBFJ (Petitioner's Evidence Nos. 20-3 and 28-3). Therefore, from the perspective that the rehabilitation claims held by Y.K. Duckhorn against the Rehabilitation Debtor should, in effect, be set off against loans by the Rehabilitation Debtor to LBFJ, subordination should be implemented, as explained below.

(3)    Grant of Loans and Change of Debtor in order to Retain Profits in LBCM

    a.    Change of Debtor Disregarding Feasibility of Claim Collection

According to the Consent Application (14) dated October 21, 2008, the Rehabilitation Debtor held 1,840,000,000 yen in loan receivables against Toranomon Capital Co., Ltd. ("Toranomon Capital") under the Loan Agreement dated November 30, 2007 (this balance existed even on the commencement determination date, but it is impossible to remove the doubt that [this amount] was not disclosed in the property appraisal). Further, based on the above consent, the Rehabilitation Debtor received repayment of the above amount from Toranomon Capital, and at the same time provided a loan of 1,640,000,000 yen to G.K. Clearth Asset ("Clearth Asset").

However, according to the Consent Application (14), the reason the Rehabilitation Debtor changed the debtor from Toranomon Capital to Clearth Asset was for the purpose of the collection of LBCM's claims, as is described on page 14 of the Consent Application (14), which states that "Clearth [Quoter's note: Clearth Asset] does not have funds on hand to repay [its obligations], so the Rehabilitation Debtor has no choice but to provide those funds in order to cause Clearth to repay [its obligations]" (Consent Application (14), p. 4) and "if these procedures are not taken…it is likely that Clearth, which is an indirect investment investor in the Rehabilitation Debtor, will go bankrupt due to its failure to raise funds…In that case, it is assumed that there will be a significant reduction in the collection amount of obligations owed by Lehman Brothers Commercial Mortgage K.K., which is a group company of the Rehabilitation Debtor, to Clearth" (Consent Application (14), p. 5).

However, the Rehabilitation Debtor replied that the current value of the real estate that had been provided as security for loan receivables worth 1,640,000,000 yen owed to Clearth Asset, is between only 500,000,000 yen to 1,000,000,000 yen (Petitioner's Evidence No. 1, p. 6), and therefore an amount of between about 640,000,000 yen to 1,140,000,000 yen remained

as unsecured claims.   Further, according to the Consent Application (14), both Toranomon Capital and Clearth Asset "seem to have a reasonable ability to make payments" (Consent Application (14), p. 6), and as a result, sufficient consideration has not been given to the possibility of collecting the unsecured claims.

    b.    Loans Granted by the Rehabilitation Debtor Applied to Repayments to LBCM

Moreover, with respect to the two buildings described in the Property Description II and the Property Description III attached to the Consent Application, Toranomon Capital received a loan from the Rehabilitation Debtor, and on November 15, 2007, about two weeks before Toranomon Capital acquired these buildings from Clearth Asset, a mortgage was created with Clearth Asset as the debtor and LBCM as the mortgagee, and with a receivable amount of 39,000,000 yen, and then this mortgage was cancelled on November 30, 2007 when Toranomon Capital acquired the title [to these buildings] (unsecured at the time of the creation of the mortgage by LBCM, Consent Application (14), Attachment 3).

This means that all or part of the amount of 1,840,000,000 yen that was loaned by the Rehabilitation Debtor to Toranomon Capital and was paid by Toranomon Capital to Clearth Asset as the purchase price [of these buildings] flowed as funds for the purpose of collecting receivables of LBCM.

    c.    Actual Condition of Loans Granted to Toranomon Capital and Change of Debtor of such Loans

Changing the debtor of loans granted by the Rehabilitation Debtor to Toranomon Capital to Clearth Asset in this way involved a very high risk of reducing the prospect of collection by the Rehabilitation Debtor.   Further, it is strongly suspected that the loan in itself granted by the Rehabilitation Debtor to Toranomon Capital was made as part of the collection of LBCM's claims.

Therefore, these transactions constitute wrongful exploitation that harmed the recourse assets of the outside creditors.

(4)    Provision of Security for the Collection of LBCM's Claims

The Rehabilitation Debtor and Toranomon Capital made a tender offer for shares of former Ryowa Life Create Co., Ltd. ("Former Ryowa Life Create") in February 2007.   Former Ryowa Life Create subsequently conducted a company split in which Former Ryowa Life Create was the split company and K.K. Clearth Life ("Clearth Life") was the newly established company, and Former Ryowa Life Create changed its trade name to K.K. Clearth Asset (and, thereafter, underwent a corporate reorganization and changed its trade name to G.K. Clearth Asset) (Consent Application (14), p. 2).

24

The Rehabilitation Debtor provided a loan of 505,800,000 yen to Yosemite, which is an SPC borrower, in the period ended November 2007 (Petitioner's Evidence No. 21-2), and Yosemite used these funds to provide a loan of 4,900,000,000 yen to K.K. Clock ("Clock") and acquire shares of Clock in an amount equivalent to 104,500,000 yen (Petitioner's Evidence No. 21-2), and then Clock used these funds to acquire 70% of the shares of Clearth Life (Consent Application (14) Attachment 10).

Meanwhile, LBCM held loan receivables worth approximately 5,300,000,000 yen against Clearth Life, and the Clock shares held by Yosemite were provided as security over these loan receivables.  It was explained by the Rehabilitation Debtor that this security was provided for the purpose of the collection of claims of LBCM as "the notion that LBCM wanted to hedge the corporate risk portion by using shares as security because [these claims] were not nonrecourse" (Petitioner's Evidence No. 1, p. 11).

However, the Rehabilitation Debtor held claims of 5,058,000,000 yen against Yosemite, so the shares held by Yosemite should have been provided as security for these claims held by the Rehabilitation Debtor, but instead they were provided as security for the purpose of hedging LBCM's risk.

This is a significant indication that the Rehabilitation Debtor was forced to assume losses for the purpose of the interests of LBCM, which belonged to the LB Group.

(5)    Execution of Security Agreements for the Preservation of LBCM's Claims

The Rehabilitation Debtor executed security agreements with LBCM and Y.K. Trench ("Trench") dated August 31, 2007 and November 30, 2007, under which the Rehabilitation Debtor would compensate losses suffered by LBCM if there was any damage to loan receivables held by LBCM against Trench (Petitioner's Evidence Nos. 8-47 and 8-52).

This is also an indication that the Rehabilitation Debtor was forced to assume losses for the purpose of preserving the claims of LBCM, which belonged to the LB Group.

(6)    Acquisition of Securities with Low Credit Rating

The Rehabilitation Debtor purchased LJAC bonds from LBCM (the LJAC bonds are securitized mortgage-backed loan receivables held by LBCM that had a rating from Moody's Investors Service, a leading rating agency, of "Baa or higher" as "investment grade" bonds and a rating of "Ba or lower" as "non-investment grade" bonds based on the safety of the bonds) in a total amount of 32,300,000,000 yen at face value in March 2008, which was six months prior to the commencement of the Rehabilitation Proceedings.   An amount of 22,230,000,000 yen (68.6% to the total amount) of the LJAC bonds was classified as "investment grade" bonds, and an amount of 10,070,000,000 yen (31.2% to the total amount) of the LJAC bonds was classified as "non-investment grade" bonds (Petitioner's Evidence Nos. 8-57 and 38).

25

From April 2008, the Rehabilitation Debtor sold to LBCM some of the purchased LJAC bonds in an amount that corresponded to 12,310,000,000 yen (8,950,000,000 yen thereof was "investment grade" and 3,360,000,000 yen thereof was "non-investment grade") (Petitioner's Evidence Nos. 8-56, 8-58, 8-59, 8-61 through 8-65, and 38).

Accordingly, the total amount of outstanding LJAC bonds owned by the Rehabilitation Debtor was 19,990,000,000 yen, of which 13,280,000,000 yen was "investment grade" and 6,710,000,000 yen was "non-investment grade"). This amount represents 58.0% of the amount of 11,560,000,000 yen of the "non-investment grade" LJAC bonds of the total face value of 57,730,000,000 yen of the LJAC bonds initially issued by LBCM. As a result, the Rehabilitation Debtor continued to hold a majority of the non-investment grade LJAC bonds (Petitioner's Evidence No. 38).

The book value of the LJAC bonds owned by the Rehabilitation Debtor as of the date on which the order of commencement of the Rehabilitation Proceedings was issued was 19,139,470,000, and the property appraisal value of these bonds was 843,400,000 yen, which represents only 4.4% of the book value (Property Value Appraisal Report), and the Rehabilitation Debtor conducted transactions in which it had to record a loss of 18,296,070,000 yen six months prior to the commencement date of the Rehabilitation Proceedings.

The Rehabilitation Debtor was forced to incur these losses for the benefit of LBCM.

(7)    Granting Non-collectable Loans

As described below, the Rehabilitation Debtor provided loans in a total amount of 11,046,000,000 yen to SPCs that were borrowers belonging to LB Group on or around the commencement date of the Rehabilitation Proceedings (Petitioner's Evidence Nos. 21-2, 22-2, 23-2, 24-3 and 25-3). The projected collectable amount is, at most, 1,884,000,000 yen (Property Value Appraisal Report), and the Rehabilitation Debtor conducted transactions in which it had to record a loss of 9,162,000,000 yen immediately before the commencement of the Rehabilitation Proceedings.

(Unit: million yen)

| Business Borrowers | Loan Timing | Loan Amount (A) | Projected Collectable Amount (B) | Difference between (A) and (B) |
|---|---|---|---|---|
| Yosemite | Period ended November 2007 | 5,000 | 4 | 4,996 |
| Yugen Kaisha Snow Bird | Period ended November 2007 | 1,496 | 400 | 1,096 |
| Yugen Kaisha Argos | Period ended November 2007 | 1,064 | 230 | 834 |
| Yugen Kaisha Perseus | Period ended November 2008 | 1,794 | 640 | 1,154 |

| Yugen Kaisha Virgo | Period ended November 2008 | 1,692 | 610 | 1,082 |
|---|---|---|---|---|
| Total | | 11,046 | 1,884 | 9,162 |

4.    Conclusion

As described above, the Rehabilitation Debtor was unjustly exploited during the period from its incorporation to its bankruptcy without taking into account the interests of outside creditors by being forced to unjustly transfer a substantial amount of profits earned by the Rehabilitation Debtor to LB Group, and assuming significant losses so that LB Group could retain the profits of other companies belonging to LB Group.

In this way, the LB Group sacrificed the Rehabilitation Debtor and enjoyed benefits by forcing the Rehabilitation Debtor to transfer its profits and assume losses, and this damaged recourse assets of the outside creditors.    However, once the Rehabilitation Debtor became insolvent due to the occurrence of risks within the LB Group, the LB Group planned to require the outside creditors to incur debts in proportion to the ratio of the outstanding balance of claims.

From an equitable and fair perspective, the acts of the LB Group are considered to be a violation of the principle of good faith and should not be permitted, and it is clear that the rehabilitation claims held by the companies belonging to LB Group against the Rehabilitation Debtor must be subordinated.

## V.    Undercapitalization

1.    Subordination Based on Undercapitalization

In a kabushiki kaisha, the members undertake a reasonable investment corresponding to the risks with respect to the business. The maintenance of such investment rationalizes the "limited" liability of the members. In other words, although the controlling shareholders undertake, within a reasonable extent, the business risks of the subordinate company, in times of favorable conditions, the controlling shareholders monopolize the profits of the subordinate company, even if the risks are transferred to external parties. At the time of or insolvency, the liability of the shareholders is extremely restricted and is assumed only within a minimal scope, and the risks due to insolvency are waived. On the other hand, requiring the same treatment for the outside creditors as the creditors violates the concept of equitableness, constitutes an abuse of the limited liability system, and violates the principle of good faith.

The refutation that the amount of capital possessed is merely a capital performance issue can be considered; however, the Corporations Law aims for a flexible, neutral system, and does not ignore the protection of the outside creditors at all.    Rather, upon acknowledging an even more independent design, the requirements for after-the-fact regulations and post-protection are increased.    From the perspective of the insolvency of a company, it can be said that the requirements for the protection of the outside creditors are even greater than the internal creditors, who created a cause for insolvency due to the and of the internal parties who can exercise control over the insolvent corporation and cause the insolvency to be. That is to say, since the risk of the outside creditors of the subordinate company, which is in a state of undercapitalization, is from the aspect of the bankruptcy of the subordinate company, the legal protection of the

outside creditors of the subordinate company is important.

Under the bankruptcy procedures, the controlling company can treat the claims against the subrogate company, which is undercapitalized, the same as the right to request the distribution of the remaining property, and subrogate the claims of the outside creditors. This treatment is required under the principles of good faith (hereinafter, Professor Matsushita's Opinion).

2.    Undercapitalization in this Case

During the period from November 30, 2006 until August 31, 2008, the capital of the Rehabilitation Debtor was between the scope of 10,000,000 yen and 500,000,000 yen, and was between 0.0027% and 0.152%, at most, compared with the amount of the total assets, which exceeded 300,000,000,000 yen. This was an extremely low level of less than 1%. In addition, since the net assets, in addition to the profit surplus amount, other than the paid-in capital fluctuated between the scope of 1,300,000,000 yen and 4,000,000,000 yen, it constituted an extremely low level of between 0.3005% and 1.2271% compared with the amount of the net assets (Petitioner's Evidence No. 14-7 through 9).

On the other hand, the majority of the loans of the Rehabilitation Debtor were procured in the form of loans from the LB Group, which is the controlling company of the Rehabilitation Debtor, and, as stated above, the LB Group intentionally conducted the unjust control of management and unjust exploitation.

Based on the foregoing, it is obvious that the Rehabilitation Debtor has fallen into a serious state of undercapitalization, and, as stated above, the insolvency of the Rehabilitation Debtor in this Case became a direct opportunity for the insolvency of LBHI. Since the nonperforming loan business, which was anticipated by the outside creditors as a source of repayment funds, was not the cause, it is a matter of course that the liability should be assumed by the LB Group companies, starting with LBHI, LBAH and LBJ, which are the controlling companies that were able to the profits of the Rehabilitation Company over the course of many years. The need to subrogate the claims of the LB Group vis-à-vis the Rehabilitation Debtor against the claims of the outside creditors of the Rehabilitation Debtor is required under the principle of good faith.

3.    Voluntary Exclusion of Deductible Expense under the Thin Capitalization Rule

(1)    Thin Capitalization Rule

The "Special Provisions for Taxation on Interest on Liabilities, etc. Payable to Foreign Controlling Shareholders, etc." under Article 66-5 of the Law on Special Measures Concerning Taxation (otherwise known as the "Thin Capitalization Rule") provide that interest payments exceeding a certain percentage of the capital contribution to lending must not be included in the amount of deductible expenses in order to prevent tax avoidance by corporate entities through the receipt of excessive lending from its foreign affiliates.

This means that even if the form of a domestic corporation receiving financing

from a foreign controlling shareholder, etc. formally takes the form of a loan (the borrowing cost of which is interest payment expenses accrued on a time basis, regardless of whether the business activities of the borrower is satisfactory or not), but should effectively be considered a contribution (the borrowing cost of which is dividend payments derived from profits after tax as the fruits of business activities), so interest payments with respect to the borrowing should not be included in the amount of deductible expenses.

More specifically, either an amount equivalent to threefold the amount of equity capital of a borrower company held by foreign controlling shareholders, etc. or an amount exceeding the interest-bearing liabilities if percentage of total interest-bearing liabilities to the net assets of a similar corporation (i.e., a peer company of the borrowing company) is applied to the borrower company and will be considered a contribution, and the interest payments with respect to the contribution will not be included in the amount of deductible expenses (CPA Suda's Opinion).

(2)    Voluntary Exclusion of Deductible Expense by the Rehabilitation Debtor

According to the tax returns of the Rehabilitation Debtor, the Rehabilitation Debtor had voluntarily excluded the interest on its borrowings from LBAH and LBHI based on the Thin Capitalization Rule for six consecutive accounting periods from the period ended November 2004 to the period ended November 2008.   In particular, in the most recent three accounting periods (namely, the periods ended June 2007, November 2007, and November 2008), the percentage of total interest-bearing liabilities to net assets compared of the Rehabilitation Debtor with similar corporations was between 16.6 and 42.9 times.   This means that the Rehabilitation Debtor was in a condition of extremely excessive borrowing (undercapitalized) and voluntarily excluded 90% or more of its interest payments from the amount of its deductible expenses (Petitioner's Evidence Nos. 8 to 10).

As set out above, this clearly proves from the tax perspective the fact that the Rehabilitation Debtor was undercapitalized.

4.    Conclusion

If the loans and financing within the group and the loans from outside [the group] pile up, the risk of lacking funds of the financing companies within the group is transferred to the outside creditors, and a serious undercapitalization problem appears.

In this Case, the Rehabilitation Debtor borrowed most of the loans from the LB Group, and most of the loans were used for loans to the companies belonging to the LB Group. If the LB Group did not go through the Rehabilitation Debtor and made direct financing to the companies within the [Lehman Brothers] Group, the LB Group would bear the risk of lacking funds of the companies within the group, and the outside creditors would not bear such risk.   However, if the Rehabilitation Debtor contributed the money financed to the companies within the group in the form of financing from the LB Group to the Rehabilitation Debtor, the risk of lacking funds and the losses of the Rehabilitation Debtor, which shared the fate as a company within the group, and the

29

companies within the group would be transferred to the outside creditors.

Accordingly, under the factual relationship in this Case whereby the risk of lacking funds of the companies within the group, other than the Rehabilitation Debtor, was transferred to the outside creditors, the necessity of the subrogation of the rehabilitation claims of the LB Group becomes even stronger under the rehabilitation plan of the Rehabilitation Debtor in accordance with the principle of good faith (Professor Matsushita's Opinion).

## VI. Treatment of Rehabilitation Claims Owned by Rehabilitation Creditors that belong to the LB Group

1.     Treatment of Rehabilitation Claims Owned by LBHI, LBAH and LBJ

As stated above, LBHI is the company that controls the entire LB Group, and is in the position to assume liability for the unjust control of management and unjust exploitation [of the group]. In addition, when the Rehabilitation Debtor requested the outside creditors for financing, LBHI proactively proposed a guaranty from LBHI, guaranteed the debts of the Rehabilitation Debtor, and expressed its intention to the effect that it would be bound to undertake the bankruptcy risk of the Rehabilitation Debtor. The intention to deny the subrogation of the claims of the controlling company LBHI is in violation of the proviso clause in Article 155, Paragraph 1 of the Civil Rehabilitation Law and the principle of good faith and should not be permitted, and the claims of LBHI should be subrogated to the claims outside the LB Group.

In this Case, it is evident that, at the time of the commencement of the rehabilitation procedures by the Rehabilitation Debtor, the debts related to the claims of the rehabilitation creditors, excluding the 15 companies in the LB Group, could not be perfected.

Accordingly, the subrogated creditor LBHI should not be permitted to exercise its voting rights at the creditors' meetings in this Case.

In addition, LBAH is also under the control of LBHI, and LBJ, which is the parent company of LBHI and the Rehabilitation Debtor, is the SPC used for the financial transactions within the LB Group in the Asian region.  Since LBHI and LBJ were merely used as vehicles for the purpose of the financial transactions within the LB Group, the rehabilitation claims of LBAH should also be subrogated to the claims of the creditors outside the LB Group, and [LBAH] should not be permitted to exercise its voting rights at the creditors' meetings in this Case.

Furthermore, as the parent company of the Rehabilitation Debtor, LBJ directly and unjustly controlled the management of the Rehabilitation Debtor, received the transfer of a considerable amount of profits from the Rehabilitation Debtor, and unjustly exploited the Rehabilitation Debtor. Since [LBJ] conducted the procurement of funds in the Asian region together with LBHI, its rehabilitation claims should also be subrogated to the claims outside the LB Group, and [LBJ] should not be permitted to exercise its voting rights at the creditors' meetings in this Case

2.     Treatment of Rehabilitation Claims Owned by 10 SPCs and JIP

(1)    The 10 SPCs and JIP were Strongly Controlled by LBHI

The Rehabilitation Creditors Plato Real Estate LLC, Gardenia LLC, Tarpin International LLC, Marine International LLC, Pike International LLC, Genia LLC, Piranha International LLC, Hisen Building LLC, Duckhorn LLC and Yellowtail International LLC are SPCs (hereinafter collectively referred to as the "10 SPCs"), and are all direct or indirect shareholders of Principal Transaction Inc. (100% parent company), a US company that belongs to the LB Group (Petitioner's Evidence Nos. 27 through 36).   In addition, Principal Transaction Inc. is also a SPC, and the controlling shareholder is LBHI (Petitioner's Evidence Nos. 4-3 and 4-4).

In addition, the directors of the 10 SPCs were changed interested persons of LBHI on January 13, 2009 in accordance with LBHI's instructions (Petitioner's Evidence No. 27).

Subsequently, the transactions of the 10 SPCs were completed and there were funds remaining after the completion of the repayment of obligations to the creditors, and as a result these funds were supposed to have been distributed to Principal Transaction Inc. (ultimately, LBHI), but for tax reasons, these funds were distributed to the creditors by way of cash sweep transaction in which all of the funds were concentrated with the Rehabilitation Debtor, which became the creditor (Petitioner's Evidence No. 5-1, p. 15).   In other words, the claims that were deemed to be held by the 10 SPCs against the Rehabilitation Debtor were, in fact, held by LBHI against the Rehabilitation Debtor.

In addition, Principal Transaction Inc. is a shareholder (100% parent company) of SPCs (Yosemite LLC (inactive [light] price of 5,000,000,000 yen), Cassiopeia LLC (inactive [light] price of 4,700,000,000 yen), Orca International LLC (inactive [light] price of 2,500,000,000 yen), Bellsouth LLC (inactive [light] price of 1,800,000,000 yen), Vargo LLC (inactive [light] price of 1,700,000,000 yen), Argo LLC (inactive [light] price of 1,000,000,000 yen), Snowbird LLC (inactive [light] price of 2,500,000,000 yen), Barracuda International LLC (inactive [light] price of 640,000,000 yen),   Keian LLC (inactive [light] price of 370,000,000 yen), Jasmine LLC (inactive [light] price of 58,360,000 yen), Bonita International (inactive [light] price of 48,700,000 yen), Horseplay International LLC (inactive [light] price of 6,720,000 yen*) to which the Rehabilitation Debtor makes consumer loans (Petitioner's Evidence No. 4-3 and Asset Evaluation Assessment).

Therefore, Principal Transaction Inc., which is a parent company, effectively confused the claims held by the 10 SPCs against the Rehabilitation Debtor and the debts owed to the Rehabilitation Debtor by the SPCs to which the Rehabilitation Debtor had provided loans.   From this perspective, the rehabilitation claims must be subordinated under the principle of good faith.

During the period ended November 2008, at least, none of the 10 SPCs made any operating income or had any actual business. (There was no operating income for Plato Real Estate LLC, Gardenia LLC, Tarpin International LLC, Marine

31

International LLC, Pike International LLC, Genia LLC, Piranha International LLC, and Hisen Building LLC during the 2 terms in November 2007 and November 2008, and the 3 terms from November 2006 until November 2009 for Duckhorn LLC; Petitioner's Evidence Nos. 28 through 37).

Although the representative seal of Mr. Kenya Shimono, who was a representative of the 10 SPCs, is affixed to the claims reports of each of the 10 SPCs except for Duckhorn Y.K. (Petitioner's Evidence Nos. 40-1 through 40-10), Mr. Shimono has no knowledge of the fact that his seal was affixed to these claims reports (Petitioner's Evidence No. 5-2, p. 9).

In addition, JIP was the initial silent partner  under the Silent Partnership Agreement, and the name of the representative indicated in the claims report of JIP is the same as the name of the representative indicated in the claims report of LBHI (Petitioner's Evidence Nos. 39 and 41).   Therefore, JIP also belongs to the LB Group and is controlled by LBHI (Petitioner's Evidence No. 4-4).   JIP is only a vehicle that was formed to make silent partnership contributions in certain transactions, and these transactions had already been completed several years earlier (Petitioner's Evidence No. 7)

(2)   Rehabilitation Claims Owned by 10 SPCs and JIP should be Subordinated

As described above, the rehabilitation claims held by the 10 SPCs are nothing more than claims that LBHI kept in the account of the Rehabilitation Debtor under the name of the 10 SPCs.   Given that the 10 SPCs are strongly controlled by LBHI, and none of them has any actual business, the rehabilitation claims of the 10 SPCs need not to be treated differently from those of LBHI.

In addition, considering that JIP is a vehicle through which transactions had been completed several years earlier, and a claims report was filed under the same name as the name of LBHI's representative, JIP is strongly controlled by LBHI and its rehabilitation claims need not to be treated differently from those of LBHI.

In the first place, the requirement for a number of the parties to give consent to a proposed rehabilitation plan under the Civil Rehabilitation Law (Article 172-3, Paragraph 1, Item 1 of the Civil Rehabilitation Law) is provided in order to protect "the creditors with small rehabilitation claims" and to grant to creditors the power to negotiate with the rehabilitation debtor and other rehabilitation creditors with differing interests.   However, as described above, the 10 SPCs and JIP are the companies in the same group as the Rehabilitation Debtor, and they exercised their voting rights only in accordance with LBHI's policies.   Therefore, it is difficult to describe the 10 SPCs and JIP as entities that independently made decisions that could be respected as decisions made by an independent rehabilitation creditor.   The 10 SPCs and JIP do not need to receive the same protection as outside creditors under the Rehabilitation Proceedings, the rehabilitation claims held by the 10 SPCs and JIP must be subordinated, and the 10 SPCs and JIP should not be allowed to exercise their voting rights because they are effectively the same as LBHI (Professor Matsushita's Opinion).

3.   Treatment of Other Creditors that Belong to the LB Group

Although it is considered that Lehman Brothers Real Estate Kabushiki Kaisha also holds rehabilitation claims worth 3,800,000,000 yen against the Rehabilitation Debtor, the indirect parent company of Lehman Brothers Real Estate Kabushiki Kaisha is LBHI and Lehman Brothers Real Estate Kabushiki Kaisha is controlled by LBHI. Therefore, the rehabilitation claims held by Lehman Brothers Real Estate Kabushiki Kaisha must be subordinated, and Lehman Brothers Real Estate Kabushiki Kaisha should not be allowed to exercise its voting rights.

## VII.  Counterarguments to Assertions of LBHI and LBAH

1.  Assertions of LBAH and LBHI

LBHI and LBAH assert in the Petition dated May 22, 2009 that the proposed rehabilitation plan submitted by Shinsei Bank, which is a rehabilitation creditor, should not be referred to a resolution at the creditors' meeting because (i) Shinsei Bank obtained a "guarantee" from LBHI regarding the Rehabilitation Debtor's claims, (ii) Shinsei Bank, an expert on financial transactions that is engaged in a banking business under the control of the FSA of Japan, should have sufficiently analyzed risks before provided financing to the Rehabilitation Debtor, and (iii) LBHI, LBAH and effectively all the LB Group Companies throughout the world are under insolvency proceedings carried out by courts with jurisdiction and all of their creditors throughout the world should be treated on an equal basis.

Although LBHI and LBAH did not make particular assertions for the grounds mentioned in (i) through (iii) above in the Petition dated May 22, 2009, we make counterarguments to these points below to the extent possible at this stage.

2.  Assertion that 'the Rehabilitation Debtor is Guaranteed by LBHI'

Not only the Civil Rehabilitation Law but the Bankruptcy Law provides that the first priority is to the collection of claims from principal debtor by creditors upon insolvency (Article 86, Paragraph 2 of the Civil Rehabilitation Law and Article 104 of the Bankruptcy Law).

The Rehabilitation Debtor voluntary offered a guarantee by LBHI of the Rehabilitation Debtor's claims when it requested financing from Shinsei Bank, one of the rehabilitation creditors. Taking this into account, it can be said that LBHI implied that it would comprehensively assume the Rehabilitation Debtor's insolvency risk by guaranteeing the full amount of the claims. The fact that LBHI made this guarantee is a basis for the subordination of claims held by LBHI, but it should not prevent the subordination. Actively offering a guarantee by a controlling company when requesting financing and then denying the subordination of claims held by the controlling company, which is a guarantor, upon insolvency should not be allowed under principle of good faith.

Under the theory of subordination, loans granted to a subsidiary company by a controlling company are considered to be contributions based on objective circumstances such as mismanagement or unjust exploitation of the subsidiary company by the controlling company and undercapitalization of subsidiary company, and claims

held by the controlling company should be subordinated to other rehabilitation claims. In this regard, claims held by the controlling company should be subordinated regardless of whether the outside creditors have obtained any guarantee or hold any real security over their claims.   This is obvious from the fact that there is no justification for LBHI to carry out mismanagement, unjust exploitation or undercapitalization with respect to the Rehabilitation Debtor or to transfer the risk of bankruptcy of the Rehabilitation Debtor and LB Group Companies to the outside creditors.

3.    Assertion that 'Shinsei Bank Should Have Conducted Sufficient Risk Analysis Before Lending'

    (1)    No Connection between Risk Analysis by Outside Creditors and Subordination under the Principle of Good Faith

        LBHI and LBAH assert that Shinsei Bank should have conducted sufficient analysis before granting loans to the Rehabilitation Debtor.

        However, there is no connection between risk analysis by Shinsei Bank and mismanagement, unjust exploitation and undercapitalization underlying a violation of the principle of good faith as grounds for subordination in this case.

        This is to say, the theory of subordination based on the principle of good faith is a doctrine under which claims held by a controlling company, which is an insider, should be subordinated in order to protect outside creditors of the subsidiary company upon insolvency of the subsidiary company based on the objective facts of undercapitalization, mismanagement and exploitation between the controlling company and the subsidiary company.   Therefore, the subjective circumstances surrounding the way the outside creditors analyzed risks, the results of these analyses, and the information available for their knowledge regarding loans to the subsidiary company have nothing to do with the question of whether to subordinate claims because these subjective facts do not impact structural unfairness.   It is in fact structural unfairness arising from significant inequality in the amount of information provided to the "controlling company" as an insider and to "outside creditors of the subsidiary company" that establishes grounds for the subordination of claims held by the controlling company.

        When we further expand the argument regarding undercapitalization, the subordination of claims held by controlling company means the loans granted to the subsidiary company by the controlling company should be considered contributions to the subsidiary company by the controlling company as an insider, and to subordinate these claims to claims held by outside creditors.   In other words, under this theory, the relationship between the controlling company and the outside creditors of the subsidiary company should be regarded the same as a relationship between shareholders and creditors.   Needless to say, in a relationship between shareholders and creditors, the circumstances surrounding how creditors analyze risks, the results of these analyses, and what information is available for their knowledge upon claims arising have nothing to do with the principle that "shareholders should be subordinated to creditors upon insolvency."

        Even if LBHI and LBAH assert comparative negligence, it must be said that such

34

assertion is not justified.    If the issue in this case is a tort committed by a controlling company in breach of the claims of outside creditors, the outside creditors, as the non-breaching parties, are subject to comparative negligence as required by their duty of care.    However, the doctrine of subordination of claims held by insiders concerns the reconciliation of interests between LB Group Companies, which are insiders, and outside creditors based on the principle of good faith and the concept of equity, which is separate from existence of the right to claim for damages with respect to a tort.    In this regard, it is wrong to concern the recognition of outside creditors or their status as financial creditors.

(2)    No Disclosure of the Actual Business Status of the Rehabilitation Debtor to Outside Creditors

It is also remarkable that in this case the LB Group continuously and systematically carried out mismanagement, unjust exploitation and undercapitalization of SF in a manner that the creditors were unable to comprehend by simply looking at financial statements or receiving an explanation from the debtor.

It can be hardly said that information necessary for risk analysis was sufficiently provided to Shinsei Bank before it granted loans to the Rehabilitation Debtor. The Rehabilitation Debtor merely disclosed its financial statements (including its business reports, balance sheets, profit and loss statements, proposals for disposal of loss for the year, and schedules; hereinafter the same; Petitioner's Evidence No. 13) for the terms ended in November 2000, November 2001, and November 2002. The amount of loans, details of significant loans, status of loans, and other related information was not disclosed even though Shinsei Bank requested this information (Petitioner's Evidence No. 44).

From the explanation given upon granting loans, Shinsei Bank believed that the "customer loans" in the Rehabilitation Debtor's balance sheet represented loans regarding the real estate financing business.    Because details of the names of accounts were not available to Shinsei Bank, Shinsei Bank did not realize, as a matter of course, that the Rehabilitation Debtor held a substantial amount of loan receivables against LB Group Companies such as LBFJ in addition to loans granted regarding the real estate financing business and other principle business [of the Rehabilitation Debtor].    Many of the borrowers that were SPCs affiliated to the LB Group described "borrowing from affiliated company" in their balance sheets (Petitioner's Evidence Nos. 18, 20, 21, 22, and 23) and explained that they had borrowings from the LB Group.

It became apparent from the interview with Mr. Yonekura that the Rehabilitation Debtor did not have any independent discretion with respect to borrowing or lending as a financing subsidiary of the LB Group and LBJ and the Treasury Department of the LB Group determined the borrowing or lending [by the Rehabilitation Debtor] without even the approval of the board of directors of the Rehabilitation Debtor.    In other words, the Rehabilitation Debtor did not have any internal control.    Of course, Shinsei Bank, could not recognize this fact.

Properly speaking, based on liability criteria, the Rehabilitation Debtor was

35

considered a "large company" as defined in the Companies Law and was required to develop 'systems necessary to ensure the appropriateness of operations of a stock company and business group consisting of its parent and subsidiaries' to perform its obligation to establish an internal control system. The financial statements [of the Rehabilitation Debtor] for the term ended November 30, 2003 that Shinsei Bank obtained from the Rehabilitation Debtor at the time of the initial lending recorded a total amount of liabilities exceeding 140,000,000,000 yen (Petitioner's Evidence No. 13-3) and it is obvious that the Rehabilitation Debtor was a large company as defined in the Companies Law. Therefore it is natural for Shinsei Bank to have believed that the borrower was a company with a properly established internal control system. If there were any different circumstances, the Rehabilitation Debtor, a potential borrower, was required to notify the creditors of non-existence of internal control.

As described above, the Rehabilitation Debtor granted loans to SPCs affiliated to LB Group as financing transaction in a manner that creditors were unable to comprehend. The amount of these loans was substantial and the amount of the liquidation balance was extremely small. For example, LBFJ's book balance as of the commencement determination date of the Rehabilitation Proceedings was 47,422,820,000 yen and its liquidation value balance was 6,596,940,000 yen; the book balance of Libertus Jutaku Loan K.K. as of the commencement determination date of the Rehabilitation Proceedings was 36,948,060,000 yen and its liquidation value balance was 14,716,490,000 yen; the book balance of LBC Y.K. as of the commencement determination date of the Rehabilitation Proceedings was 17,054,390,000 yen and its liquidation value balance was 1,168,220,000; the book balance of Yosemite as of the commencement determination date of the Rehabilitation Proceedings was 5,058,950,000 yen and its liquidation value balance was 101,590,000 yen (Property Value Appraisal Report).

4.    Assertion that 'Creditors Across the World Should be Treated Equally'

As LBHI and LBAH themselves went bankrupt and these companies have many creditors, they assert that all creditors throughout the would should be treated equally under the insolvency proceedings carried out by relevant courts of jurisdiction for most of the LB Group Companies throughout the world.

(1)    Appropriate Response by Lehman Brothers UK

Although the point of assertion by LBHI and LBAH that 'creditors throughout the world should be treated equally' is not clear, as long as each creditor throughout the world owns claims having a Lehman Brothers Company as its principal debtor, the reconciliation of interests between creditors upon insolvency of a principal debtor should follow the insolvency proceedings of the country of the principal debtor and should thoroughly correspond to the status of the claims held by each creditor.

As is common knowledge, LBHI commenced bankruptcy proceedings (Chapter 11) under the US Bankruptcy Court for the Southern District of New York from September 15, 2008, and LBHI filed a petition for approval of cross border

36

insolvency protocol ("Protocol"; Petitioner's Evidence No. 42, Attachment B) with the US Bankruptcy Court Southern District of New York on May 26, 2009. The Protocol is not binding on group companies and the group companies are not required to follow the Protocol, however, the effect of the Protocol is that group companies agree on a common set of financial and accounting records and recognize this as prima facie evidence except for certain circumstances because cost and time should not be spent for retrospective consideration of accounting records with respect to disposition of claims and debts between group companies (p.11 of the Petition, p. 8 of the Protocol).   After all, through these systematic insolvency proceedings for international LB Group determined at the initiative of LBHI, LBHI controlled other LB Group Companies in favor of LBHI and created claims and debts between group companies that were recognized without conducting proper research in order to retain profit in LBHI, even though there was a lack of appropriate grounds regarding these claims and debts within the LB Group Companies.

In contrast, we heard the liquidator of Lehman Brothers UK declined the Protocol because "(insolvency proceedings in Europe and UK) are to be carried out in accordance with rules of each country and the interests in creditors of each company under insolvency" (Lehman Brothers UK's Europe Foundation accounts for approximately one third of the assets of LBHI Foundation of approximately $630 billion; Petitioner's Evidence No. 43).

This clearly shows that the liquidators of LB Group Companies with outside creditors other than Shinsei Bank also recognize the necessity of protecting outside creditors, as Shinsei Bank has repeatedly asserted.

(2)    Meaning of Bankruptcy of Controlling Company

As described above, the subordination of insolvency claims based on undercapitalization originates from an objective attribution of rights in the sense that it is a doctrine to treat claims held by a controlling company with the same priority as claims for distributions of residual assets based on shares.   Assuming the subordination of the insolvency claims does not apply if the controlling company is also bankrupt would give rise to an unreasonable situation where creditors of the subsidiary company would not be entitled to enjoy the protection of subordination because of the bankruptcy of the controlling company, which is a situation that is unrelated to the creditors.   Further, since the creditors of a controlling company would set aside property of the controlling company as recourse assets based on the assumption that the claims against the subsidiary company would be subordinated upon the bankruptcy of the subsidiary company, the creditors of the controlling company would not suffer any unexpected loss as a result of subordination of the insolvency claims.

Based on the above, the fact that the controlling company is also bankrupt should not preclude the subordination of the insolvency claims of the controlling company (Professor Matsushita's Opinion).

## VIII. Conclusion

37

As explained above, in this case, the LB Group mismanaged and inappropriately controlled the Rehabilitation Debtor, unjustly exploited the Rehabilitation Debtor by transferring substantial profits from the Rehabilitation Debtor and by forcing the Rehabilitation Debtor to assume losses, and by doing so, harmed the recourse assets of the outside creditors as described above, while at the same time causing the Rehabilitation Debtor to become extremely undercapitalized.

Then, due to LBHI's filing for Chapter 11 protection, the risk of loss in the LB Group became real, but the cause of the bankruptcy of the Rehabilitation Debtor was based on the Rehabilitation Debtor's role as a financing subsidiary within the LB Group, and was not in any way based on the nonperforming loan business, which was the core business of the Rehabilitation Debtor and which actually existed and on which the outside creditors relied in determining the creditworthiness of the Rehabilitation Debtor.

Notwithstanding the fact that LBHI, as the controlling company, did not assume, to a reasonable extent, the business risk of the Rehabilitation Debtor, as the subsidiary, in other words the fact that LBHI transferred the risk to the outside creditors, LBHI, as the controlling company, exclusively received profits from the Rehabilitation Debtor when the Rehabilitation Debtor was in a favorable condition, and when the Rehabilitation Debtor faced difficulties or went bankrupt, LBHI assumed only limited liability as the controlling company, and avoided assuming the risk of bankruptcy and losses arising from these circumstances, and asked to receive the same the same treatment as other outside creditors.   It is obvious that these acts of LBHI constitute a violation of the principle of good faith in light of principle of fairness and equity under the Civil Rehabilitation Law.

In addition, in this case, the substantial amount of loans of the Rehabilitation Debtor from the LB Group were made upon instruction from the finance department of LBJ or LBHI, and these loans were not taken out based on any independent decision by the Rehabilitation Debtor or a resolution of the board of directors of the Rehabilitation Debtor.   Further, the Rehabilitation Debtor irresponsibly approved claims reported by companies in the LB Group, although it had the obligation to disapprove such decisions based on the duty of fairness and good faith.   Thus, in perspective of the protection of outside creditors, the Rehabilitation Debtor must provide an ex-post remedy for such illegal approvals or disapprovals.

It is therefore obvious that the rehabilitation claims of the companies in the LB Group, which controlled the Rehabilitation Debtor as a financing subsidiary within the LB Group at their discretion and should be therefore liable for the bankruptcy of the Rehabilitation Debtor, must be subordinated based on the proviso of Article 155, Paragraph 1 of the Civil Rehabilitation Law or the principle of good faith, and if all of the claims of the companies in the LB Group are not subordinated, this would constitute a breach of Article 169, Paragraph 1, Item 3 and Article 174, Paragraph 2, Items 1 and 4 of the Civil Rehabilitation Law, and should not be submitted for consideration, and this should be deemed to constitute an event of disconfirmation of the proposed rehabilitation plan.